JOE JARAMILLO (SBN 178566)
jjaramillo@heraca.org
NATALIE LYONS (SBN 293026)
nlyons@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL
(*Pro Hac Vice* forthcoming)
tmerrill@law.harvard.edu
JOSHUA D. ROVENGER
(*Pro Hac Vice* forthcoming)
jrovenger@law.harvard.edu
KYRA A. TAYLOR
(*Pro Hac Vice* forthcoming)
ktaylor@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALCIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

     *Plaintiffs*,

     v.

ELISABETH DEVOS, in her official
capacity as Secretary of the United States
Department of Education,

And

THE UNITED STATES DEPARTMENT OF
EDUCATION,

     *Defendants*.

Case No.: 19-cv-03674

**CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

(Class Action)
(Administrative Procedure Act Case)

## **PRELIMINARY STATEMENT**

*"For there is another kind of violence, slower but just as deadly, destructive as the shot or the bomb in the night. This is the violence of institutions; indifference and inaction and slow decay."*

Robert F. Kennedy
Cleveland City Club
April 5, 1968

1. The Higher Education Act (HEA), Department of Education (Department) regulations, and students' loan contracts allow students to cancel their federal student loans on the basis of their school's misconduct (borrower defense). More than 160,000 former for-profit college students have done so and are awaiting a decision. But, the Department has not granted or denied a single application since June 2018, and it has no timetable for doing so. The question in this case is whether the Department's refusal to decide borrower defenses is lawful. It is not.

2. Over the past several decades, hundreds of thousands of students borrowed federal student loans to attend various for-profit colleges, including ITT Technical Institute (ITT), Corinthian Colleges (Corinthian), DeVry University, the Art Institutes, Salter College, Brooks Institute of Photography, and more. The schools promised high-paying jobs, state-of-the-art vocational training, and long and fulfilling careers. These were lies. The schools actually delivered worthless products that left students with thousands of dollars in debt, damaged credit, and depleted access to further student aid.

3. A number of these for-profit colleges have recently closed, including Corinthian, ITT, Brooks Institute of Photography, Vatterott College, Art Institutes, Argosy University, South University, Charlotte School of Law, Arizona Summit Law School, Globe University & Minnesota School of Business, FastTrain College, Marinello School of Beauty, Virginia College, and Brightwood College.

4. The Department was responsible for authorizing and overseeing the participation of each of these for-profit colleges in the federal student aid program.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

5. Since 2015, former for-profit college students have increasingly asserted borrower defenses. As the Department explained, "borrowers have a right to assert" such a claim, and so it started to "set up a process to review and adjudicate them." It developed a universal borrower defense form and created a full-time borrower defense unit. In the six months before January 20, 2017, the Department approved approximately 28,000 borrower defenses.

6. But then the Department hit the brakes. Since January 20, 2017, the Department has claimed to be taking a short "pause" to "re-evaluate" the prior administration's actions; behind closed doors, the Department's "pause" has been a full stop. The Department has ignored the growing pile of borrower defenses, reduced its capacity to decide borrower defenses, and diverted its increasingly limited resources to un-do all of the prior administration's work.

7. In short, the Department has intentionally adopted a policy of inaction and obfuscation.

8. The Department's abdication of its responsibility is not a neutral choice. Its decision to keep over 160,000 students in limbo—some for over four years—has damaged students' credit and limited their access to federal student aid. It has caused significant emotional distress, associated physical harm, and a loss of wealth and opportunity that students will never recover. For students who have defaulted on their loans, the Department has invoked its extraordinary extrajudicial powers to garnish their wages or seize their tax credits (for many, their Earned Income Tax Credit).

9. The Department's failure to properly oversee the for-profit college industry on the front end, and its refusal to remediate the fraud that occurred on its watch, has eliminated any pretense that the government will protect these students.

10. Named Plaintiffs bring this lawsuit under the Administrative Procedure Act on behalf of themselves and all other similarly situated individuals. They do not ask this Court to adjudicate their borrower defenses. Nor do they ask this Court to dictate how the Department should prioritize their pending borrower defenses. Their request is simple: they seek an order compelling the

3

Department to start granting or denying their borrower defenses and vacating the Department's policy of withholding resolution.

## JURISDICTION AND VENUE

11. This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and the HEA and its amendments, 20 U.S.C. § 1001, *et seq.* This Court has jurisdiction over this case as it arises under federal law. 28 U.S.C. § 1331.

12. This Court is authorized to grant the relief requested in this case pursuant to the APA, 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the HEA, 20 U.S.C. § 1082, and Federal Rule of Civil Procedure 23.

13. Venue is proper in this judicial district because Named Plaintiff Sweet resides in this district and no real property is involved in the action. 28 U.S.C. § 1391(e)(1).

## INTRADISTRICT ASSIGNMENT

14. Assignment to the San Jose Division is appropriate pursuant to Local Rule 3-2 because Named Plaintiff Sweet resides in Santa Clara County, California, and no exclusion to the rule applies.

## PARTIES

15. Plaintiff Theresa Sweet is a resident of Los Gatos, located in Santa Clara County, California. Ms. Sweet attended Brooks Institute of Photography and asserted her borrower defense in Fall 2016.

16. Plaintiff Tresa Apodaca is a resident of Coeur d'Alene, located in Kootenai County, Idaho. Ms. Apodaca attended Heald College and asserted her borrower defense in May 2015.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

17. Plaintiff Chenelle Archibald is a resident of Worcester, located in Worcester County, Massachusetts. Ms. Archibald attended Salter College and asserted her borrower defense in February 2016.

18. Plaintiff Daniel Deegan is a resident of Mt. Laurel, located in Burlington County, New Jersey. Mr. Deegan attended DeVry University and asserted his borrower defense in November 2016.

19. Plaintiff Samuel Hood is a resident of Orlando, located in Orange County, Florida. Mr. Hood attended ITT and asserted his borrower defense in January 2018 and again in February 2019.

20. Plaintiff Alicia Davis is a resident of Orlando, located in Orange County, Florida. Ms. Davis attended Florida Metropolitan University and asserted her borrower defense in April 2015 and again in June 2016.

21. Plaintiff Jessica Jacobson is a resident of Lunenburg, located in Worcester County, Massachusetts. Ms. Jacobson attended the New England Institute of Art and asserted her borrower defense in March 2015.

22. Defendant Elisabeth DeVos is the Secretary of Education (the Secretary) and charged by statute with the supervision and management of all decisions and actions of the United States Department of Education.  Plaintiffs sue Secretary DeVos in her official capacity.

23. Defendant United States Department of Education is an "agency" of the United States, within the meaning of the APA, 5 U.S.C. § 701(b)(1). It is responsible for overseeing and implementing rules for the federal student aid program.

## ALLEGATIONS COMMON TO THE CLASS

### Administrative Procedure Act

24. The APA requires a federal agency to render responsive decisions on matters within its purview in a prompt and definite fashion.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

25. For example, the APA requires that, "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

26. The APA similarly requires that "prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e).

27. And, the APA requires that "[e]ach agency . . . [g]ive an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

28. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action" includes the "failure to act." 5 U.S.C. § 553(e).

29. A Court "shall – compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

30. A Court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### The Secretary's Authority over FFEL and Direct Loan Programs

31. Title IV of the HEA, 20 U.S.C. §§ 1070-1099, provides the statutory authorization for federal student loans, including the Federal Family Education Loan (FFEL) and Direct Loan programs.

32. The Secretary oversees and is responsible for these programs. *See* 20 U.S.C. § 1070.

33. Under the FFEL program, private lenders issued student loans, which were then insured by guaranty agencies and in turn reinsured by the Department. *Id.* § 1078(b)-(c).

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

34. A guaranty agency is "[a] state or private nonprofit organization that has an agreement with the Secretary under which it will administer a loan guarantee program under the Act." 34 C.F.R. § 682.200.

35. No new loans can be made under the FFEL program, effective July 1, 2010.

36. Under the Direct Loan program, the federal government directly issues student loans to eligible student borrowers for use at "participating institutions of higher education" as approved by the Department. *See* 20 U.S.C. § 1087a.

37. Direct loans and FFEL loans have the same terms, conditions, and benefits, under the HEA. 20 U.S.C. § 1087e(a)(1).

38. All institutions approved by the Department to participate in Title IV programs must enter into a Program Participation Agreement with the Department. *See* 20 U.S.C. § 1094; 34 C.F.R. § 668.14(a).

39. By entering into a program participation agreement, a school agrees to, among other things, "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under the statutory authority," and applicable state laws in its administration of its program and in its dealings with students. *See* 34 C.F.R. § 668.14(b).

40. If a school fails to comply with its contractual obligations, the Secretary may take corrective action. For instance, the Secretary may fine the school, suspend the program participation agreement, or terminate the school's participation in Title IV.

41. These programs have been, and the Direct Loan program continues to be, an important source of financing for individuals who otherwise would not be able to afford higher education and could not meet underwriting standards of private lenders.

42. Indeed, the purpose of the Direct Loan program is "to assist in making available the benefits of postsecondary education to eligible students[.]" 20 U.S.C. § 1070(a).

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

43. The Department has significant collection powers when a FFEL or Direct Loan borrower defaults on her student loans.

44. Most notably, the Department can extra-judicially seize federal tax refunds and garnish federal student loan borrowers' wages and benefits. *See* 31 U.S.C. § 3716; 31 U.S.C. § 3720A; 31 U.S.C. § 3720D.

45. When the Department invokes one of these powers, it must provide the student borrower with notice and the opportunity to request a hearing to contest the debt. *See* 20 U.S.C. § 1095a(a)(5); 34 C.F.R. §§ 30.22(d); *see also* U.S. Const. Amend. V.

46. The Department requires any such objection to the enforceability of the debt to be adjudicated quickly.

47. For example, the Department requires that a timely objection to the validity of a debt raised in response to a notice of proposed wage garnishment be decided "not later than 60 days after the date on which [the Department] received the request for hearing." 34 C.F.R. § 34.16(a).

48. The Department similarly requires that guaranty agencies adjudicate discharge applications in short order. *See* 34 C.F.R. § 682.402(d)(6)(ii)(G) (guaranty agency must review and provide a decision for closed school applications within 90 days); 34 C.F.R. § 682.402(e)(6)(iv) (guaranty agency must review and provide a decision for false certification applications within 90 days); 34 C.F.R. § 682.402(h)(1)(i)(A) (guaranty agency must review death, disability, and bankruptcy claim and make payment within 45 days after a claim is filed by the lender); 34 C.F.R. § 682.402(n)(1) (guaranty agency must review unpaid refund claim no later than 45 days after a properly filed request).

