**EXHIBIT 5**



U.S. Department of Education
Office of Inspector General

# Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process

December 8, 2017
ED-OIG/I04R0003

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

Audit Services

December 8, 2017

TO:        Dr. A. Wayne Johnson
           Chief Operating Officer
           Federal Student Aid

FROM:      Patrick J. Howard
           Assistant Inspector General for Audit

SUBJECT:   Management Information Report, "Review of Federal Student Aid's Borrower Defense to
           Repayment Loan Discharge Process," Control Number ED-OIG/I04R0003

Attached is the subject final management information report that consolidates the results of our review of Federal Student Aid's borrower defense to repayment loan discharge process. We have provided an electronic copy to your audit liaison officer. We received your comments generally agreeing with the recommendations in our draft report.

U.S. Department of Education policy requires that you develop a final corrective action plan within 30 days of the issuance of this report. The corrective action plan should set forth the specific action items and targeted completion dates necessary to implement final corrective actions on the findings and recommendations contained in this final report. Corrective actions that your office proposes and implements will be monitored and tracked through the Department's Audit Accountability and Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is required to report to Congress twice a year on the reports that remain unresolved after 6 months from the date of issuance.

We appreciate your cooperation during this review. If you have any questions, please contact me at (202) 245-6949, or Christopher Gamble at (404) 974-9417.

cc: James F. Manning, Acting Under Secretary

Attachment

# Table of Contents

Results in Brief .................................................................................................................... 1

Introduction ......................................................................................................................... 5

Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student
Loan Borrower Defense Loan Discharge Process .............................................................. 9

Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense
Claim Data ......................................................................................................................... 21

Appendix A. Scope and Methodology ............................................................................... 24

Appendix B. Acronyms and Abbreviations ........................................................................ 29

Appendix C. FSA Comments ............................................................................................. 30

## Results in Brief

### What We Did

The objectives of our review were to (1) determine Federal Student Aid's (FSA) policies and procedures over its Federal student loan borrower defense loan discharge process, (2) determine the documentation FSA maintains to support its borrower defense loan discharge decisions, and (3) determine the outcomes of FSA's borrower defense loan discharge proceedings. We obtained and analyzed the information presented in this report through interviews and documentation requests of FSA's Borrower Defense Unit (BDU) and Business Operations office, U.S. Department of Education's (Department) Office of General Counsel (OGC), and three contractors. Our review covered FSA's borrower defense loan discharge process from the end of June 2016, when the BDU assumed management of the process, through July 31, 2017.

### What We Found

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to reviewing borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with FSA's procedures for: (1) documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met.

We found that FSA established seven categories of claims that qualified for loan discharge based on characteristics that the claims had in common. We also found that FSA maintained support for its borrower defense loan discharge decisions. FSA's Business Operations maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. BDU used this information to make borrower defense claim determinations and maintained documentation. BDU also maintained supporting documentation for the legal memoranda that it relied on for its loan discharge decisions. Specifically, as support for its memoranda to establish the legal basis for borrower defense claims, BDU maintained copies of the factual evidence cited, such as deposition transcripts provided by state attorneys general. However, we found that FSA did not have documentation of an OGC opinion specifically supporting the eligibility of one category of claims for discharge or documenting the legal basis supporting the amount of loan discharges for two categories of claims.

We reviewed a sample of 50 borrower defense claims that BDU approved for loan discharges, consisting of 45 claims submitted by individual borrowers and 5 claims associated with borrowers who attended the American Career Institute. BDU and Business Operations maintained documentation to support the determinations for all 50 claims. For each of the 45 claims submitted by individual borrowers, Business Operations maintained the claim applications, attestations, and other supporting documentation; and BDU maintained spreadsheets containing the claim information and determinations for each claim. For each of the 5 claims associated with borrowers who attended the American Career Institute, BDU maintained the list provided by the Massachusetts Attorney General's office of all students who attended the school. According to documentation FSA provided, of the 50 claims we reviewed, 49 claims resulted in 249 loans discharged or pending discharge.[1] We randomly selected one loan associated with each of these 49 claims and found that each loan's status on FSA's documentation matched information in student loan database. However, for 2 of the 49 loans, we found that although FSA's documentation and student data system showed the loans were pending discharge, another system showed the loans had been discharged on July 17, 2017, and July 25, 2017, respectively. FSA took steps to correct the status of these two loans and put in place system edits to correct this situation for future discharges. On October 13, 2017, we verified that the information for the two loans had been corrected. We also reviewed the only two claims that FSA denied.[2] BDU and Business Operations maintained documentation to support the determinations for both claims.[3]

We found that FSA did not have an adequate information system to manage borrower defense claim data. Specifically, it could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

---

[1] Of the 50 claims we reviewed, 1 claim was associated with a borrower whose loans were already cancelled or paid in full.

[2] Although BDU did not have a process for closing out claims that have been denied, these two claims were handled on an ad hoc basis due to extensive communication associated with the claims, which included many Department and claimant emails and ombudsman involvement.

[3] We also confirmed that the associated loans for both claims were removed from forbearance.

FSA provided the following outcomes (as of July 2017) of its borrower defense loan discharge proceedings. FSA also reported that about $73 million in loans were associated with borrower defense claims approved prior to July 1, 2016, and that about $376 million in loans were associated with borrower defense claims approved between July 1, 2016, and January 20, 2017. The Under Secretary under the previous administration approved 27,986 claims; of these, about 16,000 claims were approved from January 1, 2017, through January 17, 2017.[4] No claims were approved after January 20, 2017. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the outcome data provided by FSA.[5]

**Table 1. FSA's Borrower Defense Outcomes**

| Claims | Before July 1, 2016[a] | July 1, 2016, through January 20, 2017 | After January 20, 2017 | Total |
|---|---|---|---|---|
| Received | 26,603 | 46,274 | 25,991 | 98,868 |
| Approved | 3,787 | 27,986 | 0 | 31,773 |
| Denied | 0 | 0 | 2 | 2 |

[a] This does not include claims received prior to the Special Master's tenure of June 25, 2015, through June 29, 2016.

From January 20, 2017 to July 31, 2017, Business Operations continued to receive borrower defense claims. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. However, the Acting Under Secretary has not approved or denied these claims. According to the Director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval or to continue developing memoranda on additional categories of claims that qualify for discharge because the borrower defense policies are being reviewed with the

---

[4] Source:  Lists of approved claims associated with 10 approval memoranda that the Under Secretary signed in January 2017. These lists include claims that were approved and had loans available for discharge, and approved claims that may not have loans available for discharge.

[5] FSA provided additional data on October 26, 2017; however, we did not have time to review the data and therefore, did not incorporate the data into this report.

change in administrations. While awaiting specific instructions, BDU's contractors summarized allegations made in unique claims. Also, BDU and Business Operations continued to develop a new claims management tool that adds an interface to the borrower defense database. In addition, Business Operations continued to discharge loans, after receiving approval from the Acting Under Secretary in June 2017, that were associated with the 16,000 claims approved[6] before January 20, 2017, and that the new administration agreed to honor.

## What We Recommend

We made several recommendations for FSA to develop, document, and implement policies and procedures over the Federal student loan borrower defense loan discharge process. We also recommended that FSA improve its information system for the borrower defense loan discharge process.

We provided a draft of this report to FSA for comment. FSA generally agreed with the report and recommendations. We include the full text of FSA's comments in Appendix C of this report. FSA also provided technical corrections; we made revisions to the report where appropriate. In response to FSA's request, we provided FSA with a copy of the final report and resolved any concerns about possible privileged material in this report or FSA's comments.

---

[6] These claims were not discharged prior to January 20, 2017.

# Introduction

## Background

### Statute and Regulations Pertaining to Borrower Defense

The Student Loan Reform Act of 1993 (Public Law 103-66) amended the Higher Education Act of 1965 to establish the William D. Ford Federal Direct Loan Program (Direct Loan). Section 455(h) of the Higher Education Act, as amended, required the Secretary to specify in regulation the acts or omissions of a borrower's school that a borrower may assert as a defense to repayment of a Direct Loan, commonly called "borrower defense."

