# EXHIBIT 10

## QUESTIONS SUBMITTED BY SENATOR

## PATTY MURRAY

### HIRING DELAYS AT THE OFFICE FOR CIVIL RIGHTS

*Question.* Despite Congress increasing appropriations for the Office for Civil Rights (OCR) for fiscal years 2018 and 2019 and this Committee directing OCR to increase the number of full-time equivalent staff, OCR staffing levels have fallen from 579 in fiscal year 2017 to 510 in fiscal year 2019, according to the 1st quarter staffing report submitted by the Department. Right now, staff at OCR handle an unacceptably high 37 cases each, more than double the number 10 years ago.

Why is the Department acting so slowly to hire these needed staff? Have there been any changes to the hiring process from the one followed prior to 2017? If so, what are they? Please provide the timeline for posting job announcements, selecting applicants, and making offers of employment to applicants for all approved hiring actions.

*Answer.* There has been no change in the Department's hiring process, which includes six major steps: Workforce Planning, Classification, Vacancy Development and Posting, Certificate of Eligibles, Interview/Reference Check, and Offer/Onboarding. Each one of the steps has variable components that directly impact the time it takes to hire staff. The Department is devoting contract and federal resources from across the agency to improve the hiring process and reduce the time it takes to on-board staff. However, even after an offer is made and accepted, the security clearance process could take weeks or even months before an employee is cleared to start work.

The Office for Civil Rights (OCR) hired 14 staff members since January 2019. In addition, OCR currently has 89 positions for which interviews are being conducted; 4 individuals that have accepted offers with a start date in April 2019; and 2 outstanding offers. Finally, 13 Position Descriptions are in the Classification stage of hiring. Once the classification is complete, OCR will post announcements that will result in multiple selections nationwide for positions such as Regional Director, Team Leaders, and new FOIA Personnel.

### RESPONSE RATE REGARDING SPECIFIC REQUESTS FROM SENATOR MURRAY

*Question.* After I raised concerns about the lack of a substantive response to my letter to you about the dismissal of the acting Inspector General and noting in my statement concerns about the Department's lack of responsiveness, Secretary DeVos claimed that the Department has responded to 110 of 124 letters I've signed. However, those figures overstate the true response rate because many of the responses do not provide the information I've requested. Please provide the number of specific requests I've made in my letters to which the Department has provided me with the requested information.

*Answer.* The Department has made every reasonable effort to provide substantive and timely responses to your letters and the information you have requested from the Department through these letters, as well as the significant number of follow up requests for information, briefings, and calls with your staff on matters related to your letters. We

### BASIS FOR REQUESTING INCREASED FUNDS FOR CHARTER SCHOOLS AND PLANS TO ADDRESS CHALLENGES

*Question.* The Department of Education requests an increase for the Charter School Program, following media reports that the Department has been unable to disburse all appropriated funding in FY19 due to lack of applicants. Why did the Department request such a sizeable increase in the program when it has not been able to spend down the funds in this program and how does the Department intend to run any future competitions to address longstanding challenges in the charter sector, including in serving students of color and students with disabilities?

*Answer.* The challenge faced by the Department in awarding the full fiscal year 2019 appropriation for the Charter Schools Program (CSP) is largely due to a couple of large states delaying their applications for State Entity grants while constraints in the appropriations language currently prevent the Department from reallocating funds for State Entity grants to areas within the CSP with greater demand. If Congress provides the requested flexibility to redistribute fiscal year 2019 funds to other CSP authorities, including the CSP facilities programs, the Department will be able to award all fiscal year 2019 CSP appropriations. In fiscal year 2020, the Department anticipates that demand for State Entity grants will return to prior-year levels, but it is important to recognize that the Administration's request includes the needed flexibility to direct CSP funds to areas of growing demand, such as facilities grants, thus helping to ensure that the Department will be able to award the full $500 million proposed in the request. Finally, in conducting CSP competitions, the Department will continue to ensure that funds support only schools that comply with the IDEA and Federal civil rights laws, consistent with the program statute's definition of "charter school." Additionally, the Parent and Educator Guide to School Climate Resources provides information to teachers and school leaders on how they can receive support from the Department's two key technical assistance centers dedicated to promoting safe and supportive schools. These centers are the National Center of Safe and Supportive Learning Environments (https://safesupportivelearning.ed.gov), and the Technical Assistance Center on Positive Behavioral Interventions and Supports (www.pbis.org). The Guide includes an appendix of additional resources.

### RESOURCES REQUIRED TO ADDRESS BORROWER DEFENSE BACKLOG

*Question.* Has the Department conducted any analysis of the resources, including staff full-time equivalencies and any contract funding necessary to clear the backlog of pending borrower defense claims, now totaling at least 158,000 from the end of quarter 4 of 2018? If so, please describe how such analysis was conducted and the principal findings of such analysis, including staffing or contracting resources that could be utilized or necessary.

*Answer.* Yes. The Department recently completed a preliminary estimate of the full-time and contractor resources needed to eliminate or substantially reduce the number of pending borrower defense applications. The process included a review of adjudication work flows, as well as platform capabilities and required updates. Additionally, the Department considered potential efficiencies that could be incorporated into the process to reduce the time that borrower defense applications remain pending. Among the principal

findings was the conclusion that existing staff and contractors are insufficient to address the existing applications and, therefore, the Department is in the process of adding full-time and contractor resources. The Department also found that various technology updates are needed to adjudicate applications efficiently. Those updates will be implemented over the next year. Even as staffing adjustments are made, however, the backlog will continue due to our inability to move forward with making determinations of damages since the methodology developed by the Department to conduct this analysis is the subject of a court appeal.

