# EXHIBIT 15

## UNITED STATES DEPARTMENT OF EDUCATION

### APPLICATION FOR BORROWER DEFENSE TO LOAN REPAYMENT

FORM APPROVED
OMB NO: 1845-0146
Exp. 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS:** To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school. Once completed, please submit this form and any additional documents you believe will help us review your application by email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 429060, San Francisco, CA 94142.

Fields marked with an asterisk (*) are required for your application to be considered complete.

### SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

*First Name: ▮▮▮

Middle Name:

*Last Name: ▮▮

*Date of Birth: ▮▮▮

*Social Security Number (XXX-XX-XXXX): ▮▮▮

*Telephone Number: ▮▮▮

*Email Address: ▮▮▮

*Street Address: ▮▮▮

*City: ▮▮▮

*State: ▮▮

*Zip Code: ▮▮

*Are you a PARENT who took out a federal loan on behalf of the student? ○ Yes ● No

*If yes, please enter the full name of the student. (Last, First, Middle): _____

*If yes, please enter the student's Social Security Number (XXX-XX-XXXX): _____

### SECTION II: SCHOOL INFORMATION

*School: Everest Institute

Campus (Including on-line campuses for distance education borrowers): Everest Brighton

*Location: City: Brighton   *State: MA

*Enrollment Dates at this School (MM/YY): *FROM: 09/2009   *TO: 06/2010   ☐ Still Enrolled

☐ Check if the enrollment dates are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended:

ED-EN-003.01

| CAMPUS PROGRAM | |
|---|---|
| **\*Program Name or Major** | **Credential** |
| Dental Assisting | Diploma |

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in:

\*Current Status at school listed above: ○ **Attending**   ○ **Withdrew**   ○ **Transferred Out**   ⦿ **Graduated**

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

\*Have you made any other requests to have your Federal loans forgiven (for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)?

○ Yes   ⦿ No

\*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available:

\*Have you made any other requests to recover tuition amounts that you paid to your school (for example, a lawsuit against the school or a claim made to a tuition recovery program?

○ Yes   ⦿ No

\*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available:

## SECTION IV: BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a detailed description of why you believe you are entitled to borrower defense, including the following information:

What the school told you or failed to tell you.

How the school communicated with you, whether in a brochure, online, over the phone, by email or in person.

The name/title or people who you believe misled you (if known).

Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section.  If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

### EMPLOYMENT PROSPECTS

Did the school mislead you (or fail to tell you important information) about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

◉ Yes    ◯ No

If yes, you must provide underlined information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

---

Misrepresenting Employment Prospects. See Affidavit ¶¶ 13, 28, 51, 55, 60. See also Combined Statement Part III, § 5.
Falsely Guaranteeing Job Placement. See Affidavit ¶¶ 20-21, 55, 60. See also Combined Statement Part III, § 6.
Inflating Earning Potential of Graduates. See Affidavit ¶¶ 17-18, 53, 55. See also Combined Statement Part III, § 8.
Misrepresenting Licensure and Certification Opportunities and Requirements. See Affidavit ¶ 24. See also Combined Statement Part III, § 9.


Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

---

*Did you choose to enroll in your school based in part on the issues describe above? ◉ Yes    ◯ No

### PROGRAM COST AND NATURE OF LOANS

Did the school mislead you (or fail to tell you important information) about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

◉ Yes    ◯ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

Misrepresenting Consequences of Student Loan Borrowing. See Affidavit ¶ 33. See also Combined Statement Part III, § 19.
Misrepresenting Borrowers' Right to Choose Their Lenders. See Affidavit ¶ 35. See also Combined Statement Part III, § 21.


Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes    ◯ No

## TRANSFERRING CREDITS

Did the school mislead you (or fail to tell you important information) about transferring your credits from this school to other schools?

⦿ Yes    ◯ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

Misrepresenting Transferability of Credits. See Affidavit ¶¶ 29, 59. See also Combined Statement Part III, § 24.

Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes    ◯ No

## CAREER SERVICES

Did the school mislead you (or fail to tell you important information) about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

⦿ Yes    ◯ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

---

Misrepresenting Job Placement Assistance. See Affidavit ¶¶ 21, 48-50. See also Combined Statement Part III, § 11.
Misrepresenting Industry Connections and Professional Reputation. See Affidavit ¶¶ 25, 52. See also Combined Statement Part III, § 12.

Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

---

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes    ◯ No

## EDUCATIONAL SERVICES

Did the school mislead you (or fail to tell you important information) about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

⦿ Yes    ◯ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

---

Misrepresenting Quality of Instruction. See Affidavit ¶¶ 22, 24. See also Combined Statement Part III, § 13.
Creating an Unsafe Learning Environment. See Affidavit ¶¶ 39-40. See also Combined Statement Part III, § 14.
Misrepresenting Quality of Teachers. See Affidavit ¶¶ 23, 38. See also Combined Statement Part III, § 15.

Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

---

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes    ◯ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you (or fail to tell you important information) about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admittance process?

⦿ Yes   ◯ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

Unfair and Deceptive Recruiter Incentives. See Combined Statement Part III, § 3.

Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes   ◯ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school? Is there some other reason you feel your school misled you? For more information about the basis for borrower defense relief, see StudentAid.ed.gov/borrower-defense.

If yes to any of the above, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

Targeting Women, Mothers, and Students of Color. See Combined Statement Part III, § 25.
Using an Unconscionable Enrollment Contract. See Combined Statement Part III, § 26.
Operating a total sham. See Combined Statement Part III, § 27.

A judgment has already been entered against my school for violations described in this application. In 2016, the Massachusetts Superior Court issued a judgment holding Everest liable for many unfair and deceptive acts in violation of the Massachusetts Consumer Protection Act. See Combined Statement Part II; see also Findings and Judgment, Massachusetts v. Corinthian Colls., Inc., No. 14-1093 (Mass. Super. Ct., Aug. 1, 2016).

Harm
Oppressive Debt. See Affidavit ¶ 63. See also Combined Statement Part IV, A.
Lost Financial Aid Eligibility. See Affidavit ¶ 66. See also Combined Statement Part IV, C.
Emotional Distress. See Affidavit ¶ 65. See also Combined Statement Part IV, E.
Waste of Time and Money. See Affidavit ¶¶ 60, 62-63. See also Combined Statement Part IV, F.

*Did you choose to enroll in your school based in part on the issues describe above? ⦿ Yes   ◯ No

**SECTION V: FORBEARANCE/STOPPED COLLECTIONS**

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds.** Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.ed.gov/borrower-defense.

\*Are you requesting forbearance/stopped collections?

☒ **Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.**

☐ **No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.**

**If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently (as applicable).**

## SECTION VI: CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief -- including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines. I understand that I may be asked to confirm the truthfulness of the statements in this app

*Signatu ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Date: 08/17/2017

*Privacy Act Notice. The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., and 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.*

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF SUFFOLK, ss.

**Affidavit of** ███████

    I, ██████████, state under penalty of perjury that the following is true and correct:

1. My name is ████████. I currently live at █████████████, ██████ ████████

2. I submit this affidavit in support of my defense to repayment to my federal student loans borrowed to attend Everest Institute, located in Brighton, Massachusetts.

3. I attended Everest from approximately September 2009 to June 2010. I graduated with a certificate in Dental Assisting in June 2010.

4. I paid for Everest with approximately $9500 in federal student loans and $4400 in Pell grants.

*Background*

5. I was born in ████ on ██████████.

6. I moved to the United States in 2003.

7. I attended high school in Boston. I graduated from Hyde Park High School in 2006.

8. After high school, I decided I wanted to become a nurse.

9. In 2007, I started an associate degree at Roxbury Community College. My degree was in general studies. I was planning on continuing with a degree in nursing after getting my prerequisites. I attended Roxbury Community College part time.

10. While I took classes at Roxbury Community College, I also worked as a nurse's aide at the Boston Center for Rehabilitation.

11. As a nurse's aide, I earned $10 per hour.

*Everest Recruitment*

12. I heard about Everest from television commercials. I saw the commercials while I was taking classes at community college and working as a nurse's aide.

13. The commercials made it seem like Everest would be a quick way to a better life. The commercials said that Everest graduates got jobs right after they finished. The commercials said "pick up the phone and call."

14. I was interested in Everest because it seemed like a quicker way to a better life. If I could get a well-paying job after just a year at Everest, then I did not want to take the slow path working and going to community college.

15. I called Everest and made an appointment to talk with someone about the school.

16. I met with a recruiter on the Everest campus.

17. The recruiter asked me why I came. I explained my situation to the recruiter. I told him that I needed a better life with better pay. I told him I wanted to earn more than $10 per hour.

18. The recruiter told me that I should do dental assisting at Everest rather than nursing at Roxbury Community College. He said that dental assistants start at $13 per hour.

19. The recruiter said that the dental assisting degree at Everest would be quick.

20. The recruiter said that I would get a job as a dental assistant.

21. He said that "Everest will help you get a job right after you finish." He said Everest would place me in a job.

22. The recruiter said that Everest would give me the skills I needed to be a dental assistant and get a job.

23. The recruiter said, "The teachers know what they are doing."

24. The recruiter told me, "you will get everything you need to pass Everest and the radiology exams from the modules" at Everest.

25. He said that Everest had a good reputation with dentists in the area.

26. I told the recruiter that even if I switched to dental assisting, I might want to go back to school after a while to become a nurse.

27. He said that I could make some money as a dental assistant and then go back to school.

28. The recruiter said that if I went back to school, my experience as a dental assistant would help me in the medical field.

29. He said that if I went back to school, the other school would waive classes if I showed them my dental assisting certificate.

30. I decided to enroll at Everest because the recruiter made it sound like a quick way to a better paying job and a better life. I thought I could make some money and then go back to school for nursing.

2

*Financial Aid*

31. I met with a financial aid person the same day.

32. The financial aid person set up a payment plan for me to pay for Everest using grants and loans.

33. I was worried about the loans. The financial aid person said, "You can tell the loan people how much you can pay them and they will make an arrangement with you."

34. The financial aid person filled out my loan paperwork for me.

35. She did not give me a choice of lenders for my federal student loans.

*Everest*

36. I started classes at Everest in approximately September 2009.

37. I kept working as a nurse's aide while I attended Everest.

38. One of my instructors at Everest did not know what she was doing. She did not explain concepts. Either we got it or not. It felt like learning by myself, without help.

39. It was hard to focus in classes because there were a lot of disruptions. The other students would curse and argue in class.

40. Some students came to class high on drugs. They would be totally checked out and I could tell they were on something.

*Externship*

41. Everest placed me in an externship at Tufts Dental School.

42. My externship really liked me. They gave me excellent reviews on my externship reports.

43. I applied for a full-time position at Tufts while I was an extern. But Tufts never responded to my application.

44. I did not get a job at my externship site.

45. I graduated from Everest in June 2010.

*After Everest*

46. After I graduated, I did not hear from Everest about finding a job at first.

47. I called the career services office at Everest for help finding a job.

3

48. The career services office sent me to one interview at a dental office. I did not get the job.

49. After that one interview, I called career services for more help. No called me back. I called at least four times.

50. Because Everest did not help, I looked for jobs on my own.

51. I applied to over 100 dental assisting jobs on my own.

52. The dental offices I applied to were not excited about Everest students. Most of the people I interviewed with did not even talk about where I went to school. Instead, they avoided the topic. It was strange.

53. Eventually, I got some job offers, but they paid around $9 per hour. I was earning $10 as a nurse's aide at the time.

54. I got one job offer for $10.50 per hour, but it was going to be an hour and a half commute each day, so in the end it made more sense to stay in my old job.

55. I looked for the well-paying dental assisting jobs that the Everest recruiter had talked about for approximately six months. Then I gave up. I realized Everest had lied to me.

56. In approximately 2011, I realized that Everest had lied to me about offering a quicker way to a better life. I started classes at Roxbury Community College again.

57. At Roxbury Community College, I restarted my associate degree in general studies. I started working toward becoming a nurse again.

58. I also kept working as a nurse's aide.

59. When I restarted at Roxbury Community College, I tried to get the school to waive classes because of my dental certificate, like the Everest recruiter said. But the community college refused to recognize any of my classes from Everest. As far as Roxbury Community College cared, it was like I had not gone to Everest at all.

60. I am still working to become a registered nurse.

61. I have never worked in the dental field.

62. Everest was a complete waste of time and money.

63. I could be a nurse by now if Everest had not lied to me. Instead, I have a worthless certificate and almost $10,000 in student loan debt.

64. It makes me angry that Everest charged me so much money for a useless certificate. Meanwhile, I have been able to attend community college on just grants.

4

65. It is really stressful for me to have so much student debt. Especially after paying so much money and not getting any better wages from it.

66. I am worried that I will not be able to continue my education towards becoming a nurse because of the grants and loans I used up to go to Everest.

*Exhibits*

67. Attached as Exhibit 1 is a true and correct copy of the master promissory note for my federal student loans.

68. Attached as Exhibit 2 is a true and correct copy of an externship evaluation report from my externship at Tufts.

69. Attached as Exhibit 3 is a true and correct copy of my certificate from Everest.

70. Attached as Exhibit 4 is a true and correct copy of a recent printout from the National Student Loan Data System that summarizes my federal student loans.

Sworn to under penalties of perjury on 

## STATEMENT OF LAW AND COMMON FACTS IN SUPPORT OF DEFENSE TO REPAYMENT APPLICATION

This document details the rampant misconduct at Everest Institute's two Massachusetts campuses. It incorporates information learned in the course of an extensive investigation by the Project on Predatory Student Lending at the Legal Services Center of Harvard Law School ("Project"), including interviews with over 80 former students of Everest Massachusetts. It also draws on investigations by the Department of Education ("Department"), the Consumer Financial Protection Bureau ("CFPB"), the California Attorney General, and the Massachusetts Attorney General (collectively, the "Enforcement Agencies") that exposed widespread illegal conduct at Everest and its parent company, Corinthian Colleges, Inc. ("Corinthian").

Misconduct permeated every aspect of Everest's business, from recruiting to graduation and beyond. It would be difficult to identify a law or regulation that Everest did not violate. Collectively, those caught up in Everest's scam operation have been lied to, saddled with invalid debt, and left with little to nothing of value.

Under the legal framework described in Section I of this statement, Everest's misconduct entitles former students to loan cancellation. Significant findings have been made based on evidence gathered by various enforcement agencies regarding Everest and Corinthian's misconduct (Section II). These findings are consistent with the results of the Project's investigation and, taken together, create a convincing case that no student of Everest in Massachusetts escaped Everest's illegal behavior (Section III), and the significant harm it inflicted (Section IV). Section V details Everest's relationship with lenders that originated FFEL loans to Everest borrowers. Materials referenced throughout this statement that are not readily available online are contained in the attached appendix ("Appendix").

TABLE OF CONTENTS

I.   **Legal Framework for Loan Cancellation** ........................................................... 1

II.  **Actions and Findings by the Department and Other Enforcement Agencies Trigger Cancellation of Corinthian-Related Debt** ................................................ 2

   A.   Department of Education Finds Corinthian Students Eligible for Complete Loan Cancellation ................................................................................................... 2

   B.   Massachusetts Attorney General Wins Judgment Mandating Full Restitution for Corinthian Loans ......................................................................................... 4

   C.   Consumer Financial Protection Bureau Action Establishes Violations Warranting Loan Cancellation ........................................................................ 5

   D.   California Attorney General Actions Conclude in Findings that Loans Are Invalid .......... 6

III. **Everest's Violations of Massachusetts Law** .................................................... 6

   RECRUITMENT AND ENROLLMENT ........................................................ 8

      1.   False Urgency to Enroll and High-Pressure Sales Tactics ....................... 9
      2.   Unfairly and Deceptively Enrolling Ineligible Students........................... 11
      3.   Unfair and Deceptive Recruiter Incentives............................................... 15
      4.   Paying Student Referral Bonuses ............................................................. 16

   EMPLOYMENT PROSPECTS ................................................................. 17

      5.   Misrepresenting Employment Prospects .................................................. 18
      6.   Falsely Guaranteeing Job Placement ....................................................... 22
      7.   Falsely Claiming Externships Would Lead to Employment ..................... 23
      8.   Inflating Earning Potential of Graduates ................................................. 25
      9.   Misrepresenting Licensure and Certification Opportunities and Requirements........... 28

   CAREER SERVICES ............................................................................. 32

      10.  Misrepresenting Externship Placement Assistance .................................. 33
      11.  Misrepresenting Job Placement Assistance .............................................. 34
      12.  Misrepresenting Industry Connections and Professional Reputation ........... 36

   EDUCATIONAL SERVICES ................................................................... 37

      13.  Misrepresenting the Nature and Quality of Programs ............................. 38
      14.  Creating an Unsafe Learning Environment .............................................. 41
      15.  Misrepresenting Competency of Teachers ............................................... 43
      16.  Inadequate Equipment and Facilities........................................................ 45
      17.  Inappropriate Externships ........................................................................ 46

   PROGRAM COST AND NATURE OF LOANS ............................................ 47

      18.  Deception About Nature and Availability of Student Aid......................... 48
      19.  Misrepresenting Consequences of Student Loan Borrowing .................... 48

20. Unfairly and Deceptively Rushing Financial Aid Process ............................. 51
21. Misrepresenting Borrowers' Right to Choose Their Lenders ......................... 52
22. Misrepresenting Borrowers' Right to Cancel and/or Withdrawal .................. 53
23. Unfair and Deceptive Genesis Loan Program ............................................. 54

TRANSFERABILITY OF CREDITS ................................................................. 57

24. Misrepresenting Transferability of Credits ................................................. 57

EVEREST'S OTHER VIOLATIONS OF STATE LAW .................................. 58

25. Targeting Women, Mothers, and Students of Color ..................................... 59
26. Entering into an Unconscionable Agreement with Students ......................... 62
27. Operating a Total Sham ............................................................................. 63

IV. Harm to Students ........................................................................................... 65

A.   Oppressive Student Loan Debt ..................................................................... 65

B.   Coercive Collection ...................................................................................... 66

C.   Lost Financial Aid Eligibility ...................................................................... 67

D.   Negative Credit Reporting ........................................................................... 68

E.   Emotional Distress ....................................................................................... 69

F.   Waste of Time and Money ............................................................................ 70

V.   Lender Relationships .................................................................................... 71

A.   Contractual borrower defense language entitles FFEL borrowers to relief. ...... 71

B.   Sallie Mae had a lender relationship with Everest. ....................................... 72

1.   Sallie Mae was affiliated with Everest by contract and business arrangement. ........... 73
2.   Sallie Mae provided improper inducement in connection with FFEL loans. ............... 74
3.   Everest referred loan applicants to Sallie Mae. ......................................... 74

C.   Carnegie Student Loans had a lender relationship with Everest. .................... 75

1.   Carnegie originated FFEL loans exclusively though Sallie Mae and thus shared
     Sallie Mae's close relationship with Everest. ............................................. 76
2.   Carnegie shared a business arrangement with Everest. ............................... 76
3.   Carnegie had a referral relationship with Everest. ..................................... 76

D.   The Higher Education Act empowers the Department to cancel Everest loans regardless
     of lender relationship. ................................................................................ 77

VI. Conclusion ..................................................................................................... 77

## I.   Legal Framework for Loan Cancellation

Longstanding federal law and regulation, as well as the language of federal student loan contracts, provide for loan cancellation where a school engages in misconduct of the kind committed by Everest.[1] Congress recognized this "borrower defense" right in the Higher Education Act, *see* 20 U.S.C. § 1087e(h), and the Department has affirmed this right in regulations governing the Direct Loan and Federal Family Educational Loan ("FFEL") programs.

A Direct Loan borrower has the right to "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1).[2] In addition, every Direct Loan contract contains similar language:

> [Y]ou may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done . . . if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law.[3]

FFEL borrowers have the same right. According to regulations governing the FFEL program, a holder of a FFEL loan is "subject to all claims and defenses that the borrower could assert against the school with respect to that loan" if a sufficiently close relationship existed between the school and the lender. 34 C.F.R. § 682.209(g). In addition, since approximately 1994, every FFEL loan has been governed by a master promissory note providing that the borrower is entitled to assert, as a defense to repayment of the loan, "all claims and defenses that the borrower could assert against the school" with respect to the loans.[4]

A borrower defense to repayment claim entitles a student to broad relief including, per Department regulations:
- Immediate and permanent cessation of loan collection;
- Loan discharge;

---

[1] Throughout this document, unless otherwise noted, "Everest" refers to the Everest Institute Chelsea, Massachusetts and the Everest Institute Brighton, Massachusetts campuses. The Brighton campus operated under the name "Bryman Institute" until April 2007. At all relevant times, Corinthian owned and operated both campuses.
[2] The Department promulgated new borrower defense regulations for Direct Loan borrowers in 2016. 81 Fed. Reg. 75,926 (Nov. 1, 2016); 82 Fed. Reg. 6253 (Jan 19, 2017). However, it has delayed implementation of these regulations. 82 Fed. Reg. 27,621 (June 16, 2017). In any event, the terms and conditions of the loans issued to students of Everest are unaffected by the new regulation. *See* 81 Fed. Reg. 75,926, 75,936 (Nov. 1, 2016) ("We cannot apply the new Federal standard retroactively . . . . Loans made before July 1, 2017 are governed by the contractual rights expressed in the existing Direct Loan promissory notes.").
[2] FFEL Master Promissory Note at 7, https://perma.cc/M3CX-X5QS.
[3] Federal Direct Loan Master Promissory Note at 7, https://perma.cc/7A2R-GX5F.
[4] FFEL Master Promissory Note at 7, https://perma.cc/M3CX-X5QS.

- Reimbursement of past payments and collections;
- Removal of negative credit reporting; and
- Restored eligibility for federal student aid.

*See* 34 C.F.R. § 685.206(c)(2).[5] As discussed below, the deceptive and unfair acts perpetrated by Everest against former students form the basis of claims under Massachusetts law and entitle borrowers to relief.

## II.  Actions and Findings by the Department and Other Enforcement Agencies Trigger Cancellation of Corinthian-Related Debt

More than one governmental oversight body has concluded that Corinthian's conduct was not only illegal, but illegal in a manner that militated cancellation of the debt that students incurred in order to attend a Corinthian-operated school or program. This Section summarizes these Enforcement Agencies' findings and actions regarding Corinthian's misconduct and violations of law and consequential loan cancellation.

### A.  Department of Education Finds Corinthian Students Eligible for Complete Loan Cancellation

The Department's investigations and findings about Corinthian's illegal conduct demonstrate that the entire Corinthian system operated in a mode of illegality of the kind that requires loan cancellation. In May 2015, Corinthian closed amidst scandal and filed for bankruptcy.[6] The school's closure was precipitated by an April 2015 action by the Department of Education, finding that Corinthian had engaged in substantial misrepresentation of its job placement rates and levying a $30 million fine against it.[7]

The Department found that Corinthian's substantial misrepresentations were a basis for loan cancellation for tens of thousands of Corinthian borrowers. On June 8, 2015, the Department announced that Corinthian had misstated job placement rates for specific programs such that

---

[5] This Direct Loan regulation applies to FFEL loans as well because, *inter alia*, the Department maintains a general principle of parity in the rights and obligations that flow to borrowers under both the Direct Loan and FFEL loan programs, *see* 20 U.S.C. § 1087e(a)(1) ("Unless otherwise specified in this part, [Direct] loans made to borrowers . . . shall have the same terms, conditions, and benefits . . . as [FFEL] loans"), and Congress has given the Secretary of Education broad power to "compromise, waive, or release any right, title, claim, lien, or demand." 20 U.S.C. § 1082(a)(5)–(6).

[6] Students filed a collective Proof of Claim in the Corinthian bankruptcy alleging, *inter alia*, that all Corinthian campuses misrepresented "placement rates, employment opportunities, earnings of graduates, the nature, character and quality of programs, the transferability of credits, the availability of externships and the nature and availability of financial aid." *See* Ex. A to Order Confirming Debtors' Third Amended and Modified Combined Disclosure Statement and Chapter 11 Plan of Liquidation at 20, *In re Corinthian Colleges, Inc., et al.*, No. 15-10952 (Bankr. D. Del. May 4, 2015), ECF No. 913-2, https://perma.cc/8XNE-8H9K.

[7] *See* Letter from Robin Minor, U.S. Dep't of Educ., to Jack Massimino, Corinthian Colleges, Inc., 10–12 (Apr. 14, 2015), https://perma.cc/J6AQ-38PY.

students borrowing to attend those programs are presumptively entitled to full loan cancellation pursuant to defense to repayment.[8] These findings covered the system of schools operated by Corinthian under the Heald brand name. Within this Corinthian-operated system, the Department found, "evidence of misrepresentation exists for students enrolled in a large majority of programs offered" at the school.[9] On March 25, 2016, the Department of Education expanded the pool of Corinthian students presumptively eligible for defense to repayment, including students who attended Everest Institutes in Massachusetts, at the Everest Chelsea and Brighton campuses.[10] The Department again cited evidence of widespread fraud, including job placement falsification uncovered by its investigation.[11]

To date, the Department has determined that evidence of misrepresentation exists for students enrolled at almost every single campus Corinthian ever operated, making certain borrowers presumptively eligible for loan cancellation based on misrepresentations about job placement rates.[12] The Department has also found that certain Corinthian borrowers are entitled to borrower defense because Corinthian misrepresented that credits from its programs would transfer to other schools and because Corinthian made false guarantees of employment.[13]

---

[8] *See* Press Release, U.S. Dep't of Educ., Fact Sheet: Protecting Students from Abusive Career Colleges: Administration Outlines New Debt Relief Process for Corinthian Colleges' Students (June 8, 2015), https://perma.cc/9PJX-DVQZ.

[9] *Id.*

[10] *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses (Mar. 25, 2016), https://perma.cc/266L-Y7DX. The Department has announced that borrowers who attended Everest Chelsea's programs during the following time periods are presumptively eligible for loan cancellation: Massage Therapy (between July 1, 2011, and September 30, 2014); Medical Assistant (between July 1, 2011, and September 30, 2014); Dental Assistant (between July 1, 2012, and September 30, 2013); Medical Administrative Assistant (between July 1, 2011, and September 30, 2014); and Medical Insurance Billing and Coding (between July 1, 2011, and September 30, 2014). The Department has also announced that borrowers who attended Everest Brighton's programs during the following time periods are presumptively eligible for loan cancellation: Dental Assistant (between July 1, 2010, and September 30, 2011); Massage Therapy (between July 1, 2010, and September 30, 2014); Medical Administrative Assistant (between July 1, 2010, and September 30, 2014); and Medical Assistant (between July 1, 2010, and September 30, 2014). *Id.*

[11] *Id.* For example, in July 2011, Everest published a 72 percent job placement rate for students in the Medical Assisting Program when the actual placement rate was 23 percent. Memorandum in Support of Motion for Summary Judgment at 13, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Dec. 23, 2015), https://perma.cc/95FG-5PBG.

