JOSEPH H. HUNT
Assistant Attorney General
David L. Anderson
United States Attorney
MARCIA BERMAN
Assistant Branch Director
KATHRYN C. DAVIS
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-8298 (phone)
(202) 616-8470 (fax)
Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>Defendants. | No. 19-cv-03674-WHA<br><br>**DECLARATION OF DIANE AUER JONES**<br><br>Honorable William H. Alsup |

# DECLARATION OF DIANE AUER JONES

I, Diane Auer Jones, declare as follows:

1. My name is Diane Auer Jones, I am over the age of 18, and serve as Principal Deputy Under Secretary, Delegated the Duties of the Under Secretary, in the United States Department of Education ("ED"). I have personal knowledge of the matters set forth herein and if called as a witness, I could and would testify competently thereto.

2. As Principal Deputy Under Secretary, I am the senior higher education official responsible for overseeing Federal Student Aid, the Office of Postsecondary Education, and the Office of Career, Technical and Adult Education at ED. In particular, I advise the Secretary of Education on policies and issues relating to the Federal student financial aid programs, authorized and administered by the Department under Title IV of the Higher Education Act of 1965, as amended, including the Federal Direct Loan Program.

3. I was appointed Principal Deputy Under Secretary at ED on June 25, 2018 and delegated the duties of Under Secretary on June 27, 2019. I also served as Acting Assistant Secretary for Postsecondary Education. Previously, I served as the Assistant Secretary for Postsecondary Education in ED during the administration of President George W. Bush. Earlier in my career, I was a biology professor at the Community College of Baltimore County in Maryland and I later worked at Princeton University and the Career Education Corporation. I have also worked at the National Science Foundation, the U.S. House of Representatives Committee on Science, and the White House Office of Science and Technology Policy, and as a senior policy advisor to the Secretary of Labor.

4. As part of my responsibilities in the Department, I have worked extensively on issues relating to the implementation and administration of the Department's regulations regarding borrower defenses to the collection of Federal student loans.

**The Department's Federal Student Aid Priorities 2018-2019**

5. In November 2016, the Department promulgated new "borrower defense" regulations addressing, among other things, standards and procedures for student borrowers to seek relief from certain federal student loan obligations based on misconduct by an educational institution ("the 2016 regulations"). Those regulations were scheduled to become effective on July 1, 2017.  However, , the Department determined that the 2016 regulations did not reflect an appropriate balance of the responsibilities of the agency to protect taxpayers, and borrowers and to hold institutions accountable.  Also, the 2016 regulations did not provide due process rights to institutions during the claim adjudication process.  Accordingly, in June 2017, the Department initiated a process to develop new rules governing borrower defense.  The Department then delayed the effective date of the 2016 regulations pending, *inter alia*, the completion of that rulemaking process.

6. When I started in my current position in 2018, the Department had just completed the statutorily required negotiated rulemaking process to develop its new borrower defense regulations, a process that required the Department to solicit the input of a broad group of stakeholders and hold public hearings over a multiple-month period. When the negotiating parties failed to reach consensus, the Department drafted new regulations and issued a Notice of Proposed Rulemaking (NPRM) with proposed borrower defense regulations on July 31, 2018.

7. In the fall of 2018, the United States District Court for the District of Columbia found the Department's delays of the 2016 regulations unlawful under the Administrative Procedure Act and vacated them.  *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C.

2018); 332 F. Supp. 3d 181 (D.D.C. 2018).   Shortly thereafter, the court denied a motion to preliminarily enjoin the 2016 regulations, and so they took effect. *California Association of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018).   Copies of those decisions are Exhibits 1 and 2 to this Declaration.

8. The 2016 regulations significantly changed the rules for considering borrower defense claims.   Under the Department's original regulations, the determination of whether a defense existed was based on whether the borrower defense claimant could establish a cause of action under applicable state law.   The 2016 regulations adopted a new federal standard that allowed a borrower to assert a defense on the basis of a school's substantial misrepresentation (as defined by the Department), breach of contract, or the existence of a favorable, nondefault contested judgment against the school.   In addition, the 2016 regulations established a new evidentiary standard for reviewing allegations made by students or others and required the Department to issue written decisions on borrower defense claims.

9. The 2016 regulations also included other provisions unrelated to borrower defense that imposed new conditions on institutions participating in the Department's Title IV student loan program.   Among these were new "financial responsibility" standards that included a requirement that all institutions of higher education report to the Department all litigation filed against them; "repayment rate" provisions that created a number of new reporting requirements for institutions; provisions disallowing participating institutions' use of predispute arbitration agreements and class action waivers in their enrollment contracts with students; and new procedures governing loan discharges based on a school's closing.

10. Once the court decisions were issued and the 2016 regulations became effective, the Department had to implement them, including the development of mechanisms to collect information on years of litigation filed against institutions that participate in the Federal student financial aid programs and to identify borrowers who qualify for automatic closed school discharges and provide loan relief. The Department also had to develop processes for implementing the new financial responsibility requirements of the 2016 regulations, which included substantial reporting requirements. The Department spent considerable time and effort identifying which offices would handle different parts of the process and developing the necessary instructions.

11. The Department also needed to issue guidance to regulated parties in light of the delay of the 2016 regulations' effective date. On March 15, 2019, the Department issued an electronic announcement to inform institutions of higher education of their responsibilities under those regulations and published a Final Rule announcing the effective date of the regulations and providing further information for program participants on how the regulations would be implemented and enforced by the Department. The electronic announcement is included as Exhibit 3 and the Final Rule is included as Exhibit 4 to this Declaration.

12. At the same time, the Department was reviewing the public comments it received on the new borrower defense NPRM published on July 31, 2018, evaluating what changes, if any, were needed to those proposed regulations, and preparing a final rule responding to the comments received and explaining any changes from the NPRM. The Department received comments on the NPRM from 38,450 parties and made significant changes to those rules to respond to those comments. We also consulted

with other government agencies which provided comments during the agency review process for the final regulations.

13. The Department published its revised final regulations on borrower defenses to repayment on October 23, 2019. The final regulations are included as Exhibit 5 to this Declaration.

Development of a new methodology for determining the amount of borrower relief

14. Neither the 1995 regulations, the 2016 regulations nor the new final regulations published in 2019 set forth a methodology to determine the appropriate relief once a borrower establishes a successful borrower defense claim. Developing such a methodology has been an important priority of the Department under Secretary DeVos' leadership. Given the difficulties associated with assessing the harm suffered by the hundreds of thousands of borrowers who have filed claims for relief based on the asserted misconduct of numerous institutions, the consideration and development of relief methodologies has required significant time and resources.

15. In 2017, the Department conducted a thorough review of its existing methods for adjudicating borrower defense claims and calculating relief and concluded that it did not have an adequate process to handle the growing list of borrower defense claims. As a result of that review, the Department developed a new methodology for determining the amount of relief to be given to successful borrower defense claimants who attended certain schools operated by Corinthian Colleges, Inc. ("Corinthian").

16. In contrast with the Department's previous approach, which had assumed that all Corinthian students received nothing of value from their education, the new methodology developed in 2017 sought to rely on empirical evidence to measure the harm that students suffered as the result of Corinthian's violations of California state

law.  It did so by comparing the average earnings of borrower defense claimants who attended certain Corinthian programs with the average earnings of students who had completed similar programs at schools that received passing scores under the Department's then-operative gainful employment regulations.  To the extent that Corinthian students, on average, earned less than their peers at comparable programs, the Department determined that they were harmed by the misrepresentations giving rise to their borrower defense claims and awarded proportionally tiered relief based on the earnings comparison.

17. On May 25, 2018, the U.S. District Court for the Northern District of California concluded that the process used by the Department to obtain earnings data from the Social Security Administration for use in the Department's methodology likely violated the Privacy Act and preliminarily enjoined that methodology.  *Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018).  The Court enjoined the Department from using that methodology "as it currently exist[ed], to the extent that the Secretary relies upon information provided by the Social Security Administration in violation of the Privacy Act."  Amended Order at 1, *Manriquez v. DeVos*, 3:17-cv-7210 (N.D. Cal. June 19, 2018), ECF No. 70.

18. The Department appealed the District Court's decision in *Manriquez* and is still waiting for a decision from the appellate court.  In the meantime, the Department has undertaken significant efforts to explore and develop an alternative approach for determining the amount of relief to be given not just to Corinthian borrowers but to all borrowers with approved borrower defense claims.

19. The Department continues to believe that the relief awarded to a borrower should be based on the financial harm suffered by the borrower and the value received from the

borrower's institution.  As the court found in *Manriquez*, the 2017 methodology's "attempt to create a policy to determine whether students obtained value and if so, how much, is a legitimate exercise of the Secretary's discretion under the Higher Education Act." 345 F. Supp. 3d at 1103. The value received by the participants in a program is best determined by using measures of aggregate outcomes for all participants rather than individual measures that are more dependent upon the individual circumstances of each participant.

20. While there are various sources of data for earnings, the Department does not have that information and it has taken the Department time to identify a source of such information that would allow for an accurate comparison of earnings across academic institutions.  In particular, because the Department believes that the best way to assess financial harm is to compare earnings data for borrowers who attend academic programs that are asserted to have engaged in misconduct with the same information at comparator programs not affected by such misconduct, the Department needed data identifying earnings for occupations in terms similar to those used by educational institutions.  Moreover, to avoid the problem identified by the court in *Manriquez*, the Department intends to use publicly available earnings data to impute earnings to both the applicant and the comparison group.

21. In some instances, a successful borrower defense applicant may have been enrolled in a program so small that median earnings are not available for use in the formula for determining the amount of relief to provide or that there is no comparable program to use for comparison purposes.  This situation presents unique challenges to the Department's ability to fairly and efficiently determine financial harm and

corresponding borrower defense relief. The Department is evaluating how best to ensure that these borrowers receive the appropriate level of debt relief.

22. The Department is working towards announcing and implementing a new partial relief methodology within the next few weeks.

23. As indicated above, the development of a new methodology has required significant time and resources for the Department. The process has involved a team of employees from the Department's Federal Student Aid office and other experts from appropriate offices as well as senior officials in the Department. The Department has had to address a number of challenges in developing a new methodology, including the identification of an accurate, reliable and accessible source of earnings data that would not raise concerns about privacy. In addition, since different institutions often assign different names to programs that are essentially the same, the Department had to determine how it would classify programs for the purpose of the earnings calculation. Finally, we have had to develop an algorithm to use to calculate the level of financial harm suffered by a successful BD applicant and therefore the level of financial relief that should be provided. It has taken months to develop the potential options, assess each option for validity, ensure that the Department would have access to the data needed to use the chosen method, and discuss the options with appropriate offices and leaders in the Department, while also avoiding the Privacy Act issues identified in *Manriquez*. Our goal throughout this process has been to develop an approach that provides an appropriate evaluation of the level of harm experienced by the borrower and a fair level of relief.

24. The Department's consideration of a borrower's application for a borrower defense discharge includes two steps: (1) a determination of whether the borrower has

submitted a borrower defense claim supported by evidence submitted by the borrower or otherwise available to the Department in accordance with the applicable standard; and if the borrower has satisfied the first step, (2) a determination of the amount of relief that the borrower should receive.

25. As explained in other declarations submitted as part of this administrative record, the Department has continued to adjudicate claims since the injunction was issued in *Manriquez*, consistent with that injunction, including making Step (1) determinations that some borrowers have established a successful borrower defense in accordance with the applicable standard.  As explained above, however, the Department has not yet finished its development of a comprehensive methodology for determining the amount of relief to award successful claimants.  The Department has prioritized development of this methodology and believes it is imperative to have it in place before finalizing decisions approving borrower defense claims and awarding relief. Once established, the new methodology will allow the Department to expeditiously determine the level of relief to award to successful BD applicants in a clear, consistent, and fair manner.

26. In some cases, the Department has determined that the borrower's claim for a discharge is not supported by the evidence submitted by the borrower or information otherwise available to the Department.  For example, in some instances, the Department has determined that the borrower actually did not have a Federal loan to enroll at the institution that is the subject of the borrower's claim.  In other instances, the borrower provided such scant information that the Department simply lacked a basis for making a determination favorable to the borrower. The Department has been working to develop documents to provide a more robust explanation for borrowers

whose claims are denied.  Once these documents are developed, the Department needs to work with each of its servicers to put the process of loan relief and borrower notification in process, which requires contract updates with each of the Federal student aid loan servicers that service Direct Loans.  It takes longer to develop decision letters that provide an explanation for each borrower of why their claim was denied, but we believe this  investment of time is important so that borrowers understand the basis for the decision, which is vital for instilling confidence in the process.  This has taken longer than we hoped but the notices are finished and we are now working with our contracting officials and loan servicers to enter these notices into servicer systems.

27. The Department plans to issue its decisions denying these borrowers' claims in the coming weeks.  The Department believes that if it issued denials in advance of issuing approvals, borrowers could be confused and believe that the Department would not be approving any claims – which is not the case.  Therefore, in order to prevent confusion or distress to borrowers who are eligible for relief, the Department decided that it should not issue denials until it has a methodology in place that will also allow it to issue approvals and relief.  As explained above, after the Department announces its new methodology, currently anticipated in the next few weeks, it can begin expeditiously processing approvals and issuing decisions.

1

I declare under penalty of perjury that the foregoing is true and correct.

2

3

Executed this _14th_ day of November 2019 in Washington, DC.

4

5

6

7

8

Diane Auer Jones

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

325 F.Supp.3d 74
United States District Court, District of Columbia.

Meaghan BAUER, et al., Plaintiffs,

v.

Elisabeth DEVOS, Secretary, U.S.
Department of Education, et al., Defendants.

Civil Action No. 17-1330 (RDM)
|
Signed 09/12/2018

**Synopsis**
**Background:** Students, coalition of states, and District of
Columbia brought suit against Department of Education,
challenging agency actions delaying implementation of
Borrower Defense Regulations. Parties moved for summary
judgment.

**Holdings:** The District Court, Randolph D. Moss, J., held
that:

[1] students had standing to challenge Department's actions;

[2] Department lacked good cause to dispense with negotiated
rulemaking; and

[3] Department acted arbitrarily and capriciously in staying
implementation of Regulations pending judicial review.

Plaintiffs' motions for summary judgment granted;
defendant's motion for summary judgment denied.

West Headnotes (30)

**[1]    Federal Courts**
         🔑   Rights and interests at stake; adverseness
         Federal courts may only adjudicate those
         disputes in which the plaintiff has a personal
         stake in the outcome of the controversy sufficient
         to warrant his invocation of federal-court
         jurisdiction. U.S. Const. art. 3, § 2.

**[2]    Federal Civil Procedure**
         🔑   In general;  injury or interest
         **Federal Civil Procedure**
         🔑   Causation;  redressability
         The plaintiff bears the burden of establishing
         standing, and, accordingly, must make a showing
         of injury-in-fact, causation, and redressability.

**[3]    Federal Civil Procedure**
         🔑   In general;  injury or interest
         Injury in fact, which is a requirement of standing,
         requires an invasion of a legally protected
         interest which is (a) concrete and particularized,
         and (b) actual or imminent, not conjectural or
         hypothetical.

**[4]    Federal Civil Procedure**
         🔑   Causation;  redressability
         Causation, which is a requirement of standing,
         requires proof of a causal connection between
         the injury and the conduct complained of—the
         injury has to be fairly traceable to the challenged
         action of the defendant, and not the result of the
         independent action of some third party not before
         the court.

**[5]    Federal Civil Procedure**
         🔑   Causation;  redressability
         Redressability, which is a requirement of
         standing, requires a substantial likelihood that
         the requested relief will remedy the alleged
         injury in fact.

**[6]    Federal Civil Procedure**
         🔑   In general;  injury or interest
         For each claim, if constitutional and prudential
         standing can be shown for at least one plaintiff,
         the court need not consider the standing of the
         other plaintiffs to raise that claim.

**[7]    Education**

Federally guaranteed loans

Students who attended for-profit college had standing to challenge decision of Department of Education delaying implementation of Borrower Defense Regulations, which were regulatory changes to federal student loan programs designed to protect student loan borrowers from misleading, deceitful, and predatory practices; Regulations would have prohibited school from keeping students from banding together with other alleged victims of school's fraud to bring suit in state court, and Regulations would have provided students with significant new protections in adjudication of their borrower defense applications.

**[8]    Courts**

Previous Decisions as Controlling or as Precedents

A district court must follow controlling precedent until it has been overruled by a court empowered to do so.

**[9]    Federal Courts**

Jurisdiction, Powers, and Authority in General

**Federal Courts**

Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Federal courts must ensure not only that they have Article III jurisdiction at the outset of a case, but also that the parties' dispute—or "controversy"—remains live at all stages of review. U.S. Const. Art. 3.

**[10]   Education**

Federally guaranteed loans

Students' challenges to decision of Department of Education delaying implementation of Borrower Defense Regulations, which were regulatory changes to federal student loan programs designed to protect student loan borrowers from misleading, deceitful, and predatory practices, were not moot, even

though date until which Department had delayed regulations had passed; Department's interpretation of provision under which it had delayed implementation had carried through to regulation that subsequently remained operative and was causing students a cognizable injury.

1 Cases that cite this headnote

**[11]   Administrative Law and Procedure**

Plain, literal, or clear meaning; ambiguity or silence

Agency interpretations of a statute are not entitled to deference where the intent of Congress is clear.

**[12]   Administrative Law and Procedure**

Deference to Agency in General

An agency is entitled to *Chevron* deference only when the agency believes that it is exercising some form of administrative discretion.

**[13]   Education**

Federally guaranteed loans

The Higher Education Act's (HEA) master calendar provision does not require that all new regulations under the HEA take effect on July 1. 20 U.S.C.A. § 1089(c)(1).

**[14]   Education**

Federally guaranteed loans

Department of Education lacked good cause to dispense with negotiated rulemaking under Higher Education Act (HEA) in delaying implementation of Borrower Defense Regulations, which were regulatory changes to federal student loan programs designed to protect student loan borrowers from misleading, deceitful, and predatory practices; Department's notice of proposed rulemaking said nothing about whether Department could have included negotiated rulemaking with respect to delay rule, notice did not identify any emergency or serious harm that would result absent waiver, and Department provided no example of cost

Department arguably avoided by dispensing with requirement. 20 U.S.C.A. § 1098a(b)(2).

1 Cases that cite this headnote

**[15]    Administrative Law and Procedure**
👉 Particular Agency Actions or Failures to Act

Stays under the provision of Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review are subject to judicial review. 5 U.S.C.A. § 705.

3 Cases that cite this headnote

**[16]    Administrative Law and Procedure**
👉 Meaningful standard for review

When a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion, the agency's action taken pursuant to that statute is unreviewable.

**[17]    Administrative Law and Procedure**
👉 Meaningful standard for review

An action is "committed to agency discretion" and is thus not reviewable if the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. 5 U.S.C.A. § 701(a).

1 Cases that cite this headnote

**[18]    Administrative Law and Procedure**
👉 Meaningful standard for review

If a statute fails to set a meaningful standard, then there is no basis for a court to conclude that the challenged agency action was unlawful or an abuse of discretion. 5 U.S.C.A. § 701(a).

**[19]    Administrative Law and Procedure**
👉 Presumptions as to Reviewability

Except in cases involving enforcement decisions, allocation of lump sum appropriations, or

other categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, courts must apply a presumption in favor of judicial review. 5 U.S.C.A. § 701(a).

1 Cases that cite this headnote

**[20]    Administrative Law and Procedure**
👉 Procedure in General

Absent good cause, courts must avoid engrafting their own notions of proper procedures upon agencies.

**[21]    Administrative Law and Procedure**
👉 Supersedeas or stay of proceedings

To justify a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review, even though an agency need not apply the same canonical four-factor test that courts do, it must weigh the same equities; this includes, but is not limited to, balancing the competing claims of injury, considering the effect on each party of granting the stay, and paying particular regard for the public consequences. 5 U.S.C.A. § 705.

**[22]    Administrative Law and Procedure**
👉 Supersedeas or stay of proceedings

At a minimum, to justify a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review, an agency must provide a reasoned explanation that is sufficient to enable courts to evaluate whether a stay was required to afford parties an adequate judicial remedy—that is, to ensure that the prevailing party in the pending litigation would ultimately obtain meaningful relief. 5 U.S.C.A. § 705.

1 Cases that cite this headnote

**[23]    Administrative Law and Procedure**
👉 Supersedeas or stay of proceedings

An agency stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a just manner. 5 U.S.C.A. § 705.

[24]   **Administrative Law and Procedure**
        👉 Supersedeas or stay of proceedings

To justify a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review, an agency must do more than pay lip service to the pending litigation, or merely assert, without any specificity, that the litigation raises serious questions concerning the validity of certain provisions of the rule. 5 U.S.C.A. § 705.

[25]   **Administrative Law and Procedure**
        👉 Supersedeas or stay of proceedings

To justify a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review, although the agency need not adhere to the specific contours of the four-factor preliminary injunction test, it must weigh the same kinds of equitable considerations that courts have long applied and must explain why, in light of the pending litigation, a stay is required to ensure the parties will ultimately obtain an adequate and just judicial remedy. 5 U.S.C.A. § 705.

[26]   **Education**
        👉 Federally guaranteed loans

Department of Education acted arbitrarily and capriciously in staying, pending judicial review, implementation of Borrower Defense Regulations, which were regulatory changes to federal student loan programs designed to protect student loan borrowers from misleading, deceitful, and predatory practices; fact that

parties would avoid costs of complying with existing regulations was insufficient to support stay, and Department's position that regulations were legally questionable was at odds with position it took when it promulgated Borrower Defense Regulations. 5 U.S.C.A. § 705.

1 Cases that cite this headnote

[27]   **Administrative Law and Procedure**
        👉 Supersedeas or stay of proceedings

The mere fact that parties would avoid the costs of complying with the existing regulations is insufficient to support a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review. 5 U.S.C.A. § 705.

1 Cases that cite this headnote

[28]   **Administrative Law and Procedure**
        👉 Review for arbitrary, capricious, unreasonable, or illegal actions in general

The "arbitrary and capricious" standard of review of agency actions under the Administrative Procedure Act (APA) requires that agencies provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision. 5 U.S.C.A. § 701(a).

1 Cases that cite this headnote

[29]   **Administrative Law and Procedure**
        👉 Supersedeas or stay of proceedings

To justify a stay under the provision of the Administrative Procedure Act (APA) permitting an agency to postpone the effective date of an action pending judicial review, an agency must do more than simply assert—without elaboration—that the litigation raises unspecified serious questions for resolution and that a stay will save regulated parties the cost of compliance. 5 U.S.C.A. § 705.

1 Cases that cite this headnote

[30]   **Administrative Law and Procedure**

➥ *Explanation or reasons for change*

An agency is entitled to change its position, and, to do so, it need not even demonstrate that its current view is better than its old one, but an unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making. 5 U.S.C.A. § 701(a).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*78** Adam R. Pulver, Scott Lawrence Nelson, Julie A. Murray, Public Citizen Litigation Group, Benjamin Michael Wiseman, Office of the Attorney General Office of Consumer Protection, Washington, DC, Toby R. Merrill, Legal Services Center of Harvard Law School, Jamaica Plain, MA, Yael Shavit, Office of the Attorney General of Massachusetts, Boston, MA, Bernard Ardavan Eskandari, California Department of Justice, Los Angeles, CA, John A.B. Langmaid, Joseph J Chambers, Office of Attorney General, Hartford, CT, Christian Douglas Wright, Delaware Department of Justice, Wilmington, DE, Mark Stanley Kubiak, Office of the Attorney General of Virginia Consumer Protection Section, Samuel Thurston Towell, Office of the Attorney General of Virginia, Richmond, VA, Bryan Chien Yee, James Collington Paige, Thomas Francis Mana Moriarty, State of Hawaii Department of the Attorney General, Honolulu, HI, Joseph Michael Sanders, Illinois Attorney General's Office, Chicago, IL, Jessica Whitney, Iowa Attorney General's Office, Des Moines, IA, Christopher John Madaio, Office of the Attorney General of Maryland, Baltimore, MD, Jason Timothy Pleggenkuhle, Minnesota Attorney General's Office, St. Paul, MN, Carolyn Fast, Jane Melissa Azia, Office of the New York Attorney General, New York, NY, Matthew Liles, North Carolina Department of Justice, Raleigh, NC, Andrew U. Shull, Oregon Department of Justice, Salem, OR, Jesse Harvey, Pennsylvania Office of the Attorney General Bureau of Consumer Protection, Pittsburg, PA, John M. Abel, Office of Attorney General, Harrisburg, PA, Michael John Fischer, Pennsylvania Office of Attorney General, Philadelphia, PA, Edmund Francis Murray, Jr., Neil F. X. Kelly, Rhode Island Department of Attorney General, Providence, RI, Christopher James Curtis, Office of the Attorney General, State of Vermont, Montpelier, VT, Benjamin Jerauld Roesch, Washington State Attorney General's Office, Seattle, WA, for Plaintiffs.

Karen Bloom, Robert Charles Merritt, U.S. Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM OPINION AND ORDER**

RANDOLPH D. MOSS, United States District Judge

Meaghan Bauer, Stephano Del Rose, and a coalition of nineteen states and the District of Columbia bring suit against the Department of Education under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Plaintiffs challenge three agency actions delaying the implementation of the "Borrower Defense Regulations," a package of regulatory changes to federal student loan programs designed to "protect student loan borrowers from misleading, deceitful, and predatory practices." William D. Ford Federal Direct Loan Program ("Borrower Defense Regulations"), 81 Fed. Reg. 75,926, 75,926 (Nov. 1, 2016). The Borrower Defense Regulations **\*79** were published on November 1, 2016, and were to become effective on July 1, 2017. Shortly before the effective date, however, the California Association of Private Postsecondary Schools ("CAPPS"), brought suit challenging the regulations, and, a week later, CAPPS sought a preliminary injunction blocking the implementation of two changes. That motion was never fully briefed or decided because the Department, on its own accord, issued a stay under § 705 of the APA ("Section 705 Stay"), postponing not only the effective date of the two changes that CAPPS had asked the Court preliminarily to enjoin, but most of the other portions of the regulations as well. While the *CAPPS* litigation continued, the Department issued an interim final rule on October 24, 2017 that delayed the effective date of the Borrower Defense Regulations to July 1, 2018, and a notice of proposed rulemaking to further delay the effective date to July 1, 2019. Then, on February 14, 2018, the Department issued a final rule delaying the effective date of the Borrower Defense Regulations until July 1, 2019.

Within weeks of the issuance of the Section 705 Stay, Bauer and Del Rose (student borrowers who allege that they would benefit from the Borrower Defense Regulations) and the coalition of nineteen states and the District of Columbia filed separate suits seeking to invalidate the stay. Over the course of the last year, both sets of plaintiffs have amended their complaints to challenge the additional delay actions taken in October 2017 and February 2018. On March 1, 2018, the Court consolidated the student borrower and state cases,

stayed the *CAPPS* case pending resolution of this case, and ordered a final round of summary judgment briefing.

The matter is now before the Court on cross-motions for summary judgment filed by the state plaintiffs, Dkt. 55, the student borrower plaintiffs, Dkt. 56, and the Department, Dkt. 58; Dkt. 59. In brief, the Court concludes that Plaintiffs have standing to challenge the delay actions; that the October 24, 2017 Interim Final Rule is based on an unlawful construction of the Higher Education Act of 1965; that the February 14, 2018 Final Delay Rule is procedurally invalid; that the Section 705 Stay is judicially reviewable; and that the Department's Section 705 Stay is arbitrary and capricious. The Court, accordingly, will **GRANT** the state plaintiffs' and the student borrower plaintiffs' motions for summary judgment, Dkt. 55; Dkt. 56, and will **DENY** the Department's cross-motion, Dkt. 66. Before entering a remedial decree, the Court will order the parties in this case and the parties and proposed intervenors in *CAPPS v. DeVos*, Civil Action No. 17-999, to appear for a status conference on September 14, 2018, at 10:30 a.m. in Courtroom 21.

# I. BACKGROUND

## A. Borrower Defense Regulations

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, empowers the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students ... in institutions of higher education" through various types of financial aid. *Id.* § 1070(a). The William D. Ford Federal Direct Loan Program ("Direct Loan Program") allows students who attend "participating institutions of higher education" to obtain direct loans from the federal government to pay for their educational expenses. *Id.* § 1087a(a). Those institutions of higher education that are selected to participate in the Direct Loan Program must enter into an agreement with the Secretary of Education, which may include any provisions "the Secretary determines are necessary to protect the **\*80** interests of the United States and to promote the purposes of" the Direct Loan Program. *Id.* § 1087d(a)(6); *see also id.* § 1087c. Moreover, and more generally, the Secretary has authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the" Direct Loan Program. *Id.* § 1221e-3. In administering the Direct Loan Program, the Secretary must also "specify in regulations which acts or omissions of an institution of higher education a borrower

may assert as a defense to repayment of a loan" made under the Direct Loan Program. *Id.* § 1087e(h).

Pursuant to these authorities, in January 1994, the Secretary issued "standards, criteria, and procedures governing the Federal Direct Student Loan ... program." Federal Direct Student Loan Program, 59 Fed. Reg. 472, 472 (Jan. 4, 1994). Those standards included the first iteration of the borrower defense rule, which permitted a Direct Loan Program borrower to "assert as a defense against the repayment of the loan a claim based on the act or omission of the school" if (1) that act or omission gave rise to a cause of action against the school under state law, (2) the borrower presented the "claim to the school and received no satisfaction," and (3) the borrower filed a timely claim with the Department of Education. *Id.* at 481.

In December 1994, the Secretary amended the Direct Loan Program regulations, including those governing borrower defenses. *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994). Under the new regulations—which remain in effect today—borrowers are permitted to assert "as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1) (2016). If that defense to "repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan," and the Secretary may provide the borrower with further relief as appropriate. *Id.* § 685.206(c)(2). The Secretary may then bring a "proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of [the] Direct Loan to pay to the Secretary the amount of the loan to which the defense applies." *Id.* § 685.206(c)(3). In short, the 1994 borrower defense rule permits a student borrower to assert his or her school's misconduct as a reason for nonrepayment, and, if successful, the regulation shifts the obligation to repay the loan from the borrower to the school.

The adequacy of the 1994 borrower defense rule was tested by "the collapse of Corinthian Colleges (Corinthian)" in May 2015. William D. Ford Federal Direct Loan Program ("June 16, 2016 Notice of Proposed Rulemaking ('NPRM')"), 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). Corinthian was "a publicly traded company [that] operat[ed] numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide." *Id.* at 39,335. After

Corinthian "filed for bankruptcy" and the Department found "that the college had misrepresented its job placement rates," the Department "received thousands of claims for student loan relief from Corinthian students." *Id.* In dealing with the aftermath, the Department concluded that the 1994 borrower defense rule was outdated and was no longer adequate to deal with the changed "landscape of higher education." *Id.*

To address these perceived deficiencies, the Department commenced a rulemaking. First, pursuant to its obligations under the HEA, it "obtain[ed] the advice of and recommendations **\*81** from individuals and representatives of the groups involved in student financial assistance programs under [Title IV of the HEA], such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." 20 U.S.C. § 1098a(a)(1). After obtaining those recommendations, the Department published a notice of intent to engage in negotiated rulemaking regarding borrower defenses and a request for public comment on August 20, 2015.[1] Negotiated Rulemaking Committee, Public Hearings, 80 Fed. Reg. 50,588 (Aug. 20, 2015). The Department selected a committee, but after a series of meetings in early 2016, the negotiators were unable to reach consensus. June 16, 2016 NPRM, 81 Fed. Reg. at 39,333–34. As a result, the Department issued its own notice of proposed rulemaking on June 16, 2016, and invited the members of the negotiating committee, in addition to members of the public, to submit comments on a set of regulations crafted by the Department in light of the negotiations and earlier public hearings. *Id.* More than 50,000 parties submitted comments in response to the Department's notice of proposed rulemaking. Borrower Defense Regulations, 81 Fed. Reg. at 75,928.

On November 1, 2016, the Department published the final regulations governing the Direct Loan Program. *See id.* at 75,926. In relevant part, the Borrower Defense Regulations: (1) revised the procedures for student borrowers seeking to discharge their federal loans as a result of school misconduct; (2) revised the processes for students seeking other forms of debt relief; (3) required "financially risky institutions [to be] prepared to take responsibility for the losses to the government for discharges of and repayments for [f]ederal student loans;" (4) expanded the disclosure obligations of institutions "at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at least one dollar the outstanding balance of the

borrower's loans received at the institution;" (5) altered the standard for students asserting a "borrower defense" to collection actions; (6) expanded the situations in which the Department could proactively forgive loans in groups, rather than upon individual applications; and (7) prohibited schools "participating in the Direct Loan Program from obtaining" or relying upon a borrower's "waive[r] [of] his or her right to initiate or participate in a class action lawsuit," or "from requiring students to engage in internal dispute processes before contacting accrediting or government agencies." *Id.* at 75,926–27.

The Borrower Defense Regulations were set to take effect eight months later, on July 1, 2017.

## B. California Association of Private Postsecondary Schools Litigation

The California Association of Private Postsecondary Schools is an industry group that represents schools subject to provisions of the Borrower Defense Regulations. CAPPS filed suit in this Court on May 24, 2017, alleging that four aspects of the regulations were unlawful. *See* Dkt. 1 at 69–75 (Compl. ¶¶202–41), **\*82** *CAPPS v. DeVos*, Civ. No. 17-999 (D.D.C.). In particular, CAPPS challenged (1) changes to the procedures and options available to students seeking debt relief; (2) modifications of certain financial responsibility standards; (3) requirements that proprietary schools disclose additional information about loan repayment rates to students and prospective students; and (4) prohibitions on the inclusion of or reliance on arbitration and class action waiver provisions in contracts with students. *Id.* CAPPS sought to enjoin the Department "from implementing, applying, or taking any action whatsoever pursuant to the final regulations," and to vacate the entirety of the final rule. Dkt. 1 at 75 (Compl. ¶ 242), *CAPPS*, Civ. No. 17-1999.

On June 2, 2017, CAPPS filed a motion for preliminary injunction. Dkt. 6, *CAPPS*, Civ. No. 17-999. The relief sought in that motion, however, was more limited than that sought in the complaint; CAPPS sought preliminarily to enjoin only the provision of the Borrower Defense Regulations prohibiting predispute arbitration clauses and class action waivers. *Id.* at 1. The Court set a briefing schedule, ordering the Department to file its opposition on or before June 15, 2017. Minute Entry (June 6, 2017), *CAPPS*, Civ. No. 17-999. On June 13, 2017, the same states that are plaintiffs in the present action moved to intervene as defendants in the *CAPPS* case and were soon followed by Bauer and Del Rose. Dkt. 16, Dkt. 22, Dkt. 31, *CAPPS*, Civ. No. 17-999. The day before the

000019

Department's opposition to CAPPS's motion was due, the Department notified the Court that it was in the process of staying the implementation of the entirety of the Borrower Defense Regulations under § 705 of the APA. [2] Dkt. 20, *CAPPS*, Civ. No. 17-999. At that point, CAPPS withdrew its motion for a preliminary injunction, Dkt. 21, *CAPPS*, Civ. No. 17-999, and, on September 6, 2017, the Department filed an answer, Dkt. 52, *CAPPS*, Civ. No. 17-999. Neither party took any step thereafter to advance the *CAPPS* litigation.

**C. Present Action**

On July 6, 2017, shortly after the Department issued its Section 705 Stay, Plaintiffs Meaghan Bauer and Stephano Del Rose filed the present action. Dkt. 1. Bauer and Del Rose attended New England Institute of Art ("NEIA"), a for-profit college. Dkt. 53 at 10 (Compl. ¶ 35). [3] Bauer attended a filmmaking program from 2011 to 2014. *Id.* Del Rose attended the same program from 2009 to 2014. *Id.* Each borrowed more than $30,000 in federal direct loans to finance his or her attendance. *Id.* (Compl. ¶¶ 36–37). Each now owes more than $40,000 to the Department. *Id.* Bauer and Del Rose both seek loan forgiveness as a result of "NEIA's fraud and other related misconduct," *id.* at 12 (Compl. ¶ 45); they also wish to bring a class action on behalf of students at NEIA, *id.* at 11 (Compl. ¶ 40). As such, they allege that the continued delay in implementing the Borrower Defense Regulations has impaired their ability to vindicate their rights against NEIA and to obtain related relief. *Id.* at 12–17 (Compl. ¶¶ 44–62).

The state plaintiffs include nineteen states and the District of Columbia. Dkt. **\*83** 80 at 1–2 (Compl.), *Massachusetts v. DeVos*, Civ. No. 17-1331 (D.D.C.). [4] The states allege that they "initiate numerous investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes," *id.* at 15 (Compl. ¶ 61), and that the Borrower Defense Regulations "afford[ ] a legally significant status to enforcement actions and investigations undertaken by state attorneys general," *id.* at 22 (Compl. ¶ 77). Specifically, under the rule, "[a] successful enforcement action brought against a postsecondary institution by a state attorney general gives rise to a borrower defense to loan repayment," and "a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to seek repayment from the school for any amounts forgiven." *Id.* The state plaintiffs argue that, "[b]y incorporating state enforcement actions and investigations

into the Department's borrower defense framework, the Borrower Defense [Regulations] enhance the effectiveness of state enforcement efforts and the remedies available for violations of state law." *Id.* (Compl. ¶ 78). The states, moreover, argue that the Borrower Defense Regulations protect "the economic health and well-being of state residents and ... the quality of higher education within each state." Dkt. 64 at 23.

Although the state and student borrower plaintiffs initially challenged only the Section 705 Stay, over the course of the last year, they have amended their complaints to encompass challenges to additional agency actions delaying the effective date of the Borrower Defense Regulations. *See* Dkt. 25; Dkt. 53; *see also* Dkt. 46, Dkt. 80, *Massachusetts v. DeVos*, Civ. No. 17-1331. The Court discusses each of those agency actions in turn.

*1. Section 705 Stay and Notice of Negotiated Rulemaking to Revise Borrower Defense Regulations*

On June 16, 2017, the Department published a notice in the Federal Register delaying the effective date of the Borrower Defense Regulations "until the judicial challenges to the regulations are resolved." [5] William D. Ford Federal Direct Loan Program ("Section 705 Stay"), 82 Fed. Reg. 27,621, 27,621 (June 16, 2017). The Department premised that decision on § 705 of the APA, which authorizes an agency to "postpone the effective date of action taken by it, pending judicial review," if the "agency finds that justice so requires." 5 U.S.C. § 705. In the view of the Department, this standard was satisfied "[i]n light of the existence and potential **\*84** consequences of the pending [*CAPPS* ] litigation." Section 705 Stay, 82 Fed. Reg. at 27,621.

The Department identified three factors in support of its conclusion that a delay was justified under § 705. First, it found value in "preserv[ing] the regulatory status quo," because the *CAPPS* "plaintiffs ha[d] raised serious questions concerning the validity of certain provisions of the final regulations and ha[d] identified substantial injuries that could result if the final regulations [went] into effect before those questions [were] resolved." *Id.* Specifically, the Department pointed to the cost to institutions of "modify[ing] their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests" and complying with the regulations' financial responsibility provisions. *Id.* On the other side of the balance, the Department found that the delay would cause little harm to

000020

student borrowers because they could still obtain relief from the Department under the 1994 borrower defense rule, which would "remain in effect during the postponement." *Id.*

Second, the Department concluded that postponing the effective date of the Borrower Defense Regulations would cause "no significant harm" to the United States. *Id.* Rather, by delaying the implementation of provisions designed to make the discharge of federal student loans easier, the United States would stand to avoid "significant costs to the Federal government and ultimately the Federal taxpayer." *Id.* at 27,621–22 ("The final regulations were estimated to have a net budget impact in costs over the 2016–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the regulations providing for a three-year automatic closed school discharge.").

Finally, the Department stated, "[s]eparately," that it would be "announcing its plan to review and revise the regulations through the negotiated rulemaking process required under section 492 of the HEA." *Id.* at 27,622. Those potential revisions were relevant to the Section 705 Stay, because "[t]he postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters." *Id.*

That same day, the Department published notice of its intent to establish a negotiated rulemaking committee to revise the Borrower Defense Regulations. Negotiated Rulemaking Committee; Public Hearings ("June 16, 2017 Notice of Intent"), 82 Fed. Reg. 27,640 (June 16, 2017).

### 2. *October 24, 2017 Interim Final Rule and Notice of Proposed Rulemaking for Final Delay Rule*

The next agency actions relevant to the pending motions occurred four months later, on October 24, 2017, when the Department published two documents. The first was an interim final rule delaying the effective date of the Borrower Defense Regulations until July 1, 2018, even if the Section 705 Stay was lifted before then.[6] **\*85** William D. Ford Federal Direct Loan Program ("Interim Final Rule"), 82 Fed. Reg. 49,114 (Oct. 24, 2017). Invoking the good cause provisions of §§ 553(b)(3)(B) and (d)(3) of the APA, the Department issued the Interim Final Rule without advance notice or the opportunity for comment. *Id.* at 49,114; *see*

*also* 5 U.S.C. § 553(b)(3)(B) (providing an exception to the notice and comment requirement when those procedures are "impracticable, unnecessary, or contrary to the public interest"); 5 U.S.C. § 553(d)(3) (providing an exception to the "required publication or service of a substantive rule ... 30 days before its effective date" upon a finding of good cause "published with the rule"). Even though the Interim Final Rule took effect immediately, the Department nevertheless invited comments for a thirty day period. *See* 82 Fed. Reg. at 49,115.

The Department premised the Interim Final Rule on the "Master Calendar Provision" of the HEA, 20 U.S.C. § 1089(c) (1). *See* Interim Final Rule, 82 Fed. Reg. at 49,115–16. That provision states that, except in cases of voluntary compliance, "any regulatory changes initiated by the Secretary affecting the programs under [Title IV of the HEA] that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). An award year begins on July 1. Interim Final Rule, 82 Fed. Reg. at 49,115. A "regulatory change," accordingly, would have to be "published in final form on or before" November 1, 2017, to become effective by July 1, 2018. *Id.* at 49,115–16.

The Department, however, did not simply rely on this November–July interval to justify the Interim Final Rule. Instead, it interpreted the Master Calendar Provision further to require that all "regulations promulgated under Title IV of the HEA have an effective date of July 1" so that institutions could "avoid incurring the costs of compliance on a rolling basis throughout the year." *Id.* at 49,116. In other words, under the Department's reading, the Master Calendar Provision allows applicable rules to take effect on only one day every year—July 1. Applied to the present circumstances, the Department posited that as soon as the Section 705 Stay delayed the effective date of the Borrower Defense Regulations beyond July 1, 2017, it lacked discretion to implement the regulations before July 1, 2018, even if the Section 705 Stay was lifted before that date. *Id.* The Department also relied on this reasoning to justify why it had good cause to forgo notice-and-comment and negotiated rulemaking; the Department concluded that because "it was impracticable" to do so between the initiation of the *CAPPS* litigation on May 24, 2017 and the July 1, 2017 effective date of the Borrower Defense Regulations, it "did not have any discretion to set an effective date earlier than July 1, 2018." *Id.*

000021

On October 24, 2017, the Department also issued a notice of proposed rulemaking to further delay the effective date of the Borrower Defense Regulations to July 1, 2019. [7]  **\*86** *William D. Ford Federal Direct Loan Program ("October 24, 2017 NPRM"), 82 Fed. Reg. 49,155 (Oct. 24, 2017).* The Department justified this delay on two grounds. First, it asserted that delaying the effective date would "ensure that there is adequate time to conduct [a] negotiated rulemaking" to reconsider the Borrower Defense Regulations. *Id.* at 49,155. Second, it explained that, under the Master Calendar Provision, "the regulations resulting from [the] negotiated rulemaking could not be effective before July 1, 2019," because "the first negotiated rulemaking session" was not scheduled to take place until November 13–15, 2017. *Id.* at 49,156.

Although the Department provided notice and an opportunity for comment on the proposed rule, it waived the negotiated rulemaking requirement of the HEA. *Id.* at 49,157. In doing so, the Department acknowledged that "all regulations proposed ... for programs under Title IV of the HEA are subject to negotiated rulemaking requirements," unless the Department can establish "good cause" to waive the requirement. *Id.* It also acknowledged that "the HEA ... requires the Secretary to publish the basis for waiving negotiations in the Federal Register at the same time as the proposed regulations in question are first published." *Id.* The Department concluded that good cause existed for waiving the negotiation process because "it would not be practicable before the July 1, 2018 effective date specified in the [Interim Final Rule], to engage in negotiated rulemaking and publish final regulations" amending the Borrower Defense Regulations. *Id.*

### 3. *February 14, 2018 Final Delay Rule*
On February 14, 2018, the Department issued a final rule delaying the effective date of the Borrower Defense Regulations until July 1, 2019. *William D. Ford Federal Direct Loan Program ("Final Delay Rule"), 83 Fed. Reg. 6,458 (Feb. 14, 2018).* In doing so, the Department addressed a number of comments regarding the proposed rule, both substantive and procedural.

Responding to concerns that further delay would harm borrowers, the Department stated that, in its view, any costs of the delay were insignificant, and, in any event, "outweighed by the administrative and transaction costs for regulated entities and borrowers of having those regulations go into

effect only to be changed a short while later." *Id.* at 6,460–61. The Department stressed, for example, that the 1994 borrower defense rule would remain in effect, "as [would] the statute that allows borrowers to assert defenses to repayment." *Id.* at 6,461. On the other hand, the Department observed that the Borrower Defense Regulations' prohibition on predispute arbitration clauses and class action waivers "would require some institutions to change their policies and procedures[,] to amend their enrollment agreements," to re-train staff, and to send "notices to borrowers informing them of the changed class action waivers and pre-dispute arbitration provisions," only to "repeat or reverse these steps" in the "likely" event that the provision is rescinded or struck down. *Id.* at 6,462.

The Department was also unpersuaded by commenters' procedural objections. *Id.* at 6,463–64. The Department maintained that the October 24, 2017 NPRM "properly articulated the good cause supporting" the Department's "waiver of the HEA's negotiated rulemaking requirement." *Id.* at 6,464. According to the Department:

> The NPRM explained that the original catalyst for the delay was the *CAPPS* litigation, filed on May 24, 2017, and that it would not have been possible for the Department to engage in negotiated rulemaking and [to] publish final regulations after that date (much less after **\*87** October 24, 2017, the date the NPRM was published), and prior to July 1, 2018 (the current effective date of the 2016 final regulations). Negotiated rulemaking on this discrete issue simply was not practicable. It is a time-consuming and resource-intensive process and could not practicably be completed by July 1, 2018.

*Id.* (italics added). The Department also rejected the argument that it needed to identify a deficiency in the underlying Borrower Defense Regulations to justify the delay. *See id.* ("[A]n agency's rulemaking [need only] justify the particular action or actions to be taken by that rule."). Rather, the Department reiterated that its earlier cost-benefit analysis of the "net budget impact of the delay" was accurate and justified the rule, although it noted that "the delay was not proposed

solely on the basis of those calculations." *Id.* Finally, the Department addressed a group of comments objecting to its use of the *CAPPS* litigation as a basis for the delay given that CAPPS had challenged only the substance of a handful of provisions in the Borrower Defense Regulations. *Id.* at 6,465. The Department responded that the *CAPPS* litigation was not the basis for the delay from July 1, 2018 to July 1, 2019, and, that in any event, CAPPS had sought relief that would have invalidated the entire rule (on grounds of non-severability). *Id.*

### 4. *Pending Motions for Summary Judgment*

At the time the Final Delay Rule was published in the Federal Register, the parties in the then-separate actions pending before the Court had just completed a second round of summary judgment briefing that encompassed challenges to the Section 705 Stay and the Interim Final Rule. *See, e.g.*, Dkt. 50 (Department's Reply in Support of its Cross-Motion for Summary Judgment). Following the publication of the Final Delay Rule, Plaintiffs moved to amend their respective complaints, and the Court held a status conference with the parties in all three relevant actions (Civil Action No. 17-999, Civil Action No. 17-1330, Civil Action No. 17-1331). Although Plaintiffs sought to convert their then-pending motions for summary judgment into motions for partial summary judgment on the Section 705 Stay and Interim Final Rule, *see, e.g.*, Dkt. 52 (Borrower Plaintiffs' Motion to Convert), the Court instead denied the earlier motions as moot and ordered the parties to file renewed motions for summary judgment addressing all three delay actions. Minute Entry (Mar. 1, 2018); Minute Order (May 24, 2018). The Court also consolidated the two actions challenging the delay actions and stayed CAPPS's challenge to the Borrower Defense Regulations. Minute Entry (Mar. 1, 2018).

## II. ANALYSIS

Plaintiffs seek to vacate the Section 705 Stay, the Interim Final Rule, and the Final Delay Rule. They assert that these regulatory actions were arbitrary and capricious, not in accordance with law, and taken without observance of the required procedures. Broadly, Plaintiffs argue that the Department impermissibly took these actions for the purpose of securing time to replace the Borrower Defense Regulations (functionally rescinding the earlier rule); that it did not adequately consider benefits to student borrowers lost

through the delays; that it relied on internally inconsistent assumptions and omitted key considerations when justifying the delay rules; that it misinterpreted the HEA; and, that it failed to comply with the HEA's requirement that public consultation and negotiated rulemaking be conducted prior to the promulgation of rules affecting federal student **\*88** loans. The Department, for its part, contests each of these assertions and argues that Plaintiffs lack standing.

On the threshold question of standing, the Court concludes that it need not decide whether the state plaintiffs have carried their burden because, as the Department concedes and as the record demonstrates, the student borrower plaintiffs have standing to seek the entirety of the relief sought by all parties to the litigation. The Court then considers Plaintiffs' challenge to the Interim Final Rule—which expired on July 1, 2018 —and concludes that it is moot, except for one issue, and, as to that issue, the Court concludes that the Department's interpretation of the Master Calendar Provision is contrary to law. Next, the Court examines Plaintiffs' substantive and procedural challenges to the Final Delay Rule and concludes that the Department failed to justify adequately its invocation of the good cause exception to the negotiated rulemaking requirement. Given that procedural flaw, the Court does not reach Plaintiffs' substantive challenges to the rule. Finally, the Court considers Plaintiffs' challenges to the Section 705 Stay and concludes that § 705 stays are subject to judicial review and that the Department failed to offer a reasoned basis to stay the implementation of the Borrower Defense Regulations.

### A. Standing

**[1]  [2]  [3]  [4]  [5]**  "Article III limits federal judicial jurisdiction to cases and controversies." *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (citing U.S. Const. art. III, § 2). That means that federal courts may only adjudicate those disputes in which the plaintiff has "a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ). The plaintiff bears the burden of establishing standing, and, accordingly, must make "a showing of injury-in-fact, causation, and redressability." *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013). Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). Causation, in turn, requires proof of "a causal connection between the injury and

000023

the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (alteration in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ). Finally, redressability requires "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. United States ex. rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

[6] The Department argues that the state plaintiffs lack standing to challenge the three delay actions. Dkt. 59-1 at 28– 32. For purposes of resolving the pending motions, however, the Court need not reach that question. It is well-settled that, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) ("Because we find California has standing, we do not **\*89** consider the standing of the other plaintiffs."). Here, both sets of plaintiffs bring identical claims seeking identical relief: a declaratory judgment that the three delay actions were unlawful, an order vacating those actions, and immediate implementation of the Borrower Defense Regulations. *Compare* Dkt. 53 at 29– 30 (Compl. Prayer for Relief), *with* Dkt. 80 at 41–42 (Compl. Prayer for Relief), *Massachusetts v. DeVos*, Civ. No. 17-1331. This means that if Del Rose and Bauer have standing, the case may proceed regardless of whether the state plaintiffs also have standing. [8] Although the Department does not challenge the student borrowers' standing to sue, the Court must consider that question *sua sponte* to ensure that it has jurisdiction. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (federal courts have an obligation to assure themselves that they have jurisdiction); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (same).

[7] According to their complaint, Del Rose and Bauer attended a for-profit college in Massachusetts at different times between 2009 and 2014. Dkt. 53 at 10 (Compl. ¶ 35). They both borrowed more than $30,000 to finance their educations, and now owe more than $40,000 to the Department. *Id.* (Compl. ¶¶ 36–37). They allege that they

were defrauded by their school. They contend, in particular, that they "relied on numerous representations made by [their school] with respect to the quality of instruction and equipment, the school's industry connections, the job prospects for ... graduates, the school's job placement assistance, and the school's high costs, especially in comparison to its graduates' low-paying employment," but then "later learned that many of these representations were untrue." *Id.* (Compl. ¶ 38). If permitted, they intend to bring a class action in state court on the basis of these misrepresentations and have taken concrete steps to initiate that litigation. *Id.* at 10–11 (Compl. ¶ 39) (describing demand letter sent to the school). They are, however, prevented from doing so by provisions in their enrollment contracts that require arbitration and bar class actions. *Id.* at 11 (Compl. ¶ 40). Their school, moreover, has refused to waive these provisions. *Id.* (Compl. ¶ 41). If the delay actions were vacated and the Borrower Defense Regulations allowed to take effect, the school would be prohibited from relying on these provisions to keep Del Rose and Bauer from banding together with other alleged victims of the school's fraud to bring suit in state court. *Id.* at 11–12 (Compl. ¶¶ 43–44).

Bauer and Del Rose further allege that they "have also submitted 'borrower defense' applications to [the Department] seeking cancellation of their federal loans based on [their school's] fraud and other misconduct related to their education," and that these applications have now been pending for nearly three years. *Id.* at 12 (Compl. ¶ 45). If the delay rules challenged here were vacated and the Borrower Defense Regulations were allowed to take effect, Bauer and Del Rose would receive "significant new protections in the adjudication of their borrower defense applications," including "a fact-finding process" that involves additional records held by the Department and—in the event the applications were denied—written decisions including the bases for those decisions. *Id.* at 13 (Compl. ¶¶ 47–50). And, while those applications remain pending, Bauer and Del Rose would automatically have their loans **\*90** placed into forbearance, a status that Bauer has not yet been able to obtain and that Del Rose holds only subject the Department's continued agreement to renew it. *Id.* at 13–14 (Compl. ¶ 51).

Bauer and Del Rose have supported these allegations with declarations detailing the misrepresentations allegedly made by their school, their efforts to sue in Massachusetts state court, and the status of their borrower defense applications. *See* Dkt. 56-2 at 1–5; Dkt. 56-3 at 1–6. They have also attached to their motion the demand letters sent to the school

and the enrollment agreement that would be affected by the Borrower Defense Regulations. *See* Dkt. 562 at 7–19; Dkt. 56-3 at 9, 11–23. The Department has not contested that the student borrower plaintiffs would benefit from vacatur of the delay actions, nor has it called into question any of the facts that they have alleged.

In light of these undisputed facts, the Court concludes that the student borrower plaintiffs have carried their burden with respect to standing. The Department's delay actions have deprived Bauer and Del Rose of several concrete benefits that they would have otherwise accrued under the Borrower Defense Regulations. The relief they seek in this action–immediate implementation of the Borrower Defense Regulations—would restore those benefits. That suffices to demonstrate (1) an injury in fact (2) caused by the agency actions at issue (3) that would be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130; *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316–17 (D.C. Cir. 2015).

Finally, although neither party has raised the issue, the Court notes that Plaintiffs brought separate actions, which the Court then consolidated. Minute Entry (Mar. 1, 2018). In the cases cited above for the proposition that a single plaintiff's standing is sufficient, in contrast, the plaintiffs had joined together in bringing a single case. *See Watt*, 454 U.S. at 158, 102 S.Ct. 205; *Mountain States Legal Found.*, 92 F.3d at 1231. The Supreme Court's recent decision in *Hall v. Hall*, ––– U.S. ––––, 138 S.Ct. 1118, 200 L.Ed.2d 399 (2018), suggests that this distinction might be of some import. In that case, the Court held that when actions are consolidated under Rule 42(a) of the Federal Rules of Civil Procedure—as was the case here—each "retains its independent character" in at least some respects. *Id.* at 1125. Notably, the Court explained that it has long "understood consolidation not as completely merging the constituent cases into one, but instead as enabling more efficient case management while preserving the distinct identities of the cases and the rights of the separate parties in them." *Id.* In support of this historical understanding of consolidation, the Court quoted a case from the mid-nineteenth century in which it had held that a consolidated proceeding "is in reality a mere joinder of distinct causes of action by distinct parties, arising out of a common injury, and which are heard and determined, so far as the merits are concerned, the same as in the case of separate libels [suits] for each cause of action." *Id.* at 1125–26 (quoting *Rich v. Lambert*, 53 U.S. 356, 353 (1852) ). Rule 42(a) adopted, rather than superseded, this "settled understanding

of consolidation"—that is, "that separate actions do not merge into one" when they are consolidated. *Id.* at 1130. All of this is to say that in consolidated cases, *Hall* might be read to call into question the application of the general rule that as long as "[a]t least one plaintiff ... ha[s] standing to seek each form of relief requested in the complaint," the case may proceed. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, ––– U.S. ––––, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017).

**\*91** The Court nevertheless applies that well-established rule in this case for two reasons. First, *Hall* acknowledged that "[n]one of [the Court's discussion of the meaning of consolidation] means that district courts may not consolidate cases for 'all purposes' in appropriate circumstances," leaving open the possibility that, in some situations, consolidated cases may be treated as a single action. 138 S.Ct. at 1131. This case is a prime candidate for that treatment; the parties raise only questions of law that can be decided on the administrative record, and the two complaints (and two summary judgment motions) are mirror images of one another that could easily have been filed in the first instance as a single action (or as a single motion for summary judgment). The extent of this overlap is perhaps best captured by the fact that, even if the Court were to hold that the state plaintiffs lack standing—and, to be clear, the Court is not deciding that question—it would make no difference to the Court's consideration of the pending motions, to the relief the Court would grant, or to any other aspect of this litigation.

**[8]** Second, and more importantly, this Court must follow controlling precedent until it has been overruled by a court empowered to do so. *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) (observing that the D.C. Circuit must leave to the Supreme Court "the prerogative of overruling its ... decisions," and that "district judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Court of Appeals], sitting en banc, or the Supreme Court, overrule it" (internal quotation marks omitted) ); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (noting that lower courts must follow precedent that "has direct application in a case," even if it "rests on reasons rejected in some other line of decisions"); *Seegars v. Gonzales*, 396 F.3d 1248, 1254 (D.C. Cir. 2005) (holding that binding precedent must be followed even when "tension" exists in the case law). With respect to the question presented here—whether proof of one plaintiff's standing may suffice for purposes of Article III standing in an action consisting of consolidated cases—numerous decisions

by the D.C. Circuit and Supreme Court have treated a showing that a single plaintiff has standing as sufficient. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984); *Belizan v. Hershon*, 495 F.3d 686, 689, 694 (D.C. Cir. 2007); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004); *cf. Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1286, 1297 (D.C. Cir. 2007) (declining to dismiss case after holding that one group of plaintiffs in consolidated case lacked standing). The Court, accordingly, concludes that it has jurisdiction and need not evaluate standing on a plaintiff-by-plaintiff basis.

### B. October 24, 2017 Interim Final Rule

 **[9]**  Plaintiffs' challenge to the Interim Final Rule delaying the effective date of the Borrower Defense Regulations also poses a threshold, jurisdictional issue—this time, mootness. All agree that the Interim Final Rule delayed the effective date of the Borrower Defense Regulations until July 1, 2018, and that July 1, 2018 has now passed. The question, then, is whether this portion of Plaintiffs' challenge still presents an "actual, ongoing controvers[y]" sufficient to sustain Article III jurisdiction. **\*92** *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 687 (D.C. Cir. 2013) (quoting *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55 (D.C. Cir. 2001) ). Federal courts must ensure not only that they have Article III jurisdiction at the outset of a case, but also that the parties' dispute—or "controversy"—remains live "at all stages of review." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) ).

When confronted with similar circumstances, the D.C. Circuit and this Court have typically dismissed challenges to regulatory actions as moot once those actions have expired or have been overtaken by other regulatory actions. *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (finding challenge to expired "guidance and policy" moot); *Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005) (holding challenge to 2001 environmental assessment and the regulations based upon it moot because they "are no longer in effect"); *In re Bluewater Network*, 234 F.3d 1305, 1314 (D.C. Cir. 2000) ("Petitioners do not here challenge the 1997 temporary regulations, either for what they did or did not do; those regulations have expired. Whatever issues could have been raised regarding their legality are moot."); *Fund for Animals v. Norton*,

512 F.Supp.2d 49, 52–53 (D.D.C. 2007) ("A challenge to agency regulations becomes moot once those regulations expire."). To take just one example, in *People for the Ethical Treatment of Animals, Inc. v. U.S. Fish and Wildlife Service*, 59 F.Supp.3d 91, 95 (D.D.C. 2014), the district court held the plaintiff's challenge to fifteen Fish and Wildlife Service permits was "clearly moot," because "[t]he permits ... [had] already expired" and, thus, "there [was] no point in this Court issuing an injunction prohibiting" their extension.

 **[10]**  This is, in many respects, a similar case. Vacatur of a delay rule that, by its own terms, no longer purports to affect the rights or obligations of the parties would be pointless. It would also be pointless to issue a declaratory judgment that the procedures used to adopt that interim rule were unlawful, both because the Department's justification for the particular procedures employed in promulgating the Interim Final Rule was premised on the specific factual circumstances at the time of the rule's adoption and because the agency actions now preventing the implementation of the Borrower Defense Regulations were adopted pursuant to different procedures. *Compare* Interim Final Rule, 82 Fed. Reg. at 49,117 (describing promulgation of interim final rule without notice and comment or negotiated rulemaking), *with* Final Delay Rule, 83 Fed. Reg. at 6,459 (describing promulgation of final rule after notice and comment but without negotiated rulemaking), *and* Section 705 Stay, 82 Fed. Reg. at 27,621–22 (describing adoption of final rule pursuant to § 705 of the APA).

But Plaintiffs' challenge to the Interim Final Rule does present one question with continuing consequences for Plaintiffs: Plaintiffs seek a declaratory judgment that the Department's interpretation of the Master Calendar Provision—the primary basis for the Interim Final Rule—was unlawful. Significantly, that interpretation was not limited to the Interim Final Rule; rather, the Department relied upon that interpretation of the Master Calendar Provision in the October 24, 2017 NPRM it issued that same day, and in the Final Delay Rule, which the Department issued in February 2018. In short, although announced in a rule that has now expired, the Department's interpretation of the Master Calendar Provision has carried through to a regulation that remains operative **\*93** today and that is causing Plaintiffs a cognizable injury. Under these circumstances, Plaintiffs' challenge to that limited aspect of the Interim Final Rule presents a live controversy. *See Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) ("It is well-established that if a plaintiff challenges both a specific agency action and the policy that underlies that

000026

action ... the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." (quoting *City of Houston, Tex. v. Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ).

That remaining live issue turns on the meaning of the HEA's Master Calendar Provision, which provides, in relevant part:

> Except as provided in paragraph (2), any regulatory changes initiated by the Secretary affecting the programs under [Title IV of the HEA] that have not been published in final form by November 1 prior to the start of the award year [i.e., July 1] shall not become effective until the beginning of the second award year after such November 1 date.

20 U.S.C. § 1089(c)(1). According to the Interim Final Rule —and as subsequently reflected in the October 24, 2017 NPRM and Final Delay Rule—two conclusions necessarily follow from this language: First, "a regulatory change" must be "published in final form on or before November 1" in order to take effect at the start of the next award year. Interim Final Rule, 82 Fed. Reg. at 49,115; Final Delay Rule, 83 Fed. Reg. at 6,459. Second, a "regulatory change ... may take effect *only at the beginning* of the next award year," that is, "July 1 of the next year." Interim Final Rule, 82 Fed. Reg. at 49,115–16 (emphasis added); Final Delay Rule, 83 Fed. Reg. at 6,459 (same). According to the Department, this means that, except in certain cases of voluntary compliance, *see* 20 U.S.C. § 1089(c)(2)(B), a regulatory change affecting a Title IV program may take effect *only* on July 1—if that date passes, the Department must wait until the next July 1 before the regulation may go into effect. Dkt. 58-1 at 68–73. These conclusions, moreover, are, according to the Department, compelled by the statute. *Id.* Indeed, it was because the Department concluded that the Borrower Defense Regulations could go into effect only on July 1, 2018—or July 1 of a subsequent year—that it found good cause to waive the notice and comment and negotiated rulemaking requirements for the Interim Final Rule. *See* Interim Final Rule, 82 Fed. Reg. at 49,117.

Although one can imagine considerable debate about the meaning of "a regulatory change" for purposes of the first of these conclusions,[9] at least for present purposes, Plaintiffs agree that the HEA mandates that a regulation must be published on or before November 1 to become effective on or after the following July 1. They take issue, however, with the Department's second conclusion. In their view, "[t]he plain meaning of the Master Calendar Provision "is unambiguous," and it does not by any stretch require that all Title IV regulations take effect *on* July 1. Dkt. 55-1 at 46. Rather, they read the statute to preclude a new regulation from taking effect *before* July 1 of the following year, but to say nothing about when the regulation may take effect *after* that date. The Court agrees with Plaintiffs' reading of the statute.

**\*94** The Court "begin[s], as usual, with the statutory text." *Maslenjak v. United States*, ––– U.S. ––––, 137 S.Ct. 1918, 1924, 198 L.Ed.2d 460 (2017). Here, the text of the Master Calendar Provision compels the Court to conclude that "until" means exactly what Plaintiffs say it means—that is, "up to" or "before" a specified time, *see* 19 Oxford English Dictionary 234 (2d ed. 1989), and not, as Defendants suggest, "only at" that time, *see* Dkt. 59-1 at 39. As used in the Master Calendar Provision, "until" is a preposition and thus "indicate[s] continuance ... of an action or condition ... to a specified time." Merriam Webster's Collegiate Dictionary 1297 (10th ed. 1996). Thus, a shopkeeper might say, "we don't open until ten" or the new widgets are "not available until tomorrow." *Id.* Nothing in either of these examples conveys a definite point in time; a customer arriving at eleven, for example, would reasonably expect to find the store open. More generally, when used as a preposition, there is no "common usage[ ] of the word 'until' that [is] synonymous with the word 'on,' meaning ... the day of an occurrence."[10] *See Claude E. Atkins Enters., Inc. v. United States*, 27 Fed.Cl. 142, 144 n.4 (1992).

The Department's arguments to the contrary are unpersuasive. The Department contends that the title of the Master Calendar Provision—"Delay of effective date of late publications," 20 U.S.C. § 1089(c)—"confirms that there is only one 'effective date' during the year" for all new regulations. Dkt. 59-1 at 52–53. As a threshold matter, this argument runs headlong into the Supreme Court's admonition that section headings "cannot limit the plain meaning of [the] statutory text." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, ––– U.S. ––––, 138 S.Ct. 883, 893, 200 L.Ed.2d 183 (2018). But, even putting that aside, the argument has little force. The Department reads too much into Congress's use of the singular form: "effective date." It is plain that, in the context of the title, "effective date" does not reference a specific day—July 1—but rather,

000027

the date on which a new rule is to come into effect. In other words, the title simply indicates that whatever "effective date" the Department might have otherwise planned must be "delay[ed]" if the regulatory change is published "late." 20 U.S.C. § 1089(c).

The Department also purports to find textual ambiguity "in the statute's inclusion of both the word 'until,' ... and the phrase 'beginning of the [award year].' " Dkt. 58-1 at 68. According to the Department, "Plaintiffs' interpretation [of the Master Calendar Provision] renders the words 'beginning of the' superfluous," and thus—at a minimum—gives rise to a statutory ambiguity. *Id.* Once again, the Court is unconvinced. Rather than creating ambiguity, the reference to the "beginning of" the award year adds clarity. Just as it is clearer to say, "I will not arrive until the beginning of July" than it is to say, "I will not arrive until July," it adds clarity to refer to the "beginning of" the award year. To be sure, most readers could probably figure out what Congress meant without this added clause, but that is not the test for superfluity. And even if the Department was right, the canon against surplusage, like reliance on section headings, cannot overcome clear statutory text. *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016).

**\*95** Nor is the Court persuaded by the Department's invocation of the "legislative history of the HEA" and its "longstanding policy and practice." Dkt. 58-1 at 69, 71. To start, neither the legislative history nor the Department's administrative practice can change the plain terms of the statute. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 279 (D.C. Cir. 2018) (noting that legislative history "may not be used to show an 'intent' at variance with the meaning of the text" (quoting *Matter of Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) ); *Exportal Ltda v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) ("[T]he plain meaning doctrine is an interpretive norm essential to perfecting the scheme of administrative governance established by the APA."). But, in any event, nothing in the legislative history of the HEA actually supports the Department's contention that Congress set a specific day of the year on which all new Title IV regulations must take effect. To the contrary, the legislative history merely confirms that the Master Calendar Provision "drive[s]" "the effective dates of all regulations on Title IV," H.R. Rep. No. 102-447, at 77 (1992), "in order to assure adequate notification and timely delivery of student aid funds," S. Rep. No. 99-296, at 11 (1986).

The Department's description of its longstanding practice is also unhelpful. The Department, admittedly, has a history of setting effective dates on July 1. But that history does not show that the July 1 date is *required by statute*; rather, it merely shows that the Department has —for pragmatic or other reasons—used that date in the past. The one example that the Department offers to counter this understanding is unconvincing. *See* Dkt. 59-1 at 63. In that case, the Department declined to extend the comment period for final regulations combatting "troubling practices" in the "student financial products marketplace." Program Integrity and Improvement, 80 Fed. Reg. 67,126, 67,126 (Oct. 30, 2015). The Department chose to publish the final regulations on October 30, 2015, explaining that had it "extended the comment period beyond 45 days, [it] would have been unable to comply with" the November 1 deadline of "the [M]aster [C]alendar [P]rovision." *Id.* at 67,131. This, in turn, would have delayed the effective date of the regulations for one year—to July 1, 2017—thus allowing "the abuses" the Department had identified in support of the reforms "to persist an additional year." *Id.* Reading the Department's words in context, there is no indication that it contemplated July 1 as the only permissible effective date for all new regulations. Instead, the Department's explanation merely invokes the noncontroversial proposition that the Master Calendar Provision precludes Title IV rules finalized *after* November 1 from taking effect before July 1 of the following year; that is why the Department felt compelled to issue the final rule on October 30 (before November 1), rather than extending the comment period for 45 days (after November 1).

**[11]** **[12]** Finally, the Department's claim that its interpretation is entitled to *Chevron* deference fails for two reasons. First, agency interpretations are not entitled to deference where the "intent of Congress is clear." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002). Here, the plain meaning of the Master Calendar Provision is unambiguous: regulations published after November 1 cannot take effect *before* July 1 of the following year. The statute imposes no limits on when the regulation can take effect *after* that date. Second, an agency is entitled to deference only when the agency believes that it is exercising some form of administrative discretion. **\*96** Here, however, the Department believed that its hands were tied.[11] In the Interim Final Rule, Notice of Proposed Rulemaking for the Final Delay Rule, and the Final Delay Rule, the Department

repeatedly explained that the Master Calendar Provision compelled it to set July 1—and only July 1—as the effective date for all regulations. *See, e.g.*, Interim Final Rule, 82 Fed. Reg. at 49,115–16 ("Under the master calendar requirement, a regulatory change ... may take effect only ... on July 1."); *id.* at 49,116 ("For the July 1, 2017, postponement to be *consistent with the HEA*, ... the effective date *must* be July 1, 2018 (or July 1 of a later year)." (emphasis added) ); *see also* October 24, 2017 NPRM, 82 Fed. Reg. at 49,156–57 ("Under the master calendar requirement, a regulatory change ... may take effect only ... on July 1."); Final Delay Rule, 83 Fed. Reg. at 6,459 (same). As the D.C. Circuit has explained, this is precisely the circumstance where "deference to an agency's interpretation of a statute is not appropriate"—that is, "when the agency wrongly believes that interpretation is compelled by Congress." *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) ).

 **[13]** The Court, accordingly, concludes that the plain meaning of the HEA precludes the Department's reading of the Master Calendar Provision to require that all new regulations take effect on July 1. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). The Department, of course, has broad discretion to make most, if not all, Title IV regulations effective on July 1 *as a matter of policy*—at least to the extent it offers a reasoned and considered basis for doing so. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). But, that is not what the Department did here, and the reading of the Master Calendar Provision that drove its decision is contrary to law.

### C. February 14, 2018 Final Delay Rule

 **[14]** Plaintiffs raise both procedural and substantive challenges to the February 14, 2018 Final Delay Rule. Because the Court concludes that the Department improperly invoked the good cause exception to the HEA's requirement for negotiated rulemaking, there is no need to reach Plaintiffs' substantive challenges.

All agree that the Department's Final Delay Rule was subject to the HEA's negotiated rulemaking requirement unless the Department established "good cause" for waiving the requirement in its October 24, 2017 NPRM. *See* 82 Fed. Reg. at 49,157. In the words of the HEA:

> All regulations pertaining to [Title IV of the HEA] ... shall be subject to a negotiated rulemaking (including the selection of the issues to be negotiated), unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest (within the meaning of **\*97** section 553(b)(3)(B) of Title 5) and publishes the basis for such determination in the Federal Register at the same time as the proposed regulations in question are first published.

20 U.S.C. § 1098a(b)(2). Citing to this requirement, the Department concluded that it had good cause to waive negotiated rulemaking for the Final Delay Rule because "it would not be practicable, before [the then-operative] July 1, 2018 effective date" of the Borrower Defense Regulations to "engage in negotiated rulemaking and publish final regulations." October 24, 2017 NPRM, 82 Fed. Reg. at 49,157. In Plaintiffs' view, the Department's "cursory statement" failed to establish good cause within the meaning of the HEA. The Court agrees.

In determining whether good cause exists to dispense with negotiated rulemaking under the HEA, the Department is required to apply the same legal standard that applies to waiving the notice and comment requirement under the APA. To be sure, as the Department argues, the application of that standard may yield different results under the APA than under the HEA because negotiated rulemaking is more time consuming than notice and comment. *See* Dkt. 58-1 at 61. But, in both cases, the standard itself—whether "good cause" exists to find that compliance with the usual process is "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(3); 20 U.S.C. § 1098a(b)(2)— is identical and, indeed, the HEA expressly incorporates the APA standard, *id.* The Court, accordingly, must be guided by the substantial body of case law interpreting the APA's good cause exception to the notice and comment requirement.

The D.C. Circuit has repeatedly observed that "the good cause exception" to the APA "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ). That standard is "meticulous and demanding." *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). The exemption excuses agencies from the notice and comment requirement—and, by extension, excuses the Department from the negotiated rulemaking requirement for Title IV regulations—only "in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted). And the otherwise applicable procedures are "[i]mpracticable" only if "the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings," or negotiated rulemaking. *N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1046 (quoting S. Doc. No. 248, at 200 (1946) ); *see also United States v. Cotton*, 760 F.Supp.2d 116, 129 (D.D.C. 2011) (same). The Court's review of the "agency's legal conclusion of good cause is de novo," although the Court defers to the agency's "factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014).

The Department's invocation of the good cause exception to the negotiated rulemaking requirement did not come close to satisfying this demanding standard. As the HEA makes clear, and as the Department acknowledged in the October 24, 2017 NPRM, the waiver provision requires the Department to set forth "the basis for" its determination that good cause exists "at the same time" that that the "proposed regulations in question are first published." 82 Fed. Reg. at 49,157 (citing **\*98** 20 U.S.C. § 1098a(b)(2) ). Yet, when the Department published the October 24, 2017 NPRM, it said almost nothing about the basis for its decision to waive the negotiated rulemaking requirement. The Department wrote:

> For the reasons stated above, it would not be practicable, before the July 1, 2018 effective date specified in the [Interim Final Rule], to engage in negotiated rulemaking and publish final regulations. There is, therefore,

good cause to waive negotiated rulemaking pertaining to this delay.

82 Fed. Reg. at 49,157. The "reasons stated above," moreover, shed little light on why the Department would have been "unavoidably prevented" from performing its functions had it complied with the negotiated rulemaking process, *N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1046, or what "emergency situation[ ]" or risk of "serious harm" required the Department to dispense with the required process, *Jifry*, 370 F.3d at 1179. To the contrary, all that precedes the Department's waiver discussion is a discussion of the Master Calendar Provision and the timeline for completing the negotiated rulemaking process for reconsidering the Borrower Defense Regulations. The Department wrote:

> Given that the first negotiated rulemaking session is scheduled for November 13–15, 2017, we cannot complete the negotiated rulemaking process and the development of revised regulations by November 1, 201[7]. [12] Under the master calendar, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before July 1, 2019.

*Id.* at 49,156. Even liberally construed, this explanation for waiving the negotiated rulemaking requirement fails on multiple levels.

*First*, the October 24, 2017 NPRM addressed the wrong regulatory action for purposes of waiving the negotiated rulemaking requirement. The HEA, unsurprisingly, requires the Department to state in the relevant notice of proposed rulemaking why it cannot practicably comply with the negotiated rulemaking requirement "*with respect to*" that

*rulemaking*. 20 U.S.C. § 1098a(b)(2). The Department's October 24, 2017 NPRM, however, said nothing about whether it had sufficient time to comply with the negotiated rulemaking requirement "with respect to" the Final Delay Rule. To the contrary, the *only* discussion addressed the time the Department needed to finalize its revisions, if any, to the Borrower Defense Regulations. *See* October 24, 2017 NPRM, 82 Fed. Reg. at 49,156. Because the October 24, 2017 NPRM said nothing about whether it could have conducted a negotiated rulemaking "with respect to" the delay rule, it failed to satisfy the waiver requirement.

The Department confronts this problem in its briefing before this Court and attempts to find an implicit finding of "good cause" to dispense with the negotiated rulemaking requirement. The Department asserts: "It would make little sense ... to **\*99** subject the rule delaying" the Borrower Defense Regulations "to the same negotiated procedures that created, at least in part, the need for" the delay rule "in the first place." Dkt. 58-1 at 62. That contention, however, fails to account for the Department's unstated assumption that the Master Calendar Provision applies to the ongoing rulemaking regarding the Borrower Defense Regulations but does not apply to the delay rules. Without that assumption, the Final Delay Rule would be meaningless because it was finalized on February 14, 2018, and thus, under the Master Calendar Provision, could not have taken effect before July 1, 2019, the date that rule was due to expire. It is only by assuming that the Master Calendar Provision does not apply to delay rules that the Department can avoid this fate. Yet, once it takes that step, it can no longer draw even an implicit comparison between the discussion of the timeline for completing the substantive revisions to the Borrower Defense Regulations, which the Department discussed in the October 24, 2017 NPRM, and the timeline for completing the delay rule, which it did not.

*Second*, the October 24, 2017 NPRM did not identify any "emergency" or "serious harm" that would result absent a waiver. *Jifry*, 370 F.3d at 1179. Although the relevant "inquiry ... 'is inevitably fact- or context-dependent,' " the D.C. Circuit has found good cause, by way of example, when "air travel security agencies" would have otherwise been "unable to address threats posing 'a possible imminent hazard to aircraft, persons, and property within the United States,' " or when "a rule ... of 'life-saving importance' to mine workers in the event of a mine explosion" was at stake. *Mack Trucks, Inc.*, 682 F.3d at 93 (citations omitted). Here, in contrast, the Department merely stated, without elaboration, that the purpose of the Final Delay Rule was

to maintain the "status quo" while it "conduct[ed] [a] negotiated rulemaking and, as necessary, develop[ed] revised regulations." October 24, 2017 NPRM, 82 Fed. Reg. at 49,155–56. That is *all* the NPRM said, and, by any measure, that bare assertion provided insufficient cause to waive the negotiated rulemaking requirement. Indeed, if that was sufficient, it is difficult to imagine a circumstance in which an agency would be required to comply with the requirements of notice and comment and, where applicable, negotiated rulemaking, to delay the effective date of a regulation.

Nor can the Department's subsequent efforts to supplement the October 24, 2017 NPRM save the rule. Each of these efforts fails either because the required findings were not included in the proposed delay rule, as required by the HEA, 20 U.S.C. § 1098a(b)(2), or because they constituted *post hoc* justifications that appeared nowhere in the administrative record, *Chenery*, 332 U.S. at 196–97, 67 S.Ct. 1760; *see also Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 568, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008). In the Final Delay Rule—but not in the October 24, 2017 NPRM—for example, the Department asserted that it "typically takes ... over 12 months to complete" a negotiated rulemaking and concluded that "it would not have been feasible" to complete that process in a timely manner, "even if the Department had [begun] on May 24, 2017, when it learned of the CAPPS litigation." Final Delay Rule, 83 Fed. Reg. at 6,494. By the time of briefing in this Court, however, the Department apparently recognized that it might, in fact, have been possible to conduct a negotiated rulemaking on the sole issue of delay in the 13 months between May 24, 2017 and July 1, 2018. It thus, once again, amended its theory of good cause, arguing that the Final Delay Rule **\*100** "needed to be published well in advance of the culmination of the (still ongoing) process to revise the borrower defense regulations, as well as in advance of the July 1, 2018 date on which the [Borrower Defense Regulations] would otherwise [have] become effective." Dkt. 58-1 at 63; *cf.* Title I—Improving the Academic Achievement of the Disadvantaged—Academic Assessments, 81 Fed. Reg. 88,886 (Dec. 8, 2016) (DOE conducted negotiated rulemaking under 20 U.S.C. § 6571 in approximately 10 months). None of that analysis, however, appeared anywhere in the October 24, 2017 NPRM, and thus both theories—the "over 12 month" theory and the "well in advance" theory—lie outside the bounds of proper consideration. *See* 20 U.S.C. § 1098a(b)(2); *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000).

000031

The Department also posited in the Final Delay Rule that regulated parties should not have to bear the costs of complying with the Borrower Defense Regulations when those regulations might be rescinded or "changed a short while later." Final Delay Rule, 83 Fed. Reg. at 6,461. That rationale is—once again—too little, too late. It is too late for the reasons explained above. And it is too little because it is at odds with the circuit's "longstanding position that the [good cause] exception should be 'narrowly construed and only reluctantly countenanced.' " *Mack Trucks, Inc.*, 682 F.3d at 94 (quoting *Util. Solid Waste*, 236 F.3d at 754). To be sure, regulatory uncertainty that "imperil[s]" "an entire industry and its customers," *id* at 93–94 (citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) ), or that would cause "serious harm" to the regulated parties or the public, *Jifry*, 370 F.3d at 1179, can support a waiver. Here, however, the Department has not specified any regulatory vacuum that would exist without the Final Delay Rule and has not identified any "serious harm"—only potentially unnecessary administrative costs —that the regulated parties would suffer if the Borrower Defense Regulations were permitted to take effect.

The Final Delay Rule did identify at least one actual cost, albeit in discussing the merits of the delay rule rather than the good cause exception. Specifically, the Final Delay Rule asserted: "[t]he Department thinks it is likely that the arbitration and class action waiver provision will be overturned" in the *CAPPS* litigation and that allowing that provision to take effect would sow "significant confusion [among] borrowers and schools who may have engaged in court litigation on the basis of the prohibitions as to the enforceability of those agreements." Final Delay Rule, 83 Fed. Reg. at 6,462. Allowing that provision to take effect, the Final Delay Rule added, would also require institutions to "change their policies and procedures[,] ... amend their enrollment agreements," re-train staff, and send "notices to borrowers informing them of the changed class action waivers and pre-dispute arbitration provisions," only to "repeat or reverse these steps" in the "likely" event that the provision is rescinded or struck down. *Id.* But, even if the Court were to read this discussion as directed at the good cause requirement, and even had the Department raised it in the October 24, 2017 NPRM, as it was required to do, it would not suffice. The problem with the rationale, as discussed further below, *see infra* at 54–55, is that it is both unexplained and directly at odds with the determination that the Department made when it finalized the Borrower Defense Regulations that the arbitration and class action rules are lawful and

that the "case law gives strong support for the position that the Department has authority to impose limits of [this] kind ...." Borrower Defense Regulations, **\*101** 81 Fed. Reg. at 76,023. The Department is, of course, entitled to change its conclusion on that question, but it cannot do so without acknowledging its prior conclusion or offering *any* explanation for its fundamental change in course. *See Fox Television Stations, Inc.*, 556 U.S. at 515, 129 S.Ct. 1800.

Without that example of an actual cost the Department arguably avoided by dispensing with the negotiated rulemaking requirement, the Department did little more than pay lip service to the good cause requirement. It merely asserted that allowing a rule to take effect, only to change the rule a year or so later, would "lead to a great deal of confusion and difficulty for borrowers and schools alike." Final Delay Rule, 83 Fed. Reg. at 6,464. Like the government's similar conclusion in *National Venture Capital Ass'n v. Duke*, 291 F.Supp.3d 5 (D.D.C. 2017), adopting such an expansive view of good cause " 'would swallow the rule,' as an agency could always argue that any given regulation provides clarification or guidance." *Id.* at 19 (citation omitted).

The Court, accordingly, concludes that the Final Delay Rule was procedurally defective because it improperly invoked the good cause exception to the HEA's negotiated rulemaking requirement.

### D. Section 705 Stay

Plaintiffs also challenge the Department's invocation of 5 U.S.C. § 705 to stay the Borrower Defense Regulations pending the resolution of the *CAPPS* litigation. This challenge raises three distinct questions. First, is an agency's decision to stay the effective date of a rule pursuant to § 705 subject to judicial review? Second, if so, what standard applies? Third, did the Department satisfy that standard?

#### 1. *Reviewability*

**[15]** **[16]** The Department first argues that judicial review of its Section 705 Stay "is unavailable because" § 705 "commits to agency discretion the decision to postpone an effective date pending judicial review." Dkt. 58-1 at 28–32. The Department is correct that, when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the agency's action taken pursuant to that statute is unreviewable. *Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). It is incorrect, however, that § 705 is such a provision.

[17] [18] [19] The APA permits aggrieved parties to seek judicial review of final agency actions for which there is no other adequate judicial remedy. *Chaney,* 470 U.S. at 828, 105 S.Ct. 1649. That waiver of sovereign immunity and cause of action, however, comes with a proviso: "before any review at all may be had, a party must first clear the hurdle of § 701(a)," which bars judicial review (1) if the applicable statute "preclude[s]" review, or (2) if the "agency action is committed to agency discretion by law." *Id.* (quoting 5 U.S.C. § 701(a) ). An action is "committed to agency discretion" if "the [relevant] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830, 105 S.Ct. 1649; *see also Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In other words, if a statute fails to set a "meaningful standard," then there is no basis for a court to conclude that the challenged agency action was unlawful or an abuse of discretion. *Chaney,* 470 U.S. at 830, 105 S.Ct. 1649. Except in cases involving enforcement decisions, allocation of lump sum appropriations, or other "categories of administrative decisions that courts **\*102** traditionally have regarded as 'committed to agency discretion,' " *Lincoln v. Vigil,* 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), however, courts must apply a presumption in favor of judicial review and must treat § 701(a) as a "very narrow" proviso that "applies only in 'rare instances,' " *Cody v. Cox,* 509 F.3d 606, 610 (D.C. Cir. 2007) (quoting *Citizens to Pres. Overton Park, Inc.,* 401 U.S. at 410, 91 S.Ct. 814).

In the Department's view, § 705 constitutes one of these "rare instances" for five reasons—four based on the text of § 705 and the fifth based on structure of the APA. The text of § 705 provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the

effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. The Department finds a commitment of discretion, first, in the fact that the statute does not say that an agency may postpone an effective date "when justice so requires" but, rather, says that an agency may do so "when [the] *agency finds* that justice so requires." Dkt. 59-1 at 33 (emphasis added) (quoting 5 U.S.C. § 705). To this, it adds that the phrase "justice so requires" is "inherently flexible;" that § 705's use of the word "may" further confirms that Congress intended to commit stay decisions to agency discretion; and that the text distinguished between the judicially manageable standard that courts must apply—"to the extent necessary to prevent irreparable injury"—and the less definite standard applicable to agency decisions. Dkt. 59-1 at 34–35, 42–43. In support of these textual arguments, the Department relies on the Supreme Court's decision in *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). There, the Court held that a statute that allows the Director of the CIA to terminate CIA employees whenever the Director "shall *deem* such termination necessary or advisable in the interests of the United States" commits those discharge decisions to the Director's discretion. *Id.* at 600, 108 S.Ct. 2047. Finally, relying on the APA's structure, the Department argues that, because § 705 appears in a standalone provision of the APA, which "is entirely separate from Section 704 ... ('[a]ctions reviewable')," it is appropriate to infer that Congress intended to make § 705 determinations "unreviewable." Dkt. 59-1 at 36 n.3.

Most of the Department's textual arguments are foreclosed by the D.C. Circuit's decision in *Dickson v. Secretary of Defense,* 68 F.3d 1396 (D.C. Cir. 1995). That case involved a statute that allowed former servicemembers to request that the Army correct "errors or injustices in their military records." *Id.* at 1399. Of relevance here, the statute set a limitations period to request such a correction, but further provided that the Army Board for Correction of Military Records ("Board") "*may* excuse a failure to file within [that period] *if it finds it to be in the interest of justice.*" *Id.* (emphasis added) (quoting 10 U.S.C. § 1552(b) ). Relying on this language, the district court dismissed the plaintiffs' petition for review of the Board's refusal to grant a waiver on the ground that the decision was committed to the Board's discretion and, as a result, was unreviewable. *Id.* at 1398. On appeal, the D.C. Circuit

000033

reversed, and, in the course of doing so, it **103** rejected most of the same arguments that the Department makes here.

First, the Court of Appeals rejected the government's contention that Congress's use of the word "may"—as opposed to "shall"—signaled an intent to commit the relevant action to the agency's discretion. *Id.* at 1401. Although the Court acknowledged that the word "may" conveys an intent "to confer some discretion on the agency," it disagreed that "such language" means that "the matter is *committed* exclusively to agency discretion." *Id.* The same holds true here; indeed, under both statutes, the agency may act only if it finds that the interest of justice standard is satisfied.

The *Dickson* decision also undermines the Department's reliance on the "agency finds" and "justice so requires" language in § 705. Again, the language at issue in *Dickson*— if the Board "finds it to be in the interest of justice"—parallels the language at issue here. *Id.* at 1402. And, again, the D.C. Circuit disagreed with the government's contention that the relevant language committed "the matter solely to agency discretion." *Id.* In reaching that conclusion, moreover, the Court of Appeals rejected the same expansive reading of *Webster* that the Department presses here. The Court found support for its conclusion in *Kreis v. Secretary of the Air Force,* 866 F.2d 1508, 1513 (D.C. Cir. 1989), a case decided the year after *Webster.* There, the Court of Appeals held that the district court was entitled to review the adequacy of the Secretary of the Air Force's explanation for denying appellant's request for a retroactive promotion. *Id.* at 1512. In *Dickson* and in *Kreis,* as in this case, the government argued that *Webster* stands for the broad proposition that a grant of authority to take an action if the agency "finds" or "deems" that action "in the interest of justice" or "in the interests of the United States" is sufficient to commit the relevant action to the discretion of the agency. *Dickson,* 68 F.3d at 1403; *Kreis,* 866 F.2d at 1508. And, in both *Dickson* and *Kreis,* the D.C. Circuit disagreed. *Id.* As the Court of Appeals explained in *Dickson,* that contention ignores the "context in which the statutory mandate [at issue in *Webster* ] operated," *Dickson,* 68 F.3d at 1403 (citation omitted), and, as it stressed in *Kreis, Webster* involved a national security "determination particularly unsuited to judicial assessment," *Kreis,* 866 F.2d at 1514. In short, outside of the context of national security or a similar context that raises doubts about judicial competence, *Webster* lacks the broad meaning that the Department urges.

The Department's remaining arguments fare no better. Pressing its final textual argument, the Department observes

that § 705 describes the standard applicable to judicial stays in different terms and argues that, by distinguishing "between agency action and court action," Congress "commit[ed] each exclusively to the province of the entity taking action." Dkt. 58-1 at 31. But the Department offers no explanation for why the difference in language—short of the reasons rejected above—shows that Congress intended to commit the decision whether to grant a stay "exclusively to the province of" the agency or the court. Nor does the fact that Congress provided both agencies and courts with the authority to stay regulations pending judicial review support the Department's view. To the contrary, as the D.C. Circuit concluded in rejecting a similar argument regarding the Clean Air Act, "[g]iven that Congress granted [courts] the power to enter a stay, it seems quite anomalous that it did not also confer upon [courts] the lesser power to review the [agency's] decision to issue a stay." *Clean Air Council v. Pruitt,* 862 F.3d 1, 7 (D.C. Cir. 2017).

**104** The Department's structural argument is also unpersuasive. The Department contends that because § 705 falls between §§ 704 and 706, which together delineate the scope and reach of judicial review, Congress intended a § 705 stay to be "a limited form of relief" that is itself immune from review. Dkt. 74 at 12. But the Department never explains why agency action taken pursuant to § 705 does not constitute "final agency action" subject to judicial review, *see* 5 U.S.C. § 704, and does not identify where Congress might have situated § 705 to avoid any implication that its placement was "intended to make the Section 705 stay ... unreviewable." Dkt. 58-1 at 32 n.3. A far more persuasive structure argument, moreover, points in the opposite direction. As noted above, § 701(a) contains two exceptions to judicial review under the APA: the first exception, which is not applicable here, applies where a "statute[ ] preclude[s] judicial review," 5 U.S.C. § 701(a)(1), and the second exception, which the Department argues is controlling here, applies where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). The first of these exceptions "seems easy in application" and merely requires courts "to determine whether Congress intended to preclude judicial review," while the second applies "even where Congress has not affirmatively precluded review." *Chaney,* 470 U.S. at 828–30, 105 S.Ct. 1649. It seems improbable, to say the least, that Congress intended to preclude judicial review of agency decisions under § 705 of the APA, but did so in the roundabout way of committing those decisions to agency discretion instead of merely saying that administrative stays are not subject to judicial review.

000034

Any remaining doubt regarding the reviewability of administrative stay decisions is put to rest by the fact that, despite the Department's arguments to the contrary, a "judicially manageable standard[ ] [is] available for judging how and when an agency should exercise its discretion." *Chaney*, 470 U.S. at 830, 105 S.Ct. 1649; *see also Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam) (holding that "the absence of clear statutory guidelines" does not preclude judicial review "unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance" as to how an agency is to exercise its discretion). Numerous judicial decisions have confirmed that review is "judicially manageable," *see Safety-Kleen Corp. v. EPA*, No. 92-16291996 U.S. App. LEXIS 2324 at *2 (D.C. Cir. Jan. 19, 1996); *Becerra v. U.S. Dep't of Interior*, 276 F.Supp.3d 953, 964 (N.D. Cal. 2017); *California v. U.S. Bureau of Land Mgmt.*, 277 F.Supp.3d 1106, 1122 (N.D. Cal. 2017); *Sierra Club v. Jackson*, 833 F.Supp.2d 11, 34 (D.D.C. 2012), and, as discussed below, this Court can, in fact, discern the relevant standard. Review of § 705 stay decisions sit at the opposite end of the spectrum from the review of security clearances in *Webster*. While the Supreme Court noted in *Webster* that courts are unsuited for assessing risk in the national security context, *see* 486 U.S. at 601, 108 S.Ct. 2047, there can be little doubt that courts are uniquely well-suited to determine whether equitable considerations warrant staying the implementation of existing regulations pending judicial review.

The Court, accordingly, concludes that § 705 stays are subject to judicial review.

2. *Standard for Invoking Section 705*

The next question is what standard an agency must apply in deciding whether to issue a stay pursuant to § 705? The parties agree that § 705 authorizes both "court[s]" and "agenc[ies]" to grant stays pending judicial review, *see* 5 U.S.C. § 705, **\*105** and they agree (or at least do not dispute) that courts must apply the four-factor test used to evaluate requests for preliminary injunctive relief, *see Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985); *Sierra Club*, 833 F.Supp.2d at 30; *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F.Supp.2d 12, 15 n.4 (D.D.C. 2010). They disagree, however, about whether agencies must apply that same four-factor test.

Plaintiffs contend that the Department's failure to apply the preliminary injunction test constitutes a legal error that renders the Section 705 Stay arbitrary and capricious. Dkt. 55-1 at 37; Dkt. 56 at 36. According to Plaintiffs, the text

of § 705, its legislative history, and this Court's precedent all support the conclusion that courts and agencies are bound to apply the same standard. Dkt. 55-1 at 31–37; Dkt. 56 at 36–41. The Department, on the other hand, argues that nothing found in the text of § 705, or in any source, requires that agencies apply the judicially fashioned four-part test. Dkt. 58-1 at 38–39. Rather, in the Department's view, § 705 authorizes agencies to issue a stay when "justice so requires," 5 U.S.C. § 705—"a broad, flexible standard conferring discretion to act," Dkt. 58-1 at 33. As explained below, the Court is unpersuaded by either extreme.

**[20]** As an initial matter, the Court agrees with the Department that, absent good cause, courts must avoid "engrafting their own notions of proper procedures upon agencies." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 525, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Here, nothing in the text of § 705 provides sufficient cause to require that agencies apply the same four-factor test that courts apply. The statute uses different language to describe what an agency must find in order to issue a stay—"that justice so requires"—and to describe what a court must find—that the stay is "necessary to prevent irreparable injury." 5 U.S.C. § 705. Moreover, not even every circuit applies precisely the same four-factor test; some, for example, apply a sliding scale, while others do not, and while still others have not resolved that question. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (noting a split between courts, like the Fourth Circuit, which read likelihood of success on the merits as "an independent, free-standing requirement for a preliminary injunction" and those, like the Second, Ninth, and Seventh Circuits, which follow a "sliding scale" approach); *id.* (noting that the D.C. Circuit has declined to weigh in on the split). Under these circumstances, it would be odd to suggest that administrative agencies are bound to apply a particular formulation of the test.

Likewise, neither the legislative history of § 705 nor other agencies' practices compels the conclusion that the judicially crafted four-factor test necessarily applies to administrative stay determinations. The Senate Report that Plaintiffs cite describes the purpose of § 705 as follows:

> This section [§ 705, formerly 5 U.S.C. § 1009(d) ] permits either agencies or courts, if the proper showing be made, to maintain the status quo .... The authority granted is equitable and

should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy.

APA, Pub. L. 1944-46, S. Doc. No. 248, at 277 (1946). Although this language confirms that courts and agencies are granted the same "equitable" authority to "maintain the status quo," *id.*, it is far from clear that in exercising that authority, Congress intended courts and agencies to apply the same standard. Nor is the fact that other agencies have opted to apply the four-factor test when deciding whether to issue *106 a stay under § 705 dispositive here. *Contra Sierra Club*, 833 F.Supp.2d at 31 (holding that the agency's failure to apply the preliminary injunction test was arbitrary and capricious because "[the agency] ... failed entirely ... to justify its departure from its many prior precedents applying this four-part test"). Had the Department done so, it might have been bound to follow its own prior practice or to have explained why a different approach was warranted. But that is not the case.

**[21]  [22]**  On the other hand, and despite the Department's arguments to the contrary, the text and legislative history of § 705 *do* provide the Court with a framework for reviewing whether an agency's determination that a stay is "require[d]" in the interests of "justice" was arbitrary and capricious. Section 705 does not permit the Department to make its own untethered assessment of what is "just." To begin, although the language differs in minor detail, the judicial and administrative authority to grant a stay is found in a single statutory provision that addresses a single topic —"relief pending review." 5 U.S.C. § 705. The relevant standard, moreover, does not differ in significant respects. The administrative determination that "justice ... requires" issuance of a stay, *id.*, is the same type of determination that courts make when they decide whether to grant preliminary injunctive relief. The legislative history of § 705 makes just this point. It explains that "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy." S. Doc. No. 248, at 277. As such, even though an agency need not apply the same canonical four-factor test that courts do, it must—given the statute's "equitable" mandate—weigh the same equities. This includes, but is not limited to, "balanc[ing] the competing claims of injury," "consider[ing] the effect on each party of ... granting" the stay, and "pay[ing] particular regard for the public consequences."

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (first quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), then quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ). At a minimum, an agency must provide a "reasoned explanation" that is sufficient to "enable ... court[s] to evaluate," *Dickson*, 68 F.3d at 1404 (citation omitted), whether a stay was "require[d]," 5 U.S.C. § 705, to "afford parties an adequate judicial remedy," S. Doc. No. 248, at 277 —that is, to ensure that the prevailing party in the pending litigation would ultimately obtain meaningful relief.

Most significantly, the relevant equitable considerations are not free-floating but, rather, must be tied to the underlying litigation. Section 705 expressly provides that an agency may "postpone the effective date of [agency] action ... *pending judicial review*." 5 U.S.C. § 705 (emphasis added). This requirement is best understood in light of the relationship between § 705 and the rest of the APA framework. For present purposes, both Plaintiffs and the Department agree that § 705, at least in the usual course, does not require notice and comment (or negotiated) rulemaking. The question is, why not?

**[23]**  The answer lies in the purpose of a § 705 stay: unlike a rulemaking, which triggers notice and comment procedures, *see* 5 U.S.C. § 553(b), an administrative stay under § 705 is not intended to "formulat[e], amend[ ], or repeal[ ]" a rule, *id.* § 551(5), nor is the stay a "rule" "designed to implement, interpret, or prescribe law or policy," *id.* at § 551(4). Rather, just as when a court issues a stay, an agency stay *107 under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a "just" manner. *See Sierra Club*, 833 F.Supp.2d at 27–28. The Department, for its part, concedes as much, arguing that the Section 705 Stay in this case was "not a substantive rule" but, rather, was "purely [a] procedural device, employed for the specific purpose of temporarily postponing the effective date of agency action during the pendency of judicial review of that action." Dkt. 58-1 at 44. That is why the standard for an agency stay, like the four-part preliminary injunction test that courts apply, must be tethered to the litigation itself; to the extent the agency's action is intended to do more than preserve the status quo pending judicial review, it would "prescribe law or policy," 5 U.S.C. § 551(4), and thus require notice and comment.

**[24]** **[25]** Finally, to justify a stay under § 705, an agency must do more than pay "lip service" to the pending litigation, *Sierra Club*, 833 F.Supp.2d at 34, or merely assert, "without any specificity," that the litigation raises "serious questions concerning the validity of certain provisions of the [r]ule," *California v. Bureau of Land Mgmt.*, 277 F.Supp.3d at 1122 (citation omitted). Although the agency need not adhere to the specific contours of the four-factor preliminary injunction test, it must weigh the same kinds of equitable considerations that courts have long applied and must explain why, in light of the pending litigation, a stay is "require[d] to ensure the parties will ultimately obtain an adequate and just judicial remedy. 5 U.S.C. § 705; S. Doc. No. 248, at 277.

### 3. *Substantive Defects*

**[26]** Applying this standard, the Court concludes that the Department's invocation of § 705 was arbitrary and capricious. The Department offered three rationales: the *CAPPS* litigation raised "serious questions" about the validity of the Borrower Defense Regulations; the delay would not cause the government any significant harm; and the Department was, in any event, reconsidering the regulations. Section 705 Stay, 82 Fed. Reg. at 27,621. None of these reasons withstands APA scrutiny. As explained further below, the first rationale is mere boilerplate; it is unsupported by any analysis, and it is at odds with the Department's prior conclusion to the contrary. The second and third rationales also lack any meaningful analysis and, more importantly, are unrelated to the pending *CAPPS* case and are thus beyond the scope of the relevant § 705 considerations.

The Department first posited in the Section 705 Stay that the plaintiff in the *CAPPS* case "raised serious questions concerning the validity of certain provisions of the final regulations and [has] identified substantial injuries that could result if the final regulations go into effect before those questions are resolved." *Id.* The Department then provided two examples in support of this conclusion. First, it asserted that "if the final regulations are not postponed, institutions ... would be required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests." *Id.* "Postponing the final regulations," would, in the Department's view, allow schools to avoid that cost "while the regulation is subject to judicial review." *Id.* Second, it pointed out that, "if the final regulations are not postponed, institutions would be subject to financial responsibility trigger provisions that could impose substantial costs." *Id.*

**[27]** The mere fact that parties would avoid the costs of complying with the existing regulations, however, is plainly insufficient *108 to support a § 705 stay. As explained above, § 705 requires an agency to explain why, in light of the pending litigation, a stay is necessary to ensure that the parties ultimately obtain adequate and just relief. As a result, the Department's first rationale rises and falls based on the Department's reliance on the "legal uncertainty" that it contends is created by the "serious questions" *CAPPS* plaintiffs raise "concerning the validity of certain provisions" of the Borrower Defense regulations. *Id.* For the reasons explained below, that rationale fails.

As an initial matter, the Department failed to justify the scope of the Section 705 Stay. Although it covers twenty-two sections of the Borrower Defense Regulations, the Department never identifies whether a few, many, or all of these sections rest on legally questionable footing. The notion that the Department needed to stay the effective date of all twenty-two of these provisions—while exempting a handful of ministerial provisions—moreover, is difficult to square with the fact that CAPPS itself sought a preliminary injunction only with respect to the arbitration and class action provision. Dkt. 6, *CAPPS*, Civ. No. 17-999. Although the Department was not required to apply the four-factor test that courts apply, it was required to apply something akin to it—some standard that ties the stay to ensuring that the outcome of the pending litigation affords the parties adequate and just relief and that balances the relevant equities. The Department, however, offers no explanation for why it was necessary to stay twenty-two sections of the final rule.

**[28]** **[29]** Moreover, the provisions of the Borrower Defense Regulations that the Department did identify are, at best, mentioned only in a perfunctory manner. The Department observed, in passing, that "if the final regulations are not postponed, institutions would be subject to financial responsibility trigger provisions that could impose substantial costs," Section 705 Stay, 82 Fed. Reg. at 27,621, but it failed to tie that observation to the litigation in any way, and it failed to consider how the public interest or the interest of student borrowers would be affected by its decision.[13] It offered slightly more detail regarding the arbitration and class action provision, but, again, the Department simply asserted, without analysis, that CAPPS had "raised serious questions concerning the validity of" the provision and that postponing the effective date would save institutions the cost of making changes to their contracts "while the regulation is subject to judicial review." *Id.* The arbitrary and capricious standard

000037

of the APA, however, requires that agencies "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." **\*109** *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). "[B]oilerplate language" like that the Department used here, however, "makes it impossible to discern [the Department's] 'path.' " *Dickson*, 68 F.3d at 1405. To justify a § 705 stay, an agency must, in short, do more than simply assert—without elaboration—that the litigation raises unspecified "serious questions" for resolution and that a stay will save regulated parties the cost of compliance. *See Sierra Club*, 833 F.Supp.2d at 34 ("The agency cannot use section 705 of the APA to stay the effectiveness of its rules ... simply because litigation *... happens to be pending.*"); *see also California v. Bureau of Land Mgmt.*, 277 F.Supp.3d at 1122.

[30] The problem with the Department's serious-legal-questions rationale, however, runs deeper than this. As with the Final Delay Rule, the Department failed to acknowledge, much less to address, the inconsistency between its current view that those provisions stand on legally questionable footing, and its prior conclusion that they were legally sound. While the Borrower Defense Regulations were under consideration, "[s]everal commenters objected that the Department lack[ed] the legal authority to ban either mandatory predispute arbitration agreements or class action waivers." Borrower Defense Regulations, 81 Fed. Reg. at 76,021. The Department, in turn, devoted nine columns of the Federal Register to describing the legal objections and to responding to them. *Id.* at 76,021–24. It concluded that the provision were lawful and that existing "case law gives strong support for the position that the Department has authority to impose limits of the kind adopted here on the use of class action waivers and predispute arbitration agreements." *Id.* at 76,022–23. An agency is entitled, of course, to change its position, and, to do so, it need not even demonstrate that its current view is "better than [its] old one." *Fox Television Stations, Inc.*, 556 U.S. at 515, 129 S.Ct. 1800 (emphasis added). But an unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making. *Id.* at 515, 129 S.Ct. 1800; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C. Cir. 2017); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014); *Action for Children's Television v. FCC*, 821 F.2d 741, 745 (D.C. Cir. 1987); *California v. Bureau of Land Mgmt.*, 286 F.Supp.3d at 1064.

The Department does not dispute that the position it took in the Section 705 Stay is at odds with the position it took when it promulgated the Borrower Defense Regulations. It argues, however, that a Section 705 Stay is "a purely procedural device" that does not "effectuate[ ] a substantive change in agency policy," and thus "the Department was not required to 'display awareness that it is changing position and provide [a] reasoned explanation.' " Dkt. 58-1 at 43. Because a Section 705 Stay is temporary in nature, is often issued on short notice, and is not a substantive rule requiring notice and comment, the Court is prepared to assume—without deciding—that a less demanding standard of review should apply. But the Department's argument still goes too far, and, in effect, rehashes its contention that § 705 stays lie beyond the reach of judicial review. The unacknowledged and unexplained inconsistency that Plaintiffs raise here could not be more apparent or more central to the Department's decision. Commenters argued that the Department lacked legal authority to issue the arbitration and class action waiver ban; the Department considered those objections in detail and concluded that it had the legal authority; and, **\*110** then, without acknowledging that conclusion or explaining why it believed its legal authority was questionable, the Department stayed the rule. That is, by any measure, a fundamental and unexplained inconsistency, and, by any measure, it runs afoul of the APA's arbitrary and capricious standard.

The Department's remaining two rationales fare no better. In the Department's view, the Section 705 Stay was also appropriate because "the United States would suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending," and, indeed, postponing the effective date would allow the federal government and taxpayers to avoid "significant costs." Section 705 Stay, 82 Fed. Reg. at 27,621–22. And, "[s]eparately," the stay would "allow the Department to consider and [to] conduct a rulemaking process to review and [to] revise the" Borrower Defense Regulations, while "ensur[ing] [that] regulated parties [would] not incur costs that could be eliminated under any future regulations the Department promulgates on these matters." *Id.* at 27,622. Both of these rationales suffer from the same defect—they are not tied to the pending litigation and thus exceed the limited scope of § 705. As the Department itself repeatedly observes, a Section 705 Stay is "a purely procedural device that operates by temporarily freezing the status quo during the pendency of judicial review," Dkt. 581 at 43, and "[i]t is not a substantive rule itself," *id.* at 44. But when an agency decides to delay the effective date of a rule to save the federal

000038

government money or to alleviate confusion or a burden on regulated parties while the agency decides whether to amend or to rescind the rule, its action is "designed to implement ... policy," 5 U.S.C. § 551(4). Considerations of that type go beyond the limited reach of a § 705 stay and would have required the Department to proceed by rulemaking. As such, they cannot provide a reasoned basis for the Department's decision to issue the Section 705 Stay.

The Court, accordingly, concludes that the Department's rationale for issuing the Section 705 Stay is arbitrary and capricious.

**D. Remedies**

Plaintiffs contend that the appropriate remedy with respect to both the Final Delay Rule and the Section 705 Stay is immediate vacatur. Dkt. 55-1 at 79; Dkt. 56 at 72. They correctly note that, when a court concludes that a rule is unlawful, "the practice ... is ordinarily to vacate the rule," *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997), and they maintain that there is no reason to depart from that usual practice here. The Department, taking a risk, chose not to brief this issue and merely requested in a footnote

that it be provided an opportunity to brief the issue, should the Court decide the case in Plaintiffs' favor. Dkt. 58-1 at 79–80 n.28. Because the Department had ample opportunity to respond to Plaintiffs' arguments, and because this case is, ultimately, about the lawfulness of delay, the Court will not delay matters further by setting a schedule for further briefing. It will, however, schedule a prompt status conference and will permit the parties to present oral argument regarding the appropriate remedies.

**CONCLUSION**

The Court will **GRANT** the state plaintiffs' and student borrower plaintiffs' motions for summary judgment, Dkt. 55; Dkt. 56, and will **DENY** the Department's cross-motion for summary judgment, Dkt. 66. It is further **ORDERED** that the parties shall appear for a status conference on **\*111** September 14, 2018 at 10:30 a.m. in Courtroom 21 to address remedies.

**All Citations**

325 F.Supp.3d 74, 358 Ed. Law Rep. 368

Footnotes

1    Pursuant to the HEA, "[a]ll regulations pertaining to" the federal direct loan programs at issue here are "subject to [this] negotiated rulemaking (including the selection of the issues to be negotiated), unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest (within the meaning of section 553(b)(3)(B) of [the APA] )." 20 U.S.C. § 1098a(b)(2).

2    Although this is actually section 10(d) of the APA, the Court adopts the convention of referring to the provisions of the APA by their sections in title 5 of the U.S. Code. *See Trudeau v. FTC*, 456 F.3d 178, 183 n.3 (D.C. Cir. 2006).

3    Although the operative complaint filed by Bauer and Del Rose is in fact their second amended complaint, for ease of reference, the Court simply refers to that pleading as the complaint.

4    As with the student borrower plaintiffs, the Court refers to the state plaintiffs' second amended complaint as the complaint for ease of reference. Although the student borrower and state cases have now been consolidated, the Court will reference the Civ. No. 17-1331 matter when referring to documents filed by state plaintiffs prior to the consolidation.

5    The Department, however, did permit several ministerial provisions of the Borrower Defense Regulations to take effect on July 1, 2017:
    We do not intend to postpone the effectiveness of the regulatory provisions published in 75[,]926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) address severability; and (4) make technical corrections.
    William D. Ford Federal Direct Loan Program, 82 Fed. Reg. 27,621, 27,621 (June 16, 2017).

6    As in the case of the Section 705 Stay, the Interim Final Rule exempted certain provisions of the Borrower Defense Regulations from the delay. In particular, the Department exempted each of the provisions that the Section 705 Stay had previously allowed to become effective, in addition to the portions of the Borrower Defense Regulations amending the regulations governing "Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless

of whether the borrower is also seeking to consolidate a Direct Program or FFEL [Federal Family Education] loan, if the borrower has a loan type identified in 34 C.F.R. 685.220(b)." Interim Final Rule, 82 Fed. Reg. at 49,116–17.

7    As with the other delay actions, the Department stated its intent to exempt a handful of ministerial provisions of the Borrower Defense Regulations from the delay. William D. Ford Federal Direct Loan Program, 82 Fed. Reg. at 49,156 (Oct. 24, 2017).

8    To the extent the state plaintiffs seek attorney's fees and costs, the Court would, presumably, need to address their standing in that separate context.

9    To take one example, which is discussed further below, the Department seems to take the view that the change of the effective date of a Title IV rule, although typically subject to notice and comment rulemaking, is not "a regulatory change" for purposes of the Master Calendar Provision.

10   When used as a conjunction, there are times when the word "until" at least comes closer to specifying a particular point in time—e.g., "the game continued until it got dark," Webster's Third New International Dictionary 2513 (1993)—but, even then, the word means "up to the time that," id., not "only on, and not after." In any event, "until" is used as a preposition, not as a conjunction, in the Master Calendar Provision.

11   That the Department now contends the Master Calendar Provision is ambiguous, Dkt. 59-1 at 51–52, is irrelevant. What matters for present purposes is the explanation the Department gave during the regulatory process. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 563, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); SEC v. Chenery Corp., 332 U.S. 194, 196–97, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947). That explanation had nothing to do with the Department's efforts to fill a statutory gap or to exercise its own judgment.

12   The agency's notice states "November 1, 2018." October 24, 2017 NPRM, 82 Fed. Reg. at 49,156. In context, this is plainly a typographical error, and the notice meant to refer to November 1, 2017. If it were true that the agency could not complete negotiated rulemaking by November 1, 2018, then July 1, 2020 would be the first possible day the resulting regulations could be effective. See 20 U.S.C. § 1089(c)(1).

13   Although student borrowers can rely on the 1994 borrower defense rule, the Department did not consider the harm they would sustain from being denied the benefits of the new regulations, which were promulgated to address deficiencies that the Department itself found in the old rule. The Department's assertion that "the postponement of the final regulations will not prevent student borrowers from obtaining relief ... under existing regulations," Section 705 Stay, 82 Fed. Reg. at 27,621, does not provide the type of reasoned balancing of equities that § 705 requires. To take just one example, as the Department itself later acknowledged in the Final Delay Rule, the statutes of limitations may run on student borrowers' claims before they are able to take advantage of the new regulations' prohibition on predispute arbitration agreements and class action waivers. See Final Delay Rule, 83 Fed. Reg. at 6,460–61. The Section 705 Stay, however, makes no mention of that cost to student borrowers or, more importantly, of any other harm student borrowers would suffer as a result of the stay.

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

332 F.Supp.3d 181
United States District Court, District of Columbia.

Meaghan BAUER, et al., Plaintiffs,

v.

Elisabeth DEVOS, Secretary, U.S.
Department of Education, et al., Defendants.

Civil Action No. 17-1330 (RDM)
|
Signed 09/17/2018

**Synopsis**
**Background:** Multiple educational groups brought action
challenging the Department of Education's promulgation of
an interim final rule and a final rule delaying the effective date
of the Borrower Defense Regulations, which made changes to
federal student loan programs. Following determination that
the rules violated the Administrative Procedure Act (APA)
and the Higher Education Act (HEA), the parties sought a
determination on the remedy.

**Holdings:** The District Court, Randolph D. Moss, J., held
that:

[1] vacatur of final rule delaying effective date of Borrower
Defense Regulations was appropriate remedy, and

[2] order vacating Department's stay postponing the effective
date of the regulations, along with 30-day stay of the vacatur
order to allow Department to cure defects of stay, was
appropriate remedy.

So ordered.

West Headnotes (6)

[1]    **Administrative Law and Procedure**
        👉 Rules and regulations
        When a reviewing court determines that
        administrative agency regulations are unlawful,
        the ordinary result is that the rules are vacated.

[2]    **Administrative Law and Procedure**
        👉 Rules, regulations, and other policymaking
        When a reviewing court determines that
        administrative agency regulations are invalid, a
        remand without vacatur may be appropriate if
        there is at least a serious possibility that the
        agency will be able to substantiate its decision
        given an opportunity to do so, and when vacating
        would be disruptive.

        2 Cases that cite this headnote

[3]    **Administrative Law and Procedure**
        👉 Rules and regulations
        When a reviewing court determines that
        administrative agency regulations are unlawful,
        the court may vacate the invalid rule but stay its
        order of vacatur for a limited time to allow the
        agency to attempt to cure defects that the court
        has identified.

        2 Cases that cite this headnote

[4]    **Administrative Law and Procedure**
        👉 Rules and regulations
        When a reviewing court determines that
        administrative agency regulations are unlawful,
        vacatur with a brief stay of the vacatur order
        may be warranted, where a prolonged agency
        remand threatens to deprive one or more parties
        of significant rights.

        2 Cases that cite this headnote

[5]    **Education**
        👉 Federally guaranteed loans
        Vacatur of Department of Education's final rule
        delaying effective date of Borrower Defense
        Regulations, which made changes to federal
        student loan programs, was appropriate remedy,
        following determination by the District Court
        that the rule was promulgated in violation of the
        procedures required by the Higher Education Act
        (HEA); the Department did not oppose vacatur.
        20 U.S.C.A. § 1070.

        2 Cases that cite this headnote

[6]    **Education**
       Loans

Order vacating Department of Education's stay postponing the effective date of Borrower Defense Regulations, which made changes to federal student loan programs, along with 30-day stay of the vacatur order to allow Department to cure defects of stay, was appropriate remedy, following determination by the District Court that the stay was arbitrary and capricious in violation of the Administrative Procedure Act (APA); although the Department could have difficulty justifying or curing the deficiencies identified by the Court, vacatur without a stay could disrupt rulemaking process, and remand to Department without vacatur could cause harm to student borrowers. 5 U.S.C.A. § 701 et seq.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*182** Adam R. Pulver, Scott Lawrence Nelson, Julie A. Murray, Public Citizen Litigation Group, Robyn Renee Bender, Office of Attorney General/DC, Benjamin Michael Wiseman, Office of the Attorney General Office of Consumer Protection, Washington, DC, Toby R. Merrill, Legal Services Center of Harvard Law School, Jamaica Plain, MA, Yael Shavit, Office of the Attorney General of Massachusetts, Boston, MA, Bernard Ardavan Eskandari, California Department of Justice, Los Angeles, CA, Nicklas A. Akers, California Department of Justice, San Francisco, CA, John A.B. Langmaid, Joseph J. Chambers, Office of Attorney General/CT, Hartford, CT, Christian Douglas Wright, Delaware Department of Justice, Wilmington, DE, Mark Stanley Kubiak, Office of the Attorney General of Virginia Consumer Protection Section, Richmond, VA, Bryan Chien Yee, Department of the Attorney General, James Collington Paige, Thomas Francis Mana Moriarty, State of Hawaii Department of the Attorney General, Honolulu, HI, Joseph Michael Sanders, Gregory Wood Jones, Illinois Attorney General's Office, Chicago, IL, Jessica Whitney, Iowa Attorney General's Office, Des Moines, IA, Christopher John Madaio, Office of the Attorney General of Maryland, Baltimore, MD, Jason Timothy Pleggenkuhle, Minnesota Attorney General's Office, St. Paul, MN, Carolyn Fast, Office of the Attorney General/NY, Jane Melissa Azia, Office of

the New York Attorney General, New York, NY, Matthew Liles, North Carolina Department of Justice, Raleigh, NC, Andrew U. Shull, Oregon Department of Justice, Salem, OR, Jesse Harvey, Pennsylvania Office of the Attorney General Bureau of Consumer Protection, Pittsburg, PA, John M. Abel, Office of Attorney General/PA Litigation Section, Harrisburg, PA, Michael John Fischer, Pennsylvania Office of Attorney General, Philadelphia, PA, Edmund Francis Murray, Jr., Rhode Island Department of Attorney General, Providence, RI, Neil F. X. Kelly, Office of the Attorney General/RI, Providence, RI, Christopher James Curtis, Office of the Attorney General, State of Vermont, Montpelier, VT, Samuel Thurston Towell, Office of the Attorney General of Virginia, Richmond, VA, Benjamin Jerauld Roesch, Washington State Attorney General's Office, Seattle, WA, for Plaintiff.

Karen Bloom, U.S. Department of Justice, Washington, DC, R. Charlie Merritt, U.S. Department of Justice - Richmond, Richmond, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

RANDOLPH D. MOSS, United States District Judge

**\*183** Having concluded that the Department of Education's various actions delaying the Borrower Defense Regulations violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., the Court turns to the issue of the appropriate remedy. The Court concludes that, as with most unlawful agency actions, the proper remedy here is vacatur. The Court will, accordingly, vacate the "Final Delay Rule," William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 6,458 (Feb. 14, 2018). The Court will also vacate the "Section 705 Stay," William D. Ford Federal Direct Loan Program, 82 Fed. Reg. 27,621 (June 16, 2017), but will stay that vacatur for 30 days from the date of issuance of the Court's original opinion, Bauer v. DeVos, 325 F.Supp.3d 74, 2018 WL 4353656 (D.D.C. 2018)—that is, until October 12, 2018 at 5:00 p.m., to allow the Department to attempt to remedy the deficiencies identified in the Court's original opinion.

## I. BACKGROUND

On November 1, 2016, the Department of Education promulgated the Borrower Defense Regulations, a package of regulatory changes to federal student loan programs that was to become effective on July 1, 2017. William D. Ford Federal Direct Loan Program ("Borrower Defense Regulations"), 81

000042

Fed. Reg. 75,926 (Nov. 1, 2016). Shortly before the effective date, the California Association of Private Postsecondary Schools ("CAPPS") brought suit challenging the regulations, and, on June 2, 2017, CAPPS sought a preliminary injunction blocking the implementation of two aspects of the new rules. Dkt. 1, Dkt. 6, *CAPPS v. DeVos*, Civ. No. 17-999 (D.D.C.). But that motion was never fully briefed or decided because the Department, on its own accord, issued a stay under § 705 of the APA, postponing not only the effective date of the two changes that CAPPS had asked the Court preliminarily to enjoin, but most of the other portions of the new regulations as well. Section 705 Stay, 82 Fed. Reg. at 27,621. Separately, the Department issued an interim final rule on October 24, 2017, that delayed the effective date of the Borrower Defense Regulations to July 1, 2018. **\*184** William D. Ford Federal Direct Loan Program ("Interim Final Rule"), 82 Fed. Reg. 49,114 (Oct. 24, 2017). That same day, the Department also issued a notice of proposed rulemaking ("NPRM") to further delay the effective date to July 1, 2019. William D. Ford Federal Direct Loan Program ("October 24, 2017 NPRM"), 82 Fed. Reg. 49,155 (Oct. 24, 2017). Then, on February 14, 2018, the Department issued a final rule delaying the effective date of the Borrower Defense Regulations until July 1, 2019. Final Delay Rule, 83 Fed. Reg. at 6,458.

In its earlier opinion, the Court held that the Final Delay Rule and Section 705 Stay were both unlawful. *See Bauer*, 325 F.Supp.3d at 78–79, 2018 WL 4353656, at \*1. With respect to the Final Delay Rule, the Court held that the Department failed to comply with the procedures prescribed by the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq.* In particular, the Court held that the Department's decision to dispense with the negotiated rulemaking procedures that generally apply in Title IV rulemakings, *see* 20 U.S.C. § 1098a(a), was not supported by a reasoned invocation of the "good cause" exception, *see Bauer*, 325 F.Supp.3d at 96–102, 2018 WL 4353656, at \*14–18. With respect to the Section 705 Stay, the Court held that the stay was arbitrary and capricious. *See id.* at 110–11, at \*25. As the Court explained, the Department had stayed the Borrower Defense Regulations pending the resolution of the *CAPPS* litigation on three grounds: the *CAPPS* litigation raised "serious questions" about the validity of the Borrower Defense Regulations; the delay would not cause the government any significant harm; and the Department was, in any event, reconsidering the regulations, and the delay would minimize confusion while that process proceeded. *Id.* at 106–07, at \*22 (citing Section 705 Stay, 82 Fed. Reg. at 27,621). The Court concluded that none of the reasons withstood APA scrutiny. *Id.* The

first rationale was "unsupported by any analysis" and "was at odds with the Department's prior [and unacknowledged] conclusion to the contrary." *Id.* The second and third rationales also lacked "any meaningful analysis" and were "beyond the scope of the § 705 considerations" because they were "unrelated to the pending *CAPPS* case." *Id.*

## II. LEGAL STANDARD

**[1]  [2]  [3]  [4]** "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated ...." *NAACP v. Trump*, 298 F.Supp.3d 209, 243 (D.D.C. 2018) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ). That rule, however, is not absolute, and a remand without vacatur may be "appropriate [if] 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.' " *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) ). In some circumstances, moreover, a combined approach is warranted, the Court may vacate the invalid rule but stay "its order of vacatur for a limited time to allow the agency to attempt to cure defects that the court has identified." *NAACP v. Trump*, 298 F.Supp.3d at 244 (staying vacatur for 90 days so agency could provide more fulsome explanation for rescission of DACA); *see also, e.g., Nat. Res. Def. Council, Inc. v. EPA*, 301 F.Supp.3d 133, 145 (D.D.C. 2018) (staying vacatur of rule governing pollution level in Anacostia River until agency promulgated replacement rule). Such a combined approach falls within the Court's remedial discretion. *See Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 142, 148 (remanding **\*185** to district court to vacate agency rule, but noting that the district court had "remedial discretion ... to stay [its] order on remand"); Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 324–25 (2003) ("[T]he criteria that judges use to determine whether to order a stay have evolved, and variations on those criteria have emerged in specific contexts, but the APA drafters' core premise that they were conferring an equitable power has not been controversial." (footnotes omitted) ); Patricia M. Wald, *Judicial Review in Midpassage: The Uneasy Partnership Between Courts and Agencies Plays On*, 32 Tulsa L.J. 221, 236 (1996) ("[T]here are inherent powers in a reviewing court to postpone vacation until the agency has a chance to make things right."); *cf. Buckley*

000043

*v. Valeo*, 424 U.S. 1, 143, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (staying judgment for 30 days to "afford Congress an opportunity to reconstitute the [FEC] by law or to adopt other valid enforcement mechanisms ...."). Vacatur with a brief stay may be warranted, for example, where the *Allied-Signal* factors are satisfied, but where a prolonged agency remand threatens to deprive one or more parties of significant rights. *See NAACP v. Trump*, 298 F.Supp.3d at 245.

### III. ANALYSIS

#### A. February 14, 2018 Final Delay Rule

[5] All parties are in accord—or at least do not contest—that vacatur is the appropriate remedy with respect to the Final Delay Rule, which was promulgated without observance of the proper procedures under the HEA. At the September 14, 2018 hearing, the Department stated that, "to the extent [the Court] feels that vacatur is appropriate ... [the Department] is not prepared ... to oppose that." Dkt. 90 at 55. Moreover, as the Court has previously noted, the Department declined to address this issue in opposing Plaintiffs' motion for summary judgment. *See* Dkt. 58-1 at 79–80 n.28. Accordingly, the Court will vacate the Final Delay Rule.

#### B. Section 705 Stay

[6] Plaintiffs and the Department disagree, however, as to the appropriate remedy with respect to the Section 705 Stay. Plaintiffs ask the Court to vacate the stay and to allow the Borrower Defense Regulations to take effect immediately. Dkt. 55-1 at 79; Dkt. 56 at 72. In the alternative, they ask the Court to allow the Borrower Defense Regulations to take immediate effect, but, if necessary, to issue a temporary restraining order ("TRO") in *CAPPS*, Civ. No. 17-999, staying the provision prohibiting predispute arbitration agreements and class action waivers—the only provision that CAPPS had previously sought to enjoin. Dkt. 90 at 48. The Department counters that the appropriate remedy is remand without vacatur, or, in the alternative, to "stay any implementation pending the [preliminary injunction] briefing" in *CAPPS*, Civ. No. 17-999. *Id.* at 41. The Department also represented that, in the event the Court orders the Borrower Defense Regulations to take immediate effect, the Department requires at least 60 days to implement the regulations. *Id.* at 56.

As an initial matter, the Court declines to adopt Plaintiffs' second suggestion. The Court cannot sua sponte issue a TRO

in *CAPPS*, Civ. No. 17-999, when CAPPS itself has not requested one. The Court, accordingly, turns to the *Allied-Signal* factors to analyze whether remand without vacatur is appropriate.

The first consideration—whether the Department could substantiate the Section 705 Stay on remand—presents a close call. **\*186** The Department could, "in theory," cure the deficiencies identified in the Court's earlier opinion, but it "may face practical obstacles when attempting to overcome them." *NAACP v. Trump*, 298 F.Supp.3d at 244. To begin, given the incongruency between the scope of the Section 705 Stay (which covers 22 provisions) and the scope of relief sought in the motion for a preliminary injunction that CAPPS filed and then withdrew, *see Bauer*, 325 F.Supp.3d at 107–09, 2018 WL 4353656, at \*23, the Department may not be able to justify the full breadth of the Section 705 Stay. The Department would also need to explain why it believes CAPPS has raised serious questions about the lawfulness of the Borrower Defense Regulations; why it no longer ascribes to the view that the prohibition of predistpute arbitration agreements and class action waivers is lawful, as it had previously stated, *see* Borrower Defense Regulations, 81 Fed. Reg. at 76,021–24; and how that conclusion relates to other provisions of the Borrower Defense Regulations. Nevertheless, because there is a "nontrivial likelihood" that the Department could justify the Section 705 Stay on remand, *NAACP v. Trump*, 298 F.Supp.3d at 244 (quoting *WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002) ), the first *Allied-Signal* factor weighs (slightly) in favor of remand without vacatur.

The second *Allied-Signal* factor—the risk of disruption—also tips in favor of remand without vacatur. In light of the *CAPPS* litigation, which is now unstayed, and the *CAPPS* plaintiff's entitlement to be heard on the merits of its preliminary injunction, the Court concludes that vacating the Section 705 Stay, and allowing the Borrower Defense Regulations to take immediate effect, could result in an "interim change" that "may itself be changed." *Id.* at 245 (quoting *Allied-Signal*, 988 F.2d at 150–51). If the Court were, for example, to vacate the Section 705 Stay, and then conclude that CAPPS is entitled to preliminary relief, the Borrower Defense Regulations might take effect this week, only to be enjoined, at least in part, two or three weeks later. Without any advance notice and opportunity to prepare, such an abrupt change would cause regulatory vertigo. As such, the threat of disruption also weighs in favor of remand without immediate vacatur, at least for a few weeks.

Because this case is about the consequences of delay, however, the Court is mindful that, in crafting the appropriate remedy, time is of the essence. The further delay that would result from remanding the Section 705 Stay to the Department for further explanation without vacatur risks depriving Plaintiffs of meaningful relief. Accordingly, the Court will chart an intermediate course: the Court will vacate the Section 705 Stay, but stay the vacatur for 30 days from the date of its opinion declaring the Section 705 Stay unlawful. This will allow the Department to attempt to remedy the deficiencies in the Section 705 Stay while the *CAPPS* litigation proceeds in an expeditious manner; it will also curtail the harm to student borrowers that a remand without vacatur would otherwise engender.

### CONCLUSION

It is hereby **ORDERED** that the Final Delay Rule, 83 Fed. Reg. 6,458, shall be immediately **VACATED**. It is further **ORDERED** that the Section 705 Stay, 82 Fed. Reg. 27,621, shall be **VACATED**, but the vacatur shall be **STAYED** until October 12, 2018 at 5:00 p.m.

**SO ORDERED**.

### All Citations

332 F.Supp.3d 181, 359 Ed. Law Rep. 898

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

344 F.Supp.3d 158
United States District Court, District of Columbia.

CALIFORNIA ASSOCIATION OF PRIVATE
POSTSECONDARY SCHOOLS, Plaintiff,

v.

Elisabeth DEVOS, in her official capacity
as Secretary of the U.S. Department
of Education, et al., Defendants,

Civil Action No. 17-999 (RDM)
|
Signed 10/16/2018

**Synopsis**

**Background:** Association of private postsecondary schools
sought preliminary injunction against implementation of
federal regulation prescribing requirements on schools for
participation in federal direct loan program.

**Holdings:** The District Court, Randolph D. Moss, J., held
that:

[1] association failed to show likelihood of irreparable harm
from enforcement of regulation's arbitration and class action
waiver provisions;

[2] association lacked standing to seek to enjoin regulation's
financial responsibility provision;

[3] association lacked standing to seek to enjoin regulation's
repayment rate provision;

[4] association lacked standing to seek to enjoin regulation's
borrower-defense provision; and

[5] issue of whether Department of Education had authority
to demand recoupment of loan obligations from schools was
not ripe for decision.

Motion denied.

West Headnotes (49)

**[1]** **Injunction**
👉 Extraordinary or unusual nature of remedy

**Injunction**
👉 Clear showing or proof

A preliminary injunction is an extraordinary
remedy never awarded as of right, but only when
the party seeking the relief, by a clear showing,
carries the burden of persuasion.

**[2]** **Injunction**
👉 Grounds in general; multiple factors

To secure a preliminary injunction, a plaintiff
must establish that he is likely to succeed on
the merits, that he is likely to suffer irreparable
harm in the absence of preliminary relief, that the
balance of equities tips in his favor, and that an
injunction is in the public interest.

1 Cases that cite this headnote

**[3]** **Injunction**
👉 Standard of proof in general

Although a party moving for a preliminary
injunction may rely on evidence that is less
complete than in a trial on the merits, he
nevertheless bears the burden of producing
credible evidence sufficient to demonstrate his
entitlement to injunctive relief.

**[4]** **Federal Courts**
👉 Timeliness issues

A court must, at each successive stage of a
proceeding, evaluate whether it has jurisdiction
to provide the relief sought, and it must do so
through the lens of the standard applicable at that
stage of the proceeding.

2 Cases that cite this headnote

**[5]** **Injunction**
👉 Persons entitled to apply; standing

000046

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 49 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

A party who fails to show a substantial likelihood of standing is not entitled to a preliminary injunction.

1 Cases that cite this headnote

[6] **Injunction**

🔑 **Unclear, unlikely, doubtful or speculative injury**

A mere possibility of irreparable harm will not suffice to support a preliminary injunction.

[7] **Injunction**

🔑 **Irreparable injury**

A showing that irreparable injury is likely is the sine qua non for obtaining a preliminary injunction; it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases.

[8] **Injunction**

🔑 **Irreparable injury**

On a motion for a preliminary injunction, if the moving party fails to demonstrate that it is likely to suffer an irreparable injury, the court must deny the motion.

[9] **Associations**

🔑 **Actions by or Against Associations**

Association of private postsecondary schools had Article III standing to seek preliminary injunction against implementation of federal regulation prohibiting schools participating in federal direct loan program from employing predispute arbitration clauses and class action waivers against student-borrowers; if such regulation were implemented, at least one of association's member schools would suffer concrete injury inasmuch as it would need to inform students of rule change, amend enrollment agreements, retrain admissions staff, and litigate new cases. U.S. Const. art. 3, § 2, cl. 1; 34 C.F.R. § 685.300.

[10] **Associations**

🔑 **Actions by or Against Associations**

When an association seeks to establish standing, it may proceed in one of two ways: it may show that the association has organizational standing to sue on its own behalf, or it may demonstrate that it has associational standing to sue on behalf of its members.

[11] **Associations**

🔑 **Actions by or Against Associations**

Associational standing is premised on the theory that the plaintiff is not seeking a remedy on its own behalf but, rather, is proceeding as the representative of its members.

[12] **Associations**

🔑 **Actions by or Against Associations**

To demonstrate associational standing, a plaintiff association need not establish that it has standing to sue in its own right, but must show that (1) at least one of its members would otherwise have standing to sue in her own right, (2) the interests that the association seeks to protect in the litigation are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

1 Cases that cite this headnote

[13] **Federal Civil Procedure**

🔑 **In general; injury or interest**

**Federal Civil Procedure**

🔑 **Causation; redressability**

The irreducible constitutional minimum of standing contains three elements: first, the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct complained

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 50 of 342

of, i.e., the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[14]    Federal Civil Procedure**
   🔑 In general;  injury or interest

Standing must be evaluated on a claim-by-claim basis.

**[15]    Federal Civil Procedure**
   🔑 In general;  injury or interest

Standing must be assessed in light of the standard applicable at the relevant stage of the proceeding.

2 Cases that cite this headnote

**[16]    Federal Civil Procedure**
   🔑 In general;  injury or interest

Standing does not depend on the size or quantum of harm to the party.

**[17]    Injunction**
   🔑 Funding and financing

Association of private postsecondary schools failed to show likelihood of irreparable harm, as required to support preliminary injunction against implementation of federal regulation prohibiting schools participating in federal direct loan program from employing predispute arbitration clauses and class action waivers against student-borrowers; although association asserted that its member schools would incur costs in conforming to regulation and suffer reputational damage, such allegations of future harm were nonspecific and conclusory, failing to state extent of predicted costs and when any such injuries would occur. 34 C.F.R. § 685.300.

**[18]    Injunction**

**[19]    Irreparable injury**

A prospective injury that is sufficient to establish standing to seeking a preliminary injunction does not necessarily satisfy the more demanding burden of demonstrating irreparable injury on a preliminary injunction motion.

**[19]    Injunction**
   🔑 Clear, likely, threatened, anticipated, or intended injury

To warrant grant of a preliminary injunction, the predicted injury must be unrecoverable; it must be both certain and great, and it must be actual and not theoretical.

2 Cases that cite this headnote

**[20]    Injunction**
   🔑 Irreparable injury

It is not true that irreparable injury exists, supporting grant of a preliminary injunction, as a matter of course, whenever a regulated party seeks preliminarily to enjoin the implementation of a new regulatory burden.

**[21]    Injunction**
   🔑 Injury, Hardship, Harm, or Effect

To warrant grant of a preliminary injunction, an asserted economic harm must be significant, even where it is irretrievable because a defendant has sovereign immunity.

1 Cases that cite this headnote

**[22]    Injunction**
   🔑 Irreparable injury

For an alleged irreparable harm to support grant of a preliminary injunction, the loss must be serious in terms of its effect on the plaintiff.

**[23]    Injunction**
   🔑 Injury to or restraint of trade or business in general

Irreparable injury, in the preliminary injunction analysis, requires damage to a business above and beyond a simple diminution in profits.

**[24]    Injunction**
    👉 Injury to or restraint of trade or business in general

To demonstrate irreparable economic harm on a motion for a preliminary injunction, even where the United States is the defendant, the plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business.

**[25]    Injunction**
    👉 Irreparable injury

On a motion for a preliminary injunction, the standard of irreparable harm requires more than conclusory assertions of potential loss.

**[26]    Injunction**
    👉 Presumptions and burden of proof

On a motion for a preliminary injunction, to permit the court to evaluate the nature and extent of an alleged irreparable economic injury, the movant bears the burden of presenting specific details regarding the extent to which its business will suffer.

**[27]    Injunction**
    👉 Weight and Sufficiency

Broad conclusory statements about the likelihood of harm will not suffice to support grant of a preliminary injunction.

**[28]    Injunction**
    👉 Irreparable injury
**Injunction**
    👉 Standard of proof in general

In the irreparable harm analysis on a motion for a preliminary injunction, bare allegations of what is likely to occur are of no value; the

movant must, instead, substantiate the claim that irreparable injury is likely to occur.

1 Cases that cite this headnote

**[29]    Injunction**
    👉 Irreparable injury
**Injunction**
    👉 Standard of proof in general

Causing "uncertainty" falls short of the type of actual and imminent threat needed to show irreparable injury on a motion for a preliminary injunction.

**[30]    Injunction**
    👉 Injury, Hardship, Harm, or Effect

Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction.

**[31]    Civil Rights**
    👉 Injunction
**Declaratory Judgment**
    👉 Proper Parties

Suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.

**[32]    Civil Rights**
    👉 Preliminary Injunction

On a motion for a preliminary injunction, the mere assertion of a constitutional violation is not sufficient to establish irreparable injury.

**[33]    Civil Rights**
    👉 Preliminary Injunction

On a motion for a preliminary injunction, where the alleged irreparable injury is a constitutional violation, the court must consider whether the movant has established that it is likely to

California Association of Private Postsecondary Schools v....., 344 F.Supp.3d 158...

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 52 of 342

361 Ed. Law Rep. 677

suffer constitutional injury in the absence of preliminary relief.

**[34] Constitutional Law**
👈 Retrospective laws and decisions; change in law

To prevail on a due process challenge to retroactive application of an economic law, the plaintiff must show that the government action bears no rational and legitimate relationship to the interest the government seeks to support. U.S. Const. Amend. 5.

**[35] Constitutional Law**
👈 Economic legislation

**Constitutional Law**
👈 Due process

Legislative acts adjusting the burdens and benefits of economic life come to the court with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the government has acted in an arbitrary and irrational way. U.S. Const. Amend. 5.

**[36] Associations**
👈 Actions by or Against Associations

Association of private postsecondary schools lacked Article III standing to seek preliminary injunction against implementation of federal regulation requiring schools participating in federal direct loan program to provide financial protection to Department of Education under certain circumstances, absent identification of any particular member school of association which would be affected by such regulation. U.S. Const. art. 3, § 2, cl. 1; 34 C.F.R. § 668.171 et. seq.

**[37] Federal Civil Procedure**
👈 In general; injury or interest

There is ordinarily little question that a plaintiff who is himself an object of a regulatory action

has sustained some injury and thus has standing to sue to challenge the regulatory action.

**[38] Associations**
👈 Actions by or Against Associations

When a petitioner claims associational standing, it is not enough to aver that unidentified members of the association have been injured.

1 Cases that cite this headnote

**[39] Associations**
👈 Actions by or Against Associations

An organization bringing a claim based on associational standing must show that at least one specifically-identified member of the organization has suffered or will suffer an injury-in-fact.

1 Cases that cite this headnote

**[40] Injunction**
👈 Funding and financing

Association of private postsecondary schools failed to show likelihood of irreparable harm, as required to support preliminary injunction against implementation of federal regulation requiring schools participating in federal direct loan program to provide financial protection to Department of Education under certain circumstances; although association asserted that its member schools would incur substantial fees and costs in posting letters of credit and otherwise conforming to regulation, there was no basis to conclude that any member school would be automatically required by regulation to post letter of credit, and association failed to state extent of predicted costs and when any injuries would occur. 34 C.F.R. § 668.171 et. seq.

**[41] Associations**
👈 Actions by or Against Associations

Association of private postsecondary schools lacked Article III standing to seek preliminary injunction against implementation of federal regulation requiring schools participating in

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 53 of 342
California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...
361 Ed. Law Rep. 677

federal direct loan program to include loan repayment warning in promotional materials if students' median repayment rate dropped below threshold; there was no showing that any of association's member schools had, or would soon have, loan repayment rate below threshold. U.S. Const. art. 3, § 2, cl. 1; 34 C.F.R. § 668.41(h).

**[42]    Injunction**
   👉 Funding and financing

Association of private postsecondary schools failed to show likelihood of irreparable harm, as required to support preliminary injunction against implementation of federal regulation requiring schools participating in federal direct loan program to include loan repayment warning in promotional materials if students' median repayment rate dropped below threshold; it was unlikely that such regulation would be enforced in near future, at even if it was, there was no showing that any of association's member schools had, or would soon have, loan repayment rate below threshold. 34 C.F.R. § 668.41(h).

**[43]    Associations**
   👉 Actions by or Against Associations

Association of private postsecondary schools lacked Article III standing to seek preliminary injunction against implementation of federal regulation amending procedure for student-borrowers to raise defenses to repayment of federal direct loans; such procedure was binding on student-borrowers and not on schools, and there was no showing that regulation would have any direct effect on association's member schools. U.S. Const. art. 3, § 2, cl. 1; 34 C.F.R. § 685.206(c).

**[44]    Federal Courts**
   👉 Education

Issue of whether Department of Education had authority to demand recoupment of federal direct loan obligations from schools following borrower-defense proceedings was not ripe for decision, in light of Department's ongoing development of procedures to govern such recoupment actions. 34 C.F.R. § 685.206(c).

**[45]    Federal Courts**
   👉 Administrative agencies and proceedings in general

Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.

**[46]    Federal Courts**
   👉 Ripeness; Prematurity

**Federal Courts**
   👉 Prudential concerns

The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**[47]    Administrative Law and Procedure**
   👉 Ripeness; prematurity

Determining whether an administrative action is ripe for judicial review requires the court to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.

**[48]    Injunction**
   👉 Funding and financing

Association of private postsecondary schools failed to show likelihood of irreparable harm, as required to support preliminary injunction against implementation of federal regulation amending procedure for student-borrowers to raise defenses to repayment of federal direct loans and providing for recoupment of unpaid loans from schools; it was unlikely that recoupment provision would be enforced in near future, and even if it was, individual decisions would be reviewable under Administrative

000051

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 54 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

Procedure Act. 5 U.S.C.A. § 551 et seq.; 34 C.F.R. § 685.206(c).

[49] **Injunction**
   👉 Rules and regulations

In the preliminary injunction analysis, a harm that can be remedied under the Administrative Procedure Act is not irreparable. 5 U.S.C.A. § 551 et seq.

**Attorneys and Law Firms**

**\*163** Robert Lawrence Shapiro, Duane Morris LLP, Caroline S. Van Zile, Clifford M. Sloan, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, Boris Bershteyn, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Plaintiff.

Karen Bloom, U.S. Department of Justice, Washington, DC, Thomas David Zimpleman, R. Charlie Merritt, U.S. Department of Justice, Richmond, VA, for Defendants.

## MEMORANDUM OPINION AND ORDER

RANDOLPH D. MOSS, United States District Judge

This is not the first (and presumably not the last) chapter in a dispute about the fate of regulations that the Department of Education promulgated in November 2016 to address perceived deficiencies in the William D. Ford Federal Direct Loan Program ("Direct Loan Program"), which allows students who attend participating schools to obtain federal loans. The regulations were intended to "protect student loan borrowers from misleading, deceitful, and predatory practices." William D. Ford Federal Direct Loan Program ("2016 Rule"), 81 Fed. Reg. 75,926 (Nov. 1, 2016). Shortly before the 2016 Rule was scheduled to take effect, Plaintiff California Association of Private Postsecondary Schools ("CAPPS") brought this action seeking to set the rule aside in its entirety. Dkt. 1 at 75–76. About a week later, CAPPS moved preliminarily to enjoin the implementation or enforcement of a single provision, which prohibits participants in the Direct Loan Program from employing predispute arbitration clauses and class action waivers in certain disputes with student-borrowers ("Arbitration and

Class Action Waiver Provision"). Dkt. 6. That motion was never fully briefed or decided, however, because the Department of Education, on its own accord, stayed the effective date of most of the 2016 Rule pursuant to 5 U.S.C. § 705 pending resolution of this case. William D. Ford Federal Direct Loan Program ("Section 705 Stay"), 82 Fed. Reg. 27,621 (June 16, 2017).

**\*164** The Department's Section 705 Stay led to the next chapter of the dispute. Within weeks of issuance of the stay, two student-borrowers and a coalition of nineteen states and the District of Columbia filed separate lawsuits seeking to invalidate the stay. See Bauer v. DeVos, No. 17-cv-1330, 2017 WL 10239119 (D.D.C. filed July 6, 2017); Massachusetts v. Dep't of Education, No. 17-cv-1331 (D.D.C. filed July 6, 2017). The Department subsequently issued an interim final rule on October 24, 2017, staying the effective date of the 2016 Rule to July 1, 2018, and then issued a final rule staying the effective date for another year. See William D. Ford Federal Direct Loan Program ("Interim Final Rule"), 82 Fed. Reg. 49,114 (Oct. 24, 2017); William D. Ford Federal Direct Loan Program ("Final Delay Rule"), 83 Fed. Reg. 6,458 (Feb. 14, 2018). With each new rulemaking, the student-borrower and state plaintiffs amended their complaints to challenge the new action. The Court consolidated the Bauer and Massachusetts cases and, on September 12, 2018, issued an opinion resolving the consolidated action. Bauer v. DeVos, 325 F.Supp.3d 74 (D.D.C. 2018) ("Bauer I"). In that decision, the Court held that the Section 705 Stay was arbitrary and capricious and thus unlawful under the Administrative Procedure Act ("APA"); that the Interim Final Rule was, for the most part, moot; and that the Final Delay Rule was issued in violation of the Higher Education Act's negotiated rulemaking requirement. Id. Five days later, the Court entered a remedial order vacating the Final Rule and Section 705 Stay but staying vacatur of the Section 705 Stay until October 12, 2018. Bauer v. DeVos, No. 17-cv-1330, 332 F.Supp.3d 181, 2018 WL 4483783 (D.D.C. Sept. 17, 2018) ("Bauer II"). On October 12, 2018, the Court extended that stay until noon on October 16, 2018. Minute Order (Oct. 12, 2018), Bauer, No. 17-cv-1330. [1]

The Bauer I decision, in turn, opened the current chapter of the dispute. Two days after issuing that decision, the Court held a status conference in this action and set a schedule for CAPPS to renew its motion for a preliminary injunction to enjoin the 2016 Rule, which would go into effect upon expiration of the Court's stay. See Minute Order (Sept. 17, 2018). The Court also granted the Bauer plaintiffs leave to

000052

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 55 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

intervene ("*Bauer* Intervenors") and granted the interested states and the District of Columbia leave to participate as amici ("State Amici"). [2] *See* Minute Entry (Sept 14, 2018); Minute Order (Sept. 18, 2018). On September 22, 2018, CAPPS filed the pending motion for a preliminary injunction. Dkt. 65. This time, however, CAPPS has sought preliminarily to enjoin four provisions of the 2016 Rule: (1) the Arbitration and Class Action Waiver that it targeted in its original motion; (2) the "Financial Responsibility Provision;" (3) the "Repayment Rate Provision;" and (4) the "Borrower Defense Provision." *Id.* at 17. The United States and *Bauer* intervenors filed briefs in opposition, and the states and the District of Columbia filed an amicus brief in opposition. *See* Dkt. 67 (State Amici); Dkt. 68 (*Bauer* Intervenors); Dkt. 69 (United States). CAPPS **\*165** filed a reply brief on October 8, 2018, Dkt. 72, and the Court held oral argument the following day, Minute Order (Oct. 9, 2018).

Each of the four provisions that CAPPS seeks to enjoin raises a distinct set of issues; overall, CAPPS raises *twenty-four* challenges to the four provisions. As to most of the challenged provisions, CAPPS has failed to demonstrate that it has standing or that the dispute is ripe for decision. Moreover, with respect to each of the four provisions, CAPPS has failed to carry its burden of demonstrating that any one of its members is likely to suffer an irreparable injury in the absence of an injunction. Because irreparable injury is the *sine qua non* for obtaining a preliminary injunction, that flaw is dispositive. In light of these threshold obstacles, the Court need not reach the merits of the plethora of substantive arguments that CAPPS raises—and, indeed, concludes that it would not be prudent to do so on such an abbreviated schedule. Those issues, in short, are for the next chapter.

The Court will, accordingly, deny the motion for a preliminary injunction and will set a schedule for cross-motions for summary judgment.

## I. BACKGROUND

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, empowers the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students ... in institutions of higher education" through various types of financial aid. *Id.* § 1070(a). The William D. Ford Federal Direct Loan Program ("Direct Loan Program") allows students who attend "participating institutions of higher education" to obtain

direct loans from the federal government to pay for their educational expenses. *Id.* § 1087a(a). To participate in the Direct Loan Program, institutions of higher education must enter into contracts, called Program Participation Agreements ("PPAs"), with the Secretary of Education and agree to comply with the HEA, all applicable regulations, and certain other conditions. *See* 20 U.S.C. §§ 1087c(a), 1094(a)(4); 34 C.F.R. §§ 668.14, 685.300(b). These contracts may include any provisions "the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program. 20 U.S.C. § 1087d(a)(6); *see also id.* § 1087c.

By statute, students who are harmed by a Title IV school's violation of certain laws, including prohibitions on fraud, may be entitled to relief from their federal Direct Loan obligations through a process known as "borrower defense" to repayment. *Id.* § 1087e(h); *see also* 34 C.F.R. § 685.206(c). In administering the Direct Loan Program, the Secretary must also "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan" made under the Direct Loan Program. 20 U.S.C. § 1087e(h). And more generally, the Secretary has authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the" Direct Loan Program. *Id.* § 1221e-3.

Pursuant to these authorities, in January 1994, the Secretary issued "standards, criteria, and procedures governing the Federal Direct Student Loan ... program," including the first iteration of the Borrower Defense Rule. Federal Direct Student Loan Program, 59 Fed. Reg. 472, 472 (Jan. 4, 1994). In December 1994, the Secretary amended the Direct Loan Program regulations, including those governing borrower defenses, *see* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994), and under those regulations, borrowers were **\*166** permitted to assert "as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). The 1994 regulations (1) permitted a student borrower to assert her school's misconduct as a reason for nonrepayment, and (2) if the borrower was successful, permitted the Department of Education to recoup the loan from the school. *Id.* § 685.206(c)(2), (3).

The adequacy of the 1994 Borrower Defense Rule was tested by the collapse of Corinthian Colleges in May 2015. *See* William D. Ford Federal Direct Loan Program ("June

16, 2016 Notice of Proposed Rulemaking ('NPRM')"), 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). Corinthian, a for-profit company that "operat[ed] numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide," *id.* at 39,335, filed for bankruptcy in 2015. In the wake of Corinthian's closure, the Department ultimately determined "that the college had misrepresented its job placement rates." *Id.* In the aftermath, "thousands of claims for student loan relief" were filed, and Corinthian's bankruptcy meant that there was "no other party from which the Federal government [could] recover any losses." 2016 Rule, 81 Fed. Reg. at 76,022. The Department concluded, against this backdrop, that the 1994 borrower defense rule was outdated and was no longer adequate to deal with the changed "landscape of higher education." June 16, 2016 NPRM, 81 Fed. Reg. at 39,335.

To address these perceived deficiencies, the Department commenced a rulemaking, and on November 1, 2016, it published the final rule governing the Direct Loan Program that is at issue in the present action. 2016 Rule, 81 Fed. Reg. at 75,926. In relevant part, the 2016 Rule: (1) prohibits schools "participating in the Direct Loan Program from obtaining" or relying upon a borrower's "waive[r] [of] his or her right to initiate or participate in a class action lawsuit," or "from requiring students to engage in internal dispute processes before contacting accrediting or government agencies" ("Arbitration and Class Action Waiver Provision"); (2) requires "financially risky institutions [to be] prepared to take responsibility for the losses to the government for discharges of and repayments for [f]ederal student loans" ("Financial Responsibility Provision"); (3) adopts certain disclosure obligations for institutions "at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at least one dollar the outstanding balance of the borrower's loans received at the institution" ("Repayment Rate Provision"); and (4) amends the standards and procedures applicable to the borrower defense process ("Borrower Defense Provision"). *Id.* at 75,926–27.

CAPPS seeks preliminarily to enjoin the implementation of each of these provisions.

## II. ANALYSIS

**[1] [2] [3]** "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Natural Res.*

*Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S.Ct. 365. Although the moving party may rely on "evidence that is **\*167** less complete than in a trial on the merits," *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998), he nevertheless "bear[s] the burden of produc[ing] ... credible" evidence sufficient to demonstrate his entitlement to injunctive relief, *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 173 (D.D.C. 2015) (quotation marks omitted) (first alteration in original).

Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, the D.C. Circuit has hinted on several occasions that "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) ), but it "has not yet needed to decide the issue," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) ("This circuit has repeatedly declined to take sides ... on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction.") (en banc); *Sherley*, 644 F.3d at 393 (reading "*Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction' " but declining to decide the issue (quoting *Davis*, 571 F.3d at 1296) ).

**[4] [5]** But, regardless of whether the sliding scale approach applies, a party seeking a preliminary injunction must clear two, non-negotiable hurdles. *First*, a court must—at each successive stage of the proceeding—evaluate whether it has jurisdiction to provide the relief sought, and it must do so through the lens of the standard applicable at that stage of the proceeding. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As a result, "a party who fails to show a 'substantial likelihood' of standing is not

Case 3:19-cv-03674-WHA  Document 56-3  Filed 11/14/19  Page 57 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

entitled to a preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). That same reasoning, moreover, extends to other jurisdictional prerequisites, such as ripeness.

[6] [7] [8] *Second*, as *Winter* makes clear, a mere "possibility" of irreparable harm will not suffice. *Winter*, 555 U.S. at 22, 129 S.Ct. 365. "Rather, a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *3–4 (D.D.C. Feb. 8, 2016); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Texas Children's Hosp. v. Burwell*, 76 F.Supp.3d 224, 241–42 (D.D.C. 2014); *Trudeau v. FTC*, 384 F.Supp.2d 281, 296 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006). As a result, if the moving party fails to demonstrate that it is likely to suffer an irreparable injury, the Court must deny the motion.

With these guideposts in mind, the Court will consider whether CAPPS has established that there is a "substantial likelihood" that the Court has Article III **\*168** jurisdiction to consider its challenge to each of the four provisions at issue and whether it has shown that the association, or one of its members, is likely to suffer an irreparable injury if the Court does not issue a preliminary injunction.

## A. Arbitration and Class Action Waiver

The first of the provisions that CAPPS seeks to enjoin adds conditions to the Direct Loan Program Participation Agreements—or "PPAs"—that participating schools must enter with the Secretary of Education in order to receive Title IV funding. 2016 Rule, 81 Fed. Reg. at 75,927. To qualify as a "participating institution," a school must enter a PPA promising to undertake an array of responsibilities, such as estimating the needs of student-borrowers, reconciling certain records on a monthly basis, and implementing a quality assurance system. 34 C.F.R. § 685.300. As relevant here, the 2016 Rule amended this regulation to require that each participating school must also agree that (1) it "will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan,

with respect to any aspect of a class action that is related to a borrower defense claim;" (2) it "will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim;" and (3) if the school has existing contracts with student-borrowers that include covered predispute class action waivers or arbitration agreements, "the school must either ensure [that] the agreement[s] [are] amended ... or provide the student[s] with written notice" that it will not "use" the predispute class action waivers or arbitration agreements. 2016 Rule, 81 Fed. Reg. at 76,087–88 (34 C.F.R. § 685.300(e)(1), (e)(3)(ii), (e)(3)(iii)(B), (f)(1), (f)(3)(ii), (f)(3)(iii)(B) ).

According to CAPPS, these additional conditions "conflict with" the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2; exceed the Secretary's authority under the HEA, 20 U.S.C. 1087d; were promulgated in violation of the APA, 5 U.S.C. § 702(2); and violate the Due Process Clause. *See* Dkt. 65 at 11–20. For present purposes, however, the Court does not reach these questions but, instead, considers whether CAPPS has established standing to bring these claims and, if so, whether it has established that at least one of its members is likely to suffer an irreparable injury if the Court does not issue a preliminary injunction. The answer to the first question is "yes," but the answer to the second is "no." As a result, the Court must deny CAPPS's motion for a preliminary injunction with respect to the Arbitration and Class Action Waiver Provision.

### 1. Standing

[9] [10] As a first step, the Court must consider whether CAPPS has met its burden of establishing a "substantial likelihood" that it has standing to challenge the Arbitration and Class Action Waiver Provision. *See Food & Water Watch, Inc.*, 808 F.3d at 913. When an association, like CAPPS, seeks to establish standing, it may proceed in one of two ways: it may show that the association has "organizational standing" to sue on its own behalf, or it may demonstrate that it has "associational standing" to sue on behalf of its members. *See Public Citizen, Inc. v. Trump*, 297 F.Supp.3d 6, 17 (D.D.C. 2018). Here, CAPPS relies only on the latter theory.

[11] [12] Associational standing is premised on the theory that the plaintiff is not seeking a remedy on its own behalf but, rather, is proceeding "as the representative of its members." **\*169** *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). As such, the plaintiff need not establish that it has standing to sue in its own right, but must show

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 58 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

that (1) at least one of "its members would otherwise have standing to sue in [her] own right," (2) the interests that the association "seeks to protect" in the litigation "are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Viewed through the lens of the pending motion, the Court has little difficulty in concluding that CAPPS is "likely" to satisfy the second and third prongs of the *Hunt* test. According to the CAPPS's executive director, Robert Johnson, CAPPS provides its member schools with advice regarding compliance with regulatory mandates and assists "in the drafting of enrollment agreements and arbitration provisions." Dkt. 65-2 at 1 (Johnson Decl. ¶ 1). And this is not a case—like a damages action, for example —that requires the participation of individual members. The first prong—the requirement that at least one member have standing to sue—however, requires more detailed analysis.

**[13]** **[14]** **[15]** The standing inquiry begins with the oft-quoted test articulated in *Lujan v. Defenders of Wildlife*:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) "actual and imminent, not 'conjectural' or 'hypothetical.' " ... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." .... Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (alterations in original) (internal citations omitted). Because standing must be evaluated on a claim-by-claim basis, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), and because standing must be assessed in light of the standard applicable at the relevant stage of the proceeding, *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130, this means that CAPPS must establish a "substantial likelihood" that at least one of its members (1) will suffer an "actual and imminent" injury, (2) that is "fairly traceable" to each of the challenged provisions, and (3) that "the injury will be redressed by a favorable decision." As explained below, the Court concludes

that CAPPS has met this burden with respect to its challenge to the Arbitration and Class Action Waiver Provision.

Six of the seven declarations CAPPS offers in support of its motion at least briefly touch on the question of arbitration. In the most extensive discussion, Johnson attests that "virtually all CAPPS schools utilize arbitration agreements with their students," and he identifies two such member schools —Colleen O'Hara's Beauty Academy and Pima Medical Institute—by name. Dkt. 65-2 at 2 (Johnson Decl. ¶ 9). Johnson adds that the Arbitration and Class Action Waiver Provision will require these schools "to send notices to their students" regarding the rule change, "to amend their agreements[,] retrain their admissions staffs[,] and actually litigate new cases, including class actions, in federal and state court." *Id.* at 3 (Johnson Decl. **\*170** ¶¶ 10–12). Declarants from five member schools confirm that member schools "use[ ] arbitration provisions in [their] enrollment agreements." Dkt. 65-4 at 1 (Casanover Decl. ¶ 5); Dkt. 65-5 at 1 (Gourji Decl. ¶ 5); Dkt. 65-6 at 1 (Wood Decl. ¶ 5); Dkt. 65-7 at 1 (Second Casanover Decl. Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 5). Those declarants, moreover, attest to the efficiency and reduced expense of resolving disputes through arbitration. Dkt. 65-4 at 1-2 (Casanover Decl. ¶¶ 6, 8–10); Dkt. 65-5 at 1-2 (Gourji Decl. ¶¶ 6, 8–10); Dkt. 65-6 at 2 (Wood Decl. ¶¶ 6, 8–10); Dkt. 65-7 at 1–2 (Second Casanover Decl. ¶¶ 6, 8–10); Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 6– 9). Finally, three member schools assert: "We currently have disputes in arbitration and are not certain how we could proceed with those disputes if the [2016 Rule] goes into effect." Dkt. 65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 10).

**[16]** The Court concludes that this showing is sufficient to establish that at least one CAPPS member school has standing to challenge the Arbitration and Class Action Waiver Provision. CAPPS has identified specific member schools that will likely suffer a concrete injury if the challenged provision takes effect, and it is likely that the relief sought from the Court—including a preliminary injunction—would redress that injury. To take the most obvious example, the declarations establish that, if the Arbitration and Class Action Waiver Provision takes effect, each of the identified member schools would be required promptly to send a notice to students with existing enrollment agreements informing them that the school will "not ... use any predispute arbitration agreement to stop [the student] from bringing a lawsuit concerning" the covered conduct, 2016 Rule, 81 Fed. Reg. at 76,088 (new §

Case 3:19-cv-03674-WHA  Document 56-3  Filed 11/14/19  Page 59 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

685.300(f)(3)(iii)(B) ). Because "standing does not depend on the size or quantum of harm to the party," *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1008 (D.C. Cir. 1977), that imminent cost is sufficient to sustain CAPPS's standing.

### 2. *Irreparable Injury*

**[17]** **[18]** **[19]** **[20]** **[21]** **[22]** A prospective injury that is sufficient to establish standing, however, does not necessarily satisfy the more demanding burden of demonstrating irreparable injury. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. The injury must be unrecoverable; it must be "both certain and great; [and] it must be actual and not theoretical." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). To be sure, economic loss sustained due to a federal administrative action is typically "uncompensable" in the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not reach damages claims, 5 U.S.C. § 702 (permitting actions "seeking relief other than money damages"). But it proves too much to suggest that "irreparable" injury exists, as a matter of course, whenever a regulated party preliminarily to enjoin the implementation of a new regulatory burden. *See Air Transport Ass'n of Am., Inc. v. Export-Import Bank*, 840 F.Supp.2d 327, 335–36 (D.D.C. 2012). Rather, an asserted "economic harm" must "be significant, even where it is irretrievable because a defendant has sovereign immunity." *Id.* at 335. In other words, the loss "must ... be serious in terms of its effect on the plaintiff." *Gulf Oil Corp. v. Dep't of Energy*, 514 F.Supp. 1019, 1026 (D.D.C. 1981).

**[23]** **[24]** **[25]** **[26]** This conclusion is consistent with an array of decisions from this Court holding that irreparable injury requires **\*171** damage to a business "above and beyond a simple diminution in profits," *Mylan Pharm., Inc. v. Shalala*, 81 F.Supp.2d 30, 43 (D.D.C. 2000), and that, even where the United States is the defendant, "a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business,' " *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F.Supp.2d 162, 168 (D.D.C. 2008) (quoting *Gulf Oil Corp.*, 514 F.Supp. at 1025). The standard also requires more than conclusory assertions of potential loss. To permit the Court to evaluate the nature and extent of the alleged irreparable injury, the movant bears the burden of presenting "specific details regarding the extent to which [its] business will suffer." *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Res. Syst.*, 773 F.Supp.2d 151, 181 (D.D.C. 2011).

**[27]** **[28]** The declarations offered in support of CAPPS's motion do not satisfy this "high standard." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Although they show that specific member schools use arbitration agreements and that they will incur some presumably imminent cost in providing the required notices to existing student-borrowers, they say nothing about the extent of that cost. [3] Likewise, although the Court understands that, if the Arbitration and Class Action Waiver Provision takes effect, those schools will need to amend their enrollment agreements, the declarations—once again—provide no meaningful information about the extent of that cost. Rather, each simply recites the same boilerplate conclusion that implementing the required "changes will be enormously burdensome and disruptive to [the school's] educational mission." Dkt. 65-4 at 2 (Casanover Decl. ¶ 14); Dkt. 65-5 at 2 (Gourji Decl. ¶ 13); Dkt. 65-6 at 2 (Wood Decl. ¶ 13); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 2 (Weerasuriya Decl. ¶ 13); *see also* Dkt. 65-2 at 3 (Johnson Decl. ¶ 12) (referring to "enormous cost). It is well-established that such " 'broad conclusory statements' about the likelihood of harm" will not suffice. *Guttenberg v. Emery*, 26 F.Supp.3d 88, 102 (D.D.C. 2014) (quoting *Cornish v. Dudas*, 540 F.Supp.2d 61, 65 (D.D.C. 2008) ). In short, "[b]are allegations of what is likely to occur are of no value;" the movant must, instead, "*substantiate* the claim that irreparable injury is 'likely' to occur." *Wis. Gas Co.*, 758 F.2d at 674 (emphasis added).

Each of the five declarations from CAPPS member schools also refers to the "harm[ ]" they will suffer due to "the absence of arbitration and class action provisions in [their] enrollment agreements." Dkt. 65-4 at 2 (Casanover Decl. ¶ 9); Dkt. 65-5 at 2 (Gourji Decl. ¶ 9); Dkt. 65-6 at 2 (Wood Decl. ¶ 9); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 8). But, even putting aside the question whether requiring parties to litigate in court, as opposed to before an arbitrable tribunal, constitutes irreparable harm, none of the declarations says anything about when, if at all, such injury is likely to occur. Specifically, they say nothing **\*172** about how often they are confronted by covered legal claims brought by their students, about the nature of those claims, or about actual expense of litigating those cases, if any. Such "theoretical" or "[un]certain" losses, once again, will not suffice. *Wis. Gas Co.*, 758 F.2d at 674.

**[29]** As noted above, three declarations do assert, in identical language: "We currently have disputes in arbitration and are not certain how we could proceed with those disputes if the

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

[2016 Rule] goes into effect." Dkt. 65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 10). Notably, however, these declarations stop short of saying that the arbitrations would be affected by the rule; they merely assert that they are *uncertain* about how they could proceed. By definition, uncertainty falls short of the type of actual and imminent threat needed to show irreparable injury. *Wis. Gas Co.*, 758 F.2d at 674. One source of uncertainty, of course, is that nothing in the 2016 Rule prevents the parties to a existing dispute from agreeing to arbitrate, and, to the extent any pending case is on the eve of arbitration, it is not difficult to imagine that all parties might have an interest moving forward as planned. The Court, of course, can only speculate about what might happen because these three declarations devote only single, qualified sentence to matters "currently ... in arbitration." Dkt. 65-4 at 2 (Casanover Decl. ¶ 11); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 10). Because those declarations say nothing about the number of arbitrations, the nature of the disputes, whether the disputes clearly fall within the scope of the 2016 Rule (or whether the declarants are merely "[un]certain" about that question, *Wis. Gas Co.*, 758 F.2d at 674), whether the opposing parties would agree to continue the arbitrations, the cost of litigating the disputes, or even about the stage of the proceedings, they fail to advance the ball in any meaningful way. [4]

[30] At oral argument, CAPPS offered a further theory of irreparable injury—the CAPPS schools will sustain "reputational injury" stemming from the need to "zigzag" in their dealings with students. Dkt. 75 at 21. Today, member schools employ arbitration clauses and class action waivers; if the 2016 Rule takes effect, they will need to notify their students that they will not use these agreements; and, if the 2016 Rule is set aside, they will want to shift back to using arbitration clauses and class action waivers. To be sure, "[i]njury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F.Supp.3d 59, 103 (D.D.C. 2017). This, however, is not such a time. To start, the declarations from the individual schools that CAPPS submitted in support of its motion make **\*173** no mention of reputational harm. Moreover, the schools have a ready answer to any criticism they may face based on changes to their contracts; the changes are not a matter of whim, but rather, they are compelled by federal law. A preliminary injunction requires far more than the indefinite prospect that some students might mistakenly blame one or more CAPPS

schools for the "zigzag" required by implementation of the 2016 Rule.

[31] [32] [33] Finally, CAPPS argues that the arbitration and class action waiver provision "violates the Due Process Clause through its retroactive application to current contracts" and that a constitutional violation is *per se* irreparable. Dkt. 65 at 36. CAPPS is, of course, correct that "suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). But, even assuming that this principle extends to constitutional claims of the type at issue here, the mere assertion of a constitutional violation is not sufficient to establish irreparable injury. Because the alleged irreparable injury is the constitutional violation itself, the Court must consider whether the movant has established that it "is likely to suffer [that] harm"—that is, the constitutional injury—"in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 129 S.Ct. 365.

[34] [35] CAPPS does not come close to clearing that hurdle. It devotes just two sentences to its due process argument, Dkt. 65 at 33, and for good reason: To prevail on a due process challenge to retroactive application of an economic law, the movant must show that the government action bears no rational and legitimate relationship to the interest the government seeks to support. *See E. Enters. v. Apfel*, 524 U.S. 498, 549, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring). Indeed, in the words of the only majority opinion CAPPS cites, "[i]t is by now well settled that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that burden is on one complaining of a due process violation to establish that the [government] has acted in an arbitrary and irrational way." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). CAPPS offers no basis to conclude that the Department has crossed that deferential constitutional line by imposing a new condition on schools that participate in the Direct Loan Program, even though that condition extends to existing contracts.

The Court, accordingly, concludes that CAPPS has failed to carry its burden of demonstrating that it, or one of its members, is likely to incur some irreparable injury if the Arbitration and Class Action Waiver Provision is not preliminarily enjoined.

000058

Case 3:19-cv-03674-WHA  Document 56-3  Filed 11/14/19  Page 61 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

## B. Financial Responsibility Provision

CAPPS also asks that the Court preliminarily enjoin the Financial Responsibility Provision of the 2016 Rule. That provision amends the standards that the Department uses to determine whether a participating school is "financially responsible." *See* 20 U.S.C. § 1094(c)(1). The Secretary makes this determination by considering whether an institution is able (1) to provide the services described in its official publications and statements; (2) to provide necessary administrative resources; and (3) to meet all of its financial obligations. 20 U.S.C. § 1099c(c)(1). Pursuant to this authority, the Secretary has promulgated "financial ratios" regulations, which assign a school a "composite score" based on a calculation **\*174** of various indicators of an institution's financial viability. *See* 34 C.F.R. § 668.172. Under the composite score methodology, a school that achieves a score of 1.5 or greater may continue to participate in the Title IV programs without providing financial protection to the Department, while an institution with a score of less than 1.0 is deemed "not financially responsible" and must provide financial protection in order to participate. *See* 2016 Rule, 81 Fed. Reg. at 75,983. Those schools that are between 1.0 and 1.5 may continue to participate, but are "subject to increased reporting and monitoring." *Id.*

In response to concerns about identifying financial problems at participating schools at an early enough stage to ensure financial protection for the Department and taxpayers, *see* June 16, 2016 NPRM, 81 Fed. Reg. at 39,361, the 2016 Rule adds various events that can, either directly or indirectly, "trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities to the Department," 2016 Rule, 81 Fed. Reg. at 75,927.

First, there are a small number of triggers that automatically require a school to obtain a letter of credit without regard for any recalculation of its composite score. The "automatic" triggers apply if (1) the school "did not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds" in the most recent fiscal year; (2) a publicly traded school fails to file required reports with the Securities and Exchange Commission ("SEC"), is warned that it "may be suspended from trading" by the SEC or has been delisted by the exchange on which it trades, or "is not in compliance with exchange requirements;" or (3) the school has a "cohort default rate," which measures the extent to which students default on their loans, of greater than thirty

percent. 2016 Rule, 81 Fed. Reg. 76,074. The Department has emphasized that these triggers automatically require financial protection because they so clearly indicate that an institution is financially at risk. For example, "[a]n institution that fails the requirement to derive at least 10 percent of its revenues from non-[T]itle IV sources is so dependent on [T]itle IV, HEA funds as to make the loss of those funds almost certainly fatal ... [.] That risk requires financial protection regardless of the most recent composite score achieved by the institution." *Id.* at 75,984.

Second, there are a number of events that require the Department to recalculate an institution's composite score. *Id.* at 76,073. These triggers include (1) a requirement to pay any debt or "liability arising from a final judgment in a judicial" or administrative proceeding or settlement; (2) a suit brought "by a Federal or State authority for financial relief on a claim related to the making of the Direct Loan for enrollment at the school or the provision of educational services," but only if "the suit has been pending for 120 days;" (3) a suit that has made it past a motion for summary judgment (or the deadline for moving for summary judgment) or that is scheduled for a pretrial conference or trial; (4) a circumstance in which the school "was required to submit a teach-out plan ... that covers the closing of the [school] or any of its branches or additional locations;" (5) a Department calculation shows that the school's "gainful employment programs ... could become ineligible ... for the next award year" based on calculations of graduates' debt-to-earnings rates; or (6) "any withdrawal of owner's equity ... by any means" if the school operates for profit and its composite score is less than 1.5.[5] *Id.* **\*175** If the recalculated "composite score" is less than 1.0, the school must provide a letter of credit or other financial protection. *Id.*

CAPPS challenges this provision on various grounds, arguing that it exceeds the Secretary's authority under the HEA, 20 U.S.C. 1087d; violates the APA, 5 U.S.C. 702(2); and violates the Due Process Clause. Dkt. 65 at 25–28. The Court concludes that CAPPS has failed to establish standing or irreparable injury and, thus, does not reach the merits of CAPPS's arguments.

### 1. Standing

**[36]** **[37]** **[38]** **[39]** Although "there is ordinarily little question" that a plaintiff who "is himself an object" of a regulatory action has sustained some "injury" and thus has standing to sue, *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130, the question presented here is not so easy. The problem that

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 62 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

CAPPS faces is that, "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Commerce v. EPA,* 642 F.3d 192, 199 (D.C. Cir. 2011). Rather, "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered [or will suffer] an injury-in-fact." *Am. Chemistry Council v. Dep't of Transp.,* 468 F.3d 810, 820 (D.C. Cir. 2006). Here, however, not one of the declarations that CAPPS submitted from its member schools makes any mention of the Financial Responsibility Provision. Dkt. 65-4 (Casanover Decl.); Dkt. 65-5 (Gourji Decl.); Dkt. 65-6 (Wood Decl.); Dkt. 65-7 (Second Casanover Decl.); Dkt. 65-8 (Weerasuriya Decl.). No identified member even hints that it might be subject to one or more of the triggers that CAPPS seeks to challenge, and not one has indicated that it has incurred any compliance cost related to those triggers. *Cf. State Nat'l Bank of Big Spring v. Lew,* 795 F.3d 48, 53 (D.C. Cir. 2015) (regulated party alleged that it incurred costs in monitoring the program). In short, there is not even a passing reference to any present or future injury that any identified CAPPS member has or will sustain due to the Financial Responsibility Provision.

The only relevant evidence that CAPPS has offered appears in the Johnson and Gunderson declarations. Both declarations assert that CAPPS member schools will be subject to the triggers, but they do so without reference to a single member school. Absent the identification of a member likely to suffer an injury, these declarations fail to satisfy an essential requirement for establishing associational standing. That omission, moreover, is not simply a technical error. Without any evidence about how an identified member school is likely to be affected by the provision, the Court cannot determine whether the risk is minimal or substantial, whether the prospective loss is minor or great, or whether the school may have an alternative remedy, such as an APA action. CAPPS may well be able to cure this deficiency but, on the present record, the Court is left to conclude that CAPPS has failed "to show a substantial likelihood of standing" and, thus, "is not entitled to a preliminary injunction." *Food & Water Watch, Inc.,* 808 F.3d at 913 (internal citation omitted).

The Court need not, however, premise its decision on this ground alone because CAPPS has also failed to carry its burden **\*176** of showing that a specific member—or, indeed, any member—is likely to sustain an irreparable injury if the financial responsibility provision is not preliminarily enjoined.

### 2. *Irreparable Injury*

**[40]** The Court's conclusions with respect to injury-in-fact extend with even greater force to the question of irreparable injury. As explained above, not one of the declarations offered by a CAPPS member school so much as mentions the Financial Responsibility Provision. The Johnson and Gunderson declarations do address the provision, but they fail to show that any member will suffer any harm that is "certain and great," "actual and not theoretical," and "beyond remediation." *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297 (citations and quotation marks omitted). Johnson and Gunderson each attest that, if the rule takes effect, "CAPPS members w[ill] be subject to [the] triggers;" that some CAPPS members are currently defending lawsuits, and others "have been required to submit teach-out plans;" that CAPPS schools "have gainful employment programs that could become ineligible for Title IV;" that the triggers "would cause CAPPS members to post letters of credit;" and that "[o]btaining letters of credit or other financial protection" would require schools to incur "substantial fees and expenses," Dkt. 65-2 at 5 (Johnson Decl. Dkt. 65-3, 175 So.2d 592 at 3–4 (Gunderson Decl. ¶¶ 11–16). Johnson notes that these consequences would pose a particular hurdle for the "smaller institutions" that make up most of CAPPS's membership. Dkt. 65-2 at 5 (Johnson Decl. ¶ 26).

As to much of this, Johnson and Gunderson do not say when it is likely to occur. Each merely says, in conclusory terms and without explanation, that CAPPS members will be required to post letters of credit, but they do not indicate whether that is likely to happen in the next weeks or months or at some time years from now. Moreover, neither declaration provides any basis to conclude that any CAPPS school is likely to face a trigger that would *automatically* require a member school to obtain a letter of credit; they do not say, for example, that a CAPPS member has a cohort default rate in excess of thirty percent or is likely to be delisted from the exchange on which it trades. Even with respect to those triggers that simply require that the Department recalculate the school's "composite score," moreover, the Johnson and Gunderson declarations fail to establish any imminent threat of irreparable harm. Johnson says, for example, that "[m]any CAPPS schools are listed as defendants in lawsuits," Dkt. 65-2 at 5 (Gunderson Decl. ¶ 21), but he does not indicate whether those lawsuits have pending motions for summary judgment or whether the size of the claim for monetary relief in any of those cases is likely to push an otherwise acceptable "composite score" into the range requiring the posting of a letter of credit. 2016 Rule, 81 Fed. Reg. at 76,073. *See also*

000060

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 63 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

Dkt. 65-3 at 3 (Gunderson Decl. ¶ 12) (making similarly general assertions). Similarly, although Johnson asserts that CAPPS schools "have been required to submit teach-out plans" in the past, Dkt. 65-2 at 5 (Johnson Decl. ¶ 22), he does not say that any such demand is "likely" in the near future or that, even if it was, that the re-calculation of that school's "composite score" would require the posting of a letter of credit. *See also* Dkt. 65-3 at 3 (Gunderson Decl. ¶ 13) (same). And, finally, he asserts that CAPPS "schools have gainful employment programs that *could* become ineligible for Title IV," Dkt. 65-2 at 5 (Johnson Decl. ¶ 23) (emphasis added); *see also* Dkt. 65-3 at 3 (Gunderson Decl. ¶ 14) (same), but that assertion is—on its face—too speculative to support preliminary relief. *See Wis. Gas Co.*, 758 F.2d at 674.

**\*177** CAPPS has failed to demonstrate, moreover, that its members would be without a remedy if subject to an unlawful or arbitrary and capricious direction to post a letter of credit. At oral argument, CAPPS did not dispute that the APA, 5 U.S.C. § 706(2), would provide a cause of action, but argued that "the mere recalculation of the composite score requires notifying state agencies with possibly profound consequences" and added that "there [is] no guarantee the state agencies will [be willing to] wait until the outcome of" the APA action before taking adverse action against a school with an unacceptable composite score. Dkt. 75 at 36. That concern—without evidence that any CAPPS member will likely receive an unacceptable "composite score" due to the operation of the 2016 Rule *and* that a state agency will likely take adverse action before the school can obtain relief under the APA—is far too speculative to support a finding that any CAPPS member is "likely" to sustain an irreparable loss if the financial responsibility provision is not preliminarily enjoined. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 ("speculative" injury insufficient to support preliminary injunction).

Finally, CAPPS argues that the automatic triggers violate the rights of its members to procedural due process, Dkt. 65 at 41, and that any related injury is, accordingly, "per se irreparable," *id.* at 43. On the present record, however, it is far from clear that an aggrieved school would lack any opportunity to contest or to refute the Department's conclusions. *See, e.g.*, 2016 Rule, 81 Fed. Reg. at 76,074 (discussing challenges relating to the cohort default rate); *id.* at 76,006 ("an institution may show (1) that a reportable event no longer exists, has been resolved, or that it has insurance that will cover debts and liabilities that arise at any time from that triggering event; or (2) that the amount claimed in a

lawsuit ... exceeds the potential recovery the claimant may receive"). Indeed, CAPPS merely asserts that "the ability to contest a trigger exists on very narrow grounds" and "only for some, not all, of the triggers." Dkt. 72 at 25. That may be true, but the Court cannot discern whether any CAPPS member faces an imminent threat that it will be forced to post a letter of credit based on some set of facts that might escape review under the Financial Responsibility Provision. And, even if CAPPS had shown that at least one of its members might be required to obtain a letter of credit without an opportunity to contest the Secretary's decision, it has not shown that its members have the type of interest in participating in the Title IV program that even implicates the Due Process Clause. *See Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 867 (D.C. Cir. 1992) (noting that a "Program Participation Agreement confers upon member schools no legally protectible interest in ... continued eligibility" for a Title IV program). Absent any such evidence, or argument, the Court cannot conclude that CAPPS has demonstrated that it, or any of its members, is likely to suffer an imminent constitutional injury.

The Court, accordingly, concludes that CAPPS has failed to carry its burden of showing that it, or one of its members, is entitled preliminarily to enjoin the Financial Responsibility Provision.

## C. Repayment Rate Provision

Next, CAPPS seeks preliminarily to enjoin the Repayment Rate Provision. Under that provision, "the Secretary calculates a proprietary [school's] loan repayment rate[ ] for the cohort of borrowers who entered repayment on their [Title IV loans] at any time during the two-year cohort period." 2016 Rule, 81 Fed. Reg at 76,070. If that calculation shows "that the median borrower has not either fully repaid ... or made loan **\*178** payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's [Title IV loans] received for enrollment [at] the [school], the [school] must, in all of its promotional materials that are made available to prospective or enrolled students, ... include a loan repayment warning in a form, place, and manner prescribed by the Secretary in a notice published in the Federal Register." *Id.* at 76,071. Unless otherwise specified in the forthcoming regulation, the warning language must provide: "U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans." *Id.* To date, the Department has yet to promulgate a rule specifying the form, place and manner for the required notice. Dkt. 69 at 15 (noting that "the Department

has not yet published any notice that specifies the form, place, and manner that would be required for such warnings").

CAPPS raises a host of challenges to this provision, both statutory and constitutional. It argues that the Secretary lacked statutory authority to adopt the rule; that it was adopted in violation of the APA; and that it will violate the First Amendment rights of those schools required to provide the mandated warning. *See* Dkt. 65 at 31–35. Once again, however, the Court declines to reach the merits because CAPPS has failed to establish that it has standing or that it or any member faces an imminent threat of irreparable injury.

### 1. *Standing*

 **[41]**  As with the Financial Responsibility Provision, in order to establish associational standing to challenge the Repayment Rate Provision, CAPPS must show that "at least one specifically-identified member has suffered [or will suffer] an injury-in-fact." *Am. Chemistry Council*, 468 F.3d at 820. At the preliminary injunction stage, this means that CAPPS bears the burden of establishing "a 'substantial likelihood' " that it will be able to prove that an identified member will suffer an injury as a result of the Repayment Rate Provision. *Food & Water Watch, Inc.*, 808 F.3d at 913. It has failed to do so.

CAPPS submitted seven declarations in support of its motion, yet only one—the Johnson declaration—even mentions the Repayment Rate Provision, and that declaration fails to meet CAPPS's burden. It merely asserts (1) that the 2016 Rule requires for-profit, participating schools, "in certain circumstances[,] to include in all promotional materials a loan repayment rate warning," and (2) that "[a]ny visitor of a school's website or reader of its promotional materials will unjustifiably view the institution[ ] as being financially unstable and ill-equipped to prepare [its] students to succeed financially upon graduation." Dkt. 65-2 at 6 (Johnson Decl. ¶¶ 29–30). The declaration does not identify a single member school with a repayment rate that is sufficiently low that the school faces a concrete threat that it will be required to provide the mandated notice. And, indeed, the declaration does not even posit that some unidentified member school faces such a threat. Because CAPPS has failed to offer any evidence that any specific member school is likely to be subject to the challenged provision, it has failed to carry its burden of establishing a substantial likelihood that it has standing to challenge the Repayment Rate Provision.

### 2. *Irreparable Injury*

 **[42]**  CAPPS's claim to irreparable injury is on even weaker ground. To start, absent evidence that any specific CAPPS member is likely to find itself subject to the new rule, CAPPS cannot establish irreparable injury. At oral argument, moreover, **\*179**  the Department removed any doubt regarding the risk that a CAPPS member school is likely to be harmed if the Court does not preliminarily enjoin the Repayment Rate Provision. As noted above, the 2016 Rule expressly contemplates that the Department will publish a notice in the Federal Register regarding the form, place, and manner of the required notice. *See* 2016 Rule, 81 Fed. Reg. at 76,071 (noting that the warning will be "in a form, place, and manner prescribed by the Secretary in a notice published in the Federal Register). At oral argument, the Court asked whether the Department would enforce the Repayment Rate Provision before that notice would be issued, and the Department represented—in unqualified terms—that it will not take any enforcement action before the notice issues. Dkt. 75 at 122–23. That is unlikely to occur anytime soon, moreover, because the Department further represented the notice will "go through notice and comment rulemaking," *id.* at 52, and will not take effect for at least thirty days following the promulgation of a final notice. *See* 5 U.S.C. § 553(d).

Plaintiff asserts three potential injuries relevant to this provision: "reputational injury, financial harm, and deprivation of their constitutional rights." Dkt. 65 at 35. All of these harms, however, turn on the premise that at least one member school will be subject to the Repayment Rate Provision, and on the (incorrect) premise that the Department will enforce the provision in the near future. At oral argument, CAPPS suggested that First Amendment harms are *sui generis* and that the mere *risk* of future enforcement may be enough to pose an irreparable injury. Dkt. 75 at 28. But the cases that recognize that type of harm are premised on the chilling effect that a speech-regulating rule might have. *See, e.g., Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (in order to make out claim of irreparable harm, "moving parties must also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct"). A risk of criminal prosecution for marching in parade, for example, might dissuade plaintiffs from attending, and that chill could provide a basis for seeking preliminary relief. This case, however, is different in kind: CAPPS has failed to even identify any speech that could be chilled by the Repayment Rate Provision. In short, no substantial First Amendment

000062

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 65 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

issue will be presented until a member school faces some risk that it will be required to issue the warnings, and that risk is non-existent at least until the Department promulgates the required notice.

The Court, accordingly, concludes that CAPPS has not made the requisite showing to entitle it to a preliminary injunction with respect to the Repayment Rate Provision.

### D. Borrower Defense Provision

The final portion of the 2016 Rule that CAPPS seeks to enjoin is the Borrower Defense Provision. As State Amici note, the parties at times conflate two distinct processes. Dkt. 67 at 49. The first process is addressed in the 2016 Rule, and it amends the way in which student borrowers may assert "defenses" to repayment of loans made to them by the Department under Title IV, *see* 20 U.S.C. § 1087e(h). Under the 2016 Rule, student-borrowers may now raise "defenses" to repayment affirmatively; that is, they need not default on a loan and wait to assert a defense to repayment in a collection action. 2016 Rule, 81 Fed. Reg. at 76,083. In addition, the 2016 Rule changes the standard for what constitutes a defense to repayment. In the past, student-borrowers could only invoke defenses to repayment premised on violations of state law. **\*180** 34 C.F.R. § 685.206(c)(1). But, under the 2016 Rule, they may now rely on a new, federal standard applicable to loans dispersed on or after July 1, 2017. 2016 Rule, 81 Fed. Reg. at 76,083. That new standard is available if (1) "the borrower ... has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal;" (2) "the school the borrower received a Direct Loan to attend failed to perform its obligations under the terms of a contract with the student;" or (3) "the school or any of its representatives ... made a substantial misrepresentation ... that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan." *Id.* Finally, the new Borrower Defense Provision authorizes "the Secretary [to] initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense." *Id.* at 76,084.

The second process begins where the first ends and contemplates that the Department, having relieved a student-borrower, in whole or in part, of his or her obligation to repay a Direct Loan, may seek to recover the amount due from the student's school. 34 C.F.R. § 685.206(c)(3). Among other potential theories of recoupment, the 2016 Rule provides that

"the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school." NPRM, 81 Fed. Reg. at 39,353. As the Department explained in the final 2016 Rule, it intends to "undertake any action to recover against a school under specific procedures that are being developed and will ensure an opportunity for the school to present its defense and [to] be heard." 2016 Rule, 81 Fed. Reg. at 75,960. Those procedures "will be comparable to that provided" under existing regulations "for actions to find, or to limit, suspend or terminate participation of, a school;" "[t]he hearing will be conducted by a Department official who is independent of the component of the Department bringing the action;" and "[a]ny decision reached in these proceedings would be reviewable under section 706 of the APA." *Id.* Although the 2016 Rule permits "the school of the borrower" to offer certain "evidence or argument" in the proceeding between the student-borrower and the Secretary, *id.* at 76,084, the Department has represented to the Court that it will not invoke collateral estoppel to bind the school with respect to findings made in that proceeding, Dkt. 75 at 83–84.

CAPPS challenges both processes. It challenges the Department's authority to adopt the new Borrower Defense Provision and argues that, in any event, the provision is arbitrary and capricious and not the product of reasoned decision making under the APA. Dkt. 65 at 38–43. And it argues that both steps in the process violate the Due Process Clause, Article III, and the Seventh Amendment "because Department officials are responsible for both prosecuting and hearing cases," and because "agency officials" are authorized "to adjudicate what in essence is a private right." *Id.* at 43. Once again, however, the Court declines to reach the merits of CAPPS's arguments because it has yet to demonstrate that CAPPS has standing to challenge any final rule and has not carried its burden of establishing irreparable injury.

### 1. *Standing and Ripeness*

**[43]** To the extent CAPPS challenges the standards and procedures applicable to the proceeding between the student-borrower and the Secretary, it has yet to show that it has standing. As clarified at **\*181** oral argument, that proceeding is not binding on the relevant school; it binds only the student-borrower. Dkt. 75 at 6–8. The question, then, is—if the new rules governing the process between the student-borrower and the Department are not set aside—what "concrete and

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

particularized" and "actual and imminent" injury, *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, will any CAPPS member likely suffer? Or, more precisely because we are at the preliminary injunction phase, what has CAPPS offered to show that there is a "substantial likelihood" that it will be able to carry its burden of proving that at least one identified CAPPS member will suffer a concrete and imminent injury? *Food & Water Watch, Inc.*, 808 F.3d at 913.

At least at this stage of the proceeding, CAPPS has failed to carry this burden. Notably, not one of the seven declarations that CAPPS has submitted so much as mentions the Borrower Defense Provision. Not a single school has indicated that the rule will affect its conduct in any way or that a proceeding between a student-borrower and the Secretary is likely to have any effect on the school. It is possible that CAPPS might eventually show that the proceeding between a student-borrower and the Secretary—which is not binding on the school—will cause a member school some cognizable injury-in-fact. Thus far, however, it has not done so.

[44]  [45]  [46]  [47] To the extent that CAPPS instead, challenges the Department's authority to bring a recoupment action against a CAPPS member school, that challenge faces both standing and ripeness difficulties. Ripeness is a justiciability doctrine designed " 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.' " *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ); *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007). "The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' " *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808, 123 S.Ct. 2026 (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57, n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ). "Determining whether an administrative action is ripe for judicial review requires" the Court to "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507).

For the most part, the standing and ripeness issues raised by CAPPS's challenge to the Department's recoupment authority overlap. As the Department explained in the final 2016 Rule, it is still "develop[ing]" procedures to govern actions

"to recover against a school" based on loan obligations the Department decides to relieve under the new Borrower Defense Provision. 2016 Rule, 81 Fed. Reg at 75,960. Before such an action could commence, a student-borrower from a CAPPS member school would need to institute a borrower-defense action; the Department would need to decide that action in favor of the student; the Department would need to develop procedures governing a recoupment action; and the Department would need to bring such an action. The Court cannot discern on the present record whether—and, if so, when—a CAPPS member would be subject to a proceeding to recoup amounts foregone in a borrower-defense proceeding.

Even putting this threshold difficulty aside, CAPPS has yet to demonstrate that its challenge to the recoupment process is **\*182** ripe for decision. To take one example, with the evidence now before it, the Court cannot determine whether the Department might seek to recover from a participating school based on a violation of the new, federal standard, or whether it would simply seek to recover based on the theory that it is subrogated to, or has been assigned, whatever rights the student borrower may have had against the school under state law. *See* 2016 Rule, 81 Fed. Reg. at 76,086. To take another example, CAPPS argues that the recoupment procedure is unconstitutional because the same "Department officials are responsible for both prosecuting and hearing cases," Dkt. 65 at 65, but the Court cannot evaluate that premise before the Department has finalized the rules that will govern those proceedings, *see* 2016 Rule, 81 Fed. Reg at 75,960. Because these questions and others that bear on CAPPS's challenge remain unanswered, the Court concludes that CAPPS has not shown a "substantial likelihood" that it will be able to establish that the challenge is fit for review. [6]

Finally, given the undisputed availability of APA review of any final recoupment decision, *see* 2016 Rule, 81 Fed. Reg. at 95,960, it has not shown that the association or its members will face a significant "hardship" if review is postponed.

### 2. *Irreparable Injury*

[48]  [49] Even if CAPPS has standing to bring a ripe challenge to some portion of the Borrower Defense Provision, CAPPS makes no plausible claim to irreparable injury. As noted above, none of CAPPS's declarations even mentions the Borrower Defense Provision and, as far as the Court can discern on the current record, there is no prospect that the Department will initiate a recoupment action against a CAPPS member school in the near future. Moreover, even if the

000064

Case 3:19-cv-03674-WHA Document 56-3 Filed 11/14/19 Page 67 of 342

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

361 Ed. Law Rep. 677

Department were to do so, CAPPS does not dispute that the Department's decision would be subject to APA review, and a harm that can be remedied under the APA is not irreparable.[7]

At oral argument, CAPPS suggested that, even if the result of a proceeding between a student-borrower and the Secretary is not binding on the student's school, a finding by the Secretary that the student should be relieved of its obligation to repay a student loan due to a breach of contract or a misrepresentation by the school "would obviously have a reputational damage" to the school. Dkt. 75 at 9. That assertion, however, is once again unsupported by any evidence and is far from self-evident. Indeed, when asked at oral argument, the Department represented that its decisions in proceedings between student-borrowers and the Department will not be published in the Federal Register. Dkt. 75 at 84; *see also id.* at 9. And, although it is possible that such a decision might be subject to a FOIA request, **\*183** *id.* at 84, it is speculative—at best—to suggest that a student from an unidentified CAPPS member school might someday bring a successful borrower defense claim that reflects poorly on that school; that someone would obtain that decision under FOIA or some other disclosure statute; and that the disclosure of the decision would cause the school some material, reputational damage above and beyond whatever accusations of wrongdoing are already public. At least on the present record, this theory does not demonstrate that type of "actual and not theoretical" harm necessary to support a preliminary injunction. *Wis. Gas Co.,* 758 F.2d at 674.

The Court, therefore, must deny CAPPS's motion with respect to the Borrower Defense Provision.

\* \* \*

In sum, the Court concludes that CAPPS has failed to carry its burden of demonstrating that it is entitled to the "extraordinary remedy" of a preliminary injunction. *Winter,* 555 U.S. at 24, 129 S.Ct. 365. With respect to many of CAPPS's challenges, the Court is not convinced that the association has shown a "substantial likelihood" that it has standing to sue. *Food & Water Watch, Inc.,* 808 F.3d at 913. With respect to some challenges, that conclusion is clear, while it is less certain as to others. But, as to each of the challenges that CAPPS raises in the pending motion, it falls well short of the "high standard for irreparable injury" that the Court of Appeals "has set." *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297. Because the likelihood that the movant will suffer an irreparable injury is the *sine qua non* for issuance of a preliminary injunction, that flaw is dispositive. *See, e.g., Chaplaincy of Full Gospel Churches,* 454 F.3d at 297; *Achagzai,* 2016 WL 471274, at \*3–4; *Texas Children's Hosp.,* 76 F.Supp.3d at 241–42; *Trudeau v. FTC,* 384 F.Supp.2d at 296. The Court will, accordingly, deny CAPPS's motion for a preliminary injunction and set a schedule for cross-motions for summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff's renewed motion to for preliminary injunction, Dkt. 65, is hereby **DENIED**.

**SO ORDERED**.

### All Citations

344 F.Supp.3d 158, 361 Ed. Law Rep. 677

Footnotes

1   The Department of Education now notes that it "will not publish by November 1, 2018 a final rule rescinding the 2016 Rule," but that "the Department remains committed to rescinding the 2016 Rule, for all of the reasons set forth in the 2018 NPRM." Dkt. 69 at 2.

2   On September 22, 2018, CAPPS sought reconsideration of the Court's decision granting the *Bauer* plaintiffs leave to intervene based on new evidence. Dkt. 64. The motion has been fully briefed, Dkt. 71, Dkt. 73, and is pending.

3   Defendants respond to CAPPS's allegations of harm with respect to this provision by pointing out that a school could elect to forego Title IV funding and continue employing predispute arbitration agreements and class action waiver provisions. Dkt. 68 at 28; Dkt. 69 at 11–12. CAPPS, in turn, argues that this only serves to "severely exacerbate[ ] the prospect of irreparable injury." Dkt. 65 at 22. CAPPS has not suggested, however, that any one of its member schools is likely to make this choice with respect to the Arbitration and Class Action Waiver Provision or any other provision they have sought

California Association of Private Postsecondary Schools v...., 344 F.Supp.3d 158...

Case 3:19-cv-03674-WHA   Document 56-3   Filed 11/14/19   Page 68 of 342

361 Ed. Law Rep. 677

to preliminarily enjoin. The Court, accordingly, does not consider whether the loss of Title IV funding would constitute irreparable harm.

4     The declarations of all five member schools also make the qualified claim that, if they "cannot include arbitration provisions in [their] enrollment agreements, the agreements will be difficult if not impossible to amend at a future date" to reincorporate predispute arbitration agreements and class action waivers. Dkt. 65-4 at 2 (Casanover Decl. ¶ 12); Dkt. 65-5 at 2 (Gourji Decl. ¶ 12); Dkt. 65-6 at 2 (Wood Decl. ¶ 12); Dkt. 65-7 at 2 (Second Casanover Decl. Dkt. 65-8 at 1 (Weerasuriya Decl. ¶ 11). Again, the qualification bears consideration. The declarations notably stop short of asserting that it would, in fact, be impossible to amend the agreements at a future date, presumably because they want to keep that option open. "Difficult" is very different from "impossible," yet the declarations offer no insight into what might be required. They do not indicate, for example, whether it would be permissible for the schools to include fallback language in their enrollment agreements that would become operative when, and if, the Arbitration and Class Action Waiver Provision is set aside.

5     The 2016 Rule also recognizes certain "discretionary" triggers, which require a school to provide letters of credit when the "Secretary demonstrates that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution." Id. at 76,074 (providing a non-exhaustive list of examples, such as failure of a financial stress test and high annual dropout rates).

6     To be sure, portions of CAPPS's challenge might be; to the extent CAPPS argues that the Department is entirely without authority to seek recoupment, for example, a challenge to the provision assigning the borrower's right to a loan refund to the Secretary might be fit for adjudication. But, even as to that more limited challenge, CAPPS has not carried its burden of showing that an *identified* member school faces an actual threat of injury.

7     CAPPS does assert in its brief that the provision will require CAPPS member schools to "expend substantial transition costs to comply with these new regulations;" which will cause a "diversion of resources from schools' mission of educating students;" and will cause a "regulatory whiplash," if the Department later rescinds the rule. Dkt. 65 at 43–44. None of that, however, is supported by any evidence, nor is it self-evident that any CAPPS members will sustain any loss related to the Borrower Defense Provision in the near future.

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3



PROUD SPONSOR *of*
*the* AMERICAN MIND ®

Posted Date: March 15, 2019

Author: Office of Postsecondary Education (OPE)

Subject: Guidance Concerning Some Provisions of the 2016 Borrower Defense to Repayment Regulations

*The U.S. Department of Education (Department) has determined that this guidance is significant guidance under the Office of Management and Budget's, Final Bulletin for Agency Good Guidance Practices.[i] Significant guidance is non-binding and does not create or impose new legal requirements.  The Department is issuing this guidance to provide institutions of higher education with information to assist them in meeting their obligations under the Higher Education Act of 1964 and implementing regulations, specifically at 34 CFR 668.41, 668.171, and 685.300 that the Department enforces. [ii]*

On November 1, 2016, the Department of Education published final regulations concerning borrower defense to repayment and other related matters in the *Federal Register* (81 Fed. Reg. 75,926).  The original effective date (July 1, 2017) of these regulations was delayed by the Department, but by order of the U.S. District Court for the District of Columbia in the case *Bauer et al. v. DeVos*, Civil Action No. 17-1330 (RDM) the 2016 Final Regulations took effect.

## The Borrower Defense to Repayment Standard

The 2016 Final Regulations established a federal standard for borrower defense to repayment applications based upon judgments against institutions, breaches of contract by institutions, and substantial misrepresentations by institutions, in 34 C.F.R. § 685.222.  This standard will be applied for borrower defense to repayment claims asserted as to loans first disbursed on or after July 1, 2017.

## The Financial Responsibility Events, Actions, and Conditions

Among other things, the 2016 Final Regulations included revisions to the Department's regulations in 34 CFR 668.171, specifying the standards institutions must meet to be deemed financially responsible.  The 2016 Final Regulations, in 34 CFR 668.171(h), require institutions to notify the Secretary within specified timeframes for any of the following events, actions, or conditions that occur on or after July 1, 2017.  Cites below refer to the locations of the definitions of each event, condition, or action, which you may see in the 2016 Final Regulations, at 81 Fed. Reg. 76,073 to 76,074 (pages 148-149 of the linked pdf):

- *Debts, liabilities, and losses* (34 CFR 668.171(c)):
  - o The institution has a debt or liability arising from a final judgment/determination (judicial or administrative proceeding) or from settlement.
  - o A lawsuit against the institution is brought by a Federal or State authority after July 1, 2017, on claims related to the making of a Direct Loan or the provision of educational services, which has been pending for more than 120 days.
  - o A lawsuit (other than the type already noted) against the institution is brought after July 1, 2017, where summary judgment motions have not been filed under certain circumstances or the institution's summary judgment motion has been denied.
  - o The institution is required by its accrediting agency to submit a teach-out plan.
  - o For an institution with a composite score less than 1.5, any withdrawal of owner's equity from the institution, unless the transfer is to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated.
- *Non-Title IV revenue* (violation of the 90/10 requirement)(34 CFR 668.171(d)): If the institution did not derive at least 10 percent of its revenue from non-Title IV programs.
- *For publicly-traded institutions* (34 CFR 668.171(e)): Certain actions by the U.S. Securities and Exchange Commission ("SEC") or stock exchange on which the institution's stock is listed.
- *Discretionary factors or events* (34 CFR 668.171(g)):
  - o The institution has received a citation by a state licensing or authorizing agency for failing state or agency requirements.
  - o The institution has been placed on probation or issued a show-cause order by an accrediting agency for a failure to meet an agency standard.

- The institution has violated a provision or requirement in a loan agreement and there has been a default or delinquency under the agreement enabling the creditor to require an increase in collateral, a change in the contract, an increase in interest rates or payments, or other sanctions, penalties, or fees.

**Notifications of Financial Responsibility Actions, Events, or Conditions Occurring Between July 1, 2017, and the Present**

We recognize that some institutions may have had one or more of the events, actions, or conditions occur between July 1, 2017, and the date of this announcement and, in light of the delays and court orders, are uncertain about how to comply with these financial responsibility requirements.

For the majority of the financial responsibility standards addressing the debts, liabilities, and losses under 34 CFR 668.171(c), we recognize that the impact of such events will have been reflected in the institution's most recent financial statement submitted after July 1, 2017.  As a result, an institution needs to submit a separate notification to the Department of the following events occurring after the fiscal year end for the most recent annual audit submission submitted to the Department:

- *Debts, liabilities, and losses*
  - The institution has a debt or liability arising from a final judgment/determination (judicial or administrative proceeding) or from settlement.
  - The institution is required by its accrediting agency to submit a teach-out plan.
  - For an institution with a composite score less than 1.5, any withdrawal of owner's equity from the institution.

For lawsuits, we will require institutions to notify the Department of:

- A lawsuit against the institution brought by a federal or state authority after July 1, 2017, on claims related to the making of a Direct Loan or the provision of educational services, which has been pending for more than 120 days <u>and which is still pending as of the date of this announcement</u>.
- A lawsuit (other than the type already noted) <u>that is still pending as of the date of this announcement</u> against the institution and was brought

after July 1, 2017, where summary judgment motions have not been filed under certain circumstances or an institution's summary judgment motion has been denied.

For non-Title IV revenue (violations of the 90/10 requirement), an institution must notify the Department 45 days after the end of the institution's first fiscal year beginning on or after July 1, 2017.

For certain actions by the SEC or stock exchange on which the institution's stock is listed for publicly-traded institutions, institutions must notify the Department of all such events occurring after July 1, 2017.

For state licensing or authorizing agency citations and accreditor show-cause orders or accreditor-imposed probation status, institutions must notify the Department of all such events occurring after July 1, 2017, <u>unless they have been resolved as of the date of this announcement</u>.

For violations of a requirement in a loan agreement, institutions must notify the Department of all such events occurring after July 1, 2017.

***Notifications should be sent to [FSAFRN@ed.gov](mailto:FSAFRN@ed.gov) within 60 days of this electronic announcement.***

**Contact Information**

We appreciate your diligence in maintaining compliance with the Title IV regulations.  For help with notifications, please contact Tiffany Hill at [Tiffany.Hill@ed.gov](mailto:Tiffany.Hill@ed.gov).

**<u>The Class Action Bans and Predispute Arbitration Agreements Provisions</u>**

The 2016 Final Regulations also included revisions to the Department's regulations in 34 CFR 685.300 covering agreements between an eligible institution and the Secretary for participation in the Direct Loan Program.  Generally, these revisions include prohibitions on:

- *Internal dispute resolution* (34 CFR 685.300(d)).  An institution may not compel any student to pursue a complaint based upon a "borrower defense claim" (generally, a claim that is or could be asserted as a borrower defense claim by a borrower under the Department's administrative process, see below) through an internal dispute process

before the student presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

The Department's administrative process allows a Direct Loan borrower to request a discharge of the borrower's loan based upon an act or omission of the institution attended by the student that relates to the making of a Direct Loan for enrollment at the institution or the provision of educational services for which the loan was provided, under standards established in the Department's regulations at 34 CFR 685.206(c) and 34 CFR 685.222.

- *Class action bans* (34 CFR 685.300(e)).  An institution may not seek to rely in any way on a predispute arbitration agreement or other predispute agreement with a student who has obtained or benefited from a Direct Loan with respect to any aspect of a class action that is related to a borrower defense claim (as defined above).
- *Predispute arbitration agreements* (34 CFR 685.300(f)).  An institution may not enter into or seek to rely in any way on a predispute agreement to arbitrate a borrower defense claim (as defined above), or any aspect of a borrower defense claim, with a student who obtained or benefited from a Direct Loan.

In addition to the prohibitions above, institutions must submit certain records to the Department:

- *Arbitral records* (34 CFR 685.300(g)).  An institution must submit copies of certain records in connection with any claim filed in arbitration by or against the institution concerning a borrower defense claim.
- *Judicial records* (34 CFR 685.200(h)).  An institution must submit copies of certain judicial records in conjunction with any claim concerning a borrower defense claim filed in a lawsuit by the institution against the student or by any party, including a government agency, against the institution.

Because the 2016 Final Regulations are now in effect, institutions are required to implement these changes.

Nothing in these regulations prohibits an institution from having and enforcing a mandatory predispute arbitration requirement or class action ban in connection with any claim not concerning a borrower defense claim or in connection with any claim asserted by a student who is not a Direct

Loan borrower.  A claim is not a borrower defense claim if it is not based upon an act or omission of the institution attended by the student that relates to the making of a Direct Loan for enrollment at the institution or the provision of educational services for which the loan was provided, such as a personal injury tort claim or a sexual or racial harassment claim.  The regulations, at 34 CFR 685.300(e)(3) and (f)(3), specifically note that the issue of whether a claim is "a claim regarding the making of a Direct Loan or the provision of educational services for which the loan was provided," (*i.e.,* a borrower defense claim) is to be decided by the court.

In addition, as explained in 34 CFR 685.300(f)(1)(ii), a student may enter into a voluntary post-dispute arbitration agreement with an institution to arbitrate a borrower defense claim.  In other words, these regulations do not prohibit an institution from providing an arbitration process for students who have borrower defense claims, or any other claims, who voluntarily agree to arbitration after a grievance has been raised with the institution.

**Implementation of the 2016 Final Regulations for Existing Predispute Arbitration Agreements and Class Action Bans**

We recognize that some institutions may have entered into mandatory predispute arbitration agreements or other predispute agreements addressing arbitration and class action bans between the 2016 Final Regulations' original effective date of July 1, 2017, and the date of this announcement.  Although such agreements cannot be enforced in relation to any borrower defense claim made by a Direct Loan recipient, the Department recognizes that institutions may need time to prepare new enrollment agreements that omit such mandatory predispute arbitration requirements or include the language specified by the regulations if the agreements address arbitration and class action bans.  Institutions need not issue new enrollment agreements or contracts to students who may have accepted the terms of such a predispute arbitration agreement or class action ban in an earlier enrollment agreement or contract, but may instead provide written notification to those students that such agreements will not be enforced with respect to borrower defense claims for Direct Loan recipients.  Therefore, institutions may do either of the following to comply with the requirements of revised 34 CFR 685.300:

- *Amend the mandatory predispute arbitration agreement within <u>60 days of this announcement</u>*, to contain the language specified in 34 CFR

685.300(f)(3)(iii)(A) (see Appendix) and, if the agreement also addresses class actions or there is a separate predispute agreement addressing class actions, to contain the language specified in 34 CFR 685.300(e)(3)(iii)(A) (see Appendix);

OR

- *Within 60 days of this announcement, begin complying with the notice requirements.*  Institutions may also choose, within 60 days of this announcement, to begin providing notice to students that mandatory predispute arbitration agreements will not be enforced for borrower defense claims, no later than at the point of exit counseling or the date on which the institution files its initial response to a demand for arbitration or service of a complaint from a student who has not already received a notice or amended agreement.  Institutions may also achieve compliance by providing notice to all impacted students now, if they choose.  The content of the notice is specified in 34 CFR 685.300(f)(3)(iii)(B) (see Appendix) as to existing predispute arbitration agreements.  The content of the notice for a class action ban — whether in an existing predispute arbitration agreement or in a separate predispute agreement — is specified in 34 CFR 685.300(e)(3)(iii)(B) (see Appendix).

The regulation is clear on the requirements for predispute arbitration agreements and other predispute agreements entered into after the 60 day window provided in this announcement.

Finally, the unenforceability of predispute arbitration agreements and class action bans under 34 CFR 685.300 also applies in the context of an arbitration proceeding between an institution and a student under the circumstances described in the regulation (*i.e.*, if the proceeding relates to a borrower defense claim, as defined above and in the regulation, and the student involved in the arbitration with the institution is a Direct Loan recipient) that was ongoing as of October 16, 2018, and was initiated pursuant to a predispute arbitration agreement.  A student involved in an ongoing arbitration may choose to continue with the arbitration process toward a final conclusion but has no obligation to do so under the regulation.

For institutions with arbitrations that are ongoing and not final at the time of this announcement, institutions must provide students with the notice(s) described above within 10 days of this announcement.  Institutions may continue to offer voluntary opportunities for students to engage in arbitration on issues related to a borrower defense claim after a grievance has been raised, but institutions may not require a Direct Loan recipient to engage in arbitration prior to filing a borrower defense claim.  Institutions may also continue to enforce mandatory predispute arbitration agreements or bans on class action suits for complaints unrelated to a borrower defense claim; however, the court is to make the determination as to whether the claim is a borrower defense claim.

**Submission of Arbitral and Judicial Records**

For any dispute in arbitration based on a borrower defense claim that was pending as of July 1, 2017,  or initiated after July 1, 2017, a copy of the arbitral records specified in 34 CFR § 685.300(g) should be sent to borrowerdefense@ed.gov.

For any lawsuit based on a borrower defense claim that was pending as of July 1, 2017, or initiated after July 1, 2017, a copy of the judicial records specified in 34 CFR 685.300(h) should be sent to borrowerdefense@ed.gov.

Institutions must submit existing records no later than 90 days of this electronic announcement and must comply with the timeframes set forth in the regulations for submission of future records.

**Contact Information**

We appreciate your diligence in maintaining compliance with the Title IV regulations.  For help with submission of arbitral and judicial records, contact Sara Hayhurst at Sara.Hayhurst@ed.gov.

**Repayment Rate and Financial Protection Disclosures**

The 2016 Final Regulations also added a requirement, 34 CFR 668.41(h), that for a proprietary institution that does not meet a certain loan repayment rate for the majority of its student loan borrowers, the institution must include a specified warning in its promotional materials that are made available to prospective or enrolled students.  As contemplated by 34 CFR

668.41(h)(3)(i)(A), the Department will inform institutions of the form, place, and manner that the warning must appear in institutions' promotional materials in an upcoming *Federal Register* notice.  Further, the Department will be engaging in consumer testing in the near future to ensure the warning is meaningful and helpful to students.  As a result, institutions will be informed through future *Federal Register* notices about when and how they must provide repayment rate warnings to students in the future and of any changes to the content of the warning.

The 2016 Final Regulations also added a requirement, 34 CFR 668.41(i), that all institutions deliver a disclosure to enrolled and prospective students regarding the occurrence of certain triggering events that are indicators of financial responsibility or other events.  As specified in 34 CFR 668.41(i)(2) and (3), the Department will be engaging in consumer testing in the near future to determine the triggering events for which disclosure will be required and to determine the form of the disclosure to ensure the disclosure is meaningful and helpful to students.  As a result, institutions do not need to provide the disclosure to students until further notice from the Department.

Appendix

To amend predispute agreements covered by 34 CFR 685.300, institutions must include the following provisions:

- For predispute arbitration agreements, under 34 CFR 685.300(f)(3)(iii)(A):

    *We agree that neither we nor anyone else who later becomes a party to this predispute arbitration agreement will use it to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to other claims.  We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.*

- For predispute arbitration agreements that address class actions, pursuant to 34 CFR 685.300(e)(3)(iii)(A):

  *We agree that neither we nor anyone else who later becomes a party to this agreement will use this agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.*

For institutions deciding to provide notices to students rather than amend the original predispute agreements, the notices must contain the following language:

- For predispute arbitration agreements, under 34 CFR 685.300(f)(3)(iii)(B):

  *We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.*

- For predispute arbitration agreements, or other predispute agreements addressing class actions under 34 CFR 685.300(e)(3)(iii)(B):

> *We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court.  You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained.  We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.*

---

[i] 72 Fed. Reg. 3432 (Jan. 25, 2007).  See https://www.gpo.gov/fdsys/pkg/FR-2007-01-25/pdf/E7-1066.pdf.

[ii] If you are interested in commenting on this guidance, please email your comment to Annmarie Weisman at Annmarie.Weisman@ed.gov and Linda Shewack at Linda.Shewack@ed.gov or write to us at the following address:

> Annmarie Weisman or Linda Shewack
> U.S. Department of Education
> 400 Maryland Avenue SW
> Washington, DC 20202

For further information about the Department's guidance processes, please visit https://www2.ed.gov/policy/gen/guid/significant-guidance.html).  Author:  Federal Student Aid and Office of Postsecondary Education.

# EXHIBIT 4

aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

*F. Environment*

We have analyzed this rule under Department of Homeland Security Directive 023–01 and Commandant Instruction M16475.1D, which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4370f), and have determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule involves a safety zone lasting 2 hours that will prohibit entry within 100-yards of swim participants. It is categorically excluded from further review under paragraph L63(a) of Appendix A, Table 1 of DHS Instruction Manual 023–01–001–01, Rev. 01. A Record of Environmental Consideration supporting this determination is available in the docket where indicated under **ADDRESSES**.

*G. Protest Activities*

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places, or vessels.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T14–0020 to read as follows:

**§ 165.T14–0020  Safety Zone; Tanapag Harbor, Saipan, CNMI.**

(a) *Location.* The following area, within the Guam Captain of the Port (COTP) Zone (See 33 CFR 3.70–15), all navigable waters within a 100-yard radius of race participants in Tanapag Harbor, Saipan. Race participants, chase boats and organizers of the event will be exempt from the safety zone.

(b) *Effective dates.* This rule is effective from 6:30 a.m. to 8:30 a.m. on March 31, 2019.

(c) *Enforcement.* Any Coast Guard commissioned, warrant, or petty officer, and any other COTP representative permitted by law, may enforce this temporary safety zone.

(d) *Waiver.* The COTP may waive any of the requirements of this rule for any person, vessel, or class of vessel upon finding that application of the safety zone is unnecessary or impractical for the purpose of maritime security.

(e) *Penalties.* Vessels or persons violating this rule are subject to the penalties set forth in 46 U.S.C. 1232 and 46 U.S.C. 192.

Dated: March 14, 2019.

**Christopher M. Chase,**
*Captain, U.S. Coast Guard, Captain of the Port, Guam.*

[FR Doc. 2019–05094 Filed 3–18–19; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

**34 CFR Parts 668, 674, 682, and 685**

[Docket ID ED–2015–OPE–0103]

**RIN 1840–AD19**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule; correction; announcement of effective date.

**SUMMARY:** Consistent with the decisions of the U.S. District Court for the District of Columbia, this document memorializes that selected provisions of these final regulations took effect. Due to more recently-effective amendments, the Department must also correct affected amendatory instructions to ensure their incorporation into the CFR.

**DATES:** As of October 16, 2018, the corrections to the amendatory instructions and the amendments to § 668.14(b)(30), (31), and (32); § 668.41(h) and (i); § 668.71(c); § 668.91(a)(3); § 668.94(h), (i) and (j); § 668.171; § 668.175(c), (d), (f), and (h); part 668, subpart L, appendix C; § 674.33(g)(3) and (8); § 682.202(b)(1);

§ 682.211(i)(7); § 682.402(d)(3), (d)(6)(ii)(B)(1) and (2), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(5), (d)(6)(ii)(C) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); § 682.405(b)(4)(ii); § 682.410(b)(4) and (b)(6)(viii); § 685.200(f)(3)(v) and (f)(4)(iii); § 685.205(b)(6); § 685.206(c); § 685.212(k); § 685.214(c)(2) and (f)(4) through (7); § 685.215(a)(1), (c)(1) through (8), and (d); § 685.222; part 685, subpart B, appendix A; § 685.300(b)(11) and (12) and (d) through (i); and § 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed June 16, 2017 (82 FR 27621), October 24, 2017 (82 FR 49114), and February 14, 2018 (83 FR 6458), are effective.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW, Mail stop 6W247, Washington, DC 20202. Telephone: (202) 453–7583. Email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** The original ''effective date'' for these provisions was July 1, 2017. 81 FR 75926. To the extent the provisions explicitly use this date as a benchmark (*e.g.*, § 685.206(c)(''For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph'')), the Department will use July 1, 2017 as the relevant date. Because the provisions referenced above did not actually take effect on July 1, 2017, the Department is, concurrently with this announcement, releasing an Electronic Announcement available at *https://ifap.ed.gov/eannouncements/030719GuidConcern Prov2016BorrowerDefenseto RypmtRegs.html* to clarify the responsibilities of institutions with respect to the Financial Responsibility, Class Action Bans, and Predispute Arbitration Agreements Provisions, and Repayment Rate Disclosure sections of the final regulations, which are now effective.

*Background:* On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court) challenging the final regulations in their entirety, and in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial

responsibility standards, provisions requiring proprietary institutions to provide warnings about their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* No. 17–cv–00999 (D.D.C. May 24, 2017). The provisions in the challenged regulations were scheduled to become effective on July 1, 2017.

In light of the pending litigation, on June 16, 2017, the Department published a notification of the partial delay of effective dates (82 FR 27621) under section 705 of the APA (5 U.S.C. 705), to delay the effectiveness of certain provisions of the final regulations until the legal challenge is resolved (705 Notice). Subsequently, on October 24, 2017, the Department issued an interim final rule (IFR) delaying the effective date of those provisions of the final regulations to July 1, 2018 (82 FR 49114), and a notice of proposed rulemaking to further delay the effective date to July 1, 2019 (82 FR 49155). On February 14, 2018, the Department published a final rule delaying the regulations' effective date to July 1, 2019 (83 FR 6458) (Final Delay Rule).

Following issuance of the 705 Notice, plaintiffs Meaghan Bauer and Stephano Del Rose filed a complaint challenging the validity of the 705 Notice. Complaint for Declaratory and Injunctive Relief, *Bauer* v. *DeVos,* No.17–cv–1330 (D.D.C. Jul. 6, 2017). The attorneys general of 18 states and the District of Columbia also filed a complaint challenging the validity of the 705 Notice. Complaint for Declaratory and Injunctive Relief, *Massachusetts* v. *U.S. Dep't of Educ.,* No. 17–cv–01331 (D.D.C. Jul. 6, 2017). Plaintiffs in both cases subsequently amended their complaints to include the IFR and the Final Delay Rule, and these cases were consolidated by the Court.

On September 12, 2018, the Court issued its Memorandum Opinion and Order in the consolidated matter, finding the challenge to the IFR was moot, declaring the 705 Notice and the Final Delay Rule invalid, and convening a status conference to consider appropriate remedies. *Bauer* v. *DeVos,* No. 17–cv–1330 (D.D.C. Sept. 12, 2018). Subsequently, on September 17, 2018, the Court issued its Memorandum Opinion and Order immediately vacating the Final Delay Rule and vacating the 705 Notice but suspending its vacatur of the 705 Notice until 5:00 p.m. on October 12, 2018, to allow for

renewal and briefing of CAPPS' motion for a preliminary injunction in the *CAPPS* v. *DeVos* case and to give the Department an opportunity to remedy the deficiencies with the 705 Notice. *Bauer,* No. 17–cv–1330 (D.D.C. Sept. 17, 2018). The Department decided not to issue a revised 705 notice. On October 12, 2018, the Court extended the suspension of its vacatur until noon on October 16, 2018. Minute Order (Oct. 12, 2018), *Bauer,* No. 17–cv–1330. On October 16, 2018, the Court denied CAPPS' motion for a preliminary injunction, ending the suspension of the vacatur. Memorandum Opinion and Order, *CAPPS,* No. 17–cv–0999 (Oct. 16, 2018).

*Regulations:* With this action by the Court, the final regulations published November 1, 2016, at 81 FR 75926, listed below took effect. Information clarifying the responsibilities of institutions with respect to the now-effective provisions is available in the Electronic Announcement, *https://ifap.ed.gov/eannouncements/030719GuidConcernProv2016Borrower DefensetoRypmtRegs.html,* the Department is releasing concurrently with this announcement.

• Section 668.14(b)(30), (31), and (32) Program participation agreement.
• Section 668.41(h) and (i) Reporting and disclosure of information.
• Section 668.71(c) Scope and special definitions.
• Section 668.90(a)(3) Initial and final decisions.
• Section 668.93(h), (i), and (j) Limitation.
• Section 668.171 General.
• Section 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668, subpart L, appendix C.
• Section 674.33(g)(3) and (8) Repayment.
• Section 682.202(b)(1) Permissible charges by lenders to borrowers.
• Section 682.211(i)(7) Forbearance.
• Section 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• Section 682.405(b)(4)(ii) Loan rehabilitation agreement.
• Section 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• Section 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• Section 685.205(b)(6) Forbearance.
• Section 685.206(c) Borrower responsibilities and defenses.
• Section 685.212(k) Discharge of a loan obligation.

• Section 685.214(c)(2) and (f)(4) through (7) Closed school discharge.
• Section 685.215(a)(1), (c)(1) through (8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• Section 685.222 Borrower defenses.
• Part 685, subpart B, appendix A Examples of borrower relief.
• Section 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• Section 685.308(a) Remedial actions.

*Note:* Section 668.90 has been redesignated as § 668.91 and § 668.93 has been redesignated as § 668.94 pursuant to the borrower defense procedural rule, published January 19, 2017 at 82 FR 6253 (the borrower defense procedural rule), so the Department must correct the amendatory instructions from the November 2016 rule to reflect the newly redesignated section numbers.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations via the Federal Digital System at: *www.govinfo.gov.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.Federal Register.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

## Corrections

In FR Doc. 2016–25448, appearing on page 75926 in the **Federal Register** of Tuesday, November 1, 2016, the following corrections are made:

### § 668.90 [Corrected]

■ 1. On page 76072, in the first column, in amendatory instruction 7, "Section 668.90" is corrected to read "Section

**9966**   **Federal Register** / Vol. 84, No. 53 / Tuesday, March 19, 2019 / Rules and Regulations

688.91'' and ''§ 668.90'' is corrected to read ''§ 668.91''.

**§ 668.93   [Corrected]**

■ 2. On page 76072, in the third column, in amendatory instruction 8, ''Section 668.93'' is corrected to read ''Section 688.94'' and ''§ 668.93'' is corrected to read ''§ 668.94''.

Dated: March 12, 2019.

**Betsy DeVos,**
*Secretary of Education.*

[FR Doc. 2019–04887 Filed 3–18–19; 8:45 am]

**BILLING CODE 4000–01–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**44 CFR Part 64**

**[Docket ID FEMA–2019–0003; Internal Agency Docket No. FEMA–8571]**

**Suspension of Community Eligibility**

**AGENCY:** Federal Emergency Management Agency, DHS.
**ACTION:** Final rule.

---

**SUMMARY:** This rule identifies communities where the sale of flood insurance has been authorized under the National Flood Insurance Program (NFIP) that are scheduled for suspension on the effective dates listed within this rule because of noncompliance with the floodplain management requirements of the program. If the Federal Emergency Management Agency (FEMA) receives documentation that the community has adopted the required floodplain management measures prior to the effective suspension date given in this rule, the suspension will not occur and a notice of this will be provided by publication in the **Federal Register** on a subsequent date. Also, information identifying the current participation status of a community can be obtained from FEMA's Community Status Book (CSB). The CSB is available at *https:// www.fema.gov/national-flood- insurance-program-community-status- book.*

**DATES:** The effective date of each community's scheduled suspension is the third date (''Susp.'') listed in the third column of the following tables.

**FOR FURTHER INFORMATION CONTACT:** If you want to determine whether a particular community was suspended on the suspension date or for further information, contact Adrienne L. Sheldon, PE, CFM, Federal Insurance

and Mitigation Administration, Federal Emergency Management Agency, 400 C Street SW, Washington, DC 20472, (202) 212–3966.

**SUPPLEMENTARY INFORMATION:** The NFIP enables property owners to purchase Federal flood insurance that is not otherwise generally available from private insurers. In return, communities agree to adopt and administer local floodplain management measures aimed at protecting lives and new construction from future flooding. Section 1315 of the National Flood Insurance Act of 1968, as amended, 42 U.S.C. 4022, prohibits the sale of NFIP flood insurance unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed in this document no longer meet that statutory requirement for compliance with program regulations, 44 CFR part 59. Accordingly, the communities will be suspended on the effective date in the third column. As of that date, flood insurance will no longer be available in the community. We recognize that some of these communities may adopt and submit the required documentation of legally enforceable floodplain management measures after this rule is published but prior to the actual suspension date. These communities will not be suspended and will continue to be eligible for the sale of NFIP flood insurance. A notice withdrawing the suspension of such communities will be published in the **Federal Register.**

In addition, FEMA publishes a Flood Insurance Rate Map (FIRM) that identifies the Special Flood Hazard Areas (SFHAs) in these communities. The date of the FIRM, if one has been published, is indicated in the fourth column of the table. No direct Federal financial assistance (except assistance pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act not in connection with a flood) may be provided for construction or acquisition of buildings in identified SFHAs for communities not participating in the NFIP and identified for more than a year on FEMA's initial FIRM for the community as having flood-prone areas (section 202(a) of the Flood Disaster Protection Act of 1973, 42 U.S.C. 4106(a), as amended). This prohibition against certain types of Federal assistance becomes effective for the communities listed on the date shown in the last column. The Administrator finds that notice and public comment procedures under 5 U.S.C. 553(b), are impracticable and unnecessary because communities listed

in this final rule have been adequately notified.

Each community receives 6-month, 90-day, and 30-day notification letters addressed to the Chief Executive Officer stating that the community will be suspended unless the required floodplain management measures are met prior to the effective suspension date. Since these notifications were made, this final rule may take effect within less than 30 days.

*National Environmental Policy Act.* FEMA has determined that the community suspension(s) included in this rule is a non-discretionary action and therefore the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) does not apply.

*Regulatory Flexibility Act.* The Administrator has determined that this rule is exempt from the requirements of the Regulatory Flexibility Act because the National Flood Insurance Act of 1968, as amended, Section 1315, 42 U.S.C. 4022, prohibits flood insurance coverage unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed no longer comply with the statutory requirements, and after the effective date, flood insurance will no longer be available in the communities unless remedial action takes place.

*Regulatory Classification.* This final rule is not a significant regulatory action under the criteria of section 3(f) of Executive Order 12866 of September 30, 1993, Regulatory Planning and Review, 58 FR 51735.

*Executive Order 13132, Federalism.* This rule involves no policies that have federalism implications under Executive Order 13132.

*Executive Order 12988, Civil Justice Reform.* This rule meets the applicable standards of Executive Order 12988.

*Paperwork Reduction Act.* This rule does not involve any collection of information for purposes of the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*

**List of Subjects in 44 CFR Part 64**

Flood insurance, Floodplains.

Accordingly, 44 CFR part 64 is amended as follows:

**PART 64—[AMENDED]**

■ 1. The authority citation for part 64 continues to read as follows:

**Authority:** 42 U.S.C. 4001 *et seq.*; Reorganization Plan No. 3 of 1978, 3 CFR, 1978 Comp.; p. 329; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp.; p. 376.

# EXHIBIT 5

84 FR 49788-01, 2019 WL 4573049(F.R.)

RULES and REGULATIONS

DEPARTMENT OF EDUCATION

34 CFR Parts 668, 682, and 685

RIN 1840-AD26

[Docket ID ED-2018-OPE-0027]

Student Assistance General Provisions, Federal Family Education
Loan Program, and William D. Ford Federal Direct Loan Program

Monday, September 23, 2019

AGENCY: Office of Postsecondary Education, Department of Education.

**\*49788**   ACTION: Final rule.

SUMMARY: The Department of Education (Department or We) establishes new Institutional Accountability regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to revise a Federal standard and a process for adjudicating borrower defenses to repayment claims for Federal student loans first disbursed on or after July 1, 2020, and provide for actions the Secretary may take to collect from schools the amount of financial loss due to successful borrower defense to repayment loan discharges. The Department also amends regulations regarding pre-dispute arbitration agreements or class action waivers as a condition of enrollment, and requires institutions to include information regarding the school's internal dispute resolution and arbitration processes as part of in the borrower's entrance counseling. We amend the Student Assistance General Provisions regulations to establish the conditions or events that have or may have an adverse, material effect on an institution's financial condition and which warrant financial protection for the Department, update the definitions of terms used to calculate an institution's composite score to conform with changes in certain accounting standards, and account for leases and long-term debt. Finally, we amend the loan discharge provisions in the Direct Loan Program.

DATES: These regulations are effective July 1, 2020. The incorporation by reference of certain publications listed in these regulations is approved by the Director of the Federal Register as of July 1, 2020. Implementation date: For the implementation dates of the included regulatory provisions, see the Implementation Date of These Regulations in SUPPLEMENTARY INFORMATION.

FOR FURTHER INFORMATION CONTACT: For further information related to borrower defenses to repayment, pre-dispute arbitration agreements, internal dispute processes, and guaranty agency fees, Barbara Hoblitzell at (202) 453-7583 or by email at: Barbara.Hoblitzell@ed.gov. For further information related to false certification loan discharge and closed school loan discharge, Brian Smith at (202) 453-7440 or by email at: Brian.Smith@ed.gov. For further information regarding financial responsibility and institutional accountability, John Kolotos (202) 453-7646 or by email at: John.Kolotos@ed.gov. For information regarding recalculation of subsidized usage periods and interest accrual, Ian Foss at (202) 377-3681 or by email at: Ian.Foss@ed.gov.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1-800-877-8339.

SUPPLEMENTARY INFORMATION:

**Executive Summary**

*Purpose of This Regulatory Action*

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   1

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. The regulations at 34 CFR 685.206(c) governing defenses to repayment were first put in place in 1995. Those 1995 regulations specified that a borrower may assert as a defense to repayment "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law," (the State law standard) but were silent on the process to assert a claim.

In May 2015, a large nationwide school operator, filed for bankruptcy. The following month, the Department appointed a Special Master to create and oversee a process to provide debt relief for the borrowers associated with those schools, who had applied for student loan discharges on the basis of the Department's authority to discharge student loans under 34 CFR 685.206(c).

As a result of difficulties in application, interpretation of the State law standard, and the lack of a process for the assertion of a borrower defense claim in the regulations, the Department began rulemaking on the topic of borrower defenses to repayment. On November 1, 2016, the Department published final regulations [FN1] (hereinafter, "2016 final regulations") on the topic of borrower defenses to repayment, which significantly expanded the rules regarding how borrower defense claims could be originated and how they would be adjudicated. The 2016 final regulations were developed after the completion of a negotiated rulemaking process and after receiving and considering public comments on a notice of proposed rulemaking. In accordance with the HEA, the 2016 final regulations were scheduled to go into effect on July 1, 2017.

On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court), challenging the 2016 final regulations in their entirety, and in particular those provisions of the regulations pertaining to: (1) The standard and process used by the Department to adjudicate borrower defense claims; (2) financial responsibility standards; (3) requirements that proprietary institutions provide warnings about their students' loan repayment rates; and (4) the provisions requiring that institutions refrain from using arbitration or class action waivers in their agreements with students.[FN2]

In light of the pending litigation, on June 16, 2017, the Department published a notification of the delay of the effective date [FN3] of certain provisions of the 2016 final regulations under section 705 of the Administrative Procedure Act [FN4] (APA), until the legal challenge was resolved (705 Notice). Subsequently, on October 24, 2017, the Department issued an interim final rule (IFR) delaying the effective date of those provisions of the final regulations to July 1, 2018,[FN5] and a notice of proposed rulemaking to further delay the effective date to July 1, 2019.[FN6] On February 14, 2018, the Department published a final rule delaying the regulations' effective date until July 1, 2019 (Final Delay Rule).[FN7]

Following issuance of the 705 Notice, the plaintiffs in Bauer filed a complaint challenging the validity of the 705 Notice.[FN8] The attorneys general of eighteen States and the District of Columbia also filed a complaint challenging the validity of the 705 *49789 Notice.[FN9] Plaintiffs in both cases subsequently amended their complaints to include the IFR and the Final Delay Rule, and these cases were consolidated by the Court.

In November 2017, the Department began a negotiated rulemaking process. The resultant notice of proposed rulemaking was published on July 31, 2018 (2018 NPRM).[FN10] The 2018 NPRM used the pre-2016 regulations, which were in effect at the time the NPRM was published, as the basis for proposed regulatory amendments.

The 2018 NPRM also expressly proposed to rescind the specific regulatory revisions or additions included in the 2016 final regulations, which were not yet effective. Accordingly, the preamble of the 2018 NPRM generally provided comparisons between the regulations as they existed before the 2016 final regulations, the 2016 final regulations, and the proposed rule. The Department received over 30,000 comments in response to the 2018 NPRM. Many commenters compared the Department's proposed regulations to the 2016 final regulations, when the 2016 final regulations differed from a proposed regulatory change in the 2018 NPRM. The Department also provided a Regulatory Impact Analysis that was based on the President's FY 2018 budget request to Congress, which assumed the implementation of the 2016 final regulations.

On September 12, 2018, the Court issued a Memorandum Opinion and Order in the consolidated matter, finding the challenge to the IFR was moot, declaring the 705 Notice and the Final Delay Rule invalid, and convening a status conference to consider appropriate remedies.[FN11]

Subsequently, on September 17, 2018, the Court issued a Memorandum Opinion and Order immediately vacating the Final Delay Rule and vacating the 705 Notice, but suspending its vacatur of the 705 Notice until 5 p.m. on October 12, 2018, to allow for renewal and briefing of CAPPS' motion for a preliminary injunction in CAPPS v. DeVos and to give the Department an opportunity to remedy the deficiencies with the 705 Notice.[FN12] The Department decided not to issue a revised 705 notice.

On October 12, 2018, the Court extended the suspension of its vacatur until noon on October 16, 2018.[FN13] On October 16, 2018, the Court denied CAPPS' motion for a preliminary injunction, ending the suspension of the vacatur.[FN14]

In the 2018 NPRM, we proposed to rescind provisions of the 2016 final regulations that had not yet gone into effect.[FN15] However, as detailed in the Department's Federal Register notice of March 19, 2019,[FN16] as a result of the Court's decision in Bauer, those regulations have now become effective. This change necessitates technical differences in the structure of this document, which rescinds certain provisions, and amends others, of the 2016 final regulations that have taken effect, compared with that of the 2018 NPRM.

In particular, while the 2018 NPRM technically proposed to amend the pre-2016 regulations (in addition to proposing that the 2016 regulations be rescinded), these final regulations, as a technical matter, amend the 2016 final regulations which have since taken effect. Thus, we describe the changes to the final regulations and show them in the amendatory language at the end of the document based on the currently effective 2016 final regulations. We do this in order to accurately instruct the Federal Register's amendments to the Code of Federal Regulations.

With the 2016 final regulations in effect, the Department initially considered publishing a second NPRM that used those regulations as the starting point, rather than the pre-2016 regulations. However, given that the policies we proposed in the 2018 NPRM were not affected by the set of regulations that served as the underlying baseline, and that we provided a meaningful opportunity for the public to comment on each of the regulatory proposals in the NPRM and on the rescission of the 2016 final regulations, we determined that an additional NPRM would further delay the finality of the rulemaking process for borrowers and schools without adding meaningfully to the public's participation in the process. The Department addressed the provisions in these final regulations in the 2018 NPRM and afforded the public a meaningful opportunity to provide comment. For these reasons, despite the intervening events since publication of the 2018 NPRM, we are proceeding with the publication of these final regulations.

Additionally, after further consideration, we are keeping many of the regulatory changes that were included in the 2016 final regulations. Some of the revisions proposed in the 2018 NPRM are essentially the same as, or similar to, the revisions made by the Department in the 2016 final regulations, which are currently in effect. The Department is not rescinding or further amending the following regulations in title 34 of the Code of Federal Regulations, even to the extent we proposed changes to those regulations in the 2018 NPRM:

• § 668.94 (Limitation),

• § 682.202(b) (Permissible charges by lenders to borrowers),

• § 682.211(i)(7) (Forbearance),

• § 682.405(b)(4)(ii) (Loan rehabilitation agreement),

000083

• § 682.410(b)(4) and (b)(6)(viii) (Fiscal, administrative, and enforcement requirements), and

• § 685.200 (Borrower eligibility).

The Department also did not propose to rescind in the 2018 NPRM, and is not rescinding here, 34 CFR 685.223, which concerns the severability of any provision of subpart B in part 685 of title 34 of the Code of Federal Regulations; 34 CFR 685.310, which concerns the severability of any provision of subpart C in part 685 of title 34 of the Code of Federal Regulations; or 34 CFR 668.176, which concerns the severability of any provision of subpart L in part 668 of title 34 of the Code of Federal Regulations. If any provision of subparts B or C in part 685, subpart L in part 668, or their application to any person, act, or practice is at some point held invalid by a court, the remainder of the subpart or the application of its provisions to any person, act, or practice is not affected.

While the negotiated rulemaking committee that considered the draft regulations on these topics during 2017-2018 did not reach consensus, these final regulations reflect the results of those negotiations and respond to the public comments received on the regulatory proposals in the 2018 NPRM. The regulations are intended to:

• Provide students with a balanced, meaningful borrower defense to repayment claims process that relies on a single, Federal standard;

• Grant borrower defense to repayment loan discharges that are adjudicated equitably, swiftly, carefully, and fairly;

• Encourage students to directly seek remedies from schools when acts or omissions by the school, including those that do not support a borrower defense to repayment claim, fail to  **49790**  provide a student access to the educational or job placement opportunities promised, or otherwise cause harm to students;

• Ensure that schools, rather than taxpayers, bear the burden of billions of dollars in losses from approvals of borrower defense to repayment loan discharges;

• Establish that the Department has a complete record to review in adjudicating claims by allowing schools to respond to borrower defense to repayment claims and provide evidence to support their responses;

• Discourage schools from committing fraud or other acts or omissions that constitute misrepresentation;

• Encourage closing institutions to engage in orderly teach-outs rather than closing precipitously;

• Enable the Department to properly evaluate institutional financial risk in order to protect students and taxpayers;

• Eliminate the inclusion of lawsuits as a trigger for letter of credit requirements until those lawsuits are settled or adjudicated and a monetary value can be accurately assigned to them;

• Provide students with additional time to qualify for a closed school loan discharge and protect students who elect this option at the start of a teach-out, even if the teach-out exceeds the length of the regular lookback period;

• Adjust triggers for Letters of Credit to reflect actual, rather than potential, liabilities; and

• Reduce the strain on the government, and the delay to borrowers in adjudicated valid claims, due to large numbers of borrower defense to repayment applications.

***Summary of the Major Provisions of This Regulatory Action: For the Direct Loan Program, the Final Regulations***

• Establish a revised Federal standard for borrower defenses to repayment asserted by borrowers with loans first disbursed on or after July 1, 2020;

• Revise the process for the assertion and resolution of borrower defense to repayment claims for loans first disbursed on or after July 1, 2020;

• Provide schools and borrowers with opportunities to provide evidence and arguments when a defense to repayment application has been filed and to provide an opportunity for each side to respond to the other's submissions, so that the Department can review a full record as part of the adjudication process;

• Require a borrower applying for a borrower defense to repayment loan discharge to supply documentation that affirms the financial harm to the borrower is not the result of the borrower's workplace performance, disqualification for a job for reasons unrelated to the education received, or a personal decision to work less than full-time or not at all;

• Revise the time limit for the Secretary to initiate an action to collect from the responsible school the amount of any loans first disbursed on or after July 1, 2020, that are discharged based on a successful borrower defense to repayment claim for which the school is liable;

• Modify the remedial actions the Secretary may take to collect from the responsible school the amount of any loans discharged to include those based on a successful borrower defense to repayment claim for which the school is liable; and

• Expand institutional responsibility and financial liability for losses incurred by the Secretary for the repayment of loan amounts discharged by the Secretary based on a borrower defense to repayment discharge.

The final regulations for the Direct Loan Program also include many of the same or similar provisions as the 2016 regulations, which are currently in effect. For example, both the 2016 regulations and these final regulations:

• Require a preponderance of the evidence standard for borrower defense to repayment claims;

• Provide that a violation by a school of an eligibility or compliance requirement in the HEA or its implementing regulations is not a basis for a borrower defense to repayment unless the violation would otherwise constitute a basis under the respective regulations;

• Allow the same universe of people to file a borrower defense to repayment claim, as the definition of "borrower" in the 2016 final regulations is the same as the definition of "borrower" in these final regulations;

• Provide a borrower defense to repayment process for both Direct Loans and Direct Consolidation Loans;

• Allow the Secretary to determine the order in which objections will be considered, if a borrower asserts both a borrower defense to repayment and other objections;

• Require the borrower to provide evidence that supports the borrower defense to repayment;

• Automatically grant forbearance on the loan for which a borrower defense to repayment has been asserted, if the borrower is not in default on the loan, unless the borrower declines such forbearance;

• Require the borrower to cooperate with the Secretary in the borrower defense to repayment proceeding; and

• Transfer the borrower's right of recovery against third parties to the Secretary.

000085

The final regulations also revise the Student Assistance General Provisions regulations to:

• Provide that schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to make a plain language disclosure of those requirements to prospective and enrolled students and place that disclosure on their website where information regarding admission, tuition, and fees is presented; and

• Provide that schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to include information in the borrower's entrance counseling regarding the school's internal dispute and arbitration processes.

The final regulations also:

• Amend the financial responsibility provisions with regard to the conditions or events that have or may have an adverse material effect on an institution's financial condition, and which warrant financial protection for students and the Department;

• Update composite score calculations to reflect certain recent changes in Financial Accounting Standards Board (FASB) accounting standards;

• Update the definitions of terms used to describe the calculation of the composite score, including leases and long-term debt;

• Revise the Direct Loan program's closed school discharge regulations to extend the time period for a borrower to qualify for a closed school discharge to 180 days;

• Revise the Direct Loan program's closed school loan discharge regulations to specify that if offered a teach-out opportunity, the borrower may select that opportunity or may decline it at the beginning of the teach-out, but if the borrower accepts it, he or she will still qualify for a closed school discharge only if the school fails to meet the material terms of the teach-out plan or agreement approved by the school's accrediting agency and, if applicable, the school's State authorizing agency;

• Affirm that in instances in which a teach-out plan is longer than 180 days, a borrower who declines the teach-out opportunity and does not transfer credits to complete a comparable program, continues to qualify, under the **\*49791** exceptional circumstances provision, for a closed school loan discharge;

• Modify the conditions under which a Direct Loan borrower may qualify for a false certification discharge by specifying that the borrower will not qualify for a false certification discharge based on not having a high school diploma in cases when the borrower could not reasonably provide the school a high school diploma and has not met the alternative eligibility requirements, but provided a written attestation, under penalty of perjury, to the school that the borrower had a high school diploma; and

• Require institutions to accept responsibility for the repayment of amounts discharged by the Secretary pursuant to the borrower defense to repayment, closed school discharge, false certification discharge, and unpaid refund discharge regulations.

• Prohibit guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency.

*Timing, Comments and Changes*
On July 31, 2018, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the Federal Register. [FN17] The final regulations contain changes from the NPRM, which are fully explained in the Analysis of Comments and Changes section of this document.

Implementation Date of These Regulations: Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1, prior to the start of the award year (July 1) to which they apply. However, that section also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier with conditions for early implementation.

The Secretary is exercising her authority under section 482(c) of the HEA to designate the following new regulations at title 34 of the Code of Federal Regulations included in this document for early implementation beginning on September 23, 2019, at the discretion of each institution, as appropriate:

(1) Section 668.172(d).

(2) Appendix A to Subpart L of Part 668.

(3) Appendix B to Subpart L of Part 668.

The Secretary has not designated any of the remaining provisions in these final regulations for early implementation. Therefore, the remaining final regulations included in this document are effective July 1, 2020.

Incorporation by Reference. In § 668.172(d) of these final regulations, we reference the following accounting standard: Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) 2016-02, Leases (Topic 842).

FASB issued ASU 2016-02 to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. This standard is available at www.fasb.org, registration required.

Public Comment. In response to our invitation in the July 31, 2018, NPRM, more than 38,450 parties submitted comments on the proposed regulations, which included comments also relevant to the 2016 regulations, the implementation of which had been delayed.

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes in the preamble.

### *Analysis of Comments and Changes*
An analysis of the comments and of any changes in the regulations since publication of the 2018 NPRM follows.

### Borrower Defenses—General (§ 685.206)
Comments: Many commenters supported the Department's proposals to improve the borrower defense to repayment regulations. These commenters asserted that the proposed regulations would provide the necessary accountability in the system to prevent fraud, while giving borrowers a path to a more expedient resolution of complaints through arbitration or a school's internal dispute processes.

Some commenters claim that the regulations demonstrate government overreach by creating regulations that would add billions of dollars to Federal spending.

Discussion: We appreciate the comments in support of the proposed borrower defense to repayment regulations.

We disagree with commenters who state that these regulations represent government overreach. Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Section 455(h) of the HEA states: "Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."

The Department is not creating a new borrower defense to repayment program but rather is revising the terms under which a borrower may assert a defense to repayment of a loan, for loans first disbursed on or after July 1, 2020, which is the anticipated effective date of these regulations. The Department believes that these regulations strike an appropriate balance between attempting to correct aspects of the 2016 final regulations, that people criticized as Federal Government overreach, and the interests of students, institutions, and the Federal Government.

The Department acknowledges that the 2016 final regulations anticipated that taxpayers would bear a great expense and seeks to cabin that burden through these final regulations. The Department generally seeks to decrease costs to Federal taxpayers and decrease Federal spending through these final regulations. These costs are more fully outlined through the Regulatory Impact Assessment section to follow.

Changes: None.

Comments: One group of commenters supported the regulations for providing a better balance between relief for borrowers and due process for schools by providing both parties with an equal opportunity to provide evidence and arguments and to review and respond to evidence. These commenters acknowledged that balance is essential to a fair process. They expressed concern, however, that the pendulum has shifted too far once again and asserted that in comparison to the 2016 final regulations, the proposed regulations, which elevated the evidentiary standard to clear and convincing, make it too difficult for borrowers to obtain relief.

Other commenters generally opposed the Department's proposed rules concerning the borrower defense to repayment. One commenter suggested that the proposed rules would effectively block relief for the vast majority of borrowers, while shielding institutions from accountability for their misconduct.

 *49792  Another group of commenters contended that the NPRM favors predatory institutions over students, doing so based upon unsupported assertions and hypotheticals that ignore and distort data and evidence.

Discussion: We appreciate the commenters' concern that, in attempting to strike a balance, the pendulum may have swung too far, making it more difficult for harmed borrowers to receive relief. Similarly, the Department appreciates the commenters' recognition that the proposed regulations better balance the rights of students and institutions alike. In the sections below, we discuss changes we have made in the final regulations to achieve the balance and fairness commenters from all perspectives encouraged.

For example, and as described below, under the final regulations, borrowers will be required to demonstrate a misrepresentation by a preponderance of the evidence instead of the clear and convincing evidence proposed alternative standard that was included in the 2018 NPRM.

We disagree with commenters who contend that the proposed rules would have blocked relief to borrowers who were victimized by bad actors. Nevertheless, we have revised the rules to provide a fairer and more equitable process for borrowers to seek relief when institutions have committed acts or omissions that constitute a misrepresentation and cause financial harm to students. The Department, in turn, has a process to recover the losses the Department sustains from institutions as a result of granting

borrower defense to repayment discharges. This process is outlined in subpart G of Part 668, of Title 34 of the Code of Federal Regulations.

We also disagree with commenters that the proposed rules indicate that the Department sides with institutions over students, and notes that those commenters used unsupported assertions and hypothetical examples to support their comments. We disagree that the proposed regulations would have shielded bad actors from being held accountable for their actions. These final regulations send a clear and unequivocal message that institutions need to be truthful in their communications with prospective and enrolled students.

Throughout this document, as in the 2018 NPRM, we explain the reasons and rationales for these final regulations using data and real-world examples, while drawing upon the Department's experience since the publishing of the 2016 final regulations. The Department remains committed to protecting borrowers and taxpayers from institutions engaging in predatory behavior— regardless of whether those institutions are propriety, non-profit, selective, or open enrollment—which includes misrepresenting an institution's admissions standards and selectivity. The proposed and final regulations also ensure that schools are accountable to taxpayers for losses from the appropriate approval of borrower defense to repayment claims. Borrowers continue to have a meaningful avenue to seek a discharge from the Department, and nothing in these rules burdens a student's ability to access consumer protection remedies at the State level.

Changes: None.

Comments: Several commenters expressed dismay at the Department's 30-day timetable, which the commenters characterized as accelerated, for considering comments and publishing a final rule. These commenters felt that a "rush to regulate" had resulted in a public comment period that did not give the public enough time to fully consider the proposals and a timeline that did not afford the Department enough time to develop an effective, cost-efficient rule. Another commenter also asserted that we were following a hastened review schedule and were inappropriately allowing only a 30-day comment period on an NPRM that the commenter asserts was riddled with inaccuracies. The commenter said that, while the APA requires a minimum of 30 days for public comment during rulemaking,[FN18] a longer period was needed in this instance to allow affected parties to provide meaningful comment and information to the Department. The commenter noted that the Administrative Conference of the United States recommends a 60-day comment period when a rule is economically significant and argued that this recommendation is appropriate in this case due to the vast number of individuals affected by a regulation that modifies the Department's responsibilities for over $1 trillion in outstanding loans.

Discussion: We disagree with the commenters who contend that the Department's timetable for developing borrower defense to repayment regulations did not give the public enough time to fully consider the proposals. The 30-day public comment period provided sufficient time for interested parties to submit comments, particularly given that prior to issuing the proposed regulations, the Department conducted two public hearings and three negotiated rulemaking sessions, where stakeholders and members of the public had an opportunity to weigh in on the issues at hand. The Department also posted the 2018 NPRM on its website several days before publication in the Federal Register, providing stakeholders additional time to view the proposed regulations and consider their viewpoints on the NPRM. Further, the Department received over 30,000 comments, many representing large constituencies. The large number of comments received indicates that the public had adequate time to comment on the Department's proposals.

Additionally, the 30-day period referenced in 5 U.S.C. 553(d) refers to the period of time between the publication of a substantive rule and its effective date and not the amount of time necessary for public comment. The applicable case law, interpreting the APA, specifies that comment periods should not be less than 30 days to provide adequate opportunity to comment.

With respect to the comment concerning inaccuracies in the NPRM, we address those concerns in response to comments summarized below.

Changes: None.

Comments: Another group of commenters offered their full support for our efforts to assist students in addressing wrongs perpetrated against them by schools that acted fraudulently or made a misrepresentation with respect to their educational services. The commenters asserted that, when students are defrauded, they need to have the means to remedy the situation. According to these commenters, colleges routinely overpromise and under-deliver for their students and must be held accountable to their students for their failures. These commenters recommended the Department proactively use the many tools already at its disposal to uniformly pursue schools throughout each sector of higher education that are not serving their students well rather than rely on the borrower defense to repayment regulations, which necessarily provide after-the-fact relief for borrowers. The commenters asserted that addressing a problem before it becomes a borrower defense to repayment issue should be the first priority, thus saving current and future students from harm. Another group of commenters offered a similar suggestion and proposed that the Department examine the effectiveness of its gatekeeping obligations under title IV of the HEA as well as the nature of its relationship with accrediting agencies  **\*49793**  and States, to prevent participation by bad actors in the title IV programs.

Another group of commenters who generally supported the proposed regulations noted areas of concern or disagreement. They suggested that we amend the regulations to provide a "material benefit" to schools that do not have a history of meritorious borrower defense to repayment claims. These commenters also propose that the regulations address the "moral hazard" created by giving students an opportunity to receive an education and raise alleged misrepresentations to avoid paying for that education after they complete their education. These commenters would like the Department to mitigate the proliferation of "scam artists" and opportunists who advertise their ability to obtain, on behalf of a borrower, "student loan forgiveness". They also would like to discourage attorneys from exploiting students through the Department's procedural rules, while harming the higher education sector and the taxpayers in the process.

Discussion: We agree with commenters who suggest that a better approach is to stop misrepresentation before it starts, rather than providing remedies after the student has already incurred debt and expended time and energy in a program that does not deliver what it promised. We also agree the Department should proactively use the many tools already at its disposal such as program reviews and findings from those reviews to pursue schools throughout each sector of higher education that are not serving their students well. The Department devotes significant resources to the oversight of title IV participants and makes every effort to work with accrediting agencies and States to identify problems early, including identifying schools that should be prevented from participating in title IV programs altogether. The Department recognizes accrediting agencies, and only recognized accrediting agencies may accredit institutions so that the institutions may receive Federal student aid.[FN19] The Department of Education's Program Compliance Office has a School Eligibility Service Group that examines, analyzes, and makes determinations on the initial and renewal eligibility applications submitted by schools for participation in Federal student aid programs.[FN20] This Office also performs financial analyses, monitors financial condition, and works with state agencies and accrediting agencies.[FN21] The Office monitors schools and their agents, through on-site and off-site reviews and analysis of various reports, to provide early warnings of program compliance problems so that appropriate actions may be taken.[FN22]

We do not believe it is necessary or appropriate, nor does the Department possess the legal authority, to provide "material benefit" to schools that follow the law and, therefore, do not have a history of meritorious borrower defense to repayment claims. The Department expects that all schools, in every sector, will engage in a forthright and honest manner with their prospective and enrolled students and, therefore, the Department has the discretion to impose certain consequences upon schools who commit certain types of misrepresentations, even if an institution has previously provided accurate information to students.

We agree that a borrower defense to repayment regulation that is poorly constructed, under the statute, may create a "moral hazard" by giving students an opportunity to complete their education and raise alleged misrepresentations to avoid paying for that education. These regulations, however, include a process by which the Department receives information from both a borrower and the school. The Department will evaluate whether a borrower defense to repayment claim is meritorious, and the

borrower will receive a discharge only if the borrower demonstrates, by a preponderance of the evidence, that the institution made a misrepresentation.

We share the concern of commenters regarding the proliferation of people described by the commenter as "scam artists" and opportunists who disingenuously advertise "student loan forgiveness" and of some plaintiff's attorneys, and others, who seek to exploit borrowers. The Department, along with the Consumer Financial Protection Bureau (CFPB) and the Federal Trade Commission (FTC), receive and investigate consumer complaints regarding student loan scams. Those investigative functions are unchanged by these regulations. State consumer protection agencies and laws also help borrowers in this regard. Given these additional protections, the Department maintains that these final regulations strike the right balance between consumer protection and due process.

The Department also seeks to prevent borrower defense claims before they arise by disseminating information about various institutions that will help students make informed decisions based upon accurate data. As stated here and throughout the rest of these final regulations, the Department believes that schools and the Federal government each play a role in helping students make informed choices when considering the pursuit of postsecondary education. We are also aware that research has shown that students across the socioeconomic spectrum receive insufficient and impersonal guidance about colleges from their high schools.[FN23] Evidence also indicates that school selection is critically important to students' postsecondary success, given that students are more likely to persist to completion or degree attainment if they attend a well-matched institution.[FN24] Similarly, research has shown that a student's choice of major or program may be even more important than his or her choice of institution in determining long-term career and earnings outcomes.[FN25] The Department has created online tools, like the College Scorecard [FN26] and College Navigator,[FN27] that provide objective data across a range of institutional attributes to enable prospective students and their families to weigh their options based upon the characteristics that they deem most important to their decision-making. While we know that millions of users access these tools each year, we have limited evidence on these tools' potential for impact on college-related decisions and outcomes. Moreover, we recognize that some students may be overwhelmed by the process of parsing through the volumes of information on  **\*49794**  potential postsecondary options and have worked to streamline data sources through the College Scorecard and College Navigator to make it easier for users to focus on the criteria they deem most important. Nonetheless, we believe that, "armed with detailed, relevant information on financial costs and benefits, students can more fairly evaluate the tradeoffs of attending a certain institution and understand the financial implications of their decisions." [FN28]

The Department has announced its intent to expand the College Scorecard to provide program level outcomes data for all title IV programs, which is the first time such data will be made available to institutions or consumers.[FN29] We believe that program-level data will be more useful to students than institution-level data. The Department's new MyStudentAid application allows the Department to provide more information to students who are completing their Free Application for Federal Student Aid (FAFSA) form online or interacting with the Department's Federal Student Aid office. Accordingly, we can ensure that more students are presented with useful information about the institutions included on their FAFSA application in a format that is user-friendly and does not require them to conduct an extensive search. Such information will help students become more informed consumers and, thus, be less likely to be deceived by an institution that provides information contradictory to the information that the Department makes available.

Changes: None.

Comments: Many commenters did not support the proposed regulations, asserting that the proposed rule would undermine Congressional intent and shortchange students to benefit corporations with a history of fraud and abuse. These commenters assert that the 2018 NPRM contained errors and logical flaws and was colored throughout by a disturbingly cynical attitude about students, along with a naively charitable view of school owners and investors. They argued that the notion that borrower complaints of fraud result from poor choices in the marketplace and that information will cure the problem has been rejected by research and analysis and is not supported by the structure, text, or legislative history of the HEA. They further assert that the legislative history does not blame students for poor choices and recognizes that schools and the government have a role

000091

in helping students avoid poor-value programs. They predicted that the Department's proposed rule would have significant, negative implications for both defrauded borrowers and taxpayers. Another commenter predicted that the effect of proposed regulations would be to depress the percentage of tertiary-trained Americans and increase the rate of borrower bankruptcy filings. This commenter further asserted that the proposed regulations would lower the value of education in the U.S. and cause schools to treat students as economic pawns to be matriculated for profit motives over educational ones.

Some commenters stated that any time limitation should be waived in cases where borrowers could produce new evidence to assert a claim or reopen a decision.

Another commenter asserted that the 2016 final regulations benefit Latino and African American students, who are disproportionately concentrated in for-profit colleges and harmed by predatory conduct. This commenter urged the Department to retain the 2016 final regulations.

Many of the commenters who did not support the proposed changes urged the Department to withdraw the 2018 NPRM and allow for the full implementation of the borrower defense regulations published in 2016.

Discussion: We appreciate the concerns raised by the commenters. Our goal in the NPRM and in these final regulations is to balance the interests of students with those of taxpayers. We need to ensure, for instance, that borrowers receiving relief have claims supported by evidence and to protect the taxpayer dollars that fund the Direct Loan Program. The Department does not agree that the NPRM portrays students or their behaviors in a negative manner or is overly charitable to schools and their investors.

To the contrary, we believe that students have the capacity to make reasoned decisions and that they should be empowered by information and shared accountability expectations. Students are not passive victims; they take an active role in making informed decisions. We describe in our response to comments, throughout this document, how we intend to support students and families in making informed decisions by disseminating information that will help students better evaluate their options.[FN30]

We disagree with commenters that the proposed regulations do not align with the HEA or Congressional intent. Through section 455(h) of the HEA, 20 U.S.C. 1087e(h), Congress specifically provided the Department with the authority "to specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under [the Direct Loan Program]." The proposed regulations, and these final regulations, represent the Department's exercise of this authority, as intended by Congress. We believe that there must be a fair and balanced process for the Department to evaluate whether a borrower, as a result of a school's act or omission, may be relieved of his or her obligation to repay a Federal student loan as contemplated by the statute. We disagree with the commenters that our approach prioritizes schools over students and believe the approach is justified by the Department's obligation to balance the interests of the Federal taxpayers with its responsibility to student borrowers under section 455(h) of the HEA.

We believe we have reached a result in these final regulations that strikes the best possible balance between the different interests at hand. More details on the projected impact of these final regulations are included in the Regulatory Impact Analysis section of this Preamble. Further, we discuss in the sections that follow the changes we have made in the final regulations to achieve the balance and fairness commenters from all perspectives encouraged.

We believe that these final regulations will increase and not lower the value of education in the United States and do not see how these final regulations would depress the number of students attending an institution of higher education. These final regulations establish clear expectations for schools in their dealings with students, and greater certainty provides an economic incentive for schools to flourish and provide better and more diverse opportunities for students. Borrowers are consumers and their choices will impact which schools are most desirable for particular careers and professions. **\*49795** While the Department cannot regulate the motives of schools, it can, and will, hold schools accountable for their acts and omissions.

Borrowers who are the victims of a misrepresentation by a deceitful institution will be able to obtain relief under these final regulations, after the Department has had the opportunity to weigh information and evidence from all sides, as discussed further below.

The Department asserts that these final regulations will benefit, not harm, all students, including Latino and African American students. These final regulations will provide more information to students regarding their borrower defense claims than the 2016 final regulations and allow students to fully flesh out their claims, as the process in these regulations more clearly provides a school with an opportunity to provide responses and information as to a borrower's borrower defense application, requires that the applicant receives a copy of any response that the school submits, and clearly establishes that the applicant has an opportunity to reply to the school's response.

In contrast, the 2016 final regulations allow a school to submit a response, but did not clearly afford a student the opportunity to reply to the response.[FN31] Additionally, under the 2016 final regulations, a student has to request that the Department identify the records that the Department considers relevant to the borrower defense to repayment claim, and the Department will only provide the borrower "any of the identified records upon reasonable request of the borrower." [FN32]

These final regulations, however, guarantee that the student will have a copy of the school's response and all the documents that the Department considers in adjudicating the borrower defense to repayment claim. Accordingly, these final regulations provide a more transparent process and afford due process for all borrowers no matter where they enroll in college and irrespective of race, religion, national origin, gender, or any other status or category.

For the reasons detailed throughout the preamble to these final regulations, we determined that withdrawing the 2018 NPRM and leaving the 2016 final regulations in place was not the best long-term approach. The Department has decided instead to take an approach that applies the 2016 final regulations and these final regulations to applicable time periods. The 2016 final regulations, thus, will apply to loans first disbursed on or after July 1, 2017 and before July 1, 2020, and these final regulations will apply to loans first disbursed on or after July 1, 2020. We describe our changes to each provision of those regulations in detail in the pertinent section of the preamble.

Changes: As explained more fully below, the Department revises the proposed regulations to allow the Secretary to extend the limitations period when a borrower may assert a defense to repayment or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered in two exceptional circumstances (relating to a final, non-default judgment on the merits by a State or Federal Court that has not been appealed or that is not subject to further appeal or a final decision by a duly appointed arbitrator or arbitration panel) as described in 34 CFR 685.206(e)(7). We also add a new paragraph (d) in § 685.206 and language to § 685.222 and Appendix A to subpart B of part 685 to clarify that the 2016 final regulations apply to loans first disbursed on or after July 1, 2017 and before July 1, 2020. These final regulations will apply to loans first disbursed on or after July 1, 2020.

Comments: Some commenters expressed concern and confusion about the structure of the 2018 NPRM, particularly the regulations the Department used as the starting point for the preamble discussion and amendatory language as well as the baseline used for the Regulatory Impact Analysis. They asserted that using the pre-2016 regulations as the baseline for the amendatory language raises issues under the APA. They also stated that using the 2019 President's Budget Request as the baseline for the Regulatory Impact Analysis, raises issues under the APA in part because the President's Budget Request assumed the implementation of the 2016 final regulations.

Discussion: We welcome the opportunity to provide additional clarification about the structure of the 2018 NPRM and the reasons for the structure. First, with respect to the amendatory language, the Federal Register requires amendatory language to be drafted as amendments to the currently effective text of the Code of Federal Regulations.[FN33] For that reason, because the effective date of the 2016 final regulations was delayed, our amendatory language in the 2018 NPRM was drafted to reflect

changes to the pre-2016 regulatory text. In the preamble, to properly fulfill our obligations under the APA, we discussed our proposed changes as related to both the pre-2016 regulatory text and the 2016 final regulations.

In the Regulatory Impact Analysis (RIA) section of this document, we discuss in detail why we were required to use the President's 2019 Budget Request as the baseline for the RIA in the 2018 NPRM.

Changes: None.

**Borrower Defenses—Claims (§ 685.206)**

*Affirmative and Defensive Claims*

Comments: Many commenters, and groups of commenters, advocated for the inclusion in the final regulations of affirmative borrower defense claims, meaning claims asserted before a borrower has defaulted on a Federal student loan. These commenters objected to the proposal that would have limited the Department's consideration of borrower defense claims to those asserted as a defense in collection proceedings. The commenters noted that limiting the consideration of borrower defense claims to defensive claims might encourage some borrowers to default on their loans to become eligible to file a claim.

Commenters representing military personnel and veterans noted that limiting borrower defense claims to defaulted borrowers would fail to recognize the significant risk such a limit would place on service members, veterans, and their dependent family members. The commenters requested clear and reasonable protections from schools with predatory practices and misleading promises. These commenters noted that many jobs held by service members, veterans, spouses, and their adult children require government security clearances. Defaulting on a student loan could result in denial or loss of clearance and, therefore, a loss of employment. In such instances, the commenters asserted that the proposed regulations would increase the likelihood of devastating and, potentially, cascading consequences for military and veteran families.

Some commenters, who supported the inclusion of both affirmative and defensive claims, did so with a caveat that these claims should be combined with a requirement that the claim be supported by clear and convincing evidence, rather than a preponderance of the evidence. One commenter, who supported the inclusion of affirmative claims, did so with a caveat that these **\*49796** claims should be supported by evidence that is beyond a reasonable doubt.

One commenter suggested that borrowers whose loan payments are current should be afforded priority over borrowers in default in the adjudication process.

In opposing the proposal to only allow consideration of defensive claims, several commenters rejected the Department's assertion that we did not accept affirmative borrower defense to repayment claims prior to 2015 and alleged that the Department's explanation for proposing that the final regulation only allow for the consideration of defensive claims was insufficient. Another commenter who supported the inclusion of affirmative claims provided evidence that the Department considered borrower defense claims before the borrower was in default prior to 2015.

A number of commenters, however, supported the proposal to consider only defensive claims. One such commenter stated that the regulation was intended to only address claims raised in debt collection actions. Another commenter argued that the proposal to accept both affirmative and defensive claims exceeds the statutory authority conferred upon the Department by the HEA and that any such change can only be addressed by Congressional action. This commenter stated that it shared the concern raised by the Department in the NPRM that allowing consideration of affirmative claims would make it relatively easy for a borrower to apply for relief, even if the borrower had suffered no financial harm, resulting in a significant burden on the Department and institutions to address numerous unjustified claims. This commenter also contended that if the Department allows affirmative claims, borrowers would have nothing to lose by filing for loan relief.

Discussion: In the 2018 NPRM, the Department explained that we were seeking public comment as to whether we should only allow defensive claims, as opposed to both affirmative and defensive claims.[FN34] The Department stated that it believed that accepting defensive claims, and not affirmative claims, might better balance the competing interests of the Federal taxpayer and of borrowers. The Department sought comment on how it could continue to accept and review affirmative claims, but at the same time discourage borrowers from submitting unjustified claims.

After consideration of the public comments received in response to the NPRM, the Department agrees that it is appropriate to accept both affirmative and defensive claims. The Department understands the concerns raised by the commenters who argued that allowing only defensive claims may provide borrowers with an incentive to default, which, in turn, would have negative consequences for the borrower. In addition, we are concerned about the potential negative impacts on military servicemembers, their families, and borrowers, in general, which could result from increased instances of loan default triggered by borrower efforts to become eligible to assert defensive claims.

The Department acknowledges that the Department did accept affirmative borrower defense in limited circumstances before 2015. However, the Department's interpretation of the existing regulation has been that it was meant to serve primarily as a means for a borrower to assert a defense to repayment during the course of a collection proceeding. After further review of the information submitted by commenters and our own records, the Department acknowledges that throughout the history of the existing borrower defense repayment regulation, the Department has approved a small number of affirmative borrower defense to repayment requests.

The Department's representation of its history of approving borrower defense to repayment loan relief in the NPRM was included as background to our explanations and reasoned bases for two alternative proposals. With these alternatives, we gave the public notice and opportunity to provide feedback on whether the Department should distinguish between affirmative and defensive borrower defense to repayment claims.

As intended by the APA, the Department provided sufficient notice and the public provided comments, and the Department weighed such comments and has decided to allow the consideration of both affirmative claims and defensive claims in these final regulations. However, as explained further in this preamble at Borrower Defenses—Limitations Period for Filing a Borrower Defense Claim, we are establishing a three-year limitations period, that begins to run when the student leaves the school, for all defense to repayment claims under the new standard.

The Department continues to be concerned about the burden to the Department and the taxpayer from a large volume of claims. However, as explained later in this document, the Department does not believe that a different evidentiary standard for affirmative claims versus defensive claims is appropriate. Different evidentiary standards might lead to inconsistency in the Department's adjudication of factually similar borrower defense claims, but for the timing of a borrower's application and loan status. Similarly, the Department does not agree that priority in adjudication should be given to borrowers whose loan payments are current over borrowers whose loans are in default. The Department believes it is appropriate for a borrower to have his or her claim adjudicated based upon the facts underlying his or her application, rather than repayment status. We also believe that the standard we adopt in these final regulations is properly calibrated to allow borrower defense relief only where it is merited, and not to open the door to a large volume of unjustified claims.

The Department disagrees with the commenters who stated that the consideration of affirmative claims is outside of the Department's statutory authority or the purpose of the borrower defense regulations. We stated in the NPRM that the proposal to consider only defensive claims was within the Department's authority under section 455(h) of the HEA.[FN35] However, by such a statement the Department did not imply that it does not have the authority to consider affirmative claims and, in fact, by proposing that borrowers could submit affirmative claims on loans first disbursed before the effective date of the final regulations, clearly indicated that it does have such authority.

000095

The Department has broad statutory authority to make, promulgate, issue, rescind, and amend regulations governing the manner of, operations of, and governing of the applicable programs administered by the Department and functions of the Department. [FN36] Further, by providing that the Department may regulate borrowers' assertion of borrower defenses to repayment, section 455(h) of the HEA grants the Department the authority to not only identify borrower causes of action that may be recognized as defenses to repayment, but also to establish the procedures for receipt and adjudication of borrower claims—including the type of proceeding through which the Department may consider such a claim. This regulatory scheme reflects the Department's history in considering borrower defense claims, whether prior to 2015, as pointed out by some commenters, or after 2015. **\*49797**  Accordingly, the Department does not agree that congressional action is necessary for the Department's consideration of affirmative claims.

Changes: We are adding § 685.206(e) to provide, with regard to loans first disbursed on or after July 1, 2020, that borrowers may submit a defense to repayment claim, both on affirmative and defensive bases, as long as the claim is submitted within three years from the date the borrower is no longer enrolled at the institution.

### *Application*

Comments: Some commenters supported the proposed regulatory provisions which would require the borrower to specify the misrepresentation being asserted for the defense to repayment, certify the claim under penalty of perjury, list how much financial harm was incurred, and acknowledge that if they receive a full discharge of the loan, the school may refuse to provide an official transcript. These commenters believe these requirements will reduce the number of unsubstantiated claims.

One commenter suggested that the application also require borrowers to provide their grade point average (GPA) at the time of their termination or leaving the school and to state, if they failed the academic program, why they failed.

One commenter suggested the Department start a process to consumer test the application, with input from other Federal agencies, to ensure that students of all institutional levels are able to comprehend and complete the application.

Several commenters objected to a proposed requirement that borrowers making a defense to repayment claim provide personal information, including confirmation of the "borrower's ability to pass a drug test, satisfy criminal history or driving record requirements, and meet any health qualifications." The commenters asserted that this would effectively require borrowers to waive their right to privacy and treats the borrower like a criminal, not an injured party. One of these commenters argued that these requirements are irrelevant to the question of school misconduct and are clearly intended to dissuade borrowers from asserting claims of fraud.

Discussion: The Department thanks the commenters who supported the proposed regulations pertaining to the application. We believe the proposed regulation set forth clear borrower defense to repayment application requirements that would allow a borrower to understand and provide the information needed for the Department to accurately evaluate the borrower's claim. As proposed in the NPRM, this application requires the borrower to sign a waiver permitting the institution to provide the Department with items from the borrower's education record relevant to the defense to repayment claim. Such a waiver gives the borrower notice that the school may release information from the borrower's education records to the Department.

We do not agree that it is appropriate to require that a borrower, submitting a borrower defense claim, include their GPA or other information regarding their success or failure in any course or program. The Department does not view that information as dispositive as to whether the borrower was harmed by a misrepresentation or an omission by the school. Including this information, however, could have an impact on determining the harm suffered by a student as a result of a misrepresentation. In considering the harm the student suffered as a result of an institution's misrepresentation, the Department must ascertain how much of that harm is the fault of the institution and how much of it is the result of a student's choices, behaviors, aspirations, and motivations.

The Department does not adopt the commenter's suggestion regarding consumer testing the borrower defense application. The Department has significant experience developing and publishing applications similar to the one required in these final regulations and will rely on that experience in creating an appropriate and effective application for this purpose. We disagree with the commenters who objected to the proposed requirement that borrowers supply information relevant to assessing the borrower's allegation of harm as a violation of borrowers' privacy rights. Under the Privacy Act, an agency may "maintain in its records only such information about an individual as is relevant and necessary to the accomplish a purpose of the agency required to be accomplished by statute . . ." [FN37] While the information relevant to assessing the borrower's allegation of harm may be private, it is also necessary for the Department to have it in order to carry out its purposes. We will maintain the borrower's privacy, except for the limited purpose of resolving the borrower's claim.

As explained earlier, the HEA provides the Department with the authority to establish regulations on all aspects of the borrower defense to repayment process, including how relief should be provided and determined. It is relevant to the Department's determination of relief to require a borrower to provide a complete picture of the financial harm caused by a school's misrepresentation, by providing information such as: Whether the borrower failed to actively pursue employment if he or she is a recent graduate; whether the borrower was terminated or removed from a job position as a result of job performance issues; or whether the borrower failed to meet other job qualifications for reasons unrelated to the school's misrepresentation.

With respect to the borrower's attempts to pursue employment, the Department revised the final regulations to clarify what the Department expects the borrower to provide as part of the application. The borrower should provide documentation that the borrower actively pursued employment in the field for which the borrower's education prepared the borrower. Examples of this documentation include but are not limited to: Job application confirmation emails; correspondence with potential employers; registration at job fairs; enrolling with a job recruiter; and attendance at a resume workshop. Failure to provide such information could result in a presumption that the borrower failed to actively pursue employment in the field. The Department would like borrowers to have notice of what documentation the Department expects in support of an application for a borrower defense to repayment and what the consequences of failing to provide such documentation will be. The Department must rely on the borrower to supply such information, as the Department will not be aware of any attempts the borrower has made to seek employment. Such documentation will help support the relief that a borrower receives.

While such information about pursuing employment may not be related to whether a school made a misrepresentation, as defined in these final regulations, it does relate directly to whether the borrower was financially harmed by the institution, as required by the standard for a borrower defense claim. Information on intervening causes of a borrower's circumstances that cannot be said to be even related to a borrower's education, much less the misrepresentation at issue, will be relevant to the Department's assessment of the amount of relief to provide to the borrower as a result of the harm that has been caused by the misrepresentation.

With regards to criminal history, we carefully reviewed the public **\*49798** comments. We do not adopt the commenters' logic that such a provision would treat borrowers like criminals, require borrowers to waive their right to privacy, or that these questions are "clearly intended" to dissuade borrowers from asserting borrower defense claims. However, after our review, the Department decided that the inclusion of the "criminal record" language is contrary to the Department's priorities and does not properly support individuals who are attempting to transition out of the criminal justice system through higher education, job training, or other career pathways.

Despite this change, the Department believes that requiring borrowers to provide a complete picture of the financial harm caused by a school's misrepresentation—including whether unrelated factors may have contributed to the borrower's financial circumstances—is appropriate to help the Department satisfy its fiduciary responsibility to taxpayers and to provide just relief for borrowers.

Changes: The Department revised the regulations about the documentation the borrower should provide as part of the borrower defense to repayment application. The borrower still must provide documentation that the borrower actively pursued

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

employment in the field for which the borrower's education prepared the borrower. The Department will presume that the borrower failed to actively pursue such employment, if the borrower fails to provide such documentation. As explained below, the Department also is revising § 685.206(e)(8) to clarify the borrower defense to repayment application will state that the Secretary will grant forbearance while the application is pending and will notify the borrower of the option to decline forbearance. The Department removes "criminal history or" from § 685.206(e)(8)(v).

### *Definition of "Borrower"*

Comments: A group of commenters recommended that the proposed regulatory language in the 2018 NPRM at § 685.206(d)(1)(i), define "borrower" to include the student on whose behalf a parent borrowed Federal funds. The purpose of this inclusion is to specifically address whether a parent borrower may raise a defense to repayment claim.

Discussion: The Department regrets the omission of parent borrowers from the borrower defense provisions in the 2018 NPRM. We have amended the definition to reflect the approach taken in the 2016 final regulations, so that a parent borrower may raise a defense to repayment claim based on a misrepresentation or omission made to the parent or to the student on whose behalf the parent borrowed Federal funds. In the final regulations, § 685.206(e)(1)(ii) mirrors § 685.222(a)(4), the definition applicable for loans first disbursed on or after July 1, 2017 and before July 1, 2020, which provides that the term "borrower" includes the student who attended the institution, any endorsers, or the student on whose behalf a parent borrowed.

Changes: The definition of "borrower" in § 685.206(e)(1)(ii) now includes both the borrower and, in the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

### *Definition of Direct Loan*

Comments: None.

Discussion: The Department would like to clarify that "Direct Loan" in § 685.206(e) means a Direct Unsubsidized Loan, a Direct Subsidized Loan, or a Direct PLUS Loan. With respect to both the pre-2016 final regulations and 2016 final regulations, the Department interprets "Direct Loan" to mean a Direct Unsubsidized Loan, a Direct Subsidized Loan, or a Direct PLUS Loan in §§ 685.206(c) and (d) and 685.222. These final regulations clarify that "Direct Loan" continues to have the same meaning as in the pre-2016 final regulations and 2016 final regulations.

Changes: The Department expressly defines a Direct Loan in § 685.206(e)(1)(i) as a Direct Unsubsidized Loan, a Direct Subsidized Loan, or a Direct PLUS Loan.

### *Group Claims: Support for Revisions*

Comments: Several commenters supported the Department's proposal to eliminate the group claim process for borrower defense claims. They expressed concern that allowing for group claims would incentivize attorneys and advocacy groups to file claims on behalf of a class of students. One commenter asserted that outside actors could attempt to monetize borrower defense claims to their own benefits, especially if the Department were to accept group claims. However, the commenter noted that there are options that the Department could consider to limit this possibility as an alternative to disallowing group claims entirely.

Discussion: The Department thanks the commenters for their support of the regulations that require individuals to assert borrower defense claims. To an extent, we understand the commenters' concerns about, and have already become aware of evidence of, outside actors attempting to personally gain from the bad acts of institutions as well as unfounded allegations. The evidence standard and the fact-based determination of the borrower's harm and resulting reliance requirements in the federal standard in these regulations for loans first disbursed after July 1, 2020, necessitates that each claim be adjudicated separately. While, depending on the circumstances, borrower defense claims brought under those other standards might be amenable to a

000098

group process or for expedited processing if there are similar facts and claims among a number of borrowers, the new federal standard envisions a more fact-specific inquiry. As a result, the Department no longer believes that a group process is appropriate.

Changes: None.

### *Group Claims: Opposition to Revisions*

Comments: Many commenters encouraged the Department to include a process in the final regulations for group claims. These commenters noted that students who were at the same school at the same time, who were subject to the same misrepresentation, could expect their claims to be adjudicated more expeditiously, if considered as a group.

Some commenters were not persuaded by the Department's assertion in the 2018 NPRM that a group claim process places an extraordinary burden on both the Department and the Federal taxpayer, given that the 2016 final defense regulations asserted that a group adjudication process with common facts and claims would conserve the Department's administrative resources. These commenters further noted that no undue burden would be placed on the taxpayer so long as the Department is holding institutions financially accountable.

Some commenters suggested that when the Department knows that a school engaged in misrepresentation to a group of students, debt relief should be granted to all of them.

The commenters further recommended that the regulation require the Department to process any relevant and substantiated information in its possession in the same manner as a Freedom of Information Act (FOIA) request and make that information, to the extent permitted by law, available to the borrower and the school.

The commenters suggested that the Department consider significant and plausible allegations of misrepresentation by multiple **\*49799** borrowers sufficient impetus to launch its own investigation, the outcome of which may be used to substantiate pending borrower defense claims and enable such claims to move to the determination of harm phase. They assert that the Department could use compliance determinations by the Department, or other oversight bodies, as an alternative to a group process that would alleviate some of the burden associated with examining individual claims and focus such reviews on harm to borrowers rather than institutional intent, without curtailing due process rights for schools.

Another commenter noted that allowing for group claims would strengthen the usefulness of the regulation as an accountability measure, as schools would know that efforts to defraud students could result in large groups of students being given relief, with the associated financial impact on the school.

A commenter cited Federal Trade Commission v. BlueHippo Funding, LLC, 762 F.3d 238 (2nd Cir. 2014) for the proposition that consumer protection agencies need not show that each consumer individually relied on a misrepresentation. Similarly, another commenter stated a limitation on group claims will limit access to relief exclusively to students who have the financial resources to obtain legal representation.

One commenter stated that a ban on group claims places undue burden on individuals who have been defrauded where there is widespread evidence of mistreatment.

Other commenters who supported the inclusion of group claims noted that, while the proposed regulations make explicit that the Department has the authority to automatically discharge loans on behalf of a group of defrauded borrowers, the regulations do not include guidance to ensure that this authority is exercised by the Secretary.

These commenters also advocated including a process in the final regulations that would enable State attorneys general (AGs) to petition the Department to provide automatic group loan discharges to students based on the findings of an AG's investigation.

000099

Another commenter also advocated for the rule to permit third parties, such as state AGs or legal aid organizations, to file group claims when they possess evidence of widespread misconduct.

One commenter suggested that group discharges should include borrower defense claimants' private loans and Federal Family Education Loan (FFEL) Program loans.

Discussion: After careful consideration of the comments, the Department retains its position that it is unnecessary to provide a process for group borrower defense claims.

In 2016, the Department decided that a group process would conserve the Department's administrative resources. However, the standard for a borrower defense claim and the process that we are adopting in these final regulations is much different from the standard and process in the 2016 final regulations.

Determinations under these final rules will be highly reliant upon evidence specific to individual borrowers, which requires the Department to reconsider its previous burden calculation. Under these final regulations, a school engaging in misrepresentation alone will not be sufficient for a successful claim. Relief will be granted based upon a borrower's ability to demonstrate that institutions made misrepresentations with knowledge of its false, misleading, or deceptive nature or with reckless disregard and to provide evidence of financial harm. This evidentiary determination and harm analysis require that the Department consider each borrower claim independently and on a case-by-case basis.

The Department declines to accept the commenter's recommendation to process relevant and substantiated information in the same manner as a FOIA request. The purpose of the FOIA process is to allow the release of information for the public. Information submitted for a borrower defense claim is provided to the Department, and it is unclear how the FOIA process could be applicable to the process created by these final regulations. While the Department welcomes information from the borrower and encourages the submission of such information, the process outlined in these final regulations allows for sufficient access to the required information and documentation for the concerned parties to a claim.

While the Department shares and understands the concerns that commenters expressed regarding the expeditious resolution of borrower claims, we believe it is prudent to balance the need for speedy recovery for students against the need to properly resolve each claim on the merits and provide relief in relation to the claimant's harm. To make this determination, it is necessary to have a completed application from each individual borrower, to consider information from both the borrower and the institution, and to examine the facts and circumstances of each borrower's individual situation.

Additionally, the Department does not believe that the elimination of group claims reduces the usefulness of the regulation as an accountability measure. Schools are still subject to the consequences of their misrepresentation and, if necessary, the Secretary retains the discretion to establish facts regarding misrepresentation claims put forward by a group of borrowers.

The Department does not agree that it is too burdensome for a borrower to submit an individual application to provide evidentiary details in order to receive consideration for a full or partial loan discharge or that a borrower must retain legal services in order to file a successful claim. Considering that a student had to sign a Master Promissory Note—a complicated legal document —as well as other documents in order to obtain a student loan, we have determined that the burden upon students to provide documentation and to complete an application is appropriate. In order to properly review the borrower's allegations and calculate the level of relief to which a student is entitled, based on the need to balance the interests of borrowers and taxpayers, the Department must collect information from borrowers through an application form.

Further, presuming reliance on the part of the students would not properly balance the Department's responsibilities to protect students as well as taxpayer dollars.

000100

We appreciate, but do not adopt, the suggestions regarding the Department's consideration of allegations from multiple borrowers as an impetus to launch an investigation (though certainly such allegations could trigger an investigation) and the use of compliance determinations, by the Department or other oversight body, as an alternative to the group process. The Department believes that the most appropriate and fairest method of determining if a student was subject to a misrepresentation, relied on that misrepresentation, and was subsequently harmed by it, is through the individual claim process in these final regulations.

Regarding any evidence from audits, program reviews, or investigations, the Department may, at the Secretary's discretion, determine if it is warranted and more efficient to establish facts regarding claims of misrepresentation put forth by a group.

The Department rejects the commenter's suggestion to include regulatory language to ensure that the authority extended to the Secretary to automatically discharge loans on behalf of a group is exercised. Even if the **\*49800** Department determines that it is more efficient to establish facts regarding claims of misrepresentation put forth by a group of borrowers, the Secretary will still need to determine that the borrower was harmed as a result of a decision based upon a misrepresentation.

While we reject the suggestion of a process for State AG or legal aid organization petitions, the Secretary may determine that evidence of widespread misconduct, obtained by State AGs or legal aid organizations, merit a broader review of a school's actions in order to establish facts regarding misrepresentation to a group of borrowers. However, the Department has an obligation to taxpayers to independently assess the strength of each borrower defense claim. Consequently, we will not be compelled to take action at the recommendation or petition of a State AG, especially if those allegations have not resulted in a judgment on the merits in an impartial court of law, nor will the Department automatically treat State AG submissions as group claims. Instead, if a State AG has concerns about a particular institution, we would recommend that it work with their State agencies responsible for authorizing and regulating institutions. Those entities are a crucial part of the regulatory triad, which includes the Department, State authorizing agencies, and accreditors, and have the right and responsibility to enforce applicable State laws.

The Department does not have the authority to discharge private student loans or FFEL loans for borrowers who assert borrower defense to repayment claims with respect to their Direct loans. Section 455(h) of the HEA specifically provides that a borrower may assert a borrower defense to repayment to "a loan made under this part," referring to the Direct Loan Program. Private loans are not part of the Direct Loan Program and thus may not be discharged under the Department's borrower defense process by statute. Similarly, FFEL loans are made under the FFEL Program, and not the Direct Loan Program. As a result, a FFEL loan also cannot be discharged through the Direct Loan borrower defense process, unless the FFEL loan has consolidated into a Direct Consolidation Loan under 34 CFR 685.220. In that situation, the FFEL loan would be paid off with the proceeds of the Direct Consolidation Loan, and the borrower's Direct Consolidation Loan—as a loan made under the Direct Loan Program—would allow the borrower to apply for relief through the borrower defense process. Unless consolidated into a Direct Consolidation Loan, as described in 34 CFR 685.200, Private and FFEL loan funds are provided by lenders other than the Department and cannot be discharged through the Direct Loan Program's regulatory or statutory provisions that apply to the Direct Loan Program.

The Department notes that the group process from the 2016 final regulations, at 34 CFR 685.222(f), will still be available for loans first disbursed on or after July 1, 2017, and before July 1, 2020.

Changes: None.

### Unsubstantiated Claims

Comments: One commenter stated that the Department's concern regarding the receipt of many frivolous claims is unfounded, wrong-headed, and not supported by research or complaints from dissatisfied consumers. Another commenter noted that in the NPRM, we stated that there was insufficient information to know whether the fear of frivolous claims was legitimate. The commenter also referred to the Department's position in the preamble to the 2016 final regulations, where we held that defense to repayment proceedings will be not be used by borrowers to raise frivolous claims.

Referring to consumer products research, a commenter asserted that the Department's concern regarding frivolous claims ignores good-government practices followed by peer agencies like the Veterans Administration, such as publishing complaints against schools, and does not reflect the overarching goals of the HEA.

A group of commenters objected to the actions taken to mitigate frivolous claims. These commenters expressed a need to balance student protections with expectations of student responsibility, suggesting that the rule must emphasize that students have a right to accurate, complete, and clear information so that they can make sound decisions. The commenters also asserted that students should not be abandoned to the principle of caveat emptor and that the higher education community should work with students to avoid bad choices that result in lost time and opportunities.

Another group of commenters expressed concern that those who are ideologically opposed to the existence of privately owned and operated schools may file frivolous claims as a means of harassing schools and harming the schools' reputations, before the claims could be adjudicated by the Department. These commenters encouraged the Department to establish a balanced adjudication process that includes procedural protections that provide for the quick dismissal of frivolous or unsubstantiated claims.

Discussion: The Department agrees with the commenters that the defense to repayment regulations must provide student protections and not endorse a caveat emptor approach, while encouraging fiscal responsibility for students and the Department. As a policy matter, we do not believe that, in practice, the 2016 final regulations will effectively prevent unsubstantiated claims, which is why these final regulations are drafted to build-in further deterrents.

The Department does not possess an official definition of "frivolous" or "unsubstantiated" claims. In typical usage, however, a frivolous claim is one with little or no weight or not worthy of serious consideration.[FN38] We use the term, here, to describe claims provided by borrowers that allege misrepresentations that actually did not occur, that seek discharge from private rather than Federal loans, or that seek relief from a school not associated with any of the borrower's current underlying loans.

Although we understand that some commenters may disagree with our approach, the Department's policy seeks to balance the needs of borrowers to have their claims resolved expeditiously against the needs of the Department to resolve claims fairly and efficiently without overburdening the Department, institutions that are operating and serving students, or taxpayers.

The Department has examined the issue of unsubstantiated claims and has concluded that it remains a concern in terms of costs, burden, and delays. Processing unsubstantiated claims would place an administrative burden on the Department. Defending against unsubstantiated claims would be costly to all institutions, particularly smaller institutions. The Department has processed only a small percentage of the claims filed thus far. Of those, around 9,000 applications have been denied as unsubstantiated for reasons that include, but are not limited to, the following: (1) Borrowers who attended the institution, but not during the time   *49801  period that the institution made the alleged misrepresentation; (2) the borrower submitted the claim without any supporting evidence; and (3) on its face, the claim lacks any legal or factual basis for relief. This high number of unsubstantiated claims, as a practical matter, strains Department resources and delays relief to borrowers who have meritorious claims.

The Department finds that the comment regarding consumer products research and borrower defense claims does not make explicit why such a comparison is an apples-to-apples comparison. It is not apparent from the commenter's argument that, in fact, they are.

The Department believes that by taking seriously its dual responsibilities to students and taxpayers, we are employing good-government practices in accordance with our statutory and regulatory responsibilities.

Contrary to some commenters' suggestions, the Department believes that the regulation appropriately emphasizes disclosure insofar as students, who are themselves taxpayers, have a right to accurate, complete, and clear information that will enable them to make sound decisions.

The Department further believes that requiring borrowers to sign an application claim under penalty of perjury will help deter unsubstantiated claims, as will the opportunity for institutions to respond to such claims, including by providing relevant documents from the student's academic and financial aid records.

The Department reserves the ability to take action against borrowers who perjure themselves in filing a substantially inaccurate claim.

We acknowledge that there is a risk that unsubstantiated claims could be filed in large numbers to target institutions for the purpose of damaging their reputations before the Department can adjudicate the claims as unsubstantiated. Indeed, we are aware of firms and advocacy groups that are engaging in such coordinated efforts against certain institutions.

Nevertheless, by allowing institutions to respond in the adjudication process to all claims—substantiated and unsubstantiated —asserted against them as part of the adjudication process, the Department will be able to mitigate this risk for institutions and make informed decisions on individual claims.

Changes: None.


*Retroactive Standards and Bases for Claims*
Comments: Several commenters also advocated that borrowers whose loans were disbursed prior to July 1, 2019, should be allowed to initiate both affirmative and defensive borrower defense claims.

These commenters assert that this is especially important when a claim has failed under the current State law standard. The commenters argue that, as a matter of equity, those borrowers should be permitted to refile a claim under the Federal standard.

Discussion: The date of loan disbursement determines which standard applies to the borrower defense claim. For loans first disbursed on or after July 1, 2020, these final regulations include opportunities for borrowers to make both affirmative and defensive claims under a Federal standard within the three-year limitations period.

Likewise, for loans disbursed on or after July 1, 2017 and before July 1, 2020, borrowers may assert both affirmative and defensive claims, but pursuant to the 2016 final regulations. Borrowers of loans first disbursed prior to July 1, 2017, may assert a defense to repayment under the State law standard set forth in 685.206(c). Neither these final regulations nor the 2016 final regulations provide a borrower whose loans were disbursed when the State law standard was in effect the ability to refile a borrower defense claim under a later-effective Federal standard, unless the loans were consolidated after July 1, 2020.

Changes: None.


**Borrower Defenses—Federal Standard (Section 685.206)**
Comments: Several commenters supported the establishment of a Federal standard for borrower defense to repayment claims, noting that a Federal standard would provide clarity and consistency and enhance Department officials' ability to work with schools to prioritize the delivery of quality education to students.

Several commenters asserted that the proposed Federal standard makes it substantially more difficult for defrauded borrowers to assert a claim. The commenters argue that by eliminating the State law standard, and excluding final judgments made by Federal or State courts against a school from the list of acceptable defenses, the Department effectively nullifies State consumer protection laws and requires a borrower who successfully sues their school for fraud in a State court to continue repaying loans used to attend the school while the school continues to reap the benefit of the borrower's Federal student aid.

000103

Several commenters suggested that the Department establish the Federal standard as a floor and allow borrowers who choose to do so to assert claims based on a State standard.

Other commenters asserted that any Federal standard should not limit the rights a borrower has in his or her own State. The commenters opined that States should have the right to protect their own consumers and ensure the quality of schools licensed to operate in their States. Several other commenters agreed, noting that the proposed standard would destroy the working relationship between the Federal government and States' attorneys general by limiting their role in protecting borrowers.

Another commenter stated that there is no good basis for expanding the reach of the Federal government and supplanting State laws with Federal regulations.

Discussion: We appreciate the support for adopting a Federal standard and agree that a Federal standard provides consistency.

Section 455(h) of the HEA expressly states: "Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." (Emphasis added). Congress did not require the Secretary to use State law as the basis for asserting a defense to repayment of a loan. Instead, Congress expressly required the Secretary to specify in regulations which acts or omissions constitute a borrower defense to repayment. Loans under title IV are a Federal asset, which means that the Secretary must maintain the authority to make determinations about when and how a student loan should be discharged.

The Department disagrees now, as it did in promulgating the 2016 final regulations, that moving to a Federal standard interferes with the ability of States to protect students. State authorizing agencies will remain an integral part of the regulatory triad, and State AGs may exercise their separate authority and pursue a legal process to take action against institutions. These final regulations do not nullify, abrogate, or derogate the authority of States to enforce their own consumer protection laws. A borrower defense to repayment application filed with the Department is only one of several available avenues for potential relief to borrowers, and borrowers may choose the best avenue of relief available to them.

 *49802  These final regulations continue to allow borrowers to submit the factual findings supporting a final judgment in a State AG enforcement action against their schools as evidence to support their borrower defense to repayment claims. However, the Department notes that, as a practical matter, factual findings in state AG enforcement actions often are of limited utility to borrower defense claims because State consumer protection laws cover broader issues than Department-backed student loans or even the provision of educational services. Accordingly, a judgment against an institution in an action brought by a State AG to enforce State law may not be relevant to a title IV defense to repayment claim. Therefore, the Department's final regulations expressly state that certain categories of State law claims which are enumerated in 34 CFR 685.206(e)(5)(ii)—including but not limited to, claims for personal injury, sexual harassment, civil rights violations, slander or defamation, property damage, or challenging general education quality or the reasonableness of an educator's conduct in providing educational services—are not directly and clearly related to the making of a loan or the provision of educational services by a school. For example, the reasonableness of an educator's conduct in providing educational services, such as the educator's teaching style, preparation for class, etc., is irrelevant to whether the educator made a misrepresentation as defined in these final regulations. When a borrower points to a final judgment in a State law action in support of an application for borrower defense to repayment, the Department must consider the final judgment's relevance to the borrower defense claim.

A Federal standard assures borrowers equitable treatment under the law regardless of where they live or where their institutions are located. In considering claims under the 1995 borrower defense regulations, the Department found it unwieldy to navigate the consumer protection laws of 50 different States. Researching and applying the consumer protection laws of the 50 States requires significant resources and, thus, delays the adjudication of borrower defense to repayment claims. Further, applying disparate State law could result in differential and inequitable treatment of similarly situated borrowers. For instance, two borrowers who were exposed to identical misrepresentations and suffered the same hardship could have their borrower defense claims resolved inconsistently simply because the borrowers reside in different States.

We do not agree that it would be beneficial to allow borrowers to select the State standard under which their claims would be reviewed. Most borrowers would lack the expertise and information to make such a choice-of-law determination. Moreover, this approach undercuts our objective to adjudicate claims swiftly and equitably.

Separately, we do not believe that the Department should share with State AGs sensitive academic and financial information for borrowers who seek individual loan discharges through borrower defense to repayment claims, the work of State AGs may inform and advance the Department's efforts to ensure accountability at the institution level because of the important role State AGs play in enforcing consumer protection laws. That being said, title IV Federal student loans are Federal assets, backed by Federal tax dollars and governed by federal law. As a result, the Department must work independently to fulfill its fiduciary responsibilities to the American taxpayer.

There is nothing in our final regulations that preempts State consumer protection laws or diminishes the State role in consumer protection. As explained above, States play a vital role in enforcing consumer protection laws that hold institutions accountable outside the realm of Federal student loans.

Changes: The Department adopts, with changes for organization and consistency, the Federal standard as articulated in Alternative B for § 685.206(e).

### *Alignment With Definition of Misrepresentation*
Comments: None.

Discussion: The Department seeks to better align the Federal standard for borrower defense claims with the definition of misrepresentation. The 2018 NPRM proposed different alternatives,[FN39] not all of which expressly incorporated the definition of misrepresentation. The Department adopts language that expressly incorporates the definition of misrepresentation in 685.206(e)(3). The Department also expressly includes a reference to the provision of educational services, which appears in the definition of misrepresentation, in the Federal standard. The Department sought to streamline the Federal standard and definition of misrepresentation and make them parallel to each other.

Changes: The Department is revising the proposed regulations creating a Federal standard for a borrower defense claim to state that the borrower must establish by a preponderance of the evidence that the institution at which the borrower enrolled made a misrepresentation, as defined in 685.206(e)(3), and also expressly to reference the provision of educational services.

### Borrower Defenses—Misrepresentation

### *Definition of Misrepresentation and Intent as Part of the Federal Standard*
Comments: Many commenters wrote in support of the proposed definition of misrepresentation, noting that it is clear and focuses on actions that are commonly accepted as dishonest. Some of these commenters noted that the definition would separate inadvertent errors from intentional actions by the school. Other commenters noted that the definition of misrepresentation will help ensure that frivolous claims will be prevented or rightly rejected. Another commenter asserted that the Department should allow for an institution's innocent mistake and that allowing students to discharge their loans for innocent mistakes would create an incredible risk to schools, taxpayers, and ultimately the workforce.

Many other commenters objected to the definition of misrepresentation, arguing that the requirement for intent, knowledge, or reckless disregard was too difficult for borrowers to meet, effectively denying access to relief to most borrowers. These commenters asserted that such evidence would likely be available only if a borrower had legal counsel and access to discovery tools, such as subpoenas for documents and testimony. They also noted that misrepresentations need not be intentional to harm students and suggested that negligent misrepresentations be incorporated into the definition as well.

000105

One commenter requested that the Department provide a more fulsome justification for why its view of misrepresentation has changed since the 2016 final regulations. Similarly, another commenter contended that the Department has not provided adequate justification for its view that misrepresentation requires intentional harm to students. One commenter asserted that if the Department can adjudicate allegations of fraud and misrepresentation in an administrative proceeding against a school, then students should be able to benefit from  **\*49803**  the same standard for borrower defense to repayment.

Another commenter argued that the proposed Federal standard would be arbitrarily difficult for borrowers to satisfy and seems designed to keep borrowers from receiving relief available to them under the law. This commenter asserted the Department should simplify the process and ensure that borrowers have equitable access to relief.

Some commenters noted that the Department in the 2018 NPRM acknowledged that it is unlikely that a borrower would have evidence to demonstrate that a school acted with intent to deceive, but borrowers are more likely to be able to demonstrate reckless disregard for the truth. The commenter recommends that, as an alternative, the regulation allow borrowers to submit sufficient evidence to prove that a substantial material misrepresentation was responsible for their taking out loans, regardless of whether the misrepresentation was made with knowledge or recklessness by the school.

According to one commenter, the proposed definition of misrepresentation adds a substantial amount of burden without distinguishing among the types of misrepresentations borrowers may have experienced. This commenter noted that the Department itself assumes that only five percent of misrepresentations are committed without intent, knowledge, or reckless disregard; or do not fall under the breach of contract or final judgment components of the standard in the 2016 final regulations. The commenter opined that the Department, through its proposed definition of misrepresentation, was attempting to prevent borrowers who have been harmed by their institutions from accessing relief simply because of asymmetry between borrowers and the school about the nature of the misrepresentation.

One commenter criticized the proposed definition of misrepresentation for exceeding the standards under State and Federal consumer protection laws.

Another commenter asserted that all fifty States have a version of consumer protection laws that prohibit certain unfair and deceptive conduct, commonly known as "unfair and deceptive trade acts and practices" (UDAP). According to this commenter, these UDAP laws are modeled after the Federal Trade Commission Act and track the CFPB's statutory authority. This commenter asserts that the UDAP laws address both deception and unfairness and offer a common, stable structure, and pedigree that the Department should adopt. This commenter asserted that a scienter requirement is inconsistent with the state of mind requirements in other Federal laws governing unfair and deceptive practices. The commenter notes that, for example, the deception standard used by the FTC does not require a showing of intent by the party against whom a deception claim is brought. The commenter further notes that the CFPB, uses a similar standard for determining whether an act or practice is deceptive. According to the commenter, under both the FTC and CFPB's standard, a practice is deceptive if, among other things, it is likely to mislead a consumer.

Discussion: We appreciate the commenters' support for the proposed definition of misrepresentation. We agree that it is important to differentiate between acts or omissions that a school made unknowingly or inadvertently and acts or omissions that a school made with knowledge of their false, misleading, or deceptive nature or with reckless disregard for the truth. The Department agrees with negotiators and commenters that it is unlikely that a borrower would have evidence to demonstrate that an institution acted with intent to deceive, and we are revising these final regulations to remove the phrase "with intent to deceive" from the Federal standard. It is difficult to prove what an officer's or employee's intent is, but it is not as difficult to prove that a statement was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth. For example, a student may demonstrate that an officer of the institution or employee misrepresented the actual licensure passage rates because the employee's representations are materially different from those included in the institution's marketing materials, website, or other communications made to the student. The officer or employee need not have an intent to deceive the student in making

the misrepresentation about actual licensure passage rates. The student may use the institution's marketing materials, website, or other communications to demonstrate that the institution's officer or employee made the representation with knowledge of its false, misleading, or deceptive nature or with reckless disregard for the truth.

To address concerns about the definition of misrepresentation and the Federal standard, the Department is revising the Federal standard to provide greater clarity. The Federal standard proposed in the 2018 NPRM requires borrowers to demonstrate that the institution made a "misrepresentation of material fact, opinion, intention, or law." [FN40] The Department realizes that it will be difficult to demonstrate a misrepresentation of "opinion, intention, or law" and, thus, is removing "opinion, intention, or law" from the Federal standard. It could be very difficult to demonstrate a misrepresentation of opinion or intention as opinions and intentions may change and do not constitute facts that may be proved or disproved. Similarly, it would be difficult to demonstrate that the institution made a material misrepresentation of law as laws are subject to different interpretations. Laws that are clearly stated and that are not subject to different interpretations may constitute a material fact. For example, if an institution made a material misrepresentation that these final regulations require a pre-dispute arbitration agreement and class action waiver, then the misrepresentation concerns a material fact. Accordingly, the Federal standard will only require borrowers to demonstrate a misrepresentation of a material fact.

Additionally, the Department is revising the definition of misrepresentation to better align with the Federal standard. The Federal standard in these final regulations requires, in part, a misrepresentation, as defined in § 685.206(e)(3), of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan, and "that directly and clearly relates to: (A) [e]nrollment or continuing enrollment at the institution or (B) [t]he provision of educational services for which the loan was made." [FN41] The definition of "misrepresentation" proposed in the 2018 NPRM, however, requires the statement, act, or omission of material fact to directly and clearly relate "to the making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan, for enrollment at the school or to the provision of educational services for which the loan was made." [FN42] Requiring the statement, act, or omission to directly and clearly relate to the making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan, does not align with the Federal standard, which requires the misrepresentation to directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of **49804**  educational services for which the loan was made.

Accordingly, the Department is revising the definition of misrepresentation to include a statement, act or omission that clearly and directly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made. Of course, a misrepresentation about the making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan, will qualify as a misrepresentation because such a misrepresentation clearly and directly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made.

The Department, however, does not wish to limit a misrepresentation of material fact to only a statement, act, or omission that directly and clearly relates to the making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan. As the examples of misrepresentation in § 685.206(e)(3)(i) through (xi) demonstrate, the misrepresentation of material fact may, for example, directly and clearly relate to the educational resources provided by the institution that are required for the completion of the student's educational program that are materially different from the institution's actual circumstances at the time the representation is made.[FN43] The Federal standard already provides that the borrower must have reasonably relied on the misrepresentation of material fact in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan.

We agree with the commenters who argued that a school should not be held liable if it committed an inadvertent mistake. Schools should work with students when an inadvertent mistake has occurred. As explained below, an inadvertent or innocent mistake should not, and will not, be treated as an act or omission that is false, misleading, or deceptive by an institution. In the preamble to the 2016 final regulations, we took the position that institutions should be responsible for the harm to borrowers as the result of even inadvertent or innocent mistakes. However, as reiterated throughout this document, in these final rules the Department is seeking to empower students by providing them with information and encouraging them to resolve disputes directly with schools in the first instance. Treating innocent mistakes in the same manner as acts or omissions made with

knowledge of their false, misleading, or deceptive nature, places well-performing schools at risk unnecessarily, potentially limiting postsecondary opportunities for students or increasing costs. Balancing the Department's dual role to protect Federal tax dollars with its responsibility to borrowers, the Department is incorporating a scienter requirement into borrower defense to repayment claims. Any claim based on misrepresentation will require proof that the institution made the misrepresentation with knowledge that it was false, misleading, or deceptive or that the institution, in making the misrepresentation, acted with reckless disregard for the truth.

The Department does not adopt the commenter's suggestion that the final regulations include a negligence standard. We view our definition of misrepresentation as similar to, but not the same as, the common law definition of fraud or fraudulent misrepresentation, which requires that the institution or a representative of the institution make the misrepresentation with knowledge of its false, misleading, or deceptive nature. Such a standard is different than the failure to exercise care that a negligence standard requires.

Generally, courts find that a defendant committed fraud or a fraudulent misrepresentation when each of the following elements have been successfully satisfied: (1) A representation was made; (2) the representation was made in reference to a material fact; (3) when made, the defendant knew that the representation was false; (4) the misrepresentation was made with the intent that the plaintiff rely on it; (5) the plaintiff reasonably relied on it; and (6) the plaintiff suffered harm as a result of the misrepresentation.[FN44] These elements, like our final regulations, create a relationship between the false statement, reliance upon the false statement, and a resulting harm.

A plaintiff alleging negligent misrepresentation must show that: (1) The defendant made a false statement or omitted a fact that he had a duty to disclose; (2) it involved a material issue; and (3) the plaintiff reasonably relied upon the false statement or omission to his detriment.[FN45] In contrast to fraudulent representation, an allegation of negligent misrepresentation need not show that the defendant had knowledge of the falsity of the representation or the intent to deceive.[FN46] In addition, courts have found that, to be actionable, a negligent misrepresentation must be made as to past or existing material facts and that predictions as to future events, or statements as to future actions by a third party, are deemed opinions and not actionable fraud.[FN47]

We believe that including a negligent misrepresentation standard into our definition would entirely alter the balance we seek to create with these final regulations, as negligent representation may include an inadvertent mistake. The Federal standard in these regulations goes beyond a mere negligence standard in requiring knowledge of the false, misleading, or deceptive nature of the representation, act, or omission and in requiring that the institution make the statement, act, omission with a reckless disregard for the truth. Reckless disregard often is a requirement of intentional torts, which go beyond mere negligence.[FN48] For example, reckless disregard for the truth in the context of libel means that a publisher must act with a " ' 'high degree of awareness of probable falsity,' " [FN49] as "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." [FN50] Similarly, an institution's statement, act, or omission must be made with a high degree of awareness of probable falsity to satisfy the requirement that the institution acted with reckless disregard for the truth.

The Department has now concluded that the 2016 final regulations' inclusion of misrepresentations that "cannot be attributed to institutional intent or knowledge and are the result of **\*49805** inadvertent or innocent mistakes" [FN51] is inappropriate for these final regulations and had the potential to result in vastly increased administrative burden and financial risk to schools and, when the burden proves too great, to the taxpayer. In such a case, a mere mathematical error could lead to devastating consequences to the institution and potentially to its current students, who will bear the cost of forgiving prior students' loans, even though the prior students may have decided to enroll for many reasons unrelated to the error.

We realize that the definition of misrepresentation in these final regulations is a marked departure from the definition of "substantial misrepresentation" by the school in accordance with 34 CFR part 668, part F, that was part of the Federal standard in the 2016 final regulations.[FN52] The 2016 final regulations defined a misrepresentation as: "Any false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting

000108

or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program." [FN53] The 2016 final regulations define a "substantial misrepresentation" as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." [FN54] In the 2016 final regulations, the Department used the standard of "substantial misrepresentation," which was interpreted to include negligent misrepresentations, to adjudicate both borrower defense to repayment claims and also any fine, limitation, suspension, or termination proceeding against the school to recover any liabilities as a result of the borrower defense to repayment claim.

Unlike these final regulations, the Department's 2016 final regulations did not guarantee that the school would be allowed to respond to a borrower defense to repayment claim. The Department's 2016 final regulations provide that the Department may, but is not required to, consider a response or submission from the school.[FN55] Under the 2016 final regulations, the Department may adjudicate a borrower defense to repayment claim without any information from the school, grant that claim under the substantial misrepresentation, breach of contract, or judgment standards in the borrower's proceeding, and proceed to initiate a separate proceeding against the school to recover the amount of any relief provided to the borrower.

The Department now believes that using the same standard in two separate proceedings, one for the borrower to receive relief and the other for the Department to recover liabilities from the school, is inefficient and does not provide the robust due process protections that are best for the borrower, school, and the Federal taxpayer. Accordingly, as discussed elsewhere in these final regulations, the Department must provide the school with notice of a borrower defense to repayment claim and a meaningful opportunity to respond to such a claim. The borrower also will be able to file a reply limited in scope to the school's response and any evidence otherwise in the possession of the Department that the Department considers.

The Department believes a Federal standard with a different, more stringent definition of misrepresentation better guards the interests of all students, including an institution's future tuition-paying students, an institution acting in good faith, and the Federal taxpayer who, in some cases, inevitably must pay for any negligent or innocent mistakes. The "substantial misrepresentation" standard in the 2016 final regulations behaves like a strict liability standard in torts that is, generally, reserved for abnormally dangerous activities where the activity at issue creates a foreseeable and highly significant risk of physical harm even when reasonable care is exercised by all actors.[FN56] Although a "substantial misrepresentation" standard is appropriate for proceedings against schools in which the Department seeks to recover liabilities, guard the Federal purse, and protect Federal taxpayers, such a low standard is not appropriate when the Department is forgiving loans and increasing the national debt to the detriment of Federal taxpayers.[FN57] Student loan debt accounts for $1.5 trillion dollars of the national debt and is "now the second highest consumer debt category—behind only mortgage debt—and higher than both credit cards and auto loans." [FN58] Each time the Department discharges loans, the Department increases the national debt, especially if the Department is not able to recover the amount of discharged loans in a proceeding against the schools.

We also believe that a less precise definition of misrepresentation would unnecessarily chill productive communication between institutions and prospective and current students. We do not want to create legal risks that dissuade schools from putting helpful and important information in writing or allowing other students and faculty to share their opinions with prospective or current students. It could have a chilling effect on academic freedom and reduce the amount of information provided to students during academic and career counseling. We also believe it would be improper to subject an institution, and its current, past, and future students, to liability and reputational harm for innocent or inadvertent misstatements.

Prospective students benefit when schools share more information, and more information naturally increases the risk that some of the information may be outdated or incorrect in some way. A student is entitled to honest dealing from the school, which means

that a school must truthfully communicate when providing information. It does not mean, necessarily, that rapidly changing or purely subjective information must be perfectly free from error.

Schools that provide a high-quality education may make innocent mistakes on highly complex or evolving issues. For example, if a school erroneously represented State licensure eligibility requirements for a particular profession because the school was unaware that the State amended its eligibility requirements just a few days before the **\*49806** school made the representation, then the school did not act with knowledge that the representation was false. On the other hand, if the school continued to make such an erroneous representation after learning that the State amended the eligibility requirements, then the school acted with knowledge that the representation was false, which constitutes a misrepresentation under these final regulations. The Department recognizes that an institution may self-correct inadvertent misrepresentations through its various compliance programs and encourages institutions to do so.

In determining whether a misrepresentation was made, the Department also may consider the context in which the misrepresentation is made. For example, demanding that the borrower make enrollment or loan-related decisions immediately, placing an unreasonable emphasis on unfavorable consequences of delay, discouraging the borrower from consulting an adviser, failing to respond to borrower's requests for more information about the cost of the program and the nature of any financial aid, or unreasonably pressuring the borrower or taking advantage of the borrower's distress or lack of knowledge or sophistication are circumstances that may indicate whether the school had knowledge that its statement was false, misleading, or deceptive or was made with a reckless disregard for the truth. These examples of circumstances that may lead to a borrower's reasonable reliance on a school's misrepresentation standing alone, however, do not suffice to demonstrate that a misrepresentation occurred under these final regulations, just as they did not under the 2016 final regulations.[FN59]

The Department disagrees that it is too difficult for borrowers to demonstrate that a misrepresentation occurred, as borrowers may easily provide the type of evidence, described in the § 685.206(e)(3)(i) through (xi), to substantiate a misrepresentation. This list of evidence is non-exhaustive, as every type of evidence that could be used to prove a misrepresentation cannot be predicted.

For example, borrowers may provide evidence that actual licensure passage rates, as communicated to them by their admissions counselor, are significantly different from those included in the institution's marketing materials, website, or other communications made to the student. The Department amended the description of evidence that constitutes a misrepresentation to clarify that actual institutional selectivity rates or rankings, student admission profiles, or institutional rankings that are significantly different from those provided by the institution to national ranking organizations may constitute evidence that a misrepresentation occurred, as borrowers may rely upon misrepresentations made by an institution to a national ranking organization. A borrower also may provide evidence of a representation, such as marketing materials or an institutional "fact sheet", regarding the total, set amount of tuition and fees that they would be charged for the program that is significantly different in the amount, method, or timing of payment from the actual tuition and fees charged. Records about the amount, method, or timing of payment should be in the borrower's possession, and the Department has further revised its amendatory language to clarify that a representation regarding the amount, method, or timing of payment of tuition and fees that the student would be charged for the program that is materially different in amount, method, or timing of payment from the actual tuition and fees charged to the student may constitute evidence that a misrepresentation has occurred.

In evaluating borrower defense claims, the Department understands that a borrower may not have saved relevant materials and records to substantiate his or her claim. The Department also may receive additional materials from the institution in its response to a borrower's allegations. The Department may rely on records otherwise in the possession of the Secretary, such as recorded calls, as long as the Department provides both borrowers and institutions with an opportunity to review and respond to such records. The Department encourages borrowers to use the Department's publicly available data as evidence to demonstrate a misrepresentation. The Department will make program-level outcome data available to institutions and students through Federal administrative datasets, and these data tools may help students satisfy this standard in a manner not previously possible. For example, a borrower may use information in the expanded College Scorecard, which will include program-level outcomes data,

to demonstrate that an institution, in providing significantly different information than the information in the expanded College Scorecard, committed a misrepresentation with knowledge of its falsity or reckless disregard for the truth.

However, if changing economic conditions result in future students facing markedly diminished job opportunities or earnings, the institution would not have made a misrepresentation unless the data reported for earlier graduates met the definition of misrepresentation.

Another area where an alleged misrepresentation may not actually meet the standard of a misrepresentation is job placement rate reporting. Since at least 2011, the Department had evidence that job placement rate determinations are highly subjective and unreliable.[FN60] On March 1-2, 2011, RTI International, contractor for the Integrated Postsecondary Education Data System (IPEDS), convened a meeting of the IPEDS Technical Review Panel (TRP) to develop a single, valid, and reliable definition of job placement determined that while calculating job placement rates using a common metric would be preferable, doing so was not possible without further study, given that States and accreditors use many different definitions to define in-field job placements and identify the student measurement cohort for calculating rates. In the absence of a common methodology, the TRP recommended institutions disclose the methodology associated with the job placement rate reported to their accreditor or relevant state agency but advised against posting institutional job placement rates on College Navigator.

For the reasons stated above, the Department encourages accreditors and States to adopt the use of program-level College Scorecard data to ensure that all students have access to earnings data that more accurately and consistently—regardless of accreditor or State—capture program outcomes and resolve the many challenges associated with more traditional job placement rate determinations. This change in practice, alone, will likely reduce the potential for misrepresentations related to job placement rate claims. Such a practice also will enable students to provide evidence of misrepresentation because the institution's representations may easily be compared to College Scorecard data.

As in the 2016 final regulations, these final regulations do not require that a defense to repayment be approved only when evidence demonstrates that a school made a misrepresentation with **\*49807** the intent to induce the reliance of the borrower on the misrepresentation.[FN61] The Department agrees with negotiators and commenters that it is unlikely that a borrower would have evidence—particularly clear and convincing evidence, as proposed in the 2018 NPRM—to demonstrate that an institution acted with intent to deceive. The final regulations provide that a defense to repayment application will be granted when a preponderance of the evidence shows that an institution at which the borrower enrolled made a representation with knowledge that the representation was false, or with reckless disregard for the truth. Accordingly, a borrower is not required to provide evidence that an institution acted with intent to deceive or with intent to induce reliance. The borrower must prove by a preponderance of the evidence that the institution's act or omission was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth.

We recognize that misrepresentations can be made verbally. It can be difficult to determine whether a representative of an institution made a verbal misrepresentation to a borrower several years after the fact. While the Department will consider borrower defense claims in which the only evidence is the claim by the borrower that an institution's representative said something years prior, these necessarily are difficult claims to adjudicate. They also carry an inherent risk of abuse. We thus encourage borrowers to obtain and preserve written documentation of any information—including records of communications, marketing materials, and other writings—that they receive from a school that they rely upon when making decisions about their education. As a general rule, it is best for students to make these important decisions based upon written representations and documentation from the institution.

Like the 2016 final regulations, the Department's proposed misrepresentation standard covers omissions. The Department believes that an omission of information that makes a statement false, misleading, or deceptive can cause injury to borrowers and can serve as the basis for a defense to repayment. For example, providing school-specific information about the employment rate or specific earnings of graduates in a particular field without disclosing employment and earnings statistics compiled for that field by a Federal agency could constitute a misrepresentation under § 685.206(e)(3)(vi). Failing to disclose state or regional

data, when available, also could constitute a misrepresentation as reflected by the new example provided in revised § 658.206(c)(3)(vi).[FN62] These revisions help clarify what the Department may consider an omission with respect to the definition of misrepresentation.

As described in other sections of this Preamble, we have structured these final regulations to provide an equitable process for borrowers and institutions. The borrower and institution may review and respond to each other's submissions. The process created by these final regulations will assist the Department in making fair and accurate decisions, while providing borrowers and schools with due process protections.

The Department believes the definition of "substantial misrepresentation," at § 668.71(c), is insufficient to address the various concerns and interests that commenters describe. As explained above, punishing an institution for an inadvertent mistake does not appropriately balance the Department's obligations to current and future students or taxpayers. The Department, however, will not require a borrower to demonstrate that the institution acted with specific intent to deceive. The borrower must only demonstrate that the institution's act or omission was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth. Additionally, the Department maintains the evidentiary standard of preponderance of the evidence from the 2016 final regulations for borrower defense to repayment applications. This lower evidentiary standard appropriately addresses concerns about the borrower's ability to demonstrate a misrepresentation occurred.

One commenter's assertion that the Department assumes five percent of misrepresentations are not committed with intent, knowledge, or reckless disregard is wrong. In the 2018 NPRM, the Department's Regulatory Impact Analysis provided: "By itself, the proposed Federal standard is not expected to significantly change the percent of loan volume subject to conduct that might give rise to a borrower defense to repayment claim. The conduct percent is assumed to be 95 percent of the [President's Budget] 2019 baseline level." [FN63] The commenter appears to have assumed that the conduct percent is tied to the specific requirement that an act or omission be made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth. As mentioned in the Net Budget Impacts section of the RIA, the distinction between the borrower percent and the conduct percent is somewhat blurred. The change the commenter points out is more reflected in the borrower percent as part of the ability of the borrower to prove elements of their case. Given that the two rates are multiplied in developing the estimates, we believe that the impacts of the regulation are captured appropriately.

The commenter's misunderstanding of the Department's Regulatory Impact Analysis informed the commenter's conclusion that the definition of misrepresentation substantially burdens borrowers without distinguishing among the types of misrepresentations borrowers may have experienced. The commenter does not provide any data to support this conclusion, and the Department's RIA does not establish this conclusion. Contrary to the commenter's assertions, the Department's definition of misrepresentation distinguishes among the different types of misrepresentations borrowers may have experienced. For example, the misrepresentation may be by act or omission. The school may have made the misrepresentation with knowledge of its false, misleading, or deceptive nature or with reckless disregard for the truth.

The Department declines to adopt the UDAP standard suggested by commenters. Both the FTC and CFPB investigate consumer complaints that are not necessarily similar to borrower defense to repayment claims. The Department is not bound by FTC and CFPB standards and chooses not to adopt them.

Additionally, the Department plays a role as a gatekeeper of taxpayer dollars regarding loan forgiveness—a role not shared by the FTC or CFPB. The Department is unique in that it is responsible for both distributing and discharging loans. The FTC and CFPB do not lend money, like the Department does, and therefore those agencies are not responsible for protecting assets in the same manner as the Department is.

We disagree that the Federal standard, including the definition of misrepresentation, should include  **\*49808**  UDAP violations to ensure that borrowers are protected. As we explained in the 2016 final regulations, we considered the available precedent and determined that it is unclear how such principles would apply in the borrower defense context as stand-alone standards.[FN64]

000112

Such unfair and deceptive practices are often alleged in combination with misrepresentations and are not often addressed on their own by the courts. With this lack of guidance, it is unclear how such principles would apply in the borrower defense context. We would like to avoid for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context. As a result, we decline to adopt a standard for relief based on UDAP.

Changes: The Department adopts, with some changes, the definition of misrepresentation in the 2018 NPRM for § 685.206(e)(3). As previously noted, the Department adopts the Federal standard in Alternative B in the 2018 NPRM and makes revisions to align the Federal standard with the definition of misrepresentation, such as removing the phrase "an intent to deceive" the phrase "making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan" from § 685.206(e)(2).

Additionally, the Department revised the regulations to clarify that the list of evidence of misrepresentation in § 685.206(e)(3) is a non-exhaustive list. The Department further amended the description of evidence that a misrepresentation may have occurred to clarify that actual institutional selectivity rates or rankings, student admission profiles, or institutional rankings that are materially different from those provided by the institution to national ranking organizations may evidence a misrepresentation. The Department also revised its amendatory language to clarify that a representation regarding the amount, method, or timing of payment of tuition and fees that the student would be charged for the program that is materially different in amount, method, or timing of payment from the actual tuition and fees charged to the student evidences a misrepresentation in these final regulations. The Department revised the example of misrepresentation under § 685.206(e)(3)(vi) to include the failure to disclose appropriate State or regional data in addition to national data for earnings in the same field as provided by an appropriate Federal agency.

The Department revised the Federal standard to require a borrower to demonstrate a misrepresentation of a material fact and not a misrepresentation of a material opinion, intention, or law.

### *Determination of Misrepresentation*

Comments: One commenter suggested that the borrower should still be eligible for a defense to repayment discharge when the misrepresentation was made by an employee acting without the school's knowledge or against the school's direction. The commenter notes that if a borrower was harmed by the school's employee or agent, then the school, not the borrower, should be responsible for the harm caused.

Several commenters sought determinations as to whether specific examples of statements or omissions would constitute misrepresentation under the proposed definition. These examples include: A failure to inform a student that the school may close prior to that final decision being made; a failure to disclose that a regulator has taken an adverse action against the school while the matter is on appeal and not final; a school makes a mistake without willful intent; an employee of the school provides inaccurate or unclear information that can be tied to a deficit in training or performance; changes that occur to the information originally provided to the borrower, through no fault of the school; if State or Federal governments make dramatic budgetary reductions in financial aid that result in a reduction of aid promised to a borrower; incorrect information regarding what financial aid is available; changes in costs after a student enrolls; incorrect information regarding the cost of attending the school; differences in reporting to adhere to State, Federal, accrediting agency, and licensing board requirements; Nursing National Council Licensure Examination (NCLEX) passage rates; clinical facility sites utilized during nursing school; institutions stating that a borrower can make the national average of earnings in a particular field, even if that average exceeds those of program graduates; typographical errors in marketing materials produced internally or by outside entities; and falsified data provided to an institutional ranking organization in order to inflate the school's rankings.

One commenter asked whether students at specific institutions would be covered under this regulation, had this standard been in place and given the evidence now available to the Department.

Other commenters sought clarification on what constitutes a deceptive practice or act or omission on the part of a school and requested guidance from the Department regarding what policies to put in place to ensure schools are not misleading students in any way. These commenters also would like to know how compliance with these policies may be enforced.

000113

Some commenters objected to the inclusion within the specific examples of statements or omissions that would constitute a misrepresentation under the proposed definition of "availability, amount, or nature of financial assistance." These commenters note that the volatility of financial aid awards is more often attributable to a change in the student's eligibility, rather than an independent determination by the school.

Another commenter objected to the inclusion within the specific examples of statements or omissions that would constitute a misrepresentation under the proposed definition of "[a] representation regarding the employability or specific earnings of graduates without an agreement between the school and another entity for such employment or specific evidence of past employment earnings to justify such a representation or without citing appropriate national data for earnings in the same field as provided by an appropriate Federal agency that provides such data."

The commenter cites research that found that earnings from the Bureau of Labor Statistics exceed the actual earnings of program graduates in gainful employment (GE) programs in 96 percent of programs analyzed, including in almost every one of the top 10 most common GE occupations, even for the program graduates with the highest earnings.

Discussion: A borrower may successfully allege a defense to repayment based on a misrepresentation by a school's employee who acts without the school's knowledge or against the school's direction as long as the borrower demonstrates they reasonably relied on the misrepresentation under the circumstances and that the employee acted with reckless disregard for the truth. The Department will not fault a borrower for failing to recognize that the employee is acting without the school's knowledge or against the school's direction, unless the circumstances clearly indicate the employee is not authorized to make the alleged representations on behalf of the school. These circumstances will help to determine whether the borrower reasonably relied on the misrepresentation of material fact, as **49809** required by the Federal standard in § 685.206(e)(2)(i).

For example, if an employee in the school's cafeteria who serves food made a misrepresentation about the availability, amount, or nature of financial assistance available to a particular student, that student should reasonably recognize the employee is not authorized to make such representations. The Department will take into consideration whether the school's employee is authorized to act on behalf of the school in determining whether to recover funds from the school.

To address some of the commenter's concerns, the Department is revising § 685.206(e)(3)(vii) to clarify that a misrepresentation may constitute a "representation regarding the availability, amount, or nature of any financial assistance available to students from the institution or any other entity to pay the costs of attendance at the institution that is materially different in availability, amount, or nature from the actual financial assistance available to the borrower from the institution or any other entity to pay the costs of attendance at the institution after enrollment." The Department recognizes that a student's eligibility for financial assistance may change and will examine the school's representation in light of the student's eligibility at the time the school made the representation regarding the availability, amount, or nature of any financial assistance available to the student. The school's representation must be materially different in availability, amount, or nature from the actual financial assistance available to the borrower in order to constitute a misrepresentation.

Additionally, the Department revised the proposed definition of the terms "school" and "institution" to align more closely with the persons or entities who may make a misrepresentation in 34 CFR 668.71. Accordingly, these final regulations expressly define a school or institution to "include an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services." [FN65] This definition captures the Department's interpretation of the 2016 final regulations, as the preamble to the 2016 final regulations indicates that schools may be held liable for their employees' representations.[FN66]

The Department agrees that it can be difficult to differentiate between an institution that misrepresents the truth to students as a matter of policy and an individual employee who violates the institution's policies to make the misrepresentation. To determine

whether an institution acted with reckless disregard for the truth, the Department may consider the controls that an institution had in place to prevent or detect any misrepresentations. For this reason, it is important that the final regulations provide an opportunity for an institution to contribute to the record. An opportunity to respond in a proceeding is a well-established principle of due process. The Department will determine whether a misrepresentation occurred based on information from both the borrower and the school.

We understand the commenters' interest in further clarification as to whether specific circumstances may constitute a misrepresentation. However, we do not believe it is possible or appropriate to provide an exhaustive list of examples or a hypothetical discussion of the analytical process the Department will undertake to ascertain whether a specific borrower's claim meets the requirements of misrepresentation. The determination of whether a school made a misrepresentation that could be the basis for a borrower defense claim will be made based on the specific facts and circumstances of each borrower defense to repayment application. The Department will carefully examine the facts presented in each application and cannot anticipate the unique facts of each application.

In response to the commenter's request for more clarity regarding the circumstances that may constitute a misrepresentation, the Department made a minor revision to § 685.206(e)(3)(ix). In § 685.206(e)(3)(ix), the Department added that a representation that the institution, its courses, or programs are endorsed by "Federal or State agencies" may constitute a misrepresentation if the institution has no permission or is not otherwise authorized to make or use such an endorsement. Institutions should not represent that their courses or programs are endorsed by Federal or State agencies, if these agencies have not endorsed them.

In § 685.206(e)(3)(x), the Department states that a representation regarding the location of an institution that is materially different from the institution's actual location at the time of the representation could constitute a misrepresentation for borrower defense purposes. The Department does not intend for this specific provision to apply to institutions that relocate to a new location after a student enrolls to comply with the new FASB standards or after an institution's lease runs out and is not subsequently renewed. Under the Department's definition of misrepresentation, an institution's representation about its location must be accurate at the time when the representation is made. If the institution makes a representation about its location and later changes its location, then the institution should accurately represent its change in location. We expect the implementation of the new FASB standards will increase the number of institutions that relocate, which should not be permitted to result in an increase in the number of borrower defense claims based upon misrepresentations about the school's location as long as the school's representation about its location is accurate at the time when the representation is made. Subject to additional material facts and circumstances, an institution that moves to a slightly different location, with comparable facilities and equipment, which does not create an overly burdensome commute, will not be viewed by the Department as having committed a misrepresentation.

The Department acknowledges that allegations against the specific institutions that the commenters referenced are well-known. The discharge applications submitted by students who attended those schools are being evaluated under the pre-2016 regulations. It is not appropriate to speculate how those cases would be decided using a different standard, a different process, and different evidence. The Department does not comment on claims or matters that are pending.

The Department's regulations provide a non-exhaustive list of evidence that a borrower may use to demonstrate that a misrepresentation occurred. Institutions may develop internal controls and compliance policies based on this non-exhaustive list. Institutions are well positioned to determine how to ensure compliance with institutional policies promulgated to prevent and prohibit misrepresentations to students. In these policies, institutions may describe the consequences, including disciplinary measures, that employees face if they make a misrepresentation.

The Department will not determine that a school made a misrepresentation if a student's eligibility for financial aid changed as a result of changes in  *49810  Federal programs or a student's eligibility for aid. The Department, however, is concerned that many institutions engage in strategic dissemination of institutional aid where they provide significant first year aid to attract a student to the institution, but do not continue that level of support throughout the program even when the student meets the

requirements for receiving that level of support. Conduct such as this could constitute a misrepresentation, depending on the details of the situation.

Similarly, the Department will not determine that an institution made a misrepresentation for complying with differing requirements of accreditors or States to report multiple job placement rates for a single program, if a student, through no fault of the institution, misunderstands which of those placement rates more accurately reflects his or her likely outcomes. If the institution uses data that is required by accreditors or States in its own publications and materials, the Department encourages institutions to provide context for a student to understand the relevance of the job placement rate or other data required by accreditors or States. For example, institutions with an Office of Postsecondary Education Identification Number (OPE ID) may report job placement rates that include many campuses across the country.

As a result, these institutions may be required to report a rate that is not intended to represent earnings for students who live in parts of the country where wages are lower than average or higher than average. The use of OPE IDs to report outcomes also may cause an institution to appear to be located in one part of the country, even though the campus that a student attends may be at an additional location in another part of the country where prevailing wages differ. Similarly, accreditors and States may define measurement cohorts differently and may have different standards for what constitutes an in-field job placement. Accordingly, an institution may report data accurately based on the various definitions they are required to use, and a student may not understand how to interpret this data. As long as the institution does not use that data in a manner to knowingly mislead or deceive students or with reckless disregard for the truth, the Department will not consider the use of such data to constitute a misrepresentation.

An institution, however, that makes claims about guaranteed employment or guaranteed earnings to borrowers should maintain evidence to support those guarantees. An institution could be considered to have made a misrepresentation if evidence of such guarantees does not actually exist or do not apply to all students to whom the guarantee is made.

We appreciate the commenters' concern regarding discrepancies between BLS and GE earnings data. To clarify, it is important to remember that GE rates, as previously calculated, were based upon earnings measured only a few years after a title IV participating student graduates, while BLS measures earnings of everyone in an occupation, including those who have years of experience and expertise.

Thus, BLS data may more accurately represent long-term, occupational earning potential rather than the expected earnings of an institution's program graduates within two or three years of graduation. Until an expanded College Scorecard provides institutions with median program-level earnings, BLS data is the most reliable source of Federal wage data available to help students understand earnings for particular occupations. BLS data is helpful because a student is generally interested in earnings over the course of a career, and not just a few years after completion of the program.

To address the concerns of commenters that a borrower may misunderstand the national data, the Department also revised § 685.206(e)(3)(vi) to include a parenthetical that institutions using should include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for graduates. Such a disclaimer places the national data that an institution may use in context and will help the borrower understand that the national data does not guarantee a specific level of income. Such a disclaimer also will help the borrower understand that the national data may not be representative of what a student will make in the early years of their career or in a particular part of the country.

Changes: The Department is revising 34 CFR 685.206(e)(3)(vi), which provides examples of misrepresentation, to include a parenthetical that instructs institutions to include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for recent graduates.

The Department revised the example of a misrepresentation in § 685.206(e)(3)(vi) regarding the availability, amount, or nature of the financial assistance available to students to expressly state that the representation regarding such financial assistance must be materially different from the actual financial assistance available to the borrower.

In § 685.206(e)(3)(ix), the Department added that a representation that the institution, its courses, or programs are endorsed by "Federal or State agencies" may constitute a misrepresentation if the institution has no permission or is not otherwise authorized to make or use such an endorsement.

The Department also revised the proposed definition of the terms "school" and "institution" to align more closely with the persons or entities who may make a misrepresentation in 34 CFR 668.71.

**Borrower Defenses—Judgments and Breach of Contract**

Comments: A number of commenters supported the Department's proposal to use State judgments, breaches of contract, and/ or other third-party information in its evaluation of, but not as an automatic approval for, borrower defense claims.

Several commenters urged the Department to view breaches of contract and prior judgments as additional bases for a borrower defense claim. One commenter noted that if colleges were in violation of other laws, recognizing such claims would provide relief to wronged borrowers and failure to recognize these types of claims limits a borrower's opportunity to obtain relief.

One commenter noted that although the preamble clarifies that breaches of contracts or judgments may be considered as evidence of a misrepresentation, this position should be explicitly stated in the text of the regulation.

One commenter suggested that the Department modify the rule to require the Department to review any State judgments for relevant information before requiring additional documentation from the borrower, and that if a State judgment satisfies the Federal standard and the school was provided an opportunity to present its evidence, the borrower's claim should be accepted and proceed to the harm stage. Another commenter noted that under the Department's proposal, a person who has been determined to be a victim through a robust judicial process at the State level is denied relief. A different commenter indicated that individual borrowers should not be  **\*49811**  required to identify illegal conduct at schools but should be able to rely on State court determinations.

One commenter indicated that the Department should not eliminate breach of contract as a basis for a claim merely because the Department did not find a sufficient number of borrowers asserting those rights in the past as the next crisis may not look like the last one.

Another commenter indicated that the final language should clarify whether a breach of contract can serve as the basis for a claim if it related directly to the educational services provided by the school.

Discussion: The Department appreciates the commenters' support for our proposed regulations.

Unlike the 2016 final regulations, the Federal standard in these final regulations does not include a breach of contract as a basis for a borrower defense to repayment claim. The 2016 final regulations provide that a borrower may assert a borrower defense to repayment, "if the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student." [FN67] The Department, however, did not identify the elements of a breach of contract and did not define what may constitute a contract between the school and the borrower. The Department noted in the 2016 NPRM that "a contract between the school and a borrower may include an enrollment agreement and any school catalogs, bulletins, circulars, student handbooks, or school regulations" and cited to two Federal cases, one of which is unpublished.[FN68] The Department further provided in the preamble of the 2016 final regulations that "it is unable to draw a bright line on what materials would be included as part of a contract because that determination is necessarily a fact-intensive determination best made on a case-by-case determination." [FN69] The Department declined to adopt a materiality element with respect to a breach of contract and did

000117

not define the circumstances in which an immaterial breach may satisfy the Federal standard.[FN70] Finally, the Department did not tie the breach of contract basis of the Federal standard to State law.

We continue to acknowledge that a breach of contract may depend on the unique facts of a claim, but are concerned that both borrowers and institutions will not know how the Department determines what constitutes a contract or a breach of contract with respect to borrower defense to repayment claims. The Department does not publish its decisions with respect to an individual borrower's claims and, thus, the public will not be able to know or understand the facts or circumstances the Department considers in accepting a breach of contract claim that satisfies the Federal standard.

We also are concerned that the lack of clarity with respect to breach of contract as a basis for a borrower defense to repayment claim will lead to uncertainty and confusion among schools and borrowers in different states because the breach of contract basis in the 2016 Federal standard is not tied to or based on State law. For example, contrary to the Federal case law cited in the preamble of the 2016 final regulations, the Supreme Court of Virginia expressly held that statements in an institution's "letters of offers of admission from the College's Admissions Committee; correspondence, including email, among the College's representatives and the students; and the College's [ ] Academic Catalog" did not constitute a contract between the school and its students.[FN71] These materials contained representations that a female liberal arts college, which had provided an education to women only for over 100 years, would remain single-sex.[FN72] The school's catalog even expressly stated: The school "offers an education fully and completely directed toward women. In a time of increasing opportunities for women, it is essential that the undergraduate years help the student build confidence, establish identity, and explore opportunities for careers and for service to the society that awaits her." [FN73]

The Supreme Court of Virginia ruled that these representations did not constitute a contract and, thus, admitting male students could not constitute a breach of contract claim.[FN74] Under the 2016 final regulations, it is not clear whether such representations in a school's catalog or other materials may constitute a breach of contract in satisfaction of the Federal standard if the school then began to admit male students subsequent to the claimant's enrollment, as the breach need not be material in nature. Breach of contract laws vary among States, and the breach of contract standard in the 2016 final regulations may be in contravention of some breach of contract laws such as the breach of contract laws in Virginia. In promulgating the 2016 final regulations, the Department expressly anticipated that guidance may eventually be necessary to further define breach of contract. [FN75] The Department does not wish to maintain a borrower defense regime that increases uncertainty as to what constitutes a contract and how that contract may be breached. Instead of maintaining a Federal standard that requires more clarification through guidance, the Department has decided to provide more certainty and clarity through regulations that provide a different Federal standard.

Unlike the Federal standard in the 2016 final regulations, the Federal standard in these final regulations requires a misrepresentation of material fact upon which the borrower reasonably relied in deciding to obtain a loan. The requirements of materiality and reasonable reliance provide more certainty and clarity. A breach of contract claim, unlike a claim of fraud or material misrepresentation, does not necessarily require any reliance by the borrower.[FN76] If the borrower does not rely on a school's promise to perform a contractual obligation, the borrower may not have suffered harm as a result of the school's breach of contract.

For example, if the school represents in its catalog that it will publish the number of robberies in a specific geographic area in a crime log but fails to do so, the school may have failed to perform its obligation. Assuming arguendo that this failure constitutes a breach of contract claim, such a breach likely will not affect the benefit the student receives from the education. Such a breach also likely is not material in nature. A Federal standard that requires a material misrepresentation and reliance by a borrower provides a more accurate gauge for any harm the student may have suffered. A more accurate gauge of harm to the student will enable the Department to more easily determine the amount of relief to provide in a successful borrower defense to repayment claim.

The Department is not eliminating breach of contract as the basis for a claim merely because the Department did not find a sufficient number of claims. The Department believes that a breach of contract that directly and clearly relates to enrollment or **\*49812** continuing enrollment or the provision of educational services may be used as evidence in support of a borrower defense to repayment claim. Standing alone, however, a breach of contract, will not be sufficient to satisfy the Federal standard.

Similarly, the Department acknowledges that if a borrower has obtained a non-default, favorable contested judgment against the school based on State or Federal law in a court or administrative tribunal of competent jurisdiction, then there may circumstances when the borrower may use such a judgment as evidence to satisfy the Federal standard in these final regulations.

For example, where a borrower obtains a judgment against a school for statements it made to the borrower about licensure passage rates for a program in which the borrower enrolled, and court found that the school knew the statement to be false and that the borrower suffered financial harm, the borrower may use the judgment as evidence in support of his or her application to seek a discharge of a Direct Loan or a loan repaid by a Direct Consolidation Loan. These regulations do not prohibit a borrower from pursuing relief from courts or administrative tribunals. For example, settlements negotiated by States have included elimination of private loans, reimbursement of cash payments, and repayment of outstanding Federal loan debt. However, the defense to repayment provision limits relief to Federal student loan repayment obligations and does nothing to assist students who used cash, college savings plans, or other forms of credit to pay tuition.

Unlike the 2016 final regulations, a judgment, standing alone, will not necessarily automatically satisfy the Federal standard. If the borrower has obtained a judgment against a school, then the court or administrative tribunal very likely provided an adequate remedy to the borrower as part of the judgment. Accordingly, the Department may not be able to offer any additional relief.

Even if the Department may offer further relief, the Federal standard should not include an inherent assumption that the relief provided by the court or administrative tribunal was insufficient. Accepting judgments as evidence in support of borrower defense claims allows for the Department to undertake the necessary analysis to determine whether additional relief is warranted, but including such judgements as an automatic basis to qualify for relief presumes more than what is appropriate in all cases. We should not supplant the judicial system by granting relief that a court or administrative tribunal did not deem necessary.

The Department chose not to use a State law standard in the 2016 final regulations because a State law standard may result in inequities among borrowers who qualify for relief. If one State's laws are more generous than those in another State, then two equally situated borrowers may obtain very different results in their respective State courts. If a judgment based on State law automatically qualifies a borrower for a borrower defense to repayment, then inequities among borrowers will perpetually continue. Accordingly, the Department has determined that a judgment against the school, alone, should not constitute the Federal standard.

In order to ensure that both borrowers and institutions have due process rights, these final regulations add new steps to the borrower defense to repayment adjudication process that provides both with an opportunity to provide evidence and respond to evidence provided by the other party. Therefore, automatic relief under any circumstance would be inappropriate, especially since the circumstances that resulted in a breach of contract may or may not meet the Federal standard for misrepresentation. As such, while a judgment or breach of contract related to enrollment or the provision of educational services may serve as compelling evidence to support a borrower's borrower defense to repayment claim, the Department cannot award automatic borrower defense relief since that would eliminate the opportunity for the institution to respond to the borrower's claim with the Department. The Department sufficiently explained in this Preamble that a judgment and/or a breach of contract may be used as evidence in support of a borrower defense to repayment claim. Changing the amendatory language to this effect is not necessary and may mislead or confuse borrowers by implying that a judgment or breach of contract may independently and automatically satisfy the Federal standard. The Federal standard in these final regulations marks a departure from the Federal standard in the 2016 final regulations with respect to a judgment or breach of contract, and the Department does not wish to cause confusion.

Changes: None.

**Borrower Defenses—Provision of Educational Services and Relationship With the Loan**

Comments: Some commenters supported the Department's proposal to exclude defense to repayment claims that are not directly related to the provision of educational services. Some commenters also supported the definition the Department proposed for the provision of educational services.

Other commenters argued that the limitation of the provision of educational services to a borrower's program of study was inappropriately narrow. These commenters suggested that the borrower's claim should apply to all Federal student loans, regardless of how the funds were spent, and to the school's pre- and post-enrollment activities. One commenter also stated that the provision of educational services is too narrowly defined, because schools may have made promises about the quality of the education that fall outside of the specific requirements of accreditors or State agencies, but that may significantly affect the borrower's educational experience. This commenter also asserted that the Department failed to adequately justify its decision to limit the provision of educational services only to those related to the borrower's program of study.

Another commenter objected to the definition limiting misrepresentation to circumstances where the school had withheld something "necessary for the completion" of the program, as that would leave too much room for abuse by schools.

One commenter found it needlessly inimical to require that a misrepresentation relate to a borrower's program of study for the borrower to make a defense to repayment claim. The commenter argued that the value of a degree rests in large part on the reputation of the school and, if that reputation is tarnished or destroyed, the value of the degree is as well.

A group of commenters asked what "educational resources" means. Additionally, they noted that accrediting agencies, State licensing agencies, or authorizing agencies may require schools to maintain certain licensure passage or job placement rates in their programs, but there are not "requirements for the completion of the student's educational program." These commenters inquired whether the definition of provision of educational services excludes borrower defenses on the basis of misrepresentations about job placement and exam passage rates. **\*49813** These commenters further inquired whether a particular attribute or representation regarding transferability of credits constitutes a "requirement for the completion of the student's educational program." These commenters noted that only subparagraph (J) of proposed § 685.206(d)(5)(iv), in the 2018 NPRM, refers to "educational resources" and inquired whether subparagraph (J) is the only provision that may serve as the basis of a misrepresentation regarding the provision of educational services.

Discussion: We thank the commenters for their support of the proposed regulations pertaining to the provision of educational services.

As noted in the NPRM, the Department included a definition of "provision of educational services" at the request of some of the non-Federal negotiators. The Department acknowledged that there are well-developed bodies of State law that explain this term, and each State may define this term differently. Accordingly, in the NPRM, we concluded that the term "provision of educational services" is subject to interpretation and proposed to add that term as "the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program." [FN77] A misrepresentation relating to the "provision of educational services" thus is clearly and directly related to the borrower's program of study.

The Department expects the school's communications and acts that are directly or clearly related to the provision of educational services to conform to the Federal standard set forth in these final regulations.

We do not believe it is appropriate to consider acts or omissions unrelated to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was made as relevant to a borrower defense claim. For example, under the Department's definition, an institution that advertises a winning sports team does not make a misrepresentation for borrower defense purposes, if in years subsequent to a borrower's enrollment the team has less successful seasons. Similarly,

000120

an institution that advertises certain on-campus restaurants does not make a misrepresentation for borrower defense purposes if one or more of those restaurants closed their on-campus locations and were no longer available to students who purchased a campus meal plan.

However, if, for example, an institution represented in their college catalog that they provided highly-qualified faculty for the business program, modern equipment, low teacher-to-student ratios, and excellent training aids, but actually provided only one unqualified teacher for the program—who was also the school's registrar—one course session of forty-two students (all taking different level courses), and only two 10-key adding machines, then, with this combination of issues, the institution may have made a misrepresentation that could be used as a basis for a discharge application.[FN78]

Similarly, it is likely a misrepresentation when an institution insists in its marketing materials that its online program is "substantially identical" to the same course offered in the traditional classroom setting, but only provided PowerPoint slides from in-class courses without any accompanying lectures or videos, scanned copies of books with cut-off information and blurred entire sentences, and instructors that did not prepare course materials and were hardly involved at all in any actual online instruction.[FN79]

The Department disagrees that it should allow a borrower's defense to repayment application to apply to all Federal student loans, irrespective of how the borrower spends the funds. These loans are Federal assets, and the Federal taxpayer should not be liable for the choices of a borrower not related to a loan for enrollment at the school or to the provision of education services for which the loan was made.

A school's pre- and post-enrollment activities may support a borrower defense to repayment application if the institution's pre- or post-enrollment acts or omissions directly and clearly relate to the making of a loan for enrollment or continuing enrollment at the school or to the provision of education services for which the loan was made. The Department revised both the regulations on the Federal standard and the definition of misrepresentation to clarify that an institution's act or omission that directly and clearly relates to the enrollment or continuing enrollment at the institution may constitute grounds for a borrower defense to repayment claim.

Although the Department rejected similar requests by commenters in the past, the Department accepts these requests, which non-Federal negotiators also made during the most recent negotiated rulemaking sessions, to clarify that the provision of educational services must relate to the borrower's program of study. In adjudicating borrower defense to repayment applications, the Department seeks to avoid making inconsistent determinations. Tying the provision of educational services to the student's program of study will result in more consistent interpretations of the term "provision of educational services." This definition provides greater clarity as claims related to more general concerns associated with the institution's provision of educational services will not be considered. The Department does consider enrollment in general education courses prior to the borrower's selection of a major or educational service provided in relation to a student's prior major to be included in the definition of a program of study.

The definition of "provision of educational services" is based on educational resources as those resources provided by the institution that are required by an institution's academic programs, its accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program. Educational resources may include an adequate number of faculty to fulfill the institution's mission and goals or successful completion of a general education component at the undergraduate level that ensures breadth of knowledge. The Department cannot describe all the educational resources that various accrediting agencies or State licensing or authorizing agencies may require for completion of the student's educational program, so we decline to provide an exhaustive list in these final regulations.

The definition of the provision of educational services does not categorically exclude all borrower defenses on the basis of misrepresentations about job placement and exam passage rates. The final regulations define a misrepresentation as directly and clearly related to the making of a loan for enrollment at the school or to the provision of educational services for which

the loan was made. Misrepresentations about job placement and exam passage rates may directly or clearly be related to the making of a loan for enrollment at the school.

A representation regarding transferability of credits may constitute a requirement for the completion of the student's educational program depending on the circumstances. If the **\*49814** school makes a statement that all credits from another school are transferable and may be used to complete an educational program with knowledge that few or none of the credits are transferable, then that school likely would be considered to have made a misrepresentation as defined in these final regulations.

The definition of "provision of educational services" relates to elements necessary for the completion of the student's educational program, but a misrepresentation is not limited to circumstances where the school had withheld something "necessary for the completion" of the program. As explained above, a misrepresentation may be an act or omission that directly and clearly relates to the making of a loan for enrollment at the school.

We disagree with the commenter who asserted that defenses to repayment should be based on harm to a school's general reputation. Institutions may suffer reputational damage for a number of reasons, including, for example, poor performance of an athletic team, sexual misconduct on the part of a member of the staff or instances when a staff member accepts payment in exchange for boosting a student's chances to be admitted. But reputational harm does not generally have a widespread impact on the quality of education the students receive. An institution's level of admissions selectivity has a significant impact on the institution's reputation, but it would be hard to argue that it is the fault of the institution if a borrower selected a less-selective institution and did not benefit from the advantages of a social network typical of an elite institution. A borrower would not be entitled to borrower defense to repayment relief as a result of reputational damage, although if the institution misrepresented its admissions selectivity or admissions criteria, then the borrower may be eligible for relief. A school's reputation is not always tied to misrepresentations as defined for purposes of these regulations, but a borrower's program of study remains integral to the purpose and use of the loan.

Changes: The Department is not making any changes to the definition of "provision of educational services." The Department is revising the definition of "misrepresentation" and the Federal standard to clarify that an institution's acts or omissions that clearly and directly relate to enrollment or continuing enrollment at the institution or provision of educational services for which the loan was made may constitute grounds for a borrower defense to repayment application.

### *Effective Date*

Comments: A group of commenters noted that the Department's 1995 Notice of Interpretation, 60 FR 37769, clarified that the act or omission of a school, in order to serve as the basis for a borrower defense, must "directly relat[e] to the loan or to the school's provision of educational services for which the loan was provided." These commenters assert that if this Notice of Interpretation is not sufficiently clear, then the Department should apply its definition of "provision of educational services" in these final regulations to existing loans instead of to loans first disbursed on or after July 1, 2019.

Discussion: Although the Department issued a Notice of Interpretation in 1995 to clarify that an act or omission must directly relate to the loan or the school's provision of education services, commenters in 2016 requested that the Department clarify that the provision of educational services is tied to the student's program of study. Some of the non-Federal negotiators made this same request during the negotiated rulemaking in 2017, and the Department has responded by providing a definition for the term "provision of educational services." For concerns discussed elsewhere in these final regulations regarding retroactively applying definitions and standards, the Department will only apply this definition to loans first disbursed on or after July 1, 2020.

Changes: These final regulations provide that the definitions of provision of educational services and misrepresentation will apply to loans first disbursed on or after July 1, 2020.

### Borrower Defenses—Consolidation Loans

000122

Comments: A group of commenters contend that FFEL borrowers should have the same rights to a borrower defense discharge as Direct Loan borrowers and that pursuant to § 455(a) of the HEA, Direct Loans and FFEL loans are to have the same terms, conditions, and benefits. Another commenter argued that borrower defense should be available to FFEL borrowers without requiring consolidation or proof of any special relationship between their schools and FFEL lenders.

A group of commenters asserted that there are several problems with the proposal to make consolidation a necessary prerequisite for FFEL borrowers to access the borrower defense to repayment process. Requiring consolidation creates another administrative obstacle for borrowers. These commenters noted other obstacles include the Department's proposal to preclude borrowers with new Direct Loans, consolidated after the effective date of the rule, from asserting defenses unless they are either in collection proceedings or within three years from leaving the school.

These commenters also noted that not every FFEL borrower is eligible to consolidate into a Direct Consolidation Loan and that the Department should change the rules to permit all FFEL borrowers to do so. These commenters further asserted that the Department should allow for refunds of amounts already paid on FFEL loans. They urged the Department to give FFEL borrowers more certainty that their loans will be discharged by committing to a pre-approval process whereby the Department will determine FFEL borrowers' eligibility for discharge, contingent upon consolidation, prior to requiring consolidation or advising borrowers to consolidate to access relief.

Another group of commenters also requested that the Department outline what policy will apply to borrowers whose borrower defense applications are submitted prior to the effective date of the final rule but are not yet approved on that date, including FFEL borrowers that have requested pre-approval of their application prior to applying for a Direct Consolidation Loan.

This group of commenters suggested specific amendatory language regarding administrative forbearance for FFEL loan borrowers while the Department makes a preliminary determination before the borrower consolidates his or her loan(s). These commenters explained that administrative forbearance would be more appropriate than discretionary forbearance due to the limit imposed on discretionary forbearance. This group of commenters also suggested early implementation of administrative forbearance and suspension of collection activities.

These commenters noted that the final regulations should allow servicers to suspend collection activity while the Department makes a preliminary determination (prior to the borrower consolidating his or her loans) as to whether relief may be appropriate under the new Federal standard.

Discussion: The Department derives its authority for the borrower defense to repayment regulations from § 455(h) of the HEA, which specifically concerns Direct Loans, not FFEL loans. The statutory authority for the borrower defense to repayment regulations does not allow FFEL borrowers to access the borrower defense to repayment process unless the FFEL borrower consolidates **\*49815** their loans into a Direct Consolidation Loan. Direct Consolidation Loans are made under the Direct Loan Program. Generally, the Department views a consolidation loan as a new loan, distinct from the underlying loans that were paid in full by the proceeds of the Direct Consolidation Loan.

Accordingly, the Department's existing practice is to provide relief under the Direct Loan authority if a qualifying borrower's underlying loans have been consolidated into a Direct Consolidation Loan under the Direct Loan Program. As a corollary, if consolidation is being considered depending on the outcome of any preliminary analysis of whether relief might be available under § 685.206(c), relief cannot be provided until the borrower's loans have been consolidated into a Direct Consolidation Loan. Although commenters allege the Department is creating administrative obstacles for borrowers, the Department is allowing FFEL borrowers who are eligible to consolidate their loans into a Direct Consolidation Loan to receive relief under these regulations. This parallels, for example, how the Department makes FFEL borrowers eligible for PSLF, which is another opportunity limited to Direct Loan borrowers.

000123

FFEL Loans are governed by specific contractual rights and the process adopted here is not designed to address those rights. We can address potential relief under these procedures for only those FFEL borrowers who consolidate their FFEL Loans into a Direct Consolidation Loan. FFEL borrowers have other protections in their master promissory note and the Department's regulations. Since 1994, and to this day, the FFEL master promissory note states that for loans provided to pay the tuition and charges for a school, "any lender holding [the] loan is subject to all the claims and defenses that [the borrower] could assert against the school with respect to [the] loan." [FN80] As noted in the 2016 final regulations, the Department adopted this provision from the FTC's Holder Rule provision, and the Department's 2018 NPRM did not propose to revise the regulation regarding this provision.

Upon further consideration, however, the Department will continue placing the borrower's loans into administrative forbearance for Direct Loan borrowers while a claim is pending.[FN81] Interest still accrues during administrative forbearance, and will capitalize if the claim is not successful. The accrual of interest will deter borrowers from submitting a borrower defense to repayment application if no misrepresentation occurred. The Department amended these final regulations to clarify the borrower defense to repayment application will state that the Secretary will grant forbearance while the application is pending and will notify the borrower of the option to decline forbearance. Similarly, FFEL loans will be placed into administrative forbearance and collection will cease on FFEL loans, upon notification by the Secretary that the borrower has made a borrower defense claim related to a FFEL loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k).

In the 2018 NPRM, the Department did not propose to revise regulations in § 682.220, concerning the eligibility of FFEL borrowers to consolidate into a Direct Consolidation Loan, and maintains that the current eligibility requirements remain appropriate. The Department also did not propose to allow for refunds of amounts already paid on FFEL loans, as such a proposal exceeds its authority under section 455(h) of the HEA. The Department is limited by statute to discharging and refunding no more than the amount of the Direct Loan at issue, and only discharge of the remaining balance on the consolidated loan is possible.

Finally, the Department does not agree with the suggestion that we revise the final regulations to create a "pre-approval" process to determine FFEL borrowers' eligibility for discharge, contingent upon consolidation. Notably, the 2016 final regulations did not include any regulations about a "pre-approval" process. The preamble of the 2016 final regulations explained that the Department will provide FFEL borrowers with a preliminary determination as to whether they would be eligible for relief on their borrower defense claims under the Direct Loan regulations, if they consolidated their FFEL Loans into a Direct Consolidation Loan.[FN82] However, no information was provided as to how such a determination would be made, what would happen if additional information made it clear that a misrepresentation did not actually occur, or that after giving advice not to consolidate, additional evidence makes it clear that it did. Importantly, FFEL payments cannot be refunded. Such a preliminary determination process, however, is not possible under these final regulations.

These final regulations create a robust process whereby borrowers and schools have an opportunity to review each other's submissions. The Department will not be able to provide a borrower with an accurate preliminary determination without weighing any evidence and issues that the school presents in its submission. Accordingly, the Department will not include a preliminary determination process under these final regulations.

The Department still believes it is appropriate to determine what standard would apply to a particular borrower's discharge application based upon the date of the first disbursement of the Direct Consolidation Loan. Therefore, for Direct Consolidation Loans first disbursed on or after July 1, 2020, the standard that would be applied to determine if a defense to repayment has been established is the Federal standard in § 685.206(e). The Department understands that this approach may deter some borrowers who might otherwise wish to consolidate their loans, but do not wish to be subject to the Federal standard and associated time limits we adopt in these final regulations. The Department believes that this concern is outweighed by the benefits of this standard. This approach is consistent with the longstanding treatment of consolidation loans as new loans, and we believe it will provide additional clarity as to the standard that applies, especially in cases where borrowers are consolidating more than

one loan. As under the existing regulations, a borrower will be able to choose consolidation if she or he determines it is the right option for them.

Changes: The Department is leaving in effect the revisions and additions to §§ 682.211(i)(7) and 682.410(b)(6)(viii) that were made in the 2016 final regulations.

Accordingly, we will ask loan holders to place FFEL loans into administrative forbearance and suspend collection upon notification by the Secretary that the borrower has made a borrower defense claim related to a FFEL loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k).

 **\*49816**  Additionally, the Department is revising § 685.205(d)(6) to provide that Direct loans will be placed in administrative forbearance for the period necessary to determine the borrower's eligibility for discharge under § 685.206, which includes the borrower defense to repayment regulations in these final regulations. The Department also is revising § 685.206(e)(8) to clarify the borrower defense to repayment application will state that the Secretary will grant forbearance while the application is pending, that interest will accrue during this period and will capitalize if the claim is not successful, and will notify the borrower of the option to decline forbearance.

In addition, we are revising the final regulations to clarify that the standard that applies to a borrower defense claim is determined by the date of first disbursement of a Direct Loan or Direct Consolidation Loan.

**Borrower Defenses—Evidentiary Standard for Asserting a Borrower Defense**

*Preponderance of the Evidence, Clear and Convincing Evidentiary Standards*
Comments: There were many comments on the preponderance of the evidence and clear and convincing evidentiary standards under consideration by the Department. Those who supported a preponderance of the evidence standard noted that it is the typical evidentiary standard for most civil lawsuits. Some stated that a higher standard would make it impossible for borrowers to prove a misrepresentation, as defined by the proposed regulations, while others argued that a higher standard would be out of step with consumer protection law and the Department's other administrative proceedings. Some commenters expressed concern that a higher standard would create new barriers to relief for defrauded students. Other commenters pointed to the HEA's intention to provide loan discharges based on institutional acts or omissions, which they asserted normally would be adjudicated on a preponderance of the evidence standard.

One commenter noted that a heightened standard of proof is particularly inappropriate for an administrative proceeding that does not include discovery rights for the borrower, which would be available to the borrower in court. This commenter noted that the vast majority of borrowers will not have access to a lawyer.

Other commenters opposed the clear and convincing evidence standard. Some commenters asserted that there is no principled or logical basis for imposing the higher standard on borrowers seeking a loan discharge. Several commenters asserted that elevating the evidentiary standard to clear and convincing evidence would create substantial new barriers to relief for defrauded students, fail to protect them against institutional misconduct, and effectively prevent them from receiving the relief to which they are legally entitled. Another commenter noted that the clear and convincing evidence standard would present an extreme change.

One commenter noted that the Department cites no support to suggest the evidentiary standard prevents or dissuades consumers from submitting claims. This commenter asserted that it seems likely that most borrowers do not know what the evidentiary standard expected of them is, would not be able to contextualize evidentiary requirements without legal assistance, and would not change their behavior even if they did understand the expectations for evidence. Similarly, another commenter asked what evidence the Department considered that a heightened evidentiary standard may be necessary to deter frivolous or unwarranted claims for relief.

Opponents to the preponderance of the evidence standard often favored a clear and convincing evidence standard because it would protect institutions and taxpayers from frivolous borrower defense claims. Those who supported a clear and convincing evidence standard argued that it strikes a balance between the looser preponderance of the evidence standard and the far more stringent beyond a reasonable doubt standard.

One commenter generally supported the clear and convincing evidence standard and asserted that the Department should provide the strongest evidentiary standard possible that also is in accordance with standard consumer protection practices.

Some commenters expressed concern that under the preponderance of the evidence standard, a misstatement related to any provision of education services, no matter how small, would support a borrower defense claim, requiring the school to repay the Department and serving as a black mark against the school. These commenters worried that under the lower evidentiary standard, colleges would disclaim everything possible, disclose nothing to students, and treat them as potential litigants.

Many commenters agreed that a school should be held accountable for knowingly providing false or misleading information to borrowers. However, they caution that misrepresentation is a serious accusation that can seriously damage a school, even if the Department determines that the institution did not make a misrepresentation. These commenters argue that a borrower making such a claim should be required to provide clear and irrefutable evidence.

Discussion: The Department appreciates the many thoughtful comments received regarding the evidentiary standard appropriate for adjudicating defense to repayment claims. The Department considered the clear and convincing evidence standard because this standard is typically the standard required by courts in adjudicating claims of fraud.[FN83]

The Department has been persuaded, however, that for borrowers, without legal representation or access to discovery tools, the clear and convincing evidence standard may be too difficult to satisfy. Therefore, we adopt a preponderance of the evidence standard for borrower defense claims in these final regulations. We note that this is the same evidentiary standard used in the 2016 final regulations.

The Department's decision to engage institutions in developing a complete record prior to adjudicating a defense to repayment claim will ensure that decisions are made on the basis of a strong evidentiary record. Such a record will help to protect institutions and taxpayers, while helping students with meritorious claims compile necessary information.

The Department agrees that access to information may differ between students and institutions. We also wish to emphasize to consumers that, given the sizeable investment one makes in a college education, it is incumbent upon students to shop wisely and get information in writing before making a decision largely dependent upon that information. The Department seeks to establish a policy that encourages students to fulfill responsibilities they have in seeking information and evaluating the accuracy and validity of that information when making a decision as important as selecting an institution of higher education.

The Department does not wish to create a standard so low that students either alone, or with the help of unscrupulous third parties, attempt to  *49817  induce statements that could then be misconstrued or used out of context to relieve borrowers who otherwise received an education from their repayment obligations.

Borrowers should be protected against misrepresentations made by institutions that result in financial harm to them, but at the same time, the Department must uphold a sufficiently rigorous evidentiary standard to ensure that the defense to repayment process does not impose unnecessary or unjustified financial risk to institutions, taxpayers, or future students. A borrower who makes an unsubstantiated claim about a school with the Department incurs comparatively little risk.

The Department believes it has established an evidentiary standard in these final regulations that carefully balances the need to protect borrowers in instances where they suffered harm as a result of misrepresentations with the need to maintain the integrity of the student loan program. In addition, this change is appropriate so that borrowers shop wisely, take personal responsibility

000126

for seeking the best information available and make informed choices, and accept the benefits of student loans with the full understanding that they, generally, are legally obligated to repay those loans in full.

The Department acknowledges that some commenters supported the clear and convincing evidence standard. The Department agrees with commenters that a school should be held accountable for knowingly providing false or misleading information to borrowers and that a misrepresentation is a serious accusation that can damage a school's reputation. A clear and convincing evidence standard for borrower defense to repayment claims may have been appropriate if the Department adopted a different definition of misrepresentation. In these final regulations, misrepresentation constitutes a statement, act, or omission by an institution that is false, misleading, or deceptive and that was made with knowledge of its false, misleading, or deceptive nature. The Department provides a non-exhaustive list of types of evidence that may be used to prove that an institution made a misrepresentation.

Changes: The Department adopts the "preponderance of the evidence" standard for both affirmative and defensive claims in these final regulations. It is appropriate to require a borrower to prove that an institution, more likely than not, made the alleged misrepresentation.

### Multiple Standards

Comments: One commenter objected to the proposal to use a higher evidentiary standard for borrowers based on their repayment status—i.e., to apply the clear and convincing standard to borrowers asserting affirmative claims, while applying a preponderance of the evidence to those asserting defensive claims.

Another commenter stated that if affirmative claims are allowed, then affirmative claims should be adjudicated under a clear and convincing evidence standard.

One commenter asserted that the Department should use the clear and convincing evidence standard for both affirmative and defensive claims.

Discussion: Although we considered applying a clear and convincing evidentiary standard to affirmative claims, we ultimately decided to apply the preponderance of the evidence standard to all claims, as described above. As previously noted, the definition of misrepresentation is more stringent than the 2016 definition and, thus, a preponderance of the evidence standard for all claims is more appropriate to balance the Department's interests in providing a fair, accessible, and equitable process for both borrowers and schools. Because a borrower is required to prove that an institution's act or omission was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth, there is no reason to require a higher evidentiary standard based on the borrower's repayment status. Applying a higher evidentiary standard to borrowers who are not in default may encourage these borrowers to default on the loans to receive the benefit of a lower evidentiary standard. After weighing the various interests, the Department determined that applying a higher evidentiary standard to affirmative claims, but not defensive claims is not justified.

Changes: The Department adopts the "preponderance of the evidence" standard for both affirmative and defensive claims in these final regulations.

### Evidence Presented in Support of the Claim

Comments: Some commenters contended that a borrower's affidavit or sworn testimony should constitute sufficient evidence to support a defense to repayment claim. These commenters argued that a borrower would typically be unable to obtain evidence from a school to evince recklessness or intent and requiring more than their testimony would erect too great of a barrier to recovery.

Some commenters suggested that a borrower should have physical forms of evidence to show misrepresentation by the school.

Another commenter expressed concern that if any evidence is permitted beyond the borrower's sworn affidavit, schools could continue to defraud borrowers by submitting false or manufactured evidence in response to borrowers' claims.

Discussion: The Department thanks the commenters for their opinions, but disagrees that a borrower's affidavit or sworn testimony, alone, is sufficient evidence to warrant a decision by the Department that has significant financial consequences not just for borrowers, but for institutions, current and future students, and taxpayers who ultimately will bear the costs if there are high volumes of discharges. Taking such an approach could increase the likelihood that future students will bear the cost of prior students' borrower defense claims in the form of increased tuition. Under the process adopted in these final regulations, a borrower may submit a sworn affidavit in support of the borrower defense application, but the institution will have an opportunity to respond and provide its own rebuttal evidence, if any. The borrower will have an opportunity to reply. Then the Department, with the full benefit of all the evidence presented, will adjudicate the claim. The Department believes that these procedures, similar to those used at certain stages in judicial proceedings, provide protections against frivolous affidavits.

The Department believes that the defense to repayment regulations can play an important role in helping borrowers become more educated consumers, including by providing an incentive for institutions to put all claims material to the student's enrollment decision in writing. As more information becomes available to borrowers, they will be better able to make informed decisions.

Borrower defense to repayment claims may be submitted three years after a borrower exited a program at a particular institution, and both the borrower and the institution may have difficulty recalling the precise language that was used or the information verbally conveyed. To be sure, institutions that make misrepresentations should suffer harsh consequences, but any finder of fact, including the Department as an adjudicator of borrower defense claims, is ill-equipped, many years after the **49818** fact, to make determinations based solely on one party's statement. Therefore, an affidavit, alone, is not sufficient evidence to adjudicate a claim that could be worth tens, if not hundreds, of thousands of dollars to the borrower making the affidavit.

The Department is removing the phrase "intent to deceive" in the Federal standard and will not require a borrower to demonstrate such intent in order to establish a borrower defense claim. Instead, the borrower must prove by a preponderance of the evidence that an institution made a misrepresentation of material fact upon which the borrower reasonably relied in deciding to obtain a loan that is clearly and directly related to enrollment or continuing enrollment at the institution or for the provision of educational services for which the loan was made. The definition of misrepresentation also does not expressly require the borrower to demonstrate that the institution acted with intent to deceive. As previously stated, a misrepresentation constitutes a statement, act, or omission that was made with knowledge of its false, misleading, or deceptive nature or with reckless disregard for the truth.

As noted elsewhere in this preamble, evidence that borrowers may present to the Department includes, but is not limited to: Web-based advertisements or claims, direct written communications with an institution official, information provided in the college catalog or student handbook, the enrollment agreement between the institution and the student, or transcripts of depositions of school officials. It is important for students to obtain, review, and retain written materials provided by the school; if the student is told information materially different than the information provided in writing, the Department will consider the evidence of the alleged verbal misrepresentation. Students should seek a written explanation to clarify any discrepancies.

The Department disagrees that an institution is likely to submit fraudulent documents to the Department in response to a borrower defense to repayment application. Institutions face grave risks for making any falsified or misleading representation to the Department. The Department may remove the institution from all title IV programs if the institution submitted false or manufactured evidence in response to a borrower's claim. Under no circumstance is a title IV participating institution permitted to commit fraud on students or the Department.

The Department's goal is to ensure that defrauded students have reasonable access to financial remedies while ensuring students have access to the information they need to be smart consumers by making decisions based on information that a seller,

000128

vendor, or service provider commits in writing. Students, like all consumers, should obtain written representations in relation to any transaction in the marketplace that presents a significant financial commitment. Borrowers should understand the risks associated with making decisions based on verbal promises that an institution or any other entity in the marketplace is unable to substantiate or support in writing. Student advocacy groups, for instance, may help student become wise consumers on the front end, rather than successful borrower defense claimants after the fact.

Changes: None.

**Borrower Defenses—Financial Harm**

*General*

Comments: Many commenters supported the Department's definition of financial harm, noting that it clarifies what might be included and excluded, including the non-exhaustive list of examples. Some commenters noted that the definition appropriately addresses the longstanding legal principle that a victim's harm should be considered in determining a remedy. Other commenters supported the view that opportunity costs should not be included.

Several commenters cited protecting the financial interest of the taxpayer as an important goal when considering financial harm, especially if a borrower continued his or her enrollment after realizing that a misrepresentation occurred.

Some commenters believed that the requirement of proving financial harm beyond the debt incurred is "arbitrary, unsupported, and not feasible." Others stated that the Department's proposed financial harm definition is burdensome to borrowers. Commenters suggested that the Department provide clear information, such as a checklist of examples of financial harm from those identified in the proposed rule, and ask borrowers to check all that apply, explaining the meaning of items in the list, and allowing borrowers to describe other examples of financial harm they have experienced. This commenter also suggested that the Department eliminate asking unnecessary questions and ask necessary questions in a way that does not deter borrowers from applying.

Other commenters claimed that requiring financial harm is inconsistent with the statute and the statutory intent, citing the statutory language of "acts or omissions by an institution of higher education."

Commenters stated that the requirement of financial harm will result in the denial of claims where a student acquired a loan on the basis of misrepresentations but did not suffer financial harm.

Discussion: The Department thanks the commenters for their support of these regulatory changes. The definition of financial harm should provide clarity and the list of examples should also further enhance the understanding of its meaning. The Department's list of examples of financial harm may be found at § 685.206(e)(4)(i) through (iv). The Department believes that borrower defense relief should relate to financial harm. The Department reminds commenters that these final regulations provide an administrative proceeding, and broader remedies are available to borrowers in other venues. The Department does not wish for its borrower defense to repayment process to supplant venues where borrowers may recover opportunity costs or other consequential or extraordinary damages.

Unlike courts, which may award the borrower more than the loan amount for opportunity costs or other consequential extraordinary damages, Section 455(h) of the HEA authorizes the Department to allow borrowers to assert "a defense to repayment of a [Direct Loan]," and to discharge outstanding amounts to be repaid on the loan. This section further provides that "in no event may a borrower recover from the Secretary . . . an amount in excess of the amount the borrower has repaid on such loan." [FN84] Accordingly, it is improper for the Department to allow for extraordinary damages that likely will exceed the loan amount.

Even if financial harm continues after the filing of a claim, the Department may not provide to a borrower any amount in excess of the payments that the borrower has made on the loan to the Secretary as the holder of the Direct Loan. Although a borrower may be able to pursue such remedies through other avenues, under applicable statute, a borrower may not receive punitive damages or damages for inconvenience, aggravation, or pain and suffering as part of a borrower defense to repayment discharge. The 2016 final regulations similarly state that relief to the borrower may not include "non-pecuniary damages such as inconvenience, aggravation, emotional distress, or punitive damages." [FN85]

 **\*49819**  Regarding the protection of taxpayer dollars, the Department believes that the financial harm standard is an important and necessary deterrent to unsubstantiated claims or those generally beyond the scope of borrower defense to repayment. Students may experience disappointments throughout their college experience and career, such as believing that they would have been better served by a different institution or major. However, such disappointments are not the institution or the taxpayer's responsibility.

Without the link between loan relief and harm, it is likely that many borrowers could point to a claim made by an institution about the potential a student could realize by enrolling at the institution. For example, institutions that advertise undergraduate research experiences typically do not guarantee that every student will have such an opportunity. Similarly, institutions that include the nicest dorm on campus as part of the college tour cannot guarantee that every student will have the opportunity to live in that dormitory. Institutions frequently feature graduates' top outcomes on their websites, but doing so does not suggest, or guarantee, that all students will have the same outcomes. Many factors beyond the control of the institution will influence outcomes.

Contrary to the commenter's statutory interpretation, the inclusion of financial harm in the calculation of a borrower's claim is a reasonable interpretation of a statute that is silent on the issue. The 2016 final regulations made clear the Department's position that, even if a misrepresentation was made by an institution, relief may not be appropriate if the borrower did not suffer harm. The Department stated in the 2016 final regulations that "it is possible a borrower may be subject to a substantial misrepresentation, but because the education provided full or substantial value, no relief may be appropriate." [FN86]

Defense to repayment relief is not provided for a borrower who is disappointed by the college experience or subsequent career opportunities, or who wishes he or she had chosen a different career pathway or a different major. Instead, defense to repayment relief is limited to instances where a school's misrepresentation resulted in quantifiable financial harm to the borrower. If a misrepresentation associated with the making of a loan did not result in any such harm, it would not qualify as a basis for a defense to repayment under these final regulations.

The Department disagrees with commenters who believe that showing financial harm is overly burdensome. Although the process should be as simple as possible for borrowers, we need to balance that concern with the need to protect the interests of taxpayers. We believe that the examples of financial harm evidence should be within the ability of most applicants to show and should not substantially complicate the process of submitting a defense to repayment application.

Although the 2016 final regulations did not expressly include "financial harm" as part of a borrower defense to repayment claim, they tied relief to a concept of financial harm. Under the 2016 final regulations and specifically under Appendix A to subpart B of Part 685, a borrower would not be able to receive any relief if a school represents in its marketing materials that three of its undergraduate faculty members in a particular program have received the highest award in their field but failed to update the marketing materials to reflect the fact that the award-winning faculty had left the school. In such circumstances and under the 2016 final regulations, the Department notes: "Although the borrower reasonably relied on a misrepresentation about the faculty in deciding to enroll at this school, she still received the value that she expected. Therefore, no relief is appropriate." [FN87]

Although the borrower had a successful borrower defense to repayment claim, the borrower did not receive any relief, which is a waste of the borrower's time and resources. To avoid such situations, financial harm will be an element of the borrower defense to repayment claim under the 2020 final regulations.

000130

The borrower may always seek financial remedies from the institution through the courts or arbitration proceedings, but for the purpose of a defense to repayment claim, the Department's role is more narrowly limited to determining whether or not the student should retain the repayment obligation. This is why financial harm is a key element of a defense to repayment claim.

The Department appreciates the suggestions for development of a new form to be used as the result of these regulations and will formally seek such public input pursuant to the Paperwork Reduction Act information collection process.

Changes: None.

*Factors for Assessing Financial Harm*

Comments: Several commenters argued that the Department should not penalize schools for conditions out of their control including economic conditions, or a borrower voluntarily choosing not to accept a job, to pursue part-time work, or to work outside of the field for which he or she studied.

Several commenters indicated that it is important to balance the financial costs to institutions of borrower defense to repayment provisions with the need to establish an equitable recourse for students impacted by an institution's actions. They indicated that concern whether a school may close should not be a factor when determining whether a student has been harmed by fraud.

Some commenters contended that the Department should expand the definition of financial harm to include monetary losses predominantly due to local, regional, or national labor market conditions or underemployment which could otherwise be used by institutions to "quibble with" borrowers' applications.

Other commenters suggested revising the rule to state that "Evidence of financial harm includes, but is not limited to, the following circumstances" to clarify that the list is not exhaustive and that a borrower may raise other types of harm to establish eligibility for relief.

Commenters noted that it can be difficult to quantify harm and especially challenging to distinguish among degrees of harm. Some pointed out that the proposed rule would not account for opportunity costs and that harm continues even after filing a claim. Some suggested that if misrepresentation is substantiated and there is resultant harm, the Department should grant full relief unless the harm can be shown to be a limited or quantifiable nature.

Several commenters objected to requiring borrowers to demonstrate economic harm beyond taking out a loan. These commenters believe that obtaining the loan is enough to show they are financially harmed when the school committed a misrepresentation. One commenter suggested that part-time work is an indication of financial harm.

Discussion: The Department agrees that schools should not be penalized for conditions beyond their control and believes that the definition of financial harm adopted in these final regulations achieves that goal. The Department is revising the definition of financial harm to expressly state that the harm is the amount of monetary loss that a borrower incurs as a consequence of a **\*49820** misrepresentation. This definition further emphasizes that financial harm is an assessment of the amount of the loan that should be discharged. Borrowers also will have an opportunity to state in their borrower defense to repayment application the amount of financial harm allegedly caused by the school's misrepresentation. The borrower needs only to demonstrate the presence of financial harm to be eligible for relief under these final regulations,[FN88] and the Department will consider the borrower's alleged amount of financial harm as stated in the application.

Also, the Department believes that part-time work is not necessarily evidence of financial harm and, as a result, cannot be treated as such. A student may have very valid reasons for deciding to work part-time that are unrelated to any consequence suffered as a result of a misrepresentation.

For example, a student who is a parent may decide to work part-time to raise children, especially as daycare is costly. If a borrower decides to work part-time, even though full-time work is available to the borrower, then the part-time work is not evidence of financial harm. If only part-time work is available to a borrower due to an institution's misrepresentation and the borrower would like and is qualified for full-time work, then part-time work may constitute evidence of financial harm.

Where an institution has engaged in misrepresentation that results in financial harm to students, the final regulations the Department implements now will provide relief to students and seek funds from institutions without regard to the impact on the institution. At the same time, the final regulations are designed to protect against a systemic financial risk to institutions that are, in good faith, providing accurate information to students.

The Department does not propose to consider the impact on a school's financial condition when making a determination of misrepresentation. In the 2018 NPRM, the Department was making the point that it cannot assume that the student is always right, accusations against an institution are always true, or false claims against an institution do not have serious implications for institutions, students, and taxpayers.

The Department maintains, as we did in the 2018 NPRM and the 2016 final regulations, that partial student loan discharge is a possible outcome of a defense to repayment claim. Our reasoning for this approach is discussed further in the Borrower Defenses—Relief section of this preamble.

The Department continues to believe that, when choosing to pursue a particular career, students face a multitude of choices—where to live, where to attend school, when to attend school, and how quickly to graduate. Students are in the best position to make these decisions in light of their own circumstances. The Department believes that students must remain the primary decision-makers on the key points of how to navigate these difficult factors. Students should allege the amount of financial harm caused by the school's misrepresentation and not any financial harm incurred as a result of the student's own choices.

The Department does not wish to impose liability on institutions for outcomes that are dependent upon highly variable local and national labor market conditions, as these conditions are outside the control of the institution. The Department is willing to clarify the type of evidence that may demonstrate financial harm. Upon further consideration and in response to commenter's concerns, the Department revised the type of evidence that may demonstrate financial harm. The 2018 NPRM proposed: "extended periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic downturns or recessions." [FN89] The Department realizes that the phrases, "extended periods" and "economic downturns," are not defined and may be subject to different interpretations. Economists, however, have defined what constitute an "economic recession." [FN90] Accordingly, the Department revised the phrase to "periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions" in § 685.206(e)(4)(i).

In response to the commenters' suggestions, the final regulations also have been revised to clarify that the list of examples is non-exhaustive. This rule provides a non-exhaustive list of examples of evidence of financial harm, meaning that borrowers are encouraged to provide evidence that they believe is instructive, and the Department will develop expertise in assessing financial harm based on this kind of evidence.

The Department is not including a specific methodology in this regulation for determining financial harm, in part, because the Department is awaiting a court ruling on at least one potential methodology developed to assess financial harm to borrowers. [FN91] The Department disagrees that it is unreasonable to require students to make their own assessment of financial harm, as they have the most information about their financial situation and circumstances. Indeed, it would be unreasonable to require the Department to assess financial harm without any input from the student as to what financial harm the student suffered. Students have the best records to assess and establish other costs associated with their education such as books, etc. Students will have the opportunity to provide whatever documentation they would like to provide to support their allegation of financial harm, and the Department will consider the student's submission. The Department also will take into account the amount of financial harm that the student alleges she or he suffered in determining the amount of relief to award for a successful borrower

defense to repayment application. As described in the section on relief, below, the borrower's relief may exceed the financial harm alleged by the borrower but cannot exceed the amount of the loan and any associated costs and fees. The Department will consider the borrower's application, the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary in awarding relief.

The Department rejects, outright, the commenter's suggestion that taking out a loan is, on its own, evidence of financial harm. Under the 2016 final regulations, the Department acknowledged in example 5 in Appendix A to subpart B of part 685 that a borrower may take out a loan as a result of a misrepresentation of a school but will not be entitled to recover any relief. The Department now understands that it is a waste of both the borrower's time and resources as well as the Department's to acknowledge that the borrower has suffered from a misrepresentation but cannot recover any relief because there was no financial harm. Accordingly, financial harm is an element of a borrower defense to repayment claim in these final regulations. The financial harm must be a consequence of an institution's misrepresentation, for the reasons explained above.

 **\*49821** Changes: We thank the commenter for the suggestion about clarifying what evidence constitutes financial harm. As a result of that recommendation, we are revising the text of § 685.206(e)(4) to state that "Evidence of financial harm includes, but is not limited to, the following circumstances." One of these examples is "extended periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions," and the Department is revising "extended periods of employment" to "periods of employment" in § 685.206(e)(4)(i). Upon further consideration, the Department determined that "periods of unemployment" is clearer than "extended periods of unemployment," as the period of time that constitutes an extended period is not specified. The Department also removed the phrase "economic downturn" in § 685.206(e)(4)(i), as the phrase "economic recession" provides greater clarity. The Department also revised § 685.206(e)(8)(v) to allow the borrower to state the amount of financial harm in the borrower defense to repayment application.

### *Submission and Analysis of Evidence*

Comments: A number of commenters supported collecting information from the borrower, such as the specific regulations they are citing for their defense to repayment, outlining how much financial harm they think they suffered, and certifying the claim under penalty of perjury.

Some commenters contended that the evidence borrowers would need to satisfy proposed financial harm requirements would require sophisticated analysis, including the possibility of expert testimony from labor economists. Similarly, several commenters argued that it is challenging to identify when students' outcomes are predominantly due to external factors and recommended that the Department eliminate that from the definition of financial harm.

One commenter noted that borrowers may not know how to quantify the harm they have suffered as a result of the misrepresentation. Many commenters criticized the proposal to ask borrowers what the commenters cited as invasive and inappropriate questions about drug tests, full-time versus part-time work status, or disqualifications for a job. These commenters noted that these are subjective and impacted by many outside factors. Commenters were also concerned that this information could potentially get back to the school. Another commenter stated that the burden should fall on the school or the Department—but not the borrower—to prove that external factors did not cause the financial harm.

Discussion: The Department does not believe, and has not stated, that borrowers should be required to cite the specific regulation which they believe the institution violated, as a typical borrower would likely not have any knowledge of the relevant parts of Federal regulations.

The Department does not believe borrowers should be required to seek legal counsel in order to submit a defense to repayment claim.

Through these final regulations, the Department intends to create a borrower defense process that is accessible to typical borrowers and rests on evidence likely to be in their possession or the possession of the school. External factors such as

000133

labor market conditions can be assessed by the Department using available and reliable data. There is no need for borrowers to engage labor economists or expert witnesses. Borrower defense is an administrative determination based upon the best available information. The Department does not believe that the calculation of the borrower's financial harm should be discarded because of its potential complexity. For example, in many instances, the Department is being asked to evaluate whether job placement rates were misrepresented to students. Given that a TRP, as discussed earlier in the document, pointed to job placement determinations as highly subjective and imprecise, the Department has shown its willingness to engage in complicated and subjective determinations.

The Secretary will determine financial harm based upon individual earnings and circumstances; the Secretary may also consider evidence of program-level median or mean earnings in determining the amount of relief to which the borrower may be entitled, in addition to the evidence provided by the individual about that individual's earnings and circumstances, if appropriate. The Department must have some information relating to the borrower's career experience subsequent to enrollment at the institution. The goal is a proper resolution for each borrower defense claim, which requires evidence not only of an institution's alleged misrepresentations, but also of, among other factors, the borrower's subsequent career and earnings. While the Department has not taken this approach previously and continues to believe that for purpose of the previous standards, information relating to the individual's career experience may not be necessary to provide appropriate relief, the administrative difficulties the Department has faced in formulating an approach without such information has led the Department to conclude that such information will be required from borrowers for these final regulations. Without information about the individual's unique circumstances, including career experience, the Department has found it difficult to determine that a particular borrower actually suffered the financial harm necessary to be entitled to relief under the borrower defense statute. The Department is accordingly moving to an approach that requires individuals to provide such evidence. It is mitigating the burden of that approach, however, by requiring borrowers to provide necessary documentation of financial harm at the time of application. In addition, the Department believes that other reforms in these regulations, including the new Federal borrower defense standard, mitigate the burdens of this approach.

In response to the many commenters strongly opposed to the Department asking borrowers for information such as employment status, employment history, or other disqualifications for employment, we believe these factors, while potentially subjective and impacted by outside forces, provide important context when determining the proper extent to which an institution caused financial harm or how much relief is warranted based on the actions of the institution. These questions are not intended, in any way, to shame borrowers, and we will maintain the borrower's privacy, as required by applicable laws and regulations. Through this regulatory provision, the Department is attempting to confirm that any financial harm results from actions of the school and not the disposition, actions, or non-education related decisions made by the borrower. Despite the commenter's suggestions, the Department continues to believe that the borrower is in the best position to know certain information and that the burden on the borrower to submit a signed statement containing information they know is appropriate.

In response to the suggestion that the burden for certain elements of a borrower defense claim should fall on the school or the Department, the process outlined is for both the borrower and school to provide the information needed for correct resolution. The process is meant to be accessible to unrepresented borrowers, and it will not rely on formal notions of burden shifting.

The Department acknowledges that it is difficult to precisely quantify  **\*49822**  financial harm. We believe that the information requested by the Department from borrowers and schools will provide a factual basis for the Department to determine the extent of financial harm.

Changes: None.

*Equitable Resolution of Claims*
Comments: Commenters indicated that common law principles of equity must apply and, as a result, the proposed definition of financial harm must be rejected. According to the commenters, the common law principle of equity requires that victims of fraud be made whole.

000134

These commenters stated that the Department is conflating harm and levels of harm based on a student's individual earning ability. The commenters explained that this analysis misuses the cause and effect of fraud upon a student's earning potential. A student's individual earning capacity is based upon that student's circumstances and one student's wages should not be used in comparison to another student. The commenters argued that the standard being used is unfair when, in an entire program that only results in graduates having wages below the Federal poverty line, a student that is making more than the Federal poverty line would receive only partial discharge, if any, because that student may be doing marginally better than his or her fellow graduates.

The only harm that can be measured consistently according to these commenters is the amount of student loan debt as it is not based on individual student circumstances, improper cause and effect analysis on earning potential, and accounting for an entire population of graduates that has poor outcomes.

Discussion: The Department appreciates the commenters' concerns, but we emphasize that the defense to repayment regulation is not meant to replace the courts in rendering decisions about consumer fraud. Instead, it seeks to provide students with relief from loan repayment obligations when an institution's misrepresentations, as defined at § 685.206(e)(3), cause a student financial harm.

The importance of harm resulting from the institution's acts or omissions was a critical part of the 2016 final regulations [FN92] and remains a critical part of these final regulations, so that the financial risk to borrowers, institutions, and taxpayers is properly and fairly balanced. Were the Department to eliminate the need for a borrower to demonstrate harm, institutions may be more reluctant to provide information to prospective students, which could make it harder, rather than easier, for a student to select the right institution for them.

In order to assess whether a borrower is being appropriately compensated in a successful claim, the Department must assess his or her financial harm in context, and that context may consider earnings relative to peers, market wages, cost of living, and other factors.

The Department disagrees that the only measure of harm that should be used is the amount of the student's loan debt. As discussed above, the Department believes that financial harm is implied in the statutory authority and necessary to the resolution of borrower claims. We believe the definition of financial harm provides such balance to all parties involved. If the borrower received an educational opportunity reasonably consistent with that promised by the institution from the institution, then the borrower should not be relieved of his or her repayment obligations, even if some of the information provided to the student in advance had inadvertent errors.

Changes: None.

**Borrower Defenses—Limitations Period for Filing a Borrower Defense Claim**

Comments: Many commenters supported the Department's proposal to limit claims to three years from the date the borrower completes his or her education. Commenters thought a three-year limitation would be fair, because: Evidence will still be available; recollections of the parties will be relatively clearer; and most borrowers should know that they have been wronged within three years. Many commenters argued that after three years, it becomes much harder for schools to defend themselves against claims, particularly since schools are discouraged by regulators from keeping records for longer than three to five years due to security and privacy concerns.

Some commenters believe that a three-year limitations period should relate to defensive claims as well as affirmative claims, arguing that three years is enough time for a borrower to file a claim and that schools should not be expected to defend themselves against a claim made many years after the student left school.

A commenter noted that one way to address this concern would be to allow borrowers to file defensive claims at any time, but only hold the school liable for five years. One commenter maintained that a three-year period instead of a five-year period for the Department to seek recovery against an institution would balance the Department's interest in recovering from institutions against the institutions' reasonable ability to predict and control their financial situation.

Another commenter suggested that a borrower should not be able to raise a claim if the borrower has been in default for more than three months.

Other commenters argued that the proposed timeline does not provide enough time for borrowers to realize that they have been harmed, learn about the claim process, gather supporting evidence, and file a claim. Those commenters noted that disadvantaged borrowers may not understand their right to seek relief, may not possess the evidence needed, or may not be made aware that they were misled until much later.

Some commenters argued that the Department cannot legally preclude borrowers from defending against a demand for repayment. Multiple commenters indicated that since there is no limitations period on repayment, there should be no limitations period on defenses. Some commenters opposed adding any limitation, arguing that a limitation would likely keep the most disadvantaged borrowers from receiving relief. One commenter noted that imposing a limitations period on borrower defense claims would be contrary to well-established law and inconsistent with the Department's practice with respect to other discharge programs. The commenter further argued that such a limitation would indiscriminately deny meritorious and frivolous claims alike.

One commenter argued that because there is no requirement that the student be made aware of their eligibility to file a borrower defense claim during the statute of limitations, the opportunity to file a claim is rendered "effectively moot."

Commenters argued that the limitations period, whatever its length, should run from discovery of the harm or misrepresentation rather than running from the date the student is no longer enrolled at the institution.

Another commenter noted that the most frequent statute of limitations for civil suits involving fraud is six years from the act.

Several commenters raised concerns that the Department was taking punitive measures against borrowers by requiring them to raise a borrower defense to repayment claim within the applicable **\*49823** timeframes set for a proceeding to collect on a loan, which could result in a short effective limitation period of 30-65 days depending upon the proceeding. The commenter suggested instead to use "positive incentives" to encourage borrowers to file claims.

Discussion: The Department appreciates the support for our limitations period proposal in the 2018 NPRM. However, after careful consideration of the comments, the Department has decided to revise the limitation period, as stated in the 2018 NPRM, in these final regulations.

The Department was persuaded by the commenter who proposed that a three-year limitations period be put in place for both affirmative and defensive borrower defense claims. The commenter pointed out that, under the 2018 NPRM, a borrower who went into default nearly twenty years after graduation could, potentially, assert a defensive claim at that time. It is very unlikely that an institution would still possess the records needed to defend against such a claim at that time. In fact, it would be ill-advised and very difficult for institutions to maintain records for that entire period, especially when considering privacy, as well as physical and digital storage considerations. It is equally unlikely that faculty or staff would still be employed at the same school or be able to recall the incident(s) subject to the claim.

Therefore, the Department now believes that a three-year period for the filing of affirmative and defensive claims with the Department, commencing from the date when the borrower is no longer enrolled at the school, is fair to both the borrower

000136

and the institution and strikes the right balance between providing obtainable relief for borrowers and allowing institutions to predict and control their financial conditions.

The final regulations would also entirely avoid the consequence of a short limitations period—30-65 days—that many commenters thought borrowers would find difficult to satisfy. The Department understands the commenter's concerns that the timeline proposed for the filing of defensive claims in the 2018 NPRM was insufficient, but we disagree with the commenter who suggested that this was a punitive measure. On the other hand, we do agree that the Department should, within certain limits, create incentives to borrowers to file meritorious claims in a timely manner. As a result, the Department will not be implementing the filing deadlines for the various proceedings in which a defense borrower defense claim may be raised, including: Tax Refund Offset proceedings (65 days); Salary Offset proceedings for Federal employees under 34 CFR part 31 (65 days); Wage Garnishment proceedings under section 488A of the HEA (30 days); and Consumer Reporting proceedings under 31 U.S.C. 3711(f) (30 days). These short limitations periods are no longer necessary given the change in the final regulations regarding the three-year limitations period for the filing of all claims, including defensive claims arising as a result of a collections proceeding.

Notwithstanding anything in these final regulations, borrowers may continue to maintain other legal rights that they may have in collection proceedings. No provision in these final regulations burdens a student's ability to seek relief outside the Department's borrower defense claim process. Subject to applicable law, borrowers are not deprived of a defense to, nor precluded from defending against, a collection action for as long as the debt can be collected.

The Department is not persuaded by the commenter's suggestion that schools should be limited to five years of liability in a defensive borrower defense claim or that the Department should waive the time limit to file a claim entirely. The three-year limitations period strikes the proper balance for records retention, the parties' recollection of the events, and documentation requirements. Similarly, waiving the time limit could potentially generate massive liabilities for schools, which could create undesirable incentives for schools and negatively impact their long-term financial stability.

We considered the commenter's suggestion to begin the limitation period at the discovery of harm. The Department recognizes that this standard can be found in other bodies of law. However, we have concluded that this suggestion would not be appropriate for an administrative proceeding like the adjudication of a borrower defense claim. Determining whether and when a borrower discovered or should have discovered the misrepresentation is a difficult task that is administratively burdensome. Such a determination is very subjective. Such a determination also requires the Department to consider evidence that likely will not be part of the borrower defense to repayment application or readily available to the borrower or the institution, especially if much time has passed between enrollment and the discovery of the misrepresentation.

The Department notes that while the limitations period begins at graduation, the institution's misrepresentation was likely committed before the borrower enrolled. Taking into account the period of the borrower's enrollment—whether two, three, or four years—the effective limitations period is between five and seven years. Consequently, the limitations period is comparable to State statute of limitations periods for civil fraud. For example, New York state law requires that a fraud-based action must be commenced within six years of the fraud or within two years from the time the plaintiff discovered the fraud or could have discovered it with reasonable diligence.[FN93]

Further, when compared to a civil proceeding in a court of law, the Department does not possess the court's ability to compel parties to produce documents, call witnesses to produce testimony, or hold formal cross-examination. Therefore, the Department is limited in our ability to judge claims. As a result, the opportunities afforded to civil litigants are not all appropriately applied here. The Department has decided to seek a balance between the need for students who are eligible for relief to obtain it and to allow schools to be exposed to unlimited liability. The Department also notes here, as elsewhere, that nothing in these final regulations burdens a student's ability to seek relief outside the borrower defense claim process.

Throughout these final regulations, the Department has emphasized the need for students to be engaged and informed consumers when making determinations about their education choices. We disagree with the commenter who stated that without

notification, presumably from the Department, of the borrower's eligibility to file a claim, the opportunity to file a claim is "effectively moot." We believe borrowers are able to inform themselves of their options, if they feel they have been harmed by an institution's misrepresentation.

The three-year limitations period should be considered in the context that the period is not tied to the date of the act or omission, but rather from the date of that the borrower is no longer enrolled in the institution. For the many borrowers who enroll in multi-year programs, the Department's limitations period will be, in actual practice, longer than even a five- or six-year limitations period that begins to run from the time of the alleged wrong.

**\*49824**  As discussed in the 2018 NPRM, the Department believes that giving consideration to all comments received and on current records retention policies, which was not the subject of this rulemaking, that three years after the date of the end of their enrollment is sufficient and appropriate. Therefore, we believe these final regulations provide sufficient time for borrowers to become aware of the borrower defense process, gather evidence, and file a claim.

The Department does not believe that, for loans first disbursed on or after July 1, 2020, it would be beneficial for students or schools to be subjected to different limitations periods depending upon the rules of individual States or accreditors. The Department notes that statutes of limitations for civil suits involving fraud vary between States and jurisdictions. For example, the statute of limitations for civil fraud in Louisiana is one year; [FN94] three years in California; [FN95] four years in Texas; [FN96] and five years in Kentucky.[FN97] Such a policy leads to inconsistent treatment of borrowers and confusion for schools that may be subject to different rules by their States and accreditors. The Department does not adopt the commenter's proposal to bar a borrower, who has been in default for more than three months, from raising a borrower defense claim. Unfortunately, the commenter did not add any justification for the Department to consider when raising this consideration. Even so, in an effort to treat all borrowers equally and fairly, we believe that every borrower, regardless of payment or non-payment status, continues to possess the ability to file a borrower defense claim within the limitations period.

The Department disagrees that creating a limitations period on filing affirmative claims is "contrary to well-established law" and inconsistent with past practice. In fact, in the past, the Department has, unwisely, embraced incongruous and inconsistent limitations periods for borrower defense claims. For loans first disbursed on or after July 1, 2017, the 2016 final regulations allowed for affirmative claims based upon judgments against the school to be filed at any time, while breaches of contract and substantial misrepresentations were limited to "not later than six years." [FN98] Despite our concerns regarding these multi-tiered limitation periods, as a matter of policy, the Department has decided to continue these inconsistencies until July 1, 2020 due to retroactivity concerns. However, the Department looks forward to a consistent application of a standard limitations period for loans first disbursed on or after July 1, 2020.

Changes: For loans first disbursed on or after July 1, 2020, the Department has established a three-year limitations period to apply to both affirmative and defensive borrower defense claims at § 685.206(e)(6).

**Borrower Defenses—Records Retention for Borrower Defense Claims**
Comments: Some commenters supported different timeframes, including four years, six years, or the record retention timeframes used by States and accreditors. Conversely, some commenters argued for shorter time-frames such as one or two years. Other commenters argued that keeping records for longer than three years raises privacy concerns.

One commenter noted that basing the three-year proposed timeframe on the Federal records retention requirement does not take into consideration that accrediting agencies require much longer retention of records and that Federal records likely would not be relevant for these claims. Another commenter indicated that the Federal records retention requirement is a minimum retention requirement and that institutions may hold records for longer periods. A number of commenters requested that a records retention requirement align with other Department records retention policies.

000138

Discussion: The Department thanks the commenters for pointing out the plethora of records retention statutes that institutions, especially those with a presence in multiple States, are subject to as well as the added complexity of accreditor records retention requirements.

As discussed in the previous section, we believe that the three-year requirement provides ample opportunity for borrowers to make a claim as well as consistency with other Department requirements for institutions. As stated above, the Department continues to assert that the three-year limitations period will provide a fair opportunity for borrowers to file claims and a fair standard for institutions who retain thousands of pages of records. This three-year limitation period will also provide greater certainty to schools and taxpayers, protect student privacy, and ensure that borrower defense matters are processed on the basis of relatively fresh recollections and with records still available.

Changes: None.


**Borrower Defenses—Exclusions**
Comments: Many commenters supported the Department's non-exhaustive list of exclusions of what constitutes grounds for filing a borrower defense to repayment claim. These commenters noted that it was helpful to explain that certain areas would not be considered as the basis for a borrower defense to repayment claim.

Some of these commenters further noted that they appreciated the Department citing factors it would not consider.

Discussion: We appreciate commenters' support in outlining examples of exclusions of what would not constitute the basis for a borrower defense to repayment claim under these final regulations.

Changes: None

Comments: None.

Discussion: As discussed above, the Department removed the phrase "that directly and clearly relates to the making of a Direct Loan, or a loan repaid by a Direct Consolidation Loan" [FN99] from the definition of misrepresentation to better align this definition with the Federal Standard. Both the Federal standard and the definition of misrepresentation refer to a misrepresentation of material fact "that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made."[FN100]

To align the language in the exclusions section with the Federal standard and the definition of misrepresentation, the Department is removing the phrase "a claim that is not directly and clearly related to the making of the loan and provision of educational services by the school" and replacing it with the phrase "a claim that does not directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made." This revision provides consistency and clarity with respect to the Federal standard, definition of misrepresentation, and exclusions section.

Changes: The exclusions apply to a claim that does not directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made instead of to  *49825  a claim that is not directly and clearly related to the making of the loan or the provision of educational services by the school. This revision aligns the exclusions section with the Federal standard and definition of misrepresentation.


**Borrower Defenses—Adjudication Process (§§ 685.206 and 685.212)**

*General*

Comments: Many commenters wrote in support of the proposed adjudication process. They noted that the process is clear and provides due process for all parties. These commenters also assert that as compared with the process in the 2016 final regulations, the proposed process strikes a fairer balance between individual responsibility and school accountability.

Discussion: We appreciate the support of these commenters. For the reasons described earlier in this document, we agree that our final rule strikes the right balance.

Changes: We are adopting, with changes for organization and consistency, Alternative B for paragraphs (d)(5) Introductory Text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020.


*Process*

Comments: Many commenters expressed support for the proposed process providing an opportunity for schools to respond and provide evidence when notified of a borrower defense to repayment claim. One commenter who supported the proposed process noted that it would provide a clear process for both parties and, thus, enable the Department an opportunity to render a fair decision, hold appropriate parties accountable, and greatly reduce abuse of the loan discharge provision.

One commenter expressed concern that the Department may require additional information about the borrower's personal employment history that is irrelevant to the allegations against a school. This commenter further asserts that racism impacts the ability to find employment, causing borrowers of color to appear less deserving of relief.

Another commenter recommended that the Department employ an initial review of a borrower's discharge application to determine whether there is probable cause or jurisdiction to continue the investigation. The commenter recommended that, if there is insufficient information provided by the student or there is no jurisdiction, a form letter be sent to the borrower on the determination that the application has been closed with no further action by the Department. The borrower may then file a new application that meets the Department's standards. The commenter also recommended that the regulation be consistent and align with Federal regulations under 34 CFR 685.206 and 668.71.

Some commenters suggested that the Department adopt a principle from civil litigation that pleadings from parties who are not represented by an attorney be liberally construed. These commenters recommend that the Department liberally construe applications from borrowers who are not represented by an attorney.

Another commenter asserted that requiring written submissions in government proceedings can be an undue burden. This commenter asserts that the Supreme Court of the United States recognized the burden of requiring written submissions in Goldberg v. Kelley,[FN101] and the Department should recognize this burden and revise its process. This commenter further noted that the lack of relief in the past may lead low-income borrowers to believe that it is not worth paying attention to the Department's notices.

Discussion: The Department appreciates support from commenters for our revised process. We agree that these regulations create a more balanced and fair process. The 2016 final regulations only expressly gave institutions the opportunity to meaningfully respond pursuant to the group claims process, assuming the institution was not closed.[FN102] The revised process affords institutions the opportunity to respond to allegations against the institution during the adjudication process for the borrower's claim. These regulations reduce the likelihood that the Department and schools will be burdened by unjustified claims or that taxpayers will bear the cost of wrongly discharged loans.

The Department will only request information that is or may be relevant to the defenses that the borrower asserts. As the Department stated in the 2016 final regulations, the kind of evidence that may satisfy a borrower's burden will necessarily depend on the facts and circumstances of each case.[FN103]

The Department does not have sufficient resources to perform a preliminary review of all claims to assess jurisdiction or sufficiency of information prior to performing a full review, and such a preliminary review would unnecessarily divert resources from the timely review of other claims. Creating such a preliminary review also would result in giving borrowers numerous attempts to file a satisfactory application, which could result in additional burden and backlog for the Department's processing of claims and a delay in awarding relief to borrowers in a timely manner. The borrower is required to submit a completed application, which the Department will review during the regular adjudication process. Incomplete applications will not be accepted, and borrowers will be notified when the Department is unable to process an incomplete application. Borrowers may submit another, completed borrower defense to repayment application within the limitations period. Borrowers must submit a completed application to receive Federal student aid and also must submit a completed borrower defense to repayment application to receive relief.

The Department revised § 685.206(e)(11)(ii) to clarify that the Department will not issue a written decision, which is final and not subject to further appeal, if the Department receives an incomplete application. Instead, the Department will return the application to the borrower and notify the borrower that the application is incomplete. The Department, however, is not precluded, when directed by the Secretary, from requesting more information from the borrower or the school with respect to the borrower defense to repayment process.

The Department is cognizant of how these final regulations will align with other Federal regulations. The definition of misrepresentation, at 34 CFR 685.206(e)(3), for the borrower's defense to repayment application is purposefully different than the definition of substantial misrepresentation in 34 CFR 668.71(c) for initiating a proceeding or other measures against the institution. The different definitions of misrepresentation allow the Department to act in a financially responsible manner to protect taxpayers. The Department will discharge a loan, in whole or in part, when a borrower demonstrates by a preponderance of the evidence a misrepresentation pursuant to 34 CFR 685.206(e)(3) and financial harm to the borrower; this provision relates to loan forgiveness for borrowers. The Department will exercise its enforcement authority against institutions pursuant to the 34 CFR 668.71(c); this provision relates to the  **\*49826**  Department's enforcement authority against schools.

As explained in more detail above, the definition of misrepresentation for Department enforcement actions is broader than the definition of misrepresentation for borrower defense to repayment claims because as the latter underpins, in part, the Department's authority to recover liabilities, guard the Federal purse, and protect Federal taxpayers.

Liberally construing pleadings of persons who are not represented by an attorney is appropriate in a court and is required pursuant to rules governing judicial proceedings. The Department is not a court of law and is not conducting a judicial proceeding that requires an attorney. The Department intends to provide instructions that are easy to understand and does not expect borrowers to provide legal arguments. The Department need not liberally construe applications filed by unrepresented borrowers, as doing so supposes that they are less capable of completing an application, which the Department does not believe is the case, however we will use our discretion and expertise, when necessary, to determine the merits of a borrower defense to repayment claims.

In Goldberg v. Kelley, the Supreme Court considered whether a State may terminate public assistance payments to a particular recipient without affording the recipient the opportunity for an evidentiary hearing prior to the termination.[FN104] The Supreme Court stated that the "opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." [FN105]

Here, we are describing a process afforded to an individual who had the opportunity to engage in higher education, meaning their written submissions are appropriate for students who have been admitted to institutions of higher education as well as the institutions that they attended. Such individuals will have received secondary education or the equivalent of such education. With respect to Parent PLUS loans, parents who are borrowers have experience in applying for Federal student aid or other loans and in making other financial decisions. Requiring written submissions should not be a substantial burden on borrowers or institutions and allows the Department to easily keep a record of each party's evidence and arguments. A written record also is helpful to borrowers or institutions who may wish to later challenge the Department's determination in court proceedings.

Unlike the 2016 final regulations, these final regulations require the Department to consider the borrower's application and all applicable evidence. The borrower will receive a copy of all applicable evidence and, thus, will know what evidence the Department relied upon in making its determination.

The Department encourages all borrowers to read and pay careful attention to the Department's notices. The Department will continue to issue such notices and will strive to make notices easy to understand and accessible to all borrowers.

Changes: We are adopting, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) of the 2018 NPRM for loans first disbursed on or after July 1, 2020.

The Department is revising § 685.206(e)(11)(ii) to clarify that if the Department receives a borrower defense to repayment application that is incomplete and is within the limitations period in 685.206(e)(6) or (e)(7), it will not issue a written decision on the application and instead will notify the borrower in writing that the application is incomplete and will return the application to the borrower.

Comments: Some commenters recommended that the Department revise the process to consider applications for borrower defense to repayment when the Department is already in possession of documents and evidence relevant to the claim.

Other commenters noted that the proposed rule indicated that if the Secretary uses evidence in his or her possession, the school will be able to review and respond to such evidence, but that borrowers are not afforded the same opportunity. The commenters request that both parties to the claim be provided an opportunity to review and respond to all evidence under consideration in the determination of the claim. One of these commenters noted that under some States' processes, schools and borrowers have the opportunity to provide evidence and arguments and to respond to each other's submissions.

Other commenters expressed concern that the Department provides schools, but not borrowers, an opportunity to respond to evidence at the point in the process where the Department is determining whether to discharge the borrower's loan.

Discussion: The Department agrees with the commenters who recommended that the Department may consider evidence otherwise in the possession of the Secretary and adopts, with changes for organization and consistency, the approach in Alternative B for § 685.206(d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) of the 2018 NPRM.[FN106]

The Department also agrees with commenters that, subject to any applicable privacy laws, both the borrower and the institution should be able to review the evidence in possession of the Secretary that will be considered in the evaluation of the claim. The Department values transparency and would like both the borrower and the institution to have the opportunity to review evidence in possession of the Secretary and to respond to such evidence. Accordingly, the Department is revising the regulatory language to expressly state that if the Secretary considers evidence otherwise in her possession, then both the borrower and the institution may review and respond to that evidence and submit additional evidence.

The Department acknowledges the concern that the borrower should have an opportunity to review and respond to the school's submission. The Department stated in its 2018 NPRM that "the borrower and the school will each be afforded an opportunity to see and respond to evidence provided by the other." [FN107] Accordingly, the Department is revising the final rule to provide that a borrower has the opportunity to review the school's submission and to respond to issues raised in that submission.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) of the 2018 NPRM for loans first disbursed on or after July 1, 2020, and revises § 685.206(e)(9) to expressly state that the Secretary may consider evidence in his or her possession provided that the Secretary permits the borrower and the institution to review and respond to this evidence and to submit

additional evidence. The Department also will revise § 685.206(e)(10) to provide that a borrower will have the opportunity to review a school's submission and to respond to issues raised in that submission. We also make a conforming change in § 685.206(e)(11), to state that the Secretary issues a written decision after considering "all applicable evidence" as opposed to specifying that **\*49827** such evidence would come from the borrower and the school.

### *Internal or Voluntary Resolution With School*

Comments: One commenter suggested that borrowers should be required to bring their claims to the school first and provide the school with an opportunity to clearly explain accountability and legal consequences to the borrower if the accusation is proven to be false or unfounded.

Another commenter who suggested we consider a Resolution Agreement process similar to that used within the Department's Office for Civil Rights when considering borrower defense claims. The commenter suggested that this would reduce the burden on the Department's resources by allowing borrowers and schools to more quickly resolve the dispute and loan obligations prior to the Department's adjudication process. Another commenter suggested adding a period of time during which the borrower and school may meet to voluntarily resolve any dispute short of commencing with a filed claim.

A group of commenters recommended a new provision that would require borrowers seeking to file an affirmative claim to first inform the school of their concern and give the school time to resolve the matter.

One commenter suggested that, if a school is deficient, the borrower should sue the school to recover the money to repay his student loans.

Discussion: The Department encourages institutions to provide an internal dispute resolution process to resolve a borrower's claims, including affirmative claims, before the borrower files the claim with the Department. The benefits of such a process included that the borrower could seek relief for cash payments, private loans, and 529 plans used to pay tuition. In such a case, should the institution determine that it should repay some or all of a borrower's loans, these payments will not be considered as a defaulted loan. The Department, however, will not require the borrower to go through the institution's internal dispute resolution process prior to filing an application with the Department. The borrower retains options to resolve a claim, such as a traditional court proceeding, arbitration proceeding, or State-level administrative process, and the Department does not wish to limit the borrower's ability to choose the best process for them. Likewise, the Department also does not wish to impose any requirement as to which process the borrower must go through first. Borrowers are best suited to determine which process will be most beneficial in their personal circumstances and will benefit from having options.

For reasons of administrative burden and resource allocation, we do not believe it is necessary to include an early dispute resolution process in these final regulations, whereby the Department or another party would mediate borrower defense disputes between a borrower and the school, to attempt to resolve the disputes without the need for the parties to go through the Department's full borrower defense adjudication process.

These final regulations do not prevent a borrower from engaging in other, existing dispute resolution processes to resolve any claim with an institution prior to filing an application with the Department. A borrower and institution also may choose to resolve a claim after the borrower files an application with the Department. The borrower may voluntarily withdraw his or her application with the Department if the borrower resolves a claim with the institution.

Institutions may disclose any internal dispute resolution process available to borrowers and explain the benefits of any such process. Institutions also may disclose the consequences of making a false or fraudulent allegation in the school's internal dispute resolution process. The institution, however, should not present the consequences of making a false or fraudulent allegation with the intent to prevent, or in a manner that prevents, a borrower from filing a borrower defense to repayment application with the Department.

000143

The Department does not prohibit a borrower from filing or require a borrower to file a lawsuit against an institution. Borrowers may utilize any process available to them.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) of the 2018 NPRM for loans first disbursed on or after July 1, 2020.

### *Role of the School in the Adjudication Process*

Comments: Some commenters expressed concern that the proposed regulation involves schools in a manner that privileges schools with respect to the adjudicatory process with no gesture towards fairness or balance for the borrowers.

One commenter recommended the Department limit the schools' roles in the process to avoid overrepresentation of institutional interests to the detriment of harmed borrowers. The commenter noted that borrowers are at a distinct disadvantage, stating that while the school maintains records on the student's time at the school, the school's disclosures to that and other prospective or enrolled students, and hundreds or thousands of other data points, the student is largely reliant on his own testimony—and largely dependent on the Department and other fact-finding agencies to seriously investigate any claims. The commenter urges the Department to be cautious to protect the borrower from undue pressure by the school.

Another commenter urged the Department to make changes to ensure the process is accessible and equitable to borrowers unrepresented by an attorney, since the proposed process, in the commenter's view, stacks unrepresented borrowers against represented schools, does not allow borrowers to re-apply based on evidence not previously considered, and will necessitate that borrowers seek guidance as to what to include in their applications. Some commenters expressed concern that providing documentation associated with a defense to repayment claim to a school provides opportunities for schools to retaliate against a borrower for filing a claim. The commenters suggested that any act of retaliation should be viewed as evidence to support the approval of a defense to repayment claim.

Discussion: The Department believes that its adjudicatory process fairly balances the interests of institutions and students. The Department's revisions to the proposed regulations allow both the borrower and the school the opportunity to see and respond to evidence provided by the other. The revisions further allow both the borrower and the school to see and respond to evidence otherwise in the possession of the Secretary that the Secretary considers in the adjudication of the claim. Such a process provides both borrowers and schools with due process protections.

It is critical that schools be provided an opportunity to respond to claims made against them so that the Department can adjudicate claims based on a complete record. It is incumbent upon the borrower to provide evidence to the Secretary to establish by a preponderance of the evidence that the school made an act or omission that qualifies as a basis for borrower defense to repayment relief, and it is reasonable to provide a school with the opportunity to respond to such claims. Additionally, if institutions have unknowingly made a misrepresentation or have an employee who has made **\*49828** misrepresentations, the Department's notice to the institution of the borrower's claim may help the institution implement corrective action more quickly to ensure that other students are not impacted.

The Department disagrees that students are largely reliant on their own testimony to file a defense to repayment claim. The Department urges students to make informed consumer decisions and treats students as empowered consumers. While students should request important information that is relevant to their enrollment decision in writing, institutional misconduct is never excusable.

The Department intends to publish instructions for submitting a borrower defense application that will explain the process and provide other relevant information to help borrowers successfully complete the application.

The Department acknowledges that institutions are more likely than students to have access to paid legal counsel, but a student will not need paid legal counsel to submit a borrower defense to repayment application. Institutions almost always are more likely than students to have access to paid legal counsel, but students do not need an attorney to file a claim with the Department's Office for Civil Rights and similarly will not need an attorney to submit a borrower defense to repayment application. Of course, students may seek help from legal aid clinics or take advantage of services from numerous student advocacy groups in submitting a borrower defense to repayment application. Additionally, institutions do not need to employ counsel to respond to a borrower's application and may choose to have staff—for example, staff in their Financial Student Aid office or admissions office—submit a response to the Department. Moreover, by adopting a preponderance of the evidence standard, the Department believes that a student should reasonably and more easily be able to satisfy that standard.

To address concerns that a student may have discovered evidence relevant to a borrower defense to repayment claim through a lawsuit or an arbitration proceeding, the Department revised section 685.206(e)(7) to state that the Secretary may extend the three-year limitations period when a borrower may assert a defense to repayment under section 685.206(e)(6) or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered in the exceptional circumstance when there is a final, non-default judgment on the merits by a State or Federal Court that establishes that the institution made a misrepresentation, as defined in § 685.206(e)(3), or a final decision by a duly appointed arbitrator or arbitration panel that establishes that the institution made a misrepresentation, as defined in § 685.206(e)(3). In this exceptional circumstance, the Secretary may extend the time period when a borrower may assert a defense to repayment or may reopen a borrower's defense to repayment application to consider evidence that was not previously considered.

The Department agrees that students should not suffer retaliatory acts by institutions that have been accused of misrepresentation, and the Department does not tolerate retaliation. The Department may consider evidence of any retaliatory acts by the institution in evaluating the borrower's application. The borrower may submit evidence of any such retaliatory acts to the Department. The Department is revising the proposed regulations to allow the borrower to file a reply to address the issues and evidence raised in the school's submission as well as any evidence otherwise in the possession of the Secretary that the Department will consider. The borrower's reply will be the final submission, and the final regulations do not provide the school with the opportunity to file a sur-reply. In this sense, the student will have the final word and may report any retaliatory acts to the Department. The Department also is not listing the types of information that the school may receive in these final regulations as proposed in the 2018 NPRM. The school will still receive the student's application as well as any evidence otherwise in the possession of the Secretary and used to adjudicate a borrower defense claim, but the language listing the information the school will receive is unnecessary. These revisions provide a more equitable balance and address the commenters' concerns.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020. As noted above, the Department revised § 685.206(e)(7) to provide that the Secretary may extend the time period when a borrower may assert a defense to repayment under § 685.206(e) or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered in two exceptional circumstances. The borrower may now file a reply that addresses the issues and evidence raised in the school's submission as well as any evidence otherwise in possession of the Secretary. Additionally, the Department will no longer list the types of information that the school may receive as proposed in § 685.206(d)(8)(i) because the final regulations expressly state the information the school will receive in § 685.206(e)(10).

*Timelines*

Comments: Several commenters requested the Department include specific timeframes within which various steps of the adjudication process would occur. Many commenters recommended a 45-day interval for a school to respond to a borrower's claim, a 30-day interval for the borrower to reply to the school's initial response, and an additional 15-day interval for the school to submit any new evidence as a result of the borrower's reply. Other commenters proposed different timeframes for a school's response, a borrower's reply, and/or the resolution of the claim.

Other commenters noted that the proposed process changes are described by the Department as a means to reduce the time required to review claims because it would discourage frivolous claims. The commenters note that most of the currently pending claims are supported by evidence in the Department's possession. They further assert that the proposed process requires a review of voluminous paperwork prepared by counsel for the school, which is likely to slow rather than expedite the adjudication process.

Some commenters who supported the proposed process expressed concern that the regulation did not include specific information regarding how final determinations would be made or timeframes for the adjudication of claims.

Discussion: The Department appreciates the recommendations made by commenters but does not believe that the proposed time limits would be appropriate in certain circumstances. For instance, the Department most likely could not adhere to the proposed time limits if a large number of defense to repayment claims were submitted to the Department simultaneously, which could be the case if an outside entity organized a particular group of students to submit claims en masse.

The Department agrees that it is reasonable to prescribe a timeframe for an institution's response and the borrower's reply and intends to do so in the instructions for the defense to repayment application and the notice to the institution. In response to these **\*49829** comments, the Department revised § 685.206(e)(16)(ii) to specify that the Department will notify the school of the defense to repayment application within 60 days of the date of the Department's receipt of the borrower's application. This revision makes clear that the school will receive the borrower's application in a timely manner.

The Department also revised § 685.206(e)(10)(i) to state that the school's response must be submitted within a specified timeframe included in the notice, which shall be no less than 60 days. To give the borrower as much time as the school, the Department also revised § 685.206(e)(10)(ii) to give the borrower no less than 60 days to submit a reply after receiving the school's response and any evidence otherwise in the possession of the Secretary. Although commenters suggested a timeframe less than 60 days for the school's response and the borrower's reply, the Department would like to give both borrowers and schools ample and equivalent time to review and respond to each other's submissions. The Department realizes that borrowers and schools have other matters to attend to and would like both borrowers and schools to have sufficient time to compile records to support their respective submissions. These timeframes also reduce the administrative burden on the Department. Because of potential process changes over time, the Department will provide more specific instructions in the application and notice to institutions and students rather than in the final regulation.

The Department does not agree that it has all of the evidence required to adjudicate borrower defense claims in its possession. For example, for one college, the Department did not complete an investigation of the documents provided by the institution, but relied on the California Attorney General to review some of the documents and draw conclusions. It was the California AG's conclusions, and subsequent allegations, that prompted the Department to take action. The Department must also assess financial harm for each pending claim and may not immediately have all the relevant evidence necessary to make such a determination.

As stated in the 2018 NPRM, the Department is committed to providing both borrowers and schools with due process and affords both the borrower and the institution the opportunity to see and respond to evidence provided by the other. We are revising the final regulations to expressly afford the borrower an opportunity to file a reply to address the issues and evidence in the school's submission as well as any evidence otherwise in the possession of the Secretary.

The Department's regulations at § 685.206(e)(3) provide how determinations will be made and examples of evidence of misrepresentation. Although such a process may be longer, this approach provides a fair and more equitable process for both borrowers and institutions.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020.

The Department is also revising at § 685.206(e)(10) to allow the borrower to file a reply to address issues and evidence in the school's submission as well as any evidence otherwise in the possession of the Secretary.

The Department revised § 685.206(e)(16)(ii) to specify that the Department will notify the school of the defense to repayment application within 60 days of the date of the Department's receipt of the borrower's application. The Department also revised § 685.206(e)(10)(i) to state that the school's response must be submitted within a specified timeframe included in the notice, which shall be no less than 60 days.

Comments: Some commenters sought assurance that, while a borrower's defense to repayment claim is pending, the borrower's loans should be placed in forbearance so that no additional financial burden accrues while the claim is being adjudicated.

One commenter suggested that we include a provision that would forgive a borrower's interest accrual when the adjudication timeline is not met by the Department. The commenter asserts that this would be a show of good faith to borrowers, assuring them the Department will process claims in a reasonable timeframe, and that borrowers will not be the ones to pay the price if it does not.

Discussion: As explained above, the Department is willing to place claims into administrative forbearance while a claim is pending. The Department determined that the accrual of interest while a loan is in administrative forbearance would deter a borrower from filing an unsubstantiated borrower defense to repayment application.

The Department is changing the procedures to process borrower defense to repayment applications in these regulations. As stated in the 2016 final regulations, we are still unable to establish specific timeframes for processing claims. Neither these final regulations nor the 2016 final regulations set a timeline for the Department's adjudication. Nonetheless, the Department will strive to efficiently resolve all borrower defense to repayment applications in a timely manner. In lieu of forgiving a borrower's interest accrual, the Department will place the loans in administrative forbearance while the borrower defense to repayment application is pending. As explained, above, the Department wishes to deter borrowers from filing unsubstantiated borrower defense to repayment claims, and interest accrual will serve as a deterrent. Automatically placing loans in administrative forbearance is a compromise from the Department's position in the 2018 NPRM, proposing to require borrowers to request administrative forbearance separately from the borrower defense to repayment application. Automatically granting administrative forbearance to borrowers who complete and submit a borrower defense to repayment application is a sufficient response to the concern raised by the commenter about interest accrual.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020. The Department is amending § 685.205(e)(6) for loans to be placed in administrative forbearance for the period necessary to determine the borrower's eligibility for discharge under § 685.206, which includes the borrower defense to repayment regulations in these final regulations.

### Appeals

Comments: Several commenters advocated for the inclusion of an appeals process for schools when a borrower defense to repayment claim is approved by the Department and for borrowers when a claim is denied. These commenters argued that, under the proposed regulations, a school seeking review of an approved borrower defense to repayment claim would be required to appeal their case in Federal court and create too high a bar for both borrowers and schools. The commenters assert that a non-appealable decision by the Department is an affront to the basic elements of due process rights of schools accused of misrepresentation by former students.

One commenter requested an appeal be specifically permitted when new  **\*49830**  evidence comes to light. This commenter noted that, in a rule that requires borrowers to demonstrate intent, knowledge, or reckless disregard to meet the Federal standard

for loan discharge, evidence is likely to come from State and Federal investigations spurred by borrower complaints, and with the extremely limited filing deadline that had been proposed, the taxpayer risk of that reconsideration is minimal.

Some commenters expressed general concern that the adjudicatory process does not allow borrowers to reapply based on new evidence. These commenters inquired whether borrowers who have received denials will be permitted to submit new applications with new evidence. These commenters suggested that to the extent the Department denies borrower defense applications for failure to state a claim, the Department should notify the borrower of the reason for the denial in writing and should allow for reconsideration if a new application with new evidence is submitted.

Another commenter asserted that it is unjust to provide schools, and not students, greater due process rights, including the ability to appeal a Department's decision.

Discussion: The Department does not believe it is necessary add an appeals process to the adjudication process, nor does due process require an appeal. The Department provides both the borrower and the school the opportunity to see and respond to evidence provided by the other, which its current procedures for adjudicating borrower defense to repayment claims do not require. Additionally, the Department is providing both borrowers and institutions an opportunity to review and respond to evidence otherwise in possession of the Secretary that is used to adjudicate the claim.

It is incumbent upon borrowers and schools to provide as much information as possible when making or responding to a borrower defense claim, and these final regulations provide a fair and equitable process for both parties. A party may challenge the Department's decision through a judicial proceeding, and courts are required to liberally construe pleadings of a party who is not represented by an attorney. Additionally, the Department is not the only avenue of relief for a borrower; the borrower may pursue relief through his or her State consumer protection agency or avail himself or herself of other consumer protection tools.

Although the Department does not allow borrowers to submit an appeal, reapply, or request reconsideration of the application, the Department made certain revisions to address concerns about newly discovered evidence. As stated above, the Department revised § 685.206(e)(7) to state that the Secretary may extend the time period when a borrower may assert a defense to repayment under § 685.206(e) or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered in the exceptional circumstance when there is a final, contested, non-default judgment on the merits by a State or Federal Court that establishes that the institution made a misrepresentation, as defined in § 685.206(e)(3), or a final decision by a duly appointed arbitrator or arbitration panel that establishes that the institution made a misrepresentation, as defined in § 685.206(e)(3).

This exceptional circumstance allows the borrower to reapply and provide newly discovered evidence to the Department for consideration. Additionally, as explained in the section regarding pre-dispute arbitration agreements, the limitations period will be tolled for the time period beginning on the date that a written request for arbitration is filed, by either the student or the institution, and concluding on the date the arbitrator submits in writing, a final decision, final award, or other final determination to the parties. Tolling the limitations period for such a pre-dispute arbitration arrangement between the school and the borrower will allow the borrower to discover evidence that may potentially be used in a borrower defense to repayment application and also provide the school with the opportunity to resolve the claim without cost to the taxpayer. Finally, the Department is providing a more robust borrower defense to repayment process in allowing both borrowers and schools to view and respond to each other's submissions. This robust process will make it less likely that there will be newly discovered evidence.

As stated above, the Department does not have sufficient resources to perform a review of claims to assess whether the borrower failed to state a claim and to allow for reconsideration if a second application with new evidence is submitted. Such a process will unnecessarily divert resources from the timely review of other claims. Such a process also will result in giving borrowers countless attempts to file a satisfactory application. The borrower is required to submit a completed application, which the Department will review during the regular adjudication process.

000148

The Department's process also does not provide schools with an appeal. The Department may choose to initiate a proceeding to require a school whose act or omission resulted in a successful borrower defense to repayment to pay the Department the amount of the loan to which the defense applies. The recovery proceeding, which would be conducted in accordance with 34 CFR part 668 subpart G, is not an appeal.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020. As noted above, the Department revised § 685.206(e)(7) to provide that the Secretary may extend the time period when a borrower may assert a defense to repayment under section 685.206(e) or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered in two exceptional circumstances. The Department is revising § 685.206(e) (10) to provide that a borrower will have the opportunity to review a school's submission and to respond to issues raised in that submission. The proposed regulations also are further revised to give the borrower an opportunity to file a reply that addresses the issues and evidence raised in the school's submission as well as any evidence otherwise in possession of the Secretary.

### Independence of Hearing Officials and Administrative Proceeding

Comments: Some commenters suggested that the Department use Administrative Law Judges (ALJs) to review and make determinations on borrower defense to repayment claims. These commenters argued that ALJs are legal professionals and would provide a level of assurance to all parties that the process is fair. Some commenters also argued that administrative review by ALJs instead of a review by Department staff will insulate schools from any political bias and asserted that the Department's staff varies based on the President's administration.

One commenter recommended that an ALJ make the determination on a claim, and that the parties be permitted to appeal this determination within a specified time. This commenter would require the Department to issue the determination on appeal in a manner consistent with the publication of decisions from the Department's Office of Hearings and Appeals (OHA). Neither party would be able to appeal the determination to the Secretary.

 *49831   Other commenters expressed concern that the adjudication process creates a conflict of interest within the Department, since the Department would be responsible for advocating on behalf of borrowers and determining the outcome of the case. These commenters urged the Department to ensure the independence of decision makers involved in borrower relief determinations.

Discussion: We believe that, under the 2016 final regulations, the Department held too much power in that the Secretary could both initiate group claims and adjudicate appeals of those claims, and the institution, assuming the institution did not close, would have a limited opportunity to respond to the Department's allegations in the group claim process. Under these final regulations, only a borrower may initiate a claim, and both the borrower and the institution always have the opportunity to provide evidence to support their positions. Because the Secretary is required to provide to borrowers and institutions any additional evidence in their possession and that is used to adjudicate a claim, there is a greater level of transparency in the adjudication process.

In contrast to the 2016 final regulations, these final regulations do not provide a process for the Secretary to initiate a claim. Section 455(h) of the HEA expressly states that the "Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." (emphasis added) We believe the better reading of Section 455(h) of the HEA is for the Department to adjudicate only borrower-initiated defense to repayment claims. We believe this will result in the adjudication of such claims being more balanced and less influenced by changes in Department policy.

Through these final regulations, the Department is providing a fair and equitable process that does not require OHA or ALJs for the determination of a borrower defense to repayment claim. The Department has learned through processing tens of thousands of defense to repayment claims that there are not sufficient resources to subject each claim to an overly-extensive administrative procedure, burdening students and delaying the timely adjudication of claims. The Department believes that including the OHA

in the process of adjudicating claims would create a regulatory process that is more costly for the Department to administer and could create the false impression that the claim or the determination are subject to a hearing and appeal, which is not the case.

The Department appreciates the suggestion regarding the incorporation of an administrative law judge in the borrower defense process, but we have determined, as above, that this would unnecessarily complicate, make more expensive, and create confusion about the availability of a hearing and appeal.

The commenter's inclusion of an ALJ would not change the Department's calculation of not including an appeals process in these final regulations, as explained in the previous section.

The Department does not advocate on behalf of the borrower or the school. The Department is a neutral arbiter and will consider the evidence submitted by both the borrower and the institution. Additionally, the Department will provide both the borrower and the school with any evidence otherwise in the possession of the Secretary, and both parties will have an opportunity to respond to such evidence.

Changes: The Department adopts, with changes for organization and consistency, the approach in Alternative B for paragraphs (d)(5) introductory text and (d)(5)(i) and (ii) (Affirmative and Defensive) for loans first disbursed on or after July 1, 2020.


**Borrower Defenses—Relief (§ 685.206)**

*General*

Comments: One commenter suggested amendments to the proposed regulations to require that, in the case of an approved borrower defense to repayment, the Secretary reverse an affected loan's default status and reinstate the borrower's eligibility for title IV aid, and update reports to consumer reporting agencies to which the Secretary had previously made adverse credit reports regarding the loan. The commenter noted that proposed regulations provide that the Secretary may take such actions and stated that regardless of whether both affirmative and defensive claims are allowed, the Secretary should always reverse an affected loan's default status and any adverse credit reports as well as recalculate a borrower's eligibility period for which the borrower may receive Federal subsidized student loans.

Discussion: The Department's practice has been, and currently is, that if the Department had previously made adverse credit reports to consumer reporting agencies regarding a Federal student loan that is the subject of an approved borrower defense application, the Department will take the appropriate steps to update those credit reports. Similarly, it is the Department's practice that, if appropriate, the necessary steps will be taken to reinstate the borrower's eligibility for title IV aid.

The Department revised the regulations to expressly provide that the relief awarded to a borrower will include updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan or loans repaid by the borrower's Direct Consolidation Loan. Additionally, the Department is revising the regulations to reference that as part of any further relief the borrower may receive, the Department will eliminate or recalculate the subsidized usage period that is associated with the loan or loans discharged, pursuant to 34 CFR 685.200(f)(4)(iii). The Department did not rescind the revisions made to 34 CFR 685.200 through the 2016 final regulations. The Department also is clarifying that the list of further relief a borrower may receive is an exclusive list.[FN108]

However, such steps may not be applicable for all approved borrower defense applicants. For example, we do not anticipate that all approved borrower defense applicants will have been subject to adverse credit reporting as a result of a defaulted Federal student loan. Similarly, not all approved borrower defense applicants will need a determination that they are not in default on their loans because there may be borrowers who are not in a default status and who apply for borrower defense discharges.

We also do not believe it is appropriate to expressly require in the final regulations that the Secretary recalculate a borrower's eligibility period for which the borrower may receive Federal subsidized student loans. Not all borrowers may have received

subsidized Federal student loans, so such an action would not be relevant to all borrowers. Further, the changes made to § 685.200(f) (2017) by the 2016 final regulations, which are now effective, require that the Department recalculate the period for which the borrower may receive Federal subsidized student loans if a borrower receives a borrower defense to repayment discharge and sets forth the specific conditions for when the recalculation may occur. As a result, we **\*49832** believe it is appropriate to designate the recalculation of a borrower's subsidized Federal student loan eligibility period as further relief that may be provided by the Secretary if a borrower defense to repayment application is approved.

For clarity only, we have moved the phrase "reimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection" from the list of potentially applicable further relief in § 685.206(e)(12)(ii) to the section on borrower defense relief in § 685.206(e)(12)(i). If applicable, this item would be part of borrower defense relief itself, so the Department believes including it in the list of further relief could be confusing.

Changes: As noted above, we moved "reimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection" from the list of potentially applicable further relief in § 685.206(e)(12)(ii) to the paragraph describing borrower defense relief in § 685.206(e)(12)(i). Additionally, the Department revised the regulations to note that "relief" and not "further relief" includes updating credit reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan or loans repaid by the borrower's Direct Consolidation Loan in § 685.206(e)(12)(i). The Department revised § 685.206(e)(12)(ii)(B), which concerns further relief, to reference 34 CFR 685.200(f)(4)(iii), which address subsidized usage periods. Finally, the Department revised § 685.206(e)(12)(ii) to clarify that the list of "further relief" is an exclusive list.

### *Partial Discharges*

Comments: Several commenters supported the Department's position that a partial loan discharge as relief for an approved borrower defense application would be warranted in some circumstances. One such commenter stated that that the proposed process would provide fair compensation to borrowers and tiers of relief to compensate borrowers as necessary. Another commenter asserted that the proposed approach, in allowing for partial relief, would provide the Department with flexibility in providing borrowers with relief. This commenter expressed support for a tiered method of relief that had been developed by the Department in 2017 based upon a comparison of earnings between a borrower defense claimant to earnings of graduates in a similar program. The commenter also supported adopting this methodology for calculating partial relief for the purposes of this regulation. One commenter asserted that relief should be based on the degree of harm suffered by a borrower.

Several commenters, in support of the provision of partial relief, suggested that partial relief should be limited to the amount of tuition paid with the Federal student loan and not include funds received for living expenses. One such commenter stated that relief should not be capped at the total cost of a student's attendance at the school, as opposed to the total amount of tuition and fees. This commenter asserted institutions should not be held responsible for portions of a Direct Loan, up to the full cost of attendance, including the student's living expenses, because schools are unable to limit the amount of Direct Loans students may choose to take out to support their living expenses under the Department's regulations. This commenter also argued that the nexus between a school's act or omission, underlying a borrower defense to repayment, is more attenuated than the nexus between the act or omission and the tuition and fees charged by the institution. This commenter stated that it is difficult to see how a claim based on an act or omission relating to the provision of educational services, as required under the proposed regulations, could be connected to a Direct Loan used to pay for living expenses given that the amount of such a loan is controlled by the Department's loan limits and the student's decisions.

Many commenters advocated full relief, in the form of a complete discharge of a borrower's remaining Direct Loan balance and a refund of payments made, for borrowers who demonstrate that they qualify for borrower defense to repayment relief. Some of these commenters supported full relief for approved applications in each instance, and others supported establishing a presumption of full relief.

000151

Many commenters argued that any effort to determine a partial loan discharge amount would lead to the inconsistent treatment of borrowers; be subjective, costly, time-consuming, and difficult to administer; add to the burden on the Department; and unnecessarily delay the Department's provision of borrower defense relief. One group of commenters stated that a calculation of partial relief based upon a borrower's degree of harm suffered would be speculative because most students would not have enrolled had the school made truthful representations. One commenter stated that full relief should be provided, given the profit the Department receives from the student loan program.

Generally, some of the commenters who objected to the Department's position that a partial loan discharge would be warranted in some circumstances argued that borrowers who had demonstrated misrepresentation by their school would have been harmed in many ways and incurred financial harm, and non-financial harms, beyond the obligation to repay a Federal student loan. As a result, even full relief from the Department through the borrower defense process would be insufficient to remedy students' injuries.

One group of commenters asserted that under State unfair and deceptive practices laws that have traditionally been the primary basis for borrower defense claims, all such types of direct and consequential damages and pecuniary as well as emotional harms may provide a basis for relief. According to these commenters, such relief may include relief exceeding the amount paid for the service or good.

Several commenters suggested that the Department adopt an approach similar to that used by enforcement agencies and financial regulators when consumers have been fraudulently induced to take on other types of consumer debt. Those other regulators, stated one of the commenters, seek to unwind the transaction and put borrowers in the same position they would have been absent fraud. This commenter stated that partial relief in accordance with an unspecified methodology on the basis of the value provided by the services received would be difficult to determine and deviates from the approach used by financial regulators.

In arguing for a full relief approach, several commenters stated that allowing partial relief would establish a presumption that the education provided by a school that has been found culpable of wrongdoing has some value to the borrower. These commenters stated that the provision of partial relief would reduce the Department's incentive to ensure it is properly monitoring schools to prevent misconduct and harm both borrowers and taxpayers.

Commenters urged the Department to abandon its proposal to provide partial relief stating that the Department spent three years trying to develop a methodology to calculate partial discharges and have been unsuccessful in devising a fair and consistent way to do so. These commenters suggested that, consistent with closed school and false certification loan discharges, the **\*49833** borrowers should receive full discharges of the Federal student loans associated with their defense to repayment claim. One group of such commenters disagreed with the Department's rationale in the NPRM for why full relief is justified for the false certification and closed school processes, but not for the borrower defense process. These commenters asserted the Department's rationale that the false certification and closed school discharge processes are straightforward as compared to the borrower defense process. This group of commenters also stated that if the Department is unwilling to provide full relief for all approved borrower defense claims, the Department should simplify the relief process and ensure that borrowers receive consistent relief, such as by establishing a presumption of full relief. Where full relief is not warranted, the commenters suggested that the Department be required to explain in writing the basis for its decision and provide the borrower with an opportunity to respond.

One group of commenters asserted that it was incumbent upon the Department to clearly delineate the conditions borrowers would need to meet in order to receive partial or full relief. The commenters noted that, given the burden the Department proposed to impose upon borrowers to assert a successful claim, providing full relief for the borrower and recovering those funds from the school remains the appropriate action for the Department to pursue. The commenters further asserted that there are a number of reasons to doubt the Department's ability to make fair and accurate determinations of the degree of financial harm suffered by each individual borrower, and stated that any such determination would need to account for a wide range of factors that could include the borrower's education and employment history, the regional unemployment rates both overall and in the borrower's career field, and numerous other circumstances that directly impact an individual's earnings potential. The

commenters asserted that, even if these factors could be reliably measured and some income gain determined to exist, that gain would then need to be measured against the expenditures the borrower put towards his or her program. The commenters noted that, as evidence of the inherent complexity of this method, the proposed rule referenced the serious difficulties the Department faced in attempting to create a formula to address this, and resultantly, does not include a proposed formula. The commenters also referenced the Department's claim of the associated administrative burden imposed by reviewing the tens of thousands of borrower defense claims that have been asserted in recent years and noted that, setting aside the significant challenges inherent in attempting to make these determinations at all, that doing so on the scale considered would greatly increase the time and difficulty involved in processing each claim, adding enormously to the burden on the Department and further delaying the expeditious review of claims.

Another commenter expressed confusion as to why the borrower's financial circumstances would be considered in determining the amount of relief to which he was entitled. The commenter agrees that a borrower's choice not to pursue a field related to their course of study at a school or periods of unemployment due to regional economic circumstances should not be a basis for relief, but was concerned that the language offered in the proposed regulation would create inequitable outcomes for borrowers who experienced the same misrepresentations, but had more successful outcomes than others. The commenter asserts that a borrower's relief in the case of proven misrepresentation should in no way be based on whether the borrower was savvy enough to pursue a different field, transfer schools, live in a more economically advantageous region, or be simply more fortunate than other borrowers. The commenter recommends that a borrower should have to show harm to receive a loan discharge, and that the measure of that harm should in no way be linked to an individual's life choices or circumstances, but instead on the harm that resulted from the fraudulent activities of the school.

Commenters asked whether the Department could approve a borrower defense discharge and subsequently determine that the amount of financial relief to be provided would be zero. The commenters also asked whether borrower defense claims could be made on the basis of misrepresentations about job placement, exam passage rates, and the transferability of credits.

One commenter stated that if a borrower has been harmed, or will clearly suffer harm, as a result of a school's misrepresentation, full relief should be provided. This commenter asserted that partial relief should be provided only in very limited cases where the value of the harm is directly related to the misrepresentation.

One commenter expressed concerns about tax implications and credit reporting for partial relief awards. The commenter stated that while a rescission of a transaction may not result in taxable income for borrowers as a "purchase price adjustment" and lead to the deletion of the related tradeline from a borrower's credit report, the Department's proposed rule would not offer borrowers such protections.

One commenter requested the Department more clearly articulate how partial relief would be applied in the case of a defensive claim asserted as to a defaulted loan. Specifically, this commenter asked whether the Department would strike the borrower's record of default and if the borrower would be obligated to pay for collection costs on the partial relief provided.

Discussion: The Department appreciates the support of commenters regarding its proposal to provide for partial loan relief, if warranted, in these final regulations, which is consistent with the existing regulation at 34 CFR 685.222(i). As we stated in 2016, given the Department's responsibility to protect the interests of Federal taxpayers as well as borrowers, we do not believe that full relief is appropriate for all approved borrower defense claims, nor do we believe that it is appropriate to establish a presumption of full relief.[FN109]

We acknowledge that an approach that allows the Department to make determinations of partial relief may be more administratively burdensome and time-consuming because it involves a more complicated analysis than an approach that assumes full relief. However, given the taxpayer and borrower interests at issue, as well as those of current and future students who will bear the cost of an institution's repayment of the claim to the Department, we continue to believe that an approach

that provides the Department with the flexibility to provide partial relief, if warranted, strikes an appropriate balance between these interests.

The Department agrees that not every borrower who experiences a misrepresentation suffers the same amount or types of harm, for a variety of reasons including those listed by commenters. However, since the degree of financial harm suffered is critical to the determination of defense to repayment relief for the reasons explained above, the Department must take this into consideration when awarding relief. It is impossible to know whether all borrowers who attended the same institution experienced the same misrepresentation, relied on that **\*49834** information to make the same decision(s), or were harmed by the misrepresentation in the same way or to the same degree.

As the Department explains in one of the examples for how relief may be determined for substantial misrepresentation borrower defense claims in Appendix A corresponding to section 685.222 of the 2016 final regulations, a borrower would not be eligible for defense to repayment relief even if an institution was proven to have misrepresented the truth, if the student still received an education of value. For example, presume a prestigious law school misstated its full-time employment rate six months after graduation by 20 percent, but the borrower graduated, obtained and maintained employment as an attorney, and has above average earnings; and the school has maintained its strong reputation. In this case, the Department may determine, notwithstanding other evidence, that the institution made a misrepresentation related to the making of a Direct Loan for enrollment at the school; however, given the facts of this hypothetical, the Department could also determine that the borrower was not harmed by the misstatement of the placement rates.

It is possible that a successful borrower defense claim could be based upon evidence of an institutional misrepresentation of job placement rates, exam passage rates, the transferability of credits, or other similar factors, if it is related to the making of a Direct Loan for enrollment at the school.

Although we are now adopting a new misrepresentation standard for loans first disbursed on or after July 1, 2020 that does not incorporate Appendix A from the 2016 final regulations, the same principle of educational value from that example applies.

We disagree that such an approach would be subjective and lead to the inconsistent treatment of borrowers. As we stated in 2016, administrative agency tribunals and State and Federal courts commonly make relief determinations, and the proposed process provides Department employees reviewing borrower defense applications with the same discretion that triers-of-fact in other fora have.[FN110]

Nor do we believe that a determination of partial relief, if warranted, under the proposed regulations would be speculative. Under § 685.206(e)(8), a borrower would be required to state the amount of financial harm that they claim to have resulted from the school's action and to supply any supporting relevant evidence. Given that applicants will provide information regarding the amount of their financial harm, the Department believes that it will be able to make relief determinations in a reasonable manner and has retained this requirement in these final regulations.

Upon further consideration, the Department revised § 685.206(e)(12)(i) to clarify that the amount of relief that a borrower receives may exceed the amount of financial harm, as defined § 685.206(e)(4), that the borrower alleges in the application pursuant to § 685.206(e)(8)(v) but cannot exceed the amount of the loan and any associated costs and fees. The Department realizes that the school's response and any evidence otherwise in the possession of the Secretary may reveal that a borrower's allegation of financial harm is too low.

Accordingly, the Department revised § 685.206(e)(12)(i) to expressly note that in awarding relief, the Secretary shall consider the borrower's application, as described in 685.206(e)(8), which includes any payments received by the borrower and the financial harm alleged by the borrower, as well as the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary, as described in § 685.206(e)(10). The Department did not intend to limit its award of relief to the

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   000154   74

financial harm that the borrower alleges. The Department also did not intend to limit its ability to award relief to consideration of the financial harm that the borrower alleges.

We acknowledge that borrowers subjected to the same misrepresentation may suffer differing degrees of financial harm. However, given the Department's interests as explained above, we do not believe it is inequitable to provide each borrower defense applicant with a meritorious claim with relief that may account for the borrower's degree of harm or injury and is in accord with the approach taken by the courts under common law.

The Department disagrees that a full relief approach should be taken because of any profit made by the Federal government on the Federal student aid programs. The Department is responsible for the interests of all Federal taxpayers whose taxes fund the Federal student aid programs, and as stated above, the Department believes an approach that balances those interests with those of borrowers seeking borrower defense relief is best served by taking an approach to relief that would allow for partial relief, if warranted, whether the loan program proves profitable or not.

While we understand that some enforcement agencies and/or financial regulators may seek "full relief" for consumers under Federal or State consumer protection law, as pointed out by some commenters, such agencies are not directly responsible, as the Department is, for the administration of a Federal benefit program funded by Federal taxpayer dollars. We also understand that under some State consumer protection laws, consumers may be able to receive similar relief. However, we do not believe such an approach is appropriate for the borrower defense process given the Department's responsibility to Federal taxpayers. The Department does not possess the authority to authorize relief beyond the monetary value of the loan made to the borrower. We note that nothing in Department's regulations precludes borrowers, who are unsatisfied with the amount of relief they receive, from seeking such relief directly from their schools through the Federal or State court systems under Federal or State consumer protection law.

We decline at this time to include a specific relief methodology for borrower defense claims asserted under the misrepresentation standard for loans first disbursed on or after July 1, 2020, or to include further conceptual examples such as those in appendix A to 34 CFR 668, part 685. While the Department will continue to consider the borrower's cost of attendance and the value of the education provided by the school for borrower defense claims asserted under the substantial misrepresentation standard for loans first disbursed on or after July 1, 2017, and before July 1, 2020, we believe that the proposed regulation appropriately provides the Department with the flexibility to determine the appropriate measure of relief that should be provided to a borrower defense applicant for claims asserted as to loans first disbursed on or after July 1, 2020.

As the Department's standard for borrower defense claims asserted after July 1, 2020, requires borrowers to demonstrate financial harm and state the amount of that harm, the Department believes that it will be able to make appropriate relief determinations in consideration of the borrower's degree of financial harm based upon the specific circumstances established by borrower defense applicants.

The Department will make its own determination of financial harm, as defined in § 685.206(e)(4), based on the information in the borrower's **49835** application, the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary that was provided to both the school and the borrower. The Department revised the final regulations to reflect that the Department makes a determination of financial harm and will award relief equivalent to the financial harm incurred by the borrower. As explained above, the Department's award of relief may exceed the financial harm alleged by the borrower in the borrower defense to repayment application. The Department's award of relief, however, may not exceed the Department's own determination of financial harm.

"Financial harm" is defined in § 685.206(e)(4), in part, as the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation, as defined in § 685.206(e)(3). Financial harm, thus, will always be related to an alleged misrepresentation. For example, an alleged misrepresentation may include a significant difference between the earnings the institution represented to the borrower that he or she would be likely to earn after graduation and the borrower's actual post-graduation earnings or

000155

aggregate earnings reported by the Department for the program in which the borrower was enrolled. Pursuant to the definition of financial harm in § 685.206(e)(4), the Department will determine how much relief to award by considering the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation and the factors outlined in 34 CFR 685.206(e) (4)(i) through (iv): Periods of unemployment after graduation unrelated to national or local economic recessions, significant differences in cost of attendance from what the borrower was led to believe, the borrower's inability to secure employment after being promised employment, and inability to complete the program because of a significant reduction in offerings.

The Department would like to be transparent about relief determinations and has revised the regulations to expressly state the Department will specify the relief determination in the written decision and publish decision letters with personally identifiable information redacted.[FN111] Accordingly, the borrower and school will know how the Department calculated the relief to the borrower.

Unlike the 2016 final regulations, these final regulations do not expressly state that the Department will advise the borrower that there may be tax implications as a consequence of any relief the borrower receives. Such an express provision is not necessary because the Department intends to inform the borrower at the outset of the borrower defense to repayment process that there may be tax implications, likely by posting such information on the Department's website. The Department, however, cannot provide tax advice, as the tax implications will vary depending on an individual borrower's circumstances and does not wish to mislead borrowers in this regard.

We disagree that the proposed regulation allowing for partial relief, if warranted, would reduce the Department's incentive to monitor schools' wrongdoing. The Department actively monitors schools for their compliance with the Department's regulations as part of its regular operations and will continue to do so, regardless of the amount of borrower defense relief provided to borrowers.

With regard to the possible tax implications and credit reporting for partial relief awards, the Department does not have the authority to determine how a full or partial loan discharge may be addressed for tax purposes. If a borrower receives a partial loan discharge, then the Department will update reports to consumer reporting agencies to which the Secretary previously made adverse credit reports. The Department has revised 34 CFR 685.206(e)(12)(1) to expressly include updating reports to consumer reporting agencies as part of the "relief" that the borrower will receive and not "further relief" that a borrower may receive.

We maintain our position from the NPRM [FN112] and the 2016 final regulations that the amount of relief awarded to a borrower during the defense to repayment process would be reduced by any amounts that the borrower received from other sources based on a claim by the borrower that relates to the same loan and the same misrepresentation by the school as the defense to repayment. To clarify that position, we are incorporating language from § 685.222(i)(8) on that point into § 685.206(e)(12) of these final regulations.

After careful consideration of the comments, our internal determination processes, and our ability to rely on the data available to us, we do not support the proposal to reduce the amount of relief by the amount of credit balances received by the borrower. The Department now agrees with the commenters who suggested that, in a situation where the borrower is granted full relief, the portion of the loan that can be forgiven should not be limited to the portion borrowed to pay direct costs to the institution. The Department will carefully consider the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation.

The currently existing regulations, at 34 CFR 685.222(i)(2)(i), provide that for claims brought under the substantial misrepresentation standard, as stated in 685.222(d)(1), as to loans first issued on or after July 1, 2017, the Department factors in the borrower's cost of attendance (COA) to attend the school, as well as the value of the borrower's education. In the preamble to those regulations, we justified factoring the student's COA into determinations of relief by explaining, in part, that the COA reflects the amount the borrower was willing to pay to attend the school based upon the information provided by the school and the Federal student loan programs were designed to support both tuition and fees and living expenses. We also noted that we

did not believe that an institution's liability should be limited to the loan amount the institution received, because that amount does not represent the full Federal loan cost to a student for the time spent at the institution.

We adopt the currently existing regulation's rationale here. While it is true that a student may not have taken out some Federal student loans for living expenses absent his or her attendance at the school, the student nonetheless received the proceeds of that loan to attend the school. The nexus between any act or omission underlying a valid borrower defense to repayment claim and a student's total COA while enrolled is sufficiently strong to necessitate full relief, where appropriate.

As a result, in these final regulations, we will not exclude credit balances from the relief calculation as to loans first disbursed on or after July 1, 2020. Relief will not be limited to those portions of a Direct Loan that are directly received by the institution. The portions of the loan that generated credit balances will be included in defense to repayment loan discharges. Additionally, treating students who lived on-campus differently than those who decided, for whatever personal reasons, to live off-campus would create disparate outcomes between these two populations of students that would be difficult for the Department to justify.

 **\*49836**   Because a borrower must make a defense to repayment claim within three years of exiting the institution, the Department does not believe that the loan discharge or collections should be limited to the amount of payments a borrower has made during that or any other period of time. Debt relief is based on the total debt associated with the enrollment during which the misrepresentation occurred, plus accumulated interest.

Because the Department is no longer differentiating between affirmative and defensive claims, we do not believe it is necessary to develop different protocols for assessing harm in either case.

Changes: The Department revised § 685.206(e)(8)(v) to allow the borrower to state the amount of financial harm in the borrower defense to repayment application. The Department will specify the relief determination in the written decision as provided in 34 CFR 685.206(e)(11)(iii). The Department also is revising the language in § 685.206(e)(8)(vi) with respect to the borrower defense application, and § 685.206(e)(10) with respect to a school's submission of evidence.

The Department revised § 685.206(e)(12)(i) to clarify that the amount of relief that a borrower receives may exceed the amount of financial harm, as defined in § 685.206(e)(4), that the borrower alleges in the application pursuant to § 685.206(e)(8)(v) but cannot exceed the amount of the loan and any associated costs and fees. The Department further revised § 685.206(e)(12) to expressly note that in awarding relief, the Secretary shall consider the borrower's application, as described in § 685.206(e)(8), which includes any payments received by the borrower and the financial harm alleged by the borrower, as well as the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary, as described in § 685.206(e)(10). The Department also revised the final regulations in § 685.206(e)(12)(i) to reflect that the Department makes a determination of financial harm and will award relief equivalent to the financial harm incurred by the borrower.

The Department revised 34 CFR 685.206(e)(12)(i) to expressly include updating reports to consumer reporting agencies as part of the "relief" and not "further relief" that a borrower will receive.

Also, for clarity, we have added to § 685.206(e)(12) the language included in § 685.222(i)(8) of the 2016 final regulations, regarding a borrower's relief not exceeding the amount of the loan and any associated fees, and being reduced by other forms of recovery related to the borrower defense.

Comments: Several commenters noted that the Department requested public comment on potential calculations for partial relief but did not include a proposal for how the Department envisions partial relief might be calculated. These commenters recommended that the Department propose a methodology in regulation and obtain public comment on the proposal. One group of these commenters asserted that a failure to include a proposal for calculating partial relief in the proposed regulations is a violation of the notice and comment requirements of the Administrative Procedure Act.

Discussion: The Department disagrees that it should or is required to publish an internal methodology for partial discharge for borrower defense in the Federal Register and seek notice and comment. As noted by the commenter, the Department sought public comment on potential methods for calculating relief in the NPRM. After considering the comments received, the Department believes that given the many factors involved in making a borrower defense determination, from those relating to the availability of data, the specific facts of any individual claim, as well as the evolution of the types of claims that are being filed, it is appropriate that the Department maintain discretion and flexibility to make relief determinations on a case-by-case basis as appropriate to the individual circumstances of a particular claim.

The Department also disagrees that it was required to include a proposal for a partial relief methodology in the 2018 NPRM. In the 2018 NPRM, the Department sought public comment on methods for calculating partial relief. And, after reviewing related comments, the Department is declining to adopt any one uniform methodology in these final regulations. These actions are in compliance with the Administrative Procedure Act's notice and comment requirements.

Changes: None.

Comments: One commenter expressed appreciation for the clear statement in proposed 34 CFR 685.206(d)(12)(iii) regarding the borrower's right to pursue relief for any portion of a claim exceeding the discharged amount or any other claims arising from unrelated matters. However, the commenter requested additional clarity in proposed 34 CFR 685.206(d)(12)(i), as the commenter stated that if only partial relief is granted to the borrower, any amounts granted outside of the Federal borrower defense to repayment process should first be credited toward loan amounts that are still owed by the borrower. The commenter asserted that a borrower's obligation to repay discharged amounts should be reinstated as a result of non-Federal relief only if full relief had been granted in the Federal process, or when non-Federal relief exceeds the remaining portion of a borrower's loan after partial relief has been provided.

Several commenters asked the Department to clarify whether financial aid awards related to private student loans, veterans' benefits, or other losses separate from those related to Federal student loans (e.g., educational expenses paid out-of-pocket, tuition payment plans, loss of state grant eligibility, and payment for childcare or transportation) should not be used to offset the discharge of Federal student loans.

Discussion: The Department thanks the commenter for its support for the clarification in proposed 34 CFR 685.206(d)(12)(iii) that a borrower is not limited or foreclosed from pursuing legal and equitable relief under applicable law for recovery of any portion of a claim exceeding that the borrower has assigned to the Secretary or any claims unrelated to the borrower defense to repayment. This provision is similar to the existing provision in 34 CFR 685.222(k)(3) (2017), and the Department does not consider this a change in its position.

The Department does not agree that it is appropriate to reinstate an approved borrower defense applicant's obligation to repay on the loan when the borrower has received a recovery from another source based on the same borrower defense claim, only when the borrower has either received full relief from the Department or has received a recovery that exceeds the remaining portion the borrower's Federal loan, if the borrower received a partial borrower defense discharge. The proposal echoes the language in the Department's existing regulation at 34 CFR 685.222(k)(1) and also does not represent a change in the Department's existing policy. This rule is intended to prevent a double recovery for the same injury at the expense of the taxpayer. As provided in the NPRM, because the borrower defense process relates to the borrower's receipt of a Federal loan, we would reinstate the borrower's obligation to repay on the loan based on the amount received from another source only if the Secretary determines that the recovery from the other source also relates to the Federal loan that is the subject of the borrower defense. Recoveries related to private loans and veterans' benefits, for **\*49837** example, would not lead to a reinstatement of the borrower's obligation to repay the Federal loan.

Changes: None.

*Withholding Transcripts*

Comments: One group of commenters supported the position that a school has the ability to withhold an official transcript from a borrower who receives a total discharge of his Federal student loan. These commenters assert that this has always been the case in instances where the borrower was provided a loan discharge through the false certification, closed school, or borrower defense to repayment provisions.

Many commenters strongly opposed the Department's assertion that schools have the ability to withhold transcripts of borrowers who receive loan discharges. The commenters concluded that schools have a moral obligation to maintain and provide students access to their academic records, especially in the case of education disruption due to institutional misrepresentation or unforeseen closure.

One commenter noted that it is unclear why, or whether, a school would have the right to withhold transcripts of a student who does not owe a debt to the school or to the Federal Government. This commenter further notes that bankruptcy case law specifically prohibits the withholding of academic transcripts after a borrower has his student loan debt discharged; the Family Educational Rights and Privacy Act (FERPA) requires that students be granted access to at least unofficial transcripts; and that policies pertaining to withholding transcripts are also a matter of State law and institutional policy, not Federal law or regulation, such that the Department's prohibition may be in violation of these laws and policies. The commenter also opined that including this warning in regulation appears to be a threat intended to deter borrowers from filing claims. The commenter asserts that this warning is unlikely to deter frivolous claims since the consequences do not apply to claimants whose loans are not discharged in full. The commenter recommends that the Department should not imply borrowers who receive discharges should not have access to their transcripts when the Department is not aware of the school's policy and has no authority to establish such a requirement.

Another commenter noted that the allowing schools to withhold transcripts is a retaliatory directive to schools to further harm borrowers who have cleared every hurdle to prove that they have been defrauded.

Discussion: The Department appreciates the commenters who pointed out that the 2018 NPRM simply acknowledges current practice, which allows institutions to establish their own policies regarding the provision of official transcripts to students. The Department agrees that as a result of FERPA regulations, an institution is obligated to make student's academic record available to him or her. However, FERPA does not require an institution to send a borrower a copy of that record or to provide an official transcript.

The Department is not requiring institutions to withhold transcripts. We emphasize the need for institutions to adhere to applicable State laws and policies that may prohibit them from withholding transcripts. To make this clear, we are revising the regulations to state that the institution may, if allowed or not prohibited by other applicable law, refuse to verify, or to provide an official transcript that verifies the borrower's completion of credits or a credential associated with the discharged loan.

The Department is aware that students who are provided loan relief through bankruptcy may still be able to obtain transcripts. A significant difference, however, is that the institution is not asked to reimburse the Department for any loans taken by the student in the case of a borrower's subsequent bankruptcy. But the Department will seek recovery from the institution for successful borrower defense claims. However, for those borrowers applying for borrower defense relief that are not also petitioning for bankruptcy, the Department believes it is appropriate to generally inform borrowers through an acknowledgement in the borrower defense application that a school may withhold an official transcript, if allowed or not prohibited by other applicable law, in the event that the borrower receives full relief. Such a provision will help inform borrowers of the possibility that the institution may refuse to verify or provide an official transcript, if allowed or not prohibited by other applicable law.

The Department is not suggesting that an institution should withhold a borrower's official transcript or that an institution's right to withhold an official transcript is a retaliatory act. Borrowers, however, should understand that by receiving a full loan discharge, there is a possibility that they may not receive an official transcript. Understanding this possibility will inform a

000159

borrower's decision whether to assert that the education they obtained was actually of no value. The higher education community consistently makes the case that higher education has inherent value beyond that which can be measured in job placements and earnings. The Department agrees with that position, which is why we believe that it would be the rare student who received no value whatsoever from the educational experience. In such rare cases, the borrower would have little use for an official transcript from the institution, such as for the purpose of transferring credits or using the credentials earned while in attendance at such an institution.

Changes: We revised the language from proposed § 685.206(d)(3)(vi), now in § 685.206(e)(8)(vi), to state that the institution may, if allowed or not prohibited by other applicable law, refuse to verify, or to provide an official transcript that verifies the borrower's completion of credits or a credential associated with the discharged loan. As previously stated, the Department also is revising the language in § 685.206(e)(8)(vi) with respect to the borrower defense application and § 685.206(e)(10) with respect to a school's submission of evidence.

### *Transfer to Secretary of Borrower's Right of Recovery Against Third Parties*
Comments: None.

Discussion: Like the 2016 final regulations, these final regulations provide that upon granting any relief to a borrower, the borrower transfers to the Secretary the borrower's right of recovery against third parties.[FN113] Unlike the 2016 final regulations, these regulations refer to "any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the provision of educational services" [FN114] because "provision of educational services" is a defined term; the 2016 final regulations instead reference the contract for educational services. The 2016 final regulations note such a transfer or rights from the borrower to the Secretary for the right to recover against third parties includes any "private fund," and these final regulations clarify that the transfer applies to any private fund, including the portion of a public fund that represents funds received from a private party.

Changes: None.

### **\*49838  Borrower Defenses—Recovery From Schools (§§ 685.206 and 685.308)**

### *Institutional Liability Cap*
Comments: Several commenters suggested that the Department's recovery from institutions for losses related to the provision of relief to borrowers for borrower defense applications be subject to a maximum limit. One commenter suggested that such institutional liability for a borrower defense claim be capped at some reasonable level and suggested the amount the borrower had paid on the loan during the first three years. Another commenter suggested that the maximum limit should be the amount paid by the student during the first five years from the student's last day of enrollment at the institution. This commenter asserted that without such a limit, borrower defense applicants would be able to bring claims at any point during the repayment of the loan, which could be beyond the document retention period for the relevant documents and affect the school's ability to defend itself.

Discussion: The Department does not agree that there should be a cap on institutional liability for relief granted for an approved borrower defense application. The Department has an obligation to protect the interests of the Federal taxpayer and borrowers. As a result, the Department believes it is appropriate to require an institution to pay the amount of relief provided in the borrower defense process based upon the institution's act or omission. In the separate recovery proceeding against the institution brought under 34 CFR part 668, subpart H, the institution will have the opportunity to dispute the amount of the liability.

We also do not agree that schools will be limited in their defense against a borrower defense relief liability to the Department without a maximum liability limit or a change to the proposed time limit on the Department's ability to recover from the school. The new requirements will apply to borrower defense relief granted as to loans first disbursed on or after July 1, 2020. We

000160

believe that schools will adjust their business practices to maintain documents for students with loans first disbursed on or after July 1, 2020, in anticipation of borrower defense claims from those students.

Changes: None.

*Limitations Period for Recovering Funds From Schools*

Comments: One group of commenters offered support for the Department's proposal for a five-year limitations period for the Department's ability to recover funds from schools in the event of a loan discharge as a result of an approved borrower defense application and requested we include a definition of "actual notice."

One commenter objected to the five-year limitations period and suggested that the recovery period should be aligned with the three-year record retention requirement.

Another commenter supported the establishment of a time limit for the Secretary to initiate an action to collect from the school the amount of any loans discharged for a successful borrower defense to repayment claim, but recommended that this limit be consistent with the standard civil statute of limitations of six years.

One commenter suggested that the Department maintain the language in the 2016 final rules (in 34 CFR 685.206 and 685.222 (2017)) allowing the Department to recover from a school the amount of borrower defense relief awarded by the Department, within the later of three years from the end of the last award year that the student-applicant attended the institution or the limitation period that would apply to the cause of action or standard that the borrower defense claim is based, or at any time notice of the borrower defense claim is received during those periods. This commenter stated that the Department's proposal to have a three-year time limit from the last award year the student was enrolled in the institution for such actions related to loans first disbursed before July 1, 2019, is contrary to the Department's stated goal of protecting taxpayers. This commenter also stated that the Department's proposed five-year time limit from the time of the borrower defense adjudication for loans first issued on or after July 1, 2019, was a strong proposal.

Another group of commenters also cited the approach in the 2016 final regulations, which the commenters implied echoes State law concepts such as tolling and discovery to statutes of limitation and asked why the Department has proposed rescinding such provisions. These commenters asserted that the 2016 final regulations seem to allow the Department to recoup more money from institutions and lessen taxpayer liability and were concerned about the budget impact of the proposal. These commenters also asked why the Department's proposal for a five-year limitation period for recovery actions based upon borrower defense relief granted for loans first disbursed on or after July 1, 2019, should not also apply to actions based upon loans first disbursed before July 1, 2019.

Discussion: The Department appreciates the comments in support of the five-year limitations period for the Department to initiate a proceeding against a school. The final regulations provide that such a proceeding will not be initiated more than five years after the date of the final determination included in the written decision referenced in § 685.206(e)(11), and the school will receive a copy of the written decision pursuant to § 685.206(e)(11) for its records. The written decision will provide adequate notice of when the five-year period begins for schools.

The Department believes that since an institution will be provided the opportunity to respond to the borrower's defense to repayment claim in the course of the borrower defense adjudication process, and that claim must be made within three years after the student leaves the institution, the institution will be made aware of the need to retain records relevant to its defense for a borrower defense to repayment claim and adjust its business practices accordingly. As a result, the Department does not agree that a longer time limit, such as six years, for a recovery proceeding is necessary. As explained in the 2018 NPRM, one reason for the recovery action limitation period to be three years is to align with the document retention requirements under the Department's regulations. We acknowledge that schools will retain records once aware of a need due to potential liability from

000161

borrower defense applications. The three-year document retention period is one, among other justifications, for the limitations period.

Further, the Department has decided not to align with the typical statute of limitations in civil statutes because that period of time is based on when the alleged act occurred. For a student enrolled in a bachelor's or graduate program, the student may not have had the opportunity to complete the program within that time period, and therefore may not understand that the institution made misrepresentations during the admissions process or enrollment period. Therefore, the Department is using established timeframes that are based on when the student left the institution rather than when the alleged act or omission occurred. The Department believes that a borrower should have three years subsequent to leaving an institution during which time he or she can submit a defense to repayment application.

The Department believes it is similarly appropriate to establish a timeframe during which it can initiate a  *49839  collection claim against an institution. The Department believes that the proposed timeframe establishes clear expectations for schools that will provide them with some certainty for their planning and operational needs and will also allow the Department to meet its responsibility to Federal taxpayers. The process by which the Department initiates a collection action against an institution is separate from the process by which the Department adjudicates a defense to repayment claim. Although the Department does not anticipate that it would typically take that long to initiate collection actions, the Department needs sufficient time to initiate that process. The Department believes that five years is ample time to complete that process and collect from the school the amount of the loan discharged.

The amount the Department may collect from the institution is limited to the amount of loan forgiveness granted as part of the defense to repayment determination. Even if it takes five years for the Department to initiate that collection, the amount collected will be limited to the amount of loan forgiveness awarded by the Department at the time of the claim adjudication. The Department will inform the institution at the same time it notifies the borrower of the outcome of the adjudication process.

For the reasons stated above, we are taking a different approach for recovery actions for borrower defense relief based upon loans first issued on or after July 1, 2020. Upon further consideration, the Department has also decided to retain the recovery process time limits and requirements in the 2016 final regulations, at 34 CFR 685.206 and 685.222 (2017), for loans first disbursed before July 1, 2020. As these provisions are currently effective, we do not believe this approach will disadvantage schools that have already made adjustments in their document retention policies and procedures in anticipation of these recovery provisions.

The Department also wanted to assure that a school will receive timely notice of a borrower's allegations in a borrower defense to repayment application and is revising these regulations to state the Department will notify the school within 60 days of the date of the Department's receipt of the borrower's application. Such timely notification will place the school on notice to preserve any records relevant to the borrower defense to repayment application and begin to prepare its response.

As was the case in the NPRM, these final regulations expressly state that the Department may initiate a proceeding against provisionally certified institutions to recover the amount of the loan to which the defense applies in accordance with 34 CFR part 668, subpart G. Such a provision is consistent with 34 CFR part 668, subpart G, as provisionally certified institutions are participating institutions as defined in 34 CFR 668.2 and receive title IV, Federal Student Aid.

Changes: We have revised 34 CFR 685.206 to reflect that the borrower defense standard, adjudication process, and recovery proceedings are tied to the date of first disbursement of the Direct Loan or Direct Consolidation Loan. We also clarified that the five-year limitations period on Departmental recovery actions against schools is applicable for borrower defense claims asserted as to loans first disbursed on or after July 1, 2020. The Department also revised 34 CFR 685.206(e)(16)(ii) to state the Department will notify the school within 60 days of the date of the Department's receipt of the borrower's application.

Comments: None.

000162

Discussion: The Department proposed in the 2018 NPRM to promulgate a regulation that the school must repay the Secretary the amount of the loan which has been discharged and amounts refunded to a borrower for payments made by the borrower to the Secretary, unless the school demonstrates that the Secretary's decision to approve the defense to repayment application was clearly erroneous. Upon further consideration, this amendatory language does not align well with 34 CFR part 668, subpart G, which provides the rules and procedures for the Department to initiate a recovery proceeding against a school. Additionally, the Department stated in the preamble of the 2018 NPRM: "The burden of proof rests with the Department, and the school has an opportunity to appeal the decision of the hearing official to the Secretary." [FN115] A clearly erroneous standard is inconsistent with the Department's intention and statement that the burden of proof lies with the Department. Accordingly, the Department is withdrawing this proposed regulation.

Changes: The Department withdraws the proposed regulation that the school must demonstrate the Secretary's decision to approve the defense to repayment application was clearly erroneous.


**Pre-Dispute Arbitration Agreements, Class Action Waivers, and Internal Dispute Processes (§§ 668.41 and 685.304)**

*Legal Authority and Basis for Regulating Class Action Waivers and Arbitration Agreements*
Comments: A group of commenters argued that the HEA grants the Department legal authority and wide discretion to place conditions upon the receipt of title IV funding by participating schools, including restricting or prohibiting the use of pre-dispute arbitration agreements or class action waivers.

A number of commenters challenged the assertion in the 2018 NPRM that the 2016 final regulations' limitations on the use of mandatory arbitration and class action waivers were not consistent with law. These commenters disagreed with the Department's citation to the Supreme Court's decision in Epic Systems Corp. v. Lewis, 138 S. Ct. 1612 (2018) and the reference to a congressional resolution disapproving a rule published by the CFPB that would have regulated certain pre-dispute arbitration agreements. These commenters argued that neither the Supreme Court decision, nor Congress' action, has any bearing on the authority of the Department to include contractual conditions relating to arbitration as part of a program participation agreement or contract. In addition, the commenters noted that Congress did not take any action to disapprove the 2016 final regulations.

Discussion: The Department agrees with the commenters who argued that the HEA grants the Department legal authority and wide discretion to place conditions upon the receipt of title IV funds. That authority includes restricting, prohibiting, and, importantly, encouraging the use of pre-dispute arbitration agreements and class action waivers.

The Department respectfully disagrees with the commenters' assertion that the 2018 NPRM's reliance on the Epic Systems decision and the congressional resolution disapproving the CFPB rule were invalid. The Department cited Epic Systems because it is consistent with precedential decisions in Federal court in favor of establishing "a liberal federal policy favoring arbitration agreements" [FN116] and decisions against prohibitions on class action waivers.[FN117] Together, these three cases stand for the **\*49840** proposition that, absent a contrary congressional mandate, Federal policy favors arbitration agreements.

Given the Court's precedents, Congress' resolution disapproving the CFPB's rule, and our reweighing of the benefits and costs regarding pre-dispute arbitration clauses and class action waivers, the Department has decided to bring its policies to align more closely with the "liberal federal policy favoring arbitration agreements." The HEA provides the authority and discretion for the Department to make that policy shift. It is our view, as explained in the 2018 NPRM, that arbitration agreements and class action waivers, when coupled with student protections promoting informed decision making, preserve reasonable transparency, and cooperative dispute resolution potential that is positive for both students and institutions.

Changes: None.


*General Support for Class Action Waivers, Pre-Dispute Arbitration Agreements, and Internal Dispute Processes*

000163

Comments: Many commenters expressed support for the regulations pertaining to the use of pre-dispute arbitration agreements, class action waivers, and internal dispute processes. These commenters frequently noted that arbitration and internal dispute processes can provide a path to resolution that is reasonable and fair to both the student and the school, while reducing potential costs to taxpayers. These commenters also underscored the importance of ensuring students were properly informed of their options and given the necessary information regarding how to proceed.

A group of commenters who wrote in support of the proposed regulations also suggested a change to the regulatory language to distinguish between schools that use such pre-dispute arbitration agreements and waivers for use of recreational facilities or parking lots or similar non-enrollment activities and those that require such agreements as a condition of enrollment.

Discussion: The Department appreciates the support for the proposed regulations from many of the commenters. The Department agrees that it is very important that students are properly informed of their options and given the necessary information regarding how to proceed. We also appreciate the detailed comments and suggestions on the proposed rules relating to mandatory arbitration and class action waivers.

We agree with the commenters who argued that arbitration may provide a method for borrowers and schools to address a student's concerns without the significant expense and time commitment that are common to court litigation. It is well established that alternative dispute resolution (ADR) processes like arbitration are more likely to result in savings to the parties, without reducing the parties' satisfaction with the result.[FN118]

We also agree with the commenters who suggested that allowing arbitration will better ensure that the school, rather than the taxpayer, will bear the cost of the school's actions. As a result, a decision in favor of the student would be the school's responsibility. In addition, depending on the particular circumstances of a claim, a student potentially could be awarded greater relief, including refunds of cash payments, when appropriate, as a result of an arbitration decision in the student's favor.

With regard to the regulatory distinction for schools that use pre-dispute arbitration agreements and waivers for the use of recreational facilities, parking lots, or other similar activities, the Department agrees with the commenter that the regulations should distinguish between schools that use pre-dispute arbitration agreements as a condition of enrollment and those that do not. The Department makes this distinction because the regulated type of agreements have a clear relationship with the educational services provided by the institution. The Department also believes that a change reflecting the commenter's suggestion would improve consistency between §§ 668.41 and 685.304.

Section 668.41(h)(1) limits arbitration disclosure requirements to cases where agreements are used as a condition of enrollment. The commenter recommended duplicating that language in § 685.304, specifically in § 685.304(a)(6)(xiii), (xiv), and (xv) replacing "if the school" with "if, as a condition of enrollment, the school." Inclusion of the commenter's suggested language would make it clearer in § 685.304 that the agreements are related exclusively to enrollment agreements.

On the other hand, the Department's proposed language does include "to pursue as a condition of enrollment" in § 685.304(a)(6) (xiii); "to enroll in the institution" in § 685.304(a)(6)(xiv); and "to enroll in the institution" in § 685.304(a)(6)(xv). We believe deleting those phrases and replacing them with the suggested language would be clearer and provide consistency between §§ 668.41 and 685.304. In addition, although not specifically raised by a commenter, we add language to clarify that our changes to the entrance counseling requirements apply for loans disbursed on or after July 1, 2020. This clarifying change is consistent with the approach we are taking throughout these final regulations.

Changes: The Department adopts the changes suggested by the commenter to replace "if the school" with "if, as a condition of enrollment, the school" in § 685.304(a)(6)(xiii), (xiv), and (xv), and deleting the previously included references to enrollment in those sections. In addition, we are adding the phrase "For loans first disbursed on or after July 1, 2020" to the beginning of § 685.304(a)(6)(xiii), (xiv), and (xv).

*General Opposition to Class Action Waivers and Pre-Dispute Arbitration Agreements*

Comments: Many commenters expressed opposition to the regulations pertaining to the use of pre-dispute arbitration agreements and class action waivers. Many commenters argued that permitting participating institutions to use mandatory pre-dispute arbitration agreements and class action waivers, as part of an enrollment or other agreement, denies students their rights, including their constitutional right, to be heard in court. They further asserted that class action restrictions prevent students from working together to assert their legal rights and helps institutions "avoid liability." One commenter asserted that a student does not hold the bargaining power to reject a forced arbitration clause.

Commenters stated that the Department's claim that arbitrations are more efficient and less adversarial than traditional court proceedings was "highly dubious."

Other commenters argued that unscrupulous schools have used mandatory arbitration, class action waiver, and internal dispute resolution provisions to discourage borrowers from raising their claims and hide evidence of illegal school conduct from the public, the result of which has been an unfair shifting of the burden of the cost of illegal conduct from schools to students and taxpayers.

A group of commenters disputed the Department's assertion that allowing schools to mandate that students sign pre-dispute arbitration agreements and class action waivers, or agree to engage internal dispute processes, helps to provide a path for borrowers to seek remedies from schools before filing a **\*49841** borrower defense claim. These commenters argued that allowing schools to require students to sign such agreements or agree to such processes limits borrowers' options in seeking redress, limits their ability to gather the types of evidence needed to support borrower defense claims, and provides protection to schools that act against the interests of their students. These commenters noted that there is usually no or very limited discovery during arbitration, and a student cannot discover documents detrimental to the school.

Another group of commenters stated that students would be at a distinct legal disadvantage against potentially large for-profit school chains that can afford high-quality legal counsel. The commenters referenced research that shows these agreements are typically used by organizations where there was already a significant power imbalance in favor of the employer or school. They further noted that the Economic Policy Institute has found that the use of mandatory arbitration among employers is much more common in low-wage workplaces and in industries that are disproportionately female and minority. Other commenters echoed these points, adding that class action waivers effectively ensure that the most economically disadvantaged will face a legal challenge skewed to the advantage of schools and deprive the Department of a vehicle that would expose the most fraudulent schools.

A commenter representing student veterans noted that veterans have a substantial interest in being able to submit complaints to Federal regulators, so that they can adequately highlight gaps or abusive practices in the market related to misrepresentations or fraud by colleges and universities and financial products, such as student loans. The commenter noted that enforcement agencies have historically relied on consumer complaints like these to bring actions against schools.

Another commenter representing veterans suggested that the regulations be amended to provide students the right to: (1) Choose to arbitrate claims once a dispute arises, and (2) exercise their constitutional right to adjudicate claims before impartial judges and juries. The commenter further suggested the Department revise the proposed regulations to include a provision from the 2016 final regulations that prohibits a school from "compel[ing] any student to pursue a complaint based on a borrower defense claim through an internal dispute process before the student presents the complaint to an accrediting agency or government entity authorized to hear the complaint."

One commenter noted that the U.S. Department of Defense has raised alarm about the dangers of arbitration, noting in a 2006 report that "loan contracts to Servicemembers should not include mandatory arbitration clauses or . . . require the Servicemember to waive his or her right of recourse, such as the right to participate in a plaintiff class [action lawsuit]." [FN119]

000165

Another commenter expressed concern that schools requiring pre-dispute arbitration agreements as a condition of enrollment would not be held accountable to a Federal agency.

One commenter suggested that the Department ban the use of Federal funds for schools mandating use of arbitration or class action waiver agreements.

Several other commenters suggested that the Department did not sufficiently justify in the NPRM this change in policy. One commenter noted the Department previously stated that "[h]ad students been able to bring class actions against" certain specific institutions "it is reasonable to expect that other schools would have been motivated to change their practices to avoid facing the risk of similar suits." [FN120]

Discussion: The Department understands the concerns expressed by commenters regarding the arbitration provisions of these final regulations. The Department has weighed the commenters' expressed concerns against the potential benefits of arbitration and believes that the best approach is to ensure a regulatory framework that requires that students have sufficient notice of whether the school mandates arbitration and to allow the student to decide whether to enroll at that institution or another.

The Department values the ability of students to make informed, freely chosen decisions regarding how they spend their education dollars, time, and efforts. This includes students, who may be concerned about the fairness of such a process. The Department is endeavoring to protect all students, including by ensuring those who are concerned about the fairness of such a process have the power to reject a forced arbitration clause by taking their financial aid dollars to institutions that do not mandate internal dispute processes, arbitrations, or bar class actions. As with any major life or financial decision the students will make, it is best for students to approach the choice with as much information as possible and conduct a unique-to-them, cost-benefit analysis on their own terms, weighing what is important to them and what they are willing to accept. These final regulations require that institutions play their part in keeping their potential students informed.

The Department does not believe that class action waivers and pre-dispute arbitration agreements are inherently "unfair," as the commenters suggest, nor are the benefits relied upon by the Department in the 2018 NPRM "highly dubious." Similarly, the use of mandatory arbitration among employers with certain worker populations does not "effectively ensure" that students, including minorities and females, will face a legal challenge skewed against them. It is true that arbitration proceedings do not have the same extensive discovery procedures provided for in traditional litigation in court. However, as cited by the American Bar Association, arbitration provides significant advantages over a court proceeding, including: Party control over the process; typically lower cost and shorter resolution time; flexible process; confidentiality and privacy controls; awards that are fair, final, and enforceable; qualified arbitrators with specialized knowledge and experience; and broad user satisfaction.[FN121] Further, in 2012, the ABA found that the median length of time from the filing of an arbitration demand to the final award in domestic, commercial cases was just 7.9 months, whereas the filing-to-disposition time in the U.S. District Court for the Southern District of New York was 33.2 months and 40.8 months in the Second Circuit Court of Appeals.[FN122] Arbitration does, in fact, help "provide a path" for borrowers to acquire relief in an efficient, cost-effective, and quicker manner than traditional litigation.

Contrary to the commenter's assertions, mandatory arbitration clauses and class action waivers do not help institutions "avoid liability," but instead provide more speedy recovery and potentially greater relief to students impacted by the institutions' alleged **\*49842** conduct, as determined by an experienced legal professional as fact-finder. Rather than discouraging borrowers from raising claims and, as a result, hiding illegal conduct, arbitration provides a more cost-effective and accessible conflict resolution path than traditional court proceedings. Neither arbitration agreements nor class action waivers limit borrowers' options for redress in reporting a complaint about an institution to the Department, an accreditor, or any other governmental entity (including the CFPB, with respect to student loans). Therefore, even in the case of a mandatory arbitration agreement, the Department can still learn about illegal actions on the part of an institution.

Institutions will continue to be held accountable to the Department because the student can still file a borrower defense claim with the Department, even if the borrower receives an unfavorable arbitration decision, as the borrower submits a borrower

000166

defense to repayment claim with the Department, not the school, and the Department adjudicates the claim in accordance with its own regulatory requirements.

We have revised the regulations at § 668.41(h)(1)(i) to require, in schools' plain language disclosures regarding their pre-dispute arbitration agreements and/or class action agreements required as a condition of enrollment, a statement that the school cannot require students to limit, relinquish, or waiver their ability to pursue filing a borrower defense claim, pursuant to § 685.206(e) at any time. The Department agrees that a student must always be allowed to voice concerns or register complaints with the Department, if the borrower's allegations meet the criteria for such a claim. Unequivocally, arbitrator determinations are not binding on the Department.

The Department rejects the commenter's suggestion that it ban the use of Federal funds for schools that mandate arbitration and class action waivers. As discussed, Federal policy favors arbitration, and the Department is not convinced by the commenter's arguments to deviate here from that policy. The Department rejects the suggestion in the 2016 NPRM that class actions against certain institutions would have motivated other institutions to change their practices. In fact, it is possible that many institutions changed their approach in light of allegations made against those certain institutions, including those made by attorneys general, regardless of whether students had been able to bring class actions. Under those specific circumstances cited in the 2016 NPRM, the State of California found that the institution misrepresented job placement rates and the transferability of credits to students, advertised programs that were not offered, and failed to disclose a relationship with a preferred student loan lender.[FN123] Further, the Department focuses its efforts on appropriately regulating the "good actors," not necessarily overcorrecting or hyper-regulating the entire sector to address outlier instances of institutional misconduct.

With respect to the Economic Policy Institute study cited by one commenter and the other commenters who echoed the concerns highlighted in the study, if the Department's final regulations would put students at a "distinct legal disadvantage" against schools that "can afford high quality legal counsel," it is difficult to understand how this same concern would not apply to a complex, expensive court proceeding. Arbitration may frequently go further than a traditional trial in leveling out the practical, real-world legal disadvantages between the institution and the student.

The Department does not adopt the suggestion by the commenter representing student veterans. We would like to thank the commenter for bringing to our attention the Department of Defense's 2006 Report. However, that report draws its conclusions from concerns regarding predatory lending practices, including payday loans, car title loans, tax refund anticipations loans, and unsecured loans focused on the military and rent-to-own.[FN124] As a result, we do not believe that the conclusions that the report reaches are applicable in the context of these final regulations. Further, these final regulations do not require a borrower to "waive his or her right of recourse." As stated repeatedly, under these final regulations, borrowers, including student veterans, who meet the eligibility requirements maintain the right to file with the Department claims for loan discharges arising from borrower defense to repayment, false certification, and closed schools.

The Department also continues to believe that the regulatory triad provides sufficient opportunities to review an institution, conduct oversight, and sanction an institution appropriately. Student complaints will continue to alert members of the triad to engage in oversight reviews.

Changes: The final regulations at § 668.41(h)(1)(i) have been revised to require, in schools' plain language disclosures regarding their pre-dispute arbitration agreements and/or class action waivers required as a condition of enrollment, a statement that a school cannot, in any way, require students to limit, relinquish, or waiver their ability to pursue filing a borrower defense claim, pursuant to § 685.206(e), at any time.

*Arbitration Agreements*

Comments: Since most arbitration proceedings and results are confidential, several commenters noted that the regulatory change could enable a lack of transparency from schools by allowing fraudulent practices to continue even after students discovered and challenged them.

000167

Another commenter noted that most students enter into a pre-dispute arbitration agreement before any harm occurs. As a result, these students are not able to make an informed choice about whether to surrender legal rights and remedies.

Another group of commenters recommended that the Department definitively state in the regulations that no arbitration agreement may abrogate a borrower's right to file a Federal borrower defense to repayment claim, and that the borrower may initiate such a claim. Moreover, they suggested that the time a borrower commits to an arbitration process should toll the time limit for filing a discharge claim.

One commenter asserted that arbitrators have a pecuniary incentive to rule in favor of a corporation. This commenter noted that arbitrators are paid based on the volume of cases and hours spent per case. Arbitrators thus have a strong financial incentive to rule in favor of the party on whom they depend for additional cases. This commenter further asserted that arbitration can cost more in "upfront" fees, as much as 3,009 percent more, than litigation. To support this point, the commenter relied upon two American Arbitration Association (AAA) studies, the CFPB's 2015 "Arbitration Study: Report to Congress, Pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act," and a Public Citizen study entitled "The Costs of Arbitration." [FN125]

**\*49843**  Another commenter noted that arbitration does not usually allow for an appeal. According to this commenter, the Federal Arbitration Act allows the losing party 90 days to appeal an arbitration award on narrow grounds, and a court essentially vacates an arbitration award for a "manifest disregard of the law."

One commenter further suggested that the likely result of an arbitration may conflict with cohort default rate restrictions. The commenter noted that the 2018 NPRM states that "[a]rbitration may . . . allow borrowers to obtain greater relief than they would in a consumer class action case where attorneys often benefit most." The commenter asserts that, if the Department believes this is the case, the practice may run counter to other regulations that prevent schools from "[making] a payment to prevent a borrower's default on a loan" for purposes of calculating the cohort default rate.

Discussion: The Department appreciates the commenters' concerns regarding the allowance of pre-dispute arbitration agreements in the final regulations and the effect of those agreements on transparency.

In making this policy determination, the Department considered many factors, including the commenter's concern about transparency. Our primary motivation for this policy change is to provide borrowers, who believe they have been wronged, an opportunity to obtain relief in the quickest, most efficient, most cost-effective, and most accessible manner possible. The Department acknowledges that arbitration proceedings are not public forums in the same way as traditional court proceedings.

However, those public hearings, while transparent, have serious drawbacks: Prohibitive costs, time delays, access for laypersons, among many others. Litigation can also have a serious negative impact on an institution's reputation, even when ultimately the court rules in the institution's favor. In our weighing of these factors, the Department has chosen to emphasize speedy relief and accessibility.

We also note that if the borrower is unsatisfied—due to the confidential nature of the arbitration proceeding or for any other reason—the final regulations do not preclude the borrower from pursuing other avenues for relief which they may find to be more transparent.

An eligible borrower may file a borrower defense to repayment claim regardless of any decision against a borrower in an arbitration proceeding and, under revised § 668.41(h)(1)(i), a school cannot require students to limit, relinquish, or waiver their ability to pursue filing a borrower defense claim. The Department acknowledges that the borrower may file a borrower defense to repayment application with the Department at the same as initiating the arbitration proceeding with the school.

000168

Regarding arbitration awards conflicting with cohort default rate restrictions, payment to the student would not violate the prohibition on an institution making a payment, even if the borrower would have otherwise defaulted on the loan. If a school loses in arbitration, making a payment to a student as a result, that payment would be made to resolve a student's complaint with the school, whether through settlement or an order from the arbitrator. Additionally, the Department believes that institutions should be allowed to repay a student's loan if, for example, during the first year of study it becomes clear to the institution that the student cannot benefit from the education provided. In such circumstances, the Department does not wish to discourage the institution from repaying the student's loans.

As discussed elsewhere in this document, the Department believes that, in reweighing the issues and subsequent legal developments, these final regulations provide students with information that they need to empower themselves to understand the legal rights and available remedies they are giving up, even before a dispute arises. Upon extensive review, the Department finds that it is a much more desirable policy to incentivize informed customers to make rational decisions that they think are best for them. The Department will not dictate to students what they ought to want. Mandatory arbitration clauses permit relatively inexpensive and expeditious resolution of customer grievances. Considering the burdens attending litigation, arbitration adjudicates claims relatively quickly, cheaply, and, concurrently, gives the "customers" what they want. The underlying, well-considered justification for all this is that Department has elected not to substitute its own subjective and paternalistic judgment in place of the student's own wishes about their legal rights and remedies.

Neither an arbitration agreement nor an arbitrator's decision can abrogate a borrower's right to file a borrower defense claim. The Department notes that students who are not satisfied with the arbitrator's determination are still free to file a borrower defense claim with the Department. We have incorporated a provision, in § 668.41(h)(1), that states that an institution's disclosure to students, where an explanation of class-action waivers and mandatory pre-dispute arbitration agreements is provided, must include a statement that the borrower need not participate in any internal dispute resolution processes prior to filing a borrower defense claim.

The Department strongly disagrees with the commenter's statement that an arbitrator's pecuniary interests would taint the arbitration proceeding. The Department notes that a failure to disclose facts that a reasonable person would consider likely to affect the impartiality of the arbitrator would be a violation of the Arbitrator's Code of Ethics as well as a violation of the Uniform Arbitration Act (Revised).[FN126] The Code of Ethics for Arbitrators in Commercial Disputes provides that an arbitrator should: (1) Uphold the integrity and fairness of the arbitration process; (2) disclose any interest or relationship, arising at any time, likely to affect the impartiality, or which might create an appearance of partiality or bias; (3) avoid impropriety or the appearance of impropriety in communicating with the parties or their counsel; (4) conduct the proceedings fairly and diligently; (5) make decisions in a just, independent, and deliberate manner; and (6) be faithful to the relationship of trust and confidentiality inherent in the office.[FN127]

Further, this commenter asserted that arbitration costs more in "upfront" fees than litigation. Neither AAA study cited by the commenter supports this proposition. The CFPB study is the **\*49844** precise document that the Department relied upon, in part, in the 2016 final regulations' rationale for the pre-dispute arbitration and class action waiver provisions. Congress's resolution disapproving the CFPB final rule could be read to reaffirm the strong Federal policy in support of arbitration. As a result, we have followed Congress' direction in not following the CFPB's final rule's concepts in these regulations.

The commenter relies on a 2002 Public Citizen study for the statistic that total arbitration costs incurred by a plaintiff's use of the AAA could increase by as much as 3,009 percent as compared with filing that same claim in court.[FN128] This claim relies upon a comparison between the costs of initiating a lawsuit in court to the fees potentially charged to a plaintiff for initiating an arbitration. The study compares court filing fees in the Circuit Court of Cook County to fees charged by the AAA. Although it is true that court filing fees are lower than arbitration initialization fees, this calculation does not take into account the additional potential costs related to litigation, including attorney's fees and costs associated with the discovery process, fees charges by expert witnesses, travel expenses, and other miscellaneous costs.[FN129]

For example, the current filing fee to initiate a civil action in the Circuit Court of Cook County, Illinois is $368.[FN130] However, for most individuals, filing a civil action usually requires them to obtain legal services or representation, which adds significantly to the cost.[FN131] Under the commercial arbitration rules of the AAA, the current initial filing fee for a claim of less than $75,000 is $925.[FN132] Admittedly, that number is higher than the court filing fee, without counting attorney's fees. However, it is a far cry from the 3,009 percent cited by the commenter. Consequently, in reality, the problems the commenter describes are not nearly as stark as advertised.

The Department disagrees with this same commenter's assertion that "individual rights" would be curtailed by an arbitration's "severely limited right to appeal." The Department notes that no constitutional right to appeal exists in a civil proceeding. In addition, a borrower has the right to file a borrower defense to repayment claim irrespective of the arbitrator's determination and still may have an avenue for relief through the Department's process.

A commenter suggested tolling the limitations period for a borrower defense claim for the time period in which the student and the institution are in active arbitration proceedings. The Department finds this suggestion reasonable and believes it may incentivize institutions to more quickly resolve arbitrations—providing relief to wronged borrowers more quickly—and not drag out proceedings in order to consume the current limitations period.

As a result, we adopt changes to the final regulations to toll the limitations period beginning on the date that the student files a request for arbitration and ending when the arbitrator submits a final determination to the parties.

Changes: We have added language to § 668.41(h)(1) to specify that schools must, in their plain language disclosures, state that borrowers do not need to participate in an arbitration proceeding or any internal dispute resolution process offered by the institution prior to filing a borrower defense to repayment application with the Department. This plain language disclosure must also state that any arbitration, required by a pre-dispute arbitration agreement, pauses the limitations period for filing a borrower defense to repayment application for the length of time that the arbitration proceeding is under way.

The Department also includes language in § 685.206(e)(6)(i) to state that, for loans first disbursed on or after July 1, 2020, the limitations period will be tolled for the time period beginning on the date that a written request for arbitration, in connection with a pre-dispute arbitration agreement, is filed, by either the student or the institution, and concluding on the date the arbitrator submits, in writing, a final decision, final award, or other final determination, to the parties.

***Class Action Waivers***
Comments: One commenter noted that class actions are an important part of resolving disputes in cases of widespread damages, especially in cases where individual damages may not be substantial or when individuals may not have the resources to seek representation for their complaints.

A group of commenters stated that the preamble to the 2018 NPRM did not adequately explain why class action waivers should be allowed, and did not reassure the public that such a waiver cannot affect a borrower's ability to file a claim or to use a class action lawsuit to help support a claim of misrepresentation. They asserted that class action lawsuits may also serve to alert the Department that a pattern of misrepresentation may be present.

Discussion: The Department appreciates the comments regarding the use of class action waivers. The commenter's concern regarding an individual's ability to acquire representation is mitigated by the Department's proposal to allow students and schools to employ internal dispute resolution options, where legal representation is not necessary, before the filing of a borrower defense claim. Further, as stated in an earlier section, nothing in these final regulations burdens a student's ability to file a borrower defense to repayment application, or any claim with a government agency, even after an arbitrator submits a finding against the student's claim.

We appreciate the commenter's concerns regarding transparency and alerting the Department to potential institutional wrongdoing. In the discussion regarding arbitration and class action waivers in the 2018 NPRM, the Department explained the benefits of our position, including allowing borrowers to obtain greater relief, reducing the expense of litigation for both students and institutions, and easing the burden on the U.S. court system.[FN133] We are concerned that the adjudication of class action lawsuits benefit the wrong individuals, that is,  **\*49845**  lawyers and not wronged students.[FN134] For these reasons, the Department has concluded that allowing class action waivers would benefit both institutions and students by fast-tracking dispute resolutions in a lower cost and more efficient.

Changes: None.

### Plain Language Disclosures

Comments: Several commenters who supported the proposed regulations requested that we develop standardized information that schools can provide to students regarding pre-dispute arbitration and class actions. The commenters suggest that this would ensure that all schools provide students with the same or similar plain language information.

One commenter suggested a number of specific changes to the disclosure requirements, including the creation of common disclosures. The commenter recommended that the Department work in consultation with the CFPB to develop and consumer-test common, plain-language disclosures about arbitration clauses and class action waivers that would be supplemented with specific information from the school about its own processes. The commenter suggested that the disclosures should, at a minimum, note that pre-dispute arbitration clauses and class action waivers are not required at all schools of higher education and clearly state that students will not be able to exercise their right to sue their school if they have concerns about their academic experience at the school. The commenter also suggested that the Department ensure the disclosures made by schools are prominent and readily available to current and prospective students. The commenter recommended that the Department require that disclosures be listed on all pages of the school's website that include information about admissions, tuition, or financial aid; post the disclosure on the homepage itself, rather than on a sub-page, with the headline portion of the disclosure in an easily readable, prominent format; and enforce the disclosure requirements as part of its regular audit and program review processes.

This commenter also expressed concern that the regulations would not require schools to submit fulsome information about arbitration proceedings at the school. If such a requirement is not included in the final regulations, the commenter recommended the Department instead require that schools submit basic details on at least a quarterly basis that would allow the Department to know if further investigation may be necessary. Specifically, the commenter suggested that we should require schools to report the total number of arbitration proceedings on borrower defense-related topics conducted during the previous quarter and provide a high-level summary of each such proceeding, including the nature of the complaint and its resolution (including whether the student completed the arbitration proceeding; whether the student is still enrolled in the school, has graduated, or has withdrawn; and the dollar amount or other forms of relief awarded to the student in each).

Commenters expressed concern that disclosures fail to change the fact that students must accept the schools' harmful contract terms or not attend the school. They asserted that students are unlikely to appreciate the rights they are giving up. Commenters argued that disclosures are "ineffective" and that an "information only" approach was not sufficient.

Another commenter noted that requiring schools to make disclosures not just on their websites, but also "in their marketing materials," is not a requirement that is included in the actual regulatory language that the Department proposed.

Discussion: The Department appreciates the many suggestions and recommendations from commenters about elements to include in disclosure materials, potential consultation partners, location of disclosures on institutional websites, as well as reported items, frequency, and submission requirements.

000171

The Department believes that government does not know what is best for a particular student, nor can bureaucrats in Washington know what is better for a student than the student knows for herself. The Department does not believe that students who enroll at institutions that use arbitration agreements and class action waivers are forced to attend those institutions or are unaware that other postsecondary options—some of which do not require such agreements—are available.

As explained in the 2018 NPRM, we are rescinding § 685.300(g) and (h)—which required schools to submit arbitral and judicial records to the Department—in an effort, in part, to reduce the administrative burden both on institutions and on the Department. Notably, these provisions required a significant amount of paperwork to be submitted to the Department, and we no longer believe that the value of these submissions outweighs the costs and burdens associated with them. Additionally, the Department is concerned about the long-term viability of these provisions and the deleterious effects that they may have. Publicizing arbitral documents would upend the arbitration process and could lead to institutions being less open during arbitration proceedings. On the other hand, publicizing these documents would potentially subject institutions to continuous liability for conduct that it has long since corrected—an outcome the Department wishes to avoid. The provisions also would require the Department to constantly monitor these submissions and would create an onerous, unnecessary administration burden for the Department when it should be dedicating its resources in this area to the adjudication of borrower defense to repayment claims.

Similarly, the Department understands the commenter's suggestion that developing standardized information for schools to provide to students regarding pre-dispute arbitration and class action waivers would be helpful. However, the Department believes that any language developed by the Department, or any standardized form, would not sufficiently respond to each institution's unique circumstances or reflect a school's particular interests or approach, and therefore could interfere with the Department's goal of allowing borrowers as well as institutions to select the appropriate dispute resolution process.

The Department agrees that any disclosures should be easy to find and provided in clear, easy-to-understand, plain language. In the final regulations, at § 668.41(h)(1), we have added language directing institutions to include plain language disclosures in 12-point font, or the equivalent on their mobile platforms, on their admissions information web page and in the admissions section of the institution's catalogue. We believe these specified locations and manner for posting the information balance the need for notification without becoming overly burdensome.

As discussed in the previous section, the Department rejects the assertion that students are unable to appreciate the rights they are giving up and the rights they are gaining. The Department believes that students, when armed with information, should have the right and opportunity to select an institution or program that will best meet their needs, whatever those needs may be. In **\*49846** addition, the Department believes that these final regulations help achieve that aim. We believe that the more detailed disclosure items in entrance counseling requirements in § 685.304, in concert with the plain language disclosures in § 668.41, will work well to provide students with the information they need to become more informed about the choices they are making, both before and after they enroll in a school.

The final regulations were revised to expressly provide that all disclosures must be in 12-point font on the institution's admissions information web page and in the admissions section of the institution's catalogue. The Department erred on the side of specifying where the disclosures should be placed to provide greater clarity and certainty in these final regulations.

Changes: The Department revised § 668.41(h)(1) to expressly state where the institution must include the requisite disclosures.

### Entrance Counseling

Comments: Some commenters who supported the disclosure requirement for schools that require their students to sign pre-dispute arbitration agreements or class action waivers objected to the requirement to include this information in entrance counseling. These commenters asserted that including the information in entrance counseling would not provide any additional value.

One commenter recommended that the Department require schools to verify that students who obtained loan counseling through an interactive tool also receive an arbitration/class action waiver disclosure through a separate avenue. The commenter suggested the Department should require that schools obtain the student's signature to verify that the student received and read the loan counseling materials. This commenter further suggested that, since it already has an experiment in progress on loan counseling, the Department should also consider the lessons learned from participating schools to continually improve these requirements, and assess whether any of the participating schools have arbitration clauses or class action waivers to evaluate those schools' outcomes specifically and separately from the overall treatment group.

One commenter asserted that counseling will not remedy their concern about unequal bargaining power between the student and the institution. The commenter argued that the Department's disclosure requirements are inadequate because the proposed rule does not address the qualifications to serve as a counselor and does not specify the method of counseling.

Discussion: The Department appreciates the suggestions from commenters regarding the regulatory provision that institutions that require students to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment include information in the borrower's entrance counseling regarding the school's internal dispute and arbitration processes. We believe that students should receive entrance counseling on the school's internal dispute and arbitration processes. While we regard the inclusion of this counseling as a best practice, we will not require it through regulation. The Department will not require schools to verify that students received arbitration or class action waiver counseling through a separate tool or to obtain a student's signature to verify that the student received and read the counseling materials. We believe that the commenter's suggested options could prove too burdensome for institutions and the Department and that this level of monitoring would not necessarily be helpful or cost-effective.

In addition, the Department has no current plans to assess schools that employ arbitration clauses or class action waivers specifically or separately in any Department experimental site. The Department will take into account any lessons learned from ongoing experimental site projects and incorporate them into future rulemaking efforts, as appropriate.

The Department disagrees with the commenter's objection that including information regarding pre-dispute arbitration agreements or class action waivers in entrance counseling would not provide any additional value to the students. We believe that the value added for students, especially at § 685.304(a)(6)(xiv) and (xv), is keeping them informed about the agreements they are becoming a party to and about the internal dispute resolution options afforded to them by the school.

The Department did not propose the additional counseling requirements to remedy concerns about the relative bargaining power between the institution and the borrower, but rather to help borrowers have the information they need about pre-dispute arbitration agreements and class action waivers. The Department believes, first and foremost, that providing disclosure information to students is in their best interests and will empower students to make informed decisions about their academic choices. We believe that the requirement in § 685.304(a)(5) that an individual with expertise in the title IV programs is reasonably available shortly after the counseling to answer questions, addresses some of the commenter's concerns about employee qualifications.

Changes: None.


**Closed School Discharges (§ 685.214)**

*Option To Accept a Teach-Out Opportunity or Apply for Closed School Discharge*
Comments: While sharing the Department's desire to encourage closed and closing schools to implement teach-out plans for their students, many commenters believed that borrowers enrolled at closed or closing schools should have the option to accept a teach-out plan or apply for a closed school discharge.

Another commenter stated that there are many reasons a student would opt for a discharge rather than a teach-out, including: The low quality of education provided previously; a preference not to continue; the teach-out school has a poor reputation; or the same program is available at a local community college or other institution.

Discussion: After considering the commenters' arguments, the Department now agrees that students should have the option to pursue a closed school loan discharge by submitting an application, transfer to another institution, or accept the teach-out plan offered by their institution, which may include a teach-out plan offered by the closing institution or a plan from a teach-out partner.

If the orderly closure or the teach-out plan has been approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, once a student accepts a teach-out plan offered by the institution or its partner, the student would not be eligible for a closed school loan discharge unless the school fails to materially adhere to the terms of the teach-out plan or agreement with the student.

Changes: In light of the commenter's suggestions, proposed § 685.214(c)(1)(ii) (now § 685.214(c)(2)(ii)) has been revised as follows: "Certify that the borrower (or the student on whose behalf the parent borrowed) has not accepted the opportunity to complete, or is not continuing in, the program of study or a comparable program through either an institutional teach-out plan performed by the school or a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency."

### *49847 *Automatic Closed School Discharges*

Comments: A number of commenters, who opposed granting automatic closed school discharges, stated that the practice is not good for the school, the government, or the taxpayer.

Several commenters supported providing automatic closed school discharges to borrowers without requiring an application, as was provided for in the 2016 final regulations. Under the 2016 final regulations, the Department would automatically discharge a borrower's loans if the borrower does not re-enroll in another school or transfer their credits within three years of their school's closure. These commenters believed that not including the automatic discharge provision in our proposed regulations after the rule had been in effect would adversely affect students already navigating the complicated school closure process. One commenter expressed the view that, without the automatic loan discharge, borrowers will find it almost impossible to have their loans discharged.

A group of commenters requested information regarding how the Department's regulatory impact analysis of its proposed rescission of the automatic closed-school discharge provision of the 2016 final regulations took into account the actual application rate of eligible students under current closed-school discharge provisions.

One commenter recommended that students that attended schools that have been found to have engaged in fraud or misrepresentation and fined by the Federal government should have a right to an automatic discharge going back at least five years from the closing of the school.

One commenter noted that the Department provided three justifications for its decision not to include an automatic discharge provision in the NPRM. In this commenter's view, none of the justifications are sufficient under the APA for this policy change.

Another commenter noted that automatic discharges would help to address the disparities that are especially detrimental to borrowers of a specific minority group and hinder their ability to obtain relief through the court system or through administrative proceedings.

Other commenters expressed the view that, in the absence of quality information or direction, rescinding the automatic discharge provisions severely limits the ability of borrowers to find a pathway to relief.

000174

Some commenters noted that the Department stated that one of the reasons that automatic discharges might be detrimental to borrowers is that schools may withhold transcripts from borrowers who receive automatic closed school discharges. The commenters argued that this is an unsubstantiated assertion, not backed up by evidence.

One commenter stated that the Department has used flawed reasoning in stating that an unknowing borrower granted an automatic closed school discharge may lose the ability to obtain an official copy of their transcript. According to this commenter, the Department's reasoning is flawed because: Relevant case law demonstrates that withholding transcripts is unconstitutional at public colleges; such withholding could violate State law property rights; the change is unsubstantiated by any evidence of customary practice; and the Department neglected to consider less arbitrary actions to ameliorate the stated concerns.

Discussion: The Department believes that providing automatic closed school discharges to borrowers runs counter to the goals of these final regulations, which include encouraging students at closed or closing schools to complete their educational programs, either through an approved teach-out plan, or through the transfer of credits separate from a teach-out.

The Department does not agree that we do not provide quality information and direction to students who are enrolled in a closed or closing school. The Department takes its responsibility to keep students at a closed or closing school well-informed seriously, as do State authorizing bodies and accreditors, and we direct the commenter to the FSA website, where we have posted an explanation of the criteria for a closed school loan discharge, a description of the discharge process and the proper steps to take, answers to the most frequently asked questions, fact sheets on closed or closing institutions, schedules for live webinars presented by FSA, information on transfer fairs, and more. While the Department encourages schools to post the "Loan Discharge Application: School Closure" form on their institutional website,[FN135] as discussed in more detail below, we are rescinding § 668.14(b)(32), which requires closing institutions provide information about closed school discharge opportunities to their students, because it is the Department's, not the school's, burden to provide this information to students.

We do not agree that without an automatic discharge it would be almost impossible for a borrower to qualify for a closed school discharge. The application process for a closed school discharge is not overly burdensome or difficult to navigate, and it is generally not difficult for the Department to make determinations of borrower eligibility for closed school discharges based on the announcement date and enrollment information regarding the borrower.

We also do not agree with the proposal that automatic closed-school discharges be available with a look-back period of five years. We believe that five years is too long, even in the case of a school against which the Department has assessed liabilities. We believe that a five-year period would include many students who left the school for reasons completely unrelated to the school's closure or the quality of instruction provided. If a closed school engaged in misrepresentation or other fraudulent practices, and the borrower was enrolled outside the window of eligibility for a closed school discharge, the appropriate remedy for the borrower is to apply for a borrower defense discharge. Also, under exceptional circumstances, the Secretary retains the right to extend the closed school loan discharge period.

In the NPRM, the Department articulated its reasons for not including in these final regulations provisions for automatic closed school discharges, which were not part of our regulations prior to 2016.[FN136] The Department continues to believe that the closed school loan discharge application is the most accurate and fairest method to initiate the discharge process and make initial determinations on the potential claim.

Additionally, as discussed in the 2016 final regulations and the 2018 NPRM, the Department evaluated the potential impact of the automatic discharge provision using a data set of borrowers from schools that closed between 2008 and 2011 so re-enrollment could be evaluated. This accounted for those that filed for a closed school discharge in the window since their school's closure.

Significantly, under the APA, an agency "must show that there are good reasons for the new policy," but it need not show that "the reasons for the new policy are better than the reasons for the old one." [FN137] As detailed again  **49848**  throughout

this section, the Department does not believe that including automatic closed school discharges in the regulations is the best approach when considering all of the relevant factors. The Department believes that it is incumbent upon the borrower to make the decision as to whether it is in his or her best interest to retain the credits earned at the closed school or receive a closed school loan discharge.

While there may be disagreement about whether automatic closed school loan discharge is better for borrowers than closed school loan discharges provided to students who apply for such a benefit, the Department has met the required legal standard for proposing and making this change. Given that automatic closed school loan discharges did not exist in our regulations until recently, we do not believe that this provision has become such an integral part of the program that it cannot function, and students cannot be served, without inclusion of an automatic discharge provision. As stated in the NPRM, the Department continues to believe that it is not overly burdensome for borrowers to apply for a closed school loan discharge, and that they should retain the choice of whether to apply.

The final regulations make no distinctions between borrowers based on race. We do not believe that the provisions of the final regulations will penalize any one racial group over another, as all borrowers will be subject to the same requirements.

Closed school discharge requests are rarely adjudicated through the court system and rarely require borrowers to participate in administrative proceedings. In most cases, to apply for a closed school discharge, an eligible borrower is only required to complete the closed school discharge application form and submit it to the Department.

The Department is neither requiring nor encouraging institutions to withhold a transcript in the event of a closed school loan discharge, the Department notes that institutions may have the authority, subject to certain State laws, to develop policies and outline circumstances under which a student may be denied an official transcript.[FN138] A student's right to a transcript under certain laws does not necessarily entitle that student to an official transcript.

However, the possibility of a school withholding transcripts was only cited as one reason not to provide for automatic closed school discharges. As noted above, granting automatic closed school discharges may be detrimental to schools and taxpayers since borrowers would not be required to state that they do not intend to transfer their credits to another institution to complete their program. Students could intentionally delay reenrollment at a new institution for three years in order to retain the credits already completed, but eliminate the debt associated with earning those credits. There are large costs to institutions and taxpayers when students retain the right to transfer their credits and also receive a closed school loan discharge. The Department wishes to emphasize to all borrowers that taking student loans has significant associated consequences, and that all borrowers who take loans should do so with the understanding that they are expected to repay their loans.

Finally, given that there may be tax implications or other negative effects on the borrower, while some borrowers may appreciate an automatic discharge provision, we believe that closed school loan discharges should only be available by application. Some borrowers may be satisfied with the education they received prior to the school's closure and may have left the school in order to meet certain family or work obligations, but wish to transfer those credits in the future in order to complete their program at another institution.

Changes: We are revising § 685.214(c)(3)(ii) to specify that the automatic closed school discharge provision will apply for schools that closed on or after November 1, 2013 and before July 1, 2020.

### *Extending the Window To Qualify From 120 Days to 180 Days*
Comments: Several commenters supported extending the window of time during which a student must have withdrawn prior to a school's closure to receive a closed school discharge to 180 days. However, some commenters believed that the additional changes proposed by the Department eliminate any benefit of this change. One commenter viewed it as an "empty gesture," and noted that the Secretary already has the authority to extend the window to 180 days under exceptional circumstances.

Some commenters supportive of the expansion recommended that the window be increased to at least one year.

A number of commenters requested data that the Department considered in assessing the impact of extending the eligibility period from 120 to 180 days.

Other commenters opposed the proposed expansion. These commenters believed that closed school discharge claims should be based on why the student decided to withdraw from the closing school, not when. One commenter believed that allowing borrowers to qualify for closed school discharges based on when they withdrew from the school and not why they withdrew is inconsistent with the statute. In these commenters' views, the statute expressly ties a student's eligibility for a closed school loan discharge to the school's closure. These commenters noted that if a borrower withdrew from a school for personal reasons it may be documented in the school records and they argued that since these students left the institution for reasons unrelated to the school's closure they should not qualify for the discharge. Another commenter opposed to the expansion noted that extending the window creates increased liability for taxpayers to forgive the loans of students whose withdrawal was unrelated to the closure, such as personal circumstances or academic dismissal.

Another commenter stated that if a borrower withdraws before the school closes, the borrower has not suffered any loss due to the school's closure.

A commenter, who is opposed to the expansion, noted that 20 U.S.C. 1087(c), the statute that authorizes closed school loan discharges, specifies that a borrower is eligible for a closed school loan discharge only if he or she "is unable to complete the program in which [he or she] is enrolled due to the closure of the institution." This commenter claimed that the statute required a causal connection between the student's inability to complete the program and the closure of the institution. The commenter contended that the Department's current regulations conflict with section 1087(c) because the regulations allow a borrower to obtain a closed school loan discharge based on when the student withdrew and without regard to the reason for the withdrawal. The commenter noted that a borrower could apply for a closed school discharge even if the borrower voluntarily withdrew before the closure decision had been announced or even made. The commenter asserted that, by expanding the loan discharge window, the Department would likely see an increase in the frequency with which closed school discharges are granted.

One commenter noted that if the Department extends the window to 180 days, conforming changes would need to be made in associated regulations.

 **\*49849**  Discussion: The Department thanks the commenters that supported extending the closed school discharge window to 180 days.

Although some commenters believed that other changes reduce the importance of the extension, we expect that more borrowers will qualify for closed school discharges as a result of the extension, and we believe this is an important benefit. While it is accurate that the Secretary already has the authority to extend the window, borrowers at closing schools cannot know in advance whether an extension will be provided. Specifying the window of 180 days in the regulations allows more borrowers to make better informed decisions regarding whether to continue attending the school while also allowing them to benefit from the intended purpose of the regulations, without the need for a determination as to whether exceptional circumstances exist.

The Department relied on its experience, as well as information from others involved in school closures, when proposing to extend the eligibility period for a closed school discharge. The Department has received numerous requests from state attorneys general, members of Congress, and former students and employees from closed schools to extend the look-back period beyond 120 days when a school closes. Together, this information validates the Department's belief that the longer period is needed.

In the event that a closing institution is engaging in a teach-out plan in which it provides the teach-out services directly, the 180-day look-back period will begin on the actual date of the campus closure. However, students who elect a closed school loan discharge at the beginning of the teach-out period remain eligible for a closed school loan discharge under the exceptional

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

circumstances provision, if the teach-out is longer than 180 days. A student should not feel compelled to continue enrollment at an institution after the announcement of a teach-out simply to be sure that he or she is enrolled less than 180 days prior to the date of closure.

We do not agree with the recommendation to extend the window to a full year. The purpose of the 180-day window is to provide borrowers access to a closed school discharge even if they choose to leave a school that is clearly showing signs of a loss of quality or institutional instability 180 days prior to closing.

Based on our experience in handling closed school situations, we believe that 180 days provides an appropriate period to assume that a student has left the school due to a loss of quality. However, if we determined that a school experienced deteriorating educational quality for a longer period before it finally closed, the Secretary could use her authority, as referenced above, to increase the window of eligibility for a closed school discharge. We have made this exceptional circumstance explicit in the final regulations.

We do not agree with the commenters who contended that the Department should make a determination as to why the borrower withdrew and not grant closed school discharges to borrowers who withdrew for personal reasons prior to the school closing. We do not believe that the statute requires a determination of the motives of a borrower for leaving a school to establish the borrower's eligibility for a closed school discharge. Moreover, the Department could not accurately make such determinations. Personal reasons, by their very nature, are individualized. They are not likely to be documented in a consistent, reliable manner and it is not always clear what factors ultimately lead anyone to take action.

We disagree with some commenters' analysis of the requirements in 20 U.S.C. 1087(c). The HEA provides that a borrower may receive a closed school discharge if the borrower "is unable to complete the program in which the student is enrolled due to the closure of the institution" (sections 454(g)(1) and 437(c)(1)), but does not establish a period prior to the closure of the school during which a borrower may withdraw and still qualify for a closed school discharge. The Department has long interpreted the statute to allow discharge for students who withdrew a short time before a school closure, in recognition that a precipitous closure may be preceded by degradation in academic quality or student services. These final regulations are in line with the Department's previous interpretations.

The Department disagrees with the commenter who stated that a borrower who withdraws from a school that is on the verge of closing has not suffered any loss due to the school's closure. As noted, a closing school's educational environment may deteriorate, especially as the remaining student population contracts. A borrower who withdraws from a school prior to the actual closure date due to deteriorating conditions has suffered a loss, whether monetary, time, or other hardship. When the borrower enrolled in the school, they had every reason to expect the school to remain in existence for the duration of their education program. Had the borrower known that the school would close before they completed the educational program, the borrower would most likely have enrolled at a different school.

Although the expansion of the window to 180 days may result in greater costs to taxpayers, we believe that any increased cost is more than offset by the benefit that it provides to borrowers who, through no fault of their own, find that they have incurred education debt for attendance at a school that is closing. In addition, the 180-day period covers any gaps between the spring and fall semesters, since the previous 120-day period could put students in a position of exceeding that window simply for not enrolling in summer classes. We believe that the totality of these regulations will encourage borrowers at closed or closing schools to complete their education program through teach-outs, rather than to take the closed school discharge. This is the Department's preferred policy because it incentivizes and prioritizes educational attainment.

Changes: Because we are extending the window to 180 days, applicable to loans first disbursed on or after July 1, 2020, we are adding a new § 685.214(g) and have made conforming changes to § 685.214(f)(1).

*Exceptional Circumstances*

Comments: Several commenters recommended that the Department retain the existing list of exceptional circumstances under which it can expand the eligibility window. These commenters believed that the Department should not tie its own hands and foreclose its future ability to assist students dealing with an abrupt school closure.

One commenter noted that the Department provided no rationale for the change, except in the case of the reference to a loss of accreditation. The commenter stated that there was no analysis of how this provision would interact with State laws. The commenter also believed that the proposed language on accreditation was unnecessarily detailed and could accidentally exclude some circumstances, such as voluntary withdrawal from accreditation without closure. The commenter believed that the elimination of the example of the institution's discontinuation of the majority of its programs would encourage institutions to keep open one small program to avoid paying for closed school discharges.

Another commenter stated that the existing extenuating circumstance language provides clear indicators that help to determine what would rise to  **49850**  the level of an exceptional circumstance. The commenter noted that the regulation is already structured as a non-exhaustive list and stated that the Department provided no justification for removing some of the items from the list. This commenter also recommended, in addition to restoring the list of exceptional circumstances that is in the current regulations, that the Department add the institution's loss of title IV eligibility to the list of exceptional circumstances. The commenter stated that, much like the loss of accreditation, the loss of Federal financial aid eligibility indicates a severe circumstance outside of closure that can severely affect a student's ability to attend the institution.

Another commenter stated that, if the Department intends to make these types of changes, it must make clear to the public that it is doing so and must also provide a good reason for the change.

Another commenter supported the proposal to narrow the list of the exceptional circumstances under which the Department can expand the window beyond 180 days.

Discussion: We thank the commenter who supported narrowing the list of exceptional circumstances.

The Department appreciates the opportunity to clarify our reasoning for the changes proposed in the NPRM to the non-exhaustive list of exceptional circumstances for extending the closed school discharge window. The Department proposed removing the reference in the existing list of extenuating circumstances to a school discontinuing the majority of its academic programs because closed school discharges are based on a school closing, not on the school discontinuing some academic programs, but continuing to offer others. We proposed removing the reference to findings by a State or Federal government agency that the institution violated State or Federal law because such violations do not necessarily lead to closure or have any bearing on why a school has closed.

The proposed revisions to the language regarding accreditation and State authorization were intended to provide more clarity and useful detail to these examples. The accreditation example does not address the situation of a school voluntarily withdrawing from accreditation because we do not believe that situation occurs frequently enough to warrant a mention in this list.

Upon further consideration, we agree with the recommendation made by the commenter to add the loss of title IV eligibility as an exceptional circumstance. The Department adopts the commenter's reasoning that the loss of Federal financial aid eligibility in conjunction with an impending school closure indicates a severe circumstance that can severely affect a student's ability to attend the institution.

The Department included an exceptional circumstance where the teach-out of the student's educational program exceeds the 180-day look back period. The Department seeks to avoid the perverse outcome of requiring a student to enroll in a longer-than-180-days teach-out that they did not want, in order to reach the 180-day look back date.

As noted above, the list remains non-exhaustive, so removing these items does not tie the hands of the Secretary in future situations in the event of a school closure. We believe that the list provides sufficient indicators for future determinations of when "exceptional circumstances" occur.

Changes: The non-exclusive list of exceptional circumstances in § 685.214(c)(1)(i)(B) (now redesignated § 685.214(c)(2)(i)(B)) has been revised to include: "the revocation or withdrawal by an accrediting agency of the school's institutional accreditation; the revocation or withdrawal by the State authorization or licensing authority of the school's authorization or license to operate or to award academic credentials in the State; the termination by the Department of the school's participation in a title IV, HEA program; or the teach-out of the student's educational program exceeds the 180-day look-back period for a closed school loan discharge."

### Imposition of Retroactive Requirements

Comments: A group of commenters contended that the teach-out proposal would impermissibly impose retroactive requirements on current and past borrowers. These commenters noted that there is no time limit on when a borrower may submit a closed school discharge claim and argued that it would be legally impermissible to apply the new requirements to loans made before the effective date of the regulations. These commenters also noted that the Department has notified current borrowers of the existing requirement and argued that there is no legal basis to change those requirements for those borrowers. These commenters also contended that the retroactivity issue is particularly applicable to the FFEL program in which no new loans have been made since 2010.

Discussion: We appreciate the commenters' concerns. We agree that the changes to the closed school discharge regulations, including those pertaining to teach-outs, should not apply to current loans. The NPRM did not specify an effective date for those changes, but we acknowledge that our proposal caused some confusion by including changes to the FFEL regulations in this area. The changes to the closed school discharge regulations will apply only to new loans made after the effective date of these regulations: July 1, 2020. Since no new loans are being made under the FFEL or Perkins Loan programs and the outstanding loans in those programs will not be affected by these changes, we are not making changes to those program regulations in this area.

Changes: We have revised § 685.214(c) and (f) and added a new paragraph (g) to specify that the changes being made to the closed school discharge regulation applies only to loans first disbursed on or after July 1, 2020. We also are not making the revisions we proposed in the NPRM to the FFEL (§ 682.402) and Perkins (§ 674.33) closed school discharge regulations.

### Teach-Out Plans, Orderly Closures, and Transfer of Credits

Comments: Several commenters supported the proposed change to the regulations that would require borrowers applying for a closed school discharge to certify that the school did not provide the borrower an opportunity to complete their program of study through a teach-out plan approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

Many commenters also expressed strong support for the proposed revisions to the closed school discharge regulations that would provide that a borrower would qualify for a closed school discharge if a school failed to meet the material terms of the teach-out plan approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, such that the borrower was unable to complete the program of study in which they were enrolled.

Some commenters expressed concerns that accreditation agency standards for teach-out agreements are not uniform.

One commenter noted that this proposal would encourage schools to follow their State or accreditor's teach-out process. This commenter stated that students, and taxpayers alike, are best protected from financial harm when schools provide the best path for students to complete their program of study rather than abruptly closing their doors.

000180

Another commenter noted that the proposed regulations would provide a **\*49851** strong incentive for schools to provide students with an opportunity to complete their program through an approved teach-out that takes place at the closing institution or at another school. Another commenter suggested that without the teach-out "safe harbor" rule, borrowers would be encouraged to submit fraudulent closed school discharge claims. This commenter argued that schools that are closing make a considerable commitment to teach out their students and that since the borrower will have an opportunity to leave the school with their planned credential, there is no need for a loan discharge in these cases.

One commenter supported the proposal to require borrowers applying for a closed school discharge to certify that the school did not provide the borrower with an opportunity to complete their program of study, regardless of whether the student took advantage of the teach-out. This commenter recommended that the Department obtain information on approved teach-out plans from accreditors and State authorizing agencies and use this information to deny discharges to students who attended those schools, instead of relying on self-certification.

One commenter argued that the proposed regulations would create an incentive for the orderly teach out of a school that is planning to close, thus offering an important protection for students, taxpayers, and schools.

Another commenter argued in support of the proposed regulations that the Department should not penalize a school that creates a teach-out program to help current students finish a program of study. In this commenter's view, if a school puts in the effort to establish a teach-out agreement, it shows that the school ultimately has their students' best interests at heart by giving them the opportunity to complete their program of study.

Another commenter noted that the proposed changes would be consistent with existing regulations, which do not allow students who transferred credits from a closed school to another school and who finished the program elsewhere to qualify for a closed school loan discharge.

Another commenter stated that the proposed regulations are consistent with the statutory requirements in 20 U.S.C. 1087(c), the section of the statute that authorizes closed school loan discharges, if the borrower "is unable to complete the program in which [he or she] is enrolled due to the closure of the institution." In this commenter's view, the statute demands a causal connection between the student's inability to complete the program of study and the institution's closure. A student's failure to complete must be "due to" the closure.

Several commenters contended that in a fully approved teach-out plan, faculty and staff often go above and beyond to serve students through completion of their program. These commenters argued that this considerable commitment by the school toward its students, and the fact the student will leave with his or her planned credential, means there is no need for a loan discharge in these cases.

Several commenters opposed the proposed changes to the closed school loan discharge provisions, as well. While one of these commenters agreed that more schools should offer teach-out plans, the commenter also stated that the quality of teach-out plans varies widely and the process for determining an acceptable teach-out plan lacks rigor and consistency. The commenter contended that the Department acknowledged this inconsistency and lack of quality in its announcement that it intended to start a negotiated rulemaking process concerning teach-out plans. The commenter also noted that, for some students, completing the credential through a teach-out plan may be undesirable.

Many commenters stated that students who attended a closed school have a right to have their debt cancelled, even if the closed school offers an option to enroll at another school or location. The commenters stated that borrowers at closed schools should not be forced to transfer to another school.

000181

One commenter recommended maintaining the current policy on closed school discharges, or, alternatively, establishing standards for degree program comparability in teach outs. The commenter recommended that the regulations specify such factors as program length, costs and aid, programmatic accreditation, and quality to determine program comparability.

One commenter stated that the proposed changes would close the window on many adult learners that do not have the money to transfer to another program.

One commenter opposed to the proposed changes to the closed school discharge requirements relating to teach outs stated that students may be wary of a teach-out option if it is being provided by a school that is about to close. These students may be uncertain of the value of participating in the teach-out, compared to the value of starting fresh elsewhere.

One commenter stated that the proposed regulations ignore the fact that a teach-out program may not meet a student's needs, or may not properly match their program of study, or may be at a school that isn't realistic for a student to attend. As another commenter noted, there are any number of reasons a student will choose a particular educational program. Some of those reasons may be related to the school's location and class schedule, or other factors relevant to that student's unique situation. In addition, there is no guarantee that the teach-out program is a high-quality program. The commenter noted that the student may be jumping from one bad program to another at the behest of the failing institution.

Another commenter opposed to the proposed changes argued that under the proposed regulations borrowers would be treated differently in different States, as States and accreditors must approve teach-out plans. The commenter believed that this is inconsistent with the rationale used in the NPRM for adopting a single Federal evidentiary standard for borrower defense claims. The commenter noted that accrediting agencies and States have complex and conflicting policies, which would result in inconsistent results based on geography, quality, and other factors. The commenter noted that the proposed regulations assume that teach outs are always the best option, but expressed the view that this may not be true in all cases, especially at the beginning of a long program. The commenter noted that there may be problems with teach outs such as exclusions, potential additional cost, geographic proximity, record keeping and transcripts, and transfer of student aid. The commenter noted that teach outs are non-binding and institutions may renege on them, and teach-out agreements may conflict with State laws, such as those regarding tuition recovery funds. As noted by another commenter, a teach out might involve travel or other constraints that make it impractical for some students. The commenter recommended that the Department take into consideration that students choose programs for reasons other than academics, such as compatibility with work or family obligations.

Another commenter expressed the view that the proposed regulations would eliminate the path to loan discharge when there is a teach out available, regardless of whether the opportunity was accessible, in the same mode of instruction, or of comparable quality, and would encourage predatory institutions to submit sub-par teach-out opportunities.

 **\*49852**  Another commenter took issue with the statement in the NPRM that "borrowers may be better served by completing their programs . . . than by having their loans forgiven." The commenter stated that the Department provided no evidence to support that assertion. In the commenter's view, this type of decision-making does not qualify as a "good reason" under the APA for changing the closed school discharge eligibility requirements.

Another commenter opposed the proposed changes to the closed school discharge regulations to deny loan discharges to those who were offered a teach-out—even if they did not complete it. The commenter stated that the statutory language creating closed school discharges indicates that Congress intended to make the discharges available to all students in a program. Specifically, 20 U.S.C. 1087(c) reads that "if a borrower . . . is unable to complete the program in which such student is enrolled due to the closure of the institution . . . then the Secretary shall discharge the borrower's liability on the loan." The statutory language does not refer to completing another, substantially similar, program; nor does it refer to a program offered by another institution, in another modality, or in another location. In the commenter's view, the Department's proposal to deny discharges to anyone who had the opportunity to complete a program is a subversion of congressional intent and the plain reading of the legislative text.

000182

The commenter also noted that the Department's proposed changes run counter to its own longstanding interpretation that the statute permitting closed school loan discharges applies to all borrowers from the institution. While teach-out plans are required from closing institutions, the Department has previously recognized that a teach-out may not be what a student signed up for, and may differ in key ways from the original program. To respect students' choices and ensure they are able to make the choice that's right for them, the regulations have allowed students to either transfer their credits (or accept a teach-out) or to receive a loan discharge.

The commenter expressed the view that the Department is proposing to eliminate that choice in an attempt to reduce liabilities for closing institutions. The commenter noted that the Department expects this provision, along with the elimination of automatic discharges, to reduce closed school discharges by 65 percent.

The commenter noted several problems with teach-out plans in the current system: In teach-out arrangements, students are not always able to transfer all of their credits or pick up their programs exactly where they left off at the closing institution; some teach-out plans offer only impractical or sub-par options for students; accrediting agency policies relating to teach-out agreements differ across agencies, particularly where teach-out agreements are concerned; none of the accrediting agencies expressly require in their standards that institutions arrange teach outs in the same modality as the original program; it can be difficult to find teach-out arrangements for some niche programs, so some students may fall through the cracks in establishing teach-out agreements; and few accreditors list standards beyond geography, costs, and program type that they consider in approving or rejecting proposed teach-out arrangements, although some regional accreditors require that teach-outs be offered by institutions with regional accreditation only.

The commenter expressed the view that the result of the proposed regulations would be to create a strong incentive for institutions to establish teach-out agreements, without much consideration for the quality of the teach out or how well it will serve the students affected by the institution's closure.

The commenter also noted that State policies vary widely on school closures. The Department provided no discussion on the question of when State authorizers require institutions to get their sign-off on teach-out plans.

The commenter stated that one State's efforts to require teach-out plans from institutions and ensure other protections are in place before colleges close received push-back from institutions of higher education, and that organizations representing States have said they are not aware of other States requiring these provisions.

Commenters requested the reason behind why the Department stated that accreditors will only approve adequate teach-out plans. In addition, the commenter requested clarification as to whether the Department would foreclose closed-school discharges to students who were offered an online-only teach out. The commenter asked what percentage of schools that closed in the past five years offered a teach-out plan and whether the Department has considered the impact of the proposed regulations in relation to this information. The commenter also requested whether the Department would allow a borrower to establish eligibility for a closed school discharge when the borrower's individual circumstances precluded them from completing their program of study through the teach-out.

The commenter stated that some accreditors require teach-out plans prior to a school closing if the school is in financial straits. However, such teach-out plans may only offer an initial suggestion of which institutions the closing college might reach an agreement with—not a signed contract with those institutions. Such a plan does not constitute a formal agreement with another institution to take over in the event that the institution cannot or will not teach out its own students. Furthermore, it does not mean the teach-out will be executed according to the plan in the event of actual closure.

The commenter suggested that, if the Department retains this proposal, teach-out agreements would be a more appropriate measure than teach-out plans for institutions not remaining open long enough to teach out their own students, since the plans may be outdated or uncertain. The commenter also recommended that the Department should require that the teach-out be the

same in its implementation as it was in the accreditor's approval of the plan, ensuring that the letter of the plan is followed through, since the documents on file with the accreditor may not always comport with on-the-ground realities.

Finally, the commenter proposed that, if the Department does not revise these proposed regulations, the Department clarify that they only apply to schools closing after the effective date of the regulations, July 1, 2020.

Another commenter recommended that the proposed "teach out" changes only apply for those closing schools whose graduates consistently find careers in their fields of study. In this commenter's view, letting a school continue to provide education that is not going to be applicable to the borrower's career goals is a waste of the borrower's time and money, and he or she should be permitted to file for full discharge of the loans.

Another commenter noted that there are times where the approved teach-out schools are out-of-State, the "teach-out" school is at risk of closing, the other school has a poor reputation, or the school with the approved teach-out is too far away from the closing school.

Discussion: The Department agrees with commenters that teach-out plan requirements are not uniform among accreditors and we, through the recent negotiated rulemaking effort, are taking steps to improve and modernize the requirements relating to teach-out plans and to better coordinate information  **49853**  between the Department and accreditors.

We acknowledge that even a well-planned and well-executed teach out may not be ideal for every student. Issues such as modality, location, and compatibility with work and family situations may make it difficult for a student in an education program to participate in a teach-out offered by a closing or closed school. Therefore, the Department has revised its proposal to allow a student to choose either the teach-out or the closed school discharge. These final regulations do not disqualify a borrower who has declined to participate in a teach out from receiving a closed school discharge. However, to avoid circumstances where students complete their program and apply for discharge, the borrower is required to certify that they did not complete the program of study, or a comparable program, through a teach-out at another school or by transferring academic credits or hours earned at the closed school to another school.

The Department does not have the authority to regulate the quality of academic instruction, nor does it have the authority to regulate each detail of teach-out plans or agreements. We do, however, work together as a member of the regulatory triad and believe that the accreditor will approve plans that will serve students appropriately in the event of a closure. The Department can hold accreditors accountable for ensuring that teach-out plans provide acceptable options and opportunities for students.

The Department does not believe that an online only teach-out is an equivalent option, if the original program was not taught exclusively via distance education. While we believe this could be an available option that may be suitable for some students, it is insufficient for this to be the only teach-out option to be offered to students currently enrolled in ground-based programs. Similarly, it is not sufficient for a teach-out plan to include only ground-based courses in the event that it is an online institution that is engaged in a teach-out.

The Department does not generally require schools to submit teach-out plans to us since accreditors and State authorizing bodies are charged with reviewing and approving teach-out plans. However, the Department reserves the right to review any teach-out plan that has been approved by the institution's accreditor and State authorizing body.

Under these final regulations, the Department allows the borrower to choose between the teach-out (or transfer) and the closed school discharge. As stated elsewhere, we believe that in many instances, and in particular among students close to the end of their program, the student may be best served by completing their academic program at the closing institution or a teach-out partner institution. For students with less than 25 percent of the program remaining to complete, a teach-out that takes place at the closing institution may offer the most rapid and cost-effective route to degree completion. Moreover, while accreditors

000184

generally require a student to complete at least 25 percent of their program at an institution that awards a credential, many accreditors waive the 25 percent rule for students who are enrolled in a formal teach-out agreement with another institution.

One commenter challenged the Department's assertion that borrowers may be better served by completing their programs than by having their loans forgiven. We stand by this assertion. In our view, obtaining the education credential that the borrower wanted to pursue is generally preferable to foregoing credential completion or being required to start a program over at another institution. Disruptions in a student's time in school can have devastating consequences and, too often, lead to the student abandoning their educational pursuit.[FN139] It is better to create a path for students to finish their degree, certificate, or program, rather than create perverse incentives to stop their schooling, with only a plan for an indeterminate, future starting date.

Our goal is not to reduce the number of closed school discharges awarded through these regulations or reduce the liability for closing institutions, as one commenter suggested. Rather, it is to provide students enrolled at a closing or closed school as many options as possible for completing their program. The Department seeks to encourage institutions to provide approved teach-out offerings rather than closing precipitously.

Regarding the commenters' other concerns about teach-out plans, we believe that the revised language in these final regulations, consistent with the Department's long-standing interpretation of 20 U.S.C. 1087(c), addresses those concerns. Since borrowers will have a choice of participating in the teach out or receiving a closed school discharge, a borrower who believes, due to the closure of the institution, that the teach out offered by the school will not meet his or her needs, may decline the teach out and still qualify for a closed school discharge.

Changes: We have revised our proposed changes (now reflected in § 685.214(c)(2)(ii)) to specify that a borrower is eligible for a closed school discharge if the borrower opts not to accept the opportunity to complete the borrower's program of study pursuant to a teach-out plan or agreement, as approved by the school's accrediting agency and, if applicable, the school's State authorizing agency. As discussed above, we are no longer making changes to the regulations regarding FFEL or Perkins loans, so parallel changes are no longer necessary to § 674.33 or § 682.402.

### *Departmental Review of Guaranty Agency Denial of a Closed School Discharge Request*
Comments: Commenters supported allowing a borrower the opportunity for the Department to review a closed school discharge claim, which was denied by the guaranty agency, to provide a more complete review of the claim for the closed school discharge. One commenter suggested that this secondary review process would result in greater uniformity of the processing of closed school discharge applications. Another commenter provided detailed proposed regulatory language in support of this change.

Discussion: We thank the commenters for their support for the proposed changes in the NPRM and their suggestions. However, since no new loans are being made under the FFEL program, plus the facts that the outstanding FFEL loans will not be affected by these changes and that the changes proposed regarding Departmental review of guaranty agencies' denials were also included in the 2016 regulations, we will not be making changes to the FFEL program regulations in this area.

Changes: None.

### *Additional Recommendations*
Comments: One commenter recommended that, before granting a closed school discharge, the Department notify the school about the proposed discharge, the basis for the proposed discharge, and provide the school with a copy of the application and supporting documentation submitted to the Department. Under this proposal, **\*49854** school would have 60 days to submit a response and information to the Secretary addressing the closed school discharge claim. The commenter also suggested that the Department should provide the borrower with a copy of any response and information submitted by the school. Another commenter also suggested that the school have an opportunity to provide information to the Department that might affect the

000185

decision of whether to grant a closed school discharge. A third commenter stated that the Department would not be able to make an accurate closed school discharge determination without information from by the school.

Discussion: The Department disagrees with the commenters' proposal. The determining factors that establish a borrower's eligibility for a closed school discharge are limited to whether the borrower was in attendance at the school at the time it closed or withdrew within the applicable number of days of the date the school closed, and the borrower did not complete his or her program or a comparable program at another institution. For most borrowers in these situations, the Department already has information about the school's closure date and has access to information about whether the borrower was in attendance or had recently withdrawn. The Department has made decisions on these claims for more than 20 years without having a formal submission process for additional information from the school, and we do not have any evidence that those decisions were incorrect. Accordingly, we do not believe that we need to establish a process for schools to review the borrower's information and respond.

Changes: None.

Comments: One commenter noted that the 2016 final regulations established requirements that closing institutions provide information about closed school discharge opportunities to their students. The commenter recommended that the Department include these requirements in these regulations, citing the concerns the Department raised in the 2016 final regulations that potentially eligible borrowers may be unaware of their possible eligibility for closed school discharges because of a lack of outreach and information about available relief.

Discussion: The Department appreciates the commenter's concerns regarding the removal of the requirements included in § 668.14(b)(32). As stated above in the Automatic Closed School Discharges section, the Department provides information on our website to students regarding the closed school loan discharge process, frequently asked questions, fact sheets, webinars, and transfer fairs.

The Department is rescinding § 668.14(b)(32) because we concluded that it is the Department's, not the school's, responsibility to provide this information to students. The Department believes that the borrower will have the best access to accurate, up-to-date and complete information by obtaining it from the Department's website, or the websites of accreditors and state authorizing bodies. Unlike institutional websites that may cease to operate when a school closes, the Department's website will continue to provide students with updated information.

Even so, we encourage schools to post the Department's closed school loan discharge application on their institutional website and to direct their students to the FSA website for further information.

Changes: None.

Comments: One commenter had specific concerns about the timeframe for appeal of closed school loan discharge determinations, whether appeal is an option for non-defaulted borrowers, and capitalization of interest. The commenter also raised concerns about PLUS loans and closed school discharges as they pertain to PLUS loans. The commenter recommended we specify that the reference to a borrower making a monetary claim with a third party refers to both the student and the parent in the case of a parent PLUS loan.

One commenter expressed a concern that the proposed closed school regulations would allow even the most financially unstable institutions on the brink of closure to continue benefitting from Federal student aid.

One commenter expressed the view that the final regulations should clarify that students are not eligible for closed school discharge when their college merges with another college, changes locations, or undergoes a change in ownership or a change in control. The commenter cited one example of a case in which a college was engaged in internal restructuring that required

a change in OPEID numbers. According to the commenter, the school was required to offer students a closed school discharge despite offering the same program to students under the new OPEID number. In this commenter's view, the Department should clarify that internal restructurings do not result in a closed school discharge.

One commenter recommended that the Department look closely at borrower defense claims regarding institutions that have recently closed. The commenter asserts that many of these claims are closed school discharge claims disguised as borrower defense claims.

One commenter recommended that the Department designate the closed school discharge regulations for early implementation to incentivize institutions that are currently considering institutional or location closures to provide a teach-out for their students.

One commenter stated that if a school goes "out of business" or goes bankrupt, the former students should have reduced loan repayment obligations, especially for loans made by the school.

One commenter noted that under both the current and proposed regulations, the Department is required to identify any Direct Loan or Perkins Loan borrower "who appears to have been enrolled at the school on the school closure date or to have withdrawn not more than 120 days prior to the closure date" and to "mail the borrower a closed school discharge application and an explanation of the qualifications and procedures for obtaining a discharge." FFEL regulations similarly require guaranty agencies, upon the Department's determination that a school has closed, to identify potentially eligible borrowers and mail them a discharge application with instructions and eligibility criteria. This commenter asserts that the Department has not fulfilled its duty to provide notices and application forms to all potentially eligible borrowers, and that many borrowers whose schools have closed remain unaware of their eligibility. The commenter contends that applying the proposed changes to the closed school discharge regulations to such borrowers would unfairly harm them by making many of them newly ineligible to discharge their loans without ever having received notice of their eligibility.

Discussion: The Department does not believe that it is necessary to create an appeal process for borrowers making claims for closed school discharges. In most cases, closed school discharge decisions are based solely on whether the borrower was attending the school when it closed or shortly before and did the borrower choose to complete their program through a teach-out or transfer of credits. If the borrower's claim is denied but they have additional supporting information they can always submit a new claim and still receive full relief. Thus, there is no reason for a new formal appeal process.

We do not share the commenter's concern that the rules relating to Parent  **49855**  PLUS loan borrowers are unclear. We believe that our current language makes it clear that Parent PLUS loan borrowers must satisfy the same requirements for a discharge as student borrowers except that the Department considers the date the student stopped attending the school and whether the student completed their program of study.

We disagree that the final regulations would have any impact on a school's eligibility to participate in the student financial aid programs. If a school stops offering educational programs, it loses its eligibility to participate in the title IV student financial aid programs for other reasons. However, if a school closes one location and otherwise keeps offering educational programs, the continuing locations would remain eligible to participate. Depending upon how far the closing or closed campus is from the remaining campuses of the institution, or in the case of a campus relocation, the distance between the old and new location, the State or the accreditor may make a determination of whether this would be classified as a school closure. For example, in some states a new or continuing campus must be within a certain travel distance of the closing or moving campus, or must be on the same mass transit line, in order for the move to a new campus or merger with an existing campus to not be classified as a school closure.

The Department has not proposed modifying the definition of "closed school." Generally speaking, the merger of campuses, changes in campus location changes of ownership would be not be considered closed schools and students enrolled at those institutions would not generally be eligible for closed school loan discharge.

000187

We do not believe that a school's closure or bankruptcy should automatically reduce its' former students' loan repayment obligations. If those students qualify for a closed school discharge, or have a borrower defense to repayment, they can apply for that relief individually. The Department has no authority to determine whether or not a student remains obligated to repay private loans, including those issued by the institution, in the event that an institution closes.

If a borrower at a school that has closed may qualify for either a closed school discharge or a borrower defense discharge, we encourage the borrower to apply for a closed school discharge. The closed school discharge application process is generally less burdensome than the borrower defense application process since in the case of the closed school, the evidence of the closure is clear and apparent. We do not believe there is a strong incentive for a borrower who may qualify for a closed school discharge to apply for a borrower defense discharge instead.

The Department thanks the commenter for the suggestion regarding early implementation of the closed school discharge regulatory provisions. We reviewed the provisions and our procedures to determine if early implementation was possible. As a result, we are limiting our early implementation of these final regulations to those expressly listed in the "Implementation Date of These Regulations" section at the beginning of this document.

Changes: None.

Comments: None.

Discussion: In the discharge procedures for loans first disbursed on or after July 1, 2020, the Department makes a technical amendment in § 685.214(g)(6) to state that if the borrower does not qualify for a closed school discharge, the Department resumes collection. This technical amendment reflects the Department's longstanding practice to resume collection if a borrower's closed school discharge application is denied.

Changes: The Department makes a technical amendment to § 685.214(g)(6) to state that if the borrower does not qualify for a closed school discharge, the Department resumes collection.

**False Certification Discharges**

*Application Process*
Comments: One commenter recommended that the Department remove the new requirement that a borrower submit a "completed" application in order to obtain a false certification loan discharge, and that we instead retain the language in the 2016 final regulations that required a borrower to submit an application in order to qualify for a false certification discharge. Another commenter agreed with the recommendation to remove "completed," at least until the false certification discharge application is tested and revised to reduce inadvertent borrower errors. The commenter believed that by requiring a completed application within 60 days of suspending collections, the Department, guaranty agencies, and servicers would lack the discretion to notify the borrower regarding inadvertent errors and allow the borrower additional time to submit a corrected application while collection remains suspended.

One commenter recommended that the Department provide a school with written notice that a student has filed a discharge application and give the school the opportunity to respond. Another commenter also supported this proposal and urged the Department to provide the institution with a copy of the application and supporting information and afford the school a reasonable period of time to respond, such as 60 days. Under this proposal, the student would be provided a copy of the school's response and supporting documentation.

One commenter expressed the view that the proposed regulatory changes related to false certification discharges will result in borrower confusion about their false certification discharge applications. The commenter objected to the Department's proposal

000188

to remove language included in the 2016 final regulations that would require the Secretary to issue a decision that explains the reasons for any adverse determination on the application, describe the evidence on which the decision was made, and provide the borrower, upon request, copies of the evidence. The 2016 final regulations also provide that the Secretary considers any response and additional information from the borrower and notifies the borrower whether the determination has changed. In the commenter's view, this language would offer borrowers an opportunity to respond and submit additional evidence that could prove critical both to the approval of a borrower's application and to the Department's oversight of institutional misconduct.

Discussion: These final regulations require the borrower to submit a "completed" application because an incomplete application —such as an application without a signature or an application with missing information—does not provide all the information necessary for the Department, guaranty agency, or servicer to make a decision on the claim, which will result in the application being returned to the borrower as incomplete. Therefore, we will retain the term "completed" in the final regulations.

Requiring the borrower to submit a "completed" application in the regulations does not preclude the Department from contacting the borrower and asking the borrower to provide the missing information. Additionally, we believe sixty days from the day that the Secretary suspended collection efforts is a reasonable period of time for a borrower to complete the application, and for any necessary follow-up communication between the borrower and the Department.

We disagree with the commenters' proposal that the Department give a **\*49856** school an opportunity to respond to the borrower's false certification discharge application. The information and documentation that the Department routinely collects through the false certification discharge application process is typically sufficient for the Department to make a determination of eligibility. Further, while information is generally not required from the school, the Department has the discretion to contact the school to request additional information. In addition to any relevant information that a school may provide in response to a request from the Department, the final regulations provide that the Secretary may determine whether to grant a request for discharge by reviewing the application in light of information available from the Secretary's records and from other sources, including, but not limited to, the school, guaranty agencies, State authorities, and relevant accrediting associations. In other words, the Secretary has the discretion to review all necessary and relevant information to make a determination about a discharge based on false certification under these final regulations. We believe this approach strikes the right balance between thoughtful use of government resources and facilitating a full and fair process, by providing secretarial discretion and not requiring the Department to conduct unnecessary mandatory steps.

We do not believe that these final regulations will result in confusion to borrowers about their false certification discharge applications. Both the proposed and final regulations expressly state that the false certification discharge application will explain the qualifications and procedure for obtaining a discharge.

Information on eligibility for a false certification discharge will be provided to borrowers on the false certification discharge form and other forms, and we will provide updated information on our websites. Additionally, these final regulations provide in § 685.215(f)(5) that if the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination, and resumes collection.

We do not believe that it is necessary to provide a formal appeal process for a borrower to dispute a denial of a false certification discharge application. Due process does not require an appeal in this context. We provide additional avenues for a borrower to dispute a denial of a loan discharge through such means as contacting the FSA Ombudsman Group.[FN140] Currently, the Ombudsman Group works with borrowers and their loan holders to attempt to resolve disputes over matters such as discharge decisions. This process continues to be effective and the Ombudsman Group is engaged in a continuing process to improve their responsiveness to borrowers.[FN141] Given the considerable time and resources involved in formal appeal processes and the efficiency of the Ombudsman Group, we have decided not to include a formal process in the final regulations. With regard to (1) providing information to borrowers with regard to "false certification" discharge and (2) a formal appeal, we believe our regulatory approach strikes the right balance between thoughtful use of government resources and facilitating a full and fair process, by not adding additional, unnecessary mandatory steps.

Changes: None.

*False Certification of a Borrower Without a High School Diploma or Equivalent*

Comments: Several commenters supported the proposal to amend the eligibility criteria for false certification loan discharges to specify that, in cases when a borrower could not provide the school an official high school transcript or diploma but provided an attestation that the borrower was a high school graduate, the borrower would not qualify for a false certification discharge based on not having a high school diploma. These commenters agreed that a student attestation of high school graduation should be a bar to a false certification discharge. Many commenters expressed the view that if a student lies about earning a high school diploma for the purpose of applying for Federal student loans, the school should not be held responsible. One commenter noted that this proposal would provide a useful protection for schools serving populations for which providing a diploma can be difficult, such as non-traditional students who are unable to access their transcripts due to the length of time since high school graduation. Another commenter made the point that institutions and taxpayers should not be accountable for the fraudulent behavior of borrowers.

One commenter supportive of the proposal suggested additional language that, in the commenter's view, would better reflect the intent of the regulatory change. The commenter recommended language specifying that a borrower does not qualify for a false certification discharge if the borrower falsely attested to the school in writing and under penalty of perjury that the borrower had a high school diploma or completed high school through home schooling.

One commenter, supportive of the proposal to deny a false certification loan discharge to students who deceived the school about the students' high school completion status, expressed concern that the parameters described in § 685.215(c)(1)(ii) are convoluted and may be difficult to manage at an open access institution such as most community colleges and vocational schools. Institutions often rely on the students' self-certification of high school completion, such as through the information submitted by the student in the FAFSA, which would fail the requirement described in proposed § 685.215(c)(1)(ii)(A). This commenter proposed revising § 685.215(c)(1)(ii) to provide that a borrower would not qualify for a false certification discharge under § 685.215(c)(1) if the borrower submitted a written attestation, including certification through the FAFSA, that the borrower had a high school diploma or its recognized equivalent.

One commenter agreed with the proposal, but noted that if the borrower reported not having a high school diploma or its equivalent upon admission to the school and the school certified the student's eligibility for Federal student aid, the school should be held liable for the funds that were provided to the student. As another commenter noted, although schools may rely on information in the FAFSA when certifying borrower eligibility, it is also the school's responsibility to resolve conflicting information. The commenter suggested including language that establishes an exception to this rule in cases where the school had information that indicates that the student's information is inaccurate.

Other commenters stated that, in some cases, a false attestation by a student is the result of a deliberate effort by a school. These commenters believed that students who have been induced to misrepresent their eligibility as a result of institutional efforts or practices should be entitled to relief under the regulations. Other commenters **\*49857** expressed the view that the proposal may lead to schools rushing students through the attestation forms and, thus, may incentivize fraud on the part of schools. One commenter asserted that students will be counseled by schools to sign the attestation and stated that at least one accrediting agency forbids such attestations. The commenter recommended that a separate process be put in place for students who are unable to obtain their high school diplomas or transcripts due to natural disasters.

A group of commenters expressed the view that the attestation provision will enable predatory schools to defraud both students and taxpayers, while denying relief to borrowers. This group believed that the proposal conflicts with the broad statutory mandate to grant false certification discharges and raises serious due process concerns by creating a blanket restriction that denies false certification discharges whenever a school produces an attestation of high school status presumably signed by the borrower without consideration of facts or evidence. These commenters also noted that the FSA Handbook allows schools to accept

alternative documentation of high school graduation status if a student cannot provide official documentation to verify high school completion status and, thus, an avenue already exists for the limited number of borrowers who cannot obtain their official high school transcripts to qualify for Federal student financial aid. These commenters asserted that the attestation exception is unnecessary and does not provide any benefit to borrowers.

Additionally, these commenters contended that the attestation exception would deprive borrowers of due process rights. According to these commenters, the proposed rule assumes the validity of a borrower's attestation and forecloses a borrower's ability to present evidence that he or she did not knowingly sign a false attestation. These commenters provided examples of signatures obtained through duress, misrepresentation, or deceitful and illegal business practices. In the view of these commenters, the regulations would provide a road map for abuse by predatory schools, that would only need to produce an attestation form—no matter how dubiously obtained—to insulate themselves from Departmental oversight and to bar any remedy for borrowers.

A group of commenters stated that it would be improperly retroactive for the Department to apply the attestation exception to all Perkins and Direct Loan borrowers, rather than to loans disbursed after the effective date of the regulations.

This group also opposed the Department's use of the disbursement date of the loan rather than the origination date to indicate when a borrower was falsely certified. These commenters argued that the use of disbursement date conflicts with the plain language of the HEA, which requires an institution to certify an individual's eligibility to borrow before it "receives" financial aid through a disbursement. These commenters stated that, while a school may admit a high school senior who is not yet eligible for student financial aid, it may not certify eligibility of that student until the student has obtained his or her high school diploma or GED. In the view of these commenters, allowing schools to certify for aid upon disbursement will incentivize schools to falsely certify high school seniors who subsequently do not graduate to continue receiving revenue. According to these commenters, the proposal would essentially allow a school to "provisionally" certify a borrower's eligibility and encourage fraud.

Discussion: We thank the commenters who supported our proposal. We also thank the commenter who pointed out that, while schools may rely on information provided on the FAFSA to certify eligibility for student financial aid, schools also have an obligation to resolve discrepant information. If the school has evidence that a borrower has falsely certified his or her high school graduation status, the school may not certify the borrower's eligibility for title IV funds, regardless of the information provided by the student in the FAFSA. While these regulations would prevent a borrower who falsely certified high school graduation status from receiving a false certification discharge, nothing in these final regulations relieves a school of its obligation to ensure that it certifies only eligible borrowers for Federal student aid under title IV.

The Department may always conduct a program review and make findings against a school that unlawfully certifies eligible borrowers for Federal student aid under title IV, and the Department may recover liabilities against such schools under 34 CFR part 668, subpart G. These final regulations, unlike the 2016 final regulations, place the burden on the borrowers and not the schools to certify eligibility for Federal student aid for purposes of a false certification discharge. Schools must rely upon the information that a borrower provides about a high school diploma or alternative eligibility requirements and cannot issue subpoenas to compel the production of records that will demonstrate the student has a high school diploma or its equivalent. Even if discrepant information exists, borrowers who submitted to the school a written attestation, under penalty of perjury, that they had a high school diploma, should not receive a false certification discharge if the borrower was untruthful in attesting that he or she had earned a high school diploma. Federal taxpayers should not pay for a borrower's misrepresentation of eligibility requirements for Federal student aid with respect to a high school diploma or its equivalent. In the event that a borrower was encouraged or coerced to sign an untrue attestation regarding his or her high school graduation status, the borrower would be entitled to relief under the borrower defense to repayment regulations, not the false certification loan discharge regulations.

The Department appreciates the suggestion to revise the regulatory language with respect to borrowers who completed high school through home schooling. We believe that proposed § 685.215(c)(1)(ii)(A) (§ 685.215(e)(1)(ii)(A) of these final

regulations), which expressly includes borrowers who were home schooled adequately addresses students who received an education through homeschooling.

Although commenters provided some examples of schools that may have deliberately encouraged borrowers to falsely certify their high school graduation status, or rushed borrowers through the process of signing attestation forms, we are not aware of data that shows this is widespread. Additionally, the commenter misinterprets what the Accrediting Commission of Career Schools and Colleges (ACCSC) states in its "Standards of Accreditation." Whereas the commenter stated that ACCSC "forbids" the use of attestations, in fact, the Standards state that ACCSC does not consider a self-certification to be documentation, not that the usage of such attestations is forbidden.[FN142] It would be detrimental to the school, and to the school's reputation, to systematically and intentionally enroll and award aid to ineligible students, who did not graduate from a high school or who do not meet the alternative eligibility criteria.

If a school knows that the borrower did not have a high school diploma or **\*49858** has not met the alternative eligibility requirements and represents to the borrower that the borrower should submit a written attestation, under penalty of perjury that the borrower had a high school diploma, then the school has committed a misrepresentation that constitutes grounds for a borrower defense to repayment claim. The Department will continue to hold schools accountable for misrepresentations made to a borrower under § 685.206, and the Department may initiate a proceeding against a school for a substantial misrepresentation by an institution under § 668.71. These enforcement mechanisms provide safeguards against fraudulent practices by schools.

The Department agrees with the commenter that 34 CFR 685.215(c)(1)(ii), as proposed in the 2018 NPRM, does not permit a student's certification of high school graduation status on the FAFSA to qualify as the written attestation, under penalty of perjury, that the borrower had a high school diploma. A form separate from the FAFSA will better signify the consequences and importance of such a written attestation, under penalty of perjury, to the borrower. The Department will provide a model language for such a written attestation that schools may choose to use.

The Department acknowledges that the FSA Handbook provides a list of documentation other than a high school diploma that may be used by a borrower to demonstrate eligibility for receiving Federal student aid under title IV. For example, a student who has a General Educational Development (GED) certificate is eligible to receive financial assistance under title IV.[FN143] A borrower who meets alternative eligibility requirements does not need to submit to the school a written attestation, under penalty of perjury, that the borrower had a high school diploma. The Department's final regulations recognize that there are alternative eligibility requirements and expressly reference these alternative eligibility requirements in 34 CFR 685.215(e)(1)(i).

We agree that the alternative eligibility requirements may benefit some borrowers, but some borrowers cannot satisfy these alternative eligibility requirements. If a borrower went to high school 40 years ago and lost his or her diploma, he or she may not be able to readily satisfy the alternative eligibility requirements. These final regulations afford such a borrower an avenue to nonetheless qualify to receive Federal student aid.

Similarly, these final regulations provide an avenue for students who lost their high school diplomas as the result of a natural disaster to qualify to receive Federal financial aid. The Department acknowledges that such students also may qualify for Federal financial aid through the alternative eligibility requirements.[FN144] Accordingly, the Department does not need to create a separate process for survivors of natural disasters.

These final regulations provide borrowers with due process. Procedural due process requires notice and an opportunity to be heard. These regulations give borrowers notice that if they falsely or fraudulently submit to the school a written attestation, under penalty of perjury, that they had a high school diploma, then they will not qualify for a false certification discharge. The Federal false certification discharge application provides the borrower with an opportunity to be heard. Accordingly, these final regulations satisfy due process. However, in the event that the borrower was coerced into signing such an attestation as a result of a school's misrepresentation, the borrower would likely qualify for relief under the borrower defense to repayment regulations.

These final regulations provide that a borrower does not qualify for a false certification discharge under § 685.215(e)(1) if the borrower was unable to provide the school with an official transcript or an official copy of the borrower's high school diploma and submitted to the school a written attestation, under penalty of perjury, that the borrower had a high school diploma. If the school forges the borrower's signature on such an attestation, then the borrower did not submit this written attestation to the school and would qualify for a false certification discharge.

Additionally, if the school signs the borrower's name on the loan application or promissory note without the borrower's authorization, then the borrower may still qualify for a false certification discharge under § 685.215(a)(1)(iii). These final regulations continue to include forged signatures on a loan application or promissory note as an adequate basis for a false certification student loan discharge.

The Department in its 2018 NPRM proposed rescinding the provision in the 2016 final regulations that if the Secretary determines that the borrower does not qualify for a false certification discharge, the Secretary will notify the borrower in writing of its determination on the request for a false certification discharge and the reasons for the determination.[FN145] In response to comments that raised due process concerns, the Department will no longer rescind this provision for the discharge procedures that apply to loans first disbursed on or after July 1, 2020, and includes this provision in the final regulations as § 685.215(f)(5). If the Secretary determines that a borrower does not qualify for a discharge, then under § 685.215(f)(5), the Secretary notifies the borrower in writing of that determination and the reasons for that determination, and resumes collection. The Department has always resumed collection of the loan after the Department denied a false certification discharge and is adding the phrase "and resumes collection" in § 685.215(f)(5) as a technical amendment to provide clarity.

We understand the commenter's concern about retroactive application of the regulatory changes. The regulations regarding false certification will apply to loans first disbursed on or after July 1, 2020, and will not apply retroactively. We have revised these final false certification regulations only to apply to new borrowers in the Direct Loan program. False certification discharges are not available in the Perkins Loan program; therefore, these regulations will not affect those borrowers. We also are not making changes to the false certification discharge requirements for the FFEL program.

The Department disagrees that using the disbursement date of the loan rather than the origination date for purposes of false certification discharge contradicts the HEA. As noted in the 2018 NPRM, the Department acknowledged the concerns of the negotiator who noted that a borrower may be a senior in high school with the intention of graduating when that borrower applies for assistance under title IV. The Department recognizes that under section 484(a)(1) of the HEA and 34 CFR 668.32(b), a student is not eligible to receive assistance under title IV if the student is enrolled in an elementary or secondary school. Section 437(c) of the HEA provides the authority for a false certification discharge, and such a discharge applies only to a "borrower  **49859**  who received . . . a loan made, insured, or guaranteed under this part." A borrower will not be eligible for the discharge unless the borrower received the loan. Moreover, a school may realize that a borrower provided the school with false or discrepant information for eligibility of title IV assistance after the origination date of the loan but before the loan is disbursed, and the school may revoke its certification of eligibility for that borrower prior to disbursement of the loan. Accordingly, the date of disbursement of the loan aligns with the HEA and serves as a better gauge to determine eligibility for a false certification discharge. As noted above, the Department has various enforcement mechanisms to address fraud by a school, and a school is not permitted to falsely certify a borrower's eligibility to receive assistance under title IV.

Changes: We have revised our proposed changes to § 685.215 to clarify that they apply only to loans disbursed on or after July 1, 2020. Additionally, in the discharge procedures for loans first disbursed on or after July 1, 2020, the Department is not rescinding the provisions in the 2016 final regulations that provide that the Secretary will notify the borrower in writing of its determination on the request for a false certification discharge and the reasons for the determination, if the Secretary determines that the borrower does not qualify for a false certification discharge.[FN146] The Department includes this provision in these final regulations as § 685.215(f)(5). If the Secretary determines that a borrower does not qualify for a discharge, then under § 685.215(f)(5), the Secretary notifies the borrower in writing of that determination and the reasons for that determination, and

resumes collection. The Department has always resumed collection of the loan after the Department denied a false certification discharge and is adding the phrase "and resumes collection" in § 685.215(f)(5) as a technical amendment.

### *Additional False Certification Discharge Recommendations*

Comments: Two commenters recommended that the Department retain language on automatic false certification discharges for Satisfactory Academic Progress (SAP) violations in the 2016 final regulations. One of these commenters noted that program reviews would not address the purpose of the SAP language in the 2016 final regulations, which was to permit loan discharges for the affected borrowers when the Department finds evidence of falsification of SAP. The commenter stated that while investigations, audits, and reviews of institutional policies and practices are necessary to uncover evidence of such falsification, and to ensure that the institution is held accountable, the borrower should not be held responsible for repaying the loan.

Discussion: We do not believe that it is appropriate to have a specific provision in the regulations providing for a false certification discharge based on falsification of SAP. Existing § 685.215(c)(8) (2016) already provides that the Department may discharge a borrower's Direct Loan by reason of false certification without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge, and § 685.215(e) (7), will also include such a provision. This regulation gives the Secretary broad discretion in discharging a loan without an application from the borrower based on information in the Secretary's possession. Accordingly, this regulation does not preclude the Secretary from considering evidence in her possession that the school falsified the SAP progress of its students as part of the Secretary's decision to discharge a loan.

However, we do not think it is appropriate for the regulation to specifically include Satisfactory Academic Process as information the Secretary would consider, and we do not include that language for loans first disbursed on or after July 1, 2020. Evaluation of an institution's implementation of their SAP policy is part of an FSA program review, and thus, the Department has a mechanism in place to identify inappropriate activities in implementing an institution's SAP policy. SAP determinations are subject to the internal policies of the school, and it would be difficult to determine if a school violated its own SAP policies in the context of, and in conjunction with, reviewing a false certification discharge application. The Department does not wish to single out and elevate evidence that the school has falsified the SAP of its students above other information in the Secretary's possession that she may use to discharge all or part of a loan without a Federal false certification application from the borrower.

Additionally, we do not have evidence that falsification of SAP is widespread. As we stated in the 2016 final regulations, schools have a great deal of flexibility both in determining and in implementing SAP standards. There are a number of exceptions under which a borrower who fails to meet SAP can continue to receive title IV aid. Borrowers who are in danger of losing title IV eligibility due to a failure to meet SAP standards often request reconsideration of the SAP determination. Schools typically work with borrowers in good faith to attempt to resolve the situation without cutting off the borrower's access to title IV assistance.

We do not believe that a school should be penalized for legitimate attempts to help a student who is not meeting SAP standards, nor do we believe a student who has successfully appealed a SAP determination should be able to use that initial SAP determination to obtain a false certification discharge on his or her student loans. However, a student may use a misrepresentation about SAP to successfully allege a borrower defense to repayment under 34 CFR 685.206(e), assuming the student satisfies the other elements of a borrower defense to repayment claim. For these reasons, it is not necessary to expressly state that the information the Secretary may consider includes evidence that the school has falsified the SAP of its students.

Changes: None.

Comments: None.

Discussion: A disqualifying condition or condition that precludes a borrower from meeting State requirements for employment was a basis for a false certification discharge prior to the 2016 final regulations and remains a basis for a false certification discharge. In the 2016 final regulations, the Department added language in 34 CFR 685.215(c)(2) to require a borrower to

state in the application for a false certification discharge that the borrower did not meet State requirements for employment (in the student's State of residence) in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary. The Department in its 2018 NPRM noted that "the changes in the 2016 final regulations did not alter the operation of the existing regulation as to disqualifying conditions in any meaningful way, and as a result does not propose such added language in these regulations." [FN147] The Department would like to further note that its past guidance previously discouraged schools from requesting or relying upon a borrower's criminal record.[FN148] Some **\*49860** State and Federal laws also may discourage or prevent schools from requesting information about a student's physical or mental health condition, age, or criminal record. [FN149] If schools do not have knowledge of the disqualifying condition that precludes the student from meeting State requirements for employment in the occupation for which the training program supported by the loan was intended, then schools cannot falsely certify a student's eligibility for Federal student aid under title IV. Accordingly, a borrower's statement that the borrower has a disqualifying condition, standing alone, will not qualify a borrower for a false certification discharge under 34 CFR 685.215(a)(1)(iv).

Changes: None.


*Financial Responsibility, Subpart L of the General Provisions Regulations*

**Section 668.171, Triggering Events**
Comments: Numerous commenters wrote that the Department should strengthen the mandatory triggers. They urged the Department to strengthen the financial responsibility portion of the proposed rules by reinstating the full list of triggers provided in the 2016 final rules or by adding additional triggers. Commenters reasoned that, in order to protect taxpayer dollars, the Department should strengthen school accountability by increasing the number of early warnings of an institution's coming financial difficulties. A commenter stated that the Department needs "to develop more effective ways to identify events or conditions that signal impending financial problems." [FN150] Without that, the commenters concluded the Department would not truly be able to anticipate potential taxpayer liabilities and obtain financial protection prior to incurring those liabilities.

The commenters believed that the mandatory and discretionary triggering events in § 668.171(c) and (d) were inadequate, too narrow and less predictive, or late in detecting misconduct by institutions compared to the triggering events in the 2016 final regulations. The commenters argued that by eliminating or weakening several of the 2016 triggering events, or making those triggering events discretionary, the Department has made it easier for an institution to continue to operate, or operate without consequences or accountability, in cases when the institution would likely close or incur significant liabilities.

As a result, the commenters reasoned that the Department would be less likely to obtain financial protection, or obtain it on a timely basis, leaving taxpayers to bear the costs. In addition, some of these commenters noted that the Department's Office of the Inspector General issued a report [FN151] stating, in part, that (1) the Department would receive important, timely information from institutions experiencing the triggering events in the 2016 final regulations that would improve the Department's processes for identifying institutions at risk of unexpected or abrupt closure, and (2) enforcement of the regulations would also improve the Department's processes for mitigating potential harm to students and taxpayers by obtaining financial protection based on broader and more current information than institutions provide in their financial statements.

Many commenters supported the mandatory and discretionary triggering events proposed in the 2018 NPRM, noting that they focus on known, quantifiable, or material actions. As such, some of these commenters believed the triggering events are an improvement over those in the 2016 final regulations that could have exacerbated the financial condition of an institution with minor and temporary financial issues or required an evaluation of the impact that undefined regulatory standards (i.e., high drop-out rates, significant fluctuations in title IV funding) would have on an institution's financial condition.

Other commenters were concerned that the proposed triggering events exceed the Department's authority, arguing that the triggers include factors that are not grounded in accounting principles and do not account for an institution's total financial

circumstances as required under section 498(c) of the HEA. Along the same lines, a few commenters were concerned that some of the triggering events were overly broad and poorly calibrated to identify situations when an institution is unable to meet its obligations and asked the Department to consider whether the triggers are necessary.

Some commenters believed that the Department should apply the mandatory and discretionary triggers equally across all institutions. In addition, the commenters noted that proprietary institutions must already comply with the provisions that a school must receive at least 10 percent of its revenue from sources other than title IV, HEA program funds (also known as the "90/10" requirement). In addition, all institutions must meet the requirements for a passing composite score and cohort default rates and argued that the Department should not create new requirements for these provisions exclusively for proprietary institutions.

Discussion: The Department disagrees with the comments that the proposed triggering events will diminish our oversight responsibilities. These regulations do not change the approach the Department currently uses to identify and react contemporaneously to actions or events that have a material adverse effect on the financial condition or viability of an institution.

The 2016 final regulations include as triggers (1) events whose consequences are uncertain (e.g., estimating the likely outcome and dollar value of a pending lawsuit or pending defense to repayment claims, or evaluating the effects of fluctuations in title IV funding levels), (2) events more suited to accreditor action or increased oversight by the Department (e.g., unspecified State violations that may have no bearing on an institution's financial condition or ability to operate in the State), and (3) results of a yet-undefined test (e.g., a financial stress test) that would be akin to the current financial responsibility standards and potentially inconsistent with the current composite score methodology. The Department acknowledges that the composite score methodology should be updated through future rulemaking. In these final regulations, we adopt mandatory triggering events whose consequences are known, material, and quantifiable (e.g., the actual liabilities incurred from lawsuits) and objectively assessed through the composite score methodology or whose consequences pose a severe and imminent risk (e.g., SEC or stock exchange actions) to the Federal interest that warrants financial protection.

Additionally, based upon our review of the comments, the Department has decided to revise the proposed triggers in these final regulations. First, the Department has decided not to rescind the high annual drop-out rates trigger in the 2016 final regulations. Despite our previous concerns about whether a threshold has ever been established for this trigger and whether it is an event more suited to action by an accreditor, we have reconsidered this position, in part based on a comment pointing out that Congress has identified drop-out rates as an area of such significant **\*49861** concern that a high rate should be factored into the Department's selection of institutions for program reviews.

However, we do not adopt this commenter's logic regarding significant fluctuations in Pell Grants or loan volume. While statutorily appropriate for a program review, we believe that additional financial oversight, in the form of a discretionary trigger, would be ill-suited to fluctuations in loan volume and Pell grant amounts. First, significant fluctuations in loan volume year-over-year more readily stem from events that do not indicate financial instability, such as through institutional mergers, which the Department has reason to believe will continue if not increase in the future.[FN152] Next, the Department is concerned that linking Pell Grant fluctuations to a discretionary trigger would harm low-income students and discourage institutions from serving students who rely on Pell Grants. Finally, fluctuations in Pell Grants and loan volume may be inversely related to national economic conditions—such as a recession leading to newly unemployed workers seeking additional training or education—rather than the financial health of an institution.

Second, the Department closely considered comments regarding whether our proposed triggers were strong enough to identify early warning signs of financial difficulty and whether the Department could properly and quickly identify events or conditions that signaled impending financial problems. As more fully explained below, the Department continues to believe that our proposed triggers provide necessary protections and are sensitive to early warning signs. However, the Department takes its responsibility as stewards of taxpayer funds seriously and, as a result, is responsive to community concerns regarding whether our oversight of those funds is insufficient.

Based upon numerous comments that we should strengthen the financial responsibility regime, as well as our general duty to taxpayers, the Department has decided that when two or more unresolved discretionary triggers occur at an institution within the same fiscal year, those unresolved discretionary triggers will convert into a mandatory triggering event, meaning that they will result in a determination that the institution is not able to meet its financial or administrative obligations.

Institutions will already have notice of, and be subject to, the discretionary triggering events in § 668.171(d). The Department has determined that two or more unresolved discretionary triggers may be indicators of near-term financial danger that leads to the conclusion that an institution is unable to meet its financial or administrative obligations. This regulatory change strengthens authority the Secretary already possesses, at § 668.171(d), by empowering the Department to act when an institution exhibits a pattern of problematic behavior.

We believe the elevation of multiple discretionary triggers, that are unresolved and occur in the same fiscal year, to mandatory triggers strengthens the Department's ability to enforce its financial responsibility requirements. Institutions that exhibit behavior that is likely to have a material adverse effect on the financial condition of the institution require the Department to respond to protect taxpayer and student interests.

Despite these changes, our review of the comments does not lead us to the conclusion that the Department should adopt the 2016 triggers in their entirety. Through these triggers, the Department balances its interest in taxpayer protection with institutional stability. In particular, the Department seeks to avoid a repeat of prior instances in which the Department sought a letter of credit from an institution that it triggered a precipitous closure, harmed a large number of students who were unable to complete their program of study, and required taxpayers to pay an even greater cost in the form of closed school discharges. We also seek to avoid the use of triggers, such as pending, unsubstantiated claims for borrower relief discharge and non-final judgements, that do not provide an opportunity for due process, invite abuse, and have already resulted in high numbers of unsubstantiated claims. The triggers have also proven unduly burdensome for institutions that were required to report all litigation, even allegations unrelated to claims for borrower defense relief. We view the triggers in these final regulations as providing a sound and more objective basis than the 2016 triggers for determining whether an institution is financially responsible.

Contrary to the presumption by the commenters that the 2016 triggers would have identified more financially troubled institutions, we note that (1) the potential liabilities arising from pending lawsuits or borrower defense claims is far from certain both in timing and in amount, and estimating those liabilities for the purpose of recalculating the composite score is problematic and could inappropriately affect institutions for several years (see the discussion under heading "Mandatory and Discretionary Triggering Events."), and (2) reclassifying some the triggers as discretionary will still provide review to identify actions or events that may have a material adverse impact on institutions. In addition, while we agree with the OIG report that information provided by the triggering events will better enable the Department to exercise its oversight responsibilities, we disagree with the notion raised by the commenters that the triggering events outlined in the 2018 NPRM will dilute the Department's ability to do so. To the contrary, we believe the approach adopted in these final regulations, together with the revisions explained above, will identify those institutions whose post-trigger financial condition actually warrants financial protection, rather than applying triggers that presumptively result in institutions having to provide financial protection and unduly precipitate coordinated legal action against an institution that trigger financial protections that could have devastating—and in many cases unwarranted—financial and reputational impacts on the institution.

With regard to the comments that the triggers exceed the Department's authority, we note that section 498(c) of the HEA directs the Secretary to determine whether the institution "is able . . . to meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary." [FN153] The statute uses the present tense to direct the Secretary to assess the ability of the institution to meet current obligations. These regulations satisfy that directive by requiring that the assessment is performed contemporaneously with the occurrence of a triggering event. The use of these triggers for interim evaluations, in addition to the composite score calculated from the annual audited financial statements, using the financial responsibility ratios, takes into **\*49862** consideration the total financial circumstances of the institution on an ongoing basis.

000197

We disagree with the comment that some of the triggering events are overly broad and poorly calibrated. As discussed in this section and under the heading "Mandatory and Discretionary Triggering Events," the Department recalibrated the triggers from the 2016 final regulation to more narrowly focus on actions or events that have or may have a direct adverse impact and eliminated the triggers from that final regulation that were speculative or not associated directly with making a financial responsibility determination.

In response to the comments that the triggering events should apply equally to all institutions, the commenters appear to suggest that the Department somehow change or extend existing statutory requirements (e.g., impose the 90/10 trigger on all institutions) or not consider other agency provisions that apply only to certain institutions (e.g., SEC and exchange requirements for publicly traded institutions).

The Department lacks the authority to apply certain statutory requirements to other institutions and cannot ignore for the sake of uniformity the risks associated with, or the consequences of, an institution that fails to comply with such requirements. With regard to the objections for establishing triggers for provisions that already have associated sanctions (90/10 and CDR), it is the consequence of those sanctions that we are attempting to mitigate by obtaining financial protection. An institution that fails 90/10 for one year, or has a cohort default rate of 30 percent or more for two consecutive years, is one year away from possibly losing all or most of its title IV eligibility as well as its ability to continue to operate as a going concern. In that event, the financial protection obtained as a result of these triggering events would cover some of the debts and liabilities that would otherwise be shouldered by taxpayers. However, the Department agrees that in instances in which the HEA does not designate a specific trigger for a specific type or class of institution, the Department will not use its regulatory power to create new requirements or sanctions that apply to some but not all institutions.

Changes: The Department revises § 668.171 to include a new paragraph at § 668.171(d)(5) to read: "As calculated by the Secretary, the institution has high annual dropout rates; or". Proposed § 668.171(d)(5) is now redesignated § 668.171(d)(6). Additionally, the Department adds paragraph § 668.171(c)(3) to state that, for the period described in § 668.171(c)(1), when the institution is subject to two or more discretionary triggering events, as defined in § 68.171(d), those events become mandatory triggering events, unless a triggering event is resolved before any subsequent event(s) occurs.

Comments: Some commenters were concerned that the proposed framework of mandatory and discretionary triggering events does not clearly specify how the Department will manage multiple triggering events or specify whether a recalculated composite score is used only for determining that an event has a material adverse effect on an institution or whether the recalculated score represents a new, official composite score. Similarly, other commenters requested that the Department explain how it will apply, handle, determine, or view specific instances surrounding a triggering event and, for discretionary triggering events, how the Department will determine whether an event has a material adverse effect on an institution.

Other commenters noted that the NPRM appears to obligate the Department to recalculate the composite score every time a triggering event is reported. The commenters suggested that the Department reserve the right to forgo a recalculation if the reported liability is deemed immaterial.

The commenters argued that an institution should not be required to report every liability arising from a judicial or administrative action, without regard to the amount or resulting implications, and the Department would not need to perform a recalculation for every reported liability. To address these issues, the commenters suggested that the Secretary establish a minimum percentage or dollar value above which an institution would be required to notify the Department and the Department would recalculate the composite score. For example, a judicial or administrative action resulting in a liability under $10,000 would not require reporting or recalculating the composite score and would reduce burden on institutions and the Department.

Discussion: Based on the actual liability or loss incurred by an institution from a triggering event, the Department recalculates the institution's composite score to determine whether any additional action is needed. As was the case in the 2016 final regulations,

if the institution's recalculated score is 1.0 or higher, no additional action is needed, and there is no change in the institution's official composite score.

For example, assume that an institution's official composite is 1.8, but as a result of a triggering event, its recalculated score is 1.4. The institution's official composite score remains at 1.8, even though a score of 1.4 would in the normal course require the institution to participate in the title IV, HEA programs under the zone alternative in 34 CFR 668.175(c). Under the trigger provisions, an institution with a recalculated score in the zone would not be required to provide a letter of credit, nor would it be subject to any of the zone provisions.

On the other hand, if the institution's recalculated composite score was a failing score of less than 1.0 (e.g., a score of 0.7), that score becomes the institution's official composite score and remains the composite score unless modified by a subsequent triggering event or until the Department calculates a new official composite score based on the institution's annual audited financial statements for that fiscal year. In this case, with a failing score of 0.7, the institution would be required to participate in, and be subject to the provisions of, the letter of credit or provisional certification alternatives under 34 CFR 668.175(c) or (f).

The Department has determined that there is a greater risk to taxpayers when an institution has a failing composite score. As was the case with the 2016 final regulations, the Department will only take action based on interim adjustments that result in a failing composite score. The official composite score is based on an institution's annual audited financial statements. The interim adjustments are made based on triggering events that occurred after the end of the institution's fiscal year. These adjustments will show up in a subsequent year and be reflected in the audited financial statements for that year. The official composite score needs to be based only on the institution's audited information. The adjustments that are made to a composite score subsequent to the most recently accepted audited financial statements are designed to protect the Department, students, and taxpayers.

Given that a recalculated score does not affect an institution's official composite score, unless it is a failing score less than 1.0, we believe it is unnecessary to establish a materiality threshold below which a triggering event is not reported, as suggested by the commenters. A settlement, final judgment, or federal or state final determination resulting in a liability of $10,000 may be material for an institution whose financial condition is already precarious, but a $10 million liability may not have a material impact on a financially healthy institution.

*49863 To objectively assess whether a liability is material to a specific institution, we rely on the composite score methodology. Regardless of whether an institution is on the cusp of failing the composite score or has a high composite score, the relevant issue is whether the liability that must be reported results in a failing recalculated score.

We believe that liabilities arising from minor settlements, final judgments, and final determinations by a Federal or State agency are not likely to create variability in composite scores that could have negative implications, particularly with oversight entities that use or rely on the composite score, because composite scores will only be changed if the recalculated scores are failing. In the cases where the recalculated scores are failing, we believe that the cognizant oversight entities should be interested in those outcomes.

On its own, it is important for the Department to know that an institution has incurred liabilities arising from settlements, final judgments, and final determinations by Federal or State agencies. Although the amount of each liability arising from such instances may be a minor amount, the cumulative effect of numerous settlements, final judgments, and final Federal or State agency determinations could damage the institution's financial stability. The threshold that the Department has established is any amount that causes the institution to have a failing composite score, and the only way the Department can determine if an institution has reached this threshold, is by requiring the institution to report the liabilities referenced in paragraph (c)(1)(i)(A).

Regarding the comments about the burden associated with reporting all incurred liabilities, we considered this burden in establishing the reporting process in these final regulations and believe it adequately balances the burden on schools with the

Department's ability to obtain necessary information. In addition, we discuss more details of the reporting requirements under the heading "Reporting Requirements, § 668.161(f)" below.

With respect to how the Department will manage and evaluate a triggering event or handle multiple events, we believe it is not appropriate or feasible to detail the Department's internal review process in these final regulations. The outcome for any failing composite score recalculation will be available to the reporting institution. To the extent that the Department establishes procedures for institutions to report and respond to the triggering events or develops guidelines regarding how we intend to evaluate certain triggering events, the Department will make that information available to institutions.

Generally, the mandatory triggers reflect actions or events whose consequences are realized immediately, such as a liability incurred through a final judgment after a judicial action or through a final administrative action by a Federal or State agency, a withdrawal of owner's equity that reduces resources available to the institution to meet current needs, or an SEC or exchange violation that diminishes the institution's ability to raise capital or signals financial distress. For a mandatory trigger whose consequences can be quantified (a monetary liability incurred by the institution or withdrawal of owner's equity), a failing recalculated score (less than 1.0) evidences an adverse material effect. For the other mandatory triggers (SEC and exchange violations), given the nature and gravity of those events, we presume they will have an adverse material effect on the institution's financial condition. In either case, the burden falls on the institution to demonstrate otherwise at the time it notifies the Department that the event has occurred.

On the other hand, discretionary triggers generally reflect actions or events whose consequences are less immediate and less certain. For a discretionary trigger, the Department will need to show that the event is likely to have a material adverse effect on the institution's financial condition or jeopardize the institution's ability to continue to operate as a going concern.[FN154] The Department will consider in its review any additional information provided by the institution at the time it reports that event.

Changes: None.

Comments: One commenter criticized the Department's rulemaking with respect to financial responsibility, claiming that the Department has not analyzed data on the existing financial protection held by the Department to assess the degree to which it may fall short of institutional liabilities, or provided the public with information necessary to establish the extent to which the Department's current policies and practices meet the statutory requirement that the Department ensure institutions of higher education are financially responsible. The commenter submitted a FOIA request related to this topic and stated that the request is now the subject of ongoing litigation.

In addition, the commenter contended that the Department failed to provide information during the rulemaking process regarding how it sets the amount of a required LOC. While acknowledging the Department's longstanding regulations that establish a floor for the amount of the LOC at 10 percent of the amount of an institution's prior year title IV funding, the commenter admonished the Department for failing to (1) consider whether to increase the amount of LOC floor in the proposed regulations in light of revoking the automatic triggers and (2) provide any information on the methodology the Department uses to set the amount of an LOC.

As a result, the commenter said the Department had not provided the necessary information to say whether it is adequately protecting taxpayers from significant liabilities. The commenter also asserted that the Department cannot engage in a reasoned negotiated rulemaking and cannot provide a fulsome opportunity to comment as required by both the HEA and the APA, without first analyzing the information the commenter had requested.

Other commenters contended that the Department is not adequately identifying risks from institutions noting that the majority of the letters of credit (LOC) obtained by the Department came from institutions with failing composite scores, but only a few LOCs stemmed from significant concerns or events like those envisioned by the 2016 triggers.

Discussion: First, we note that the sufficiency of the Department's response to any individual FOIA request is beyond the scope of this rulemaking and decline to comment on conclusions drawn about the response or the ongoing litigation.

With respect to the other aspects of the comment, the commenter appears to be confusing LOCs obtained for different purposes. The financial protection triggers in these and the 2016 final regulations were designed to help **\*49864** identify conditions or events that were likely to have a forward-looking impact on an institution's financial stability. The 2016 final regulations were not in effect at the time of the 2018 NPRM and the negotiated rulemaking that preceded it, so no triggers were in place at the time. Prior to the 2016 final regulations becoming effective, the Department's regulations primarily authorized requiring a LOC from an institution for failing to satisfy the standards of financial responsibility based on its annual audited financial statements, or during a change of institutional control, or more recently in the event that an institution files for receivership.

We do not believe that an analysis of LOCs obtained under the preexisting regulations based solely on information contained in audited financial statements would have facilitated fulsome comment and participation about how best to calibrate forward-looking financial responsibility triggers because the actions or events relating to the triggers may not be evident, or otherwise disclosed, in those statements. The Department must walk a fine line between protecting taxpayers against sizeable unreimbursed losses through borrower defense loan and closed school loan discharges, and forcing the closure by establishing LOC requirements that themselves push the institution in unreasonable financial duress.

In addition, we did not propose in the 2018 NPRM to remove the concept of automatic triggers altogether. We proposed modifying or removing some of the triggers, referred to in the 2018 NPRM and in these final regulations as "mandatory" instead of "automatic," but the concept that certain events trigger a requirement for financial protection, absent a compelling response from an institution that the triggering event does not and will not have a material adverse effect on its financial condition, was not removed from the proposed or these final regulations. In the 2018 NPRM and these final regulations, we set forth a reasoned basis for the way we propose to structure the automatic/mandatory and discretionary triggers, including why and how that structure differs from the 2016 final regulations. This basis includes our analysis of the rationales specified in the 2016 final regulations and the reasons for why our weighing of facts and circumstances results in a different approach.[FN155]

The analysis of the triggers we incorporate into these final regulations is detailed elsewhere in this section. In summary, both at negotiated rulemaking and through the 2018 NPRM comment process, the public had sufficient information for a fulsome opportunity to comment and participate in the discussion about financial protection triggers.

With regard to how the Department establishes the amount of a LOC, as the commenter noted, the amount is, and has historically been, set initially at 10 percent of the total amount of the prior year's title IV funds received by an institution. We have always had the discretion to require a LOC greater than 10 percent, but established in the 2016 final regulations under § 668.175(f)(4), that the amount of a LOC may be any amount over 10 percent that the Department demonstrates is sufficient to cover estimated losses. However, in the 2018 NPRM we did not propose, and do not adopt in these final regulations, the approach in the 2016 final regulations that specifically tied any increase in the LOC over 10 percent to the amount needed to cover estimated losses. While that approach may be appropriate in some cases, we believe the Secretary should have, and historically has had, the flexibility to establish the amount of the LOC on a case by case basis, as may be warranted by the specific facts of each case.

With respect to the comment about increasing the LOC floor, if the commenter is suggesting that by providing larger LOCs, institutions that are not subject to the removed triggers would mitigate the risk to taxpayers from institutions that were previously subject to those triggers, that arrangement implies the existence of a shared risk pool from which the Department could tap to cover liabilities from any institution. A LOC is specific to an institution and cannot be used to cover the liabilities of any other institution. Consequently, increasing the LOC floor would not have the effect the commenter intended, but perversely result in inappropriately increasing the LOCs of unaffected institutions.

Changes: None.

**Mandatory and Discretionary Triggering Events**

***Section 668.171(c)(1), Actual Liabilities From Defense to Repayment Discharges and Final Judgments or Determinations***
Comments: Some commenters believed that the 2016 final regulations unfairly penalized an institution based upon unfounded or frivolous accusations in pending lawsuits that, once settled or adjudicated, could result in no material financial impact on the institution. These and other commenters agreed with the proposal in the 2018 NPRM to hold an institution accountable for the actual amount of liabilities from settlements, final judgments, or final Federal or State agency determinations.

Similarly, other commenters believed that the proposal to use the actual liabilities incurred by an institution in recalculating its composite score corrected a significant flaw in the 2016 final regulations that could have triggered a reassessment of an institution's financial responsibility based on alleged or contingent claims that may never come to pass.

Other commenters believed that the current triggers for pending lawsuits and defense to repayment claims under § 668.171(c)(1)(i) and (ii) and (g)(7) and (8) should be retained to better protect students and taxpayers.

Discussion: We have determined that the 2016 final regulations enumerated certain triggering events that may not serve as accurate indicators of an institution's financial condition. To reduce the burden on institutions in reporting the triggering events and mitigate the possibility that institutions would improperly be required to provide financial protection as a consequence of those events, while balancing the need to protect the Federal interests, it is our objective in these regulations to establish triggers that are more targeted and more consistently identify financially troubled institutions.

For example, under existing § 668.171(c)(1)(i)(B) and (c)(1)(ii) (2017), an institution is not financially responsible if the liabilities from pending lawsuits brought by State or Federal authorities, or generally by other parties, result in a recalculated composite score of less than 1.0, as provided under § 668.171(c)(2) (2017). To perform this calculation, we value the potential liability from a pending suit as the amount demanded by the suing party or the amount of all of the institution's tuition and fee revenue for the period at issue in the litigation. However, we recognize as a commonsense matter that some lawsuits may demand unrealistic amounts of money at the outset of the proceedings, yet may ultimately be resolved for significantly lower amounts or no liability. Because the amount of the potential liability from pending suits or borrower defense-related claims, however it is determined, is treated as if it were paid in recalculating an institution's composite score, the institution could be required unnecessarily to provide a letter of credit or other financial protection not **\*49865** only in the year the suit is brought, or that claims are made, but also for any subsequent years in which the suit or claims remain pending. This result places a significant burden on the institution for lawsuits that ultimately may not have a material adverse effect on its financial condition and viability.

Further, in the brief time since implementing the 2016 final regulations, the Department has encountered a significant administrative burden and difficulty in monitoring institutions' reports of pending litigation, determining whether such litigation meets the requirements of the 2016 final regulations, and valuing such suits, many of which have not led to a failure of financial responsibility due to a recalculated composite score of less than 1.0.

We reaffirm our position in the preamble to the 2016 final regulations that the Department has the authority to review lawsuits pending against an institution. However, in view of the burden on institutions and the difficulty of accurately valuing the potential liability of pending suits, in these regulations, we have instead determined that the mere existence of a lawsuit against an institution should not qualify as a triggering event and decline to include pending suits, whether brought by a Federal or State entity, or by another party, as automatic or mandatory triggers, as was the case in the 2016 final regulations.

Likewise, valuing the amount of pending borrower defense claims under existing § 668.171(g)(7) and (8) (2017), depends in part on factors such as whether the claims stem from similarly situated borrowers (e.g., claims arising for the same reasons), the timing of the valuation (e.g., the valuation may occur after a few claims are filed or the Department may look at a pool

of claims filed during a specified time period), and whether the Department re-values the remaining pending claims in a pool after it has adjudicated some of the claims.

As estimates, these valuations could create false-positive outcomes (i.e., inaccurately valuing borrower defense claims could result in an otherwise financially responsible institution inappropriately providing financial protection) and would impose a significant burden on the Department to monitor and analyze the potential impact of unanalyzed borrower defense claims. Similarly, outside groups could be encouraged to manipulate borrowers to file unjustified borrower defense claims, or could do so on behalf of borrowers, simply to create a financial trigger that will negatively impact the institution, even if the borrower defense claims are ultimately found to have no merit. As a result, we did not propose adopting either of the discretionary triggers related to pending or potential borrower defense claims in the 2018 NPRM and do not incorporate them into these final regulations.

In sum, valuing the liability accurately and objectively is critical in assessing, through the composite score calculation, whether lawsuits or claims have an adverse impact on the financial condition of an institution that justifies requiring the institution to secure a letter of credit or other financial protection. We believe that valuation is best done by using the actual amount of the liability incurred by the institution and would appropriately balance the Department's administrative burden in monitoring an institution's financial condition and safeguard the taxpayers' interest in the Federal student aid programs.

We also accordingly rescind the reporting requirements in the 2016 final regulations related to pending lawsuits. Instead, we require an institution to notify the Department no later than 10 days after it incurs a liability arising from a settlement, a final judgement arising from a judicial action, or a final determination arising from an administrative proceeding initiated by a Federal or State entity. We note that in the preamble to 2018 NPRM,[FN156] the Department proposed as triggering events a liability arising from (1) borrower defense to repayment discharges granted by the Secretary or (2) a final judgment or determination from an administrative or judicial action or proceeding initiated by a Federal or State entity. We clarify in these regulations that a judgment or determination becomes final when the institution does not appeal, or has exhausted its appeals, of that judgement or determination. In addition, we note that the Department initiates an administrative action whenever it seeks reimbursement for a liability arising from borrower defense to repayment discharges and that action results in a final determination. Consequently, we have incorporated the proposed borrower defense trigger as part of the general trigger for liabilities from final determinations under § 668.171(c)(1)(i)(A). Finally, in the 2016 Final Regulations, the trigger, in § 668.171(c)(1)(i), specifically identified liabilities incurred by an institution from settlements. Although settlements were not likewise identified in the 2018 NPRM, we intended to account for that outcome in proposed § 668.171(c)(1)(i)(B). To avoid confusion, we clarify in these regulations that settlements are part of that trigger.

In the 2018 NPRM, the Department proposed that a liability from a final judgment or determination arising from an administrative or judicial action or proceeding should constitute a mandatory trigger. The Department is revising § 668.171(c)(1)(i)(A) to more specifically describe the type of administrative or judicial action or proceeding that gives rise to the trigger. As previously noted, an administrative or judicial proceeding must be initiated by a Federal or State entity. With respect to an administrative action or proceeding initiated by a Federal or State entity, the Department further specifies that the determination must be made only after an institution had notice and an opportunity to submit its position before a hearing official because the institution should receive due process protections in any such administrative action or proceeding initiated by a Federal or State entity.

Changes: We are revising § 668.171(c)(1) to provide that liabilities incurred by an institution include those arising from a settlement, final judgment, or final determination from an administrative or judicial action or proceeding initiated by a Federal or State entity. In addition, we establish that a judgment or determination becomes final when the institution does not appeal or has exhausted its appeals of that judgment or determination.

*Section 668.171(d)(1), Accrediting Agency Actions*

Comments: Many commenters supported the proposed accrediting agency trigger in § 668.171(d)(1) of the 2018 NPRM and the Department's willingness to work with an institution and its accreditor to determine whether an event has or will have a material adverse effect on the institution. The commenters agreed that a show cause order that would lead to the withdrawal, revocation, or suspension of an institution's accreditation was an appropriate discretionary triggering event. Some commenters suggested that in addition to a show cause order, the trigger should apply to instances where an accrediting agency places an institution on probation or similar status. Other commenters believed that the accrediting agency trigger should be mandatory instead of discretionary.

Some commenters urged the Department to retain the accrediting agency trigger in current § 668.171(c)(1)(iii) where an institution **\*49866** is not financially responsible if it is required by its accrediting agency to submit a teach-out plan.

Discussion: We agree with commenters that the trigger should be revised to include the phrase "probation or similar status" as that action by an accrediting agency may have the same effect as a show cause order. Instead of presuming the action will have a materially adverse effect, as a discretionary trigger, we would first obtain information about why the accrediting agency issued the show cause order or placed the institution on a probationary status, and the time within which the agency requires or allows the institution to come into compliance with its standards. The Department would then determine whether the accrediting agency action will likely have an adverse effect on the institution's financial condition depending on the nature or severity of the violations that precipitated that action and the compliance timeframe.

Under the trigger in current § 668.171(c)(1)(iii), where an institution notifies the Department whenever its accrediting agency requires a teach-out plan for a reason described in § 602.24(c)(1) that could result in the institution closing or closing one or more of its locations, the Department recalculates the institution's composite score based on the loss of title IV funds received by students attending the closed location during its most recently completed fiscal year, and by reducing the expenses associated with providing programs to those students.

While the Department can determine the amount of the title IV funds received by students in those programs, and that amount could serve as a reasonable proxy for lost revenue, determining the reduction in expenses associated with not providing the programs is less certain.

Under current appendix C, the associated expense allowance is calculated by dividing the Cost of Goods Sold by the Operating Income and multiplying that result by the amount of title IV funds received by students at the affected location. However, the level of detail needed to accurately derive the expenses associated with providing a program, particularly at a location of the institution, is typically not contained or disclosed in an institution's audited financial statements. While the Cost of Goods Sold approximates those expenses at the parent level, it does not reflect all of them, and attempting to more accurately associate expenses at the location level would require additional, unaudited information from the institution.

As noted in the discussion for pending lawsuits and borrower defense claims, incorrectly valuing the amount used in recalculating the composite score may result in imposing unnecessary financial burdens on an institution that, in this case, could cause the institution to forgo providing or executing a teach-out.

Changes: We are revising § 668.171(d)(1)(iv) to include the phrase "probation order or similar action."

### *Section 668.171(c)(1)(i)(B), Withdrawal of Owner's Equity*

Comments: Commenters generally supported the mandatory trigger relating to the withdrawal of owner's equity.

One commenter believed that in recalculating the composite score for a withdrawal of owner's equity, the Department should, in addition to decreasing modified equity by the amount of the withdrawal, also adjust the equity ratio by decreasing total assets.

000204

Discussion: The purpose of this trigger, is to identify instances where the withdrawal or use of resources would likely cause an institution whose financial condition is already precarious (i.e., an institution with a composite of less than 1.5) to fail the composite score standard. For this purpose, total assets in the equity ratio would not be reduced by any transaction associated with capital distributions or related party receivables. For capital distributions, the initial accounting transaction recorded in the institution's financial records would increase liabilities and reduce equity. Consequently, there would be no reduction in assets for these transactions.

The 2016 final regulations were not clear on what the Department meant by withdrawal of owner's equity. Withdrawal of owner's equity includes distributions of capital and related party transactions for the purposes of this trigger. In these regulations, we distinguish between two types of capital distributions—the equivalent of wages in a sole proprietorship or partnership, and dividends or return of capital.

Under the 2018 NPRM, a sole proprietorship or partnership would be required to report every distribution of the equivalent of wages. However, in view of the comments relating to the need for, and burden associated with, reporting the occurrence of the triggering events, we establish in these regulations that, in accordance with procedures established by the Secretary, an affected institution must report no later than 10 days after it is informed that its composite score is below a 1.5, the total amount of wage equivalent distributions it made during the fiscal year associated with that composite score. As long as the institution does not make wage-equivalent distributions in excess of 150 percent of that amount during its current fiscal year and for six months into its subsequent fiscal year, we will not require the institution to report any of those distributions for that 18-month period.

However, if the institution makes wage-equivalent distributions in excess of 150 percent of the reported amount at any time during the 18-month period, the institution must report the amount of each of those distributions within 10 days, and the Department will recalculate the institution's composite score based on the cumulative amount of the actual distributions. Because a proprietary institution may submit its financial statement audits to the Department up to six months after the end of its fiscal year, the Department will not know the actual amount of wage-equivalent distributions the institution made during its most recently completed fiscal year until we receive those audits.

In addition, like other triggers, we account for the occurrence of events that are not yet reflected in an institution's financial statement audits. Therefore, the 18-month period consists of the 12 months in the institution's current fiscal year plus the six months of its subsequent fiscal year that transpire before the institution submits its financial statement audits. The Department believes this approach will reduce, or eliminate entirely, the burden that most institutions would have incurred under the 2018 NPRM, while at the same time providing the Department the means to assess the actions of those institutions that are most likely to fail the composite score standard because of this trigger.

With regard to distributions of dividends or return of capital, an institution must report the amount of any dividend once declared, and the amount of any return of capital once approved, no later than 10 days after the respective event occurs. The Department will use that amount to recalculate the institution's composite score.

While we recognize that related party receivables do not impact equity, per se, any increase in those receivables reduces the liquid assets available to an institution to meet its financial obligations.

Therefore, in keeping with the purpose of this trigger, except for transfers between entities in an affiliated group as provided under § 668.171(c), an institution must report  **49867**  any increases in the amount of related party receivables that occur during its fiscal year, regardless of whether those receivables are secured or unsecured. The Department will use the reported amount to recalculate the composite score.

Changes: We have revised § 668.171(c)(1)(i)(B) to include capital distributions that are the equivalent of wages in a sole proprietorship or partnership as an example of an event under the trigger. We also revised § 668.171(f)(1)(ii)(A) to provide that for distributions akin to wages, an affected institution must report the total amount of wage-equivalent distributions that it

made during its prior fiscal year and is not required to report any wage-equivalent distributions that it makes during its current fiscal year or the first six months of its subsequent fiscal year, if the total amount of those distributions does not exceed 150 percent of the amount reported by the institution. We have also changed the regulation to require that the institution report such wage-equivalent distributions, if applicable, no later than 10 days after the date the Secretary notifies the institution that its composite score is less than 1.5.

We have clarified in § 668.171(c)(1)(i)(B) that a dividend or a return of capital may be an event under the trigger. We similarly clarify in § 668.171(f)(1)(B), that a distribution of dividends, or a return of capital, must be reported no later than 10 days after the dividends are declared, or the return of capital is approved. In addition, we establish that an institution must report a related party receivable no later than 10 days after it occurs.

### *Section 668.171(c)(2)*, *SEC and Exchange Violations*

Comments: One commenter contended that the mandatory trigger with respect to the SEC does not provide a valid correlation with respect to an institution's ability to satisfy its financial obligations. The commenter noted that the correlation that ED identified in the 2018 NPRM is misplaced. This commenter asserted that the SEC may delist the stock of an institution as a result of concerns about governance that are not indicative of a publicly-traded institution's financial health. Similarly, the failure of an institution to file a report does not necessarily reflect that the institution is unable to meet its financial or administrative obligations as the report may have been filed late for reasons unrelated to the institution's financial condition or administrative obligations. For these reasons, the commenter encouraged the Secretary to avoid classifying the SEC and exchange actions as mandatory triggering events and proposed a different mandatory trigger.

Discussion: After careful consideration of the comments, we have decided to keep the mandatory triggers for publicly traded institutions.

The commenter raises a valid concern that the failure of an institution to file a report does not necessarily reflect that the institution is unable to meet its financial or administrative obligations, as the filing may have been filed late for reasons unrelated to the institution's financial condition. This is particularly true where a company files the late report within a relatively short time after the original or extended due date and is late only with respect to a single report. Filing late could also be due to unforeseen circumstances such as the individual required to sign the report is unavailable, an unpredictable circumstance with an institution's auditors, or the need to address a financial restatement done for technical reasons.

We do not adopt the commenter's suggestions regarding § 668.171(c)(B)(2)(i) and (c)(B)(2)(ii). The commenters are correct that a delisting does not necessarily mean that an institution has financial problems, but it could mean that it does. Even more concerning, delisting could be a prelude to bankruptcy. These actions are likely to impair an institution's ability to raise capital and that potential consequence calls into question the viability of the institution.

We also note that the SEC and stock exchange violations triggers existed in the 2016 final regulations, at § 668.171(e) (2017). Under those regulations, a warning by the SEC that it may suspend trading on the institution's stock would render the institution not financially responsible. By limiting, in these regulations, the trigger to SEC orders as opposed to warnings, the trigger is more specifically tailored to identify institutions with a high likelihood of financial difficulties. The exchange action component of the trigger in these regulations is similarly more tailored than the 2016 final regulations. Under the 2016 final regulations, an institution would not be financially responsible if the exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements or the institution's stock is delisted. Under these regulations, the Department will limit its determination that an institution is not financially responsible to those situations where the institution's stock has actually been delisted.

We note that the occurrence of a mandatory triggering event does not automatically precipitate financial protection, as alluded to by the commenter in requesting the trigger to be reclassified.

000206

As a mandatory trigger, the burden is on the institution to demonstrate, at the time it reports an SEC or exchange action, that the action does not or will not have an adverse material effect on its financial condition or ability to continue operations as a going concern, and a favorable demonstration would obviate the need for financial protection. We see no utility in reclassifying this trigger as discretionary because it is reasonable for the Department to rely on the expertise of the SEC or exchange about actions stemming from violations of their requirements that may have an immediate and severe impact on the institution—the responsibility is rightly on the institution to demonstrate the contrary to the Department.

Changes: None.

*Section 668.171(d)(4) and (6), 90/10 Revenue and Cohort Default Rate (CDR) Triggering Events*
Comments: Some commenters believe that the cohort default rate (CDR) and 90/10 triggers are unrelated to an institution's financial stability and should be removed. Other commenters urged the Department to classify both of these events as mandatory instead of discretionary triggers. Along the same lines, another commenter believed that the statutory requirements governing the loss of title IV eligibility stemming from a 90/10 or cohort default rate failure do not require or allow the Department to consider alternative remedies or mitigating circumstances. The commenter asserted that there was no reasonable basis on which the Department could determine that no risk exists when institutions fail the 90/10 or CDR triggers, and, therefore, it would be arbitrary for the Department to determine on a case-by-case basis which of the failing institutions that would be required to provide financial protection. To ensure that the Department upholds the statutory requirements for 90/10 and CDR, and financial responsibility in the event of closure, the commenter urged the Department to classify the failure of both events as mandatory triggers.

Discussion: We disagree that the triggers are unrelated to an institution's financial stability. As discussed previously under the heading "Triggering Events, General," if either of these triggering events occur, an **\*49868** institution may be one year away from losing all or most of its eligibility to participate in the title IV programs. That loss would likely have a significant adverse impact on the institution's financial condition or its ability to continue as a going concern, and either outcome may warrant financial protection.

The current regulations require an institution that fails 90/10 or whose cohort default rates are more than 30 percent for two consecutive years to provide a letter of credit or other financial protection to the Department. However, rather than presuming that financial protection is required, we believe it is more appropriate to reclassify these triggers as discretionary triggers to allow the Department to review the institution's efforts to remedy or mitigate the causes for its 90/10 or CDR failure or to assess the extent to which there were anomalous or mitigating circumstances precipitating these triggering events, before determining whether financial protection for the Department in the form of a LOC is warranted. Part of that review is evaluating the institution's response to the triggering event to determine whether a subsequent failure is likely to occur, based on actions the institution is taking to mitigate its dependence on title IV funds, the extent to which a loss of title IV funds (from either 90/10 or CDR failure) will affect its financial condition or ability to continue as a going concern, or whether the institution has challenged or appealed one or more of its default rates.

Contrary to the assertion made by the commenter, this case-by-case review forms the basis needed for the Department to proceed under these regulations with issuing a determination regarding whether the institution is financially responsible. We wish to clarify that the Department's review or consideration of circumstances relating to whether a 90/10 or CDR failure affects an institution's financial responsibility has no bearing on how the statutory requirements are applied or the consequences of those requirements.

Changes: None.

*Section 668.171(d)(2), Violations of Loan Agreements*

000207

Comments: Some commenters were concerned with the amount of discretion the Department has in situations where a creditor has affirmatively determined that a loan or credit is not at risk and suggested that the Department qualify the trigger so it does not apply in cases where the violation is waived by the creditor. Other commenters argued that an institution should have ample time to remedy a situation with a creditor before reporting it to the Department. On the other hand, some commenters questioned why this was a discretionary trigger or a trigger at all, noting the requirement that an institution be current in its debt payments currently serves as a baseline standard for determining whether an institution is financially responsible and the Department did not provide any evidence, analysis, or examples of existing loan violations that would not constitute a threat to the overall financial health of an institution.

Discussion: A violation of a loan agreement is a discretionary trigger under the existing regulations, and we continue to believe that this trigger will assist the Department in fulfilling its objective of identifying and acting on signs of financial distress. With regard to the comments on whether the Department should exempt the reporting of a loan violation in cases where the creditor waives the violation or provide some time for an institution to remedy a loan violation before it reports the violation, we believe that all violations are potentially significant and must be reported, regardless of whether they are waived or remedied. In cases where the creditor waives a violation without imposing new requirements or restrictions, the institution simply reports that outcome. Although we decline to define the waiver as a cure for the violation, we typically would accept the waiver if it was obtained promptly by the institution during the then-current fiscal year. Institutions that violate a debt provision without obtaining a waiver are also at risk that the total debt may be called by the creditor. We are concerned about allowing time for an institution to remedy a loan violation because that defeats or lessens the utility of allowing the Department to act contemporaneously in response to potentially significant issues.

With respect to the comment that instead of establishing a discretionary trigger, the Department should retain as a "baseline standard" the requirement that an institution is current in its debt payments, we note that the trigger for loan violations is currently discretionary and the proposed provisions for this trigger are the same as they are in the current regulations under 668.171(g) (6). The baseline standard the commenters refer to was part of regulations that were in effect before the 2016 final regulations.

Nevertheless, the commenters incorrectly presumed that the "baseline standard" is somehow more robust or better than the trigger on loan violations. To the contrary, under the "baseline" the Department would not be aware that an institution violated a loan agreement unless: (1) It was identified in a footnote to the institution's audited financial statements, which are submitted to the Department six to nine months after the institution's fiscal year; or (2) the institution failed to make a payment under a loan obligation for 120 days and the creditor filed suit to recover its funds. As a discretionary trigger, the Department will be aware of a loan violation within 10 days of when the creditor notifies the institution, regardless of whether the creditor filed suit, and can assess contemporaneously the consequences of that violation.

Changes: None.

### *Section 668.171(d)(3), State Licensing or Authorization*

Comments: Some commenters argued that the current State licensing or authorization trigger under § 668.171(g)(2) (2017) is too broad because it requires an institution to report any violation of State requirements and concluded that it could have the unintended consequence of requiring an institution to close precipitously. The commenters believed that the proposed trigger takes a more precise approach by requiring an institution to report only those violations that could lead to the institution losing its licensing or authorization.

On the other hand, a few commenters believed it was critical for the Department to get information on all State actions and review those actions on a case-by-case basis to determine whether financial protection should be required.

Other commenters suggested revising the trigger to state that "the institution is notified by a State licensing or authorization agency that its license or authorization to operate has been or is likely to be withdrawn or terminated for failing to meet one of the agency's requirements." The commenters note that State authorizing entities often include boilerplate language in notices of

noncompliance that indicates that if the noncompliance is not remedied, authorization can be lost. The commenters believed that under proposed language, a notice that included a single instance of immaterial noncompliance would still have to be reported if the State included that boilerplate language.

Other commenters asserted that the Department should define "state licensing or authorizing agency" to only **\*49869** refer to the primary State agency responsible for State authorization, not specialized State agencies, such as boards of nursing.

Discussion: Under the 2016 final regulations, at § 668.171(g)(2), the Department requires institutions to report any citation by a State licensing or authorizing agency for failing State or agency requirements. As we stated in the 2018 NPRM, we believe that a more targeted approach is appropriate for these regulations to better identify State or agency actions that are likely to have an adverse financial impact on institutions and to reduce reporting burden on institutions and burden on the Department in reviewing citations. We see little benefit in requiring an institution to report, and for the Department to review, violations of State or agency requirements that have no bearing on the institution's ability to operate and offer programs in the State. Doing so may provide some insight for program review risk assessments, but would not have a material adverse effect on an institution's ability to operate. A notice from the State contemplating the termination of an institution's authorization or licensure, which could result in the institution closing or discontinuing programs, satisfies that purpose without imposing unnecessary burdens on the institution or the Department.

While we appreciate the commenters' language suggestions, the Department must be able to react to any State licensing or authorizing agency actions that are required to be reported, regardless of whether those actions are qualified or prefaced by boilerplate language. If the Department allows an institution to determine that a termination notice from the State licensing or authorizing agency stems from immaterial noncompliance, as suggested by the commenter, there is a potential that significant actions might not be reported if they were misunderstood or mischaracterized by the institution as being immaterial. In cases where an institution believes that the State or agency action is not material, it may provide an explanation to that effect when it reports that action to the Department.

With regard to the suggestion that the Department define the term "State licensing or authorizing agency" to be the only cognizant entity, we believe that narrowing the meaning of the term to exclude other State agencies, such as boards of nursing, would inappropriately weaken the effectiveness of trigger, particularly in cases where programs are licensed by those other agencies or boards.

Changes: None.

### Reporting Requirements, § 668.161(f)

Comments: Many commenters appreciated that the Department proposed to allow institutions to provide an explanation or information pertaining to a triggering event at the time that event is reported and then again in response to a determination made by the Department.

Some commenters suggested that an institution should be allowed 30 days, instead of 10 days, to report a triggering event. These commenters argued that various offices within an institution might be involved and have contemporaneous knowledge of a triggering event, but individuals dealing with an unrelated agency action, such as renegotiated debt, are unlikely to be cognizant of the Department's reporting deadline.

Discussion: The Department will not adopt the commenters' proposal. First, we note that under the existing regulations, institutions also have a 10-day reporting window from the date of each of the triggering events, except for the 90/10 trigger (which is also the case in these regulations). As a result, we believe that institutions will have appropriate processes and procedures in place by the time these regulations are effective to allow for timely reporting.

Second, there are a limited number of triggering events, not all of which apply to every institution, and institutions should delegate authority to one or more individuals to identify triggering events and ensure that reporting deadlines are met. The 10-day reporting deadline is needed to alert the Department timely of triggering events that may have serious consequences for institutions, students, and taxpayers, and for the Department to take timely action to mitigate the impact of those consequences.

Third, if, as the commenter asserts, the individuals in various campus offices that are responsible for actions related to a triggering event would not be aware of the reporting deadline, the institution has an obligation to make sure that its staff understand triggering events and the reporting deadlines associated with those triggers.

Changes: None.


### Section 668.172, Financial Ratios

#### Procedural Concerns Regarding the Financial Responsibility Subcommittee

Comments: A commenter noted that the formation of the Financial Responsibility Subcommittee, which consisted of negotiators and individuals selected by the Department who were not negotiators, departed from typical practice where the negotiators initiate the formation of a subcommittee comprised of negotiators during the negotiations. The commenter contended that because subcommittee members were not seated on the full committee and the subcommittee meetings were not open to the public, there was not a fulsome discussion of the issues by the full committee.

The commenter asserted that the Department seemed to have acknowledged that the closed-door sessions were inappropriate by announcing that the sessions for two future subcommittees would be livestreamed. In addition, the commenter was concerned that the Department seated an individual with pecuniary interests in financial responsibility as both a negotiator and a subcommittee member but did not acknowledge that the individual was from an institution that had an active issue with the Department on subcommittee matters. The commenter asserted that because the individual's institution would receive favorable treatment under the proposed regulations, this apparent conflict of interest should have been avoided, or clearly identified prior to start of the rulemaking. In short, the commenter argued that the Department did not follow the appropriate procedures under the APA, and other requirements, in promulgating the proposed changes to the composite score, and that the Department should withdraw those changes.

Discussion: Neither the APA nor the HEA stipulates the precise procedures the Department must use when conducting negotiated rulemaking, and the Department has the discretion to use different procedures to fit the contours of different negotiated rulemakings. Thus, the fact that the Department's approach to establishing the subcommittee differed from past practice is not indicative of impropriety or insufficiency.

In this case, the Department knew prior to commencement of negotiations that, in order to facilitate full public participation on applicable financial accounting and reporting standards promulgated by the Financial Accounting Standards Board, subcommittee members with specific expertise in these matters would be needed. For this reason, in the Federal Register notice of intent to establish negotiated rulemaking committees, we specifically sought the participation of individuals with certain knowledge. As in the past, following its meetings, the subcommittee presented its recommendations to the main **\*49870** negotiated rulemaking committee for a final vote. The evolution of the Department's practices in subsequent negotiated rulemakings reflects its efforts to best provide for negotiation of the complex issues at hand, but does not reduce, or call into question, the legal sufficiency of past practices.

Generally, every institution with a representative has an interest in the outcomes of regulations that govern their participation in the Federal student aid programs. For the representative that participated on the subcommittee, the institution met the financial responsibility requirements for prior years by providing a letter of credit while raising, along with other institutions, an objection as to the Department's calculation of its composite score. There was no unresolved issue concerning this institution's compliance

with existing Department requirements related to the calculation of its composite score, and no conflict of interest with respect to the participation by that institution's representative both on the committee and in the subcommittee.

Changes: None.

**Section 668.91, Initial and Final Decisions**
Comments: None.

Discussion: As discussed in the 2018 NPRM, the Department's proposed regulations would update the regulations to reflect the language in proposed 668.175 and generally represent technical changes to the 2016 final regulations to track the actions and events in proposed § 668.171. In addition, after further review, we have determined that an insurer would likely be unable or unwilling to provide a statement that an institution is covered for the full or partial amount of a liability arising from a triggering event in § 668.171, as required under the 2016 Final Regulations and the 2018 NPRM. Therefore, we are revising § 668.91(a)(3) (iii)(A) to provide that an institution may demonstrate that it has insurance that will cover the risk posed by the triggering event by presenting the Department with a copy of the insurance policy that makes clear the institution's coverage. Finally, we clarify that an institution may demonstrate for a mandatory or discretionary triggering event that the amount of the letter of credit or other financial protection demanded by the Department is not warranted for a reason described in § 668.91(a)(3)(iii)(A).

Changes: We are revising § 668.91(a)(3)(iii)(A) to clarify that it applies to mandatory and discretionary triggering events and provide than an institution may provide a copy of its insurance policy demonstrating that it has insurance to cover or partially cover the trigger-associated risk.

**Section 668.172(c), Excluded Items, Termination of the Perkins Loan Program**
Comments: Commenters noted that, as result of terminating the Perkins Loan Program, some institutions may elect to liquidate their portfolios and assign all loans to the Department for servicing. The commenters believed that a liquidation decision can result in a one-time loss that a non-profit institution will likely display separately or as a non-operating loss on its financial statements ("Statement of Activities").

Although the commenters asked the Department to clarify how it will treat Perkins Loan Program liquidation losses, they argued than an institution should not be penalized for the dissolution of the Perkins Loan Program and, thus, recommended that the Department consider non-operating losses related to a Perkins liquidation to be infrequent and unusual in nature and, therefore, excluded from the calculation of the composite score.

Discussion: The liquidation of the Perkins Loan portfolio would normally not result in a loss to an institution. Generally, a loss would only occur if the institution had to purchase loans that were not acceptable for assignment. The Department does not believe that the administration of title IV, HEA programs should be excluded from the composite score computation. The liquidation of the Perkins Loan portfolio would result in removal of the receivables by assignment to the Department. The cash would be returned to the Department or be released from restriction, which would not result in a loss, and only loans that are not acceptable for assignment would result in any loss to the institution, because it would be required to purchase the loans and those losses should be reflected in the composite score.

Changes: None.

**Section 668.172(d), Leases**
Comments: Many commenters supported the proposal that the Department could calculate a composite score for an institution under the new requirements issued by the Financial Accounting Standards Board (FASB ASU 2016-02, ASC 842 (Leases)), and

at the institution's request, a second composite score that excludes the lease liabilities and right to use assets that the institution is otherwise required to report under these new requirements.

Although many commenters appreciated the Department's recognition of the complexity and impact of the FASB changes, they encouraged the Department to guarantee that it would calculate the two composite scores for a minimum of six years, without regard to whether the methodology is updated through rulemaking, to provide stability and ensure that institutions have time to adjust operations.

Other commenters urged the Department to simply calculate the two composite scores until the methodology is updated.

Some commenters argued that since the Department did not propose any consequences for an institution that fails one of the two composite scores and offered no justification for permitting all operating leases to be excluded, even those entered into after the rule takes effect, the Department should eliminate, or at least shorten, the transition period and align the FASB implementation timeline to the effective date of the regulations. However, during any transition period the Department may offer, the commenters urged the Department to hold accountable any institution that fails either of the two composite scores. Specifically, any institution with a failing composite score under the new FASB requirements should be placed on heightened cash monitoring, be required to provide timely financial reporting, and/or be required to provide financial protection.

Commenters also wrote that the Department should eliminate, or at least shorten, the transition period and align the FASB implementation timeline to the effective date of the regulations. However, during any transition period offered, the commenters urged the Department to hold any institution accountable that fails either of the two composite scores by placing the institution on heightened cash monitoring, requiring timely financial reporting, and/or compelling financial protection.

Other commenters noted that the proposed transition for leases differed from the Subcommittee recommendation that the six-year transition applied only to operating leases in effect during the initial reporting period following the effective date of these regulations. The commenters stated that since 2010, all institutions should have known FASB was preparing to change the lease standards.

Another commenter objected to the transition period for leases arguing that the Department had provided no data to **\*49871** support this approach or rationale for why a six-year period was appropriate.

Discussion: In view of the comments regarding the length, or application, of the transition period, the use of two composite scores, and the need to align the FASB implementation timeline to these regulations, we conclude that it is reasonable for the Department to calculate one composite score for an institution by grandfathering in leases entered into prior to December 15, 2018 (pre-implementation leases) and applying Accounting Standards Update (ASU) 2016-02, Accounting Standards Codification (ASC) 842 (Leases) to any leases entered into on or after that date (post-implementation leases).

The Department will grandfather in leases if the institution provides adequate information to the Department in the Supplemental Schedule and a note in, or on the face of, the audited financial statements on the leases it entered into prior to December 15, 2018 and will treat those leases as they have been treated prior to the requirements of ASU 2016-02. That is, the amount of any right of use asset and associated liability will be removed from the balance sheet or statement of financial position. Because the value of leases entered into prior to December 15, 2018, can only decrease, any increase in the value of leases will be considered a new lease and ASU 2016-02 requirements will apply to those leases. Any leases entered into on or after December 15, 2018, will be treated as required under ASU 2016-02.

In establishing this approach, the Department considered three factors: That FASB changes an accounting standard when it recognizes that the standard is obsolete or no longer addresses the economic reality that it seeks to address; that an institution made business decisions prior to the requirements of ASU 2016-02; and that changes to the standards for leases could have a

detrimental impact on an institution's composite score even in cases where the underlying financial condition of the institution may not have changed.

The Department believes that calculating the composite score by grandfathering in existing leases and applying the FASB standards to new leases strikes an appropriate balance between these factors.

While the subcommittee specified a transition period during which the Department would allow leases in existence as of the effective date of the regulations to be treated the way leases were treated prior to the requirements of ASU 2016-02, doing so would mitigate but not eliminate the impact on all institutions for business decisions they made prior to the requirements of ASU 2016-02. In addition, the Department could not identify an empirical basis to support a six-year timeframe, as opposed to a different timeframe, and therefore could not include the six-year period in this final rule.

Rather than a time-limited transition period, the Department believes it is reasonable to grandfather in existing leases by establishing in these regulations that leases entered into prior to December 15, 2018 are treated as they would have been treated prior to ASU 2016-02 until the balance of those leases is zero. Because an institution is required to value the right-of-use assets and associated liabilities based on whether it will exercise options and other lease clauses in existence as of the effective date of ASU 2016-02, any leases entered into prior to December 15, 2018, and treated as they would have been prior to ASU 2016-02 for the composite score, cannot increase and would only decrease over time to zero.

The Department establishes December 15, 2018, as the effective date for new leases because that is the first effective date of ASU 2016-02 for public entities for fiscal years beginning after December 15, 2018. The Department recognizes that not all institutions will be required to implement ASU 2016-02 for fiscal years beginning after December 15, 2018, but in an effort to treat all institutions fairly, the Department will apply the first required implementation date to all institutions.

Changes: We are revising 668.172(d) to provide that the Secretary accounts for operating leases by applying the new FASB standards to all leases the institution has entered into on or after December 15, 2018 (post-implementation leases), as specified in the Supplemental Schedule, and treating leases the institution entered into prior to December 15, 2018 (pre-implementation leases), as they would have been treated prior to the new FASB requirements. An institution must provide information about all leases on the Supplemental Schedule, and in a note, or on the face of its audited financial statements. In addition, any adjustments, such as any options exercised by the institution to extend the life of a pre-implementation lease, are accounted for as post-implementation leases.

### Section 668.172, Appendix A and B

**Format**

Comments: Some commenters found the Appendices confusing and difficult to read, suggesting that a consistently formatted layout with proper labeling is needed to improve usability. In addition, the commenters noted that in Section 3 of Appendix B, the Department mistakenly labeled some of the components of the ratios and their corresponding line numbers and in Appendix B, Section 1, and that the value of property, plant, and equipment (PP&E) is net of depreciation, not appreciation.

A few commenters suggested that the formula for expendable net assets begin with "total net assets" instead of the proposed construction of "net assets without donor restrictions + net assets with donor restrictions" to alleviate the potential misinterpretation about the sub-groupings of "net assets with donor restrictions."

Discussion: We appreciate the comments that identified errors in the Appendices, and we will correct those errors. With regard to using "Total net assets" as opposed to "Net assets with donor restrictions plus Net assets without donor restrictions" to arrive at Expendable net assets, the commenters did not explain how any misinterpretations could occur. Because Net assets with donor restrictions and Net assets without donor restrictions are taken directly from the face of the Statement of Financial Position, it is unclear to us how these numbers can be misinterpreted.

Changes: Appendix A and B are revised to correct the labels and line numbers noted by the commenters, and to otherwise improve usability and clarity.

**Long-Term Debt**

Comments: Some commenters disagreed with the proposal that if an institution wishes to include debt obtained for long-term purposes in total debt, the institution must disclose in its financial statements that the debt, including long-term lines of credit, exceeds twelve months and was used to fund capitalized assets. Under that proposal, the debt disclosure must include the issue date, term, nature of capitalized amounts, and amounts capitalized. Otherwise, the Department would exclude from debt obtained for long-term purposes the amount of any other debt, including long-term lines of credit used to fund operations, in calculating the numerator of the Primary Reserve Ratio.

One commenter believed that a corresponding change needs to be made to Total Assets that would allow any cash balances, or assets related to the excluded borrowing, to also be excluded. The commenter argued that without this change, the composite **\*49872** score would be unbalanced and would unfairly penalize an institution that utilizes debt to finance capital improvements, ongoing operations, and growth opportunities.

Discussion: The Department believes that a long-term debt disclosure is needed because it provides the information necessary to ensure that the primary reserve ratio is calculated accurately for all institutions and helps to identify and guard against those institutions that attempt to manipulate their composite scores. Long-term debt up to the value of Property, Plant and Equipment (PP&E) is treated favorably in the composite score calculation because that debt is intended to reflect investments by an institution in those items.

The Department disagrees that any adjustment to total assets needs to be made, as total assets are not an element of the primary reserve ratio. The issue of debt obtained for long-term purposes is central only to the primary reserve ratio and for determining the appropriate amount of debt obtained for long-term purposes that is related and limited to PP&E under that ratio. The Department is establishing how to determine the correct amount of debt obtained for long-term purposes for calculating the primary reserve ratio.

Changes: None.

Comments: Some commenters stated that the proposed treatment of long-term debt in the 2018 NPRM was not discussed, or discussed thoroughly enough, by the Subcommittee or the main negotiating Committee and should be withdrawn.

Other commenters noted that the discussions with the Subcommittee centered on closing a loophole on the use of long-term lines of credit that some institutions manipulated to increase their composite scores. To this end, the Subcommittee recommended that long-term lines of credit may be used to calculate adjusted equity or expendable net assets if the lines of credit are identified separately in the Supplemental Schedule with accompanying information specifying the issue date, term, nature of capitalized amounts, and amounts capitalized.

The commenters argued that instead of adopting the Subcommittee's recommendation, the Department's proposal fundamentally changes the definition of all debt obtained for long-term purposes, effectively repealing the guidance provided in Dear Colleague Letter (DCL) GEN-03-08.

Some commenters suggested that the Department phase-in or create a transition period before requiring institutions to link long-term debt to the acquisition of PP&E. The commenters noted that some institutions have large investments in old and newly constructed buildings and hold long-term debt that directly or indirectly relates to brick and mortar. These commenters asserted that it can be challenging for institutions to show a direct relationship between issues of debt within all debt obtained for long-term purposes and capitalized asset acquisitions. The commenters identified a variety of factors that make this difficult,

including institutional longevity, contributions that support PP&E payment and payout timing, variability in build, renovation, and maintenance schedules as well as debt consolidations, restructurings, and refinancing over decades.

Discussion: The discussions in the subcommittee centered around the abuse of long-term lines of credit and manipulation of the composite score in general. Based on those discussions and in developing these regulations, the Department determined that long-term notes payable should not be treated differently from long-term lines of credit.

Both can be used for the purpose of purchasing PP&E, including construction-in-progress (CIP), both can be used to fund investments or operations, and both can be used to manipulate the composite score if the purpose and use of the debt is not known. The Department's goal, as discussed in the Subcommittee meetings, is to limit or eliminate instances where institutions report long-term debt to manipulate their composite scores, and to include long-term debt related to PP&E and construction in progress (CIP) to compute an accurate composite score. The Department sees no reason to have different requirements for different types of debt. We believe the best approach is for all debt to be treated the same, except for short-term debt obtained for CIP which can be considered debt obtained for long-term purposes up to the amount of the CIP.

These regulations effectively repeal DCL GEN-03-08. Typically, no amount of PP&E would be included in a primary reserve ratio. However, at the time the financial responsibility regulations were originally developed, the community expressed concerns that institutions would be discouraged from investing in PP&E. To mitigate that concern, the Department provided in the regulations that long-term debt up to the amount of PP&E an institution reported would be added to the numerator of the primary reserve ratio, effectively crediting the institution for the long-term debt associated with a portion of the PP&E that had properly been subtracted from the numerator of the primary reserve ratio.

Over time, there has been significant manipulation of the composite score in reliance on DCL GEN-03-08, where the reported long-term debt was not associated with investments into an institution's PP&E and CIP. We believe that reverting back to the original intent of adding debt obtained for long-term purposes to the numerator of the primary reserve ratio is the proper approach because it results in a more accurate portrayal of an institution's financial health.

The Department agrees with the commenters that some type of phase-in or transition is appropriate to account for institutions that do not have the records to, or otherwise cannot, associate debt to PP&E acquired in the past under the guidance provided in DCL GEN-03-08.

In these regulations, we revise the calculation of the primary reserve ratio with regard to the amount of long-term debt that is included in debt obtained for long-term purposes and used as an offset to PP&E, including CIP and right-of-use assets. Specifically, we will consider the PP&E that an institution had prior to the effective date of these regulations (pre-implementation) and the additional PP&E it has acquired after that date (post-implementation). For this discussion, qualified debt refers to any post-implementation debt obtained for long-term purposes that is directly associated with PP&E acquired with that debt. Any debt obtained for long-term purposes post-implementation must be qualified debt.

Since institutions were not required under DCL GEN-03-08 to associate debt obtained for long-term purposes with capitalized assets and may not have the accounting records pre-implementation to associate debt with specific PP&E, in determining the amount of pre-implementation PP&E that is included in the primary reserve ratio, the Department will use the lesser of (1) the PP&E minus depreciation/amortization or other reductions, or (2) the qualified debt obtained for long-term purposes minus any payments or other reductions, as the amount of debt obtained for long-term purposes.

The basis for the pre-implementation PP&E and qualified debt will be the amounts reported in the institution's most recently accepted financial statement submitted to the Department prior to the effective date of these regulations. An institution must adjust the amount of pre-implementation debt by any payments or other reductions  *49873  and must also adjust the pre-implementation PP&E by any depreciation/amortization or other reductions in subsequent years.

Post-implementation debt is the amount of debt that an institution used to obtain PP&E since the end of the fiscal year of its most recently accepted financial statement submission to the Department prior to the effective date of these regulations less any payments or other reductions. An institution must adjust post-implementation debt by any debt obtained and associated with PP&E in subsequent years by any payments or other reductions. Similarly, the institution must also adjust post-implementation PP&E by any PP&E obtained in subsequent years and any depreciation/amortization or other reductions in subsequent years. Any refinancing or renegotiated debt cannot increase the amount of debt associated with previously purchased PP&E. No pre-implementation debt required to be disclosed can increase. For each debt to be considered for the composite score, the individual debts must be disclosed as described below.

The Department is revising the reporting on long-term debt to require that an institution must, in a note to its financial statements, clearly identify for each debt to be considered in the composite score for pre- and post-implementation long-term debt and PP&E net of depreciation or amortization and the amount of CIP and the related debt.

An institution must also disclose in a note to its financial statements, for each pre- and post-implementation debt, the terms of its notes and lines of credit that include the beginning balance, actual payments and repayment schedules, ending balance, and any other changes in its debt including lines of credit.

Changes: We are revising the definition of debt obtained for long-term purposes in Section 1 of Appendices A and B to reflect the amount of pre- and post-implementation long-term debt that can be included in the primary reserve ratio. The definition also provides that any amount of pre- and post-implementation debt obtained for long-term purposes that an institution wishes to be considered for the primary reserve ratio must be clearly presented or disclosed in the financial statements. We have also modified Section 3 of appendices A and B to show how the definition of qualified debt obtained for long-term purposes will be presented or disclosed by institutions.

Comments: Some commenters believed that access to a long-term line of credit reflects an institution's ability to access credit in the open market and argued that the institution should not be penalized for having access to credit unless it needs to post collateral to gain access to this credit. In addition, the commenters believed that long-term debt should be specifically tied to PP&E acquisitions in order to be added back in the computation of adjusted equity.

While long-term debt can be used specifically for PP&E acquisitions, the commenters noted that some institutions use cash to pay for PP&E acquisitions and decide later to obtain long-term debt in a future year using the assets purchased as collateral. The commenters asked whether this practice creates a disconnect if the assets are not acquired in the same year as the occurrence of the debt. In addition, if the long-term debt is secured by PP&E, the commenters questioned why it matters if the debt was specifically for the purchase of those assets. These commenters, and others, believed that the proposed changes relating to long-term debt should be removed and discussed as part of a broader negotiated rulemaking for the composite score.

Another commenter stated that the primary reserve ratio is intended to measure liquidity and argued that the acquisition of long-term debt that is immediately accessible (like a line of credit) is conclusive evidence of liquidity up to the amount of line. Therefore, the commenter reasoned that it does not matter whether the institution uses the funds from that line of credit for property, plant and equipment or anything else. The commenter posited that an institution should not have to draw down on the line of credit to get the benefit afforded long-term debt in the primary reserve ratio. As support for this position, the commenter cited a study.[FN157]

Discussion: The Department disagrees that an institution would be penalized for having access to credit. The question before the Department was the appropriate amount to use in the composite score calculation for debt obtained for long-term purposes. To the extent that the proceeds from a long-term line of credit were used to purchase PP&E and the amount used is still outstanding at the end of the institution's fiscal year, that amount is included in determining the amount of debt obtained for long-term purposes. Where PP&E is used as collateral for obtaining debt, that debt would not count as debt obtained for long-term purposes unless it is used to purchase other PP&E.

With regard to using cash to purchase PP&E, for the purposes of debt obtained for long-term purposes used in the primary reserve ratio, there is no long-term debt associated with those assets. When an institution later uses the PP&E as collateral, there is still no long-term debt associated with the purchase of those assets. Additionally, none of the debt obtained would count toward the primary reserve ratio unless the proceeds from the borrowing were used to purchase PP&E.

There is a difference in long-term debt being used to purchase PP&E and PP&E being used to secure long-term debt. For example, a long-term line of credit may be used to purchase furniture. There is no security interest by the creditor in the furniture, but the long-term line of credit was used to purchase PP&E and the amounts from the line of credit used to purchase the furniture that are still outstanding at the end of the institution's fiscal year would be considered debt obtained for long-term purposes. Conversely, an institution secures a loan using a building as collateral for the loan and then uses the proceeds to pay salaries and taxes. In this case, there is no debt obtained for long-term purposes because the proceeds of the loan were not used for the purchase of PP&E, a long-term purpose.

The Department does not agree that the issues surrounding long-term debt need to be part of a broader negotiated rulemaking for the composite score because the approach established in these regulations does not penalize institutions for decisions made prior to this regulation. We are grandfathering in existing long-term debt as reported under DCL GEN-03-08 and requiring only that new long-term debt must be associated with and used for PP&E.

The study cited by the commenter specifically states, "Credit lines have a predetermined maturity. This implies that any drawn amount has to be repaid before the credit line matures, thus limiting the use of lines of credit for example for long term investments." The authors also state that lines of credit "are normally issued with a stated purpose which restricts their possible uses." The primary reserve ratio, as a measure of liquidity, would normally not include any PP&E and no amount of debt obtained for long-term purposes would normally be added back to the numerator in determining Adjusted Equity or Expendable Net Assets. The original recommendation from the KPMG study which formed the basis for the Department's current financial *49874 responsibility regulations excluded net PP&E from the Primary Reserve Ratio and had no provision for adding back debt obtained for long-term purposes. Regarding net PP&E and the Primary Reserve Ratio the KPMG study provided the following: "The logic for excluding net investment in plant (net of accumulated depreciation) is twofold. First, plant assets are sunk costs to be used in future years by an institution to fulfill its mission. Plant assets will not normally be sold to produce cash since they will presumably be needed to support ongoing programs. In some instances, there is a lack of ready market to turn the assets into cash, even if they are not needed for operations. Second, excluding net plant assets is necessary to obtain a reasonable measure of liquid equity available to the institution on relatively short notice."

***(Methodology for Regulatory Test of Financial Responsibility Using Financial Ratios—December 1997)***
In response to comments from the community that this treatment would influence institutions not to invest in PP&E, the Department provided that to the extent debt obtained for long-term purposes was used for PP&E, the Department would add such amounts back to Adjusted Equity or Expendable Net Assets up to the total amount of PP&E to encourage institutions to reinvest in themselves. To the extent that a long-term line of credit is allowed to be used for, and is used, for the purchase of PP&E, although there are limits to the use of lines of credit for long-term investments, that amount will be added back to Adjusted Equity or Expendable Net Assets as provided for in the regulations.

While a line of credit does provide resources for an institution to use to meet its needs prior to being drawn on, it is not reflected in the institution's financial statements. When a line of credit is drawn on, it is reflected as a liability in the financial statements. At the point that a line of credit is drawn on, that amount becomes a drain on other liquid resources of the institution. The mere existence of a line of credit is not proof of liquidity. If the line of credit is exhausted, there is no liquidity associated with that line of credit. An option for the Department given the manipulation of the Composite Score through the use of debt obtained for long-term purposes would have been to return to the original KPMG methodology and the way Primary Reserve Ratios are normally calculated in the financial community by excluding Net PP&E from Adjusted Equity or Expendable Net Assets and not adding back any debt obtained for long-term purposes associated with the Net PP&E. The Department wants to encourage

institutions to reinvest in themselves, but also wants to curb manipulation of the composite score. The Department believes that its approach to debt obtained for long-term purposes accomplishes both goals.

Changes: None.

Comments: A few commenters believed the Department should consider any long-term debt obtained by an institution for the primary reserve ratio.

Discussion: The Department does not agree with the commenter's proposal. As discussed more thoroughly in the preamble to the NPRM, the Department's Office of Inspector General and the Government Accountability Office have both identified the use of long-term debt as one of the primary means of manipulating the composite score and these regulations are intended to reduce or eliminate that manipulation.

Changes: None.


*Appendix A and B, Related Parties*
Comments: For non-profit institutions, some commenters suggested that related party contributions receivables from board members should be included in secured related party receivables if there is no "business relationship" with board members.

Discussion: The commenters are asking the Department to change the regulatory requirements for related party transactions under 34 CFR 668.23(d). The requirements under those regulations were not included in the notice announcing the formation of the Subcommittee and, thus, are beyond the scope of these regulations.

Changes: None.


*Appendix A and B, Construction in Progress*
Comments: One commenter disagreed that CIP should be included as PP&E in the computation of adjusted equity unless the corresponding debt associated with the CIP is also included. The commenter argued that if the corresponding debt is not included, this could create a significant issue if the construction loan is deemed to be a short-term line of credit. While the construction loan is specifically for the building project, the commenter believed that a short-term line of credit would be excluded as debt in the primary reserve ratio since it is not considered to be long-term, and only when the construction loan is termed-out as permanent long-term financing upon the project's completion would the debt be included in the primary reserve ratio. The commenter argued that this disconnect could cause a composite score issue for an institution that has a significant multi-year building project. In addition, the commenter stated the CIP is not placed in-service until the project is completed and, therefore, not usable by the institution.

For these reasons, the commenter recommended that the composite score continue to exclude construction-in-progress assets until they are completed and placed in service as PP&E.

Discussion: To the extent that an institution is using short-term financing for CIP and clearly shows in the notes to the financial statements the amount of short-term financing that is directly related to CIP, it would be appropriate to include that amount as debt obtained for long-term purposes because the Department considers construction projects to serve a long-term purpose for the institution. The Department agrees that CIP has not been placed in service. However, CIP is not an expendable asset and most closely resembles PP&E; therefore, the Department is including it and its associated debt in the primary reserve ratio.

Changes: We are revising the Appendices to reflect that short-term financing for CIP will be considered debt obtained for long-term purposes up to the value of CIP and only to the extent that the short-term financing is directly related to the CIP.

**Appendix A and B, Net Pension Liability**

Comments: One commenter noted that the primary reserve ratio treats the net pension liability as short-term, which reduces the net assets available for short-term obligations. As a result, the commenter argues that her specific institution cannot achieve a composite score higher than a 1.4, which over time triggers the requirement that the institution provide a letter of credit to the Department. The commenter urged the Department to eliminate the net pension liability from the calculation of the primary reserve ratio and treat it instead as a long-term liability.

Discussion: The commenter is mistaken—the Department has never made a distinction between short-term and long-term pension liabilities.

Changes: None.

**Appendix A and B, Supplemental Schedule and Financial Statement Disclosures**

Comments: Some commenters believed that to satisfy the reporting **\*49875** requirements in these regulations and avoid conflicts with GAAP, any additional information the Department seeks about leases, long-term lines of credit, related-party receivables, split-interest gifts, or other items should be provided in the Supplemental Schedule rather than in the notes to the financial statements. The commenters argued that because the Supplemental Schedule identifies all the financial elements needed to calculate the composite score, and those elements are cross-referenced to the financial statements and reviewed by the institution's auditor in relation to the financial statements as a whole, there is no need to alter GAAP. Consequently, the commenters recommend that the Department remove the proposed additional disclosure requirements in the financial statements.

Other commenters believed that including the Supplemental Schedule as part of an institution submission to the Department should eliminate any differences between the composite score calculated by the institution and the score calculated by the Department. To further minimize any differences, the commenters recommended that the Supplemental Schedule include the elements used to calculate the pre-ASU 2016-02 composite score so that the Department has both calculations at the time of the institution's submission.

Discussion: Under section 498(c)(5) of the HEA, the Department must use the audited financial statements of an institution to determine whether it is financially responsible. As the commenters note, the Supplemental Schedule is not part of the audited financial statements but any notes to the financial statements are part of the audited financial statements. Consequently, the Department cannot rely on the information contained in the Supplemental Schedule as the commenters suggest.

In addition, we do not believe that the notes to the financial statements required under these regulations alter GAAP because the Department is not requiring that the information needed to calculate the composite score must be provided in the notes to the financial statements. Rather, it is up to an institution to determine the level of aggregation or disaggregation it uses in preparing its financial statements. Therefore, a note will need to be included only when the required information is not readily identifiable in any other part of the audited financial statements.

We agree with the suggestion that the Department revise the Supplemental Schedule to include the elements needed to calculate the composite score for leases, but note that an institution is not required to include or report to the Department any composite score that it chooses to calculate based on the Supplemental Schedule.

Changes: We are revising the Supplemental Schedules to identify the elements relating to leases that are needed to calculate the composite scores.

*Financial Protection—§ 668.175(h)*

Comments: Many commenters supported the Department's efforts to expand the types of financial protection that an institution may provide.

One commenter argued that the Department did not comply with applicable law to support the provision in § 668.175(h)(1) that it would publish in the Federal Register other acceptable forms of surety or financial protection. The commenter stated that this provision is nothing more than a proposal to make a future proposal on unspecified future action and, thus, should be withdrawn.

Another commenter objected to this provision arguing that it allows the Department to concoct any new kind of financial protection with no standards or requirements in place to ensure that it serves its purpose of paying for liabilities and debts that would otherwise be incurred by taxpayers. The commenter concluded that because the Department failed to demonstrate that there is a specific need for this flexibility and provided no restrictions to ensure that alternatives would be on par with a letter of credit, this provision should be removed.

Discussion: The Department disagrees with the contention that its proposal to publish in the Federal Register other acceptable forms of surety or financial protection does not comply with the law. Announcing our intent to accept such form of surety would not change the substance of these final regulations, as it would merely provide an additional method by which institutions could comply with the rule. In addition, the Department would not concoct a form of financial protection that offers no financial protection. As discussed in the NPRM (83 FR 37263) and the 2016 final regulations (81 FR 76008), we understand that obtaining irrevocable letters of credit can be costly, but are not aware of other surety instruments that that would provide the Department with same the level of financial protection or ready access to funds. However, if surety instruments become available that are more affordable to institutions but offer the same benefits to the Department, we wish to retain the flexibility to consider accepting those instruments in the future.

Changes: None.

Comments: None.

Discussion: In the 2016 final regulations, we revised 668.175 to provide that an institution that fails to meet the financial responsibility standards as a result of the new triggering events in § 668.171(c)-(g), as opposed to just as a result of § 668.171(b), may begin or continue to participate in the title IV, HEA programs through the alternate standards set forth in § 668.175. The 2016 final regulations also established under § 668.175(h)(2017) that if the institution did not provide a letter of credit within 45 days of the Secretary's request, the Department would offset the amount of the title IV, HEA program funds the institution is eligible to receive in a manner that ensured that, over a nine-month period, the total amount of offset would equal the amount of financial protection the institution was requested to provide. For the regulations proposed in the 2018 NPRM, and in these final regulations, we adopt the same concept, but with technical changes to track the new triggers in § 668.171(c) and (d). We also amend § 668.175(h) to incorporate the possibility of additional types of financial protection in the future, to be identified in a Federal Register notice, allow for cash as an alternative form of financial protection, and modify the nine-month set-off period to be six to twelve months. As we explained in the preamble of the 2018 NPRM, these changes were made to provide the Department with flexibility to assess what time period might be appropriate as an off-set period and to accommodate the possibility of future financial instruments or surety products that may satisfy the Department's requests for financial protection.

In addition, we codify current practice in these regulations that the Department may use a letter of credit or other financial protection provided by an institution to cover costs other than title IV, HEA program liabilities. Under current practice, we notify an institution that the Department may use the letter of credit or other protection to pay, or cover costs, for refunds of institutional or non-institutional charges, teach-outs, or fines, penalties, or liabilities arising from the institution's participation in the title IV, HEA programs.

Changes: We are revising § 668.175(h) to provide that under procedures established by the Secretary or as part of an agreement with an institution, the Secretary may use the funds from a letter of credit or other financial protection to satisfy the debts,

**\*49876** liabilities, or reimbursable costs owed to the Secretary that are not otherwise paid directly by the institution including costs associated with teach-outs as allowed by the Department.

### Section 668.41(h) and (i), Loan Repayment Rate and Financial Protection Disclosures

Comments: Some commenters believed that establishing early warning triggering events that require an institution to provide disclosures to students and financial protection to the Department, as promulgated in the 2016 final regulations, would offer critical information to students and help protect taxpayers from financial risk.

Some of these commenters argued that removing disclosures to students runs counter to the Department's stated goal of enabling students to make informed decisions on the front-end of college enrollment. For these reasons, the commenters urged the Department to maintain the disclosure requirements in the 2016 final regulations.

Similarly, other commenters believed that providing disclosures to students about institutions that are required to submit letters of credit to the Department, or after consumer testing, disclosures relating to triggering events, is important for alerting current and prospective students as well as the general public about potential financial problems at those institutions.

Some of these commenters stated that rather than presuming that prospective students would not understand letters of credit or the triggering events, as discussed in the preamble to the 2018 NPRM, the Department should leave those presumptions aside and require the disclosures. Other commenters likened the situation where a student does not understand the calculation of the debt to earnings rate but benefits nonetheless from the information that it provides about a program's quality to the letter of credit disclosure providing greater knowledge about the financial condition of the institution.

With regard to the disclosure associated with the loan repayment rate for proprietary institutions, some commenters agreed with the Department's proposal to rescind that disclosure, but other commenters cited research or analysis that they alleged supported maintaining the disclosure. Some of these commenters contend that a recent research paper found that almost 50 percent of the borrowers who attend proprietary institutions default on their loans within five years of entering repayment and that another paper shows that the relatively poor outcomes of students at for-profit institutions remain even after controlling for differences in family income, age, race, academic preparation, and other factors. Other commenters cited research showing that, among for-profit institutions, there were almost no schools with repayment rates above 20 percent. In addition, some commenters noted that in the preamble to the NPRM, the Department argued that repayment rates reflect financial circumstances and not educational quality, but did not cite any research, analysis, or data to support that claim. These commenters believed that repayment rates are a critical measure for safeguarding $130 billion in Federal aid and supported that belief by citing various reports raising concerns over rising default and delinquency rates and linking repayment outcomes to other metrics of educational outcomes. Other commenters argued that the focus on proprietary institutions is justified and cited research from the Brookings Institution, showing that among non-degree certificate students, those in for-profit programs earned less per year than their counterparts at public institutions despite taking out more in loans. Another commenter voiced similar concerns for proprietary institutions in New York, noting particularly that only seven percent of students enroll at those institutions but account for one in four New Yorkers who default on their loans within three years of entering repayment.

Discussion: We note that the loan repayment rate warning and financial protection disclosures were discussed during the Gainful Employment (GE) negotiated rulemaking and associated NPRM along with GE-related disclosures. However, we are including these disclosures in these final regulations because they were part of the 2016 final regulations we are proposing to revise.

In the 2016 final regulations, we explained that we were requiring repayment rate disclosures that relied upon a repayment rate calculation based on the data provided to the Department by institutions through the GE regulations and on the repayment calculation in those regulations. However, on July 1, 2019, the Department published a final rule that rescinds those requirements.[FN158] As a result, providing the same repayment rate disclosure as required in the 2016 final regulations is no longer feasible and we do not maintain this disclosure in these final regulations.

As a general matter, we consider repayment rates to be an important factor students and their families may consider when choosing an institution and the Department intends to continue to make comparable information about repayment rates, as well as other information, for all institutions publicly available on the Department's College Scorecard website.[FN159] This information is a useful resource because it includes repayment rate information, not only for proprietary institutions, but also for nonprofit and public institutions of higher education.

We believe that any benefit that a student may derive from knowing the loan repayment rate for a proprietary institution is negated by not knowing the comparable loan repayment rate at a non-profit or public institution, because the student may rely on the limited repayment rate information available and end up enrolling at an institution whose repayment rate is the same or even worse than the proprietary institution.

With respect to the financial protection disclosures, we acknowledge that some prospective students may find this information helpful, but on balance, we believe that the disclosures, if viewed without proper context, could tarnish the reputation of an institution that otherwise satisfies title IV provisions, and thus jeopardize or diminish the credential, or employment or career opportunities, of enrolled students and prior graduates.

Changes: None.

**Guaranty Agency (GA) Collection Fees (§§ 682.202(b)(1), 682.405(b)(4)(ii), 682.410(b)(2) and (4))**

Comments: Some commenters supported the proposed changes in §§ 682.202(b)(1), 682.405(b)(4)(ii), and 682.410(b)(4), providing that a guaranty agency may not capitalize unpaid interest after a defaulted FFEL Loan has been rehabilitated, and that a lender may not capitalize unpaid interest when purchasing a rehabilitated FFEL Loan.

One commenter proposed that the Department retain in § 682.402(e)(6)(iii) a provision of the 2016 final regulations that deleted a reference to a guaranty agency capitalizing interest.

One commenter strongly opposed the changes to § 682.410(b)(2), asserting that section 484F of the HEA explicitly permits a guarantor to charge a borrower who enters into a rehabilitation agreement reasonable collection costs up to 16 percent. The commenter further asserted that section 484A(b) of the HEA provides that a defaulted borrower must pay reasonable collection costs and that there are no exceptions **\*49877** under which the borrower is not required to pay such costs. The commenter argued that the regulatory change raises equal protection concerns because it ties the Rehabilitation Fee to a 60-day interval that does not have any discernable or rational relationship to borrowers, guarantors, default, or anything else related to loan rehabilitation.

The commenter further asserted that the regulation creates due process concerns because it calls for the elimination of a statutorily-conferred right to payment that is often guarantors' only real compensation for fulfilling their fiduciary obligation to the Department and helping borrowers rehabilitate defaulted loans. The commenter expressed concern that the regulatory change could create perverse incentives and harm borrowers, the federal government, and taxpayers by inhibiting creative outreach tactics that have proven successful bringing defaulted borrowers back into repayment. This commenter also drew a distinction between a defaulted borrower entering into an "acceptable repayment plan" and a defaulted borrower entering into a Rehabilitation Agreement. This commenter noted that it is a common practice for guarantors to dispense with per-payment collection fees when borrowers enter an acceptable repayment plan within 60 days of receiving a default notice, even though they are required to do so. They reiterate that loan rehabilitation is a unique process that is defined and mandated by the HEA and controlled by detailed regulations.

Discussion: We thank the commenters who are supportive of the proposed revisions of the guaranty agency collection fee regulatory provisions. We will retain the 2016 final regulations, which are currently effective, with respect to §§ 682.202(b)(1), 682.405, and 682.410(b)(4) because the 2016 final regulations effectively accomplish the same policy objective as the proposed amendatory language in the 2018 NPRM.

We agree with the comment about 34 CFR 682.402(e)(6)(iii) and retain the change made in the 2016 final regulations to remove the sentence regarding capitalization of interest.

We disagree with the commenter who raised legal objections to the Department's proposed regulation. The changes in § 682.410(b)(2) are consistent with the regulatory interpretation and position that the Department outlined in Dear Colleague Letter (DCL) GEN-15-14 (July 10, 2015). We withdrew that DCL to allow for public comment on a regulatory change rather than rely solely on our interpretation of existing regulations.

The Department has considered the commenter's objections but believes that the proposed change is consistent with the HEA and the existing regulations. We note that the United States Court of Appeals for the Seventh Circuit accepted the Department's statutory and regulatory interpretation in Bible v. United Student Aid Funds, Inc.[FN160]

Section 484A(a) of the HEA provides that defaulted borrowers "shall be required to pay, in addition to other charges specified in this subchapter . . . reasonable collection costs." Section 428F(a) of the HEA requires the guarantor to offer the borrower an opportunity to have a defaulted loan "rehabilitated," and the default status cured, by making nine timely payments over 10 consecutive months, after which the loan may be sold to a FFEL Program lender or assigned to the Department, and the record of default as reported by the guarantor is removed from the borrower's credit history. Under the HEA and the Department's regulations, the installment amounts payable under a rehabilitation agreement must be "reasonable and affordable based on the borrower's total financial circumstances."

The regulations direct the guarantor to charge the borrower "reasonable" collection costs incurred to collect the loan.[FN161] Generally, the charges cannot exceed the lesser of the amount the borrower would be charged as calculated under 34 CFR 30.60 or the amount the Department would charge if the Department held the loan. Before the guarantor reports the default to a credit bureau or assesses collection costs against a borrower, the guarantor must provide the borrower written notice that explains the nature of the debt, and the borrower's right to request an independent administrative review of the enforceability or past-due status of the loan and to enter into a repayment agreement for the debt on terms satisfactory to the guarantor.[FN162]

Thus, the regulations direct the guaranty agency to charge the borrower collection costs, but only after the guaranty agency provides the borrower the opportunity to dispute the debt, to review the objection, and to agree to repay the debt on terms satisfactory to the guarantor. If the borrower agrees within that initial period to repay the debt under terms satisfactory to the guarantor and consistent with the requirements, the borrower cannot be charged collection costs at any time thereafter unless the borrower later fails to honor that agreement.

We also disagree with the commenter's suggestion that the imposition of collection costs is intended to compensate the guaranty agencies and provide them an incentive to offer loan rehabilitation. A guaranty agency is permitted to charge the borrower for the reasonable collection costs it incurs in collecting on loans. It is not reasonable for the guaranty agency to charge collection costs for collection activities it does not need to take because the borrower entered into and met the requirements of a loan rehabilitation agreement. Collection costs are not intended to be a funding source for guaranty agencies or an incentive for them to offer a statutorily required opportunity to borrowers.

Changes: The Department retains the 2016 regulations, which are currently effective, with respect to §§ 682.202(b)(1), 682.405, and 682.410(b)(4) because the 2016 final regulations effectively accomplish the same policy objective as the proposed amendatory language in the 2018 NPRM. The Department will proceed to revise § 682.410(b)(2) as proposed in the 2018 NPRM.

The Department also retains the change made in § 682.402(e)(6)(iii) as a result of the 2016 final regulations.

Comments: A group of commenters stated that the preamble to the 2018 NPRM specified that collection costs are not assessed if the borrower enters into a repayment agreement with the guaranty agency within 60 days from "receipt" of the initial notice,

000223

while the regulatory language was less specific about when the 60-day time period would commence. These commenters requested a change to the regulatory language to make clear that the 60-day period begins when the guaranty agency "sends" the initial notice described in paragraph (b)(6)(ii), since this is the only date that can be determined by the guaranty agency.

Discussion: We agree with the commenters who noted that that it is appropriate that the 60-day period be determined from the date the guaranty agency sends the notice to the borrower, because the guaranty agency cannot reasonably establish when a borrower receives the notice.

Changes: We have modified § 682.410(b)(2)(i) by replacing the word "following" with "after the guaranty agency sends".

**\*49878  Subsidized Usage Period and Interest Accrual (§ 685.200)**

Comments: A group of commenters wrote in support of the regulations that provide a recalculation of the subsidized usage period and restoration of subsidies when any discharge occurs. They noted that this action assures that harmed borrowers are made more completely whole.

Discussion: We thank the commenters for their support of the proposed revisions to the regulations governing subsidized usage periods and interest accrual. The Department is not rescinding the revisions that the 2016 final regulations made to § 685.200, which concerns the subsidized usage period and interest accrual. Additionally, the borrower defense to repayment provisions in these final regulations expressly state that further relief may include eliminating or recalculating the subsidized usage period that is associated with the loan or loans discharged, pursuant to § 685.200(f)(4)(iii).

Changes: The changes proposed to § 685.200 in the 2018 NPRM were effectuated by the 2016 final regulations, so no additional changes are necessary at this point. The Department revised § 685.206(e)(12)(ii)(B), which describes the relief that a borrower may receive, to expressly reference § 685.200(f)(4)(iii), which addresses the subsidized usage period.

### *Regulatory Impact Analysis (RIA)*

Under Executive Order 12866, the Office of Management and Budget (OMB) determines whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order.

This final regulatory action will have an annual effect on the economy of more than $100 million because changes to borrower defense to repayment and closed school discharge provisions impact transfers among borrowers, institutions, and the Federal Government and changes to paperwork requirements increase costs. Therefore, this final action is "economically significant" and subject to review by OMB under section 3(f)(1) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits of this final regulatory action and have determined that the benefits justify the costs.

Under Executive Order 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under Executive Order 12866 and that imposes total costs greater than zero, it must identify two deregulatory actions. For FY 2019, no regulations exceeding the agency's total incremental cost allowance will be permitted, unless required by law or approved in writing by the Director of OMB. Much of the effect of these final regulations involves reducing transfers between the Federal Government and affected borrowers, but, as described in the Paperwork Reduction Act section, we expect annualized burden reductions of approximately $4.7 million when discounted to 2016 dollars as required by Executive Order 13771. These final regulations are a deregulatory action under Executive Order 13771 and therefore the two-for-one requirements of Executive Order 13771 do not apply.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these final regulations only on a reasoned determination that their benefits justify their costs.

Consistent with these Executive Orders, we assessed all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Our reasoned bases for rulemaking include the non-quantified benefits of our chosen regulatory approach and the negative effects of not regulating in this manner. The information in this RIA measures the effect of these policy decisions on stakeholders and the Federal government as required by and in accordance with Executive Orders 12866 and 13563.[FN163] Based on the analysis that follows, the Department believes that these final regulations are consistent with the principles in Executive Orders 12866 and 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, and tribal governments in the exercise of their governmental functions. State, local, and tribal governments will be able to continue to take actions to protect borrowers at institutions of higher education, and these final regulations do not interfere with other government's actions. As explained in the preamble, actions taken by State Attorneys General **49879** may provide evidence for borrowers to use in making claims, but nothing in the regulations requires or limits such investigations or other state government action.

000225

As required by OMB circular A-4, we compare the final regulations to the current regulations, which are the 2016 final regulations. In this regulatory impact analysis, we discuss the need for regulatory action, the potential costs and benefits, net budget impacts, assumptions, limitations, and data sources, as well as the regulatory alternatives we considered.

As further detailed in the Net Budget Impacts section, this final regulatory action is expected to have an annual effect on the economy of approximately $550 million in transfers among borrowers, institutions, and the Federal Government related to defense to repayment and closed school discharges, as well as $1.15 million in costs to comply with paperwork requirements. This economic estimate was produced by comparing the proposed regulation to the current regulation under the President's Budget 2020 baseline (PB2020) budget estimates. The required Accounting Statement is included in the Net Budget Impacts section.

Elsewhere, under the Paperwork Reduction Act of 1995, we identify and explain burdens specifically associated with the information collection requirements included in this regulation.

Pursuant to the Congressional Review Act (5 U.S.C. 801 et seq.), the Office of Information and Regulatory Affairs designated this rule as a "major rule", as defined by 5 U.S.C. 804(2).

## 1. Need for Regulatory Action

These final regulations address a significant increase in burden resulting from the vast increase in borrower defense claims since 2015. These final regulations reduce this burden in a number of ways, as discussed further in the Costs, Benefits, and Transfers section of this RIA.

Although the borrower defense to repayment regulations have provided an option for borrower relief since 1995, in 2015, the number of borrower defense to repayment claims increased dramatically when certain institutions filed for bankruptcy. Students enrolled at those campuses and those who had left the institution within 120 days of its closure were eligible for a closed school loan discharge. The Department decided to also provide student loan discharge to additional borrowers who did not qualify for a closed school loan discharge, but could qualify under the defense to repayment regulation (34 CFR 685.206(c)). The Department encouraged impacted borrowers to submit defense to repayment claims, which it agreed to consider for all institutional-related loans. This resulted in a significant increase in claim volume compared to the prior years: 7,152 claims received by September 30, 2015; 82,612 claims received by September 30, 2016, 165,880 applications received by June 30, 2018; 200,630 applications received by September 30, 2018; 218,366 applications by December 31, 2018; 239,937 by March 31, 2019.

This growth significantly expanded the potential cost to the Federal budget.

In addition, provisions in the 2016 final regulations enable the Secretary to initiate defense to repayment claims on behalf of entire classes of borrowers. Initiating the group discharge process is extremely burdensome on the Department and results in inefficiency and delays for individual borrowers. It also has the potential of providing loan forgiveness to borrowers who were not subject to a misrepresentation, did not make a decision based on the misrepresentation, or did not suffer financial harm as a result of their decision. The 2016 final regulations impose onerous administrative burdens on the Department. Indeed, the Department must: Identify the members of the group; determine that there are common facts and claims that apply to borrowers; designate a Department official to present the group's claim in a fact-finding process; provide each member of the group with notice that allows the borrower to opt out of the proceeding; if the school is still open, notify the school of the basis of the group's borrower defense, the initiation of the fact-finding process, and of any procedure by which the school may request records and respond; and bear the burden of proving that the claim is valid.[FN164] This process is cumbersome and does not provide an efficient approach.

The group discharge process, which we are not including in these final regulations for loans first disbursed on or after July 1, 2020, may otherwise create large and unnecessary liabilities for taxpayer funds. To make a determination as to a borrower defense to repayment claim under these final regulations, it is necessary to have a completed application from each individual

000226

borrower, to consider information from both the borrower and the institution, and to examine the facts and circumstances of each borrower's individual situation. Presuming borrowers' reliance on a school's misrepresentation would not properly balance the Department's responsibilities to protect students as well as taxpayer dollars. Schools are still subject to the consequences of their misrepresentations under this standard and, if necessary, the Secretary retains the discretion to establish facts regarding misrepresentation claims put forward by a group of borrowers.

These final regulations also eliminate the pre-dispute arbitration and class action waiver ban in the 2016 final regulations, reflecting the Department's position that arbitration can be a beneficial process for students and recent court decisions holding that such bans violate the Federal Arbitration Act (FAA).[FN165] Instead, the final regulations favor disclosure and transparency by requiring schools relying upon mandatory pre-dispute arbitration agreements to provide plain language about the meaning of the restriction and the process for accessing arbitration. With the clear disclosures on institutions' admissions information web page, in the admissions section of the institution's catalogue, and discussion in entrance counseling, the Department believes students can make informed decisions about enrolling at institutions that require such pre-dispute mandatory arbitration agreements versus those that do not. The final regulations also eliminate requirements for institutions to submit arbitration documentation to the Department.

The increased number of school closures in recent years has prompted the Department to review regulations related to closed schools and make changes to them. Under the 2016 final regulations, students who are enrolled at institutions that close, as well as those who left the institution no more than 120 days prior to the closure, are entitled to a closed school loan discharge, provided that the student does not transfer credits from the closed school and complete the program at another institution. To allow more borrowers to make better informed decisions regarding whether to continue attending the school while also allowing them to benefit from the intended purpose of the regulations without the need for a determination as to whether exceptional circumstances exist, the Department extends the closed school discharge window for Direct Loan borrowers from 120 days to 180 days **49880** prior to the school's closure. In these final regulations, a borrower would qualify for a closed school discharge as long as the borrower did not transfer to complete their program, or accept the opportunity to complete his or her program through an orderly teach-out at the closing school or through a partnership with another school. Borrowers who choose the option of participating in a teach-out would not qualify for a closed school discharge, unless the closing institution or other institution conducting the teach-out failed to meet the material terms of the closing institution's teach-out plan, such that the borrower was unable to complete the program of study in which the borrower was enrolled. This mirrors the existing regulations that disallow students who transferred credits from the closed school to another school, or who finished the program elsewhere, to qualify for the closed school loan discharge.

These regulations also revise the current regulations providing for automatic closed school loan discharge for eligible Direct Loan borrowers who do not re-enroll in another title IV-eligible institution within three years of their school's closure to apply to schools that closed on or after November 1, 2013, and before July 1, 2020. This is in line with the Department's preference for opt-in requirements rather than opt-out requirements, such as in the case of Trial Enrollment Periods. (https://ifap.ed.gov/ dpcletters/GEN1112.html).

The automatic closed school discharge provision also increases the cost to the taxpayer, including for borrowers who are not seeking relief, because default provisions typically capture a much larger population than opt-in provisions. For this and the other reasons articulated in the preamble, the final regulations require borrowers to submit an application to receive a closed school loan discharge.

The final regulations also update the Department's regulations regarding false certification loan discharges. Under these final regulations, if a student does not obtain or provide the school with an official high school transcript, but attests in writing under penalty of perjury that he or she has completed a high school degree, the borrower may receive title IV financial aid, but will not then be eligible for a false certification discharge if the borrower had misstated the truth in signing the attestation.

000227

These final regulations also address several provisions related to determining the financial responsibility of institutions and requiring letter of credit or other financial protection in the event that the school's financial health is threatened. The Financial Accounting Standards Board (FASB) recently issued updated accounting standards that change the way that leases are reported in financial statements and thus considered by the Department in determining whether an institution is financially responsible. To align with these new standards and current practice, these regulations update the definition of terms used in 34 CFR part 668, subpart L, appendices A and B, which are used to calculate an institution's composite score. The Department intends to recalibrate the composite score methodology to better align it with FASB standards in a future rulemaking, but in the meantime, these regulations mitigate the impact of changes in the accounting standards and accounting practice by updating the definition of terms and not penalizing institutions for business decisions they made regarding leases or long-term debt.

In addition, the final regulations adjust the financial responsibility requirements to account for certain triggering events that occur between audit cycles. As in the 2016 final rule, instead of relying solely on information contained in an institution's audited financial statements, which are submitted to the Department six to nine months after the end of the institution's fiscal year, we will continue to determine at the time that certain events occur whether those events have a material adverse effect on the institution's financial condition. In cases where the Department determines that an event poses a material adverse risk, this approach will enable us to address that risk quickly by taking the steps necessary to protect the Federal interest.

These final regulations take a similar approach to the 2016 final regulations which are currently in effect, but here we focus on known and quantifiable debts or liabilities. For example, instead of relying on speculative liabilities stemming from pending lawsuits or defense to repayment claims, under these final regulations, only actual liabilities incurred from lawsuits or defense to repayment discharges could trigger surety requirements. As explained in the preamble, we are revising some of the triggering events for which surety may be required if the potential consequences of those events pose a severe and imminent risk to the Federal interest (for example, SEC or stock exchange actions).

We have also revised or reclassified some of the triggering events, such as high cohort default rates, State agency violations, and accrediting agency actions, that could have a material adverse effect on an institution's operations or its ability to continue operating. These final regulations direct the Department to fully consider the circumstances surrounding those events before making a determination that the institution is not financially responsible. In that regard, these final regulations do not contain certain mandatory triggering events that were included in the 2016 final regulations because the cost and burden of seeking surety is significant. In many cases the 2016 final regulations specified speculative events as triggering events such as pending litigation or pending defense to repayment claims, that can in many cases be resolved with no or minimal financial impact on the institution. As discussed in the preamble, these final regulations also do not include as a mandatory triggering event the results of a financial stress test, which was included in the 2016 final regulations without an explanation of what that stress test would be and on what empirical basis it would be developed.

## 2. Summary of Comments and Changes From the NPRM

Changes from the NPRM generally fall into two categories: borrower defense claims and closed school discharges. Table 1 expands further upon these changes.

### Table 1—Summary of Key Changes in the Final Regulations From the NPRM

| Provision | Regulation section | Description of change from NPRM |
|---|---|---|
| Part II | | |
| Defense to repayment | 685.206(e)(2) | Establishes a preponderance of the evidence standard with requirements for reasonable reliance and financial harm. Establishes that borrowers may |

|  |  |  |  |
|---|---|---|---|
|  |  |  | submit an application, regardless of the status of their loans. |
| Borrower Defense Period of limitation | 685.206(e)(6) |  | Places a three-year limitation on borrower defense claims relating to loans first disbursed on or after July 1, 2020. For borrowers subject to a pre-dispute arbitration agreement, arbitration suspends the comments of the three-year limitations period from the time arbitration is requested until the final outcome. Exceptions also possible for consideration of new evidence when a final arbitration ruling or a final, contested, non-default judgment on the merits by a State or Federal Court that establishes that the institution made a misrepresentation. |
| Borrower defenses—Adjudication Process | 685.206(e)(9)(ii) and (10) |  | Permits the Secretary to consider evidence in her possession provided that the Secretary permits the borrower and the institution to review and respond to this evidence and to submit additional evidence. Establishes that a borrower will have the opportunity to review a school's submission and to respond to issues raised in that submission. |
| Borrower defense partial relief for approved claims | 685.206(e)(4) |  | Clarifies that the Secretary shall estimate the financial harm experienced by the borrower. |
| Defense to Repayment—Role of the School in the Adjudication Process | 685.206(e)(10) |  | Clarifies what evidence constitutes financial harm. |
| Process for asserting or requesting a discharge |  | 682.402, 685.212 | Establishes an application process for borrower defense claims, suspension of collection during processing of said claim, adjudication of borrower defense claims, notification requirements post-adjudication. Clarifies that borrower defense standards and Departmental process apply to loans repaid by a Direct Consolidation Loan. |
| Borrower Defenses—Adjudication Process |  | 685.206, 685.212 | Revises the circumstances when the Secretary may extend the time period when a borrower may assert a defense to repayment or may reopen the borrower's defense to repayment application to consider evidence that was not previously considered. Automatically grants forbearance on the loan for which a borrower defense to repayment has been asserted, if |

000229

| | | |
|---|---|---|
| | | the borrower is not in default on the loan, unless the borrower declines such forbearance. |
| Closed school discharges | 685.214 | Changes the eligibility criteria to exclude borrowers who continue their education through a teach-out or by transferring credits, as opposed to those who have been offered a teach-out by a closing school. |
| Closed school discharges | 674.33 and 682.402 | No longer making closed school discharge changes to FFEL or Perkins regulations. |
| Financial Responsibility | 668.171, 668.172, 668.175 | Revised provision related to withdrawal of owner's equity and the treatment of capital distributions equivalent to wages. Included new discretionary trigger for institutions with high annual dropout rates. Revised treatment of discretionary triggers so that when the institution is subject to two or more discretionary triggering events in the period between composite score calculations, those events become mandatory triggering events unless a triggering event is cured before the subsequent event occurs. Leases entered into on or after December 15, 2018, will be treated as required under ASU 2016-02 while those entered before then will be grandfathered. Please see Table 2 for further description of financial responsibility triggers. |

  **\*49881**  Additionally, after further consideration, we are keeping many of the regulatory changes that were included in the 2016 final regulations. Some of the revisions the Department proposed in the 2018 NPRM were essentially the same as or similar to the revisions made in the 2016 final regulations, which are currently in effect. The Department is not rescinding or further amending the following regulations in title 34 of the Code of Federal Regulations, even to the extent we proposed changes to those regulations in the 2018 NPRM: §§ 668.94, 682.202(b)—guaranty agency collection fees, §§ 682.211(i)(7), 682.405(b)(4)(ii), 682.410(b)(4) and (b)(6)(viii), and 685.200—subsidized usage period and interest accrual.

Comments: Some commenters assert that the proposed regulations would limit the circumstances in which a borrower may seek loan cancellation based on school misconduct to "defensive," post-default administrative collection proceedings, and that this is demonstrated by its incorporation into the Department's analysis. The NPRM identifies the 2016 final regulations as the baseline for the impact analysis in its three options. The commenters argue that the option of using the 1995 regulations as a more lenient option is invalid because it is the same as the baseline with respect to the Department's acceptance of affirmative claims. Likewise, the Department's option of limiting consideration of borrower defenses to repayment to post-default collection proceedings would be a change not only from the 2016 final regulations, but from the pre-2016 practice as well. As a result, the commenter claims it represents a new scenario. The commenters assert that these inaccuracies undermine the compliance of this NPRM with Executive Orders 12866 and 13563.

000230

Another commenter asserted that using the 2016 final regulations as a baseline for the impact analysis is problematic because the Department's conclusion that borrowers will benefit from increased transparency with respect to the required disclosures is contingent upon a regulatory environment in which pre-dispute arbitration agreements and class action waivers are permitted, but not subject to **\*49882** robust disclosures. Additionally, this commenter notes that the Department is not "assuming a budgetary impact resulting from prepayments attributable to the possible availability of funds from judgments or settlement of claims related to Federal student loans." [FN166] This commenter contends this assumption does not support the Department's assertion that borrower may recover more from schools in arbitration than through a lawsuit.

Discussion: We thank the commenters for their submissions on the types of claims the Department should accept. Upon further consideration, the Department changed its position on the posture (i.e., defensive and affirmative) from which borrowers may submit borrower defense to repayment applications. Affirmative claims are permitted in these final regulations, and that is reflected in the Regulatory Impact Analysis. These regulations include a three-year limitations period for both affirmative and defensive claims. These regulations also promulgate a different Federal standard than the 2016 final regulations. The limitations period and Federal standard in these regulations limit the circumstances in which a borrower's loan may be cancelled with respect to a defensive claim during a post-default administrative collection proceeding.

We disagree with commenters who state that we used the wrong baseline or were inconsistent in our application of the baseline. The Regulatory Impact Analysis, per OMB Circular A-4, is required to compare to the world without the proposed regulations, which would be the 2016 final regulations. This baseline is clearly stated in the Regulatory Alternatives Considered section and in various sections throughout the analysis. Further, the Department computed various impact scenarios and discussed other regulatory options that were considered. With respect to the discussion of pre-dispute arbitration agreements in the Costs, Benefits and Transfers section of this RIA, the Department does describe the change compared to the 2016 final regulations but also points out the benefits of the required disclosures. Accordingly, the Department believes it is in compliance with Executive Orders 12866 and 13563.

Changes: None.

Comments: A commenter stated that methods by which the Department estimates lifetime default rates under Alternative A overestimate the share of borrowers who could raise a defensive claim under this rule, even if strategic defaults would occur. The commenter also noted that borrowers with defensive claims would only be able to file a claim during the timeframe governing a collections action and only after that action has been initiated—but those actions are not universally applied, nor are those timeframes well understood by borrowers. Further, the Department received numerous comments recommending that defense to repayment be made available to all borrowers, including those in regular repayment status, default and collections. According to these commenters, in all cases of collection proceedings, administrative hurdles such as filing claims within the timeframe for filing an affirmative defense will disproportionately affect borrowers with valid claims, as those borrowers are unlikely to be notified of their rights under the proposed rules, causing them financial harm. In order to avoid this, commenters suggested that the Department should examine data on the initiation of collection processes to determine for how many borrowers per year it initiates debt collection proceedings like those described in Alternative A; reduce the share of defensive claims to parallel the share the defaulters per year placed in those proceedings with an opportunity to challenge its initiation; and consider whether a small inflation is appropriate to account for borrowers who default strictly to file a claim. In the final regulations, commenters suggested that the Department should detail the revision it makes to these numbers and publish those data to better inform stakeholders of the underlying information informing the budget estimates.

Discussion: The Department appreciates the commenter's concern that the defensive claims percentage overstates the share of borrowers who would be able to file a claim. The suggestions about analysis based on the share of defaulters in collections proceedings who present a defense are appreciated, but the Department did not have that data available and the changes to the final regulations make that analysis less relevant to the final regulations we adopt here. The final regulations do allow those in all repayment statuses to apply for a borrower defense discharge. If we did reduce the defensive claims percentage as the commenter suggests, we know the transfers from the Federal government to affected borrowers would be reduced, as shown

in the sensitivity analyses presented in the 2018 NPRM and in these final regulations. As discussed in the Net Budget Impact section, the defensive claims percentage has been replaced by the Allowable Claims percentage based on the number of claims filed within the three-year timeframe applicable under these final regulations.

As detailed in the preamble section on Affirmative and Defensive Claims, the Department agreed with commenters that it is appropriate to accept both affirmative and defensive claims and this approach balances concerns about incentivizing strategic defaults, effects on borrowers, and administrative burden on the Department.

As described in the Borrower Defenses—Limitations Period for Filing a Borrower Defense Claim section of the preamble, the Department has determined that a three-year limitations period for both affirmative and defensive claims is appropriate. In order to mitigate the risk that borrowers with a valid claim will not be notified of their rights in time to file a borrower defense to repayment application, the final regulations provide that the Secretary may extend the time period for filing a borrower defense to repayment if there is a final, non-default judgment on the merits by a State or Federal court that has not been appealed or that is not subject to further appeal and that establishes the institution made a misrepresentation as defined in § 685.206(e)(3). The Secretary also may extend the limitations period for a final decision by a duly appointed arbitrator or arbitration panel that establishes the institution made a misrepresentation as defined in § 685.206(e)(3).

Changes: The Department revised § 685.206(e)(7) to provide for the circumstances in which the Secretary may extend the limitations period to file a borrower defense to repayment application.

Comments: One commenter cites Executive Order 12291 which requires both that agencies describe potential benefits of the rule, including any beneficial effects that cannot be quantified in monetary terms, identify those likely to receive the benefits, and ensure that the potential benefits to society for the regulation outweigh the potential costs to society. In order to accomplish this, the commenter asserted the Department should add several components to the regulatory impact analysis of these final regulations, including: Quantifying the total share of loan volume and the total share of borrowers affected by institutional misconduct that meets the standard it expects will receive relief on their loans; detailing the average share of relief it expects borrowers in each **49883** sector to receive; and conducting a quantitative analysis that directly compares the benefits under this rule against the costs (particularly to borrowers), to create a true cost-benefit analysis. The commenters said that the RIA also needs to address the non-monetary component of the benefit-cost analysis, and one component of this analysis should be the fairness of the rule to borrowers. For example, the Department indicates that some borrowers who should be eligible for claims based on the misconduct of their institutions will be unable to have their loans discharged due to the way the Department has designed the process.

Discussion: First, we note that Executive Order 12291 was revoked by Executive Order 12866 on September 30, 1993, though E.O. 12866 contains similar provisions as 12291 for these purposes. The monetized estimates in the Regulatory Impact Analysis are based on the budget estimates, which can be found in the Net Budget Impacts section. The assumptions described there are based on a percent of loan volume and, like the 2016 final regulations, do not specify a number or percent of borrowers affected as the share of loan volume affected could be reached under a range of scenarios and involve many borrowers with relatively small balances or a mix of borrowers with higher balances. Other impacts, including expected burdens and benefits are discussed in the Costs, Benefits, and Transfers and Paperwork Reduction Act of 1995 sections. The Department believes its NPRM and these final regulations are in compliance with Executive Order 12866.

The Department addresses the cost-benefit analysis of these regulations extensively in the preamble. The Department explains why the Federal standard in these final regulations is more appropriate than the Federal standard in the 2016 final regulations and also how the adjudication process provides more robust due process protections for both borrowers and schools. These final regulations provide a fair process for borrowers while also protecting a Federal asset and safeguarding the interests of the Federal taxpayers.

Changes: None.

000232

Comments: Some commenters argued that an estimated tax burden between $2 billion and $40+ billion over ten years is of such a large range that it indicates the Department is unsure of the tax burden that these regulations will have. In fact, some commenters suggested that the Department withdraw the NPRM and resubmit it with an accurately stated baseline and budget impact scenarios, and allow the public additional time to comment on the proposed regulation.

Discussion: We disagree with the commenters who state that the regulations would result in between $2 and $40 billion increased burden on taxpayers. The range presented by the commenter refers to the 2016 NPRM,[FN167] and that range was narrowed for the 2016 final regulations. The Department has always acknowledged uncertainty in its borrower defense estimates, as reflected in the additional scenarios presented in the Net Budget Impacts section of this RIA. Further, the Accounting Statement contained in the NPRM shows a savings to taxpayer funds of $619.2 million annually. The final regulations revise this estimate to $549.7 million.

Changes: None.

Comments: One commenter noted that the Department should clarify the assumptions in each component of the net budget impact, i.e., determine the degree to which the Department accounted for data on collections proceedings within the default rates it examined for the defensive applications percent to account for the share of defaulted borrowers who experienced a given collection proceeding in a year and the narrow timeframe (30-65 days) in which borrowers will have to file a defense to repayment claim. Also, commenters asked that the Department clarify how the RIA accounts for the elimination of a group process; how it evaluates the evidence requirements associated with demonstrating how a misrepresentation meets the standard of having been made with reckless disregard or intent; and how it accounts for recoveries of discharged funds through a proceeding with the institution as opposed to the financial protection triggers. To do this, commenters suggested that the Department could conduct additional sensitivity analyses to show how each aspect of the proposed rule interacts with the remainder of the rule, and the implications estimates. Current sensitivity analyses do not test all of these items; and neither the sensitivity analyses nor the alternative scenarios account for how a group process would alter the benefits to borrowers under this rule. The commenters also stated that the Department should clarify that the net budget impact, not the annualized figures presented in the classification of expenditures, is the primary budget estimate and clarify the total impact it expects this rule to have on borrowers.

Discussion: The Department thanks the commenters for identifying an area of the analysis that may have been unclear. The Department has clarified the impacts of eliminating the borrower defense to repayment group discharge process in the Costs, Benefits, and Transfers and Regulatory Alternatives Considered sections. The Department also notes that the Federal standard and the definition of misrepresentation no longer require intent, as discussed in the "Federal Standard" and "Misrepresentation" sections of the Preamble. Requests for additional sensitivity analysis and clarifications about the budget assumptions are addressed within the Net Budget Impacts section of this RIA.

Changes: Additional discussion and sensitivity runs regarding borrower defense estimates were added to the Net Budget Impacts section.

Comments: One commenter stated that because the two large institutions that closed used forced arbitration, the Department does not have the data on offsetting funds so it cannot account for the reduced likelihood that injured students will recover any damages when their only option for bringing a claim is in arbitration. The Department's statements about students' likely recovery also do not show that those few students who do prevail in arbitration are more likely to obtain greater awards. At a minimum, the commenters asserted that the Department must contend with available evidence regarding these students' experiences in arbitration, which show that arbitration does not provide meaningful relief. They also said that the Department should justify the assertion that lawsuits are any less likely to have merit than arbitration demands.

000233

Discussion: This commenter erroneously assumed that allowing institutions to use pre-dispute arbitration agreements prevents borrowers from accessing the Department's borrower defense to repayment process. A borrower's only option is not arbitration if a borrower signs a pre-dispute arbitration agreement. Under these final regulations, even if a borrower signs an agreement for pre-dispute arbitration, the borrower has access to the Department's borrower defense to repayment process. The borrower may file a borrower defense to repayment application before the arbitration begins, during the arbitration, or after the arbitration as long as the borrower **49884** otherwise meets the requirements for submitting a borrower defense to repayment application under these final regulations. Additionally, these final regulations suspend the commencement of the limitations period for submitting a borrower defense to repayment application for the time period beginning on the date that a written request for arbitration is filed and concluding on the date the arbitrator submits, in writing, a final decision, final award, or other final determination to the parties.

The Department disagrees that what occurred at certain institutions should determine the Department's policy regarding pre-dispute arbitration agreements. What occurred at one or two schools does not bind the Department's policy determinations and is not indicative of what occurs at schools throughout the country.

The Department has not asserted that lawsuits are less likely to have merit than arbitration demands or that borrowers who do prevail in arbitration will, in all cases, receive greater awards. The Department has asserted that arbitration may be more accessible to borrowers since it does not require legal counsel and can be carried out more quickly than a legal process that may drag on for years.[FN168] Even if arbitration does not provide meaningful relief, borrowers may still submit a borrower defense to repayment application and obtain additional relief.

The Department has clarified the impacts of mandatory, pre-dispute arbitration relative to borrower defense to repayment in the Costs, Benefits, and Transfers section. Specifically, the Department's analysis now centers around the strong public policy preference in favor of arbitration as set forth in statute and in Supreme Court jurisprudence. As explained at length in the Preamble, arbitration provides significant advantages over traditional litigation in court, including: Party control over the process; typically lower cost and shorter resolution time; flexible process; confidentiality and privacy controls; awards that are fair, final, and enforceable; qualified arbitrators with specialized knowledge and experience; and broad user satisfaction. Requests for clarification about what is accounted for in the budget estimates are addressed in the Net Budget Impact section of this RIA.

Changes: None.

Comments: One commenter expressed concerns that inconsistent standards were used throughout the NPRM with regard to comparison with the pre-2016 regulations and 2016 final regulations. The commenter asserted that this inconsistency of positions, inconsistent use of existing data, and inconsistent reliance on different regulations are indicative of arbitrary decision making. They also asserted that the Department did not provide a strong rationale for the assertion that the small number of claims data from prior to 2015 are acceptable to guide policy, yet the more recent experience with larger numbers of claims is not, specifically in terms breach of contract. Furthermore, the commenter stated that the Department provided no empirical evidence that an easy claims process may result in borrowers filing claims due to dissatisfaction as opposed to misrepresentation, but dismisses data as useful evidence to guide decision making.

This commenter asserts that the Department has not conducted any data analysis on existing claims to indicate the share of claims that were defensive or affirmative. This commenter also requests that the Department address concerns raised by the Project on Predatory Student Lending,[FN169] demonstrating that the Department has accepted affirmative claims since at least 2000. Additionally, this commenter asserts that the Department has not provided a reasoned explanation for the elimination of a group claims process. The commenter contends that the Department provides no evidence for or analysis of the claim that the group discharge process may create large and unnecessary liabilities for taxpayer funds.

000234

Discussion: We disagree with the commenters who state that the standards we applied in the Regulatory Impact Analysis were inconsistent. The Regulatory Impact Analysis, per OMB Circular A-4, requires the agency compare impacts of the proposed regulation to the world without the proposed regulations, which in this case would have been the 2016 final regulations. This baseline is clearly stated in the Alternatives Considered section and in various sections throughout the analysis. Further, the Department analyzed data from its Borrower Defense database and made them available during the negotiating sessions.[FN170] Although 22 percent of claims had been completed as of November 2017 (29,780/135,050), they were not a representative sample of the universe of all claims. The data in 2017 was skewed because so many of the claims were from a very small number of institutions. This remains the case today. For that reason, the Department's data were insufficient for use in decision-making relative to claim outcomes.

Additionally, it is reasonable to conclude that borrowers are more likely to submit a borrower defense to repayment claim if the standard governing these claims is lower. The commenter acknowledges that there have been a larger number of borrower defense to repayment applications. The great volume of borrower defense to repayment applications submitted under the 2016 final regulations, which provides a more lenient standard than these final regulations, may indicate that borrowers are more likely to submit a borrower defense to repayment claim if the standard governing these claims is lower. While the Department has not yet processed all of the filed claims, of the total number of applications reviewed so far, over 9,000 applications have been denied, for reasons that include: Borrowers who attended the institution, but not during the time period of the institution's misrepresentation; claims submitted without evidence; and claims that were made without any basis for relief.

The Department agrees with commenters regarding the affirmative claims received prior to 2015. We intend to update the Borrower Defense Database to include older records not received through an application.

The Department acknowledges that it accepted affirmative claims in the past. An analysis on the number of claims that were affirmative or defensive or of the correlation between an affirmative claim and a finding against the borrower is not necessary as the Department will continue to allow both affirmative and defensive claims to be filed. As discussed earlier in the preamble to these final regulations, the Department is adopting the approach in both instances of Alternative B from its proposed regulatory text for loans first disbursed on or after July 1, 2020, which will allow for both affirmative and defensive claims, and those changes are reflected in the Regulatory Impact Analysis.

The Department's reasoned explanation for eliminating the group claims process is in the relevant sections of the preamble.

Changes: Changes regarding the Department's decision to accept both affirmative and defensive claims are reflected in the assumptions used for  *49885  the Net Budget Impact section of this analysis.

Comments: Some commenters expressed concern that the proposed regulations would lead to costly and frivolous lawsuits at the expense of taxpayers, while doing little to help students by comparison. Another commenter stated that the NPRM provided no evidence of students who, under current borrower defense rules, asserted a defense to repayment simply because they regretted their educational choices. One the other hand, another commenter felt that the proposed regulations would save taxpayers several billions of dollars from false claims over the next decade, while also providing necessary accountability in the system to prevent fraud.

Discussion: The Department appreciates the support of the commenter who asserts that these final regulations will result in a significant savings to Federal taxpayers.

The Department's decision to accept both affirmative and defensive borrower defense to repayment applications may reduce lawsuits between borrowers and institutions. More borrowers will be able to file defense to repayment applications than if the Department accepted only defensive claims. The school has an opportunity to respond to the borrower's allegations, and the borrower also has an opportunity to address the issues and evidence raised in the school's response. The Department's borrower defense to repayment process is more accessible and less costly than litigation for a borrower who seeks relief. Through the

Department's process, the borrower will receive any evidence the school may have against the borrower's allegations and will be better able to assess whether to pursue litigation if they are unsatisfied with the result of their borrower defense to repayment claim. The Department has clarified the impacts of lawsuits relative to borrower defense to repayment and also its assumptions regarding borrower motivation in the Costs, Benefits, and Transfers section.

Additionally, in the 2018 NPRM, the Department did not assert that borrowers are seeking a defense to repayment because they regret their educational choices. The Department stated: "The Department has an obligation to enforce the Master Promissory Note, which makes clear the students are not relieved of their repayment obligations if they later regret the choices they made." [FN171] The Department does not weigh the motives of students who file a borrower defense to repayment application. The Department is implementing regulations that will more rigorously enforce the terms and conditions in the Master Promissory Note.

Changes: As noted in the Net Budget Impacts section, we have revised the assumptions to include affirmative as well as defensive claims.

Comments: One commenter expressed concern that the proposed regulations would narrow the standards under which claims would be adjudicated. The reduction of claims that result would not be the result of changes in institutional behavior due to disincentives to misbehave, but rather from process changes imposed on borrowers. Commenters also suggested that defensive claims would provide greater advantages to students in a collections proceeding than a student who has continued to pay her loan since the student in repayment would not be able to seek relief through defense to repayment.

Discussion: Based upon the Department's revised position relative to which borrowers may submit borrower defense to repayment applications, the period of limitation, and the revised evidentiary standard, we increased our estimate of the percent of loan volume subject to a potential claim as compared to the NPRM, as reflected in the Allowable Claims percentage in Table 3 compared to the Defensive Claims percentage in Table 5 of the NPRM. We do still expect that the annual number will be less than that anticipated under the 2016 final regulations. The Department believes its final regulations protect borrowers, whether in default or not, from institutional misrepresentation while holding institutions accountable for their actions.

The Department discusses why its Federal standard and adjudication process are appropriate and will sufficiently address institutional misconduct in the preamble and more specifically in the Federal Standard and Adjudication Process sections of the Preamble.

We agree with the commenter that borrowers who are in default and are filing defensive claims should not have greater advantages than borrowers who have been paying off their loans and who are making affirmative claims. Accordingly, these final regulations provide the same limitations period of three years for both affirmative and defensive claims in § 685.206(e)(6).

Changes: As discussed above, we made revisions to the Allowable Claims percentage in Table 3, as compared to the Defensive Claims percentage in Table 5 of the NPRM. Additionally, the Department revised § 685.206(e)(6) to provide a three-year limitations period for both affirmative and defensive claims.

Comments: Another commenter noted that the Department needs to account for the costs to students and justify how the regulations will improve conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools. Another commenter stated that the Department does not indicate what economic analysis justifies placing on students the burden of showing schools' intentional deception. Another commenter mentioned that the Department's estimates in the net budget impact do not contain the potential for significant institutional liabilities, as the proposed regulations have fewer financial protection triggers, resulting in lower levels of recovery. Accordingly, the Department's assumption that these proposed regulations will have the same deterrent effect is impractical and unreasonable.

000236

Through other departmental actions unrelated to this rule, the commenter stated it is likely that the frequency of unlawful conduct will actually increase.

An additional commenter stated that assumptions underlying this forecast that students could be left with "narrowed educational options as a result of unwarranted school closures" appear without basis in fact or reason. The commenter asserts that not only would putting primary responsibility for purveying accurate information on schools be no more of a burden than is normally expected of any honest commercial enterprise, but it would improve overall free market competition by enabling honest schools to flourish in a reliably transparent marketplace at the expense of the dishonest ones. Commenters asserted that the Department needs to show why it would be too burdensome on schools' potential productivity to require them to take the precautions needed to assure their provision of accurate information to prospective students and why students should be expected to be efficient and effective evaluators of the accuracy of schools' promotional efforts.

Discussion: We disagree with commenters who state that we did not account for costs to borrowers. These are covered in the Costs, Benefits, and Transfers, Net Budget Impacts, and Paperwork Reduction Act of 1995 sections. Further, in response to comments, the final regulations revise our proposed borrower defense to repayment standard, which now **\*49886** requires an application and a preponderance of the evidence showing the borrower relied upon the misrepresentation of the school and that the reliance resulted in financial harm to the borrower. The standard in these final regulations does not require students to prove schools' intent to deceive. We agree with commenters that all institutions should bear the burden of their misrepresentations, which is why the Department intends to recoup its losses from institutions due to borrower defense discharges. Despite the commenter's concern, the financial triggers we have included in the final regulations are better calibrated to link the triggering events to a precise and accurate picture of an institution's financial health. The pattern and maximum rate of recoveries is reduced from the PB2020 baseline, but the recovery rate remains significant and will reduce help offset borrower defense discharges.

The comments about the specific budget assumptions and the potential deterrent effect of the regulations are addressed in the Net Budget Impacts section of this RIA.

Other Departmental actions unrelated to this rule are not at issue in promulgating these final regulations. The commenter is welcome to submit comments in response to other proposed regulations if the commenter believes that the Department's other actions will somehow increase unlawful conduct. While it is true that the Department's regulations may have interactive effects, the Department does not agree that the proposed changes to the accreditation regulations described in the NPRM published June 12, 2019, will lead to a substantial increase in conduct that could generate borrower defense claims. Even if an influx of bad actors were to occur and go unchecked as suggested by the commenter, we believe the range of outcomes described in the Net Budget Impact sensitivity runs capture the potential effects.

The Department agrees with commenters that institutions should be held accountable for making a misrepresentation, as defined in these final regulations. The Department does not believe that it is too burdensome for institutions to provide accurate information to their students. Borrowers have choices in the education marketplace, and these final regulations seek to eliminate, prevent, and address unlawful conduct. The Department explains why its Federal standard, the definition of misrepresentation, and the adjudication process adequately address unlawful conduct in the applicable sections of the preamble.

Changes: None.

Comments: One commenter mentioned that lifting the ban on pre-dispute arbitration clauses, class action waivers, and internal dispute processes and deleting provisions that would require reporting on the number of arbitrations and judicial proceedings, award sizes, and status of students would allow institutions to limit the flow of information regarding abuses, misrepresentations, and fraudulent activity. The resulting delay of information would add costs to the taxpayer and burden to borrowers. In fact, another commenter opines that the Department does not state key costs and overstates relative benefits of rescinding the 2016 provisions restricting funds to schools that use forced arbitration and class-action waivers and replacing them with an

"information-only" approach. Although the NPRM claims that borrowers will benefit due to transparency, the data would be helpful to law enforcement and future student loan borrowers.

Another commenter contends that the Department has no support for the assertion that permitting forced arbitration will reduce the cost impact of unjustified lawsuits. This commenter also contends that the Department does not acknowledge one of the benefits of the 2016 final regulations in deterring misconduct of schools and recommends that the Department assess the reduction in deterrence as a cost.

Discussion: The Department supports the use of internal dispute resolution processes as a way for disputes to be resolved expeditiously, which was not prohibited by the 2016 final regulations. An internal dispute resolution process is often a vehicle for a borrower to receive relief directly from an institution, in a cost-effective and timely manner. The use of an internal dispute resolution process can be a vehicle for potential resolution, without placing the burden on the Department to adjudicate.

The Department also reminds the commenters that borrowers who have entered into a pre-dispute arbitration agreement or endorsed a class action waiver may still avail themselves of the borrower defense to repayment process offered in these final regulations. Indeed, the Department will toll the limitations period for filing a borrower defense to repayment application until the final arbitration award is entered. As previously stated, the borrower, however, may file a borrower defense to repayment application before the arbitration proceeding, during the proceeding, or after the proceeding. The Department does not wish to create a burden in requiring institutions to report the number of arbitrations and judicial proceedings, award sizes, and various other matters. As detailed in the Paperwork Reduction Act discussion of Section 685.300, these changes are estimated to reduce burden by 179,362 hours and $6.56 million annually.

Additionally, the final regulations on financial responsibility standards do require institutions to report the occurrence of risk events that may have a material impact on their financial stability or ability to operate.

The Department does not assert that arbitration will reduce the cost impact of unjustified lawsuits only but instead that arbitration generally eases burdens on the overtaxed U.S. court system.[FN172] The section on "Pre-Dispute Arbitration Agreements, Class Action Waivers and Internal Dispute Processes" in the preamble provides a more fulsome justification for the Department's policy determinations.

Finally, the Department believes that these final regulations also deter unlawful conduct by an institution, and the commenter does not provide any evidence to support the assumption that these final regulations will not do so. Accordingly, the Department will not assess the reduction in deterrence as a cost. However, in response to the commenter's points about reduced deterrence, the Department added a sensitivity scenario assuming no deterrent effect on institutional conduct in the Net Budget Impacts section of this RIA.

Changes: As mentioned above, we added a sensitivity scenario assuming no deterrent effect on institutional conduct in the Net Budget Impacts section of this RIA.

Comments: One commenter noted that the Department's analysis of benefits to borrowers makes unsupported assertions regarding the advantages of arbitration relative to litigation in court. The commenter said that available evidence in the higher education context does not support the Department's predictions. Another commenter stated that the NPRM provides no explanation for decreasing the estimate of students at proprietary schools that would be impacted by arbitration clauses from 66 percent to 50 percent. The impact of both in costs to students and to the number of students directly affected needs to be reevaluated.

Discussion: We thank the commenters who provided counter-analysis on mandatory arbitration clauses. We disagree with commenters who state the budget estimate is poorly explained; a **\*49887** specific estimate for students affected by the provision identified by the commenter is not included in either the 2016 budget estimate or the NPRM budget estimate. We believe

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the commenter is referring to the Paperwork Reduction Act burden calculation that in the 2016 final rule that assumed 66 percent of students would receive the notices required in § 685.300(e) or (f).[FN173] No specific basis was described for the 66 percent. In the NPRM published July 31, 2018, the Department used the percent of students who use the Department's online entrance counseling as a basis for its assumption that 50 percent of students would be affected by pre-dispute arbitration agreements.[FN174] Additional detail about the burden calculation is provided in the Paperwork Reduction Act discussion related to arbitration disclosures.

The Department's reasons for allowing borrowers and schools to enter into a pre-dispute arbitration agreement and class action waivers, and the benefits of this policy are explained more fully in the "Pre-dispute Arbitration Agreements, Class Action Waivers and Internal Dispute Processes" section in the Preamble.

Changes: No change necessary.

Comment: One commenter noted that the Department's definition of small businesses under the Regulatory Flexibility Act does not make sufficient use of Department data, defines a small institution in an arbitrary manner, and that this definition is not in line with the definition used by the Small Business Administration. The commenter asserted that the Department should rely on the IPEDS finance survey to identify institutions with less than $7 million in annual revenue. The commenter stated that the Department should consider the typical size of nonprofit institutions in evaluating whether they qualify as dominant in their fields by calculating the median for four-year and less-than-four-year nonprofits. They also said that this definition would be more responsive going forward, by reflecting potential changes in the education marketplace through adjustments to the median in future calculations. For public institutions, the commenter said the Department should explain why it chose to measure them based on student enrollment, when the proposed regulations noted that public institutions are usually determined to be small organizations based on the population size overseen by their operating government. If a justification cannot be made for Department's determinations, the commenter said it should revert to the definition it has historically used until it can work with institutions of higher education to find a more accurate threshold.

Discussion: We disagree with the commenter who stated that the Department's reasons for proposing a definition of small institutions are unclear. While the Department did use the IPEDS finance survey to identify proprietary institutions that were considered small for previous regulations including the 2016 final regulations, we believe the enrollment-based definition provides a better standard that can be applied consistently across types of institutions. As we stated in the NPRM, the Department does not have data to apply the Small Business Administration's definition for institutions; specifically, we do not have data to identify which private nonprofit institutions are dominant in their field nor do we have data on the governing body for public institutions. We disagree with commenters who suggest that a "typical" size of nonprofit institutions should be used to determine whether the institution is dominant in its field. Further, we disagree with the commenter's suggestion to use median (50th percentile) enrollment as the threshold for identifying small institutions; no evidence presented by the commenter suggests that the bottom 50 percent of institutions are small. In fact, selecting a percentile threshold without an analytical basis for selection of that threshold would be an unsupported conclusion.

We disagree with the commenter who stated that the definition of small institutions proposed by the Department was arbitrary and capricious. As stated in the NPRM, the definition was based upon IPEDS data from 2016, and we used statistical clustering techniques to identify the smallest enrollment groups. Specifically, coverage of and correlations between revenue, title IV volume, FTE enrollment, and number of students enrolled were evaluated for all institutions that responded to the 2016 IPEDS survey. Because this definition should work for all institutions, and not just title IV participating institutions, title IV funds were rejected as a variable to measure size. Further, research found that revenue had poor coverage and was not well correlated with enrollment in the public and private nonprofit sectors, so it was also rejected as a variable to measure size. Department data do have good coverage, for all institutions, in enrollment data. Therefore, enrollment data were selected as the variable to measure size. Additionally, data were grouped into two-year and four-year institutions based on visual differences in data distribution.

We used a k-means model to identify optimal numbers of clusters by determining local maxima in the pseudo F statistic (SAS Support, Usage Note 22540, available at: support.sas.com/kb/22/540.html and SAS Community, Tip: K-means clustering in SAS—comparing PROC FASTCLUS and PROC HPCLUS, available at: https://communities.sas.com/t5/SAS-Communities-Library/Tip-K-means-clustering-in-SAS-comparing-PROC-FASTCLUS-and-PROC/ta-p/221369). We then used a centroid method to identify clusters (SAS Institute Inc, 2008, Introduction to Clustering Procedures: SAS/STAT® 9.2 User's Guide, Cary, NC: SAS Institute Inc. available at: support.sas.com/documentation/cdl/en/statugclustering/61759/PDF/default/statugclustering.pdf) and confirmed visually. The smallest cluster of four (0-505) was used for the two-year institutions' definition, and the two smallest clusters of six (0-425 and 425-1015) were used for the four-year institutions' definition. The thresholds were rounded to the nearest 100 for simplicity and to allow for annual variation. Further, the results were deemed sufficient by visual inspection for each control (public, private, and proprietary). Finally, the four-year definition further confirms the existing IPEDS definition for a small institution.

Changes: None.

Comments: One commenter stated that given policy changes in the proposed regulations, the Department assumes too high a recovery rate from institutions. This commenter contends that the assumptions should be revisited and the percentage for recovery should be reduced. They also note that the proposed regulations include fewer financial protections than what the Department laid out in the 2016 final regulations, many of which were early-warning indicators. The commenter asserted that the financial triggers included in the proposed regulations are much less predictive of problems and will apply to very few colleges than those included in the 2016 final regulations. They also asserted that these triggering events constitute such significant evidence of concern that it may well be too late to prevent further damage and liabilities for taxpayers will likely not provide enough financial protection to explain the difference between the recovery percentages **\*49888** estimated in the 2016 final regulations and those included in the 2018 NPRM. Accordingly, the commenter said that use of the triggers will not increase the effectiveness of financial protection over time. Thus, they said there is little reason to believe the share of borrower defense discharges recovered from institutions will increase over time at all; it may even decrease, since some of these events will likely lead to the closure of the school and the removal of the riskiest institutions from the marketplace.

Discussion: The Department appreciates the commenter's detailed comments about the recovery rate assumption and addresses the comment in the Net Budget Impacts section of this RIA. The top recovery rate in the main scenario was reduced to 20 percent. Additionally, the sensitivity run related to recovery rates and the no-recovery scenario described after Table 4 are designed to reflect the possibility that recoveries will be lower than anticipated in the main estimate, and the Department believes this is appropriate to address the concerns raised by the commenter about the level of recoveries.

Changes: Recovery rate assumption updated as described in Net Budget Impacts section.ne.


### 3. Costs, Benefits, and Transfers

These final regulations will affect all parties participating in the title IV, HEA programs. In the following sections, the Department discusses the effects these proposed regulations may have on borrowers, institutions, guaranty agencies, and the Federal government.


### 3.1. Borrowers

These final regulations would affect borrowers through borrower defense to repayment applications, closed school discharges, false certification discharges, loan rehabilitation, and institutional disclosures. Borrowers may benefit from an ability to appeal to the Secretary if a guaranty agency denies their closed school discharge application, from lower tuition and increased campus stability associated with longer leases, and from a more generous "look back" period with regard to closed school loan discharges.

In response to comments, the Department will provide the opportunity to seek loan relief through borrower defense to repayment to all borrowers, regardless of that borrower's repayment status. Some borrowers may incur burden to review institutional disclosures on mandatory arbitration and class action waivers or complete applications for loan discharges, and there could be additional burden to borrowers who would otherwise, through no affirmative action on their part, be included in a class-action proceeding.

### 3.1.1. Borrower Defenses

Upon further consideration and in response to comments, the Department will provide the opportunity to seek loan relief through borrower defense to repayment to all borrowers, regardless of that borrower's repayment status. However, the Federal defense to repayment standard for loans first disbursed on or after July 1, 2020, includes certain limits and conditions to prevent frivolous or stale claims, including a three-year period within which to apply after exiting the institution and a requirement that borrowers demonstrate both reliance and harm. The Department estimates this change will result in more applications relative to the NPRM, but fewer than that expected under the 2016 final regulations. Borrowers are more likely to have their borrower defense to repayment applications processed and decided more quickly if the Department has a smaller volume of claims.

Relative to the 2016 regulations, the final regulations do not include a group claim process because the evidence standard and the fact-based determination of the borrower's harm that the Department is requiring in these final regulations necessitates that each claim be adjudicated separately to determine the borrower's reliance on the institution's alleged misrepresentation. The definition of misrepresentation in these final regulations would make borrowers who may have been included in the group determination that cannot prove individual reliance and harm ineligible for borrower defense loan discharges.

When borrower defense to repayment discharge applications are successful, dollars are transferred from the Federal government to borrowers because borrowers are relieved of an obligation to pay the government for the loans being discharged. As further detailed in the Net Budget Impacts section, the Department estimates that annualized transfers from the Federal Government to affected borrowers, partially reimbursed by institutions, would be reduced by $512.5 million. This is based on the difference in cashflows associated with loan discharges when these final regulations are compared to the 2016 final regulations as estimated in the President's Budget 2020 baseline and discounted at 7 percent. To the extent borrowers with successful defense to repayment claims have subsidized loans, the elimination or recalculation of the borrowers' subsidized usage periods could relieve them of their responsibility for accrued interest and make them eligible for additional subsidized loans.

A defense to repayment discharge is one remedy available to students, among other available avenues for relief. Students harmed by institutional misrepresentations continue to have the right to seek relief directly from the institution through arbitration, lawsuits in State court, or other available means. Borrowers would possibly receive quicker and more generous financial remedies from institutions through these means since schools may be more motivated to make students whole through the arbitration process in order to avoid defense to repayment claims. The 2016 final regulations prohibited mandatory pre-dispute arbitration agreements, and while institutions may have continued to provide voluntary arbitration, schools may not have made it obvious to students how to avail themselves of arbitration opportunities. The final regulations do not prohibit institutions from including mandatory pre-dispute arbitration clauses and class action waivers in enrollment agreements, but require institutions to provide the borrower with information about the meaning of mandatory arbitration clauses, class action waivers, and how to use the arbitration process in the event of a complaint against the institution. The benefit of arbitration is that it is more accessible and less costly to students and institutions than litigation. For borrowers who seek relief from a court, there may be additional advantages since courts can award damages beyond the loan value, which the Department cannot do; although, this could be offset by the expense in both time and dollars of a lawsuit. In addition, borrowers who seek relief through arbitration may also be awarded repayment of tuition charges that were paid in cash or through other forms of credit, which the Department cannot do.

### 3.1.2. Closed School Discharges

Some borrowers may be impacted by the changes to the closed school discharge regulations. These final regulations would, for a loan first disbursed on or after July 1, 2020, extend the window for a Direct Loan borrower's eligibility for a closed

school discharge from 120 to 180 days from the date the school closed. Under the final regulations, a borrower whose school closed would qualify for a closed school discharge unless the borrower accepted a teach-out opportunity approved by the institution's accrediting agency and, if **\*49889** applicable, the institution's State authorizing agency; unless the school failed to meet the material terms of the teach-out plan approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, such that borrower was unable to complete the program of study in which the borrower was enrolled. The final regulations also provide that borrowers who transfer their credits to another institution would not be eligible for a closed school discharge. These final regulations also revise the provision in the 2016 Direct Loan regulations that provides for an automatic closed school discharge without an application for students that did not receive a closed school discharge or re-enroll at a title IV participating institution within three years of a school's closure to apply to schools that closed on or after November 1, 2013 and before July 1, 2020. While the automatic discharge would have benefitted some students who no longer would need to submit an application to receive relief, it may have disadvantaged students who wish to continue their education at a later time or provide proof of credit completion to future employers. There could also be tax implications associated with closed school loan discharges, and borrowers should be aware of those implications and given the opportunity to make a decision according to their needs and priorities.

The expansion of the eligibility period for a closed school discharge will increase the number of students eligible under this provision and encourage institutions to provide opportunities for students to complete their programs in the event that a school plans to close. The reduced availability of closed school discharges because of the elimination of the three-year automatic discharge for schools that close on or after July 1, 2020 may reduce debt relief for students. As further detailed in the Net Budget Impacts section, the Department estimates that annualized closed school discharge transfers from the Federal Government to affected borrowers would be reduced by $37.2 million. This is based on the difference in cashflows associated with loan discharges when the final regulations are compared to the 2016 final regulations as estimated in the President's Budget 2020 baseline (PB2020) and discounted at 7 percent.

The Department's accreditation standards [FN175] require accreditors to approve teach-out plans at institutions under certain circumstances, which emphasizes the importance of these plans to ensuring that students have a chance to complete their program should their school close. Teach-out plans that would require extended commuting time for students or that do not cover the same academic programs as the closing institution likely would not be approved by accreditors. In addition, an institution whose financial position is so degraded that it could not provide adequate instructional or support services would similarly likely not have their teach-out plan approved. In the case of the precipitous closures of certain institutions in 2015 and 2016, it is possible that enabling those institutions to offer teach-out plans to their current students—including by arranging teach-outs plans delivered by other institutions or under the oversight of a qualified third party—could have benefited students and saved hundreds of millions of dollars of taxpayer funds.

Large numbers of small, private non-profit colleges could close in the next 10 years, which could significantly increase the number of borrowers applying for closed school discharges if these institutions are not encouraged to provide high quality teach-out options to their students.[FN176] For example, Mt. Ida College announced [FN177] that it would close at the end of the Spring 2018 semester and while the institution had considered entering into a teach-out arrangement with another institution, this did not materialize. While there may be other institutions that have accepted credits earned at Mt. Ida, due to the distance between Mt. Ida and other campuses, it may be impractical for the student to attend another institution.[FN178] A proper teach-out plan may have allowed more students to complete their program. The requirement of accreditors to approve such options ensures protection for borrowers to ensure that a teach-out plan provides an accessible and high-quality option for students to complete the program.

### 3.1.3. False Certification Discharges

Some borrowers may be impacted by the changes to the false certification discharge regulations, although this provision of the final regulations simply updates the regulations to codify current practice required as a result of the removal of the ability to benefit option as a pathway to eligibility for title IV aid. In the past, a student unable to obtain a high school diploma could still receive title IV funds if he or she could demonstrate that he or she could benefit from a college education.

With that pathway eliminated by a statutory change, prospective students unable to obtain their high school transcripts when applying for admission to a postsecondary institution would be allowed to certify to their institutions that they graduated from high school or completed a home school program and qualify for Federal financial aid. At the same time, it will disallow students who misrepresent the truth in signing such an attestation from subsequently seeking a false certification discharge. Although the Department has not seen an increase in false certification discharges as a result of the elimination of the ability to benefit option, given the increased awareness of various loan discharge programs, the Department believes it is prudent to set forth in regulation that if a student falsely attests to having received a high school diploma, the student would not be eligible for a false certification discharge. Codifying this practice will not have a significant impact, but will ensure that students who completed high school but are unable to obtain an official diploma or transcript will retain the opportunity to participate in postsecondary education. The Department does not believe that there are significant numbers of students who are unable to obtain an official transcript or diploma, but recent experiences related to working with institutions following natural disasters demonstrates that this alternative for those unable to obtain an official transcript is important.

### 3.1.4. Institutional Disclosures of Mandatory Arbitration Requirements and Class Action Waivers

Borrowers, students, and their families would benefit from increased transparency from institutions' disclosures of mandatory arbitration clauses and class action lawsuit waivers in their enrollment agreements. Under the final regulations, institutions would be required to disclose that their enrollment agreements contain class action waivers and mandatory pre-dispute arbitration clauses. Institutions would be required to make these disclosures to students, prospective students, and the public on institutions' websites and in the admission's section of their catalogue. Further, borrowers would be notified of these during entrance counselling. As further discussed in the Paperwork Reduction Act section, we estimate there is 5 minutes of burden to 342,407 borrowers **\*49890** annually at $16.30 [FN179] per hour to review these notifications during entrance counseling, for an annual burden of $446,506.

As institutions began preparing to implement the 2016 final regulations, some eliminated both mandatory and voluntary arbitration provisions to be sure they would be in compliance with the letter and spirit of the regulations. Under the newly finalized regulations, institutions would be able to include these provisions in their enrollment agreements. The effect will be to allow schools to require borrowers to redress their grievances through a quicker and less costly process, which we believe will benefit both the institution and the borrower by introducing the judgment of an impartial third party, but at a lower cost and burden than litigation. Arbitration may be in the best interest of the student because it could negate the need to hire legal counsel and result in adjudication of a claim more quickly than in a lawsuit or the Department's 2016 borrower defense claim adjudication process. Mandatory arbitration also reduces the cost impact of unjustified lawsuits to institutions and to future students, since litigation costs may be ultimately passed on to current and future students through tuition and fees. As discussed in more depth in the preamble, arbitration also increases the likelihood that damages will be paid directly to students, rather than used to pay legal fees.

However, with the removal of the requirement to report certain arbitration information to the Department, if more disputes are resolved in arbitration there may be less feedback to the Department, the public and prospective students about potential issues at institutions. This may extend the period that misrepresentation by institutions may go undetected, potentially exposing more borrowers and increasing taxpayer exposure to potential claims.

### 3.2. Institutions

Institutions will be impacted by the final regulations in the areas of borrower defenses, closed school discharges, false certification discharges, FASB accounting standards, financial responsibility standards, and information disclosure. The benefits to institutions include a decrease in the number of reimbursement requests resulting from Department-decided loan discharges based on borrower defenses, closed school, and false certification; an increased involvement in the borrower defense adjudication process; the ability to continue to receive the benefit from the cost savings associated with existing longer-term leases and reduced relocation costs until such time as the composite score methodology can be updated through future negotiated

rulemaking; and the ability to incorporate arbitration and class action waivers in enrollment agreements. Institutions may incur costs from increased arbitration and internal dispute resolution processes, providing teach-out plans in the event of a planned school closure, and compliance with required disclosure and reporting requirements.

### 3.2.1. Borrower Defenses

Many institutions, those that do not have a significant number of claims filed against them would not incur additional burden as a result of the final regulatory changes in the borrower defense to repayment regulations. Those institutions against which claims are filed will be given the opportunity to provide evidence to the Department during claim adjudication. Further, these final regulations include a three-year period of limitations, which aligns with institutions' records retention requirements. We further estimate that successful defense to repayment applications under the Federal standard and process will affect only a small proportion of institutions. The Department expects that the changes in these regulations would result in fewer successful defense to repayment applications as compared to the 2016 final regulations, and therefore fewer discharges of loans. Therefore, the Department expects to request fewer repayment transfers from institutions to cover discharges of borrowers' loans. Under the main budget estimate explained further in the Net Budget Impacts section, the Department estimates an annual reduction of reimbursements of borrower defense claims from institutions to the government of $153.4 million under the seven percent discount rate.

However, the Department believes that by requiring institutions that utilize mandatory arbitration clauses and class action waivers to provide plain language disclosures along with additional information at entrance counseling, more students may utilize arbitration to settle disputes. As a result, institutions may have increased costs related to increased use of internal dispute processes; although, the Department was unable to monetize those costs as it has limited information about the procedures used in different institutions and the associated costs.

### 3.2.2. Closed School Discharges

A small percentage of institutions close annually, with 630 closures at the 8-digit OPEID branch level in 2018. Some institutions provide teach-out opportunities to enable students to complete their programs and others leaving students to navigate the closure on their own, resulting in their eligibility for closed school loan discharges. The final regulations expand the eligibility window for students with Direct loans first disbursed on or after July 1, 2020, who left the institution but are still eligible to receive closed school loan discharges from 120 to 180 days. The final regulations also clarify that a borrower who accepts a teach-out plan would not qualify for a closed school discharge, unless the institution failed to meet the material terms of the teach-out plan, such that the borrower was unable to complete the program of study in which the borrower was enrolled.

The Department has worked with a number of schools that have successfully completed teach-out plans. As additional schools close in the future, the Department wants to encourage them to offer orderly teach-outs rather than close without making arrangements to protect their students. We believe the final regulations will encourage institutions to provide teach-out opportunities, despite their potential high cost, if doing so would reduce the total liability that could result from having to reimburse the Secretary for losses due to closed school discharges. Title IV-granting institutions are required by their accreditors [FN180] to have an approved teach-out plan on file and to update that plan with more specific information in the event that the institution is financially distressed, is in danger of losing accreditation or State authorization, or is considering a voluntary teach-out for other reasons. Accreditors, and in some cases, State authorizing agencies, must approve teach-out plans and carefully monitor teach-out activities. Students who opt to participate in an approved teach-out plan and who are provided that opportunity as outlined in the plan will not be eligible for a closed school loan discharge under this provision. As in the current regulation, students who transfer their credits will also not be eligible for a closed school discharge.

The Department is revising the regulatory provision that provides automatic closed school discharges for Direct Loan borrowers who do not complete their program within three years after the school closed to apply to **\*49891** schools that closed on or after November 1, 2013 and before July 1, 2020. This is expected to reduce closed school discharges and the potential institutional liability associated with them.

000244

### 3.2.3. False Certification Discharges

A small percentage of institutions are affected by false certification discharges annually. The final regulations would permit institutions to obtain a written assurance from prospective students who completed high school but are unable to obtain their high school transcripts when applying for admission and Federal financial aid, without exposing themselves to financial liabilities should those students misrepresent the truth in their attestations. To ensure that the unintended consequence of this policy change is not an increase in the frequency or cost of false certification discharges, the Department believes it is necessary to specify that a student who misrepresents his or her high school completion status under penalty of perjury cannot then receive a false certification loan discharge due to non-completion of high school or a home school program. The final regulations will protect institutions as they seek to serve students who are pursuing postsecondary education but cannot obtain an official diploma or transcript. We believe this final regulation will not have a significant impact on institutions because the Department receives very few false certification discharge requests and, as discussed further in the Net Budget Impacts section, the Department does not include any false certification discharge recoupment transfers in its estimate.

### 3.2.4. Financial Responsibility Standards

Both the 2016 final regulations and these final regulations include conditions under which institutions would have to provide a letter of credit or other form of financial protection in order to continue to participate in the title IV, HEA programs. The following table compares the financial responsibility triggers established by the 2016 final regulations and in these final regulations. Mandatory events or actions automatically result in a determination that the institution is not financially responsible and trigger a request for a letter of credit or other financial protection from the institution, whereas discretionary events or actions give the Secretary the discretion to make that determination at the time the event or action may occur. In a change from the NPRM, if an institution is subject to two discretionary events within the period between calculation of composite scores, the events will be treated as mandatory events unless a triggering event is resolved before any subsequent event(s) occurs. These final regulations also keep high annual dropout rates as a discretionary trigger, as was the case in the 2016 final rule, with the specific threshold to be determined in the future.

### Table 2—Financial Responsibility Triggers

| Financial responsibility trigger | 2016 regulation | Final regulation | Change summary |
|---|---|---|---|
| Mandatory Actions or Events: Recalculated Composite Score <1.0 | | | |
| Action or Event triggers Secretary decision and may result in a letter of credit or other financial protection to Department | Actual or projected expenses incurred from a triggering event | Actual expense incurred from a triggering event | Eliminates projected expenses. |
| Defense to repayment that does or could lead to an institution repaying government for discharges | Department has received or adjudicated claims associated with the institution | Department has discharged loans resulting from adjudicated claims | Changed from Discretionary to Mandatory or reduced to actual discharges only. |
| Lawsuits and Other Actions that leads or could lead to institution paying a debt or incurring a liability | Final judgment in a judicial proceeding, administrative proceeding or determination, or final settlement; legal action brought by a Federal | Final judgment or determination in a judicial or administrative proceeding or action | Reduced to final judgments or determinations with public records. |

000245

|  |  |  |  |
|---|---|---|---|
|  | or State Authority pending for 120 days; or other lawsuits that have survived a motion for summary judgment or the time for such a motion has passed |  |  |
| Withdrawal of Owner's Equity at proprietary institutions | Excludes transfers between institutions with a common composite score | Excludes transfers to affiliated entities included in composite score, reduces reporting of wage-equivalent distributions | Revised, clarifies the most common types of withdrawals. |
| **Mandatory Actions or Events** |  |  |  |
| Non-Title IV Revenue (90/10): Fails in most recent fiscal year | At proprietary institutions | At proprietary institutions | Reclassified as a discretionary trigger. |
| Cohort Default Rates | Two most recent rates are 30 percent or above after any challenges or appeals | Two most recent rates are 30 percent or above after any challenges or appeals | Reclassified as a discretionary trigger. |
| SEC or Exchange Actions regarding the institution's stock (Publicly Traded Institutions) | Warned SEC may suspend trading; failed to file required report with SEC on-time; notified of noncompliance with Stock exchange requirements; or Stock delisted | SEC suspends trading or stock delisted | Changed from an SEC warning, which does not require shareholder notification, to events in which shareholder notification is required. |
| Accreditor Actions—Teach-Outs | Accreditor requires institution to submit a teach-out plan for closing the institution, a branch, or additional location | Removed | Regulatory update. |
| Gainful Employment | Programs one year away from losing their eligibility for title IV, HEA program funds due to GE metrics | Removed | Regulatory update. |
| **Discretionary Actions or Events** |  |  |  |
| Accreditor Actions—probation, show-cause, or other equivalent or greater action | Accreditor takes action on institution | Institutional accreditor issues a show-cause order that, if not resolved, would result in the loss of institutional accreditation; accreditation is removed | Limits trigger to accreditor actions that do or could imminently lead to loss of institutional accreditation and/or closure of the school. |
| Security or Loan Agreement violations | Creditor requires an increase in collateral, a change in contractual obligations, an increase in interest rates or | Creditor requires an increase in collateral, a change in contractual obligations, an increase in interest rates or | No Change. |

000246

| | payments, or other sanctions, penalties, or fees | payments, or other sanctions, penalties, or fees | |
|---|---|---|---|
| Cited for Failing State licensing or authorizing agency requirements | Notified of noncompliance with any provision | Notified of noncompliance relating to termination or withdrawal of licensure or authorization if institution does not take corrective action | Reduced reporting of State actions. |
| Significant Fluctuations in Pell Grant and Direct Loan funds | Changes in consecutive award years, or over a period of award years, not due to title IV program changes | Removed | None, not directly relevant. |
| Financial Stress Test developed or adopted by the Secretary | Institution fails the test but specific stress test never proposed or developed | Removed | None because test never created. |
| High Drop-Out Rates, as defined by the Secretary | Institution has high annual drop-out rate but Specific threshold never developed | Included, a revision from the NPRM | None. |
| Anticipated Borrower Defense Claims | Secretary predicts claims as a result of a lawsuit, settlement, judgment, or finding from a State or Federal administrative proceeding | Removed | Reduced Liability. |

**\*49892**  Some institutions may incur burden from the requirement to report any action or event described in § 668.171(e) within the specified number of days after the action or event occurs. As further explained in the Paperwork Reduction Act of 1995 section, the Department estimates the burden for reporting these events to the Secretary would be 720 hours annually for private schools and 2,274 hours for proprietary institutions for a total burden of 2,994 hours. Using an hourly rate of $44.41, [FN181] we estimate that the costs incurred by this regulatory change would be $132,964 annually ($44.41 * 2,994).

FASB is a standard-setting body that establishes generally accepted accounting principles and the Department requires that institutions participating in the title IV, HEA programs file audited financial statements annually, with the audits performed under FASB standards. Therefore, financial statements will begin to contain elements that are either new or reported differently, including long-term lease liabilities. This topic was not addressed in the 2016 final regulations, but was included in the 2018 NPRM.

Changes in the definition of terms used under the financial responsibility standards will align the regulations with current practice and FASB standards.[FN182] However, the new FASB lease standard could negatively affect or cause an institution to fail the composite score and the Department has no mechanism to make a timely adjustment to the composite score calculation to accommodate this change. The Department also has no data to understand what the impact of this change will be on institutional composite scores. Therefore, the Department must obtain audited financial statements prepared in accordance with FASB standards, and will calculate one composite score for an institution by grandfathering in leases entered into prior to December 15, 2018 (pre-implementation leases) and applying the new standard to any leases entered into on or after that date (post-implementation leases).

The Department may use the data it will collect under the final regulations to conduct analyses that might inform future rulemaking to update the composite score methodology. As explained further in the Paperwork Reduction Act of 1995 section, 1,896 proprietary institutions and 1,799 private institutions will each need 1 hour annually to prepare a  **\*49893**  Supplemental

Schedule to post along with their annual audit ((1,896 + 1,799) x 1 hour x $44.41). This will result in an additional annual burden of $164,095. The Department is not yet receiving these data on institutions' financial statements, so it is unable to quantify anticipated changes.

### 3.2.5. Enrollment Agreements

The final regulations would permit institutions to include mandatory arbitration clauses and class action waivers in enrollment agreements they have with students receiving title IV financial aid. These provisions were prohibited by the 2016 regulations. The recent Supreme Court decision in Epic Systems Corp. v. Lewis, 138 S. Ct. 1612 (2018) held that arbitration clauses in employment contracts must be enforced by the courts as written, in essence confirming the right of private parties to sign contracts that compel arbitration and waive class action rights. Institutions may benefit from arbitration in that it is a faster and less expensive way to resolve disputes, while reducing reputational effects; however, they may incur costs resulting from an increased use of arbitration under the final regulations.

### 3.2.6. Institutional Disclosures

Some institutions will incur costs under the proposed disclosure requirements. Institutions that include mandatory pre-dispute arbitration clauses or class action waivers in their enrollment agreements would be required to make certain disclosures. As further explained in the Paperwork Reduction Act of 1995 section, the Department estimates the burden for making these disclosures would affect 944 proprietary institutions for a total of 4,720 hours annually. Using an hourly rate of $44.41,[FN183] we estimate the costs incurred by this regulatory change would be $209,615. Also as discussed in the Paperwork Reduction Act of 1995 section, we estimate these same institutions would be required to include this information to borrowers during entrance counseling, for a further burden of 3 hours each annually, totaling $125,769 annually (944 * 3 * 44.41). Therefore, we estimate the total burden for disclosures would be $335,384 annually ($209,615 + $125,769).

### 3.3. Guaranty Agencies

In the 2018 NPRM, the Department estimated one-time costs of $14,922 and annual costs of $3,286 for systems updates and reporting related to borrowers eligible for closed school discharges and for forwarding escalated review requests to the Secretary. As noted in the preamble discussion of Departmental Review of Guaranty Agency Denial of Closed School Discharge Requests, these provisions are currently in effect from the 2016 Final Rule and are not included in these final regulations. Therefore, the estimated costs from the NPRM are not included in this Regulatory Impact Analysis. The Department does not have data on interest capitalization and collection costs for rehabilitated loans to estimate the impact of the changes in the final regulations.

### 3.4. Federal Government

These final regulations would affect the Federal government's administration of the title IV, HEA programs. The Federal government would benefit in several ways, including reductions in student loan discharge transfers, reduced administrative burden, and increased access to data. The Federal government would incur costs to update its IT systems to implement the changes. The changes to the financial responsibility triggers may reduce recoveries relative to the 2016 final rule. The Department believes that it has retained many of the key triggers, but, as noted in the Net Budget Impacts section, these changes could increase the costs to taxpayers.

### 3.4.1. Borrower Defenses

The final regulations permit borrowers to submit claims to the Department regardless of loan status but impose a statute of limitations. It is more likely that the cost of misrepresentation would be incurred by institutions committing the act or omission than the taxpayer, because the Department would recoup defense to repayment discharge transfers from institutions. Further, because the Department estimates it will receive fewer borrower defense applications under the final regulations than under the 2016 regulations, the Department expects a reduction in administrative burden.

### 3.4.2. Loan Discharges

Under the final regulations, the Department would expect to process and award fewer closed school and potentially fewer false certification loan discharges than it would have under the 2016 regulations. To the extent defense to repayment, closed school, and false certification loan discharges are not reimbursed by institutions, Federal Government resources that could have been used for other purposes will be transferred to affected borrowers. As further detailed in the Net Budget Impacts section, the Department estimates that annualized transfers from the Federal government to affected borrowers, partially reimbursed by institutions, would be reduced by $512.5 million for borrower defenses and $37.2 million for closed school discharges with reductions in reimbursement from institutions of $153.4 million annually. This is based on the difference in cashflows associated with loan discharges when the final regulation is compared to the President's Budget 2020 baseline (PB2020) and discounted at 7 percent.

The Department has also determined that it is the appropriate party to provide affected students with a closed school discharge application and a written disclosure describing the benefits and consequences of a closed school discharge. When institutions were expected to fill this role, the estimated burden was approximately $70,000. As the Department already is in contact with affected students and has the relevant materials, we do not expect a significant increase in administrative burden after some initial set up costs.

### 3.4.3. Financial Responsibility Standards

The Department will benefit from receiving updated financial statements consistent with FASB standards and therefore would have data necessary for developing updated composite score regulations through future rulemaking. The financial responsibility disclosures will enable the Department to receive the information necessary to calculate the composite score.

The Department would incur one-time costs for modifying eZ-Audit and other systems to collect the data needed to calculate composite scores under the new FASB reporting requirements and other systems to collect financial responsibility disclosures. The Department has not yet conducted the Independent Government Cost Estimate (IGCE) to determine the costs for making these system changes. However, the Department has not yet developed its internal process for implementing the final regulations, which may necessitate a software modification or individually-generated calculations; consequently, it is unable to estimate the change in administrative burden. Therefore, the Department is unable to estimate its burden for implementing the regulatory changes in the financial responsibility provisions.

### *49894  4. Net Budget Impacts

These final regulations are estimated to have a net Federal budget impact over the 2020-2029 loan cohorts of $-11.075 billion in the primary estimate scenario, including $-9.812 billion for changes to the defense to repayment provisions and $-1.262 billion for changes related to closed school discharges. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. Several comments were received about the assumptions for the budget estimate presented in the NPRM and those are addressed in the Discussion portion of this Net Budget Impact section.

The Net Budget Impact compare these regulations to the 2016 final regulations as estimate in the 2020 President's Budget baseline (PB2020). This baseline assumed that the borrower defense regulations published by the Department on November 1, 2016, would go into effect and utilized the primary estimate scenario,[FN184] described in the final rule published February 14, 2018.[FN185] The primary difference with the PB2019 baseline was the effective date and the cohorts subject to the Federal standard established by the 2016 final rule with cohorts 2017 to 2019 being subject to the 2016 Federal standard in the PB2020 baseline. Several commenters objected to the use of the PB2019 baseline as the basis for the budget estimate in the NPRM and the discrepancy with the framing of the regulation in comparison to the 1995 regulation in other sections of the NPRM and believed it could violate the APA. The Department maintains that the most recent budget baseline, now PB2020, is the

appropriate baseline for estimating the net budget impact of these final regulations. In the absence of these regulations, the 2016 final regulations would go into effect and that is reflected in the PB2020 baseline. We believe this comparison is appropriate and accurately captures that these final regulations are expected to reduce the amount of claims paid to students by the Federal government and reduce the institutional liability for reimbursing those claims.

The final regulatory provisions with the greatest impact on the Federal budget are those related to the discharge of borrowers' loans. Borrowers may pursue closed school, false certification, or defense to repayment discharges. The precise allocation across the types of discharges will depend on the borrower's eligibility and ease of pursuing the different discharges, and we recognize that some applications may be fluid in classification between defense to repayment and the other discharges, particularly closed school. In this analysis, we assign any estimated effects from defense to repayment applications to the defense to repayment estimate and the remaining effects associated with eligibility and process changes related to closed school discharges to the closed school discharge estimate.

### 4.1. Defense to Repayment Discharges

As noted previously, the Department had to incorporate the changes to the defense to repayment provisions related to the 2016 final regulations into its ongoing budget estimates, and changes described here are evaluated against that baseline. In our main estimate, based on the assumptions described in Table 3, we present our best estimate of the impact of the changes to the defense to repayment provisions in the final regulation.

### 4.1.1. Assumptions and Estimation Process

The net present value of the reduced stream of cash flows compared to what the Department would have expected from a particular cohort, risk group, and loan type generates the expected cost of the proposed regulations. We applied an assumed level of school misconduct, allowable claims, defense to repayment applications success, and recoveries from institutions (respectively labeled as Conduct Percent, Allowable Applications Percent, Borrower Percent, and Recovery Percent in Table [3]) to loan volume estimates to generate the estimated net number of borrower defense applications for each cohort, loan type, and sector. Table [3] presents the assumptions for the main budget estimate with the budget estimate for each scenario presented in Table [4]. We also estimated the impact if the Department received no recoveries from institutions, the results of which are discussed after Table 4.

The model can be described as follows: To generate gross claims (gc), loan volumes (lv) by sector were multiplied by the Conduct Percent (cp), the Allowable Applications Percent (aap) and the Borrower Percent (bp); to generate net claims (nc) processed in the Student Loan Model, gross claims were then multiplied by the Recovery Percent (rp). That is, gc = (lv * cp * aap * bp) and nc = gc - (gc * rp). The Conduct Percent represents the share of loan volume estimated to be affected by institutional behavior resulting in a defense to repayment application. The Borrower Percent captures the percent of loan volume associated with approved defense to repayment applications, with factors such as an individual claims process, proof of reliance and financial harm requirement being key determinants of the reduced level compared to the PB2020 baseline. The Recovery Percent estimates the percent of gross claims reimbursed by institutions. The Allowable Applications Percent replaces the Defensive Claims Percent from the NPRM and captures the share of applications estimated to be made within the 3-year timeframe for borrowers in all repayment statuses to apply for defense to repayment. The numbers in Table 3 are the percentages applied for the main estimate and PB2020 baseline scenarios for each assumption for cohorts 2020-2029.

Table 3—Assumptions for Main Budget Estimate Compared to PB2020 Baseline

| Cohort | | | | | | |
|---|---|---|---|---|---|---|
| | PB2020 baseline | | | Final rule | | |
| | Pub | Priv | Prop | Pub | Priv | Prop |
| Conduct Percent | | | | | | |

| Year | | | | | | |
|---|---|---|---|---|---|---|
| 2020 | 1.7 | 1.7 | 11.6 | 1.62 | 1.62 | 11.02 |
| 2021 | 1.5 | 1.5 | 9.8 | 1.43 | 1.43 | 9.31 |
| 2022 | 1.4 | 1.4 | 8.8 | 1.33 | 1.33 | 8.36 |
| 2023 | 1.3 | 1.3 | 8.4 | 1.24 | 1.24 | 7.98 |
| 2024 | 1.2 | 1.2 | 8 | 1.14 | 1.14 | 7.6 |
| 2025 | 1.2 | 1.2 | 7.8 | 1.14 | 1.14 | 7.41 |
| 2026 | 1.1 | 1.1 | 7.7 | 1.05 | 1.05 | 7.32 |
| 2027 | 1.1 | 1.1 | 7.7 | 1.05 | 1.05 | 7.32 |
| 2028 | 1.1 | 1.1 | 7.7 | 1.05 | 1.05 | 7.32 |
| 2029 | 1.1 | 1.1 | 7.7 | 1.05 | 1.05 | 7.32 |

Allowable Applications Percent (Not in PB2020 Baseline)

| | | | | | | |
|---|---|---|---|---|---|---|
| All Cohorts | | ....................... | | 70 | 70 | 70 |

Borrower Percent

| Year | | | | | | |
|---|---|---|---|---|---|---|
| 2020 | 42.4 | 42.4 | 54.6 | 3.3 | 3.3 | 4.95 |
| 2021 | 46.7 | 46.7 | 60 | 3.75 | 3.75 | 5.475 |
| 2022 | 50 | 50 | 63 | 4.125 | 4.125 | 5.925 |
| 2023 | 50 | 50 | 65 | 4.5 | 4.5 | 6.3 |
| 2024 | 50 | 50 | 65 | 4.8 | 4.8 | 6.75 |
| 2025 | 50 | 50 | 65 | 5.25 | 5.25 | 6.975 |
| 2026 | 50 | 50 | 65 | 5.25 | 5.25 | 7.5 |
| 2027 | 50 | 50 | 65 | 5.25 | 5.25 | 7.5 |
| 2028 | 50 | 50 | 65 | 5.25 | 5.25 | 7.5 |
| 2029 | 50 | 50 | 65 | 5.25 | 5.25 | 7.5 |

Recovery Percent

| Year | | | | | | |
|---|---|---|---|---|---|---|
| 2020 | 75 | 28.8 | 28.8 | 75 | 16 | 16 |
| 2021 | 75 | 31.68 | 31.68 | 75 | 20 | 20 |
| 2022 | 75 | 33.26 | 33.26 | 75 | 20 | 20 |
| 2023 | 75 | 34.93 | 34.93 | 75 | 20 | 20 |
| 2024 | 75 | 36.67 | 36.67 | 75 | 20 | 20 |

| Year | | | | | | |
|---|---|---|---|---|---|---|
| 2025 | 75 | 37.4 | 37.4 | 75 | 20 | 20 |
| 2026 | 75 | 37.4 | 37.4 | 75 | 20 | 20 |
| 2027 | 75 | 37.4 | 37.4 | 75 | 20 | 20 |
| 2028 | 75 | 37.4 | 37.4 | 75 | 20 | 20 |
| 2029 | 75 | 37.4 | 37.4 | 75 | 20 | 20 |

*49895  As in previous estimates, the recovery percentage reflects the fact that public institutions are not subject to the changes in the financial responsibility triggers because of their presumed backing by their respective States, which has never depended upon or been linked to a specific provision of any borrower defense regulation. Therefore, the PB2020 baseline and main recovery scenarios are the same for public institutions and set at a high level to reflect the Department's confidence in recovering amounts from the expected low number of claims against public institutions. The decrease in the recovery percentage assumption for private and proprietary institutions compared to the PB2020 baseline reflects the removal or modification of some financial responsibility triggers as described in Table 2. We do not specify how many institutions are represented in the estimate as the assumptions are based on loan volumes and the scenario could represent a substantial number of institutions engaging in acts giving rise to defense to repayment applications or could represent a small number of institutions with significant loan volume subject to a large number of applications. According to Federal Student Aid data center loan volume reports, the five largest proprietary institutions in loan volume received 25.7 percent of Direct Loans disbursed in the proprietary sector in award year 2017-18 and the 50 largest proprietary institutions represent 70.7 percent of Direct Loans disbursed in that same time period.[FN186] We were conservative in our estimates of the share of volume captured in the conduct percentage and the number of applications submitted in the Allowable Applications percentage as we did not want to underestimate costs associated with changes to the borrower defense regulations. Due to the similarities between the conduct covered by the standard in the proposed regulations and the standard in the 2016 final regulations, as described in the Discussion segment, the Conduct Percent did not change from the PB2020 Baseline as much as the Borrower Percent. Changes to the definition of misrepresentation to require reasonable reliance and a materiality threshold, as further described in the Analysis of Comments and Changes—Evidentiary Standard for Asserting a Borrower Defense section of this preamble are reflected in the changes to the Borrower Percent as part of the likelihood of the borrower succeeding with their defense to repayment. As recent loan cohorts progress further in their repayment cycles, if future data indicate that the percent of volume affected by conduct that meets the standard that would give rise to defense to repayment applications differs from current estimates, that difference will be reflected in future baseline re-estimates.

**\*49896  4.1.2. Discussion**

The Department has some additional experience with processing defense to repayment applications and data on the approximately 230,000 applications received since 2015, but while this information has helped inform these estimates, it does not eliminate the uncertainty about institutional and borrower response to the final regulations. As noted earlier, given the limited number of applications that the Department has adjudicated, both in number and sector of institutions that are represented in this number, our data may not reflect the final results of the Department's review and approval process.

As a result of comments received and the Department's continued internal deliberations, a number of changes were made from the proposed regulation in the NPRM published July 31, 2018. Several commenters suggested allowing affirmative claims, expanding the timeframe for borrowers to make claims, and not requiring student borrowers to prove an institution's intent to mislead them. A number of commenters expressed concern that the Department's alternative in the proposed rule, which would provide relief to borrowers in a collection proceeding, could encourage students to engage in strategic defaults and would give preferential treatment to borrowers in default as compared to those in repayment. The Department agrees with these concerns and therefore is removing the references to affirmative or defensive claims. Instead, these final regulations provide a borrower —regardless of whether that borrower is in repayment, forbearance, deferment, default, or collection—an opportunity to submit

a borrower defense to repayment application for loan forgiveness. Other commenters expressed concern that affirmative claims could lead to an increase in frivolous claims, which could increase the cost of responding to these claims on the part of the institution and the Department. In order to reduce the number of unjustified claims, the Department has included in these final regulations that borrowers must prove reasonable reliance on the institution's misrepresentation, that the misrepresentation caused financial harm to the borrower, and that the borrower submitted a borrower defense to repayment application three years from the date of graduation or withdrawal from the institution. The Department believes that a borrower would know within three years of departing the institution whether the institution had made a misrepresentation to the borrower and caused the borrower financial harm. This three-year period also aligns with the Department's records retention policies, which is important since the final regulation seeks to enable the Department to review a complete record, including the institution's response to the student's allegations of misrepresentation. That change is reflected in the Allowable Applications Percent and would likely reduce the estimated savings from the proposed regulations in the NPRM, although the precise outcome depends upon the balance between the 3-year timeframe for filing and removing the limitation to defensive claims only. Although some commenters supported the use of a preponderance of evidence standard in adjudicating claims, others commented that given the tendency for institutional misrepresentations to be referred to as fraud, the Department's standard should more closely align with that required by most states in adjudicating claims of consumer fraud. The Department has decided to retain the preponderance of evidence standard to provide a reasonable opportunity for a borrower to seek and receive student loan relief. Therefore, more borrowers, including those not in default or collections, will have an opportunity to prove their defense to repayment application should be approved, but the borrowers will have to prove more elements of misrepresentation including materiality, with the budget effects of the two changes going in opposite directions. Nothing in this regulation interferes with other rights of the borrower, including during a collections procedure, to assert equitable defenses, such as equitable recoupment. By itself, the Federal standard is not expected to significantly change the percent of loan volume subject to conduct that might give rise to a borrower defense claim. The changes in the misrepresentation definition and removal of the breach of contract claims will have some downward effect, so the conduct percent is assumed to be 95 percent of the PB2020 baseline level.

In addition, some commenters addressed specific aspects of the Department's assumptions and budget estimate or provided additional information for the Department to consider. These comments are addressed below in the discussion relevant to the specific assumptions.

As has been estimated previously, we are incorporating a deterrent effect of the borrower defense to repayment provisions on institutional behavior as is reflected in the decrease in the conduct percent in Table [3]. One commenter challenged the inclusion of a deterrent effect as unreasonable because several of the mechanisms that would act as a deterrent under the 2016 rule would not be included in these final regulations. The commenter argued that the prohibition of pre-dispute arbitration and increased financial responsibility triggers in the 2016 rule would result in higher liabilities and increased transparency with respect to institutional misrepresentation and form a basis for a deterrent effect on institutional conduct in the 2016 rule. According to the commenter, allowing pre-dispute mandatory arbitration and the reduced applications and resulting liabilities reduces the reputational risk to institutions and makes the inclusion of a deterrent effect unreasonable. This commenter also asserts that there will likely be an increase in the percentage of unlawful conduct due to the elimination of the gainful employment rule in addition to these final regulations. The Department acknowledges that the financial responsibility triggers have changed and the mechanisms to influence institutional conduct are different under these final regulations, but we still believe that the potential liability, political risk, and some reputational risk will continue to have some deterrent effect. We recognize that the timing or extent of this effect may vary from that under the 2016 rule and have developed an alternative scenario with no deterrent effect in the additional scenarios presented in Table 4 to capture the possibility raised by the commenter that institutions will not modify their behavior. A commenter also questioned the recovery percentage applied given the changes in the financial protection triggers compared to the 2016 rule. In particular, the commenter pointed to the increased timeframe for recovery and the increased number of more predictive financial responsibility triggers in the 2016 rule as reasons for higher recovery rates that increased over time from about 25 percent to 37 percent. The Department appreciates the comment and agrees with the commenter that the changes in the timeframe for recovery and changes in the triggers in the final regulations will reduce the percentage of gross claims recovered from institutions, as was reflected in the reduced recovery percentage in the NPRM of 16 percent to 25 percent compared to the PB2020 baseline of 28 to 37 percent. As there is limited information about recoveries

related to borrower defense claims currently being processed, the exact percentage that will be recovered is uncertain, as it was for the 2016 final regulations, and the **\*49897** Department and the commenter disagree on the extent to which recoveries will be reduced by the timeframe and the changes in triggers that the Department supports for the reasons detailed in the Analysis of Comments and Changes related to the Financial Responsibility provisions. These final regulations also revise the treatment of discretionary events so that they are treated as mandatory events if multiple events occur in the period between the calculation of composite scores, unless a triggering event is resolved before subsequent events occur. The discretionary trigger related to high dropout rates was also included after being removed in the NPRM. We believe these changes support the recovery level the Department has assumed for its estimates. Additionally, the sensitivity run related to recovery rates and the no-recovery scenario described after Table 4 are designed to reflect the possibility that recoveries will be lower than anticipated in the main estimate, and the Department believes this is appropriate to address the concerns raised by the commenter about the level of recoveries. Upon consideration, the Department does agree that the ramp-up in recovery rates is likely aggressive compared to the 2016 final regulations which included triggering events at earlier stages that the Department now considers an overreach. The ramp-up in recoveries has been modified to reflect this reconsideration, as demonstrated in Table 3.

Overall, we expect that the changes in the final regulations that will reduce the anticipated number of borrower defense applications are related more to changes in the process, not due to changes in the type of conduct on the part of an institution that would result in a successful defense, as demonstrated by the 95 percent overlap compared to the PB2020 baseline.

The final regulations modify the framework in which borrower defense to repayment applications are submitted in response to certain collection activities initiated by the Department, specifically administrative wage garnishment, Treasury offset, credit bureau default reporting, and Federal salary offset. As has always been the case, borrowers will be able to seek relief from their institutions in State or Federal courts or from State or Federal agencies, or through arbitration, but defense to repayment applications through the Department will be reserved to applications made in the first three years after the borrower leaves the institution. In the estimate for the NPRM, the Department used the assumed default rates by student loan model risk group to estimate the percent of loan volume associated with borrowers who, over the life of the loan, might be in a position to raise a defense to repayment. As the final regulations allow applications within three years of leaving an institution, the Department looked at existing borrower defense claims by time to submission from the date the borrower completed or exited the program. Approximately 30 percent of existing claims were submitted within 3-years or less. The Department anticipates that this share will increase when borrowers have the incentive to file within the 3-year timeframe established by the final regulations. Therefore, we used the approximately 67 percent of existing claims filed within 5 years as the basis for the 70 percent assumed for the Allowable Applications Percent in Table [3] to capture the potential effect of this incentive.

Several process changes contribute to the reduction in the Borrower Percent compared to the PB2020 baseline assumption. A separate assumption for the allowable applications provision was explicitly included so it could be varied in sensitivity runs or in response to comments. Specifically, the final regulations modify the definition of misrepresentation. This requires borrowers to prove reliance upon the misrepresentation and the financial harm they experienced. Another significant factor is the emphasis on determinations of individual applications and the lack of an explicit process for aggregating like applications. The Department will be able to group like applications against an institution for more efficient processing, but, even if there is a finding that covers multiple borrowers, relief will be determined on an individual basis and be related to the level of financial harm proven by the borrower. Together, these changes could require more effort on the part of individual borrowers to submit a borrower defense application, which is reflected in the change in the Borrower Percent assumption.

The net budget impact of the emphasis on other avenues for relief is complicated by the potential for amounts received in lawsuits, arbitration, or agency actions to reduce the amount borrowers would be eligible to receive through a defense to repayment filing. While it would be prudent for borrowers to use any funds received with respect to the Federal loans in such proceedings to pay off the loans, there is no mechanism in the proposed regulations to require this. This offset of funds received in other actions was also a feature in the 2016 final regulations, but the majority of applications processed did not have offsetting funds to consider due to the precipitous closure of two large institutions. Accordingly, we are not assuming a budgetary impact resulting from prepayments attributable to the possible availability of funds from judgments or settlement of claims related to

000254

Federal student loans. Another factor that could affect the number of defense applications presented is the role of State Attorneys General or State agencies in pursuing actions or settlements with institutions about which they receive complaints. The level of attention paid to this area of consumer protection could alert borrowers in a position to apply for a defense to repayment and result in a different number of applications than the Department anticipates. Evidence developed in such proceedings could be used by borrowers to support their individual applications. However, unlike in the 2016 final regulations, final judgments on the merits of such lawsuits or other allegations made by State Attorneys General will not provide an automatic basis for a successful borrower defense application, further contributing to the reduction of the assumed borrower percent.

The Department has used data available on defense to repayment applications, associated loan volumes, Departmental expertise, the discussions at negotiated rulemaking, information about past investigations into the type of institutional acts or omissions that would give rise to defense to repayment applications, and decisions of the Department to create new sanctions and apply them to institutions thus instigating precipitous closures to develop the main estimate and sensitivity scenarios that we believe will capture the range of net budget impacts associated with the defense to repayment regulations.

### 4.1.3. Additional Scenarios

The Department recognizes the uncertainty associated with the factors contributing to the main budget assumption presented in Table 3. For example, allowing institutions to present evidence may result in fewer unjustified findings of misrepresentation that lead to an adjudicated claim. We have not included the impact of this potential evidence in our calculations as we have no basis for determining the impact that an institutional defense will have on the adjudication of applications. The uncertainty in the defense to repayment estimate, given the unknown level of future school conduct that could give **\*49898** rise to claims; institutions' reaction to the regulations to eliminate such activities; the impact of allowing institutions to present evidence in response to borrowers' applications; the expansion of College Scorecard data to include program level outcomes, potentially reducing the opportunity for misrepresentation by providing information on outcomes on a common basis; the extent of full versus partial relief granted; the level of State activity are reflected in additional analyses that demonstrate the effect of changes in the specific assumption being tested. Some commenters suggested additional runs that would single out individual aspects of the assumptions like the individual versus group processing of claims, a factor the commenter correctly points out is a major contributor to the reduction in the borrower percentage. However, the borrower defense assumptions have never been specified by individual components and the data to do so is limited, so the sensitivity runs are designed to capture the effect of changes in the assumptions, whatever the combination of factors that may cause the change. The Department believes this is appropriate and avoids a false sense of precision about the effect of changes to specific components of the assumptions.

The Department designed the following scenarios to isolate the assumption being evaluated and adjust it in the direction that would increase costs, increasing the Allowable Applications or Borrower Percent and decreasing the recovery percent. The first scenario the Department considered is that the Allowable Applications Percent will increase by 15 percent (AAP15). This could occur if economic conditions or strategic behavior by borrowers increase defaults or more borrowers than anticipated file applications within the 3-year window. In the second scenario the Department increased the Borrower Percent by 25 percent (Bor25) to reflect the possibility that outreach, model applications, or other efforts by students may increase the percent of loan volume associated with successful defense to repayment applications. As the gross borrower defense claims are generated by multiplying the estimated volumes by the Conduct Percent, Allowable Applications Percent, and the Borrower Percent, the scenarios capture the impact of a 15 percent or 25 percent change in any one of those assumptions. The Recovery Percentage is applied to the gross claims to generate the net claims, so the RECS scenario reduces recoveries by approximately 40 percent to demonstrate the impact of that assumption. We also included the combined scenario that includes those changes together as they may likely occur simultaneously. In response to commenter concerns about the potential absence of a deterrent effect on institutional behavior, we have added a scenario that keeps the highest level of the conduct percentage across all cohorts in the No Deter scenario. The final scenario (Bor50) takes a different approach and recognizes that the borrower percent changed significantly from the 2016 final rule. As we have discussed throughout the Net Budget Impact section, the impact associated with the changes made in these final regulations is speculative, so this run assumes a 50 percent reduction in the borrower percent from the 2016 final rule assumptions that are in the PB2020 budget baseline. This would reflect a scenario where many borrowers who may have been brought in through a group claim submit applications and are able to provide the information to

support their application. The net budget impacts of the various additional scenarios compared to the PB2020 baseline range from $-7.97 billion to $-9.70 billion and are presented in Table 4.

**Table 4—Budget Estimates for Additional Borrower Defense Scenarios**

| Scenario | Estimated costs for cohorts 2020-2029 (outlays in $mns) |
| --- | --- |
| Main Estimate | $-9,812 |
| AAP15 | -9,699 |
| Bor25 | -9,656 |
| Recs40 | -9,690 |
| No deterrence | -9,567 |
| Combined | -9,047 |
| Bor50 | -7,972 |

The transfers among the Federal government, affected borrowers, and institutions associated with each scenario above are included in Table 5, with the difference in amounts transferred to borrowers and received from institutions generating the budget impact in Table 3. The amounts in Table 4 assume the Federal Government will recover from institutions some portion of amounts discharged. In the absence of any recovery from institutions, taxpayers would bear the full cost of approved defense to repayment applications. For the primary budget estimate, the annualized costs with no recovery are approximately $498 million at a 3 percent discount rate and $512.5 million at a 7 percent discount rate. This potential increase in costs demonstrates the effect that recoveries from institutions have on the net budget impact of the final defense to repayment regulations.

**4.2. Closed School Discharges**

In addition to the provisions previously discussed, the final regulations also would make two changes to the closed school discharge process that are expected to have an estimated net budget impact of -$1.2621 billion, of which -$187 million is a modification to past cohorts related to the elimination of the automatic three-year discharge for schools that close on or after July 1, 2020. The combined effect of the elimination of the three-year automatic discharge and the expansion of the eligibility window to 180 days for Direct Loan borrowers is -$1,075 million for cohorts 2020-2029. In the NPRM version, students offered a teach-out opportunity approved by the institution's accrediting agency and State authorizing agency were not eligible for a closed school discharge. In the final regulations, students are eligible to receive a closed school loan discharge unless they transfer their credits, or participate in an approved teach-out plan. Once a borrower chooses to participate in an approved teach-out plan, they are no longer eligible for a closed school loan discharge unless the institution fails to materially meet the requirements of the approved teach-out plan. As with the estimates related to the borrower defense to repayment provisions, the net budget impact estimates for the closed school discharge provisions are developed from the PB2020 budget baseline that accounted for the delayed implementation of the 2016 final regulations and assumed the 2016 final regulations would take effect on July 1, 2019.

As described in the regulation, the standard path to such a discharge will require borrowers to submit an application. The savings from eliminating the three-year automatic closed school discharge provisions offset the costs of expanding the eligibility window to 180 days for cohorts 2020-2029. The precise interaction between the two effects is uncertain as outreach and better information for borrowers about the closed school loan discharge process may increase the rate of borrowers who submit applications. In estimating the effect of the 2016 final regulations, the Department looked at all Direct Loan **\*49899** borrowers at schools that closed from 2008-2011 to see the percentage of loan volume associated with borrowers that had not received a closed school discharge and had no NSLDS record of title-IV aided enrollment in the three years following their school's closure and found it was approximately double the amount of those who received a discharge. This could be because the students received a teach-out or transferred credits and completed their program without additional title IV aid, or it could be that the students did not apply for the discharge because of a lack of awareness or other reasons. Whatever the reason, in estimating the potential cost of the 3-year automatic discharge provision in the PB2020 baseline, the Department applied this increase to the closed school discharge rate. For these final regulations, we have reversed the increase attributed to the 3-year automatic discharge.

The volume of additional discharges that might result from the expansion of the window is also difficult to predict. The Department analyzed borrowers who were enrolled within 180 days of the closure date for institutions that closed between July 1, 2011 and February 13, 2018 and found that borrowers who withdrew within the 121 to 180-day time frame would increase loan volumes eligible for discharge by approximately nine percent. However, it is possible that some borrowers who complete their programs in that window or the current 120-day window for eligibility would choose to withdraw and pursue a closed school loan discharge instead of completing the program if the school closure is known in advance. The likelihood of this is unclear as it might depend on the relative length of the program, the time the borrower has remaining in the program, and the borrower's perception of the value of the credential versus the burden of starting the program over again as compared to the prospect of debt relief. Further, if the student knows that the school plans to close, it is likely because the school has implemented a teach-out plan, which would negate the borrower's ability to claim a closed school discharge if borrower accepts the teach-out. For these reasons, the Department did not adjust for this strategic withdrawal factor in estimating the impact of the expansion of the eligibility window.

The incentives in the final regulations with respect to teach-outs are similar to the existing regulations for both institutions and borrowers, so the Department has reversed the 65 percent reduction in the baseline closed school discharges estimated in the NPRM, reducing the overall savings estimated for the closed school discharge provision. As is demonstrated by the estimated net savings from the closed school discharge changes, the removal of the three-year automatic discharge provisions is still expected to reduce the anticipated closed school discharge claims significantly more than the expansion of the window to 180 days increases them.

## 4.3. Other Provisions

The final regulations will also make a number of changes that are not estimated to have a significant net budget impact including changes to the financial responsibility standards and treatment of leases, false certification discharges, guaranty agency collection fees and capitalization, and the calculation of the borrower's subsidized usage period process. The false certification discharge changes update the regulations to reflect current practices. The proposed regulations would also make borrowers who provide a written attestation of high school completion in place of an earned but unavailable high school diploma ineligible for a false certification discharge. In FY2017, false certification discharges totaled approximately $7 million. As before, we do not expect a significant change in false certification discharge claims that would result in a significant budget impact from this change in terms or use of an application that has been available at least ten years in place of a sworn statement. False certification discharges may decrease due to the ineligibility of borrowers who submit a written attestation in place of a high school diploma, but given the low level of false certification discharges in the baseline, even if a large share were eliminated, it would not have a significant net budget impact. Therefore, we do not estimate an increase in false certification discharge claims or their associated discharge value.

Some borrowers may be eligible for additional subsidized loans and no longer be responsible for accrued interest on their subsidized loans as a result of their subsidized usage period being eliminated or recalculated because of a closed school, false certification, unpaid refund, or defense to repayment discharge. As in the 2016 final regulations, we believe the institutions primarily affected by the 150 percent subsidized usage regulation are not those expected to generate many of the applicable discharges, so this reflection of current practice is not expected to have a significant budget impact.

### 5. Accounting Statement

As required by OMB Circular A-4 we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations (see Table 5). This table provides our best estimate of the changes in annual monetized transfers as a result of these proposed regulations. The amounts presented in the Accounting Statement are generated by discounting the change in cashflows related to borrower discharges for cohorts 2020 to 2029 from the PB2020 baseline at 7 percent and 3 percent and annualizing them. This is a different calculation than the one used to generate the subsidy cost reflected in the net budget impact, which is focused on summarizing costs at the cohort level. As the life of a cohort is estimated to last 40 years, the discounting does have a significant effect on the impact of the difference in cashflows in the outyears. Expenditures are classified as transfers from the Federal Government to affected student loan borrowers.

**Table 5—Accounting Statement: Classification of Estimated Expenditures**

| [In millions] | | |
| --- | --- | --- |
| **Category** | **Benefits** | |
| | **7%** | **3%** |
| Disclosure to borrowers about use of mandatory pre-dispute arbitration clauses and potential increase in settlements between borrowers and institutions (01)Not Quantified | | |
| Reduced administrative burden related to processing defense to repayment applications (01)Not Quantified | | |
| Cost reductions associated with paperwork compliance requirements | -$6.01 | -$6.02 |
| Category (01)Costs | | |
| Changes in Department's systems to collect relevant information and calculate revised composite score (01)Not Quantified | | |

| **Category** | **Transfers** | |
| --- | --- | --- |
| | **7%** | **3%** |
| Reduced defense to repayment discharges from the Federal Government to affected borrowers (partially borne by affected institutions, via reimbursements | $-512.5 | $-498.0 |
| Reduced reimbursements of borrower defense claims from affected institutions to affected student borrowers, via the Federal government | -153.4 | -149.0 |
| Reduced closed school discharges from the Federal Government to affected borrowers | -37.2 | -40.6 |

**\*49900**  Previous Accounting Statements by the Department, including for the 2016 final regulations, presented a number that was the average cost for a single cohort. If calculated in that manner, the reduced transfers for defense to repayment from the Federal government to affected borrowers would be $-1,377.0 billion, reimbursements would be reduced $-414.08 million, and closed school discharge transfers would be reduced $-140.61 million at a 7 percent discount rate.

## 6. Regulatory Alternatives Considered

In response to comments received and the Department's further internal consideration of these final regulations, the Department reviewed and considered various changes to the final regulations detailed in this document. The changes made in response to comments are described in the Analysis of Comments and Changes section of this preamble. We summarize below the major proposals that we considered but which we ultimately declined to implement in these regulations.

In particular, the Department extensively reviewed the financial responsibility provisions and related disclosures and arbitration provisions of these final regulations. In developing these final regulations, the Department considered the budgetary impact, administrative burden, and effectiveness of the options it considered.

### Table 6—Comparison of Alternatives

| Topic | Baseline | Alternatives | Proposal | Final |
|---|---|---|---|---|
| Borrower Defense claims accepted | Affirmative and defensive | Defensive only, Affirmative and defensive, Affirmative and defensive with a limitation period | Defensive only | Claims from any borrower within three years after leaving the institution, regardless of the borrower's repayment status, with some extension for those who are involved in arbitration hearings. |
| Party that adjudicates borrower defense claims | Department | Department, State court or arbiter | Department | Department. |
| Standard for borrower defense claims | Federal Standard | State laws, Federal standard | Federal standard | Federal standard. |
| Borrower defense application process | Application | Submit judgment from state court or similar using application, Submit sworn attestation or application, select borrower defense in response to wage garnishment or similar actions, and Application | Select borrower defense in response to wage garnishment or similar actions | Application. |
| Loans associated with BD claims | Forbearance during adjudication and interest accrues | Forbearance during adjudication process and interest accrues, forbearance not necessary | Forbearance not necessary | Forbearance during adjudication and interest accrues. |
| Closed school discharge eligibility window | 120 days | 120, 150, and 180 days | 180 days | 180 days. |

| | | | | |
|---|---|---|---|---|
| Closed school discharge exclusions | Borrower completed teach-out or transferred credits | Borrower completed teach-out or transferred credits; School offered a teach-out plan | School offered a teach-out plan | Borrower completed teach-out or transferred credits. |
| Composite score calculation and timeline | No FASB updates | No changes until full negotiation of composite score; no grace period or phase-in for FASB updates; higher of current or FASB-updated score forever; and higher of current or FASB-updated score for 6 years, then FASB-updated score | Higher of current or FASB-updated score forever | Current leases grandfathered; FASB applies on renewal. |
| Financial responsibility triggers | Reporting that automatically results in surety request | New reporting that may result in surety request, new reporting that automatically results in surety request | New reporting that may result in surety request | New reporting that may result in surety request. |
| Notification of mandatory arbitration and class action waivers | Prohibits mandatory arbitration clauses and class action waivers | On website, during entrance and exit counseling, and annually by email to students; no required notification beyond the enrollment agreement; notification of students on website and during entrance counseling | Notification of students on website and entrance counseling | Notification of students on website and during entrance counseling. |

**\*49901  6.2. Summary of Final Regulations**

The final regulations amend the baseline regulations to update composite score calculations to comply with new FASB standards, but provide a grandfathering period for existing leases; require institutions to disclose fewer adverse events to the Department; require notification regarding mandatory pre-dispute arbitration clauses or agreements or class-action prohibitions; expand the closed school discharge eligibility period; modify the conditions under which a Direct Loan borrower may qualify for false certification and closed school discharges; eliminate the automatic closed school discharge for schools that closed on or after July 1, 2020; revise the Federal standard for borrower defense claims for loans disbursed on or after July 1, 2020; eliminate the borrower defense group application provision for loans disbursed on or after July 1, 2020; and request evidence from institutions prior to completing adjudication of any borrower defense claims. Finally, there are changes to the regulations collection costs charged by guaranty agencies.


**6.3. Discussion of Alternatives**

The Department considered a broad range of provisions relative to borrower defenses to repayment. One option would require borrowers to submit a judgment from a Federal or State court or arbitration panel to qualify for a defense to repayment discharge, which would not include a process for the Department to adjudicate claims because claimants would already have obtained a decision from a court or arbitrator at the State level. This alternative would place an increased burden on borrowers if they decide to hire a lawyer in order to present their claims to a State court or incur costs associated with an arbitration proceeding. Moreover, because consumer protection laws vary by State, a borrower filing a claim in one State may be subject to different criteria compared to a borrower filing a defense to repayment claim in another State. It may also be unclear as to which State serves as the relevant jurisdiction for a given borrower. A second option would be to rescind the 2016 regulations on borrower defenses and go back to the 1995 regulations. In this alternative the Department would accept only defensive borrower defense claims to repayment applications or attestations and adjudicate them, applying a State law standard. Under this alternative, borrowers could elect to have loans placed in forbearance while their claims are adjudicated.

000260

The Department considered keeping the closed school discharge eligibility window at 120 days or expanding it to 150 or 180 days. Further, one option excludes students whose institutions offer them a teach-out plan from such a discharge, while another option excludes borrowers who complete a teach-out or transfer credits. One alternative considered for the false certification discharge provisions included rescission of the technical changes in the 2016 final regulations.

Relative to pre-dispute arbitration and class-action waiver policies, alternatives included requiring an institution to notify current and potential students on its website, at entrance and exit counselling for all title IV borrowers, and annually to all enrolled students by email; and requiring no notification beyond the enrollment agreement.

Lastly, alternatives were considered related to financial responsibility. One option would implement revisions to FASB standards in the calculation of an institution's composite score without a transition period and would prevent an institution from appealing the composite score calculation while others provided for a transition period or made no changes at all. Whether the Department would require (automatically, discretionarily, or at all) that the institution automatically provide a surety in the event that a financial responsibility risk event occurs was considered.

## 7. Regulatory Flexibility Act

Section 605 of the Regulatory Flexibility Act (5 U.S.C. 603(a)) allows an agency to certify a rule if the rulemaking does not have a significant economic impact on a substantial number of small entities. This certification was revised from the NPRM **\*49902** based upon public comment to improve its clarity.

Comments: The Small Business Association Office of Advocacy expressed concern that the Department has certified that the proposed rule will not have a significant economic impact on a substantial number of small entities without providing a sufficient factual basis for the certification as required by the Regulatory Flexibility Act. The commenter stated that, at a minimum, the factual basis should include: (1) Identification of the regulated small entities based on the North American Industry Classification System; (2) the estimated number of regulated small entities; (3) a description of the economic impact of the rule on small entities; and (4) an explanation of why either the number of small entities is not substantial or the economic impact is not significant under the RFA. They noted that the Department's estimated costs are assumed to be the same for large and small entities, which the commenter objected to on the basis that small institutions have reduced economies of scale. The commenter objected to the Department's statement that potential economic impacts would be minimal and entirely beneficial to small institutions, and claimed the Department lacked data to support the statement. The commenter suggested that the Department should analyze significant alternatives, including: An early claim resolution process to minimize the potential cost of borrower defense claims; allowing borrowers to bring affirmative claims against institutions up to three years after the date of graduation; and applying a clear and convincing evidentiary standard.

The commenter also points out that, currently, the Department requires institutions to maintain student data for three years after a student's graduation, but if a borrower may bring a claim at any point in repayment, schools must maintain student data for decades. Nevertheless, the record contains no information on how high this cost could be. The commenter expressed concern that the need to maintain student data will impose significant liability on small institutions for cybersecurity and student privacy. The commenter stated that these costs to smaller institutions should be analyzed, and recommended that the Department publish for public comment either a supplemental certification with a valid factual basis or an Initial Regulatory Flexibility Analysis (IRFA) before proceeding with this rulemaking.

Discussion: We disagree that the Department did not provide sufficient factual basis for the Regulatory Flexibility Act certification. Specifically, the Department proposed in the Federal Register and requested comment on a definition of small institutions that it is capable of computing using its own data (see: SBA Office of Advocacy, August 2017, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act, p. 15, available at: www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf). We have revised our certification to increase clarity and to account for changes in the final regulations, including a three-year period of limitations on borrower defense to repayment applications, including affirmative claims, from the date the borrower is no longer enrolled at the institution. Finally, the Department defines

significant economic impact as a burden or cost to small institutions, and its estimates build upon those from the Net Budget Impacts and Paperwork Reduction Act of 1995 sections. As compared to the PB2020 baseline that assumed implementation of the 2016 final rule, the impacts of the borrower defense changes are benefits or reduced recoupments, and zero dollars are estimated as impacts of closed school and false certification discharges. Compliance costs for changes to financial responsibility reporting of risk events, disclosure of forced arbitration clauses is minimal. Specifically, the annual costs per entity were estimated at $178 to $266 and $489 the first year with $133 in subsequent years, respectively. Further, the two latter costs only occur at institutions that either have documented risks to their financial responsibility or that are proactively choosing to require mandatory pre-dispute arbitration agreements or class action waivers. While economies of scale may exist for larger institutions, the Department does not have information on the cost differential between types of institutions. The Department does not assume different costs for small institutions, especially for data storage for which additional options are being developed on a regular basis.

As to proposed alternatives, the Department notes that claim resolution can occur between borrowers and institutions freely without the Department's involvement, via mediation or arbitration, or through other avenues if the parties so choose. These final regulations permit claims within a three-year limitation period with limited exceptions for borrowers engage in proceedings that would involve the institution and therefore indefinite records retention will not be required. Additionally, for reasons discussed at greater length above, the final rule adopts a preponderance of the evidence standard.

Changes: Added information about percent of small proprietary institutions under $7 million threshold previously used by the Department for informational purposes.

This rule directly affects all public nonprofit and proprietary institutions participating in title IV programs relative to the proposed financial responsibility provisions; it also affects a small proportion of institutions participating in title IV programs in each sector relative to the loan discharge requirements. As found in the Paperwork Reduction Act of 1995 section, there are currently 5,868 institutions participating in title IV programs, of which 1,799 are private nonprofit and 1,896 are proprietary. Table 6 presents an estimated number and percent of small institutions using the Department's enrollment based definition for small institution. This definition applies equally across control categories and defines a small institution as one with under 500 FTE for 2-yr or less institutions, and 1,000 FTE for 4-year institutions.

Table 6—Small Institutions Under Enrollment-Based Definition

| Level | Type | Small | Total | Percent |
|-------|------|-------|-------|---------|
| 2-year | Public | 342 | 1,240 | 28 |
| 2-year | Private | 219 | 259 | 85 |
| 2-year | Proprietary | 2,147 | 2,463 | 87 |
| 4-year | Public | 64 | 759 | 8 |
| 4-year | Private | 799 | 1,672 | 48 |
| 4-year | Proprietary | 425 | 558 | 76 |
| Total | | 3,996 | 6,951 | 57 |

*49903  In previous regulations, the Department used the small business definitions based on tax status that defined "non-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Compared to those definitions of small institutions which resulted in the Department considering all private nonprofit institutions

as small and no public institutions as small, we think the enrollment-based approach establishes a reasonable framework applicable to all postsecondary institutions. Under the previous definition, proprietary institutions were considered small if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. Using FY2017 IPEDs finance data for proprietary institutions, 50 percent of four-year and 90 percent of two-year or less proprietary institutions would be considered small. The enrollment-based definition captures a similar share of proprietary institutions will having the benefit of allowing comparison to other types of institutions on a consistent basis.

Table 7 summarizes the summarizes number of institutions affected by these final regulations.

**Table 7—Estimated Count of Small Institutions Affected by the Final Regulations**

| | Small institutions affected | As % of small institutions |
|---|---|---|
| Borrower Defense | 355 | 9 |
| Closed School | 57 | 1 |
| False Certification | 183 | 5 |
| Composite Score | 2,565 | 64 |
| Composite Score Recalculation: | | |
| Risk Event Reporting | 641 | 16 |
| Mandatory | 417 | 10 |
| Arbitration Disclosure | 806 | 20 |

The Department has determined that the negative economic impact on small entities affected by the regulations will not be significant. As further explained in the Net Budget Impacts section, the Department estimates a reduction in recoupment due to borrower defense provisions and zero change in recoupment for closed school and false certification provisions. As further explained in the Paperwork Reduction Act of 1995 section, compliance costs associated with the financial responsibility reporting and disclosure requirement changes are minimal and occur only at institutions that either have documented risks to their financial responsibility or that require pre-dispute mandatory arbitration agreements or class-action waivers. Table 8 captures estimated compliance costs per entity and across small institutions.

**Table 8—Compliance Costs for Small Institutions**

| Compliance area | Small institutions affected (01) | Cost range per institution (01) | Estimated overall cost range |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Financial responsibility reporting | 417 | $178 | $266 | $74,226 | $110,922 |
| Mandatory arbitration disclosure | 806 | 133 | * 489 | 107,198 | 394,134 |

Accordingly, the Secretary hereby certifies that these regulations will not have a significant economic impact on a substantial number of small entities.

## 8. Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: The public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

**\*49904**  Sections 668.41, 668.171, appendices A & B to part 668, subpart L, and §§ 685.206, 685.214, 685.215, and 685.304 of these final regulations contain information collection requirements. Additionally, burden assessed in §§ 668.14, 668.41, 668.172, 674.33, 682.402, and 685.300 from the 2016 final regulations and 2018 NPRM is being removed based on these final regulations. Under the PRA, the Department has or will at the required time submit a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

In these final regulations, we have displayed the control numbers assigned by OMB to any information collection requirements proposed in the NPRM and adopted in the final regulations.

### *Section 668.14* Program Participation Agreement

Requirement: In the 2016 final regulations, § 668.14(b)(32) required that an institution, as part of the program participation agreement, provide all enrolled students with a closed school discharge application and a written disclosure describing the benefits and consequences of a closed school discharge after the Department initiated any action to terminate the participation of the school or any occurrence of events specified in § 668.14(b)(31) requiring the institution submit a teach out plan. The Department has since determined that it is the Department's, not the school's, responsibility to provide this information to students, and we are rescinding this regulatory requirement.

Burden Calculation: The Department removes the associated burden of 1,953 hours under the OMB Control Number 1845-0022 and will remove the hours on or after the effective date of the regulations.

### Student Assistance General Provisions—OMB Control Number: 1845-0022

| Institution type | Respondent | Responses | Burden hours | Cost |
|---|---|---|---|---|
| | | | | $36.55 per institution |

000264

| | | | | from 2016 Final Rule |
|---|---|---|---|
| Private | -8 | -1,912 | -340 | $-12,427 |
| Proprietary | -38 | -9,082 | -1,613 | -58,955 |
| Total | -46 | -10,994 | -1,953 | -71,382 |

## Section 668.41 *Reporting and Disclosure of Information*

Requirements: Under the final changes in §668.41(h), an institution that uses pre-dispute arbitration agreements and/or class action waivers will be required to disclose that information in a written plain language disclosure available to enrolled and prospective students, and the public. The regulatory language also prescribes the font size and location of the information on its website on the same page where admissions information is made available as well as in the admissions section of the institution's catalog.

This replaces the previous "Loan repayment warning for proprietary institutions" regulatory text from the 2016 final regulations.

Burden Calculation: There will be burden on schools to make additional disclosures of the institution's use of a pre-dispute arbitration agreement and/or class action waiver to students, prospective students, and the public under this final regulation. Based on informal conversations held with proprietary institutions during negotiated rulemaking and conferences, the Department believes such agreements are currently used primarily by proprietary institutions. Of the 1,888 proprietary institutions participating in the title IV, HEA programs, we estimate that 50 percent or 944 will use a pre-dispute arbitration agreement and/or class action waiver and will provide the required information electronically. We anticipate that it will take an average of 5 hours to develop, program, and post the required information to the websites where admission and tuition and fees information is made available. The estimated burden would be 4,720 hours (944 x 5 hours) under OMB Control Number 1845-0004.

**Student Assistance General Provisions—Student Right To Know (SRK)—OMB Control Number: 1845-0004**

| Institution type | Respondent | Responses | Burden hours | Cost $44.41 per institution from 2018 NPRM |
|---|---|---|---|---|
| Proprietary | 944 | 944 | 4,720 | $209,615 |
| Total | 944 | 944 | 4,720 | 209,615 |

Due to these final regulatory text changes in 668.41(h), the previous burden assessed under the 2016 final regulations will be removed upon the effective date of these regulations. 5,346 hours will be deleted from OMB Control Number 1845-0004 on or after the effective date of the regulations.

**Student Assistance General Provisions—Student Right to Know (SRK)—OMB Control Number: 1845-0004**

000265

| Institution type | Respondent | Responses | Burden hours | Cost |
| --- | --- | --- | --- | --- |
| | | | | $36.55 per institution from 2016 Final Rule |
| Proprietary | -972 | -1,949 | -5,346 | $-195,396 |
| Total | -972 | -1,949 | -5,346 | -195,396 |

**\*49905** *Section 668.171 General*

Requirements: Under the final § 668.171(f), in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or event described in the specified number of days after the action or event occurred. In the notice to the Secretary or in the institution's preliminary response, the institution may show that certain of the actions or events are not material or that the actions or events are resolved.

Burden Calculation: There will be burden on institutions to provide the notice to the Secretary when one of the actions or events occurs. We estimate that an institution will take two hours per action to prepare the appropriate notice and to provide it to the Secretary. We estimate that 180 private institutions may have two events annually to report for a total burden of 720 hours (180 institutions x 2 events x 2 hours). We estimate that 379 proprietary institutions may have three events annually to report for a total burden of 2,274 hours (379 institutions x 3 events x 2 hours). This total burden of 2,994 hours will be assessed under OMB Control Number 1845-0022.

**Student Assistance General Provisions—OMB Control Number: 1845-0022**

| Institution type | Respondent | Responses | Burden hours | Cost |
| --- | --- | --- | --- | --- |
| | | | | $44.41 per institution from 2018 NPRM |
| Private | 180 | 360 | 720 | $31,975 |
| Proprietary | 379 | 1,137 | 2,274 | 100,988 |
| Total | 559 | 1,497 | 2,994 | 132,963 |

**Section 668.172** *Financial Ratios*

Requirements: The proposed changes to § 668.172(d) from the NPRM have been deleted from these final regulations.

Burden Calculation: The proposed burden is being deleted from the Information Collection Request that was filed with the NPRM. There is no longer an estimated increase in burden of 232 hours based on changes to § 668.172 under the OMB Control Number 1845-0022.

**Student Assistance General Provisions—OMB Control Number: 1845-0022**

| Institution type | Respondent | Responses | Burden hours | Cost |
|---|---|---|---|---|
| | | | | $44.41 per institution from 2018 NPRM |
| Private | -450 | -450 | -113 | $-5,018 |
| Proprietary | -474 | -474 | -119 | -5,285 |
| Total | -924 | -924 | -232 | -10,303 |

*Appendix A and B for Section 668—Subpart L—Financial Responsibility*

Requirements: Under final Section 2 for appendix A and B, proprietary and private institutions will be required to submit a Supplemental Schedule as part of their audited financial statements. With the update from the FASB, some elements needed to calculate the composite score will no longer be readily available in the audited financial statements, particularly for private institutions. With the updates to the Supplemental Schedule to reference the financial statements, this issue will be addressed in a convenient and transparent manner for both the schools and the Department by showing how the composite score is calculated.

Burden Calculation: There will be burden on institutions to provide the Supplemental Schedule to the Department. During the negotiations, the members of the negotiated rulemaking subcommittee indicated that they believed that as the information will be readily available upon completion of the required audit the burden would be minimal. We estimate that it will take each proprietary and private institution one hour to prepare the Supplemental Schedule and have it made available for posting along with the annual audit. We estimate that 1,799 private schools will require 1 hour of burden to prepare the Supplemental Schedule and have it made available for posting along with the annual audit for a total burden of 1,799 hours (1,799 **\*49906** institutions x 1 hour). We estimate that 1,888 proprietary schools will require 1 hour of burden to prepare the Supplemental Schedule and have it made available for posting along with the annual audit for a total burden of 1,888 hours (1,888 institutions x 1 hour). This total burden of 3,695 hours will be assessed under OMB Control Number 1845-0022.

The total additional burden under OMB Control Number 1845-0022 will be 6,921 hours.

**Student Assistance General Provisions—OMB Control Number: 1845-0022**

| Institution type | Respondent | Responses | Burden hours | Cost |
|---|---|---|---|---|
| | | | | $44.41 per institution from 2018 NPRM |
| Private | 1,799 | 1,799 | 1,799 | $79,894 |
| Proprietary | 1,896 | 1,896 | 1,896 | 84,201 |

| | | | | |
|---|---|---|---|---|
| Total | 3,695 | 3,695 | 3,695 | 164,095 |

### *Section 682.402 Death, Disability, Closed School, False Certification, Unpaid Refunds, and Bankruptcy Payments*

Requirements: The proposed changes to § 682.402 regarding the requirement that a guaranty agency provide information to a borrower about how to request a review of the guaranty agency's denial of a closed school discharge from the Secretary from the NPRM are not included in the final regulations.

Burden Calculation: The proposed burden is being deleted from the Information Collection Request that was filed with the NPRM. There is no longer an estimated increase in burden of 410 hours based on the changes to § 682.402(d)(6)(ii)(F) under OMB Control Number 1845-0020.

**Federal Family Education Loan Program Regulations—OMB Control Number: 1845-0020**

| Institution type guaranty agency | Respondent | Responses | Burden hours | Cost $44.41 per institution from 2018 NPRM |
|---|---|---|---|---|
| Private | -11 | -89 | -188 | $-8,349 |
| Public | -13 | -105 | -222 | -9,859 |
| Total | -24 | -194 | -410 | -18,208 |

### *Section 685.206 Borrower Responsibilities and Defenses*

Requirements: Under final § 685.206(e), a defense to repayment discharge claim on a Direct Loan disbursed after July 1, 2020, will be evaluated under the Federal standard using an application approved by the Secretary. Under final § 685.206(e), a defense to repayment must be submitted within three years from the date the student is no longer enrolled at the institution.

Burden Calculation: We believe that the burden will be associated with the new form that the borrower receives that accompanies the notice of action from the Department. The new form will be completed and made available for comment through a full public clearance package before being made available for use.

### *Section 685.214 Closed School Discharge*

Requirements: Under final § 685.214(c), the number of days that a borrower must have withdrawn from a closed school to qualify for a closed school discharge will be extended from 120 days to 180 days, for loans first disbursed on or after July 1, 2020. Additionally, if a closed school provided a borrower an opportunity to complete his or her academic program through a teach-out plan approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, the borrower will not qualify for a closed school discharge. The final regulation further provides that the Secretary may extend that 180 days further if there is a determination that exceptional circumstances justify an extension.

Burden Calculation: The extension from 120 days to 180 days for withdrawal prior to the closing of the school will require an update to the current closed school discharge application form with OMB Control Number 1845-0058. We do not believe that

000268

the language update will change the amount of time currently assessed for the borrower to complete the form from those which has already been approved. The form update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations.

### Section 685.215 *Discharge for False Certification of Student Eligibility or Unauthorized Payment*

Requirements: Under final § 685.215, the application requirements for false certification discharges will be amended to reflect the current practice of requiring a borrower to apply for the discharge using a Federal application form instead of a sworn statement. The final regulations will remove the term "ability to benefit" to reflect changes to the HEA. Under the final regulatory changes, a Direct Loan borrower will not qualify for a false certification discharge based on not having a high school diploma in cases when the borrower did not obtain an official transcript or diploma from the high school, and the borrower provided an attestation to the institution that the borrower was a high school graduate.

**\*49907** Burden Calculation: The clarification to require the submission of a Federal application to receive a discharge and updating of the form to remove "ability to benefit" language will require an update to the current false certification application form with OMB Control Number 1845-0058. We do not believe that the language update will change the amount of time currently assessed for the borrower to complete the form, nor an increase in the number of borrowers who may qualify, to complete the form from those that have already been approved. The form update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations.

### Section 685.300 *Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program*

Requirements: Under final § 685.300, paragraphs (d) through (i) finalized in the 2016 final regulations covering borrower defense claims in an internal dispute process, class action bans, pre-dispute arbitration agreements, submission of arbitral records, submission of judicial records, and definitions are removed from the regulations.

Burden Calculation: Due to these final regulatory text changes, the previous burden assessed under paragraphs (e) through (h) in the 2016 final regulation will be removed upon the effective date of these regulations. 179,362 hours will be deleted from OMB Control Number 1845-0143 on or after the effective date of these regulations.

Agreements Between and Eligible School and the Secretary To Participate in the Direct Loan Program—OMB Control Number: 1845-0143

| Institution type | Respondent | Responses | Burden hours | Cost |
|---|---|---|---|---|
| | | | | $36.55 per institution from 2016 Final rule |
| Proprietary | -1,959 | -1,010,519 | -179,362 | $-6,555,681 |
| Total | -1,959 | -1,010,519 | -179,362 | -6,555,681 |

### Section 685.304 *Counseling Borrowers*

Requirements: Under final § 685.304 there are changes to the requirements to counsel Federal student loan borrowers prior to making the first disbursement of a Federal student loan (entrance counseling). Institutions that use pre-dispute arbitration agreements and/or class action waivers will be required to include in mandatory entrance counseling plain-language information about the institution's process for initiating arbitration and dispute resolution, including who the borrower may contact regarding

a dispute related to educational services for which the loan was made. Institutions that require borrowers to accept a pre-dispute arbitration agreement and/or class action waiver will be required to provide information in writing to the student borrower about the plain language meaning of the agreement, when it would apply, how to enter into the process, and who to contact with questions.

Burden Calculation: We believe there will be burden on the institutions to create any institution specific pre-dispute arbitration agreement and/or class action waivers and provide that information in addition to complying with the current entrance counseling requirements. Of the 1,888 participating proprietary institutions, we estimate that 50 percent or 944 institutions will need to create additional entrance counseling information regarding the use of the pre-dispute arbitration agreement and/or class action waivers to provide to their student borrowers. We anticipate that it will take an average of 3 hours to adapt the information provided in § 668.41 as a part of the required entrance counseling, to identify staff who will be able to answer additional questions, and to obtain evidence indicating the provision of the material for a total of 2,832 hours (944 x 3 hours).

Additionally, we believe that there will be minimum additional burden for borrowers to review the information when completing the required entrance counseling and provide the required evidence that the borrowers received the information. In calendar year 2017, 684,813 Direct Loan borrower completed entrance counseling using the Department's on-line entrance counseling. Assuming the same 50 percent of borrowers attend a school that uses pre-dispute arbitration agreements and/or class action waivers will require five minutes to review the material and provide evidence of receipt of the information, we estimate a total of 27,393 hours of additional burden (342,407 borrowers time .08 (5 minutes) = 27,393 hours). There will be a total increase in burden of 30,225 hours under OMB Control Number 1845-0021.

**William D. Ford Federal Direct Loan Program (DL) Regulations—OMB Control Number: 1845-0021**

| Institution type | Respondent | Responses | Burden hours | Cost |
|---|---|---|---|---|
| | | | | $44.41 per institution; $16.30 per individual from 2018 NPRM |
| Proprietary | 944 | 944 | 2,832 | $125,769 |
| Individual | 342,407 | 342,407 | 27,393 | 446,506 |
| Total | 343,351 | 343,351 | 30,225 | 572,275 |

**\*49908**  Consistent with the discussions above, the following chart describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net cost of the burden for institutions, lenders, guaranty agencies and students, using wage data developed using Bureau of Labor Statistics data, available at https://www.bls.gov/ooh/management/postsecondary-education-administrators.htm is $1,078,948 for all positive entries as shown in the chart below. With the deletion of certain regulations, there will be a corresponding savings of $-6,850,970 upon the effective date of these regulations. This cost is based on an estimated hourly rate of $44.41 for institutions, lenders, and guaranty agencies and $16.30 for students unless otherwise noted in the table.

| Regulatory section | Information collection | OMB control No. and estimated burden (change in burden) | Estimated costs |
|---|---|---|---|
| § 668.14 | In the 2016 final regulations, § 668.14(b)(32) required that an institution, as part of the program participation agreement, provide all enrolled students with a closed school discharge application and a written disclosure describing the benefits and consequences of a closed school discharge under certain circumstance. The Department has since determined that it is the Department's, not the school's, responsibility to provide this information to students, and we are rescinding this regulatory requirement | 1845-0022; -1,953. The Department will remove the hours on or after the effective date of the regulations | $-71,382. This amount was based on the 2016 cost of 36.55/hr for institutions. |
| § 668.41 | Under the final regulatory language in § 668.41(h) institutions that use pre-dispute arbitration agreements and/or class action waivers will be required to disclose that information in a plain language disclosure available to enrolled and prospective students, and the public on its website where admissions and tuition and fees information is made available | 1845-0004; +4,720 hours | $209,615. |
| | Additionally due to the changes in the final regulatory text for § 668.41(h), the burden of 5,346 hour previously assessed in the 2016 final regulations will be deleted from this information collection upon the effective | The Department will remove the hours on or after the effective date of the regulations. -5,346 hours | $-195,396. This amount was based on the 2016 cost of 36.55/hr for institutions. |

000271

|  |  |  |  |  |
|---|---|---|---|---|
|  | date of this regulatory package |  |  |  |
| § 668.171 | Under the final regulatory language in § 668.171(f) in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or event described in the specified number of days after the action or event occurs. In the notice to the Secretary or in the institution's response, the institution may show that certain of the actions or events are not material or that the actions or events are resolved | 1845-0022; +2,994 hours |  | $132,964. |
| § 668.172 | The proposed changes to § 668.172(d) from the NPRM have been deleted from the Final rule | 1845-0022; -232 hours | $-10,303. |  |
| Appendix A & B of 668 subpart L | Under final Section 2 for appendix A and B, proprietary and private institutions will be required to submit a Supplemental Schedule as part of their audited financial statements. With the update from the Financial Standards Accounting Board (FASB) some elements needed to calculate the composite score will no longer be readily available in the audited financial statements, particularly for private institutions. With the updates to the Supplemental Schedule to reference the financial statements, this issue will be addressed in a convenient and transparent manner for both the institutions and the Department by showing how the composite score is calculated | 1845-0022; +3,695 hours |  | $164,095. |
| § 682.402 | The final regulations no longer incorporate the proposed change requiring guaranty agencies to provide | 1845-0020; -410 hours | -$18,208. |  |

| | | | |
|---|---|---|---|
| | information to a borrower about how to request a review of an agency's denial of a closed school discharge from the Secretary. This removes the proposed burden | | |
| § 685.206 | Under final § 685.206(e), a borrower defense claim related to a direct loan disbursed after July 1, 2020 will be evaluated under the Federal standard. Under final § 685.206(e), a borrower defense must be submitted within three years from the date the borrower is no longer enrolled at the institution | A new collection will be filed closer to the implementation of this requirement; +0 hours | $0. |
| § 685.214 | Under the final regulations, the number of days that a borrower may have withdrawn from a closed institution to qualify for a closed school discharge will be extended from 120 days to 180 days for loans first disbursed after July 1, 2020. The final language further allows that the Secretary may extend that 180 days further if there is a determination that exceptional circumstances justify an extension | 1845-0058; +0 hours | $0. |
| § 685.215 | Under the final regulatory language in § 685.215, the application requirements for false certification discharges are amended to reflect the current practice of requiring a borrower to apply for the discharge using a completed application form instead of a sworn statement. The final regulatory language removed the use of term "ability to benefit" to bring the definition in line with the current HEA language. Under final regulatory language, a Direct Loan borrower will not qualify for a false certification discharge based on not | 1845-0058; +0 hours | $0. |

| | | | |
|---|---|---|---|
| | having a high school diploma provide that in cases when they did not obtain an official transcript or diploma from the high school, and the borrower provided an attestation to the institution that the borrower was a high school graduate. The attestation will have to be provided under penalty of perjury | | |
| § 685.300 | Under final § 685.300 previous paragraphs (d) through (i) which covered borrower defense claims in an internal dispute process, class action bans, pre-dispute arbitration agreements, submission of arbitral records, submission of judicial records, and definitions are removed from regulation | 1845-0143; -179,362. The Department will remove the hours on or after the effective date of the regulations | $-6,555,681. This amount was based on the 2016 cost of 36.55/hr for institutions. |
| § 685.304 | Under final § 685.304 there are changes to the requirements to counsel Federal student loan borrowers prior to making the first disbursement of a Federal student loan. Institutions that use pre-dispute arbitration agreements and/or class action waivers include in the required entrance counseling information on the institution's internal dispute resolution process and who the borrower may contact regarding a dispute related to educational services for which the loan was made. Institutions that require a pre-dispute arbitration agreement and/or class action waiver will be required to review with the student borrower the agreement and when it will apply, how to enter into the process and who to contact with questions | 1845-0021; +30,225 hours (2,832 institutions +27,393 individual hours) | Total: $572,275. Inst. 125,769; Indiv. 446,506. |

**\*49909  Collections of Information**

The total burden hours and change in burden hours associated with each OMB Control number affected by the regulations as of the effective date of the regulations are as follows:

| Control No. | Total proposed burden hours | Proposed change in burden hours |
|---|---|---|
| 1845-0004 | 23,390 | -626 |
| 1845-0020 | 8,249,520 | -410 |
| 1845-0021 | 739,746 | +30,225 |
| 1845-0022 | 2,286,015 | +4,504 |
| 1845-0143 | 0 | -179,362 |
| Total | 11,298,671 | -145,669 |

Accessible Format: Individuals with disabilities can obtain this document in an accessible format (e.g., Braille, large print, audiotape, or compact disc) on request to the person listed under FOR FURTHER INFORMATION CONTACT.

Electronic Access to This Document: The official version of this document is the document published in the Federal Register. You may access the official edition of the Federal Register and the Code of Federal Regulations is available at www.govinfo.gov. At this site, you can view this document, as well as all other documents of this Department published in the Federal Register, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the Federal Register by using the article search feature at: www.federalregister.gov. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 668*
Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Incorporation by reference, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Parts 682 and 685*
Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: September 3, 2019.

Betsy DeVos,

Secretary of Education.

For the reasons discussed in the preamble, the Secretary of Education amends parts 668, 682, and 685, of title 34 of the Code of Federal Regulations as follows:

**PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS**

1. The authority citation for part 668 is revised to read as follows:

 **\*49910**  Authority: 20 U.S.C. 1001-1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c-1, 1221-3, and 1231a, unless otherwise noted.

Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a-3, 1099c, and 1141.

Section 668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.

Section 668.91 also issued under 20 U.S.C. 1082, 1094.

Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95-452, 92 Stat. 1101-1109.

Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95-452, 92 Stat. 1101-1109.

Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.
 34 CFR § 668.14

**§ 668.14 [Amended]**
34 CFR § 668.14
2. Section 668.14 is amended:

a. In paragraph (b)(30)(ii)(C), by adding the word "and" after "by the institution;";

b. In paragraph (b)(31)(v), by removing "; and" and adding a period in its place;

c. Removing paragraph (b)(32); and

d. Removing the parenthetical authority citation at the end of the section.
 34 CFR § 668.41
3. Section 668.41 is amended:

a. In paragraph (a), in the definition of "Undergraduate students," by adding the words "at or" before "below", and adding the word "level" after "baccalaureate";

b. In paragraph (c)(2) introductory text, by removing "or (g)" and adding in its place "(g), or (h)";

c. By revising paragraph (h); and

d. By removing paragraph (i) and the parenthetical authority citation at the end of the section.

The revision reads as follows:
 34 CFR § 668.41

## § 668.41 Reporting and disclosure of information.

* * * * *

(h) Enrolled students, prospective students, and the public—disclosure of an institution's use of pre-dispute arbitration agreements and/or class action waivers as a condition of enrollment for students receiving title IV Federal student aid. (1) (i) An institution of higher education that requires students receiving title IV Federal student aid to accept or agree to a pre-dispute arbitration agreement and/or a class action waiver as a condition of enrollment must make available to enrolled students, prospective students, and the public, a written (electronic) plain language disclosure of those conditions of enrollment. This plain language disclosure also must state that: The school cannot require the borrower to participate in arbitration or any internal dispute resolution process offered by the institution prior to filing a borrower defense to repayment application with the Department pursuant to § 685.206(e); the school cannot, in any way, require students to limit, relinquish, or waive their ability to pursue filing a borrower defense claim, pursuant to § 685.206(e) at any time; and any arbitration, required by a pre-dispute arbitration agreement, tolls the limitations period for filing a borrower defense to repayment application pursuant to § 685.206(e)(6)(ii).

(ii) All statements in the plain language disclosure must be in 12-point font on the institution's admissions information web page and in the admissions section of the institution's catalogue. The institution may not rely solely on an intranet website for the purpose of providing this notice to prospective students or the public.

(2) For the purposes of this paragraph (h), the following definitions apply:

(i) Class action means a lawsuit or an arbitration proceeding in which one or more parties seeks class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process analogous to Federal Rule of Civil Procedure 23.

(ii) Class action waiver means any agreement or part of an agreement, regardless of its form or structure, between a school, or a party acting on behalf of a school, and a student that relates to the making of a Direct Loan or the provision of educational services for which the student received title IV funding and prevents an individual from filing or participating in a class action that pertains to those services.

(iii) Pre-dispute arbitration agreement means any agreement or part of an agreement, regardless of its form or structure, between a school, or a party acting on behalf of a school, and a student requiring arbitration of any future dispute between the parties relating to the making of a Direct Loan or provision of educational services for which the student received title IV funding.
 * * * * *34 CFR § 668.91
4. Section 668.91 is amended by revising paragraph (a)(3) and removing the parenthetical authority citation.

The revisions read as follows:
 34 CFR § 668.91

## § 668.91 Initial and final decisions.

(a) * * *

(3) Notwithstanding the provisions of paragraph (a)(2) of this section—

(i) If, in a termination action against an institution, the hearing official finds that the institution has violated the provisions of § 668.14(b)(18), the hearing official also finds that termination of the institution's participation is warranted;

(ii) If, in a termination action against a third-party servicer, the hearing official finds that the servicer has violated the provisions of § 668.14(b)(18), the hearing official also finds that termination of the institution's participation or servicer's eligibility is warranted;

(iii) In an action brought against an institution or third-party servicer that involves its failure to provide a letter of credit, or other financial protection under § 668.15 or § 668.171(c) or (d), the hearing official finds that the amount of the letter of credit or other financial protection established by the Secretary under § 668.175 is appropriate, unless the institution demonstrates that the amount was not warranted because—

(A) For financial protection demanded based on events or conditions described in § 668.171(c) or (d), the events or conditions no longer exist, have been resolved, or the institution demonstrates that it has insurance that will cover all potential debts and liabilities that arise from the triggering event or condition. The institution can demonstrate it has insurance that covers risk by presenting the Department with a copy of the insurance policy that makes clear the institution's coverage;

(B) For financial protection demanded based on the grounds identified in § 668.171(d), the action or event does not and will not have a material adverse effect on the financial condition, business, or results of operations of the institution;

(C) The institution has proffered alternative financial protection that provides students and the Department adequate protection against losses resulting from the risks identified by the Secretary. Adequate protection may consist of one or more of the following—

(1) An agreement with the Secretary that a portion of the funds due to the institution under a reimbursement or heightened cash monitoring funding arrangement will be temporarily withheld in such amounts as will meet, no later than the end of a six to 12 month period, the amount of the required financial protection demanded; or

(2) Other form of financial protection specified by the Secretary in a notice published in the Federal Register.

(iv) In a termination action taken against an institution or third-party servicer based on the grounds that the institution or servicer failed to comply with the requirements of § 668.23(c)(3), if the hearing official finds that the  **49911**  institution or servicer failed to meet those requirements, the hearing official finds that the termination is warranted;

(v)(A) In a termination action against an institution based on the grounds that the institution is not financially responsible under § 668.15(c)(1), the hearing official finds that the termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.15(d)(4) have been met; and

(B) In a termination or limitation action against an institution based on the grounds that the institution is not financially responsible—

(1) Upon proof of the conditions in § 668.174(a), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all the conditions in § 668.175(h)(2) have been met; and

(2) Upon proof of the conditions in § 668.174(b)(1), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.174(b)(2) or § 668.175(h)(2) have been met.
 * * * * *34 CFR § 668.171
5. Section 668.171 is revised to read as follows:
 34 CFR § 668.171

## § 668.171 General.
(a) Purpose. To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that it is financially responsible under the standards established in this subpart. As provided under section 498(c)(1) of the HEA, the Secretary determines whether an institution is financially responsible based on the institution's ability to—

(1) Provide the services described in its official publications and statements;

000278

(2) Meet all of its financial obligations; and

(3) Provide the administrative resources necessary to comply with title IV, HEA program requirements.

(b) General standards of financial responsibility. Except as provided under paragraphs (c), (d), and (h) of this section, the Secretary considers an institution to be financially responsible if the Secretary determines that—

(1) The institution's Equity, Primary Reserve, and Net Income ratios yield a composite score of at least 1.5, as provided under § 668.172 and appendices A and B to this subpart;

(2) The institution has sufficient cash reserves to make required returns of unearned title IV, HEA program funds, as provided under § 668.173;

(3) The institution is able to meet all of its financial obligations and provide the administrative resources necessary to comply with title IV, HEA program requirements. An institution is not deemed able to meet its financial or administrative obligations if—

(i) It fails to make refunds under its refund policy or return title IV, HEA program funds for which it is responsible under § 668.22;

(ii) It fails to make repayments to the Secretary for any debt or liability arising from the institution's participation in the title IV, HEA programs; or

(iii) It is subject to an action or event described in paragraph (c) of this section (mandatory triggering events), or an action or event that the Secretary determines is likely to have a material adverse effect on the financial condition of the institution under paragraph (d) of this section (discretionary triggering events); and

(4) The institution or persons affiliated with the institution are not subject to a condition of past performance under § 668.174(a) or (b).

(c) Mandatory triggering events. An institution is not able to meet its financial or administrative obligations under paragraph (b)(3)(iii) of this section if—

(1) After the end of the fiscal year for which the Secretary has most recently calculated an institution's composite score, one or more of the following occurs:

(i)(A) The institution incurs a liability from a settlement, final judgment, or final determination arising from an administrative or judicial action or proceeding initiated by a Federal or State entity. A determination arising from an administrative action or proceeding initiated by a Federal or State entity means the determination was made only after an institution had notice and an opportunity to submit its position before a hearing official. A final determination arising from an administrative action or proceeding initiated by a Federal entity includes a final determination arising from any administrative action or proceeding initiated by the Secretary. For purposes of this section, the liability is the amount stated in the final judgment or final determination. A judgment or determination becomes final when the institution does not appeal or when the judgment or determination is not subject to further appeal; or

(B) For a proprietary institution whose composite score is less than 1.5, there is a withdrawal of owner's equity from the institution by any means (e.g., a capital distribution that is the equivalent of wages in a sole proprietorship or partnership, a distribution of dividends or return of capital, or a related party receivable), unless the withdrawal is a transfer to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated; and

(ii) As a result of that liability or withdrawal, the institution's recalculated composite score is less than 1.0, as determined by the Secretary under paragraph (e) of this section.

(2) For a publicly traded institution—

(i) The U.S. Securities and Exchange Commission (SEC) issues an order suspending or revoking the registration of the institution's securities pursuant to Section 12(j) of the Securities and Exchange Act of 1934 (the "Exchange Act") or suspends trading of the institution's securities on any national securities exchange pursuant to Section 12(k) of the Exchange Act; or

(ii) The national securities exchange on which the institution's securities are traded notifies the institution that it is not in compliance with the exchange's listing requirements and, as a result, the institution's securities are delisted, either voluntarily or involuntarily, pursuant to the rules of the relevant national securities exchange.

(iii) The SEC is not in timely receipt of a required report and did not issue an extension to file the report.

(3) For the period described in (c)(1) of this section, when the institution is subject to two or more discretionary triggering events, as defined in paragraph (d) of this section, those events become mandatory triggering events, unless a triggering event is resolved before any subsequent event(s) occurs.

(d) Discretionary triggering events. The Secretary may determine that an institution is not able to meet its financial or administrative obligations under paragraph (b)(3)(iii) of this section if any of the following events is likely to have a material adverse effect on the financial condition of the institution—

(1) The accrediting agency for the institution issued an order, such as a show cause order or similar action, that, if not satisfied, could result in the withdrawal, revocation or suspension of institutional accreditation for failing to meet one or more of the agency's standards;

(2)(i) The institution violated a provision or requirement in a security or loan agreement with a creditor; and

(ii) As provided under the terms of that security or loan agreement, a monetary or nonmonetary default or delinquency event occurs, or other events occur, that trigger or enable the creditor to require or impose on the **\*49912** institution, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

(3) The institution's State licensing or authorizing agency notified the institution that it has violated a State licensing or authorizing agency requirement and that the agency intends to withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement;

(4) For its most recently completed fiscal year, a proprietary institution did not receive at least 10 percent of its revenue from sources other than title IV, HEA program funds, as provided under § 668.28(c);

(5) As calculated by the Secretary, the institution has high annual dropout rates; or

(6) The institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(i) The institution files a challenge, request for adjustment, or appeal under that subpart with respect to its rates for one or both of those fiscal years; and

(ii) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both of those years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(e) Recalculating the composite score. The Secretary recalculates an institution's most recent composite score by recognizing the actual amount of the liability, or cumulative liabilities, incurred by an institution under paragraph (c)(1)(i)(A) of this section as an expense or accounting for the actual withdrawal, or cumulative withdrawals, of owner's equity under paragraph (c)(1)(i)(B) of this section as a reduction in equity, and accounts for that expense or withdrawal by—

(1) For liabilities incurred by a proprietary institution—

(i) For the primary reserve ratio, increasing expenses and decreasing adjusted equity by that amount;

(ii) For the equity ratio, decreasing modified equity by that amount; and

(iii) For the net income ratio, decreasing income before taxes by that amount;

(2) For liabilities incurred by a non-profit institution—

(i) For the primary reserve ratio, increasing expenses and decreasing expendable net assets by that amount;

(ii) For the equity ratio, decreasing modified net assets by that amount; and

(iii) For the net income ratio, decreasing change in net assets without donor restrictions by that amount; and

(3) For the amount of owner's equity withdrawn from a proprietary institution—

(i) For the primary reserve ratio, decreasing adjusted equity by that amount; and

(ii) For the equity ratio, decreasing modified equity by that amount.

(f) Reporting requirements. (1) In accordance with procedures established by the Secretary, an institution must notify the Secretary of the following actions or events—

(i) For a liability incurred under paragraph (c)(1)(i)(A) of this section, no later than 10 days after the date of written notification to the institution of the final judgment or final determination;

(ii) For a withdrawal of owner's equity described in paragraph (c)(1)(i)(B) of this section—

(A) For a capital distribution that is the equivalent of wages in a sole proprietorship or partnership, no later than 10 days after the date the Secretary notifies the institution that its composite score is less than 1.5. In response to that notice, the institution must report the total amount of the wage-equivalent distributions it made during its prior fiscal year and any distributions that were made to pay any taxes related to the operation of the institution. During its current fiscal year and the first six months of its subsequent fiscal year (18-month period), the institution is not required to report any distributions to the Secretary, provided that the institution does not make wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year, less any distributions that were made to pay any taxes related to the operation of the institution. However, if the institution makes wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year less any distributions that were made to pay any taxes related to the operation of the institution at any time during the 18-month period, it must report each of those distributions no later than

10 days after they are made, and the Secretary recalculates the institution's composite score based on the cumulative amount of the distributions made at that time;

(B) For a distribution of dividends or return of capital, no later than 10 days after the dividends are declared or the amount of return of capital is approved; or

(C) For a related party receivable, not later than 10 days after that receivable occurs;

(iii) For the provisions relating to a publicly traded institution under paragraph (c)(2) of this section, no later than 10 days after the date that—

(A) The SEC issues an order suspending or revoking the registration of the institution's securities pursuant to Section 12(j) of the Exchange Act or suspends trading of the institution's securities on any national securities exchange pursuant to Section 12(k) of the Exchange Act; or

(B) The national securities exchange on which the institution's securities are traded involuntarily delists its securities, or the institution voluntarily delists its securities, pursuant to the rules of the relevant national securities exchange;

(iv) For an action under paragraph (d)(1) of this section, 10 days after the date on which the institution is notified by its accrediting agency of that action;

(v) For the loan agreement provisions in paragraph (d)(2) of this section, 10 days after a loan violation occurs, the creditor waives the violation, or the creditor imposes sanctions or penalties in exchange or as a result of granting the waiver;

(vi) For a State agency notice relating to terminating an institution's licensure or authorization under paragraph (d)(3) of this section, 10 days after the date on which the institution receives that notice; and

(vii) For the non-title IV revenue provision in paragraph (d)(4) of this section, no later than 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3).

(2) The Secretary may take an administrative action under paragraph (i) of this section against an institution, or determine that the institution is not financially responsible, if it fails to provide timely notice to the Secretary as provided under paragraph (f)(1) of this section, or fails to respond, within the timeframe specified by the Secretary, to any determination made, or request for information, by the Secretary under paragraph (f)(3) of this section.

(3)(i) In its notice to the Secretary under this paragraph, or in its response to a preliminary determination by the Secretary that the institution is not financially responsible because of a triggering event under paragraph (c) or (d) of this section, in accordance with procedures established by the Secretary, the institution may—

(A) Demonstrate that the reported withdrawal of owner's equity under paragraph (c)(1)(i)(B) of this section was used exclusively to meet tax liabilities **\*49913** of the institution or its owners for income derived from the institution;

(B) Show that the creditor waived a violation of a loan agreement under paragraph (d)(2) of this section. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (d)(2)(ii) of this section, the institution must identify and describe those penalties, constraints, or requirements and demonstrate that complying with those actions will not adversely affect the institution's ability to meet its financial obligations;

(C) Show that the triggering event has been resolved, or demonstrate that the institution has insurance that will cover all or part of the liabilities that arise under paragraph (c)(1)(i)(A) of this section; or

(D) Explain or provide information about the conditions or circumstances that precipitated a triggering event under paragraph (c) or (d) of this section that demonstrates that the triggering event has not or will not have a material adverse effect on the institution.

(ii) The Secretary will consider the information provided by the institution in determining whether to issue a final determination that the institution is not financially responsible.

(g) Public institutions. (1) The Secretary considers a domestic public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the State, local, or municipal government entity, tribal authority, or other government entity that has the legal authority to make that designation; and

(B) Provides a letter from an official of that State or other government entity confirming that the institution is a public institution; and

(ii) Is not subject to a condition of past performance under § 668.174.

(2) The Secretary considers a foreign public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(B) Provides documentation from an official of that country or other government entity confirming that the institution is a public institution and is backed by the full faith and credit of the country or other government entity; and

(ii) Is not subject to a condition of past performance under § 668.174.

(h) Audit opinions and disclosures. Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Secretary does not consider the institution to be financially responsible if, in the institution's audited financial statements, the opinion expressed by the auditor was an adverse, qualified, or disclaimed opinion, or the financial statements contain a disclosure in the notes to the financial statements that there is substantial doubt about the institution's ability to continue as a going concern as required by accounting standards, unless the Secretary determines that a qualified or disclaimed opinion does not have a significant bearing on the institution's financial condition, or that the substantial doubt about the institution's ability to continue as going concern has been alleviated.

(i) Administrative actions. If the Secretary determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative standard in § 668.175, or the institution does not submit its financial and compliance audits by the date and in the manner required under § 668.23, the Secretary may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs; or

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d).

34 CFR § 668.172

6. Section 668.172 is amended by:

000283

a. Adding paragraphs (d) and (e).

b. Removing the parenthetical authority citation.

The additions read as follows:

34 CFR § 668.172

§ 668.172 Financial ratios.

* * * * *

(d) Accounting for operating leases. The Secretary accounts for operating leases by—

(1) Applying FASB Accounting Standards Update (ASU) 2016-02, Leases (Topic 842) to all leases the institution has entered into on or after December 15, 2018 (post-implementation operating/financing leases), as specified in the Supplemental Schedule (see Section 2 of Appendix A to this subpart and Section 2 of Appendix B to this subpart);

(2) Treating leases the institution entered into prior to December 15, 2018 (pre-implementation operating/financing leases), as they would have been treated prior to the requirements of ASU 2016-02, as long as the institution provides information about those leases on the Supplemental Schedule and a note in, or on the face of, its audited financial statements; and

(3) Accounting for any adjustments, such as any options exercised by the institution to extend the life of a pre-implementation operating/finance lease, as post-implementation operating/finance leases.

(e) Incorporation by Reference. (1) The material required in this section is incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at U.S. Department of Education, Office of the General Counsel, 202-401-6000, and is available from the sources indicated below. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email fedreg.legal@nara.gov or go to www.archives.gov/federal-register/cfr/ibr-locations.html.

(2) Financial Accounting Standards Board (FASB), 401 Merritt 7, P.O. Box 5116, Norwalk, CT 06856-5116, (203) 847-0700, www.fasb.org.

(i) Accounting Standards Update (ASU) 2016-02, Leases (Topic 842), (February 2016).

(ii) [Reserved]

* * * * * 34 CFR § 668.175

7. Section 668.175 is amended by revising paragraphs (a) through (c), (f) and (h) and removing the parenthetical authority citation.

The revisions read as follows:

34 CFR § 668.175

§ 668.175 Alternative standards and requirements.

(a) General. An institution that is not financially responsible under the general standards and provisions in § 668.171, may begin or continue to participate in the title IV, HEA programs by qualifying under an alternate standard set forth in this section.

(b) Letter of Credit or surety alternative for new institutions. A new institution that is not financially responsible solely because the Secretary determines that its composite score is less than 1.5, qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Secretary, or providing other surety described under paragraph

000284

(h)(2)(i) of this section, for an amount equal to at least one-half of the amount of title IV, HEA program funds that the Secretary determines the institution will receive during its initial year of participation. A new institution is an institution that seeks to participate for the first time in the title IV, HEA programs.

 *49914  (c) Financial protection alternative for participating institutions. A participating institution that is not financially responsible either because it does not satisfy one or more of the standards of financial responsibility under § 668.171(b), (c), or (d), or because of an audit opinion or going concern disclosure described under § 668.171(h), qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Secretary, or providing other financial protection described under paragraph (h) of this section, for an amount determined by the Secretary that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this requirement does not apply to a public institution.
 * * * * *
(f) Provisional certification alternative. (1) The Secretary may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b), its recalculated composite score under § 668.171(e) is less than 1.0, it is subject to an action or event under § 668.171(c), or an action or event under paragraph (d) that has an adverse material effect on the institution as determined by the Secretary, or because of an audit opinion or going concern disclosure described in § 668.171(h); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Secretary that it has satisfied or resolved that condition; and

(2) Under this alternative, the institution must—

(i) Provide to the Secretary an irrevocable letter of credit that is acceptable and payable to the Secretary, or provide other financial protection described under paragraph (h) of this section, for an amount determined by the Secretary that is not less than 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this requirement does not apply to a public institution that the Secretary determines is backed by the full faith and credit of the State;

(ii) Demonstrate that it was current on its debt payments and has met all of its financial obligations, as required under § 668.171(b)(3), for its two most recent fiscal years; and

(iii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3) of this section.

(3) If at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible, the Secretary may again permit the institution to participate under a provisional certification but the Secretary—

(i) May require the institution, or one or more persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), or both, to provide to the Secretary financial guarantees for an amount determined by the Secretary to be sufficient to satisfy any potential liabilities that may arise from the institution's participation in the title IV, HEA programs;

(ii) May require one or more of the persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), to be jointly or severally liable for any liabilities that may arise from the institution's participation in the title IV, HEA programs; and

(iii) May require the institution to provide, or continue to provide, the financial protection resulting from an event described in § 668.171(c) and (d) until the institution meets the requirements of paragraph (f)(4) of this section.

(4) The Secretary maintains the full amount of financial protection provided by the institution under this section until the Secretary first determines that the institution has—

(i) A composite score of 1.0 or greater based on a review of the audited financial statements for the fiscal year in which all liabilities from any event described in § 668.171(c) or (d) on which financial protection was required; or

(ii) A recalculated composite score of 1.0 or greater, and any event or condition described in § 668.171(c) or (d) has ceased to exist.

 * * * * *

(h) Financial protection. (1) In accordance with procedures established by the Secretary or as part of an agreement with an institution under this section, the Secretary may use the funds from that financial protection to satisfy the debts, liabilities, or reimbursable costs, including costs associated with teach-outs as allowed by the Department, owed to the Secretary that are not otherwise paid directly by the institution.

(2) In lieu of submitting a letter of credit for the amount required by the Secretary under this section, the Secretary may permit an institution to—

(i) Provide the amount required in the form of other surety or financial protection that the Secretary specifies in a document published in the Federal Register;

(ii) Provide cash for the amount required; or

(iii) Enter into an arrangement under which the Secretary offsets the amount of title IV, HEA program funds that an institution has earned in a manner that ensures that, no later than the end of a six to twelve-month period selected by the Secretary, the amount offset equals the amount of financial protection the institution is required to provide. The Secretary provides to the institution any funds not used for the purposes described in paragraph (h)(1) of this section during the period covered by the agreement, or provides the institution any remaining funds if the institution subsequently submits other financial protection for the amount originally required.

 * * * * *34 CFR Pt. 668, Subpt. L, App. A

8. Appendix A to subpart L of part 668 is revised to read as follows:

 34 CFR Pt. 668, Subpt. L, App. A

**Appendix A to Subpart L of Part 668—Ratio Methodology for Propriety Institutions**
BILLING CODE 4001-01-P

Appendix A: Ratio Methodology for Propriety Institutions

**SECTION 1: Ratio and Ratio Terms**

| Primary Reserve Ratio | Adjusted Equity / Total Expenses and Losses |
|---|---|
| Equity Ratio | Modified Equity / Modified Assets |
| Net Income Ratio | Income Before Taxes / Total Revenue and Gains |

Total Expenses and Losses excludes income tax, discontinued operations not classified as an operating expense or change in accounting principle and any losses on investments, post-employment and defined benefit pension plans and annuities. Any losses on investments would be the net loss for the investments. Total Expenses and Losses includes the nonservice component of net periodic pension and other post-employment plan expenses.

Modified Equity = (total owner's equity) –(intangible assets) –(unsecured related-party receivables)

Modified Assets = (total assets) –(intangible assets) –(unsecured related-party receivables)

Income Before Taxes includes all revenues, gains, expenses and losses incurred by the school during the accounting period. Income before taxes does not include income taxes, discontinued operations not classified as an operating expense or changes in accounting principle.

Total Revenues and Gains does not include positive income tax amounts, discontinued operations not classified as an operating gain, or change in accounting principle (investment gains should be recorded net of investment losses).

* Unsecured related party receivables based on the related party disclosures as required by 34 C.F.R 668.23(d).

** The value of property, plant and equipment includes construction in progress and lease right-of-use assets, and is net of accumulated depreciation/amortization.

*** All debt obtained for long-term purposes, not to exceed total net property, plant and equipment includes lease liabilities for lease right-of-use assets and the short-term portion of the debt, up to the amount of net property, plant and equipment and construction in progress short-term line of credits and note payable, not to exceed total construction in progress. If an institution wishes to include the debt, including debt obtained through long-term lines of credit in total debt obtained for long-term purposes, the institution must include a disclosure in the financial statements that the debt, including lines of credit exceeds twelve months and was used to fund capitalized assets (i.e. property, plant and equipment or capitalized expenditures per Generally Accepted Accounting Principles (GAAP)). If an institution wishes to include short-term lines of credit or notes payable for construction in progress, the institution must include a disclosure in the notes of the financial statements. The disclosures that must be presented for any debt to be used in adjusted equity include the issue date, term, nature of capitalized amounts and amounts capitalized. Institutions that do not include debt in total debt obtained for long-term purposes, including long-term lines of credit, do not need to provide any additional disclosures other than those required by GAAP. The debt obtained for long-term purposes will be limited to only those amounts disclosed in the financial statements that were used to fund capitalized assets. Any debt amount including long-term lines of credit used to fund operations must be excluded from debt obtained for long-term purposes. Any debt obtained for long-term purposes post-implementation must be directly associated with the property, plant and equipment acquired with that debt. In determining the amount of pre-implementation property, plant and equipment to include in the primary reserve ratio, the Department will use the lesser of the property, plant and equipment minus depreciation/amortization or other reductions or the qualified debt obtained for long-term purposes minus any payments or other reductions as the amount of debt obtained for long-term purposes in determining the amount of pre-implementation property, plant and equipment that should be included in the primary reserve ratio.

The basis for the pre-implementation property, plant and equipment and qualified debt obtained for long-term purposes will be the amounts reported in the institutions most recently accepted financial statement submission to the Department prior to the effective date of these regulations. An institution must adjust the amount of pre-implementation debt by any payments or other reductions and the pre-implementation property, plant and equipment by any depreciation/amortization or other reductions in subsequent years. Post-implementation debt will be the amount of debt that an institution used to obtain property, plant and equipment since the end of the fiscal year of its most recently accepted financial statement submission to the Department prior to the effective date of these regulations less any payments or other reductions. Post- implementation property, plant and equipment will be the amount of property, plant and equipment that an institution obtained since the end of the fiscal year of its most recently accepted financial statement submission to the Department prior to the effective date of these regulations less any depreciation/amortization or other reductions. An institution must adjust post-implementation debt by any debt obtained and associated with property, plant and equipment in subsequent years and any payments or other reductions. An institution must adjust post-implementation property, plant and equipment by any property, plant and equipment obtained in subsequent years and any depreciation/amortization or other reductions in subsequent years. Any refinanced or renegotiated debt cannot increase the amount of debt associated with previously purchased property, plant and equipment.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**SECTION 2:  Financial Responsibility Supplemental Schedule Requirement and Example**

A Supplemental Schedule must be submitted as part of the required audited financial statements submission.  The Supplemental Schedule contains all of the financial elements required to compute the composite score.  Each item in the Supplemental Schedule must have a reference to the Balance Sheet, Statement of (Loss) Income, or Notes to the Financial Statements.  The amount entered in the Supplemental Schedules should tie directly to a line item, be part of a line item (if part of a line item it must also include a note disclosure of the actual amount), or a note in the financial statements

**"Financial Responsibility Supplemental Schedule"**

Example location of number in the financial statements and/or notes - the number reference to sample numbers; however, could be more lines based on financial statements and/or notes

| Lines | | Primary Reserve Ratio: | | |
|---|---|---|---|---|
| | | **Adjusted Equity** | | |
| 31 | Balance Sheet – Total Equity | Total equity | | 3,035,000 |
| 4,5,10 | Balance Sheet - All Related party receivable, net and Receivable from affiliate, net and Related party note* | Secure and Unsecured related party receivables and/or other related party assets | 1,330,000 | |
| 4, 10 | Balance Sheet - Related party receivable, net and Receivable from affiliate, net and Related party note* | Unsecured related party receivables and/or other related party assets | | 1,130,000 |
| 8 | Balance Sheet - Property, Plant and Equipment, net* | Property, plant and equipment, net - including construction in progress | 7,000,000 | |
| FS Note line 8A | Note of the Financial Statements -Balance Sheet - Property, Plant and Equipment, net - pre-implementation* | Property, plant and equipment, net - pre-implementation less any construction in progress | | 5,500,000 |
| FS Note line 8B | Note of the Financial Statements Balance Sheet - Property, Plant and Equipment, net - post-implementation with outstanding debt for original purchase* | Property, plant and equipment, net - post-implementation less any construction in progress with outstanding debt for original purchase with debt* | | 1,000,000 |
| FS Note line 8D | Note of the Financial Statements Balance Sheet - Property, Plant and Equipment, net - post-implementation without outstanding debt for original purchase* | Property, plant and equipment, net - post-implementation less any construction in progress with outstanding debt for original purchase without debt* | | 300,000 |
| FS Note line 8C | Note of the Financial Statements Balance Sheet -Property, Plant and Equipment - Construction in process | Construction in progress ( | | 200,000 |
| 9 | Balance Sheet - Lease right-of-use asset* | Lease right-of-use asset | 2,500,000 | |
| Excluded 9 Note Leases | Note of Financial Statements - Balance Sheet - Lease right-of-use asset pre-implementation* | Lease right-of-use asset - pre-implementation | | 1,500,000 |
| M9 Note Leases | Note of Financial Statements - Balance Sheet - Lease right-of-use asset pre-implementation* | Lease right-of-use asset - post-implementation | | 1,000,000 |
| 11 | Balance Sheet - Goodwill* | Intangible assets | | 80,000 |
| 27 | Balance Sheet - Post-employment and pension liability* | Post-employment and defined pension plan liabilities | | 300,000 |
| 15, 19, 20, 23 24 | Balance Sheet - Notes payable and Line of Credit (both current and long-term) and Line of Credit for Construction in process* | Long-term debt - for long-term purposes and Construction in process debt | 5,975,000 | |
| M15,  19  20,23 24 Note Debt A. | Balance Sheet - Notes payable and Line of Credit (both current and long-term) and Line of Credit for Construction in process* | Long-term debt for long-term purposes pre-implementation | | 4,925,000 |
| Debt Note B | Balance Sheet - Notes payable and Line of Credit (both current and long-term) for purchase of Property, Plant and Equipment | Qualified Long--term debt for long-term purposes post-implementation for purchase of Property, Plant and Equipment | | 900,000 |

000288

| Lines | | | | |
|---|---|---|---|---|
| Debt Note C | Balance Sheet - Notes payable and Line of Credit for Construction in process* | Line of Credit for Construction in process | | 100,000 |
| 17, 25 | Balance Sheet - Lease right-of-use assets liability (both current and long-term)* | Lease right-of-use asset liability | 2,100,000 | |
| Excluded 17,25 Leases | Balance Sheet - Lease right-of-use assets liability (both current and long-term | Pre-Implementation right-of-use leases | | 1,100,000 |
| M17, 25 FS Note | Balance Sheet - Lease right-of-use assets liability (both current and long-term | Post-Implementation right-of-use leases | | 1,000,000 |
| 40, 42, 44, 45 | Statement of (Loss) Income - Total Operating Expenses, Interest Expense, Loss on Impairment of Assets and Loss on Disposal of Assets* | **Total Expenses and Losses:** | | 5,900,000 |

| Lines | | Equity Ratio: | | |
|---|---|---|---|---|
| | | **Modified Equity** | | |
| 31 | Balance Sheet - Total Equity | Total equity | | 3,035,000 |
| Excluded 17, 25 Leases | Balance Sheet - Lease right-of-use assets liability (both current and long-term | Pre-Implementation right-of-use leases | | 1,100,000 |
| Excluded 9 Note Leases | Note of Financial Statements - Balance Sheet - Lease right-of-use asset pre-implementation* | Lease right-of-use asset - pre-implementation | | 1,500,000 |
| 11 | Balance Sheet - Goodwill* | Intangible assets | | 80,000 |
| 4,5,10 | Balance Sheet - All Related party receivable, net and Receivable from affiliate, net and Related party note* | Secure and Unsecured related party receivables and/or other related party assets | 1,330,000 | |
| 4, 10 | Balance Sheet - Related party receivable, net and Receivable from affiliate, net and Related party note* | Unsecured related party receivables and/or other related party assets | | 1,130,000 |
| | | **Modified Assets:** | | |
| 13 | Balance Sheet - Total Assets | Total assets | | 14,210,000 |
| Excluded 9 Note Leases | Note of Financial Statements - Balance Sheet - Lease right-of-use asset pre-implementation* | Lease right-of-use asset - pre-implementation | | 1,500,000 |
| 11 | Balance Sheet - Goodwill* | Intangible assets | | 80,000 |
| 4,5,10 | Balance Sheet - All Related party receivable, net and Receivable from affiliate, net and Related party note* | Secure and Unsecured related party receivables and/or other related party assets | 1,330,000 | |
| 4,10 | Balance Sheet - Related party receivable, net and Receivable from affiliate, net and Related party note* | Unsecured related party receivables and/or other related party assets | | 1,130,000 |

| Lines | | Net Income Ratio: | | |
|---|---|---|---|---|
| 48 | Statement of (Loss) Income - Net Income Before Income Taxes | **Income Before Taxes** | | 1,070,000 |
| 35, 43, 46 | Statement of (Loss) Income - Total Revenue, Interest income and Other miscellaneous income* | **Total Revenues and Gains** | | 6,970,000 |

* In the example the number came from the actual financial statements; however, the number could come from the notes.

SECTION 3: Example Financial Statement and Composite Score Calculation

| Line | BALANCE SHEET | | | Line | STATEMENT OF (LOSS) INCOME | |
|---|---|---|---|---|---|---|
| | **Current Assets** | | | | **Revenue** | |
| 1 | Cash and cash equivalents | 790,000 | | 33 | Tuition and fees, net | 6,400,000 |
| 2 | Accounts receivable, net | 1,010,000 | | 34 | Clinic revenue | 300,000 |
| 3 | Prepaid expenses | 150,000 | | 35 | **Total Revenue** | 6,700,000 |
| 4 | Related party receivable | 130,000 | | | | |
| 5 | Related party receivable, secured | 200,000 | | | **Operating Expenses** | |
| 6 | Student loans receivable, net | 1,330,000 | | 36 | Education expense | 2,000,000 |
| 7 | **Total Current Assets** | 3,610,000 | | 37 | General expense | 1,000,000 |
| 8 | Property, plant and equipment, net | 7,000,000 | | 38 | Occupancy expense | 500,000 |
| 9 | Lease right-of-use assets, net | 2,500,000 | | 39 | Depreciation and Amortization | 350,000 |
| 10 | Receivable from affiliate, net | 1,000,000 | | 40 | **Total Operating Expenses** | 4,250,000 |
| 11 | Goodwill | 80,000 | | 41 | **Operating Income (Loss)** | 2,450,000 |
| 12 | Deposits | 20,000 | | | Other Income (expense) | |
| 13 | **Total Assets** | 14,210,000 | | 42 | Interest expense | (750,000) |
| | **Current Liabilities** | | | 43 | Interest income | 20,000 |
| 14 | Accounts payable/Accrued expenses | 850,000 | | 44 | Loss on impairment of assets | (400,000) |
| 15 | Line of credit –short term CIP | 100,000 | | 45 | Loss on disposal of assets | (500,000) |
| 16 | Deferred revenue | 650,000 | | 46 | Other miscellaneous income | 250,000 |
| 17 | Leases right-of-use assets liability | 100,000 | | 47 | **Total Other Income (Expense)** | (1,380,000) |
| 18 | Line of credit – operating | 100,000 | | 48 | **Net Income Before Income Taxes** | 1,070,000 |
| 19 | Line of credit - for long term purposes | 75,000 | | 49 | Income taxes | 267,000 |
| 20 | Note payable | 300,000 | | 50 | **Net Income (Loss)** | 803,000 |
| 21 | **Total Current Liabilities** | 2,175,000 | | | | |
| 22 | Line of credit – operating | 200,000 | | | | |
| 23 | Line of credit - for long term purposes | 500,000 | | | | |
| 24 | Notes payable | 5,000,000 | | | | |
| 25 | Lease right-of-use asset liabilities | 2,000,000 | | | | |
| 26 | Other liabilities | 1,000,000 | | | | |
| 27 | Post-employment and pension liability | 300,000 | | | Note for Line 9 – Lease right-of-use assets | |
| 28 | **Total Liabilities** | 11,175,000 | | | | |
| | **Equity** | | | A. | Lease right-of-use assets - pre-implementation | 1,500,000 Removed from Assets |
| 29 | Common stock | 500,000 | | | | |
| 30 | Retained earnings | 2,535,000 | | B. | Lease right-of-use assets- post implementation | 1,000,000 |
| 31 | **Total Equity** | 3,035,000 | | | | |
| 32 | **Total Liabilities and Equity** | 14,210,000 | | | Total | 2,500,000 |

Note for Line 8 - Net Property, Plant and Equipment

| | | | |
|---|---|---|---|
| A. | Pre-Implementation Property, Plant and Equipment | | 5,500,000 |
| B. | Post-Implementation Property, Plant and Equipment | | 1,000,000 |
| | Vehicles | 500,000 | |
| | Furniture | 300,000 | |
| | Computers | 200,000 | |
| C. | Construction in progress | | 200,000 |
| D. | Post-Implementation Property, Plant and Equipment with no outstanding debt | | 300,000 |
| | Total | | 7,000,000 |

Notes for Line 15,19, 20,23 & 24 - Long-term debt for long term purposes

| | | | |
|---|---|---|---|
| A. | Pre-Implementation Long-term Debt | | 4,925,000 |
| B. | Allowable Post-Implementation Long-term Debt | | 900,000 |
| | Vehicles | 500,000 | |
| | Furniture | 200,000 | |
| | Computers | 220,000 | |
| C. | Construction in progress - debt | | 100,000 |
| D. | Long-term debt not for the purchase of Property, Plant and Equipment or liability greater than assets value (30,000 not for fixed assets & 20,000 above value of Property, Plant and Equipment) | | 50,000 |
| | Total | | 5,975,000 |

A. This is the ending balance on the last financial statement submission prior to the implementation of the regulations -- Less any depreciation or disposals

B. This is the balance of assets purchased after the implementation of the regulations that was purchased by obtaining debt.

C. Asset value of the Construction in progress.

D. Post-Implementation Property, Plant and Equipment with no outstanding debt.

A. This is the ending balance of the last financial statement submission prior to the implementation of the regulations --Less in repayments

B. This is the lessor of actual outstanding debt of each assets or the value of the asset. Therefore only $200,000 of the $220,000 debt for the computers is allowable.

C. All debt associated with Construction in progress up to the asset value for construction in process is included.

D. Long-term debt not for the purchase of Property, Plant and Equipment.

Note for Lines 17 and 25 - Lease right-of-use asset liability

| | | | |
|---|---|---|---|
| A. | Lease right-of-use assets liability - pre-implementation | 1,100,000 | Remove from Liabilities |
| B. | Lease right-of-use assets liability - post-implementation | 1,000,000 | |
| | Total | 2,100,000 | |

| Calculating the Composite Score | Lines | | |
|---|---|---|---|
| *Primary Reserve Ratio = Adjusted Equity | 31-11-(4+10)-(8+M9)+27+(M15 +M17+M19+ M20+M23+M24+M25) | 650,000 | 0.1102 |
| / Total Expenses and Losses | 40 +42 +44 +45 | 5,900,000 | |
| *Equity Ratio = Modified Equity | 31 -(4 +10) -11 | 1,425,000 | 0.1239 |
| / Modified assets | 13 -(4 +10) -11 | 11,500,000 | |
| Net Income Ratio = Income Before Taxes | 48 | 1,070,000 | 0.1535 |
| /Total Revenues and Gains | 35 +43 +46 | 6,970,000 | |

*All pre-implementation right-of-use assets and liabilities are removed from total assets and total liabilities
M# - Modified for right-of-use liabilities pre-implementation and post-implementation debt not directly related to purchase of assets.

Step 1: Calculate the strength factor score for each ratio by using the following algorithms:

Primary Reserve strength factor score = 20 x the primary reserve ratio result

Equity strength factor score = 6 x the equity ratio result

Net Income strength factor score = 1 + (33.3 x net income ratio result)

If the strength factor score for any ratio is greater than or equal to 3, the strength factor score for that ratio is 3.

If the strength factor score for any ratio is less than or equal to -1, the strength factor score for that ratio is -1

Step 2: Calculate the weighted score for each ratio and calculate the composite score by adding the three weighted scores

Primary Reserve weighted score = 30% x the primary reserve strength factor score

Equity weighted score = 40% x the equity strength factor score

Net Income weighted score = 30% x the net income strength factor score

Composite Score = the sum of all weighted scores

Round the composite score to one digit after the decimal point to determine the final score

| RATIO | Ratio | Strength Factor | Weight | Composite Scores |
|---|---|---|---|---|
| Primary Reserve Ratio | 0.1102 | 2.2034 | 30% | 0.6610 |
| Equity Ratio | 0.1239 | 0.7435 | 40% | 0.2974 |
| Net Income Ratio | 0.1535 | 3.0000 | 30% | 0.9000 |
| TOTAL Composite Score - Rounded | | | | 1.8584 |
| | | | | 1.9 |

34 CFR Pt. 668, Subpt. L, App. B

**\*49919**  9. Appendix B to Subpart L of part 668 is revised to read as follows:

34 CFR Pt. 668, Subpt. L, App. B

**Appendix B to Subpart L of Part 668—Ratio Methodology for Private Non-Profit Institutions**

Appendix B: Ratio Methodology for Private Non-Profit Institutions

**SECTION 1: Ratio and Ratio Terms**

| | |
|---|---|
| Primary Reserve Ratio | Expendable Net Assets |
| | Total Expenses without Donor Restrictions and Losses without Donor Restrictions |
| | |
| Equity Ratio | Modified Net Assets |
| | Modified Assets |
| | |
| Net Income Ratio | Change in Net Assets without Donor Restrictions |
| | Total Revenue without Donor Restrictions and Gains without Donor Restrictions |

Definitions:

Expendable Net Assets = (net assets without donor restrictions) + (net assets with donor restrictions) − (net assets with donor restrictions: restricted in perpetuity)* − (annuities, term endowments and life income funds with donor restrictions)** − (intangible assets) − (net property, plant and equipment)*** + (post-employment and defined benefit pension plan liabilities) + (all long-term debt obtained for long-term purposes, not to exceed total net property, plant and equipment)**** − (unsecured related party receivables)*****

Total Expenses without Donor Restrictions and Losses without Donor Restrictions = All expenses and losses without donor restrictions from the Statement of Activities less any losses without donor restrictions on investments, post-employment and defined benefit pension plans and annuities. (For institutions that have defined benefit pension and other post-employment plans, total expenses include the nonservice component of net periodic pension and other post-employment plan expenses, and these expenses will be classified as non-operating. Consequently, such expenses will be labeled non-operating or included with "other changes –nonoperating changes—in net assets without donor restrictions" when the Statement of Activities includes an operating measure.)

Modified Net Assets = (net assets without donor restrictions) + (net assets with donor restrictions) − (intangible assets) − (unsecured related party receivables)

Modified Assets = (total assets) − (intangible assets) − (unsecured related party receivables)

Change in net assets without donor restrictions is taken directly from the audited financial statements

Total Revenue without Donor Restriction and Gains without Donor Restrictions = total revenue (including amounts released from restriction) plus total gains. With regard to gains, investment returns are reported as a net amount (interest, dividends, unrealized and realized gains and losses net

of external and direct internal investment expense). Institutions that separately report investment spending as operating revenue (e.g. spending from funds functioning as endowments) and remaining net investment return as a non-operating item, will need to aggregate these two amounts to determine if there is a net investment gain or a net investment loss (net investment gains are included with total gains).

* Net assets with donor restrictions: restricted in perpetuity is subtracted from total net assets. The amount of net assets with donor restrictions: restricted in perpetuity is disclosed as a line item, part of a line item (if part of a line item it must also include a note disclosure of the actual amount) or a note, or a note in the financial statements.

** Annuities, term endowments and life income funds with donor restrictions are subtracted from total net assets. The amount of annuities, term endowments and life income funds with donor restrictions is disclosed in as a line item (if part of a line item it must also include a note disclosure of the actual amount) or a note, or a note in the financial statements.

***The value of property, plant and equipment includes construction in progress and lease right-of-use assets and is net of accumulated depreciation/amortization.

**** All Debt obtained for long-term purposes, not to exceed total net property, plant and equipment includes lease liabilities for lease right-of-use assets and the short-term portion of the debt, up to the amount of net property, plant and equipment and construction in progress short-term lines of credit and notes payable, not to exceed total construction in progress. If an institution wishes to include the debt, including debt obtained through long-term lines of credit in total debt obtained for long-term purposes, the institution must include a disclosure in the financial statements that the debt, including lines of credit exceeds twelve months and was used to fund capitalized assets (i.e. property, plant and equipment or capitalized expenditures per Generally Accepted Accounting Principles (GAAP)). If an institution wishes to include short-term lines of credit or notes payable for construction in progress, the institution must include a disclosure in notes of the financial statements. The disclosures that must be presented for any debt to be included in expendable net assets include the issue date, term, nature of capitalized amounts and amounts capitalized. Institutions that do not include debt in total debt obtained for long-term purposes, including long-term lines of credit, do not need to provide any additional disclosures other than those required by GAAP. The debt obtained for long-term purposes will be limited to only those amounts disclosed in the financial statements that were used to fund capitalized assets. Any debt amount including long-term lines of credit used to fund operations must be excluded from debt obtained for long-term purposes.

The basis for the pre-implementation PP&E and qualified debt obtained for long-term purposes will be the amounts reported in the institutions most recently accepted financial statement submission to the Department prior to the effective date of these regulations. An institution must adjust the amount of pre-implementation debt by any payments or other reductions and the pre-implementation PP&E by any depreciation/amortization or other reductions in subsequent years. Post-implementation debt will be the amount of debt that an institution used to obtain PP&E since the end of the fiscal year of its most recently accepted financial statement submission to the Department prior to the effective date of these regulations less

any payments or other reductions. Post- implementation PP&E will be the amount of PP&E that an institution obtained since the end of the fiscal year of its most recently accepted financial statement submission to the Department prior to the effective date of these regulations less any depreciation/amortization or other reductions. An institution must adjust post-implementation debt by any debt obtained and associated with PP&E in subsequent years and any payments or other reductions. An institution must adjust post-implementation PP&E by any PP&E obtained in subsequent years and any depreciation/amortization or other reductions in subsequent years. Any refinanced or renegotiated debt cannot increase the amount of debt associated with previously purchased PP&E.

*** **Unsecured related party receivables based on the related party disclosures as required by 34 C.F.R 668.23(d).

000291

SECTION 2:  Financial Responsibility Supplemental Schedule Requirement and Example

A Supplemental Schedule must be submitted as part of the required audited financial statements submission.  The Supplemental Schedule contains all of the financial elements required to compute the composite score.  Each item in the Supplemental Schedule must have a reference to the Balance Sheet, Statement of (Loss) Income, or Notes to the Financial Statements.  The amount entered in the Supplemental Schedules should tie directly to a line item, be part of a line item (if part of a line item it must also include a note disclosure of the actual amount), or a note in the financial statements

"Financial Responsibility Supplemental Schedule"

Example location of number in the financial statements and/or notes - the number reference to sample numbers; however, could be more lines based on financial statements and/or notes

| Lines | | Primary Reserve Ratio: | | |
|---|---|---|---|---|
| | | Expendable Net Assets: | | |
| 24 | Statement of Financial Position - Net assets without donor restrictions | Net assets without donor restrictions | | 15,190,000 |
| 30 | Statement of Financial Position – Net assets with donor restrictions | Net Assets with donor restrictions | | 11,800,000 |
| 4 | Statement of Financial Position - Related party receivable and Related party note disclosure* | Secured and Unsecured related party receivable | 100,000 | |
| 4 | Statement of Financial Position - Related party receivable and Related party note disclosure* | Unsecured related party receivable | | 100,000 |
| 8 | Statement of Financial Position - Property, plant and equipment, net | Property, plant and equipment, net (includes Construction in progress) | 40,000,000 | |
| FS Note line 8A | Note of the Financial Statements - Statement of Financial Position - Property, Plant and Equipment - pre-implementation* | Property, plant and equipment – pre-implementation | | 38,800,000 |
| FS Note line 8B | Note of the Financial Statements - Statement of Financial Position - Property, Plant and Equipment - post-implementation with outstanding debt for original purchase* | Property, plant and equipment- post-implementation with outstanding debt for original purchase | | 750,000 |
| FS Note line 8D | Note of the Financial Statements - Statement of Financial Position - Property, Plant and Equipment - post-implementation without outstanding debt for original purchase* | Property, plant and equipment -post implementation without outstanding debt for original purchase | | 250,000 |
| FS Note line 8C | Note of the Financial Statements- Statement of Financial Position – Construction in process | Construction in process | | 200,000 |
| 9 | Statement of Financial Position - Lease right-of-use assets, net** | Lease right-of-use asset, net | 10,000,000 | |

| | | | | |
|---|---|---|---|---|
| Excluded Line 9 Note Leases | Note of Financial Statements - Statement of Financial Position - Lease right-of-use asset pre-implementation | Lease right-of-use asset pre-implementation | | 2,000,000 |
| M9 Note Leases | Note of Financial Statements - Statement of Financial Position - Lease right-of-use asset post-implementation | Lease right-of-use asset post-implementation | | 8,000,000 |
| 10 | Statement of Financial Position – Goodwill | Intangible assets | | 500,000 |
| 17 | Statement of Financial Position - Post-employment and pension liabilities | Post-employment and pension liabilities | | 6,600,000 |
| 14, 20, 22 | Statement of Financial Position - Note Payable and Line of Credit for long-term purposes (both current and long term) and Line of Credit for Construction in process | Long-term debt - for long term purposes | 26,000,000 | |
| M24, 20, 22, Note Debt A | Statement of Financial Position - Note Payable and Line of Credit for long-term purposes (both current and long term) and Line of Credit for Construction in process | Long-term debt - for long term purposes pre-implementation | | 25,000,000 |
| M24, 20, 22, Note Debt B | Statement of Financial Position - Note Payable and Line of Credit for long-term purposes (both current and long term) and Line of Credit for Construction in process | Long-term debt - for long term purposes post-implementation | | 650,000 |
| M24, 20, 22, Note Debt C | Statement of Financial Position - Note Payable and Line of Credit for long-term purposes (both current and long term) and Line of Credit for Construction in process | Line of Credit for Construction in process | | 100,000 |
| 21 | Statement of Financial Position - Lease right-of-use of asset liability** | Lease right-of-use asset liability | 10,000,000 | |
| Excluded Line 21 Note Leases | Statement of Financial Position - Lease right-of-use of asset liability pre-implementation | Pre-implementation right-of-use leases | | 2,000,000 |
| Line 21 Note Leases | Statement of Financial Position - Lease right-of-use of asset liability pre-implementation | Post-implementation right-of-use leases | | 8,000,000 |
| 25 | Statement of Financial Position - Annuities* | Annuities with donor restrictions | | 300,000 |
| 26 | Statement of Financial Position - Term Endowments* | Term endowments with donor restrictions | | 50,000 |
| 27 | Statement of Financial Positions—Life Income Funds* | Life income funds with donor restrictions | | 150,000 |

| | | | | |
|---|---|---|---|---|
| 29 | Statement of Financial Position - Perpetual Funds* | Net assets with donor restrictions: restricted in perpetuity | | 8,800,000 |
| | | Total Expenses and Losses: | | |
| 43 | Statement of Activities -, Total Operating Expenses, (Total from Statement of Activities prior to adjustments) | Total expenses without donor restrictions -taken directly from Statement of Activities | | 51,080,000 |
| (35),45, 46,47,48,49 | Statement of Activities _ Non-Operating (Investment return appropriated for spending), Investments, net of annual spending gain (loss), Other components of net periodic pension costs, Pension-related changes other than net periodic pension, Change in value of split-interest agreements and Other gains (loss)*- (Total from Statement of Activities prior to adjustments) | Non-Operating and Net Investment (loss) | | 1,900,000 |
| (35), 45 | Statement of Activities - (Investment return appropriated for spending) and Investments, net of annual spending, gain (loss)* | Net investment leases | | 400,000 |
| 47 | Statement of Activities - Pension-related changes other than periodic pension* | Pension -related changes other than net periodic costs | | 350,000 |

| | | Equity Ratio: | | |
|---|---|---|---|---|
| | | Modified Net Assets: | | |
| 24 | Statement of Financial Position - Net Assets without Donor Restrictions | Net assets without donor restrictions | | 15,190,000 |
| 30 | Statement of Financial Position - Total Net Assets with Donor Restriction | Net assets with donor restrictions | | 11,800,000 |
| 10 | Statement of Financial Position – Goodwill | Intangible assets | | 500,000 |
| 4 | Statement of Financial Position - Related party receivable and Related party note disclosure* | Secured and Unsecured related party receivable | 100,000 | |
| 4 | Statement of Financial Position - Related party receivable and Related party note disclosure* | Unsecured related party receivables | | 100,000 |
| | | Modified Assets: | | |
| 12 | Statement of Financial Position - Total assets | Total assets | | 76,240,000 |
| Excluded Line 9 Note Leases | Note of Financial Statements - Statement of Financial Position - Lease right-of-use asset pre-implementation | Lease right-of-use asset pre-implementation | | 2,000,000 |
| Excluded Line 21 Note Leases | Statement of Financial Position - Lease right-of-use of asset liability pre-implementation | Pre-implementation right-of-use leases | | 2,000,000 |

| | | | | |
|---|---|---|---|---|
| 10 | Statement of Financial Position – Goodwill | Intangible assets | | 500,000 |
| 4 | Statement of Financial Position - Related party receivable and Related party note disclosure* | Secured and Unsecured related party receivable | 100,000 | |
| 4 | Statement of Financial Position - Related party receivables and Related party note disclosure* | Unsecured related party receivables | | 100,000 |

| | | Net Income Ratio: | | |
|---|---|---|---|---|
| 51 | Statement of Activities - Change in Net Assets Without Donor Restrictions | **Change in Net Assets Without Donor Restrictions** | | -80,000 |
| 38, (35), 50 | Statement of Activities - (Net assets released from restriction), Total Operating Revenue and Other Additions and Sale of Fixed Assets, gains (losses) | **Total Revenues and Gains** | | 52,900,000 |

* In the example the number came from the actual financial statements; however, the number could come from the notes.

000294

**SECTION 3:** Example Financial Statements and Composite Score Calculation

| STATEMENT OF FINANCIAL POSITION | | | STATEMENT OF ACTIVITIES | |
|---|---|---|---|---|
| Line | | | Line | |
| 1 | Cash and cash equivalents | 1,720,000 | | Changes in Net Assets Without Donor Restrictions |
| 2 | Accounts receivable, net | 6,000,000 | | Operating Revenue and Other Additions |
| 3 | Prepaid expenses | 1,900,000 | 33 | Tuition and fees, net | 43,200,000 |
| 4 | Related party receivable | 100,000 | 34 | Contributions | 1,200,000 |
| 5 | Contributions receivable, net | 2,000,000 | 35 | Investment return appropriated for spending | 200,000 |
| 6 | Student loans receivable, net | 8,000,000 | 36 | Auxiliary enterprises | 7,000,000 |
| 7 | Investments | 6,000,000 | 37 | Net assets released from restriction | 500,000 |
| | Property, plant and | | 38 | Total Operating Revenue and Other Additions | 52,100,000 |
| 8 | equipment, net | 40,000,000 | | Operating Expenses and Other Deductions |
| 9 | Lease right-of-use asset, net | 10,000,000 | 39 | Education and research expenses | 38,000,000 |
| 10 | Goodwill | 500,000 | 40 | Depreciation and Amortization | 5,000,000 |
| 11 | Deposits | 20,000 | 41 | Interest expense | 2,880,000 |
| 12 | **Total Assets** | 76,240,000 | 42 | Auxiliary enterprises | 5,200,000 |
| | | | 43 | Total Operating Expenses | 51,080,000 |
| 13 | Line of credit - short term | 300,000 | 44 | Change in Net Assets from Operations | 1,020,000 |
| 14 | Line of credit - short term for CIP | 100,000 | | Non-Operating Changes |
| 15 | Accrued expenses/Accounts payable | 4,500,000 | | |
| 16 | Deferred revenue | 650,000 | 45 | Investments, net of annual spending, gain (loss) | (600,000) |
| 17 | Post-employment and pension liability | 6,600,000 | 46 | Other components of net periodic pension costs | (1,090,000) |
| 18 | Line of credit - operating | 200,000 | 47 | Pension-related changes other than net periodic pension costs | (350,000) |
| 19 | Other liabilities | 1,000,000 | 48 | Change in value of split-interest agreements | (80,000) |
| 20 | Notes payable | 24,000,000 | 49 | Other gains (losses) | (70,000) |
| 21 | Lease right-of-use asset liability | 10,000,000 | 50 | Sale of fixed assets, gains (losses) | 1,000,000 |
| 22 | Line of credit for long term purposes | 1,900,000 | | | |
| 23 | **Total Liabilities** | 49,250,000 | | Total Non-Operating Changes | (1,100,000) |
| 24 | **Net Assets without Donor Restrictions** | 15,190,000 | 51 | Change in Net Assets Without Donor Restrictions | (80,000) |
| | Net Assets with Donor Restrictions | | | Change in Net Assets With Donor Restrictions | |
| 25 | Annuities | 300,000 | 52 | Contributions | 400,000 |
| 26 | Term endowments | 50,000 | | | |
| 27 | Life income funds | 150,000 | 53 | Net assets released from restriction | (500,000) |
| 28 | Other restricted by purpose and time | 2,500,000 | | | |
| 29 | Restricted in perpetuity | 8,800,000 | 54 | Change in Net Assets With Donor Restrictions | (100,000) |
| 30 | **Total Net Assets with Donor Restrictions** | 11,800,000 | 55 | Change in Net Assets | (180,000) |
| 31 | **Total Net Assets** | 26,990,000 | 56 | Net Assets, Beginning of Year | 27,170,000 |
| 32 | **Total Liabilities and Net Assets** | 76,240,000 | 31 | Net Assets, End of Year | 26,990,000 |

Note for Line 8 – Lease right-of-use assets

| | | | |
|---|---|---|---|
| A. | Lease right-of-use assets - pre-implementation | 2,000,000 | Removed from Assets |
| B. | Lease right-of-use assets- post implementation | 8,000,000 | |
| | Total | 10,000,000 | |

Note for Line 21 - Lease right-of-use asset liability

| | | | |
|---|---|---|---|
| A. | Lease right-of-use assets liability- pre-implementation | 2,000,000 | Remove from Liabilities |
| B. | Lease right-of-use assets liability - post-implementation | 8,000,000 | |
| | Total | 10,000,000 | |

Note for Line 8 - Net Property, Plant and Equipment

| | | | |
|---|---|---|---|
| A. | Pre-Implementation Property, Plant and Equipment | | 38,800,000 |
| B. | Post-Implementation Property, Plant and Equipment | | 750,000 |
| | Vehicles | 50,000 | |
| | Furniture | 300,000 | |
| | Computers | 400,000 | |
| C. | Construction in progress | | 200,000 |
| D. | Post-Implementation Property, Plant and Equipment | | 250,000 |
| | Total | | 40,000,000 |

A. This is the ending balance on the last financial statement submission prior to the implementation of the regulations -- Less any depreciation or disposals.

B. This is the balance of assets purchased after the implementation of the regulations that was purchased by obtaining debt.

C. Asset value of the Construction in progress.

D. Post-Implementation Property, Plant and Equipment with no outstanding debt.

Notes for Line 14,20 and 24- Long-term debt for long term purposes

| | | | |
|---|---|---|---|
| A. | Pre-Implementation Long-term Debt | | 25,000,0000 |
| B. | Allowable Post -Implementation Long-term Debt | | 650,000 |
| | Vehicles | 50,000 | |
| | Furniture | 200,000 | |
| | Computers | 400,000 | |
| C. | Construction in progress --debt | | 100,000 |
| D. | Long-term debt not for the purchase of Property, Plant and Equipment or liability greater than assets value | | 250,000 |
| | Total | | |

A. This is the ending balance of the last financial statement submission prior to the implementation of the regulations --Less in repayments

B. This is the lesser of actual outstanding debt of each asset or the value of the asset.

C. All debt associated with Construction in progress up to the asset value for construction in process is included.

D. Long-term debt not for the purchase of Property, Plant and Equipment.

**SECTION 3:** Example Financial Statements and Composite Score Calculation
Calculating the Composite Score without pre-implementation losses

| | Lines | | |
|---|---|---|---|
| | 24+30-29(25+26+27)-10- | | |
| *Primary Reserve Ratio = Expandable Net Assets | (8+9)+17+(M14+M20+M21+M22)-4 | 9,440,000 | 0.1807 |
| / Total Expenses and Losses Without Donor Restrictions | 43+46+48+49 | 52,230,000 | |

| *Equity Ratio = Modified Net Assets | 24 + 30-10-4 | 26,390,000 | 0.3584 |
|---|---|---|---|
| / Modified assets | 12-10-4 | 73,640,000 | |

| Net Income Ratio = Change in Net Assets Without Donor Restrictions | 51 | (80,000) | 0.0015 |
|---|---|---|---|
| Total Revenues and Gains Without Donor Restrictions | 38-35+50 | 52,900,000 | |

*All pre-implementation right-of-use assets and liabilities are removed from total assets and total liabilities
M# - For post-implementation debt not directly related to purchase of assets.

**Step 1:** Calculate the strength factor score for each ratio by using the following algorithms:
Primary Reserve strength factor score = 10 x the primary reserve ratio result
Equity strength factor score = 6 x the equity ratio result.
Negative net income ratio result:  Net Income strength factor = 1 + (25 x net income ratio result)
Positive net income ratio result:  Net income strength factor = 1 + (50 x net income ratio result)
Zero result for net income ratio:  Net income strength factor = 1

If the strength factor score for any ratio is greater than or equal to 3, the strength factor score for the ratio is 3.

If the strength factor score for any ratio is less than or equal to -1, the strength factor score for the ratio is -1.

**Step 2:** Calculate the weighted score for each ratio and calculate the composite score by adding the three weighted scores

Primary Reserve weighted score = 40% x the primary reserve strength factor score
Equity weighted score = 40% x the equity strength factor score
Net Income weighted score = 20% x the net income strength factor score
Composite Score = the sum of all weighted scores
Round the composite score to one digit after the decimal point to determine the final score

| RATIO | Ratio | Strength Factor | Weight | Composite Scores |
|---|---|---|---|---|
| Primary Reserve Ratio | 0.1807 | 1.8074 | 40% | 0.7230 |
| Equity Ratio | 0.3584 | 2.1502 | 40% | 0.8601 |
| Net Income Ratio | (0.0015) | 0.9622 | 20% | 0.1924 |
| | | | | 1.7755 |
| **TOTAL Composite Score - Rounded** | | | | 1.8 |

**\*49925**  BILLING CODE 4000-01-C


**\*49926  PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM**

10. The authority citation for part 682 is revised to read as follows:

Authority: 20 U.S.C. 1071-1087-4, unless otherwise noted.

Section 682.410 also issued under 20 U.S.C. 1078, 1078-1, 1078-2, 1078-3, 1080a, 1082, 1087, 1091a, and 1099.
 34 CFR § 682.410

11. Section 682.410 is amended by revising paragraph (b)(2) and removing the parenthetical authority citation at the end of the section.

The revision reads as follows:
 34 CFR § 682.410

**§ 682.410 Fiscal, administrative, and enforcement requirements.**

* * * * *

(b) * * *

(2) Collection charges. (i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim unless, within the 60-day period after the guaranty agency sends the initial notice described in paragraph (b)(6)(ii) of this section, the borrower enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrower any collection costs.

(ii) An acceptable repayment agreement may include an agreement described in § 682.200(b) (Satisfactory repayment arrangement), § 682.405, or paragraph (b)(5)(ii)(D) of this section. An acceptable repayment agreement constitutes a repayment arrangement or agreement on repayment terms satisfactory to the guaranty agency, under this section.

(iii) The costs under this paragraph (b)(2) include, but are not limited to, all attorneys' fees, collection agency charges, and court costs. Except as provided in §§ 682.401(b)(18)(i) and 682.405(b)(1)(vi)(B), the amount charged a borrower must equal the lesser of—

(A) The amount the same borrower would be charged for the cost of collection under the formula in 34 CFR 30.60; or

(B) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

\* \* \* \* \*

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

12. The authority citation for part 685 is revised to read as follows:

Authority: 20 U.S.C. 1070g, 1087a, et seq., unless otherwise noted.

Section 685.205 also issued under 20 U.S.C. 1087a et seq.

Section 685.206 also issued under 20 U.S.C. 1087a et seq.

Section 685.212 also issued under 20 U.S.C. 1087a et seq.; 28 U.S.C. 2401.

Section 685.214 also issued under 20 U.S.C. 1087a et seq.

Section 685.215 also issued under 20 U.S.C. 1087a et seq.

Section 685.222 also issued under 20 U.S.C. 1087a et seq.; 28 U.S.C. 2401; 31 U.S.C. 3702.

Section 685.300 also issued under 20 U.S.C. 1087a et seq., 1094.

Section 685.304 also issued under 20 U.S.C. 1087a et seq.

Section 685.308 also issued under 20 U.S.C. 1087a et seq.

34 CFR § 685.205

## § 685.205 [Amended]

34 CFR § 685.205

13. Section 685.205 is amended:

a. In paragraph (b)(6)(i), by removing the citation "§ 685.206(c)" and adding, in its place, the citation "§ 685.206(c), (d) and (e)"; and

b. By removing the parenthetical authority citation at the end of the section.

34 CFR § 685.206

14. Section 685.206 is amended:

a. In paragraph (c), by revising the subject heading;

000297

b. By adding paragraphs (d) through (e); and

c. Removing the parenthetical authority citation at the end of the section.

The revision and additions read as follows:

34 CFR § 685.206

**§ 685.206 Borrower responsibilities and defenses.**

* * * * *

(c) Borrower defense to repayment for loans first disbursed prior to July 1, 2017. * * *

* * * * *

(d) Borrower defense to repayment for loans first disbursed on or after July 1, 2017, and before July 1, 2020. For borrower defense to repayment for loans first disbursed on or after July 1, 2017, and before July 1, 2020, a borrower asserts and the Secretary considers a borrower defense in accordance with § 685.222.

(e) Borrower defense to repayment for loans first disbursed on or after July 1, 2020. This paragraph (e) applies to borrower defense to repayment for loans first disbursed on or after July 1, 2020.

(1) Definitions. For the purposes of this paragraph (e), the following definitions apply:

(i) A "Direct Loan" means a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct PLUS Loan.

(ii) "Borrower" means

(A) The borrower; and

(B) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(iii) A "borrower defense to repayment" includes—

(A) A defense to repayment of amounts owed to the Secretary on a Direct Loan, or a Direct Consolidation Loan that was used to repay a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act; and

(B) Any accompanying request for reimbursement of payments previously made to the Secretary on the Direct Loan or on a loan repaid by the Direct Consolidation Loan.

(iv) The term "provision of educational services" refers to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.

(v) The terms "school" and "institution" may be used interchangeably and include an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services.

(2) Federal standard for loans first disbursed on or after July 1, 2020. For a Direct Loan or Direct Consolidation Loan first disbursed on or after July 1, 2020, a borrower may assert a defense to repayment under this paragraph (e),if the borrower establishes by a preponderance of the evidence that—

(i) The institution at which the borrower enrolled made a misrepresentation, as defined in § 685.206(e)(3), of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan, and that directly and clearly relates to:

(A) Enrollment or continuing enrollment at the institution or

(B) The provision of educational services for which the loan was made; and

 **\*49927**  (ii) The borrower was financially harmed by the misrepresentation.

(3) Misrepresentation. A "misrepresentation," for purposes of this paragraph (e), is a statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive; that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth; and that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made. Evidence that a misrepresentation defined in this paragraph (e) may have occurred includes, but is not limited to:

(i) Actual licensure passage rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;

(ii) Actual employment rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;

(iii) Actual institutional selectivity rates or rankings, student admission profiles, or institutional rankings that are materially different from those included in the institution's marketing materials, website, or other communications made to the student or provided by the institution to national ranking organizations;

(iv) The inclusion in the institution's marketing materials, website, or other communication made to the student of specialized, programmatic, or institutional certifications, accreditation, or approvals not actually obtained, or the failure to remove within a reasonable period of time such certifications or approvals from marketing materials, website, or other communication when revoked or withdrawn;

(v) The inclusion in the institution's marketing materials, website, or other communication made to the student of representations regarding the widespread or general transferability of credits that are only transferrable to limited types of programs or institutions or the transferability of credits to a specific program or institution when no reciprocal agreement exists with another institution or such agreement is materially different than what was represented;

(vi) A representation regarding the employability or specific earnings of graduates without an agreement between the institution and another entity for such employment or sufficient evidence of past employment or earnings to justify such a representation or without citing appropriate national, State, or regional data for earnings in the same field as provided by an appropriate Federal agency that provides such data. (In the event that national data are used, institutions should include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for recent graduates.);

(vii) A representation regarding the availability, amount, or nature of any financial assistance available to students from the institution or any other entity to pay the costs of attendance at the institution that is materially different in availability, amount, or nature from the actual financial assistance available to the borrower from the institution or any other entity to pay the costs of attendance at the institution after enrollment;

(viii) A representation regarding the amount, method, or timing of payment of tuition and fees that the student would be charged for the program that is materially different in amount, method, or timing of payment from the actual tuition and fees charged to the student;

(ix) A representation that the institution, its courses, or programs are endorsed by vocational counselors, high schools, colleges, educational organizations, employment agencies, members of a particular industry, students, former students, governmental officials, Federal or State agencies, the United States Armed Forces, or other individuals or entities when the institution has no permission or is not otherwise authorized to make or use such an endorsement;

(x) A representation regarding the educational resources provided by the institution that are required for the completion of the student's educational program that are materially different from the institution's actual circumstances at the time the representation is made, such as representations regarding the institution's size; location; facilities; training equipment; or the number, availability, or qualifications of its personnel; and

(xi) A representation regarding the nature or extent of prerequisites for enrollment in a course or program offered by the institution that are materially different from the institution's actual circumstances at the time the representation is made, or that the institution knows will be materially different during the student's anticipated enrollment at the institution.

(4) Financial harm. Financial harm is the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation, as defined in § 685.206(e)(3). Financial harm does not include damages for nonmonetary loss, such as personal injury, inconvenience, aggravation, emotional distress, pain and suffering, punitive damages, or opportunity costs. The Department does not consider the act of taking out a Direct Loan or a loan repaid by a Direct Consolidation Loan, alone, as evidence of financial harm to the borrower. Financial harm is such monetary loss that is not predominantly due to intervening local, regional, or national economic or labor market conditions as demonstrated by evidence before the Secretary or provided to the Secretary by the borrower or the school. Financial harm cannot arise from the borrower's voluntary decision to pursue less than full-time work or not to work or result from a voluntary change in occupation. Evidence of financial harm may include, but is not limited to, the following circumstances:

(i) Periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions;

(ii) A significant difference between the amount or nature of the tuition and fees that the institution represented to the borrower that the institution would charge or was charging and the actual amount or nature of the tuition and fees charged by the institution for which the Direct Loan was disbursed or for which a loan repaid by the Direct Consolidation Loan was disbursed;

(iii) The borrower's inability to secure employment in the field of study for which the institution expressly guaranteed employment; and

(iv) The borrower's inability to complete the program because the institution no longer offers a requirement necessary for completion of the program in which the borrower enrolled and the institution did not provide for an acceptable alternative requirement to enable completion of the program.

(5) Exclusions. The Secretary will not accept the following as a basis for a borrower defense to repayment—

(i) A violation by the institution of a requirement of the Act or the Department's regulations for a borrower defense to repayment under paragraph (c) or (d) of this section or under § 685.222, unless the violation would otherwise constitute the basis for a successful borrower defense to repayment under this paragraph (e); or

**\*49928**  (ii) A claim that does not directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made, including, but not limited to—

(A) Personal injury;

(B) Sexual harassment;

(C) A violation of civil rights;

(D) Slander or defamation;

(E) Property damage;

(F) The general quality of the student's education or the reasonableness of an educator's conduct in providing educational services;

(G) Informal communication from other students;

(H) Academic disputes and disciplinary matters; and

(I) Breach of contract, unless the school's act or omission would otherwise constitute the basis for a successful defense to repayment under this paragraph (e).

(6) Limitations period and tolling of the limitations period for arbitration proceedings. (i) A borrower must assert a defense to repayment under this paragraph (e) within three years from the date the student is no longer enrolled at the institution. A borrower may only assert a defense to repayment under this paragraph (e) within the timeframes set forth in § 685.206(e)(6) (i) and (ii) and (e)(7).

(ii) For pre-dispute arbitration agreements, as defined in § 668.41(h)(2)(iii), the limitations period will be tolled for the time period beginning on the date that a written request for arbitration is filed, by either the student or the institution, and concluding on the date the arbitrator submits, in writing, a final decision, final award, or other final determination, to the parties.

(7) Extension of limitation periods and reopening of applications. For loans first disbursed on or after July 1, 2020, the Secretary may extend the time period when a borrower may assert a defense to repayment under § 685.206(e)(6) or may reopen a borrower's defense to repayment application to consider evidence that was not previously considered only if there is:

(i) A final, non-default judgment on the merits by a State or Federal Court that has not been appealed or that is not subject to further appeal and that establishes the institution made a misrepresentation, as defined in § 685.206(e)(3); or

(ii) A final decision by a duly appointed arbitrator or arbitration panel that establishes that the institution made a misrepresentation, as defined in § 685.206(e)(3).

(8) Application and Forbearance. To assert a defense to repayment under this paragraph (e), a borrower must submit an application under penalty of perjury on a form approved by the Secretary and sign a waiver permitting the institution to provide the Department with items from the borrower's education record relevant to the defense to repayment claim. The form will note that pursuant to paragraph (b)(6)(i) of this section, if the borrower is not in default on the loan for which a borrower defense has been asserted, the Secretary will grant forbearance and notify the borrower of the option to decline forbearance. The application requires the borrower to—

000301

(i) Certify that the borrower received the proceeds of a loan, in whole or in part, to attend the named institution;

(ii) Provide evidence that supports the borrower defense to repayment application;

(iii) State whether the borrower has made a claim with any other third party, such as the holder of a performance bond, a public fund, or a tuition recovery program, based on the same act or omission of the institution on which the borrower defense to repayment is based;

(iv) State the amount of any payment received by the borrower or credited to the borrower's loan obligation through the third party, in connection with a borrower defense to repayment described in paragraph (e)(2) of this section;

(v) State the financial harm, as defined in paragraph (e)(4) of this section, that the borrower alleges to have been caused and provide any information relevant to assessing whether the borrower incurred financial harm, including providing documentation that the borrower actively pursued employment in the field for which the borrower's education prepared the borrower if the borrower is a recent graduate (failure to provide such information results in a presumption that the borrower failed to actively pursue employment in the field); whether the borrower was terminated or removed for performance reasons from a position in the field for which the borrower's education prepared the borrower, or in a related field; and whether the borrower failed to meet other requirements of or qualifications for employment in such field for reasons unrelated to the school's misrepresentation underlying the borrower defense to repayment, such as the borrower's ability to pass a drug test, satisfy driving record requirements, and meet any health qualifications; and

(vi) State that the borrower understands that in the event that the borrower receives a 100 percent discharge of the balance of the loan for which the defense to repayment application has been submitted, the institution may, if allowed or not prohibited by other applicable law, refuse to verify or to provide an official transcript that verifies the borrower's completion of credits or a credential associated with the discharged loan.

(9) Consideration of order of objections and of evidence in possession of the Secretary. (i) If the borrower asserts both a borrower defense to repayment and any other objection to an action of the Secretary with regard to a Direct Loan or a loan repaid by a Direct Consolidation Loan, the order in which the Secretary will consider objections, including a borrower defense to repayment, will be determined as appropriate under the circumstances.

(ii) With respect to the borrower defense to repayment application submitted under this paragraph (e), the Secretary may consider evidence otherwise in the possession of the Secretary, including from the Department's internal records or other relevant evidence obtained by the Secretary, as practicable, provided that the Secretary permits the institution and the borrower to review and respond to this evidence and to submit additional evidence.

(10) School response and borrower reply. (i) Upon receipt of a borrower defense to repayment application under this paragraph (e), the Department will notify the school of the pending application and provide a copy of the borrower's request and any supporting documents, a copy of any evidence otherwise in the possession of the Secretary, and a waiver signed by the student permitting the institution to provide the Department with items from the student's education record relevant to the defense to repayment claim to the school, and invite the school to respond and to submit evidence, within the specified timeframe included in the notice, which shall be no less than 60 days.

(ii) Upon receipt of the school's response, the Department will provide the borrower a copy of the school's submission as well as any evidence otherwise in possession of the Secretary, which was provided to the school, and will give the borrower an opportunity to submit a reply within a specified timeframe, which shall be no less than 60 days. The borrower's reply must be limited to issues and evidence raised in the school's submission and any **\*49929** evidence otherwise in the possession of the Secretary.

(iii) The Department will provide the school a copy of the borrower's reply.

(iv) There will be no other submissions by the borrower or the school to the Secretary, unless the Secretary requests further clarifying information.

(11) Written decision. (i) After considering the borrower's application and all applicable evidence, the Secretary issues a written decision—

(A) Notifying the borrower and the school of the decision on the borrower defense to repayment;

(B) Providing the reasons for the decision; and

(C) Informing the borrower and the school of the relief, if any, that the borrower will receive, consistent with paragraph (e)(12) of this section, and specifying the relief determination.

(ii) If the Department receives a borrower defense to repayment application that is incomplete and is within the limitations period in § 685.206(e)(6) or (7), the Department will not issue a written decision on the application and instead will notify the borrower in writing that the application is incomplete and will return the application to the borrower.

(12) Borrower defense to repayment relief. (i) If the Secretary grants the borrower's request for relief based on a borrower defense to repayment under this paragraph (e), the Secretary notifies the borrower and the school that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay or will be reimbursed for amounts paid toward the loan voluntarily or through enforced collection. The amount of relief that a borrower receives may exceed the amount of financial harm, as defined in § 685.206(e)(4), that the borrower alleges in the application pursuant to § 685.206(e)(8)(v). The Secretary determines the amount of relief and awards relief limited to the monetary loss that a borrower incurred as a consequence of a misrepresentation, as defined in § 685.206(e)(3). The amount of relief cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense to repayment. In awarding relief, the Secretary considers the borrower's application, as described in § 685.206(e)(8), which includes information about any payments received by the borrower and the financial harm alleged by the borrower. In awarding relief, the Secretary also considers the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary, which was previously provided to the borrower and the school, as described in § 685.206(e)(10). The Secretary also updates reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan or loans repaid by the borrower's Direct Consolidation Loan.

(ii) The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include one or both of the following, if applicable:

(A) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act and

(B) Eliminating or recalculating the subsidized usage period that is associated with the loan or loans discharged pursuant to § 685.200(f)(4)(iii).

(13) Finality of borrower defense to repayment decisions. The determination of a borrower's defense to repayment by the Department included in the written decision referenced in paragraph (e)(11) of this section is the final decision of the Department and is not subject to appeal within the Department.

000303

(14) Cooperation by the borrower. The Secretary may revoke any relief granted to a borrower under this section who refuses to cooperate with the Secretary in any proceeding under paragraph (e) of this section or under 34 CFR part 668, subpart G. Such cooperation includes, but is not limited to—

(i) Providing testimony regarding any representation made by the borrower to support a successful borrower defense to repayment; and

(ii) Producing, within timeframes established by the Secretary, any documentation reasonably available to the borrower with respect to those representations and any sworn statement required by the Secretary with respect to those representations and documents.

(15) Transfer to the Secretary of the borrower's right of recovery against third parties. (i) Upon the grant of any relief under this paragraph (e), the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the provision of educational services for which the loan was received, against the school, its principals, its affiliates and their successors, or its sureties, and any private fund, including the portion of a public fund that represents funds received from a private party. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense to repayment and for the same loan for which the discharge was granted under this section.

(ii) The provisions of this paragraph (e)(15) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(iii) Nothing in this paragraph (e)(15) limits or forecloses the borrower's right to pursue legal and equitable relief arising under applicable law against a party described in this paragraph (e)(15) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

(16) Recovery from the school. (i) The Secretary may initiate an appropriate proceeding to require the school whose misrepresentation resulted in the borrower's successful borrower defense to repayment under this paragraph (e) to pay to the Secretary the amount of the loan to which the defense applies in accordance with 34 CFR part 668, subpart G. This paragraph (e)(16) would also be applicable for provisionally certified institutions.

(ii) The Secretary will not initiate such a proceeding more than five years after the date of the final determination included in the written decision referenced in paragraph (e)(11) of this section. The Department will notify the school of the borrower defense to repayment application within 60 days of the date of the Department's receipt of the borrower's application.
 * * * * *34 CFR § 685.212
15. Section 685.212 is amended by revising paragraph (k) and removing the parenthetical authority citation at the end of the section.

 **49930**  The revision reads as follows:
 34 CFR § 685.212

## § 685.212 Discharge of a loan obligation.
* * * * *

(k) Borrower defenses. (1) If a borrower defense is approved under § 685.206(c) or under § 685.206(d) and § 685.222—

(i) The Secretary discharges the obligation of the borrower in whole or in part in accordance with the procedures in §§ 685.206(c) and 685.222, respectively; and

(ii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the loan that exceed the amount owed on that portion of the loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim subject to § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or

(B) For a claim subject to § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(2) In the case of a Direct Consolidation Loan, a borrower may assert a borrower defense under § 685.206(c) or § 685.222 with respect to a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act that was repaid by the Direct Consolidation Loan.

(i) The Secretary considers a borrower defense claim asserted on a Direct Consolidation Loan by determining—

(A) Whether the act or omission of the school with regard to the loan described in this paragraph (k)(2), other than a Direct Subsidized, Unsubsidized, or PLUS Loan, constitutes a borrower defense under § 685.206(c), for a Direct Consolidation Loan made before July 1, 2017, or under § 685.222, for a Direct Consolidation Loan made on or after July 1, 2017, and before July 1, 2020; or

(B) Whether the act or omission of the school with regard to a Direct Subsidized, Unsubsidized, or PLUS Loan made on after July 1, 2017, and before July 1, 2020, that was paid off by the Direct Consolidation Loan, constitutes a borrower defense under § 685.222.

(ii) If the borrower defense is approved, the Secretary discharges the appropriate portion of the Direct Consolidation Loan.

(iii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the Direct Consolidation Loan that exceed the amount owed on that portion of the Direct Consolidation Loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim asserted under § 685.206(c), the limitation period under the law applicable to the claim on which relief was granted; or

(B) For a claim asserted under § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(iv) The Secretary returns to the borrower a payment made by the borrower or otherwise recovered on the loan described in this paragraph (k)(2) only if—

(A) The payment was made directly to the Secretary on the loan; and

(B) The borrower proves that the loan to which the payment was credited was not legally enforceable under applicable law in the amount for which that payment was applied.

(3) If a borrower's application for a discharge of a loan based on a borrower defense is approved under § 685.206(e), the Secretary discharges the obligation of the borrower, in whole or in part, in accordance with the procedures described in § 685.206(e).

* * * * *34 CFR § 685.214

16. Section 685.214 is amended:

a. In paragraph (c)(1) introductory text, by removing the word "In" at the beginning of the paragraph and adding in its place "For loans first disbursed before July 1, 2020, in";

b. By redesignating paragraph (c)(2) as paragraph (c)(3);

c. By adding new paragraph (c)(2);

d. In newly redesignated paragraph (c)(3)(ii), by adding "and before July 1, 2020," after "on or after November 1, 2013,";

e. By adding introductory text to paragraph (f);

f. By adding paragraph (g); and

g. By removing the parenthetical authority citation at the end of the section.

The additions read as follows:
 34 CFR § 685.214

§ 685.214 **Closed school discharge.**
\* \* \* \* \*
(c) \* \* \*

(2) For loans first disbursed on or after July 1, 2020, in order to qualify for discharge of a loan under this section, a borrower must submit to the Secretary a completed application, and the factual assertions in the application must be true and made by the borrower under penalty of perjury. The application explains the procedures and eligibility criteria for obtaining a discharge and requires the borrower to—

(i) Certify that the borrower (or the student on whose behalf a parent borrowed)—

(A) Received the proceeds of a loan, in whole or in part, on or after July 1, 2020 to attend a school;

(B) Did not complete the program of study at that school because the school closed on the date that the student was enrolled, or the student withdrew from the school not more than 180 calendar days before the date that the school closed. The Secretary may extend the 180-day period if the Secretary determines that exceptional circumstances related to a school's closing justify an extension. Exceptional circumstances for this purpose may include, but are not limited to: The revocation or withdrawal by an accrediting agency of the school's institutional accreditation; revocation or withdrawal by the State authorization or licensing authority to operate or to award academic credentials in the State; the termination by the Department of the school's participation in a title IV, HEA program; the teach-out of the student's educational program exceeds the 180-day look-back period for a closed school loan discharge; or the school responsible for the teach-out of the student's educational program fails to perform the material terms of the teach-out plan or agreement, such that the student does not have a reasonable opportunity to complete his or her program of study or a comparable program; and

(C) Did not complete the program of study or a comparable program through a teach-out at another school or by transferring academic credits or hours earned at the closed school to another school;

(ii) Certify that the borrower (or the student on whose behalf the parent borrowed) has not accepted the opportunity to complete, or is not continuing in, the program of study or a comparable program through either an institutional teach-out plan performed by the school or a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.
\* \* \* \* \*

(f) Discharge procedures. The discharge procedures in this paragraph (f) apply to loans first disbursed before July 1, 2020.
* * * * *
(g) Discharge procedures. The discharge procedures in this paragraph (g) apply to loans first disbursed on or after July 1, 2020.

 **49931**  (1) After confirming the date of a school's closure, the Secretary identifies any Direct Loan borrower (or student on whose behalf a parent borrowed) who appears to have been enrolled at the school on the school closure date or to have withdrawn not more than 180 days prior to the closure date.

(2) If the borrower's current address is known, the Secretary mails the borrower a discharge application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(3) If the borrower's current address is unknown, the Secretary attempts to locate the borrower and determines the borrower's potential eligibility for a discharge under this section by consulting with representatives of the closed school, the school's licensing agency, the school's accrediting agency, and other appropriate parties. If the Secretary learns the new address of a borrower, the Secretary mails to the borrower a discharge application and explanation and suspends collection, as described in paragraph (g)(2) of this section.

(4) If a borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(5) If the Secretary determines that a borrower who requests a discharge meets the qualifications for a discharge, the Secretary notifies the borrower in writing of that determination.

(6) If the Secretary determines that a borrower who requests a discharge does not meet the qualifications for a discharge, the Secretary notifies that borrower in writing of that determination and the reasons for the determination, and resumes collection.
* * * * *34 CFR § 685.215
17. Section 685.215 is amended:

a. In paragraph (a)(1) introductory text, by removing the word "The" at the beginning of the paragraph and adding in its place "For loans first disbursed before July 1, 2020, the";

b. In paragraph (a)(1)(ii) introductory text, by removing the word "Certified" and adding in its place "For loans first disbursed before July 1, 2020, certified";

c. In paragraph (a)(1)(iv), removing the word "or" at the end of the paragraph;

d. Removing the period at the end of paragraph (a)(v) and adding in its place "; or";

e. Adding paragraph (a)(1)(vi);

f. Revising paragraph (c) introductory text;

g. Adding introductory text to paragraph (d);

h. Adding paragraphs (e) and (f); and

i. Removing the parenthetical authority citation at the end of the section.

The revisions and additions read as follows:

34 CFR § 685.215

**§ 685.215 Discharge for false certification of student eligibility or unauthorized payment.**
(a) * * *

(1) * * *

(vi) For loans first disbursed on or after July 1, 2020, certified eligibility for a Direct Loan for a student who did not have a high school diploma or its recognized equivalent and did not meet the alternative eligibility requirements described in 34 CFR part 668 and section 484(d) of the Act applicable at the time of disbursement.
* * * * *

(c) Borrower qualification for discharge. This paragraph (c) applies to loans first disbursed before July 1, 2020. To qualify for discharge under this paragraph, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraph (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.
* * * * *

(d) Discharge procedures. This paragraph (d) applies to loans first disbursed before July 1, 2020.
* * * * *

(e) Borrower qualification for discharge. This paragraph (e) applies to loans first disbursed on or after July 1, 2020. In order to qualify for discharge under this paragraph, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary, and the factual assertions in the application must be true and made under penalty of perjury. In the application, the borrower must demonstrate to the satisfaction of the Secretary that the requirements in paragraphs (e)(1) through (6) of this section have been met.

(1) High School diploma or equivalent. (i) In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative eligibility requirements, the borrower must certify that the borrower (or the student on whose behalf a parent borrowed)—

(A) Received a disbursement of a loan, in whole or in part, on or after January 1, 1986, to attend a school; and

(B) Received a Direct Loan at that school and did not have a high school diploma or its recognized equivalent and did not meet the alternative to graduation from high school eligibility requirements described in 34 CFR part 668 and section 484(d) of the Act applicable at the time of disbursement.

(ii) A borrower does not qualify for a false certification discharge under this paragraph (e)(1) if—

(A) The borrower was unable to provide the school with an official transcript or an official copy of the borrower's high school diploma or the borrower was home schooled and has no official transcript or high school diploma; and

(B) As an alternative to an official transcript or official copy of the borrower's high school diploma, the borrower submitted to the school a written attestation, under penalty of perjury, that the borrower had a high school diploma.

(2) Unauthorized loan. In the case of a borrower requesting a discharge because the school signed the borrower's name on the loan application or promissory note without the borrower's authorization, the borrower must—

000308

(i) State that he or she did not sign the document in question or authorize the school to do so; and

(ii) Provide five different specimens of his or her signature, two of which must be within one year before or after the date of the contested signature.

(3) Unauthorized payment. In the case of a borrower requesting a discharge because the school, without the borrower's authorization, endorsed the borrower's loan check or signed the borrower's authorization for electronic funds transfer, the borrower must—

(i) State that he or she did not endorse the loan check or sign the authorization for electronic funds transfer or authorize the school to do so;

(ii) Provide five different specimens of his or her signature, two of which must be within one year before or after the date of the contested signature; and

 **49932** (iii) State that the proceeds of the contested disbursement were not delivered to the student or applied to charges owed by the student to the school.

(4) Identity theft. (i) In the case of an individual whose eligibility to borrow was falsely certified because he or she was a victim of the crime of identity theft and is requesting a discharge, the individual must—

(A) Certify that the individual did not sign the promissory note, or that any other means of identification used to obtain the loan was used without the authorization of the individual claiming relief;

(B) Certify that the individual did not receive or benefit from the proceeds of the loan with knowledge that the loan had been made without the authorization of the individual;

(C) Provide a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is named as the borrower of the loan was the victim of a crime of identity theft; and

(D) If the judicial determination of the crime does not expressly state that the loan was obtained as a result of the crime of identity theft, provide—

(1) Authentic specimens of the signature of the individual, as provided in paragraph (e)(2)(ii) of this section, or of other means of identification of the individual, as applicable, corresponding to the means of identification falsely used to obtain the loan; and

(2) A statement of facts that demonstrate, to the satisfaction of the Secretary, that eligibility for the loan in question was falsely certified as a result of the crime of identity theft committed against that individual.

(ii)(A) For purposes of this section, identity theft is defined as the unauthorized use of the identifying information of another individual that is punishable under 18 U.S.C. 1028, 1028A, 1029, or 1030, or substantially comparable State or local law.

(B) Identifying information includes, but is not limited to—

(1) Name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, and employer or taxpayer identification number;

(2) Unique biometric data, such as fingerprints, voiceprint, retina or iris image, or unique physical representation;

(3) Unique electronic identification number, address, or routing code; or

(4) Telecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e)).

(5) Claim to third party. The borrower must state whether the borrower (or student) has made a claim with respect to the school's false certification or unauthorized payment with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower (or student) or credited to the borrower's loan obligation.

(6) Cooperation with Secretary. The borrower must state that the borrower (or student)—

(i) Agrees to provide to the Secretary upon request other documentation reasonably available to the borrower that demonstrates that the borrower meets the qualifications for discharge under this section; and

(ii) Agrees to cooperate with the Secretary in enforcement actions as described in § 685.214(d) and to transfer any right to recovery against a third party to the Secretary as described in § 685.214(e).

(7) Discharge without an application. The Secretary discharges all or part of a loan as appropriate under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge.

(f) Discharge procedures. This paragraph (f) applies to loans first disbursed on or after July 1, 2020.

(1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower the application described in paragraph (e) of this section, which explains the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit a completed application within 60 days of the date the Secretary suspended collection efforts, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(3) If the borrower submits a completed application, the Secretary determines whether to grant a request for discharge under this section by reviewing the application in light of information available from the Secretary's records and from other sources, including, but not limited to, the school, guaranty agencies, State authorities, and relevant accrediting associations.

(4) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(5) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination, and resumes collection.

* * * * *34 CFR § 685.222

18. Section 685.222 is amended:

a. By revising the section heading;

b. In paragraph (a)(2), by adding the words "and before July 1, 2020," after the words "after July 1, 2017,";

c. In paragraph (b), by adding the words "under this section" after the words "The borrower has a borrower defense";

d. In paragraph (c), by adding the words "under this section" after the words "The borrower has a borrower defense";

e. In paragraph (d)(1), by adding the words "under this section" after the words "A borrower has a borrower defense";

f. In paragraph (e)(2) introductory text, by adding the words "under this section" after the words "Upon receipt of a borrower's application";

g. In paragraph (e)(3) introductory text, by adding the words "submitted under this section" after the words "review the borrower's application";

h. In paragraph (e)(3)(ii), by removing the word "Upon" and adding in its place the words, "For borrower defense applications under this section, upon";

i. In paragraph (e)(4) introductory text, by adding the words "under this section" after the words "fact-finding process";

j. In paragraph (e)(5) introductory text, by adding the words "under this section" after the words "Department official";

k. In paragraph (f)(1) introductory text, by adding the words "under this section" after the words "has a borrower defense";

l. In paragraph (g) introductory text, by adding the words "under this section" after the words "for which the borrower defense";

m. In paragraph (h) introductory text, by adding the words "under this section" after the words "for which the borrower defense"; and

n. By removing the parenthetical authority citation at the end of the section.

 **\*49933**  The revision reads as follows:
 34 CFR § 685.222

**§ 685.222 Borrower defenses and procedures for loans first disbursed on or after July 1, 2017, and before July 1, 2020, and procedures for loans first disbursed prior to July 1, 2017.**
* * * * *

**Appendix A to Subpart B of Part 685 [Amended]**
34 CFR Pt. 685, Subpt. B, App. A
19. Appendix A to subpart B of part 685 is amended by removing the word "The" at the beginning of the introductory text and adding in its place the words "As provided in 34 CFR 685.222(i)(4), the".
 34 CFR § 685.300
20. Section 685.300 is amended by:

a. Revising paragraph (b)(8);

b. Removing paragraph (b)(11);

c. Removing "and" after "any benefits associated with such a loan;" from paragraph (b)(10);

d. Redesignating paragraph (b)(12) as paragraph (b)(11);

e. Adding "; and" after "the purposes of Part D of the Act" in newly redesignated paragraph (b)(11);

f. Adding a new paragraph (b)(12);

g. Removing paragraphs (d) through (i); and

h. Removing the parenthetical authority citation at the end of the section.

The revision and addition read as follows:

 34 CFR § 685.300

**§ 685.300** **Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.**
* * * * *

(b) * * *

(8) Accept responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement;
 * * * * *
(12) Accept responsibility and financial liability stemming from losses incurred by the Secretary for repayment of amounts discharged by the Secretary pursuant to §§ 685.206, 685.214, 685.215, 685.216, and 685.222.
 * * * * *34 CFR § 685.304
21. Section 685.304 is amended by:

a. Adding paragraphs (a)(3)(iii)(A) and (B);

b. Revising paragraph (a)(5);

c. Removing the word "and" after the words "conditions of the loan;" in paragraph (a)(6)(xii);

d. Redesignating paragraph (a)(6)(xiii) as paragraph (a)(6)(xvi) and adding new paragraph (a)(6)(xiii) and paragraphs (a)(6)(xiv) and (xv); and

e. Removing the parenthetical authority citation at the end of the section.

The additions and revision read as follows:

 34 CFR § 685.304

**§ 685.304** **Counseling borrowers.**
(a) * * *

(3) * * *

(iii) * * *

(A) Online or by interactive electronic means, with the borrower acknowledging receipt of the information.

(B) If a standardized interactive electronic tool is used to provide entrance counseling to the borrower, the school must provide to the borrower any elements of the required information that are not addressed through the electronic tool:

(1) In person; or

(2) On a separate written or electronic document provided to the borrower.

* * * * *

(5) A school must ensure that an individual with expertise in the title IV programs is reasonably available shortly after the counseling to answer the student borrower's questions. As an alternative, in the case of a student borrower enrolled in a correspondence, distance education, or study-abroad program approved for credit at the home institution, the student borrower may be provided with written counseling materials before the loan proceeds are disbursed.

(6) * * *

(xiii) For loans first disbursed on or after July 1, 2020, if, as a condition of enrollment, the school requires borrowers to enter into a pre-dispute arbitration agreement, as defined in § 668.41(h)(2)(iii) of this chapter, or to sign a class action waiver, as defined in § 668.41(h)(2)(i) and (ii) of this chapter, the school must provide a written description of the school's dispute resolution process that the borrower has agreed to pursue, including the name and contact information for the individual or office at the school that the borrower may contact if the borrower has a dispute relating to the borrower's loans or to the provision of educational services for which the loans were provided;

(xiv) For loans first disbursed on or after July 1, 2020, if, as a condition of enrollment, the school requires borrowers to enter into a pre-dispute arbitration agreement, as defined in § 668.41(h)(2)(iii) of this chapter, the school must provide a written description of how and when the agreement applies, how the borrower enters into the arbitration process, and who to contact if the borrower has any questions;

(xv) For loans first disbursed on or after July 1, 2020, if, as a condition of enrollment, the school requires borrowers to sign a class-action waiver, as defined in § 668.41(h)(2)(i) and (ii) of this chapter, the school must explain how and when the waiver applies, alternative processes the borrower may pursue to seek redress, and who to contact if the borrower has any questions; and

* * * * *34 CFR § 685.308

22. Section 685.308 is amended by revising paragraph (a) and removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

34 CFR § 685.308

## § 685.308 Remedial actions.

(a) General. The Secretary may require the repayment of funds and the purchase of loans by the school if the Secretary determines that the school is liable as a result of—

(1) The school's violation of a Federal statute or regulation;

(2) The school's negligent or willful false certification under § 685.215; or

(3) The school's actions that gave rise to a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to § 685.206, § 685.214, § 685.216, or § 685.222.

* * * * *

[FR Doc. 2019-19309 Filed 9-20-19; 8:45 am]

BILLING CODE 4000-01-P

Footnotes

1        81 FR 75926.

2    Complaint and Prayer for Declaratory and Injunctive Relief, California Association of Private Postsecondary Schools v. DeVos, No. 17-cv-00999 (D.D.C. May 24, 2017).

3    82 FR 27621.

4    5 U.S.C. 705.

5    82 FR 49114.

6    82 FR 49155.

7    83 FR 6458.

8    Complaint for Declaratory and Injunctive Relief, Bauer v. DeVos, No. 17-cv-1330 (D.D.C. Jul. 6, 2017).

9    Massachusetts v. U.S. Dep't of Educ., No. 17-cv-01331 (D.D.C. Jul. 6, 2017).

10    83 FR 37242.

11    Bauer, No. 17-cv-1330.

12    Bauer, No. 17-cv-1330.

13    Minute Order (Oct. 12, 2018), Bauer, No. 17-cv-1330.

14    Memorandum Opinion and Order, CAPPS, No. 17-cv-0999 (Oct. 16, 2018).

15    See: 83 FR 37250-51.

16    84 FR 9964.

17    83 FR 37242.

18    5 U.S.C. 553(d).

19    20 U.S.C. 1001, et seq.; 34 CFR 600.2; 34 CFR 600.20; 34 CFR 668.13.

20    U.S. Dep't of Educ., Office of Federal Student Aid, Principal Office Functional Statements, available at https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html.

21    Id.

22    Id.

23    Alexandria Walton Radford, Top Student, Top School?: How Social Class Shapes Where Valedictorians Go to College, University of Chicago Press, (2013).

24    Audrey Light & Wayne Strayer, Determinants of College Completion: School Quality or Student Ability?, 35 J. of Human Res. 299-332 (2000).

25    See: Holzer, Harry J. and Sandy Baum, Making College Work: Pathways to Success for Disadvantaged Students (Washington, DC: Brookings Institution Press, 2017); Carnevale, Anthony, et al., "Learning While Earning: The New Normal," Center on Education and the Workforce, Georgetown University, 2015, 1gyhoq479ufd3yna29x7ubjn-wpengine.netdna-ssl.com/wp-content/uploads/Working-Learners-Report.pdf; Schneider, Mark, "Are Graduates from Public Universities Gainfully Employed? Analyzing Student Loan Debt and Gainful Employment," American Enterprise Institute, 2014, www.aei.org/publication/are-graduates-from-public-universities-gainfully-employed-analyzing-student-loan-debt-and-gainful-employment/.

26    U.S. Dep't of Educ., College Scorecard, available at https://collegescorecard.ed.gov/.

27    U.S. Dep't of Educ., College Navigator, available at https://nces.ed.gov/collegenavigator/.

28    Exec. Office of the U.S. President, Using Federal Data to Measure and Improve the Performance of U.S. Institutions of Higher Education (rev. Jan. 2017), available at https://collegescorecard.ed.gov/assets/UsingFederalDataToMeasureAndImprovePerformance.pdf.

29    See U.S. Dep't of Education, Secretary Devos Delivers on Promise to Expand College Scorecard, Provide Meaningful Information to Students on Education Options and Outcomes, available at https://www.ed.gov/news/press-releases/secretary-devos-delivers-promise-expand-college-scorecard-provide-meaningful-information-students-education-options-and-outcomes (May 21, 2019); See also: 84 FR 31392, 31408.

30    See, e.g., U.S. Dep't of Educ., College Scorecard, available at https://collegescorecard.ed.gov/; U.S. Dep't of Educ., College Navigator, available at https://nces.ed.gov/collegenavigator/.

31    34 CFR 685.206(e)(3).

32    Id.

33    See 1 CFR part 21. "Each agency that prepares a document that is subject to codification shall draft it as an amendment to the Code of Federal Regulations . . ." 1 CFR 21.1.

34    83 FR 37253-37254.

35    83 FR 37253-37254.

36    See 20 U.S.C. 1221e-3.

000314

37   5 U.S.C. 552a(e)(1).

38   Webster's Dictionary defines frivolous as: "of little weight or importance; having no sound basis; lacking in seriousness." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/frivolous?src=search-dict-hed. Black's Law Dictionary defines "frivolous" as when an answer or plea is "clearly insufficient on its face, and does not controvert the material points of the opposite pleading, and is presumably interposed for mere purposes of delay or to embarrass the plaintiff." https://thelawdictionary.org/frivolous/. The Supreme Court has held that a complaint is frivolous when it lacks "an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319 (1989).

39   83 FR 37325-28.

40   83 FR 37325.

41   § 685.206(e)(2).

42   83 FR 37326.

43   § 685.206(e)(3)(x).

44   In re APA Assessment Fee Litigation, 766 F.3d 39, 55 (D.C. Cir. 2014); See also: Mid Atlantic Framing, LLC. v. Varnish Construction, Inc., 117 F.Supp.3d 145, 151 (N.D.N.Y. 2015); Chow v. Aegis Mortgage Corporation, 185 F.Supp. 914, 917 (N.D.Ill 2002); Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC, 739 F.Supp.2d 109, 114 (D.Conn. 2010). Note: In cases involving commercial contracts, courts have often required a further element that the defrauded party's reliance must be reasonable. Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. Cir. 1992).

45   Sundberg v. TTR Realty, 109 A.3d 1123, 1131 (D.C. 2015); See also: Indy Lube Investments, LLC v. Wal-Mart Stores, Inc., 199 F.Supp. 2d 1114, 1122 (D.Kan. 2002); City of St. Joseph, Mo. v. Southwestern Bell Telephone, 439 F.3d 468, 478 (8th Cir. 2006); Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1207 (D.C. 1999).

46   Sundberg, 109 A.3d at 1131.

47   Stevens v. JPMorgan Chase Bank, N.A., 2010 WL 329963 (N.D.Cal. 2010); See also: Newton v. Kenific Group, 62 F.Supp 3d 439, 443 (D. Md. 2015); Fabbro v. DRX Urgent Care, LLC, 616 Fed. Appx. 485, 488 (3rd Cir. 2015) (Negligent misrepresentation claims, regarding the expenses involved in starting a franchise, were dismissed, in part, because: "Predictions or promises regarding future events . . . are necessarily approximate.")

48   See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657 (1989); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).

49   Gertz, 418 U.S. at 332 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).

50   Id. at 332.

51   81 FR 75947.

52   34 CFR 685.222(d).

53   34 CFR 668.71(c).

54   Id.

55   34 CFR 685.222(e)(3).

56   Restatement (Third) of Torts § 20 (2010).

57   See Federal Reserve, Consumer Credit Outstanding (Levels), available at https://www.federalreserve.gov/releases/g19/HIST/cc_hist_memo_levels.html.

58   Zack Freidman, Student Loan Debt Statistics in 2019: A $1.5 Trillion Crisis, Forbes, Feb. 25, 2019, available at https://www.forbes.com/sites/zackfriedman/2019/02/25/student-loan-debt-statistics-2019/#7577f5f3133f.

59   34 CFR 685.222(d)(2)(i) through (v).

60   Report and Suggestions from IPEDS Technical review Panel #34 Calculating Job Placement Rates, available at https://edsurveys.rti.org/IPEDS_TRP_DOCS/prod/documents/TRP34_Final_Action.pdf. The TRP does not report to or advise the Department of Education.

61   83 FR 37257.

62   Note: As explained in the next section, below, the Department also revised § 685.206(e)(3)(vi) to include a parenthetical that institutions using national data should include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for graduates.

63   83 FR 37299.

64   81 FR 75939-75940.

65   34 CFR 685.206(e)(1)(iv).

66   81 FR 75952.

67   34 CFR 685.222(c).

68   81 FR 39341 (citing Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992) and Vurimindi, 435 F. App'x at 133 (quoting Ross)).

69   81 FR 75944.

70   Id.

71   Dodge v. Trustees of Randolph-Macon College Woman's College, 661 SE2d 801, 802-03 (Va. 2008).

72   Id.

73   Id. at 802.

74   Id. at 803-04.

75   81 FR 75994.

76   Compare Restatement (First) of Contracts section 312 (2018) with Restatement (First) of Contracts sections 470-471.

77   83 FR 37254.

78   American Commercial Colleges, Inc. v. Davis, 821 S.W.2d 450, 452 (Tex. App. Eastland 1991).

79   Bradford v. George Washington University, 249 F.Supp. 3d 325, 330 (D.D.C. 2017).

80   34 CFR 682.209(g).

81   These final regulations, unlike the 2016 final regulations, do not expressly state that a borrower who asserts a borrower defense to repayment application will be provided with information on availability of income-contingent repayment plans and income-based repayment plans because this information is always available to borrowers. Borrowers also may avail themselves of such information on the Department's website at https://studentloans.gov/myDirectLoan/ibrInstructions.action.

82   83 FR 75961.

83   See Restatement (Third) of Torts: Liab. For Econ. Harm section 9 TD No 2(2014) ("The elements of a tort claim ordinarily must be proven by a preponderance of the evidence, but most courts have required clear and convincing evidence to establish some or all of the elements of fraud.").

84   20 U.S.C. 1087e(h).

85   34 CFR 685.222(i)(8).

86   83 FR 75975.

87   34 CFR part 685, app. A.

88   83 FR 37259-60 ("As with the 2016 final regulations, however, the Department does not believe it is necessary for a borrower to demonstrate a specific level of financial harm, other than the presence of such harm, to be eligible for relief under the proposed standard.")

89   83 FR 37327.

90   See, e.g., Miller, David S. (2019). "Predicting Future Recessions," FEDS Notes. Washington: Board of Governors of the Federal Reserve System, May 6, 2019, https://doi.org/10.17016/2380-7172.2338.

91   Manriquez v. Devos, No. 18-16375 (9th Cir. argued Fed. 8, 2019).

92   Example 5 in Appendix A to subpart B of part 685 demonstrates that a borrower would not receive relief from the Department unless there was financial harm.

93   Sargiss v. Magarelli, 12 NY3d 527, 532 (2009), quoting CPLR 213 [8] and CLPR 203 [g].

94   La. Civ. Code art. 3492.

95   Cal. Civ. Proc. Code § 338 (2006).

96   Tx. Civ. Prac. & Rem. § 16.001(a)(4).

97   Ky. Rev. Stat. § 413.120(11) (2016).

98   34 CFR 685.222(b)-(d).

99   83 FR 37326.

100  Compare § 685.206(e)(2) with § 685.206(e)(3).

101  397 U.S. 254 (1970).

102  34 CFR 685.222.

103  81 FR 75962.

104  Goldberg, 397 U.S. at 255.

105  Id. at 268-69.

106  83 FR 37326.

107  83 FR 37262.

108    The exclusive list of further relief is located at § 685.206(e)(12)(ii). Further relief includes one or both of the following, if applicable: (1) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV; and (2) eliminating or recalculating the subsidized usage period that is associated with the loan or loans discharged pursuant to § 685.200(f)(4)(iii).

109    See 81 FR 75973-75976.

110    See 81 FR 75975.

111    Note: It is possible that particular programs and/or schools are so small, even including the school or program's name could be too revealing. We will consider an exception in these types of circumstances.

112    83 FR 37263.

113    Compare 34 CFR 685.222(k) with 34 CFR 685.206(e)(15).

114    34 CFR 685.206(e)(15)(i).

115    83 FR 37263.

116    CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012).

117    AT&T Mobility, LLC v. Concepcion, 563 U.S. 333, 347-51 (2011).

118    Hensler, Deborah R., "Court-Ordered Arbitration: An Alternative View," University of Chicago Legal Forum, Volume 1990, Issue 1, Article 12, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1074&context =uclf.

119    Department of Defense, "Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents," August 9, 2006, http://archive.defense.gov/pubs/pdfs/Report_to_Congress_final.pdf.

120    81 FR 39383.

121    Sussman, Edna, and John Wilkinson, "Benefits of Arbitration for Commercial Disputes," American Bar Association, March 2012, https://www.americanbar.org/content/dam/aba/publications/dispute_resolution_magazine/ March_2012_Sussman_Wilkinson_March_5.authcheckdam.pdf.

122    Sussman and Wilkinson, https://www.americanbar.org/content/dam/aba/publications/dispute_resolution_magazine/ March_2012_Sussman_Wilkinson_March_5.authcheckdam.pdf.

123    Final Judgment, State of California v. Corinthian Colleges, Inc., et. al., No. CGC-13-534793 (Superior Court of California, County of San Francisco). Note: In 2018, the California Attorney General announced a settlement with Balboa Student Loan Trust providing debt relief for students who took out private loans to attend Corinthian Colleges. Final Judgment and Permanent Injunction, State of California v. Balboa Student Loan Trust, No. BC-709870 (Superior Court of California, County of Los Angeles).

125    American Arbitration Association, "Consumer Arbitration Rules," January 1, 2016, https://www.adr.org/sites/default/files/ ConsumerRules.pdf; and "Commercial Arbitration Rules and Mediation Procedures," July 1, 2016 https://www.adr.org/sites/ default/files/CommercialRules.pdf; Arbitration Study: Report to Congress, Pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act section 1028(a), CFPB, Appendix A at 43 (2015), available at http://files.consumerfinance.gov/ f/201503_cfpb_arbitration-studyreport-to-congress-2015.pdf; Public Citizen, "The Costs of Arbitration," p. 2, April 2002, available at https://www.citizen.org/documents/ACF110A.PDF.

126    "The Code of Ethics for Arbitrators in Commercial Disputes," American Arbitration Association, Effective March 1, 2004, https:// www.adr.org/sites/default/files/document_repository/Commercial_Code_of_Ethics_for_Arbitrators_2010_10_14.pdf; Uniform Arbitration Act (Revised), National Conference of Commissioners on Uniform State Laws, 2000, https://www.uniformlaws.org/ viewdocument/final-act-1?CommunityKey=a0ad71d6-085f-4648-857a-e9e893ae2736&tab=librarydocuments; Note: The Uniform Arbitration Act has been adopted in 35 jurisdictions and 14 jurisdictions have adopted substantially similar legislation.

127    American Arbitration Association, https://www.adr.org/sites/default/files/document_repository/ Commercial_Code_of_Ethics_for_Arbitrators_2010_10_14.pdf.

128    Public Citizen, "The Costs of Arbitration," https://www.citizen.org/documents/ACF110A.PDF.

129    See, e.g., Epic Systems Corp. v. Lewis, 138 S.Ct. 1612, 1621 (2018) (referring to the Federal Arbitration Act (FAA), 9 U.S.C. 2, and citing Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974)) ("[I]n Congress's judgment arbitration had more to offer than courts [once] recognized—not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved.") (emphasis added). Notably, "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness" should not, in the Supreme Court's view, "be shorn away;" as a corollary, "arbitration [ought not to] look[ ] like the litigation" the FAA "displace[d]." Epic Systems, 138 S.Ct. at 1623 (emphasis added); see also AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 347, 348 (2011). Note: It could be argued that the calculation in the study does not take into account the many other additional potential costs of both litigation and arbitration. Regardless the cost, however, it is incontrovertible that Congress has found to favor arbitration.

130    Clerk of the Court, Cook County, "Court Fees and Costs 705 ILCS 105/27.2a," Effective January 1, 2017, http:// www.cookcountyclerkofcourt.org/Forms/pdf_files/CCG0603.pdf.

000317

131    See: Paula Hannaford-Agor, "Measuring the Cost of Civil Litigation: Findings from a Survey of Trial Lawyers," Voir Dire, Spring 2013, https://www.ncsc.org/#/media/Files/PDF/ServicesandExperts/Areasofexpertise/CivilJustice/Measuring-cost-civil-litigation.ashx.

132    American Arbitration Association, "Commercial Arbitration Rules and Mediation Procedures: Administrative Fee Schedules," May 1, 2018, https://www.adr.org/sites/default/files/Commercial_Arbitration_Fee_Schedule_1.pdf.

133    83 FR 37245.

134    For more information on this topic, see: James R. Copland, et al., "Trial Lawyers, Inc. 2016," Manhattan Institute, https://media4.manhattan-institute.org/sites/default/files/TLI-0116.pdf.

135    "Loan Discharge Application: School Closure," https://ifap.ed.gov/dpcletters/attachments/GEN1418AttachLoanDischargeAppSchoolClosure.pdf.

136    83 FR 37267-37268.

137    FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

138    Note: The Department discusses the issues regarding the withholding of transcripts in more detail in the "Relief" section of these Final Regulations.

139    See: Park, Toby J., "Working Hard for the Degree: An Event History Analysis of the Impact of Working While Simultaneously Enrolled," April 2012, Presented at the American Educational Research Association's Annual Conference, Vancouver, BC, available at: https://www.insidehighered.com/sites/default/server_files/files/PARK_WORKING.pdf.

140    See: https://studentaid.ed.gov/sa/repay-loans/disputes/prepare.

141    In the Report of the Federal Student Aid Ombudsman, the Ombudsman Group reported that customer satisfaction survey results were "not as high as desired," but had improved from FY 2016. (See: FSA Fiscal Year 2018 Annual Report, https://www2.ed.gov/about/reports/annual/2018report/fsa-report.pdf, at pg. 100-101.) The Ombudsman noted, however, that they attributed the customer rating to individuals expressing dissatisfaction because they expected the Ombudsman to act as their advocate, desired an outcome that falls outside law and regulations, or based their satisfaction on the outcome achieved rather than the service provided.

142    ACCSC, "Standards of Accreditation," July 1, 2018, http://www.accsc.org/UploadedDocuments/1967/ACCSC-Standards-of-Accreditation-and-Bylaws-07118.pdf.

143    Federal Student Aid Handbook, AVG-90 (2017-18).

144    Federal Student Aid Handbook, "School-Determined Requirements," May 2018, Pg. 1-10, https://ifap.ed.gov/fsahandbook/attachments/1819FSAHbkVol1Ch1.pdf.

145    83 FR 37251.

146    83 FR 37251.

147    83 FR 37270.

148    U.S. Dep't of Educ., Beyond the Box: Increasing Access to Education for Justice-Involved Individuals (May 9, 2016), available at https://www2.ed.gov/documents/beyond-the-box/guidance.pdf.

149    See e.g., Wash. Rev. Code section 28B.160.020 (2018).

150    81 FR 39361. (emphasis in comment).

151    ED-OIG/I13K0002, available at https://www2.ed.gov/about/offices/list/oig/auditreports/fy2017/a09q0001.pdf.

152    Kellie Woodhouse, "Closures to Triple," Inside Higher Ed, September 28, 2015, https://www.insidehighered.com/news/2015/09/28/moodys-predicts-college-closures-triple-2017; Clayton M. Christensen and Michael B. Horn, "Innovation Imperative: Change Everything," The New York Times, November 1, 2013, https://www.nytimes.com/2013/11/03/education/edlife/online-education-as-an-agent-of-transformation.html; Abigail Hess, "Harvard Business School Professor: Half of American Colleges Will Be Bankrupt in 10 to 15 Years," CNBC, August 30, 2018, https://www.cnbc.com/2018/08/30/hbs-prof-says-half-of-us-colleges-will-be-bankrupt-in-10-to-15-years.html.

153    20 U.S.C. 1099c(c)(1).

154    Note: In the 2016 final regulations, we established that for the discretionary triggers, an institution does not meet its financial or administrative obligations if the Secretary demonstrates that the trigger was "reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution," and included a non-exhaustive list of discretionary triggers. 34 CFR 668.171(g) (2017). In contrast, in the 2018 proposed regulations, we characterized the Secretary's burden as determining if any of the listed events "is likely to have a material adverse effect on the financial condition of the institution . . ." This phrasing is a technical change for clarity and as a result, we are retaining this phrasing in the final regulations. However, we include a finite list of discretionary trigger events, to provide more certainty to institutions and to facilitate the Department's ability to administer the regulations.

155    See e.g., 83 FR 37272.

000318

156  83 FR 37271.

157  Filippo Ippolito and Ander Perez, Credit Lines: The Other Side of Corporate Liquidity, Barcelona Graduate School of Economics, March 2012, available at: https://www.barcelonagse.eu/sites/default/files/working_paper_pdfs/618.pdf.

158  81 FR 31392.

159  See: https://collegescorecard.ed.gov/.

160  799 F.3d. 633 (7th Cir. 2015).

161  34 CFR 682.410(b)(2).

162  34 CFR 682.410(b)(5)(ii).

163  Although the Department may designate certain classes of scientific, financial, and statistical information as influential under its Guidelines, the Department does not designate the information in this Regulatory Impact Analysis as influential and provides this information to comply with Executive Orders 12866 and 13563. U.S. Dep't of Educ., Information Quality Guidelines (Oct. 17, 2005), available at https://www2.ed.gov/policy/gen/guid/iq/iqg.html.

164  34 CFR 685.222(g) and (h); U.S. Dep't of Educ., Student Assistance General Provisions, Final Regulations, 81 FR 75926, 75955 (Nov. 1, 2016).

165  Epic Systems Corp. v. Lewis, 138 S. Ct. 1612 (2018).

166  83 FR 37299.

167  81 FR 39394. Net Budget Impact section of NPRM published June 16, 2016 presented a number of scenarios with a range of impacts between $1.997 to $42.698 billion.

168  83 FR 37265.

169  https://predatorystudentlending.org/press-releases/department-educations-borrower-defense-includes-fundamental-lie-documents-show-press-release/.

170  www2.ed.gov/policy/highered/reg/hearulemaking/2017/borrowerdefensedataanalysis11118.docx.

171  83 FR 37243.

172  83 FR 37265.

173  81 FR 76067. See burden calculation for § 685.300(e) and (f).

174  83 FR 37306. See burden calculation for § 658.304.

175  34 CFR 602.24(c).

176  www.insidehighered.com/news/2017/11/13/spate-recent-college-closures-has-some-seeking-long-predicted-consolidation-taking.

177  www.insidehighered.com/news/2018/04/09/mount-ida-after-trying-merger-will-shut-down.

178  www.insidehighered.com/news/2018/04/23/when-college-goes-under-everyone-suffers-mount-idas-faculty-feels-particular-sense.

179  Students' hourly rate estimated using BLS for Sales and Related Workers, All Other, available at: www.bls.gov/oes/2017/may/oes_nat.htm#41-9099.

180  34 CFR 602.24(c).

181  Hourly wage data uses the Bureau of Labor Statistics, available at swww.bls.gov/ooh/management/postsecondary-education-administrators.thm.

182  www.fasb.org/jsp/FASB/Page/LandingPage&cid=1175805317350.

183  Hourly wage data uses the Bureau of Labor Statistics, available at www.bls.gov/ooh/management/postsecondary-education-administrators.thm.

184  See 81 FR 76057 published November 1, 2016, available at ifap.ed.gov/fregisters/attachments/FR110116.pdf.

185  See 83 FR 6468, available at www.gpo.gov/fdsys/pkg/FR-2018-02-14/pdf/2018-03090.pdf.

186  Federal Student Aid, Student Aid Data: Title IV Program Volume by School Direct Loan Program AY2015-16, Q4, available at studentaid.ed.gov/sa/about/data-center/student/title-iv accessed August 22, 2016.

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.    239

000319

1   JOSEPH H. HUNT
    Assistant Attorney General
2   David L. Anderson
    United States Attorney
3   MARCIA BERMAN
    Assistant Branch Director
4   KATHRYN C. DAVIS
    R. CHARLIE MERRITT
5   Trial Attorneys
    U.S. Department of Justice
6   Civil Division, Federal Programs Branch
7   1100 L Street, NW
    Washington, DC 20530
8   (202) 616-8298 (phone)
    (202) 616-8470 (fax)
9   Kathryn.C.Davis@usdoj.gov
10
11  *Counsel for Defendants*

12              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13

14  THERESA SWEET, *et al.*,

15              Plaintiffs,                     No. 19-cv-03674-WHA

16      v.

17  ELISABETH DEVOS, in her official capacity   **DECLARATION OF**
    as Secretary of Education, and the UNITED   **IAN FOSS**
18  STATES DEPARTMENT OF EDUCATION
                                                Honorable William H. Alsup
19
              Defendants.
20

21

22

23

24

25

26

27

28

# DECLARATION OF IAN FOSS

I, Ian Foss declare as follows:

1. My name is Ian Foss, I am over the age of 18, and currently serve as a Program Specialist at Federal Student Aid office ("FSA") of the United States Department of Education ("ED" or "Department"). I have held this position since December 6, 2010. I have personal knowledge of the matters set forth herein and if called as a witness, I could and would testify competently thereto.

2. As a Program Specialist, I am a member of FSA's Policy Liaison and Implementation office, which, among other things, provides guidance for other FSA offices concerning the proper implementation of regulations about, or that affect, the federal student financial aid programs, including borrower defense.

3. Through my duties as a Program Specialist, my work on ED's Borrower Defense ("BD") effort, and my discussions with ED staff working on the BD effort, I am generally familiar with the process for implementing the BD framework.

## 2016 Rules Implementation Effort

4. The 2016 BD regulations ("2016 rule") were promulgated to modify the original 1995 BD regulation. However, in 2017 and 2018, the Department delayed the 2016 rule until July 1, 2019, while simultaneously engaging in a process to further revise the BD regulations. In October 2018, the U.S. District Court for the District of Columbia struck down the delay of the 2016 rule in *Bauer v. DeVos*, eventually causing the 2016 rule to go into effect.

5. The new regulations included several new provisions, including a change to a closed school discharge provision, which previously only provided upon an application of the borrower for a discharge of a loan taken to attend an educational institution that closed. 34 C.F.R.

§685.214. The new provision added an automatic closed school discharge, 34 C.F.R. §685.214(c)(2), which mandated that ED automatically discharge loans obtained by borrowers to attend educational institutions that closed on or after November 1, 2013 if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date of school closure.

6. The implementation of the new 2016 regulations necessitated multiple operational changes, based on both the new closed school discharge provision and other measures. The changes included the following:

Implement new Automatic Closed School Discharge:

· Every month, the Department executes a program, which relies upon loan disbursement and enrollment information contained in National Student Loan Data System ("NSLDS"), to identify borrowers who are eligible for an automatic closed school discharge.

· After the program is executed, a pre-notification communication via email and U.S. Mail is sent to identified borrowers by loan holders.

· Also after the program is executed, the Department instructs loan holders and its contractors to 1) discharge the applicable loans and 2) officially notify borrowers after the loans have been discharged.

Implement new repayment rates policies and procedures under the 2016 BD rule where none previously existed:

· Under the 2016 BD regulations, schools are required to provide a notice to students if their repayment rate is below a specific threshold described in the regulations.

· To calculate the repayment rate, the Department needed to modify applicable contracts to instruct its contractor to calculate the rate (which relies on millions of records), and provide specific details about which data in Departmental systems were to be used, the fields within that system that must be used, as well as how the rate was to be calculated using the identified fields.

· In addition to systems modifications, the Department needed to develop procedures that would be used to permit schools to correct data in the system that would be used to calculate the repayment rate.

Implement new False Certification discharge process

· Create processes and triggers for new bases for borrowers to receive false certification discharge automatically.

Implement changes to BD claims adjudication

· The 2016 BD regulations established a procedural framework for the adjudication of borrower defense applications. This framework applied to both new applications and applications that were outstanding as of the date the 2016 BD regulations went into effect.

· One procedural difference that had to be accommodated under the 2016 BD regulations was providing notice to the school associated with the borrower's application that the borrower had filed a BD application based on the school's conduct and to give the school an opportunity to respond to the borrower's allegations.

· To implement this procedural change, ED has had to examine the technological mechanism by which such notice would be sent, what information, precisely, would be sent to the school, how long to give the school before proceeding as though no response would be forthcoming, where any data received from the school would be stored and whether any given solution complied with the Privacy Act of 1974, as amended, draft contract modification documents, and procedures to evaluate that information, if received.

· The foregoing change is just one modification that affected pending BD applications. It does not encompass all changes, and does not include the changes necessary to implement a new Federal standard that would be used to determine whether a borrower qualifies for a borrower defense discharge, among other changes.

See Exhibit A (Summary of Modifications Necessitated by 2016 BD Rules), p. 2.

7.   In June of 2019, the Department initiated a modification of its contract with Senture, LLC to ensure the completion of changes necessitated by the implementation of the 2016 rule by January of 2020. See Exhibit B (Modification of Contract with Senture, LLC dated August 1, 2017), p. 3.   The Department continues to monitor the progress of the process

and system changes, as well as servicer compliance with the new requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __14__ day of November, 2019 in Washington, DC.

Ian Foss

**Exhibit A**

**ONR Title:** 2016 Rules

**Request Originator, Organization:**  EU/ Business Operations

**Sponsor:** Jeff Appel

**Organization:** Policy Liaison and Implementation (PLI)

**Category:** Ongoing

**Justification:  Legislative requirement**

**Reason (Business Need):**

The 2016 borrower defense to repayment regulation (2016 rule) was created to modify the original 1995 borrower defense to repayment regulation. However, in 2017, the Department issued a variety of regulatory documents to delay the 2016 rule to July 1, 2019, while also undergoing a process to further revise the borrower defense regulations.

In October 2018, the U.S. District Court for the District of Columbia struck down the regulatory documents supporting the delay of the 2016 rule as invalid under the Administrative Procedures Act. This caused the 2016 rule to become effective, retroactive to July 1, 2017.

The 2016 rules established the following requirements:

- New borrower defense standards used to evaluate whether, for new loans, borrowers are eligible for discharge
- New borrower defense processes, including a group process, to determine borrower eligibility for discharge
- A requirement to automatically discharge loans due to school closure if a borrower doesn't re-enroll within 3 years of the school's closure
- New mandatory and discretionary triggers that could result in schools being required to provide a letter of credit
- A ban on pre-dispute mandatory arbitration and class action waiver clauses in enrollment agreements
- A disclosure requirement for proprietary schools to provide notices to students based on a 'low,' ED-calculated repayment rate
- A disclosure requirement for schools, which are required to provide a letter of credit to ED, pending the development by ED of the specific language required to be disclosed to the students

Although borrower defense issues were a significant part of the 2016 regulatory action, the 2016 rule established new and amended existing regulations unrelated to the borrower defense provisions. The work to expedite the implementation of the provisions of the 2016 rule is ongoing.

The implementation of these requirements involves multiple work streams. There are six work streams and four business unit work stream owners: Business Operations (BO); Policy Liaison and Implementation (PLI); Program Compliance (PC); and the Enforcement Unit-Borrower Defense (EU-BD). See the chart below for the work streams, owners, and the scope of each work stream.

| Work Stream | Scope |
|---|---|
| Automatic Closed School Discharge/ Existing CSD (BO/PLI) | New automatic discharge if borrower is generally otherwise eligible and doesn't enroll at another school <= 3 years from closure. |
| Financial Protection (PC/PLI) | New required and discretionary triggers for financial protection and disclosure requirements. |
| Arbitration (PC/PLI) | Ban on pre-dispute mandatory arbitration and class action waivers for BD-like claims. |
| Repayment Rate (BO/PC/PLI) | A school-level GE repayment rate must be calculated, and, if too low, schools must disclose low repayment rate to students. |
| False Certification (BO/PLI) | Limited new bases for borrowers to receive false certification discharge automatically. |
| Borrower Defense (EU-BD/PLI) | Created federal standard for evaluating BD claims and new processes for borrower and schools, including a group discharge process. |

**Change Description by work stream:**

Automatic Closed School Discharge/ Existing CSD:

- FSA and financial partners to perform ongoing ACSD discharges
- Perform on-going ACSD discharges based on borrower eligibility
- Loan disbursement and enrollment information contained in NSLDS will be used to identify borrowers who are eligible for an automatic closed school discharge
- A pre-notification communication via email and U.S. Mail will be sent to identified borrowers by loan holders
- Loan holders will be instructed to 1) discharge the applicable loans and 2) officially notify borrowers after the loans have been discharged
- Implement changes in NSLDS for new discharge type and reports
- Design EDWA reporting to support discharge

Financial Protection

- Begin requesting financial protection based on new Letter of Credit (LOC) triggers

Arbitration

- Work with OPE to begin consumer testing for financial protection warnings for schools subject to new triggers

Repayment Rate

- Determine repayment rate policy and procedures
- Begin contract modification to implement system changes to calculate new repayment rates

False Certification

- Create processes and triggers for new bases for borrowers to receive false certification discharge automatically

Borrower Defense

- Begin drafting technical requirements for updates to support 2016 Rules
- Begin design or build for new technical requirements on the BD platform to support the new 2016 Rules
- Begin contract modifications and other procedural changes to implement changes to core borrower defense processes and eligibility determinations, including, if necessary, a group discharge process
- Begin to close out BD applications if borrower is eligible to receive an ACSD when discharge processed by servicer(s)
- Updates to the Customer Engagement Management System (CEMS) platform will be necessary to accommodate the changes to the borrower defense tool necessitated by the 2016 Rules
- Design EDWA reporting to support BD changes

**List any related Organizational Needs or Change Requests:**
CR-4983: ACSD borrower pre-notification and reporting
CR-5000: NSLDS-Servicers create, implement, update new discharge type
CR-5001: NSLDS-Servicers data provider notification
CR-5005: ACSD processing and reporting (Phase II of 4912)
CR-5017: Repayment Rate

**List systems, system components impacted by this change:**
CEMS
NSLDS
EDWA
COD

**List business area/external groups impacted by this change:**

POLICY LIASON AND IMPLEMENTATION
PROGRAM COMPLIANCE
ENFORCEMENT UNIT
COO
BUSINESS OPERATIONS
SERVICERS

**Provide the target date for need to be met:**
12/31/2019

**Exhibit B**

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. Contract ID Code | | Page of Pages | |
|---|---|---|---|---|---|
| | | | | 1 | 8 |

| 2. AMENDMENT MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (if applicable) |
|---|---|---|---|
| 0012P00017 | JUN 27, 2019 | | |

| 6. ISSUED BY | CODE | FSA-ACQ | 7. ADMINISTERED BY (If other than item 6) | CODE |
|---|---|---|---|---|
| US Department of Education<br>FSA - Acquisitions, 830 First St NE - Suite 91F3<br>Washington DC 20202 | | | See Block 6 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (NO., Street, Country, State and ZIP Code) | | | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|---|
| SENTURE, LLC<br>460 INDUSTRIAL BOULEVARD<br>LONDON KY 40741 | DUNS: 146265173<br>Cage Code: 3W2E5 | (x) | | |
| | | | | 9B. DATED (SEE ITEM 11) |
| | | ✕ | | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>ED-FSA-14-D-0004/0012 |
| CODE 00035039 | FACILITY CODE | | | 10B. DATED (SEE ITEM 13)<br>AUG 01, 2017 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing items 8 and 15, and returning _____ copies of amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OR OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) | |
|---|---|
| See Schedule | Modification Amount: $332,789.86<br>Modification Obligated Amount: $332,789.86 |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| Check One | | |
|---|---|---|
| | A. | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| ✕ | D. | OTHER (Specify type of modification and authority)<br>43.103(a) Changes |

E. IMPORTANT:  Contractor ☐ is not, ☒ is required to sign this document and return ___1___ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible)

The purpose of this modification is to implement CR 5129 BD System 2016 Quick Wins

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Jim Gayhart<br>SVP | Kenneth C. Bell, Contracting Officer<br>202-377-4322   KENNETH.BELL@ED.GOV |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| *Jim Gayhart*<br>(Signature of person authorized to sign) | June 26, 2019 | Kenneth Bell  Digitally signed by Kenneth Bell<br>Date: 2019.06.27 06:29:39 -04'00'<br>(Signature of Contracting Officer) | JUN 27, 2019 |

NSN 7540-01-152-8070
Previous Edition unusable

**STANDARD FORM 30. (Rev. 10-83)**
Prescribed by GSA FAR (48 CFR) 53.243

The purpose of this modification is to:

1. Implement CR 5129 2016 Regulations Quick Wins Part A

1a. Period of performance

June 27, 2019 – January 31, 2020

| Description | Total |
|---|---|
| Implementation | $284,291 |
| O&M | $48,499 |
| Total | $332,790 |

1b. Billing Schedule

| Deliverable | Invoice Date | Total |
|---|---|---|
| Borrower Defense 2016 Regulations: Quick Wins Part A Implementation | 8/15/2019 | $284,291 |
| Status Report – August 2019 | 8/31/2019 | $8,083 |
| Status Report – September 2019 | 9/30/2019 | $8,083 |
| Status Report – October 2019 | 10/31/2019 | $8,083 |
| Status Report – November 2019 | 11/30/2019 | $8,083 |
| Status Report – December 2019 | 12/31/2019 | $8,083 |
| Status Report – January 2020 | 1/31/2020 | $8,083 |
| Total | | $332,790 |

1c. Deliverables

| No. | Deliverable Description | Frequency | Acceptance Criteria |
|---|---|---|---|
| 1 | Requirements | Updated requirements for Borrower Defense | Document due for review two (2) weeks after design phase ends based on contract award and will adhere to the Acceptance Criteria outlined in the Task Order. |
| 2 | Preliminary Functional Design Document | Updated end-to-end functional solution design documents. Associated work products will also be provided. | Documents due for review no later than two (2) weeks after design phase ends and will adhere to the Acceptance Criteria outlined in the Task Order. |
| 3 | Technical Materials– Configuration Management Plan | Updated end-to-end technical solution deliverable, Configuration Management Plan that includes configuration or inputs into the solution. | Documents due for review no later than two (2) weeks after build phase ends and will adhere to the Acceptance Criteria outlined in the Task Order. |
| 4 | Training Materials | | As part of this CR, the following Training Materials will be created or modified:<br>• Borrower Defense Training<br>• Case management training |

**Note:** Any significant change to information included in these deliverables will be resubmitted to FSA, as needed, for consideration and potential inclusion and/or deletion of existing performance metric(s).

2.  **Replace Section 3 of the Task Order labeled FDMS CRM Development and CRM O&M with the following:**

The Value of the Task Order has increased: from **$12,454,593.47** by **$332,790.00** to **$12,787,383.47**

| Description | Base Period | Option Period 1 | Total |
|---|---|---|---|
| Implementation | $2,405,995.47 | $1,786,450.15 | $4,192,445.62 |
| Travel | $13,505.00 | $6,434.00 | $19,939.00 |
| Feedback and Dispute Management System O&M | $1,755,637.00 | 2,372,494.71 | $4,128,131.71 |
| Coalition of Federal Ombudsman Website O&M | $20,213.00 | $20,801.00 | $41,014.00 |
| Software | $1,018,822.00 | $1,411,572.00 | $2,430,394.00 |
| 6 Month Extension | | $1,975,459.00 | $1,975,459.00 |
| **TOTAL FIRM FIXED PRICE** | **$5,214,172.47** | **$7,573,210.86** | **$12,787,383.47** |

3.  CR 5129 2016 Regulations Quick Wins Part A SOW

**Federal Student Aid**

**Borrower Defense – 2016 Rules**

1.  **Background**

Since October 2018, the Department transformed its Borrower Defense system by transitioning to the new platform, Customer Engagement Management System (CEMS). In the new system on the CEMS platform, we enabled a proactive, secure approach for case management, review of the allegations within the application, integration to streamline operations, and reporting and analytical capabilities.

On July 1, 2017, U.S. Department of Education (ED or FSA) planned to implement the regulations outlined in what is known as the *2016 Rules*. These rules not only impacted Borrower Defense, but other policies related to closed school discharges, a new repayment rate calculation and new financial notifications and rules on arbitrations for schools to comply with in the *2016 Rules*. ED originally plan to implement the new rules to be effective as of July 1, 2017; however, ED decided it would delay key parts of the rule and begin a new rulemaking to reconsider the rule. Due to this delay, a lawsuit, *Bauer v. DeVos*, occurred regarding the ED's decision to delay the new rules. In a recent judgement in *Bauer v. DeVos*, the court ruled that ED is required to implement the regulations outlined in what is known as the *2016 Rules* effective immediately.

1.1.  **Timeline**

In order for ED to remain in compliance with the court's ruling and with the *2016 Rules*, FSA proposes the following approach to ensure we can continue to perform intake, legal review and post-determination process of borrower defense applications. The following is our proposed schedule:

**Table 1 - Change Requests**

| Phase | Name | Status | Date | Proposed Timeline Details: |
|---|---|---|---|---|
| 1 – BD System 2016 | CR5129 - BD System 2016 Rules Quick Wins | Not Started | May 20, 2019 – June 16, 2019 | Design: May 20-24 Build: May 27-June 5 |

| Phase | Name | Status | Date | Proposed Timeline Details: |
|---|---|---|---|---|
| **Rules Quick Wins** | | | | Test: June 6-13 Deployment: June 14-16 |
| **1 – Contact Center 2016 Rules Quick Wins** | CR5130 - Contact Center 2016 Rules Quick Wins | **Not Started** | **May 20, 2019 – June 14, 2019** | O&M Design: May 28-June 3 Training Material Prep: June 4-11 Training: Week of June 12-14 |
| **2 – BD System 2016 Rules E2E Solution** | CR5131 - BD System 2016 Rules E2E Solution | **Not Started** | **June 10, 2019 – August 9, 2019** | Design: June 10 (2 weeks) Build: June 24 (4 weeks) Test: June 15 (3 weeks/ 1 Week regression) Deployment: August 9-11 |
| **2 – Contact Center 2016 Rules E2E Solution** | CR5132 - Contact Center 2016 Rules E2E Solution | **Not Started** | **June 24, 2019 – August 9, 2019** | O&M Design: July 8 (1 weeks) Training Material Prep: July 15 (3 weeks) Training: Week of August 5 |

## 2. Requirements

To support borrower defense in our implementation of the 2016 Rules, the Contractor shall include in their approach and plan the ability to fulfill the following requirements and functionality:

### 2.1. Technical Requirements

To support borrower defense, FSA needs the functionality to support operations and new features in the borrower defense system. The below list is not exhaustive but is a high-level summary. For the details, the Contractor should refer to the requirements in the excel file.

1. Modifications to borrower defense applications in both English and Spanish; including the new integration with the online application

2. Enhance and fix issues related to the creation of PDF attachment that is stored on the borrower's application upon submission

3. Upon application creation, pre-populate based on the borrower's loan history, the regulation(s) that applies to the applications. The same standard will be assessed on allegations and reviews for borrowers that fall under dual programs, different enrollment periods and/or loan history across multiple regulation time periods.

4. Update correspondence templates including an updated FSA letterhead and create new rules to support automation or pre-population of application fields on the templates (e.g., allegations, school, decision, borrower's first name, etc.)

5. Ability to systematically create an "administrative record" of the borrower's application.

6. Ability to create, track and automate a new reconsideration process across our borrower customer service channels (e.g., online, email, and physical mail).

7. Support data migration as designated in the requirements document to update existing applications and/or support interim processes dependent on 2016 rules.

8. Ability to track allegations, reviews, documents, etc. that were submitted while the application is undergoing its "initial" assessment vs. Reconsideration assessment.

9. Create new statuses to improve workflow where appropriate.

10. Create new automation based on triggers such as status and/or field changes to improve

workflow where appropriate.

11. Create and support new relief methodologies.

12. Create and support the new group processes for borrower defense.

13. Create and support the new school notification process, both interim and an E2E solution with integration.

The Government requests the Contractor should propose an option that includes "reserve" bucket of development hours in order to ensure if the Government identifies solution modifications in design the changes may be accommodated within the planned releases. This bucket should be optional that the Government may execute if it is required.

**Figure 1 - Detailed Requirements**

**2.2.      Response**

We ask the Contractor to provide responses in the following format:

| Phase | Name | Scope & Requirements | Date | Proposed Timeline Details: |
|---|---|---|---|---|
| **1 – BD System 2016 Rules Quick Wins** | CR5129 - BD System 2016 Rules Quick Wins | Requirements identified as 1 – Urgent Priority | **May 20, 2019 – June 16, 2019** | Design: May 20-24 Build: May 27-June 5 Test: June 6-13 Deployment: June 14-16 |
| **1 – Contact Center 2016 Rules Quick Wins** | CR5130 - Contact Center 2016 Rules Quick Wins | Requirements identified as 1 – Urgent Priority | **May 20, 2019 – June 14, 2019** | O&M Design: May 28-June 3 Training Material Prep: June 4-11 Training: Week of June 12-14 |
| **2 – BD System 2016 Rules E2E Solution** | CR5131- BD System 2016 Rules E2E Solution | Requirements identified as 2 – E2E Solution w/ two options for School Notification: 1) Integration with COD 2) Integration with new Community | **June 10, 2019 – August 9, 2019** | Design: June 10 (2 weeks) Build: June 24 (4 weeks) Test: June 15 (3 weeks/ 1 Week regression) Deployment: August 9-11 |
| **2 – Contact Center 2016 Rules E2E Solution** | CR5132 - Contact Center 2016 Rules E2E Solution | Requirements identified as 2 – E2E Solution | **June 24, 2019 – August 9, 2019** | O&M Design: July 8 (1 weeks) Training Material Prep: July 15 (3 weeks) Training: Week of August 5 |

**2.3.      Licenses**

We do not anticipate any new license requests.

**3.   Performance Standards**

We do not anticipate any changes to Performance Standards.

**4.   General Deliverables**

The Contractor shall provide the deliverables identified in the following Deliverable List in accordance with the schedule approved by the Government. The Contractor may be required to provide additional

deliverables either upon Government request or as proposed by the Contractor.

Deliverable acceptance shall follow the deliverable process and acceptance procedures as outlined in the IDIQ.

**Table 6 Deliverables**

| No. | Deliverable Description | Frequency | Required | Acceptance Criteria |
|---|---|---|---|---|
| | | | **General Deliverables** | |
| 1 | Requirements Traceability Matrix | Due at end of Design | Quick Wins & E2E Solution | • FSA provided a baseline of requirements for the contractor. Any updates or clarifications of requirements are due 5 days after design is completed. |
| 2 | Preliminary Design Document | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. Due at the end of E2E Solution. |
| 3 | Object Field Matrix | Due at end of Design | Quick Wins & E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 4 | Report and Dashboard Matrix | Due at end of Design | Quick Wins & E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 5 | Customer Portal Validation | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria. |
| 6 | Borrower Defense Text Baseline | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria. |
| 7 | Email Templates | Due at end of Design | Quick Wins & E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 8 | Page Layout and Mock Ups | Due at end of Design | Quick Wins & E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution.<br><br>Mock-ups are required in both releases but especially Quick Win to ensure we can visual the changes since we are deferring the Preliminary Design Document deliverable for both phases to the end of E2E Solution. |
| 9 | Knowledge Reference Article and Job Aid Inventory | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 10 | Master Test Plan and Test Conditions | Due 1 week before end of Build | Quick Wins & E2E Solution | • See section 5.0 for Acceptance Criteria. |

| No. | Deliverable Description | Frequency | Required | Acceptance Criteria |
|---|---|---|---|---|
| 11 | Salesforce.com Technical Architecture Diagram | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 12 | FSA NGDC Application Specific Information Document | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Document will incorporate changes from Quick Wins and E2E Solution. |
| 13 | CEMS Tailoring Plan | Due at end of Design | E2E Solution | • See section 5.0 for Acceptance Criteria.<br><br>Requires review to see if any changes required. |
| **Note:** Any significant change to information included in these deliverables will be re-submitted to FSA, as needed, for consideration and potential inclusion and/or deletion of existing performance metric(s). |||||

## 5.  Acceptance Criteria

All deliverables shall be delivered electronically to the Contracting Officer and his/her representative and shall adhere to the industry and Government standards.

Along with each deliverable, the Contractor shall submit Government Comments Matrix (MS Excel) including row number, deliverable title, section name, paragraph, page number, and any other relevant information such as figure or table in order to facilitate the Government's review process.

The Government shall review each deliverable and provide written notice of acceptance or rejection within three (3) business days upon receipt. Upon notice of formal written rejection from FSA's CO, the Contractor shall address all comments/changes and submit a revised deliverable within five (5) business days if the changes can be easily addressed and understood by both the Government and Contractor. If the deliverable is rejected and/or must be altered to significantly change the deliverable, the Contractor will have two (2) business days to resubmit from date of the Government's notice. The Government shall review the deliverable to determine that:

- It addresses the government's requirement as stated in this SOW;
- It is organized appropriately and written clearly;
- It is formatted in either MS Word or Adobe Acrobat or other acceptable format such as MS Excel or MS PowerPoint; and
- It adheres to industry (e.g., PMI PMP®), government (e.g., FISMA, NIST), and FSA standards, guidance, and regulations (e.g., LMM, Management's IT assessments as a function of security authorization, formerly certification and accreditation from FSA Technology Office), as applicable and related with regard to documentation content, format, quality, and contractual terms.

**Note:** Non-conforming services/ deliverables will be corrected at no additional cost to the Government.

## SCHEDULE Continued

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
|---|---|---|---|---|---|
| | Contracting Officer: Kenneth C. Bell, 202-377-4322, KENNETH.BELL@ED.GOV | | | | |
| | Primary Contracting Officer Representative: ShaVon Holland, 202-377-4838, shavon.holland@ed.gov | | | | |
| | Alternate Contracting Officer Representative(s): Sharyn Hutson, (202) 377-4379, Sharyn.Hutson@ed.gov | | | | |
| | Primary Technical Point of Contact: ShaVon Holland, 202-377-4838, shavon.holland@ed.gov | | | | |
| | Alternate Technical Point(s) of Contact: None | | | | |
| 4035 | (New Line Item) Budget Initiative: Borrower Defense DME To fund the DME part of CR5129. Additionally funding for BD DME to implement the new 2016 Rules: New 2016 Rules BD DME Support Contract Modification Accounting and Appropriation Data: 0202M2019.A.2019.ENE00000.6NA.2572A.Z4J.000. 0000.000000 $284,291.15 FOB : Destination | 1.00 | SE | 284,291.15 | 284,291.15 |
| 4036 | (New Line Item) Budget Initiative: Borrower Defense O&M To fund the O&M technology piece of CR5129. Additional funding for the additional support desk O&M for the new 2016 Rules. New 2016 Rules BD O&M Support Contract Modification Accounting and Appropriation Data: 0202M2019.A.2019.ENE00000.6NA.2572A.Z4K.000. 0000.000000 $48,498.71 FOB : Destination | 1.00 | SE | 48,498.71 | 48,498.71 |