JOSEPH H. HUNT
Assistant Attorney General

David L. Anderson
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 23219
(202) 616-8098 (phone)
(804) 819-7417 (fax)
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>         Plaintiffs,<br><br>    v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>         Defendants. | No. 19-cv-03674-WHA<br><br>**DECLARATION OF COLLEEN M. NEVIN** |

I, Colleen M. Nevin, hereby declare under the penalty of perjury as follows:

1.      I am over the age of 18 and competent to testify to the matters herein.

2.      I am the Director of the Borrower Defense Unit ("BDU") of the Enforcement Office within the Office of Federal Student Aid ("FSA") for the United States Department of Education ("Department"). I have been in my current position since October of 2016. Prior to joining the Department, I was an Assistant Attorney General at the Massachusetts Attorney General's Office for three years, where I investigated and civilly prosecuted consumer protection violations. In my over twenty-year career as an attorney, I have worked in both private practice and state and federal government.

3.      I certify that I am qualified to make the statements contained in this Declaration regarding the Department's process for reviewing applications filed by borrowers to obtain borrower defense to repayment ("BD") discharges of their Federal student loans under the Department's statutory and regulatory authorities. The statements contained herein are based on my personal knowledge as an employee of the Department, information that I have received in the performance of my official duties, and my review of the pertinent records.

4.      As the Director of the BDU, I manage the BDU and oversee its work. That work includes conducting legal research and analyses of borrower defense claims; corresponding with institutions of higher education and third parties to obtain information and records needed to evaluate BD applications; developing systems and processes to adjudicate applications and to track the status of the applications; adjudicating BD applications and recording decisions on the applications that constitute the final decision of the Secretary; implementing policy and instructions from Department leadership regarding relief to be provided for approved

applications, prioritization of claims, and other work to be performed by BDU; and advising the Chief Enforcement Officer on matters related to BD applications.

5.      Through my role as the Director of the BDU, I am familiar with the Department's efforts to adjudicate and process borrower defense applications, as well as with the human and technological resources available to the BDU and FSA to do so.

**_Relevant Borrower Defense to Repayment Regulations_**

6.      Under the Direct Loan Program, the Department makes loans to students and parents to pay the costs of attendance at participating institutions of higher education. Under certain conditions, borrowers can have their loans cancelled or discharged.

7.      Under § 455(h) of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1087e(h), the Department is authorized to establish regulations under which borrowers may assert "acts or omissions of an institution of higher education . . . as a defense to repayment" of a Direct Loan. In 1994, the Department implemented the statutory requirement by publishing 34 C.F.R. § 685.206(c). That regulation provided that a borrower could assert a defense against repayment on a Direct Loan based on an act or omission of the institution which would give rise to a cause of action against the institution under applicable State law.

8.      On November 1, 2016, the Department published a new borrower defense regulation (the "2016 BD Regulation") with an effective date of July 1, 2017. The Department delayed the effective date of the regulation, but the delay was vacated and the regulation went into effect on October 12, 2018 as the result of court orders in _Bauer v. DeVos_, No. 17–cv–1330 (D.D.C.) and _California Association of Private Postsecondary Schools v. DeVos_, 17-cv-999 (D.D.C.). A notice published by the Department in the _Federal Register_ describing these events and

memorializing that the 2016 Borrower Defense Regulations were in effect as a result of the court's order is attached as Exhibit 1.

**Borrower Defense Applications Received Since 2015**

9.      Based upon my review of relevant documents and from speaking to others knowledgeable about such events within the Department in the course of the performance of my duties, it is my understanding that prior to 2015, the Department had received only a very small number of requests for Federal student loan discharges under the Department's borrower defense to repayment authorities.  It further is my understanding that those requests were decided by the Department's Office of General Counsel.

10.      However, in 2015, the number of borrower defense applications increased significantly following the collapse of Corinthian Colleges, Inc. ("CCI") and the Department's announcement of investigative findings that certain CCI-operated schools had made misrepresentations regarding certain of its job placement rates.

11.      To address the unprecedented number of pending borrower defense claims, on or about June 25, 2015, the Department announced the appointment of a Special Master, Joseph Smith.

12.      It is my understanding from the Special Master's reports that the number of borrower defense applications received by the Department escalated dramatically during the following year, as follows:

| Date of Special Master Report | BD Applications Received |
|---|---|
| 9/3/15 | 4,140 |
| 12/3/15 | 6,691 |
| 3/25/16 | 11,000 |
| 6/29/16 | 26,603 |

Copies of the Special Master's four quarterly reports are attached as Exhibits 2 through 5.

13.     As the Special Master's tenure drew to a close in or about June 2016, a newly created FSA Enforcement Office began oversight of the borrower defense adjudication process.  On October 28, 2016, Enforcement issued a Report on Borrower Defense (the "Enforcement Report") indicating that between June and October 2016, the number of applications increased three-fold to approximately 82,000 borrower defense applications received.  A copy of that report is attached as Exhibit 6.

14.     The Enforcement Report noted that about 60% of the 82,000 applications pending in October 2016 appeared to be from borrowers who had attended CCI schools during the time periods covered by the Department's CCI job placement rate ("JPR") misrepresentation findings, as discussed below.  *Id.*  The report also noted that only approximately 4,000 of the applications received at that time were from borrowers from other schools. *Id.*

15.     The Department has produced quarterly reports with borrower defense data since June 2018.  The report for the period ending June 30, 2019  states that the Department had received 272,721 borrower defense applications since 2015.  In the quarter ending on June 30, 2019 alone, the Department reported having received 32,784 applications.  210,168 of the total applications remained pending as of that point in time.  These reports are attached as Exhibit 7  and are available on the Department's website at https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/borrower-defense-data.

16.     As of November 12, 2019, the Department has received over 290,000 applications and more than 225,000 remain pending.  Approximately 74,000 of the pending applications are from

borrowers who attended CCI.  The remaining applications are from borrowers who attended other schools.

***Creation and Staffing of the Borrower Defense Unit***

17.    BDU currently has the responsibility of adjudicating these hundreds of thousands of borrower defense claims.  The processing of adjudicated applications, which includes notifying the borrowers of decisions and all loan handling issues (including forbearance, interest credits, and discharges), is performed by other FSA staff working with a contractor and student loan servicers.

18.    In the fall of 2015, the Special Master hired four attorneys to assist in reviewing the roughly 4,000 applications that the Department had received at that time and to develop a framework for their adjudication.  The Special Master hired three additional attorneys in early 2016 to address the increase in borrower defense claims that the Department was receiving.

19.    On February 8, 2016, the Department announced that it had formed the aforementioned Enforcement Office which would include a new division, the present-day Borrower Defense Unit or Group (also known as the BDU).  A copy of the February 8, 2016 announcement is attached as Exhibit 8. The seven attorneys hired by the Special Master subsequently became the first employees in the new BDU.

20.    As the volume of applications received was increasing, FSA added to the BDU staff. When I joined the Department as Director of BDU in October of 2016, BDU had ten full-time attorneys (in addition to myself), as well as twenty (20) contractor paralegals and attorneys.

21.    In the fall of 2016, Enforcement also had requested approval to hire several additional attorneys for BDU.  That request was tabled pending the transition to the new administration in January 2017.

22.     As discussed below, adjudications were halted in 2017 pending a review of the borrower defense program and processes, and the contractor staff was reduced to six individuals at that time.

23.     Four of the BDU attorneys voluntarily left the Department between December 2016 and early 2018, leaving five full-time attorneys and one part-time attorney. Starting in 2018, after processing of adjudications resumed, we were given authority to increase our contractor staff. As of November 2018, BDU had eleven contractor attorneys.  For the past year, the contractor staff size was between 7 and 12 contractor attorneys.

24.     BDU again requested additional hiring authority and recently was given approval to significantly increase the BDU staff to include permanent positions to replace the attorneys who left the Department, as well as sixty (60) term-appointed law clerks and attorneys to assist in expeditiously adjudicating the large number of pending borrower defense applications.  A copy of the posting for permanent BDU attorneys is attached as Exhibit 9.  Additionally, a copy of one of the announcements that was posted at law schools to recruit law clerks/attorneys is attached as Exhibit 10.

25.     Currently, the BDU has five full-time attorneys and one part-time attorney on the permanent BDU staff; nine contractors; and twenty (20) new term-appointed law clerks and attorneys who joined BDU in the last two months. We are in the process of hiring and onboarding additional attorneys for the remaining above-noted positions.

***Applying for a Borrower Defense Loan Discharge***

26.     On June 8, 2015, the Department announced a streamlined process for borrowers who had relied upon the Department's CCI JPR misrepresentation findings and who wished to assert

claims for the discharge of their Federal student loans under the Department's regulatory and statutory authority. A copy of the June 8, 2015 announcement is attached as Exhibit 11.

27.     Subsequently, as part of the streamlined process, the Department created a simple application form (the Heald JPR "attestation form") for borrower defense applicants who had borrowed Direct Loans to attend CCI-operated Heald College and who were relying on the Department's CCI JPR misrepresentation findings to support their claims. A copy of the Heald JPR attestation form is attached as Exhibit 12.

28.     Additionally, the Department created a simple application form (the "Everest and WyoTech JPR attestation form") for borrower defense applicants who had borrowed Direct Loans to attend CCI-operated Everest and WyoTech schools and who were relying on the Department's JPR misrepresentation findings to support their claims; the form mirrors the Heald JPR attestation form. A copy of the Everest and WyoTech JPR attestation form is attached as Exhibit 13.

29.     The streamlined application forms for CCI JPR claims enabled BDU to more efficiently identify, prioritize, and adjudicate the JPR claims.

30.     However, there was no such application form for borrowers who attended schools other than CCI or for CCI borrowers who were asserting claims other than JPR claims in 2015 or 2016. The Department created a "Universal Borrower Defense Form" that could be used by all borrower defense claimants; the form was published and available for use by borrowers on or about December 31, 2016. A copy of the universal borrower defense form is attached as Exhibit 14.

31.     Prior to the release of the universal borrower defense form, applications for borrowers other than CCI borrowers asserting JPR claims were generally long, narrative emails, letters and

other documents.  These claims were difficult for FSA to categorize at intake, and there was no established system for reviewing and adjudicating them.

***Borrower Defense Claims Management Systems***

32.     In addition to not having an application for non-CCI borrowers, there also was no borrower defense claims management system.  From 2015 to the fall of 2017, BDU tracked borrower defense applications and their statuses and adjudication decisions on excel spreadsheets.

33.     Recognizing the tremendous limitations in not having any claims management system, BDU worked with U.S. Digital Services personnel to design and build a Microsoft Access review platform for the BDU as a short-term solution. Design discussions began in November 2016, significant work continued well into 2017, and the platform was fully implemented and used in adjudicating applications by October 2017.  The review platform was used to record intake data, as well as adjudications, and to assist with both reporting BD data and tracking applications from intake through issuance of a final decision.

34.     Also, to improve the Department's ability to track borrower defense claims, from as early as January 2018, FSA began developing a more advanced claims management system/platform as part of FSA's Customer Engagement Management System ("CEMS").

35.     For much of 2018, three members of the BDU staff spent considerable time working through multiple phases of requirements and design to customize the CEMS platform so that it could be used for borrower defense adjudications. The time that the BDU staff was required to spend working on requirements for and design and implementation of the CEMS platform necessarily diverted those human resources away from adjudicating BD claims.

36.     Preliminary construction of the borrower defense component of the CEMS platform was completed in the fall of 2018, but the platform was not available for use in adjudicating claims until April 2019.  To use the CEMS platform, FSA had to transfer or "migrate" all of its borrower defense application data into the system.  Data migration and related work was completed in April 2019.  Prior to that time, BDU staff could not change or add data to the platform.

37.     Additional changes to the platform were required as a result of the 2016 BD regulation, which went into effect by court order in October 2018 and includes a new review standard for loans first disbursed after July 1, 2017.  FSA now has to determine and record the regulation applicable to a given borrower defense application, which also requires that the platform include the borrower's loan history.  Additionally, the 2016 Regulation required FSA to develop a process to give notice to schools when their students file borrower defense claims and to track responses and receive and store evidence.  There also are other components of the review process that required changes to the CEMS platform, such as the different statutes of limitations depending on the regulation.

38.     All of the BDU permanent staff were involved in developing new processes to comply with the 2016 BD Regulation, and three of the staff in particular have spent a significant amount of time working with FSA's vendor on the design and requirements to implement the new processes.

*Borrower Defense Review*

39.     As described below, the Department has identified certain categories of claims, based on systemic institutional conduct, with established criteria for approval.  For each of the categories of approvals to date, BDU analyzed and summarized the relevant evidence, determined and

applied applicable law, established criteria for approval of that type of claim, and drafted claim-specific review protocols. The protocol may be specific to a school, campus, program and/or type of claim, depending on the nature of the conduct alleged. The process to develop review protocols currently is ongoing with respect to several schools other than CCI.

40.     BDU and its contractors then use the protocols to individually adjudicate each borrower defense application to determine whether it meets the criteria for approval. Copies of the CCI and ITT (CA) review protocols are attached as Exhibits 15 through 17.

41.     For borrowers who attended schools for which BDU is not aware of relevant evidence from the Department or from other sources such as law enforcement partners, BDU and contractors must review the application and any accompanying evidence from the borrower and determine whether the borrower has established by a preponderance of the evidence that the claim should be approved under either the applicable state law (1995 BD Regulation) or the federal standard (2016 BD Regulation), depending on the loan issuance date. Otherwise, the borrower's application is denied. A copy of the review protocol for such claims is attached as Exhibit 18.

42.     BDU and its contractors specify certain information that will be included in the written decision to the borrower, such as the evidence considered and whether a statute of limitations applies, and they also perform quality control reviews on a percentage of adjudicated applications.

43.     For approved applications, BDU and its contractors also input the relief (the percentage of the borrower's loans to be discharged) as determined by the Secretary.

44.     An adjudicated application is processed when FSA issues a written decision to the borrower and notifies the loan servicer through the CEMS platform to discharge and/or put the

borrower's loans back into repayment in accordance with the decision and the relief provided, if any.

### *Adjudicated Borrower Defense Applications*

45.     In 2015 and 2016, the Special Master and his team focused primarily on CCI and, specifically, JPR claims and reported the following adjudications:

| Date of Special Master Report | CCI JPR Applications Adjudicated |
|---|---|
| 9/3/15 | N/A |
| 12/3/15 | 1,312 |
| 3/25/16 | 736 |
| 6/29/16 | 1,739 |

46.     No decisions were issued on any claims other than JPR claims prior to the creation of BDU.

47.     In October 2016, Enforcement reported that it anticipated resolving all then-pending CCI JPR findings claims by spring 2017.  (Ex. 6. at 1, 2).  The Enforcement Report did not provide an anticipated timeline for deciding borrower defense claims other than the CCI JPR claims.

### Approved Applications other than CCI JPR Claims

48.     By the fall of 2016, BDU had made progress on Corinthian claims that were not related to the Department's CCI JPR misrepresentation findings.

49.     In October 2016, BDU developed two new categories of borrower defense claims. Generally, those categories (the "CCI transfer of credit claims") related to borrower defense claims asserted by borrowers who attended certain CCI schools and campuses alleging that CCI misrepresented that the credits earned at such schools were generally transferable.

50.     Borrower defense claims were approved and loans discharged on this basis from December, 2016 to January, 2017.  Additional CCI transfer of credit claims have been adjudicated and are pending a relief determination and processing.

51.     In January 2017, the BDU developed two other categories of borrower defense claims: (a) those asserted by borrowers who attended certain CCI schools and campuses and alleged that CCI promised that the borrowers would receive jobs upon graduation or that all graduates would obtain employment (the "CCI guaranteed employment claims") and (b) those asserted by borrowers who attended California campuses of ITT Technical Institute ("ITT") and alleged that ITT promised that the borrowers would receive jobs upon graduation or that all graduates would obtain employment (the "ITT guaranteed employment claims").

52.     Borrower defense claims were approved and loans discharged on these bases in January 2017.  Additional CCI and ITT (California campuses) guaranteed employment claims have been adjudicated and are pending a relief determination and processing.

53.     Also in January 2017, the Enforcement Unit recommended to the Under Secretary that all students who had attended American Career Institute's Massachusetts campuses receive borrower defense relief.  That recommendation was approved, and all such students received relief.

54.     From January 20, 2017 through March 2017, the BDU continued to adjudicate CCI transfer of credit and guaranteed employment borrower defense claims and from January 20, 2017 through May 4, 2017, BDU continued to adjudicate CCI JPR claims.

Borrower Defense Review Panel and Inspector General Review

55.     In March 2017, the Department's leadership convened a Borrower Defense Review Panel (the "Review Panel") to make recommendations on the borrower defense process.  It is my

understanding that the Review Panel recommended, and the Secretary subsequently requested, a comprehensive review of the borrower defense work and processes by the Department's Office of the Inspector General ("IG").

56.     Enforcement was advised in the spring of 2017 that the Department might make significant changes to the BDU processes and that no additional approvals would be processed until the completion of the work of the Review Panel and, subsequently, by the IG.

57.     In the summer and fall of 2017, the IG performed a thorough review of the BDU and its adjudication processes and systems, as well as the related loan processing work performed by other FSA staff. The review generally covered the period of time that the borrower defense adjudications were handled by the BDU as part of Enforcement, or from the end of June 2016 to July 31, 2017.

58.     While claim adjudication was on hold during the IG review, BDU staff spent a substantial amount of time gathering information and materials in response to IG requests. BDU also worked with U.S. Digital Servicers to finalize the design and building of the above-referenced Access platform. Additionally, BDU reviewed evidence and also developed improved review protocols.

59.     BDU received permission to resume adjudication of CCI JPR claims (only) on or about October 30, 2017.

60.     The IG's report (the "IG Report") detailing its review of the BD processes was issued on December 8, 2017 and is attached as Exhibit 19.

61.     The IG Report recommended improved documentation and information systems. The IG did not recommend any changes to existing review processes and protocols.

### New CCI Relief Methodology – Application Processing Resumes

62.     In December of 2017, the Department finalized a new methodology for determining the amount of relief that the Department would approve for CCI borrowers with successful JPR, transfer of credits, or guaranteed employment claims.  The memorandum discussing the new CCI relief methodology ("CCI Relief Memo") and directing FSA in how to apply it is attached as Exhibit 20.

63.     Immediately thereafter, BDU was instructed to apply the new CCI methodology to the CCI JPR claims that had previously been adjudicated and approved.  BDU quickly developed new processes to implement the new relief methodology in accordance with the CCI Relief Memo, and between December 2017 and May 2018, BDU submitted for approval over 16,000 CCI JPR claims.

64.     Additionally, between December 2017 and May 2018, OUS authorized the denial of over 10,000 applications.

### Adjudication of Applications Continues

65.     While no additional decisions have been issued to borrowers since in or about June 2018, BDU has continued to make progress on adjudicating applications.  Specifically, nearly 50,000 applications have been adjudicated on the merits and are pending relief and/or processing.  This includes approximately 31,000 applications that are approved JPR claims for class members in *Manriquez v. DeVos*, No. 17-cv-7210 (N.D. Cal.).  Additionally, approximately 1,000 applications from CCI and ITT borrowers have been adjudicated as approvals and are not subject to the *Manriquez* injunction.  BDU also has adjudicated nearly 7,000 applications from CCI and ITT borrowers that were not successful, as well as several thousand denials from numerous schools other than CCI and ITT.

66.     Because BDU has been instructed to maximize the number of applications adjudicated per week, the streamlined JPR claims have been prioritized.  For the same reason, BDU also has focused on applications from borrowers who did not provide any evidence and who attended schools for which BDU is not aware of evidence that would support approval of the applications.

67.     Over the last several months, BDU has adjudicated on the merits an average of close to 1,000 applications per week.

68.     BDU expects to adjudicate the remaining CCI applications in the next few months. Additionally, BDU has initiated its review and analysis of the evidence relating to ITT (including campuses outside of California), DeVry University, and Brooks Institute but has not had available staff to complete that work and proceed to adjudicate applications from borrowers who attended those schools.  BDU has not yet initiated its work with respect to the remaining named plaintiffs' schools.

69.     However, as discussed above, FSA has approved BDU's request for a substantial increase in staffing so that attorneys can be assigned to review and analyze evidence regarding, and applications from borrowers who attended, schools for which the Department has a substantial amount of evidence that must be reviewed and analyzed before the related applications can be adjudicated.

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 14th day of November, 2019.

Colleen M. Nevin
Director, Borrower Defense Unit
Enforcement Office
Office of Federal Student Aid
United States Department of Education

17
Declaration of Colleen M. Nevin
No. 19-cv-03674-WHA

# EXHIBIT 1



aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

### F. Environment

We have analyzed this rule under Department of Homeland Security Directive 023–01 and Commandant Instruction M16475.1D, which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4370f), and have determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule involves a safety zone lasting 2 hours that will prohibit entry within 100-yards of swim participants. It is categorically excluded from further review under paragraph L63(a) of Appendix A, Table 1 of DHS Instruction Manual 023–01–001–01, Rev. 01. A Record of Environmental Consideration supporting this determination is available in the docket where indicated under **ADDRESSES**.

### G. Protest Activities

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places, or vessels.

### List of Subjects in 33 CFR Part 165

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T14—0020 to read as follows:

**§ 165.T14—0020   Safety Zone; Tanapag Harbor, Saipan, CNMI.**

(a) *Location.* The following area, within the Guam Captain of the Port (COTP) Zone (See 33 CFR 3.70–15), all navigable waters within a 100-yard radius of race participants in Tanapag Harbor, Saipan. Race participants, chase boats and organizers of the event will be exempt from the safety zone.

(b) *Effective dates.* This rule is effective from 6:30 a.m. to 8:30 a.m. on March 31, 2019.

(c) *Enforcement.* Any Coast Guard commissioned, warrant, or petty officer, and any other COTP representative permitted by law, may enforce this temporary safety zone.

(d) *Waiver.* The COTP may waive any of the requirements of this rule for any person, vessel, or class of vessel upon finding that application of the safety zone is unnecessary or impractical for the purpose of maritime security.

(e) *Penalties.* Vessels or persons violating this rule are subject to the penalties set forth in 46 U.S.C. 1232 and 46 U.S.C. 192.

Dated: March 14, 2019.

**Christopher M. Chase,**

*Captain, U.S. Coast Guard, Captain of the Port, Guam.*

[FR Doc. 2019–05094 Filed 3–18–19; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 668, 674, 682, and 685

**[Docket ID ED–2015–OPE–0103]**

**RIN 1840–AD19**

### Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule; correction; announcement of effective date.

**SUMMARY:** Consistent with the decisions of the U.S. District Court for the District of Columbia, this document memorializes that selected provisions of these final regulations took effect. Due to more recently-effective amendments, the Department must also correct affected amendatory instructions to ensure their incorporation into the CFR.

**DATES:** As of October 16, 2018, the corrections to the amendatory instructions and the amendments to § 668.14(b)(30), (31), and (32); § 668.41(h) and (i); § 668.71(c); § 668.91(a)(3); § 668.94(h), (i) and (j); § 668.171; § 668.175(c), (d), (f), and (h); part 668, subpart L, appendix C; § 674.33(g)(3) and (8); § 682.202(b)(1);

§ 682.211(i)(7); § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (2), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); § 682.405(b)(4)(ii); § 682.410(b)(4) and (b)(6)(viii); § 685.200(f)(3)(v) and (f)(4)(iii); § 685.205(b)(6); § 685.206(c); § 685.212(k); § 685.214(c)(2) and (f)(4) through (7); § 685.215(a)(1), (c)(1) through (8), and (d); § 685.222; part 685, subpart B, appendix A; § 685.300(b)(11) and (12) and (d) through (i); and § 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed June 16, 2017 (82 FR 27621), October 24, 2017 (82 FR 49114), and February 14, 2018 (83 FR 6458), are effective.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW, Mail stop 6W247, Washington, DC 20202. Telephone: (202) 453–7583. Email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** The original "effective date" for these provisions was July 1, 2017. 81 FR 75926. To the extent the provisions explicitly use this date as a benchmark (*e.g.,* § 685.206(c)("For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph")), the Department will use July 1, 2017 as the relevant date. Because the provisions referenced above did not actually take effect on July 1, 2017, the Department is, concurrently with this announcement, releasing an Electronic Announcement available at *https://ifap.ed.gov/ eannouncements/030719GuidConcern Prov2016BorrowerDefenseto RypmtRegs.html* to clarify the responsibilities of institutions with respect to the Financial Responsibility, Class Action Bans, and Predispute Arbitration Agreements Provisions, and Repayment Rate Disclosure sections of the final regulations, which are now effective.

*Background:* On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court) challenging the final regulations in their entirety, and in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial

responsibility standards, provisions requiring proprietary institutions to provide warnings about their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos*, No. 17–cv–00999 (D.D.C. May 24, 2017). The provisions in the challenged regulations were scheduled to become effective on July 1, 2017.

In light of the pending litigation, on June 16, 2017, the Department published a notification of the partial delay of effective dates (82 FR 27621) under section 705 of the APA (5 U.S.C. 705), to delay the effectiveness of certain provisions of the final regulations until the legal challenge is resolved (705 Notice). Subsequently, on October 24, 2017, the Department issued an interim final rule (IFR) delaying the effective date of those provisions of the final regulations to July 1, 2018 (82 FR 49114), and a notice of proposed rulemaking to further delay the effective date to July 1, 2019 (82 FR 49155). On February 14, 2018, the Department published a final rule delaying the regulations' effective date until July 1, 2019 (83 FR 6458) (Final Delay Rule).

Following issuance of the 705 Notice, plaintiffs Meaghan Bauer and Stephano Del Rose filed a complaint challenging the validity of the 705 Notice. Complaint for Declaratory and Injunctive Relief, *Bauer* v. *DeVos*, No.17–cv–1330 (D.D.C. Jul. 6, 2017). The attorneys general of 18 states and the District of Columbia also filed a complaint challenging the validity of the 705 Notice. Complaint for Declaratory and Injunctive Relief, *Massachusetts* v. *U.S. Dep't of Educ.*, No. 17–cv–01331 (D.D.C. Jul. 6, 2017). Plaintiffs in both cases subsequently amended their complaints to include the IFR and the Final Delay Rule, and these cases were consolidated by the Court.

On September 12, 2018, the Court issued its Memorandum Opinion and Order in the consolidated matter, finding the challenge to the IFR was moot, declaring the 705 Notice and the Final Delay Rule invalid, and convening a status conference to consider appropriate remedies. *Bauer* v. *DeVos*, No. 17–cv–1330 (D.D.C. Sept. 12, 2018). Subsequently, on September 17, 2018, the Court issued its Memorandum Opinion and Order immediately vacating the Final Delay Rule and vacating the 705 Notice but suspending its vacatur of the 705 Notice until 5:00 p.m. on October 12, 2018, to allow for

renewal and briefing of CAPPS' motion for a preliminary injunction in the *CAPPS* v. *DeVos* case and to give the Department an opportunity to remedy the deficiencies with the 705 Notice. *Bauer*, No. 17–cv–1330 (D.D.C. Sept. 17, 2018). The Department decided not to issue a revised 705 notice. On October 12, 2018, the Court extended the suspension of its vacatur until noon on October 16, 2018. Minute Order (Oct. 12, 2018), *Bauer*, No. 17–cv–1330. On October 16, 2018, the Court denied CAPPS' motion for a preliminary injunction, ending the suspension of the vacatur. Memorandum Opinion and Order, *CAPPS*, No. 17–cv–0999 (Oct. 16, 2018).

*Regulations:* With this action by the Court, the final regulations published November 1, 2016, at 81 FR 75926, listed below took effect. Information clarifying the responsibilities of institutions with respect to the now-effective provisions is available in the Electronic Announcement, *https://ifap.ed.gov/eannouncements/030719GuidConcernProv2016BorrowerDefensetoRypmtRegs.html*, the Department is releasing concurrently with this announcement.

• Section 668.14(b)(30), (31), and (32) Program participation agreement.
• Section 668.41(h) and (i) Reporting and disclosure of information.
• Section 668.71(c) Scope and special definitions.
• Section 668.90(a)(3) Initial and final decisions.
• Section 668.93(h), (i), and (j) Limitation.
• Section 668.171 General.
• Section 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668, subpart L, appendix C.
• Section 674.33(g)(3) and (8) Repayment.
• Section 682.202(b)(1) Permissible charges by lenders to borrowers.
• Section 682.211(i)(7) Forbearance.
• Section 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• Section 682.405(b)(4)(ii) Loan rehabilitation agreement.
• Section 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• Section 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• Section 685.205(b)(6) Forbearance.
• Section 685.206(c) Borrower responsibilities and defenses.
• Section 685.212(k) Discharge of a loan obligation.

• Section 685.214(c)(2) and (f)(4) through (7) Closed school discharge.
• Section 685.215(a)(1), (c)(1) through (8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• Section 685.222 Borrower defenses.
• Part 685, subpart B, appendix A Examples of borrower relief.
• Section 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• Section 685.308(a) Remedial actions.

*Note:* Section 668.90 has been redesignated as § 668.91 and § 668.93 has been redesignated as § 668.94 pursuant to the borrower defense procedural rule, published January 19, 2017 at 82 FR 6253 (the borrower defense procedural rule), so the Department must correct the amendatory instructions from the November 2016 rule to reflect the newly redesignated section numbers.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations via the Federal Digital System at: *www.govinfo.gov.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.Federal Register.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**Corrections**

In FR Doc. 2016–25448, appearing on page 75926 in the **Federal Register** of Tuesday, November 1, 2016, the following corrections are made:

**§ 668.90   [Corrected]**

■ 1. On page 76072, in the first column, in amendatory instruction 7, "Section 668.90" is corrected to read "Section

**9966**   **Federal Register** / Vol. 84, No. 53 / Tuesday, March 19, 2019 / Rules and Regulations

688.91'' and ''§ 668.90'' is corrected to read ''§ 668.91''.

**§ 668.93 [Corrected]**

■ 2. On page 76072, in the third column, in amendatory instruction 8, ''Section 668.93'' is corrected to read ''Section 688.94'' and ''§ 668.93'' is corrected to read ''§ 668.94''.

Dated: March 12, 2019.

**Betsy DeVos,**

*Secretary of Education.*

[FR Doc. 2019–04887 Filed 3–18–19; 8:45 am]

**BILLING CODE 4000–01–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**44 CFR Part 64**

**[Docket ID FEMA–2019–0003; Internal Agency Docket No. FEMA–8571]**

**Suspension of Community Eligibility**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Final rule.

**SUMMARY:** This rule identifies communities where the sale of flood insurance has been authorized under the National Flood Insurance Program (NFIP) that are scheduled for suspension on the effective dates listed within this rule because of noncompliance with the floodplain management requirements of the program. If the Federal Emergency Management Agency (FEMA) receives documentation that the community has adopted the required floodplain management measures prior to the effective suspension date given in this rule, the suspension will not occur and a notice of this will be provided by publication in the **Federal Register** on a subsequent date. Also, information identifying the current participation status of a community can be obtained from FEMA's Community Status Book (CSB). The CSB is available at *https:// www.fema.gov/national-flood-insurance-program-community-status-book.*

**DATES:** The effective date of each community's scheduled suspension is the third date (''Susp.'') listed in the third column of the following tables.

**FOR FURTHER INFORMATION CONTACT:** If you want to determine whether a particular community was suspended on the suspension date or for further information, contact Adrienne L. Sheldon, PE, CFM, Federal Insurance and Mitigation Administration, Federal Emergency Management Agency, 400 C Street SW, Washington, DC 20472, (202) 212–3966.

**SUPPLEMENTARY INFORMATION:** The NFIP enables property owners to purchase Federal flood insurance that is not otherwise generally available from private insurers. In return, communities agree to adopt and administer local floodplain management measures aimed at protecting lives and new construction from future flooding. Section 1315 of the National Flood Insurance Act of 1968, as amended, 42 U.S.C. 4022, prohibits the sale of NFIP flood insurance unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed in this document no longer meet that statutory requirement for compliance with program regulations, 44 CFR part 59. Accordingly, the communities will be suspended on the effective date in the third column. As of that date, flood insurance will no longer be available in the community. We recognize that some of these communities may adopt and submit the required documentation of legally enforceable floodplain management measures after this rule is published but prior to the actual suspension date. These communities will not be suspended and will continue to be eligible for the sale of NFIP flood insurance. A notice withdrawing the suspension of such communities will be published in the **Federal Register.**

In addition, FEMA publishes a Flood Insurance Rate Map (FIRM) that identifies the Special Flood Hazard Areas (SFHAs) in these communities. The date of the FIRM, if one has been published, is indicated in the fourth column of the table. No direct Federal financial assistance (except assistance pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act not in connection with a flood) may be provided for construction or acquisition of buildings in identified SFHAs for communities not participating in the NFIP and identified for more than a year on FEMA's initial FIRM for the community as having flood-prone areas (section 202(a) of the Flood Disaster Protection Act of 1973, 42 U.S.C. 4106(a), as amended). This prohibition against certain types of Federal assistance becomes effective for the communities listed on the date shown in the last column. The Administrator finds that notice and public comment procedures under 5 U.S.C. 553(b), are impracticable and unnecessary because communities listed in this final rule have been adequately notified.

Each community receives 6-month, 90-day, and 30-day notification letters addressed to the Chief Executive Officer stating that the community will be suspended unless the required floodplain management measures are met prior to the effective suspension date. Since these notifications were made, this final rule may take effect within less than 30 days.

*National Environmental Policy Act.* FEMA has determined that the community suspension(s) included in this rule is a non-discretionary action and therefore the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) does not apply.

*Regulatory Flexibility Act.* The Administrator has determined that this rule is exempt from the requirements of the Regulatory Flexibility Act because the National Flood Insurance Act of 1968, as amended, Section 1315, 42 U.S.C. 4022, prohibits flood insurance coverage unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed no longer comply with the statutory requirements, and after the effective date, flood insurance will no longer be available in the communities unless remedial action takes place.

*Regulatory Classification.* This final rule is not a significant regulatory action under the criteria of section 3(f) of Executive Order 12866 of September 30, 1993, Regulatory Planning and Review, 58 FR 51735.

*Executive Order 13132, Federalism.* This rule involves no policies that have federalism implications under Executive Order 13132.

*Executive Order 12988, Civil Justice Reform.* This rule meets the applicable standards of Executive Order 12988.

*Paperwork Reduction Act.* This rule does not involve any collection of information for purposes of the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*

**List of Subjects in 44 CFR Part 64**

Flood insurance, Floodplains.

Accordingly, 44 CFR part 64 is amended as follows:

**PART 64—[AMENDED]**

■ 1. The authority citation for part 64 continues to read as follows:

**Authority:** 42 U.S.C. 4001 *et seq.;* Reorganization Plan No. 3 of 1978, 3 CFR, 1978 Comp.; p. 329; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp.; p. 376.

# EXHIBIT 2

## United States Department of Education

## First Report of the Special Master for Borrower Defense to the Under Secretary

### September 3, 2015

On June 25, 2015, Ted Mitchell, Under Secretary of the United States Department of Education (the Department, or ED), appointed me as Special Master tasked with advising the Department about borrower defense issues.  I have been asked to help the Department develop processes and systems to provide relief to Federal student loan borrowers who have legal claims against the schools they attended.

My appointment was part of an ongoing effort by the Department to address issues arising from abusive practices of institutional participants in ED student loan programs.  It followed years of effort to, in Under Secretary Mitchell's words, "hold career colleges accountable for giving students what they deserve—a high-quality, affordable education that prepares them for their careers," including through increased enforcement activities in this area.

The unfortunate reality is that some colleges, including certain career colleges, have used abusive practices to prey on students.  They have made false and misleading statements to students or prospective students about the value of certain career college programs or the financing needed to pay for a program.  Such practices can have serious adverse effects for both students and taxpayers.  Accordingly, prior to my appointment, Secretary of Education Arne Duncan made it clear that such predatory practices would not be tolerated.  He also stated that students affected by such practices would receive the loan relief they deserved under the law.

My paramount goal as Special Master is to develop a system for providing debt relief to borrowers that is **fair, transparent, and efficient**, with minimal burden on borrowers.  Under Secretary Mitchell asked me to advise on the creation of a durable process—one that would, consistent with the Higher Education Act, be applicable to the crisis that unfolded with the closure of Corinthian Colleges, but also one that would apply more broadly to students at all institutions who believe they have been defrauded by their colleges. To that end, I have been asked to advise the Department regarding:

- Creation of a simple application for debt relief for all borrowers applying for loan discharges based on borrower defense.

- Issues of law and fact related to borrower defense claims received by the Department.

- The process by which the Department can recover money from schools after successful borrower defense claims.

At the time of my appointment, I stated I would regularly inform students, stakeholders, and the public at large about my work as Special Master.  This report is intended to be the first in a series of reports describing the progress the Department has made on this important issue.

Joseph A. Smith, Jr.
Special Master for Borrower Defense
U.S. Department of Education

1

***

In this report, I use the term Borrower Defense Program (or BDP) to refer to the Department's plans, systems, and processes designed to enable aggrieved borrowers to assert a defense to repayment of their federal student loans. That right—commonly known as "borrower defense" or "defense to repayment"—emanates from provisions in the Higher Education Act and associated regulations.[1]  As I mentioned above, the Department's goal is to make these processes fair, transparent, and efficient.  Success requires ensuring that borrowers are aware of their options and can clearly understand the processes so that they can make informed choices about seeking relief.  In addition, the BDP should allow borrowers to pursue that defense with as little burden as is possible, consistent with the development of facts sufficient to support the defense. In the interest of efficiency and ease to the borrower, I intend to establish both clear rules of decision about what evidence of wrongdoing is sufficient to provide relief for borrowers and protocols for when similar claims can be treated together and alike.  Successful borrower defense claims will not only result in relief to the borrower, but will also have consequences for the school whose conduct created such a defense.

As will be more fully described below, BDP stems from the Department's receipt of an unprecedented number of claims from aggrieved borrowers, and represents new territory for ED. This being the case, BDP will proceed deliberatively to address borrower claims through the development of protocols and precedent based on the facts presented by student claims.[2]  This is critical if the Department is to create a durable system that helps not only the borrowers that already have submitted claims, but also those that may submit claims in the future.

## I.     Legal and Regulatory Background Regarding Borrower Defense

The following forms the statutory and regulatory framework that guides my work as Special Master.

Section 455(h) of the Higher Education Act (HEA) requires that the Department define by regulation which acts or omissions of a school constitute defenses to repayment of a Direct Loan.[3]  In 1994, the Department promulgated regulations providing that a borrower may, in any proceeding to collect on a Direct Loan, "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[4]

If the borrower's defense is successful, the borrower "is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay."  The Secretary may provide the borrower further relief as the Secretary deems appropriate, including "[r]eimbursing the borrower for amounts paid toward the loan," "[d]etermining that the borrower is not in default on the loan" and is therefore eligible for title IV assistance, and

---

[1] 20 U.S.C. § 1087e(h); 34 C.F.R. § 685.206(c).

[2] As discussed below, the Department is offering to put Corinthian borrowers who wish to raise a defense to repayment into forbearance so that they do not have to make payments on their loans while this system is being developed and their claims are being reviewed.

[3] 20 U.S.C. § 1087e(h).

[4] 34 C.F.R. § 685.206(c)(1).

2

"[u]pdating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan."[5]

In the event of a successful defense to repayment, the regulations authorize the Secretary to initiate "an appropriate proceeding" against the school whose conduct gave rise to such defense "to pay to the Secretary the amount of the loan to which the defense applies."[6]

The history of the borrower defense regulations and the Department's interpretation of them are worth noting. The borrower defense rule was first adopted in 1994 as a temporary measure pending promulgation of a rule through the negotiated rulemaking process.[7] On April 25, 1995, the Secretary of Education convened the Borrower Defenses Regulations Negotiated Rulemaking Advisory Committee (Committee), which represented all affected parties, including representatives of institutions of higher education, higher education organizations, student loan lenders, guaranty agencies, loan servicers, legal aid organizations, students, and the Department.[8] During the Committee's first session, however, the Department was informed that the non-Federal negotiators had all agreed to recommend to the Department that no changes be made to existing regulations. The non-Federal negotiators on the Committee told the Department that they were satisfied that the current regulations adequately addressed the issue of borrower defenses and that no further regulatory action was needed. The Secretary accepted this recommendation, and the Department stated at the time that "the Secretary believes that borrower defenses issues, in particular issues related to the consequences of such defenses, can be adequately addressed by clarifying current regulations and by administrative processes."[9]

In 1995, the Department issued a Notice of Interpretation providing basic guidelines for the borrower defense process. These guidelines indicated that the Department will acknowledge a Direct Loan borrower's cause of action under state law as a defense to repayment of a loan only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provided. The Department will not recognize actions such as personal injury tort claims or actions based on allegations of civil rights violations as defenses to repayment. Under these regulations, the Department looks to the law of the state where the action took place to determine whether to accept the borrower defense.[10]

The regulation provides that a borrower may assert, as a defense to repayment, a school's actions or omissions that "would give rise to a cause of action against the school under applicable State law."[11] The borrower defense regulations speak of the consequences of a "successful" borrower's defense. By its own terms, the regulation indicates that a borrower's defense is based on acts or omissions by the school. Thus, for the defense to be successful, the evidence must support the claim that those acts or omissions occurred. Furthermore, the terms of the regulation also indicate that, from a legal point of view, those acts or omissions must be such that they

---

[5] *Id.* at § 685.206(c)(2). Direct Loan refers to loans made by the Department under the William D. Ford Federal Direct Loan Program.
[6] *Id.* at § 685.206(c)(3).
[7] 59 Fed. Reg. 42649 (Aug. 18, 1994); 59 Fed. Reg. 61664 (Dec. 1, 1994).
[8] 60 Fed. Reg. 11004 (Feb. 28, 1995).
[9] 60 Fed. Reg. 37768 (July 21, 1995).
[10] *Id.*
[11] 34 C.F.R. § 685.206(c)(1).

3

would give the borrower a cause of action against the school. In other words, it is the cause of action under state law against the school that establishes an equivalent right to relief from the obligation to repay a Direct Loan. If the relevant evidence, considered as a whole, would not support a state law cause of action, then the acts or omissions asserted cannot be the basis of a defense to repayment.[12]

Nothing in the regulation requires the borrower to be the sole source of evidence establishing a right to relief under state law. Accordingly, on June 8, 2015, the Department took an unprecedented step and announced that it would use existing evidence, where appropriate, to ease borrowers' burden in establishing their eligibility for borrower defense relief:

> Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers.[13]

## II.    Background Regarding Corinthian Colleges' Collapse

The Department's investigation into the falsification of Corinthian Colleges' placement rates began in the winter of 2013. In January 2014, the Department asked Corinthian for data regarding the school's advertised placement rates. Following a back and forth during which the Department pressed Corinthian for placement rate data and Corinthian refused to provide that data, the Department placed Corinthian on heightened cash monitoring status in June 2014.[14]

In July 2014, the Department and Corinthian reached an Operating Agreement in which Corinthian agreed to cease operations by teaching out at least a dozen of its campuses and by selling as many of the rest of its schools as possible. The Department also appointed a monitor, Patrick Fitzgerald, the former U.S. Attorney for the Northern District of Illinois, who was charged with overseeing Corinthian's operations and wind-down activities, including its federal student aid draws, its expenditures (including refunds required under the Operating Agreement), and its compliance with its obligations to the Department.

In November 2014, Corinthian agreed to sell 53 of its Everest and WyoTech campuses, covering about 35,000 students, to Zenith, a newly created non-profit organization. In that transaction, the Department secured conduct provisions about Zenith's ownership of its new schools, including provisions about how Zenith would calculate placement rates and the appointment of a monitor to oversee Zenith's compliance with the regulations surrounding the federal financial aid program. In the transaction, the Department settled future liabilities against Zenith that might have arisen from Corinthian's management of the schools for an initial sum of $12 million, and an earn-out of $17.5 million over seven years. In contrast, the Department gave no release to Corinthian and indicated that its pending investigations into Corinthian would continue.

---

[12] *See id.*
[13] http://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges.
[14] Heightened Cash Monitoring is an administrative status that Federal Student Aid can impose on institutions to provide additional oversight for a number of financial or federal compliance issues.

000360

In the following months, the Department continued its regulatory activity.  In March 2015, after Corinthian failed to file audited financial statements, the Department requested a letter of credit. In April, the Department concluded part of its investigation into Corinthian's placement rate falsification and issued a fine letter against Corinthian.  That fine letter concluded that Corinthian had misled students about its programs by inflating placement rates at its Heald College locations.  Corinthian did so by, among other means, counting students as placed based in jobs they held before enrolling at Corinthian, creating temporary unsustainable jobs for its students and counting those students as placed, and counting students as placed when their jobs were unrelated to the education they received at Corinthian.  The Department notified Corinthian that it intended to fine Heald $30 million for those violations, and also ordered that Corinthian stop enrollments at those locations.[15]

On April 27, 2015, shortly after the Department notified Corinthian of its intention to impose a fine based on the falsified placement rates, Corinthian announced the closure of all of its schools and then filed for bankruptcy in May 2015.  Approximately 13,500 students were enrolled at Corinthian's locations at the time of its closure.

The collapse of Corinthian Colleges was a landmark event for the concept of borrower defense to repayment.  In the 20 years between the establishment of these regulations and Corinthian's collapse, borrowers had made borrower defense claims to the Department only a handful of times.  As a result, the Department did not have in place an established infrastructure for accepting, processing, and reviewing large numbers of such claims from borrowers. Corinthian's collapse almost immediately produced over 1,000 claims from borrowers for a defense to repayment, before the Department took any action to clarify how to seek such relief.  Along with other factors, this significant increase in claims volume necessitated building a durable system to collect, process, and review such claims.  The great burden already facing many of the affected students underscored the importance of making this system fair, transparent, and efficient.

In keeping with its desire to use established evidence of wrongdoing, where appropriate, the Department analyzed the applicability of its findings against Heald College to potential borrower defense claims.  Because Heald was headquartered in and managed from California, the Department looked to California law and determined that Heald's misrepresentation of placement rates constituted prohibited unfair competition under California's Unfair Competition Law (UCL).[16]  Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law.  Based on this analysis, the Department created a simple attestation form that allows borrowers to document the inflated rates' impact on them in a manner that supports a cause of action under the UCL.  The Department anticipates being able to grant relief to borrowers who provide the necessary information on the form.

---

[15] The letter detailing those findings is available at http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.
[16] Cal. Bus. & Prof. Code  § 17200 *et seq.*

5

### III.     Department Actions to Assist Borrowers Seeking Debt Relief

In the wake of Corinthian Colleges' collapse and prior to my appointment as Special Master, the Department took significant steps to help borrowers learn about their options and apply for appropriate loan relief.  This section summarizes these steps.

#### A.  Expanded Eligibility for Closed School Discharge

The Department's first set of actions related to closed school discharge.  Under the law, if a college closes while a student who has not yet finished her program coursework is enrolled (or soon after she withdraws), that student may seek a discharge of her federal student loans.[17]  This relief is available if a student is not completing a comparable educational program at another school.  (Completing a comparable program could happen through a teach-out agreement with the school or after transferring credits from the closed school to that new school.)

On April 27, 2015, Corinthian closed its remaining campuses, rendering students enrolled at the time eligible for a closed school discharge.  Given the unique circumstances faced by former Corinthian students, the Secretary exercised his authority to expand eligibility for students to apply for a closed school loan discharge by extending the window of time back to June 20, 2014 (instead of the typical 120-day window).  This captured students who attended the now-closed campuses after Corinthian entered into an agreement with the Department to terminate Corinthian's ownership of its schools.  As a result, about 15,000 students in total are now eligible to have their federal loans discharged through a closed school discharge.

After acting to extend the window back to June 20, 2014, the Department engaged in a multi-prong approach to contact students who were potentially eligible for closed school discharge relief.  The Department, through its servicers, sent closed school discharge application forms to potentially eligible students by physical and electronic mail.  The Department also placed the closed school discharge application form on the Corinthian information page of the Federal Student Aid website where borrowers could easily access it.  As a result of this outreach, the Department has received closed school discharge applications from borrowers at a much greater rate than it has in prior closed school instances (about 500% higher).  Information about closed school discharge applications received and discharged is found in section IV below.

#### B.  Help for Students Seeking Relief Based on Borrower Defense

On June 8, 2015, the Department made a series of announcements to help clarify borrowers' options and the borrower defense process.[18]  Following those announcements, the Department has provided helpful information and meaningful pathways to relief for former Corinthian students through a number of borrower-facing actions taken by Federal Student Aid (FSA):

- **Forbearance or stopped collections.**  Corinthian students who believe they were defrauded by their school and intend to submit claims based on borrower defense can request that their federally serviced loans be placed into forbearance for twelve months while their claim is reviewed.  If those loans are in default, they can request that collection activities be stopped.  Students can request this relief

---

[17] 20 U.S.C. § 1087(c)(1).

[18] http://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges.

000362

by either filling out a simple web-based form, submitting a request by phone to a dedicated call center, or—for students submitting an attestation form for Heald College programs covered by Department findings—by checking a box on that form.  As a result, the burden to the borrower of continuing to make payments on these loans or facing collection activities is relieved while the Department establishes its processes and claims are reviewed.

- **Streamlined relief for certain Heald College students.**  As discussed above, the Department made findings that Heald College had published misleading placement rates related to the majority of programs at its campuses between 2010 and 2014.  The Department determined that students who relied on misleading placement rates when they enrolled in a program at Heald College could be eligible for streamlined relief based on borrower defense by filling out a simple attestation form and providing other basic information.  The Department has posted the list of programs covered by its findings online,[19] and has created a specific online form (also available as a fillable PDF) for affected Heald College borrowers to submit their borrower defense claims.[20]  Through this form, these borrowers can also request that their federal loans be placed in forbearance or stopped collections while their claim is reviewed.

- **Direct outreach to former Heald College students.**  Beginning in July, FSA conducted an email outreach campaign to over 50,000 borrowers who attended Heald College since 2010 to notify them that they may be eligible for debt relief based on borrower defense.  That email, sent to borrowers' last known email addresses, provided general information about borrower defense and described the Department's findings related to misleading placement rates published by Heald College.  The email provided information about eligibility and linked to both the list of programs covered by the Department's findings and the page where they could fill out the attestation form.  Borrowers were also informed how to request forbearance of payments or stopped collection.  Additional outreach efforts will continue to ensure borrowers are aware of their options.

- **Dedicated call center for borrower defense information.**  A dedicated call center was created to provide guidance and assistance for students seeking to learn more about their options and how to apply for relief.  This call center also is processing requests for forbearance or stopped collections from Corinthian students who intend to submit a borrower defense claim.  The center has received over 7,000 calls to date.

- **Updated information posted online.**  Updated information and frequently asked questions about the availability for relief under the borrower defense regulations, including how borrowers can apply for relief, has been posted on FSA's website.[21]

---

[19] The list is available here: https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf.
[20] The form is available here: https://borrowerdischarge.ed.gov/attestation.
[21] See here: https://studentaid.ed.gov/sa/about/announcements/corinthian.

These actions with regard to borrower defense have resulted in a significant response—summarized in the following section of this report—that has provided me with actionable cases upon which to begin my work as Special Master.

## IV.     Current Borrower Defense and Closed School Claims

Since the collapse of Corinthian and the announcements made by the Department in early June and subsequent outreach activities, the Department has received several thousand claims from borrowers seeking borrower defense relief, in addition to phone calls to its dedicated call center and emails to a dedicated inbox.

Specifically, as of August 26, 2015, the Department has received the following:

- **Borrower Defense claims: 4,140**

    - Heald Attestation Forms: 1,992
        - ~ 97% reported attending Heald
        - < 2% reported attending Everest
        - < 0.5% reported attending WyoTech
        - < 2% reported attending other schools

    - Other Borrower Defense claims: 2,148
        - ~ 68% reported attending Everest
        - ~ 14% reported attending Heald
        - ~ 6% reported attending WyoTech
        - ~ 11% reported attending other schools

- **Forbearance/stopped collection requests processed: 7,696**

- **Phone calls to dedicated call center for borrower defense: 7,344**

- **Incoming emails to dedicated email inbox: 4,114**

- **Outgoing emails sent to Heald College students: 54,170**

In addition, it is worth noting the numbers of applications from Corinthian students seeking a **closed school discharge**, as some of those borrowers may seek a closed school discharge in lieu of making a borrower defense claim.  As of August 21, 2015, the Department has received **7,815 closed school claims** from Corinthian students.   Of these, **3,128 have been approved** (representing an estimated $40 million in loans) with the rest still under review.  These claims break down among the Corinthian colleges as follows:

- Everest: 2,359 (925 approved)

- Heald: 4,513 (1,893 approved)

- WyoTech: 943 (310 approved)

8

## V.        Building an Infrastructure to Implement BDP

As described above, the number of borrower defense claims received to date is in the thousands. At this point, it is difficult to say how quickly that number of claims will grow, but it is safe to assume it will increase—although it should be noted that not all borrowers that attended affected schools may wish to submit a borrower defense claim.  Department leadership agrees that the best way to meet its goal of creating a fair, transparent, and efficient process for handling borrower defense claims is to establish an infrastructure that is flexible and scalable.  This will allow the Department to handle current claims in a way that is fair to students, effective, and efficient, and expand the infrastructure as needed to meet future demand.

By "infrastructure," I mean both the human and physical resources necessary to handle claims, as well as a decision-making framework that will accommodate efficient and fair resolution of borrower defense matters.  Current human and physical resources include the ED and FSA personnel and systems devoted to the issue.  The Department has recognized the need for additional staff dedicated solely to this issue and committed to hiring staff for that purpose.  To bolster that capacity, in addition to myself, the Department has hired four attorneys for the sole purpose of working on BDP so far.  These attorneys, who will begin work in early September, will assist me in reviewing the batches of claims that the Department already has received, analyzing the state laws involved in such claims, and developing analytical templates to facilitate claims intake and assessment processes that are scalable and durable.  Moving forward, I will recommend adding additional staff or systems capacity as appropriate.

The intellectual infrastructure of BDP will be a set of rules for deciding cases in a consistent way.  I will start by analyzing claims where both facts and law are clear, and will develop rules of decision for other cases as my colleagues and I gain experience in reviewing and analyzing claims.  The clearest claims at present are claims from Heald College students using the Attestation Form created by the Department that meet the criteria set forth in that form.  For other claims, the rules of decision will be based on a review of the factual allegations made by borrowers about, for example, the conduct of school personnel in the inducement of the student to pursue a course of study and take on the debt that is now disputed.  Factual information established by state attorneys general, proceedings in state courts, and other federal enforcement agencies is also relevant.  Having reviewed a number of claims from various sources, my initial view is that a student's description about what happened to her, in her own words, will be crucial in developing this set of rules. Creating a durable, fair, transparent, and efficient process will likely require the borrower to provide information about school misconduct that would be available to her.

This process will reduce the burdens on borrowers to the maximum extent possible.  I share the urgency felt by borrowers who were defrauded, and believe it is important to reach decisions in this project in a deliberate way that will support the relief that students deserve, protect taxpayers, and justify public trust and confidence in this process.  I will do everything possible to serve those goals.

## VI.        Special Master Outreach and Engagement

In my work as Special Master, I believe it is important to engage with and listen to stakeholders affected by student debt issues, particularly borrowers and those who counsel, represent and

advocate for borrowers.  This view is based on my experience as North Carolina Commissioner of Banks and as Monitor of the National Mortgage Settlement, where interaction with counsellors and advocates, while sometimes challenging, was always informative and helpful.

Accordingly, since my appointment I have met with multiple representatives of a large coalition of advocates for debtors on student loans.  I have also established email and written communications with several advocacy groups and have received from them detailed proposals regarding borrower defense.

I have also spoken with several State Attorneys General regarding borrower defense and have heard from a number of them regarding a suggested course of conduct for the project.  Given the importance of state law to borrowers' defenses and the critical roles that State Attorneys General have played and are playing in regard to this important issue, I value their input immensely and I look forward to working with them to ensure that every borrower receives the relief they deserve with the minimum burden.

As this work continues, I will continue to engage with these and other stakeholders. And I will continue to give their ideas, expertise, and proposals due consideration.

## VII.   Next Steps

Over the past few months, the Department has made significant process in clarifying borrowers' options based on closed school discharge and borrower defense to repayment, and in building the intake systems to collect borrower defense claims.

Over the coming months, I will continue to work with Department personnel to build a durable system and infrastructure within the Department to review borrower defense claims and discharge loans for eligible borrowers.  To that end, I expect to undertake the following efforts:

- Along with newly hired attorneys, review the current inventory of attestation forms from students enrolled in Heald College programs covered by ED's findings.  I expect that over the course of the next three months, all Heald attestation forms submitted to this point will be initially reviewed and determinations of eligibility for loan discharges will be made.

- Along with newly hired attorneys, review other borrower defense claims to begin developing rules of decision.  When coupled with further consultation and engagement with stakeholders, this review will help the Department develop a streamlined intake form that aggrieved borrowers can use to submit borrower defense claims.

- Advise the Department on further outreach efforts that will help ensure that borrowers are aware of their options in seeking relief.

- Further engage State Attorneys General and other enforcement agencies to discuss pending or past investigations they may have pursued against career colleges; evidence of wrongdoing emerging from those investigations that may be relevant to the Department's borrower defense process; and their own state statutes and case law as it relates to wrongdoing relevant for borrower defense

10

claims. I will also create processes by which the State Attorneys General can submit evidence developed through their investigatory findings, so that wherever possible, like claims can be treated together and alike.

- Analyze the effects of loan discharge on students' credit reports and engage with credit reporting bureaus on the proper treatment of loan discharge.

- Report to the public on a quarterly basis, beginning no later than November 30, 2015, as to the status of pending assertions of borrower defense and relief granted.

*** 

This report is a baseline report intended to inform stakeholders and the public about the current status of the BDP.  By necessity, it emphasizes process and start-up issues.  Readers should know, however, that the leadership of the Department and I well understand that the success of this effort will be measured in the relief granted to aggrieved borrowers who requested relief and the establishment of fair and transparent rules for future assertion of the defense.  To that end, I will continue working to process these claims in an efficient manner and to set up a durable process that can be used for future claims by aggrieved borrowers.

11

# EXHIBIT 3

**United States Department of Education**
**Second Report of the Special Master for Borrower Defense to the Under Secretary**
**December 3, 2015**

This is my second report as Special Master to the United States Department of Education (the Department or ED) with regard to borrower defense (BD) issues. In my first report, I discussed the legal and regulatory basis for the Department's approach to BD and the sequence of events that led to the establishment of a program to address BD claims (the Borrower Defense Program, or BDP) and my appointment as Special Master.  This report will address:

- ED's progress in granting BD and closed school relief to student loan debtors.
- Details on the population of BD and closed school claims under review.
- The standards under which BD relief has been granted and the development of additional rules under which further relief may be granted.

The report that follows shows that we have made substantial progress on a number of BDP goals. My BDP colleagues and I have recommended to Under Secretary Mitchell the granting of $27,832,370 of relief with respect to 1,312 borrowers making BD claims related to Heald College. Those recommendations were accepted by the Under Secretary and, pursuant to his order, the Department has begun the process of effecting the discharges.  Beginning on December 4, 2015, the Department will notify this initial set of borrowers that their claims have been approved.  As of November 18, 2015, there are 5,379 open BD claims that remain to be addressed.  In addition, as of November 18, 2015, the Department has processed 5,814 closed school claims, comprising $75,461,790 in loan relief.

This report also discusses areas where work remains to be done—namely: developing rules of decision to resolve future claims and additional engagement with state attorneys general. The BD team and I are working diligently on these matters.  I am satisfied that we are developing the protocols and criteria that will allow us to efficiently address these claims. As we proceed, we are gaining the knowledge that only comes from working with claims and that will guide our development of a general purpose BD procedure that is efficient and fair.

My colleagues and I look forward to continued engagement with stakeholders in the BD process.

Joseph A. Smith, Jr.
Special Master for Borrower Defense
U.S. Department of Education

1

## I.      Borrower Defense Claims

As discussed in my first report, ED receives BD claims from a number of sources in a variety of formats.  A substantial number of BD claims by former Heald College students have been received on an attestation form created by the Department for that purpose (Heald Attestation Form), although that form has also been used by debtors from other schools.  (About 3% of the Heald Attestation Forms received are for claims related to other schools).  An additional substantial number of BD claims—by former Heald students, former students at other Corinthian Colleges, Inc.-owned colleges, and other students generally—have been submitted in other formats.

As of November 18, 2015, ED had received 6,691 BD claims, collectively representing up to about $138 million in loans. The claims break down as follows:

| School | Number | Percent of total |
|---|---|---|
| Heald (Corinthian) | 3,356 | **50.2%** |
| Everest (Corinthian) | 1,701 | **25.4%** |
| WyoTech (Corinthian) | 283 | **4.2%** |
| Art Institute | 931 | **13.9%** |
| ITT | 159 | **2.4%** |
| University of Phoenix | 22 | **<0.5%** |
| Other  (no more than 10 claims from one school) | 239 | **3.6%** |
| **Total** | **6,691** | **100%** |

## II.     Borrower Defense Claims Review and Approval

Since my first report, the Department has added staff to review borrower defense claims and has approved the first wave of borrowers for discharges. This section: (i) describes the team reviewing claims; (ii) summarizes the progress made to date regarding claims from Heald College students; and (iii) discusses next steps for reviewing other borrower defense claims.

2

**A.  Borrower Defense Program Team**

In my first report, I discussed the need for an infrastructure to handle both present and prospective claims.  Since that report, four talented lawyers have been hired by the Department to address this work.  They have hit the ground running and, in cooperation with Federal Student Aid (FSA) staff, have made a very good start at analyzing claims.  The rest of this report is a testament to the hard work of these lawyers and our colleagues at ED and FSA to achieve the BDP objectives.  Collectively, I refer to them as the BDP Team.

As the work of the BDP Team has ramped up, it has also become apparent that additional attorneys will be necessary to swiftly analyze claims. Accordingly, I have recommended that the Department add additional attorneys, and the Department has agreed to do so.

**B.  Approval of Claims from Heald College Students**

My first report discussed in detail the legal basis for the Department's view, with which I concur, that relief for BD claims under the current regulations must be based on the showing of an act or omission by a school that would support a state law cause of action.  It went on to describe the Department's investigation of Corinthian Colleges, Inc., including the Heald College campuses, and of and the Department's determination, after consultation with the Office of the California Attorney General, that students who relied upon false or misleading placement rate disclosures in enrolling in Heald College programs would have established a BD claim as to which relief would be granted under California law.  The Heald Attestation Form provided by ED to student borrowers incorporated each of these elements of a claim as to which relief could be granted.

To focus our initial efforts on claims where relief could be granted on the basis of fully developed facts, the BDP Team first reviewed all claims received from all sources as of September 30, 2015, for Heald student loans where the initial loan advance had occurred on or after July 1, 2010 – the earliest date covered by ED's letter of findings against Heald College (ED Fine Letter).[1]  There were 1,670 borrowers that fit these criteria (the Initial Review Population).  The BDP Team then reviewed each of the claims in the Initial Review Population to determine whether they met the elements for relief, namely whether they were enrolled in the covered programs for the time periods for which the Department found that Heald College had misrepresented job placement rates.

From this review, 1,312 borrower claims, representing $27,832,370 of loans, qualified for BD relief.  I informed Under Secretary Mitchell of this determination and recommended that he authorize full relief (restitution of all amounts paid) for such loans.  The Under Secretary has authorized such relief and directed that the necessary steps be taken to give effect to that

---

[1] ED issued a Notice of Intent to Fine Heald College, dated April 14, 2015.

authorization.  The BDP Team will continue reviewing and approving similar claims—including Heald claims received after the September 30, 2015 cutoff date we used—on a rolling basis going forward.

While my team was reviewing these claims, the United States Department of the Treasury (Treasury) analyzed the federal income tax implications of BD relief for students that attended Corinthian schools.  Treasury recently issued a revenue procedure regarding the tax implications of discharge for former Corinthian students, concluding that Corinthian students do not need to include discharged amounts in their taxable income.  This revenue procedure is available here.

The 1,312 BD claimants approved for relief to date are concentrated heavily in California, where most Heald College campuses were located.  There are also significant populations of approved claimants in Hawaii and Oregon, where other Heald campuses were located.

The chart below lists the number of claimants who qualified for relief among the Initial Review Population, based on their state of residence at the time they submitted their claim:

| State | Borrower Count | | State | Borrower Count |
|---|---|---|---|---|
| CA | 1,062 | | ID | 2 |
| HI | 117 | | AZ | 1 |
| OR | 72 | | WI | 1 |
| WA | 20 | | OK | 1 |
| TX | 7 | | MI | 1 |
| FL | 5 | | PA | 1 |
| IL | 3 | | KY | 1 |
| CO | 3 | | MO | 1 |
| SC | 3 | | NE | 1 |
| NV | 3 | | GA | 1 |
| AK | 2 | | SD | 1 |
| LA | 2 | | VA | 1 |

From the Initial Review Population of 1,670 claims, 358 claims remain under consideration.  I did not yet recommend relief for those claims because they involved one or more of the following situations: (i) the claimants already had their loans discharged through a closed school discharge; (ii) claimants were enrolled in programs or time periods that were not covered by the ED Fine Letter; or (iii) claimants did not have Federal Direct Loans.  It should be noted that these and other BD claims have not been denied; rather, additional consideration, as discussed in the next section, will be required to determine whether and to what extent BD relief may be granted.

4

### C.  Next Steps for Other Borrower Defense Claims

In addition to the Heald claims discussed above, a significant number of BD claims have been received from students at schools other than Heald College.  At the time I considered the Initial Review Population of Heald claims, ED had not made specific factual determinations of wrongdoing with regard to other schools.[2]  Recently, however, the Department announced findings against Corinthian's Everest and WyoTech schools based in California and Everest online programs based in Florida as a result of a joint investigation with the office of the California Attorney General. The Everest and WyoTech findings include specific determinations of misstatements of placement rates in specified programs at specified Everest and WyoTech campuses (or online).  The BD team and I have begun an in-depth review of these recent findings.  I expect that they will allow the Department to provide borrower defense relief to additional students, similar to the way the ED Fine Letter issued to Heald has done.  This topic will be addressed in future reports.

There are also claims from former students—both from Corinthian schools and other schools—whose loans are not covered by specific ED findings.  This does not mean that material misstatements or other wrongdoing that trigger BD relief did not occur with regard to these claims; rather, it means that the BDP Team will have to review these claims to determine whether there is evidence supporting relief.  We are hard at work with our colleagues in the Department to develop rules for deciding claims where no explicit findings have been made about the programs involved.  This work will also inform our development of a general application form for borrower defense to be used in such cases.

Beyond this work reviewing claims, the BDP Team and I have consulted with the attorneys general of states where BD claims have been made to gain the benefit of any investigations they have made and their interpretations of applicable state law.  The Everest and WyoTech findings made by the Department and the California Attorney General referred to above are one fine example of this work. The Department has also received investigative evidence regarding Corinthian from the Illinois Attorney General's office and, more recently, the Massachusetts Attorney General's office.  We will analyze that evidence in the coming weeks.  We continue to invite all state attorneys general to provide evidence of institutions' wrongdoing to me and the Department so that I can make determinations about the implications of the evidence on potential borrower defense claims.

In determining the availability of BD relief to additional student loan debtors that have submitted claims, my colleagues and I will especially look for evidence of patterns and practices that show

---

[2] The exception to this are the campuses operating under the Everest Institute-Cross Lanes, WV OPEID (01035600), with regard to which ED made findings, per its letter dated July 24, 2014.  There are approximately 33 claims relating to this campus. They will be considered in light of ED's findings.

5

a concerted effort to mislead students or otherwise engage in conduct that violates applicable state law.  One way of making these determinations is to determine whether the BD claims filed against a school show common patterns of misconduct with regard to a particular program, campus, or both.

Pursuing this mode of inquiry will allow the BDP Team its best opportunity to establish broad-based patterns of misconduct and to provide relief to a significant number of claimants more quickly.  In this regard, it is important to note that the statements by claimants in their own words of how they were treated by the schools against which they have made a claim will be helpful to our resolution of claims.  This will help increase understanding of what happened to students and whether state law was violated.  In considering this evidence, however, the BDP Team will not expect or require certain words or phrases to trigger relief.

## III.   Closed School Claims

As discussed in my prior report, a significant number of former Corinthian students who were students at or around the time the colleges ceased operations have elected to seek a closed school discharge in lieu of making a borrower defense claim.  As of November 18, 2015, FSA had approved 5,814 closed school discharge applications, resulting in $75,461,790 of relief to borrowers.  FSA continues to work through other closed school application claims at a steady clip, and anticipates that tens of millions of dollars or additional relief will be granted in the coming months.

Approved closed school applications from Corinthian students break down as follows:

| School | Applications Received as of Nov. 18, 2015 | Grants of relief Received as of Nov. 18, 2015 | Loan Amounts |
|--------|---------------------------------|-------------------------------|--------------|
| Heald | 6,213 | 3,698 | $53,046,706 |
| Everest | 3,110 | 1,712 | $19,196,090 |
| WyoTech | 1,204 | 404 | $3,218,994 |
| **Total** | **10,527** | **5,814** | **$75,461,790** |

## IV.   Conclusion

The Borrower Defense Program has made a good start at addressing BD claims, but much work remains to be done.  To address remaining claims, we will make any aggregate findings that are justified by available evidence, and we will also analyze school conduct by campus and program. Input from the borrowers, state attorneys general, and other sources will be crucial in making determinations that are fair and supportable.

6

In this process, we will continue to engage with Congress, state attorneys general, and advocates for students to obtain the benefit of their insights and experience.  As we gain further knowledge and experience, including through further engagement with stakeholders, the BDP Team and I will develop a general purpose application for borrower defense and make suggestions to the Under Secretary about a permanent infrastructure in the Department to address this issue.  Each of these objectives is difficult, but a high-quality team is working on them.  I look forward to reporting our progress in February 2016.

***

In the meantime, if any individual wishes to assert a defense to repayment of his or her federal student loan(s), please submit materials via email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 194407, San Francisco, CA 94119.

Information on what to include in your borrower defense submission is provided at: https://studentaid.ed.gov/sa/about/announcements/corinthian under the subheading "Background about Borrower Defense to Repayment."

# EXHIBIT 4

**United States Department of Education**
**Third Report of the Special Master for Borrower Defense to the Under Secretary**
**March 25, 2016**

This is my third report as Special Master to the United States Department of Education (the Department or ED) with regard to borrower defense to repayment (BD) issues. My first and second reports outlined the legal and regulatory bases for the granting of BD relief and the actual grants of relief made for BD and closed school claims through September 30, 2015.

This report shows continued progress on a number of BD goals.  My colleagues and I have recently recommended to Under Secretary Ted Mitchell the granting of $10,346,414 of additional relief with respect to 546 borrowers making BD claims related to Heald College, one of the subsidiaries of Corinthian Colleges, Inc. (CCI) and $4,139,799 of relief with regard to 190 borrowers making claims related to two other CCI schools: Everest and WyoTech. Those recommendations were accepted by the Under Secretary and, pursuant to his order, the Department has begun the process of making the discharges.  These actions bring BD relief to date to a total of $42,318,574 relating to 2,048 borrowers.  In addition, as of March 1, 2016, the Department has processed 6,838 closed school claims, many of whom were also eligible for BD relief, but chose to apply under the closed school discharge provision, comprising $90,066,132 in loan relief.  As described further herein, there is more work to be done.  The Department is renewing efforts to reach borrowers who attended CCI schools who may be eligible for debt relief resulting from the Department's findings.

Since my last report, significant improvements have been made to the Department's infrastructure for dealing with BD claims.  Robert Kaye, an experienced and respected enforcement lawyer, has been appointed to the newly created position of Chief Enforcement Officer, in which capacity he will head up the BD process, among other duties.  Kaye will also spearhead the agency's efforts to enhance its investigative capabilities of institutions to enforce the Department's laws and regulations, as well as working with me to establish and implement processes for adjudicating related borrower defense claims.  This action, which establishes full-time and permanent leadership for the program, has been further strengthened by the hiring of three additional lawyers to work on BD claims.

This report also discusses areas where work remains to be done, including 8,952 open BD claims that require additional work to resolve.  The Borrower Defense Team and I are working diligently on these matters.  I believe that we are proceeding in a way that will serve the interests of distressed borrowers and taxpayers and that will promote public trust and confidence in this process and in the federal student loan program.

1

My colleagues and I look forward to continuing our very important work on borrower defense, to continued engagement with stakeholders in the BD process, and to reporting to the public on our further progress.

Joseph A. Smith, Jr.
Special Master for Borrower Defense
U.S. Department of Education

2

## I.        Borrower Defense Claims

As discussed in prior reports, ED established the Borrower Defense process (BD) to provide a clearer path for borrowers to seek and obtain relief available under the law resulting from unlawful practices by institutional participants in its student loan programs.  As of March 1, 2016, ED had received 11,000 Borrower Defense (BD) claims. The claims break down as follows:

| School | Number | Percent of total |
|---|---|---|
| Heald (Corinthian)[1] | 5,835 | 53.0% |
| Everest (Corinthian) | 2,235 | 20.3% |
| WyoTech (Corinthian) | 431 | 3.9% |
| The Art Institute (EDMC) | 1,109 | 10.1% |
| ITT | 344 | 3.1% |
| University of Phoenix | 172 | 1.6% |
| DeVry | 78 | <1% |
| Kaplan | 64 | <1% |
| Westwood College | 40 | <1% |
| International Academy of Design & Technology | 32 | <1% |
| Other (no more than 20 claims from one school) | 660 | 6.0% |
| **Total** | **11,000** | |

My last report discussed in detail the granting of relief with respect to 1,312 BD claims, with aggregate balances of $27,832,370 by former students of Heald College, one of the schools owned by Corinthian Colleges, Inc. (CCI).  This report will discuss the granting of additional relief, aggregating $14,486,204 to 736 former students of Heald and its CCI affiliates, Everest and WyoTech, for claims made through December 31, 2015.

## II.        ED Investigation of Everest and WyoTech Campuses

As described in my last report, ED's first Borrower Defense effort concerned loans to former students of Heald College (Heald), a subsidiary of Corinthian Colleges, Inc. (CCI). The

---

[1] The total number of claimants who attended CCI schools includes both borrowers who attended campuses and programs that are covered by the Department's findings about misleading placement rates during the relevant date ranges, as well as those who did not.

000377

Department, in consultation with the Office of the California Attorney General, investigated and made findings regarding Heald that include specific determinations of misstatements of placement rates for specified programs at specified Heald campuses.

Following this work, the Department and the Office of the California Attorney General, continued investigating CCI campuses operating under the following names: Everest University, Everest College, and Everest Institute (collectively, "Everest") and WyoTech.  As a result of this investigation, on November 17, 2015, the Department and the California Attorney General released a letter (November 2015 Everest/WyoTech letter) reporting findings regarding 20 Everest and WyoTech campuses that include specific determinations of misstatements of placement rates for specified programs offered at Everest and WyoTech campuses located in California and for online programs.  As more fully discussed below, BD relief has been authorized by Under Secretary Mitchell on the basis of the Everest/WyoTech findings and steps are being taken to facilitate the submission of additional BD claims by former Everest and WyoTech students in these programs.

The Department's work investigating the rest of the Corinthian campuses continued after the California Everest and WyoTech findings were announced.  More recently, as a result of its multi-year investigation, the Department made further findings regarding misrepresented job placement rates at an additional 71 Everest and WyoTech campuses, such that the Department's findings now cover Everest and WyoTech campuses located in 23 states.  The Department has made me aware of those findings, and the BD Team has prepared an attestation form for Everest and WyoTech students to facilitate BD claims that mirrors the Heald Attestation Form.  The Everest and WyoTech programs that are covered by the Department's additional findings with regard to misrepresented job placement rates and the Everest/WyoTech Attestation Form are available online at https://studentaid.ed.gov/corinthian.  In addition to enhanced outreach to eligible former Heald students, the Department will soon conduct outreach to this group of students to inform them of their eligibility for BD relief.

### III.    Borrower Defense Claims Review and Approval

My prior reports have discussed that relief for BD claims under current ED regulations must be based on the showing of an act or omission by a school that would support a state law cause of action.  To that end, the Department has worked with its law enforcement partners to gather evidence relevant to a determination of these claims.

As described above, ED's first priority was to expedite relief of eligible loans to former students of Heald who were enrolled in programs that are covered by ED's findings and relied on misleading placement rates.  To further that process, the Department created and made available an attestation form for former Heald students to facilitate the filing of BD claims (Heald

4

Attestation Form) while accepting Heald claims from other sources as well.  As a result of these efforts, relief with respect to 1,312 claims, having aggregate balances of $27,832,370, was granted to claimants who submitted a claim on or before September 30, 2015.

### A.  CCI Claims

All of the BD relief granted for the period covered by this report relates to claims by former students of CCI schools. The details with regard to this relief are set forth below.

### a.  Heald Claims

In order to continue to expedite claims where relief could be granted on the basis of ED's findings, the BD Team first reviewed all pending claims as of December 31, 2015, with regard to Heald student loans where the initial advance had occurred after July 1, 2010 (the Heald Initial Review Population).  As a result, it was determined that there were 844 claims in the Heald Initial Review Population, including (i) claims in hand at on September 30, 2015, as to which relief had not been granted and (ii) claims received after September 30, 2015.

The BD Team reviewed information from the Heald Attestation Forms and Departmental records to determine eligibility of loans in such population for BD relief.  **From this review, 546 borrower claims, representing $10,346,414 of loans, qualified for BD relief.  I informed Under Secretary Mitchell of this determination and recommended that he authorize full relief (including restitution of all amounts paid) for such loans.  The Under Secretary has authorized such relief and those discharges are in process.**  The BD Team will continue reviewing and approving similar claims—including Heald claims received after December 31, 2015, on a rolling basis going forward.

An additional 298 Heald claims remain under consideration.  I did not yet recommend relief for those claims because: (i) claimants were not enrolled in programs or time periods that were covered by the ED Fine Letter; or (ii) claimants did not have Federal Direct Loans (different rules govern BD relief in those cases).

### b.  Everest and WyoTech Claims

As of December 31, 2015, there were 2,114 BD claims from former students of Everest and WyoTech. As a result of the issuance by the Department of the November 2015 Everest/WyoTech letter, the BD Team has begun a review of claims relating to these schools comparable to the work that has been done (and is ongoing) with regard to Heald claims.  Similar to Heald claims, these claims had been received through a number of channels in a variety of formats, including Everest and WyoTech borrowers who used the Department's Heald

5

Attestation Form to file their claims, forms from the "Debt Collective" website, and claims that were submitted in narrative form.

As it had done with Heald loans, the BD Team first reviewed all claims from all sources as of December 31, 2015 for Everest and WyoTech student loans issued to students who attended the California or online schools that were covered by the findings detailed in the November 2015 Everest/WyoTech letter, where the initial loan advance had occurred on or after July 1, 2010 – the earliest date covered by the Everest/WyoTech letter. There were 475 borrower claims that passed this screen (the Everest/WyoTech Initial Review Population). The BD Team then reviewed each of the claims in the Everest/WyoTech Initial Review Population to determine whether it met the elements for relief, namely whether the borrower was enrolled in a covered program or programs during the time period for which the Department found that Everest or WyoTech had misrepresented job placement rates and where the relevant misrepresentations was material. **From this review, 190 borrower claims, representing $4,139,799 of loans, qualified for BD relief. I informed Under Secretary Mitchell of this determination and recommended that he authorize full relief (including restitution of all amounts paid) for such loans. The Under Secretary has authorized such relief and those discharges are in process.** The BD Team will continue reviewing and approving similar claims on a rolling basis.

As a result of the process just mentioned, 285 Everest and WyoTech claims remain under consideration. As is the case with the Heald claims discussed above, relief was not granted because (i) claimants were not enrolled in programs or time periods that were covered by the Everest/WyoTech letter; (ii) misstatements by the school were immaterial; or (iii) claimants did not have Federal Direct Loans.

### B. Other Borrower Defense Claims

It should be noted that the CCI claims mentioned above as to which relief has not been granted have not been denied; rather, additional consideration of such claims will be required to determine whether and to what extent BD relief may be granted. In addition, BD claims have been received and are likely to be received from former students at schools other than the CCI schools.

These claims from former students—both from CCI schools and other schools— often relate to loans that are not covered by specific ED findings with regard to misstatement of placement rates. This does not mean that material misstatements or other wrongdoing that could be the basis for BD relief did not occur with regard to these claims; in fact, claims the BD Team has received often include allegations of misrepresentation, including false or misleading statements by school staff regarding employment prospects, the cost of attendance, amount of debt to be incurred, curriculum (including externships), career placement support, qualifications for job

licensure, and transferability of course credits. These claims will be reviewed. To address them, the BD Team and the Department's Office of General Counsel have done and are doing extensive research as to whether, under applicable federal and state law, (i) these allegations can provide bases for establishing school liability and (ii) the evidentiary support necessary to establish BD claims is present with regard to such allegations. In addition, based on what we have learned from reviewing many of these claims, the BD Team is developing a "universal" BD attestation form to facilitate claims from students around the country.

## III.    Closed School Claims

As discussed in my prior report, a significant number of former Corinthian students who were students at or around the time the colleges ceased operations have elected to seek a closed school discharge in lieu of making a borrower defense claim. As of March 1, 2016, FSA had received 11,470 applications for closed school relief and had approved 6,838 of these applications, resulting in $90,066,132, of relief to borrowers. FSA continues to work through other closed school application claims at a steady clip, and anticipates that tens of millions of dollars or additional relief will be granted in the coming months.

Approved closed school applications from Corinthian students break down as follows:

| School | Applications Received as of March 1, 2016 | Grants of relief Received as of March 1, 2016 | Loan Amounts |
|--------|-------------------------------------------|-----------------------------------------------|--------------|
| Heald | 6,954 | 4,381 | $63,803,375 |
| Everest | 3,455 | 1,994 | $22,561,742 |
| WyoTech | 1,331 | 463 | $3,701,015 |
| **Total** | 11,740 | 6,838 | $90,066,132 |

## IV.    Outreach Activities

The Department has made numerous efforts to reach borrowers who may be eligible for loan discharges, by virtue of the Department's findings regarding misleading placement rates, in order to inform them of their options. Thus far, this outreach has consisted of multiple rounds of emails and postal mail to the over 54,000 Heald borrowers who had their first loan disbursement as early as January 1, 2010. The average open rate for these email campaigns is approximately 40%, which is higher than the average open rate for previous FSA email campaigns, as well as for government email campaigns generally. Nevertheless, the Department will continue its efforts to reach Heald borrowers. In order to improve the response rate, the Department has conducted email subject line testing, the results of which we anticipate will improve open rates in future email campaigns. The Department is also in the process of starting similar outreach campaigns for Everest and WyoTech borrowers who may have attended programs during time

7

periods that are covered by more recent Department findings that those schools published misleading placement rates based on the Department's lessons learned regarding how best to communicate with borrowers from prior outreach.  In addition, the Department is exploring alternative methods of outreach—including, but not limited to, social media outreach and enhanced coordination with servicers—to reach potentially eligible borrowers that may not regularly check email and/or postal mail.

Further, the BD Team has received additional evidence from the Offices of the Attorneys General of Massachusetts, Illinois and Wisconsin regarding BD claims of former students of Everest in those states and with respect to other schools that are alleged to have engaged in similar misconduct. The team is working with these agencies to develop further findings and other bases for granting relief with respect to these matters, as appropriate.

## V.      Buildout of BD Infrastructure

Since my last report, the Department has made significant progress in the establishment of an infrastructure to address BD issues both now and in the future.

On February 8, 2016, Secretary John King announced the establishment of a Student Aid Enforcement Unit to respond more quickly and efficiently to allegations of illegal actions by higher education institutions.  The Enforcement Unit will be led by Robert Kaye, one of the nation's top enforcement attorneys – most recently as a leader in the Federal Trade Commission's work protecting consumers. Through his work as the Bureau of Consumer Protection's Chief Litigation Counsel and as a manager in the Bureau's Division of Enforcement, Kaye has considerable experience supervising and advising managers and attorneys engaged in consumer protection investigations, as well as federal court and administrative litigation.

Kaye reports to Jim Runcie, the Chief Operating Officer of the Office of Federal Student Aid (FSA), under the oversight of the Under Secretary Ted Mitchell. The Chief Enforcement Officer is working closely with James Cole, Jr., General Counsel, Delegated the Duties of Deputy Secretary, to establish policies and practices for the Office.  Borrower Defense will be one of four areas for which Rob Kaye and the Enforcement Unit will be responsible.

This important advance by the Department is augmented by the addition to the BD Team of three additional lawyers, all of whom began working at the Department this month.

## VI.     Conclusion

The Department has made significant progress in addressing the BD claims that it has received. It has granted significant additional relief to borrowers, through both BD and closed school

channels.  More importantly, it has made significant investments in infrastructure to address claims of aggrieved students for years to come.  I look forward to continuing to report on both aspects of this important work.

***

In the meantime, if any individual wishes to assert a defense to repayment of his or her federal student loan(s), please submit materials via email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 194407, San Francisco, CA 94119.

Information regarding what to include in your borrower defense submission is provided at: StudentAid.gov/borrower-defense.

000383

# EXHIBIT 5

**United States Department of Education**
**Fourth Report of the Special Master for Borrower Defense to the Under Secretary**
**June 29, 2016**

This is my fourth and final report as Special Master to the United States Department of Education (the Department or ED) with regard to borrower defense (BD) issues. As disclosed in my last report, responsibility for Borrower Defense has now been transferred to the new Enforcement Office within Federal Student Aid. I am pleased to report that this transition has been accomplished effectively and professionally. The leadership of the Enforcement Office has informed me that it will continue to issue periodic reports on borrower defense issues.

This report will primarily address two important and complementary subjects: (i) the number and status of claims filed by former students at schools owned by Corinthian Colleges, Inc. (CCI); and (ii) the Department's continuing efforts to reach CCI students who may be eligible for borrower defense relief, including students with FFEL and Perkins loans.

With regard to CCI claims, this report shows a sharp increase in the number of claims filed, many of which followed the Department's March 25, 2016 announcement of job placement rate findings for Everest and WyoTech. From the beginning of my tenure in the fall of 2015 through June 24, 2016, the Department has approved 3,787 BD claims by former CCI students, with an aggregate loan amount of $73,110,502. In addition, as of June 24, 2016, closed school loan relief has been granted to 7,386 CCI students, with an aggregate outstanding principal of $97,613,625. Any remaining BD claims not yet adjudicated will be addressed by the Enforcement Office.

The Department has increased its outreach activities to make former CCI students aware of the availability of borrower defense relief. Section III of this report details several of the Department's recent outreach efforts.

I leave my engagement as Special Master with a profound sense of gratitude for the opportunity to have worked with the Department's extraordinarily talented and hardworking staff on a matter of critical importance to borrowers. In this work, we were fully supported by the Department's leadership. I am heartened by the appointment of talented professionals to continue this work in the newly created Enforcement Office and am confident that the Department's best work on borrower defense is yet to come. I look forward to following and supporting its progress as a citizen and taxpayer.

Joseph A. Smith, Jr.
Special Master for Borrower Defense
U.S. Department of Education

1

## I.        Borrower Defense Claims

As discussed in prior reports, ED established the Borrower Defense Program to enhance its ability to address claims by borrowers seeking relief from unlawful practices by institutional participants in its student loan programs.  In this report, I use the term Borrower Defense Program (or BD Program) to refer to the Department's plans, systems, and processes designed to enable aggrieved borrowers to assert a defense to repayment of their federal student loans.  As of June 24, 2016, ED had received 26,603 BD claims.  The claims break down as follows:

| School | Total Claims |
|---|---|
| Heald (Corinthian) | 8,079 |
| Everest (Corinthian) | 12,925 |
| WyoTech (Corinthian) | 2,181 |
| Other (schools with more than 10 claims) | 2,641 |
| Other (no more than 10 claims about one school) | 777 |
| **Total** | **26,603** |

The chart above shows that claims from former students of schools owned and operated by CCI account for 87% of claims received to date.

### A.  CCI Claims Based on Department Findings

All of the BD relief granted during the period covered by this report (March 2, 2016 to June 24, 2016) relates to claims by former students of CCI schools.  As discussed in prior reports, this relief has been based on: (i) the Department's analysis of the requirements of its BD regulations (including applicable state law); (ii) findings by the Department, in cooperation with state attorneys general, of misstatements of placement rate data relating to the particular programs attended by the borrowers seeking relief; and (iii) corresponding claims by former students. The chart below sets forth in detail the relief granted as of June 24, 2016, in terms of both number and aggregate principal amount of loans as to which relief has been granted.

000385

| School | Loans Approved for Discharge through 3/1/16 | Loans Approved for Discharge from 3/2/16 through 6/24/16 | Total Loans Approved for Discharge |
|---|---|---|---|
| **Heald** | 1,812<br>$37,767,392 | 1,366<br>$25,770,136 | 3,178<br>$63,537,528 |
| **Everest** | 196<br>$4,091,658 | 310<br>$4,180,652 | 506<br>$8,272,310 |
| **WyoTech** | 40<br>$488,769 | 63<br>$811,895 | 103<br>$1,300,664 |
| **Total** | **2,048**<br>**$42,347,819** | **1,739**<br>**$30,762,683** | **3,787**<br>**$73,110,502** |

## B. Other CCI Borrower Defense Claims

As stated in prior reports, borrowers who did not participate in a program covered by the Department's job placement rate findings may still be eligible for relief based on other allegations of misconduct. In this regard, the Department has received BD applications that include allegations of multiple misrepresentations to borrowers. These claims include important substantive issues. To address them, the BD Team has conducted extensive investigation into these claims, as well as research on whether these allegations constitute a claim under state law as required by the BD regulations now in effect. The BD Team will continue to investigate, research, and adjudicate these claims as part of the FSA Enforcement Office.

In the coming weeks, the Enforcement Office expects to begin ruling on BD claims based on allegations not covered by the Department's job placement findings. The Department will report on its progress on these claims in its next report.

## C. Claims by State

BD claims have been received from borrowers around the country, with particular concentrations from borrowers in California and Florida. The chart below lists the twenty states with the most claims received as of June 24, 2016, based on the borrower's state of residence at the time the claim was submitted:

3

| State | Claims Received | State | Claims Received |
|-------|-----------------|-------|-----------------|
| CA | 9,697 | PA | 496 |
| FL | 2,040 | VA | 452 |
| TX | 1,338 | OH | 451 |
| IL | 1,074 | NY | 442 |
| WA | 1,023 | CO | 417 |
| MA | 1,006 | NC | 406 |
| GA | 957 | IN | 286 |
| HI | 726 | NV | 284 |
| OR | 659 | MD | 272 |
| MI | 655 | AZ | 262 |

### D.  Information for FFEL and Perkins Program Borrowers

The Department has received a number of inquiries seeking clarification regarding the treatment of borrower defense claims made by Federal Family Education Loan (FFEL) Program and Federal Perkins (Perkins) Program borrowers.  FFEL and Perkins loans pose several distinct challenges in the borrower defense context.  While FFEL loans (which have not been issued since 2010) included a borrower defense provision, the FFEL standard for borrower defense has additional requirements, such as requiring the borrower to prove a referral relationship against the school.  Thus, the FFEL standard is harder to satisfy than the standards available to William D. Ford Federal Direct Loan (Direct Loan) borrowers.  Furthermore, non-federal lenders initiated FFEL loans, and to the extent such lenders still hold these loans, borrowers would have to bring their borrower defense claims against these non-federal loan holders.  Perkins loans simply do not have a borrower defense provision.

The Department seeks to put FFEL and Perkins borrowers on equal footing to the extent possible with federal Direct Loan borrowers.  The Department has determined that FFEL and Perkins borrowers who submit borrower defense claims will be evaluated under the same standards as those available to Direct Loan borrowers if those borrowers consolidate their FFEL and/or Perkins loans into Direct Consolidation Loans.  This equal treatment is possible because Direct Consolidation Loans are a type of Direct Loan that can be treated as such for borrower defense purposes.  However, because the Department is limited by statute to discharging and refunding no more than the amount of the Direct Loan at issue, and because the Department will not have received funds previously repaid to a private loan holder, only discharge of the remaining balance on the consolidated loan will be available through this route.  Any return of funds paid back on FFEL loans to private holders would have to be pursued with such holders directly.  In addition, no return of amounts paid on Perkins loans will be available.

4

Prior to consolidation, the Department will provide FFEL and Perkins borrower defense claimants with the opportunity to obtain a pre-determination with respect to whether they are eligible for relief under the Direct Loan regulations.  For FFEL and Perkins borrower defense claimants who are determined to be eligible, the Department will advise such borrowers to consolidate their loans to obtain relief and will inform them that relief cannot be granted until the loans are consolidated.  For FFEL and Perkins borrowers who have already filed borrower defense claims, the Department is in the process of reviewing those claims, and no further action is required by those claimants at this time.  The Department will continue to develop further guidance for FFEL and Perkins borrowers who wish to file borrower defense applications.

### E.  Federal Tax Implications

The United States Department of the Treasury (Treasury) has analyzed the federal income tax implications of BD relief for students who attended CCI schools and, as a result, has issued a revenue procedure concluding that such students do not need to include discharged amounts in their taxable income.  This revenue procedure is available at https://www.irs.gov/pub/irs-drop/rp-15-57.pdf.

It should be emphasized that the revenue procedure mentioned above applies only to students who attended CCI schools.  BD relief to borrowers whose loans relate to programs at other schools may have different and possibly adverse tax consequences.  The Department urges potential recipients of such relief to consult competent tax advisors.  The Department will communicate with Treasury regarding the number of BD claims relating to other schools and provide borrowers with information as appropriate.

## III.    The Department's Outreach Activities

The Department is making numerous efforts to reach borrowers who may be eligible for loan discharges under the CCI job placement rate findings, and continues to work to improve its outreach efforts.  This outreach consists of multiple rounds of emails and postal mail to CCI borrowers who had their first loan disbursement as early as January 1, 2010.  This includes email and postal mail to over 280,000 Everest and WyoTech borrowers and over 55,000 Heald borrowers.  The average open rate for these email campaigns ranges between approximately 30% and 40% depending on the specific group of borrowers (for example, the open rate is lower for campaigns in which borrowers are receiving an email for the second time).  These open rates are significantly higher than the average open rates for government and education industry email campaigns generally.  Notably, the Department has refined these outreach efforts based on its experience with outreach to Heald borrowers.  For example, the Department expanded its

5

outreach to include parent PLUS borrowers and enhanced the overall readability of the communications.

In addition, the Department is working closely with numerous state attorneys general who plan to contact borrowers in their states about BD through a variety of means, including telephone calls, postal mail, and/or email.  The Department expects that a number of states will soon be actively participating in CCI Borrower Defense outreach.  The Illinois and Maryland AGs' offices, among others, have been instrumental in helping to organize these outreach partnerships. The Department also will soon launch a Facebook ad pilot designed to test whether social media is an effective means of reaching borrowers – many of whom may not regularly check email and/or postal mail.  In addition, the Department is exploring a comprehensive servicer outreach pilot to determine whether BD outreach might be improved when also conducted by servicers.

Finally, the Department has developed a "universal" BD application form to facilitate BD applications from all borrowers, regardless of their schools or alleged bases for BD relief.  Once released, the form will standardize and simplify the BD application process for students who are not covered by specific ED findings.  ED expects this form to become the primary means by which non-findings based BD claims are submitted going forward.  The universal form has been published in the Federal Register at 81 Fed. Reg. 41530, and is pending required Paperwork Reduction Act clearance.  The Department invites interested persons to submit comments on the form by August 26, 2016.  To access and review the form and all related documents, please visit *http://www.regulations.gov* and search the Docket ID number ED–2016–ICCD–0075.

## IV.    CCI Closed School Claims

As discussed in my prior report, a significant number of former CCI students who were enrolled at or around the time the colleges ceased operations have elected to seek a closed school discharge.  As of June 24, 2016, CCI borrowers have filed 12,254 applications for closed school relief.  Of those, 7,386 were eligible for relief, resulting in $97,613,625 of relief to borrowers, approximately 60 are still pending, and the remaining applications were not eligible under the closed school discharge requirements because, among other things, applicants graduated or withdrew prior to the June 20, 2014 deadline.  FSA continues to work through closed school discharge applications and anticipates additional relief to be granted in the coming months.

Approved closed school applications from CCI students break down as follows:

| School | Applications Received as of June 24, 2016 | Applications Granted as of June 24, 2016 | Loan Amounts |
|---|---|---|---|
| Heald | 7,253 | 4,722 | $69,187,570 |
| Everest | 3,607 | 2,167 | $24,420,435 |
| WyoTech | 1,394 | 497 | $4,005,620 |
| **Total** | **12,254** | **7,386** | **$97,613,625** |

## V.    The Department's Proposed Borrower Defense Regulations

To further protect borrowers and taxpayers, the Department recently announced new proposed borrower defense regulations.  These regulations, which followed an extensive negotiated rulemaking process, would clarify, simplify, and strengthen the existing regulations that have governed borrower defense during my tenure as Special Master.  The proposed regulations would create an improved process for borrowers who have been wronged, as well as create a process for group-wide loan discharges, which could be granted with or without applications from borrowers, when groups of students have been subject to misconduct.  The proposed regulations also establish triggers that would require institutions to put up funds if events occur that indicate they are at financial risk.  In addition, the proposed regulations would make it simpler for eligible students to receive closed-school discharges.

As set forth in my first report in September 2015, my paramount goal as Special Master was to help develop a fair, transparent, and efficient system for providing debt relief to deserving borrowers.  I believe that the proposed regulations would go a long way toward making this goal a reality.

The proposed regulations were published in the Federal Register on June 16, 2016 and the public comment period ends August 1, 2016. The Department will publish final regulations by November 1, 2016.

## VI.    Conclusion

The BD program has made progress, but much remains to be done.  To that end, the new Enforcement Office continues to grow, hiring additional attorneys and support staff to work on borrower defense, investigations, and related matters to accelerate progress on providing relief to defrauded borrowers.  Under new and able leadership, and with additional resources, the BD Team expects, in the coming months, to begin adjudicating CCI claims that are not based on job placement rate findings, as well as claims by borrowers from schools other than CCI.  Overall, by housing the BD program within the FSA Enforcement Office, the Department has made the program a permanent part of its broader effort to ensure greater accountability in Title IV lending.

As stated in previous reports, these efforts require close collaboration with a wide range of stakeholders, including state attorneys general, federal law enforcement agencies, advocates for students, members of Congress, and others.  Interaction with these stakeholders has been critical to the BD program's progress, and I hope and trust that it will continue.

In closing, I will take the liberty of expressing a personal opinion.  I have led a fortunate life because of education.  The privileges I have enjoyed and do enjoy are due to the educational attainments of my parents and grandparents and the opportunities that they gave me to get an education.  As a citizen and taxpayer, I can think of no better use of public funds than the opening of educational opportunity to all Americans.

Unfortunately, although the college investment still pays off for most students who graduate, any students that enroll in colleges that engage in the deceptive, fraudulent practices evidenced at CCI risk having their investment do more harm than good – leaving them with worthless degrees and substantial debt.  This result not only harms the students affected, it harms our country as a whole.  I am confident that the creation of the Enforcement Office and growth of the BD program—along with numerous other ED efforts, including gainful employment, increased accreditor accountability, and others—will go a long way toward ensuring that that the federal student loan program does what it was designed to do:  help students build a better life for themselves, their families, and the nation.


***


If any individual wishes to assert a defense to repayment of his or her federal student loan(s), please submit materials via email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 194407, San Francisco, CA 94119.

Information regarding what to include in your borrower defense application is provided at: StudentAid.gov/borrower-defense.

# EXHIBIT 6

**Federal Student Aid Enforcement Office**
**Report on Borrower Defense**
**October 28, 2016**

This is the first periodic report of the Federal Student Aid ("FSA") Enforcement Office regarding the work of its Borrower Defense Unit ("BD Unit"). The Enforcement Office assumed management of borrower defense in June 2016, taking over responsibilities that had previously been assigned to the Special Master. Since then, due to the Department of Education's ongoing outreach efforts to former students of Corinthian Colleges, Inc. ("Corinthian" or "CCI"), there has been a considerable increase in borrower defense claims. Accordingly, the BD Unit's focus has been to accelerate adjudication of the rapidly increasing number of claims based on the Department's findings concerning Corinthian's misleading job placement rates ("findings claims"), as well as to initiate adjudication of claims filed by Corinthian students based on other allegations of misconduct ("non-findings claims"). To that end, as detailed below, since the issuance of the Special Master's fourth and final report of June 29, 2016, the Department has approved an additional 11,822 findings claims for a total of more than 15,000 findings claim approvals, constituting a total of $247,370,853 of relief. At the current pace, the Department expects to resolve all pending eligible findings claims by spring 2017. The Department also has identified its first approvals of non-findings claims for students harmed by CCI misrepresentations that their credits were generally transferable to other institutions.

This report will focus on: (1) the ongoing development of the Borrower Defense Unit to meet the demands of submitted claims; (2) the growth of claims submitted and the Department's progress toward resolving those claims; and (3) the Department's borrower defense outreach efforts. The report also will provide an update on closed school discharges for former CCI students.[1]

## I.       FSA Enforcement's Borrower Defense Unit

As stated in the June 29 report, the Borrower Defense Unit is now under the supervision of FSA's new Enforcement Office. Chief Enforcement Officer Robert Kaye and Deputy Chief Enforcement Officer Laura Kim lead the Office, which encompasses four divisions: Borrower Defense, Investigations, Administrative Actions and Appeals, and the Clery Group. The work of the Borrower Defense Unit will be enhanced by its close interactions with its sister units, which all work to quickly and efficiently identify misconduct at institutions receiving Title IV aid and take appropriate action to protect students and taxpayers.

On October 17, Colleen Nevin joined the Enforcement Office as the new Director of the Borrower Defense Unit, where she oversees a team dedicated to investigating and adjudicating borrower defense claims. Nevin joins the Department after working most recently as an Assistant Attorney General at the Massachusetts Attorney General's Office, where she investigated and civilly prosecuted consumer protection violations.

---

[1] While the Enforcement Office does not process closed school discharge applications, we include this information because we recognize that many stakeholders are interested in updated information about the issuance of closed school relief to eligible Corinthian students.

000392

In addition, to meet the rapid increase in claims, the BD Unit also recently added contract attorneys and analysts, on a temporary basis, to assist with ongoing claim review. These additional resources have contributed to the Unit's substantial progress resolving claims.

## II.    Borrower Defense Claims

### a.  Claims Received

As a result of the ongoing outreach efforts to borrowers detailed below, the Department has seen a large increase in the number of claims submitted. Significantly, the recent postal mail campaign to Everest and WyoTech borrowers nearly doubled the total number of claims received. The Department has now received a total of approximately 82,000 claims.[2] Once a claim is submitted and processed through intake, borrowers' loans are placed in forbearance or stopped collections until their claim is resolved, unless they opt-out.[3]

Based on the number of claims that have been processed through intake, approximately 60% of the Corinthian claims have been filed by borrowers who enrolled in CCI schools during the time periods covered by the Department's findings. Many of these claims are from borrowers who attended programs that the Department found had been publicized with misleading job placement rates. All of these claims that are not granted on the basis of the Department's findings will also be reviewed to determine whether relief is warranted on other bases. We also have more than 4,000 pending applications from borrowers who attended non-CCI schools.

### b.  Claims Adjudicated

#### i.   Corinthian Findings Claims

As of the last report on June 29th, the Department had approved a total of 3,787 claims based on the Department's findings. As of October 12, the Department has approved an additional 11,822 findings claims. Details on the amount of the discharges associated with these claims are in the table below. Assuming the current rate of approval is sustained, the Department expects to resolve all pending eligible findings claims by the spring of 2017.

| School | Findings Claims Approved for Discharge through 10/12/16 | Total Amount of Loans Approved for Discharge through 10/12/16 |
|---|---|---|
| Heald | 5,490 | $104,085,830 |
| Everest | 8,146 | $116,874,687 |
| WyoTech | 2,058 | $26,410,336 |
| **Total** | **15,694**[4] | **$247,370,853** |

---

[2] This total number may include some duplicate or incomplete claims that will not be identified until all of the claims have been processed through intake.

[3] Note that, in limited circumstances, borrowers will not be placed in forbearance because they are still in their grace period, or otherwise in a status where forbearance would not be beneficial.

[4] This number is higher than the total number of findings applications approved because some borrowers attended multiple schools.

2

### ii.   Corinthian Non-Findings Claims

In addition to this significant progress on findings claims, the BD Unit also has made progress on the pending non-findings claims submitted by former Corinthian students. The BD Unit has conducted a thorough investigation into the practices of Corinthian personnel, including reviewing thousands of pages of internal documents, documents obtained from other state and federal agencies, publicly available documents, as well as the personal narratives contained in thousands of borrower defense applications. Based on this work, the BD Unit has identified the most common categories of claims made by CCI borrowers and whether and under what circumstances borrowers should qualify for relief on the basis of the claim. While these efforts are ongoing, the Department is now prepared to issue relief for the first category of such claims.

At the time of this publication, the BD Unit has identified 293 claims for approval on the basis of misrepresentations CCI made about the general transferability of its credits. These applicants will be eligible for relief subject to the applicable state statute of limitations. Although this is a limited number compared to the universe of claims, additional claims alleging this misrepresentation will now be processed for relief.

### iii.   Denial of Claims Not Eligible for Borrower Defense

Finally, in addition to the approvals noted above, the BD Unit also has resolved 245 claims that do not qualify for relief. These claims are being denied because the claims are not eligible under the Department's findings (*e.g.*, the applicants did not enroll during the findings time periods or did not enroll in eligible programs) and do not allege any other basis for borrower defense relief. The Department will inform these borrowers of the basis for the denial. The Department also will inform borrowers that they may re-apply if they have new information bearing on their claim or if they would like to allege another basis for relief not included in their original application. The Department also is updating its borrower defense hotline to ensure that it can assist these borrowers who may have questions about their loans or the status of their loan forbearance. In addition, for any of these borrowers who may also be eligible for closed school discharge, the Department will inform them of their potential eligibility.

## III.   Outreach to Potentially Eligible Corinthian Borrowers

The Department has pursued various methods to inform borrowers that they may be eligible for borrower defense relief and other forms of loan discharges. In addition to accelerating its adjudication of claims, the Department has expanded its direct outreach to potentially eligible Corinthian borrowers who have not yet submitted applications. As detailed below, this ongoing work includes expanded postal mail outreach, a Facebook advertisement pilot, a servicer pilot that relies on emails, postal mail, phone calls, and texts, an outreach partnership with state attorneys general, and publication of a new "universal form" for public comment. The Department expects that the finalization of the universal form will facilitate future outreach and educational efforts to borrowers who may be eligible for borrower defense relief. Finally, the Department also has made considerable efforts to inform students of recently closed schools about their options, whether through transfer or closed school discharge.

3

### a.  Postal Mail Campaign

Since the last borrower defense report, the Department completed its postal mail campaign to over 280,000 Everest and WyoTech borrowers who enrolled between 2010 and 2014, the period covered by the Department's findings. The Department estimates that this postal campaign yielded over 30,000 additional borrower defense applications.

### b.  Facebook Pilot

The Department also has experimented with new types of outreach. The Department recently conducted a pilot that deployed 219,000 Facebook ads to users who had expressed an interest in Heald College, one of the Corinthian schools. For example, the pilot directed ads to users who had indicated they attended Heald College. Evidence from the pilot suggests that this type of outreach may be effective to direct certain borrowers – including those relying on mobile devices – to relevant information on the Department's website. The Department continues to evaluate the appropriate circumstances for this type of outreach to borrowers.

### c.  Servicer Pilot

Additionally, the Department is launching an outreach pilot with all of its servicers. Through the pilot, each servicer will communicate with a subset of Corinthian borrowers using emails, letters, outbound calls, or texts. The pilot will help the Department determine the efficacy of each of these modes of communication, as well as whether emails and letters from the servicer may be more effective for reaching eligible borrowers than communications directly from the Department. The results of this pilot, which we expect to have this winter, should provide the Department with information to guide its future outreach to students from other institutions.

### d.  Partnership with State Attorneys General

In addition to these internal efforts, the Department also is working closely with state attorneys general from across the country to conduct outreach to former CCI students from their states. These 42 state partners, as well as the Attorney General of the District of Columbia, will use a variety of methods – including email, postal mail, telephone calls, and events – to reach more Corinthian borrowers. The Borrower Defense Unit would like to especially thank the Illinois and Maryland Attorney General's Office for their leadership and coordination of these efforts, as well as the Massachusetts Attorney General's Office, which has already gathered and submitted a large number of claims from borrowers who attended campuses in Massachusetts. The BD Unit thanks all of these state partners for their commitment to helping the eligible borrowers in their states.

### e.  Universal Form

The Department is in the final stages of developing a "universal form" that would provide more guidance to all borrowers on how to apply for borrower defense. The Department revised the form based on the many useful comments received through the first round of required Paperwork Reduction Act clearance and, as of October 17, 2016, is in its second round of comments (see https://www.gpo.gov/fdsys/pkg/FR-2016-09-28/pdf/2016-23400.pdf). The Department expects to publish the final form along with additional guidance about the application process on its website later this year.

4

As noted in the last Special Master report, the universal form also will include detailed information specific to FFEL borrowers. In the meantime, eligible students should visit StudentAid.gov/borrower-defense to learn what to include in a borrower defense submission and how to submit an application. Application materials may be submitted via email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 429060, San Francisco, CA 94142.

## IV.     CCI Closed School Claims

Although it has now been more than a year since the April 27, 2015 closure of Corinthian schools, the Department continues to process claims from former Corinthian students that opt to pursue a closed school discharge. The Department last reported that, as of June 24, CCI borrowers had filed 12,254 applications for closed school relief, of which 7,386 were eligible, resulting in $97,613,625 of relief to borrowers. As of October 12, there are now a total of 13,010 closed school discharge applications that have been received, resulting in 7,858 approvals, for a total of $103,050,594 of relief granted. Approximately 189 closed school discharge applications are pending. To date, 4,963 applicants for closed school discharge (38%) have been denied relief, most commonly because:  (1) the application was incomplete; (2) the borrower withdrew from their program prior to the June 20, 2014 deadline; or (3) the borrower completed their program of study (either at the closed school or another school to which they were able to transfer their credits). The chart below shows the number of claims granted by school.

| School | Applications Received as of October 8 | Applications Granted as of October 12 | Total Loans Approved for Discharge |
| --- | --- | --- | --- |
| Heald | 7,623 | 5,062 | $73,321,497 |
| Everest | 3,929 | 2,282 | $25,544,812 |
| WyoTech | 1,458 | 514 | $4,184,285 |
| **Total** | **13,010** | **7,858** | **$103,050,594** |

The Department is also taking steps to ensure that all Corinthian borrowers who are eligible for a closed school discharge receive that discharge. Through the Borrower Defense final rule, the Secretary is exercising his authority to implement new and amended regulations specific to automatic closed school discharges on a faster timeline than other elements of the new regulation. As a result, all Corinthian borrowers who may be eligible for closed school discharge stand to benefit from a streamlined discharge process over the next year.

## V.      Conclusion

Adjudicating borrower defense claims is an important part of the Department's ongoing efforts to protect students and ensure greater accountability among institutions receiving federal student aid. While the Department has laid a strong foundation for this process, much work remains ahead — not only for former Corinthian students but also for students subject to misconduct by other institutions. This work includes implementation of the Department's final Borrower Defense rule, which goes into effect on July 1, 2017, and creates a new federal standard for borrowers whose loans disbursed on or after that date. The Enforcement Office looks forward to working with its stakeholders to ensure that the BD program fulfills its mission and the important goals of the new regulation. To that end, the Enforcement Office will continue to publish periodic reports on the Borrower Defense program and its work on behalf of students and taxpayers.

5

# EXHIBIT 7

## Borrower Defense - Quarterly Report - for quarter end 12/31/2018*

| | | | |
|---|---|---|---|
| Total Received Claims | 218,366 | Percentage of the total approved claims receiving partial discharge | 31.3% |
| Total Pending Claims | 158,110 | Percentage of the total approved claims receiving 100% discharge | 68.7% |
| Total Approved Claims | 47,942 | Total dollar amount of outstanding debt prior to discharge | $ 602,445,930 |
| Total Denied Claims | 9,077 | Median dollar amount of outstanding debt prior to discharge | $ 11,542 |
| Total Closed Claims | 3,237 | Median loan debt remaining for claims receiving partial discharge | $ 7,851 |
| Total Amount Discharged | $534,765,563 | | |

**State Level Breakouts:**

| Total Received | | Total Pending | | Total Approved | | Total Denied | | Total Closed | | Total Amount Discharged | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower State of Residence | Total Received | Borrower State of Residence | Pending | Borrower State of Residence | Approved | Borrower State of Residence | Denied | Borrower State of Residence | Closed | Borrower State of Residence | Total Discharged |
| TOTAL | 218,366 | TOTAL | 158,110 | TOTAL | 47,942 | TOTAL | 9,077 | TOTAL | 3,237 | TOTAL | $ 534,765,562.65 |
| CA | 49,804 | CA | 31,971 | CA | 15,047 | CA | 1,683 | CA | 1,103 | CA | $ 181,534,401.68 |
| FL | 18,201 | FL | 13,864 | MA | 3,857 | IL | 1,039 | TX | 184 | FL | $ 42,988,608.01 |
| TX | 16,768 | TX | 12,158 | TX | 3,464 | TX | 962 | FL | 171 | MA | $ 30,668,620.67 |
| IL | 11,242 | IL | 8,335 | FL | 3,230 | FL | 936 | GA | 138 | TX | $ 25,655,187.48 |
| GA | 9,559 | GA | 7,018 | WA | 2,289 | GA | 528 | IL | 141 | GA | $ 21,052,060.65 |
| WA | 7,878 | OH | 5,558 | GA | 1,875 | WA | 486 | HI | 119 | WA | $ 18,933,759.95 |
| MA | 6,366 | NY | 5,290 | IL | 1,727 | MI | 318 | MA | 107 | IL | $ 14,977,816.71 |
| OH | 6,611 | WA | 4,991 | MI | 1,463 | PA | 278 | OH | 90 | NC | $ 14,869,392.57 |
| NY | 6,219 | PA | 4,665 | VA | 1,039 | VA | 245 | WA | 112 | MI | $ 14,153,986.21 |
| PA | 6,001 | NC | 4,400 | NC | 976 | MD | 241 | MN | 48 | HI | $ 12,586,220.53 |
| MI | 5,867 | MI | 4,031 | PA | 972 | OR | 210 | PA | 86 | PA | $ 12,221,509.98 |
| NC | 5,577 | VA | 3,789 | HI | 913 | CO | 163 | NC | 86 | OR | $ 10,492,103.89 |
| VA | 5,138 | IN | 3,487 | OH | 841 | NV | 162 | VA | 65 | OH | $ 10,464,714.95 |
| IN | 4,205 | AZ | 3,332 | OR | 836 | NY | 160 | NY | 70 | VA | $ 10,213,706.62 |
| MO | 4,068 | MO | 3,137 | CO | 774 | IN | 159 | MI | 55 | NY | $ 9,693,154.96 |
| CO | 3,647 | NJ | 2,859 | MO | 729 | HI | 155 | MO | 64 | CO | $ 8,620,865.33 |
| AZ | 3,717 | MN | 2,774 | NY | 699 | MO | 138 | MS | 52 | MO | $ 7,151,531.27 |
| MN | 3,502 | CO | 2,684 | MN | 643 | OH | 122 | OR | 39 | NV | $ 6,375,114.85 |
| NJ | 3,517 | MD | 2,537 | IN | 522 | NC | 115 | WI | 46 | SC | $ 6,033,202.05 |
| OR | 3,281 | TN | 2,527 | NJ | 515 | WI | 105 | IN | 37 | IN | $ 5,863,531.95 |
| MD | 3,178 | NV | 2,309 | NV | 433 | NJ | 103 | MD | 31 | TN | $ 5,714,017.12 |
| TN | 2,949 | NV | 2,253 | SC | 382 | MA | 93 | NJ | 40 | MD | $ 5,222,338.59 |
| NV | 2,881 | OR | 2,196 | MD | 369 | AZ | 58 | NV | 33 | MS | $ 4,884,963.73 |
| HI | 2,533 | WI | 2,147 | TN | 359 | SC | 57 | AL | 33 | MN | $ 4,859,558.93 |
| WI | 2,529 | AL | 1,837 | MS | 342 | UT | 48 | Less than 30 | 287 | NJ | $ 4,527,620.08 |
| SC | 2,305 | SC | 1,674 | AL | 307 | WV | 47 | | | AL | $ 4,442,080.99 |
| AL | 2,047 | KY | 1,669 | AZ | 307 | TN | 45 | | | LA | $ 4,015,068.21 |
| KY | 1,891 | LA | 1,403 | LA | 273 | LA | 44 | | | AZ | $ 3,850,660.42 |
| LA | 1,733 | HI | 1,346 | AR | 235 | DC | 42 | | | KY | $ 3,021,453.11 |
| MS | 1,558 | UT | 1,144 | WI | 231 | MS | 38 | | | WI | $ 2,842,268.55 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| UT | 1,381 | MS | 1,126 | WV | 230 | MN | 37 | AR | $ 2,693,604.27 |
| OK | 1,211 | OK | 1,041 | UT | 182 | AL | 33 | WV | $ 2,475,106.47 |
| KS | 1,126 | KS | 964 | KY | 177 | Less than 30 | 227 | KS | $ 2,074,560.94 |
| WV | 1,044 | AR | 815 | IA | 147 | | | UT | $ 1,821,799.26 |
| AR | 1,086 | CT | 774 | KS | 138 | | | IA | $ 1,681,706.17 |
| IA | 872 | WV | 743 | OK | 137 | | | OK | $ 1,618,205.02 |
| CT | 927 | IA | 698 | CT | 130 | | | CT | $ 1,467,437.04 |
| NM | 754 | NM | 658 | ID | 109 | | | ID | $ 1,242,733.49 |
| ID | 713 | ID | 590 | WY | 109 | | | NE | $ 1,050,694.52 |
| NE | 599 | NE | 481 | NE | 101 | | | NM | $ 1,023,915.71 |
| DC | 505 | DC | 373 | NH | 97 | | | WY | $ 1,023,544.83 |
| NH | 404 | NH | 295 | NM | 87 | | | DE | $ 997,436.54 |
| DE | 372 | DE | 286 | DC | 81 | | | NH | $ 975,557.41 |
| MT | 343 | MT | 265 | FC | 71 | | | FC | $ 918,270.21 |
| WY | 314 | ME | 245 | DE | 70 | | | MT | $ 889,873.78 |
| ME | 319 | RI | 227 | MT | 64 | | | DC | $ 797,027.97 |
| SD | 271 | SD | 211 | ME | 62 | | | AK | $ 688,927.93 |
| RI | 278 | WY | 194 | AK | 56 | | | ME | $ 685,577.58 |
| AK | 238 | ND | 177 | SD | 49 | | | RI | $ 612,236.75 |
| ND | 225 | AK | 169 | RI | 46 | | | SD | $ 559,249.52 |
| FC | 190 | FC | 97 | ND | 43 | | | ND | $ 432,409.52 |
| VT | 124 | VT | 81 | VT | 36 | | | VI | $ 357,365.20 |
| PR | 73 | PR | 63 | Less than 30 | 71 | | | VT | $ 300,486.42 |
| VI | 64 | AE | 37 | | | | | AE | $ 134,933.88 |
| AE | 51 | VI | 39 | | | | | GU | $ 133,610.94 |
| Less than 30 | 110 | Less than 30 | 76 | | | | | Less than $100,000 | $ 179,611.24 |

NOTES*

Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate claims. As a result, the methodology of this report now excludes duplicate applications. Due to this change, it is possible that the counts of claims in various categories may decrease from previous quarters' reports.

Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.

As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the aggregate data is provided on a quarterly basis, but the state data biannually due to small numbers of applications.

All dollar amounts and percent elements in the 12/31/2018 Quarterly report that are unchanged from the 9/30/2018 Quarterly report reflect the fact that ED deferred processing of discharges during this quarter as a result of ongoing litigation. This includes the values referenced: Total Amount Discharged, Percentage of the total approved claims receiving partial discharge, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge and Median loan debt remaining for claims receiving partial discharge.

Data Descriptions:

Total Received Claims: Total count of applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.

Total Denied Claims: Total count of applications that ED reviewed and signed off as denied applications.

Total Closed Claims: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application.)

Total Pending Claims: Total count of applications under review prior to a determination.

Total Approved Claims: Total count of applications approved for discharge.

Total Amount of Discharges: Total dollar amount associated with discharged applications.

Sources:

CEMS Borrower Defense System

NSLDS (National Student Loan Data System)

**Borrower Defense - Quarterly Report - for quarter end 6/30/2019***

| | | | |
|---|---|---|---|
| Total Received Applications | 272,721 | Percentage of the total approved applications receiving partial discharge | 31.3% |
| Total Pending Applications | 210,168 | Percentage of the total approved Applications receiving 100% discharge | 68.7% |
| Total Approved Applications | 47,942 | Total dollar amount of outstanding debt prior to discharge | $ 602,445,930 |
| Total Denied Applications | 9,077 | Median dollar amount of outstanding debt prior to discharge | $ 11,542 |
| Total Closed Applications | 5,534 | Median loan debt remaining for applications receiving partial discharge | $ 7,851 |
| Total Amount Discharged | $534,765,563 | | |

**State Level Breakouts:**

### Total Received

| Borrower State of Residence | Total Received | Change since Last Quarter |
|---|---|---|
| TOTAL | 272,721 | 32,784 |
| California | 58,221 | 5,510 |
| Florida | 23,089 | 2,967 |
| Texas | 21,413 | 2,823 |
| Illinois | 13,918 | 1,558 |
| Georgia | 12,153 | 1,540 |
| Washington | 9,369 | 970 |
| Ohio | 8,505 | 1,077 |
| Pennsylvania | 8,014 | 1,128 |
| New York | 8,010 | 1,071 |
| Michigan | 7,535 | 1,016 |
| North Carolina | 7,096 | 886 |
| Massachusetts | 7,081 | 431 |
| Virginia | 6,372 | 714 |
| Indiana | 5,428 | 710 |
| Missouri | 5,320 | 709 |
| Arizona | 4,938 | 701 |
| Colorado | 4,596 | 575 |
| New Jersey | 4,554 | 655 |
| Minnesota | 4,466 | 647 |
| Maryland | 4,175 | 570 |
| Tennessee | 4,112 | 659 |
| Oregon | 3,934 | 371 |
| Nevada | 3,634 | 470 |
| Wisconsin | 3,233 | 457 |
| South Carolina | 3,145 | 435 |
| Alabama | 2,905 | 469 |
| Hawaii | 2,767 | 139 |
| Kentucky | 2,642 | 453 |
| Louisiana | 2,307 | 364 |
| Mississippi | 2,133 | 386 |
| Utah | 1,729 | 222 |
| Oklahoma | 1,662 | 260 |
| Kansas | 1,478 | 220 |
| Arkansas | 1,437 | 231 |
| West Virginia | 1,334 | 162 |
| Connecticut | 1,181 | 143 |
| Iowa | 1,159 | 155 |
| New Mexico | 989 | 156 |
| Idaho | 944 | 128 |
| Nebraska | 795 | 106 |
| District of Columbia | 636 | 78 |
| New Hampshire | 505 | 58 |
| Delaware | 472 | 62 |
| Montana | 447 | 72 |
| Maine | 425 | 56 |
| Wyoming | 383 | 39 |
| Rhode Island | 368 | 52 |
| South Dakota | 346 | 47 |
| Alaska | 290 | 23 |
| North Dakota | 266 | 41 |
| Foreign Country | 211 | 21 |
| Vermont | 154 | 17 |
| Puerto Rico | 108 | 24 |
| US Virgin Islands | 76 | 12 |
| Armed Forces Europe | 68 | 17 |
| Federated Micronesia | 32 | - |
| Armed Forces Pacific | 30 | - |
| Less than 30 | 131 | (69) |

### Total Pending

| Borrower State of Residence | Pending | Change since Last Quarter |
|---|---|---|
| TOTAL | 210,168 | 30,791 |
| California | 39,802 | 4,981 |
| Florida | 18,585 | 2,817 |
| Texas | 16,638 | 2,683 |
| Illinois | 10,908 | 1,469 |
| Georgia | 9,494 | 1,450 |
| Ohio | 7,378 | 1,016 |
| New York | 6,999 | 1,002 |
| Pennsylvania | 6,616 | 1,080 |
| Washington | 6,424 | 912 |
| North Carolina | 5,848 | 828 |
| Michigan | 5,645 | 962 |
| Virginia | 4,983 | 674 |
| Indiana | 4,663 | 663 |
| Arizona | 4,518 | 671 |
| Missouri | 4,346 | 666 |
| New Jersey | 3,873 | 632 |
| Minnesota | 3,696 | 605 |
| Colorado | 3,608 | 553 |
| Tennessee | 3,658 | 634 |
| Maryland | 3,496 | 532 |
| Massachusetts | 2,967 | 374 |
| Nevada | 2,982 | 446 |
| Oregon | 2,815 | 337 |
| Wisconsin | 2,830 | 436 |
| South Carolina | 2,661 | 421 |
| Alabama | 2,505 | 442 |
| Kentucky | 2,402 | 436 |
| Louisiana | 1,953 | 334 |
| Hawaii | 1,554 | 113 |
| Mississippi | 1,665 | 350 |
| Utah | 1,472 | 205 |
| Oklahoma | 1,475 | 248 |
| Kansas | 1,307 | 211 |
| Arkansas | 1,148 | 216 |
| Connecticut | 1,019 | 135 |
| West Virginia | 1,024 | 153 |
| Iowa | 974 | 148 |
| New Mexico | 890 | 153 |
| Idaho | 816 | 125 |
| Nebraska | 670 | 101 |
| District of Columbia | 494 | 71 |
| New Hampshire | 392 | 54 |
| Delaware | 382 | 60 |
| Montana | 366 | 69 |
| Maine | 347 | 52 |
| Rhode Island | 312 | 48 |
| South Dakota | 286 | 47 |
| Wyoming | 262 | 38 |
| Alaska | 218 | 20 |
| North Dakota | 216 | 39 |
| Foreign Country | 116 | 19 |
| Vermont | 109 | 15 |
| Puerto Rico | 97 | 23 |
| US Virgin Islands | 51 | 12 |
| Armed Forces Europe | 54 | 17 |
| Less than 30 | 159 | (7) |

### Total Approved

| Borrower State of Residence | Approved | Change since Last Quarter |
|---|---|---|
| TOTAL | 47,942 | NA |
| California | 15,047 | NA |
| Massachusetts | 3,857 | NA |
| Texas | 3,464 | NA |
| Florida | 3,230 | NA |
| Washington | 2,289 | NA |
| Georgia | 1,875 | NA |
| Illinois | 1,727 | NA |
| Michigan | 1,463 | NA |
| Virginia | 1,039 | NA |
| North Carolina | 976 | NA |
| Pennsylvania | 972 | NA |
| Hawaii | 913 | NA |
| Ohio | 841 | NA |
| Oregon | 836 | NA |
| Colorado | 774 | NA |
| Missouri | 729 | NA |
| New York | 699 | NA |
| Minnesota | 643 | NA |
| Indiana | 522 | NA |
| New Jersey | 515 | NA |
| South Carolina | 382 | NA |
| Maryland | 369 | NA |
| Tennessee | 359 | NA |
| Mississippi | 342 | NA |
| Alabama | 307 | NA |
| Arizona | 307 | NA |
| Louisiana | 273 | NA |
| Arkansas | 235 | NA |
| Wisconsin | 231 | NA |
| West Virginia | 230 | NA |
| Utah | 182 | NA |
| Kentucky | 177 | NA |
| Iowa | 147 | NA |
| Kansas | 138 | NA |
| Oklahoma | 137 | NA |
| Connecticut | 130 | NA |
| Idaho | 109 | NA |
| Wyoming | 109 | NA |
| Nebraska | 101 | NA |
| New Hampshire | 97 | NA |
| New Mexico | 87 | NA |
| District of Columbia | 81 | NA |
| Foreign Country | 71 | NA |
| Delaware | 70 | NA |
| Montana | 64 | NA |
| Maine | 62 | NA |
| Alaska | 56 | NA |
| South Dakota | 49 | NA |
| Rhode Island | 44 | NA |
| North Dakota | 43 | NA |
| Vermont | 36 | NA |
| Less than 30 | 71 | NA |

### Total Denied

| Borrower State of Residence | Denied | Change since Last Quarter |
|---|---|---|
| TOTAL | 9,077 | NA |
| California | 1,683 | NA |
| Illinois | 1,039 | NA |
| Texas | 962 | NA |
| Florida | 936 | NA |
| Georgia | 528 | NA |
| Washington | 486 | NA |
| Michigan | 318 | NA |
| Pennsylvania | 278 | NA |
| Virginia | 245 | NA |
| Maryland | 241 | NA |
| Oregon | 210 | NA |
| Colorado | 163 | NA |
| Nevada | 162 | NA |
| New York | 160 | NA |
| Indiana | 159 | NA |
| Hawaii | 155 | NA |
| Missouri | 138 | NA |
| Ohio | 122 | NA |
| North Carolina | 115 | NA |
| Wisconsin | 105 | NA |
| New Jersey | 103 | NA |
| Massachusetts | 93 | NA |
| Arizona | 58 | NA |
| South Carolina | 57 | NA |
| Utah | 48 | NA |
| West Virginia | 47 | NA |
| Tennessee | 45 | NA |
| Louisiana | 44 | NA |
| District of Columbia | 42 | NA |
| Mississippi | 38 | NA |
| Minnesota | 37 | NA |
| Alabama | 33 | NA |
| Less than 30 | 227 | NA |

### Total Closed

| Borrower State of Residence | Closed | Change since Last Quarter |
|---|---|---|
| TOTAL | 5,534 | 1,993 |
| California | 1,689 | 529 |
| Texas | 349 | 140 |
| Florida | 338 | 150 |
| Georgia | 256 | 90 |
| Illinois | 244 | 89 |
| Washington | 170 | 58 |
| Massachusetts | 164 | 57 |
| Ohio | 164 | 61 |
| North Carolina | 157 | 58 |
| New York | 152 | 69 |
| Pennsylvania | 148 | 48 |
| Michigan | 145 | 26 |
| Missouri | 107 | 43 |
| Virginia | 105 | 40 |
| Minnesota | 90 | 42 |
| Mississippi | 88 | 36 |
| Indiana | 84 | 47 |
| Nevada | 73 | 34 |
| Oregon | 73 | 34 |
| Maryland | 69 | 38 |
| Wisconsin | 67 | 21 |
| New Jersey | 63 | 23 |
| Alabama | 60 | 27 |
| Nevada | 57 | 24 |
| **Arizona | 55 | 55 |
| **Colorado | 55 | 51 |
| **Tennessee | 50 | 50 |
| South Carolina | 45 | 14 |
| **Louisiana | 37 | 37 |
| **Kentucky | 35 | 35 |
| **West Virginia | 33 | 33 |
| **Arizona | 30 | 30 |
| Less than 30 | 215 | (151) |

### Total Amount Discharged

| Borrower State of Residence | Total Discharged | Change since Last Quarter |
|---|---|---|
| TOTAL | 534,765,563 | NA |
| California | $ 181,534,402 | NA |
| Florida | $ 42,988,608 | NA |
| Massachusetts | $ 30,668,621 | NA |
| Texas | $ 25,655,187 | NA |
| Illinois | $ 14,977,977 | NA |
| North Carolina | $ 14,869,393 | NA |
| Michigan | $ 14,153,986 | NA |
| Hawaii | $ 12,586,221 | NA |
| Pennsylvania | $ 12,221,510 | NA |
| Oregon | $ 10,492,104 | NA |
| Ohio | $ 10,464,715 | NA |
| Virginia | $ 10,213,707 | NA |
| New York | $ 9,693,155 | NA |
| Colorado | $ 8,620,865 | NA |
| Missouri | $ 7,151,531 | NA |
| South Carolina | $ 6,033,202 | NA |
| Indiana | $ 5,863,532 | NA |
| Maryland | $ 5,222,339 | NA |
| Mississippi | $ 4,884,964 | NA |
| Minnesota | $ 4,859,559 | NA |
| New Jersey | $ 4,527,620 | NA |
| Alabama | $ 4,442,081 | NA |
| Louisiana | $ 4,015,068 | NA |
| Kentucky | $ 3,850,660 | NA |
| Wisconsin | $ 3,021,453 | NA |
| Arkansas | $ 2,842,269 | NA |
| Kansas | $ 2,693,604 | NA |
| Utah | $ 2,074,561 | NA |
| Iowa | $ 1,821,799 | NA |
| Oklahoma | $ 1,681,706 | NA |
| Connecticut | $ 1,618,205 | NA |
| Idaho | $ 1,467,437 | NA |
| Nebraska | $ 1,242,733 | NA |
| New Mexico | $ 1,050,695 | NA |
| Wyoming | $ 1,023,916 | NA |
| Delaware | $ 1,023,545 | NA |
| New Hampshire | $ 997,437 | NA |
| Foreign Country | $ 975,557 | NA |
| Montana | $ 918,270 | NA |
| District of Columbia | $ 889,874 | NA |
| Alaska | $ 797,028 | NA |
| Maine | $ 688,928 | NA |
| Rhode Island | $ 685,578 | NA |
| South Dakota | $ 612,237 | NA |
| North Dakota | $ 559,250 | NA |
| Vermont | $ 432,410 | NA |
| US Virgin Islands | $ 357,365 | NA |
| Armed Forces Europe | $ 300,486 | NA |
| Guam | $ 134,934 | NA |
| Guam | $ 133,611 | NA |
| Less than $100,000 | $ 179,611 | NA |

NOTES*

*Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate Applications. As a result, the methodology of this report now excludes duplicate applications.*

*Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.*

*\*\*As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the state data has not been updated in the event that the borrower count has changed less than 10 since the previous report. These changes are included in the bucket, "Less than 30," as to not impact the total numbers.*

*All dollar amounts and percent elements in the 6/30/2019 Quarterly report that are unchanged from the 3/31/2019 Quarterly report reflect the fact that ED deferred processing of discharges during this quarter as a result of ongoing litigation. This includes the values referenced: Total Amount Discharged, Percentage of the total approved Applications receiving partial discharge, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge and Median loan debt remaining for Applications receiving partial discharge.*

*\*\*This is the first time the location reached the 30-application threshold for the indicated status.  Previously, the location was reported in the "Less than 30" category.*

Data Descriptions:

*Total Received Applications: Total count of applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.*

*Total Pending Applications: Total count of applications under review prior to a determination.*

*Total Approved Applications: Total count of applications approved for discharge.*

*Total Denied Applications: Total count of applications that ED reviewed and signed off as denied applications.*

*Total Closed Applications: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application.)*

*Total Amount of Discharges: Total dollar amount associated with discharged applications.*

Sources:

*CEMS Borrower Defense System*
*NSLDS (National Student Loan Data System)*

# Borrower Defense - Quarterly Report - for quarter end 6/30/2018

| | | | |
|---|---|---|---|
| **Total Received Claims** | 165,880 | **Percentage of the total approved claims receiving partial discharge** | **31.3%** |
| **Total Pending Claims** | 105,998 | | |
| **Total Approved Claims** | 47,942 | **Total dollar amount of outstanding debt prior to discharge** | $602,445,930 |
| **Total Denied Claims** | 9,077 | **Median dollar amount of outstanding debt prior to discharge** | $ 11,542 |
| **Total Closed Claims** | 2,863 | **Median loan debt remaining for claims receiving partial discharge** | $ 7,851 |
| **Total Amount Discharged** | $ 534,765,563 | | |

Data Descriptions:

Total Received Claims: Total count of applications received by the Department that have passed initial intake reviews and deemed ready for further review and adjudication.

Total Pending Claims: Total count of applications under review prior to a determination.

Total Approved Claims: Total count of applications approved for discharge.

Total Denied Claims: Total count of applications the Department reviewed and signed off as denied applications.

Total Closed Claims: Total count of applications closed with no need for adjudication. (e.g. duplicate applications; borrower requests that the Department stop processing application.)

Total Amount of Discharges: Total dollar amount associated with discharged applications.

Sources:

Borrower Defense database

NSLDS (National Student Loan Data System)

Federal Servicers (via Borrower Defense Reporting)

Other Notes:

Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.

**Borrower Defense - Quarterly Report - for quarter end 3/31/2019\***

| | | | |
|---|---|---|---|
| Total Received Applications | 239,937 | Percentage of the total approved applications receiving partial discharge | 31.3% |
| Total Pending Applications | 179,377 | Percentage of the total approved Applications receiving 100% discharge | 68.7% |
| Total Approved Applications | 47,942 | Total dollar amount of outstanding debt prior to discharge | $ 602,445,930 |
| Total Denied Applications | 9,077 | Median dollar amount of outstanding debt prior to discharge | $ 11,542 |
| Total Closed Applications | 3,541 | Median loan debt remaining for applications receiving partial discharge | $ 7,851 |
| Total Amount Discharged | $534,765,563 | | |

**State Level Breakouts:**

**Total Received**

| Borrower State of Residence | Total Received | Change since Last Quarter |
|---|---|---|
| TOTAL | 239,937 | 21,571 |
| California | 52,711 | 2,907 |
| Florida | 20,122 | 1,921 |
| Texas | 18,590 | 1,822 |
| Illinois | 12,360 | 1,118 |
| Georgia | 10,613 | 1,054 |
| Washington | 8,399 | 521 |
| Ohio | 7,428 | 817 |
| New York | 6,939 | 720 |
| Pennsylvania | 6,886 | 885 |
| Massachusetts | 6,650 | 284 |
| Michigan | 6,519 | 652 |
| North Carolina | 6,210 | 633 |
| Virginia | 5,658 | 520 |
| Indiana | 4,718 | 513 |
| Missouri | 4,611 | 543 |
| Arizona | 4,237 | 520 |
| Colorado | 4,021 | 374 |
| New Jersey | 3,899 | 382 |
| Minnesota | 3,819 | 317 |
| Maryland | 3,605 | 427 |
| Oregon | 3,563 | 282 |
| Tennessee | 3,453 | 504 |
| Nevada | 3,164 | 283 |
| Wisconsin | 2,776 | 247 |
| South Carolina | 2,710 | 405 |
| Hawaii | 2,628 | 95 |
| Alabama | 2,436 | 389 |
| Kentucky | 2,189 | 298 |
| Louisiana | 1,953 | 220 |
| Mississippi | 1,747 | 189 |
| Utah | 1,507 | 126 |
| Oklahoma | 1,402 | 191 |
| Kansas | 1,258 | 132 |
| Arkansas | 1,206 | 120 |
| West Virginia | 1,172 | 128 |
| Connecticut | 1,038 | 111 |
| Iowa | 1,004 | 132 |
| New Mexico | 833 | 79 |
| Idaho | 816 | 103 |
| Nebraska | 689 | 90 |
| District of Columbia | 558 | 53 |
| New Hampshire | 447 | 43 |
| Delaware | 410 | 38 |
| Montana | 375 | 32 |
| Maine | 369 | 50 |
| Wyoming | 344 | 30 |
| Rhode Island | 316 | 38 |
| South Dakota | 299 | 28 |
| Alaska | 267 | 29 |
| North Dakota | 225 | 0 |
| Foreign Country | 190 | 0 |
| Vermont | 137 | 13 |
| Puerto Rico | 84 | 11 |
| US Virgin Islands | 64 | 0 |
| Armed Forces Europe | 51 | 0 |
| \*\*Federated Micronesia | 32 | 32 |
| \*\*Airmed Forces Pacific | 30 | 30 |
| Less than 30 | 200 | 90 |

**Total Pending**

| Borrower State of Residence | Pending | Change since Last Quarter |
|---|---|---|
| TOTAL | 179,377 | 21,267 |
| California | 34,821 | 2,850 |
| Florida | 15,768 | 1,904 |
| Texas | 13,955 | 1,797 |
| Illinois | 9,439 | 1,104 |
| Georgia | 8,044 | 1,026 |
| Ohio | 6,362 | 804 |
| New York | 5,997 | 707 |
| Pennsylvania | 5,536 | 871 |
| Washington | 5,512 | 521 |
| North Carolina | 5,020 | 620 |
| Michigan | 4,683 | 652 |
| Virginia | 4,309 | 520 |
| Indiana | 4,000 | 513 |
| Arizona | 3,847 | 515 |
| Missouri | 3,680 | 543 |
| New Jersey | 3,241 | 382 |
| Colorado | 3,055 | 371 |
| Tennessee | 3,024 | 497 |
| Maryland | 2,964 | 427 |
| Massachusetts | 2,593 | 284 |
| Nevada | 2,536 | 283 |
| Oregon | 2,478 | 282 |
| Wisconsin | 2,394 | 247 |
| South Carolina | 2,240 | 403 |
| Alabama | 2,063 | 389 |
| Kentucky | 1,966 | 297 |
| Louisiana | 1,619 | 216 |
| Hawaii | 1,441 | 95 |
| Mississippi | 1,315 | 189 |
| Utah | 1,267 | 123 |
| Oklahoma | 1,227 | 186 |
| Kansas | 1,096 | 132 |
| Arkansas | 932 | 117 |
| Connecticut | 884 | 110 |
| West Virginia | 871 | 128 |
| Iowa | 826 | 128 |
| New Mexico | 737 | 79 |
| Idaho | 691 | 101 |
| Nebraska | 569 | 88 |
| District of Columbia | 423 | 50 |
| New Hampshire | 338 | 43 |
| Delaware | 322 | 36 |
| Montana | 297 | 32 |
| Maine | 295 | 50 |
| Rhode Island | 264 | 37 |
| South Dakota | 239 | 28 |
| Wyoming | 224 | 30 |
| Alaska | 198 | 29 |
| North Dakota | 177 | 0 |
| Foreign Country | 97 | 0 |
| Vermont | 94 | 13 |
| Puerto Rico | 74 | 11 |
| US Virgin Islands | 39 | 0 |
| Armed Forces Europe | 39 | 0 |
| Less than 30 | 166 | 90 |

**Total Approved**

| Borrower State of Residence | Approved | Change since Last Quarter |
|---|---|---|
| TOTAL | 47,942 | NA |
| California | 15,047 | NA |
| Massachusetts | 3,857 | NA |
| Texas | 3,464 | NA |
| Florida | 3,230 | NA |
| Washington | 2,289 | NA |
| Georgia | 1,875 | NA |
| Illinois | 1,727 | NA |
| Michigan | 1,463 | NA |
| Virginia | 1,039 | NA |
| North Carolina | 976 | NA |
| Pennsylvania | 972 | NA |
| Hawaii | 913 | NA |
| Ohio | 841 | NA |
| Oregon | 836 | NA |
| Colorado | 774 | NA |
| Missouri | 729 | NA |
| New York | 699 | NA |
| Minnesota | 643 | NA |
| Indiana | 522 | NA |
| New Jersey | 515 | NA |
| Nevada | 433 | NA |
| South Carolina | 382 | NA |
| Maryland | 369 | NA |
| Tennessee | 359 | NA |
| Mississippi | 342 | NA |
| Arizona | 307 | NA |
| Arizona | 307 | NA |
| Louisiana | 273 | NA |
| Arkansas | 235 | NA |
| Wisconsin | 231 | NA |
| West Virginia | 230 | NA |
| Utah | 182 | NA |
| Kentucky | 177 | NA |
| Iowa | 147 | NA |
| Kansas | 138 | NA |
| Oklahoma | 137 | NA |
| Connecticut | 130 | NA |
| Idaho | 109 | NA |
| Wyoming | 109 | NA |
| Nebraska | 101 | NA |
| New Hampshire | 97 | NA |
| New Mexico | 87 | NA |
| District of Columbia | 81 | NA |
| Foreign Country | 71 | NA |
| Delaware | 70 | NA |
| Montana | 64 | NA |
| Maine | 62 | NA |
| Alaska | 56 | NA |
| South Dakota | 49 | NA |
| Rhode Island | 46 | NA |
| North Dakota | 43 | NA |
| Vermont | 36 | NA |
| Less than 30 | 71 | NA |

**Total Denied**

| Borrower State of Residence | Denied | Change since Last Quarter |
|---|---|---|
| TOTAL | 9,077 | NA |
| California | 1,683 | NA |
| Illinois | 1,039 | NA |
| Texas | 962 | NA |
| Florida | 936 | NA |
| Georgia | 528 | NA |
| Washington | 486 | NA |
| Michigan | 318 | NA |
| Pennsylvania | 278 | NA |
| Virginia | 245 | NA |
| Maryland | 241 | NA |
| Oregon | 210 | NA |
| Colorado | 163 | NA |
| Nevada | 162 | NA |
| New York | 160 | NA |
| Indiana | 159 | NA |
| Hawaii | 155 | NA |
| Missouri | 138 | NA |
| Ohio | 122 | NA |
| North Carolina | 115 | NA |
| Wisconsin | 105 | NA |
| New Jersey | 103 | NA |
| Massachusetts | 93 | NA |
| Arizona | 58 | NA |
| South Carolina | 57 | NA |
| Utah | 48 | NA |
| West Virginia | 47 | NA |
| Tennessee | 45 | NA |
| Louisiana | 44 | NA |
| District of Columbia | 42 | NA |
| Mississippi | 38 | NA |
| Minnesota | 37 | NA |
| Alabama | 33 | NA |
| Less than 30 | 227 | NA |

**Total Closed**

| Borrower State of Residence | Closed | Change since Last Quarter |
|---|---|---|
| TOTAL | 3,541 | 304 |
| California | 1,160 | 57 |
| Texas | 209 | 25 |
| Florida | 188 | 17 |
| Georgia | 166 | 28 |
| Illinois | 155 | 14 |
| Hawaii | 119 | 0 |
| Washington | 112 | 0 |
| Massachusetts | 107 | 0 |
| Ohio | 103 | 13 |
| Pennsylvania | 100 | 14 |
| North Carolina | 99 | 13 |
| New York | 83 | 13 |
| Virginia | 65 | 0 |
| Missouri | 64 | 0 |
| Michigan | 55 | 0 |
| Mississippi | 52 | 0 |
| Wisconsin | 48 | 0 |
| New Jersey | 40 | 0 |
| Oregon | 39 | 0 |
| Indiana | 37 | 0 |
| Alabama | 33 | 0 |
| Nevada | 33 | 0 |
| Maryland | 31 | 0 |
| \*\*South Carolina | 31 | 31 |
| Less than 30 | 366 | 79 |

**Total Amount Discharged**

| Borrower State of Residence | Total Discharged | Change since Last Quarter |
|---|---|---|
| TOTAL | $ 534,765,563 | NA |
| California | $ 181,534,402 | NA |
| Florida | $ 42,988,608 | NA |
| Massachusetts | $ 30,668,621 | NA |
| Texas | $ 25,655,187 | NA |
| Georgia | $ 21,052,061 | NA |
| Washington | $ 18,933,760 | NA |
| Illinois | $ 14,977,977 | NA |
| North Carolina | $ 14,869,393 | NA |
| Michigan | $ 14,153,986 | NA |
| Hawaii | $ 12,586,221 | NA |
| Pennsylvania | $ 12,221,510 | NA |
| Oregon | $ 10,492,104 | NA |
| Ohio | $ 10,464,715 | NA |
| Virginia | $ 10,213,707 | NA |
| New York | $ 9,693,155 | NA |
| Colorado | $ 8,620,865 | NA |
| Nevada | $ 6,375,115 | NA |
| South Carolina | $ 6,033,202 | NA |
| Indiana | $ 5,863,532 | NA |
| Tennessee | $ 5,714,017 | NA |
| Maryland | $ 5,222,339 | NA |
| Mississippi | $ 4,884,964 | NA |
| Minnesota | $ 4,859,559 | NA |
| New Jersey | $ 4,527,620 | NA |
| Alabama | $ 4,442,081 | NA |
| Louisiana | $ 4,015,068 | NA |
| Arizona | $ 3,850,660 | NA |
| Kentucky | $ 3,021,453 | NA |
| Wisconsin | $ 2,842,269 | NA |
| Arkansas | $ 2,693,604 | NA |
| West Virginia | $ 2,475,106 | NA |
| Kansas | $ 2,074,561 | NA |
| Utah | $ 1,821,799 | NA |
| Iowa | $ 1,681,706 | NA |
| Oklahoma | $ 1,618,205 | NA |
| Connecticut | $ 1,467,437 | NA |
| Idaho | $ 1,242,733 | NA |
| Nebraska | $ 1,050,695 | NA |
| New Mexico | $ 1,023,916 | NA |
| Wyoming | $ 1,023,545 | NA |
| Delaware | $ 997,437 | NA |
| New Hampshire | $ 975,557 | NA |
| Foreign Country | $ 918,270 | NA |
| Montana | $ 889,874 | NA |
| District of Columbia | $ 797,028 | NA |
| Alaska | $ 688,928 | NA |
| Maine | $ 685,578 | NA |
| Rhode Island | $ 612,237 | NA |
| South Dakota | $ 559,250 | NA |
| North Dakota | $ 432,410 | NA |
| US Virgin Islands | $ 357,365 | NA |
| Vermont | $ 300,486 | NA |
| Armed Forces Europe | $ 134,934 | NA |
| Guam | $ 133,611 | NA |
| Less than $100,000 | $ 179,611 | NA |

NOTES\*

*Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate Applications. As a result, the methodology of this report now excludes duplicate applications. Due to this change, it is possible that the counts of Applications in various categories may decrease from previous quarters' reports.*

*Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.*

As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the state data has not been updated in the event that the borrower count has changed less than 10 since the previous report.  These changes are included in the bucket, "Less than 30," as to not impact the total numbers.

All dollar amounts and percent elements in the 3/31/2019 Quarterly report that are unchanged from the 9/30/2018 Quarterly report reflect the fact that ED deferred processing of discharges during this quarter as a result of ongoing litigation. This includes the values referenced: Total Amount Discharged, Percentage of the total approved Applications receiving partial
**This is the first time the location reached the 30-application threshold for the indicated status.  Previously, the location was reported in the "Less than 30" category.

Data Descriptions:

    *Total Received Applications: Total count of applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.*

    *Total Denied Applications: Total count of applications that ED reviewed and signed off as denied applications.*

    *Total Closed Applications: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application.)*

    *Total Pending Applications: Total count of applications under review prior to a determination.*

    *Total Approved Applications: Total count of applications approved for discharge.*

    *Total Amount of Discharges: Total dollar amount associated with discharged applications.*

Sources:

    *CEMS Borrower Defense System*

    *NSLDS (National Student Loan Data System)*

# Borrower Defense - Quarterly Report - for quarter end 9/30/2018

| | | | | |
|---|---|---|---|---|
| **Total Received Claims** | 200,630 | **Percentage of the total approved claims receiving partial discharg** | | 31.3% |
| **Total Pending Claims** | 139,021 | | | |
| **Total Approved Claims** | 47,942 | **Total dollar amount of outstanding debt prior to discharge** | $ | 602,445,930 |
| **Total Denied Claims** | 9,077 | **Median dollar amount of outstanding debt prior to discharge** | $ | 11,542 |
| **Total Closed Claims** | 4,590 | **Median loan debt remaining for claims receiving partial discharge** | $ | 7,851 |
| **Total Amount Discharged** | $   534,765,563 | | | |

Data Descriptions:

Total Received Claims: Total count of applications received by the Department that have passed initial intake reviews and deemed ready for further review and adjudication.

Total Pending Claims: Total count of applications under review prior to a determination.

Total Approved Claims: Total count of applications approved for discharge.

Total Denied Claims: Total count of applications the Department reviewed and signed off as denied applications.

Total Closed Claims: Total count of applications closed with no need for adjudication. (e.g. duplicate applications; borrower requests that the Department stop processing application.)

Total Amount of Discharges: Total dollar amount associated with discharged applications.

Sources:

Borrower Defense database

NSLDS (National Student Loan Data System)

Federal Servicers (via Borrower Defense Reporting)

Other Notes:

(1) Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.

(2) All dollar amounts and percent elements in the 9/30/2018 Quarterly report that are unchanged from the 6/30/2018 Quarterly report reflect the fact that ED deferred processing of discharges during this quarter as a result of ongoing litigation. This includes the values referenced: Total Amount Discharged, Percentage of the total approved claims receiving partial discharge, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge and Median loan debt remaining for claims receiving partial discharge.

# EXHIBIT 8

# Student Aid Enforcement Unit Formed to Protect Students, Borrowers, Taxpayers

FEBRUARY 8, 2016
**Contact:** Press Office, (202) 401-1576, press@ed.gov

### • More Resources

 Audio of Press Call

 Transcript of Press Call

As part of the Obama Administration's aggressive action to protect students and taxpayers, the U.S. Department of Education is creating a Student Aid Enforcement Unit to respond more quickly and efficiently to allegations of illegal actions by higher education institutions.

"When Americans invest their time, money and effort to gain new skills, they have a right to expect they'll actually get an education that leads to a better life for them and their families," said Acting Secretary of Education John B. King Jr. "When that doesn't happen we all pay the price. So let me be clear: schools looking to cheat students and taxpayers will be held accountable."

The Enforcement Unit will be led by Robert Kaye, one of the nation's top enforcement attorneys - most recently as a leader in the Federal Trade Commission's work protecting consumers. Through his work as the Bureau of Consumer Protection's Chief Litigation Counsel and as a manager in the Bureau's Division of Enforcement, Kaye has considerable experience supervising and advising managers and attorneys engaged in consumer protection investigations, as well as federal court and administrative litigation.

Kaye will report to Jim Runcie, the Chief Operating Officer of the Office of Federal Student Aid (FSA), under the oversight of the Under Secretary Ted Mitchell. The Chief Enforcement Officer will work closely with James Cole Jr., General Counsel, Delegated the Duties of Deputy Secretary, to establish policies and practices.

As part of the 2017 budget, the President is requesting $13.6 million in additional funds to strengthen FSA's enforcement and oversight activities. The office will work with closely with federal and state agencies to investigate and bring actions against bad actors in order to best protect students and taxpayers. The Enforcement Unit will consist of the following four divisions:

- **Investigations Group** — to identify potential misconduct or high-risk activity among higher education institutions and protect federal funding.
- **Borrower Defense Group** —to provide legal analysis, support and advice concerning claims of borrowers of Direct Loans. The unit will analyze claims to make determinations of injury, investigate institutions in connection with borrower defense claims and coordinate with federal and state agencies regarding those claims.
- **The Administrative Actions And Appeals Service Group (AAASG)** --to impose administrative actions such as Emergency, Termination, Limitation, Suspension or Fine actions. This group will continue to resolves appeals by program participants from final audit and final program review determinations, initiate debarment and suspension actions, and issue school revocation and denials of re-certification.

- **Clery Group** — to ensure institutions comply with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, requiring colleges and universities participating in federal financial aid programs to disclose campus crime statistics and security information.

The new unit will collaborate with, and incorporate evidence gathered in investigations by, partner state and federal agencies, in building cases against institutions of higher education. The unit will also collaborate with the Program Compliance Unit regarding evidence which may impact ongoing program compliance reviews. Moreover, the new Investigations Group will utilize a broad set of interventions and tools, including subpoena authority, document demands, and interrogatories and interviews to enforce against violations of federal law.

The Department remains strongly committed to investigating violations that harm students and taxpayers and taking swift and immediate action as necessary. These new resources would help ensure such activities are completed in an effective and efficient manner, including supporting more reviews of high-risk institutions, responsive to the concerns raised by states' and other federal agencies' investigations of such institutions, as well as by complaints by students.

The creation of the new Enforcement Unit builds on steps the Obama Administration has taken over the past seven years to hold schools accountable for a providing a quality education, including:

- Developing a wealth of consumer tools to help provide families with clear information to make a smart college choice
- Establishing gainful employment regulations to help ensure that students at career colleges don't end up with debt they cannot repay
- Creating a federal interagency taskforce to crack down on bad actors through investigations and enforcement actions
- Enforcing the ban on incentive compensation to protect students from aggressive recruiting practices
- Proposing to close the 90/10 loophole so institutions do not take advantage of service members

In recent weeks, the Department of Education has taken a series of enforcement actions, including actions against DeVry Education Group, Marinello Schools of Beauty, and Computer Systems Institute.

# EXHIBIT 9

# "FSA-2019-0009" Vacancy Details

## About

| | |
|---|---|
| **Announcement Number:** | FSA-2019-0009 |
| **Hiring Agency:** | EDUCATION-OFC OF FEDERAL STUDENT AID |
| **Position Title:** | General Attorney (Excepted Service) |
| **Open Period:** | 05/28/2019 - 06/18/2019 |
| | Format MM/DD/YYYY |

This vacancy is limited to a certain number of applicants and may close before the close date listed here if that limit is reached.

| | |
|---|---|
| **Series/Grade:** | GS - 0905 13/14 |
| **Salary:** | USD $99,172 - USD $152,352 |
| **Work Schedule:** | Full-time - |
| **Promotion Potential:** | GS-14 |
| **Duty Location(s):** | **4** Vacancy in |
| | 830 First Street NE |
| | Washington, DC, US |
| **Telework Eligible:** | Yes |
| **For More Info:** | Oksana Elgamal |
| | 202-377-4506 |
| | Oksana.Elgamal@ed.gov |

## Overview

| | |
|---|---|
| **Hiring Path:** | • Excepted service |
| | • Open to the public |
| **Who May Apply/Clarification From the Agency:** | This announcement is open to all U.S. citizens. This position is an excepted service AD Professional/ Technical position filled under authority of P.L. 105-244. This position is not in the competitive service and grants no eligibility to move to the competitive service. This excepted service appointment is not subject to the competitive service hiring requirements. The position is subject to a trial period: 1 year for a veteran or 2 years for a non-veteran. |
| **Security Clearance Required:** | Other |

**Appointment Type**   Permanent

**Marketing Statement:**   Federal Student Aid (FSA) is Funding America's Future, One Student At A Time.  Our vision is to be the most trusted and reliable source of student financial aid, information, and services in the nation.

**Summary:**   Come be a part of the innovative highly skilled Next Gen team within Federal Student Aid!

The Next Gen initiative is transforming Federal Student Aid to provide a world-class student aid customer experience using industry best-in-class financial services technologies to provide better outcomes for students and greater value to taxpayers. We are deploying a mobile-first mobile-complete digital customer service experience.

**Supervisory Position:**   No

**Relocation Expenses Reimbursed:**   No

**Travel Required:**   Not Required

Back to top

## Duties

At Federal Student Aid (FSA), we are proud sponsors of the American mind. As a principal office of the U.S. Department of Education (ED), FSA provides students and families financial assistance for higher education, and we promote the value of postsecondary education to society. We ensure that all eligible students and families can benefit from federal financial aid for education or training beyond high school.

The Borrower Defense Group in the FSA Enforcement Office adjudicates and issues decisions on claims by individual borrowers who assert a defense to repayment of their Federal student loans based on an act or omission of an institution of higher education that gives rise to a cause of action under State law or Federal regulations, as applicable. General Attorneys in the Borrower Defense Group perform the following duties:

Analyze, investigate, and adjudicate borrower defense claims.

Conduct legal research and draft legal memoranda/reports detailing relevant evidence, applicable laws and regulations, and bases for recommendations and adjudication decisions.

Develop and implement strategies and improved processes and systems to efficiently analyze, investigate, and decide borrower defense claims.

Provide legal advice to supervisor and Enforcement Office resulting in formulation and implementation of management decisions.

Back to top

## Qualifications and Evaluations

**Requirements:**   Key Requirements:

1. U.S. Citizenship.

2. Background investigation and fingerprint check (if applicable).

3. Must serve a probationary period.

Applicants must have:

1. Law degree and

2. 
    Be an active member of the bar (any U.S. jurisdiction) in good standing.

**Key Requirements:**
- U.S. Citizenship
- Background investigation and fingerprint check (if applicable).
- Must serve a probationary period
- Law degree
- Be an active member of the bar (any U.S. jurisdiction) in good standing

**Education Requirements:**   Must be a graduate from a law school accredited by the American Bar Association.

**Evaluations:**   We use a multi-step process to review and evaluate applicants:

1. Eligibility and Minimum Qualifications
Once the vacancy announcement closes, we will review your submitted resume and documents to determine if you meet the eligibility and minimum qualification requirements, including any required education, experience, and/or selective placement factors. You will be rated as ineligible if you are outside of the area of consideration (i.e., who may apply) or your application is missing any required documents. You will be rated as not qualified if you do not possess the minimum

000409

qualification requirements.

## 2. Rating and Ranking

If you are found to meet both the eligibility and minimum qualification requirements, we will assess the quality of your experience and the extent to which you possess the required KSAs by comparing your submitted resume and documents against your responses to the occupational questionnaire. Your application may be referred to a subject matter expert or panel of subject matter experts for further evaluation.

Based on the outcome of this evaluation, you will be placed into one of three categories: Best Qualified, Well Qualified, or Qualified.

If your responses to the occupational questionnaire are not substantiated by your submitted resume, you may be eliminated from receiving further consideration.

Veterans' Preference: Qualified veterans' preference eligibles will be ranked ahead of qualified non-preference eligibles within each category for which they are qualified. Qualified veterans' preference eligibles with a compensable service-connected disability of 10 percent or more (CPS and CP) will be placed at the top of the Best Qualified category, except in the case of scientific or professional positions at the GS-9 grade level or higher.

## 3. Referral and Selection

If you are found to be amongst the most highly qualified applicants, you will be referred to the selecting official. As part of the assessment and selection process, the selecting official may invite you to participate in a structured interview, check your references, and/or request that you submit a writing sample or complete a written assessment or exercise to further evaluate your qualifications for this position.

If you require reasonable accommodation for any part of the interview process or written assessment or exercise, please inform the selecting official at the time of scheduling.

**Qualifications:**   **Selective Factor**

Must be a graduate from a law school accredited by the American Bar Association.

Proof of admission to the Bar of the highest court of a state, territory, the District of Columbia, or the Commonwealth of Puerto Rico; and a current membership in such Bar as would permit the practice of law.  You must be a member in good standing of a state, territory of the United States, District of Columbia, or the Commonwealth of Puerto Rico bar.

**Preferred Qualifications**

Experience relating to Borrower Defense regulations, other loan discharge regulations, and/or consumer protection statutes highly desirable.

**Specialized Experience for GS-13 equivalent**

One year of experience equivalent to the GS-12 performing at least two (2) of the following three (3) duties of work assignments:

1. Performing basic legal analysis and formulating recommendations for senior attorneys or managers.

2. Composing legal memoranda, reports, and position papers on legislative history, laws, regulations, and court opinions in support of civil or criminal litigation.

3. Demonstrated interest in civil or criminal litigation and/or complex administrative law proceedings and adjudications.

**Specialized Experience for GS-14 equivalent**

One year of experience equivalent to the GS-13 performing at least two (2) of the following three (3) duties of work assignments:

1. Performing legal analysis and formulating recommendations to senior managers.

2. Composing pleadings, briefs, or other court documents involving complex legal issues in civil or criminal litigation or administrative proceedings.

3. Conduct civil or criminal litigation or complex administrative law proceedings; adjudicate administrative decisions; or draft memoranda, orders or decisions for judges or deciding officials.

[Back to top](#)

## Benefits and Other Info

**Benefits:**
**Agency Benefits:**

FSA is a great place to work. We offer a comprehensive benefits package, including paid vacation and sick leave, federal holidays, health and life insurance, and participation in the Federal Employees Retirement System (FERS), including the Thrift Savings Plan (TSP). For more information about the many benefits available to Federal employees, please visit: https://help.usajobs.gov/index.php/Pay_and_Benefits

As an FSA employee, you will also benefit from our family-friendly work environment. As part of our commitment to maintain a productive balance between work and home, we offer excused leave for Parent/Teacher Conferences (3 hours); excused leave for annual health screenings (4

hours); and matching leave for community volunteer service. Other flexibilities that may be available to you, may include teleworking and alternative work schedules.

Student Loan Repayment may be paid if negotiated and approved prior to appointment.

There are many other benefit programs that make the Federal Government a model employer and a top ranking career choice.

**Other Information:**    Equal Employment Opportunity: We do not discriminate on the basis of race, color, religion, sex, national origin, age, disability, genetic information, sexual orientation, gender identity, status as a parent, marital status, or political affiliation.

People with Disabilities: We are committed to expanding access to employment by hiring people with disabilities; providing reasonable accommodations for people with disabilities; and, identifying and removing barriers to work. Persons with disabilities, including disabled veterans, may apply for jobs filled either competitively (where qualified individuals compete with one another through a structured process), noncompetitively (where a qualified individual may be selected based on a special hiring authority), or through an excepted appointing authority for people with disabilities (i.e., Schedule A). If you require a reasonable accommodation for any part of the application process, please contact us. The decision on granting reasonable accommodation is made on a case-by-case basis. For more information, please visit: http://opm.gov/disability/PeopleWithDisabilities.asp

Veterans' Career Counseling: If you are a veteran interested in receiving tips on preparing a Federal resume and/or how to prepare for an interview, you may email Iwork@ed.gov to schedule a session with a career counselor ("Veterans Counseling Session" should be placed in the subject line of the email).

Selective Service: If you are a male applicant born after 12/31/1959, you must have registered for the Selective Service. For more information, please visit: https://help.usajobs.gov/index.php/Registering_with_the_Selective_Service_before_you_apply or http://www.sss.gov/default.htm.

Student Loan Default: If selected for this position, we will verify that you have not defaulted on any loan funded or guaranteed by the U.S. Department of Education. If you are found to be in default, we will contact you to make arrangements for repayment prior to making an official offer of employment.

Suitability and Investigation: If selected for this position, you will be required to complete the Declaration for Federal Employment (OF-306) to determine your suitability for federal employment and subject to a pre-appointment investigation/background check.

Level of Risk and Sensitivity: Level of this position is moderate risk public trust.

Probationary Period: If selected for this position, you will be required to successfully complete a one-year probationary period.

Essential/Non-Essential: This position is considered non-essential for purposes of reporting to work during federal government closures.

Telework: This position is telework eligible.

Bargaining Unit: This position is not included in the bargaining unit.

Back to top

## How to Apply

**How to Apply:**    Step 1: Create a USAJOBS account (if you do not already have one) at www.usajobs.gov.

Step 2: Create a resume using the USAJOBS resume builder or upload a resume into your USAJOBS account. Ensure that your resume demonstrates your education, experience, training, and accomplishments as it relates to the qualifications for this position and substantiates your responses to the occupational questionnaire.

Step 3: Upload any required documents into your USAJOBS account (must be less than 3MB and in one of the following document formats: GIF, JPG, JPEG, PNG, RTF, PDF, or Word (DOC or DOCX)).

Step 4: Click "Apply Online" and follow the prompts to complete the occupational questionnaire and attach any required documents. Verify that uploaded documents from USAJOBS transfer into the agency's hiring system. You will have the opportunity to upload any additional required documents in the agency's hiring system. Click "Finish" to submit your application.

NOTE: You may update your application or required documents at any time while the announcement is open by logging into your USAJOBS account, clicking on "Application Status," clicking on the position title, clicking "Update Application," and following the prompts.

In order to receive consideration for this position, you must submit your complete application, including all required documents, by 11:59 PM Eastern Time on the closing date of the vacancy announcement. If the vacancy announcement has an application limit, we recommend that you submit your complete application at the time of initial application. We will not accept any required documentation after the closing date of the vacancy announcement.

**Required Documents:**    You must submit:

- A resume demonstrating your education, experience, training, and accomplishments as it relates to the qualifications for this position and substantiating your responses to the occupational questionnaire.

000413

- Law school transcript (unofficial or copy is acceptable at the application stage)

- Bar card  (at time of offer)

- Letter of interest discussing relevant experience

- Writing sample (not to exceed 10 pages)

If you are claiming Veterans' Preference, you must submit:

• A copy of your DD214, member copy 4 (Separated Members only).
• A certification of expected discharge or release from active duty under honorable conditions. A "certification" is any written document from the armed forces that certifies the service member is expected to be discharged or released from active duty service in the armed forces under honorable conditions within 120 days after the certification is submitted by the applicant. The certification letter should be on letterhead of the appropriate military branch of the service and contain (1) the military service dates including the expected discharge or release date; and (2) the character of service. (Current Active Duty Members only).
• The Application for 10-Point Veteran Preference (SF-15)
https://www.opm.gov/forms/pdf_fill/SF15.pdf AND all documents indicated on the form as proof of type of preference (e.g., a letter from the Department of Veterans' Affairs certifying the service-connected disability and percentage of disability) (if claiming preference based on a service-connected disability or derived preference).

If you are claiming selection priority under Interagency Career Transition Assistance Plan (ICTAP) and Career Transition Assistance Plan (CTAP), please visit:

CTAP: http://www.ed.gov/about/jobs/open/edhires/ctap.html
ICTAP: http://www.ed.gov/about/jobs/open/edhires/ictap.html

**Next Steps:**   As an applicant, you may check your application status through your USAJOBS account at any time.  We will also notify you via email of your application status at three key stages in the recruitment process.
1. Once the vacancy announcement closes, we will inform you that your application has been received.
2. After we review your submitted resume and supporting documentation, we will inform you if you are eligible and qualified, if your application was referred to a subject matter expert or panel of subject matter experts for further evaluation, and if you were amongst the most highly qualified candidates referred to the selecting official.
3. Finally, we will inform you if and when a selection is made.

Back to top

Notices | FOIA | Privacy | Accessibility | Security | Information Quality | Inspector General
Whitehouse.gov | USA.gov | Benefits.gov | Regulations.gov

000414

https://jobs.monstergovt.com/edu/vacancy/preview!printVacancy.hms?_ref=exvkq2jbpt0&popup=true&jnum=64282&orgId=1[9/19/2019 4:01:58 PM]

This is a Federal job application system. Providing false information, creating fake IDs, or failing to answer all questions truthfully and completely may be grounds for not hiring, for disbarment from Federal employment, or for dismissal after the applicant begins work. Falsifying a Federal job application, attempting to violate the privacy of others, or attempting to compromise the operation of this system may be punishable by fine or imprisonment (US Code, Title 18, section 1001).

# EXHIBIT 10

**Federal**Student**Aid**
An OFFICE of the U.S. DEPARTMENT of EDUCATION

PROUD SPONSOR of
the AMERICAN MIND®

As the nation's largest provider of financial aid for education beyond high school, the U.S. Department of Education's office of Federal Student Aid delivers more than $120 billion in aid each year to students and their families. Through programs authorized under the Higher Education Act of 1965, as amended, FSA provides grants, loans, and work-study funds for college or career school. We also oversee the more than 6,000 postsecondary institutions that participate in the federal student aid programs.

In every interaction with students and their families, FSA strives to be the most trusted and reliable source of student financial aid information and services in the nation.

FSA is looking for bright, talented attorneys, including recent law school graduates, who are interested in public service work with the federal government for a term position in Washington, D.C., or one of our Regional Offices. The incumbents will participate in the legal review and adjudication process of borrower applications that make a claim(s) that the borrower took out student loans and attended a school that misled or engaged in other misconduct in violation of certain state laws. The term positions are two-years.  Admission to a state bar is not required.

# EXHIBIT 11

Fact Sheet: Protecting Students from Abusive Career Colleges

**Administration outlines new debt relief process for Corinthian Colleges' students**

JUNE 8, 2015

**Contact:**   Press Office, Press Office, (202) 401-1576, press@ed.gov

- **More Resources**

 Audio of Press Call

 Transcript of Press Call

Over the past six years, the Education Department has taken unprecedented steps to hold career colleges accountable for giving students what they deserve: a high-quality, affordable education that prepares them for their careers. The Department established tougher regulations targeting misleading claims by colleges and incentives that drove sales people to enroll students through dubious promises. The Department has cracked down on bad actors through investigations and enforcement actions. The Department also issued "gainful employment" regulations, which will help ensure that students at career colleges don't end up with debt they cannot repay. The Department will continue to hold institutions accountable in order to improve the value of their programs, protect students from abusive colleges, and safeguard the interests of taxpayers.

"While some for-profit career colleges play a critical role in helping students succeed in their educational and training pursuits, too often, bad actors in the sector have preyed on some of our nation's most vulnerable students and taken advantage of hard-working Americans who simply want a better future for themselves and their families," said U.S. Secretary of Education Arne Duncan. "I am committed to ensuring that every student has access to an education that will put them on solid footing for a career, and I will hold schools accountable for practices that undercut their students and taxpayers. Where students have been harmed by fraudulent practices, I am fully committed to making sure students receive every penny of relief they are entitled to under law. We will make this process as easy as possible for them, including by considering claims in groups wherever possible, and hold institutions accountable."

Today, the Education Department is announcing new steps in this work, particularly to address the concerns of students who attended schools owned by Corinthian Colleges Inc.

**How debt relief will work for Corinthian students**

The Department has worked to rapidly develop a streamlined process for getting debt relief to Corinthian students. The Department's aim is to make the process of forgiving loans fair, clear and efficient—and to ensure that students who are eligible to participate know about this opportunity.

Some Corinthian schools closed down, while others were sold but remain open under different ownership. The announcements today are for:

- Corinthian students whose schools have closed down.

- Corinthian students who believe they were victims of fraud, regardless of whether their school closed.

**Helping Corinthian students whose schools have closed**

In general, when a college closes, students are eligible to discharge their federal student loans if they were attending when the school closed or who withdrew from the school within 120 days of the closing date. Given the unique circumstances for former Corinthian students, the Department is expanding eligibility for students to apply for a closed school loan discharge, extending the window of time back to June 20, 2014, to capture students who attended the now-closed campuses after Corinthian entered into an agreement with the Department to terminate Corinthian's ownership of its schools.

The Department's Federal Student Aid office has been and will continue to contact potentially impacted student borrowers to provide clear information about their options, including loan discharge applications, in addition to providing enhanced information on the Department's website.

In addition, the Department has worked with a group of organizations and institutions—including those within the California State University system, led by CSU Fullerton and C-REAL, Beyond 12, and the National Association of Student Financial Aid Administrators and its California and Western region affiliates—as they have established an independent volunteer advising corps that will help students navigate their options. The resource is available at www.NextStepsEDU.org, where students can sign up and be connected to a volunteer advisor from the field who can help students determine which option is best suited to their situation. (Note that as the Department is not managing this initiative, it cannot endorse any advice that a student may receive.)

**Helping students who believe they were victims of fraud, regardless of whether their school closed**

Provisions in the law called "defense to repayment" or "borrower's defense" allow borrowers to seek loan forgiveness if they believe they were defrauded by their college under state law. This provision has rarely been used in the past. Now, the Department is taking unprecedented action to create a streamlined process that is fair to students who may have been victims of fraud and that holds colleges accountable to taxpayers.

In taking these actions, as Under Secretary Ted Mitchell outlined in a blog post today, the Department is committed to helping support affected students. Given the pressing need presented by the unique situation for students who attended colleges owned by Corinthian, the Department is today announcing specific steps for students who attended those campuses, as well as outlining broader processes for all students that will be established moving forward.

- **Extending debt relief eligibility to groups of students wherever possible:** In order to receive loan forgiveness under a "defense to repayment," students must assert that a college's actions violated state law and affected their provision of educational services or their federal loans. Wherever possible, the Department will rely on evidence established

by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers.

For example, after analyzing the Department's findings in its investigation of Heald College and relevant California law, the Department has determined that evidence of misrepresentation exists for students enrolled in a large majority of programs offered at Heald College campuses between 2010 and 2015. Specifically, the Department has determined that students who relied on misrepresentations found in published job placement rates for many Heald programs qualify to have their federal direct student loans discharged. Students can have their loans forgiven and receive refunds for amounts paid based on a simple attestation. More information about this process—including the attestation form—is available on studentaid.gov/Corinthian. Additional details will be posted on the website in the coming weeks.

- **Providing loan forbearance and pausing payments**: All former Corinthian students who apply for borrower defense have the option of having their federal loans immediately placed into forbearance, which stops their monthly payments to ensure they do not fall behind or default on their loans while the Department works to resolve the claim. For such students who are already in default on their loans, the Department will immediately halt collection activity. Students will receive a notification from their loan servicer to confirm the change in status of their loans.

- **Appointing a Special Master dedicated to borrower defense issues:** The Department will appoint a Special Master to oversee borrower defense issues and charge that person with ensuring the process is simple, streamlined, and fair to students and taxpayers. While the specific steps announced today are for former Corinthian students, the Special Master will help develop a broader system that will support students at other institutions who believe they have a defense to repayment. The Special Master will be named in the coming weeks.

- **Establishing a streamlined process:** As noted above, the Department will work to provide debt relief to groups of students wherever possible, as we already have determined is possible for many Heald College students. For other Corinthian students, with the help of the Special Master, the Department will create a simple application for debt relief, which borrowers can complete online or by email or postal mail. Starting today, former Corinthian students can visit studentaid.gov/Corinthian to learn more, and in the coming weeks, the Department will have an online form available for these borrowers. In addition, students can call a special toll-free borrower defense hotline at (855) 279-6207 to ask about their options.

- **Building a better system for debt relief for the future**: The Department will develop new regulations to clarify and streamline loan forgiveness under the defense to repayment provision, while maintaining or enhancing current consumer protection standards and strengthening those provisions that hold colleges accountable for actions that result in

loan discharges. That process will begin later this year and will not slow down the loan discharge process for current applicants.

**Calling on Congress to do its part**

The Department continues to take aggressive action that ensures defrauded borrowers get the debt relief they are entitled to, steps up oversight and enforcement to identify colleges that present the greatest risk to students and taxpayers, and holds schools accountable for their actions. But to fully address these issues, Congress must also take action. Congress needs to strengthen both consumer protections for students and accountability for colleges to make sure there are better oversight and enforcement tools in place to prevent colleges from harming students and leaving taxpayers holding the bag. The Department looks forward to working with Congress on such efforts, including:

- Congress should strengthen—not roll back—efforts to protect students and taxpayers from waste and fraud.

- Congress needs to enact rules that hold colleges and their executives responsible for fraudulent acts, not taxpayers.

- Students deserve truth in advertising. Congress needs to ensure students have access to meaningful information about college costs and outcomes and are not bombarded by aggressive and deceptive marketing.

- Students deserve borrower protections. Congress should also consider preventative action to protect prospective and current students by ensuring that students are not pressured into enrolling and can get relief when the program they signed up for is not what they were promised.

- Congress must protect our service members and veterans by eliminating loopholes that make them targets for aggressive marketing and recruitment by for-profit colleges.

**Additional Administration efforts to strengthen consumer protections**

The Obama Administration has moved swiftly to take action on some of the most problematic practices in the for-profit industry. The steps the Department announced today are part of the Administration's comprehensive approach to protecting students, eliminating bad actors, and encouraging behavior that improves student outcomes—especially in making it easier to afford and complete a degree.

Too often, students at some of the largest career colleges—many run by for-profit companies—enroll with hopes of finding a good job but instead are left saddled with debt in exchange for a worthless degree or certificate.

- **For-profit students pay more up front**: On average, attending a two-year for-profit institution costs a student four times as much as attending a community college.

- **They borrow more often**: More than 80 percent of students at for-profits borrow federal student loans to pay for college, while less than half of students at public institutions do.

- **And they default on their student loans at disproportionately high rates**: Ultimately, students at for-profit colleges represent only about 11 percent of the total higher education population but 44 percent of all federal student loan defaults, a clear sign that some of these colleges were not preparing students for good jobs.

Today's announcement, coupled with the work over the past six years and upcoming efforts, aim to crack down on these abuses and to strengthen consumer protections. Some of the additional steps the Department has taken and updates on its ongoing work include:

**Establishing Regulations to Protect Students from Poor-Performing Career Colleges**

Last year, the Department published regulations that will eliminate the flow of federal student aid to career training programs that leave students buried in debt with few opportunities to repay it. Those regulations take effect on July 1, 2015.

To qualify for federal student aid, the law requires that for-profit programs and certificate programs at private non-profit and public institutions prepare students for "gainful employment in a recognized occupation." In May 2015, the U.S. District Court for the Southern District of New York upheld the Department's approach to the gainful employment regulations against a challenge from a for-profit industry trade association, saying the Department's regulations represented "reasoned decisionmaking."

**Enforcing the Ban on Incentive Compensation**

In 2010, the Obama Administration released a broad set of rules to: strengthen the Department's authority to protect students from aggressive recruiting practices fueled by incentive compensation; take action against colleges engaging in deceptive advertising, marketing and sales practices; and to clarify minimum requirements for states to oversee postsecondary programs and handle student complaints.

Under Secretary Mitchell recently issued a memo encouraging the Office of Federal Student Aid to recover funds from schools that are found to have violated the incentive compensation ban. The memo reverses a more lenient approach initiated in 2002 under the Bush Administration by Education Deputy Secretary Hansen, which both the Education Department Inspector General and the Government Accountability Office found to be a barrier to effective enforcement of the law.

**Protecting military service members, veterans and their families**

For-profit colleges can obtain no more than 90 percent of their revenue from Title IV federal student aid dollars, but federal education aid from programs like the Department of Defense Tuition Assistance and Department of Veterans Affairs GI Bill Benefits is not counted toward that limit. This has made service members and veterans particularly vulnerable to aggressive marketing and recruitment by for-profit colleges, which often pursue aid targeted to such individuals to make up the required 10 percent of their revenue.

In its FY 2016 budget proposal, the Department proposed to eliminate this loophole by including DOD's tuition assistance and GI Bill benefits into the 90 percent calculation. Now, it is up to Congress to act on this plan and protect our nation's military and their families.

In addition, through Executive Order 13607 (the Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members), the Administration has worked to protect our nation's military families by ensuring that federal military and veterans educational benefits programs are providing service members, veterans, spouses, and other family members with the information, support, and protections they deserve.

**Strengthening accountability and oversight across the federal government through a career college task force**

The Department has established an interagency task force, led by Under Secretary Ted Mitchell, to help ensure proper accountability for and oversight of career colleges and for-profit institutions. The task force will enhance the enforcement activity at the Department as well as at other federal and state agencies through tighter coordination of their activities and better information sharing to protect students from school practices and policies that are unfair, deceptive, and abusive, and that put taxpayer funds at risk.

The task force is building on efforts already under way among various federal agencies, and includes the Departments of Justice, Defense, Treasury, Veterans Affairs, and Labor, as well as the Consumer Financial Protection Bureau, Federal Trade Commission, Internal Revenue Service, and Securities and Exchange Commission. In addition, the federal partners will continue engaging with state Attorneys General and other stakeholders. The task force gathered for its first official meeting in May.

Given the important responsibilities each of these agencies has and the vital role that states play, this team will leverage their resources and expertise to continue to assist one another in the enforcement of federal criminal and civil laws and regulations, including against institutions and individuals who commit fraud or other criminal activity, thereby making the best use of scarce resources and better protecting the interests of students and taxpayers. And to allow for greater transparency and participation from the higher education community in these efforts—including institutions, consumer advocates and student groups—the task force will periodically organize opportunities for public discussions beginning this summer.

**Holding Corinthian Colleges Accountable**

In the case of Corinthian Colleges, the Department began tightening oversight of the college's practices and uncovered misrepresentation of its job placement rates. The Department acted to hold Corinthian accountable and ensured students pursuing their education did not face abrupt disruption while enforcement action was being undertaken.

Since that process began in 2014, the Department has taken a series of steps to protect students by requiring the company to sell or close all of its programs, ensuring students received more information about what was happening and their options, requiring expanded refund rights for students, and establishing an independent monitor under the leadership of former U.S. Attorney

Patrick Fitzgerald, who ensured Corinthian remained accountable to students. Fitzgerald and his team ensured that students were made aware of their refund options, ensured that Corinthian's use of federal student aid was made in accordance with Department regulations, and ensured that students were provided correct information about the state of Corinthian's campuses and programs.

Most of Corinthian's campuses were acquired by the nonprofit Zenith Education Group, which agreed to provide a number of new consumer protections, such as providing refund and withdrawal opportunities to students in poorly-performing programs, and to take steps to strengthen programs and improve affordability, including by reducing tuition. The sale allowed most Corinthian students to continue pursuing their education and career goals without disruption, and the Department and the Consumer Financial Protection Bureau have worked together to provide more than $480 million in loan forgiveness for borrowers who took out Corinthian's high-cost private student loans.

In April 2015, the Department informed Corinthian that it was being fined about $30 million for misrepresenting job placement rates to current and prospective students in its Heald College system. Since then, Corinthian announced it was closing down the last of its remaining campuses. Recognizing the challenges and uncertainty facing students, the Department continues to provide information directly to Corinthian's students about their federal student aid and their options, including both transferring to another school to continue their education or discharging their loan.

### Creating options that make it easier to repay federal student loans

The Department is helping more students manage their student debt through flexible repayment options such as the Pay As You Earn plan (PAYE), which caps student loan payments at 10 percent of a borrower's monthly income. The Department is also acting on President Obama's Student Aid Bill of Rights proposal from earlier this year to support more borrowers to help borrowers enroll and participate in PAYE.

In addition, the Administration is continuing outreach to help borrowers who may be struggling to repay their loans, ensuring that they have the information they need to select the best repayment option for them and avoid default. Thanks to these comprehensive efforts, there are now 3.8 million borrowers enrolled in income-driven repayment plans, up from 760,000 in 2012.

### Providing families with clear information to make a smart college choice

The Department has provided a wealth of consumer tools designed to help students and families decide which college is right for them. In addition to requiring institutions to provide accurate information about their graduates' job placement success and the types of employment their graduates obtained, the Administration has created resources such as the College Scorecard and the Financial Aid Shopping Sheet, which can help families compare financial aid packages apples-to-apples. Since the launch of the Shopping Sheet in 2012, more than 3,000 institutions—representing more than two-thirds of the entire undergraduate population—have voluntarily adopted the Shopping Sheet to provide prospective students.

The Department also believes there is more to be done to help increase student access to affordable higher education and to improve student outcomes, and will continue to take action toward that goal.

# EXHIBIT 12



# UNITED STATES DEPARTMENT OF EDUCATION

### ATTESTATION FOR CERTAIN HEALD COLLEGE STUDENTS
### APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 12/31/2015

The Department of Education has found that at various times between 2010 and 2014, Heald College published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Heald College students to enroll in these programs. This form covers federal Direct Loans received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Heald College students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at studentaid.ed.gov.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 194407, San Francisco, CA 94119.

## SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I, _____ _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Heald program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting. If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note:** This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. **The earliest enrollment date covered is July 1, 2010.**

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date*** (MM/YYYY) | **Enrollment End Date*** (MM/YYYY) |
| | | |

| Program Name | | Credential | |
|---|---|---|---|
| | | | |

1.  Prior to my enrollment in this Heald College program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

    ☐  Brochures advertising Heald College's academic programs or other printed materials, including those provided by Heald College representatives or recruiters;

    ☐  Emails, online materials, or online disclosures from or by Heald College.

2.  I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3.  I applied for and received a federal Direct Loan to cover the cost of attendance of the Heald program in which I enrolled.

4.  As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Heald College that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Heald College and dates of enrollment.) The document(s) I have attached are:

    ☐  *Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. (Deselect the check box to remove any enrollment dates added in error.)*

| Add Campus Program | Remove Campus Program |
|---|---|

### SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Heald College that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend a Heald College program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Heald College programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Heald College program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I have read and understand all of the information in this form.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____     Date _____

***Privacy Act Notice.*** The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087(a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

***Paperwork Reduction Act Notice.*** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

FORM APPROVED OMB NO: 1845-0132 Exp. 11/30/2018



UNITED STATES DEPARTMENT OF EDUCATION

# ATTESTATION FOR CERTAIN HEALD COLLEGE STUDENTS

### (APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE)

The Department of Education has found that at various times between 2010 and 2014, Heald College published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Heald College students to enroll in these programs. This form covers federal Direct Loans received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Heald College students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at studentaid.ed.gov .

Instructions: Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

## SECTION I: BORROWER INFORMATION

| Name *(First, Middle, Last)* | | Date of Birth | Social Security Number *(Last 4 Digits)* | |
|---|---|---|---|---|
| Phone Number | Email Address | | | |
| Home Address | | City | State | Zipcode |

I, _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Heald program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

Note: This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. The earliest enrollment date covered is July 1, 2010.

## CAMPUS PROGRAM

Campus

| Enrollment Start Date *(mm/dd/yyyy)* | Enrollment End Date *(mm/dd/yyyy)* |
|---|---|

| Program Name | Credential |
|---|---|

1. Prior to my enrollment in this Heald College program, I received information about job placement rates related to my program of study through one or more of the following ways *(check each that applies)*.

   ☐ Brochures advertising Heald College's academic programs or other printed materials, including those provided by Heald College representatives or recruiters;

   ☐ Emails, online materials, or online disclosures from or by Heald College.

2. I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3. I applied for and received a federal Direct Loan to cover the cost of attendance of the Heald program in which I enrolled.

4. As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Heald College that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Heald College and dates of enrollment.) The document(s) I have attached are:

Select Add Another Date Range if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(This provides user ability to add multiple periods of enrollment. Select Remove Another Date Range to remove any enrollment dates added in error.)*

| Add Another Date Range | Remove Another Date Range |
|---|---|

| Add New Campus Program: | Add Program | Remove Campus Program: | Remove Program |
|---|---|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Heald College that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are not eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend a Heald College program not on the enclosed list of covered programs, or loans taken out to attend another institution.

Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Heald College programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Heald College program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do not want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

| Supervisor's Signature | Date |
|---|---|
| | |

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087(a) et seq., and 20 U.S.C. 1087(a) et seq., and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov.



# UNITED STATES DEPARTMENT OF EDUCATION

ATTESTATION FOR CERTAIN HEALD COLLEGE STUDENTS
APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 12/31/2015

The Department of Education has found that at various times between 2010 and 2014, Heald College published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Heald College students to enroll in these programs. This form covers federal Direct Loans received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Heald College students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at studentaid.ed.gov.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 429060, San Francisco, CA 94142.

## SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I, _____ _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Heald program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting. If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note:** This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf.
**The earliest enrollment date covered is July 1, 2010.**

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date*** (MM/YYYY) | **Enrollment End Date*** (MM/YYYY) |
| | | |

| **Program Name** | | **Credential** | |
|---|---|---|---|
| | | | |

1.  Prior to my enrollment in this Heald College program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

    ☐  Brochures advertising Heald College's academic programs or other printed materials, including those provided by Heald College representatives or recruiters;

    ☐  Emails, online materials, or online disclosures from or by Heald College.

2.  I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3.  I applied for and received a federal Direct Loan to cover the cost of attendance of the Heald program in which I enrolled.

4.  As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Heald College that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Heald College and dates of enrollment.) The document(s) I have attached are:

    | |
    |---|
    | |

    ☐  *Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| **Add Campus Program** | **Remove Campus Program** |
|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Heald College that you believe is relevant: *(2,000 characters max)*

| |
|---|
| |

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend a Heald College program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Heald College programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Heald College program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I have read and understand all of the information in this form.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____    Date _____

*Privacy Act Notice.* The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087(a) *et seq.*, and 20 U.S.C. 1087(a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

# EXHIBIT 13



## UNITED STATES DEPARTMENT OF EDUCATION

ATTESTATION FOR CERTAIN EVEREST AND WYOTECH STUDENTS
APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 11/30/2018

The Department of Education has found that at various times between 2010 and 2014, Everest Institute, Everest College, and Everest University ("Everest"), and WyoTech published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Everest and WyoTech students to enroll in these programs. This form covers federal Direct Loans (including Parent PLUS loans issued to parents of Everest and WyoTech students) received on or after July 1, 2010.  A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/ev-wy-findings. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Everest and WyoTech students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment.  Additional instructions to file a claim for loan forgiveness can be found at https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Instructions:** Please complete this form.  To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign.  Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 194407, San Francisco, CA 94119.

### SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I, _____  _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

### SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Everest/WyoTech program, you will need to complete the following for each covered program you attended.  For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note**: This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at **https://studentaid.ed.gov/ev-wy-findings**. The earliest enrollment date covered is July 1, 2010.

ED-EN-002.01

ED 075

Page 1 of 4

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date*** (MM/YYYY) | **Enrollment End Date*** (MM/YYYY) |
| | | |

| **Program Name** | | **Credential** | |
|---|---|---|---|

1.  Prior to my enrollment in this Everest/WyoTech program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

☐  Brochures advertising Everest/WyoTech academic programs or other printed materials, including those provided by Everest/WyoTech representatives or recruiters;

☐  Emails, online materials, or online disclosures from or by Everest/WyoTech.

2.  I believed that the job placement rates related to my program of study indicated the level of quality an Everest/WyoTech education offered to students. I chose to enroll at Everest/WyoTech based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3.  I applied for and received a federal Direct Loan to cover the cost of attendance of the Everest/WyoTech program in which I enrolled.

4.  As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Everest/WyoTech that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Everest/WyoTech and dates of enrollment.) The document(s) I have attached are:

☐  *Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| Add Campus Program | Remove Campus Program |
|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Everest/WyoTech that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend an Everest and/or WyoTech program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on <u>all</u> of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Everest and/or WyoTech programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Everest/WyoTech program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____   Date _____

***Privacy Act Notice.*** The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087(a) *et seq.*, and 20 U.S.C. 1087(a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

***Paperwork Reduction Act Notice.*** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

ED-EN-002.1

ED 075

Page 4 of 4



# UNITED STATES DEPARTMENT OF EDUCATION

ATTESTATION FOR CERTAIN EVEREST AND WYOTECH STUDENTS
APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 11/30/2018

The Department of Education has found that at various times between 2010 and 2014, Everest Institute, Everest College, and Everest University ("Everest"), and WyoTech published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Everest and WyoTech students to enroll in these programs. This form covers federal Direct Loans (including Parent PLUS loans issued to parents of Everest and WyoTech students) received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/ev-wy-findings. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Everest and WyoTech students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 194407, San Francisco, CA 94119.

## SECTION I: BORROWER INFORMATION

| First Name | Middle Name | Last Name | Date of Birth |
|---|---|---|---|
|  |  |  |  |

| Social Security Number *(last 4 digits)* | Telephone Number | Email Address |
|---|---|---|
|  |  |  |

| Home Address | City | State | Zipcode |
|---|---|---|---|
|  |  |  |  |

I, _____ _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Everest/WyoTech program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note**: This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at **https://studentaid.ed.gov/ev-wy-findings**. The earliest enrollment date covered is July 1, 2010.

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date\*** (MM/YYYY) | **Enrollment End Date\*** (MM/YYYY) |
| | | |

| **Program Name** | | **Credential** | |
|---|---|---|---|
| | | | |

1.  Prior to my enrollment in this Everest/WyoTech program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

   ☐ Brochures advertising Everest/WyoTech academic programs or other printed materials, including those provided by Everest/WyoTech representatives or recruiters;

   ☐ Emails, online materials, or online disclosures from or by Everest/WyoTech.

2.  I believed that the job placement rates related to my program of study indicated the level of quality an Everest/WyoTech education offered to students. I chose to enroll at Everest/WyoTech based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3.  I applied for and received a federal Direct Loan to cover the cost of attendance of the Everest/WyoTech program in which I enrolled.

4.  As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Everest/WyoTech that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Everest/WyoTech and dates of enrollment.) The document(s) I have attached are:

   \*Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently
   ☐ discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| **Add Campus Program** | **Remove Campus Program** |
|---|---|

### SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Everest/WyoTech that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend an Everest and/or WyoTech program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Everest and/or WyoTech programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Everest/WyoTech program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

- ☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.
- ☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____    Date _____

ED-EN-002.1                                                                                                          ED 075          Page 3 of 4

*Privacy Act Notice.* The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a) *et seq.*, and 20 U.S.C. 1087(a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.



## UNITED STATES DEPARTMENT OF EDUCATION

ATTESTATION FOR CERTAIN EVEREST AND WYOTECH STUDENTS
APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 11/30/2018

The Department of Education has found that at various times between 2010 and 2014, Everest Institute, Everest College, and Everest University ("Everest"), and WyoTech published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Everest and WyoTech students to enroll in these programs. This form covers federal Direct Loans (including Parent PLUS loans issued to parents of Everest and WyoTech students) received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.gov/ev-wy-findings. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Everest and WyoTech students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at https://studentaid.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 194407, San Francisco, CA 94119.

### SECTION I: BORROWER INFORMATION

First Name

Middle Name

Last Name

Date of Birth

Social Security Number *(last 4 digits)*

Telephone Number

Email Address

Home Address

City

State

Zipcode

I, _____  _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

### SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Everest/WyoTech program, you will need to complete the following for **each** covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note:** This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at **https://studentaid.gov/ev-wy-findings**. The earliest enrollment date covered is July 1, 2010.

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date*** (MM/YYYY) | **Enrollment End Date*** (MM/YYYY) |
| | | |

| Program Name | | Credential | |
|---|---|---|---|
| | | | |

1. Prior to my enrollment in this Everest/WyoTech program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

   ☐ Brochures advertising Everest/WyoTech academic programs or other printed materials, including those provided by Everest/WyoTech representatives or recruiters;

   ☐ Emails, online materials, or online disclosures from or by Everest/WyoTech.

2. I believed that the job placement rates related to my program of study indicated the level of quality an Everest/WyoTech education offered to students. I chose to enroll at Everest/WyoTech based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3. I applied for and received a federal Direct Loan to cover the cost of attendance of the Everest/WyoTech program in which I enrolled.

4. As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Everest/WyoTech that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Everest/WyoTech and dates of enrollment.) The document(s) I have attached are:

   

☐ *Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| Add Campus Program | Remove Campus Program |
|---|---|

| SECTION III: OTHER INFORMATION |
|---|

Please provide or attach any other information about your experience at Everest/WyoTech that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education.  Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend an Everest and/or WyoTech program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Everest and/or WyoTech programs covered by the enclosed list), you must notify your loan servicer.  At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Everest/WyoTech program will be discharged.  Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans.  You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

**Signature** _____   **Date** _____

***Privacy Act Notice.*** The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a) *et seq.*, and 20 U.S.C. 1087a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

***Paperwork Reduction Act Notice.*** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have any comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.



# UNITED STATES DEPARTMENT OF EDUCATION

### ATTESTATION FOR CERTAIN EVEREST AND WYOTECH STUDENTS
### APPLICATION FOR BORROWER DEFENSE TO REPAYMENT LOAN DISCHARGE

FORM APPROVED
OMB NO: 1845-0132
Exp. 11/30/2018

The Department of Education has found that at various times between 2010 and 2014, Everest Institute, Everest College, and Everest University ("Everest"), and WyoTech published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Everest and WyoTech students to enroll in these programs. This form covers federal Direct Loans (including Parent PLUS loans issued to parents of Everest and WyoTech students) received on or after July 1, 2010. A list of covered programs and dates of enrollment is available at https://studentaid.ed.gov/ev-wy-findings. Please fill out this attestation ONLY IF your program and dates of enrollment are included on this list.

Everest and WyoTech students who did not attend programs where the Department of Education found misleading job placement rates, or whose decision to enroll was not influenced by those job placement rates, may still be eligible for loan forgiveness based on borrower defense to repayment. Additional instructions to file a claim for loan forgiveness can be found at https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Instructions:** Please complete this form. To sign the form, insert a digital image of your signature in the appropriate field below or print a hard copy of the form and sign. Submit your form and all supplementary documents referenced in question #4 via email to FSAOperations@ed.gov or mail to Department of Education, PO Box 429060, San Francisco, CA 94142.

## SECTION I: BORROWER INFORMATION

**First Name**

**Middle Name**

**Last Name**

**Date of Birth**

**Social Security Number** *(last 4 digits)*

**Telephone Number**

**Email Address**

**Home Address**

**City**

**State**

**Zipcode**

I, _____ _____ , attest to the following:

I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206 (c).

## SECTION II: PROGRAM INFORMATION

If you enrolled in more than one covered Everest/WyoTech program, you will need to complete the following for each covered program you attended. For example, if you were a criminal justice student in 2011 and returned in 2012 for an accounting program, you should complete the first Campus Program section based on your enrollment in criminal justice and the second Campus Program section based on your enrollment in accounting.

If you have more than one program, click the Add Campus Program button that appears at the bottom of the Campus Program section.

**Note**: This form applies to students who enrolled in a program after misleading placement rates were published for the program. A list of covered programs and dates of enrollment is available at **https://studentaid.ed.gov/ev-wy-findings**. The earliest enrollment date covered is July 1, 2010.

| CAMPUS PROGRAM | | |
|---|---|---|
| **Campus** | **Enrollment Start Date\*** (MM/YYYY) | **Enrollment End Date\*** (MM/YYYY) |
| | | |

| Program Name | | Credential | |
|---|---|---|---|

1.  Prior to my enrollment in this Everest/WyoTech program, I received information about job placement rates related to my program of study through one or more of the following ways (check each that applies)

    ☐ Brochures advertising Everest/WyoTech academic programs or other printed materials, including those provided by Everest/WyoTech representatives or recruiters;

    ☐ Emails, online materials, or online disclosures from or by Everest/WyoTech.

2.  I believed that the job placement rates related to my program of study indicated the level of quality an Everest/WyoTech education offered to students. I chose to enroll at Everest/WyoTech based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

3.  I applied for and received a federal Direct Loan to cover the cost of attendance of the Everest/WyoTech program in which I enrolled.

4.  As an attachment to this attestation, I have included documents(s) with additional information to confirm that I was enrolled in the program of study at Everest/WyoTech that I identified above, and was enrolled for the dates I provided above. (Suggested documents include transcripts and registration documents indicating your specific program of study at Everest/WyoTech and dates of enrollment.) The document(s) I have attached are:

    ☐ \*Select the check box if you had multiple periods of enrollment in a program, that is, if you enrolled in a program but subsequently discontinued enrollment, and then reenrolled in the same program at a later date, please provide all start and end dates applicable to this program. *(Deselect the check box to remove any enrollment dates added in error.)*

| Add Campus Program | Remove Campus Program |
|---|---|

## SECTION III: OTHER INFORMATION

Please provide or attach any other information about your experience at Everest/WyoTech that you believe is relevant: *(2,000 characters max)*

## SECTION IV: DIRECT LOAN FORBEARANCE

By completing this form, you are eligible to have all of your federal loans placed into forbearance and for collections on any federal loans in default to stop while your claim is reviewed by the Department of Education. Please read the following information carefully before making your selection below.

During any period that your loans are in forbearance, you do not have to make payments on those loans, and the loans will not go into default. If your loans are already in default, collections will stop. This will continue until the loan discharge review process is completed. Your servicer will notify you when your loan has been placed into forbearance or stopped collections. Until you receive that notice, you should continue to make payments.

The forbearance or stopped collections will affect all of a borrower's federal loans, including loans that are **not** eligible for discharge through this form, such as Federal Family Education Loans (FFEL), loans taken out to attend an Everest and/or WyoTech program not on the enclosed list of covered programs, or loans taken out to attend another institution.

**Note that interest will continue to accrue on all of these federal loans, including subsidized loans, during the forbearance or stopped collections period.**

If you want the forbearance or stopped collections to apply only to those loans that may be eligible for a discharge using this form (federal Direct Loans received on or after July 1, 2010 to attend Everest and/or WyoTech programs covered by the enclosed list), you must notify your loan servicer. At any time during the forbearance or stopped collections period, you may voluntarily make payments on your loans, including payments for accrued interest, or end the forbearance or stopped collections by contacting your servicer.

If your claim made using this form is successful, your federal Direct Loans borrowed to attend a covered Everest/WyoTech program will be discharged. Also at that time, the forbearance or stopped collections period for your other federal loans will end. You will be responsible for repaying these other remaining loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

If your claim is denied, you will not receive a discharge of any of your loans and the forbearance or stopped collections period will end for all of your loans. You will be responsible for repaying these loans, including interest that accrued during the forbearance or stopped collections period, under the terms of your promissory note.

☐ Yes, I want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

☐ No, I do **not** want my federal loans to be placed in forbearance and for collections to stop on any loans in default while my loan discharge claim is reviewed.

## SECTION V: CERTIFICATION

By signing this attestation I certify that:

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department of Education or its designee that I meet the qualifications for borrower defense to repayment loan discharge.

All of the information I provided is true and complete to the best of my knowledge and I agree, if asked, to provide information reasonably available to me to the Department of Education that will verify the accuracy of my completed attestation.

I understand that the Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S. Code § 1001.

Signature _____   Date _____

**Privacy Act Notice.** The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087a) *et seq.*, and the authorities for collecting and using your Social Security Number (SSN) are §428B(f) and §484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4) and 31 U.S.C. 7701(b)). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Paperwork Reduction Act Notice.** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0132. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

# EXHIBIT 14



# U.S. DEPARTMENT OF EDUCATION
## APPLICATION FOR BORROWER DEFENSE
## TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**:  To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school.  Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

<u>Fields marked with an asterisk (*) are required for your application to be considered complete.</u>

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name *(First, Middle, Last)* | *Date of Birth *(mm/dd/yyyy)* | *Social Security Number *(Last 4 Digits)* |
|---|---|---|
| *Telephone Number | *Email Address | |
| *Street Address | *City | *State | *Zipcode |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes     ☐ No

*If yes, please enter the full name of the student *(Last, First, Middle)*:

*If yes, please enter the student's Social Security Number *(XXX-XX-XXXX)*:

## SECTION II: SCHOOL INFORMATION

*School

Campus *(including on-line campuses for distance education borrowers)*

*Location *(City, State)*

* Enrollment Dates at this school:

*From *(month/year)*:                    *To *(month/year)*:

☐ If you are still attending this school/campus, please indicate by checking the box.

☐ Check if the enrollment dates above are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

_____

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal).*

_____

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters).*

_____

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

_____

*Current Status at school listed above

☐ Graduated     ☐ Transferred Out     ☐ Withdrew     ☐ Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐ Yes     ☐ No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

_____

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for example, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐ Yes     ☐ No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1.  How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2.  The name/title of people who you believe misled you *(if known)*

3.  What the school told you or failed to tell you.

4.  Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☐ Yes   ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☐ Yes     ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes     ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☐ Yes     ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes     ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

☐ Yes   ☐ No

Is there some other reason you feel your school misled you?

☐ Yes   ☐ No

If yes, you must provide detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes   ☐ No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default.** Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds.** Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

☐ Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

☐ No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently *(as applicable)*.

## SECTION VI. CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines. I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| *Signature | Date |
|---|---|
| | |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

## PRIVACY NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087aa *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

## PAPERWORK REDUCTION ACT NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.



**UNITED STATES DEPARTMENT OF EDUCATION**

**APPLICATION FOR BORROWER DEFENSE TO LOAN REPAYMENT**

FORM APPROVED
OMB NO: 1845-0146
Exp. 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS:** To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school. Once completed, please submit this form and any additional documents you believe will help us review your application by email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 429060, San Francisco, CA 94142.

Fields marked with an asterisk (*) are required for your application to be considered complete.

### SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

**\*First Name:**

**Middle Name:**

**\*Last Name:**

**\*Date of Birth:**

**\*Social Security Number (XXX-XX-XXXX):**

**\*Telephone Number:**

**\*Email Address:**

**\*Street Address:**

**\*City:**

**\*State:**

**\*Zip Code:**

\*Are you a PARENT who took out a federal loan on behalf of the student?  ○ Yes  ○ No

\*If yes, please enter the full name of the student. (Last, First, Middle):

\*If yes, please enter the student's Social Security Number (XXX-XX-XXXX):

### SECTION II: SCHOOL INFORMATION

**\*School:**

**Campus (Including on-line campuses for distance education borrowers):**

**\*Location:  City:**          **\*State:**

**\*Enrollment Dates at this School (MM/YY):**  **\*FROM:**     **\*TO:**     ☐ **Still Enrolled**

☐ **Check if the enrollment dates are approximate, or if you are unsure of them.**

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended:

ED-EN-003.01

| CAMPUS PROGRAM | |
| --- | --- |
| **\*Program Name or Major** | **Credential** |
| | |

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in:

\*Current Status at school listed above: ○ **Attending**    ○ **Withdrew**    ○ **Transferred Out**    ○ **Graduated**

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

\*Have you made any other requests to have your Federal loans forgiven (for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)?

○ Yes    ○ No

\*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available:

\*Have you made any other requests to recover tuition amounts that you paid to your school (for example, a lawsuit against the school or a claim made to a tuition recovery program?

○ Yes    ○ No

\*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available:

**SECTION IV: BASIS FOR BORROWER DEFENSE**

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a detailed description of why you believe you are entitled to borrower defense, including the following information:

1. What the school told you or failed to tell you.
2. How the school communicated with you, whether in a brochure, online, over the phone, by email or in person.
3. The name/title or people who you believe misled you (if known).
4. Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section.** If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you (or fail to tell you important information) about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

○ Yes   ○ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

```
┌─────────────────────────────────────────────────────────────┐
│                                                             │
│                                                             │
│                                                             │
│                                                             │
│                                                             │
│                                                             │
└─────────────────────────────────────────────────────────────┘
```

*Did you choose to enroll in your school based in part on the issues describe above? ○ Yes   ○ No

## PROGRAM COST AND NATURE OF LOANS

Did the school mislead you (or fail to tell you important information) about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

○ Yes   ○ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

```
┌─────────────────────────────────────────────────────────────┐
│                                                             │
│                                                             │
│                                                             │
│                                                             │
│                                                             │
└─────────────────────────────────────────────────────────────┘
```

*Did you choose to enroll in your school based in part on the issues describe above? ○ Yes   ○ No

## TRANSFERRING CREDITS

Did the school mislead you (or fail to tell you important information) about transferring your credits from this school to other schools?

○ Yes     ○ No

If yes, you must provide underlined detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ○ Yes     ○ No

## CAREER SERVICES

Did the school mislead you (or fail to tell you important information) about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

○ Yes     ○ No

If yes, you must provide underlined detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ○ Yes     ○ No

## EDUCATIONAL SERVICES

Did the school mislead you (or fail to tell you important information) about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

⊙ Yes      ⊙ No

If yes, you must provide underlined(detailed) information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ⊙ Yes      ⊙ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you (or fail to tell you important information) about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admittance process?

⊙ Yes      ⊙ No

If yes, you must provide underlined(detailed) information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ⊙ Yes      ⊙ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school? Is there some other reason you feel your school misled you? For more information about the basis for borrower defense relief, see StudentAid.ed.gov/borrower-defense.

If yes to any of the above, you must provide detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above?  ○ Yes     ○ No

**SECTION V: FORBEARANCE/STOPPED COLLECTIONS**

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default.** Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds.** Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.ed.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

☐ **Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.**

☐ **No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.**

**If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently (as applicable).**

## SECTION VI: CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief -- including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

**\*Signature:** _____     **Date:** _____

*Privacy Act Notice.* The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., and 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans become delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

*Paperwork Reduction Act Notice.* According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.



# U.S. DEPARTMENT OF EDUCATION
# APPLICATION FOR BORROWER DEFENSE
# TO LOAN REPAYMENT

OMB Number: 1845-0146
Expiration Date: 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS**:  To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school.  Once completed, please submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov or mail to US Department of Education - Borrower Defense to Repayment, PO Box 1854, Monticello, KY 42633.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *Name (First, Middle, Last) | | *Date of Birth (mm/dd/yyyy) | *Social Security Number (Last 4 Digits) |
|---|---|---|---|
| *Telephone Number | *Email Address | | |
| *Street Address | | *City | *State | *Zipcode |

*Are you a PARENT who took out a federal loan on behalf of the student?

☐ Yes      ☐ No

*If yes, please enter the full name of the student (Last, First, Middle):

*If yes, please enter the student's Social Security Number (XXX-XX-XXXX):

## SECTION II: SCHOOL INFORMATION

*School

Campus (including on-line campuses for distance education borrowers)

*Location (City, State)

* Enrollment Dates at this school:
*From (month/year):                    *To (month/year):

☐ If you are still attending this school/campus, please indicate by checking the box.

☐ Check if the enrollment dates above are approximate, or if you are unsure of them.

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended.

*Program Name or Major *(e.g. Nursing, Medical Assistant, Paralegal).*

Credential/Degree Sought *(e.g. Certificate, Diploma, Associates, Bachelors, Masters).*

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in.

*Current Status at school listed above

☐  Graduated    ☐  Transferred Out    ☐  Withdrew    ☐  Attending

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

*Have you made any other requests to have your Federal loans forgiven *(for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)*?

☐  Yes    ☐  No

*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available.

*Have you made any requests to anyone else to recover tuition amounts that you paid to your school *(for example, a lawsuit against the school or a claim made to a tuition recovery program)*?

☐  Yes    ☐  No

*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available.

## SECTION IV.  BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a **detailed** description of why you believe you are entitled to borrower defense, including the following information:

1.  How the school communicated with you, whether in a brochure, online, over the phone, by email, or in person

2.  The name/title of people who you believe misled you *(if known)*

3.  What the school told you or failed to tell you.

4.  Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

## EMPLOYMENT PROSPECTS

Did the school mislead you *(or fail to tell you important information)* about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

☐ Yes     ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

\*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes     ☐ No

## PROGRAM COST AND NATURE OF LOAN

Did the school mislead you *(or fail to tell you important information)* about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

☐ Yes     ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

\*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes     ☐ No

## TRANSFERRING CREDITS

Did the school mislead you *(or fail to tell you important information)* about transferring your credits from this school to other schools?

☐ Yes     ☐ No

If yes, you must provide underline{detailed} information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes     ☐ No

## CAREER SERVICES

Did the school mislead you *(or fail to tell you important information)* about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☐ Yes     ☐ No

If yes, you must provide underline{detailed} information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?
☐ Yes     ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you *(or fail to tell you important information)* about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you *(or fail to tell you important information)* about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admission process?

☐ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school?

☐ Yes    ☐ No

Is there some other reason you feel your school misled you?

☐ Yes    ☐ No

If yes, you must provide detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues you describe above?

☐ Yes    ☐ No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default.** Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds.** Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

☐ Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.

☐ No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed.  During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.

If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently (as applicable).

## SECTION VI.  CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief --including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines.  I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

| *Signature | Date |
|---|---|
|  |  |

Submit this form and any additional documents you believe will help us review your application by email to BorrowerDefense@ed.gov  or by mail to: U.S. Department of Education - Borrower Defense to Repayment, PO Box 42633, Monticello, KY 42633.

# PRIVACY NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you: The authorities for collecting the requested information from and about you are §421 *et seq.*, §451 *et seq.* and §461 *et seq.* of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 *et seq.*, 20 U.S.C. 1087a *et seq.*, and 20 U.S.C. 1087aa *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

# PAPERWORK REDUCTION ACT NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0146. Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)). If you have comments or concerns regarding the status of your individual submission of this application, please contact BorrowerDefense@ed.gov directly.

# EXHIBIT 15

**JPR Instructions**

Steps:

1. Check the school that the borrower says he/she attended against the Primary School listed in Salesforce.

2. Check for Official School document and any Related Cases.

3. Determine if the borrower made a job placement rate allegation.

4. Determine if one or more programs fall within the coverage dates found in the findings lists.

5. Adjudicate the JPR claim and add one of the following reviews into Salesforce:
   a. Approve
   b. In due to QC
   c. Dual program first out
   d. Dual program due to QC
   e. Outside Coverage dates
   f. Out due to QC
   g. Incomplete Application
   h. Non-Reliance

6. Determine if the borrower is potentially eligible for greater relief under a non-JPR allegation
   a. If yes then transcribe (or add an allegation and put "See Application at X) all non-JPR allegations

1

## STEP ONE:  CHECK THE OPEID AND "SCHOOL 1 NAME" INFORMATION AND CHECK FOR RELATED CASES

Check the school that the borrower says he/she attended against the Primary School listed in Salesforce. The "Customer-Provided School" is the school the borrower wrote on their application, while the "Primary School" field is automatically pulled into Salesforce from the assigned OPEID.

**If the application is against a completely different school than the school listed as the "Primary School"** (e.g. application is against CCI and "Primary School" is DeVry), create a task to the Tier 1 reviewer stating "Application is against CCI, but the Primary School is listed as DeVry" and change the status to **1.4**.[1]

**Move on to your next case.**

**If the school/campus named by the borrower is the same as the school/campus reflected by the Primary School in Salesforce you may continue.**

**Look for Related Cases**:  If a case has a "related case" you must assign the case to the individual designated by BDU and move on to the next claim until you are instructed the claim is able to be adjudicated.  To look for a related case review the "Related Cases" field on the case page.  Additionally, click into "Contacts" by clicking the borrower's name and selecting "Details" in the "Primary Cases" tab. If there are no related cases the claim may be adjudicated:

**MOVE ONTO STEP TWO**

---

[1] If Salesforce or NSLDS indicates a claim is against Bryman or Alterius treat the case as against Corinthian.

## STEP TWO:  CHECK FOR OFFICIAL SCHOOL DOCUMENT

Check to see whether the borrower has attached a transcript, enrollment agreement, or some other official school document that records campus/program/date information.

**If there is an official school document**:

Click on "New Program & Credential"
- You will fill in the school document type, the first program from the school document, and the start date for the first program from the school document. If there are second (and third, fourth, etc.) programs/dates also reflected in the school document, add those programs to the notes field. Then click "ok" to save all of the recorded information into the review box.
- If there is more than one official school document in the file, the order of preference for which document to use is: transcript, enrollment agreement, and other.  Loan documents are not "official school documents."  Loan documents rarely contain information required to complete these steps.

    **NOTE:  <u>The school name, campus, program information, and enrollment start date contained on the official school document will serve as the definitive data points for the adjudication of the programs contained on the school document.</u>**  This means that the official school document overrides what the borrower wrote in their application as well as the school provided data.  However, it is important to remember that the borrower data and/or the school provided data may contain information on additional programs not contained within the official school document.

MOVE ON TO STEP THREE

**If there is NOT an official school document:**

MOVE ON TO STEP THREE

3

## STEP THREE:  RECORD THE JPR ALLEGATION

Add a JPR allegation into the tool.
- If there is a JPR allegation you can simply write "yes" for the text of the allegation
- If there NOT a JPR allegation you can simply write "no" for the text of the allegation

How to determine if a JPR allegation was made:

If the borrower's application is on an attestation form:
- Check if the form is signed. Any indication that the student intended to sign in the signature box, including a typed name, is acceptable. The file may also contain a separate piece of paper signed by the student which is fine. Unless there is a signature on a separate page, an empty signature box does not count. Attached photos* of the borrower will be accepted as a signature.  *Must be a photo of a real person (no cartoons, etc.).

For all other application types
- Check if the form has an eligible checkbox for job placement rates that states: "Citing false and/or misleading job placement statistics and salary information to convince me to enroll." If the form has *exactly* that language, and the box is checked, then the borrower made a JPR allegation.[2] For the universal form, if the borrower checks "yes" under the Employment Prospects box, we will accept this as constituting reliance on JPR.
- If there is no such checkbox, or if the checkbox is not checked, does borrower allege in the text of their application that they were presented with job placement rates?

Examples of what kind of statements indicate the borrower made a placement rate allegation:
- Would count:
  - "…told me their job placement in your field of study was 90%..."
  - "Heald College drew me in by their promising rates of employment after graduation."
  - "…they also had shown me brochure/papers that showed high job numbers for their past students and promising careers."
- Would NOT count:[3]
  - "told me that they had lifetime career assistance…"
  - "…enrolled because of the job placement program they had."
  - "The school told me they would help me find a job."
  - "They said they would also assist in finding me employment"
  - "They promised/guaranteed me a job"

Whether or not the borrower made a JPR allegation, move onto STEP FOUR.

---

[2] Note: Keep an eye out for forms with *similar* language. There is one form in particular that has a checkbox followed by: "Misleading me about how this program would prepare me for a job…" and then language about both job placement statistics and other possible misrepresentations. That is not an eligible checkbox.
[3] In these examples, it's unclear whether the borrower is alleging a false rate or making a claim about career services/employment.

000481

## STEP FOUR:  DETERMINE WHICH PROGRAMS FALL WITHIN THE FINDINGS

**Determine the appropriate campus, date, and program to use:**
**Campus: If the CAMPUS named by the borrower is a completely different campus than the OPEID found in the NSLDS data:**

Check to see if the CCI data confirms one of the data points, if so use the confirmed campus.

If the CCI data does NOT confirm one of the data points, review the findings at both campuses.

**If the borrower leaves the CAMPUS field blank:**

If the CCI data and NSLDS data match, use the confirmed campus.

If the CCI data and NSLDS data do NOT match, change the status to **1.4** and task the Tier 1 reviewer with reaching out to the borrower to confirm their campus.

**Program & Credential:** If the program and credential listed by the borrower in their application matches the CCI data (or there is no CCI data available) treat the program and credential as being confirmed.

If the program and credential listed by the borrower in their application DO NOT match the CCI data treat them as separate programs.[4]

If the borrower leaves his program and/or credential blank and there is no CCI data, set to 1.4 with a task to ask the borrower about the programs/credential.

**Enrollment Start Date:** Check to see if the enrollment start date on the borrower's application, the CCI data, and NSLDS data match.  If two of the three data points match, the date is confirmed and the date will be your Enrollment Start Date.

If the data points do not match:
- And all three data points are within the findings period, the earliest date within the findings will be your Enrollment Start Date.
- And one data point is outside the findings period, but the dates from the other two data points are within **30 days** of each other AND both data points fall within the findings, use the earliest date within the findings as the Enrollment Start Date.
- And there is no CCI data, use the borrower's date as the Enrollment Start Date.
- IF all you have is an NSLDS date (no CCI data and borrower's date is blank), set it to 1.4 with a task to ask the borrower about the enrollment date.

**Repeat the above steps for each distinct program found on the application/CCI data.**

**Review the Findings:**

1. Using the Everest/WyoTech Findings list or the Heald Findings list, locate the first campus attended by the borrower as alleged on the borrower's application and then the corresponding program.
     i. **NOTE:** if the borrower's application does not contain the enrollment begin date or the program (on either the application itself or an attached official school

---

[4] If the borrower does not have a program/credential/date listed you may still be able to adjudicate the case if there is CCI data.

000482

document) but we have CCI data, you may use the CCI data to adjudicate the claim. If there is no CCI data available and you are unable to adjudicate the claim, set the status to **1.4** and task the Tier 1 reviewer with reaching out to the borrower.

   b. If the campus is not on the findings lists, then there are no eligible programs at this campus.

   c. If the program is not on the findings list for a given campus then that program has no eligible coverage dates.

      i. **NOTE:** this is not necessarily the case for California campuses. If the program is not listed under a given California campus on the findings lists, please consult the California Exception Instructions at the end of this packet to determine whether there are eligible coverage dates for that program at the campus.

2. Using the findings lists determine whether the enrollment start date for this program is within the listed coverage dates for the program.

   a. **NOTE:** on the early attestation forms the earliest date a borrower could enter was July 2010, however some borrowers wrote their actual date in the comment section of the form.

3. Repeat steps 1 and 2 for all other programs.

4. Determine how many programs fall within the findings and go to the appropriate next step:

   **a. Go to STEP FIVE Approval Instructions if:**

      i. The earliest program (either from borrower application or school provided data) falls within the findings

      ii. The earliest program alleged on the borrower's application falls within the findings (even if an earlier program from the school provided data falls outside the findings)

   **b. Go to STEP FIVE Dual Program instructions if:**

      i. The earliest program alleged **<u>on the borrower's application</u>** falls outside the findings, but a later program falls within the findings

   **c. Go to STEP FIVE Denial instructions if:**

      i. All programs fall outside the findings.

6

**STEP FIVE:  ADJUDICATING THE JPR CLAIM**

**Approval Instructions**

You should only be here if the earliest program (either from borrower application or school provided data) falls within the findings or the earliest program alleged on the borrower's application falls within the findings (even if an earlier program from the school provided data falls outside the findings).

**If the earliest approvable program** is found on the borrower's application or official school document, add a review with the Recommendation as **"Approved"** and the Recommendation Reason as **"Approve**." However, if the borrower has an approvable program and date on their application, but the CCI data **AND** NSLDS loan information indicate the borrower attended that program at a time NOT covered by the findings add a review stating "**Out due to QC**" as opposed to "Approve."

If the earliest approvable program is found <u>only</u> in the CCI data, add a review stating **"In due to QC."**

**Add the Controlling Date & Source to Your Review:**
The controlling date will be the earliest Enrollment Start Date (from Step 4) <u>within the findings period</u>. Enter the source that corresponds to your controlling date.[5]

Remember: Check if the enrollment start date on the borrower's application, the CCI data, and NSLDS data match.  If two of the three data points match, the date is confirmed and the date will be your Enrollment Start Date.

If the data points do not match:
- And all three data points are within the findings period, the earliest date within the findings will be your Enrollment Start Date.
- And one data point is outside the findings period, but the dates from the other two data points are within **30 days** of each other AND both data points fall within the findings, use the earliest date within the findings as the Enrollment Start Date.
- And there is <u>no CCI data</u>, use the borrower's date as the Enrollment Start Date.

**Add the Applicable Program & Source to Your Review:**
Enter the program the borrower attended and the credential.  For consistency, enter the program and credential as it appears on the findings sheet.  Select the source for the program.[6]  If the borrower attended multiple programs that fall within the findings write "Update at Relief" as the Applicable Program.

**NOTE:**  Often if there is no school provided data it is because the application is from a parent for a parent plus loan.  If there is no school provided data, double check the "Student SSN" in Salesforce.  You will often be able to find the CCI data by searching the "Student SSN."

If the borrower has NOT made a JPR allegation (see STEP THREE):
- If the application is an attestation form and the borrower has an approvable JPR allegation add a review with a recommendation of **Reviewed** and a reason of **Incomplete Application.**  Change global status to **1.4** and send a task to the tier 1 reviewer stating that attestation is not signed.

---

[5] Currently in Salesforce there is no dropdown for CCI data.  If your controlling date comes from CCI data, select NSLDS as the drop down.
[6] Remember an official school document will override any other data source.

- If the application is not an attestation form and the borrower does not make a JPR allegation (see STEP THREE), add a review with the Recommendation as **"Denied"** and the Recommendation Reason as **"Lack of Reliance"**

Save your review. Propagate the review up to the allegation. Propagate the allegation up to the case. Then do the following:

- **If you are off 100% QC:** change the case status to **2.21 (Ready for QC)** and change the case owner to "BD FSA Adjudication Queue."
- **IF you are still on 100% QC:** Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer.

8

## STEP FIVE:  ADJUDICATING THE JPR CLAIM

### Dual Program Instructions

You should only be in this section if the earliest program alleged **on the borrower's application** falls outside the findings, but a later program falls within the findings.  If the date on the borrower's application is outside the findings, but the date from the CCI data, and the date from the NSLDS data are within **30 days** of each other AND both the CCI date and NSLDS date falls within the findings, use the earliest date within the findings and move to **STEP FIVE: Approval Instructions.**

If the later program, that falls within the findings, is only found in the CCI data add a review with the Recommendation at "Partial" and the Recommendation Reason as **"Dual Program Due to QC."**

If the later program, that falls within the findings, is listed on the borrower's application add a review Recommendation at "Partial" and the Recommendation Reason as **"Dual Program, First Out."**

**Add the Controlling Date & Source to Your Review:**
The controlling date will be the earliest Enrollment Start Date (from Step 4) <u>within the findings period</u>. Enter the source that corresponds to your controlling date.

**Add the Applicable Program & Source to Your Review:**
Enter the program the borrower attended and the credential.  For consistency, enter the program and credential as it appears on the findings sheet.  Select the source for the program.[7]

**Determine if Borrower May be Eligible for Non-JPR Relief:**
If the borrower made substantive non-JPR allegations <u>against the earlier program that is outside the findings period</u> there is an opportunity for greater relief.  If necessary, transcribe any additional allegations into Salesforce[8]

If the borrower has NOT made a JPR allegation (see STEP FIVE):
- If the application is an attestation form and the above instructions lead you to put **Dual Program first out, or Dual program due to QC,** as the JPR recommendation; instead put **Incomplete Application.**  Change global status to **1.4** and leave a comment saying that the attestation is not signed.
- If the application is **NOT** an attestation form and the below instructions lead you to put **Dual Program first out, or Dual program due to QC** as the JPR recommendation; instead put **Non-Reliance.**

Save your review.  Propagate the review up to the allegation.  Propagate the allegation up to the case.  If the borrower made substantive non-JPR allegations, change the case status to **2.2 (EU Review in Progress)**. If the borrower made no substantive non-JPR allegations do the following:
- **If you are off 100% QC:**  change the case status to **2.21 (Ready for QC)** and change the case owner to "BD FSA Adjudication Queue."
- **IF you are still on 100% QC:**  Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer.

---

[7] Remember an official school document will override any other data source.
[8] If the allegations are more than a few sentences you may just add the allegation and type "See Application."

## STEP FIVE:  ADJUDICATING THE JPR CLAIM

### Denial Instructions

Double check that all programs fall outside the coverage dates

Add JPR review with a Recommendation of **"Deny"** and the Recommendation Reason as "**Outside Coverage Dates**."

### Determine if Borrower May be Eligible for Non-JPR Relief:
If the borrower made substantive non-JPR allegations there is an opportunity for greater relief.  If necessary, transcribe any additional allegations into Salesforce[9]

Save your review.  Propagate the review up to the allegation.  Propagate the allegation up to the case.  If the borrower made substantive non-JPR allegations, change the case status to **2.2 (EU Review in Progress)**. If the borrower made no substantive non-JPR allegations do the following:
- **If you are off 100% QC:**  change the case status to **2.21 (Ready for QC)** and change the case owner to "BD FSA Adjudication Queue."
- **IF you are still on 100% QC:**  Change the case status to **2.22 (Currently being QCd)** and change the case owner to your QCer.

---

[9] If the allegations are more than a few sentences you may just add the allegation and type "See Application."

## California Exception Instructions

If a program is not listed under a given California campus on the findings lists you will have to consult the master list for California campuses.

If a particular program appears on the master list but not on the findings list, it is because that program published correct rates. Thus, that program is ineligible for relief. However, if the borrower enrolled in a program that does not appear on either list see if the program the borrower applied for is eligible at any campus (to find the correct relief percentage). If so, enter the program as the controlling program and the appropriate relief percentage. This will generally apply only to WyoTech programs **for California campuses only**!

EXAMPLES:

EXAMPLE 1: The borrower enrolled in Motorsports Chassis Fabrication with Automotive Technology at Wyotech West Sacramento. This program is ineligible because it is on the master list but not on the findings list.

EXAMPLE 2: The borrower enrolled in Automotive Technology with Light Duty Diesel at Wyotech West Sacramento. This program is eligible because it is not on either list, but the findings list does show a similarly-sounding eligible Auto Tech program.

EXAMPLE 3: The borrower enrolled in medical assisting at Wyotech West Sacramento. This program is ineligible because, even though it is not on either the findings or master lists, there is no similarly sounding program on the findings list.

If you come across a situation like Example 2 at a non-California campus, please email FSA with the BD# and move onto the next claim. This should be a rare situation.

**If you have any questions about program eligibility, especially regarding Wyotech programs, please email BDU**

000488

# EXHIBIT 16

Protocol for Reviewing Corinthian Allegations

1. In Salesforce, go to your assigned cases and open the first case.

2. Click "Get Loans & Programs."

3. Open the application and confirm the borrower's application is against Corinthian[1].
   a. If not, send the case to 1.4 with a task to the Tier 1 reviewer.

4. Click into the contact and determine if the borrower has another application pending.
   a. If the borrower does have another application against the same school:
      i. If both cases are in a status prior to Status 3.0-- Save all applications and documents to one case and close the other case as a duplicate. To close the case, edit the case details so Status = 4.0 and Resolution Action = "Duplicate – Existing Application." Move onto Step 5 and adjudicate the open case.
      ii. If one case is in a 4.0 status because it was closed as a duplicate (see the resolution action), ensure that all applications and documents are saved into the open case. Then leave the 4.0 case closed and move onto Step 5 to adjudicate the open case.
      iii. If one case is in a 4.0 status because a prior application was already approved or denied (see application decision), place the open case in Status 5.10 "Reconsideration Request Submitted by Borrower." Leave the 4.0 case as is. You are done.
      iv. If one case is in 4.0 status for another reason than described in (ii) or (iii) above, or if one case is in a 3.0 status, create a task for an individual designated by BDU. You are done.
   b. If the borrower has another application pending against a different school, make a note for yourself for Step 15.

5. Verify the enrollment date[2] for the program the borrower is applying against is within the time period Corinthian owned the campus using the "CCI Campuses OPEIDs and Acquisition Dates" document by using the date on the application, NSLDS data, and any available CCI data.
   a. If two data points match, the enrollment date is confirmed.
      i. If the confirmed date is within the time period Corinthian owned the campus move on to Step 6.
      ii. If the confirmed date is outside the time period Corinthian owned the campus, treat the application as a one off denial/medium batch school.
   b. If two data points are within the time period Corinthian owned the campus, the earliest date within the time period is the enrollment date.  Move on to Step 6.
   c. If two data points are outside the period Corinthian owned the campus treat the application as a one off denial/medium batch school.

---

[1] Corinthian schools include the names: Heald, Everest, Wyotech, Alterius, Bryman, Florida Metropolitan University
[2] This date will be used as the controlling date if the case is approved.

d.  If there are only two data points and one is within the time period Corinthian owned the campus, this will be the enrollment date.  Move on to Step 6.

6.  Click into the appropriate allegation, select "Related" and select "New Review."

7.  Review the allegation using applicable review criteria/protocol.

8.  Determine which Borrower Defense regulation applies:
    a.  The 2016 regulation will apply (and the borrower is subject to a six-year SOL) if
        i.  The borrower only has loans taken out on or after July 1, 2017 for the school they are applying against.
        ii.  The borrower has consolidated their loans into a Direct Loan on or after July 1, 2017.[3]
        iii.  The borrower took out FFEL or Perkins loans (Loan Type: PL/RF/SF/SF/SU/DU/EU/IC/NU/PU) for the school they are applying against that have not been consolidated and the borrower has no Direct Loans before July 1, 2017.
    b.  The 1995 regulation will apply (and the borrower is subject to a five-year SOL) if
        i.  The borrower has only taken out Direct Loans (D1-D9) before July 1, 2017 for the school they are applying against.
        ii.  The borrower has consolidated their loans into a Direct Loan prior to July 1, 2017.
    c.  Both the 2016 and the 1995 regulations will apply (and the borrower will be subject to the longer six year SOL) if:
        i.  The borrower has Direct loans (D1-D9) both before and after July 1, 2017 for the school they are applying against.
        ii.  The borrower took out FFEL or Perkins loans (Loan Type: PL/RF/SF/SF/SU/DU/EU/IC/NU/PU) for the school they are applying against that have not been consolidated and the borrower has at least one Direct Loan before July 1, 2017.
    d.  If the borrower's application is approved, move onto Step 9. If the borrower's application is denied, move onto Step 12.

9.  Determine the Applicable Statute of Limitations
    a.  If the 2016 regulation applies the borrower is subject to a six-year statute of limitations.
    b.  If the 1995 regulation applies the borrower is subject to a five-year statue of limitations.
    c.  If both regulations apply the borrower is subject to a six-year statute of limitations.

10. Determine the Statute of Limitations Date
    a.  Use the later of the last Loan Period End Date from the NSLDS data (*for any underlying CCI loan; cannot use consolidated or other school loan end dates) or the Enrollment End Date from the CCI data.  Compare that date to the date the borrower signed the

---

[3] The consolidation date may be found by clicking into the consolidation loan and looking at the disbursement date.

application (or the Date/Time Opened field in Salesforce if the application does not have a date).[4] If the difference is greater than the applicable statute of limitations date (five or six years depending on the regulation that applies), then the borrower is subject to the statute of limitations.

b. If the borrower is **not** subject to the statute of limitations move on to Step 10 and select "Approve" for the Recommendation Reason and leave the Statute of Limitations date blank.

c. If the borrower **is** subject to the statute of limitations review the later of the last Loan Period End Date from the NSLDS data or the Enrollment End Date from the CCI data:

   i. If the borrower is subject to the 1995 regulation add five years to this date. Enter this new date into the Statute of Limitations Date (after selecting Recommendation Reason: Approve Pending SOL).

   ii. If the borrower is subject to the 2016 regulation add six years to this date. Enter this new date into the Statute of Limitations Date (after selecting Recommendation Reason: Approve Pending SOL).

11. If the allegation should be approved, change the following fields in the review screen:

   a. Recommendation: Approve.

   b. Recommendation Reason: Approve or Pending SOL.

   c. Controlling Begin Date: The enrollment date from Step 5.

   d. Controlling Date Source: Select the source of the enrollment date.

   e. Applicable Program: Enter the program the borrower attended and the credential level. If the borrower attended multiple programs, enter "Update at Relief."

   f. Applicable Program Source: Select the source of the program name. If the borrower attended multiple programs, enter "Update at Relief."

   g. Relevant State Law:

      i. If the 2016 regulation applies enter "Federal Standard"

      ii. If the 1995 regulation applies enter "CA."

      iii. If the 1995 regulation and the 2016 regulation apply enter "CA."

   h. Statute of Limitations Date: Enter the applicable statute of limitations date from Step 8.

   i. Legal Basis: Misrepresentation.

   j. Review Regulation: Enter the applicable regulation from Step 8.

12. If the allegation should be denied, change the following fields in the review screen:

   a. Recommendation: Deny.

   b. Recommendation Reason: "Failure to State a Legal Claim" or "Insufficient Evidence" as appropriate.

   c. Relevant State Law:

      i. If the 2016 regulation applies enter "Federal Standard"

      ii. If the 1995 regulation applies enter "CA."

      iii. If the 1995 regulation and the 2016 regulation apply enter "CA."

   d. Legal Basis: Misrepresentation

---

[4] If the Date/Time opened is equal to 12/8/2018 create a task to the Tier 1 reviewer requesting the correct application open date.

e.   Review Regulation: Enter the applicable regulation from Step 8.

13. Save your review and go back to the allegation tab.  Refresh the page if necessary and update the allegation with the review that was just recorded.

14. If the allegation is denied, repeat the above steps for the next allegation.

15. Return to the case page:

   a.   If the allegation is approved, click the related tab and select the applicable allegation. Update the case.

      i.   Change the status to 2.21 (Ready for QC).[5]

      ii.   Change the Suggested Closing Correspondence as indicated in Closing Correspondence Chart.

   b.   If there are no other allegations, or all other allegations have been denied change the "Application Decision"  to "Flagged for Denial." Change the "Decision Reason" to either "Lack of Evidence" or "No Claim Stated."

      i.   Change the status to 2.21.

---

[5] If you are 100% QC change the status to 2.22 and change the case owner to your QCer.

# EXHIBIT 17

**ITT Employment Prospects Instructions**

1. **When to Mark a Claim "Approve"**:
    A. **Borrower enrolled at an ITT Technical Institute campus located in California *after* January 1, 2005, *and***
    B. **Borrower alleged that ITT made at least one of the following misrepresentations:**
        i. ITT expressly guaranteed "job placement" (i.e., "They promised employment.").
        ii. ITT implied that employment was assured (i.e., "They said everyone finds a job.").
            1. ITT staff presented recruitment documents with a "wink and a nod" – in a manner that led students to believe employment was assured (i.e. a recruiter displayed an employment prospects document and reassured the borrower regarding his chances of landing one of the jobs listed: "You'll be good to go.").
        iii. ITT guaranteed Borrower a post-graduate income (e.g. a qualitative description of how much money Borrower will make, or specific or minimum salary or hourly pay).
            1. Common Examples:
                a. "Don't worry about your student loans, you'll be able to pay them back quickly with all the money you'll be making"
                b. "You'll be making tons of money"
                c. "you're externship site will hire you"
                    i. **NOTE:  NOT** the same as guaranteeing an externship
    C. **Note on Nominal Limitations**: Nominal limitations to an employment guarantee do not preclude relief.  For example, representations that "almost all" ITT students get a job, or that the school "basically" guaranteed employment, do not preclude approval.

2. **When to Mark a Claim "Deny"**: If Borrower does not make a valid guaranteed employment claim, change "Guaranteed Employment Recommendation" to "Deny."
    A. Common examples
        i. If the allegation talks about "help" being placed in a job this is not a job prospects claim, but rather a career services claim
        ii. Allegations that graduates are in high demand
        iii. Employers are calling us asking for graduates
        iv. Allegations about being told what the average Medical Assistant (or whatever the borrower is studying) salary
        v. Allegations of being told information about employment after the borrower was already employed
            1. For example:  "At graduation I was told finding a job was guaranteed" or "When I worked with the career services office they told me not to worry about finding a job"

3. **Note**: Whether Borrower ultimately obtains employment is not part of this analysis and should not be considered when making a recommendation.

# EXHIBIT 18

**STANDARD PROTOCOL**

**PART I:  Small/Medium Batch Memo**

1. Open SalesForce and go to "My Cases" to see which schools have been assigned to you
2. Select one school:
   a. If the school has between 1-5 cases only move on to Part II
   b. If the school has between 6-20 cases complete a small batch school memo using the "Small Batch Memo Template"
   c. If the school has between 21-100 cases complete a medium batch memo using the "Medium Batch Memo Template"
3. Once you complete the appropriate memo email the appropriate Borrower Defense attorney to tell them that you have completed the memo.
4. While you wait for feedback start developing a small/medium batch memo for the next school in your queue your next school.
5. Once you have been informed that you can start adjudicating the cases for your school move to Part II.

**PART II:  Case Review**

1. Open the files and/or attachments for the case you are reviewing. Confirm that there are no related case or intake issues.

2. Review all the allegations individually, using the Types of Claims 10.23.2018 document.
   a. If the allegations have not been transcribed, you do not need to transcribe the application into the tool. Create a new allegation of the appropriate type(s), and enter the narrative "See attached." Identify the page number and, if there are multiple documents, identify which document to refer to ("[Transfer of Credits]: See attached, 'John Smith Letter,' p. 3").

3. If the borrower attaches any evidence that indicates there has been an attorney general action or class action or any lawsuit relevant to the borrower defense inquiry:
   a. Email your assigned QC attorney with the case # and explanation of the evidence/action.
   b. Stop work on the school. Move on to the next school.

4. If the borrower attaches any evidence that supports that borrower's particular allegation, but does not indicate any larger action against the school,
   a. Email your assigned QC attorney with the case # and why you think the evidence supports the allegation
   b. Stop work on the case. Move onto the next case.
5. If the allegation does not state a claim, does not state a BD claim, or does not have sufficient evidence to support a claim,
   a. set the allegation review recommendation as "denied"

b. select the appropriate denial reason:
    i. does not state a claim = "No claim stated"
    ii. does not state a BD claim = "Failure to state a claim actionable under BD reg"
    iii. insufficient evidence = "Lack of evidence"
c. Update the allegation.
d. Move onto the next allegation.

6. Once all the allegations have been reviewed, update the Application Decision, Decision Reason and Status:
    a. Set the Application Decision to "Flagged for Denial," and select the appropriate denial reason:
        i. If all allegations were denied for the same reason, select that reason;
        ii. If the allegations were denied for multiple reasons, one of which was "Lack of Evidence", select "Lack of Evidence";
        iii. If the allegations were denied for a combination of "No Claim Stated" and "Failure to state a claim actionable under BD reg", select "No Claim Stated."
    b. If you are on 100% QC update the status to 2.22 and assign the case to your QC attorney (please choose the option to not send an email).  If you are off 100% QC update the status to 2.21

7. Move on to the next case against the school you are reviewing.

# EXHIBIT 19



U.S. Department of Education
Office of Inspector General

# Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process

December 8, 2017
ED-OIG/I04R0003

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

Audit Services

December 8, 2017

TO:         Dr. A. Wayne Johnson
            Chief Operating Officer
            Federal Student Aid

FROM:       Patrick J. Howard
            Assistant Inspector General for Audit

SUBJECT:    Management Information Report, "Review of Federal Student Aid's Borrower Defense to
            Repayment Loan Discharge Process," Control Number ED-OIG/I04R0003

Attached is the subject final management information report that consolidates the results of our review of Federal Student Aid's borrower defense to repayment loan discharge process. We have provided an electronic copy to your audit liaison officer. We received your comments generally agreeing with the recommendations in our draft report.

U.S. Department of Education policy requires that you develop a final corrective action plan within 30 days of the issuance of this report. The corrective action plan should set forth the specific action items and targeted completion dates necessary to implement final corrective actions on the findings and recommendations contained in this final report. Corrective actions that your office proposes and implements will be monitored and tracked through the Department's Audit Accountability and Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is required to report to Congress twice a year on the reports that remain unresolved after 6 months from the date of issuance.

We appreciate your cooperation during this review. If you have any questions, please contact me at (202) 245-6949, or Christopher Gamble at (404) 974-9417.

cc: James F. Manning, Acting Under Secretary

Attachment

# Table of Contents

Results in Brief ................................................................................................................ 1

Introduction .................................................................................................................... 5

Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student
Loan Borrower Defense Loan Discharge Process ............................................................ 9

Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense
Claim Data.................................................................................................................... 21

Appendix A. Scope and Methodology............................................................................ 24

Appendix B. Acronyms and Abbreviations..................................................................... 29

Appendix C. FSA Comments.......................................................................................... 30

## Results in Brief

### What We Did

The objectives of our review were to (1) determine Federal Student Aid's (FSA) policies and procedures over its Federal student loan borrower defense loan discharge process, (2) determine the documentation FSA maintains to support its borrower defense loan discharge decisions, and (3) determine the outcomes of FSA's borrower defense loan discharge proceedings. We obtained and analyzed the information presented in this report through interviews and documentation requests of FSA's Borrower Defense Unit (BDU) and Business Operations office, U.S. Department of Education's (Department) Office of General Counsel (OGC), and three contractors. Our review covered FSA's borrower defense loan discharge process from the end of June 2016, when the BDU assumed management of the process, through July 31, 2017.

### What We Found

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to reviewing borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with FSA's procedures for: (1) documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met.

We found that FSA established seven categories of claims that qualified for loan discharge based on characteristics that the claims had in common. We also found that FSA maintained support for its borrower defense loan discharge decisions. FSA's Business Operations maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. BDU used this information to make borrower defense claim determinations and maintained documentation. BDU also maintained supporting documentation for the legal memoranda that it relied on for its loan discharge decisions. Specifically, as support for its memoranda to establish the legal basis for borrower defense claims, BDU maintained copies of the factual evidence cited, such as deposition transcripts provided by state attorneys general. However, we found that FSA did not have documentation of an OGC opinion specifically supporting the eligibility of one category of claims for discharge or documenting the legal basis supporting the amount of loan discharges for two categories of claims.

We reviewed a sample of 50 borrower defense claims that BDU approved for loan discharges, consisting of 45 claims submitted by individual borrowers and 5 claims associated with borrowers who attended the American Career Institute. BDU and Business Operations maintained documentation to support the determinations for all 50 claims. For each of the 45 claims submitted by individual borrowers, Business Operations maintained the claim applications, attestations, and other supporting documentation; and BDU maintained spreadsheets containing the claim information and determinations for each claim. For each of the 5 claims associated with borrowers who attended the American Career Institute, BDU maintained the list provided by the Massachusetts Attorney General's office of all students who attended the school. According to documentation FSA provided, of the 50 claims we reviewed, 49 claims resulted in 249 loans discharged or pending discharge.[1] We randomly selected one loan associated with each of these 49 claims and found that each loan's status on FSA's documentation matched information in student loan database. However, for 2 of the 49 loans, we found that although FSA's documentation and student data system showed the loans were pending discharge, another system showed the loans had been discharged on July 17, 2017, and July 25, 2017, respectively. FSA took steps to correct the status of these two loans and put in place system edits to correct this situation for future discharges. On October 13, 2017, we verified that the information for the two loans had been corrected. We also reviewed the only two claims that FSA denied.[2] BDU and Business Operations maintained documentation to support the determinations for both claims.[3]

We found that FSA did not have an adequate information system to manage borrower defense claim data. Specifically, it could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

---

[1] Of the 50 claims we reviewed, 1 claim was associated with a borrower whose loans were already cancelled or paid in full.

[2] Although BDU did not have a process for closing out claims that have been denied, these two claims were handled on an ad hoc basis due to extensive communication associated with the claims, which included many Department and claimant emails and ombudsman involvement.

[3] We also confirmed that the associated loans for both claims were removed from forbearance.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

2

FSA provided the following outcomes (as of July 2017) of its borrower defense loan discharge proceedings. FSA also reported that about $73 million in loans were associated with borrower defense claims approved prior to July 1, 2016, and that about $376 million in loans were associated with borrower defense claims approved between July 1, 2016, and January 20, 2017. The Under Secretary under the previous administration approved 27,986 claims; of these, about 16,000 claims were approved from January 1, 2017, through January 17, 2017.[4] No claims were approved after January 20, 2017. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the outcome data provided by FSA.[5]

**Table 1. FSA's Borrower Defense Outcomes**

| Claims | Before July 1, 2016[a] | July 1, 2016, through January 20, 2017 | After January 20, 2017 | Total |
|---|---|---|---|---|
| Received | 26,603 | 46,274 | 25,991 | 98,868 |
| Approved | 3,787 | 27,986 | 0 | 31,773 |
| Denied | 0 | 0 | 2 | 2 |

[a] This does not include claims received prior to the Special Master's tenure of June 25, 2015, through June 29, 2016.

From January 20, 2017 to July 31, 2017, Business Operations continued to receive borrower defense claims. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. However, the Acting Under Secretary has not approved or denied these claims. According to the Director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval or to continue developing memoranda on additional categories of claims that qualify for discharge because the borrower defense policies are being reviewed with the

---

[4] Source:  Lists of approved claims associated with 10 approval memoranda that the Under Secretary signed in January 2017. These lists include claims that were approved and had loans available for discharge, and approved claims that may not have loans available for discharge.

[5] FSA provided additional data on October 26, 2017; however, we did not have time to review the data and therefore, did not incorporate the data into this report.

change in administrations. While awaiting specific instructions, BDU's contractors summarized allegations made in unique claims. Also, BDU and Business Operations continued to develop a new claims management tool that adds an interface to the borrower defense database. In addition, Business Operations continued to discharge loans, after receiving approval from the Acting Under Secretary in June 2017, that were associated with the 16,000 claims approved[6] before January 20, 2017, and that the new administration agreed to honor.

## What We Recommend

We made several recommendations for FSA to develop, document, and implement policies and procedures over the Federal student loan borrower defense loan discharge process. We also recommended that FSA improve its information system for the borrower defense loan discharge process.

We provided a draft of this report to FSA for comment. FSA generally agreed with the report and recommendations. We include the full text of FSA's comments in Appendix C of this report. FSA also provided technical corrections; we made revisions to the report where appropriate. In response to FSA's request, we provided FSA with a copy of the final report and resolved any concerns about possible privileged material in this report or FSA's comments.

---

[6] These claims were not discharged prior to January 20, 2017.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                    4

# Introduction

## Background

### Statute and Regulations Pertaining to Borrower Defense

The Student Loan Reform Act of 1993 (Public Law 103-66) amended the Higher Education Act of 1965 to establish the William D. Ford Federal Direct Loan Program (Direct Loan). Section 455(h) of the Higher Education Act, as amended, required the Secretary to specify in regulation the acts or omissions of a borrower's school that a borrower may assert as a defense to repayment of a Direct Loan, commonly called "borrower defense."

The Department established regulations covering such borrower defenses at 34 CFR § 685.206(c), effective July 1, 1995. The regulations specified that a borrower may assert as a defense against repayment, any act or omission of the borrower's school that would give rise to a cause of action against the school under applicable State law.

In response to the collapse of Corinthian Colleges, Inc., the Department issued revised regulations on borrower defense, which were scheduled to be effective July 1, 2017. These revised regulations established a Federal standard for borrower defense claims. On June 16, 2017, the Department announced a delay in the implementation, until further notice, of the revised borrower defense regulations due to pending litigation. The Department established a rulemaking committee to review and revise the borrower defense regulations. The Department announced that the rulemaking committee would meet from November 2017 through February 2018 to develop proposed borrower defense regulations. On October 24, 2017, the Department announced that it would continue to preserve the regulatory status quo until July 1, 2018, and proposed further delay until July 1, 2019. Until the delay in implementing the 2017 regulations is lifted or new regulations are issued, all claims are subject to the regulations that became effective July 1, 1995.

### Increase in Borrower Defense Claims and Appointment of Special Master

Before 2015, borrowers had made only a handful of borrower defense claims. Claims significantly increased when Corinthian Colleges closed in April 2015 and ITT Technical Institutes closed in September 2016, and thousands of borrowers submitted borrower defense claims to FSA to have their Federal student loans discharged. Because the Department did not have an established infrastructure for accepting, processing, and reviewing large numbers of loan defense claims, in June 2015, the Under Secretary appointed a Special Master to advise the Department on the creation of a borrower defense process. The Department also announced on June 8, 2015, that it would use

existing evidence, where appropriate, to ease borrowers' burden in establishing their eligibility for borrower defense relief: "Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers." The Special Master served as an advisor in the borrower defense claim process from June 24, 2015, through June 23, 2016, after which the FSA Enforcement Unit's BDU took over the process.

Table 2 shows the increase in borrower defense claims over time.

**Table 2. Increase in Borrower Defense Claims**

| Time Period | Number of Claims Received |
|---|---|
| July 1, 1995, through June 24, 2015 <br> *(Implementation of Borrower Defense Regulations to Appointment of the Special Master)* | 5 |
| June 25, 2015, through June 29, 2016[a] <br> *(Appointment of Special Master through last Special Master Report)* | 26,603 |
| June 30, 2016, through January 20, 2017 <br> *(Formation of BDU through end of the prior administration)* | 46,274 |
| January 21, 2017, to July 24, 2017[b] <br> *(Beginning of current administration through the end of our review period)* | 25,991 |

[a] Source: Special Master Report, June 29, 2016.

[b] The end of our review period was July 31, 2017; however, FSA issued a periodic report of claims received on July 24, 2017. Source: Data from FSA's list of claims.

Of the 26,603 claims FSA received while the Special Master was authorized, 3,787 claims, associated with about $73 million in loans, were approved for full loan discharges during the Special Master period.[7]

---

[7] Source: Special Master Report, June 29, 2016.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

6

## Duties of the Special Master and Team of Attorneys

The Special Master was appointed to advise the Office of the Under Secretary in the creation of a process to evaluate borrower defense claims and interpret State laws. He was to provide advice on legal and administrative procedures for borrower defense claims and train staff to implement the borrower defense loan discharge process. The Special Master provided advisory services as a consultant and did not perform or supervise operating functions.

The Special Master worked with a team of four attorneys within FSA to analyze laws and regulations, review claims, and develop templates for the claims intake and review process; three additional attorneys were added in the spring of 2016. The team of attorneys operated without the support of contractors for the review of claims. The team of attorneys focused its efforts on job placement rate misrepresentation claims related to borrowers who attended the Heald College, Everest, and WyoTech campuses of Corinthian Colleges.

FSA's Business Operations managed the claims intake process, maintained borrower defense claim applications, attestations, and other supporting documentation, such as school transcripts. The team of attorneys used this information to make borrower defense claim determinations. The Special Master recommended claims that the Under Secretary should approve for a borrower defense loan discharge. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

## Creation of FSA's Borrower Defense Unit

In late June 2016, the Department completed the transition of borrower defense oversight from the Special Master and the team of attorneys working with him to the Enforcement Unit's BDU. In late June, when the transition from the Special Master to the Enforcement Unit was complete, there were seven full-time BDU attorneys and no contractors. By early November 2016, BDU was staffed with 10 attorneys, a director, and 19 contracted staff from 2 contractors.[8] As of September 2017, BDU had only six contracted staff from the two contractors.

In addition to continuing to process discharges under the memorandum developed prior to the creation of BDU, BDU also developed additional memoranda to justify loan discharges. In addition to job placement rate discharges, BDU focused its efforts on determining whether categories of claims sharing common facts qualified for discharge

---

[8] BDU contracted with Midtown Personnel, Inc. and GCC Technologies, LLC. to review claims.

and then determining whether individual claims qualified for discharge under approved categories. BDU concentrated on processing job placement rate, transfer of credit, and guaranteed employment claims related to borrowers who attended Heald, Everest, and WyoTech campuses of Corinthian Colleges, California campuses of ITT, and American Career Institute—Massachusetts. BDU sent memoranda to the Under Secretary to recommend claims that the Under Secretary should approve for a borrower defense loan discharge; these approval memoranda were signed by the Under Secretary. For approved claims, FSA's Business Operations worked with its loan servicers to discharge the associated loans.

According to its functional statement, BDU issues written decisions on borrower defense claims that constitute the final decision of the Secretary, in collaboration with OGC. In practice, BDU reviewed the claims and then made a recommendation to the Under Secretary on whether the Department should approve claims for loan discharge. The Under Secretary made the decision on whether to accept BDU's recommendation.

### Borrower Defense Loan Discharge Process

Borrowers submitted borrower defense claims for loan discharge to FSA either online, through email, or by mail. Business Operations and its contractor received the borrower defense claims and, as part of the intake process, entered claim data into the borrower defense database and into a spreadsheet that it used to track the status of claims. Then, Business Operations notified loan servicers to place borrowers' loans into forbearance; when a loan is in forbearance, the borrower is not required to make payments but interest continues to accumulate against the outstanding loan balance.[9] BDU and its contractors reviewed claims for eligibility using criteria established in legal memoranda as the basis for approval. BDU and its contractors made claim determinations and performed quality control reviews on the claims. Then BDU recommended claims for approval and the associated loans for discharge to the Under Secretary. The Under Secretary approved the list of claims, and Business Operations notified loan servicers to discharge the borrowers' loans associated with the approved claims. Business Operations also updated the approval status in the database and spreadsheet used to track claims. Servicers updated the National Student Loan Database System (NSLDS) and Business Operations later verified that the loans statuses were discharged in NSLDS.

---

[9] Borrowers can choose not to have their loans placed in forbearance by selecting that option on the borrower defense application.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                                      8

## Finding 1. FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process

We found that FSA established policies and procedures related to the intake and discharge of borrower defense claims in 2015 and refined the claims intake policies and procedures throughout our review period. FSA also established policies and procedures related to the review of borrower defense claims in April 2016 and introduced new policies and procedures throughout our review period. However, we identified weaknesses with the following FSA procedures: (1) consistently documenting the review and approval of the legal memoranda related to borrower defense claims, (2) reviewing borrower defense claims, (3) processing claims approved for loan discharge and flagged for denial, and (4) establishing timeframes for the claims intake, claims review, loan discharge, and claims denial processes. Some of these weaknesses could harm borrowers by negatively affecting their credit reports and increasing the amounts owed by borrowers. For example, if BDU eventually denies a claim, the loan could then be reported as delinquent or in default and accumulated interest could be added to the amount the borrower owed.

According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, Federal agencies are required to establish internal controls. Agencies should design control activities, such as policies and procedures, to achieve objectives and respond to risks. Agencies should document those policies and procedures. Agencies should also document and maintain readily available evidence of all significant transactions and events, such as the results of quality control reviews. In addition, agencies should establish performance measures and indicators, such as timeframes for processing claims.

### Documentation of the Legal Basis for Borrower Defense Claims

We found that the review and approval of the legal memoranda was not consistently documented, that FSA did not have a legal memorandum or other documentation[10] specifically concluding that the job placement rate misrepresentation findings for Everest and WyoTech supported a cause of action under State law that qualified borrowers for a loan discharge, and that FSA did not maintain in its documentation any OGC opinion supporting the amount of loan discharges for job placement rate

---

[10] We refer to "legal memorandum or other documentation" as OGC advice or concurrence can be documented by formal memorandum, less formal writing, or by documenting oral advice.

000508

misrepresentation claims. FSA established seven categories of borrower defense claims that supported a cause of action under applicable State law and thus qualified a borrower for a loan discharge. These included:

1. Heald College job placement rate misrepresentation claims, based on a May 2015 memorandum prepared by the OGC and findings in a fine action letter prepared by FSA's Administrative Actions & Appeals Service Group;

2. Everest and WyoTech job placement rate misrepresentation claims, based on findings in an April 2015 document prepared by FSA's Administrative Actions & Appeals Service Group;

3. Heald College transfer of credit misrepresentation claims, based on an October 2016 memorandum prepared by BDU;

4. Everest and WyoTech transfer of credit misrepresentation claims based on an October 2016 memorandum prepared by BDU;

5. Corinthian Colleges guaranteed employment misrepresentation claims, based on a January 2017 memorandum prepared by BDU;

6. ITT Technical guaranteed employment misrepresentation claims for California campuses, based on a January 2017 memorandum prepared by BDU; and

7. American Career Institute, Massachusetts campuses claims, based on a January 2017 memorandum prepared by BDU.

From January 20, 2017, through July 31, 2017, BDU did not complete or begin preparing any legal memoranda establishing whether additional categories of borrower defense claims qualified for discharge. According to the Director of BDU, the BDU staff has been instructed not to continue developing memoranda on whether additional categories of claims qualify for discharge because the borrower defense policies are being reviewed with the change in administrations.

## Documentation of Review and Approval of Legal Basis

OGC and BDU prepared memoranda to establish the legal basis for borrower defense claims. However, OGC, the Special Master, and BDU did not consistently document review and approval of the legal memoranda.

Specifically, we found the following inconsistencies:

- One memorandum, which also served as an approval memorandum, that BDU attorneys prepared was signed by both the Under Secretary and the Deputy General Counsel for Postsecondary Education.

- Two memoranda that BDU attorneys prepared were signed by only the Deputy General Counsel for Postsecondary Education.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

10

- One memorandum that OGC prepared was unsigned in draft form.

- Two memoranda that BDU attorneys prepared were not signed, but the Deputy General Counsel reviewed and concurred with them.

## No Legal Memorandum for Everest and WyoTech Job Placement Rate Claims

FSA did not have a legal memorandum or other documentation specifically addressing the eligibility for discharge of borrowers affected by job placement rate misrepresentation at Everest and WyoTech. According to the approval memoranda for borrower defense claims concerning the misrepresentation of job placement rates at Heald, Everest, and WyoTech, the Special Master relied on FSA findings that the schools misrepresented job placement rates and the determination by OGC that these misrepresentations violated California unfair competition law.

FSA's documentation included a May 2015 OGC legal memorandum addressing the qualification for borrower defense loan discharges of students who relied on job placement rate misrepresentations by Heald College. This legal memorandum addressed the qualification for discharge of students at Heald College; it did not address the qualification of students at Everest and WyoTech. When approving job placement rate claims for Everest and WyoTech, BDU followed the same practice as the Special Master.

## Legal Basis for Appropriate Relief

FSA did not maintain in its documentation an OGC opinion or other documented advice supporting the amount of the loan discharges for job placement rate misrepresentation claims.

For all of the other claim categories, the legal memoranda developed by the BDU documented the legal justification for the relief to be provided. For these categories, BDU also maintained documentation of OGC concurrence in the appropriate amount of relief.

## Claims Intake Process

FSA's Business Operations implemented an intake process for borrower defense claims in April 2015. FSA contracted with the Missouri Higher Education Loan Authority (MOHELA), one of the Department's loan servicers, to perform the intake for borrower defense claims. Since implementation, the claims intake process was as shown in the following figure.

**Figure 1. Claim Intake Process**



*Note: Borrowers may choose not to place their loans in forbearance.*

Borrowers can submit borrower defense claim applications three ways: online, by postal mail, or by email. Business Operations receives the borrower defense claims either directly from the borrower or via spreadsheets from the MOHELA. For claims received through postal mail, MOHELA reconciled the count of claim envelopes to the accompanying list of claims, scanned the claim documents, and entered the data from the scanned documents into spreadsheets. For online application claims borrowers submitted through the internet portal, MOHELA transferred the claim data from the claim applications to spreadsheets. MOHELA then sent the processed claims (from postal mail and online applications) to Business Operations.

Business Operations imported the MOHELA claim spreadsheets into the borrower defense database, assigned a case number, and ensured that MOHELA included all key elements the borrower provided. Business Operations then used NSLDS to match the borrower's Social Security number and also inputted certain information from NSLDS regarding the borrower's loans, the associated Office of Postsecondary Education Identification for the borrower's school, and loan servicer information.

For claims borrowers submitted through email, Business Operations input the claim into the borrower defense database, assigned a case number, and confirmed the borrowers

provided all the key elements. Business Operations then used NSLDS to obtain and input the same information as described above with the MOHELA processed claims.

Business Operations ran a claims query for all claims on the borrower defense database, which generated a spreadsheet for BDU to review. Business Operations also maintained an online folder for each claimant that stored all their information and documentation. In addition, Business Operations created a spreadsheet for each loan servicer that contained claimants' loan information so that the loan servicers could place the claimant's loans into forbearance whereby no collections would be pursued and no payments would be due for 12 months. If the borrower defense loan discharge process took longer than 10 or 11 months for claimants, Business Operations created a spreadsheet for each loan servicer with the claimants' loan information and requested a 12 month extension to the forbearance.

## Review of Borrower Defense Claims

BDU had policies and procedures for reviewing and making determinations for borrower defense to repayment claims associated with the seven established categories. To be eligible for a Federal loan discharge, the borrower must have

- met the following three eligibility criteria: (1) attended specific schools at specific locations, (2) been enrolled in specific programs of study during specific time periods, and (3) specified in the claim application or attestation form that the school misrepresented information regarding job placement rates, transfer of credit, or guaranteed employment; or

- attended a Massachusetts campus of American Career Institute.

BDU did not implement policies and procedures for reviewing and making determinations on unique claims that do not fit into one of the seven established categories; claims with no common factual bases; or claims for which there was no associated legal memorandum. When borrowers filed a claim that did not fit into the established categories, their loans were placed in forbearance and all collection actions were halted. While in this status, borrowers do not have to make payments, but their debts remains on record and interest continues to accumulate on the loan balances.

From July 1, 2016, through January 20, 2017, BDU reviewed borrower defense claims, made claim determinations, and recommended claims to the Under Secretary for loan discharge. From January 20, 2017, through March 2017, BDU continued to review transfer of credit and guaranteed employment claims, and from January 20, 2017, through May 4, 2017, BDU continued to review job placement rate claims where they were able to make preliminary determinations of denial or approval based on existing legal memoranda or reports. All other claims were on hold pending review.

BDU reviewed claims to determine if the borrower qualified under one of the seven established categories. BDU first reviewed whether a claim qualified under the job placement rate categories. If the claim did not qualify under those categories, BDU would review whether the claim qualified under the transfer of credit or guaranteed employment categories. The following sections describe BDU's processes for reviewing claims, according to BDU's written policies and procedures and interviews with BDU attorneys and contracted reviewers.

### Review Process for Job Placement Rate Claims

BDU hired contractors to review borrower defense claims. A contracted reviewer verified key information relating to the claim contained in a spreadsheet and the borrower's claim file that Business Operations provided. The contracted reviewer checked whether the borrower met the three eligibility criteria listed above. If the borrower met all conditions, then the contracted reviewer recommended the claim for approval. If the borrower did not meet all conditions, the contracted reviewer flagged the claim for further review by a BDU attorney. The contracted reviewer generally reviewed batches of about 100 claims per spreadsheet.

Each batch of claims then went through a quality control review. From November 2016 through March 2017, BDU's quality control policy did not specify that all claims in the batch could be selected for a quality control review. From November 2016 through March 2017, the quality control process consisted of two levels of review. The first level of the quality control process varied depending on the experience and past performance of the contracted reviewer who initially reviewed the batch of claims. For experienced contracted reviewers, quality control consisted of spot check reviews performed by another contracted reviewer (generally 20 percent of the claims). These spot check reviews consisted of checking for notations in the spreadsheet that BDU considered to be susceptible to errors. For less experienced contracted reviewers, quality control consisted of claim-by-claim reviews performed by another contracted reviewer (generally five claims at a time), where the contracted quality control reviewer reperformed the review and determined whether the contracted reviewer made the appropriate determination. The contracted reviewer then made any necessary corrections. The contracted quality control reviewer or contracted reviewer sent the spreadsheet of claims to BDU for a second level of quality control review.

After March 2017, the policy for the first level of the quality control changed to require that 20 percent of each contracted reviewer's claims be reviewed and that the contracted quality control reviewer reperform the entire review and make corrections, if necessary. The quality control reviewer then sends the spreadsheet of claims to BDU for a second level of quality control review.

The second level of the quality control review process was established September 2016 and refined through February 2017. A BDU attorney compiled spreadsheets into a single group of about 1,000 claims and performed a quality control review by scanning the claims in the spreadsheet for missing, incomplete, or inconsistent information. The BDU attorney spot checked all the claims. If the BDU attorney found errors, the BDU attorney corrected and documented them and then notified the initial contracted reviewer of the errors. If the BDU attorney found too many errors, the BDU attorney sent the spreadsheet back to the contracted reviewer. BDU's policies did not define how many errors would be considered too many. BDU attorneys used professional judgment to determine whether a spreadsheet had too many errors and should be returned to the contracted reviewer. FSA acknowledged that evidence related to quality control reviews was not readily available because BDU lacked a database for tracking such information. We could not confirm that BDU conducted a second level of review for all claims and could not determine whether all claims were subject to a second level of review. Once the quality control process was completed, the claims that were recommended for approval went through the final approval and discharge process.

### Review Process for Transfer of Credit and Guaranteed Employment Claims

Before reviewing a claim for misrepresentations of transfer of credit and guaranteed employment, a BDU attorney verified that the claim was not eligible for a loan discharge based on job placement rate. If the claim was not eligible for discharge based on the school's misrepresentation of job placement rates, the BDU attorney reviewed the claim based first on the school's misrepresentation of transfer of credit and then on the school's misrepresentation of guaranteed employment. The BDU attorney checked whether the borrower met the three eligibility criteria. If the borrower met all criteria, then the BDU attorney recommended the claim for approval. If the borrower did not meet all criteria and the borrower did not make allegations in other categories, the BDU attorney recommended it for denial.

We did not identify any weaknesses in BDU's quality control process for its review of guaranteed employment and transfer of credit claims. BDU attorneys described the quality control process for the review of claims associated with guaranteed employment and transfer of credit as follows:  After a BDU attorney performed an initial review of the claims and input a claims decision into a spreadsheet, a second BDU attorney reperformed the review, input a claims decision into the spreadsheet, and determined whether the first attorney made the appropriate determination. If the attorneys disagreed on whether the claim should be approved, then a third attorney reperformed the review, input a decision into the spreadsheet, and made a final recommendation. Once the quality control process was complete, the claims that a BDU attorney recommended for approval go through the final approval and discharge process.

### Review Process for American Career Institute Claims

Borrowers who attended the Massachusetts campuses of the American Career Institute were not required to submit a borrower defense claim. Instead, the Massachusetts Attorney General's office provided FSA with a list of all students who attended the school. Using the list of students, Business Operations identified the borrowers' loans that were eligible for discharge. These loans then went through the final approval and discharge process.

### Analysis of Unique Claims

For claims other than those related to the seven established categories for job placement rate, transfer of credit, and guaranteed employment, BDU analyzed claims received to identify common allegations and conducted research to develop a legal basis to establish additional categories of valid borrower defense claims. As of January 20, 2017, BDU had identified additional categories of claims warranting further research. However, this research was placed on hold. Starting January 20, 2017, BDU tasked contractors with summarizing the allegations made in unique claims. BDU has not established any additional categories of valid borrower defense claims since January 20, 2017.

### The Processing of Claims Approved for Discharge and Flagged for Denial

Business Operations had policies and procedures to discharge most loans associated with approved claims under borrower defense. However, as of July 31, 2017, the policies and procedures did not address approved claims with certain characteristics. As a result, the progress of these claims stopped before discharging the associated loans. Similar to the situation with the lack of policies and procedures for reviewing and making determinations on claims for which there was no associated legal memorandum, this weakness of no action on the claims could adversely impact borrowers' credit reports.

Also, BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial, which is a preliminary determination. BDU provided a list of 7,285 claims it had flagged for denial as of July 31, 2017.[11] The Director of BDU told us that because the process for denying claims had not been fully developed, these claims were not submitted to the Acting Under Secretary with a recommendation for

---

[11] According to FSA, a proposed process was agreed upon by the Office of the Under Secretary, the Office of General Counsel, and FSA in August 2017; the process was implemented in September 2017.

denial. Loans associated with the claims flagged for denial remain in forbearance and continue to accumulate interest until FSA denies the claim and notifies the servicer to end forbearance. When forbearance ends, the accumulated interest may be added to the amount the borrower owed. As a result, borrowers may end up owing more than they did before submitting a claim. According to FSA, in September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.

According to Business Operations personnel and its written policies and procedures, the process for discharging Direct Loans approved under borrower defense was as follows.

- BDU notified Business Operations of claims recommended for approval.

- Business Operations used NSLDS to identify loans associated with the claims.

- BDU drafted a memorandum recommending that the Under Secretary approve the loans associated with the claims for discharge.

- After the Under Secretary's approval, BDU notified Business Operations that the loans were approved for discharge.

- Business Operations created a list for each servicer of the loans approved for discharge and sent it to the servicers.

- The servicer discharged the loans.

- Business Operations verified that the loans were discharged by querying NSLDS every 2 weeks.

- Servicers notified borrowers that their loans were discharged.[12]

FSA did not have a process for discharging loans associated with approved claims with the following characteristics:

- the borrower was enrolled in multiple programs and at least one of the programs was eligible for relief under borrower defense;

- the borrower received a loan disbursement after the borrower's Corinthian campus changed ownership;

---

[12] For the first set of discharges of Heald College claims made under the Special Master, FSA (rather than the servicer) notified the borrowers that their loans were discharged.

- the borrower's loan discharge was impacted by a State's statute of limitations; or

- the borrower's loan was a Federal Family Education Loan program loan or a Perkins loan.

## FSA Did Not Establish Timeframes for the Processing of Claims

FSA did not establish timeframes for claims intake, claims review, loan discharge, and claims denial processes. According to the U.S. Government Accountability Office's Standards for Internal Control in the Federal Government, agencies should establish performance measures and indicators, such as timeframes for processing claims.

As part of our review, we tested 50 approved claims. We found the following:

- loans associated with 6 claims were discharged within 180 days of receipt;

- loans associated with 25 claims were discharged within 181 through 365 days of receipt;

- loans associated with 11 claims were discharged more than 365 days after receipt;

- loans associated with 7 claims (received by FSA between July 10 2015, and November 15, 2016; 2 claims were approved on December 29, 2016, and 5 were approved on January 17, 2017) have not been discharged as of September 28, 2017; and

- 1 claim did not have any loans requiring discharge.

We also tested the only two claims BDU denied. We found that both claims were denied more than 365 days after FSA received them.

## Recommendations

We recommend that the Chief Operating Officer for FSA—

1. Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.

2. Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge.

3. Ensure consistent documentation of the review and approval of legal memoranda or other findings used to justify discharges.

4. Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement rate misrepresentation rate claims and (2) the amount of relief for all job placement rate misrepresentation claims.

5. Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.

6. Document and maintain readily available evidence for all quality control reviews.

7. Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.

8. Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.

9. Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.

## FSA Comments

FSA generally agreed with the recommendations. In regards to the section titled "Documentation of Review and Approval of Legal Basis," FSA maintained documentation of OGC's approval of the five legal memoranda developed by BDU.  For the job placement rate claims associated with Heald, Everest, and WyoTech, BDU will draft a memorandum documenting OGC's prior advice regarding the legal basis for these borrower defense claims. OIG misunderstood the legal memoranda approval process to require that the Under Secretary sign any legal memorandum concerning borrower defense claims. OIG's confusion was likely due to the fact that one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum.

FSA does not believe that its policies and procedures resulted in harm to the borrowers. In September 2017, the Department decided that it would provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed.  In addition, OIG incorrectly stated in the report that interest that accrues during forbearance when a borrower files a borrower defense claim is capitalizing; such interest is actually non-capitalizing.

## OIG Response

Our report notes that BDU documented OGC concurrence with the five legal memoranda developed by BDU.  FSA's plans to document OGC's advice regarding the job placement rate claims appear responsive to our recommendation.  However, we did not misunderstand the legal memoranda approval process. Rather, the issue we raise is that the approval of legal memoranda concerning borrower defense claims were not consistently documented: some memoranda were unsigned and other memoranda were signed by different Department officials. We revised the report to note that the one memorandum signed by the Under Secretary served as both a legal memorandum and an approval memorandum. BDU addressed each legal memorandum to the Under Secretary with a recommendation that relief be granted for a category of borrowers. We did not state that the Under Secretary was required to sign legal memoranda concerning borrower defense claims.

The Department's decision to provide relief to borrowers for interest accumulated on loans placed in forbearance beyond one year while the associated borrower defense claim is processed will help reduce harm to borrowers.  Regarding FSA's statement that the forbearances applied are non-capitalizing, borrowers are still harmed if interest accumulates during a period of extended consideration of a borrower defense claim that is denied. We revised our report to describe the treatment of accumulated interest during a forbearance associated with a borrower defense claim in the manner described on FSA's website, specifically, that "interest that accumulated will be added to the amount [the borrower] owed."

## Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data

Since FSA had not received borrower defense claims in significant numbers prior to 2015, FSA did not have an established information system to manage a large volume of claims. The information system that FSA has developed to date is not adequate to manage the claims it has received since 2015.

FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not readily available for use without a labor-intensive, manual data retrieval process. Further, FSA had no controls to prevent or detect problems with the integrity of the data contained in the more than a thousand spreadsheets FSA relied on to track the status of borrower defense claims.

FSA's information system for borrower defense to repayment claims consisted of (1) a database managed by Business Operations containing all of the claimant's application information for the claims received and (2) spreadsheets created by Business Operations and used by BDU contractors and attorneys to review claims and to record the outcomes determined by the BDU. Before January 2017, the database was not updated with any claim outcomes; however, in January 2017, Business Operations began to record in the database a flag indicating all final claim decisions approved by the Under Secretary. The status of other claims remained in the spreadsheets without a process to integrate those statuses back to the database. The statuses of the other claims consist of reviewed and flagged for denial by BDU, reviewed and flagged for approval by BDU, reviewed and pending a decision by BDU, and those that have not been reviewed by BDU. Although FSA does not update the database, Business Operations periodically generates a review ready spreadsheet with a general status[13] of each claim as of a specific point in time. However, when FSA provided us with one of its review ready spreadsheets, a Senior Advisor for Business Operations explained that the statuses may not be accurate because of duplicate claims and changes/updates to the status tracking process over time. As of September 2017, FSA was testing a claims management tool that is intended to allow BDU to list claims by status and report the number of claims by status, school, or allegation.

---

[13] In general, the statuses are approved, pending, and ready for review.

Because of the way that FSA maintained its data, information on the status of loan discharges was not readily available. Consequently, it took FSA at least 3 weeks to produce outcome data on the status of claims. We did not verify the accuracy and completeness of this data. Table 3 presents borrower defense claim outcome data FSA provided and the amount of time it took for FSA to provide us with the data.

**Table 3. Borrower Defense Outcome Data**

| Description | Number of Claims | Number of Days Before FSA Provided the Data |
|---|---|---|
| Claims received through July 24, 2017[a] | 98,868 | 21 days |
| Claims reviewed for determination through July 24, 2017 | 72,842 | 63 days |
| Claims not reviewed for determination as of July 24, 2017 | 26,026 | 63 days |
| Claims approved, with any associated loans discharged as of July 24, 2017 | 26,964 | 69 days |
| Claims approved, with any associated loans pending discharge as of July 24, 2017 | 4,809 | 69 days |
| Claims flagged for approval by BDU, but not yet approved by the Under Secretary as of July 31, 2017 | 11,857 | 29 days |
| Claims flagged for denial by BDU, but not yet denied by the Under Secretary as of July 31, 2017 | 7,285 | 29 days |
| Claims reviewed but no determination has been made by BDU as of July 24, 2017 | 21,927 | 70 days |
| Claims denied as of July 31, 2017 | 2 | N/A (FSA provided this information at the entrance meeting) |

[a] We requested July 31, 2017 data; however, FSA had issued a periodic report of claims received on July 24, 2017.

The U.S. Government Accountability Office's Standards for Internal Control in the Federal Government states that management should design the entity's information system and related control activities to achieve objectives and respond to risks.

Information systems should provide management with quality information. Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. Management needs quality information to make informed decisions and evaluate the entity's performance in achieving objectives and addressing risks.

Because FSA did not have ready access to current and complete information on borrower defense claims, FSA cannot ensure that the borrower defense process meets its objectives, management may be unable to respond to risks that may arise, and management may be unable to make well-informed business decisions.

Further, FSA uses more than a thousand spreadsheets to track borrower defense claim outcomes, which can potentially result in the loss of data if any of the spreadsheets are misplaced or corrupted. If FSA loses a borrower's claim outcome, FSA may have to reperform a claim review and the borrower may have to wait for an extended duration for a decision on their claim. In addition, if a borrower contacts FSA to request a status update on their claim, FSA may not be able to readily find that information. Finally, because FSA has no controls to prevent or detect problems with the integrity of the outcome data contained in the spreadsheets, FSA is at risk of having data changed erroneously or fraudulently.

## Recommendation

We recommend the Chief Operating Officer for FSA—

1. Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.

### FSA Comments

FSA agreed with the recommendation.

## Appendix A. Scope and Methodology

To achieve our objectives, we performed the following procedures:

1. Reviewed documentation related to the following:

    a. FSA's policies and procedures over (1) Business Operations' claims intake process; (2) the review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation; and (3) Business Operations' loan discharge process for approved claims;

    b. the development, review, and approval of memoranda that provide the legal basis for claim approval;

    c. BDU's review and determination of borrower defense loan discharge claims including applications, attestation forms, and supporting documentation;

    d. the Special Master's appointment;

    e. FSA's claims management tool;

    f. quality control processes associated with FSA's borrower defense loan discharge process, including intake, review of claims, and discharge of approved loans;

    g. laws, regulations, memoranda of understanding, and decision letters related to the borrower defense loan discharge process; and

    h. FSA findings related to Corinthian's misrepresentation of job placement rates.

2. We interviewed the following people to determine FSA's policies related to the borrower defense loan discharge process and areas lacking in policies and procedures related to the borrower defense loan discharge process, and to gain an understanding of procedures related to the borrower defense loan discharge process:

    a. from FSA's BDU, the Director and attorneys;

    b. from FSA's Business Operations, a Senior Advisor, Branch Chief and Loan Analyst;

    c. FSA's Chief Compliance Officer;

     d.   from the Office of General Counsel, Division of Post-Secondary Education attorney;

     e.   from the Department, the Director of Financial Improvement Operations;

     f.   from MOHELA, contractors that perform the claims intake process;

     g.   from Midtown Personnel, Inc., contracted attorneys that review claims;

     h.   from GCC Technologies, LLC., contracted analysts that review claims.

3. Performed testing on a sample of 50 borrower defense claims that BDU approved for discharge under borrower defense between July 1, 2016, and July 31, 2017, and the only 2 claims that BDU denied for discharge during the same time period, to determine the documentation FSA maintains to support its borrower defense loan discharge decisions.

We held an entrance meeting with FSA on July 31, 2017, and an exit meeting on October 6, 2017.

## Sampling Methodology

We selected random samples of borrower defense claims FSA approved and all claims FSA denied to determine whether FSA maintained documentation to support its approval and denial decisions. In addition, for the selected claims that FSA approved, we randomly selected one loan associated with each claim to determine whether the discharge status in FSA's records matched the loan status in NSLDS. For the two claims that FSA denied, we used NSLDS to verify that the students did not have any loans that were discharged under borrower defense. The results from our testing of approved claims pertain only to the approved borrower defense claims and associated loans we reviewed and should not be projected to the entire universe of approved claims and associated loans.

### Samples of Borrower Defense Claims

FSA provided us with 27,996 claim numbers or borrower names that it had approved for loan discharge under borrower defense from July 1, 2016, through January 20, 2017. The claim numbers and borrower names are associated with the 13 approval memoranda BDU drafted and the Under Secretary signed. We stratified the universe of claim numbers and borrower names into five categories, according to the basis for the approval. The five categories were job placement rate,[14] transfer of credit,[15] Corinthian

---

[14] We combined two of the seven established categories related to job placement rates into one category for sampling purposes.

Colleges guaranteed employment, ITT guaranteed employment, and ACI. We then selected random sample of claim numbers or borrower names, herein referred to as "claims," from each of the five categories, resulting in a selection of 50 claims. Table 4 below shows the number of approved claims for each of the five categories and the sample size we selected for each group. Because FSA had denied only two borrower defense claims between July 2016 and July 2017, we reviewed both claims.

**Table 4. Universes and Sample Sizes of Approved Borrower Defense Claims or Borrower Names**

| Basis for Approval | Universe of Claims | Sample Size of Claims |
|---|---|---|
| Job placement rates | 24,504 | 30 |
| Transfer of Credit | 426 | 5 |
| Guaranteed Employment—Corinthian Colleges | 169 | 5 |
| Guaranteed Employment—ITT Technical Institute | 33 | 5 |
| American Career Institute | 2,864 | 5 |
| **Total** | **27,996** | **50** |

To determine whether FSA maintained documentation to support its approval or denial for all 52 selected claims, we reviewed the following:

1. For the sample of 45 approved job placement rate, transfer of credit, and guaranteed employment claims, we reperformed reviews of the claims and determined (a) whether the approval was documented in the spreadsheet where BDU made the claim determination, (b) the legal basis for the approval, (c) the accuracy of the data in the spreadsheet compared to the supporting documentation, (d) whether the claim contained an attestation form or similar document, (e) whether the file contained documentation to support the approval, (f) whether the borrower was enrolled in a program approved for relief at the approved time and location, (g) whether there was evidence that

---

[15] We combined two of the seven established categories related to transfer of credit into one category for sampling purposes.

the determination spreadsheet containing the claim went through the first level of BDU's quality control process, and (h) the number of days from the date the claim was received to the date the associated loans were discharged.

2. For a sample of five borrowers that attended American Career Institute, we verified that the borrower was included on the list of American Career Institute students provided by the Massachusetts' State Attorney General's office.[16]

3. For the two claims that BDU denied, we tested to determine whether (a) the denial was documented in the claim file, (b) the claim was associated with a legal memorandum as a basis for approval, (c) the reason the claim was denied was documented, (d) the borrower was notified of the denial, (e) the file contained documentation to support the denial determination, (f) the claim included an attestation form or similar document, and (g) whether the borrower was enrolled in a program approved for relief at the approved time and location. In addition, we calculated the number of days from the date the claim was received by FSA to the date of the denial notification letter issued to the borrower.

### Samples of Loans Associated with Selected Borrower Defense Claims

For the 50 sampled claims that FSA approved, 49 of them had a total of 249 loans that were eligible for discharge, according to a list of loans provided by FSA. We randomly selected one loan associated with each of the 49 claims. According to FSA's records the 49 loans were either discharged or pending discharge as of July 31, 2017. We used NSLDS to determine whether the loans' discharge status in FSA's records coincided with the loan status in NSLDS.

For the two claims that FSA denied, there was not a list of loans associated with the claims, so we used NSLDS to determine whether the borrowers had any loans associated with the schools named in their claims. The borrowers had a total of 16 loans. We confirmed in NSLDS that none of the 16 loans had been discharged under borrower defense.

### Use of Computer-Processed Data

We obtained computer-processed data related to outcomes of the borrower defense loan discharge proceedings. Specifically, we obtained lists of claims that FSA

---

[16] American Career Institute borrowers were approved as a group.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

27

- received as of July 24, 2017;

- reviewed as of July 24, 2017;

- did not review as of July 24, 2017;

- denied as of July 31, 2017;

- flagged for denial as of July 31, 2017;

- approved through July 24, 2017, with associated loans; and

- flagged for approval as of July 31, 2017;

- reviewed but no decision made as of July 24, 2017.

As noted in Finding 2, FSA could not readily retrieve borrower defense claim outcomes from its current information system because data were not available for use without a labor-intensive, manual data retrieval process. FSA provided outcome data throughout the performance of our review. We did not verify the accuracy, completeness, and reliability of the data provided by FSA. However, FSA obtained the outcome data from its borrower defense database, which is FSA's primary system managing borrower defense claims and the main resource for FSA to provide information on the management of such claims. Therefore, we decided to use the borrower defense claims data FSA provided to determine the outcomes of the borrower defense loan discharge proceedings.

## Support for Borrower Defense Loan Discharge Decisions

The only computer-processed data we relied on was the list of denied claims, approved claims, and the list of loans associated with those claims. Although we could not determine the completeness of those lists, we tested both of the denied claims and a sample of the approved claims and the associated loans to determine whether the claim approvals and denials were adequately supported and appropriate under BDU's policies and procedures, and whether the associated loans were discharged or pending discharge. To answer our objective, we reported the data that FSA provided.

We conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency Inspection and Evaluation Standards. We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our objectives.

## Appendix B. Acronyms and Abbreviations

| | |
|---|---|
| BDU | Borrower Defense Unit |
| Department | U.S. Department of Education |
| Direct Loan | William D. Ford Federal Direct Loan Program |
| FSA | Federal Student Aid |
| MOHELA | Missouri Higher Education Loan Authority |
| NSLDS | National Student Loan Database System |
| OGC | Office of General Counsel |

## Appendix C. FSA Comments

**DATE:**       November 29, 2017

**TO:**         Christopher Gamble
                Regional Inspector General for Audit
                U.S. Department of Education

**FROM:**       A. Wayne Johnson
                Chief Operating Officer
                Federal Student Aid

**SUBJECT:**    Response to Draft Review Report, "Federal Student Aid's Borrower Defense to
                Repayment Loan Discharge Process"
                Review Control Number ED-OIG/I04N0003

Thank you for the opportunity to review and respond to the Office of Inspector General's Draft Review Report, "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process," (the "Report") (Review Control Number ED-OIG/I04N0003). Federal Student Aid ("FSA") appreciates the review by the Office of Inspector General ("OIG") of the policies, procedures and documentation relating to the borrower defense claims review and loan discharge processes.

As you know, the period of time at issue in this Report begins at the end of June 2016, when FSA's new Enforcement Office ("Enforcement") assumed full management and oversight of the Borrower Defense Unit ("BDU") from the Special Master. At that time, we were expeditiously building processes while also making every effort to respond in a timely manner to the over 27,000 borrower defense claims that had been filed between the closing and sale of campuses owned by Corinthian Colleges, Inc. in early 2015 and the expiration of the Special Master's tenure in June 2016. Predictably, this scenario created a number of challenges. The need to timely perform the work of reviewing and processing claims while also creating and implementing new processes and protocols competed with the delays sometimes inherent in taking the time to fully document in detail the processes and protocols being implemented.

Despite these challenges, we are pleased to note that OIG did not identify any errors in the adjudicated claims, and that the review for each of the sampled claims was properly documented. In addition, OIG found that FSA created policies and procedures for borrower defense that have evolved over time as FSA has continued to refine its processes. While the Report notes that these policies and procedures were not always reduced to writing in formal policy documents, the policies and procedures were consistently communicated and understood throughout the borrower defense program as demonstrated by the absence of errors identified by OIG. FSA understands the importance of documenting all policies and procedures and will continue to improve upon and formally document both new and previously existing processes and protocols.

**Finding 1:  FSA Needs to Improve its Policies and Procedures over the Federal Student Loan Borrower Defense Loan Discharge Process**

We generally agree that policies and procedures always can be improved and, therefore, FSA has continued to refine and strengthen its policies and procedures throughout the period at issue in the Report and continuing. While improvements were needed in the establishment of policies and procedures, we do not believe that the former policies and procedures resulted in harm to the borrowers.

   1.  Legal Memoranda

We agree that documentation of the review and approval by the Office of the General Counsel ("OGC")[17] of the legal memoranda submitted by the Borrower Defense Unit ("BDU") should be consistent.  With respect to all five categories of approved claims for which the legal framework, review criteria and legal basis for relief were developed by FSA, we consistently maintained written documentation of OGC's approval of the FSA legal memoranda.  The inconsistencies that OIG described by FSA in applying established procedures to document the review and approval of legal memoranda, was a demonstration of the evolution of its approval process over a period of time.

**Summer 2015 through June 2016 – Processes That
Pre-Date FSA Oversight of Claims Review**

As a preliminary matter, the legal framework, review criteria, and legal basis for granting BD claims all were established by the Office of the Under Secretary ("OUS"),  OGC, and the Special Master in 2015 – prior to the establishment of the borrower defense claim review process in FSA. It was OUS, OGC and the Special Master who determined in 2015 that "full relief" (defined as a full discharge of loans associated with the program at issue and a full refund of amounts paid) was appropriate for Heald, Everest and WyoTech borrowers with approved Job Placement Rate ("JPR") claims.

> **Summer and Early Fall 2016 – Enforcement Unit Continued the Review of JPR Claims under the Previously Established Framework and Created a New Approval Process for Groups of "non-JPR" claims based on Legal Memoranda to be Approved by OGC and Approval Memoranda to be Approved by OUS**

---

[17] The Report suggests that OIG misunderstood the legal memoranda approval process to require that OUS sign any legal memorandum that provided the legal framework to approve a particular type of claim. That was not the process.  OUS's approval is found on the claim "Approval Memos," not on the legal memoranda.  OIG's confusion likely is due to the fact that the American Career Institute ("ACI") memo *is* signed by OUS because, as discussed on page 4 below, ACI was a "group discharge" for which the legal memo also <u>was</u> the approval memo that authorized discharge of the loans of ACI Massachusetts borrowers.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003                                                                                                                    31

The first types of claim reviews originated by FSA were the transfer of credits claims detailed in two legal memoranda.  OIG correctly notes that these two memoranda were not signed by OGC. There was no signature block for OGC because that was not the process in Fall 2016. Instead, the memos were discussed in a series of meetings with OUS, OGC and Enforcement, and OGC gave a verbal concurrence in those meetings and also confirmed with a written concurrence via email.

BD attorneys continued review of JPR claims under the same review criteria, legal framework, and relief previously established by OUS, OGC and the Special Master.  Enforcement agreed with OGC's legal conclusions that: 1) borrowers who met the criteria required in the Heald and Everest/WyoTech attestation forms were eligible for borrower defense discharges; and 2) that full relief was appropriate.[18] Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos.[19]

**November 2016 - January 2017 – BDU's Approval Process for
Legal Memoranda Evolved**

BDU submitted pre-decisional legal memoranda recommending legal frameworks, review criteria and proposed relief for two new types of non-JPR claims[20] between November 2016 and January 2017.  Improving upon the previously established process of obtaining the written concurrence of OGC via email, BDU included a signature block for OGC on the face of each legal memorandum. As OIG correctly notes, each of the two documents was, in fact, signed by OGC's Deputy General Counsel.  Consistent with the previously established non-JPR approval processes, the approval of OUS is found on each of the Approval Memos for the claims approved pursuant to said legal memoranda.

**American Career Institute was the First "Group Discharge" Approval and
Therefore had a Different Approval Process**

The American Career Institute ("ACI") memo is different because the nature of the approval was different and first of its kind. ACI was a "group discharge" for which no individual claim applications were required.  Accordingly, the usual approval memo (to be executed by OUS) could not be used because there were no application numbers to attach to the memo.  Therefore, the legal memo also <u>was</u> the approval memo in that circumstance, and OUS's signature on the document authorized discharge of the loans of all ACI Massachusetts borrowers.

**April 2015 Administrative Actions & Appeals Service Group Memorandum**

---

[18] *See e.g.,* the OGC-approved Guaranteed Employment memo (citing to OGC's previous determination that borrowers should receive full relief, without offset) and the OGC Concurrence re: Transferability Concurrence (appropriate relief is "full discharge of Direct loan debt" and "refund of amounts paid ... subject to the statute of limitations").

[19] From the summer of 2016 through mid-January 2017, Enforcement also met weekly with OGC's Deputy General Counsel and OUS regarding the claims, and there was no uncertainty regarding OGC's legal positions on review criteria, legal framework, or relief.

[20] These were the Corinthian guaranteed employment and ITT guaranteed employment memoranda.

The Report identifies an April 2015 Administrative Actions & Appeals Service Group letter (and specifically, the fact that the letter was signed only by AAASG's director) as evidence that BDU was inconsistent in documenting OGC's approvals of BDU's legal memoranda.  The letter was appropriately signed by the director of AAASG – because it is an AAASG document, and not a legal memorandum drafted by the Special Master or OGC for approval of borrower defense claims.   The reason that the document surfaced in connection with this Report is that it was considered and relied upon in 2015 by OUS and OGC when they published findings regarding misrepresented job placement rates at Corinthian.

2.   Review of Claims

The Report cites as another weakness that "BDU did not have policies and procedures for reviewing and making determinations [regarding] unique claims that do not fit into one of the seven established categories; claims with no common factual basis; or claims for which there was no associated legal memorandum."  Prior to February 2017, these claims were not being processed, and no policies and procedures had been submitted for approval to the prior administration.  However, BDU's proposed protocols for addressing claims that are unique or unsupported by existing legal memos were included in the February 2017 "Borrower Defense Unit Claims Review Protocol" document presented to the landing team.  Shortly thereafter, the Department initiated the Review of Pending Borrower Defense Claims project led by the Borrower Defense Review Panel (the "Review Panel") to make recommendations to the Secretary on how to address pending claims going forward.

3.   Processing of Claims Flagged for Denial

The Report also cites as a weakness that "BDU did not have a process for closing out and issuing decisions on borrower defense claims it flagged for denial."   As described above with respect to the review of unique claims, no procedures had been submitted to the previous administration for approval and these claims were not being processed.  In August, OUS, OGC and FSA agreed on a procedure to deny claims.

We also wanted to clarify two other statements in this section.   First, the Report states that "[a]ccording to the Director of BDU, FSA is currently considering providing relief to borrowers for interest accrued [after the claim is pending for one year]." We wanted to clarify that the Director stated that the Department (not specifically FSA) was considering the interest credit; Department leadership made that decision.

**Harm to Borrowers**

FSA takes issue with OIG's conclusion that weaknesses in the processes may have harmed borrowers. The Report fails to recognize that the change in administrations necessarily required time for the Secretary and Acting Under Secretary and their staffs to familiarize themselves with the history of the borrower defense claim review process in order to determine and advise FSA as to any policy changes that would be made.  To that end, in March 2017, Department leadership

created the aforementioned Review Panel to make recommendations,[21] and in May 2017, based on the Panel's recommendations, the Secretary determined that the claims already approved prior to January 20, 2017 would be processed. The panel's work also laid the foundation to approve new claims. Additionally, a denial process now has been approved.[22]

The Department recognizes that the interest on pending claims has continued to accrue and, therefore, the Department has authorized an interest credit for borrowers whose claims are adjudicated and denied more than one year after submittal of the claim.  We also note that the Report in three different places inaccurately states that the borrowers with pending claims will be harmed because their accrued interest will be capitalized.   The forbearance applied when a borrower files a borrower defense claim is non-capitalizing.

**Recommendation 1: Request approval from the Acting Under Secretary to resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval.**

We agree with this recommendation. Pursuant to OUS's May 4, 2017 memorandum to the Secretary, OUS and the Chief Financial Officer's Internal Controls Unit ("CFOICU") are working with FSA to "develop interim procedures" to review claims. We have been working to implement those processes and protocols with respect to the seven established categories so that the review, approval and discharge processes for these categories of claims may resume as soon as possible.

With respect to the over 11,000 Corinthian claims flagged for approval during this Report period, as publicly stated by the Acting Under Secretary, approval of some of these claims is imminent.

**Recommendation 2: Request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge.**

We agree with this recommendation.  As with respect to our response to Recommendation 1, we will work with the CFOICU to strengthen BDU's processes and protocols so that the work on these claims can proceed.

---

[21] We want to clarify a statement in the Report regarding the pause in submitting claims for approval and in developing additional memoranda for new categories of claims that qualify for discharge.  Although the Report suggests that the Deputy Chief Enforcement Officer made a decision to stay this work, we wanted to clarify that the Deputy Chief Enforcement Officer actually just communicated to the Director of BDU the guidance and direction provided by OUS and the Review Panel.

[22] As of January 20, 2017, FSA had adjudicated over 40% of the claims received.  While the volume of pending claims has increased significantly since January, once the approval and denial processes are finalized, we anticipate being able to begin processing the currently pending CCI claims very soon.

**Recommendation 3**: **Ensure consistent documentation of the review and approval of legal memorandums or other findings used to justify discharges.**

As previously discussed, FSA has consistently documented OGC's approvals of its legal memoranda and will continue to do so using the same process that was utilized for the Guaranteed Employment legal memoranda unless the CFOICU requires a different process. Additionally, FSA will continue to document OUS's approval (of eligibility) on the Approval Memos unless the CFOICU requires a different process.

**Recommendation 4**: **Confirm and document OGC advice on the (1) discharge of Everest and WyoTech job placement misrepresentation rate claims and, (2) the amount of relief for all job placement rate misrepresentation claims.**

Enforcement agrees to document in its "desk book" or standard operating procedures the following regarding claims approved to date: (1) Enforcement's concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal basis and eligibility determinations pursuant to which the claims have been approved to date; and, (2) Enforcement's concurrence with OGC's previously articulated legal conclusions on the appropriate relief for JPR claims.

OGC established the legal framework, review criteria and legal basis for relief for both the Heald and Everest/WyoTech JPR claims – pursuant to which there were three separate sets of approvals and the discharge of the loans of over 3,800 borrowers during the time when claim review was overseen by OUS, OGC and the Special Master. Enforcement documented its <u>concurrence</u> in each of the Approval Memos that it submitted based on the previously established legal framework, review criteria and legal basis for relief for the JPR claims.

Therefore, regarding the Report's recommendation that BDU seek further "advice" from OGC regarding the eligibility of Everest and WyoTech students who enrolled in programs covered by the Department's published findings (that Everest and WyoTech mispresented the job placement rates for those programs), Enforcement and BDU previously confirmed said advice and applied it during the Report period. Also, to the extent that the recommendation implies that BDU has to seek written guidance from OGC regarding claim eligibility on every claim, BDU's existing protocols provide for obtaining OGC's approval on any new types of claims where the legal framework, review criteria and legal basis for relief are developed by BDU. To bolster the written documentation detailing the legal framework, review criteria and legal basis for relief for the Heald and Everest/WyoTech JPR claims, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions regarding the JPR claims and confirming the legal bases and eligibility determinations pursuant to which the claims have been approved to date.

With respect to part (2) of this recommendation, Enforcement's concurrence with OGC's legal conclusions is documented in the Approval Memos and also is reflected in the Corinthian Guaranteed Employment memo. However, in the interest of ensuring detailed documentation regarding the work performed during the Report period, FSA agrees that BDU will draft a memorandum documenting its concurrence with OGC's previously articulated legal conclusions on the appropriate relief for Heald, Everest, and WyoTech JPR claims.

FSA will ensure that OGC's advice in connection with any future relief determinations will be formally documented and incorporated into FSA's existing borrower defense protocols and processes.

**Recommendation 5: Establish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA has no associated legal memorandum.**

The February 2017 Protocol provides for reviewing and adjudicating claims that are "unique" and/or for which there is no associated legal memorandum. For example, the Protocol states that the "[p]reponderance [of the evidence standard] and thus eligibility is not met when there is a single uncorroborated claim."[23] We will work with the Department to implement such protocols, so that these claims can be adjudicated by BDU and submitted to OUS and other designated officials for approval or authorization to deny.

**Recommendation 6: Document and maintain readily available evidence for all quality control reviews.**

We agree with this recommendation and concede that evidence relating to BDU reviews and quality control was not "readily available" because BDU lacked a database for tracking such information throughout the Report period. Therefore, accessing this data required pulling it from BDU's over 1,000 Excel spreadsheets. Upon inheriting oversight of the claim reviews in 2016, Enforcement was acutely aware of the need for a claim review system that would store the data, track reviews and changes in claims status, and provide reporting capabilities. As discussed with respect to Finding 2 below, FSA began the process for creating that system in 2016, and as of October 2017, BDU now has an Access claim review platform that records each review. BDU currently is documenting new and adjusted processes and protocols utilizing the claim review platform.

**Recommendation 7: Establish and document policies and procedures for discharging loans associated with approved claims with certain characteristics. These characteristics include (a) borrowers enrolled in multiple programs and at least one program is eligible for relief, (b) the borrower received a loan disbursement after the school closed, (c) the discharge is impacted by a State's statute of limitations, and (d) the borrower's loan is a Federal Family Education Loan program loan or a Perkins loan.**

We agree with this recommendation for establishing documented policies and procedures for discharging loans both generic and character-specific. To that end, for each of the four types of claims referenced, BDU has developed draft policies and procedures that incorporate use of the new review platform discussed in our response to Finding 2. These protocols will be reviewed by CFOICO before final implementation. Additionally, we have initiated Change Request (CR) 4280 (October 2017) which requires the loan servicers to accept any special processing instructions provided by ED. As part of the implementation of that CR, FSA will define the procedures to

---

[23] *See* Protocol at p. 7.

U.S. Department of Education
Office of Inspector General
ED-OIG/I04R0003

36

determine which loans require special processing and how the instructions will be provided to the servicers to discharge the loans. It is anticipated that this CR will be implemented at the loan servicers early in CY 2018.

**Recommendation 8**: Establish and document policies and procedures for closing out and issuing decisions on borrower defense claims flagged for denial.

We agree with this recommendation; it is a fundamental activity critical to quality customer service to ensure that borrowers are aware of the disposition of their claims in a timely and consistent manner. As discussed, a process for obtaining authorization to deny claims has been agreed upon by OUS, OGC and FSA. BDU has begun implementation of the agreed-upon denial process.

Also, an interest credit was approved by OUS in September, and Change Requests (CRs) 4379 (which addresses interest adjustments) and 4280 (see Recommendation 7) have been initiated with anticipated implementation in early CY 2018. Through these CRs, Business Operations will refine its procedures for notifying borrowers of the denial decisions and enhance processes/procedures currently utilized at the servicers for executing denial processing.

**Recommendation 9**:   Establish timeframes for the claims intake, claims review, loan discharge, and claims denial processes and develop controls to ensure timeframes are met.

We agree with the recommendation that there should be set timeframes for processing claims from intake to review to final decision and through discharge; further, controls should be in place to ensure that those timeframes are met. Because many processes for review, adjudication and final decision/authorization require work to be performed by OUS and/or OGC, Enforcement will work with OUS and OGC to develop mutually agreeable timelines. Additionally, Business Operations will review all steps in the process to ensure that we have accounted for the various scenarios involved, both generic and as pertains to any school specific considerations. As stated in Recommendation 7, once current procedures have been reviewed for operational accuracy, documented and approved, timeframes for milestone steps will be developed and implemented.

**Finding 2. FSA Had an Inadequate Information System to Manage Borrower Defense Claim Data.**

**Recommendation: Implement an information system that (a) maintains quality information regarding borrower defense claims, process status, and decision outcomes; (b) allows for claim data queries for all stages of claim review; and (c) contains controls to protect the integrity of the claims data.**

We agree with this recommendation. Accordingly, we have been working toward the development of a claims management system since the summer of 2016. Because of the timeline for obtaining funding for, and completing the design, development and operationalizing of, a new Claims Management System, we also worked on a parallel track to find short-term alternatives. We recognized the potential problems and limitations noted by OIG regarding the storage of data on Excel spreadsheets, and we therefore worked with U.S. Digital Services (USDS) personnel who made several recommendations and agreed to build an Access review platform for BDU. The

USDS platform, which is now fully functioning, is a short-term solution, but we believe that it achieves the objectives in this recommendation and significantly enhances efficiencies and reporting capabilities.

FSA is further developing the USDS platform to meet new review and processing requirements arising from policy changes and will continue to document these new processes and protocols as they are developed.  Additionally, FSA is in the process of developing new requirements and obtaining funding for a long-term, more robust system.

## Technical Corrections – Appendix A

We have enclosed a list of technical corrections in Appendix A.  We request that the final Report be corrected to accurately reflect these facts.

## Redactions

In the draft Report, OIG discloses attorney-client privileged communications and information and data that are confidential and deliberative, and the Report also includes statements which require the disclosure of attorney-client privileged communications in order to respond.  FSA respectfully requests that OIG confer with FSA, OGC and OUS as to appropriate redactions to the Report and this response so that OIG does not waive privileges and appropriate objections on behalf of the Department.

We appreciate the opportunity to comment on the draft Report.  Please let us know if you have any questions about our comments or need further information.

Enclosure

cc.     Jeffrey Nekrasz, Auditor, Student Financial Assistance Advisory and Assistance Team

# EXHIBIT 20

December 15, 2017

# Borrower Defense Relief Methodology for CCI Claims[1]

Purpose

This document describes the methodology used to calculate the amount of relief to award former Corinthian Colleges Inc. (CCI) students with borrower defense claims eligible for approval under existing Job Placement Rate (JPR), Guaranteed Jobs, and Transferability of Credits claim theories. This methodology was developed to provide borrowers relief consistent with and appropriate to the harm they incurred from the misrepresentation by CCI, thereby making them whole. It is rooted in a determination of the value of the claimant's CCI education, as calculated by comparing average earnings of CCI claimants who attended a given academic program to those who attended similar programs at schools the Department has determined adequately prepare students for gainful employment.

Methodology

**Step 1: Map all CCI claims to official classification codes and credentials**

In order to compare the value of a CCI claimant's education against other students, it was necessary to ensure the Department had an accurate record of the particular title IV CCI academic Program Name(s) and credential (level of degree or certificate for the program) the borrower had enrolled in and attended. Federal Student Aid (FSA) enlisted the assistance of the Office of the Chief Financial Officer (OCFO) to map all CCI claims to official program classification codes established by the National Center for Education Statistics.  These codes, known as the Classification of Instructional Programs (CIPs), provide a taxonomic scheme that supports the accurate tracking and reporting of fields of study and program completions activity. CIPs are also used as one of the identifiers comprising a Gainful Employment (GE) Program, the others being the credential level and OPEID ID number.

(For purposes of this exercise, hereinafter a "CCI Program/Credential Group" consists of a specific CIP code, its corresponding CIP Description, and a specific credential. This is essentially the equivalent of a GE Program for comparison purposes. "CCI Program/Credential Group" is different from the "Program Name" that is a narrower identifier than a CIP Code. A CIP Program/Credential Group will typically encompass multiple Program Names.)

FSA provided to OCFO files containing summary data for 68,836 claims from former CCI students. These files contained both the Program Name(s) of study and credential obtained by former CCI students as reported on their applications for relief, as well as the Program Name(s) of study and credentials obtained for these individuals as previously reported to the Department by Zenith Education Group, an education entity that acquired a majority of CCI campuses in 2015 after CCI ceased operations.

As the borrower or Zenith-provided Program Names and credentials in these claims were not uniform and did not always match the Department's official list of Program(s) Names offered by CCI (in most cases due

---

[1] This document reflects work performed by the OCFO, FSA, and the OGC. OPE also consulted on the project in its early stages.

December 15, 2017

to abbreviations, misspellings, or because of the inclusion of informal or inaccurate program titles), OCFO developed a 3-part process for ensuring borrowers were uniformly assigned to the correct CCI Program/Credential Group:

Step 1a) OCFO developed and applied a series of formulas to files of claims to automate the cleaning of the data, and to cross-walk the various reported CCI Program Names and credentials to the "CIP Description" and "Program Name" data for CCI institutions as reflected in the Department's Postsecondary Education Participants System (PEPS). The CIP Description was mapped to official CIP codes (located here: https://nces.ed.gov/ipeds/cipcode/), and credentials were mapped to the following categories:

| Certificate or Diploma | Associate's Degree | Bachelor's Degree | Master's Degree |
|---|---|---|---|
| 01 | 02 | 03 | 05 |

Step 1b) OCFO sorted and manually cross-walked claims, correcting for any errors generated by the automated cleaning and mapping. At this step of the process, three key decision rules were applied to claims:

1) If there was a discrepancy between the CCI Program Name and/or credential as reported by the individual and as reported by Zenith, the claim was mapped to the Program Name found in the data provided by Zenith. This is because, as a general rule, we found the Zenith data to be more accurate and closely aligned to the Department's official list of former title IV eligible CCI Program Names.

2) If a student or Zenith reported multiple programs, the claim was mapped to the first Program Name listed. This is because the first Program Name was most commonly associated with the primary claim submitted by the student

3) If no credential information was available, the claim was mapped to the most common credential earned by CCI students for that Program Name. This is because the most common credential was likely to be accurate from a statistical standpoint.

OCFO then combined all claims into a single file and conducted another round of sorting and cross-walking to identify and correct any inconsistencies or errors. The combined claim file contained the final cross-walk between the Program Name(s) and credential reported by former CCI students in their applications, the information provided by Zenith, and the CCI Program/Credential Code and credential to which the claim was mapped.[2]

Step 1c) OCFO and FSA staff reviewed the combined claim data file in an effort to identify and correct any inconsistencies or errors. OCFO, FSA, and Office of the General Counsel (OGC) staff reviewed the mapping decisions for claims with somewhat ambiguous information to determine how best to map

---

[2] Having all of this information in one record will be helpful if later there is any need to research any potential discrepancies about why a borrower was placed in a given CCI Program/Credential Group.

2

December 15, 2017

those CCI program(s) Names to the appropriate CIP code and credential.[3]  A list of the CCI Program Names with corresponding CIP codes is attached as Appendix B.

**Step 2: Submit claims to the Social Security Administration (SSA) for income information**

FSA used an existing interagency agreement with the SSA to calculate earnings data for former CCI students. Using a file template required by SSA, OCFO extracted the requisite data from the combined claim file and prepared it for submission to SSA. This included adding a field with date of birth, grouping claims by CIP code and credential to exclude individuals in groups with fewer than 10 claims, and sorting data to identify and correct or remove any files containing missing or duplicate Social Security Numbers. FSA reviewed the file and corrected or removed any data containing missing or duplicate names, reconciling names with official FSA records.

FSA sent the names of 61,717 former CCI students to SSA, organized by 79 CCI Program/Credential Groups.  SSA provided to FSA the mean and median incomes for these 79 groups, based on 2014 earnings data—the most current year of Gainful Employment reporting data to be used for comparison. SSA reported a match rate of 99.25% indicating the individual borrower data was incredibly accurate.

**Step 3: Compare 2014 earnings of CCI students to 2014 earnings of students from "passing" Gainful Employment programs**

FSA, OCFO, and OGC agreed, as a guiding principle, to use earnings comparisons most favorable to CCI students. OCFO compared 2014 earnings of CCI students in a CCI Program Credential/Group against 2014 earnings of students completing programs with the same CIP code and credential that earned passing scores as part of the programs in the Department's GE program (a list of the GE data is available here: https://studentaid.ed.gov/sa/about/data-center/school/ge). There were CCI programs which had passing GE scores. These CCI programs were excluded from the GE comparison set, as that was more favorable to CCI students and provided for a more distinct comparison of GE earnings between CCI and non-CCI programs. For each of the 79 program/credential groupings, OCFO calculated the following data:

1. Mean CCI earnings divided by average mean earnings of passing schools
2. Mean CCI earnings divided by weighted[4] average mean earnings of passing schools
3. Median CCI earnings divided by average median earnings of passing schools
4. Median CCI earnings divided by median of the median earnings of passing schools

For each of the 79 CCI Program/Credential Groups, OCFO identified the GE earnings data comparison approach most favorable to CCI students (of the four above, the one approach that resulted in the

---

[3] Claims without program information were left blank, and those individuals were later excluded from the data submitted to SSA.
[4] The weighted average accounted for the number of students reported. For example, rather than treat the earnings of a GE passing school that reported 25 students the same as the earnings of a school that reported 250 students, this calculation took into account the sample size of students for each GE passing school and weighted them accordingly.

lowest comparative percentage earnings for CCI students). OCFO analyzed the results, including the earnings of students from across similar programs, and made the following adjustments when it resulted in a more favorable comparison:

- For credentials with limited (1-3 schools reporting) or no GE data with which to compare, OCFO adjusted the result to the credential within the same CIP Code with the most favorable comparison to the borrower. Similarly, some CCI borrowers were not sent to SSA because they were part of a CCI Program/Credential Group consisting of students enrolled in a program whose credential level had fewer than 10 students for which the Department had data. For these Groups that were likely to have approved claims, OCFO assigned to the borrower the most favorable earnings comparison within the same CIP Code.[5]
- For CCI CIP Codes with no corresponding GE program classification data with which to compare, OCFO used the closest possible GE match. When there were multiple similar classifications to choose from OCFO opted to use the GE classification most favorable to the borrower.
- For CCI CIP Codes that were not commonly reported by passing programs or for which there were similar CIP codes for reporting (such as "other" CIP codes within a category of programs), OCFO adjusted the result to the most favorable comparison among similar classifications.[6]

**Step 4: Analyzing Results and Determining Formula for Relief**

FSA, OCFO and OGC analyzed the results of the comparisons, and considered various approaches for applying relief on the basis of the comparative earnings with the primary consideration making CCI students whole. Based on that analysis and consideration the following decisions were made:

1. 100% relief will be provided for all borrowers with claims who we determined were enrolled in a CCI Program/Credential Group whose average earnings for the group were less than 50% of earnings of comparable passing GE programs.  This results in a large number of CCI Programs/Credential Groups (19 of the 83 groups) receiving full relief, and recognizes that programs producing such low comparative earners did not, by and large, provide measurable value to CCI students.
2. Claimants enrolled in a CCI Program/Credential Group with earnings between 50% and 90% of earnings of passing GE programs will be awarded relief in amounts inverse with their earnings. For example, a CCI borrower enrolled in a program included in a CCI Program/Credential Group with earnings of 60% of the average GE earnings will receive 40% relief. Relief amounts will be

---

[5] The results of these adjustments added Groups to the total number of CIP codes and credentials compared.  For example, the Department has claims mapped to the Certificate, Associate's, and Bachelor's credentials for the Homeland Security CIP. Only 2 of these groupings were sent to SSA, and GE comparison earnings are available for only 1, which resulted in 100% relief.  All 3 credential groupings were set to 100% relief.

[6] For example, the Department's PEPS data originally mapped CCI programs related to information technology network administration or network security to CIP code 119999. However, the Department determined that CIP code 111001, Network and System Administration, was a better fit and resulted in a greater percentage relief when comparing to GE earnings.

December 15, 2017

rounded up to the nearest 10 percentage-point increment. For example, students in CCI Program/Credential Groups included in classifications with comparative earnings of 50-59% will receive 50% relief. This results in higher levels of relief than would be provided using smaller increments (such as CCI Programs/Credential Groups with earnings of 55-59% receiving only 45% relief). In addition, rounding up in large increments, along with all the other borrower-friendly adjustments already discussed, mitigates possible data imprecision that would be more likely to impact relief levels if calculated in smaller increments.[7] Finally, this approach also eases the business process difficulties in administering unique relief percentages for each borrower receiving partial relief.

3. A minimum of 10% relief will be provided for all borrowers with approved claims, including those enrolled in CCI Programs/Credential Groups with earnings greater than passing GE programs. This recognizes that, although the value of the education in certain CCI programs was comparatively high, the Department did not include an examination of factors unique to each student that could otherwise merit some relief for a particular student or lead the Department to conclude no relief was appropriate. For example, we did not examine how well a student performed in school, how aggressively a student sought employment in their field of study, whether a student was employed in their field of study, or whether a student's earnings were low for the field of study within their geographic location. Given the relative lack of information regarding harm provided by borrowers in their claims it was not possible to conduct an individualized determination of relief on a case-by-case basis.

A table matching the CIP Codes to the percentage relief by credential level is included as <u>Appendix A</u>.

**Step 5: Relief Percentages and Programs from Appendices A and B Matched to Programs and Credentials at each CCI School**

Next, in order to apply the relief percentages in Appendix A to approved CCI Programs at each CCI school, FSA developed more detailed crosswalks. FSA searched for each CCI Program and credential listed in Appendices C and D on the Crosswalk in Appendix B ("Crosswalk of CIP Codes and Descriptions to CCI Program Names"), identified the CIP Code under which the CCI Program was listed in the Crosswalk, and then found the corresponding CIP Code and Credentials on Appendix A.  FSA then found on Appendix A the assigned percentage for the CIP Code and Credential and recorded that percentage in Appendix C.  The process was repeated for each CCI Program and Credential listed in Appendix C.[8] The same process was repeated for each CCI Program and Credential in Appendix D.

---

[7] Possible data imprecision could be due to factors such as a school making an error in the data reported for GE, or the Department making an error in mapping a student to a program/credential for purposes of calculating CCI earnings.

[8] In consultation with OCFO, FSA used exact matches from the Crosswalk to record on Appendices C and D.  Where there was not an exact match, FSA recorded an "X."  The absence of an exact match on the Crosswalk indicates that there were not a sufficient number of students to determine relief using the methodology described in this paper. Note that CCI did not have a Program at every Credential Level.  For any approved CCI claim for which the percentage relief is not included in Appendices C or D, the relief is still to be determined. As such, this Methodology and the Appendices subsequently may be amended as those decisions are made.

December 15, 2017

**Step 6: Process for applying relief methodology to each claim**

The following is a summary of the process to determine relief for former CCI students with borrower defense claims eligible for approval:

1. This relief methodology along with legal analysis and conclusions by OGC documented in a formal memorandum, serve as the framework for approving and awarding relief for CCI claims approved under existing Job Placement Rate (JPR), Guaranteed Jobs, and Transferability of Credits claim groups.

2. FSA will apply the corresponding percentage of relief to be awarded using Appendix C for Everest and WyoTech approved claims and using Appendix D for Heald claims. The process of applying the relief percentage, notifying students, and discharging (or denying) claims is documented in FSA procedures.

   a. FSA will examine the Program Name(s) and credential(s) reported on the application for relief for each former CCI student, as well as the Program Name(s) and credential(s) reported for that student by Zenith.

   b. For eligible Programs, FSA will determine the percentage relief based on the student's program/credential that is most favorable. For example, if a student reported that he or she was in multiple programs of study, or there is a discrepancy between the data reported by the student and Zenith, FSA will award the level of relief (*e.g.*, 10%, 20%, etc.) that is highest among those CCI Program/Credential Groups.

6

December 15, 2017

## Appendix A: Table for Matching CIP Codes to Percentage Relief by Credential Level

| CIP Code | CIP Description | Relief % Awarded | | | |
|---|---|---|---|---|---|
| | | Certificate | Associates | Bachelors | Masters |
| 110101 | Computer and Information Sciences, General | 100.0% | 100.0% | 100.0% | |
| 111001 | Network and System Administration/Administrator | 10.0% | 40.0% | | |
| 111006 | Computer Support Specialist | 100.0% | | | |
| 150303 | Electrical, Electronic and Communications Engineering Technology/Technician | 30.0% | 20.0% | | |
| 220302 | Legal Assistant/Paralegal | 100.0% | 50.0% | 100.0% | |
| 430103 | Criminal Justice/Law Enforcement Administration | 100.0% | 50.0% | 50.0% | 40.0% |
| 430107 | Criminal Justice/Police Science | | 100.0% | | |
| 430301 | Homeland Security | 100.0% | 100.0% | 100.0% | |
| 460201 | Carpentry/Carpenter | 30.0% | | | |
| 460302 | Electrician | 20.0% | | | |
| 460503 | Plumbing Technology/Plumber | 30.0% | | | |
| 470101 | Electrical/Electronics Equipment Installation and Repair, General | | 50.0% | | |
| 150501 | Heating, Air Conditioning and Refrig. Technol/Tech (ACH/ACR/ACHR/HRAC/HVAC/AC) | 30.0% | | | |
| 470201 | Heating, AC, Ventilation and Refrig Main. Techlogy/Techn. (HAC,HACR,HVAC,HVACR) | 30.0% | | | |
| 470603 | Autobody/Collision and Repair Technology/Technician | 10.0% | 30.0% | | |
| 470604 | Automobile/Automotive Mechanics Technology/Technician | 10.0% | 10.0% | | |
| 470605 | Diesel Mechanics Technology/Technician | 20.0% | 20.0% | | |
| 470611 | Motorcycle Maintenance and Repair Technology/Technician | 30.0% | | | |
| 470616 | Marine Maintenance/Fitter and Ship Repair Technology/Technician | 10.0% | | | |
| 500602 | Cinematography and Film/Video Production | | 100.0% | | |
| 510601 | Dental Assisting/Assistant | 30.0% | 40.0% | | |
| 510701 | Health/Health Care Administration/Management | | 40.0% | 40.0% | |
| 510705 | Medical Office Management/Administration | 20.0% | 30.0% | | |
| 510707 | Health Information/Medical Records Technology/Technician | | 10.0% | | |
| 510714 | Medical Insurance Specialist/Medical Biller | 20.0% | 20.0% | | |
| 510716 | Medical Administrative/Executive Assistant and Medical Secretary | 30.0% | 10.0% | | |
| 510801 | Medical/Clinical Assistant | 30.0% | 30.0% | | |

7

December 15, 2017

| CIP Code | CIP Description | Relief % Awarded | | | |
|---|---|---|---|---|---|
| | | Certificate | Associates | Bachelors | Masters |
| 510805 | **Pharmacy Technician/Assistant** | 20.0% | 10.0% | | |
| 510908 | **Respiratory Care Therapy/Therapist** | | 30.0% | | |
| 510909 | **Surgical Technology/Technologist** | 50.0% | 30.0% | | |
| 511011 | **Renal/Dialysis Technologist/Technician** | 10.0% | | | |
| 513501 | **Massage Therapy/Therapeutic Massage** | 20.0% | | | |
| 513801 | **Nursing/Registered Nurse (RN, ASN, BSN, MSN)** | 40.0% | 100.0% | 100.0% | |
| 513901 | **Licensed Practical/Vocational Nurse Training** | 20.0% | 40.0% | | |
| 513902 | **Nursing Assistant/Aide and Patient Care Assistant/Aide.** | 20.0% | | | |
| 520201 | **Business Administration and Management, General** | 100.0% | 50.0% | 100.0% | 100.0% |
| 520299 | **Business Administration, Management and Operations, Other** | 100.0% | 50.0% | 100.0% | 100.0% |
| 529999 | **Business, Management, Marketing, and Related Support Services, Other** | 100.0% | 50.0% | 100.0% | 100.0% |
| 520301 | **Accounting** | 50.0% | 50.0% | 50.0% | |
| 520305 | **Accounting and Business/Management** | 50.0% | 50.0% | 50.0% | |
| 520401 | **Administrative Assistant and Secretarial Science, General** | 10.0% | | | |
| 520407 | **Business/Office Automation/Technology/Data Entry** | | 10.0% | | |
| 520408 | **General Office Occupations and Clerical Services** | 20.0% | | | |
| 520499 | **Business Operations Support and Secretarial Services, Other** | 20.0% | 20.0% | | |
| 520701 | **Entrepreneurship/Entrepreneurial Studies** | | 50.0% | | |
| 520901 | **Hospitality Administration/Management, General** | | 20.0% | | |
| 521801 | **Sales, Distribution, and Marketing Operations, General** | | 50.0% | | |
| 522001 | **Construction Management** | | 50.0% | | |

000545

December 15, 2017

## Appendix B: Crosswalk of CIP Codes and Descriptions to CCI Program Names

**CIP: 110101**

    **CIP Description: Computer and Information Sciences, General**

     **Zenith and Borrower-Provided Program Names:[9]**

Business Software Applications

Computer Applications

Computer Business Administration

Computer Information Science

Computer Information Science (AAS)

Computer Information Science-Programming

Computer Information Science-Web Design

Computer Information Technology

Computer Science

Computer Software Applications

Computer Technology

Information Systems

Multimedia Production

Software Technologies

**111001**

    **Network and System Administration/Administrator**

CIS-Network Administration

Computer Science/Network

Information Technology - Emphasis in Network Security

Information Technology - Emphasis in Network Sys Adm

IT - Network Systems Admin

Information Technology Network Security

IT Network Security

Network Administration

Network Internet Security Spec

Network Systems Support

Networking Technology - Emphasis in CCNA Curriculum

Networking Technology - Emphasis in Microsoft Windows Server Administration

NT - CCNA Curriculum

NT - Cisco Systems

NT - Windows NT

Networking Technology, Emphasis in CCNP« Curriculum – CERT

Networking Technology, Microsoft and Cisco Systems Administration

Networking Technology, Microsoft Emphasis – CERT

---

[9] The Program Names include the official program names listed in PEPS, the names reported by Zenith for individual borrowers, and the borrower-provided names. Similar CIP Codes for which relief levels were identical were grouped together for purposes of this Crosswalk.

9

December 15, 2017

Networking Technology, Microsoft Windows 2000
Web Administration
Web Administration Diploma
Web Design
Web Design and Administration
Web Design and Administration, Web Design
Web Development
Web Security

**111006**

**Computer Support Specialist**
IT - Technical Support
IT Support Specialist
Information Technology Support Specialist

**150303**

**Electrical, Electronic and Communications Engineering Technology/Technician**
Electrical technology
Electronics and Computer Technology
Electronics Computer Technology
Electronics Technology

**220302**

**Legal Assistant/Paralegal**
Legal Assistant/Paralegal
Paralegal
Paralegal (AAS)
Paralegal/Legal Assistant

**430103**

**Criminal Justice/Law Enforcement Administration**
Bus Admin - Criminal Justice
Business Administration – Criminal Justice
Business Administration - Emphasis in Criminal Justice
Criminal Justice
Criminal Justice - Homeland Security
Criminal Justice – Investigations
Criminal Justice Administration
Criminal Justice Private & Homeland Security
Criminology

**430107**

**Criminal Justice/Police Science**
Crim. Invest.
Criminal Investigation
Crime Scene Investigation
Crime Scene Technician

**430301**

000547

December 15, 2017

**Homeland Security**
    Homeland Security
    Homeland Security Specialist (Diploma)

**460201**

**Carpentry/Carpenter**
    Carpentry

**460302**

**Electrician**
    Electrical Technician
    Electrician
    Electrician/Industrial Electrical Tech
    Electronics, Computers, & Industrial
    Electrician with Industrial Electrical Technology Concentration
    Electrician with Renewable Energy and Photovoltaics Concentration
    Industrial Electrical Technology
    Industrial Electrical Technology (Diploma)

**460503**

**Plumbing Technology/Plumber**
    Plumbing
    Plumbing Technician
    Plumbing Technology

**470101**

**Electrical/Electronics Equipment Installation and Repair, General**
    Electronic Computer and Communication
    Electronics, Computer, and Communications Technology

**150501 and 470201**

**Heating, Air Conditioning and Refrig. Technol/Tech (ACH/ACR/ACHR/HRAC/HVAC/AC)**

**Heating, AC, Ventilation and Refrig Main. Techlgy/Techn. (HAC,HACR,HVAC,HVACR)**
    Air Conditioning, Heating, Refrigeration & Appliances
    Commercial Heating Ventilation & Air Conditioning
    Heating, Ventilation & Air Conditioning
    Residential Heating, Ventilation and Air Conditioning Technician
    Residential Heating Vent and AC
    Residential Heating Ventilation and Air Conditioning
    Heating, Ventilation and Air Conditioning
    Air Conditioning, Heating and Refrigeration - ATI Teachout
    Air Conditioning, Heating, Refrigeration & Appliances - ATI Teach-out Program
    AOS / Concentration in Service Systems - Climate Control & Refrig Tech
    Assoc Applied Science - Climate Control & Refrigeration Tech
    Climate Control & Refrigeration Technology
    Commercial / Industrial Heating Ventilation & Air Conditioning
    Commercial Heating, Ventilation & Air Conditioning
    Heating, Ventilation & Air Conditioning

000548

December 15, 2017

Heating, Ventilation & Air Conditioning with Renewable Energy and Photovoltaics
Heating, Ventilation and Air Conditioning
Heating, Ventilation and Air Conditioning- TX
Heating, Ventilation, Air Conditioning Technician
Heating, Ventilation, and Air Conditioning

**470603**

**Autobody/Collision and Repair Technology/Technician**

Auto Body
Automotive
Automotive Mechanics
Automotive Repair
Automotive Specialist
Chassis Fabrication and High Performance Engines with Collision/Refinishing Tech
Collision/ Refinishing Technology with Off-Road Power
Collision Refinishing Tech
Collision Repair
Collision/Refinishing & Upholstery Technology
Collision/Refinishing Technician
Collision/Refinishing Technology  ( Concentration Motorsports Chassis Fabrication )
Collision/Refinishing Technology (Concentration Trim & Upholstery Technology)
Collision/Refinishing Technology ( Concentration Street Rod & Custom Fabrication )
Collision/Refinishing Technology and Management
Collision/Refinishing Technology w/ Motorsports Chassis Fabrication and
Management
Collision/Refinishing Technology w/ Street Rod and Management
Collision/Refinishing Technology with Specialty Auto Fabrication
Street Rod & Custom Fabrication w/ Collision/Refinishing Technology
Street Rod Building & Auto Customizing with Collision/Refinishing Tech.
Trim and Upholstery
Collision Technology (all credential levels)
Collision/Refinishing (all credential levels)
Collision/Refinishing with Specialization in Automotive Fabrication (Diploma)

**470604**

**Automobile/Automotive Mechanics Technology/Technician**

Advanced Diagnostics
AOS Automotive Technology-Automotive Diagnostics
AOS Automotive Technology-Service Management
AOS-Automotive Technology/Automotive Diagnostics
Applied Automotive Technology
Auto Tech
Automotive Technician
Automotive Technology - (Concentration Upholstery Technology
Automotive Technology ( Concentration Advanced Automotive Diagnostic )
Automotive Technology ( Concentration High Performance Power Trains )

December 15, 2017

Automotive Technology ( Concentration Motorsports Chassis Fabrication )
Automotive Technology ( Concentration Street Rod & Custom Fabrication )
Automotive Technology (Concentration Motorsports)
Automotive Technology (Concentration St. Rod)
Automotive Technology and Management
Automotive Technology w/ Advanced Automotive Diagnostics
Automotive Technology w/ High Performance Power Trains
Automotive Technology w/ Motorsports
Automotive Technology w/ Motorsports Chassis Fabrication and Management
Automotive Technology w/ Street Rod and Management
Automotive Technology w/ Trim & Upholstery Technology
Automotive Technology with Specialty Auto Fabrication
Automotive Technology with High Performance Power Transmission (Diploma)
Automotive Technology-Automotive Diagnostics
Applied Automotive Technology  - Advanced Diagnostics Concentration (Diploma)
Automotive Technology/ Concentration in Automotive Diagnostics (Associate)
Automotive Technology/ Concentration in Service Management (Associate)
Automotive Technology (Diploma)
Street Rod & Custom Fabrication w/ Automotive Technology

**470605**

**Diesel Mechanics Technology/Technician**
Advanced Diesel Technology
Diesel Technology Advanced (Diploma)
Diesel/Automotive Vehicle Technology (Diploma)
Auto Technology ( Concentration Diesel )
Automotive Technology with Light Duty Diesel (Diploma)
Diesel Technology with High Performance Power Transmission (Diploma)
Auto/Diesel Vehicle Technology
Chassis Fabrication and High Performance Engines with Diesel Technology
Diesel
Diesel Auto Vehicle Technology
Diesel Automotive Technology
Diesel Mechanic
Diesel Tech
Diesel Technology (all credential levels)
Diesel Technician
Diesel Technology ( Concentration Advanced Diesel )
Diesel Technology ( Concentration Automotive )
Diesel Technology ( Concentration Motorsports Chassis Fabrication )
Diesel Technology ( Concentration Street Rod & Custom Fabrication )
Diesel Technology and Management
Diesel Technology w/ High Performance Power Trains
Diesel Technology w/ Light Duty Diesel
Diesel Technology w/ Trim & Upholstery Technology
Motorsports Chassis Fabrication w/ Diesel Technology

December 15, 2017

Street Rod & Custom Fabrication w/ Diesel Technology

**470611**

**Motorcycle Maintenance and Repair Technology/Technician**

Motorsports Chassis Fabrication

Motorsports Chassis Fabrication w/ Automotive Technology

Motorsports Chassis Fabrication w/ Automotive Technology

Motorsports Chassis Fabrication w/ Collision/Refinishing Technology

Harley-Davison and Motorcycle

Motorcycle Technician

Motorcycle Technology

Motorcycle Technology - European Concentration

Motorcycle Technology-  Harley Davidson Concentration

Motorcycle Technology Asian Concentration

Applied Automotive Technology - Motorsports Concentration

Motorcycle Technology and Management

Comprehensive 25 Week Multi-Line Program

Comprehensive 30 Week Multi-Line Program

MDBMW Motorcycle Mechanics, Dealership Management  & BMW Advanced Training

MDDUC Motorcycle Mechanics Dealership Management & Ducati Advanced Training

MDH Harley-Davidson & Motorcycle Mechanics/Dealership Management

MDHON Motorcycle Mechanics, Dealership Management & Honda Advanced Training

MDKAW Motorcycle Mechanics, Dealership Management & Kawasaki Advanced Training

MDSUZ Motorcycle Mechanics, Dealership Management & Suzuki Advanced Training

MDTRI Motorcycle Mechanics, Dealership Management & Triumph Advanced Training

MDYAM Motorcycle Mechanics, Dealership Management & Yamaha Advanced Training

MH - Harley -Davidson Motorcycle Mechanics Training

Motorcycle Technician

Motorcycle Technician with Off Road Power

**470616**

**Marine Maintenance/Fitter and Ship Repair Technology/Technician**

Marine Specialist – Advanced

Marine Specialist

Marine Technology

**500602**

**Cinematography and Film/Video Production**

Film and Video

**510601**

**Dental Assisting/Assistant**

14

December 15, 2017

Dental Assist.
Dental Assistant
Dental Assisting
Dental technician

**510701**

**Health/Health Care Administration/Management**

Health Care Admin
Health Care Administration
Health Services Administration

**510705**

**Medical Office Management/Administration**

Medical Office Administration
Medical Office Management
Medical Secretary

**510707**

**Health Information/Medical Records Technology/Technician**

Health Information Technology

**510714**

**Medical Insurance Specialist/Medical Biller**

Medical Coding
Med Ins Bill & Coding
Med Ins Billing/Coding
Med Insurance Billing & Coding
Medical Billing
Medical Insurance Billing & Coding
Medical Insurance Billing and Coding

**510716**

**Medical Administrative/Executive Assistant and Medical Secretary**

Administrative Assistant-Medical
Administrative Medical Assist
Administrative Medical Assistant
Medical Admin  Assistant
Medical Administrative Assistant
Medical Administrative Secretary

**510801**

**Medical/Clinical Assistant**

Medical Assist.
Medical Assistance
Medical Assistant
Medical Assistant (AAS)
Medical Assisting

**510805**

**Pharmacy Technician/Assistant**

15

December 15, 2017

Pharmacy Tech
Pharmacy Technician
Pharmacy Technology

**510908**

**Respiratory Care Therapy/Therapist**
Respiratory Care

**510909**

**Surgical Technology/Technologist**
Surgical Tech
Surgical Technologist
Surgical Technology

**511011**

**Renal/Dialysis Technologist/Technician**
Dialysis Technician

**513501**

**Massage Therapy/Therapeutic Massage**
Massage Therapist
Massage Therapy
Massage Therapy Spa Specialist
Massage Therapy Sports Specialist
Advanced Massage Therapist
Massage Therapy- Norcross
Professional Licensing and Aromatherapy and Spa Specialist Program
Professional Licensing and Clinical and Sports Massage Specialist

**513801**

**Nursing/Registered Nurse (RN, ASN, BSN, MSN)**
Nursing

**513901**

**Licensed Practical/Vocational Nurse Training**
Licensed Practical Nursing
LPN
Practical Nurse
Practical Nursing
Vocational Nursing

**513902**

**Nursing Assistant/Aide and Patient Care Assistant/Aide.**
Nursing Assistant
Nurse Assistant /Home Health Aide
Patient Care Technician
Patient Care Technology

**520201 and 520299 and 529999**

**Business Administration and Management, General**
**Business Administration, Management and Operations, Other**

000553

December 15, 2017

**Business, Management, Marketing, and Related Support Services, Other**

Applied Management

Business

Business Administration

Business Administration (AAS)

Business Administration (AS)

Business International

Business Management

General Management

International Business

Management/Marketing

**520301 and 520305**

**Accounting**

**Accounting and Business/Management**

Accounting

Accounting (AAS)

Accounting/Business Administration

Bus Admin – Accounting

Business Accounting

Business Administration – Accounting

Business Administration-Emphasis in Accounting

**520401**

**Administrative Assistant and Secretarial Science, General**

Administrative Assistant

Administrative Secretary

Bus Mgmt/Admin Assist.

Business Management  / Administrative Assistant

Career Access

Career Access Program

Computer Office Administrative Specialist

**520407**

**Business/Office Automation/Technology/Data Entry**

Administrative Information Processing

Business Admin, Software Technologies Emphasis – CCNA

Business Administration-Emphasis in Software Technologies

Business Administration – Software Technologies

Business Software Applications

Information Processing Specialist

**520408**

**General Office Occupations and Clerical Services**

Office Skills

**520499**

**Business Operations Support and Secretarial Services, Other**

Administrative and Secretarial Services, Other

17

December 15, 2017

Administrative Assistant
Admin  Office Technology
Administrative Office Technology - Executive
Administrative Office Technology - Legal
Administrative Office Technology - Me
Administrative Office Technology - Medical
Administrative Secretary
Automated Office Technology
Business Office Administration
Business Operations
Office Administration
Computer Office Technologies and Applications
Computer Office Technology and Applications (all credential levels)
Computerized Office Applications
Microsoft Office User Specialist
Office Administration
Office Assistant / Data Entry
Word Processing Specialist

**520701**

**Entrepreneurship/Entrepreneurial Studies**

Business Administration - Emphasis in Entrepreneurship
Entrepreneurship

**520901**

**Hospitality Administration/Management, General**

Bus Admin - Hospitality & Tourism
Business Administration-Emphasis in Hospitality and Tourism
Business Administration - Hospitality/Tourism
Hospitality Management
Travel and Tourism
Travel Studies
Travel/Hospitality

**521801**

**Sales, Distribution, and Marketing Operations, General**

Bus Admin - Sales & Marketing
Business Administration-Emphasis in Sales and Marketing
Business Administration - Sales/Marketing Emphasis
Business Marketing
Business Sales & Customer Service

**522001**

**Construction Management**

Construction Management

18

December 15, 2017

## Appendix C: Everest and WyoTech Findings List

| STATE | CAMPUS/PROGRAM | FIRST DATE OF ENROLLMENT | PERCENT RELIEF |
|---|---|---|---|
| CA | Everest Alhambra-Business Operations (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| CA | Everest Alhambra-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Alhambra-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| CA | Everest Alhambra-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Alhambra-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Alhambra-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest Alhambra-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| | | | |
| CA | Everest Anaheim-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| CA | Everest Anaheim-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Anaheim-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Anaheim-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| | | | |
| CA | Everest City of Industry-Business Management/Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 10 |
| CA | Everest City of Industry-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| CA | Everest City of Industry-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest City of Industry-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest City of Industry-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| CA | Everest City of Industry-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest City of Industry-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| | | | |
| CA | Everest Gardena-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Gardena-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest Gardena-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Gardena-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| CA | Everest Gardena-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| | | | |
| CA | Everest Hayward-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest Hayward-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Hayward-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Hayward-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| | | | |
| CA | Everest Los Angeles Wilshire-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Los Angeles Wilshire-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| CA | Everest Los Angeles Wilshire-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Los Angeles Wilshire-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CA | Everest Los Angeles Wilshire-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |

000556

December 15, 2017

| CA | Everest Los Angeles Wilshire-Pharmacy Technician (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 10 | x | x |
|---|---|---|---|---|---|---|
| | | | | | | |
| CA | Everest Ontario-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Ontario-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| CA | Everest Ontario-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Ontario-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Ontario-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest Ontario-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| | | | | | | |
| CA | Everest Ontario Metro-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| CA | Everest Ontario Metro-Applied Management (Bachelor) | 7/1/2011 – 9/30/2014 | 100 | | | |
| CA | Everest Ontario Metro-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| CA | Everest Ontario Metro-Business (Bachelor) | 7/1/2010 – 9/30/2014 | 100 | | | |
| CA | Everest Ontario Metro-Business Administration (AAS) | 7/1/2010 – 9/30/2014 | 50 | | | |
| CA | Everest Ontario Metro-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| CA | Everest Ontario Metro-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2014 | 50 | | | |
| CA | Everest Ontario Metro-Nursing (Associate) | 7/1/2012 – 9/30/2014 | 100 | | | |
| CA | Everest Ontario Metro-Paralegal (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| | | | | | | |
| CA | Everest Reseda-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Reseda-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| CA | Everest Reseda-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Reseda-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest Reseda-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest Reseda-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest Reseda-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2014 | 50 | | | |
| | | | | | | |
| CA | Everest San Bernardino-Business (Associate) | 7/1/2012 – 9/30/2014 | 50 | | | |
| CA | Everest San Bernardino-Criminal Justice (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 | | | |
| CA | Everest San Bernardino-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Bernardino-Electrician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest San Bernardino-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest San Bernardino-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Bernardino-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| | | | | | | |
| CA | Everest San Francisco-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Francisco-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest San Francisco-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| CA | Everest San Francisco-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| | | | | | | |
| CA | Everest San Jose-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Jose-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest San Jose-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Jose-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest San Jose-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| | | | | | | |

000557

December 15, 2017

| CA | Everest Torrance-Medical Assistant (Diploma) | 7/1/2012 – 9/30/2014 | 30 | | | |
| CA | Everest Torrance-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 | | | |
| | | | | | | |
| CA | Everest West Los Angeles-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 | 50 | | | |
| CA | Everest West Los Angeles-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest West Los Angeles-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| CA | Everest West Los Angeles-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest West Los Angeles-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | Everest West Los Angeles-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | Everest West Los Angeles-Paralegal (Associate) | 7/1/2013 – 9/30/2014 | 50 | | | |
| CA | Everest West Los Angeles-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| | | | | | | |
| CA | WyoTech Fremont-Applied Automotive Technology  - Advanced Diagnostics Concentration (Diploma) | 7/1/2010 – 9/30/2013 | 10 | | | |
| CA | WyoTech Fremont-Applied Automotive Technology (Diploma) | 7/1/2010 – 9/30/2013 | 10 | | | |
| CA | WyoTech Fremont-Automotive Technology/ Concentration in Automotive Diagnostics (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech Fremont-Automotive Technology/ Concentration in Service Management (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech Fremont-Commercial Heating Ventilation and Air Conditioning (CHVAC) (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| CA | WyoTech Fremont-Electrician (Diploma) | 7/1/2011 – 9/30/2012 | 20 | | | |
| CA | WyoTech Fremont-Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2011 – 9/30/2013 | 30 | | | |
| CA | WyoTech Fremont-Motorcycle Technician (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| CA | WyoTech Fremont-Plumbing Technology (Diploma) | 7/1/2011 – 9/30/2012 | 30 | | | |
| CA | WyoTech Fremont-Residential Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| | | | | | | |
| CA | WyoTech Long Beach-Automotive Technician (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech Long Beach-Automotive Technology (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech Long Beach-Electrician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | WyoTech Long Beach-Heating Ventilation and Air Conditioning (HVAC) (Diploma) | 7/1/2010 – 9/30/2013 | 30 | | | |
| CA | WyoTech Long Beach-Industrial Electrical Technology (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| CA | WyoTech Long Beach-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| CA | WyoTech Long Beach-Plumbing Technology (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| | | | | | | |
| CA | WyoTech West Sacramento-Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 | 10 | 10 | x | x |
| CA | WyoTech West Sacramento-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech West Sacramento-Automotive Technology with Advanced Automotive Diagnostics (all credential levels) | 7/1/2010 – 9/30/2014 | 10 | 10 | x | x |
| CA | WyoTech West Sacramento-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |
| CA | WyoTech West Sacramento-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |

21

December 15, 2017

| CO | Everest Aurora (CO)-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
|---|---|---|---|
| CO | Everest Aurora (CO)-Business (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| CO | Everest Aurora (CO)-Criminal Justice (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| CO | Everest Aurora (CO)-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 |
| CO | Everest Aurora (CO)-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 |
| CO | Everest Aurora (CO)-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 |
| CO | Everest Aurora (CO)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 |
| CO | Everest Aurora (CO)-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012 | 20 |
| CO | Everest Colorado Springs-Accounting (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| CO | Everest Colorado Springs-Business (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| CO | Everest Colorado Springs-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 | 50 |
| CO | Everest Colorado Springs-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 | 100 |
| CO | Everest Colorado Springs-Criminal Justice (Associate) | 7/1/2011 – 9/30/2013 | 50 |
| CO | Everest Colorado Springs-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 |
| CO | Everest Colorado Springs-Legal Assistant/Paralegal (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| CO | Everest Colorado Springs-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| CO | Everest Colorado Springs-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2013 | 30 |
| CO | Everest Colorado Springs-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2013 | 30 |
| CO | Everest Thornton-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| CO | Everest Thornton-Business (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| CO | Everest Thornton-Business Accounting (Diploma) | 7/1/2010 – 9/30/2014 | 50 |
| CO | Everest Thornton-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| CO | Everest Thornton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CO | Everest Thornton-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| CO | Everest Thornton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| CO | Everest Thornton-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| CO | Everest Thornton-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 50 |
| CO | Everest Thornton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2013 | 20 |
| CO | Everest Thornton-Surgical Technologist (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| FL | Everest Brandon-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 - 9/30/2014 | 50 |
| FL | Everest Brandon-Accounting (Bachelor) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Brandon-Applied Management (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Brandon-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Brandon-Business (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Brandon-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Brandon-Business Administration (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |

000559

December 15, 2017

| FL | Everest Brandon-Business Administration (Masters) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 | | | |
| FL | Everest Brandon-Computer Information Science (Associate) | 7/1/2010 – 9/30/2014 | 100 | | | |
| FL | Everest Brandon-Computer Information Science (Bachelor) | 7/1/2010 – 9/30/2014 | 100 | | | |
| FL | Everest Brandon-Computer Office Technology and Applications (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 20 | x | x |
| FL | Everest Brandon-Criminal Justice (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 | | | |
| FL | Everest Brandon-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 | | | |
| FL | Everest Brandon-Criminal Justice (Masters) | 7/1/2010 – 9/30/2012 | 40 | | | |
| FL | Everest Brandon-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| FL | Everest Brandon-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| FL | Everest Brandon-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 | | | |
| FL | Everest Brandon-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| FL | Everest Brandon-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| FL | Everest Brandon-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| FL | Everest Brandon-Nursing (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 | | | |
| FL | Everest Brandon-Paralegal (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 | | | |
| FL | Everest Brandon-Paralegal (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 | | | |
| FL | Everest Brandon-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| FL | Everest Brandon-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| FL | Everest Brandon-Radiologic Technician (Associate) | 7/1/2013 – 9/30/2014 | x | | | |
| FL | Everest Brandon-Surgical Technologist (Associate) | 7/1/2010 – 9/30/2014 | 30 | | | |
| | | | | | | |
| FL | Everest Fort Lauderdale-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| FL | Everest Fort Lauderdale-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| FL | Everest Fort Lauderdale-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| FL | Everest Fort Lauderdale-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| FL | Everest Fort Lauderdale-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| | | | | | | |
| FL | Everest Hialeah-Business (Associate) | 7/1/2012 – 9/30/2014 | 50 | | | |
| FL | Everest Hialeah-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 | 100 | | | |
| FL | Everest Hialeah-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 | | | |
| FL | Everest Hialeah-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 | | | |
| FL | Everest Hialeah-Criminal Justice Social and Youth Services (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | x | | | |
| FL | Everest Hialeah-Diagnostic Card Sonogram (Associate) | 7/1/2010 – 9/30/2014 | x | | | |
| FL | Everest Hialeah-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| FL | Everest Hialeah-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |

23

December 15, 2017

| FL | Everest Hialeah-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 | 20 |
|----|----|----|----|
| FL | Everest Hialeah-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| FL | Everest Hialeah-Patient Care Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Hialeah-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| FL | Everest Hialeah-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| | | | |
| FL | Everest Jacksonville-Accounting (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Jacksonville-Applied Management (Associate) | 7/1/2011 – 9/30/2013 | 50 |
| FL | Everest Jacksonville-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Jacksonville-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Jacksonville-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Jacksonville-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Jacksonville-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Jacksonville-Business Administration (Master) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Jacksonville-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012– 9/30/2014 | 50 |
| FL | Everest Jacksonville-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Jacksonville-Criminal Justice (Master) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 40 |
| FL | Everest Jacksonville-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Jacksonville-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 20 |
| FL | Everest Jacksonville-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| FL | Everest Jacksonville-Medical Assistant  (Diploma) | 7/1/2010 – 9/30/2011 | 30 |
| FL | Everest Jacksonville-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| FL | Everest Jacksonville-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| FL | Everest Jacksonville-Paralegal (Associate) | 7/1/2010 – 9/30/2011 | 50 |
| FL | Everest Jacksonville-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 | 20 |
| | | | |
| FL | Everest Kendall (Miami)-Applied Management (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Kendall (Miami)-Business (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Kendall (Miami)-Business Sales and Customer Design (Diploma) | 7/1/2012 – 9/30/2014 | x |
| FL | Everest Kendall (Miami)-Criminal Investigations (Associate) | 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Kendall (Miami)-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Kendall (Miami)-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Kendall (Miami)-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 | 20 |
| FL | Everest Kendall (Miami)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| FL | Everest Kendall (Miami)-Patient Care Technician (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| | | | |

24

December 15, 2017

| FL | Everest Lakeland-Accounting (Associate) | 7/1/2011 – 9/30/2012 | 50 |
|----|----|----|----|
| FL | Everest Lakeland-Applied Management (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Lakeland-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Business (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Lakeland-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Criminal Justice (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Criminal Justice (Bachelor) | 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
| FL | Everest Lakeland-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 –  9/30/2014 | 30 |
| FL | Everest Lakeland-Medical Assistant (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 –  9/30/2013 | 30 |
| FL | Everest Lakeland-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 –  9/30/2013 | 30 |
| FL | Everest Lakeland-Paralegal (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Lakeland-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
|  |  |  |  |
| FL | Everest Largo-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Largo-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Largo-Business (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Largo-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Largo-Business Administration (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Largo-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Largo-Business Administration (Master) | 7/1/2010 – 9/30/2011 | 100 |
| FL | Everest Largo-Business Office Administration (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| FL | Everest Largo-Business Sales and Customer Service (Diploma) | 7/1/2011 – 9/30/2014 | x |
| FL | Everest Largo-Computer Information Science (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Largo-Computer Information Science (Bachelor) | 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Largo-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Largo-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| FL | Everest Largo-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Largo-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| FL | Everest Largo-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 | 30 |
| FL | Everest Largo-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| FL | Everest Largo-Medical Insurance Billing and Coding (Associate) | 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Largo-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Largo-Paralegal (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Largo-Paralegal (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Largo-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
|  |  |  |  |
| FL | Everest Melbourne-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Melbourne-Business (Associate) | 7/1/2012 – 9/30/2013 | 50 |
| FL | Everest Melbourne-Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Melbourne-Business Administration (Associate) | 7/1/2012 – 9/30/2013 | 50 |
| FL | Everest Melbourne-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |

000562

December 15, 2017

| | | | |
|---|---|---|---|
| FL | Everest Melbourne-Business Administration (Master) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Melbourne-Business Office Administration (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
| FL | Everest Melbourne-Computer Information Science (Associate) | 7/1/2010– 9/30/2011 | 100 |
| FL | Everest Melbourne-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Melbourne-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Melbourne-Film and Video (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Melbourne-Health Care Administration (Bachelor) | 7/1/2012 – 9/30/2013 | 40 |
| FL | Everest Melbourne-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Melbourne-Paralegal (Bachelor) | 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Melbourne-Pharmacy Technician (Associates) | 7/1/2013 – 9/30/2014 | 10 |
| FL | Everest Melbourne-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| | | | |
| FL | Everest Miami-Applied Management (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Miami-Business (Associate) | 7/1/2011 – 9/30/2013 | 50 |
| FL | Everest Miami-Business Office Administration (Diploma) | 7/1/2011 – 9/30/2013 | 20 |
| FL | Everest Miami-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Miami-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Miami-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Miami-Heating. Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| FL | Everest Miami-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |
| FL | Everest Miami-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |
| FL | Everest Miami-Medical Insurance Billing and Coding (Associates) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Miami-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Miami-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| FL | Everest Miami-Pharmacy Technician (Diploma) | 7/1/2010 –9/30/2013 | 20 |
| | | | |
| FL | Everest Orange Park-Applied Management (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 50 |
| FL | Everest Orange Park-Applied Management (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orange Park-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Orange Park-Business (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Orange Park-Business Office Administration | 7/1/2010 – 9/30/2014 | 20  20  x  x |
| FL | Everest Orange Park-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orange Park-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Orange Park-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Orange Park-Electrician (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| FL | Everest Orange Park-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| FL | Everest Orange Park-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |

000563

December 15, 2017

| FL | Everest Orange Park-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
|----|---|---|---|
| FL | Everest Orange Park-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| FL | Everest Orange Park-Medical Insurance Billing and Coding (Associate) | 7/1/2011 – 9/30/2014 | 20 |
| FL | Everest Orange Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| FL | Everest Orange Park-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
|  |  |  |  |
| FL | Everest Orlando North – Business (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Accounting (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Accounting (Bachelor) | 7/1/2012 – 9/30/2013 | 50 |
| FL | Everest Orlando North-Business (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Business Accounting (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Business Administration (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Business Administration (Master) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Business Sales and Customer Service (Diploma) | 7/1/2011 – 9/30/2014 | x |
| FL | Everest Orlando North-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2013 | 100 |
| FL | Everest Orlando North-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Criminal Justice (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Orlando North-Film and Video (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Health Care Administration (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 40 |
| FL | Everest Orlando North-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011 | 20 |
| FL | Everest Orlando North-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| FL | Everest Orlando North-Medical Assistant (Associate) | 7/1/2010 – 9/30/2013 | 30 |
| FL | Everest Orlando North-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| FL | Everest Orlando North-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2011 | 20 |
| FL | Everest Orlando North-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 | 20 |
| FL | Everest Orlando North-Paralegal (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orlando North-Pharmacy Technician (Associate) | 7/1/2012 – 9/30/2013 | 10 |
| FL | Everest Orlando North-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
|  |  |  |  |
| FL | Everest Orlando South-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |

27

December 15, 2017

| FL | Everest Orlando South-Accounting (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
|---|---|---|---|
| FL | Everest Orlando South-Applied Management (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Orlando South-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Orlando South-Business (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Orlando South-Business Administration (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Business Administration (Masters) | 7/1/2010 – 9/30/2012 | 100 |
| FL | Everest Orlando South-Business Sales and Customer Service (Diploma) | 7/1/2010 – 9/30/2014 | x |
| FL | Everest Orlando South-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2012 | 100 |
| FL | Everest Orlando South-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Orlando South-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Orlando South-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Healthcare Administration (Bachelor) | 7/1/2012 – 9/30/2014 | 40 |
| FL | Everest Orlando South-Homeland Security (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| FL | Everest Orlando South-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| FL | Everest Orlando South-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| FL | Everest Orlando South-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| FL | Everest Orlando South-Paralegal (Associate) | 7/1/2010 – 9/30/2011 | 50 |
| FL | Everest Orlando South-Paralegal (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Orlando South-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 | 10 |
| FL | Everest Orlando South-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 |
| | | | |
| FL | Everest Pompano Beach-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Accounting (Bachelor) | 7/1/2010 – 9/30/2011 | 50 |
| FL | Everest Pompano Beach-Applied Management (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Business (Bachelor) | 7/1/2011– 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Business Administration (Bachelor) | 7/1/2011 – 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Business Administration (Masters) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 | 100 |

000565

December 15, 2017

| FL | Everest Pompano Beach-Computer Information Science (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
|----|----|----|----|
| FL | Everest Pompano Beach-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Criminal Justice (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Criminal Justice (Bachelor) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Pompano Beach-Criminal Justice (Master) | 7/1/2011 – 9/30/2014 | 40 |
| FL | Everest Pompano Beach-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Pompano Beach-Homeland Security (Associate) | 7/1/2010 – 9/30/2011 | 100 |
| FL | Everest Pompano Beach-Hospitality Management (Associate) | 7/1/2010 – 9/30/2012 | 20 |
| FL | Everest Pompano Beach-Hospitality Management (Bachelor) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | x |
| FL | Everest Pompano Beach-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| FL | Everest Pompano Beach-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| FL | Everest Pompano Beach-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 |
| FL | Everest Pompano Beach-Medical Insurance Billing and Coding (Associate) | 7/1/2010 – 9/30/2014 | 20 |
| FL | Everest Pompano Beach-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 | 20 |
| FL | Everest Pompano Beach-Paralegal (Associate) | 7/1/2010  – 9/30/2013 | 50 |
| FL | Everest Pompano Beach-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| FL | Everest Pompano Beach-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2013 | 20 |
|  |  |  |  |
| FL | Everest Tampa-Accounting (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Tampa-Accounting (Bachelor) | 7/1/2011 – 9/30/2014 | 50 |
| FL | Everest Tampa-Applied Management (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 |
| FL | Everest Tampa-Applied Management (Bachelor) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 |
| FL | Everest Tampa-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| FL | Everest Tampa-Business (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Tampa-Business Administration (Master) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Tampa-Computer Information Science (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Tampa-Computer Information Science (Bachelor) | 7/1/2011 – 9/30/2013 | 100 |
| FL | Everest Tampa-Criminal Investigations (Associate) | 7/1/2010 – 9/30/2014 | 100 |
| FL | Everest Tampa-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Tampa-Criminal Justice (Bachelor) | 7/1/2012 – 9/30/2014 | 50 |
| FL | Everest Tampa-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 100 |
| FL | Everest Tampa-Electrician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| FL | Everest Tampa-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| FL | Everest Tampa-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |

000566

December 15, 2017

| FL | Everest Tampa-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |
|----|----|----|----|----|----|----|
| FL | Everest Tampa-Medical Assistant (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |
| FL | Everest Tampa-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |
| FL | Everest Tampa-Medical Insurance Billing and Coding (Associates) | 7/1/2012 – 9/30/2013 | 20 | | | |
| FL | Everest Tampa-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| FL | Everest Tampa-Paralegal (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 | | | |
| FL | Everest Tampa-Paralegal (Bachelor) | 7/1/2013 – 9/30/2014 | 100 | | | |
| FL | Everest Tampa-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011 | 10 | | | |
| FL | Everest Tampa-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 | 20 | | | |
| | | | | | | |
| GA | Everest Atlanta (Greenbriar)-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| GA | Everest Atlanta (Greenbriar)-Medical Administrative Assistant (Diploma) | 7/1/2013  – 9/30/2014 | 30 | | | |
| GA | Everest Atlanta (Greenbriar)-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| GA | Everest Atlanta (Greenbriar)-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| GA | Everest Atlanta (Greenbriar)-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| GA | Everest Decatur-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| GA | Everest Decatur-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| GA | Everest Decatur-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| GA | Everest Decatur-Respiratory Care | 7/1/2010 – 9/30/2014 | x | 30 | x | x |
| | | | | | | |
| GA | Everest Jonesboro-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011 | 20 | | | |
| GA | Everest Jonesboro-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| GA | Everest Jonesboro-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| GA | Everest Jonesboro-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| GA | Everest Jonesboro-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 | | | |
| GA | Everest Jonesboro-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011 | 20 | | | |
| | | | | | | |
| GA | Everest Marietta-Massage Therapy (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | x | x | x |
| GA | Everest Marietta-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| GA | Everest Marietta-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| GA | Everest Marietta-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| GA | Everest Marietta-Surgical Technologist (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 50 | | | |
| | | | | | | |
| GA | Everest Norcross-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| GA | Everest Norcross-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2012 | 20 | | | |
| GA | Everest Norcross-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |

30

December 15, 2017

| GA | Everest Norcross-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011;<br>7/1/2013 – 9/30/2014 | 30 | | | |
|----|------|------|----|--|--|--|
| GA | Everest Norcross-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011;<br>7/1/2012 – 9/30/2013 | 20 | | | |
| | | | | | | |
| IL | Everest Burr Ridge-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Burr Ridge-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Burr Ridge-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Burr Ridge-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| | | | | | | |
| IL | Everest Chicago-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| IL | Everest Chicago-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| IL | Everest Chicago-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| IL | Everest Chicago-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| | | | | | | |
| IL | Everest Melrose Park-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Melrose Park-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Melrose Park-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Melrose Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| IL | Everest Melrose Park-Pharmacy Technician (Associate) | 7/1/2013 – 9/30/2014 | 10 | | | |
| | | | | | | |
| IL | Everest Merrionette Park-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Merrionette Park-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| IL | Everest Merrionette Park-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011;<br>7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Merrionette Park-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011;<br>7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Merrionette Park-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| IL | Everest Merrionette Park-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011;<br>7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| IL | Everest North Aurora (IL)-Electrician (Diploma) | 7/1/2012 – 9/30/2014 | 20 | | | |
| IL | Everest North Aurora (IL)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| IL | Everest North Aurora (IL)-Medical Assistant (all credential levels) | 7/1/2010 – 9/30/2014 | 30 | 30 | x | x |
| IL | Everest North Aurora (IL)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| | | | | | | |
| IL | Everest Skokie-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2013 | 30 | | | |
| IL | Everest Skokie-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Skokie-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| IL | Everest Skokie-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 | 20 | | | |
| IL | Everest Skokie-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2012;<br>7/1/2013 – 9/30/2014 | 10 | | | |
| IL | Everest Skokie-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2012;<br>7/1/2013 – 9/30/2014 | 20 | | | |

31

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| IN | Everest Merrillville-Business Accounting (all credential levels) | 7/1/2010 – 9/30/2014 | 50 | 50 | 50 | x |
| IN | Everest Merrillville-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| IN | Everest Merrillville-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 | 20 | | | |
| IN | Everest Merrillville-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012  – 9/30/2013 | 30 | | | |
| IN | Everest Merrillville-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 30 | | | |
| IN | Everest Merrillville-Practical Nursing (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| MA | Everest Brighton-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 | | | |
| MA | Everest Brighton-Massage Therapy (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | x | x | x |
| MA | Everest Brighton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| MA | Everest Brighton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| | | | | | | |
| MA | Everest Chelsea-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2013 | 30 | | | |
| MA | Everest Chelsea-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| MA | Everest Chelsea-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| MA | Everest Chelsea-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| MA | Everest Chelsea-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| | | | | | | |
| MI | Everest Dearborn-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 | | | |
| MI | Everest Dearborn-Massage Therapy (Associates) | 7/1/2013 – 9/30/2014 | x | | | |
| MI | Everest Dearborn-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| MI | Everest Dearborn-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 | | | |
| MI | Everest Dearborn-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 | | | |
| MI | Everest Dearborn-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 | 20 | | | |
| MI | Everest Dearborn-Patient Care Technician (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| MI | Everest Dearborn-Pharmacy Technician (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 10 | x | x |
| | | | | | | |
| MI | Everest Detroit-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| MI | Everest Detroit-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| MI | Everest Detroit-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| MI | Everest Detroit-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2014 | 20 | | | |
| | | | | | | |
| MI | Everest Grand Rapids-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| MI | Everest Grand Rapids-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 | | | |
| MI | Everest Grand Rapids-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| MI | Everest Grand Rapids-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| MI | Everest Grand Rapids-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| MI | Everest Grand Rapids-Practical Nursing (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| MI | Everest Kalamazoo-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 | 50 | | | |
| MI | Everest Kalamazoo-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |

32

December 15, 2017

| MI | Everest Kalamazoo-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| MI | Everest Kalamazoo-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| MI | Everest Kalamazoo-Medical Assistant (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| MI | Everest Kalamazoo-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| MI | Everest Kalamazoo-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2014 | 10 |
| | | | |
| MI | Everest Southfield-Computer Technology (Diploma) | 7/1/2010 – 9/30/2014 | 100 |
| MI | Everest Southfield-Electronics Computer Technology (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MI | Everest Southfield-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| MI | Everest Southfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MI | Everest Southfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MI | Everest Southfield-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| | | | |
| MN | Everest Eagan-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 |
| MN | Everest Eagan-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MN | Everest Eagan-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MN | Everest Eagan-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| MN | Everest Eagan-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| | | | |
| MO | Everest Springfield-Accounting (AAS) | 7/1/2010 – 9/30/2013 | 50 |
| MO | Everest Springfield-Accounting (Associate) | 7/1/2010 – 9/30/2013 | 50 |
| MO | Everest Springfield-Accounting (Bachelor) | 7/1/2010 – 9/30/2011 | 50 |
| MO | Everest Springfield-Applied Management (Bachelor) | 7/1/2010 – 9/30/2011 | 100 |
| MO | Everest Springfield-Business Accounting (Diploma) | 7/1/2010 – 9/30/2011 | 50 |
| MO | Everest Springfield-Business Administration (AAS) | 7/1/2010 – 9/30/2014 | 50 |
| MO | Everest Springfield-Business Administration (Associate) | 7/1/2010 –9/30/2014 | 50 |
| MO | Everest Springfield-Computer Information Science (AAS) | 7/1/2011 –9/30/2014 | 100 |
| MO | Everest Springfield-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 | 100 |
| MO | Everest Springfield-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 |
| MO | Everest Springfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MO | Everest Springfield-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| MO | Everest Springfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| MO | Everest Springfield-Paralegal (Associate) | 7/1/2010 –9/30/2014 | 50 |
| MO | Everest Springfield-Paralegal (Bachelor) | 7/1/2010 – 9/30/2014 | 100 |
| | | | |
| MO | Everest St. Louis (Earth City)-Business Accounting (Diploma) | 7/1/2010 – 9/30/2014 | 50 |
| MO | Everest St. Louis (Earth City)-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| MO | Everest St. Louis (Earth City)-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| MO | Everest St. Louis (Earth City)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |
| MO | Everest St. Louis (Earth City)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |

000570

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| MO | Everest St. Louis (Earth City)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 | 20 | | | |
| MO | Everest St. Louis (Earth City)-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| | | | | | | |
| NJ | Everest South Plainfield-Electrician (Diploma) | 7/1/2012 – 9/30/2014 | 20 | | | |
| NJ | Everest South Plainfield-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 | | | |
| NJ | Everest South Plainfield-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| NJ | Everest South Plainfield-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| NJ | Everest South Plainfield-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| NJ | Everest South Plainfield-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 | 20 | | | |
| | | | | | | |
| NV | Everest Henderson-Accounting (Associate) | 7/1/2010 – 9/30/2011 7/1/2012 – 9/30/2014 | 50 | | | |
| NV | Everest Henderson-Business (Associate) | 7/1/2012 – 9/30/2014 | 50 | | | |
| NV | Everest Henderson-Criminal Justice – SAS | 7/1/2010 – 9/30/2014 | x | | | |
| NV | Everest Henderson-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| NV | Everest Henderson-Massage Therapy | 7/1/2010 – 9/30/2014 | 20 | x | x | x |
| NV | Everest Henderson-Nursing (Associate) | 7/1/2013 – 9/30/2014 | 100 | | | |
| NV | Everest Henderson-Paralegal – SAS | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | x | | | |
| NV | Everest Henderson-Paralegal (Associate) | 7/1/2010 – 9/30/2011 7/1/2012 – 9/30/2013 | 50 | | | |
| | | | | | | |
| NY | Everest Rochester-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| NY | Everest Rochester-Administrative Office Technology (Associate) | 7/1/2011 – 9/30/2013 | 20 | | | |
| NY | Everest Rochester-Business (Associate) | 7/1/2011 – 9/30/2014 | 50 | | | |
| NY | Everest Rochester-Business Accounting and Applications (Diploma) | 7/1/2010 – 9/30/2014 | x | | | |
| NY | Everest Rochester-Business Management (Diploma) | 7/1/2010 – 9/30/2014 | 100 | | | |
| NY | Everest Rochester-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 | | | |
| NY | Everest Rochester-Medical Assistant (AAS) | 7/1/2010 – 9/30/2013 | 30 | | | |
| NY | Everest Rochester-Medical Assistant (Associate) | 7/1/2010 – 9/30/2013 | 30 | | | |
| NY | Everest Rochester-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 | | | |
| | | | | | | |
| OH | Everest Columbus (Gahanna)-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 | 30 | | | |
| OH | Everest Columbus (Gahanna)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| OH | Everest Columbus (Gahanna)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| OH | Everest Columbus (Gahanna)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| OH | Everest Columbus (Gahanna)-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| OR | Everest Portland-Accounting (Associate) | 7/1/2011 – 9/30/2014 | 50 | | | |
| OR | Everest Portland-Accounting (Diploma) | 7/1/2011 – 9/30/2014 | 50 | | | |
| OR | Everest Portland-Administrative Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |

34

December 15, 2017

| OR | Everest Portland-Business Accounting (Diploma) | 7/1/2011 – 9/30/2014 | 50 | | | |
|----|----|----|----|----|----|----|
| OR | Everest Portland-Computer Information Science (Associate) | 7/1/2011 – 9/30/2014 | 100 | | | |
| OR | Everest Portland-Criminal Justice (Associate) | 7/1/2011 – 9/30/2014 | 50 | | | |
| OR | Everest Portland-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 | 30 | | | |
| OR | Everest Portland-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| OR | Everest Portland-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 | 20 | | | |
| OR | Everest Portland-Network and Internet Security Specialist (Diploma) | 7/1/2011 – 9/30/2014 | 10 | | | |
| OR | Everest Portland-Paralegal (Associate) | 7/1/2011 – 9/30/2014 | 50 | | | |
| OR | Everest Portland-Pharmacy Technician (Associate) | 7/1/2011 – 9/30/2013 | 10 | | | |
| OR | Everest Portland-Pharmacy Technician (Diploma) | 7/1/2011 –9/30/2014 | 20 | | | |
| | | | | | | |
| OR | Everest Tigard- Massage Therapy (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| OR | Everest Tigard-Massage Therapy Spa Specialist (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| OR | Everest Tigard-Massage Therapy Sports Specialist (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| OR | Everest Tigard-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 | | | |
| OR | Everest Tigard-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2012 | 20 | | | |
| OR | Everest Tigard-Pharmacy Technician (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| PA | Everest Bensalem-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| PA | Everest Bensalem-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 | | | |
| PA | Everest Bensalem-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| PA | Everest Pittsburgh-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| PA | Everest Pittsburgh-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| PA | Everest Pittsburgh-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| PA | Everest Pittsburgh-Career Access Program | 7/1/2010 – 9/30-2014 | 10 | x | x | x |
| PA | Everest Pittsburgh-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 | 50 | | | |
| PA | Everest Pittsburgh-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |
| PA | Everest Pittsburgh-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 | | | |
| PA | Everest Pittsburgh-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| PA | Everest Pittsburgh-Paralegal (Associate) | 7/1/2010 – 9/30/2011 | 50 | | | |
| PA | Everest Pittsburgh-Patient Care Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 | | | |
| PA | Everest Pittsburgh-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 10 | | | |
| PA | Everest Pittsburgh-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 | | | |
| | | | | | | |
| PA | WyoTech Blairsville-Auto/Diesel Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| PA | WyoTech Blairsville-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| PA | WyoTech Blairsville-Automotive Technology with High Performance Power Transmission (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |

35

December 15, 2017

| PA | WyoTech Blairsville-Automotive Technology with Light Duty Diesel (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
|----|----|----|----|
| PA | WyoTech Blairsville-Automotive Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 | 10 |
| PA | WyoTech Blairsville-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2011 – 9/30/2013 | 10 |
| PA | WyoTech Blairsville-Collision/Refinishing Technology and Management (Associate) | 7/1/2011 – 9/30/2014 | 30 |
| PA | WyoTech Blairsville-Diesel Technology and Management (Associate) | 7/1/2012 – 9/30/2014 | 20 |
| PA | WyoTech Blairsville-Diesel Technology with High Performance Power Transmission (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| PA | WyoTech Blairsville-Diesel/Auto Vehicle Technology (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Automotive Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| PA | WyoTech Blairsville-Motorsports Chassis Fabrication with Diesel Technology (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2011 – 9/30/2014 | 10 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2011 – 9/30/2014 | 10 |
| PA | WyoTech Blairsville-Street Rod and Custom Fabrication with Diesel Technology (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| | | | |
| TX | Everest Arlington (Mid Cities)-Business (Associate) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 50 |
| TX | Everest Arlington (Mid Cities)-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Arlington (Mid Cities)-Criminal Justice (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 |
| TX | Everest Arlington (Mid Cities)-Electrical Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| TX | Everest Arlington (Mid Cities)-Electrician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| TX | Everest Arlington (Mid Cities)-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Arlington (Mid Cities)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Arlington (Mid Cities)-Medical Assistant (Associate) | 7/1/2010 9/30/2014 | 30 |
| TX | Everest Arlington (Mid Cities)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Arlington (Mid Cities)-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| TX | Everest Arlington (Mid Cities)-Pharmacy Technician (Associate) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 10 |
| TX | Everest Arlington (Mid Cities)-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| | | | |
| TX | Everest Austin-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |
| TX | Everest Austin-Electrical Technician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |

36

December 15, 2017

| TX | Everest Austin-Electrician (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
|---|---|---|---|
| TX | Everest Austin-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 |
| TX | Everest Austin-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| TX | Everest Austin-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| TX | Everest Austin-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 | 20 |
|  |  |  |  |
| TX | Everest Dallas-Business Administration (Associate) | 7/1/2011 – 9/30/2014 | 50 |
| TX | Everest Dallas-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| TX | Everest Dallas-Medical Administrative Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Dallas-Medical Assistant (Associate) | 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Dallas-Medical Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Dallas-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| TX | Everest Dallas-Paralegal (Associate) | 7/1/2012 – 9/30/2014 | 50 |
|  |  |  |  |
| TX | Everest Fort Worth North-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Business Administration (AAS) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Business Administration (AS) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Criminal Justice (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Dental Assisting (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| TX | Everest Fort Worth North-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| TX | Everest Fort Worth North-Medical Assistant (Associate) | 7/1/2010 – 9/30/2014 | 30 |
| TX | Everest Fort Worth North-Medical Assisting (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| TX | Everest Fort Worth North-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 | 20 |
| TX | Everest Fort Worth North-Paralegal (AAS) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Paralegal (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| TX | Everest Fort Worth North-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
|  |  |  |  |
| TX | Everest Fort Worth South-Dental Assistant (Diploma) | 7/1/2013 – 9/30/2014 | 30 |
| TX | Everest Fort Worth South-Medical Administrative Assistant (Diploma) | 7/1/2012 – 9/30/2013 | 30 |
| TX | Everest Fort Worth South-Medical Assistant (Diploma) | 7/1/2012 – 9/30/2013 | 30 |
| TX | Everest Fort Worth South-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
|  |  |  |  |
| TX | Everest Houston (Bissonnet)-Carpentry (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| TX | Everest Houston (Bissonnet)-Electrical Technician (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| TX | Everest Houston (Bissonnet)-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2012 – 9/30/2014 | 30 |
| TX | Everest Houston (Bissonnet)-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| TX | Everest Houston (Bissonnet)-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
| TX | Everest Houston (Bissonnet)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| TX | Everest Houston (Bissonnet)-Plumbing Technology (Diploma) | 7/1/2011 – 9/30/2014 | 30 |
|  |  |  |  |

37

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| TX | Everest Houston (Greenspoint)-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| TX | Everest Houston (Greenspoint)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012. | 30 | | | |
| TX | Everest Houston (Greenspoint)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 | | | |
| | | | | | | |
| TX | Everest Houston (Hobby)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| TX | Everest Houston (Hobby)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| TX | Everest Houston (Hobby)-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2012 | 20 | | | |
| | | | | | | |
| TX | Everest San Antonio-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 | | | |
| TX | Everest San Antonio-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 30 | | | |
| TX | Everest San Antonio-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011 | 20 | | | |
| TX | Everest San Antonio-Pharmacy Technology (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 10 | x | x |
| | | | | | | |
| UT | Everest Salt Lake City-Applied Management (Bachelor) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 100 | | | |
| UT | Everest Salt Lake City-Computer Information Science (Bachelor) | 7/1/2013 – 9/30/2014 | 100 | | | |
| UT | Everest Salt Lake City-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 | 50 | | | |
| UT | Everest Salt Lake City-Criminal Justice (Bachelor) | 7/1/2011 – 9/30/2014 | 50 | | | |
| UT | Everest Salt Lake City-Criminal Justice Private and Homeland Security (Diploma) | 7/1/2013 – 9/30/2014 | 100 | | | |
| UT | Everest Salt Lake City-Criminal Justice Social and Youth Services (Diploma) | 7/1/2013 – 9/30/2014 | x | | | |
| UT | Everest Salt Lake City-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| UT | Everest Salt Lake City-Medical Assistant (Associate) | 7/1/2011 – 9/30/2014 | 30 | | | |
| UT | Everest Salt Lake City-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2014 | 30 | | | |
| UT | Everest Salt Lake City-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 | 20 | | | |
| UT | Everest Salt Lake City-Paralegal (Associate) | 7/1/2011 – 9/30/2011; 7/1/2013 – 9/30/2014 | 50 | | | |
| UT | Everest Salt Lake City-Pharmacy Technician (Associate) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 10 | | | |
| UT | Everest Salt Lake City-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| | | | | | | |
| VA | Everest Arlington-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| VA | Everest Arlington-Business Administration (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| VA | Everest Arlington-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| VA | Everest Arlington-Homeland Security Specialist (Diploma) | 7/1/2010 – 9/30/2014 | 100 | | | |
| VA | Everest Arlington-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 | | | |
| VA | Everest Arlington-Paralegal (Associate) | 7/1/2011 – 9/30/2014 | 50 | | | |
| | | | | | | |

38

December 15, 2017

| VA | Everest Chesapeake-Accounting (Associate) | 7/1/2010 – 9/30/2013 | 50 |
|----|----|----|----|
| VA | Everest Chesapeake-Business (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| VA | Everest Chesapeake-Business Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| VA | Everest Chesapeake-Criminal Justice (Associate) | 7/1/2011 – 9/30/2013 | 50 |
| VA | Everest Chesapeake-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| VA | Everest Chesapeake-Electrician (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
| VA | Everest Chesapeake-Heating, Ventilation and Air Conditioning (Diploma) | 7/1/2012 – 9/30/2013 | 30 |
| VA | Everest Chesapeake-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| VA | Everest Chesapeake-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| VA | Everest Chesapeake-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| VA | Everest Chesapeake-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| VA | Everest Chesapeake-Pharmacy Technician (Diploma) | 7/1/2012 – 9/30/2013 | 20 |
| | | | |
| VA | Everest Newport News-Business (Associate) | 7/1/2010 – 9/30/2013 | 50 |
| VA | Everest Newport News-Business Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| VA | Everest Newport News-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| VA | Everest Newport News-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| VA | Everest Newport News-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 |
| VA | Everest Newport News-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 |
| VA | Everest Newport News-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2012 | 20 |
| | | | |
| VA | Everest Tyson's Corner (McLean/Vienna)-Business Administration (Associate) | 7/1/2012 – 9/30/2014 | 50 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Criminal Justice (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Massage Therapy (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2013 | 30 |
| VA | Everest Tyson's Corner (McLean/Vienna)-Medical Insurance Billing and Coding (Diploma) | 7/1/2012 – 9/30/2014 | 20 |
| | | | |
| WA | Everest Bremerton-Criminal Justice (Associate) | 7/1/2013 – 9/30/2014 | 50 |
| WA | Everest Bremerton-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Bremerton-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| WA | Everest Bremerton-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Bremerton-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Bremerton-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2014 | 20 |

39

December 15, 2017

| WA | Everest Bremerton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 |
|---|---|---|---|
| | | | |
| WA | Everest Everett-Dental Assistant (Diploma) | 7/1/2011 – 9/30/2012 | 30 |
| WA | Everest Everett-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 |
| WA | Everest Everett-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012 | 30 |
| WA | Everest Everett-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2013 | 20 |
| WA | Everest Everett-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| | | | |
| WA | Everest Renton-Dental Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| WA | Everest Renton-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Renton-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Renton-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| WA | Everest Renton-Pharmacy Technician (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 |
| | | | |
| WA | Everest Seattle-Massage Therapy (Diploma) | 7/1/2010 – 9/30/2013 | 20 |
| WA | Everest Seattle-Massage Therapy Spa Specialist (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| WA | Everest Seattle-Medical Administrative Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Seattle-Medical Assistant (Diploma) | 7/1/2011 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 |
| WA | Everest Seattle-Medical Insurance Billing and Coding (Diploma) | 7/1/2011 – 9/30/2013 | 20 |
| | | | |
| WA | Everest Tacoma-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 | 30 |
| WA | Everest Tacoma-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 |
| WA | Everest Tacoma-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2011 | 30 |
| WA | Everest Tacoma-Medical Insurance Billing and Coding (Diploma) | 7/1/2013 – 9/30/2014 | 20 |
| WA | Everest Tacoma-Pharmacy Technician (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2013 – 9/30/2014 | 20 |
| | | | |
| WA | Everest Vancouver-Accounting (Associate) | 7/1/2010 – 9/30/2014 | 50 |
| WA | Everest Vancouver-Accounting/Business Administration (Diploma) | 7/1/2010– 9/30/2014 | 50 |
| WA | Everest Vancouver-Administrative Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| WA | Everest Vancouver-Executive Assistant (Associate) | 7/1/2010 – 9/30/2012 | x |
| WA | Everest Vancouver-Massage Therapy (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| WA | Everest Vancouver-Massage Therapy Spa Specialist (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| WA | Everest Vancouver-Massage Therapy Sports Specialist (Diploma) | 7/1/2011 – 9/30/2014 | 20 |
| WA | Everest Vancouver-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| WA | Everest Vancouver-Medical Assistant (Associate) | 7/1/2010 – 9/30/2012 | 30 |
| WA | Everest Vancouver-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2014 | 30 |
| WA | Everest Vancouver-Medical Insurance Billing and Coding (Diploma) | 7/1/2010 – 9/30/2014 | 20 |
| WA | Everest Vancouver-Paralegal/Legal Assistant (Associate) | 7/1/2010 – 9/30/2011 | 50 |
| | | | |

40

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| WI | Everest Milwaukee-Dental Assistant (Diploma) | 7/1/2012 – 9/30/2014 | 30 | | | |
| | | | | | | |
| WV | Everest Cross Lanes-Electronics, Computer and Communication Technology (Associate) | 7/1/2010 – 9/30/2014 | 50 | | | |
| WV | Everest Cross Lanes-Massage Therapy (Diploma) | 7/1/2013 – 9/30/2014 | 20 | | | |
| WV | Everest Cross Lanes-Medical Administrative Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| WV | Everest Cross Lanes-Medical Assistant (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| | | | | | | |
| WY | WyoTech Laramie-Auto/Diesel Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 | 10 | 10 | x | x |
| WY | WyoTech Laramie-Automotive Technology and Management (Associate) | 7/1/2010 – 9/30/2014 | 10 | | | |
| WY | WyoTech Laramie-Automotive Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 | 10 | | | |
| WY | WyoTech Laramie-Collision Technology (all credential levels) | 7/1/2010 – 9/30/2014 | 10 | 30 | x | x |
| WY | WyoTech Laramie-Collision/Refinishing (all credential levels) | 7/1/2010 – 9/30/2012 | 10 | 30 | x | x |
| WY | WyoTech Laramie-Collision/Refinishing and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2012 | 10 | | | |
| WY | WyoTech Laramie-Collision/Refinishing Technology and Management (Associate) | 7/1/2010 – 9/30/2012 | 30 | | | |
| WY | WyoTech Laramie-Collision/Refinishing w/ St Rod & Mgmt (Diploma) | 7/1/2010 – 9/30/2012 | 10 | | | |
| WY | WyoTech Laramie-Collision/Refinishing with Specialization in Automotive Fabrication (Diploma) | 7/1/2010 – 9/30/2012 | 10 | | | |
| WY | WyoTech Laramie-Diesel Technician (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 20 | x | x |
| WY | WyoTech Laramie-Diesel Technology  (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 20 | x | x |
| WY | WyoTech Laramie-Diesel Technology Advanced (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Diesel Technology and Management (Associate) | 7/1/2010 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Diesel Technology with Trim and Upholstery Technology (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Diesel/Automotive Technology (all credential levels) | 7/1/2010 – 9/30/2014 | 20 | 20 | x | x |
| WY | WyoTech Laramie-Diesel/Automotive Vehicle Technology (Diploma) | 7/1/2010 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 30 | | | |
| WY | WyoTech Laramie-Motorsports Chassis Fabrication with Diesel Technology (Diploma) | 7/1/2010 – 9/30/2012; 7/1/2013 – 9/30/2014 | 20 | | | |
| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Automotive Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 10 | | | |
| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Collision/Refinishing Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 10 | | | |
| WY | WyoTech Laramie-Street Rod and Custom Fabrication with Diesel Technology (Diploma) | 7/1/2010 – 9/30/2011; 7/1/2012 – 9/30/2014 | 20 | | | |

000578

December 15, 2017

000579

December 15, 2017

## Appendix D: Condensed Heald Findings List

| CAMPUS NAME | CAMPUS PROGRAM | ENROLLMENT ON OR AFTER | Relief % | | | |
|---|---|---|---|---|---|---|
| | | | D | A | B | M |
| CONCORD | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 | x | 10 | x | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 7/1/2010 | 30 | 40 | x | x |
| | IT – Network Security | 7/1/2010 | 10 | 40 | x | x |
| | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
| | Medical Administrative Asst | 7/1/2010 | 30 | 10 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2011 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | xx | x |
| | | | | | | |
| FRESNO | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 | x | 10 | x | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | IT Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2010 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| HAYWARD | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |

000580

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Sales/Marketing Emphasis | 7/1/2010 | x | 50 | x | x |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 | x | 10 | x | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 7/1/2010 | 30 | 40 | x | x |
| | IT – Network Security | 7/1/2010 | 10 | 40 | x | x |
| | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2011 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| | | | | | | |
| HONOLULU | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Hospitality and Tourism | 7/1/2010 | x | 20 | x | x |
| | Business Administration – Sales and Marketing | 7/1/2010 | x | 50 | x | x |
| | Business Administration – Software Technologies | 7/1/2010 | x | 10 | x | x |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Hospitality/Tourism Emphasis | 7/1/2010 | x | 20 | x | x |
| | Business Administration – Sales/Marketing Emphasis | 7/1/2010 | x | 50 | x | x |
| | Business Administration  - Software Technologies Emphasis | 7/1/2010 | x | 10 | x | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2012 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 7/1/2010 | 30 | 40 | x | x |
| | Electronics Technology | 7/1/2010 | 30 | 20 | x | x |
| | Health Information Technology | 7/1/2010 | x | 10 | x | x |

44

000581

December 15, 2017

| | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
|---|---|---|---|---|---|---|
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Networking Technology (all emphases) | 7/1/2010 | 10 | 40 | x | x |
| | Office Skills | 7/1/2010 | 20 | x | x | x |
| | Paralegal | 2/13/2014 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | Web Design | 7/1/2010 | 10 | 40 | x | x |
| | | | | | | |
| MILIPITAS / SAN JOSE | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Electronics Technology | 7/1/2010 | 30 | 20 | x | x |
| | IT – Network Security (all emphases) | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2010 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| PORTLAND | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 2/3/2014 | 30 | 40 | x | x |
| | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2011 | 20 | x | x | x |

000582

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| RANCHO CORDOVA | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | IT – Network Security | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2010 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| ROSEVILLE | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | IT – Network Security | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2012 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| | | | | | | |
| SALIDA / MODESTO | Accounting | 2/13/2014 | 50 | 50 | 50 | x |
| | Business Administration | 2/13/2014 | 100 | 50 | 100 | 100 |
| | Criminal Justice | 7/1/2012 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 7/1/2011 | 30 | 40 | x | x |

000583

December 15, 2017

|  | Medical Assisting | 7/1/2011 | 30 | 30 | x | x |
|---|---|---|---|---|---|---|
|  | Medical Insurance Billing & Coding | 7/1/2012 | 20 | 20 | x | x |
|  | Medical Office Administration | 2/13/2014 | 20 | 30 | x | x |
|  | Paralegal | 2/13/2014 | 100 | 50 | 100 | x |
|  |  |  |  |  |  |  |
| SALINAS | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
|  | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
|  | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
|  | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
|  | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
|  | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
|  | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
|  | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
|  | Office Skills | 7/1/2010 | 20 | x | x | x |
|  | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
|  | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |
| SAN FRANCISCO | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
|  | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
|  | Business Administration – Software Technologies | 7/1/2010 | x | 10 | x | 10 |
|  | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
|  | Business Administration – Software Technology Emphasis | 7/1/2010 | x | 10 | x | x |
|  | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
|  | Construction Management | 7/1/2012 | x | 50 | x | x |
|  | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
|  | Electronics Technology | 7/1/2010 | 30 | 20 | x | x |
|  | IT – Network Security (all emphases) | 7/1/2010 | 10 | 40 | x | x |
|  | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
|  | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
|  | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
|  | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
|  | Office Skills | 7/1/2010 | 20 | x | x | x |
|  | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
|  | Pharmacy Technology | 7/1/2012 | 20 | 10 | x | x |

47

000584

December 15, 2017

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| STOCKTON | Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration | 7/1/2010 | 100 | 50 | 100 | 100 |
| | Business Administration – Accounting | 7/1/2010 | 50 | 50 | 50 | x |
| | Business Administration – Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Business Administration – Accounting Emphasis | 7/1/2010 | 50 | 50 | 50 | x |
| | Entrepreneurship | 7/1/2010 | x | 50 | x | x |
| | Construction Management | 7/1/2012 | x | 50 | x | x |
| | Criminal Justice | 7/1/2010 | 100 | 50 | 50 | 40 |
| | Dental Assisting | 7/1/2010 | 30 | 40 | x | x |
| | IT – Network Systems Administration | 7/1/2010 | 10 | 40 | x | x |
| | Networking Technology – all emphases | 7/1/2010 | 10 | 40 | x | x |
| | Medical Assisting | 7/1/2010 | 30 | 30 | x | x |
| | Medical Insurance Billing & Coding | 7/1/2010 | 20 | 20 | x | x |
| | Medical Office Administration | 7/1/2010 | 20 | 30 | x | x |
| | Office Skills | 7/1/2010 | 20 | x | x | x |
| | Paralegal | 7/1/2011 | 100 | 50 | 100 | x |
| | Pharmacy Technology | 2/3/2014 | 20 | 10 | x | x |

48