JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 616-8098
Fax: (202) 616-8470
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>  Defendants. | No. 19-cv-03674-WHA<br><br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  February 13, 2020<br>Time:  8:00 a.m.<br>Place:  Courtroom 12, 19th Floor<br>Honorable William Alsup |

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

I.      STATUTORY AND REGULATORY BACKGROUND ...................................................... 2

II.     THE BORROWER DEFENSE REVIEW PROCESS ........................................................ 5

III.    THE DEPARTMENT'S EFFORTS TO ISSUE BORROWER DEFENSE DECISIONS...... 6

IV.     THIS LAWSUIT ............................................................................................................ 12

LEGAL STANDARD .................................................................................................................. 13

ARGUMENT .............................................................................................................................. 15

I.      THIS COURT CANNOT ISSUE AN INJUNCTION AGAINST THE SECRETARY ....... 15

II.     THE DEPARTMENT HAS NOT UNREASONABLY DELAYED ISSUING FINAL
        DECISIONS ON BORROWER DEFENSE APPLICATIONS ........................................... 16

                    A.   The Department's Pace of Adjudicating Borrower Defense Claims is
                         Reasonable ................................................................................................. 17

                    B.   The Remaining *TRAC* Factors Favor Defendants .................................... 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Cosmetology Sch. v. Riley*,
    170 F.3d 1250 (9th Cir. 1999) ...................................................................................... 16

*Anderson v. McCarthy*,
    No. 16-cv-00068-WHA, 2016 WL 6834215 (N.D. Cal. Nov. 21, 2016)...................................... 13

*Brower v. Evans*,
    257 F.3d 1058 (9th Cir. 2001) ...................................................................................... 24

*Californians for Renewable Energy v. EPA*,
    No. 15-cv-3292-SBA, 2018 WL 1586211 (N.D. Cal. Mar. 30, 2018)......................................... 13

*Calvillo Manriquez v. Devos*,
    345 F. Supp. 3d 1077 (N.D. Cal. 2018)................................................................................ 9, 21

*Carr v. DeVos*,
    369 F. Supp. 3d 554 (S.D.N.Y. 2019) ............................................................................ 16

*Cent. Sierra Envtl. Res. Ctr. v. Stanislaus Nat'l Forest*,
    304 F. Supp. 3d 916 (E.D. Cal. 2018) ..................................................................... 16, 23, 24, 25

*City of Santa Clarita v. U.S. Dep't of Interior*,
    No. 02-cv-0697-DT (FMOX), 2005 WL 2972987 (C.D. Cal. Oct. 31, 2005) ............................. 15

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ...................................................................................................... 14

*Friends of the Clearwater v. Dombeck*,
    222 F.3d 552 (9th Cir. 2000) ........................................................................................ 15

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    593 F.3d 923 (9th Cir. 2010) ........................................................................................ 16

*Indep. Min. Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) .................................................................................. 14, 15

*In re A Cmty. Voice*,
    878 F.3d 779 (9th Cir. 2017) ................................................................................... 14, 17

*In re Barr Labs., Inc.*,
    930 F.2d 72 (D.C. Cir. 1991)........................................................................................ 19

*In re Cal. Power Exch. Corp.*,
    245 F.3d 1110 (9th Cir. 2001) ........................................................................... *passim*

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008)...................................................................................... 14

*In re Pesticide Action Network N. Am.*,

532 F. App'x 649 (9th Cir. 2013) ................................................................... 14, 17, 18

*Islam v. Heinauer,*
32 F. Supp. 3d 1063 (N.D. Cal. 2014) ........................................................... 25

*Mashiri v. U.S. Dep't of Educ.,*
724 F.3d 1028 (9th Cir. 2013) ...................................................................... 16

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
336 F.3d 1094 (D.C. Cir. 2003) ............................................................ 19, 20, 22

*Norton v. S. Utah Wilderness All.* (*SUWA*),
542 U.S. 55 (2004) ..................................................................................... 13, 16

*Nw. Motorcycle Ass'n v. USDA,*
18 F.3d 1468 (9th Cir. 1994) ......................................................................... 13

*Orion Reserves Ltd. P'ship v. Kempthorne,*
516 F. Supp. 2d 8 (D.D.C. 2007) .............................................................. 16, 23

*San Luis & Delta Mendota Water Auth. v. U.S. Dep't of the Interior,*
984 F. Supp. 2d 1048 (E.D. Cal. 2013) ......................................................... 15

*S.F. Baykeeper, Inc. v. Browner,*
147 F. Supp. 2d 991 (N.D. Cal. 2001) .......................................................... 14

*Sierra Club v. Thomas,*
828 F.2d 783 (D.C. Cir. 1987) ............................................................. 19, 20, 25

*Singh v. Napolitano,*
909 F. Supp. 2d 1164 (E.D. Cal. 2012) ......................................................... 25

*Telecommc'ns Research & Action Ctr. v. FCC,*
750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 14

*Tolowa Nation v. United States,*
380 F. Supp. 3d 959 (N.D. Cal. 2019) ........................................................... 13

*Towns of Wellesley, Concord & Norwood v. FERC,*
829 F.2d 275 (1st Cir. 1987) ......................................................................... 19

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n,*
783 F.2d 1117 (D.C. Cir. 1986) ..................................................................... 24

*Viet. Veterans of Am. v. CIA,*
811 F.3d 1068 (9th Cir. 2016) ....................................................................... 14

**Statutes**

5 U.S.C. § 551(13) ......................................................................................... 13

5 U.S.C. § 701(b)(2) ...................................................................................... 13

5 U.S.C. § 702 .................................................................................................................... 15

5 U.S.C. § 706(1) ................................................................................................................. 13

20 U.S.C. § 1070 .............................................................................................................. 2, 3

20 U.S.C. § 1071-1087-4 ....................................................................................................... 3

20 U.S.C. § 1078(a)(1) ........................................................................................................... 3

20 U.S.C. § 1082(a)(2) ........................................................................................................ 15

20 U.S.C. § 1087 .................................................................................................................... 3

20 U.S.C. § 1087e(h) ................................................................................................... 3, 5, 21

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................... 13

**Regulations and Administrative Materials**

34 C.F.R. § 685.205(a) ........................................................................................................... 5

34 C.F.R. § 685.206(c)(1) ...................................................................................................... 3

34 C.F.R. § 685.222(a)-(d) ..................................................................................................... 4

34 C.F.R. § 685.222(a)(2) ...................................................................................................... 4

34 C.F.R. § 685.222(e) ....................................................................................................... 4, 5

34 C.F.R. § 685.222(i)(1) ....................................................................................................... 5

34 C.F.R. § 685.206(c)(2) ...................................................................................................... 4

59 Fed. Reg. 42646 (Aug. 18, 1994) ..................................................................................... 3

59 Fed. Reg. 61664 (Dec. 1, 1994) ........................................................................................ 3

60 Fed. Reg. 37768 (July 21, 1995) ...................................................................................... 3

81 Fed. Reg. 39330 (June 16, 2016) ................................................................................... 6, 7

81 Fed. Reg. 75926 (Nov. 1, 2016) ....................................................................................... 4

82 Fed. Reg. 27621 (June 16, 2017) ...................................................................................... 4

82 Fed. Reg. 49155 (Oct. 24, 2017) ...................................................................................... 4

83 Fed. Reg. 6458 (Feb. 14, 2018) ........................................................................................ 4

84 Fed. Reg. 49788 (Sept. 23, 2019) ..................................................................................... 4

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

Notice is hereby given that on February 13, 2020, at 8:00 a.m., before the Honorable William Alsup, in Courtroom 12 of the 19th Floor of the San Francisco Courthouse, Defendants will move the Court to enter summary judgment for Defendants on all claims asserted in Plaintiffs' Complaint.

Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure, and seek an Order entering final judgment for Defendants on all claims asserted in this action.  The basis for this motion is set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs, unsatisfied with the pace at which the U.S. Department of Education (Department) is adjudicating borrower defense claims, *i.e.*, claims by federal student loan borrowers for relief from their repayment obligations based on the misconduct of their school, bring this claim under Section 706(1) of the Administrative Procedure Act (APA) to compel the Department to issue decisions on thousands of pending claims.  As described below, the Court lacks jurisdiction to enter an injunction requiring the Department to take such action.  Even putting that side, while it is undisputed that the Department has not issued a final decision on a borrower defense claim for approximately 18 months since June 2018, Plaintiffs ignore that the cases awarding the type of relief they seek "have involved delays of years, not months," and that an order compelling agency action is only warranted where the agency's delay "is so egregious as to warrant mandamus."  *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1124-25 (9th Cir. 2001).  The Department's certified administrative record demonstrates that, far from meeting this high threshold, the Department's temporary delay in making final borrower defense decisions, even as it makes significant progress in reviewing claims and clearing the way for final decisions to issue in the near future, is a reasonable balancing of competing agency priorities and the needs of federal student loan borrowers.

Since 2015, the Department has been inundated with borrower defense claims, receiving nearly 100,000 by the end of 2017 after receiving only a small number of claims over the previous twenty years.  Initially, the Department did not have an adequate infrastructure in place to review borrower defense applications and make decisions, but the Department has taken a number of steps

over the years to create such an infrastructure and reduce the backlog of claims.  A number of factors—from staffing and resource shortages to issues associated with implementing technological improvements and new regulations governing borrower defense—have contributed to the slowdown in claims adjudication, and are explained in detail below and in the administrative record.  But the key facts are straightforward.  First, the relevant regulatory framework entails a time-intensive analysis to determine whether a borrower defense application and any supporting evidence establishes the borrower's entitlement to a defense to repayment under the governing standard, and the Department has made significant progress on this phase of the claims review process over the past 18 months, adjudicating nearly 50,000 claims on the merits, including, more recently, an average of about 1,000 claims per week.  And second, the Department has, since 2017, prioritized developing a comprehensive methodology for awarding relief in a manner that is fair, consistent, and that takes into account the harms a borrower actually suffered as the result of his or her school's misconduct.  It is critical that the Department finalize a comprehensive methodology before issuing final relief decisions rather than make such decisions in an arbitrary and haphazard manner without a methodology in place.  Developing this methodology has been difficult and time-consuming, characterized by fits and starts (including a court order preliminarily enjoining the Department's first attempt), but the Department has made substantial strides and is close to announcing a new relief methodology in the coming weeks that will allow it to systematically adjudicate pending claims.

In short, the Department has taken concrete steps to bring to a timely resolution the final agency decision(s) at issue in this lawsuit, and the delay in this case is well within the length of time that the Ninth Circuit has upheld in unreasonable delay cases.  Because the Department's delay is reasonable, relief in the nature of mandamus, which this Court is in any event without jurisdiction to grant, is inappropriate here.  The Court should grant the Department summary judgment.

## BACKGROUND

## I.    STATUTORY AND REGULATORY BACKGROUND

The Secretary of Education (Secretary) is charged with carrying out certain student loan programs under Title IV of the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1070 *et seq.*, which was enacted "to assist in making available the benefits of postsecondary education to eligible

students" through financial assistance to students and institutions of higher education, *id.* § 1070(a). Under this authority, Congress created the William D. Ford Federal Direct Loan Program (Direct Loan Program), *see id.* § 1087a *et seq.*, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses, *id.* § 1087*ll*, and the Federal Family Education Loan (FFEL) Program, *see id*. §§ 1071-1087-4. Effective July 1, 2010, no new loans are authorized under the FFEL Program. *Id*. § 1078(a)(1). The HEA provides that, unless otherwise specified, Direct Loans "shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made" under the FFEL Program. *Id.* § 1087e(a)(1).

Although borrowers in these loan programs generally are obligated to repay any federal loans received, Congress has authorized the Secretary, in certain circumstances, to "relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school." 59 Fed. Reg. 42646, 42649 (Aug. 18, 1994). FFEL borrowers have long been able to assert a defense to repayment during the loan collection process based on "some action or failure of the borrower's school." 60 Fed. Reg. 37768, 37770 (July 21, 1995). For Direct Loans, the HEA authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment." 20 U.S.C. § 1087e(h). Pursuant to this authority, the Department promulgated regulations in 1994 (effective 1995) which were "intended to ensure that institutions participating in the FFEL and Direct Loan Programs have a similar potential liability" and permitted a borrower to "assert as a defense against repayment of his or her loan 'any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law.'" 60 Fed. Reg. at 37769-70. This standard is applicable to all loans "first disbursed prior to July 1, 2017." 34 C.F.R. § 685.206(c). If a borrower asserted a "successful" defense against repayment, the 1994 regulations provided for the Secretary to "notif[y] the borrower that the borrower is relieved of the obligation to repay all or part of [his or her relevant] loan," and then "afford[] the borrower such further relief as the Secretary determines is appropriate under the circumstances." 59 Fed. Reg. 61664, 61696 (Dec. 1, 1994).

The Department promulgated new borrower defense regulations in 2016, which had an

effective date of July 1, 2017.  *See* 81 Fed. Reg. 75926 (Nov. 1, 2016) (2016 regulations).  The Department, however, took various actions to delay them, initially in light of litigation challenging the new regulations, and later to allow the Department time to develop revised regulations.  *See* 83 Fed. Reg. 6458-02 (Feb. 14, 2018); 82 Fed. Reg. 49114 (Oct. 24, 2017); 82 Fed. Reg. 27621 (June 16, 2017).  The regulations eventually took effect in October 2018 as a result of court rulings vacating the delays and denying a motion to preliminary enjoin the 2016 regulations.  *See* Admin. R. (AR) 003-04, ECF No. 56 (Decl. of Diane Auer Jones ¶¶ 5-7, Nov. 14, 2019 (Jones Decl.)).

The 2016 regulations announced a new standard for evaluating borrower defense claims pertaining to loans first disbursed on or after July 1, 2017.  Pursuant to that standard, a borrower can assert a borrower defense—defined as "an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided"—where (1) the borrower or a governmental agency "has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction," (2) the borrower's school "failed to perform its obligations under the terms of a contract with the student," or (3) the borrower's school (or its representatives) "made a substantial misrepresentation . . . that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan."  34 C.F.R. § 685.222(a)-(d).[1]

The 2016 regulations also established procedures for the assertion and adjudication of borrower defense claims, regardless of when a loan was first disbursed.  *See* 34 C.F.R. §§ 685.206(c)(2); 685.222(a)(2).  The regulations require that individual borrowers submit an application providing evidence supporting their claim and "any other information or supporting documentation reasonably requested by the Secretary," and provide for the Secretary to designate an official to resolve the claim through a fact-finding process and to issue a written decision.  *Id.* § 685.222(e)(1)-(4).  If the borrower defense is approved, the Department official designated to

---

[1] The Department published a new final rule in September 2019, rescinding in large part the 2016 regulations and establishing new standards governing the assertion and consideration of borrower defenses for loans first disbursed on or after July 1, 2020.  *See* AR 081-319 (copy of 84 FR 49788 (Sept. 23, 2019)).

decide the claim "determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount." *Id*. § 685.222(i)(1).

