# EXHIBIT 1



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

DATE:          October 4, 2000

TO:            Jane Holman, Acting Director of Title IV Delivery, Direct Loan Program
               Debra Wiley, Ombudsman, Office of Student Financial Assistance

FROM:          Vanessa Santos, General Attorney
               Division of Postsecondary Education

SUBJECT:       Interstate Business College, ND Former Students' Defense to Repayment
               of their Direct Loans: Kristina Benedict & Heather Gust

**INTRODUCTION:** This memo is written in response to two former Interstate Business College (hereinafter "IBC") students' requests for a release from their obligation to repay their Direct Loans. █████████ and █████████ contend that IBC's misrepresentations, upon which they obtained Direct Loans, constitute a defense sufficient to avoid repayment of their Direct Loans, pursuant to 34 C.F.R. 685.206(c). Under the Direct Loan Regulations, a borrower can avoid repayment on the loan if she "asserts as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. 685.206(c). The Department will only recognize such claims as a defense against repayment if the school's act or omission has a clear, direct relationship to receipt or distribution of the loan or to the school's provision of educational services for which the loan was provided. 60 Fed. Reg. 37768 (Notice of Interpretation, July 21, 1995). Thus, Ms. ████████ and Ms. ████ have to prove three elements in order for their claims to be recognized: (1) that IBC engaged in wrongful conduct and that such conduct gives rise to a legal cause of action under North Dakota State law, (2) that IBC's actions were directly related to the receipt or distribution of their Direct Loans, and (3) that they were damaged as a result of IBC's actions.

In evaluating Ms. ████████ and Ms. ████ claims, I reviewed the following: (1) a letter from Ms. █████████ husband in which he alleges that IBC engaged in fraud when IBC staff lied to his wife about the certification and accreditation of their Medical Assistant (hereinafter "MA") program and that Ms. █████████ loan should be forgiven, (2) newspaper articles regarding IBC's closing and the criminal indictment of its owner, (3) a letter from Ms. █████ attorney wherein he alleges that IBC induced Ms. ████ into enrolling into their MA program through material misrepresentations and, as a result of IBC's wrongful conduct, Ms. ████ should be relieved of her obligation to repay her Direct loans, (4) Ms. ████ complaint initiating a lawsuit against

Interstate Business College Memo
October 4, 2000
Page 2

IBC, (5) the settlement agreement which ended another lawsuit brought by former students against IBC, (6) the North Dakota statutes and case law, and (7) Education's regulations and interpretation of the regulations.

After careful consideration of ███ these documents and the specific facts of Ms. Benedict and Ms. █████ cases, it appears that both students have adequately established sufficient causes of action against IBC under North Dakota law for negligent misrepresentation. Further, Ms. █████ and Ms. █████ have established that IBC's wrongful actions were directly related to their receipt of the Direct Loans and that they have been damaged as a result of IBC's actions in amounts sufficient to offset the full amounts due on their Direct loans.

**DISCUSSION:** **Factual Background:** IBC closed on January 22, 1998. The owner of the school, Susan Jensen, later pled guilty to failing to return to Education unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. Ms. █████ was not eligible for a closed school discharge because she had withdrawn from IBC more than 90 days prior to its closing in January, 1998. See 34 C.F.R. 682.408(d)(1)(i). However, she was given a $2,121.00 credit on her loan balance as a result of a credit balance she had with IBC or an unpaid refund due to her from IBC. (It is unclear from letter from Direct Loans which type of credit Ms. █████ received). See 34 C.F.R. 685.306. Thus, Ms. █████ loan balance was reduced from $6,625.00 to $4,504.00. Despite this credit, however, Ms. █████ still claims that she should not have to pay the remaining balance on her loan account. With regard to Ms. ███, she was not eligible for a closed school discharge because she had withdrawn or completed the program more than 90 days prior to IBC's closing in January, 1998. We do not have any information about whether she was among those students who received a credit or an unpaid refund, however her name does not appear on the Inspector General's list of students who received a refund or credit balance. Regardless, Ms. ███ is currently claiming that she should not have to pay the balance on her student loan account.

(1) █████████████: According to correspondence received from ████████████, Ms. █████ husband, Ms. █████ enrolled in the MA program at IBC in Fargo, North Dakota in 1996. According to the correspondence, Ms. █████ was told that at the end of the program, she would obtain her certificate as an MA. Ms. █████ took out two Direct loans (one for $4,000.00 and one for $2,625.00) to finance the program at IBC. However, the program in which Ms. █████ had actually enrolled was not an MA program but an administrative assistant program. Ms. █████ did not learn the truth about the program until she and her husband discovered that the IBC staff had lied about the MA program's accreditation. Mr. ███ stated in his letter that he later learned that "the reason the Direct Loan Program made payments to the school was due to the fact that IBC was billing under an accredited program for administrative assistants." Ms. █████ withdrew from the school on March 1, 1997 upon learning that the MA program was not accredited. She is now seeking to avoid repayment of her Direct loan.

Interstate Business College Memo
October 4, 2000
Page 3

(2) ██████████ River Educational Services, Inc., at North Dakota Corporation, d/b/a Interest Business College: On July 5, 2000, Ms.████ through her attorney, Gene Doeling, served Susan Jensen with a Complaint in the above-titled lawsuit. Mr. Doeling sent a letter to Shon Hastings, an Assistant United States Attorney in Fargo, North Dakota, asserting that Ms. ████ has a defense to repayment of her loan under 34 C.F.R. 685.206(c). He enclosed a copy of Ms. ████Complaint. Mr. Doeling also stated that he had obtained judgments for approximately 40 former IBC students against IBC based on a Stipulation, which he enclosed. See Discussion   3. Ms. Hastings forwarded Mr. Doeling's letter to our office on July 27, 2000 for review and comment. Ms. ████suit against IBC is still pending.

In her Complaint, Ms.████contends that in the summer of 1995, she enrolled in IBC's Medical Administrative Assistant program (presumably the same program which Mr.████████refers to as a Medical Assistant program). In her Complaint, Ms.████states that she obtained $15,000.00 in Direct loans to cover the cost and expenses of the program. Education's records show that Ms.████obtained five Direct Loans totaling $11,925.00. Ms. ████ states that she was induced into enrolling in IBC based upon the staff's false representations. Apparently, the IBC representative told Ms. ████ that the MA program was fully accredited, that she would be "taught by experienced instructors who were MA's themselves," that she would be "supplied with computers equipped with the most advanced computerized accounting and MA software," and that IBC had a "90% placement rate for their graduates." Ms. ████ alleges in her Complaint that none of the above assertions were true. She states that she ceased attending IBC in March 1997.[1]

(3) ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████ v. Red River Educational Services.
Interstate Business College, and Susan Jensen individually and, dba Interstate Business College (hereinafter 40 plaintiff lawsuit): As stated above, in his letter to Shon Hastings, Mr. Doeling stated that he had obtained judgments for approximately 40 former IBC students, including 31 students in the MA program, in a separate lawsuit against IBC. In that lawsuit, the parties settled the suit and stipulated, in a settlement agreement adopted by the plaintiffs and IBC through their attorney, to the following facts which established a pattern of negligent misrepresentation:

(1) that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;
(2) that the term "in the field" is a term of art defined by the Accrediting Counsel for Independent Colleges and Schools as requiring "a direct use of the skills taught in the

---

[1] It is uncertain from the Complaint whether Ms. ████completed the MA program or she withdrew. Regardless, we will use the March 1997 date as her date of separation from IBC.

Interstate Business College Memo
October 4, 2000
Page 4

program." Also, ACICS defines "related field" as employment as a position that
requires "an indirect use of the skills taught in the program;"

(3) that based on the representations by the enrollment counselor, the Plaintiffs signed an
agreement enrolling in the Medical Administrative Assistant program (MAA) and
incurring thousands of dollars in loan debt;

(4) that the program was not accredited by any accrediting agency;

(5) that the graduates of this program were ineligible to take the certification exam as an
MA until they had one year of full-time work experience in a position "in their field";

(6) that graduation with a degree as an MA, without being certified, gives candidates no
greater chance of employment or pay grade, than would be available without the degree;

(7) that it was critical that the training received at IBC enable plaintiffs to secure
employment qualifying graduates for the exam;

(8) that IBC's past employment placement was lower than stated during the enrollment
interview;

(9) that the enrollment counselor had no personal knowledge of the placement statistics
or of the meaning of "in the field" as defined by the accrediting agencies nor did she
intend to deceive the students with her misstatements;

(10) that there was no evidence that Susan Jensen personally participated in the
preparation of the enrollment materials or that she had any intent to deceive;

(11) that the Plaintiffs should be awarded damages in the amount of three times their
enrollment contract, pursuant to NDCC 15-20.4-09[2], lost wages, books and travel
expenses and miscellaneous expenses;

(12) that the lawsuit be dismissed.

The court entered the consent settlement agreement and issued judgments in favor of the
plaintiffs, thus, concluding the lawsuit. The facts in this suit were conclusively established by
the stipulation agreement between the litigation parties and not by a court or jury. However,
because IBC's stipulated to engaging in negligent misrepresentation in this lawsuit and the court
issued judgments against it as a result, IBC cannot argue in any future lawsuits that IBC *did not*
engage in negligent misrepresentation (under the legal theory of collateral estoppel). Thus, if
Ms. ███████ lawsuit moves forward, IBC would not be able to successfully argue that IBC did not
engage in the same negligent misrepresentation with her.

Further, it should be noted that the damage amount set forth in the stipulation is based solely on
an agreement between the litigation parties and the provable facts of each plaintiff's case. In the
stipulation, IBC admitted to engaging in negligent misrepresentation. Yet, IBC agreed to give
the plaintiffs treble damages pursuant to NDCC 15-20.4-09 which is a damage provision for
defendants who engage in fraud. *See* Footnote 2. Fraud requires a finding of an *intent to deceive.*
IBC did not admit to such an intent and specifically included in the stipulation that neither Susan
Jensen nor the IBC recruitment staff intended to deceive the students. It is not clear from Mr.
Goeling's letter how the litigation parties agreed on the damage amount. However, perhaps
during the negotiations, the plaintiffs would only agree to settle if they received treble damages

---

[2] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular
issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the
pupils thereof, may recover from such institution or person three times the amount paid.

Interstate Business College Memo
October 4, 2000
Page 5

or the amount of damages that they would have received had they prevailed on a fraud claim. Regardless, there is an inconsistency between IBC's stipulation to negligent misrepresentation and the damage awards, which would only be warranted if IBC had stipulated to engaging in fraud. Therefore, given the discrepancy, the damage figure from the 40 plaintiff suit will not be used in our analysis of Ms. ███████ and Ms. ████ claims.

## LEGAL ANALYSIS:

**(1) IBC's Actions Violate the Applicable State Law:** In evaluating a claim for a defense against repayment of a Direct loan, one must look to the law of the state where the alleged wrongful act or omission occurred. In this case, IBC's alleged wrongful actions occurred in North Dakota. Thus, we must evaluate Ms. ███████ and Ms. ████ claims under North Dakota law.

Under the North Dakota Code, a negligent misrepresentation is a statement made for the guidance of others which is not warranted by the information of the person making it. NDCC 8-03-08(2). The North Dakota courts have recognized a statutory claim for relief based on negligent misrepresentation. See Bourgois v. MDU, 466 N.W.2d 813 (N.D. 1991). In Bourgois, the court found that the plaintiff, Bourgois, had sufficiently established that the Defendant, MDU, had induced Bourgois into entering into a contract to demolish MDU's closed steam plant by making false statements about the demolition project which were unwarranted by the information available to MDU. (MDU knew that there was buried concrete in the area where Bourgois was to perform the demolition that would have made the contract much more costly for Bourgois to perform). However MDU, never disclosed this fact during the contract negotiations).

The alleged facts of Ms. ███████ and Ms. ████ cases fit within the definition of negligent misrepresentation under the North Dakota law. Moreover, in the 40 plaintiff lawsuit, IBC stipulated to facts similar to those alleged by ███████ and ████ that established a negligence-based cause of action. Here, IBC staff made statements to both students that it had an accredited MA program which fulfilled the requirements of an MA certificate. IBC staff also told Ms. ████ that IBC had a 90% success rate placing MA graduates in their field. The stipulation establishes that neither of these statements were warranted by the information available to the IBC staff. However, relying on these same statements, both Ms. ███████ and Ms. ████ enrolled in IBC and obtained student loans to participate in the MA program. When Ms. ███████ discovered that the MA program was not accredited, she withdrew from IBC in March 1997 owing about $6,000.00 in student loans. Likewise, Ms. ████ separated from IBC in March 1997, owing about $12,000.00 in student loans.

**(2) IBC's Wrongful Actions are Directly Related to Ms. ███████ and Ms. ████ Receipt of the Direct Loans:** If IBC had not misrepresented the accreditation and qualifications of its MA program, Ms. ███████ and Ms. ████ would not have enrolled in its program. If Ms. ███████ and Ms. ████ had not enrolled in IBC, they would not have obtained Direct Loans. Therefore, IBC's negligent misrepresentation is directly related to Ms. ███████ and Ms. ████ receipt of their Direct Loans. Thus, both students have satisfied the requirement under Education's

Interstate Business College Memo
October 4, 2000
Page 6

interpretation of its regulations that the cause of action against the school be directly related to the receipt or distribution of the loan or the school's educational services.

**(3) Ms.████ and Ms.███ were damaged as a result of IBC's Negligent Misrepresentation**: Ms.████ and Ms.██ took out loans to pay for tuition for IBC's MA program. The stipulated facts from the 40 plaintiff lawsuit establish that had they completed the program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms.████ and Ms.███ were damaged by incurring debts to pay tuition for an education that has no value.

To quantify their damages, we have to determine the amount of damages they could recover from IBC under state law. The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory. Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could have been anticipated or not, absent exceptional circumstances. NDCC 32-03-20. *See also* Delzer v. United Bank, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money, paid out in two installments, to the Dezler's to operate their ranch. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan. The Delzers lost all of their collateral and their ranch. During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the Delzer's damages were foreseeable. The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages).

Here, both Ms.████ and Ms.███ would be entitled to receive damages from IBC in an amount that would compensate them for all the losses directly caused by IBC's negligent misrepresentation. Given the fact that their education from IBC has virtually no value, the amount of their damages is at least the amount of tuition they paid to obtain that education. Presumably, the total amount of both Ms.████ and Ms.████ Direct loans were used to pay for their tuition. Thus, Ms.████ damages equal the principal amount of the Direct loans she obtained to pay for her tuition minus her credit, or $4,504.00. Likewise, Ms.███ damages equal the principal amount of the Direct loans she obtained to pay for her tuition, or $11,925.00. These amounts are then used to offset the loan balances due and owing to Education on each student's account, notwithstanding unpaid, accrued interest. Therefore, Ms.████ and Ms.███ loan obligations are fully offset by the amount of their damages against IBC.

**CONCLUSION**: Based on the foregoing, we believe that Ms.████ and Ms.███ have adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to their receipt of the Direct loans, and (3) they were damaged by IBC's misrepresentations in the amount of their Direct Loans. We believe that Ms.████ and Ms.███ claims should be recognized as a defense to collection of their loans. Further, we recommend that Ms.███████

Interstate Business College Memo
October 4, 2000
Page 7

and Ms. ▇▇ be relieved of their obligation to repay their Direct loans, provided, however, that the allegations which they have asserted against IBC are not later proven to be false.  If it is proven that Ms. ▇▇▇▇▇ and Ms. ▇▇▇ fabricated their assertions against IBC, their Direct Loan obligations should be immediately reinstated in the amount due and owing at the time relief was provided to them pursuant to the recommendation in this memo.

I have attached to this Memorandum a draft copy of a letter to Mr. ▇▇▇▇▇▇ and Mr. Doeling in response to their inquires.  I recommend that this letter or a similar one be sent to these gentlemen with regard to Ms. ▇▇▇▇▇ and Ms. ▇▇▇▇ loans.

If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE OMBUDSMAN
OFFICE OF STUDENT FINANCIAL ASSISTANCE

October 4, 2000

Gene W. Doeling, Esq.
1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota 58107-0029

Re:   United States v. Heather Gust
      Civil No. A3-00-36

Dear Mr. Doeling:

I am in receipt of the letter which you sent to Shon Hastings in the U.S. Attorney's Office in Fargo. She has asked our legal office to look into your inquiry about a defense to repayment of Ms. ███ loan, pursuant to 34 C.F.R. 685.206(c). In conjunction with our legal counsel, the officials in the Direct Loan program have reviewed the specific facts of Ms. ███ case, the materials you have provided, and the current law in North Dakota. After careful consideration of Ms. ███ specific situation, Education has determined that she has adequately established a sufficient cause of action against IBC for negligent misrepresentation under North Dakota law. As a result, she will be relieved of her obligation to repay her loans provided, however, that it is not later proven that her allegations against IBC were false. If, at some point in the future, it is proven that Ms. ███ allegations against IBC were untrue, her Direct Loan obligation will be reinstated retroactive from the date she was relieved of that obligation.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit Ms. ███ account. If you have any further questions or comments, please feel free to contact me, toll free, at (877) 557-2575.

Sincerely,

Debra Wiley
Ombudsman
Student Financial Assistance

cc: Shon Hastings, AUSA
    Jane Holman, Director Loan Program



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE OMBUDSMAN
OFFICE OF STUDENT FINANCIAL ASSISTANCE

October 4, 2000

████████████████████████████

124 Woodland Court
Highlands Ranch
Denver, Colorado 80126

Re:    Defense to Repayment of Direct Loans

Dear Mr. ███████ and Ms. ███████:

This letter is the belated response to your inquiry of November 15, 1999. On behalf of the Department, I apologize for the delay in getting this response to you and appreciate your patience. In conjunction with our legal counsel, the officials within the Direct Loan program have carefully reviewed the specific facts of your case, the materials you have provided to us and the current law in North Dakota. As a result, Education has determined that Ms. ███████ has adequately established a sufficient cause of action against IBC for negligent misrepresentation under North Dakota law. Therefore, Ms. ███████ will be relieved of her obligation to repay her Direct loans, provided, however, that it is not later proven that her allegations against IBC were false. If, at some point in the future, it is proven that Ms. ███████ allegations against IBC were untrue, her Direct Loan obligation will be reinstated retroactive from the date she was relieved of that obligation.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit Ms. ███████ account. If you have any further questions or comments, please feel free to contact me, toll free, at (877) 557-2575.

Sincerely,

Debra Wiley
Ombudsman
Student Financial Assistance

cc: Jane Holman, Direct Loan Program

# EXHIBIT 2



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

**DATE:**      **February 6, 2001**

**TO:**        **Dan Hayward, Director, Student Channel Repayment,
               Student Financial Assistance**

**FROM:**      **Vanessa Santos, General Attorney** 
               **Division of Postsecondary Education**

**SUBJECT:**   **Interstate Business College, ND Former Students' Defense to
               Repayment of their Direct Loans**

**INTRODUCTION:** This memorandum is written in response to correspondence from attorney Dale Craft on behalf of his 25 clients who were former Interstate Business College ("IBC") students. He is requesting that we recognize his clients' defense to repayment of their Direct Loans pursuant to 34 C.F.R. §685.206(c). The 25 students include:[1]

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.

---

[1] Two of the 25 "students", Linda Barth and Vicki Bergman, are actually parents who obtained PLUS loans for their daughters, Christy Tursso and Dawn Weaver respectively, to attend IBC. All references to "the students" will include these two parents.

Interstate Business College Memo
February 6, 2001
Page 2 of 11

18.
19.
20.
21.
22.
23.
24.
25.



These students' are presenting the same defense to repayment of their Direct Loans as█████
█████ and████████████did, which was addressed in my October 4, 2000 Memorandum.
Attached as Exhibit A. As Ms. ████ and Ms.████████did, these 25 students contend that IBC's
false representations, which induced them to enroll into IBC and obtain Direct Loans, constitute
a defense sufficient to avoid repayment of their Direct Loans. Under the Direct Loan
Regulations, a borrower can avoid repayment on the loan if he or she "asserts as a defense
against repayment, any act or omission of the school attended by the student that would give rise
to a cause of action against the school under applicable State law." 34 C.F.R. §685.206(c). The
Department will only recognize such claims as a defense against repayment if the school's act or
omission has a clear, direct relationship to receipt or distribution of the loan or to the school's
provision of educational services for which the loan was provided. 60 Fed. Reg. 37768 (Notice
of Interpretation, July 21, 1995). Thus, these 25 students have to prove three elements in order
for their claims to be recognized: (1) that IBC engaged in wrongful conduct and that such
conduct gives rise to a legal cause of action under State law (in this case North Dakota law); (2)
that IBC's actions were directly related to the receipt or distribution of their Direct Loans; and
(3) that they were damaged as a result of IBC's actions.

In evaluating the students' claim, I reviewed the following: (1) my October 4, 2000
memorandum and underlying documentation; (2) letters from Mr. Craft wherein he alleges that
IBC induced the students into enrolling into their educational programs and obtain Direct Loans
through material misrepresentations and, as a result of IBC's wrongful conduct, the students
should be relieved of their obligation to repay their Direct loans; (3) Stipulation agreements,
which ended four different lawsuits brought by former students against IBC; (4) the North
Dakota statutes and case law; and (5) Education's relevant regulations and interpretation of those
regulations.

After careful consideration of these documents and the specific facts of these students' cases, all
of the 25 students, [2] except█████████████, have adequately established sufficient causes of
action against IBC under North Dakota law for negligent misrepresentation. Further, these 24
students have established that IBC's wrongful actions were directly related to their receipt of the
Direct Loans and that they have been damaged as a result of IBC's actions in amounts sufficient
to offset the full amounts due on their Direct loans. Since█████████████ suit against IBC

---

[2] According to the records I received from the Direct Loan Program,█████████does not have any Direct
Loans. Therefore, this Memo, and the decision herein, does not apply to her. If it is determined that she does have
Direct Loans that are due and owing, given the fact that IBC admitted to engaging in negligent misrepresentation
with regard to her enrollment, she should be relieved of her obligation to repay her Direct Loans.

Interstate Business College Memo
February 6, 2001
Page 3 of 11

has not yet been reduced to a judgment or a Stipulation, I am unable to make a recommendation on her defense to repayment. If, at some point in the future, IBC stipulates or it is determined that IBC engaged in fraud or negligent misrepresentation, her claim will be reviewed at that time.

**DISCUSSION: Factual Background:** IBC closed on January 22, 1998. The owner of the school, Susan Jensen, later pled guilty to failing to return to the Department unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. The following students received a credit for unpaid refunds: ▮▮▮▮▮▮▮ ($278.75) and ▮▮▮▮ ▮▮▮▮($1,200.24). The following students received a refund for their Direct Loans: ▮▮▮▮▮ ($2,741.00), ▮▮▮▮▮▮▮ ($3,472.00), and ▮▮▮▮▮▮▮ ($4,017.00).[3] We do not have any information about whether the remaining students were among the ones who received a credit or an unpaid refund, however their names do not appear on the Inspector General's list of students who received a refund or credit balance. Regardless, all of the students are claiming that they should not have to pay the balance on their student loan accounts.

**(1)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮: These seventeen students were part of a lawsuit against IBC, along with 23 other former students (hereinafter "40 plaintiff lawsuit"). In January 2000, the parties settled the suit and stipulated, in a settlement agreement adopted by the plaintiffs and IBC through their attorney, to the following facts which established a pattern of negligent misrepresentation under North Dakota law:

1.   that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;

2.   the Accrediting Counsel for Independent Colleges and Schools defines the term "in the field" as requiring "a direct use of the skills taught in the program." Also, ACICS defines "related field" as employment as a position that requires "an indirect use of the skills taught in the program";

3.   that based on the representations by the enrollment counselor, the Plaintiffs signed an agreement enrolling in the Medical Administrative Assistant program (MAA) and incurring thousands of dollars in loan debt;

4.   that the program was not accredited by any accrediting agency;

5.   that the graduates of this program were ineligible to take the certification exam as a Medical Assistant until they had one year of full-time work experience in a position "in their field";

---

[3] According to the Inspector General's audit report, Ms. Bauer Hill did receive a $1,531.00 refund.

6.      that graduation with a degree as an MAA, without being certified, gives candidates no greater chance of employment or pay grade, than would be available without the degree;

7.      that it was critical that the training received at IBC enable plaintiffs to secure employment qualifying graduates for the exam;

8.      that IBC's past employment placement was lower than stated during the enrollment interview;

9.      that the enrollment counselor had no personal knowledge of the placement statistics or of the meaning of "in the field" as defined by the accrediting agencies nor did she intend to deceive the students with her misstatements;

10.      that there was no evidence that Susan Jensen personally participated in the preparation of the enrollment materials or that she had any intent to deceive;

11.      that the Plaintiffs should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC §15-20.4-09[4], lost wages, books and travel expenses and miscellaneous expenses;

12.      that the lawsuit be dismissed.

The court entered the Stipulation and issued judgments in favor of the plaintiffs, thus, concluding the lawsuit.[5] The facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. However, because IBC stipulated to engaging in negligent misrepresentation in this lawsuit and the court issued judgments against it as a result, IBC cannot argue in any future lawsuits that it *did not* engage in negligent misrepresentation (under the legal theory of collateral estoppel). Thus, IBC is bound by its admission of negligent misrepresentation in all future lawsuits.