49. Finally, the Department must follow certain requirements before reporting the borrowers' debt to a consumer reporting agency.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

50. For Direct Loan borrowers, the Master Promissory Note provides that the Department "will report information about [the student's] loan to nationwide consumer reporting agencies (commonly known as credit bureaus) on a regular basis." It further informs that if a borrower defaults on the loan, she "will be given a chance to ask for review of the debt before [the Department] report[s] it."

51. Under the Fair Credit Reporting Act, if a borrower disputes her debt, a furnisher has 30 days to complete an investigation into the validity of the claim. *See* 15 U.S.C. § 1681s-2(E)(iii).

### Borrower Defense

52. Borrowers of FFEL and Direct Loans can assert a right to a complete discharge of their federal student loans on the basis of their school's misconduct—*i.e.*, a borrower defense.

53. Borrower defense arises in the backdrop of the Federal Trade Commission's Trade Regulation Rule Concerning Preservation of Consumer's Claims and Defenses (Holder Rule), 16 C.F.R. Pt. 433, which was promulgated in 1975. 40 Fed. Reg. 53506 (Nov. 18, 1975). The Holder Rule ensures that consumers are not forced to repay loans to a financer when a seller fails to provide the goods or services purchased.

54. The logic underlying the Holder Rule is that, as between "an innocent consumer, whose dealings with an unreliable seller are, at most, episodic, and a finance institution . . . the financer is in a better position both to protect itself and to assume the risk of a seller's reliability." *Id.* at 53509. By making financers liable for a seller's misconduct, the Holder Rule encourages lenders to avoid commercial dealings with disreputable sellers that defraud consumers.

55. Drawing upon the Holder Rule, a holder of a FFEL loan is, by regulation, "subject to all claims and defenses that the borrower could assert against the school with respect to that loan" if a sufficiently close relationship existed between the school and the lender. 34 C.F.R. § 682.209(g).

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

56. Since approximately 1994, every FFEL loan has been governed by a Master Promissory Note ("MPN") that contains similar language, providing that the borrower is entitled to assert, as a defense to repayment of the loan, "all claims and defenses that the borrower could assert against the school."

57. Similarly, in 1993, Congress altered the terms and conditions of Direct Loans to allow for student loan borrowers to seek cancellation of their loans on the basis of school misconduct. 103 P.L. 66, 107 Stat. 312.

58. The statute directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h).

59. Implicit in this statutory directive is that the Department must recognize at least some acts or omissions as establishing a borrower defense.

60. Pursuant to this directive, the Secretary promulgated a regulation that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable state law." 34 C.F.R. § 685.206(c)(1).

61. This regulation became effective July 1, 1995, and governs the claims of all Direct Loans issued from that time until at least July 1, 2017. *Id.* at § 685.222.

62. Starting in 1995 and at least until October 16, 2018, all Direct Loans have been issued pursuant to a MPN that informs borrowers that he or she "may assert, as a defense against collection of [his or her] loan, that the school did something wrong or failed to do something that it should have done," provided that "the school's act or omissions directly relates to [his or her] loan or to the educational services that the loan was intended to pay for, and if what the school did

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

or did not do would give rise to a legal cause of action against the school under applicable state law."

63. Upon a successful borrower defense assertion, the Secretary "may initiate a proceeding to collect from the school the amount of relief resulting from a borrower defense." *Id.* at §685.222(a)(6)

64. The Higher Education Act, the Department's regulations, and students' MPN requires the Department to adjudicate borrower defense assertions, and to grant at least some borrower defenses.

65. When a borrower establishes a borrower defense, the Department has a mandatory duty to notify the borrower and to provide her with some relief. *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1100 (N.D. Cal. 2018).

66. Before it can certify a defaulted borrower for a tax offset, the Department has an obligation to entertain the merits of a borrower defense. *See Williams v. DeVos*, No. 16-11949-LTS, 2018 WL 5281741 (D. Mass. Oct. 24, 2018).

67. The Department itself has repeatedly acknowledged its own obligation to decide borrower defenses.

68. In a letter to Senator Elizabeth Warren in 2014, the Department stated that a

> borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school.

69. In 2015, the Department for the first time established an official form to "aid in preserving borrowers' rights" and to "allow the Department of Education to inform borrowers and loan

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

servicers of the information needed to review and adjudicate requests for relief under borrower defense regulations," 80 Fed. Reg. 32944, 329445 (June 10, 2015).

70. And, in a letter to the Office of Management and Budget about this collection effort, the Department stated that "borrowers have a right to assert a defense to repayment claim." It added that: "Because borrowers have a right to submit defense to repayment claims, the Department must set up a process to review and adjudicate them."

71. In addition to the statutory and regulatory directives and the terms of borrowers' loans, the Department is bound to recognize borrower defenses by the law governing the collection of debts owed to the federal government.

72. Under the Federal Claims Collection Act of 1966, "[b]efore disclosing information to a consumer reporting agency," the Department is required "on a request of a person alleged by the agency to be responsible for the claim, for a review of the obligation of the person, including an opportunity for reconsideration of the initial decision on the claim." 31 U.S.C. § 3711(e)(2); *accord* 34 C.F.R. § 30.33(b)(3)(ii) (prior to reporting of debt to consumer reporting agency, Department must provide borrower with notice and opportunity to "obtain a review within the Department of the existence, amount, enforceability, or past due status of the debt").

73. Furthermore, because agencies are statutorily required to refer delinquent non-tax debts to the Department of Treasury for centralized collection through offset, the Secretary enters into an annual certification agreement with Treasury's Bureau of the Fiscal Service.

74. Under that agreement, whenever the Secretary refers a debt to Treasury, the Secretary must certify, under penalty of perjury, that certain facts concerning the debt are true.

75. For example, the Secretary must certify that she "has considered any and all evidence presented by the Debtor disputing the Creditor Agency's determination that would preclude

collection of the Debt." *See* U.S. Dep't of the Treasury, Bureau of the Fiscal Service, Agreement to Certify Federal Nontax Debts (revised September 2014).

76. The Secretary must also certify that she notified the debtor of "the Debtor's rights to an explanation of the claim, and an administrative repeal or review of the claim," and, upon request of a Debtor, "provided for a review of the Debtor's claim(s), including an opportunity for reconsideration of the initial decision on the Debt." *Id.*

## A Predatory Industry

77. As the name implies, for-profit colleges are operated as businesses that seek to maximize revenue and minimize costs in order to profit or increase share prices for owners and investors.  In contrast, non-profits are required to reinvest all net earnings in service of their educational mission.

78. As documented in an extensive 2012 report by the Senate Committee on Health, Education, Labor, and Pensions (HELP), for-profit colleges have increased their revenue by relying on taxpayer dollars, namely in the form of federal student aid.

79. For instance, in 2009-2010, the sector received $32 billion from the Department's student aid program funds; this constituted 25 percent of all such funds. This was approximately five times the amount of federal student aid that the sector collected a decade earlier.

80. Similarly, Pell grants to for-profit schools increased from $1.1 billion in the 2000-2001 school year, to $7.5 billion in the 2009-2010 school year.

81. To maximize this federal aid, for-profit schools specifically target low-income students, students of color, single parents, and veterans. Many for-profit college students are the first in their family to attend college.

82. The Senate HELP committee concluded that these schools "seek to enroll a population of non-traditional prospective students who are often not familiar with traditional higher education and may be facing difficult circumstances in their life."

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

83. The committee added that, "[s]ervice members, veterans, spouses, and family members have become highly attractive prospects to for-profit colleges, and many schools have put significant resources into recruiting and enrolling [these] students."

84. As a result of this targeting, African Americans and other people of color are disproportionately enrolled in for-profit colleges. Students of color make up one-third of all college students, but represent nearly half of those attending for-profit institutions.

85. Furthermore, according to the HELP committee, in order to achieve company enrollment goals, "recruiting managers at some companies created a boiler-room atmosphere, in which hitting an enrollment quota was the recruiters' highest priority." Indeed, "documents indicate that the recruiting process at for-profit education companies is essentially a sales process."

86. As part of this process, the schools recruit students with lies and false promises of well-paying jobs and meaningful careers.

87. As the HELP committee found, "many companies used tactics that misled prospective students with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, or the reputation and accreditation of the school."

88. For instance, one school told students that it placed 70% to 90% of students in jobs, when only 20% to 30% of students actually obtained employment.

89. The Senate HELP committee found that these for-profit schools trained their recruiters to "locate and push on the pain in students' lives." They also trained the recruiters to "overcome objections of prospective students in order to secure enrollments." Moreover, "companies trained recruiters to create a false sense of urgency to enroll and inflate the prestige of the college."

90. Some for-profit schools have also falsified student high school diplomas in order to boost enrollment. And they have falsified financial aid records to provide the school with more federal

14

financial aid than students were actually eligible for, or to divert funds from the student to the school.

91. Enrollment across the industry increased from approximately 766,000 students in 2001 to 2.4 million students in 2010.

92. For-profit schools fail to provide the quality programs promised by the recruiters, in part because the schools fail to invest sufficient resources in their educational programs.

93. According to the HELP committee, in fiscal year 2009, the companies the committee examined spent 22.7% of all of their revenue on marketing, advertising, recruiting, and admissions. They also took 19.4% of all revenue as pre-tax profit. In contrast, they spent 17.2% of all revenue on instruction. In other words, "the companies together devoted less to actual instruction costs (faculty and curriculum) than to either marketing and recruiting or profit."

94. The Century Foundation think tank found similar spending trends between August 2016 and January 2017. It concluded that several of the largest for-profit schools in the country were spending less than 30% of tuition on instruction.

95. For instance, during that time period, the University of Phoenix spent 21% of tuition on instruction.

96. During that time period, DeVry spent 24% of tuition on instruction.

97. During that time period, Capella University spent 10% of tuition on instruction.

98. Yet, these schools charge substantially higher tuition than comparable programs at community colleges and flagship State public universities.

99. Indeed, for a low-income student, some for-profit schools can cost more than private non-profit schools like Harvard or Stanford.

100. Bachelor's degree programs averaged 20 percent more at for-profits than the cost of analogous programs at flagship public universities.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

101. Associate programs averaged four times the cost of programs at comparable community colleges.

102. And, certificate programs averaged four and a half times the cost of such programs at comparable community colleges.

103. Students who attend for-profit schools are ultimately left with substantial debt but without means to pay for it.

104. The Department of Education reported in 2014 that 72 percent of the for-profit college programs it analyzed produced graduates who, on average, earned less than high school dropouts.