The Department established regulations covering such borrower defenses at 34 CFR § 685.206(c), effective July 1, 1995. The regulations specified that a borrower may assert as a defense against repayment, any act or omission of the borrower's school that would give rise to a cause of action against the school under applicable State law.

In response to the collapse of Corinthian Colleges, Inc., the Department issued revised regulations on borrower defense, which were scheduled to be effective July 1, 2017. These revised regulations established a Federal standard for borrower defense claims. On June 16, 2017, the Department announced a delay in the implementation, until further notice, of the revised borrower defense regulations due to pending litigation. The Department established a rulemaking committee to review and revise the borrower defense regulations. The Department announced that the rulemaking committee would meet from November 2017 through February 2018 to develop proposed borrower defense regulations. On October 24, 2017, the Department announced that it would continue to preserve the regulatory status quo until July 1, 2018, and proposed further delay until July 1, 2019. Until the delay in implementing the 2017 regulations is lifted or new regulations are issued, all claims are subject to the regulations that became effective July 1, 1995.

### Increase in Borrower Defense Claims and Appointment of Special Master

Before 2015, borrowers had made only a handful of borrower defense claims. Claims significantly increased when Corinthian Colleges closed in April 2015 and ITT Technical Institutes closed in September 2016, and thousands of borrowers submitted borrower defense claims to FSA to have their Federal student loans discharged. Because the Department did not have an established infrastructure for accepting, processing, and reviewing large numbers of loan defense claims, in June 2015, the Under Secretary appointed a Special Master to advise the Department on the creation of a borrower defense process. The Department also announced on June 8, 2015, that it would use

existing evidence, where appropriate, to ease borrowers' burden in establishing their eligibility for borrower defense relief: "Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers." The Special Master served as an advisor in the borrower defense claim process from June 24, 2015, through June 23, 2016, after which the FSA Enforcement Unit's BDU took over the process.

Table 2 shows the increase in borrower defense claims over time.

**Table 2. Increase in Borrower Defense Claims**

| Time Period | Number of Claims Received |
|---|---|
| July 1, 1995, through June 24, 2015<br>*(Implementation of Borrower Defense Regulations to Appointment of the Special Master)* | 5 |
| June 25, 2015, through June 29, 2016[a]<br>*(Appointment of Special Master through last Special Master Report)* | 26,603 |
| June 30, 2016, through January 20, 2017<br>*(Formation of BDU through end of the prior administration)* | 46,274 |
| January 21, 2017, to July 24, 2017[b]<br>*(Beginning of current administration through the end of our review period)* | 25,991 |

[a] Source: Special Master Report, June 29, 2016.

[b] The end of our review period was July 31, 2017; however, FSA issued a periodic report of claims received on July 24, 2017. Source: Data from FSA's list of claims.

Of the 26,603 claims FSA received while the Special Master was authorized, 3,787 claims, associated with about $73 million in loans, were approved for full loan discharges during the Special Master period.[7]

---

[7] Source: Special Master Report, June 29, 2016.

## Duties of the Special Master and Team of Attorneys

The Special Master was appointed to advise the Office of the Under Secretary in the creation of a process to evaluate borrower defense claims and interpret State laws. He was to provide advice on legal and administrative procedures for borrower defense claims and train staff to implement the borrower defense loan discharge process. The Special Master provided advisory services as a consultant and did not perform or supervise operating functions.

The Special Master worked with a team of four attorneys within FSA to analyze laws and regulations, review claims, and develop templates for the claims intake and review process; three additional attorneys were added in the spring of 2016. The team of attorneys operated without the support of contractors for the review of claims. The team of attorneys focused its efforts on job placement rate misrepresentation claims related to borrowers who attended the Heald College, Everest, and WyoTech campuses of Corinthian Colleges.

FSA's Business Operations managed the claims intake process, maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. The team of attorneys used this information to make borrower defense claim determinations. The Special Master recommended claims that the Under Secretary should approve for a borrower defense loan discharge. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

## Creation of FSA's Borrower Defense Unit

In late June 2016, the Department completed the transition of borrower defense oversight from the Special Master and the team of attorneys working with him to the Enforcement Unit's BDU. In late June, when the transition from the Special Master to the Enforcement Unit was complete, there were seven full-time BDU attorneys and no contractors. By early November 2016, BDU was staffed with 10 attorneys, a director, and 19 contracted staff from 2 contractors.[8] As of September 2017, BDU had only six contracted staff from the two contractors.

In addition to continuing to process discharges under the memorandum developed prior to the creation of BDU, BDU also developed additional memoranda to justify loan discharges. In addition to job placement rate discharges, BDU focused its efforts on determining whether categories of claims sharing common facts qualified for discharge

---

[8] BDU contracted with Midtown Personnel, Inc. and GCC Technologies, LLC. to review claims.

and then determining whether individual claims qualified for discharge under approved categories. BDU concentrated on processing job placement rate, transfer of credit, and guaranteed employment claims related to borrowers who attended Heald, Everest, and WyoTech campuses of Corinthian Colleges, California campuses of ITT, and American Career Institute—Massachusetts. BDU sent memoranda to the Under Secretary to recommend claims that the Under Secretary should approve for a borrower defense loan discharge; these approval memoranda were signed by the Under Secretary. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

According to its functional statement, BDU issues written decisions on borrower defense claims that constitute the final decision of the Secretary, in collaboration with OGC. In practice, BDU reviewed the claims and then made a recommendation to the Under Secretary on whether the Department should approve claims for loan discharge. The Under Secretary made the decision on whether to accept BDU's recommendation.

### Borrower Defense Loan Discharge Process

Borrowers submitted borrower defense claims for loan discharge to FSA either online, through email, or by mail. Business Operations and its contractor received the borrower defense claims and, as part of the intake process, entered claim data into the borrower defense database and into a spreadsheet that it used to track the status of claims. Then, Business Operations notified loan servicers to place borrowers' loans into forbearance; when a loan is in forbearance, the borrower is not required to make payments but interest continues to accumulate against the outstanding loan balance.[9] BDU and its contractors reviewed claims for eligibility using criteria established in legal memoranda as the basis for approval. BDU and its contractors made claim determinations and performed quality control reviews on the claims. Then BDU recommended claims for approval and the associated loans for discharge to the Under Secretary. The Under Secretary approved the list of claims, and Business Operations notified loan servicers to discharge the borrowers' loans associated with the approved claims. Business Operations also updated the approval status in the database and spreadsheet used to track claims. Servicers updated the National Student Loan Database System (NSLDS) and Business Operations later verified that the loans statuses were discharged in NSLDS.

---

[9] Borrowers can choose not to have their loans placed in forbearance by selecting that option on the borrower defense application.

## Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to the review of borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with the following FSA procedures: (1) consistently documenting the review and approval of the legal memoranda related to borrower defense claims, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for the claims intake, claims review, loan discharge, and claims denial processes. Some of these weaknesses could harm borrowers by negatively affecting their credit reports and increasing the amounts owed by borrowers. For example, if BDU eventually denies a claim, the loan could then be reported as delinquent or in default and accumulated interest could be added to the amount the borrower owed.

According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, Federal agencies are required to establish internal controls. Agencies should design control activities, such as policies and procedures, to achieve objectives and respond to risks. Agencies should document those policies and procedures. Agencies should also document and maintain readily available evidence of all significant transactions and events, such as the results of quality control reviews. In addition, agencies should establish performance measures and indicators, such as timeframes for processing claims.