### EFFECT OF PARTIAL RELIEF METHODOLOGY ON PREVIOUSLY APPROVED BORROWER DEFENSE APPLICATIONS

*Question.* How many borrower defense applications have previously been designated approved, but have not yet been formally discharged due to the partial relief methodology announced December 21, 2017?
Answer.  Approximately 23,900.

### RESOURCES REQUIRED TO ISSUE PARTIAL VERSUS FULL DISCHARGE FOR PREVIOUSLY APPROVED BORROWER DEFENSE APPLICATIONS

*Question.*  What resources, including staff full-time equivalencies and any contract funding, does the Department estimate are necessary to provide partial relief to borrowers who attended Corinthian Colleges, Inc. who would otherwise have been eligible for full relief prior the partial relief or discharge formula announced December 21, 2017?
Answer. The Department is considering alternative relief methodologies, and when one is selected, the Department will be able to fully assess the data and personnel needed to implement that methodology.

### RECENT ACTIVITY ON BORROWER DEFENSE APPROVALS, DENIALS, AND FINDINGS

*Question.*  As of March 28, 2019, when was the last time the Department:
a. approved a borrower defense claim?
b. denied a borrower defense claim?
c. developed any findings related to borrower defense claims?
Answer.  a. The last time a borrower defense application was approved was June 12, 2018.
b. The last time a borrower defense application was denied was May 24, 2018. However, the Department has decided to move forward with processing denials while awaiting the court's decisions regarding the methodology to be used for partial relief. Once the Department determines an alternate relief methodology, approved applications processing will begin immediately. Additionally, the Department is completing updates to the new customer engagement platform, which will bring the platform fully into compliance with the 2016 borrower defense regulations and allow the Department to resume processing application denials.

  c. The Department has identified no facts relevant to the review of Corinthian Colleges claims, other than the admissions made by Heald College regarding placement rate falsifications, and has instead relied on the allegations of the California Attorney General and other AGs to adjudicate claims. The Department has similarly made no findings of fraud regarding ITT Tech, which is why from the start the Department recommended to ITT Tech students that they pursue closed school loan forgiveness rather than borrower defense to repayment relief. However, as claims are reviewed they may contain information that leads to new findings.

### STAFF ALLOCATED TO BORROWER DEFENSE ACTIVITY

 *Question.* How many full-time equivalent positions with the primary job function or responsibility of reviewing, or providing analysis of, borrower clams, including attorneys or advisors:
- Were filled with active employees as of January 19, 2017
- Have become vacant since January 20, 2017
- Have been listed with a vacancy announcement by the Department since January 20, 2017
- Have been hired by the Department since January 20, 2017
- Are employed as of the date of the response to this inquiry

 *Answer.* As of January 19, 2017, there were 11 employees in the Borrower Defense Group. Since January 20, 2017, four of those employees voluntarily separated from the Department. As of March 31, 2019, seven employees remain in the Borrower Defense Group, which includes six full-time employees and one part-time employee. Since January 20, 2017, no additional employees have been hired in the Borrower Defense Group. The Department currently is preparing announcements to fill the vacant positions.

### EXTENT OF AUTONOMY AFFORDED TO BORROWER DEFENSE UNIT

 *Question.* Is the Borrower Defense unit at Federal Student Aid empowered to make decisions about whether a borrower qualifies for borrower defense without authorization from senior political appointees? If not, please describe the specific approvals from the rest of Federal Student Aid or the Department that are required.

 Answer. The Borrower Defense group, under the leadership of a Department Official, determines whether a borrower's application is approved and, therefore, whether the borrower is eligible for relief. The amount of relief to be provided is also determined by the Department Official based on the methodology developed by the Department and approved by the Department Official. Senior Department officials may be consulted regarding relief approaches and decisions for approved applications.

### PROGRAM REVIEW AND SCHOOL OVERSIGHT CHANGES REQUIRED TO IMPLEMENT 2016 BORROWER DEFENSE REGULATIONS

 *Question.* How will the program review process, and any other FSA school oversight functions, be modified to implement the 2016 borrower defense regulations?

Borrower Defense Applications by School Group

| School Group | Applications Received | Percent Pending |
|---|---:|---:|
| Corinthian Colleges, Inc. | 113,066 | 50% |
| ITT Educational Services, Inc. | 19,213 | 99% |
| Devry | 13,543 | 100% |
| Apollo Group, Inc (University Of Phoenix) | 8,139 | 100% |
| EDMC | 6,284 | 100% |
| CEC | 5,667 | 100% |
| ACI | 3,011 | 3% |
| Westwood | 2,371 | 100% |
| Graham Holdings Company (Kaplan) | 1,919 | 100% |
| Globe University/Minnesota School Of Business | 1,530 | 100% |
| Dream Center Education Holdings (DCEH) | 1,490 | 100% |
| Education Corporation of America (Willis Stein & Partners III, L.P.) | 1,387 | 100% |
| Bridgepoint Education, Inc. | 962 | 100% |
| Infilaw Holding, LLC | 923 | 100% |
| Marinello School Of Beauty | 806 | 99% |
| Ati Career Training | 739 | 100% |
| Sp/Palm Iec Holdings LLC (United Education Institute) | 616 | 100% |
| Lincoln Technical Institute, Inc. | 584 | 100% |
| Weston Educational, Inc. | 449 | 100% |
| Anthem College | 431 | 100% |

*Note: Pending Numbers are not provided due to a risk of an inadvertent privacy disclosure resulting from small cell sizes.*

**Approvals**

| | |
|---|---:|
| Corinthian Colleges, Inc. | 44987 |
| ACI | 2897 |
| ITT Educational Services, Inc. | 33 |
| All Others | 25 |

Data Source: Customer Engagement Management System