[12] *Id.* The Department's March 25, 2016 announcement identified an additional 91 campuses where such evidence exists, bringing the total to "more than 100" Corinthian campuses. *Id.* At the time of its peak enrollment in 2010, Corinthian operated 105 campuses nationwide.

[13] Press Release, U.S. Dep't of Educ., American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans: Education Department Announces Continued Progress with Borrower Defense and Closed School Loan Discharges (Jan. 13, 2017), https://perma.cc/BNM6-3ASK ("[T]he Department has approved two additional types of borrower defense claims: those involving misrepresentations about the transferability of credits as the basis for debt relief, and those involving C[orinthan]'s false guarantees of employment for graduates.").

### B.  Massachusetts Attorney General Wins Judgment Mandating Full Restitution for Corinthian Loans

On April 3, 2014, the Massachusetts Attorney General filed suit against Corinthian for committing violations of Massachusetts consumer protection law at the two Everest Institutes in Massachusetts ("MA Complaint").[14] The suit alleged that, from at least 2009 onward, the company misrepresented: (1) the urgency of enrollment and the need to enroll immediately in Everest schools, (2) Everest's influence and historical success in finding jobs in the students' fields of study, (3) the employment opportunities available to Everest graduates, (4) the earnings of Everest graduates, (5) the assistance Everest schools provided graduates in obtaining employment in their fields of study, (6) the nature, character, and quality of Everest programs, (7) the transferability of Everest credits, (8) the availability of externships in the students' fields of study, together with the training provided by and employment opportunities accompanying externships, and (9) the nature and availability of financial aid. *See* MA Complaint ¶¶ 38, 120, 126.

The Attorney General filed extensive evidence in support of its lawsuit in its Statement of Undisputed Facts ("MA Statement of Facts"),[15] and established the legal merits of its case in Summary Judgment filings ("MA SJ" & "MA MSJ").[16] On the basis of this undisputed evidence, the Court granted judgment in favor of the Attorney General on August 1, 2016 ("MA Judgment").[17] The Superior Court found Corinthian liable for $67,333,091 in restitution for its violation of Massachusetts consumer protection law. MA Judgment at 5. That amount represents the total of all monies acquired by Everest from all graduates who attended between July 1, 2007 and June 30, 2014. *Id.*

On November 30, 2015, the Massachusetts Attorney General submitted a defense to repayment application to the Department of Education on behalf of each of the approximately 7200 students who attended the Everest Institutes in Massachusetts. This application ("MA Borrower Defense Application") was supported with 2700 pages of investigatory findings, supporting evidence, and statements from former Corinthian students and employees, and requested loan cancellation of all federal student loans issued to Massachusetts students from the time that Corinthian began to

---

[14] Complaint, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Apr. 3, 2014), https://perma.cc/JT5X-SY3K.

[15] *See* Statement of Undisputed Material Facts, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Dec 23, 2015), https://perma.cc/T7D3-3WQ2.

[16] *See* Motion for Summary Judgment, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Dec 23, 2015), https://perma.cc/H2TZ-7PLG; Memorandum in Support of Motion for Summary Judgment, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Dec 23, 2015), https://perma.cc/95FG-5PBG.

[17] *See* Findings and Judgment, *Massachusetts v. Corinthian Colls., Inc.*, No. 14-1093 (Mass. Super. Ct., Aug. 1, 2016), https://perma.cc/M5SJ-WADL.

operate campuses under its Everest Institute brand in 2007 until the schools collapsed in 2015.[18]
In the view of the state's chief law enforcement officer, Everest's former students are "legally
entitled to relief" because an "extensive investigation" of Everest "uncovered a program built on
predation and lies," amounting to "an unrelenting scheme to secure unaffordable federal loans
from vulnerable students, without providing the education, services, or opportunities
promised."[19] According to the Attorney General, "Corinthian amounted to a pervasive violation
of Massachusetts law."[20] This application remains pending.

In a recent court filing, the Attorney General emphasized that her office produced "wide-ranging
evidence of the systematic unfair and deceptive acts and practices that Corinthian committed in
Massachusetts."[21] Thus, the Department "should defer to the findings of the Massachusetts
Superior Court that Plaintiffs were harmed by Corinthian's violation of state law" because the
Attorney General and the Court are the primary adjudicators of the Massachusetts Consumer
Protection Act.[22]

## C.  Consumer Financial Protection Bureau Action Establishes Violations Warranting Loan Cancellation

In 2014, the Consumer Financial Protection Bureau sued Corinthian for violations of the federal
Consumer Financial Protection Act and the Fair Debt Collection Practices Act ("CFPB
Complaint").[23] According to the CFPB, for years, on a nationwide basis, the company induced
prospective students to enroll through false and misleading representations about its graduates'
career opportunities and likelihood of obtaining jobs upon graduation, using falsely inflated job
placement statistics. CFPB Complaint ¶¶ 2–3.

The case ended in a 2015 judgment against Corinthian ("CFPB Judgment").[24] The Court found
that:

> Corinthian misrepresented the availability and the utility of its career services,
> which it told prospective and current students would provide career assistance for
> life, helping them find a job, or improving their resume and interviewing skills. The

---

[18] *See* Press Release, Atty. Gen. of Mass., AG Healey Submits Application to U.S. Department of Education to Cancel Thousands of Loans for Former Corinthian Students (Nov. 30, 2015), https://perma.cc/5AJ2-TVMW.
[19] Cover Letter with Application from Maura Healey, Mass. Atty. Gen., to Arne Duncan, Sec., U.S. Dep't of Educ. 1 (Nov. 30, 2015), https://perma.cc/48XT-X9FN.
[20] *Id.*
[21] *See* Brief of Amicus Curiae Commonwealth of Massachusetts at 3, *Williams v. DeVos*, No. 16-cv-11949 (D. Mass. Sept. 28, 2016), https://perma.cc/4FS6-6KDL.
[22] *Id.* at 12–13.
[23] Complaint, *Consumer Financial Protection Bureau v. Corinthian Colls., Inc.*, No. 14-7194 (N.D. Ill., Sept. 16, 2014), https://perma.cc/U67T-8MEP.
[24] *See* Default Judgment, *Consumer Financial Protection Bureau v. Corinthian Colls., Inc.*, No. 14-7194 (N.D. Ill., Oct. 27, 2015), https://perma.cc/BYU9-P8KU.

actual services provided were limited, such as providing postings already publicly available from services like Craigslist.

CFPB Judgment ¶ 20. These misrepresentations warranted restitution of the entire amount of debt incurred by consumers, as the debts were "wrongfully originated." *Id.* ¶¶ 50–56.

### D. California Attorney General Actions Conclude in Findings that Loans Are Invalid

In 2007 and 2013, the Attorney General of California successfully sued Corinthian for a "persistent pattern of unlawful conduct" in the operation of its schools in California, including Everest College. In 2007, the Attorney General asserted that the company used false and misleading advertisements and statements to induce students to enroll in Corinthian schools, including the use of falsely inflated job placement statistics.[25] The 2007 stipulated judgment prevented Corinthian from enrolling new students in certain programs, cancelled student debt owed directly to the school, and ordered further injunctive provisions related to calculation of job placement rates.[26] Similarly, in a 2013 case by the Attorney General of California against Corinthian, the court made multiple findings of systematic fraud and misrepresentation by Corinthian.[27]

## III. Everest's Violations of Massachusetts Law

Everest committed 27 distinct violations of Massachusetts law that are of the kind determined by the Department to be the basis for loan cancellation.[28] As explained by the Department, in order to trigger loan cancellation, a school's act or omission must not only be illegal under state law, it must also relate to the making of a federal student loan or the educational services for which the loan was provided.[29]

The Massachusetts Consumer Protection Act prohibits all "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). The Act is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights" beyond those recognized at common law. *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000) (quoting *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 772 (Mass. 1975)); *accord Commonwealth v. DeCotis*, 316 N.E.2d 748, 755 n.8

---

[25] Complaint ¶¶ 11, 14, *California v. Corinthian Schools, Inc.*, No. BC374999 (Cal. Super. Ct., L.A. Cnty., July 31, 2007), https://perma.cc/4MKL-TYGL.

[26] *See* Final Judgment ¶¶ 6–8, *California v. Corinthian Schools, Inc.*, No. BC374999 (Cal. Super. Ct., L.A. Cnty., July 31, 2007), https://perma.cc/KXH5-XU4G.

[27] *See* Final Judgment ¶ 14–39, *California v. Heald College, LLC*, No. CGC-13-534793 (Cal. Super. Ct., S.F. Cnty., Mar. 23, 2016), https://perma.cc/EJ77-YX8H.

[28] This section organizes these 27 violations in accordance with each violation's alignment with the categories of misconduct by a school that would give rise to a borrower's defense to repayment of a student loan. *See* U.S. Dep't of Educ., Application for Borrower Defense to Loan Repayment ("Universal Borrower Defense Form"), OMB No. 1845-0146 (Exp. Dec. 31, 2019), https://studentaid.ed.gov/sa/sites/default/files/borrower-defense-application.html.

[29] *See, e.g.,* 81 Fed. Reg. 75,945 (discussing "long-standing interpretation" of borrower defense provision).

(Mass. 1974) ("[The Act] mak[es] conduct unlawful which was not unlawful under the common law or any prior statute.").

The Consumer Protection Act does not define or restrict the definition of "unfair or deceptive acts or practices," because "[t]here is no limit to human inventiveness in this field." *Kattar*, 739 N.E.2d at 257. Indeed, "[t]he purpose of [the Act's] open-ended legislative use of the words 'unfair' and 'deceptive' was to allow for the regulation of future, as-yet-undevised, business practices." *Purity Supreme, Inc. v. Att'y Gen.*, 407 N.E.2d 297, 303 (Mass. 1980). This flexibility permits the Act's concepts of unfairness and deception to take into account "those unexpressed standards of fair dealing which the conscience of the community may progressively develop." *DeCotis*, 316 N.E.2d at 754.

Unfairness includes acts "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [and] (2) immoral, unethical, oppressive, or unscrupulous [acts]." *Gossels v. Fleet Nat'l Bank*, 902 N.E.2d 370, 378 (Mass. 2009) (internal quotation marks and citation omitted). Practices that are unconscionable are also unfair and in violation of the Act. *See DeCotis*, 316 N.E.2d at 754–55. An act or practice may be unfair even if a consumer participates willingly and with full information. *Id.* at 755.

Deception is also defined broadly under the Act. Courts have adopted an outcome-oriented approach to deception, asking whether an act or practice "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Lowell Gas Co. v. Att'y Gen.*, 385 N.E.2d 240, 249 (Mass. 1979). Omissions constitute deception pursuant to the Act if they withhold "any fact . . . which may have influenced a person not to enter into a transaction." *Grossman v. Waltham Chem. Co.*, 436 N.E.2d 1243, 1245 (Mass. App. Ct. 1982). Deception does not require that a defendant have knowledge or intent to deceive. *See Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 486 (Mass. 2004). Moreover, "plaintiffs need not show proof of actual reliance on a misrepresentation" in order for a violation to occur. *Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879, 886 n.12 (Mass. 2008).

The Act expressly authorizes the Attorney General of Massachusetts to promulgate regulations thereunder. *See* Mass. Gen. Laws ch. 93A, § 2(c). These regulations do not limit the scope of the Act, but do identify *per se* violations of the Act. *See* 940 Mass. Code Regs. § 3.00 ("[The Attorney General's regulations are] promulgated pursuant to M.G.L. c. 93A, § 2(c) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices, in violation of M.G.L. c. 93.A, § 2(a). [The regulations are] not intended to be all inclusive as to the types of activities declared unlawful by [the Act.]"). The Attorney General's regulations governing for-profit and occupational schools, codified at 940 Mass. Code Regs. §§ 31.01–.08, apply the Act to for-profit schools, including

7

Everest, in a detailed manner, providing a touchstone for what constitutes unfair or deceptive conduct in the operation of a for-profit school. [30]

Everest violated the Act, as elaborated by the regulations, in the recruitment and enrollment of students, by misrepresenting the employment prospects of graduates, the career services offered, the nature of the educational programs and services, the transferability of credits, among other things. The patterns of illegality established by all law enforcement agencies who have examined Corinthian's operations are consistent with experiences of the Project's clients. Students who ended up enrolled in an Everest campus in Massachusetts report experiencing the same kind of misconduct so frequently that it can be no accident. For example, 95% of former Everest students interviewed by the Project experienced misrepresentations about their employment prospects, and 96% experienced misrepresentations about career services offered at Everest. In addition, 93% of former students interviewed experienced deceptive and unfair practices by Everest related to its educational services, and 95% experienced misconduct related to program cost and student loans. In short, a student could not walk through the doors of Everest Institute without encountering illegal deception or unfair practices.

## RECRUITMENT AND ENROLLMENT

*"[T]ake the first step to your new, rewarding career. But hurry. Make sure you're one of the people . . . who gets a spot. . . ." "LIMITED SPACE AVAILABLE . . . Please call within 7 days. Even if you are not sure, call so we can reserve a 'Pending' spot for you."*

-Everest "Limited Time" Mailers (A.950).

As part of its scheme to generate mass sales of its sham product, Everest employed aggressive and misleading sales tactics to enroll prospective students, in violation of the Massachusetts Consumer Protection Act. Like all businesses operated by Corinthian, a massive amount of Everest's resources were expended on marketing and recruiting. For example, in the year 2010, Corinthian drew in a total of $1.4 billion dollars in federal student aid dollars. It used a quarter of this money not on educational services but on marketing and recruiting.

From these expenditures, Corinthian devised systems of recruiting and marketing that were inherently manipulative and abusive. Everest created a false sense of urgency to enroll, recruited students who did not have the academic preparation to succeed, maintained a hidden incentive

---

[30] In 2014, the Attorney General updated these regulations, which were first promulgated in 1978. *See* 940 Mass. Code Regs. § 31.01. Because the regulations enumerate but do not limit violations of the Consumer Protection Act, *see id.* § 31.02, and because the Act purposefully eschews fixed definitions of unfairness and deception in order to "allow for the regulation of future, as-yet-undevised, business practices," *Purity Supreme, Inc.*, 407 N.E.2d at 304, the regulations identify conduct that was unfair and deceptive regardless of whether it occurred prior to 2014. In other words, the Attorney General's regulations instantiate "standards of fair dealing which the conscience of the community may progressively develop." *DeCotis*, 316 N.E.2d at 755 n.8.

compensation scheme for recruiters, and paid students to refer new prospects. These practices were consistent across all campuses. Recruiters were trained to interact with potential students—in the parlance of Corinthian, "customers"—according to scripts designed by Corinthian. *See* Everest "Admissions Interview Guide" (A.942–49). The careful orchestration of the process used to enroll as many students as possible explains the consistent exposure of Corinthian borrowers to deceptive tactics. For example, the script prompts salespeople to describe themselves as "admissions representatives," even though the school was open enrollment. *Id.* at *1 (A.942). The script prompts salespeople to emphasize that going to a Corinthian school is a direct path to a specific job. *Id.* at *3 (A.942). The script prompts recruiters to emphasize the career assistance that will "begin on day one and continue throughout your experience[.]" *Id.* at *4 (A.945). The script prompts salespeople to downplay the cost and gloss over the consequences of loans, by stating that "an education pays for itself . . . through higher earnings potential and greater advancement opportunities in the employment market." *Id.* at *5 (A.946). The script coaches recruiters to brush past any question about affordability and cost by "[t]reat[ing] any expenses as an investment in [your customer's] mind, not a cost." *Id.* at *6 (A.947).

Corinthian trained its employees who worked in recruiting and financial aid to build up a sense of trust with potential students, and encourage them to "believe you are operating with their best interest at hear[t]." CFPB Complaint ¶ 45. Corinthian targeted students who had "low self esteem," were "isolated" and "stuck," and looking for "quick solutions." *Id.* ¶ 5. Corinthian trained recruiters to identify the vulnerabilities of potential students, and convince them that "enrolling in a program was their best or only chance" to get out desperate circumstances. *Id.* ¶ 45.

These practices were effective at enrolling over 7200 individuals in Massachusetts. The experience of those individuals, uncovered by the Attorney General and the Project, is remarkably consistent, and demonstrates that Everest engaged in the same or similar misconduct with respect to all students it encountered.

### 1.  False Urgency to Enroll and High-Pressure Sales Tactics

Through advertisements and during recruitment, Everest created a false sense of urgency in order to pressure people to enroll on the spot without time to reflect. Everest made incessant recruitment calls to prospective students. One former student received recruitment calls "approximately two times a day." J. Weeks Aff. ¶ 12 (A.479). Another student recalls, "[Everest recruiters] called me every single day and harassed me to get me in." H. Dow Aff. ¶ 10 (A.95). *See also, e.g.*, B. Carter Aff. ¶ 6 (A.36) ("Representatives from Everest . . . called me a lot to try to get me to come in. I felt like they were hounding me."). A former Everest admissions employee explains, "I was instructed to call each prospective student continuously until he or she agreed to come to the campus for an in-person interview." N. Napolitano Aff. ¶ 2 (A.970). *See also* S. Koral Aff. ¶ 2 (A.983) ("As an admissions representative, I was instructed to make

between 100 and 300 phone calls per day to prospective students, often dialing the same number several times."). Everest policy required recruiters to continue calling a prospective student against her will until the student made three written requests for the calls to stop. E. Morrison Aff. ¶ 2 (A.967) (testifying as former Everest Chelsea Admissions Representative).

When prospective students visited an Everest campus, recruiters deceptively told potential students that they had to enroll immediately or risk losing the "opportunity" to secure a place at Everest. Many students were pressured to enroll on the spot. *See, e.g.,* M. Oxidor Aff. ¶ 27 (A.291) ("The admissions representative rushed me to sign up on the spot. She told me that classes started the next week and that I needed to sign up to secure my spot."); J. Perez Aff. ¶ 17 (A.312) ("I was told that if I didn't sign up right away I would not be able to get a job. . . . The admissions representative made it seem like this was a once in a lifetime opportunity."); C. Morales Aff. ¶ 30 (A.266) ("The admissions representative told me . . . I would be missing out if I did not enroll immediately.").

Financial aid representatives played an active role in perpetuating the high pressure environment and fomenting a false sense of urgency. As one former student describes:

> The financial aid representative acted like I had to enroll immediately because the deadline was approaching and the classes were close to being full. The financial aid representative told me if I did not enroll at that particular time I would lose my chance.

S. Griffiths Aff. ¶ 16 (A.166).

Everest's enrollment processes were designed to enroll as many students as possible, as quickly as possible, before prospects learned that Everest was a sham: "When prospective students visited the campus for in-person interviews, the admissions representatives/counselors attempted to enroll them before they left. This was due to the concern that prospective students would change their minds about enrolling if they had more time to think about it." N. Napolitano Aff. ¶ 3 (A.970); *see also* C. Kelly Aff. ¶ 3 (A.958) ("It was known that if the students did not come back within a short period of time, then they were more likely to lose interest or end up at a competitor's school.").

In reality, there was no need for students to enroll "on the spot" because Everest maintained an open enrollment policy and would admit anyone who could be convinced to enroll. This reality was contrary to Everest's corporate-designed marketing and recruitment materials, which fostered the illusion of a selective admissions process. For example, the school called its enrollment agreement an "application" for admission. *See, e.g.*, Everest 2009 Application/Enrollment Agreement at *1 (A.600). And the school's brochures explained:

> All applicants are required to complete a personal interview with an Admissions Representative. Personal interviews enable school administrators to determine an applicant's qualifications for enrollment in a program. Once an application has completed and submitted an Enrollment agreement, the school reviews the information and informs the applicant of its decision.

Bryman Brochure at *4 (A.539). This description is false, because there was no decision at all. According to employee testimony, "Everest was only interested in enrolling as many students as possible." E. Morrison Aff. ¶ 3 (A.967); *accord* N. Napolitano Aff. ¶ 4 (A.962) ("It was Everest's policy to enroll as many students as possible."). As one former student describes it:

> Everest . . . representatives pressured me to sign up right away. They said I would likely miss my chance to get started if I waited to sign up. I only found out later that the school admitted people all the time on a rolling basis.

T. Fontellio Aff. ¶ 10 (A.140). As Ms. Fontellio and many other students discovered, classes were never full and students were frequently enrolled after classes had already started. *See also, e.g.*, S. Rooney Aff. ¶ 43 (A.396) ("Everest constantly added new students to keep the seats full"); MA Statement of Facts ¶ 9 ("New class cohorts started at least once, and sometimes twice, per month, and students were also added to cohorts during the month.").

Everest's false urgency to enroll violated the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act for a school to "represent to students, prospective students, or any other person that enrollment in a particular program is only open or available for a particular period of time or until a date certain when enrollment in the program occurs on a rolling, ongoing, or regular basis." 940 Mass. Code Regs. § 31.04(10). In addition, a school may not "use false advertising or use deceptive language towards students. *See id.* §§ 31.04(1), 31.04(2). Finally, a school may not engage in "high-pressure" sales tactics by initiating communication with a student more than twice a week. *Id.* § 31.06(9). The Massachusetts Attorney General sued Everest for these acts, among others. MA MSJ at 12 (documenting Everest's misrepresentations "concerning the limited space in its programs and the need to enroll immediately"). The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. *See* MA Judgment at 5.

## 2. Unfairly and Deceptively Enrolling Ineligible Students

Everest unfairly and deceptively enrolled ineligible students, in violation of the Massachusetts Consumer Protection Act, by enrolling students who (1) lacked the requisite high school education, (2) lacked English proficiency, and (3) who had criminal backgrounds that would prevent them from gaining employment in the field. Everest then failed to provide support to these students, further depriving them of the purported benefit of enrolling in Everest.

11

*Students Who Lacked High School Diplomas or GEDs*

Everest promised that potential students could enroll without a high school diploma or GED, that Everest would then help these students obtain GEDs, and that they would be successful in their fields of study. Everest did this despite not offering GED programs, while pitching programs purported to lead to employment in fields where high school equivalency is a general prerequisite to employment.

One student recalls a printed advertisement that "said that you didn't need a high school diploma or GED to attend Everest and that they would help you get your GED." C. Riquelme Aff. ¶ 10 (A.365). Other former students recall similar promises in Everest's television commercials. *See, e.g.*, M. Wynter Aff. ¶ 13 (A.499) ("the commercial talked about . . . not needing a GED or high school diploma to enroll"); *see also* J. Curran Aff. ¶ 6 (A.68) ("the ads said something like, no high school diploma, no problem"). These promises attracted prospective students. *See, e.g.*, A. Echevarria Aff. ¶ 24 (A.116) ("I decided to enroll in Everest's Dental Assistant program because I liked the idea of guaranteed job placement without a high school degree or GED."); *see also, e.g.*, J. Curran Aff. ¶ 27 (A.71) ("Everest told me when I signed up that they would help me get my G.E.D."); J. Burgos Aff. ¶ 11 (A.16) ("I was primarily interested in obtaining my GED.").

Everest did not help students earn high school equivalency credentials. *See, e.g.*, C. Riquelme Aff. ¶ 20 (A.366) ("The people at Everest lied to me when they told me they would help me get my GED while I was a student."); J. Curran Aff. ¶ 28 (A.71) ("Despite the promises at the beginning, Everest did not provide any guidance or assistance with preparing for the G.E.D. test."); *see also* D. Garrow-Pruitt Stmt. at *1 (A.976) (explaining that Everest Brighton did not offer a GED program).

And contrary to Everest's promises, high school credentials are essential for many of the school's targeted professions. For instance, as the former Director of Education for Everest Brighton explains, "For students in Everest's Medical Assistant Program, having a GED or high school diploma is critical because hospitals and other medical employers in Massachusetts will not hire a person without either a GED or high school diploma." *Id.* Former Everest students learned this fact firsthand, but only after graduating with thousands of dollars in student loans:

> Not getting my GED from Everest was a big problem because all of the medical administrative assistant job postings I saw required a high school diploma or a GED. . . . Everest didn't tell me that I would need a high school diploma or a GED to work as a medical administrative assistant. The people at Everest made it seem like it was no problem that I didn't have a high school diploma or GED.

C. Riquelme Aff. ¶¶ 21–22 (A.366). *See also, e.g.*, J. Curran Aff. ¶ 35 (A.72) ("employers told me that they wouldn't hire someone without a high school diploma").

12

Furthermore, Everest obtained federal financial aid for these students through deception. Prior to 2012, federal Ability to Benefit ("ATB") regulations required that students without high school degrees or equivalency certificates pass a standardized test ("ATB test") to demonstrate an ability to benefit from federal aid. *See* 34 C.F.R. §§ 668.32(e), 668.141–.156 (2011).[31] Everest systematically violated these testing requirements in order to enroll ineligible students. In some cases, proctors fed students the answers to questions on the ATB test. *See, e.g.*, V. Cooper Aff. ¶ 16 (A.61) ("the test monitor . . . told me the answers to some of the math questions on the test"); A. Echevarria Aff. ¶ 27 (A.117) ("Everest assigned me a tutor for the test. . . . [A]s I worked through the test, he sat next to me and put his finger next to the correct answer bubbles."); Q. Ho Aff. ¶ 10 (A.183) ("Before I took the test, a school representative told me that . . . if I didn't pass, someone would help me pass the next time."); S. Easter Aff. ¶ 20 (A.109) ("The questions were the same as the ones on the study guide."). In other cases, Everest failed to administer a test altogether. *See, e.g.,* J. Curran Aff. ¶ 14 (A.69) ("I do not recall Everest giving me an admissions exam or any type of exam before I enrolled.").

Everest's treatment of students who lacked high school credentials while promising them jobs that required this minimal credential violated the Consumer Protection Act, which prohibits the enrollment of students who are unlikely to graduate or meet the requirements for employment in the field due to material disqualifications that include prior educational level, training, or experience. 940 Mass. Code Regs. § 31.06(6); *id.* § 31.04. Everest committed illegal deception when it outright lied to many students that students could obtain a GED through enrollment in its programs. In obtaining financial aid on behalf of students with no high school diploma or its equivalent, Everest unfairly broke rules designed to ensure that students benefit from higher education. *See Gossels*, 902 N.E.2d at 378 (noting that unfairness includes acts "within the penumbra of a . . . statutory . . . or other established concept of unfairness" as well as "immoral, unethical, oppressive, or unscrupulous" acts). Finally, Everest's ATB test violations enabled and encouraged cheating, in violation of 940 Mass. Code Regs § 31.06(2).