The 2016 regulations codified the Department's long-standing practice, *see, e.g.*, AR 417-24 (*Fact Sheet: Protecting Students from Abusive Career Colleges* (June 8, 2015) (June 8 Fact Sheet)), of placing the loans of borrower defense applicants who are not in default on their loans in forbearance[2] or, for borrowers already in default, suspending collection activity during the pendency of their application.  34 C.F.R. § 685.222(e)(2).  While in forbearance, a borrower's loan will continue to accrue interest.  However, all interest that accrues on the loan during the borrower defense processing period is forgiven if the borrower's application is approved.[3]  If the borrower's application is denied, the Department will nevertheless apply a credit to interest that accrued on the loan for any period during which the borrower's application was pending beyond one year.[4]

## II.   THE BORROWER DEFENSE REVIEW PROCESS

Both sets of borrower defense regulations discussed above provide for separate consideration of, in the first instance, whether a given borrower defense claimant asserts sufficient "acts or omissions," 20 U.S.C. § 1087e(h), on the part of his school to establish a defense to repayment and second, if so, the appropriate relief.  Thus, the Department's consideration of borrower defense claims "includes two steps: (1) a determination of whether the borrower has submitted a borrower defense claim supported by evidence submitted by the borrower or otherwise available to the Department in accordance with the applicable standard; and . . . (2) a determination of the amount of relief that the borrower should receive."  AR 009-010 (Jones Decl. ¶ 24).  As to the first step, as discussed further below, "the Department has identified certain categories of claims, based on

---

[2] When a borrower is in "forbearance," the Department "permit[s] the temporary cessation of payments, allow[s] an extension of time for making payments, or temporarily accept[s] smaller payments than previously scheduled."  34 C.F.R. § 685.205(a).

[3]   https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/borrower-defense-data

[4]   https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers

systemic institutional conduct, with established criteria for approval." AR 345 (Decl. of Colleen M. Nevin ¶ 39, Nov. 14, 2019 (Nevin Decl.)). In making such findings, the Borrower Defense Unit (BDU) in the Federal Student Aid (FSA) Enforcement Office "analyzed and summarized . . . relevant evidence, determined and applied applicable law, established criteria for approval of [various] type[s] of claim[s], and drafted claim-specific review protocols." AR 345-46 (Nevin Decl. ¶ 39). To adjudicate a borrower defense that raises a claim based on these established categories, the BDU uses the relevant protocol to individually review and determine whether the application meets the approval criteria. AR 346 (Nevin Decl. ¶ 40). For all other claims, the BDU must individually "review the application and any accompanying evidence from the borrower and determine whether [he] has established by a preponderance of the evidence that the claim should be approved under either the applicable state law [(1994 regulations)] or the federal standard [(2016 regulations)]." AR 346 (Nevin Decl. ¶ 41).

In either case, the BDU specifies the "information that will be included in the written decision to the borrower, such as the evidence considered and whether a statute of limitations applies." AR 346 (Nevin Decl. ¶ 42). For approvals, the BDU inputs the amount of relief determined by the Secretary. AR 346 (Nevin Decl. ¶ 43). A borrower defense application is finally processed when FSA "issues a written decision to the borrower and notifies the loan servicer through the [claims management] platform to discharge and/or put the borrower's loan back into repayment in accordance with the decision and the relief provided, if any." AR 346-47 (Nevin Decl. ¶ 44).

## III.   THE DEPARTMENT'S EFFORTS TO ISSUE BORROWER DEFENSE DECISIONS

Prior to 2015, the Department's borrower defense regulation was "rarely used." 81 Fed. Reg. 39330, 39330 (June 16, 2016). The Department received "only a very small number of requests" for borrower defense relief, which were decided by the Department's Office of the General Counsel. AR 339 (Nevin Decl. ¶ 9). In May 2015, however, Corinthian Colleges, Inc. (Corinthian), "a publicly traded company operating numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide, filed for bankruptcy." 81 Fed. Reg. at 39335. Thereafter, the Department received a "flood of borrower defense claims submitted by Corinthian students." *Id*. at 39330-31. "Corinthian's collapse almost immediately produced over 1,000" such claims, AR 361

(*First Report of the Special Master for Borrower Defense to the Under Secretary* (Sept. 3, 2015)), a number that approached 27,000 by June 2016, AR 339 (Nevin Decl. ¶ 12).

At the time of Corinthian's closure, the existing regulatory scheme was "silent on the process a borrower follows to assert a borrower defense claim." 81 Fed. Reg. at 39335. The Department had neither a standardized borrower defense application nor a borrower defense claims management system to track "applications and their statuses and adjudication decisions." AR 343-44 (Nevin Decl. ¶¶ 30-32). "To address the unprecedented number of pending borrower defense claims," the Department appointed a Special Master in June 2015, AR 339 (Nevin Decl. ¶ 11), to "creat[e] . . . a process to evaluate [such] claims," AR 506 (Office of Inspector Gen., U.S. Dep't of Educ., *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process* (Dec. 8, 2017)). During the Special Master's tenure from June 2015 to June 2016, the Department prioritized claims of borrowers whose borrower defense applications were based on findings made by the Department that certain Corinthian schools "made misrepresentations regarding [their] job placement rates" (JPR claims). AR 339 (Nevin Decl. ¶ 10); *see* AR 347 (Nevin Decl. ¶ 45); *see also* AR 419 (June 8 Fact Sheet). Borrower defense applications from borrowers who attended schools covered by the Department's JPR findings represented 60% of the 82,000 applications pending in October 2016. AR 340 (Nevin Decl. ¶ 14). To facilitate the adjudication of these claims, the Department announced streamlined procedures using simple application forms for borrowers asserting JPR claims, *see* AR 342-43 (Nevin Decl. ¶¶ 26-29). By the end of June 2016, the Department had adjudicated almost 3,800 such borrower defense applications. AR 347 (Nevin Decl. ¶ 45). As described below, *see infra* p. 21, the Department generally adjudicated these applications, and awarded full loan discharges as relief, without conducting an empirical assessment of the harms suffered by borrowers as a result of attending Corinthian programs.

As the work of the Special Master neared its completion, the Department announced the creation of the FSA Enforcement Office, including the present-day BDU, to oversee and implement the borrower defense adjudication process. AR 340, 341 (Nevin Decl. ¶¶ 13, 19). "In late June 2016, the Department completed the transition of borrower defense oversight from the Special Master and the team of [seven] attorneys working with him to the Enforcement Unit's BDU." AR 506. The

BDU then carried on with developing new categories of borrower defense claims and adjudicating applications based on those criteria, with the Department approving approximately 28,000 borrower defense claims between July 1, 2016 and January 20, 2017.  AR 502; *see* AR 347-48 (Nevin Decl. ¶¶ 48-51) (describing development of claim categories based on findings that certain Corinthian schools misrepresented that credits earned were transferable and that certain Corinthian and ITT Technical Institute (ITT) schools promised that all graduates were guaranteed to obtain employment).  During this time period, the BDU made improvements to its process for adjudicating claims.  In December 2016, it first made available a "Universal Borrower Defense Form" for use by all borrower defense claimants.  AR 343 (Nevin Decl. ¶ 30).  Additionally, the BDU began in November 2016 (with significant work continuing well into 2017) planning and building a Microsoft Access claims review platform to help, *inter alia*, track borrower defense claims from intake through final decision.  AR 344 (Nevin Decl. ¶ 33).  This platform replaced the prior practice of tracking adjudications on over 1,000 Microsoft Excel spreadsheets.  AR 344 (Nevin Decl. ¶ 32); *see* AR 535.