Further, it should be noted that the damage amount set forth in the Stipulation is based solely on an agreement between the litigation parties and the provable facts of each plaintiff's case. In the Stipulation, IBC admitted to engaging in negligent misrepresentation. Yet, IBC agreed to give the Plaintiffs treble damages pursuant to NDCC15-20.4-09, which is a damage provision for defendants who engage in fraud. *See* Footnote 4. Fraud requires a finding of an *intent to deceive*. IBC did not admit to such intent and specifically included in the Stipulation that neither Susan Jensen nor the IBC recruitment staff intended to deceive the students. Perhaps during the negotiations, the plaintiffs would only agree to settle if they received treble damages or the amount of damages that they would have received had they prevailed on a fraud claim. Regardless, there is an inconsistency between IBC's stipulation to negligent misrepresentation and the amount of the damage awards, which would only be warranted if IBC had stipulated to

---

[4] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the pupils thereof, may recover from such institution or person three times the amount paid.

[5] According to Mr. Craft, ▮▮▮▮, ▮▮▮▮, ▮▮▮▮ and ▮▮▮▮ did not have their claims reduced to judgment because of other pending claims in their individual cases against IBC. However, since IBC admitted to engaging in negligent misrepresentation and inducing these four students into enrolling into the MA program and because IBC agreed to pay them damages based on the Stipulation, these four students will be considered in the same category as their co-plaintiffs for purposes of this Memo.

engaging in fraud.  Therefore, given the discrepancy, the damage figure from this lawsuit will
not be used in our analysis of other student's claims that were not part of this lawsuit.

(2)██████████████████: These two students were Plaintiffs in a separate lawsuit
against IBC for allegations of fraud with regard to IBC's Computer Aided Drafting (CAD)
program. On January 10, 2000 the parties signed a Stipulation for Entry of Judgement in which
IBC admitted to engaging in actual fraud, as defined under North Dakota law.  In the stipulation,
the following facts were stipulated to:

1.    That based on the representations by the enrollment counselor, Ms.████and
      Mr.████ signed an agreement enrolling in the CAD program and incurred in
      excess of $15,428.00 each in debt;

2.    That IBC agents and employees negligently made oral and/or written
      representations which were positive assertions, in a manner not warranted by the
      information of the person making it, of that which was not true though the person
      believed it to be true, for the purpose of inducing Ms.████ and Mr.████into
      contracting with IBC for educational services;

3.    That IBC agents represented that Ms.████and Mr.████ would be placed in a
      curriculum designed specifically and exclusively for persons interested in
      becoming experts in CAD;

4.    That IBC agents represented that the program was taught by experienced
      instructors who were themselves experts in CAD;

5.    That IBC agents represented that Ms.████ and Mr.████ would be supplied
      with computers equipped with the most advanced CAD software;

6.    That IBC agents represented that the school had a 90% success rate in placing
      CAD graduates in-the-field;

7.    That IBC agents represented that the program was fully accredited;

8.    That IBC's CAD program had not been specifically and exclusively designed for
      persons interested in becoming experts in CAD, that the instructors were not
      experts in CAD, that the computers were not loaded with the most advanced CAD
      software, that IBC had not experienced a 90% success rate in placing CAD
      graduates in-the-field, and that the CAD program was not fully accredited;

9.    That IBC's affirmative misstatements induced Ms.████ and Mr.████ to enroll
      in their CAD program and as a direct and proximate result of their reliance on
      IBC's fraudulent statements of material facts, they sustained pecuniary injury in
      the form of loss or diminution of previous employment, loss of employment
      during school, failure to receive compensation in accordance with representations
      and costs and expenses of schooling;

10.   That Ms.████ and Mr.████should each be awarded damages in the amount of
      three times their enrollment contracts, pursuant to NDCC §15-20.4-09, lost
      wages, books and travel expenses and miscellaneous expenses.

On June 14, 2000 the North Dakota court entered the Stipulation for Entry of Judgment in favor
of Ms.████and Mr.████ thus, concluding the lawsuit. As in the 40-plaintiff suit against
IBC, the facts in this suit were conclusively established by the stipulation agreement between the
litigation parties and not by a court or jury.   Also, as in the 40-plaintiff lawsuit, it should be

Interstate Business College Memo
February 6, 2001
Page 6 of 11

noted that the damage amount set forth in the stipulation is based solely on an agreement
between the litigation parties and the provable facts of Ms. Glines and Mr. Engle's case.

(3)██████████████████: These two students were Plaintiffs in a separate lawsuit
against IBC for allegations of fraud with regard to IBC's Computer Information Specialist (CIS)
program. The parties signed a Stipulation for Entry of Judgement in which IBC admitted to
engaging in actual fraud, as defined under North Dakota law. IBC admitted:

1. That it made "positive assertions, in a manner not warranted by the information of the
   person making it, of that which was not true through the person believed the
   representation to be true, for the purpose of inducing the Plaintiffs into contracting
   with IBC for educational services";
2. That IBC's staff made material misrepresentations that were not true; that the CIS
   program was specifically and exclusively designed for persons interested in becoming
   experts in CIS, that the instructors were experts in CIS, that the computers were
   loaded with the most advanced CIS software, that IBC had experienced a 90%
   success rate in placing CIS graduates in-the-field, and that the CIS program was fully
   accredited;
3. That IBC's affirmative misstatements induced Ms.████ and Ms.████ to
   enroll in the CIS program and as a direct and proximate result of their reliance on
   IBC's fraudulent statements of material facts, they sustained pecuniary injury in the
   form of loss or diminution of previous employment, loss of employment during
   school, failure to receive compensation in accordance with representations and costs
   and expenses of schooling;
4. That IBC would pay Plaintiffs money damages, which would include the amount of
   their enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages books
   and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of Ms.████ and against
IBC in the amount of $52,200.00, inclusive of costs and disbursements. Judgment was also
entered in favor of Ms.████ and against IBC in the amount of $52,200.00, inclusive of
costs and disbursements. As in the 40-plaintiff suit against IBC, the facts in this suit were
conclusively established by the stipulation agreement between the litigation parties and not by a
court or jury. Also, as in the 40-plaintiff lawsuit, it should be noted that the damage amount set
forth in the stipulation is based solely on an agreement between the litigation parties and the
provable facts of Ms.████ and Ms.████ case.

(4)████████: Ms.████ was a Plaintiff in her own lawsuit against IBC for allegations of
fraud with regard to IBC's Medical Transcriptionist (MT) program. She and a representative
from IBC signed a Stipulation for Entry of Judgement in which IBC admitted to engaging in
actual fraud, as defined under North Dakota law. IBC admitted:

1. That it made "positive assertions, in a manner not warranted by the information of the
   person making it, of that which was not true through the person believed the

Interstate Business College Memo
February 6, 2001
Page 7 of 11

representation to be true, for the purpose of inducing Plaintiff into contracting with IBC for educational services";

2. That IBC's staff had made material misrepresentations that were not true; that the MT program had been specifically and exclusively designed for persons interested in becoming experts in MT, that the instructors were experts in MT, that the computers were loaded with the most advanced MT software, that IBC had experienced a 90% success rate in placing MT graduates in-the-field, and that the MT program was fully accredited;

3. That IBC's affirmative misstatements induced Ms. ▇▇▇▇ to enroll in the MT program and as a direct and proximate result of her reliance on IBC's fraudulent statements of material facts, she sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

4. That IBC would pay Ms. ▇▇▇▇ money damages, which would include the amount of her enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of Ms. ▇▇▇▇ and against IBC in the amount of $23,175.00 inclusive of costs and disbursements. As in the other lawsuits against IBC, the facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. Also, as in the other lawsuits, it should be noted that the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of Ms. ▇▇▇▇ case.

(5) ▇▇▇▇▇ and ▇▇▇▇▇▇: According to correspondence from Mr. Craft and NSLDS, in 1996 these two women obtained PLUS loans for their daughters to attend IBC. ▇▇▇▇▇ daughter is ▇▇▇▇▇ and ▇▇▇▇▇▇▇ daughter is ▇▇▇▇▇. Both Ms. ▇▇▇ and Ms. ▇▇▇▇ were part of the 40-plaintiff suit against IBC. According to Mr. Craft, after obtaining the judgment in the 40-plaintiff lawsuit, he learned that these two women had PLUS loans for two of the plaintiffs in that suit. He argues that Ms. ▇▇▇ and Ms. ▇▇▇▇ claims arise out of the misrepresentations made to their daughters and thus, their obligations on the PLUS loans should be relieved. Ms. ▇▇▇ obtained a PLUS loan for her daughter totaling $8,350.00 and Ms. ▇▇▇▇ obtained a PLUS loan for her daughter totaling $4,800.00.

## LEGAL ANALYSIS:

(1) **IBC's Actions Violate the Applicable State Law:** In evaluating a claim for a defense against repayment of a Direct loan, one must look to the law of the state where the alleged wrongful act or omission occurred. In this case, IBC's alleged wrongful actions occurred in North Dakota. Thus, we must evaluate these 24 students' claims under North Dakota law. Since IBC admitted in the Stipulations of four lawsuits referenced above, that it engaged either in negligent misrepresentation or actual fraud, the students in those lawsuits have satisfied the legal analysis necessary to determine that IBC's action violated North Dakota law. However, Ms.

Interstate Business College Memo
February 6, 2001
Page 9 of 11

**(a)  The students were damaged as a result of IBC's Negligent Misrepresentation:**

The students in the 40-plaintiff lawsuit obtained Direct loans to pay for IBC's MA program.  The stipulated facts from this lawsuit established that had these students completed the MA program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, the students were damaged because they incurred debts to pay tuition for an education that has no value.

Likewise, Ms. ▆▆▆ and Mr. ▆▆▆ obtained Direct Loans to pay for IBC's CAD program.  The Stipulation of Judgment established that had they completed the CAD program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in CAD, the computer software was not the most advanced and the staff were not experts in CAD, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ▆▆▆ and Mr. ▆▆▆ were damaged because they incurred debts to pay tuition for an education that has no value.



Ms. ▆▆▆ and Ms. ▆▆▆ obtained Direct Loans to pay for IBC's CIS program.  The Stipulation of Judgment established that had they completed the CIS program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in CIS, the computer software was not the most advanced and the staff were not experts in CIS, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ▆▆▆ and Ms. ▆▆▆ were damaged because they incurred debts to pay tuition for an education that has no value.

Similarly, Ms. ▆▆▆ obtained Direct Loans to pay for IBC's MT program.  The Stipulation of Judgment established that had she completed the MT program, her degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in MT, the computer software was not the most advanced and the staff were not experts in MT, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ▆▆▆ was damaged because she incurred debts to pay tuition for an education that has no value.

Ms. ▆▆▆ and Ms. ▆▆▆ both obtained PLUS loans for their daughters to be trained as ▆▆▆ Assistants. As explained in the first paragraph of this section, Ms. ▆▆▆ and Ms. ▆▆▆ degrees from IBC would have been worthless given that (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ▆▆▆ and Ms. ▆▆▆ were damaged in that they obtained PLUS loans to pay for their daughters' tuition for an education that has no value.

Interstate Business College Memo
February 6, 2001
Page 10 of 11

## (b) Amount of Damages

Pursuant to the Stipulations filed in all four of the lawsuits against IBC, the damages owed to these students has been quantified as being three times their enrollment contract, plus lost wages, books, travel expenses and miscellaneous school expenses. However, as stated previously, the amount of the damages awarded in the lawsuits was governed by an agreement of the parties, not by the court or a jury. Thus, the damage awards and the formula used in these lawsuits will not be used as a measure of damages for students who were not parties to the suit.

To quantify Ms. ███ and Ms. ████████ damages, we have to determine the amount of damages they could recover from IBC under state law. The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory. Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could have been anticipated or not, absent exceptional circumstances. NDCC §32-03-20. *See also* Delzer v. United Bank, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money to the Dezler's to operate their ranch. The loan was to be paid out in two installments. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan. The Delzers lost all of their collateral and their ranch. During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the ███ damages were foreseeable. The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages).

Here, both Ms. ███ and Ms. ████ would be entitled to receive damages from IBC in an amount that would compensate them for all the losses directly caused by IBC's negligent misrepresentations to their daughters. Given the fact that Ms. ███ and Ms. ████ education from IBC has virtually no value, the amount of their damages is at least the amount of tuition they paid to obtain that education. Presumably, the total amount of the PLUS loans was used to pay for a portion of Ms. ███ and Ms. ████ tuition at IBC. Thus, Ms. ███ damages equal the principal amount of the PLUS loan she obtained to pay for her daughter's tuition minus any credit given, or $8,350.00. Likewise, Ms. ████ damages equal the principal amount of the PLUS Loans she obtained to pay for her daughter's tuition, or $4,521.25. These amounts are then used to offset the loan balances due and owing to Education on Ms. ███ and Ms. ████ student loan accounts, notwithstanding unpaid, accrued interest. Therefore, both Ms. ███ and Ms. ████ PLUS loan obligations are fully offset by the amount of their damages against IBC.

For the students in the lawsuits, there damage awards are also used to offset the loan balances due and owing to Education, notwithstanding unpaid, accrued interest. Thus, their loan obligations are fully offset by the amount of their damages against IBC.

**CONCLUSION:** Based on the foregoing, we believe that 24 students have adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to their receipt of the

Interstate Business College Memo
February 6, 2001
Page 11 of 11

Direct loans, and (3) that they were damaged by IBC's misrepresentations in the amount of their Direct Loans. We believe that these students' claims should be recognized as a defense to collection of their Direct loans only. Further, we recommend that these students be relieved of their obligation to repay their Direct loans, provided, however, that the allegations that they have asserted against IBC are not later proven to be false. If it is proven that these students fabricated their assertions against IBC, their Direct Loan obligations should be immediately reinstated in the amount due and owing at the time relief was provided to them pursuant to the recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft in response to his inquires. I recommend that this letter or a similar one be sent to him with regard to his clients' loan obligations.

If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.

Exhibits/Attachments

cc: Rosa Wright, Direct Loan Program
Adam Evans, AWG Branch Chief
Debra Wiley, OSFA Ombudsman
Naomi Randolph, Closed Schools



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF THE OMBUDSMAN
OFFICE OF STUDENT FINANCIAL ASSISTANCE

February 6, 2001

Dale J. Craft, Esq.
1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota 58107-0029

Re:   Defense to Repayment of Direct Loan Debt  on behalf of:

Dear Mr.  Craft:

I am in receipt of your requests, on behalf of your 25 clients, to recognize their defense to
repayment of their Direct loans, pursuant to 34 C.F.R. §685.206(c).   In conjunction with our
legal counsel, the officials in the Direct Loan program have reviewed the specific facts of your
clients' cases, the materials you have provided, and the current law in North Dakota.  After
careful consideration of each student's specific situation, we have determined that all 25 of your
clients, except                               have adequately established a sufficient cause of action
against IBC for negligent misrepresentation under North Dakota law.  As a result, they will be
relieved of their obligations to repay their Direct Loans provided, however, that it is not later
proven that their allegations against IBC were false.  If, at some point in the future, it is proven
that their allegations against IBC were untrue, their Direct Loan obligation will be reinstated
retroactive from the date they were relieved of that obligation.  At this  time, we are unable to
make a determination about Ms.          claim given the posture of her suit against IBC.  If her suit
against IBC is resolved in her favor, we will be reconsider her defense  to repayment and make a
final determination.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to
credit your clients' accounts.  If you have any further questions or comments, please feel free to
contact me, toll free, at (202) 205-2672.

Sincerely,

Dan Hayward
Director, Student Channel Repayment
Student Financial Assistance

# EXHIBIT 3



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

TO:             Dan Hayward
                Student Channel Repayment
                Federal Student Aid

FROM:           Vanessa A. Santos
                Division of Postsecondary Education

DATE:           February 11, 2003

SUBJECT:        Interstate Business College, ND Former Students' Defense to Repayment
                of their Direct Loans

## INTRODUCTION:

This memorandum addresses correspondence dated February 20, 2002 from attorney Dale Craft
on behalf of his clients, former Interstate Business College ("IBC") students. He requests that
we recognize his clients' claims as a complete defense to repayment of their Direct Loans
pursuant to 34 C.F.R. §685.206(c). Like Craft's other clients,[1] the 58 borrowers listed in
Attachment A to this memorandum[2] contend that IBC's false representations induced them to
enroll into IBC and obtain Direct Loans and constitute fraud under North Dakota law, which
permits them to avoid repayment of their Direct Loans under 34 C.F.R. §685.206(c).

Direct Loan regulations provide that a borrower may avoid repayment on a Direct loan to the
extent that he or she "asserts as a defense against repayment, any act or omission of the school
attended by the student that would give rise to a cause of action against the school under
applicable State law." 34 C.F.R. §685.206(c). The Department will only recognize such claims
as a defense against repayment if the school's act or omission has a clear, direct relationship to
receipt or disbursement of the loan or to the school's provision of educational services for which
the loan was provided. 60 Fed. Reg. 37768 (Notice of Interpretation, July 21, 1995). Thus, in
order to establish a defense to repayment, these 58 students must prove three elements: (1) that
IBC engaged in wrongful conduct that gives rise to a legal cause of action under State law (in
this case North Dakota law); (2) that IBC's actions were directly related to the receipt or
distribution of their Direct Loans or the provision of educational services paid for with those
loans; and (3) that they were in fact injured as a result of IBC's actions, and that those injuries

---

[1] Mr. Craft's previous clients (see my February 2001 memo) as well as ▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓(see my
October 4, 2000 Memorandum)
[2] Eleven of the 58 are actually parents who obtained PLUS loans for their children. All references to "the students"
will include these parents.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation*

Interstate Business College Memo
February 11, 2003
Page 2 of 8

can be measured as a specific damage amount. If the borrowers prove all three elements, the amount of that damage is the amount recognized as a defense to repayment.

In evaluating the borrowers' claims, I reviewed the following: (1) my October 4, 2000 and February 2001 memoranda and underlying documentation; (2) letter from Mr. Craft dated February 20, 2002; (3) the Complaint and Default Judgment from the lawsuit brought by these 58 students against IBC, *Holzer et al. v. Red River Educational Services, Inc.*, Civil Case No. 09-02-C-476, District Court, County of Cass, State of North Dakota; (4) the North Dakota statutes and case law; (5) Education's relevant regulations and interpretation of those regulations; and (6) IBC's prior stipulations of fraud in previous lawsuits.

After careful consideration of these documents and the specific facts of these students' cases, I conclude that all 58 borrowers have adequately established each prong of the three-part test and should be relieved of the full amount of their Direct Loan obligations.

## DISCUSSION:

**Factual Background:** As stated in my previous Memos, IBC closed on January 22, 1998. The owner of the school, ███████ later pled guilty to failing to return to the Department unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. Of the 58 students involved here, eight received a credit for unpaid refunds.[3]

We do not have any information about whether the remaining students were among the ones who received a credit for an unpaid refund; however their names do not appear on the Inspector General's list of students who were owed a refund or had a credit balance. Regardless, all 58 students now claim that they should not have to pay any remaining balance on their Direct student loan accounts.

**Programs in which claimants were enrolled:** The 58 students involved in the instant case were enrolled in one of the following 9 programs:



[3] ███████ SSN ███████ ($1,883.00)
███████ SSN ███████ ($506.00)
███████ SSN ███████ ($655.00)
███████ SSN ███████ ($188.57)
███████ SSN ███████ ($3,127.00)
███████ SSN ███████ ($791.00)
███████ SSN ███████ ($238.68)
███████ SSN ███████ ($80.06).

Interstate Business College Memo
February 11, 2003
Page 3 of 8

1. Medical Administrative Assistant Program (MAAP): (30)[4]

2. Business Management Program (BMP): (9)[5]

3. Computer Information Specialist Program (CISP) (1)[6]

4. Computer Travel Business Management Program: (8)[7]

5. Computer Accounting Program: (3)[8]

6. Dental Assistance Program: (1)[9]

7. Administrative Legal Assistant Program: (4)[10]

8. Computer Programming Program: (2)[11]

**Mr. Craft's Prior Litigation with IBC:** Mr. Craft has represented numerous IBC students and/or graduates in their suits against IBC for fraud.[12] IBC stipulated to fraudulent conduct with regard to five of its academic programs: the MAAP, BMP, CISP, the Computer Aided Drafting Program (CADP), and the Medical Transcription Program (MTP). The specific acts which IBC stipulated to committing differ somewhat from case to case, but generally include misrepresentations regarding its placement success, the accreditation status of the program, and whether completion of the IBC program qualified or otherwise equipped the student to gain and



---

[4] ██████ (PLUS loan), ████████████ ████ ██████ ██████ (PLUS loan), ██ (PLUS Loan), ███████ ████ (PLUS loan), ████ (PLUS loan) ██, ████ ██, ████ (PLUS), █████ ████, (PLUS), ████ .

[5] ████ ████ ████ ████ (PLUS), ████ .

[6] ████ .

[7] ████ ████████ ████ .

[8] ██████ .

[9] ███ .

[10] ████████ .

[11] ███████ .

[12] In a telephone call on January 21, 2003, Mr. Craft indicated that he did not have any other clients seeking relief from the Department due to IBC's misconduct. He stated that had retired from the practice of law and that his partner, Gene Doeling, was doing corporate work and was not interested in taking any more of these IBC cases.

Interstate Business College Memo
February 11, 2003
Page 4 of 8

retain employment in the field.   The five cases and the specific stipulations are described in detail in Attachment B.

## LEGAL ANALYSIS:

### 1. Are the Actions Allegedly Taken by IBC Those for Which Applicable State Law Permits a Party to Sue a School for Damages?

The first step in evaluating a claim against a school for a defense against repayment of a Direct loan is determining whether the grievance raised by the borrower describes an injury for which State law would permit the borrower to sue the school for a financial recovery.   To do so, one must look to the law of the state where the alleged wrongful act or omission occurred.   In the instant case, IBC's alleged wrongful actions occurred in North Dakota.   Thus, we must evaluate these 58 students' claims under North Dakota law, in conjunction with IBC's previous admissions of fraud with regard to the MAAP, BMP, CISP, CADP and MTP.

Under the North Dakota Code, §9-03-08, actual fraud "consists of any of the following acts committed by a party to a contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into a contract:

1.  The suggestion as a fact of that which is not true by one who does not believe it to be true;
2.  The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true; :
3.  The suppression of that which is true by one having knowledge or belief of the fact;
4.  A promise made without any intention of performing it; or
5.  Any other act fitted to deceive."

Under paragraph 2 of this section, North Dakota courts have recognized a statutory claim for relief based on negligent misrepresentation when the misrepresentation is given to induce a person into a contract.   See *Bourgois v. MDU*, 466 N.W.2d 813 (N.D. 1991).   The 58 borrowers claim that IBC made misrepresentations of various kinds, and withheld the truth of other facts, which induced them to enroll in IBC and borrow Direct Loans to finance that enrollment.   The grievance would appear to be one that North Dakota law recognizes as a valid basis for a suit for damages.

### 2. Were IBC' Alleged Actions Directly Related to the Students' Receipt of the Direct Loans or the Provision of Educational Services Financed by those Loans?

The second step is determining whether the cause of action against the school is one related to the receipt of the loan or the provision of services paid for with the loan.   The stipulations in the prior lawsuits help resolve this question.   In the lawsuits referenced above, IBC admitted that the students who were plaintiffs in those cases had relied on the IBC staff's misrepresentations regarding the MAAP, BMP, CISP, CADP, and MTP and based on these assertions were induced into enrolling in the programs and incurring student loan debt.   IBC admitted that its "agents and employees negligently made oral and/or written representations which were positive assertions

Interstate Business College Memo
February 11, 2003
Page 5 of 8

... for the purpose of inducing the plaintiff[s] into contracting with IBC for educational services." IBC further admits that the "affirmative misstatements ... induced the plaintiff[s] to enroll in IBC's program and as a result [the plaintiffs] were damaged." Thus, by virtue of IBC's previous admission of fraud, the students in the instant case who were enrolled in the MAAP, BMP, CISP, CADP, and MTP have proven that IBC's actions were directly related to the receipt or distribution of their Direct Loans. With regard to the students in this case who were enrolled in IBC's other programs, in the default judgment the court found that IBC's false assertions of material facts as to the various programs induced the students to enroll into contracts with IBC and to obtain loans. See §C-D of Judgment. Based on the default judgment and IBC's prior admissions, I believe it is reasonable to conclude that these 18 students have shown that IBC's actions were directly related to the receipt or disbursement of their Direct Loans and the provision of services paid for with those loans.

(3) Damages:

(a) Did the borrowers prove that they were injured as a result of IBC's Negligent Misrepresentations?

The third step in analyzing whether a school-related grievance is in fact a defense to repayment of specific borrowers' Direct Loans is a two-part test of the facts: have the borrowers proven that the offending conduct of the school actually occurred, and if so, how much injury have they proven? To determine whether the claimed misconduct actually occurred in this instance, one looks to the stipulated facts from previous lawsuits against IBC, which established that students in the MAAP, BMP, CISP, CADP, or MTP who completed or would have completed their academic programs gained little or no value from their degree or education from IBC because: (1) the programs were not accredited, (2) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam (MAAP), (3) the program was not designed to make the students experts in the CISP, CADP, or MTP; (4) the computer software was not the most advanced and the staff were not experts in their fields, and (5) the job placement rate for IBC graduates was significantly lower than 90% pronounced, therefore employment was not guaranteed. Here, because IBC previously stipulated to committing fraud with regard to the MAAP, BMP, CISP, CADP, and MTP, that stipulation prevents IBC from disputing in any future lawsuit whether it engaged in such fraud with regard to these programs.[13] Of the 58 students involved in this particular case, 40 of them obtained loans for the MAAP, BMP and CISP. Given IBC's previous admission of fraud with respect to these programs, the 40 students in the MAAP, BMP, and CISP have proven that IBC actually engaged in the wrongful conduct they allege, as well as that such conduct gives rise to a legal cause of action under North Dakota law.