105. A 2016 study found that for-profit college students earned less after leaving school than they did before they enrolled.

106. As a result, students who attend for-profit schools account for 13% of the student population, but 47% of all federal student loan defaults. And, 70% of African Americans who borrow to attend a for-profit college default on their loans within ten years.

107. The Department has allowed this to occur on its watch and many of these problems are the direct result of its lax oversight.

108. For example, in October 2002, the Deputy Secretary of Education ordered enforcement staff to treat violations of the statutory ban on commission-paid recruiting as a minor infraction. This allowed companies like the University of Phoenix to violate the ban (and therefore pay admissions staff based on the number of students enrolled) and pay a relatively small fine (rather than returning all of their Title IV aid from the time the violation occurred).

109. Similarly, in Department audits of companies like Corinthian—the corporate parent to Heald College, WyoTech, and Everest—it focused predominantly on issues related to compliance with financial aid rules, rather than broader problems infecting the school. As a result, despite conducting dozens of audits of Corinthian, the Department overlooked evidence of endemic

16

problems, such as Corinthian's improper recruitment tactics (*i.e.*, providing inadequate or misleading information to students), the school's rapid growth, staff turnover, and student withdrawals.

110. And, the Department has permitted several institutions, such as Grand Canyon University, Remington Colleges, Keiser/Everglades Colleges, and Kaplan to transition from for-profit status to non-profit status, even as these schools continue to outsource much of their operations to companion for-profit entities. The schools escape specific regulatory requirements and the stigma their industry's bad behavior created, even while they continue to operate like for-profit institutions.

111. Given the predatory nature of this industry, and the Department's failure to regulate it, it is no surprise that students of for-profit colleges accounted for approximately 98% of all loan cancellation applications sent to the government between 2016 and 2018.

**The Department starts to grant and deny borrower defenses and decides nearly 31,000 borrower defenses by January 20, 2017**

112. The Department promulgated its borrower defense regulation in 1994 and received its first claims in 1998.

113. Between October 1998 and February 2003, the Department's Office of General Counsel recommended that the loans of at least 85 Direct Loan borrowers be discharged.

114. However, until 2015, the Department did little to build a borrower defense infrastructure, to inform students about their rights under borrower defense, or to make it clear how students could assert their rights.

115. Students were also blocked from seeking recourse in court against their schools. Approximately 98 percent of students who attended for-profit schools were coerced into signing an arbitration provision and class action waiver in their enrollment agreement.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

116. This void was compounded by students' inability to discharge their debts in bankruptcy; federal and private student loans are presumptively non-dischargeable in bankruptcy.

117. This situation became untenable in Spring 2015.

118. At that time, the Department fined Corinthian $30 million for substantial job placement rate misrepresentations. The company subsequently collapsed, leaving tens of thousands of students with no recourse for the substantial student loan debt they incurred in exchange for less than nothing of value.

119. A number of other for-profit schools have subsequently shut down over the last few years, including: Allied American University, Altierus Career Colleges, American College of Commerce and Technology, American School of Technology, Antonelli Medical and Professional Institute, Argosy University, the Art Institutes, Bradford School, Briarcliffe College, Brightwood Career Institute, Brightwood College, Brooks Institute, Brown Mackie College, Cambria-Row Business College, Cameron College, Career Point College, Carousel Beauty College & Spa Institute, Charlotte School of Law, Corinthian Colleges, Daniel Webster College, DuBois Business College, Duluth Business University, Ferrara's Beauty Institute, Fountainhead College of Technology, Freemont College-Los Angeles, Gallipolis Career College, Globe Institute of Technology, Globe University/Minnesota School of Business, Golden State College of Court Reporting and Captioning, Graham Webb International Academy of Hair, Harrison College, Heritage College, Hickey College, International Career Development Center College, ITT, John Marshall Law School (Atlanta), Keystone Technical Institute, Le Cordon Bleu Colleges of Culinary Art, Marinello Schools of Beauty, Mattia College, McCann School of Business & Technology, McNally Smith College of Music, Medtech Colleges/Institutes, New England Institute of Art, Parker West Barber School, Radians College, Regency Beauty Institute, Ridley-Lowell Business and Technical Institute, Sage College, Santa Fe University of Art and Design, South University,

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

Star Career Academy, Trumbull Business College, Tucson College, Utica School of Commerce, Vantage College, Vatterott College, Virginia College, West Virginia Business College, Westech College, Westwood College, Wood Tobe-Coburn School, and YTI Career Institutes

120. Through the tireless efforts of borrowers, organized in groups such as the Debt Collective, thousands of former Corinthian students began to assert to the Department their right to a complete loan cancellation under borrower defense.

121. Around the same time, hundreds of former students who were defrauded by other for-profit institutions, began to assert their right to borrower defense.

122. In June 2015, the Department appointed a Special Master to "help develop a broader system to aid students at" Corinthian "and other institutions who are seeking debt relief" under the borrower defense regulations.

123. The Special Master served from June 24, 2015 through June 23, 2016.

124. During his appointment, the Special Master issued four reports on borrower defense, which primarily addressed and resolved claims from Corinthian students.

125. As he detailed in his first report, the Special Master also focused on "creating a fair, transparent, and efficient process for handling borrower defense claims" in a way that was "flexible and scalable." He detailed the infrastructure that would be needed on a "human and physical" level "as well as a decision-making framework that will accommodate efficient and fair resolution of borrower defense matters."

126. The Special Master "share[d] the urgency felt by borrowers who were defrauded, and believe[d] it [was] important to reach decisions in this project in a deliberate way that [would] support the relief that students deserve, protect taxpayers, and justify public trust and confidence in the process."

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

127. The Special Master and the Department emphasized that they were going to "rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers."

128. During his one-year tenure, the Special Master recommended the discharge of the federal student loans of approximately 3,787 borrowers.

129. On February 8, 2016, the Department announced the creation of a "Student Aid Enforcement Unit" with a dedicated "Borrower Defense Group" (BDU).

130. The Department tasked the BDU with providing "legal analysis, support, and advice concerning claims of borrowers of Direct Loans. The unit [will] analyze claims to make determinations of injury, investigate institutions in connection with borrower defense claims and coordinate with federal and state agencies regarding those claims."

131. In June 2016, the Special Master formally transferred authority of borrower defense over to the BDU. There were approximately 22,800 pending borrower defenses.

132. At the time authority was transferred to the BDU in June 2016, it had seven full-time attorneys and no contractors.

133. By November 2016, the BDU had "hir[ed] additional attorneys and support staff to work on borrower defense." Specifically, it was staffed with a director, 10 attorneys, and 19 contracted staff.

134. Around this same time, the Department published a final new borrower defense regulation that was to become effective July 1, 2017.  81 Fed. Reg. 75926 (Nov. 1, 2016).

135. Between July 2016 and January 20, 2017, the BDU granted approximately 27,996 borrower defenses.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

136. Specifically, the Department granted claims of former students of a handful of schools on the basis of different theories of liability.

137. The Department granted 24,504 "Job Placement Rate" claims for former Corinthian students.

138. The Department determined that students who attended specific Corinthian programs, at certain times, as enumerated and published by the Department, established a borrower defense under this job placement rate theory. *See* https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf; https://studentaid.ed.gov/sa/ sites/default/files/ev-wy-findings.pdf.

139. The Department also granted 426 "transferability of credit" claims for former Corinthian students. The basis and rationale for the granting of these claims is recorded in a memo or memos and, upon information and belief, the memo(s) on their face set forth criteria that apply to more than 426 borrowers.

140. The Department granted 169 "Guaranteed Employment" claims for former Corinthian students. The basis and rationale for the granting of these claims is recorded in a memo or memos and, upon information and belief, the memo(s) on their face set forth criteria that apply to more than 169 borrowers.

141. Specifically, and upon information and belief, any former Corinthian student who asserts that they were guaranteed employment (i.e., promised employment, a specific salary, or a job with a specific employer) establishes a borrower defense.

142. The Department also granted 33 "Guaranteed Employment" claims for former ITT students. The basis and rationale for the granting of these claims is recorded in a memo or memos and, upon information and belief, the memo(s) on their face set forth criteria that apply to more than 33 borrowers.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

143. The Department, in the form of a group discharge (that is, without individual applications), granted borrower defenses to 2,863 former American Career Institute students.

144. By the end of the prior administration, the Department "expect[ed] to resolve all pending eligible [Corinthian job placement rate] findings claims by Spring 2017."

145. And, in or around the beginning of 2017, the Department informed a Director, Claim Management at USA Funds, Inc. (a guarantor of FFEL loans), that it would take 12-14 months for it to make a determination of eligibility on a borrower defense application.

146. Yet, as of January 2017, there were approximately 54,000 borrower defenses pending.

147. To tackle these pending applications, the BDU had a proposed protocol to "[d]evelop and implement an administrative process capable of ensuring supportable and timely decisions" on borrower defense claims, including "claims that are unique or unsupported by existing legal memos[.]"

148. When assessing new claims, this "Borrower Defense Unit Claims Review Protocol" required the BDU to "evaluate all available relevant evidence to determine whether" a claim was established, including the "BD claim," "[e]vidence from ED investigations," [e]vidence from other law enforcement investigations," "[e]vidence obtained from whistleblower suits," and "[c]orroborating evidence from other similar BD claims."

**The Department stops deciding borrower defenses and adopts a policy of refusing to grant any borrower defenses**

149. Since January 20, 2017, the Department has sharply curtailed its borrower defense infrastructure.

150. At the outset of her tenure, Secretary DeVos staffed the high ranks of her Department with employees who had worked for, or were connected with, the for-profit college industry. For example:

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

a. The Secretary appointed James Manning to be a Senior Advisor to the Under Secretary and then Acting Under Secretary. Mr. Manning was a former consultant to USA Funds (later Strada Education Network), which heavily invested in for-profit schools.

b. The Secretary appointed Julian Schmoke to head the enforcement unit, which includes the BDU. Mr. Schmoke is the former dean of for-profit school, DeVry University. In FY 2018, the Department paid Mr. Schmoke a $15,000 bonus.

c. The Secretary appointed Diane Auer Jones as Principal Deputy Under Secretary. Ms. Jones is the former Senior Vice President and Chief External Affairs Officer of Career Education Corporation, a company that owns now-shuttered for-profit schools Brooks Institute of Photography, Sanford-Brown Colleges and Institutes, Le Cordon Bleu, Collins College of Art and Technical Colleges and Briarcliffe College.

d. The Secretary appointed Robert Eitel as a senior advisor. Mr. Eitel worked for Bridgepoint Education, owner of Ashford University.

e. The Secretary appointed attorney Linda Rawles as a senior advisor. Ms. Rawles also worked at Bridgepoint Education.

f. And, the Secretary hired General Counsel Carlos G. Muniz. Mr. Muniz also has prior ties to Career Education Corporation.