### Documentation of the Legal Basis for Borrower Defense Claims

We found that the review and approval of the legal memoranda was not consistently documented, that FSA did not have a legal memorandum or other documentation[10] specifically concluding that the job placement rate misrepresentation findings for Everest and WyoTech supported a cause of action under State law that qualified borrowers for a loan discharge, and that FSA did not maintain in its documentation any OGC opinion supporting the amount of loan discharges for job placement rate

---

[10] We refer to "legal memorandum or other documentation" as OGC advice or concurrence can be documented by formal memorandum, less formal writing, or by documenting oral advice.

misrepresentation claims. FSA established seven categories of borrower defense claims that supported a cause of action under applicable State law and thus qualified a borrower for a loan discharge. These included:

1. Heald College job placement rate misrepresentation claims, based on a May 2015 memorandum prepared by the OGC and findings in a fine action letter prepared by FSA's Administrative Actions & Appeals Service Group;

2. Everest and WyoTech job placement rate misrepresentation claims, based on findings in an April 2015 document prepared by FSA's Administrative Actions & Appeals Service Group;

3. Heald College transfer of credit misrepresentation claims, based on an October 2016 memorandum prepared by BDU;

4. Everest and WyoTech transfer of credit misrepresentation claims based on an October 2016 memorandum prepared by BDU;

5. Corinthian Colleges guaranteed employment misrepresentation claims, based on a January 2017 memorandum prepared by BDU;

6. ITT Technical guaranteed employment misrepresentation claims for California campuses, based on a January 2017 memorandum prepared by BDU; and

7. American Career Institute, Massachusetts campuses claims, based on a January 2017 memorandum prepared by BDU.

From January 20, 2017, through July 31, 2017, BDU did not complete or begin preparing any legal memoranda establishing whether additional categories of borrower defense claims qualified for discharge. According to the Director of BDU, the BDU staff has been instructed not to continue developing memoranda on whether additional categories of claims qualify for discharge because the borrower defense policies are being reviewed with the change in administrations.

## Documentation of Review and Approval of Legal Basis

OGC and BDU prepared memoranda to establish the legal basis for borrower defense claims. However, OGC, the Special Master, and BDU did not consistently document review and approval of the legal memoranda.

Specifically, we found the following inconsistencies:

- One memorandum, which also served as an approval memorandum, that BDU attorneys prepared was signed by both the Under Secretary and the Deputy General Counsel for Postsecondary Education.

- Two memoranda that BDU attorneys prepared were signed by only the Deputy General Counsel for Postsecondary Education.

- One memorandum that OGC prepared was unsigned in draft form.

- Two memoranda that BDU attorneys prepared were not signed, but the Deputy General Counsel reviewed and concurred with them.

## No Legal Memorandum for Everest and WyoTech Job Placement Rate Claims

FSA did not have a legal memorandum or other documentation specifically addressing the eligibility for discharge of borrowers affected by job placement rate misrepresentation at Everest and WyoTech. According to the approval memoranda for borrower defense claims concerning the misrepresentation of job placement rates at Heald, Everest, and WyoTech, the Special Master relied on FSA findings that the schools misrepresented job placement rates and the determination by OGC that these misrepresentations violated California unfair competition law.

FSA's documentation included a May 2015 OGC legal memorandum addressing the qualification for borrower defense loan discharges of students who relied on job placement rate misrepresentations by Heald College. This legal memorandum addressed the qualification for discharge of students at Heald College; it did not address the qualification of students at Everest and WyoTech. When approving job placement rate claims for Everest and WyoTech, BDU followed the same practice as the Special Master.

## Legal Basis for Appropriate Relief

FSA did not maintain in its documentation an OGC opinion or other documented advice supporting the amount of the loan discharges for job placement rate misrepresentation claims.

For all of the other claim categories, the legal memoranda developed by the BDU documented the legal justification for the relief to be provided. For these categories, BDU also maintained documentation of OGC concurrence in the appropriate amount of relief.

## Claims Intake Process

FSA's Business Operations implemented an intake process for borrower defense claims in April 2015. FSA contracted with the Missouri Higher Education Loan Authority (MOHELA), one of the Department's loan servicers, to perform the intake for borrower defense claims. Since implementation, the claims intake process was as shown in the following figure.

**Figure 1. Claim Intake Process**



*Note: Borrowers may choose not to place their loans in forbearance.*

Borrowers can submit borrower defense claim applications three ways: online, by postal mail, or by email. Business Operations receives the borrower defense claims either directly from the borrower or via spreadsheets from the MOHELA. For claims received through postal mail, MOHELA reconciled the count of claim envelopes to the accompanying list of claims, scanned the claim documents, and entered the data from the scanned documents into spreadsheets. For online application claims borrowers submitted through the internet portal, MOHELA transferred the claim data from the claim applications to spreadsheets. MOHELA then sent the processed claims (from postal mail and online applications) to Business Operations.

Business Operations imported the MOHELA claim spreadsheets into the borrower defense database, assigned a case number, and ensured that MOHELA included all key elements the borrower provided. Business Operations then used NSLDS to match the borrower's Social Security number and also inputted certain information from NSLDS regarding the borrower's loans, the associated Office of Postsecondary Education Identification for the borrower's school, and loan servicer information.

For claims borrowers submitted through email, Business Operations input the claim into the borrower defense database, assigned a case number, and confirmed the borrowers

provided all the key elements. Business Operations then used NSLDS to obtain and input the same information as described above with the MOHELA processed claims.

Business Operations ran a claims query for all claims on the borrower defense database, which generated a spreadsheet for BDU to review. Business Operations also maintained an online folder for each claimant that stored all their information and documentation. In addition, Business Operations created a spreadsheet for each loan servicer that contained claimants' loan information so that the loan servicers could place the claimant's loans into forbearance whereby no collections would be pursued and no payments would be due for 12 months. If the borrower defense loan discharge process took longer than 10 or 11 months for claimants, Business Operations created a spreadsheet for each loan servicer with the claimants' loan information and requested a 12 month extension to the forbearance.

## Review of Borrower Defense Claims

BDU had policies and procedures for reviewing and making determinations for borrower defense to repayment claims associated with the seven established categories. To be eligible for a Federal loan discharge, the borrower must have

- met the following three eligibility criteria: (1) attended specific schools at specific locations, (2) been enrolled in specific programs of study during specific time periods, and (3) specified in the claim application or attestation form that the school misrepresented information regarding job placement rates, transfer of credit, or guaranteed employment; or

- attended a Massachusetts campus of American Career Institute.

BDU did not implement policies and procedures for reviewing and making determinations on unique claims that do not fit into one of the seven established categories; claims with no common factual bases; or claims for which there was no associated legal memorandum. When borrowers filed a claim that did not fit into the established categories, their loans were placed in forbearance and all collection actions were halted. While in this status, borrowers do not have to make payments, but their debts remains on record and interest continues to accumulate on the loan balances.

From July 1, 2016, through January 20, 2017, BDU reviewed borrower defense claims, made claim determinations, and recommended claims to the Under Secretary for loan discharge. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. All other claims were on hold pending review.

BDU reviewed claims to determine if the borrower qualified under one of the seven established categories. BDU first reviewed whether a claim qualified under the job placement rate categories. If the claim did not qualify under those categories, BDU would review whether the claim qualified under the transfer of credit or guaranteed employment categories. The following sections describe BDU's processes for reviewing claims, according to BDU's written policies and procedures and interviews with BDU attorneys and contracted reviewers.

### Review Process for Job Placement Rate Claims

BDU hired contractors to review borrower defense claims. A contracted reviewer verified key information relating to the claim contained in a spreadsheet and the borrower's claim file that Business Operations provided. The contracted reviewer checked whether the borrower met the three eligibility criteria listed above. If the borrower met all conditions, then the contracted reviewer recommended the claim for approval. If the borrower did not meet all conditions, the contracted reviewer flagged the claim for further review by a BDU attorney. The contracted reviewer generally reviewed batches of about 100 claims per spreadsheet.