### Students with Limited English Proficiency

Everest violated the Massachusetts Consumer Protection Act by enrolling individuals who lacked proficiency in English, and then failing to provide them language support. As one Everest recruiter reports, "There were instances when the front office greeted students in Spanish, an admissions representative conducted interviews in Spanish, and a financial advisor spoke to students and their parents in Spanish . . . ." S. Koral Aff. ¶ 4 (A.983). Students who were enrolled with limited English proficiency frequently struggled to understand their classes— which were taught exclusively in English—and obtain employment. *See, e.g.*, K. Cabrera Aff. ¶¶

---

[31] As of July 1, 2012, the so-called "ATB exception" was largely eliminated, meaning that having a high school diploma or its equivalent is now necessary in order to receive federal student aid.

30, 41 (A.23–24) ("I managed to complete the course, but I didn't understand a lot of what the teacher was saying.").

Further, Everest used enrollment and financial aid forms written in English that these students could not read. *See* Everest Applications and Enrollment Agreements (A.583–612); Everest Financial Aid Documents (A.614–706). As Everest Brighton's former Director of Student Finance explains, "Finance Planners . . . prepared financial aid packages for students who spoke very little English and did not understand the contents of the documents they were signing." J. Malkin Aff. ¶ 2 (A.964). Then, as with the ATB test, Everest ensured that students passed its basic literacy test, no matter how limited the students' fluency. According to a former recruiter:

> The students were given a basic literacy or competency test. I recall many times students coming in who did not speak English at all and maybe had relatives come in who would translate for them. Somehow, they would pass the literacy test.

V. Sulkowski Aff. ¶ 6 (A.981). Instead of preparing students with limited English proficiency for success, Everest set them up to fail. Everest representatives enrolled and procured loans for these students despite knowing that "they had language barriers that made it extremely difficult to benefit from [Everest's] programs." J. Malkin Aff. ¶ 42 (A.964) (testifying as former director of student finance at Everest). The use of Spanish-speaking recruiters and financial aid personnel created a deceptive impression that Everest would provide such support to non-English speakers throughout the program. For instance, when former student Kennya Cabrera told a recruiter that she had recently immigrated from El Salvador, and her "English language skills were very limited," K. Cabrera Aff. ¶¶ 12–13 (A.21), the recruiter switched to Spanish, promising Ms. Cabrera high earnings and career success if she enrolled. *Id.* at ¶¶ 14–19 (A.21). Everest staff then walked Ms. Cabrera through enrollment and financial aid in Spanish, but used English language documents and contracts. *Id.* at ¶¶ 23–24 (A.22); *see also id.* ¶ 60(b)–(c) (A.27) (attaching English-language forms). Yet the language of instruction was English, not Spanish, and as a result, Ms. Cabrera "didn't understand a lot of what the teacher was saying." *Id.* at ¶¶ 30, 41 (A.23–24). Not surprisingly, Ms. Cabrera was unable to find employment in her field. *Id.* ¶ 47 (A.25).

Everest recruitment and enrollment of students with limited English ability was inherently deceptive and unfair. Everest further violated the Consumer Protection Act by failing to provide language-appropriate financial aid enrollment forms as required by regulation. 940 Mass. Code Regs. § 31.06(8).

### Students with Prior Criminal Records

Everest enrolled individuals who had criminal records that made them unlikely or ineligible to obtain jobs in their field of study. The Director of Education at the Brighton campus admitted to the Attorney General that it was not appropriate "for Everest Brighton to admit students with

14

[Massachusetts' Criminal Offender Record Information] records because their records would make it impossible for these students to benefit from the Everest Brighton program." D. Garrow-Pruitt Stmt. at *1 (A.976). Nevertheless, potential students who self-reported criminal offenses on their record were "promised [that] the charges were not a problem," and that "it would be okay." MA Statement of Facts ¶ 56 (quoting former student Robert Heckathorn).

These reassurances offered false hope. One former student disclosed her criminal record to an Everest recruiter, who deceptively told her that 98% of students obtain work in the field, T. Coakley Aff. ¶ 14 (A.43), and said nothing about the limitations that her criminal record would present for working as a medical assistant. Ms. Coakley struggled to find any work in the medical field, and she ultimately worked as a hair dresser until her prior arrest was dismissed and she was able to find medical work based on an earlier-obtained CNA certification, not her Everest credentials. *Id.* ¶¶ 30, 33 (A.44).

Ms. Coakley and others like her were harmed by Everest's persistent misrepresentations about likely employment outcomes for students with criminal records. Everest unfairly enrolled these students with full knowledge that they would face extreme challenges finding employment. *See* Mass. Code Regs. § 31.06(7) (prohibiting enrollment of students who are ineligible to obtain licensure in their fields due to a prior criminal record).

### 3. Unfair and Deceptive Recruiter Incentives

Everest violated the Massachusetts Consumer Protection Act by failing to disclose to prospective students that its recruiters were being paid to enroll as many students as possible.

Everest misrepresented the role of recruiters by referring to them as "Admissions Representatives," "Counselors," or "Student Finance Planners." Its written materials further implied that recruiters had a counseling role, *see, e.g.*, Bryman Thank You Card at *2 (A.520) ("As your . . . Admissions Representative, I want to personally thank you . . . . Call me for answers, information . . . or just to talk."), and suggested that Everest recruitment staff had student's best interests at heart, *see, e.g.*, Everest Dental Assisting Program Brochure at *2 (A.546) ("[w]e're committed to helping you identify a career where you can succeed"). And Everest's script for recruitment meetings made this counseling role explicit: Everest instructed recruiters to explain, "My role as an Admissions Representative is to help you find a career path that is the best fit for you." Everest "Admissions Interview Guide" at *1 (A.942).

In reality, Everest recruiters' primary role was to sell the school's programs and enroll "as many students as possible." J. Malkin Aff. ¶ 2 (A.964). Everest maintained enrollment quotas and if recruiters failed to meet their enrollment numbers, they faced termination. N. Napolitano Aff. ¶ 4 (A.970) ("Admissions representatives/counselors were given goals for the number of students to enroll each month . . . [and] were afraid of losing their jobs if they did not meet their enrollment goals."). These incentives existed at all Corinthian schools, where "management and regional

leadership [tried] to get students in regardless of their situation and whether they could benefit from the education at that time." C. Kelly Aff. ¶ 5 (A.959).

These hidden incentives led to aggressive behavior on the part of recruiters who were willing to use any means necessary to enroll students and keep their own jobs with Everest:

> When I told the admissions representative that I needed time to think about whether or not to enroll, he became very pushy and aggressive. He . . . questioned why I would want to continue to make minimum wage when I could be making $14 per hour if I enrolled.

 J. Wahman Aff. ¶ 14 (A.465); *see also, e.g.*, C. Morales Aff. ¶ 18 (A.265) ("The recruiters that I dealt with were aggressive. . . . When I said no, they would call me back the next day."); R. Rivera Aff. ¶ 18 (A.378) ("The recruiter told me lots of fairy tales about Everest. She lied to me to drag me in.").

Many prospective students found out too late that Everest recruiters did not have their best interests at heart. For example, one former student enrolled at Everest and completed the Medical Assisting certificate program "based on Everest's promises at the beginning . . . [that] it would lead to a better paying job." C. Randolph Aff. ¶ 19 (A.361). These recruitment promises, however, were false and misleading. This former student already had experience and on-the-job training in the medical field, and it was so clear that the program had nothing to offer her that an Everest instructor pulled her aside and suggested that she should leave Everest because she "already had experience and training and the program would not benefit" her. *Id.* ¶ 18 (A.360). Despite clear indications that Ms. Randolph would not benefit from Everest's programs, aggressive recruiters operating under unfair and deceptive incentives pushed Ms. Randolph to enroll with Everest.

Everest's practice of misleading prospective students about the role of recruitment personnel violated the Massachusetts Consumer Protection Act and its regulations, which dictate that a school may not "refer to salespersons or recruiters as 'counselors' or 'advisors' or . . . imply that a salesperson or recruiter is an academic advisor or counselor, when (a) the primary role of such person is to sell the school's programs or enroll students in the school; or (b) such person is evaluated or compensated in any part based on student recruitment." 940 Mass. Code Regs. § 31.06(10).

### 4.  Paying Student Referral Bonuses

Everest generated deceptive advertising for its programs through Everest's "Refer a Friend" program, under which, Everest offered valuable "gifts" to students who generated recruits for the school. *See, e.g.*, K. Cabrera Aff. ¶ 28 (A.23) ("Everest pushed me and other students to bring in new student referrals. Everest said that they would give out prizes if we brought in new students .

. . ."). These gifts were worth up to $100, *see* Bryman Institute Referral Award Program at *1 (A.513) (listing items); T. Santos Aff. ¶ 40 (A.421) ("When I enrolled at Everest, the staff there gave me a sheet about the school's 'Refer a Friend' program. . . . I could get a $100 gift per referral."). Under the program, students were paid upon enrollment of new recruits. *See* Bryman "Refer a Friend" Brochure at *2 (A.517). As part of their interview script, recruiters were instructed to show prospective students a trophy case of referral prizes and to close by pressing prospective students for referrals:



### Referrals

When we toured by the Referral Case, you mentioned you know someone who shares your desire to improve their career and financial status.

· Do you believe the process that you and I shared would benefit them?

· Will you include their name on my list of individuals that we invite to receive information?

(Present *Referral Card* - ( 11))

DOA Welcome.

Everest "Admissions Interview Guide at *7 (A.948).

This peer referral system obscured Everest's role in paying for endorsements. For example, one former student, Ms. Zene, was recruited by Everest after her sister referred her "as part of Everest's referral program." B. Zene Aff. ¶ 11 (A.505). Everest did not inform Ms. Zene or others in her position about the cash prizes and incentives for referrals like the one that led to her enrollment. It was only after enrolling in Everest's courses that Ms. Zene found out that her sister had participated in Everest's referral program, and received prizes for referring Ms. Zene to Everest. *See id.*

Everest's Refer a Friend program generated deceptive advertising, in violation of the Consumer Protection Act. Through this program, Everest cultivated peer endorsements that did not disclose Everest's payment for endorsement. *See* 940 Mass. Code Regs. § 31.04(1) (a school may not "cause or permit to be made or published . . . any statement or representation which has the tendency or capacity to mislead or deceive . . . prospective students . . . concerning the school['s] . . . activities in attempting to enroll students. . . .").

### EMPLOYMENT PROSPECTS

*"[W]e're all about employment. . . . We know you're not coming here just for kicks, just to learn medical administrative assisting for kicks. You're coming here to get a job, right? . . . We train people for careers . . . ." "As an institution, let me tell you, we have a very good job placement rate."*

-Recorded enrollment call, January 7, 2013, Everest Brighton Recruiter.[32]

Everest misrepresented employment prospects to prospective students through its advertising, recruitment, and retention strategies, both during recruitment and throughout a student's course of study in, order to increase enrollment and decrease attrition. These misrepresentations came in several forms, including statements about the type of career an Everest graduate could anticipate, false promises about job placement rates, and direct and indirect guarantees of job placement. Everest also misrepresented the likelihood that externships would lead to full-time employment, the earning potential of graduates, and the licensure and certification requirements and opportunities associated with its programs.

### 5.  Misrepresenting Employment Prospects

Everest misled students about the likelihood of finding a job in their fields of study after attending Everest, in violation of the Massachusetts Consumer Protection Act. Everest's misrepresentations regarding employment outcomes included (1) representations about labor market demand, (2) qualitative representations about graduates' careers, and (3) specific job placement rates. In reality, Everest graduates experienced terrible job outcomes. All three forms of representations by Everest were false or misleading.

*Misrepresentations about Labor Market Demand for Everest Graduates*

Everest's promotional brochures claim that those who completed their programs would "be in particularly high demand." Everest Medical Insurance Billing and Coding Program Brochure at *2 (A.577). Everest repeatedly told prospective students that its graduates would have no trouble finding a job. In advertising brochures, Everest promised "[t]he vast majority of our graduates are placed in jobs for which they have been trained." Bryman Brochure at *3 (A.537). Everest commercials similarly claimed "that Everest graduates got jobs right after they finished." M. Colas Aff. ¶ 13 (A.47). The promise of immediate employment upon completion was repeated systematically by recruiters and financial aid workers. L. Penton Aff. ¶ 18 (A.305) ("[The recruiter] promised that I could 'hav[e] the career and life [I] deserve, in less time than [I] think!'"); S. Rooney Aff. ¶ 14 (A.394) ("The recruiter . . . said that I would find a job as a massage therapist after graduating from Everest. She said, 'You will not have to worry about employment.'"); N. Bello. Aff. ¶ 24 (A.3) ("The first thing the financial aid counselor said to me was, 'Aren't you excited to start school? You are going to have a great job soon.'"). In short, Everest's marketing materials and in-person sales pitch caused prospective students "to focus on the twin expectations of employment and earnings." R. Williams Report at 6 (A.875).

In addition to promising that graduates would quickly find employment because Everest's graduates were in high demand, Everest also made false promises of lifelong job security and

---

[32] *Reproduced in* MA Statement of Facts ¶ 22.

career advancement. A pre-orientation letter described Everest Institute's Dental Assistant Program as "a life-changing event" that would set students on a "new career path." Pre-Orientation Letter from Everest President at *1 (A.798). Many students described similar representations that were made throughout Everest's recruitment process. *See, e.g.*, J. Ocasio Aff. ¶ 34 (A.281) ("During the [Everest] orientation, speakers told us prospective students how great Everest was and how we would change our lives by enrolling."); M. Rivera Aff. ¶ 20 (A.371) ("The recruiter . . . [brochures] said things like 'The Path to Your New Career Begins with Everest' and 'Why Everest? Because We Care About Your Success.'"). Recruiters emphasized the likelihood of career success after graduating from Everest. Some made unrealistic claims about career advancement. *See, e.g.*, R. Mislin Aff. ¶ 24 (A.243) ("The recruiter told me that once I got a job as a dental assistant, I . . . would want to move up to become a hygienist. She said, 'It is so easy to move up once you are in the field.'"); W. Moore Aff. ¶¶ 27–28 (A.258) ("I told the recruiter that I wanted to . . . do more advanced medical work, like surgeries and nursing. He told me I would be able to move up in the medical field once I got a job as a medical assistant.").

In reality, demand for Everest graduates was abysmal. Everest graduates experienced terrible job outcomes, and after graduating, many former students were unable to even get job interviews in their fields, despite lengthy job searches. *See, e.g.*, J. Murray Aff. ¶¶ 45–46 (A.274) ("For three years, I looked on my own for a job but I could not find anything related to my degree. During my three year search I did not land one interview."). After graduating, former students discovered that contrary to Everest's boasts of "solid relationships with employers both in our local communities and nationwide," Everest Career Services Brochure (A.850), employers specifically avoided Everest graduates. *See, e.g.*, B. Quinones Aff. ¶ 44 (A.335–36) ("On one interview, I overheard the receptionist say, 'another one from Everest' when I came in. Based on the way she said it, I could tell that she had not had good experiences with Everest students and did not want to hire me because of that. I did not get the job. Many of my interviews were like that."); *see generally* Section III.12, *infra.*

One former student describes her career trajectory after graduating from Everest:

> For three years, I looked on my own for a job but I could not find anything related to my degree. During my three year search I did not land one interview. It was rough. Eventually I found a job at Stop and Shop earning about $9 per hour. I worked there for almost two years.

J. Murray Aff. ¶¶ 45–47 (A.274). Students were unable to find jobs in their fields after attending Everest. *See, e.g.*, M. Wynter Aff. ¶¶ 16, 64 (A.500, 502) ("The recruiter told me that I was 'sure to get a job' if I went to Everest . . . . I have never worked as a medical assistant."); B. Burgos Aff. ¶ 49 (A.12) ("After graduation, I got a job at Dunkin Donuts because I could not find a job as a medical assistant. I earned $8 per hour . . . ."); S. Ramos Aff. ¶ 53 (A.355) ("I have not

worked in the field of dental assisting . . . I am self-employed. I work as a house cleaner."); N. Bello Aff. ¶ 45 (A.5) ("I was not working in the field. I was very embarrassed about not having a job as a medical assistant. Especially after borrowing so much money and putting in so much time at Everest.").

       *False and Inflated Job Placement Rates*

Everest deceived students with falsely inflated job placement rates and in oral statements to prospective students. Each year, Everest published job placement rates for its programs and reported that information to its accreditor. *See* Everest Reported Placement Rates (A.956). The Massachusetts Attorney General has established that Everest falsified these published job placement rates between 2009 or earlier and 2014, when it stopped enrolling students. MA Statement of Facts ¶¶ 18–22. The Attorney General reviewed 30 reported job placement rates and found that in every case, Everest significantly inflated its placement rates. *See id.* ¶¶ 26–27 (presenting tables with published and actual job placement rates). For example, Everest Chelsea's reported 71% job placement rate for Medical Insurance Billing and Coding in July 2011 should have been 25%. MA Statement of Facts ¶ 27. According to the Attorney General's analysis, the spread between published placement rate and actual placement rate was nearly always greater than 30 percentage points, and often greater than 50 percentage points. *See id.* Notably, while Everest always reported that the majority (over 50%) of graduates found jobs in their field, in reality, only 2 of 30 job placement rates analyzed were actually over 50%. And, even for those programs, Everest inflated its placement rates by 20%. *See id.* In other words, Everest falsely promised placement rates of 70% or higher over and over again, in print ads, in phone calls, and in face-to-face recruiting, to encourage students to enroll. In reality, Everest graduates were more likely than not to be unable to land jobs in their fields of study.

Former students recall Everest recruiters citing specific and convincingly high job placement rates as part of the sales pitch. *See, e.g.*, G. Carrasquillo Aff. ¶ 31 (A.31) ("[The Everest recruiter] said that Everest had an 85% job placement rate."); S. Ramos Aff. ¶ 18 (A.353) ("[The Everest recruiter] said that 90% of Everest students got jobs after graduating."); J. Santiago Aff. ¶ 15 (A.407) ("The representative told me that 98 percent of people graduating from Everest in the Billing and Coding program got jobs in the field.").

These statistics influenced students to enroll. *See, e.g.,* J. Weeks Aff. ¶¶ 29, 71 (A.481, 484) ("The admissions representative, Julie, said that 80% of the students who completed the Dental Assisting program at Everest got jobs in the field . . . . If I knew the job placement numbers the admissions representative showed me were false, I would not have signed up . . . ."). These false promises made Everest "seem[] like a good opportunity[,]" S. Ramos Aff. ¶ 31 (A.354), and deceived many students into enrolling in Everest's scam programs. *See* MA Statement of Facts ¶ 20 (noting that "historical job placement rates were critical to [Everest's] ability to recruit students" and quoting Corinthian SEC filing).

Testimony by former employees makes clear that Everest's inflated job placement rates were a product of deliberate misconduct. Everest employees were instructed to game the job placement numbers. According to a former Director of Education at Everest Brighton, in 2010:

> Everest Brighton was not meeting the standards of its accreditor. . . . [which] required that the school place at least 70% of students in jobs. My understanding is that Everest Brighton's placement rate at this time was around 50%.

D. Garrow-Pruitt Stmt. at *2 (A.977). To resolve this discrepancy and maintain accreditation, Everest arranged for a local staffing agency to hire 25 unemployed former students for two days, ostensibly to staff an on-campus "health fair." *Id.* Everest then counted these students as having job placements. *Id.*; *see also* M. Goodus Aff. ¶ 3 (A.986) ("[T]he President of the Chelsea Campus, Wade Charlton, asked me to be creative with my placement numbers. . . . He wanted me to find a way to make the placement numbers meet what the accreditors were asking for."); J. Malkin Aff. ¶ 4 (A.964–65) ("Everest fudged job placement rates to meet accreditation requirements. . . . [S]tudents who worked at the job fair were counted as employed . . . ."). Moreover, Everest's management knew that Everest's job placement promises were false and "met periodically to discuss the placement issue." D. Garrow-Pruitt Stmt. at *2 (A.977).

This deception was not isolated to the two campuses in Massachusetts but, rather, occurred at all Corinthian-operated schools. The Department of Education also found that Everest and other Corinthian schools misrepresented employment prospects to prospective and enrolled students. According to the Department, students "were defrauded at 91 former Corinthian . . . campuses nationwide," and the Department specifically found "evidence that Corinthian's two Everest Institute campuses in Massachusetts—Chelsea and Brighton—misrepresented their job placement rates to enrolled and prospective students."[33]

Pursuant to the Massachusetts Consumer Protection Act, "[i]t is an unfair or deceptive act or practice for a school to make any false, untrue, or deceptive statement or representation or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person regarding . . . the likelihood of employment in any job or occupation." 940 Mass. Code Regs. § 31.04(7); *see also id*. § 31.04(2) (prohibiting use of deceptive language toward students); *id.* § 31.04(1); *id.* 31.04(4) (stating that it is unfair or deceptive to fail to accurately disclose placement rates and employment statistics for past graduates). Everest consistently misrepresented to prospective and enrolled students their likelihood of employment. These misrepresentations were made in order to induce prospective students to enroll and stay enrolled. As recognized by the Massachusetts Superior Court, Everest

---

[33] Press Release, U.S. Dep't of Educ., U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses (Mar. 25, 2016), https://perma.cc/YLK4-XVME.

violated the Massachusetts Consumer Protection Act by misrepresenting the employment prospects of students. *See* MA Judgment at 2, 5; *see also* 940 Mass. Code Regs. § 31.04(4).

### 6. Falsely Guaranteeing Job Placement

Everest representatives also went beyond misrepresenting employment rates and deceptively promised prospective students that they were *guaranteed* to obtain employment in their field of study after graduation.

Everest recruiters used this false guarantee of job placement as a deceptive but effective enrollment tactic. Former Everest students recall that recruiters explicitly guaranteed job placement. *See, e.g.,* S. Valdes Aff. ¶ 18 (A.450) ("The admissions representative's exact words were 'We guarantee that you will get a job.'"); S. Veiga Aff. ¶ 15 (A.456) ("The recruiter . . . said that I was 'guaranteed' a job and that it would not take long after I graduated to find a job."); J. Weeks Aff. ¶ 13 (A.479) ("[T]he recruiters said that I was guaranteed a job in the medical field . . . ."); T. Coakley Aff. ¶ 41 (A.45) ("They said I was guaranteed a job as a medical assistant if I graduated from the program . . . ."); M. Oxidor Aff. ¶ 16 (A.290) ("[The Everest recruiter] said, 'Everyone who successfully completes the program gets into a job.'"). Everest recruiters also personalized these false job placement guarantees. For example, as one former student recalls: "The recruiter said that I was 'guaranteed' a job after I graduated from Everest. She said, 'Don't worry about not getting a job. You have good energy. You are going to get a job.'" G. Carrasquillo Aff. ¶¶ 32–33 (A.31). Other recruiters made false guarantees of job placement even when a prospective student presented circumstances—such as the lack of a high school diploma or GED—that raised additional barriers to employment. For example, one former student was "guaranteed job placement" even after he expressly asked if his likelihood of employment would be impacted by his lack of a high school degree or GED. Echevarria Aff. ¶¶ 18–24 (A.116). Yet another former student recalls that Everest's advertisements reinforced these false representations of guaranteed job placement. *See, e.g.,* B. Burgos Aff. ¶ 12 (A.9) ("The advertisements for Everest talked about guaranteed job placement for graduates.").

The frequency with which students recall receiving an oral guarantee that they would get a job after graduation suggests that it was a standard element of the Everest sales pitch. This is confirmed by the Attorney General of Massachusetts, who found that Everest falsely guaranteed prospective students job placements in their fields of study. According to the Attorney General, Everest representatives orally told prospective students that if they enrolled in Corinthian's schools they were guaranteed to obtain jobs after graduating, or orally promised students that they would obtain jobs in their fields of study despite knowing that the vast majority of students did not obtain jobs in their fields of study. *See* MA Statement of Facts ¶¶ 23–29. Variations of the statement that Everest "guaranteed jobs" were made by recruiters on phone calls with prospective students, emphasized by recruiters during in-person visits, and reinforced by instructors while students were enrolled in Everest programs. *Id.* ¶ 23. The Attorney General concluded that "Corinthian's misrepresentations concerning guaranteed or promised employment

were material and false and violated c. 93A . . . ." MA MSJ at 15; *accord* MA Judgment at 2, 5 (entering judgment for misrepresentations about "probability of employment"). The Department of Education also concluded that Everest falsely guaranteed employment for graduates and that this is a basis for granting borrower defense relief. In January 2017, the Department of Education publicly announced that Everest's "false guarantees of employment for graduates" was an additional basis for granting Everest students' borrower defense claims.[34]

### 7. Falsely Claiming Externships Would Lead to Employment

Everest falsely promised prospective students that it would place them in externships that were likely to lead to permanent and paid employment in their fields of study, in violation of the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act to mislead or deceive students about the likelihood of employment through any particular job, opportunity, or occupation. *Id*. § 31.04(7); *see also id*. § 31.04(1)–(2) (prohibiting use of false advertising and deceptive language towards students).

Everest's false promises about externships leading to employment bolstered the fiction that Everest provided effective guaranteed pipeline to employment. For example, in a recorded call, an Everest recruiter assured a prospective student "[y]ou go on an externship on your final month. . . . Once you finish that up *you actually get offered a job*." MA Statement of Facts ¶ 36 (emphasis added). The Project's investigation confirmed that Everest consistently used this false claim to enroll students. *See, e.g.*, S. Williams Aff. ¶ 18 (A.488) ("The recruiter . . . said that I was 'guaranteed' a job after my externship."); C. Ramirez Aff. ¶ 17 (A.340) ("[The admissions representative] told me I was guaranteed a job because Everest would place me in a good externship, which would lead to a permanent job."); N. Bello Aff. ¶ 18 (A.3) ("The admissions representative said that Everest helped students find externship placements, and students almost always got hired at their externship sites."); B. Zene Aff. ¶ 21 (A.506) ("The recruiter told me that the majority of Everest students get hired at their externship sites."). One former student describes the persuasive impact of these false promises on her decision to enroll:

> Everest representatives told me, before and while I was enrolling, that the externship was going to provide hands-on training, and that my placement in an externship assured me a job. I remember being told, "if you like it, you can stay there." That is what got me excited enough to sign up for Everest.

C. Morales Aff. ¶¶ 27–28 (A.265–66).

---

[34] *See* Press Release, U.S. Dep't of Educ., American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans: Education Department Announces Continued Progress with Borrower Defense and Closed School Loan Discharges (Jan. 13, 2017), https://perma.cc/BNM6-3ASK (discussing Corinthian borrower defense claims in context of "Continued Progress with Borrower Defense").