Upon the change in administrations, the Department's new leadership conducted a review of the existing borrower defense process.  Because the review had the potential to result in significant changes, the BDU was informed that "no additional approvals would be processed" during the review.  AR 349 (Nevin Decl. ¶ 56).  In March 2017, the Department convened a Borrower Defense Review Panel to examine the process and make recommendations on how to resolve pending claims going forward.  AR 348 (Nevin Decl. ¶ 55); *see* AR 532.  The panel ultimately recommended, and the Secretary subsequently requested, that the Department's Office of Inspector General (IG) perform "a comprehensive review" of borrower defense work and processes.  AR 348-49 (Nevin Decl. ¶ 55).  The IG conducted his review throughout the summer and fall of 2017, during which period the BDU spent a significant amount of time responding to the IG's requests for information.  AR 349 (Nevin Decl. ¶¶ 57-58).  The IG issued his report in December 2017, recommending "improved documentation and information systems" but no "changes to existing review processes and protocols."  AR 349 (Nevin Decl. ¶¶ 60-61).

At the conclusion of the Department's thorough review, it announced the development of a new methodology—based on empirical measures of harm—for determining the amount of relief to

be awarded to borrowers whose claims were approved on the basis of the Department's JPR, transfer of credits, and guaranteed employment misrepresentation findings.  AR 006-07 (Jones Decl. ¶¶ 15-16); AR 350 (Nevin Decl. ¶ 62); AR 538-43 (*Borrower Defense Relief Methodology for CCI Claims*). In a press release, the Department announced that it had "approved for discharge 12,900 pending claims submitted by former Corinthian . . . students" and denied 8,600 pending claims based on the methodology.  U.S. Dep't of Educ., *Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers* (Dec. 20, 2017).[5]  Between December 2017 and May 2018, the BDU applied the new methodology to submit for approval over 16,000 Corinthian JPR borrower defense claims and to deny over 10,000 claims.  *See* AR 350 (Nevin Decl. ¶¶ 63-64).  The Department's methodology, however, was challenged and, on May 25, 2018, a judge in this district preliminarily enjoined the Department from using it.  AR 007 (Jones Decl. ¶ 17).  The court held, among other things, that the plaintiffs demonstrated a likelihood of success with respect to their claim that the methodology violated the Privacy Act.  *Id.* (citing *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018), *as amended by* Am. Order at 1, *Calvillo Manriquez v. DeVos*, No. 3:17-cv-7210 (N.D. Cal. June 19, 2018), ECF No. 70).  The Department appealed the preliminary injunction and is awaiting the Ninth Circuit's decision.  AR 007 (Jones Decl. ¶ 18).

The *Manriquez* injunction has not prevented the Department from exploring other options "for determining the amount of relief to be given not just to Corinthian borrowers but to all borrowers with approved borrower defense claims."  *Id.*  As a matter of policy judgment, the Department continues to believe that the amount of relief afforded to a borrower should reflect the "financial harm suffered by the borrower and the value received from the borrower's institution."  AR 007-08 (Jones Decl. ¶ 19).  Developing a methodology that ensures an appropriate level of debt relief consistent with this policy has been challenging.  Among other things, the Department has had to identify "an accurate, reliable and accessible source of earnings data that would not raise concerns about privacy;" determine how to classify programs that allegedly engaged in misconduct so that it can compare the earnings of borrowers in those programs with the earnings of students in equivalent

---

[5] https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers

programs not affected by such misconduct; and "develop an algorithm to use to calculate the level of financial harm suffered by a successful [borrower defense] applicant."  AR 009 (Jones Decl. ¶ 23); *see also* AR 008 (Jones Decl. ¶ 20).  The Department plans to announce and implement an alternative methodology in the coming weeks.  AR 009 (Jones Decl. ¶ 22).

Court orders issued in separate litigation in the months following the *Manriquez* injunction likewise had a significant impact on the Department's borrower defense work.  As noted above, these orders resulted in the 2016 regulations that the Department had delayed taking effect in October 2018.  "The 2016 regulations significantly changed the rules for considering borrower defense claims."  AR 004 (Jones Decl. ¶ 8).  These changes included, *inter alia*, (1) a new federal standard for establishing a basis for borrower defense to repayment for loans disbursed after July 1, 2017; (2) a new evidentiary standard and adjudication process applicable to all borrower defense claims regardless of loan disbursement date, including the requirement to issue written decisions; and (3) a requirement to notify schools when their students filed borrower defense claims.  *See id.*; *see also* AR 345 (Nevin Decl. ¶ 37).

Once the 2016 regulations became effective in October 2018, the Department spent considerable time and effort implementing the new requirements, and it issued guidance on how it would implement and enforce the regulations.  *See* AR 005 (Jones Decl. ¶¶ 10-11); *see generally* AR 320-24 (Decl. of Ian Foss, Nov. 14, 2019 (Foss Decl.)).  This included numerous changes to the claims management tool—the Customer Engagement Management System (CEMS)—that the BDU had begun developing as early as January 2018 and had spent considerable time working on through much of 2018.  *See* AR 344, 345 (Nevin Decl. ¶¶ 34-35, 37).  "All of the BDU permanent staff were involved in developing new processes to comply with the 2016 . . . regulation, and three of the staff in particular spent a significant amount of time working . . . to implement the new processes."  AR 345 (Nevin Decl. ¶ 38).  CEMS became available to adjudicate claims in April 2019 following a months-long data migration process.  *See* AR 345 (Nevin Decl. ¶ 36).

Against this backdrop, the BDU's available human resources have been strained.  Between December 2016 and early 2018, four of the ten full-time BDU attorneys voluntarily left the Department, "leaving five full-time attorneys [(including the director)] and one part-time attorney,"

AR 342 (Nevin Decl. ¶ 23), and the contractor attorney staff was reduced in 2017 while the Department reviewed the borrower defense process, AR 342 (Nevin Decl. ¶ 22). The BDU, however, increased contractor staffing beginning in early 2018, AR 342 (Nevin Decl. ¶ 23), and recently received approval to "significantly increase the BDU staff," including four permanent attorneys and 60 term-appointed law clerks and attorneys, AR 342 (Nevin Decl. ¶ 24). Twenty new clerks and attorneys have already "joined [the] BDU in the last two months." AR 342 (Nevin Decl. ¶ 25). But the Department continues to be inundated with borrower defense claims. According to its reports, as of the quarter ending June 30, 2019, "the Department ha[s] received 272,721 borrower defense applications since 2015." AR 340 (Nevin Decl. ¶ 15). It received 32,784 applications alone in the quarter ending on June 30. *Id.* As of that point in time, 210,168 applications remained pending. *Id.*

Notwithstanding these numerous challenges, the BDU "has continued to make progress on adjudicating [borrower defense] applications." AR 350 (Nevin Decl. ¶ 65). "[N]early 50,000 applications have been adjudicated on the merits and are pending relief and/or processing," including both approved and denied applications from Corinthian and ITT borrowers, and several thousand denials for borrowers who attended numerous other schools. *Id.* The BDU is currently prioritizing its limited resources on the streamlined JPR claims and applications that are likely to be denied. *See* AR 351 (Nevin Decl. ¶ 66). On average, the BDU has been adjudicating on the merits approximately 1,000 applications per week and expects to complete its adjudication of the remaining Corinthian applications in the next few months. *See* AR 351 (Nevin Decl. ¶¶ 67-68). It has also begun reviewing and analyzing evidence relating to allegations against several other schools. *See* AR 351 (Nevin Decl. ¶ 68) *see also* AR 345-46 (Nevin Decl. ¶ 39). The BDU anticipates that new attorneys can be assigned to continue that process so that the BDU can begin adjudicating applications from borrowers who attended those schools. *See* AR 351 (Nevin Decl. ¶¶ 68-69).