The remaining 18 students who were enrolled in the Computer Travel Business Management Program, Computer Accounting Program, (Executive) Administrative Legal Assistant Program, Dental Assistance Program, and Computer Programming programs, do not have the benefit of IBC's prior admission of fraud. Thus, we must evaluate whether the claimed misconduct

---

[13] IBC is considered to be "collaterally estopped" from disputing in any other lawsuit – even one involving different plaintiffs – those facts established against IBC in a prior lawsuit involving the school.

Interstate Business College Memo
February 11, 2003
Page 6 of 8

actually occurred using other available evidence. These borrowers did obtain a default judgment against IBC in *Holzer v. Red River Educational Services, Inc.* On December 26, 2001 Mr. Craft's firm issued a Summons on The Red River Educational Services, Inc., IBC to answer the complaint filed by his clients. The summons was served on January 8, 2002 to Susan Jensen at 3518 Serene Way in Lynnwood, Washington. In the complaint, the students alleged that IBC made affirmative misstatements to induce them to enroll in IBC's programs and that, as a result, they were damaged. IBC failed to answer. On February 13, 2002, a default judgment was entered in favor of the students due to IBC's failure to answer the complaint. The Judgment included a detailed description of IBC's fraudulent actions as to each student and the treble damage amount that each student was entitled to, which totaled $1,847,850.00 plus costs of $155.00.

A default judgment is a judgment entered against a party who has failed to defend against a claim that has been brought by another party. Blacks Law Dictionary, 6th ed. Under North Dakota law, once a complaint is filed and a summons is issued on a defendant, the defendant has 20 days in which to answer the complaint. If the defendant fails to answer the complaint within the stated time frame, the plaintiff may file a motion with the court to enter judgment in its favor due to the defendant's failure to file a timely answer.[14] If the plaintiff shows that the summons and complaint were properly served on the defendant to satisfy due process and the defendant is not on active military duty, the court will enter a default judgment.

The courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their own orders. *Phoceene Sous-Marine v. U.S. Phosmarine, Inc.*, 682. F.2d 802 (9th Cir. 1982)(citing *Landis v. North American Co.*, 299 U.S. 248, 81 L. Ed. 153, 57 S. Ct. 163 (1936); *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975); *O'Brien v. Sinatra*, 315 F.2d 637, 641 (9th Cir. 1963). A default judgment is awarded not because the court is necessarily satisfied that the claim has substantive merit (although it may scrutinize the claim before awarding judgment) but because the party in default failed to offer any defense. Restatement 2d of Judgments, §3.

A default judgment binds the defendant like any other judgment. However, because a default judgment is not the result of actual opposition by the defendant, it lacks the credibility of, for example, those judgments in the other four cases against IBC (see Attachment B), which were based on stipulations agreed to the defendant (IBC) in the course of active defense of those cases. In this instance, although the court had the opportunity to scrutinize the students' claims prior to entering default judgment, there is no way to determine whether the court in fact scrutinized the complaint, or simply relied on IBC's failure to answer. Particularly where a default judgment is entered after a school has closed and under circumstances in which the

---

[14] Under North Dakota law "when a defendant fails to answer or appear within the time prescribed, the court upon proof of default by affidavit may render judgment against defendant. If action is upon written instrument, same must be produced and filed. In other cases, proof must be submitted and court may in its discretion submit any question involved to a jury. If any appearance is entered by defendant, he must be given eight days notice of application for default judgment. If summons was served by publication plaintiff may be required to file satisfactory security to abide the order of the court relating to restitution of any property or money which may be collected in case defendant is thereafter permitted to defend and shall succeed in his defense." N.D.R., Civ. P., Rule 55 (2002).

principals of the school would have little economic motive to defend against the suit, a default judgment simply proves that the defendant – or those in control of the defendant – either lacked the resources to defend or saw no reason to defend. Accordingly, we see little in the default judgment itself that would be persuasive evidence that IBC committed the misconduct charged by these 18 borrowers.

However, we can also look to other evidence that has been provided to determine whether these 18 students have proven that their charges against IBC actually occurred.[15] In four other cases that IBC actually defended, as stated previously, IBC admitted to engaging in fraud with regard to the MAAP, BMP, CISP, CADP and MTP, that induced students to enroll on those programs and obtained student loans and caused them damage. It is reasonable to infer that if IBC was engaging in fraud and making material misstatements with regard to instructors' qualifications, quality of the equipment, graduate placement rate, and accreditation with respect to five other programs, that it did so with respect to it's other programs as well. The complaint and default judgment entered against IBC in *Holzer v. Red River* cite the same kind of fraudulent misrepresentations and inducements with regard to each student, as those stipulated to in other cases with respect to the MAAP, BMP, CISP, CADP, and MTP. Thus, it is reasonable to infer, based on the scope of IBC's misconduct as proven from the stipulated judgments and the criminal investigation and prosecution, that IBC actually committed fraud and made the misrepresentations charged by these 18 students in their programs.

(b) Amount of Damages:

To quantify the students' damages, we have to determine the amount of damages they could recover from IBC under state law. The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory. Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could have been anticipated or not, absent exceptional circumstances. NDCC §32-03-20. *See, e.g., Delzer v. United Bank*, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money to the Dezlers to operate their ranch. The loan was to be paid out in two installments. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan. The Delzers lost all of their collateral and their ranch. During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the Delzer's damages were foreseeable. The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages). In the educational arena, North Dakota law permits a person defrauded by any advertisement or circular issued by a postsecondary educational institution to recover three times the amount of the actual damages. See N.D.C.C. §15-20.4-09.

---

[15] In a letter dated September 4, 2002 I asked Mr. Craft to provide me with additional evidence of IBC's fraud with regard to these 18 students and the programs in which they were enrolled, beside the complaint and entry of judgment, but he has not been able to obtain any such evidence.

Interstate Business College Memo
February 11, 2003
Page 8 of 8

Here, the students can demonstrate the amount of their damages by pointing to the amount they
borrowed to attend IBC. Given that their education from IBC has virtually no value, the amount
of their damages is at least the amount of tuition they paid to obtain that education times three
pursuant to §15-20.4-09. Presumably, the total amount of the loans was used to pay for a portion
of the tuition at IBC. Thus, the students' damage award should equal the principal amount of the
loans they obtained to pay for the tuition minus any credit given, times three. This amount is
then used to offset the loan balances due and owing to Education on the student loan accounts,
including unpaid, accrued interest. Therefore, the students' loan obligations are fully offset by
the amount of their damages against IBC.

## CONCLUSION:

Based on the foregoing, I conclude that all 58 students in *Holzer v. Red River* have adequately
established that: (1) the students charged IBC with conduct that would constitute fraud under
North Dakota state law; (2) IBC's actions as charged had a direct connection to their receipt of
the Direct loans; and (3) IBC actually committed the conduct charged, and the borrowers were
injured in an amount that at least equals the amount they borrowed on their Direct loans. These
students' claims should be recognized as a defense to collection of their Direct loans only,
pursuant to 34 C.F.R. 685.206(c).

These conclusions rest in large part on inferences drawn from other cases involving IBC but not
these individuals. It is therefore possible that these individuals were not in fact injured by the
conduct they charged, or even that the conduct did not occur as to them. In the unlikely event
that evidence emerges later that these students fabricated their assertions against IBC, their
Direct Loan obligations should be immediately reinstated in the amount due and owing at the
time relief was provided to them pursuant to the recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft in response to his
inquires. I recommend that this letter or a similar one be sent to him with regard to his clients'
loan obligations.

If you have any questions or concerns about the contents of this memo or its conclusion, please
feel free to contact me at (202) 401-6007.


Exhibits/Attachments

cc: Rosa Wright, Direct Loan Program (electronically)
    Debra Wiley, OSFA Ombudsman (electronically)
    Naomi Randolph, Closed Schools (electronically)

Attachment B

In a January 10, 2000 Stipulation[1] IBC admitted to engaging in fraud with regard to the Medical Administrative Assistant (MAA) program. In that document, IBC admitted to the following:

1.  that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;

2.  that the Accrediting Counsel for Independent Colleges and Schools defines the term "in the field" as requiring "a direct use of the skills taught in the program," as well as that ACICS defines "related field" as employment as a position that requires "an indirect use of the skills taught in the program";

3.  that based on the representations by the enrollment counselor, the Plaintiffs signed an agreement enrolling in the MAA and incurring thousands of dollars in loan debt;

4.  that the program was not accredited by any accrediting agency;

5.  that the graduates of this program were ineligible to take the certification exam as a Medical Assistant until they had one year of full-time work experience in a position "in their field";

6.  that graduation with a degree as an MAA, without being certified, gives candidates no greater chance of employment or pay grade, than would be available without the degree;

7.  that it was critical that the training received at IBC enable plaintiffs to secure employment qualifying graduates for the exam;

8.  that IBC's past employment placement was lower than stated during the enrollment interview;

9.  that the Plaintiffs should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC §15-20.4-09[2], lost wages, books and travel expenses and miscellaneous expenses;

10. that the lawsuit be dismissed.

In a February 12, 2001 Stipulation in a second case[3] IBC admitted to engaging in fraud with regard to the Business Management Program (BMP). In this stipulation, the following facts were stipulated to:

---

[1] ████████████ et al. v. Red River Educational Services, Inc., Interstate Business College, C. A. No. 97-02501 (District Court, County of Cass, North Dakota).

[2] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the pupils thereof, may recover from such institution or person three times the amount paid.

[3] ████████████ v. Red River Educational Services, Inc., Interstate Business College, C. A. No. CV-00-000119, (District Court, County of Cass, North Dakota).

Attachment B
Page 2 of 4

1.  That based on the representations by IBC staff, the borrower signed an agreement
    enrolling in the BMP and incurred in excess of $15,428.00 in student loan debt;
    the borrower was enrolled at IBC from August 1996 to April 1997;

2.  That IBC agents and employees negligently made oral and/or written
    representations which were positive assertions, in a manner not warranted by the
    information of the person making it, of that which was not true though the person
    believed it to be true, for the purpose of inducing the student into contracting with
    IBC for educational services;

3.  That IBC agents represented that the borrower would be placed in a curriculum
    designed specifically and exclusively for persons interested in becoming experts
    in Business Management;

4.  That IBC agents represented that the program was taught by experienced
    instructors who were themselves experts in Business Management;

5.  That IBC agents represented that the borrower would be supplied with computers
    equipped with the most advanced computerized accounting and business
    management software;

6.  That IBC agents represented that the school had a 90% success rate in placing
    BMP graduates in-the-field;

7.  That IBC agents represented that the program was fully accredited;

8.  That IBC's BMP program had not been specifically and exclusively designed for
    persons interested in becoming experts in business management, that the
    instructors were not experts in business management, that the computers were not
    loaded with the most advanced computerized accounting and business
    management software, that IBC had not experienced a 90% success rate in
    placing BMP graduates in-the-field, and that the BMP was not fully accredited;

9.  That IBC's affirmative misstatements induced the borrower to enroll in its
    program and as a direct and proximate result of her reliance on IBC's fraudulent
    statements of material facts, she sustained pecuniary injury in the form of loss or
    diminution of previous employment, loss of employment during school, failure to
    receive compensation in accordance with representations and costs and expenses
    of schooling;

10. That the borrower should be awarded damages in the amount of three times her
    enrollment contract, pursuant to NDCC §15-20.4-09, lost wages, books and travel
    expenses and miscellaneous expenses.

IBC made similar admissions of fraud in a stipulation filed in a third case;[4] here IBC stipulated
to committing fraud with regard to the CIS program, specifically --

1.  That it made "positive assertions, in a manner not warranted by the information of the
    person making it, of that which was not true through the person believed the
    representation to be true, for the purpose of inducing the borrowers into contracting
    with IBC for educational services";

2.  That IBC's staff made material misrepresentations that were not true; that the CIS
    program was specifically and exclusively designed for persons interested in becoming

---

[4] ██████████ v. Red River Educational Services, Inc., Interstate Business College, C. A. No. CV-00-00118
(District Court, County of Cass, North Dakota).

Attachment B
Page 3 of 4

experts in CIS, that the instructors were experts in CIS, that the computers were loaded with the most advanced CIS software, that IBC had experienced a 90% success rate in placing CIS graduates in-the-field, and that the CIS program was fully accredited;

3. That IBC's affirmative misstatements induced the borrowers to enroll in the CIS program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

4. That IBC would pay the borrowers money damages, which would include the amount of their enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages books and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of the borrowers and against IBC.

In a January 2000 stipulation filed in a fourth case,[5] IBC admitted to engaging in fraud with regard to the Computer Aided Drafting (CAD) program. IBC admitted to the following:

1. That based on the representations by the enrollment counselor, Engle and Glines signed agreements enrolling in the CAD program and incurred in excess of $15,428.00 in debt;

2. That IBC agents and employees negligently made oral and/or written representations which were positive assertions, in a manner not warranted by the information of the person making it, of that which was not true though the person believed it to be true, for the purpose of inducing Engle and Glines into contracting with IBC for educational services;

3. That IBC agents represented that the students would be placed in a curriculum designed specifically and exclusively for persons interested in becoming experts in CAD;

4. That IBC agents represented that the program was taught by experienced instructors who were themselves experts in CAD;

5. That IBC agents represented that the students would be supplied with computers equipped with the most advanced CAD software;

6. That IBC agents represented that the school had a 90% success rate in placing CAD graduates in-the-field;

7. That IBC agents represented that that the program was fully accredited;

8. That IBC's CAD program had not been specifically and exclusively designed for persons interested in becoming experts in CAD, that the instructors were not experts in CAD, that the computers were not loaded with the most advanced CAD software, that IBC had not experienced a 90% success rate in placing CAD graduates in-the-field, and that the IBC CAD program was not fully accredited;

---

[5] ██████████ v. *Red River Educational Services, Inc., Interstate Business College*, C. A. No. CV-00-00120 (District Court, County of Cass, North Dakota.)

9.  That IBC's affirmative misstatements induced Engle and Glines to enroll in their CAD program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

10. That Engle and Glines should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

On June 14, 2000 the North Dakota court entered the Stipulation for Entry of Judgment in favor of the plaintiffs, thus, concluding the lawsuit.

Lastly, in a fifth case,[6] IBC signed another Stipulation, also on January 10, 2000, admitting to fraud with regard to the Medical Transcription Program (MT Program). In the Stipulation, IBC admitted to engaging in fraud that induced Ms. ███to enroll in IBC. Judgment was entered on June 14, 2000 on this Stipulation, which was very similar to the other Stipulations. Damages were awarded to Ms. Rubin in the amount of $23,175.00.

---

[6] ███v. *Red River Educational Services, Inc. and Interstate Business College*, C. A. No. 00-00117 (District Court, County of Cass, North Dakota).



**Craft**
**Doeling, PC**
Attorneys At Law
Licensed in ND & MN

February 20, 2002

Dale J. Craft
Gene W. Doeling

1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota  58107-0029
(701) 293-8050
(701) 293-3708  Fax
E-Mail: cdpc@myexcel.com

Dan Hayward, Director
Student Financial Assistance
United States Department of Education
7th and D Street
ROB 3, Room 4025
Washington, DC  20202

Re:    Student Defense to Debt Pursuant to 34 C.F.R. §685.206(c)

Dear Mr. Hayward:

This firm represents a number of students who attended Interstate Business College in Fargo, North Dakota.  The Department of Education suspended the school from participating in Student Loan Programs and it closed in January 1998.   In 1999, the owner of the school, Susan Jensen, was sentenced in South Dakota and Federal Courts for theft of student money.  The students we represent who claim a defense to repayment of their student loans pursuant to 34 C.F.R. § 685.206(c) are:



The student/debtors listed above have outstanding loans under the Federal Direct Student Loan Program.  Each student's name, address, social security number and dates of attendance are attached to this correspondence. The students assert, based on the enclosed Complaint dated December 26, 2001, and Judgment dated February 13, 2002, that they have a defense pursuant to 34 C.F.R. § 685.206(c),  which regulation recognizes a defense based on any act or omission

Dan Hayward, Director
February 20, 2002
Page Two

of the school that would give rise to a cause of action against the school under applicable state law. We submit that the Judgment in favor of the students and against the school on the grounds of fraud in the inducement is evidence these borrowers have claims against the school recognized by state law. We would also assert that Interstate Business College's pattern of engaging in this type of fraud is known to the Department of Education since other students who attended Interstate Business College have asserted this defense based on similar claims of misrepresentation.

Please note that the enclosed Judgment states specific material assertions of fact which were made by Interstate Business College representatives before the students enrolled at Interstate Business College. Each student relied on those assertions of fact when deciding to sign their enrollment contracts. The Judgment establishes that those assertions were not true. Under North Dakota law negligent misrepresentation inducing a person into a contract is actual fraud. NDCC § 9-03-08(2); Bourgois v. Montana-Dakota Utilities Co., 466 NW2d 813, 818 (N.D. 1991).

Please review these materials promptly, and tell us whether your agency acknowledges the defenses based on these documents. We hope the Department will, at a minimum, determine that these students do have a potential defense to its collection actions, and not make any formal attempts to collect on the notes. Our ultimate request is that the Department determine that the notes are not collectable, refund all payments made, and void the notes. As you will probably recall, these students claims of misrepresentation are based on the same representations that were made by Interstate Business College to ███████████, ████████, ████████, and approximately twenty other former Interstate Business College students who were granted forgiveness of their Direct Loan obligations as set forth in your letter dated February 28, 2001.

As the students have retained this office with respect to their claims against the school and their defense under your regulations, please make your response to this office and not directly to the students.

Sincerely,

Gene W. Doeling

GWD/ck
Enc.
98152let.011

# EXHIBIT 4

To:     Under Secretary Ted Mitchell

From:   Borrower Defense Unit

Date:   October 24, 2016

Re:     Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims

The Borrower Defense team recommends borrower defense (BD) relief for students who: (1) enrolled at any Corinthian-operated, nationally accredited Everest[1] campus or at WyoTech's Laramie campus[2] between the time Corinthian opened or acquired the campus and April 2015; and (2) alleges that Corinthian misrepresented the transferability of credits earned at that campus. Corinthian represented that credits earned at these Everest campuses were generally transferable. These representations were false and misleading. Accordingly, for the reasons explained below, full BD relief is appropriate for all Everest and WyoTech Laramie borrowers alleging misrepresentations regarding the transferability of credits, subject to reduced relief for those borrowers impacted by the statute of limitations.

**BACKGROUND**

Everest consistently misled prospective students about the transferability of credits earned at their campuses in two ways. First, school staff made explicit representations regarding transferability. Second, staff strongly implied transferability by emphasizing the school's accreditation status.

The misleading nature of these statements hinges on the key differences between national career-related and regional institutional accreditation. Traditionally, national accreditors accredit mainly for-profit, career-based, single-purpose institutions, both degree and non-degree.[3] By contrast, regional accreditors accredit public and private, mainly non-profit and degree-granting, two- and four-year institutions.[4] Broadly speaking, credits earned at nationally accredited colleges "are rarely accepted at regionally accredited schools;"[5] and have never been generally transferable.[6] Almost every Everest campus was nationally accredited since its inception, and Corinthian personnel were fully aware of the negative impact of their accreditation on transferability.[7] Nevertheless, as Senator Tom Harkin notes in his 2012 report on the for-profit college sector (the "Harkin Report"), recruiters at for-profits "sometimes play on prospective students' ignorance about accreditation in order to use their schools' accreditation as a selling point."[8]

As discussed below, Everest personnel regularly led prospective students to believe, either through express or strongly implied representations, that credits earned at Everest would generally be

---

[1] Everest schools include Florida Metropolitan University campuses, which Corinthian acquired in 1996 and later rebranded as Everest University.

[2] To date, the BD Team has only reviewed WyoTech claims from the Laramie campus. While we have no reason to believe the facts and recommendations in this memorandum do not apply to other WyoTech campuses, at this time we are not extending our analysis to those campuses. For the purposes of this memorandum, references to "Everest" include WyoTech Laramie.

[3] *See Council for Higher Education Accreditation: An Overview of US Accreditation*, http://www.chea.org/pdf/Overview%20of%2US%Accreditation%202015.pdf. For this memorandum, "national" refers to national career-related accreditors or accreditation.

[4] *Id.* p. 2.

[5] Harkin Report, p. 56, citing Council for Higher Education Accreditation, *The Fundamentals of Accreditation: What Do You Need to Know, Council for Higher Education Accreditation*, p. 7, September 2002, http://www.chea.org/pdf/fund_accred_20ques 02.pdf (accessed May 24, 2012).

[6] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm.

[7] *See* Mark Pelesh's statement at https://www.insidehighered.com/news/2007/02/26/transfer.

[8] Harkin Report at 55.

accepted at regionally accredited post-secondary institutions. In actuality, those credits generally did not transfer to or were not accepted at regionally accredited schools.

**I.      Summary of Evidence of Representations of Transferability**

Everest staff orally represented to potential students that they could generally transfer their Everest credits to any other school. These oral representations occurred both in person and during telephone calls with prospective students. Specifically, the school personnel: (a) stated credits were generally transferable; and/or (b) "play[ed] on prospective students' ignorance about accreditation" to make claims about national accreditation that strongly implied general transferability.[9]

**A. Student Accounts of In-Person Oral Representations of Transferability**

Hundreds of student applications reviewed to date provide corroborative evidence that Everest admissions personnel regularly made misleading oral representations about transferability. Indeed, our review of claims spanning from 1998 through 2010 shows that personnel made consistent transferability claims throughout the entire time that Corinthian operated the schools.

A sample of claims from the Everest Brandon campus demonstrates the consistency and specificity of false transferability claims made by school representatives:

- "In my entrance interview, I was told that I should enroll in the paralegal program if I planned on being a lawyer. I was told guarantee that my credits would be good to transfer to USF or UT and then Stetson Law."[10]
- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."[11]
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them I was told that employers will recognize the degree from them and they laugh at me."[12]
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."[13]
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[14]
- "The representative for FMU, asked what my goals were for my education. I stated that I wanted to attend USF for a bachelors degree. He said my credits would absolutely transfer and that he worked hand in hand with the academic advisers over at USF, to help students transition smoothly. He said that my credits would transfer even mid-way through the program."[15]
- "The admissions department also ensured me that earned credits would be accepted by other educational institutions... later discovered that credits from Everest University were not honored at state and local universities."[16]

---

[9] As discussed below, in Section III(B)(1), footnote 102, the implied representations also constitute actionable material omissions.
[10] BD151795
[11] BD150990
[12] BD151323
[13] BD150355
[14] BD151723
[15] BD150789
[16] BD153129

- "I asked if I decided to transfer after rec associates degree would all credits transfer to any college? I was told, an associates is an associates no matter where it comes from."[17]
- "Brian Walker admissions representative had stated that if I wanted to get a Masters degree from another college that my credits will transfer with no problem as FMU (now Everest) is accredited university"[18]
- "I asked if I could transfer my credits to get my Bachelor's degree after earning my Associate's and i was told they would transfer but I would receive a discount if i was to get my Bachelor's with them. They told me i could get my Master's anywhere because my credits would transfer. I asked for specific schools which would take the credits and I was told they don't see why anyone wouldn't take them . . . I was going to pursue my Master's but found out my credits do not transfer."[19]

In all of the above examples, the school explicitly misrepresented the transferability of its credits to the student.

Applicants also state that the school represented general transferability via statements that Everest was "accredited" or "fully accredited." Such implied representations of transferability are supported by the Harkin Report, as well as the Corinthian telephone audits and recordings discussed below. That this "accreditation" tactic, in context, created a strongly implied representation of transferability is illustrated by the fact that students who were unable to transfer their credits believe that Everest lied about being accredited at all (italics added):

- "FLORIDA METROPOLITAN UNIVERSITY-ONLINE (FMU-ONLINE) *LIED BY STATING THAT THEY WERE AN ACCREDITED UNIVERSITY WHEN IN FACT THEY KNOW THEY WERE NOT* . . . THE MISCONDUCT FROM FMU-ONLINE PREVENTED ME TO TRANSFER ANY OF THE CLASSESS I HAD TAKEN THERE, TO BE TRANSFERABLE."[20]
- "Before i applied for the loan i was told my credit can be tranfer if need when i was attending class *i found out thats not true they* [sic] *are not a acredited school*."[21]
- "I DID NOT KNOW THAT THE SCHOOL WAS NOT PROPERLY ACCREDITED. CREDIT WERE NOT TRANSFERABLE"[22]
- "Everest University misrepresented their accreditation I was told during my school interview that the school was accredited, *and later found out once I applied to other colleges that the school was not accredited*."[23]
- "I actually went to Valencia once and they told me that they [Everest] are not accredited, thus I'd have to start all over again."[24]
- "Throughout the course, there was speculation that the school was not accredited, but they continuously posted fake documents around the school claiming that they were accredited and that any credits we received would transfer over without any problem."[25]
- "I was told that credits would transfer to other schools offering the same classes but when i tried to transfer after having ear problems i was told that *NONE of my credits could transfer because FMU [later Everest] was not an accredited school*."[26]

---

[17] BD153757
[18] BD150139
[19] BD150545
[20] BD154282
[21] BD153723
[22] BD152794
[23] BD152222
[24] BD150941
[25] BD150786

- 'I am struggling to have my credits transfer to Southern New Hampshire University. They told me that since Everest is closing that it may be difficult to get any credits to transfer *because Everest is not an accredited institution. Everest told me that they were accredited*."[27]

Whether students allege an explicit misrepresentation about transferability ("I was told all my credits would transfer") or a strongly implied misrepresentation ("I was told the school was accredited, but then I found out my credits wouldn't transfer"), the student statements are unprompted,[28] specific, and consistent across a span of years.