151. As the Department explained in a response to Questions for the Record from the Senate HELP Committee, "Senior Department officials may be consulted regarding relief approaches and decisions for approved applications."

152. As of September 2017, the entire Enforcement Unit had no director and only six contracted staff.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

153. The Department recognized in a procurement notice that "the FSA [Federal Student Aid] borrower defense unit currently lacks sufficient staff."

154. In June 2018, the Department reported that the BDU had six full-time employees and one part-time employee. At that time, there were 99,335 borrower defenses pending review.

155. In March 28, 2019 answers to Questions for the Record from the Senate HELP Committee, the Department explained that it had "recently completed a preliminary estimate of the full-time and contractor resources needed to eliminate or substantially reduce the number of pending borrower defense applications." It concluded that "existing staff and contractors are insufficient to address the existing applications."

156. The Department further noted that it was "in the process of adding full-time and contractor resources," but had not, at that point, hired any additional employees since January 20, 2017.

157. Also around the same time, Secretary DeVos testified to the Subcommittee on Labor, Health and Human Services, Education, and Related Agencies of the Senate Committee on Appropriations that "the enforcement unit, part of Federal Student Aid, is very robust and functioning very well."

158. This sharp reduction in staffing and resources began immediately with the change in administration, even as the administration inherited a significant backlog of borrower defense claims.

159. As of February 21, 2017, there were ten schools other than Corinthian—the school that accounted for the vast majority of borrower defense applications granted to date— that had over 100 pending borrower defense applications: Education Management Corporation (EDMC), ITT, DeVry, CEC, Apollo/University of Phoenix, Westwood, ACI, Charlotte School of Law, Globe University/MN School of Business, and Graham Holdings/Kaplan University.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

160. As of February 21, 2017, there were six schools with 31-100 pending borrower defense applicants. They included: Marinello School of Beauty, Bridgepoint/Ashford University, ATI Career Training, Anthem, Willis Stein/Kaplan College, and Palm Holdings/United Education Institute (UEI).

161. As of February 21, 2017, there were 28 schools with 11-30 pending borrower defense applicants. They included: Full Sail University, Strayer University, Walden University, Virginia College, Academy of Art University, Grand Canyon University, Medtech, Capella, Fasttrain, Dade Medical College, Fortis College, Star Career Academy, Career Point College, Lincoln Technical Institute, Brown College, Daymar College, Universal Technical Institute, Court Reporting Institute, Mountain State University, Florida Career College, Regency Beauty Institute, Keiser University, Remington College, Wright Career College, Concorde Career College, Jones International University, Masters of Cosmetology College, and Salter College.

162. As of February 21, 2017, there were 797 schools with 10 or fewer borrower defense applicants.

163. In March 2017, senior Department staff instructed BDU to "pause . . . submitting claims for approval and . . . developing additional memoranda for new categories of claims that qualify for discharge."

164. That same month, the Department created a Borrower Defense Review Panel. As explained by Under Secretary Manning, this "short-term evaluation" was performed during "the winter and early spring [by] a team consisting of both career and on-career Department leadership" in order to "ensure the administration of the program was built on solid foundation that would in the long term operate efficiently[.]"

165. In May 2017, the Review Panel decided to honor approximately 16,000 borrower defense claim approvals made, but not effectuated, prior to January 20, 2017.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

166. The Review Panel informed the Secretary that Department leadership were developing interim procedures "with respect to the seven established categories so that the review, approval, and discharge processes for these categories of claims may resume as soon as possible."

167. Secretary DeVos requested the Department's Office of Inspector General (OIG) review the borrower defense program because she believed it reflected a "haphazard approach taken by the previous administration, actively encouraging borrowers to flood the Department with claims without a prior infrastructure in place to intake and manage them."

168. Secretary DeVos also stated publicly that she believed borrower defense allows students to "raise his or her hand" to get "free money."

169. In late 2017, the OIG released the requested audit report (ED-OIG/I04R0003) entitled "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process."

170. The report states that "[a]ccording to the Director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval or to continue developing memoranda on additional categories of claims that qualify for discharge because the borrower defense policies are being reviewed with the change in administrations." It added, "[w]hile awaiting specific instructions, BDU's contractors summarized allegations in unique claims."

171. In response to the OIG report, the FSA confirmed "the pause in submitting claims for approval and in developing additional memoranda for new categories of claims that qualify for discharge," but clarified "that the Deputy Chief Enforcement Officer actually just communicated to the Director of BDU the guidance and direction provided by OUS and the Review Panel."

172. Thus, "[f]rom January 20, 2017, through July 31, 2017, BDU did not complete or begin preparing any legal memoranda establishing whether additional categories of borrower claims qualified for discharge."

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

173. According to the OIG,

> BDU did not implement policies and procedures for reviewing and making determinations on unique claims that do not fit into one of the seven established categories; claims with no common factual bases; or claims for which there was no associated legal memorandum. When borrowers filed a claim that did not fit into the established categories, their loans were placed in forbearance and all collections actions were halted.  While in this status, borrowers do not have to make payments, but their debts remain on record and interest continues to accumulate on the loan balances.

174. In addition to the seven established categories, according to OIG, "[a]s of January 20, 2017, BDU had identified additional categories of claims warranting further research. However, this research was placed on hold. Starting January 20, 2017, BDU tasked contractors with summarizing the allegations made in unique claims. BDU has not established any additional categories of valid borrower defense claims since January 20, 2017."

175. The OIG recommended (among other things) that the Chief Operating Officer (COO) for FSA:

> Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge; establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA had no associated legal memorandum; and establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.

176. In a November 29, 2017 response to the OIG's submission, FSA agreed to work with its Chief Financial Officer to strengthen BDU's processes and protocols so that the work on additional categories of claims could proceed, and to work with Department leadership to develop mutually agreeable timelines.

177. The U.S. Government Accountability Office standards for internal control in the federal government directed that agencies should establish performance measures and indicators, such as timeframes for processing claims.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

178. Department policy required FSA to develop a final corrective action plan within 30 days of the issuance of the OIG report, tracked through the Department's Audit Accountability and Resolution Tracking System.

179. Notwithstanding the Department's obligation to develop a final corrective plan, on February 11, 2019, the OIG responded to a FOIA request for the plan by saying: "The OIG conducted a search and located no records responsive to your request."

180. Between December 2017 and May 2018, the Department only granted or denied claims from certain Corinthian students.

181. The Department last approved a borrower defense application on June 12, 2018.

182. The Department last denied a borrower defense application on May 24, 2018.

183. The only applications the Department has resolved in the past year have been duplicate applications or for students who were eligible for other types of loan discharges. The Department has "closed" these borrower defense applications without any review of the merits.

184. As of spring 2019, the Department confirmed that it "has identified no facts relevant to the review of Corinthian College claims," and "has similarly made no findings of fraud regarding ITT Tech."

185. On May 22, 2019, Principal Deputy Under Secretary Diane Auer Jones testified to the Economic and Consumer Subcommittee of the House Committee on Oversight and Reform that the Department could not commit to any timeline to grant or deny pending borrower defenses.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

186. According to the Department's Borrower Defense Quarterly Report issued for the quarter ending December 31, 2018,[1] there were 158,110 pending borrower defense assertions.

187. Since January 1, 2019, borrowers have continued to assert their right to borrower defense and the Department refuses to grant or deny any of the pending borrower defenses.

188. Today, more than 20 schools have more than 500 applications from former students pending, in addition to Corinthian and ITT: DeVry, University of Phoenix, Alterius Career College, Purdue University Global, Ashford University, Charlotte School of Law, The Art Institute (Pittsburgh), Minnesota School of Business, Westwood College, Keller Graduate School of Management, Brooks Institute, American InterContinental University, Globe University, Education Corporation of America-owned schools, Dream Center Educational Holdings-owned schools, Bridgepoint Education, Marinello School of Beauty, ATI Career Training, United Education Institutes, and Lincoln Technical Institutes.

189. To date, the Department has granted borrower defense applications to former students of Corinthian (44,987), ACI (2,897), ITT (33), and unnamed "other" schools (25).

190. In the face of this clear evidence to the contrary, the Department has misrepresented to the public and borrowers that it is prioritizing borrower defense and that it is actively granting or denying claims.

191. On July 11, 2017, the Department's Office of Postsecondary Education responded to an inquiry from a former ITT student by saying,

> We appreciate the concerns you raise regarding protections for borrowers who have

---

[1] Senate Report 115-150 directed the Department to issue quarterly reports on borrower defense claims that include the total and median dollar amount of outstanding debt from borrowers prior to discharge, the percentage of the total approved claims receiving partial relief, the median student loan debt remaining as part of claims receiving partial relief, the total number of pending borrower defense claims, and total number of denied claims, all disaggregated by state.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

been defrauded by their institutions. Our top priority is to protect students from fraudulent practices. Borrowers continue to have the right to file a BD claim with the Department, and we will continue to evaluate whether a borrower's claim gives rise to a cause of action consistent with the current state-law based standard.

192. In a letter to Senator Elizabeth Warren, dated August 17, 2017, the Department wrote, "Even though the Department has delayed the regulations, borrowers continue to have the right to submit a BD claim with the Department under our long-standing, current regulations, and we will continue to evaluate whether a borrower's claim gives rise to a cause of action consistent with the current, State law-based standard."

193. In an August 18, 2017 letter to a borrower, the Department assured that it "will continue to evaluate whether a borrower's claim gives rise to a cause of action consistent with the current, State-law based standard."

194. In October 2017, the Department justified a delay of the prior administration's borrower defense regulations by claiming that the delay would not harm borrowers because it "would continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue to apply for the discharge of all or part of their loans." 82 Fed. Reg. 49,155 (Oct. 24, 2017).

195. On November 9, 2017, Under Secretary Manning wrote to members of Congress that Borrowers still have the right to submit borrower defenses and that the Department would "continue to evaluate whether a borrower's claim gives rise to a cause of action consistent with the current, State-law based standard."

196. On November 14, 2017, during the first session of a negotiated rulemaking that the Department undertook to replace the 2016 Borrower Defense regulation, Under Secretary Manning stated:

As you know, the borrower defense regulations enacted in 2016 have been delayed and so the Department has and will continue to consider claims under the regulatory

30

status quo[.] . . . [The Department] is also working to adjudicate pending claims related to other schools and we are making progress on that front . . . I can promise you we are working night and day to get these claims and I expect a consistent downward trend in the number of pending claims starting soon, very soon.