Each batch of claims then went through a quality control review. From November 2016 through March 2017, BDU's quality control policy did not specify that all claims in the batch could be selected for a quality control review. From November 2016 through March 2017, the quality control process consisted of two levels of review. The first level of the quality control process varied depending on the experience and past performance of the contracted reviewer who initially reviewed the batch of claims. For experienced contracted reviewers, quality control consisted of spot check reviews performed by another contracted reviewer (generally 20 percent of the claims). These spot check reviews consisted of checking for notations in the spreadsheet that BDU considered to be susceptible to errors. For less experienced contracted reviewers, quality control consisted of claim-by-claim reviews performed by another contracted reviewer (generally five claims at a time), where the contracted quality control reviewer reperformed the review and determined whether the contracted reviewer made the appropriate determination. The contracted reviewer then made any necessary corrections. The contracted quality control reviewer or contracted reviewer sent the spreadsheet of claims to BDU for a second level of quality control review.

After March 2017, the policy for the first level of the quality control changed to require that 20 percent of each contracted reviewer's claims be reviewed and that the contracted quality control reviewer reperform the entire review and make corrections, if necessary. The quality control reviewer then sends the spreadsheet of claims to BDU for a second level of quality control review.

The second level of the quality control review process was established September 2016 and refined through February 2017. A BDU attorney compiled spreadsheets into a single group of about 1,000 claims and performed a quality control review by scanning the claims in the spreadsheet for missing, incomplete, or inconsistent information. The BDU attorney spot checked all the claims. If the BDU attorney found errors, the BDU attorney corrected and documented them and then notified the initial contracted reviewer of the errors. If the BDU attorney found too many errors, the BDU attorney sent the spreadsheet back to the contracted reviewer. BDU's policies did not define how many errors would be considered too many. BDU attorneys used professional judgment to determine whether a spreadsheet had too many errors and should be returned to the contracted reviewer. FSA acknowledged that evidence related to quality control reviews was not readily available because BDU lacked a database for tracking such information. We could not confirm that BDU conducted a second level of review for all claims and could not determine whether all claims were subject to a second level of review. Once the quality control process was completed, the claims that were recommended for approval went through the final approval and discharge process.

### Review Process for Transfer of Credit and Guaranteed Employment Claims

Before reviewing a claim for misrepresentations of transfer of credit and guaranteed employment, a BDU attorney verified that the claim was not eligible for a loan discharge based on job placement rate. If the claim was not eligible for discharge based on the school's misrepresentation of job placement rates, the BDU attorney reviewed the claim based first on the school's misrepresentation of transfer of credit and then on the school's misrepresentation of guaranteed employment. The BDU attorney checked whether the borrower met the three eligibility criteria. If the borrower met all criteria, then the BDU attorney recommended the claim for approval. If the borrower did not meet all criteria and the borrower did not make allegations in other categories, the BDU attorney recommended it for denial.

We did not identify any weaknesses in BDU's quality control process for its review of guaranteed employment and transfer of credit claims. BDU attorneys described the quality control process for the review of claims associated with guaranteed employment and transfer of credit as follows:  After a BDU attorney performed an initial review of the claims and input a claims decision into a spreadsheet, a second BDU attorney reperformed the review, input a claims decision into the spreadsheet, and determined whether the first attorney made the appropriate determination. If the attorneys disagreed on whether the claim should be approved, then a third attorney reperformed the review, input a decision into the spreadsheet, and made a final recommendation. Once the quality control process was complete, the claims that a BDU attorney recommended for approval go through the final approval and discharge process.

### Review Process for American Career Institute Claims

Borrowers who attended the Massachusetts campuses of the American Career Institute were not required to submit a borrower defense claim. Instead, the Massachusetts Attorney General's office provided FSA with a list of all students who attended the school. Using the list of students, Business Operations identified the borrowers' loans that were eligible for discharge. These loans then went through the final approval and discharge process.

### Analysis of Unique Claims

For claims other than those related to the seven established categories for job placement rate, transfer of credit, and guaranteed employment, BDU analyzed claims received to identify common allegations and conducted research to develop a legal basis to establish additional categories of valid borrower defense claims. As of January 20, 2017, BDU had identified additional categories of claims warranting further research. However, this research was placed on hold. Starting January 20, 2017, BDU tasked contractors with summarizing the allegations made in unique claims. BDU has not established any additional categories of valid borrower defense claims since January 20, 2017.

### The Processing of Claims Approved for Discharge and Flagged for Denial

Business Operations had policies and procedures to discharge most loans associated with approved claims under borrower defense. However, as of July 31, 2017, the policies and procedures did not address approved claims with certain characteristics. As a result, the progress of these claims stopped before discharging the associated loans. Similar to the situation with the lack of policies and procedures for reviewing and making determinations on claims for which there was no associated legal memorandum, this weakness of no action on the claims could adversely impact borrowers' credit reports.

Also, BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial, which is a preliminary determination. BDU provided a list of 7,285 claims it had flagged for denial as of July 31, 2017.[11] The Director of BDU told us that because the process for denying claims had not been fully developed, these claims were not submitted to the Acting Under Secretary with a recommendation for

---

[11] According to FSA, a proposed process was agreed upon by the Office of the Under Secretary, the Office of General Counsel, and FSA in August 2017; the process was implemented in September 2017.

denial. Loans associated with the claims flagged for denial remain in forbearance and continue to accumulate interest until FSA denies the claim and notifies the servicer to end forbearance. When forbearance ends, the accumulated interest may be added to the amount the borrower owed. As a result, borrowers may end up owing more than they did before submitting a claim. According to FSA, in September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.

According to Business Operations personnel and its written policies and procedures, the process for discharging Direct Loans approved under borrower defense was as follows.

- BDU notified Business Operations of claims recommended for approval.

- Business Operations used NSLDS to identify loans associated with the claims.

- BDU drafted a memorandum recommending that the Under Secretary approve the loans associated with the claims for discharge.

- After the Under Secretary's approval, BDU notified Business Operations that the loans were approved for discharge.

- Business Operations created a list for each servicer of the loans approved for discharge and sent it to the servicers.

- The servicer discharged the loans.

- Business Operations verified that the loans were discharged by querying NSLDS every 2 weeks.

- Servicers notified borrowers that their loans were discharged.[12]

FSA did not have a process for discharging loans associated with approved claims with the following characteristics:

- the borrower was enrolled in multiple programs and at least one of the programs was eligible for relief under borrower defense;

- the borrower received a loan disbursement after the borrower's Corinthian campus changed ownership;

---

[12] For the first set of discharges of Heald College claims made under the Special Master, FSA (rather than the servicer) notified the borrowers that their loans were discharged.

- the borrower's loan discharge was impacted by a State's statute of limitations; or

- the borrower's loan was a Federal Family Education Loan program loan or a Perkins loan.

## FSA Did Not Establish Timeframes for the Processing of Claims

FSA did not establish timeframes for claims intake, claims review, loan discharge, and claims denial processes. According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, agencies should establish performance measures and indicators, such as timeframes for processing claims.

As part of our review, we tested 50 approved claims. We found the following:

- loans associated with 6 claims were discharged within 180 days of receipt;

- loans associated with 25 claims were discharged within 181 through 365 days of receipt;

- loans associated with 11 claims were discharged more than 365 days after receipt;

- loans associated with 7 claims (received by FSA between July 10 2015, and November 15, 2016; 2 claims were approved on December 29, 2016, and 5 were approved on January 17, 2017) have not been discharged as of September 28, 2017; and

- 1 claim did not have any loans requiring discharge.

We also tested the only two claims BDU denied. We found that both claims were denied more than 365 days after FSA received them.

## Recommendations

We recommend that the Chief Operating Officer for FSA—

1. Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.

2. Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge.

3. Ensure consistent documentation of the review and approval of legal memoranda or other findings used to justify discharges.

4. Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement rate misrepresentation rate claims and (2) the amount of relief for all job placement rate misrepresentation claims.

5. Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.

6. Document and maintain readily available evidence for all quality control reviews.

7. Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.

8. Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.

9. Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.

## FSA Comments

FSA generally agreed with the recommendations. In regards to the section titled "Documentation of Review and Approval of Legal Basis," FSA maintained documentation of OGC's approval of the five legal memoranda developed by BDU.  For the job placement rate claims associated with Heald, Everest, and WyoTech, BDU will draft a memorandum documenting OGC's prior advice regarding the legal basis for these borrower defense claims. OIG misunderstood the legal memoranda approval process to require that the Under Secretary sign any legal memorandum concerning borrower defense claims. OIG's confusion was likely due to the fact that one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum.