In reality, however, Everest's externships rarely led to paid positions. *See, e.g.*, *id.* ¶ 49 (A.267) ("I was not offered a job by my externship like Everest promised. When the externship was over, it was over."); C. Ramirez Aff. ¶ 37 (A.342) ("[M]y externship did not turn into a permanent job."); R. Mislin Aff. ¶ 60 (A.246) ("I did not get offered a job at any of my externship sites."); N. Bello Aff. ¶ 39 (A.4) ("I did not get hired at my externship site."). According to the Attorney General of Massachusetts "Everest MA students rarely receive[d] jobs as a result of Everest . . . externships." MA Complaint ¶ 89.

A manager at Brigham and Women's Advanced Primary Care Associates ("BWAPCA") explains some of the reasons why externships rarely led to employment for former Everest students:

> Everest students were not as prepared as they should have been to perform standard medical assistant tasks. For example, one Everest student did not know how to take a patient's blood pressure, a skill students are expected to learn in their medical assistant classes before they begin their clinical externship. . . . It was difficult for BWAPCA staff to supervise and work with Everest students because of their lack of proper training. . . . Everest's industry reputation is very negative because the school did not properly train its students.

C. Victorino-Griffiths Decl. ¶¶ 4–6 (A.905).

Rather than providing externships that led to employment for its former students as promised, Everest set its students up for disappointment and failure when these students sought paid employment at their externship sites. Desperate to get a foot in the door at the sites where they had been promised employment, some students accepted lower and even unpaid positions with their externship sites. *See, e.g.,* R. McConnell Aff. ¶¶ 66, 71 (A.239) ("When my externship . . . was over, they did not offer me a paid position. . . . I extended my unpaid externship . . . [and] I worked there for no pay for about a year."); D. Jones Aff. ¶¶ 42–46 (A.198–99) ("Recognizing that I did not have the skills and education to do the job well Tufts . . . told me that they couldn't hire me on as a dental assistant, but that they . . . had an opening for a temporary position as a lab technician."). These students clearly did not obtain the results that they were promised when they enrolled with Everest.

Everest's repeated and deceptive promises about externships that would transition into full-time and paid employment in the field violated the Consumer Protection Act. *See* 940 Mass. Code Regs. § 31.04(1)–(2), (7). The Massachusetts Attorney General also concluded that Everest violated the Consumer Protection Act by misrepresenting "employment opportunities accompanying externships," MA SJ at 4, and the state court granted judgment, in part, on this basis. *See* MA Judgment at 5.

### 8.  Inflating Earning Potential of Graduates

Everest recruiters inflated hourly wages and made false and misleading statements about general earnings expectations. These statements included promises by recruiters that students would "make more money," earn multiples of their current wages, and be better positioned to provide for their children after enrolling in Everest programs. *See* MA Statement of Facts ¶ 40. In many cases, Everest recruiters falsely told prospective students that they would earn a specific salary. *See, e.g.,* N. Bello Aff. ¶ 22 (A.3) ("The admissions representative told me that medical assistants earned $20 per hour starting out."); W. Moore Aff. ¶ 34 (A.259) ("The recruiter told me that as a medical assistant, my starting wage would be $15 to $20 per hour.") R. Mislin Aff. ¶ 23 (A.243) ("The recruiter told me that I would make $18 to $20 per hour straight out of school as a dental assistant."); J. Ocasio Aff. ¶ 20 (A.280) ("The admissions representative, Leah, told me that graduates of Everest's Medical Insurance Billing and Coding program earned $18 per hour or more after they graduated."). The Massachusetts Attorney General also found systematic misrepresentations by Everest of their graduates' earning potential. According to the Attorney General,

> [B]etween 2009 or earlier and 2014 . . . Corinthian recruiters told consumers and prospective students that they would earn an hourly wage between $16 and $25 per hour in entry-level jobs in their fields of study. . . [However,] the average salary reported for Everest MA graduates who were able to obtain jobs was significantly lower than [the promised rate of] $16 per hour.

MA Statement of Facts ¶¶ 40–43; *see also id.* ¶ 41 (listing affidavit testimony by students and staff across Everest programs and locations in Massachusetts).

Everest's advertising materials reinforced deceptive representations about earnings. *See, e.g.,* S. Valdes Aff. ¶ 18 (A.450) ("The flyer listed dental assistants at $33,000 per year."). One former student, who enrolled in 2007 when Everest operated under the Bryman brand, describes how recruitment staff deceptively used news articles and other materials to create a false and inflated impression of earning potential.

> Bryman staff members also gave me news articles about massage therapists. One was a 2007 Work and Wealth Magazine article about a licensed massage therapist that listed the salary range as $25,000-$100,000. The Work and Wealth Magazine article directs readers to contact Bryman Institute about pursuing a career in massage therapy. This article convinced me that graduating from Bryman would increase my salary and would give me the opportunity to be more self-sufficient.

L. Penton Aff. ¶ 17 (A.305); *see also* Magazine Story Given to Client (A.543). One brochure titled "The Value of Education" states that "[i]n many cases, the increased earnings after only one year will justify the cost of a student's education." Bryman Value of Education Sheet

(A.528); Everest Value of Education Sheet (A.530) (identical). The bold print on this brochure leads students to expect "[a] $5.00 wage increase per hour" or "an extra $10,000 a year":



Bryman Value of Education Sheet (A.528); Everest Value of Education Sheet (A.530) (identical). Similar brochures containing identical claims were included in materials distributed to prospective students across different programs at Bryman and Everest Institutes. *See* S. Rooney Aff. at 5–6 (A.398–99) (describing recruitment materials for the Massage Therapy program at Bryman Institute in Brighton, MA in 2007); T. Santos Aff. ¶ 28 (A.420) (describing recruitment materials for the Medical Billing and Insurance program at Everest Institute in Chelsea, MA in 2010).

Everest's script for recruiters delivered the same message:

> Some of the ways that an education pays for itself are through higher earnings potential and greater advancement opportunities in the employment market. Tell me how you see your educational investment benefitting you? (Present *The Value of Education* . . . and discuss.)

Everest "Admissions Interview Guide" at *5 (A.946).

In reality, wages for the occupations associated with Everest's training programs were so low that they put many students in a worse economic position than if they had never enrolled. According to analysis by expert labor market economist Russell Williams, while Everest presented itself to prospective students as a way to boost earning potential, in fact attending Everest typically led to wages that were lower than the median earning for a worker with only high school education experience:

> A prospective student making the median income for a high school graduate who entered one of Everest's five programs and subsequently began a job in the field at entry-level wages would experience (in 2006) 23% decrease in earnings as a

26

> medical assistant, a 21% decrease in earnings as a medical administrative assistant, a 14% decrease in earnings as a dental assistant, a 36% decrease in earnings as a medical records and health information technician, and a 6% decrease in earnings as a massage therapist.

R. Williams Report at 11 (A.880). After reviewing both entry-level and median earnings for career paths associated with Everest's programs, Williams concluded that "[t]he income changes associated with Everest's occupations do not justify the cost." *Id.* at 14 (A.883). In fact,

> At entry-level wages, students who found employment in any of the five occupations would have experienced substantial decreases in their incomes and accordingly, the approximately $15,000 investment in Everest's programs from such students would never be economically recouped. Even Everest students who managed to attain median wages . . . would be in worse economic position in three of the five occupations, relative to median high school earners.

*Id.* at 15 (A.884).

When Everest students managed to find work in their fields of study, they earned far less than promised. For example, one former student recalls

> The recruiter told me that I would make $18 to $20 per hour straight out of school as a dental assistant. She said that I would make $25 to $30 per hour after I had some experience. . . . Even though I was a licensed dental assistant, I was still earning $13 per hour. It was not enough to make ends meet living on my own in Boston. I had to quit.

R. Mislin Aff. ¶¶ 23, 75 (A.243, 247). Another former student reports that a recruiter and instructor both assured him that "the average starting salary of Everest Dental Assistant students was $22 per hour[,]" however, this student's actual starting rate "was $9 per hour -- $2 per hour less than [what he] earned at the restaurant" where he was a dishwasher prior to enrolling with Everest. A. Echevarria Aff. ¶¶ 42–43, 58 (A.118–19). Many others had similar experiences. *See, e.g.*, N. Bello Aff. ¶ 48 (A.5) ("My starting wage at Beth Israel was $13.75 per hour . . . significantly lower than the wage the admission representative from Everest told me I would make after graduation, which was $20 per hour."); J. Weeks Aff. ¶ 52 (A.483) ("In [my] interviews, I learned that the starting salary for dental assistants was $10-12 per hour, and not $17 like the Everest recruiter told me in her office"); R. Rivera ¶¶ 43, 50 (A.379–80) ("Work was slow and I ended up earning less . . . than at Chipotle. . . . I know now that doing massage full-time is not sustainable financially."). These experiences are corroborated by the analysis of labor market economist Russell Williams, which finds entry-level wages for Everest's fields far below recruiters' promises. *See* R. Williams Report at 19 (A.888) (reporting entry-level hourly

earnings for Everest's occupations from 2005 to 2015). For example, in 2007, the entry level wages for Everest's occupations ranged from $11.81 to $15.06. *Id.*

In sum, Everest's pattern of feeding its largely low-income students a deceptive story about increased earnings is a well-documented and widespread violation of the Massachusetts Consumer Protection Act. Everest made deceptive statements about probable earnings, 940 Mass. Code Regs. § 31.04(3) (identifying as unfair or deceptive "any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person regarding actual or probable earnings . . . of the school's graduates"), implied that students would earn above the entry level wages for their fields, *id.* § 31.04(4)(a) (identifying as unfair or deceptive to represent or imply that students will earn a stated income that is greater than the entry-level salary for that occupation in Massachusetts), and failed to disclose limitations, conditions, and requirements implicit in the promised earnings, *id.* § 31.04(4)(b) (identifying as unfair or deceptive failure to disclose "limitations, conditions, or other requirements . . . which must be met before the stated salary or income can be earned").

### 9.  Misrepresenting Licensure and Certification Opportunities and Requirements

Everest concealed and misrepresented the licensing and certification requirements that are often mandatory for students to work in the highly regulated medical assistant, medical administrative assistant, dental assistant, and massage therapy fields, in violation of the Massachusetts Consumer Protection Act.

*Dental Assistant Certification and Licensure*

Everest concealed necessary information from students in the Dental Assistant program regarding the field's professional accreditation and certification requirements, in violation of the Consumer Protection Act. Nationwide and throughout the duration of Everest's operation, private certification by the Dental Assistant National Board ("DANB") was (and remains) an important career credential. Under the private certification regime, Everest's poor standing with DANB and its lack of accreditation with a professional association, the Commission on Dental Accreditation ("CODA"), disqualified its students from obtaining many dental assistant positions.

In 2015, Massachusetts formalized the DANB requirement and made licensing mandatory for dental assistants. *See generally* Chapter 530 of the Acts of 2008, *codified at* Mass. Gen. Laws ch. 13. Under Massachusetts's system of licensure, Everest's lack of accreditation by a dental assisting organization also limits students' ability to obtain three of the four types of licensure available to dental assistants in Massachusetts: (1) formally trained dental assistants, (2) expanded function dental assistants, and (3) certified dental assistants. According to Jeffrey Mills, the Assistant Executive Director of the Massachusetts Board of Registration in Dentistry, Everest's Dental Assisting graduates cannot be licensed as "Formally Trained Dental Assistants"

28

or "Expanded Function Dental Assistants" because Everest did not satisfy the educational requirements for these higher-level certifications. J. Mills Decl. ¶¶ 10–12, 17–19 (A.908–09). Everest students also face additional barriers to obtain licensure as a Certified Dental Assistant ("CA"), because Everest's dental assisting program was not accredited by CODA. *Id.* ¶¶ 13–16 (A.909). In particular, graduates who seek CA status after attending non-CODA-accredited schools, including Everest, cannot take certification exams provided by DANB unless they are able to satisfy additional requirements. Everest graduates with a high school diploma or GED must complete an additional 3500 hours of approved work to overcome Everest's lack of professional accreditation, while former Everest students who do not have a high school diploma or GED are ineligible to take DANB's certification exams and cannot become CAs.

Everest failed to inform students that its Dental Assistant program was not CODA-accredited. One student describes her experience:

> I asked the recruiter if Everest was accredited. She said it was. She said that Everest had to be accredited to give students federal financial aid. She said that after I finished at Everest, I could go to the Dental Assisting National Board [DANB] and . . . get licensed with the state of Massachusetts . . . In late 2015, I tried to get licensed as a dental assistant in Massachusetts. I thought that licensure would help me find a job as a dental assistant. I spoke with someone at the Massachusetts Department of Licensure and learned that Everest was not accredited for dental assisting . . . . That was the first time I learned that Everest was not accredited for dental assisting.

R. Mislin Aff. ¶¶ 25, 70 (A.243, 247). Another former Everest student lost his job after he failed to become a CA. A. Echevarria Aff. ¶¶ 59–65 (A.119).

For Everest students who do not have high school diplomas or GEDs, or who cannot obtain 3500 hours of approved pre-licensure work experience, the only path to working as a dental assistant in Massachusetts is to seek licensure as a "Dental Assistant Trained on the Job" ("OJT"):

> To become an OJT, a candidate does not need to complete a formal dental assisting educational program like the program offered by Everest Institute. A candidate need only complete a [free] 1-hour infection control course and become certified in life support through the American Red Cross, the American Heart Association, or another entity approved by the Board.

J. Mills Decl. ¶¶ 6–9 (A.908). Everest enrolled these students into its substandard and non-CODA-accredited dental assisting program only to leave them in no better position than if they had not completed a formal education in this field.

29

Additionally, many former dental assisting students found that x-ray or radiology certification was required by many employers, but Everest did not provide the relevant training and credentials. *See, e.g.*, S. Valdes Aff. ¶¶ 42–43 (A.452) ("[M]ost dental offices require certification in radiology or state certification, and those are things Everest did not provide me with. Everest told me about radiology certification but said it was not a requirement for the field."). A. Echevarria Aff. ¶ 59 (A.119) ("[My employer] told me I needed to get certified right away so that I could take x-rays."); T. Webster Aff. ¶ 30 (A.476) ("I was also told that they could not hire me because I did not have a radiology license. Everest never told me that I needed to be licensed in radiology in order to work as a dental assistant.").

> *Medical Assistant Certifications*

Everest also failed to tell students in the Medical Assistant programs that they were unlikely to obtain jobs in the field unless they became Certified Medical Assistants. Like dental assistants before 2015, medical assistants in Massachusetts operate under a private certification regime. While certification is not required by law, many medical assisting job require this certification. *See, e.g.*, M. Wynter Aff. ¶ 53 (A.501) ("A lot of the jobs I applied for wanted certified medical assistants. I think that is why no one answered my applications."); W. Moore Aff. ¶ 65 (A.261) ("A lot of the jobs that I wanted to apply for only took certified medical assistants, so I could not apply."); A. Ramos Aff. ¶ 39 (A.348) ("When I started looking for work, I learned about certification as a medical assistant. A lot of the jobs I saw wanted certified medical assistants.").

Everest did not tell students about the importance of certification and did not prepare students to become certified. *See, e.g.*, L. Dykes Aff. ¶ 41 (A.104) ("Until I talked with employers, I did not know that I had to be certified as a medical assistant to get almost all of the jobs in the field. This was never mentioned by anyone at Everest."); S. Easter Aff. ¶ 36 (A.111) ("No one at Everest said anything to me about this before I enrolled or while I attended."). In other cases, Everest misrepresented the certification process. One former student recalls that:

> The recruiter told me that once I got a job at a hospital as a medical assistant, the hospital would pay for my certification. . . . Everest did not help me with the certification process for medical assisting. I could not afford to take the certification exam for medical assisting.

G. Carrasquillo Aff. ¶¶ 35, 66–67 (A.31, 33). Another student describes how Everest failed to inform, assist, or prepare her for certification as a medical assistant:

> No one at Everest ever told me about certification. Everest did not help me with certification at all. I paid for the test myself and prepared by myself. I took the certification exam twice and failed both times. I was angry that Everest did not teach me what I needed to know to get certified in my field, even though I had done so well in classes there.

A. Ramos Aff. ¶¶ 39–41 (A.348–49). Yet another student learned that Everest lacked the professional accreditation to support the type of certification she wanted:

> When I contacted the American Association of Medical Assistants (AAMA) to become a Certified Medical Assistant (CMA), they told me I did not qualify for those credentials because the Everest program I attended was not accredited. . . . It was devastating to learn the school I attended prevented me from qualifying for a certification I earned.

C. Ramirez Aff. ¶ 54 (A.344).

*Billing and Coding Certification*

Everest's former students in the Medical Insurance Billing and Coding ("MIBC") program were blind-sided by the fact that employers in the field typically require an official billing and coding certification, which Everest did not provide. According to the AAPC, a professional organization representing over 155,000 medical coders, "certified medical coders typically earn 20 percent more than non-certified coders."[35] Everest representatives, however, failed to disclose information about this important professional certification opportunity and the fact that students would need to take additional preparation courses to obtain the certification. As one former student recalls:

> All of the potential employers asked me for an official billing and coding certification. But I only got a diploma from Everest, not the certification that the employers were asking for. I didn't know about this official certification until after I left Everest.

K. Cabrera Aff. ¶ 44 (A.25). Another student in the MIBC program knew about certification before she enrolled and asked Everest representatives about the path to obtaining this important credential. An Everest representative told her "that the way it worked was that medical offices would hire graduates and then pay for the graduates' certification exam prep." J. Ocasio Aff. ¶ 21 (A.280). This claim was false and the student never worked as a medical insurance biller or coder. *Id.* ¶ 58 (A.285). At one point, she worked as a Practice Assistant, a lower-paid position, at a hospital, and learned there that contrary to Everest's false claims, the hospital did not offer to pay for formal certification in medical billing or coding. *Id.* at ¶ 57 (A.285).

*Massage Therapy Licensure*

Finally, Everest deceived prospective students about the strict licensing requirements in the massage therapy field, and falsely promised students that Everest would help them obtain the

---

[35] *Medical Coding Certification,* AAPC (Aug. 8, 2017, 1:48 PM), https://perma.cc/KUR5-YL2K; *see also About AAPC*, AAPC (Aug. 8, 2017, 1:48 PM), https://perma.cc/XS4S-TQRX.

necessary certifications. In Massachusetts, massage therapists must be licensed with the Commonwealth pursuant to a strict licensure regime. *See generally* Mass. Gen. Laws ch. 112, §§ 227–35; 269 Mass. Code Regs. §§ 3.01–.08 (setting forth licensure requirements for massage therapists).[36] In order to be licensed as a massage therapist, an applicant must, *inter alia*, possess a high school diploma or GED, 940 Mass. Code Regs. § 3.01(2)(a), have completed a course of study approved by the Massachusetts Board of Registration of Massage Therapy, *id.* § 3.01(2)(e), and not have any criminal conviction that raises a question about the applicant's "good moral character," *id.* § 3.04.

Everest failed to inform students about these licensure requirements prior to enrollment. Instead, it left students to fend for themselves:

> [T]oward the end of my program, I found out that in order to work as a massage therapist, I would need a license. Everest did not inform me of this when I first enrolled . . . . After I found out about the license requirement, I was also told that Everest would help me get my massage therapy license, but they never did.

J. Perez Aff. ¶¶ 26–27 (A.313); *see also, e.g.*, L. Penton Aff. ¶ 37 (A.307) ("[Everest] did not help me become a licensed massage therapist.").

Across various training programs, Everest repeatedly deceived prospective students regarding licensing and certification requirements in order to induce prospective students to enroll, in violation of Massachusetts law. Pursuant to the Act, it is unfair or deceptive to mislead or deceive students about the "necessity, requirement, or usefulness of any program in obtaining professional licensure, or employment in the field of study," or to fail to disclose "the necessity of or qualification(s) for certification or licensure in any job or occupation." 940 Mass. Code Regs. § 31.04(7)(c). It is also illegal to fail to provide clear and conspicuous statements about "any limitations, conditions, or other requirements . . . which must be met before the stated salary or income can be earned." 940 Mass. Code Regs. § 31.04(4)(b). Finally, schools may not enroll students who may be barred from employment in their fields of study. 940 Mass. Code Regs. § 31.06 (6)–(7).

### CAREER SERVICES

*"One of the most important services of [Everest] is the Career Assistance that our graduates receive. Those efforts begin on day one and continue throughout your experience with us."*

-Everest "Admissions Interview Guide" (A.945).

Everest deceived prospective students about the career services assistance it offered, in violation of the Massachusetts Consumer Protection Act. Everest misrepresented the availability, nature,

---

[36] The licensure regime for massage therapists went into effect 2006. 2006 Mass. Acts. Ch. 135.

and quality of externship and job placement services, and the school's connection to and good reputation with potential employers. Together with Everest's misrepresentations about employment prospects, these false promises led students to enroll at Everest with the hopes of building a career. In reality, Everest provided little or no career service assistance and most Everest students have never been employed in their field.

### 10. Misrepresenting Externship Placement Assistance

Everest repeatedly promised students that the school would place them in externships in their fields of study. *See, e.g.*, A. Pontes Aff. ¶ 13 (A.329) ("During our meeting, the admissions representative told me that as part of the Medical Assistant program, Everest would place me in an externship and that this was guaranteed to lead to a permanent job in the field."); S. Williams Aff. ¶ 18 (A.488) ("The recruiter told me that Everest would help me get an externship as a medical assistant . . . ."). The externship was a mandatory part of the curriculum at Everest. *See, e.g.*, Everest 2010 Enrollment Agreement at 4 (A.610) ("Requirements for Graduation . . . A student must . . . successfully complete all externship hours . . . .").

However, despite its promises, Everest routinely failed to secure appropriate externships, and students were often forced to fend for themselves in order to fulfill this mandatory program component. *See, e.g.*, E. Hernandez Aff. ¶¶ 16, 38 (A.172, 174) ("The admissions representative told me that Everest would be able to place me in an externship with MGH as a medical biller if I got good grades. . . . Everest was unable to place me in a part-time externship at MGH, or at any other location."); B. Zene Aff. ¶¶ 47–48 (A.508) ("When it was time to find an externship, my teacher, Ms. Bellson, told me that I had better start looking for an externship on my own . . . . I looked for an externship on my own by calling hospitals in the phone book."). When students contacted the career services office for assistance with placement, the staff was unresponsive and evasive.

The Massachusetts Attorney General found the same conduct. *See* MA Complaint ¶ 3 ("[Everest misrepresented] the availability of externships in the students' fields of study . . . ."); MA MSJ at 16. ("In many cases [Everest] did not provide students with externships at all."); MA Complaint ¶ 59 ("[Everest often require[d] students to find their own externships, with no help from the school.").

Everest's misrepresentations about externship placement violated the Massachusetts Consumer Protection Act because Everest required the externship to graduate but failed to help students get the externships they needed, *see* 940 Mass. Code Regs. § 31.06(5) (identifying as unfair or deceptive conduct to "promise or require an externship where the externship does not offer training in the field of study or the school fails to assist in locating and arranging the externship"), and because its promises of assistance were false, *see id.* § 31.04(2) (generally prohibiting use of deceptive language toward students). The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. *See* MA Judgment at 5.

### 11. Misrepresenting Job Placement Assistance

Everest falsely promised prospective students that its career services office would help students find jobs in their fields. *See, e.g.*, G. Carrasquillo Aff. ¶¶ 28–29 (A.30) ("The recruiter said that Everest would help me get a job as a medical assistant. The recruiter said, 'We are always working hard to find students jobs.' And that, 'We will call you and work for you.'"); M. Colas Aff. ¶ 21 (A.48) ("[The Everest recruiter] said that 'Everest will help you get a job right after you finish.' He said Everest would place me in a job."). Everest's former employees also reported these false promises. *See* E. Morrison Aff. ¶ 5 (A.968) ("Admissions representatives . . . told the prospective students that the career services department will help them after graduation and they will definitely find jobs."). Everest's admissions interview script stated "One of the most important services of [Everest] is the Career Assistance that our graduates receive. Those Efforts begin on day one and continue throughout your experience with us." Everest "Admissions Interview Guide" at *4 (A.945). And Everest's printed materials provided to students proclaimed that "The Path to Your New Career Begins with Everest" and promised that "Career Services is on campus to help you attract and interview with the kind of employer you want to work for." Everest "Path to Your New Career" Sheet (A.522). Everest representatives also gave prospective students materials that declared "we're . . . committed to helping you find a job that's right for you," Everest Career Services Brochure at 2 (A.848), and other similar statements. *See also*, Everest Dental Assisting Program Brochure at 1 (A.545) ("[O]ur Career Services team will help you prepare, with a range of resources and strong networks of local employers."); Everest Massage Therapy Program Brochure at 1 (A.552) (same); Everest Medical Administrative Assistant Program Brochure at 1 (A.562) (same); Everest Medical Assisting Program Brochure at 1 (A.569) (same); Everest Medical Insurance Billing and Coding Program Brochure at 1 (A.576) (same).

Everest also promised prospective students that in the purportedly unlikely event that they did not obtain full-time employment in their field of study, Everest's career services department would help them obtain another job in the field. *See, e.g.*, S. Smalls Aff. ¶ 15 (A.427) (The admissions representative "told me that if the internship did not lead to a permanent job, Everest's career services would always be available to help me find a job in my field even after I graduated."); *see also* Section III.7, *supra*.

Everest represented that Everest's career services office would be available after students graduated and throughout their careers to help students find jobs in their fields. *See, e.g.*, E. Hernandez Aff. ¶ 19 (A.172) ("[The admissions representative] said that staff at Everest's career services office would meet with me on a monthly basis to help me find a job."); B. Zene Aff. ¶ 22 (A.506) ("The recruiter said that Everest's Career Center would help me find a job. He said that Everest 'would always be there' to help me find jobs. He said I could always call the Career Center or visit."); M. Oxidor Aff. ¶ 23 (A.290) ("The admissions representative told me that Everest would help me get a job as a medical assistant after I graduated. She said, 'After you

34

graduate, the relationship does not stop. We will not give up until you get a job.' She told me that Everest would set up interviews for me and set me up with contacts."). Everest brochures made the same promises. *See, e.g.*, MA Complaint ¶ 86 ("We help our graduates find jobs after graduation. At Everest, training you for a career doesn't stop at graduation.").

In reality, students received little to no job placement assistance from Everest. A former Everest receptionist describes how difficult it was for Everest students to actually receive any assistance from the career services department:

> [S]tudents were supposed to get career services [assistance]. But I know from forwarding calls that the people in career services did not answer students' calls or provide services to former students. Their voicemails were always full. It was very rare that I would hand off a former student who called to one of those people. The career services employees were not given resources to actually place people. . . . They could not do their jobs[.]