Once the Department finalizes its new methodology—currently anticipated in the coming weeks—it will be able to begin "expeditiously processing and issuing decisions" for borrowers whose claims have been approved. AR 011 (Jones Decl. ¶ 27). It also intends at the same time to issue decisions for borrowers whose applications have been adjudicated as denials. The Department has completed its development of a denial letter that will explain to borrowers the basis for the

Department's decision and is currently "working with [its] contracting officials and loan servicers to enter these notices into servicer systems." AR 011 (Jones Decl. ¶ 26). In order to prevent confusion or distress, the Department has decided to issue denials contemporaneously with approvals, which it expects to do soon. *See* AR 011 (Jones Decl. ¶ 27).

## IV.    THIS LAWSUIT

Plaintiffs filed a class action complaint on June 25, 2019, challenging the Department's alleged delay in adjudicating borrower defense claims. *See* Compl. ¶¶ 181-82, ECF No. 1 (asserting that the Department "last approved a borrower defense application on June 12, 2018" and "last denied" one on May 24, 2018). Plaintiffs bring a claim under APA § 706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." *See id.* ¶¶ 377-89 (Count 1). Plaintiffs also brought a claim under APA § 706(2), claiming that the Department's purported "policy" to "not grant any borrower defenses pending the outcome of [the *Manriquez* appeal]" is arbitrary and capricious. *Id.* ¶ 391; *see id.* ¶¶ 390-404 (Count 2). Plaintiffs did not oppose Defendants' partial motion to dismiss their arbitrary-and-capricious claim, and the Court granted Defendants' motion to dismiss Count 2. *See* Order (Sept. 28, 2019), ECF No. 41. Plaintiffs seek injunctive relief compelling the Department to grant or deny borrower defenses and to notify borrowers of such decisions. *See* Compl. at 61 (Prayer for Relief ¶¶ F-H).

On July 23, 2019, Plaintiffs moved to certify a class consisting of every Direct Loan and FFEL borrower who has asserted a borrower defense and "whose borrower defense has not been granted or denied on the merits." Pls.' Mot. for Class Cert. at 1, ECF No. 20 (Class Cert. Mot.). The proposed class expressly excludes Corinthian borrowers who are members of the class certified in *Manriquez*. *Id.* Plaintiffs also sought to certify a sub-class with respect to their APA § 706(2) challenge. *Id.* Plaintiffs withdrew their request for sub-class certification after they abandoned their § 706(2) claim. *See* Pls.' Reply in Support of Mot. for Class Cert. at 2 n.2, ECF No. 42.

On October 30, 2019, the Court granted Plaintiffs' motion and certified the following class to be represented in this action by the named Plaintiffs and their attorneys as class counsel:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied

on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 17-[7210] (N.D. Cal.).

Order Granting Mot. for Class Cert. at 14, ECF No. 46 (Class Cert. Order).

Defendants filed an Answer to Plaintiffs' Complaint and lodged a certified Administrative Record on November 14, 2019.  *See* ECF Nos. 55, 56.  As shown by the Administrative Record, and as demonstrated below, Plaintiffs' claim that Defendants have unlawfully withheld or unreasonably delayed decisions on borrower defense applications in violation of the APA is without merit. Summary judgment should be entered in favor of Defendants.

## LEGAL STANDARD

"APA claims may be resolved via summary judgment, pursuant to the standard set forth in Federal Rule of Civil Procedure 56."  *Californians for Renewable Energy v. U.S. EPA*, No. 15-cv-3292-SBA, 2018 WL 1586211, at *10 (N.D. Cal. Mar. 30, 2018) (citing *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994)).  Summary judgment is appropriate under Rule 56 when the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When a court reviews a government agency's action, however, the standard for summary judgment is amplified by the APA, which provides the applicable standard of review."  *Anderson v. McCarthy*, No. 16-cv-00068-WHA, 2016 WL 6834215, at *3 (N.D. Cal. Nov. 21, 2016); *see also Tolowa Nation v. United States*, 380 F. Supp. 3d 959, 963 (N.D. Cal. 2019) ("Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." (citation omitted)).

The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Such a claim can proceed, however, "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004) (emphasis in original).  A court can only compel "agency action," which is defined by the APA as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §§ 701(b)(2), 551(13).  As the Supreme Court has made clear, a "failure to act" in this context is "properly understood as a failure to take . . . one of the agency actions . . . defined in § 551(13)."  *SUWA*, 542

U.S. at 62.  A court can only compel such "agency action" where it is "pursuant to a legal obligation 'so clearly set forth that it could traditionally have been enforced through a writ of mandamus.'" *Viet. Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2016) (citation omitted)).

"An agency action may be deemed 'unreasonably delayed' where the governing statute does not require agency action by a date certain, whereas an action is 'unlawfully withheld' if an agency fails to meet a clear deadline prescribed by Congress."  *S.F. Baykeeper, Inc. v. Browner*, 147 F. Supp. 2d 991, 1005 (N.D. Cal. 2001).  Where, as here, no such deadline is prescribed, "[t]here is no per se rule as to how long is too long to wait for agency action."  *In re Pesticide Action Network N. Am.*, 532 F. App'x 649, 651 (9th Cir. 2013) (quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)).  Rather, the Ninth Circuit has held that a court's determination of "whether an agency's delay . . . is so 'egregious' as to warrant mandamus" is guided by the six-factor test articulated in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*).  *In re Cal. Power Exch. Corp.*, 245 F.3d at 1124-25.

The so-called *TRAC* factors are:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 n.7 (9th Cir. 1997).  "The most important is the first factor, the 'rule of reason,' though it, like the others, is not itself determinative."  *See In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (citation omitted).

Generally, judicial review in an APA case is "based on the record the agency presents to the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see* Jt. Case Mgmt. Stmt. at 7, ECF No. 36 (indicating the parties' agreement "that this APA case should be decided on the administrative record").  This is as true of claims challenging agency inaction as it is

of claims challenging agency action.  *San Luis & Delta Mendota Water Auth. v. U.S. Dep't of the Interior*, 984 F. Supp. 2d 1048, 1056 (E.D. Cal. 2013); *City of Santa Clarita v. U.S. Dep't of Interior*, No. 02-cv-0697-DT (FMOX), 2005 WL 2972987, at *2 (C.D. Cal. Oct. 31, 2005).  In the former case, however, "there is no final agency action to demarcate the limits of the record."  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).  Courts may thus consider agency declarations explaining the agency's actions or otherwise justifying the inaction challenged under § 706(1).  *See, e.g.*, *Indep. Min. Co.*, 105 F.3d at 511-12 (noting that when a suit challenges agency inaction, district court can consider supplemental statements of an agency position because there is no date certain by which to define the administrative record).