For example, of the 303 claims reviewed to date at the Everest-Brandon campus, 52 include the allegation that admissions personnel made express representations regarding transferability (examples of which were quoted above) and an additional 6 allege an implied misrepresentation (tying accreditation to transferability).[29] The student statements are consistent regarding the representations made, including details such as specific schools that would accept Everest credits, or the suggestion that credits earned in Everest's paralegal program would enable students to continue on to law school.

The 58 Everest-Brandon transferability claims come from students who attended between 1998 and 2010.[30] Corinthian owned and controlled the Everest-Brandon location beginning in 1996, and the first claim alleging a transferability misrepresentation comes from a student who enrolled in 1998. We have transferability claims from this campus for each year from 1998 through 2010, with a spike in the late-2000s. We have fewer claims from earlier years, but those earlier claims bear the same indicia of reliability as the later claims. Significantly, the student statements about the admissions representatives' misrepresentations exhibit consistency across the span of years:

- 1998: "I attended the school due to the flexible hours and the fact that I was told by the [the school] that my credits in fact would transfer over to other schools."[31]
- 2000: "I was also told that my credits could transfer to any local college or university that was regionally accredited."[32]
- 2006: "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[33]
- 2010: "...Also, was told that credits would transfer to any University (not true)."[34]

The pervasiveness and consistency of the misrepresentation over time at Everest-Brandon corroborate students' allegations about transferability claims throughout the entirety of Corinthian's control of the school.

---

[26] BD150315

[27] BD152848

[28] All of the above student statements came from a variety of different types of applications including the Everest/WyoTech attestation form ED created for JPR claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form specifically ask about transfer of credits, but others do not, and ED's attestation form only instructs borrowers to provide "any other information...that you think is relevant."

[29] These figures do not include applications on the Debt Collective form where the applicant only checked the box indicating they were misled about "[t]he fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college" without providing any narrative.

[30] Review Group 15, from which these sample claims are taken, includes any Everest or WyoTech claim from students who enrolled before 2010. A few claims from students enrolled in 2010 can also be found in the review group.

[31] BD1617575

[32] BD1600530

[33] BD151723

[34] BD1613824

Significantly, just as the 58 Everest-Brandon claims corroborate each other, the number of similar allegations at and across multiple other campuses further corroborates students' allegations of transferability representations made by Everest personnel. Across campuses and across years, the similarity of student statements indicates that the misrepresentations were system-wide and, indeed, part of the Corinthian culture, discussed below, of enticing students to enroll at any cost.[35]

| Campus | Applications reviewed | Applications alleging an express or implied transferability representation | % |
|---|---|---|---|
| Everest Brandon | 303 | 58 | 19 |
| Everest Grand Rapids | 46 | 11 | 24 |
| Everest Orange Park | 36 | 9 | 25 |
| Everest Orlando North | 45 | 11 | 24 |
| Everest Orlando South | 157 | 56 | 36 |
| Everest Phoenix[36] | 81 | 22 | 27 |
| Everest Pompano Beach | 28 | 10 | 36 |
| Everest Rochester | 53 | 15 | 28 |
| Everest Tampa | 26 | 10 | 38 |
| WyoTech Laramie | 18 | 6 | 33 |
| **TOTAL** | **793** | **198** | **25** |

The campuses shown above represent the nine Everest campuses, and one WyoTech campus, for which we have the most claims. The campuses are located in five separate states (AZ, FL, MI, NY, and WY) and the total applications reviewed are from the period of time when Corinthian gained control of the campus[37] through 2010. Every campus from which we have reviewed a significant number of applications has revealed that between one-fifth and one-third of total applicants allege a misrepresentation about transferability of credits. Just like the Everest-Brandon campus discussed above, the transferability claims from these campuses are distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students are making extremely similar allegations about what the schools said about transferability — whether that student enrolled at Brandon in 1998 or Rochester in 2008.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for every one of the over ninety Everest campuses as unnecessary. The hundreds of claims reviewed corroborate that Everest personnel made representations that credits were generally transferable beginning shortly after Corinthian opened or gained control of a campus.

## B. Telephone Scripts, Audits, and Recordings

Not surprisingly, Corinthian's training documents do not contain express misrepresentations about transferability. However, they lay the foundation for abuses by failing to emphasize the non-transferability of credits or other potentially important information and in some cases tacitly encouraging misinformation. For example, in a Corinthian presentation entitled "Overcoming Phone Obstacles" attached to the Harkin Report, Corinthian instructs its admissions representatives to provide limited

---

[35] *See* discussion below, Section III(C), detailing Corinthian's high-pressure sales techniques and internal emphasis on enrolling as many students as possible whether or not it is in the students' interest.

[36] Although Everest Phoenix was a regionally accredited campus, these figures are included for their corroborative value in establishing that Everest personnel regularly made representations regarding transferability.

[37] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The nine campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

information.[38] By encouraging its admissions representatives to listen more and talk less, Corinthian believed it could give the student "limited information that will bring the student into the school."[39] Similarly, a training manual for admissions representatives attached to the Harkin Report contains call scripts for admissions representatives.[40] One section of the script suggests that representatives tell students who ask that credits "will probably not be transferable,"[41] but a later sample conversation instructs the representatives to tell students: "… you'll need to ask the receiving institution that question. I can't tell you what their policy might be because every institution sets their own policy regarding credit transfer."[42]

However, an internal Corinthian audit shows that even to the extent the scripts accurately described the transferability of Corinthian credits, admissions representatives under pressure to enroll students frequently did not follow them. A 2012 audit of Everest's Online Learning Division – Colorado Springs, Tempe,[43] and Tampa (which includes Brandon, South Orlando, and Pompano Beach) – identified substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students. Specifically, representatives for the Colorado Springs campus "failed to or incorrectly mentioned" credit transferability 31% of the time when students asked; at Tempe and Tampa, these errors occurred in 40% of audited calls.[44] Karen Fleming, a quality assurance and compliance auditor for Corinthian, summed up the inaccurate information on transferability in an April 13, 2012 email to colleagues, stating: "Admissions representative[s] did not inform the student that if they wish to transfer their credits from Everest to another institution, that the acceptance of those credits would be at the judgment of the receiving institution…"[45]

Recordings of phone calls supplied by the Illinois Attorney General further illustrate that Corinthian employees misled potential students to believe that credits would be accepted at other schools. In summaries of 9 out of 29 recorded calls between Everest call center employees and prospective students provided to us by the Illinois Attorney General's office, Everest representatives gave prospective students information about transferability that was either false or technically accurate but misleading.[46] In one phone call, the representative directly links accreditation to transferability stating: "We are a nationally accredited school. So you can use that almost anywhere you go."[47] Another representative, after confirming the school was accredited, refused to answer a prospective student's question about transferability.[48]

---

[38] Harkin report, Appendix 25, CoCo Document 3.

[39] *Id.* at p. 7

[40] Harkin report, Appendix 25, CoCo Document 4

[41] Harkin report, Appendix 25, CoCo Document 4, pp. 7-8

[42] Harkin report, Appendix 25, CoCo Document 4, p. 14

[43] Everest Tempe was one of the regionally accredited campuses in Arizona. While the effect of accreditation on transferability for the AZ campus is not the same as for nationally accredited schools, the fact that representatives for that campus either failed to provide accurate information, or affirmatively provided inaccurate information, regarding transferability between 20% and 40% of the time when observed serves to corroborate allegations that such representations were regularly made regarding other campuses nationwide.

[44] Quach Decl. Ex. 40, at CCICA156477. After a "corrective action plan" was initiated, those numbers dropped to 18% at Colorado Springs, 20% at Tempe, and 26% at Tampa. *See* Quach Decl. Ex. 40, at CCICA156454

[45] *Id.*

[46] IL AG "Hot Call" table

[47] IL AG; 3333182367_3333182298_efb49c0853f315387993e156

[48] ""The school will obviously give you the education and credentials with regard to certification"    24:00 "Are you guys accredited." A: "Absolutely." Student then asked about transfer of credits. She wouldn't answer. IL AG; Second Leg, 3333592713_3333592639_13469370fa1b53e21c997bc8

## II.     Summary of Evidence of Falsity of Representation

Three main sources of evidence demonstrate that credits from Everest were not generally transferable to most other schools. The first is the nature of the schools' accreditation. The second is the *Transfer Credit Practices* guide, which admissions officers use to determine how other schools treat a school's credits. The third is a survey we conducted of transfer policies in a few states that had large populations of Everest students. Additionally, public statements by Corinthian executives show that Corinthian was aware that credits from their schools were not generally transferable.

### A.  Accreditation

Regionally accredited schools generally do not accept transfer credit from nationally accredited schools. Most of the nation's two- and four-year degree-granting post-secondary schools are regionally accredited, while national accrediting agencies accredit career, vocational, and trade schools. Generally, schools that are regionally accredited will not accept credits from nationally accredited schools.

A 2014 study by the National Center for Education Statistics found that 81.4% - 84.3% of students who transfer to, from, or between nationally accredited schools have none of their earned credits transfer (compared to 37% of students transferring between regionally accredited schools),[49] and that the average student transferring to, from, or between nationally accredited schools lost 83% - 90% of their credits upon transfer (compared to an average loss of 39% for regional to regional transfers).[50] The California State University system, the largest four-year public university system in the US, does not generally accept credits from *any* institution without regional accreditation.[51] Similarly, major systems in Florida, Georgia, Texas, Minnesota, and Massachusetts only generally accept credits from regionally accredited schools.[52]

Similarly, a GAO report found that among regionally accredited schools, 63% specified that they accepted credits from *any* regionally accredited school, whereas only 14% specified that they accepted transfer credits from nationally accredited schools;[53] less than one percent of post-secondary institutions specified that accreditation was not a factor in their transfer decisions.[54] Nationally accredited institutions told the GAO that their students "often have difficulty transferring credits and that . . . regionally accredited institutions did not always accept courses taken at the nationally accredited institution."[55] Nationally accredited institutions reported that they "advised students to assume that credits would not transfer to regionally accredited institutions."[56]

---

[49] Simone, S.A. (2014). *Transferability of Postsecondary Credit Following Student Transfer or Coenrollment* (NCES 2014-163). U.S. Department of Education. Washington, DC: National Center for Education Statistics. p. 36

[50] *Id.* at 37. While the study did not conclude there was a direct link between accreditation status and credit transfer, it did find that accreditation status was a factor in credit transfer. The importance of that "factor" is highlighted in the percentage of transfer credits lost when nationally accredited students attempts to transfer those credits. Moreover, experts in the field consider accreditation to be a major factor in credit transferability. According to Christine Kerlin, Ed.D., the "type of accreditation is one of the first considerations, and often the primary consideration, by a receiving institution in reviewing transfer credit." See Expert Rebuttal Report to Expert Report by Dennis M. Cariello in the Matter of *State of Minnesota by its Attorney General, Lori Swanson v. Minnesota School of Business, Inc. et al.* at 4 (July 2015). *See also* statements of Herman Bounds, Ed.D, Director of Accreditation Group at the Department of Education, referenced in FN 6.

[51] *Transfer Credit Practices*, 2015 Edition

[52] See "Survey of Two- and Four-Year Schools in Selected States", Section II(C).

[53] GAO-06-22, p. 9

[54] GAO-06-22, p. 9

[55] *Id*, p. 10

[56] *Id*

The fact that regionally accredited schools generally do not accept nationally accredited credits has always been true. The 2005 GAO report treats the issue as the status quo, and not a recent development.[57] Until the last couple decades, credit transfer between nationals and regionals was a non-issue since, historically, nationally accredited schools offered technical certificates, not degree programs.[58] However, in the last 15-20 years, more nationally accredited schools have started offering degree programs, and the inability of those credits to transfer has become a larger issue.[59]

Corinthian itself was sufficiently aware of the impact of national accreditation on transferability that it supported various regulatory and/or legislative efforts to require schools to "state that they will not automatically reject credit from nationally accredited institutions."[60] In 2007, Corinthian's VP for legislative and regulatory affairs, Mark Pelesh, stated: "Students are required too often to repeat coursework, pay for something twice, use the public's resources in terms of federal and state financial aid, and have impediments put in the way to advancing their career objectives… it's high time we do something that has some regulatory teeth and impact."[61]

**B.   Transfer Credit Practices of Designated Educational Institutions**

The *Transfer Credit Practices of Designated Educational Institutions,* a reference guide published by the American Association of Collegiate Registrars and Admissions Officers, also demonstrates that these credits were not generally transferable as Corinthian frequently told borrowers. It reports the transfer acceptance practices of one major institution in each state, usually the flagship campus of the state university system, regarding credit from institutions in that state. Other schools are not required to follow the reporting school's policies, but the guide is useful for determining how institutions' credits are treated generally.

In a review of *Transfer Credit Practices* from the last twenty years,[62] none of the reporting institutions, outside of Arizona, had a policy of generally accepting credits from Everest. Outside of Arizona, the most favorable policy regarding credits from Everest was one university system that accepted them "on a provisional basis subject to validation as prescribed by the reporting institution".[63] All other reporting institutions either had no official policy or did not normally accept credits from Everest.[64]

---

[57] *See also* https://www.americanprogress.org/issues/higher-education/report/2015/12/14/127200/hooked-on-accreditation-a-historical-perspective/; https://en.wikipedia.org/wiki/Regional_accreditation; El-Kwahas, Elaine (2001) *Accreditation in the USA: Origins, Developments, and Future Prospects* http://unesdoc.unesco.org/images/0012/001292/129295e.pdf; Brittingham, Barbara (2009) *Accreditation in the United States: How Did We Get to Where We Are?*
http://onlinelibrary.wiley.com/doi/10.1002/he.331/pdf; http://www.acics.org/accreditation/content.aspx?id=2258

[58] *See* "Council for Higher Education Accreditation: Transfer and the Public Interest" (Nov. 2000) available at http://www.chea.org/pdf/transfer_state_02.pdf, where, without addressing for-profits specifically, the reports states that "higher education is experiencing a significant change in how students attend college and who provides higher education"; *see also* "History of Accreditation" available on a major national accreditor's website at
http://www.acics.org/accreditation/content.aspx?id=2258.

[59] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm. *See also* 2006 Spellings Report (ED report arguing that something needs to be done about credit transfer practices).

[60] https://www.insidehighered.com/news/2005/10/19/transfer

[61] https://www.insidehighered.com/news/2007/02/26/transfer

[62] The 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.

[63] California State University, Northridge, for certain Everest campuses, but only in 2006 and 2012. Of the 6 Everest campuses from which CSU would accept credits on a provisional basis, credits from 5 of those were limited to "graduate, professional, or technical programs only". By 2015, CSU Northridge policy for all Everest/WyoTech campuses was "credit not normally accepted".

[64] Florida statute allows nationally accredited schools to participate in the Statewide Course Numbering System, which may allow credits taken at those schools to transfer, but for the Everest campuses that participated in the System, "the credentials of

8

C. **Survey of Two- and Four-Year Schools in Selected States**

In May 2016, the BD Team also surveyed the transfer policies of two- and four-year schools in three of the states with high numbers of Everest students (FL, GA, and TX), regarding credits earned at Everest. We reviewed the schools' credit transfer acceptance policies available online, emailed admissions officers, and/or spoke directly with admissions officers. None of the state four-year school systems had a policy of generally accepting credits from nationally accredited schools, including Everest.[65] Most of the two-year community colleges would only accept credits from regionally accredited schools on a general basis (one two-year school in FL and one in TX regularly accepted credits from ACICS schools, including Everest).

Similarly, as part of their investigation into Everest campuses in Massachusetts, MA AGO contacted several two- and four-year schools within commuting distance of the Everest schools. None of the schools normally accepted credits from Everest, with all of the four-year and one of the two-year schools specifying that they only had acceptance policies for regionally accredited schools.[66] The UMass flagship campus either was not contacted or did not reply, but according to its website, "the following courses generally will not transfer to UMass: Taught by a school which does not have regional academic accreditation at the post-secondary level."[67]

D. **Student Accounts**

Unsurprisingly, student accounts also show that other institutions of higher learning did not accept credits earned at Everest:

- "I am currently a student at Daytona State College and have been forced to repeat many of the courses I took and paid for at Florida Metropolitan University [Everest Orlando North]. Daytona State does not recognize any of credits earned at FMU, forcing me to repeat them and continue to pay a student loan on worthless education."[68]
- "I tried to enroll at University of Central Florida, Seminole State College and Valencia College. UCF did not even respond to me. SSC and Valencia informed me that they could not accept my credits."[69]
- "I was Told all college credits would transfer, it didn't matter that this college was private, I spoke with a community college advisor and none of these credits transfer."[70]
- "Credits were not transferable. I checked with Western Dakota Tech in Rapid City SD at the time as I felt I was not getting the education I was promised."[71]

In some instances, students even lost the majority of credits earned at one Everest campus when they transferred or re-enrolled at another Everest campus. One student writes: "The fact is none of them [credits earned at Tampa] were accepted by Tempe Everest even though it was from their OWN sister

---

faculty teaching each course are considered in determining the number assigned to the course and the transferability of the course"; those Everest campuses are still listed as "credits not normally accepted".

[65] University of Florida (Gainesville), University of West Florida, the Georgia State University system, University of Georgia (Athens), University of Texas (Austin), University of Texas (San Antonio), Baylor University, and Rice University. Florida State University (Tallahassee) would accept, and has accepted, Everest credits on a provisional basis, upon review, as noted above.
[66] MA AGO, Ex. 34
[67] https://www.umass.edu/registrar/students/transfer-information/transfer-credit
[68] BD151803
[69] BD1604707
[70] BD150366
[71] BD155798

school."[72] Another student reports: "They told me that I will be able to use my previous credit... but [Everest Orlando South] made me take the class again."[73]

This inability to transfer credits to other institutions is consistent both at individual campuses and between campuses during the time they were operated by Corinthian.

## III. Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[74] The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. For the following reasons, the cohort of Everest students identified below applying for borrower defense relief predicated on Everest's transferability misrepresentations: 1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL. Moreover, given the lack of value conferred by Everest credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A. Everest Students Have Standing Under California's UCL

Both students who attended Everest programs in California and those who attended campuses in other states have standing under the California UCL. First, students attending Everest programs in California can demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Everest regarding the transferability of Everest course credits. Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[75] Second, while California statutes do not generally have effect outside of California, "[California] statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."[76] Courts look to "where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising and other promotional literature decisions were made"[77] when determining whether non-California residents may avail themselves of California's consumer protection statutes. Corinthian and its subsidiaries, through which it operated Everest schools, had their primary places of business and headquarters in California,[78] had more campuses in California than any other state,[79] produced and coordinated marketing and advertising in California,[80] and developed and promulgated the policies and training materials for their personnel in California.[81] Further, the single

---

[72] BD1603868

[73] BD155063

[74] 34 C.F.R. § 685.206(c).

[75] CAL. BUS. & PROF. CODE §17204.

[76] *Norwest Mortgage, INc. v. Super. Ct.*, 72 Cal.App.4th 214, 224-25, 85 Cal.Rptr.2nd 18(Cal.Ct.App. 1999)

[77] *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1237 -1238 (N.D.Cal., 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)).

[78] CCI Answer CA Amended Complaint ¶¶9-27

[79] There were 27 Corinthian campuses in California (14 Everest, 3 WyoTech, and 10 Heald). The other states with large numbers of Corinthian campuses were Florida (15 Everest and 1 WyoTech campuses) and Texas (9 Everest campuses).

[80] Tim Evans Interview, WI AG Sutherlin Affidavit Ex. 12 ("Evans said that all advertising was done by corporate."); Mark Sullivan interview, WI AG Sutherlin Affidavit Ex. 13 ("He [Sullivan] didn't do any of the marketing. That wasn't done by the local campuses."); Deposition of Scott Lester, WI AG Sutherlin Ex. 15  ("Every bit of marketing came out of corporate. Every marketing decision came from corporate.")

[81] WI Educational Approval Board letters to Everest Milwaukee,  WI AG Sutherline Affidavit, Ex. 10

incoming call facility for prospective Everest students from the throughout the nation was located in California.[82]

Additionally, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment:

- "Q: And when the Admissions Reps were making representations to the students about the externships, about the career possibilities, about what life could be, were those accurate representations given the state of the school?
  A: *They were the representations that they were given by corporate as part of their -- the way they were told to do the job.* Were they accurate? No."[83]
- Call center representatives "were trained to lie."[84]
- "There is a huge cultural issue at Corinthian Colleges that quietly promotes dishonesty & fraud at all the Everest campuses. *This culture of dishonesty & intimidation is generated by the corporate office* that has spread all over the company like cancer."[85]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, and that decisions and policies made by its California based corporate leadership harmed Everest students across the nation – Everest students from campuses nationwide have standing under the California UCL.

### B. Everest Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[86] Here, Everest's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[87]

#### 1. The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[88] Thus, if a business practice violates any law, this is *per se* a UCL violation.[89]

Corporate misrepresentations like those Everest made regarding transferability are prohibited by a number of state and federal laws. In particular, Everest's misrepresentation of the transferability of its

---

[82] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.

[83] Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15

[84] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.

[85] Letter from Anonymous former Everest employee to ACCSC Commissioner, Ex. 54 of CA AG Motion for Default at CCICA179681

[86] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[87] Although not discussed here, Everest's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair…business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code § 172000 Practice at 3:212 (2016).

[88] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

[89] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[90] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[91]

As described above, Everest's representations about the transferability of its credits were false, erroneous and misleading. Everest's transfer of credits representations misled students about the value of the credits they would be earning at Everest. Based on the school's misrepresentations, individuals considering enrolling at Everest would have the false belief that Everest credits would not only allow them to obtain an Everest degree, but would also provide them with credits generally transferable to any other institution.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[92] Everest's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In applications submitted to the Department,[93] these borrowers have specifically identified false representations regarding transferability as some of the misconduct giving rise to their claim. Many students' applications specifically state that they intended to continue their educations at four-year schools.[94] For other students intent on beginning a career as soon as possible, the transferability of credits and ability to continue academically offered an alternative if they were unable to find a job immediately.[95] Finally, students considered the transferability of credits earned at an institution to be an indicator of the quality and value of that institution's instruction.[96]

---

[90] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[91] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

[92] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[93] Although many of these applicants submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of the Department's form and therefore made unsworn statements.

[94] "They claimed that all credits earned would be accepted by any other colleges... I wanted to continue my education and perhaps attend law school but was told that a majority, if not all of my credits from Everest, would not be accepted." BD150202; "I was told that after completing my AA in Forensics I would be able to take the credits and pursue a Bachelors degree in Forensic Psychology which would double/triple my future earnings..." BD150303

[95] "After graduating and not being able to get into the career I had studied for. I tried transfering credits and could not find schools that wanted to accept them." BD151251; "One of my first questions once I enrolled in Everest University was regarding the credibility and accreditation of the school. I wanted to make sure that upon graduation, I would be able to find a job and/or be able to further my education using Everest as a foundation." BD1602822

[96] "'Students who may not even be interested in transferring credits nonetheless will ask us whether other institutions will accept their credits,' [Corinthian Executive Vice President for Legislative and Regulatory Affairs Mark] Pelesh said. 'What they're really asking is, is this a legitimate institution? Is it part of the legitimate postsecondary higher education world?' And policies

These students' reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Everest students after the institution closed. Thus, Everest's transferability misrepresentations constitute unlawful business practices under the UCL.

## 2. The Fraudulent Prong

Everest's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Everest students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[97] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[98] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[99] As noted, the transferability representations that Everest made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and... lost money or property" as a result of the deceptive practice alleged.[100] However, for a consumer who was deceived into purchasing a product[101]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions[102] of the entity.[103]

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[104] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[105]

As discussed above, the evidence shows that students relied on Everest's transferability representations when they enrolled.[106] Indeed, express or implied claims like those made by Everest about

---

that openly distinguish between credits earned at for-profit and nonprofit colleges -- turning down their nose at the former -- send a signal that answers that question No, he said." https://www.insidehighered.com/news/2007/02/26/transfer

[97] *See Bank of the West*, 2 Cal. 4th at 1254.

[98] CAL. CIV. C. § 1709.

[99] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[100] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[101] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[102] Everest's implied representations of transferability are also actionable as deceptive half-truth omissions. A half-truth omission occurs when an affirmative representation is misleading in the absence of material qualifying information. *See* Deception Policy Statement, 103 F.T.C. at 176; *FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive."). An advertisement can be deceptive because it failed to disclose material information even if it does not contain any false statements. *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). Here, Everest's affirmative statements about being "accredited" were deceptive absent further information distinguishing between regional and national accreditation and explaining the impact of national accreditation on transferability.

[103] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").

[104] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[105] *Id.* (internal quotation marks omitted).

[106] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a transferability misrepresentation, regardless of subsequent efforts to transfer.

the transferability of credits are presumptively material.[107] Moreover, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[108] Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C. Weak Disclaimers In Some of Everest's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Everest's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials. In many instances enrollment agreements and course catalogs contained technically accurate information about transferability, but such written information did not change the overall impression created by the oral representations.