197. He further commented that:

assuming my responsibilities on January 20 I began an evaluation of the Borrower Defense Program. This review is complicated by a lack of defined policies, protocols and procedures established to handle the process and additionally the lack of a proper SORN or a database system that instead was 1,000 spreadsheets that had to be searched manually. These claims were approved in haste just before the inauguration and there was no infrastructure in place to adjust them, as I just said. Given the budgetary implications to the taxpayer and the impact on thousands of borrowers and institutions it was necessary to conduct a high level assessment of the program including all these already approved claims.

198. Under Secretary Manning summarized the Department's stated position when he said that "Secretary DeVos views borrower defense as one of the most important issues facing the Department."

199. He added in late 2017 and early 2018 that "our hope for claims moving forward is that borrowers' . . . claim[s] should be dispensed within a year's time."

200. As of January 2018, Manning reported to a negotiated rulemaking committee that the Department "is also working to assess claims from schools other than Corinthian. We have roughly 46,000 pending claims from non-Corinthian schools and, while we are working diligently to adjudicate those claims, I do not have any more specific information to share with you today."

201. On February 14, 2018, the Department stated in a Federal Register publication that "borrowers can continue to apply for relief from payment of loans under this existing process, and the Department is committed to processing those applications in a timely manner." 83 Fed. Reg. at 6,641. Thus, according to the Department, the delay of the 2016 Borrower Defense regulation would have no negative impact on borrowers.

202. On May 22, 2018, Secretary DeVos testified to the House Education and Workforce

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

Committee that "[w]e are continuing to move forward on students' claims that these schools did defraud them," and "I know that there were students that were defrauded as I said earlier, fraud is not to be tolerated."

203. In June 2018, a Department representative told the Senate Committee on Appropriations that it was "working tirelessly to reduce the number of pending claims."

204. The Department advises applicants for borrower defense that it "processes applicants in the order in which they are received."

**The Department's inaction causes class members ongoing harm**

205. The Department's refusal to grant or deny borrower defenses exacerbates the harm to a borrower's credit that is caused by the very existence of the invalid student debt.

206. Class members' loans are accruing interest and, for many borrowers, creating an untenable debt-to-income ratio. During the Department's inaction, members of the proposed class who need loans to secure basic housing and transportation are unable to qualify for loans, or qualify only for the most predatory ones.

207. Class members' impaired credit also restricts their employment options. Some students have been outright denied jobs on account of their credit, and others are unable to obtain the security clearances necessary to obtain certain jobs.

208. This credit harm perversely prevents some students from attaining even entry-level employment, locking them into a negative cycle of financial insecurity.

209. A successful borrower defense removes negative credit reporting associated with the discharged loan or loans, and refunds any amount paid on the loan.

210. Upon the submission of a borrower defense, the Department is required to place a student's loans in administrative forbearance unless the borrower requests otherwise. *See* 34 C.F.R. § 682.211.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

211. Indeed, the Department's universal borrower defense application asks borrowers if they are "requesting forbearance/stopped collections." A borrower can select: "Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue."

212. The form also states that: "If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently (as applicable)."

213. And, in testimony to the Subcommittee on Economic and Consumer Policy of the House Committee on Oversight and Reform, Principal Deputy Under Secretary Jones acknowledged that "when someone has a pending borrower defense claim, they are entitled to a forbearance."

214. In practice, the Department, through its loan servicers, are only placing students' loans into administrative forbearance for a limited period of time. They are then moving the students' loans back into repayment.

215. At that point, loan servicers are refusing to place a class members' loans back into administrative forbearance unless the class member affirmatively calls the Department and requests it.

216. Many members of the proposed class have also defaulted on their federal student loans while their borrower defenses remain pending. For them, the Department has taken extraordinary, extrajudicial action to collect on their loans, including by seizing their wages and garnishing Earned Income Tax Credits and Social Security benefits.

217. The Department has consistently taken these actions with knowledge of a borrower's pending borrower defense and without first adjudicating that assertion. Put another way, the Department is seizing students' wages and tax credits notwithstanding the student's bona fide objection to the enforceability of the debt.

218. For example, on February 26, 2019, the Department denied a student's objection to a tax offset notwithstanding her assertion of a borrower defense. It said "[w]e have received your application for borrower defense to repayment discharge. Your discharge request has been forwarded to the Department's Borrower Defense Unit for review."

219. It then did not render a decision on the borrower defense but concluded that the "student aid obligation [was] past due and legally enforceable" and so "the Department has referred this debt to the U.S. Department of the Treasury for offset."

220. During the Department's delay, members of the proposed class have forgone or deferred education. Many members have exhausted their financial aid eligibility on their for-profit programs. Others are wary of taking out further debt until the Department renders a decision on their borrower defense.

221. Borrower defense discharge not only removes the obligation to repay the loan, but it restores a borrower's eligibility for federal financial aid.

222. The Department's failure to grant or deny borrower defenses also limits students' professional and personal choices.

223. For instance, the lingering debt and the uncertainty regarding the debt causes students to delay making significant purchases, borrowing money (if they can) to seek additional education, or accepting positions with lower earnings.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

224. Individuals are likewise missing substantial opportunities to develop their wealth, notably in the form of home equity and retirement savings, because of their student loan debt and the Department's refusal to adjudicate the status of the debt.

225. Indeed, during the life of a student loan, an individual with higher student debt is more likely to forgo home ownership than a comparable individual without student loan debt. One study has found that households with an average student debt burden experienced a lifetime wealth loss of nearly $208,000 compared to households without student debt. This largely occurs because borrowers cannot put money into retirement savings or invest in a home during the life of the loan.

226. The uncertainty of the loan obligation is causing class members to divert their income to pay for the loans rather than to invest in their financial future. Class members are therefore suffering long-term lost wealth, including lost home equity.

227. Even if borrowers eventually get a full loan discharge, their inability to make financial decisions or investments during the Department's inaction leads to a delayed accumulation of wealth.

228. The uncertainty and confusion engendered by the Department's inaction causes students significant psychological distress.

229. One body of peer-reviewed literature documents a strong and persistent link between financial strain, the psychological stress related to financial strain, and mental health. Indeed, financial strain and general consumer debt are associated with higher levels of depressive symptoms, psychological functioning, anxiety, and psychological distress.

230. The emerging research on student debt is consistent with these findings. Students may experience poor mental health as they accumulate the loans during school and as they enter repayment after graduation.

231. The negative psychological functioning can manifest in several ways. These include stress, depressive symptoms, anxiety, feelings of sadness, long-term behavioral health developments, and other forms of psychological distress.

232. The literature also documents the adverse physical health outcomes that are associated with significant consumer debt. Most notably, increased consumer debt is correlated with decreased duration and quality of sleep. Inadequate and poor sleep, in turn, is associated with many physical health problems, including obesity, cardiovascular disease, and premature mortality.

233. The Department's refusal to adjudicate borrower defenses leaves borrowers with a lack of faith that their government works for them.

234. For many students, their borrower defense assertion is the most significant interaction that they have had, or will have, with their government.

235. The Department's refusal to grant or deny borrower defenses, particularly as to students who attended schools that the Department knows engaged in misconduct, has a tangible and negative impact on class members' belief that their government is acting in their interest.

## **FACTS CONCERNING NAMED PLAINTIFFS**

### *Theresa Sweet*

236. Theresa Sweet is 43 years old and resides in Los Gatos, California.

237. Ms. Sweet enrolled in a BA program in professional photography at the Brooks Institute of Photography (Brooks) in 2003. She graduated from that program in 2006.

238. Brooks was a for-profit school owned and operated by Career Education Corporation (CEC). The school offered programs in the visual arts and was located in Ventura, California.

239. Brooks was the subject of numerous investigations and lawsuits, including one in 2005 by the California Bureau for Private Postsecondary and Vocational Education (BPPVE). That

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

investigation determined that Brooks violated state law in various ways, including by misrepresenting students' post-graduation income. Brooks ultimately shut down in August 2016.

240. According to the Department, as of December 31, 2018, 588 former Brooks students had asserted a borrower defense to the Department. All of the claims remain pending.

241. CEC also operated, among other schools, Sanford Brown College and American InterContinental University. CEC has been investigated by more than a dozen attorneys general and been subject to increased financial oversight from the Department. Over the past few years, several of CEC's other schools, including Sanford Brown College, have shut down following allegations of wrongdoing.

242. According to the Department, as of December 31, 2018, 5,667 students from CEC colleges have asserted a borrower defense. The Department has not decided a single one.

243. When Ms. Sweet enrolled at Brooks, the school made a number of misrepresentations to her. As she explained in her borrower defense assertion to the Department, representatives of Brooks:

    a.  Stated that because Brooks had such a great reputation in the industry, 80-90% of graduates were employed "right out of school." These numbers were false and many, if not most of Ms. Sweet's classmates do not work in the media/photography industry;

    b.  Falsely promised her that there would be no tuition increases during the program, even though the cost of the program increased while she attended;

    c.  Guaranteed that they would assist her in getting a job either through "faculty networking" or from the job placement assistance office. In reality, when she was approaching graduation, instructors told her that most students spend years as unpaid interns or as unpaid "assistants." The placement office only told her about

37

"opportunities" to work for free. They also provided her Craigslist postings that Ms. Sweet had already found on her own;

    d.  Described the program as "rigorous" with "very tough standards" for admissions, when in reality, an applicant only needed a GED to gain admission;

    e.  Falsely promised Ms. Sweet that her Brooks credits were "certain" to transfer to other schools. In fact, Ms. Sweet was told by a number of community colleges and public schools that her credits would not transfer; and,

    f.  Told her not to worry about financial aid and that she would have no issue paying back her loans.

244. To attend Brooks, Ms. Sweet borrowed approximately $46,107 in FFEL loans. She also borrowed over $140,000 in private loans, because federal loans would not cover the full cost of her program. Indeed, as of April 2012, Brooks charged approximately $78,480 per year in tuition.

245.  Since attending Brooks, Ms. Sweet has worked a number of different jobs, including as a nanny and bartender. She has never had a job where she utilized the education she received at Brooks.

246. Ms. Sweet now works as a Certified Nurse's Assistant in a hospital. This position is unrelated to her studies at Brooks.