FSA does not believe that its policies and procedures resulted in harm to the borrowers. In September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.  In addition, OIG incorrectly stated in the report that interest that accrues during forbearance when a borrower files a borrower defense claim is capitalizing; such interest is actually non-capitalizing.

## OIG Response

Our report notes that BDU documented OGC concurrence with the five legal memoranda developed by BDU.  FSA's plans to document OGC's advice regarding the job placement rate claims appear responsive to our recommendation.  However, we did not misunderstand the legal memoranda approval process. Rather, the issue we raise is that the approval of legal memoranda concerning borrower defense claims were not consistently documented: some memoranda were unsigned and other memoranda were signed by different Department officials. We revised the report to note that the one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum. BDU addressed each legal memorandum to the Under Secretary with a recommendation that relief be granted for a category of borrowers. We did not state that the Under Secretary was required to sign legal memoranda concerning borrower defense claims.

The Department's decision to provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed will help reduce harm to borrowers.  Regarding FSA's statement that the forbearances applied are non-capitalizing, borrowers are still harmed if interest accumulates during a period of extended consideration of a borrower defense claim that is denied. We revised our report to describe the treatment of accumulated interest during a forbearance associated with a borrower defense claim in the manner described on FSA's website, specifically, that "interest that accumulated will be added to the amount [the borrower] owed."

# Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data

Since FSA had not received borrower defense claims in significant numbers prior to 2015, FSA did not have an established information system to manage a large volume of claims. The information system that FSA has developed to date is not adequate to manage the claims it has received since 2015.

FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not readily available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

FSA's information system for borrower defense to repayment claims consisted of (1) a database managed by Business Operations containing all of the claimant's application information for the claims received and (2) spreadsheets created by Business Operations and used by BDU contractors and attorneys to review claims and to record the outcomes determined by the BDU. Before January 2017, the database was not updated with any claim outcomes; however, in January 2017, Business Operations began to record in the database a flag indicating all final claim decisions approved by the Under Secretary. The status of other claims remained in the spreadsheets without a process to integrate those statuses back to the database. The statuses of the other claims consist of reviewed and flagged for denial by BDU, reviewed and flagged for approval by BDU, reviewed and pending a decision by BDU, and those that have not been reviewed by BDU. Although FSA does not update the database, Business Operations periodically generates a review ready spreadsheet with a general status[13] of each claim as of a specific point in time. However, when FSA provided us with one of its review ready spreadsheets, a Senior Advisor for Business Operations explained that the statuses may not be accurate because of duplicate claims and changes/updates to the status tracking process over time. As of September 2017, FSA was testing a claims management tool that is intended to allow BDU to list claims by status and report the number of claims by status, school, or allegation.

---

[13] In general, the statuses are approved, pending, and ready for review.

Because of the way that FSA maintained its data, information on the status of loan discharges was not readily available. Consequently, it took FSA at least 3 weeks to produce outcome data on the status of claims. We did not verify the accuracy and completeness of this data. Table 3 presents borrower defense claim outcome data FSA provided and the amount of time it took for FSA to provide us with the data.

**Table 3. Borrower Defense Outcome Data**

| Description | Number of Claims | Number of Days Before FSA Provided the Data |
|---|---|---|
| Claims received through July 24, 2017[a] | 98,868 | 21 days |
| Claims reviewed for determination through July 24, 2017 | 72,842 | 63 days |
| Claims not reviewed for determination as of July 24, 2017 | 26,026 | 63 days |
| Claims approved, with any associated loans discharged as of July 24, 2017 | 26,964 | 69 days |
| Claims approved, with any associated loans pending discharge as of July 24, 2017 | 4,809 | 69 days |
| Claims flagged for approval by BDU, but not yet approved by the Under Secretary as of July 31, 2017 | 11,857 | 29 days |
| Claims flagged for denial by BDU, but not yet denied by the Under Secretary as of July 31, 2017 | 7,285 | 29 days |
| Claims reviewed but no determination has been made by BDU as of July 24, 2017 | 21,927 | 70 days |
| Claims denied as of July 31, 2017 | 2 | N/A (FSA provided this information at the entrance meeting) |

[a] We requested July 31, 2017 data; however, FSA had issued a periodic report of claims received on July 24, 2017.

The U.S. Government Accountability Office's Standards for Internal Control in the Federal Government states that management should design the entity's information system and related control activities to achieve objectives and respond to risks.

Information systems should provide management with quality information. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Management needs quality information to make informed decisions and evaluate the entity's performance in achieving objectives and addressing risks.

Because FSA did not have ready access to current and complete information on borrower defense claims, FSA cannot ensure that the borrower defense process meets its objectives, management may be unable to respond to risks that may arise, and management may be unable to make well-informed business decisions.

Further, FSA uses more than a thousand spreadsheets to track borrower defense claim outcomes, which can potentially result in the loss of data if any of the spreadsheets are misplaced or corrupted. If FSA loses a borrower's claim outcome, FSA may have to reperform a claim review and the borrower may have to wait for an extended duration for a decision on their claim. In addition, if a borrower contacts FSA to request a status update on their claim, FSA may not be able to readily find that information. Finally, because FSA has no controls to prevent or detect problems with the integrity of the outcome data contained in the spreadsheets, FSA is at risk of having data changed erroneously or fraudulently.

## Recommendation

We recommend the Chief Operating Officer for FSA—

1. Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.

### FSA Comments
FSA agreed with the recommendation.

## Appendix A. Scope and Methodology

To achieve our objectives, we performed the following procedures:

1.  Reviewed documentation related to the following:

    a.  FSA's policies and procedures over (1) Business Operations' claims intake process; (2) the review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation; and (3) Business Operations' loan discharge process for approved claims;

    b.  the development, review, and approval of memoranda that provide the legal basis for claim approval;

    c.  BDU's review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation;

    d.  the Special Master's appointment;

    e.  FSA's claims management tool;

    f.  quality control processes associated with FSA's borrower defense loan discharge process, including intake, review of claims, and discharge of approved loans;

    g.  laws, regulations, memoranda of understanding, and decision letters related to the borrower defense loan discharge process; and

    h.  FSA findings related to Corinthian's misrepresentation of job placement rates.

2.  We interviewed the following people to determine FSA's policies related to the borrower defense loan discharge process and areas lacking in policies and procedures related to the borrower defense loan discharge process, and to gain an understanding of procedures related to the borrower defense loan discharge process:

    a.  from FSA's BDU, the Director and attorneys;

    b.  from FSA's Business Operations, a Senior Advisor, Branch Chief and Loan Analyst;

    c.  FSA's Chief Compliance Officer;

    d.   from the Office of General Counsel, Division of Post-Secondary Education attorney;

    e.   from the Department, the Director of Financial Improvement Operations;

    f.   from MOHELA, contractors that perform the claims intake process;

    g.   from Midtown Personnel, Inc., contracted attorneys that review claims;

    h.   from GCC Technologies, LLC., contracted analysts that review claims.

3.   Performed testing on a sample of 50 borrower defense claims that BDU approved for discharge under borrower defense between July 1, 2016, and July 31, 2017, and the only 2 claims that BDU denied for discharge during the same time period, to determine the documentation FSA maintains to support its borrower defense loan discharge decisions.

We held an entrance meeting with FSA on July 31, 2017, and an exit meeting on October 6, 2017.

## Sampling Methodology

We selected random samples of borrower defense claims FSA approved and all claims FSA denied to determine whether FSA maintained documentation to support its approval and denial decisions. In addition, for the selected claims that FSA approved, we randomly selected one loan associated with each claim to determine whether the discharge status in FSA's records matched the loan status in NSLDS. For the two claims that FSA denied, we used NSLDS to verify that the students did not have any loans that were discharged under borrower defense. The results from our testing of approved claims pertain only to the approved borrower defense claims and associated loans we reviewed and should not be projected to the entire universe of approved claims and associated loans.