V. Sulkowski Aff. ¶ 7 (A.981); *accord*, *e.g.*, Wynter Aff. ¶ 49 (A.501) ("I called the career services office many times. Each time, the staff told me they would call me back. But they never did."); N. Bello Aff. ¶ 44 (A.5) ("Every time I called career services, I felt like they were just trying to get me off the phone. I started to feel like I was harassing the career services staff.").

Even when some students were able to reach Everest's career services department, Everest representatives failed to provide students with jobs leads, or arrange interviews for students. *See, e.g.*, L. Dykes Aff. ¶ 31 (A.103) ("[S]taff at Everest's career services offices gave me a list of temp agencies so that I could call them on my own and try to get a job. They did not introduce me to any employers on the list or any other employers."); G. Carrasquillo Aff. ¶¶ 68–69 (A.33) ("Everest did not help me find a job after I graduated. No one from the school called to check in. No one from the school called employers for me. I called the career services office for help finding jobs. They did not help. I looked for medical assisting jobs on my own."); B. Quinones Aff. ¶ 40 (A.335) ("After graduation, I went back to Everest's career services office a few times each week for help looking for medical assisting jobs. The career services staff did not help me look for a job. They just put me on a computer and had me search Craigslist for jobs."). Students did not receive the job placements they were promised.

Everest repeatedly and deceptively misrepresented its job placement assistance to prospective students in violation of the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice to make any false, unsubstantiated, or deceptive statements to prospective students as to job placement services. 940 Mass. Code Regs. § 31.04(5); *see also id.* § 31.04(2) (prohibiting use of deceptive language toward students). The Massachusetts Attorney General has also concluded that Everest violated the Act in this manner. MA MSJ at 2, 3, 10, 15. According to the Attorney General, Corinthian misrepresented the employment assistance

Everest MA schools provided to students, when "[i]n fact, Corinthian provided little or no help to students looking for jobs, and even the few students who obtained jobs typically found them on their own, without any assistance from Corinthian."). *Id.* at 15. The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 5.

### 12. Misrepresenting Industry Connections and Professional Reputation

Everest misrepresented its industry connections and its professional reputation among employers in the field, in violation of the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice to make false or deceptive statements regarding the "school's influence in obtaining employment for its students." 940 Mass. Code Regs. § 31.04(1); *see also id.* § 31.04(2) (prohibiting use of deceptive language toward students).

Admissions representatives commonly told prospective students that Everest had a great reputation, that a degree from Everest was highly valued among employers in the field, and that Everest had connections with the best clinics, hospitals, and dental and medical offices. *See, e.g.*, M. Oxidor Aff. ¶ 21 (A.290) ("The admissions representative told me, 'Everest has been around a long time. Employers respect the training that students get here. It is reputable and respected. Employers notice that degree from Everest when you apply.'"); R. McConnell Aff. ¶¶ 26–28 (A.236) ("The recruiter took me into the hallway and showed me a bulletin board. The board had postings with employers and jobs. The recruiter said that 'every single employer' on the board 'only hired Everest graduates.' She said that the employers on the board came to the school each month to check on the students they wanted to hire."); N. Bello Aff. ¶ 20 (A.3) ("The admissions representative said that Everest had relationships with lots of clinics and hospitals. She mentioned Brigham and Women's Hospital and Beth Israel Hospital by name."); S. Valdes Aff. ¶ 16 (A.450) ("The admissions representative said Everest had contacts with good dental offices, and those offices only wanted Everest students."); S. Rooney Aff. ¶ 18 (A.395) ("Ms. Martinez said the Everest had lots of connections with employers. She specifically mentioned Massage Envy, a chain. She said, 'We have a foot in the door. We know the people that do the hiring.' And, 'We have relationships across the United States, so it will not be a problem.'").

Printed materials provided to prospective students also boasted of the school's "network of employers," and "access to one of the largest physician and hospital databases in the world." Everest Career Services Brochure (A.849) ("Everest Career Services has a network of employers to help students find jobs."). Everest boasted of "solid relationships with employers both in our local communities and nationwide" and emphasized that "employers know that they can count on our graduates to be knowledgeable and professional." *Id.* (A.850) Everest's materials further claimed that "Everest Institutes and Universities are part of Corinthian Colleges, Inc., one of North America's leading and well-respected families of private career schools[,]" and that "Corinthian Colleges' schools are highly reputable . . . ."  Everest "Right Choice for Your

Career" Sheet (A.534) ("Our education is recognized and valued by employers, and so are our graduates."); *see also* Bryman "Right Choice for Your Career" Sheet (A.532) (containing identical claims about Bryman Institute).

In fact, Everest did not have industry connections with potential employers in the field and an Everest degree was not highly valued. *See, e.g.*, M. Colas Aff. ¶ 52 (A.50) ("The dental offices I applied to were not excited about Everest students. Most of the people I interviewed with did not even talk about where I went to school. Instead, they avoided the topic. It was strange."). In students' experience, a degree from Everest was often an impediment to obtaining work in the field and many employers refused to hire Everest graduates because of the school's poor reputation. *See, e.g.*, R. McConnell Aff. ¶ 78 (A.240) ("One hospital told me, 'Sorry, we wanted to meet you because of your GPA, but by hospital policy, we cannot hire Everest graduates.'"); K Cabrera Aff. ¶ 43 (A.25) ("While I was looking for a new job, one potential employer looked at the Everest diploma and told me it was worthless. That employer said that he needed people who know what they're doing."); C. Ramirez Aff. ¶ 45 (A.342–43) ("Working at Brigham and Women's as a medical assistant, I learned Everest had a very poor reputation among potential employers. Their reputation was so poor, Brigham and Women's considered whether to stop accepting Everest students for externships."); D. Exil Aff. ¶ 36 (A.133) ("When the dentist noticed I graduated from Everest, he told me I would not get the job because Everest was not a 'real school.'").

Everest's misrepresentations regarding its connections with employers and professional reputation violate the Massachusetts Consumer Protection Act. The Attorney General of Massachusetts also found that Everest falsely boasted of its industry reputation and connections. MA Complaint ¶ 89 ("Corinthian advertise[d] its 'network of employer relationships' and state[d] that '[o]ur placement experts help you find a job in your new career through a vast network of employer relationships.'"); *id.* ("Everest MA students rarely receive[d] jobs as a result of Everest MA 'relationships . . . .'"). The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 5.

## EDUCATIONAL SERVICES

*"[S]tudents made it through the program without having the ability to do the work of a medical assistant, medical administrative assistant, or dental assistant. It was unfair to the students. . . . [I]t is also dangerous."*

-Former Everest Employee Kristin Marie Creighton (A.961).

In violation of the Massachusetts Consumer Protection Act, Everest deceived prospective students and falsely promised that it would provide them with the training and skills they would need to work in the field, instruction by qualified and experienced teachers, state-of-the-art and up-to-date facilities and equipment, and a safe and professional educational environment. In

37

reality, Everest employed incompetent instructors in an unsafe and unprofessional environment, and did not provide students with the skills needed to work in the field.

### 13. Misrepresenting the Nature and Quality of Programs

In advertisements and during recruitment, Everest falsely promised prospective students that an Everest education would provide students with the skills they would need to work in their fields, and misrepresented the educational environment it provided. *See, e.g.*, M. Colas Aff. ¶ 22 (A.48) ("The recruiter said that Everest would give me the skills I needed to be a dental assistant and get a job."); J. Weeks Aff. ¶ 13 (A.479) ("[The Everest recruiters] said that the program was designed to give me all the knowledge I would need to work in the medical field in a short amount of time so I could start earning quickly."); B. Zene Aff. ¶ 17 (A.506) ("The recruiter said that Everest was better than college because it just focused on the classes that students needed to get jobs.").

The skills Everest taught students were outdated and irrelevant to the field of study. For example, students in the Medical Administrative Assistant program were not taught the proper coding software. Instead, students were taught only outdated paper-based coding techniques. *See* J. Murray Aff. ¶ 56 (A.275) ("Now that I work in medical administration, I can see that Everest did not teach me what I needed to know. For example, all the systems they used at Everest were outdated. At Everest, we practiced using paper forms. But in the real world, everything is electronic.").

 As one student in the Medical Administrative Assistant program states:

> The program did not fully prepare me for work in the field because we never learned or used the appropriate and relevant coding software because Everest did not have this. Ms. Colbert, an instructor at Everest told the class we were not learning the appropriate software because we did not have enough time. A substitute teacher told us the same thing. I think Everest knew it was impossible to learn all of the skills we needed to be successful in our field in 9 months.

S. Smalls Aff. ¶ 28 (A.428).

In all programs, Everest failed to expose students to the techniques, terminology, and procedures relevant to their fields:

> In January 2010, I transferred to the Salter School and I graduated with a certificate in Medical Billing and Coding in July 2010 . . . . I . . . had to stay after class to learn material that was not taught at Everest in order to catch up to where I needed to be in the Salter program. For example, I had to stay after class with my teachers to learn medical terminology and how to use a specific client software because we

were not taught these things at Everest. Students at Salter take a medical terminology class during their first month because you need to know medical terminology to get a job as a medical insurance biller and coder.

J. Santiago Aff. ¶¶ 23–24 (A.408); *see also, e.g.*, S. Smalls Aff. ¶ 29 (A.428) ("We did not cover all of the material we were supposed to cover. For example, we were supposed to do a blood pressure module, but we didn't because the substitute teacher did not know how to do this and we ran out of time. We also did not learn how to put in IVs, even though we were supposed to.").

Everest students who managed to obtain externships or jobs quickly realized that Everest had not prepared them to work in the field and they had to learn the required skills on the job. *See, e.g.*, L. Penton Aff. ¶ 37 (A.307) ("My education at Everest inadequately prepared me for the massage therapy profession. Everest did not teach me the basic skills needed for the profession, such as how to sequence a massage, and did not help me become a licensed massage therapist."). This inadequate training frustrated employers and often resulted in students' termination. *See e.g.*, M. Rivera Aff. ¶¶ 52–53 (A.373) ("When I started at the dental office, I realized that Everest did not teach me anything close to what I needed to work as a dental assistant. I felt blindsided. The dentist that I worked with was rude to me because I did not know anything. She yelled at me and treated me badly.").

Former students also report rampant plagiarism and cheating at Everest. According to one student,

> There was also a lot of cheating in class. The teacher would give us practice sheets the day before each exam. The practice sheets were basically the same as the exams, except the questions were worded a bit differently and were in a different order. Some students would even use the practice sheet during the test. If students were caught cheating, they were given a warning. If they cheated again, they were supposed to be kicked out of the program, but this was never enforced. The teacher didn't care that students cheated.

S. Johnson Aff. ¶¶ 32–33 (A.189). Sometimes, instructors facilitated cheating at Everest. According to a former student "[m]y teacher, Rhonda Heard, would give me and the other students the answers before our tests. . . . In case that was not enough, Ms. Heard let us retake the exact same tests over and over until we passed." A. Echevarria Aff. ¶¶ 40–41 (A.117–18).

Classes were overcrowded and experienced high student turnover. *See, e.g.*, B. Carter Aff. ¶ 15 (A.37) ("I found it difficult that there were always new students coming into class. It was like putting freshman and seniors together in high school. This was very disruptive."); E. Parent Aff. ¶ 43 (A.299) ("During my year at Everest, other students were constantly joining and leaving my class. New students would enroll and join the class in the middle of the program, while other students would leave because they graduated or dropped out.").

39

Overall, the educational environment at Everest was not as promised. *See, e.g.*, B. Burgos Aff. ¶ 33 (A.11) ("The class environment at Everest was bad. It was supposed to be a college but people acted like children."); S. Rooney Aff. ¶ 33 (A.396) ("During classes, I could hear students screaming and running in the halls. It was like an elementary school."). Everest instructors evaluated students based on metrics like whether a "Student's Hair Was Properly Groomed" and whether a "Student Wore Only Appropriate Jewelry" rather than focusing on the technical training and academic supports that were promised. *See* Everest "Mid-Module Advising" Sheet (A.835).

As a result, students who managed to complete Everest's programs were not prepared to work in their fields. *See, e.g.*, G. Carrasquillo Aff. ¶¶ 55, 57–58 (A.32) ("When I went to my externship, I realized that Everest had not prepared me at all. . . . For example, I did not know how to enter data into computers. The system at my externship was not the same as the one from my classes. I also did not know that I was supposed to call patients by their first name only."); R. Mislin Aff. ¶ 73 (A.247) ("When I started working at U-Smile, I realized that Everest had not taught me what I needed to know to be a dental assistant. I learned the names of dental procedures on the job, even though I should have known them from school."); C. Ramirez Aff. ¶ 33 (A.342) ("During my externship, I realized I was not as prepared as I thought I should have been to succeed in the field. The software system Boston Medical Center used was different from what Everest had taught me.").

The testimony of Charlene Victorino-Griffiths corroborates students' experience. Ms. Victorino-Griffiths worked as a practice assistant at Brigham and Women's Advanced Primary Care Associates in Jamaica Plain, Massachusetts (BWAPCA) when BWAPCA served as an externship site for students in Everest's Medical Assistant program. C. Victorino-Griffiths Aff. ¶¶ 2–3 (A.905). According to Ms. Victorino-Griffiths,

> Everest students were not as prepared as they should have been to perform standard medical assistant tasks. For example, one Everest student did not know how to take a patient's blood pressure, a skill students are expected to learn in their medical assistant classes before they begin their clinical externship.

*Id.* ¶ 4 (A.905). Furthermore, "[i]t was difficult for BWAPCA staff to supervise and work with Everest students because of their lack of proper training," and "Everest's industry reputation is very negative because the school did not properly train its students." *Id.* ¶¶ 5–6 (A.905).

Everest's misrepresentations regarding the skills it would teach students and Everest's educational environment violate the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice to make false or deceptive statements regarding the "the character, nature, quality, value, or scope" of an education program. 940 Mass. Code Regs. § 31.04(1); *see also id.* § 31.04(2) (prohibiting use of deceptive language toward students). Additionally, it is an unfair or deceptive act or practice for a school "to award a certificate or

diploma or confer a degree which misrepresents the program or course of study or instruction covered or completed or the accomplishments or standing of the student receiving such certificate, diploma, or degree." 940 Mass. Code Regs. § 31.06(4). Finally, it is an unfair or deceptive act or practice for a school to "encourage, enable, or reasonably fail to prevent students from cheating on examinations or classwork." 940 Mass. Code Regs. § 31.06(2).

The Attorney General of Massachusetts also found that Everest misrepresented to prospective students the skills Everest would teach. *See, e.g.*, MA MSJ at 12 ("Corinthian advertised and promoted the nature, character, and quality of its Massachusetts schools as providing high-quality career-ready education," however, "the content of Corinthian classes did not provide students with skills needed to adequately prepare them for careers in their fields of study."). The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 2, 5.

### 14. Creating an Unsafe Learning Environment

Everest exposed students to dangerous and unsanitary practices in the classroom, fights among students and teachers, drug and alcohol use, and theft.

First, several programs at Everest were unsafe and put students at risk of harm from improper, dangerous, and unsanitary practices. For example, students in the Medical Assistant program were instructed to practice drawing each other's blood, often before they received adequate training. As one former student recalls:

> The other students and I . . . would draw each other's blood. My teacher . . . didn't give us any safety instructions or have us take any other precautions before we experimented on each other. . . [A] classmate drew blood from me, but he forgot to remove the tourniquet before taking out the needle and blood ended up spilling everywhere.

Y. Pimentel Aff. ¶¶ 22–24 (A.318). Students were also forced to use expired supplies. *See, e.g.*, C. Ramirez Aff. ¶ 28 (A.341) ("The supplies we used were discolored and in bad condition. The teacher acknowledged that the supplies were old, but said it was okay because we were only using them for training purposes."). Everest did not provide proper instructions on how to perform these procedures or take appropriate safety precautions. *See, e.g.*, *id.* ¶ 26 (A.341) ("For example, my teacher did a phlebotomy on a student, and this resulted in the student's foot swelling because it was not done properly. The teacher also did an ear lavage on a student who had ear tubes in her ears, which she should not have done, and it caused the student extreme pain."); T. Maldonado Aff. ¶ 24 (A.226) ("I really didn't like practicing medical techniques on other students and having them practice on me. This was horrible, especially drawing blood on each other since most people didn't know what they were doing."). As a former Everest employee recognized, "students made it through the program without having the ability to do the

work of a medical assistant, medical administrative assistant, or dental assistant. It was unfair to the students. . . . [I]t is also dangerous."). K. Creighton Aff. ¶ 3 (A.961).

Second, many Everest students described classrooms that were disrupted by assaults and other criminal acts. These disruptions made students feel unsafe and interfered with their learning:

> While I was taking classes, the police came at least three times to stop students from attacking their teachers. . . . One time, I heard one of the students get arrested outside the school for threatening his teacher. At the time, I was surprised that the Everest staff did not seem bothered at all. I realized that they did not have a problem with the fights. To them, the fights were normal. I did not feel safe in the classroom. I felt like the students were taking over the classroom. The teachers had no control.

S. Rooney Aff. ¶¶ 28, 30–32 (A.395–96); *see also, e.g.*, S. Smalls Aff. ¶ 30 (A.428) ("I often saw students get into fights in the classroom and in Everest's hallways. When students fought, I felt unsafe because we did not have security."); R. McConnell Aff. ¶ 52 (A.238) ("There was violence on campus at Everest. While I was enrolled, two kids beat up a person at their externship site at Tufts hospital and got kicked out of their externship."); K. Kent Aff. ¶ 7 (A.974) ("I frequently saw fights at the school.").

Third, former students report that drug and alcohol use was a problem on campus and disrupted classroom instruction. *See, e.g.*, M. Colas Aff. ¶¶ 39–40 (A.49) ("It was hard to focus in classes because there were a lot of disruptions. The other students would curse and argue in class. Some students came to class high on drugs. They would be totally checked out and I could tell they were on something."); D. Jones Aff. ¶ 21 (A.195) ("Many students regularly smoked marijuana in the parking lots during breaks, and sometimes showed up drunk to class—even bringing drinks in on a few occasions."). Administrators at Everest were unwilling to take action to address drug use by students who were also expected to practice medical and dental procedures on one another. According to a former instructor:

> [T]here was a young lady who we suspected of being on drugs. She would always pass out in class. I brought it to the Director of Education, but nothing was done. . . . There was another student in my class who always came to school smelling of marijuana. . . . Inside his backpack, there was a glass jar with multiple bags of marijuana. I brought this to the attention of the Director of Education . . . [and] the campus President. They told me that they were not going to do anything about it.

K. Kent Aff. ¶ 4–5 (A.973).

Fourth, many former students report theft on campus. As one former student recalls:

> There was a lot of stealing at Everest. . . . It felt like anything that was not nailed
> down got stolen. People had books and wallets taken. Cars left unlocked got robbed.
> Someone even stole the camera from the front office. The staff could not take my
> picture for my ID tag because their camera had been stolen.

R. McConnell Aff. ¶¶ 49–51 (A.238). Others describe similar concerns with theft at Everest. *See,
e.g.*, S. Mattis Aff. ¶ 24 (A.231) ("There was theft at Everest. I had some money taken from my
backpack at school.").

Everest's misrepresentations regarding its professional standards and educational environment
violate the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or
deceptive act or practice to make false or deceptive statements regarding the "character, nature,
quality, value, or scope of any course or program offered." 940 Mass. Code Regs. § 31.04(1); *see
also id.* § 31.04(2) (prohibiting use of deceptive language toward students). Unfair acts and
practices are also prohibited. Mass. Gen. Laws ch. 93A, § 2. The Attorney General of
Massachusetts similarly found that Everest misrepresented its professional standards and
educational environment. MA Complaint ¶ 51 ("[C]lasses were subject to constant disruptions
that teachers and administrators refused or made no effort to control. Students spoke of drug use,
fights, swearing, and cheating in class."). The Massachusetts Superior Court has entered a
judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 5.

### 15. Misrepresenting Competency of Teachers

Admission representatives deceptively promised prospective students that they would be taught
by experienced and qualified instructors. *See, e.g.*, M. Colas Aff. ¶ 23 (A.48) ("The recruiter
said, 'The teachers know what they are doing.'"); E. Hernandez Aff. ¶ 14 (A.172) ("The
admissions representative also told me that Everest employed 'qualified teachers.'"). On its
website, Everest stated: "We don't just hire any instructor. We recruit qualified professionals
with industry-specific expertise. So you get the benefit of real-world knowledge and gain the
kind of practical insights that can't be learned from a textbook." MA Complaint ¶ 46. "The
instructors at the Chelsea campus bring a wealth of personal experience, which results in
innovative classroom projects and inspirational classroom discussions," and

> [t]he instructors at the Brighton campus are professionals who can give you
> practical advice in each area of study-all based on the real-world experience they
> bring to the classroom. They understand what it takes to make the subject matter
> come alive through inspirational classroom discussions and creative classroom
> projects. Small work teams allow the instructors to work with you one-on-one when
> needed.

*Id.* ¶ 47. Everest's printed materials also advertised "[e]xperienced [i]nstructors who offer
insight, make learning interesting and provide real world experience." Everest "Right Choice for

Your Career" Sheet (A.534); *see also* Bryman "Right Choice for Your Career" Sheet (A.532) (same).

In reality, many instructors at Everest were incompetent, lacked minimal qualifications, and had no experience teaching or in the relevant fields. *See, e.g.*, M. Colas Aff. ¶ 38 (A.49) ("One of my instructors at Everest did not know what she was doing. She did not explain concepts. Either we got it or not. It felt like learning by myself, without help."); S. Mattis Aff. ¶ 22–23 (A.231) ("My instructor at Everest seemed like she did not know a lot. She would stutter and struggle to speak about course topics when she was presenting to the class. She mostly stuck to what was in the books. My instructor at Everest told the class that she was just a medical assistant who taught on the side. It did not seem like she had any other teaching experience or advanced degrees."). One former Everest instructor stated that a fellow instructor "would stay for just two hours" in a class "that was supposed to last for four hours." K. Kent Aff. ¶ 3 (A.973) ("I told the Director of Education and the President at the Brighton campus that this teacher only had her students stay for two hours, but no one did anything.").

Many instructors at Everest behaved unprofessionally and failed to control their classrooms. *See, e.g.*, N. Bello Aff. ¶ 31 (A.4) ("[O]ne of my teachers, Ms. Lopez, came late to class a lot and did not seem prepared for class. She would have us read the textbook together out loud, which made me think that she did not have a plan for class. . . . [S]he acted more like a friend than a teacher. She asked us about our social lives and joked with us rather than teaching us."); S. Valdes Aff. ¶ 24 (A.450) ("My teacher let the students speak out, swear, and interrupt class. The teacher had no control over those kids."); C. Ramirez Aff. ¶ 24 (A.341) ("The teachers were more concerned with being friends with the students than teaching. They were on their phones during class, and chit-chatting with students. They would even gossip in class about other teachers . . . ."). Instructors were routinely late to class, or did not show up for class at all, leaving students unsupervised and untaught during class hours. There was also a high turnover rate among instructors, and instructors often changed multiple times throughout the course of the semester. As one student experienced, this high turnover often left students without any instructor at all:

> The teacher told my class that she was leaving and that someone would replace her. However, a replacement teacher was never hired. Instead, students who had only been in the program for a couple of months started teaching our class. Occasionally, we would have a substitute teacher, but for the most part the classes were taught by different students who were not qualified to teach the material. Over a three to four month period, we had several different students and substitutes who taught.

J. Santiago Aff. ¶ 21 (A.407).

Everest's misrepresentations regarding instructors' competency violate the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to "make a statement or representation through advertising or otherwise that a certain

individual or individuals have particular teaching or instructional or professional qualifications, certifications, or degrees when they do not." 940 CMR § 31.04(13); *see also id.* § 31.04(1) (prohibiting false or deceptive statements regarding the "character, nature, quality, value, or scope" of an education program); *id.* § 31.04(2) (prohibiting use of deceptive language toward students). The Attorney General of Massachusetts also found that Everest falsely promised prospective students that they would be trained by "qualified instructors," who had "real-world experience." MA Complaint ¶ 46. The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 5.

### 16. Inadequate Equipment and Facilities

Everest falsely represented the state of its equipment and facilities and deceptively failed to tell prospective students that the school's equipment and facilities were subpar, outdated, and often broken.

In printed materials, Everest promised students an opportunity "to practice with the real tools of your new job." Everest "Tips to Help You Succeed" Booklet (A.816); *see also* Bryman "Right Choice for Your Career" Sheet (A.532) (promising "Hands-On Training" and "real-world experience"). Across all programs, Everest promised "real-world learning programs" and "hands-on instruction." *See* Everest Dental Assisting Program Brochure at 1–2 (A.545–46); Everest Massage Therapy Program Brochure at 1–2 (A.552–53); Everest Medical Administrative Assistant Program Brochure at 1–2 (A.562–63); Everest Medical Assisting Program Brochure 1–2 (A.569–70); Everest Medical Insurance Billing and Coding Program Brochure at 1–2 (A.576–77). Recruiters used campus tours to highlight facilities that reinforced these promises, while hiding the reality of Everest's broken and outdated equipment. *See, e.g.*, R. Mislin Aff. ¶ 14 (A.243) ("I met with a recruiter at Everest. She gave me a tour of campus. The recruiter showed me the lab and the medical supplies. She did not show me the broken mannequins.").

In reality, Everest's inadequate equipment and facilities resulted in students not being taught the skills they needed to work in their fields. M. Gedeon Aff. ¶ 33 (A.155) ("There was rarely enough time to practice with the x-ray machines during lab. There were only four machines and one was broken. The machines were usually busy, because there weren't enough for the number of students."); S. Speight Aff. ¶ 34 (A.441) ("When I worked at my externship, I realized that the classes at Everest were outdated. For example, most of the equipment and procedures at Boston Medical Center were automated. Everything at Everest used older, manual equipment."). Everest lacked the digital x-ray equipment used by employers in the dental assistant industry. Instead, students in the Dental Assistant program learned how to develop x-ray photographs on film. *See, e.g.*, E. Parent Aff. ¶ 42 (A.299) ("[I]n our radiology class we spent a long time learning how to develop x-ray photographs on film, and to put them in the right sequence so they looked like a mouth. When I worked as a dental assistant, we used a digital x-ray machine and a computer to line up the images."). The medical coding software taught to Medical Administrative Assistant

students was also "very outdated." C. Ramirez Aff. ¶ 27 (A.341). At Everest, even basic equipment was in disrepair. *See* N. Bello Aff. ¶ 34 (A.4) ("The school building itself was pretty dingy. In my classrooms, there were broken chairs and tables with handwritten signs telling students not to sit there.").