## <u>ARGUMENT</u>

## I.   THIS COURT CANNOT ISSUE AN INJUNCTION AGAINST THE SECRETARY

To the extent Plaintiffs request relief in the form of an injunction against the Secretary, this Court is without jurisdiction to grant it.  Although the APA supplies a partial waiver of sovereign immunity for certain types of claims asserted by persons "suffering legal wrong because of agency action," it expressly provides that such waiver of immunity and right of action does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The HEA is another "statute that grants consent to suit." *Id.*; *see* 20 U.S.C. § 1082(a)(2) (allowing the Secretary to "sue and be sued" in civil actions arising from her performance of statutorily granted powers and duties).  And the HEA clearly states that "no . . . injunction . . . or other similar process . . . shall be issued against the Secretary."  *Id.*  It thus "expressly . . . forbids the relief," 5 U.S.C. § 702, Plaintiffs seek—an order compelling the Department to "grant class members' individual borrower defense assertions if they are eligible for a borrower defense," "deny class members' individual borrower defense assertions if they are not eligible for a borrower defense," and "notify class members of their borrower defense decisions," Compl. at 61 (Prayer for Relief ¶¶ F-H)—and deprives the Court of jurisdiction to enter an injunction against the Secretary in this matter.[6]

---

[6] Such relief is also improper because, as Defendants have explained, *see* Defs.' Opp'n to Pls.' Mot. for Class Cert. at 20-21, ECF No. 38, it would amount to an impermissible "obey the law" injunction,

Moreover, the Ninth Circuit has held that the HEA's anti-injunction provision similarly precludes declaratory relief that would "produce the same effect as an injunction," *Am. Ass'n of Cosmetology Sch. v. Riley*, 170 F.3d 1250, 1254 (9th Cir. 1999), and that it extends to requests for mandamus relief, *Mashiri v. U.S. Dep't of Educ.*, 724 F.3d 1028, 1031 (9th Cir. 2013).  Thus, to the extent Plaintiffs seek relief that is "coercive," *Am. Ass'n of Cosmetology Sch.*, 170 F.3d at 1254, *i.e.*, "would have the practical effect of forcing the Secretary to take certain actions," *Carr v. DeVos*, 369 F. Supp. 3d 554, 561 (S.D.N.Y. 2019), the Court lacks jurisdiction to award such relief.  *See id.* (noting that such a suit is "just the type of action that Congress sought to foreclose by including the HEA's limitation on injunctive relief").

## II.     THE DEPARTMENT HAS NOT UNREASONABLY DELAYED ISSUING FINAL DECISIONS ON BORROWER DEFENSE APPLICATIONS

To the extent the Court has jurisdiction to award relief pursuant to § 706(1), its authority under that statutory provision, as indicated above, is "carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  In the case of an alleged delay, the Ninth Circuit has emphasized that a court's authority to interfere with agency proceedings and award relief in the nature of mandamus is "narrow indeed," available only where "an agency's delay in issuing a final order is . . . 'egregious.'"  *In re Cal. Power Exch. Corp.*, 245 F.3d at 1124.[7]  In assessing claims seeking to compel delayed agency action under the APA, courts apply the six-factor *TRAC* test described above, the most important of which is "the rule of reason."  *Cent. Sierra Envtl. Res. Ctr.*

---

which is particularly inappropriate in a case against a government agency because it would enmesh the court in "pervasive oversight . . . over the manner and pace of agency compliance with [its] congressional directives," which is "not contemplated by the APA," *id.* at 21 (quoting *SUWA*, 542 U.S. at 67).  Defendants hereby incorporate by reference that argument here.

[7] Because § 706(1), like a writ of mandamus, "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act," *SUWA*, 542 U.S. at 64 (citation omitted), any relief in this case (to the extent it is available), must be limited to an order directing the Department to take action—and specifically to issue final decisions—on pending borrower claims, without specifying how those claims should be resolved or under what timeframe, *e.g.*, *Orion Reserves Ltd. P'ship v. Kempthorne*, 516 F. Supp. 2d 8, 11 (D.D.C. 2007) (because only "egregious" agency delays "warrant a court to order agency action with a specific time frame," "courts rarely compel an agency to render an immediate decision on an issue").

*v. Stanislaus Nat'l Forest*, 304 F. Supp. 3d 916, 951 (E.D. Cal. 2018).  Here, given the substantial work the Department has done processing and adjudicating borrower defense applications and the concrete steps it has taken towards completing the complex task of developing a comprehensive methodology to award relief to successful applicants, as well as the Department's commitment to resolving applications expeditiously in the near future, the Department's delay in issuing final decisions is reasonable.  The other *TRAC* factors likewise weigh in the Department's favor.

**A.**      **The Department's Pace of Adjudicating Borrower Defense Claims is Reasonable**

1.      As an initial matter, the Ninth Circuit has made clear that "[t]he cases in which courts have afforded relief have involved delays of years, not months."  *In re Cal. Power Exch. Corp.*, 245 F.3d at 1125 (comparing cases finding delays of four, eight, and ten years unreasonable with cases finding reasonable delays of "five years and two years" and a delay of fourteen months); *see also In re Pesticide Action Network*, 532 F. App'x at 650-51 (delay of six years to act on petition "not unreasonable in light of the complexity of the issue"); *cf. In re A Cmty. Voice*, 878 F.3d at 787 (issuing mandamus relief where delay was "into its eighth year," and contrasting that delay with cases involving delays of "only months or a few years" where the Ninth Circuit had deemed such relief inappropriate).  Here, the Department's approximate 18-month delay in issuing final decisions aligns it much more closely with the cases declining judicial intervention than those awarding such extraordinary relief.  And that delay is explained by a number of factors—including the complexity of the issues before the Department and the sheer volume and diversity of pending claims, as well as the Department's competing priorities and limited resources—that the Department has taken concrete steps to address.  The delay thus "does not run afoul of any 'rule of reason.'"  *In re Cal. Power Exch. Corp.*, 245 F.3d at 1125.

2.      In granting Plaintiffs' motion for class certification, the Court characterized Plaintiffs' complaint as challenging an alleged "systemic abdication of [the Department's] obligation to process borrower defense claims" and seeking "to restart the decision-making process."  Class Cert. Order at 12.  But as the Department's record now makes clear, this is not the case:  the Department's decision-making process has been ongoing, and the Department has made significant progress adjudicating borrower defense claims, *i.e.*, evaluating applications and determining whether each

application demonstrates that the borrower's school engaged in the types of acts or omissions that establish a successful borrower defense under the Department's regulations. *See, e.g.*, *In re Pesticide Action Network*, 532 F. App'x at 651 (treating an agency's "concrete steps" towards resolving the issues before it as a factor justifying six-year delay).

Under the standard applicable to many of the claims before it (*i.e.*, those pertaining to loans first disbursed prior to July 1, 2017), the Department must determine whether the borrower's school engaged in acts or omissions "which would give rise to a cause of action against the institution under applicable State law." AR 338 (Nevin Decl. ¶ 7). Applying such a standard necessarily involves a legal analysis of what state law applies to a given application and whether evidence provided by the borrower establishes a cause of action under the applicable standard. As a matter of easing the administrative burden associated with engaging in this potentially time-consuming analysis on a claim-by-claim basis, as well as the practical reality that the Department has received a great number of claims alleging patterns of misconduct by particular schools, such as Corinthian, the Department has primarily focused its efforts to date on "identif[ying] certain categories of claims, based on systemic institutional conduct." AR 345-46 (Nevin Decl. ¶ 39). For each such category that has been approved, the Department's BDU has "analyzed and summarized the relevant evidence, determined and applied applicable law, established criteria for approval of that type of claim, and drafted claim-specific review protocols." *Id.* The Department is engaging in an ongoing process to develop claims criteria for additional schools and programs, *id.*, but for each claim that does not fit within an established category (*i.e.*, for which the "BDU is not aware of relevant evidence from the Department or from other sources such as law enforcement partners"), the BDU must individually "review the application and any accompanying evidence from the borrower and determine whether the borrower has established" a defense under the relevant regulation, AR 346 (Nevin Decl. ¶ 41).