If a student examined the enrollment agreement, the student would have to read through four pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[109] Midway through that box of fine print, item number 5 provides some information on transferability. That item is not highlighted or bolded in any way. The text cautioned students that Corinthian could not *guarantee* the transferability of credits to another school, but did not go so far as to cast doubt on the general transferability of Corinthian credits.[110] The agreement then continues on with two additional pages of fine print disclaimers. Everest's course catalogs generally contained limiting language similar to the enrollment agreements, and that language was similarly buried.[111]

These disclaimers do not cure the falsity of Everest's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[112] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[113]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised general transferability. Moreover, here, Everest's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.

---

[107] *See, e.g.*, *Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[108] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

[109] *See, e.g.*, Everest Institute Brighton/Chelsea Enrollment Agreement.

[110] *See, e.g.*, Everest Institute Brighton/Chelsea Enrollment Agreement: "The School does not guarantee the transferability of credits to any school, university or institution. The student should contact a receiving institution regarding transfer of credit from The School prior to enrollment." MA AGO Ex. 9 at AGO-MA02062

[111] Most course catalogs stated that the acceptance of credits was at the discretion of the receiving institution. We found one outlier example, the Everest Miami course catalog, which declared Everest credits were not generally transferable.

[112] *See, e.g.*, *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[113] *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[114] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[115] Corinthian advertised on daytime TV,[116] targeting the un- or under-employed. In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[117] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Moreover, the nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students were rushed through the enrollment process at Corinthian and were not provided an opportunity to read and digest the enrollment agreement.[118] As the Harkin Report found, this practice stemmed from the emphasis on growth: "Enrollment growth is critical to the business success of for-profit education companies... In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible to sign up for their programs."[119] The report quotes a 2005 Corinthian hiring manual as stating: "remember that this is a sales position and the new hire must understand that from the very beginning."[120] At Corinthian, internal documents make clear that recruiters were not trained or expected to advise students,[121] but to sell the program – to "enroll your brains out."[122]

Many Everest students state that they did not choose their own classes[123] or sometimes even their own program of study, making it even less likely they would see disclosures in course catalogs.[124] These student reports back up the Harkin report's conclusion that Corinthian recruiters were effectively salespersons, with the goal to enroll the student in whichever classes or programs made the most sense for

---

[114] CA AG Quach Decl. Ex 113.

[115] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[116] CA AG Quach Decl. Ex 113.

[117] CA AG Decl. of Holly Harsh.

[118] "After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process." Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891; "The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision." Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914; "They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour." Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887

[119] Harkin Report, p. 387.

[120] *Id.*

[121] Harkin Report, p. 387.

[122] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, WI AG, Sutherlin Affidavit Exhibit 15 , p. 49

[123] "I ended up taking courses that were not even applicable to my degree or not necessary for me to complete my degree. In other words, *I paid additional for classes I didn't really need to take*." BD150455; "My student advisor when I first got started was explaining how classes were available for a few hundred dollars for the courses. While there may have been some for that price, not many were *the classes they said I had to take*." BD150813

[124] "I went to school from Jan 2011 to March 2014 and was enrolled in the Associates Billing and Coding and then they *convinced me to move to a BS in Health Care Administration...* As I approached my end of my degree I ran out of money and realized *they had made me take classes I did not need* in my program and had 4 classes to finish and I was stuck..." BD151750; "They totally mislead me when I was requesting to sign up for their Crime Scene Investigator program. My student adviser had actually put me into their Criminal Justice Program instead and the mistake wasn't figured out until it was past their drop/add time frame of classes so I was stuck taking classes that had NOTHING to do with my actual program I wanted to study. They told me there was nothing they could do and I had to just wait til the time frame of starting their next term." BD153136

the school, not the student. Students were not provided the time to read any written materials because the students' interests were not at the heart of the transaction.[125]

Finally, the fact that 198 of the 793 (25%) Everest/WyoTech claims reviewed to date allege that Corinthian represented that credits would generally be accepted at other schools, with no mention of any written disclaimer, strongly supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations we know Corinthian personnel to have employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D. Eligible Borrowers

Based on the above analysis, the following Everest and WyoTech Laramie students alleging transfer of credits claims should be eligible for relief:

1. Any claimant who attended a nationally accredited Everest campus or WyoTech's Laramie campus and who:

    a. alleges that Everest expressly represented that credits earned there would be generally transferable; or

    b. alleges that Everest misrepresented the nature and/or value of their accreditation, in a manner that implied that their credits were generally transferable.

2. Borrowers who allege that their credits did not transfer, but do not allege a corresponding misrepresentation, will not be eligible for relief on this basis.

3. Eligible borrowers will be limited to students first enrolling after Corinthian acquired the campus in question.

### E. Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[126] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[127]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to

---

[125] "I was also provided with a course catalog/program disclosure statement stating in writing that the placement rate was 72%. *These written materials were provided only after I had signed up.*" MA AGO Ex. 03 at AGO-MA00180
[126] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).
[127] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[128]

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim. The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[129]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[130]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."[131]

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of ... remedies."[132] Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Everest education. *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student cannot generally transfer credits, a chief value conferred by such credits is greatly diminished.

Second, and perhaps more importantly, the Department has found that Everest and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its

---

[128] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[129] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

[130] 34 C.F.R. § 685.206(c)(2).

[131] *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 621 (1966).

[132] *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n,* 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy ordered by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC,* 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC,* 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively).

accreditation.[133]  Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest education has been severely limited.

Borrower defense applications confirm the lack of value of an Everest education as many Everest students report that their coursework from Everest has been an impediment rather than an asset as they seek employment.  For example, one student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[134]  Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[135]  Yet another student states: "Employers will not touch me. After graduating I posted a resume online. I did not receive any responses until I removed Everest Online from my resume."[136]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

---

[133] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinithan (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).
[134] BD1614100
[135] BD1602593
[136] BD151191

# EXHIBIT 5

| To: | Under Secretary Ted Mitchell |
| --- | --- |
| From: | Borrower Defense Unit |
| Date: | January 9, 2017 |
| Re: | Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment |

Corinthian Colleges, Inc. ("Corinthian") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. Accordingly, the Borrower Defense Unit recommends full relief for Corinthian borrower defense (BD) applicants who submit "guaranteed employment allegations" – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

## I.    Summary of Corinthian's Representations to Borrowers Promising Employment

In BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs. These oral representations sometimes took the form of a guarantee regarding the individual student and sometimes took the form of a guarantee of universal employment for graduates. In both cases, the obvious impression to students would have been that 1) the value of the education would be substantial; and 2) they would get jobs upon graduation.

These representations occurred both in person and during telephone calls with prospective students. Borrowers' allegations of "guaranteed employment" are unprompted,[1] specific, and consistent across a span of years. Indeed, the Department has received consistent guaranteed employment claims from borrowers at every campus sampled, including borrowers who enrolled between 1998 and 2013, demonstrating that personnel made consistent guaranteed employment representations throughout the entire time that Corinthian operated its schools. Taken together, based on an evaluation of the credibility of those statements, as well as Corinthian's record of making misrepresentations to prospective students,[2] a preponderance of the evidence demonstrates that Corinthian promised borrowers that they would receive jobs upon graduation.

### A.    Guaranteed Employment Representations at Heald College

At Heald, of the 1015 claims sampled, 141 (13.9% of the total) include allegations of guaranteed employment.[3] The high incidence of guaranteed employment allegations was evident at all Heald campuses. At Heald Modesto, for example, of 61 BD claims sampled, 9 allege guaranteed employment (14.8% of the

---

[1] All of the above student statements came from a variety of different types of applications including the Heald, Everest, and WyoTech attestation forms ED created for job placement rate claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but ED's attestation form only instructs borrowers to provide "any other information...that you think is relevant."

[2] *See* discussion below, Section II, describing Corinthian's misrepresentations regarding job placement rates.

[3] This count excludes allegations that may pertain to guaranteed jobs but that were not sufficiently clear or specific to qualify for relief. For example, allegations that Corinthian's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment allegations.

total).[4] A sample of claims from Modesto borrowers demonstrates the consistency and specificity of guaranteed employment representations made by school representatives:

- "Heald college recruiters stated, 'I was guaranteed' to obtain a job after graduation."[5]
- "I was told that when I finished my program I would automatically have job placement and never received that placement."[6]
- "Heald promised me a job placement in the field. To this day, I haven't been able to find a job in my field, or a good paying job."[7]
- "I was given the false pretense that I could obtain a career in law enforcement with an Associate's degree and was guaranteed job placement."[8]

Guaranteed employment allegations appeared with similar pervasiveness and consistency at all of the other 11 Heald campuses. A sample of these claims, detailed below, demonstrates the high incidence of guaranteed employment misrepresentations at the school.

- Heald Concord: "During my experience, they promised me jobs after graduation . . . I still have the same jobs after graduation and Heald did nothing to help me . . . Heald College promised that they will find job for me upon graduation."[9]
- Heald Honolulu: "Upon admission, my admission's advisor, Roy Honjo, informed that an associate's degree in applied science in Health Information Technology (HIT) would provide me many job opportunities . . . He insisted I would find a job that would suit me and would be a smart decision to pursue."[10]
- Heald Roseville: "When I first looked into Heald College and spoke with the Academic Advisor, I was promised a job position within six months. It is now 2015 and I have yet to have ever worked in a medical office. The degree has done nothing for me."[11]
- Heald Salinas: "When I first enrolled, they said I had a job at the end of my education."[12]
- Heald San Jose: "They stated on many occasions that after I graduate and complete the program that I would be placed in job where I would be able to pay off my student loans easily... They guaranteed job placement and never delivered."[13]
- Heald San Francisco: "Heald College's promises of guaranteed job placement after graduation sold me on becoming a student."[14]

---

[4] The Modesto campus was selected because relatively few Modesto borrowers qualified for relief based on ED's findings regarding job placement rates. Modesto was a relatively new campus, and therefore had calculated placement rates for fewer years in the period surveyed.

[5] BD155524.
[6] BD155784.
[7] BD155698.
[8] BD154018.
[9] BD151426.
[10] BD1600328.
[11] BD157436.
[12] BD151163.
[13] BD153799.
[14] BD153784.

| Heald Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Heald Modesto | 61 | 9 | 14.8% |
| Heald San Jose | 151 | 29 | 19.2% |
| Heald Rancho Cordova | 40 | 5 | 12.5% |
| Heald Roseville | 56 | 9 | 16.1% |
| Heald Hayward | 138 | 18 | 13.0% |
| Heald Stockton | 125 | 11 | 8.8% |
| Heald Concord | 150 | 22 | 14.7% |
| Heald Fresno | 103 | 11 | 10.7% |
| Heald Honolulu | 63 | 10 | 15.9% |
| Heald Portland | 24 | 3 | 12.5% |
| Heald Salinas | 43 | 4 | 9.3% |
| Heald San Francisco | 61 | 10 | 16.4% |
| **TOTAL** | **1015** | **141** | **13.9%** |

## B.    Guaranteed Employment Representations at Everest and WyoTech

The high incidence of guaranteed employment allegations at Heald was evident at Everest and WyoTech, as well. At Everest, 231 out of 1277 BD claims sampled, or 18.1%, made guaranteed employment allegations. At Everest Brandon, for example, 45 of 305 claims sampled, or 14.8% of the total, alleged guaranteed employment. A sample of claims from Everest Brandon borrowers follows:

- "They told me that every student that graduated the program was placed."[15]
- "I was told that I would be able to attain a job in my field with no problem. I have applied to multiple agencies and was told I was not qualified."[16]
- "I was told I would find a job in my field . . . I 'graduated' and still can't find a job that will honor my degree."[17]
- "I was told that I would be placed into a career field of my studies, but I was not."[18]

The Department sampled claims at 22 Everest campuses[19] across ten separate states (AZ, FL, MI, MA, TX, VA, CO, WI, NY, CA). Just like the Everest Brandon campus discussed above, the guaranteed employment allegations were common at all of these campuses and were distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students made substantially similar guaranteed employment allegations – whether the student enrolled at Brandon in 1998 or Rochester in 2008.

---

[15] BD151311.

[16] BD150332

[17] BD1612793.

[18] BD1614055.

[19] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The 22 campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

Similarly, at WyoTech, 64 out of 455 BD claims sampled, or 14.1%, alleged guaranteed employment. At WyoTech Laramie, for example, 8 of 31 claims, or 25.8% of the total, alleged guaranteed employment. A sample of claims from WyoTech Laramie borrowers follows:

- "They promised me a high paying career and said they would find it for me after graduation. They stated that all of the students who pass the prográm . . . will have jobs waiting for them."[20]
- "The education was sold as a way to guarantee future employment, with access to a nationwide network of job placement experts."[21]
- "The school was promising a career in the field after schooling."[22]
- "[They] would say that just by speaking the name Wyotech you so get hired and make over 100K a year. They said it would be automatic hiring and that the industry knows the Wyotech name."[23]
- "We were recruited hard and we were promised [that] [name redacted] . . . would have his choice of many fine, well-paying positions once he completed his studies."[24]

The tables below summarize the number of guaranteed employment allegations at Everest and WyoTech for all of the sampled campuses:

| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
|---|---|---|---|
| Everest Brandon | 305 | 45 | 14.8% |
| Everest Grand Rapids | 46 | 3 | 6.5% |
| Everest Largo | 31 | 6 | 19.4% |
| Everest Ontario Metro | 34 | 7 | 20.6% |
| Everest Orange Park | 36 | 9 | 25.0% |
| Everest Orlando North | 47 | 6 | 12.8% |
| Everest Orlando South | 226 | 33 | 14.6% |
| Everest Phoenix | 81 | 40 | 49.4% |
| Everest Pompano Beach | 97 | 9 | 9.3% |
| Everest Rochester | 53 | 14 | 26.4% |
| Everest Tampa | 32 | 9 | 28.1% |
| Everest San Bernardino | 15 | 1 | 6.6% |
| Everest Milwaukee | 38 | 6 | 15.8% |
| Everest Colorado Springs | 37 | 10 | 27.0% |
| Everest Ft. Worth South | 54 | 8 | 14.8% |
| Everest Tyson's Corner | 15 | 2 | 13.3% |
| Everest Vienna | 21 | 2 | 9.5% |
| Everest Arlington | 31 | 4 | 12.9% |
| Everest Aurora | 50 | 3 | 6% |
| Everest Thornton | 4 | 1 | 25% |
| Everest Chelsea | 12 | 6 | 50% |
| Everest Brighton | 12 | 7 | 58.3% |
| **TOTAL** | **1277** | **231** | **18.1%** |

[20] BD150863.
[21] BD152602.
[22] BD155621.
[23] BD151128.
[24] BD151903.

| | WyoTech Claims | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| WyoTech Laramie | 31 | 8 | 25.8% |
| WyoTech Fremont | 135 | 16 | 11.8% |
| WyoTech Blairsville | 157 | 18 | 11.4% |
| WyoTech West Sacramento | 132 | 22 | 16.6% |
| **TOTAL** | **455** | **64** | **14.1%** |

Significantly, just as the aforementioned Heald, Everest, and WyoTech claims at each campus corroborate each other, the number of similar allegations at and across all Corinthian schools and campuses strongly suggests that promises of employment were endemic to Corinthian's institutional culture.

C.    Guaranteed Employment Claims Consistent Across a Span of Years

Although the Borrower Defense Unit has received fewer claims from borrowers that attended Corinthian schools in earlier years,[25] such claims bear the same indicia of reliability as claims from students who attended more recently. Student statements about admissions representatives' misrepresentations are consistent across a span of years, as demonstrated by claims from former students at Everest – Orlando South:

- [1999]: "Everest recruiters told students that they were 'guaranteed' to obtain jobs."[26]
- [2001]: "They . . . told me I would be **guaranteed a job once I graduated.**"[27]
- [2002]: "I was told **I would get a job right away…**"[28]
- [2003]: "I was lured into this organization with false promises of **100% job placement…**"[29]
- [2005]: "They said I was **guaranteed job placement after I graduated.**"[30]
- [2006]: "**Everest guaranteed me career placement upon graduation.**"[31]
- [2007]: "They told me that I will be **guaranteed a job placement after I graduate.**"[32]
- [2008]: "They told me I was **guaranteed a job.**"[33]
- [2009]: "**I was promised job placement, high salaries and success.**"[34]
- [2010] "I was **guaranteed a job** from my Academic advisor and Career Counselor."[35]
- [2011] "…told me I was **guaranteed a job** in my profession **after I graduated** making twice as much as minimum wage at least."[36]
- [2012]: "I was **promised employment after graduation.**"[37]

---

[25] The Department's outreach has targeted borrowers from more recent years in an attempt to reach borrowers that may be eligible for relief on the basis of misrepresented job placement rates.
[26] BD155177.
[27] BD156179.
[28] BD1600004
[29] BD151816
[30] BD150148.
[31] BD157758.
[32] BD153166.
[33] BD153136.
[34] BD156038
[35] BD1605002.
[36] BD155731.
[37] BD1615288.

- [2013]: "They called me over and over and promise jobs after graduating..."[38]

### D.    Corinthian Employee Statements and Other Employment-Related Misrepresentations Corroborate Guaranteed Employment Claims

The similarity of student statements across schools, campuses, and years strongly suggests that the misrepresentations were system-wide and, indeed, part of Corinthian's institutional culture. This conclusion finds further support in the affidavits of former employees, who admitted that Corinthian employees misled prospective students about their employment prospects. For example, a former instructor at Everest's Chelsea campus stated, "People in corporate told prospective students they guaranteed jobs . . . They saw job placement not as job placement in the students' fields of study, but as a student getting any job."[39]  An admissions representative from the same campus stated, "Admissions representatives told prospective students that medical assistants are in high-demand and that they would have no problem finding jobs . . .  and they will definitely find jobs."[40]

Furthermore, guaranteeing jobs to prospective students appears to have been part of a pattern of employment-related misrepresentations at Corinthian. An internal Corinthian audit of admissions calls from one its campuses found that that 21% of admissions representatives "provided [a] false or misleading statement (such as best case scenario)," which likely pertained to employment outcomes.[41]  Further, in a letter issuing a nearly $30 million fine to Heald, the Department found that Heald "represented with regard to many of its programs that it placed 100% of its graduates in jobs," but Heald was unable to provide evidence to substantiate these representations. The Department further noted that based on the evidence that Heald was able to provide, the job placement rates appeared to be substantially lower than 100%, and for several programs, below 50%.[42]  At the same time that Corinthian was making false representations about its job placement rates, executives at Corinthian were putting heavy pressure on campuses to attract new students. One admissions director reported that his superiors at Corinthian instructed him to "enroll your brains out."[43]  In this context, it is unsurprising that staff at the campus level would be guaranteeing students a job.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for additional Corinthian campuses. The hundreds of claims reviewed corroborate that Corinthian personnel made guaranteed employment representations beginning shortly after Corinthian opened or gained control of a campus.

## II.    Evidence of the Falsity of the Alleged Representations

Corinthian's own records show that the school was unsuccessful at placing large numbers of Corinthian graduates. The Everest records, for example, reveal that nearly half of the school's programs placed 50% or fewer of the program graduates. Further, evidence from Corinthian's internal communications shows that they were aware that the school could not live up to their promises of employment. For example, an internal email from Corinthian's Vice President for Operations stated that, "at some campuses" they had "not been

---

[38] BD1617088.

[39] *Massachusetts v.  Corinthian Colleges, Inc.*, Civil Action 14-01093-E, *Medolo* Aff. ¶ 4, June 26, 2015.

[40] *Massachusetts v.  Corinthian Colleges, Inc.*, Civil Action 14-01093-E, Morrison Aff. ¶ 5, July 6, 2015.

[41] Exhibit 40 - CA AG Default Motion at 278.

[42] Heald Fine Letter, http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.

[43] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, Exhibit 36 - CA AG Default Motion.

consistently delivering" on the promise to students to "find a position that will help them launch a successful career."[44]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations—and many other BD applicants—state that they were unable to find a job upon graduation; that they were unable to find employment that used their degree; or that they were forced to remain in the job that they had prior to enrolling at Heald, Everest, or WyoTech. In sum, the evidence overwhelmingly shows that Corinthian campuses could not truthfully guarantee prospective students employment upon graduation.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations

For the reasons set forth below, the Corinthian borrowers' applications for borrower defense relief predicated on a guaranteed employment allegation: a) are reviewed under California law; and b) have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[45] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. Moreover, given the lack of value conferred by Corinthian credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

### A.   The Department will apply California Law to These Claims.

To prevail with a defense to repayment, a borrower must assert acts or omissions "that would give rise to a cause of action against the school under applicable state law."[46] With the assistance of the Office of General Counsel, we have examined specifically whether borrowers making the claims described in this memo could bring a cause of action in California and determined that they could. Specifically, the Department has concluded not only that students who were subjected in California to the acts complained of here would have been able to bring their cases in California courts under California law, but also that borrowers who attended Corinthian in other states could have brought their claims in the context of a class action in a California court, which would have applied California law.

California has general jurisdiction over Corinthian.[47] As to the law a California court would have applied, California courts have recognized that a forum state (such as California) "may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'" *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001) (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)). California is neither an arbitrary nor an unfair state for a class of Corinthian borrowers to bring a

---

[44] Exhibit 36 - CA AG Default Motion.

[45] CAL. BUS. & PROF. CODE § 17200, et seq.

[46] 34 C.F.R. § 685.206(c) (emphasis added).

[47] Corinthian was headquartered in California, and was therefore a resident corporation subject to the state's general jurisdiction. Furthermore, even a non-resident corporation is subject to a forum's general jurisdiction "if [its] contacts in the forum state are substantial[,] continuous and systematic." *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1092 (Cal. 1996) (internal quotation marks and alterations omitted). In such a case, "defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction," and there is no need to determine whether the specific acts alleged in the suit meet the threshold for specific jurisdiction. *Id.* Such is the case with Corinthian; the largest numbers of both campuses and students were located in California.

claim, and the conduct at issue had significant contacts with California insofar as the students were enrolling in a California-based school and recruiters were receiving at least some of their training from high levels of administration at the school.

Furthermore, under California's choice-of-law test, the court considers both the defendant's headquarters and the state where many students attended the school.[48] Another key factor in the choice-of-law analysis under California law is the location "where the wrong occurred."[49] At Corinthian, the largest numbers of both campuses and students were located in California. Further, as proved to be the case in the Department's investigation of Corinthian, the fact that a school is headquartered in a given state will often mean that "*some or all* of the challenged conduct emanates" from that state, another common factor in choice of law determinations.[50] At Corinthian, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment. [51]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, that the largest numbers of its campuses and students were located in California, and that decisions and policies made by its California based corporate leadership harmed students across the nation – it is reasonable for the Department to determine that a California court would apply California law to these claims. Therefore, BD claims submitted by former students from all Corinthian campuses will be considered under the California UCL.

### B.   Corinthian Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the UCL

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[52] Here, Corinthian's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

#### 1.   The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[53] Thus, if a business practice violates any law, this is *per se* a UCL violation.[54] Corporate

---

[48] *See, e.g., In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)) (considering, among other factors, "where the defendant does business [and] whether the defendant's principal offices are located in California…").

[49] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). *See also McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("Although California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred without regard to the nature of the issue that was before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." (internal citation and quotation marks omitted)).

[50] *See, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612 (Ct. App. 1987).

[51] *See* Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15; Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013).

[52] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[53] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

misrepresentations like Corinthian's promises of employment are prohibited by a number of state and federal laws.[55] In particular, Corinthian's misrepresentation regarding its students' employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[56] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[57]

Applying that three step inquiry, Corinthian clearly violated the FTC Act.

1. As described above, Corinthian made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[58] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that Corinthian schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Students enrolled "primarily to gain skills and find a position that will help them launch a successful career."[59] Corinthian's own marketing materials emphasized that the school was a pathway to employment, often noting "solid industry employment contacts"[60] and the availability of "lifetime career services." For many students, the principal purpose of attending a career college like

---

[54] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[55] Though the analysis below focuses exclusively on the FTC Act, Corinthian's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that Corinthian's conduct violates the FTC Act, this memo does not reach the issue of whether it may be unlawful under other applicable rules.

[56] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[57] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[58] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[59] Exhibit 36 - CA AG Default Motion.

[60] Exhibit 179, Part 1; Declaration of Jacinto P. Fernandez (CA AG), Exhibit Y

Everest, Heald or WyoTech was to obtain employment in a particular field.[61]  Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation.  Accordingly, Corinthian's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

### 2.  The Fraudulent Prong

Corinthian's misrepresentations regarding employment prospects also are a fraudulent business practice under the UCL, and therefore are another form of unfair competition providing an independent basis for borrower defense relief for Corinthian students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[62]  The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[63]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[64]  As noted, the representations Corinthian made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[65]  However, for a consumer who was deceived into purchasing a product[66]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[67] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[68]

Express or implied claims like those made by Corinthian about employment prospects are presumptively material,[69] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[70]  However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to

---

[61] Under these circumstances, students' reliance on a guarantee of employment was reasonable.  Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery."  The large volume of claims making guaranteed employment allegations is a clear indication that students believed what they were told.
[62] *See Bank of the West*, 2 Cal. 4th at 1254.
[63] CAL CIV. C. § 1709.
[64] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).
[65] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).
[66] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[67] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[68] *Id.* (internal quotation marks omitted).
[69] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).
[70] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

enroll.[71] Statements by large numbers of borrowers across Corinthian campuses make clear that the promise of employment entered substantially into their choice to attend a Corinthian school.

### C.   Weak Disclaimers In Some of Everest and WyoTech's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

Corinthian's promises of employment were false and misleading, despite the limited disclaimers on some Everest and WyoTech enrollment agreements. Although those enrollment agreements state that the school does not guarantee "job placement" or "a salary," such written information did not change the overall impression created by the oral representations.