247. In or around Fall 2016, Ms. Sweet asserted her borrower defense to the Department.

248. To date, the Department has neither granted nor denied her borrower defense.

249. Since she submitted her borrower defense, the interest on Ms. Sweet's loans continues to grow. Her federal loans have ballooned to $65,000.

250. This experience has harmed Ms. Sweet's credit. She lacks adequate credit to obtain a vehicle at a reasonable rate.

251. She currently has a car because of help from a friend.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

252. Ms. Sweet lives in a room at a friend's house.

253. At work, doctors and nurses tell Ms. Sweet that she should return to school and seek a nursing degree to advance her career. Although Ms. Sweet is interested in returning to school, she cannot afford to borrow more money while her Brooks loans are outstanding. She has put any further education on hold pending the Department's decision on her borrower defense and until she can save money to defray the costs of school.

254. The Department's inaction harms Ms. Sweet's private life. Ms. Sweet has had to end a number of promising relationships because of her partners' fear about the debt. She is now reluctant to date because of the size and uncertainty of her debt.

255. Despite the Department's promise that her loans would remain in forbearance while her borrower defense claim was pending, Ms. Sweet recently received notice that her loans were going back into repayment. Following this notice, Ms. Sweet called the borrower defense hotline to ask the Department put her loans back into forbearance. If her loans were placed back into repayment, she would be unable to save money for schooling that could actually, unlike Brooks, further her career.

256. Attending Brooks was the worst mistake of Ms. Sweet's life. And now, as the Department sits on her borrower defense, Ms. Sweet is losing faith that the government will protect students like her.

### *Tresa Apodaca*

257. Tresa Apodaca is 34 years old and resides in Coeur d'Alene, Idaho.

258. She lives with her husband and two children, ages eight and 11. Her youngest son has significant medical needs and has been diagnosed with cystic fibrosis.

259. Ms. Apodaca attended the AAS/AA program in Medical Assisting at the Roseville, California campus of Heald college. She enrolled in 2008 and graduated in 2010.

260. Heald, like the other Corinthian-owned schools, was the subject of significant investigations by the Department, the CFPB, and various Attorneys General. In 2015, after the Department fined Corinthian $30 million for substantial misrepresentations, the school shut down.

261. According to the Department, as of December 31, 2018, there were 56,533 pending borrower defenses from former Corinthian students.

262. Ms. Apodaca was excited about the prospect of going to college because most of her family had barely completed high school.

263. During enrollment, Heald made a number of misrepresentations to Ms. Apodaca. As she detailed in her borrower defense, representatives of Heald:

   a. Told her that Heald graduates were "in very high demand" and that with good grades and attendance she was guaranteed to get a job anywhere she wanted. The representative specifically mentioned the employers Kaiser, UC Davis, and Sutter, and also stated that she would be able to work in a private practice if she so chose;

   b. Stated that Heald had a 98% job placement rate, which "really stuck with" Ms. Apodaca and convinced her that Heald would be a good investment for her family's future;

   c. Promised that her starting wage would be $16.00 to $18.00 an hour. In reality, she was only called for one interview for a job that paid $12.00 an hour. She has not been able to find any job after graduating Heald that paid what Heald promised;

   d. Guaranteed job placement assistance. In reality, Heald did not provide job placement assistance beyond a cursory resume review; and,

   e. Promised that she would get an externship at places like Kaiser, UC Davis, Sutter, a big hospital, or with a private practice. In truth, none of those were options for her externship.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

264. To attend Heald, Ms. Apodaca borrowed over $30,000 in FFEL federal loans. In 2014, she consolidated these into federal Direct Loans.

265. In May 2015, Ms. Apodaca asserted her borrower defense to the Department.

266. Upon information and belief, the Department's memorandum stating that former students of Corinthian who were guaranteed employment by Corinthian had established a borrower defense applies to Ms. Apodaca, and she has therefore established her borrower defense.

267. Nonetheless, the Department has not granted her borrower defense application, provided her notice of a decision, or discharged her debt.

268. Ms. Apodaca has contacted the Department at least once a year to ask about the status of her application. The Department has not provided her with any timeline for a decision.

269. During the Department's inaction, the interest on Ms. Apodaca's loans continues to grow.

270. The Department's inaction harms Ms. Apodaca's credit. For example, when Ms. Apodaca and her partner were looking for a home, the amount they could borrow decreased when they included her name on the application, because of her student loan debt.

271. The Department's inaction also makes it impossible for Ms. Apodaca and her family to financially plan for the future. For example, they cannot spend money to buy a winter vehicle or travel to visit family because of the uncertainty of the debt. Instead, Ms. Apodaca and her family put any extra income into savings in case they need to pay back the Heald loans. This is particularly stressful given their son's medical needs and the significant financial cost of caring for him.

272. The debt and the Department's refusal to take action is a significant stressor on Ms. Apodaca's marriage. Ms. Apodaca and her husband have worked hard on their finances and credit; although Ms. Apodaca intended to benefit her family by attending Heald, the student loans are now their only significant source of debt. The debt and its uncertainty sparks stress and tension between Ms. Apodaca and her husband.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

273. The debt and the Department's inaction also causes Ms. Apodaca extreme stress and anxiety. This has been exacerbated by the uncertainty of what the Department will do with her application.

274. Ms. Apodaca asked that the Department place her loans in forbearance until it decides her borrower defense. Nonetheless, she has to call and renew her forbearance every year.

275. Ms. Apodaca is interested in going back to school, but she does not believe that the Department is protecting students from other fraudulent institutions. Indeed, the Department knows that Heald cheated its students, but is doing nothing to help. She is thus reluctant to borrow more money to attend another school.

276. Ms. Apodaca's faith in government has been eroded by her experience at Heald and the Department's refusal to act on her borrower defense.

### *Chenelle Archibald*

277. Chenelle Archibald is 37 years old and resides in Worcester, Massachusetts.

278. Ms. Archibald has five children, aged five to 20.

279. Ms. Archibald enrolled in a certificate program in Business Office, Administration at the West Boylston, Massachusetts campus of Salter College. She enrolled in 2009 and graduated in 2010.

280. Salter is a for-profit school with campuses in Massachusetts and is owned by Premier Education Group.

281. Salter has been the subject of a number of investigations. For example, the Attorney General of Massachusetts filed a complaint against Salter because the school made significant misrepresentations to students during the enrollment process. The school settled the charges in 2014 for $3.75 million.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

282. Ms. Archibald first learned about Salter from a television advertisement touting Salter's teachers and promising a fulfilling career.

283. At the time of enrollment, Salter made a number of misrepresentations to Ms. Archibald. As she detailed in her borrower defense, representatives of Salter:

a. Said the school had connections with the University of Massachusetts and other medical facilities and that students "immediately" got internships and employment after completion. Similarly, representatives said that the school had a connection with the courthouse and that they could "guarantee" Ms. Archibald a job and internship or externship there. In reality, Salter lacked any such connections. When Ms. Archibald called the courthouse, she learned that there was no connection or internship or externship program with Salter;

b. Promised Ms. Archibald that students immediately got internships and employment after graduation, and told her that she "just had to keep good grades" to get a job. However, even though Ms. Archibald was on the Dean's list the entire time she was at the school and graduated with honors, she never found employment in the field;

c. Showed Ms. Archibald false job placement statistics;

d. Guaranteed career placement assistance, even though the school only sent her job advertisements from monster.com and other commercial sites. And, when Ms. Archibald went to a job fair at Salter, the employers were places like Burger King and Pizza Hut; and,

e. Told Ms. Archibald that because of her financial situation—she was receiving public assistance—the majority of her schooling would be covered by financial aid and grants and, if she was to take out a loan, it would be at most $300. The school

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

then took out a loan for Ms. Archibald without her signature, knowledge, or permission.

284. To attend the program, Ms. Archibald borrowed over $20,000 in federal Direct Loans. She also received over $7,000 in Pell grants.

285. Although Ms. Archibald graduated from Salter with honors and was on the Dean's list, she has never found employment in her field of study.

286. Ms. Archibald now works as a Principal Clerk for the Worcester Housing Authority and attends school at Worcester State. She wants to go to law school.

287. In 2015, Ms. Archibald defaulted on her federal student loans. She rehabilitated them in 2016.

288. After Ms. Archibald had already started making rehabilitation payments, the Department seized her tax refund in 2016 in the amount of $2,416; this was money Ms. Archibald needed to support her five children.

289. In February 2016, Ms. Archibald asserted her borrower defense to the Department.

290. To date, the Department has neither granted nor denied Ms. Archibald's borrower defense.

291. Ms. Archibald cannot financially plan for her future because of the uncertainty of her debt.

292. For example, she cannot spend extra money on her family or plan for retirement because she does not know if she will need the money for the loans.

293. Similarly, the Department's inaction harms her credit. Ms. Archibald applied to approximately 10 different banks for a car loan, but was denied every time because of her debt-to-income ratio. When she eventually secured a loan, the price was significantly higher than it would have otherwise been without the Salter-related debt.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

294. Although Ms. Archibald is back in school, she is paying out of pocket and stretching her family's finances. She does not want to borrow student loans while her Salter loans remain in limbo.

295. And, although Ms. Archibald dreams of going to law school, she will not do so until she can pay out of pocket because of the uncertainty of her Salter debt and her general mistrust of the Department.

296. Ms. Archibald has also suffered significant anxiety while waiting for resolution of her borrower defense application. In the first year after her submission, she was highly anxious and particularly worried that she would never be able to fix her credit. Now, the Department's inaction has left her feeling numb.

297. Because the Department refuses to decide her borrower defense, Ms. Archibald believes that the government considers her, and students like her, insignificant.

### *Daniel Deegan*

298. Daniel Deegan is 42 years old and resides in Mt. Laurel, New Jersey.

299. Mr. Deegan obtained an undergraduate degree in communications at Widener.

300. Mr. Deegan attended the online MBA program at the Keller School of Graduate Management at DeVry University. He enrolled in 2006 and graduated in 2008.

301. At the time of his enrollment in DeVry, Mr. Deegan believed that his MBA would allow him to seek a new job in business or as a manager.

302. DeVry has been the subject of numerous investigations and lawsuits. For example, in 2016, the Federal Trade Commission filed suit against DeVry for misleading students about their employment and income prospects. The school settled with the FTC for $100 million.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

303. According to the Department, as of December 31, 2018, 13,543 former DeVry students have asserted a borrower defense (with 629 assertions specifically regarding the Keller school). The Department has not decided a single one.