### Samples of Borrower Defense Claims

FSA provided us with 27,996 claim numbers or borrower names that it had approved for loan discharge under borrower defense from July 1, 2016, through January 20, 2017. The claim numbers and borrower names are associated with the 13 approval memoranda BDU drafted and the Under Secretary signed. We stratified the universe of claim numbers and borrower names into five categories, according to the basis for the approval. The five categories were job placement rate,[14] transfer of credit,[15] Corinthian

---

[14] We combined two of the seven established categories related to job placement rates into one category for sampling purposes.

Colleges guaranteed employment, ITT guaranteed employment, and ACI. We then selected random sample of claim numbers or borrower names, herein referred to as "claims," from each of the five categories, resulting in a selection of 50 claims. Table 4 below shows the number of approved claims for each of the five categories and the sample size we selected for each group. Because FSA had denied only two borrower defense claims between July 2016 and July 2017, we reviewed both claims.

**Table 4. Universes and Sample Sizes of Approved Borrower Defense Claims or Borrower Names**

| Basis for Approval | Universe of Claims | Sample Size of Claims |
|---|---|---|
| Job placement rates | 24,504 | 30 |
| Transfer of Credit | 426 | 5 |
| Guaranteed Employment—Corinthian Colleges | 169 | 5 |
| Guaranteed Employment—ITT Technical Institute | 33 | 5 |
| American Career Institute | 2,864 | 5 |
| **Total** | **27,996** | **50** |

To determine whether FSA maintained documentation to support its approval or denial for all 52 selected claims, we reviewed the following:

1. For the sample of 45 approved job placement rate, transfer of credit, and guaranteed employment claims, we reperformed reviews of the claims and determined (a) whether the approval was documented in the spreadsheet where BDU made the claim determination, (b) the legal basis for the approval, (c) the accuracy of the data in the spreadsheet compared to the supporting documentation, (d) whether the claim contained an attestation form or similar document, (e) whether the file contained documentation to support the approval, (f) whether the borrower was enrolled in a program approved for relief at the approved time and location, (g) whether there was evidence that

---

[15] We combined two of the seven established categories related to transfer of credit into one category for sampling purposes.

the determination spreadsheet containing the claim went through the first level of BDU's quality control process, and (h) the number of days from the date the claim was received to the date the associated loans were discharged.

2. For a sample of five borrowers that attended American Career Institute, we verified that the borrower was included on the list of American Career Institute students provided by the Massachusetts' State Attorney General's office.[16]

3. For the two claims that BDU denied, we tested to determine whether (a) the denial was documented in the claim file, (b) the claim was associated with a legal memorandum as a basis for approval, (c) the reason the claim was denied was documented, (d) the borrower was notified of the denial, (e) the file contained documentation to support the denial determination, (f) the claim included an attestation form or similar document, and (g) whether the borrower was enrolled in a program approved for relief at the approved time and location. In addition, we calculated the number of days from the date the claim was received by FSA to the date of the denial notification letter issued to the borrower.

### Samples of Loans Associated with Selected Borrower Defense Claims

For the 50 sampled claims that FSA approved, 49 of them had a total of 249 loans that were eligible for discharge, according to a list of loans provided by FSA. We randomly selected one loan associated with each of the 49 claims. According to FSA's records the 49 loans were either discharged or pending discharge as of July 31, 2017. We used NSLDS to determine whether the loans' discharge status in FSA's records coincided with the loan status in NSLDS.

For the two claims that FSA denied, there was not a list of loans associated with the claims, so we used NSLDS to determine whether the borrowers had any loans associated with the schools named in their claims. The borrowers had a total of 16 loans. We confirmed in NSLDS that none of the 16 loans had been discharged under borrower defense.

### Use of Computer-Processed Data

We obtained computer-processed data related to outcomes of the borrower defense loan discharge proceedings. Specifically, we obtained lists of claims that FSA

---

[16] American Career Institute borrowers were approved as a group.

- received as of July 24, 2017;

- reviewed as of July 24, 2017;

- did not review as of July 24, 2017;

- denied as of July 31, 2017;

- flagged for denial as of July 31, 2017;

- approved through July 24, 2017, with associated loans; and

- flagged for approval as of July 31, 2017;

- reviewed but no decision made as of July 24, 2017.

As noted in Finding 2, FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the data provided by FSA. However, FSA obtained the outcome data from its borrower defense database, which is FSA's primary system managing borrower defense claims and the main resource for FSA to provide information on the management of such claims. Therefore, we decided to use the borrower defense claims data FSA provided to determine the outcomes of the borrower defense loan discharge proceedings.

## Support for Borrower Defense Loan Discharge Decisions

The only computer-processed data we relied on was the list of denied claims, approved claims, and the list of loans associated with those claims. Although we could not determine the completeness of those lists, we tested both of the denied claims and a sample of the approved claims and the associated loans to determine whether the claim approvals and denials were adequately supported and appropriate under BDU's policies and procedures, and whether the associated loans were discharged or pending discharge. To answer our objective, we reported the data that FSA provided.

We conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency Inspection and Evaluation Standards. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our objectives.

## Appendix B. Acronyms and Abbreviations

| | |
|---|---|
| BDU | Borrower Defense Unit |
| Department | U.S. Department of Education |
| Direct Loan | William D. Ford Federal Direct Loan Program |
| FSA | Federal Student Aid |
| MOHELA | Missouri Higher Education Loan Authority |
| NSLDS | National Student Loan Database System |
| OGC | Office of General Counsel |

## Appendix C. FSA Comments

**DATE:**        November 29, 2017

**TO:**           Christopher Gamble
                   Regional Inspector General for Audit
                   U.S. Department of Education

**FROM:**       A. Wayne Johnson
                   Chief Operating Officer
                   Federal Student Aid

**SUBJECT:**   Response to Draft Review Report, "Federal Student Aid's Borrower Defense to
                   Repayment Loan Discharge Process"
                   Review Control Number ED-OIG/I04N0003

Thank you for the opportunity to review and respond to the Office of Inspector General's Draft Review Report, "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process," (the "Report") (Review Control Number ED-OIG/I04N0003). Federal Student Aid ("FSA") appreciates the review by the Office of Inspector General ("OIG") of the policies, procedures and documentation relating to the borrower defense claims review and loan discharge processes.

As you know, the period of time at issue in this Report begins at the end of June 2016, when FSA's new Enforcement Office ("Enforcement") assumed full management and oversight of the Borrower Defense Unit ("BDU") from the Special Master. At that time, we were expeditiously building processes while also making every effort to respond in a timely manner to the over 27,000 borrower defense claims that had been filed between the closing and sale of campuses owned by Corinthian Colleges, Inc. in early 2015 and the expiration of the Special Master's tenure in June 2016. Predictably, this scenario created a number of challenges. The need to timely perform the work of reviewing and processing claims while also creating and implementing new processes and protocols competed with the delays sometimes inherent in taking the time to fully document in detail the processes and protocols being implemented.

Despite these challenges, we are pleased to note that OIG did not identify any errors in the adjudicated claims, and that the review for each of the sampled claims was properly documented. In addition, OIG found that FSA created policies and procedures for borrower defense that have evolved over time as FSA has continued to refine its processes. While the Report notes that these policies and procedures were not always reduced to writing in formal policy documents, the policies and procedures were consistently communicated and understood throughout the borrower defense program as demonstrated by the absence of errors identified by OIG. FSA understands the importance of documenting all policies and procedures and will continue to improve upon and formally document both new and previously existing processes and protocols.

**Finding 1:  FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process**

We generally agree that policies and procedures always can be improved and, therefore, FSA has continued to refine and strengthen its policies and procedures throughout the period at issue in the Report and continuing. While improvements were needed in the establishment of policies and procedures, we do not believe that the former policies and procedures resulted in harm to the borrowers.