Everest's deceptions regarding the nature and quality of its facilities violated the Massachusetts Consumer Protection Act. Pursuant to the Massachusetts Consumer Protection Act, it is an unfair or deceptive act or practice to make false or deceptive statements regarding the "character, nature, quality, value, or scope of any course or program offered." 940 Mass. Code Regs. § 31.04(1); *see also id.* § 31.04(2) (prohibiting use of deceptive language toward students).

### 17. Inappropriate Externships

Everest representatives and promotional materials claimed that students' externships would be in their fields of study and would help them learn the skills they needed to gain employment and thrive in the field. Across all programs, Everest promised that students would "get to practice in a real-world setting" and that this practice opportunity would provide students with "everything you need to start–and flourish—in your new career." *See* Everest Dental Assisting Program Brochure at 2 (A.546); Everest Massage Therapy Program Brochure at 2 (A.553); Everest Medical Administrative Assistant Program Brochure at 2 (A.563); Everest Medical Assisting Program Brochure at 2 (A.570); Everest Medical Insurance Billing and Coding Program Brochure at 2 (A.577). Everest recruiters routinely described the externship as a selling point. As one former student recalls:

> The recruiter said that Everest "will teach you everything that you need to be successful." . . . The recruiter said that Everest would place me in an externship. She said that Everest had, "so many good sites in Boston and Chelsea." She said I would be able to get experience with doctors as part of the externship. She told me that the experience that I would get during my externship would give me an opportunity to demonstrate my skills to employers.

C. Santos Aff. ¶¶ 21–22 (A.411).

In fact, many students' externships did not give them any opportunity to practice the skills of their fields, and some externships were completely outside the students' fields. *See, e.g.*, A. Pontes Aff. ¶ 24 (A.329) ("The first externship was with a chiropractor and was not in my field. I was very upset and frustrated Everest placed me in an externship completely unrelated to the medical assistant field."); T. Santos Aff. ¶¶ 52–53 (A.422) ("At Healing Hands, I did not do much billing or coding. Instead, I spent most of my time doing human resources paperwork, faxing and filing documents, and answering phones . . . . I was working for free and not practicing billing and coding much. It was not what I signed up for."); C. Randolph Aff. ¶ 20 (A.361) ("Everest first assigned me to an externship at an adult day care center. I called Everest

to complain because I was not using medical assistant skills in the externship."); C. Morales Aff. ¶ 48 (A.267) ("I had been told by Everest that my externship would involve bookkeeping, but it did not."). Medical Assistant students widely report being assigned only ministerial tasks at their externship, such as answering phones and filing paperwork:

> Everest placed me in an externship at Tufts Medical. Although my externship was in my field of studies, the hospital limited the tasks I was allowed to perform. . . . The externship consisted almost entirely of paper filing and answering phones. . . . I was not allowed any access to the computer systems and I did absolutely no medical insurance coding. I do not think that the externship prepared me for a job in the field.

S. Smalls Aff. ¶¶ 33–35 (A.429); *see also, e.g.*, N. Bello Aff. ¶ 38 (A.4) ("My externship was not really about medical assisting at all. It was more about paperwork and filing."); S. Griffiths Aff. ¶ 29 (A.167) ("I just watched other people answer and transfer calls. I did not learn anything helpful from my externship experience at Barron Chiropractic.").

Everest's failure to provide students with appropriate externships violates the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act, "for a school to promise or require an externship where the externship does not offer training in the field of study." 940 Mass. Code Regs. § 31.06(5); *see also id.* § 31.04(2) (prohibiting use of deceptive language toward students). The Massachusetts Attorney General has also found that "many externships provided by Corinthian provided little or no training in the students' fields of study." MA MSJ at 15–16. The Massachusetts Superior Court has entered a judgment against Corinthian based, in part, on these violations. S*ee* MA Judgment at 5.

### PROGRAM COST AND NATURE OF LOANS

*"The primary concern of your customer at this moment is whether they can afford to go to school. . . . Treat any expenses as an investment in their mind, not a cost."*

　-Everest "Admissions Interview Guide" (A.947).

*"The income changes associated with Everest's occupations do not justify the cost."*

　-Labor Market Economist Russell Williams (A.883).

Everest deceived students about its program costs and the nature of the student loans it facilitated in a number of ways. Everest representatives induced students to borrow loans they could not afford, often without informed consent, and put students on a path to financial ruin, credit harm, and debt collection. Corinthian recognized that it recruited individuals with "[m]inimal to non-existent understanding of basic financial concepts," and used abusive tactics and deception to steamroll them into enrolling and incurring debt they could not repay, the consequences of which

they did not understand. CFPB Complaint ¶ 6. These deceptive and unfair acts violated the Consumer Protection Act.

### 18. Deception About Nature and Availability of Student Aid

Everest deceived prospective students about whether, when, and in what amount they were borrowing loans.

Everest financial aid staff told some students that they would not need to repay their loans. *See, e.g.*, S. Johnson Aff. ¶ 30 (A.189) ("The worst part was that I had to take out new loans, which I didn't realize. I thought that I was getting grants because Everest told me that I qualified for two grants, including a grant for single mothers."); D. Exil Aff. ¶ 26 (A.132) ("The financial aid representative did not explain the difference between a grant and a loan."). Still others were told that they were borrowing only a small amount. *See, e.g.*, J. Rogers Aff. ¶ 9 (A.390) ("I thought I was getting one loan, but I found out later that there were two."); M. Gedeon Aff. ¶ 24 (A.155) ("I did not understand what kind of loans I was borrowing. I did not think I had to pay back the subsidized loans. . . . [I] did not know how much money I was borrowing."). Finally, recruiters deceived students who were recent immigrants to the United States and were not familiar with the financial aid process. *See, e.g.*, A. Jusufi Aff. ¶ 23 (A.203) ("The financial aid staff told me that in the United States, everyone signed up for student loans to go to college. They said that the loans were no big deal. . . ."); A. Thorley Aff. ¶ 13 (A.446) ("The process was very rushed and confusing especially since I had never taken out loans before. My confusion also stemmed from the fact that I had recently arrived in the United States."). Often, students did not learn the reality of their financial aid until payments came due. *See, e.g.*, J. Rogers Aff. ¶ 22 (A.391) ("I found out about the federal loan when it went into default."); M. Gedeon Aff. ¶ 25 (A.155) ("I did not find out that Everest cost $14,000 until I received my first bill about three months after I enrolled. I would not have signed up if I knew it would be that expensive.").

Everest's deceptive financial aid practices violated the Massachusetts Consumer Protection Act because Everest repeatedly and deceptively misled students about whether, when, and in what amount they were borrowing to enroll. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to make "any statement or representation to students, prospective students, or any other person as to student loans or financial aid that is misleading or has the capacity to deceive students or prospective students." 940 Mass. Code Regs. § 31.07(1). In addition, a school may not state that financial aid need not be repaid or that a program is "free" if financial aid consists in whole or in part of loans. *Id.* 31.07(2)(b)–(c).

### 19. Misrepresenting Consequences of Student Loan Borrowing

Everest misled prospective and enrolled students about how easy it would be for them to repay private and federal student loans borrowed to attend the school. *See, e.g.*, B. Zene Aff. ¶ 31 (A.507) ("The financial aid person said that my loan payments would be affordable and not to

worry about them. The financial aid person said it 'wouldn't be that much money.'"); J. Santiago Aff. ¶ 18 (A.407) ("I wasn't concerned about making payments because she made it sound easy."); J. Ocasio ¶ 26 (A.280) ("[the Everest Student Finance Planner] said that I would pay the loans really quickly. . . ."). Representatives often linked false promises of inflated earnings to false promises that loan repayment would be easy. *See, e.g.*, D. Exil Aff. ¶ 24 (131) ("I was told not to worry about student loans because I was guaranteed a good job when I graduated and would make enough to repay my loans.").

In its promotional brochures and its scripted pitch to students, Everest emphasized that prospective students should view the cost of attending as an "investment, not a cost":

## Admissions Interview Guide



### Education Investment Planning

The primary concern of your customer at this moment is whether they can afford to go to school. Explain the tuition amount and any additional costs associated with their program. Treat any expenses as an investment in their mind, not a cost.

Example discussion:

- The tuition investment of your selected program is _____.

  (Present *Education Investment Flyer* – I 9 and discuss.)

- There are many ways our students pay for their education. Some students receive partial assistance through grants. Some receive government or private loans. Students can also pay part of their tuition in cash or get assistance from a co-borrower. What types of things have you thought about?

- How do you feel about the opportunity to invest financially in your future?

Everest "Admissions Interview Guide" at *6 (A.947).

Everest representatives also told students that they would have flexible repayment options, including the ability to set their own repayment amounts. *See, e.g.*, G. Carrasquillo Aff. ¶ 50 (A.32) ("The representative said that I could pay whatever I was 'comfortable with.'"). Everest's sales pitch hammered affordability. *See, e.g.*, Everest "Admissions Interview Guide" at *1 (A.942) ("Once you decide this is right for you, I will introduce you to a Student Finance Planner who will show you how your training can be affordable.").

In reality, Everest students experienced great difficulty repaying their student loans from Everest. As discussed above, many Everest students did not get jobs in their field. Those who managed to find jobs after much time and effort did not earn the level of pay promised by Everest. *See, e.g.*, S. Veiga Aff. ¶ 46 (A.458) ("I am not earning enough money to pay off my loans from Everest like the people from Everest promised. I am stuck with student loan bills and no way to pay them."). The "investment" in an Everest education was a terrible one. *See* R. Williams Report at 14 (A.883) ("The income changes associated with Everest's occupations do not justify the cost.").

As a result, Everest students struggle greatly to pay their loans. *See, e.g.*, S. Smalls Aff. ¶¶ 51–52 (A.430) ("My student debt makes me anxious because it is going to be hard to get rid of with my current salary. To date, I have paid a total of $0 towards my federal student loans and $299 towards my Genesis loan."). *See generally* Sections IV.A & B, *infra*.

Government data corroborates the experiences described by former Everest students. The Massachusetts Attorney General's investigation shows "about 70% of students induced to take out private Genesis loans default on these loans within two years of the origination of the loans." MA Statement of Facts ¶ 70. Similarly, while federal data on Everest borrowers are limited, data that do exist show a 30% repayment rate for federal student loans borrowed to attend Everest. Everest borrowers are considerably more likely to default than they are to make progress toward repayment on their student loans:

| Everest Brighton Program[37] | 2011 Loan Repayment Rate[38] |
|---|---|
| Dental Assisting | 33.1% |
| Medical Administrative Assisting | 25.4% |
| Medical Assisting | 29.3% |
| Massage Therapy | 30.6% |

---

[37] U.S. Dep't of Educ., 2011 Informational Gainful Employment Rates, *available at* https://perma.cc/Z8N3-LZAR. Data are not available for the Chelsea campus.

[38] The 2011 Gainful Employment repayment rate measures "the percent of the GE Program's former students who are repaying their federal student loans, regardless of whether the former students completed the GE Program." It does so by dividing the total amount of loan balance outstanding on loans that have been paid in some amount by the total loan balance borrowed by the relevant student cohort. *See* U.S. Dep't of Educ., 2011 Gainful Employment (GE) Informational Rates Downloadable Spreadsheet Column Field Names Glossary at *2, *available at* https://perma.cc/Z8N3-LZAR.

These data support students' assertion that Everest recruiters blatantly misrepresented the ease of repayment on loan obligations, along with the debt loads and the earnings potential of Everest graduates.

Everest's false statements about the speed and ease of federal and private student loan repayment violated the Massachusetts Consumer Protection Act because they constituted extremely deceptive statements about financial aid. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to make "any statement or representation to students, prospective students, or any other person as to student loans or financial aid that is misleading or has the capacity to deceive students or prospective students." 940 Mass. Code Regs. § 31.07(1).

### 20. Unfairly and Deceptively Rushing Financial Aid Process

Everest deliberately rushed students to sign up for federal financial aid and private loans. This deliberately hurried financial aid process built upon, and was implicitly justified by, the false sense of urgency that the entire admissions process created.

During financial aid discussions, Everest staff consistently rushed students to complete paperwork, moving quickly through important financial documents and depriving students the opportunity to fully understand what they were signing. *See, e.g.*, J. Wahman Aff. ¶ 17 (A.465) ("I felt very rushed and pressured during this process."); S. Griffiths Aff. ¶ 21 (A.166) ("The financial aid process was very rushed. They did not explain what types of loans were available or the amount of money I would need to borrow."). Former students report confusion at the time and frustration that they were not given a chance to make meaningful choices regarding financial aid. *See, e.g.*, O. Wright Aff. ¶ 10 (A.494) ("The financial aid representative talked really fast about financial aid. I was confused, but the process went fast and I didn't get counseling about the types of loans."); V. Cooper Aff. ¶¶ 24–25 (A.62) ("The financial aid counselor filled out all of the paperwork, and told me my student loan applications were approved. I am not sure what type of student loans I borrowed."). To further rush the process, Everest financial aid staff completed loan paperwork on behalf of students. *See, e.g.*, H. Dow Aff. ¶ 27 (A.96) ("The financial aid representative did everything involving paperwork for the loans. It felt like I was not allowed to do the paperwork. I was nervous and too intimidated to ask questions.").

Everest financial aid staff pushed students to complete the financial aid process as soon as possible, before students had second thoughts. According to a former employee:

> In the financial aid department, we tried to have the students come back to campus within 24 to 48 hours of their initial meeting with the admissions reps with copies of W-2s and tax returns, as applicable, to complete the financial aid application process. It was known that if the students did not come back within a short period of time, then they were more likely to lose interest or end up at a competitor's school.

C. Kelly Aff. ¶ 3 (A.958). Everest staff used unscrupulous methods "to get students in and have all their paperwork finished." *Id.* For example, when a prospective student "told the counselor that I wanted to go home and talk it over with my parents" Everest staff pushed this student to complete loan paperwork on the spot anyway, "just to see what it would be like." R. Mislin Aff. ¶ 30 (A.244) (internal quotation marks omitted). This student "felt pressured" and ultimately "signed the papers." *Id.* Many former students say they would have chosen differently if given the chance to make an informed financial aid decision. *See, e.g.*, B. Burgos. Aff. ¶ 30 (A.11) ("Everest took advantage of my youth and ignorance about student loans and rushed me through the process."). The stakes were high for prospective students: Everest's unfair process pushed students into programs that cost between $14,000 and $20,000. *See* MA Complaint ¶ 25 (noting costs for Everest's programs between 2009 and 2014).

Everest's rushed financial aid process violated the Massachusetts Consumer Protection Act, which bans all practices that are "oppressive or otherwise unconscionable in any respect." 940 Mass. Code Regs. § 3.16(1). Rushed loan dealings are a hallmark of unconscionability. For example, in *Drakopoulos v. U.S. Bank Nat. Ass'n*, 991 N.E.2d 1086, 1096 (Mass. 2013), the Massachusetts Supreme Judicial Court affirmed that "rush[ing borrowers] to sign the documents at closing," thereby making them "unaware of the loan interest rate, the amount of their monthly payments, or the nature of the[ir] . . . loan[s]" is unconscionable. Like the borrowers in *Drakopolis*, Everest students were pressured to sign financial aid documents in oppressive, high-pressure situations. 991 N.E.2d at 1096. Further, Everest obscured information that borrowers needed to make informed financial aid decisions, including "the loan interest rate, the amount of their monthly payments, or the nature of the[ir] . . . loan[s]." *Cf. id.*; *see also Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 488 (Mass. 2004) (noting that conduct is "deceptive" when "it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted").

### 21. Misrepresenting Borrowers' Right to Choose Their Lenders

During the financial aid process, Everest consistently failed to inform students about Everest's conflicts of interest and close relationships with the lenders it recommended to students: Sallie Mae, Carnegie Student Loans, and Genesis. Everest financial aid representatives further concealed that students had the option of selecting other lenders, besides those with whom Everest had a preferred relationship. *See, e.g.*, C. Ramirez Aff. ¶ 20 (A.340) ("I was told the only loans I qualified for were Sallie Mae and the Genesis loan. I was told that the Genesis loan was a good choice because it had cheaper interest rates. They never mentioned other loan options to me."). Financial aid brochures used by Everest never indicated that students had the right to choose a lender. *See* Everest "Student Financial Planning" Brochure 3 (A.626) (omitting discussion of lender choice from a page-long description of FFEL loans). Often, Everest staff specifically instructed students as to which lender to select, *see, e.g.*, J. Murray Aff. ¶ 30 (A.273) ("The representative told me to fill in 'Sallie Mae' on my federal student loan contract."), or

even filled out the paperwork for students, *see, e.g.,* D. Exil Aff. ¶ 25 (A.132) ("The financial aid representative completed all of the loan documentation for me.").

Students have the right to select their lender and to comparison shop. However, Everest maintained special relationships with certain FFEL and private lenders and it steered students to these institutions. For federal loans, Everest maintained special relationships with Sallie Mae and Carnegie Student Loans. As discussed in detail below, Everest steered students to these institutions in exchange for special benefits. Similarly, for private loans, Everest's omissions concealed its special lending relationship with Sallie Mae, and its heavy involvement and financial stake in the Genesis lending program, *see* CFPB Complaint ¶ 109 (noting that Corinthian included Genesis on its Preferred Lending List). In both cases, Everest failed to disclose its relationship with these lenders. *See* CFPB Complaint ¶¶ 111–13.

Everest's failure to disclose students' lender options, denial of students' right to choose lending institutions, and failure to disclose its affiliations with Genesis, Sallie Mae, and Carnegie Student Loans violated the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to "deny any consumer's right to choose any Lending Institution" or "discourage any consumer from choosing a lender solely because that Lending Institution is not on the school's Preferred Lender List." 940 Mass. Code Regs. § 31.07(4). It is also a violation of the Act for a school to recommend a specific lending institution but fail to disclose "that the Lending Institution is affiliated with the school or its corporate parent" or "that the Lending Institution is providing something of value . . . to the school in exchange for any advantage or consideration." 940 Mass. Code Regs. § 31.07(3).

### 22. Misrepresenting Borrowers' Right to Cancel and/or Withdrawal

Everest deceived students about their right to loan cancellation and refunds if they left the school. Cancellation rights arise from federal and state law. Pursuant to federal law, a borrower has a right to cancel her federal student loans within 30 days of notification of award if she does not confirm that she wants the loans, or within 14 days after notification of award if she does confirm. *See* 34 C.F.R. § 668.165(4)(ii). In addition, a borrower who withdraws from a post-secondary program before she completes 60% of her period of enrollment is entitled to a pro-rated cancellation of her federal aid. *See* 34 C.F.R. § 668.22. Massachusetts law requires private occupational schools like Everest to conform to the following cancellation schedule:

| Termination Time | Cancellation Due |
|---|---|
| Within 5 days of enrollment | Full refund of all monies paid. |

| Prior to commencement of program | Full refund, minus actual reasonable administrative costs.[39] |
|---|---|
| During first quarter of program | At least 75% of tuition, less actual reasonable administrative costs. |
| During the second quarter of program | At least 50% of tuition, less actual reasonable administrative costs. |
| During the third quarter of program | At least 25% of tuition, less actual reasonable administrative costs. |

Mass. Gen. Laws ch. 255 § 13K.

Everest deceived borrowers about their right to cancel, denying them this right. Many students had doubts about Everest almost immediately after enrollment and sought to leave. *See, e.g.*, E. Parent Aff. ¶ 33 (A.298) ("Approximately three weeks to a month after beginning the program, I went to school with the intention of withdrawing from the program."). Everest staff induced these students to stay by falsely stating that these students would have to pay their loan obligations even if they withdrew. *See id.* ¶ 36 (A.299) ("The staff members pressured me into not withdrawing from the program [three weeks in]. They told me, 'No, no, no, you've got to stay.' They told me if I withdrew I would have to pay $10,000 of my loans right away."); *see also, e.g.*, Q. Ho Aff. ¶ 22 (A.184) ("[The Everest representative] said that I would owe the loans anyway, so why not stay and finish."); B. Colon Aff. ¶ 35 (A.55) ("The staff at Everest tried to pressure them to stay by telling the students that they would still have to pay even if they did not finish the program.").

Everest's misrepresentations regarding borrowers' right to loan cancellation upon withdrawal violated the Massachusetts Consumer Protection Act. This conduct was both deceptive, *see* 940 Mass. Code Regs. § 31.04(2), and expressly prohibited by the Act's implementing regulations, *see id.* § 31.06(11) (identifying as unfair or deceptive for "a school to misrepresent in any manner the student's right to cancel.").

### 23. Unfair and Deceptive Genesis Loan Program

Everest facilitated private loans through its Genesis Lending Program that were designed to fail, deceived students about the terms of these loans, and collected these loans by unfair means, all in violation of the Massachusetts Consumer Protection Act.

*Genesis Loans Were Designed to Fail*

Everest violated the law by facilitating Genesis loans that were designed to fail. Corinthian, Everest's parent company, created the Genesis program in 2008 in conjunction with Genesis

---

[39] Actual reasonable administrative costs may not exceed $50.

Lending Services, Inc. ("Genesis"). MA Statement of Facts ¶ 61; *see generally* CFPB Complaint ¶¶ 89–103 (providing detailed history of Genesis program). The goal of the Genesis lending program was to protect Corinthian's access to federal aid by sidestepping federal regulations which require that schools receive no more than 90% of their revenues from the federal government. CFPB Complaint ¶ 12 ("Every Genesis loan dollar that Corinthian induced its students to borrow, in effect, allowed Corinthian to receive up to an additional nine dollars in Title IV aid"). As part of the partnership, Corinthian paid Genesis to market, manage, service, and collect private loans originated through an affiliated bank. MA Statement of Facts ¶ 61. Corinthian guaranteed the loans itself. *Id.*

Genesis loans had terms that were extremely unfavorable to borrowers. The loans had interest rates from 16 to 18% and origination fees of 3 to 6%. *Id.* ¶ 66. The Genesis lending program targeted students with low credit scores. *Id.* ¶ 62. According to the Consumer Financial Protection Bureau, "the default rate on Genesis loans was consistently extremely high." CFPB Complaint ¶ 146. Moreover, "Corinthian knew of the high default rates for its Genesis loans, and at all times during operation of the Genesis loan program, Corinthian anticipated that the default rates would remain at these high levels." *Id.* ¶ 147.

The Massachusetts Consumer Protection Act prohibits loans made to borrowers "on terms that showed [borrowers] would be unable to pay and therefore were likely to lead to default." *Commonwealth v. Freemont Investment and Loan*, 897 N.E.2d 548, 557 (Mass. 2008). For example, in *Freemont*, the Massachusetts Supreme Judicial Court concluded that facilitating mortgage loans "doomed to failure" because of their onerous financial terms constituted a violation of the Consumer Protection Act. *Id.* at 554, 559. The Massachusetts Attorney General investigated the Genesis lending program extensively and concluded that it violated the law. According to the Attorney General, Genesis loans were "subprime loans," "doomed to failure," with a 70% default rate within two years of graduation. MA Statement of Facts ¶¶ 70–71. In its judgment against Corinthian, the Suffolk Superior Court agreed, concluding that Corinthian violated the Act by originating Genesis loans. *See* MA Judgment at 2, 5; *see also* MA MSJ at 20.

### Everest Deceived Students about Genesis Loans' Terms

Everest deceived prospective and enrolled students about when their Genesis loan repayment obligations would start. Everest often told students they would not need to pay their Genesis loans back until after graduation. *See, e.g.*, R. McConnell Aff. ¶ 45 ("I thought that I did not have to pay my loans until six months after I graduated."). However, once students began classes, they learned that the grace period promised for all of their loans did not apply. *See, e.g.*, R. McConnell Aff. ¶ 45 (A.237) ("In my first month of classes at Everest, someone from the financial aid office came to class. He told me that I owed Everest $5000 and that if I did not start paying, I could be suspended or not get my diploma. Before that, I thought that I did not have to pay my loans until six months after I graduated."); *see also* CFPB Complaint ¶ 116 ("Under the

Genesis loan program, nearly all student borrowers were required to make monthly loan payments while attending school.").

Everest's misrepresentations about the timing of loan repayment violated the Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to make "any statement or representation to students, prospective students, or any other person as to student loans or financial aid that is misleading or has the capacity to deceive students or prospective students." 940 Mass. Code Regs. § 31.07(1). In addition, schools may not state that "financial need not be repaid while the student is in school when the financial aid consists in whole or in part of public or private loans, any of which have no grace period or deferral term." 940 Mass. Code Regs. § 31.07(2)(d).

### *Everest Used Unfair Collection Tactics*

Everest used unscrupulous tactics to collect Genesis loans. Everest called students out of class and demanded repayment. *See, e.g.*, S. Valdes Aff. ¶¶ 30–31 (A.451) ("The [Everest] staff kept pulling me out . . . in the middle of class, to talk to me about making payments. The staff pulled me out of class five times in two weeks. . . . During those meetings the staff members told me that I would not be allowed to complete the program unless I made a payment. It felt like they were attempting to bully me."). Everest often threatened students that they could not continue with classes or graduate if they did not pay their Genesis loans. *See, e.g.*, V. Cooper Aff. ¶ 27 (A.62) ("The financial aid counselor told me if I did not make the [Genesis] payments while attending Everest I would be suspended."). Moreover, the Massachusetts Attorney General's investigation confirmed that pulling students from class was Everest's corporate practice. According to a former financial aid representative at Everest, "[i]f the students were not on time with monthly [Genesis] payments, a representative from Student Accounts would follow up with the student while they were in class to find out why they had not paid." C. Kelly Aff. ¶ 4 (A.959); *see also* K. Creighton Aff. ¶ 2 (A.961) ("One of my jobs at Everest was to contact current students who were behind in paying private student loans, which were borrowed from Genesis Lending and required repayment while in school. I contacted students by e-mail and telephone. Sometimes I would go to class to speak with students.").

Everest's attempts to embarrass and harass students by calling them from class and threatening suspension for nonpayment constituted illegal debt collection. Pursuant to Massachusetts law, creditors may not collect or attempt to collect in an "unfair, deceptive, or unreasonable manner." Mass. Gen. Laws ch. 93 § 49. Communicating with an alleged debtor "in such a manner as to harass or embarrass the alleged debtor" constitutes a violation. Mass. Gen. Laws ch. 93 § 49(c). Violations of Massachusetts debt collection laws also constitute *per se* violations of the Massachusetts Consumer Protection Act. *Id.*

56

### TRANSFERABILITY OF CREDITS

*"The Everest employee . . . said that if I wanted to go back to school to further my medical education then my credits from Everest would transfer. . . . [But when] I went back to school . . . for a nursing program . . . [n]one of my credits from Everest transferred . . . . I had to start over."*

>          -Former Everest Student Jessica Weeks (A.480, 483).