Within this framework, the Department is moving the "conveyor belt" of pending borrower defense applications, Class Cert. Mot. at 23, pushing applications forward even as a combination of factors have prevented the Department from issuing final decisions. Nearly 50,000 applications have been "adjudicated on the merits" since June 2018, including claims submitted by Corinthian borrowers that are members of the *Manriquez* class, Corinthian borrowers that are not members of

that class, borrowers who attended ITT, as well as borrowers who attended "numerous schools other than [Corinthian] and ITT."  AR 350 (Nevin Decl. ¶ 65).  That is, over the last "several months," while no final decisions have been issued, the BDU has nonetheless "adjudicated on the merits an average of close to 1,000 applications per week."  AR 351 (Nevin Decl. ¶ 67).  In addition to its work processing claims and determining their eligibility on the merits for borrower defense relief, the BDU has also initiated review and analysis of evidence pertaining to additional schools and campuses, which will allow the Department to make streamlined determinations about whether borrowers who attended those programs can meet the regulatory standards for asserting a defense and, ultimately, whether they are entitled to loan relief as a result.  AR 351 (Nevin Decl. ¶ 68).

Thus, it is simply not the case that the Department is engaged in a policy of total inaction with respect to borrower defense claims.  Issuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process, and agencies must be given, within reason, the "time necessary to analyze [the issues presented] so that [they] can reach considered results." *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987); *see also Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (declining to "interfere in ongoing agency proceedings" where a final decision had been delayed fourteen months, given agency assurances that "it is moving in a diligent manner to conclude" the matter before it).

3.    The Department's pace of claims adjudication is also justified by its weighing of competing demands on agency resources.  Courts must give due regard to "the importance of 'competing priorities' in assessing the reasonableness of an administrative delay."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)).  As the D.C. Circuit has recognized, the "agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.  Such budget flexibility as Congress has allowed the agency is not for [courts] to hijack."  *In re Barr Labs.*, 930 F.2d at 76.  As detailed above and in the record, a number of competing demands on the Department's time and resources have slowed its ability to finally determine pending borrower defense claims.  These include:

- Implementing the 2016 regulations that had previously been delayed but became

effective in fall 2018. *See generally* AR 321-24 (Foss Decl.); AR 004-05 (Jones Decl. ¶¶ 8-11).

- Developing and issuing new borrower defense regulations in 2018 and 2019 through the negotiated rulemaking process. AR 005-06 (Jones Decl. ¶¶ 12-13).
- Creating and implementing new claims management systems for borrower defense claims. AR 344-45 (Nevin Decl. ¶¶ 32-38).
- Developing a new methodology for determining the measure of relief to award successful borrower defense claimants, following a preliminary injunction barring the use of the methodology developed in 2017. AR 006-09 (Jones Decl. ¶¶ 14-23).

As the record further explains, the Department, and the BDU in particular, has faced resource-based staffing issues during this period of time that have constrained its ability to work through pending claims. Due to voluntary departures of personnel between 2016 and 2018 and the Department's pause in adjudicating borrower defense claims in 2017 while it reviewed existing processes and developed a new relief methodology, *see supra* pp. 10-11, the BDU staff decreased from ten full-time attorneys and 20 contractor paralegals and attorneys in October 2016 to five full-time attorneys, one part-time attorney, and six contractor staff by early 2018. AR 341-42 (Nevin Decl. ¶¶ 20-23). Those numbers have significantly increased in recent months, however, and the Department has recently authorized the replacement of all the full-time attorneys who have left the BDU under this administration and the hiring of 60 "term-appointed law clerks and attorneys to assist in expeditiously adjudicating the large number of pending borrower defense applications." AR 342 (Nevin Decl. ¶¶ 24).

Nonetheless, the responsibility of adjudicating over 200,000 pending borrower defense claims falls solely on the BDU, AR 341 (Nevin Decl. ¶ 17), which has allocated its limited resources to addressing numerous competing demands related to the borrower defense process and in accordance with the Department's overall priorities. Any order requiring the Department to issue final decisions on borrower defense claims according to a timeline set by the Court would necessarily divert the Department's resources from the allocation the Department has in its discretion chosen. The Court should decline to impose such an order because where Congress assigns an agency a broad mandate and "finite resources to satisfy [its] responsibilities, the agency cannot avoid setting priorities among them." *Sierra Club*, 828 F.2d at 798; *see also Mashpee Wampanoag Tribal Council*, 336 F.3d at 1101 (noting that a delay that "stemmed from a lack of resources," was "a problem for

the political branches to work out" (citation omitted)).

4.       While all of these factors serve to explain and justify the delay challenged in this case, the primary driver of that delay is the Department's eminently reasonable policy judgment that it needs to develop a comprehensive methodology for awarding borrower defense relief to successful claimants before it resumes issuing final decisions (and, necessarily, determining how much relief to award successful claimants). *See* AR 010 (Jones Decl. ¶ 25). As noted above, Congress has said almost nothing about borrower defense, choosing instead to delegate to the Department the broad authority to define the concept. *See* 20 U.S.C. § 1087e(h) (providing that the Secretary "shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part"). Pursuant to that authority, the Department has set forth a regime, under both sets of regulations that apply to the loans of Plaintiff class members (the 1994 and 2016 regulations), pursuant to which the Secretary first determines whether a claimant establishes a borrower defense (*i.e.*, that the claimant's school engaged in the requisite "acts or omissions" as defined by the relevant regulation) and then exercises her discretion to determine the appropriate amount of relief to award a successful claimant. *See supra* pp. 3-5.

Neither set of regulations, however, sets forth guidance, much less a particular methodology, for how the Secretary should determine what relief is appropriate for a successful borrower defense claimant. In contrast with the Department's approach under previous leadership, which had presumed that Corinthian students, at least, had "received nothing of value from their education," AR 006-07 (Jones Decl. ¶ 16), the Department has been committed since 2017 to developing a borrower defense relief methodology that is "based on the financial harm suffered by the borrower and value received from the borrower's institution." AR 006-08 (Jones Decl. ¶¶ 14-19); *see also Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d at 1103 (recounting Secretary's findings in 2017 that "previous approvals had been based on the assumption that [Corinthian] borrowers received a worthless education," which assumption the Department determined was "not factually accurate for all students"). As another court in this district has already concluded, the Secretary's preferred policy of premising borrower defense relief on "whether students obtained value and if so, how much, is . . . a legitimate exercise of the Secretary's discretion under the [HEA]." *Id.*

Given these considerations, devising such a methodology—which requires an analysis of the value that particular educational programs provide students—is a complicated process, and the Jones Declaration details the extent of the Department's efforts, and progress, on the issue. *See Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102 (recognizing that the reasonableness of an agency's delay "will depend in large part . . . upon the complexity of the task at hand").  First, the Department spent several months in 2017 reviewing its existing borrower defense infrastructure and procedures and, eventually, developing a relief methodology for claimants who attended certain Corinthian schools.  AR 006-07 (Jones Decl. ¶¶ 15-16).  When this methodology was preliminarily enjoined in May 2018, the Department understandably spent some time evaluating its next steps and considering how to adjudicate borrower defense claims in light of the ruling.  *See, e.g.*, Defs.' Reply Brief at 4, *Calvillo Manriquez v. DeVos*, No. 3:17-cv-7210 (N.D. Cal. Aug. 16, 2018), ECF No. 87.  But the Department has not, as Plaintiffs allege, refused to take action.  While waiting for the Ninth Circuit to rule on its appeal, the Department has determined to move forward with "an alternative approach for determining the amount of relief to be given not just to Corinthian borrowers but to all borrowers with approved borrower defense claims."  AR 007 (Jones Decl. ¶ 18).