For example, if a student examined an Everest enrollment agreement, the student would have to read through two pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[72] Part of the way through that box of fine print, item number 2 states that Everest "does not guarantee job placement to graduates upon program / course completion or upon graduation, and does not guarantee a salary or salary range to graduates."[73] That item is not highlighted or bolded in any way. The agreement then continues on with an additional page of fine print disclaimers. The WyoTech enrollment agreement includes a similar disclaimer on its first page: "The school does not guarantee employment following graduation, but does offer placement assistance to graduates." This is included as item "(a)" in a list of nine fine print disclaimers following a paragraph-long disclaimer about the cost of books and tools.

These disclaimers do not cure the falsity of Everest and WyoTech's oral promises regarding employment prospects. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[74] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[75]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, Corinthian's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.[76]

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want[ed] quick solutions."[77] Corinthian's CEO, in a letter to

---

[71] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

[72] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement.

[73] BD150633, Attachment #3, page 7.

[74] *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[75] *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[76] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics.

[77] CA AG Quach Decl. Ex 113.

Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[78] Corinthian advertised on daytime TV,[79] targeting the un- or under-employed. In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[80] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Finally, the fact that the 436 Corinthian claims reviewed to date that allege Corinthian guaranteed employment make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations that Corinthian personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D. Eligible Borrowers

Based on the above analysis, the following Corinthian students making guaranteed jobs allegations should be eligible for relief: any claimant who attended a Corinthian campus and who alleges that they were promised, guaranteed, or otherwise assured employment or job placement.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis, the misrepresentation in this case went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of the borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E. Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[81] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[82]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[78] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[79] CA AG Quach Decl. Ex 113.

[80] CA AG Decl. of Holly Harsh.

[81] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[82] *See, e.g., FTC v. Stefanchik,* 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[83]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Corinthian education. *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). The Department has found that Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[84]  Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest, Heald or WyoTech education has been severely limited.

Borrower defense applications confirm the lack of value of a Corinthian education as many Corinthian students report that their degree or affiliation with the school has been an impediment rather than an asset as they seek employment. For example, one Everest student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[85]  Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[86]  A student from WyoTech states: "Any association with WyoTech hurts my chances for employment. I was promised jobs with big salaries, a career I would hold for life and all WyoTech gave me was debt and shame. I was told by two interviewers, that they would NEVER hire a WyoTech graduate…"[87]  And a Heald student states: "The school is not reputable no other institution recognizes the credits earned and jobs stray away from Heald graduates, claiming they lack in teaching students current and up to date information in the coding industry. I have yet to work in my field of study and utilize my degree. I have a useless degree from a closed college."[88]

Finally, awarding full relief to students who make guaranteed employment allegations is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inconsistent to limit the relief of students who make guaranteed employment allegations—which are essentially 100% job placement claims—while providing full relief to those students who qualify for job placement rate relief.

---

[83] *Makaeff v. Trump Univ.,* 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

[84] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CORINTHIAN-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

[85] BD1614100.

[86] BD1602593.

[87] BD151191.

[88] BD157356.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, [89] it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

CONCUR:

Office of the General Counsel                    Date   1/12/17

---

[89] This approach also is consistent with the Department's new regulations in that the Department has considered whether the value of the education provided by Corinthian was such that it would be appropriate to offset the relief provided to borrowers who were guaranteed employment. The Department has concluded that the Corinthian education lacked sufficient value to do so.

# EXHIBIT 6

To:    Under Secretary Ted Mitchell
From: Borrower Defense Unit
Date:  January 10, 2017
Re:    Recommendation for ITT Borrowers Alleging That They Were Guaranteed Employment -- California
      Students

---

ITT Technical Institute ("ITT") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. This memorandum addresses borrower defense (BD) claims premised on these misrepresentations submitted by borrowers who attended an ITT campus in California.[1] As set forth below, the Borrower Defense Unit recommends full relief (subject to the statute of limitations) for borrowers[2] who (1) enrolled at any ITT California campus between January 1, 2005[3] and ITT's closing and (2) whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including representations that all graduates obtain employment.

## I.    Summary of ITT's Representations to Borrowers Promising Employment

Like former Corinthian students,[4] former ITT students have submitted guaranteed employment claims that are factually consistent, pervasive across campuses, and constant over a span of years. In these BD applications, ITT borrowers (both from California and throughout the country) consistently allege, each in their own words,[5] that ITT staff promised, guaranteed, or otherwise assured that they would be placed in jobs. These oral representations occurred both in person and during phone calls with prospective students. The Department has received guaranteed employment claims from borrowers at every campus sampled, dating back to the 1990s. Based on those statements, as well as corroborating evidence from former ITT employees, a preponderance of the evidence demonstrates that ITT guaranteed or otherwise assured borrowers future job placement.[6]

---

[1] As discussed below, guaranteed jobs misrepresentations were evident throughout ITT's campuses nationwide. Because California law has already been thoroughly analyzed by the Department for the same claim in connection with Corinthian Colleges, we recommend proceeding with discharges for ITT California students with guaranteed jobs allegations, as set forth below.

[2] For purposes of this memorandum, Parent PLUS borrowers are included in the definition of California students.

[3] Although this memorandum only addresses borrowers who enrolled on or after January 1, 2005, additional evidence (including from additional BD claims) may support future relief for applicants who enrolled prior to 2005. The Department will evaluate this evidence on an ongoing basis and may update this recommendation accordingly.

[4] *See* Memorandum from Borrower Defense Unit to Under Secretary Mitchell re: Corinthian Borrowers Alleging That They Were Guaranteed Employment (Jan. 9, 2016).

[5] The Department has received ITT BD applications submitted via narratives in Word documents and emails, as well as via forms provided to borrowers by the Debt Collective. A vast majority of these allegations are unprompted. Some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but the Department's BD website has only instructed borrowers to provide "other information…that you think is relevant."

[6] We have reviewed the ITT evidence on a nationwide level as well as on a California-specific level. As set forth below, ITT's conduct with respect to guaranteed jobs was consistent nationwide; we have found nothing unique about ITT's conduct in California as compared to other states. Thus, the fact section addresses both California-specific evidence as well as nationwide evidence.

### A.    Guaranteed Employment Representations Consistent in Nature

Of 320 randomly sampled BD applications submitted by ITT borrowers, 103 (32% of the total) state that the borrower was promised, guaranteed, or otherwise assured employment.[7] The unprompted factual similarity of these BD claims evidence a strong indicia of reliability.  For example, at ITT-San Diego, where 7 of 19 BD applications sampled alleged guaranteed employment, borrowers submitted the following highly consistent statements:

- "The school assured me that I would find employment in my field of study and that the industry of my field of study was in high demand."[8]
- "I was also told by the recruiters from the school about wages I could make that I have yet to be able to earn due to the fact that the school is and was not very credible. . . .The ITT Tech recruiters assured me A.A. students graduate making around 50-60K a year and the B.S. graduates would be around $80k a year. They misrepresented their product, their name brand and their education."[9]
- "The promises were that it would be easy to find a high paying job right away."[10]
- "I was promised that once I graduated I would be able to get into any field of my choice from Crime Scene Investigator, Crime Mapping, Probation to Detective to many many more. The promise of salaries starting at 50K upward depending on my field of choice and my recruiter said employers are beating down their door saying we want to hire the graduates as they know the latest and the best information available."[11]
- "They promised to place me into a good job making a middle class wage but were unable to put myself or other students into anything but a low paying temp job. Then it was promised that I would be better off with a Bachelors from ITT in order to get the higher pay job. I and multiple other students were duped into thinking that."[12]
- "They additionally gave promises of placement in good jobs, while in reality I have been swamped with a large amount of debt, inability to attain a job in the degree field or of even better earnings."[13]
- "I was also told that they have a great job placement program and that all students that seek help would be placed with a job within my new field after the first six months of school."[14]

### B.    Guaranteed Employment Representations Pervasive Throughout ITT

Guaranteed employment representations were not limited to ITT-San Diego.  In fact, such representations were pervasive throughout ITT's network of campuses in California and nationwide.  Former students alleged guaranteed employment at each of the 22 ITT campuses sampled, which were located across 17 states (CA, IL, MI, PA, WA, AK, VA, MO, FL, NM, TX, OR, TN, AL, NY, OK, and WI).  A sample of these claims, detailed below, demonstrates the pervasiveness of guaranteed employment misrepresentations throughout ITT:

---

[7] This total excludes allegations that may pertain to guaranteed jobs but were not sufficiently specific to qualify for relief. For example, allegations that ITT's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment claims.

[8] BD1655184.

[9] BD1639392.

[10] BD1655377.

[11] BD1605233.

[12] BD1655410.

[13] BD1655354.

[14] BD1638087.

- ITT-Orange (CA): "I was told that ITT had a 100% job placement upon graduating students."[15]
- ITT-Anaheim (CA): "I was promised that immediately after graduating, I would be placed in a job within my field of study."[16]
- ITT-Sylmar (CA): "I was told that my degree would guarantee me employment."[17]
- ITT- Rancho Cordova (CA): "The sales representative stated that after completion of my education courses I would make between $50,000 and $75,000 USD per year."[18]
- ITT-Oak Brook (IL): "They advised me that I would have a job waiting for me. The credits for the field I was in were not accredited. The degree is not worth anything and the school is a scam."[19]
- ITT-Swartz Creek (MI): "They guarantee jobs right after graduating."[20]
- ITT-Harrisburg (PA): "I was told on several occasions by ITT Admissions Representatives that the school has 100% job placement upon completion for students"[21]
- ITT-Seattle (WA): "They said that 100% job placement and that I should have no problem finding a job in my field."[22]
- ITT-Little Rock (AK): "They promised that they had companies like Blizzard Entertainment, Electronic Arts, Sony, Nintendo, etc. fighting for graduates for their companies . . . They not only lied about the job placement but they lied about the fact that we could be making a 5 figure salary."[23]
- ITT-Springfield (VA): "I WAS LED BY THE RECRUITER TO BELIEVE THAT THE JOB OPPORTUNITIES WOULD BE POURING IN."[24]
- ITT-Arnold (MO): "I was told that I would get a job in my field"[25]
- ITT-Albuquerque (NM): "ITT lied about job prospects and guaranteed a job after graduation."[26]
- ITT-Richardson (TX): "After the tour ended, the counselor told me the multimedia program was game development and stated that upon completion of the program I would have a guaranteed job through their job placement program and that the starting base pay for such a job was $70,000/year."[27]
- ITT-Portland (OR): "Told me they would have me in a career by the end of my first year in school."[28]
- ITT-Knoxville (TN): "I was told that they had 100's of jobs waiting for only their graduates. No one but ITT Tech graduates could apply to these jobs"[29]
- ITT-Bessemer (AL): "I was promised job placement upon completing my courses . . . I was also given an estimated range of amount of starting salary/hourly pay."[30]
- ITT-Greenfield (WI): "They also provided misleading stories about how their program would land me the job of tomorrow and how much people in my field were being paid during and after graduation."[31]
- ITT-Tulsa (OK): "They said they would have me working in the gaming industry....they told me to look in the classifieds."[32]

---

[15] BD156693.
[16] BD1651614.
[17] BD1639208.
[18] BD1601288.
[19] BD156627.
[20] BD153161.
[21] BD156697.
[22] BD1600120.
[23] BD153747.
[24] BD155274.
[25] BD1659434.
[26] BD1604365.
[27] BD1659402.
[28] BD1607247.
[29] BD1619298.
[30] BD1655120.
[31] BD1604587.

| ITT Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| San Diego (CA) | 19 | 7 | 42.11% |
| Anaheim (CA) | 10 | 4 | 40.00% |
| Rancho Cordova (CA) | 15 | 2 | 13.33% |
| Sylmar (CA) | 16 | 2 | 12.5% |
| Dayton (OH) | 12 | 5 | 41.66% |
| Arnold (MO) | 23 | 6 | 26.09% |
| Greenfield (WI) | 17 | 6 | 35.29% |
| Knoxville (TN) | 18 | 5 | 27.78% |
| Portland (OR) | 14 | 2 | 14.29% |
| Richardson (TX) | 15 | 3 | 20.00% |
| Spokane Valley (WA) | 30 | 10 | 33.33% |
| Tampa (FL) | 17 | 4 | 23.53% |
| Arlington Heights (IL) | 11 | 3 | 27.27% |
| Getzville (NY) | 10 | 1 | 10% |
| Albuquerque (NM) | 9 | 3 | 33.33% |
| Various Campuses[33] | 84 | 39 | 46.43% |
| **TOTAL** | **320** | **102** | **31.90%** |

Moreover, BD applications alleging guaranteed employment are buttressed by numerous borrower statements in connection with government investigations and private litigation, as well as statements provided to the Borrower Defense Unit by veterans targeted by ITT for enrollment.[34]

### C.   Guaranteed Employment Representations Constant Across Years

Guaranteed employment representations also are constant across a span of years. Importantly, the claims of borrowers who attended in earlier years are consistent with claims submitted by students who attended more recently. Just as the claims sampled at each campus corroborate each other, the following allegations over time strongly suggest that representations of guaranteed employment were endemic at ITT:

- [2005]: "Promised great jobs and prosperous careers . . ."[35]

---

[32] BD153174.

[33] This number includes a random sample of 84 claims from 22 campuses across 18 states.

[34] In response to government investigations, ITT borrowers consistently alleged that they were "guaranteed to get a job," *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.,* Civil Action 14-00292-SEB-TAB (S.D. Ind.) (hereinafter "*CFPB Case*"), Declaration of MT at ¶3 (July 11, 2016); that they would be placed in "jobs in their field of study within nine months of graduating," *Commonwealth of Massachusetts v. ITT Educational Services, Inc.,* Civil Action 16-0411 (Mass. Sup. Ct. Compl. at ¶ 55, filed Mar. 31, 2016) (hereinafter "*MA AG Case*"); and that "recruiters guarantee ITT will find you a job," S. Health, Educ., Labor & Pensions Comm., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012) (hereinafter "*Harkin Report*"), p. 539, *available at* https://www.help.senate.gov/imo/media/for_profit_report/PartII/ITT.pdf. These statements are corroborated by 90 allegations of guaranteed employment cited in a recent class action filed by the Harvard Legal Services Center, *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), as well as by dozens of guaranteed employment allegations submitted by veterans who attended ITT, *Veterans Education Success,* "ITT Trends" (2016) (compiling summaries of interviews and student quotations) (on file) (hereinafter "*ITT Trends*").

[35] BD156898 (ITT Torrance).

- [2006]: "I was told that I would be able to make about 64K once I graduated because I was going into a Bachelors program degree. I got promised the stars and the sky."[36]
- [2007]: "I was also led to believe that what I was going to school for would be a sure job after graduation."[37]
- [2009]: "I was told that I would definitely have a job if I enrolled."[38]
- [2011]: "We were told that there would be no problem getting a job and they would help."[39]
- [2013]: "I was told I would obtain a job in the field upon graduation, easily with a high salary."[40]

As further discussed below, these claims are supported by corroborating evidence from former employees and spanning the period of at least 2005 to the school's closure.

### D.   Statements of Former ITT Employees Corroborate Guaranteed Employment Claims

ITT borrower defense claims based on guaranteed employment misrepresentations are substantiated by the affidavits, interviews, and testimony of former employees at campuses nationwide. This former employee evidence establishes that, in response to oral directives from management, recruiters from at least 2005 through ITT's closing led prospective students to believe that employment was guaranteed.

ITT orally directed staff to present recruitment documents in a manner that guaranteed or otherwise assured employment. ITT employees were trained to provide these oral promises of employment despite the existence of written documents to the contrary.[41] For example, one former employee explained that "[w]ritten instruction from ITT headquarters was contradicted by oral instructions from the District Manager or a Senior Vice President . . . [ITT] was interested in getting students into the school no matter what it took to do so."[42] Another former employee, in testimony before the National Advisory Committee on Institutional Quality and Integrity (NACIQI), explained that recruiters "were consistently trained . . . to go verbally around the requirements" and that, even if recruiters did not expressly guarantee employment, "it was taken that way."[43]

As a result, former employees at ITT consistently report that staff guaranteed or otherwise assured employment. Some employees guaranteed employment expressly. For example, one former employee stated, "[m]arketing told students not to worry about prior felonies and they would get placed in jobs."[44] Another stated, "I heard recruiters assure students that they would get a great job that would enable them to pay back

---

[36] BD156228 (ITT-Sylmar).

[37] BD1659496 (ITT-Rancho Cordova).

[38] BD157549 (ITT-Indianapolis).

[39] BD156506 (ITT-Swartz Creek).

[40] BD154555 (ITT-Murray).

[41] *State of New Mexico v. ITT Educational Services, Inc.*, Civil Action D-202-CV-2014 (D.N.M) (hereinafter "*NM AG Case*"), ITT Training Document entitled "The Importance of our Language: Comments to Avoid," dated July 18, 2011, ITT-NMAG 0006448 (Feb. 26, 2014) (explaining that ITT disseminated a document on "Comments to Avoid," which barred personnel from promising job placement and stated, "[w]e do not guarantee jobs to any student or graduate").

[42] *CFPB Case*, Interview of Wendy Maddox-Wright, former employee from April 2005 to August 2011, ITT-Louisville (Jan. 28, 2014). See also *id.*, Interview of Amy St. Clair Lachman, former employee, ITT-Johnson City (April 9, 2014) ("[E]mployees knew what ITT wanted and it was not about helping people. Rather, it was about how many people ITT could get into a chair.").

[43] Transcript of Testimony of ITT Recruiter Matthew Mitchell before NACIQI at 217 (June 23, 2016) (Mitchell was employed as a recruiter in 2013).

[44] *CFPB Case*, Interview of former employee Sarah Doggett (employed from late 2005 to 2009) at 6 (ITT-Louisville, Feb. 26, 2014).

their loans."[45] And another explained that "[b]efore showing any forms or numbers to students, financial aid staff was trained to emphasize all of the benefits students would receive from their education. From 2004 to 2007, this was done with the guidance of a 'return on investment document' that [the President and CEO of ITT] developed" which "contained misleading information about the average salaries of graduates of different programs."[46]

Recruiters, under pressure to enroll students, used a variety of tactics to pave the way for these false employment promises, including presenting documents in a manner that led students to believe employment was assured. A review of ITT's internal "Mystery Shopper" audio files corroborated testimony that recruiters deceived prospective students with a "wink and a nod." In one recording, for example, a recruiter displayed a "Career Wheel" and reassured the borrower regarding his chances of landing one of the entry level jobs listed: "As long as you have the foundation to be able to go in there and experience some of this, you'll be good to go."[47]

Guaranteed employment claims are further corroborated by recent ACICS findings against ITT[48] as well as by numerous former employee statements regarding falsification of student documents and manipulation of job placement statistics.[49] Based on the widespread evidence cited herein that ITT guaranteed or otherwise assured employment to its prospective students during the period of 2005 until the school's closure in 2016, we recommend no further year-by-year or campus-by-campus breakdown for additional ITT campuses.

## II.   Evidence of the Falsity of the Alleged Representations

ITT's own records show that for the students who managed to graduate, the school was unsuccessful at placing thousands of them. Moreover, former employee statements show the school knew it could not live up to its employment promises. For example, according to a former employee from ITT-Louisville, marketing representatives told prospective students that they could get jobs creating PlayStation games with a certain Bachelor's degree; however, not a single student with the degree obtained employment.[50] Another former

---

[45] *CFPB Case,* Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[46] *Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), Affidavit of Dawn Lueck (Dec. 20, 2016) Lueck began working at ITT's Henderson, Nevada, campus in 1999. In 2002, she began working at ITT's corporate office in Carmel, Indiana, as a student loan refund coordinator. In 2003, she moved to ITT's Murray, Utah campus, where she began working as a financial aid administrator, and was promoted to director of finance in 2006. In 2007, she moved to ITT's new Phoenix, Arizona campus to set up their financial aid department, and was employed there until she left ITT in 2009.

[47] *Audiotape: ITT Mystery Shopper Investigation,* ITDS0000009 at 30 mins (Nov. 21, 2012) (on file).

[48] ACICS found that ITT violated its requirements for reporting job placements rates. *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016), *available at* http://acics.org/commission%20actions/content.aspx?id=6712.

[49] *CFPB Case,* Interview of former employee Bradley Parrish, ITT-Knoxville (April 23, 2014) (explaining that some graduate employment verification forms, or GEI's, "had been falsified and student signatures had been fabricated . . . These were called 'magic GEI's' because magic tape was used to either transfer a student signature from another form to the GEI or to have the student sign a blank GEI"); *CFPB Case,* Complaint at ¶ 33 (alleging that "placement rates do not include former students who did not graduate . . . may include jobs that do not require the degrees students paid for . . . and may include positions that were merely seasonal"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.,* 388 F. Supp. 2d 932, 938 (S.D. Ind. 2005) (former ITT employee who worked as a mater admissions representative at ITT-San Bernardino (CA) allegedly "concealed adverse student statistics by switching students from program to program"); *id.* (former ITT employee from the Torrence, California Campus stated that ITT fabricated and stretched its student statistics and that ITT's graduate placement figures were inaccurate by at least 20%).

[50] *CFPB Case,* Interview of former employee Sarah Doggett, ITT-Louisville (Feb. 26, 2014) (employed from late 2005 to 2009).

employee, who served as the Dean of Academic Affairs at ITT-Tallahassee, stated that recruiters asked prospective students if they were familiar with the show "CSI Miami" and then guaranteed future employment as crime scene investigators, even though he was "not aware of a single student who graduated from the Criminal Justice program and became a CSI."[51] Instead, most of those students became security guards – "positions that didn't require a degree at all."[52]

The narratives in borrower defense applications also support these conclusions. Many students that make guaranteed employment allegations – and many other ITT BD applicants – state that they were unable to find a job at graduation; that they were unable to find employment that used their degree; and/or that they were forced to remain in a job that they had prior to enrolling at ITT.[53] These narratives are consistent with student accounts provided to law enforcement agencies[54] and non-profit organizations regarding their inability to find employment related to their fields of study.[55] In sum, the evidence overwhelmingly shows that ITT could not truthfully guarantee employment upon graduation.

**III.    Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for California Students Making Guaranteed Employment BD Claims Under California Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

For the reasons set forth below, California students with borrower defense claims predicated on a guaranteed employment allegation have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[56] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.[57]

Moreover, California students with guaranteed employment allegations should, under California law, be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

**A.    The Department Will Apply California Law to Claims by California Students**

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from

---

[51] *CFPB Case*, Affidavit of former employee Rodney Lipscomb at ¶ 25 (ITT-Tallahassee, Aug. 17, 2016) (Lipscomb was Dean of Academic Affairs at Tallahassee from April 4, 2011 to January 28, 2015).

[52] *Id.*

[53] *See supra*, Section I and *infra* Section III(E).

[54] *CFPB Case*, Complaint at ¶¶ 36-49 (providing that numerous students complained that ITT promised better results than they were able to achieve and that ITT misled potential students through job placement rates which inappropriately included temporary work); *Id.* Declaration of Jacy Belyeu at ¶ 8 (ITT-Tucson July 14, 2016) (stating that "[i]n the three years since I graduated, my ITT degree hasn't increased my pay of my job opportunities as promised"); *Id.* Declaration of Michael Tolliver at ¶ 10 (ITT-Chattanooga, July 11, 2016) (stating that since graduating, the "degree has been worthless to me. I have applied for hundreds of jobs in the IT field and I haven't been hired in the field. The job opportunities the recruiter talked about have not been available as he promised").

[55] *See ITT Trends* (providing dozens of statements by veteran borrowers attending California campuses, as well as campuses nationwide, that ITT promised them jobs upon graduation).

[56] CAL. BUS. & PROF. CODE § 17200.

[57] Although we elected to review applications of borrowers attending California campuses based on California law, *see supra* note 1, we note that claims by such borrowers may also be reviewed under Indiana law, the location of ITT's corporate headquarters. Indiana law would support relief for guaranteed jobs claims under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a) *et seq*, as well as under the Indiana common law theory of constructive fraud, *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996); *Harmon v. Fisher*, 56 N.E.3d 95, 100 (Ind. App. 2016).

the Secretary, in any action arising from or relating to a [Direct] loan…, an amount in excess of the amount such borrower has repaid on such loan."[58] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[59]

At the time of its closing, there were more ITT students *and* campuses in California than in any other state.[60] ITT was incorporated in Delaware but operated no campuses there. ITT's corporate headquarters were located in Indiana, but at the time of closing fewer than 3% of its students were Indiana residents, a smaller number of residents than each of the following eleven states (in order from most to least)— California, Texas, Florida, Ohio, Virginia, Pennsylvania, Michigan, Georgia, Tennessee, North Carolina and Alabama.

Here, the Department has determined that it is appropriate to apply California law to claims by California students. This approach is reasonable and consistent with common state choice-of-law analyses, which look primarily to the location of the wrong (and only secondarily to the place of incorporation or location of corporate headquarters). Indeed, the key factor in the choice-of-law analysis under California law,[61] Indiana law,[62] and the Restatement (2nd) of Conflict of Laws is the location "where the wrong occurred."[63] Accordingly, because the wrong for California students occurred in California, it is reasonable for the Department to determine that a California court would apply California law in addressing the claims of ITT's California students.

**B.    California Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the California UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[64] Here, ITT's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.    The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[65] Thus, if a business practice violates any law, this is *per se* a UCL violation.[66] Corporate

---

[58] 20 USC § 1087e(h).

[59] 34 C.F.R. § 685.206(c)(1).