304. During enrollment, DeVry made a number of misrepresentations to Mr. Deegan. As he explained in his borrower defense, representatives of DeVry:

    a. Showed Mr. Deegan inflated employment statistics that influenced his choice to enroll;

    b. Promised Mr. Deegan a new job with higher salary after his program, even though he remained in the same job, with the same salary, then was laid off not too long after he received his MBA. He then spent several years without gainful employment, receiving unemployment benefits and COBRA; and

    c. Claimed he would be assisted by DeVry's career service department upon graduation. This never happened. On numerous occasions, Mr. Deegan called the career services department for help, left a voicemail message, and never heard back. In fact, Mr. Deegan never once received a return phone call or any assistance in finding a job.

305. To attend DeVry, Mr. Deegan borrowed approximately $45,475 in FFEL loans. In or around August 2012, he consolidated his loans into federal Direct Loans.

306. After graduating from DeVry, Mr. Deegan remained in the same job that he had before he started. This was true even though he applied, and was denied, for a substantial number of other positions, at a number of different companies.

307. Shortly after graduating, Mr. Deegan was laid off from this position. Notwithstanding his attempts to find a position in management or business, Mr. Deegan has not found a job related to his MBA.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

308. Mr. Deegan now works in IT. His job is unrelated to his field of study at DeVry.

309. In November 2016, Mr. Deegan asserted his borrower defense to the Department.

310. To date, the Department has neither granted nor denied his borrower defense.

311. During the delay, Mr. Deegan's loans have continued to grow. Since his submission, they have accrued approximately $9,000 in interest.

312. The Department's inaction leaves Mr. Deegan unable to financially plan for his future. He does not know what he should be doing with his money (i.e., saving or spending). Mr. Deegan cannot make informed choices about how to save for retirement since he does not know whether he should be investing the money or putting it towards his loans.

313. Mr. Deegan and his partner are also delaying having children given the uncertainty of the debt. They are concerned about their ability to pay for both the loans and childcare.

314. The Department's inaction harms Mr. Deegan's credit. For instance, Mr. Deegan recently applied for a mortgage but was only approved for a loan in amount less than he needed because of his debt-to-income ratio.

315. Mr. Deegan is under acute stress because of the Department's inaction. The debt is always on his mind. He cannot ignore it when everything in his life is on hold pending the Department's borrower defense decision.

316. Because of the Department's inaction, Mr. Deegan has lost confidence that the government has any interest in representing and responding to everyday citizens like himself.

### Samuel Hood

317. Samuel Hood is 33 years old, and resides in Orlando, Florida with his wife and two-year old child.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

318. Mr. Hood enrolled in a BA program for Computer Networking Systems, Information Security Systems, at the Cordova, Tennessee campus of ITT Tech. He enrolled in 2007 and graduated in 2011.

319. ITT was the subject of wide-ranging and significant investigations and oversight by the Department, the Consumer Financial Protection Bureau ("CFPB"), the Securities and Exchange Commission ("SEC"), and multiple attorneys general.

320. In September 2016, the school filed for bankruptcy. The Department filed a Proof of Claim against ITT's bankruptcy estate for $230,518,488.49 plus unliquidated amounts. The Department based this claim, in part, on its estimated liabilities arising from the anticipated grant of borrower-defense discharges for former ITT students.

321. According to the Department, as of December 31, 2018, the Department had received 19,213 borrower defenses from former ITT students. It has decided just 33.

322. Mr. Hood was particularly interested in ITT because it offered night classes. This allowed him to work at FedEx during the day and attend ITT at night.

323. During enrollment, representatives of ITT made a number of misrepresentations. Representatives:

   a. Falsely told him that he would find a job in his field of study, even though the school only provided opportunities for positions outside of his area of study;

   b. Promised that he would make a sufficient income to cover any loans that he borrowed, even though this was not true;

   c. Promised job placement assistance that never materialized; and,

   d. Promised that his credits would transfer. In truth, when he tried to transfer his credits to the University of Memphis, he was told that they did not accept credits from ITT.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

324. To attend ITT, Mr. Hood borrowed over $40,000 in FFEL federal loans and received $8,896 in Pell grants. In or around January 2013, he consolidated his loans into Direct Loans.

325. Since finishing the program, Mr. Hood has found only one job in his field of study. But, the employer cut Mr. Hood's hours almost immediately after he started. This made it impossible for Mr. Hood to keep the job and support himself.

326. Since then, Mr. Hood has taken ITT off of his resume because it has limited his employment prospects. At least one potential employer called ITT "trash" during an interview.

327. Mr. Hood now works as a field engineer in a job unrelated to his field of study.

328. In January 2018, Mr. Hood asserted his borrower defense to the Department. Because he did not receive confirmation or correspondence from the Department, Mr. Hood resubmitted his borrower defense in or around February 2019.

329. The Department has neither granted nor denied Mr. Hood's borrower defense.

330. Since submitting his borrower defense, Mr. Hood's loans continue to grow.

331. Mr. Hood's credit is harmed by the debt and the delay. For example, although Mr. Hood was able to obtain a mortgage for a home (after several rejections), the bank charged him a significantly higher interest rate than it would have if he did not have student loan debt.

332. Mr. Hood has been unable to purchase a car with traditional financing because of his student loan debt. Instead, he relied on a family friend for assistance.

333. Mr. Hood is interested in returning to school, to a program that will actually allow him to learn valuable skills, but cannot do so during this limbo. Instead, he has put a hold on all major professional decisions while the debt hangs over him.

334. Mr. Hood thinks about his debt every day. The Department's inaction exacerbates the stress that the debt already causes.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

335. Because of the Department's inaction, Mr. Hood doubts that the Department will protect students like him.

### *Alicia Davis*

336. Alicia Davis is 36 years old and resides in Orlando, Florida.

337. Ms. Davis attended the BA Criminal Justice Program online at Florida Metropolitan University (FMU). While Ms. Davis was attending FMU, Corinthian purchased it and re-named it Everest. Ms. Davis was enrolled in the program from 2006 until 2008.

338. After leaving the program, Ms. Davis earned her BA from Valencia Community College and a masters degree from the University of Central Florida. Her credits from Corinthian did not transfer to either school.

339. During her enrollment, Corinthian made a number of misrepresentations to Ms. Davis. As she explained in her borrower defense assertion to the Department, representatives of FMU/Corinthian:

a. Promised her that she would be able to get a job "anywhere" with the degree, and specifically told her that she could get a job as a crime scene investigator, hearkening to the television series "CSI," on the basis of a degree from the Criminal Justice program alone, which was false;

b. Told Ms. Davis that she would earn $35,000 annually, which proved to be false;

c. Assured Ms. Davis that she would have "no problem" transferring credits. In truth, she was unable to transfer a single credit to Valencia Community College or University of Central Florida, and she had to start from scratch;

d. Pressured her to enroll; and

e. Lied about the cost of the program, stating that the program would be covered by Pell Grants, and the remaining amount would be covered by scholarships the school

50

offered. Ms. Davis was unaware that she was agreeing to borrow and repay federal

loans when she filled out the paperwork provided by the financial aid office.

340. To attend FMU/Corinthian, Ms. Davis borrowed approximately $22,350 in FFEL loans.

She also received approximately $5,357 in Pell grants for her time at Corinthian.

341. Ms. Davis had to borrow additional student loans to complete her education after she left

Corinthian and started from scratch.

342. Ms. Davis currently works in law enforcement as a Crime Analyst. She was able to get

this job because of her masters degree; she got this job in spite of her Corinthian experience. She

did not include FMU/Corinthian on her resume and did not discuss it during her interview.

343. Ms. Davis asserted her borrower defense in April 2015. Because the Department did not

say anything in response, she re-filed it in June 2016.

344. Upon information and belief, the Department's memorandum stating that former students

of Corinthian who were guaranteed employment by Corinthian had established a borrower defense

applies to Ms. Davis, and therefore she has established her borrower defense.

345. Upon information and belief, the Department's memorandum stating that former students

of Corinthian who were promised that their credits would transfer to a different school had

established a borrower defense applies to Ms. Davis, and therefore she has established her

borrower defense.

346. The Department has not granted her borrower defense, provided her notice of a decision,

or discharged her debt.

347. Since she filed her borrower defense, Ms. Davis' loans continue to grow. She now owes

approximately $25,775 in principal on her FMU/Corinthian loans.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

348. Ms. Davis defaulted on her FMU/Corinthian loans in or around February 2016. The Department sent her many notices of threatened wage garnishment and tax offset, even after she asserted her borrower defense.

349. The Department's refusal to decide Ms. Davis' claim has compounded the harm to her credit. For instance, Ms. Davis has tried to refinance her credit card debt, but has been unable to do so because of her debt-to-income ratio and because of the outstanding defaulted loans.

350. It has also limited her ability to get certain jobs. Ms. Davis is interested in applying for a job with the Federal Bureau of Investigation. However, the FBI's website warns that an applicant's credit will be considered in the application process. Ms. Davis is therefore delaying her application until she has more clarity on the status of her Corinthian loans.

351. Even for her current position, she had to explain her credit issues to her employer before she was formally offered the job.

352. Because of the Department's inaction, Ms. Davis has suffered significant anxiety and has sought treatment. She constantly worries about her finances and about possible wage garnishment. She and her husband feel trapped under the debt and its uncertain status.

353. As she explained in her borrower defense: "This experience has ruined me. I cannot fathom how this can happen and that students and taxpayers are the ones who are defrauded. I am a slave to this for the rest of my life with no hopes of having a life with no harassment, threats, court dates, or collections. It depresses me that I am a victim of this school . . . ."

354. Until the Department decides her claim, she cannot close this chapter of her life.

### *Jessica Jacobson*

355. Jessica Jacobson is 35 years old and resides in Lunenburg, Massachusetts.

356. Ms. Jacobson enrolled in the Media Arts and Animation Program at the New England Institute of Art (NEIA) in 2005. She finished the program in 2008.

357. Ms. Jacobson obtained her Associates Degree from Mount Wachusett Community College before she enrolled at NEIA.

358. NEIA, and the other Art Institutes, were the subject of numerous investigations. For instance, the Attorney General of Massachusetts investigated and eventually sued NEIA because the school employed aggressive sales tactics. NEIA also misrepresented the school's selectivity, its job placement rates, its job placement services, and its costs and financial aid. In 2015, NEIA stopped enrolling new students.

359. According to the Department, as of December 31, 2018, approximately 6,284 former students of EDMC (the owner of NEIA) had asserted a borrower defense. The Department has not decided any of them.