1. Legal Memoranda

We agree that documentation of the review and approval by the Office of the General Counsel ("OGC")[17] of the legal memoranda submitted by the Borrower Defense Unit ("BDU") should be consistent.  With respect to all five categories of approved claims for which the legal framework, review criteria and legal basis for relief were developed by FSA, we consistently maintained written documentation of OGC's approval of the FSA legal memoranda.  The inconsistencies that OIG described by FSA in applying established procedures to document the review and approval of legal memoranda, was a demonstration of the evolution of its approval process over a period of time.

**Summer 2015 through June 2016 – Processes That
Pre-Date FSA Oversight of Claims Review**

As a preliminary matter, the legal framework, review criteria, and legal basis for granting BD claims all were established by the Office of the Under Secretary ("OUS"),  OGC, and the Special Master in 2015 – prior to the establishment of the borrower defense claim review process in FSA. It was OUS, OGC and the Special Master who determined in 2015 that "full relief" (defined as a full discharge of loans associated with the program at issue and a full refund of amounts paid) was appropriate for Heald, Everest and WyoTech borrowers with approved Job Placement Rate ("JPR") claims.

> **Summer and Early Fall 2016 – Enforcement Unit Continued the Review of JPR Claims under the Previously Established Framework and Created a New Approval Process for Groups of "non-JPR" claims based on Legal Memoranda to be Approved by OGC and Approval Memoranda to be Approved by OUS**

---

[17] The Report suggests that OIG misunderstood the legal memoranda approval process to require that OUS sign any legal memorandum that provided the legal framework to approve a particular type of claim. That was not the process.  OUS's approval is found on the claim "Approval Memos," not on the legal memoranda.  OIG's confusion likely is due to the fact that the American Career Institute ("ACI") memo *is* signed by OUS because, as discussed on page 4 below, ACI was a "group discharge" for which the legal memo also <u>was</u> the approval memo that authorized discharge of the loans of ACI Massachusetts borrowers.

The first types of claim reviews originated by FSA were the transfer of credits claims detailed in two legal memoranda. OIG correctly notes that these two memoranda were not signed by OGC. There was no signature block for OGC because that was not the process in Fall 2016. Instead, the memos were discussed in a series of meetings with OUS, OGC and Enforcement, and OGC gave a verbal concurrence in those meetings and also confirmed with a written concurrence via email.

BD attorneys continued review of JPR claims under the same review criteria, legal framework, and relief previously established by OUS, OGC and the Special Master. Enforcement agreed with OGC's legal conclusions that: 1) borrowers who met the criteria required in the Heald and Everest/WyoTech attestation forms were eligible for borrower defense discharges; and 2) that full relief was appropriate.[18] Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos.[19]

**November 2016 - January 2017 – BDU's Approval Process for
Legal Memoranda Evolved**

BDU submitted pre-decisional legal memoranda recommending legal frameworks, review criteria and proposed relief for two new types of non-JPR claims[20] between November 2016 and January 2017. Improving upon the previously established process of obtaining the written concurrence of OGC via email, BDU included a signature block for OGC on the face of each legal memorandum. As OIG correctly notes, each of the two documents was, in fact, signed by OGC's Deputy General Counsel. Consistent with the previously established non-JPR approval processes, the approval of OUS is found on each of the Approval Memos for the claims approved pursuant to said legal memoranda.

**American Career Institute was the First "Group Discharge" Approval and
Therefore had a Different Approval Process**

The American Career Institute ("ACI") memo is different because the nature of the approval was different and first of its kind. ACI was a "group discharge" for which no individual claim applications were required. Accordingly, the usual approval memo (to be executed by OUS) could not be used because there were no application numbers to attach to the memo. Therefore, the legal memo also <u>was</u> the approval memo in that circumstance, and OUS's signature on the document authorized discharge of the loans of all ACI Massachusetts borrowers.

**April 2015 Administrative Actions & Appeals Service Group Memorandum**

---

[18] *See e.g.,* the OGC-approved Guaranteed Employment memo (citing to OGC's previous determination that borrowers should receive full relief, without offset) and the OGC Concurrence re: Transferability Concurrence (appropriate relief is "full discharge of Direct loan debt" and "refund of amounts paid ... subject to the statute of limitations").

[19] From the summer of 2016 through mid-January 2017, Enforcement also met weekly with OGC's Deputy General Counsel and OUS regarding the claims, and there was no uncertainty regarding OGC's legal positions on review criteria, legal framework, or relief.

[20] These were the Corinthian guaranteed employment and ITT guaranteed employment memoranda.

The Report identifies an April 2015 Administrative Actions & Appeals Service Group letter (and specifically, the fact that the letter was signed only by AAASG's director) as evidence that BDU was inconsistent in documenting OGC's approvals of BDU's legal memoranda.  The letter was appropriately signed by the director of AAASG – because it is an AAASG document, and not a legal memorandum drafted by the Special Master or OGC for approval of borrower defense claims.   The reason that the document surfaced in connection with this Report is that it was considered and relied upon in 2015 by OUS and OGC when they published findings regarding misrepresented job placement rates at Corinthian.

2.  Review of Claims

The Report cites as another weakness that "BDU did not have policies and procedures for reviewing and making determinations [regarding] unique claims that do not fit into one of the seven established categories; claims with no common factual basis; or claims for which there was no associated legal memorandum."  Prior to February 2017, these claims were not being processed, and no policies and procedures had been submitted for approval to the prior administration.  However, BDU's proposed protocols for addressing claims that are unique or unsupported by existing legal memos were included in the February 2017 "Borrower Defense Unit Claims Review Protocol" document presented to the landing team.  Shortly thereafter, the Department initiated the Review of Pending Borrower Defense Claims project led by the Borrower Defense Review Panel (the "Review Panel") to make recommendations to the Secretary on how to address pending claims going forward.

3.  Processing of Claims Flagged for Denial

The Report also cites as a weakness that "BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial."   As described above with respect to the review of unique claims, no procedures had been submitted to the previous administration for approval and these claims were not being processed.  In August, OUS, OGC and FSA agreed on a procedure to deny claims.

We also wanted to clarify two other statements in this section.  First, the Report states that "[a]ccording to the Director of BDU, FSA is currently considering providing relief to borrowers for interest accrued [after the claim is pending for one year]." We wanted to clarify that the Director stated that the Department (not specifically FSA) was considering the interest credit; Department leadership made that decision.

**Harm to Borrowers**

FSA takes issue with OIG's conclusion that weaknesses in the processes may have harmed borrowers. The Report fails to recognize that the change in administrations necessarily required time for the Secretary and Acting Under Secretary and their staffs to familiarize themselves with the history of the borrower defense claim review process in order to determine and advise FSA as to any policy changes that would be made.  To that end, in March 2017, Department leadership

created the aforementioned Review Panel to make recommendations,[21] and in May 2017, based on the Panel's recommendations, the Secretary determined that the claims already approved prior to January 20, 2017 would be processed. The panel's work also laid the foundation to approve new claims. Additionally, a denial process now has been approved.[22]

The Department recognizes that the interest on pending claims has continued to accrue and, therefore, the Department has authorized an interest credit for borrowers whose claims are adjudicated and denied more than one year after submittal of the claim.  We also note that the Report in three different places inaccurately states that the borrowers with pending claims will be harmed because their accrued interest will be capitalized.   The forbearance applied when a borrower files a borrower defense claim is non-capitalizing.

**Recommendation 1**: **Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.**

We agree with this recommendation. Pursuant to OUS's May 4, 2017 memorandum to the Secretary, OUS and the Chief Financial Officer's Internal Controls Unit ("CFOICU") are working with FSA to "develop interim procedures" to review claims. We have been working to implement those processes and protocols with respect to the seven established categories so that the review, approval and discharge processes for these categories of claims may resume as soon as possible.

With respect to the over 11,000 Corinthian claims flagged for approval during this Report period, as publicly stated by the Acting Under Secretary, approval of some of these claims is imminent.

**Recommendation 2**: **Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge**.

We agree with this recommendation.  As with respect to our response to Recommendation 1, we will work with the CFOICU to strengthen BDU's processes and protocols so that the work on these claims can proceed.

---

[21] We want to clarify a statement in the Report regarding the pause in submitting claims for approval and in developing additional memoranda for new categories of claims that qualify for discharge.  Although the Report suggests that the Deputy Chief Enforcement Officer made a decision to stay this work, we wanted to clarify that the Deputy Chief Enforcement Officer actually just communicated to the Director of BDU the guidance and direction provided by OUS and the Review Panel.

[22] As of January 20, 2017, FSA had adjudicated over 40% of the claims received.  While the volume of pending claims has increased significantly since January, once the approval and denial processes are finalized, we anticipate being able to begin processing the currently pending CCI claims very soon.

**Recommendation 3**: **Ensure consistent documentation of the review and approval of legal memorandums or other findings used to justify discharges.**

As previously discussed, FSA has consistently documented OGC's approvals of its legal memoranda and will continue to do so using the same process that was utilized for the Guaranteed Employment legal memoranda unless the CFOICU requires a different process. Additionally, FSA will continue to document OUS's approval (of eligibility) on the Approval Memos unless the CFOICU requires a different process.

**Recommendation 4**:  **Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement misrepresentation rate claims and, (2) the amount of relief for all job placement rate misrepresentation claims.**

Enforcement agrees to document in its "desk book" or standard operating procedures the following regarding claims approved to date: (1) Enforcement's concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal basis and eligibility determinations pursuant to which the claims have been approved to date; and, (2) Enforcement's concurrence with OGC's previously articulated legal conclusions on the appropriate relief for JPR claims.

OGC established the legal framework, review criteria and legal basis for relief for both the Heald and Everest/WyoTech JPR claims – pursuant to which there were three separate sets of approvals and the discharge of the loans of over 3,800 borrowers during the time when claim review was overseen by OUS, OGC and the Special Master.  Enforcement documented its <u>concurrence</u> in each of the Approval Memos that it submitted based on the previously established legal framework, review criteria and legal basis for relief for the JPR claims.

Therefore, regarding the Report's recommendation that BDU seek further "advice" from OGC regarding the eligibility of Everest and WyoTech students who enrolled in programs covered by the Department's published findings (that Everest and WyoTech mispresented the job placement rates for those programs), Enforcement and BDU previously confirmed said advice and applied it during the Report period.  Also, to the extent that the recommendation implies that BDU has to seek written guidance from OGC regarding claim eligibility on every claim,  BDU's existing protocols provide for obtaining OGC's approval on any new types of claims where the legal framework, review criteria and legal basis for relief are developed by BDU.  To bolster the written documentation detailing the legal framework, review criteria and legal basis for relief for the Heald and Everest/WyoTech JPR claims, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal bases and eligibility determinations pursuant to which the claims have been approved to date.

With respect to part (2) of this recommendation, Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos and also is reflected in the Corinthian Guaranteed Employment memo. However, in the interest of ensuring detailed documentation regarding the work performed during the Report period, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions on the appropriate relief for Heald, Everest, and WyoTech JPR claims.

FSA will ensure that OGC's advice in connection with any future relief determinations will be formally documented and incorporated into FSA's existing borrower defense protocols and processes.

**Recommendation 5**: **Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.**

The February 2017 Protocol provides for reviewing and adjudicating claims that are "unique" and/or for which there is no associated legal memorandum. For example, the Protocol states that the "[p]reponderance [of the evidence standard] and thus eligibility is not met when there is a single uncorroborated claim."[23]   We will work with the Department to implement such protocols, so that these claims can be adjudicated by BDU and submitted to OUS and other designated officials for approval or authorization to deny.

**Recommendation 6**:   **Document and maintain readily available evidence for all quality control reviews.**

We agree with this recommendation and concede that evidence relating to BDU reviews and quality control was not "readily available" because BDU lacked a database for tracking such information throughout the Report period. Therefore, accessing this data required pulling it from BDU's over 1,000 Excel spreadsheets. Upon inheriting oversight of the claim reviews in 2016, Enforcement was acutely aware of the need for a claim review system that would store the data, track reviews and changes in claims status, and provide reporting capabilities. As discussed with respect to Finding 2 below, FSA began the process for creating that system in 2016, and as of October 2017, BDU now has an Access claim review platform that records each review. BDU currently is documenting new and adjusted processes and protocols utilizing the claim review platform.

**Recommendation 7**: **Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.**

We agree with this recommendation for establishing documented policies and procedures for discharging loans both generic and character-specific. To that end, for each of the four types of claims referenced, BDU has developed draft policies and procedures that incorporate use of the new review platform discussed in our response to Finding 2. These protocols will be reviewed by CFOICO before final implementation. Additionally, we have initiated Change Request (CR) 4280 (October 2017) which requires the loan servicers to accept any special processing instructions provided by ED. As part of the implementation of that CR, FSA will define the procedures to

---

[23] *See* Protocol at p. 7.

determine which loans require special processing and how the instructions will be provided to the servicers to discharge the loans. It is anticipated that this CR will be implemented at the loan servicers early in CY 2018.

**Recommendation 8**: **Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.**

We agree with this recommendation; it is a fundamental activity critical to quality customer service to ensure that borrowers are aware of the disposition of their claims in a timely and consistent manner. As discussed, a process for obtaining authorization to deny claims has been agreed upon by OUS, OGC and FSA. BDU has begun implementation of the agreed-upon denial process.

Also, an interest credit was approved by OUS in September, and Change Requests (CRs) 4379 (which addresses interest adjustments) and 4280 (see Recommendation 7) have been initiated with anticipated implementation in early CY 2018. Through these CRs, Business Operations will refine its procedures for notifying borrowers of the denial decisions and enhance processes/procedures currently utilized at the servicers for executing denial processing.

**Recommendation 9**: **Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.**

We agree with the recommendation that there should be set timeframes for processing claims from intake to review to final decision and through discharge; further, controls should be in place to ensure that those timeframes are met. Because many processes for review, adjudication and final decision/authorization require work to be performed by OUS and/or OGC, Enforcement will work with OUS and OGC to develop mutually agreeable timelines. Additionally, Business Operations will review all steps in the process to ensure that we have accounted for the various scenarios involved, both generic and as pertains to any school specific considerations. As stated in Recommendation 7, once current procedures have been reviewed for operational accuracy, documented and approved, timeframes for milestone steps will be developed and implemented.

**Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data.**

**Recommendation: Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.**

We agree with this recommendation. Accordingly, we have been working toward the development of a claims management system since the summer of 2016. Because of the timeline for obtaining funding for, and completing the design, development and operationalizing of, a new Claims Management System, we also worked on a parallel track to find short-term alternatives. We recognized the potential problems and limitations noted by OIG regarding the storage of data on Excel spreadsheets, and we therefore worked with U.S. Digital Services (USDS) personnel who made several recommendations and agreed to build an Access review platform for BDU. The

USDS platform, which is now fully functioning, is a short-term solution, but we believe that it achieves the objectives in this recommendation and significantly enhances efficiencies and reporting capabilities.

FSA is further developing the USDS platform to meet new review and processing requirements arising from policy changes and will continue to document these new processes and protocols as they are developed.  Additionally, FSA is in the process of developing new requirements and obtaining funding for a long-term, more robust system.

## Technical Corrections – Appendix A

We have enclosed a list of technical corrections in Appendix A.  We request that the final Report be corrected to accurately reflect these facts.

## Redactions

In the draft Report, OIG discloses attorney-client privileged communications and information and data that are confidential and deliberative, and the Report also includes statements which require the disclosure of attorney-client privileged communications in order to respond.  FSA respectfully requests that OIG confer with FSA, OGC and OUS as to appropriate redactions to the Report and this response so that OIG does not waive privileges and appropriate objections on behalf of the Department.

We appreciate the opportunity to comment on the draft Report.  Please let us know if you have any questions about our comments or need further information.

Enclosure

cc.     Jeffrey Nekrasz, Auditor, Student Financial Assistance Advisory and Assistance Team