Everest deceived prospective students about the transferability of credits that they would earn at Everest, in violation of the Massachusetts Consumer Protection Act. These misrepresentations led Everest students to waste valuable time, expense, and federal financial aid eligibility on credits that could not be transferred to other institutions. The Department recently acknowledged this misconduct and announced that it had begun granting Borrower Defense claims predicated on such misrepresentations.

### 24. Misrepresenting Transferability of Credits

Everest deceived prospective students about the transferability of credits they would earn at Everest. Everest representatives commonly told prospective students that credits from Everest could be transferred to other schools. *See, e.g.*, J. Ocasio Aff. ¶ 16 (A.279) ("[The Everest representative] told me that all of the credits that I took at Everest would work at 'any college' and that 'this school is accredited.'"). Everest representatives often misled students planning further education in their fields of study by falsely claiming that Everest credits would establish a foundation for more advanced study. *See, e.g.*, R. Rivera Aff. ¶ 25 (A.378) ("The recruiter said that 'most of the classes' in a sports physical therapy degree 'are the same' as in massage therapy. She said, 'Most of your credits will transfer and you will be in school for less time.'"). These misrepresentations were especially common during recruitment for the Medical Assisting and Dental Assisting programs, where many prospective students sought pathways to becoming nurses or dental hygienists. *See, e.g.*, M. Colas Aff. ¶¶ 26–29 (A.48) ("I told the recruiter that . . . I might want to go back to school to become a nurse. . . . He said that if I went back to school, the other school would waive classes if I showed them my dental assisting certificate."); J. Weeks Aff. ¶ 22 (A.480) ("The Everest employee also said that if I wanted to go back to school to further my medical education then my credits from Everest would transfer.").

In fact, few schools in Massachusetts accepted credits from Everest, either from students seeking to transfer from Everest or from those hoping to use Everest credits to satisfy programmatic prerequisites for more advanced degrees. *See, e.g.*, M. Colas Aff. ¶ 59 (A.50) ("As far as Roxbury Community College cared, it was like I had not gone to Everest at all."); J. Ocasio Aff. ¶ 63 (A.285) ("None of my credits from Everest transferred . . . I have to start over."). Indeed, Everest's national accreditation by the Accrediting Commission of Career Schools and Colleges of Technology ("ACCSC") rendered its credits categorically non-transferable to many other

schools. *See* Everest 2008-2009 Course Catalog at 5 (2008) (A.739).[40] Virtually all of Massachusetts' community colleges and not-for-profit universities are regionally accredited. This distinction meant that Everest credits would not transfer to such schools. Indeed, registrars from Fitchburg State University, Framingham State University, MassBay Community College, Roxbury Community College, Salem State University, and UMass Dartmouth have confirmed that they do not accept credits from Everest Institute.[41]

The Department of Education and the Massachusetts Attorney General have reported the same violations. According to the Department, it is "prepared to issue relief for . . . claims for approval on the basis of misrepresentations [Corinthian] made about the general transferability of its credits."[42] According to the Attorney General, "Corinthian recruiters told . . . prospective students that Corinthian credits transfer[ed] to any accredited school. In fact, Corinthian credits transfer to few or no schools." MA MSJ at 16; *see generally* MA Statement of Facts ¶ 51 (describing in detail Everest's misrepresentations regarding transferability of credits).

Without question, Everest misrepresented the transferability of its credits and, in doing so, violated the Massachusetts Consumer Protection Act. Pursuant to the Act, it is an unfair or deceptive act or practice for a school to make "any false, untrue, or deceptive statement or representation or any statement or representation which has the tendency or capacity to mislead or deceive . . . prospective students . . . concerning . . . transferability of credits." 940 Mass. Code Regs. § 31.04(1).

## EVEREST'S OTHER VIOLATIONS OF STATE LAW

*"Everest was a complete scam. The school lied to me to get me to enroll and sign up for student loans. It is sad that so many people got duped by them."*

     -Former Student Lucy Dykes (A.106).

Everest unfairly targeted women, mothers and students of color, used an unconscionable enrollment agreement, and operated a total sham.

---

[40] In October 2009, ACCSC changed its name from the Accrediting Commission of Career Schools and Colleges of Technology to the Accrediting Commission of Career Schools and Colleges. *About Us*, ACCSC, https://perma.cc/824F-S38T.

[41] *See* Letter from Linda Dupell, Registrar, Fitchburg State Univ. (Sept. 30, 2015) (A.988); Letter from Revathi O'Neal, Assistant University Registrar, Framingham State Univ. (Sept. 30, 2015) (A.990); Letter from Lynn Hunter, Vice President of Academic Affairs, MassBay Cmty. Coll. (Oct. 16, 2015) (A.992); Letter from Registrar Staff, Roxbury Cmty. Coll. (Sept. 30, 2015) (A.994); Letter from John Keenan, General Counsel, Salem State Univ. (Oct. 2, 2015) (A.996); Letter from Tracy Wallace, Senior Coordinator for New Student Transfer, UMass Dartmouth (Nov. 2, 2015) (A.998).

[42] U.S. Dep't of Educ., Federal Student Aid Enforcement Office, *Report on Borrower Defense* 3 (Oct. 28, 2016), https://perma.cc/FW83-QUVT.

### 25. Targeting Women, Mothers, and Students of Color

Everest unfairly focused its recruiting efforts on women, mothers, and minority students, and used unfair and deceptive tactics to encourage enrollment by students within these vulnerable communities.

Recruitment materials that Everest produced, such as advertisements and videos, were targeted at single mothers. For example, one former Everest student describes watching "an orientation video [which] featured a single Latina mother of two, living out of her car, who enrolls at Everest and soon after gets a job and buys a house and has a full, happy family." D. Jones Aff. ¶ 17 (A.195). Another former student recalls:

> [Recruiters] played an ad for me and other prospective students. The ad showed a woman who supposedly graduated from Everest, and now she had a career instead of just a job, and could afford to support her kids.

C. Ramirez Aff. ¶ 15 (A.340).

Recruiters also emphasized Everest's suitability for single mothers in their pitches. For example, as one student recalls:

> I told the recruiter that I was a single mother looking for a way to support my kids. He told me that a lot of Everest students were single moms like me. He brought in a current student who was also a single mother. The current student told me that she was also a single mother . . . . The current student told me that a majority of the students at Everest were single mothers like me.

B. Quinones Aff. ¶¶ 13–15 (A.333–34). Another student describes a similar experience:

> The recruiter told me, 'This is a great opportunity for you and your children. . . .' The recruiter said that Everest had flexible schedules so it would be easy to take care of my family and go to school at the same time. . . . I can see now that Everest took advantage of women like me with children. They lied to us and said that Everest would help our families, when really they were hurting us.

C. Santos Aff. ¶¶ 17–18, 72 (A.411, 415).

Everest's unfair recruitment of single mothers was effective and, as a result, single mothers were disproportionately harmed by Everest's many violations of the Massachusetts Consumer Protection Act. In 2014, 85% of students enrolled in Everest's Massachusetts programs were women. *See* Everest Demographic Charts (A.940). As one former student recalls, "[m]y classmates at Everest were mostly women. Like me, many of them had

children that they needed to care for." C. Santos Aff. ¶ 35 (A.412). *See also* S. Valdes Aff. ¶ 26 (A.451) ("There were several pregnant young women in the program including me.").

Everest also used an advertising strategy that aggressively targeted minority students for scam programs. Everest invested heavily in ads with Black Entertainment Television, LLC ("BET"), spending $646,257, or over half a million dollars in a two-week period just as it was going out of business. Corinthian Vendors Table (A.931). By comparison, MTV was Corinthian's second-biggest television advertiser, and took in only $81,389 during the same period, or 12.6 percent of the amount spent at BET. These figures show that Corinthian focused its advertising efforts towards recruiting students from minority populations.[43] Former employees of Everest affiliates in Illinois claimed that "[t]elevision, radio, and billboard advertisements, as well as flyers and pamphlets, are placed so as to reach a disproportionately large African-American audience. These materials also rely heavily on images and language cues designed to appeal to African Americans."[44]

In addition to advertising in fora targeted to communities of color, Everest advertising campaigns were racially coded. Many clients described seeing a "get off the couch" advertisement featuring a young African American man enthusiastically promoting Everest's programs. *See, e.g.*, D. Jones Aff. ¶ 4 (A.193) ("I first learned of Everest through a commercial on TV. The commercial depicted an African American man standing in a parking lot saying something to the effect of 'Get off the couch and make something of yourself.'"). Another Everest advertisement opens with the message, "hey ladies, get up," and features a woman of color encouraging other women to enroll in Everest's programs.

Everest hired recruiters from minority communities in order to increase its capacity to unfairly enroll minority students for its scam programs. According to former recruiters for Everest programs in Illinois, Everest "operated a high school recruitment program in or around 2009 and 2010 that was designed to target African Americans," "utilized a software program called 'Everest Connect Portal' so that it could identify predominantly African-American high schools," and hired African-American recruiters "to dupe African Americans into enrolling."[45]

Everest deployed a Spanish-language recruitment strategy to aggressively recruit immigrants from Spanish-speaking countries. This strategy worked on Kennya Cabrera, a former student who attended Everest in 2008, two years after immigrating from El Salvador. K. Cabrera Aff. ¶ 13 (A.21). Ms. Cabrera told Everest recruiters that her English skills were limited, and that her mother, Marta, was even less comfortable with English. *Id.* ¶¶ 13, 23–24 (A.21–22). Everest conducted the recruitment, enrollment, and financial aid processes in Spanish. But Ms. Cabrera's

---

[43] *See* Complaint ¶ 99, *U.S. ex rel. Boyd v. Corinthian Colls., Inc* 14-cv-6620 (N.D. Ill., Aug 27, 2014), https://perma.cc/NJF2-5U9K.

[44] *Id.*

[45] *Id.* ¶¶ 96–98; *see also, id.* ¶ 98 ("Ruthie Parker, who was one of the high school recruiters, was told by a white [Everest] official that she would be good for the high school program because she was a 'black mother type.'")

classes were in English and she "didn't understand a lot of what the teacher was saying." *Id.* ¶ 30 (A.23). After graduating from Everest, Ms. Cabrera was fired from her first job because her English skills were not strong enough. *Id.* ¶ 42 (A.24). Ms. Cabrera subsequently obtained a GED but still has never found a job in her field due to her poor English. *Id.* ¶¶ 45–47 (A.25).

Everest's recruitment strategies resulted in enrollment that was predominantly African American and Latino. For example, in 2014, roughly 75% of Everest's students were either African American or Latino. Everest Demographic Charts (A.940).

Everest's exploitative targeting of women, single mothers, and minority students violated the Massachusetts Consumer Protection Act's prohibition against unfair and deceptive conduct. *See* Mass. Gen. Laws ch. 93A, § 2(a). An act or practice is unfair if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [or] (2) immoral, unethical, oppressive, or unscrupulous." *Gossels*, 902 N.E.2d at 378 (internal quotation marks and citation omitted). Pursuant to the Massachusetts Consumer Protection Act, acts or practices may be unfair even if consumers enter into them willingly and with full information and knowledge. *DeCotis*, 316 N.E.2d at 755 ("The willingness of [a consumer] to pay . . . fees, and even to contract knowingly to pay those fees, does not make the collection of such a fee fair."). In determining whether an act is unfair, courts must consider all relevant circumstances of a transaction, including whether an individual is specifically targeted because of his or her vulnerabilities. *See Billingham v. Dornemann*, 771 N.E.2d 166, 175 (Mass. App. Ct. 2002) (holding that trial judge erroneously failed to consider all relevant evidence of unfairness, including fact that Plaintiff was specifically targeted as a "distressed" seller).

In addition, Everest violated the Equal Credit Opportunity Act ("ECOA") by targeting students based on race and gender and steering these students toward federal, private, and proprietary loans that were expected to fail. 15 U.S.C. § 1691 *et seq.*; *see, e.g.*, *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 306 (E.D.N.Y. 2014) (collecting cases that present reverse redlining as "a target of civil rights litigation and . . . cognizable as a claim in the federal courts").[46] Everest's violations of ECOA form the basis of state law claims that in turn establish defenses to repayment for former Everest students. *Bolduc v. Beal Bank*, 167 F.3d 667, 672 (1st Cir. 1999) (affirming that an ECOA violation in the formation of a loan may create a state-law defense to the repayment of the loan). In turn, these practices constitute illegal and unfair business practices that violate Massachusetts consumer protection law. 940 Mass. Code Regs. § 3.16(4) (prohibiting conduct that violates "Federal consumer protection statues within the purview" of the Massachusetts Consumer Protection Act); *see Kaitz v. Shane*, No. 922509, 1995 WL 808735, at *8 (Mass. Super. July 18, 1995) (recognizing that ECOA violations constitute violations of the Consumer Protection Act); *see generally Gossels*, 902 N.E.2d at 378 (noting

that unfairness includes acts "(1) within the penumbra of a . . . statutory . . . concept of unfairness; [and] (2) immoral, unethical, oppressive, or unscrupulous [acts].").

### 26. Entering into an Unconscionable Agreement with Students

Everest's enrollment contracts were one-sided, based on a slew of misrepresentations, and signed in high-pressure sales settings that amplified the disparities in power and sophistication between the parties. These contracts are substantively and procedurally unconscionable and are not enforceable under state law.

The substance of the bargain between Everest and its students, codified in the standard-form enrollment agreement, was unconscionable. *See generally* Everest Applications and Enrollment Agreements (A.583–612). These agreements locked students into exorbitantly priced programs that provided little to no value to students. In one critical metric—future earnings—Everest programs actually provided negative value to students. The conclusion of Russell Williams, labor market economist, is that graduates of Everest programs in Massachusetts were likely to have wages lower than the median for high school graduates in the area. In other words, students decreased their earning potential by going to Everest. They thus face "significant challenges" in recouping the cost of their education and repaying their student loans. *See* R. Williams Report at 16 (A.885). For students, there simply is no benefit of the bargain.

Everest's enrollment contracts were also procedurally unconscionable. Everest was part of a sophisticated national corporation with trained recruiters whose job was to enroll as many students in its programs as they could, without regard to the consequences for students. It dictated non-negotiable terms and, as discussed extensively above, used deceptive and high-pressure tactics to pressure potential students to enroll quickly, leaving little time for them to investigate or evaluate Everest's false promises.

In Massachusetts, unconscionability is found when, "at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party." *Miller v. Cotter*, 863 N.E.2d 537, 545 (Mass. 2007). The agreement between Everest and its students was unconscionable in light of multitudes of misrepresentations made by Everest about what exactly it was selling. In essence, these misrepresentations go to the heart of the transaction. Former students describe Everest in terms that make clear that this was a purchase that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Waters v. Min Ltd.*, 587 N.E.2d 231, 233 (Mass. 1992) (internal quotations omitted); *see, e.g.*, R. Mislin Aff. ¶ 82 (A.248) ("If I knew then what I know now, I never would have gone to Everest. They got me to go by lying to me"); S. Veiga Aff. ¶ 49 (A.458) ("I would not have gone to Everest if Everest had not lied to me. . . ."). Coupled with the high-pressure sales tactics deployed by Everest recruiters, students entered into contracts with Everest that were both substantively and

procedurally unconscionable. In the predatory lending context, Massachusetts courts have previously found procedural unconscionability where borrowers:

> Were rushed to sign the loan documents, not given an opportunity to read them, and told to "just sign the documents." They . . . did not know anything about this type of loan, were never informed that they had received one . . . were not informed that such loans come with a higher interest rate . . . . [The borrowers] were rushed to sign the documents at closing and were unaware of the loan interest rate, the amount of their monthly payments, or the nature of the . . . loan.

*Drakopoulos v. U.S. Bank Nat. Ass'n*, 991 N.E.2d 1086, 1090, 1096 (Mass. 2013); *see* Section III.20, *supra*. Everest's enrollment contracts were one-sided, based on a slew of misrepresentations, and signed in high-pressure sales settings that amplified the disparities in power and sophistication between the parties. These contracts are substantively and procedurally unconscionable and are not unenforceable under common law contracts principles nor Massachusetts consumer protection law.

### 27. Operating a Total Sham

Everest's many lies and deceptions fit together to form a complete sham. Everest promised to take in students and provide a combination of practice-oriented education, externship experience, and career placement assistance that would lead to either employment by the externship site, employment through Everest's touted relationships with employers, or employment through the use of Everest's "life-long" career services. *See* Sections III.5–17, *supra*. In each of these ways, potential students were falsely guaranteed employment. *See* Sections III.6, *supra*. Everest's employment guarantee extended beyond students' first job. *See* Section III.11, *supra*. Everest promised students a pipeline into a career path with specific salary ranges and job opportunities that would continue to increase over time. *See* Sections III.5–9, *supra*. If the promises sounded too good to be true, Everest compensated by paying recruiters and other students to be brazen about varnishing the truth. *See* Sections III.3–4, *supra*. Further, Everest rushed potential students through their decision with additional lies that clipped opportunities to research the validity of Everest's claims and weigh the decision. *See* Sections III.1, 20, 26, *supra*. Finally, Everest targeted its scheme at particularly vulnerable communities and caused its former students devastating harm. *See* Sections III.2, 25, *supra*. As one former student states, "Everest was a complete scam. The school lied to me to get me to enroll and sign up for student loans. It is sad that so many people got duped by them." L. Dykes Aff. ¶ 61 (A.106). Many others share this sentiment. *See, e.g.,* J. Murray Aff. ¶ 67 (A.275) ("Everest was a complete rip-off. My certificate from Everest did not help me get my current job. . . If anything, [Everest] held me back."); S. Valdez Aff. ¶ 50 (A.453) ("Everest promised stability, but all they provided was debt."); S. Johnson Aff. ¶ 49 (A.191) ("Everest only cared about getting you in the door and having you take out loans so that they could make money."); J. Weeks Aff. ¶ 69 (A.484) ("It makes me

angry and sad to think I am still paying for such a worthless degree. Attending Everest cost me more than I can explain without breaking down emotionally.").

Former employees also describe Everest's operations as a sham. E. Morrison ¶ 3 (A.967) ("Everest was only interested in enrolling as many students as possible, and it engaged in misleading recruiting practices to do so."); N. Napolitano ¶ 5 (A.970) ("[I]t was Everest's policy to enroll anyone, without considering their ability to benefit from its programs."). Employees were well aware that Everest was not delivering the results that it promised during recruitment. V. Sulkowski Aff. ¶ 5 (A.980) ("[T]he goal was to bring people in the door and get them to sign up. After that, the level of hand holding and service providing fell off."); S. Koral Aff. ¶¶ 3, 7 (A.983–84) ("The Career Services representatives did not mention graduates making only minimum wage, or graduates who did not find a job at all. . . . it was very difficult to see so many students . . . have difficulty finding a job."); M. Goodus Aff. ¶ 3 (A.986) ("[T]he President of the Chelsea Campus, Wade Charlton, asked me to be creative with my placement numbers. . . . He wanted me to find a way to make the placement numbers meet what the accreditors were asking for."). Everest's scam was designed to fool accreditors as well as students. *See* J. Malkin Aff. ¶ 4 (A.964) ("Everest fudged job placement rates to meet accreditation requirements."); D. Garrow-Pruitt Stmt. at *2 (A.977) ("Everest Brighton was not meeting the standards of its accreditor Accrediting Commission of Career Schools and Colleges ('ACCSC') . . . [and] 'mastermind[ed]' a plan to defraud ACCSC."). Many employees left to avoid the unethical and unlawful tasks Everest required of them. N. Napolitano ¶ 5 (A.970) ("I resigned from my position [in the admissions department] at Everest . . . because I felt morally conflicted."); K. Kent Aff. ¶ 10 (A.974) ("I left the school because I was tired of . . . the lies everyone was told."); V. Sulkowski Aff. ¶ 8 (A.981) ("I left my job . . . because in my opinion, they were selling a pretty terrible product to people who did not know better.").

The Department of Education has already acknowledged several components of Everest's sham. The Department announced first that Everest misrepresented job placement rates across all programs and campuses.[47] Then, in October 2016, it announced that Everest also misrepresented the transferability of credits on a widespread basis.[48] In January 2017, the Department announced that Everest's false guarantees of employment were a third, distinct basis for widespread relief to former students.[49] Each of these three misrepresentations is a small piece of the systematic deception that Everest perpetrated against every student.

---

[47] *See* Press Release, U.S. Dep't of Educ., Fact Sheet: Protecting Students from Abusive Career Colleges: Administration Outlines New Debt Relief Process for Corinthian Colleges' Students (June 8, 2015), https://perma.cc/9PJX-DVQZ; Press Release, U.S. Dep't of Educ., U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses (Mar. 25, 2016), https://perma.cc/266L-Y7DX.
[48] U.S. Dep't of Educ., Federal Student Aid Enforcement Office, *Report on Borrower Defense* 3 (Oct. 28, 2016), (recognizing "misrepresentations [Corinthian] made about the general transferability of its credits"), https://perma.cc/FW83-QUVT.
[49] *See* Press Release, U.S. Dep't of Educ., American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans: Education Department Announces Continued Progress with Borrower Defense and Closed School Loan Discharges (Jan. 13, 2017), https://perma.cc/BNM6-3ASK.

Massachusetts law does not allow total shams to defraud consumers with impunity. Indeed, the Massachusetts Attorney General has already obtained a judgment against Everest in state court based on common misrepresentations about the jobs and salaries of Everest graduates, the nature, character and quality of the programs, the transferability of credits, and the availability and training provided by externships. *See generally* MA Judgment at 2, 5. At the same time, Everest set students up to fail by recruiting and admitting students who did not meet prevailing education, language, and background qualifications for their fields of study and steering these students into predatory, subprime loans that Everest knew they would be unable to repay.

## IV.   Harm to Students

Everest's unlawful operations have caused students to suffer many types of ongoing harm. Such harms include negative consequences from unfairly obtained student loan debt, coercive collection, lost financial aid eligibility, emotional distress, and the waste of students' time and money.[50]

### A.  Oppressive Student Loan Debt

Everest's unfair, deceptive, and unlawful practices caused former Everest students to be burdened with oppressive student loan debt. By the Department's standards, Everest programs burdened students with too much debt in relation to their value. For example, by one measure, after attending the Massage Therapy program, students typically had to devote 100 percent of their discretionary earnings to service their debt; dental students had to devote nearly 200 percent of discretionary earning to debt service.[51] As one former student states, "I could be a nurse by now if Everest had not lied to me. Instead, I have a worthless certificate and almost $10,000 in student loan debt." M. Colas Aff. ¶ 63 (A.50). Many former Everest students suffer these harms particularly acutely because they have very limited incomes after graduating from Everest and cannot afford to repay their student loans. *See, e.g.,* A. Ramos Aff. ¶ 49 (A.349) ("I cannot afford to pay my student loans."); B. Quinones Aff. ¶ 48 (A.336) ("I could not afford to pay bills, take care of my five children on my own, and pay my student loans."); *see also* R. Williams Report at 10, 14 (A.879, 883) (finding that Everest graduates earn less than the median earner with only a high school degree and concluding that "the income changes associated with Everest's occupations do not justify the costs"). Worse still, unmanageable student loan debt creates long-lasting harm for former Everest students precisely because Everest did not actually deliver better salaries or career options as its recruiters promised. Former students' oppressive student loan

---

[50] In addition to these harms, the purchase of "falsely represented product[s]" is, "by itself, an ascertainable injury under our consumer protection statute." *Aspinall v. Philip Morris Co., Inc.*, 813 N.E.2d 476, 486 (Mass. 2004).

[51] *See* U.S. Dep't of Educ., 2011 Informational Gainful Employment Rates, *available at* https://perma.cc/Z8N3-LZAR.

debt continues to grow despite their efforts to repay. *See, e.g.*, J. Murray Aff. ¶ 62 (A.275) ("My total outstanding debt from attending Everest is $11,953. And it is going up.").

### B. Coercive Collection

Many former Everest students have experienced or continue to experience coercive collection on their unlawfully-originated Everest loans, such as wage garnishment, and tax refund ("Treasury") offset. Disturbingly, as of September 2016, nearly 80,000 Corinthian students nationwide were experiencing coercive collection in the form of wage garnishment or Treasury offset.[52] In Massachusetts, these coercive collection practices have left Everest's low-income students even worse off than they were before they enrolled at Everest. Rather than putting students on a path to obtaining the inflated wages promised by recruiters, Everest set its former students up for financial hardship.

Many former Everest students have been harmed by administrative wage garnishment because they defaulted on their Everest loans:

> The loans went into default because I could not afford to keep up. I even got a wage garnishment notice. This was very frightening because I need my earnings to provide for my family, including my wife and five children.

M. Pimentel Aff. ¶ 43 (A.319). For another former student, a tax refund offset and monthly wage garnishment "has created an extreme financial hardship . . . and has made it difficult . . . to afford basic necessities." J. Perez Aff. ¶¶ 35–36 (A.313).

Former Everest students have also experienced the administrative seizure—or "offset"—of much needed tax refunds, including the seizure of the earned income tax credit, which provides an important lifeline to low-income working families. One former Everest student describes the rippling harms that flowed from tax offset to pay her Everest loans:

> In February 2016, my earned income tax credit, which I rely on to pay for basic living expenses, was offset by the Department of Education in the amount of $6,313. Because of the offset, I could not afford to buy anything for my children and I fell behind on most of my bills. The offset caused my four kids to suffer. The worst feeling I ever had was not being able to pay most of my bills. I have four kids that rely on me.

D. Exil Aff. ¶¶ 43–44 (A.133). Another former Everest student describes the devastating consequences of a Treasury offset that represented nearly half of her already-low earnings:

---

[52] *See* Letter from Sen. Warren to Sec'y King, Dept. of Educ. 1 (Sept. 29, 2016), https://perma.cc/2MST-2VLB.

> In 2016, the federal government took all of my tax refund . . . to pay my student loans from Everest. In total, the government took $7771, including my $5548 Earned Income Tax Credit. That year, my income was $16,103. I really needed that money to take care of my family.

B. Quinones Aff. ¶ 49 (A.336). Many other former students describe the painful consequences that Treasury offsets to pay Everest loans have wrought on their families and their financial stability. *See, e.g.,* S. Speight Aff. ¶ 47 (A.442) ("The government took my full tax refund for 2013 and 2014 to pay my student loans. I gave birth to my daughter in 2013 and I really needed the money to take care of her."); D. Smallwood Aff. ¶ 32 (A.436) (describing experience of Treasury offset amidst housing eviction); W. Moore Aff. ¶ 84 (A.262) ("I worry that the government will keep taking my taxes and make it even harder to keep up with the cost of living.").

For the low-income students whom Everest recruited with false promises of improved job prospects and earnings potential, *see generally* Sections III.5–.9, *supra,* the financial consequences of coercive student loan collection are beyond harmful, and often devastating for former students and their families.

### C.  Lost Financial Aid Eligibility

Everest squandered its students' limited federal financial aid funds, without advancing their economic and career opportunities. Depleted financial aid eligibility has limited—and in some cases eliminated—students' options to seek educational advancement because they are unable to pay for school without federal financial aid.[53] *See, e.g.,* M. Colas Aff. ¶ 66 (A.51) ("I am worried that I will not be able to continue my education towards becoming a nurse because of the grants and loans I used up to go to Everest."); M. Rivera Aff. ¶ 62 (A.374) ("I would like to go back to school to become a dental hygienist but I am worried about taking on more loans. I am in a worse position because Everest used up some of my federal aid eligibility."). Additionally, by consuming significant portions of former students' Pell grant eligibility, Everest expended an important benefit for low-income students for its own profit. As one former student put it, "Everest used up more than $4,000 of my Pell grant eligibility. That means I have less to work with in my future studies." J. Weeks Aff. ¶ 65 (A.484).

---

[53] Federal law limits the amount of federal student loans a student can borrow each academic year, depending on her status as a dependent and her year in school. *See* 34 C.F.R. § 685.203 (specifying loan limits). The aggregate loan limit is $31,000 for a dependent student and $57,500 for an independent undergraduate. *Id.* § 685.203(e). Similarly, a student may only receive a maximum Pell grant award of $5775 per academic year, and may only receive Pell grants for a maximum of 12 semesters. *See Programs: Federal Pell Grant Program,* U.S. Dep't of Educ., https://perma.cc/4KA3-WP57 (listing maximum grant for 2015-16 year); U.S. Dep't of Educ., Changes Made to the Title IV Student Aid Programs by the Recently Enacted Consolidated Appropriations Act, 2012, Dear Colleague Letter GEN-12-01 at 2 (Jan. 18, 2012), https://perma.cc/TZA3-BRPQ (listing 12-semester limit).

The harm of lost financial aid eligibility is magnified for Everest students because Everest credits are non-transferable, *see generally* Section III.24, *supra*. This non-transferability puts former Everest students in a difficult position because in order to access the employment opportunities that Everest promised them, students would have to complete comparable programs from the beginning, but with less financial aid, and with the additional burden of debt and other negative consequences from Everest. Every former Everest student that the Project spoke with has suffered this type of harm because each has lost a portion of their limited financial aid eligibility by enrolling at Everest.

### D.  Negative Credit Reporting

Many former Everest students experience or fear negative credit reporting based on their fraudulently-generated student loans. Notwithstanding the Massachusetts court's conclusion that Everest loans are unlawful products of unfair and deceptive business practices, former Everest students continue to experience negative credit consequences.

Some former Everest students cannot access credit because of the negative reporting of their unlawful Everest loans. Because Everest graduates have limited job prospects and low wages, diminished credit jeopardizes their ability to secure basic necessities like housing and transportation. As one former student concludes, "Everest has hurt my credit. Having poor credit has made obtaining some of life's necessities very difficult." S. Smalls Aff. ¶ 53 (A.430). Another former student explains:

> My student loans from Everest hurt my credit. In 2014, I applied for a car loan. My application was denied because of my bad credit score. Twice, I have had applications for apartments denied because of my bad credit score.

J. Murray Aff. ¶¶ 636–65 (A.275). Another student says, "I will not be able to get a loan to buy a car or a house while my credit score is so low because of my loans from Everest." E. Parent Aff. ¶ 69 (A.302). These negative credit effects spill over and impact the entire families of former Everest students, further exacerbating the harm from Everest's deceptive and unfair loans. *See, e.g.*, S. Valdes Aff. ¶¶ 47, 49 (A.452–53) ("My student loans hurt my credit score and have caused my family to suffer. . . . I am truly fearful that my debt might prevent me from providing for my family . . . .").

Furthermore, negative credit reporting creates a vicious cycle whereby former Everest students struggle to improve their damaged credit. As one student puts it:

> My loans from Everest hurt my credit. My parents say that I should get a credit card to improve my credit. But I cannot get a card because my credit is bad. I have been denied at least three credit cards since I graduated from Everest.

R. Mislin Aff. ¶ 79 (A.247). Another former student could only access subprime credit:

> Because of my student loans, it is very hard for me to get access to credit. Since I
> borrowed my student loans, my applications for approximately fifteen credit cards
> have been denied. I believe all of the denials were because of my student loans. I
> do not apply for credit cards anymore because they all either deny me or offer very
> high interest rates.

L. Dykes Aff. ¶ 59 (A.106). Others have similar experiences. *See, e.g.,* T. Webster Aff. ¶ 34
(A.476) ("As a result of my student loans from Everest, I have been denied several times when I
applied for credit cards. . . . I was told that my Sallie Mae [student] loans were the reason."); Y.
Pimentel Aff. ¶ 36 (A.325) ("This hurt my credit[.]").

Given the harm that flows from damaged credit, even the full restitution that Everest students are
owed under the Massachusetts court's judgment would fail to adequately compensate former
students who were harmed by negative credit reporting on these unlawful student loans.

### E.  Emotional Distress

Everest students suffer emotional distress as a result of having been targeted and fraudulently
recruited by a sham school, wasting time and money, and then struggling to find employment
while suffering coercive collection and negative credit reporting. *See, e.g.,* C. Morales Aff. ¶ 67
(A.268–69) ("Not being able to repay my student loans gets to me emotionally . . . . it hangs over
my head. I think about my loans every day . . . ."); G. Carrasquillo Aff. ¶¶ 82, 85 (A.34) ("My
loans are very stressful. . . . I am a single mother trying to support my kids. I have been
struggling. I am lost and confused. I do not know what I am supposed to do.").

As one student explains:

> It makes me angry and sad to think I am still paying for such a worthless degree.
> Attending Everest cost me more than I can explain without breaking down
> emotionally. . . . [T]he pain my family has suffered as a result of deception by
> Everest is difficult to talk about. I went from being hopeful to homeless because I
> was deceived by Everest.

J. Weeks Aff. ¶ 69, 72 (A.484). For some, this distress manifests itself through negative health
consequences. *See, e.g.,* J. Ocasio Aff. ¶ 50 (A.284) ("I went to see a doctor. She diagnosed me
with anxiety and depression . . . my struggles at Everest caused my condition to reach the
breaking point."); D. Jones Aff. ¶ 45 (A.198) ("Under the stress of failing to find employment,
and feeling crushed under the weight of my loans, I found myself turning to alcohol and other
drugs.").

Emotional distress is cognizable under Massachusetts's consumer protection law, even in the absence of monetary loss. *Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 533 (Mass. 2006).

### F. Waste of Time and Money

Everest's sham led students to dedicate irretrievable time toward the illusory goal of advancing their education and careers. Everest was "a complete waste of time and money" for former students. M. Colas Aff. ¶ 62 (A.50). Many students express frustration that Everest did not actually deliver the promised benefits. *See, e.g.*, B. Colon Aff. ¶ 77 (A.58) ("Everest was a waste of time . . . [and] now I have this big loan that I cannot pay."); C. Morales Aff. ¶ 67 (A.268) ("I know that I put my name on the line, but I never got anything out of going there."); J. Burgos Aff. ¶ 29 (A.17) ("Unfortunately, the longer I was there the more obvious it became that I was wasting both my time and my money."); V. Cooper Aff. ¶ 46 (A.64) ("My friends and family would tell me that my Everest diploma was not worth anything. I felt horrible about that, especially after all of the time and money I spent to get the diploma.").

This form of injury is particularly acute for former students who left Everest only to find that they would need to invest even more time and money simply to work in their fields:

> When I went on job interviews, I also found out that I would need to get a separate phlebotomy certificate to draw blood if I wanted to work as a medical assistant. This meant that I wasn't qualified to get a job as a medical assistant and I would need to spend more money to become qualified.

T. Coakley Aff. ¶ 27 (A.44); *see also* W. Moore Aff. ¶ 77 (A.261) ("[S]even years after I graduated from Everest, I have to start my education over. It is even more wasted time and money."); S. Valdes Aff. ¶¶ 42–43 (A.452) ("[M]ost dental offices require certification in radiology or state certification, and those are things Everest did not provide . . . . Everest must have known that I would need to be certified in radiology in order to qualify for most jobs in the field."). *See generally* Section III.9, *supra*.

Everest's systematic deception led former students to enroll in programs that were a waste of time, failed to deliver the promised benefits, and required students to invest even more time and money in additional coursework in order to actually obtain the promised benefits. Massachusetts law recognizes that deceived consumers are injured by the costs required to obtain benefits falsely promised by a business. *See Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879, 886 (Mass. 2008) (recognizing an injury where consumers were deceptively sold cars that did not comply with federal standards); *Ferreira v. Sterling Jewelers, Inc.*, 130 F. Supp. 3d 471, 483–84 (D. Mass. 2015) (recognizing an injury where a deceptively sold product imposed future economic costs for consumers due to lower quality).

## V.   <u>Lender Relationships</u>

Many students borrowed FFEL loans to attend Everest. Like Direct Loans, FFEL loans are subject to borrower defense to repayment. Federal regulations governing FFEL loans dictate that "[a]ny lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan," so long as the borrower can establish that there was a sufficiently close relationship between the school and the lender. 34 C.F.R. § 682.209(g).[54] Similarly, FFEL Master Promissory Notes provide that "[a]ny lender holding a loan made under this MPN is subject to all claims and defenses that I could assert against the school with respect to that loan," so long as a sufficiently close relationship between the school and the original lender was present. FFEL Master Promissory Note at 2.[55] As discussed below, FFEL borrowers may assert defenses to repayment pursuant to this language because the mere presence of that language triggers a borrower defense right, because the lenders in question had close relationships with Everest, and because the Higher Education Act empowers the Department to grant borrower defense discharges regardless of lender relationship.

### A.   Contractual borrower defense language entitles FFEL borrowers to relief.

The mere presence of the Holder language in Everest FFEL borrowers' promissory notes entitles them to assert borrower defenses because this language represents the Department's adoption of the Federal Trade Commission's ("FTC") Holder Rule. *See, e.g.*, 57 Fed. Reg. 28,814, 28,815 n. 11 (July 29, 1992) (noting that this Rule applies to educational loans). Pursuant to the Holder Rule, consumer contracts must include a "Holder notice" in transactions with sufficiently close relationships between lenders and sellers. 16 C.F.R. § 433.2. The Holder notice permits consumers to assert against their lenders claims and defenses they have against their sellers. *See*

---

[54] "Any lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan if—
    (1)  The loan was made by the school or a school-affiliated organization;
    (2)  The lender who made the loan provided an improper inducement, as described in paragraph (5)(i) of the definition of Lender in § 682.200(b), to the school or any other party in connection with the making of the loan;
    (3)  The school refers borrowers to the lender; or
    (4)  The school is affiliated with the lender by common control, contract, or business arrangement."
34 C.F.R. § 682.209(g).

[55] A sample FFEL Master Promissory Note is available on the Department's website: https://perma.cc/M3CX-X5QS ("If a particular loan under this MPN is made by the school, or if the proceeds of a particular loan made under this MPN are used to pay tuition and charges of a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract, or business arrangement, any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan.").

16 C.F.R. §§ 433.1(d), (e), (i), 433.2. Crucially, it is the inclusion of the notice itself in any consumer contract that serves to preserve claims and defenses. *See* 16 C.F.R. § 433.2.[56]

Textually, the FFEL language is almost identical to that of the Holder Rule. *Compare* FFEL Master Promissory Note at 2 ("any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan"), *with* 16 C.F.R. § 433.2(a) ("ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF."). Moreover, the Department's analysis of the FFEL language when it was adopted shows that the Department viewed the language in question as a Holder notice.[57]

The inclusion of the Holder notice in Everest FFEL MPNs allows borrowers to raise school-related claims as a defense vis-à-vis *any* holder of their FFEL loans. Because the Holder notice is only required in consumer contracts for which the seller acts as a creditor, refers customers to the creditor, or is affiliated with the creditor by common control, contract, or business arrangement, the operative question is whether a contract contains the Holder notice. *See* 16 C.F.R. §§ 433.1(d), (e), (i), 433.2. Where, as here, the notice appears, a consumer may raise her claims and defenses against the holder of her contract.[58]

### B.  Sallie Mae had a lender relationship with Everest.

In addition to the inclusion of the Holder notice in FFEL borrowers' contracts, Everest's close relationship with Sallie Mae entitles Everest FFEL borrowers who borrowed from Sallie Mae to assert borrower defense. Sallie Mae (1) was affiliated with Everest by contract and business arrangement, (2) provided improper inducements, and (3) received referrals from Everest. Each of these facts constitutes an independent basis for borrower defense liability for the holders of Sallie Mae FFEL loans. An astonishing 61% of former Everest students that we asked had Sallie Mae as their FFEL lender.[59]

---

[56] *See also* Fed. Trade Comm'n, Staff Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses [hereinafter FTC Staff Guidelines] 5–6 (May 4, 1976), https://perma.cc/7SES-5AZJ (describing "mechanism of the rule").

[57] *See, e.g.*, U.S. Dep't of Educ., Overview of Federal Trade Commission (FTC) Holder Rule 1 (July 2, 1993), https://perma.cc/SKT2-DDFS ("In preparing the common loan application/promissory note for the FFEL Program . . . [o]ne of the main topics of discussion was the incorporation of the FTC Holder Rule into the promissory note. . . . [U]ltimately the Secretary concluded that the notice must be in the promissory note.").

[58] *See* FTC Staff Guidelines at 6 ("For those consumer credit contracts in which the Rule requires insertion of this specific contract provision, or Notice, the Notice will become a part of the agreement between the consumer and the creditor. . . . [The Notice] protect[s] the consumer's right to assert against the creditor any legally sufficient claim or defense against the seller.").

[59] During the course of our investigation, we were able to ascertain the FFEL lender of 71 former Everest students. Of those, 43 had Sallie Mae as their lender. "Sallie Mae" for these purposes includes Sallie Mae Trust, and other Salle Mae affiliated entities.

1. **Sallie Mae was affiliated with Everest by contract and business arrangement.**

Pursuant to FFEL regulations and MPN terms, a borrower may assert school-related claims against the current holder of her loans if the school was "affiliated with the lender by . . . contract[] or business arrangement." 34 C.F.R. § 682.209(g)(4); *accord* FFEL Master Promissory Note at 2. Everest was in fact affiliated with Sallie Mae by *both* contract *and* business arrangement—although Everest borrowers need only demonstrate one or the other.

First, Everest was affiliated with Sallie Mae by contract. The FTC defines a contract as "[a]ny oral or written agreement, formal or informal, between a creditor and a seller, which contemplates or provides for cooperative or concerted activity in connection with the sale of goods or services to consumers or the financing thereof." 16 C.F.R. § 433.1(f). From at least March 21, 2007 until at least the end of the FFEL program in June 30, 2010,[60] Everest, through its parent company, Corinthian,[61] maintained a lender agreement with Sallie Mae in the form of a letter of understanding.[61] This agreement applied to "all Corinthian schools," including Everest Brighton and Chelsea.[62] The agreement provided that Sallie Mae "would be Corinthian's primary loan provider and would grant Corinthian students access to both Federal and private education loans."[63] This relationship was clearly a contractual affiliation.

Second, Everest and Sallie Mae shared a business arrangement. A business arrangement is "[a]ny understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller, in connection with the sale of goods or services to consumers or the financing thereof." 16 C.F.R. § 433.1(g). Evidence of an affiliation by business arrangement includes the fact that the seller maintains loan applications from the creditor in its office, or that the seller prepares loan documents for the buyer.[64] Clearly, the lender agreement between Corinthian Colleges and Sallie Mae—which covered federal and private loans, designated Sallie Mae as Corinthian's primary lender in both categories, and covered all of Corinthian's campuses nationwide, including Everest—qualified as a "course of dealing or arrangement" as defined by regulation.[65] The system-wide reliance on Sallie Mae was so central to Corinthian's operations that it was frequently referenced on earnings calls between Jack Massimino, Chief Executive Officer of Corinthian, and investors. For example, on a call in April 2008, Massimino stated that

---

[60] Origination of FFEL loans ceased July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2201 *et seq.*, 124 Stat. 1029, 1074 *et seq.* (2010).

[61] *See* U.S. Dep't of Educ., Office of Inspector Gen., Final Audit Report No. ED-OIG/L02K0001 [hereinafter OIG Corinthian Audit] 6 (Aug. 4, 2010), https://perma.cc/6772-HF9R. The lender relationship appears to have been ongoing as of the date of the OIG report, August 4, 2010. *See id.* at 6. (noting Sallie Mae's ongoing noncompliance).

[62] *Id.* at 2 n.2.

[63] *Id.* at 6.

[64] FTC Statement of Enforcement Policy in re Trade Regulation Rule on Preservation of Consumers' Claims and Defenses, 41 Fed. Reg. 34,594, 34,595 (Aug. 16, 1976).

[65] *See* OIG Corinthian Audit at 12.

Sallie Mae "is still our largest FFEL lender" and is "the biggest part of our business."[66] Additionally, sworn testimony by former Everest students indicates that Everest maintained Sallie Mae's loan applications on site. *See, e.g.*, J. Ocasio Aff. ¶ 30 (A.281) ("Susan, the Student Finance Planner, helped me fill out the Master Promissory Note for my federal loans. She told me how to fill out my paperwork, including the name of the lender, Sallie Mae, and the lender code. Susan did not mention anything about having a choice of lender. I had no idea that I could choose a different lender for my federal loans. It was a sign-on-the-dotted line kind of thing.").

This evidence proves an affiliation by contract and business arrangement between Sallie Mae and Everest that creates holder liability for borrower defense claims.

### 2. Sallie Mae provided improper inducement in connection with FFEL loans.

Pursuant to FFEL regulations and the terms of FFEL MPNs, a borrower can also establish holder liability by showing that "the lender who made the loan provided an improper inducement (as defined by the Act) to the school or to any other party in connection with the making of the loan." 34 C.F.R. § 682.209(g)(2); *accord* FFEL Master Promissory Note at 2; *see also* 20 U.S.C. § 1085(d)(5) (2012) (listing examples of improper inducements).

In its 2010 final audit report regarding Corinthian's lender agreement with Sallie Mae, the Department's Office of Inspector General determined that Sallie Mae offered improper inducements to Everest borrowers.[67] Specifically, the Department found that Sallie Mae offered Parent PLUS borrowers a one-time $500 credit toward closing costs on a new Sallie Mae home loan.[68] The Department made this finding after providing Sallie Mae with notice and opportunity to respond.[69] These improper inducements appear to have been made pursuant to the very same agreement between Everest and Sallie Mae that governed origination of FFEL loans: "According to the letter [of understanding between Sallie Mae and Corinthian], SLM would be Corinthian's primary loan provider and would grant Corinthian students access to both Federal and private education loans."[70]

### 3. Everest referred loan applicants to Sallie Mae.

A third way to establish Holder liability is by showing that the school "refer[red] loan applicants to the lender." FFEL Master Promissory Note at 2; *accord* 34 C.F.R. § 682.209(g)(3). A referral

---

[66] Corinthian Colleges, Inc. F3Q08 Earnings Call Transcript [hereinafter Corinthian Earnings Call] (Apr. 30, 2008) *reproduced at* www.SeekingAlpha.com.
[67] OIG Corinthian Audit at 2, 6 ("SLM offered the inducement through the [lender] agreement itself in violation of Section 435 (d)(5)(A) and (C) of the HEA.") (citing 2008 version of HEA, the text of which now appears at § 435(d)(5)(A) & (H)).
[68] *Id.* at 6.
[69] *Id.*
[70] *See id.*

relationship consists of "cooperative or concerted conduct to channel a consumer to a particular lender," demonstrated by a "pattern of mutual accommodation in arranging loans."[71]

Everest not only referred borrowers to Sallie Mae for their FFEL loans, but forced borrowers to use Sallie Mae by failing to mention other options, *see, e.g.*, S. Mattis Aff. ¶ 18 (A.230) ("The staff at Everest did not give me a choice of lenders for my federal student loans. Sallie Mae was the only option that I was offered."), instructing borrowers to select Sallie Mae as their lender, *see, e.g.*, J. Murray Aff. ¶ 30 (A.273) ("The representative told me to fill in 'Sallie Mae' on my federal student loan contract."), and completing borrowers' loan paperwork, *see, e.g.*, D. Exil Aff. ¶ 25 (A.132) ("The financial aid representative completed all of the loan documentation for me. . . . [for my] Sallie Mae loans."). These forced lender referrals were part of a larger corporate practice to promote the school's relationship with Sallie Mae.[72] Everest's forced referrals to Sallie Mae went well beyond the bounds of an industry lender relationship and into the realm of unfair, deceptive, and illegal conduct. *See* Section III.21.

For all of foregoing reasons, Everest students with FFEL loans from Sallie Mae may assert all claims they have against Everest against the current holder of their FFEL loans.

### C. Carnegie Student Loans had a lender relationship with Everest.

Another lender, Carnegie Student Loans ("Carnegie") also shared a close lender relationship with Everest that entitles Everest FFEL borrowers who used Carnegie to assert borrower defense against the holders of their loans. Carnegie lent to Everest borrowers through the 2007-2008 award year.[73] Carnegie satisfied three of the lender relationship tests. First, Carnegie originated all of its loans through Sallie Mae and thus shared Sallie Mae's lender relationship with Everest.[74] Second, Carnegie enjoyed a near-exclusive relationship with Everest Brighton, demonstrating a business relationship with Everest. Third, Carnegie's near lending monopoly constituted a referral relationship. A sizeable 32 percent of former Everest students that we asked had Carnegie as their FFEL lender.[75]

---

[71] FTC Statement of Enforcement Policy, 41 Fed. Reg. at 34,596; *see also* U.S. Dep't of Educ., Overview Federal Trade Commission (FTC) Holder Rule at 3 (July 2, 1993), https://perma.cc/SKT2-DDFS (adopting FTC standard); Letter from Robert Evans, U.S. Dep't of Educ., to John Dean, Esq. at 2 (July 30, 1993), https://perma.cc/4ZBY-U7KA (similar).

[72] *See* Corinthian Colleges Earnings Call; OIG Corinthian Audit at 6.

[73] *See* U.S. Dep't of Educ., Office of Inspector Gen., Final Audit Report ED-OIG/A05I0026 [hereinafter "OIG Carnegie Audit"] at 2 (Feb. 24, 2010), https://perma.cc/3G2D-X43F.

[74] *See id.*

[75] During the course of our investigation, we were able to ascertain the FFEL lenders of 71 former Everest students. Of those, 23 had Carnegie as their lender.

1.  **Carnegie originated FFEL loans exclusively though Sallie Mae and thus shared Sallie Mae's close relationship with Everest.**

Carnegie lent FFEL loans exclusively through Sallie Mae. Pursuant to a 1993 financing agreement and a 2006 partnership agreement, "students applied to Sallie Mae for all FFEL Program loans that C[arnegie] originated."[76] In other words, students who borrowed FFEL loans from Carnegie to attend Everest applied to Sallie Mae and in all likelihood, thought that Sallie Mae was their lender. Thus, Carnegie shared Sallie Mae's close relationship with Everest.

2.  **Carnegie shared a business arrangement with Everest.**

Pursuant to FFEL regulations and MPN terms, a borrower may assert school-related claims against the current holder of her loans if "the school [was] affiliated with the lender by . . . business arrangement." 34 C.F.R. § 682.209(g)(4); *accord* FFEL Master Promissory Note at 2. Carnegie had a business relationship with Everest because it originated an extremely high percentage of loans at Everest campuses. According to Department records, in award year 2006-2007,[77] the year before Carnegie ceased participation in FFEL, Carnegie originated 95% of all FFEL loans to the Everest Brighton campus. Preferred Lender Table at 13 (A.924).[78] This near-monopoly on FFEL origination easily qualifies as an "understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller, in connection with the sale of goods or services to consumers or the financing thereof." 16 C.F.R. § 433.1(g). Carnegie's business relationship creates borrower defense liability for holders of its FFEL loans to Everest students.

3.  **Carnegie had a referral relationship with Everest.**

In addition, a borrower may establish Holder liability if "the school refer[red] borrowers to the lender." 34 C.F.R. § 682.209(g)(3); *accord* FFEL Master Promissory Note at *2. Carnegie's near-monopolistic dominance of the FFEL lending at Everest Brighton in 2006-2007 is strong evidence of such a relationship. Indeed, it is difficult to imagine a lender capturing 95% of eligible borrowers at a school without "cooperative or concerted conduct to channel a consumer" to that lender.

In addition, former Everest students who borrowed FFEL loans from Carnegie report forced referrals:

---

[76] OIG Carnegie Audit at 2.

[77] That year, the campus changed its name from "Bryman Institute" to "Everest Institute." OIG Corinthian Audit at 1. However, it had been owned by Corinthian since 1995. *Id.*

[78] The Office of Inspector General's Audit Report refers to "Carnegie Student Loans, Inc.," a "captive insurance company for Carnegie Health Systems." OIG Carnegie Audit at 1. Thus, the Department's records refer to Carnegie as "Carnegie Insurance Company."

> [Everest]'s financial aid representative did not offer me a choice of lenders.
> [Everest]'s financial aid brochure did not mention any choice of lenders. My lender
> for my federal student loans, Carnegie Student Loans, was pre-printed on the
> contract that [Everest]'s financial aid representative gave me. . . . I was never
> informed I had a choice of lender, let alone offered the opportunity to make that
> choice.

L. Penton Aff. ¶¶ 22–24 (A.306); *see also* J. Rogers Aff. ¶¶ 10, 27 (A.390–91) (reporting, for her Carnegie FFEL loans, that "[n]o one at the school told me that I could choose the type of loan or lender"). These facts establish a referral relationship between Everest and Carnegie that creates borrower defense liability.

For all of the foregoing reasons, Everest students with FFEL loans from Carnegie may raise all claims they have against Everest against the current holder of their FFEL loans.

### D.  The Higher Education Act empowers the Department to cancel Everest loans regardless of lender relationship.

Congress has granted the Secretary of Education unfettered compromise authority for FFEL and Direct loans. *See* 20 U.S.C. § 1082(a)(5)–(6). Department regulations also recognize this right. Indeed, in its 2016 borrower defense regulations, the Department recognized that FFEL borrowers are also entitled to borrower defense relief and created a process for them that did not require proof of referral relationship. *See, e.g.*, 81 Fed. Reg. 75,926, 75,961 (describing process). The lender relationship test is not a meaningful barrier to relief for any borrower.

## VI.   <u>Conclusion</u>

Everest Institute was a sham—a pervasive violation of Massachusetts law that inflicted severe harm on borrowers. Its misconduct entitles the borrower whose materials are included with this combined statement to complete borrower defense relief.