The Department continues to believe, consistent with the district court's decision in *Manriquez*, that borrower defense relief should be determined on the basis of the harm that a borrower suffers as the result of his or her school's misconduct, as measured by the value of the education the student ultimately received from that school.  AR 007-08 (Jones Decl. ¶ 19).  Its efforts to develop a new relief methodology have thus focused on aggregate earnings data for particular programs affected by institutional misconduct as compared to such earnings data for programs not so affected.  AR 008 (Jones Decl. ¶¶ 19-20).  Identifying earnings data that is public and that is compiled in a format that allows for meaningful and efficient comparison with the academic programs offered by educational institutions has been a challenge—even devoting a team of expert employees with operational knowledge and senior Department officials to the issue, it has taken the Department "months to develop the potential options, assess each option for validity, ensure that the Department would have access to the data needed to use the chosen method, and discuss the options with appropriate offices and leaders in the Department."  AR 009 (Jones Decl. ¶ 23).  Reconciling

these competing policy interests, and taking the time necessary to develop a policy that can be consistently applied to adjudicate pending claims systematically, is a task that is properly performed by the Department, not the courts. *See Cent. Sierra Envtl. Res. Ctr.*, 304 F. Supp. 3d at 952 (rejecting unreasonable delay claim where, *inter alia*, Congress had granted the agency "discretion to determine the priority and timing for performance" of specified duties, without offering a timetable or other indication for how to order such priorities); *Orion Reserves Ltd. P'ship*, 516 F. Supp. 2d at 14 ("When confronted with practical difficulties in executing a task and the need to prioritize limited resources, administrative agencies are in the best position to allocate their resources to complete the task in a timely manner.").

Most importantly, the Jones Declaration establishes that the Department has made substantial progress towards developing a comprehensive methodology and "is working towards announcing and implementing a new partial relief methodology within the next few weeks." AR 009 (Jones Decl. ¶ 22). Once this methodology is in place, the Department plans to use it expeditiously to provide relief "to successful [borrower defense] applicants in a clear, consistent, and fair manner," AR 010 (Jones Decl. ¶ 25), and to issue final decisions on pending borrower defense claims in the coming weeks, AR 011 (Jones Decl. ¶ 27). On this basis alone, summary judgment is appropriate for Defendants on Plaintiffs' unreasonable delay claim. *See Cent. Sierra Envtl. Res. Ctr.*, 304 F. Supp. 3d at 951-52 (collecting cases for the proposition that where the agency provides a "concrete timeline" for taking the action sought to be compelled and the delay is "relatively short," courts have declined to find that such delay is "unreasonable . . . under the APA"); *In re Cal. Power Exch.*, 245 F.3d at 1125 (in light of concrete steps the agency had taken to address the issue, court was "confident" that agency would act "in due course," and found that the agency's "decision to give higher priority" to resolving certain structural issues than to making individualized determinations did not "in any way entitle the [plaintiff] to the mandamus relief it requests").

Indeed, the Department's efforts to devise a comprehensive borrower defense relief methodology are akin to the type of agency progress the Ninth Circuit deemed sufficient to preclude mandamus relief in *In re California Power Exchange*. In particular, the court noted that the Federal Energy Regulatory Commission's delay in making individualized retroactive refund determinations

while it instead took "action to develop both an empirical and methodological framework for addressing refund liability issues" was consistent with its statutory obligations and an inappropriate basis on which to award mandamus relief.  245 F.3d at 1125.  So too here.  The Department's decision to prioritize an overarching methodology for consistently awarding relief to successful borrower defense applicants, pursuant to its authority under the HEA, *see supra* p. 21, provides no basis for this Court to compel the Department to issue final decisions on borrower defense claims (and much less so before that methodology is even in place).  *See also United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (noting that "we cannot say in advance that the amount of time the agency contemplates taking to reach a final determination," which would necessarily address "a host of complex . . . technical issues," will be unreasonable, and declining invitation to "punish" the agency for its "past delay").

**B.      The Remaining *TRAC* Factors Favor Defendants**

As noted above, while the rule of reason is the most important of the *TRAC* factors, the Court should also consider whether Congress has provided "a timetable or other indication of the speed with which it expects the agency to proceed;" the nature and extent of the interests prejudiced by the delay, including whether "human health and welfare are at stake;" and "the effect of expediting delayed action on agency activities of a higher or competing priority."  *Brower v. Evans*, 257 F.3d 1058, 1068 (9th Cir. 2001).  Because Congress has not set forth any time frame for issuing a decision on a borrower defense claim, the second factor collapses into the first.  And as explained above, the Department's delay in issuing final decisions adheres to the rule of reason given the progress it has made toward bringing the matters to conclusion and its reasonable balancing of competing policy considerations.

The third, fourth, and fifth factors—"whether human health and welfare are at stake, the effect of expediting action on other agency priorities, and the nature and extent of the interests prejudiced by the delay"—are also interrelated.  *Cent. Sierra Envtl. Res. Ctr.*, 304 F. Supp. 3d at 952.  The effect on agency priorities of an order compelling the Department to issue final decisions with respect to pending borrower defense applications is addressed above and weighs heavily against mandamus relief.  *See supra* pp. 19-21.  As to the interests involved, the mere fact that the agency

action "could affect human health [or welfare]" is "not dispositive." *Cent. Sierra Envtl. Res. Ctr.*, 304 F. Supp. 3d at 952. Rather where, as here, "virtually the entire docket of the agency involves issues," *Sierra Club*, 828 F.2d at 798, concerning the financial welfare of student loan borrowers, the agency's consideration of such issues is necessarily intertwined with its balancing of its own resources and competing priorities. *Cent. Sierra Envtl. Res. Ctr.*, 304 F. Supp. 3d at 952 ("Whether the public welfare will benefit if action on [borrower defense claims] is prioritized 'depends crucially upon the competing priorities that consume [the Department's] time, since any acceleration here may come at the expense of delay of . . . action elsewhere.'" (citation omitted)). Because the Department's balancing of competing interests and priorities militates against compelling agency action here, the third and fifth factors do not tip the scales towards such relief.

The manner in which courts, particularly within this district, have treated § 706(1) claims challenging the Department of Homeland Security's (DHS) processing of I-485 applications provides further support for Defendants in this case. DHS issued policy memoranda that placed a pause on the agency's adjudication of certain such applications pending the Secretary's review and possible exercise of discretion to apply certain exemptions which could affect the processing of individual applications. *See, e.g.*, *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1168, 1175 (E.D. Cal. 2012). In reviewing claims challenging processing delays, courts in this district "have generally found delays of four years or less not to be unreasonable." *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071-72 (N.D. Cal. 2014). As the court in *Singh* explained, even where the agency action involved human health and welfare, a four-year delay in processing the relevant application was reasonable upon balancing of all the *TRAC* factors. *Singh*, 909 F. Supp. 2d at 1177. The Court should come to the same conclusion with respect to the far shorter delay at issue in this case.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and enter final judgment for Defendants on all claims. A proposed order is attached.

Dated: December 5, 2019                         Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General

1

2                  MARCIA BERMAN
Assistant Branch Director

3

4                  */s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)

5                  KATHRYN C. DAVIS (DC Bar No. 985055)
KEVIN P. HANCOCK

6                  Trial Attorneys
United States Department of Justice

7                  Civil Division, Federal Programs Branch
1100 L Street, NW

8                  Washington, DC 20005
Telephone: (202) 616-8098

9                  Fax: (804) 819-7417
robert.c.merritt@usdoj.gov

10

11                 *Counsel for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2019, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

Executed on December 5, 2019, in Charlottesville, Virginia.

/s/ *R. Charlie Merritt*
R. CHARLIE MERRITT