[60] At the time of closing, ITT operated fourteen campuses in California. No other state operated more than nine. Similarly, ITT enrolled 4,482 California residents, over 1,100 more than Texas, the state with the second largest student population.

[61] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). See also *Hernandez v. Burger*, 102 Cal.App.3d 795, 802, 162 Cal. Rptr. 564 (1980), *cited with approval by Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (holding that the state with "the predominant interest" is the state "where the wrong occurred.")

[62] Indiana treats a consumer protection claim as recovery in tort. *See McKinney v. State*, 693 N.E.2d 65, 72 (Ind. 1998) (finding that, despite the fact that "fraud is not an element of" an IDCSA claim, "the action is nonetheless based on fraud"). Under Indiana law, the choice-of-law rule governing tort actions is *lex loci delicti*—"the law of the place where the tort was committed is the law of the resulting litigation." *Eby v. York-Div., Borg-Warner*, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983).

[63] Restatement (Second) of Conflict of Laws § 145 (1971) ("Subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection.").

[64] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[65] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

misrepresentations like ITT's promises of employment are prohibited by a number of state and federal laws.[66] In particular, ITT's misrepresentation regarding its student's employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[68] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[69]

Applying that three step inquiry, ITT clearly violated the FTC Act.

1. As described above, ITT made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[70] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that ITT schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Indeed, for many students, the principal purpose of attending a career college like ITT was to obtain employment in a particular field.[71] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, ITT's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

---

[66] See *Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[67] Though the analysis below focuses exclusively on the FTC Act, ITT's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that ITT's conduct violates the FTC Act, this memorandum does not reach the issue of whether it may be unlawful under other applicable rules.

[68] See FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[69] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).

[70] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[71] Under these circumstances, students' reliance on a guarantee of employment was reasonable. Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery." The large volume of ITT claims making guaranteed employment allegations is a clear indication that students believed what they were told.

### 2.   The Fraudulent Prong

ITT's misrepresentations regarding employment prospects are also a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for ITT students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[72]  The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[73]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[74]  As noted, the representations ITT made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and . . . lost money or property" as a result of the deceptive practice alleged.[75]  However, for a consumer who was deceived into purchasing a product[76]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[77] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[78]

Express or implied claims like those made by ITT about employment prospects are presumptively material,[79] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[80]  However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to enroll.[81]  Statements by large numbers of borrowers across ITT campuses make clear that the promise of employment entered substantially into their choice to attend ITT.

### C.   Weak Disclaimers In Some of ITT's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment

ITT's promises of employment were false and misleading, despite the limited, fine print disclaimers on some enrollment agreements that the school does not guarantee "job placement" or "a salary." As set forth

---

[72] *See Bank of the West*, 2 Cal. 4th at 1254.

[73] CAL. CIV. C. §1709.

[74] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[75] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[76] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[77] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[78] *Id.* (internal quotation marks omitted).

[79] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept.17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[80] *In re Tobacco II Cases*, 46 Cal.4th at 298.

[81] Because deception occurs at the time of decision, it is sufficient for ITT students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

below, these fine print disclaimers do not change the overall impression created by the oral representations described above.

For example, if a student examined an ITT enrollment agreement, the student would have to read through two pages of fine print to find a list of twenty-eight fine print disclaimers, the eleventh of which states that ITT "does not represent, promise or guarantee that Student or any other student will obtain employment."[82] This disclaimer is not highlighted or bolded in any way. The agreement then continues on with four more pages of fine print.

These disclaimers do not cure the falsity of ITT's oral promises regarding employment prospects. Courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[83] The California Supreme Court also has held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[84]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, ITT's disclaimers were particularly ineffective when considered in the context of its unsophisticated student population and high-pressure admissions practices.[85] Indeed, there is evidence that some ITT students were not afforded the opportunity to even review the enrollment agreement prior to enrollment and that admission representatives would go so far as to e-sign enrollment paperwork on behalf of students, without their consent.[86] Moreover, as with Corinthian, ITT advertised heavily on daytime TV, targeting the un- or under-employed. Indeed, admissions representatives were under such tremendous pressure to enroll new students that even homeless veterans were recruited despite the additional challenges

---

[82] *See, e.g.,* ITT Albuquerque Enrollment Agreement (September 1, 2011) (on file).

[83] *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[84] *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("[T]he fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[85] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics. ITT's high pressure enrollment tactics are described in detail by numerous sources. *See, e.g.,* Harkin Report at 527-531; *CFPB Case,* Complaint at ¶¶64-66 ("In contrast to the lengthy sales pitch, the enrollment and financial aid processes were much faster, so that many consumers did not know or did not understand what they signed up for. Recruiters induced prospective students to sign forms without giving them sufficient information about what they were signing [and] required potential students to sign an Enrollment Agreement before they could receive information about their financial aid options . . .")

[86] *CFPB Case,* Affidavit of former admissions representative Ricky Bueche at ¶ 15 (ITT-Baton Rouge, 2010-2014) (explaining that "[m]any times, when students left the campus without agreeing to apply, the Director of Admissions would instruct representatives to go back to the computer to e-sign on behalf of the students to apply to ITT, without the students being present and without the students' knowledge or agreement"); *Villalba* Compl. at Ex. 19, Student Statement 14 ("First and foremost I never physically signed an enrollment agreement (I have a copy). The recruiter signed for myself and my dad via computer, and because of this dishonest tactic my dad is on the hook for a parent plus loan."); *Id.*at Student Statement 49 ("There are MANY instances that I have found on all the enrollment paperwork (that I have since gotten copies of) where my signature/initials were forged, and not in my handwriting. There were many things that weren't explained to me AT ALL, where I was told to 'sign' electronically.").

they would face in completing their studies.[87] In sum, the net impression of the oral misrepresentations on the typical ITT student likely would not have been altered by buried written disclosures.

Finally, the fact that the ITT guaranteed employment claims reviewed to date make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population ITT targeted, and the high pressure sales tactics and oral representations that ITT personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

D.      Eligible Borrowers

Based on the above analysis, the following ITT students should be eligible for relief: any BD claimant who enrolled at an ITT campus in California on or after January 1, 2005 and whose claim is premised on a promise, guarantee, or other assurance that they would receive a job upon graduation, including those told that all graduates obtain employment.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis for Corinthian, the type of misrepresentation at issue here went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

E.      Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, California courts rely on cases interpreting the Federal Trade Commission Act.[88] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[89]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[87] *CFPB Case*, Affidavit of former admissions representative Pearl Gardner at ¶¶ 11-12 (ITT-Atlanta South, 2008-2014) ("There was enormous pressure on me and the other representatives and financial aid coordinators ("FACS") to make sales calls, enroll students, complete financial aid packages, and get students to attend an ITT class. This pressure was relentless . . . To solicit interest in ITT programs, I would go to job fairs, workforce events, and Stand Down events for homeless veterans (events where homeless veterans are given supplies and services, such as food, clothing, shelter, health screenings, and other assistance)."); *see also CFPB Case*, Complaint at ¶¶ 55-84 (summarizing mystery shopper evidence related to high pressure sales tactics).

[88] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[89] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[90]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value provided by ITT.[91] The facts described above closely resemble those relating to Corinthian Colleges, where the Department determined that borrowers should receive full relief. That determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by:

- Repeated misleading statements to students, regulators and accreditors;
- Elaborate job placement fraud; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Given such pervasive and highly publicized misconduct, the Department determined that the value of the education provided by Corinthian was severely limited.

ITT's conduct was as flagrant as Corinthian's. Hundreds of unprompted student statements confirm the lack of value of an ITT education, as ITT students time and again report that their education was sub-standard and that their degree or affiliation with the school was an impediment rather than an asset as they sought employment. These include numerous statements in BD claims,[92] statements to VES,[93] and over 500 statements attached to the *Villalba* Class Action Complaint.[94]

Furthermore, the ITT "brand" became severely tarnished in the lead-up to and wake of its collapse. Over the past several years, ITT has been the subject of a steady stream of federal, state, and private lawsuits and investigations detailing misleading statements to students regarding (among other things) placement rates, employment prospects, expected salaries, transferability of credits, and the quality of the education.[95] This

---

[90] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).
[91] *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery).
[92] *See, e.g.* BD1655232, BD1619298, BD1658596, BD155745, and BD153269 (alleging that employers "will not hire ITT grads because they find the college to be subpar," that borrowers "had to take ITT off [their] resume" in order to get a job, that ITT grads were considered to have "no college education," and that they were "mocked because of [their] education at ITT").
[93] *See, e.g., ITT Trends* (containing statements from dozens of veterans who attended various ITT California campuses alleging, among other things, that "I feel scammed out of a proper education," that "employers do not see the school as a real school," that "no one would even consider me for employment," and that "I wasted over 50k and 2 years of my life I can never get back").
[94] The exhibits attached to the *Villalba* Complaint include the following: 521 statements explaining how an ITT degree operates as a disadvantage in the job market (Ex. 1); 326 statements explaining how ITT misrepresented the quality of instructors, training, curriculum, or facilities (Ex. 6); 62 statements describing how ITT is "ruining people's lives" (Ex. 25); 473 statements about how ITT prevented other opportunities (Ex. 27); and 18 statements about how ITT debt has driven borrowers into or to the brink of homelessness (Ex. 28).
[95] *See, e.g. CFPB Case, MA AG Case, NM AG Case, Villalba et al. v. ITT ESI et al. (In re ITT ESI, No, 16-07207-JMC-7A)* (Bankr. S.D. Ind. Compl. filed Jan.3, 2017), and *Lipscomb v. ITT Ed. Servs. Inc.* (M.D. FL Compl. filed Apr. 8, 2015). In addition, over 15 state AGs have issued subpoenas or CIDs relating to fraud and deceptive marketing against ITT from the beginning of 2004 through the end of May 2014. These states include: Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Hawaii, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, Tennessee and Washington. *See* ITT Form 10-Q Quarterly Report (June 30, 2014).

conduct has also led to actions against ITT by the Department[96] and ACICS,[97] as well as to numerous negative national news stories.[98]

Given this extensively well-documented, pervasive, and highly publicized misconduct, the Department has determined that the value of an ITT education—like Corinthian—is likely either negligible or non-existent. In a court proceeding, ITT would very likely be unable to produce any persuasive evidence showing why the amount of recovery should be offset by value received by the borrowers from ITT education so as to preclude full recovery. Accordingly, it is appropriate for the Department to award eligible borrowers full relief.


CONCUR:

_____          _____
Office of the General Counsel                    Date


---

[96] In the years leading up to its closure, the Department increased financial oversight over ITT and required it to increase its cash reserves to cover potential damages to taxpayers and students. The nature and scope of the Department's actions against ITT are contained within a series of letters from the Department to ITT dated: August 19, 2014, August 21, 2014, May 20, 2015, June 08, 2015, October 19, 2015, December 10, 2015, June 6, 2016, July 6, 2016, and August 25, 2016.

[97] *See* Letter from Roger Williams (Interim President, ACICS) to Kevin Modany (President and CEO, ITT) re: Continue Show-Cause Directive (Aug. 17, 2016).

[98] *See, e.g.* Mary Beth Marklein, Jodi Upton and Sandhya Kambhampati, "College Default Rates Higher Than Grad Rates," USA TODAY (July 2, 2013) (listing more than 50 ITT campuses as "red flag" schools because student loan default rates were higher than graduation rates); Kim Clark, "The 5 Colleges that Leave the Most Students Crippled by Debt" Time.com (Sept. 24, 2014) (ranking ITT second on the list of schools that leave the most students crippled by debt).

# EXHIBIT 7

## *CONFIDENTIAL AND DELIBERATIVE*

### PURPOSE: ACTION

**DATE:**    May 4, 2017

**TO:**    The Secretary

**FROM:**    James Manning, Acting Undersecretary

**SUBJECT:**    Action Items on Borrower Defense

### SUMMARY:

The previous administration approved approximately 16,000 borrower defense to repayment claims that have not yet been processed, and the Department has received an additional approximately 58,600 claims it has not yet approved. This memo provides some background information and recommendations on how to proceed with the review and processing of these claims.

We established a Review Panel consisting of Joe Conaty, Lynn Mahaffie, Phil Rosenfelt, Justin Riemer, and myself to examine the claims and background information and make recommendations on how to resolve the pending claims and proceed in the future.

### REASON FOR NEEDED ACTION:

In January of 2017, the Department sent approval emails to approximately 16,000 borrower defense claimants informing them their loans should be discharged within either 60 or 90 to 120 days (with 120 days from receipt being approximately mid-May). No further action has been taken to discharge those loans, and I understand that it will take 30 to 45 days to execute the discharge after sign off.

### SUMMARY OF CONCERNS:

DOE_00000127

*CONFIDENTIAL AND DELIBERATIVE*



**RECOMMENDATIONS:**



DOE_00000128

*CONFIDENTIAL AND DELIBERATIVE*



DOE_00000129

## CONFIDENTIAL AND DELIBERATIVE

██████████████████████████████████████████████████

**DECISION:**

**Recommendation**: Proceed with discharge for direct and non-direct loans for all impacted borrowers. Direct OUS and the CFO's Internal Control Unit to set up interim procedures to process claims until new borrower defense regulations are adopted and take effect. Proceed with requesting OIG launch a review of the borrower defense program.

Approve_____ ✗ _____ Signature _____

Disapprove_____ Signature_____

Needs more discussion_____ _____Signature _____

Modify_____ Signature_____

Other/Comments:
_____with extreme displeasure_____

_____ _____


CONTACT:      James Manning, Acting Undersecretary, HQ-LBJ-7E303, (202) 453-6236

Page 4 of 4

# EXHIBIT 8

# EXHIBIT 8



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

December 14, 2017

## MEMORANDUM

To:        James Manning, Delegated the Authority to Perform the Functions and Duties of
           the Under Secretary

Through:   Justin Riemer, Special Counsel

From:      Steven Menashi, Acting General Counsel

Re:        Legal bases for approval and discharge of pending borrower defense claims for
           former Corinthian students qualifying for approval on the grounds of Job
           Placement Rate, Guaranteed Jobs, and Transfer of Credit findings

## I.   Introduction

In connection with the Department's resumption of adjudications of Borrower Defense (BD) loan discharge claims from former students of Corinthian Colleges, Inc. (CCI), this memorandum summarizes and adopts in part the evidentiary findings and legal bases previously employed to approve claims for the CCI claim categories examined in the memoranda listed below. This memorandum also modifies the conclusions previously offered by the Office of the General Counsel (OGC) regarding the legal principles applicable to assessing the remedy for approved claims and the appropriate measure of relief for borrowers. Accordingly, this memorandum addresses issues related to the approval of claims made under the following claim categories for certain CCI-owned schools:

1. Job placement rate misrepresentations made to attendees of specified programs
   offered at Heald College campuses (Heald "JPR" or "Findings Claims"). The legal
   basis for the approval of JPR claims was previously offered in a May 14, 2015
   memorandum (Appendix A).[1]
2. Job placement rate misrepresentations made to attendees of specified programs
   offered at certain Everest/WyoTech campuses (Everest/WyoTech "JPR" or "Findings
   Claims").
3. Guarantees of employment by CCI, applicable to all CCI campuses between the time
   when CCI opened or acquired the campus and April 2015 ("Guaranteed Jobs"). The
   legal basis for the approval of these claims was previously offered in a January 9,
   2017 memorandum from the Borrower Defense Unit (BDU) (Appendix B).

---

[1] Two versions of the Heald JPR Memorandum have circulated in draft form. This memorandum adopts, in part, the 11-page version that is found in Appendix A.

4. Misrepresentations regarding the transferability of credits at any Everest school or WyoTech's Laramie campus between the time when CCI opened or acquired the campus and April 2015 ("Everest/WyoTech Transfer of Credits"). The legal basis for the approval of these claims was previously offered in an October 24, 2016 memorandum from the BDU (Appendix C).

5. Misrepresentations regarding the transferability of credits at CCI's California Heald campuses after CCI acquired the school ("Heald Transfer of Credits"). The legal basis for the approval of these claims was previously offered in an October 20, 2016 memorandum from the BDU (Appendix D).

## II.     Background

Between May 2015 and January 2017, the Department approved relief for BD claims filed for over 30,000 borrowers who attended a CCI-owned institution. The Department approved the claims on one of the five bases for approval listed above because the Department concluded that CCI had made, on a widespread and systemic basis, unlawful misrepresentations to borrowers. Eligibility for approval under some of the categories of relief was limited to students who had enrolled in specific programs during particular time periods. The Department's evidentiary findings were based partly on information that borrowers submitted with their claims showing a pattern of wrongful conduct, such as misrepresentations by the school with respect to guarantees of employment or assurances about the transferability of a student's credits. The Department also relied on information supplied by state Attorneys General and gathered by the Department. In some instances, the Department corroborated its findings with information found on school promotional materials and websites. The Department's findings related to the Heald JPR claims were partly based on a fine letter to the CCI-owned Heald College on April 14, 2015,[2] and other findings were documented in internal recommendations from the BDU.

## III.    Legal Basis for Approval of Claims

### A.     Summary of Existing Legal Basis for Relief

Under Department regulations, "[i]n any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). If "the borrower's defense against repayment is successful," the borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees." *Id.* § 685.206(c)(2). The Department may also, as it "determines is appropriate under the circumstances," reimburse the borrower for amounts paid toward the loan voluntarily or through enforced collection and approve certain other relief. *Id.*

While the Department has received claims from residents of all 50 states and the District of Columbia, the Department has approved CCI claims on the ground that CCI's conduct would give rise to a cause of action against CCI under California's Unfair Competition Law ("UCL"),

---

[2] Notice of Intent to Fine Heald College to Jack D. Massimino, President/CEO of Corinthian Colleges, Inc., from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group (April 14, 2015) ("Fine Letter").

which prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. California law applies to CCI because CCI was headquartered there, it engaged in the wrongful conduct there, and many of its students attended school there.[3]

The Department approved claims for borrowers who attested to the elements establishing a cause of action under the UCL. While the details for approval varied by category, the general analysis for relief under the UCL required the following conclusions: (1) CCI engaged in an unlawful or fraudulent business act, (2) the borrower suffered an injury in fact, and (3) the borrower relied on the misrepresentation made by the school in obtaining a loan.

## B. Adoption of Existing Memoranda for Approval of Claims

The Department could have required each borrower to provide evidence for each of these elements rather than rely on attestations and inferences from common findings. Nevertheless, the Department has decided to allow claimants from CCI institutions to rely on the Department's findings about CCI's conduct and to attest to the elements of harm and reliance. In support of that decision, the Department will continue to rely—unless otherwise stated in this memorandum—on the findings for each of the five categories of claims that are outlined in the corresponding memoranda on which the Department has relied to date as those memoranda relate to establishing a borrower's cause of action under the UCL.

This memorandum also adopts as final the following:
- Part I of the JPR Heald Memo attached as Appendix A, which was previously considered only a draft.
- Part I of the JPR Heald Memo's legal analysis as to the legal basis for approval of the Everest/WyoTech JPR claims.
- The October 20, 2016 Heald Transfer of Credits Memo, attached as Appendix D, which was denominated a draft but which has been relied on and considered final.

## IV. Legal Basis for Full Relief of Claims

### A. Existing Legal Basis

In its previous memoranda, the Department concluded that all borrowers with successful claims should receive a full discharge of their loans, subject only to some restrictions for Guaranteed Jobs and Transfer of Credits claims partially barred by the applicable state statute of limitations. The memoranda purported to apply the UCL to determine the appropriate measure of relief, even though an award under the UCL aims at restitution, which is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received."[4]

---

[3] The Department concluded, for example, that all Heald students would have standing to bring a hypothetical action against CCI under the UCL, and therefore CCI's conduct could be said to give rise to a cause of action against CCI under that statute. *See* Heald Transfer of Credits Memo, Appendix D.

[4] *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (quoting *Cortez v. Purolator Air Filtration Products Co.*, 999 P.2d 706, 713 (Cal. 2000)).

In fact, the memoranda—specifically Part II of the JPR Memo from OGC attached as Appendix A and the Transfer of Credits memoranda from the BDU attached as Appendices C and D—disagreed over what might count as restitution under the UCL. One argument, advanced by OGC in May 2015, held that restitution should allow borrowers to "receive the amount paid to Heald, through loans, to attend its programs; i.e., tuition and fees," regardless of the size of the loan or the value of the education received. The other argument, advanced by the BDU in October 2016, advocated "complete restitution of the amount paid by consumers," meaning the full value of the loan, regardless of the amount paid to Heald. The BDU memos recognized that the value of the education received would "offset" the amount of relief, but the BDU argued that the education received by these borrowers had no value and therefore no offset should be applied.

Importantly, the BDU also concluded that "nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim." The regulation requires a borrower to allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, but it does not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, the borrower defense regulation provides that the Secretary has discretion to fashion relief "as the Secretary determines is appropriate under the circumstances." 34 C.F.R. § 685.206(c)(2).

On January 19, 2017, OGC issued a memo disagreeing with the conclusion reached by the BDU in October 2016 that the federal borrower defense regulation and statute grant discretion to the Secretary to decide how to fashion relief. Instead, OGC concluded that the state law which gives rise to the legal claim against the seller must also be the basis for determining relief.[5] In short, the January 19 OGC memo reasoned as follows:

1. The borrower defense rule for Federal Family Education Loan Program (FFELP) loans is the Federal Trade Commission's Holder Rule.
2. The Holder Rule requires using the same law that gives rise to the legal claim to determine the offset against the lender (i.e. the relief). In the cases addressed by the Transfer of Credits memoranda, the law was the California UCL.
3. Because 20 U.S.C. § 1087e(a)(1) (the "parallel terms and conditions statute") requires that FFELP loans and Direct Loans have the same terms, conditions, and benefits, the application of the Holder Rule for FFELP borrower defense claims requiring application of state law for relief must apply to Direct Loan borrower defense claims.

The OGC Memo otherwise agreed with the BDU's analysis that complete restitution amounting to the full value of the loan would be appropriate relief under the UCL, abandoning OGC's May 2015 position. While the January 19 OGC memorandum specifically addressed the Transfer of Credit claims, the BDU has applied its conclusions to the other claim groups as well.

---

[5] *See* "Transferability of credit recommendations for Heald, Everest and WyoTech" from Office of the General Counsel to Borrower Defense Group (January 19, 2017) (Appendix E).

## B. Modification of Existing Legal Basis For Calculating Relief

### i. Secretary's Discretion to Determine Relief

It is now OGC's position that the BDU's analysis that Department regulations and the borrower defense statute allow the Secretary to assess relief in her discretion—that is, independent of the state law used to assess the cause of action—is the better conclusion. This conclusion should now apply to the assessment of relief for all of the claim groups. The Secretary, given her discretion under the HEA and borrower defense regulation to fashion relief, may look to the state law giving rise to the cause of action as a guide but is not required to do so.

OGC's earlier memorandum mistakenly applies the Holder Rule to Direct Loans in the context of borrower defense relief. OGC's memorandum overlooks the exception clause in the parallel terms and conditions statute and the existence of such an exception for borrower defense relief:

> *Unless otherwise specified in this part*, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers [of FFELP loans].[6]

The "part" of the HEA referenced in 20 U.S.C. § 1087e(a)(1) is the part of the HEA containing the Direct Loan Program statutes and includes the borrower defense provision for Direct Loans which is also found in § 1087e:

> Notwithstanding any other provision of State or Federal law, *the Secretary shall specify in regulations* which acts or omissions of an institution … a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.[7]

The January 19, 2017 OGC memorandum recognizes that the above emphasized provision in 20 U.S.C. § 1087e(h) authorizes the Secretary to promulgate a regulation that would allow for the assessment of relief on some other basis but asserts that the Secretary did not do so:

> [T]he Secretary by regulation *could* have provided that while borrower defense should be based on a state law cause of action, relief would be determined by some other law. However, he did not. … [T]he borrower defense regulation does not specifically address what law is to be applied in determining relief. Absent such a regulation, § 1087e(a)(1) controls, and the Direct Loan borrower defense rule must be the same as that for FFELs – in other words, it is the Holder Rule.[8]

---

[6] 20 U.S.C. § 1087e(a)(1) (emphasis added). "This part" references the Direct Loan part of the HEA.
[7] 20 U.S.C. § 1087e(h) (emphasis added).
[8] "Transferability of credit recommendations for Heald, Everest and WyoTech" from Office of the General Counsel to Borrower Defense Group (January 19, 2017) (Appendix E).

This analysis mistakenly overlooks provisions of the borrower defense regulation that, as stated in the BDU memoranda, decline to look to state law for fashioning relief and instead give the Secretary the authority to assess the remedy and relief owed to the borrower. As the BDU noted, "the Secretary has discretion to fashion relief as suited to the facts of a particular case"[9] because the borrower defense regulation vests that discretion in the Secretary:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation *to repay all or part of the loan* and associated costs and fees that the borrower would otherwise be obligated to pay. *The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances*.[10]

Such relief the Secretary may determine is appropriate includes "[r]eimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection."[11] As the BDU noted, "[t]he only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan."[12]

The OGC memo appears to argue that, absent some explicit reference in the regulation directing the Secretary to use a different specific law to assess relief, the Department is limited to utilizing the same state law assessing whether the borrower has asserted a cause of action. This ignores the provisions in the regulation that grant the Secretary the discretion to determine how much relief should be awarded to a borrower.

Indeed, the codification in regulations of borrower defenses applicable to Direct Loans was necessary because the Holder Rule does not by its own terms apply to loans made by the federal government. The Holder Rule "applies only when the seller [i.e., the school] is arranging credit, through either an established pattern of referrals [to the lender] or affiliation [with the lender]."[13] Thus, borrower defenses are available only when "credit is arranged or secured in connection with a continuing relationship between a seller and a creditor. In such cases a seller and creditor may properly be viewed as joint venturers."[14] Accordingly, the Department's regulations incorporating the Holder Rule with respect to FFELP loans provide that borrower defenses are available only if the lender has a referral or affiliate relationship with the school.[15] The Department has explained that such a relationship does not exist where the school and the lender cooperate merely by "performing specific duties required by the HEA and regulations" and the school "does no more than give its students *information* on the availability of student loans."[16]

---

[9] Heald Transfer of Credits Memo Claims at 16 (Appendix D). *See also* Everest/WyoTech Transfer of Credits Memo at 17 (Appendix C).

[10] 34 C.F.R. § 685.206(c)(2).

[11] *Id.*

[12] Heald Transfer of Credit Memo at 16 (paraphrasing 20 U.S.C. § 1087e(h)).

[13] Federal Trade Commission, Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 41 Fed. Reg. 20022, 20025 (May 14, 1976).

[14] Federal Trade Commission, Preservation of Consumers' Claims and Defenses: Statement of Enforcement Policy, 41 Fed. Reg. 34594, 34595 (Aug. 16, 1976).

[15] 34 C.F.R. § 682.209(g).

[16] U.S. Department of Education, Overview: Federal Trade Commission (FTC) Holder Rule 2 (Jul. 2, 1993).

The federal government does not provide Federal Student Aid as part of a joint venture with institutions but pursuant to its own sovereign interest and legal duty. If the same conditions applicable to FFELP loans governed borrower defenses to Direct Loans, no borrower defense would be available because the requisite relationship between the school and the lender—that is, the federal government—would not be present. That is why the Higher Education Act provides that, "[n]otwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." 20 U.S.C. § 1087e(h). Borrower defenses to repayment of Direct Loans are available only by virtue of the regulations promulgated pursuant to that provision, namely 34 C.F.R. § 685.206(c), and would not be available by operation of the Holder Rule or the regulations that codify the Holder Rule with respect to FFELP loans, namely § 682.209(g). The HEA makes clear that the borrower defense regulations for Direct Loans govern "[n]otwithstanding any other provision of State or Federal law"—including the Holder Rule, its codification in § 682.209(g), and the parallel terms and conditions statute.

For these reasons, OGC now agrees with the BDU's conclusion that "the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case."[17]

Because the regulation commits the choice of remedy to the Secretary's discretion, the Secretary's resolution of borrower defense claims is not subject to judicial review.[18] The BDU's Transfer of Credits memoranda cite multiple authorities for the principle that the Department enjoys wide discretion in fashioning discretionary relief.[19] OGC agrees with the BDU's conclusion that the Department has such discretion.

## ii. Measure of Relief

In assessing the appropriate measure of relief it is important to note that few borrowers provided the Department with evidence of harm to support their claims. Even though the Department has determined that these borrowers made a prima facie case for borrower defense relief, the borrowers have generally not provided evidence of the scope of the resulting harm. Accordingly, the Department has examined other evidence in its possession to assess the relief owed to borrowers.

Previously, the Department assumed that CCI borrowers received a worthless education and therefore that full discharge (or discharge of all tuition and fees, depending on the advice) was appropriate for all CCI borrowers with valid claims. In its reevaluation of this assumption, the Department has sought to measure the value of the education CCI borrowers may have received in order to determine the appropriate measure of relief. In this context, "value" refers to the extent to which the education helped students to obtain gainful employment—that is, a paying job. While assessing the value of an education in such economic terms may not be appropriate in

---

[17] Heald Transfer of Credits Memo at 16 (Appendix D).

[18] 5 U.S.C. § 701(2); *Dalton v. Specter*, 511 U.S. 462, 477 (1994); *Webster v. Doe*, 486 U.S. 592, 601 (1988); *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).

[19] Heald Transfer of Credits Memo at 16-17 (Appendix D).

all contexts, the Department already evaluates the type of academic programs offered by CCI according to this metric. The programs CCI offered were legally required to provide training that prepares students for gainful employment in a recognized occupation (a "Gainful Employment" or "GE Program"),[20] and borrower defense claimants allege that CCI failed to provide that preparation and therefore hampered students' ability to obtain gainful employment. For these reasons, the Department assesses the value of the education based on earnings, as it has done for all GE Programs pursuant to regulation. To determine value for the purposes of the CCI BD claims, the Department compared the average earnings of borrowers who enrolled in particular CCI programs with the earnings of those enrolled in the same GE Program at other schools that have a passing debt-to-earnings ratio under the GE regulations. The difference between these numbers provides a measure of the difference in value between the CCI program and a program in the same field that provided adequate preparation for gainful employment in a recognized occupation. It therefore provides a measure of the relief needed to put the CCI borrower in the position he or she would have occupied absent CCI's misconduct.

The CCI borrowers affirmed in their applications that the primary reason for enrolling at CCI was to improve their careers and to make a better living. To the extent borrowers offer allegations of any harm in their claims, they focus on the struggles they have had in finding gainful employment. Accordingly, the methodology for determining relief quantifies the harm alleged by borrowers.

The Department is in a unique position to perform this analysis because it possesses detailed data about the performance of CCI's academic programs, including how its students have performed in the job market since attending CCI. The Department also has detailed earnings information about the performance of graduates of GE programs in the same fields in which CCI borrowers enrolled. Pursuant to its GE regulations at 34 C.F.R. part 668, subpart Q, the Department has determined whether specific GE programs adequately prepared students for gainful employment in a recognized occupation by examining the typical loan debt versus earnings information for program completers and setting specific "passing" levels for such debt-to-earnings ratios. Utilizing the Department's knowledge of these "passing" GE programs gives the Department a measure of the value of the corresponding CCI-provided programs.

A comparison of the CCI and GE data has led the Department to conclude that many CCI programs provided measurable value to students. The Department's data comparison allowed it to determine the differences in earnings (both average and median) between CCI borrowers who enrolled in particular programs and borrower earnings for students who completed the same or similar GE programs at non-CCI schools. In other words, the comparison yielded a measure of the value a CCI borrower received versus what he or she could have reasonably expected to receive absent CCI's misconduct. This is the proper measure of relief owed to the borrower. Therefore, the Department will award relief—up to the statutory cap of the full amount of the Direct Loan underlying a BD claim—by calculating the difference in earnings by percentage of the CCI borrowers against corresponding GE-passing program borrowers.[21] This calculation will

---

[20] *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b).

[21] Because of the difficulty in administering a true 1-to-1 inverse ratio of relief to borrowers the Department will award relief in increments of 10 percentage points with CCI borrower earnings within the 10 percent increment rounded down to be more favorable to the student. For example, under a true 1-to-1 inverse relief formula, a

be modified at the lower and higher ends of the earnings scale. CCI borrowers earning less than 50% of the earnings of graduates of GE-passing programs will receive a full discharge while CCI borrowers earning 90% or more of the GE-passing earnings will receive a discharge of 10% of their outstanding loans. As is the practice in the GE regulations, the Department will calculate both the average earnings and the median earnings and utilize the figure that is most generous to the borrower.

The Department's determination that borrowers with average or median earnings of less than half of their comparable GE-passing earners are entitled to a full discharge is reasonable and based on careful consideration of the evidence. If the data reveal that the average earnings of borrowers in a specific CCI program are not even half of those in a GE-passing program, that disparity suggests that the CCI program provided no measurable value to the CCI students. Even if some borrowers in the CCI program were able to obtain gainful employment, the data provide strong evidence that the program itself did little or nothing to prepare its students for success in the workforce. Those CCI programs where the graduates earn on average between 50% and 90% of the earnings of their peers in comparable GE-passing programs represent a different circumstance. The data reveal those CCI programs provided some value. While graduates of those programs may not have performed as well as those in comparable GE-passing programs, these CCI borrowers still obtained gainful employment with incomes at least half that of their peers in GE-passing programs. Their relief, therefore, will be designed to make them whole—that is, to put the CCI borrower in the same position as the borrower from a GE-passing program by affording relief in an amount corresponding to the difference between CCI-program earnings and GE-passing-program earnings. Finally, the minimum floor of 10% relief recognizes that, although the data reveal the value of the education in certain CCI programs was comparatively high, borrowers suffered some basic harm by virtue of the misrepresentations such that the Department cannot conclude that denying relief is appropriate.

This methodology rests on substantial evidence of the harm to borrowers that resulted from CCI's conduct—that is, the difference between the value of the education that borrowers received and an education that would have met borrowers' reasonable expectations of preparation for gainful employment. The Department utilized actual earnings data for borrowers maintained by the Social Security Administration. The Department compared these data with earnings data for GE-passing programs compiled pursuant to the gainful employment regulations. The GE data are well vetted, subject to challenge and correction by institutions, and already utilized to measure the quality of title IV, HEA programs, particularly as it relates to ensuring employment outcomes for graduates.

This methodology applies to all five CCI claim groups. While the legal and factual bases for the approval of claims may differ, the assessment of relief applies to all CCI claims approvable under the existing criteria. Accordingly, this memorandum supersedes those sections of prior memoranda which conclude that a full discharge should be entered for every successful claimant.[22]

---

borrower with 47% of the earnings of a comparable GE program would be entitled to 53% relief but in our formula would be rounded up to 60% relief.

[22] This memorandum also supersedes the analysis in the final paragraph of page 10 in the JPR Memorandum in Appendix A which argues for limiting relief to the cost of room and board, books, and transportation. As noted

### iii.   Other Authorities

As noted above, the question of the relief to be afforded to successful claimants under the borrower defense regulation is committed to the Secretary's discretion.  The methodology she has adopted nevertheless finds support in the common law.  A basic principle in the law of torts is that the victim of a fraudulent misrepresentation is entitled to recover the pecuniary loss he or she suffered as a result of relying on the misrepresentation, less the value he or she received in the transaction.[23]

It also finds support in restitutionary principles under the UCL, which as noted aim at "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received."[24]  In cases "[w]here plaintiffs are 'deceived by misrepresentations into making a purchase, … the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately,'" and "restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information."[25]  A student might, for example, be deceived by the misrepresentation that an academic program will prepare him or her for gainful employment and therefore take out a loan of $100 to attend the program.  In fact, the program provides only 55% of the preparation for gainful employment, based on a comparison with programs that do prepare students for gainful employment.  Had the student known this information at the outset, he or she would have reasonably paid only $55 for the program.  Therefore restitution of $45 is appropriate.

Such principles of restitution, like the borrower defense regulation, afford the decision-maker "broad discretionary power to order restitutionary relief … in the absence of individualized proof."[26]  In calculating "restitution, California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."[27]

In exercising her discretion under the borrower defense regulation, the Secretary has drawn on these well-established principles to determine when and to what extent a borrower "is relieved of the obligation to repay all or part of the loan" and receives "such further relief as the Secretary determines is appropriate under the circumstances."  34 C.F.R. § 685.206(c)(2).

---

above, OGC previously abandoned that position, which in any event was based on a questionable understanding of the UCL and was disconnected from the remedial provision of the borrower defense regulation.

[23] Restatement (Second) of Torts § 549.

[24] *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (quoting *Cortez v. Purolator Air Filtration Products Co.*, 999 P.2d 706, 713 (Cal. 2000)).

[25] *Id.* at 989.

[26] *Fletcher v. Security Pacific National Bank*, 591 P.2d 51, 57 (Cal. 1979).

[27] *Pulaski*, 802 F.3d at 988 (internal quotation marks omitted).  For these reasons, even if the Secretary were to award remedies pursuant to the UCL, she would adopt the same methodology to calculate relief.

## V.     Statute of Limitations

The BDU should also continue to rely on the findings in the January 12, 2017 memorandum related to the statute of limitations for CCI Guaranteed Jobs and Transfer of Credit claims and section I(E) of the May 14, 2015 memo found in Appendix A for all JPR claims.[28]

CC:     Julian Schmoke, Chief Enforcement Officer, Federal Student Aid
        Colleen Nevin, Director, Borrower Defense Unit

---

[28] Statute of Limitations Analysis Under the California UCL for Corinthian and ITT Borrower Defense Claims re: Guaranteed Jobs and Transfer of Credits, from Borrower Defense Unit to Office of General Counsel (January 12, 2017) (Appendix F).

# EXHIBIT 9

# BORROWER DEFENSE UNIT

# CLAIMS REVIEW PROTOCOL

DOE_00003348

Case 3:17-cv-07106-SK   Document 71-3   Filed 08/28/19   Page 2 of 10

# GUIDING PRINCIPLES

- Develop and implement an administrative process capable of ensuring supportable and timely decisions

- Achieve consistency among similarly-situated borrowers

- Base decisions on evidence

- Provide relief for harmed borrowers and protect taxpayers

2

DOE_00003349

# LEGAL FRAMEWORK FOR ELIGIBILITY

- BD application must state a claim under state law:

  - "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c).

  - Applicable state law typically is law governing alleged misrepresentations and material omissions made by a school

- Legal threshold for eligibility = preponderance of the evidence

- Must base decisions granting or denying relief on a record sufficient to withstand court scrutiny

3

DOE_00003350

# REVIEW PROCESS FOR JOB PLACEMENT RATE FINDINGS CLAIMS

- Five steps to determine eligibility under ED's published job placement rate findings:

  1. Verify the claim is <u>complete</u>, noting pertinent missing information for follow up with borrower.

  2. Determine whether borrower attended a <u>covered campus</u>, including reviewing NSLDS data if necessary.

  3. Determine whether borrower attended a <u>covered program</u>, including reviewing the transcript and other documentation to determine whether the borrower attended more than one eligible program.

  4. Confirm the enrollment date is within the <u>covered eligibility period</u>, including reviewing the transcript, NSLDS, and school records if necessary to determine eligibility and the date from which loans should be forgiven.

  5. Verify the borrower signed the form and made the required attestation of <u>reliance</u>.

4

DOE_00003351

# TRAINING AND QUALITY CONTROL FOR CONTRACTORS

- Training:

  - Full day training by BD Unit, including reviewing several claims with BD Unit attorney.

  - Until contractors demonstrate 100% accuracy, every claim reviewed by another experienced reviewer.

  - Once contractors demonstrate 100% accuracy, statistically significant number of claims spot checked.

  - If significant errors, contractors returned to 100% review of all claims or removed from project.

- Quality Control:

  - Project manager spot checks statistically significant number of all contractor-reviewed claims.

  - BD Unit conducts final QC check to ensure no claim is accidently processed as an approval.

DOE_00003352

- Includes making sure all approved claims alleged a placement rate misrepresentation and

  ensures denied claims are not inadvertently included.

# ELIGIBILTY AND RELIEF:  SEPARATE DETERMINATIONS

- First – determine eligibility of BD application under the regulation

  - *i.e.*, whether preponderance of the evidence establishes a valid claim under applicable state law

- Second – determine any appropriate relief only for claims determined eligible

6

DOE_00003353

# DETERMINING ELIGIBILITY: NON-FINDINGS

- Evaluate all available relevant evidence to determine whether preponderance is satisfied:
  - Possible sources of evidence:
    - BD claim
    - Evidence from ED investigations
    - Evidence from other law enforcement investigations
    - Evidence obtained from whistleblower suits
    - Corroborating evidence from other similar BD claims

- Preponderance and thus eligibility is not met when there is a single uncorroborated claim

- Single claim may be denied without further investigation where:
  - Application does not state a claim (*e.g.*, applicant does not identify any misrepresentation actionable under state law); or
  - There is no corroborating evidence of the misrepresentation
    - Consistent with ED's false certification rules
    - Consistent with other agencies deciding benefits claims

- Conduct additional investigation of claim or claims where warranted by size of affected group, ability to develop extrinsic evidence efficiently, and other operational considerations.

7

# EXAMPLE OF ELIGIBILITY DETERMINATION:

**Corinthian misrepresented to students at nationally accredited Everest and Wyotech campuses that the credits they earned would be generally transferable to other institutions**

- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them."
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere."

**Evidence that representation was made:**

- Claims are consistent regarding the representation made, include specific details, and are consistent between campuses and over time
- Claims are corroborated by the school's own internal audits finding substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students, as well as by calls provided by state investigators.

**Evidence of falsity:**

- Regionally accredited schools, including the in-state institutions where students often sought to transfer, overwhelmingly do not accept credits from nationally accredited schools such as Everest and WyoTech.
- Evidenced by National Center for Education Statistics study; GAO report; the American Association of Collegiate Registrars and Admissions Officers transfer practices guide; a survey of schools conducted by BD unit; as well as numerous student accounts.

**Misrepresentation gives "rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c):**

- Applicable California law prohibits deceptive or misleading representations, including material misrepresentations reasonably relied on by students.
- Misrepresentations about the general transferability of credits earned are highly material to students deciding whether to enroll (and take on debt to do so) and it was reasonable for students to rely on such representations made by school personnel.

8

DOE_00003355

# RELIEF DETERMINATION

- **Full Relief:** In recognition of the considerable impact a material misrepresentation or omission has on a person's decision to enter a transaction (*e.g.* to take out loans to enroll at a school), many state laws provide for full restitution to restore the person to the status quo.
    - o Full relief may be particularly appropriate when a student did not receive a central attribute of the education the student was promised, such as certain programmatic accreditation (*e.g.*, promised ability to sit for law enforcement or nursing exam).
    - o All findings claims and non-findings claims approved to date have received full relief.

- **Partial relief**: State law also may recognize an "offset" of the full amount of restitution for the value of goods or services a person subject to a material misrepresentation or omission nonetheless received.
    - o An offset may be appropriate where there is substantial value provided by school and the amount of that value can be readily calculated for all eligible students.
    - o Note: individualized determinations of value are likely to be administratively burdensome (*e.g.*, determining post-attendance employment outcomes for every student in a large group)

9

DOE_00003356

**BREAKDOWN OF NON-CCI SCHOOLS WITH BORROWER DEFENSE CLAIMS PENDING**

**As of February 21, 2017**

- **10 Non-CCI Schools with 100+ Claims**
  - EDMC, ITT, DeVry, CEC, Apollo/University of Phoenix, Westwood, ACI, Charlotte School of Law, Globe University/MN School of Business, Graham Holdings/Kaplan University

- **6 Schools with 31-100 Claims**
  - Abry/Marinello School of Beauty, Bridgepoint/Ashford University, ATI Career Training, Anthem, Willis Stein/Kaplan College, Palm Holdings/United Education Institute (UEI)

- **28 Schools with 11-30 Claims**
  - Full Sail University, Strayer, Walden University, Virginia College, Academy of Art University, Grand Canyon University, Medtech, Capella, Fasttrain, Dade Medical College, Fortis College, Star Career Academy, Career Point College, Lincoln Technical Institute, Brown College, Daymar College, Universal Technical Institute, Court Reporting Institute, Mountain State University, Florida Career College, Regency Beauty Institute, Keiser University, Remington College, Wright Career College, Concorde Career College, Jones International University, Masters of Cosmetology College, Salter College

- **797 Schools with 10 or Fewer Claims**

DOE_00003357

# EXHIBIT 10

# BORROWER DEFENSE UNIT

# CLAIMS REVIEW PROTOCOL

# GUIDING PRINCIPLES

- Develop and implement an administrative process capable of ensuring supportable and timely decisions

- Achieve consistency among similarly-situated borrowers

- Base decisions on evidence

- Provide relief for harmed borrowers and protect taxpayers

2

# LEGAL FRAMEWORK FOR ELIGIBILITY

- BD application must state a claim under state law:

    o "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c).

    o Applicable state law typically is law governing alleged misrepresentations and material omissions made by a school

- Legal threshold for eligibility = preponderance of the evidence

- Must base decisions granting or denying relief on a record sufficient to withstand court scrutiny

3

# REVIEW PROCESS FOR JOB PLACEMENT RATE FINDINGS CLAIMS

- Five steps to determine eligibility under ED's published job placement rate findings:

    1. Verify the claim is <u>complete</u>, noting pertinent missing information for follow up with borrower.

    2. Determine whether borrower attended a <u>covered campus</u>, including reviewing NSLDS data if necessary.

    3. Determine whether borrower attended a <u>covered program</u>, including reviewing the transcript and other documentation to determine whether the borrower attended more than one eligible program.

    4. Confirm the enrollment date is within the <u>covered eligibility period</u>, including reviewing the transcript, NSLDS, and school records if necessary to determine eligibility and the date from which loans should be forgiven.

    5. Verify the borrower signed the form and made the required attestation of <u>reliance</u>.

# TRAINING AND QUALITY CONTROL FOR CONTRACTORS

- <u>Training</u>:

    o Full day training by BD Unit, including reviewing several claims with BD Unit attorney.

    o Until contractors demonstrate 100% accuracy, every claim reviewed by another experienced reviewer.

    o Once contractors demonstrate 100% accuracy, statistically significant number of claims spot checked.

    o If significant errors, contractors returned to 100% review of all claims or removed from project.

- <u>Quality Control</u>:

    o Project manager spot checks statistically significant number of all contractor-reviewed claims.

    o BD Unit conducts final QC check to ensure no claim is accidently processed as an approval.

- Includes making sure all approved claims alleged a placement rate misrepresentation and ensures denied claims are not inadvertently included.

# ELIGIBILTY AND RELIEF:  SEPARATE DETERMINATIONS

- First – determine eligibility of BD application under the regulation

  - *i.e.,* whether preponderance of the evidence establishes a valid claim under applicable state law

- Second – determine any appropriate relief only for claims determined eligible

# DETERMINING ELIGIBILITY: NON–FINDINGS

- Evaluate all available relevant evidence to determine whether preponderance is satisfied:
  - Possible sources of evidence:
    - BD claim
    - Evidence from ED investigations
    - Evidence from other law enforcement investigations
    - Evidence obtained from whistleblower suits
    - Corroborating evidence from other similar BD claims

- Preponderance and thus eligibility is not met when there is a single uncorroborated claim

- Single claim may be denied without further investigation where:
  - Application does not state a claim (*e.g.*, applicant does not identify any misrepresentation actionable under state law); or
  - There is no corroborating evidence of the misrepresentation
    - Consistent with ED's false certification rules
    - Consistent with other agencies deciding benefits claims

- Conduct additional investigation of claim or claims where warranted by size of affected group, ability to develop extrinsic evidence efficiently, and other operational considerations.

# EXAMPLE OF ELIGIBILITY DETERMINATION:



(b)(7)(E)

Case 3:17-cv-07210-SK   Document 69-1   Filed 06/15/18   Page 8 of 20

# RELIEF DETERMINATION

- **Full Relief:**  In recognition of the considerable impact a material misrepresentation or omission has on a person's decision to enter a transaction (*e.g.* to take out loans to enroll at a school), many state laws provide for full restitution to restore the person to the status quo.
  - o Full relief may be particularly appropriate when a student did not receive a central attribute of the education the student was promised, such as certain programmatic accreditation (*e.g.*, promised ability to sit for law enforcement or nursing exam).
  - o All findings claims and non-findings claims approved to date have received full relief.

- **Partial relief**:  State law also may recognize an "offset" of the full amount of restitution for the value of goods or services a person subject to a material misrepresentation or omission nonetheless received.

(b)(5)

9

**BREAKDOWN OF NON-CCI SCHOOLS WITH BORROWER DEFENSE CLAIMS PENDING**

As of February 21, 2017

(b)(5)

Page 1228 of 2200

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 1230 of 2200

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 1231 of 2200

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 1232 of 2200

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

# APPROVALS
## Borrower Defense Claims



BD Unit forwards particular claims that fall within scope of approved recommendation to CEO and COO for authorization to discharge loans

BD Unit formulates recommendation for approval of type of claims that qualify for BD relief

Chief Enforcement Officer (CEO) Approves

Chief Operating Officer (COO) Approves

Office of General Counsel (OGC) Concurs

FSA Internal Control Notification

Fiscal impact greater than $10 million OR Raises policy issues?

No

Yes

Under Secretary (OUS) Approves

Updated 1/30/2017

# DENIALS
## Borrower Defense Claims



BD Unit formulates recommendation for denial of type of claims that do not qualify for BD relief

Chief Enforcement Officer (CEO) Approves

Chief Operating Officer (COO) Approves

Office of General Counsel (OGC) Concurs

Substantial number of affected borrowers OR Significant precedential impact?

No

Yes

BD Unit forwards particular claims that fall within scope of approved denial recommendation to CEO and COO for authorization to inform BD applicants

FSA Internal Control Notification

Under Secretary (OUS) Approves

Updated 1/30/2017



Number of Borrower Defense Claims



| Date | CCI | ITT | Other Schools |
|---|---|---|---|
| Nov-15 | 3,179 | 148 | 1,370 |
| Dec-15 | 4,720 | 178 | 1,367 |
| Jan-16 | 6,260 | 207 | 1,363 |
| Feb-16 | 6,702 | 294 | 1,879 |
| Mar-16 | 7,982 | 326 | 2,069 |
| Apr-16 | 9,281 | 377 | 2,423 |
| May-16 | 16,659 | 395 | 2,565 |
| Jun-16 | 20,661 | 415 | 2,666 |
| Jul-16 | 26,184 | 454 | 3,358 |
| Aug-16 | 30,934 | 501 | 3,255 |
| Sep-16 | 32,111 | 508 | 3,364 |
| Oct-16 | 37,010 | 530 | 3,622 |
| Nov-16 | 54,919 | 1,392 | 4,161 |
| Dec-16 | 58,514 | 2,023 | 4,423 |
| Jan-17 | 59,740 | 2,743 | 5,252 |