360. During her enrollment, the school made a number of misrepresentations to Ms. Jacobson. As she explained in her borrower defense, representatives of NEIA:

    a.  Assured her that NEIA's Media Arts and Animation program would prepare her for a career in visual effects, even though the program focused solely on gaming and animation;

    b.  Told her that NEIA's program was difficult to get into, creating "pressure" and a sense of urgency to apply to NEIA right away even though this was not true;

    c.  Claimed that the school's name had weight in the visual effects industry, and the school and its career services office had exclusive connections, job leads, and networking opportunities in visual effects. The representative said that NEIA would help her through all stages of her job search and most of its graduates got great jobs. In reality, Ms. Jacobson repeatedly reached out to the Career Services Office about getting an internship in visual effects, but was never put in touch with a single

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

employer in visual effects. At most, the school directed Ms. Jacobson to Craigslist with a document entitled "Tips for Applying to a Job from Craigslist;"

    d.  Guaranteed that the average salary of graduates exceeded their debt, even though this was false; and,

    e.  Showed Ms. Jacobson state-of-the-art technology that was purportedly used in classes. In reality, all of Ms. Jacobson's classes used different, obsolete equipment.

361. To attend NEIA, Mr. Jacobson borrowed $67,053 in private loans and approximately $25,000 in federal FFEL student loans.

362. Since attending the program, Ms. Jacobson has never found a job in the field.

363. In spite of her experience at NEIA, Ms. Jacobson is currently working on her own small business.

364. In March 2015, Ms. Jacobson asserted her borrower defense to the Department.

365. The Department has neither granted nor denied Ms. Jacobson's borrower defense.

366. During the Department's inaction, Ms. Jacobson's loans continue to accrue interest. Her federal loans have grown to approximately $38,035.12.

367. The debt and Department's inaction have destroyed Ms. Jacobson's credit and have left her unable to access necessities like a car. For instance, Ms. Jacobson has only secured housing because of her family's assistance.

368. The Department's inaction and her debt impacts Ms. Jacobson's day-to-day life. Because of the uncertainty of her debt, Ms. Jacobson refuses to get married to her long-term partner. He has proposed several times, but she refuses to say yes because of the uncertainty of the debt. She does not want to saddle him with her student loan debt.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

369. The debt and the Department's inaction has harmed Ms. Jacobson's mental health. Over the past few years, Ms. Jacobson has experienced significant depressive episodes attributable to this experience.

370. Given the delay, Ms. Jacobson has lost faith that the Department is going to do the right thing or that it is working to protect students like her.

## CLASS ACTION ALLEGATIONS

371. Named Plaintiffs file this action on behalf of themselves and all other individuals similarly situated. They seek to represent a class (the § 706(1) Class) consisting of:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to the Department, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 17-7106 (N.D. Cal.).

372. Named Plaintiffs Apodaca and Davis also seek to represent a sub-class (the § 706(2) Sub-Class) consisting of:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to the Department, whose applications are addressed by existing Department memoranda establishing borrower defenses, and who have not received notice of their borrower defense decision.

373. The proposed class satisfies the requirements of Rule 23(a) of the Federal Rule of Civil Procedure.

    a. The class is so numerous that joinder of all members is impracticable because, as of December 2018, there are at least 158,110 individuals who are members of the proposed class.

    b. There are questions of law and fact common to the class, including without limitation, whether the Department has a mandatory duty to decide borrower

defense claims and whether the Department's policy of inaction constitutes an unlawful withholding.

c. The claims of Named Plaintiffs are typical of (indeed, they are identical to) the claims of the proposed class. Each plaintiff is experiencing the same deprivation: the absence of any decision on their borrower defense assertion.

d. The Named Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the Class they seek to represent, they have retained counsel who are competent and experienced in APA and class action litigation, and because they intend to prosecute this action vigorously.

e. Named Plaintiffs are represented by attorneys from the Project on Predatory Student Lending of the Legal Services Center of Harvard Law School (the Project) and the Housing and Economic Rights Advocates (HERA). The Project and HERA have, respectively, represented and/or advised numerous former for-profit college students regarding the borrower defense process, and have represented classes of students against the Department of Education. They have knowledge of and familiarity with the relevant law and regulations concerning federal student loans and borrower defense.

374. A class action is superior to other available means for the fair and efficient adjudication of the claims of Named Plaintiffs and the class. Each member has been damaged by reason of the Department's refusal to adjudicate any borrower defense claims.

375. A class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendants' action in refusing to adjudicate borrower defense claims applies generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

the class as a whole. Indeed, a court order requiring the Department to start adjudicating claims, irrespective of how the Department prioritizes them, would resolve each class member's claim.

376. A class is also appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions could create inconsistent or varying adjudications that could establish incompatible standards of conduct for the Department. Similarly, the adjudication of one class member's claims would, as a practical matter, be dispositive of the interests of the other members not party to the adjudication.

## CAUSES OF ACTION

### COUNT 1

*Unlawfully Withheld and Unreasonably Delayed Agency Action – APA § 706(1)*

**(§ 706(1) Class)**

377. Plaintiffs repeat and re-allege the foregoing paragraphs as if full set forth herein.

378. Defendants have violated the APA, 5 U.S.C. § 706(1) because they have refused to grant applications from members of the proposed class.

379. Defendants have violated the APA, 5 U.S.C. § 706(1) because they have refused to deny applications from members of the proposed class.

380. Pursuant to the APA, a court "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

381. Since at least June 2018, the Department has not granted any borrower defense applications from any class member.

382. Since at least May 2018, the Department has not denied any borrower defense application.

383. Over 158,110 claims remain pending.

384. The Department has not brought to conclusion the applications presented to it within a reasonable time, as required by the APA.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

385. Defendants' inaction has harmed and prejudiced Named Plaintiffs and members of the proposed class, including by threatening their health and welfare.

386. The Department has repeatedly invoked the importance of efficiently granting or denying borrower defense claims and has repeatedly declared that it is a top agency priority. Nonetheless, the Department refuses to grant or deny borrower defenses.

387. The Department has acted in repeated bad faith in refusing to grant or deny individual borrower defenses.

388. The Court should declare that the Department has violated the APA and compel the Department to start granting Class Members' individual borrower defense assertions if they are eligible for a borrower defense.

389. The Court should declare that the Department has violated the APA and compel the Department to start denying Class Members' individual borrower defense assertions if they are not eligible for a borrower defense.

## COUNT 2

### *Arbitrary and Capricious Final Agency Action -- APA § 706(2)*

### (§ 706(2) Sub-Class)

390. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

391. Defendants have adopted a policy under which it will not grant any borrower defenses pending the outcome of *Calvillo Manriquez v. DeVos,* No. 17-7016 (N.D. Cal.), a case that involves a subset of former Corinthian students who attended specific programs at specific times.

392. Upon information and belief, FSA was recently ordered to cease granting borrower defense applications because of the litigation.

393. Department officials have also publicly stated, at least four times since June 2018, that the Department cannot and will not grant borrower defenses pending the litigation.

394. This policy of refusing to grant any claims constitutes a final agency action within the meaning of the APA.

395. In *Calvillo Manriquez,* the District Court entered a preliminary injunction preventing the Department from using a partial relief methodology that it created for a subset of Corinthian students "to the extent the Secretary relies upon information provided by the Social Security Administration in violation of the Privacy Act." *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018). The Court further ordered the Department to "cease all efforts to collect debts from Plaintiffs" and other members of the class (which, as noted, comprised a subset of Corinthian students). The Department has appealed this order to the Ninth Circuit.

396.  The Department claims that it cannot grant any borrower defense relief on account of the preliminary injunction. This is a misreading and arbitrary application of the preliminary injunction in *Calvillo Manriquez v. DeVos*.

397. The Court's order does not prevent the Department from fully discharging any borrower's debt. It expressly states that: "Nothing in this Order prohibits the Secretary from fully discharging the loans of any borrower who has successfully completed or who successfully completes an attestation form."

398. Similarly, the injunction, on its face, does not prevent the Department from granting applications from students who attended any school other than Corinthian, or Corinthian students outside of the *Calvillo Manriquez* class.

399. The Department itself has also acknowledged that the methodology enjoined was to be used solely for Corinthian students.

400. In its brief to the Ninth Circuit in *Calvillo Manriquez v. DeVos*, the Department stated that "[t]here are no plans for further disclosures to implement the Rule, and there is no ongoing violation of the Privacy Act to enjoin."  It added, "[t]he data at issue was obtained through a single

59

exchange of information between the Department and the SSA [Social Security Administration]. There is no allegation that in implementing the Rule prospectively, the Department intends to provide additional aggregated earnings information to the Department."

401. This policy is also arbitrary and capricious and not otherwise in accordance with the law because Defendants have a legal obligation to both grant and deny individual borrower defenses. Its refusal to grant borrower defenses is inconsistent with that legal duty.

402. Defendants have further adopted this policy without articulating a satisfactory explanation as to its adoption and without considering the harms its inaction causes to class members, including the approximately 23,900 borrowers whose applications have "been designated approved," but whose applications have not been formally granted.

403. Defendants' policy runs counter to all evidence before it, including that at least some members of the class are entitled to a full discharge of their student loans.

404. The Court should declare that the Department's final agency action is unlawful and vacate its refusal to grant borrower defenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and grant the following relief:

A. Certify the class and sub-class as defined in paragraphs 371-372, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Declare that the Department's refusal to grant individual borrower defense claims submitted by members of the class is unlawful;

C. Declare that the Department's refusal to deny individual borrower defense claims submitted by members of the class is unlawful;

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

D.  Declare that named Plaintiffs and members of the class are entitled to a decision on their pending individual borrower defense assertions;

E.  Vacate the Department's policy of refusing to grant borrower defenses;

F.  Compel the Department to grant class members' individual borrower defense assertions if they are eligible for a borrower defense;

G.  Compel the Department to deny class members' individual borrower defense assertions if they are not eligible for a borrower defense;

H.  Compel the Department to notify class members of their borrower defense decisions;

I.  Order the Department to place class members' loans in stopped collection status until their borrower defense is granted or denied;

J.  Retain jurisdiction as appropriate;

K.  Award reasonable costs and attorneys' fees as authorized by law; and

L.  Grant such further relief as may be just and proper.

Respectfully submitted,

/s/ *Eileen M. Connor*

Joe Jaramillo (SBN 178566)
Natalie Lyons (SBN 293026)
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel: (510) 271-8443
Fax: (510) 280-2448

Eileen M. Connor (SBN 248856)
Toby R. Merrill (*Pro Hac Vice* forthcoming)
Kyra A. Taylor (*Pro Hac Vice* forthcoming)
Joshua D. Rovenger(*Pro Hac Vice* forthcoming)
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF