# EXHIBIT 11

**SUMMARY:** Pursuant to Section 102(2)(C) of the National Environmental Policy Act (NEPA) of 1969, as implemented by the Council on Environmental Quality Regulations (40 CFR parts 1500–1508), the Department of the Navy (DoN) has prepared the ROD for the FEIS for the disposal and reuse of NASJRB Willow Grove Pennsylvania. The DoN is required to close NASJRB Willow Grove per Public Law 101–510, the Defense Base Closure and Realignment Act of 1990, as amended in 2005. The ROD was prepared by the DoN.

**FOR FURTHER INFORMATION CONTACT:** Director, Base Realignment and Closure (BRAC) Program Management Office East, 4911 Broad Street, Building 679, Philadelphia, PA 19112–1303, telephone 215–897–4900, fax 215–897–4902, email: *Gregory.preston@navy.mil*

**SUPPLEMENTARY INFORMATION:** The complete text of the ROD is available on the Navy BRAC Program Management Office Web site at *http://www.bracpmo.navy.mil/* along with the FEIS and other supporting documents. Single copies of the ROD are available upon request by contacting Director, BRAC Program Management Office East, 4911 Broad Street, Building 679, Philadelphia, PA 19112–1303, telephone 215–897–4900, fax 215–897–4902, email: *Gregory.preston@navy.mil*

Dated: June 4, 2015.

**N.A. Hagerty-Ford,**

*Federal Register Liaison Officer, Commander, Judge Advocate General's Corps, U.S. Navy.*

[FR Doc. 2015–14172 Filed 6–9–15; 8:45 am]

**BILLING CODE 3810–FF–P**

---

# DEPARTMENT OF EDUCATION

[Docket No.: ED–2015–ICCD–0075]

## Agency Information Collection Activities; Comment Request; Talent Search (TS) Annual Performance Report

**AGENCY:** Office of Postsecondary Education (OPE), Department of Education (ED).

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 3501 *et seq.*), ED is proposing an extension of an existing information collection.

**DATES:** Interested persons are invited to submit comments on or before August 10, 2015.

**ADDRESSES:** Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http://*

*www.regulations.gov* by selecting Docket ID number ED–2015–ICCD–0075 or via postal mail, commercial delivery, or hand delivery. If the regulations.gov site is not available to the public for any reason, ED will temporarily accept comments at *ICDocketMgr@ed.gov*. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted; ED will ONLY accept comments during the comment period in this mailbox when the regulations.gov site is not available.* Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 400 Maryland Avenue SW., LBJ, Mailstop L–OM–2–2E319, Room 2E105, Washington, DC 20202.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Craig Pooler, 202–502–7640.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize the public's reporting burden. It also helps the public understand the Department's information collection requirements and provide the requested data in the desired format. ED is soliciting comments on the proposed information collection request (ICR) that is described below. The Department of Education is especially interested in public comment addressing the following issues: (1) Is this collection necessary to the proper functions of the Department; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the Department enhance the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* Talent Search (TS) Annual Performance Report

*OMB Control Number:* 1840–0826

*Type of Review:* An extension of an existing information collection.

*Respondents/Affected Public:* State, Local and Tribal Governments

*Total Estimated Number of Annual Responses:* 450

*Total Estimated Number of Annual Burden Hours:* 7,200

*Abstract:* Talent Search grantees must submit the report annually. The report provides the Department of Education with information needed to evaluate a grantee's performance and compliance with program requirements and to award prior experience points in accordance with the program regulations. The data collection is also aggregated to provide national information on project participants and program outcomes.

Dated: June 5, 2015.

**Stephanie Valentine,**

*Acting Director, Information Collection Clearance Division, Office of the Chief Privacy Officer, Office of Management.*

[FR Doc. 2015–14165 Filed 6–9–15; 8:45 am]

**BILLING CODE 4000–01–P**

---

# DEPARTMENT OF EDUCATION

[Docket No.: ED–2015–ICCD–0072]

## Agency Information Collection Activities; Comment Request; Borrower Defenses against Loan Repayment

**AGENCY:** Federal Student Aid (FSA), Department of Education (ED).

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction of 1995 (44 U.S.C. Chapter 3507(j)), ED is requesting the Office of Management and Budget (OMB) to conduct an emergency review of a new information collection.

**DATES:** An emergency review has been requested in accordance with the Act (44 U.S.C. Chapter 3507 (j)), due to an unanticipated event. Approval by the Office of Management and Budget (OMB) has been requested by June 4, 2015.

**ADDRESSES:** Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http:// www.regulations.gov* by selecting Docket ID number ED–2015–ICCD–0072 or via postal mail, commercial delivery, or hand delivery. If the regulations.gov site is not available to the public for any reason, ED will temporarily accept comments at *ICDocketMgr@ed.gov*. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted; ED will ONLY accept comments during the comment period*

**32945**

in this mailbox when the regulations.gov site is not available. Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 400 Maryland Avenue SW, LBJ, Mailstop L–OM–2–2E319, Room 2E103, Washington, DC 20202.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Colleen McGinnis, (202) 377–4330.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize the public's reporting burden. It also helps the public understand the Department's information collection requirements and provide the requested data in the desired format. ED is soliciting comments on the proposed information collection request (ICR) that is described below. The Department of Education is especially interested in public comment addressing the following issues: (1) Is this collection necessary to the proper functions of the Department; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the Department enhance the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* Borrower Defenses Against Loan Repayment.

*OMB Control Number:* 1845–NEW.

*Type of Review:* A new information collection.

*Respondents/Affected Public:* Individuals or Households.

*Total Estimated Number of Annual Responses:* 150,000.

*Total Estimated Number of Annual Burden Hours:* 150,000.

*Abstract:* This is a request for an emergency collection to facilitate the collection of information for borrowers who believe they have cause to invoke the borrower defenses against repayment of a loan as noted in regulation. This collection includes Web site language that will provide minimum information that requests need to include for consideration as well as a separate specific attestation form. These processes are being offered to aid in preserving borrowers' rights and to meet the fiduciary responsibilities of the federal student loan programs. These collections will allow the Department of Education to inform borrowers and loan servicers of the information needed to review and adjudicate requests for relief under borrower defenses regulations.

*Additional Information:* Section 455(h) of the Higher Education Act of 1965, as amended (20 U.S.C. 1087e(h) provides that the U.S. Department of Education (Department) defines by regulation which claims against a school constitute defenses to repayment of a loan under the Federal Direct Loan (Direct Loan) program. Following a negotiated rulemaking process, the Department published amendments to the Direct Loan program regulations on December 1, 1994. These regulations included borrower defenses specified in 34 CFR 685.206(c). The regulation, in part, states ''(c)(1) [i]n any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, an act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law.'' Prior to 2015, the borrower defense identified above was rarely asserted by any borrowers and no specific methods of collecting information was defined or found necessary. In the 20 years prior, the Department received 5 claims for borrower defense. Over the last several months, the Department has received over 1000 such claims due to a building debt activism movement as well as the notoriety of Corinthian's collapse, creating a need for a clearer process for potential claimants. This exponential increase in demand was unexpected and outside of the Department's control.

Dated: June 5, 2015.

**Stephanie Valentine,**

*Acting Director, Information Collection Clearance Division, Office of the Chief Privacy Officer, Office of Management.*

[FR Doc. 2015–14184 Filed 6–9–15; 8:45 am]

**BILLING CODE 4000–01–P**

## DEPARTMENT OF ENERGY

### Federal Energy Regulatory Commission

[Project No. 3230–010]

**Chasm Hydro Partnership; Ampersand Chasm Falls Hydro LLC; Notice of Transfer of Exemption**

1. By letter filed March 3, 2015, Ampersand Chasm Falls Hydro LLC informed the Commission that the exemption from licensing for the Chateaugay Chasm Project, FERC No. 3230, originally issued June 15, 1981,[1] has been transferred to Ampersand Chasm Falls Hydro LLC. The project is located on the Chateaugay River in Franklin County, New York. The transfer of an exemption does not require Commission approval.

2. Ampersand Chasm Falls Hydro LLC is now the exemptee of the Chateaugay Chasm Project, FERC No. 3230. All correspondence should be forwarded to: Ian Chow, Project Manager, Ampersand Chasm Falls Hydro LLC, 717 Atlantic Avenue, Suite 1A, Boston, MA 02111.

Dated: June 3, 2015.

**Kimberly D. Bose,**

*Secretary.*

[FR Doc. 2015–14107 Filed 6–9–15; 8:45 am]

**BILLING CODE 6717–01–P**

## DEPARTMENT OF ENERGY

### Federal Energy Regulatory Commission

**Combined Notice of Filings #1**

Take notice that the Commission received the following electric rate filings:

*Docket Numbers:* ER06–615–061; ER02–1656–038.

*Applicants:* California Independent System Operator Corporation.

*Description:* Compliance Filing in Response to June 3, 2014 Order of the California Independent System Operator Corporation.

*Filed Date:* 6/3/15.

*Accession Number:* 20150603–5191.

*Comments Due:* 5 p.m. ET 6/24/15.

*Docket Numbers:* ER12–2414–004.

*Applicants:* New York Independent System Operator, Inc..

*Description:* Compliance filing per 35: Amendment to compliance filing revision of BSM Rules to be effective 6/22/2012.

*Filed Date:* 6/3/15.

---

[1] 15 FERC ¶ 62,339, Order Granting Exemption from Licensing of a Small Hydroelectric Project of 5 Megawatts or Less (1981).

# EXHIBIT 12



# FEDERAL REGISTER

| Vol. 81 | Thursday, |
|---------|-----------|
| No. 116 | June 16, 2016 |

Part II

## Department of Education

34 CFR Parts 30, 668, 674, et al.
Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program; Proposed Rule

## DEPARTMENT OF EDUCATION

**34 CFR Parts 30, 668, 674, 682, 685, and 686**

RIN 1840–AD19

[Docket ID ED–2015–OPE–0103]

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.
**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to amend the regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to establish a new Federal standard and a process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of a school. We propose to also amend the Direct Loan Program regulations by prohibiting participating schools from using certain contractual provisions regarding dispute resolution processes, such as mandatory pre-dispute arbitration agreements or class action waivers, and to require certain notifications and disclosures by schools regarding their use of arbitration. We propose to also amend the Direct Loan Program regulations to codify our current policy regarding the impact that discharges have on the 150 percent Direct Subsidized Loan Limit. We also propose to amend the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we propose to amend the discharge provisions in the Federal Perkins Loan (Perkins Loan), Direct Loan, Federal Family Education Loan (FFEL), and Teacher Education Assistance for College and Higher Education (TEACH) Grant programs. The proposed changes would provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school liabilities resulting from borrower defenses.

**DATES:** We must receive your comments on or before August 1, 2016.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the U.S. Department of Education (the Department) to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using Regulations.gov, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the proposed regulations, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW., Room 6W232B, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** For further information related to borrower defenses, Barbara Hoblitzell at (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.* For further information related to false certification and closed school loan discharges, Brian Smith at (202) 453–7440 or by email at: *Brian.Smith@ed.gov.* For further information regarding institutional accountability, John Kolotos or Greg Martin at (202) 453–7646 or (202) 453–7535 or by email at: *John.Kolotos@ed.gov* or *Gregory.Martin@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Purpose of This Regulatory Action*

The purpose of the borrower defense regulation is to protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in the Department's student aid programs. Most postsecondary institutions provide a high-quality education that equips students with new knowledge and skills and prepares them for their careers. However, when postsecondary institutions make false and misleading statements to students or prospective students about school or career outcomes or financing needed to pay for those programs, or fail to fulfill specific contractual promises regarding program offerings or educational services, student loan borrowers may be eligible for discharge of their Federal loans.

The proposed regulations would give students access to consistent, clear, fair, and transparent processes to seek debt relief; protect taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government for discharges of and repayments for Federal student loans; provide due process for students and institutions; and warn students, using plain language issued by the Department, about proprietary schools at which the typical student experiences poor loan repayment outcomes—defined in these proposed regulations as a proprietary school with a loan repayment rate that is less than or equal to zero percent, which means that the typical borrower has not paid down at least a dollar on his or her loans—so that students can make more informed enrollment and financing decisions.

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Current regulations at § 685.206(c) governing defenses to repayment have been in place since 1995 but, until recently, rarely used. Those regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."

In response to the collapse of Corinthian Colleges (Corinthian) and the flood of borrower defense claims submitted by Corinthian students

stemming from the school's misconduct, the Secretary announced in June 2015 that the Department would develop new regulations to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges.

Consistent with the Secretary's commitment, we propose regulations that would specify the conditions and processes under which a borrower may assert a defense to repayment of a Direct Loan, also referred to as a "borrower defense," based on a new Federal standard. The current standard allows borrowers to assert a borrower defense if a cause of action would have arisen under applicable state law. In contrast, the new Federal standard would allow a borrower to assert a borrower defense on the basis of a substantial misrepresentation, a breach of contract, or a favorable, nondefault contested judgment against the school for its act or omission relating to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. The new standard would apply to loans made after the effective date of the proposed regulations. The proposed regulations would establish a process for borrowers to assert a borrower defense that would be implemented both for claims that fall under the existing standard and for later claims that fall under the new, proposed standard. In addition, the proposed regulations would establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

The Department also proposes a regulation that would prohibit a school participating in the Direct Loan Program from requiring, through the use of contractual provisions or other agreements, arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's regulations. The proposed regulations also would prohibit a school participating in the Direct Loan Program from obtaining agreement, either in an arbitration agreement or in another form, that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims and from requiring students to engage in internal institutional complaint or grievance procedures before contacting accrediting or government agencies with authority over the school regarding such claims. The proposed regulations also would prohibit a school participating in the Direct Loan Program from requiring, through the use of contractual provisions or other agreements, arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's regulations. The proposed regulations would also impose certain notification and disclosure requirements on a school regarding claims that are voluntarily submitted to arbitration after a dispute has arisen.

*Summary of the Major Provisions of This Regulatory Action:* For the Direct Loan Program, we propose new regulations governing borrower defenses that would—

• Clarify that borrowers with loans first disbursed prior to July 1, 2017, may assert a defense to repayment under the current borrower defense State law standard;

• Establish a new Federal standard for borrower defenses, and limitation periods applicable to the claims asserted under that standard, for borrowers with loans first disbursed on or after July 1, 2017;

• Establish a process for the assertion and resolution of borrower defense claims made by individuals;

• Establish a process for group borrower defense claims with respect to both open and closed schools, including the conditions under which the Secretary may allow a claim to proceed without receiving an application;

• Provide for remedial actions the Secretary may take to collect losses arising out of successful borrower defense claims for which an institution is liable; and

• Add provisions to schools' Direct Loan program participation agreements that, for claims that may form the basis for borrower defenses—

▪ Prevent schools from requiring that students first engage in a school's internal complaint process before contacting accrediting and government agencies about the complaint;

▪ Prohibit the use of mandatory pre-dispute arbitration agreements by schools;

▪ Prohibit the use of class action lawsuit waivers; and

▪ To the extent schools and borrowers engage in arbitration in a manner consistent with applicable law and regulation, require schools to disclose to and notify the Secretary of arbitration filings and awards.

The proposed regulations would also revise the Student Assistance General Provisions regulations to—

• Amend the definition of a misrepresentation to include omissions of information and statements with a likelihood or tendency to mislead under the circumstances. The definition would be amended for misrepresentations for which the Secretary may impose a fine, or limit, suspend, or terminate an institution's participation in title IV, HEA programs. This definition is also adopted as a basis for alleging borrower defense claims for Direct Loans first disbursed after July 1, 2017;

• Clarify that a limitation may include a change in an institution's participation status in title IV, HEA programs from fully certified to provisionally certified;

• Amend the financial responsibility standards to include actions and events that would trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities to the Department;

• Require proprietary schools with a student loan repayment rate that is less than or equal to zero percent to provide a Department-issued plain language warning to prospective and enrolled students and place the warning on its Web site and in all promotional materials and advertisements; and

• Require a school to disclose on its Web site and to prospective and enrolled students if it is required to provide financial protection, such as a letter of credit, to the Department.

The proposed regulations would also—

• Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower ("death discharge") in the Perkins, FFEL, Direct Loan, and TEACH Grant programs;

• Revise the Perkins, FFEL, and Direct Loan closed school discharge regulations to ensure borrowers are aware of and able to benefit from their ability to receive the discharge;

• Expand the conditions under which a FFEL or Direct Loan borrower may qualify for a false certification discharge;

• Codify the Department's current policy regarding the impact that a discharge of a Direct Subsidized Loan has on the 150 Percent Direct Subsidized Loan Limit; and

• Make technical corrections to other provisions in the FFEL and Direct Loan Program regulations and to the regulations governing the Secretary's debt compromise authority.

Please refer to the *Summary of Proposed Changes* section of this notice of proposed rulemaking (NPRM) for more details on the major provisions contained in this NPRM.

*Costs and Benefits:* As further detailed in the *Regulatory Impact Analysis,* the benefits of the proposed regulations include: (1) An updated and clarified process and the creation of a Federal standard to streamline the administration of the borrower defense rule and to increase protections for students as well as taxpayers and the Federal government; (2) increased financial protections for the Federal government and thus for taxpayers; (3) additional information to help students, prospective students, and their families make educated decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs. Costs include paperwork burden associated with the required reporting and disclosures to ensure compliance with the proposed regulations, the cost to affected institutions of providing financial protection, and the cost to taxpayers of borrower defense claims that are not reimbursed by institutions.

*Invitation to Comment:* We invite you to submit comments regarding these proposed regulations.

To ensure that your comments have maximum effect in developing the final regulations, we urge you to identify clearly the specific section or sections of the proposed regulations that each of your comments addresses, and provide relevant information and data whenever possible, even when there is no specific solicitation of data and other supporting materials in the request for comment. We also urge you to arrange your comments in the same order as the proposed regulations. Please do not submit comments that are outside the scope of the specific proposals in this NPRM, as we are not required to respond to such comments.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further ways we could reduce potential costs or increase potential benefits

while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about the proposed regulations by accessing *Regulations.gov.* You may also inspect the comments in person at 400 Maryland Ave. SW., Washington, DC, between 8:30 a.m. and 4:00 p.m., Washington, DC time, Monday through Friday of each week except Federal holidays. To schedule a time to inspect comments, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the proposed regulations. To schedule an appointment for this type of accommodation or auxiliary aid, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT.**

## Background

The Secretary proposes to amend §§ 30.70, 668.14, 668.41, 668.71, 668.90, 668.93, 668.171, 668.175, 674.33, 674.61, 682.202, 682.211, 682.402, 682.405, 682.410, 685.200, 685.205, 685.206, 685.209, 685.212, 685.214, 685.215, 685.200, 685.220, 685.300, 685.308, and 686.42 of title 34 of the Code of Federal Regulations (CFR), and also to add new §§ 668.176, 685.222, 685.223, and 685.310 to that title. The regulations in 34 CFR part 30 pertain to Debt Collection. The regulations in 34 CFR part 668 pertain to Student Assistance General Provisions. The regulations in 34 CFR part 674 pertain to the Perkins Loan Program. The regulations in 34 CFR part 682 pertain to the FFEL Program. The regulations in 34 CFR part 685 pertain to the Direct Loan Program. The regulations in 34 CFR part 686 pertain to the TEACH Grant Program. We are proposing these amendments to: (1) Specify that the standards used to identify an act or omission of a school that provides the basis for a borrower defense will depend on when the Direct Loan was first disbursed; (2) establish a new Federal standard and limitation periods that the Department will use to identify an act or omission of an institution that constitutes a borrower defense; (3) establish the procedures to be used for a borrower to initiate a borrower defense; (4) establish the standards and certain procedures that the Department would use to determine the liability of

an institution for the amount of relief arising from a borrower defense; (5) prohibit schools' use of mandatory pre-dispute arbitration agreements or class action bans to resolve disputes for claims that could also form the basis of borrower defense claims or require borrowers to waive any rights to initiate or participate in class actions regarding such claims; and impose certain notification and disclosure requirements relating to a school's use of arbitration; (6) establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect the Federal government, and thus taxpayers, against potential institutional liabilities; (7) require a proprietary institution with a student loan repayment rate that is less than or equal to zero percent to place a Department-issued plain language warning on its Web site and in advertising and promotional materials, as well as to provide the warning to prospective and enrolled students; (8) require that a school disclose to prospective and enrolled students if it is required to provide financial protection to the Department; (9) expand the allowable documentation that may be submitted to demonstrate eligibility for a death discharge of a title IV, HEA loan or a TEACH Grant service obligation; (10) revise the closed school discharge regulations to ensure borrowers are aware of and able to benefit from their ability to receive the discharge; (11) expand the eligibility criteria for the false certification loan discharge; (12) make technical corrections to the regulation that describes the authority of the Department to compromise, or suspend or terminate collection of, debts; (13) make technical corrections to the regulations governing the Pay as You Earn (PAYE) and Revised Pay as You Earn (REPAYE) repayment plans; (14) allow for the consolidation of Nurse Faculty Loans; (15) allow borrowers to obtain a Direct Consolidation Loan if the borrower consolidates at least one of the eligible loans listed in § 685.220(b); (16) clarify the conditions under which the capitalization of interest by FFEL Program loan holders is permitted; and (17) codify the conditions under which the discharge of a Direct Subsidized Loan will lead to the elimination or recalculation of a Subsidized Usage Period under the 150 Percent Direct Subsidized Loan Limit or the restoration of interest subsidy.

## Public Participation

On August 20, 2015, we published a notice in the **Federal Register** (80 FR 50588) announcing our intent to

establish a negotiated rulemaking committee under section 492 of the HEA to develop proposed regulations for determining which acts or omissions of an institution of higher education ("institution" or "school") a borrower may assert as a borrower defense under the Direct Loan Program and the consequences of such borrower defenses for borrowers, institutions, and the Secretary. We also announced two public hearings at which interested parties could comment on the topic suggested by the Department and suggest additional topics for consideration for action by the negotiated rulemaking committee. The hearings were held on—

September 10, 2015, in Washington, DC; and

September 16, 2015, in San Francisco, CA.

Transcripts from the public hearings are available at *www2.ed.gov/policy/ highered/reg/hearulemaking/2016/ index.html*.

We also invited parties unable to attend a public hearing to submit written comments on the proposed topics and to submit other topics for consideration. Written comments submitted in response to the August 20, 2015, **Federal Register** notice may be viewed through the Federal eRulemaking Portal at *www.regulations.gov*, within docket ID ED–2015–OPE–0103. Instructions for finding comments are also available on the site under "How to Use Regulations.gov" in the Help section.

On October 20, 2015, we published a notice in the **Federal Register** (80 FR 63478) requesting nominations for negotiators to serve on the negotiated rulemaking committee and setting a schedule for committee meetings.

On December 21, 2015, we published a notice in the **Federal Register** (80 FR 79276) requesting additional nominations for negotiators to serve on the negotiated rulemaking committee.

**Negotiated Rulemaking**

Section 492 of the HEA, 20 U.S.C. 1098a, requires the Secretary to obtain public involvement in the development of proposed regulations affecting programs authorized by title IV of the HEA. After obtaining extensive input and recommendations from the public, including individuals and representatives of groups involved in the title IV, HEA programs, the Secretary in most cases must subject the proposed regulations to a negotiated rulemaking process. If negotiators reach consensus on the proposed regulations, the Department agrees to publish without alteration a defined group of

regulations on which the negotiators reached consensus unless the Secretary reopens the process or provides a written explanation to the participants stating why the Secretary has decided to depart from the agreement reached during negotiations. Further information on the negotiated rulemaking process can be found at: *www2.ed.gov/policy/ highered/reg/hearulemaking/hea08/neg-reg-faq.html*.

On October 20, 2015, the Department published a notice in the **Federal Register** (80 FR 63478) announcing its intention to establish a negotiated rulemaking committee to prepare proposed regulations governing the Federal Student Aid programs authorized under title IV of the HEA. The notice set forth a schedule for the committee meetings and requested nominations for individual negotiators to serve on the negotiating committee.

The Department sought negotiators to represent the following groups: Students/borrowers; legal assistance organizations that represent students/ borrowers; consumer advocacy organizations; groups representing U.S. military servicemembers or veteran Federal loan borrowers; financial aid administrators at postsecondary institutions; State attorneys general (AGs) and other appropriate State officials; State higher education executive officers; institutions of higher education eligible to receive Federal assistance under title III, parts A, B, and F, and title V of the HEA, which include Historically Black Colleges and Universities, Hispanic-Serving Institutions, American Indian Tribally Controlled Colleges and Universities, Alaska Native and Native Hawaiian-Serving Institutions, Predominantly Black Institutions, and other institutions with a substantial enrollment of needy students as defined in title III of the HEA; two-year public institutions of higher education; four-year public institutions of higher education; private, nonprofit institutions of higher education; private, for-profit institutions of higher education; FFEL Program lenders and loan servicers; and FFEL Program guaranty agencies and guaranty agency servicers (including collection agencies). The Department considered the nominations submitted by the public and chose negotiators who would represent the various constituencies.

On December 21, 2015, the Department published a notice in the **Federal Register** (80 FR 79276) requesting additional nominations for negotiators to serve on the negotiated rulemaking committee to represent constituencies that were not represented following the initial request for

nominations. The Department sought negotiators to represent the following groups: State higher education executive officers; institutions of higher education eligible to receive Federal assistance under title III, parts A, B, and F, and title V of the HEA; two-year public institutions of higher education; private, for-profit institutions of higher education; and national, regional, or specialized accrediting agencies.

The negotiating committee included the following members:

Ann Bowers, for-profit college borrower, and Chris Lindstrom (alternate), U.S. Public Interest Research Group, representing students/borrowers.

Noah Zinner, Housing and Economic Rights Advocates, and Eileen Connor (alternate), Project on Predatory Student Lending at Harvard Law School (at the time of nomination, New York Legal Assistance Group) representing legal assistance organizations that represent students.

Maggie Thompson, Higher Ed, Not Debt, and Margaret Reiter (alternate), attorney, representing consumer advocacy organizations.

Bernard Eskandari, Office of the Attorney General of California, and Mike Firestone (alternate), Commonwealth of Massachusetts Office of the Attorney General, representing State attorneys general and other appropriate State officials.

Walter Ochinko, Veterans Education Success, Will Hubbard (first alternate), Student Veterans of America, and Derek Fronabarger (second alternate), Student Veterans of America, representing U.S. military servicemembers or veterans.

Karen Solinski, Higher Learning Commission, and Dr. Michale McComis (alternate), Accrediting Commission of Career Schools and Colleges, representing accreditors.

Becky Thompson, Washington Student Achievement Council, representing State higher education executive officers.

Alyssa Dobson, Slippery Rock University, and Mark Justice (alternate), The George Washington University, representing financial aid administrators.

Sharon Oliver, North Carolina Central University, and Emily London Jones (alternate), Xavier University of Louisiana, representing minority-serving institutions.

Angela Johnson, Cuyahoga Community College, and Shannon Sheaff (alternate), Mohave Community College, representing two-year public institutions.

Kay Lewis, University of Washington, and Jean McDonald Rash (alternate),

Rutgers University, representing four-year public institutions.

Christine McGuire, Boston University, and David Sheridan (alternate), Columbia University, representing private, nonprofit institutions.

Dennis Cariello, Hogan Marren Babbo & Rose, Ltd., and Chris DeLuca (alternate), DeLuca Law, representing private, for-profit institutions.

Wanda Hall, EdFinancial Services, and Darin Katzberg (alternate), Nelnet, representing FFEL Program lenders and loan servicers.

Betsy Mayotte, American Student Assistance, and Jaye O'Connell (alternate), Vermont Student Assistance Corporation, representing FFEL Program guaranty agencies and guaranty agency servicers.

Gail McLarnon, U.S. Department of Education, representing the Department.

The negotiated rulemaking committee met to develop proposed regulations on January 12–14, 2016, February 17–19, 2016, and March 16–18, 2016. The Department held informational sessions by telephone for interested members of the committee on March 1 and March 3, 2016, to review the Department's loan repayment rate disclosure proposal, and on March 9 and March 10, 2016, at the request of a non-Federal negotiator, to hear from Professor Adam Zimmerman of Loyola Law School regarding agency class settlement processes.

At its first meeting, the negotiating committee reached agreement on its protocols and proposed agenda. The protocols provided, among other things, that the committee would operate by consensus. Consensus means that there must be no dissent by any member in order for the committee to have reached agreement. Under the protocols, if the committee reached a final consensus on all issues, the Department would use the consensus-based language in its proposed regulations. Furthermore, the Department would not alter the consensus-based language of its proposed regulations unless the Department reopened the negotiated rulemaking process or provided a written explanation to the committee members regarding why it decided to depart from that language.

During the first meeting, the negotiating committee agreed to negotiate an agenda of seven issues related to student financial aid. These seven issues were: Borrower defenses, false certification discharges, institutional accountability, electronic death certificates, consolidation of Nurse Faculty Loans, interest capitalization, and technical corrections to the PAYE and REPAYE plans. During the second meeting, the negotiating

committee agreed to add two additional issues: Closed school discharges and a technical correction to the regulations that describe the authority of the Department to compromise, or suspend, or terminate collection of, debts. Under the protocols, a final consensus would have to include consensus on all nine issues.

During committee meetings, the negotiators reviewed and discussed the Department's drafts of regulatory language and the committee members' alternative language and suggestions. At the final meeting on March 18, 2016, the committee did not reach consensus on the Department's proposed regulations. For that reason, and according to the committee's protocols, all parties who participated or were represented in the negotiated rulemaking, in addition to all members of the public, may comment freely on the proposed regulations. For more information on the negotiated rulemaking sessions, please visit: *http://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html.*

**Summary of Proposed Changes**

The proposed regulations would—
• Amend § 685.206 to clarify that existing regulations with regard to borrower defenses apply to loans first disbursed prior to July 1, 2017, and that a borrower defense asserted pursuant to this section will be subject to the procedures in proposed § 685.222(e) to (k);
• Amend § 685.206 to remove the period of limitation on the Secretary's ability to recover from institutions the amount of the losses incurred by the Secretary on loans to which an approved borrower defense applies;
• Amend § 685.206 to clarify that a borrower defense may be asserted as to an act or omission of the school that relates to the making of the loan or the provision of educational services that would give rise to a cause of action against the school under applicable State law;
• Add a new borrower defense section at § 685.222 that applies to loans first disbursed on or after July 1, 2017;
• Provide in § 685.222(a) that a borrower defense may be established if a preponderance of the evidence shows that the borrower has a borrower defense claim that relates to the making of the borrower's Direct Loan or the provision of educational services and meets the requirements in § 685.222(b), (c), or (d);
• Provide in § 685.222(a) that a violation by a school of an eligibility or compliance requirement in the HEA or its implementing regulations is not a basis for a borrower defense;

• Define in § 685.222(a) the terms "borrower" and "borrower defense";
• Amend the definition of "misrepresentation" in § 668.71 to define a misleading statement as one that "includes any statement that has the likelihood or tendency to mislead under the circumstances" and to include "any statement that omits information in such a way as to make the statement false, erroneous, or misleading";
• Establish in § 685.222(b), (c), and (d) a new Federal standard upon which a borrower defense may be based—a judgment against the school, a breach of contract by the school, or a substantial misrepresentation by the school;
• Provide in § 685.222(d)(2) that in determining whether a school made a substantial misrepresentation, the Secretary may consider certain factors as to whether the reliance of a borrower on the misrepresentation was reasonable;
• Establish in § 685.222(e) a procedure under which an individual borrower may assert a borrower defense;
• Provide in § 685.222(f) a general description of a group borrower defense claim process, including the conditions under which the Secretary may allow a claim to proceed without receiving an application;
• Establish in § 685.222(g) and (h) processes for borrower defense claims made by groups of borrowers with respect to closed schools and open schools, respectively;
• Specify in § 685.222(i) that the relief granted to a borrower with an approved borrower defense is based on the facts underlying the borrower's claim;
• Require in § 685.222(j) and (k) cooperation by the borrower in any borrower defense proceeding and, upon the granting of relief to a borrower, provide for the transfer to the Secretary of the borrower's right to recovery against third parties;
• Add a new paragraph (k) to § 685.212 to include an approved borrower defense among the reasons for a discharge of a loan obligation, and to address borrower defense claims on Direct Consolidation Loans;
• Amend § 685.205 to expand the circumstances under which the Secretary grants forbearance without requiring documentation from the borrower to include periods of time when a borrower defense has been asserted and is under review;
• Amend § 685.300 to prevent schools from requiring that students first engage in a school's internal complaint process before contacting accrediting and government agencies about the

complaint; prohibit the use of pre-dispute mandatory arbitration agreements by schools; prohibit the use of class action lawsuit waivers; and require schools to disclose to and notify the Secretary of arbitration filings;

• Clarify in § 685.308 that the Secretary may recover from the school losses from loan discharges, including losses incurred from approved borrower defenses;

• Amend § 668.171 to include conditions and events that trigger a requirement that the school provide financial protection, such as a letter of credit. Such conditions and events include incurring significant amounts of liability in recent years for borrower defense claim losses, a school's inability to pay claims, and events that would compromise a school's ability to continue its participation in the title IV, HEA programs;

• Require in § 668.41 a proprietary school with a student loan repayment rate that is less than or equal to zero percent to place a Department-issued plain language warning on its Web site and in advertising and promotional materials, as well as to provide the warning to prospective and enrolled students;

• Require in § 668.41 that a school disclose to prospective and enrolled students if it is required to provide financial protection, such as a letter of credit, to the Department;

• Amend § 668.175 to state the amounts of financial protection, such as letters of credit, required in the event of particular occurrences;

• Clarify in § 668.90 when a hearing official must uphold the limitation or termination requested by the Secretary for disputes related to the amount of financial protection, such as a letter of credit, for a school's failure under the financial responsibility standards;

• Clarify in § 668.93 that a limitation sought by the Secretary on a school's participation in title IV, HEA programs may include a change in participation from fully certified to provisionally certified;

• Amend §§ 674.61, 682.402, 685.212, and 686.42 to allow for a death discharge of a loan or TEACH Grant service obligation to be granted based on an original or certified copy of a death certificate that is submitted electronically or sent by facsimile transmission, or through verification of death in an electronic Federal or State database that is approved for use by the Secretary;

• Amend §§ 668.14(b), 674.33(g), 682.402(d), and 685.214(f) to increase outreach by the Secretary and schools and make more information available to

borrowers eligible for a closed school discharge so that they are aware of this option;

• Amend § 685.215 to update and expand the existing categories of false certification discharge to include the improper certification of eligibility of a student who is not a high school graduate and false certification of a borrower's academic progress;

• Amend § 682.211 to require lenders to grant a mandatory administrative forbearance for borrowers who have filed a borrower defense claim with the Secretary with the intent of seeking relief under § 685.212(k) after consolidating into the Direct Loan Program;

• Update the provisions in § 30.70 to reflect the increased debt resolution authority provided in Public Law 101–552 that authorizes the Department to resolve debts up to $100,000 without approval from the Department of Justice (DOJ) as well as other changes to the Department's claim resolution authority;

• Amend § 685.209 by making technical corrections and clarifying changes to the PAYE and REPAYE repayment plan regulations;

• Amend § 685.220 to allow a borrower to obtain Direct Consolidation Loan, if the borrower consolidates any of the eligible loans listed in § 685.220(b); and

• Clarify in §§ 682.202, 682.405, and 682.410 that guaranty agencies and FFEL Program lenders are not permitted to capitalize outstanding interest on FFEL loans when the borrower rehabilitates a defaulted FFEL loan; and

• Amend § 685.200 to codify the Department's current practice regarding the elimination or recalculation of a subsidized usage period or the restoration of interest subsidy under the 150 Percent Direct Subsidized Loan Limit when a Direct Subsidized Loan is discharged.

## Significant Proposed Regulations

We group major issues according to subject, with the applicable sections of the proposed regulations referenced in parentheses. We discuss other substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

## Borrower Defenses (§§ 668.71, 685.205, 685.206, and 685.222)

*Background:* The proposed regulations address several topics related to the administration of title IV, HEA student aid programs and benefits and options for borrowers. The Department first implemented borrower

defense regulations for the Direct Loan Program in the 1995–1996 academic year to protect borrowers. The Department's original intent was for this rule to be in place for the 1995–1996 academic year, and then to develop a more extensive rule for both the Direct Loan and FFEL Loan programs through negotiated rulemaking in the following year.

However, based on the recommendation of non-Federal negotiators in the spring of 1995, the Secretary decided not to develop further regulations for the Direct Loan and FFEL programs. 60 FR 37768. As a result, the regulations have not been updated in two decades to establish appropriate processes or other necessary information to allow borrowers to effectively utilize their options under the borrower defense regulation.

In May 2015, Corinthian, a publicly traded company operating numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide, filed for bankruptcy. Corinthian collapsed under deteriorating financial conditions and while subject to multiple State and Federal investigations, one of which resulted in a finding by the Department that the college had misrepresented its job placement rates. Upon the closure of Corinthian, which included Everest Institute, Wyotech, and Heald College, the Department received thousands of claims for student loan relief from Corinthian students.

The Department is committed to ensuring that borrowers harmed by Corinthian's fraudulent practices receive the relief to which they are entitled under the current closed school and borrower defense regulations. The Department appointed a Special Master in June 2015 to create and oversee a process to provide debt relief for these Corinthian borrowers who applied for Federal student loan discharges based on claims against Corinthian.

The current borrower defense regulation, which has existed since 1995 but has rarely been used, requires a borrower to demonstrate that a school's acts or omissions would give rise to a cause of action under "applicable State law." The regulation is silent on the process a borrower follows to assert a borrower defense claim.

The landscape of higher education has changed significantly over the past 20 years. The role of distance education in the higher education sector has grown substantially. In the 1999–2000 academic year, about eight percent of students were enrolled in at least one distance education course; by the 2007–2008 academic year, that number had

**39336**    **Federal Register** / Vol. 81, No. 116 / Thursday, June 16, 2016 / Proposed Rules

grown to 20 percent.[1] Recent IPEDS data indicate that in the fall of 2013, 26.4 percent of students at degree-granting, title IV-participating institutions were enrolled in at least one distance education class.[2] Much of this growth occurred within and coincided with the growth of the proprietary higher education sector. In the fall of 1995, degree-granting, for-profit institutions enrolled approximately 240,000 students. In the fall of 2014, degree-granting, for-profit schools enrolled over 1.5 million students.[3] These changes to the higher education industry have allowed students to enroll in colleges based in other States and jurisdictions with relative ease.

These changes have had an impact on the Department's ability to apply its borrower defense regulations. The current borrower defense regulations do not identify which State's law is considered "applicable" State law on which the borrower's claim can be based.[4] Generally, the regulation was assumed to refer to the laws of the State in which the institution was located; we had little occasion to address differences in protection for borrowers in States that offer little protection from school misconduct or borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States have extended their rules to protect these students, while others have not. As a result of the difficulties in application and interpretation of the current State law standard, as well as the lack of clarity surrounding the procedures that apply for borrower defense, the Department took additional steps to improve the borrower defense claim process.

In a **Federal Register** notice published on October 20, 2015 (80 FR 63478), the Department announced its intent to establish a negotiated rulemaking committee to develop proposed

---

[1] Learning at a Distance: Undergraduate Enrollment in Distance Education Courses and Degree Programs (*http://nces.ed.gov/pubs2012/2012154.pdf*).

[2] 2014 Digest of Education Statistics: Table 311.15: Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2012 and Fall 2013.

[3] 2015 Digest of Education Statistics: Table 303.10: Total fall enrollment in degree-granting postsecondary institutions, by attendance status, sex of student, and control of institution: Selected years, 1947 through 2025—*http://nces.ed.gov/programs/digest/d14/tables/dt14_303.10.asp?current=yes.*

[4] In the few instances in which claims have been recognized under current regulations, borrowers and the school were typically located in the same State.

regulations that establish, among other items, the criteria that the Department will use to identify acts or omissions of an institution that constitute, for borrowers of Federal Direct Loans, a borrower defense, including a Federal standard, the procedures to be used for a borrower to establish a borrower defense, and the standards and procedures that the Department will use to determine the liability of the institution for losses arising from approved borrower defenses.

We propose to create a new § 685.222, and amend §§ 668.71, 685.205, and 685.206, to establish, effective July 1, 2017, a new Federal standard for borrower defenses, new limitation periods for asserting borrower defenses, and processes for the assertion and resolution of borrower defense claims. In the following sections, we describe in more detail these proposed changes and other clarifying changes proposed to improve the borrower defense process.

## Borrower Defenses—General (§ 685.222(a))

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

Section 487 of the HEA provides that the Secretary can take enforcement action against an institution participating in the title IV, HEA programs that substantially misrepresents the nature of the institution's education program, its financial charges, or the employability of its graduates.

*Current Regulations:* Section 685.206(c) establishes the conditions under which a Direct Loan borrower may assert a borrower defense, the relief afforded by the Secretary in the event the borrower's claim is successful, and the Secretary's authority to recover from the school any loss that results from a successful borrower defense. Specifically, § 685.206(c) provides that a borrower defense may be asserted based upon any act or omission of the school that would give rise to a cause of action against the school under applicable State law. The current regulations in § 685.206(c) are described in more detail under "Borrower Responsibilities and Defenses (34 CFR 685.206)."

*Proposed Regulations:* Proposed § 685.222(a) would provide that borrower defense claims asserted by a borrower for Direct Loans first disbursed before July 1, 2017, are considered by the Secretary in accordance with the provisions of § 685.206(c), while borrower defense claims asserted by a

borrower for Direct Loans first disbursed on or after July 1, 2017, will be considered by the Secretary in accordance with the provisions of § 685.222.

For borrower defense claims asserted by a borrower for Direct Loans first disbursed on or after July 1, 2017, proposed § 685.222 would establish a new Federal standard and new limitation periods. Proposed § 685.222 would also establish a process for the assertion and resolution of all borrower defense claims—both those made under § 685.206(c) for Direct Loans first disbursed prior to July 1, 2017, and for those made under proposed § 685.222. We describe the proposed regulations relating to the new Federal standard and new limitation periods under "Federal Standard and Limitation Periods (34 CFR 685.222(b), (c), and (d) and 34 CFR 668.71)," and the borrower defense claim process under "Process for Individual Borrowers (34 CFR 685.222(e))," "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School (34 CFR 685.222(h))."

For borrower defense claims asserted by a borrower for Direct Loans first disbursed on or after July 1, 2017, proposed § 685.222(a)(2) would provide that a preponderance of the evidence must show that the borrower has a borrower defense that relates to the making of the borrower's Direct Loan or the provision of educational services by the school to the student and that meets the requirements under § 685.222(b), (c), or (d), which are described in detail under "Federal Standard and Limitation Periods (34 CFR 685.222(b), (c), and (d) and 34 CFR 668.71)."

Section 685.222(a)(3) would clarify that a violation by the school of an eligibility or compliance requirement in the HEA or its implementing regulations is not a basis for a borrower defense unless that conduct would by itself, and without regard to the fact that the conduct violated an HEA requirement, give rise to a cause of action against the school under either applicable State law or under the new Federal standard, whichever is applicable depending on the first disbursement date of the Direct Loan in question.

Proposed § 685.222(a)(4) would define "borrower" and "borrower defense." Under the proposed definitions, "borrower" would mean the borrower and, in the case of a Direct PLUS Loan, the student and any endorsers. Under proposed § 685.222(a)(5), "borrower defense" would include one or both of

the following: a defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and a right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

If the borrower asserts both a borrower defense under § 685.222 and any other objection to an action of the Secretary with regard to the Direct Loan at issue (such as a claim for a closed school discharge or false certification discharge), the Secretary would notify the borrower of the order in which the Secretary considers the borrower defense and any other objections. The order in which the Secretary will consider objections, including borrower defense, would be determined by the Secretary as appropriate under the circumstances.

*Reasons:* We propose to establish in § 685.222 a new Federal standard and new limitation periods for borrower defense claims asserted with respect to loans first disbursed after the expected effective date of these proposed regulations—July 1, 2017—as well as a process for the assertion and resolution of all borrower defense claims, both those made under proposed § 685.206(c) and those made under proposed § 685.222. The Department believes that the proposed changes could reduce the number of borrowers who are struggling to meet their student loan obligations. During the public comment periods of the negotiated rulemaking sessions, many public commenters who were borrowers mentioned that they believed that they had been defrauded by their institutions of higher education and were unable to pay their student loans or obtain debt relief under the current regulations. For instance, many of these borrowers stated that they had relied upon the misrepresentation by their school as to employment outcomes, but later found out that they were unable to secure employment as had been represented to them before their enrollment.

We discuss more specifically our reasons for adopting a new Federal standard and limitation periods under the discussion of "Federal Standard and Limitation Periods (34 CFR 685.222(b), (c), and (d) and 34 CFR 668.71)." We discuss our reasons for establishing a borrower defense claim process under "Process for Individual Borrowers (34 CFR 685.222(e)," "Group Process for Borrower Defenses—General (34 CFR 685.222(f)," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g)," and "Group Process for Borrower Defense Claims—Open School (23 CFR 685.222(h)." We explain why the borrower defense regulations

apply only to the Direct Loan Program under "Discharge of a Loan Obligation (§ 685.212)."

Proposed § 685.222(a) would establish provisions of general applicability for borrower defense claims. As noted above, we would clarify in paragraphs (a) and (b) of that section that borrower defense claims for loans disbursed before July 1, 2017, are made under § 685.206(c) and that borrower defense claims for loans disbursed on or after July 1, 2017, are made under proposed § 685.222. Although proposed § 685.206(c) also would specify that it applies to borrower defense claims for loans disbursed before July 1, 2017, we believe that also stating the general framework in § 685.222 would help eliminate any confusion as to which standard applies.

In proposed § 685.222(a)(2) and (5), we would establish the basic elements of borrower defense claims for loans disbursed on or after July 1, 2017. Specifically, proposed § 685.222(a)(2) and (5) would require that a borrower defense claim:

• Is supported by a preponderance of the evidence;
• Relates to the making of the borrower's Direct Loan or the provision of educational services; and
• Meets the requirements under paragraph (b), (c), or (d) of the section.

In addition, proposed § 685.222(a)(2) would clarify that a claim may be brought by a borrower to discharge amounts owed to the Secretary on a Direct Loan, in whole or in part, or to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part, or both.

A claim is supported by a "preponderance of the evidence" if there is sufficient evidence produced to persuade the decision maker that it is more likely than not that something happened or did not happen as claimed. In practice, the decision maker in a borrower defense proceeding would measure the value, or weight, of the evidence (including attestations, testimony, documents, and physical evidence) produced to prove that the borrower defense claim as alleged is true. We believe this evidentiary standard is appropriate as it is the typical standard in most civil proceedings. Additionally, the Department uses a preponderance of the evidence standard in other processes regarding borrower debt issues. See 34 CFR 34.14(b), (c) (administrative wage garnishment); 34 CFR 31.7(e) (Federal salary offset). We believe that this evidentiary standard strikes a balance between ensuring that borrowers who have been harmed are not subject to an

overly burdensome evidentiary standard and protecting the Federal government, taxpayers, and institutions from unsubstantiated claims. We discuss the types of evidence that may be presented in support of a claim under "Process for Individual Borrowers (34 CFR 685.222(e)."

Proposed § 685.222 would clarify that, whether a borrower defense is brought under the standard described in § 685.206(c) or the standards in proposed § 685.222(b), (c), and (d), the Department's position is that it will acknowledge a borrower defense asserted under the regulations "only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provided." 60 FR 37768, 37769. Such claims may include, for example, fraud in the making of the Direct Loan in the course of student recruitment or a failure to provide educational services. In some circumstances, this may include post-enrollment services like career advising or placement services. The Department does not recognize as a defense against repayment of the loan a cause of action that is not directly related to the loan or to the provision of educational services, such as personal injury tort claims or actions based on allegations of sexual or racial harassment. *Id.* The proposed language is consistent with this longstanding position and is also reflected in similar proposed language for § 685.206(c). Non-Federal negotiators also requested clarification on whether borrower defenses may be asserted as to tort claims asserting that educational institutions and their employees breached their duty to educate students adequately (otherwise known as "educational malpractice"), or to issues relating to academic and disciplinary disputes. Courts that have considered claims characterized as educational malpractice have generally concluded that State law does not recognize such claims.[5] The Department does not intend in these regulations to create a different legal standard, and for existing loans would apply that same principle under § 685.206(c), and would maintain that same position in applying the standards proposed in § 685.222. Claims relating to the quality of a student's education or matters regarding academic and disciplinary disputes within the

---

[5] See *Bell* v. *Board of Educ. of City of West Haven,* 55 Conn. App. 400, 739 A.2d 321, 139 Ed. Law Rep. 538 (1999), noting that the vast majority of courts have refused to recognize a cause of action for educational malpractice; *Sain* v. *Cedar Rapids Cmty. Sch. Dist.,* 626 NW.2d 115, 121 (Iowa 2001) (Educational malpractice almost universally rejected as a cause of action).

judgment and discretion of a school are outside the scope of the borrower defense regulations. The Department recognizes, however, that in certain circumstances, such as where a school may make specific misrepresentations about its facilities, financial charges, programs, or employability of its graduates, such misrepresentations may function as the basis of a borrower defense as opposed to being a claim regarding educational quality.[6] Additionally, a breach of contract borrower defense may be raised where a school has failed to deliver specific obligations, such as programs and services, it has committed to by contract. The Department also notes that the limitations of the scope of the borrower defense regulations should not be taken to represent any view that other issues are not properly the concern of the Department as well as other Federal agencies, State authorizers and other State agencies, accreditors, and the courts.

With regard to the other required elements of a borrower defense claim, we discuss our reason for requiring a borrower defense to meet the requirements under paragraphs (b), (c), and (d) of proposed § 685.222 under "Federal Standard and Limitation Periods (34 CFR 685.222(b), (c), and (d) and 34 CFR 668.71)."

Proposed § 685.222(a)(3) would set forth the Department's longstanding position that an act or omission by the school that violates an eligibility or compliance requirement in the HEA or its implementing regulations does not necessarily affect the enforceability of a Federal student loan obtained to attend the school, and is not, therefore, automatically a basis for a borrower defense.[7] The HEA vests the Department with the sole authority to determine and apply the appropriate sanction for HEA violations. A school's act or omission

that violates the HEA may, of course, give rise to a cause of action under other law, and that cause of action may also independently constitute a borrower defense claim under § 685.206(c) or proposed § 685.222. For example, advertising that makes untruthful statements about placement rates violates section 487(a)(8) of the HEA, but may also give rise to a cause of action under common law based on misrepresentation [8] or constitute a substantial misrepresentation under the new Federal standard and, therefore, constitute a basis for a borrower defense claim.

In proposed § 685.222(a)(4), we propose to define "borrower" to provide clarity and to include all parties who may be responsible for repaying the Secretary for a Direct Loan to which a borrower defense claim relates or who are otherwise harmed.

In proposed § 685.222(a)(5), "borrower defense" is defined to include one or both of the following: A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and a right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part. Currently, the existing regulation for borrower defense at § 685.206(c) allows for reimbursement of amounts paid towards a loan as possible further relief, in addition to a discharge of any remaining loan obligation, for approved borrower defenses. The Department believes that the proposed definition will more accurately capture borrowers' requests for and the Secretary's ability to offer relief through the borrower defense process—for both a discharge of any remaining loan obligation and for reimbursement of amounts paid to the Secretary for the loan that is the subject of an approved borrower defense.

## Federal Standard and Limitation Periods (§ 685.222(b), (c), and (d) and § 668.71)

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

Section 487 of the HEA provides that institutions participating in the title IV, HEA programs shall not engage in substantial misrepresentation of the nature of the institution's education program, its financial charges, or the employability of its graduates.

*Current Regulations:* Section 685.206(c) provides that a borrower defense may be asserted based upon any act or omission of the school that would give rise to a cause of action against the school under applicable State law. The current regulations in § 685.206(c) are described in more detail under "Borrower Responsibilities and Defenses (34 CFR 685.206)."

Subpart F of the Student Assistance General Provisions establishes the types of activities that may constitute substantial misrepresentation by an institution and defines "misrepresentation" and "substantial misrepresentation."

"Misrepresentation" is defined in proposed § 668.71(c) as a false, erroneous, or misleading statement that an eligible institution, one of its representatives, or any eligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, makes directly or indirectly to a student, prospective student, a member of the public, an accrediting agency, a State agency, or the Secretary. Under the proposed regulations, we would clarify that a misleading statement also includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means. "Misrepresentation" also includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

"Substantial misrepresentation," also defined in § 668.71(c), means "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."

*Proposed Regulations:* Proposed § 685.222(b), (c), and (d) would establish a new Federal standard for a borrower defense.

Proposed § 685.222(b) would provide that if a borrower has submitted for consideration a nondefault, favorable contested judgment against the school based on State or Federal law from a court or administrative tribunal of competent jurisdiction for relief, the judgment might serve as a basis for a borrower defense. This would apply regardless of whether the judgment was obtained by the borrower as an individual or member of a class, or was obtained by a State attorney general (State AG) or other governmental

---

[6] See, e.g., Sain v. Cedar Rapids Cmty. Sch. Dist., 626 NW.2d 115, 121 (Iowa 2001), recognizing that tort of negligent misrepresentation applicable in education context.

[7] As stated by the Department in 1993:

[The Department] considers the loss of institutional eligibility to affect directly only the liability of the institution for Federal subsidies and reinsurance paid on those loans. . . . [T]he borrower retains all the rights with respect to loan repayment that are contained in the terms of the loan agreements, and [the Department] does not suggest that these loans, whether held by the institution or the lender, are legally unenforceable merely because they were made after the effective date of the loss of institutional eligibility.

58 FR 13337. *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.,* 168 F.3d 1362, 1369 (D.C. Cir. 1999), *opinion amended on denial of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999) (rejecting claim of mistake of fact regarding institutional accreditation as grounds for rescinding loan agreements).

[8] See, e.g., Moy v. Adelphi Inst., Inc., 866 F. Supp. 696, 706 (E.D.N.Y. 1994) (upholding claim of common law misrepresentation based on false statements regarding placement rates.)

agency. Judgments that could form the basis of a borrower defense under this section would not be limited to causes of action based on breach of contract or a substantial misrepresentation under § 685.222(c) or (d), respectively. Rather, they could also be based on other causes of action under State or Federal law, provided that the claim relates to the making of the borrower's Direct Loan for enrollment at the school, or the provision of educational services for which the loan was provided. There would be no time limitation on a borrower's ability to assert a borrower defense based on such a judgment.

Proposed § 685.222(c) would define the conditions under which a breach of contract might be the basis for a borrower defense and specify the limitation period for recovering payments previously made on the loan in connection with such a claim. Under proposed § 685.222(c), a borrower would have a borrower defense if the school that the borrower received a Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. A borrower would be permitted to assert, at any time, a claim based on breach of contract as a defense to repayment of the amount still outstanding on the loan. A borrower would be permitted to assert that same claim as grounds for recovery of amounts previously collected by the Secretary not later than six years after the breach by the school of its contract with the student.

Proposed § 685.222(d) would establish the conditions under which a substantial misrepresentation might serve as the basis for a borrower defense, and the limitation period for recovering payments previously made on the loan. Under proposed § 685.222(d), a borrower would have a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation that the borrower reasonably relied on when the borrower decided to attend, or to continue attending, the school. "Substantial misrepresentation" would have the definition set forth in subpart F, as amended by these proposed regulations. The proposed regulations would modify the definition of misrepresentation in § 668.71(c) to replace the word "deceive" with "mislead under the circumstances." The definition would also be expanded to specify that a misrepresentation includes any statement that omits information in

such a way as to make the statement false, erroneous, or misleading.

Section 685.222(d) would also establish that a borrower may assert, at any time, a defense to repayment for amounts still owed on the loan to the Secretary, but may assert a right to recover funds previously collected by the Secretary no later than six years after the borrower discovers, or reasonably could have discovered, the information constituting the substantial misrepresentation.

The definition of "substantial misrepresentation" would require a borrower to have reasonably relied on a misrepresentation to his or her detriment. Under proposed § 685.222(d), in determining whether a borrower's reliance on a misrepresentation was reasonable, the decision maker, whether a designated Department official or hearing official, as described in detail under "Process for Individual Borrowers (34 CFR 685.222(e))," "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School (34 CFR 685.222(h))," could consider, among other things, if the school or its representatives or other specified parties engaged in conduct such as:

• Demanding that the borrower make enrollment or loan-related decisions immediately;

• Placing an unreasonable emphasis on unfavorable consequences of delay;

• Discouraging the borrower from consulting an adviser, a family member, or other resources;

• Failing to respond to the borrower's requests for more information, including about the cost of the program and the nature of any financial aid; or

• Otherwise taking advantage of the borrower's distress or lack of knowledge or sophistication.

*Reasons:* The current borrower defense standard in § 685.206(c) is wholly dependent upon State law and, as a result, may provide uneven relief to students affected by the same bad practices but who attended schools in different States; a Federal standard would help to ensure fair and equitable treatment of all borrowers. Moreover, the reliance upon State law presents a significant burden for borrowers who are making a threshold determination as to whether they may have a claim and for Department officials who must determine the applicability and interpretation of laws that may vary from one State to another.

In crafting the Federal standard, the Department sought to incorporate not

only the substantial misrepresentation regulation (34 CFR 668 subpart F), but also other causes of action upon which students had based complaints against schools in court cases. For example, the Federal standard maintains the borrower's ability to bring forward a claim based on a judgment determined by a court or administrative tribunal applying either State or Federal law. We also noted that a common claim that students had raised in lawsuits against postsecondary schools was breach of contract.[9] These bases for a borrower defense would ensure that the Federal standard provides effective relief opportunities for borrowers, and efficient administration of the process by which the Department and borrowers interpret and apply the standard, resulting in more timely resolution for all parties involved. However, we do not believe it would be appropriate to adopt a standard that would make the fact that the conduct violates an HEA requirement an automatic ground for a borrower defense, whether that claim is asserted directly or indirectly based on State law. Such conduct, to the extent it injures borrowers through substantial misrepresentation or a breach of contract, would already be covered by the proposed Federal standard. Moreover, it is not clear that any other such conduct forms an appropriate basis for loan discharge. Similarly, non-Federal negotiators suggested that the Department provide that all causes of action under State law constitute a basis for borrower defense. As explained previously, we believe that an approach based on State law would present a significant burden for borrowers and Department officials to determine the applicability and interpretation of States' laws and would increase the risk of uneven relief for similarly situated borrowers; therefore, we decline to adopt such a standard.

Non-Federal negotiators also proposed other bases for borrower defense, such as deceptive, unfair, or abusive conduct. We carefully considered such suggestions and decided that they were not appropriate for the borrower defense regulations. The Department believes it would face significant challenges in determining which cases of such conduct warrant relief. A wide variety of conduct can be considered deceptive, unfair, or abusive, under both State and Federal law, and characterizing particular conduct as falling under such standards would

─────────

[9] See, e.g., *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011); *Chenari v. George Washington Univ.*, No. CV 14–0929 (ABJ), 2016 WL 1170922 (D.D.C. Mar. 23, 2016).

require the Department to engage in a nuanced application of complex legal doctrines that vary across jurisdictions and that often have not been subject to a degree of judicial development sufficient to make their application to the borrower defense context clear. Furthermore, some of the significant sources of law regarding such conduct would not easily transfer to the borrower defense context. Federal and State law empowers government agencies to pursue relief for deceptive and unfair conduct.[10] In exercising this authority, Federal and State agencies are charged with gathering facts about particular practices, and weighing appropriate policy considerations to determine whether the practice warrants the exercise of their authority under these laws. The borrower defense regulations, on the other hand, are directed necessarily toward claims by individuals, which should not be subject to public policy considerations. Nonetheless, we agree with the negotiators that deceptive, unfair, or abusive practices that may not otherwise constitute a misrepresentation under the proposed definition should be taken into consideration when we are evaluating a borrower defense claim. See "Substantial misrepresentation: Reasonable reliance" in this section for a discussion of how we propose to consider such conduct for the purpose of a borrower defense claim based on a substantial misrepresentation.

The Department's substantial misrepresentation regulations (34 CFR part 668 subpart F) were informed by the FTC's policy guidelines on deception, and we believe they are more tailored to, and suitable for, use in the borrower defense context. The Department proposes that in the borrower defense context, certain factors addressing specific problematic conduct may be considered to determine whether a misrepresentation has been relied upon to a borrower's detriment, thus making the misrepresentation "substantial" under the proposed regulation. With regard to unfair and abusive conduct, we considered the available precedent and determined that it is unclear how such principles would apply in the borrower defense context as stand-alone standards. Such practices

are often alleged in combination with misrepresentations and are not often addressed on their own by the courts. With this lack of guidance, it is unclear how such principles would apply in the borrower defense context. Moreover, many of the borrower defenses the Department has addressed or is considering have involved misrepresentations by schools, such as in the case of Corinthian. The Department believes that its proposed standard as described below will address much of the behavior arising in the borrower defense context. We believe that the standard that we are proposing appropriately addresses the Department's interests in accurately identifying and providing relief to borrowers for misconduct by schools; providing clear standards for borrowers, schools, and the Department to use in resolving claims; and avoiding for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context.

As a result, the Department declines to adopt standards for relief based on unfair and abusive conduct. However, we note that actions against institutions may be taken, and borrowers may have avenues of relief outside of the Department, under other Federal or State statutes based on unfair and abusive conduct, which may result in State or Federal court judgments. Because the Department does not adopt the unfair and abusive conduct as a Federal borrower defense standards unless reduced to a contested judgment against the school under proposed § 685.222(b), the Department does not consider its own findings and determinations in the borrower defense context for the proposed standards in § 685.222 to be dispositive or controlling for actions brought by any other Federal or any State agency in the exercise of their power under the statutes on which they rely. We intend that, to the extent that borrowers fail to establish a claim under the regulations proposed here, such a determination does not affect the ability of another agency to obtain relief under a different standard that the agency is authorized to apply.

We note that the Department commonly uses the term "hearing official" in its regulations, such as 34 CFR subparts G and H (proceedings for limitation, suspension, termination and fines, and appeal procedures for audit determinations and program review determinations). The hearing officials referred to in the proposed regulations would make decisions and determinations independent of the Department official described in

proposed § 685.222(e) to (h). Although here we use the term "Department official" to describe the individual who reviews and decides an individual borrower defense claim pursuant to § 685.222(e), for the group processes described in proposed § 685.222(g) and (h), we use the term "Department official" to describe the individual who performs a very different role. In the group process, the "Department official" is the individual who would initiate the group borrower defense process and who would present evidence and respond to any argument for the group borrower defense claimants. The decision would then be made by the hearing official, who is independent of the Department official who asserts the claims, and that decision would be based on the merits of the borrower defense claim as described in the proposed regulations, and not upon other considerations.

### Judgment Against a School

As discussed, the Department is declining to adopt a standard based on applicable State law for loans first disbursed after July 1, 2017, due, in part, to the burden to borrowers and Department officials in interpreting and applying States' laws. While we believe that the proposed standards will capture much of the behavior that can and should be recognized as the basis for borrower defenses, it is possible that some State laws may offer borrowers important protections that do not fall within the scope of the Department's Federal standard. To account for the situations in which this is the case, the proposed regulations would provide, as a basis for a borrower defense, nondefault, contested judgments obtained against a school based on any State or Federal law, whether obtained in a court or administrative tribunal of competent jurisdiction. Under the proposed regulations, a borrower may use such a judgment as the basis for a borrower defense if the borrower was personally affected by the judgment, that is, the borrower was a party to the case in which the judgment was entered, either individually or as a member of a class that obtained the judgment in a class action lawsuit. As with all the borrower defense standards, to support a borrower defense claim, the judgment would be required to pertain to the making of a Direct Loan or the provision of educational services to the borrower. We believe that the proposed standard would allow for recognition of State law and other Federal law causes of action, but would also reduce the burden on the Department and borrowers of having to make

[10] See, e.g., 12 U.S.C. 5531, 15 U.S.C. 43 (authorities used or referenced, respectively, by the Consumer Financial Protection Bureau (CFPB) and State agencies, and the Federal Trade Commission (FTC)). For deceptive and unfair practices, the CFPB has stated that its standards are informed by the standards for the same terms as used by the FTC. See CFPB Bulletin 2013–7, "Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts," (Jul. 10, 2013).

determinations on the applicability and interpretation of those laws.

We also propose that a judgment obtained by a governmental agency, such as a State AG or a Federal agency, that a borrower can show relates to the making of the borrower's Direct Loan or the provision of educational services to the borrower, may also serve as a basis for a borrower defense under the standard, whether the judgment is obtained in court or in an administrative tribunal. Governmental agencies may not specifically join individual constituents as parties to a lawsuit; however, any resulting judgment may result in determinations that an act or omission of a school was in violation of State or Federal law and thus be the basis of a borrower defense for an individual within the group identified as injured by the conduct for which the government agency brought suit.

In considering a borrower defense claim, for either an individual borrower under proposed § 685.222(e) for individually-filed applications or for a group of borrowers under proposed § 685.222(f),(g), and (h), based upon a favorable judgment obtained in court or an administrative tribunal, the Department will consider the relief to which that judgment entitles the borrower based upon the judgment's findings regarding the school's liability under the state or Federal law at issue, whether or not the form and amount of relief was prescribed as part of the favorable judgment. Depending on the facts and circumstances of the judgment, the Department may determine relief as described in proposed § 685.222(i).[11] The Department will also consider to what degree the claimant has already received relief as an outcome of the judgment at issue, if any.

The Department is aware that many court cases may not result in contested, nondefault judgments, for reasons such as settlement. However, we are proposing to limit the basis for a borrower defense under § 685.222(b) to nondefault, contested judgments in courts or administrative tribunals. The Department is seeking to establish a process that results in accurate determinations of borrower defenses after a careful consideration of evidence. We are proposing to consider decisions

made by courts and administrative tribunals, as the decision-making process in those forums similarly involves a consideration of evidence from all parties and the decision is one that has been made on the merits of the claim. By limiting this standard to nondefault, contested judgments, we would reduce or eliminate the need for the Department to evaluate the merit of borrower claims based on State law by including only those judgments that are in fact the product of litigation in which both claimant and school challenged the contentions of the opponent and a tribunal decided the case on the merits. The standard would echo the principle of res judicata, whereby parties are bound by a judgment entered by a court of competent jurisdiction and may not challenge that judgment either before that tribunal or before a different tribunal. Default judgments generally do not involve the same level of factual and evidentiary evaluation, or provide a decision on the merits resulting from a contested hearing where all parties have had an opportunity to present evidence and arguments. Similarly, settlements do not require a decision maker to reach a decision after an evaluation of the evidence. As a result, we propose that judgments may form the basis of a borrower defense only if they are nondefault, contested judgments rendered by a court or administrative tribunal of competent jurisdiction.

Although other court orders that do not rise to the level of a contested, nondefault judgment (*e.g.,* settlement or motion to dismiss orders) may not be used to satisfy the proposed judgment standard for borrower defense claims, the Department welcomes the submission of and will consider any such orders, other court filings, admissions of fact or liability, or other evidence used in such a court proceeding as evidence in the borrower defense process under the other proposed standards. The Department would also welcome the submission of and will consider any arbitration filings, orders, and decisions for consideration in the borrower defense process. Similarly, we recognize that a party to a suit or administrative proceeding may be barred from disputing a factual finding or issue decided in that proceeding if that fact or issue were to arise in a different case, even if the ruling on the fact or issue was not a final judgment on the merits resulting from a contested proceeding that meets the standard we propose here. We propose to take such findings and rulings on such specific facts and issues into account, and give them appropriate

weight if principles of collateral estoppel would bar the school from disputing the matter.

*Breach of Contract*

In developing a new Federal borrower defense standard, we recognize that students enter into enrollment agreements and other contracts with the school to provide educational services and that borrowers have, over the years, asserted claims for relief against schools for losses arising from a breach of those contracts.[12] We therefore propose to include a separate ground for relief, based on a breach by the school of the contract with the borrower, because such claims may not necessarily fall within the scope of the substantial misrepresentation component of the Federal standard.

The terms of a contract between the school and a borrower will largely depend on the circumstances of each claim. For example, a contract between the school and a borrower may include an enrollment agreement and any school catalogs, bulletins, circulars, student handbooks, or school regulations.[13]

A non-Federal negotiator requested that we limit the standard to material breaches of contract.[14] The Department anticipates that it may receive borrower defense claims regarding breaches of contract that may not be considered to be material breaches that would have warranted a cancellation of the contract between the borrower and the school. For example, a breach of contract may pertain to a school's failure to fulfill a specific contractual promise to provide certain training or courses, but the school may have otherwise performed its other obligations under its contract with the borrower. The Department is comfortable with its ability to grant relief commensurate to the injury to a borrower alleged under the breach of contract standard, which may constitute full relief or partial relief with respect to a borrower's Direct Loan. The Department's proposed methods for determining relief, which would require a consideration of available evidence

---

[11] For example, the judgment may be one obtained by an enforcement agency and may not identify or require any individual as a party for whom particular relief is required; the judgment may simply provide injunctive relief, barring a particular practice as violating applicable law, but not addressing or requiring any relief for individuals; or the judgment may find liability, but also determine that the affirmative claim is time-barred.

[12] See, *e.g.,* Vurimindi v. Fuqua Sch. of Bus., 435 F. App'x 129 (3d Cir. 2011).

[13] In *Ross v. Creighton University,* 957 F.2d 410 (7th Cir. 1992), in describing the limits of a contract action brought by a student against a school, the court stated that there is " 'no dissent' " from the proposition that " 'catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant' " become part of the contract. See 957 F.2d at 416 (citations omitted). See also *Vurimindi,* 435 F. App'x at 133 (quoting *Ross*).

[14] See Modern Law of Contracts § 11:1 (quoting Andersen, A New Look at Material Breach in the Law of Contracts, 21 UC Davis L. Rev. 1073 (1988)) ("[M]ateriality is best understood in terms of the specific purpose of the cancellation remedy that material breach entails.")

and arguments by a Department official or a hearing official, as applicable, are discussed in more detail under "Borrower Relief (34 CFR 685.222(i) and Appendix A)."

The non-Federal negotiator also requested that we exclude claims for educational malpractice or claims regarding schools' academic standards. As explained earlier in this discussion, we decline to impose a materiality requirement, but would consider the circumstances underlying a breach of contract borrower defense and award relief that is commensurate with the injury to the borrower. We also explain under "Borrower Defenses—General (§ 685.222(a))'')" that the Department does not consider claims relating to educational malpractice or academic disputes to be within the scope of the proposed borrower defense regulations.

*Substantial Misrepresentation*

The proposed Federal standard for borrower defense based upon a substantial misrepresentation is predicated on existing regulations in the Student Assistance General Provisions (34 CFR 668 subpart F) that address misrepresentation. These existing regulations provide a clear framework regarding the acts or omissions that would constitute misrepresentations as they relate to the nature of educational programs, the nature of financial charges, and the employability of graduates.

Under proposed § 685.222(d), to establish a borrower defense based on a substantial misrepresentation, a borrower must demonstrate that (1) there was a misrepresentation by the college made to the borrower, (2) the borrower reasonably relied on that substantial misrepresentation when he or she decided to attend, or to continue attending, the school, and (3) that reliance resulted in a detriment to the borrower.

*Substantial Misrepresentation: Misrepresentation*

We have proposed to revise the definition of "misrepresentation" in § 668.71 to provide clarity and specificity, as it is important that the definition of "misrepresentation," whether for the Department's enforcement purposes or in the borrower defense context, capture the full scope of acts and omissions that may result in a borrower being misled about the provision of educational services or making of a Direct Loan.

Specifically, we propose to replace the word "deceive" with "mislead under the circumstances." In some contexts the word "deceive" implies

knowledge or intent on the part of the school, which is not a required element in a case of misrepresentation. Although we stated that the Department "considers a variety of factors, including whether the misrepresentation was intentional or inadvertent" in the preamble to the final rule for subpart F, 75 FR 66915, we believe that this proposed change would more clearly reflect the Department's intent that a misrepresentation does not require knowledge or intent on the part of the school. A non-Federal negotiator at the negotiated rulemaking requested that specific intent be considered as an element of misrepresentation. As the Department explained in the preamble to the final rule for subpart F, 75 FR 66914, while the Department declines to include a specific intent element, the Department has always operated within a rule of reasonableness and has not pursued sanctions without evaluating the available evidence in extenuation and mitigation as well as in aggravation. Whether using the definitions in subpart F for the Department's enforcement purposes or for evaluating a borrower defense claim, we intend to continue to consider the circumstances surrounding any misrepresentation before determining an appropriate response. That said, the general rule is that an institution is responsible for the harm to borrowers caused by its misrepresentations, even if such misrepresentations cannot be attributed to institutional intent. We believe this is more reasonable and fair than having the borrower (or the Department) bear the cost of such injuries. It is also reflective of the consumer protection laws of many States.

We also propose to add to the definition of "misrepresentation" a sentence addressing omissions, which would read, "Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading." Some non-Federal negotiators were concerned about the use of the word "information" as opposed to "facts." These non-Federal negotiators were concerned that the use of the word "facts" might imply a higher standard than would be required for a borrower to prove a substantial misrepresentation had occurred. Another non-Federal negotiator believed that a misrepresentation of "facts" more accurately described what should be required. Although we believe that the two words are effectively synonymous, we propose to use the word "information," as this change was

endorsed by most of the non-Federal negotiators.

Non-Federal negotiators requested that the Department clarify what is meant by "misleading under the circumstances," as used in the proposed definition of "misrepresentation." One non-Federal negotiator asked whether the term "under the circumstances" was a reference to the use of the term by the Federal Trade Commission (FTC). In the 1983 FTC Policy Statement on Deception, the FTC clarified that, for a representation, omission, or practice to be deceptive, it must be likely to mislead reasonable consumers under the circumstances.[15] The FTC looks at the totality of the practice when determining how a reasonable recipient of the information would respond. If a representation is targeted to a specific audience, then the FTC determines the effect of the practice on a reasonable member of that group. We believe it is appropriate that, in reviewing a borrower defense claim based on a substantial misrepresentation, we similarly consider the totality of circumstances in which the statement or omission occurs, including the specific group at which a statement or omission was targeted, to determine whether the statement or omission was misleading under the circumstances. A statement made to a certain target group of students may not lead to reliance and injury; however, when the statement is made to a different target group that may not be the case.

Moreover, we propose to include the language "under the circumstances" to clarify that, to constitute a substantial misrepresentation, the misleading statement or omission must have been made in a situation where the borrower or student should have been able to rely upon the school to provide accurate information. For example, if a student is speaking with a course instructor about her difficulties paying tuition and the course instructor advises her to meet with the financial aid office because "there are scholarships available," that circumstance would most likely not create an expectation that the course instructor is assuring the student that she will receive a scholarship. However, if a student is speaking with a financial aid advisor and asks if she will receive scholarships to help cover the cost of her education and the financial aid advisor says, "Yes. Most of our students receive scholarships," that statement may be considered misleading under the

---

[15] FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1984) (appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)), available at *www.ftc.gov/bcp/policystmt/ad-decept.htm*.

circumstances, given that the speaker is someone whose professional role is to provide students with guidance pertaining to student aid.

*Substantial Misrepresentation: Reasonable Reliance*

Although the definition of "substantial misrepresentation" in § 668.71 requires that the borrower reasonably relied on the misrepresentation, or could reasonably be expected to rely, proposed § 685.222(d) would require there to have been actual reasonable reliance. Section 668.71 refers to the Department's enforcement authority to impose fines, or limit, suspend, or terminate a school's participation in title IV, HEA programs. As an enforcement body acting in the public interest, the Department believes that it is appropriate for the Department to be able to stop misrepresentations even before any persons are misled, and thus to act upon misrepresentations that "could have been reasonably relied upon" by a person. However, borrower defenses relate to injuries to individual borrowers. Unlike the Department's interest in public enforcement of its regulations and laws, an individual borrower's interest in bringing a borrower defense is predicated upon the harm to the borrower. We also believe that an actual reliance requirement will protect the Federal Government, taxpayers, and institutions from unsubstantiated claims. As a result, we believe that it is appropriate to require that the evidence show that the misrepresentation at issue influenced the borrower, or led to the borrower's reliance on the misrepresentation, to the borrower's detriment. We note, however, that a rebuttable presumption of reasonable reliance may arise in claims brought for a group of borrowers, as we discuss in detail under "Group Process for Borrower Defenses—General (34 CFR 685.222(f))."

Generally, reasonable reliance refers to what a prudent person would believe and act upon if told something by another person. Moreover, reasonable reliance considers the representation or statement from the viewpoint of the audience the message is intended to reach—in this case, prospective or continuing students. Thus, in assessing whether a substantial misrepresentation has occurred, the Department would consider the facts of the case in the context of the audience.

As discussed, the standard requires not just that a borrower has relied upon a misrepresentation to the borrower's detriment, but also requires that the reliance be reasonable. As discussed in

the introduction to this "Reasons" section, non-Federal negotiators representing students and borrowers, consumer advocacy organizations, and legal assistance organizations that represent students and borrowers, advocated that the Federal standard include a provision for abusive practices on the part of a school, particularly as they relate to high pressure or aggressive sales tactics. We agree that there has been evidence of such conduct on the part of some schools, but believe it would be difficult to develop clear, consistent standards as to when such conduct, in the absence of any misrepresentation by the school, should give rise to a right of relief from the loans taken out to attend the school. However, we also believe that such high pressure or aggressive sales tactics may make borrowers more likely to rely upon a misrepresentation. As a result, we have determined that reliance on a misrepresentation may be appropriately viewed as more reasonable when the misrepresentation is made in the context of certain circumstances, including those that may be considered to be high pressure or aggressive sales tactics.

To address these concerns, in proposed § 685.222(d) we include a non-exhaustive list of examples of factors that, if present in conjunction with a misrepresentation on the part of the school, would likely elevate that misrepresentation to a substantial misrepresentation. However, as proposed by the Department, the factors by themselves would not necessarily mandate a finding of substantial misrepresentation, nor would the absence of any of the factors defeat a borrower defense based on substantial misrepresentation. It may be entirely reasonable for a borrower to rely on a misrepresentation without any of these factors present. Rather, as proposed, the factors would be non-exhaustive examples of conduct that could be considered in a determination of whether a borrower's reliance on a misrepresentation was reasonable, even if such reliance would not have been reasonable in the absence of such conduct, thus making the misrepresentation substantial.

Specifically, we looked at the borrower defenses before the Department and comments from non-Federal negotiators regarding issues such as schools making insistent demands of students to make commitments to enroll and the borrowers' lack of information and resources. As a result, we propose that a misrepresentation, when coupled with conduct that affects a borrower's

understanding of his or her decision-making timeframe, such as demanding that the borrower make enrollment or loan-related decisions immediately or placing an unreasonable emphasis on unfavorable consequences of delay, may lead a borrower to reasonably rely upon the misrepresentation and, thus, elevate the misrepresentation to a substantial misrepresentation for the purposes of asserting a borrower defense. Similarly, conduct that affects a borrower's information-gathering regarding the risks and potential benefits of his or her decision, such as discouraging a borrower from consulting an advisor, a family member, or other resources or failing to respond to a borrower's reasonable requests for information, may lead a borrower to reasonably rely upon the misrepresentation for the purposes of asserting a substantial misrepresentation as a borrower defense. We also recognize that school conduct that takes advantage of the borrower's distress or lack of knowledge or sophistication may also elevate the misrepresentation to a substantial misrepresentation, by way of affecting a borrower's reasonable reliance on a misrepresentation, for the purposes of borrower defense. For example, a school may be found to have made statements that would not have been misleading to a borrower of average English ability; however, when made to a borrower with limited English proficiency in a way that takes advantage of the borrower's lack of knowledge or sophistication, the circumstances may warrant a borrower defense under the standard.

As noted above, a non-Federal negotiator requested that the Department use a "justifiable" reliance standard. While a reasonable reliance standard looks to whether a reasonably prudent person would be justified in his or her reliance and may be measured against the behavior of other persons, the justifiable reliance standard is measured by reference to the plaintiff's capabilities and knowledge.[16] As discussed, the proposed standard would allow consideration of practices that would impact a specific borrower's understanding and reliance upon a misrepresentation in a way that would reference the borrower's understanding and knowledge. However, the Department believes that it is appropriate for the proposed standard to

---

[16] See Restatement (Third) of Torts: Liab. for Econ. Harm § 11 TD No 2 (2014)["[R]easonableness is measured against community standards of behavior. Justifiable reliance has a personalized character. It is measured by reference to the plaintiff's capabilities and knowledge; a plaintiff's sophistication may affect a court's judgments about what dangers were fairly considered obvious."].

consider the perspective of not only the borrower, but of similarly situated borrowers, especially to the extent it is composed of other Direct Loan borrowers or potential Direct Loan borrowers who may be subject to the same misrepresentations by the school. As discussed under "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School (34 CFR 685.222(h))," in addition to proposing this regulation to provide relief for individual borrowers who have filed borrower defense applications for relief, the borrower defense regulation also proposes that the Department may initiate a process for determinations as to both a school's liability and as to borrower defenses for a group of borrowers, which may include those who have not applied for relief. As discussed under "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," the Department anticipates that such proceedings, in which Secretary may recover from the school the amount of losses from granting borrower defense relief, will have a significant deterrent effect on the school and promote compliance among other schools in a way that will benefit other borrowers. By considering both the individual borrower's perspective and the perspective of similarly situated borrowers at the institution, we believe the Department official or hearing official, as applicable, would be able to determine an amount of relief that is fair to the borrower and protect the Department's general interest in other Direct Loan borrowers who have also attended the school and who may have been subject to the same misrepresentations.

The non-Federal negotiator also requested that we limit the standard to material misrepresentations. It is the Department's understanding that under Federal deceptive conduct prohibitions, a misrepresentation must be material for deception to occur. In this context, material misrepresentation involves information important to consumers, likely to affect the consumer's choice or conduct regarding a product or service.[17] The Department believes that

a materiality element is not required in either the proposed amendments to the definition for the Department's enforcement authority under § 668.71 or as this definition is adopted for the purposes of the proposed Federal standard under § 685.222(d). In the context of the Department's enforcement authority, the Department previously declined in 2010 to adopt a materiality component, stating that the regulatory definition of "substantial misrepresentation" is "clear and can be easily used to evaluate alleged violations of the regulations." 75 FR 66916.

In adopting the definition of "substantial misrepresentation" for the purposes of borrower defense, the Department similarly believes that the definition is clear and can be easily used to evaluate borrower defenses. Moreover, a substantial misrepresentation in the borrower defense context incorporates similar concepts to materiality. Under proposed § 685.222(d), the borrower must show that he or she "reasonably relied" upon the misrepresentation at issue. As discussed above, generally materiality refers to whether the information in question was information to which a reasonable person would attach importance to, in making the decision at issue. Similarly, in determining whether the borrower reasonably relied on the misrepresentation, the Department would consider whether the misrepresentation related to information to which the borrower would reasonably attach importance in making the decision to enroll or continue enrollment at the school. As a result, the Department considers it unnecessary to add an explicit materiality element to the definition of "substantial misrepresentation," for the purposes of claims under the borrower defense regulations.

### Substantial Misrepresentation: The Borrower's Detriment

The definition of "substantial misrepresentation," for the purpose of proposed § 685.222(d), would require that the borrower reasonably relied on the misrepresentation to the borrower's detriment. As noted previously, the proposed borrower defense regulations are intended to provide relief for individual borrowers for schools' wrongful conduct that led in a meaningful way to harm or injury to the borrower based upon the borrower's specific circumstances. We believe that a demonstration of detriment or injury to the borrower will protect the Federal government, taxpayers, and institutions from unsubstantiated claims. As a

result, we believe that it is appropriate to require that a preponderance of the evidence demonstrate the misrepresentation at issue influenced the borrower, or led to the borrower's reliance on the misrepresentation, to the borrower's detriment.

### Limitation Periods

For each of the bases for a borrower defense under the proposed Federal standard, the Department considered whether there should be a limitation on the time period during which borrower defense claims may be brought and, if so, what the limitation period should be. Because the availability of evidence for a borrower defense that is based on a judgment in a court or administrative tribunal is not a concern, as the only evidence required is the judgment itself, we propose no limitation period under proposed § 685.222(b) for those claims. However, for the bases for a borrower defense in proposed § 685.222(c) and (d), we believe a limitation period is appropriate. A limitation period for borrower defense claims based on a breach of contract or substantial misrepresentation, by encouraging borrowers to assert borrower defense claims while memories and evidence are fresh, would make the claim resolution process more reliable.

When considering a limitation period that would provide for a reasonable amount of time during which a borrower might submit a claim, we also recognized that common law generally allows a debtor to assert claims from the same transaction as the loan at any time as a defense to repayment of the loan, but requires a debtor to assert any claim for recovery of payments already made within the deadlines that would apply had the debtor brought suit on the claim. Consistent with that generally applicable principle, we propose here that no limitation period would apply to borrower defense claims asserted under proposed § 685.222(c) or (d) as defenses to repayment of any outstanding loan obligation. To select an appropriate limit on the period during which a claim for recovery may be made, we looked to the existing limitation periods under State and Federal law for similar claims. With regard to a borrower defense claim based on a substantial misrepresentation, we considered, among other things, limitation periods applicable to consumer protection and fraud claims, as those claims often address misleading or deceptive conduct and are, thus, analogous to claims based on a substantial misrepresentation.

The Department's research indicates that six years is one of the breach of

---

[17] See, e.g., F.T.C. Policy Statement on Deception, 103 F.T.C. at 182; see also Restatement (Second) of Torts § 538 (1977) ("The matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.").

contract limitation periods most commonly used by States, as well as the limitation period applicable to non-tort claims against the United States, 28 U.S.C. 2401(a).

Because many non-Federal negotiators' discussions of school misconduct included discussions of fraud, the Department also considered existing limitation periods for fraud. Although limitation periods under State consumer protection laws vary, our research indicates that three years is one of the most common limitation periods used by the States.

For claims for recovery of payments already made that are based on breach of contract, we propose a six-year limitation period that would begin upon the breach of contract. For claims for recovery of payments already made that are based on a substantial misrepresentation, we also propose six years as the limitation period, but the period would begin when a borrower discovers or should have reasonably discovered the facts that constitute the misrepresentation. Although six years is longer than the period afforded under many State laws for fraud and consumer protection, other States do provide a six-year limitation period for similar claims, and the Department believes a six-year period would provide sufficient time for a borrower to gather evidence related to a substantial misrepresentation.

The non-Federal negotiators representing consumer advocates, legal assistance organizations, and State AGs suggested that no limitation period should apply to defenses to repayment of remaining amounts owed on a debt, under the legal principle of recoupment (asserting a claim as a defense to repayment). As noted earlier, we propose to adopt this position. Later, some non-Federal negotiators suggested that, notwithstanding the distinction under State and Federal law between recoupment and asserting a claim for an affirmative recovery of amounts previously paid, the Department should apply no limitation period to affirmative claims for recovery. In support of this position, they cited the Department's ability to collect on a Direct Loan until it is paid in full or discharged. Other non-Federal negotiators, however, expressed concerns about having no limitation period for borrower defense claims, stating that such an approach would result in significant difficulties for a school in responding to allegations due to a lack of documentary evidence and witnesses and would subject schools to broader liability than under the current borrower defense standard based upon State law under § 685.206(c).

After careful consideration of the legal principles cited by the negotiators, we do not believe there is justification to depart from the requirements that Federal and State courts generally apply to affirmative claims to recover amounts already collected on a debt. We believe the proposed limitation periods are appropriate for the reasons stated above, regarding existing periods of limitation in State and Federal law and the Department's interest in the reliability of the claim resolution process. However, we seek comment on whether the Department should adopt different limitation periods for borrower defense claims under § 685.222(c) and (d), and, if so, what the limitation periods should be, what the supporting rationale for those periods would be, and why those other limitation periods would meet the objectives outlined in this section.

Non-Federal negotiators asked the Department to clarify, with respect to the substantial misrepresentation limitation period, when a borrower would be deemed to have discovered, or when a borrower should have reasonably discovered, the facts constituting a substantial misrepresentation. For example, a borrower may learn of a substantial misrepresentation upon discussion with other students or borrowers, or it may be deemed that a borrower should have reasonably known of the facts underlying a substantial misrepresentation if facts concerning the misrepresentation are published in nationwide news articles. However, the borrower must demonstrate when the borrower discovered the facts underlying the specific substantial misrepresentation forming the basis of the borrower defense. For example, knowledge of one particular problem at a school would not necessarily give notice of other, unrelated problems. Thus, student warnings issued for gainful employment programs under 34 CFR 668.410 or relating to repayment rate under proposed § 668.41(h), or the disclosure of proposed financial protections, such as a letter of credit, under proposed § 668.41(i), would warn students about whether a program could close soon, the repayment outcomes of borrowers at the school, or the school's financial risk, but would not put students on notice of misrepresentations by the school of matters other than earnings and debt of graduates or financial soundness.

To demonstrate that the borrower is asserting a borrower defense within six years of discovery of the facts on which the claim is based, the borrower should explain in the borrower defense application how he or she learned of the substantial misrepresentation and include any applicable documents or other information demonstrating the source of the knowledge. Again, we note that, under the proposed regulations, the borrower may assert a claim based on substantial misrepresentation solely for discharge of the remaining amount owed on the Direct Loan at any time.

**Process for Individual Borrowers (§ 685.222(e))**

*Statute:* Section 455 of the HEA sets forth the terms and conditions of Direct Loan Program loans.

*Current Regulations:* Section 685.206(c) states that borrowers have the right to assert borrower defenses, but does not establish any process for doing so.

*Proposed Regulations:* Proposed § 685.222(e) would establish the process for an individual borrower to bring a borrower defense. Proposed § 685.222(e)(1) would describe the steps an individual borrower must take to initiate a borrower defense claim. First, an individual borrower would submit an application to the Secretary, on a form approved by the Secretary. In the application, the borrower would certify that he or she received the proceeds of a loan to attend a school; would have the opportunity to provide evidence that supports the borrower defense; and would indicate whether he or she has made a claim with respect to the information underlying the borrower defense with any third party, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation. The borrower would also be required to provide any other information or supporting documentation reasonably requested by the Secretary. The Secretary would provide notice of the borrower's application for a borrower defense to the school at issue.

Proposed § 685.222(e)(2) would describe the treatment of defaulted and nondefaulted borrowers upon the Secretary's receipt of the borrower defense claim. If the borrower is not in default on the loan for which a borrower defense has been asserted, the Secretary would grant an administrative forbearance, notify the borrower of the option to decline the forbearance and to continue making payments on the loan, and provide the borrower with information about the availability of the income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221. If the borrower is in default on the loan for which a borrower defense has been asserted, the Secretary would suspend collection activity on the loan until the

Secretary issues a decision on the borrower's claim; notify the borrower of the suspension of collection activity and explain that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and notify the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

To process the claim, the Secretary would designate a Department official to review the borrower's application to determine whether the application states a basis for a borrower defense, and would resolve the claim through a fact-finding process conducted by the Department official. As part of the fact-finding process, the Department official would consider any evidence or argument presented by the borrower and would also consider any additional information, including Department records, any response or submissions from the school, and any additional information or argument that may be obtained by the Department official. The Department official would identify to the borrower, and may identify to the school, the records he or she considers relevant to the borrower defense. The Secretary provides any of the identified records upon reasonable request to either the school or the borrower.

At the conclusion of the proposed fact-finding process, the Department official would issue a written decision. The decision of the Department official would be final as to the merits of the claim and any relief that may be warranted on the claim. If the Department official approves the borrower defense, the Department official would notify the borrower in writing of that determination and of the relief provided as determined under § 685.222(i) or, if the Department official denies the borrower defense in full or in part, the Department official would notify the borrower of the reasons for the denial, the evidence that was relied upon, the portion of the loan that is due and payable to the Secretary, whether the Secretary will reimburse any amounts previously collected, and would inform the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's application. The Secretary would also inform the borrower of the opportunity to request reconsideration of the claim based on new evidence not previously provided or identified as relied upon in the final decision.

Under proposed § 685.222(e)(5)(ii), the Secretary could reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. The Secretary could also consolidate individual applications that have common facts and claims and resolve such borrower defenses as a group through the group processes described under "Group Processes for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School 34 CFR 685.222(h))."

Finally, the Secretary could initiate a separate proceeding to collect from the school the amount of relief resulting from a borrower defense.

*Reasons:* The current regulations for borrower defense do not provide a process for claims. Since Corinthian's 2015 bankruptcy, the Department has received a number of borrower defense claims from individuals outside of the Federal loan relief process initiated by the Department for Corinthian students in response to the bankruptcy. The lack of guidance has led to confusion for borrowers and inconsistency in the types and format of information submitted for such requests. To ease the Department's administrative burden in reviewing such requests and the burden of borrowers making borrower defense claims, we propose § 685.222(e) to establish clear guidelines for individuals who wish to submit a borrower defense claim.

Many of the non-Federal negotiators at the negotiated rulemaking sessions emphasized the advantages of deciding claims on a group basis wherever possible. In response to these arguments, the proposed regulations would permit the Secretary to consolidate individual claims that present common facts and claims pertaining to the same school and resolve those claims through the group processes described under "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School (34 CFR 685.222(h))."

To standardize the form of the requests and facilitate the Department's efficient review, under the proposed process, the Department would create an easy-to-use claim form for borrower defense for use by individual borrowers to provide information regarding the borrower's Direct Loan and evidence the borrower may have in support of his or her claim, or such other information that the Department may reasonably decide is necessary. In addition, the application would require the borrower to indicate if he or she has submitted a claim to, and received money from, entities aside from the Department for the same alleged harm underlying the borrower defense claim. We believe requesting such information is important to make clear to borrowers the information the Department needs from them, to ensure the fairness of the discharge process, and to protect Federal taxpayers by prohibiting borrowers from collecting relief from multiple parties for the same claim. If the borrower should choose to be represented by counsel, the Department would work directly with such a representative, upon receipt of the borrower's consent.

One non-Federal negotiator requested that the Department clarify what evidence might be considered by the Department official, or hearing official, in the group processes discussed under "Group Process for Borrower Defenses—General (34 CFR 685.222(f))," "Group Process for Borrower Defenses—Closed School (34 CFR 685.222(g))," and "Group Process for Borrower Defense Claims—Open School (34 CFR 685.222(h))," when adjudicating a claim for borrower defense. Evidence that a borrower could submit as part of the application may include, but would not be limited to: The borrower's own statement or declaration regarding the claim, statements of any other persons that the borrower believes support the claim, and copies of any documents that may be relevant to the borrower's claim. These documents may include, for example, copies of the enrollment agreement with the school, school catalogs, bulletins, letters or other communications, Web page print-outs, circulars, advertisements, or news articles. In addition to written materials, documents may also include any media by which information can be preserved, such as videos or recordings. For applications filed by an individual, a Department official may also contact the borrower to obtain more information and such oral statements may also be evidence that would be considered in the borrower defense process. The Department official may also consider other information that the Department has in its possession, such as information obtained from the school or otherwise obtained by the Department or third parties (*e.g.*, accreditors, government agencies). The kind of evidence that will be needed and available to determine the validity of the borrower's claim will vary from case to case and will depend on the specific circumstances of each borrower's claim.

The Department also proposes in § 685.222(e)(7) that the Secretary may initiate a separate proceeding to collect

from the school the amount of relief resulting from a borrower defense determined under § 685.222(e). As proposed, the Secretary may initiate a proceeding to recover against the school, but may also determine that a separate proceeding will not be initiated. For example, the Secretary may decide not to initiate such a proceeding due to evidentiary constraints. The Department intends that the proposed fact-finding process used for an individual borrower defense claim be separate and distinct from the Department's efforts to recover from schools any losses arising from a borrower defense. The final decision would determine the amount of relief to be awarded, which in turn would determine the amount of losses to the Secretary that the Department can then collect from the school. However, the Department's proposed regulation would not condition borrower relief awarded in this proceeding on whether the Secretary has the actual ability to recover those losses from the school. Rather, the Department will provide relief to the borrower according to the final decision of this process, and the Department's action to recover losses from the school will follow in a separate proceeding.

**Group Process for Borrower Defenses— General (§ 685.222(f))**

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

Section 487 of the HEA provides that institutions participating in the title IV, HEA programs shall not engage in substantial misrepresentation of the nature of the institution's education program, its financial charges, or the employability of its graduates.

*Current Regulations:* Section 685.206(c) states that borrowers have the right to assert borrower defenses, but does not establish any process for doing so.

*Proposed Regulations:* Proposed § 685.222(f) would provide a framework for the borrower defense group process, including descriptions of the circumstances under which borrower defense claims asserted by or with regard to a group could be considered and the process the Department would follow for borrower defenses for a group.

Generally, we propose that the Secretary would initiate a review of borrower defense claims asserted by or with regard to a group. This would occur when, upon consideration of

factors including, but not limited to, the existence of common facts and claims among borrowers that are known to the Secretary, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participants, the Secretary determines it is appropriate to initiate a process to determine whether a group of borrowers has a common borrower defense.

The proposed regulations would also provide for members of the group to be identified by the Secretary from individually filed applications or from any other source of information. Moreover, if the Secretary determines that common facts and claims exist that apply to borrowers who have not filed an application, the Secretary could include such borrowers in the group.

Once a group of borrowers with common facts and claims has been identified, under § 685.222(f)(2)(i), the Secretary would designate a Department official to present the group's common borrower defense claim in the fact-finding process described in § 685.222(g) or (h) of this section, as applicable, and would provide each identified member of the group with notice that allows the borrower to opt out of the proceeding. The Secretary would notify the school, as practicable, of the basis of the group's borrower defense, the initiation of the fact-finding process, any procedure by which to request records, and how the school should respond.

For a group of borrowers with common facts and claims for which the Secretary determines there may be a borrower defense on the basis of a substantial misrepresentation that was widely disseminated, there would be a rebuttable presumption that all of the members of the group reasonably relied on the misrepresentation.

*Reasons:* In response to requests by non-Federal negotiators representing students and borrowers, consumer advocacy organizations, and legal assistance organizations, we propose to establish a group claim process that is designed to be simple, accessible, and fair, and to promote greater efficiency and expediency in the resolution of borrower defense claims.

The Secretary would determine whether a group process should be initiated after consideration of relevant factors. We expect that the Secretary would initiate a group process only where there are common facts and claims among the borrowers. These common facts and claims may emerge, for example, from the Department's analysis of individual borrower defense claims; the identification by the Secretary of factors that indicate a

school has engaged in substantial misrepresentation that has potentially impacted a group of borrowers; the Department's receipt of a judgment possibly affecting a group of borrowers in the same way; the Department's identification of a breach of contract that may affect a group of borrowers; or, for loans first disbursed before July 1, 2017, the Department's knowledge of a violation of State law relating to the making of Direct Loans or provision of education services affecting a group of borrowers. Evidence for any of these determinations might come from submissions to the Department by claimants, State AGs or other officials, or advocates for claimants, as well as from the Department's investigations.

We also propose that if the Secretary determines that there are common facts and claims that may affect numerous borrowers, the Secretary may include in the group those borrowers whom we can identify from Department records who are likely to have experienced conduct involving common facts as those who have filed, and who could be expected to have similar claims, even if those we identify have not filed a borrower defense application. The Department believes that including such borrowers would allow for faster relief for a broader group of borrowers than if the process is limited to just those who file applications for relief.

In proposed § 685.222(f), we specify that, in determining whether to initiate a group process, the Secretary may also consider other factors. These factors include items such as the fiscal impact of considering claims only in individual instances and the significant amount of administrative resources required to consider such claims one by one, the promotion of compliance by pursuing recovery from the schools in aggregated amounts that may affect a school's interests, and the deterrent effect such actions can be expected to have on both the individual school and similarly situated schools. Although the Department intends to carefully weigh the above factors in deciding whether to initiate a group process—which we anticipate will have more formal processes and procedures, involvement by the school, and commitment of administrative resources by the Department—the Department's consideration of such factors for the initiation of a group process would not prevent individual borrowers from obtaining determinations. Individual borrowers would be able to continue to seek relief and obtain determinations as described in proposed § 685.222(e), and could also opt out of a group process as described in proposed § 685.222(f)(2) at

the outset and utilize the process in § 685.222(e).

We believe the Secretary is best positioned to make a determination as to whether a group process is appropriate since the Secretary is likely to have the most information regarding the circumstances that warrant use of a group process. However, non-Federal negotiators requested that State AGs and legal assistance organizations be allowed to request that the Secretary initiate a group process and to make submissions in those processes, and that the Secretary be required to issue written responses to such requests and submissions. The Department always welcomes cooperation and input from other Federal and State enforcement entities, as well as legal assistance organizations and advocacy groups. In our experience, such cooperation is more effective when it is conducted through informal communication and contact. Accordingly, we have not incorporated a provision regarding written responses from the Secretary, but plan to create a point of contact for State AGs to allow for active channels of communication on borrower defense issues, and reiterate that we welcome a continuation of cooperation and communication with other interested groups and parties. As indicated above, the Department is also fully ready to receive and make use of evidence and input from other stakeholders, including advocates and State and Federal agencies.

In response to negotiator concerns, the proposed group process is designed to ensure that the school has an opportunity for a full and fair opportunity to be heard regarding claims. We propose that, when the Secretary determines that the group claim process is appropriate, the Department would assume responsibility for presenting the group's claims in the administrative proceeding against the school. Because the administrative proceeding will determine both the validity of the borrowers' claims and the liability of the school to the Department, the Department believes that it is the appropriate party to present the claims. Additionally, by undertaking this role, the Department intends to reduce the likelihood that third parties, such as debt "counselors" or collection companies, are able to prey upon borrowers unfamiliar with the borrower defense process by promoting their services to arrange relief, and to lessen the legal costs and administrative burden to borrowers in the process.

In response to negotiator concerns, we have proposed that a borrower could opt

out of a group borrower defense claim action, and instead submit an individual application. This would allow the individual to make his or her own case (with or without legal representation), giving the individual the same right to control the assertion of the individual's claim as would be available in a class action. Fed. R. Civ. Proc. 23(c). A determination made in the administrative proceeding on the group claim would be given substantial weight in any subsequent evaluation of the individual claim of a borrower who "opted out" of the group process.

Finally, for a group of borrowers with common facts and claims for which the Secretary determines there may be a borrower defense on the basis of a substantial misrepresentation that was widely disseminated, there would be a rebuttable presumption that all of the members of the group to which the representation was made reasonably relied on the misrepresentation. If a representation that is reasonably likely to induce a recipient to act is made to a broad audience, we consider it logical to presume that those audience members did in fact rely on that representation. We believe there is a rational nexus between the publication of the misrepresentation and the likelihood of reliance by the audience such that we propose to adopt a rebuttable presumption that all members of the group did in fact so rely.[18] This rebuttable presumption would shift the burden to the school, requiring the school to demonstrate that individuals in the identified group did not in fact rely on the misrepresentation at issue.

### Group Process for Borrower Defenses—Closed School (§ 685.222(g))

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

---

[18] Case law requires no more than such a rational nexus:

. . . [A]dministrative agencies may establish presumptions, "as long as there is a rational nexus between the proven facts and the presumed facts." *Cole* v. *U.S. Dep't of Agric.,* 33 F.3d 1263, 1267 (11th Cir. 1994); *Sec'y of Labor* v. *Keystone Coal Mining Corp.,* 151 F.3d 1096, 1100–01 (D.C. Cir. 1998) (stating that presumptions are permissible "if there is 'a sound and rational connection between the proved and inferred facts' ") (quoting *Chem. Mfrs. Ass'n* v. *Dep't of Transp.,* 105 F.3d 702, 705 (D.C. Cir. 1997)). "Appellants bear 'the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed.'" *USX Corp.,* 395 F.3d at 170 (quoting *Cole,* 33 F.3d at 1267).

*U.S. Steel Corp.* v. *Astrue,* 495 F.3d 1272, 1284 (11th Cir. 2007).

*Current Regulations:* Section 685.206(c) states that borrowers may assert borrower defenses, but does not establish any process for doing so.

*Proposed Regulations:* Section 685.222(g) of the proposed regulations would establish a process for review and determination of borrower defense claims for groups identified by the Secretary for which the claims relate to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses.

Under proposed § 685.222(g)(1), a hearing official would review the Department official's basis for identifying the group and resolve the claim through a fact-finding process. As part of that process, the hearing official would consider any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official would consider any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in § 668.174(b) as reported to the Department or as recorded in the Department's records, if practicable. As discussed under "Borrower Relief (34 CFR 685.222(i) and Appendix A)," the hearing official may also request information as described in § 685.222(i)(1).

The hearing official would issue a written decision determining the merits of the group borrower defense claim. If the hearing official approves the borrower defense, that decision would notify the members of the group of that determination and of the relief provided on the basis of the borrower defense claim. If the hearing official denies the borrower defense in full or in part, that decision would state the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and would inform the borrowers that if any balance remains on their respective loans, the loans will return to their statuses prior to the group process. The Secretary would provide copies of the written decision to the members of the group, and, as practicable, to the school.

Similar to the individual claim process, the hearing official's decision

would be final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense. However, if relief for the group was denied in full or in part, an individual borrower would be able to request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's individual borrower defense claim as described in proposed § 685.222(e)(5)(i). Additionally, the proposed regulation provides that the Secretary may also reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision.

*Reasons:* When a group borrower defense is asserted with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity such as a corporate owner of a school from which the Secretary can otherwise practicably recover such losses,[19] the proposed regulations on the process for resolving the claim would focus on the arguments and evidence that may be brought by the Department official before a hearing official.

We expect that the fact-finding process in this case would occur after a school has liquidated its assets and, thus, would not typically involve the school. The evidence and records used to make a determination would be largely composed of the common facts and claims that served as the basis for forming the group.

While this group borrower defense process would not typically involve the school, a hearing official would still preside over the fact-finding process to ensure that the decision is based on a sound and thorough evaluation of the merits of the claim. The hearing official would consider the arguments and evidence presented by the designated Department official and, as discussed under "Borrower Relief (34 CFR 685.222(i) and Appendix A)," may also request information under proposed § 685.222(i)(1).

---

**Group Process for Borrower Defense Claims—Open School (§ 685.222(h))**

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

*Current Regulations:* Section 685.206(c) states that borrowers may assert borrower defenses, but does not establish any process for doing so.

*Proposed Regulations:* Proposed § 685.222(h) would establish the following process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school.

A hearing official would resolve the borrower defense and determine any liability of the school through a fact-finding process. As part of the process, the hearing official would consider any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary, evidence presented on behalf of individual group members. As discussed under "Borrower Relief (34 CFR 685.222(i) and Appendix A)," the hearing official may also request information as described in § 685.222(i)(1).

The hearing official would issue a written decision, regardless of the outcome of the group borrower defense. If the hearing official approved the borrower defense, that decision would describe the basis for the determination, notify the members of the group of the relief provided on the basis of the borrower defense, and notify the school of any liability to the Secretary for the amounts discharged and reimbursed.

If the hearing official denied the borrower defense in full or in part, the written decision would state the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, whether reimbursement of amounts previously collected is granted, and would inform the borrowers that their loans—in the amounts determined to be enforceable obligations—will return to their statuses prior to the group borrower defense process. It also would notify the school of any liability to the Secretary for any amounts discharged. The Secretary would provide copies of the written decision to the members of the group, the Department official, and the school.

The hearing official's decision would become final as to the merits of the group borrower defense claim and any relief that may be granted within 30 days after the decision is issued and

received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. A decision of the hearing official would not take effect pending the appeal. The Secretary would render a final decision following consideration of any appeal.

After a final decision has been issued, if relief for the group has been denied in full or in part, a borrower may file an individual claim for relief for amounts not discharged in the group process. In addition, the Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision, as discussed above.

The Secretary would collect from the school any amount of relief granted by the Secretary for the borrowers' approved borrower defense. Relief may include discharge of some or all accrued interest, and the loss to the government in those instances will include that discharged interest.

*Reasons:* The group borrower defense process involving an open school would be structured to provide substantive and procedural due process protections to both the borrowers and the school. By having a Department official present the group's borrower defense claims, the Department seeks to lessen, if not eliminate, the need for borrowers to retain counsel in order to pursue relief and remove potential difficulties that navigating the borrower defense process could present for borrowers. As proposed, schools would have the opportunity to raise arguments and evidence, including any defenses, in the proceeding. Additionally, as discussed under "Borrower Relief (34 CFR 685.222(i) and Appendix A)," the hearing official may also independently request information as described in § 685.222(i)(1).

The open school process would also provide for an appeal to the Secretary of the hearing official's decision, by either the school or the Department official. The proposed regulations would allow individual members of the group to request reconsideration of their individual claims upon the presentation of new evidence in the event the group claim is not successful.

Non-Federal negotiators requested clarification as to whether a hearing official's determination of borrower relief in the open school process would be contingent upon the Department's ability to recover its losses from granting such relief from the school. The final decision of the hearing official, or of the Secretary upon appeal, would determine the amount of relief to be

---

[19] In some instances, the Department may consider a school owned by a corporate parent to be financially responsible based on an evaluation of the consolidated balance sheets of the school, the parent corporation, and affiliated subsidiaries. 34 CFR 668.23(d)(2). If the school is considered to be financially responsible only based on the assets of the consolidated entities, the Department requires the parent corporation to execute the Program Participation Agreement by which the school participates.

awarded, which in turn would determine the amount of losses to the Secretary that the Department can then collect from the school under proposed § 685.222(h)(5). However, while the final decision will include a determination as to a school's liability for the conduct in question, the Department intends that determinations of borrower relief will be independent of, and not contingent upon, determinations of school liability that will lead to the Department's ability to recover the losses it incurs from granting such relief.

## Borrower Relief (§ 685.222(i) and Appendix A)

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

*Current Regulations:* Section 685.206(c) states that, in the event of a successful borrower defense claim against repayment, the Secretary would notify the borrower that he or she is relieved of the obligation to repay all or part of the loan and associated costs and fees, and also affords the borrower further appropriate relief. This further relief may include, but is not limited to, reimbursement for amounts paid toward the loan voluntarily or through enforced collection, a determination that the borrower is not in default and is eligible to receive title IV, HEA program aid, and updating reports to consumer reporting agencies.

*Proposed Regulations:* Proposed § 685.222(i)(1) describes the proposed process by which a borrower's relief would be determined when a borrower defense claim is approved under the procedures in § 685.222(e), (g), or (h). The Department official or—for group claims, the hearing official—charged with adjudicating the claim would determine the appropriate method for calculating, and amount of, relief arising out of the facts underlying the borrower's claim, based upon the information gathered by, or presented to and considered by, the official. The amount of relief may include a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. The official would consider the availability of information required for a method of calculation and could use one or more of the methods described in Appendix A to the proposed regulations, or some other method determined by the official. For group claims, the official could

consider information from a sample of borrowers in the group.

The designated Department official would notify the borrower of the relief determination and the potential for tax implications and would provide the borrower an opportunity to opt out of group relief, if applicable.

Consistent with the determination of relief, the Secretary would discharge the borrower's obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay and, if applicable, would reimburse the borrower for amounts paid to the Secretary toward the loan voluntarily or through enforced collection.[20]

The Secretary or the hearing official, as applicable, would afford the borrower such further relief as the Secretary or the hearing official determines is appropriate under the circumstances. That relief would include, but not be limited to, determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the HEA, and updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

The total amount of the relief granted with respect to a borrower defense cannot exceed the amount of the loan and any associated costs and fees, and would be reduced by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other benefit received by, or on behalf of, the borrower that was related to the borrower defense. The relief to the borrower may not include non-pecuniary damages such as inconvenience, aggravation, emotional distress, or punitive damages.

Appendix A describes some of the methods the Secretary could employ to calculate relief if the requested relief for a borrower defense is approved in full or in part. The amount of relief may include a cancellation of the outstanding balance on the loan at issue, or some lesser amount, and may include

the recovery of amounts previously collected by the Secretary on the portion of the loan determined to be not enforceable against the borrower as a result of the borrower's claim, taking into account any limiting factors such as applicable limitation periods or statutes of limitation. The methods described include the following:

- The difference between what the borrower paid and what a reasonable borrower would have paid had the school made an accurate representation as to the issue that was the subject of the substantial misrepresentation underlying the borrower defense claim;
- The difference between the amount of financial charges the borrower could have reasonably believed the school was charging, and the actual amount of financial charges made by the school, for claims regarding the cost of a borrower's program of study; and
- The total amount of the borrower's economic loss, less the value of the benefit, if any, of the education obtained by the borrower. Economic loss, for the purposes of this section, may be no greater than the amount of the cost of attendance. The value of the benefit of the education may include transferable credits obtained by the borrower,, and, for gainful employment programs, qualifying placement in an occupation within the Standard Occupational Classification (SOC) code for which the training was provided, provided that the borrower's earnings meet the expected salary for the program's designated occupation(s) or field, as determined using an earnings benchmark for that occupation. The Department official or hearing official will consider any evidence indicating that no identifiable benefit of the education was received by the student.

The Secretary may also calculate the borrower's relief on the basis of such other measures as the Secretary may determine.

*Reasons:* The proposed regulations provide for the determination of relief commensurate with the borrower's injury stemming from the act or omission of the school asserted in the borrower defense claim. While some borrower defenses may merit a discharge of the full amount of the Direct Loan, other claimants may prove an injury in an amount less than that full amount. After considering relevant facts and data, the Department official or the hearing official, as applicable, would determine an amount of relief that is fair to the borrower. This approach would compensate borrowers fairly for the harm they suffered while protecting the fiscal interests of the Federal government.

---

[20] Reimbursement includes only the actual gross amount paid, including any amount used to defray collection costs, but does not include interest on the amount paid.

"Under the long-standing 'no-interest rule,' sovereign immunity shields the U.S. government from interest charges for which it would otherwise be liable, unless it explicitly waives that immunity[.]" *Sandstrom v. Principi,* 358 F.3d 1376, 1379 (Fed. Cir. 2004).

*DMS Imaging, Inc. v. United States,* 123 Fed. Cl. 645, 660 (2015). There is no waiver of that immunity in the HEA.

Proposed § 685.222(i)(5) would provide that the relief provided to a borrower under § 685.206(c) or § 685.222 may not exceed the amount of the Direct Loan and associated costs and fees. The Department's ability to provide relief for borrowers is predicated upon the existence of the borrower's Direct Loan, and the Department's ability to provide relief for a borrower on a Direct Loan is limited to the extent of the Department's authority to take action on such a loan. Section 455(h) of the HEA, 20 U.S.C. 1087e(h), gives the Department the authority to allow borrowers to assert "a defense to repayment of a [Direct Loan]," and discharge outstanding amounts to be repaid on the loan. However, section 455(h) also provides that "in no event may a borrower recover from the Secretary . . . an amount in excess of the amount the borrower has repaid on such loan." As a result, the Department may not reimburse a borrower for amounts in excess of the payments that the borrower has made on the loan to the Secretary as the holder of the Direct Loan. Additionally, proposed § 685.222(i)(5) would reduce a borrower's amount of relief from the borrower defense process by any amounts that the borrower obtained pursuant to such other sources for reasons discussed under "Process for Individual Borrowers (34 CFR 685.222(e))." The rule is intended to prevent a double recovery for the same injury at the expense of the taxpayer. Because the borrower defense process relates to the borrower's receipt of a Federal loan, we would reduce the amount of a borrower's relief from the borrower defense process by the amount received from such other sources only if the relief from the other sources also relates to the Federal loan that is the subject of the borrower defense.

Additionally, proposed § 685.222(i)(5) would also clarify that a borrower may not receive non-pecuniary damages such as damages for inconvenience, aggravation, emotional distress, or punitive damages. We recognize that, in certain civil lawsuits, plaintiffs may be awarded such damages by a court. However, such damages are not easily calculable and may be highly subjective. The Department believes that excluding non-pecuniary damages from relief under this rule would help produce more consistent and fair results for borrowers.

Subject to these limitations, the Department's proposal would require that the designated Department official, or hearing official, as applicable, determine the appropriate method for

calculating the relief to the borrower and the amount of such relief, whether relief to the borrower was approved in full or in part. Determinations on borrower defenses may vary widely, depending on the underlying basis of the claim and circumstances alleged, as well as the level of injury suffered by or detriment to the borrower. For example, for a borrower defense claim brought for a breach of a discrete contractual term such as a school's failure to provide some specific service, the borrower's injury may be more appropriately calculated in consideration of the value of that service and may not warrant a full discharge of the borrower's loan and full reimbursement of payments on the loan made to the Secretary. For example, if the school contractually promised to provide tutoring services, but failed to provide such services, the borrower would receive the cost of such tutoring services as relief under the proposed method.

We also recognize that the feasibility of any particular method of calculation may be limited due to a lack of available information required for such a method. Information regarding tuition prices among comparable programs in a specific geographic region may not be available or suitable for use in the calculation of relief for an individual borrower's claim, but may in certain circumstances be available and relevant for the calculation of relief for a group of borrowers. To permit the Department official or the hearing official, as applicable, to determine the appropriate method of calculation and to determine relief, the proposed regulations would provide that the official may request information for such purposes. Additionally, the proposed regulations would require the official to consider what information may be feasibly obtained in selecting a method of calculation and in making requests for information.

For determinations of relief for a group of borrowers pursuant to § 685.222(g) and (h), the Department also believes it is appropriate to allow the hearing official to consider evidence from a sample of borrowers from the group. The proposed group claim processes are designed to facilitate the efficient adjudication of borrower defenses with common facts and claims. We believe that allowing a calculation of relief based upon information from a sample of borrowers would facilitate this goal. However, the hearing official would consider in each case the feasibility of using a sample, and the method of determining the sample, in determining the appropriate method for calculating relief.

In proposed § 685.222(i)(1), the Department also cross-references proposed Appendix A to subpart B of part 685, which lists specific methods by which a borrower's relief may be calculated. Appendix A notes that the amount of the borrower's relief may include a discharge of all amounts owed to the Secretary on the loan at issue, or a lesser amount, and may include the recovery of amounts previously collected by the Secretary on the loan. The Department recognizes that the choice and use of any method listed in Appendix A may vary depending on the availability of information and underlying facts and claims for the borrower defense, as noted in paragraph (i)(1), and also notes that the designated Department official or hearing official, as applicable, may use another method that is not listed to calculate relief. However, the Department proposes the methods in Appendix A as possible methodologies for a designated Department official or hearing official, as applicable, to consider in determining calculations for relief.

The first proposed method in Appendix A applies in the case of a substantial misrepresentation and looks to the difference between what was actually paid by a borrower in reliance on a misrepresentation, and what the borrower would have paid if the borrower had been given an accurate understanding of the subject of the substantial misrepresentation. The item at issue in the substantial misrepresentation could include the total cost of attendance at a school, or could pertain to a specific service related to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. In some situations, as when the borrower receives education that proves to be worthless, a substantial misrepresentation may warrant full relief, without further analysis. However, in other situations, the Department believes it may be appropriate to determine a borrower's relief by restoring to the borrower the value of what he or she paid for, but did not receive. We believe that such an approach is consistent with the Department's interest in providing relief to borrowers for the harm they suffered while protecting the Federal taxpayer and the interests of the Direct Loan Program.

The second proposed method in Appendix A looks to the difference between the amount of financial charges a borrower reasonably believed that a school was charging, and the actual amount of charges made by the school regarding the cost of a borrower's

program of study. For example, if a school misrepresented the amount of a participation fee or the costs of books for a specific class, under this method, the borrower would be entitled to the difference between what the borrower reasonably thought the charges were as represented by the school, and the actual costs of such items. To the extent that a borrower did, for example, participate in such an experience or did receive the books, we believe that such an approach balances the borrower's interest in paying actual costs with the Department's interest in protecting the Federal taxpayer.

The third proposed method in Appendix A is based on the concept that, if circumstances warrant, a borrower may be entitled to receive the total amount of his or her economic loss. Economic loss may not be greater than the borrower's cost of attendance, which is a term defined in section 472 of the HEA, 20 U.S.C. 1087ll. Pursuant to section 472, a borrower may obtain Federal financial aid up to the cost of attendance at a school and may use that aid only for expenses related to attendance, which include costs such as tuition and fees; allowances for books, supplies, transportation, and miscellaneous personal expenses; allowances for room and board; and allowances for dependent care for students with dependents, among others. The Department has stated that it will recognize borrower defenses only if they are directly related to the making of a Direct Loan or to the school's provision of educational services for which the loan was provided. 60 FR 37768, 37769. Section 484(a)(4)(A) of the HEA requires the borrower to commit to use title IV, HEA funds received only to pay expenses incurred to attend the school. By clarifying that a borrower's relief under the proposed method may be no greater than the borrower's cost of attendance at the school, the proposed approach would avoid the difficulty of attempting to track which particular expense the borrower paid with the loan proceeds, as opposed to those paid with grant funds or personal funds. It would do so by including only those costs that Congress considered to be costs that all title IV, HEA applicants would incur and warrant Federal consideration and support. The third proposed method would also note that the relief measured will be reduced by the value of the benefit, if any, of the education. We recognize that under some circumstances, a borrower's education will be deemed to have no value, and thus the borrower's relief would be

measured by the borrower's total economic loss, subject to the limit that the borrower's relief can only be approved up to the amount of the borrower's Direct Loan. The proposed method explicitly states that the Department official, or hearing official, will consider any evidence that no benefit was received by the student. However, in other circumstances, we believe it will be appropriate for a designated Department official or hearing official, as applicable, to consider the value provided by the education, as determined by the official. For example, if a borrower obtained transferrable credits, then the borrower can use those credits towards the completion of his or her education at another school, thus reducing his or her cost of attendance at that other institution. However, if transferability of those credits is limited due to the school's accreditation or for other reasons, then the hearing official or designated Department official may consider such factors and assign due value to the credits. Similarly, for gainful employment programs, where the explicit purpose of such programs is to train students for specific vocations, the Department believes it could be appropriate to consider whether the borrower obtained qualifying placement with earnings commensurate with the expected earnings for the occupation or field for which the borrower obtained his or her training. The expected salary would be determined using an earnings benchmark for that occupation. Although the proposed method would note transferable credits and qualifying placement and earnings for gainful employment program borrowers as possible indicators of value, this list is not exhaustive and the hearing official or designated Department official would be permitted to also consider other factors. As with the other proposed methods, we believes this approach balances the interest of the Federal taxpayer with a borrower's interest in paying for only the true cost of his or her education, in light of the act or omission of the school giving rise to the borrower defense.

Non-Federal negotiators requested that the Department create a presumption of full discharge and reimbursement of amounts paid on the loan whenever a borrower defense is approved by the Department. In cases where a Department official is making determinations, under proposed § 685.222(e), such a presumption would shift the burden of disproving loss to the Department. In cases where a group process has been initiated under

proposed § 685.222(f)–(h), this burden would be shifted to the school. However, as noted, the Department has a responsibility to protect the interests of Federal taxpayers and such burden shifting is not justified when losses from borrower defenses may be borne by the taxpayer. The Department believes that to balance its interest in protecting the taxpayer with its interest in providing fair outcomes to borrowers, the Department must consider the extent to which claimants actually suffered financial loss when determining relief. In proposing that designated Department officials and hearing officials consider such calculations, however, the Department does not preclude full relief for borrowers; rather, such officials would carefully consider available evidence and make reasoned determinations as to when and whether full relief is justified.

Proposed § 685.222(i)(2) lists certain items the designated Department official or hearing official would include in the notification to the borrower of the relief determination. Given that the Department does not have the authority to determine the tax implications for relief in borrower defenses, which is within the jurisdiction of the Internal Revenue Service, the notice would simply advise the borrower that accepting the relief could affect the borrower's tax obligations. The Department would encourage any borrower who receives relief to seek advice from tax professionals on the tax implications of his or her acceptance of that relief.

Relief granted through the group processes described in proposed § 685.222(f) to (h) may raise specific concerns for members who did not file an application for borrower defense or members who may not have been engaged in the process to their satisfaction. As a result, for determinations of relief for a group of borrowers, the notice would also provide members of the group with an opportunity to opt out of the relief determination. This would provide borrowers in a group process with a second opportunity to opt out of the proceeding, in addition to the opt-out provided by the notice given at the initiation of the group process described in proposed paragraph (f)(2). If a borrower declines to accept the relief determination from the group process, the borrower may choose to have his or her borrower defense considered on an individual basis through the process described in proposed paragraph (e) of this section. As noted earlier, the decision of the hearing official in a group proceeding would likely bear

strongly on the resolution of the borrower's claim, if pursued on an individual basis.

**Borrower Cooperation and Transfer of Rights (§ 685.222(j) and (k))**

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

*Current Regulations:* Current borrower defense regulations (§ 685.206(c)) do not address borrower cooperation or the transfer of rights.

*Proposed Regulations:* Section 685.222(j) of the proposed regulations would require that a borrower seeking relief through the borrower defense process reasonably cooperate with the Secretary, whether relief is sought through an individual application filed under proposed § 685.222(e) or through the group processes described in proposed § 685.222(f) to (h). The Secretary would be permitted to revoke relief granted to a borrower who does not fulfill this obligation.

In addition, proposed § 685.222(k) would provide that, when the Secretary grants relief in response to a borrower defense claim, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund. If the borrower asserts and recovers on a claim with a public fund, and if the Secretary determines that the borrower's recovery from that public fund was based on the same claim raised as a borrower defense and for the same loan for which the discharge was granted, the Secretary may reinstate the borrower's obligation to repay the amount discharged on the loan based on the amount recovered from the public fund.

Proposed § 685.222(k) would apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights. However, § 685.222(k) would not prevent a borrower from pursuing relief against any party named in § 685.222(k) for claims in excess of what has been assigned to the Secretary, or for claims

unrelated to the basis of the borrower defense on which the borrower received relief.

*Reasons:* When a borrower seeks a discharge of a Direct Loan, the Department would require the borrower's cooperation to determine the facts of the claim and provide the school with due process, as appropriate. Absent this cooperation, the Department could be unable to successfully resolve the borrower's request for relief. Similarly, for the reasons discussed for requesting such information on claims to third parties under "Process for Individual Borrowers (34 CFR 685.222(e))," it is important that the Department prevent double recovery for the same claim, when the borrower has already recovered from another source.

**Borrower Responsibilities and Defenses (§ 685.206)**

*Statute:* Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan.

*Current Regulations:* Section 685.206(c) establishes the conditions under which a Direct Loan borrower may assert a borrower defense, the relief afforded by the Secretary in the event the borrower's claim is successful, and the Secretary's authority to recover from the school any loss that results from a successful borrower defense. Specifically, § 685.206(c) provides that a borrower defense may be asserted based upon any act or omission of the school that would give rise to a cause of action against the school under applicable State law. Under § 685.206(c), a borrower defense is presumed to be raised only in response to a proceeding by the Department to collect on a Direct Loan, including, but not limited to, tax refund offset proceedings under 34 CFR 30.33, wage garnishment proceedings under 31 U.S.C. 3720D, salary offset proceedings for Federal employees under 34 CFR part 31, and consumer reporting proceedings under 31 U.S.C. 3711(f). Under § 685.206(c), if a borrower defense is successful, the borrower is relieved of the obligation to pay all or part of the loan and associated costs and fees, and the borrower may be afforded such further relief as the Secretary determines is appropriate, including, among other things, reimbursement of amounts previously paid toward the loan. Although § 685.206(c) permits the Secretary to seek recovery from the school of the amount of the loan to which the borrower defense applies, it also provides that the Secretary may not

initiate such a proceeding after the three-year record retention period referenced in § 685.309(c).

*Proposed Regulations:* Proposed § 685.206(c) would specify that it applies only to borrower defenses asserted with respect to Direct Loans disbursed prior to July 1, 2017. It would clarify that a borrower defense must relate to the making of the Direct Loan or the provision of educational services and define "borrower defense" to include one or both of the following: A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and a right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part. Proposed § 685.206(c) would also exclude the language that specifically refers to the Department's defaulted loan collection proceedings.

Rather than specifying the available relief in proposed § 685.206(c) for an approved borrower defense, proposed § 685.206(c)(2) would refer to proposed § 685.222(e)–(k), which would provide procedures for both the assertion and the resolution of a borrower defense claim, including available relief for an approved borrower defense.

Proposed § 685.206(c)(2) also would refer to proposed § 685.222(a) for applicable definitions and to specify the order in which the Department would process multiple loan discharge claims submitted by the same borrower for the same loan or loans. Under proposed § 685.222(a)(6), the Secretary would determine the order in which multiple loan discharge claims submitted by the same borrower for the same loan or loans are processed, and notify the borrower of that order.

Proposed § 685.206(c) would continue to permit the Secretary to initiate a proceeding to recover from the school the amount of relief arising from an approved borrower defense, but it would remove the three-year limitation on the Secretary's ability to initiate such a proceeding.

*Reasons:* The introduction of a definition of "borrower defense" streamlines the regulations. The proposed updates to § 685.206 provide clarity to borrowers who have loans first disbursed prior to July 1, 2017, and who are seeking relief based on a borrower defense claim. The Department considered whether to change the standard by which a borrower may assert a borrower defense for loans disbursed prior to the anticipated effective date of these regulations, or July 1, 2017. However, the existing Direct Loan promissory notes incorporate the current borrower defense to repayment process for loans

first disbursed before July 1, 2017, which is based on an act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. As a result, the Department has decided to keep the current standard for loans first disbursed prior to July 1, 2017. Acts or omissions that may give rise to a cause of action under applicable State law may include any cause of action pertaining to the making of the Direct Loan or the provision of educational services for which the loan was provided. Similarly, other applicable State law principles governing the State law cause of action would apply, such as any applicable State law statutes of limitation.

We discuss under "Borrower Defenses—General (§ 685.222(a))" the Department's reasons for clarifying that the Department will acknowledge a borrower defense asserted under the regulations "only if the cause of action directly relates to the loan or to the school's provision of educational services for which the loan was provided." 60 FR 37768, 37769. We also discuss the reasons for the proposed definition of "borrower defense" in that part of this NPRM.

Proposed § 685.206(c) would exclude the language that specifically refers to the Department's defaulted loan collection proceedings. While many loans that are the subject of a borrower defense may be in default, the Department has committed in this proposed rulemaking to establish a process outside of the defaulted loan collection proceedings to evaluate borrower defenses for loans regardless of whether the loans are in default or not. We believe that establishing such a dedicated process will enhance the Department's efforts to review and process borrower defenses and offer borrowers more consistent and focused relief.

We also propose to amend § 685.206 to refer to a new section of the regulations, § 685.222, for the process to be followed when pursuing a borrower defense claim. Proposed § 685.222 would provide an expanded description of the regulatory framework for the range of borrower defense claims, including the process by which claims and relief are determined.

Proposed § 685.206(c)(2) would refer to proposed § 685.222(a)(6), which addresses the order in which multiple claims for loan discharge from the same borrower for the same loan or loans will be processed by the Secretary. The proposed language indicates that, if the borrower asserts both a borrower defense and any other objection to an

action of the Secretary with regard to that Direct Loan, the Secretary notifies the borrower of the order in which the borrower defense and any other objections will be considered. During the negotiated rulemaking process, a non-Federal negotiator requested that further clarification be provided regarding the order in which claims will be determined. The Department did not agree that it was appropriate to do so within the proposed regulations, since the particular circumstances may vary and establishing one order for all cases could result in a progression that could be unfair to individual borrowers. In general, we will evaluate claims in the order that is likely to result in a decision for the borrower sooner, while also effectively and efficiently using the Department's resources.

While a borrower may still assert a borrower defense in connection with the Department's defaulted loan collection proceedings, the Department's current experience with borrower defense claims from Corinthian students suggests that such claims are more likely to arise outside of such proceedings. However, it is not clear whether this will be true in the future.

The existing Direct Loan promissory notes incorporate the current borrower defense to repayment process for loans first disbursed before July 1, 2017, which is based on an act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. Because current regulations in § 685.206(c) do not include a process for submission and consideration of claims, the Department intends to extend to borrowers with loans first disbursed before July 1, 2017, the processes developed to submit, review, and resolve borrower defense claims for borrowers with loans first disbursed on or after July 1, 2017.

The Department is also proposing to remove the limitation period on the Department's ability to initiate a proceeding to recover losses from approved borrower defenses. We explain the reasons for this proposed change under the discussion for § 685.206 and § 685.308, "Remedial Action and Recovery from the Institution."

**150 Percent Direct Subsidized Loan Limit (§ 685.200)**

*Statute:* Section 455(q) of the HEA provides that a first-time borrower on or after July 1, 2013, is not eligible for additional Direct Subsidized Loans if the borrower has received Direct Subsidized Loans for a period that is equal to or greater than 150 percent of

the length of the borrower's current program of study (thereinafter referred to as the "150 percent limit"). In addition, some borrowers who are not eligible for Direct Subsidized Loans because of the 150 percent limit become responsible for the interest that accrues on their loans when it would otherwise be paid by the government. The statute does not address what effect a discharge of a Direct Subsidized Loan has on the 150 percent limit. The statute also does not address whose responsibility it is to pay the outstanding interest on any remaining loans that have not been discharged, but have previously lost eligibility for interest subsidy.

*Current Regulations:* Section 685.200(f)(4) provides two exceptions to the calculation of the period of time that counts against a borrower's 150 percent limit—the subsidized usage period—that can apply based on the borrower's enrollment status or loan amount. The regulations do not have an exception to the calculation of a subsidized usage period if the borrower receives a discharge of his or her Direct Subsidized Loan. They also do not address whose responsibility it is to pay the outstanding interest on any remaining loans that have not been discharged, but have previously lost eligibility for the interest subsidy based on the borrower's remaining eligibility period and enrollment.

*Proposed Regulations:* Proposed § 685.200(f)(4)(iii) would specify that a discharge based on school closure, false certification, unpaid refund, or defense to repayment will lead to the elimination or recalculation of the subsidized usage period that is associated with the loan or loans discharged.

The proposed regulations would also specify that, when the complete amount of a Direct Subsidized Loan or a portion of a Direct Subsidized Loan is discharged, the entire subsidized usage period associated with that loan is eliminated. In the event that a borrower receives a closed school, false certification, or, depending on the circumstances, defense to repayment or unpaid refund discharge, the Department would completely discharge a Direct Subsidized Loan or a portion of a Direct Subsidized Consolidation Loan that is a attributable to a Direct Subsidized Loan.

The proposed regulations would also specify that, when only a portion of a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged, the subsidized usage period is recalculated instead of eliminated. Depending on the

circumstances, discharges due to defense to repayment and unpaid refund could result in only part of a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan being discharged.

The proposed regulations would specify that when a subsidized usage period is recalculated instead of eliminated, the period is only recalculated when the borrower's subsidized usage period was calculated as one year as a result of receiving the Direct Subsidized Loan in the amount of the annual loan limit for a period of less than an academic year. For example, if a borrower received a Direct Subsidized Loan in the amount of $3,500 as a first-year student and on a full-time basis for a single semester of a two-semester academic year, the subsidized usage period would be one year. If the borrower later receives an unpaid refund discharge in the amount of $1,000, the subsidized usage period would be recalculated, and the subsidized usage period would become 0.5 years because the subsidized usage period was previously based on the amount of the loan and, after the discharge, is based on the relationship between the period for which the borrower received the loan (the loan period) and the academic year for which the borrower received the loan.

In contrast, if the borrower received a Direct Subsidized Loan in the amount of $3,500 as a first-year student and on a full-time basis for a full two-semester academic year, the subsidized usage period would be one year. If the borrower later receives an unpaid refund discharge in the amount of $1,000, the subsidized usage period would still be one year because the subsidized usage period would still be calculated based on the relationship between the loan period and the academic year for which the borrower received the loan.

Proposed § 685.200(f)(3) would provide that, if a borrower receives a discharge based on school closure, false certification, unpaid refund, or defense to repayment that results in a remaining eligibility period greater than zero, the borrower is no longer responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of the loan.

For example, suppose a borrower receives three years' worth of Direct Subsidized Loans at school A and then transfers to school B and receives three additional years' worth of Direct Subsidized Loans. Further suppose that at this point, the borrower has no remaining eligibility period and enrolls in an additional year of academic study at school B, which triggers the loss of interest subsidy on all Direct Subsidized Loans received at schools A and B. If the borrower later receives a false certification discharge with respect to school B, the borrower's remaining eligibility period is now greater than zero. The borrower is no longer responsible for paying the interest subsidy lost on the three loans from school A. If the borrower then enrolled in school C and received three additional years of Direct Subsidized Loans, resulting in a remaining eligibility period of zero, and then enrolled in an additional year of academic study, the borrower would lose the interest subsidy on the Direct Subsidized Loans received at schools A and C.

*Reasons:* The proposed regulations would codify the Department's current practice in this area and would provide clarity in the Department's policies and practices. Under the circumstances in which a borrower receives a closed school, false certification, defense to repayment, or unpaid refund discharge, a borrower has not received all or part of the benefit of the loan due to an act or omission of the school. In such event, we believe that a student's eligibility for future loans and the interest subsidy on existing loans should not be negatively affected by having received all or a portion of such loan. Accordingly, under the proposed regulations, we would increase the borrower's eligibility for Direct Subsidized Loans or reinstate interest subsidy on other Direct Subsidized Loans under the 150 percent limit where the borrower receives a discharge of a Direct Subsidized Loan and the discharge was based on an act or an omission of the school that caused the borrower to not receive all or part of the benefit of the loan.

### Administrative Forbearance (§ 685.205(b)(6))

*Statute:* Section 428(c)(3) of the HEA provides for the Secretary to permit FFEL Program lenders to exercise administrative forbearances that do not require the agreement of the borrower, under conditions authorized by the Secretary. Section 455(a) provides that Direct Loans have the same terms, conditions, and benefits as FFEL Loans.

*Current Regulations:* Section 685.205(b) of the current regulations describes the circumstances under which the Secretary may grant forbearance on a Direct Loan without requiring documentation from the borrower. Section 685.205(b)(6) specifies that these circumstances include periods necessary for the Secretary to determine the borrower's eligibility for a closed school discharge, a false certification of student eligibility discharge, an unauthorized payment discharge, an unpaid refund discharge, a bankruptcy discharge, and teacher loan forgiveness.

*Proposed Regulations:* We propose to add to § 685.205(b)(6) a mandatory administrative forbearance when the Secretary is in receipt of, and is making a determination on, a discharge request based on a claimed borrower defense. The proposed changes would add cross-references to the regulations on borrower defense claims (§§ 685.206(c) and 685.222). By these references, we would expand the circumstances under which the Secretary may grant forbearance on a Direct Loan without requiring documentation from the borrower.

*Reasons:* During the Department's review of a borrower defense, we believe borrowers seeking relief should have the option to continue to make payments on their loans, as well as the option to have their loans placed in forbearance. Providing an automatic forbearance with an option for the borrower to decline the temporary forbearance and continue making payments would reduce the potential burden on borrowers pursuing borrower defenses.

### Mandatory Administrative Forbearance for FFEL Program Borrowers (§ 682.211)

*Statute:* Section 428(c)(3)(D) of the HEA provides for the Secretary to permit lenders to provide borrowers with certain administrative forbearances that do not require the agreement of the borrower, under conditions authorized by the Secretary.

*Current Regulations:* Section 682.211(i) specifies the circumstances under which a FFEL lender must grant a mandatory administrative forbearance to a borrower. The current regulations do not address circumstances in which a borrower has asserted a borrower defense with respect to a loan.

*Proposed Regulations:* Proposed § 682.211(i)(7) would require a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application

for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief, as reflected in proposed § 685.212(k). The administrative forbearance would remain in effect until the Secretary notifies the lender that a determination has been made as to the borrower's eligibility for a borrower defense discharge. If the Secretary notifies the borrower that he or she would qualify for a borrower defense discharge if he or she were to consolidate, the borrower would then be able to consolidate the loan(s) to which the defense applies. If the borrower then obtains the Direct Consolidation Loan, the Secretary would recognize the defense and discharge that portion of the Consolidation Loan that paid off the FFEL Loan in question.

*Reasons:* We are proposing to change the Direct Loan forbearance regulations in § 685.205(b)(6) to provide for the Secretary to grant an administrative forbearance to a Direct Loan borrower during the period when the Secretary is determining the borrower's eligibility for a borrower defense discharge. Some non-Federal negotiators believed that a comparable forbearance benefit should be provided to FFEL Program borrowers who believe that they have a defense to repayment on a FFEL Loan and intend to seek relief under the Direct Loan borrower defense provisions by consolidating the FFEL Loan into a Direct Consolidation Loan, as addressed in proposed § 685.212(k). As described more fully below regarding proposed § 685.212, that section will be amended to address how a Direct Consolidation Loan borrower may assert a defense to repayment of that Consolidation Loan based on an act or omission of a school the borrower attended using the Direct Loan, FFEL Stafford or PLUS Loan, or a Perkins Loan paid off by that Consolidation Loan. If the borrower defense claim is approved in full, for example, the Secretary would discharge the portion of the Direct Consolidation Loan that paid off the Direct Loan, FFEL Loan, or Perkins Loan. Non-Federal negotiators requested that the mandatory administrative forbearance provisions for FFEL Program borrowers who are seeking relief based on a borrower defense claim be amended to mirror the mandatory administrative forbearance provisions for Direct Loan borrowers who are seeking relief under borrower defense. The Department agreed that this was appropriate and proposes to revise § 682.211 to provide this benefit.

## Discharge of a Loan Obligation (§ 685.212)

*Statute:* Section 455(h) of the HEA provides that the Secretary may specify in regulations which acts or omissions of a school a borrower may assert as a defense to repayment of a Direct Loan. This provision allows for the discharge of the borrower's Direct Loan pursuant to the regulations regarding borrowers' defenses to repayment.

*Current Regulations:* Current § 685.212 states those grounds specified or explicitly referenced in sections 437 and 455(m) of the HEA, and section 6 of Public Law 109–382 (authorizing September 11 survivors discharge), on which the Secretary discharges some or all of a borrower's obligation to repay a Direct Loan. These grounds include death, disability, closed school, false certification, bankruptcy, teacher loan forgiveness, public service loan forgiveness, and September 11 survivors discharge.

*Proposed Regulations:* We propose to amend § 685.212 to include discharge of all or part of a borrower's Direct Loan obligation by reason of a borrower defense that has been approved under § 685.206(c) or proposed § 685.222. The proposed addition would also specify that, with respect to a Direct Consolidation Loan for which a borrower defense was approved, the Secretary would provide relief as to the portion of the Consolidation Loan obligation that repaid the original Direct Loan, FFEL Loan, Perkins Loan or other federally financed student loan used to attend the school to which the borrower defense claim relates. The proposed addition would further describe the standard we would apply to consideration of borrower defense claims raised by borrowers to Direct Consolidation Loans and to claims for return of payments and recoveries on the Consolidation Loan itself, and to payments and recoveries on the Federally-financed loans that were paid off by the Direct Consolidation Loan.

*Reasons:* The proposed changes to § 685.206(c) and proposed new § 685.222 include new language establishing the grounds on which a borrower's obligation to repay a Direct Loan may be discharged. This proposed change to § 685.212 would clarify current policy and provide for a more complete set of cross-references to the loan discharge types covered in § 685.212.

The proposed changes would also clarify that an appropriate portion of a borrower's obligation to repay a Direct Consolidation Loan may be discharged, if a borrower defense has been approved

pursuant to § 685.206(c) or proposed § 685.222. Section 455(h) of the HEA provides that the Secretary may allow for the discharge of a loan pursuant to a borrower defense for a loan made "under this part"—the Direct Loan Program. This includes Direct Consolidation Loans made under section 455(g) of the HEA. This proposed change to § 685.212 is also meant to clarify current policy regarding the types of loans for which a borrower defense may be asserted, and how a borrower's obligation to repay a Direct Consolidation Loan is affected if a borrower defense claim has been approved under § 685.206(c) and proposed § 685.222. Because the act or omission of the school that would constitute a borrower defense under § 685.206(c) or proposed § 685.222 would pertain to the making of the Federal loans that were consolidated into his or her Direct Consolidation Loan or the provision of educational services for such Federal loans, the proposed language would clarify that relief for a borrower defense approved as to a Direct Consolidation Loan will be provided for that portion of the Consolidation Loan that corresponds to the original loan obtained to attend the school whose act or omission gave rise to a borrower defense. Thus, § 685.212 would be amended in new paragraph (k) to list the Federal education loans that may be paid off by a Direct Consolidation Loan and with regard to which the borrower may assert a borrower defense claim. Those original loans include the loans listed in § 685.220. For some of the discharges already listed in this section, the relief available is explained here; for others, the relief is described only in the specific regulations that describe the grounds and procedure for obtaining relief. Some of the discharges already listed provide only relief from the obligation to repay the remaining outstanding balance on the loan, while others, such as closed school discharges, may provide for both debt relief and refund of payments already recovered. The relief available for each of the listed discharges is controlled by the law on which the discharge is based; the basis and relief available for borrower defense discharges are stated fully in § 685.206(c) and proposed § 685.222 and will be reflected in the new § 685.212(k).

Thus, § 685.212 would be amended to clarify that the Secretary would evaluate a borrower defense claim on a Direct Loan using the standards stated in § 685.206(c) or, for loans first disbursed, or made, on or after July 1, 2017, in

§ 685.222. The standard that would be applied would depend upon factors such as the date that the Direct Consolidation Loan was first made; whether the underlying loan to which a borrower defense is asserted is a Direct Loan or some other eligible loan for consolidation; and whether the issue at hand refers either to a borrower's defense to repayment to the applicable portion of a Direct Consolidation Loan that may be attributable to the underlying loan to which a borrower defense is being asserted, or refers to the borrower's request for a return of payments collected by the Secretary on the underlying loan.

*Direct Loans Paid Off by Direct Consolidation Loans*

Applicable Standard

For Direct Loans for which borrowers may be considering consolidation, the standards would differ depending on the date on which the first Direct Loan to which a claim is asserted was made. If the Direct Loan Consolidation borrower asserts a claim regarding an underlying Direct Subsidized, Unsubsidized, or PLUS Loan made before July 1, 2017, we would apply the standard in § 685.206(c). For underlying Direct Loans made after July 1, 2017, we would apply the standard stated in § 685.222(b), (c), or (d) to the borrower's defenses to repayment, as we would if the borrower had challenged those loans directly through the borrower defense process.

Return of Payments

For underlying Direct Loans made before July 1, 2017, we would apply applicable state law as to the limitations period pursuant to § 685.206(c), to any claim for return of payments made or recovered on the underlying loans or on that portion of the Direct Consolidation Loan attributable to the paying off of the underlying Direct Loan.

For underlying Direct Loans made on or after July 1, 2017, we would apply the limitations period in § 685.222(b), (c), or (d), as applicable, to any claim for return of payments made or recovered on the underlying loans or on that portion of the Direct Consolidation Loan attributable to the paying off of the underlying Direct Loan.

*Other Eligible Loans Paid Off by Direct Consolidation Loans*

Applicable Standard

For other education loans paid off by the Direct Consolidation Loan, such as FFEL, Perkins, or other eligible loans for consolidation that are not Direct Loans, the standard that will apply to a defense

to repayment of an applicable portion of the outstanding balance of borrowers' Direct Consolidation Loans would depend upon the date that the Direct Consolidation Loan was made. For such defense to repayment claims raised by Direct Consolidation Loan borrowers with regard to other education loans paid off by a Direct Consolidation Loan that was made before July 1, 2017, we would evaluate the defense to repayment with respect to the underlying loan under the Direct Loan defense standard in § 685.206(c), as if the challenged loan were a Direct Loan. For such a Direct Consolidation Loan made on or after July 1, 2017, we would evaluate the borrower's defense to repayment with respect to the underlying loan under the Direct Loan borrower defense standard in proposed § 685.222.

Return of Payments

However, for claims for return of payments made or recovered on the underlying loan, we would return only payments made or recovered by the Department directly, and only if the borrower proved that the loan or portion of the loan to which the payment was credited was not legally enforceable under the law governing the claims on the underlying, paid off loans. If the borrower seeks recovery of a payment made on the Direct Consolidation Loan itself, as distinct from payments made on the underlying paid-off loan, the applicable standard governing claims for return of payments would be that provided in § 685.206(c) (for Direct Consolidation Loans made before July 1, 2017) or § 685.222(b), (c), or (d) (for Direct Consolidation Loans made on or after July 1, 2017). Similarly, depending on the date that the Direct Consolidation Loan was made, the limitation periods applicable to claims for return of payments made on the Direct Consolidation Loan would be those stated in either § 685.206(c) or § 685.222(b), (c), or (d), accordingly.

In addition, the proposed amendment to § 685.212 would not allow a borrower to assert a borrower defense more than once for a claim that is based on the same underlying circumstances and same evidence, unless allowed under the procedures in proposed § 685.222. For instance, if a borrower asserted a borrower defense with respect to a loan under either § 685.206(c) or proposed § 685.222 that was denied in full or in part, the borrower may not then assert a borrower defense with respect to that original loan after consolidation, absent new evidence as described in proposed § 685.222(e)(5) or a reopening of an

application for borrower defense by the Secretary under that section.

**Remedial Action and Recovery From the Institution**

General (§§ 685.206, 685.308)

*Statute:* Section 454(a) of the HEA provides that the Secretary may include in Direct Loan participation agreements with institutions provisions that are necessary to protect the interests of the United States and to promote the purposes of the Direct Loan Program, and that the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement.

*Current Regulations:* The current regulations provide, in § 685.206(c), that the Secretary may initiate an action to recover from a school whose act or omission resulted in an approved borrower defense the amount of loss incurred by the Department for that claim, but may not do so after the end of the record retention period provided under § 685.309(c), which is three years after the end of the award year in which the student last attended the institution. See § 685.309, which references § 668.24.

In addition, current § 685.308 provides that the Secretary may take various actions to recover for losses caused by institutions, and describes the procedures that would be used for some claims.

*Proposed Regulations:* We propose to remove from § 685.206 the provision stating that the Secretary would not initiate action to recover after the end of the three-year record retention period. We further propose to revise § 685.308 to more accurately describe the instances in which the Secretary incurs a loss for which the institution is accountable.

*Reasons:* We propose to remove the limitation on bringing actions against an institution to recover for losses incurred from borrower defenses for two reasons. First, the current three-year limitation in § 685.206(c)(3) cites § 685.309(c), which refers to § 668.24, the general record retention requirements for the title IV, HEA student financial assistance programs. Section 668.24(e)(2) provides that the institution is to keep records of borrower eligibility and other records of its "participation" in the Direct Loan Program for three years after the last award year in which the student attended the institution. The requirement pertains to the retention of "program records"—records of the determination of eligibility for Federal student financial assistance and management of Federal funds provided

to the institution for those awards. §§ 668.24(a), 685.309.[21] The Department believes that these records will rarely, if ever, be needed to address borrower defense claims. Borrower defense claims will turn on other evidence—advertising, catalogs, enrollment contracts, recruiting scripts—that have not been and cannot be categorized as "program records." Moreover, institutions have always faced potential litigation on claims that would also constitute borrower defense claims, and have already made business judgments as to the need and period for which to retain business records that may be relevant in such litigation. The proposed change would do no more than hold the school to the same risk it has already assessed and for which it has exercised its business judgment to protect itself. As noted under "Federal Standard and Limitation Periods (34 CFR 685.222(b), (c), and (d) and 34 CFR 668.71)," State laws and the new proposed Federal standard generally provide that the limitation period for affirmative claims for recovery based on misrepresentation begins only upon the claimant's discovery of the facts that give notice that the representation was false, and thus an institution would already be expected to have accounted for that potential in adopting its own record retention policies. We are not, however, proposing to impose any new requirements relating to record retention. Moreover, borrowers—whether a designated Department official assists in developing the evidence for the borrower under proposed § 685.222 or not—always bear the burden of proof, either initially or ultimately.[22] The institution thus faces potential risk where a borrower belatedly asserts a borrower defense only if the borrower—or the Department, for claims considered as a group, asserts a claim pertaining to the borrower—meets that burden by producing credible evidence of the facts on which the claim is based.

Second, the most readily available tool for recovery of Federal claims has always been administrative offset, which Federal law encourages and even requires agencies to use. 31 U.S.C. 3716. That authority was amended in 2008 to

remove its previous 10-year limitation period.[23] Case law makes clear that limitations periods adopted by a legislative authority can be changed or abrogated, and the new limitation period applied even to claims that may have been barred under the prior rule.[24] Because the limitation period in current § 685.206(c)(3) is solely a regulatory limitation adopted by the Department pursuant to its regulatory authority and was in no way compelled by statute, the Department can change or remove that limitation and can apply the revised rule to any claim, without regard to when that claim arose. This would not produce an unfair result. As noted in the background discussion under "Borrower Defenses (34 CFR 668.71, 685.205, 685.206, and 685.222)," the borrower defense provision in § 685.206(c) has been infrequently utilized from 1995 until the recent Corinthian experience, and there is no reason to believe that any institution would have relied on the three-year limitation period in current § 685.206(c)(3) to discard business records that it would otherwise have retained.

We propose to revise § 685.308 to more accurately describe the grounds on which an institution can cause loss for which the Secretary holds the school accountable, and the procedures used to establish and enforce that liability in some particular circumstances. An institution participates in the title IV, HEA programs only by entering into a program participation agreement. Under that agreement, the institution accepts responsibility to act as a fiduciary in handling, awarding, and accounting for title IV, HEA funds that it awards, and is liable for the costs of funds it fails to account for, or funds it awards or causes to be awarded improperly.[25] An

institution participates in the Direct Loan Program only by entering into a Direct Loan program participation agreement.[26] Under that agreement, the institution agrees to "originate" Direct Loans that are made by the Department, and to accept financial liability for losses "stemming from" its failure to perform its functions under that agreement. The institution breaches its fiduciary duty as originator of Direct Loans when it causes a loan to be made to an individual who was ineligible to receive that loan, or causes an eligible individual to receive a loan in an ineligible amount, or by its act or omission causes the Secretary to incur an obligation to discharge a loan or to be unable to enforce the loan.

We propose to revise § 685.308 to more accurately describe the range of these circumstances. In some instances, the Secretary identifies possible claims for Department losses for which the Secretary holds the school accountable in audits and program reviews, and if such claims are asserted in the final determinations that ensue from these audits or program reviews, the institution may contest the claims under the procedures in subpart H of part 668. In other instances, the Secretary asserts these claims in other contexts, and may follow other procedures to claim recovery. In any such other procedure, Federal law and Department regulations require the Secretary to provide the institution notice and an opportunity to dispute the claim and obtain a hearing on its objections. See 34 CFR 34.20 et seq. For borrower defense claims, we describe briefly in proposed § 685.222 the procedures we propose to use for these claims and intend to prescribe them in more detail in the future.

---

[21] The record retention regulation was adopted pursuant to 20 U.S.C. 1232f, which requires each recipient of Federal funds under a Department program to keep records that disclose "the amount and disposition of those funds," and to "maintain such records for three years after the completion of the activity for which the funds are used."

[22] The rebuttable presumption applicable to group claims shifts the burden of rebuttal to the school; if the school submits evidence to rebut that presumption, the burden of proof then, and only then, shifts back to the borrower.

[23] "Notwithstanding any other provision of law, regulation, or administrative limitation, no limitation on the period within which an offset may be initiated or taken pursuant to this section [§ 3716] shall be effective." 31 U.S.C. 3716(e)(1).

[24] In re Lewis, 506 F.3d 927, 932 (9th Cir. 2007); U.S. v. Distefano, 279 F.3d 1241, 1244 (10th Cir. 2002) (noting that "the Supreme Court has upheld, against due process challenges, statutes reviving such barred claims. See Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 311–14, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); Campbell v. Holt, 115 U.S. 620, 628, 6 S.Ct. 209, 29 L.Ed. 483 (1885). As we have. See Bernstein v. Sullivan, 914 F.2d 1395, 1400–03 (10th Cir. 1990).").

[25] See, e.g., Nat'l Career Coll., Inc. v. Spellings, 371 F. App'x 794, 796 (9th Cir. 2010) (college has fiduciary duties in handling the public's money. 34 CFR 668.15, 668.16, 668.82); Sistema Universitario Ana G. Mendez v. Riley, 234 F.3d 772, 775 (1st Cir. 2000) (As a result of fiduciary status, institutions bear burden of proving that their expenditures of title IV funds were warranted and that they complied with program requirements); St. Louis Univ. v. Duncan, 97 F. Supp. 3d 1106, 1109 (E.D.

Mo. 2015) (institution acts as fiduciary and is liable for improperly awarded funds); Maxwell v. New York Univ., No. 08 CV 3583 (HB), 2009 WL 1576295, at *7 (S.D.N.Y. June 1, 2009), aff'd, 407 F. App'x 524 (2d Cir. 2010) (school acts as a fiduciary for the Department); Instituto De Educ. Universal, Inc. v. U.S. Dep't of Educ., 341 F. Supp. 2d 74, 82 (D.P.R. 2004), aff'd sub nom. Ruiz-Rivera v. U.S. Dep't of Educ., No. 05–1775, 2006 WL 1343431 (1st Cir. May 10, 2006), and subsequently aff'd sub nom. Instituto de Educacion Universal v. U.S. Dep't of Educ., No. 06–1562, 2007 WL 1519059 (1st Cir. May 11, 2007) (Under HEA, an educational institution operates as a fiduciary to the Department, and is subject to the highest standard of care and diligence in administering these programs and accounting to the Department for the funds it receives. 34 CFR 668.82(a), (b) (1991–94)); see also Chauffeur's Training Sch., Inc. v. Riley, 967 F. Supp. 719, 727 (N.D.N.Y. 1997) (institution liable under breach of contract for costs of payments the Department made to third parties on account of loans the institution improperly caused to be made).

[26] This Direct Loan Program Participation Agreement is now included in, and a separate part of, the general program participation agreement required by section 487(a) of the HEA.

We also propose to remove the reference to a remedial action (requiring schools to purchase loans) that was sanctioned under FFEL regulations in effect when this section was adopted in 1995, but which has not and will not be used for Direct Loans.

### Severability (§ 685.223)

*Statute:* Section 454(a) of the HEA provides that the Secretary may include in Direct Loan participation agreements with institutions provisions that are necessary to protect the interests of the United States and to promote the purposes of the Direct Loan Program; 20 U.S.C. 3474 authorizes the Secretary to adopt such regulations as needed for the proper administration of programs.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 685.223 would make clear that, if any part of the proposed regulations for part 685, subpart B, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to students, prospective students, and their families, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions.

### Institutional Accountability

### Financial Responsibility

### General (§ 668.171)

*Statute:* Section 487(c)(1) authorizes the Secretary to establish reasonable standards of financial responsibility. Section 498(a) of the HEA provides that, for purposes of qualifying an institution to participate in the title IV, HEA programs, the Secretary must determine the legal authority of the institution to operate within a State, its accreditation status, and its administrative capability and financial responsibility.

Section 498(c)(1) of the HEA authorizes the Secretary to establish ratios and other criteria for determining whether an institution has the financial responsibility required to (1) provide the services described in its official

publications, (2) provide the administrative resources necessary to comply with title IV, HEA requirements, and (3) meet all of its financial obligations, including but not limited to refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred for programs administered by the Secretary.

*Current Regulations:* The current regulations in § 668.171(a) mirror the statutory requirements that to begin and continue to participate in the title IV, HEA programs, an institution must demonstrate that it is financially responsible. The Secretary determines whether an institution is financially responsible based on its ability to provide the services described in its official publications, properly administer the title IV, HEA programs, and meet all of its financial obligations.

The Secretary determines that a private non-profit or for-profit institution is financially responsible if it satisfies the ratio requirements and other criteria specified in the general standards under § 668.171(b). Under those standards, an institution:

• Must have a composite score (combining the named measures of financial health elements to yield a single measure of a school's overall financial health) of at least 1.5, based on its Equity, Primary Reserve, and Net Income ratios;

• Must have sufficient cash reserves to make required refunds;

• Must be current in its debt payments. An institution is not current in its debt payment if it is in violation of any loan agreement or fails to make a payment for 120 days on a debt obligation and a creditor has filed suit to recover funds under that obligation; and

• Must be meeting all of its financial obligations, including but not limited to refunds it is required to make under its refund policy or under § 668.22, and repayments to the Secretary for debts and liabilities arising from the institution's participation in the title IV, HEA programs.

*Proposed Regulations:* We are not proposing any changes to the composite score requirements under § 668.172 or in appendices A and B of subpart L, the refund reserve standards under § 668.73, or the past performance requirements under § 668.174.

We propose to restructure § 668.171, in part, by adding a new paragraph (c) that provides that an institution is not able to meet its financial or administrative obligations if it is subject to one or more of the following actions or triggering events:

• *Any of the following lawsuits and other actions.*

*Claims and actions related to a Federal loan or educational services.* Currently or at any time during the three most recently completed award years, the institution is or was required to pay a material amount, or incurs a material liability, arising from an investigation or similar action initiated by a State, Federal, or other oversight entity, or settles or resolves for a material amount a suit by that entity based on claims related to the making of a Federal loan or the provision of educational services. An amount paid or settled is material if it exceeds the lesser of the threshold amount for which an audit is required under 2 CFR part 200, currently $750,000, or 10 percent of the institution's current assets. Or, the institution is being sued by one or more State, Federal, or other oversight entities based on claims related to the making of a Federal loan or provision of educational services for an amount that exceeds the lesser of the threshold amount for which an audit is required under 2 CFR part 200, currently $750,000, or 10 percent of the institution's current assets.

*Claims of any kind.* The institution is currently being sued by one or more State, Federal, or other oversight entities based on claims of any kind that are not related to a Federal loan or educational services, and the potential monetary sanctions or damages from that suit or suits are in an amount that exceeds 10 percent of its current assets.

*False claims and suits by private parties.* The institution is currently being sued in a lawsuit filed under the False Claims Act or by one or more private parties for claims that relate to the making of loans to students for enrollment at the institution or the provision of educational services if that suit (1) has survived a motion for summary judgment by the institution and has not been dismissed, and (2) seeks relief in an amount that exceeds 10 percent of the institution's current assets.

For suits relating to claims of any kind, suits filed under the False Claims Act, 31 U.S.C. 3729 *et seq.,* or suits by private parties, during the fiscal year for which the institution has not yet submitted its financial statements, the institution settled or resolved the suit, had a judgment entered against it, or incurred a liability for an amount that exceeds 10 percent of its current assets.

An institution would determine whether any of these suits or actions exceeded a materiality threshold by using the current assets reported in its most recent audited financial statements

submitted to the Department. Except for a suit by private parties, if a suit or action does not demand a specific amount of relief, the institution would calculate the potential amount of the relief by totaling the tuition and fees it received from every student who attended the institution during the period for which the relief is sought. In cases where no period is stated in the suit or action, the institution would total the tuition and fees it received from students who attended the institution during the three award years preceding the date that suit or action was filed or initiated.

• *Repayments to the Secretary.* Currently or at any time during the three most recently completed award years, the institution is or was required to repay the Secretary for losses from borrower defense claims in an amount that, for one or more of those years, exceeds the lesser of the threshold amount for which an audit is required under 2 CFR 200, currently $750,000, or 10 percent of the institution's current assets, as reported in the most recent audited financial statements.

• *Accrediting agency actions.* Currently or at any time during the three most recently completed award years, the institution's primary accrediting agency (1) required the institution to submit a teach-out plan, for a reason described in 34 CFR 602.24(c)(1), that covers the institution or any of its branches or additional locations, or (2) placed the institution on probation, show-cause, or similar status for failing to meet one or more of the agency's standards, and the accrediting agency does not notify the Secretary within six months of taking that action that the action is withdrawn because the institution has come into compliance with the agency's standards.

• *Loan agreements and obligations.* With regard to the creditor with the largest secured extension of credit, (1) the institution violated a provision or requirement in a loan agreement with that creditor, (2) the institution failed to make a payment in accordance with its debt obligations with that creditor for more than 120 days, or (3) as provided under the terms of the security or loan agreement, a default or delinquency event occurs or other events occur that trigger, or enable the creditor to require or impose, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanction penalty or fee. These actions would be disclosed in a note to the institution's audited financial statements or audit opinion, or reported to the Department by the institution.

• *Non-title IV revenue.* For its most recently completed fiscal year, a proprietary institution did not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds, as provided under § 668.28(c) (90/10 revenue test).

• *Publicly traded institutions.* As reported by the institution, or identified by the Secretary, (1) the Securities and Exchange Commission (SEC) warns the institution or its corporate parent that it may suspend trading on the institution's stock, or the institution's stock is delisted involuntarily from the exchange on which the stock was traded, (2) the institution disclosed or was required to disclose in a report filed with the SEC a judicial or administrative proceeding stemming from a complaint filed by a person or entity that is not part of a State or Federal action, (3) the institution failed to file timely a required annual or quarterly report with the SEC, or (4) the exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements.

• *Gainful employment (GE).* As determined by the Secretary each year, the number of students enrolled in GE programs that are failing or in the zone under the D/E rates measure in § 668.403(c) is more than 50 percent of the total number of title IV recipients enrolled in all the GE programs at the institution. However, an institution is exempt from this provision if fewer than 50 percent of students enrolled at the institution who receive title IV, HEA program funds are enrolled in GE programs.

• *Withdrawal of owner's equity.* For an institution whose composite score is less than 1.5, any withdrawal of owner's equity from the institution by any means, including by declaring a dividend.

• *Cohort default rates.* The institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of 34 CFR part 668. However, this provision does not apply if the institution files a challenge, request for adjustment, or appeal under that subpart with regard to its cohort default rate, and that action results in (1) reducing its default rate below 30 percent, or (2) the institution not losing its eligibility or being placed on provisional certification.

• *Other events or conditions.* The Secretary determines that an event or condition is reasonably likely to have an adverse impact on the financial condition, business, or results of operations of the institution. These

events or conditions would include but are not limited to whether:

• There is a significant fluctuation between consecutive award years, or over a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs, such as changes in award amounts or eligibility requirements;

• The institution is cited by a State licensing or authorizing agency for failing State or agency requirements;

• The institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient resources to absorb losses that may be incurred as a result of adverse conditions and continue to meet its financial obligations to the Secretary and students;

• The institution or corporate parent has a non-investment grade bond or credit rating;

• As calculated by the Secretary, the institution has high annual dropout rates; or

• Any event reported on a Form 8–K to the SEC.

In addition, we propose to add a new paragraph (d) under which an institution would notify the Secretary of any action or triggering event described above no later than 10 days after that action or event occurs. In that notice, the institution could show that certain actions or events are not material, or that those actions are resolved. Specifically, the institution would be permitted to demonstrate that:

• For a judicial or administrative proceeding the institution disclosed to the SEC, the proceeding does not constitute a material event;

• For a withdrawal of owner's equity, the withdrawal was used solely to meet tax liabilities of the institution or its owners for income derived from the institution; or, in the case where the composite score is calculated based on the consolidated financial statements of a group of institutions, the amount withdrawn from one institution in the group was transferred to another entity within that group;

• For a violation of a loan agreement, the creditor waived that violation. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation and continuing with the loan, the institution must identify and describe those constraints or requirements. In addition, if a default or delinquency event occurs or other events occur that trigger, or enable the creditor to require or impose, additional constraints or

penalties on the institution, the institution would be permitted to show why these actions would not have an adverse financial impact on the institution.

*Reasons:* As discussed under "Alternative standards and requirements," the Department seeks to identify, and take action regarding, material actions and events that are likely to have an adverse impact on the financial condition or operations of an institution. In addition to the current process where, for the most part, the Department determines annually whether an institution is financially responsible based on its audited financial statements, under these proposed regulations the Department may determine at the time a material action or event occurs that the institution is not financially responsible. The consequences of these actions and events threaten an institution's ability to (1) meet its current and future financial obligations, (2) continue as a going concern or continue to participate in the title IV, HEA programs, and (3) continue to deliver educational services. In addition, these actions and events call into question the institution's ability or commitment to provide the necessary resources to comply with title IV, HEA requirements.

Furthermore, we note that recent experiences with Corinthian, in which the Department ended up with no financial protection for either closed school or borrower defense claims, highlight the need to develop more effective ways to identify events or conditions that signal impending financial problems and secure financial protection while the institution has resources sufficient to provide that protection either by a letter of credit, or, by arranging a set-aside from current payables of Federal funds that could defray losses that may arise. Applying the routine tests under current regulations did not result in financial protection, because Corinthian appeared at the time it provided the Department with its audited financial statements to pass those tests. Only later—too late to secure financial protection—did further investigation reveal that Corinthian in fact had failed the financial tests in current regulations.[27] Based on that experience, we conclude that regulations must be revised to better identify signs, and to augment the Department's tools for detection, of

impending financial difficulties that could be taken into account and that would have required Corinthian to provide financial protection.

Most visible among these actions or triggering events are investigations of, and suits against, institutions by State, Federal, and other oversight agencies. For example, the FTC has investigated or filed suit against institutions for deceptive and unfair marketing practices.[28] The SEC has investigated institutions for inflating job placement rates.[29] The DOJ, CFPB, and various State AGs have investigated or filed suit against institutions for making false claims to the Federal and State governments as well as violations of consumer protection laws, false advertising and deceptive practices, and falsifying job placement rates.[30] Putting aside, but in no way diminishing, the harm inflicted on students by troubling practices that precipitated these agency actions, the debts or liabilities resulting from those actions may be substantial.

For suits that are settled or investigations that are otherwise resolved, we initially proposed during negotiated rulemaking to adopt as materiality thresholds those amounts included in the SEC disclosure rules for legal proceedings under 17 CFR 229.103, otherwise referred to as Item 103 of Regulation S–K. Under those regulations, an entity filing an annual or quarterly report on Form 10–K or 10–Q with the SEC must disclose information about (1) any administrative or judicial proceeding that involves a claim for damages that exceeds 10 percent of the entity's current assets, or (2) any environmental claim where a governmental authority is a party to the proceeding and the monetary sanctions are more than $100,000.

Some of the non-Federal negotiators argued that the $100,000 threshold could easily be exceeded by claims resolved in favor of a small number of students, and that outcome would have no bearing on the financial operations of most institutions. Those negotiators suggested that a more reasonable threshold would be the amount applicable to audits required of non-profit and public entities that expend

Federal funds. Under 2 CFR 200.501 of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Administrative Requirements), a non-Federal entity that expends more than $750,000 in Federal funds during its fiscal year must conduct an audit. We agreed, and propose in this NPRM to set the dollar threshold at the amount specified in the Uniform Administrative Requirements.

The non-Federal negotiators also argued that because the dollar threshold and the percentage threshold based on SEC disclosure requirements would apply to a suit based on claims that were not related to a Federal student aid activity or requirement (for example, a violation of copyright laws), the Federal protection that would otherwise be required under this circumstance is not warranted. We agreed, and propose in this NPRM to apply the dollar and percentage thresholds to those suits or actions that are based on claims related to the making of a Federal loan or the provision of educational services.

The publicity and information stemming from these suits and actions will make members of the public, and in particular currently enrolled and former students of the institution, aware or more aware of the alleged practices that gave rise to these suits and actions. As a result, we expect current and former students to be better informed and thus more likely to file borrower defense claims. Some students may file claims immediately after a suit or action is resolved, while others may take longer. In any case, because the institution is required to repay the Secretary for losses from borrower defense claims, the institution's liability does not end when it pays to resolve the suit or action; it continues as long as students file borrower defense claims based on the misconduct alleged and publicized in the suit. Consequently, if the amount paid by an institution to resolve the suit is material, it jeopardizes the institution's ability to meet not only its current financial obligations, but also future financial obligations stemming from borrower defense claims. For this reason, we propose that an institution is not financially responsible during the three-year period following the resolution if the amount the institution is required to pay is material—that is, it exceeds the lesser of the dollar or percentage thresholds. If the amount is not material, we believe it is unlikely that any resulting borrower defense claims will have an adverse impact on the institution.

---

[27] At that very time, in 2013, the State of California had already sued Corinthian for widespread fraud. *California v. Heald Coll.,* No. CGC–13–534793 (Sup. Ct. S.F. County, filed Oct. 10, 2013).

[28] See, *e.g., Fed. Trade Comm'n v. DeVry Educ. Group, Inc.,* C.A. No. 15–CF–00758 (S.D. Ind. Filed Jan. 17, 2016).

[29] See, *e.g., Sec. and Exch. Comm'n v. ITT Educ. Servs. Inc.,* C. A. No. 1:15–cv–00758–JMS–MJD (S.D. Ind. filed May 12, 2015).

[30] See, *e.g., U.S. et al. ex rel. Washington* v. *Educ. Mgmt. Corp.,* C.A. No. 2:07-cv–00461–TFM (W.D. Pa. filed Aug. 8, 2011); *Consumer Fin. Prot. Bureau v. Corinthian Colls., Inc.,* C.A. No. 1:14–cv–07194 (N.D. Ill., filed Oct. 27, 2015); *California v. Heald Coll.,* No. CGC–13–534793 (Sup. Ct. S.F. County, filed Oct. 10, 2013).

For a suit or action initiated by a State, Federal, or other oversight agency, or by an individual or relator,[31] where the potential monetary sanctions or damages sought exceed 10 percent of an institution's current assets, we propose that the institution is not considered to be financially responsible for any year in which that suit or action is pending or unresolved.[32]

Like a contingent liability, a pending material government or individual action (one seeking an amount greater than 10 percent of current assets) would pose a threat to an institution's ability to meet its current financial obligations, because when a suit or action is settled or resolved, the institution must satisfy the resulting liability using current assets. In other words, a significant amount of current assets (cash and liquid assets, such as securities and accounts receivable, that can readily be converted to cash) that an institution would otherwise need to use to pay for typical current liabilities (for instance, wages payable and accounts payable) would be used instead to pay for damages stemming from the suit. However, for several reasons, we propose to treat a pending material State, Federal, or individual action as a liability for filed against the institution. First, as previously noted in this discussion, State and Federal suits and actions aim to address serious violations and harmful practices and may lead to settlements or compensation for victimized students, with an attendant financial burden on the institution. Moreover, it is not uncommon for several State AGs to file suits or take actions against an institution for the same or similar reasons or for State AGs to join a Federal action. These combined efforts underscore the severity and magnitude of the misconduct the suits or actions seek to address. Second, the impact of a suit or action may hinder or prevent investors or creditors from providing needed funds to an institution and make it more expensive for the institution to raise or obtain additional funds. Also, to protect their investment or stake in the institution, creditors may condition or alter the terms of existing loan agreements or otherwise make it more difficult for the institution to obtain additional loans. Third, the institution will have to use or divert resources that would otherwise be used to carry out normal operations to defray the costs of defending the litigation or the costs of achieving compliance with the State or Federal requirements on which the actions were based. In addition, it is not uncommon for the Department to impose additional administrative requirements on an institution subject to a suit or action, which may further stress the institution's financial resources. So, due to the severity and likely success of suits by State and Federal agencies or other oversight entities, and to account for the costs and risks stemming from a pending suit, we believe that a potential liability in the amount considered material under this proposed regulation would threaten an institution's ability to meet its current and future financial obligations.

With regard to the threshold relating to current assets, we note that on May 9, 1973, the SEC published final regulations reducing its threshold for disclosures relating to legal proceedings from 15 percent to 10 percent of current assets, stating that the reduced percentage is a "more realistic test of materiality." 38 FR 12100, 12101

We are not proposing any changes to the composite score requirements under § 668.172 or in appendices A and B of subpart L, the refund reserve standards under § 668.73, or the past performance requirements under § 668.174. We believe that the current financial ratio regulations in subpart L of part 668 reflect the kind of consideration of the effect of the financial risks that judgments and other actions pose on the ability of an institution to continue operating if faced with the need to satisfy such claims. We therefore include a brief explanation of the way this has been taken into account to some extent in the current regulations. For title IV purposes, KPMG Peat Marwick developed the composite score methodology that is the key element for establishing the financial responsibility requirements under 34 CFR part 668, subpart L. That methodology uses three ratios, Primary Reserve, Equity, and Net Income, to evaluate the overall financial health of an institution. Under this methodology, strength factors based on a common scale are assigned to each ratio result, making it arithmetically possible to weight and add the results of each ratio together to arrive at a composite score. The strength factors and weights were designed to reflect the different governing, mission, and operating characteristics of for-profit and non-profit institutions, and to allow institutions to offset a poor performance under one ratio with a good performance under another ratio.

The first of these ratios, the Primary Reserve ratio is a measure of an institution's expendable or liquid resource base in relation to its operating size, so it is in effect a measure of the institution's margin against adversity. A for-profit institution with a Primary Reserve ratio of 0.05 earns a strength factor of 1.0 which means that the value of the institution's assets that can be converted to cash exceeds its liabilities by an amount equal to five percent of its total expenses. Expressed in days, the institution could continue operations at its current level for about 18 days (5 percent of 365 days) without additional revenue or support. 62 FR 62854 (November 25, 1997). A non-profit institution with the same strength factor score could continue operations at its current level for about 37 days without additional revenue or support. *Id.* At this strength factor level, institutions have a small amount of expendable capital and would have difficulty finding resources internally to handle large negative economic events. Table 1 below shows, for a range of Primary Reserve ratio results, the margin against adversity expressed both as percentage of expendable assets that exceed liabilities and the number of days an institution can continue operations.

---

[31] A person may bring a suit under the False Claims Act, 31 U.S.C. 3729 *et seq.*, on behalf of the United States against a party whom the relator claims submitted false claims to the government. The suit is referred to as a "qui tam" suit, and the person is referred to as a "relator."

[32] A party who submits false claims may be liable under the False Claims Act for treble the actual amount of the claim plus a penalty of at least $5000 per violation. 31 U.S.C. 3729(a)(1)

TABLE 1

| Primary reserve ratio result | Liquid assets exceed liabilities, as % of total expenses | Strength factor | Survive without additional support, # of days |
|---|---|---|---|
| **For-profit Institutions** | | | |
| 0.00 ............................................... | 0 | 0 | 0 |
| 0.25 ............................................... | 3 | 0.5 | 9 |
| 0.50 ............................................... | 5 | 1 | 18 |
| 0.75 ............................................... | 8 | 1.5 | 27 |
| 0.100 ............................................. | 10 | 2 | 37 |
| 0.125 ............................................. | 13 | 2.5 | 46 |
| 0.150 ............................................. | 15 | 3 | 55 |
| **Non-profit Institutions** | | | |
| 0.00 ............................................... | 0 | 0 | 0 |
| 0.05 ............................................... | 5 | 0.5 | 18 |
| 0.10 ............................................... | 10 | 1 | 37 |
| 0.15 ............................................... | 15 | 1.5 | 55 |
| 0.20 ............................................... | 20 | 2 | 73 |
| 0.25 ............................................... | 25 | 2.5 | 91 |
| 0.30 ............................................... | 30 | 3 | 110 |

As illustrated in Table 1, a for-profit institution with a Primary Reserve strength factor of less than 2.0, or a non-profit institution with a strength factor of less than 1.0, would generally not have resources that it could liquidate in the short term to cover current operations if it also had to pay damages or settle a suit for an amount that exceeds 10 percent of its expendable assets. However, the institution may have the ability to borrow the funds needed to cover operations and pay damages stemming from a suit. For that, we look to another component of the composite score, the Equity ratio.

The Equity ratio measures the amount of total resources that is financed by owners or the institution's investments, contributions, or accumulated earnings and how much of that amount is subject to claims of third parties. So, the Equity ratio captures an institution's overall capitalization structure and ability to borrow. The strength factors for the Equity ratio are the same for non-profit and for-profit institutions. A strength factor of zero means that that value of an institution's assets is equal to the value of its liabilities. For a for-profit institution, the absence of equity provides no evidence of owner commitment to the business because there are no accumulated earnings or invested amounts beyond the liabilities that are at risk. For a non-profit institution, the absence leaves there is little or no permanent endowment from which the institution could draw in extreme circumstances. At a strength factor of 1.0, an institution has about $8.33 of liabilities for every $10.00 of

assets. However, this small amount of equity still makes it difficult for the institution to borrow significant amounts of money at market rates. For a strength factor of 2.0, the institution has about $6.67 of liabilities for every $10.00 of assets. At this strength factor and higher levels where an increasing proportion of the institution's resources are not subject to claims of third parties, it is more likely that the institution will be able to borrow significant amounts of money at market rates.

The remaining ratio, Net Income, is a primary indicator of the underlying causes of a change in an institution's financial condition because it directly affects the resources reflected on the institution's balance sheet (continued gains and losses measured by the ratio will impact all other fundamental elements of financial health over time). This ratio helps to answer the question of whether an institution "operated within its means" during its most recent fiscal year. A strength factor of 1.0 for the Net Income ratio means that an institution broke even for the year—it did not incur operating losses or add to its wealth with operating gains or surpluses. In other words, the institution was able to cover its cash and non-cash expenses for the year, but no more. As the strength factor increases, the wealth and surpluses added by operating gains help to increase an institution's margin against adversity.

An institution is financially responsible under the composite score methodology if, after weighting, the strength factors for all of the ratios sum

to a score that is at least 1.5. For a for-profit institution, the weighting for each ratio is fairly equal—30 percent of the score is based on the Primary Reserve ratio, 40 percent on the Equity ratio, and 30 percent on the Net Income ratio. For a non-profit institution the weighting places less emphasis on the Net Income ratio at 20 percent, with the Primary Reserve and Equity ratios at 40 percent each. As noted previously, the weighting reflects the importance or significance of the operating characteristics in the two sectors.

In summary, a low strength factor for any of the three ratios indicates that an institution has little or no margin against adversity, and may not have the resources necessary to meet its operating needs. As one or more of the strength factors increase to 2.0 and above, the institution's margin against adversity improves through a combination of increases in expendable assets, equity, or operating gains. After accounting for the importance of each of the ratios, the composite score provides an overall measure of the financial health of an institution.

However, as shown in Table 1, the methodology contemplates that an institution would have expendable assets that exceed liabilities by at least 10 percent to earn a strength factor (1.0 for an non-profit, and 2.0 for a for-profit) for the Primary Reserve ratio that provides for a margin against adversity in keeping with the minimum passing composite score of 1.5. While a good performance under the Equity ratio may help an institution obtain resources to meet its operating and contingency

needs, or a good performance under the Net Income ratio may increase its wealth over time, the expendable assets reflected in the Primary Reserve ratio, which represents 30 percent to 40 percent of the composite score, are the first line of defense in dealing with an adverse situation, such as a lawsuit. That is, an institution would first seek to pay damages resulting from the suit out of expendable assets or current assets as they are referred to under the comparable SEC materiality threshold. Either way, paying damages out of liquid assets for an amount above 10 percent of expendable or current assets is likely to have an adverse impact on an institution's ability to meet its current and future financial obligations, particularly if the institution has little or no liquid assets.

With regard to a suit that is based on claims other than the making of a Federal loan or the provision of educational services, while that suit is pending an institution would not be financially responsible. If the institution settles or otherwise resolves that suit for an amount that exceeds 10 percent of its current assets, the institution would still not be considered financially responsible until it submits audited financial statements that cover the fiscal year in which the suit was settled or resolved. At that point, the Department would be able to evaluate the impact of the suit through the calculation of the institution's composite score. So, until the Department calculates the institution's composite score, the institution would be treated as if the suit was still pending.

In cases where a suit or action does not demand a specific amount as relief, we could allow an institution to estimate and use that amount in determining whether the suit or action would exceed the materiality thresholds. However, doing so would lead to inconsistent and widely differing estimates among institutions, or more concerning, estimates significantly lower than the potential damages. Consequently, we propose a uniform approach under which the estimates are based on the total amount of tuition and fees received by the institution for students enrolled at the institution during the period for which the relief is sought. If no period is stated, an institution would estimate the amount based on the total amount of tuition and fees received by the institution for the three award years preceding the date the suit or action was filed or initiated. However, we do not believe this approach is appropriate for private party actions that do not demand a specific amount of relief because the reasons for

those actions may impact a more limited group of students. We seek comment on this approach and on other approaches that provide a reasonable way to estimate the potential damages from suits and other actions.

With regard to repayments to the Secretary for losses to the Secretary from resolved borrower defense claims, an institution's ability to meet its current and future financial obligations is threatened whenever repayments for those losses rise to levels above the materiality thresholds, regardless of whether those repayments are related to or otherwise stem from the factual findings and theories resulting from an investigation or lawsuit initiated by the Department, a State or Federal agency, oversight entity, or some other party. Therefore, we propose to apply the dollar and percentage materiality thresholds to this triggering event.

To provide background on the proposed trigger relating to a teach-out plan, under 34 CFR 602.24(c)(1), an accrediting agency requires an institution to submit a teach-out plan whenever (1) the Secretary takes an emergency action or initiates a proceeding to limit, suspend, or terminate the institution's participation in the title IV, HEA programs, (2) the agency acts to withdraw, terminate, or suspend the accreditation or pre-accreditation of the institution, (3) the institution notifies the agency that it intends to cease operations entirely or close a location that provides 100 percent of at least one program, or (4) a State licensing or authorizing agency notifies the accrediting agency that it has or will revoke the institution's license or legal authorization to provide an educational program. Except for the closure of small locations, these actions jeopardize the institution's participation in the title IV, HEA programs. During the negotiated rulemaking sessions, some of the non-Federal negotiators noted that an institution may close a location that only a few students attended. In that case, the negotiators argued that some materiality threshold should apply because that closure would probably not have an adverse impact on the institution. Although those negotiators did not propose any specific thresholds, they suggested that thresholds based on the number of students enrolled or affected by the closure, or a dollar amount associated with those students, would be appropriate. We seek comment on whether the Department should adopt a threshold for this circumstance, and specifically seek comment on what that threshold should be.

With regard to a situation where an accrediting agency places an institution on probation, issues a show-cause order, or places an institution in a similar status, we view that action as calling into question the institution's ability to continue to provide educational services, and it may be a precursor to losing accreditation. Some of the non-Federal negotiators argued that because an institution may be placed on probation for a minor infraction or for a reason that could be readily resolved, the Department should not determine, or at least not determine immediately, that the institution is not financially responsible. In response, we suggested, and are proposing in this NPRM, that the Department would wait six months before making a determination to provide adequate time for an institution with a minor infraction to come into compliance with its accrediting agency standards. We also suggested during the negotiating sessions that we could accept an accrediting agency determination that an institution's failure to comply with agency standards within a six-month timeframe has not had and is not expected to have a material adverse financial impact on the institution, and that the agency anticipates the institution will come into compliance within a longer time frame set by the agency under 34 CFR 602.20. However, some of the non-Federal negotiators believed that an accrediting agency could not make this determination or make predictions about future compliance by an institution. We seek comment about whether or how we should provide a way for an accrediting agency to inform the Department why its action of placing an institution on probation will not have an adverse impact on the institution's financial or operating condition.

With regard to the triggers on loan agreements and obligations, some of the non-Federal negotiators believed that it was inappropriate to conclude that an institution is not financially responsible if it violates any loan agreement or fails to make a payment on a loan, regardless of the amount of or purpose for the loan or whether the loan was collateralized. In response we suggested, and are proposing in this NPRM, to apply this trigger when an institution violates a loan agreement with, or as currently provided under § 668.171(b)(3)(ii), fails to make a payment for more than 120 days to, the creditor with the largest secured extension of credit to the institution. We believe this proposal addresses the materiality concerns raised by the negotiators and speaks

directly to an institution's ability to meet its current financial obligations. However, the creditor may impose penalties or more restrictive requirements on the institution under the terms of its security or loan agreements that call into question the institution's ability to meet its current and future financial obligations. The Department is particularly concerned about identifying events in which the institution displays early indications of financial difficulty, and taking appropriate precautions as early as possible to protect the taxpayer. Lenders and creditors that provide financing to an institution under security and loan agreements typically monitor the institution's financial performance to ensure that it satisfies the loan requirements and are thus in the best position to identify contemporaneously any risks or problems that may hinder or prevent the institution from doing so. If these risks or problems arise, the creditor may impose penalties and additional restrictions on the institution, including increasing collateral or compensating balance requirements. For this reason, we propose to treat the imposition of penalties and additional requirements in loan agreements as a triggering event but, under the reporting requirements in proposed paragraph (d), we will allow the institution to demonstrate that these actions by the creditor will not have adverse impact on the institution.

With regard to the 90/10 revenue test, a for-profit institution that fails the test for a fiscal year is in danger of losing its eligibility to participate in the title IV, HEA programs if it fails again in the subsequent fiscal year. Therefore, we believe this is an appropriate trigger to include.

For a publicly traded institution, we are proposing as triggers four SEC-related actions that jeopardize the institution's ability to meet its financial obligations or continue as a going concern. First, we propose as a trigger an SEC warning to the institution that it may suspend trading on the institution's stock and take other action regarding the registration status of the company, pursuant to section 12(k) of the Securities Exchange Act, 15 U.S.C. 78l(k). The SEC does not make this warning public or announce that it is considering a suspension until it determines that the suspension is required to protect investors and the public interest.[33] In that event, the SEC posts the suspension and the grounds

for the suspension on its Web site. However, under the reporting requirements in proposed § 668.171(d), the institution would be required to notify the Department within 10 days of receiving such a warning from the SEC. The SEC may decide to suspend trading on the institution's stock based on (1) a lack of current, accurate, or adequate information about the institution, for example when the institution is not current in filing its periodic reports, (2) questions about the accuracy of publicly available information, including information in institutional press releases and reports and information about the institution's current operational status, financial condition, or business transactions, or (3) questions about trading in the stock, including trading by insiders, potential market manipulation, and the ability to clear and settle transactions in the stock.[34]

Second we propose that whenever the exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements, that notice is a triggering event. The major exchanges typically require institutions whose stock is listed to satisfy certain minimum requirements such as stock price, number of shareholders, and the level of shareholder's equity.[35] If a stock falls below the minimum price, other requirements are not met, or the institution fails to provide timely reports of its performance and operations in its Form 10–Q or 10–K filings with the SEC, the exchange may delist the institution's stock. Delisting is generally regarded as the first step toward Chapter 11 bankruptcy. However, before the exchange initiates a process to delist the stock, it notifies the institution and gives it several days to respond with a plan of the actions it intends to take to come into compliance with exchange requirements.

Third, as proposed, if an institution discloses or is required to disclose in a report filed with the SEC a judicial or administrative proceeding stemming from a complaint filed by a person or entity that is not part of a State or Federal action, that would be a triggering event. SEC rules require the institution to disclose litigation that is

material within the context of its disclosure obligations to investors. 17 CFR 229.103. We recognize that publicly traded institutions may, to comply unequivocally with this obligation, report litigation that they would not otherwise consider to be a material adverse event. As noted in the description of these proposed regulations above, an institution that makes such a disclosure of litigation in an SEC filing may explain in reporting that disclosure to the Department why that litigation or suit does not constitute a material adverse event that would pose an actual risk to its financial health.

Fourth, we propose to add as a trigger the institution's failure to file timely a required annual or quarterly report with the SEC. As noted previously in this discussion, the late filing of, or failure to file, a required SEC report may precipitate an adverse action by the SEC or a stock exchange. We seek comment on how we could more narrowly tailor these proposed triggers for publicly traded institutions to capture only those circumstances that could pose a risk to the institution's financial health.

The proposed GE trigger would apply to an institution at which the majority of its students who receive title IV, HEA assistance are enrolled in GE programs, and the majority of those GE students enroll in failing and zone programs. Since failing and zone programs are in danger of losing the title IV, HEA eligibility, the corresponding loss of revenue from those programs may jeopardize the institution's ability to continue as a going concern. In addition, because most of the GE students are enrolled in programs that have not enabled former graduates to earn enough to afford to pay their student loans, we question the institution's ability to provide adequate educational services. We seek comment on whether the majority of students that enroll in zone or failing GE programs is an appropriate threshold or whether and why we should adopt a different threshold.

The withdrawal of owner's equity is currently an event that an institution reports to the Department under the provisions of the zone alternative in § 668.175(d). An institution participates under the zone alternative if its composite score is between 1.0 and 1.5. We proposed at negotiated rulemaking and propose in this NPRM to relocate this provision to the general standards of financial responsibility under § 668.171. Under the general standards, this provision would become a trigger in cases where an institution's financial condition is already precarious and any

---

[33] See SEC Investor Bulletin: Trading Suspensions, available at *www.sec.gov/answers/tradingsuspension.htm.*

[34] Id.

[35] See, e.g., New York Stock Exchange Rule 801.00:

Suspension and Delisting: Securities admitted to the list may be suspended from dealings or removed from the list at any time that a company falls below certain quantitative and qualitative continued listing criteria. When a company falls below any criterion, the Exchange will review the appropriateness of continued listing.

Available at *http://nysemanual.nyse.com/lcm/sections/lcm-sections/chp_1_9/default.asp.*

withdrawal of funds from the institution would further jeopardize its ability to continue as a going concern or its continued participation in the title IV, HEA programs. However, as noted in the discussion of these proposed regulations above, an institution may show that the withdrawal of funds was for a legitimate purpose or that it has no impact on the institution's composite score.

With regard to the trigger for an institution whose cohort default rate is 30 percent or more for two consecutive years, the institution is in danger of losing its program eligibility in the subsequent year if its cohort default rate is again 30 percent or more. However, if the institution files a challenge, request for adjustment, or appeal under subpart N, we propose to wait until that challenge, request, or appeal is resolved before determining whether the institution violated the trigger. However, we seek comment on whether this trigger should apply to an institution whose cohort default rate is 30 percent or more for any one year because, under that circumstance, the institution is required by statute to develop a default prevention plan and submit it to the Secretary, indicating that Congress recognized the risk that such an institution could pose to borrowers and taxpayers and therefore warranted a plan for remediation after a single year of low performance.

As discussed during the negotiated rulemaking sessions, all of these actions and events would serve as "automatic triggers," meaning that an institution would not be financially responsible for at least one year based solely on the occurrence of that action or event, or for the triggers relating to an action by a State, Federal, or other oversight entity, including an accrediting agency, would not be financially responsible for a period of three years after an action by that agency. During negotiated rulemaking we also discussed, and we have proposed in this NPRM, other factors or conditions that the Secretary could consider in determining whether an institution is financially responsible. These factors and conditions, which we refer to as "discretionary triggers," are factors or conditions that could be reasonably likely to have an adverse impact on the financial condition, business, or results of operations of a particular institution. If the Secretary determines that any of these factors alone or in combination calls into question the financial capability of an institution, the Secretary notifies the institution of the reasons for that determination.

Two of the discretionary triggers, fluctuations in Direct Loan and Pell Grant funds and high dropout rates, stem from the statutory provisions for selecting institutions for program reviews in section 498a(a) of the HEA. 20 U.S.C. 1099c–1(a). Significant increases or decreases in the volume of Federal funds may signal rapid expansion or contraction of an institution's operations that may either cause or be driven by negative turns in the institution's financial condition or its ability to provide educational services. Similarly, high dropout rates may signal that an institution is employing high-pressure sales tactics or is not providing adequate educational services, either of which may indicate financial difficulties and result in enrolling students who will not benefit from the training offered and will drop out, leading to financial hardship and borrower default claims.

Another discretionary trigger deals with the oversight activities of a State authorizing or licensing agency, where a failure by an institution to comply with agency requirements could jeopardize its ability to operate, or provide educational programs, in that State.

Some non-Federal negotiators expressed support for the proposed use of a financial stress test that would be developed or adopted by the Department. Under the test, we would be able to assess or model an institution's ability to deal with an economic crisis or other adverse conditions. Like the composite score, the stress test could be used to assess whether, or to augment an analysis of whether, an institution is able to meet its financial obligations to students and the Secretary. An institution's bond or credit rating could be used in a similar way. During negotiated rulemaking we proposed, and propose in this NPRM, that an institution with a non-investment grade bond or credit rating[36] could be subject to additional scrutiny because any rating below investment grade indicates that the institution is likely to default on the debt for which that rating is issued.

The last discretionary trigger, any event reported by an institution to the SEC on a Form 8–K, is intended to capture events that are not included in the automatic triggers but may nevertheless have a significant adverse impact on business operations. For example, an institution must report to the SEC that a material definitive

agreement (a contract on which business operations are substantially dependent) was terminated.

Under the reporting requirements in proposed § 668.171(d), an institution would notify the Department of any action or event that constitutes an automatic or discretionary trigger no later than 10 days after that action or event occurs. Some of the non-Federal negotiators identified a few events that may not be material or would be resolved during the reporting period and argued that these events should not prompt any action by the Department. We agreed, and propose in this NPRM that, to keep the Department apprised, an institution would still be required to report those events but the institution may tell us in its notice why the action or event is not material or that it has been resolved. If we do not agree with the institution's assessment, the Department will notify the institution of the reasons for that determination.

*Alternative Standards and Requirements (§ 668.175)*

*Statute:* Under sections 437(c) and 464(g) of the HEA, if the Secretary discharges a borrower's liability on a loan due to the closure of an institution, false certification, or unpaid refund, the Secretary pursues a claim against the institution or settles the loan obligation pursuant to the financial responsibility standards described in section 498(c).

Section 498(c)(3) of the HEA provides that if an institution fails the composite score or other criteria established by the Secretary to determine whether the institution is financially responsible, the Secretary must determine that the institution is financially responsible if it provides third-party financial guarantees, such as performance bonds or letters of credit payable to the Secretary, for an amount that is not less than one-half of the annual potential liabilities of the institution to the Secretary for title IV, HEA funds, including liabilities for loan obligations discharged pursuant to section 437, and to students for refunds of institutional charges, including required refunds of title IV, HEA funds.

Under section 498(h) of the HEA, the Secretary may provisionally certify an institution's eligibility to participate in the title IV, HEA programs for not more than one year in the case of an institution seeking an initial certification, or for no more than three years for an institution that seeks to renew its certification, if, in the judgment of the Secretary, the institution is in an administrative or financial condition that may jeopardize its ability to perform its financial

---

[36] Generally, a bond rating lower than Baa3 (Moody's) or BBB − (Standard and Poor's, Fitch). *www.investopedia.com/exam-guide/series-7/debt-securities/bond-ratings.asp.*

responsibilities under a program participation agreement. If, prior to the end of a period of provisional certification, the Secretary determines that the institution is unable to meet its responsibilities under its program participation agreement, the Secretary may revoke the institution's provisional certification to participate in the title IV, HEA programs.

*Current Regulations:* Section 668.13(c) of the current regulations identifies the reasons and conditions for which the Secretary may provisionally certify an institution to participate in the title IV, HEA programs, including an institution's failure to meet the standards of financial responsibility under § 668.15 or subpart L of the general provisions regulations. Under § 668.13(c)(4), an institution may participate in the title IV, HEA programs under a provisional certification if the institution demonstrates to the Secretary's satisfaction that it (1) is capable of meeting the standards of participation in subpart B of the general provisions regulations within a specified period, and (2) is able to meet its responsibilities under its program participation agreement, including compliance with any additional conditions that the Secretary requires the institution to meet for the institution to participate under a provisional certification. If the Secretary determines that the institution is unable to meet its responsibilities under its provisional program participation agreement, the Secretary may revoke the institution's provisional certification as provided under § 668.13(d).

As provided under § 668.175, an institution that is not financially responsible under the general standards in § 668.171 may begin or continue to participate in the title IV, HEA programs only by qualifying under an alternative standard.

Under the zone alternative in § 668.175(d), a participating institution that is not financially responsible solely because its composite score is less than 1.5 may participate as a financially responsible institution for no more than three consecutive years, but the Secretary requires the institution to (1) make disbursements to students under the heightened cash monitoring or reimbursement payment methods described in § 668.162, and (2) provide timely information regarding any adverse oversight or financial event, including any withdrawal of owner's equity from the institution. In addition, the Secretary may require the institution to (1) submit its financial statement and compliance audits earlier than the date specified in § 668.23(a)(4), or (2) provide

information about its current operations and future plans.

Under the provisional certification alternative in § 668.175(f), an institution that is not financially responsible because it does not meet the general standards in § 668.171(b), or because of an audit opinion in § 668.171(d) or a condition of past performance in § 668.174(a), may participate under a provisional certification for no more than three consecutive years, if the institution (1) provides an irrevocable letter of credit, for an amount determined by the Secretary that is not less than 10 percent of the title IV, HEA program funds the institution received during its most recently completed fiscal year, (2) demonstrates that it was current in its debt payments and has met all of its financial obligations for its two most recent fiscal years, and (3) complies with the provisions under the zone alternative.

*Proposed Regulations:* We propose to relocate to proposed new § 668.171(c) two of the oversight and financial events that an institution currently reports to the Department under the zone alternative in § 668.175(d)(2)(ii)— actions by an accrediting agency and any withdrawal of owner's equity from the institution. In addition we propose to remove from § 668.175(d)(2) the two reporting events related to loan agreements and debt obligations.

Under the provisional certification alternative in § 668.175(f), we propose to add a new paragraph (4) that ties the amount of the financial protection that an institution must provide to the Secretary to an action or triggering event described in § 668.171(c). Specifically, under this alternative, an institution would be required to provide to the Secretary financial protection, such as an irrevocable letter of credit, for an amount that is:

• For a State or Federal action under § 668.171(c)(1)(i) or (ii), 10 percent or more, as determined by the Secretary, of the amount of Direct Loan Program funds received by the institution during its most recently completed fiscal year;

• For repayments to the Secretary for losses from borrower defense claims under § 668.171(c)(2), the greatest annual loss incurred by the Secretary during the three most recently completed award years to resolve those claims or the amount of losses incurred by the Secretary during the current award year, whichever is greater, plus a portion of the amount of any outstanding or pending claims based on the ratio of the total value of claims resolved in favor of borrowers during the three most recently completed award years to the total value of claims

resolved during the three most completed award years; and

• For any other action or triggering event described in § 668.171(c), or if the institution's composite score is less than 1.0, or the institution no longer qualifies under the zone alternative, 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year.

We propose to remove § 668.175(e) because the transition year alternative, which pertains to fiscal years beginning after July 1, 1997, and before June 30, 1998, is no longer applicable.

In addition, we propose to add a new paragraph (h) that provides for providing financial protection using a set-aside in lieu of cash or a letter of credit. If an institution does not provide cash or the letter of credit for the amount required to participate under the zone or provisional certification alternatives within 30 days of the Secretary's request, the Secretary would provide funds to the institution only under the reimbursement or heightened cash monitoring payment methods, and would withhold temporarily a portion of any reimbursement claim payable to the institution in an amount that ensures that by the end of a nine-month period, the total amount withheld equals the amount of cash or the letter of credit the institution would otherwise provide. The Secretary would maintain the amount of funds withheld under this offset arrangement in a temporary escrow account, would use the funds to satisfy the debt and liabilities owed to the Secretary that are not otherwise paid directly by the institution, and would return to the institution any funds not used for this purpose during the period for which the cash or letter of credit was required.

*Reasons:* The reportable items under the zone alternative were intended to alert the Department to adverse actions or events that could occur at any time, or fall outside the scope of activities that are typically included or disclosed in financial statements, and that could further degrade the financial health of an institution with little or no margin against adversity. As noted previously, the Department is taking a more contemporaneous and broader view of the actions or events that are likely to have an adverse impact on an institution, regardless of whether the institution is participating under the zone or another alternative. As such, the reportable events under the zone alternative relating to adverse actions by an accrediting agency or withdrawals of owner's equity fall naturally under the

scope of triggering events for the general standards of financial responsibility. With regard to removing the reporting requirements for loan agreements and debt obligations from the zone alternative, we note that while the provisions relating to loan agreements and debt obligations are currently part of the general standards, the Department typically relies on footnote disclosures in the financial statements to determine whether an institution violated those agreements or obligations. Because we would require under proposed § 668.171(d) that institutions report these violations no later than 10 days after they occur, there would be no need to maintain the same reporting under the zone alternative.

With regard to the proposed changes under the provisional certification alternative that tie the amount of the financial protection, such as a letter of credit, to an action or triggering event, as explained more fully under the discussion of the general standards in § 668.171, every cited action or event is material and, on its own, likely to have an adverse impact on the institution. So, while the Secretary retains the discretion to determine the amount of the financial protection for any action or event, we propose for most of the triggering events to set as a floor the longstanding minimum—10 percent of the amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year. To be clear, each of these triggering events would require a form of financial protection, such as a letter of credit, of at least 10 percent, so an institution with three triggering events would have to submit financial protection for at least 30 percent of its prior year title IV, HEA program funds.

For borrower defense claims, the amount of the financial protection is tied to the prior experience or history of an institution in having to reimburse the Secretary for losses stemming from those claims and the potential for future losses. As proposed, the Department would calculate the amount of the financial protection by looking at the three most recently completed award years and the current award year to determine the year in which the greatest Federal losses occurred, and adding to that amount an estimate for the amount of losses from any outstanding or pending claims. For example, the estimated loss for pending claims would be calculated by multiplying the percentage of prior claims resolved in the students' favor (say 75 percent) by the total amount of the pending claims (say $500,000), or $375,000. In the normal course, the Department would

first seek reimbursement from the institution before using the financial protection to recover losses from borrower defense claims.

For a State or Federal action under § 668.171(c)(1)(i) or (ii), the amount of the financial protection is based only on Direct Loan funds, instead of all title IV, HEA funds as for all of the other triggers, because the Federal protection sought is related directly to loan liabilities that could arise in the wake of a State or Federal agency suit against the institution.

With regard to the set-aside, the Department wishes to provide an alternative to an institution that, for costs or other reasons, is unable to provide a letter of credit, or cash equivalent to the amount of the letter of credit, within 30 days. However, while we acknowledge that obtaining a letter of credit could be costly and time consuming for some institutions, or obtaining a letter of credit collateralized by physical assets requiring valuation by a bank or creditor could take an extended time, we believe that the severity or potential consequences of the triggering events warrant the Department taking immediate steps to protect the Federal interest. Therefore, if an institution does not provide the letter of credit or cash within 30 days of the Secretary's request, the Department would initiate administrative offsets to implement the set-aside.

**Severability**

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 668.176 would make clear that, if any part of the proposed regulations for part 668, subpart L, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions proposed in this NPRM serves one or more important, related, but distinct, purposes. Each of the requirements provides value to students, prospective students, and their families, to the public, taxpayers, and the Government, and to institutions separate from, and in addition to, the value provided by the other requirements. To best serve these purposes, we would include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions.

**Debt Collection**

**How does the Secretary exercise discretion to compromise a debt or to suspend or terminate collection of a debt? (§ 30.70)**

*Statute:* Section 432(a) of the HEA authorizes the Secretary to enforce or compromise a claim under the FFEL Program; section 451(b) provides that Direct Loans are made under the same terms and conditions as FFEL Loans; and section 468(2) authorizes the Secretary to enforce or compromise a claim on a Perkins Loan. Section 452(j) of the General Education Provisions Act (GEPA) authorizes certain compromises under Department programs, and 31 U.S.C. 3711 authorizes a Federal agency to compromise or terminate collection of a debt, subject to certain conditions.

*Current Regulations:* The current regulation in § 30.70 was adopted in 1988 to describe the procedures and standards the Secretary follows to compromise, or suspend or terminate collection of, debts arising under programs administered by the Department. The HEA has, since 1965, authorized the Secretary to compromise—without dollar limitation—debts arising from title IV, HEA student loans. The Federal Claims Collection Act of 1966 (FCCA), now at 31 U.S.C. 3711, authorized Federal agencies to compromise, or suspend or terminate collection of, debts, subject to dollar limitations and compliance with the Federal Claims Collection Standards (FCCS), now at 31 CFR 900–904. As in effect in 1988 when the current regulation was adopted, the FCCA required agencies generally to obtain approval from the DOJ in order to resolve debts exceeding $20,000, unless DOJ were to prescribe a higher amount. No higher amount was prescribed, and the Department included that $20,000 dollar limit in § 30.70.

In 1988, section 452(j) of GEPA (20 U.S.C. 1234a(j)) was enacted to provide standards and procedures for certain compromises of debts arising under any program administered by the Department other than the Impact Aid Program or HEA programs. These provisions were also included in § 30.70(c), (d), and (e). However, in 1989, the Department adopted 34 CFR 81.36 to implement these same GEPA standards; that regulation supersedes current § 30.70(c), (d), and (e) to govern compromises of debts under certain Department programs. Compromises of debts under Department programs that do not fall under standards in § 81.36 would continue to be subject to the standards and dollar limits generally applicable to Department debts. In 1990,

in Public Law 101–552, Congress increased the size of debts that agencies may resolve without DOJ approval to $100,000; that change is not reflected in § 30.70. Finally, in 2008, Public Law 110–315 amended section 432 of the HEA to require the Department to provide DOJ an opportunity to review and comment on any proposed resolution of a claim arising under any of the title IV, HEA loan programs that exceed $1,000,000. That, too, is not reflected in current § 30.70.

*Proposed Regulations:* The proposed changes would revise § 30.70 to—
• Reflect the increased debt resolution authority ($100,000);
• Refer to § 81.36 to describe the authority and procedures for those compromises of claims that are subject to section 452(j) of GEPA;
• Clarify that the generally applicable $100,000 limit does not apply to resolution of claims arising under the FFEL Program, or under the Direct Loan Program or Perkins Loan Program; and include the requirement that the Department seek DOJ review of any proposed resolution of a claim exceeding $1,000,000 under any of those loan programs.

*Reasons:* The current regulations do not reflect a series of statutory changes that have expanded the Secretary's authority to compromise, or suspend or terminate the collection of, debts.

### Closed School Discharges (§§ 668.14, 673.33, 682.402, and 685.214)

*Statute:* Sections 437(c) and 464(g)(1) of the HEA provide for the discharge of a borrower's liability to repay a FFEL Loan or a Perkins Loan if the student is unable to complete the program in which the student was enrolled due to the closure of the school. The same benefit applies to Direct Loan borrowers under the parallel terms, conditions, and benefits provisions in section 455(a) of the HEA.

*Current Regulations:* Section 668.14(b)(31) provides that, as part of an institution's program participation agreement, the institution must submit a teach-out plan, if, among other conditions, the institution intends to close a location that provides 100 percent of at least one program offered by the institution or if the institution otherwise intends to cease operations. Sections 674.33(g), 682.402(d), and 685.214 describe the qualifications and procedures in the Perkins, FFEL, and Direct Loan Programs for a borrower to receive a closed school discharge.

*Proposed Regulations:* Proposed § 668.14(b)(32) would require, as part of its program participation agreement with the Department, a school to provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that would require the institution to submit a teach-out plan.

Proposed revisions to § 682.402(d)(6)(ii)(F) would require a guaranty agency that denies a closed school discharge request to inform the borrower of the opportunity for a review of the guaranty agency's decision by the Secretary, and explain how the borrower may request such a review. Proposed § 682.402(d)(6)(ii)(K) would describe the responsibilities of the guaranty agency and the Secretary if the borrower requests such a review.

Under current and proposed 682.402(d)(6)(ii)(H) and 685.214(f)(4), as well as under current §§ 674.33(g)(8)(v), if a FFEL or Direct Loan borrower fails to submit a completed closed school discharge application within 60 days of the notice of availability of relief, the guaranty agency or the Department resumes collection on the loan. However, proposed §§ 674.33(g)(8)(vi), 682.402(d)(6)(ii)(I), and 685.214(f)(5) would require the guaranty agency or the Department, upon resuming collection, to provide a Perkins, FFEL, or Direct Loan borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge.

Proposed §§ 674.33(g)(3)(iii), 682.402(d)(8)(iii), and 685.214(c)(2) would authorize the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a Perkins, FFEL, or Direct Loan borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed.

*Reasons:* Many borrowers eligible for a closed school discharge do not apply. The Department is concerned that borrowers are unaware of their possible eligibility for a closed school discharge because of insufficient outreach and information about available relief. In some instances, the closing school might inform borrowers of the option to complete their program through a teach-out, but fail to advise them of the option for a closed school discharge. Currently,

the Department sends identified eligible borrowers an application and an explanation of the qualifications and procedures to obtain a closed school discharge. Schools that close, or close a location, may also conduct teach-outs in accordance with their accreditor's standards. The proposed amendments to the program participation agreement regulations would provide such information to borrowers earlier in the process, and would help to ensure that the borrowers receive accurate and complete information with regard to their eligibility for a closed school discharge, as well as the consequences of receiving such a discharge.

Non-Federal negotiators cited cases in which schools that were closing or had closed failed to provide complete or accurate information to their students about their options. They described instances in which schools told students that, if the student received a closed school discharge, the credits that the student earned at the school would not be transferable to another school. While borrowers who receive a closed school discharge may be able to transfer the credits that they have earned, others may struggle to find another institution willing to accept those credits. Yet relying on the information provided to them, these borrowers often choose teach-outs rather than closed school discharges. Though teach-outs can be beneficial to borrowers in a closed school situation, a closed school discharge may be a better option for some students.

In the Perkins and Direct Loan Programs, closed school discharge determinations are generally made by the Department. The Department is the loan holder for all Direct Loans, and would become the loan holder for Perkins Loans held by a school that closes. In the FFEL Program, closed school discharge determinations are generally made by a guaranty agency. Under the current FFEL Program regulations, a borrower cannot request a review of a guaranty agency's determination of a borrower's eligibility for a closed school discharge. Proposed § 682.402(d)(6)(ii)(F) would provide for Departmental review of denied closed school discharge claims in the FFEL Program in order to provide an opportunity for a more complete review of their claims, comparable to that provided in current regulations for false certification claims.

The proposed amendments to the FFEL, Perkins, and Direct Loan regulations, which would require loan holders to send borrowers a second closed school application if a borrower fails to submit an application within 60

days of the date the first application was sent, are intended to provide another opportunity to encourage borrowers who may be eligible for the closed school discharge to apply.

The Department proposed during negotiated rulemaking that the Secretary allow closed school discharges to be granted without an application in all three loan programs if the borrower does not re-enroll in a title IV-eligible program within three years. We asserted that such borrowers can be assumed to not have completed their academic program through a teach-out or transfer, and have included these provisions in the proposed regulations. We also asserted that an application or discharge request in these cases should not be necessary. By amending the regulations to provide for more outreach, disclosure of a borrower's options in a teach-out situation, and review by the Secretary of guaranty agency determinations, we hope to increase the number of eligible borrowers who apply for and receive a closed school discharge.

### Death Discharges (§§ 674.61(a), 682.402(b)(2), 685.212(a), and 686.42(a))

*Statute:* Section 420N(d)(2) of the HEA provides for the Secretary to establish, through regulations, categories of extenuating circumstances under which a TEACH Grant recipient who is unable to satisfy all or part of the TEACH Grant service obligation may be excused from fulfilling that portion of the service obligation.

Section 437(a)(1) of the HEA provides for the discharge of a loan made under the FFEL Program if the borrower dies. In accordance with section 455(a)(1) of the HEA, this discharge provision also applies to loans made under the Direct Loan Program.

Section 464(c)(1)(F)(i) provides that the liability to repay a Perkins Loan is cancelled upon the death of the borrower.

*Current Regulations:* For the Perkins Loan Program, § 674.61(a) provides that an institution must discharge the unpaid balance on a Perkins Loan if the borrower dies. For the FFEL Program and the Direct Loan Program, §§ 682.402(b)(2) and 685.212(a)(1), respectively, provide for the discharge of a loan based on the death of the borrower or, in the case of a PLUS loan made to a parent, the death of the student on whose behalf the parent borrowed. For the TEACH Grant Program, § 686.42(a) specifies that the Secretary discharges a grant recipient's obligation to complete the agreement to serve if the grant recipient dies. For all of these programs, the current regulations specify that a death

discharge can be granted based on an original or certified copy of the borrower's, student's, or TEACH grant recipient's death certificate; an accurate and complete photocopy of the original or a certified copy of the death certificate; or, on a case-by-case basis, other reliable documentation of the individual's death.

*Proposed Regulations:* We propose to amend §§ 674.61(a), 682.402(b)(2), 685.212(a), and 686.42(a) to allow for death discharges to be granted based on an accurate and complete original or certified copy of a death certificate that is scanned and submitted electronically or sent by facsimile transmission, or verification of a borrower's, student's or TEACH Grant recipient's death through an authoritative Federal or State electronic database that is approved for use by the Secretary. The proposed regulations would also make minor changes to the current death discharge regulatory language to make it more consistent across the title IV, HEA programs.

*Reasons:* The proposed regulations would streamline the death discharge process and reduce administrative burden by allowing for death certificates to be submitted electronically or by facsimile transmission, and would further simplify the process in the future by allowing for death discharges to be granted based on verification of an individual's death through an authoritative Federal or State electronic database that the Secretary authorizes to be used for this purpose.

During the negotiations, a non-Federal negotiator asked if, under the proposed regulations, it would be permissible for a loan holder to automatically grant a death discharge based on verification of a borrower's or student's death in an approved State or Federal electronic database, without the loan holder having received a request for the death discharge from a family member. The Department responded that loan holders can only grant death discharges after being informed of the borrower's or student's death by a family member or other representative of the deceased individual, but that they can use the information in an approved electronic database as the necessary supporting documentation for doing so.

### Interest Capitalization (§§ 682.202(b)(1), 682.410(b)(4), and 682.405)

*Statute:* Section 428H(e)(2) of the HEA allows a FFEL Program lender to capitalize interest when the loan enters repayment, upon default, and upon the expiration of deferment and forbearance, but does not specifically

authorize the capitalization of interest when a defaulted loan is rehabilitated.

*Current Regulations:* The current FFEL Program regulations in §§ 682.202, 682.405, and 682.410 permit FFEL Program lenders to capitalize interest when the borrower enters or resumes repayment and requires a guaranty agency to capitalize interest when it pays the FFEL Program lender's default claim. However, these regulations do not specifically address whether a guaranty agency may capitalize interest when the borrower has rehabilitated a defaulted FFEL Loan or whether a FFEL Program lender may capitalize interest when purchasing a rehabilitated FFEL Loan from a guaranty agency.

*Proposed Regulations:* The proposed revisions to the above-referenced regulations would clarify that the only time that a guaranty agency may capitalize interest is when it pays the FFEL Program lender's default claim and, therefore, that capitalization by the guaranty agency when selling a rehabilitated FFEL Loan is not permitted. Similarly, the proposed regulations would clarify that capitalization by the FFEL Program lender when purchasing a rehabilitated FFEL Loan is not permitted. The proposed regulations would also clarify, through a conforming change, that, when a guaranty agency holds a defaulted FFEL Loan and the guaranty agency has suspended collection activity to give the borrower time to submit a closed school or false certification discharge application, capitalization is not permitted if collection on the loan resumes because the borrower does not return the appropriate form within the allotted timeframe.

*Reasons:* Currently, some guaranty agencies and FFEL Program lenders capitalize interest when the borrower rehabilitates the loan, while others do not. Also, some guaranty agencies capitalize interest when resuming collection on a defaulted FFEL Loan when a borrower has not submitted a closed school or false certification discharge with a specific timeframe. The Department does not believe that interest capitalization in either circumstance is warranted, and the Department does not capitalize interest on loans that it holds in comparable circumstances. Further, the Department believes that FFEL Program lenders, in the case of a rehabilitated FFEL Loan, have sufficient tools at their disposal to ensure that a rehabilitated loan that has an outstanding interest balance is repaid in full by the end of the applicable repayment period or, in the case of the income-based repayment plan, forgiven.

**Loan Repayment Rate Warnings and Financial Protection Disclosures (§ 668.41)**

*Statute:* Under 20 U.S.C. 1221–3 and 3474, the Secretary is authorized to adopt such regulations as needed for the proper administration of programs.

*Current Regulations:* Current § 668.41 requires institutions to make certain general disclosures of information to enrolled and prospective students, including availability of financial assistance, detailed institutional information, retention rate, completion and graduation rates, and placement of and types of employment obtained by graduates. Section 668.41 further requires specialized disclosures related to the "Annual Security Report and Annual Fire Safety Report," the "Report on Completion or Graduation Rates for Student-Athletes," and the "Report on Athletic Program Participation Rates and Financial Support Data."

**Proposed Regulations**

**Proprietary Institution Loan Repayment Warning**

Proposed § 668.41(h) would expand the reporting and disclosure requirements under § 668.41 to provide that, for any fiscal year in which an affected postsecondary institution has a loan repayment rate that is less than or equal to zero, the institution must deliver a Department-issued plain language warning to prospective and enrolled students and place the warning on its Web site and in all promotional materials and advertisements. In accordance with proposed § 668.41(h)(6), the Department would not calculate a repayment rate for an institution whose cohort is based on fewer than 10 borrowers. An institution with 10 or more borrowers that receives a failing repayment rate will have the opportunity to appeal its rate if the institution demonstrates that it has a low participation rate under the Direct Loan program by applying, with slight modifications, the participation rate index calculation described in § 668.214(b)(1) that institutions may use to appeal a loss of eligibility due to high cohort default rates or placement on provisional certification. Consistent with the existing process, in calculating the participation rate index for the purposes of proposed § 668.41(h)(6), the institution would divide the number of students receiving a Direct Loan to attend the institution during a period of enrollment that overlaps any part of a 12-month period that ended during the six months immediately preceding the fiscal year for which the Department calculated the loan repayment rate, by

the number of regular students enrolled at the institution on at least a half-time basis during any part of the same 12-month period. The resulting percentage would then be multiplied by 30 percent to yield a participation rate. A figure of 30 percent is used because that is the minimum cohort default rate that could precipitate a participation rate challenge. A participation rate equal to or less than 0.0625 for a fiscal year in which the Department has calculated a loan repayment rate would exempt the institution from having to deliver a loan repayment warning under proposed § 668.41(h).

Under proposed § 668.41(h)(3), for each fiscal year, the Secretary would calculate the loan repayment rate for a proprietary institution based on the cohort of borrowers whose Direct Loans entered repayment at any time during the fifth fiscal year prior to the most recently completed fiscal year. The percentage change between what we refer to as the "original outstanding balance (OOB)" (the amount owed, as defined more specifically in proposed § 668.41(h)(2)(ii), when the borrower enters repayment, including any accrued interest) and the "current outstanding balance" (including principal and both capitalized and uncapitalized interest) as of the end of the prior fiscal year for each borrower in the cohort would be calculated and expressed as a percentage reduction of, or increase in, the OOB. For any loan reported as being in default status at any time during the "measurement period" and where there is a percentage reduction of the original balance, the difference between the OOB and COB would be considered to be zero; and for any loan that defaulted and had a percentage increase from the original balance, the difference between the OOB and COB would be that percentage increase. "Measurement period" is defined in proposed § 668.41(h)(2)(iv) as the period of time between the date a borrower's loan enters repayment and the end of the fiscal year for which the current outstanding balance of that loan is determined. The OOB of a loan does not include PLUS loans made to parent borrowers, Perkins loans, or TEACH Grant-related loans. For consolidation loans, the OOB includes only those loans attributable to the borrower's enrollment in the institution. A median value is then determined on a scale where percentage reductions in original outstanding balance are positive values and percentage increases in original balance are negative values. The median value for all included borrowers at an

institution is the institution's loan repayment rate for that year.

Proposed § 668.41(h)(4) would provide certain exclusions from the above calculation. The Secretary would exclude a borrower from the calculation if one or more of the borrower's loans were in a military deferment status during the last fiscal year of the measurement period; one or more of the borrower's loans are either under consideration by the Secretary, or have been approved, for discharge on the basis of the borrower's total and permanent disability under § 682.402 or § 685.213; the borrower was enrolled in an institution during the last fiscal year of the measurement period; or the borrower died.

In proposed § 668.41(h)(5), we describe the process by which the Department would notify an institution of its loan repayment rate, and provide the institution an opportunity to challenge that rate. Specifically, the Department would provide to each institution a list of students in the cohort as determined under proposed § 668.41(h)(3), the draft repayment rate for that cohort, and the information used to calculate the draft rate. The institution would have 45 days to challenge the accuracy of the information used to calculate the draft rate. After considering any challenges to the draft rate made by the institution, the Department would notify the institution of its final repayment rate and whether the institution must deliver a loan repayment warning to students.

*Financial Protection Disclosure*

Under proposed § 668.41(i), institutions that are required to provide financial protection, including an irrevocable letter of credit or cash under proposed § 668.175(d) or (f), or set-aside under proposed § 668.175(h), would have to disclose that status, which would include information about why the institution is required to provide financial protection, to both enrolled and prospective students until released from the obligation to provide financial protection by the Department.

*Disclosures to Students*

Under proposed § 668.41(h)(7), an institution that is subject to the loan repayment warning must provide that warning to prospective and enrolled students and place the warning on its Web site and in all advertising and promotional materials in a form and manner prescribed by the Department in a notice published in the **Federal Register**. Prior to publishing the notice, the Department would conduct

consumer testing to improve the effectiveness of the warning language.

Under proposed § 668.41(h)(7), an affected institution would be required to provide the loan repayment warning to both enrolled and prospective students by hand delivering the warning as part of a separate document to the student individually or as part of a group presentation. Alternatively, an institution could send the warning to a student's primary email address or by another electronic communication method used by the institution for communicating with the student. In all cases, proposed § 668.41(h)(7) would require the institution to ensure that the warning is the only substantive content in the message, unless the Secretary specifies additional, contextual language to be included in the message. Institutions would be required to provide a prospective student with the warning before the student enrolls, registers, or enters into a financial obligation with the institution.

Proposed § 668.41(h)(8) would also require that all promotional and advertising materials prominently include the warning. Promotional materials include, but are not limited to, an institution's Web site, catalogs, invitations, flyers, billboards, and advertising on or through radio, television, print media, social media, or the Internet. Proposed § 668.41(h)(8) would further require that all promotional materials, including printed materials, about an institution be accurate and current at the time they are published, approved by a State agency, or broadcast.

Finally, an institution would, under proposed § 668.41(h)(9), be required to post the warning on the home page of the institution's Web site, in a simple and meaningful manner, within 30 days of the date the institution is informed by the Department of its final loan repayment rate. The warning must remain posted to the institution's Web site until the Department notifies the institution that it is no longer under a requirement to do so as a result of having a loan repayment rate greater than zero percent.

Under proposed § 668.41(i), an affected institution would be required to provide the financial protection disclosure to enrolled and prospective students in the manner described in proposed § 668.41(h)(7). An affected institution would also be required to post the disclosure on the home page of the institution's Web site in the manner described in proposed § 668.41(h)(9) no later than 30 days after the date on which the Secretary informs the institution of the need to provide

financial protection, until such time as the Secretary releases the institution from the requirement that it provide financial protection.

*Reasons:* In deciding to enroll or continue attendance at any institution of higher education, students are making a substantial personal commitment that may mean incurring considerable amounts of student loan debt. Such a decision should, to the greatest extent possible, be an informed one. We believe that the warning related to loan repayment under proposed § 668.41(h) and the financial protection disclosure under § 668.41(i) would provide students with important information in making their educational and financial decisions.

Loan Repayment Rate

The loan repayment rate warning would provide enrolled and prospective students with valuable information about the repayment outcomes associated with the Federal student loan debt incurred by students who attend a proprietary institution. Zero percent or negative loan repayment rates indicate that borrowers at the institution are likely to have experienced financial distress as they attempted to repay their loans and may continue to experience difficulty. Loans in negative amortization status are viewed with concern.[37] Students who borrow to attend institutions should reasonably expect to be in a financial position that enables them to pay down their loans after leaving. Warning students of institutions with particularly low—zero percent or negative—repayment rates will give them critical information on which to base enrollment and borrowing decisions.

Based on internal analysis of data from the National Student Loan Data System (NSLDS), the typical borrower in negative amortization—more than half of those who have made no or negative repayment progress five years after leaving school—experienced long-term repayment hardship such as default. Those borrowers are especially unlikely to satisfy their loan debt in the long-term.[38][39] In particular, we believe

[37] Looney, Adam and Constantine Yannelis. "A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Loan Defaults." Brookings Institution: *http://www.brookings.edu/~/media/projects/bpea/fall-2015/pdflooneytextfallbpea.pdf.*

[38] Borrowers in negative amortization would be considered to have a "negative repayment rate" under the proposed regulations.

[39] Analysis of NSLDS data was based on a statistical sample of three cohorts of borrowers with FFEL Loans and Direct Loans entering repayment in 1999, 2004, and 2009, respectively. The

that it strikes an appropriate balance to measure repayment rates after five years, given that those data show that a substantial proportion of borrowers whose loans are in negative amortization five years after entering repayment remain in negative amortization or have defaulted on their loans 10 and even 15 years after entering repayment.

Several non-Federal negotiators expressed concerns about the additional administrative burden that would be associated with the proposed regulations. Several non-Federal negotiators argued that both the opportunity to review and correct data calculated by the Department, as well as the obligation to ensure the warnings are properly provided to all prospective and enrolled students, would add significant burden for those institutions. Some of those negotiators suggested that institutions should be able to satisfy the warning requirement by providing a link from the institution's Web site to the College Scorecard. Others recommended that the Department be responsible for the dissemination of loan repayment rates and associated warnings, perhaps through the Free Application for Federal Student Aid (FAFSA). Still others proposed the Department explore ways to limit the warning requirement only to those institutions that contribute most to negative repayment outcomes.

In response to suggestions that the Department assume responsibility for disseminating loan repayment rates, we believe that schools, as the primary and on-the-ground communicators with their students and the source of much of the information students receive about financial aid, are well placed to reach their students and to notify them of the potential risks of borrowing at that institution.

Nonetheless, we recognize the potentially increased administrative responsibilities attendant to the proposed requirement and agree with the negotiators who suggested minimizing administrative burden by applying this requirement only to the sector of institutions where the frequency of poor repayment outcomes is greatest. Analysis of repayment performance under the proposed methodology shows that zero and negative repayment outcomes are endemic to the proprietary sector, but are relatively rare in the public and non-

repayment statuses of the loans were tracked in five-year intervals at five, ten, and fifteen years after entry into repayment, depending on the age of the cohort.

profit sectors.[40] Proprietary institutions are far more likely to have poor repayment rates, along with lower post-college earnings and higher default rates, than public or non-profit institutions, and therefore pose the greatest risk to students and taxpayers.[41][42] For instance, a preliminary Department analysis of the College Scorecard five-year undergraduate repayment rates (using a comparable threshold of 50 percent of borrowers or fewer making progress on their loans) shows that more than 70 percent of institutions with a repayment rate below the threshold are proprietary institutions, and those institutions represent more than two in five of all proprietary institutions. On the other hand, at both public and private nonprofit institutions, fewer than 10 percent of institutions had repayment rates below the threshold.[43] Based on this analysis, the financial risk to students is far more severe in the proprietary sector; so we propose to limit the burden of the warning requirement only to those institutions. Accordingly, the proposed warning requirement is tailored to address the sector in which these issues are most concentrated. By doing so, we would limit burden on postsecondary institutions generally and better target the Department's efforts to provide valuable consumer information.

Several non-Federal negotiators also expressed concerns about the methodology for calculating the repayment rate. One negotiator, commenting on how the cohorts for this proposed repayment rate are determined, objected to the use of a five-

year horizon on the grounds that students progressing directly to graduate study following completion of an undergraduate degree may be shortly out of school and in forbearance or otherwise have accrued interest at the time of the calculation. Another negotiator expressed concerns that the proposed new methodology would be overly punitive toward institutions with historically underserved student populations, and that disclosure of resulting loan repayment rates would, to an unfair degree, reflect negatively on them.

While we appreciate the concerns and suggestions raised by negotiators, we maintain that the loan repayment rate methodology in proposed § 668.41(h)(3) results in a rate that would provide useful new information. Specifically, this rate would effectively identify the proprietary institutions that are generating zero or negative repayment outcomes and that should be providing warnings to students as they are assessing the likelihood of their ability to repay the loan debt they may incur for enrollment at a particular institution, based on the outcomes of former students who have already entered repayment. Other repayment rate methodologies, such as those used for the disclosures required under the Gainful Employment rule and College Scorecard, calculate the share of borrowers who have reduced their principal balance by at least one dollar. The rate proposed in this regulation would measure the extent to which students repaid their loans, identifying those proprietary institutions at which students are least likely to repay their loans in full. Moreover, the Department will look for ways to harmonize the multiple repayment rate methodologies, contingent on consumer testing and user needs.

We recognize that not all institutions present similar risk. Therefore, institutions with low numbers of borrowers and low borrowing rates are accordingly exempted from the proposed warning requirement. As discussed above, proposed § 668.41(h)(6) would exempt an institution from the warning requirement if its repayment rate is based on fewer than 10 borrowers who have entered repayment in the fiscal year; or if the institution demonstrates that it has a low participation rate under the Direct Loan program. The exemption for a repayment rate calculation based on fewer than 10 borrowers reflects the concern that individuals comprising so small a cohort might be able to be identified, potentially compromising the privacy of those individuals. We

propose the low participation rate exemption in recognition that, if the number of students who borrow Direct Loans constitutes a small percentage of the institution's students, in some cases due to the institution's low tuition costs, the loan repayment outcomes of those students may not provide a full picture of student experiences at the institution.

Under the proposed calculation, borrowers who default at any point during the measurement period on their loans and who see a percentage reduction in their loan balances are treated as "zero" for the purposes of the repayment rate; borrowers who default and see a percentage increase in their loan balances are counted by the actual percentage increase. Given the significant impact that defaulting has on borrowers' financial circumstances, this provision is designed to ensure that institutions are held accountable for, and appropriate weight is placed on, those students' loan repayment outcomes.

In addressing the negotiators' concerns related to basing the cohort on a five-year horizon beyond the fiscal year when borrowers entered repayment, and the possibility that some students may still be enrolled in or have recently separated from school, we note that borrowers who are enrolled in an institution (either the same or another institution) at any time during the last fiscal year of the measurement period are excluded from the calculation. Even those students recently out of school and remaining in a forbearance status (having made no payments on their loans) would not be included unless their loans went into repayment at some time during the fifth prior fiscal year. We also believe that the other exceptions included in proposed § 668.41(h)(4) strengthen the accuracy of the rate.

Regarding concerns that proposed § 668.41(h) would unfairly target institutions whose enrollment is largely composed of underserved or economically disadvantaged populations, the Department holds that the requirement would not identify institutions on the basis that they enroll large numbers of underserved or economically disadvantaged populations. Rather, it would identify institutions at which borrowers on average are unable to repay their loans and accordingly pose a disproportionate risk to both students and taxpayers. Borrowers are responsible for managing debt payments, which begin shortly after they complete a program, even in the early stages of their career, and even if they come from economically disadvantaged backgrounds. As the U.S.

---

[40] Analysis of NSLDS data was based on a cohort of borrowers with FFEL Loans and Direct Loans who entered repayment in 2009. The repayment status of loans taken out for attendance at each institution was observed five years after entry into repayment.

[41] The For-Profit Postsecondary School Sector: Nimble Critters Or Agile Predators? *www.nber.org/papers/w17710.pdf*; and Miller, Ben and Antoinette Flores. September 2015. Initial Analysis of College Scorecard Earnings and Repayment Data. *www.americanprogress.org/issues/higher-education/news/2015/09/17/121485/initial-analysis-of-college-scorecard-earnings-and-repayment-data/*.

[42] Looney, Adam and Constantine Yannelis. "A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Loan Defaults." Brookings Institution: *http://www.brookings.edu/~/media/projects/bpea/fall-2015/pdflooneytextfallbpea.pdf*.

[43] Analysis of the Department's College Scorecard data was based on a combined cohort of borrowers with FFEL Loans and Direct Loans who entered repayment in 2008 and 2009. At schools where fewer than 50 percent of borrowers have repaid at least $1 on their loans (as is calculated using the Scorecard methodology), the median borrower has repaid nothing on his loans.

District Court for the District of Columbia stated in *Association of Private Sector Colleges & Universities* v. *Duncan,* 110 F.Supp.3d 176, 194 (D.D.C. June 23, 2015), "[W]hen graduates get low-paying jobs and then default on their student loans, nobody wins—not the government (which picks up the tab), and not the student (who may get back on her feet eventually, but who—in the meantime—may be denied credit, miss bill due dates, or even file for bankruptcy)." Indeed, the Department believes it is even more important to warn students from disadvantaged populations about the poor repayment outcomes of an institution at which they are considering enrolling because they will bear the same responsibility for managing their debt as everybody else.

One negotiator expressed concerns over the intended scope of the term "promotional materials" as now defined in proposed § 668.41(h)(8), pointing out that, at some large institutions, it would be difficult to put reasonable parameters around what might be considered promotional material. Other negotiators felt that the speed with which information about their institutions can be spread using social media, and the potential scale of dissemination, would make it impossible for them to ensure compliance with the proposed regulations.

Proposed § 668.41(h)(8)(ii) identifies the most commonly used methods to promote and advertise an institution, with the qualification that this list is not exhaustive and promotional materials are not limited to items on the list. We expect institutions to include the required warning in such other comparable media and formats in which they promote and advertise themselves. We invite comment on ways the Department can ensure that this warning, when included in promotional and advertising materials, is not hidden or presented in a way that makes it difficult for the public to see. Regarding the inclusion of social media as promotional material, we acknowledge the concerns related to potential burden and scope expressed by negotiators. To that end, we clarify here that it is not our intention for every "post" on a social media site or every individual "Tweet" to be considered promotional material. However, an institution's landing page on a social media platform is considered to be promotional material, as are any advertisements. On any social media profile/page that an institution maintains on such a platform, the institution would be required to include the warning.

## Financial Protection

The proposed financial protection disclosure would provide enrolled and prospective students with valuable information about the viability of the institution as a participant in the Federal financial aid programs. Under proposed § 668.175(d), (f), or (h), some institutions would be required to provide financial protection, such as an irrevocable letter of credit, if the institution is not financially responsible because of an action or event described in proposed § 668.171(b) or (c). We believe that current and prospective students have a demonstrable interest in being made aware of the specific reasons for which their institution was required to provide any financial protection because these are factors that could have a significant impact on a student's ability to complete his or her education at an institution. For the thousands of students in recent years whose institutions have closed their doors precipitously, advance notice that those institutions faced significant financial risk and compliance issues could have allowed students time to reevaluate their decision to remain at an institution and choose to instead continue their education without interruption at an institution where the prospects for completing their education are more certain. We also believe that students are entitled to know about any such event that is significant enough to warrant disclosure to investors since students can have an equal, if not greater, financial stake in the continued operation of their institution.

## Method of Delivery

These provisions are designed to ensure that students receive any required loan repayment rate warning or financial protection disclosure. The information we propose to require in the loan repayment rate warning and financial protection disclosure pertains to material and deeply concerning problems at an institution that create significant risk to the educational prospects of students enrolling or already enrolled at that institution. Students deserve to know information that could have a significant impact on or relate to their chances of success.

In addition to our interest in ensuring that students have accurate and complete information on which to base decisions about attending an institution, the Department has a significant interest in ensuring transparency more broadly. Recent events involving the closure of several large proprietary institutions have shown the need for lawmakers, regulatory bodies, State authorizers,

taxpayers, and students to be more broadly aware of circumstances that could affect the continued existence of an institution. Though these additional disclosure requirements are not a singular remedy for this problem, we believe them to be an important step toward creating a more transparent environment in which institutions participate in the title IV, HEA programs.

Some negotiators objected to the lack of specificity with respect to the wording of the proposed warning. Our intent, however, is to build a certain amount of flexibility into the proposed regulations to ensure that the warning is as meaningful as possible to its intended audience. Accordingly, under proposed § 668.41(h)(7)(i), the Department would conduct consumer testing to help improve the effectiveness of the warning language. Upon completion of consumer testing, the final language would be published in the **Federal Register**. For illustrative purposes, we include examples of possible repayment rate warning language below:

- U.S. Department of Education Warning: A majority of borrowers at this school are not likely to repay their loans.
- U.S. Department of Education Warning: A majority of borrowers at this school have difficulty repaying their loans.
- U.S. Department of Education Warning: Most of the students who attended this school owe more on their student loans five years after leaving school than they originally borrowed.

During negotiated rulemaking, the Department proposed requiring institutions to deliver any loan repayment rate warning or financial protection disclosure to prospective students at the first contact with those students. Negotiators requested clarification of what is considered "first contact," believing it to be particularly difficult to establish at large institutions with which potential students regularly interact prior to enrolling. We agree with the negotiators that, in many cases, a point of first contact between an institution and a student may not be easy to isolate. Accordingly, we propose in § 668.41(h)(7)(iii) to state that an institution must provide the warning or disclosure required under this section to a prospective student before that student enrolls, registers, or enters into a financial obligation with the institution.

## Initial and Final Decisions (§ 668.90)

*Statute:* Section 498(d) of the HEA provides that the Secretary is authorized to consider the past performance of an

institution or of a person in control of an institution, in determining whether an institution has the financial capability to participate in the title IV, HEA programs. Section 487(c)(1)(F) of the HEA, 20 U.S.C. 1094(c)(1)(F), provides that the Secretary shall prescribe such regulations as may be necessary to provide for the limitation, suspension, or termination of the participation of an eligible institution in any program under title IV of the HEA.

*Current Regulations:* When the Department proposes to limit, suspend, or terminate a fully certified institution's participation in a title IV, HEA program, the institution is entitled to a hearing before a hearing official under § 668.90. In addition to describing the procedures for issuing initial and final decisions, § 668.90 also provides requirements for hearing officials in making initial and final decisions in specific circumstances.

These regulations generally provide that the hearing official determines whether an adverse action—a fine, limitation, suspension, or termination— is "warranted," but direct that in specific instances, the sanction must be imposed if certain predicate conditions are proven. For instance, in an action involving a failure to provide a surety in the amount specified by the Secretary under § 668.15, the hearing official is required to consider the surety amount demanded to be "appropriate," unless the institution can demonstrate that the amount was "unreasonable."

Further, § 668.90(a)(3)(v) states that, in a termination action brought on the grounds that the institution is not financially responsible under § 668.15(d) are met. Section 668.15(c)(1) provides that an institution is not financially responsible if a person with substantial control over that institution exercises or exercised substantial control over another institution or third-party servicer that owes a liability to the Secretary for a violation of any title IV, HEA program requirements, and that liability is not being repaid. Section 668.15(d)(4) provides that the Secretary can nevertheless consider the first institution to be financially responsible if the person at issue has repaid a portion of the liability or the liability is being repaid by others, or the institution demonstrates that the person at issue in fact currently lacks that ability to control or lacked that ability as to the debtor institution.

*Proposed Regulations:* The Secretary proposes to amend § 668.90(a)(3)(iii) by substituting the terms "letter of credit or other financial protection" for "surety" in describing what an institution must provide to demonstrate financial responsibility. Additionally, § 668.90(a)(3)(iii) would be modified to require the hearing official to uphold the amount of the letter of credit or financial protection demanded by the Secretary, unless the institution demonstrates that the events or conditions on which the demand is based no longer exist or have been resolved in a manner that eliminates the risk they posed to the institution's ability to meet its financial obligations, or has now provided the required financial protection. We propose to further modify § 668.90(a)(3)(v) to list the specific circumstances in which a hearing official may find that a termination or limitation action brought for a failure of financial responsibility for an institution's past performance failure under § 668.174(a), or a failure of a past performance condition for persons affiliated with an institution under § 668.174(b)(1), was not warranted. For the former, revised § 668.90(a)(3)(v) would state that these circumstances would be compliant with the provisional certification and financial protection alternative in § 668.175(f). For the latter, the circumstances would be those provided in § 668.174(b)(2) or § 668.175(g).

*Reasons:* The proposed changes to § 668.90(a)(3)(iii) would update the regulations to reflect both the current language in § 668.175 and proposed changes to that section. The changes would also create specific conditions under which the hearing official may find that the letter of credit or financial protection amount demanded would not be warranted. We believe that the new language would provide more clarity than the current standard, which only notes that the institution has to show that the amount was "unreasonable." The proposed language would clearly establish that the amount would be unwarranted only if the reasons for which the Secretary required the financial protection no longer exist or have been resolved, or if some other acceptable form of financial protection arrangement is in place with the Secretary.

Our proposed revisions to § 668.90(a)(3)(iii) would reflect previous, as well as proposed, changes to the financial responsibility standards. First, the current financial responsibility standards in § 668.175 require an institution in some instances to provide a letter of credit in order to be financially responsible. We propose to modify § 668.90(a)(3)(iii) to reflect that language as well as changes proposed

now to § 668.175 by substituting the terms "letter of credit or other financial protection" for "surety." Thus, the proposed changes to § 668.90 would clarify that a limitation, suspension, or termination action may involve a failure to provide any of the specified forms of financial protection, letter of credit or otherwise.

We further propose to modify § 668.90(a)(3)(iii) to state the specific grounds on which a hearing official may find that a limitation or termination action for failure to provide financial protection demanded is not warranted. The proposed change would provide that a hearing official must adopt the amount of the letter of credit or financial protection demanded by the Secretary, unless the institution demonstrates that the events or conditions forming the grounds for the financial protection or letter of credit no longer exist or have been resolved in a manner resolving the risk posed to the institution's ability to meet its financial obligations. The institution would be permitted to demonstrate that the Department miscalculated the amount on which the demand is grounded. However, it could not claim that the event does not constitute grounds for a demand for financial protection or that the amount demanded is unreasonable based on the institution's assessment of the risk posed by the event or condition. The institution could challenge a demand for protection based on delinquency on secured debt by proving that the delinquency has been cured or a workout satisfactory to the secured lender has been arranged. In the case of a demand for financial protection based on pending litigation, the institution would be permitted to demonstrate that the suit was dismissed or settled favorably. Alternatively, the institution could demonstrate that it has provided the Department with appropriate alternative financial protection (cash or a reimbursement funding arrangement with the Secretary that will result in set-aside of the amount required within an agreed timeframe).

The proposed changes to § 668.90(a)(3)(v) would also clarify and conform with other existing regulations the alternative methods in current regulations by which an institution may be able to meet the financial responsibility standards, and thus would be able to claim that a limitation or termination is unwarranted. Section 668.90(a)(3)(v) would be revised to state the grounds on which a hearing official is authorized to find that a termination or limitation action brought for a failure of financial responsibility for an institution's failure of a past

performance condition under § 668.174(a) or a failure of a past performance condition for persons affiliated with an institution under § 668.174(b)(1) was not warranted. None of these provisions would be changed under these proposed regulations. The changes would not add substantive new restrictions, but simply conform § 668.90 to these substantive requirements already in current regulations. Thus, as revised, § 668.90(a)(3)(v) would require the hearing official to find that the limitation or termination for adverse past performance by the institution itself was warranted, unless the institution met the provisional certification and financial protection alternative in current § 668.175(f). For an action based on adverse past performance of a person affiliated with an institution, the hearing official would be required to find that limitation or termination of the institution was warranted unless the institution demonstrated either proof of repayment or that the person asserted to have substantial control in fact lacks or lacked that control, as already provided in § 668.174(b)(2), or the institution has accepted provisional certification and provided the financial protection required under § 668.175(g).

**Limitation (§ 668.93)**

*Statute:* Section 487(c)(1)(F) of the HEA, 20 U.S.C. 1094, provides that the Secretary shall prescribe such regulations as may be necessary to provide for the limitation, suspension, or termination of an eligible institution's participation in any program under title IV of the HEA.

*Current Regulations:* Section 668.86 provides that the Secretary may limit an institution's participation in a title IV, HEA program, under specific circumstances, and describes procedures for a challenge to such a limitation. Current § 668.93 lists types of specific restrictions that may be imposed by a limitation action, and includes in paragraph (i) "other conditions as may be determined by the Secretary to be reasonable and appropriate." 34 CFR 668.93(i).

Although a change in an institution's status from fully certified to provisionally certified is not currently a limitation listed in § 668.93, § 668.13(c) provides that the Secretary may provisionally certify an institution whose participation has been limited or suspended under subpart G of part 668, and § 668.171(e) provides that the Secretary may take action under subpart G to limit or terminate the participation of an institution if the Secretary

determines that the institution is not financially responsible under the provisions of § 668.171 or § 668.175.

*Proposed Regulations:* The Secretary proposes to amend § 668.93 to clarify that a change in an institution's participation status from fully certified to provisionally certified to participate in a title IV, HEA program under § 668.13(c) is a type of limitation that may be the subject of a limitation proceeding under § 668.86.

*Reasons:* The proposed change to § 668.93 would clarify current policy and provide for a more complete set of limitations covered in § 668.93.

**Pay As You Earn (PAYE) and Revised Pay As You Earn (REPAYE) Repayment Plans (§ 685.209(a) and (c))**

*Statute:* Section 455(d)(1)(D) of the HEA authorizes the Secretary to offer Direct Loan borrowers (except parent PLUS borrowers) an income-contingent repayment (ICR) plan with varying annual repayment amounts based on the income of the borrower, for a period of time prescribed by the Secretary, not to exceed 25 years. Section 455(e)(1) of the HEA authorizes the Secretary to establish ICR plan repayment schedules through regulations.

*Current Regulations:* For the PAYE Plan and the REPAYE Plan, current § 685.209(a)(1)(ii) and (c)(1)(ii), respectively, define "eligible loan" as "any outstanding loan made to a borrower under the Direct Loan Program or the FFEL Program except for a defaulted loan, a Direct PLUS Loan or Federal PLUS Loan made to a parent borrower, or a Direct Consolidation Loan or Federal Consolidation Loan that repaid a Direct PLUS Loan or Federal PLUS Loan made to a parent borrower."

For the REPAYE Plan, current § 685.209(c)(2)(ii)(B) provides that if a married borrower and the borrower's spouse each have eligible loans, the Secretary adjusts the borrower's REPAYE Plan monthly payment amount by determining each individual's percentage of the couple's total eligible loan debt and then multiplying the borrower's calculated REPAYE Plan monthly payment amount by this percentage.

For the REPAYE Plan, current § 685.209(c)(4)(iii)(B) specifies that the annual notification to a borrower of the requirement to provide updated income and family size information explains the consequences, including the consequences described in § 685.209(c)(4)(vi), if the Secretary does not receive the information within 10 days following the annual deadline specified in the notification. Paragraph (c)(4)(vi) of § 685.209 provides that if

the Secretary removes a borrower from the REPAYE Plan because the borrower has failed to provide updated income information by the specified deadline, the Secretary sends the borrower a written notification containing the borrower's new monthly payment amount and providing other information, including the borrower's option to change to a different repayment plan and the conditions under which the borrower may return to the REPAYE Plan.

*Proposed Regulations:* The proposed regulations make technical changes to amend § 685.209(a)(1)(ii) of the PAYE Plan regulations by adding language to the definition of "eligible loan" stating that this term is used for purposes of determining whether a borrower has a partial financial hardship and adjusting the monthly payment amount for certain married borrowers. The definition of "eligible loan" in § 685.209(c)(1)(ii) of the REPAYE Plan regulations would be amended by adding language stating that this definition is used for purposes of adjusting the monthly payment amount for certain married borrowers.

The proposed regulations would amend § 685.209(c)(2)(ii)(B) of the REPAYE Plan regulations by adding language to provide that there is no adjustment to a married borrower's monthly payment amount based on the eligible loan debt of the borrower's spouse if the spouse's income is excluded from the calculation of the borrower's monthly payment amount in accordance with § 685.209(c)(1)(i)(A) or (B).

The proposed regulations would revise § 685.209(c)(2)(v) of the REPAYE Plan regulations by removing language that refers to the Secretary's determination that the borrower does not have a partial financial hardship. Finally, the proposed regulations also would revise § 685.209(c)(4)(iii)(B) of the REPAYE Plan regulations by removing the cross-reference to § 685.209(c)(4)(vi).

*Reasons:* The language that would be added to the definitions of "eligible loan" in the PAYE and REPAYE plan regulations is intended to clarify that the inclusion of certain types of FFEL Loans in the definitions of "eligible loan" does not mean that these loans may be repaid under the PAYE or REPAYE plans. The PAYE and REPAYE plans are available only for Direct Loans. The proposed language would clarify that the FFEL Loans listed in the definitions are taken into consideration only for certain purposes related to the terms and conditions of the PAYE and REPAYE plans.

The proposed change in § 685.209(c)(2)(ii)(B) is needed to accurately reflect that the monthly payment amount for a married borrower who files a separate Federal income tax return from his or her spouse is not adjusted to take into account the spouse's eligible loan debt if the spouse's income is excluded from the calculation of the borrower's monthly payment amount in accordance with § 685.209(c)(1)(i)(A) or (B). Paragraphs (c)(1)(i)(A) and (B) provide that only the borrower's income is used to calculate the monthly REPAYE Plan payment amount if a married borrower filing separately is separated from his or her spouse or is unable to reasonably access the spouse's income information.

The proposed change in § 685.209(c)(4)(iii)(B) removes an unnecessary reference to the requirement for the annual notification informing a borrower of the need to recertify income and family size to provide information about the contents of a separate notification required under § 685.209(c)(4)(vi) that will be sent if the borrower is removed from the REPAYE Plan as a result of failure to recertify income. The information included in that separate notification is not applicable at the time a borrower is merely being notified of the requirement to annually recertify income and family size.

The removal of the reference to partial financial hardship in § 685.209(c)(2)(v) reflects that the concept of partial financial hardship does not apply under the terms and conditions of the REPAYE Plan.

**False Certification Discharges (§ 685.215)**

*Statute:* Section 437(c) of the HEA provides for the discharge of a borrower's liability to repay a FFEL Loan if the student's eligibility to borrow was falsely certified by the school. The false certification discharge provisions also apply to Direct Loans, under the parallel terms, conditions, and benefits provisions in section 455(a) of the HEA. Section 484(d) of the HEA specifies the requirements that a student who does not have a high school diploma or a recognized equivalent of a high school diploma must meet to qualify for a title IV, HEA loan.

*Current Regulations:* Section 685.215(a)(1)(i) provides that a Direct Loan borrower may qualify for a false certification discharge if the school certified the eligibility of a borrower who was admitted on the basis of the ability to benefit but the borrower did not in fact meet the eligibility requirements in 34 CFR part 668 and

did not meet the eligibility requirements in section 484(d) of the HEA. Section 685.215(a)(1)(iii) provides that a borrower may qualify for a false certification discharge if the school certified the eligibility of a student who would not meet requirements for employment in the occupation for which the training program supported by the loan was intended due to a physical or mental condition, age, criminal record, or other requirement accepted by the Secretary that was imposed by State law. Section 685.215(c) and (d) describes the qualifications and procedures for receiving a false certification discharge.

*Proposed Regulations:* Proposed § 685.215(a)(1)(i) would eliminate the reference to "ability to benefit" and specify that a borrower qualifies for a false certification discharge if the borrower reported not having a high school diploma or its equivalent and did not satisfy the alternative to graduation from high school requirements under section 484(d) of the HEA.

Under proposed § 685.215(a)(1)(ii), if a school certified the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) the borrower would qualify for a false certification discharge if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma.

Proposed § 685.215(a)(1)(iv) would specify that a borrower qualifies for a false certification discharge if the borrower failed to meet applicable State requirements for employment due to a physical or mental condition, age, criminal record, or other reason accepted by the Secretary that would prevent the borrower from obtaining employment in the occupation for which the training program supported by the loan was intended.

Proposed § 685.215(c) would update the information specifying how a borrower applies for a false certification discharge. It would also specify that the Department would notify a borrower who applies but does not meet the requirements for a false certification discharge and explain why the borrower does not meet the requirements.

Proposed § 685.215(c)(1) would describe the requirements a borrower must meet to qualify for a discharge due to a false certification of high school graduation status.

Proposed § 685.215(c)(2) would state the requirements a borrower must meet to obtain a discharge based on a

disqualifying condition, as specified in proposed § 685.215(a)(1)(iv).

Proposed § 685.215(c)(8) would amend the provisions for granting a false certification discharge without an application to include cases in which the Department has information in its possession showing that the school has falsified the Satisfactory Academic Progress (SAP) of its students.

Proposed § 685.215(d) would update the procedures for applying for a false certification discharge, and describe the types of evidence that the Department uses to determine eligibility for a false certification discharge. It would also provide that the Department will explain to the borrower the reasons for a denial of a false certification discharge claim, describe the evidence that the determination was based on, and provide the borrower with an opportunity to submit additional evidence supporting his or her claim. The Department would consider the response from the borrower, and notify the borrower whether the determination of eligibility has changed.

*Reasons:* We propose to remove the "ability to benefit" language from § 685.215(a)(1)(i) because there is no longer a statutory basis for certifying the eligibility of non-high school graduates based on an "ability to benefit." Currently section 484(d) of the HEA establishes different standards under which a non-high school graduate may qualify for title IV aid. We believe that it is preferable to refer to section 484(d) of the HEA by cross-reference, rather than incorporate the statutory language in the regulations, so that any future changes to that language would be incorporated into the regulation. The changes we propose to make to § 685.215(c)(1) (currently titled "Ability to benefit") are intended to conform to these changes.

The proposed revisions to § 685.215(a)(1)(i) and (ii) are intended to state more explicitly that a school's certification of eligibility for a borrower who is not a high school graduate, and does not meet the alternative to high school graduate requirements, is grounds for a false certification discharge. We propose these changes specifically to address the problem of schools encouraging non-high school graduates to obtain false high school diplomas to qualify for Direct Loans. Many non-Federal negotiators noted that often borrowers are misled by schools. These non-Federal negotiators stated that some schools tell borrowers that a high school diploma is not a requirement for title IV student aid, or that the borrower will be able to earn a high school diploma through the

program for which the borrower is taking out the student loan, so the borrower should answer "Yes" to the high school graduation question on the FAFSA. Non-Federal negotiators stated that some schools encourage borrowers to obtain the services of a third party that will provide them with what appears to be a legitimate high school diploma. These borrowers often do not understand that the "high school diploma" provided by the third party is worthless. Many non-Federal negotiators were supportive of the Department's efforts to provide relief for borrowers who have been victimized in this way. Some of the non-Federal negotiators, while supportive of this proposal, noted that borrowers themselves may provide false information to the schools regarding the borrower's high school graduation status. Unless the school investigates the borrower's claim to be a high school graduate, for instance by requesting transcripts, which are harder to falsify, the school may unknowingly falsely certify the borrower's eligibility.

To address these situations, the Department proposed during the negotiated rulemaking to include the requirement in proposed § 685.215(a)(1)(i)(A) that the borrower "reported" not having a high school diploma or its equivalent. If the borrower informed the school that the borrower was not a high school graduate, and the borrower also did not satisfy the alternative to high school graduation eligibility criteria, but the school still certified the borrower's eligibility for title IV aid, the borrower would qualify for a false certification discharge.

Under proposed § 685.215(a)(1)(ii), a borrower would qualify for a false certification discharge if the borrower was not a high school graduate, and the school certified the borrower's eligibility based on falsified high school graduation status or based on a high school diploma falsified by the school or a third party to which the school referred the borrower. The reference in proposed § 685.215(a)(1)(ii)(B) to cases in which a school refers a borrower to a third party to obtain a false high school diploma would not refer only to a formal referral relationship between the school and the third party. An informal relationship involving any level of contact between the school and the third party would also qualify under the proposed regulations. A school would be considered to have "referred the borrower" to the third party in any instance in which the school advised or encouraged a borrower to obtain a false

high school diploma from the third party.

The proposed revision to § 685.215(a)(1)(iv) would clarify that this section refers to a situation in which a borrower failed to meet State requirements for employment in the occupation for which the training program was supported or the loan was intended. These State requirements would not necessarily have to be imposed by State statutes; they could be requirements established through State regulations or other limitations established by the State. The Department considered using other employment standards, such as Federal standards, or standards established by non-governmental professional associations. However, we were unable to find examples of Federal standards for particular professions, other than standards specifically for employment in the Federal government. The Department believes that employment standards established by professional associations could vary, and that it would not be practical to require schools to determine which professional association standards to use.

Some of the non-Federal negotiators recommended including limited English proficiency (LEP) as one of the characteristics that would disqualify a borrower from working in a particular profession and serve as the basis for a false certification loan discharge. We reviewed this proposal, but determined that it would not be practical to determine a borrower's English language proficiency at the time the borrower enrolled in the program. While a student's score on the Test of English as a Foreign Language (TOEFL) is a generally accepted indicator of English language proficiency, many schools do not administer this test, the TOEFL is not required for all academic programs, and the scores required to demonstrate sufficient proficiency differ between schools. Moreover, the TOEFL is not intended to measure an individual's language proficiency for any particular profession.

Non-Federal negotiators recommended that the Department require schools to certify an LEP student's ability to successfully complete a postsecondary program by either administering an evaluative test such as the TOEFL; providing the student with complete instruction, instructional materials, and exams in her or his native language; or providing specific and sufficient accommodation through an approved English as a Second Language component. The Department expressed concern that such a limitation could impede access to

postsecondary education for some LEP students. The Department also noted that certification of LEP students for Direct Loans does not constitute false certification of eligibility for title IV, HEA program funds. Non-Federal negotiators recommended that false certification discharge apply in cases in which an LEP student is enrolled in a program for a profession that requires English proficiency, or an LEP student is told that instruction will be offered in the student's first language or that the student will be provided English as a Second Language courses, but after the student takes out a Direct Loan and enrolls, no such instruction is provided. However, the Department noted that these are examples of misrepresentation, which would fall under the borrower defenses regulations.

Current § 685.215(c) requires the borrower to submit a "written request and a sworn statement" to apply for a false certification discharge. We propose replacing this language with a requirement for a borrower to submit an application for discharge on "a form approved by the Secretary," which more accurately reflects current practice. The proposed changes to redesignated § 685.215(c)(8) would add, as an example of information that the Department may use to grant a false certification discharge without an application, evidence that a school has falsified the SAP of its students. Although the Department may already do this under the language in current § 685.215(c)(7), we believe that it is helpful to specifically address such cases in the regulatory language. This change would put schools on notice that, if the Department learns of a school falsifying SAP through a program review or an audit, the Department has the authority to independently grant false certification discharges to affected borrowers at that school.

Some of the non-Federal negotiators recommended that we also allow an individual borrower to apply for a false certification discharge if the borrower believes that the school falsified the borrower's SAP. We examined this proposal, and determined that it would be impractical. Schools have a great deal of flexibility both in determining and implementing SAP standards. There are a number of exceptions under which a borrower who fails to meet SAP can continue to receive title IV loans. As one of the non-Federal negotiators pointed out, borrowers who are in danger of losing title IV eligibility due to the failure to meet SAP standards often request reconsideration of the SAP determination. Schools often work with borrowers in good faith efforts to

attempt to resolve the situation without cutting off the borrowers' access to title IV assistance. We do not believe that a school should be penalized for legitimate attempts to help a student who is having difficulty meeting SAP standards, nor do we believe a student who has successfully appealed a SAP determination should then be able to use that initial SAP determination to obtain a false certification discharge of his or her student loans. In addition, we believe it would be very difficult for an individual borrower to sufficiently demonstrate that a school violated its own SAP procedures. Given these considerations, we propose to limit false certification discharges based on falsification of SAP to discharges based on "information in the Secretary's possession." Such information would include, for example, findings from program reviews, audits, or other investigations.

The proposed revisions to § 685.215(d)(3) would provide more transparency to the process for granting false certification discharges. For example, under proposed § 685.215(d)(3), when the Department denies a false certification discharge request, we would explain the reasons for the denial to the borrower, provide the borrower with the evidence that the decision was based on, and provide the borrower the opportunity to provide additional information which the Department would evaluate. This proposed new language was suggested by one of the non-Federal negotiators, and was generally supported by all of the members of the negotiating committee.

In addition to the revisions that we are proposing in this NPRM, the non-Federal negotiators submitted recommendations to the Department for additional revisions to the false certification regulations. These included recommendations to extend the revisions to the FFEL regulations as well as the Direct Loan regulations; to allow false certification discharges in cases when a program that the borrower is enrolled in fails to meet title IV eligibility requirements (although the program was participating in the title IV, HEA programs at the time the loan was made); and to require active confirmation when a school notifies a borrower that an additional loan was made under the borrower's previously executed Master Promissory Note (MPN), to address issues of possible forgery of electronic signatures on an MPN.

The Department declined to accept these recommendations. We are not proposing to extend the revisions to the FFEL Program because no new loans are being made in the FFEL Program, and we cannot apply these changes retroactively.

False certification discharges are based on a school falsely certifying a borrower's eligibility. They do not apply in instances that do not concern a personal characteristic or qualification of the borrower, such as ineligibility of the school or the program offered by the school. See 59 FR 22469 (April 28, 1994).

The recommendations regarding active confirmation and use of the MPN relate more to the way Direct Loans are awarded and disbursed than to the false certification requirements, and go beyond the scope of this regulatory action.

## Direct Consolidation Loans (§ 685.220)

*Statute:* Section 455(g) of the HEA provides that the loan types listed in section 428C(a)(4) may be consolidated into a Direct Consolidation Loan. Section 428C(a)(4)(E) of the HEA provides that loans made under part E of title VIII of the Public Health Service Act are eligible to be consolidated into a Federal Consolidation Loan under the FFEL Program. Loans made under part E of title VIII of the Public Health Service Act include both Nursing Student Loans and Nurse Faculty Loans.

*Current Regulations:* Current § 685.220(b)(21) specifies that nursing loans made under subpart II of part B of title VIII of the Public Health Service Act may be consolidated into a Direct Consolidation Loan.

Current § 685.220(d)(1)(i) states that a borrower may obtain a Direct Consolidation Loan if the borrower consolidates at least one Direct Loan or FFEL Loan. If the borrower has certain other eligible loan types such as a Perkins Loan or a loan issued by the U.S. Department of Health and Human Services (HHS), the borrower can only include these loans in a Direct Consolidation Loan if the borrower also includes at least one Direct or FFEL loan. Under § 685.220(b), loans issued by HHS that may be consolidated into a Direct Consolidation Loan, if the borrower also includes at least one Direct or FFEL loan, include Health Professions Student Loans (HPSL), and Loans for Disadvantaged Students (LDS), made under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loans (HEAL), and Nursing Loans made under subpart II of part B of title VII of the Public Health Service Act.

## Proposed Regulations

### Consolidation of Nursing Loans

The proposed regulations would revise § 685.220(b)(21) to provide that nursing loans made under part E of title VIII of the Public Health Service Act may be consolidated into a Direct Consolidation Loan.

### Consolidation of Eligible Loans

We propose to remove current § 685.220(d)(1)(i) to eliminate the requirement that a borrower must consolidate at least one FFEL or Direct Program Loan. This would allow a borrower to consolidate under the Direct Loan Program, if the borrower had any of the eligible loans listed in § 685.220(b).

### Reasons

### Consolidation of Nursing Loans

The proposed change is needed to conform § 685.220(b)(21) to the statutory language in section 428C(a)(4)(E) of the HEA, which allows for the consolidation of both Nursing Student Loans and Nurse Faculty Loans. The current regulatory reference to nursing loans "made under subpart II of part B of title VIII of the Public Health Service Act" includes Nursing Student Loans, but not Nurse Faculty Loans. The current regulatory language reflects earlier statutory language that was subsequently amended.

### Consolidation of Eligible Loans

The proposed change to remove current § 685.220(d)(1)(i) would eliminate the requirement that a borrower must have a Direct Program or FFEL loan to consolidate. As a result, other loan types listed in § 685.220(b), such as Perkins Loans and certain loans issued by HHS, would also be allowed to access consolidation, even if the borrower did not also consolidate a Direct Program or FFEL loan.

The proposed change is necessary to be consistent with sections 451(b)(2) and 455(a)(1) of the HEA, which provide that, unless otherwise specified, Direct Loans are to have the same terms, conditions, and benefits as FFEL Loans. 20 U.S.C. 1087a(b), 1087e(b)(1). Under the FFEL Program, certain loans issued by HHS (HPSL, LDS, HEAL, and Nursing loans) and Federal Perkins loans were considered eligible student loans for consolidation, without any added requirement that the borrower also consolidate at least one FFEL Loan. 20 U.S.C. 1078–3a(4)(B), (D); 34 CFR 682.100(a)(4). The authority for lenders to make FFEL Consolidation Loans expired on June 30, 2010, under section 428C(e) of the HEA, 20 U.S.C. 1078–

3(e). Since current § 685.220(d)(1)(i) does not allow Federal Perkins loan borrowers and borrowers of loans issued by HHS as listed in § 685.220 to obtain a Direct Consolidation Loan, unless they also consolidate either a Direct or FFEL loan, Federal Perkins and HHS student loan borrowers who do not also have at least one Direct Loan or FFEL Loan do not currently have access to consolidation. As a result, these borrowers are not receiving the same terms, conditions and benefits in the Direct Loan program as in the FFEL Program.

To correct this situation, the Department proposes to allow borrowers to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Program or FFEL loan, if the borrower has a loan type identified in § 685.222(b).

### Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program (§ 685.300)

*Statute:* Section 454(a)(6) of the HEA, 20 U.S.C. 1087d(a)(6), provides that schools enter into Direct Loan Participation Agreements that include provisions needed to protect the interests of the United States and promote the purposes of the Direct Loan Program.

*Current Regulations:* Section 685.300 states the requirements for a school to participate in the Direct Loan Program. First, the school must meet the requirements for eligibility under the HEA and applicable regulations. Second, the school must enter into a written program participation agreement with the Secretary. Under the agreement, the school agrees to comply with the HEA and applicable regulations. Paragraph (b) of § 685.300 lists several specific provisions of the program participation agreement.

*Proposed Regulations:* Proposed § 685.300(d), (e), (f), (g), (h) and (i) would add specific provisions to the Direct Loan program participation agreement related to student claims and complaints based upon acts or omissions [44] of a school that are related to the making of a Federal loan or the provision of educational services for which the loan was provided and that could also form the basis of borrower defense claims under § 685.206(c) or proposed § 685.222.

Specifically, proposed § 685.300(d), (e), (f), (g), (h) and (i) would provide that—

• A school may not require any student to pursue a complaint based on such acts or omissions through an internal institutional process before the student presents the complaint to an accrediting agency or government agency authorized to hear the complaint;

• The school may not obtain or attempt to enforce a waiver of or ban on class action lawsuits regarding borrower defense-type claims;

• The school may not compel the borrower to enter into a pre-dispute agreement to arbitration of a borrower defense-type claim, or attempt to compel a borrower to arbitrate such a claim by virtue of an existing a pre-dispute arbitration agreement; [45] and

• The school must notify the Secretary of the initial filing of such a claim, whether in arbitration or in court, and must provide copies of the initial filing, certain subsequent filings, and any decisions on such claims.

*Reasons:* Through this rulemaking, the Department is proposing to address the procedures to be used for a borrower to establish a borrower defense based on acts or omissions of a school related to the making of a Direct Loan or the provision of educational services for which the Direct Loan was provided, and the effect of borrower defenses on institutional capability assessments, among other things. 80 FR 63479. For disputes involving claims that may be potential borrower defenses, we propose to add to the Direct Loan program participation agreement provisions relating to schools' current use of certain dispute resolution procedures. For the reasons explained here, these procedures, individually and collectively, can:

• Affect whether institutions are held accountable for the acts and omissions that give rise to borrower defense claims;

• Make it more likely that the costs of losses from those acts or omissions will be passed on to the taxpayer;

• Reduce the incentive for institutions to engage in fair and ethical business practices rather than practices that give rise to borrower defense claims; and

• Frustrate or reduce the effectiveness of the Department's proposed processes for submitting and determining the validity of borrower defense claims.

Accordingly, proposed § 685.300(d) through (i), individually and collectively, are designed to help ensure that the proposed borrower defense and institutional accountability regulations will achieve their intended goals—to protect students, the Federal government, and taxpayers against risks from potential borrower defenses and potential school liabilities.

We believe that to protect students, taxpayers, and the Federal government from the risk of loss arising from borrower defense claims based on the acts or omissions of the school, financial responsibility for these risks should be placed on the party whose conduct gives rise to the risk. To do so, borrowers must be free to present these claims to an authority well-situated to consider the merits of their claims and provide effective recourse directly against the school. Accordingly, we propose regulatory changes to § 685.300 that would support these objectives in separate but complementary ways. In each case, the proposed regulations would enhance the opportunities for borrowers with borrower defenses to obtain relief directly from schools and help ensure that schools are held accountable for their acts or omissions that give rise to borrower defenses.

Specifically, for Direct Loan participants, we propose to:

• Prohibit the use of class action waivers in order to, among other things, permit the aggregation of claims that may reflect widespread wrongdoing for which institutions might not otherwise be held accountable;

• Bar the use of mandatory pre-dispute arbitration agreements, in order to, among other things, prevent institutions from suppressing individual student complaints and shifting the financial risk associated with institutional wrongdoing to the Department and the taxpayers;

• Require institutions to modify existing arbitration agreements or notify individuals who have already executed arbitration agreements that the institution will not attempt to enforce an existing arbitration agreement in a manner prohibited by the regulations; and

• Require institutions to inform the Secretary of the assertion and resolution of potential borrower defense claims to enable the Secretary to monitor compliance with these requirements, to assess the nature and incidence of acts or omissions that form the grounds on which claims are asserted, to better focus corrective or enforcement actions, and to disseminate useful information about the nature and frequency of such

---

[44] Unless otherwise noted, we use the phrases "borrower defense-type claims" or "potential borrower defenses" to refer to such complaints or disputes.

[45] Unless otherwise noted, we use the phrase "pre-dispute arbitration agreement" to refer to agreements providing for arbitration of any future disputes between the parties, regardless of the label given the agreement, its form or its structure. These could take the form of stand-alone agreements, as well as such an agreement that is included within, annexed to, incorporated into, or otherwise made a part of a larger agreement between the parties.

claims and the judicial and arbitral outcomes of these claims.

We further propose in § 685.300(d), regarding exhaustion of internal complaint procedures, to prohibit the school from requiring or attempting to require students to exhaust a school's internal complaint process before contacting or communicating a grievance with the school's accreditor or government agencies—including this Department—with authority over the school.

In proposing these regulatory changes, the Department is responding to comments made during negotiated rulemaking by the public and by non-Federal negotiators, and to a proposal submitted by a negotiator, which was supported by a number of other negotiators, in each case relating to the use of arbitration by schools. Proposals the Department received both from non-Federal negotiators and from the public on this issue are available at *www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html*.

During the negotiated rulemaking, we sought comment on two alternative options. Both options would bar the use of any pre-dispute arbitration agreements that include a waiver of the student's right to bring or participate in a class action lawsuit for claims that would constitute borrower defenses within the scope of § 685.206(c) and proposed § 685.222—in other words, claims related to the making of the Direct Loan or the provision of educational services for which the loan was intended. Both options would also require the school to submit copies of initial filings of any such claims and each ruling, award, or decision on the claims to the Secretary. Proposed Option A would prohibit schools from requiring students to pursue complaints, grievances, or disputes for such claims through an internal complaint process before presenting the complaint, grievance or dispute to an accrediting agency or government agency. Option A would allow the school to require the arbitration of claims asserted in a class action only if a court were to deny class certification or dismiss the class claims. This option would further require schools to ensure that the arbitration included certain procedural protections to increase the transparency and fairness of the arbitration proceeding. Option B would include provisions regarding class action waivers and submission of filings to the Secretary described above, but would only have barred the use of pre-dispute arbitration agreements.

Nearly all of the negotiators supported the proposed Option B. Many

negotiators stated that by requiring students to arbitrate disputes, arbitration clauses function to suppress meritorious student complaints. They also noted that many schools' arbitration agreements contain confidentiality clauses. Since arbitration records are not public like court records, the negotiators noted that potential student claimants and their representatives generally may not have access to prior pleadings, awards, or arbitrator decisions. Negotiators also noted that many school enrollment agreements contain bans on class claims or have provisions with that effect, which prevents evidence of widespread patterns and unlawful practices to come to the attention of students, the public, and the Department. One negotiator, however, stated that the Department's proposal was outside the notice of issues to be considered, and thus beyond the scope of the issues for the rulemaking, and was concerned that neither proposed Option A or Option B fit within the U.S. Supreme Court precedent regarding arbitration. However, the negotiator stated that of the two proposed options, Option B was preferred.

As opposed to the options that were proposed by the Department at the negotiated rulemaking, in this NPRM, the Department proposes adding provisions that we believe would similarly prevent schools' use of internal complaint processes as a barrier to students' communication of such issues to accreditors or government agencies; ban the use of class action waivers by schools for potential borrower defense claims; prohibit mandatory pre-dispute arbitration agreements; and create transparency regarding the conduct and outcomes of arbitration proceedings. After evaluating the available research on arbitration and the concerns of all of the negotiators at the table, the Department has chosen to propose a modified version of Option B in this NPRM.

*The Direct Loan Program Participation Agreement*

The Department proposes to add provisions addressing the use of class action waivers, pre-dispute arbitration agreements, submission of filings, and internal complaint processes to the Direct Loan program participation agreements. Section 452(b) of the HEA states, "No institution of higher education shall have a right to participate in the [Direct Loan] programs authorized under this part [part D of title IV of the HEA]." 20 U.S.C. 1087b(b). Rather, an institution may participate only by supplying an

application containing "such information and assurances as the Secretary may require." 20 U.S.C. 1087c(b)(1). Further, section 454 of the HEA directs that a school may participate in the Direct Loan Program only by virtue of a "participation agreement." 20 U.S.C. 1087d. Section 454 further states that such program participation agreement shall include, among other things, "such other provisions as the Secretary determines are necessary to protect the interests of the United States and promote the purposes of this part [Part D of title IV of the HEA, describing the Direct Loan Program]." 20 U.S.C. 1087d(a)(6). The Direct Loan Agreement described in section 454 of the HEA is now included as a separate component of the program participation agreement required under section 487(a) of the HEA. 20 U.S.C. 1094(a). The purpose of the Direct Loan Program is to provide loans to students and parents to finance the attendance of students in postsecondary education. Loans are not grants, and are expected to be repaid. The same part of the HEA, part D, also includes the borrower defense provision, section 455(h) of the HEA, which directs the Department to "specify in regulations which acts or omissions of an institution . . . a borrower may assert as a defense to repayment" of a Direct Loan. 20 U.S.C. 1087e(h).

While section 455(h) of the HEA authorizes the Department to establish grounds for a borrower to avoid repaying a Direct Loan, we believe that the overall "purpose" of the Direct Loan Program is to make loans that will then be repaid. To be repayable, the loans must be enforceable obligations of the borrowers. Acts and omissions by schools that give a borrower grounds for avoiding repayment of a Direct Loan thereby frustrate the achievement of the primary objectives of the Federal loan program—to both finance education and obtain repayment. By impeding the ability of borrowers to obtain effective relief directly from the school, the practices we propose to prohibit in § 685.300(d) through (ii) instead encourage these borrowers to raise their claims against the school to the Department as reasons for not repaying their loans, and in so doing, increase the financial risk to the taxpayer from the claims themselves.

*Class Action Waivers*

In considering class action waivers, we consider the effect that such waivers can and have already had on the interests of taxpayers and the achievement of the purposes and objectives of the Direct Loan Program.

Among other things, the Department has reviewed the Notice of Proposed Rulemaking recently issued by the CFPB (hereinafter the "CFPB Arbitration Agreements NPRM") and considers the analysis and proposals made there as they bear on these assessments for the Direct Loan Program.[46] The CFPB has been charged by statute with evaluating the use of mandatory, pre-dispute arbitration agreements. 12 U.S.C. 5518(a). The CFPB conducted a comprehensive three-year study of those agreements' effect on consumers, and has made a preliminary determination that a ban on the use of mandatory pre-dispute arbitration agreements regarding covered consumer financial products and services to preclude assertion of claims through class action lawsuits would benefit consumers, serve the public interest, and be consistent with its study.[47] The CFPB stated that its study, together with the CFPB's experience and expertise, resulted in the CFPB's notice of proposed rulemaking regarding class action waivers. The CFPB stated the following "preliminary conclusions":

(1) The evidence is inconclusive on whether individual arbitration conducted during the Study period is superior or inferior to individual litigation in terms of remediating consumer harm; (2) individual dispute resolution is insufficient as the sole mechanism available to consumers to enforce contracts and the laws applicable to consumer financial products and services; (3) class actions provide a more effective means of securing relief for large numbers of consumers affected by common legally questionable practices and for changing companies' potentially harmful behaviors; (4) arbitration agreements block many class action claims that are filed and discourage the filing of others; and (5) public enforcement does not obviate the need for a private class action mechanism.

CFPB Arbitration Agreements NPRM, 81 FR 32830, 32855.

The CFPB identified several features of class actions in the consumer financial services markets that we consider applicable to the postsecondary education market. First, the CFPB noted that class actions facilitate relief for individual consumers because they "provide a mechanism for compensating individuals where the amounts at stake for individuals may be

so small that separate suits would be impracticable."[48] Second, class actions "strengthen incentives" for industry members to "engage in robust compliance and customer service on an ongoing basis."[49] While government agencies "can and do bring enforcement actions against companies that cause injury to large numbers of consumers, government resources to pursue such lawsuits are limited."[50] Thus, the CFPB preliminarily concludes, "Public enforcement is not a sufficient means to enforce consumer protection laws and consumer financial contracts."[51] As the CFPB stated, "When companies can be called to account for their misconduct, public attention on the cases can affect or influence their individual business practices and the business practices of other companies more broadly."[52] Moreover, the CFPB preliminarily finds that "exposure to consumer financial class actions creates incentives that encourage companies to change potentially illegal practices and to invest more resources in compliance in order to avoid being sued."[53] Based on its comprehensive study of the use of pre-dispute arbitration agreements in the financial services sector, the CFPB now proposes to bar the use of arbitration agreements to preclude the pursuit of class actions, which includes the use of class action waivers in arbitration agreements—agreements that require consumers in the financial services markets to agree to forego class action.[54]

The proposed CFPB rule describes the financial services markets to which the

CFPB rule would apply.[55] We believe the findings and reasoning of the CFPB support the protections for Direct Loan borrowers of the kind we propose here. Agreements that bar relief by class action lawsuits for potential borrower defenses remove the risk to a school that the threat of such a class action would pose and, thus, they eliminate the financial incentive for the school to comply with the law that such a risk of a class action would otherwise create.[56] By doing so, class action waivers impede borrowers from obtaining compensatory relief for themselves, and further prevent borrowers from obtaining injunctive relief to compel a school, in a timely manner, to desist from the conduct that caused them injury and could continue to cause other borrowers injury in the future. Class action waivers effectively allow a school to perpetuate misconduct with much less risk of adverse financial consequences than if the school could be held accountable in a class action lawsuit.

Recent history demonstrates the need to address bans by postsecondary institutions on class actions for potential borrower defense claims. Corinthian Colleges included explicit class action waiver provisions in enrollment agreements, and used those, with mandatory pre-dispute arbitration clauses, to resist class actions by students.[57] Government investigations established that Corinthian had for years engaged in widespread misrepresentations and other abusive conduct. In April 2015, the Department levied a $30 million fine against Heald, a chain owned by Corinthian, for misrepresenting its placement rates, but several days later, Heald and the remaining Corinthian-owned schools closed, and Corinthian filed for bankruptcy relief. The State of California sued Corinthian in September 2013, and obtained a $1.1 billion judgment against the company only in March 2016, after the company had filed for bankruptcy relief. The CFPB sued Corinthian in September 2014, and obtained a $531 million judgment

---

[46] Consumer Financial Protection Bureau, Arbitration Agreements, 80 FR 32830 (May 24, 2016).

[47] CFPB, Small Business Advisory Review Panel for Potential Rulemaking on Arbitration Agreements, Oct. 7, 2015 (SBREFA Outline) at 4.

[48] CFPB Arbitration Agreements NPRM, at 81 FR 32833; see also *SBARP*, at 15.

[49] *Id.* As the CFPB noted in its study, in the 46 consumer class actions and six individual suits filed by consumers in which defendant companies obtained orders compelling arbitration, in only 12 instances did a consumer then pursue arbitration, and none of the 12 were class arbitrations. CFPB, Arbitration Study, March 2015, § 6.7.1.

[50] *Id.* As the CFPB also noted in its study, government enforcement authorities brought some 1150 administrative or judicial enforcement actions during the 2010–2012 survey period, of which some 133 address the same conduct as that on which consumers had brought a class action lawsuit; in 71 percent of these instances, the private class action preceded the government enforcement action. CFPB Arbitration Study, March 2015, § 9.1.

[51] CFPB Arbitration Agreements NPRM, at 81 FR 32860.

[52] CFPB Considers Proposal to Ban Arbitration Clauses that Allow Companies to Avoid Accountability to Their Customers, Oct. 7, 2015, available at *www.consumerfinance.gov/newsroom*

[53] CFPB Arbitration Agreements NPRM, at 81 FR 32864.

[54] *www.consumerfinance.gov/about-us/ newsroom/consumer-financial-protection-bureau- proposes-prohibiting-mandatory-arbitration- clauses-deny-groups-consumers-their-day-court/* CFPB Arbitration Agreements NPRM, 81 FR 32830, 32925, to be codified at 12 CFR 1040.4.

[55] See CFPB Arbitration Agreements NPRM, 81 FR 32830, 32925, to be codified at 12 CFR 1040.3 (describing covered services); See also: SBREFA Outline at 22.

[56] The Department makes no distinction between class action waivers included in arbitration agreements and such waivers established otherwise, such as in an enrollment agreement that does not include any reference to or agreement regarding arbitration. The negative effects of such waivers discussed here hold regardless of where the waiver is established.

[57] See, e.g., *Montgomery v. Corinthian Colleges*, C.A. No. 11–C–365 (N.D.Ill. Mar. 25, 2011); *Ferguson v. Corinthian Colleges, Inc.*, 773 F.3d 928 (9th Cir. 2013).

against the company only in October 2015—well after Corinthian had become insolvent and filed in bankruptcy. None of these government actions actually achieved affirmative recovery for Corinthian Direct Loan borrowers.[58] Yet in 2012, a class of students attending Corinthian Colleges, including Heald College and Everest Institute, Miami, had filed class actions against the schools for students who attended the schools since 2005 (Everest) or 2009 (Heald), for "misrepresenting the quality of its education, its accreditation, the career prospects for its graduates, and the cost of education." *Ferguson v. Corinthian Colleges*, 733 F.3d 928 (9th Cir. 2013). Corinthian defended by claiming that the arbitration clause in their enrollment agreements barred relief in a class action, and in an August 2013 ruling the Ninth Circuit Court of Appeals agreed. *Id.* Another class action filed in 2011 in Illinois against Corinthian Colleges by students, alleging deception about placement rates, was similarly barred. *Montgomery v. Corinthian Colleges*, C.A. No. 11–C–365 (N.D.Ill. Mar. 25, 2011). Other Corinthian students unsuccessfully pursued relief through individual and class actions against Corinthian schools, and, in each instance, Corinthian successfully opposed the suits and obtained rulings compelling individual arbitration of the student claims.[59] In yet another case, Corinthian opposed recovery by a student who had been compelled to arbitrate, and had obtained a favorable award from the arbitrator that granted relief not only to the individual student but to a class of students; Corinthian argued, and the court agreed, that the arbitration agreement barred even class arbitrations. *Reed v. Fla. Metropolitan Univ.*, 681 F.3d 630 (5th Cir. 2012), abrogated by *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013).

If the student class actions had been able to proceed, the class actions could

have compelled Heald College and the Corinthian Colleges, generally, to provide financial relief to the students and to change their practices while Corinthian was still a viable entity. Instead, impacted borrowers with Direct Loans from attendance at any of the Corinthian Colleges will only be able to obtain relief by raising the schools' misconduct as a defense to their Federal loans through the Department's current borrower defense process under § 685.206(c).[60] As of the close of March 2016, the Department had granted discharge relief in the amount of $42,318,574 to 2,048 Direct Loan borrowers making claims related to Heald, Everest Institute, and Wyotech.[61] As of June 1, the Department had received more than 23,000 claims relating to Corinthian and other schools.

Similarly, the inability of borrowers to bring class actions removed the deterrent force that the threat of being sued in a class action posed to other industry members during this same period. Federal and State reviews of for-profit school practices over the past five years, recounted, for example, in the Department's notice of proposed rulemaking for Program Integrity: Gainful Employment, 79 FR 16426 (March 25, 2014), show numerous instances in which major for-profit schools engaged in deceptive acts of the kind on which students were attempting to sue. However, during that same period, courts regularly rebuffed the students' attempts by compelling the students to submit their claims to arbitration. See, *e.g.*, *Rosendahl v. Bridgepoint Educ., Inc.*, No. 11CV61 WQH WVG, 2012 WL 667049 (S.D. Cal. Feb. 28, 2012). Had students been able to bring class actions against Corinthian or other industry members, it is reasonable to expect that other schools would have been motivated to change their practices to avoid facing the risk of similar suits.

Class action bans eliminate this incentive. By doing so, these agreements increase the likelihood that borrowers who have such claims will present them solely to the Department as defenses to repayment of their taxpayer-funded Federal loans. The Department's borrower defense process gives limited relief for borrowers, providing only discharge of the borrower's Federal loan

obligation, and potential recovery of past payments made to the Secretary, rather than compensation in damages from the school for his or her losses. Recoveries through the court system —for the cost of the loan itself—would eliminate any need to seek relief from the Department—and the taxpayers. In addition, recoveries in damages may include other losses the borrower incurred as well, such as the tuition an individual privately paid or the value of the time spent at the institution. In the Department's experience, borrower defense claims are presented to the Department well after the underlying act or omission that gave rise to the claim has occurred, at a point at which the school may well have ceased operations and there may be less reliable evidence available to borrowers. That shifts the financial risk of a school's insolvency to the taxpayer, rather than to the school as the responsible party.

We believe that class action lawsuits not only provide a vehicle for addressing a multitude of relatively small claims that would otherwise not be raised—or raised only as borrower defense claims—but create a strong financial incentive for both a defendant school and other similarly situated schools to comply with the law in their business operations. Pre-dispute arbitration agreements coupled with class action waivers eliminate this incentive by preventing the aggregation of small claims that may reflect widespread wrongdoing. We believe that banning class action waivers as they pertain to potential borrower defense claims would promote direct relief to borrowers from the party responsible for injury, encourage schools' self-corrective actions, and, by both these actions, lessen the amount of financial risk to the taxpayer in discharging loans through the defense to repayment process.

*Pre-Dispute Arbitration Agreements*

Because pre-dispute arbitration agreements bar the student from bringing an individual lawsuit against the school for relief, these agreements pose some of the same risks to borrowers and the taxpayer as those posed by class action waivers. Even if the borrower were not contractually foreclosed from pursuing a class action suit, Federal and State rules impose requirements on class actions that may well prevent particular borrowers from bringing and successfully maintaining a class action. For such borrowers, mandatory pre-dispute arbitration agreements bar them from seeking

---

[58] This Department and the CFPB did achieve substantial relief in 2015 for many Corinthian students who had obtained private loans, but only through negotiations with the Educational Credit Management Corporation, which acquired some of the Corinthian schools.

[59] *Eakins v. Corinthian Colleges, Inc.*, No. E058330, 2015 WL 758286 (Cal. Ct. App. Feb. 23, 2015); *Okwale v. Corinthian Colleges*, No. 1:14–CV–135–RJS, 2015 WL 730015 (D. Utah Feb. 19, 2015); *Kimble v. Rhodes College*, No. C–10–5786, 2011 WL 2175249 (N.D. Cal. June 2, 2011); *Miller v. Corinthian Colleges*, 769 F.Supp.2d 1336 (D. Utah 2011); *Rodriguez v. Corinthian Colleges, Inc.*, No. 07–CV–02648–EWNMJW, 2008 WL 2979505 (D. Colo. Aug. 1, 2008); *Ballard v. Corinthian Colleges, Inc.*, No. C06–5256 FDB, 2006 WL 2380668 (W.D. Wash. Aug. 16, 2006); *Anderson v. Corinthian Colleges, Inc.*, No. C06–5157 FDB, 2006 WL 2380683 (W.D. Wash. Aug. 16, 2006).

[60] Because Corinthian required pre-dispute arbitration agreements, students were unable to successfully pursue individual lawsuits against the schools.

[61] Third Report of the Special Master for Borrower Defense to the Under Secretary, March 25, 2016, available at *https://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-3.pdf*.

judicial relief.[62] The ability to compel arbitration allows the school to bar the individual from bringing a suit, either individually or, by joinder, with other borrowers, and thereby avoid the publicity and financial risks described earlier that follow from class actions. Similarly, foreclosing individual or joinder actions eliminates, for other industry members, the risk that a well-publicized lawsuit will inspire similar individual or joinder actions against those schools, and therefore dampens or eliminates the incentive for other schools to comply with the law in their business dealings with their student customers. In addition, a well-publicized lawsuit is more likely to attract the attention and risk of compensatory or prophylactic enforcement action by this Department and other government agencies. Foreclosing individual student lawsuits removes this risk, much like class action waivers. Accordingly, mandated arbitration can be expected to frustrate the Federal and Direct Loan interests for the same reasons, though to a lesser degree, than class action waivers.

We note that the CFPB considered a ban on mandatory pre-dispute arbitration agreements, and in light of its mandate, preliminarily found the evidence to be "inconclusive whether individual arbitration conducted during the Study period is superior or inferior to individual litigation in remediating consumer harm . . ." 81 FR 32830, 32855, 32921. The CFPB did acknowledge that a ban on pre-dispute arbitration agreements would "give[ ] providers [of financial services the] same incentives to comply with the law as the proposed rule [banning class action waivers]. 81 FR 32830, 32921. Section 1028(b) of the Dodd-Frank Act provides that the mandate of the CFPB

with respect to any regulation the CFPB adopts regarding arbitration is to determine whether, it would be in the "public interest and for the protection of consumers" to "prohibit or impose limitations on the use of an agreement . . . for a consumer financial product or service providing for arbitration of any future dispute between the parties . . ." 12 U.S.C. 5518(b). Also, under section 1028(b), "the findings in such rule shall be consistent with the study."

The Department proposes to act under a different mandate, under section 454(a)(6) of the HEA, to adopt "provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of this part [the Direct Loan Program under Part D of title IV of the HEA]." 20 U.S.C. 1087d(a)(6).

As discussed above, the interests at stake in this determination are not the interests of the "public" and "consumers," but the interests of the Federal taxpayers whose funds are at risk for borrower defense claims asserted on Federal Direct Loans, and the objective at stake here, as discussed, is the successful financing of postsecondary education by providing loans repayable by current recipients for the benefit of future generations of borrowers. Because the interests at stake in regard to Direct Loans, though not inconsistent with those prescribed in the Dodd-Frank Act, are different, the Department, for the reasons stated here, considers individual litigation a better tool to protect the taxpayers' interests in the Direct Loan program than individual arbitration.

The current regulations in § 685.206(c) require Department decision makers to apply the State law applicable to the variety of causes of action that constitute borrower defenses to repayment. Under the proposed regulations, this standard would continue to apply to grievances by borrowers related to existing Direct Loans and, thus, continue to require Department officials to acquire sufficient familiarity with the law of the States to properly apply that law to thousands of borrower defense claims. The Federal interest, and the purposes of the Direct Loan program, are frustrated to the extent that schools are able to bar individuals with Direct Loan-related grievances from having those claims adjudicated by State courts, which are well-situated to adjudicate these claims under judicial procedures that assure appellate review of trial court rulings. We recognize the desirability of this option by retaining, under the proposed new standard in § 685.222, the option to obtain borrower

relief based on a favorable judgment of a court of competent jurisdiction, even if the judgment rests on a State law-based cause of action. By requiring institutions to permit individual borrowers access to judicial forums for claims that may constitute borrower defenses, the proposed regulations would allow borrower claims based on State law causes of action to be resolved locally, by tribunals well versed in that law, and whose decisions are subject to appellate review, unlike the far more narrow review to which arbitral awards are subject.[63] Permitting this access would promote a balanced evolution of the borrower defense standard, assuring that borrowers with meritorious State law claims will be able to pursue those in an appropriate forum, thereby reducing both the incentive for borrowers to assert their claims only through the Department process, and the burden on the Federal administrative process to continue to evaluate those claims.

Accordingly, we propose to prohibit a Direct Loan participating school from requiring the student to agree, prior to a dispute about a potential borrower defense claim, to arbitrate such a dispute. We refer to such agreements as "mandatory pre-dispute arbitration agreements" and define those agreements as "mandatory" if the school requires the student to agree to arbitrate either as part of the enrollment agreement or in any other form the student is required to execute in order to enroll or continue in school. We recognize that some pre-dispute arbitration agreements allow the consumer within a set period to affirmatively opt-out of an agreement to arbitrate. We include in the proposed definition that such agreements are binding unless the student affirmatively opts out of the agreement, and we invite comment on whether opt-out agreements should be considered "mandatory" agreements.

*Transparency of the Arbitral Process and Outcomes*

The Department currently has little opportunity to monitor, and more importantly timely respond to, grievances that borrowers present in arbitration and even private suits, and the defenses and arguments raised by title IV participants in opposing relief. We propose, therefore, to require schools to provide us, in a timely manner, with copies of initial and certain subsequent filings in judicial or arbitral tribunals, and decisions and awards rendered in those proceedings.

---

[62] Fed. R. Civ. Proc. 23 requires, for example, that questions of law or fact common to members of the class predominate over issues affecting only individual members. Fed. R. Civ. P. 23(b)(3). Courts have not infrequently denied class certification for student loan borrowers raising class action fraud claims against schools:

When students who seek to be named as plaintiffs in a proposed class action may have considered a variety of factors in deciding to enroll in a school alleged to have defrauded them, absent are typical and predominant questions whether such plaintiffs relied upon misrepresentations made by the school in deciding to enroll therein; class certification must therefore be denied. *Rodriguez* v. *McKinney*, 156 FRD. 112, 116 (E.D.Pa. 1994) (no predominance); *Graham* v. *Sec. Sav. & Loan*, 125 FRD. 687, 691 n. 4 (N.D.Ind. 1989) (no typicality), *aff'd sub nom. Veal* v. *First Am. Sav. Bank*, 914 F.2d 909 (7th Cir. 1990); *see Torres* v. *CareerCom Corp.*, 1992 WL 245923, at *5 (E.D.Pa. Sept. 18, 1992) (no predominance); *see generally Seiler Jr.* v. *E.F. Hutton & Co.*, 102 FRD. 880, 890 (D.N.J. 1984) (no typicality).

*Morgan* v. *Markerdowne Corp.*, 201 FRD. 341, 348 (D.N.J. 2001).

[63] See 9 U.S.C. 10.

The CFPB also proposes to require companies that use pre-dispute arbitration agreements to submit to the CFPB copies of initial arbitration claim filings made or received by the companies, arbitration awards, and certain other records.[64] The CFPB states that it is considering whether to make these available to the public by posting them to its Web site. The CFPB notes that this would permit the CFPB and the public to monitor arbitrations on an ongoing basis and identify trends that might "indicate problematic business practices that harm consumers, particularly since many claims settle before an award is rendered."[65]

We propose the same kind of requirement here, for similar reasons. Lack of timely notice and confidentiality provisions make it difficult for the Department to discern patterns and practices that may generate borrower defense claims, involve misuse of title IV, HEA funds, or constitute misrepresentations of the kind that the HEA authorizes the Department to remedy by fines and other actions. Without knowledge of the kinds of claims and relief granted, we cannot evaluate whether further measures are needed, or whether the school is resisting class action complaints on claims that would constitute borrower defenses under the proposed regulations.

The proposed submission requirement for institutions that use arbitration agreements would enable the Department to analyze the claims that may also be potential borrower defense claims, the schools' responses, and the outcomes of the claims in arbitration. We would be able then, as needed, to publicize both the kinds of potential borrower defense claims asserted and the decisions on those claims, and to decide whether either an immediate response or intervention was needed, or whether systemic correction action was warranted.[66] We would also be better

able to evaluate the merits of a claim that a borrower later raises as a borrower defense to repayment. We believe that proposed § 685.300(g), which would require schools to submit copies of filings for arbitration, responses, awards, and certain other documents within 60 days of the filing or receipt by the school, as applicable, is needed to enable the Secretary to monitor and evaluate these claims and thereby protect the interests of the United States and promote the purposes of the Direct Loan Program.[67] In contrast, the Secretary has a far greater and more immediate interest in claims and defenses asserted in litigation, because court rulings on those assertions may construe the HEA and Department regulations, and thus have far greater effect than arbitration decisions. The issues will be joined as early as 20 days after the service of the complaint, when the defendant must answer or move to dismiss the complaint. To participate in a timely manner in litigation in which the parties assert their interpretations of the HEA and regulations, the Department needs prompt notice of these filings, in order to identify those that raise these kinds of assertions, and we propose in § 685.300(h) that the school submit copies of each complaint, any counterclaim, any dispositive motion filed by either party, any ruling on a dispositive motion, and any judgment, within 30 days of receipt or filing by the school. We believe the proposed submission requirements are appropriate for the reasons stated above. However, we seek comment on whether the Department should adopt different submission, transparency, or procedural fairness requirements, and if so, what the supporting rationale for those requirements would be, and why those other requirements would meet the objectives outlined in this section.

To the extent that a school may now include in its arbitration agreements a confidentiality provision, the rule would require the school to remove that provision or modify its use to the extent needed to make these disclosures.

*Federal Arbitration Act*

A negotiator asserted that the Department does not have the authority to proscribe waivers of class action litigation or use of mandatory pre-dispute arbitration agreements, citing recent Supreme Court rulings upholding contractual agreements to arbitrate that held that the Federal Arbitration Act (FAA) protects enforceable arbitration agreements and expresses a "liberal Federal policy favoring arbitration."[68] The FAA protects the validity and enforceability of arbitration agreements. Section 2 of the FAA states: "[a] written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. 2. This act was intended to reverse judicial hostility to arbitration and to put arbitration agreements on an equal footing with other contracts.[69] The negotiator contended that the FAA as applied in case law barred the Department from adopting a rule that would ban either such class action waivers or mandatory pre-dispute arbitration agreements.

The Department does not have the authority, and does not propose, to displace or diminish the effect of the FAA. However, the Department has clear authority to regulate the conduct of institutions that wish to participate in the Direct Loan Program. As noted earlier, section 452(b) of the HEA states, "No institution of higher education shall have a right to participate in the [Direct Loan] programs authorized under this part [part D of title IV of the HEA]." 20 U.S.C. 1087b(b). If a school chooses to participate in the Direct Loan Program, it must enter into a Direct Loan Program participation agreement. 20 U.S.C. 1087d. Section 454(a)(6) of the HEA authorizes the Department to include in that participation agreement "provisions that the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program. 20 U.S.C. 1087d(a)(6). We propose to adopt regulations that limit the use of arbitration agreements under this authority. We discuss earlier the reasons we consider the proposed limits on arbitration to be necessary to protect the interests of the United States and promote the purposes of the Direct Loan Program. Under proposed § 685.300(f), an institution would

---

[64] CFPB Arbitration Agreements NPRM, 81 FR 32830, 32926 (May 24, 2016), to be codified at 12 CFR 1040.4(b)(1).

[65] SBREFA Outline, at 20.

[66] Schools and other institutions participating in the title IV, HEA programs have defended suits by borrowers by contending that borrowers cannot rely on State law to redress conduct by a defendant that also violates an HEA requirement, because, they argue, enforcement of HEA requirements is vested solely in the Secretary, not in private parties. See, *e.g.*, *Sanchez* v. *ASA College Inc.*, in which the defendant school raised this argument:

Defendants also assert that dismissal is warranted because the HEA grants the Secretary "exclusive authority" to remedy any Title IV violations and, thus, that the HEA precludes Plaintiffs' claims based on failures to comply with its provisions. (Defs. Mem. 10–15).

*Sanchez* v. *ASA Coll., Inc.*, No. 14–CV–5006 JMF, 2015 WL 3540836, at *4 (S.D.N.Y. June 5, 2015). The Department, with timely notice in that instance, was able to file a statement of interest to rebut this serious misconception that a party injured by conduct that violates an HEA requirement of law cannot sue for relief for that injury in reliance on a State law that would allow a party to sue for relief for that conduct. A suit for relief based on State law in such a situation is not an attempt to find a private right of action for relief under the HEA.

[67] The 60-day submission requirement is the same period as proposed by the CFPB for submission of arbitral filings. CFPB Arbitration Agreements NPRM, 81 FR 32830, 32926, to be codified at 12 CFR 1040.4(b)(2).

[68] *AT&T Mobility* v. *Concepcion*, 563 U.S. 333 (2011).

[69] *Id.* at 342.

remain free to require students to enter into mandatory pre-dispute arbitration agreements, so long as those agreements exclude any requirement to arbitrate a potential borrower defense. An institution that does not choose to accept these provisions is free to include arbitration requirements in its enrollment agreements, and to exercise its contractual rights under such agreements to compel arbitration. However, under the proposed regulations, the institution would not be permitted to obtain or exercise such agreements and continue to participate in the Direct Loan Program unless those agreements exclude any requirement that the student arbitrate a potential borrower defense claim.

*Implementation for Agreements Regarding Arbitration*

Institutions that intend to mandate pre-dispute arbitration agreements or obtain class action waivers from students after the effective date of the proposed regulations will be required to include provisions in those agreements that exclude from any class action waiver or commitment to arbitrate those claims that relate to the making of the Direct Loan or the provision of educational services by the institution. The proposed regulations include provisions explaining the institution's commitment not to attempt to compel arbitration or resist class actions, as applicable, for claims that are potential borrower defense claims.

We recognize that many agreements regarding arbitration or class action waivers have already been executed and more may be executed prior to the date on which the proposed regulations may be issued in final and take effect. The proposed regulations therefore require that an institution that has such agreements not only to comply with the regulations that would bar the institution from attempting to exercise mandatory pre-dispute arbitration agreements or class action waivers regarding borrower defense-type claims, but also to either amend the agreements, or at least notify, the students who executed those agreements that the institution would not attempt to exercise those agreements in a manner proscribed by the regulations.

The institution would be required to notify students who had already executed a non-compliant arbitration or class action waiver agreement no later than the date on which the institution provides exit counseling, which provides a useful context in which to explain the change. For those who have executed a non-compliant arbitration or class action waiver but whom the

institution has already provided exit counseling that included or accompanied the notice or amendment, the proposed rule would require the institution to provide the notice or amendment within 60 days of the date on which the institution receives a complaint in a lawsuit by a former student that raised borrower defense claims, or a demand for arbitration of a borrower defense claim. As proposed here, the institution would be barred from opposing such a lawsuit on the ground that the borrower had already agreed to waive class action relief or individual lawsuit for relief for such a claim. We request comment on whether the institution should provide notice to currently-enrolled students or to former students, and if so, when and to whom those notices should be required.

*Severability*

While the Department is confident that the provisions addressing arbitration in § 685.300(d), (e), (f), (g), (h) and (i) would not violate the FAA, it has carefully considered the negotiator's view, and the possibility that a court might rule that any of these provisions is invalid based on the FAA or any other reason. The Department considers the separate provisions barring waivers of class actions, barring mandatory pre-dispute arbitration agreements, and requiring the institution to provide to the Department copies of initial filings and subsequent filings, awards, and decisions in borrower defense suits or arbitrations, to be valuable independently and to operate independently and to serve separate but complementary objectives. Accordingly, in an abundance of caution, we propose in § 685.309 to specify the Department's intent that if any provision of subpart C of part 685 is held invalid, the remaining parts shall not be affected.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

**Introduction**

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or

State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This proposed regulatory action would have an annual effect on the economy of more than $100 million because the proposed regulations would have annual federal budget impacts of approximately $199 million in the low impact scenario to $4.2323 billion in the high impact scenario at 3 percent discounting and $198 million and $4.17 billion at 7 percent discounting, additional transfers from affected institutions to student borrowers via reimbursements to the Federal government, and annual quantified costs of $14.9 million related to paperwork burden. Therefore, this proposed action is "economically significant" and subject to review by OMB under section 3(f) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits, both quantitative and qualitative, of this proposed regulatory action and have determined that the benefits would justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these proposed regulations only on a reasoned determination that their benefits would justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these proposed regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action would not unduly interfere with State, local, and tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis we discuss the need for regulatory action, the potential costs and benefits, net budget impacts, assumptions, limitations, and data sources, as well as regulatory alternatives we considered.

Under "Initial Regulatory Flexibility Act Analysis," we consider the effect of the proposed regulations on small entities.

*Need for Regulatory Action*

The proposed regulations address several topics related to the administration of title IV, HEA student aid programs and benefits and options for borrowers. As stated in the preamble, the Department first implemented borrower defense regulations for the Direct Loan Program in the 1995–1996 academic year to protect borrowers. The Department's original intent was for this rule to be in place for the 1995–1996 academic year, and then to develop a more extensive rule for both the Direct and FFEL loan programs through negotiated rulemaking in the following year.

However, based on the recommendation of non-Federal negotiators in the spring of 1995, the Secretary decided not to develop further regulations for the Direct Loan and FFEL programs. As a result, the regulations have not been updated in two decades to establish appropriate processes or provide other necessary information to allow borrowers to effectively utilize borrower defenses.

For instance, the current regulations require an analysis of State law in order to determine the validity of a borrower defense claim. This approach creates complexities in determining which State law applies and potential inequities, as students in one State may receive different relief than students in another State, despite having common facts and claims.

For example, the landscape of higher education has changed significantly over the past 20 years. In particular, the role of distance education in the higher education sector has grown substantially. In the 1999–2000 academic year, about eight percent of students were enrolled in at least one distance education course; by the 2007–2008 academic year, that number had grown to 20 percent.[70] Recent IPEDS data indicate that in the fall of 2013, 26.4 percent of students at degree-granting, title IV participating institutions were enrolled in at least one distance education class.[71] Much of this growth occurred within, and coincided with, the growth of the proprietary higher education sector. In the fall of 1995, degree-granting, for-profit institutions enrolled approximately 240,000 students. In the fall of 2014, degree-granting, for-profit schools enrolled over 1.5 million students.[72] These changes to the higher education industry have allowed students to enroll in colleges based in other States and jurisdictions with relative ease.

These changes have also had an impact on the Department's ability to apply its borrower defense regulations. The current borrower defense regulations do not identify which State's law is considered the "applicable" State law on which the borrower's claim can

be based.[73] Generally, the regulation was assumed to refer to the laws of the State in which the institution was located; we did not have much occasion to address differences in protection for borrowers in States that offer little protection from school misconduct or borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States have extended their rules to protect these students, while others have not.

As noted in the preamble, Corinthian, a publicly traded for-profit higher education company that enrolled over 70,000 students at more than 100 campuses nationwide, filed for bankruptcy in 2015 after being the subject of multiple investigations and actions by Federal and State governments. While the Department is committed to ensuring that students harmed by Corinthian's misrepresentations receive the relief to which they are entitled under the current borrower defense and closed school discharge regulations, the Department also recognized that the existing rules made this process burdensome, both for borrowers and for the Department. As the Department began to determine the best process for dealing with the fall-out of the Corinthian bankruptcy, it became apparent that under the current process, significant Department resources would be required to review individual State laws to determine the law that would be applicable to claims that might be received from many of these individual borrowers. In order to create and oversee a process to provide debt relief for these Corinthian students who applied for Federal student loan discharges based on claims against Corinthian, the Department appointed a Special Master in June of 2015.

As a result of this experience, the Department is proposing new regulations that would develop a Federal standard for borrower defense to help ensure that all Direct Loan borrowers have a process to obtain adequate loan relief for injury caused by the acts or omissions of the institutions they attended. The proposed regulations would also provide clarity to the process by which a borrower defense is asserted and resolved. To protect taxpayers and the Federal government, the Department also seeks to hold institutions responsible for their acts and omissions that give rise to borrower

---

[70] Learning at a Distance: Undergraduate Enrollment in Distance Education Courses and Degree Programs (*http://nces.ed.gov/pubs2012/2012154.pdf*).

[71] 2014 Digest of Education Statistics: Table 311.15: Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: fall 2012 and fall 2013.

[72] 2015 Digest of Education Statistics: Table 303.10: Total fall enrollment in degree-granting postsecondary institutions, by attendance status, sex of student, and control of institution: Selected years, 1947 through 2025 (*http://nces.ed.gov/programs/digest/d14/tables/dt14_303.10.asp?current=yes*).

[73] In the few instances prior to 2015 in which claims have been recognized under current regulations, borrowers and the school were typically located in the same State.

defenses. The proposed regulations would also limit required arbitration or internal institutional dispute resolution processes for borrower defense claims.

Additionally, to enhance and clarify other existing protections for students, the proposed regulations would update the basis for obtaining a false certification discharge, clarify the processes for false certification and closed school discharges, require institutions to provide applications and explain the benefits and consequences of a closed school discharge, and establish a process for a closed school discharge without an application for students who do not re-enroll in a title IV-participating institution within three years of an institution's closure. The proposed regulations would also codify

the Department's practice that a discharge based on school closure, false certification, unpaid refund, or defense to repayment will result in the elimination or recalculation of the subsidized usage period associated with the loan discharged.

The Department also proposes to amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; clarify rules regulating the capitalization of interest on defaulted FFEL Loans; require that proprietary schools with zero or negative loan repayment rates warn prospective and enrolled students of those repayment rate outcomes; require that a school disclose on its Web

site and to prospective and enrolled students if it is required to provide financial protection to the Department; clarify the treatment of spousal income in the PAYE and REPAYE plans; and make other changes that we do not expect to have a significant economic impact.

We believe that our proposals in this NPRM represent our best efforts to engage all sectors of the postsecondary industry and develop regulations that are both effective and practical.

**Summary of Proposed Regulations**

The table below briefly summarizes the major provisions of the proposed regulations.

TABLE 2—SUMMARY OF PROPOSED REGULATIONS

| Provision | Reg section | Description of provision |
|---|---|---|
| **Borrower defense to repayment** | | |
| Applicability ........................................... | §685.206 | Clarifies that existing regulations apply to loans first disbursed before July 1, 2017. |
| State Law ............................................... | §685.206 | Clarifies that a borrower defense claim may be asserted if an institution violates applicable State law as it relates to the making of the loan or the provision of educational services. |
| Federal Standard and Process ........... | §685.222 | Adds a new section addressing borrower defenses for loans first disbursed on or after July 1, 2017, and defines circumstances under which a borrower defense may be established. Establishes a process for asserting and determining a borrower defense claim for loans first disbursed before and after July 1, 2017. |
| Misrepresentation ................................. | §668.71<br>§685.222(d)(2) | Amends the definition of "misrepresentation" for what the Secretary may consider in determining whether schools engaged in misrepresentation for §668.71, adopts the definition for §685.222, and in §685.222 requires that a borrower must have reasonably relied on the misrepresentation. |
| Remedial Action and Recovery from the Institution. | §685.206 | Removes provision that the Secretary will not initiate action to recover after the end of the three-year record retention period. |
|  | §685.222(e) | Establishes that the Secretary may initiate an action to recover for the amount of relief resulting from an individually filed and determined borrower defense application. |
|  | §685.222(h)(5) | Indicates that the Secretary will recover the amount of relief resulting from a group process for borrower defenses with respect to loans made to attend an open school. |
|  | §685.308 | Revises to describe grounds on which an institution causes a loss for which the Secretary holds schools accountable, along with the procedures to establish and enforce that liability. |
| Administrative Forbearance ................. | §685.205(b)(6) | Adds a mandatory administrative forbearance during the period when the Secretary is determining the borrower's eligibility for a borrower defense discharge. |
|  | §682.211 | Mirrors the Direct Loan mandatory administrative forbearance for FFEL program loans. |

TABLE 2—SUMMARY OF PROPOSED REGULATIONS—Continued

| Provision | Reg section | Description of provision |
|---|---|---|
| Limits on Dispute Resolution Procedures. | § 685.300(b)(11), (d)–(i) | Adds to Direct Loan program participation agreement provisions relating to schools' use of certain dispute resolution procedures. Under these proposed provisions, schools may not: (1) Require students to pursue borrower defense complaints through an internal institutional process before the student presents the complaint to an accrediting agency or government agency; (2) require arbitration of a potential borrower defense claim asserted through a class action lawsuit until a court has denied class certification or dismissed the class claim, and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved, or (3) compel a student to enter into a pre-dispute agreement to arbitrate a borrower defense claim, or to rely in any way on a pre-dispute arbitration agreement with respect to any aspect of a borrower defense claim.<br>Requires institutions to include the notices and provisions in § 685.300(e)(3) in any agreements entered into after effective date of this regulation with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, including any agreement regarding arbitration.<br>Requires institutions to notify the Secretary of the initial filing of the claim, whether in court or in arbitration, and provide copies of the complaint and any counterclaim, any pre-dispute arbitration agreement filed with the arbitrator or arbitration administrator, any dispositive motion filed by a party to the suit, and the ruling on any dispositive motion and the judgment issued by the court.<br>For agreements executed before the effective date of the proposed regulation, requires institutions to comply with the regulations and either amend the agreements or notify students that the institution would not attempt to exercise those agreements in a manner proscribed by the proposed regulations. Notification would occur no later than exit counseling, or in the case of previously enrolled exit students who did not receive the updated exit counseling and who sue or file for arbitration, the date on which the institution files its initial response or answer to a complaint in a lawsuit or demand for arbitration made by a student who was not already provided with notice or amendment. |
| Closed School Discharge |  |  |
| Provide Application ............................... | § 668.14(b)(32) | Requires a school to provide to all enrolled students, after the Department initiates any action to terminate the school's participation, a closed school discharge application and a written disclosure of the benefits and consequences of a closed school discharge as an alternative to a teach-out. |
| Departmental Review of Guaranty Agency Denials. | § 682.402(d)(6)(ii)(F) | Requires guaranty agency that denies a closed school discharge request to inform borrower of opportunity for review by the Secretary. |
| Discharge without Application ............. | § 674.33(g)(3)(iii);<br>§ 682.402(d)(8)(iii);<br>§ 685.214(c)(2) | Authorizes the Department or a guaranty agency acting with the Department's permission to grant a closed school discharge without borrower application based on evidence in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in a title IV institution within three years after the school closed. |
| False Certification Discharge |  |  |
| Basis for Discharge ............................. | § 685.215 | Eliminates references to "ability-to-benefit" and establishes as grounds for a false certification discharge the certification of eligibility of a student who is not a high school graduate or the improper certification of a borrower's satisfactory academic progress.<br>Borrower can also qualify for false certification discharge if the borrower failed to meet applicable State requirements for employment due to physical or mental condition, age, criminal record, or other reason accepted by the Secretary that would prevent the borrower from obtaining employment in the field for which the training program supported by the loan was intended. |
| Process ................................................. | § 685.215(d) | Updates procedures and describes evidence the Department uses to determine eligibility for a false certification discharge.<br>Also requires the Department to: Explain to the borrower the reasons for a denial and the evidence the determination was based on; provide the borrower with an opportunity to submit additional evidence; and notify the borrower if the determination changes based on the additional evidence submitted. |

TABLE 2—SUMMARY OF PROPOSED REGULATIONS—Continued

| Provision | Reg section | Description of provision |
|---|---|---|
| **Other Provisions** | | |
| Disclosures and Warnings ................. | § 668.41(h) and (i) | Requires warning to enrolled and prospective students by a proprietary institution that does not qualify for a low borrowing exemption if its loan repayment rate is equal to or below zero percent. Requires disclosure by an institution from any sector that is required to provide financial protection to the Secretary such as an irrevocable letter of credit or cash under § 668.175(d) or (f), or to establish a set-aside under § 668.175(h). Specifies manner in which such disclosures must be made. |
| Interest Capitalization .......................... | § 682.202(b)(1); § 682.410(b)(4); § 682.405 | Clarifies that interest capitalization when a guaranty agency sells a rehabilitated loan is not permitted. Also clarifies that when a guaranty agency holds a defaulted FFEL Loan and the guaranty agency has suspended collection activity to give the borrower time to submit a closed school or false certification discharge application, capitalization is not permitted if collection on the loan resumes because the borrower does not return the appropriate form within the allotted timeframe. |
| 150 Percent Direct Subsidized Loan Limit. | § 682.202 | Codifies Department's current practice that a discharge based on school closure, false certification, unpaid refund, or defense to repayment will lead to the elimination (for full discharge) or recalculation (for partial discharge) of the subsidized usage period that is associated with the loan or loan discharged. If the discharge results in a remaining eligibility period greater than zero, the borrower is no longer responsible for interest that accrues on a Direct Subsidized Loan or portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, unless the borrower again exceeds the 150 percent limit with additional borrowing. |
| Electronic Death Certificate ................. | § 674.61(a); § 682.402(b)(2); § 685.212(a); § 686.42(a) | Allows death discharges to be based on an accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or through verification of the death through an authoritative Federal or State electronic database approved by the Secretary. |
| Debt Compromise Authority ................. | 34 CFR 30.70 | Reflects increased debt compromise authority to $100,000. |
| | | Clarifies that generally applicable limit does not apply to claims arising under FFEL, Direct Loans, or Perkins Loan programs and requires that the Department seek DOJ review for resolution of such claims over $1,000,000. |
| PAYE and REPAYE Clarifications ...... | § 685.209(a) and (c) | For REPAYE, removes language regarding, and cross-references to, partial financial hardship. |
| | | For REPAYE, makes it clear that no adjustment is made to a borrower's monthly payment for a spouse's eligible loan debt if the spouse's income is excluded from the calculation of the borrower's monthly payment. |
| | | For PAYE and REPAYE, makes it clear that the inclusion of FFEL Loans in the definition of "eligible loans" is to take them into consideration for certain terms and conditions of the PAYE and REPAYE plans, but does not allow FFEL program loans to be repaid under these plans. |
| Nurse Faculty Loan, Federal Perkins, or Health Professions Student Loan Consolidation. | § 685.220 | Provides that nurse faculty loans made under part E of title VIII of the Public Health Service Act may be consolidated into a Direct Consolidation Loan. Reflects updates to statutory language. |
| | | Revises § 685.220(d)(1)(i) to allow a borrower to obtain a Direct Consolidation Loan if the borrower consolidates at least one eligible loan under § 685.222(b). This reflects the Department's long-standing policy that generally Direct Program Loans should be given the same treatment for parallel aspects of FFEL Loans, unless otherwise provided for in the HEA or the Department's regulations. |

## Discussion of Costs and Benefits

The primary potential benefits of the proposed regulations are: (1) An updated and clarified process and a Federal standard to improve the borrower defense process and usage of the borrower defense process and to increase protections for students; (2) increased financial protections for taxpayers and the Federal government; (3) additional information to help students, prospective students, and their families make educated decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved

conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs.

We have considered and determined the primary costs and benefits of the proposed regulations for the following groups or entities that we expect to be impacted by the proposed regulations:
• Students and borrowers
• Institutions

• Guaranty agencies and loan servicers
• Federal, State, and local government

### Borrower Defense, Closed School Discharges, and False Certification Discharges

#### Students and Borrowers

Borrowers would be the primary beneficiary of the proposed regulations. The proposed regulations would allow borrowers to navigate the borrower defense process more efficiently and effectively. A simplified process may encourage borrowers who may have

been unaware of the process, or intimidated by the complexity of the process in the past, to file a claim.

Furthermore, these proposed changes could reduce the number of borrowers who are struggling to meet their student loan obligations. During the public comment periods of the negotiated rulemaking sessions, many public commenters who were borrowers mentioned that they felt that they had been defrauded by their institutions of higher education and were unable to pay their student loans or obtain debt relief under the current regulations. Future borrowers are less likely to face these misrepresentations, since the financial consequences to schools would be dire.

Providing an automatic forbearance with an option for the borrower to decline the temporary relief and continue making payments would reduce the potential burden on borrowers pursuing borrower defenses. These borrowers would be able to focus on supplying the information needed to process their borrower defense claims without the pressure of continuing to make payments on loans for which they are currently seeking relief. When claims are successful, there will be a transfer between the Federal government and affected student borrowers as balances are forgiven and some past payments are returned. In the scenarios described in the *Net Budget Impacts* section of this analysis, those transfers range from $182 million to $5.8 billion annually.

Borrowers who ultimately have their loans discharged will be relieved of debts they may not have been able to repay, and that debt relief can ultimately allow them to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for daycare. They also will be able to return into the higher education marketplace and pursue credentials they need for career advancement. To the extent borrowers have subsidized loans, the elimination or recalculation of the borrowers' subsidized usage period could relieve them of their responsibility for accrued interest and make them eligible for additional subsidized loans, which could make returning to higher education a more acceptable option.

The proposed regulations would also give borrowers more information with which they can make informed

decisions about the institutions they choose to attend. An institution would be required to disclose the reasons that it was required to obtain a letter of credit. Recent events involving closure of several large proprietary institutions have shown the need for lawmakers, regulatory bodies, State authorizers, taxpayers, and students to be more broadly aware of circumstances that could affect the continued existence of an institution. The disclosure of institutions' status as being required to provide financial protection would allow borrowers to receive early warning signs that an institution's financial or accreditation status may be at risk, and therefore borrowers may be able to withdraw or transfer to an institution in better standing in lieu of continuing to work towards earning credentials that may have limited value.

Proprietary institutions would also be required to provide a warning to prospective and enrolled students if their repayment rate is equal to or below zero percent. To estimate the effect of the repayment rate warning on institutions, the Department analyzed College Scorecard data and found that 493 of 1,174 proprietary institutions with repayment rates in the data had rates less than or equal to 50 percent, roughly equivalent to a repayment rate of zero percent or below, which would trigger the warning requirement under the proposed regulations. This analysis does not take into account the low borrowing exemption, and does not include graduate students.

### Institutions

Institutions would bear many of the costs of the proposed regulations, which fall into three categories: Paperwork costs associated with compliance with the regulations; other compliance costs that may be incurred as institutions adapt their business practices and training to ensure compliance with the regulations; and costs associated with obtaining letters of credit or suitable equivalents if required by the institution's performance under a variety of triggers. Additionally, there may be a potentially significant amount of funds transferred between institutions and the Federal government as reimbursement for successful claims. Some institutions may close some or all of their programs if their activities generate large numbers of borrower defense claims.

A key consideration in evaluating the effect on institutions is the distribution of the impact. While all institutions participating in title IV loan programs are subject to the possibility of borrower defense, closed school, and false certification claims, and the reporting requirements in the proposed regulations, the Department expects that fewer institutions will engage in conduct that generates borrower defense claims. Eventually, the proposed regulations can be expected to reduce the number of schools that would face the most significant costs to come into compliance, transfers to reimburse the government for successful claims, costs to obtain required letters of credit, and disclosure of borrower defense claims against the schools. In the scenarios described in the *Net Budget Impacts* section of this analysis, the annual transfers from institutions to students, via the Federal government, as reimbursement for successful claims ranges from $55 million to $3.8 billion. On the other hand, it is possible that high-quality, compliant institutions, especially in the for-profit sector, will see benefits if the overall reputation of the sector improves as a result of (1) more trust that enforcement against bad actors will be effective, and (2) the removal of bad schools from the higher education marketplace, freeing up market share for the remaining schools.

The accountability framework in the proposed regulations requiring institutions to provide financial protection in response to various triggers would generate costs for institutions. Some of the triggering provisions would affect institutions differently depending upon their type and control, as, for example, only publicly traded institutions are subject to delisting or SEC suspension of trading, only proprietary institutions are subject to the 90/10 rule, and public institutions are not subject to the financial protection requirements. To the extent data were available, the Department evaluated the financial protection triggers to analyze the expected impact on institutions. Several of the triggers are based on existing performance measures and are aimed at identifying institutions that may face sanctions and experience difficulty meeting their financial obligations. The triggers and their potential consequences are discussed in Table 3.

TABLE 3—AUTOMATIC TRIGGERS

| Trigger | Description | Impact |
|---|---|---|
| **Automatic Triggers (institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard)** | | |
| State or Federal agency actions. | If currently or in three most recently completed award years an institution has to repay a debt or liability arising from an investigation by a State, Federal, or other oversight entity, or settles or resolves a suit brought by one of those entities related to the making of a Federal loan or the provision of educational services, or has been sued by a government agency for such claims, unless that suit has since been dismissed. Material if amount exceeds the audit threshold in 2 CFR part 200, currently $750,000, or 10 percent of current assets.<br>For judgments entered against the institution in most recent fiscal year in suit by government agency, if amount exceeds thresholds above.<br>For suits by State, Federal, or other oversight entities unrelated to Federal loans or provision of educational services, if the potential damages exceed 10 percent of current assets.<br>For pending qui tam suits or suits by private parties related to borrower defense-type claims if the suit has survived a motion for summary judgment and the suit seeks recovery of 10 percent of current assets or more. | Since 2010, at least 25 institutions have been investigated or reached settlements with State AGs, with some being involved in actions by multiple States. Federal agencies, including the Department, DOJ, FTC, CFPB, and the SEC have been involved in actions against at least 20 institutions, with multiple actions against some schools.<br>Amount of financial protection calculated as 10 percent or more, as determined by the Secretary, of the amount of Direct Loans received by the institution in the most recently completed fiscal year. |
| Repayments to the Secretary. | Currently or at any time in the three most recently completed award years, the institution was required to repay the Secretary for any losses from borrower defense claims that exceeded the lesser of the audit threshold amount in 2 CFR part 200 (currently $750,000) or 10 percent of current assets. | Amount of required financial protection calculated as the greatest annual loss incurred in the last three completed award years plus the portion of outstanding claims represented by the ratio of successful borrower claims to total claims over the three most recently completed award years. |
| Accrediting Agency Actions. | If currently or at any time in the three most recently completed award years, the institution's primary accrediting agency required the institution to submit a teach-out plan for itself or any additional branches or locations or placed the institution on probation, issued a show-cause order, or placed the institution in a similar accreditation status for failing to meet one or more of the agency's standards, and the accrediting agency does not notify the Secretary within six months that the institution has come into compliance. | In the past three fiscal years, 52 non-public institutions have lost eligibility based on accreditation issues and 54 were put on heightened cash monitoring level two. |
| Loan Agreements and Obligations. | If an institution discloses in a note in its most recently audited financial statement that it violated a provision or requirement in a loan agreement with its largest secured creditor or failed to make a payment for more than 120 days to its largest secured creditor. Also, the occurrence of a monetary or nonmonetary default or delinquency event, as defined under the terms of a security or loan agreement between the institution and the creditor with the largest secured extension of credit to the institution, or the occurrence of any other event as provided under such an agreement that triggers or provides a recourse by the creditor for an increase in collateral, changes in contractual obligations, an increase in interest rates or payments, or imposes some sanction, penalty, or fee upon the institution. | |
| Non-Title IV Revenue. | If the institution fails the 90/10 revenue test in the most recently completed fiscal year. Applies to proprietary institutions only. | In the most recent 90/10 report, 14 institutions received 90 percent or more of their revenues from title IV funds. The total title IV funding for those institutions in award year (AY) 2013–14 was $57 million. |
| Publicly Traded Institutions. | If the institution's stock is involuntarily delisted from the exchange on which it is traded, the SEC warns the institution it will suspend trading on the institution's stock, or the institution fails to file a required annual or quarterly report with the SEC on time, or the institution disclosed or was required to disclose in a report filed with the SEC a judicial or administrative proceeding not covered under the triggers listed above. | |

TABLE 3—AUTOMATIC TRIGGERS—Continued

| Trigger | Description | Impact |
|---|---|---|
| Gainful Employment | For institutions where over 50 percent of students who receive title IV aid are enrolled in GE programs, if more than 50 percent of those enrolled in GE programs are in programs that failed or are in the zone under the D/E rates measure. | The Department found that of 3,958 institutions that reported GE programs for 2013–14, 1,059 institutions had a D/E rate in our 2011 GE Informational Rates and over 50 percent of their enrollment in GE programs. Of these, 107 non-public institutions had more than 50 percent of their GE enrollment in zone or failing programs. Title IV aid received by these institutions in AY2014–15 totaled $1.02 billion. The Department will continue to monitor this trigger as more recent D/E rates become available. |
| Withdrawal of Owner's Equity. | For institutions with a composite score under 1.5, any withdrawal of owner's equity from the institution by any means, including by declaring a dividend. | |
| Cohort Default Rates. | Institution's two most recent cohort default rates are 30 percent or greater. Does not apply if institution files a challenge, request for adjustment, or appeal with respect to its CDR, and that action results in reducing the CDR below 30 percent or the institution not losing eligibility or not being placed on provisional certification. | From the most recently released official CDR rates, for AY2012–13 and AY2011–12, 37 of 3,081 non-public institutions that had CDR rates in both years were over 30 percent in both years. Title IV aid received by these institutions in AY2014–15 totaled $27.8 million. |
| **Discretionary Triggers** | | |
| Significant Fluctuation in Direct Loan or Pell Grant Volumes. | There are significant fluctuations in Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution in consecutive award years that cannot be explained by changes in the institutions' programs. No specific threshold is established. | The Department looked at fluctuations in Direct Loan amounts and found that 991 of 3,590 non-public institutions had an absolute change in Direct Loan volume of 25 percent or more between the 2013–14 and 2014–15 award years. |
| High Annual Dropout Rates. | High dropout rates as calculated by the Secretary. No specific threshold is established. | The Department analyzed College Scorecard data to develop a withdrawal rate within six years. Of 928 proprietary institutions with data, 482 had rates from 0 to 20 percent, 415 from 20 to 40 percent, 30 from 40 to 60 percent, and 1 from 60 to 80 percent. Of 1,058 private not-for-profit institutions with data, 679 had rates from 0 to 20 per cent, 328 from 20 to 40 percent, 51 from 40 to 60 percent, and none above 60 percent. Of 1,476 public institutions with data, 857 had rates from 0 to 20 per cent, 587 from 20 to 40 percent, 32 from 40 to 60 percent, and none above 60 percent. |
| State Licensing Agency. | Institution is cited by State licensing or authorizing agency for failing State or agency requirements. | |
| Financial Stress Test. | The institution fails a financial stress test used to evaluate whether the institution has sufficient resources to absorb losses that may be incurred as a result of adverse conditions and continue to meet its obligations to students and to the Secretary. | |
| Credit Rating | Institution or corporate parent has non-investment grade bond or credit rating. | According to Moody's Investors Services, it rates over 500 universities representing the majority of debt in the sector. This includes over 230 four-year public institutions, which are exempt from the financial protection triggers, and almost 275 private colleges and universities. Of these, only 12 were below the Baa3 rating for investment grade as of December 2014, but the report did note that downgrades were more common than upgrades.[74] |
| SEC 8–K Reporting | If an institution reports an adverse event to the SEC on a Form 8–K. | At least eight publicly traded institutions have reported events in Form 8–K filings, with most reporting multiple events in the past five years. |

In addition to any resources institutions would devote to training or changes in business practices to improve compliance with the proposed

---

[74] See Moody's Investors Service, The Financial & Strategic Outlook for Private Colleges, January 5, 2015, available at www.cic.edu/News-and-Publications/Multimedia-Library/CICConference Presentations/2015%20Presidents%20Institute/ 20150105-The%20Financial%20and%20 Strategic%20Outlook%20for%20Private %20Colleges%205.pdf.

---

regulations, institutions would incur costs associated with the reporting and disclosure requirements of the proposed regulations. This additional workload is discussed in more detail under Paperwork Reduction Act of 1995. In total, the proposed regulations are estimated to increase burden on institutions participating in the title IV, HEA programs by 384,293 hours. The monetized cost of this burden on institutions, using wage data developed

using BLS data available at www.bls.gov/ncs/ect/sp/ecsuphst.pdf, is $14,045,915. This cost was based on an hourly rate of $36.55.

*Guaranty Agencies and Loan Servicers*

Several provisions may impose a cost on guaranty agencies or lenders, particularly the limits on interest capitalization. Loan servicers may have to update their process to accept electronic death certificates, but

increased use of electronic documents should be more efficient over the long term. As indicated in the *Paperwork Reduction Act of 1995* section of this preamble, the proposed regulations are estimated to increase burden on guaranty agencies and loan servicers by 7,622 hours related to the mandatory forbearance for FFEL borrowers considering consolidation for a borrower defense claim and reviews of denied closed school claims. The monetized cost of this burden on guaranty agencies and loan servicers, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/ sp/ecsuphst.pdf,* is $278,584. This cost was based on an hourly rate of $36.55.

*Federal, State, and Local Governments*

In addition to the costs detailed in the *Net Budget Impacts* section of this analysis, the proposed regulations would affect the Federal government's administration of the title IV, HEA programs. The borrower defense process in the proposed regulations would provide a framework for handling claims in the event of significant institutional wrongdoing. The Department may incur some administrative costs or shifting of resources from other activities if the number of applications increases significantly and a large number of claims require hearings. Additionally, to the extent borrower defense claims are not reimbursed by institutions, Federal government resources that could have been used for other purposes will be transferred to affected borrowers. Taxpayers will bear the burden of these unreimbursed claims. In the scenarios presented in the *Net Budget Impacts* section of this analysis, annualized unreimbursed claims range from $64 million to $4.1 billion.

The accountability framework and financial protection triggers would provide some protection for taxpayers as well as potential direction for the Department and other Federal and State investigatory agencies to focus their enforcement efforts. The financial protection triggers may potentially assist the Department as it seeks to identify, and take action regarding, material actions and events that are likely to have an adverse impact on the financial condition or operations of an institution. In addition to the current process where, for the most part, the Department determines annually whether an institution is financially responsible based on its audited financial statements, under these proposed regulations the Department may determine at the time a material action or event occurs that the

institution is not financially responsible.

*Other Provisions*

The technical corrections and additional changes in the proposed regulations should benefit student borrowers and the Federal government's administration of the title IV, HEA programs. Updates to the acceptable forms of certification for a death discharge would be more convenient for borrowers' families or estates and the Department. The provision for consolidation of Nurse Faculty Loans reflects current practice and gives those borrowers a way to combine the servicing of all their loans. Many of these technical corrections and changes involve relationships between the student borrowers and the Federal government, such as the clarification in the REPAYE treatment of spousal income and debt, and they are not expected to significantly impact institutions.

**Net Budget Impacts**

The proposed regulations are estimated to have a net budget impact in costs over the 2017–2026 loan cohorts ranging between $1.997 billion in the lowest impact scenario to $42.698 billion in the highest impact scenario. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans.

The provisions most responsible for the costs of the proposed regulations are those related to the discharge of borrowers' loans, especially the changes to borrower defense and closed school discharges. When an institution engages in behavior that could result in successful borrower defense claims against it, there are several possible methods borrowers could pursue to obtain relief under the proposed regulations. If the level of misconduct and resulting investigations and demands for financial protection lead to the closure of the institution, borrowers that fall within the applicable timeframes may choose a closed school discharge. If applicable, borrowers could also consider a false certification discharge based on the institution falsely certifying the borrower's high school diploma or satisfactory academic progress. The cost of these two options is discussed in the *Closed School and False Certification Discharges* discussion of this *Net Budget Impacts* section. If the institution does not close,

the borrower cannot or does not pursue closed school or false certification discharges, or the Secretary determines the borrower's claim is better suited to a borrower defense group process, the borrower may pursue a borrower defense claim.

*Borrower Defense Discharges*

The proposed regulations would establish a Federal standard for borrower defense claims related to loans first disbursed on or after July 1, 2017, as well as describe the process for the assertion and resolution of all borrower defense claims—both those made for Direct Loans first disbursed prior to July 1, 2017, and for those made under the proposed regulations after that date. As indicated in this preamble, while regulations governing borrower defense claims have existed since 1995, those regulations have rarely been used. Therefore, the Department has used the limited data it has available on borrower defense claims, especially information about the results of the collapse of Corinthian, projected loan volumes, Departmental expertise, the discussions at negotiated rulemaking, and information about past investigations into the type of institutional acts or omissions that would give rise to borrower defense claims to develop scenarios that the Department believes will capture the range of net budget impacts associated with the borrower defense proposed regulations. The Department will continue to refine these estimates, welcomes comments about the assumptions used in developing them, and will consider those comments as the final regulations are developed.

While there are many factors and details that will determine the cost of the proposed regulations, ultimately a borrower defense claim entered into the student loan model (SLM) by risk group, loan type, and cohort will result in a reduced stream of cash flows compared to what the Department would have expected from a particular cohort, risk group, and loan type. The net present value of the difference in those cash flow streams generates the expected cost of the proposed regulations. In order to generate an expected level of claims for processing in the SLM, the Department used President's Budget 2017 (PB2017) loan volume estimates to identify the maximum potential exposure to borrower defense claims for each cohort, loan type, and sector. While all of the PB2017 projected Direct Loan volume for the 2017 to 2026 cohorts of over $1 trillion is subject to the proposed regulations, the Department expects only a fraction of that amount to be affected by institutional behavior that

results in a borrower defense claim (labeled as "Misrep Scenario" in Table 4). Additionally, while FFEL, Perkins, and certain other Federal student loan borrowers are able to claim relief under the Direct Loan process by consolidating into a Direct Loan, borrowers may choose not to consolidate because they may lose some benefits in doing so or because they have determined that their chances of success under the borrower defense process may not warrant the step of consolidation. As a result, the percentage of that volume that consolidates will also affect the estimated net budget impact. The budget impact would be further affected by the percentage of potentially eligible borrowers who successfully pursue a claim (labeled as "Borr Claim Pct" in Table 4) and the level of recoveries the Department is able to receive from

institutions subject to borrower defense claims (labeled as "Recovery Pct" in Table 4). The scenarios presented in this budget estimate involve assumptions about these factors as shown in Table 4. The Department also faced a challenge in establishing the appropriate baseline against which to compare the costs of the regulation. Due to the limited history of borrower defense claims, existing budget estimates contain no data from which to devise a baseline. While many borrowers who will pursue a claim through the new process would have been able to do so under the existing standard, the Department is attributing their claims to the proposed regulations. That is, while the costs we are describing here are the actual projected costs of borrower defense discharges, not all of them are attributable to the new standard

proposed in this regulation. Another factor that could mitigate the costs to the Federal government of the proposed regulations (and change the nature of the costs experienced by affected institutions) is that elimination or modification of the practices giving rise to borrower defense claims could improve outcomes for student borrowers. In the scenarios, we assume that 4-year institutions may be able to implement training or practice changes faster than some smaller 2-year institutions, resulting in a lower upper end of the range for the Misrep Scenario 2. To avoid underestimating the potential cost of the proposed regulations, the Department did not explicitly adjust its estimates for this factor.

TABLE 4—ASSUMPTIONS FOR BUDGET SCENARIOS

| Sector | Misrep scenario 1 (% of volume) | Misrep scenario 2 (% of volume) | Borr claim pct A (% of volume) | Borr claim pct B (% of volume) | Recovery pct 1 (% of claim) | Recovery pct 2 (% of claim) |
|---|---|---|---|---|---|---|
| 2yr or less public ........................................ | 0.5 | 2 | 10 | 75 | 30 | 65 |
| 2yr or less private not-for-profit ............... | 0.5 | 2 | 10 | 75 | 30 | 65 |
| 2yr or less private for profit ...................... | 5 | 25 | 10 | 75 | 30 | 65 |
| 4yr public ................................................... | 0.5 | 1 | 10 | 75 | 30 | 65 |
| 4yr private not-for-profit ............................ | 0.5 | 1 | 10 | 75 | 30 | 65 |
| 4yr private for profit ................................... | 5 | 20 | 10 | 75 | 30 | 65 |

The combined application of these assumptions created the eight (= two Misrep Scenarios × two Borr Claim Pct × two Recovery Pct) scenarios evaluated in the SLM as an increase in the claims rate. Scenario 1A2, the lowest Federal budget impact scenario, assumes that institutional misconduct is not widespread, but instead limited to actors representing a small share of loan volume. It also assumes that the increased information about the availability of borrower defense relief does not lead to a significant increase in the percentage of borrowers making a claim, and that the Department recovers a substantial portion of successful claims from institutions. As shown in Table 4, the other end of the range is represented by Scenario 2B1, in which

a high percentage of borrowers from institutions representing a significant percent of loan volume make successful claims and the Department is unable to recover a significant amount from institutions. The Department also estimated the impact if the Department received no recoveries from institutions for each combination of misrepresentation and borrower claim percentage scenario, the results of which are discussed after Table 5.

The Department does not specify how many institutions are represented in each scenario, as the scenario could represent a substantial number of institutions engaging in acts giving rise to borrower defense claims or could represent a small number of institutions with significant loan volume subject to

a large number of claims. According to Federal Student Aid data center loan volume reports,[75] the five largest proprietary institutions in loan volume received 26 percent of Direct Loans disbursed in the proprietary sector in award year 2014–15 and the 50 largest represent 69 percent. The Department has not assigned specific probabilities to any of the scenarios and the results in Table 5 and the likelihood of any one scenario will depend on how institutions conduct their activities to ensure compliance, how much borrowers' awareness of their options increases, and the extent of the deterrent effect that the Department's and other agencies' efforts to uncover and sanction misconduct through investigations and enforcement may have on the industry.

TABLE 5—BUDGET ESTIMATES FOR BORROWER DEFENSE SCENARIOS

| Scenario | Estimated costs for cohorts 2017–2026 ($mns) | Annualized cost to Federal Gov't (3% discounting) | Annualized cost to Federal Gov't (7% discounting) |
|---|---|---|---|
| 1A1: ............................................................................................................................. | $1,297 | $128 | $127 |
| 1A2: ............................................................................................................................. | 646 | 64 | 63 |

[75] Federal Student Aid, *Student Aid Data: Title IV Program Volume by School*, available at https:// studentaid.ed.gov/sa/about/data-center/student/ title-iv.

TABLE 5—BUDGET ESTIMATES FOR BORROWER DEFENSE SCENARIOS—Continued

| Scenario | Estimated costs for cohorts 2017–2026 ($mns) | Annualized cost to Federal Gov't (3% discounting) | Annualized cost to Federal Gov't (7% discounting) |
|---|---|---|---|
| 1B1: | 10,174 | 1,007 | 993 |
| 1B2: | 5,072 | 502 | 446 |
| 2A1: | 5,498 | 544 | 537 |
| 2A2: | 2,752 | 272 | 269 |
| 2B1: | 41,347 | 4,092 | 4,039 |
| 2B2: | 20,674 | 2,046 | 2,020 |

The transfers among the Federal government and affected borrowers and institutions associated with each scenario above are included in Table 6, with the difference in amounts transferred to borrowers and received from institutions generating the budget impact in Table 5. In the absence of any recovery from institutions, taxpayers would bear the full cost of successful claims from affected borrowers. At a 3 percent discount rate, the annualized costs with no recovery are approximately $184 million for Misrep_Scenario_1 and Borr Claim_Pct_A, $1.44 billion for Misrep_Scenario_1 and Borr Claim_Pct_B, $778 million for Misrep_Scenario_2 and Borr Claim_Pct_A, and $5.85 billion for Misrep_Scenario_2 and Borr Claim_Pct_B. At a 7 percent discount rate, the annualized costs with no recovery are approximately $180

million for Misrep_Scenario_1 and Borr Claim_Pct_A, $1.42 billion for Misrep_Scenario_1 and Borr Claim_Pct_B, $768 million for Misrep_Scenario_2 and Borr Claim_Pct_A, and $5.77 billion for Misrep_Scenario_2 and Borr Claim_Pct_B. This potential increase in costs demonstrates the significant effect that recoveries from institutions have on the net budget impact of the borrower defense provisions.

*Closed School Discharge and False Certification Discharges*

In addition to the provisions previously discussed, the proposed regulations also would make changes to the closed school discharge process, which are estimated to cost $1.351 billion for cohorts 2017–2026. The proposed regulations include requirements to inform students of the

consequences, benefits, requirements, and procedures of the closed school discharge option, including providing students with an application form, and establishes a Secretary-led discharge process for borrowers who qualify but do not apply and, according to the Department's information, did not subsequently re-enroll in any title IV-eligible institution within three years from the date the school closed. The increased information about and automatic application of the closed school discharge option and possible increase in school closures related to the institutional accountability provisions in the proposed regulations are likely to increase closed school claims. Chart 1 provides the history of closed schools, which totals 12,040 schools through April 2016.

## Chart 1: History of School Closures



In order to estimate the effect of the proposed changes to the discharge process that would grant relief without an application after a three-year period,

the Department looked at all Direct Loan borrowers at schools that closed from 2008–2011 to see what percentage of them had not received a closed school

discharge and had no record of title-IV aided enrollment in the three years following their school's closure. Of 2,287 borrowers in the file, 47 percent

had no record of a discharge or subsequent title IV aid. This does not necessarily mean they did not re-enroll at a title IV institution, so this assumption may overstate the potential effect of the three-year discharge provision. The Department used this information and the high end of closed school claims in recent years to estimate the effect of the proposed regulations related to closed school discharges. The resulting estimated cost to the Federal government of the closed school provisions is $1.351 billion over the 2017 to 2026 loan cohorts.

The proposed regulations would also change the false certification discharge process to include instances in which schools certified the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) where the borrower would qualify for a false certification discharge if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma. Under existing regulations, false certification discharges represent a very low share of discharges granted to borrowers. The proposed regulations would replace the explicit reference to ability to benefit requirements in the false certification discharge regulations with a more general reference to requirements for admission without a high school diploma as applicable when the individual was admitted, and specify how an institution's certification of the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) could give rise to a false certification discharge claim. However, the Department does not expect an increase in false certification discharge claims to result in a significant budget impact from this change. We believe that schools that comply with the current ability to benefit assessment requirement and that honor the current high school

graduation requirements will continue to comply in the manner they now do, and we have no basis to believe that changing the terminology or adding false certification of SAP as an example of a reason the Secretary may grant a false certification discharge without an application will lead to an increase in claims that will result in a significant net budget impact. The Department will continue to evaluate the changes to the false certification discharge regulations and welcomes comments to consider as the final analysis of the proposed regulations is developed.

*Other Provisions*

In addition to the provisions previously discussed, the proposed regulations would also make a number of technical changes related to the PAYE and REPAYE repayment plans and the consolidation of Nurse Faculty Loans, update the regulations describing the Department's authority to compromise debt, and update the acceptable forms of verification of death for discharge of title IV loans or TEACH Grant obligations. The technical changes to the REPAYE and PAYE plans were already reflected in the Department's budget estimates for those regulations, so no additional budget effects are included here. While some borrowers may be eligible for additional subsidized loans and no longer be responsible for accrued interest on their subsidized loans as a result of their subsidized usage period being eliminated or recalculated because of a closed school, false certification, unpaid refund, or defense to repayment discharge, the institutions primarily affected by the 150 percent subsidized usage regulation are not those expected to generate many of the applicable discharges, so this reflection of current practice is not expected to have a significant budget impact. Allowing death discharges based on death certificates submitted or verified through additional means is convenient for borrowers, but is not estimated to substantially change the amount of death discharges. The proposed updates to the debt compromise limits reflect

statutory changes and the Secretary's existing authority to compromise debt, so we do not estimate a significant change in current practices. Revising the regulations to expressly permit the consolidation of Nurse Faculty Loans is not expected to have a significant budget impact, as this technical change reflects current practices. According to Department of Health and Human Services budget documents, approximately $26.5 million in grants are available annually for schools to make Nurse Faculty Loans, and borrowers would lose access to generous forgiveness terms if they choose to consolidate those loans. Therefore, we would expect the volume of consolidation to be very small, and do not estimate any significant budget impact from this provision.

*Assumptions, Limitations, and Data Sources*

In developing these estimates, a wide range of data sources were used, including data from the National Student Loan Data System; operational and financial data from Department systems; and data from a range of surveys conducted by the National Center for Education Statistics such as the 2012 National Postsecondary Student Aid Survey. Data from other sources, such as the U.S. Census Bureau, were also used.

**Accounting Statement**

As required by OMB Circular A–4 (available at *www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf*), in the following table, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. This table provides our best estimate of the changes in annual monetized costs and transfers as a result of these proposed regulations. Expenditures are classified as transfers from the Federal Government to affected student loan borrowers or from affected institutions to students (via the Federal government), as noted.

TABLE 6—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES (IN MILLIONS) WITH DISCOUNT RATES OF THREE PERCENT AND SEVEN PERCENT

| Category | Benefits |
|---|---|
| Updated and clarified borrower defense process and Federal standard to increase protection for student borrowers and taxpayers ............................................................................................................................................... | not quantified |
| Improved awareness and usage of closed school and false certification discharges ............................................. | not quantified |
| Improved consumer information about institutions' performance and practices ..................................................... | not quantified |

TABLE 6—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES (IN MILLIONS) WITH DISCOUNT RATES OF THREE PERCENT AND SEVEN PERCENT—Continued

| Category | Costs | |
|---|---|---|
| | 3% | 7% |
| Costs of obtaining Letters of credit or equivalents | not quantified | |
| Costs of compliance with paperwork requirements | 14.95 | 14.91 |

| Category | Transfers | |
|---|---|---|
| | 3% | 7% |
| Borrower Defense claims from the Federal government to affected borrowers (partially borne by affected institutions, via reimbursements): | | |
| SC1A1 | 184 | 181 |
| SC1A2 | 182 | 180 |
| SC1B1 | 1,438 | 1,419 |
| SC1B2 | 1,434 | 1,415 |
| SC2A1 | 777 | 767 |
| SC2A2 | 778 | 768 |
| SC2B1 | 5,846 | 5,770 |
| SC2B2 | 5,846 | 5,770 |
| Reimbursements of borrower defense claims from affected institutions to affected student borrowers, via the Federal government: | | |
| SC1A1 | 55 | 54 |
| SC1A2 | 119 | 117 |
| SC1B1 | 431 | 426 |
| SC1B2 | 932 | 920 |
| SC2A1 | 233 | 230 |
| SC2A2 | 506 | 499 |
| SC2B1 | 1,754 | 1,731 |
| SC2B2 | 3,800 | 3,751 |
| Closed school discharges from the Federal government to affected students | 135 | 135 |

## Alternatives Considered

In the interest of promoting good governance and ensuring that these proposed regulations produce the best possible outcome, the Department reviewed and considered various proposals from internal sources as well as from non-Federal negotiators and the public. We summarize below the major proposals that we ultimately declined to implement in these proposed regulations.

Areas of significant discussion between the Department and the non-Federal negotiators included the group discharge process for borrower defense claims, the limitation periods, the appropriate procedure for considering borrower defense claims including the role of State AGs, legal assistance organizations, the Department, borrowers, and institutions, and the continued use of or adoption of certain State standards for borrower defense claims and the process of the Department's recovery from schools for any liabilities to the Department for borrower defense claims. The extensive discussion of these issues is summarized in the preamble sections related to each topic. In developing the proposed regulations, the Department considered the budgetary impact, administrative burden, and effectiveness of the options it considered.

## Clarity of the Regulations

Executive Order 12866 and the Presidential memorandum "Plain Language in Government Writing" require each agency to write regulations that are easy to understand.

The Secretary invites comments on how to make these proposed regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the proposed regulations clearly stated?

• Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the proposed regulations (grouping and order of sections, use of headings, paragraphing, etc.) aid or reduce their clarity?

• Would the proposed regulations be easier to understand if we divided them into more (but shorter) sections? (A "section" is preceded by the symbol "§" and a numbered heading; for example, § 668.16.)

• Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

• What else could we do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, see the instructions in the **ADDRESSES** section.

## Initial Regulatory Flexibility Analysis

*Description of the Reasons That Action by the Agency Is Being Considered*

The Secretary is proposing to amend the regulations governing the Direct Loan Program to establish a new Federal standard, limitation periods, and a process for determining whether a borrower has a borrower defense based on an act or omission of a school. We also propose to amend the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we propose to amend the discharge provisions in the Perkins Loan, Direct Loan, FFEL Program, and TEACH Grant programs. The proposed changes would provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school

liabilities resulting from borrower defenses.

The U.S. Small Business Administration Size Standards define "for-profit institutions" as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. The standards define "non-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Under these definitions, an estimated 4,365 institutions of higher education subject to the paperwork compliance provisions of the proposed regulations are small entities. Accordingly, we have prepared this initial regulatory flexibility analysis to present an estimate of the effect of the proposed regulations on small entities. The Department welcomes comments on this analysis and requests additional information to refine it.

*Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Regulations*

Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Current regulations in § 685.206(c) governing defenses to repayment have been in place since 1995, but rarely used. Those regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." In response to the collapse of Corinthian, the Secretary announced in June of 2015 that the Department would develop new regulations to clarify and streamline the borrower defense process, in a manner that would protect borrowers and allow the Department to hold schools accountable for actions that result in loan discharges.

*Description of and, Where Feasible, an Estimate of the Number of Small Entities to Which the Regulations Will Apply*

These proposed regulations would affect institutions of higher education that participate in the Federal Direct Loan Program and borrowers. Approximately 60 percent of IHEs qualify as small entities, even though the range of revenues at the non-profit institutions varies greatly. Using data from the Integrated Postsecondary Education Data System, the Department estimates that approximately 4,365 IHEs qualify as small entities—1,891 are not-for-profit institutions, 2,196 are for-profit institutions with programs of two years or less, and 278 are for-profit institutions with four-year programs.

*Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Regulations, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record*

Table 7 relates the estimated burden of each information collection requirement to the hours and costs estimated in the *Paperwork Reduction Act of 1995* section of the preamble. This additional workload is discussed in more detail under the *Paperwork Reduction Act of 1995* section of the preamble. Additional workload would normally be expected to result in estimated costs associated with either the hiring of additional employees or opportunity costs related to the reassignment of existing staff from other activities. In total, these changes are estimated to increase burden on small entities participating in the title IV, HEA programs by 171,250 hours. The monetized cost of this additional burden on institutions, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf*, is $6,259,193. This cost was based on an hourly rate of $36.55.

TABLE 7—PAPERWORK REDUCTION ACT FOR SMALL ENTITIES

| | Reg section | OMB Control No. | Hours | Cost |
|---|---|---|---|---|
| Program Participation Agreement—requires school to provide enrolled students a closed school discharge application and written disclosure of the benefits of consequences of the discharge as an alternative to completing their educational program through a teach-out. | 668.14 | OMB 1845–0022 | 939 | $34,308 |
| Reporting and Disclosure of repayment rate outcomes and letters of credit to enrolled and prospective students. | 668.41 | OMB 1845–0004 | 64,084 | 2,342,270 |
| Financial Responsibility—reporting of actions or triggering events in 668.171(c) no later than 10 days after action or event occurs. | 668.171 | OMB 1845–0022 | 1,617 | 59,094 |
| Alternative Standards and Requirements—ties amount of letter of credit to action or triggering event in 668.171(c). | 668.175 | OMB 1845–0022 | 32,336 | 1,181,881 |
| Borrower defense process—provides a framework for the borrower defense process. Institutions could engage in fact-finding, provide evidence related to claims and appeal decisions. | 685.222 | OMB 1845–NEW | 530 | 19,372 |
| Agreements between an eligible school and the Secretary for participation in the Direct Loan Program—prohibits pre-dispute arbitration agreements for borrower defense claims, specifies required agreement and notification language, and requires schools to provide copies of arbitral and judicial filings to the Secretary. | 685.300 | OMB 1845–NEW2 | 71,745 | 2,622,268 |

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap, or Conflict With the Regulations*

The proposed regulations are unlikely to conflict with or duplicate existing Federal regulations.

*Alternatives Considered*

As described above, the Department participated in negotiated rulemaking when developing the proposed regulations, and considered a number of options for some of the provisions. Issues considered include the group discharge process for borrower defense claims, the limitation periods, the appropriate procedure for considering borrower defense claims including the role of State AGs, the Department, borrowers, and institutions, and the continued use of State standards for borrower defense claims. While no alternatives were aimed specifically at

small entities, limiting repayment rate warnings to affected proprietary institutions will reduce the burden on the private not-for-profit institutions that are a significant portion of small entities that would be affected by the proposed regulations.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: The public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Sections 668.14, 668.41, 668.171, 668.175, 682.211, 682.402, 685.222, and 685.300 contain information collection requirements. Under the PRA, the Department has submitted a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

In the final regulations, we will display the control numbers assigned by OMB to any information collection requirements proposed in this NPRM and adopted in the final regulations.

**Discussion**

**Section § 668.14—Program Participation Agreement**

**Requirements**

Proposed § 668.14(b)(32) would require, as part of the program participation agreement, a school to provide to all enrolled students a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that would require the institution to submit a teach-out plan.

**Burden Calculation**

From AY 2011–12 to 2014–15 there were 182 institutions that closed (30 private, 150 proprietary, and 2 public). The number of students who were enrolled at the institutions at the time of the closure was 43,299 (5,322 at the private institutions, 37,959 at the proprietary institutions, and 18 at the public institutions). With these figures as a base, we estimate that there could be 46 schools closing in a given award year (182 institutions divided by 4 = 45.5) with an average 238 students per institution (43,299 divided by 182 = 237.9).

We estimate that an institution will require two hours to prepare and process the required written disclosure with a copy of the closed school discharge application and the necessary mailing list for currently enrolled students. We anticipate that most schools will provide this information electronically to their students, thus decreasing burden and cost.

On average, we estimate that it will take the estimated 8 private institutions that will close a total of 324 hours (1,904 students × .17 (10 minutes)) to prepare and process the required written disclosure with a copy of the closed school discharge application and the necessary mailing list for the estimated 1,904 enrolled students.

On average, we estimate that it will take the estimated 38 proprietary institutions that will close a total of 1,537 hours (9,044 students × .17 (10 minutes)) to prepare and process the required written disclosure with a copy of the closed school discharge application and the necessary mailing list for the estimated 9,044 enrolled students.

For § 668.14, the total increase in burden will be 1,861 hours under OMB Control Number 1845–0022.

**Section § 668.41—Reporting and Disclosure of Information**

**Requirements**

Proposed § 668.41(h) would expand the reporting and disclosure requirements under § 668.41 to provide that, for any fiscal year in which a proprietary institution's loan repayment rate is equal to or less than zero, the institution must deliver a warning about its repayment outcomes to enrolled and prospective students. Institutions with fewer than 10 borrowers, or that meet the threshold for a low borrowing rate exemption, would not be required to make the disclosure.

The process through which a proprietary institution would be informed of its repayment rate, and provided the opportunity to challenge that rate, is included in proposed § 668.41(h)(5). Initially, the Department provides to each institution a list composed of students selected in accordance with the methodology in proposed § 668.41(h)(3) and discussed above, as well as the draft repayment rate and the underlying data used to make the calculation. A period of 45 days is allowed for institution to make corrections to the underlying data. The institution has 45 days following the date it receives notification of its draft loan repayment rate to challenge the accuracy of the information used by the Department to calculate the draft rate. After considering any challenges to its draft loan repayment rate, the Department notifies the institution of its final repayment rate.

Under proposed § 668.41(i), institutions that are required to provide financial protection, including an irrevocable letter of credit or cash under proposed § 668.175(d), or set-aside under proposed § 668.175(h), would have to disclose information about that requirement to both enrolled and prospective students until released from the letter of credit, or obligation to provide alternative financial protection, by the Department.

The loan repayment warning under proposed § 668.41(h) and the financial protection disclosure under proposed § 668.41(i) must be provided to both enrolled (§ 668.41(h)(7)(ii)) and prospective students (§ 668.41(h)(7)(iii)) by hand delivery as part of a separate document to the student individually or as part of a group presentation. Alternatively, the warning or disclosure may be sent to the primary email address or other electronic communication method used by the institution for communicating with the student. In all cases, the institution must ensure that the warning or disclosure is the only substantive content in the message unless the Secretary specifies additional, contextual language to be included in the message. Prospective students must be provided with the warning or disclosure before the student enrolls, registers, or enters into a financial obligation with the institution.

Under proposed § 668.41(h)(8), all promotional materials made available by or on behalf of an institution to

prospective students must prominently include the loan repayment warning. All promotional materials, including printed materials, about an institution must be accurate and current at the time they are published, approved by a State agency or broadcast.

## Burden Calculation

There will be burden on schools to review the list identified in § 668.41(h)(5)(i)(A) and to submit challenges to the accuracy of the information used to calculate the draft loan repayment rate, as provided in § 668.41(h)(5)(iii). Based on an analysis of College Scorecard repayment rate data for 1,174 proprietary institutions, we estimate that 493 proprietary institutions would not meet the zero percent or less threshold for the loan repayment rate calculations.

We estimate that it will take institutional staff 20 hours to review the listing of students included in the initial loan repayment rate calculation. We estimate that it will take institutional staff another 35 hours to review the draft loan repayment rate produced by the Secretary when challenging the accuracy of the information used to calculate that draft rate. We are estimating a total of 55 hours burden per institution for institutional activities under proposed § 668.41(h)(5).

We estimate that it will take proprietary institutions a total of 27,115 hours (493 institutions × 55 hours) for an initial review and subsequent challenge to information used in the calculation of the institution's repayment rate.

For § 668.41(h)(5), the total increase in burden related to the calculation, issuance, and challenges of the loan repayment rate will be 27,115 hours under OMB Control Number 1845–0004.

There will be burden on schools to deliver the loan repayment warning and the financial repayment disclosure to enrolled and prospective students under this proposed regulation.

For the loan repayment warning, under proposed § 668.41(h)(7)(i), the Department commits to consumer test the language of the warning, which the Secretary will publish in a Federal Register notice. We anticipate that it will take proprietary institutions a total of 32,045 hours (493 institutions × 65 hours) to produce and provide the loan repayment warnings to current and prospective students, ensure that promotional materials include the warning, and update the institution's Web site.

For § 668.41(h)(7), the total increase in burden related to the production and dissemination of the loan repayment

warnings is 32,045 hours under OMB Control Number 1845–0004.

For the financial protection disclosure, we estimate that it will take institutions an additional 50 hours to produce and provide the required financial protection disclosures to current and prospective students and update the institution's Web site. We estimate that 169 private institutions may have 2 events requiring such reporting for a total burden of 16,900 hours (169 institutions × 2 events × 50 hours). We estimate that 392 proprietary institutions may have 3 events requiring such reporting for a total burden of 58,800 hours (392 institutions × 3 events × 50).

For § 668.41(i), the total increase in burden related to the production and dissemination of the financial protection disclosures is 75,700 hours under OMB Control Number 1845–0004.

The combined total increase in burden under OMB Control Number 1845–0004 for proposed § 668.41 will be 134,860 hours.

## Financial Responsibility

### General (34 CFR 668.171)

#### Requirements

Under proposed § 668.171(d), in accordance with procedures to be established by the Secretary, an institution would notify the Secretary of any action or triggering event described in proposed § 668.171(c) no later than 10 days after that action or event occurs.

In that notice, the institution may show that certain actions or events are not material or that those actions are resolved. Specifically:

• The institution may explain why a judicial or administrative proceeding the institution disclosed to the SEC does not constitute a material event.

• The institution may demonstrate that a withdrawal of owner's equity was used solely to meet tax liabilities of the institution or its owners. Or, where the composite score is calculated based on the consolidated financial statements of a group of institutions, the amount withdrawn from one institution in the group was transferred to another entity within that group.

• The institution may show that the creditor waived a violation of a loan agreement. If the creditor imposes additional constraints or requirements as a condition of waiving the violation and continuing with the loan, the institution must identify and describe those constraints or requirements. In addition, if a default or delinquency event occurs or other events occur that trigger, or enable the creditor to require or impose, additional constraints or

penalties on the institution, the institution would be permitted to show why these actions would not have an adverse financial impact on the institution.

### Burden Calculation

There will be burden on schools to provide the notice to the Secretary when one of the actions or triggering events identified in § 668.171(c) occurs. We estimate that an institution will take two hours per action or triggering event to prepare the appropriate notice and provide it to the Secretary. We estimate that 169 private institutions may have 2 events annually to report for a total burden of 676 hours (169 institutions × 2 events × 2 hours). We estimate that 392 proprietary institutions may have 3 events annually to report for total burden of 2,352 hours (392 institutions × 3 events × 2 hours). We estimate that 91 public institutions may have 1 event annually to report for a total burden of 182 hours (91 institutions × 1 event × 2 hours). This total burden of 3,210 hours will be assessed under OMB Control Number 1845–0022.

### Alternative Standards and Requirements (34 CFR 668.175)

#### Requirements

Under the provisional certification alternative in § 668.175, we propose to add a new paragraph (f)(4) that ties the amount of the financial protection that an institution must submit to the Secretary to an action or triggering event described in proposed § 668.171(c). Specifically, under this alternative, an institution would be required to provide the Secretary financial protection, such as an irrevocable letter of credit, for an amount that is:

• For a State or Federal action under proposed § 668.171(c)(1)(i)(A) or (B), 10 percent or more, as determined by the Secretary, of the amount of Direct Loan program funds received by the institution during its most recently completed fiscal year; and

• For repayments to the Secretary for losses from borrower defense claims under proposed § 668.171(c)(2), the greatest annual loss incurred by the Secretary during the three most recently completed award years to resolve those claims or the amount of losses incurred by the Secretary during the most recently completed award year, whichever is greater, plus a portion of the amount of any outstanding or pending claims based on the ratio of the total value of claims resolved in favor of borrowers during the three most recently completed award years to the

total value of claims adjudicated during the three most completed award years;

• For any other action or triggering event described in proposed § 668.171(c), if the institution's composite score is less than 1.0, or the institution no longer qualifies under the zone alternative, 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year.

### Burden Calculation

There will be burden on schools to provide the required financial protection, such as a letter of credit, to the Secretary to utilize the provisional certification alternative. We estimate that an institution will take 40 hours per action or triggering event to obtain the required financial protections and provide it to the Secretary. We estimate that 169 private not-for-profit institutions may have 2 events annually to report for a total burden of 13,520 hours (169 institutions × 2 events × 40 hours). We estimate that 392 proprietary institutions may have 3 events annually to report for total burden of 47,040 hours (392 institutions × 3 events × 40 hours). We estimate that 91 public institutions may have 1 event annually to report for a total burden of 3,640 hours (91 institutions × 1 event × 40 hours). This total burden of 64,200 hours will be assessed under OMB Control Number 1845–0022.

The combined total increase in burden under OMB Control Number 1845–0004 for proposed § 668.41 will be 134,860 (27,115 + 32,045 + 75,700) hours.

The combined total increase in burden under OMB Control Number 1845–0022 for proposed § 668.14, § 668.171, and § 668.175 will be 69,271 (1,861 + 3,210 + 64,200) hours.

### Mandatory Administrative Forbearance for FFEL Program Borrowers (§ 682.211)

#### Requirements

Under proposed § 682.211(i)(7), a lender would be required to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under proposed § 685.212(k). The administrative forbearance would remain in effect until the Secretary notifies the lender that a determination has been made as to the

borrower's eligibility for a borrower defense discharge. If the Secretary notifies the borrower that the borrower would qualify for a borrower defense discharge if the borrower were to consolidate, the borrower would then be able to consolidate the loan(s) to which the defense applies and, if the borrower were to do so, the Secretary would recognize the defense and discharge that portion of the Consolidation Loan that paid off the FFEL Loan in question.

### Burden Calculation

There will be burden for the current 1,446 FFEL lenders to track the required mandatory administrative forbearance when they are notified by the Secretary of the borrower's intention to enter their FFEL Loans in a Direct Consolidation Loan to obtain a borrower defense discharge. We estimate that it will take each lender approximately four hours to develop and program the needed tracking into their current systems. There will be an estimated burden of 5,480 hours on the 1,370 for-profit lenders (1,370 × 4 = 5,480 hours). There will be an estimated burden of 304 hours on the 76 not-for-profit lenders (76 × 4 = 304 hours). The total burden of 5,784 hours will be assessed under OMB Control Number 1845–0020.

### Closed School Discharges—§ 682.402

#### Requirements

Proposed § 682.402(d)(6)(ii)(F) would provide a second level of Departmental review for denied closed school discharge claims in the FFEL Program. The proposed regulations would require a guaranty agency that denies a closed school discharge request to inform the borrower of the opportunity for a review of the guaranty agency's decision by the Secretary, and an explanation of how the borrower may request such a review.

Proposed § 682.402(d)(6)(ii)(I) would require the guaranty agency or the Department, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge.

Proposed § 682.402(d)(6)(ii)(K) would describe the responsibilities of the guaranty agency if the borrower requests such a review.

Proposed § 682.402(d)(8)(iii) would authorize the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll

in any title IV-eligible institution within a period of three years after the school closed.

### Burden Calculation

There will be burden on guaranty agencies to provide information to borrowers denied closed school discharge regarding the opportunity for further review of the discharge request by the Secretary. We estimate that it will take the 27 guaranty agencies 4 hours to update their notifications and establish a process for forwarding any requests for escalated reviews to the Secretary. There will be an estimated burden of 68 hours on the 17 public guaranty agencies (17 × 4 hours = 68 hours). There will be an estimated burden of 40 hours on the 10 not-for-profit guaranty agencies (10 × 4 hours = 40 hours). The total burden of 108 hours will be assessed under OMB Control Number 1845–0020.

There will be burden on guaranty agencies to, upon receipt of the request for escalated review from the borrower, forward to the Secretary the discharge form and any relevant documents. For the period between 2011 and 2015 there were 43,268 students attending closed schools, of which 9,606 students received a closed school discharge. It is estimated that 5 percent of the 43,268, or 2,163, closed school applications were denied. We estimate that 10 percent or 216 of those borrowers whose application was denied will request escalated review by the Secretary. We estimate that the process to forward the discharge request and any relevant documentation to the Secretary will take .5 hours (30 minutes) per request. There will be an estimated burden of 58 hours on the 17 public guaranty agencies based on an estimated 116 requests (116 × .5 hours = 58 hours). There will be an estimated burden of 50 hours on the 10 not-for-profit guaranty agencies (100 × .5 hours = 50 hours). The total burden of 108 hours will be assessed under OMB Control Number 1845–0020.

The guaranty agencies will have burden assessed based on these proposed regulations to provide another discharge application to a borrower upon resuming collection activities with explanation of process and requirements for obtaining a discharge. We estimate that for the 2,163 closed school applications that were denied, it will take the guaranty agencies .5 hours (30 minutes) to provide the borrower with another discharge application and instructions for filing the application again. There will be an estimated burden of 582 hours on the 17 public guaranty agencies based on an estimated 1,163 borrowers (1,163 × .5 hours = 582

hours). There will be an estimated burden of 500 hours on the 10 not-for-profit guaranty agencies (1,000 × .5 hours = 500 hours). The total burden of 1,082 will be assessed under OMB Control Number 1845–0020.

There will be burden assessed the guaranty agencies to determine the eligibility of a borrower for a closed school discharge without the borrower submitting such an application. This requires a review of those borrowers who attended a closed school but did not apply for a closed school discharge to determine if the borrower re-enrolled in any other institution within three years of the school closure. We estimate that there will be 20 hours of programming to allow for a guaranty agency to establish a process to review its records for borrowers who attended a closed school and to determine if any of those borrowers reenrolled in a title IV-eligible institution within three years. There will be an estimated burden of 340 hours on the 17 public guaranty agencies for this programming (17 × 20 hours = 340 hours rounded up). There will be an estimated burden of 200 hours on the not-for-profit guaranty agencies for this programming (10 × 20 hours = 200 hours). The total burden of 540 hours will be assessed under OMB Control Number 1845–0020.

The total burden of 1,838 hours for § 682.402 will be assessed under OMB Control Number 1845–0020.

The combined total increase in burden under OMB Control Number 1845–0020 for proposed § 682.211 and § 682.402 will be 7,622 hours (5,784 + .108 + 540 + 108 + 1,082).

## Process for Individual Borrowers (34 CFR 685.222(e))

### Requirements

Proposed § 685.222(e)(1) would describe the steps an individual borrower must take to initiate a borrower defense claim. First, an individual borrower would submit an application to the Secretary, on a form approved by the Secretary. In the application, the borrower would certify that he or she received the proceeds of a loan to attend a school; may provide evidence that supports the borrower defense; and would indicate whether he or she has made a claim with respect to the information underlying the borrower defense with any third party, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation. The borrower would also be required to provide any other information or supporting documentation reasonably requested by the Secretary.

While the decision of the Department official would be final as to the merits of the claim and any relief that may be warranted on the claim, if the borrower defense is denied in full or in part, the borrower would be permitted to request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" would be defined as relevant evidence that the borrower did not previously provide and that was not identified by the Department official as evidence that was relied upon for the final decision.

### Burden Calculation

There will be burden associated with the filing of the Departmental form by the borrower asserting a borrower defense claim. We are conducting a separate information collection review process for the proposed form to provide for public comment on the form as well as the estimated burden. A separate information collection review package will be published in the **Federal Register** and available through *Regulations.gov* for review and comment.

Additionally there will be burden on any borrower whose borrower defense claim is denied, if they elect to request reconsideration from the Secretary based on new evidence in support of the borrower's claim. We estimate that two percent of borrower defense claims received would be denied and those borrowers would then request reconsideration by presenting new evidence to support their claim. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 467 borrowers, including those that opt out of a successful borrower defense group relief, would require .5 hours (30 minutes) to submit the request for reconsideration to the Secretary for a total of 234 burden hours (467 × .5 hours). This burden will be assessed under OMB Control Number 1845–NEW.

## Group Process for Borrower Defenses— General (34 CFR 685.222(f))

### Requirements

Proposed § 685.222(f) would provide a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department would follow for borrower defenses for a group.

Once a group of borrowers with common facts and claims has been

identified, the Secretary would designate a Department official to present the group's common borrower defense in the fact-finding process, and would provide each identified member of the group with notice that allows the borrower to opt out of the proceeding.

### Burden Calculation

There will be burden on any borrower who elects to opt out of the group process after the Secretary has identified them as a member of a group for purposes of borrower defense. We estimate that one percent of borrowers who are identified as part of a group process for borrower defense claims would opt out of the group process. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 187 borrowers would require .08 hours (5 minutes) to submit the request to opt out of the group process to the Secretary for a total of 15 burden hours (187 × .08 hours). This burden will be assessed under OMB Control Number 1845–NEW.

## Group Process for Borrower Defense— Closed School (34 CFR 685.222(g))

### Requirements

Section 685.222(g) of the proposed regulations would establish a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses.

Under proposed § 685.222(g)(1), a hearing official would review the Department official's basis for identifying the group and resolve the claim through a fact-finding process. As part of that process, the hearing official would consider any evidence and argument presented by the Department official on behalf of the group and on behalf of individual members of the group. The hearing official would consider any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described § 668.174(b) as reported to the Department or as recorded in the Department's records if practicable.

Burden Calculation

There will be burden on any school which elects to provide records or response to the hearing official's fact finding. We anticipate that each group would represent a single institution. We estimate that there will be four potential groups involving closed schools. We estimate that the fact-finding process would require 50 hours from 1 private closed school or persons affiliated with that closed school (1 private institution × 50 hours). We estimate that the fact-finding process would require 150 hours from 3 proprietary closed schools or persons affiliated with that closed school (3 proprietary institutions × 50 hours). We estimate the burden to be 200 hours (4 institutions × 50 hours). This burden will be assessed under OMB Control Number 1845–NEW.

Group Process for Borrower Defense— Open School (34 CFR 685.222(h))

Requirements

Proposed § 685.222(h) would establish the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school.

A hearing official would resolve the borrower defense and determine any liability of the school through a fact-finding process. As part of the process, the hearing official would consider any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary, evidence presented on behalf of individual group members.

The hearing official would issue a written decision. If the hearing official approves the borrower defense, that decision would describe the basis for the determination, notify the members of the group of the relief provided on the basis of the borrower defense, and notify the school of any liability to the Secretary for the amounts discharged and reimbursed.

If the hearing official denies the borrower defense in full or in part, the written decision would state the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and would inform the borrowers that their loans will return to their statuses prior to the group borrower defense process. It also would notify the school of any liability to the Secretary for any amounts discharged. The Secretary would provide copies of the written decision to the members of the group, the Department official and the school.

The hearing official's decision would become final as to the merits of the group borrower defense claim and any relief that may be granted within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. A decision of the hearing official would not take effect pending the appeal. The Secretary would render a final decision following consideration of any appeal.

After a final decision has been issued, if relief for the group has been denied in full or in part, a borrower may file an individual claim for relief for amounts not discharged in the group process. In addition, the Secretary may reopen a borrower defense application at any time to consider new evidence, as discussed above.

Burden Calculation

There will be burden on any school that provides evidence and responds to any argument made to the hearing official's fact finding and if the school elects to appeal the final decision of the hearing official regarding the group claim. We anticipate that each group would represent claims from a single institution. We estimate that there will be six potential groups involving open schools. We estimate that the fact-finding process would require 150 hours from the 3 open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the fact-finding process would require 150 hours from the 3 open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours).

We further estimate that the appeal process would require 150 hours from the 3 open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the appeal process would require 150 hours from the 3 open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours). The total estimated burden for this section will be 600 hours assessed under OMB Control Number 1845–NEW.

Additionally, any borrower whose borrower defense claim is denied under the group claim may request reconsideration based on new evidence to support the individual claim. We believe that the estimate for the total universe of denied claims in § 685.222(e) includes these borrowers.

The combined total increase in burden under OMB Control Number 1845–NEW for proposed § 685.222 will be 1,049 hours (234 + 15 + 200 + 600).

Section 685.300 Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program

Requirements

Proposed § 685.300(e) requires institutions that, after the effective date of the proposed regulations, incorporate pre-dispute arbitration or any other pre-dispute agreement addressing class actions in any agreements with Direct Loan Program borrowers to include specific language regarding a borrower's right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, in the case of institutions that, prior to the effective date of the proposed regulations, incorporated pre-dispute arbitration or any other pre-dispute agreement addressing class actions in any agreements with Direct Loan Program borrowers, the proposed regulations would require institutions to provide to borrowers agreements or notices with specific language regarding a borrower's right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Institutions would be required to provide such notices or agreements to such borrowers no later than at the time of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who hasn't received such agreement or notice.

Proposed § 685.300(f) would require institutions that, after the effective date of the proposed regulations, incorporate pre-dispute arbitration agreements with Direct Loan Program borrowers to include specific language regarding a borrower's right to file a lawsuit against the institution when it concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, in the case of institutions that, prior to the effective date of the proposed regulations, incorporated pre-dispute arbitration agreements with Direct Loan Program borrowers, the proposed regulations would require institutions to provide to

borrowers agreements or notices with specific language regarding a borrower's right to file a lawsuit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Institutions would be required to provide such agreements or notices to such borrowers no later than at the time of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who hasn't received such agreement or notice.

**Burden Calculation**

There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. Based on the AY 2014–2015 Direct Loan information available, there were 1,528,714 Unsubsidized Direct Loan recipients at proprietary institutions. Assuming 66 percent of these students would continue to be enrolled at the time these regulations become effective there would be 1,008,951 students who would be required to receive the agreements or notices required by proposed § 685.300(e) or (f). We anticipate that it will take proprietary institutions .17 hours (10 minutes) per student to research who is required to receive these agreements or notices, prepare them, and forward the information

accordingly for a total burden of 171,522 hours (1,008,951 students × .17 hours) assessed under OMB Control Number 1845–NEW2.

**Requirements**

Proposed § 685.300(g) requires institutions to provide to the Secretary copies of specified records connected to a claim filed in arbitration by or against the school regarding a borrower defense claim. The school must submit any records within 60 days of the filing by the school of such records to an arbitrator or upon receipt by the school of such records that were filed by someone other than the school, such as an arbitrator or student regarding a claim.

Proposed § 685.300(h) requires institutions to provide to the Secretary copies of specified records connected to a claim filed in a lawsuit by the school, a student, or any party against the school regarding a borrower defense claim. The school must submit any records within 30 days of the filing or receipt of the complaint by the school or upon receipt by the school of rulings on a dispositive motion or final judgement.

**Burden Calculation**

There will be burden on any school that must provide to the Secretary copies of specified records connected to a claim filed in arbitration by or against the school regarding a borrower defense claim. We estimate that 5 percent of the 1,959 proprietary schools, or 98 schools,

would be required to submit documentation to the Secretary to comply with the proposed regulations. We anticipate that each of the 98 schools would have an average of 4 filings, with an average of four submissions for each filing. Because these are copies of documents required to be submitted to other parties we anticipate 5 burden hours to produce the copies and submit to the Secretary for a total of 7,840 hours (98 institutions × 4 filings × 4 submissions/filing × 5 hours) assessed under OMB Control Number 1845–NEW2.

The combined total increase in burden under OMB Control Number 1845–NEW2 for proposed § 685.300 will be 179,362 hours (171,522 + 7,840).

Consistent with the discussion above, the following chart describes the sections of the proposed regulations involving information collections, the information being collected, and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net costs of the increased burden on institutions, lenders, guaranty agencies, and borrowers, using wage data developed using BLS data, available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf*, is $14,328,558 as shown in the chart below. This cost was based on an hourly rate of $36.55 for institutions, lenders, and guaranty agencies and $16.30 for borrowers.

### COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.14  Program participation agreement. | The proposed regulation would require, as part of the program participation agreement, a school to provide to all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that would require the institution to submit a teach-out plan. | 1845–0022 .............................................. This would be a revised collection. We estimate burden would increase by 1,861 hours. | $68,025 |
| § 668.41  Reporting and disclosure of information. | The proposed regulation would provide that, for any fiscal year in which a proprietary institution's loan repayment rate is zero percent or less, the institution must provide a warning to enrolled and prospective students about that institution's repayment outcomes. If an institution is required to provide financial protection to the Secretary, such as an irrevocable letter of credit or cash under § 668.175(d) or (f), or to establish a set-aside under § 668.175(h), the institution must disclose that protection to enrolled and prospective students. | 1845–0004 .............................................. This would be a revised collection. We estimate burden would increase by 134,860 hours. | 4,929,133 |
| § 668.171  Financial responsibility—General. | The proposed regulations add a new paragraph (d) under which, in accordance with procedures to be established by the Secretary, an institution would notify the Secretary of any action or triggering event described in § 668.171(c) no later than 10 days after that action or event occurs. | 1845–0022 .............................................. This would be a revised collection. We estimate burden would increase by 3,210 hours. | 117,326 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.175 Alternative standards and requirements. | The proposed regulations would add a new paragraph (f)(4) that ties the amount of the letter of credit that an institution must submit to the Secretary to an action or triggering event described in § 668.171(c). | 1845–0022 ............................................. This would be a revised collection. We estimate burden would increase by 64,200 hours. | 2,346,510 |
| § 682.211 Forbearance. | The proposed regulations would add a new paragraph § 682.211(i)(7) that requires a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under proposed § 685.212(k). | 1845–0020 ............................................. This would be a revised collection. We estimate burden would increase by 5,784 hours. | 211,405 |
| § 682.402 Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments. | The proposed regulations would provide a second level of Departmental review for denied closed school discharge claims in the FFEL Program. The proposed language would require a guaranty agency that denies a closed school discharge request to inform the borrower of the opportunity for a review of the guaranty agency's decision by the Department, and an explanation of how the borrower may request such a review. The proposed regulations would require the guaranty agency or the Department, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge. The proposed regulations would describe the responsibilities of the guaranty agency if the borrower requests such a review. The proposed regulations would authorize the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed. | 1845–0020 ............................................. This would be a revised collection. We estimate burden would increase by 1,838 hours. | 67,179 |
| § 685.222 Borrower defenses. | The proposed regulation would describe the steps an individual borrower must take to initiate a borrower defense claim. The proposed regulations also would provide a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department would follow for borrower defenses for a group. The proposed regulations would establish a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses. The proposed regulation would establish the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school. | 1845–NEW ............................................. This would be a new collection. We estimate burden would increase by 1,049 hours. | 33,299 |
| 685.300 Agreements between an eligible school and the Secretary for participation in the Direct Loan Program. | The proposed regulations would require institutions, following the effective date of the regulations, to incorporate language into agreements allowing participation by Direct Loan students in class action lawsuits as well as pre-dispute arbitration agreements. There is required language and notification language to be provided to affected students. Additionally, the proposed regulations would require institutions to submit to the Secretary copies of arbitral records and judicial records within specified timeframes when the actions concern a borrower defense claim. | 1845–NEW2 ............................................. This would be a new collection. We estimate burden would increase by 179,362 hours. | 6,555,681 |

The total burden hours and change in burden hours associated with each OMB Control number affected by the proposed regulations follows:

| Control No. | Total proposed burden hours | Proposed change in burden hours |
|---|---|---|
| 1845–0004 ........ | 153,530 | 134,860 |
| 1845–0020 ........ | 8,249,520 | +7,622 |
| 1845–0022 ........ | 2,285,241 | +69,271 |
| 1845–NEW ........ | 1,049 | +1,049 |
| 1845–NEW2 ........ | 179,362 | +179,362 |
| Total .............. | 10,868,702 | +392,164 |

We have prepared Information Collection Requests for these information collection requirements. If you want to review and comment on the Information Collection Requests, please follow the instructions in the **ADDRESSES** section of this NPRM.

Note: The Office of Information and Regulatory Affairs in OMB and the Department review all comments posted at *www.regulations.gov.*

In preparing your comments, you may want to review the Information Collection Requests, including the supporting materials, in *www.regulations.gov* by using the Docket ID number specified in this NPRM. These proposed collections are identified as proposed collections 1845–0004, 1845–0020, 1845–0022, 1845–NEW, and 1845–NEW2.

We consider your comments on these proposed collections of information in—
• Deciding whether the proposed collections are necessary for the proper performance of our functions, including whether the information will have practical use;
• Evaluating the accuracy of our estimate of the burden of the proposed collections, including the validity of our methodology and assumptions;
• Enhancing the quality, usefulness, and clarity of the information we collect; and
• Minimizing the burden on those who must respond. This includes exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques.

Between 30 and 60 days after publication of this document in the **Federal Register**, OMB is required to make a decision concerning the collections of information contained in these proposed regulations. Therefore, to ensure that OMB gives your comments full consideration, it is important that OMB receives your comments on these Information Collection Requests by July 18, 2016. This does not affect the deadline for

your comments to us on the proposed regulations.

If your comments relate to the Information Collection Requests for these proposed regulations, please specify the Docket ID number and indicate "Information Collection Comments" on the top of your comments.

**Intergovernmental Review**

These programs are not subject to Executive Order 12372 and the regulations in 34 CFR part 79.

**Assessment of Educational Impact**

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether these proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to one of the persons listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

(Catalog of Federal Domestic Assistance Number does not apply.)

**List of Subjects**

*34 CFR Part 30*

Claims, Income taxes.

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs— education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Part 686*

Administrative practice and procedure, Colleges and universities, Education, Elementary and secondary education, Grant programs—education, Reporting and recordkeeping requirements, Student aid.

Dated: June 9, 2016.

**John B. King, Jr.,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education proposes to amend parts 30, 668, 674, 682, 685, and 686 of title 34 of the Code of Federal Regulations as follows:

**PART 30—DEBT COLLECTION**

■ 1. The authority citation for part 30 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3(a)(1), and 1226a–1, 31 U.S.C. 3711(e), 31 U.S.C. 3716(b) and 3720A, unless otherwise noted.

■ 2. Section 30.70 is revised to read as follows:

**§ 30.70 How does the Secretary exercise discretion to compromise a debt or to suspend or terminate collection of a debt?**

(a)(1) The Secretary uses the standards in the FCCS, 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department, unless compromise of the debt is subject to paragraph (b) of this section.

(2) If the amount of the debt is more than $100,000, or such higher amount as the Department of Justice may prescribe, the Secretary refers a proposed compromise of the debt to the Department of Justice for approval, unless the compromise is subject to paragraph (b) of this section or the debt is one described in paragraph (e) of this section.

(b) Under the provisions in 34 CFR 81.36, the Secretary may enter into certain compromises of debts arising because a recipient of a grant or cooperative agreement under an applicable Department program has spent some of these funds in a manner that is not allowable. For purposes of this section, neither a program authorized under the Higher Education

Act of 1965, as amended (HEA), nor the Impact Aid Program is an applicable Department program.

(c)(1) The Secretary uses the standards in the FCCS, 31 CFR part 903, to determine whether suspension or termination of collection action on a debt is appropriate.

(2) Except as provided in paragraph (e), the Secretary—

(i) Refers the debt to the Department of Justice to decide whether to suspend or terminate collection action if the amount of the debt outstanding at the time of the referral is more than $100,000 or such higher amount as the Department of Justice may prescribe; or

(ii) May suspend or terminate collection action if the amount of the debt outstanding at the time of the Secretary's determination that suspension or termination is warranted is less than or equal to $100,000 or such higher amount as the Department of Justice may prescribe.

(d) In determining the amount of a debt under paragraph (a), (b), or (c) of this section, the Secretary deducts any partial payments or recoveries already received, and excludes interest, penalties, and administrative costs.

(e)(1) Subject to paragraph (e)(2) of this section, under the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D of the HEA, or the Perkins Loan Program authorized under title IV, part E, of the HEA.

(2) The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection, of a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.

(f) The Secretary refers a proposed resolution of a debt to the Government Accountability Office (GAO) for review and approval before referring the debt to the Department of Justice if—

(1) The debt arose from an audit exception taken by GAO to a payment made by the Department; and

(2) The GAO has not granted an exception from the GAO referral requirement.

(g) Nothing in this section precludes—

(1) A contracting officer from exercising his authority under applicable statutes, regulations, or common law to settle disputed claims relating to a contract; or

(2) The Secretary from redetermining a claim.

(h) Nothing in this section authorizes the Secretary to compromise, or suspend or terminate collection of, a debt—

(1) Based in whole or in part on conduct in violation of the antitrust laws; or

(2) Involving fraud, the presentation of a false claim, or misrepresentation on the part of the debtor or any party having an interest in the claim.

(Authority: 20 U.S.C. 1082(a)(5) and (6), 1087a, 1087hh, 1221e–3(a)(1), 1226a–1, and 1234a, 31 U.S.C. 3711)

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221–3, and 1231a, unless otherwise noted.

■ 4. Section 668.14 is amended by:
■ A. In paragraph (b)(30)(ii)(C), removing the word "and".
■ B. In paragraph (b)(31)(v), removing the period and adding, in its place, the punctuation and word "; and".
■ C. Adding a new paragraph (b)(32).
The addition reads as follows:

§ 668.14   Program participation agreement.
* * * * *

(b) * * *
(32) The institution will provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and consequences of a closed school discharge as an alternative to completing their educational program through a teach-out agreement, as defined in 34 CFR 602.3, immediately upon submitting a teach-out plan after the occurrence of any of the following events:

(i) The initiation by the Secretary of an action to terminate the participation of an institution in any title IV, HEA program under 34 CFR 600.41 or subpart G of this part or the initiation of an emergency action under § 668.83; or

(ii) The occurrence of any of the events in paragraph (b)(31)(ii)–(v) of this section.

* * * * *

■ 5. Section 668.41 is amended by:

■ A. Adding new paragraphs (h) and (i).
■ B. Revising the authority citation.
The additions and revision read as follows:

§§ 668.41 Reporting and disclosure of information.
* * * * *

(h) *Loan repayment warning for proprietary institutions*—(1) *General.* For any fiscal year in which a proprietary institution's loan repayment rate is equal to or less than zero, the institution must deliver a warning to enrolled and prospective students in the manner described in paragraphs (h)(7) and (8) of this section.

(2) *Definitions.* For purposes of this section, the term—

(i) "Fiscal year" means the 12-month period beginning on October 1 and ending on the following September 30 that is identified by the calendar year in which it ends;

(ii) "Original outstanding balance" (OOB) means the amount of the outstanding balance, including accrued interest, on the Direct Loans owed by a student for enrollment at the institution on the date the loans first entered repayment. The OOB does not include PLUS loans made to parent borrowers or TEACH Grant-related loans. For consolidation loans, the OOB includes only those loans attributable to the borrower's enrollment at the institution;

(iii) "Current outstanding balance" (COB) means the amount of the outstanding balance, including capitalized and uncapitalized interest, on the Direct Loans owed by the student at the end of the most recently completed fiscal year; and

(iv) "Measurement period" is the period of time between the date that a borrower's loan enters repayment and the end of the fiscal year for which the COB of that loan is determined.

(3) *Methodology.* For each fiscal year, the Secretary calculates an institution's loan repayment rate for the cohort of borrowers whose Direct Loans entered repayment at any time during the fifth fiscal year prior to the most recently completed fiscal year by—

(i) Determining the OOB of the loans for each of those borrowers;

(ii) Determining the COB of the loans for each of those borrowers;

(iii) Calculating the difference between the OOB and the COB of the loans for each of those borrowers and expressing that difference as a percentage reduction of, or an increase in, the OOB;

(iv) Using zero as the value for any loan on which the borrower defaulted for which there is a percentage reduction of the OOB; and

Federal Register / Vol. 81, No. 116 / Thursday, June 16, 2016 / Proposed Rules    **39409**

(v) On a scale where percentage reductions in principal are positive values and percentage increases in principal are negative values, determining the median value. The median value is the loan repayment rate for that fiscal year.

(4) *Exclusions.* The Secretary excludes a borrower from the calculation of the loan repayment rate if—

(i) One or more of the borrower's loans were in a military-related deferment status during the last fiscal year of the measurement period;

(ii) One or more of the borrower's loans are either under consideration by the Secretary, or have been approved, for a discharge on the basis of the borrower's total and permanent disability, under § 685.213;

(iii) The borrower was enrolled in an eligible institution during the last fiscal year of the measurement period; or

(iv) The borrower died.

(5) *Issuing and correcting loan repayment rates.* In accordance with procedures established by the Secretary—

(i) Before issuing a final loan repayment rate for a fiscal year, the Secretary—

(A) Provides to the institution a list of the students in the cohort described in paragraph (h)(3) of this section, the draft repayment rate for that cohort, and the information used to calculate the draft rate; and

(B) Allows 45 days for the institution to challenge the accuracy of the information that the Secretary used to calculate the draft rate; and

(ii) After considering any challenges to the draft loan repayment rate, the Secretary notifies the institution of its final repayment rate.

(iii) If an institution's final loan repayment rate is equal to or less than zero—

(A) Using the calculation described in paragraph (h)(6)(ii) of this section, the institution may submit an appeal to the Secretary within 15 days of receiving notification of its final repayment rate; and

(B) The Secretary will notify the institution if the appeal is accepted and the institution qualifies for an exemption from the warning requirement under paragraph (h)(7) of this section.

(6) *Privacy and low borrowing considerations.* An institution is not required to deliver a warning under paragraph (h)(7) of this section based on a final repayment rate for that fiscal year if the institution demonstrates to the Secretary's satisfaction that—

(i) That rate is based on fewer than 10 borrowers in the cohort described in paragraph (h)(3) of this section; or

(ii) The institution's participation rate index is less than or equal to 0.0625. An institution calculates its participation rate index as if its cohort default rate were 30 percent, using the formula described in § 668.214(b)(1).

(7) *Student warnings* — (i) *General.* An institution must deliver the warning required under this section to enrolled and prospective students in a form and manner prescribed by the Secretary in a notice published in the **Federal Register.** Before publishing that notice, the Secretary will conduct consumer testing to help ensure that the warning is meaningful and helpful to students.

(ii) *Delivery to enrolled students.* An institution must deliver the warning required under this section by notifying each enrolled student in writing no later than 30 days after the institution informs the institution of its final loan repayment rate by—

(A)(1) Hand-delivering the warning as a separate document to the student individually or as part of a group presentation; or

(2) Sending the warning to the student's primary email address or delivering the warning through the electronic method used by the institution for communicating with the student about institutional matters; and

(B) Ensuring that the warning is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(iii) *Delivery to prospective students.* An institution must provide the warning required under this paragraph (h) to a prospective student before that student enrolls, registers, or enters into a financial obligation with the institution by—

(A)(1) Hand-delivering the warning as a separate document to the student individually, or as part of a group presentation; or

(2) Sending the warning to the student's primary email address or delivering the warning through the electronic method used by the institution for communicating with prospective students about institutional matters; and

(B) Ensuring that the warning is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(8) *Promotional materials.* (i) If an institution is required to deliver a warning under paragraph (h)(1) of this section, it must, in all promotional materials that are made available to prospective or enrolled students by or on behalf of the institution, include the warning under paragraph (h)(7) of this section, in a prominent manner.

(ii) Promotional materials include, but are not limited to, an institution's Web site, catalogs, invitations, flyers, billboards, and advertising on or through radio, television, print media, social media, or the Internet.

(iii) The institution must ensure that all promotional materials, including printed materials, about the institution are accurate and current at the time they are published, approved by a State agency, or broadcast.

(9) *Institutional Web site.* (i) An institution must prominently provide the warning required in this section in a simple and meaningful manner on the home page of the institution's Web site.

(ii) The warning must be posted to the institution's Web site no later than 30 days after the date the Secretary informs the institution of its final loan repayment rate, and remain posted to that Web site for the 12-month period following the date on which the Secretary informs the institution of its final loan repayment rate.

(i) *Financial protection disclosures.* If an institution is required to provide financial protection to the Secretary, such as an irrevocable letter of credit or cash under § 668.175(d) or (f), or to establish a set-aside under § 668.175(h), the institution must—

(1) Disclose information about that financial protection to enrolled and prospective students in the manner described in paragraph (h)(7) of this section;

(2) Post the disclosure on the home page of the institution's Web site in the manner described in paragraph (h)(9) of this section no later than 30 days after the date the Secretary informs the institution of the need for the institution to provide financial protection, until such time as the Secretary releases the institution from the requirement that it provide financial protection; and

(3) Identify and explain clearly in that disclosure the reason or reasons that the institution was required to provide that financial protection.

(Authority: 20 U.S.C. 1092, 1094, 1099c)

**§ 668.71    [Amended]**

■ 6. Section 668.71 is amended by:
■ A. In the second sentence of the definition of "Misrepresentation" in paragraph (c), removing the word "deceive" and adding in its place the words "mislead under the circumstances".

■ B. In the definition of "Misrepresentation" in paragraph (c), adding a new fourth sentence, "Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading."

■ 7. Section 668.90 is amended by revising paragraph (a)(3) to read as follows:

§ 668.90   Initial and final decisions.

(a) * * *

(3) Notwithstanding the provisions of paragraph (a)(2) of this section—

(i) If, in a termination action against an institution, the hearing official finds that the institution has violated the provisions of § 668.14(b)(18), the hearing official also finds that termination of the institution's participation is warranted;

(ii) If, in a termination action against a third-party servicer, the hearing official finds that the servicer has violated the provisions of § 668.82(d)(1), the hearing official also finds that termination of the institution's participation or servicer's eligibility, as applicable, is warranted;

(iii) In an action brought against an institution or third-party servicer that involves its failure to provide a letter of credit or other financial protection in the amount specified by the Secretary under § 668.15 or subpart L of part 668, the hearing official finds that the amount of the letter of credit or other financial protection established by the Secretary is appropriate, unless the institution can demonstrate that the amount was not warranted because—

(A) The events or conditions identified by the Secretary as the grounds on which the protection is required no longer exist or have been resolved in a manner that eliminates the risk they posed to the institution's ability to meet its financial obligations; or

(B) The institution has proffered alternative financial protection that provides students and the Department adequate protection against losses resulting from the risks identified by the Secretary. Adequate protection consists of one or both of the following—

(1) A deposit with the Secretary of cash in the amount of financial protection demanded by the Secretary to be held by the Secretary in escrow; or

(2) An agreement with the Secretary that a portion of the funds earned by the institution under a reimbursement funding arrangement will be temporarily withheld in such amounts as will meet, by the end of a nine-month period, the amount of the required financial protection demanded;

(iv) In a termination action taken against an institution or third-party servicer based on the grounds that the institution or servicer failed to comply with the requirements of § 668.23(c)(3), if the hearing official finds that the institution or servicer failed to meet those requirements, the hearing official finds that the termination is warranted;

(v)(A) In a termination action against an institution based on the grounds that the institution is not financially responsible under § 668.15(c)(1), the hearing official finds that the termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.15(d)(4) have been met; and

(B) In a termination or limitation action against an institution based on the grounds that the institution is not financially responsible—

(1) Upon proof of the conditions in § 668.174(a), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all the conditions in § 668.175(f) have been met; and

(2) Upon proof of the conditions in § 668.174(b)(1), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.174(b)(2) or § 668.175(g) have been met.

* * * * *

■ 8. Section 668.93 is amended by redesignating paragraphs (h) and (i) as paragraphs (i) and (j), respectively, and adding a new paragraph (h), to read as follows:

§ 668.93   Limitation.

* * * * *

(h) A change in the participation status of the institution from fully certified to participate to provisionally certified to participate under § 668.13(c).

* * * * *

■ 9. Section 668.171 is revised to read as follows:

§ 668.171   General.

(a) *Purpose.* To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that it is financially responsible under the standards established in this subpart. As provided under section 498(c)(1) of the HEA, the Secretary determines whether an institution is financially responsible based on the institution's ability to—

(1) Provide the services described in its official publications and statements;

(2) Meet all of its financial obligations; and

(3) Provide the administrative resources necessary to comply with title IV, HEA program requirements.

(b) *General standards of financial responsibility.* Except as provided under paragraphs (c) and (d) of this section, the Secretary considers an institution to be financially responsible if the Secretary determines that—

(1) The institution's Equity, Primary Reserve, and Net Income ratios yield a composite score of at least 1.5, as provided under § 668.172 and appendices A and B to this subpart;

(2) The institution has sufficient cash reserves to make required returns of unearned title IV, HEA program funds, as provided under § 668.173;

(3) The institution is able to meet all of its financial obligations and otherwise provide the administrative resources necessary to comply with title IV, HEA program requirements; and

(4) The institution or persons affiliated with the institution are not subject to a condition of past performance under § 668.174(a) or (b).

(c) *Actions and triggering events.* An institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if it is subject to one or more of the following actions or triggering events.

(1) *Lawsuits and other actions.* (i)(A) Currently or at any time during the three most recently completed award years, the institution is or was required to pay a debt or incurs a liability arising from an audit, investigation, or similar action initiated by a State, Federal, or other oversight entity, or settles or resolves a suit brought against it by that entity, that is based on claims related to the making of a Federal loan or the provision of educational services, for an amount that, for one or more of those years, exceeds the lesser of the threshold amount for which an audit is required under 2 CFR part 200 or 10 percent of its current assets; or

(B) The institution is currently being sued by a State, Federal, or other oversight entity based on claims related to the making of a Federal loan or the provision of educational services for an amount that exceeds the lesser of the threshold amount for which an audit is required under 2 CFR part 200 or 10 percent of its current assets;

(ii) The institution is currently being sued by one or more State, Federal, or other oversight entities based on claims of any kind that are not described in paragraph (c)(1)(i)(B) of this section, and the potential monetary sanctions or damages from that suit or suits are in an amount that exceeds 10 percent of its current assets;

(iii) The institution is currently being sued in a lawsuit filed under the False Claims Act, 31 U.S.C. 3729 *et seq.*, or by one or more private parties for claims that relate to the making of loans to students for the purpose of enrollment or the institution's provision of educational services, if that suit—

(A) Has survived a motion for summary judgment by the institution and has not been dismissed; and

(B) Seeks relief in an amount that exceeds 10 percent of the institution's current assets; or

(iv) For a suit described in paragraph (c)(1)(ii) or (iii) of this section, during a fiscal year for which the institution has not submitted its audited financial statements to the Secretary, the institution entered into a settlement, had judgment entered against it, incurred a liability, or otherwise resolved that suit for an amount that exceeds 10 percent of its current assets.

(v) In determining whether a suit or action under this paragraph exceeds the audit or percentage thresholds, the institution must—

(A) Except for private party suits under paragraph (c)(1)(iii) of this section, for a suit or action that does not demand a specific amount as relief, calculate that amount by totaling the tuition and fees the institution received from every student who was enrolled at the institution during the period for which the relief is sought, or if no period is stated, the three award years preceding the date the suit or action was filed or initiated; and

(B) Use the amount of current assets reported in its most recent audited financial statements submitted to the Secretary.

(2) *Repayments to the Secretary.* During the current award year or any of the three most recently completed award years, the institution is or was required to repay the Secretary for losses from borrower defense claims in an amount that, for one or more of those years, exceeds the lesser of the threshold amount for which an audit is required under 2 CFR part 200 or 10 percent of its current assets, as reported in its most recent audited financial statements submitted to the Secretary.

(3) *Accrediting agency actions.* Currently or any time during the three most recently completed award years, the institution is or was—

(i) Required by its accrediting agency to submit a teach-out plan, for a reason described in § 602.24(c)(1), that covers the institution or any of its branches or additional locations; or

(ii) Placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation, by its accrediting agency for failing to meet one or more of the agency's standards, and the accrediting agency does not notify the Secretary within six months of taking that action that it has withdrawn that action because the institution has come into compliance with the agency's standards.

(4) *Loan agreements and obligations.* As disclosed in a note to its audited financial statements or audit opinion, or reported by the institution under paragraph (d) of this section—

(i) The institution violated a provision or requirement in a loan agreement with the creditor with the largest secured extension of credit to the institution;

(ii) The institution failed to make a payment for more than 120 days in accordance with its debt obligations owed to the creditor with the largest secured extension of credit to the institution; or

(iii) As provided under the terms of a security or loan agreement between the institution and the creditor with the largest secured extension of credit to the institution, a monetary or nonmonetary default or delinquency event occurs, or other events occur that trigger, or enable the creditor to require or impose on the institution, an increase in collateral, an increase in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees.

(5) *Non-title IV revenue.* For its most recently completed fiscal year, a proprietary institution did not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds, as provided under § 668.28(c).

(6) *Publicly traded institutions.* As reported by the institution under paragraph (d) of this section, or identified by the Secretary—

(i) The Securities and Exchange Commission (SEC) warns the institution that it may suspend trading on the institution's stock, or the institution's stock is delisted involuntarily from the exchange on which the stock was traded;

(ii) The institution disclosed or was required to disclose in a report filed with the SEC a judicial or administrative proceeding stemming from a complaint filed by a person or entity that is not part of a State or Federal action under paragraph (c)(1) of this section;

(iii) The institution failed to file timely a required annual or quarterly report with the SEC; or

(iv) The exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements.

(7) *Gainful employment.* As determined annually by the Secretary, the number of students who receive title IV, HEA program funds enrolled in gainful employment programs that are failing or in the zone under the D/E rates measure in § 668.403(c) is more than 50 percent of the total number of students who received title IV program funds who are enrolled in all the gainful employment programs at the institution. An institution is exempt from this provision if less than 50 percent of all the students enrolled at the institution who receive title IV, HEA program funds are enrolled in gainful employment programs.

(8) *Withdrawal of owner's equity.* For an institution whose composite score is less than 1.5, any withdrawal of owner's equity from the institution by any means, including by declaring a dividend.

(9) *Cohort default rates.* The institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(i) The institution files a challenge, request for adjustment, or appeal under that subpart with respect to its rates for one or both of those fiscal years; and

(ii) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(10) *Other events or conditions.* The Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution, including but not limited to whether—

(i) There is a significant fluctuation between consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs;

(ii) The institution is cited by a State licensing or authorizing agency for failing State or agency requirements;

(iii) The institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient capital to absorb losses that may be incurred as a result of adverse conditions and continue to meet its financial obligations to the Secretary and students;

(iv) The institution or its corporate parent has a non-investment grade bond or credit rating;

(v) As calculated by the Secretary, the institution has high annual dropout rates; or

(vii) Any adverse event reported by the institution on a Form 8–K filed with the SEC.

(d) *Reporting requirements.* In accordance with procedures established by the Secretary, an institution must notify the Secretary of any action or event identified in paragraph (c) of this section no later than 10 days after that action or event occurs. The Secretary may take an administrative action under paragraph (g) of this section against the institution if it fails to provide timely notice under this paragraph. In its notice to the Secretary, the institution may demonstrate that—

(1) The reported disclosure of a judicial or administrative proceeding under paragraph (c)(6)(ii) of this section does not constitute a material event;

(2) The reported withdrawal of owner's equity under paragraph (c)(8) of this section was used exclusively to meet tax liabilities of the institution or its owners for income derived from the institution, or, in the case where the composite score is calculated based on the consolidated financial statements of a group of institutions, the amount withdrawn from one institution in the group was transferred to another entity within that group; or

(3) The reported violation of a provision or requirement in a loan agreement under paragraph (c)(4) of this section was waived by the creditor. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (c)(4)(iii) of this section, the institution must identify and describe those penalties, constraints, or requirements and demonstrate that complying with those actions will not adversely affect the institution's ability to meet its current and future financial obligations.

(e) *Public institutions.* (1) The Secretary considers a domestic public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the State, local, or municipal government entity, tribal authority, or other government entity that has the legal authority to make that designation; and

(B) Provides a letter from an official of that State or other government entity confirming that the institution is a public institution; and

(ii) Is not subject to a condition of past performance under § 668.174.

(2) The Secretary considers a foreign public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(B) Provides documentation from an official of that country or other government entity confirming that the institution is a public institution and is backed by the full faith and credit of the country or other government entity; and

(ii) Is not subject to a condition of past performance under § 668.174.

(f) *Audit opinions.* Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Secretary does not consider the institution to be financially responsible if, in the institution's audited financial statements, the opinion expressed by the auditor was an adverse, qualified, or disclaimed opinion, or the auditor expressed doubt about the continued existence of the institution as a going concern, unless the Secretary determines that a qualified or disclaimed opinion does not significantly bear on the institution's financial condition.

(g) *Administrative actions.* If the Secretary determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative standard in § 668.175, or the institution does not submit its financial and compliance audits by the date and in the manner required under § 668.23, the Secretary may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs; or

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d).

(Authority: 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95–452, 92 Stat. 1101–1109)

■ 10. Section 668.175 is amended by:
■ A. Revising paragraphs (d) and (f).
■ B. Removing and reserving paragraph (e).
■ C. Adding paragraph (h).
■ D. Revising the authority citation.
   The revisions and addition read as follows:

**§ 668.175   Alternative standards and requirements.**

\*   \*   \*   \*   \*

(d) *Zone alternative.* (1) A participating institution that is not

financially responsible solely because the Secretary determines that its composite score is less than 1.5 may participate in the title IV, HEA programs as a financially responsible institution for no more than three consecutive years, beginning with the year in which the Secretary determines that the institution qualifies under this alternative.

(i)(A) An institution qualifies initially under this alternative if, based on the institution's audited financial statement for its most recently completed fiscal year, the Secretary determines that its composite score is in the range from 1.0 to 1.4; and

(B) An institution continues to qualify under this alternative if, based on the institution's audited financial statement for each of its subsequent two fiscal years, the Secretary determines that the institution's composite score is in the range from 1.0 to 1.4.

(ii) An institution that qualified under this alternative for three consecutive years, or for one of those years, may not seek to qualify again under this alternative until the year after the institution achieves a composite score of at least 1.5, as determined by the Secretary.

(2) Under the zone alternative, the Secretary—

(i) Requires the institution to make disbursements to eligible students and parents, and to otherwise comply with the provisions, under either the heightened cash monitoring or reimbursement payment method described in § 668.162;

(ii) Requires the institution to provide timely information regarding any of the following oversight and financial events—

(A) Any event that causes the institution, or related entity as defined in Accounting Standards Codification (ASC) 850, to realize any liability that was noted as a contingent liability in the institution's or related entity's most recent audited financial statement; or

(B) Any losses that are unusual in nature or infrequently occur or both, as defined in accordance with Accounting Standards Update (ASU) No. 2015–01 and ASC 225;

(iii) May require the institution to submit its financial statement and compliance audits earlier than the time specified under § 668.23(a)(4); and

(iv) May require the institution to provide information about its current operations and future plans.

(3) Under the zone alternative, the institution must—

(i) For any oversight or financial event described in paragraph (d)(2)(ii) of this section for which the institution is

required to provide information, in accordance with procedures established by the Secretary, notify the Secretary no later than 10 days after that event occurs; and

(ii) As part of its compliance audit, require its auditor to express an opinion on the institution's compliance with the requirements under the zone alternative, including the institution's administration of the payment method under which the institution received and disbursed title IV, HEA program funds.

(4) If an institution fails to comply with the requirements under paragraphs (d)(2) or (3) of this section, the Secretary may determine that the institution no longer qualifies under this alternative.

(e) [Reserved]

(f) *Provisional certification alternative.* (1) The Secretary may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b)(1), is subject to an action or triggering event under § 668.171(c), or because of an audit opinion described in § 668.171(f); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Secretary that it has satisfied or resolved that condition.

(2) Under this alternative, the institution must—

(i) Provide to the Secretary an irrevocable letter of credit that is acceptable and payable to the Secretary, provide cash, or agree to a set-aside under paragraph (h) of this section, for an amount determined by the Secretary under paragraph (f)(4) of this section, except that this requirement does not apply to a public institution; and

(ii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3) of this section.

(3) If at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible, the Secretary may again permit the institution to participate under a provisional certification, but the Secretary—

(i) May require the institution, or one or more persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), or both, to provide to the Secretary financial protection for an amount determined by the Secretary to be

sufficient to satisfy any potential liabilities that may arise from the institution's participation in the title IV, HEA programs; and

(ii) May require one or more of the persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), to be jointly or severally liable for any liabilities that may arise from the institution's participation in the title IV, HEA programs.

(4) The institution must provide to the Secretary an irrevocable letter of credit for an amount that is—

(i) For a State or Federal action under § 668.171(c)(1)(i)(A) or (B), 10 percent or more, as determined by the Secretary, of the amount of Direct Loan Program funds received by the institution during its most recently completed fiscal year;

(ii) For repayments to the Secretary for losses from borrower defense claims under § 668.171(c)(2), equal to the greatest annual loss incurred by the Secretary during the three most recently completed award years to resolve those claims or the amount of losses incurred by the Secretary during the current award year, whichever is greater, plus a portion of the amount of any outstanding or pending claims based on the ratio of the total value of claims resolved in favor of borrowers during the three most recently completed award years to the total value of claims resolved during the three most recently completed award years; and

(iii) For any other action or triggering event described in § 668.171(c), or if the institution's composite score is less than 1.0 or the institution no longer qualifies under the zone alternative, 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year.

\*     \*     \*     \*     \*

(h) *Set-aside.* If an institution does not provide cash or the letter of credit for the amount required under paragraph (d) or (f) of this section within 30 days of the Secretary's request, the Secretary offsets the amount of title IV, HEA program funds that an institution has earned in a manner that ensures that, by the end of a nine-month period, the total amount offset equals the amount of cash or the letter of credit the institution would otherwise provide. The Secretary maintains the amount of funds offset in a temporary escrow account, uses the funds to satisfy the debt and liabilities owed to the Secretary not otherwise paid directly by the institution, and provides to the institution any funds not used for this purpose during the period

for which the cash or letter of credit was required.

(Authority: 20 U.S.C. 1094 and 1099c)

■ 11. Section 668.176 is added to subpart L to read as follows:

### § 668.176   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1094, 1099c)

## PART 674—FEDERAL PERKINS LOAN PROGRAM

■ 12. The authority citation for part 674 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087aa—1087hh, unless otherwise noted.

■ 13. Section 674.33 is amended by:
■ A. In paragraph (g)(3) introductory text, removing the words "may discharge" and adding, in their place, the word "discharges".
■ B. In paragraph (g)(3)(i), removing the word "or".
■ C. In paragraph (g)(3)(ii), removing the period and adding, in its place, the punctuation and word "; or".
■ D. Adding paragraph (g)(3)(iii).
■ E. Redesignating paragraphs (g)(8)(vi), (vii), (viii), and (ix) as paragraphs (g)(8)(vii), (viii), (ix), and (x), respectively.
■ F. Adding a new paragraph (g)(8)(vi).
    The additions read as follows:

### § 674.33   Repayment.

\*     \*     \*     \*     \*

(g) \*   \*   \*

(3) \*   \*   \*

(iii) Based on information in the Secretary's possession, the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

\*     \*     \*     \*     \*

(8) \*   \*   \*

(vi) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

\*     \*     \*     \*     \*

■ 14. Section 674.61 is amended by revising paragraph (a) to read as follows:

### § 674.61   Discharge for death or disability.

(a) *Death.* (1) An institution must discharge the unpaid balance of a borrower's Defense, NDSL, or Federal Perkins loan, including interest, if the borrower dies. The institution must discharge the loan on the basis of—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the chief financial officer of the institution may approve a discharge based upon other reliable documentation of the borrower's death.

*       *       *       *       *

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 15. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

### § 682.202   [Amended]

■ 16. Section 682.202 is amended in paragraph (b)(1) by removing the words "A lender" and adding, in their place, "Except as provided in § 682.405(b)(4), a lender".

■ 17. Section 682.211 is amended by adding paragraph (i)(7) to read as follows:

### § 682.211   Forbearance.

*       *       *       *       *

(i) * * *

(7) The lender must grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k). The mandatory administrative forbearance shall remain in effect until the lender is notified by the Secretary that the Secretary has made a determination as to the borrower's eligibility for a borrower defense discharge.

*       *       *       *       *

■ 18. Section 682.402 is amended by:
■ A. Revising paragraphs (b)(2), (d)(6)(ii)(F) introductory text and (d)(6)(ii)(H).
■ B. Redesignating paragraph (d)(6)(ii)(I) as paragraph (d)(6)(ii)(J).
■ C. Adding new paragraphs (d)(6)(ii)(I) and (d)(6)(ii)(K).
■ D. In paragraph (d)(8) introductory text, removing the words "may be" and adding in their place the word "is".

■ E. In paragraph (d)(8)(i), removing the word "or".
■ F. In paragraph (d)(8)(ii), removing the period and adding in its place the punctuation and word "; or".
■ G. Adding paragraph (d)(8)(iii).
■ H. In paragraph (e)(6)(iii), removing the last sentence.
The revisions and additions read as follows:

### § 682.402   Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

*       *       *       *       *

(b) * * *

(2)(i) A discharge of a loan based on the death of the borrower (or student in the case of a PLUS loan) must be based on—

(A) An original or certified copy of the death certificate;

(B) An accurate and complete photocopy of the original or certified copy of the death certificate;

(C) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(D) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(ii) Under exceptional circumstances and on a case-by-case basis, the chief executive officer of the guaranty agency may approve a discharge based upon other reliable documentation of the borrower's or student's death.

*       *       *       *       *

(d) * * *
(6) * * *
(ii) * * *

(F) If the guaranty agency determines that a borrower identified in paragraph (d)(6)(ii)(C) or (D) of this section does not qualify for a discharge, the agency shall notify the borrower in writing of that determination, the opportunity for review by the Secretary, and an explanation of the manner in which to request such a review within 30 days after the date the agency—

*       *       *       *       *

(H) If a borrower described in paragraph (d)(6)(ii)(E) or (F) fails to submit the completed application within 60 days of being notified of that option, the lender or guaranty agency shall resume collection and shall be deemed to have exercised forbearance of payment of principal and interest from the date it suspended collection activity. The lender may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period.

(I) Upon resuming collection on any affected loan, the lender or guaranty

agency provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

*       *       *       *       *

(K)(1) Within 30 days after receiving the borrower's request for review under paragraph (d)(6)(ii)(F) of this section, the agency shall forward the borrower's discharge request and all relevant documentation to the Secretary for review.

(2) The Secretary notifies the agency and the borrower of the determination upon review. If the Secretary determines that the borrower is not eligible for a discharge under paragraph (d) of this section, within 30 days after being so informed, the agency shall take the actions described in paragraph (d)(6)(ii)(H) or (d)(6)(ii)(I) of this section, as applicable.

(3) If the Secretary determines that the borrower meets the requirements for a discharge under paragraph (d) of this section, the agency shall, within 30 days after being so informed, take actions required under paragraph (d)(6) and (d)(7) of this section, as applicable.

*       *       *       *       *

(8) * * *

(iii) The Secretary or guaranty agency determines, based on information in their possession, that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed.

*       *       *       *       *

■ 19. Section 682.405 is amended by:
■ A. Redesignating paragraph (b)(4) as paragraph (b)(4)(i).
■ B. Adding a new paragraph (b)(4)(ii). The addition reads as follows:

### § 682.405   Loan rehabilitation agreement.

*       *       *       *       *

(b) * * *
(4) * * *
(ii) The lender must not consider the purchase of a rehabilitated loan as entry into repayment or resumption of repayment for the purposes of interest capitalization under § 682.202(b).

*       *       *       *       *

### § 682.410   [Amended]

■ 20. Section 682.410 is amended in paragraph (b)(4) by adding, after the words "to the lender", the words and punctuation ", but shall not capitalize any unpaid interest thereafter".

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 21. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.*, unless otherwise noted.

■ 22. Section 685.200 is amended by:
■ A. Adding paragraph (f)(3)(v).
■ B. Adding paragraph (f)(4)(iii).
   The additions read as follows:

§ 685.200   Borrower eligibility.

*      *      *      *      *

   (f) * * *
   (3) * * *
   (v) A borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge that results in a remaining eligibility period greater than zero is no longer responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of the loan, as described in paragraph (f)(3)(i) of this section.
   (4) * * *
   (iii) For a first-time borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge on a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan, the Subsidized Usage Period is reduced. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in full, the Subsidized Usage Period is zero years. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in part, the Subsidized Usage Period may be reduced if the discharge results in the inapplicability of paragraph (f)(4)(i) of this section.

*      *      *      *      *

■ 23. Section 685.205 is amended by revising paragraph (b)(6) to read as follows:

§ 685.205   Forbearance.

*      *      *      *      *

   (b) * * *
   (6) Periods necessary for the Secretary to determine the borrower's eligibility for discharge—
   (i) Under § 685.206(c);
   (ii) Under § 685.214;
   (iii) Under § 685.215;
   (iv) Under § 685.216;
   (v) Under § 685.217;
   (vi) Under § 685.222; or
   (vii) Due to the borrower's or endorser's (if applicable) bankruptcy;

*      *      *      *      *

■ 24. Section 685.206 is amended by revising paragraph (c) to read as follows:

§ 685.206   Borrower responsibilities and defenses.

*      *      *      *      *

   (c) Borrower defenses. (1) For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph (c). A ''borrower defense'' refers to any act or omission of the school attended by the student that relates to the making of the loan or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:
   (i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.
   (ii) A claim to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.
   (2) The order of objections for defaulted Direct Loans are as described in § 685.222(a)(1) to (6). A borrower defense claim under this section must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k).
   (3) For an approved borrower defense under this section, the Secretary may initiate an appropriate proceeding to collect from the school whose act or omission resulted in the borrower defense the amount of relief arising from the borrower defense.

*      *      *      *      *

§ 685.209   [Amended]

■ 25. Section 685.209 is amended by:
■ A. In paragraph (a)(1)(ii), adding the punctuation and words '', for purposes of determining whether a borrower has a partial financial hardship in accordance with paragraph (a)(1)(v) of this section or adjusting a borrower's monthly payment amount in accordance with paragraph (a)(2)(ii) of this section,'' immediately after the words ''Eligible loan''.
■ B. In paragraph (c)(1)(ii), adding the punctuation and words '', for purposes of adjusting a borrower's monthly payment amount in accordance with paragraph (c)(2)(ii) of this section,'' immediately after the words ''Eligible loan''.
■ C. In paragraph (c)(2)(ii)(B) introductory text, removing the word ''Both'' and adding, in its place, the words ''Except in the case of a married borrower filing separately whose spouse's income is excluded in accordance with paragraph (c)(1)(i)(A) or (B) of this section, both''.
■ D. In paragraph (c)(2)(v), removing the words ''or the Secretary determines the borrower does not have a partial financial hardship''.
■ E. In paragraph (c)(4)(iii)(B), removing the citations ''(c)(2)(iv), (c)(4)(v), and

(c)(4)(vi)'' and adding, in their place, the citations ''(c)(2)(iv) and (c)(4)(v)''.
■ 26. Section 685.212 is amended by:
■ A. Revising paragraphs (a)(1) and (a)(2).
■ B. Adding paragraph (k).
   The revision and addition read as follows:

§ 685.212   Discharge of a loan obligation.

   (a) Death. (1) If a borrower (or a student on whose behalf a parent borrowed a Direct PLUS Loan) dies, the Secretary discharges the obligation of the borrower and any endorser to make any further payments on the loan based on—
   (i) An original or certified copy of the death certificate;
   (ii) An accurate and complete photocopy of the original or certified copy of the death certificate;
   (iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or
   (iv) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.
   (2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges a loan based upon other reliable documentation of the borrower's or student's death that is acceptable to the Secretary.

*      *      *      *      *

   (k) Borrower defenses. (1) If a borrower defense is approved under § 685.206(c) or § 685.222—
   (i) The Secretary discharges the obligation of the borrower in whole or in part in accordance with the procedures in §§ 685.206(c) and 685.222, respectively; and
   (ii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the loan that exceed the amount owed on that portion of the loan not discharged, if the borrower asserted the claim not later than—
   (A) For a claim subject to § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or
   (B) For a claim subject to § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.
   (2) In the case of a Direct Consolidation Loan, a borrower may assert a borrower defense under § 685.206(c) or § 685.222 with respect to a Direct Loan, a FFEL Program Loan, a Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public

Health Service Act, Health Education Assistance Loan, or Nursing Loan made under subpart II of part B of the Public Health Service Act that was repaid by the Direct Consolidation Loan.

(i) The Secretary considers a borrower defense claim asserted on a Direct Consolidation Loan by determining—

(A) Whether the act or omission of the school with regard to the loan described in paragraph (k)(2) of this section other than a Direct Subsidized, Unsubsidized, or PLUS Loan, constitutes a borrower defense under § 685.206(c), for a Direct Consolidation Loan made before July 1, 2017, or under § 685.222, for a Direct Consolidation Loan made on or after July 1, 2017; or

(B) Whether the act or omission of the school with regard to a Direct Subsidized, Unsubsidized, or PLUS Loan made on or after July 1, 2017 that was paid off by the Direct Consolidation Loan, constitutes a borrower defense under § 685.222.

(ii) If the borrower defense is approved, the Secretary discharges the appropriate portion of the Direct Consolidation Loan.

(iii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the Direct Consolidation Loan that exceed the amount owed on that portion of the Direct Consolidation Loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim asserted under § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or

(B) For a claim asserted under § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(iv) The Secretary returns to the borrower a payment made by the borrower or otherwise recovered on the loan described in paragraph (k)(2) of this section only if—

(A) The payment was made directly to the Secretary on the loan; and

(B) The borrower proves that the loan to which the payment was credited was not legally enforceable under applicable law in the amount for which that payment was applied.

*    *    *    *    *

■ 27. Section 685.214 is amended by:
■ A. Revising paragraph (c)(2).
■ B. Revising paragraph (f)(4).
■ C. Redesignating paragraphs (f)(5) and (6) as paragraphs (f)(6) and (7), respectively.
■ D. Adding a new paragraph (f)(5).
The revisions and addition read as follows:

§ 685.214   Closed school discharge.

*    *    *    *    *

(c) *  *  *
(2) The Secretary discharges a loan under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that—

(i) The borrower qualifies for the discharge; and

(ii) The borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

*    *    *    *    *

(f) *  *  *
(4) If a borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(5) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

*    *    *    *    *

■ 28. Section 685.215 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Revising paragraph (c) introductory text.
■ C. Revising paragraph (c)(1).
■ D. Redesignating paragraphs (c)(2) through (7) as paragraphs (c)(3) through (8), respectively.
■ E. Adding a new paragraph (c)(2).
■ F. Revising redesignated paragraph (c)(8).
■ G. Revising paragraph (d).
The revisions and addition read as follows:

§ 685.215   Discharge for false certification of student eligibility or unauthorized payment.

(a) Basis for discharge—(1) False certification. The Secretary discharges a borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if a school falsely certifies the eligibility of the borrower (or the student on whose behalf a parent borrowed) to receive the proceeds of a Direct Loan. The Secretary considers a student's eligibility to borrow to have been falsely certified by the school if the school—

(i) Certified the eligibility of a student who

(A) Reported not having a high school diploma or its equivalent; and

(B) Did not satisfy the alternative to graduation from high school requirements under section 484(d) of the Act that were in effect at the time of certification;

(ii) Certified the eligibility of a student who is not a high school graduate based on—

(A) A high school graduation status falsified by the school; or

(B) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(iii) Signed the borrower's name on the loan application or promissory note without the borrower's authorization;

(iv) Certified the eligibility of a student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment (in the student's State of residence when the loan was originated) in the occupation for which the training program supported by the loan was intended; or

(v) Certified the eligibility of a student for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (c)(5)(ii) of this section.

*    *    *    *    *

(c) Borrower qualification for discharge. To qualify for discharge under this section, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraph (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.

(1) High school diploma or equivalent. In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative to graduation from high school eligibility requirements under section 484(d) of the Act applicable at the time the loan was originated, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student on whose behalf a parent received a PLUS loan)—

(i) Did not have a valid high school diploma at the time the loan was certified; and

(ii) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable at the time the institution certified the loan.

(2) *Disqualifying condition.* In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan) did not meet State requirements for employment (in the student's State of residence) in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

\*     \*     \*     \*     \*

(8) *Discharge without an application.* The Secretary discharges all or part of a loan as appropriate under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge. Such information includes, but is not limited to, evidence that the school has falsified the Satisfactory Academic Progress of its students, as described in § 668.34.

(d) *Discharge procedures.* (1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower an application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(3) If the borrower submits the application described in paragraph (c) of this section, the Secretary determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the Secretary's records and gathered by the Secretary from

other sources, including guaranty agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations. The Secretary issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence, and considers any response from the borrower and any additional information from the borrower, and notifies the borrower whether the determination is changed.

(4) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(5) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination.

\*     \*     \*     \*     \*

## § 685.220   [Amended]

■ 29. Section 685.220 is amended by:
■ A. Removing the words "subpart II of part B" from paragraph (b)(21) and adding, in their place, the words "part E".
■ B. Removing paragraph (d)(1)(i).
■ C. Redesignating paragraph (d)(1)(ii) as (d)(1)(i), and paragraph (d)(1)(iii) as (d)(1)(ii).
■ 30. Section 685.222 is added to subpart B to read as follows:

## § 685.222   Borrower defenses.

(a) *General.* (1) For loans first disbursed prior to July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with the provisions of § 685.206(c), unless otherwise noted in § 685.206(c).

(2) For loans first disbursed on or after July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with this section. To establish a borrower defense under this section, a preponderance of the evidence must show that the borrower has a borrower defense that meets the requirements of this section.

(3) A violation by the school of an eligibility or compliance requirement in the Act or its implementing regulations is not a basis for a borrower defense under either this section or § 685.206(c) unless the violation would otherwise constitute a basis for a borrower defense under this section.

(4) For the purposes of this section or § 685.206(c), "borrower" means—
(i) The borrower; and
(ii) In the case of a Direct PLUS Loan, the student and any endorsers.

(5) For the purposes of this section or § 685.206(c), a "borrower defense" refers to an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided and that meets the requirements under paragraphs (b), (c), or (d), and includes one or both of the following:
(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and
(ii) A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(6) If the borrower asserts both a borrower defense and any other objection to an action of the Secretary with regard to that Direct Loan, the Secretary notifies the borrower of the order in which the Secretary considers the borrower defense and any other objections. The order in which the Secretary will consider objections, including a borrower defense, will be determined by the Secretary as appropriate under the circumstances.

(b) *Judgment against the school.* (1) The borrower has a borrower defense if the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction.

(2) A borrower may assert a borrower defense under this paragraph at any time.

(c) *Breach of contract by the school.* The borrower has a borrower defense if the school the borrower received a Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. A borrower may assert a defense to repayment of amounts owed to the Secretary under this paragraph at any time after the breach by the school of its contract with the student. A borrower may assert a right to recover amounts previously collected by the Secretary under this paragraph not later than six years after the breach by the school of its contract with the student.

(d) *Substantial misrepresentation by the school.* (1) A borrower has a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide

educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on when the borrower decided to attend, or to continue attending, the school. A borrower may assert, at any time, a defense to repayment under this paragraph (d) of amounts owed to the Secretary. A borrower may assert a claim under this paragraph (d) to recover funds previously collected by the Secretary not later than six years after the borrower discovers, or reasonably could have discovered, the information constituting the substantial misrepresentation.

(2) For the purposes of this section, a designated Department official pursuant to paragraph (e) of this section or a hearing official pursuant to paragraphs (f), (g), or (h) may consider, as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation, whether the school or any of the other parties described in paragraph (d)(1) engaged in conduct such as, but not limited to:

(i) Demanding that the borrower make enrollment or loan-related decisions immediately;

(ii) Placing an unreasonable emphasis on unfavorable consequences of delay;

(iii) Discouraging the borrower from consulting an adviser, a family member, or other resource;

(iv) Failing to respond to the borrower's requests for more information, including about the cost of the program and the nature of any financial aid; or

(v) Otherwise unreasonably pressuring the borrower or taking advantage of the borrower's distress or lack of knowledge or sophistication.

(e) *Procedure for an individual borrower.* (1) To assert a borrower defense under this section, an individual borrower must—

(i) Submit an application to the Secretary, on a form approved by the Secretary—

(A) Certifying that the borrower received the proceeds of a loan, in whole or in part, to attend a named school;

(B) Providing evidence that supports the borrower defense; and

(C) Indicating whether the borrower has made a claim with respect to the information underlying the borrower defense with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and

(ii) Provide any other information or supporting documentation reasonably requested by the Secretary.

(2) Upon receipt of a borrower's application, the Secretary—

(i) If the borrower is not in default on the loan for which a borrower defense has been asserted, grants forbearance and—

(A) Notifies the borrower of the option to decline the forbearance and to continue making payments on the loan; and

(B) Provides the borrower with information about the availability of the income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221; or

(ii) If the borrower is in default on the loan for which a borrower defense has been asserted—

(A) Suspends collection activity on the loan until the Secretary issues a decision on the borrower's claim;

(B) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and

(C) Notifies the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

(3) The Secretary designates a Department official to review the borrower's application to determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official.

(i) As part of the fact-finding process, the Department official notifies the school of the borrower defense and considers any evidence or argument presented by the borrower and also any additional information, including—

(A) Department records;

(B) Any response or submissions from the school; and

(C) Any additional information or argument that may be obtained by the Department official.

(ii) The Department official identifies to the borrower and may identify to the school the records he or she considers relevant to the borrower defense. The Secretary provides to the borrower or the school any of the identified records upon reasonable request.

(4) At the conclusion of the fact-finding process, the Department official issues a written decision as follows:

(i) If the Department official approves the borrower defense in full or in part, the Department official notifies the borrower in writing of that determination and of the relief provided as described in paragraph (i) of this section.

(ii) If the Department official denies the borrower defense in full or in part, the Department official notifies the borrower of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected, and informs the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application. The Department official also informs the borrower of the opportunity to request reconsideration of the claim based on new evidence pursuant to paragraph (e)(5)(i) of this section.

(5) The decision of the Department official is final as to the merits of the claim and any relief that may be granted on the claim. Notwithstanding the foregoing—

(i) If the borrower defense is denied in full or in part, the borrower may request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" is relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision; and

(ii) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision.

(6) The Secretary may consolidate applications filed under this paragraph (e) that have common facts and claims, and resolve the borrowers' borrower defense claims as provided in paragraphs (f), (g), and (h) of this section.

(7) The Secretary may initiate a separate proceeding to collect from the school the amount of relief resulting from a borrower defense under this paragraph.

(f) *Group process for borrower defense, generally.* (1) Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participants, the Secretary may initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense.

(i) The members of the group may be identified by the Secretary from individually filed applications pursuant to paragraph (e)(6) of this section or from any other source.

(ii) If the Secretary determines that there are common facts and claims that apply to borrowers who have not filed an application under paragraph (e) of this section, the Secretary may identify such borrowers as members of a group.

(2) Upon the identification of a group of borrowers under paragraph (f)(1) of this section, the Secretary—

(i) Designates a Department official to present the group's claim in the fact-finding process described in paragraph (g) or (h) of this section, as applicable;

(ii) Provides each identified member of the group with notice that allows the borrower to opt out of the proceeding; and

(iii) Notifies the school, as practicable, of the basis of the group's borrower defense, the initiation of the fact-finding process described in paragraph (g) or (h) of this section, and of any procedure by which to request records and respond.

(3) For a group of borrowers identified by the Secretary, for which the Secretary determines that there may be a borrower defense under paragraph (d) based upon a substantial misrepresentation that has been widely disseminated, there is a rebuttable presumption that each member reasonably relied on the misrepresentation.

(g) *Procedures for group process for borrower defenses with respect to loans made to attend a closed school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to a Direct Loan to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses arising from borrower defenses, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses—

(1) A hearing official resolves the borrower defense through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official also considers any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in § 668.174(b), if practicable. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision notifies the members of the group in writing of that

determination and of the relief provided on the basis of that claim as determined under paragraph (i) of this section.

(ii) If the hearing official denies the borrower defense in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that if any balance remains on the loan, the loan will return to its status prior to the group claim process.

(iii) The Secretary provides copies of the written decision to the members of the group and, as practicable, to the school.

(2) The decision of the hearing official is final as to the merits of the group borrower defense and any relief that may be granted on the group claim.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (g)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision.

(h) *Procedures for group process for borrower defenses with respect to loans made to attend an open school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to Direct Loans to attend an open school or a school that is not otherwise covered by paragraph (g) of this section, the claim is resolved in accordance with the procedures in this paragraph (h).

(1) A hearing official resolves the borrower defense and determines any liability of the school through a fact-finding process. As part of the process, the hearing official considers any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision establishes the basis for the determination, notifies the members of the group of the relief as described in paragraph (i) of this section, and notifies the school of any liability to the Secretary for the amounts discharged and reimbursed.

(ii) If the hearing official denies the borrower defense for the group in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that their loans will return to their statuses prior to the group borrower defense process. The decision notifies the school of any liability to the Secretary for any amounts discharged or reimbursed.

(iii) The Secretary provides copies of the written decision to the members of the group, the Department official, and the school.

(2) The decision of the hearing official becomes final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. In the case of an appeal—

(i) The decision of the hearing official does not take effect pending the appeal; and

(ii) The Secretary renders a final decision.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (h)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision.

(5) The Secretary collects from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under this paragraph (h).

(i) *Relief.* If a borrower defense is approved under the procedures in paragraphs (e), (g), or (h) of this section—

(1) The Department official or the hearing official, as applicable, determines the appropriate method for calculating, and the amount of, relief arising out of the facts underlying an individual or group borrower defense, based on information then available to the official or which the official may request; and determines the amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. In

determining the appropriate method for calculating relief, the Department official or the hearing official, as applicable—

(i) Will consider the availability of information required for a method of calculation;

(ii) When calculating relief for a group of borrowers, may consider information derived from a sample of borrowers from the group; and

(iii) May use one or more of the methods described in Appendix A to this subpart, or such other method determined by the official;

(2) In the written decision described in paragraphs (e), (g), and (h) of this section, the designated Department official or hearing official, as applicable, notifies the borrower of the relief provided and—

(i) Specifies the relief determination;

(ii) Advises that there may be tax implications; and

(iii) Provides the borrower an opportunity to opt out of group relief, if applicable;

(3) Consistent with the determination of relief under paragraph (i)(1) of this section, the Secretary discharges the borrower's obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay and, if applicable, reimburses the borrower for amounts paid toward the loan voluntarily or through enforced collection;

(4) The Secretary or the hearing official, as applicable, affords the borrower such further relief as the Secretary or the hearing official determines is appropriate under the circumstances. Such further relief includes, but is not limited to, one or both of the following:

(i) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(ii) Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan; and

(5) The total amount of relief granted with respect to a borrower defense cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other benefit received by, or on behalf of, the borrower that was related to the borrower defense. The relief to the borrower may not include non-pecuniary damages such as

inconvenience, aggravation, emotional distress, or punitive damages.

(j) *Cooperation by the borrower.* To obtain relief under this section, a borrower must reasonably cooperate with the Secretary in any proceeding under paragraph (e), (g), or (h) of this section. The Secretary may revoke any relief granted to a borrower who fails to satisfy his or her obligations under this paragraph (j).

(k) *Transfer to the Secretary of the borrower's right of recovery against third parties.* (1) Upon the granting of any relief under this section, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense and for the same loan for which the discharge was granted under this section.

(2) The provisions of this paragraph (k) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(3) Nothing in this paragraph (k) limits or forecloses the borrower's right to pursue legal and equitable relief against a party described in this paragraph (k) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

■ 31. Section 685.223 is added to subpart B to read as follows:

§ 685.223  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

■ 32. Appendix A to subpart B of part 685 is added to read as follows:

Appendix A to Subpart B of Part 685— Calculating Borrower Relief

The Department official or the hearing official, as applicable, determines the amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. A borrower's relief may be calculated using one or more of the following methods or such other method as the Secretary may determine.

(A) The difference between what the borrower paid, and what a reasonable borrower would have paid had the school made an accurate representation as to the issue that was the subject of the substantial misrepresentation underlying the borrower defense claim.

(B) The difference between the amount of financial charges the borrower could have reasonably believed the school was charging, and the actual amount of financial charges made by the school, for claims regarding the cost of a borrower's program of study.

(C) The total amount of the borrower's economic loss, less the value of the benefit, if any, of the education obtained by the student. Economic loss, for the purposes of this section, may be no greater than the cost of attendance. The value of the benefit of the education may include transferable credits obtained and used by the borrower; and for gainful employment programs, qualifying placement in an occupation within the Standard Occupational Classification (SOC) code for which the training was provided, provided the borrower's earnings meet the expected salary for the program's designated occupations or field, as determined using an earnings benchmark for that occupation. The Department official or hearing official will consider any evidence indicating that no identifiable benefit of the education was received by the student.

■ 33. Section 685.300 is amended by:

■ A. Redesignating paragraph (b)(11) as paragraph (b)(12).

■ B. Adding a new paragraph (b)(11).

■ C. Adding new paragraphs (d) through (i).

The additions read as follows:

§ 685.300  Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

*   *   *   *   *

(b) * * *

(11) Comply with the provisions of paragraphs (d) through (i) regarding student claims and disputes.

*   *   *   *   *

(d) *Borrower defense claims in an internal dispute process.* The school will not compel any student to pursue a complaint based on a borrower defense claim through an internal institutional process before the student presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

(e) *Class action bans.* (1) The school shall not seek to rely in any way on a pre-dispute arbitration agreement, nor on any other pre-dispute agreement, with a student, with respect to any aspect of a class action that is related to a borrower defense claim including to seek a stay or dismissal of particular claims or the entire action, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2) Reliance on a pre-dispute arbitration agreement, or on any other pre-dispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a class action;

(ii) Seeking to exclude a person or persons from a class in a class action;

(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action;

(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action;

(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved; and

(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court in that class action has granted a motion to dismiss the claim and, in doing so, the court noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed.

(3) *Required provisions and notices.* (i) The school must include the following provision in any agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding pre-dispute arbitration or any other pre-dispute agreement addressing class actions and that are entered into after effective date of this regulation:

"We agree that neither we nor anyone else will use this agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims

concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained."

(ii) When a pre-dispute arbitration agreement or any other pre-dispute agreement addressing class actions has been entered into before the effective date of this regulation that did not contain a provision described in paragraph (e)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (e)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (e)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (e)(3)(ii) of this section is amended to contain the provision specified in paragraph (e)(3)(iii)(A) or must provide the notice specified in paragraph (e)(3)(iii)(B) to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.*

"We agree that neither we nor anyone else who later becomes a party to this agreement will use it to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained."

(B) *Notice provision.*

"We agree not to use any pre-dispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained."

(f) *Pre-dispute arbitration agreements.* (1) The school will not compel a student to enter into a pre-dispute agreement to arbitrate a borrower defense claim, or rely in any way on a mandatory pre-dispute arbitration agreement with respect to any aspect of a borrower defense claim.

(2) Reliance on a mandatory pre-dispute arbitration agreement with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student;

(ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and

(iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

(3) *Required provisions and notices.* (i) The school must include the following provision in any mandatory pre-dispute arbitration agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS loan, a student for whom the PLUS loan was obtained, that include any agreement regarding arbitration and that are entered into after effective date of this regulation:

"We agree that neither we nor anyone else will use this agreement to stop you from bringing a lawsuit regarding our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to lawsuits concerning other claims."

(ii) When a mandatory pre-dispute arbitration agreement has been entered into before the effective date of this regulation that did not contain a provision described in paragraph (f)(3)(i), the school shall either ensure the agreement is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (f)(3)(iii)(B) of this section.

(iii) The school shall ensure the agreement described in paragraph (f)(3)(ii) of this section is amended to contain the provision specified in paragraph (f)(3)(iii)(A) or shall provide the notice specified in paragraph (f)(3)(iii)(B) to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.*

"We agree that neither we nor anyone else who later becomes a party to this pre-dispute arbitration agreement will use it to stop you from bringing a lawsuit regarding our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you

do not file it. This provision does not apply to other claims.''

(B) *Notice provision.*

''We agree not to use any pre-dispute arbitration agreement to stop you from bringing a lawsuit regarding our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims.''

(g) *Submission of arbitral records.* (1) A school shall submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim filed in arbitration by or against the school concerning a borrower defense claim:

(i) The initial claim and any counterclaim;

(ii) The pre-dispute arbitration agreement filed with the arbitrator or arbitration administrator;

(iii) The judgment or award, if any, issued by the arbitrator or arbitration administrator;

(iv) If an arbitrator or arbitration administrator refuses to administer or dismisses a claim due to the school's failure to pay required filing or administrative fees, any communication the school receives from the arbitrator or an arbitration administrator related to such a refusal; and

(v) Any communication the school receives from an arbitrator or an arbitration administrator related to a determination that a pre-dispute arbitration agreement regarding educational services provided by the school does not comply with the administrator's fairness principles, rules, or similar requirements, if such a determination occurs.

(2) *Deadline for submission.* A school shall submit any record required pursuant to paragraph (g)(1) of this section within 60 days of filing by the school of any such record with the arbitrator or arbitration administrator and within 60 days of receipt by the school of any such record filed or sent by someone other than the school, such as the arbitration administrator or the student.

(h) *Submission of judicial records.* (1) A school shall submit a copy of the following records to the Secretary, in the form and manner specified by the

Secretary, in connection with any claim filed in a lawsuit by the school against the student, or by any party, including a government agency, against the school concerning a borrower defense claim:

(i) The complaint and any counterclaim;

(ii) Any dispositive motion filed by a party to the suit; and

(iii) The ruling on any dispositive motion and the judgment issued by the court.

(2) *Deadline for submission.* A school shall submit any record required pursuant to paragraph (h)(1) of this section within 30 days of filing or receipt, as applicable, of the complaint, answer, or dispositive motion, and within 30 days of receipt of any ruling on a dispositive motion or a final judgment.

(i) *Definitions.* For the purposes of paragraphs (d) through (h) of this section, the term—

(1) ''Borrower defense claim'' means a claim that is or could be asserted as a defense to repayment under § 685.206(c) or § 685.222;

(2) ''Class action'' means a lawsuit in which one or more parties seek class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process analogous to Federal Rule of Civil Procedure 23;

(3) ''Dispositive motion'' means a motion asking for a court order that entirely disposes of one or more claims in favor of the party who files the motion without need for further court proceedings;

(4) ''Pre-dispute arbitration agreement'' means an agreement between a school and a student providing for arbitration of any future dispute between the parties; and

(5) ''Mandatory pre-dispute arbitration agreement'' means a pre-dispute arbitration agreement included in an enrollment agreement or other document that must be executed by the student as a condition for enrollment at the school.

\*   \*   \*   \*   \*

■ 34. Section 685.308 is amended by revising paragraph (a) to read as follows:

§ 685.308   Remedial actions.

(a) The Secretary collects from the school the amount of the losses the Secretary incurs and determines that the institution is liable to repay under §§ 685.206, 685.214, 685.215(a)(1)(i), (ii), or (iii), 685.216, or 685.222 that were disbursed—

(1) To an individual, because of an act or omission of the school, in amounts that the individual was not eligible to receive; or

(2) Because of the school's violation of a Federal statute or regulation.

\*   \*   \*   \*   \*

■ 35. Section 685.310 is added to subpart C to read as follows:

§ 685.310   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

PART 686—TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION (TEACH) GRANT PROGRAM

■ 36. The authority citation for part 686 continues to read as follows:

Authority: 20 U.S.C. 1070g, *et seq.,* unless otherwise noted.

■ 37. Section 686.42 is amended by revising paragraph (a) to read as follows:

§ 686.42   Discharge of an agreement to serve.

(a) *Death.* (1) If a grant recipient dies, the Secretary discharges the obligation to complete the agreement to serve based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the grant recipient's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges the obligation to complete the agreement to serve based on other reliable documentation of the grant recipient's death that is acceptable to the Secretary.

\*   \*   \*   \*   \*

[FR Doc. 2016–14052 Filed 6–13–16; 11:15 am]

BILLING CODE P

# EXHIBIT 13

# DEPARTMENT OF EDUCATION

**34 CFR Parts 30, 668, 674, 682, 685, and 686**

RIN 1840–AD19

[Docket ID ED–2015–OPE–0103]

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary establishes new regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to establish a new Federal standard and a process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of a school. We also amend the Direct Loan Program regulations to prohibit participating schools from using certain contractual provisions regarding dispute resolution processes, such as predispute arbitration agreements or class action waivers, and to require certain notifications and disclosures by schools regarding their use of arbitration. We amend the Direct Loan Program regulations to codify our current policy regarding the impact that discharges have on the 150 percent Direct Subsidized Loan Limit. We amend the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we amend the discharge provisions in the Federal Perkins Loan (Perkins Loan), Direct Loan, Federal Family Education Loan (FFEL), and Teacher Education Assistance for College and Higher Education (TEACH) Grant programs. The changes will provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school liabilities resulting from borrower defenses.

**DATES:** These regulations are effective July 1, 2017. Implementation date: For the implementation dates of the included regulatory provisions, see the *Implementation Date of These Regulations* section of this document.

**FOR FURTHER INFORMATION CONTACT:** For further information related to borrower defenses, Barbara Hoblitzell at (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.* For further

information related to false certification and closed school loan discharges, Brian Smith at (202) 453–7440 or by email at: *Brian.Smith@ed.gov.* For further information regarding institutional accountability, John Kolotos or Greg Martin at (202) 453–7646 or (202) 453–7535 or by email at: *John.Kolotos@ ed.gov* or *Gregory.Martin@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Purpose of This Regulatory Action:* The purpose of the borrower defense regulations is to protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in the Department's student aid programs. Most postsecondary institutions provide a high-quality education that equips students with new knowledge and skills and prepares them for their careers. However, when postsecondary institutions make false and misleading statements to students or prospective students about school or career outcomes or financing needed to pay for those programs, or fail to fulfill specific contractual promises regarding program offerings or educational services, student loan borrowers may be eligible for discharge of their Federal loans.

The final regulations give students access to consistent, clear, fair, and transparent processes to seek debt relief; protect taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government for discharges of and repayments for Federal student loans; provide due process for students and institutions; and warn students in advertising and promotional materials, using plain language issued by the Department, about proprietary schools at which the typical student experiences poor loan repayment outcomes—defined in these final regulations as a proprietary school at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at least one dollar the outstanding balance of, the borrower's loans received at the institution—so that students can make more informed enrollment and financing decisions.

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. 1087e(h), authorizes the Secretary to specify in regulation which acts or omissions of an

institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Section 685.206(c), governing defenses to repayment, has been in place since 1995 but, until recently, has rarely been used. Those final regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."

In response to the collapse of Corinthian Colleges (Corinthian) and the flood of borrower defense claims submitted by Corinthian students stemming from the school's misconduct, the Secretary announced in June 2015 that the Department would develop new regulations to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges.

These final regulations specify the conditions and processes under which a borrower may assert a defense to repayment of a Direct Loan, also referred to as a "borrower defense." The current standard allows borrowers to assert a borrower defense if a cause of action would have arisen under applicable State law. In contrast, these final regulations establish a new Federal standard that will allow a borrower to assert a borrower defense on the basis of a substantial misrepresentation, a breach of contract, or a favorable, nondefault contested judgment against the school, for its act or omission relating to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. The new standard will apply to loans made after the effective date of the proposed regulations. The final regulations establish a process for borrowers to assert a borrower defense that will be implemented both for claims that fall under the existing standard and for later claims that fall under the new, proposed standard. In addition, the final regulations establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

These final regulations also prohibit a school participating in the Direct Loan Program from obtaining, through the use of contractual provisions or other agreements, a predispute agreement for

arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's regulations. The final regulations also prohibit a school participating in the Direct Loan Program from obtaining an agreement, either in an arbitration agreement or in another form, that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims and from requiring students to engage in internal dispute processes before contacting accrediting or government agencies with authority over the school regarding such claims. In addition, the final regulations impose certain notification and disclosure requirements on a school regarding claims that are the subject of a lawsuit filed in court or that are voluntarily submitted to arbitration after a dispute has arisen.

Summary of the Major Provisions of This Regulatory Action: For the Direct Loan Program, the final regulations—

• Clarify that borrowers with loans first disbursed prior to July 1, 2017, may assert a defense to repayment under the current borrower defense State law standard;

• Establish a new Federal standard for borrower defenses, and limitation periods applicable to the claims asserted under that standard, for borrowers with loans first disbursed on or after July 1, 2017;

• Establish a process for the assertion and resolution of borrower defense claims made by individuals;

• Establish a process for group borrower defense claims with respect to both open and closed schools, including the conditions under which the Secretary may allow a claim to proceed without receiving an application;

• Provide for remedial actions the Secretary may take to collect losses arising out of successful borrower defense claims for which an institution is liable; and

• Add provisions to schools' Direct Loan Program participation agreements (PPAs) that, for claims that may form the basis for borrower defenses—

▪ Prevent schools from requiring that students first engage in a school's internal complaint process before contacting accrediting and government agencies about the complaint;

▪ Prohibit the use of predispute arbitration agreements by schools;

▪ Prohibit the use of class action lawsuit waivers;

▪ To the extent schools and borrowers engage in arbitration in a manner consistent with applicable law and regulation, require schools to disclose to and notify the Secretary of arbitration filings and awards; and

▪ Require schools to disclose to and notify the Secretary of certain judicial filings and dispositions.

The final regulations also revise the Student Assistance General Provisions regulations to—

• Amend the definition of a misrepresentation to include omissions of information and statements with a likelihood or tendency to mislead under the circumstances. The definition would be amended for misrepresentations for which the Secretary may impose a fine, or limit, suspend, or terminate an institution's participation in title IV, HEA programs. This definition is also adopted as a basis for alleging borrower defense claims for Direct Loans first disbursed after July 1, 2017;

• Clarify that a limitation may include a change in an institution's participation status in title IV, HEA programs from fully certified to provisionally certified;

• Amend the financial responsibility standards to include actions and events that would trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities to the Department;

• Require proprietary schools at which the median borrower has not repaid in full, or paid down by at least one dollar the outstanding balance of, the borrower's loans to provide a Department-issued plain language warning in promotional materials and advertisements; and

• Require a school to disclose on its Web site and to prospective and enrolled students if it is required to provide financial protection, such as a letter of credit, to the Department.

The final regulations also—

• Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower ("death discharge") in the Perkins, FFEL, Direct Loan, and TEACH Grant programs;

• Revise the Perkins, FFEL, and Direct Loan closed school discharge regulations to ensure borrowers are aware of and able to benefit from their ability to receive the discharge;

• Expand the conditions under which a FFEL or Direct Loan borrower may qualify for a false certification discharge;

• Codify the Department's current policy regarding the impact that a discharge of a Direct Subsidized Loan has on the 150 percent Direct Subsidized Loan limit; and

• Make technical corrections to other provisions in the FFEL and Direct Loan program regulations and to the regulations governing the Secretary's debt compromise authority.

Costs and Benefits: As noted in the NPRM, the primary potential benefits of these regulations are: (1) An updated and clarified process and a Federal standard to improve the borrower defense process and usage of the borrower defense process to increase protections for students; (2) increased financial protections for taxpayers and the Federal government; (3) additional information to help students, prospective students, and their families make informed decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs. Costs associated with the regulations will fall on a number of affected entities including institutions, guaranty agencies, the Federal government, and taxpayers. These costs include changes to business practices, review of marketing materials, additional employee training, and unreimbursed claims covered by taxpayers. The largest quantified impact of the regulations is the transfer of funds from the Federal government to borrowers who succeed in a borrower defense claim, a significant share of which will be offset by the recovery of funds from institutions whose conduct gave rise to the claims.

On June 16, 2016, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register** (81 FR 39329). The final regulations contain changes from the NPRM, which are fully explained in the *Analysis of Comments and Changes* section of this document.

*Implementation Date of These Regulations:* Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1, prior to the start of the award year (July 1) to which they apply. However, that section also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier and the conditions for early implementation.

The Secretary is exercising his authority under section 482(c) to designate the following new regulations included in this document for early implementation beginning on November

1, 2016, at the discretion of each lender or guaranty agency:

(1) Section 682.211(i)(7).

(2) Section 682.410(b)(6)(viii).

Additionally, the Secretary intends to exercise his authority under section 482(c) of the HEA to permit the Secretary and guaranty agencies to implement the new and amended regulations specific to automatic closed school discharges in §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii) and 685.214(c)(2)(ii) as soon as operationally possible after the publication date of these final regulations. We will publish a separate **Federal Register** notice to announce this implementation date.

The Secretary has not designated any of the remaining provisions in these final regulations for early implementation. Therefore, the remaining final regulations included in this document are effective July 1, 2017.

*Public Comment:* In response to our invitation in the June 16, 2016, NPRM, more than 50,000 parties submitted comments on the proposed regulations.

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes in this preamble.

*Analysis of Comments and Changes*

An analysis of the comments and of any changes in the regulations since publication of the NPRM follows.

**General**

*Comments:* Many commenters supported the Department's proposals to improve the borrower defense regulations by establishing a Federal standard for permissible defenses to borrower repayment, standardizing the defense to repayment claim processes for both borrowers and institutions, and strengthening the financial responsibility standards for institutions. The commenters also supported granting automatic closed school discharges in certain instances and ending the use of mandatory, predispute arbitration agreements at schools that receive Federal financial aid.

Other commenters expressed support for the proposed regulations, but felt that the Department should further strengthen them. For example, these commenters believed that the final regulations should provide full loan relief to all defrauded students, eliminate the six-year time limit to recover amounts that borrowers have already paid on loans for which they have a borrower defense based on a

breach of contract or substantial misrepresentation, and allow automatic group discharges without an application in cases where there is sufficient evidence of a school's wrongdoing.

Many commenters agreed with the Department's proposed objectives, but believed that the proposed regulations would have the unintended consequences of creating a "cottage industry" of opportunistic attorneys and agents attempting to capitalize on students who have been, or believe they have been, victims of wrongdoing by schools and unleashing a torrent of frivolous and costly lawsuits, which would tarnish the reputation of many institutions. The commenters also believed that the proposed Federal standard is so broad that borrowers will have nothing to lose by claiming a borrower defense even if they are employed and happy with their college experience.

Many commenters did not support the proposed regulations and stated that the Department should completely revise them and issue another NPRM and 30-day comment period, or that the proposed regulations should be withdrawn completely. The commenters were concerned that the projected net budget impact provided in the NPRM would undermine the integrity of the Direct Loan Program and that neither American taxpayers, nor schools that have successfully educated students, could cover these costs if thousands of students or graduates start requesting discharges of their loans. Other commenters stated that the proposed regulations would create unneeded administrative and financial burdens for institutions that work hard to comply with the Department's regulations and establish new substantive standards of liability, new procedural issues, new burdens of proof, widespread and unwarranted "triggering" of the financial responsibility requirements, and the abolition of a "Congressionally favored" arbitration remedy, that are unnecessary or counterproductive.

*Discussion:* We appreciate the commenters' support. In response to the commenters requesting that the proposed regulations be strengthened, completely revised, or withdrawn, we believe these final regulations strike the right balance between our goals of providing transparency, clarity, and ease of administration to the current and new regulations while at the same time protecting students, the Federal government, and taxpayers against potential liabilities resulting from borrower defenses. In response to commenters' concerns that the proposed regulations will create a "cottage

industry" of opportunistic attorneys attempting to capitalize on victimized students and unleash a torrent of frivolous lawsuits, the individual borrower defense process described in § 685.222(e) is intended to be a simple process that a borrower may access without the aid of counsel. Similarly, by providing that only a designated Department official may present group borrower claims in the group processes described in § 685.222(f) to (h), the Department believes that the potential for frivolous suits in the borrower defense process will be limited. To date, Department staff have generally not received borrower defense claims submitted by attorneys, opportunistic or otherwise, and we have not observed the filing of frivolous lawsuits against schools. We will monitor both situations going forward. We note that we address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions.

*Changes:* None.

*Comments:* One commenter contended that the proposed regulations run contrary to Article III (separation of powers) and the Seventh Amendment (right to jury trial) of the Constitution, in that it would vest the Department with exclusive judicial powers to determine private causes of action in the absence of a jury.

The commenter contended that the proposed regulations do not ensure Constitutional due process because they do not ensure that schools would have the right to receive notice of all the evidence presented by a borrower in the new borrower defense proceedings. The commenter stated that the lack of due process also affects the process for deciding claims, under which the Department is effectively the prosecutor, the judge, the only source of appeal, and the entity tasked with executing judgment.

The commenter also contended that a breach of contract or a misrepresentation determination are determinations that normally arise in common law claims and defenses and are subject to the expertise of the courts, rather than a particular government agency. The commenter believes that these determinations are not matters of public right, but are instead matters of "private right, that is, of the liability of one individual to another under the law as defined," which cannot be delegated outside the judiciary. *Stern* v. *Marshall,* 564 U.S. 462, 489 (2011) (quoting *Crowell* v. *Benson,* 285 U.S. 22, 50 (1932).

*Discussion:* The rights adjudicated in borrower defense proceedings are rights

of the Direct Loan borrower against the government regarding the borrower's obligation to repay a loan made by the government, and rights of the government to recover from the school for losses incurred as a result of the act or omission of the school in participating in the Federal loan program. The terms of these rights are governed (for loans disbursed prior to July 1, 2017) by common law or State law, but in each instance the rights are asserted against or by a Federal agency, with respect to obligations incurred by the borrower and the school in the course of their voluntary participation in the Federal loan program. Those facts give the rights adjudicated in these proceedings, both the individual borrower adjudications and the adjudications of group claims against the school, the character of public rights, even if the resolution of those rights turns on application of common law and State law (for current loans), and thus giving them some of the characteristics of private rights as well.

Even if these common law rights of the borrower and the school were to be considered simply private rights, Congress could properly consign their adjudication to the Department, as it did in committing purely private rights of the investor and broker asserted in the reparations program to the Commodity Futures Trading Commission for adjudication. *Commodity Futures Trading Comm'n* v. *Schor,* 478 U.S. 833 (1986). In *Schor,* the competing claims asserted were not creations of Federal law, nor were the rights asserted by or against a Federal agency. Nevertheless, the Court ruled that Congress properly assigned adjudication of those private rights to the agency. Like the claimants in *Schor,* both parties—the Direct Loan borrower, by filing the claim for relief, and the Direct Loan-participant school, by entering into the Direct Loan Participation Agreement—have consented to adjudications of their respective rights by the Federal agency—the Department. Moreover, these rights are adjudicated in this context precisely because Congress directed the Department to establish by regulation which acts or omissions of a school would be recognized by the Department as defenses to repayment of the Direct Loan; by so doing, and by further requiring the Department to conduct a predeprivation hearing before credit bureau reporting, Federal offset, wage garnishment, of Federal salary offset, Congress necessarily committed adjudication of these claims to the Department. 20 U.S.C. 1080a(c)(4), 31 U.S.C. 3711(e) (credit bureau reporting);

5 U.S.C. 5514 (Federal salary offset); 20 U.S.C. 1095, 31 U.S.C. 3720D (wage garnishment); 31 U.S.C. 3716, 3720B (Federal payment offset). Similarly, by recognizing that acts or omissions of the school in participating in the title IV, HEA programs would give rise to a claim by the Department against the school that arises not by virtue of any statutory requirement, but under common law as discussed elsewhere and by requiring the Department to provide a hearing for a school that disputes that common law claim for damages, Congress necessarily committed adjudication of that common law claim to the Department. 20 U.S.C. 1094(b) (administrative hearing on appeal of audit or program review liability claim). In each of these instances, judicial review of these agency adjudications by an Article III court is available under the APA. 5 U.S.C. 706. The fact that the borrower, the school, and the Department might have pursued their claims solely in a judicial forum instead of an administrative forum does not preclude assignment of their adjudication to the Department: "(T)he Congress, in exercising the powers confided to it may establish 'legislative' courts . . . to serve as special tribunals 'to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.' " *Atlas Roofing Co.* v. *Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 452 (1977) (*quoting Crowell* v. *Benson,* 285 U.S. 22, 50 (1932)).

As to the assertion that committing adjudication of these claims to the Department deprives a party of the right to trial by jury, the Court has long rejected that argument, as it stated in *Atlas Roofing,* on which the commenter relies:

. . . the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication. . . . This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.

*Atlas Roofing Co,* 430 U.S. at 454–55 (*quoting Pernell* v. *Southall Realty,* 416 U.S. 363, 383 (1974)).

We address the comment with respect to ensuring due process in the sections of this preamble specific to the framework for the borrower defense claims process.

*Changes:* None.

*Comments:* Some commenters asserted that the Department lacks

authority to recover from the institution losses incurred by reason of borrower defenses to repayment. A commenter asserted that nothing in section 455(h) of the HEA (20 U.S.C. 1087e(h)) permits the Department to seek recoupment from any institution related to defenses to repayment. In contrast, the commenter asserted, section 437(c)(1) of the HEA (20 U.S.C. 1087) explicitly provides that, in the case of closed school discharges, the Secretary shall pursue any claim "available to the borrower" against the institution to recover the amounts discharged. The commenter contended that this clear grant of authority to pursue claims to recoup funds associated with closed school discharges and false certification discharges indicates that Congress intended no grant of authority to recover for borrower defense losses. The commenter noted that the Department conditions discharge on the borrower transferring any claim she has against the institution to the Department. The commenter asserted that this assignment does not empower the Department to enforce the borrower's claim, because the Secretary does not have the ability to acquire a claim from the borrower on which it may seek recoupment from a school. The commenter based this position on section 437(c) of the HEA, which provides that a borrower who obtains a closed school or false certification discharge is "deemed to have assigned to the United States the right to a loan refund," and the absence of any comparable provision in section 455 of the HEA, which authorizes the Secretary to determine which acts or omissions of the institution may constitute defenses to repayment of a Direct Loan. Given that Congress indicated clear intent that the Secretary pursue claims related to closed school and false certification discharges, and explicitly provided for an assignment of claims, the commenter considered the failure of Congress to give any indication it wanted the Department to pursue claims of recoupment against institutions for section 455(h) loan discharges, or to acquire any claims from borrowers related to section 455(h) discharges, to show congressional intent to preclude a recoupment remedy against institutions.

Another commenter questioned whether the Department would have a valid right to enforce a collection against an institution in the absence of what the commenter called a "third-party adjudication" of the loan discharge.

A commenter stated that the Department could not recover from the institution losses incurred from

borrower defense claims because the commenter considered those losses to be incurred voluntarily by the Department. The commenter based this view on common law, under which a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution. The commenter asserted that the Department is further barred from recovery from the institution under a theory of indemnity or equitable subrogation because, under either theory, a party that voluntarily makes a payment or discharges a debt may not seek reimbursement.

*Discussion:* We address under "Group Process for Borrower Defenses— Statutory Authority" comments regarding whether the Department has authority to assert against the school claims that borrowers may have, and discuss here only the comments that dispute whether the Department has a legal right to recover from a school the amount of loss incurred by the Department upon the recognition of a borrower defense and corresponding discharge of some or all of a Direct Loan obtained to attend the school.

Applicable law gives the Department the right to recover from the school losses incurred on Direct Loans for several reasons. First, section 437(c) of the HEA gives the Department explicit authority to recover certain losses on Direct and FFEL loans. Section 437(c) provides that, upon discharge of a FFEL Loan for a closed school default, false certification discharge, or unpaid refund, the Secretary is authorized to pursue any claim of the borrower against the school, its principals, or other source, and the borrower is deemed to have assigned his or her claim against the school to the Secretary. 20 U.S.C. 1087(c). Section 487(c)(3)(ii) authorizes the Secretary to deduct the amount of any civil penalty, or fine, imposed under that section from any amounts owed to the institution, but any claim for recovery is not based on authority to fine under that section. Section 432(a)(6) authorizes the Secretary to enforce any claim, however acquired, but does not describe what those claims may be. 20 U.S.C. 1082(a)(6) (applicable to Direct Loan claims by virtue of section 455(a)(1), 20 U.S.C. 1078e(a)(1)). In addition, section 498(c)(1)(C) of the HEA, 20 U.S.C. 1099c(c)(1)(C), implies that the Secretary has claims that the Secretary is expected to enforce and recover against the institution for "liabilities and debts"—the "liabilities of such institution to the Secretary for funds under this title, *including* loan obligations discharged pursuant to section 437." 20 U.S.C. 1099c(c)(3)(A)

(emphasis added).[1] These provisions are meaningless if the Secretary can enforce claims against institutions only if the HEA or another statute explicitly authorizes such recoveries.

There are two distinct, and overlapping, lines of authority that empower the Secretary to recover from the school the amount of losses incurred due to borrower defense claims. The first relies on the Secretary's longstanding interpretation of the HEA as authorizing such recovery. The second relies on the government's rights under common law.

In both the Direct Loan and FFEL programs, the institution plays a central role in determining which individuals receive loans, the amount of loan an individual receives, and the Federal interest subsidy, if any, that an individual qualifies to receive on the loan, a determination based on assessment of financial need. In the Direct Loan Program, the institution determines whether and to whom the Department makes a loan; in the FFEL Program, the institution determines whether and to whom a private lender may make a loan that will be federally reinsured.

In *Chauffeur's Training School* v. *Spellings,* 478 F.3d 117 (2d Cir. 2007), the court addressed a challenge by an institution to the Department's asserted right to hold the school liable through an administrative procedure for losses incurred and to be incurred on FFEL Loans that were made by private lenders and federally reinsured and subsidized, after the school had wrongly determined that the borrowers had proven eligibility for these loans. The court noted that no provision of the HEA expressly authorized the Department to determine and recover these losses on student loans (as opposed to recovery of losses of grant funds, expressly authorized by 20 U.S.C. 1234a)). However, the court looked to whether the Department's interpretation of the HEA as authorizing the Department to assess a liability for loan program violations was reasonable. 478 F.3d at 129. The court concluded that the Department had reasonably interpreted the HEA's grant of authority to administer the FFEL program to empower the Department to "assess liability to recover its guarantee payments" on loans made as a result of

the school's "improper documentation." *Id.*

Similarly, the Department is authorized under the HEA to administer the Direct Loan Program. The HEA directs that, generally, Direct Loans are made under the same "terms, conditions, and benefits" as FFEL Loans. 20 U.S.C. 1087a(b)(2), 1087e(a)(1). In 1994 and 1995, the Department interpreted that Direct Loan authority as giving the Department authority to hold schools liable for borrower defenses under both the FFEL and Direct Loan programs, and stated that, for this reason, it was not pursuing more explicit regulatory authority to govern the borrower defense process.

Thus, in Dear Colleague Letter Gen 95–8 (Jan. 1995), the Department stated (emphasis in original):

Finally, some parties warn that Direct Loan schools will face potential liability from claims raised by borrowers that FFEL schools will not face. . . . The liability of any school—whether a Direct Loan or FFEL participant—for conduct that breaches a duty owed to its students is already established under law other than the HEA—usually state law. In fact, borrowers will have no legal claims against Direct Loan schools that FFEL borrowers do not already have against FFEL schools. The potential legal liability of schools under both programs for those claims is the same, and the Department proposes to develop procedures and standards to ensure that in the future schools in both programs will face identical actual responsibility for borrower claims based on grievances against schools.

The Direct Loan statute creates NO NEW LIABILITIES for schools; the statute permits the Department to recognize particular claims students have against schools as defenses to the repayment of Direct Loans held by the Department. Current Direct Loan regulations allow a borrower to assert as a defense any claim that would stand as a valid claim against the school under State law.

. . . Congress intended that schools participating in either FFEL or Direct Loan programs should receive parallel treatment on important issues, and the Department has already committed during negotiated rulemaking to apply the same borrower defense provisions to BOTH the Direct Loan and FFEL programs. Therefore, schools that cause injury to student borrowers that give rise to legitimate claims should and, under these proposals, will bear the risk of loss, regardless of whether the loans are from the Direct Loan or FFEL Program.

The Department reiterated this position in a notice published in the **Federal Register** on July 21, 1995 (60 FR 37768, 37769–37770):

Some members of the FFEL industry have asserted that there will be greater liabilities for institutions participating in the Direct Loan Program than for institutions participating in the FFEL Program as a consequence of differences in borrower

---

[1] The Secretary can require the institution to submit "third-party financial guarantees" which third-party financial guarantees shall equal not less than one-half of the annual potential liabilities of such institution to the Secretary for funds under this title, including loan obligations discharged pursuant to section 437 [20 U.S.C. 1087], and to students for refunds of institutional charges, including funds under this title." 20 U.S.C. 1099c(c)(3)(A).

defenses between the Direct Loan and FFEL Programs. These assertions are inaccurate.

The Department has consistently stated that the potential legal liability resulting from borrower defenses for institutions participating in the Direct Loan Program will not be significantly different from the potential liability for institutions participating in the FFEL Program. (59 FR 61671, December 1, 1994, and Dear Colleague Letter GEN 95–8 January 1995) That potential liability usually results from causes of action allowed to borrowers under various State laws, not from the HEA or any of its implementing regulations. Institutions have expressed some concern that there is a potential for greater liability for institutions in the Direct Loan Program than in the FFEL Program under 34 CFR 685.206. The Secretary believes that this concern is based on a misunderstanding of current law and the intention of the Direct Loan regulations. The Direct Loan regulations are intended to ensure that institutions participating in the FFEL and Direct Loan programs have a similar potential liability. Since 1992, the FFEL Program regulations have provided that an institution may be liable if a FFEL Program loan is legally unenforceable. (34 CFR 682.609) The Secretary intended to establish a similar standard in the Direct Loan Program by issuing 34 CFR 685.206(c). Consistent with that intent, the Secretary does not plan to initiate any proceedings against schools in the Direct Loan Program unless an institution participating in the FFEL Program would also face potential liability. . . .

Thus, the Secretary will initiate proceedings to establish school liability for borrower defenses in the same manner and based on the same reasons for a school that participates in the Direct Loan Program or the FFEL Program. . . .

Thus, applying the *Chauffeur's Training* analysis, this history and formal interpretation shows that the Department has, from the inception of the Direct Loan Program, considered its administrative authority under the HEA for the Direct Loan Program to authorize the Department to hold schools liable for losses incurred through borrower defenses, and to adopt administrative procedures to determine and liquidate those claims.

Alternatively, common law provides the Department a legal right to recover from the school the losses it incurs due to recognition of borrower defenses on Direct Loans. Courts have long recognized that the government has the same rights under common law as any other party. *U.S.* v. *Kearns*, 595 F.2d 729 (D.C. Cir. 1978). Even when Congress expressly provides a remedy by statute, the government has the remedies that "normally arise out of the relationships authorized by the statutory scheme." *U.S.* v. *Bellard*, 674 F.2d 330 (5th Cir. 1982) (finding the Department had a common law right to recover as would any other guarantor regardless of an

HEA provision describing the Department as assignee/subrogor to rights of the private lender whom it insured).[2] In fact, as noted by the *Bellard* court, statutes must be read to preserve common law rights unless the intent to limit those rights is "clearly and plainly expressed by the legislature." *Id.* The *Bellard* court found no such limiting language in the HEA, nor does any exist that is relevant to the Direct Loan issue presented here.

The school enters into a PPA with the Department in order to participate in the Direct Loan Program. 20 U.S.C. 1087(a). The PPA is a contract. *San Juan City College Inc.* v. *U.S.*, 74 Fed. Cl. 448 (2006); *Chauffeurs Training School* v. *Riley*, 967 F.Supp. 719, 727 (N.D. N.Y. 1997). In executing the contract, the school "assume[s] a fiduciary relationship with the title IV, HEA Programs." *Chauffeurs Training School* v. *Paige*, C.A. No. 01–CV–02–08 (N.D. N.Y. Sept. 30, 2003), at 7; 34 CFR 682.82(a). An institution must "act with the competency and integrity necessary to qualify as a fiduciary" on behalf of taxpayers, "in accordance with the highest standard of care and diligence in administering the program *and* in accounting to the Secretary for the funds received under [title IV HEA] programs." *Id.;* see 34 CFR 668.82.

Specifically, under the Direct Loan Program, the HEA describes the institution pursuant to its agreement with the Department as "originating" Direct Loans, 20 U.S.C. 1087c(a), 1087d(b), and accepting "responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement." 20 U.S.C. 1087d(a)(3), 34 CFR 685.300(b)(8). The regulations describe the role of the institution as "originating" Direct Loans. 34 CFR 685.300(c), 685.301.

As a loan "originator" for the Department, the school is the authorized agent of the Department: The school acts pursuant to Department direction, the school manifests its intent to act as agent by entering into the PPA, and, most importantly, the school has power to alter the legal relationships between the principal (the Department) and third parties (the students). But for the school's act in originating the loan, there would be no lender-borrower relationship.

The interests of the Department as lender and principal in this Direct Loan Program relationship with the institution are simple: To enable

students and parents to obtain Federal loans to pay for postsecondary education. 20 U.S.C. 1087a. Congress selected the vehicle—a loan, not a grant—under which the borrower repays the loan, made with public funds, which in turn enables the making of new loans to future borrowers. Acts or omissions by an agent of the Department that frustrate repayment by the borrower of the amount the Department lends are contrary to the Department's benefit and interest. Acts or omissions by the institution, as the Department's loan-making agent, that harm the Department's interests in achieving the objectives of the loan program violate the duty of loyalty owed by the institution as the Department's loan originator, or agent. The Department made clear at the inception of the Direct Loan relationship with the institution that the institution would be liable for losses caused by its acts and omissions, in 1994 and 1995, when the Department publicly and unequivocally adopted the "borrower defense to repayment" regulation, 34 CFR 685.206, and, in the **Federal Register** and other statements described earlier, stated the consequences for the institution that caused such losses.

The government has the same protections against breach of fiduciary duty that extend under common law to any principal against its agent. *U.S.* v. *Kearns*, at 348; see also *U.S.* v. *York*, 890 F.Supp. 1117 (D.D.C. 1995) (breach of fiduciary duty to government by contractor, loan servicing dealings constituting conflict of interest). The remedies available for breach of fiduciary duty are damages resulting from the breach of that duty. "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Restatement Second, Torts* § 874.

Applying this common law analysis to the relationship between the Department and the Direct Loan participating institution as it bears on the Department's right to recover, we note, first, that the Department has the rights available under common law to any other party, without regard to whether any statute explicitly confers such rights. Second, the institution enters into a contract with the Department pursuant to which the institution acts as the Department's agent in the making of Direct Loans. The school is the loan "originator" for the Department. Third, under common law, an agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency. Fourth, under common law, an agent's

---

[2] See: *U.S.* v. *Texas*, 507 U.S. 529, 534 (1993) (courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.' ").

breach of its fiduciary duty makes the agent liable to the principal for the loss that the breach of duty causes the principal. And last, a school that commits an act or omission that gives a Direct Loan borrower a defense to repayment that causes the Department loss thereby violates its common law fiduciary duty to act loyally for the interests of the Department, and is liable to the Department for losses caused by that breach of duty.

The commenter who argued that the Secretary incurs the loss by honoring the borrower defense "voluntarily," and is barred by that fact from recovery against the institution, misconceives the nature of the claim. As early as *Bellard,* the courts have consistently recognized that in its capacity as a loan guarantor under the FFEL Program, the Department pays the lender under its contractual obligation as loan guarantor, and not as a volunteer. The Department guarantees FFELP loans at the request of the borrower who applied for the guaranteed loan, as well as the lender. By virtue of payment of the guarantee, the Department acquired an implied-in-law right against the borrower for reimbursement of the losses it incurred in honoring the guarantee—a claim distinct from its claim as assignee from the lender of the defaulted loan. Similarly, where the Department incurs a loss under a statutory obligation to discharge by reason of closure of the school or false certification, the Department does not incur that loss voluntarily, but rather under legal obligation imposed by the statute, as well as the terms of the federally prescribed promissory note. Regardless of whether the HEA explicitly authorized the Secretary to recover for that loss, or deemed the borrower's claim against the school to be assigned to the Secretary, common law gives the Secretary the right to recover from the school for the loss incurred as a result of the act or omission of the school. Section 455(h) of the HEA, by directing that the Secretary determine by regulation which acts or omissions of the school constitute defenses to repayment, requires the Department to discharge the borrower's obligation to repay when the borrower establishes such a defense. 20 U.S.C. 1087e(h). To the extent that the borrower proves that the act or omission of the school gave the borrower a defense, the amount not recoverable from the borrower was a loss incurred because of the Department's legal obligation to honor that defense. That loss, like the loss on payment of a loan guarantee on a FFEL Loan, is not one incurred voluntarily,

but rather is incurred, like the loss on the loan guarantee, by legal obligation. By honoring the proven defense of the Direct Loan borrower, like honoring the claim of the lender on the government guarantee, the Secretary acquires by subrogation the claim of the Direct Loan borrower or FFEL lender, as well as a claim for reimbursement from the party that caused the loss—the borrower, on the defaulted FFEL Loan, or the school, on the Direct Loan defense.

*Changes:* None.

*Comments:* Several commenters stated that the HEA does not authorize, or even contemplate, the sweeping regulatory framework set forth in the Department's borrower defense proposals. The commenters questioned the three HEA provisions cited by the Department as the source of its statutory authority: Section 455(h), which allows the Secretary to identify "acts or omissions . . . a borrower may assert as a defense to repayment of a loan;" Section 487, which outlines certain consequences for an institution's "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates;" and Section 454(a)(6), which permits the Department to "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program in each institution's PPA. The commenters believed that section 455(h) of the HEA only empowers the Department to define these "acts or omissions" that an individual borrower may assert as a defense in a loan collection proceeding and noted that none of the provisions allows the Department to create a novel cause of action for a borrower to levy against her school, which the Department would both prosecute and adjudicate in its own "court." Accordingly, the commenters believed that the Department should substantially revise the rule to be consistent with the regulatory authority granted to the Department by Congress. Other commenters stated that the Department should withdraw the proposed regulations and instead work jointly with Congress to address the issues in the proposed regulations as part of the reauthorization of the HEA. The commenters believed that borrower defense policy proposals are so substantive and commit such an enormous amount of taxpayer dollars that careful consideration by Congress is required so that all of the available options are weighed in the overall context of comprehensive program changes.

*Discussion:* We disagree with the commenters who contended that the HEA does not authorize the regulatory framework proposed in the Department's borrower defense proposals. As explained above, common law and the HEA as interpreted by the Department in adopting the Direct Loan regulations, give the Department the right to recover losses incurred due to borrower defense claims. The commenters rightly identify sections 455(h), 487, and 454(a)(6) of the HEA as some of the sources of the Department's statutory authority for these regulations as they relate to identification of causes of action that are recognized as defenses to repayment, as well as procedures for receipt and adjudication of these claims. In addition, the HEA authorizes the Secretary to include in Direct Loan PPAs with institutions any provisions that are necessary to protect the interests of the United States and to promote the purposes of the Direct Loan Program. In becoming a party to a Direct Loan PPA, the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement. And, as a result, students and parents are able to obtain Federal loans to pay for postsecondary education. Far from exceeding its statutory authority in developing procedures for adjudicating these claims, section 455(h) presumes that the Department must recognize in its existing administrative collection and enforcement proceedings the very defenses that section directs the Department to establish, or create new procedures to better address these claims, as we do here.

In addition, section 410 of the General Education Provisions Act (GEPA) provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department. 20 U.S.C. 1221e–3. Further, under section 414 of the Department of Education Organization Act, the Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department. 20 U.S.C. 3474. These general provisions, together with the provisions in the HEA and common law explained earlier, noted above, authorize the Department to promulgate regulations that govern defense to repayment standards, process, and institutional liability.

With regard to the commenters who believe that the Department's proposals are so substantive and commit such an

enormous amount of taxpayer dollars that the Department should work with Congress, or defer to Congress, in terms of the development of such comprehensive program changes, we do not agree that the Department should not take, or should defer, regulatory action on this basis until Congress acts. Since the collapse of Corinthian, the Department has received a flood of borrower defense claims stemming from the school's misconduct. In order to streamline and strengthen this process, we believe it is critical that the Department proceed now in accordance with its statutory authority, as delegated by Congress, to finalize regulations that protect student loan borrowers while also protecting the Federal and taxpayer interests.

*Changes:* None.

*Comments:* Several commenters stated that the proposed regulations were arbitrary and capricious and therefore violate the APA. Commenters raised this concern both generally and with respect to specific elements of the proposed regulations. For example, several commenters argued that the Department withheld substantive detail regarding its expansion of the loan repayment defenses into offensive causes of action and on the process by which borrower defense claims and Department proceedings to collect claim liabilities from institutions will be adjudicated, thereby depriving institutions and affected parties the opportunity to offer meaningful comment on critical parts of the rule.

*Discussion:* We address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions. However, as a general matter, in taking this regulatory action, we have considered relevant data and factors, considered and responded to comments and articulated a reasoned basis for our actions. *Marsh* v. *Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also Pub. Citizen, Inc.* v. *Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C. Cir. 1993); *PPL Wallingford Energy LLC* v. *FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005).

*Changes:* None.

*Comments:* Several commenters stated that the negotiated rulemaking process, by which the proposed rules were developed, was flawed.

One commenter stated that input from representatives of publicly held proprietary institutions was not included in the public comment process prior to the establishment of a negotiated rulemaking committee. This commenter also stated that only representatives from private, proprietary institutions were represented on the negotiated rulemaking committee and that those representatives had no expertise in the active management of an institution. The commenter also stated that the NPRM 45-day public comment process was too short.

Several commenters contended that the Department failed to provide adequate notice to the public of the scope of issues to be discussed at the negotiated rulemaking. The commenters stated that the issues of financial responsibility and arbitration clauses were not included in the **Federal Register** notices announcing the establishment of a negotiated rulemaking committee or the solicitation of negotiators and that, had the higher education community known these issues were within the scope of the rulemaking, negotiators more familiar with these issues would have been nominated. The commenters believed that the Department failed to carry out its statutory mandate under 20 U.S.C. 1098 to engage the public and receive input on the issues to be negotiated. One commenter also expressed dismay at the Department's accelerated timetable and intent to publish final regulations one week before the general election. The commenter felt that the "rush to regulate" resulted in a public comment period that did not give the public enough time to fully consider the proposals and a timeline that did not afford the Department enough time to develop an effective, cost-effective rule.

*Discussion:* The negotiated rulemaking process ensures that a broad range of interests is considered in the development of regulations. Specifically, negotiated rulemaking seeks to enhance the rulemaking process through the involvement of all parties who will be significantly affected by the topics for which the regulations will be developed. Accordingly, section 492(b)(1) of the HEA, 20 U.S.C. 1098a(b)(1), requires the Department to choose negotiators from groups representing many different constituencies. The Department selects individuals with demonstrated expertise or experience in the relevant subjects under negotiation, reflecting the diversity of higher education interests and stakeholder groups, large and small, national, State, and local. In addition, the Department selects negotiators with the goal of providing adequate representation for the affected parties while keeping the size of the committee manageable. The statute does not require the Department to select specific entities or individuals to be on the committee. As there was both a primary and an alternate committee member representing proprietary institutions, we believe that this group was adequately represented on the committee.

We note that the Department received several nominations to seat representatives from proprietary schools on the committee after publication of our October 20, 2015, **Federal Register** notice. The Department considered each applicant to determine their qualifications to serve on the committee.

This process did not result in proprietary sector nominees with the requisite qualifications, so we published a second **Federal Register** notice on December 21, 2015, seeking further nominations for the negotiated rulemaking committee, including representation from the proprietary sector. Dennis Cariello, Shareholder, Hogan Marren Babbo & Rose, Ltd., and Chris DeLuca, Founder, DeLuca Law, were selected following this second notice. Given the topics under discussion, we believe Mr. Cariello and Mr. DeLuca adequately represented the proprietary sector.

We disagree with the commenters who contended that the Department failed to provide adequate public notice and failed to engage and receive input from the public on the scope of issues to be discussed at the negotiated rulemaking, in particular the issues of financial responsibility and arbitration clauses. On August 20, 2015, the Department published a notice in the **Federal Register** announcing our intention to establish a negotiated rulemaking committee. We also announced our intention to accept written comments and to hold two public hearings (September 10, 2015 and September 16, 2015, in Washington, DC and San Francisco, respectively) at which interested parties could comment on the topics suggested by the Department and suggest additional topics that should be considered for action by the committee. Lastly, we announced our intent to develop proposed regulations for determining which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under the Direct Loan Program and the consequences of such borrower defenses for borrowers, institutions, and the Secretary. We specifically stated that we would address the issues of defense to repayment procedures; the criteria that constitute a defense to repayment; the standards and procedures that the Department would use to determine institutional liability for amounts based

on borrower defenses; and, the effect of borrower defenses on institutional capability assessments. No representatives of the proprietary sector testified at the hearings. One proprietary association representing 1,100 cosmetology schools submitted written testimony stating that the association was interested in working with the Department to determine the institutional liability and capability assessments associated with borrower defense claims. In addition, we presented issue papers prior to the first day of the first of the three negotiating sessions in which we outlined the particular questions to be addressed.[3] These included Issue Paper No. 5, which explicitly addresses financial responsibility and letters of credit.[4] Negotiators who had any question about the scope of issues we intended to cover were thus given very explicit notice before the first day of negotiations, and were free to obtain then, or at any time during the nine days of hearings over three months, any expert advisors they wished to engage to inform their deliberations.

We received written testimony from other parties that supported both holding institutions financially accountable for the costs associated with borrower defenses and limiting a school's use of certain dispute resolution procedures.

We disagree with the commenter who contended that the Department's timetable for developing borrower defense regulations was rushed and that the comment period did not give the public enough time to fully consider the proposals. We believe that the 45-day public comment period provided sufficient time for interested parties to submit comments, particularly given that prior to issuing the proposed regulations, the Department conducted two public hearings and three

negotiated rulemaking sessions, where stakeholders and members of the public had an opportunity to weigh in on the development of much of the language reflected in the proposed regulations. In addition, the Department also posted the NPRM on its Web site several days before publication in the **Federal Register**, providing stakeholders additional time to view the proposed regulations and consider their viewpoints on the NPRM.

*Changes:* None.

*Comments:* Although the regulations will affect all schools, many commenters expressed frustration at their perception that the regulations target proprietary schools in particular. The commenters noted several provisions of the regulations—for example, financial protection triggers related to publicly traded institutions, distributions of equity, the 90/10 regulations, and the Gainful Employment regulations, and disclosure provisions regarding loan repayment rates—as unfairly targeting only proprietary schools with no justification or rationale. The commenters noted that that there are many private sector career schools and colleges that play a vital role in the country's higher education system by providing distinctive, career-focused programs and that the Department should develop rules that are applied uniformly across all educational institutions that offer title IV, HEA funding. Another commenter appreciated the distinction made in the NPRM between nonprofit/public institutions and proprietary schools as the basis for restricting the loan repayment rate disclosure to proprietary schools. The commenter suggested that the fundamental differences in the governance structures and missions of the public and non-profit sectors versus the for-profit sector provide a substantive basis for differentiating this regulation among the sectors.

Several commenters urged the Department to reconsider the changes to the financial responsibility standards to include actions and events that would trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities, given their sweeping scope and potentially damaging financial impact on historically black colleges and universities (HBCUs). The commenters contended that these provisions could lead to the closure of HBCUs that are not financially robust but provide quality educational opportunities to students and noted that HBCUs have not been the focus of Federal and State investigations nor

have they defrauded students or had false claims lawsuits filed against them. These commenters expressed concern about a number of the specific financial protection triggers, including, but not limited to, the triggers relating to lawsuits, actions by accrediting agencies, and cohort default rate.

*Discussion:* We agree that there are many proprietary career schools and colleges that play a vital role in the country's higher education system. We do not agree, however, that either the financial protection triggers or the loan repayment rate disclosure unfairly target proprietary institutions. We apply the financial protection triggers related to publicly traded institutions, the distribution of equity, and the 90/10 regulations only to proprietary institutions because, as another commenter noted, of the fundamental differences in the governance structures and missions of the public and non-profit sectors and the unique nature of the business model under which these institutions operate. These triggers identify events or conditions that signal impending financial problems at proprietary institutions that warrant action by the Department. We apply the loan repayment rate disclosure only to the for-profit sector primarily because the frequency of poor repayment outcomes is greatest in this sector. We appreciate the support of the commenter who agreed with this approach.

We note that we address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions.

We also note that HBCUs play a vital role in the Nation's higher education system. We recognize the concerns commenters raised regarding the financial protection provisions of the proposed regulations, which they argue would have a damaging financial impact on HBCUs. We note that the triggers are designed to identify signs, and to augment the Department's tools for detection, of impending financial difficulties. If an institution is subject to material actions or events that are likely to have an adverse impact on the financial condition or operations of an institution, we believe that the Federal government and taxpayers should be protected from any resulting losses incurred by requiring a letter or credit, regardless of the institution's sector. As commenters mentioned, our recent experience suggests that HBCUs have not been the subject of government agency suits or other litigation by students or others, or of administrative enforcement actions. Institutions that do not experience these kinds of claims,

---

[3] *http://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html.*

[4] The paper states—

Questions to be considered by the negotiating committee include:

1. Should the Department take additional steps to protect students and taxpayers from (a) potential borrower defense to repayment (DTR) claims, (b) liabilities stemming from closed school discharges, and (c) other conditions that may be detrimental to students?

■ If so, what conditions, triggering events, metric-based standards, or other risk factors should the Department consider indicative of failing financial responsibility, administrative capability, or other standards?

■ What should the consequences be for a violation? Letter of credit or other financial guarantee? Disclosure requirements and student warnings? Other consequences?

■ If a letter of credit or other financial guarantee is required, how should the amount be determined?

including HBCUs, will not experience adverse impacts under these triggers. In addition, institutions, including HBCUs, will retain their existing rights of due process and continue to have the ability to present to the Secretary if there is any factual objection to the grounds for the required financial protection. Accordingly, the Secretary can consider additional information provided by an institution before requiring a letter of credit. Even in instances where the Department still requires a letter of credit over a school's objection, the school could raise such issues to the Department's Office of Hearing and Appeals.

Finally, we have made a number of changes to the proposed triggers that address the commenters' specific objections to particular triggers, to more sharply focus the automatic triggers on actions and events that are likely to affect a school's financial stability. For instance, as we stated in other sections of this preamble, in light of the significant comments received regarding the potential for serious unintended consequences if the accreditation action triggers were automatic, we are revising the accreditation trigger so that accreditation actions such as show cause and probation or equivalent actions are discretionary. We note that we address commenters' arguments with respect to additional specific financial protection triggers, and any changes we have made in the final regulations, in the sections of this preamble specific to those provisions.

*Changes:* None.

*Comments:* One commenter suggested that the Department ensure that its contractors are aware of the basis for borrower defense discharge claims and the accompanying process. The commenter noted that inconsistent servicing and debt collection standards impede borrowers' access to the benefit and other forms of relief. The commenters also suggested that the Department update its borrower-facing materials to reflect the availability and scope of the borrower defense discharge.

*Discussion:* We are committed to ensuring that our contractors and any borrower-facing material published by the Department provide accurate and timely information on the discharge standards and processes associated with a borrower defense to repayment. We have begun the process of updating applicable materials to reflect these final regulations and will continue working closely with our contractors to help ensure that they have the information they need to assist borrowers expeditiously and accurately.

*Changes:* None.

*Comments:* Several commenters requested that the Department make information available to the public on the number of borrowers who submitted borrower defense applications, the number of borrowers who received a discharge, the amount of loans discharged, the basis or standard applied by the Department in a successful discharge claim, discharged amounts collected from schools, a list of institutions against which successful borrower defense claims are made, and any reports relevant to the process. The commenters believed that this information would provide transparency and facilitate a better understanding of how the process is working as well.

*Discussion:* We are committed to transparency, clarity and ease of administration and will give careful consideration to this request as we refine our borrower defense process.

*Changes:* None.

*Comments:* Several commenters noted that they, as student loan borrowers, are taxpayers like every American citizen and that paying student loans that were fraudulently made on top of paying taxes is a double penalty. The commenters also requested that the Department permit a borrower to include all types of student loans— private student loans, FFEL, Perkins, Parent Plus—they received to finance the cost of higher education in a borrower defense claim.

*Discussion:* The Department is committed to protecting student loan borrowers from misleading, deceitful, and predatory practices of, and failure to fulfill contractual promises by, institutions participating in the Federal student aid programs. These final regulations permit a borrower to consolidate loans listed in § 685.220(b), including nursing loans made under part E of title VIII of the Public Health Service Act, to pursue borrower defense relief by consolidating those loans, as provided in proposed § 685.212(k). The Department does not have the authority to include private student loans in a Direct Loan consolidation.

*Changes:* None.

*Comments:* Several commenters stated that, in order to avoid another failure as serious as that of Corinthian, the Department should implement strong compliance and enforcement policies to proactively prevent institutions that engage in fraudulent activity from continuing to receive title IV, HEA funding. The commenters believe that institutions that do not meet statutory, regulatory or accreditor standards and that burden students with debt without providing a quality

education should be identified early and subjected to greater scrutiny and sanctions so that a borrower defense is a last resort.

*Discussion:* The Department is committed to strong compliance and enforcement policies to proactively prevent institutions that engage in fraudulent activity from continuing to receive title IV, HEA funding. These final regulations establish the definitive conditions or events upon which an institution is or may be required to provide to the Department with financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

*Changes:* None.

*Comments:* One commenter requested that the Department and the Internal Revenue Service develop a determination on the tax treatment of discharges of indebtedness for students with successful defense to repayment claims. While acknowledging that the Department does not administer tax law, the commenter stated that the Department should question, or at least weigh in on the matter, of the Internal Revenue Service's "decline to assert" policy on successful defense to repayment claims that currently applies to loans for students who attend schools owned by Corinthian, but not to loans for students who attend other schools.

*Discussion:* As noted by the commenter, the tax treatment of discharges that result from a successful borrower defense is outside of the Department's jurisdiction. However, the Department recognizes the commenter's concern and will pursue the issue in the near future.

*Changes:* None.

**Borrower Defenses (Sections 668.71, 685.205, 685.206, and 685.222)**

*Federal Standard*

Support for Standard

*Comments:* A group of commenters fully supported the Department's intent to produce clear and fair regulations that protect student borrowers and taxpayers and hold schools accountable for acts and omissions that deceive or defraud students. However, these commenters suggested that the Department has not fully availed ourselves of existing consumer protection remedies and have, instead, engaged in overreach to expand our enforcement options.

Another group of commenters noted that the proposed Federal standard is a positive complement to consumer protections already provided by State law. Another group of commenters

offered support for the Federal standard specifically because it addresses complexities and inequities between borrowers in different States.

One commenter explicitly endorsed our position that general HEA eligibility or compliance violations by schools could not be used a basis for a borrower defense.

Another group of commenters noted that the proposed Federal standard provides an efficient, transparent, and fair process for borrowers to pursue relief. According to these commenters, the Federal standard eliminates the potential for disparate application of this borrower benefit inherent with the current rule's State-based standard, and enables those who are providing training and support to multiple institutions to develop standardized guidance.

A different group of commenters expressed support for the Federal standard, noting that it would be challenging for us to adjudicate claims based on 50 States' laws. Yet another group of commenters requested that the new Federal standard be applied retroactively when a borrower makes a successful borrower defense claim and has loans that were disbursed both before and after July 1, 2017.

*Discussion:* We appreciate the support of these commenters.

However, we do not agree with the commenters' contention that we are engaging in overreach to expand our enforcement options, nor have we disregarded existing consumer protection remedies. The HEA provides specific authority to the Secretary to conduct institutional oversight and enforcement of the title IV regulations. The borrower defense regulations do not supplant consumer protections available to borrowers. Rather, the borrower defense regulations describe the circumstances under which the Secretary exercises his or her long-standing authority to relieve a borrower of the obligation to repay a loan on the basis of an act or omission of the borrower's school. The Department's borrower defense process is distinct from borrowers' rights under State law. State consumer protection laws establish causes of action an individual may bring in a State's courts; nothing in the Department's regulation prevents borrowers from seeking relief through State law in State courts. As noted in the NPRM, 81 FR 39338, the limitations of the borrower defense process should not be taken to represent any view regarding other issues and causes of action under other laws and regulations that are not within the Department's authority.

As to the request to make the new Federal standard available to all Direct Loan borrowers, we cannot apply the new Federal standard retroactively when a borrower makes a successful borrower defense claim and has loans that were disbursed both before and after July 1, 2017. Loans made before July 1, 2017 are governed by the contractual rights expressed in the existing Direct Loan promissory notes. These promissory notes incorporate the current borrower defense standard, which is based on an act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. Promissory notes for loans made after July 1, 2017 will include a discussion of the new Federal standard for borrower defense claims.

*Changes:* None.

*Evidentiary Standard*

*Comments:* A number of commenters and an individual commenter remarked that the proposed Federal standard increases the risk to institutions by granting loan discharges when the borrower's case is substantiated by a preponderance of the evidence.

Another commenter expanded on this position, asserting that the evidentiary standard in most States for fraudulent misrepresentation is clear and convincing evidence. A few commenters echoed these viewpoints and suggested that the perceived minimal burden of proof may encourage bad actors to entice borrowers into filing false claims.

A couple of other commenters wrote that the standard is not clear enough to preclude students from asserting claims of misrepresentation without supporting evidence. These commenters suggested that the proposed regulations presume that all proprietary schools engage in deliberate misrepresentation.

*Discussion:* We do not agree that the "preponderance of the evidence" standard will result in greater risk to institutions. We believe this evidentiary standard is appropriate as it is the typical standard in most civil proceedings. Additionally, the Department uses a preponderance of the evidence standard in other proceedings regarding borrower debt issues. See 34 CFR 34.14(b), (c) (administrative wage garnishment); 34 CFR 31.7(e) (Federal salary offset). We believe that this evidentiary standard strikes a balance between ensuring that borrowers who have been harmed are not subject to an overly burdensome evidentiary standard and protecting the Federal government, taxpayers, and institutions from unsubstantiated claims. Under the standard, the designated Department

official may determine whether the elements of the borrower's cause of action under the Federal standard for borrower defenses have been sufficiently alleged and shown. If the official determines that the elements have not been alleged or have not met the preponderance of evidence standard, the claim will be denied.

The Department is aware of unscrupulous businesses that prey upon distressed borrowers, charging exorbitant fees to enroll them in Federal loan repayment plans that are freely available. On January 28, 2016, the Department sent cease and desist letters to two third-party "debt relief" companies that were using the Department's official seal without authorization. The misuse of the Department's Seal is part of a worrying trend. Some of these companies are charging large up-front or monthly fees for Federal student aid services offered by the Department of Education and its student loan servicers for free. In April of 2016, the Department launched several informational efforts to direct borrowers to the Department's free support resources, as well as to share information regarding State and Federal entities that have the authority to act against companies that engage in deceptive or unfair practices. Although these or similar opportunists may seek to profit from filing false claims, the Department will be aggressive in curtailing this activity, and will remain vigilant to help ensure that bad actors do not profit from this process.

We do not agree that the Federal standard will incent borrowers to assert claims of misrepresentation without sufficient evidence to substantiate their claims. As explained in more detail under "Process for Individual Borrowers," under § 685.222(a)(2), a borrower in the individual process in § 685.222(e) bears the burden of proof in establishing that the elements of his or her claim have been met. In a group process under § 685.222(f) to (h), this burden falls on the designated Department official. Borrower defense claims that do not meet the evidentiary standard will be denied. We also disagree with the commenters' interpretation of the borrower defense regulations as based on a presumption that all proprietary institutions engage in deliberate misrepresentation. These borrower defense regulations are applicable to and designed to address all institutions of postsecondary education participating in the Direct Loan Program; further, they contain no presumption regarding the activities of any institution, but instead provide a fair process for determining whether

acts or omissions by any particular institution give rise to a borrower defense. We also discuss this issue in more detail under "Substantial Misrepresentation."

*Changes:* None.

*Educational Malpractice*

*Comments:* A group of commenters asked that we clarify the difference between educational malpractice and a school's failure to provide the necessary aspects of an education (such as qualified instructors, appropriately equipped laboratories, etc.).

*Discussion:* We do not believe that the regulations should differentiate between educational malpractice and a school's failure to provide the necessary aspects of an education, such as might be asserted in a claim of substantial misrepresentation or breach of contract. State law does not recognize claims characterized as educational malpractice, and we do not intend to create a different legal standard for such claims in these regulations. Claims relating to the quality of a student's education or matters regarding academic and disciplinary disputes within the judgment and discretion of a school are outside the scope of the borrower defense regulations. We recognize that there may be instances where a school has made specific misrepresentations about its facilities, financial charges, programs, or the employability of its graduates, and these misrepresentations may function as the basis of a borrower defense, as opposed to a claim regarding educational quality. Similarly, a borrower defense based on a breach of contract may be raised where a school has failed to deliver specific obligations, such as programs and services, it has committed to by contract.

*Changes:* None.

*Intent*

*Comments:* A number of commenters expressed concern that the proposed Federal standard does not require intent on the part of the institution. These commenters were concerned that inadvertent errors by an institution or its employees could serve as the basis for a borrower defense claim. Some commenters cited an example of an employee misstating or omitting information that is available to the borrower in a complete and correct form in publications or electronic media. One of these commenters noted that the six-year statute of limitations may exacerbate this issue, by permitting borrowers to present claims relying on distant memories of oral conversations that may have been misunderstood.

*Discussion:* Gathering evidence of intent would likely be nearly impossible for borrowers. Information asymmetry between borrowers and institutions, which are likely in control of the best evidence of intentionality of misrepresentations, would render borrower defense claims implausible for most borrowers.

As explained in more detail under "Substantial Misrepresentation," we do not believe it is necessary to incorporate an element of intent or knowledge into the substantial misrepresentation standard. This reflects the Department's longstanding position that a misrepresentation does not require knowledge or intent on the part of the institution. The Department will continue to operate within a rule of reasonableness and will evaluate available evidence of extenuating, mitigating, and aggravating factors prior to issuing any sanctions pursuant to 34 CFR part 668, subpart F. We will also consider the totality of the circumstances surrounding any misrepresentation for borrower defense determinations. However, an institution will generally be responsible for harm to borrowers caused by its misrepresentations, even if they are not intentional. We continue to believe that this is more reasonable and fair than having the borrower (or taxpayers) bear the cost of such injuries. It also reflects the consumer protection laws of many States.

Similarly, we do not believe it is necessary or appropriate to adopt an intent element for the breach of contract standard. Generally, intent is not a required element for breach of contract, and we do not see a need to depart from that general legal principle here.

Regardless of the point in time within the statute of limitations at which a borrower defense claim is made, the borrower will be required to present a case that meets or exceeds the preponderance of the evidence standard.

*Changes:* None.

*State Law Bases for the Federal Standard*

*Comments:* A number of commenters advocated the continuation of State-based standards for future borrower defense claims. These commenters put forward several arguments in support of their position.

Several commenters suggested that the proposed Federal standard effectively reduces, preempts, or repeals borrowers' current rights under the current, State law-based standard.

According to another commenter, the proposed acceptance of favorable,

nondefault, contested judgments based on State law suggests that allegations of State law violations should provide sufficient basis for a borrower defense claim. Another group of commenters contended that, when a Federal law or regulation intends to provide broad consumer protections, it generally does not supplant all State laws, but rather, replaces only those that provide less protection to consumers.

A group of commenters noted that the HEA's State authorization regulations require States to regulate institutions and protect students from abusive conduct. According to these commenters, the laws States enact under this authority would not be covered by the Federal standard unless the borrower obtained a favorable, nondefault, contested judgment.

Additionally, one commenter believed that providing a path to borrower defense based on act or omission of the school attended by the student that would give rise to a cause of action under applicable State law would preserve the relationship between borrower defense, defense to repayment, and the "Holder in Due Course" rule of the Federal Trade Commission (FTC).[5]

These commenters stated that the Department has not provided sufficient evidence to support its assertions that borrower defense determinations based on a cause of action under applicable State law results or would result in inequitable treatment for borrowers, or that the complexity of adjudicating State-based claims has increased due to the expansion of distance education. Further, these commenters also stated that the Department has not provided any examples of cases that would meet the standard required to base a borrower defense claim on a nondefault, contested judgement based on State law.

A group of commenters contended that State law provides the most comprehensive consumer protections to borrowers. Other commenters contended that State law provides clarity to borrowers and schools, as precedents have been established that elucidate what these laws mean with respect to the rights and responsibilities of the parties.

---

[5] The FTC's "Holder Rule" or "Holder in Due Course Rule" is also formally known as the "Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses," 16 CFR part 433. The Holder Rule requires certain credit contracts to include a contractual provision that establishes that the holder of such a contract is subject to all claims and defenses which the debtor could assert against the seller of the goods or services obtained with the proceeds of the contract, with recovery by the debtor being limited to the amounts paid by the debtor under the contract.

Another commenter suggested that providing borrowers comprehensive options to claim a borrower defense, including claims based on violation of State law, should be an essential precept of borrower relief.

One commenter contended that the elimination of the State standard is at odds with the proposed ban on mandatory arbitration, as this ban will clear the way for borrowers to pursue claims against their schools in State court.

Several commenters noted that the Department will continue to apply State law standards to borrower defense claims for loans disbursed prior to July 2017, necessitating the continued understanding and application of State laws regardless of whether or not they remain a basis for borrower defense claims for loans disbursed after July 2017.

A group of commenters expressed concern that borrowers with loans disbursed before July 2017 can access the Federal standard by consolidating their loans; however, borrowers with loans disbursed after July 2017 can only avail themselves of the State standard by obtaining a nondefault, contested judgment. They contended that Department should not introduce this inequity into the Federal student loan programs.

Another group of commenters asserted that defining bases for future borrower defense claims based on past institutional misconduct may limit the prosecution of future forms of misconduct that are unforeseeable.

Several commenters noted that many borrowers lack the resources necessary to obtain a nondefault, contested judgment based on State law. Moreover, these borrowers would not have access to the breadth of data and evidence available to the Department.

Several commenters contended that borrowers whose schools have violated State law should not have to rely upon their State's Attorney General (AG) to access Federal loan relief.

One commenter wrote that creating multiple paths a borrower may use to pursue a borrower defense claim is unnecessarily complex.

A group of commenters remarked that the proposed Federal standard is both too complex and the evidentiary standard too low, suggesting that the prior State standard was more appropriate for borrower defense claims.

*Discussion:* We disagree that the Federal standard effectively reduces, preempts, or repeals borrowers' current rights under the State standard. Borrowers may still submit a claim based on violation of any State or

Federal law, whether obtained in a court or an administrative tribunal of competent jurisdiction. As also explained in the "Claims Based on Non-Default, Contested Judgments" section of this document, the Department's borrower defense process is distinct from borrowers' rights to pursue judicial remedies in other State or Federal contexts and nothing in the Department's regulation prevents borrowers from seeking relief through State law in State courts.

We agree, as proposed in the NPRM and reflected in these final regulations, that the acceptance of favorable, nondefault, contested judgments based on State or Federal law violations may serve as a sufficient basis for a borrower defense claim. We believe it is important to enable borrowers to bring borrower defense claims based on those judgments, but we do not think this means that we should maintain the State-based standard.

We acknowledge that the HEA's State authorization regulations require States to regulate institutions and protect students from abusive conduct and that the laws States have enacted in this role would only be covered by the Federal standard where the borrower obtained a favorable, nondefault, contested judgment. However, we do not view this as a compelling reason to maintain an exclusively State-based standard, or a standard that also incorporates State law in addition to the Federal standard, for borrower defense.

We disagree that the Federal standard for borrower defense should incorporate the FTC's Holder Rule. We acknowledge that the current borrower defense regulation's basis in applicable State law has its roots in the Department's history with borrower defense.[6] However, we have decided that it is appropriate that the Department exercise its authority under section 455(h) of the HEA to specify "which acts or omissions" may serve as the basis of a borrower defense and establish a Federal standard that is not

based in State law, for loans made after the effective date of these final regulations.

We have acknowledged that potential disparities may exist as students in one State may receive different relief than students in another State, despite having common facts and claims. This concern is substantiated, in part, by comments made by non-Federal negotiators and members of the public in response to the NPRM, asserting that consumer protections laws vary greatly from State to State.

We have also described how the complexity of adjudicating State-based claims for borrower defense has increased due to the expansion of distance education. As noted in the NPRM (81 FR 39335 to 39336), while a determination might be made as to which State's laws would provide protection from school misconduct for borrowers who reside in one State but are enrolled via distance education in a program based in another State, some States have extended their rules to protect these students, while others have not.

Additionally, we have discussed the administrative burden to the Department and difficulties Department has experienced in determining which States' laws apply to any borrower defense claim and the inherent uncertainties in interpreting another authorities' laws. 81 FR 39339.

We agree that borrower relief should include comprehensive options, including claims based on violations of State law. While we believe that the proposed standards will capture much of the behavior that can and should be recognized as the basis for borrower defenses, it is possible that some State laws may offer borrowers important protections that do not fall within the scope of the Department's Federal standard. To account for these situations, the final regulations provide that nondefault, contested judgments obtained against a school based on any State or Federal law, may be a basis for a borrower defense claim, whether obtained in a court or an administrative tribunal of competent jurisdiction. Under these regulations, a borrower may use such a judgment as the basis for a borrower defense if the borrower was personally affected by the judgment, that is, the borrower was a party to the case in which the judgment was entered, either individually or as a member of a class. To support a borrower defense claim, the judgment would be required to pertain to the making of a Direct Loan or the provision of educational services to the borrower.

---

[6] As explained in the "Expansion of Borrower Rights" section, before the Department enacted the borrower defense regulations in 1994 as part of its Direct Loan Program regulations, 59 FR 61664, the Department had preserved borrowers' rights under the FFEL Program to bring any claims a borrower may have against a school as defenses against the holder of the loan if the school had a referral or affiliation relationship with the lender. This was done by adopting a version of the FTC's Holder Rule language in the FFEL Master Promissory Note in 1994, and was later formalized in regulation at 34 CFR 682.209(g) in 2008. As further explained under "General," in 1995, the Department clarified that the borrower defense Direct Loan Program regulation was meant to create rights for borrowers, and as to liabilities for schools corresponding to those that would arise under the FFEL Program.

While State law may provide clarity to borrowers and schools regarding the rights and responsibilities of the parties under established precedents, we believe that the Federal standard for borrower defenses more clearly and efficiently captures the full scope of acts and omissions that may result in a borrower defense claim.

We disagree that the elimination of the State standard is at odds with the ban on predispute arbitration clauses. Rather, we assert that prohibiting predispute arbitration clauses will enable more borrowers to seek redress in court and, as appropriate, to submit a nondefault, contested judgment in support of their borrower defense claim, including a claim based on State law.

We concur that the Department's continued application of State law standards to borrower defense claims for loans disbursed prior to July 2017, will require the continued interpretation of State law. However, the number of loans subject to the State standard will diminish over time, enabling the Department to transition to a more effective and efficient borrower defense standard and process.

We understand the commenters' concern that borrowers may be treated inequitably based on when their loans were disbursed. However, while it is true that borrowers with loans disbursed prior to July 2017 may consolidate those loans, as discussed in the NPRM (81 FR 39357), the standard that would apply would depend upon the date on which the first Direct Loan to which a claim is asserted was made. Therefore, the standard applied to those loans does not change by virtue of their consolidation.

We do not agree that the Federal standard supplants all State consumer protection laws, as borrowers may still pursue relief based on these laws by obtaining a nondefault, contested judgment by a court or administrative tribunal of competent jurisdiction.

We do not agree that the three bases for borrower defenses under the Federal standard limit the prosecution of future unforeseeable forms of misconduct. We expect that many of the borrower defense claims that the Department anticipates receiving will be addressed through the categories of substantial misrepresentation, breach of contract, or violations of State or Federal law that are confirmed through a nondefault, contested judgment by a court or administrative tribunal of competent jurisdiction. Additionally, the Department's borrower defense process is distinct from borrowers' rights or other Federal, State, or oversight agencies' authorities to prosecute or initiate claims against schools for

wrongful conduct in State or other Federal tribunals. We recognize that, while the attainment of a favorable judgment can be an effective and efficient means of adjudicating a borrower's claim of wrongdoing by an institution, it can also be prohibitively time-consuming or expensive for some borrowers. The regulation includes a provision that enables a borrower to show that a judgment obtained by a governmental agency, such as a State AG or a Federal agency, that relates to the making of the borrower's Direct Loan or the provision of educational services to the borrower, may also serve as a basis for a borrower defense under the standard, whether the judgment is obtained in court or in an administrative tribunal. We do not agree that borrowers whose schools have violated State law will have to rely upon their State's AG to access Federal loan relief. These borrowers are still able to file borrower defense claims under the substantial misrepresentation or breach of contract standards, even if a nondefault, contested judgment is not obtained by the government entity. Moreover, the prohibition against predispute arbitration clauses and class action waivers will enable more borrowers to pursue a determination of wrongdoing on the part of an institution individually or as part of a class.

We do not agree that the State standard is less complex than the new Federal standard. As discussed, the current State law-based standard necessarily involves complicated questions relating to which State's laws apply to a specific case and to the proper and accurate interpretation of those laws. We believe the elements of the Federal standard and the bases for borrower defense claims provide sufficient clarity as to what may or may not constitute an actionable act or omission on the part of an institution. As discussed earlier, we also disagree that the State standard provides a higher evidentiary standard. Preponderance of the evidence is the typical standard in most civil proceedings. Additionally, the Department uses a preponderance of the evidence standard in other processes regarding borrower debt issues.

*Changes:* None.

### Federal Standard as a Minimum Requirement

*Comments:* Several groups of commenters recommended that we establish a Federal standard that serves as a floor, or minimum requirement, to provide additional consumer safeguards to borrowers in States that have less robust consumer protection laws. One group of commenters suggested that this

could assure consistency with the FTC Holder Rule. These commenters opined that expansion of the Federal standard to include Unfair, Deceptive or Abusive Acts and Practices (UDAP)[7] violations and breaches of contract would benefit borrowers and simplify borrower defense claim adjudication, as very few States would provide more robust consumer protections.

Another commenter opined that a strong Federal standard as a more robust minimum requirement, *i.e.,* one that requires only reasonable reliance to prove substantial misrepresentation and includes UDAP violations, would eliminate the need to maintain a State law standard.

*Discussion:* We disagree that the Federal standard requires expansion to include UDAP violations in order to ensure borrowers are protected or that the Federal standard should be established as a minimum requirement for borrower defense. As noted in the NPRM, reliance upon State law not only presents a significant burden for Department officials who must apply and interpret various State laws, but also for borrowers who must make the threshold determination as to whether they may have a claim. We believe that many of the claims the Department will receive will be covered by the standards proposed by the Department and that those standards will streamline the administration of the borrower defense regulations. The Department's substantial misrepresentation regulations (34 CFR part 668 subpart F) were informed by the FTC's Policy Guidelines on Deception, and we believe they are more tailored to, and suitable for, use in the borrower defense context. Under the borrower defense regulations, certain factors addressing specific problematic conduct may be considered to determine whether a misrepresentation has been relied upon to a borrower's detriment, thus making the misrepresentation "substantial." With regard to unfair and abusive conduct, we considered the available precedent and determined that it is unclear how such principles would apply in the borrower defense context as stand-alone standards. Such practices are often alleged in combination with misrepresentations and are not often addressed on their own by the courts. With this lack of guidance, it is unclear

---

[7] Each State has consumer protection laws that prohibit certain unfair and deceptive conduct, which are commonly known as "unfair and deceptive trade acts and practices" or "UDAP" laws. The FTC also enforces prohibitions against unfair and deceptive conduct in certain contexts under section 5 of the FTC Act, 15 U.S.C. 45, which may also be described as Federal "UDAP" law.

how such principles would apply in the borrower defense context.

Moreover, many of the borrower defense claims the Department has addressed or is considering have involved misrepresentations by schools. We believe that the standard established in these regulations will address much of the behavior arising in the borrower defense context, and that this standard appropriately addresses the Department's goals of accurately identifying and providing relief to borrowers for misconduct by schools; providing clear standards for borrowers, schools, and the Department to use in resolving claims; and avoiding for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context. As a result, we decline to adopt standards for relief based on UDAP.

As discussed earlier, we also disagree that the Federal standard for borrower defense should incorporate the FTC's Holder Rule, 16 CFR part 433, and believe that it is appropriate for the reasons discussed that the Department exercise its authority to establish a Federal standard that is not based in State law.

Notwithstanding the foregoing discussion, we appreciate that State law provides important protections for students and borrowers. Nothing in the borrower defense regulations prevents a borrower from seeking relief under State law in State court. Moreover, § 685.222(b) provides that if a borrower has obtained a nondefault, favorable contested judgment against the school under State or other Federal law, the judgment may serve as a basis for borrower defense. As explained further under "Claims Based on Non-Default, Contested Judgments," we believe this strikes the appropriate balance between providing relief to borrowers and the Department's administrative burden in accurately evaluating the merits of such claims.

*Changes:* None.

*Additional Grounds*

State AGs

*Comments:* A number of commenters requested that the final regulations include a process for State AGs to petition the Secretary to grant relief based on State law violations. One group of commenters expanded on this request, suggesting that other law enforcement agencies and entities also be permitted to bring forward evidence in support of group claims, and to receive from the Department a formal response regarding its determination of the claim. Another group of commenters

contended that State AGs uncover institutional wrongdoing before others do, and, accordingly, their direct participation in the borrower defense process would provide affected borrowers more timely access to relief.

*Discussion:* The group process for borrower defenses in § 685.222(f) provides for a process by which evidence for determinations of substantial misrepresentation, breach of contract, or judgments, might come from submissions to the Department by claimants, State AGs or other officials, or advocates for claimants, as well as from the Department's investigations. We recognize that these entities may uncover institutional wrongdoing early and may have relevant evidence in support of group claims.

The Department always welcomes cooperation and input from other Federal and State enforcement entities, as well as legal assistance organizations and advocacy groups. In our experience, such cooperation is more effective when it is conducted through informal communication and contact. Accordingly, we have not incorporated a provision requiring formal written responses from the Secretary, but plan to create a point of contact for State AGs to allow for active communication channels. We also reiterate that we welcome a continuation of cooperation and communication with other interested groups and parties. As indicated above, the Department is fully prepared to receive and make use of evidence and input from other stakeholders, including advocates and State and Federal agencies. We also discuss this issue in more detail under "Group Process for Borrower Defense."

*Changes:* None.

*Unfair or Deceptive Acts or Practices (UDAP)*

*Comments:* Several groups of commenters advocated the inclusion of State UDAP laws as a stand-alone basis for borrower defense claims.

One group of commenters opined that UDAP laws, which include prohibitions against misrepresentation, along with unfair, fraudulent, and unlawful business acts, have been refined by decades of judicial decisions, while the proposed substantial misrepresentation basis for borrower defense claims remains untested.

Another group of commenters argued that State UDAP laws incorporate the prohibitions and deterrents that the Department seeks to achieve and offer the flexibility needed to deter and rectify institutional acts or omissions that would be presented as borrower defenses under the Department's

substantial misrepresentation and breach of contract standards. Another group of commenters noted that some acts that may violate State laws intended to protect borrowers may not constitute a breach of contract or misrepresentation.

Another commenter noted that multiple State AGs have investigated schools and provided the Department with their findings of wrongdoing based on their States' UDAP laws.

One group of commenters suggested that, if the Department did not opt to restore the State standard, the inclusion of a similar UDAP law provision would become even more important. These commenters assert that the additional factors that would favor a finding of a substantial misrepresentation would not close the gap between the Federal standard and States' UDAP laws. They recommend using State UDAP laws as the additional factors that would elevate a misrepresentation to substantial misrepresentation.

*Discussion:* As discussed above, we disagree that the inclusion of UDAP violations as a basis for a borrower defense claims is required to assure borrowers are protected by the Federal standard.

We believe that the Federal standard appropriately addresses the Department's interests in accurately identifying and providing relief to borrowers for misconduct by schools; providing clear standards for borrowers, schools, and the Department to use in resolving claims; and avoiding for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context. While UDAP laws may play an important role in State consumer protection and in State AGs' enforcement actions, we believe the Federal standard addresses much of the same conduct, while being more appropriately tailored and readily administrable in the borrower defense context. As a result, we decline to include UDAP violations as a basis for borrower defense claims.

*Changes:* None.

*Comments:* One commenter stated that by foreclosing HEA violations from serving as a basis for borrower defense claims, the proposed regulations would effectively preempt State UDAP laws, which the commenter argued often use violations of other laws as a basis for determining that a practice is unfair or deceptive.

*Discussion:* The Department's borrower defense process is distinct from borrowers' rights under State law. State UDAP laws establish causes of action an individual may bring in a State's courts; nothing in the

Department's regulations prevents borrowers from seeking relief through State law in State courts. As noted in the NPRM, the specifics of the borrower defense process should not be taken to represent any view regarding other issues and causes of action under other laws and regulations that are not within the Department's authority.

*Changes:* None.

### HEA Violations

*Comments:* One commenter requested that the regulations make clear that borrower defense claims do not include claims based on noncompliance with the HEA or sexual or racial harassment allegations, as described in the preamble to the NPRM. One commenter suggested that the explicit exclusion of sexual or racial harassment as the basis of a borrower defense claim is intended to protect public and non-profit schools.

Another commenter believed the current regulations would allow borrowers to base a claim for a borrower defense on an institution's violations of the HEA where those violations also constitute violations under State UDAP law. The commenter viewed the Department's position in the NPRM that a violation of the HEA is not, in itself, a basis for a borrower defense as a retroactive change to the standard applicable to loans made before July 2017. The commenter rejected the Department's assertion that this limitation is in fact based on a longstanding interpretation of the bases for borrower defense claims.

*Discussion:* It is indeed the Department's longstanding position that an act or omission by the school that violates an eligibility or compliance requirement in the HEA or its implementing regulations does not necessarily affect the enforceability of a Federal student loan obtained to attend the school, and is not, therefore, automatically a basis for a borrower defense. With limited exceptions not relevant here, the case law is unanimous that the HEA contains no implied private right of action for an individual to assert a claim for relief.[8] The HEA

vests the Department with the sole authority to determine and apply the appropriate sanction for HEA violations.

A school's act or omission that violates the HEA may, of course, give rise to a cause of action under other law, and that cause of action may also independently constitute a borrower defense claim under § 685.206(c) or § 685.222. For example, advertising that makes untruthful statements about placement rates violates section 487(a)(8) of the HEA, but may also give rise to a cause of action under common law based on misrepresentation or constitute a substantial misrepresentation under the Federal standard and, therefore, constitute a basis for a borrower defense claim. However, this has always been the case, and is not a retroactive change to the current borrower defense standard under § 685.206(c).

As explained in more detail under "Federal Standard," it has been the Department's longstanding position that sexual and racial harassment claims do not directly relate to the making of a loan or provision of educational services and are not within the scope of borrower defense. 60 FR 37769. We also note, moreover, that sexual and racial harassment are explicitly excluded as bases for borrower defense claims in recognition of other entities, both within and outside of the Department, with the authority to investigate and resolve these complaints, and not in an effort to protect public and non-profit schools.

*Changes:* None.

### Claims Based on Non-Default, Contested Judgments

*Comments:* A group of commenters requested that the Department explain how, if continuing to operate under the State standard results in potentially inequitable treatment for borrowers, it is still reasonable to rely upon State law when judgments have been obtained, thereby providing borrower protections that vary by State.

Several commenters suggested that a borrower should be required to obtain a favorable judgment under State law in order to obtain a loan discharge. One commenter suggested that borrowers pursuing State law judgments receive forbearance on their Direct Loans while their cases are proceeding.

*Discussion:* When the Department relies upon a nondefault, contested judgment to affirm a borrower defense, it is not required to interpret State law.

Rather, it relies upon the findings of a court or administrative tribunal of competent jurisdiction.

Although we expect that the prohibition against certain mandatory arbitration clauses will enable more borrowers to pursue a determination of wrongdoing on the part of an institution, we do not agree that it is appropriate to require borrowers to obtain a favorable judgment in order to obtain a loan discharge.

While the attainment of a favorable judgment can be an effective and efficient means of adjudicating a borrower's claim of wrongdoing by an institution, it can also be prohibitively time-consuming or expensive for some borrowers. We have included a provision under which a judgment obtained by a governmental agency, such as a State AG or a Federal agency, that relates to the making of the borrower's Direct Loan or the provision of educational services to the borrower, may also serve as a basis for a borrower defense under the standard, whether the judgment is obtained in court or in an administrative tribunal.

We agree that borrowers should receive forbearance on their Direct Loans while their cases are proceeding. Borrowers may use the General Forbearance Request form to apply for forbearance in these circumstances; we would grant the borrower's request, and the final regulations also will require FFEL Program loan holders to do the same upon notification by the Secretary. In addition, a borrower defense loan discharge based on a nondefault, contested judgment may provide relief for remaining payments due on the loan and recovery of payments already made.

*Changes:* None.

*Comments:* Several commenters stated that the Department's proposal to allow borrower defenses on the basis of "nondefault, favorable contested judgments" was unrealistic, and argued that such judgments are unlikely to occur. These commenters argued that both plaintiffs (either government agencies or students themselves) as well as institutions are under substantial pressure to settle lawsuits, and pointed to the lack of any current judgments against institutions that would meet this standard. One commenter argued that the lack of such nondefault favorable contested judgments effectively barred State causes of action and would force borrowers to rely on the Department's Federal standard as the only basis for relief.

*Discussion:* The Department recognizes that nondefault, favorable contested judgments may not be common, relative to the number of

---

[8] As stated by the Department in 1993:

[The Department] considers the loss of institutional eligibility to affect directly only the liability of the institution for Federal subsidies and reinsurance paid on those loans. . . . [T]he borrower retains all the rights with respect to loan repayment that are contained in the terms of the loan agreements, and [the Department] does not suggest that these loans, whether held by the institution or the lender, are legally unenforceable merely because they were made after the effective date of the loss of institutional eligibility.

58 FR 13,337. See, *e.g. Armstrong* v. *Accrediting Council for Continuing Educ. & Training,* 168 F.3d 1362 (D.C. Cir. 1999), *opinion amended on denial*

*of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999) (rejecting claim of mistake of fact regarding institutional accreditation as grounds for rescinding loan agreements); *McCullough* v. *PNC Bank,* 298 F.3d 1362, 1369 (11th Cir. 2002)(collecting cases).

**75942** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

lawsuits that are filed. The Department includes this basis for relief as a way for borrowers to avoid having to re-litigate claims actually decided on the merits. If no such determination against the institution has yet occurred, borrowers may bring claims to the Department for evaluation that satisfy the standards described for a substantial misrepresentation under § 685.222(d) or breach of contract under § 685.222(c). The Department will thus continue to recognize State law causes of action under § 685.222(b), but will require a tribunal of competent jurisdiction to decide the legal and factual basis for the claim.

*Changes:* None.

*Comments:* Several commenters stated that the proposed standard for nondefault, favorable contested judgments effectively narrows State law causes of action by putting what the commenters argued was a significant and unrealistic burden on borrowers to litigate claims to judgment. These commenters argued that the Department should not effectively remove these bases for relief. One of the commenters asked that the Department recognize settlements with the institution as a basis for relief, while another proposed that the Department recognize class action settlements in which the settlement has been approved by a judge or in which the plaintiff(s) have survived a motion for summary judgment. Another asked that claim preclusive court judgments and findings of fact and admissions in settlements should likewise serve as a basis for relief.

*Discussion:* As stated in the NPRM, 81 FR 39340, we decline to adopt a standard based on applicable State law due, in part, to the burden to borrowers and the Department in interpreting and applying States' laws. However, we recognize that State law may provide important protections for borrowers and students. We believe that a standard recognizing nondefault, favorable, contested judgments strikes a balance between recognizing causes of action under State or other Federal law and minimizing the Department's administrative burden in accurately evaluating the merits of such claims. For the reasons discussed here and in the NPRM, we decline to recognize settlements as a way to satisfy the standard in § 685.222(b). However, we welcome the submission of, and will consider, any orders, court filings, admissions, or other evidence from a borrower for consideration in the borrower defense process.

*Changes:* None.

*Comments:* One commenter stated that the Department's proposed language leaves it unclear whether the judgment against the institution must include a specific determination regarding the act or omission forming the basis of the borrower defense, and urged the Department to explicitly require such a determination. Another commenter argued that the carve-outs of certain claims that the Department would not consider to be borrower defenses are not explicitly included for judgments obtained against an institution, and urged that the Department include such carve-outs.

*Discussion:* For a judgment to form the basis of a borrower defense, it must include a determination that an act or omission that would constitute a defense to repayment under State or Federal law occurred and that the borrower would be entitled to relief under such applicable law. That said, the overarching principles established in § 685.222(a) apply to claims under all the standards established in § 685.222, including to judgments under § 685.222(b). Thus, under § 685.222(a)(3), the Department will not recognize a violation by the school of an eligibility or compliance requirement in the HEA or its implementing regulations as a basis for borrower defense under § 685.222 or § 685.206(c) unless the violation would otherwise constitute a basis for borrower defense. Similarly, borrower defense claims must be based upon an act or omission of the school attended by the student that relates to the making of a Direct Loan or the provision of educational services for which the loan was provided, under § 685.222(a)(5).

If a borrower, a class of consumers, or a government agency made a claim against a school regarding the provision of educational services and receives a favorable judgment that entitles the borrower to restitution or damages, but the borrower only obtained a partial recovery from the school on this judgment, under § 685.222(i)(8), we would recognize any unpaid amount of the judgment in calculating the total amount of relief that could be provided on the Direct Loan. If the borrower, a class of consumers, or a government agency obtained a judgment holding that the school engaged in wrongful acts or omissions regarding the provision of private loans, the borrower could demonstrate to the Department whether the findings of fact on which the judgment rested also established acts or omissions relating to the educational services provided to the borrower or the making of the borrower's Direct Loan that could be the basis of a borrower

defense claim under these regulations. This borrower defense claim would be a basis for relief independent of the judgment that related exclusively to the private loans, and such relief would be calculated without reference to any relief obtained through that private loan judgment.

*Changes:* None.

*Comments:* Several commenters raised concerns about a student's ability to bring a borrower defense claim based on judgments obtained by government agencies. One of the commenters stated that it is not always clear when an agency is acting on behalf of the students.

*Discussion:* The final regulation recognizes that judgments obtained by governmental agencies may not be brought on the behalf of specific students, as opposed to having been brought, for example, on the behalf of a State or on the behalf of the United States. As described in the final regulation, a judgment under the standard brought by a governmental agency must be a favorable contested judgment obtained against the school. As discussed previously, such judgments must also meet the requirements of § 685.222(a).

*Changes:* None.

*Comments:* One commenter argued that the Department's judgment standard should only apply with respect to loans disbursed, or judgments obtained, after July 1, 2017.

*Discussion:* We believe that the standard does not represent any change from current practice. If a borrower submitted a nondefault, contested judgment from a court or administrative tribunal of competent jurisdiction deciding a cause of action under applicable State law for a loan first disbursed before July 1, 2017, the Department would apply principles of collateral estoppel to determine if the judgment would bar a school from disputing the cause of action forming the basis of the borrower's claim under 34 CFR 685.206(c).

*Changes:* None.

*Comments:* One commenter urged the Department to specify that the judgments referenced in § 685.222(b) must be obtained in court cases and not merely through administrative proceedings.

*Discussion:* As set forth in in § 685.222(b), the judgment must be obtained "in a court or administrative tribunal of competent jurisdiction." The Department continues to believe that administrative adjudications serve an important role in determining the factual and legal basis for claims that could serve as borrower defenses. We do

not believe further clarification is necessary on this point.

*Changes:* None.

*Comments:* One commenter stated that the Department should add language to the final regulations stating that it will also respect judgments in favor of the school as precluding a borrower defense claim.

*Discussion:* We will not incorporate an absolute bar on borrower defense claims where the borrower has already lost in a State proceeding because different underlying legal or factual bases may have been involved in the prior litigation. For example, a student might lose a breach of contract suit in State court premised on an institution's failure to provide job placement services, but have a valid claim that the institution misrepresented whether credits would be transferrable. The Department will, however, follow established principles of collateral estoppel in its determination of borrower defense claims.

*Changes:* None.

*Comments:* One commenter stated that the Department's proposed regulatory language would disrupt the adversarial process because institutions would be more likely to settle cases than risk a judgment that could lead to borrower defense liabilities, and also that institutions may be forced not to settle if the opposing party insists on admission of liability in the settlement that could form the basis of borrower defense liabilities. The commenter also argued that it would be unfair for the Department to consider past settlements retroactively. Another commenter argued that the Department should recognize default judgments against institutions obtained by a law enforcement agency such as the FTC, the Consumer Financial Protection Bureau (CFPB), or a State AG.

*Discussion:* We appreciate the concern that the new standard may cause disruptions to the strategy and risk calculus in other litigation by private parties as well as government agencies. The Department's purpose in this rulemaking is to create a Federal standard that will more efficiently and fairly determine whether a borrower is entitled to relief, and we consider this purpose to outweigh the concern raised about altering litigation strategies. We do not intend either to dissuade or encourage settlements between borrowers and institutions, and will give settlements and admissions in previous litigation the weight to which they are entitled. That said, the Department will continue to require the Department to

make an independent assessment of the underlying factual and legal basis for the claim. Settlements prior to July 1, 2017 will not be considered under this standard.

*Changes:* None.

### Claims Based on Breach of Contract

*Comments:* Several commenters questioned why the Department would permit a breach of contract claim, but not any other State law claims. One commenter noted that evaluation of a breach of contract claim would require substantial Department resources, including choice-of-law decisions that may be especially complicated in cases of distance education. One commenter said that other contract-related causes of action should be open to borrowers, such as lack of consideration, lack of formation due to lack of capacity, and contract contrary to public policy, among others. Another commenter said that borrowers should be able to assert contract-related claims under State UDAP laws for signing forms saying they received materials that they never received.

*Discussion:* The comments suggest some confusion about the Department's standard for evaluating breach of contract claims. For loans first disbursed prior to July 1, 2017, the Department will continue to recognize any applicable State-law causes of action, in accordance with the State of the law prior to these regulations. That standard requires the Department to evaluate State law questions, including choice-of-law questions. For loans first disbursed after July 1, 2017, however, the Department will move to a Federal standard for misrepresentation and breach of contract claims, and will cease to recognize State-law bases that may exist for those causes of action. Some commenters appeared to question why the Department drew the line at accepting breach of contract claims but rejecting other traditional State law contract-related causes of action. As we explained in the NPRM, 81 FR 39341, breach of contract is a common allegation against schools, and the underlying facts for a breach of contract claim may very well not fit into the Department's substantial misrepresentation standard. Furthermore, breach of contract is a cause of action established in common law recognized across all States, and its basic elements are likewise uniform across the States. Developing a Federal standard in the particularized area of student-institution contracts will ultimately lead to better consistency and greater predictability in this area. That said, the Department will continue to

recognize a borrower defense based on any applicable State law cause of action, provided that such a claim is litigated to a non-default, favorable contested judgment under § 685.222(b). Thus, we believe the final regulations strike an appropriate balance between the efficiency and predictability of a Federal standard, while still providing sufficient bases upon which a borrower entitled to debt relief may seek it.

*Changes:* None.

*Comments:* Several commenters asked the Department to incorporate the covenant of good faith and fair dealing when evaluating breach of contract claims. One commenter argued that these doctrines could be used to prevent institutions from relying on fine print disclaimers, "job placement assistance" that does not provide any targeted advice for students but instead refers them to Internet job-posting sites, and other tactics the commenter believes are unfair to students. Another commenter attached examples of current institutional agreements that seek to disclaim any promises beyond what are made in the enrollment agreement, and urged the Department not to honor such disclaimers.

*Discussion:* The Department's position on this issue is that it will rely on general, widely accepted principles of contract law in developing a Federal standard in this area. We decline to elaborate further on what specific types of contract claims might or might not be successful at this time. We believe that a Federal standard for breach of contract cases within the education context will ultimately be more helpful if developed on a case-by-case basis.

*Changes:* None.

*Comments:* Several commenters weighed in on the Department's position that documents beyond the enrollment agreement might serve as part of the contract. Some of these commenters noted that this position may lead to inconsistent results, since different State laws and circumstances may or may not allow a student to rely on other documents beyond the enrollment agreement. Some of the commenters argued for more clarity from the Department on which materials we would consider to constitute the contract, and one of these commenters pointed to cases varying on the treatment of such materials. One commenter invited us to specify that a contract would include any promise the borrower reasonably believed would be the institution's commitment to them. Other commenters argued that, by raising the possibility that a student might be able to point to course catalogues and similar documents as

part of the "contract," the Department's rule would have the effect of limiting the information schools provide to students. These commenters said that the uncertainty could pose practical obstacles for large institutions in particular, and asked the Department to explicitly exclude such material from the definition of contract. One commenter said that the ultimate effect of the current uncertainty might be to reduce recruitment from under-served student populations.

*Discussion:* We understand the concerns from both the student advocates and the institutional advocates regarding the lack of certainty in the NPRM language. However, the Department is unable to draw a bright line on what materials would be included as part of a contract because that determination is necessarily a fact-intensive determination best made on a case-by-case basis. The Department intends to make these determinations consistent with generally recognized principles applied by courts in adjudicating breach of contract claims.[9] To the extent that Federal and State case law has resolved these issues, we will be guided by that precedent. Application of the standard will thus be guided but not controlled by State law. Moreover, the Department will continue to evaluate claims as they are received and may issue further guidance on this topic as necessary.

*Changes:* None.

*Comments:* A commenter argued that allowing breach of contract as a basis for borrower defense claims will not be effective. The commenter said that most contracts in the for-profit education sector are written to bind the student and not the institution. The commenter also argued that the NPRM preamble failed to cite any successful breach of contract suits students have made against schools, arguing that the Department's citation to *Vurimindi v. Fuqua Sch. Of Business,* 435 F. App'x 129 (3d Cir. 2011) is inapposite.

*Discussion:* The Department appreciates this concern, and intends to follow general fairness and contract principles in its analysis of whether other promises made to a student beyond the enrollment agreement should be considered.

*Changes:* None.

*Comments:* A commenter argued that the Department should not refer to "specific obligations" in its preamble discussion of how a borrower could make out a breach of contract theory, saying it was unnecessarily confusing in light of well-developed State law on what kind of promises are sufficient to make out a breach of contract claim.

*Discussion:* We believe the phrase "specific obligations" is consistent with general contract principles that a breach of contract cannot be based on promises that are so abstract as to be unenforceable, and believe that determinations regarding an institution's obligations under a contract with a student will be highly fact-specific. Given that many borrowers may not be legally sophisticated regarding what constitutes an enforceable promise, we do not believe that any modification to the language is necessary.

*Changes:* None.

*Comments:* Several commenters were concerned that the proposed rule did not include a "materiality" element that a borrower would need to show in order to make out a breach of contract claim, which they worried might lead to numerous, frivolous claims as well as wide uncertainty as to potential future liabilities. One commenter further invited the Department to explain in the final rule what would constitute a "de minimis" claim that would lead a judge to dismiss a case. Other commenters asked that the Department focus on systemic problems and material breaches, and identify the standards it will use to make determinations. A group of commenters suggested the Department adopt the standards used for such cases in New York.

*Discussion:* We appreciate the concerns, first raised during the negotiated rulemaking, about the lack of a materiality element in the standard for a breach of contract borrower defense. As explained in the NPRM, 81 FR 39341, we believe it is appropriate that the regulations allow borrowers to assert a borrower defense based on any breach of contract that would entitle them to any relief—including relatively minor breaches—and thus do not include a materiality requirement. The Department will consider whether any alleged breach of contract by an institution is material in its assessment of whether the borrower would be entitled to relief, as well as whether such relief would be full or partial.

*Changes:* None.

*Comments:* Several commenters expressed concern that the proposed regulation contains an exception to the bar on using HEA violations for

borrower defense claims if "the violation would otherwise constitute a basis for a borrower defense." These commenters stated that this exception could swallow the rule to the extent a compliance violation could be restated as a borrower defense, and further noted that the HEA does not contain a private right of action. These commenters urged the Department to bar compliance violations asserted as breach of contract.

*Discussion:* We agree that the HEA does not itself contain a private right of action, but note that the underlying conduct constituting a violation of the HEA may also be a cognizable borrower defense. For example, the Department has the authority to prohibit and penalize substantial misrepresentations under the HEA, but such misrepresentations may also serve as the basis for a borrower defense which a borrower is undoubtedly entitled to pursue with the Department if the borrower can demonstrate proof of substantial misrepresentation under § 685.222(d), which also requires that a borrower demonstrate actual, reasonable reliance to their detriment for relief. For that reason, the final regulations strike a balance between allowing borrowers to pursue defenses based on misconduct that might also constitute HEA violations, but only so long as the underlying misconduct also satisfies a standard under which borrower defense claims may be brought as noted at § 685.222(a)(3).

*Changes:* None.

*Comments:* A commenter argued that the lack of a reliance element on a contractual promise could lead to borrower relief that is unwarranted. Other commenters argued the same for lack of an injury element.

*Discussion:* The Department will analyze breach of contract defenses under general and well established contract principles shared by State law. At this time, the Department has not set forth more fulsome details for what elements a borrower must show in the Federal standard to allow the standard to develop on a case-by-case basis. We believe that the Federal standard will ultimately be more useful if developed in light of actual student claims.

*Changes:* None.

*Comments:* Several commenters urged the Department to exclude any claims related to academic considerations, such as the quality of instructional materials, because such matters should be left to the institution or the institution's accreditor or State licensing agency.

*Discussion:* We do not see any present need for categorical exemptions. The Department will evaluate claims in accordance with well-established

---

[9] Section 455(h)of the HEA clearly gives the Secretary the power to create legal defenses, which until now has been done by adopting State law; this rulemaking adopts a Federal standard, the interpretation and application of which will require consideration of principles developed by Federal and State courts in deciding cases brought on claims for breach of contract or misrepresentation, as distilled, for example, in the restatements of the law.

principles of contract law. Claims related to academic consideration may well be beyond the scope of a cognizable borrower defense or even the Department's jurisdiction, but that is something the Department will consider on a case-by-case basis in evaluating the borrower defense applications.

*Changes:* None.

*Comments:* One commenter argued that the Department should recognize defenses an institution could raise, such as compliance with contract terms, economic hardship, or that the borrower not be entitled to refund of monies already paid.

*Discussion:* The final regulations, like the proposed regulations, do not put limits on the defenses an institution can make in a proceeding before the Department.

*Changes:* None.

*Comments:* One commenter noted that the Department's proposed language was ambiguous as to whether the act or omission must give rise to the breach of contract or itself constitute a breach of contract.

*Discussion:* Consistent with the Department's interpretation of its authorizing statute, the act or omission by the school must be the breach of contract itself. We believe, however, that this reading is clear from the language in the final rule.

*Changes:* None.

*Comments:* One commenter asked the Department to clarify what kinds of actions it would consider to be within the scope of a borrower defense based on a breach of contract.

*Discussion:* We do not believe further detail or elaboration is necessary of helpful at this time, given the wide variety of allegations the Department expects to receive. Under the regulations, the Department will recognize as a borrower defense any breach of contract claim that reasonably relates to the student loan.

*Changes:* None.

### Claims Based on Substantial Misrepresentation

*Comments:* A group of commenters expressed concern that the Department's substantial misrepresentation standard is too narrow. These commenters believed that the standard would allow schools to engage in problematic behavior, so long as they did not make untrue statements.

*Discussion:* We appreciate the concerns that the substantial misrepresentation standard does not capture all actions that may form causes of action under standards in State or other Federal law. However, as noted in the NPRM, 81 FR 39340, we believe that

the standard appropriately addresses the Department's interests in accurately identifying and providing relief for borrowers and in providing clear standards for borrowers, schools, and the Department in resolving claims. We believe that § 668.71(c), which is referenced in § 685.222(d), will address much of the behavior the Department anticipates arising in the borrower defense context.

We disagree that the substantial misrepresentation standard would not necessarily capture institutional misconduct that did not involve untrue statements. As revised in these final regulations, § 668.71(c) defines a "misrepresentation" as including not only false or erroneous statements, but also misleading statements that have the likelihood or tendency to mislead under the circumstances. The definition also notes that omissions of information are also considered misrepresentations. Thus, a statement may still be misleading, even if it is true on its face. As explained in the NPRM, 81 FR 39342, we revised the definition of "misrepresentation" to add the words "under the circumstances" to clarify that the Department will consider the totality of the circumstances in which a statement occurred, to determine whether it constitutes a substantial misrepresentation. We believe the Department has the ability to properly evaluate whether a statement is misleading, but otherwise truthful, to a degree that it becomes an actionable borrower defense claim.

*Changes:* None.

*Comments:* Several commenters expressed concern that the substantial misrepresentation standard would apply only to proprietary institutions. One commenter stated that the standard should apply to all institutions of higher education, stating that many public colleges and universities also misrepresent the benefits and outcomes of the education provided. Another commenter stated that the proposed addition of misrepresentation through omissions would target only borrower defense claims that would be made by students attending proprietary institutions, and not students at traditional schools.

Other commenters stated that by limiting the subject matter covered by the substantial misrepresentation standard to just those related to loans, in their view, the standard would target only proprietary schools and exclude issues facing students at traditional colleges, such as campus safety or sexual discrimination in violation of title IX of the HEA.

*Discussion:* There appears to be some confusion about the institutions covered under the scope of both 34 CFR part 668, subpart F and proposed § 685.222(d). Even prior to the proposed changes in the NPRM, § 668.71 was applicable to all institutions, whether proprietary, public, or private non-profit. Similarly, the current borrower defense regulation at § 685.206(c) does not distinguish between types of schools. The proposed and final regulations do not represent a change in these positions.

As discussed under the "Making of a Loan and Provision of Educational Services" section of this document, the Department's long-standing interpretation has been that a borrower defense must be related to the making of a loan or to the educational services for which the loan was provided. As a result, the Department has stated consistently since 1995 that it does not does not recognize as a defense against repayment of the loan a cause of action that is not directly related to the loan or to the provision of educational services, such as personal injury tort claims or actions based on allegations of sexual or racial harassment. 60 FR 37768, 37769. Such issues are outside of the scope of these regulations, and we note that other avenues and processes exist to process such claims. We also disagree with commenters that such issues are the only types of issues that may be faced by students at public and private non-profit institutions. While the Department acknowledges that the majority of claims presently before it are in relation to misconduct by Corinthian, we believe that scope of claims that may be brought as substantial misrepresentations that relate to either the making of a borrower's loan, or to the provision of educational services, is objectively broad in a way that will capture borrower defense claims from any type of institution.

*Changes:* None.

*Comments:* A few commenters opposed the proposed changes and argued that the proposed substantial misrepresentation standard either exceeds the Secretary's authority under the law or is contrary to Congressional intent. One commenter argued that the Department's proposal to use § 668.71 as the basis for borrower defense exceeds the Department's statutory authority under section 487 of the HEA, 20 U.S.C. 1094(c)(3)(A), which authorizes the Department to bring an enforcement action for a substantial misrepresentation for a suspension, limitation, termination, or fine action. The commenter also argued that the HEA does not authorize the Department

**75946**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

to seek recoupment from schools for relief granted for a borrower defense claim based on substantial misrepresentation. Another commenter suggested that the borrower defense standard should be based only on contract law.

Other commenters stated that the substantial misrepresentation standard was in violation of the Congressional intent in the HEA, as proposed. One commenter said that, in its view, Congress' intent in Section 455(h) was that borrower defenses should be allowed only for acts or omissions that are fundamental to the student's ability to benefit from the educational program and at a level of materiality that would justify the rescission of the borrower's loan obligation. In discussing the use of § 668.71 for borrower defense purposes, another commenter acknowledged that, while misrepresentation is not defined in the HEA, the penalties assigned to misrepresentation by statute are severe. From its perspective, the commenter stated that this indicates that Congress did not intend for the misrepresentation standard to be as low as negligence and suggested keeping the original language of § 668.71.

A few commenters argued that the Department lacks justification for the proposed changes to § 668.71, given that the Department last changed the definition in a previous rulemaking.

*Discussion:* We disagree that the Department lacks the statutory authority to designate what acts or omissions may form the basis of a borrower defense. Section 455(h) of the HEA clearly authorizes the Secretary to "specify in regulations which act or omissions of an institution of higher education a borrower may assert as a defense to repayment under this part," without any limitation as to what acts or omissions may be so specified. As explained previously, we believe that the substantial misrepresentation standard, with the added requirements listed in § 685.222(d), will address not only much of the behavior that we anticipate arising in the borrower defense context, but also our concerns in accurately identifying and providing relief for borrowers. We believe it is within the Department's discretion to adopt the substantial misrepresentation standard for loans first disbursed after July 1, 2017 in § 685.222(d), with the added requirements of that section, to address borrower defense claims. No modification has been proposed to § 668.71(a), which establishes that the Department may bring an enforcement action for a substantial misrepresentation for a suspension, limitation, termination, or fine action.

We discuss the Department's authority to recover from schools on the basis of borrower defense under "General."

We do not agree that the Department lacks authority to similarly specify the scope of the acts or omissions that may form the basis of a borrower defense. The Department understands that, generally, the rescission of a contract refers to the reversal of a transaction whereby the parties restore all of the property received from the other,[10] usually as a remedy for a material or significant breach of contract.[11] However, in stating that "in no event may a borrower recover . . . an amount in excess of the amount such borrower has repaid on the loan," section 455(h) clearly contemplates that an amount may be recovered for a borrower defense that is less than the amount of a borrower's loan, as opposed to a complete rescission of a borrower's total loan obligation. This position also echoes the Department's consistent approach to borrower defenses to repayment. The Direct Loan borrower defense regulation that was promulgated in 1994 clearly established that a borrower may assert a borrower defense claim based upon "any act or omission of the school. . .that would give rise to a cause of action against the school under applicable State law," without qualification as to whether the act or omission warrants a rescission of the borrower's loans. 34 CFR 685.206(c)(1). The regulation also stated that relief may be awarded as either "all or part of the loan." *Id.* at § 685.206(c)(2). As explained by the Department in 1995, the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed in the FFEL Program. 60 FR 37769–37770. Under the FFEL Program at the time, a borrower was allowed to assert a defense to repayment on the ground that all or part of his or her FFEL Loan was unenforceable. *Id.* at 37770.

We also disagree that the HEA does not give the Department the discretion to define "substantial misrepresentation," whether for the

Department's enforcement purposes in § 668.71 or for use for the borrower defense process. As noted, the HEA does not define "substantial misrepresentation," thus giving the Secretary discretion to define the term. With regard to the commenter who expressed concern that the proposed revisions to the definition of "misrepresentation" constitute a lessening of the standard to negligence,[12] we note that even absent the proposed revisions, a misrepresentation under § 668.71 does not look to the actor's intent or the materiality of the statement, but considers whether the statement is false, erroneous, or misleading.

We disagree that there is no justification for the changes to 34 CFR part 668, subpart F. Since the Department's last negotiated rulemaking in 2010 on 34 CFR part 668, subpart F, the Department utilized its authority in 2015 under the substantial misrepresentation enforcement regulations to issue a finding that Corinthian had misrepresented its job placement rates. The subsequent closure of Corinthian led to thousands of claims relating to the misrepresentations at issue by Corinthian borrowers under borrower defense. These claims prompted, in part, this effort by the Department to establish rules and procedures for borrower defense, which in turn led to a review of and the proposed changes to the Department's regulations at 34 CFR part 668, subpart F. These changes were discussed extensively as part of the negotiated rulemaking process for borrower defense where reasons for each specific change to § 668.71 were explained and discussed.

*Changes:* None.

*Comments:* Many commenters generally stated that the proposed standard for substantial misrepresentation is vague and suggested that the regulation include an element of intent or distinguish between intentional and unintentional acts. These commenters expressed concern that inadvertent and innocent, but erroneous, statements or mistakes would lead to a large number of frivolous claims by borrowers and result in significant financial liabilities for schools. Another commenter stated that the standard, absent intent, is unconstitutionally vague and does not give fair notice of the conduct that is being required or prohibited.

---

[10] *See* Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011).

[11] *See* Restatement (Third) of Restitution and Unjust Enrichment § 37, comment c (2011) ("Any breach of contract that results in quantifiable injury gives the plaintiff a remedy in damages, but the remedy of rescission is available only in cases of significant default. Short of a repudiation, the defendant's breach must be 'material,' 'substantial,' 'essential,' or 'vital'; it must 'go to the root' of the defendant's obligation, or be 'tantamount to a repudiation.' To replace this familiar catalogue of adjectives, both Restatements of Contracts employ the expression 'total breach.'").

[12] Generally, "negligence" refers to a failure to exercise a reasonable duty of care and does not consider whether the failure was intentional. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (2010).

Other commenters stated that students' own misunderstandings may lead to claims, even for schools that provide training and inspections to ensure compliance with pertinent guidelines, regulations, and standards. One commenter expressed concern that unavoidable changes to instructional policies and practices could lead to borrower defense claims for substantial misrepresentation. Another commenter expressed concern that the proposed standard would lead to allegations of substantial misrepresentation by students, even where a variety of reasons unrelated to the alleged misrepresentation may have contributed to a student outcome, which may not yet be apparent.

Several commenters supported using § 668.71 as a basis for borrower defense, but objected to the proposed changes to the definition in § 668.71(c), that would change the word "deceive" in the sentence, "A misleading statement includes any statement that has the likelihood or tendency to deceive," to "mislead under the circumstances." These commenters stated that the proposed change would give the same weight to inadvertent or unintentional misrepresentations as to a willful deception by a school. Some such commenters appeared to believe that, without the revisions reflected in proposed subpart F of part 668, the standard for substantial misrepresentation is a standard for fraud and requires proof of intentional deception.

One commenter stated that the borrower defense process does not provide for a contextualized analysis of whether a statement is misleading in the same manner as the FTC, and argued that this would lead to significant consequences for schools and would undercut FTC precedent.

Several commenters agreed with the Department that the standard should not require an element of institutional intent generally, stating that the Department's approach is consistent with existing State and other Federal law, citing the FTC's definition of deception as an example. One commenter stated that institutions should be responsible for the harm to borrowers caused by misrepresentations, even absent intent, and that proving intent would be very difficult for borrowers.

Other commenters supported the specific amendment of the definition to include "mislead under the circumstances." One commenter stated that the amendment was appropriate to provide more context as to whether a statement is misleading. Another

commenter stated that the Department's amendments are consistent with State consumer protection law and cited examples of States where courts consider an individual's or the target audience's circumstances in assessing whether an act is deceptive or unfair. The commenter also noted that the amendments are in keeping with the approaches used by other Federal agencies, such as the FTC, the CFPB, and the Office of the Comptroller of the Currency. The commenter noted that in its experience working with student loan borrowers, consideration of the circumstances of a misrepresentation is important, because many schools target borrowers in specific circumstances who may be more likely to trust a school's representations and rely upon promises tailored to such students. Another commenter noted that the Department's proposed rule is in keeping with well-established consumer protection legal precedent under State law, which is that schools are liable for deceptive and unfair trade practices, including a failure to deliver educational services of the nature and quality claimed. This commenter supported the Department's preamble statement, 81 FR 39337 to 39338, that educational malpractice is not a tort recognized by State law, but also stated that educational malpractice is to be narrowly construed.

One commenter supported the Department's reasoning for including omissions among misrepresentations for borrower defense purposes, but stated that intent should be a factor for the Department's enforcement actions based upon § 668.71. The commenter agreed that a school should be responsible for even an unintentional error that harms borrowers, but believed that that intent or knowledge of the school should be a required factor for the purposes of institutional eligibility and penalties.

One commenter stated that substantial misrepresentation should be limited to false and erroneous statements, and not include true but misleading statements. The commenter raised concerns about the adequacy of the Department's process for gathering evidence and the Department's experience and expertise in making such determinations.

*Discussion:* We disagree with the commenters who opined that the proposed regulations are broad, vague or subjective. As explained previously, section 455(h) of the HEA provides that the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part. The regulations in § 685.222(d),

which adopt the regulations in subpart F of part 668 and establish certain other requirements, set forth the types of activities that constitute misrepresentation by an institution and describe the process and procedure by which borrowers may receive relief based upon a substantial misrepresentation by a school. The regulations in § 685.222 also set forth the process by which the Secretary will evaluate borrower defenses and recover such losses from the institutions at issue. The proposed changes to the regulations strengthen the Department's regulatory authority to evaluate and determine borrower defense claims. Further, they not only establish what constitutes a misrepresentation for borrower defense claims, but they also clarify the definition for the Department's enforcement purposes under part 668, subpart F. We believe that aligning the definition and types of substantial misrepresentations for borrower defense with the Department's long-held authority to bring enforcement actions under part 668, subpart F, will provide more clarity for schools and reduce their burden in having to interpret and adjust for the new borrower defense standards.

There appears to be some confusion as to whether the definition for misrepresentation in part 668, subpart F, requires a demonstration of intent, as would be required in common law fraud. In proposing to replace the word "deceive" with "mislead under the circumstances" in § 668.71(c), the Department is not seeking to remove any intent element, but rather to clarify the definition to more accurately reflect the position it expressed in 2010 as to part 668, subpart F. As noted in the NPRM, 81 FR 39342, the word "deceive" may be viewed as implying knowledge or intent. However, in the Department's 2010 rulemaking on part 668, subpart F, we explicitly declined to require that a substantial misrepresentation under the regulation require knowledge or intent by the school. 75 FR 66915. We believe that an institution is responsible for the harm to borrowers caused by its misrepresentations, even if such misrepresentations cannot be attributed to institutional intent or knowledge and are the result of inadvertent or innocent mistakes. Similarly, we believe this is the case even for statements that are true, but misleading. We believe this is more reasonable and fair than having the borrower, or the Federal government and taxpayers, bear the cost of such injuries. As noted by some commenters, this approach is in accord with other

Federal and State consumer protection law regarding misrepresentation, and we believe it is appropriate for not only the Department's enforcement purposes, but also for borrower defense. As explained later in this preamble, we believe that we have the capability to evaluate borrower defense claims based upon substantial misrepresentations and anticipate establishing procedural rules that will provide schools with the opportunity to present evidence and arguments in accordance with due process, similar to what is available in the Department's proceeding in part 668, subparts G and H.

In 2010, the Department stated that, in deciding to bring an enforcement action under part 668, subpart F, it would operate within a rule of reasonableness and consider the circumstances surrounding any misrepresentation before determining an appropriate response. 75 FR 66914. In response to the comment that the proposed standard does not view the misrepresentation in context, the Department's addition of the words "under the circumstances" is intended to clarify and make explicit the Department's long-standing position that misrepresentations should be viewed in light of all of the available underlying facts. As explained in the NPRM, 81 FR 39342 to 39343, this also echoes the approach taken by the FTC with regard to deceptive acts and practices.[13] In determining whether a statement is a misrepresentation, the Department will consider the totality of the circumstances in which the statement occurred, including the specific group at which the statement or omission was targeted. The Department will also consider whether the situation was such that the borrower would have had reason to believe he or she could rely on the information being given to the borrower's detriment, such as because the statement was made by an individual by whom the borrower believed could be trusted to give accurate information, such as a school admissions officer.

*Changes:* None.

*Comments:* Some commenters supported the proposed inclusion of omissions in the definition under § 668.71. One commenter stated that the inclusion of omissions, as well as the additional factors listed in § 685.222(d)(2), would improve the information provided to students. One commenter stated that, in their experience, the inclusion of omissions

was needed, to prevent schools from taking advantage of the asymmetry of information and bargaining power between themselves and students. This commenter emphasized that omissions should be considered in the context of the specific audience targeted and cited schools that may target immigrants with little experience with the United States' higher education system and limited English ability as an example. Another commenter emphasized that the amendment would benefit first generation and low income students, who may not know what information is important or what questions to ask prior to enrolling at an institution. One commenter specifically supported the proposed language providing that a misrepresentation includes omissions of "information" in such a way as to make a statement false, erroneous, or misleading.

Other commenters disagreed with the inclusion of omissions of information as part of the definition of substantial misrepresentation. One commenter stated that such language provides assistance to students attending career colleges, but not students attending traditional schools. One commenter stated that amending the standard to include omissions would create a strict liability standard that would not account for a school's actions or intent, and that the standard should distinguish minor and unintentional claims from material and purposeful misrepresentations.

Other commenters stated that the inclusion of omissions would not benefit students. One commenter stated that amending the definition of misrepresentation to include omissions could cause schools to provide students with numerous and confusing qualifications or to provide students with minimal information to avoid making misrepresentations. Another commenter stated that the inclusion of omissions would hinder the flow of advice to students and cause schools to expend time and money reviewing materials for misrepresentations.

One commenter stated that the Department's proposal to amend the definition to include omissions runs counter to the position the Department expressed in its 2010 rulemaking on 34 CFR part 668, subpart F, when it rejected commenters' suggestions that omissions be included in the definition.

One commenter stated that the Department's proposed amendment to include omissions, absent an intent element, runs counter to the limit established by the D.C. Circuit in the case *Ass'n of Private Sector Colls. & Univs.* v. *Duncan,* 681 F.3d 427, 452

(D.C. Cir. 2012) that a substantial misrepresentation under part 668, subpart F cannot include true and nondeceitful statements that have only the tendency or likelihood to confuse.

One commenter requested clarification regarding the effect of disclosures posted on the school's Web site or in printed materials. The commenter inquired about whether the school needed to disclose information about investigations, pending civil rights or legal matters; information about the qualifications and availability of faculty to teach certain courses or levels of students; and how a school's compliance with a State's required disclosures would be evaluated. This commenter also asked whether the Department would consider limiting the application of the new standard to only schools governed by States without a reasonable oversight mechanism. This commenter also asked for clarification as to what constitutes "information," and asked whether information would include aspirational goals or speculative plans; subjective beliefs or internal questions about the school's educational programs, financial charges, or the employability of its graduates; concerns about, the possibility, or existence of an upcoming audit; items listed in a title IV Audit Corrective Action Plan; items identified by the institution or an accreditor for improvement; or an institution's efforts to seek voluntary accreditation.

One commenter expressed concern that the inclusion of omissions in the standard would place schools with high default rates at risk. The commenter cited news articles calling for schools with default rates higher than graduation rates, which would include some HBCUs and community colleges, to lose their title IV eligibility. The commenter stated that students could argue that a failure to disclose such a measure constitutes a substantial misrepresentation under the proposed standard.

*Discussion:* We appreciate the support received from some commenters and agree with these commenters who stated that the inclusion of omissions will improve the information provided by schools.

As discussed earlier in this section, the commenters who stated that the revision to § 668.71 would apply only to proprietary institutions are incorrect. The final regulation applies to all schools. We also discuss our reasons for not including an intent element earlier in this section and our reasons for not including a materiality element later in this section.

---

[13] *See* FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1984) (appended to Cliffdale Assocs., Inc., 103 F.T.C. 110 (1984)), available at *www.ftc.gov/bcp/policystmt/ad-decept.htm.*

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations   **75949**

We disagree that the revision is contrary to the Department's purpose in revising part 668, subpart F, in its 2010 rulemaking. We believe that amending the definition to include "any statement that omits information in such a way as to make the statement false, erroneous, or misleading" merely clarifies the Department's original intent, aligns the definition of misrepresentation used for the Department's enforcement actions with the standard to be used in evaluating borrower defense claims, and is appropriate given the Department's experiences since 2010.

In 2010, the Department declined to include omissions in the definition of misrepresentation during its rulemaking on part 668, subpart F, on the basis that the Department's regulations require schools to provide accurate disclosures of certain information. 75 FR 66917 to 66918. The Department emphasized that the purpose of the regulations was to ensure that all statements made by an institution are truthful, *id.*, and that whether such a statement was a misrepresentation would be viewed in context of the circumstances. *Id.* at 66914. As noted earlier, however, the Department has had more experience with omissions in the context of its substantial misrepresentation regulations at part 668, subpart F, since that 2010 rulemaking. In 2014, the Department issued a fine of $29,665,000 to Heald College, of the Corinthian Colleges, in part, as a result of a finding that Heald College had omitted essential and material information concerning the methodology used to calculate job placement rates.[14] This same finding, concerning omissions, has resulted in thousands of borrower defense claims filed with the Department. As noted by some commenters, given the close connection between borrower defense and the Department's purpose of ensuring truthful statements by schools when viewed in the entirety of a situation, we believe it is appropriate to adopt the regulations at part 668, subpart F, with some added requirements, for the borrower defense regulations and to revise the definition at § 668.71 to better meet that purpose and enact the Department's long-standing purpose for part 668, subpart F, enforcement actions.

We disagree with the commenter that the inclusion of omissions in the definition, absent an intent element, runs counter to the limit established by the D.C. Circuit in *Ass'n of Private*

*Sector Colls. & Univs.*, 681 F.3d 427. In that case, the court held that a substantial misrepresentation under part 668, subpart F, cannot include true and non-deceitful statements that have only the tendency or likelihood to confuse. However, the court also stated that it agreed with the Department that a misrepresentation can be a true statement that is deceitful, and specifically disagreed with the appellant that an intent element should be a required part of the definition. *Id.* We believe that the inclusion of omissions of information that may make a statement false, erroneous, or misleading clarifies the context under which a misrepresentation may be a true statement that is deceitful and does not infringe upon the court's ruling regarding statements with a likelihood to confuse. We also note that it is our understanding that many States' laws and other Federal consumer protection law also include omissions of information within prohibitions on deceptive acts and practices, and the proposed revision is in keeping with such precedent.

With respect to the commenters who expressed concern about how these regulations may affect schools' behaviors in their provision of certain types of information to students and prospective students, including information regarding investigations, pending civil rights or legal matters, faculty qualifications or availability, the school's compliance with State law, or a school's default rates, among others, the final regulation explicitly states that the Department will consider whether the statement omitting any such information is misleading "under the circumstances." As noted earlier, the Department will consider the totality of the circumstances to determine whether a statement is misleading—including whether the school is or is not under an affirmative legal obligation to disclose such information, or whether concerns such as privacy requirements prevent the disclosure or disclosure in full of such information. For borrower defense, § 685.222(d) also requires that the Department consider the reasonableness of the borrower's detrimental reliance on the misrepresentation.

We note, however, that it should not matter where or how a misrepresentation, whether as an omission or an affirmative statement, takes place, particularly as it pertains to the nature of a school's educational program, its financial charges, or the employability of its graduates. As we stated in 2010, 75 FR 66918, what is important is to curb the practice of misleading students regarding an

eligible institution. We continue to strongly believe that institutions should be able to find a way to operate in compliance with these regulations. As discussed later in this section, disclosures made by a school in publications or on the Internet may be probative evidence as to the reasonableness of a borrower's reliance on an alleged misrepresentation, depending on the totality of the circumstances.

*Changes:* None.

*Comments:* One commenter argued that it would be inappropriate to apply the FTC Policy Statement on Deception to cases of misrepresentation in higher education. The commenter stated that the FTC policy focuses specifically on deception perpetrated through advertising and is not aimed at establishing individual claims. The commenter noted that borrowers have more extensive interactions with their schools that may constitute fraud, and that absent the elements of materiality, reliance, and harm, the proposed Federal standard would fail to provide adequate protection.

*Discussion:* We disagree that the substantial misrepresentation standard in either part 668, subpart F, or in § 685.222(d) is the same as the FTC's prohibition on deceptive acts and practices. We considered a wide variety of both State and Federal legal precedents in developing the "substantial misrepresentation" definition in § 668.71 and have added specific elements, such as a reasonable reliance requirement, to address specific borrower defense claims in § 685.222(d).

*Changes:* None.

*Comments:* Some commenters stated that, for borrower defense purposes, the standard should specify that misrepresentations must be material, in order to avoid frivolous claims or claims based upon inadvertent errors or omissions. One commenter stated that such a materiality standard should not capture small deviations from the truth. Another commenter stated that the standard should allow only claims at a level of materiality that would justify the rescission of the loan at issue. One commenter expressed concern that under the standard without an accompanying materiality requirement, inadvertent or partial omissions of information would give rise to borrower claims.

One commenter stated that the Department should incorporate an express materiality requirement, emphasizing that the lack of such a standard is of particular concern because the standard does not incorporate an element of intent. The

---

[14] *See* Dept. of Educ., Notice of Intent to Fine Heald College, OPE–ID: 00723400 (Apr. 14, 2015), *available at www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.*

commenter also stated that the need for a materiality standard is enhanced, because the Department's proposed standard does not seem to require proof of detriment to a student as a result of his or her actual, reasonable reliance. The commenter stated that the definition in § 668.71 only requires that an individual show that he or she could have relied on a misrepresentation and expressed concern about the Department's proposal to include a presumption of reliance for group claims, in the absence of a materiality requirement.

Several commenters stated that the inclusion of omissions, related to the provision of any educational service, is too broad without an accompanying materiality requirement in the regulation. These commenters expressed concern that students would be able to present claims for substantial misrepresentation by claiming that schools had failed to provide contextual information, such as how faculty-student ratio information works.

*Discussion:* As discussed in the NPRM, 81 FR 39344, we do not believe that a materiality element is required in either the proposed amendments to the definition for the Department's enforcement authority under § 668.71 or as the definition is adopted for the substantial misrepresentation borrower defense standard under § 685.222(d). We believe that the regulatory definition of "substantial misrepresentation" is clear and can be easily used to evaluate alleged violations of the regulations. *See* 75 FR 66916; 81 FR 39344. Generally, under both Federal deceptive conduct prohibitions and common law, information is considered material if it would be important to the recipient, or likely to affect the recipient's choice or conduct.[15] By noting specifically in section 487(c)(3) of the HEA, 20 U.S.C. 1094(c)(3), that the Department may bring an enforcement action against a school for a substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates, Congress indicated its intent that information regarding the nature of a school's educational program, its financial charges, or the employability of its graduates should be viewed as

material information of certain importance to students. *See Suarez* v. *Eastern Int'l Coll.,* 50 A.3d 75, 89–90 (N.J. Super. 2012).

As also noted in the NPRM, 81 FR 39344, we believe that by requiring that students demonstrate actual, reasonable reliance to the borrower's detriment under § 685.222(d), the borrower defense regulations incorporate similar concepts to materiality. As discussed, materiality refers to whether the information in question was information to which a reasonable person would attach importance in making the decision at issue. By requiring reasonable reliance to the borrower's detriment, the Department would consider whether the misrepresentation related to information to which the borrower would reasonably attach importance in making the decision to enroll or continue enrollment at the school and whether this reliance was to the borrower's detriment. This would be the case both for individual claims, and for the presumption of reliance applied in the process for group claims under § 685.222(f)(3). We discuss the rebuttable presumption of reasonable reliance in greater detail in the "Group Process" section of this document. As a result, we disagree it should include a materiality element in the standard.

*Changes:* None.

*Comments:* Many commenters expressed concerns about the requirement for borrowers to assert reliance under the substantial misrepresentation standard. One commenter expressed concern that a borrower could establish that a substantial misrepresentation had occurred by providing evidence of the misrepresentation and showing that he or she could have reasonably relied upon it to his or her detriment, notwithstanding the requirement in § 685.222(d) that the borrower demonstrate actual reasonable reliance upon the misrepresentation.

One commenter supported the use of a reasonable reliance standard, given that the standard may allow claims for statements, particularly unintentional statements, that are not accurate or complete.

A couple of commenters suggested that the Department should not require that borrowers actually and reasonably rely upon misrepresentations to obtain relief for borrower defense purposes, but rather that borrowers should be entitled to relief so long as actual reliance is demonstrated without regard for the reasonableness of that reliance. Alternatively, one commenter suggested that if a reasonable reliance standard were maintained, then the

reasonableness of the reliance should be judged according to the circumstances of the misrepresentation and the characteristics of the audience targeted by the misrepresentation, which the commenter stated would be in keeping with State consumer protection law.

One group of commenters suggested that the Department use the same standard for reliance for the Department's enforcement activities under § 668.71, as for borrower defenses under § 685.222(d), so that a borrower may assert a claim for borrower defense without having to show that he or she actually relied on the misrepresentation at issue. These commenters stated that neither State nor Federal consumer protection law typically requires actual reliance and that requiring actual reliance would increase the burden on both the borrower and the trier of fact without serving the purpose of deterring misrepresentations. The commenters also stated that actual reliance is not needed to protect schools from frivolous claims given the fact-finding process and separate proceedings that would be initiated by the Department to recover from schools under the proposed rule.

Another commenter also supported using a standard that did not require actual reliance, as opposed to showing that a borrower could have reasonably relied upon the misrepresentation. However, the commenter stated that in the alternative, borrowers should only be required to certify that they relied upon the misrepresentation, without any further proof, to satisfy the reliance requirement of the standard.

*Discussion:* There appears to be some confusion as to whether the substantial misrepresentation standard for borrower defense would require actual, reasonable reliance to a borrower's detriment. Although the definition of substantial misrepresentation in § 668.71 requires that, for a misrepresentation to be substantial, it must be one upon which a person "could reasonably be expected to rely, or has reasonably relied, to that person's detriment," the standard for substantial misrepresentation under § 685.222(d) requires that the borrower show that he or she "reasonably relied on" the misrepresentation at issue—in other words, that the borrower actually and reasonably relied upon the misrepresentation. As discussed later in this section, the Department acknowledges that the language of § 685.222(d) is confusing as to whether the borrower must also prove that he or she actually relied upon the misrepresentation to his or her detriment. As a result, we will to modify the language of proposed § 685.222(d) to

---

[15] *See, e.g.,* F.T.C. Policy Statement on Deception, 103 F.T.C. at 182; *see also* Restatement (Second) of Torts § 538 (1977) ("The matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.").

clarify that actual, reasonable reliance to the borrower's detriment must be demonstrated under the borrower defense substantial misrepresentation standard.

We disagree that the purpose of the borrower defense regulations would be served if an actual reliance standard (without a reasonableness component) or a standard that did not require actual reliance was adopted. As explained in the NPRM, 81 FR 39343, a standard that does not require actual reliance serves the Department's interest in the public enforcement of its regulations: The Department requires title IV-participating institutions not to make false statements on which borrowers could reasonably rely to their detriment, and the Department appropriately will impose consequences where an institution fails to meet that standard. However, the Department will grant borrower defenses to provide relief to borrowers who have been harmed by an institution's misrepresentation, not borrowers who could have been harmed but were not; and an actual, reasonable reliance requirement is the mechanism by which borrowers demonstrate that they were indeed actually reasonably relied upon the misrepresentation to their detriment. The requirement also allows the Department to consider the context and facts surrounding the misrepresentation to determine whether other similar students and prospective students would have acted similarly.[16] We believe that the actual, reasonable reliance requirement for a borrower defense based upon a substantial misrepresentation enables the Department to provide relief for borrowers while properly avoiding

discharges and payments by the Federal government, taxpayers, and institutions. What may be deemed sufficient evidence to prove whether a borrower has reasonably relied upon a misrepresentation to his or her detriment will differ from case to case. As a result, we reject the suggestion that a certification of reliance should necessarily and in all cases by itself be found to be adequate proof of reliance for all borrower defense claims the Department may receive in the future.

*Changes:* We have revised § 685.222(d) to clarify that a borrower must have relied upon a substantial misrepresentation to his or her detriment.

*Comments:* One commenter expressed concern that the Department's proposed standard does not require that the borrower allege injury or damages as a requirement to assert substantial misrepresentation. Another commenter stated that students should be required to establish the extent of their injuries or damages, so that discharges are not granted where students received what they bargained for and so that claims are not filed for harmless errors by schools. Another commenter stated that the standard should require the borrower to show proof of detriment sufficient to deprive the student of the intended benefits of the tuition funded by the loan at issue.

*Discussion:* To assert a borrower defense under proposed § 685.222(d), the borrower must demonstrate that they reasonably relied upon a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, in deciding to attend, or continue attending, the school. A "substantial misrepresentation" is defined in § 668.71 as a misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. The Department understands that, generally, "detriment" refers to any loss, harm, or injury suffered by a person or property.[17] When §§ 668.71 and 685.222(d) are read together, a borrower may assert a borrower defense for a misrepresentation, if also in accordance with the other requirements of 34 CFR part 668, subpart F, if he or she can demonstrate that the misrepresentation was one on which the borrower actually reasonably relied, to the borrower's detriment, in deciding to attend, or continue attending, the school at issue. However, we acknowledge that the language of § 685.222(d) may be confusing. For this reason, we are

clarifying in § 685.222(d) that the borrower must show reasonable detrimental reliance.

In contrast to detriment, "damages" refers to money claimed by, or ordered to be paid to, a person as compensation for loss or injury.[18] We do not believe that the term "damages" is appropriate in the context of borrower defense, because the Department is limited by statute to providing relief to the borrower on his or her Direct Loan and may not provide a borrower with the complete amount or types of compensation that might traditionally be considered to be damages at law.

There is no quantum or minimum amount of detriment required to have a borrower defense claim, and the denial of any identifiable element or quality of a program that is promised but not delivered due to a misrepresentation can constitute such a detriment. In contrast, proposed § 685.222(i) provides that the trier-of-fact, who may be a designated Department official for borrower defenses determined through the process in § 685.222(i) or a hearing official for borrower defenses decided through the processes in § 685.222(f) to (h), will determine the appropriate amount of relief that should be afforded the borrower under any of the standards described in § 685.222 and § 685.206(c), including substantial misrepresentation. We explain the considerations for triers-of-fact for relief determinations under the "Borrower Relief" section of this document.

*Changes:* We have revised § 685.222(d) to clarify that a borrower must have relied upon a substantial misrepresentation to his or her detriment.

*Comments:* Several commenters expressed concern about the factors listed in proposed § 685.222(d)(2). A couple of commenters suggested that all of the additional factors listed in § 685.222(d)(2) should be removed. One commenter argued that the factors do not establish the falsity or misleading nature of a substantial misrepresentation claim. Another commenter stated that the factors are subjective and would be difficult to prove or disprove and thus should be removed in their entirety.

A couple of commenters disagreed with specific factors listed in proposed § 685.222(d)(2). One commenter stated that the factor pertaining to failure to respond to information was unnecessary, because passive and requested disclosures are already enforceable through existing consumer compliance requirements. Another

[16] It is our understanding that several other Federal agencies charged with consumer protection, such as the FTC and the CFPB, when bringing enforcement actions for violations of prohibitions of deceptive acts and practices, are not required to prove actual reliance by consumers upon alleged misrepresentations. However, we note that such agencies have prosecutorial discretion in bringing such cases, and are not charged with evaluating and deciding individual claims for relief by consumers as the Department is seeking to do with these regulations. Furthermore, such agencies obtain relief for consumers from the culpable actor, while the Department will be providing relief through public resources, with a possibility of recovery from the actor in some cases. In contrast to the laws these other Federal agencies enforce, many, if not all, States allow consumers to bring private actions under their consumer protection laws. However, it is the Department's understanding that the requirements as to whether reliance is required at all, or if the courts will consider the reasonableness of such reliance, varies. *See, e.g.,* National Consumer Law Center, Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes, at 20, 22 (2009); Schwartz & Silverman, Commonsense Construction of Consumer Protection Acts, 54 U. Kan. L. Rev. 1, 18–19 (Oct. 2005).

[17] *See* Black's Law Dictionary (10th ed. 2014).

[18] *See* Black's Law Dictionary (10th ed. 2014).

commenter stated that the factors should not include failures to respond to information, or that this factor should be revised to include only purposeful failures to provide requested information. The commenter argued that a failure to respond promptly may be due to routine events or extraneous factors, such as an enrollment officer's vacation or workload issues, or a student's own delay of enrollment. A commenter also requested clarification as to the "unreasonable emphasis on unfavorable consequences of delay" language. This commenter argued that under this factor, routine, truthful provisions of information regarding timelines and possible late fees or other consequences as a result of actions such as late enrollment or making late housing arrangements may be viewed as improper conduct.

One commenter expressed support for the factors listed in § 685.222(d)(2), stating that it agreed with the Department that misrepresentations should be viewed in the context of circumstances, including the possible use of high pressure enrollment tactics.

One commenter expressed concern that decision makers would expect to see one or more of the newly added factors before finding that a substantial misrepresentation exists. This commenter suggested that the Department clarify that a borrower need not show the factors to have a claim for substantial misrepresentation under borrower defense.

Several commenters stated that the factors listed in proposed § 685.222(d)(2) were insufficient as part of the standard for substantial misrepresentation, as many problematic practices relating to high pressure and abusive sales practices do not necessarily involve misrepresentations as opposed to puffery or abusive or unfair practices.

*Discussion:* We disagree with the commenters' suggestion to remove the non-exhaustive list of factors in § 685.222(d)(2). We appreciate the concerns that the factors do not necessarily prove whether a statement was erroneous, false, or misleading. However, as explained in the NPRM, 81 FR 39343, we believe it is appropriate to consider factors that may have influenced whether a borrower's or student's reliance upon a misrepresentation to his or her detriment is reasonable, thus elevating the misrepresentation to a substantial misrepresentation under § 668.71 and § 685.222(d) for the purposes of evaluating a borrower defense claim. We recognize that such factors consider the viewpoint of the borrower as to his or

her reliance on a misrepresentation and may be subjective. However, in evaluating whether a statement is a misrepresentation, the Department will consider whether the statement is a misrepresentation "under the circumstances" and consider the totality of the situation, in addition to the reasonable reliance factors listed in § 685.222(d)(2). We also disagree with commenters that the factors are insufficient as part of the substantial misrepresentation standard. As discussed earlier in this section, we decline to include standards such as unfair or abusive acts or practices, which some commenters have stated would address issues such as puffery and abusive sales practices that may occur absent a misrepresentation, because of a lack of clear precedent and guidance. We believe that consideration of the factors, if the trier-of-fact determines that they are warranted under § 685.222(d)(2), strikes a balance between the Department's interests in establishing consistent standards by which the Department may evaluate borrower defenses; providing borrowers and schools with clear guidance as to conduct that may form the basis of a borrower defense claim; and providing appropriate relief to borrowers who have been harmed.

We understand the concern raised by commenters that a failure to respond to a borrower's requests for more information, including regarding the cost of the program and the nature of any financial aid, 34 CFR 685.222(d)(iv), may be due to unintentional and routine events such as an employee's oversight and vacation schedule. However, as discussed earlier in this section, we disagree that the substantial misrepresentation standard should include an element of intent. We also disagree that the factor is unnecessary, as different States and oversight entities may have differing disclosure standards and institutions' compliance with such standards may vary.

Section 685.222(d)(2)(ii) notes that in considering whether a borrower's reliance was reasonable, that an "unreasonable" emphasis on the unfavorable consequence of a delay may be considered. Generally, we do not believe that routine and truthful provisions of information such as timelines and fees to a borrower are unreasonable. However, as discussed, the standard requires that a consideration of any of the factors listed in § 685.222(d)(2) also include consideration of whether a statement is a misrepresentation under the circumstances or, in other words, in the context of the situation.

We also disagree that further modification of the regulations is needed to clarify that the factors do not need to exist for a borrower to have a borrower defense under § 685.222(d). We believe that in stating that the Secretary "may consider, if warranted" whether any of the factors listed in § 685.222(d)(2) were present, that the Department's intent is clear that the factors do not need to be alleged for a substantial misrepresentation to be established.

*Changes:* None.

*Comments:* One commenter stated that the preponderance of evidence standard established in the regulation, combined with the lower proof standard of preponderance of the evidence for misrepresentation, would open the door to frivolous claims. One commenter expanded on this position, asserting that the evidentiary standard in most States for fraudulent misrepresentation is clear and convincing evidence.

One commenter requested clarification regarding the reasonable reliance and the preponderance of evidence standard for the purposes of the substantial misrepresentation, raising as an example, that an error or oversight in one publication should not satisfy the preponderance of the evidence standard for substantial misrepresentation, if the statement was otherwise correct and complete in all of the school's other publications.

*Discussion:* We disagree that a "preponderance of the evidence" is a lesser standard of proof than what is used currently. As explained in the NPRM, 81 FR 39337, we believe that this evidentiary standard is appropriate as it is both the typical standard in most civil proceedings, as well as the standard used by the Department in other processes regarding borrower debt issues. See 34 CFR 34.14(b), (c) (administrative wage garnishment); 34 CFR 31.7(e) (Federal salary offset).

We understand that some commenters have concerns about baseless charges and frivolous claims that may be brought by borrowers as borrower defenses and lead to liabilities for schools. However, as established in § 685.222(e)(7) and (h), in determining whether a school may face liability for a borrower defense claim or a group of borrower defense claims, the school will have the opportunity to present evidence and arguments in a fact-finding process in accordance with due process. If, for example, during the course of such a fact-finding process, the school provides proof that a misstatement or oversight in one publication was otherwise correct and complete in the school's other

publications, such evidence may be determinative as to whether a borrower's reliance on the original misrepresentation was reasonable under the circumstances, as required under § 668.71 and § 685.222(d). However, the probative value of such evidence will vary depending on the facts and circumstances of each case. We also discuss comments relating to the evidentiary standard under "General."

*Changes:* None.

*Comments:* Several commenters suggested that we provide schools with specific safe harbors or defenses to substantial misrepresentation borrower defense claims. One commenter suggested such safe harbors could include a demonstration that an alleged misstatement is found to be true and not misleading when made; proof that a student participated in Student Loan Entrance counseling despite a claim that the student did not understand repayment requirements; proof that a borrower failed to obtain a professional license due to his or her own behavior despite having been provided with information on professional licensing requirements; a showing that the student has been made whole by the school; proof that the student has signed acknowledgements as to the information about which the student is claiming to have been misled; or underlying circumstances that are based on standard operational or institutional changes.

Another commenter stated that schools should be provided with defenses in the form of proof that the misrepresentation had been subsequently corrected by the school or that the institution had policies, procedures, or training in place to prevent the misrepresentation at issue.

*Discussion:* We disagree with commenters that specific defenses or safe harbors should be included in the regulations. Many of the factors listed by commenters, such as whether a student participated in entrance or exit counseling, proof of the availability of or receipts of accurate information by a student, or proof of underlying circumstances that are based on standard operational or institutional changes that should have been apparent to the borrower or student may be important evidence in the Department's consideration of whether a borrower's reliance upon an alleged misrepresentation is reasonable, as required by § 685.222(d). However, determinations as to the impact of such factors may vary significantly depending on the type of allegations made and the facts and circumstances at issue. As a result, we do not believe that

the inclusion of such factors is appropriate.

Similarly, other factors noted by commenters, such as a showing that a student has already been made whole by the school, may, depending on the specific circumstances, be important considerations for the Department in its determination of whether a borrower may be entitled to relief or to the determination of the amount of relief under § 685.222(i), which in turn will affect the amount of liability a school may face in either the separate proceeding for recovery under § 685.222(e)(7) or in the group process described in § 685.222(h). Given that the importance of such factors will vary depending on the circumstances of each case, we also do not believe that the inclusion of such factors is appropriate for the regulations.

Section 668.71 defines a "misrepresentation" as any false, erroneous, or misleading statement. If an alleged misstatement can be proven to be true statement of fact when made, not false or erroneous, and it is not misleading when made, then such statements would not be actionable misrepresentations under the standard. However, as explained previously in this section, to determine whether a statement that was true at the time of its making was misleading, the Department will consider the totality of the situation to determine whether the statement had "the likelihood or tendency to mislead under the circumstances" or whether it "omit[ted] information in a way as to make the statement false, erroneous, or misleading." The Department will also look to whether the reliance by the borrower was reasonable. This would include a consideration of whether a misrepresentation has been corrected by the school in such a way or in a timeframe so that the borrower's reliance was not reasonable. This would also mean that, generally, claims based only on the speaker's opinion would not form the basis of a borrower defense claim under the standard, if it can be determined that under the circumstances borrowers would understand the source and limitations of the opinion.[19] For the same reason, it is our understanding that claims based on exaggerated opinion claims, also known as "puffery," would also generally not

be able to form the basis of a misrepresentation under State or Federal consumer protection law.[20] However, the determination of whether a statement is an actionable misrepresentation will necessarily involve consideration of the circumstances under which the representation was made and the reasonableness of the borrower's reliance on the statement.

We do not believe that the existence of policies, procedures, or training to be a defense to the existence of a substantial misrepresentation. As discussed earlier in this section, the Department does not consider intent in determining whether a substantial misrepresentation was made and believes that a borrower should receive relief if the borrower reasonably relied upon a misrepresentation to his or her detriment.

*Changes:* None.

*Comments:* Several commenters expressed concerns regarding the subject matter or topics upon which a substantial misrepresentation may be based. A few commenters expressed concerns that the substantial misrepresentation standard narrows the scope of borrower defenses by not including claims relating to campus safety and security, as well as those for sexual or racial harassment. One commenter expressed the view that not including such non-loan related issues is inconsistent with the purpose of the HEA and the borrower defense regulations. Another commenter said that by excluding such topics, the substantial misrepresentation standard targets just proprietary institutions and excludes traditional colleges.

Another commenter asked whether statements about topics such as cafeteria menu items, speakers hosted by a school, or opponents on a team's athletic schedule would be considered substantial misrepresentations.

One commenter supported using 34 CFR part 668, subpart F, as the basis for borrower defense claims, including limiting substantial misrepresentation claims to the categories listed in subpart F.

*Discussion:* We explain earlier our reasons for why subjects that do not relate the making of a borrower's loan or the provision of educational services for which the loan was provided, such as sexual or racial harassment and campus safety or security, are included within the scope of the borrower defense regulations.

---

[19] It should be noted, however, that a claim phrased as an opinion may still form the basis of a substantial misrepresentation, if the borrower reasonably interpreted the statement as an implied statement of fact, *see, e.g.,* FTC Policy Statement on Deception, 103 F.T.C. at 184, or if any of the factors listed in § 685.222(d)(2) existed so as to affect the reasonableness of the borrower's reliance on the misrepresentation.

[20] *See, e.g., Rasmussen v. Apple Inc.,* 27 F. Supp. 3d 1027 (N.D. Cal. 2014); FTC Policy Statement on Deception, 103 F.T.C. 110.

As also discussed earlier in this section, we disagree that the substantial misrepresentation standard targets proprietary institutions and excludes issues facing public and private non-profit schools.

In response to questions about whether misrepresentations on specific topics may form the basis of a borrower defense, we note such determinations will necessarily be fact and situation specific-dependent inquiries. As proposed, the substantial misrepresentation standard considers a number of factors in determining whether a borrower defense claim may be sustained. Proposed § 685.222(d) specifies that the borrower defense asserted by the borrower must be a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on when the borrower decided to attend, or to continue attending, the school. 34 CFR part 668, subpart F, specifically limits the scope of substantial misrepresentation to misrepresentations concerning the nature of an eligible institution's educational program, 34 CFR 668.72; the nature of an eligible institution's financial charges, *id.* at § 668.73; and the employability of an eligible institution's graduates, *id.* at § 668.74. If a misrepresentation falls within one of these categories, then it may be a misrepresentation upon which a borrower may assert a borrower defense claim. However, as required by the revised language of § 668.71, the Department would consider the totality of the situation to determine whether the statement was false, erroneous, or misleading "under the circumstances." Additionally, the borrower would have to show that he or she reasonably relied upon the misrepresentation to his or her detriment in deciding to attend the school or in continuing his or her attendance at the institution under proposed § 685.222(d). If such requirements are met, then it is possible that a substantial misrepresentation may form the basis of a borrower defense claim.

*Changes:* None.

*Comments:* Several commenters expressed concern that the standard would result in schools being held liable for misrepresentations of contractors and others acting on their behalf. According to one commenter, this standard is acceptable for enforcement activities conducted by and guided by the Department in its discretion, but is not suitable for borrower defense. Another commenter stated that, as proposed, § 685.222 is unclear, because under § 685.222(a), a borrower defense is limited to the act or omission of the school, whereas under § 685.222(d), it does not appear to be clear that the act or omission may be by the school's representatives.

*Discussion:* In response to concerns in 2010 that institutions may be held accountable for false or misleading statements made by persons with no official connection to a school, the Department narrowed the scope of substantial misrepresentation to statements made by the school, the school's representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs or those that provide marketing, advertising, recruiting, or admissions services. 75 FR 66916. As explained in 2010, such persons actually either represent the school or have an agreement with the school for the specific purposes of providing educational programs, marketing, advertising, recruiting, or admissions services. Section § 685.222(d) similarly names the persons and entities making a substantial misrepresentation upon which a borrower may assert a claim and echoes the official relationships in § 668.71. We believe the definition provided in proposed § 685.222(d) does not need further clarification. We also believe that the specific persons and entities identified in § 685.222(d) upon whose substantial misrepresentation a borrower may assert a borrower defense claim is appropriate for the same reasons stated in 2010 as to their appropriateness for § 668.71 and decline to make any changes in this regard.

*Changes:* None.

*Comments:* One commenter requested that borrower defense claims extend to guaranty agencies and, specifically, suggested that § 685.222(d)(2) be revised to enable the Secretary to consider certain factors, listed in § 685.222(d)(2), to determine whether a guaranty agency's reliance on a substantial misrepresentation is reasonable.

*Discussion:* The Department's authority to regulate borrower defenses arises from Section 455(h) of the HEA, which describes borrower defenses that may be asserted by a borrower to the Department for loans made under the Direct Loan Program. We do not believe that it is appropriate to include guaranty agencies, which are not participants in the Direct Loan Program, in the borrower defense regulations and decline the commenter's suggestion.

*Changes:* None.

*Comments:* One commenter concurred with the Department's goal of deterring misrepresentations, but requested that the Department exempt foreign institutions with relatively small numbers of American students from the regulation. The commenter stated that eligible foreign institutions are governed by different countries' laws and oversight regimes, and that there are no indicators that the issues giving rise to borrower defense claims have affected Americans enrolled in foreign institutions.

*Discussion:* We do not agree that it would be appropriate to ignore any potential harm to students that may constitute the basis of a borrower defense from schools participating in the Direct Loan Program, whether such institutions are foreign or domestic. The standards proposed in § 685.222 for borrower defense were drafted for the purpose of ensuring that students receive consistent and uniform treatment for borrower defense claims, regardless of the type of institution. Exempting some institutions from the borrower defense process, whether partially or fully, would undermine the effectiveness of the regulation in providing relief for borrowers and providing the Department with information on misconduct forming the basis of borrower defenses among institutions participating the Direct Loan Program.

*Changes:* None.

*Limitations on Department Actions To Recover*

*Comments:* Commenters objected to the proposal to remove the limitations period in current § 685.206(c) to Department action to recover from the school for losses arising from borrower defense claims on both loans made before July 1, 2017, and those made thereafter. Section 685.206(c) refers to § 685.309(c), which in turn refers to the three-year record retention requirement in § 668.24. The current regulations also provide that the three-year limitation would not apply if the school received actual notice of the claim within the three-year period. Commenters objected for a variety of reasons.

Several commenters argued that it would be unduly burdensome and expensive for institutions to retain records beyond the mandatory three-year record retention period. These commenters also argued that it would be unfair for an institution to have to defend itself if it no longer has records from the time period in question. One commenter also noted that it would be difficult for the Department to assess claims in the absence of records. One commenter disagreed with the Department's statements in the NPRM that institutions have not previously

relied on the three-year limitations period and student-specific files are likely unnecessary to a borrower defense claim. A commenter asserted that the records to which the current record retention rule applies—including the Student Aid Report (SAR), documentation of each borrower's loan eligibility, documentation of each borrower's receipt of funds, documentation of exit counseling, documentation of the school's completion rates, among numerous other categories of documents—would be relevant and that the Department had failed to demonstrate that resolution of borrower defense claims would rarely, if ever, turn on the records to which the three-year record retention rule now applies. The commenter contended that these records will likely go to the heart of borrower claims concerning misrepresentation regarding student loans.

Some commenters stated that schools have tied their general record retention policies to the three-year student aid record retention regulation. Other commenters contended that the proposal would place an unfair, and unnecessary burden on schools by requiring them to retain records indefinitely, even though a borrower would reasonably be expected to know within a few years after attendance whether the student had a claim regarding the training he or she had received. Some commenters argued that due process requires a defined limitations period so that borrowers and schools would know how long to retain relevant records. These commenters also suggested that a defined limitation period would promote early awareness of claims, and proposed a six-year period for recovery actions on both misrepresentation and contract claims.

A commenter asserted that periods of limitation are enacted not merely to reduce the risk of failing memories and stale evidence, but to promote finality of transactions and an understanding of the possible risks that may arise from transactions. This proposed change, the commenter asserts, frustrates these objectives served by periods of limitation. One commenter contended that an unlimited record retention period would increase the risk that data security lapses could occur.

One commenter suggested that the limitation period for recovery actions should be tied to the rule adopted by the school's accreditor, or to the statute of limitations in the State, as even non-student specific records, such as catalogs (which the Department noted are likely to be the basis of borrower defense claims), are likely to be destroyed at the end of these retention periods. Another commenter viewed the proposal as an impermissible retroactive regulation, by converting what was enacted as defense to repayment into an affirmative recovery claim, available to the Department for recovery for losses from actions of the school that occurred before the new regulation took effect.

*Discussion:* We fully address in the NPRM at 81 FR 39358 the contention that removing or extending a limitation period is unconstitutional and beyond the power of the Department.[21] As to the objections that the change would be unfair because schools in fact relied on the record retention rules, we note first that these record retention rules require the school to retain specific, particular student-aid related records. We include the specific records that must be maintained in order to provide the context in which to address the commenters' assertion that these records would go to the heart of borrower defense claims. 34 CFR 668.24. The commenters identify no lawsuits in which resolution of the dispute actually turned on any of the records listed here and, with minor exceptions, we are aware of no lawsuits against schools by borrowers or government entities, or borrower defense claims presented to the Department, in which the records described here are dispositive. In a handful of instances, recognition of borrower defenses under § 685.206 turned on records showing whether refunds owed to students had in fact been made, a requirement ordinarily examined in the routine required compliance audit and in Department program reviews. In a few other cases, Department reviews have identified instances in which the school falsified determinations of satisfactory academic progress, another matter commonly examined in routine audits and program reviews, and we are amending the false certification discharge provisions to ensure that the Department can implement relief when this particular failure is identified. In contrast, even a cursory review of claims raised by students and student borrowers over the years that would constitute potential borrower defense claims have turned not on the individualized aid-specific records itemized in the Department's record retention regulations, but on broadly disseminated claims regarding such matters as placement rates,[22] accreditation status,[23] and employment prospects.[24]

Whether a school actually retains records relevant to the borrower's claim does not determine the outcome of any claim, because the borrower—and in group claims, the Department—bears the burden of proving that the claim is valid. The borrower, or the Department, must therefore have evidence to establish the merit of the claim, a prospect that becomes more unlikely as time passes. If the borrower or the Department were to assert a claim against the school, the school has the opportunity to challenge the evidence proffered to support the claim, whether or not the school itself retains contradictory records.

We acknowledge, however, that institutions might well have considered their potential exposure to direct suits by students in devising their record retention policies for records that may in fact be relevant to borrower defense type claims. Although we consider applicable law to support collection of claims by offset without regard to any previously applicable limitation period, we recognize that the burden of doing so may be unwarranted after the limitation period otherwise applicable had expired and the institution had no reason to expect that claims would arise later. Under current regulations, there is no limit on the time in which the Department could take recovery action if the institution received notice of a claim within the three-year period. Under the current regulation, an institution must have "actual notice of a claim" to toll the three-year period. An institution would in fact have ample warning that the claims may arise from other events besides receipt of a claim from an individual, such as lawsuits

[21] We add only that statutes of limitation applicable to government actions to collect these claims affect only the ability to recover by a particular action, and do not extinguish claims. Thus, a suit by the government to collect a liability arising in title IV, HEA program remains governed by the limitation periods in 28 U.S.C. 2415(a), while actions to collect by Federal offset have not, since subsection (i) was added to § 2415 by the 1982 Debt Collection Act to exempt actions to collect by administrative offset under 31 U.S.C. 3716, which originally imposed a 10-year statute of limitations, until amended in 2008 to remove any limitation period from collection by Federal offset.

[22] See *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.,* 168 F.3d 1362, 1369 (D.C. Cir. 1999), *opinion amended on denial of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999)

[23] *California v. Heald Coll.,* No. CGC–13–534793, Sup. Ct. Cty of San Francisco (March 23, 2016); *Consumer Fin. Prot. Bureau v. Corinthian Colls., Inc.,* No. 1:14–CV–07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015); *Ferguson v. Corinthian Colls., Inc.,* 733 F.3d 928 (9th Cir. 2013); *Moy v. Adelphi Inst., Inc.,* 866 F. Supp. 696, 706 (E.D.N.Y. 1994) (upholding claim of common law misrepresentation based on false statements regarding placement rates.); *Lilley v. Career Educ. Group,* 2012 IL App (5th) 100614–U (Oct. 25, 2012); *Fed. Trade Comm'n v. DeVry Educ.Group, Inc.,* C.A. No. 15–CF–00758 (S.D. Ind. Filed Jan. 17, 2016).

[24] *Suarez v. E. Int'l Coll.,* 428 N.J. Super. 10, 50 A.3d 75 (App. Div. 2012).

involving the same kind of claim, law enforcement agency investigations, or Department actions. State law, moreover, already commonly recognizes that the running of limitation periods may be suspended for periods during which the claimant had not yet discovered the facts that would support a claim, and may impose no limit on the length of the suspension, effectively allowing a claim to be asserted long after the otherwise applicable limitation period had run. The limitation period applicable to a particular recovery claim will thus depend—for current loans—on the limitation period State law would impose on an action by the student against the institution for the cause of action on which the borrower seeks relief, as that period may be affected by a discovery rule, as well as whether an event has occurred within that period to give the institution notice. The current three-year limit will be retained, subject to the notice provisions, if that limit exceeded the applicable State law limitation. For new loans, the applicable periods would be those in § 685.222(e)(7) and § 685.222(h)(5); for actions based on judgments, no limitation would apply.

We recognize that the retention of records containing personally identifiable information poses data security risks. However, the school already faces the need to secure such information, and we expect the school to have already adopted steps needed to do so. The regulation does not impose any new record retention requirement.

*Changes:* We have amended § 685.206(c) to remove the provision that the Secretary does not initiate a recovery action later than three years after the last year of attendance, and have modified § 685.206(c)(3) to provide that the Department may bring a recovery action against the school within the limitation period that would apply to the cause of action on which the borrower defense is based, unless within that period the school received notice of the borrower's claim. We have further modified the regulations to state that notice of the borrower's claim includes actual notice from the borrower, a representative of the borrower, or the Department, of a claim, including notice of an application filed pursuant to § 685.222 or § 685.206(c); receipt of a class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of the borrower defense claim; and notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that it is initiating an investigation into conduct of the school relating to specific programs, periods, or practices that may affect the student for underlying facts that may form the basis of the borrower defense claim.

We have also revised § 685.222(h)(5) and (e)(7) to provide that the Department may bring a recovery action against the school for recovery of claims brought under § 685.222(b) at any time, and may bring a recovery action for recovery of claims brought under § 685.222(c) or (d) within the limitation period that would apply to the cause of action on which the borrower defense is brought, unless within that period the school received notice of the borrower's claim. The Department further modifies § 685.222(h)(5) to include the same description of events that constitute notice as described above.

*Comments:* One commenter requested that the Department continue the three-year statute of limitations period for loans disbursed prior to July 1, 2017. Another commenter suggested it would be unfair for the Department to hold an institution accountable for claims going back more than ten years.

*Discussion:* As noted in the NPRM, the Department will continue to apply the applicable State statute of limitations to claims relating to loans disbursed prior to July 1, 2017. We also note that we will apply all aspects of relevant State law related to the statute of limitations as appropriate, including discovery rules and equitable tolling. However, these comments may reflect a drafting error in the NPRM that suggested loans disbursed prior to July 1, 2017, would be subject to the new limitations period established by the final regulations.

*Changes:* We have revised § 685.222(a)(5) to make clear that the six-year statute of limitations period established under that section does not apply to claims under § 685.206(c).

*Expansion of Borrower Rights*

*Comments:* A number of commenters noted that the regulations in proposed § 685.206(c) expand the rights of borrowers by allowing borrowers to assert defenses regardless of when the loan was disbursed. Under the current regulations, a defense to repayment is available only when collection on a Direct Loan has been initiated against a borrower, such as wage garnishment or tax offset proceedings. The commenters asserted that the revisions to the borrower defense regulations have reconstituted current defenses to collection, so they now serve as the bases for expanded borrower rights to initiate an action for affirmative debt relief at any time.

*Discussion:* We disagree that proposed § 685.206(c) would be an expansion of borrowers' rights as to the context in which a borrower defense may be raised. As explained by the Department in 1995, 60 FR 37769–37770, the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed in the FFEL Program—which allowed borrowers to assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings. Specifically, FFEL borrowers' ability to raise such a claim was pursuant the Department's 1994 inclusion in the FFEL master promissory note for all FFEL Loans a loan term [25]—that remains in FFEL master promissory notes to this day—stating that for loans provided to pay the tuition and charges for a for-profit school, "any lender holding [the] loan is subject to *all the claims and defenses* that [the borrower] could assert against the school with respect to [the] loan" (emphasis added).[26] *See also* Dept. of Educ., Dear Colleague Letter Gen 95–8 (Jan. 1995) (stating the Department's position that borrower defense claims would receive the same treatment as they were given in the FFEL program, which allowed borrowers to not only assert defenses but also claims under applicable law).

We also disagree that the revisions to § 685.206(c) expand any timeframe for a borrower to assert a borrower defense. As explained above, the Department's borrower defense regulation at § 685.206(c) was based upon the right of FFEL borrowers to bring claims and defenses, which in turn was adopted from the FTC's Holder Rule provision. The FTC has stated that applicable State law principles, such as statutes of limitations as well as any principles that would permit otherwise time-barred claims or defenses against the loan holder, apply to claims and defenses brought pursuant to a Holder Rule provision.[27] The Department's position on the application of any applicable statutes of limitation or principles that

---

[25] This loan term was adapted from a similar contract provision, also known as the Holder Rule, required by the Federal Trade Commission (FTC) in certain credit contracts. *See* 40 FR 533506.

[26] The substance of this loan term was also adopted as part of the FFEL Program regulations at 34 CFR 682.209(g) in 2009.

[27] Letter from Stephanie Rosenthal, Chief of Staff, Division of Financial Practices, Bureau of Consumer Protection, FTC to Jeff Appel, Deputy Under Secretary, U.S. Dep't. of Educ. (April 7, 2016), *available at* www.ftc.gov/policy/advisory-opinions/ letter-stephanie-rosenthal-chief-staff-division-financial-practices-bureau.

may permit otherwise time-barred claims is the same as the FTC's. We do not seek to change this position in revising § 685.206(c), which would apply to loans first disbursed before July 1, 2017.

*Changes:* None.

*Administrative Burden*

*Comments:* A group of commenters questioned the validity of the Department's argument that maintaining a State-based standard would be administratively burdensome. The commenters suggested that the Department could establish a system for determining which State's laws would pertain to students enrolled in distance education programs.

Several commenters criticized the Federal standard as being too broad and vague to provide sufficient predictability to institutions. One of these commenters asserted that the proposed regulations could encourage borrowers to file unsubstantiated claims. Many commenters noted that borrowers have existing avenues to resolve issues with their schools, using the complaint systems provided by institutions, accrediting agencies, and States, as well as judicial remedies.

One commenter suggested that the implementation of the proposed regulations would hamper interactions between school employees and students by creating an environment where any interaction could be misconstrued and used as a basis for borrower defense. The commenter concluded that this dynamic would increase the burden on schools as they seek to implement means of communicating to and interacting with borrowers that mitigate risk.

Several commenters recommend that the Federal standard describe the specific acts and omissions that would and would not substantiate a borrower defense claim. Another commenter suggested that the final rule include examples of serious and egregious misconduct that would violate the Federal standard.

*Discussion:* Reliance upon State law not only presents a significant burden for Department officials who must apply and interpret various State laws, but also for borrowers who must make the threshold determination as to whether they may have a claim. Contrary to the commenter's assertion, this challenge cannot be resolved through the Department's determination as to which State's laws would provide protection from school misconduct for borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States

have extended their rules to protect these students, while others have not.

We agree with commenters that the Federal standard does not provide significant predictability to institutions regarding the number or type of borrower defense claims that may be filed or the number of those claims that will be granted. However, the purpose of the Federal standard is not to provide predictability, but rather, to streamline the administration of the borrower defense regulations and to increase protections for students as well as taxpayers and the Federal government. That being said, the bases for borrower defense claims under the new Federal standard—substantial misrepresentation, breach of contracts, and nondefault, contested judgments by a court or administrative tribunal of competent jurisdiction for relief—do provide specific and sufficient information to guide institutions regarding acts or omissions pertaining to the provision of Direct Loan or educational services that could result in a borrower defense claim against the institution.

We do not agree that implementation of the Federal standard will hamper interactions between school personnel and students. Institutions that are providing clear, complete, and accurate information to prospective and enrolled students are exceedingly unlikely to generate successful borrower defense claims. While individuals may continue to misunderstand or misconstrue the information they are provided, a successful borrower defense claim requires the borrower to demonstrate by a preponderance of the evidence that a substantial misrepresentation or breach of contract has occurred.

We decline to describe the specific acts and omissions that would and would not substantiate a borrower defense claim, as each claim will be evaluated according to the specific circumstances of the case, making any such description illustrative, at best. We believe the elements of the Federal standard and the bases for borrower defense claims provide sufficient clarity as to what may or may not constitute an actionable act or omission on the part of an institution.

*Changes:* None.

*Authority*

*Comments:* A group of commenters expressed concern that the proposed Federal standard exceeds the Department's statutory authority. This same group of commenters opined that the proposed Federal standard violates the U.S. Constitution.

Two commenters suggested that the proposed regulations have exceeded the Department's authority to promulgate regulations for borrowers' defenses to repayment on their Federal student loans when advanced collection activity has been initiated. One of these commenters suggested that loan discharges based on institutional misconduct should be pursued only when the Department has court judgments against a school, final Department program review and audit determinations, or final actions taken by other State or Federal regulatory agencies, after the school has been afforded its due process opportunities.

*Discussion:* The Department's authority for this regulatory action is derived primarily from Sections 454, 455, 487, and 498 of the Higher Education Act, as discussed in more detail in the NPRM. Section 454 of the HEA authorizes the Department to establish the terms of the Direct Loan Program Participation Agreement, and section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Sections 487 and 498 authorize the adoption of regulations to assess whether an institution has the administrative capability and financial resources needed to participate in the title IV, HEA programs.[28]

Support for regulating in particular areas is also found in Section 432(a) of the HEA, which authorizes the Secretary to issue regulations for the FFEL program, enforce or compromise a claim under the FFEL Program; section 451(b) provides that Direct Loans are made under the same terms and conditions as FFEL Loans; and section 468(2) authorizes the Secretary to enforce or compromise a claim on a Perkins Loan.

Section 452(j) of the GEPA authorizes certain compromises under Department programs, and the Administrative Dispute Resolution Act, 31 U.S.C. 3711, authorizes a Federal agency to compromise or terminate collection of a debt, subject to certain conditions.

The increased debt resolution authority is provided in Public Law 101–552 and authorizes the Department to resolve debts up to $100,000 without approval from the Department of Justice (DOJ).

The HEA vests the Department with the sole authority to determine and

---

[28] This discussion addresses the Department's authority to issue regulations in the areas described below. As discussed earlier, the Department's authority to recoup losses rests on common law as well as HEA provisions included among those cited here.

apply the appropriate sanction for HEA violations. The Department's authority for the regulations is also informed by the legislative history of the provisions of the HEA, as discussed in the NPRM.

*Changes:* None.

*Making of a Loan and Provision of Educational Services*

*Comments:* Several commenters expressed support for the Department's efforts to limit the scope of borrower defense claims by focusing the proposed regulations on acts or omissions that pertain to the provision of educational services. However, these commenters also suggested that the phrase, "provision of educational services" was open to interpretation and, as such, may not effectively constrain potential claims. One commenter suggested revising the phrase to read, "provision of educational services related to the program of study."

A number of commenters requested that the clarification included in the preamble to the NPRM, explaining that claims pertaining to personal injury, allegations of harassment, educational malpractice, and academic or disciplinary actions are not related to the making of a borrower's Direct loan or the provision of educational services be included in the regulatory text, as they viewed these specific examples as particularly helpful clarifications.

Two commenters listed a number of specific circumstances that may or may not fall within the scope of providing educational services, and requested that the Department provide an analysis of these acts and omissions.

Another commenter remarked that the Department's efforts to limit the scope of borrower defense claims by focusing the proposed regulations on acts or omissions that pertain to the provision of educational services fell short of its objective. Similar to other commenters, this commenter requested that the Department provide explicit descriptions of the claims that would and would not meet the proposed standard.

Another commenter who shared this view suggested the Department include in the final regulations a discussion of the factors that would be considered in determining whether a borrower defense claim pertained to the provision of educational services.

*Discussion:* We appreciate the support for our efforts to appropriately limit the scope of borrower defense claims to those that are related specifically to the provision of educational services or the making of a Direct Loan. We understand the commenters' interest in further clarification. However, we do not believe it is appropriate to provide detailed institutional-borrower scenarios, or a hypothetical discussion of the analytic process the Department would undertake to ascertain whether a specific borrower's claim related to the provision of educational services or the making of a Direct Loan at this time. As is often the case in matters that address an individual's experience as part of the Federal Student Aid process, the Department's determination of whether a claim pertains to the provision of educational services or the making of a Direct Loan will depend greatly upon the specific elements of that claim.

For example, while it may appear to be a relatively straightforward clarifying change to amend the regulatory language to read, "provision of educational services related to the program of study," such a change could be interpreted to mean that claims related to more general concerns associated with the institution's provision of educational services would not be considered. That is not our intent, and we believe the regulatory language as proposed best captures the intended scope of borrower defense claims.

Similarly, we do not believe that including in the regulatory language specific examples of acts or omissions that would not be considered in a borrower defense is appropriate at this time. These circumstances may evolve over time, necessitating a re-evaluation of their relevance. The Department can provide additional clarification, as needed, through other documents, such as a Dear Colleague Letter, Electronic Announcement, or the FSA Handbook.

*Changes:* None.

*Comments:* One commenter recommended that the phrase "making of a Direct Loan" be revised to include the phrase "for enrollment at the school," to ensure consistency with the proposed regulatory language in § 685.222(a)(5). The commenter suggested that this modification would be required to ensure that all Direct Loans a borrower has obtained attend a school are covered by the regulation.

*Discussion:* We agree with the commenter that such a change would ensure consistency throughout the regulation.

*Changes:* We have revised § 685.206(c) to include the qualifying phrase, "for enrollment at the school" when referring to the "making of the loan."

*Comments:* Several commenters expressed concern that the proposed borrower defense regulations would limit borrower defense claims to acts or omissions that occurred during the same academic year in which the borrower obtained a Direct Loan for which he or she is now seeking a loan discharge. One commenter suggested this concern could be ameliorated by amending the regulatory language in § 685.222(a)(5) to include acts and omissions that occur prior to enrollment (*e.g.*, marketing, recruitment) and after the borrower has left the school (*e.g.*, career placement).

Another commenter expressed concern that the limitation of scope would create discrepancy between loan proceeds that were used to pay for tuition and loan proceeds used to pay for other elements of the institution's cost of attendance.

*Discussion:* The preamble to the NPRM explicitly acknowledged that the proposed standard described in § 685.206(c) and § 685.222(b), (c), and (d), would include periods of time prior to the borrower's enrollment, such as when the borrower was being recruited by the school, and periods of time after the borrower's enrollment, such as when the borrower was seeking career advising or placement services. 81 FR 39337.

The regulatory language in § 685.222(a)(5) refers to the making of a Direct Loan that was obtained in conjunction with enrollment at the school. This would include all eligible elements of the school's cost of attendance for which a Direct Loan can be obtained. The language in § 685.222 does not restrict potential borrower relief to the portion of a Direct Loan used to pay for tuition.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(a)(6), the Department has determined that including an affirmative duty upon the Department to notify the borrower of the order in which his or her objections, if he or she asserts other objections in addition to borrower defense, to his or her loan will be determined is too burdensome because it would require the expenditure of administrative resources and time, even if not desired by the borrower. The borrower may contact the Department to find out the status of his or her objections, including borrower defense, if desired.

*Changes:* We have revised § 685.222(a)(6) to remove the requirement that the Department notify the borrower of the order in which his or her objections to a loan will be determined.

*Limitation Periods (Statute of Limitations)*

*Comments:* Several commenters requested that the Department allow

students to recoup loan funds already paid beyond the proposed six-year statute of limitations. These commenters argued that students often do not know that they are entitled to relief for many years. Some commenters stated that the beginning of the time limit would be difficult for borrowers to determine, since it could vary depending on the specifics of the alleged misconduct. Another commenter stated that some institutions have been defrauding borrowers for decades. One commenter stated that since there is no time limit for false certification discharges, there should not be a time limit for borrower defenses. A group of commenters argued that since there is no limit on the Department's ability to collect student debt, there should not be a limit on the ability of borrowers to recover. Other commenters pointed to the relatively smaller number of borrower applications, as opposed to numbers of borrower estimated to be eligible for relief, from Corinthian as evidence that many borrowers do not know they have claims.

*Discussion:* As noted in the NPRM, the six-year statute [29] of limitations is only applicable to students' claims for amounts already paid on student loans. A borrower may assert a defense to repayment at any time. This rule comports with the FTC Holder Rule [30] and general State law principles, as well as general principles relating to the defense of recoupment. *See, e.g., Bull* v. *United States,* 295 U.S. 247, 262 (1935) ("Recoupment is in the nature of a defense arising out of some feature of a transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.") We understand that students may not always be in a position to bring borrower defense claims immediately, but believe the final regulations strike a balance between allowing borrowers sufficient time to bring their claims and ensuring that the claims are brought while there is still evidence available to assess the claims.

*Changes:* None.

*General Process*

*Comments:* Many commenters and groups of commenters expressed

concerns about potential due process issues with the process proposed in § 685.222(e) for individual borrowers to pursue borrower defense claims. These commenters asserted that the Department should allow institutions to actively participate in all aspects of the process, starting with a right to be notified of the claim and an opportunity to review the claimant's assertions and supporting documentation. These commenters further proposed that the Department's hearing official should advise the institution about the specific arguments and documents used in the fact-finding process. Some commenters offered proposed timeframes for each step in the review process, while emphasizing that most determinations should be made based solely on document review.

Some of these commenters acknowledged the value of not establishing a purely adversarial process, but emphasized the need to balance the interests of providing relief to students who were treated unfairly with the rights of schools to defend themselves, especially in light of the possible financial and legal exposure to institutions and potentially taxpayers.

Several commenters also contended that the exclusion of school participation in the individual process is especially problematic because of the fact-specific nature of such claims. These commenters expressed their belief that most individual cases cannot be thoroughly investigated without school input. Some commenters suggested that the proposed regulations flip the presumption of innocence that applies in many processes on its head and unfairly burdens institutions without an adequate process to vindicate their claims.

While many commenters emphasized that the proposed process tilts too favorably toward claimants, a few commenters asserted that it may not always fully protect the rights of adversely affected borrowers. Additionally, they noted that the Department's proposal removed not only the option of arbitration, but also the borrower's choice in the makeup of and the representation for the group. These commenters asserted that the rights of an individual claimant could be adversely affected because of some defect in a group claim that the Department interprets will cover the affected individual. They further stated that borrowers have no recourse to challenge the Department official's determination, who they allege will be acting under a set of obtuse and poorly defined rules, resulting in determinations benefitting borrowers

who were not wronged and possibly denying relief to deserving claimants.

*Discussion:* Schools will not be held liable for borrower defense claims until after an administrative proceeding that provides them due process. The Department already runs such proceedings in its Office of Hearings and Appeals on matters such as assessing a school's liability to the Department or limiting, suspending, or terminating a school's title IV participation.

We disagree that moving a claimant from the individual process into the group process negatively impacts the borrower. In fact, we believe the borrower may receive a faster decision using the group process. Additionally, the borrower maintains the ability to request reconsideration if there is new evidence that was not previously considered. Finally, the borrower retains the right to "opt-out" of the group process.

The Department will outline specific procedures, including other details requested by the commenters, in a separate procedural rule. We believe this is the most appropriate place for such detail.

*Changes:* None.

*Comments:* Many commenters expressed concerns relating to proposed § 685.222(e)(3), which provides for a Department official to administer the individual borrower process. Many of these commenters were concerned that these officials would have too much authority in deciding what evidence to review and use in decision making. Some of these commenters also argued that giving the Department's official the sole discretion over disposition of the claims actually denies borrowers certain rights.

Several commenters claimed that the Department official would be subject to political influence and not necessarily the unbiased, independent, and impartial party needed in this role.

*Discussion:* Department officials make independent decisions daily regarding the merit of objections to loan enforcement raised by borrowers who default on their loans, and borrower defense would be no different. Department officials also make decisions regarding institutional liabilities to the Department and enforcement actions against institutions. These officials do so in accordance with established standards in the APA for such decisions made by administrative agencies, such as ensuring that decision makers do not report to individuals responsible for managing or protecting the funds of an agency.

---

[29] In the NPRM, we explain our reasoning for establishing a six-year statute of limitations for the breach of contract and substantial misrepresentation standards under § 685.222(c) and (d). Further, we note that six-year period echoes the period applicable to non-tort claims against the United States under 28 U.S.C. 2401(a). *See also* 31 U.S.C. 3702.

[30] The FTC Holder Rule is explained in more detail elsewhere in the "State Standard" and "Expansion of Borrower Rights" sections.

As discussed during negotiated rulemaking, the Department also plans to outline more specific details about the process for schools and borrowers in forthcoming procedural rules.

*Changes:* None.

*Comments:* Commenters argued that the Department's proposed structure in § 685.222(e) places too much authority with the Department and its officials, creating a conflict of interest. These commenters had misgivings about designating an official who would have the ability to perform multiple functions, including adjudicating cases, creating groups from individual claims, as well as advocating on behalf of the group. Several commenters called for separation between the investigative and adjudicative functions.

Many of these commenters expressed concern that the entire process created conditions that would inevitably lead to unfair treatment of schools. This argument is based on the hypothesis that the inherent conflicts in the proposed investigative and adjudication processes will result in a high number of vindicated claims and the cost associated with high levels of loan forgiveness will force the Department to seek indemnification from schools regardless of the legitimacy of the claims.

Numerous commenters also expressed concerns that some of the Department officials hearing cases may not have the requisite experience to properly and dispassionately evaluate and decide these cases. Several commenters specifically offered alternatives to the Department's officials, including using independent hearing officials, administrative law judges, or a third party such as a member of the American Arbitration Association to decide cases. Some commenters specifically suggested this separation to ensure the decision maker would be more isolated form political pressures.

One commenter also noted that the proposed rule does not provide for review of determinations by the Secretary, which specifically limits the Secretary's authority.

*Discussion:* As we make clear elsewhere here, the Department will undertake any action to recover against a school under specific procedures that are being developed and will ensure an opportunity for the school to present its defenses and be heard. The process will be comparable to that provided under part 668, subpart G for actions to fine, or to limit, suspend or terminate participation of, a school, and under part 668, subpart H for audit and program review appeals. The hearing will be conducted by a Department

official who is independent of the component of the Department bringing the action. This is currently done for appeals under subparts G and H, and like those procedures, the new procedures would include an opportunity for an appeal to the Secretary. Any final decision reached in these proceedings would be reviewable under section 706 of the APA, 5 U.S.C. 706, as are final decisions under subparts G and H. The separation of functions under those subparts fully complies with the requirements that would apply under the APA, to which some commenters have alluded, and would be mirrored in the procedure used for recoveries against schools. However, neither the APA nor other applicable law requires the Department to provide an appeal from an administrative decision maker to the Secretary or other senior authority, and the decision of the official designated the authority to adjudicate individual claims is final agency action, similarly reviewable in an action brought under section 706 of the APA. The Department has conducted a great number of such individual adjudications of borrower objections to Federal payment offset and wage garnishment over the past decades, and neither those procedures, nor those used for Federal salary offset, include any provision for an appeal from the decision of the designated official to the Secretary. 34 CFR 30.33, 34 CFR part 31, 34 CFR part 34.

*Changes:* None.

*Comments:* One commenter expressed support for restricting borrowers from receiving relief where relief was already granted for the same complaint through a separate source. Conversely, another commenter requested additional legal recourse to collect damages beyond the borrower defense to repayment process.

*Discussion:* The individual application process in § 685.222(e)(1)(i)(C) requires the borrower to return to the Department of any other claim based on the same information and any payments or credits received resulting from such a claim. The NPRM included performance bond holders and tuition recovery programs as examples of sources of these payments or credits. The statutory authority in section 455(h) of the HEA provides for defense to repayment of a Direct Loan. The Department's ability to provide relief for borrowers is predicated upon the existence of the borrower's Direct Loan, and that relief is limited to the extent of the Department's authority to take action on such a loan. By providing relief appropriate to the borrower's loss, and based on the amount borrowed, the Department

would provide relief under the relevant statutory authority. A borrower may pursue the payment of other damages for costs not covered by the Direct Loan in court or via other available avenues without restriction.

*Changes:* None.

*Comments:* Several commenters expressed concern for frivolous, false, exaggerated, or politically driven claims and the accompanying administrative burden and cost this process will place on institutions and the Department. Commenters suggested a firm statute of limitations for filing claims, increasing the burden of proof for the student, limiting opportunities to reopen cases, and a prominently stated penalty for filing false claims on the application form to prevent false or exaggerated claims.

*Discussion:* We believe the commenters' suggestions, though well intentioned, would do little to reduce any potential frivolous claims. As outlined earlier, we believe we have established a strong position for the limitations periods and the burden of proof in these regulations.

Additionally, an individual borrower may only request reconsideration of an application when he or she introduces new information not previously considered. The borrower defense application form includes a certification statement that the borrower must sign indicating that the information contained on the application is true and that making false or misleading statements subjects the borrower to penalties of perjury. We believe these protections against false or frivolous claims are sufficient.

*Changes:* None.

*Comments:* Several commenters and groups of commenters contended that the Department should provide equal relief to Direct Loan and FFEL borrowers. These commenters objected to the Department's proposed process in § 685.206, which would require FFEL borrowers who want to apply for a borrower defense to consolidate their FFEL Loans into the Direct Consolidation Loans. These commenters noted that over 40 percent of borrowers with outstanding Federal loans have FFEL Loans and conveyed that borrowers were typically not able to choose among Federal loan programs. One commenter noted the inequities pertain not only to borrowers, but also to schools. Institutions with significant FFEL volume face reduced risk of Department efforts to recover funds. One commenter specifically indicated that requiring FFEL borrowers to consolidate obliterates the use of the group process because FFEL borrowers

cannot be automatically included in the group without further action on their part.

These commenters also noted inequities in relief for FFEL borrowers, which includes no mechanism to seek refund of amounts already paid by the borrower. Thus, the commenters asked the Department to stop all collection activities upon receipt of a FFEL borrower's application to at least reduce the amount the borrower pays on the loan. Additionally, these commenters requested that the Department apply forbearance to FFEL borrowers in the same manner as with Direct Loan borrowers.

While expressing a strong preference for identical treatment of Direct Loan and FFEL borrowers, one commenter also recognized that this might not be possible, and suggested that the Department could lessen the imbalance by specifying that a referral relationship existed between lenders and institutions when a large number of borrowers at a school had the same lender. Another commenter suggested that the Department make findings of groups of borrowers entitled to discharge of their loans and require FFEL lenders to comply with them.

One commenter articulated that the Department could take additional steps to assist FFEL borrowers in multiple ways. First, the commenter suggested that the Department could compel a lender or guaranty agency to discharge a loan. This commenter further suggested that borrowers who dispute a FFEL Loan who are denied can appeal a lender or guaranty agency's decision to the Secretary, giving the Department final authority in each case. Finally, the commenter indicated that the Department could move groups of loans under the Department's responsibility as it would in cases where a guaranty agency closes. The commenter claimed that the Department previously took such action for false certification and closed school discharges.

*Discussion:* We seek to provide an effective process for all borrowers within the Department's ability under applicable laws and regulations.

Current regulations do not require a FFEL lender to grant forbearance under these circumstances except with regard to a FFEL borrower who seeks to pay off that FFEL Loan with a Consolidation Loan, and that requirement provides a time-limited option. 34 CFR 682.211(f)(11). Because the Secretary has designated that section of the final regulations for early implementation, lenders may implement this provision before it becomes a requirement on July 1, 2017. Thus, when these borrower

defense regulations take effect on July 1, 2017, FFEL Program lenders must grant administrative forbearance when the Department makes a request on behalf of a borrower defense claimant, pursuant to § 682.211(i)(7).

We also do not believe we have adequate data to identify those lenders and schools that established a referral relationship.

We believe we have outlined the best possible path to relief for the remaining FFEL borrowers within our legal abilities. We appreciate the commenters' suggestions for other ways to assist FFEL borrowers in pursuing borrower defenses, but do not believe those suggestions are practicable. We recognize that this process requires additional steps for FFEL borrowers. To mitigate this, as described in the preamble to the NPRM, we will provide FFEL borrowers with a preliminary determination as to whether they would be eligible for relief on their borrower defense claims under the Direct Loan regulations, were they to consolidate their FFEL Loans into a Direct Consolidation Loan. FFEL borrowers may receive such a determination without having to establish a referral relationship between the lender of the underlying FFEL Program Loan and the school. The notice of preliminary determination will provide information on the Loan Consolidation process and instructions on how to begin the process. As described in § 685.212(k), after the borrower consolidates into the Direct Loan program, he or she may receive an appropriate amount of relief on the principal balance.

*Changes:* None.

**Process for Individual Borrowers (§ 685.222(e))**

*Comments:* Multiple commenters and groups of commenters suggested that the Department unfairly limited the rights of institutions and exceeded its authority to recoup funds resulting from borrower defense claims. They noted that they believe that the HEA grants no such authority. Moreover, these commenters pointed out the difference between such silence and the specific authority in the HEA regarding closed school discharges, false certification discharges, and regarding Perkins Loans.

The same commenters who asserted that the Department exceeded its authority with recoupment of successful borrower defense claims stated that the Department should outline the details of its process if it proves it has such authority. Several commenters requested more information about the recovery process from schools, focusing

on the institution's involvement in the process. Furthermore, some commenters requested a specific appeal process for attempts to recover funds from schools.

*Discussion:* As discussed more fully elsewhere in this preamble, the Department has ample legal authority to recover losses on borrower defenses from schools, and the absence of explicit statutory provision authorizing such recovery does not affect its authority. We are developing specific procedures for conducting such recovery actions that will reflect current regulations for appeals of audit and program review claims and actions to fine the school, or to limit, suspend, or terminate its participation.

*Changes:* None.

*Comments:* Multiple groups of commenters supported the preponderance of evidence standard in the Department's individual process proposed in § 685.222(e) and appreciated that borrowers would not need legal counsel to pursue a borrower defense. Multiple commenters also commented on the desire that the process not penalize borrowers for the absence of written documentation. They noted that many borrowers may not have items such as enrollment agreements or other items that might assist the Department in reviewing their claims. The commenters added that this should not be held against the borrowers, as schools frequently do not provide borrowers with copies of such documents, and borrowers may encounter difficulties in obtaining them.

One commenter suggested that, when documents are not available because of the school's failure to provide the borrower with proper documentation, the burden should shift to the school to disprove the claims from the borrower's attestation.

Another commenter suggested that the Department specify that it will accept a student's sworn testimony, absent independent corroborating evidence contradicting it, as fulfilling the preponderance of the evidence standard (which requires the borrower to persuade the decision maker that it is more likely than not that events happened or did not happen as claimed). In other words, the commenter suggested that, when a borrower submits sworn testimony but does not submit corroborating evidence, the Department should not take this to mean that there was no substantial misrepresentation or breach of contract. Another group of commenters suggested that the Department track similar claims and consider those claims as evidence when reviewing applications.

Another group of commenters recommended that the Department accept information on the application form as sufficient for the claim, requesting additional information only when necessary. This group of commenters pointed out that misrepresentations were often from oral statements made to the borrower that did not include any written evidence. Furthermore, this group of commenters requested that the Department fully use all available information it and other Federal agencies possess, rather than requesting it from borrowers.

*Discussion:* We disagree that the final regulations should specify what weight might be given to different types of evidence, such as borrower testimony or statements, under the preponderance of the evidence standard specified in § 685.222(a)(2) for borrower defenses under the Federal standard for loans first disbursed after July 1, 2017. Under § 685.222(a)(2), the borrower has the burden of demonstrating, by a preponderance of the evidence, that it is more likely than not that the facts on which his or her borrower defense claim rests have been met. However, § 685.222(e)(3) provides that for individually filed borrower defense applications, the designated Department official will also consider other information as part of his or her review of the borrower's claim. As noted in the NPRM, 81 FR 39337, in practice, the decision maker in a borrower defense proceeding would assess the value, or weight, of all of the evidence relating to the borrower's claim that has been produced to prove that the borrower defense claim as alleged is true. The kind of evidence that may satisfy this burden will necessarily depend on the facts and circumstances of each case, including factors such as whether the claimant's assertions are corroborated by other evidence. Accordingly, we decline to elaborate further on what specific types of evidence may or may not be viewed as satisfying the preponderance of evidence standard.

*Changes:* None.

*Comments:* Several groups of commenters encouraged the Department to adopt a simple, accessible, and transparent process for borrowers. These commenters indicated support for a process that reduces inequities in resources so that borrowers interact only with the Department, even when additional information is needed from the school. In particular, numerous commenters expressed appreciation that, under the proposed regulations, borrowers would not be pitted against institutions, which generally possess significantly more resources.

While generally supportive of the Department's process, another group of commenters expressed concern for the potentially overwhelming number of applications that would be filed in connection with potential borrower defense claims and questioned the Department's capacity to employ enough capable staff to handle the large workload. The same group noted the benefits of specifying timeframes for actions within the process, despite recognizing the difficulty in doing so.

*Discussion:* With these regulations, the Department works toward evening the playing field for students. Individual claims will be decided in a non-adversarial process managed by a Department official, and group claims would be brought by the Department against the school, not by students. Thus, the process does not require students to directly oppose schools. We appreciate the support that some commenters expressed for these processes.

As we discussed in the NPRM, the Department may incur administrative costs and may need to reallocate resources depending on the volume of applications and whether a hearing is required.

After having received only a few borrower defense claims in over 20 years, the Department has now received more than 80,000 claims in just over two years. We responded by building an entirely new process and hiring a new team to resolve these claims. Our ability to resolve claims quickly and efficiently has grown and will continue to grow. Particularly because we are still growing our capacity, we are unable to establish specific timeframes at this point for processing claims. Additionally, processing time is considerably affected by the varied types and complexities of claims.

*Changes:* None.

*Comments:* One group of commenters strongly supported the Department's pledge to provide written determinations to borrowers who submit borrower defense claims.

*Discussion:* We appreciate the support of these commenters.

*Changes:* None.

*Comments:* Another group of commenters noted the difficulty that many borrowers face in completing even seemingly simple forms and in explaining wrongdoing in a way that clearly makes a complex legal argument.

*Discussion:* We appreciate the commenters' concern and do not expect borrowers to submit a complicated, lengthy narrative requiring any legal analysis by the borrower to apply for relief. We specifically set out to design a process that would not be onerous for borrowers and that would not require third-party assistance, such as but not limited to an attorney.

*Changes:* None.

*Comments:* Two commenters suggested using existing school complaint processes to resolve borrower defense claims prior to a Department review to reduce administrative burden on the Department and on institutions.

*Discussion:* Nothing in these regulations prohibits a borrower from directly contacting an institution to resolve a complaint. Additionally, a borrower may pursue other paths to relief, such as filing a claim with a State consumer bureau or filing a lawsuit. However, at the point where a borrower approaches the Department for assistance, we take seriously the obligation to review the claim and to respond to the borrower. We believe this process provides the best avenue for relief when a borrower applies for a borrower defense claim. In addition to using data collected from the Department's "FSA Feedback System," the Department will also continue to partner with other Federal agencies that are engaged in the important work aimed of protecting the rights of students. Depending on the specifics of the case, these agencies may include the CFPB, DOJ, FTC, the SEC, and the Department of Defense among others. The Department will also look to State officials and agencies responsible for education quality, student financial assistance, law enforcement, civil rights, and consumer protection.

*Changes:* None.

*Comments:* Multiple commenters expressed support for the proposed prohibition on capitalization of interest when the Department suspends collection activity following receipt of a borrower defense application. However, one of these commenters objected to the Department prohibiting interest capitalization when collection resumes as a result of the borrower's failure to submit appropriate documentation. The commenter believed this could lead to false claims by borrowers seeking to avoid repayment.

*Discussion:* We appreciate the commenters' support for the prohibition of interest capitalization and believe it is in line with our concept of the appropriate use of capitalization, as the borrower is not newly entering repayment. Accordingly, we disagree with the commenter who objected to prohibiting capitalization upon resumption of collection activity where a borrower did not submit appropriate documentation. We believe more legitimate avenues exist for struggling

borrowers to postpone or reduce payment rather than filing false borrower defense claims, and do not believe that the prohibition of interest capitalization in this narrow circumstance provides significant incentive for borrowers to incur the significant risks associated with filing false claims.

*Changes:* None.

*Comments:* One group of commenters noted the importance of reconsideration of borrower defense claims, especially for borrowers completing applications without assistance. This group, however, encouraged the Department to clearly explain the borrower's right to reconsideration, rather than merely allowing borrowers to request reconsideration with the Department having discretion on whether to consider the application.

Multiple commenters and groups of commenters expressed concern with the borrower's ability to introduce new evidence for reconsideration in proposed § 685.222(e)(5). Specifically, these commenters noted concerns that individual claims could continue indefinitely. These commenters indicated that the Department should include reasonable time limitations for reconsideration of claims.

Another commenter suggested that the Department official who made the determination of the original claim should not be permitted to review a request for reconsideration and suggested using a panel or board for such claims.

*Discussion:* We highlight the distinction between reconsideration of an application and an appeal process. A borrower must submit new evidence in order for the Department to reconsider an application, and there is no appeal process. We believe it is important to allow a borrower to submit new evidence, which he or she may have only recently acquired. We do not intend to limit borrowers' rights. However, there needs to be finality in the borrower defense process as well, and we do not believe it is appropriate to consider applications regarding claims that have already been decided unless there is clear demonstration that new evidence warrants that reconsideration. We will consider the commenters' suggestions regarding the explanation of the reconsideration process in our communications with borrowers.

We believe the limitations periods for borrower defense claims adequately address the concern about time limits and do not agree with imposing an artificial limitation on borrower applications for reconsideration for new

evidence based on a specific number or time period.

We see no basis for requiring this evaluation of new evidence to be made by an individual other than the original decision maker. This is a reconsideration, not an appeal, and the original decision maker is in a position to efficiently make that decision.[31] Therefore, we do not prohibit the same official from hearing the reconsideration claim.

*Changes:* None.

*Comments:* One commenter asked that we restrict a borrower's ability to present new evidence in support of a claim already rejected. The commenter said that borrowers should be required to show good cause for why the evidence was not previously available.

*Discussion:* We disagree that borrowers should be required to show good cause for why evidence was not previously available. We recognize that borrowers may not have the same access to information that the Department or the school may have. Furthermore, we believe that the requirements for "new evidence" provide clear guidelines for what is required. Section 685.222(e)(5)(i) specifies that "new evidence" must be evidence that the borrower did not previously provide, but also must be relevant to the borrower's claim, and was not identified by the decision-maker as being relied upon for the final decision. For "new evidence" to meet this standard, the evidence cannot just be cumulative of other evidence in the record at the time, but must also be relevant and probative evidence that might change the outcome of the decision being reconsidered.

*Changes:* None.

*Comments:* Multiple commenters suggested that the Department specifically permit schools to appeal decisions on any individual claim. One commenter added that schools would not file frivolous appeals, as the resulting workload is too time-consuming. The commenter further suggested that if schools are not provided with an appeal process, that the Department should provide schools with an opportunity to challenge the Department official's decision during any related recoupment action.

*Discussion:* We do not include an appeals procedure in the individual

borrower claim process. We believe the reconsideration process adequately allows borrowers to submit new evidence. However, as one commenter requested, the regulations do afford an opportunity to present a defense when the Department seeks to hold a school liable and recover funds in both the individual and group claim processes.

*Changes:* None.

*Comments:* Although the Department outlined a separate process to recover funds from an institution, a group of commenters stated that the Department needed to include the borrower to ensure a fair process for the institution.

*Discussion:* We believe that using a separate proceeding to determine whether a group of borrowers have meritorious claims, and if so, to recover from the school for losses on those claims, is an appropriate method to achieve a fair result. The procedure will accord the institution the right to confront witnesses on whom the Department would rely, and to call witnesses on its own, as it currently has under procedures under subpart G of part 668. We also note that under § 685.222(j), borrowers are required to reasonably cooperate with the Secretary in any such separate proceeding.

*Changes:* None.

*Comments:* One commenter suggested that borrowers should not be permitted to bring individual claims when the facts and circumstances have already been considered by hearing official in a group claim. The commenter expressed concern that proposed § 685.222(h) would allow for this to happen, effectively providing borrowers a second bite at the apple and violating the legal principle of res judicata.

*Discussion:* We discuss the treatment of individual claims from a student who opted out of a group proceeding, or who disputes the outcome of the group proceeding decision as it pertains to his or her claim, in our discussion of the group process.

*Changes:* None.

*Comments:* A group of commenters suggested that the Department modify language in proposed § 685.222(e)(1)(i)(A) so that references to the school more clearly emphasize that we mean the school named on the borrower defense to repayment application.

*Discussion:* We agree that the commenter's suggested change clarifies the intent of the regulation.

*Changes:* We revised § 685.222(e)(1)(i)(A) to reference "the" named school.

*Comments:* One commenter suggested that the Department make available on an annual basis a list of all borrower

---

[31] This is hardly unusual: Under Social Security regulations, the hearing officer who conducts the disability hearing ordinarily conducts the reconsideration determination. 20 CFR 404.917(a). In addition, requests for relief from judgments—a somewhat comparable plea to the request for reconsideration at issue here are routinely considered by the judge that issued the original decision. Fed. R. Civ. P. 60.

defense applications submitted (minus any personally identifiable information) along with outcome of the request. The goal of this list would be to provide transparent information to borrowers.

*Discussion:* We support transparency in this process and will consider this suggestion as we move forward with implementation of the individual and group processes.

*Changes:* None.

*Comments:* One commenter suggested that the Department proactively conduct a review of all federally guaranteed loans back to 1995 (when the commenter considers the regulations to have been last considered) to determine potentially eligible loans for a defense to repayment. The commenter recommended that the Department identify loans for which there is a high likelihood of granting a discharge stemming from lawsuits, investigations, etc.

*Discussion:* We do not believe that the Department possesses adequate information to accurately identify potentially eligible loans on such a large scale. As borrowers have had the ability to bring borrower defense claims under the current regulations for some time, we do not believe a review of data over more than 20 years is warranted. Additionally, the Department cannot determine through such a review whether specific students were subjected to misrepresentation, for example, whether they relied on such misrepresentations, and how they were affected if they did so. The Department must determine if relief is warranted, and merely obtaining a loan to attend an institution is not adequate to suggest relief is due.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(e)(3)(ii), we have determined that including an affirmative duty on the Department to identify to the borrower records that may be relevant to the borrower's borrower defense claim is too burdensome because it would require the expenditure of administrative resources and time, even if not desired by the borrower. As a result, we have revised the § 685.222(e)(3) to provide that the Department will identify records upon the borrower's request.

We note that we expect that consideration of individual borrower defense claims will lead to information gathering as part of enforcement investigations. When such an investigation is ongoing, we may defer release of records obtained in that investigation to individual claimants to protect the integrity of the investigation.

If requested, records will be made available to individual claimants after the investigation is complete and prior to the borrower defense decision. We may defer consideration of individual claims where we determine that releasing potentially relevant records prior to the completion of the investigation would be undesirable.

We have also determined that the parallel identification of records to schools, which under the proposed regulations was permissive, would also cause unnecessary administrative delay, given that the fact-finding process described in § 685.222(e) will not decide any amounts schools must pay the Secretary for losses due to the borrower defense at issue. The school will have the right and opportunity to obtain such evidence, and present evidence and arguments, in the separate proceeding initiated by the Secretary under § 685.222(e)(7) to collect the amount of relief resulting from the individually filed borrower defense claim.

*Changes:* We have revised § 685.222(e)(3)(ii) to provide that the designated Department official will identify to the borrower the records the Department official considers relevant to the borrower defense upon request. We have also revised § 685.222(e)(3)(ii) to remove the identification of records to schools.

*Comments:* One commenter expressed support for the Department's proposal to allow claims made by individuals as well as groups. However, the commenter suggested that a right of appeal for both institutions and borrowers be provided in the individual claims process as to open schools.

*Discussion:* During the negotiated rulemaking sessions, the Department heard from negotiators as to the importance of a timely and streamlined process for borrower defense claims. In consideration of such concerns, the Department believes that it is appropriate that decisions made by the designated Department official presiding over the fact-finding process for individually filed applications be final agency decisions to avoid delays that may be caused by an appeals process. Borrowers are able to seek judicial review of final agency decisions in Federal court if desired. *See* 5 U.S.C. 702 & 704. Additionally, the borrower will also be able to request that the Secretary reconsider his or her claim upon the identification of new evidence under § 685.222(e)(5).

Although the fact-finding process described in § 685.222(e) provides schools with an opportunity to submit information and a response, as discussed in the NPRM, 81 FR 39347,

the fact-finding process for individually filed applications do not determine the merits of any resulting claim by the Department for recovery from the school. Rather, § 685.222(e)(7) provides that the Secretary may bring a separate proceeding for recovery, in which the school will be afforded due process similar to what schools receive in the Department's other administrative adjudications for schools. Given that the institution's potential liability for the Department's recovery is to be adjudicated in this separate process, the Department does not believe that an appeal right for schools should be included in the § 685.222(e) fact-finding process. As discussed earlier in this section, the Department is developing rules of agency practice and procedure for borrower defenses that will be informed by the Department's rules and protections for its other administrative adjudications.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(e)(5), the Department has determined that if a borrower defense application is under review because a request for reconsideration by the Secretary has been granted under § 685.222(e)(5)(i) or because a borrower defense application has been reopened by the Secretary under § 685.222(e)(5)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as when the borrower filed an initial borrower defense to repayment application.

*Changes:* We have revised § 685.222(e)(5) to provide that the forbearance and defaulted loan procedures will be followed when the Secretary has granted a request for reconsideration or has reopened a borrower defense application.

**Group Process for Borrower Defenses**

*Statutory Authority*

*Comments:* Some commenters argued that the Department's proposed group borrower defense process would violate the HEA. These commenters stated that section 455(h) of the HEA specifically limits the Department's authority to specifying acts or omissions that an individual borrower, as opposed to a group, may assert as a defense to repayment. These commenters argued that the creation of a process that would award relief to a borrower who has not asserted a defense to repayment exceeds the Department's statutory authority. A few commenters also stated that the HEA does not authorize the Department

to act as a class action attorney, and stated that such authority requires specific statutory authorization. One commenter suggested that any provision providing that the Secretary may identify borrowers who have not filed a borrower defense application as part of a group process for borrower defense should be removed.

One commenter stated a recent recommendation from the Administrative Conference of the United States found that, while the APA does not specifically provide for aggregate adjudication, it does not foreclose the possibility of such procedures. The recommendation also stated that agencies generally have broad discretion in formal and informal adjudications to aggregate claims.

*Discussion:* We disagree with commenters' assertion that the proposed group process is in violation of the HEA. The Department's statutory authority to enact borrower defense regulations is derived from section 455(h) of the HEA, 20 U.S.C. 1087e(h), which states that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan. . . ." While the language of the statute refers to a borrower in the singular, it is common default rule of statutory interpretation that a term includes both the singular and the plural, absent a contrary indication in the statute. *See* 1 U.S.C. 1. We believe that, in giving the Secretary the discretion to "specify which acts or omissions" may be asserted as a defense to repayment of loan, Congress also gave the Department the authority to determine such subordinate questions of procedure, such as the scope of what acts or omissions alleged by borrowers meet the Department's requirements, how such claims by borrowers should be determined, and whether such claims should be heard contemporaneously as a group or successively, as well as other procedural issues. *See FCC* v. *Pottsville Broad. Co.,* 309 U.S. 134, 138 (1940).

We believe that this discretion afforded the Secretary under the statute not only allows it to determine borrower defense claims on a group basis and to establish such processes and procedures, but also authorizes the Department to proactively identify and contact borrowers who may qualify for relief under the borrower defense regulations based upon information in its possession. As described in § 685.222(f), the Department would notify such borrowers of the opportunity to participate in the group process, and inform such borrowers that by opting out, the borrower may choose

to not assert a borrower defense. By such notice and opt-out, borrowers who had not previously filed an application for borrower relief may assert a borrower defense for resolution in the group borrower defense process.

In response to comments that the Department is not authorized to act as a class action attorney, we note that, in bringing cases before a hearing official in the processes described in § 685.222(f), (g), and (h), the Department would not be bringing claims as the representative of the borrowers. Although the Department would be presenting borrower defense claims for borrowers, with their consent as described above, the Department official would be bringing claims on its own behalf as the administrator of the Direct Loan Program, or alternatively as a beneficiary of the fiduciary relationship between the school and the Department as explained earlier in "Borrower Defenses—General." *See also Chauffeur's Training School* v. *Spellings,* 478 F.3d 117 (2d Cir. 2007). We believe that the group process we adopt here will facilitate the efficient and timely adjudication of not only borrower defense claims for large numbers of borrowers with common facts and claims, but will also conserve the Department's administrative resources by also adjudicating any contingent claim the Department may have for recovery from an institution.

*Changes:* None.

*Independence of Hearing Officials*

*Comments:* Many commenters expressed concerns that the group borrower defense process would present conflict of interest or separation of powers issues and would be unfair, given that the proposed process involves a Department-designated employee presenting evidence to a hearing official who also has been appointed by the Secretary, with appeals to be decided by the Secretary. Several commenters stated that this issue was of particular concern, given the limited or unclear role afforded to institutions to participate in the borrower defense process and to appeal decisions proposed by the Department. One commenter acknowledged that while other Federal agencies, such as the FTC, allow agencies to act as both prosecutor and judge, such proceedings are governed by the APA, 5 U.S.C. 554. The commenter stated that the APA provides statutory safeguards that ensure fair proceedings, such as prohibitions on ex parte communications and prosecutorial supervision of the employee presiding over the proceeding. This commenter

suggested that group borrower defense claims be presided over by the Department's Office of Hearings and Appeals.

One commenter stated that determinations in the group process should be made by a representative who is not affiliated with the Department. Another commenter stated that the office responsible for presenting the claim on behalf of a group in a group borrower defense proceeding should not be the same office that decides the group claim. Several commenters suggested specifically that determinations be made by administrative law judges or their equivalent, who have a level of expertise and independence from the Department. One commenter stated that the regulations should provide for determinations in group borrower defense processes to be made by an administrative judge.

One commenter stated that the Department should seek and use independent hearing officials with experience in handling complex disputes, given the large numbers of students that may be impacted by such proceedings.

One commenter stated that the Department's proposed group borrower defense process violates both the separation of powers doctrine in Article III and the jury trial requirement of the Seventh Amendment of the Constitution, by vesting in the Department exclusive judicial power to determine private causes of action without a jury.

*Discussion:* The Department understands the concerns raised by commenters regarding the objectivity and independence of the hearing official in group borrower defense cases. However, administrative agencies commonly combine both investigatory and adjudicative functions, *see Winthrow* v. *Larkin,* 421 U.S. 35 (1975), and due process does not require a strict adherence to the separation of those functions, *see Hortonville Joint School District No. 1* v. *Hortonville Educ. Ass'n.,* 426 U.S. 482, 493 (1976). The Department is no different and performs both investigative and adjudicative functions in other contexts, including

those that involve borrower debts [32] and institutional liabilities.[33]

We disagree that the regulations should specify that the hearing official presiding over the fact-finding processes in § 685.222(f) to (h) must be an administrative law judge or an administrative judge. As explained in the NPRM, 81 FR 39340, the Department uses the term "hearing official" in its other regulations, such as those at 34 CFR part 668, subparts G and H. In those contexts, hearing officials make decisions and determinations independent of the Department employees initiating and presenting evidence and arguments in such proceedings. Similarly, the Department would structure the group borrower defense fact-finding processes so that they are presided over by hearing officials that are independent of the employees performing investigative and prosecutorial functions for the Department.

As stated in the NPRM, 81 FR 39349, the group borrower defense process involving an open school [34] under § 685.222(h) would be structured to provide the substantive and procedural due process protections both borrowers and the school are entitled to under applicable law, including any required under the APA, 5 U.S.C. 554. The Department is developing rules of agency procedure and practice governing the fact-finding processes described in both § 685.222(e) and § 685.222(f) to (h), which will be informed by the procedures and protections established by the Department in its other administrative proceedings, such as 34 CFR part 668, subparts G and H.

As explained under "General," we also disagree that the proposed regulations violate Article III and the Seventh Amendment of the Constitution. The rights at issue in the

proposed borrower defense proceedings have the character of public rights, which may be consigned by Congress to the Department for adjudication.

*Changes:* None.

*Single Fact-Finding Process*

*Comments:* One commenter stated that the Department's proposed single fact-finding process for group claims described in § 685.222(f) to (h), where a hearing official makes determinations as to both institutional liability and relief for borrower defense claims, is not justified. This commenter stated that the Department had not presented a factual basis for the change from the approach in § 685.206(c), which states that the Department may initiate a proceeding to require the school to pay the amount of the loan to which a successful borrower defense lies.

A group of commenters stated that the Department should not engage in a single fact-finding process for group claims. These commenters suggested that the Department should gather and consider evidence regarding borrower defenses, render a decision on borrower relief, and then initiate a separate proceeding for recovery from schools. The commenters stated that this approach would be similar to the Department's proceedings for group borrower defense claims against closed schools and for individually filed applications, as well as the Department's proposed processes for closed school and false certification discharges.

*Discussion:* We disagree with commenters that relief for borrower defense claims should be determined in a separate proceeding from the Department's right to recovery from schools for the open school group borrower defense process described in § 685.222(h). For borrower defenses asserted as to an open school, the Department is not only responsible for making determinations on relief for claims, but may also be entitled to recover against the school. This right to recover, which will also turn on the facts of the borrower defense claim, must be decided in a proceeding where the school is afforded procedural and substantive due process protections. Particularly in situations where the Department has determined that there are multiple claims against a school with common facts and claims, we believe that a single fact-finding proceeding to determine both borrowers' rights to relief, the amount of relief to be provided, and the Department's contingent right of recovery against an institution will better serve the interests of adjudicative

efficiency and of conserving agency resources than individual borrower defense determinations followed by separate proceedings against the school.

*Changes:* None.

*Group Process: Bifurcation*

*Comments:* One commenter suggested that the Department use a bifurcated process so that the group process is used to resolve common questions of fact and law, and then require borrowers in the putative group to file individual claims to determine the appropriate amount of relief. Such bifurcated proceedings, argued the commenter, would avoid windfalls to borrowers who would not have otherwise sought out relief and provide exact damages to students seeking relief.

*Discussion:* Section 685.222(f)(1) provides the Department with the discretion to form groups that may be composed only of borrowers who have filed applications through the process in § 685.222(e) or who the Department has identified from other sources, as well as groups that may include borrowers with common facts and claims who have not filed applications. In situations when groups may be composed only of borrower defense applicants, or if the hearing official determines that relief for a group with non-applicants can be ascertained without more individualized evidence, bifurcated proceedings may not be necessary or suitable. However, we believe that the regulations do not prevent a hearing official from using his or her discretion to structure a fact-finding process under § 685.222(g) or (h) as necessary based upon the circumstances of each group case, and including ordering a bifurcated process if appropriate.

*Changes:* None.

*Meet and Confer Prior to Initiation of Group Process*

*Comments:* Several commenters suggested the Department require or allow borrowers to confer with institutions to allow schools to remedy claims, prior to a borrower's participation in the Department's borrower defense process.

*Discussion:* We acknowledge that borrowers and schools may communicate and confer outside of the formal processes established for borrower defense. However, we do not believe it is necessary that the regulations include a specific requirement for schools and borrowers to meet and confer prior to a borrower's participation in a group borrower defense process under § 685.222(f) to (h).

*Changes:* None.

---

[32] For example, the Department provides both schools and borrowers the opportunity to request and obtain an oral evidentiary hearing in both offset and garnishment actions against a borrower and in an offset action against a school. *See* 34 CFR 30.25 (administrative offset generally); 34 CFR 30.33 (federal payment offset); 34 CFR 34.9 (administrative wage garnishment).

[33] *See* 34 CFR part 668, subparts G and H (proceedings for limitation, suspension, termination and fines, and appeal procedures for audit determinations and program review determinations).

[34] As described in § 668.222(g), the "closed school" group borrower defense process would apply only when the school in question has both closed and provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no entity from which the Secretary may recover such losses. Or, in other words, when there is no entity from whom the Department may obtain a recovery.

*Initiation of Group Process: Secretarial Discretion*

*Comments:* Many commenters supported the inclusion of a group borrower defense process. However, these commenters objected to the Department's proposal in § 685.222(f) that the initiation of a group borrower defense process be at the discretion of the Secretary. Some commenters argued that the discretion to initiate a group borrower defense process should not be given to the Secretary, whose decision may be influenced by policy or political considerations. These commenters also objected to the Department's proposal that the decision to initiate a group process would consider fiscal impact as a possible factor for consideration, stating that the decision to grant relief to large numbers of students should not be based upon cost.

Other commenters stated that the Department should provide clear guidelines, triggers, or conditions for requiring the initiation of a group process, particularly for groups of borrowers who have not filed applications with the Department (also referred to as automatic group discharges). A group of commenters suggested that such conditions should include petitions presenting plausible prima facie cases, evidence found by the Department that might present plausible *prima facie* cases, or some threshold number of cases. One commenter suggested that the regulation include provisions whereby multiple individual claims would be grouped together if the borrowers had attended the same school or trigger an investigation by the Department as the claims and the feasibility of initiating a group process. Another commenter suggested that the regulation include a non-exhaustive list of situations that would require the initiation of a group process, absent a written explanation from the Department as to why such a group process is not appropriate, or why borrowers who had not filed an application were not included if a group process was initiated.

One commenter stated that borrowers should be allowed to initiate group borrower defense claims, either for themselves or through representation by consumer advocates, legal aid organizations, or other entities, in addition to the Secretary. This commenter stated that possible concerns that allowing independent representation would give rise to an industry seeking to take advantage of borrowers, do not apply if claims are submitted by entities such as legal aid

organizations, consumer advocates, and law enforcement agencies.

A few commenters stated that borrowers should be allowed to access borrower defense discharges as a group on the bases of actions by local, State, and Federal entities.

One commenter stated that to protect taxpayers, group claims should be initiated only in extreme cases, and should only come after a final, non-appealable decision has been made by a Federal or State agency or court in a contested proceeding.

*Discussion:* We disagree with commenters that factors or conditions mandating the initiation of a group process should be included in the regulation. As explained in the NPRM, 81 FR 39348, we believe that the Department is best positioned to make a determination as to whether the circumstances at hand would warrant the initiation of a group process. We also believe that it is also appropriate for the Department to consider the factors listed in § 685.222(f), such as the existence of common facts and claims among a putative group of borrowers, fiscal impact, and the promotion of compliance. As explained earlier in this section and elsewhere in this preamble, the group process will not only determine relief for borrower defenses for the group, but will also serve as the method by which the Department will receive an adjudication as to its right of recovery against a school on the basis of its losses from any relief awarded to borrowers in the group. We believe that it is important that the Department retain the discretion to decide if the circumstances warrant the initiation of a group process to decide its right of recovery from a school. However, we do not believe that the initiation of the group process will prevent borrowers from being able to proactively seek relief. Borrowers may choose to file individual applications for relief under § 685.222(e) or, even if their applications are identified by a designated Department official for a group process, choose to opt-out of the group process and receive determinations through the individual application process if desired. As noted in the NPRM, 81 FR 39348, the Department welcomes information from any source, including State and other Federal enforcement agencies, as well as legal aid organizations, that may assist it in deciding whether to initiate group borrower defense process under § 685.222(f), (g), and (h).

We explain our reasoning as to the different standards that may form the basis of a borrower defense in the respective sections for those standards.

We believe it is appropriate that group proceedings should be initiated for claims based upon any of the allowed standards, as opposed to just one of the standards or standards outside of those described in the regulations.

*Changes:* None.

*Third-Party Petitions for Initiation of Group Process*

*Comments:* Many commenters stated that outside entities, such as student advocates, State AGs, and legal aid attorneys should be given a formal role in the group borrower defense process. Some of these commenters urged the Department to adopt language proposed at the third session of negotiated rulemaking in March 2016, which would have explicitly established that State or Federal enforcement agencies, or legal aid organization, may submit a written request to the Department identifying a group of borrowers for the initiation of a group borrower defense process. Under this proposed language, the Department would have responded to such requests in writing. These commenters argued that such entities have direct contact with borrowers and are likely to have necessary information for proving borrower defense claims. Commenters also stated that allowing third party petitions is important, given that the borrower defense process only allows an individual borrower to dispute a group borrower defense decision in the proposed regulation by filing an individual application. One commenter stated that allowing such third party requests will result in faster adjudications for borrowers and administrative cost-savings for taxpayers. Another commenter stated that a formal referral process would recognize both the states' role in the triad of higher education oversight and the States' efforts to protect consumers through State general consumer protection laws.

A group of commenters argued that a right for such outside entities should be included given that group determinations will result in the most widespread relief, will be the easiest way for borrowers to access relief, and are the only proposed method by which borrowers who have not filed applications may access relief.

In response to the Department's reasoning in the NPRM, 81 FR 39348, that informal communication facilitates cooperation with such entities, one commenter stated that providing such third parties with a formal petition in the regulation would not preclude informal contact and communication, but would rather increase transparency and efficiency. The commenter also

suggested that, to address any concerns that parties that may take advantage of borrowers, that the final rule should allow the Secretary to decline to respond to a petition if the organization does not appear to be a bona fide organization that represents borrowers.

*Discussion:* We disagree that a formal right of petition for entities such as State AGs, advocacy groups, or legal aid organizations should be included in the regulations. As explained in the NPRM, 81 FR 39348, in the Department's experience, cooperation with such outside entities has been best facilitated through informal communication, which allows for more candor and flexibility between the Department and interested groups and parties. The Department always welcomes cooperation and input from other Federal and State enforcement entities, as well as legal assistance organizations and advocacy groups. To this end, the Department anticipates creating a designated point of contact for State AGs to allow for active communication on borrower defense issues and also actively encourages a continuation of cooperation and communication with other interested groups and parties. As also reiterated in the NPRM, *id.,* the Department is ready to receive and make use of evidence and input from any interested party, including advocates and State and Federal agencies.

We also reiterate our position that the determinations arising from the borrower defense process should not viewed as having any binding effect on issues, such as causes of actions that borrowers may have against schools under State or other Federal law, that are not properly within the purview of the Department. We also encourage borrowers and their representatives to weigh all available avenues for relief, whether it is through the borrower defense process or through avenues outside of the Department.

*Changes:* None.

*Challenges to the Initiation of a Group Process*

*Comments:* Many commenters expressed concern that the group borrower defense process would not include an opportunity for schools to dispute the initiation of a group process and the formation of the group. One commenter stated that the lack of a provision for schools to contest the formation of the group was in violation of due process. Several commenters expressed concern that schools are not given a right to contest the Department's decision as to whether there are "common facts and claims" to initiate a

group process and requested clarification of that factor. Several commenters stated that the Department's proposal effectively would allow the Department to certify a class, without any of the procedural protections available to defendants in a class proceeding under Federal Rule of Civil Procedure 23. One commenter expressed concern that the proposed regulation does not require that the Department initiate a group process only where common facts and claims are found among the borrowers in the group, but rather gives the Secretary discretion to consider a nonexclusive list of factors. One commenter stated that the Department define the sources of information the Department would use to identify borrowers for inclusion in a group process.

One commenter stated that by not providing a review of the Department's initiation or group certification decision by the hearing official or allowing a challenge by the school, and by proposing that the Department's decision to initiate a group process may consider the factor of "compliance by the school or other Title IV participants," that the purpose of the group borrower defense process is to hold schools accountable and make them examples to the industry, and not to efficiently handle claims before the Department.

*Discussion:* We disagree that the regulations should include an explicit step by which an institution may dispute the formation or composition of a group under § 685.222(f). As discussed previously in this section, the Department is developing agency rules of practice and procedure for borrower defense, which will be informed by the legal requirements for administrative adjudications and the due process protections provided in the Department's other administrative adjudications. For instance, we will consider the proceedings including those under 34 CFR part 668, subparts G and H, which allow for standard motion practice and interlocutory appeals. We believe that, as proposed, § 685.222(f), (g), and (h) provides hearing officials with the flexibility and discretion to allow motions by parties as is deemed appropriate.

We believe that it is appropriate that § 685.222(f) notes that the Department may generally consider a nonexhaustive list of factors in deciding to initiate a group claim. As described earlier, we believe it is important for the Department to retain discretion in deciding whether to initiate a proceeding to adjudicate its right of recovery from a school, as a contingent

claim to a hearing official's relief determination for the borrower defense claims of a group of borrowers in the same process. Similarly, we believe that it is important for the Department to retain the flexibility to bring groups of varying sizes or types before a hearing official in a group process, including groups that are formed in a manner more akin to a joinder of parties under Federal Rule of Civil Procedure 20 than to a class action under Federal Rule of Civil Procedure 23.

Regarding the sources of information the Department will use to identify borrowers for inclusion in a group process, as explained in the NPRM, in addition to applications submitted through the process in § 685.222(e), the Department also may identify borrowers from records within its possession or from information that may be provided to the Department by outside sources. We do not believe further clarification as to such sources of the information is necessary.

We disagree that consideration of the compliance impact of a group borrower defense claim is inappropriate for the initiation of a group process and also disagree that this factor lends an appearance of bias or unfairness to the fact-finding processes described in § 685.222(f), (g), and (h). As discussed above, the procedure we will use for the group process will provide the institution with due process protections very similar to those that the Department now uses when it fines an institution or terminates the eligibility of an institution to participate in the title IV, HEA programs, which are found in current subpart G of part 668. These rules do not preclude motion practice, nor will the rules we develop. Moreover, given that such proceedings will involve the Department's right of recovery against schools, we believe that is appropriate for the regulations to reflect that the Department will consider a number of factors in its decision whether to initiate a process for the adjudication of such recovery by the Department. As stated in the NPRM, the group borrower defense process is intended to provide simple, accessible, and fair avenues to relief for borrowers, and to promote greater efficiency and expediency in the resolution of borrower defense claims, and we believe this structure furthers that goal.

*Changes:* None.

*Members of the Group*

*Comments:* Many commenters supported the Department's proposal under § 685.222(f)(1)(ii) that borrowers who may not have filed an application for borrower defense may be included as

Federal Register / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations    75969

members of a group for a determination of relief. Such commenters urged the Department to establish criteria requiring the initiation of such a group process.

A number of other commenters opposed the proposal and suggested that only borrowers who have filed an individual claim be included in the group process. These commenters stated that limiting group members to applicants would ensure that only borrowers who have actually been harmed would receive relief. Other commenters also argued that non-applicants should not be included in the group process, due to concerns about the use of borrowers' personal information and consent.

Other commenters stated that borrowers should only be allowed to participate in the group process if they affirmatively opt-in to the process. Several of these commenters also cited concerns about the use of borrowers' personal information and consent if an opt-out method is used.

*Discussion:* We appreciate the commenters' support for the use of a group process to resolve claims for a group with non-applicant borrowers as described in § 685.222(f)(1)(ii). However, as discussed earlier in this section, we believe that it is appropriate that the Department retain the discretion to initiate the group process, given that the Department will have the most information regarding the circumstances and the Department's contingent interest in the proceedings.

We disagree with the commenters that suggested that the group processes described in § 685.222(f), (g), and (h) should only include borrower defense applicants or that we should require borrowers to affirmatively opt-in to the process. We believe that, where the Department has decided to bring a group borrower defense proceeding and non-applicant borrowers with common facts and claims can be identified, such borrowers should also be entitled to the benefits of the designated Department official's advocacy and the opportunity to obtain relief and findings in such proceedings. Additionally, providing such borrowers with an opportunity to opt-out of the proceedings, given sufficiency of the notice to be provided by the Department to such borrowers, follows well-established precedent in class action law. *See, e.g., Phillips Petroleum Co.* v. *Shutts,* 472 U.S. 797 (1985).

The Department will continue to safeguard borrowers' personal information in this process, according to its established procedures.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(f)(2), the Department has determined that if a group process for borrower defense is initiated, and the Secretary has identified a borrower who has not filed a borrower defense application pursuant to § 685.222(f)(1)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as if the borrower had filed a borrower defense to repayment application under § 685.222(e)(2).

*Changes:* We have revised § 685.222(f)(2) to provide that the forbearance and defaulted loan procedures will be followed for members of a group identified by the Secretary who have not filed a borrower defense application.

### Opt-Out for Group Discharge; Reopening by the Secretary After Determination Is Made

*Comments:* A number of commenters objected to the Department's proposal in § 685.222(i)(2) that borrowers would be given an opportunity to opt-out of a group determination of relief. One commenter stated that providing borrowers with an opt-out would provide borrowers with the ability to bring successive, identical claims in the group and individual processes, and would create unpredictability and administrative inefficiencies. The commenter stated that borrowers who have agreed to be part of the group process should be bound by any resulting decision. One commenter stated that allowing only one opportunity for a borrower to opt-out of the group process would be consistent with Federal Rule of Civil Procedure 23, prevent uncertainty and inconsistency, and would further the purpose of the group borrower defense process to promote efficiency and expediency in the resolution of claims.

Other commenters stated that allowing borrowers to opt-out of a denial of a group claim, to file an individual claim, would place an undue burden on schools to defend the same claim multiple times. Some of these commenters stated that this situation would deprive schools of protection from double jeopardy. These commenters expressed concern that the financial resources schools would have to expend to defend such claims would lead to tuition increases for students. Several commenters stated that allowing such an opt-out would allow students to file multiple, unjustified claims for the purpose of delaying repayment.

One commenter also suggested that a time limit be imposed upon the Secretary's ability to reopen a borrower's application is bound by any applicable limitation periods. Several commenters stated that relief in the group process should be opt-out only.

*Discussion:* We appreciate the concern raised by commenters that allowing an opt-out for borrowers after a determination for relief has been made will subject schools to continuing litigation risk and uncertainty. As a result, we will modify § 685.222(i) to remove the post-determination opt-out opportunity for borrowers in group proceedings.

We disagree that a time limit should be placed on the Secretary's ability to reopen a borrower's application. We believe that if the Department becomes aware of new evidence that would entitle a borrower to relief under the regulations, then the borrower is entitled to relief regardless of the passage of time.

*Changes:* We have revised § 685.222(i) to remove the opportunity for a borrower to opt-out of the proceedings after a determination for relief has been made in a group proceeding.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(g)(4) and (h)(4), the Department has determined that if a borrower defense application is under review because a borrower defense application has been reopened by the Secretary under § 685.222(e)(5)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as when the borrower filed an initial borrower defense to repayment application.

*Changes:* We have revised § 685.222(g)(4) and (h)(4) to provide that the forbearance and defaulted loan procedures will be followed when the Secretary has reopened a borrower defense application.

### Due Process Proceedings

*Comments:* Several commenters stated that the proposed regulations do not provide details of how and what schools may dispute in the group borrower defense fact-finding process, and requested clarification in the final regulations. Other commenters expressed concern that the proposed group fact-finding process does not provide sufficient due process protections for schools. These commenters emphasized that participation by schools would create a more fair process and increase the reliability of the results.

One commenter stated that the limited protections in the proposed group borrower defense process does not provide schools with an opportunity to confront and cross-examine adverse witnesses and thus does not satisfy the due process requirements established in *Mathews* v. *Eldridge*, 424 U.S. 319 (1976); *Goldberg* v. *Kelly*, 397 U.S. 254 (1970); and *Greene* v. *McElroy*, 360 U.S. 474 (1959) for depriving schools of their property rights to funds already received. Several commenters suggested that the Department use the procedures in 34 CFR part 668, subpart H, to ensure due process protections for schools.

Commenters expressed concern about institutions' opportunities to receive notice and evidence in the proposed group borrower defense process. Many of these commenters expressed concern and requested clarification regarding the Department's proposal in § 685.222(f)(2)(iii) that notice to the school of the group process would occur "as practicable." One commenter suggested that we include language specifying that no notice will be provided if notice is impossible or irrelevant due to a school's closure. Other commenters expressed concern that the proposed regulations do not specify whether the scope of a group will be disclosed to schools and stated that schools must be aware of the members of the group in order to be able to raise a defense. Another commenter expressed concern that the proposed regulations do not require the Department to notify the school as to the basis of the group; the initiation of the borrower defense process; of any procedure or timeline for requesting records, providing information to the Department, or making responses; or provide schools with an opportunity to appear at a hearing.

Several commenters stated that institutions should be provided with notice and copies of all the evidence presented underlying the borrower defense claims in a group process. Another commenter stated that the proposed regulation gives the Department complete discretion as to what evidence the trier of fact will use to make decisions. This commenter stated that, when combined with the proposal that the persons advocating for students, as well as the persons making decisions, in the group borrower defense process are all chosen by the Department, this discretion appears to favor students over schools in the group process.

Several commenters also stated that institutions should be given an opportunity to provide a written response to the substance of the group borrower defense claim within a certain number of days (45 or 60) after the resolution of any appeal on the Department's basis for a group claim or of the notification to the school of the group process if no challenge to the group is filed, provided with copies of any evidence and records to be considered or deemed relevant by the hearing official, be allowed to present oral argument before the hearing official, and provided with a copy of the hearing official's decision in the group process. One commenter emphasized that the decision should identify the calculation used by the hearing official for the amount of relief given by the decision. These commenters also stated that institutions should be provided with a right of appeal to the hearing official's decision in both the closed and open school group processes. One commenter expressed concern that the proposed process does not include any process for how an appeal may be filed.

Several commenters expressed concerns that the process does not appear to provide to any opportunities for schools to conduct discovery or to cross-examine witnesses. Some of these commenters expressed the view that, in cases where the rebuttable presumption proposed in § 685.222(f)(3) applies, schools will need to be able to question borrowers in order to rebut the presumption.

One commenter stated that the group borrower defense process should allow for both students to present their own claims and institutions to have the same opportunity to present a defense, including any affirmative defenses, and to appeal adverse decisions. The commenter stated that both the school and the borrower should have such opportunities to present evidence and arguments in any proceeding or process to determine claims, not just proceedings where recovery against the school is determined. The commenter emphasized that permitting school participation would lead to correct results, since schools often have information as to any alleged wrongdoing.

*Discussion:* The Department understands commenters' concerns regarding the broad guidelines for the group fact-finding process established in § 685.222(f), (g), and (h). As noted throughout this section, the group borrower defense process involving an open school [35] in § 685.222(h) would be structured to provide the substantive and procedural due process protections both borrowers and schools are entitled to under applicable law, including those provided under the APA, 5 U.S.C. 554, and under the Department's other administrative proceedings. Such protections would include those regarding notice; the opportunity for an oral evidentiary hearing where the parties may confront and cross-examine adverse witnesses if warranted,); or those for the submission and exchange written material, as provided under enforcement procedures at 34 CFR part 668, subpart G. The Department is developing procedural rules to govern the fact-finding processes described in both § 685.222(e) and (f) to (h), which will establish these details more firmly and be informed by the procedures and protections established by the Department in its other administrative proceedings, such as 34 CFR part 668, subparts G and H.

We appreciate the concern that § 685.222(f)(2)(iii) is not clear as to the Department's intent that notice of a group proceeding will occur unless there is no party available to receive such notice—in other words, as would be the case under the closed school group borrower defense process described in § 685.222(g). We are revising § 685.222(f)(2)(iii) to clarify that no notice will be provided if notice is impossible or irrelevant due to a school's closure.

*Changes:* We have revised § 685.222(f)(2)(iii) to clarify that no notice will be provided if notice is impossible or irrelevant due to a school's closure.

*Rebuttable Presumption of Reliance*

*Comments:* A number of commenters objected to § 685.222(f)(3), which provides that a rebuttable presumption of reasonable reliance by members of the group applies if a group borrower defense claim involves a substantial misrepresentation that has been widely disseminated. One commenter stated that reliance cannot be presumed any more than the occurrence of a misrepresentation can be presumed, and that such an approach does not comply with general legal principles. Another commenter expressed concern that the rebuttable presumption of reasonable reliance would impermissibly preclude schools from presenting evidence as to the main fact of a group borrower defense case. These commenters expressed concern that the presumption

---

[35] As described in § 668.222(g), the "closed school" group borrower defense process would apply only when the school has both closed and provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no entity from which the Secretary may recover such losses. Or, in other words, when there is no entity from whom the Department may obtain a recovery.

would be difficult or impossible for schools to rebut. One commenter expressed concern that a school would be unable to rebut the presumption for borrowers who are unknown or not named as being part of the group for the group borrower defense process. One commenter expressed concern that the rebuttable presumption of reliance would be difficult for schools to disprove, particularly in situations where disproving a claim would require documentation that falls outside of the record retention requirements.

One commenter stated that the presumption would set up a system by which omissions by school employees or agents or misunderstandings by students may be considered substantial misrepresentations, without the Department needing to show reliance or that the misconduct caused the harm at issue. The commenter expressed general concern that the Department has proposed a negligence standard that is not contemplated by the HEA, and that this expansion in the standard has not been justified by the Department. The commenter argued that the presumption would allow claims based on accusations of omissions or misunderstandings on which the borrower did not rely.

One commenter stated that the presumption would threaten institutions with high liability and impose high costs on taxpayers. A couple commenters stated that the presumption is unfair, absent an intent or materiality requirement.

One commenter stated that it objected to the establishment of the rebuttable presumption generally, but requested clarification as to what the Department means by "widely disseminated," specifically the size of the audience that would be required for a statement to be considered to have been widely disseminated and methods of dissemination that would trigger the presumption.

Several commenters supported the inclusion of a presumption of reasonable reliance on a widely disseminated misrepresentation is consistent with existing consumer protection law. One commenter stated that the presumption recognizes that it is unfair and inefficient to require cohorts of borrowers to individually assert claims against an actor engage in a well-documented pattern of misconduct.

*Discussion:* We disagree that the presumption established in § 685.222(f)(3) does not comport with general legal principles. It is a well-established principle that administrative agencies may establish evidentiary

presumptions, as long as there is a rational nexus between the proven facts and the presumed facts. *Cole* v. *U.S. Dep't of Agric.*, 33 F.3d 1263, 1267 (11th Cir. 1994); *Chem. Mfrs. Ass'n* v. *Dep't of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997). As explained in the NPRM, 81 FR 39348, we believe that if a representation that is reasonably likely to induce a recipient to act is made to a broad audience, it is logical to presume that those audience members did in fact rely on that representation. We believe that there is a rational nexus between the wide dissemination of the misrepresentation and the likelihood of reliance by the audience, which justifies the rebuttable presumption of reasonable reliance upon the misrepresentation established in § 685.222(f)(3). A similar presumption exists in Federal consumer law. *See, e.g., F.T.C.* v. *Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1206 (10th Cir. 2005); *F.T.C.* v. *Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1315–16 (8th Cir. 1991).

We disagree that the rebuttable presumption establishes a different standard than what is required under the current regulations. As explained under "Substantial Misrepresentation," the Department's standard at part 668, subpart F, has never required intent or knowledge as an element of the substantial misrepresentation standard. Additionally, the current standard for borrower defense allows "any act or omission of the school . . . that would give rise to a cause of action under applicable State law." 34 CFR 685.206(c)(1). As explained under "Federal Standard" and "Substantial Misrepresentation," under many States' consumer protection laws, knowledge or intent is not a required element of proof for relief as to an unfair or deceptive trade practice or act. Moreover, we disagree with any characterization that the rebuttable presumption would remove the reliance requirement for substantial misrepresentation in group proceedings. The rebuttable presumption does not change the burden of persuasion, which would still be on the Department. As § 685.222(f)(3) states, the Department would initially have to demonstrate that the substantial misrepresentation had been "widely disseminated." Only upon such a demonstration and finding would the rebuttable presumption act to shift the evidentiary burden to the school, requiring the school to demonstrate that individuals in the identified group did not in fact rely on the misrepresentation at issue. This echoes the operation of the similar presumption of reliance for widely disseminated misrepresentations

under Federal consumer law described above. *See Freecom Commc'ns, Inc.*, 401 F.3d at 1206. A school would be entitled to introduce any relevant evidence to rebut the presumption and what may constitute relevant evidence may vary depending on the facts of each case. Similarly, what may be viewed as "wide dissemination" may also vary from case to case.

There appears to be confusion as to whether schools would be required to rebut the presumption of reliance as to "unknown" or "unidentified" members of the group. Under § 685.222(f)(1)(ii), the Department will identify all members of the group. Although the group may include borrowers who did not file an application through the process in § 685.222(e), the members of the group will be known in the group process.

We appreciate the support of commenters supporting the establishment of a rebuttable presumption. As discussed earlier, one of the reasons we are establishing a rebuttable presumption in cases of a widely disseminated substantial misrepresentation is that we believe that there is a rational nexus between a well-documented pattern of misconduct in the instance of a wide dissemination of the misrepresentation and the likelihood of reliance by the audience.

We also disagree that a materiality or intent element is necessary, as explained earlier under "Claims Based on Substantial Misrepresentation."

*Changes:* None.

### Representation in the Group Process

*Comments:* Many commenters expressed concern that the Department would designate a Department official to present borrower claims in the group borrower defense fact-finding process, when schools would be permitted to obtain their own representation in the process. These commenters stated that they should be allowed to obtain their own outside representation. Some commenters stated that such outside representation should be either paid for by the Department, or that schools should not be allowed to participate in the group process until after the school's liability has been determined.

One commenter stated that borrowers should be allowed to have their own representatives in the group borrower defense process, either at their own expense or pro bono. This commenter stated that borrowers should at least be allowed to act as "intervenors" in a group borrower defense process, with separate representation, to protect their interests.

One commenter suggested that the Department establish procedures for individual borrowers and their legal representatives to petition the Department to initiate a group proceeding or, in the alternative, establish a point of contact for borrowers to notify the Department of potential candidates for group claims. The commenter also suggested that borrowers be allowed to file appeals to the Secretary in group proceedings, given borrowers' vested interest in obtaining favorable adjudications that will make obtaining relief easier for borrowers.

*Discussion:* We disagree that borrowers should be allowed to initiate group borrower defense claims or be able to retain their own counsel and present evidence and arguments before a hearing official in a group borrower defense process. As explained earlier in this section, we acknowledge that the designated Department official responsible for presenting the group borrower defense claim and initiating a group borrower defense process would not be the borrower's legal representative. However, as the holder of a claim to recovery that is contingent upon the relief awarded to a group's borrower defense claims, we believe that the Department is the appropriate party to present both the group's borrower defense claims and the Department's claim for recovery against the institution in question. As explained in the NPRM, 81 FR 39348, we also believe that the Department's fulfillment of this role will reduce the likelihood of predatory third parties seeking to take advantage of borrowers unfamiliar with the borrower defense process. Additionally, we note that, under § 685.222(f)(2)(ii), borrowers may also choose to opt-out of a group process and participate in the process established in § 685.222(e), if they are not satisfied with the Department's role in the group proceeding. Borrowers may also reach out to the designated Department official if they have questions about the process.

As discussed earlier in this section, in consideration of borrowers' desire for timely and efficient adjudications, we disagree that borrowers should be provided with a right of appeal to the Secretary. However, we note that borrowers may also seek judicial review in Federal court of the Department's final decisions or request a reconsideration of their claims by the Department upon the identification of new evidence under § 685.222(e)(5).

*Changes:* None.

*Appeals*

*Comments:* Several commenters expressed concern that, in the group borrower defense process, liability will be automatically assigned to a school, and that schools will have no opportunity to dispute the liability. One commenter stated this is unfair to school owners, and to principals and affiliates of schools, from whom the Department proposes to seek repayment in certain situations.

*Discussion:* The commenters are incorrect. Section 685.222(h)(2) provides both schools and the designated Department official in the open school group hearing process with the opportunity to file an appeal with the Secretary from a hearing official's decision. Further, § 685.222(g), which does not provide for such an appeal, applies only if a school has closed and has provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no other entity from which the Secretary can otherwise practicably recover such losses. If the Secretary seeks to recover borrower defense losses from the principal or affiliate of a "closed school," the open school process in § 685.222(h) would apply.

*Changes:* None.

*Open and Closed School Group Processes*

*Comments:* Several commenters expressed concern about schools' participation in the closed school group process. One commenter expressed concern that in the group process for closed schools described in proposed § 685.222(g), that the hearing official deciding the claims at issue may consider additional information or responses from the school that the designated Department official considers to be necessary. This commenter stated that if there are persons affiliated with the school who are prepared to participate, then those persons should be given full rights of participation in the closed school group borrower defense process. One commenter stated that institutions should be provided with a right of appeal to the hearing official's decision in both the closed and open school group processes.

One commenter requested clarification as to claims filed by borrowers who have attended a school that has since closed, but where the school has posted a letter of credit or other surety with the Department.

Another commenter supported the distinction between the open school and closed school group processes.

*Discussion:* The commenters are incorrect about the nature of the closed school borrower defense group process described in § 685.222(g). As described, the standard provides that § 685.222(g) will apply only if a school is closed, there is no financial protection available to the Secretary from which to recover losses from borrower defense claims, and there is no other entity from which the Secretary may recover. If there is a letter of credit or some other surety that the school has posted to the Department and that is currently available to pay losses from borrower defense claims, the open school, borrower defense group process under § 685.222(h) will apply. If there is no ability for the Department to recover on any losses resulting from an award of relief in the closed school, group borrower defense process, then the Department will be unable to exercise its right to recovery against a school and the school will not face any possible deprivation of property. As a result, we believe it is appropriate that schools do not receive a right of administrative appeal in the closed school group process. If there are persons affiliated with the school who disagree with the final decision resulting from the process, however, such persons may still seek judicial review in Federal court under 5 U.S.C. 702 and § 704.

*Changes:* None.

*Public Databases*

*Comments:* A group of commenters suggested that decision makers be required to document decisions so that they may be appealed and reviewed in Federal court. These commenters and others also requested that the regulations require public reporting of borrower defense adjudications and that the Department maintain a public, online database of decisions resulting from any group process or individual application. The commenters stated that such public reporting would allow political representatives and advocates to review such decisions, suggest improvements, and ensure consistency in the Department's decision making.

One commenter also stated that the Department should develop a publicly available information infrastructure, such as a docketing system, to allow users to identify and track cases that may be candidates for group proceedings or informal aggregation and to allow users to learn from Departmental decisions.

*Discussion:* We appreciate the commenters' concerns regarding transparency and consistency in the borrower defense process, and will consider their suggestions as we move

forward with the implementation of these regulations. All of the Department's administrative determinations are presumptively available for public disclosure, subject to privacy concerns. We will contemplate and evaluate appropriate methods for the release of information about borrower defense claims on an ongoing basis as the processes and procedures in the regulations take effect.

*Changes:* None.

*Informal Aggregation*

*Comments:* One commenter suggested that, in addition to the group borrower defense process, the Department allow hearing officials to informally aggregate, or to allow borrowers to petition for informal aggregation of, separate but related cases to be heard in front of the same trier of fact. The commenter stated that such informal aggregation would expedite the resolution of similar claims, enhance consistency, and conserve resources.

*Discussion:* We appreciate the suggestion by the commenter, but do not believe it is necessary to modify the regulations to provide for informal aggregation. Such aggregation would be within the discretion of the hearing officials presiding over the group processes as part of their routine caseload management responsibilities.

*Changes:* None.

*FFEL Borrowers*

*Comments:* Several commenters stated that FFEL borrowers should be included in any group discharges for borrower defense. One commenter suggested that the Department allow FFEL borrowers to participate in the group and individual borrower defense processes without having to consolidate FFEL Loans into Direct Consolidation Loans or by having to prove any relationship between the borrowers' schools and lenders. This commenter argued that not all FFEL borrowers are eligible for Direct Consolidation Loans, and that the proposed regulations do not address the needs of such FFEL borrowers.

*Discussion:* We disagree with the suggestion that FFEL borrowers be included in any group discharges for borrower defense. As explained under "Expansion of Borrower Rights," FFEL Loans are governed by specific contractual rights and the process adopted here is not designed to address those rights. We can address potential relief under these procedures for only those FFEL borrowers who consolidate their FFEL Loans into Direct Consolidation Loans. As cases are received, the Department may consider

whether to conduct outreach to FFEL borrowers who may be eligible for borrower defense relief by consolidating their loans into Direct Consolidation Loans under § 685.212(k) as appropriate.

*Changes:* None.

*Abuse by Plaintiffs' Attorneys*

*Comments:* Several commenters expressed concern that the group process would create opportunities for plaintiffs' attorneys. The commenters stated that the proposed regulations would encourage attorneys to have borrowers file suspect claims with the Department, while also bringing class actions in court. The commenters stated that this would result in the Department initiating a group process, identifying members of a putative class for the court proceeding, and obtaining determinations that class action attorneys would then be able to use in court to their advantage, while collecting attorneys' fees.

*Discussion:* We disagree that the regulations will create opportunities for plaintiffs' attorneys. Under the regulations, the Department has the discretion to decide whether a group borrower defense process will be initiated, and the filing of individual claims may not necessarily lead to the initiation of a group borrower defense process. Additionally, we recognize that borrowers may seek to utilize other avenues for relief outside of the borrower defense process and provide in § 685.222(k) that if the borrower has received relief through other means, the Department may reinstate the borrower's obligation to repay the loan to protect the Federal fiscal interest and avoid receipt by the borrower of multiple recoveries for the same harm.

*Changes:* None.

**Borrower Relief**

*Process Arbitrary and Outside the Scope of Department Authority*

*Comments:* Some commenters argued that the proposal for calculation of borrower relief is arbitrary and that the Department is neither qualified nor authorized to conduct this calculation. According to one commenter, implementation of the proposed framework for calculating relief would constitute arbitrary agency adjudication under relevant case law. One commenter cited 20 U.S.C. 3403(b) and section 485(h)(2)(B) of the HEA as imposing statutory limits on the Department's authority to direct or control academic content and programming, and argued that the Department would be exceeding its authority by attempting to assess the

value of an education by including the quality of academic programming among the factors to be considered in carrying out an adjudication on any borrower defense claim.

*Discussion:* We disagree that the Department's proposal to adjudicate or calculate borrower relief is arbitrary. By directing the Secretary to designate acts and omissions that constitute borrower defenses to repayment in section 455(h) of the HEA, Congress has explicitly charged the Department, under the current and new regulations, to adjudicate the merits of claims brought alleging such acts and omissions. Such adjudications necessarily require the Department to determine the relief warranted by a proven claim against an institution. If a court adjudicating a borrower's cause of action against the institution would assess the value of the education provided in order to determine relief, section 455(h) requires and authorizes the Department to do so as well.

Further, we do not agree that the Department's adjudications on borrower defense claims will involve an "exercise [of] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law." 20 U.S.C. 3403(b). As described above earlier, the Department's adjudications will determine whether a school's alleged misconduct constitutes an "act[] or omission[] of an institution of higher education a borrower may assert as a defense to repayment of a loan . . .", 20 U.S.C. 1087e(h), and provide relief to borrowers and a right of recovery to the Department from schools, in a manner that is explicitly authorized by statute. Notwithstanding, we believe that the provision of relief, as the result of and after any conduct by the school, through the borrower defense process is not the same as the active "exercise [of] any direction, supervision, or control" over any of the prohibited areas.

*Changes:* None.

*Presume Full Relief*

*Comments:* A number of commenters argued in favor of a presumption of full relief for borrowers. These commenters recommended that Appendix A be either deleted or modified to eliminate or alter the proposed partial relief calculations. The commenters contended that the proposed partial

relief calculation process would be complex and subjective and potentially deny relief to deserving borrowers.

Multiple commenters argued that calculating partial relief would be excessively complicated, expensive, and time consuming. According to these commenters, the process of calculating relief would lead to the waste of Department resources and cause unnecessary delays in the provision of relief to borrowers. Additionally, commenters were concerned about the possibility that this process would be confusing and difficult for borrowers to navigate.

Some commenters argued that the proposed partial relief calculation process would unfairly subject borrowers who had already succeeded on the merits of their claims to a burdensome secondary review process. Commenters noted that, in the case of a claim based on a school's substantial misrepresentation, borrowers would have already demonstrated entitlement to relief by meeting the substantial misrepresentation standard. Consequently, these commenters suggested that the relief calculation process would create an unnecessary hurdle to the appropriate relief for these borrowers. The commenters argued that, after being defrauded by their schools, student borrowers should not be required to undergo an extensive process of calculating the value of their education. Further, these commenters argued that the partial relief system would be unfair because it affords a culpable school the presumption that its education was of some value to the borrower.

Other commenters suggested that it would be unfair for the borrower to bear the burden of demonstrating eligibility for full relief. Instead, these commenters proposed that the Secretary should bear the burden of demonstrating why full relief is not warranted. The commenters proposed that full relief be automatic for borrowers when there is evidence of wrongdoing by the school. These commenters suggested either eliminating partial relief or limiting it to cases in which compelling evidence exists that the borrower's harm was limited to some clearly delimited part of their education.

Commenters suggested that, in addition to being difficult to calculate, partial relief would be insufficient to make victimized borrowers whole. To support the argument in favor of a presumption of full relief, these commenters asserted that many Corinthian students never would have enrolled had the institution truthfully represented its job placement rates.

Some commenters raised concerns about the subjectivity of the process for calculating partial relief for borrowers. These commenters were concerned that the methods proposed in Appendix A for calculating relief are too vague, afford excessive discretion to officials, and could lead to potential inconsistencies in the treatment of borrowers. Some commenters suggested that Appendix A should prescribe one particular method for calculating relief, rather than providing multiple options in order to increase certainty and consistency.

Some commenters raised concerns about the potential impact of resource inequities between schools and borrowers on the partial relief calculation process. Specifically, these commenters argued that because schools will be able to afford expensive legal representation, schools would likely be able to find technicalities in the relief calculation process, potentially resulting in the denial of relief to deserving borrowers. These commenters were particularly concerned about disadvantages faced by borrowers who cannot afford legal representation. Commenters also noted that borrowers may feel pressure to retain legal counsel, which they contended would frustrate the Department's intent to design a process under which borrowers do not need legal representation, and are shielded from predatory third-party debt relief companies.

One commenter suggested that the provision of partial relief would lead to an excessive number of claims, particularly when implemented in conjunction with what was described as a low threshold for qualified claims.

Several commenters also supported the presumption of full relief by stating that this approach would be consistent with existing legal approaches to relief for fraudulent inducement or deceptive practices. Some commenters urged the Department to adopt the approach used for false certification and closed school discharges—providing full discharges for all meritorious claims, including cancellation of outstanding balances and refunds of amounts already paid.

As an alternative to fully eliminating partial relief, some commenters suggested limiting the availability of partial relief to claims based on breach of contract, based on the proposition that when a school breaches a contractual provision, it is possible that a borrower nevertheless received at least a partial benefit from his or her education.

Several commenters argued that Appendix A should be fully removed because it adds confusion to the process

and it is not clear when or how it should be applied. Some commenters argued that we should remove Appendix A and revise proposed § 685.222(i) so that full relief is provided upon approval of a borrower defense, except where the Department explains its reasoning and affords the borrower the opportunity to respond.

*Discussion:* As noted in the NPRM, the Department has a responsibility to protect the interests of Federal taxpayers as well as borrowers. We discuss below that while the borrowers' cost of attendance (COA), as defined in section 472 of the HEA, 20 U.S.C. 1087ll, is the starting point in cases based on a substantial misrepresentation for determining relief, we do not believe, in proceedings other than those brought under § 685.222(h), that establishing a legal presumption of full relief is justified when losses from borrower defenses may be borne by the taxpayer. While the Department's other loan discharge processes for closed school discharges, 34 CFR 685.214; false certification, 34 CFR 685.215; and unpaid refunds, 34 CFR 685.216, do provide for full loan discharges and recovery of funds paid on subject loans, the factual premises for such discharges are clearly established in statute and are relatively straightforward. In contrast, we anticipate that determinations for borrower defense claims will involve more complicated issues of law and fact. Generally under civil law, determinations as to whether the elements of a cause of action have been met so as to state a claim for relief and then to establish liability are determinations separate from those for the amount or types of relief the plaintiff may receive. To balance the Department's interest in protecting the taxpayer with its interest in providing fair outcomes to borrowers, when a borrower defense based in misrepresentation has been established, the Department will determine the appropriate relief by factoring in the borrower's COA to attend the school and the value of the education provided to the borrower by the school. Importantly, the COA reflects the amount the borrower was willing to pay to attend the school based on the information provided by the school about the benefits or value of attendance. The Department may also consider any other relevant factors. In determining value, the Department may consider the value that the education provided to the borrower, or would have provided to a reasonable person in the position of the borrower. Moreover, in some circumstances, the Department

will consider the actual value of the education in comparison to the borrower's reasonable expectation, or to what a reasonable person in the position of the borrower would have expected under the circumstances given the information provided by the institution. Accordingly, any expectations that are not reasonable will not be incorporated into the assessment of value.

We acknowledge commenters' concerns that references to "calculations" or "methods" in the regulations may be confusing. As a result, we are revising § 685.222(i) to remove such references. Additionally, to address concerns that the proposed relief determination requirements appear complicated, we are also revising § 685.222(i) to directly establish the factors to be considered by the trier-of-fact: The COA paid by the borrower to attend the school; and the value of the education. The Department will incorporate these factors in a reasonable and practicable manner. In addition, the Department may consider any other relevant factors. In response to concerns that the proposed methods in Appendix A are confusing, we have also replaced the methods with conceptual examples intended to serve as guidance to borrowers, schools, and Department employees as to what types of situations may lead to different types of relief determinations. As it receives and evaluates borrower defense cases under the Federal standard, the Department may issue further guidance as to relief as necessary.

The Department emphasizes that in some cases the value of the education may be sufficiently modest that full relief is warranted, while in other cases, partial relief will be appropriate. In certain instances of full or substantial value, no relief will be provided. Thus, it is possible a borrower may be subject to a substantial misrepresentation, but because the education provided full or substantial value, no relief may be appropriate. As revised, § 685.222(i) states that the starting point for any relief determination for a substantial misrepresentation claim is the full amount of the borrower's COA incurred to attend the institution. As explained later, the COA includes all expenses on which the loan amount was based under section 472 of the HEA, 20 U.S.C. 1087ll. Taken alone, these costs would lead to a full discharge and refund of amounts paid to the Secretary. Section 685.222(i) then provides that the Department will consider the value of the education in the determination of relief and how it compares to the value the borrower could have reasonably expected based on the information

provided by the school. In some cases, the Department expects that this analysis will not result in reduction of the amount of relief awarded. This could be because the evidence shows that the school provided value that was sufficiently modest to warrant full relief or what the school provided was substantially different from what was promised such that the value would not be substantially related to the value the school represented it would provide. The presence of some modest value does not mean full relief is inappropriate.

We also note that the revised regulations require value to be factored in to determinations for relief, but do not prescribe any particular approach to that process. Because there will be cases where the determination of value will be fact-specific to an individual or group of individuals—and the determination of value may pose more significant difficulties in certain situations than in others—the Department believes that the official needs substantial flexibility and discretion in determining how to incorporate established factors into the assessment of value. The fact that the case has reached the phase of relief determination necessarily means that a borrower has experienced some detriment and that a school has engaged in substantial misrepresentation or breached a contract, or was found culpable in court of some legal wrong. At that point in the process, we intend that the Official be able to employ a practicable and efficient approach to assessing value and determining whether the borrower should be granted relief and if so how much. Relief will be determined in a reasonable and practicable manner to ensure harmed borrowers receive relief in a timely and efficient manner.

We have also revised § 685.222(i) to provide that in a group borrower defense proceeding based on a substantial misrepresentation brought against an open school under § 685.222(h), the school has the burden of proof as to showing any value or benefit of the education. The Department will promulgate a procedural rule that will explain how evidence will be presented and considered in such proceedings, taking full account of due process rights of any parties. We believe that these revisions address many of the concerns that borrower defense relief determinations may be confusing or complicated.

We also note that the process for determining relief in a borrower defense claim has no bearing on the Department's authority or processes in

enforcing the prohibition against misrepresentation under 34 CFR 668.71. Schools may face an enforcement action by the Department for making a substantial misrepresentation under part 668, subpart F. As described under "Substantial Misrepresentation," for the purposes of borrower defense in a group claim, actual, reasonable, detrimental reliance is required to establish a substantial misrepresentation under § 685.222(d). However, for the purposes of the Department's enforcement authority under part 668, subpart F, the scope of substantial misrepresentation is broader in that it includes misrepresentations that could have reasonably been relied upon by any person, as opposed to misrepresentations that were actually reasonably relied upon by a borrower. It is also conceivable that there could be a case in which a borrower did experience detriment through reasonably relying on a misrepresentation—for example, by having been induced to attend a school he or she would not have otherwise—yet the school provided sufficient value to the borrower or would have provided sufficient value to a reasonable student in the position of the borrower so as to merit less than full, or no, relief. Nevertheless, the school in such a case may still face fines or other enforcement consequences by the Department under its enforcement authority in part 668, subpart F, because a borrower reasonably relied on the school's misrepresentation to his or her detriment.

We disagree that the relief determination process would be subjective. Agency tribunals and State and Federal courts commonly make determinations on relief. We do not believe the process proposed provides a presiding designated Department official or hearing official presiding, as applicable, with more discretion than afforded triers-of-fact in other adjudicative forums.

We also disagree with commenters who expressed concerns that borrowers may be disadvantaged due to resource inequities between students and schools. As discussed under "Process for Individual Borrowers (§ 685.222(e))," under the individual application process, a borrower will not be involved in an adversarial process against a school. In the group processes described in § 685.222(f) to (h), the Department will designate a Department official to present borrower claims, including through any relief phase of the fact-finding process. If a borrower does not wish to have the Department official

assert his or her claim in the group borrower defense process, the borrower may opt-out of the process and pursue his or her claim under the individual borrower defense process under § 685.222(e).

We note that, in determining relief for a borrower defense based on a judgment against the school, where the judgment awards specific financial relief, the relief will be the amount of the judgment that remains unsatisfied, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations. Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations. In determining relief for a borrower defense based on a breach of contract, relief in such a case will be determined according to the common law of contract subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations.

*Changes:* We have revised § 685.222(i) to remove references to methods or calculations for relief. We have included factors that will be incorporated by a designated Department official or hearing official deciding the claim, including the COA paid by the borrower to attend the school, as well as the value of the education to the borrower. In addition, the Department official or hearing official deciding the claim may consider any other relevant factors.

We have revised § 685.222(i) to clarify how relief is determined for a borrower defense based upon a judgment against the school or a breach of contract by the school.

We include that for group borrower defense claims under § 685.222(h), the school has the burden of proof as to any value or benefit of the education.

We have also revised Appendix A to describe conceptual examples for relief.

*Calculation of Relief*

*Comments:* Some commenters raised concerns about the appropriateness of the specific factors for consideration, and methods to be applied, in calculating partial relief. Specifically, some commenters were concerned about relying on student employment outcomes to determine the value of a borrower's education. These commenters noted that graduates exercise substantial discretion in determining what type of employment to pursue after graduation, which would likely impact relevant calculations. These commenters also cited variations in median income throughout the

country as another factor that could potentially complicate the calculation process. One commenter objected to consideration of the expected salary for the field, because expected salaries in certain professions are so low. These commenters recommended that earnings benchmarks not be considered in the calculation of relief because of the risk of discrepancies associated with those considerations.

Some commenters were concerned about the reliability of the proposed methods for calculating relief in Appendix A. Specifically, commenters raised concerns about the method for calculating relief in paragraph (A). Under this method, relief would be provided in an amount equivalent to the difference between what the borrower paid, and what a reasonable borrower would have paid absent the misrepresentation. These commenters suggested that this assessment would be unreliable because it would involve speculation by the official tasked with valuing a counterfactual.

In addition, some commenters disapproved of the method in paragraph (C), which would cap the amount of economic loss at the COA. These commenters suggested that legally cognizable losses often exceed the COA. Some commenters also disapproved of the proposal to discount relief when a borrower acquires transferrable credits or secures a job in a related field. According to these commenters, the discounted relief would not reflect the true harm experienced by the borrowers. These commenters stated that transferrable credits often lose their value because they are either not used, or used at another predatory or low-value school. These commenters also argued that discounting relief based on transferrable credits could penalize borrowers with otherwise meritorious defenses who opt to take a teach out. Some commenters also argued that discounting relief when a borrower obtains a job in the field with typical wages may penalize borrowers who succeed at finding work despite the failings of their programs. One commenter was concerned that the method in paragraph (C) may be read to place a burden on the borrower to produce evidence that the education he or she received lacks value.

One commenter suggested minimizing the potential for subjectivity by replacing the proposed methods of calculation with a system for scheduling relief based on the nature of the claim. This commenter recommended providing a table outlining the percentage of loan principal to be relieved for each of a series of specific

enumerated claims. Another commenter suggested that the Department specify a single theory for calculating damages that would apply in each class of borrower defense cases.

Some commenters requested additional information about the circumstances that may impact partial relief determinations.

*Discussion:* We acknowledge commenters' concerns with the various methods in proposed Appendix A, some of which highlighted specific concerns about different methods' applicability to various fact-specific scenarios. As discussed earlier, we also appreciate that references to calculations or methods for relief may be confusing. As a result, we have revised Appendix A to reflect conceptual examples to provide guidance to borrowers, schools, and Department employees as to different scenarios that might lead to full, partial, or no relief. As stated in revised § 685.222(i), the examples are not binding on the Department or hearing official presiding over a borrower defense claim. Rather, they are meant to be simple, straight-forward examples demonstrating possible relief scenarios, and the outcomes of any borrower defense case may vary from the examples depending on the specific facts and circumstances of each case.

*Changes:* We have revised Appendix A to describe conceptual examples for relief.

*Comments:* Some commenters were concerned that the proposed regulations would grant Department officials the authority to make determinations for which they are not qualified. Specifically, commenters were concerned that the proposed regulations do not require the Department to rely on expert witnesses for certain calculations, despite the fact that they may be necessary in some cases.

Commenters also stressed the importance of ensuring the independence of the officials involved in making relief determinations. Similarly, some commenters requested more specificity and transparency regarding who will be calculating relief and how they will be conducting those calculations.

*Discussion:* We believe that Department officials designated to hear individual claims, and the Department hearing officials who preside over the group claim proceedings have the capability to evaluate borrower defense claims based upon the Federal standard, similar to how Department employees perform determinations in other agency adjudications.

As discussed under "General" and "Group Process for Borrower Defense,"

the Department will structure the borrower defense proceedings in ways to ensure the independence and objectivity of the Department employees presiding over such processes. With regard to commenters' concerns about transparency and specificity, as established in § 685.222(e), (g) and (h), the decisions made in the proceedings will be made available to involved parties and will specify the basis of the official's determination. All of the Department's administrative determinations are presumptively available for public disclosure, subject to privacy concerns.

*Changes:* None.

*Group Relief*

*Comments:* Some commenters argued that group relief should be limited to situations in which a preponderance of the evidence shows that no member of the group received any identifiable benefit from his or her education. These commenters suggested that group relief would frustrate the Department's efforts to ensure that borrowers receive only the relief to which they are entitled. These commenters suggested that in the limited circumstances where group relief is provided, the amount should be determined based on a statistically valid sample of students. Some commenters also opposed the Department's proposal to consider potential cost to taxpayers in making group relief determinations.

*Discussion:* Section 685.222(a)(2), for loans first disbursed after July 1, 2017, explicitly states that borrower defenses must be established by a preponderance of evidence. This requirement applies regardless of whether the borrower defenses at issue are raised in the procedure for an individual borrower in § 685.222(e) or in the group processes under § 685.222(f) to (h). However, for group claims, § 685.222(f) establishes that the group process may be initiated upon the consideration of factors including the existence of common facts and claims among the members of the group. How the preponderance of evidence requirement may apply in group borrower defenses cases may vary from case to case. Additionally, as discussed earlier, for cases of substantial misrepresentation, the starting point for any relief determination is the full amount of the borrower's costs incurred to attend the institution. We have revised § 685.222(i) to provide that in such cases against an education school, the burden shifts to the school to prove the existence of any offsetting value to the borrowers provided by the education paid for with the proceeds of the loans at issue.

We disagree with commenters that the regulation should specify that relief should be based upon a statistically valid sample of students at this time. While a statistically valid sample may be appropriate for some cases, we believe the determination of what may be the criteria for an appropriate sample for group borrower defense cases should be developed on a case by case basis. We discuss our reasons for including fiscal impact as a factor for consideration in the initiation of group processes under "Group Process for Borrower Defense." Section 685.222(i), which pertains to the relief awarded for either a group or individual borrower defense claim, does not include a consideration of fiscal impact.

*Changes:* We have revised § 685.222(i) to provide that in group borrower defense cases against an union school, the burden shifts to the school to prove the existence of any offsetting value to the students provided by the education paid for with the proceeds of the loans at issue.

**Expand the Scope of Available Relief**

*Comments:* Some commenters argued that full relief must extend beyond loans, costs, and fees to account for other expenses associated with school attendance. These commenters cited expenses such as travel expenses, costs of not pursuing other opportunities, child care expenses, consequential losses, and nonfinancial harms including pain and suffering. Commenters also noted that borrowers who attend fraudulent schools often lose out on portions of their lifetime Federal loan and grant eligibility, effectively losing several thousands of dollars in Pell grants that could be used towards other educational opportunities. To support the expansion of relief, one commenter cited State unfair and deceptive practices laws, under which all types of harms—direct and consequential, pecuniary and emotional—may provide the basis for relief.

Some commenters argued that relief should include updates to consumer reporting agencies to remove adverse credit reports. Citing the impact of negative credit reports on borrowers' ability to find employment, own a home, etc., commenters urged the Department to adopt language clarifying that any adverse credit history pertaining to any loan discharged through a borrower defense will be deleted. Some commenters suggested that the language in proposed § 685.222(i)(4)(ii) conform to the language in proposed § 685.206(c)(2)(iii), which requires the

Department to fix adverse credit reports when it grants discharges. Additionally, some commenters argued that relief should include a determination that the borrower is not in default on the loan and is eligible to receive assistance under title IV.

One commenter requested simplification of the language describing available relief, specifically, removal of the portion of § 685.222(i)(5) describing the unavailability of non-pecuniary relief on the basis that the provision would cause confusion.

*Discussion:* The Department's ability to provide relief for borrowers is predicated upon the existence of the borrower's Direct Loan, and the Department's ability to provide relief for a borrower on a Direct Loan is limited to the extent of the Department's authority to take action on such a loan. Section 455(h) of the HEA, 20 U.S.C. 1087e(h), gives the Department the authority to allow borrowers to assert "a defense to repayment of a [Direct Loan]," and discharge outstanding amounts to be repaid on the loan. However, section 455(h) also provides that "in no event may a borrower recover from the Secretary . . . an amount in excess of the amount the borrower has repaid on such loan." As a result, the Department may not reimburse a borrower for amounts in excess of the payments that the borrower has made on the loan to the Secretary as the holder of the Direct Loan.

Additionally, § 685.222(i)(8) also clarifies that a borrower may not receive non-pecuniary damages such as damages for inconvenience, aggravation, emotional distress, or punitive damages. We recognize that, in certain civil lawsuits, plaintiffs may be awarded such damages by a court. However, such damages are not easily calculable and may be highly subjective. We believe that excluding non-pecuniary damages from relief under the regulations would help produce more consistent and fair results for borrowers.

The Department official or the hearing official deciding the claim would afford the borrower such further relief as the Department official or the hearing official determines is appropriate under the circumstances. As specifically noted in § 685.222(i)(7), that relief would include, but not be limited to, determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the HEA, and updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan. We do not

believe a modification of this provision to conform with § 685.206(c)(2)(iii) is necessary.

*Changes:* None.

*Comments:* Some commenters suggested that the proposed regulations could result in excessive institutional liability. These commenters argued that institutions would be liable under a successful claim only for costs related to tuition and fees, rather than all amounts borrowed. Commenters supported limiting claims for relief to the payment of loans issued under title IV, and only that portion of loans directly related to the costs of the education. Some commenters proposed that relief be limited to funds actually received by the institution. One commenter cited the measure of student loan debt contained in the Department's Gainful Employment regulations to support this proposed cap on relief. In support of this position, several commenters argued that some students borrow excessively, and institutions play a limited role in determining the level or purpose of student borrowing. These commenters opposed holding institutions liable for loans borrowed to support a student's living expenses because of the attenuated nature of the nexus between any act or omission underlying a valid borrower defense claim and a student's living expenses while enrolled. These commenters were concerned that assigning responsibility to schools in excess of tuition and fees would constitute an unjustifiable, unprecedented expansion of potential institutional liability.

*Discussion:* Since their inception, the Federal student loan programs were designed to support both tuition and fees and living expenses in recognition of the fact that students need resources such as food and housing when they are pursuing their educations. Indeed, the HEA's definition of cost of attendance, 20 U.S.C. 1087ll, includes tuition, fees, books, supplies, transportation, miscellaneous personal expenses including a reasonable allowance for the documented rental or purchase of a personal computer, room and board, childcare, and expenses related to a student's disability if applicable. When a student makes the choice to attend an institution, he is also choosing to spend his time in a way that may require him to take out Federal loans for living expenses, and very likely to forgo the opportunity to work to defray those costs from earnings. If he had not chosen to attend the institution, he would not have taken out such loans for living expenses: His Federal aid eligibility depends on his attendance at the institution. Therefore we believe

that an institution's liability is not limited to the loan amount that the institution received, since it does not represent the full Federal loan cost to students for the time they spent at the institution.[36] Regarding comments suggesting that some students borrow excessively and that institutions play a limited role in determining borrowing levels, it is important to note that institutions have the discretion to determine a reasonable COA based on information they have about their students' circumstances. Limiting gainful employment measurements to amounts borrowed for tuition and fees was reasonable for the context in which that approach was taken—measurement of eligibility of an entire program, based on borrowing decisions made by an entire cohort of completers. That context is not the paradigm for considering actual loss to individual borrowers. As discussed here, an institution may already face exposure in a private lawsuit for amounts greater than the amount the institution charged and received as tuition and fees, and the commenter offers no reason, and we see none, why a different rule should apply to determining the extent of the institution's liability for the same kinds of claims if successfully proven in the borrower defense context.

*Changes:* None.

*Fiscal Impact Considerations Inappropriate*

*Comments:* Commenters argued that full relief should be provided without consideration of fiscal concerns. Some commenters were concerned that consideration of fiscal impact would lead to groups of borrowers being denied relief to which they are entitled because of financial concerns. These commenters acknowledged taxpayer interests, but stated that taxpayers would benefit in the long term from a presumption of full relief because the presumption would deter fraud and

increase institutional accountability. Some commenters also suggested that partial relief would negatively impact Department incentives and conduct by, for example, reducing the Department's incentive to monitor schools appropriately on the front end. One commenter opposed consideration of fiscal impact because of concerns about the Department's potential to profit off of the student loan program.

*Discussion:* We discuss our reasons for including fiscal impact as a factor for consideration in the initiation of group processes under "Group Process for Borrower Defense." Section 685.222(i), which pertains to the relief awarded for either a group or individual borrower defense claim, does not include a consideration of fiscal impact.

*Changes:* None.

**Institutional Accountability**

*Financial Responsibility*

General Standards § 668.171

Scope of Rulemaking

Retroactivity and Authority

*Comments:* Commenters argued that the proposed financial protection triggers exceeded the Department's authority under the HEA to assess financial responsibility on the ground that the proposed regulations would be impermissibly retroactive. In particular, commenters objected to the proposed requirement in § 668.171(c)(3) that a school is not financially responsible if it has been required by its accreditor to submit a teach-out plan because of a Department action to limit, suspend, or terminate the school, or if its accreditor has taken certain actions due to failure to meet accreditor standards and not later notified the Department that the failure has been cured.

Others objected that proposed § 668.171(c)(1)(i)(A) is also impermissibly retroactive by providing that a school that, currently or during the three most recently completed award years, is or was required to pay a debt or liability arising from a Federal, State, or other oversight entity audit or investigation, based on claims related to the making of a Federal loan or the provision of educational services, or that settles or resolves such an amount that exceeds the stated threshold, is not financially responsible. Under proposed § 668.175(f)(1)(i), an institution affected by either § 668.171(c)(1)(i)(A) or (c)(3) could continue to participate in the title IV, HEA programs only under provisional certification and by providing financial protection in an amount not less than 10 percent of the amount of Direct Loan funds or title IV,

---

[36] Common law recognizes that a party who may rescind a transaction and obtain restitution from the defendant of amounts paid to the defendant may also assert a claim for related expenditures made in reliance on the rescinded transaction.

Compensation of such loss by an award of damages is a remedy different in kind from rescission and restitution, but the remedies are not necessarily inconsistent when the claimant's basic entitlement is to be restored to the status quo ante. Damages measured by the claimant's expenditure can be included in the accounting that accompanies rescission, in order to do complete justice in a single proceeding. Recovery of what are commonly called "incidental damages" may thus be allowed in connection with rescission, consistent with the remedial objective of restoring the claimant to the precontractual position.

Restatement (Third) of Restitution and Unjust Enrichment, § 54 note (i).

HEA funds, respectively, received in the most recently completed fiscal year.

*Discussion:* None of the litigation or other provisions of the regulation are impermissibly retroactive. They attach no new liability to an event or transaction that was permissible at the time it occurred and that occurred prior to the effective date of the regulations. They simply address the risk that certain events that occurred prior to the effective date of the regulations create risks that warrant protection now. The risks in these instances are that these suits, and the other events included in § 668.171(c), can cause the institution to close or so substantially reduce operations as to generate closed school discharge claims, borrower defense claims, or both, from the students who are directly affected by the action at issue. The school is liable for borrower defense claims and closed school discharge claims; the requirement that the school provide financial protection does not increase any liability that would otherwise attach, but merely provides a resource that the Department may access to meet liabilities that would already arise if borrowers were to seek discharges on either ground. In either case, the Department would establish any such liability in the same manner in which it would were there no protection provided, and would release or refund any portion of the financial protection that was not needed to satisfy any claims established under those procedures, in which the school would have the same opportunity to object to the claims and be heard on those objections as it would have if no protection had been provided.

Regulated parties have repeatedly challenged Department rules that attached particular new consequences to actions that have already occurred. Courts have regularly rejected claims that regulations that operate like the regulations adopted here are impermissibly retroactive. A regulation is unconstitutionally retroactive if it "alter[s] the *past* legal consequences of past actions"[37] or, put another way, if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."[38]

Thus, whether a regulation "operates retroactively" turns on "whether the new provision attaches new legal consequences to events completed before its enactment."[39] It is, however, well settled that "[a] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment."[40] Nor is a statute impermissibly retroactive simply because it "upsets expectations based in prior law."[41] Like each of the regulations challenged in these cases, the present regulations in some instances would attach prospectively consequences for certain actions that occurred prior to the effective date of the regulations, but would not attach any new liability to those actions or transactions that were permissible when the events occurred.

Moreover, we have clarified that the regulations apply to any triggering events that occur on or after July 1, 2017. We have also removed the two triggers highlighted by these commenters as looking to certain past events in a way that mitigates almost all of the commenters' concerns. First, we modified the accrediting agency actions trigger substantially, to assess as an automatic trigger[42] only the effect of a closure of a school or location pursuant to a teach-out requirement, and consider other accreditor actions occurring in the past three years only as a discretionary trigger. There is no three-year look-back in the automatic trigger. For this and other discretionary triggers, there is an opportunity for further review of the impact of those events. We have removed the three-year look-back in the lawsuits and other actions trigger. These

changes are described in more detail in the sections specific to these triggers. Finally, as we have described, the final regulations permit an institution to demonstrate, either when it reports the occurrence of a triggering event or in an action for failure to provide a required letter of credit or other financial protection, that an event or condition no longer exists or has been resolved or that it has insurance that will cover the debts and liabilities that arise at any time from that triggering event.

*Changes:* We have revised §§ 668.90(a)(iii) and 668.171(h) to include consideration of insurance; we have removed the three-year period for review from § 668.171(c); we have revised the teach-out provisions in § 668.171(c)(1)(iii) to consider only the effect on the overall institutional financial capability of closures of locations or institutions as determined by recalculating the institution's composite score, as discussed more fully under the heading "Teach-out Plan"; and we have revised § 668.171(b) to provide that the regulations address only those triggering events or conditions listed in § 668.171(c) through (g) that occur after July 1, 2017.

*Comments:* Several commenters contended that the proposed triggers in § 668.171(c) fail to take into account the provisions in section 498(c)(3) of the HEA that require the Secretary to determine that an institution is financially responsible if the school can show, based on an audited and certified financial statement, that it has sufficient resources to ensure against precipitous closure, including the ability to meet all of its financial obligations. To support this contention, the commenters stated that the proposed regulations do not provide a process or procedural mechanism for an institution to make this statutory showing before the Department would require the institution to submit a letter of credit in response to running afoul of an automatic trigger.

Similarly, some commenters stated that requiring financial protection by reason of the occurrence of a single triggering event was contrary to the requirement in section 498(c)(1) of the HEA that the Department assess the financial responsibility of the institution in light of the total financial circumstances of the institution.

Other commenters stated that section 498(c) of the HEA requires the Department to assess financial responsibility based solely on the audited financial statements provided by the institution under section 487(c) of the HEA.

---

[37] *Ass'n of Private Sector Colleges & Universities v. Duncan,* 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities v. Duncan,* 640 F. App'x 5 (D.C. Cir. 2016) (internal citations removed).

[38] *Ass'n of Proprietary Colleges v. Duncan,* 107 F. Supp. 3d 332, 356 (S.D.N.Y. 2015) (gainful employment measured by using debt and earnings incurred prior to effective date of new rule); see also: *Ass'n of Accredited Cosmetology Sch. v.*

*Alexander,* 774 F. Supp. 655, 659 (D.D.C. 1991), *aff'd,* 979 F.2d 859 (D.C. Cir. 1992), and *order vacated in part sub nom. Delta Jr. Coll., Inc. v. Riley,* 1 F.3d 45 (D.C. Cir. 1993) and *Ass'n of Accredited Cosmetology Sch. v. Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992) (application of cohort default rate to eligibility using pre-rule data).

[39] Id.

[40] *Ass'n of Proprietary Colleges v. Duncan,* 107 F. Supp. 3d at 356.

[41] Id.

[42] Under the proposed regulations, an institution would not be financially responsible for at least one year if it was subject to a triggering event that exceeded a materiality threshold or for a State or accrediting agency action, three years after that action. In these final regulations, an institution is not financially responsible if an automatic triggering event such as a lawsuit or loss of GE program eligibility produces a recalculated composite score of less than 1.0 or for a 90/10 or CDR violation or SEC action, the occurrence of that violation or action. In both the NPRM and these final regulations, discretionary triggers refer to actions, conditions, or events that are evaluated by the Department on a case-by-case basis to determine whether they have a material adverse impact on the financial condition or operations of the institution.

*Discussion:* Section 498(c) of the HEA directs the Secretary to determine whether the institution "is able . . . to meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary." 20 U.S.C. 1099c(c)(1). The statute uses the present tense to direct the Secretary to assess the ability of the institution to meet current obligations. The statute then provides that the Secretary shall also develop criteria based on financial ratios, which are to be measured and reported in audited financial statements. 20 U.S.C. 1099c(c)(2), (5). Obligations that accrued in the past may be reflected in financial statements showing the institution's financial status as of the close of the most recent institutional fiscal year, which are to be submitted to the Department "no later than six months after the last day of the institution's fiscal year." 34 CFR 668.23(a)(4). Obligations that accrue after the close of that fiscal year are not included in those statements, and those losses that are considered probable may receive limited recognition in those statements. Potential losses from pending litigation that are not yet considered probable are not included in those statements.

Thus, as the commenters state, the statute directs the Secretary to take into account "an institution's total financial circumstances in making a determination of its ability to meet the standards herein required." 20 U.S.C. 1099c(c)(2). Far from precluding the Secretary from giving controlling weight to a single significant occurrence in making this determination, the statute recognizes that the Secretary may do so if certain enumerated single adverse events have occurred in the past two to five years (*e.g.*, audit liabilities exceeding five percent of the institution's prior year title IV, HEA funding, or a limitation, suspension or termination action or settlement of such an action). 20 U.S.C. 1099c(e). The Secretary has since, at least the 1994 regulations, consistently considered even one such "past performance" event as sufficient grounds to render an institution not financially responsible even if it met or exceeded the requisite composite financial score, and if the Secretary nevertheless permitted the institution to participate, the institution was required to do so under provisional certification with financial protection. 34 CFR 668.174(a), 668.175(f), (g). The current regulations have also considered an institution not financially responsible if the institution is currently delinquent by at least 120 days on trade debt, and at least one creditor has sued. 34 CFR 668.171(b)(3). Thus, in considering the institution's total financial circumstances, the Secretary has consistently regarded a single such occurrence as a sufficient threat to the institution's ability "to meet . . . its financial obligations" as to make the institution not financially responsible. In so doing, the current regulations do not delegate to the suing creditor, or to the guarantor that brought the limitation, suspension, or termination action, the determination of the financial responsibility of the institution. To the contrary, the current regulations already identify particular past or present events as raising significant threats to the institution's ability to meet current obligations to creditors, to students, and to the taxpayer. The changes to the financial responsibility regulations articulate a more comprehensive list of adverse events that similarly call into question the institution's ability to meet current and impending obligations.

*Changes:* None.

*Comments:* Some commenters argued that under the APA, the Department cannot enact regulations applicable to time periods prior to the enactment of those regulations and therefore should remove the proposed § 668.171(c)(3), which would impose penalties on an institution that is currently, or was any time during the three most recently completed award years, subject to an action by its accrediting agency.

*Discussion:* As discussed above, in response to the commenters' objection that the rules are impermissibly retroactive, they are not because they affect only future participation. In light of the adoption of the composite score methodology, in this section, we evaluate risks under that methodology as they affect the current financial responsibility of the institution. We evaluate on a three-year look-back period, as a discretionary triggering event, only certain accreditor actions.

*Changes:* We have revised § 668.171(c)(1)(i) so that it does not include events that occurred in the prior three years, and we have revised § 668.171 to apply to events occurring on or after July 1, 2017, and we have relocated accreditor actions regarding probation and show cause to § 668.171(g)(5) as discretionary triggers.

### Penalty-Financial Protection

*Comments:* A commenter stated that requiring the institution to provide financial protection constituted a penalty on the institution, and that requiring the institution to provide such protection from its own funds constituted a deprivation of the institution's property interest in those institutional funds. The commenter stated that the requirement would also deprive the institution of its liberty interest by stigmatizing it. The commenter stated that the proposed requirement offered the institution no opportunity to dispute the requirement prior to the deprivation of these interests, and thus the deprivation would be imposed without the due process required by applicable law. The commenter stated that Congress requires the Department to provide schools with meaningful procedures before the imposition of a significant penalty. Specifically, the commenter stated that section 487 of the HEA requires the Department to afford schools "reasonable notice and opportunity for hearing" before imposing a "civil penalty." This requirement applies when the Department seeks to limit, suspend, or terminate the school's participation in any title IV, HEA program; determine that a school has made a substantial misrepresentation; or determine that a school has violated statutes or regulations concerning the title IV, HEA programs, each of which carry severe penalties. The commenter asserted that the required financial protection under this rule constitutes a civil penalty under the HEA, and is in fact far more onerous than the other examples in the HEA. Accordingly, the commenter contended that the Department must afford parties the same process that Congress contemplated in analogous circumstances.

*Discussion:* The requirement that the school provide financial protection is not a "penalty" under the HEA, which clearly labels as "civil penalties" what the regulations refer to as "fines." 20 U.S.C. 1094(c)(3)(B); 34 CFR 668.84. In contrast, section 498(c) of the HEA refers to financial protections using completely different terms: "third party guarantees," "performance bonds," and "letters of credit." The fact that the financial protections may inconvenience or burden the school in no way makes their requirement a "penalty." However, current regulations already require the Department to provide the school with the procedural protections that the commenter seeks. 34 CFR 668.171(e) requires that the Department enforce financial responsibility standards and obligations using the procedures pertinent to the school's participation status; for fully certified schools, the regulations require the Department to use termination or limitation actions under subpart G of

part 668 to enforce the requirement that the school's participation be terminated for lack of financial responsibility, or that the school's continued participation be reduced to provisional participation status and further conditioned on the provision of financial protection. Current regulations already assure that the school will receive all the procedural protections to which the HEA entitles it, not because the Department would deprive the school of its property right in its funds (which the financial standards would not do), but because the method of enforcing the financial responsibility obligation is through a termination or limitation action, subject to the procedural protections of an administrative hearing. 34 CFR part 668, subpart G. These requirements will not change under the new regulations.

Section 668.90(a) affords the school the opportunity to demonstrate, in the administrative proceeding, that a proposed limitation or termination is "unwarranted." That same regulation, however, includes some 14 specific circumstances in which the hearing official has no discretion but to find that the proposed action is "warranted" if certain predicate facts are proven. Among these restrictions is a provision that, in a proposed enforcement action based on failure to provide "surety" in an amount demanded, the hearing official must find the action warranted unless the hearing official concludes that the amount demanded is "unreasonable." In addition, § 668.174 provides explicit, detailed, curative or exculpatory conditions that must be met for a school subject to a past performance issue to participate. However, these substantive requirements are not incorporated in subpart G of part 668, the regulations regarding the conduct of limitation or termination proceedings. This may have created the impression that an institution subject to the requirements of § 668.174 could raise a challenge to those requirements in an administrative action to terminate or limit the institution that does not meet the requirements of § 668.174. This was never the intent of the Department. We therefore revise the regulations in § 668.90 governing hearing procedures to make clear that the requirements in current § 668.174 that limit the type and amount of permitted curative or exculpatory matters apply in any administrative proceeding brought to enforce those requirements. As for the restriction in the final regulations on challenges to a requirement that the school provide the "surety" or other

protection, the Department is updating and expanding one of the existing 14 provisions in which an action must be found warranted if a predicate fact is proven—in this case, the occurrence of certain triggering events, established through notice-and-comment rulemaking, that pose significant risk warranting the provision of adequate financial protection, in a minimum amount also established as sufficient through this same notice-and-comment rulemaking, with any added amount demanded and justified on a case-by-case basis. The Department is significantly revising the triggers proposed in the NPRM to simplify and reduce the number of conditions or occurrences that qualify as automatic triggers. As we discuss in adopting the composite score methodology, we measure the effect of most of the triggering events not in isolation, but only as each may affect the overall financial strength of the institution, as that strength was most recently assessed under the financial ratio analysis adopted in current regulations. § 668.172. And, for all discretionary triggers, the Department undertakes to assert a demand for protection only on a case-by-case basis, with full articulation of the reasons for the requirement.[43] For these discretionary triggers, a school may contest not only whether the predicate facts have actually occurred, but also whether the demanded "surety"—financial protection—is reasonable.

*Changes:* We have revised § 668.90(a)(3) to incorporate the limitations contained in current § 668.174, as well as the limits on challenges to demands for financial protection based on the automatic triggers in § 668.171(c)–(f) as modified in these final regulations.

*Composite Score and Triggering Events*

General

*Comments:* Some commenters believed that the Department should not promulgate new financial responsibility requirements, or have otherwise

---

[43] As discussed with regard to determining the appropriate amount of financial protection, ordinarily the expected result of closure or a significant reduction in operations in closed school discharge claims. We recognize that in some instances financial protection may be warranted for an institution that does not participate in a title IV, HEA loan program, and its closure thus cannot generate closed school claims. Such an institution remains subject to a demand based on a discretionary assessment of other potential losses, and we have revised § 668.90(a)(3) to ensure that such an institution can object to a demand for financial protection if that demand was based *solely* on the 10 percent minimum requirement generally applicable.

engaged in a rulemaking to do so, without reviewing and making changes to the composite score methodology used in the current financial responsibility standards in subpart L of part 668, particularly in view of changing accounting standards, and the manner in which the Department applies, calculates, and makes adjustments to the composite score.

Similarly, other commenters contrasted the process used to develop these financial responsibility amendments with the process used by the Department to develop the subpart L standards. The commenters noted that, in developing the subpart L standards, the Department engaged in systematic, sustained efforts to study the issue and develop its methodology through the formal engagement and aid of KPMG, an expert auditing firm, with significant community involvement. That process took approximately two years, and began with empirical studies by KPMG into the potential impact of the rule over a year before the issuance of any proposed language. The commenters stated that, in this case, the Department is rushing out these revisions without the necessary and appropriate analysis. Commenters noted that the Department produced draft language on the triggers and letter of credit requirements in the second negotiated rulemaking session, but with no significant accompanying analysis or basis for its proposal, and did not consult effectively or sufficiently with affected parties or prepare sufficient information and documentation to convey, or for the negotiated rulemaking panel to understand, the impact of this portion of the proposed regulations.

Some commenters were concerned that the Department did not harmonize the proposed financial responsibility provisions with the current composite score requirements and questioned whether it was reasonable for the Department to require an institution with the highest composite score of 3.0 to secure one or more letters of credit based on triggering events. The commenters further questioned why the Department proposed numerous and overlapping requirements, if the Department believes that the current composite score is a valid indicator of an institution's financial health.

Overlapping Triggers

Some commenters argued that it would be unnecessarily punitive to list as separate triggering events, and thereby impose stacking letter of credit requirements for, items that may be connected to the same underlying facts or allegations. For example, a lawsuit or

administrative proceeding settled with a government oversight agency for an amount exceeding a set threshold could lead an institution's accrediting agency to place the institution on probation, or an institution that fails the 90/10 revenue requirement might thereby violate a loan covenant.

As another example, commenters noted that an institution could be subject to a lawsuit or multiple lawsuits about the same underlying allegations, an accrediting agency may take action against the institution in connection with the same allegations, and a State agency may cite the institution for failing State requirements that relate to those same allegations. The commenters stated that multiple triggering events did not necessarily warrant additional financial protection and believed that this "stacking" of triggers is especially punitive to publicly traded institutions, which may be required to or voluntarily elect to disclose certain triggering events, such as lawsuits in reports to the SEC where making such disclosures is then itself an independent trigger. In this case, the commenters believed it was unfair to penalize a publicly traded institution twice, while any other institution with fewer shareholders or one that opts to raise capital privately would be subject to only one letter of credit requirement.

Commenters objected that it would be theoretically possible that a school could be required to post letters of credit exceeding 100 percent of the title IV, HEA funds the school receives, effectively crippling the school. The commenters cautioned that the Department should not require multiple letters of credit stemming from the same underlying facts or allegations—rather, the rules should reflect a more refined approach for setting an appropriate level of financial protection for each unique set of facts or allegations. The commenters suggested that to ensure that an institution provides the amount of financial protection that relates specifically to its ability to satisfy its obligations, the Department should evaluate each triggering event that occurs to determine whether any additional financial protection is needed.

A few commenters suggested that, rather than applying the proposed triggering events in a one-size-fits-all manner, the Department should consider other institutional metrics that serve to mitigate concerns about institutional viability and title IV, HEA program risks. For example, the commenters suggested that the Department could presumptively exclude from many of the new triggers

those institutions that have low and stable cohort default rates, consistently low 90/10 ratios, a general lack of accrediting or State agency actions, or any combination of these items. The commenters reasoned that, in the context of the NPRM, these attributes would generally indicate strong student outcomes and less likelihood of borrower defense claims arising from the institution. Or, the Department could provide that institutions with cohort default rates and 90/10 ratios below specified thresholds would not be required to post cumulative letters of credit under the new general standards of financial responsibility. Similarly, the commenters urged the Department to assess the circumstances of each triggering event to determine whether any additional protection is needed rather than requiring cumulative letters of credit for each of the triggering events. The commenters believed that by taking these alternate approaches, the financial responsibility regulations could be tailored to assess institutional risk profiles on a more holistic basis, rather than in the generally non-discerning manner reflected by the NPRM.

Other commenters requested that the Department specify in the final regulations the duration of each letter of credit for each triggering event, noting that in the preamble to the NPRM, the Department stated that schools subject to an automatic trigger would not be financially responsible for at least one year based on that trigger, and in some instances, for as long as three years after the event.

A commenter asserted that the institution should be provided the opportunity to demonstrate by audited financial statements that it had the resources to ensure against precipitous closure pursuant to section 498(c)(3)(C) of the HEA.

*Discussion:* After carefully considering the comments, the objective of the changes that we proposed, and the availability of other measures, we are changing the method of assessing the effect of many of the triggering events. We explain here briefly the composite methodology currently used to evaluate financial strength, and how we will use the composite score methodology to evaluate whether, and how much, those triggering events actually affect the financial capability of the particular institution. In addition, as discussed later in this preamble, we are revising and refining the triggers to consider as discretionary triggering events several of the events included as automatic triggers in the NPRM.

The composite score methodology in subpart L used under current regulations is the product of a comprehensive study of the issue and of numerous financial statements of affected institutions, as well as substantial industry involvement. The 1997 rulemaking that adopted this method established a basic model for evaluating financial responsibility that was intended to serve as the core of the Department's evaluation process for proprietary and private non-profit institutions, replacing a piecemeal approach still reflected in § 668.15(b)(7), (8), and (9). The regulations in subpart L were adopted to replace the prior structure, in which an institution was required to satisfy a minimum standard in each of three independent tests. The Department replaced that with "a ratio methodology under which an institution need only satisfy a single standard—the composite score standard. This new approach is more informative and allows a relative strength in one measure to mitigate a relative weakness in another measure." 62 FR 62831 (Nov. 25, 1997).[44] However, we note that even the prior financial responsibility standards considered whether the school was subject to a pending administrative action or suit by a Federal agency or State entity. § 668.15(d)(2)(ii)(C). Section 668.15 contained, and still contains, provisions addressing matters that may well occur after the audited period—for example, delinquency on an existing debt obligation, and a suit by at least one creditor, § 668.15(b)(4)(ii), as well as the same familiar past performance standards regarding parties with substantial control over the institution or the institution itself. 34 CFR 668.15(c).[45]

Although the 1997 regulations replaced the three independent financial ratio tests with the new composite score methodology as the core measure of financial responsibility,

---

[44] The composite score methodology assesses three aspects of financial strength but, unlike the prior method, assigns relative weights to each of the three assessments to produce a single, "composite" score.

[45] The 1994 financial responsibility regulations implemented the provision of section 498(c)(3)(C) of the HEA that would have allowed an institution that failed other financial responsibility to demonstrate by audited financial statements that it would not pose a risk of "precipitous closure." § 668.15(d)(2)(ii). The 1997 regulations supplanted the standards in § 668.15 with new subpart L, which centered the assessment of financial responsibility on the composite score methodology. The Department there adopted the "zone" assessment to assess "precipitous closing" rather than the separate audited financial statement showing previously permitted. 62 FR 62860–62862 (1997).

those regulations retained most of the accompanying provisions dealing with examples of financial risks that would not necessarily or even ordinarily be reflected in the audited financial statements on which the composite score rests. The Department made clear in the NPRM that, despite requests to revisit or modify the composite score component of the financial responsibility regulations, we were not doing so. 81 FR 31359. Thus, we retain here unchanged the methodology that the commenters laud as the product of careful, comprehensive, and engaged development.

In these final regulations the Department addresses the significance of new events that occur after the close of an audited period, or that are not recognized, or not fully recognized, and reflected in audited financial statements, to assess whether the school, regardless of its composite score, "is able to provide the services described in its publications and statements, to provide the administrative resources necessary to comply with the requirements of this title [title IV of the HEA], and to meet all its financial obligations. . . ." 20 U.S.C. 1099c(c)(1). In doing so, we are expanding the consideration of events that would make a school not financially responsible in the near term—from the single example in current regulations (commercial creditor lawsuits) to other major lawsuits and other events that pose a potential material adverse risk to the financial viability of the school. In the negotiated rulemaking meetings, and in the NPRM, we articulated the adverse events that recent history indicates pose a significant risk to the continued ability of an institution to meet these several obligations. We address elsewhere in this preamble comments directed at events that pose particular risks, but discuss here the manner in which these events will be evaluated.

The composite score methodology, as commenters stressed and as we acknowledge, is designed to measure the viability of an institution from three different aspects and develop a score that assigns relative weight to each aspect to produce a score showing the relative financial health and viability of the institution. In general, institutions with a composite score of 1.5 or more are financially responsible; those with a score between 1.0 and 1.5 are in the "zone" and subject to increased reporting and monitoring; those with a score below 1.0 are not financially responsible, and may participate only on conditions that include providing financial protection to the Department.

However, the limitations of the existing composite score methodology are two-fold: The score is calculated based on the audited financial statements for the most recent fiscal year of the institution, and the audited financial statements recognize threatened risks only if accounting rules require the institution to recognize those events. If those events are recognized, however, the composite score can readily assess their effect on the viability of the institution, with due regard for the actual financial resources of the institution, including its ability to meet exigencies with internal resources and to borrow to meet them. The institution's composite score in each instance has already been calculated; to assess the effect of a threat or event identified in these regulations, the institution's financial statements on which that composite score was calculated will be adjusted to reflect the amount of loss attributed to, and other impacts of, that threat, and based on the adjusted statements, the Department will recalculate the institution's composite score. This recalculation will occur regularly as threats or events identified in these regulations are identified. By adopting this approach, the final regulations provide an individualized assessment rather than the one-size-fits-all method proposed in the NPRM that commenters found unrealistic. Unless other conditions apply, under the current regulations, an institution that undergoes a routine assessment of financial responsibility and achieves a composite score of 1.5 or greater may continue to participate without providing financial protection; an institution with a score between 1.0 and 1.5 may participate subject to heightened reporting and scrutiny; and an institution with a composite score below 1.0 is not financially responsible and may participate only with financial protection.[46] §§ 668.171(b)(1), 668.175(c), 668.175(f). Under the approach we adopt here, where the recognition of the triggering event produces a recalculated composite score of 1.0 or greater, we will regard the event as not posing a risk that makes or is likely to make the institution not financially responsible, and will therefore not require financial protection. If the recognition of the

event or risk produces a failing composite score—less than 1.0—the institution is required to provide financial protection.[47]

For the purpose of recalculating an institution's composite score, as detailed in Appendix C to these regulations, the Department will make the following adjusting entries to the financial statements used to calculate an institution's most recent composite score. For clarity, the adjusting entries refer to the line items in the balance sheet and income statements illustrated in Appendix A for proprietary institutions and Appendix B for non-profit institutions.

For a proprietary institution, for events relating to borrower-defense lawsuits, other litigation, or debts incurred as a result of a judicial or administrative proceeding or determination, or for a withdrawal of owner's equity, the Department will debit Total Expenses, line item #32, and credit Total Assets, line item #13, for the amount of the loss—the amount of relief claimed, the debt incurred, the amount withdrawn, or other amount as determined under § 668.171(c)(2). Except for the withdrawal of owner's equity, the corresponding entries for a non-profit institution are a debit to Total Expenses, line item 38b (unrestricted), and a credit to Total Assets, line item #12, for the amount of the loss.

For a proprietary institution, for events relating to a closed location or institution or the potential loss of eligibility for GE programs, the Department will debit Total Income, line item #27, and credit Total Assets, line item #13, for the amount of the loss. The loss is the amount of title IV, HEA funds the institution received in the most recently completed fiscal year for the location or institution that is closing or for the GE programs that are in jeopardy of losing their eligibility for title IV, HEA funds in the next year. In addition, the Department will debit Total Assets, line item #13, and credit Total Expenses, line item #32, for an amount that approximates the educational costs that the institution would not have incurred if the programs at the closing location or the affected GE programs were not offered. We believe it is reasonable that this reduction in costs is proportional to the ratio of Cost of Goods Sold (line item #28) to Operating Income (line item #25)—that is, the amount it cost the institution to provide all of its

---

[46] As provided under § 668.175(f)(3), an institution that has a composite score of less than 1.0 is not financially responsible until it achieves a composite score of 1.5 or higher. In other words, if an institution with a composite score of less than 1.0 has in the following year a composite score between 1.0 and 1.5, the institution is still subject to the requirements under the provisional certification alternative, including the letter of credit provisions, even though it scores in the zone.

[47] As the Department stated in the 1997 rulemaking, "However, an analysis of data of closed institutions indicates that institutions that fail the ratio test should not be allowed to continue to participate without some additional surety to protect the Federal interest."

educational programs divided by the revenue derived from offering those programs.

The corresponding entries for a non-profit institution are, for the loss, a debit to Total Revenue, line item #31b, and a credit to Total Assets, line item #12. The reduction in costs is calculated by dividing Operating Expenses, line item #32, by Tuition and Fees, line item #27, and multiplying the result by the amount of the loss, the amount of title IV, HEA funds received by the location or affected GE programs. To account for the reduction in costs, the Department will debit Total Assets, line item #12, and credit Total Expenses, line item 38b.

Recognition of recent or threatened events can be appropriately measured under the composite score methodology if the event causes or is likely to cause a loss that can be quantified. All but two of the events that we retain as automatic triggers pose risks that we can quantify in order to assess their impact on the institution's composite score. Lawsuits, new debts of any kind, borrower defense discharge claims, closure of a location, loss of eligibility of gainful employment programs, and withdrawal of owner equity all have effects that may be quantified so that their effects can be assessed using the composite score methodology.

In at least two instances, there is no need to attempt to quantify the loss, because the loss is self-evident. An institution that fails the requirement to derive at least 10 percent of its revenues from non-title IV sources is so dependent on title IV, HEA funds as to make the loss of those funds almost certainly fatal, and we see no need to quantify that amount through the composite score methodology. That risk requires financial protection regardless of the most recent composite score achieved by the institution. Similarly, an institution whose cohort default rate exceeds 30 percent in two consecutive years is at risk of losing title IV, HEA eligibility the following year and requires no composite score calculation. These risks require financial protection regardless of the most recent composite score achieved by the institution.

An action taken by the SEC to suspend trading in, or delist, an institution's stock directly impairs an institution's ability to raise funds—creditors may call in loans or the institution's credit rating may by downgraded. However, unlike lawsuits and other threats, it is difficult to quantify readily the amount of risk caused by that action and assess that new risk using the prior year's financials and the composite score

derived from those statements. Nevertheless, because the impaired ability to raise funds caused by these actions is potentially significant, that risk warrants financial protection without the reassessment of financial health that can be readily performed for more quantifiable risks. Nevertheless, because the impaired ability to raise funds caused by these actions is potentially significant, that risk warrants financial protection without the reassessment of financial health that can be readily performed for more quantifiable risks.

We recognize that the institution's current year financial strength may differ from that reported and analyzed for the prior fiscal year. That difference, however, can be favorable or unfavorable, and would be difficult to reliably determine in real time. Given that uncertainty, we consider it a reasonable path to use as the baseline the data in the most recent audited financials for which we have computed a composite score, and adjust that data to reflect the new debt or pending threat. Any disadvantage this may cause an institution will be temporary, because the baseline will be corrected with submission, evaluation, and scoring of the current year's audited financial statements. In assessing the composite score of the new financial statements for purposes of these standards, we will continue to recognize, for purposes of requiring financial protection, any threats from triggering events that would not yet be fully recognized under accounting standards. However, improvements in positions demonstrated in the new audited financials may offset the losses recognized under these regulations. If those improved positions produce a composite score of 1.0 or more, despite the loss recognized under these regulations, the institution may no longer be required to provide financial protection.

With regard to the suggestion by the commenters that the Department allow an institution to submit new month-end or partial-year audited financial statements from which the composite score would be recalculated, we believe that doing so would be costly and unworkable, because those financial statements do not reflect a full year's transactions, and would potentially recognize only new debts, or partially recognize new litigation or other claims for which the institution determines that a loss is probable. We note that the composite score methodology was designed to measure the financial performance of an institution over an entire 12-month operating cycle, the

institution's fiscal year, and believe that attempting to calculate a composite score for a partial year would produce anomalous results. In addition, it is not clear how an institution could produce audited financial statements by the end of the month in which a triggering event occurred. Further, the suggestion does not appear to offer a realistic approach because separate actual or threatened losses may occur throughout the year, and for each event, this proposal would require a new set of financial statements.

This approach will affect only institutions that have a recalculated composite score of less than 1.0. If recognition of the event produces a recalculated composite score of between 1.0 and 1.5 for an institution that had a routine composite score of 1.5 or more, the recalculated score does not change the existing score to a zone score, so the institution is not required to comply with the zone requirements. § 668.175(d). For some institutions, a single event or threat may produce a failing composite score, while for others, a series of actions or events may together place the institution at substantial risk. Using the composite score methodology to assess new or threatened risks, instead of using a dollar- or percentage-based materiality threshold for individual triggering events, allows the Department to assess the cumulative effect on the institution of individual threats or events regardless. Thus, we will require financial protection only when the recalculated composite score is failing and the cumulative effect produces a failing score.

In response to the commenters who objected that the proposed triggering scheme would arbitrarily "stack" protection requirements, the composite score methodology distinguishes among levels of financial strength, and as we explain below, permits the Department to align the amount of protection required with the relative risk or weakness posed by successive triggering events or conditions. We agree with the commenters that an institution should not be required to provide financial protection for every automatic triggering event for which the underlying facts or circumstances are the same or where a direct causal relationship exists between two or more events, like the circumstance noted by the commenters where a 90/10 violation causes a loan agreement violation, or a settlement generates an accreditor sanction.

In response to the objection that these regulations could require financial protection equal to all of the title IV, HEA funds received in the prior year,

we adopt here an approach that tailors the amount of protection required to a minimum amount we consider sufficient to cover the losses to the government reasonably likely to occur upon closure, plus any additional amount that we estimate is reasonable to expect based on the circumstances presented by the risks posed for the particular institution. Under current regulations, an institution that does not meet financial responsibility standards may participate under provisional certification requirements by providing a letter of credit equal to at least 10 percent of the prior fiscal year title IV, HEA program funds received. § 668.175(f)(2)(i). This restriction applies to any institution that no longer qualifies for continued participation in the zone, or, as particularly pertinent here, achieves anything less than a score of 1.0—for example, a score of .90. Because the composite score makes these kinds of distinctions among scores, current regulations give dispositive weight to its results in critical determinations regarding an institution's ability to participate. Thus current regulations have long attached controlling significance to what may be relatively slight differences in composite score outcomes. We adopt here a rule that an institution that receives an adjusted composite score of less than 1.0 must provide financial protection in an amount not less than 10 percent of the prior fiscal year's title IV, HEA funding, and, as the composite score decreases, the institution may be required to provide an added amount of protection where supported by the particular facts and circumstances—including the history of the institution, the nature of the risks posed, the presence of existing liabilities to the Department, the presence, amount, and rate at which borrower defense claims are being filed, and the likelihood that the risk will result in increases in borrower defense claims.

The requirement to provide at least a 10 percent letter of credit is rooted in the 1994 regulations regarding provisional certification of institutions that did not meet generally applicable financial responsibility standards. 34 CFR 668.13(d)(1)(ii)(1994). We adopt here this 10 percent as a minimum requirement because we consider financial protection in the amount of 10 percent of prior year title IV, HEA funding to be the minimum amount needed to protect the taxpayer from losses reasonably expected from an institution's closing. These losses include, at a minimum, costs of closed school discharges. Closed school

discharges can affect all loans—including PLUS loans—obtained to finance attendance at the closing institution. This includes any loans obtained for enrollment in years before the year in which the institution closes, not merely those loans received by students for attendance at the institution in the year in which it closes. Thus, a closure could, in some instances, generate closed school discharge losses in amounts exceeding the total amount of Direct Loan funds that the institution received in the year preceding the year of that closure.

Liabilities of an institution could also include liabilities for funds unaccounted for by audit, because the institution as a fiduciary is liable for the costs of title IV, HEA funds it received unless it affirmatively demonstrates by the required compliance audit that it spent those funds properly. An institution that closes may have neither the resources nor the incentive to secure an audit of its expenditures of these funds. The liability of an institution that fails to account for those funds includes the full amount of Pell Grant funds received, and, for loans that are received for that period and are not discharged, the subsidy costs for those loans, which varies from year to year among loan types.[48] An institution that closes may also owe liabilities to the Department for debts arising from audits, program reviews, or fine actions, or from borrower defense claims. Closure of the institution would also jeopardize recovery of all these liabilities, and the risk to the taxpayer in those instances is considerably greater than the costs of closed school discharges.

We have already experienced closed school discharge claim losses in one of the most recent and significant school closures, that of Corinthian, that permits development of estimates of liabilities. Corinthian was composed of three chains of some 37 separate institutions, operating at 107 campuses, with 65,000 students enrolled in 2014. It received

$1.439 billion in title IV, HEA funding in FY 2013, the last full fiscal year preceding its closure. During the year preceding its closure, Corinthian sold 50 campuses, with some 30,000 students enrolled, to a new entity, a transaction that allowed a major portion of Corinthian students to complete their training. In addition, under agreement with the Department, Corinthian continued training at the campuses it retained until its closure in April 2015.

The Department has to date granted closed school discharges of some $103.1 million for some 7,858 Corinthian borrowers, with the average discharge some $13,114.[49] Additionally, the Department has thus far approved 3,787 borrower defense discharges, totaling $73.1 million. Together, Corinthian's liabilities through both closed school and borrower defense total more than $176 million, with additional claims expected to be approved later. A letter of credit at the level of 10 percent of prior year title IV, HEA funding would have been $143 million—enough to cover the estimated total closed school discharges and far too little to cover the school's total liabilities on individual student loan losses.[50]

From this history, we estimate that an institution that closes in an orderly wind down, under which the majority of the students are able to continue their education by transfer or otherwise, will generate closed school discharge claims of at least 10 percent of the amount of all title IV, HEA funding received in the last complete fiscal year prior to the year in which the institution finally closes. Therefore, we adopt 10 percent of prior year title IV, HEA funding as the minimum amount of financial protection required of an institution that achieves a recalculated composite score of less than 1, or otherwise faces the risks (90/10, cohort default rates, SEC action) for which we do not recalculate a composite score. This is consistent with many years of Department practice.

Obviously, not all closures will arise in such fortuitous situations. It is realistic to expect that for other closures, including those that are more precipitous, a far greater percentage of borrowers will qualify for closed school discharges. Moreover, these regulations are expected to increase the number of instances in which we will give a closed school discharge by providing relief without an application where we have sufficient information to determine eligibility. In addition, based on the Corinthian experience, we expect that

[48] Because every institution must affirmatively account for the title IV, HEA funds it has caused to be awarded during an entire fiscal year as properly spent, an institution receiving funds on the cash monitoring or reimbursement method does not meet this obligation simply by having payments approved under the requirements applicable to funding under those methods, which do not necessarily involve the comprehensive examination conducted in an audit. Similarly, because the institution must make this accounting on a fiscal year basis, the fact that an institution may offer short programs several of which may be completed within a fiscal year does not limit the potential loss in the case of a precipitous closure to the amount of funds received for a program that may be curtailed by such a closure, rather than all the funds for which it was responsible for the entire fiscal year.

[49] As of October 2016.
[50] The Department also fined Corinthian $30 million.

the law enforcement agency actions that can constitute triggering events will generate borrower defense claims as well.[51] Other liabilities to the Department may already exist or are expected to arise. Under these regulations, therefore, the Department demands greater financial protection in cases in which these risks are identified, in addition to the minimum 10 percent. We include other conditions as discretionary triggering events, but in particular circumstances, those conditions can separately indicate that the potential losses that may arise warrant levels of financial protection greater than 10 percent. If the Department demands greater financial protection than the 10 percent level, the Department articulates the bases on which that added protection is needed, which can include any of the considerations discussed here. If an institution has already arranged financial protection, the Department credits the amount of protection already provided toward the amount demanded, if the protection already provided has the same terms and extends for the duration of the period for which protection is required pursuant to these regulations. In determining the proper amount of financial protection, then, we intend to look closely at any evidence that these kinds of liabilities may ensue from the risk posed by adverse events to a particular institution. We note, in particular, that section 498(e)(4) of the HEA, by indicating which specific histories of compliant behavior are enough to bar the Department from requiring personal guarantees from owners or institutions, has identified those histories that indicate future risk. 20 U.S.C. 1099c(e). Since 1994, the Department has implemented the statute in precisely this way, by adopting these histories as per se financial responsibility failures, warranting surety and provisional certification. §§ 668.174(a), 668.175(f)(1)(ii).

Similarly, section 498(c)(1)(C) of the HEA specifically directs the Secretary to consider whether the institution is able

to meet its refund obligations to students and the Department. 20 U.S.C. 1099c(c)(1)(C). The Department has implemented this provision by requiring an institution that has a performance rate of less than 95 percent in either of the two most recently completed fiscal years to provide surety in an amount of 25 percent of the amount of refunds owed during the most recently completed fiscal year. § 668.173(d). We intend to apply these long-standing and statutorily sanctioned predictors of potential liabilities in determining the amount of financial protection that we may require over and above that minimum amount to cover the costs of closed school discharges. Thus, we may determine that the potential loss to the taxpayer of the closure or substantial reduction in operations of an institution that has failed the 95 percent refund performance standard to be 25 percent of refund obligations in the prior year, in addition to the 10 percent of prior year title IV, HEA funding needed to cover closed school discharges. We may determine that the potential loss to the taxpayer of the closure or substantial reduction in operations of an institution that has had audit or program liabilities in either of the two preceding fiscal years of five percent or more of its title IV, HEA funds to present a potential loss of that same percent of its most recent title IV, HEA funding, in addition to the 10 percent of funding needed to defray closed school discharge losses. We may determine that the closure or substantial reduction in operations of an institution that has been cited in any of the preceding five years for failure to submit in a timely fashion required acceptable compliance and financial statement audits presents a potential loss of the full amount of title IV, HEA funds for which an audit is required but not provided, in addition to any other potential loss identified using these predictors.

Relying on the composite score methodology also helps clarify how long financial protection for risks or conditions should be maintained, because some events have already occurred, and will necessarily be assessed in the next audited financial statements and the composite score, which is routinely calculated. Others, such as pending suits or borrower defense claims, will not be reflected in the new financial statements, and those risks may still warrant continuing the financial protection already in place. Along these lines, we will maintain the full amount of the financial protection provided by the institution until the Department determines that the

institution has (1) a composite score of 1.0 or greater based on the review of the audited financial statements for the fiscal year in which all losses from any triggering event on which the financial protection was required have been fully recognized, or (2) a recalculated composite score of 1.0 or greater, and that any triggering event or condition that gave rise to the financial protection no longer applies.

We believe it is reasonable to require an institution to maintain its financial protection to the Department as noted above until the consequences of those events are reflected in the institution's audited financial statements or until the institution is no longer subject to those events or conditions. If the institution is not financially responsible based on those audited statements, or the triggering events continue to apply, then the financial protection on hand can be used to cover all or part of the amount of protection that would otherwise be required. Doing so minimizes the risks to the Federal interests by having financial protection in place in the event that an institution does not sufficiently recover from the impact of a triggering event—any cash or letter of credit on hand would be retained and any funds under a set-aside arrangement would reduce or eliminate the need to offset current draws of the title IV, HEA funds.

With regard to the comment that a letter of credit could exceed 100 percent of the title IV, HEA funds received by an institution, we note that the regulations adopted here set 10 percent of prior year title IV, HEA funding as the minimum financial protection required for an institution that achieves a recalculated score below a 1, or fails the 90/10, cohort default rate, or SEC triggers, and permit the Department to demand greater protection when the Department demonstrates that the risk to the Department is greater.

*Changes:* We have revised § 668.171(c)(1) to provide that losses from events or risks listed as triggering events are generally evaluated by determining whether the amount of loss recognized for this purpose, if included in the financial statements for which a composite score was most recently calculated under § 668.172, would produce a composite score less than 1.0. In § 668.171(c)(2) we have specified that the actual or potential losses from the actions or events in § 668.171(c)(1) are accounted for by revising an institution's most recent audited financial statements and that the Secretary recalculates the institution's composite score based on the revised statements regularly. If the recalculated

[51] These losses can be very substantial. The Department has already granted $73 million in borrower defense discharge relief to some 3800 Corinthian Direct Loan borrowers under § 685.206, and thousands of Corinthian borrower claims are pending. The average amount of loan indebtedness discharged for these 3800 was $19,300; many thousands of other Corinthian borrowers may have valid claims for relief, and the Department has been reaching out to some 335,000 of these individuals. See: United States Department of Education Fourth Report of the Special Master for Borrower Defense to the Under Secretary, June 29, 2016. If even 20 percent of these other borrowers qualify for relief, the loss to the Federal taxpayer would add another billion dollars to the $73 million in losses already experienced.

composite score is less than 1.0, the institution is not financially responsible and must provide financial protection.

*Triggering Events*

*Comment:* Some commenters objected that the Department had produced no data to support the assertion that the triggering events in fact pose the risks that would warrant their use. Other commenters stated that the requirement to provide financial protection based on the mere filing of a lawsuit seeking the proposed recoveries was speculative, not based on actual data showing that an adverse result was reasonably expected to result from that suit and was thus arbitrary and lacked a reasonable basis. Another commenter asserted that the Department's reference to the Corinthian situation does not support adopting the rule proposed here, and that current regulations were sufficient to enable the Department to obtain from Corinthian the protections needed to mitigate or eliminate the risks now cited to justify the new rules. The commenter asserted that Corinthian failed financial responsibility tests in FY 2011, could have been required to post a letter of credit, but was not required to do so, nor was it required to post a letter of credit for FY 2014, when Corinthian again failed the tests.

*Discussion:* As discussed for each of the triggers, each reflects a new financial obligation already incurred and not yet reflected in the composite score for the institution, or a new financial risk that is realistically imminent, whether or not yet recognized in the audited financial statements. Current regulations permit the Department to demand 10 percent or more financial protection, but provide no structured scheme to assess whether a particular event actually jeopardizes the institution, and if so, by how much, and what amount of protection is needed beyond that 10 percent minimum described in the regulations. We described in the NPRM the history of Corinthian's evaluation under the existing financial responsibility scheme.[52] Even if Corinthian's financial statements had been accurate when presented, they would not have accounted for the risk posed by the pending California attorney general action, that ended in a judgment for $1.1

billion, and the LOC that would likely have been demanded—a small fraction of the title IV, HEA funding for the prior year—would barely have covered the liabilities already established by the Department against Corinthian. The Corinthian experience highlighted the need to identify events that posed realistic jeopardy in the short term, and to secure financial protection before the loss was incurred and the institution on account that that loss no longer had the ability to provide that protection. Similarly, current standards would not require protection where an institution was on the very cusp of loss of title IV, HEA eligibility, as with cohort default rate and 90/10 sanctions.

*Changes:* None.

**Automatic Triggering Events**

*Lawsuits and Other Actions § 668.171(c)(1)(i)*

Lawsuits Settlements/Resolutions

*Comments:* Under proposed § 668.171(c)(1)(i)(B), (ii), and (iii), a school may not be financially responsible if it is currently being sued by a State, Federal, or other oversight entity, or by private litigants in actions, including qui tam suits under the False Claims Act, that have survived a motion for summary judgment.

Some commenters objected that requiring financial protection based on suits by private parties was unreasonable because the commenters considered those suits to have no bearing on the financial responsibility and administrative capability of the institution. Others considered reliance on the filing of suits that had not yet resulted in judgments against the institution to constitute an unreasonable standard that deprived the institution of its due process rights to contest the lawsuits. A commenter objected to the inclusion of government suits because the commenter considered proprietary institutions to often be the target of ill-planned and discriminatory suits by State and Federal agencies. A commenter stated that suits filed by State AGs have been shown in some cases to be politically motivated and argued that such suits should not be the basis for a letter of credit as they may unfairly target unpopular members of the higher education industry, depending on the party affiliation of the AG. The commenter stated that the suits are not required to be based in fact and rarely lead to a finding, that the judicial process should be allowed to follow its usual course, and that requiring schools to post letters of credit prior to a judicial ruling in the case amounts to finding a school guilty and requiring the school to

prove innocence. The commenter stated that the risk posed by the filing of a suit cannot be determined simply from the complaint filed in the suit, and the actual risk posed by such suits, some commenters urged, could be reasonably determined only after determining the merits of the suit.

Commenters objected that these triggering events would require a school to submit a letter of credit before there was any determination of merit or wrongdoing by an independent arbiter, and stated that such suits should not be taken into account until judgment. The commenters stated that they believed that, contrary to the Department's statement in the preamble that suits by State and Federal agencies are likely to be successful, most cases settle due to the outsized leverage of the government, despite their merits. In addition, the commenters believed that suits filed by State AGs should not be the basis for a letter of credit because these suits have been shown in some cases to be politically motivated and to unfairly target institutions.

Another commenter urged the Department to remove the lawsuit triggers, arguing that the mere filing of an enforcement action by a State, Federal, or other oversight entity based on the provision of educational services should not be considered a trigger. The commenter stated that lawsuits are easy to file, allegations are not facts, and, even assuming good faith on the part of State and Federal regulatory agencies, sometimes mistakes are made. The commenter contended that the litigation process creates the incentive for sweeping allegations that may or may not be verifiable, or there may be cases filed by an agency in the hope of making new law or establishing a new standard for liability or mode of recovery beyond that applied by courts in ruling on such claims. A commenter was concerned that an "other oversight agency" could refer to a town or county zoning board or land use agency that could threaten to file a multi-million dollar suit for pollution, or a nuisance suit like a violation of a local sign ordinance, or failure to recycle soda cans, as a way to leverage concession from the institution for other reasons. These suits would be covered under proposed § 668.171(c)(1)(ii) even though they have nothing to do with the educational mission of the school. The commenter contended that giving such unbridled power to non-State, non-Federal, non-education-related oversight entities would effectively place the "sword of Damocles" over the head of every college president who needs to negotiate a dorm or a new parking facility.

---

[52] Applying the routine tests under current regulations did not result in financial protection, because Corinthian appeared at the time it provided the Department with its audited financial statements to pass those tests. Only later—too late to secure financial protection—did further investigation reveal that Corinthian in fact had failed the financial tests in current regulations. 81 FR 39361.

Many commenters objected to consideration of settlements with government agencies under proposed § 668.171(c)(1). As proposed, the regulation might make a school not financially responsible if during the current or three most recently completed award years it was required to pay a debt to a government agency, including a debt incurred under a settlement. Commenters viewed this provision as overly broad and punitive, and suggested that settlements be excluded from this provision. A commenter believed that an institution under investigation will have a strong incentive to avoid a settlement that would precipitate the triggering event in proposed § 668.171(c)(1)(i)(A), which would require it to provide the Department a potentially expensive or unobtainable letter of credit. A commenter noted that bringing suit can be an important tool in facilitating settlement, and cited a case where a State AG filed a consumer fraud suit against an institution. The parties were able to negotiate a settlement that provided $2.1 million in loan forgiveness and $500,000 in refunds for students. Imposing a letter of credit in such situations would deter such favorable settlements. Commenters asserted that many businesses settle claims with the government due to the cost of litigation and the outsized leverage of the government, regardless of the merits of the underlying claims.

Commenters objected to consideration of debts already paid, asserting that if a school pays a liability as a result of an agency action, the school has already paid an amount that was deemed appropriate by the agency and should not be subject to the additional punitive requirement of posting a letter of credit. The commenters argued that this is especially true if the school's payment resulted in repayments to students such that a letter of credit is no longer necessary to provide for possible student claims.

Similarly, other commenters claimed that lawsuit triggers would create every incentive for borrowers who get behind in their loan payments to file claims or suits against an institution, regardless of how frivolous those suits or claims may be, and therefore these triggers should not be part of the borrower defense rulemaking.

Evaluation

A commenter urged the Department to make the lawsuit and investigation triggers in § 668.171(c)(1) evaluative instead of automatic, so that the Department would evaluate the type of suit, the merit of the claims, the amount

of money at stake, and the likelihood of success. With this system in place, only institutions with a serious financial risk would be required to obtain a letter of credit, leaving other institutions room to negotiate with State AGs or other enforcement entities.

Other commenters objected to assessing the value of the lawsuits (in proposed § 668.171(c)(v)) by using "the tuition and fees the institution received from every student who was enrolled at the institution during the period for which the relief is sought" as wrongly presuming that every student in the period (or three years if none is stated) would receive a full refund, and may have no relation to the event on which suit was brought. While the commenters do not suggest using the damages proposed in any complaint, which they claim are often speculative and designed to grab media attention rather than reflect a true damage calculation, a better way to assess value would be an analysis of the merits of the specific litigation at issue, guided by past recoveries and settlements for similar actions. Some commenters objected that State AGs and private litigants will likely include demands for relief in pleadings that equal or exceed the thresholds set by the Department in order to gain additional leverage over an institution. Other commenters objected that State AG suits will also exceed the thresholds because they will state no dollar amount of relief, and thus be deemed to seek restitution in the amount of all tuition received for a period.

Some commenters believed that an institution should be afforded the opportunity to demonstrate, by an independent analysis, that the actual amount at issue is below the thresholds set for the applicable action and therefore the action is not material. Some commenters suggested that the Department allow an institution to seek an independent appraisal from a law firm, accounting firm, or economist that would state the actual amount at issue in the lawsuit. Others stated that this analysis could be accomplished as part of an appeal process with a hearing official deciding the amount based on evidence from the institution and the Department.

Threshold

Some commenters stated that it is common for plaintiffs suing colleges and universities to allege damages far exceeding any amount that could feasibly be obtained in either a settlement or final judgment, as a tactic to maximize any final settlement amount and contingency fees to the

attorney. For this reason, the commenters argued that requiring a letter of credit based solely on a claim exceeding 10 percent of an institution's assets is arbitrary and unwarranted, as the claimed amounts often have little factual basis or legal support. Further, the commenters were concerned that enacting this new standard would lead to plaintiffs' attorneys stating claims in excess of the 10 percent threshold to create negotiating leverage.

Other commenters believed that the $750,000 and 10 percent of current assets thresholds were arbitrary because they do not take into account that the size of schools varies significantly and, as such, their exposure may vary significantly. The commenters reasoned that a larger school that serves a greater number of students may be subject to a larger liability, but may also be able to adequately withstand that liability. For these reasons, the commenters suggested that the triggering events in § 668.171(c)(1) should be removed entirely, but if they are not removed, the commenters urged the Department to exclude the settlement provisions and the $750,000 threshold because debts of that size are not indicative of the financial stability of the school.

Some commenters noted that Federal and State settlements are often very small, and therefore believed those settlement amounts would not likely reach or exceed the proposed threshold of 10 percent of current assets. The commenters urged the Department to eliminate the 10 percent threshold in the final regulations, arguing that a settlement, in and of itself, should be sufficient to trigger a letter of credit. Other commenters believed that the threshold of $750,000 for the lawsuit triggers was so low that an auditor would not consider that amount to be material and therefore would not include the lawsuit in the footnotes of an institution's financial statements. They suggested that the Department set the materiality threshold as the higher, rather than the lesser, of $750,000 or 10 percent of current assets. The commenters reasoned that the lesser amount would almost always be the audit threshold ($750,000) which, in the case of any large school, will not be material. Alternatively, the commenters suggested that the Department remove the audit-based threshold and simply rely on the 10 percent of current assets threshold.

No Amount Claimed

Objecting to the method of calculating a claim in a suit in which the plaintiff does not state a dollar amount of relief, a commenter noted that in a number of

State courts—in New York, Maryland, and Maine, for example—a specific dollar-amount demand is not permitted in many civil actions. In such cases, proposed § 688.171(c)(1)(v)(A) would require that the amount be calculated "by totaling the tuition and fees the institution received from every student who was enrolled at the institution during the period for which relief was sought, or if no period is stated, the three award years preceding. . . ." The commenter feared that applying this principle would result in a "deemed" ad damnum of at least three years' total revenue—and it would be a fortunate institution that maintained sufficient current assets to keep the made-up "deemed" ad damnum below 10 percent of current assets. In addition, the commenter notes that other States, like Virginia, do not permit recovery in excess of the written ad damnum, regardless of what a jury may award—for example, if the demand is $10,000 and the jury awards ten million dollars, only the demanded amount is awarded. The commenter opined that in those States, the incentive is to massively over-plead the value of the case, so that an attorney's client is not forced to accept less money after encountering a generous jury. The underlying point is the same: Neither a stated ad damnum in any lawsuit nor the "deemed" ad damnum of proposed § 688.171(c)(1)(v)(A) bears any necessary relationship to the actual value of the suit, to the likely range of recovery, or to the effect of the suit on the financial responsibility of the educational institution.

Second, the commenter argued that a pending private lawsuit seeking large damages should not be considered a trigger event, as proposed in § 688.171(c)(1)(iii). The commenter cautioned that considering filed-but-not-decided litigation to impair the financial responsibility of an institution would overly empower opportunistic or idealistic members of the plaintiff's bar. The commenter asserted that the proposed position would give every lawyer with a draft lawsuit containing enormous damage claims a chokehold on any school. The commenter noted that although proposed § 688.171(c)(1)(iii)(A) is intended to restrict this triggering event to only those claims that survive summary judgment, the commenter asserted that in some States, this restriction would be ineffective. The commenter asserted that, for example, in New York State courts, a plaintiff can file a "Motion For Summary Judgment in Lieu of Complaint," under CPLR Section 3213,

to initiate the case. A plaintiff can demand a response on the date an answer would otherwise be due; if the defendant were to file a cross-motion for summary judgment as a response, the court ostensibly would deny both and treat the cross-motions as an answer and complaint, and the case would go forward. But the case would have "survived a motion for summary judgment by the institution," and would then constitute a trigger event at its outset.

The commenter further asserted that California State courts permit not only summary judgment, but also a separate procedure for resolution of entire claims by "summary disposition." Cal. Code of Civ. Pro. Section 437c. The grant of judgment to the institution on any relevant claim by summary disposition would not seem to affect whether a trigger event has occurred, even if the only relevant claim was disposed of. The commenter asserted as well that in Virginia, summary judgment is technically available, but, as a practical matter, the commenter states that it is never granted because a motion for summary judgment cannot procedurally be supported by documents, affidavits, depositions, or other similar evidence. Moreover, the real effect of this provision would be to deter institutions from ever moving for summary judgment, fearing that the motion would be denied therefore generating a triggering event.

For these reasons, the commenter concluded that institutions would have to bring every covered private case to trial, at much greater financial and emotional expense not only to the school but also to the opposing parties. The commenter expressed concern that the proprietary school sector was a target for enterprising trial lawyers, and that because of the heightened scrutiny faced by financial institutions making lending decisions, it would be impossible for many institutions facing one of these triggering events to obtain a sufficient letter of credit to comply with the regulations. The commenter cautioned that an institution in such a circumstance would have little choice but to cease operations, even if its financial basis remained fundamentally sound—and even if the claims represented by the proposed triggering events were insubstantial or frivolous.

Similarly, another commenter stated that in litigation, plaintiffs are able to survive a motion for summary judgment due to a variety of factors. The commenter said that judges may decline to dispose of a case on summary judgment because there remains an issue of material fact that may have little

to do with the underlying false claim or provision of educational services. The commenter offered that a final judgment requires a higher level of proof than a motion for summary judgment and would therefore be a fairer threshold. In addition, the commenter noted that private rights of action are fundamentally different than agency or government actions that are subject to well-established policies and procedures. Further, the commenter anticipated that private parties will likely request relief in excess of the proposed thresholds of $750,000 or 10 percent of current assets to gain additional leverage in seeking a settlement.

With regard to proposed § 668.171(c)(1)(iii), some commenters asked the Department to clarify whether the mere filing of a False Claims Act case is a triggering event or if paragraphs (A) and (B) apply to that case (as well as private litigation). The commenters offered that the mere filing of a False Claims Act case should not subject an institution to a letter of credit. While the commenters recognized the seriousness of a False Claims Act case, they stated that these cases do not garner intervention from the Federal government and are typically settled for amounts that are dramatically less than the stated damages in the complaint. Further, while the commenters appreciated the Department's attempt to ensure it was only capturing meritorious private litigation under § 668.171(c)(1), they believed that the provision would penalize an institution for settling a case for nuisance value or harming a school for filing a motion for summary judgment which it ultimately loses.

*Discussion:* Proposed § 668.171(c)(1) included a range of governmental actions and certain actions by private parties, and proposed § 668.171(c)(6)(ii) included any other litigation that the institution was required to report in a filing with the SEC. Regardless of the substantive basis or motivation of the party suing, each of these suits could pose a serious potential threat to the continued existence and operation of the school, and as such, they affect the assessment of the school's ability to meet its financial obligations. We see no basis for ignoring that risk simply because some suits in each of these types may in fact be frivolous, assert exaggerated demands, rest on attempts to make new law, or attempt to extract concessions from the school in what the commenter calls areas unrelated to the school's educational mission. We consider pending suits under these regulations for two reasons. First, a

judgment entered in any of these suits may significantly jeopardize the existence or continued operations of the institution, and that threat bears directly on the statutory requirement that the Secretary determine whether the institution for the present and near future, the period for which the assessment is made, "is able to meet . . . all its financial obligations." 20 U.S.C. 1098c(c)(1)(C). Second, that consideration looks not merely at obligations already incurred, but looks as well to the ability of the institution to meet "potential liabilities"—whether the institution has the resources to "ensure against precipitous closure"—and thus demands that we assess threats posed by suits not yet reduced to judgments that would be recognized in the financial statements submitted annually and evaluated under the current composite score methodology. In response to the comment regarding treatment of qui tam suits under the False Claims Act, we confirm that those actions are evaluated like any other litigation not brought by a Federal or State agency enforcing claims that may relate to borrower defenses. They are evaluated under the summary judgment test.

Responding to the objection that we should consider only claims reduced to judgment, we stress that ignoring the threat until judgment is entered would produce a seriously deficient assessment of ability to meet financial obligations, and worse, would delay any attempt by the Department to secure financial protection against losses until a point at which the institution, by reason of the judgment debt, may be far less able to supply or borrow the funds needed to provide that protection. We reject this suggestion as contrary to the discharge of the duty imposed on the Department by section 498 of the HEA. Similarly, we see no basis for the contention that taking into account risk posed by pending suits somehow deprives an institution of its due process right to contest the suit. If the risk posed is within the statutory mandate to assess, as we show above, taking that risk into account in determining whether an institution qualifies to participate in the title IV, HEA programs cannot deprive the institution of any constitutionally protected right. The institution remains free to respond to the suit in any way it chooses; it is frivolous to contend that we are barred from considering whether that risk warrants financial protection for the taxpayer as a condition for the continued participation by that institution in this Federal program.

Besides these general objections to the consideration of pending suits, the comments we received addressed several distinct aspects of the proposed consideration. These included comments addressed to the inclusion of suits by an oversight entity, which may include a local government component, in the category of government suits; the proposal that suits be evaluated on their merits by a third party, by Department officials, or by a Department hearing official; objections to inclusion of debts arising from settlements; objections that the thresholds in the proposed rule were unrealistic or arbitrary; objections to the proposed method of calculating the amount claimed where the institution contends that the amount claimed exceeds the amount that applicable law would support; objections to the proposed calculation of the amount in actions that did not seek a stated amount of relief; objections to the proposed use of summary judgment as a test of the potential risk posed by the suit; and objections to consideration of debts already incurred and paid in prior years. We discuss each in turn and, as discussed earlier explaining the use of an adapted composite score methodology, we are modifying the proposed regulations in several regards that we intend and expect to assess the risk posed by pending suits in a manner that alleviates several of major concerns raised by commenters.

We address first the changes to the proposed thresholds, because adoption of the composite score methodology of assessing risk affects the response to those objections and other concerns as well. Each institution is well aware of its most recent composite score, and as explained above, the amount of risk posed by each suit considered under the regulations will be assessed by recognizing that loss in the financial statements on which that composite score was based, and determining whether that recognition will produce a failing composite score. Any institution can readily evaluate that effect and take that result into account in responding to the suit. A pending suit that produces a failing score will be recognized as a threat until the suit is resolved and that result produces a score of 1.0 or more, whether by favorable judgment or settlement. Second, we include an opportunity for an institution to demonstrate that loss from any pending suit is covered by insurance. Commenters advised that we should not treat lawsuits as potential triggering events because the risks posed by these suits are commonly covered by insurance. If the institution

demonstrates that insurance fully covers the risk, the suit is simply not considered under these financial responsibility standards. The institution can demonstrate that insurance fully or partially covers risk by presenting the Department with a statement from the insurer that the institution is covered for the full or partial amount of the liability in question.

In response to the proposal that the regulations should provide for an evaluation of the merit of a suit by a third party, by a Department official, or by a Department hearing official, we see no practical way to implement such a procedure. Litigants already have the ability to engage in court-sponsored or independent mediation, in which both parties can adequately present their positions; if both parties are amenable to such a two-party assessment, the parties can readily pursue that course through mediation, and we see no need for the Department to undertake that role. We see little or no value in entertaining and evaluating a presentation solely from a defendant institution, whether that evaluation were to be performed by a Department official or an administrative hearing official in a Department proceeding. As noted, a party whose defense is financed by insurance may find the insurer conducting precisely such an evaluation in conducting the litigation, and that assessment will influence the conduct of the litigation.

In addition, the proposal that the Department or a third party assess the merit of an action by a government agency would require the Department or a third party to interpret the statutes and regulations on which that agency based its actions as well as assess whether the action was a reasonable exercise of the agency's authority. We have no authority to second guess the actions of another agency in the exercise of its authority, and we would neither presume to do so nor adopt a procedure in which we would credit such second-guessing by a third party.

The proposed regulation would treat "oversight authority" actions like actions of Federal or State agencies. By this term, we include local government entities with power to assert and recover on financial claims. This consideration applies only to affirmative government financial claims against the institution, not to government actions that deny approvals or suits that seek only injunctive or other curative relief but make no demand for payment. Local authorities can take enforcement actions that can pose a serious financial risk to the institution, and we see no basis for disregarding that risk or undertaking any internal or third-party assessment of

the merit of the claim. Given the wide range of such government actions, we agree that those that do not directly seek relief that affects or relates to borrower defenses under this regulation might warrant a different assessment of risk than those closely related to borrower defenses. Generally the risks posed by the events deemed automatic triggers are events that threaten the viability of the institution, and the risks to the taxpayer posed by those threats include risks posed by closed school discharges and unaccounted-for Federal grant and loan funds. Federal or State agency suits asserting claims related to the making of a Direct Loan or the provision of educational services, as the latter term is considered under Department regulations, pose an additional risk and warrant a different assessment of risk, because these Federal or State actions not only pose a threat to the viability of the institution but are also reasonably expected to give rise to, and support, borrower defense claims. For those suits, we continue to consider it reasonable to treat the amount claimed in the suit as discernable from the scope of the allegations to quantify the potential loss from these suits.[53] However, we acknowledge the value of having the obligation to require financial protection depend on something more than the mere filing of a lawsuit if delaying surety does not jeopardize our ability to obtain appropriate financial protection. The summary judgment scheme we adopt for all other litigation may result in significant delay before protection is required for borrower defense-related suits, which may impair our ability to obtain adequate surety. Rather than delaying protection requirements until summary judgment or even a point close to trial, or creating some third-party evaluation of the merit of government agency suits involving borrower defense-related claims, we will rely on the outcome of the initial opportunity available in the litigation process itself for an institution to challenge the viability of the suit—the motion to dismiss. Thus, under these regulations, a government suit related to potential borrower defenses is a potential triggering event only if the suit remains pending 120 days after the institution is served with the complaint. This change provides the institution with ample time

to move to dismiss the suit on any ground, including failure to state a claim on which relief can be granted.[54]

For suits by a Federal or State agency not directly implicating borrower defenses, and suits by other government agencies, we consider the summary judgment test applicable to private party lawsuits—not a motion to dismiss test—to provide a reasonable basis for testing the degree of risk posed.[55] Moreover, the threat posed by any of these suits may have no substantial effect on the composite score of the institution; as explained above, threats evaluated here require financial protection only if the threats together produce a failing composite score under these regulations.

We recognize that settlements may well achieve highly desirable outcomes, and that regulations should not create a disincentive to settlements. Regardless of the position taken in these regulations, a debt actually incurred under a settlement entered into in the current fiscal year will be recognized in the financial statements of the institution eventually submitted for the current year, and will be part of the financial information on which the institution's composite score will be calculated for the current year. The concerns raised about treatment of settlement obligations are therefore concerns only about how the regulations treat during the current fiscal year those settlement debts incurred during the current year, not their subsequent treatment. A settlement debt that the institution can meet will likely not jeopardize its financial score when actually evaluated, and we approach such debts from the same perspective by assessing their effect when incurred using the composite score method as

adopted here. We do not expect that an institution will enter into a settlement that jeopardizes its viability, and by removing the thresholds and assessing that debt in a holistic manner, we believe that the regulation will remove any disincentive to enter into settlement. If an adjusted composite score includes a potential liability from a suit or oversight action that eventually results in a settlement, the previously recorded risk will be accordingly adjusted downward to the settlement amount.

We are retaining the summary judgment test for all non-governmental suits, because awaiting a final judgment that may cripple the institution would substantially frustrate our objective to acquire financial protection at a time when a significant threat is posed and while the institution is far more likely to be able to afford to provide that coverage. That alternative is unacceptable for those reasons, and those who object to use of a summary judgment standard pose no alternative judicial test that avoids these problems. We recognize that a complaint that lacks substantive merit may avoid dismissal if sufficiently well pled, but that such a suit survives summary judgment only with a showing of some evidence sufficient to support recovery.[56] The

---

[53] The most prominent recent example of such government actions that have resulted in judgments—those against Corinthian—does not suggest that assigning this level of risk to a government borrower defense-related suit is unreasonable, and, for that reason, as well, we decline the proposal to consider claims that such suits should be discounted.

[54] The Federal Rules of Civil Procedure require an answer or motion to dismiss to be filed within 20 days of service of the complaint, and also allow a defendant to move at any time for summary judgment. Fed. R. Civ. Proc. 12(a), (b); 56(b).

[55] The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." . . . Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment.

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L. Ed. 2d 265 (1986).

[56] As one writer has observed, "summary judgment stands as the only viable postpleading protector against unnecessary trials." Martin H. Redish, *Summary Judgment and the Vanishing Trial: Implications of the Litigation Matrix* (2005), 57 Stan. L. Rev. 1329. The comments that some States adopt summary judgment or summary adjudication procedures that differ either in labels (*e.g.*, California) or in some detail from the Federal standard do not show that the test is not available or sufficient to meet this objective. Where a plaintiff asserts several causes of action, a summary adjudication under Cal.C.C.P. § 437c(f) or similar law, or partial summary judgment that disposes of some but not all causes of action, those claims not disposed of remain pending and proceeding to trial, and therefore continue to pose risk. Furthermore, the regulations treat a failure to file for summary disposition by a defendant as a concession that the plaintiff has sufficient evidence to withstand a motion, and therefore that the claim has sufficient support to merit presentation to a jury. The fact that a State permits a plaintiff to seek summary judgment immediately upon commencement of the action (*e.g.*, N.Y. C.P.L.R., rule 3213, 28 U.S.C.A. (McKinney)) does not frustrate use of this summary judgment test by a defendant institution; the institution is required merely to answer the plaintiff's motion. N.Y. Uniform Dist. Ct. Act § 1004 (McKinney). The institution is not required to make a cross motion for summary judgment, and may move later for summary judgment. N.Y. C.P.L.R., rule 3212, 28 U.S.C.A. (McKinney). The comment cites Virginia law as restricting the defendant's use of declarations and affidavits as making summary judgment less effective a test there. Even if this support is disfavored, the defendant is free to support the motion with "admissions, interrogatories, and documents produced" in discovery. *Nicoll v. City of Norfolk Wetlands Bd.*, 90 Va. Cir. 169 (Va. Cir. Ct. 2015). The tool,

Continued

obvious inference from a choice not to file for summary judgment is that a defendant fears that such a motion would not be well-founded, an assessment that implies a concession that the suit does pose a risk. Such a suit is at that point hardly frivolous, and constitutes a significant threat to the viability of the institution. Summary judgment is available in Federal court litigation, in which we expect a significant amount of even private party litigation to be brought, such as qui tam actions under the False Claims Act. As to the shortcomings of the summary judgment test under particular State law as asserted by the commenter, we note that the commenter pointed to only a few States in which the commenter asserted that summary judgment (or summary disposition) is less effectively available than in Federal courts. Institutions are already subject to those limitations, and face scrutiny by any party from whom the institution seeks investment or loans for the risks posed by such suits. The consideration we undertake here is no different in kind.

In response to the commenters who raised concerns about assessing the potential recovery sought in an action that articulates no specific financial recovery, we cannot ignore the threats posed by such suits. The fact that a particular suit may avoid stating a dollar amount of damages in the complaint in no way affects whether the suit poses a significant risk to the school. The potential recovery in such suits may not be obvious from a complaint, but will ordinarily be articulated in a number of different ways, at least one of which would be routinely available. For example, the plaintiff may have articulated a specific financial demand in a written demand made prior to suit. Second, a plaintiff may have offered to settle the claim for a specific amount.[57] Third, defendants engage in discovery, the amount of financial relief claimed is highly relevant to the handling of the suit, and we expect that a defendant would invariably seek such information in discovery. We recognize that suits

brought by Federal and State authorities may and commonly do seek "rescission," "restitution," and "disgorgement" in unspecified amounts from the school, with civil penalties, for patterns and practices affecting students enrolled for years up to the filing.[58] The institution may be able to demonstrate that the complaint seeks unstated financial relief that as pled, pertains only to students enrolled in a particular program, location, or period of enrollment, and not all students enrolled at the institution, and may calculate the maximum recovery sought using data for that cohort.

Together, these changes are expected and designed to enable a school faced with the kinds of suits the commenters describe to either vigorously contest the suits as the school sees fit or to settle them. In either case, even a suit or settlement that might warrant financial protection in one year, that protection would be required only until the institution later may achieve a passing composite score despite recognition of the settlement obligation.

*Changes:* We have revised § 668.171(c)(1) to remove both the $750,000 and 10 percent of current asset threshold amounts for events that constitute an automatic trigger. Section 668.171(c) is revised to consider government actions unrelated to borrower defense claim subjects, and any private party lawsuits, to constitute a triggering event only if the suit has survived a motion for summary judgment or disposition, or the institution has not attempted to move for summary judgment and the suit progresses to a pretrial conference or trial. Section 668.171(c)(2) is revised to identify the sources from which an institution may discern the amount of financial recovery sought if that amount is not stated in the complaint.

*Accrediting Agency Actions*

*Teach-Out Plan § 668.171(c)(1)(iii)*

*Comments:* Under proposed § 668.171(c)(3)(i), an institution is not financially responsible if it is currently or was at any time during the three most recently completed award years required by its accrediting agency to submit a teach-out plan, for a reason described in § 602.24(c)(1), that covers

the institution or any of its branches or additional locations.

Some commenters suggested making the submission of a teach-out plan under 34 CFR 602.24(c) a separate, automatic trigger. The commenters argued that, unlike accreditor sanctions, the teach-out provisions are clearer circumstances that suggest the institution may imminently close.

Commenters argued that a letter of credit for institutions that trigger the teach-out provision is unnecessary and duplicative of existing protections in the regulations. The commenters stated that in the scenario of a closing institution, it is highly unlikely that the school will be able to obtain a letter of credit, and argued that, as a result, requiring the closing school to submit a letter of credit could convert a planned, orderly closing into a sudden shut down, thus leaving students stranded and harming taxpayers.

Some commenters warned that including the voluntary closure as a trigger would have unwanted effects. The commenters argued that this trigger would incent schools to keep locations open, despite the fact that the locations may no longer be serving its purpose and its continued presence may constitute a drain on institutional resources. Forced to choose between a location that is running slightly in the red and a letter of credit calculated against the entire institution's title IV expenditures, the commenters believed institutions may have no choice but to keep the doors open.

Moreover, the commenters argued that requiring a letter of credit makes little sense in the circumstance in which a school closes one or more locations, but the institution remains open. The commenters offered that in any scenario involving the closure of a location but not the main campus, the Department may pursue derivative student claims against an institution when those students receive a loan discharge pursuant to proposed § 685.214.

Some commenters also contended that the closure of locations is typically designed to increase the financial soundness of an institution and believed that the Department's records would show that most individual locations are closed only after an orderly teach-out and without triggering many (or any) closed school discharges. They argued that the closing of one or more locations of a school does not necessarily signal financial instability of a school; it may signal prudent fiscal controls. Closing locations that are not profitable or that cannot effectively serve students makes the institution as a whole more financially responsible and better able

---

therefore, remains substantially available to test meritless cases.

[57] We recognize the settlement negotiations are privileged, and this option does not in any way diminish that privileged status. Private parties commonly disclose voluntarily to government agencies material that is privileged without risk of losing that privilege, and parties that share a settlement proposal with the Department under this option would not lose that protection. Thus, the Department would not disclose, in response to a Freedom of Information Act request, material regarding settlements if that material fell within exemption 4 of that Act, 5 U.S.C. 552(b)(4). 34 CFR 5.11. Such information includes commercial or financial information provided voluntarily and not customarily disclosed by the party to the public.

[58] We derive the default recovery amount of three years of tuition and fees from actions such as *Consumer Fin. Prot. Bureau v. Corinthian Colleges, Inc.*, No. 1:14–CV–07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015) (claims for actions over three year period); see also *California v. Heald College*, No. CGC–13–534793, Sup. Ct. Cty of San Francisco (March 23, 2016). (claims based on actions of varying duration). An institution may demonstrate that lesser amounts are applicable.

to serve its remaining students. Consequently, the commenters cautioned that schools should not be punished for making reasonable business decisions to conduct an orderly wind down of an additional location. The commenters recommended that no letter of credit be imposed in the circumstance of the proposed closure of individual locations, and that the Department address on a case-by-case basis the appropriateness of requiring a letter of credit from a school that announces a teach out of the entire school. Alternatively, if the Department maintains the letter of credit requirement based on a school's intention to close a location, the commenters suggested that the letter of credit should only apply to locations that service 25 percent or more of the institution's students.

Similarly, other commenters suggested that the Department adopt a materiality threshold, such as the number of students enrolled or affected or the title IV dollar amount associated with those students, because the closure of an additional location may have no adverse effect on an institution.

In response to the Department's request for comment on whether a threshold should be established below which the closure of a branch or additional location would not trigger the letter of credit requirement, as noted previously, commenters urged the Department to eliminate the closure of a branch or additional location as a triggering event, or at minimum, make the trigger discretionary rather than mandatory. If the Department does not do so, the commenters asserted that a threshold is then both necessary and appropriate, but the commenters believed that a letter of credit should be required only if the closure of a branch or additional location would have a material financial impact on the school as a whole. The commenters offered that the Department could request a letter of credit if the closure of a branch or additional location:

• Would reduce total school enrollment by 30 percent or more;
• Would reduce total school title IV receipts by 30 percent or more; or
• Would reduce total school tuition revenues by 30 percent.

Other commenters suggested that the Department extend the 10 percent materiality concept to this situation and apply the letter of credit requirement only if the closure of a location involves more than 10 percent of the school's population.

Some commenters noted that locations are often part of campus models that, among other things, bring postsecondary education to areas that might otherwise have none, and believed that institutions may elect to forgo these innovative efforts if they are unable to close a location without incurring a significant financial penalty.

Other commenters suggested that the Department clarify whether the letter of credit provisions would be applied based on the title IV, HEA funds received by the main or branch campus, and how the letter of credit provisions would apply to teach-out plans that might be submitted for a branch campus instead of the entire main campus.

*Discussion:* Under the teach-out provisions in 34 CFR 602.24(c)(1), an accrediting agency must require an institution to submit a teach-out plan whenever (1) the Department initiates an emergency action or an action to limit, suspend, or terminate the institution's participation in the title IV, HEA programs, (2) the accrediting agency acts to withdraw, terminate, or suspend the institution's accreditation, (3) the institution notifies the accrediting agency that it intends to cease operations entirely or close a location that provides 100 percent of a program, or (4) a State licensing or authorizing agency notifies the accrediting agency that the institution's license or authority to provide an educational program has been or will be revoked. The occurrence of any of these actions may call into question an institution's ability to continue, placing at risk the welfare of students attending the institution. However, in keeping with our treatment for other automatic triggering events, instead of using a materiality threshold, the Department will recalculate the institution's composite score (1) based on the loss of title IV, HEA funds received by students attending the closed location during the most recently completed fiscal year, and (2) by reducing the expenses associated with providing programs to those students, as specified in Appendix C to these regulations. We believe that this approach will corroborate the position of some of the commenters that closing an unprofitable location was a good business decision in cases where the recalculated composite score is higher but not less than the original score. Otherwise, a failing recalculated composite score shows that closing the location had an adverse impact on the institution's financial condition.

*Changes:* We have added a new § 668.171(c)(1)(iii) to provide that an institution is not financially responsible if it is required by its accrediting agency to submit a teach-out plan under § 602.24(c) that covers the institution or any of its branches or additional locations if, as a result of closing that institution or location, the institution's recalculated composite score is less than 1.0. In addition, we provide in Appendix C to subpart L, the adjustments to the financial statements that are needed to recalculate the composite score.

*Show Cause or Probation § 668.171(g)(5)*

*Comments:* Under proposed § 668.171(c)(3)(ii), an institution is not financially responsible if it is currently, or was at any time during the three most recently completed award years, placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation by its accrediting agency for failing to meet one or more of the agency's standards, and the accrediting agency does not notify the Secretary within six months of taking that action that it has withdrawn that action because the institution has come into compliance with the agency's standards.

Some commenters were concerned that the scope of the proposed accrediting agency triggering events is too broad because it includes matters that do not necessarily pose any existential threat to the viability of an institution. The commenters stated that an institution placed on probation or show-cause status does not, in all cases, signal an imminent threat to the continued viability of the institution that should automatically require a letter of credit; in the tradition of accreditation, while these designations are meant to identify and make public areas of concern at an institution, the goal remains that of self-improvement and correction.

Other commenters agreed that an institution placed on show cause by most accrediting agencies is typically at substantial risk of losing its accreditation, and loss of accreditation would likely have some impact on its finances and operations. However, the commenters noted that in, many cases, the agency placed the institution on show cause because it had demonstrated significant financial and operational deficiencies that were already having an impact on its business and educational outcomes. Therefore, the commenters cautioned that in many cases, it is the reason behind the show cause order (*i.e.,* concerns about the financial and operational capacity of the institution), and not the show-cause status itself, that suggests an institution is not financially responsible.

Some commenters stated that in many cases, an accrediting agency places an

institution on probation for issues of academic quality or dysfunction at the governance level even while the institution's operations and finances remain strong. The commenters stated that, while the issues that lead to the probation are certainly not minimal, it would take an institution longer than six months to correct them. In addition, the agency will need time to evaluate the changes and determine that the institution is now in compliance. Moreover, the commenters maintain that there is no clear evidence that institutions on probation routinely or uniformly experience operational or financial outcomes as a result of being on probation, particularly when the issues leading to the probation are unrelated to finance or operations. Again, the commenters cautioned that uniformly concluding that all institutions on probation that cannot correct non-compliance issues in six months are not financially responsible is overly broad. In addition, the commenters noted that it effectively punishes an institution that is on probation for issues not related to financial and operational deficiencies by requiring the institution to provide a letter of credit and participate in the title IV, HEA programs under a provisional certification.

The commenters believed that if the Department intends to rely on accrediting actions to determine financial responsibility, then the Department must review the content of the accrediting actions and act based on the reasons for those actions. As a matter of due process, each accrediting agency action imposing probation makes highly individualized findings of non-compliance that provide clear indicators regarding the institution's risk, as determined by the agency. For these reasons, the commenters suggested that the Department revise the show cause and probation provisions to refer specifically to agency standards related to finances, operations, or institutional ethics or integrity or related areas.

Other commenters supported tying accrediting agency actions to financial or operational issues but, in the alternative, would also support the Department's suggestion during the negotiated rulemaking process that there be a way for an accrediting agency to inform the Department as to why its probation or show-cause action will not have an adverse effect on the institution's financial or operating condition (see 81 FR 39364). Along somewhat similar lines, other commenters believed that, if an accrediting agency takes an action

against a school based on financial responsibility concerns, that action should not supplant the Department's own analysis under subpart L of the regulations.

Other commenters stated that accreditors do not consider a show-cause order a negative action—to the contrary, accreditors routinely use it as a mechanism to promote institutional change and compliance. The commenters argued the Department itself has not previously taken the view that a show-cause order or probation was a significant threat to an institution's financial health by noting that a recent report listing the institutions the Department required to submit letters of credit did not identify an accrediting agency action as the basis for requiring any of those letters of credit. The commenters also noted that the Department's recent spreadsheet listing the institutions on heightened cash monitoring indicates that 13 of the 513 institutions were placed there for Accreditation Problems, which the Department defined as "accreditation actions such as the school's accreditation has been revoked and is under appeal, or the school has been placed on probation." The commenters asserted the spreadsheet establishes (1) that the Department already has a mechanism for seeking financial protection from institutions experiencing accreditation problems, and (2) that a mere show cause order historically has not been viewed as posing the same risk as revocation or probation. In addition, the regulations governing recognized accreditors permit an accreditor to afford an institution up to two years to remedy a show-cause before it must take action, and the commenters believe that this allowable timeframe effectively codifies the notion that a show-cause order is neither a sign of impending financial failure, nor a matter than an institution would expect to resolve in six months' time. See 34 CFR 602.20.

Other commenters agreed with the Department that actions taken by an accreditor could be a sign that the institution may imminently lose access to Federal financial aid. In those cases, the commenters believed that asking for additional funds upfront would be a sensible step as an advance protection for taxpayers. However, the commenters point to recent review of accreditor actions over the last five years showing that the current sanctions system is highly inconsistent. The commenters stated this inconsistency was true with respect to terminology, the frequency with which actions happen, and how long an institution stays on a negative

status. (Antoinette Flores's "Watching the Watchdogs," published in June 2016). Given this inconsistency, the commenters recommend making the following changes to the proposed accrediting triggering events.

Commenters suggested that the Department make accreditor actions a discretionary trigger because, given the inconsistency among accreditors, establishing an automatic trigger tied to negative sanctions may be difficult. They stated that accreditors do not interpret what it means to be on probation or show cause in the same way. In addition, the commenters stated that making sanctions by accreditors an automatic trigger also risks making them unlikely to take action when they should.

The commenters note that a clear finding from the research, "Watching the Watchdogs," is that many accreditors put institutions on a negative status for a very short period of time, while other accreditors required institutions facing a sanction to stay in that status for at least a year. The commenters were concerned that setting a clear threshold of six months would give an institution too much leverage to argue that its accreditor should withdraw the sanctions sooner than the accreditor otherwise would.

*Discussion:* In view of the significant number of comments that a probation or show cause action taken by an accrediting agency may not be tied to a financial reason or have financial repercussions, and could have serious unintended consequences as an automatic trigger, we are revising this trigger to make it discretionary. As such, we will work with accrediting agencies to determine the nature and gravity of the reasons that a probation or show cause action was taken and assess whether that action is material or would otherwise have an adverse impact on an institution's financial condition or operations. Moreover, under this approach, the proposed six-month waiting period for an institution to come into compliance with accrediting agency standards is no longer necessary.

*Changes:* We have reclassified and relocated the automatic probation and show-cause trigger in proposed § 668.171(c)(3)(ii) as a discretionary trigger under § 668.171(g)(5) and revised the trigger by removing the six-month compliance provision.

*Gainful Employment § 668.171(c)(1)(iv)*

*Comments:* Under proposed § 668.171(c)(7), an institution would not be financially responsible if, as determined annually by the Secretary, the number of title IV recipients

enrolled in gainful employment (GE) programs that are failing or in the zone under the D/E rates measure in § 668.403(c) is more than 50 percent of the total number of title IV recipients who are enrolled in all the GE programs at the institution. An institution is exempt from this provision if fewer than 50 percent of its title IV recipients are enrolled in GE programs.

Some commenters noted that many institutions subject to the GE regulations have limited program offerings, and in some cases offer only one program. For those institutions, a single program scoring in the zone will result in more than 50 percent of its students being enrolled in zone-scoring programs. The commenters further noted that the GE regulations provide for a runway for institutions to bring programs into compliance, and institutions do so through cost reductions that are passed along to students. The commenters reasoned that imposing a letter of credit requirement on such an institution would deprive it of curative resources and ultimately lead to a closure of the program, rather than its remediation.

In response to the Department's request for comment on whether the majority of students who enroll in zone or failing GE programs is an appropriate threshold, commenters offered several observations and recommendations.

First, the commenters believed that a simple tally of the number of GE programs that may be failing or in the zone at a given point in time will not produce a consistently accurate assessment of an institution's current or future financial stability. The first set of debt-to-earnings rates, for example, are based on debt and earnings information for students who graduated between the 2008–09 and 2011–12 award years (assuming an expanded cohort). See generally 34 CFR 668.404. By the time the associated debt-to-earnings ratio for these programs are released (likely early 2017), many institutions will be offering new or different programs that are designed to perform favorably under the GE framework. Though, as of 2017, a significant number of the students may still be enrolled in the institution's older GE programs, these programs will no longer be integral to the institution's business model, and indeed, may be in a stage of phase-out. For this reason, the commenters suggested that any reasonable assessment of an institution's financial health would need to account for the phase-out of older GE programs and the strength of the newer ones.

Second, the commenters recommended that the Department exclude from this determination any GE programs that are in the zone, or at a minimum, GE programs that have only been in the zone for two or fewer years. The commenters argued that, because a GE program must be in the zone for four consecutive years for which rates are calculated before it loses eligibility, the inclusion of a zone program prior to this point does not justify the presumption that the program may lose eligibility.

Finally, the commenters suggested that, rather than exempting institutions where fewer than 50 percent of the title IV recipients are enrolled in GE programs, the regulations should simply compare the number of students who receive title IV, HEA funds and are enrolled in failing GE programs to the total number of students. The commenters believed this approach would be a better and more straightforward measure of the risk of financial failure posed to the entire institution.

*Discussion:* We appreciate the concerns and suggestions made by the commenters regarding the GE trigger and are persuaded that the trigger should be revised to (1) account for the time that an institution has to improve a GE program in the zone, and (2) focus more on the financial impact of failing programs instead of the percentage of students enrolled in GE programs.

We proposed including zone programs in the GE trigger because there are no assurances that an institution will attempt to improve or succeed in improving those programs. However, we agree that the proposed trigger could influence an institution to discontinue an improving program prematurely or hold an institution accountable for poorly performing programs that it voluntarily discontinues. In proposing the 50 percent threshold, we were attempting to limit this trigger to those situations where the potential loss of program eligibility would have a material financial impact on an institution. But, as alluded to by the commenters, the percentage threshold based on title IV recipients may not apply to situations where an institution discontinues a zone program, or cases where 50 percent of the title IV recipients enrolled at an institution account for a small fraction of (1) the total number of students enrolled, or (2) institutional revenue.

To address these concerns, we are revising the GE trigger by considering only those programs that are one year away from losing their eligibility for title IV, HEA program funds and assessing the impact of that program's closure and any potential loss under the recalculated composite score approach. Specifically, the Department will use the amount of title IV, HEA program funds the institution received for those programs during its most recently completed fiscal year as the potential loss and recalculate the composite score based on that amount and an allowance for reductions in expenses that would occur if those programs were discontinued.

*Changes:* We have revised the GE trigger as described above. We have also revised the GE trigger in § 668.171(c)(1)(iv) to provide that the loss used in recalculating the institution's composite score under § 668.171(c)(2) is the amount of title IV, HEA program funds the institution received for affected programs during the most recently completed fiscal year. Lastly, we specify in Appendix C to subpart L, the changes needed to reflect that loss of funding and the reduction in educational expenses associated with discontinuing those programs.

*Withdrawal of Owner's Equity*
*§ 668.171(c)(1)(v)*

*Comments:* Under proposed § 668.171(c)(8), an institution whose composite score is less than 1.5 is not financially responsible if there is any withdrawal of owner's equity from the institution by any means, including by declaring a dividend.

Some commenters appreciated the provision in § 668.171(d)(2) that would allow an institution whose composite score is based on the consolidated financial statements of a group of institutions, to report that an amount withdrawn from one institution was transferred to another entity within that group. However, the commenters argued that, since the Department is aware of the institutions whose composite scores are calculated based on consolidated financial statements, requiring those institutions to report every intercompany funds transfer imposes an unnecessary burden because the reporting provides little if any benefit to the Department. Therefore, the commenters recommend amending proposed § 668.171(c)(8) to expressly exclude any withdrawal of equity that falls within the circumstances described in § 668.171(d)(2).

Other commenters assumed that this provision is intended to apply only to proprietary institutions because nonprofits do not have owners. However, because in financial reporting, the term "equity" is often used conceptually to refer both to owner's equity for businesses or net assets for nonprofits, the commenters recommended that the Department clarify in the final regulations that this provision applies only to proprietary institutions.

*Discussion:* We agree that, where a composite score is calculated based on the consolidated financial statements of a group of institutions, funds transfers between institutions in the group should not be reported as withdrawals of owner's equity. The trigger for the withdrawal of owner's equity was based on the reporting requirement under the zone alternative in current § 668.175(d)(2)(ii)(E), which applies only to proprietary institutions. We agree to clarify in the regulations that as a triggering event under § 668.171(c), the withdrawal of owner's equity applies only to proprietary institutions.

In addition, by recalculating the composite score we capture the impact of withdrawals of owner's equity in cases where the withdrawals were not made solely to meet tax liabilities.

*Changes:* We have revised the withdrawal of owner's equity trigger now in § 668.171(c)(1)(v) to specify that it applies only to a proprietary institution and that it does not include transfers to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated. In addition, we specify in § 668.171(c)(2)(iv)(B) that except for a withdrawal used solely to meet tax liabilities, as provided under § 668.171(h)(3)(ii), the Secretary will recalculate the institution's composite score to account for that withdrawal.

*Cohort Default Rates § 668.171(f)*

*Comments:* Under proposed § 668.171(c)(9), an institution is not financially responsible if its two most recent official cohort default rates are 30 percent or greater, unless the institution files a challenge, request for adjustment, or appeal with respect to its rates for one or both of those fiscal years and that action remains pending, results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

Some commenters urged the Department to remove the cohort default rate trigger, citing concerns that this trigger would have unintended consequences. The commenters believed that, because of the corresponding letter of credit requirements, it is likely that banks would curtail their lending to affected institutions making it more difficult for those institutions to initiate, or continue with, innovative educational efforts that are often capital-intensive.

In response to the Department's request for comment on whether a cohort default rate of 30 percent or more for a single year should be a triggering

event, some commenters believed that the proposed two-year trigger should not be changed. One commenter suggested that this trigger should apply to any institution whose most recent cohort default rate is 30 percent or higher, arguing that keeping default rates below 30 percent is a very low standard for an institution to meet—only 3.2 percent of institutions have a default rate of 30 percent or higher. The commenter noted that, among all students attending institutions of higher education where the default rate is 30 percent or higher, 85 percent attend public institutions and just 11 percent attend proprietary institutions. The commenter urged the Department not to exempt public institutions from this trigger if the Department's goal is to protect as many students as possible.

*Discussion:* We wish to make clear that the Department will not apply the cohort default rate trigger until any challenge, request for adjustment, or appeal that an institution qualifies to file, under subpart N of the General Provisions regulations, is resolved. If that action is resolved in favor of the institution, the Department will take no further action and make no further requests of the institution with regard to this trigger. Otherwise, after the challenge, request, or appeal is resolved, the Department will apply the cohort default rate trigger and request the corresponding financial protection from the institution.

We disagree with the notion that a bank will curtail its lending to an institution solely because the Department requests financial protection under this trigger. Like other creditors, a bank would assess the risks inherent in making a lending decision, including regulatory risks. In this case, under the statutory provisions in section 435(a)(2) of the HEA, pending any appeal for, or adjustment to, its cohort default rates the institution is one year away from losing its eligibility for title IV, HEA funds. Although an institution's intention to initiate or continue innovative educational efforts are laudable, we believe it is questionable that a bank would jeopardize funds requested by the institution after having assessed the risks of whether the institution could repay those funds in the event that the institution's eligibility under the title IV, HEA programs is terminated in the near term.

With regard to the Department's request for comment, we are persuaded to maintain the proposed two-year threshold.

With respect to the comment that, to protect as many students as possible,

the Department should not exempt a public institution from the cohort default rate trigger, we note that while cohort default rates for all institutions are publicly available and can be used by students and parents in making enrollment decisions for particular institutions, the purpose of this trigger is to protect the Federal interest in the event an institution loses its eligibility for title IV, HEA funds in the coming year. In that circumstance for a public institution, we already have financial protection in the form of full faith and credit of the State to cover any liabilities that may arise (see the discussion under the heading "Public Domestic and Foreign Institutions").

*Changes:* None.

*Non-Title IV Revenue (90/10) § 668.171(d)*

*Comments:* Under proposed § 668.171(c)(5), a proprietary institution is not financially responsible if it does not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds during its most recently completed fiscal year.

Some commenters believed this trigger was unjustified, arguing that an institution's eligibility to participate in the title IV, HEA programs is not at risk after a one-year failure. The commenters stated that section 487(d)(2) of the HEA provides that no penalties are imposed on an institution until it loses title IV eligibility by failing the 90/10 revenue test for two consecutive years, and that the sanctions that are specified do not include the financial responsibility consequences proposed under this trigger. For these reasons, the commenters concluded that, lacking specific statutory authority, the Department should remove this trigger from the final regulations.

Other commenters were concerned that institutions actively game the 90/10 requirements by (1) delaying title IV disbursements until the next fiscal year; (2) combining locations that exceed the 90 percent revenue limit with those that do not, and (3) raising tuition, which forces students to take out private loans that increase revenue from non-title IV sources. The commenters believed that these gaming strategies are the reason that only a few institutions fail the 90/10 revenue test each year (14 institutions for the 2013–14 reporting period) and urged the Department to limit the use of these strategies, recommending for example, that Department track for three years the 90/10 compliance for each location included at the institution's request under a single PPA or that the Department should not grant those

requests when institutional 90/10 compliance is in question.

*Discussion:* As we noted in the preamble to the NPRM, an institution that fails the 90/10 revenue test for one year, is one year away from losing its title IV eligibility. Under § 668.28(c)(3), an institution that fails the revenue test must notify the Department of that failure no later 45 days after the end of its fiscal year. If the institution fails again in the subsequent fiscal year, it loses its eligibility for title IV, HEA funds on the day following the end of its fiscal year, not at the end of the 45-day reporting period. After the end of its fiscal year, the institution's ability to continue to make disbursements to enrolled students is severely limited under the provisions in § 668.26. Consequently, in view of the institution's dependence on revenues from title IV, HEA funds that it is no longer eligible to receive, it is likely that the institution would close, possibly precipitously, leading to closed school discharges and program liabilities owed to the Department. These are the same outcomes that would result from an existential threat, such as a crippling lawsuit or loss of accreditation, for which financial protection is authorized under the financial responsibility provisions in section 498(c) of the HEA.

Contrary to the commenters' assertion that there is no risk to an institution's eligibility after a one-year failure, the HEA contemplates that risk under section 487(d)(2)(B) by providing that after a one year failure, the institution automatically becomes provisionally certified and remains on that status for the following two years, unless it fails the 90/10 revenue test in the subsequent year and loses eligibility. Moreover, the Department's authority to establish 90/10 as a basis for determining whether an institution is financially responsible is anchored under the provisions in section 498(c)(1) of the HEA, not the provisions governing the institution's eligibility under the 90/10 revenue provisions.

With regard to the comments about institutions evading the 90/10 requirements, we note that changes to these requirements are beyond the scope of this rulemaking. Administratively however, the Department will continue to diligently enforce the 90/10 requirements and work closely with the Office of the Inspector General to help ensure that institutions properly calculate their 90/10 rates.

*Changes:* None.

*Publicly Traded Institutions § 668.171(e)*

General

*Comments:* Under proposed § 668.171(c)(6), a publicly traded institution is not financially responsible if the SEC warns the institution that it may suspend trading on the institution's stock, the institution's stock is delisted involuntarily from the exchange on which it was traded, the institution disclosed in a report to the SEC that it is subject to a judicial or administrative proceeding, the institution failed to file timely a required report with the SEC, or the exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements.

Commenters believed that the NPRM did not provide meaningful rationale for some of the provisions that the Department asserts require financial protection, pointing for example to an institution's failure to file a timely report with the SEC, or noncompliance with exchange requirements, and noting that the Department only suggested that such events could lead to institutional failure. In response to the Department's request for comment regarding how these triggers could be more narrowly tailored to capture only those circumstances that could pose a risk to an institution's financial health, the commenters offered that the final regulations should provide that in every instance where an SEC action occurs, the Department will only take action after it affords the institution a notice and hearing and thereafter makes a reasoned determination that the event is likely to result in a material adverse effect. The commenters further stated that, to be a triggering event, any SEC action should be a final, non-appealable judgment or suspension and not merely a warning or notification. The commenters also stated that because many companies inadvertently and regularly miss a periodic filing deadline, the final regulations should require a finding of materiality, as applied to the delinquency of the filing, and the Department should consider whether the filing failure is an isolated incident or part of a pattern of conduct, and whether the missed filing was the fault of the institution.

Similarly, in response to the Department's request for comment, other commenters identified the following situations that they believed would provide for a more appropriate set of triggers for publicly traded institutions:

(1) The institution is in default on an obligation to make payments under a credit facility, or other debt instrument,

and the default involves an amount in excess of 10 percent of the institution's current assets, and the default is not cured within 30 days;

(2) An event of default has been declared by the relevant lender or trustee under any outstanding credit facility or debt instrument of the institution or its parent, including any bond indenture, and the default is not cured within 30 days; or

(3) The institution or its parent declares itself insolvent, files a petition for reorganization or bankruptcy under any Federal bankruptcy statute, or makes an assignment for the benefit of creditors.

The commenters believed that adopting the recommended triggers would enable the Department to efficiently identify those cases in which a publicly traded institution is in financial trouble, and would avoid conflating investor-facing disclosures or nonmaterial administrative matters (*e.g.,* failure to timely file a required report, notification of non-compliance with exchange requirements) with reliable indicators of financial distress.

*Discussion:* With regard to the suggestion that the Department apply these triggering events only when an SEC action is what the commenter describes as a final, non-appealable judgment or suspension, and not a warning or notification, doing so would further distance these events as early but significant indicators of serious financial distress. We understand that the warning is issued by the SEC only after repeated efforts have already been made to alert the delinquent party of the need to file, and despite these attempts, the registrant continues to fail to respond. We understand that the consequences of failure to file timely required reports after this warning include significant burdens should the institution wish to raise capital, and that not uncommonly, the reason a registrant becomes so delinquent as to be issued this warning is that the registrant has ceased operations. We are not capturing, or requiring contemporaneous reporting of, the actions and circumstances that give rise to an SEC or exchange action— information that may at an early stage forecast operational or financial difficulties—because that would be unmanageable and could lead to erroneous conclusions. Instead, we are relying on the conclusions reached by the SEC and the stock exchange that the actions taken by the institution warrant a significant and corresponding reaction.

With regard to the proposal that the Department take action to impose financial protection based on an SEC or

exchange action only after providing the institution an opportunity for a hearing and a case-by-case evaluation of the significance of the particular event on which the SEC or exchange acted, we note that § 668.171(h)(3)(iv) provides the institution with an opportunity at the time it reports the event to demonstrate that the condition no longer exists, has been cured or, that it has insurance that will cover any and all debts and liabilities that arise at any time from that triggering event. The liabilities referred to here are those that arise from a precipitous closure of an institution, including, but not limited to losses from closed school discharges, and liabilities for grant and loan funds not accounted for as properly spent by the statutorily required compliance audit. If the Department takes an enforcement action based on this trigger, or any other automatic triggering events, to condition the continuing participation of the institution on providing the required financial protection, § 668.90(a)(3)(iii)(A) provides the institution a more formal opportunity to demonstrate these defenses. The event itself is of such significance that the Department considers only these defenses, and not contentions that the event itself is not grounds for requiring protection.

While we appreciate the suggestions made by the commenters to streamline the triggers for publicly traded institutions, particularly with regard to making payments under a credit facility, as discussed more thoroughly under the heading "Violation of Loan Agreement," we have made these provisions discretionary and they apply to all institutions. While we agree that some of the situations described would signal serious distress, under these regulations we will make those determinations on a case-by-case basis. As previously noted, if the lender files suit as a result of the delinquency, that suit would be considered under the private litigation assessment in § 668.171(c)(1)(ii).

*Changes:* None.

Delisting

*Comments:* With regard to the triggers pertaining to a warning from the SEC that it may suspend trading and the involuntary delisting of an institution's stock, some commenters found the correlation the Department was attempting to make between an institution's failure to comply with exchange requirements and its ability to meet its financial obligations troublesome.

The commenters argued that, while a delisting is significant, correlating an institution's financial health to its

delisting incorrectly assumes that the delisting is generated as a result of financial problems and the delisting will materially impact the institution's financial health. Even where the delisting is itself related to something that is measured in dollars, like a minimum bid price, that measure is not necessarily indicative of the health of an institution, as opposed to the market value of a share of the institution.

*Discussion:* While the commenters are technically correct that an involuntary delisting does not necessarily mean that an institution has financial problems, it could equally or more likely mean that it does. Even worse, the delisting may be a prelude to bankruptcy. Generally speaking, financially healthy institutions are not involuntarily delisted. As discussed in the preceding comment, the regulations provide the institution ample informal and formal opportunities to show that the risks that the triggering event may cause have been removed by curing the event itself. These liabilities are those that ensue from a precipitous closure, as described above. An institution's financial viability under the Department's composite score methodology assesses, as explained earlier, the ability of the institution to borrow and access capital as needed. Delisting and SEC actions directly affect the ability of a publicly-traded institution to access capital. An institution may contend that the event on which the action was premised does not portend closure, but the action by the exchange or SEC unquestionably affects the ability of the institution to obtain financing, a critical aspect of financial viability. While the negative effect of that impairment may be difficult to quantify, and cannot immediately be assessed under the composite score methodology, that impairment warrants requiring financial protection.

*Changes:* None.

SEC Filings Regarding Judicial or Administrative Proceeding

*Comments:* With regard to judicial or administrative proceedings, some commenters noted that the SEC's requirements are designed to encourage disclosure of information to potential investors and cautioned that the proposed regulations may discourage those disclosures. The commenters believed that although the proposed reporting requirements under § 668.171(d)(i) would permit an institution to explain why a particular litigation or suit does not constitute a material adverse event that would pose an actual risk to its financial health, a publicly traded institution that elects to

make broad disclosures to the SEC and potential investors would be dependent on the Department agreeing with the institution's position. If the Department disagrees, the commenters opined that the institution would face a financial penalty (*i.e.,* be required to submit a letter of credit) for a situation where the disclosure may not have been required by the SEC in the first place. Along similar lines, other commenters noted that the reporting provisions do not require the Department to act on any evidence provided by the institution, and do not specify what opportunity, if any, the institution would have to discuss these events with the Department. For these reasons, the commenters suggested that the Department should not implement regulations that would interfere with the primary purpose of SEC disclosures—to permit potential investors to make their own decisions about whether to invest in the institution.

Similarly, other commenters believed this triggering event would run counter to the long-standing practice of publicly traded institutions generally erring on the side of disclosing legal and regulatory events to the public and their shareholders. More specifically, the commenters asserted that publicly traded institutions tend to over-disclose these events, particularly since the materiality of those events often cannot be reasonably determined at their onset.

*Discussion:* We acknowledge that a judicial or administrative proceeding reported by an institution to the SEC may or may not be material. We believe that proceedings reported in SEC filings that seek substantial recovery but may not be meritorious pose a risk similar to the risk posed by non-governmental actions. The institution may succeed in dismissing such a suit, or at least testing its merit by moving for summary judgment or disposition. The institution may also have insurance that fully protects the institution from loss from the suit.

*Changes:* We have added a new § 668.171(c)(1)(ii) to treat all private party litigation as a triggering event only if the action survives a motion for summary judgment or disposition, or the institution has chosen not to file for summary judgment, and have amended § 668.171(h) to enable the institution to demonstrate that all actual and potential losses stemming from that litigation are covered by insurance.

SEC Reports Filed Timely

*Comments:* With respect to the trigger for filing timely SEC reports under proposed § 668.171(c)(6)(iii), some commenters warned that the

Department should not assume that an institution is unable to meet its financial or administrative obligations and impose punitive actions based on a failure to meet SEC filing requirements. As an initial matter, the commenters argued that the proposed trigger is more stringent than the SEC's rules, which allow an institution to file a notification of late filing, that enables the institution to file the report by an extended deadline, and once filed the institution would be deemed to have timely filed the report. In addition, the commenters stated that an institution's failure to file a report may not necessarily reflect that the institution is unable to meet its financial or administrative obligations, because the report could be late for many reasons outside of financial problems at an institution, including the unavailability of an individual required to sign the report, an unforeseen circumstance with an institution's auditors, or the need to address a financial restatement done for technical reasons. Similarly, other commenters urged the Department to apply this trigger only where the filing would be considered late under SEC rules. The commenters explained that pursuant to SEC rules, an institution that fails to timely file a report must file a Form 12b–25, reporting the failure to file no later than one business day after the report was due. If the Form 12b–25 is properly filed, the institution will have 15 additional calendar days to file an annual report or five additional calendar days to file a quarterly report. If the institution files the late report within the extended deadline, the SEC considers that the report was timely filed.

*Discussion:* A late SEC filing, or failure to file, may precipitate an adverse action against an institution by the SEC or a stock exchange. For example, an AMEX or Nasdaq-listed institution that files a late SEC report is cited for failing to meet exchange requirements and will be required by the exchange to submit a plan for regaining compliance with listing requirements. The exchange may suspend trading on the institution's stock if it does not come into compliance with those requirements. Or, a late filing may limit the institution's ability to conduct certain types of registered securities offerings. In addition, capital markets tend to react negatively in response to late filings. All told, the consequences of late SEC filing may impact the institution's capital position or its ability to raise capital, and we believe that it remains a

significant event to include as an automatic trigger.

*Changes:* None.

*Discretionary Triggering Events § 668.171(g)*

*Comments:* Under proposed § 668.171(c)(10), an institution is not financially responsible if the Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution, including but not limited to whether (1) there is a significant fluctuation in the amount of Direct Loan or Pell Grant funds received by the institution that cannot be accounted for by changes in those programs, (2) the institution is cited by a State licensing or authorizing agency for failing State or agency requirements, (3) the institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient capital to absorb losses that may be incurred as a result of adverse conditions, or (4) the institution or its corporate parent has a non-investment grade bond or credit rating.

Commenters believed that the proposed discretionary triggers were unreasonable for several reasons. First, the commenters noted that the discretionary provisions do not afford institutions any opportunity to communicate with the Department regarding a possible materiality determination. Instead, it appeared to the commenters that the Department may determine unilaterally, and without engaging the school, that there is an event or condition that is reasonably likely to have a material adverse effect and proceed to demand financial protection, violating the school's due process. Moreover, the commenters argued that any standard of financial responsibility that does not permit the receipt and review of information from the school cannot produce consistent and accurate results and, as such, fails to satisfy the reasonability standard put into place by Congress.

Second, the commenters noted that the Department did not define the term "material adverse effect" and made no mention of the concept in the preamble to the proposed regulations. The commenters asserted that the Department must define this term to ensure that the regulations are consistently applied, particularly where an institution could be significantly penalized (required to submit a letter of credit) pending the result of the determination.

Third, the commenters argued that by requiring under proposed § 668.171(d) that an institution must report any automatic or discretionary trigger within 10 days, the proposed regulations are unworkable—because the discretionary triggers are not exhaustive, an institution would have an obligation to speculate as to the types of events the Department might determine would have a material adverse effect and report those events. Conversely, the commenters were concerned that the Department could argue that an institution's failure to report an event, that the Department might deem likely to have material adverse effect, is a failure to provide timely notice under § 668.171(d), and grounds to initiate a proceeding.

Fourth, the commenters argued that the six examples of events that the Department might consider "reasonably likely" to have a material adverse effect on an institution are vague, and asserted that the Department offered no factual support in the preamble for the notion that these events regularly, or even more often than not, lead to financial instability at an institution. The commenters stated that the only rationale the Department offers for including these six events is that each could, in theory, signal financial stress. For example, they noted that a citation from a State-authorizing agency for failing a State requirement could concern almost any aspect of an institution's operations. The commenters contended that routine citations occur with great frequency in annual visit reports and routine audits. Therefore, under the proposed regulations, an institution would be required to report every citation, without regard to materiality, frequency, or the relationship to the institution's financial health. According to the commenters, events such as "high annual dropout rates," a "significant fluctuation" in the amount of Federal financial aid funds received by an institution, an undisclosed stress test, and an adverse event reported on a Form 8–K with the SEC are equally problematic and vague. Commenters stated that it was unclear what these thresholds or events represent, how they would be evaluated, or how an institution would know that one has occurred and report it to the Department.

Other commenters believed that the Secretary should not have open-ended discretion to determine which categories of events or conditions would be financial responsibility triggers. Like other commenters, these commenters argued that as a practical matter it

would likely be impossible for an institution to comply with the reporting requirements in proposed § 668.171(d) for any event or condition that is not specifically identified by the Secretary because the institution would have to guess which additional events or conditions might be of interest. Similarly, some commenters believed the discretionary triggers should be exhaustive with established parameters so that institutions know the events they must comply with and report to the Department.

Some commenters believed that the discretionary triggers constitute an open invitation for litigation by anyone with an "axe to grind" with any school. The commenters were concerned that the Secretary could use the expanded authority under the discretionary triggers to take actions against institutions for any reason.

*Discussion:* As a general matter, the discretionary triggers are intended to identify factors or events that are reasonably likely to, but would not in every case, have an adverse financial impact on an institution. Compared to the automatic triggers, where the impact of an action or event can be reasonably and readily assessed (*e.g.,* claims, liabilities, and potential losses are reflected in the recalculated composite score), the materiality or impact of the discretionary triggers is not as apparent. The Department will have to conduct a case-by-case review and analysis of the factors or events applicable to an institution to determine whether one or more of those factors or events has an adverse financial impact. In so doing, the Department may request additional information or clarification from the institution about the circumstances surrounding the factors or events under review. If the Department determines that the factors or events have a material adverse effect on the institution's financial condition or operations, the Department notifies the institution of the reasons for, and consequences of, that determination. As for the comment that we should define "material adverse effect," we do not intend to adopt a specific measure here, because identification of those events that cause such an effect is a particularized judgment.[59] We disagree with the notion

that it is inappropriate for the Department to determine which factors or events may be used as discretionary triggers, or that the list of factors and events in the regulations should be exhaustive. Each discretionary trigger rests on a particularized judgment that a factor or event has or demonstrates such a substantial negative condition or impact on the institution as to place continued operations in jeopardy.[60] In this regard, as explained more fully under the heading "Reporting Requirements," an institution is

[17 CFR 229.101(c)(1)(i), (vii)]. While not defining material adverse effect, the selection of this threshold supports an inference that loss of this magnitude can be expected to constitute a material adverse effect. A popular characterization of the significance of such a loss states that material adverse effect is a term that commonly denotes an effect that

. . . usually signals a severe decline in profitability and/or the possibility that the company's operations and/or financial position may be seriously compromised. This is a clear signal to investors that there is something wrong . . . Material adverse effect is not an early warning signal, but rather a sign that a situation has already deteriorated to a very bad stage. Investopedia *www.investopedia.com/articles/analyst/ 112702.asp#ixzz4JKIpsbwk.*

[60] The assessment would look to the factors identified in recent revisions to Financial Accounting Standards Board rules regarding the expectations regarding whether the entity's ability to continue as a going concern. FASB Standards Update, No. 2014–15, Presentation of Financial Statements—Going Concern (Snbtopic 205–40):

205–40–55–2 The following are examples of adverse conditions and events that may raise substantial doubt about an entity's ability to continue as a going concern. The examples are not all-inclusive. The existence of one or more of these conditions or events does not determine that there is substantial doubt about an entity's ability to continue as a going concern. Similarly, the absence of those conditions or events does not determine that there is no substantial doubt about an entity's ability to continue as a going concern. Determining whether there is substantial doubt depends on an assessment of relevant conditions and events, in the aggregate, that are known and reasonably knowable at the date that the financial statements are issued (or at the date the financial statements are available to be issued when applicable). An entity should weigh the likelihood and magnitnde of the potential effects of the relevant conditions and events, and consider their anticipated timing. a. Negative financial trends, for example, recurring operating losses, working capital deficiencies, negative cash flows from operating activities, and other adverse key financial ratios. b. Other indications of possible financial difficulties, for example, default on loans or similar agreements, arrearages in dividends, denial of usual trade credit from suppliers, a need to restructure debt to avoid default, noncompliance with statutory capital requirements, and a need to seek new sources or methods of financing or to dispose of substantial assets. c. Internal matters, for example, work stoppages or other labor difficulties, substantial dependence on the success of a particular project, uneconomic long-term commitments, and a need to significantly revise operations. d. External matters, for example, legal proceedings, legislation, or similar matters that might jeopardize the entity's ability to operate; loss of a key franchise, license, or patent; loss of a principal customer or supplier; and an uninsured or underinsured catastrophe such as a hurricane, tornado, earthquake, or flood.

responsible for reporting only the actions and events specified in these regulations.

We address specific concerns and suggestions about the discretionary triggers in the following discussion for each factor or event. In addition, we have added pending borrower defense claims as a discretionary trigger because it is possible that an administrative action could cause an influx of borrower defense claims that we can expect to be successful, though that will vary on a case-by-case basis.

*Changes:* None.

## Discretionary Triggering Events

*Bond or Credit Rating, Proposed § 668.171(c)(11)*

*Comments:* Commenters argued that a non-investment grade bond or credit rating is not a reliable indicator of financial problems. The commenters stated that, because the rating assigned by a rating agency is a measure designed for the benefit of creditors concerned solely with pricing the institution's debt, a rating below investment grade does not necessarily mean that an institution cannot meet its financial obligations. Moreover, the commenters questioned how the Department would determine that an institution or its corporate parent had a non-investment grade rating, since there are multiple rating agencies and the agencies may not necessarily assign the same rating to a particular institution or in the case where the institution or its corporate parent have multiple ratings, some of which are investment grade. The commenters stated that this financial structuring is not unusual and has no impact on the ability of the institution to meet its obligations. For these reasons, the commenters suggested that, if the Department retains bond or credit ratings as a triggering event, it should specify how those ratings are determined. In addition, the commenters were concerned that applying this trigger could potentially increase costs to institutions because, in an effort to avoid this risk of a non-investment grade rating, an institution may seek not to have a credit rating in the first place, so obtaining alternate financing could increase its costs of capital.

Other commenters argued that assuming that schools with noninvestment grade bond ratings are somehow deficient is unwarranted. The commenters noted that the majority of nonprofit colleges and universities do not have a bond rating at all, since they have not issued public debt, citing the data provided by the Department in the

[59] Accounting rules do not set a specific figure for such effects. However, SEC regulations require the registrant to disclose resources the loss of which would have a material adverse effect on the registrant, and in that rule explicitly require the registrant to disclose an investment of 10 percent or more of company resources in an entity, 17 CFR 210.1–02(w), and identify any customer or revenue source that accounts for 10 percent or more of the registrant's consolidated revenues, if the loss of that revenue would constitute a material adverse effect.

NPRM that shows that only 275 private institutions have been rated by Moody's (some others likely have used other rating agencies like Fitch or Standards & Poor). The commenters contended that institutions that have a rating are arguably in better financial condition than those that do not, so rather than being a trigger for additional scrutiny, the existence of a credit rating and outstanding public debt would, in itself, be an indication of financial responsibility. Further, the commenters noted that a bond rating seeks to assess the creditworthiness and risk of nonpayment over an extended time period—typically 20 to 30 years—that is well beyond the much shorter timeframe contemplated by the financial responsibility regulations.

*Discussion:* In considering the complexities and difficulties noted by the commenters in using and relying on bond or credit ratings, we are removing this triggering event.

*Changes:* We have removed bond or credit ratings as a discretionary trigger.

*Adverse Events Reported on Form 8–K, Proposed § 668.171(c)(11)*

*Comments:* Commenters believed that the trigger regarding the reporting of adverse events on the SEC's Form 8–K is too narrow since it is not used to identify adverse events at non-publicly traded institutions and too broad since it would capture events reported on Form 8–K that are not indicative of an institution's financial health. Although the commenters acknowledged that it may be efficient to use existing disclosure channels to identify potential issues of concern, they nevertheless believed that it was unfair for the Department to impose burdens on publicly traded institutions, but not on other institutions that may be experiencing adverse events. In addition, the commenters stated that many events listed on Form 8–K have no bearing on an institution's ability to meet its financial obligations, so the Department should identify the events it considers to be adverse. Once identified, the commenters suggested that the Department could develop a broader list of adverse events that would be applicable to all institutions.

Also, the commenters believed that, because of the proposed trigger, publicly traded institutions would have an incentive not to report events on Form 8–K that could potentially be adverse events, but in the ordinary course would have provided useful information to investors. In conclusion, the commenters feared that, without clear guidelines from the Department about what constitutes an adverse event,

publicly traded institutions would have to make their own decisions as to whether to treat something as an adverse event. Commenters were concerned that, even where institutions make that decision in good faith, they could potentially be exposing themselves later to an action by the Department if the Department exercises its own judgment in hindsight.

Similarly, other commenters believed that a number of events on Form 8–K have little or no relationship to the institution's continued capacity to operate or to administer the title IV, HEA programs. Instead of using a trigger based on Form 8–K reporting, the commenters suggested that the financial responsibility regulations should be focused on potential risks to the title IV, HEA programs and, as a related matter, institutional outcomes that are indicative of that risk.

*Discussion:* While we are not convinced that some of the reportable items on Form 8–K will not have an adverse financial impact on an institution, we will not require an institution to report any Form–8K event because that information is otherwise publicly available to the Department. We may, however, evaluate the effect of an event reported in a Form 8–K as if it were a discretionary triggering event, on a case by case basis, or in light of the effect on an institution's composite score as applied under these regulations.

*Changes:* We have removed the discretionary trigger regarding an adverse event reported by an institution on a Form 8–K under proposed § 668.171(c)(10)(vii).

*High Drop-Out Rates and Fluctuations in Title IV, HEA Funding*

Drop-Out Rates § 668.171(g)(4)

*Comments:* Some commenters urged the Department to define how it will calculate high annual dropout rates and provide an opportunity for the pubic to comment on the methodology employed. The commenters noted that in the preamble to the NPRM, the Department stated that it uses high dropout rates to select institutions for program reviews, as described in 20 U.S.C. 1099c–1(a), and that "high dropout rates may signal that an institution is employing high-pressure sales tactics or is not providing adequate educational services, either of which may indicate financial difficulties and result in enrolling students who will not benefit from the training offered and will drop out, leading to financial hardship and borrower defense claims" (81 FR 39366 (emphasis added)).

Although the commenters agreed that those statements may be true, they argued that when the Department conducts a program review, it investigates whether high dropout rates are in fact signs of financial difficulties. Under the NPRM, the commenters surmised that the Department would have the discretion to impose a requirement to provide a letter of credit or other financial protection without any review of institutional practice or other investigation to find a causal connection between high dropout rates and financial difficulties, thus depriving the institution of fair process.

Other commenters were concerned that this trigger is arbitrary because it is unlikely that a high dropout rate is related to a school's financial stability. The commenters pointed to a study published in December 2009 by Public Agenda showing that the most common reason students dropped out of school is because they needed to work. Other reasons cited in the study include: Needing a break from school, inability to afford the tuition and fees, and finding the classes boring or not useful. Based on this study and survey results from the Pew Research Center, the commenters concluded that the reasons students drop out of school typically have very little to do with school itself, and therefore suggested that the Department remove this triggering event.

Some commenters argued that the use of the dropout rate as a trigger fails to account for the various missions that title IV institutions represent, or the extended time to graduation that many contemporary students face as they balance career, family and higher education. The commenters believed that establishing a dropout rate as a trigger for a letter of credit creates a perverse incentive for institutions to enroll and educate only those students who are most likely to succeed, instead of continuing to extend access to higher education to the broader population. In addition, the commenters believed that measures of academic quality are best left to accreditors, but if the Department chooses to take on this role, it should consider instead triggering a letter of credit if an institution's persistence rate decreases significantly between consecutive award years, or over a period of award years. The commenters believed this approach would account for the significant variances in mission and student body across higher education without potentially limiting access.

*Fluctuations in Funding § 668.171(g)(1)*

Commenters believed the proposed trigger for a significant fluctuation between consecutive award years, or a period of award years, in the amount of Pell Grant and Direct Loan funds received by an institution, is overly vague. The commenters noted that year-over-year fluctuations can occur when an institution decides to discontinue individual programs or close campus locations, often because those campuses or programs are under-performing financially even where the overall institution is financially strong and argued that because these are sound business decisions made in the long-term interests of the institution, they should not give rise to a letter of credit requirement.

Some commenters believed that a decrease in total title IV expenditures should not trigger a letter of credit requirement because the decreases in the amount of title IV, HEA funds disbursed puts the Department at less risk of financial loss. In addition, the commenters stated that a decrease in title IV, HEA funding to a school is largely out of the school's control—it is usually a result of decreased enrollments or the Department's rulemaking actions.

Other commenters agreed that big changes in the amount of financial aid received by an institution could be a sign that growth is too fast, or an enrollment decline may signal a school is in serious trouble. The commenters argued, however, that at small schools, big percentage changes could simply be the result of small changes in the number of students. While the commenters were confident that the actual implementation of this rule would not result in the Department holding a small school accountable for what is a minor change, they believed the Department should clarify that the change in Federal aid would need to be large both in percentage and dollar terms as a way of proactively assuaging this concern.

One commenter noted that the phrase "significant fluctuation" was not defined, but that the Department implied on page 39393 of its NPRM that it believes a reasonable standard would be a 25 percent or greater change in the amount of title IV, HEA funds a school receives from year to year, after accounting for changes in the title IV, HEA programs. The commenter urged the Department to clarify in the final regulations precisely what this phrase means so that institutions would know how to comply. Moreover, the commenter argued that the Department

may be evaluating institutions by the wrong metric, stating that the for-profit sector has seen six-fold enrollment growth over the past 25 years where significant fluctuations in title IV, HEA program volume may be a reflection of that expansion. Said another way, a significant fluctuation in title IV, HEA program volume, without looking at important contextual clues, is insufficient to determine whether there is questionable conduct at the institution. In addition, the commenter warned that including significant fluctuation as a trigger may serve to deter institutional growth, since a large increase in enrollment would trigger the financial protection requirement even if that increase was perfectly legitimate.

In addition, the commenter believed that, while the Department has a compelling interest in ensuring that institutions do not raise tuition unnecessarily to take advantage of title IV, HEA aid, the Department should try to address this problem in a way that does not discourage institutions from expanding their enrollment.

For these reasons, the commenter suggested revising the trigger so it refers to a significant fluctuation in title IV, HEA program volume per aid recipient, not program volume overall. The commenters believed this approach would guard against increases in tuition designed to take advantage of the title IV, HEA programs while not penalizing institutions with rapid enrollment growth.

*Discussion:* We intend to use the high drop-out rate and fluctuations in funding triggers only when we make a careful, reasoned analysis of the effect of any of these events or conditions on a particular institution, and conclude that the condition or event is likely to have a material adverse effect on the institution. An institution that challenges this determination may present an argument disputing this determination. If we are not persuaded, we will take enforcement action under 34 CFR part 668, subpart G to limit the institution's participation to condition further participation on supplying the financial protection demanded. The institution may obtain an administrative hearing to dispute the determination, and unlike with the automatic triggers, the institution may present and have considered both evidence and argument in opposition to the determination that the condition may constitute a material adverse effect, but also whether the amount of financial protection demanded is warranted.

As noted in the introductory discussion of this section and noted by some commenters, the materiality or

relevance of factors like dropout rates and fluctuations in funding must be evaluated on a case-by-case basis in view of the circumstances surrounding or causes giving rise to what may appear to be excessive or alarming outcomes. In other words, what may be a high dropout rate or significant fluctuation in funding at one institution may not be relevant at another institution. In this regard, we appreciate the suggestions made by the commenters for how the Department could view or determine whether or the extent to which these factors are significant.

While a case-by-case approach argues against setting bright-line thresholds, to mitigate some of the anxiety expressed by the commenters as to what may be a high dropout rate or fluctuation in funding, we may consider issuing guidance or providing examples of actual cases where the Department made an affirmative determination.

*Changes:* None.

*State or Agency Citations § 668.171(g)(2)*

*Comments:* With respect to the discretionary trigger under proposed § 668.171(c)(10)(ii), some commenters noted that because State agencies may issue citations for minor violations of State requirements and not subject an institution to any penalties, the Department should remove this triggering event. The commenters believed this triggering event would unnecessarily capture citations for minor violations, such as failure to update the institution's contact information. It would also capture violations for which the State agency has decided no penalty is necessary. The commenters questioned why the Department should substitute its judgment for that of the State agency and determine that an otherwise non-punitive citation is indicative of financial problems. In the alternative, the commenters suggested that the final regulations should provide that this trigger would only be invoked if an institution's failure to comply with State or agency requirements was material. In addition, the commenters suggested that the final regulations should define "State licensing or authorizing" agency in this context to mean only the primary State agency responsible for State authorization, not specialized State agencies, such as boards of nursing, that have responsibility for professional licensure and other matters that would not have a material impact on the overall financial condition of the institution.

Other commenters recommend that the Department apply the State agency-

based trigger only if the citation by the State authorizing agency is final and relates to the same bases that can support a borrower defense claim. Or, because State agencies frequently cite institutions for findings of noncompliance that are remedied appropriately and timely, the commenters supported applying the trigger only if the State agency has initiated an action to suspend or terminate its authorization of the institution.

Some commenters were concerned that the Department did not provide any evidence that would support that an institution that chooses to discontinue State approval for a single program at a single location would implicate the financial stability of an entire institution, much less a large institution with a wide range of programming and multi-million dollar endowment.

*Discussion:* The State agency-based trigger and other discretionary triggers are intentionally broad to capture events that may have an adverse financial impact on an institution. With regard to the comments that the Department should not require an institution to report State agency actions for events or violations (1) that the institution considers minor, (2) for which the agency did not penalize the institution, or (3) that are remedied timely, we believe that doing so under any of these circumstances defeats the purpose of the trigger. There is little or no reporting burden on an institution that is sporadically cited for a violation by a State agency, but where the institution is cited repeatedly the reporting burden is warranted because even if individual violations are minor, collectively those violations may signal a serious issue at the institution.

A State licensing or authorizing agency, for the purpose of this trigger, includes any agency or entity in the State that regulates or governs (1) whether an institution may operate or offer postsecondary educational programs in the State, (2) the nature or delivery of those educational programs, or (3) the certification or licensure of students who complete those programs. In this regard, we disagree with the assertion that actions by a State agency responsible for professional licensure would never have a material impact on the financial condition of the institution. To the contrary, because the State agency enforces standards that restrict professional practice to individuals who, in part, satisfy rigorous educational qualifications, a citation or finding by the agency could impact how an institution offers or delivers an educational program.

Finally, with regard to the comment about an institution voluntarily discontinuing State approval for a program at a particular location, we note that, unless the State cited the institution for discontinuing the program, this is not a reportable event.

*Changes:* None.

*Comments:* Some commenters believed that considering "claims of any kind" against an institution, in proposed § 668.171(c)(1)(ii), would invite a broad set of claims that may not cause financial damages. Others objected to the apparent ability under proposed § 668.171(c)(10) to add other events or conditions as it wished without public comment. Commenters believed that proposed triggers do not focus just on fiscal solvency; rather, they assert, the proposed triggers include events not related to financial solvency: Accrediting agency actions, cohort default rates, and dropout rates. The commenters opined that the Department was inappropriately attempting to shift the emphasis of these regulations from financial oversight into much broader accountability measures and to insert the Federal government into institutional decision-making.

*Discussion:* To the extent that the proposed regulations would have included events other than explicit claims, we are revising the regulations to include only events that pose an imminent risk of very serious financial impact. An institution that could lose institutional eligibility in the next year is indeed at serious risk of severe financial distress. Other events cited here we agree pose a risk only under particular circumstances, and should not be viewed as per se risks.

*Changes:* Section 668.171 has been revised to make clear that accreditor sanctions and government citations, are considered, like high dropout rates, as triggering events only on a reasoned, case-by-case basis under § 668.171(g)(2) and (5).

*Stress Test § 668.171(g)(3)*

*Comments:* Commenters believed that a trigger based on the proposed stress test is redundant because the Department uses the existing composite score methodology as the primary means of evaluating the financial health of an institution. In addition, the commenters were concerned that the Department did not provide schools with enough information regarding what the financial stress test will be and if it will be developed through negotiated rulemaking. The commenters suggested removing the stress test as a trigger, but if the Department does implement a

stress test, it should first be developed through negotiated rulemaking.

Other commenters echoed the suggestion to develop the stress test through negotiated rulemaking, arguing that developing a test would not only be time consuming and complex, but have serious implications for institutions—all the reasons why institutions and other stakeholders should have an opportunity to provide their views and analyses.

Some commenters argued that it was premature and unreasonable to include reference to a stress test, which has yet to be developed, and which schools have not had a chance to review and offer comment on.

*Discussion:* We do not intend to replace the composite score methodology with a financial stress test. The stress test could be used to assess an institution's ability to deal with an economic crisis or adverse event under a scenario-based model, whereas the composite score methodology focuses primarily on actual financial performance over a fiscal year operating cycle.

We certainly understand the community's desire to participate in any process the Department undertakes to develop a stress test, or evaluate adopting an existing stress test, but cannot at this time commit to a particular process. However, we wish to assure institutions and other affected parties that we will seek their input in whatever process is used.

*Changes:* None.

*Violation of Loan Agreement § 668.171(g)(6)*

*Comments:* Under proposed § 668.171(c)(4), an institution is not financially responsible if it violated a provision or requirement in a loan agreement with the creditor with the largest secured extension of credit to the institution, failed to make a payment for more than 120 days with that creditor, or that creditor imposes more stringent loan terms or sanctions as a result of a default or delinquency event.

Some commenters noted that because the largest secured extension of credit may be for a very small dollar amount, the Department should specify a minimum threshold below which a violation of a loan agreement is not a triggering event.

Other commenters believed that a school that satisfies the composite score requirements should not be required to post a letter of credit relating to violations of loan agreements. The commenters cautioned that this provision could have the unintended impact of altering the relationship

between schools and their creditors because creditors would have additional leverage in negotiations regarding violations of loan agreements. The commenters believed that, because this additional leverage could potentially place a school's financial stability at risk where it otherwise was not, this triggering event should be deleted.

Along the same lines, other commenters warned that the proposed loan agreement triggers would create significant leverage for banks that does not presently exist. The commenters opined that a bank potentially could threaten to trigger a violation of a loan agreement or obligation, thereby exercising inappropriate leverage over the institution and its operations to the detriment of its educational mission, students, and employees. The commenters believed this outcome would be a significant threat that the Department must consider this "countervailing evidence" in rationalizing the reasonableness of this proposed trigger. *See Am. Fed'n of Labor & Cong. of Indus. Organizations* v. *Occupational Safety & Health Admin., U.S. Dep't of Labor,* 965 F.2d 962, 970 (11th Cir. 1992) (*quoting AFL–CIO* v. *Marshall,* 617 F.2d 636, 649 n. 44 (D.C. Cir. 1979)).

Other commenters agreed that, in certain circumstances, the violation of a loan agreement or other financial obligation may signal the need for financial protection. However, the commenters believed the proposed triggering events were overly broad and could result in financially sound institutions being regularly penalized. The commenters recommended that the Department revise the triggering events in two ways.

First, the Department should include a materiality threshold in proposed § 668.171(c)(4)(i) so that this provision is only triggered when a default is material and adverse to the institution. In addition, the commenters suggested that this provision should apply only to any undisputed amounts and issues that are determined by a final order after all applicable cure periods and remedies have expired. With regard to proposed § 668.171(c)(4)(ii), because cross-defaults are prevalent in most material loan agreements, commenters suggested that the Department should focus on defaults that are material and adverse to the institution as a going concern, as opposed to narrowing the trigger to the institution's largest secured creditor.

Second, commenters suggested that the language in proposed § 668.171(c)(4)(iii) should be revised to exclude events where the institution it permitted to cure the violation in a timely manner in accordance with the loan agreement. They noted that this type of "curing" is a common occurrence and specifically contemplated in the agreements between the parties.

Other commenters believed that the Department should include allowances for instances in which the creditor waives any action regarding a violation of a provision in a loan agreement, or the creditor does not consider the violation to be material. The commenters note that although the reporting requirements under proposed § 668.171(d)(3) permit an institution to notify the Department that a loan violation was waived by the creditor, it does not explicitly state that such a waiver would make the institution financially responsible. The commenters urged the Department to revise this provision to clearly state that a waiver of a term or condition granted by a creditor cures the triggering event so that financial protection is not required. According to the commenters, certified public accountants use this standard when assessing a school's ability to continue as a going concern—if a waiver is issued or granted by the creditor the certified public accountant does not mention this event in the school's audited financial statements because it is no longer an issue for the debtor.

Some commenters believed that the proposed loan agreement provisions were too broad and would unnecessarily impact institutions that pose no risk. The commenters stated that loan agreements may include a number of events that are not related to the failure of the institution to make payments that trigger changes to the terms of the agreement, and in that case the proposed provisions would seem to capture the change in terms as a reportable event. The commenters noted that nonprofit institutions have access to and use variable rate loans, and that some nonprofit institutions have synthetically converted their variable rate interest borrowings into fixed rate debt by entering into an interest rate swap agreement. The commenters believed that, under these circumstances, it would be incorrect to assume that changes to the interest rates negatively impact the institution. Further, while the loan provision in the proposed regulations is narrower than the current one since it only applies to an institution's largest secured creditor, rather than all creditors, the commenters believed the Department should establish a materiality threshold and/or make a determination that any changes to the interest rate or other terms would have a material impact on the institution. In addition, the commenters noted that the exception provided under § 668.171(d)(3), allowing the institution to show that penalties or constraints imposed by a creditor will not impact the institution's ability to meet its financial obligations, only applies if the creditor waived a violation and questioned whether the end result would be the same if the creditor did not waive the violation, but the penalties or changes to the loan nevertheless would not have an adverse impact.

*Discussion:* In considering the comments regarding the materiality of loan violations, and whether the sanctions or terms imposed by a creditor as a result of a default or delinquency event are relevant or adverse, we are making the provisions in proposed § 668.171(c)(4) discretionary triggers under § 668.171(g)(6). We believe that evaluating a delinquency or default on a loan obligation under the discretionary triggers addresses the commenters' concerns that the Department should review or assess a loan violation on a case-by-case basis to determine whether that violation is material and sufficiently adverse to warrant financial protection. This case-by-case review eliminates the need to qualify or limit the scope of loan violations to the largest secured creditor. Moreover, making these discretionary triggers maintains the Department's objective of identifying and acting on early warning signs of financial distress. We expect that making the proposed provisions discretionary will abate the concerns raised by the commenters that an automatic action by the Department in response to a loan violation would prompt or create an unfair advantage for creditors, because that action is no longer certain. In addition, we note that if a creditor files suit in response to a loan violation, that suit is covered under the provisions in § 668.171(c)(1)(ii) as an automatic triggering event.

*Changes:* We have relocated the proposed loan agreement provision to § 668.171(g)(6), reclassified these provisions as discretionary events, and removed the qualifier that the loan violation is for the largest secured creditor.

### Borrower Defense Claims § 668.171(g)(7)

*Comments:* None.
*Discussion:* After further consideration, the Department concluded that, in instances in which the Department can expect an influx of successful borrower defense claims as a

result of a lawsuit, settlement, judgment, or finding from a State or Federal administrative proceeding, we may wish to require additional protection. However, since such instances are fact-specific, we have decided to make such a trigger discretionary.

*Changes:* We have added a new discretionary trigger in § 668.171(g)(8) relating to claims for borrower relief as a result of a lawsuit, settlement, judgment, or finding from a State or Federal administrative proceeding.

*Reporting Requirements § 668.171(h)*

*Comments:* Some commenters believed that the proposed mandatory reporting requirements under §668.171(d) are outside the scope of the Department's authority. The commenters argued that statutory provisions cited by the Department, that the Secretary has authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department," and that the Secretary is authorized "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department" (20 U.S.C. 1221e–3), are "implementary rather than substantive," meaning that they "can only be implemented consistently with the provisions and purposes of the legislation." *New England Power Co.* v. *Fed. Power Comm'n.,* 467 F.2d 425, 430 (D.C. Cir. 1972), aff'd, 415 U.S. 345 (1974) (citation omitted).

*Discussion:* The Secretary cited 20 U.S.C. 1221e–3 as authority for revisions to 34 CFR 30.70, 81 FR 39407, and the repayment rate disclosures proposed as new § 668.41(h). 81 FR 39371. As pertinent here, the Department cited as authority for the proposed changes to § 668.171, which includes the new reporting requirements under § 668.171(h), sections 487 and 498(c) of the HEA, 20 U.S.C. 1094 and 1099c. Section 487 states that the Secretary "notwithstanding any other provision of this title (title IV of the HEA), shall prescribe such regulations as may be necessary to provide . . . in matters not governed by specific program regulations, the establishment of reasonable standards of financial responsibility . . . including any matter the Secretary deems necessary to the sound administration of the financial aid programs, such as the pertinent actions of any owner, shareholder, or person exercising control over an

eligible institution." 20 U.S.C. 1094(c)(1)(B). Section 498 states that the Secretary is to determine whether an institution is able to meet its financial obligations to all parties, including students and the Secretary, including adopting financial criteria ratios. 20 U.S.C. 1099c(c). These provisions give the Secretary ample substantive authority to adopt regulations that require the institution to provide audited financial statements and other records needed to evaluate the financial capability of the institution. This authority is direct and specifically authorizes the required reporting by participating institutions, unlike the charge imposed by the Federal Power Commission in *New England Power Co.* v. *Fed. Power Comm'n,* cited by the commenter to support its view. The court there concluded that the Commission lacked authority to impose that charge on the industry member for costs incurred not for the benefit of the member but for the general public. *New England Power Co.* v. *Fed. Power Comm'n,* 467 F.2d 425, 427 (D.C. Cir. 1972), aff'd, 415 U.S. 345 (1974). Here, the HEA expressly authorizes the Secretary to adopt regulations governing the conditions for participation in the title IV, HEA programs, and in particular, the assessment of the institution's financial capability.

*Changes:* None.

*Comments:* Under the reporting requirements in proposed § 668.171(d), an institution must report any action or event identified as a trigger under § 668.171(c) no later than 10 days after the action or event occurs. For three of the reportable actions or events— disclosure of a judicial or administrative proceeding, withdrawal of owner's equity, and violations of loan agreements—the institution may show that those actions or events are not material or relevant.

Commenters were concerned that the Department would not be bound to act or consider any evidence an institution would provide under proposed § 668.171(d)(2) regarding the waiver of a violation of a loan agreement, or provide any opportunity to the institution to discuss the waiver. Moreover, the commenters were concerned that the waiver reporting provisions would permit the Department to disregard any such evidence if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements. Absent a materiality modifier, the commenters believed that the waiver "carve out" would become meaningless. Ostensibly, the commenters feared that the Department could proceed to

demand financial protection even if a creditor waived the underlying violation and the institution effectively demonstrated that the additional requirements imposed would only have a negligible impact on the institution's ability to meet current and future financial obligations. The commenters recommended that at a minimum, proposed § 668.171(d)(2) should be modified to require a material adverse effect on the institution's financial condition.

Other commenters believed that requiring institutions to report the widely disparate events reflected in the proposed triggering events within 10 days is unreasonable, particularly for large, decentralized organizations. The commenters believed that it was one thing to demand that type of prompt reporting on a limited number of items from institutions that already have been placed on heightened monitoring but quite different to require hyper-vigilance from all institutions. The commenters argued that various offices across the institution might be involved and have contemporaneous knowledge of the triggering events, but the individuals dealing with an unrelated agency action, a lawsuit, or a renegotiation of debt are unlikely to have a Department reporting deadline on the top of minds. Moreover, the commenters believed that individuals at an institution who are charged with maintaining compliance with Department regulations are unlikely to learn about some of these events within such a short period of time.

*Discussion:* In view of these comments and other comments discussing the triggering events, we clarify in these final regulations the reporting requirement that applies to each triggering event. As shown below, an institution must notify the Department no later than:

1. For the lawsuits and other actions or events in § 668.171(c)(1)(i), 10 days after a payment was required, a liability was incurred, or a suit was filed, and for suits, 10 days after the suit has been pending for 120 days;

2. For lawsuits in § 668.171(c)(1)(ii), 10 days after the suit was filed and the deadlines for filing summary judgment motions established, and 10 days after the earliest of the events for the summary judgments described in that paragraph;

3. For accrediting agency actions under § 668.171(c)(1)(iii), 10 days after the institution is notified by its accrediting agency that it must submit a teach-out plan.

4. For the withdrawal of owner's equity in § 668.171(c)(1)(v), 10 days

after the withdrawal is made. 5. For the non-title IV revenue provision in § 668.171(d), 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3).

6. For the SEC and exchange provisions for publicly traded institutions under § 668.171(e), 10 days after the SEC or stock exchange notifies or takes action against the institution, or 10 days after any extension granted by SEC.

7. For State or agency actions in paragraph (g)(2), 10 days after the institution is cited for violating a State or agency requirement;

8. For probation or show cause actions under paragraph (g)(5), 10 days after the institution's accrediting agency places the institution on that status; or

9. For the loan agreement provisions in paragraph (g)(6), 10 days after a loan violation occurs, the creditor waives the violation, or imposes sanctions or penalties in exchange or as a result of the waiver. We note that the proposed loan agreement provisions are discretionary triggers in these final regulations, and as such facilitate a more thorough dialogue with the institution about waivers of loan violations and creditor actions tied to those waivers.

We also are providing that an institution may show that a reportable event no longer applies or is resolved or that it has insurance that will cover the debts and liabilities that arise at any time from that triggering event.

In addition, we are providing that an institution may demonstrate at the time it reports a State or Federal lawsuit under § 668.171(c)(1)(i)(B) that the amount claimed under that lawsuit exceeds the potential recovery. We stress that this option does not include any consideration of the merit of the government suit. It addresses only the situation in which the government agency asserts a claim that the facts alleged, if accepted as true, and the legal claims asserted, if fully accepted, could still not produce a recovery of the deemed or claimed amount for reasons totally distinct from the merit of the government suit. Thus, the regulations in some instances deem a suit to seek recovery of all tuition received by an institution, but the allegations of the complaint describe only a limited period, or a given location, or specific programs, and the institution can prove that the total amount of tuition received for that identified program, location, or period is smaller than the amount claimed or the amount of recover deemed to be sought.

*Changes:* We have revised § 668.171(h)(1) to specify the reporting requirements that apply to a triggering event, as described above. We have also provided in revised paragraph (g)(3) that an institution may show (1) that a reportable event no longer exists, has been resolved, or that it has insurance that will cover debts and liabilities that arise at any time from that triggering event; or (2) that the amount claimed in a lawsuit under § 668.171(c)(1)(i)(B) exceeds the potential recovery the claimant may receive.

*Public Domestic and Foreign Institutions § 668.171(i)*

Domestic Public Institutions

*Comments:* Commenters were concerned that the proposed regulations would unfairly target private institutions, noting that public institutions would be exempt from the triggering events requiring letters of credit, even as recent events have shown that public institutions are not necessarily more financially stable than other institutions.

Other commenters believed that the Department intended to exempt public institutions, as it currently does, from the financial responsibility standards, including the proposed triggering events, but the Department did not explicitly do so in the NPRM.

*Discussion:* We rely, and have for nearly 20 years relied, on the full-faith and credit of the State to cover any debts and liabilities that a public institution may incur in participating in the title IV, HEA programs. Under the current regulations in §§ 668.171(b) and (c), a public institution is not subject to the general standards of financial responsibility and is considered financially responsible as long as it does not violate any past performance provision in § 668.174. The Department has on occasion placed public institutions on heightened cash monitoring for failing to file required audits in a timely manner, but even then has never required a public institution to provide financial protection of any type because we already have it in the form of full-faith and credit. We would like to clarify that we are not changing long-standing policy for public institutions with these final regulations. In other words, the triggering events in § 668.171(c) through (g) of these regulations do not apply to public institutions.

*Changes:* None.

Foreign Institutions

*Comments:* Commenters believed that the actions and events that could trigger a letter of credit under § 668.171(c) are not applicable to foreign institutions, and requested that foreign institutions be exempted from these regulations, at least until the composite score methodology is revised. In addition, the commenters reasoned that a foreign institution with thousands of students from the institution's home country and perhaps a few dozen U.S. students should not be required to post warnings for all of its students based on this U.S. regulatory compliance issue.

*Discussion:* While we agree that some triggering events in §§ 668.171(c) through (g) may not apply to foreign institutions, that circumstance does not justify exempting those institutions from the triggering events that do apply. In addition, we see no reason to grant a temporary exemption until the composite score methodology is revised because it is unlikely that accounting-based revisions to a financial statement-centered methodology will affect triggering events like lawsuits that are applied contemporaneously, or title IV, HEA program compliance requirements like cohort default rate and gainful employment. We note that foreign public institutions, like U.S.-based public institutions, are currently exempt, and continue to be exempt in these final regulations, from most of the general standards of financial responsibility, including the composite score.

*Changes:* None.

*Alternative Standards and Requirements § 668.175*

*Provisional Certification Alternative § 668.175(f)*

*Amount of Financial Protection § 668.175(f)(4)*

Cost of Letter of Credit

*Comments:* One commenter stated that, years ago, letters of credit were both widely available and very inexpensive; it was not unusual for a bank to issue a small letter of credit on behalf of a client for no charge and without any collateral. However, the commenter stated that the bursting of the stock bubble in the late 1990s and the new rules regulating banks after the financial crisis has had a tremendous effect on the ability of banks to issue letters of credit, the price charged for them, and the amount of collateral required to issue one.

According to the commenter, a $1,000,000 letter of credit that might have cost $5,000 to issue with no collateral 30 years ago now costs $10,000–$20,000 and requires $500,000 to $1,000,000 of cash to collateralize it. The commenter opined that while this is still relatively easy for the wealthiest

schools with the largest endowments to meet, it would place a tremendous burden on smaller schools, vocational schools, and schools that serve the poorest students in the poorest areas because it will tie up a significant portion of their cash as collateral. For these reasons the commenter urged the Department to accept alternatives to bank-issued letters of credit, noting that performance bonds are used widely in business to guarantee satisfactory performance of construction, services, and delivery of goods. The commenter stated that most States that have regulations to protect students from poorly run schools allow performance bonds already.

According to the commenter, a performance bond guarantees the performance of a task on behalf of the client. In the case of a borrower defense, the Department is using the letter of credit to guarantee to successful completion of the education for which the Department issued title IV loans. By allowing performance bonds, according to the commenter, the Department could protect itself from poorly run schools that harm students without harming thinly capitalized schools by forcing them to purchase more expensive products. The commenter stated that a typical surety bond for $1,000,000 might cost $5,000–$15,000 and only require 25 percent collateral or less. This means that the schools get to keep more of their cash to better deliver education to students and the Department is still adequately protected against a claim from a closed school.

Some commenters noted that the Department has the statutory authority under section 498(c)(3)(A) of the HEA to accept performance bonds and should use that authority because surety bonds cost far less than letters of credit and are equally secure.

Other commenters were concerned that the cost of securing required letters of credit could be prohibitive and cause some schools to close. These and other commenters believed that schools are finding that it is increasingly more difficult to secure letters of credit because of high cost and the regulatory uncertainties facing the higher education sector. The commenters noted that these costs include fees to the lenders and attorneys each time the underlying credit facility is negotiated to expand the letters of credit (schools are required to pay their attorney's fees as well as lender attorney fees for these transactions). Moreover, the commenters stated that because of the Department's compliance actions against proprietary schools, many lenders will no longer lend to

proprietary institutions. Therefore, if schools are forced to obtain large letters of credit they will need to turn to second or third tier lenders, or lenders who offer crisis loans, who will charge significant fees for these letters of credit.

In view of the cost and financial resources needed to secure a letter of credit, some commenters believed that the Department should apply a cap of 25 percent on the amount of the cumulative letters of credit that a provisionally certified institution could be required to post under the revised regulations.

Other commenters suggested that if a letter of credit is imposed for an accrediting agency trigger relating to closing a location, the letter of credit should be based on a percentage of the amount of title IV, HEA funds the closing location received, not a percentage of title IV, HEA funds received by the entire institution. The commenters reasoned that if the financial impact of the closing of the branch or additional location will have a material negative impact on the school, then the Department should set the letter of credit amount based on 10 percent of the branch or additional location's title IV, HEA funds, arguing that this approach is straight-forward: Any liabilities that the school may incur resulting from the closure of a branch or additional location would relate only to the students attending the closing location. In contrast, the commenter believed that imposing the letter of credit based on the total title IV, HEA funds received by the school would be disproportionate to the financial impact of the potential student issues to which a letter of credit may relate. The commenters noted that the NPRM expressly recognized the cost of securing letters of credit and the difficulties a school may have in obtaining a letter of credit within 30 days. 81 FR 39368. If a school cannot secure a letter of credit within that timeframe, the Department would set aside title IV, HEA funds, which according to the commenters would almost assuredly have a catastrophic financial impact on the institution. Therefore, the commenters concluded that imposing a larger letter of credit on the school than is necessary will impose cost and financial burden on the school far greater than any possible benefits that the Department could obtain from the larger letter of credit, and will negatively impact students in the process.

*Discussion:* With regard to the comment that the Department cap any cumulative letters of credit to 25 percent of amount that would otherwise be

required, we believe setting an inflexible cap would defeat the purpose of requiring financial protection that is commensurate with the risks posed by one or more of the triggering events. The Secretary currently has the discretion to establish the amount of financial protection required for a particular institution, starting at 10 percent of the amount the title IV, HEA program funds the institution received in the prior award year, and that discretion is not limited by these regulations. As noted previously in this preamble under the heading "Composite Score and Triggering Events," the amount of the financial protection required is based on a recalculated composite score of less than 1.0—the total amount of financial protection required is, at a minimum, 10 percent of the title IV, HEA funds the institution received during its most recently completed fiscal year, and such added amount as the Secretary demonstrates is warranted by the risk of liabilities with regard to that institution.

We do not disagree with the general notion that the costs associated with a letter of credit have increased over time and that some institutions may not be able to secure, or may have difficulty securing, a letter of credit. We acknowledged this in the preamble to the NPRM and offered the set-aside as an alternative to the letter of credit. With regard to other alternatives, we are not aware of any surety instruments that are as secure as bank-issued letters of credit and that can be negotiated easily by the Department to meet the demands of protecting the Federal interests in a dependable and efficient manner. However, if surety instruments come to light, or are developed, that are more affordable to institutions than letters of credit but that offer the same benefits to the Department, we will consider accepting those instruments. To leave open this possibility, we are amending the financial protection requirements in § 668.175(f)(2)(i) to provide that the Department may, in a notice published in the **Federal Register**, identify acceptable surety alternatives or other forms of financial protection. We wish to make clear that the Department will not accept, or entertain in any way, surety instruments or other forms of financial protection that are not specified in these final regulations or that are not subsequently identified in the **Federal Register**. In this vein, the Department is continuing to examine generally the alternatives to a letter of credit to ensure that such alternatives strike a reasonable balance between protecting the interests of the taxpayers and the Federal Government and

providing flexibility to institutions, and is revising the regulations to provide that all alternatives to a letter of credit or a set-aside arrangement, including cash, will be permitted only in the Secretary's discretion.

Lastly, as discussed previously throughout this preamble, an institution that can prove that it has sufficient insurance to cover immediate and potential debts, liabilities, claims, or financial obligations stemming from each triggering event, will not be required to provide financial protection of any kind.

With regard to the amount of financial protection stemming from the teach-out trigger for closed locations under § 668.171(c)(iv), by considering only closures of locations that cause the composite score to fall below a 1.0, we identify those events that pose a significant risk to the continued viability of the institution as a whole, and the financial protection needed should be based on the risk of closure and attendant costs to the taxpayer, not merely the expected costs of closed school discharges to students enrolled at the closed location.

Finally, the Department has long had discretion, under current regulations, in setting the amount of the required financial protection, and we are revising § 668.175(f)(4) to memorialize our existing discretion to require financial protection in amounts beyond the minimum 10 percent where appropriate.

*Changes:* We have revised § 668.175(f)(2)(i) to provide that the Secretary may identify acceptable surety instruments or other forms of financial protection in a notice published in the **Federal Register**. In each place in the regulations where we address acceptable forms of financial protection, we have revised the regulations to provide that alternatives to letters of credit and set-aside arrangements will be permitted in the Secretary's discretion. In addition, we have revised § 668.175(f)(4) to provide the minimum amount of financial protection required, specifically to set 10 percent of prior year title IV, HEA funding as the minimum required protection amount, with a minor exception for institutions that do not participate in the loan program, and to authorize the setting of such larger added amount as the Secretary determines is needed to ensure that the total amount of financial protection provided is sufficient to fully cover any estimated losses, provided that the Secretary may reduce this added amount only if an institution demonstrates that this added amount is unnecessary to protect, or is contrary to, the Federal interest. We made a

conforming change to § 668.90(a)(3)(iii)(D).

*Set-Aside § 668.175(h)*

*Comments:* Commenters believed that the set-aside under proposed § 668.175(h) as an alternative a letter of credit or cash would not be a viable option. The commenters argued that most schools rely on title IV, HEA funds for cash flow purposes, so administratively offsetting a portion of those funds would likely force many schools to close. Similarly, if a school is placed on Heightened Cash Monitoring 2 (HCM2) or reimbursement because it cannot secure a letter of credit, the commenters asserted that the school would likely close because historically the Department and institutions have not been able to timely process funds under HCM2.

Other commenters acknowledged the Department's concern about getting financial protection into place quickly, but believed that 90 days would be a more reasonable timeframe. The commenters stated that under current conditions in the financial markets, even with the best efforts it is almost impossible to get a letter of credit approved within the proposed 30-day timeframe. Also, the commenters suggested that if the Department implements the set-aside because of a school's delay in providing the letter of credit, this section needs to allow for the set-aside agreement to be terminated once the school is able to provide the letter of credit.

Other commenters agreed that the Department needs some way to obtain funds from institutions that fail to provide a letter of credit. The commenters believed, however, that the proposed set-aside provisions are overly generous in terms of time and amount. In particular, the commenters suggested the following changes:

(1) *Make set-aside amounts larger than letter of credit requests.* An institution's inability to obtain a letter of credit may in and of itself be a warning sign that private investors do not trust the institution enough to be involved with it. Therefore, the commenters suggested that any amounts covered by the set-aside provision should be set at 1.5 times the size of a letter of credit. This would both encourage colleges to obtain letters of credit and also send a strong message that the set-aside is a last resort action.

(2) *Implement other limitations on colleges that cover letters of credit through set asides.* According to the commenters, the set-aside is not the ideal way to get institutions to provide their financial commitments.

Accordingly, they proposed that this provision should come with greater protections for students and taxpayers or, at the very least, include some sort of limitation on Federal financial aid that prevents the institution from increasing the number of Federal aid recipients at the school and potentially even considers not allowing for new enrollment of federally aided students. Absent such protections, commenters noted that schools may face perverse incentives where they are encouraged to grow enrollment as a way of meeting the set-aside conditions.

(3) *Lessen the time period for collecting set-aside amounts.* Commenters noted that nine months is a long period of time for collecting amounts that an institution would otherwise be expected to provide in 30 days through a letter of credit. Nine months is also a long time in general— almost an entire academic year. Commenters stated that collecting the funds in this amount of time makes it possible for institutions to still enroll a large number of students and then run the risk of shutting down, and suggested that the Department shorten this time period to no more than half an academic year.

*Discussion:* While a set-aside may not be an option for an institution that is unable to compensate for a temporary loss of a percentage of its title IV, HEA funding, either by using its own resources or obtaining some form of financing, it is unlikely that the institution has any other options. For other institutions with at least some resources, we believe the set-aside is a viable alternative.

We disagree with the assertion that an institution is likely to close if it is placed on HCM2. Based on data available on the Department's Web site at *https://studentaid.ed.gov/sa/about/ data-center/school/hcm,* approximately 60 percent of the institutions on HCM2 as of March 2015 were still on that status as of June 2016.

With regard to extending the time within which an institution must submit a letter of credit, we adopt in these regulations the Department's current practice of allowing an institution 45 days.

In addition, we are providing in the final regulations that when an institution submits a letter of credit, the Department will terminate the corresponding set-aside agreement and return any funds held under that agreement. With regard to the comments that the Department should increase the amount of the set-aside or shorten the time within which the set-aside must be fully funded, we see no justification for

either action. The Department proposed the set-aside as an alternative for an institution that is unable to timely secure a letter of credit, so that inability cannot be used as a reason to increase the amount of financial protection under the set-aside arrangement. For the funding timeframe, the Department proposed nine months, roughly the length of an academic year, as a reasonable compromise between having financial protection fully in place in the short term and minimizing the consequences of reducing an institution's cash flow. We believe that shortening the funding timeframe may put unnecessary financial stress on an institution that would otherwise fulfill its obligations to students and the Department. We continue to analyze, and will publish in the **Federal Register**, the terms on which an institution may provide financial protection other than a letter of credit or set-aside arrangement.

*Changes:* We have revised § 668.175(h) to increase from 30 to 45 days the time within which an institution must provide a letter of credit to the Department and provide that the Secretary will release any funds held under a set-aside if the institution subsequently provides the letter of credit or other financial protection required under the zone or provisional certification alternatives in § 668.175(d) or (f).

*Provisional Certification (Section 668.175(f)(1)(i))*

*Comments:* Some commenters were concerned that the Department would place a school on provisional certification simply because of a triggering event in § 668.171(c), such as the school's cohort default rate, 90/10 ratio, or D/E rates under the GE regulations. The commenters argued that the regulations covering these measures did not intend or contemplate their use as reasons for placing an institution on provisional certification, so schools should not be subject to additional penalties.

Other commenters questioned whether the Department made a change in the applicability of the provisional certification alternative in § 668.175(f) that was not discussed in the NPRM. The commenters stated that it was unclear whether excluding the measures in § 668.171(b)(2) and (b)(3) from either zone alternative or the provisional certification alternatives in proposed § 668.175(d) and (f) was intentional or if the reference to § 668.171(b)(1) should just be § 668.171(b). In addition, the commenters noted that only the provisional certification alternative in

proposed § 668.175(f) refers to the proposed substitutes for a letter of credit (cash and the set-aside), whereas both the NPRM and proposed § 668.175(h), by cross-reference to § 668.175(d), refer to the substitutes as applicable to the zone alternative.

One commenter noted that the current regulations create multiple options for institutions with a failing financial responsibility score, but the terms between the zone and provisional certification alternatives are not sufficiently equal. The commenter also contended that the time limits associated with the alternatives are unclear. To address this, the commenter recommended the following changes to the current regulations.

(1) Increase the minimum size of the initial letter of credit for institutions on provisional status.

Currently, an institution choosing this option only has to provide a letter of credit for an amount that in general is, at a minimum, 10 percent of the amount of title IV, HEA funds received by the institution during its most recently completed fiscal year, while an institution that chooses to avoid provisional certification must submit a 50 percent letter of credit. The commenter recognized that part of this difference reflects the bigger risks to an institution that come with being provisionally certified but believed the current gap in letters of credit is too large. The commenter recommended that the Department increase the minimum letter of credit required from provisionally certified institutions that enter this status after the final regulations take effect to 25 percent.

(2) Automatically increase the letter of credit for institutions that renew their provisional status.

The commenter stated that § 668.175(f)(1) of the current regulations suggests that an institution may participate under the provisional certification alternative for no more than three consecutive years, whereas § 668.175(f)(3) suggests that the Secretary may allow the institution to renew this provisional certification and may require additional financial protection.

The commenter requested that the Department clarify the terms on which it will renew a provisional status. In particular, the commenter recommended that we require the institution, as part of any renewal, to increase the size of the letter of credit to 50 percent of the institution's Federal financial aid. This amount would align with the current requirements for an institution with a failing composite score that does not choose the

provisional certification alternative and, according to the commenter, would reflect that an institution has already spent a great deal of time in a status that suggests financial concerns.

(3) Limit how long an institution may renew its provisional status.

The commenter stated that § 668.175(f)(3) of the current regulations suggests an institution could potentially stay in provisional status forever. The commenter asked the Department to place a time limit on these renewals that would ideally be no longer than the period during which institutions can continue to participate in the title IV, HEA programs while subject to other conditions under the Department's regulations, which tends to be three years. However, the commenter believed that even six years in provisional status may be an unacceptably long amount of time.

*Discussion:* Contrary to the comments that the current cohort default rate, 90/10, and GE regulations do not contemplate provisional certification, we note the 90/10 and cohort default rate provisions do just that after a one- or two-year violation of those standards. In addition, we clarify that an institution under either the zone or provisional certification alternative may provide a letter of credit or, in the Secretary's discretion, provide another form of financial protection in a form or under terms or arrangements that will be specified by the Secretary or enter into a set-aside arrangement. The set-aside arrangement is not available to an institution that seeks to participate for the first time in the title IV, HEA programs or that failed the financial responsibility standards but seeks to participate as a financially responsible institution, because in either case the institution must show that it is financially responsible. That is, the institution must show that it has the financial resources to secure, or a bank is willing to commit the necessary resources on behalf of the institution to provide, a letter of credit. For the references to the general standards and triggering events, an institution that fails the general standards under § 668.171(b)(1) or (3), as reflected in the composite score or the triggering events under § 668.171(c), or no longer qualifies under the zone alternative, is subject to the minimum financial protection required under § 668.175(f). With respect to the numerous changes the commenter proposed for how the Department should treat institutions on provisional certification, since we did not propose any changes to the provisional certification requirements under § 668.175(f) or § 668.13(c), or to

the long-standing minimum letter of credit requirements, the suggested changes are beyond the scope of these regulations.

*Changes:* None.

## Financial Protection Disclosure

### General

*Comments:* One commenter asserted that the proposed financial protection disclosure requirements exceed the Department's statutory authority because the financial responsibility provisions in the HEA, unlike other provisions of the Act, do not mention disclosures. The commenter maintained that such omissions must be presumed to be intentional, since Congress generally acts intentionally when it uses particular language in one section of the statute but omits it from another.

*Discussion:* We do not agree with the commenter. The financial protection disclosure requirements do not conflict with the financial responsibility provisions in the HEA. Furthermore, the lack of specific mention of such disclosures in the provisions of the HEA related to financial responsibility does not preclude the Department's regulating in this area. Courts have recognized that the Department under its general rulemaking authority may require disclosures of information reasonably considered useful for student consumers.[61]

As noted above, the Department continues to assert both its authority to require disclosures related to financial responsibility and the usefulness of those disclosures for student consumers. However, in the interest of clarity and ensuring that disclosures are as meaningful as possible, we have made several changes to proposed § 668.41(i). Under the proposed regulations, institutions required to provide financial protection to the Secretary must disclose information about that financial protection to enrolled and prospective students. These final regulations state that the Department will rely on consumer testing to inform the identification of events for which a disclosure is required. Specifically, the Secretary will consumer test each of the

events identified in § 668.171(c)–(g), as well as other events that result in an institution being required to provide financial protection to the Department, to determine which of these events are most meaningful to students in their educational decision-making. The Department expects that not all events will be demonstrated to be critical to students; however, events like lawsuits or settlements that require financial protection under § 668.171(c)(1)(i) and (ii); borrower defense claims that require financial protection under § 668.171(g)(7); and two consecutive years of cohort default rates of at least 30 percent, requiring financial protection under § 668.171(f) are likely to be of more relevance to students. Findings resulting from the Department's administrative proceedings are included among these triggering events. The issue of students being ill-informed about ongoing lawsuits or settlements with their institutions was raised by students, particularly Corinthian students, during negotiated rulemaking, as well as by commenters during the public comment period. We also believe that students will have a particular interest in, and deserve to be made aware of, instances in which an institution has a large volume of borrower defense claims; this may inform their future enrollment decisions, as well as notify them of a potential claim to borrower defense they themselves may have. Finally, we believe that cohort default rate is an important accountability metric established in the HEA, and that ability to repay student loans is of personal importance to many students. Any or all of these items may be identified through consumer testing as important disclosures.

*Changes:* We have revised § 668.41(i) to clarify that all actions and triggering events that require an institution to provide financial protection to the Department will be subject to consumer testing before being required for institutional disclosures to prospective and enrolled students.

*Comments:* A few commenters expressed strong overall support for requiring disclosures to prospective and enrolled students of any financial protection an institution must provide under proposed § 668.175(d), (f), or (h). The commenters cited the significant financial stake an institution's students have in its continued viability, and a resulting right to be apprised of financially related actions that might affect that viability.

However, some commenters who supported the proposed requirements raised the concern that unscrupulous

institutions might intentionally attempt to undermine the disclosures by burying or disguising them. Accordingly, those commenters suggested that the Department should prescribe the wording, format, and labeling of the disclosures. Other commenters expressed disappointment that the proposed regulations do not require institutions to deliver financial protection disclosures to prospective students at the first contact with those students, and strongly supported including such a requirement in the final regulations. Though acknowledging several negotiators' objections that establishing a point of first contact would prove too difficult, one commenter was unconvinced, and asserted the importance of requiring delivery of critical student warnings at a point when they matter most. The same commenter found the proposed regulatory language on financial protection disclosures to be vague, and requested clarification as to whether proposed § 668.41(h)(7) (requiring institutions to deliver loan repayment warnings in a form and manner prescribed by the Secretary) applies to financial protection disclosures as well. The commenter further asserted that information regarding financial protection is even more important to consumers than repayment rates, and therefore institutions' promotional materials should be required to contain financial protection disclosures in the same way that the proposed regulations require such material to contain repayment rate warnings.

Finally, some commenters urged that, notwithstanding the proposed financial protection disclosures required of institutions, the Department should itself commit to disclosing certain information about institutions that are subject to enhanced financial responsibility requirements. Specifically, the commenters suggested that the Department disclose the amount of any letter of credit submitted and the circumstances that triggered the enhanced financial responsibility requirement.

For several reasons described in this section, many commenters opposed either the concept of requiring institutions to make financial protection disclosures, or the way in which such disclosures are prescribed under the proposed regulations. One commenter suggested removing financial protection disclosure requirements solely on the grounds that students will neither take notice of nor care about this information. The commenter expressed the belief that most people do not really know what a letter of credit is, and that

---

[61] *See, e.g.,* Ass'n of Private Colleges & Universities v. Duncan, 870 F. Supp. 2d 133 (D.D.C. 2012)(Department has broad authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. 1221e–3 (2006); *see also id.* § 3474 ("'The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary of the Department.'"). The financial protection disclosures fall comfortably within that regulatory power.

therefore informing them of an institution's obligation to secure such an instrument would only cause confusion.

*Discussion:* We thank those commenters who wrote in support of the proposed financial protection disclosures. In response to the commenter who raised concerns about unscrupulous institutions attempting to undermine the proposed disclosures and warnings, including by burying or disguising them, we share those concerns and drafted the applicable regulatory language accordingly. Section 668.41(i)(1) of the final regulations requires that an institution disclose information about certain actions and triggering events (subject to and identified through consumer testing) it has experienced to enrolled and prospective students in the manner described in paragraphs (i)(4) and (5) of that section, and that the form of the disclosure will be prescribed by the Secretary in a notice published in the **Federal Register**. Before publishing that notice, the Secretary will also conduct consumer testing to help ensure the warning is meaningful and helpful to students. This approach both holds institutions accountable and creates flexibility for the Department to update warning requirements, including specific language and labels, as appropriate in the future. Based on these comments, and the comment expressing confusion as to which of the delivery requirements in this section apply to financial protection disclosures, we have revised § 668.41(i) to make the requirements that apply to the actions and triggering events disclosure and the process by which the language of the disclosure will be developed and disseminated more explicit.

While mindful of the potential benefit to prospective students of receiving disclosures early, we are not convinced that requiring institutions to deliver such disclosures at first contact with a student is necessary or efficacious. In many cases and at certain types of institutions, it is impractical if not impossible to isolate the initial point of contact between a student and an institutional representative. Such a requirement would place a significant burden on compliance officials and auditors as well as on institutions. Section 668.41(i)(5) of the final regulations requires institutions to provide disclosures to prospective students before they enroll, register, or enter into a financial obligation with the institution. We believe this provides prospective students with adequate advance notice.

Regarding whether requirements in the proposed regulations pertaining to the delivery of loan repayment warnings to prospective and enrolled students apply to financial protection disclosures as well, we are revising the regulations to separately state the requirements for loan repayment warnings and financial protection disclosures. Section § 668.41(i) states that, subject to consumer testing as to which events are most relevant to students, an institution subject to one or more of the actions or triggering events identified in § 668.171(c)–(g) must disclose information about that action or triggering event to enrolled and prospective students in the manner prescribed in paragraphs (i)(4) and (5).

However, the actions and triggering events disclosures are not required to be included in an institution's advertising and promotional materials. We concur with the commenter that such financial protection disclosures will provide critical information to students, but maintain that delivery of those disclosures to students through the means prescribed in revised § 668.41(i)(4) and (5), and posting of the disclosures to the institution's Web site as included in revised § 668.41(i)(6), are most appropriate for this purpose. The loan repayment warning provides information on the outcomes of all borrowers at the institution, whereas the financial protection disclosure pertains directly to the institution's compliance and other matters of financial risk. We believe this type of disclosure is better provided on an individual basis, directly to students, and that it may require a longer-form disclosure than is practicable in advertising and promotional materials.

Regarding the commenters' suggestion that the Department itself disclose certain information about institutions subject to enhanced financial responsibility requirements, we understand the value of this approach, especially with respect to uniformity and limiting the opportunity for unscrupulous institutions to circumvent the regulations. However, we remain convinced that schools, as the primary and on-the-ground communicators with their students, and the source of much of the information students receive about financial aid, are well-placed to reach their students and notify them of the potential risks of attending that institution. We do not believe there are any practical means through which the Department might similarly convey to individual students the volume of information suggested by commenters. Nevertheless, we intend to closely monitor the way in which institutions comply with the actions and triggering events disclosure requirements, and may consider at some point in the future whether the Department should assume responsibility for making some or all of the required disclosures. Additionally, the Department may, in the future, consider requiring these disclosures to be placed on the Disclosure Template under the Gainful Employment regulations, to streamline the information flow to those prospective and enrolled students.

We respectfully disagree with the commenter who suggested removing the financial protection disclosure requirements on the grounds that students will neither take notice of nor care about this information. Some of the information conveyed in the disclosures would undoubtedly be of a complex nature. We also recognize that many people have limited familiarity with financial instruments such as letters of credit. For that reason, and to minimize confusion, we proposed consumer testing of the disclosure language itself, in addition to consumer testing of the actions and triggering events that require financial protection, to ensure that the disclosures are meaningful and helpful to students. As discussed above, in the final regulations we are revising proposed § 668.41(i) to require consumer testing prior to identifying the actions and/or triggering events for financial protection that require disclosures. We believe this change will result in disclosures that are more relevant to students, and that relate directly to actions and/or events that potentially affect the viability of institutions they attend or are planning to attend. In keeping with the intent of the proposed regulations to ensure that disclosures are meaningful and helpful to students, the final regulations retain the use of consumer testing, not only in determining the language to be used in such disclosures but also the specific actions and triggering events to be disclosed.

*Changes:* We have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

*Comments:* Several commenters contended that the proposed regulations inappropriately equate financial weakness with lack of viability, and would require institutions to make disclosures that are misleading or untrue. For example, an institution that is financially responsible may experience a triggering event that nevertheless requires the institution to disclose to students that it is financially at risk. In the opinion of one

commenter, this constitutes compelling untrue speech and violates the First Amendment.

Echoing this overall concern, one commenter expressed the belief that warnings based on triggering events that have not been rigorously proven to demonstrate serious financial danger would destroy an institution's reputation based on insinuation, not fact. The commenter proposed that an institution should have the opportunity to demonstrate that it is not in danger of closing before requiring disclosures.

Strenuously objecting to financial protection disclosures, one commenter described the relationship between some of the triggering events listed in § 668.171(c) and the institution's value to students or its financial standing as tenuous. The commenter further argued that the "zone alternative" found in current § 668.175(d) recognizes the potential for an institution to be viable in spite of financial weakness; and that the proposed regulations weaken the zone alternative.

A commenter, although acknowledging that students should be made aware of some triggering events, took particular exception to the Department's assertion that students are entitled to know about any event significant enough to warrant disclosures to investors, suggesting that SEC-related disclosures are not a reliable basis on which to require disclosures to students. In support of this position, the commenter noted that SEC disclosure requirements may or may not indicate that a publicly traded institution will have difficulty meeting its financial obligations to the Department, because such disclosures serve a different purpose, namely to assist potential investors in pricing the publicly traded institution's securities. The commenter stated that linking financial protection disclosures to SEC reporting may create false alarms for students and cause them to react impulsively.

*Discussion:* We do not agree that the proposed regulations either inappropriately equate financial weakness with lack of viability, or require institutions to issue misleading or untrue disclosures.

Under the regulations, an institution is required to provide financial protection, such as an irrevocable letter of credit, only if that institution is deemed to be not financially responsible because of an action or event described in § 668.171(b). As described in the NPRM, we believe that the factors necessitating an institution to provide financial protection could have a significant impact on a student's ability

to complete his or her education at an institution.

However, we recognize that not all of the actions and triggering events for financial protection will be relevant to students. Therefore, we have revised the requirement to clarify that the Secretary will select particular actions and events from the new triggers specified in § 668.171(c)–(g), as well as other events that result in an institution being required to provide financial protection to the Department, based on consumer testing. The events that are demonstrated to be most relevant to students will be published by the Secretary, and schools subject to financial protection requirements for those events will be required to make a disclosure, with language to be determined by the Secretary, to prospective and enrolled students about the event. In addition to making required disclosures more useful and understandable to students, while accurately reflecting concerns about the institution's financial viability, this change will ensure that the action or triggering events behind the disclosure are relevant to students.

As the actions and triggering events identified in proposed § 668.171(c) may affect an institution's ability to exist as a going concern or continue to deliver educational services, we continue to believe that, having made a substantial investment in their collective educations, students have an absolute interest in being apprised of at least several of these actions and events. This is not, as the commenter suggests, destruction of an institution's reputation by insinuation in place of facts, but rather the providing of factual information to students on which they can make a considered decision whether to attend or continue to attend that institution.

We agree with the commenter that noted that the purposes of disclosures to investors required by the SEC and these proposed disclosures are different in some respects. As discussed under "Automatic Triggering Events," we are revising the triggers in § 668.171(c) to ensure that the triggers, including the proposed triggers that were drawn from SEC disclosure requirements, are tailored to capture events that are most relevant to an institution's ability to provide educational services to its students. With these changes, we believe that each of these triggers and the related disclosure will serve the Department's stated purpose.

We understand the commenters' concern that some students may draw undesirable or even erroneous conclusions from the disclosures or act

impulsively as a result of the disclosures. As students must decide for themselves the value of any institution and the extent to which that value is affected by the event or condition that triggered the disclosure, there might always be some subjectivity inherent to an individual's reading of the required disclosure. However, we believe the benefit to those students in being apprised of actions or events that might affect an institution's viability outweighs this potential concern. Moreover, as previously discussed, the Department will conduct consumer testing to ensure that both the events that result in institutions being required to provide financial protection to the Department, as well as the language itself, is meaningful and helpful to students before requiring disclosures of those events. Our intent is for the required disclosures to convey accurate, important information.

Finally, with regard to the suggestion made by one commenter that institutions be afforded the opportunity to demonstrate that they are not in imminent danger of closing before having to provide financial protection and the accompanying financial protection disclosures, as discussed above under "Reporting Requirements," we are revising § 668.171(h) to permit an institution to demonstrate, at the time it reports a triggering event, that the event or condition no longer exists, has been resolved or that it has insurance that will cover any and all debts and liabilities that arise at any time from that triggering event. If such a demonstration is successfully made, the institution will not be required to provide financial protection, and will not be subject to the financial protection disclosure requirement.

We agree with the commenter who pointed out that the "zone alternative" in current § 668.175(d) recognizes the potential for an institution to be viable in spite of financial weakness, but we do not concur with the assertion that the regulations would weaken the zone alternative. The zone alternative is specific to an institution that is not financially responsible solely because the Secretary determines its composite score is less than 1.5 but at least 1.0. Such an institution may nevertheless participate in the title IV, HEA programs as a financially responsible institution under the provisions of the zone. We are not proposing to change current regulations related to the zone alternative. Participation under the zone alternative is not an action or triggering event and would, therefore, not result in an institution having to make a disclosure.

*Changes:* We have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

Scope of the Disclosure Requirement

*Comments:* Several commenters requested clarification as to the scope of the financial protection disclosure requirements. One commenter expressed concern about proposed § 668.41(i), which stated that an institution required to provide financial protection to the Secretary such as an irrevocable letter of credit under § 668.175(d, or to establish a set-aside under § 668.175(h), must provide the disclosures described in § 668.41(i)(1)–(3). The commenter contended that it is not clear whether the disclosure requirement pertains only to financial protections resulting from the new triggers in the proposed regulations, or whether the disclosures would be required for any financial protections, including those required under existing financial responsibility standards, such as the 50 percent letter of credit provided under current § 668.175(c). The commenter added that when an institution provides a letter of credit pursuant to current § 668.175(b) and (c), it qualifies as a financially responsible institution, and thus there should be no need for disclosures in these situations. However, the commenter asserted that the Department's frequent use of the undefined phrase "financial protection," throughout § 668.175, has resulted in a lack of clarity. The commenter asked that the Department limit financial protection disclosures to the new triggers in § 668.171.

Another commenter noted that the zone alternative under § 668.175(d) does not include a requirement to provide financial protection to the Department and therefore should not be referenced in the disclosure requirement.

*Discussion:* We thank the commenter who brought to our attention the unintentional reference in § 668.41(i) to financial protection provided to the Secretary under § 668.175(d). As the commenter pointed out, § 668.175(d) relates to the zone alternative and does not include a requirement to provide financial protection. Proposed § 668.41(i) is intended to reference only financial protection provided to the Secretary under § 668.175(f), or the set-aside under § 668.175(h).

To clarify the scope of proposed § 668.41(i), that section would have required disclosures for any financial protection an institution is required to provide under § 668.175(f) or for any set-aside under § 668.175(h), not just

financial protection provided as a result of the new triggering actions and events established in these regulations.

However, as described above, we are revising the financial protection disclosures so that the Secretary will conduct consumer testing to identify which actions and triggering events should be disclosed. Institutions will be required to disclose information about those events only if it is found to be relevant to students.

*Changes:* As described above, we have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

*Harm to Institutions*

*Comments:* Several commenters addressed the potential harm to institutions they believe will result from the proposed financial protection disclosures. These commenters warned of irreparable damage to an institution's reputation that could drive away students, alarm potential donors, diminish access to capital, and unfairly brand an unknown number of institutions as untrustworthy. One commenter envisioned a cascading series of events in which declining enrollment and alumni and donor support forces tuition hikes, which in turn lead to further declines in enrollment and the institution's eventual closure.

Underlying the commenters' concern over potential negative outcomes was the opinion that the required disclosures are based on flawed financial standards that are not truly indicative of whether an institution is carrying out its educational mission. One commenter suggested that the Department might cause lasting and perhaps grave harm to institutions not currently at risk of failure, turning disagreements about accounting issues into existential enrollment threats. Another commenter pointed out that some nonprofit institutions operate close to the margin of sustainability because of their mission, or a charitable commitment to supporting needy students. The proposed financial protection disclosures would, in the opinion of the commenter, thrust such institutions into a cycle of failure.

*Discussion:* We understand the concern regarding the potential for the financial protection disclosures that were initially proposed, as well as the financial protection disclosures in these final regulations, to damage an institution's reputation. However, we do not believe that the possibility of harm to an institution's reputation is reason enough to withhold from students, who

in many cases have borrowed heavily to finance their educations, information on the financial viability of the institutions they attend. Regarding the catastrophic series of events predicted by some commenters, we believe such occurrences are unlikely. However, in the event that some institutions do fall into what one commenter termed a cycle of failure, we believe that is more appropriately attributable to the actions or failures of the institutions themselves than to the financial protection disclosures.

We address earlier in this section the commenters' contention that the financial responsibility standards on which the actions and triggering events disclosure requirements are based are flawed and not indicative of institutions' actual financial positions. We do not agree with the observation of one commenter that the proposed regulations require financial protection disclosures for what are essentially disagreements about accounting issues. As discussed under "Triggering Events," our analysis and assessment of the triggering actions and events which necessitate providing financial protection indicates they would have a demonstrable effect on an institution's financial position.

Lastly, with regard to the point made by one commenter that some nonprofit institutions operate close to the margin in adherence to a mission or particular commitment to funding needy students, the Department commends the efforts of such institutions. We do not believe that for the most part, such institutions have a heightened risk of experiencing a triggering action or event. The financial stress on institutions operating close to the margin of sustainability for the reasons noted above is most likely to reflect in a lower composite score than might otherwise be the case. Those institutions are frequently able to operate as financially responsible institutions under the zone alternative, and would not be subject to financial protection disclosures.

*Changes:* None.

*Warnings to Students—General*

*Comments:* Some commenters contended that the proposed provisions related to mandatory warnings to students are not consistent with the provisions and purposes of the HEA. They noted that the HEA enumerates an extensive list of information that institutions must "produce . . . and [make] readily available upon request" to current and prospective students (20 U.S.C. 1092(a)(1)), which includes, among other things, graduation rates and crime statistics, but makes no

reference to any requirement to disclose information that bears on the institution's financial viability or its need to provide financial protection. *See id.* §§ 1092(a)–(m). Moreover, the commenters opined that the mandatory warning requirements run afoul of the First Amendment, arguing that compelled speech, as included in the proposed regulation's required warnings, is subject to strict scrutiny and permissible only if "reasonably related to the State's interest in preventing deception of consumers." *R.J. Reynolds Tobacco Co.* v. *FDA,* 696 F.3d 1205, 1212 (D.C. Cir. 2012).

*Discussion:* Section 668.41(h)(3) and (i)(4) and (5) requires the institution to provide what are described as "warnings" to students, regarding the repayment rate of its alumni, through advertising and promotional materials, and "disclosures" regarding the actions and triggering events for any financial protection, identified pursuant to consumer testing, directly to prospective and enrolled students. The repayment rate provision requires the institution to state in its disclosure that: "A majority of recent student loan borrowers at this school are not paying down their loans"—a statement that will rest squarely on factual determinations of repayment patterns demonstrated by a recent cohort of student borrowers from that institution, derived from data validated through a challenge process in which the institution may contest the accuracy of the data elements. The statement does not, unlike the warning criticized in a prior court ruling, state that the prospective student should expect difficulty in repayment.[62] It merely provides a factually accurate statement that ascribes no adverse quality to the institution itself as the cause of this pattern.[63] The regulation does not compel the institution to articulate a government position on the cause of that pattern, or to engage in or disseminate as true what is "uncertain, speculative estimates." *Association of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 199

(D.D.C. 2015), *aff'd* 640 Fed.Appx. 5 (D.C. Cir. 2016). Rather, the repayment rate provision simply requires disclosure of a factual statement that the Department considers valuable information to the consumer. The institution is free to explain, if it wishes, why it believes that pattern exists, or why it believes that the pattern does not indicate that it is unable to deliver a quality education. The statement falls well within the grounds upheld for other required disclosures.

Furthermore, the form, place, and even the actual language of this warning may change based on consumer testing or other factors to help ensure that the warning is meaningful and helpful to students, and if so, the Department will publish those matters in a notice in the **Federal Register.** § 668.41(h)(3). For the financial protection disclosures, the Secretary will also conduct consumer testing to determine precisely which actions and triggering events that require financial protection would be most relevant and important for prospective and enrolled students to know, and to determine the appropriate language for a disclosure. § 668.41(i).

We note first that the governmental interest in compelling speech is not limited to "preventing deception," as the commenter appears to suggest.[64] This follows from the nature of the test applied to First Amendment challenges to compelled speech, as demonstrated in recent litigation challenging disclosures mandated by the Department's GE regulations. Because the required disclosures/warnings are commercial speech, the government may require the commercial disclosure of 'purely factual and uncontroversial information' as long as there is a rational justification for the means of disclosure and it is intended to prevent consumer confusion." *Ass'n of Private Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 155 (D.D.C. 2012). As that court noted in upholding a requirement that an institution offering GE programs make disclosures about its programs, costs, and student outcomes:
. . . The Department has broad authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. 1221e–3 (2006); *see also* Id. § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). The

disclosures mandated here fall comfortably within that regulatory power, and are therefore within the Department's authority under the Higher Education Act.

*Ass'n of Private Colleges & Universities* v. *Duncan,* 870 156.[65] The regulations accord the institution a challenge process regarding the calculation of the repayment rate itself, as well as an opportunity for a hearing to consider challenges to a requirement to provide financial protection. These procedures will produce a factual outcome; the factual outcome—like the disclosures about costs, placements, completion rate and repayment rate mandated in the GE regulations already upheld—may themselves also be "vanilla" disclosures of unpleasant, but factually accurate determinations. How alumni are repaying their loans, and whether the school has experienced actions or triggering events that pose financial risk to the government (and students), are of direct interest to consumers. We believe disclosures—and warnings—that convey determinations on those matters fall well within the kind of disclosures the courts have upheld.

*Changes:* None.

### Proprietary Institution Loan Repayment Warning

#### General: Repayment Rate

*Comments:* A number of commenters supported requiring warnings for prospective and enrolled students at proprietary institutions with poor repayment rates. They argued that the warnings will provide useful information for students as they make educational and borrowing decisions. One group of commenters urged the Department to release all loan repayment rates publicly, including for

---

[62] "[A] student who enrolls or continues to enroll in the program should expect to have difficulty repaying his or her student loans." Debt Measure Rule, 76 Fed.Reg. at 34,432. . . . the court doubts that the statement that every student in a program "should expect to have difficulty repaying his or her student loans" is a purely factual one. *Association of Private Colleges and Universities v. Duncan,* 870 F. Supp. 2d 133, 155 (D.D.C. 2012).

[63] Similarly, the statement simply describes whether borrowers are paying "down" their loans, a readily understood term meaning that the payments made are not *reducing* the loan amount—not whether they are repaying under whichever repayment plan they chose, or are in default.

[64] *Am. Meat Inst.* v. *U.S. Dep't of Agric.,* 760 F.3d 18, 22 (D.C. Cir. 2014) (upholding country of origin labelling requirements; overruling prior opinions of that court that limited requirements to those aimed at preventing deception).

[65] In contrast, the court there doubted that the language of the warning also required under those regulations (that every student in a program "should expect to have difficulty repaying his or her student loans") would have been "purely factual and uncontroversial information." *Ass'n of Private Colleges & Universities v. Duncan,* 870 F. Supp. 2d 155. When that regulation was reissued and later challenged on First Amendment grounds, this same court upheld the disclosures required in the new rule, and in doing so contrasted the "graphic, compelled speech" challenged by tobacco advertisers in R.J. Reynolds, on which the commenters relay, with "the vanilla, estimated-cost disclosures at issue" in the Department regulation. *Id.* Moreover, the court further noted that even "*R.J. Reynolds* acknowledged that the *Zauderer* standard applies not just to purely factual and uncontroversial information, but also to 'accurate statement[s].' . . . The 'total cost' estimates contemplated here certainly meet that description." *Ass'n of Private Sector Colleges & Universities v. Duncan,* 110 F. Supp. 3d 176, 200 n.12 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities v. Duncan,* 640 F. App'x 5 (D.C. Cir. 2016).

institutions that are not required to deliver loan repayment warnings under § 668.41(h).

However, several commenters argued that, because repayment behavior is not controllable by the institution, the repayment rate is not an appropriate institutional performance measure. Another argued that loan repayment rate reflects financial circumstances, but not educational quality, so it is not appropriate to require institutions to issue warnings based on their loan repayment rate.

Several commenters also raised concerns that § 668.41(h) would place an undue burden on institutions and duplicates other established disclosure requirements. They contended that the requirement is unnecessary, particularly because the proprietary institutions required to comply with § 668.41(h) are already subject to the GE reporting and disclosure requirements, including a repayment rate disclosure if specified by the Secretary; and because the Department already publishes both cohort default rates and institutional repayment rates on the College Scorecard. Other commenters suggested that the measure would increase costs of higher education due to higher administrative burden, and contended that the disclosures were not likely to make much impact, given the large number of mandated disclosures already in place.

*Discussion:* We appreciate the comments supporting the repayment rate warning provision. We agree that this provision will provide critical information for students that will help them to make well-informed decisions about where to go to college and their financial aid use. Repayment rates provide a key indicator of students' post-college repayment outcomes, which are of vital interest to students considering their families' personal financial circumstances, as well as to taxpayers and policymakers. The Department has already worked to promote greater access to such information through the GE regulations and the College Scorecard; we believe that the repayment rate warning requirement in these regulations will provide an important complement to those other efforts.

We do not agree with the commenters who stated that repayment does not constitute a measure of educational quality, or the commenter who argued that repayment rate is a measure of students' financial backgrounds and not academic quality. We believe that all students deserve to have information about their prospective outcomes after leaving the institution. Particularly for

students who expect to borrow Federal loans to attend college, it is critical to know whether other students have been able to repay their debts incurred at the institution.

However, while we believe that this information is very important for prospective students to be aware of and to consider, we agree with the concerns that creating a new rate could confuse the borrowers who will also receive the GE program-level repayment rate disclosures using a different calculation and different cohorts for measuring borrower outcomes. While not decisive, we also recognize and understand the comments from those who raised concerns that the requirement may be overly burdensome because of the differences with the data used in the GE calculation. Requiring a separate data corrections process for proprietary institutions, which are already subject to reporting requirements for repayment rate under GE for virtually all of their borrowers, may be needlessly burdensome given the virtually complete overlap in students covered.

To avoid any confusion resulting from a new repayment rate calculation, as well as to limit burden on institutions, we are revising the repayment rate provision. Under this revised provision, the repayment rate data that proprietary institutions report at the program level will be used to calculate a comparable repayment rate at the institution level. Specifically, the Department will calculate, for those borrowers who entered repayment during a particular two-year cohort period, the repayment rate as follows: The number of borrowers in GE programs who are paid in full or who are in active repayment (defined as the number of borrowers who entered repayment and, during the most recently completed award year, made loan payments sufficient to reduce the outstanding balance of loans received for enrollment in the program by at least one dollar), divided by the number of borrowers reported in GE programs who entered repayment. Institutions with a repayment rate showing that the median borrower has not either fully repaid the borrower's loans by the end of the third year after entering repayment, or reduced their outstanding balance by at least one dollar, over the third year of repayment (which, under the calculation methodology, is equivalent to a loan repayment rate of less than 0.5) will be subject to a requirement that they include a warning, to be prescribed in a later **Federal Register** notice by the Secretary, in advertising and promotional materials. We are also removing the proposed requirement for

direct delivery of repayment rate warnings to prospective and enrolled students, recognizing that the GE regulations already require those proprietary institutions to deliver a program-level disclosure template that includes repayment rate to those students. We believe that these changes will reduce administrative burden on institutions considerably, and help to ensure that increased administrative burden is not passed on by institutions in greater costs to students.

We disagree with the commenters who argued that the disclosures would not make much impact. A large and growing body of research suggests that in many cases, students and families react to information about the costs and especially the value of higher education, including by making different decisions.[66] To maximize the potential for effective warnings to students, the Department has revised the regulatory language about the warnings that must be included in advertising and promotional materials to maximize the likelihood that such information will be well presented in a timely manner. We believe that this information will build upon, and not conflict with, other disclosures that institutions currently make. In particular, we believe that the institutional warning requirement in advertising and promotional materials will provide a valuable caution to students in their early stages of considering which colleges to attend. We also believe that the institutional warning requirement will act as a complement to other disclosure requirements, including the disclosure template required to be provided under the GE regulations and the Department's own efforts to promote greater transparency and better-informed decision-making through the College Scorecard and the Financial Aid Shopping Sheet. The Department will also promote this information through its own channels to reach students, including through the College Scorecard or the FAFSA, after consideration of the most effective and efficient ways to do so.

---

[66] Wiswall, M., and Zafar, B. (2015). How Do College Students Respond to Public Information about Earnings? Journal of Human Capital, 9(2), 117–169. DOI: 10.1086/681542. Retrieved from ; Hastings, J., Neilson, C.A., and Zimmerman, S.D. (June 2015). The Effects of Earnings Disclosure on College Enrollment Decisions. Cambridge, MA: National Bureau of Economic Research. NBER Working Papers 21300. Retrieved from *www.nber.org/papers/w21300;* and Hoxby, C. and Turner, S. (2015). What High-Achieving Low-Income Students Know About College. Cambridge, MA: National Bureau of Economic Research. NBER Working Paper No. 20861. Retrieved from *www.nber.org/papers/w20861.pdf.*

*Changes:* We have revised the loan repayment rate calculation in § 668.41(h), altered the loan repayment rate issuing process to reflect that any corrections will occur under the GE regulations, and provided that proprietary institutions with a sufficiently large number of borrowers who are not covered under GE reporting may be exempt from the warning requirement (as described in more detail later in this section). We have made conforming changes to separate the loan repayment warning delivery provisions, which require a warning to be included in advertising and promotional materials but no individual disclosure to students, from the delivery provisions for the financial protection disclosure required under § 668.41(i) of the final regulations, which require delivery of the disclosure to prospective and enrolled students.

*Legal/Process Concerns*

*Comments:* Noting that the proposed loan repayment warning was not included in the Department's notice announcing its intent to establish a negotiated rulemaking committee published in the **Federal Register** on August 20, 2015 (80 FR 50588), one commenter contended that the requirement falls outside the scope of the rulemaking process.

*Discussion:* The first session of negotiated rulemaking, held January 12–14, 2016, included a discussion of the potential consequences for "conditions that may be detrimental to students," including the possibility of disclosure requirements and student warnings. The Department proposed regulatory text concerning a repayment rate warning at the second negotiated rulemaking session (February 17–19, 2016), and the committee discussed the proposal during the second and third sessions. Moreover, the negotiated rulemaking process ensures that a broad range of interests and qualifications are considered in the development of regulations. We believe that sufficient notice was provided about the potential for inclusion of the repayment rate warning, and that the negotiators involved in developing these regulations were well-qualified to explore the option.

*Changes:* None.

*Comments:* One commenter argued that the loan repayment rate provision does not constitute "reasoned decision-making," because the Department did not explain the evaluation of repayment on an individualized basis; the use of a median, rather than an average, borrower to determine the school's rate; the zero percent threshold; the length of

the measurement window; and the exemption of in-school and military deferments only in the final year. Another commenter asserted that the requirement is arbitrary and capricious because several points in the preamble (such as the level of the calculation and the data challenge process) were unclear.

*Discussion:* We disagree with the commenters who stated that the repayment rate warning provision is arbitrary and capricious, and that it does not constitute reasoned decision-making. The repayment rate measure identified in the proposed regulations, while different from other repayment rate measures the Department has used in other contexts, was designed to measure repayment outcomes in greater detail than existing measures do (for instance, by looking at the percentage of the balance repaid rather than the share of borrowers who met a binary threshold of paying down at least one dollar in principal).

However, as described earlier, the Department has revised the repayment rate provision in the final regulations to mirror the program-level rates used under the GE regulations. Those rates calculate the share of borrowers who have made progress in repaying their loans, and will rely exclusively on data reported already under the GE regulations. We believe that these changes address the concerns of the commenters.

*Changes:* We have revised the calculation of the loan repayment rate in § 668.41(h), as previously described.

*Proprietary Sector Requirement*

*Comments:* Several commenters wrote that limiting the repayment rate provision to proprietary institutions is reasonable, given the differences in structure between those institutions and other sectors and the data that indicate poor repayment outcomes are widespread in the for-profit sector.

However, many commenters disagreed with the Department's proposal to limit the requirement to proprietary institutions. One commenter questioned the validity of the Department's argument that limiting the applicability of § 668.41(h) to proprietary institutions reduces the burden on institutions because only certain institutions benefit from the reduced burden. Noting that there is no similar limitation applicable to financial protection disclosures, one commenter suggested that the Department's limitation of the repayment rate provision to proprietary institutions was inconsistent. Some commenters argued that the Department was ignoring the

needs of students at the estimated 30 percent of public and private nonprofit institutions with similarly low repayment rates that are not subject to the warning requirement, particularly because a majority of Federal student loan borrowers attend public institutions. Others stated that a repayment rate warning requirement for public and private nonprofit institutions is necessary to help students understand their choices and contextualize the information available to them. Several of these commenters proposed that public and private nonprofit institutions be required to disclose that the Department had not calculated a loan repayment rate for the institution and that it is therefore not possible to know whether the institution's repayment rate is acceptable.

Some commenters contended that there is no rationale for limiting the warning requirement to the proprietary sector. Other commenters stated that the Department lacked sufficient research to support the proposed regulations. Several commenters argued that the information cited as justification for limiting the repayment rate warning requirement to the proprietary sector was overstated or invalid. One commenter suggested that the Department cited inaccurate data from the College Scorecard. Several commenters noted that they could not replicate their Scorecard repayment rates due to inconsistencies in the National Student Loan Data System (NSLDS) data underlying the measure. Another commenter suggested that the cohort used to support the analysis did not reflect typical cohorts, since those students entered repayment during a recession. Several other commenters contended that the decision to limit the warning requirement to proprietary institutions violates GEPA and has no basis in the HEA.

A number of commenters suggested removing the loan repayment warning provision entirely, while several proposed expanding its application to all institutions with low repayment rates, regardless of sector. Several commenters suggested limiting the repayment rate warning requirement to institutions at which a majority of students are enrolled in programs subject to the Department's GE regulations, because, according to the commenters, students at career-oriented institutions frequently have misconceptions about their likely earnings. Alternatively, commenters suggested limiting the requirement to schools with "financially interested boards" to include proprietary

institutions that have converted to nonprofit status.

*Discussion:* We appreciate the comments supporting the limitation of the repayment rate warning to proprietary institutions in light of the concentration of poor repayment outcomes in the proprietary sector and the risk of excessive and unnecessary burden to institutions with a far lower likelihood of poor repayment rates. As discussed in both the NPRM[67] and in the Gainful Employment final regulations,[68] a wide body of evidence demonstrates that student debt and loan repayment outcomes are worse for students in the proprietary sector than students in other sectors.

Most students in the proprietary sector borrow Federal loans, while borrowing rates among public and private nonprofit institutions are far lower; and debt levels are often higher. For instance, as also noted in the final Gainful Employment regulations, in 2011–2012, 60 percent of certificate students who were enrolled at for-profit two-year institutions took out Federal student loans during that year, compared with 10 percent at public two-year institutions. Of those who borrowed, the median amount borrowed by students enrolled in certificate programs at two-year for-profit institutions was $6,629, as opposed to $4,000 at public two-year institutions. Additionally, in 2011–12, 66 percent of associate degree students who were enrolled at for-profit institutions took out student loans, while only 20 percent of associate degree students who were enrolled at public two-year institutions did so. Of those who borrowed in that year, for-profit two-year associate degree enrollees had a median amount borrowed during that year of $7,583, compared with $4,467 for students at public two-year institutions.[69]

In addition to higher rates of borrowing, students at proprietary schools also default at higher rates than borrowers who attend schools in other sectors. Proprietary institutions have higher three-year cohort default rates than other sectors (15.0 percent, compared with 7.0 percent at private nonprofit institutions and 11.3 percent at public institutions in fiscal year 2013), and enroll a disproportionate

share of students who default relative to all borrowers in the repayment cohort.[70]

In the final regulations, the Department seeks to reduce confusion among students and families by using rates that parallel the Gainful Employment program-level repayment rate, including using the same cohorts of students as the GE rates do. As a result of these changes, the repayment rate will be calculated using data that institutions already report to the Department through the GE regulations, rather than through a distinct data reporting and corrections process. This eliminates many of the concerns raised by commenters and discussed in the NPRM about the burden to institutions of complying with the repayment rate calculation provision.

However, the Department believes that, because of the changes, it would be inappropriate to apply an institutional warning to sectors other than the proprietary sector, because public and private nonprofit institutions are not typically comprised solely of GE programs and the repayment rate warning may not be representative of all borrowers at the school. Federal student loan borrowers also typically represent a relatively small proportion of the student population in the public sector, whereas borrowing rates are much higher, on average, at proprietary institutions (for instance, among full-time undergraduates enrolled in 2011–12, 19.7 percent borrowed Stafford loans at public less-than-two-year institutions, compared with 82.9 percent at for-profit less-than-two-year institutions and 83.3 percent at for-profit two-year-and-above institutions).[71] Moreover, the mix of programs at public and private nonprofit institutions may shift from year to year, changing the share of GE borrowers at the institution on an annual basis; including such institutions in the repayment rate requirement would require the Department to expend even greater efforts to identify schools that are comprised entirely of GE programs for a relatively small number of schools. Therefore, this requirement is limited only to proprietary institutions. We recognize that some proprietary institutions may have Federal student loan borrowers in

non-GE programs under section 102(b)(1)(ii) of the HEA. Accordingly, the final regulations specify that proprietary institutions with a failing repayment rate may appeal to the Secretary for an exemption from the warning requirement if they can demonstrate that including non-GE borrowers in the rate would increase the rate to passing.

With these changes, we believe that the Department's decision to limit the repayment rate warning to proprietary institutions is well-founded and does not raise concerns about excessive burden or inaccurate representation of student outcomes, and we disagree with the commenters who stated that the limitation to proprietary schools is not appropriate.

In response to the commenter who asserted that requiring only proprietary institutions to disclose repayment rates is inconsistent, as noted earlier, we decided to limit the repayment rate warning requirement to the sector of institutions where the frequency of poor repayment outcomes is greatest. Also as described earlier, the Department's analysis of data shows the financial risk to students to be far more severe in the proprietary sector; and data suggest that an institution-wide warning about borrower outcomes is more appropriate in the proprietary sector, given higher rates of borrowing among students (particularly in GE programs).

While we recognize some users' concerns with specific elements of the data cited in the NPRM, we believe that the data corrections process that will be established through the GE regulations will ensure the accuracy of the information on which the warning in advertisements and promotional materials is based. We recognize the concerns of the commenter who stated that the data cited in the NPRM reflect a cohort that entered repayment during the recession, but believe that this regulation will appropriately capture the actual outcomes of students, given that even students who enter repayment during a recession will be required to repay their loans in accordance with the terms and conditions of the Federal student loan programs. The provision of GEPA to which the commenter refers requires uniform application of regulations throughout the United States. 20 U.S.C. 1232(a). The HEA authorizes the Department to adopt disclosure regulations as does the general authority of the Secretary in 20 U.S.C. 1221e–3 and 20 U.S.C. 3474. *Assn. of Private Coll. and Univs.* v. *Duncan,* 870 F. Supp. 2d at 156. We believe that our analysis of the outcomes provides a reasonable basis on

---

[67] *www.regulations.gov/document?D=ED-2015-OPE-0103-0221.*

[68] *www.regulations.gov/document?D=ED-2014-OPE-0039-2390.*

[69] National Postsecondary Student Aid Study (NPSAS) 2012. Unpublished analysis of restricted-use data using the NCES PowerStats tool.

[70] "Comparison of FY 2013 Official National Cohort Default Rates to Prior Two Official Cohort Default Rates." U.S. Department of Education. Calculated August 6, 2016: *http://www2.ed.gov/offices/OSFAP/defaultmanagement/schooltyperates.pdf.*

[71] U.S. Department of Education, National Center for Education Statistics, 2007–08 and 2011–12 National Postsecondary Student Aid Study (NPSAS:08 and NPSAS:12). (This table was prepared July 2014.) *https://nces.ed.gov/programs/digest/d15/tables/dt15_331.90.asp?current=yes.*

which to focus this requirement on for-profit schools.

We disagree with the commenters who propose to remove the repayment rate warning provision from the regulations. The Department believes that this information is critical to ensure students and families have the information they need to make well-informed decisions about where to go to college. Given the concerns discussed earlier about the inaccuracy of applying a warning to an entire institution based on data that do not necessarily represent all borrowers at the school, and the added burden both on public and private nonprofit institutions and on the Department to identify the relatively few institutions that might be accurately represented by such a rate, we believe it is appropriate to maintain the repayment rate warning provision only for proprietary schools. We appreciate the comments from those who suggested tying the repayment rate warning requirement to those institutions with a significant proportion of students in GE programs, and have adopted a version of that requirement (*i.e.*, the warning requirement applies only to those institutions at which a majority of GE borrowers are not in active repayment or repaid in full; and only at proprietary institutions, where effectively all programs are subject to the GE requirements). While we appreciate the comments from those who proposed instead limiting the requirement to "financially interested boards" to prevent certain institutions from avoiding the requirements, we believe that the requirements as stated in the final regulations will cover the vast majority of students at institutions with such boards, and that the added burden of identifying those institutions in another way would not yield much additional coverage for the requirement.

*Changes:* We have revised § 668.41(h) to provide that, if a proprietary institution has a repayment rate that shows that the median borrower has not either fully repaid, or made loan payments sufficient to reduce by at least one dollar, the outstanding balance of the borrower's loans, it may seek to demonstrate to the Secretary's satisfaction that it has borrowers in non-GE programs who would increase the school's repayment rate above the threshold for the warning requirement if they were included in the calculation. If an institution demonstrates this to the Secretary's satisfaction, it will receive an exemption from the warning requirement.

*Income-Driven Repayment (IDR) Enrollment*

*Comments:* A number of commenters asserted that § 668.41(h) conflicts with the Administration's income-based repayment plan enrollment campaigns. One commenter pointed to a Council of Economic Advisers report that states that borrowers on IDR plans are from more disadvantaged backgrounds than those on the standard repayment plans, suggesting that borrowers' investments in higher education pay off over time. That commenter contended that measuring borrowers' repayment behavior in the first five years is not appropriate because of the long-term payoff of postsecondary education. Other commenters argued that institutions would be unfairly—and retroactively—penalized for encouraging students to sign up for IDR plans.

Several commenters proposed to remove from the repayment rate calculation any borrower making payments under any Federal repayment plan, including IDR plans. Alternatively, one of the commenters proposed that the Department should allow institutions to include in the warning to students that the negative amortization of its borrowers occurred because of federally authorized repayment plans where that is the case.

*Discussion:* We disagree with the commenters' statements that income-driven repayment plans conflict with the loan repayment warning provision. The IDR plans that Congress and the Department provide to borrowers were created to act as a safety net for struggling borrowers—those whose debts are sufficiently high, or incomes are sufficiently low, to make repaying them on the expected timeline exceedingly difficult. However, a post-college safety net program for borrowers does not eliminate the responsibility the institution has to provide a high-quality education that ensures borrowers are able to, at a minimum, afford to pay down their loans, even in the first years after entering repayment. Moreover, the Department agrees with the commenter who noted that many of the borrowers currently enrolled in income-driven repayment (IDR) plans would otherwise be in distress on their loans, and may thus be in negative amortization regardless of whether they were on an IDR plan or may have defaulted. For instance, a recent report from the Council of Economic Advisers found that over 40 percent of borrowers who entered repayment in fiscal year 2011 and later enrolled in income-driven repayment had defaulted, had an

unemployment or economic hardship deferment, or had a single forbearance of more than two months in length before entering their first income-driven repayment plan.[72] While the report shows that measurements of short-term distress were mitigated for the borrowers who enrolled in income-driven repayment plans, the Department believes that the fact that such borrowers experienced types of financial distress—whether failure to pay down the outstanding balance of the loans or deferments, forbearances, and defaults that suggest acute problems in repaying in the initial several years after leaving school—constitute critical information that prospective students and potential borrowers should be aware of prior to making enrollment or financial aid decisions. To that point, we do not agree with the commenters who stated that enrollment in IDR plans among students would unfairly penalize institutions; on the contrary, borrowers who enroll in IDR plans and still do not have sufficiently high incomes or low debts to pay down the balance on their loans are experiencing precisely the negative post-college outcomes about which students, taxpayers, and the Department should have concerns. This argument is especially relevant for institutions that are eligible for title IV, HEA aid on the basis of providing educational programs that prepare students for gainful employment in a recognized occupation. Students considering such programs should be warned if the majority of borrowers do not have sufficient income to pay down their Federal student debt, even if those borrowers are protected from default by enrolling in IDR plans.

*Changes:* None.

*Inconsistency of Rates*

*Comments:* Several commenters noted that the Department has considered many variations of a repayment rate calculation in recent years. They stated that none of these rates has been subject to peer-review research and that the Department has not sufficiently supported its proposal with research. Several commenters raised concerns that the use of multiple repayment rates would lead to significant confusion. These commenters urged the Department to use an existing definition of repayment rate, or to remove the provision entirely.

*Discussion:* We appreciate the commenters' concerns that multiple

---

[72] "Investing in Higher Education: Benefits, Challenges, and the State of Student Debt." Council of Economic Advisers. July 2016: *www.whitehouse.gov/sites/default/files/page/files/20160718_cea_student_debt.pdf*.

repayment rates, particularly where provided to the same students, may lead to confusion. While we believe that this is important information for students and families to consider while deciding where to apply and enroll in college, we do not wish to create confusion for borrowers.

To that end, as described earlier, the Department has revised the repayment rate provision in the final regulations to mirror the program-level rates used under the GE regulations. Those rates calculate the share of borrowers who have made progress in repaying their loans; and will rely exclusively on data already reported under the GE regulations. We believe that these changes address the commenters' concerns. Moreover, the GE definition of "repayment rate" has been subjected to research, analysis, and consumer testing by the field.

*Changes:* We have revised the calculation of the loan repayment rate in § 668.41(h), as described in more detail earlier in this section.

*Technical Comments About the Calculation*

*Comments:* A number of commenters suggested specific changes to the repayment rate. One commenter disagreed with the Department's proposed use of a median repayment rate, rather than a mean. Several others argued that an institutional median is not appropriate because post-college repayment outcomes may vary significantly by program. One commenter was confused as to whether the loan repayment rate would be calculated on a per-borrower or a per-loan basis. Another commenter proposed to separate out, and create distinct loan repayment rates and warnings for graduate, undergraduate, and Parent PLUS Loan debts. Several commenters stated that the treatment of consolidation loans was unclear. One commenter suggested changing treatment of payments on consolidation loans by attributing the same payments to loans at multiple institutions, rather than attributing payments based on the share of debt from each institution.

One commenter expressed confusion over the use of "accrued interest" in the definition of "original outstanding balance," and the use of "capitalized interest" in the definition of current outstanding balance for the repayment measure. Another commenter proposed that, for graduate programs that prepare students for medical residencies, the original outstanding balance should be defined as the principal balance after the medical residency forbearance period.

Other commenters suggested minor changes to the proposed calculation. One commenter argued that the Department proposed inconsistent treatment of borrowers who default on their loans. This commenter urged the Department to ensure that all defaulters appear as a zero percent repayment rate, or that defaulters are given no distinct treatment. Another commenter proposed that, under § 668.41(h)(6)(i), there should be a minimum of 30 students in the cohort, rather than 10, before requiring a loan repayment warning.

As noted earlier, several commenters argued that the zero percent repayment rate threshold was not supported by any evidence or analysis, and one contended that it is legally unsupportable.

Several commenters raised concerns about the five-year window for measuring borrowers' repayment. Some argued that the five-year measurement period is not predictable because of insufficient data. Some commenters argued that a two- or three-year measurement period would be better supported; or alternatively, proposed to use a 10-year window. Another commenter stated that analysis of data from the College Scorecard found that three- or seven-year repayment rates would be more reliable. One commenter argued that the repayment rate window for medical schools should be seven years, as in the Gainful Employment regulations; while another commenter proposed that repayment rates for graduate programs that prepare students for medical residencies should be measured five years from the end of their medical residency forbearance period.

Several commenters raised concerns about excluding from the measurement only those students who are in certain deferments during the measurement year. One commenter proposed to extend the measurement window of borrowers who spend several years in in-school deferments, while others proposed to exclude any borrower who entered an in-school or military deferment at any point during the measurement period.

Several commenters argued that borrowers' backgrounds affect their repayment rates; one commenter asserted that when borrowers' backgrounds are taken into consideration, repayment rates of low-income students and students enrolled at proprietary institutions are similar to those of their higher-income peers. One commenter suggested that the Department would revise the loan repayment rate methodology to exclude all borrowers with an Expected Family

Contribution of zero dollars in any year of attendance. Another proposed to disclose the percentage of Pell Grant recipients or adjust the threshold at institutions with a high enrollment of Pell Grant recipients.

*Discussion:* We appreciate the commenters' concerns about the specific calculation of the repayment rate. We have made changes to the calculation of the repayment rate, as described earlier, that address or eliminate many of the concerns raised, including clarifying that the median rate over a mean is comparable to a proportion of borrowers; the use of program-level data to calculate an institution-level rate, ensuring that borrowers in GE programs receive warnings if either or both rates raise cause for concern; and whether the rate would be calculated on a per-borrower or per-loan basis (because the rate was replaced by a proportion of borrowers who have not repaid at least one dollar in outstanding balance). We disagree with the commenter who suggested that creating distinct repayment rates and warning requirements for particular programs is necessary, because such rates will already be made available at the educational program level through the GE regulations; this warning requirement is designed to complement and supplement that rate with a broader measure of the entire institution.

We believe that we have clarified the treatment of consolidation loans, which will mirror the treatment of such loans in the GE regulations. We also believe that additional clarification of the definitions of "accrued" and "capitalized" interest, and one commenter's proposed change to the definition for graduate programs that prepare students for medical residencies, is not necessary because the repayment rate will instead rely on data already reported under the GE regulations. Similarly, the treatment of defaulted student loans will mirror the GE data that are already reported to the Department. We will continue to use a minimum cohort size of 10, rather than 30 as one commenter proposed, because 10 is a sufficiently large size to meet both minimum requirements and best practices for the protection of student privacy; a minimum count of 10 borrowers is also the standard already used in the GE regulations for repayment rate and other metrics. With respect to concerns from several commenters about the use of negative amortization as a threshold for requiring warnings, we disagree that there is no support in research for doing so. Based on internal analysis of data from the National Student Loan Data System

(NSLDS), the typical borrower in negative amortization—more than half of those who have made no or negative repayment progress in the third year after entering repayment—experienced long-term repayment hardship such as default. Those borrowers are especially unlikely to satisfy their loan debt in the long term.[73] Additionally, several public comments received and papers published during the negotiations for the Department's GE regulations include reference to negative-amortization thresholds for student loan repayment rates.[74] Moreover, we believe this will be an understandable measure to help inform consumer choice.

We agree with commenters who stated that a measurement three years after entering repayment (e.g., examining borrowers' outcomes three years after they enter repayment) is well supported. Given the other changes to the repayment rate calculation made to mirror the GE repayment rate metric, we will use this period, rather than the five-year period included in the proposed regulations, to calculate the institutions' rate. We believe that a 10-year window, as some commenters proposed, would be too long to provide relevant and timely data; such long-term outcomes would fail to incorporate improvement in quality or other changes at the institution since those borrowers entered repayment, and would likely fail to capture many of the signs of short-term financial distress that some borrowers experience. We agree with the commenter who stated that the repayment rate window should be lengthened for medical schools; we are revising the provision to provide that the same period will be used for this requirement as is used in the GE regulations.

With respect to comments raised about students who use in-school or military deferments, we will again mirror the provisions outlined in the GE regulations. Because that calculation measures active repayment during the most recently completed award year, we believe that we have addressed concerns about borrowers who may have used

deferments in the interim. For the purposes of this calculation, the Department plans to rely on the data reporting and data corrections under the GE regulations for the purposes of calculating repayment rates.

We disagree with the commenters who stated that borrowers' backgrounds drive their ability to repay, and that institutions should therefore not be held accountable for their repayment rates. One of the central missions of institutions of higher education is to ensure low-income students receive an education that will help them to earn a living and successfully repay their loans. At institutions where more than half of borrowers do not successfully pay down the balance on their loans, the Department believes that students have the right to know—before they enroll or borrow financial aid—that the majority of borrowers have not repaid even one dollar in outstanding balance three years out of school.

*Changes:* We have revised § 668.41(h) as described earlier in this section.

*Challenge Process*

*Comments:* One commenter asked the Department to clarify whether institutions will have an opportunity to challenge the Department's student-level data. Another commenter recommended that the Department use a 20.8 percent borrowing rate in place of the proposed two-step borrowing rate calculation in order to simplify the calculation and reduce the associated burden.

*Discussion:* We appreciate the commenter's concern for the accuracy of the data. Given the changes to the rate described earlier, there will be no additional data corrections process beyond the one already provided for in the GE regulations. Institutions will already be responsible for reporting accurate data under the GE regulations, and for making any necessary corrections to the data. The Department will use those already-corrected data to derive the institution-level repayment rate. However, a proprietary institution at which the median borrower has not repaid in full, or paid down the outstanding balance of, the borrower's loans may receive an exemption from the warning requirement if the institution demonstrates that not all of its programs constitute GE programs and that if the borrowers in the non-GE programs were included in the calculation of the loan repayment rate, the loan repayment rate would be equal to or greater than 0.5, meaning that the median borrower had paid down the outstanding balance of the borrower's loans by at least one dollar.

Additionally, we do not believe the participation rate index (i.e., the index comparable to the 20.8 percent borrowing rate percentage) appeal is still necessary under this revised version of the repayment rate. The GE repayment rate calculation does not include such an exception, and limiting the warning requirement only to proprietary institutions means that the rates will cover all borrowers at the institution, accurately representing the universe of students with Federal loan debt. In the interest of ensuring consistency between the GE repayment rates and this one, and of reducing burden on both institutions and the Department, we have removed the participation rate index appeal.

*Changes:* We have revised § 668.41(h) to remove the data corrections process and the participation rate index appeal. We have also added § 668.41(h)(4)(ii), which creates an exemption to the warning requirement for institutions that demonstrate that they have borrowers in non-GE programs and that, if those borrowers were included in the loan repayment rate calculation, the loan repayment rate would meet the threshold.

*Warnings*

*Comments:* Several commenters supported using a plain-language warning that has been tested with consumers, and that is timely for students. One commenter supported incorporating those warnings into institutional promotional materials, and suggested expanding the definition of "promotional materials" to include all materials and services for which an institution has paid or contracted. Several commenters requested that we further clarify how the warning must be presented, so that it is not difficult for the public to see. Other commenters expressed disappointment that the proposed regulations do not require institutions to deliver repayment rate warnings to prospective students at the first contact with those students, when the information may be most valuable to students, and strongly supported including such a requirement in the final regulations.

However, several commenters suggested that the loan repayment warning raises First Amendment concerns. Some commenters believed that the requirement would both target institutions at which borrowers are appropriately using IDR plans and excuse private nonprofit and public institutions with similarly poor loan repayment rates. One commenter raised concerns that the specific language provided for illustrative purposes in the

---

[73] Analysis of NSLDS data was based on a statistical sample of two cohorts of borrowers with FFEL Loans and Direct Loans entering repayment in 1999 and 2004, respectively. The repayment statuses of the loans were tracked at 10 and 15 years after entry into repayment, depending on the age of the cohort.

[74] For instance, "TICAS Detailed Comments on Proposed Gainful Employment Rule," The Institute for College Access and Success. May 27, 2014. *http://ticas.org/content/pub/ticas-detailed-comments-proposed-gainful-employment-rule;* and Miller, Ben. "Improving Gainful Employment: Suggestions for Better Accountability." New America. *www.newamerica.org/education-policy/policy-papers/improving-gainful-employment/.*

NPRM did not accurately describe the loan repayment rate.

One commenter believed that the warning would be most effective if it were included with other loan and borrowing information, rather than delivered separately along with other disclosures. The commenter also stated that institutions should not be required to provide the warning to students who do not intend to borrow Federal student loans.

Several commenters argued that requiring institutions to include the entire content of the warning in advertising and promotional materials would be cost-prohibitive. Instead, commenters proposed that institutions provide a briefer statement, similar to the requirements in the Gainful Employment regulations.

*Discussion:* We appreciate the support of commenters who stated that they agreed with the Department's proposed use of a plain-language, consumer-tested warning. We also agree with commenters who supported incorporating warnings into a wider range of promotional materials, and have strengthened the definitions for warnings and promotional materials accordingly. We recognize and agree with the concerns of commenters who suggested additional clarity around the presentation of the warning to prevent obfuscation. To that end, we have clarified the requirements for promotional materials to ensure the warning will be prominent, clear, and conspicuous, including a variety of conditions both for advertising and promotional materials. The Secretary may require the institution to modify its materials if the Department determines that the warning is not sufficiently prominent or conspicuous. The Secretary may also issue guidance describing form, place, and manner criteria that would make the warning sufficiently prominent, clear, and conspicuous.

We also appreciate the perspective of commenters who supported hand-delivered warnings at early stages in a student's college search. However, we recognize that many of these goals will be accomplished under the GE regulations, which require that program-level data be provided on a GE disclosure template to students. To that end, we have removed the requirement that an institution-level warning also be provided directly to prospective and enrolled students, and instead will require that the warnings be provided through advertising and promotional materials. This also resolves the concerns of the commenter who believed that the warning would be

most effective if accompanied by other loan and borrowing information; and the commenter who argued that institutions should be required to provide the warning directly to only those students who intend to borrow Federal student loans.

While we recognize that some institutions believe providing these warnings in advertising and promotional materials would be cost-prohibitive, we believe that this is important information to help students themselves make critical cost-benefit analyses prior to investing their time and money in an institution.

We address the First Amendment concerns above in the section "Warnings" and do not repeat them here. We also remind commenters that the warning language included in the final regulations may be subject to consumer testing and may change in accordance with the results of that testing. The precise warning language, if revised, will be published in the **Federal Register** by the Secretary.

*Changes:* We have revised § 668.41(h) to remove the delivery of a repayment rate warning to prospective and enrolled students. Instead, we have strengthened the requirements under § 668.41(h)(3) to ensure the materials are appropriately provided in advertising and promotional materials.

**Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program (Section 685.300)**

*Legal Authority and Basis for Regulating Class Action Waivers and Arbitration Agreements*

*Comments:* Several commenters objected that the Department lacks the legal authority to ban either mandatory predispute arbitration agreements or class action waivers. These commenters strongly believed that by this regulation, the Department would be inappropriately interfering with institutional operations, violating established Federal law, and interfering with parties' freedom to contract. Commenters suggested that the Department has ignored clear messages from both Congress and the Supreme Court indicating Federal policy favoring arbitration.

Many commenters argued that the Federal Arbitration Act (FAA) precludes the Department from restricting the use of arbitration agreements. Commenters noted that the FAA makes arbitration agreements "valid, irrevocable, and enforceable as written," reflecting a national preference for resolving disputes by arbitration. These

commenters believed that the proposed regulations run counter to public policy and violate the FAA. According to commenters, the prohibition on arbitration in the proposed regulations is precisely the type of agency action that Congress sought to curtail with the FAA.

The commenters asserted that the Supreme Court has repeatedly demonstrated its support for the FAA and for arbitration as an effective method of dispute resolution. Commenters cited cases in which they view the Supreme Court as having struck down regulations and statutes that are inconsistent with the pro-arbitration policy established by the FAA, such as *DirecTV* v. *Imburgia,* 136 S.Ct. 463 (2015). Commenters further cited to a line of Supreme Court precedent favoring arbitration, including *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.,* 552 U.S. 576 (2008), and *Moses H. Cone Mem. Hosp.* v. *Mercury Constr. Corp.,* 460 U.S. 1 (1983). According to these commenters, the Department's proposed regulations are contrary to well-established law.

Commenters contended that, under the FAA, the Department may not issue the proposed regulations absent a clear congressional command, which they argued the Department lacks. According to commenters, when Federal law is silent as to whether Congress intended to override the FAA for a claim, the FAA requires that an arbitration agreement be enforced according to its terms. Here, in the absence of explicit congressional command, commenters believed that the Department is not authorized to restrict arbitration. To support this position, commenters noted that Congress has granted the necessary authority to other agencies in other circumstances. Commenters suggested that because Congress has granted agencies this authority in the past, but has not granted this authority to the Department, this silence means that Congress did not intend for the Department to exercise such authority.

Specifically, commenters stated that the HEA does not authorize the Department to supersede the FAA. As a result, commenters contended that the proposed ban on arbitration must yield to the FAA. Specifically, commenters noted that sections 454(a)(6) and 455(h) of the HEA, which the Department cites in the proposed regulations, provide no indication that the Department is authorized to override the FAA. One commenter contended that the Department has misinterpreted its statutory mandate by relying on these provisions to justify the proposed arbitration ban. Specifically, this

commenter asserted that, unlike other sections of the HEA, section 454(a)(6) does not contain a provision that expressly makes the FAA inapplicable. According to the commenter, the Department should interpret this distinction to mean that the Department may not disregard the FAA in its actions pursuant to this provision.

Further, another commenter stated that section 454(a) of the HEA does not relate to contracts between students and schools and that none of the current regulatory requirements governing PPAs regulate contracts between students and the institution. These commenters objected that the Department is acting outside the scope of its statutory authority by attempting to become involved in contractual relationships between students and institutions.

Other commenters, in contrast, asserted that the Department has authority to regulate the use of arbitration. One commenter stated that the FAA does not limit the Department's ability to require schools to remove forced arbitration clauses and class action waivers from enrollment contracts. The commenter noted that the FAA legal analysis is not triggered in the absence of an arbitration clause and that the FAA does not preclude laws or regulations preventing parties from placing arbitration provisions in their contracts. This commenter asserted that the history of the FAA and judicial treatment of arbitration provisions does not suggest an absolute right to impose an arbitration agreement.

Another commenter strongly asserted that the Department may condition Federal funding on a school's agreement not to use forced arbitration clauses without violating the FAA. This commenter cited to section 2 of the FAA, stating that agreements to arbitrate are "valid, irrevocable, and enforceable," except where grounds "exist at law or in equity for the revocation of any contract." This commenter suggested that the proposed regulations would not interfere with existing arbitration agreements and that students would still have the ability to arbitrate if they chose to do so. One commenter noted that the Department's authority to adopt stand-alone conditions on funding as part of its PPAs is broad with respect to the Direct Loan Program, and stated that barring predispute arbitration agreements is within the scope of this authority. The commenter noted that including this restriction in PPAs would force schools to internalize the cost of their misconduct and minimize costs imposed on the public.

Another commenter cited the Spending Clause of the Constitution in support of its position that the Department is authorized to impose conditions of this nature on Federal funding recipients. The commenter stated that the Supreme Court has recognized the constitutionality of such conditional funding in *South Dakota* v. *Dole,* 483 U.S. 203 (1987). In addition to citing this holding, the commenter noted that other agencies, such as the U.S. Commodity Futures Trading Commission (CFTC) and the U.S. Department of Defense (DoD) place similar conditions on recipients of their funding.

*Discussion:* Addressing the comment that the Department lacks legal authority to ban either class action waivers or predispute arbitration agreements regarding borrower-defense type claims, we repeat the position and rationale for each as stated in the NPRM. As we stressed there, the HEA gives the Department the authority to impose conditions on schools that wish to participate in a Federal benefit program. In this regulation, the Department is exercising its broad authority, as provided under the HEA, to impose conditions on schools that wish to participate in the Federal Direct Loan Program. Section 452(b) of the HEA states, "No institution of higher education shall have a right to participate in the [Direct Loan] programs authorized under this part [part D of title IV of the HEA]." 20 U.S.C. 1087b(b). If a school chooses to participate in the Direct Loan Program, it must enter into a Direct Loan Program participation agreement (PPA). 20 U.S.C. 1087d. Section 454(a)(6) of the HEA authorizes the Department to include in that PPA "provisions that the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program. 20 U.S.C. 1087d(a)(6); 81 FR 39385.

This regulation addresses class action waivers and predispute arbitration agreements separately, because the proscriptions adopted here are distinct and apply to each separately. As we explained in the NPRM, recent experience with class action waivers demonstrates that some institutions, notably Corinthian, aggressively used class action waivers to thwart actions by students for the very same abusive conduct that government agencies, including this Department, eventually pursued. Corinthian used these waivers to avoid the publicity that might have triggered more timely enforcement agency action, which came too late for Corinthian to provide relief to affected

students. 81 FR 39383.[75] Corinthian's widespread use of these waivers and mandatory arbitration agreements resulted in grievances against Corinthian being asserted not against the now-defunct Corinthian, but as defenses to repayment of taxpayer-financed Direct Loans, with no other party from which the Federal government may recover any losses. As noted, Corinthian was not alone in this practice. The absence of class action risk coincided with the use of deceptive practices in the industry during this same period, as recounted in the NPRM and in the earlier NPRM for Program Integrity: Gainful Employment. 79 FR 16426 (March 24, 2014). We infer that from the continued misconduct and from the extensive use of class action waivers that the waivers effectively removed any deterrent effect that the risk of such lawsuits would have provided. These claims, thus, ended up as defenses to repayment of Direct Loans. This experience demonstrates that class action waivers for these claims substantially harm the financial interest of the United States and thwart achievement of the purpose of the Direct Loan Program. Accordingly, section 454(a)(6) of the HEA authorizes the Department to ban Direct Loan participant institutions from securing class action waivers of borrower-defense type claims.

Separately, we considered the effect of predispute arbitration agreements on the achievement of Direct Loan Program objectives and the Federal interest, as evidenced during the same period. A major objective of the program is protecting the taxpayer investment in Direct Loans. That objective includes preventing the institutions empowered to arrange Direct Loans for their students from insulating themselves from direct and effective accountability for their misconduct, from deterring publicity that would prompt government oversight agencies to react, and from shifting the risk of loss for that misconduct to the taxpayer. Predispute arbitration agreements, like class action waivers, do each of these, and thus jeopardize the taxpayer investment in Direct Loans. Aligned with these steps

---

[75] As one commenter noted, during the period in question—2011 to 2015—very few Corinthian students pursued arbitration, according to records maintained by the American Arbitration Association, and even fewer received any award. *www.regulations.gov/document?D=ED-2015-OPE-0103-10723*, citing Consumer Arbitration Statistics, Provider Organization Report, available at *www.adr.org*. This data supports our conclusion that widespread use of mandatory arbitration agreements effectively masked serious misconduct later uncovered in government enforcement actions, while providing minimal relief for students.

to protect the taxpayer investment in Direct Loans, we note that these regulations replace, for new loans, the State law cause of action standard with a new Federal standard. Negotiators had objected to that change, and we retained the State law option for those State law claims reduced to judgment. Mandatory predispute arbitration agreements would have made this standard a null option.

For all these reasons, as explained in the NPRM, we concluded that agreements barring individual or joint actions by students frustrate Federal interests and Direct Loan Program objectives for the same reasons as did class action waivers. Therefore, we concluded that section 454(a)(6) of the HEA authorizes the Department to regulate the use of predispute arbitration agreements.

As explained in the NPRM, we acknowledge that the FAA assures that agreements to arbitrate shall be valid, and may not be invalidated "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. 2. Contrary to the commenters' assertion, none of the case authority to which the commenters cite addresses Federal regulations that may affect arbitration, and the disputes addressed in that case authority appear to involve litigation between private parties regarding rights arising under Federal, State, or local law or contracts between those parties.

As we also stated in the NPRM, the Department does not have the authority, and does not propose, to displace or diminish the effect of the FAA. 81 FR 39385. These regulations do not invalidate any arbitration agreement, whether already in existence or obtained in the future. Moreover, the Department does not have the authority to invalidate any arbitration agreement, did not propose to do, and does not in this final rule attempt to do so.

However, as we explained in the NPRM, and repeat under "Class Action Waivers" here, the Department considers the regulation of class action waivers and predispute arbitration agreements to be justified because they affect Direct Loan borrowing.[76] The arguments that by these regulations, the Department attempts to override, displace, or disregard the FAA mischaracterize the regulations. The regulations do not control the conduct of purely private transactions between private parties, transactions unrelated to the Direct Loan Program.[77] Direct Loans

are not purely private transactions; but for the Direct Loan, the student may very likely not have enrolled at all in a chosen school. The terms of enrollment agreements between the institution and the student loan recipient, and the school's performance with respect to the education financed by that loan, directly affect the Direct Loan program. These regulations impose a condition on the participation by a school in this specific Federal program, a Federal program in which Congress explicitly stated that "no institution shall have a right to participate . . ." 20 U.S.C. 1087b(b). The final regulations do not bar schools from using any kind of predispute arbitration agreements, or class action waivers, so long as they pertain only to grievances unrelated to the Direct Loan Program. The regulations merely require that a school that participates in the Direct Loan program cannot enter into a predispute arbitration agreement regarding borrower defense-type claims with a student who benefits from aid under that program.

These requirements are well within the kind of regulation upheld by courts that address the authority of the government to impose conditions that limit the exercise of constitutional rights by beneficiaries. That case law gives strong support for the position that the Department has authority to impose limits of the kind adopted here on the use of class action waivers and predispute arbitration agreements. For example, the government may impose a restriction on the exercise of a recipient's First Amendment rights so long as that restriction does not extend beyond the recipient's participation in the Federal program:

Our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

*Agency for Int'l Dev.* v. *All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2330–31 (2013), *quoting Rust* v. *Sullivan,* 500 U.S. 173, 197 (1991).[78] Here, the scope

of the federally funded program—the Direct Loan Program—extends far beyond the simple act of originating the loan on behalf of the Department; the HEA itself regulates a broad range of school actions *as they relate to Direct Loan participation,* from advertising and recruiting practices that lead to enrollment to refunding tuition payments after a student drops out. *See, e.g.,* 20 U.S.C. 1094(a)(20) (incentive compensation); 20 U.S.C. 1094(a)(22) (refund requirements). Section 454 of the HEA provides that under the Direct Loan program, the school acts as the Department's loan originator, and accepts responsibility and financial liability for failure to perform its functions pursuant to the Direct Loan PPA. 20 U.S.C. 1087d(a)(3). The HEA gives the Secretary the authority to modify the terms of the PPA as needed to protect Federal interests and promote the objectives of the program. 20 U.S.C. 1087d(a)(6). The Department issues these regulations pursuant to that authority, to regulate conduct well within the "scope of the federally funded program" at issue here. As we explained in the NPRM and earlier in this discussion, the restrictions involve terms, conditions, and practices that directly and closely affect the objectives of the Federal Direct Loan Program.[79]

For several reasons, the fact that Congress gave certain agencies power to regulate arbitration, or outright banned mandatory arbitration, supports no inference that Congress considered other agencies, such as the Department, to lack the power to regulate.[80] First, these enactments regulate purely private transactions between private parties. As such, transactions in these contexts fall squarely within the terms of the FAA, a Federal statute, and arbitration clauses in these transactions would be deemed valid and enforceable if Congress had not, by Federal legislation, barred or nullified their use, or explicitly

---

[76] 81 FR 39382–39383.

[77] Purely private transactions are the kinds of relationships that the CFPB may regulate under section 1028(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. 5518(b) (authority to regulate the use of agreements between covered persons and consumers).

[78] The Spending Clause of the Federal Constitution grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The clause provides Congress broad discretion to tax and spend for the "general Welfare," including by funding particular State or private programs or activities. That power includes the authority to impose limits on the use of such

funds to ensure they are used in the manner Congress intends. *Rust* v. *Sullivan,* 500 U.S. 173, 195, n. 4, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use."). *Agency for Int'l Dev.* v. *All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2327–28, (2013).

[79] See 81 FR 39383–84.

[80] See, *e.g.,* 10 U.S.C. 987(f)(4), (h) (authorizing the DoD to regulate use of mandatory arbitration in extensions of credit to servicemembers); 12 U.S.C. 5518 (authorizing the CFPB to regulate use of arbitration in consumer financial services); 15 U.S.C. 78o (authorizing the SEC to regulate use of mandatory arbitration in certain investment relationships); 15 U.S.C. 1639c(e) (barring mandatory arbitration in extensions of credit secured on the principal dwelling of a cousumer); and 18 U.S.C. 1514A(e) (prohibiting use of arbitration in regard to certain whistleblower proceedings regarding securities).

authorized a Federal agency to do so by regulation. Federal legislation was therefore essential to achieve the intended restriction of arbitration in that context. None of the situations cited involve the terms and conditions of participation in a Federal benefit program.[81] Second, these latter enactments offer no legislative interpretation of the 1993 amendment to the 1965 Higher Education Act, which enacted section 454, because they deal with different subject matters. Thus, courts interpret statutes *with similar language*, and which address *the same general subject matter*, "as if they were one law." *See Erlenbaugh* v. *United States*, 409 U.S. 239, 243–44 (1972). In such a case, a "later act can . . . be regarded as a legislative interpretation of (an) earlier act . . ." *United States* v. *Stewart*, 311 U.S. 60, 64–65 (1940) (construing two statutes that both address the scope of the tax exemption afforded farm loan bonds).

Here, newer enactments addressing arbitration provide no "legislative interpretation" of the HEA, because they share neither language nor subject matter with the 1965 Higher Education Act in general or the 1993 Direct Loan Program statute in particular. To the contrary, Congress has generally rejected any inference that other Federal law regulating consumer lending, most prominently, the Truth in Lending Act (TILA), operates on "the same general subject matter" as Federal education loans financed under the HEA. See, *e.g.*, 15 U.S.C. 1603(7) (exempting from TILA those loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965). Section 454 itself—the statutory basis for adopting "other provisions" needed to protect Federal interests evidences this distinction in subject matter by repeatedly referencing not other Federal laws addressing consumer lending, but specific disclosure requirements in the HEA itself, as well as provisions barring the school from charging fees for arranging Direct Loans. 20 U.S.C. 1087d(a)(1)(E). This context compels the conclusion that the scope of the power to regulate under section 454 was to be governed by reference to the Federal objectives stated in this very statute, not by inferences drawn from subsequent legislation addressing very different objectives in transactions involving different—private—participants. The objection that section 454(a)(6) of the HEA does not authorize the Department

to involve itself in the contractual relationships—or impair its freedom to contract with others and exercise rights under existing contracts—ignores a host of HEA provisions that regulate the "contractual relationships" between the school and other parties. These provisions restrict, and in some instances ban, the exercise of rights that the school may already have under existing contracts or wish to include in future contracts. The HEA thus regulates contractual relationships with students: The qualifications for enrollment of students who may become borrowers, 20 U.S.C. 1091(a), (d); the manner in which the school must determine whether the student borrower is making academic progress while enrolled, 20 U.S.C. 1091(c); banning the school from imposing penalties and late fees on students whose tuition payments may be delayed for various reasons, 20 U.S.C. 1094(a)(19); and determining when that student has ceased enrollment and whether and how much the school must refund to the student and the Department of tuition payments the school has already received for that student, 20 U.S.C. 1091b. The HEA, moreover, imposes significant prohibitions that ban the institution from the exercise of rights it may have under its existing contracts with its employees and third parties, or may wish to include in future contracts with those employees and third parties. Thus, an institution cannot compensate its employees on the basis of success in securing enrollments ("incentive compensation"). 20 U.S.C. 1094(a)(20). More recently, section 487 of the HEA was amended by Public Law 110–315, the Higher Education Opportunity Act of 2008, to impose significant new restrictions on the exercise by institutions and affiliated entities of rights under existing contracts with lenders that provided financing for their students. That act mandated adoption and compliance by institutions with a code of conduct governing their relationships with lenders that made both Federal loans and private loans for their students, and banned numerous practices in widespread use at the time under arrangements between the institution, affiliated entities, its own employees and their family members, and lenders. 20 U.S.C. 1094(a)(25), (e). These amendments were effective on the date of enactment. Public Law 110–3110–315, § 3, August 14, 2008, 122 Stat 3078. Thus, the HEA itself repeatedly conditions participation in title IV, HEA programs on an institution's refraining from exercising rights the institution may already have under existing

contracts or may acquire under new contracts. These regulations similarly operate within the very scope of the Federal program in which these HEA provisions operate, to bar the institution from exercising certain rights it may have already acquired or wished to acquire by contract. In doing so, neither the HEA nor these regulations improperly infringe on the institution's freedom of contract or freedom of expression.

*Changes:* None.

*Comments:* A few commenters suggested that the proposed regulations may violate the rights of institutions under the First Amendment, by compelling speech, and under the Takings and Due Process Clauses of the Fifth Amendment by interfering with or depriving the institution of its contractual rights in arbitration and class action waiver agreements. Several commenters objected that by applying to existing contracts, the regulations are impermissibly retroactive.

*Discussion:* The regulations effect neither a deprivation of a property right of an institution in agreements it already has with students, nor an impairment of those contracts. The regulation affects the terms on which an institution may continue to participate in a Federal program. The institution has no property right to continue to participate on the terms under which the institution previously participated. See *Ass'n of Private Sector Colleges & Universities* v. *Duncan*, 110 F. Supp. 3d at 198. Rights acquired by the institution under agreements already executed with students remain fully enforceable on their own terms.

Like any new regulations, these regulations impose requirements on the future conduct of institutions that intend to continue to participate in the Direct Loan Program. Regulations commonly change the future consequences of permissible acts that occurred prior to adoption of the regulations, and such regulations are not retroactive, much less impermissibly retroactive, if they affect only future conduct, and impose no fine or other liability on a school for lawful conduct that occurred prior to the adoption of the regulations. The regulations do not make an institution prospectively ineligible because it has already entered into contracts with arbitration provisions. The regulations impose no fine or liability on a school that has already obtained such agreements. The regulations address only future conduct by the institution, and only as that conduct is related to the institution's participation in the Federal Direct Loan Program. The institution is not obligated

---

[81] Congress's power to regulate in these matters rests, thus, on the Commerce Clause, not the Spending Clause.

to continue to participate in the Direct Loan program. If it chooses to continue to participate, it agrees to do so under rules such as these that change—prospectively—the conduct in which it can engage. These rules thereafter bar the institution that chooses to continue to participate from exercising rights acquired by the institution under agreements already executed with students. The regulations abrogate none of those agreements; an institution that chooses not to continue to participate is free to rely on those agreements.

In response to the assertion that requiring the institution to include provisions in any arbitration agreement it has obtained or obtains in the future violates the First Amendment, we note that the regulations compel action, not merely speech. The requirements of § 685.300(e)(1) and (2) and (f)(1) and (2) are different than the warnings required under § 668.41, and those warnings and disclosures regarding gainful employment programs that were challenged and upheld in *Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 182 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 640 Fed. Appx 5 (D.C. Cir. 2016). Section 685.300(e) and (f) requires an institution that has obtained a class action waiver or predispute arbitration agreement that included borrower defense-type claims to, most importantly, take no action to enforce that waiver or agreement and, secondly, to notify the affected student that it does not intend to enforce the agreement. The regulations further require the institution to avoid certain actions, or to conduct those actions in a particular manner, which include adding a clause to new agreements to advise the student of its commitment. To the extent that the regulations compel speech, they compel commercial speech, like other communications with students required by Department regulations, and the content of the speech is limited to stating that the institution agrees to comply with a particular Federal regulation. The regulations do not require the institution to express the viewpoint of any other party on the value of arbitration, much less to disparage arbitration. Nor do they prevent the institution from advocating in its communications with students its opinion of the benefits of arbitration and the disadvantages of litigation, or from encouraging students who have a grievance with the institution from agreeing to arbitration. To the extent that the regulations compel speech,

therefore, they compel only factual, non-controversial speech.

*Changes:* None.

*Comments:* Several commenters considered the Department's proposed arbitration and class action waiver bans to be arbitrary and capricious agency actions, adopted without proper, reasoned decision-making. Some commenters contended that the Department did not gather sufficient evidence to support its positions in the NPRM. Commenters also believed that the Department relied too heavily on a CFPB study that they believed was not relevant to the public student loan context at issue. Additionally, commenters believed that the Department did not sufficiently consider conflicting evidence, such as the benefits of arbitration and the drawbacks of class actions. A commenter cited to literature and academic studies that the commenter asserts demonstrate the merits of arbitration.

*Discussion:* As discussed elsewhere, we do not deny the merits of arbitration, and the regulations do not ban arbitration. The Department gathered substantial evidence to support the position taken in the regulations, as described in detail in the NPRM. That evidence showed that the widespread and aggressive use of class action waivers and predispute arbitration agreements coincided with widespread abuse by schools over recent years, and effects of that abuse on the Direct Loan Program. It is indisputable that the abuse occurred, that a great many students were injured by the abuse, that the abusive parties aggressively used waivers and arbitration agreements to thwart timely efforts by students to obtain relief from the abuse, and that the ability of the school to continue that abuse unhindered by lawsuits from consumers has already cost the taxpayers many millions of dollars in losses and can be expected to continue to do so.

Regarding the commenter that objected to our reliance on the CFPB study because that study may not be relevant to the Federal student loan market, the CFPB's study did analyze the prevalence of arbitration agreements for private student loans as well as disputes concerning those loans. Schools participating in the Direct Loan Program not infrequently provide or arrange private student loans to their students; these private loan borrowers may also have Direct Loans, and in any case can be expected often to share characteristics with Direct Loan borrowers.

*Changes:* None.

*Comments:* One commenter stated that the arbitration ban falls outside the scope of topics the Department announced that it would be addressing in development of these regulations and therefore the Department is not authorized to address the issue.

*Discussion:* The proposal to include consideration of arbitration agreements and class action waivers was presented in writing by at least one negotiator during the negotiated rulemaking proceedings, and was the subject of significant discussion during the final negotiated rulemaking session. The issue was highly relevant to the consideration of borrower defense claims, the core of the rulemaking exercise, and was duly and properly considered.

*Changes:* None.

*Class Action Waivers*

*Comments:* Commenters offered opposing views on the treatment of class action waivers under the regulations. Several commenters approved of the Department's proposal to prohibit the use of class action waivers, noting the government's obligation to protect taxpayers and students from misuse of funds dispensed through the Direct Loan Program. One commenter cited research from the CFPB showing that class actions are more effective at securing relief for consumers than individual arbitrations. This commenter suggested that arbitration agreements prevented Corinthian students from receiving relief from the institution, and that class actions are essential to safeguarding taxpayer money. This commenter asserted that the provisions in the proposed regulations addressing class action waivers are narrowly tailored, consistent with precedent established in *Rust* v. *Sullivan,* 500 U.S. 173 (1991).

Another commenter suggested that class actions are beneficial to students because they minimize resource obstacles often faced by students. According to this commenter, class actions are powerful tools that can rectify wrongs and create incentives for industries to change behavior. Further, this commenter noted that class actions enable students to band together to seek relief, rather than bringing such grievances to the Department as defenses to repayment of taxpayer-funded Direct Loans.

Other commenters disapproved of the Department's proposed ban on class action waivers. These commenters contended that class actions only benefit lawyers and are not helpful to students. A few commenters noted that an individual participant in a class

action often receives only nominal returns for his or her claim, while attorneys receive disproportionately large returns. One commenter suggested that class actions cannot be effective because the needs and particular circumstances of individuals within the class cannot be properly considered, so students cannot receive the appropriate tailored relief.

Another commenter criticized class actions as being incredibly time consuming and yielding minimal public benefit. The commenter stated that attorneys are less likely to represent students from small schools in class actions because of the lower potential rewards, leaving injured students at small schools without adequate recourse.

One commenter rejected the Department's position that class actions are likely to have a deterrence effect, contending that plaintiffs' lawyers often pursue frivolous claims for which institutions could not anticipate liability and therefore could not effectively monitor their own behavior.

One commenter stated that the ban on class action waivers would be harmful to schools, particularly private institutions that lack the legal protections afforded to public institutions. A commenter contended that the rule would expose institutions to frivolous lawsuits and thus would divert funds needed for educational expenses to pay the costs of litigation.

*Discussion:* In the NPRM, we described in detail the actual effect that class action waivers have had in the postsecondary education field on students and Federal taxpayers. 81 FR 39382. Nothing in the comments opposing the regulation demonstrates that these effects are exaggerated or mischaracterized, that the substantial problems created by the use of class action waivers can be reduced or eliminated by more modest measures, that the disadvantages and burdens the regulation would place on schools outweigh the costs and harm that use of class action waivers has already caused, or that there is any reason to expect that this pattern will change so that such waivers will not cause these same problems in the future. It is possible that banning class action waivers may increase legal expenses and could divert funds from educational services, or lead to tuition increases.[82] We expect that

the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place.[83]

We expect that institutions, like other parties that provide consumer services, already monitor, and will continue to monitor, court rulings to guide these efforts. By strengthening the incentive for all institutions to serve consumers fairly, and thereby reduce both grievances by students and attendant scrutiny by the Department (and other enforcement agencies), we expect that the limits we adopt here will tend to reduce the likelihood that an institution that neglects these efforts will enjoy a competitive advantage over those that engage in these efforts. Although it is possible that frivolous lawsuits may be brought, and that institutions will incur costs to defend such suits, institutions already face that risk and expense. We do not dismiss this risk, but we have no basis from which to speculate how much this regulation might increase that risk and attendant expense. We see that risk as outweighed by the benefits to students and the taxpayer in allowing those students who wish to seek relief in court the option to do so.

Commenters who oppose the regulations on the ground that class actions benefit lawyers more than consumers, and may result in modest returns for an individual member of the class, disregard the need for this regulation in this field. Contrary to the assertion that class actions provide only modest returns, we note that the CFPB found, in its study, that the 419 consumer finance class actions during the five-year period it studied produced some \$2.2 billion in net cash or in kind relief to consumers in those markets.[84] Whether or not consumer class actions have produced minimal or no actual benefit to the consumers who comprise the class, there is little evidence that this has happened in the postsecondary education industry.[85] Rather, precisely

because of schools' widespread and aggressive use of class action waivers, and even opposition to class arbitration, as described in the NPRM, there appears to be no history of such minimal benefits in this market.

We do not suggest that class actions are a panacea, and the criticisms of class actions in other markets may also apply to class actions in the postsecondary education market if such suits were available. We stress that class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later. The CFPB described these effects in its proposed rule,[86] and as we demonstrated in the NPRM, recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool. As to the comment that class actions would harm private non-profit institutions, we note that these institutions are already subject to that risk, and nevertheless, only a small percentage of non-profit institutions currently use arbitration agreements with their students.[87] This suggests that institutions in this sector have generally felt no need for such protection, and we see no reason to expect that this regulation will change the exposure of non-profit institutions to class actions or other suits.

*Changes:* None.

*Comments:* A commenter objected that the proposed regulations would improperly restrict borrowers' choices regarding how they are represented. This commenter expressed concern that borrowers from small schools would be overlooked under the proposed regulations because they would not be able to share the costs of litigation with a larger group. Another commenter objected that the regulations would adversely affect students who could not successfully pursue class actions because their claims would not meet the commonality and predominance requirements for class actions. This commenter asserted that alternative forms of aggregate litigation other than class action suits are essential to ensuring that students are able to obtain

---

[82] It is probable that institutions against whom arbitrations have been filed are already incurring legal costs for arbitration. The CFPB study found that on the average, over 90 percent of the companies involved in the arbitrations it surveyed were represented by counsel in those proceedings. CFPB, Arbitration Study, § 5.5.3.

[83] "[C]lass actions increase negative publicity of for-profits and draw attention to deceptive recruiting in a much more public fashion than bilateral arbitration." Blake Shinoda, *Enabling Class Litigation As an Approach to Regulating for-Profit Colleges,* 87 S. Cal. L. Rev. 1085 (2014).

[84] 81 FR 32858.

[85] It appears that at least in the postsecondary education market, the claim is unfounded; in one of the few class actions to proceed to trial, a class of students obtained two million dollars in relief from a for-profit school. *Jamieson v. Vatterott Educational Centers, Inc.,* 259 FRD 520 (D. Kan. 2009); Nick DeSantis, *Missouri Court Upholds Ex-Student's Win in Suit Against Vatterott College,* Chronicle of Higher Education, The Ticker (Aug. 27, 2014), available at *www.chronicle.com/blogs/ticker/mo-appeals-court-upholds-ex-students-win-in-suit-against-vatterott-college/84777.*

[86] See, e.g., 81 FR 32861–32865.

[87] Tariq Habash and Robert Shireman, *How College Enrollment Contracts Limit Students' Rights,* The Century Foundation, (April 28, 2016), available at *https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.*

judicial relief, and found the regulations insufficient to enable those actions.

*Discussion:* The objective of § 685.300(e) is to ensure that those students who choose to pursue their claims against a voluntarily participating school by a class action are not prevented from doing so by agreements they are compelled to enter in order to enroll at the school. The Department cannot change the rules and practical consequences of class action litigation so that groups of students would be spared the costs and risks incurred by class action litigants, and did not intend to do so in these regulations. Similarly, the Department has neither the mandate nor the authority to create alternative forms of aggregate litigation in other forums, but the regulations, by ensuring that individuals are free to retain the right to sue for relief, necessarily enable those individuals to enjoy the benefits of joinder under Fed. R. Civ. Proc. 20 or comparable State rules, as an alternative to class actions.

*Changes:* None.

*Arbitration Agreements*

*Comments:* Several commenters urged the Department to bar the use of any predispute arbitration agreements by schools. Commenters asserted that limiting the regulation to mandatory predispute agreements would prove ineffective for several reasons: The agreement could be presented to the student as part of a packet of enrollment materials, or included as another term in a mandatory enrollment agreement with merely an opportunity to agree or decline; the agreement could be required as a condition of other benefits, even if not a condition of enrollment; or the clause could be included, with an "opt-out" provision. The commenters stressed that for a student to understand the significance of the agreement, the school would have to explain its significance, a duty that the proposed rule did not impose. The commenters further contended that even if the student were to be aware of the clause, it is reasonable to expect that the student would not understand the significance of entering into such an agreement. A commenter stated that numerous student consumers represented by the commenter had agreed to arbitration, stating that they did so even, in some instances, where the agreement was labeled voluntary, because they did not understand the significance of the agreement itself or their ability to opt out, or because they relied on misstatements by recruiters.[88] Other commenters stressed that the literature is replete with evidence that consumers do not understand the terms of agreements governing the consumer financial transactions in which they engage, making it unlikely that the student would fully understand either the significance of the agreement itself or a warning that the student need not agree to arbitration in order to enrollment. A commenter provided declarations and statements from students attesting to their lack of understanding either that they had executed agreements to arbitrate, or what arbitration meant, or both.[89]

Commenters also addressed the issue of "opt-out" clauses with similar concerns. A comment signed by sixteen attorneys general urged that the regulation ban the use of "opt-out" clauses, which they viewed as unfair as mandatory arbitration clauses. They asserted that predatory for-profit schools, in particular, have a history of using arbitration clauses to violate the rights of their students, and that in their experience, students often do not consider the consequences of an arbitration agreement, or the value of opting out, until they have a legitimate complaint against the school, at which point it is too late to opt out of any arbitration agreement that may have appeared in the student's enrollment agreement. Other commenters strongly believed that arbitration agreements containing opt-out clauses should still be considered mandatory, and should be prohibited under § 685.300(f). According to these commenters, opt-out provisions are highly ineffective because students misunderstand the provisions or choose not to accept them to avoid being disagreeable. Commenters also asserted that recruiters at proprietary institutions are trained to manipulate students and may be able to convince them to sign agreements even if students are apprehensive about the meaning and consequences. Some commenters noted that students are unable to make informed decisions about whether to accept these optional agreements because students must understand and exercise the option well before any disputes arise. One commenter cited to a CFPB study that found that, even when consumers are afforded the opportunity to opt-out of arbitration clauses, many are either unaware of this option or do not exercise this right. Another commenter

cited to examples from court records indicating that students who receive an opt-out provision rarely take advantage.

Based on these concerns, commenters recommended that the Department prohibit schools from entering into any predispute arbitration agreements, even those containing opt-out provisions. Commenters cautioned that the Department's failure to explicitly prohibit these agreements would create an exception that swallows the Department's proposed rule on forced arbitration. Some commenters suggested that failure to ban opt-out clauses would actually make students worse off than if the agreements had no such option. According to these commenters, students who unknowingly sign arbitration agreements containing opt-out provisions may face greater hurdles in any efforts to circumvent them by demonstrating their unconscionability, as is generally required for challenges to arbitration agreements. Additionally, commenters suggested that, as proposed, it would be more difficult for the Department to take enforcement actions against schools that take advantage of loopholes in the regulations.

Another commenter believed that allowing the enforcement of arbitration agreements containing opt-out provisions would be highly beneficial to both students and the Department. This commenter believed that these provisions afford students a higher degree of choice and control over their situations. Additionally, this commenter believed that allowing such provisions would relieve the Department of a potential influx of claims.

*Discussion:* The Department solicited comments on how the regulations should treat agreements that would mandate arbitration of borrower defense claims but that contain opt-out clauses. We have considered the comments received, as well as the findings of the CFPB cited by the commenter as relevant to this question. We have considered as well the comments about students' lack of awareness either that they were executing an agreement to arbitrate, or that doing so had significant consequences that they did not understand, or both. The same considerations that apply to opt-out clauses apply as well to our proposal in the NPRM that would ban only mandatory predispute arbitration.

Our proposal in the NPRM to bar only mandatory "take it or leave it" predispute arbitration agreements rested on the expectation that a student consumer could make an informed choice prior to a dispute to agree to arbitrate such a dispute, and that this

[88] *www.regulations.gov/document?D=ED-2015-OPE-0103-10729.*

[89] *www.regulations.gov/document?D=ED-2015-OPE-0103-10723.*

objective could realistically be accomplished by having the agreement presented to the student in a manner that would separate the agreement from the bulk of enrollment material presented to the borrower on or at the beginning of class, with a clearly-worded notice that the student was free not to sign the agreement. These comments have persuaded us that the steps we proposed in the NPRM would not produce an informed decision, because even if the agreement were to be presented to students in this manner, it is unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate. The submissions from commenters provide specific evidence of this lack of understanding in the postsecondary education market among students enrolled in the very sector of that market that far more commonly uses predispute arbitration agreements.[90] They are not alone. The literature regarding use of arbitration agreements in consumer transactions provides repeated anecdotal and empirical evidence that consumers commonly lack understanding of the consequences of arbitration agreements.[91] In its survey of credit card users, the CFPB found generally that "consumers generally lack awareness regarding the effects of arbitration agreements" and specifically that "[r]espondents were also generally unaware of any opt-out opportunities afforded by their issuer." CFPB,

[90] Indeed, a commenter noted testimony in one case that the school official shared her students' lack of understanding: None of [the students] knew what arbitration was or asked any questions about the arbitration provision. Ms. Dennison testified that, although she interviews hundreds of applicants each year, she has never been asked a question about the arbitration provision and she has not mentioned it when meeting with prospective students. In fact, Ms. Dennison testified that she did not understand the arbitration provision herself.

*Rude v. NUCO Edn. Corp.,* 2011 WL 6931516 Ohio Ct. App. Dec. 30, 2011.

[91] See: Jeff Sovern, et al., "*Whimsy Little Contracts*" with Unexpected Consequences, 75 Md. L. Rev. 1, at 21 (2015): The degree of literacy required to comprehend the average disclosure form and key contract terms simply is not within reach of the majority of American adults." Judge Posner has explained "not all persons are capable of being careful readers." Former Federal Reserve Chair Ben S. Bernanke, whose agency was responsible for administering the Truth in Lending disclosures, among others, has said that "not even the best disclosures are always adequate. . . . [S]ome aspects of increasingly complex products simply cannot be adequately understood or evaluated by most consumers, no matter how clear the disclosure." And noted scholar and now-Senator Elizabeth Warren . . . has been quoted as saying about a credit card contract: "I teach contract law at Harvard, and I can't understand half of what it says."

Arbitration Agreements, 81 FR 32843 (May 24, 2016).[92]

We see no reason to expect that students who are now enrolled or will enroll in the future will be different than those described or included in the comments. We see no realistic way to improve this awareness, and thus, we do not believe that the use of predispute agreements to arbitrate will result in well-informed choices, particularly by students in the sector of the market in which such agreements are most commonly used. Based on the lack of understanding of the consequences of these agreements evidenced in the CFPB survey of credit card users, in the literature dealing with credit cards and other financial products, and in the examples of financial postsecondary students' lack of awareness, we consider predispute arbitration agreements, whether voluntary or mandatory, and whether or not they contain opt-out clauses, to frustrate achievement of the goal of the regulation—to ensure that students who choose to enter into an agreement to arbitrate their borrower defense type claims do so freely and knowingly.

*Changes:* We have revised § 685.300(f)(1) to delete the words "will not compel a student"; we have revised § 685.300(f)(1), (2), and (3)(i) and (ii) to remove the word "mandatory" each time it appears; we have revised § 685.300(g)(1)(ii) to delete the word "predispute"; and we have revised § 685.300(i) to delete paragraph (i)(4). We also have removed the definition of a "voluntary agreement" from § 685.300(f)(1)(ii) and revised the definition of "predispute arbitration agreement" in § 685.300(i).

*Comments:* Several commenters believed that the proposed regulations would unfairly deny students the opportunity to seek relief through arbitration. Commenters suggested that if given the option, many students would choose to seek relief through arbitration, rather than litigation. Multiple commenters suggested that limiting the availability of arbitration would be highly burdensome for students, particularly those from low-income backgrounds who are less likely to be able to afford attorneys and fees associated with litigation. These commenters suggested that without arbitration, many low-income students may be prevented from actively pursuing relief. These commenters contended that arbitration is beneficial

[92] The CFPB stated that it focused on use of credit card users, a subset of the financial products included in its Study, because "credit cards offer strong market penetration across the nation." Id.

to students and should remain available to those students who would like to pursue it as a means of obtaining relief.

Some commenters lauded arbitration as fair and legally sound. One commenter noted that under a particular arbitration agreement, students received a fair and impartial hearing, comprehensive review of evidence, and an impartial ruling by an independent arbitrator. This commenter also noted that the arbitration agreement in question is governed by State law, which the commenter believes provides sufficient legal oversight.

Other commenters noted that arbitrators generally have more subject area expertise than judges, which makes them more qualified to issue an informed decision on a particular matter. One commenter suggested that students benefit from widespread arbitration because administrators learn to run more effective and service-oriented schools by participating in arbitration proceedings. One commenter noted that the benefits of arbitration are particularly profound in smaller institutions with closer relationships between students and administrators.

Further, commenters suggested that arbitration is more efficient than litigation, and suggested that limiting the availability of arbitration would unduly delay provision of relief to students. Some commenters suggested that students benefit from the flexibility afforded by arbitration agreements. According to a few commenters, the flexibility available in arbitration proceedings allows participants to schedule events around their availability. Additionally, commenters believed that parties benefit from not being restricted by requirements that they adhere to traditional rules of evidence or civil procedure.

One commenter asserted that arbitrators are generally very fair to students. This commenter opined that the consumer arbitration rules are particularly friendly to plaintiffs, particularly because of lower fees associated with proceedings. Another commenter asserted that plaintiffs prevail in arbitration proceedings at least as frequently as they do in court. Some commenters believed that the arbitration process often facilitates more positive outcomes because both students and institutions participate fully in the process, and are more invested in the outcomes.

Additionally, some commenters suggested that in the absence of widespread arbitration, legal fees associated with litigation would take money away from institutions that could be used towards resources that

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations   **76029**

would improve educational outcomes for students. Several commenters suggested that the arbitration ban may ultimately lead to tuition increases as institutions are required to spend more money on litigation. These commenters also noted that the arbitration ban will be particularly harmful to smaller institutions that lack the resources necessary to hire robust legal teams. One commenter believed that some smaller institutions may be forced to close if responsible for funding costly litigation. This commenter also worried about "ambulance chasing" attorneys encouraging students to bring frivolous suits.

On the other hand, a number of commenters supported the proposed ban on mandatory predispute arbitration agreements for various reasons. Several commenters suggested that arbitration systems create structures that the commenters view as inherently biased against students. Commenters noted that arbitrators are often paid on a case-by-case or hour-by-hour basis, which can create incentives for them to rule in favor of institutions, which are more likely than individuals to be able to produce repeat business for them. One commenter cited to empirical evidence that the commenter viewed as supporting its position that arbitration is harmful to consumers. Additionally, commenters noted that because arbitrators are not bound by adhering to precedent, their decisions are less predictable and reliable.

Further, commenters stated that arbitration can be extremely costly. Commenters attributed the high costs of arbitration to the private nature of the system, noting that individual parties are often responsible for paying costs associated with arbitration, which may include high fees that arbitrators may tack on to total costs without sufficient notice. One commenter also cited the procedural limitations of arbitration as another detriment. This commenter stated that students may miss out on the opportunity for discovery in arbitration because the discovery process is not formalized in the same manner as civil lawsuits. According to the commenter, students are often denied access to information that is essential to their claims. Additionally, the commenter noted that there is a lack of oversight in arbitration proceedings, which may result in a lack of accountability among arbitrators for following by their own established procedures. This commenter also believed that the appeal process under arbitration is inadequate and that the narrow grounds and limited time frame for appeals ultimately harms students. Several commenters also

suggested that the lack of transparency in the arbitration system works to the detriment of students. These commenters believed that the public and parties benefit from the transparency offered by civil litigation. Unlike civil litigation, arbitration is generally not public, transcripts are not provided to the public at large, and some proceedings include gag clauses to maintain privacy.

One commenter believed that forced arbitration impedes the Department's ability to effectively oversee Federal assistance programs and ensure proper use of taxpayer dollars. This commenter also suggested that forced arbitration is unfair to students and deprives them of the opportunity to receive an education in a well-regulated system. Several commenters lauded the Department for taking measures to ensure that students who are wronged by unscrupulous schools receive their day in court. These commenters were particularly concerned that many students have been signing their rights away upon enrollment and urged the Department to prevent the continuation of that practice.

*Discussion:* We appreciate the support for the proposed regulations from many of the commenters. For those commenters that did not support § 685.300(f), many of their objections incorrectly suggested that the regulations pose an outright ban or effectively preclude any use of arbitration. The regulations do not bar the use of arbitration and therefore do not deny students the benefits that the commenters ascribe to arbitration. Rather, consistent with the scope of our statutory authority, the regulations ban predispute arbitration agreements for borrower defense-type claims.

The regulations do not bar the school from seeking to persuade students to agree to arbitrate, so long as the attempt is made after the dispute arises. The regulations, moreover, extend only to predispute agreements to arbitrate borrower defense-type grievances. They do not prohibit a school from requiring the student, as a condition of enrollment or continuing in a program, to agree to arbitrate claims that are not borrower defense-related grievances. Consistent with our statutory authority to regulate Direct Loan participation terms, the regulations address only predispute arbitration agreements for claims related to borrower defenses and not for other claims.

*Changes:* None.
*Comments:* A commenter suggested that the private nature of arbitration affords a level of protection to parties. According to this commenter, because

arbitration proceedings are not public, parties need not be concerned about private information being revealed during proceedings.

*Discussion:* The regulations do not ban arbitration entirely, but only arbitration achieved through predispute arbitration agreements for borrower defense-type claims. Students and institutions are free under this rule to agree to arbitration if privacy is an important consideration to the student. We expect that a student who chooses to litigate rather than pursue arbitration is already aware that generally litigation is a public proceeding, or becomes aware of that fact very quickly, and accepts that fact voluntarily. The regulations simply assure that a student will have the option to choose that forum.

*Changes:* None.
*Comments:* A few commenters addressed the effect of delegation clauses within arbitration agreements—provisions that assign, or delegate, to the arbitrator, not a court, the power to decide whether a particular claim or grievance falls within the agreement to arbitrate. The commenters considered such delegation clauses problematic because they allow arbitrators who, according to the commenters, may have financial incentives that impact their neutrality, to make decisions regarding whether a claim belongs in court or arbitration. The commenters suggested that if the Department does not address delegation provisions, the proposed regulations may not fulfill their intended purpose. The commenters urged the Department to prohibit the use of delegation clauses to ensure that any questions about the enforceability or scope of predispute arbitration agreements are resolved by a court rather than an arbitrator, so that schools cannot force students into time-consuming arbitration proceedings to resolve threshold questions about enforceability.

*Discussion:* The commenters identify an important issue, one made particularly significant because § 685.300(e) and (f) distinguish between borrower defense-type claims or grievances, which the regulations address, and other student claims, which it does not. The commenters rightly argue that the objective of the regulation may be frustrated if the school resists a suit by moving to compel arbitration and the arbitrator, not the court, were to have authority under the agreement to decide whether the claim is one that the student must arbitrate. In the NPRM, we described the recent history of aggressive actions to compel arbitration of student claims,

and consider it reasonable to expect that schools will continue to oppose lawsuits by moving to compel arbitration, and would rely on delegation clauses in arbitration agreements to support these efforts. We did not explicitly address in the NPRM the use of delegation clauses, but we proposed there to preclude attempts, where the student had agreed to a class action waiver, to ''seek[] dismissal, deferral or stay'' of ''any aspect of a class action,'' § 685.300(e)(2)(i), or, if the student had entered into a mandatory predispute arbitration agreement, to ''seek[] dismissal, deferral or stay'' of ''any aspect of a judicial action filed by the student.'' § 685.300(f)(2)(i).[93] These prohibited actions could rest on an express delegation clause committing to the arbitrator the determination whether the claim was a borrower-defense type claim. We did not intend to allow that action, and in response to the commenters who stressed the significance of this issue, we are adding language making it clear that the court, not the arbitrator, is to decide the scope of any arbitration agreement or class action waiver. Of course, if the student has in fact agreed to arbitrate some or all claims in a post-dispute agreement, then the school has every right, pursuant to these terms of its Direct Loan agreement with the Department, to oppose litigation by relying on that arbitration agreement. However, the regulation is intended to protect the rights of students who agree, predispute, only to arbitration of other kinds of claims, to have their borrower defense claims heard by a court. To ensure that goal is achieved, we believe that any arbitration agreement with a Direct Loan borrower should place power to decide the scope of the agreement in the court, not the arbitrator.

*Changes:* We have modified §§ 685.300(e)(3) and 685.300(f)(3) to add to the required provisions and notices the statement that ''we agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.''

*Comments:* A few commenters recommended alternatives to proposed § 685.300(f). One commenter recommended that the Department eliminate its ban and instead provide

suggested best practices to facilitate dispute resolution. Another commenter recommended that the Department develop rules to govern arbitration proceedings rather than banning them entirely. Some rules proposed by the commenter included: (1) A neutral arbitrator, (2) more than minimal discovery, (3) a written arbitration award, (4) all forms of relief available in court available in arbitration, and (5) prohibition on imposing unreasonable costs in arbitration. Another commenter suggested that the Department establish an annual threshold for the number of arbitration settlements for all institutions. Under this proposal, institutions would only be held accountable if their number of arbitration proceedings exceeded this threshold.

*Discussion:* The regulations do not ban arbitration entirely, as suggested by some of the commenters. Rather, the regulations ban predispute arbitration agreements for borrower defense-type claims. We discussed at some length in the last negotiated rulemaking session the proposal to regulate the conduct of arbitration, rather than banning compelled predispute arbitration agreements, but in issuing this final rule, we conclude that limiting agreements to arbitrate borrower defense claims to those entered into after a dispute has arisen will achieve the goal of an informed decision by the borrower. Therefore, we have no reason to set a limit on the number of such arbitrations a school may conduct. The regulations do, however, require information from the school about the substance and outcomes of arbitration.

*Changes:* None.

*Comments:* One commenter suggested that eliminating mandatory arbitration would be overly burdensome on our judicial system because many claims that otherwise would have gone to arbitration will wind up in court.

*Discussion:* The regulations allow students who agree to arbitration to use that method, rather than pursuing relief through a lawsuit, and we have no expertise or experience from which to estimate the effect of the regulation on judicial filings.

*Changes:* None.

*Comments:* One commenter contended that the Department's position is logically inconsistent, because the commenter viewed the Department as simultaneously asserting that courts do not provide adequate relief for students, while also asserting that access to the judicial system is essential for students to obtain relief.

*Discussion:* We do not believe, and did not state, that the judicial system

provides inadequate relief for students; to the contrary, we noted that recent history shows that access to the judicial system was denied by widespread use of mandatory predispute arbitration agreements and class action waivers. Far from implying that the judicial system did not or could not provide relief, we included in the new borrower defense Federal standard, for new loans, an alternative that rests entirely on a court judgment on a borrower defense claim based on State law.

*Changes:* None.

*Comments:* One commenter stated that permitting only post-dispute arbitration agreements would be entirely ineffective and cautioned the Department against allowing only post-dispute arbitration as an option to students. Another commenter urged the Department to implement additional safeguards to protect students under post-dispute arbitration agreements. This commenter was concerned that schools could potentially force students to sign post-dispute arbitration agreements with prohibitions limiting their ability to seek relief and urged the Department to take measures to prevent schools from engaging in this activity.

*Discussion:* Section 685.300(f) does not limit the ability of the school to enter into a post-dispute arbitration agreement, even one that would include arbitration of a borrower defense-type claim. A student with an actual claim has every reason to question the consequences of agreeing to arbitrate the claim, as opposed to filing suit, and at that point we expect such a decision to be an informed choice by the student.

*Changes:* None.

*Comments:* A commenter noted that some students would have difficulty joining in a class action for various reasons, and would lack the resources to pursue an individual suit, but that recently consumers had had success by participating in aggregate litigation. The commenter feared that the NPRM by barring class action waivers would not have barred the institution from attempting to force an individual student to pursue litigation alone and not as part of a combined suit.

*Discussion:* The regulation as proposed would bar an institution from relying on a mandatory predispute arbitration agreement by ''dismissal, deferral, or stay of any aspect of a judicial action filed by the student.'' § 685.300(f)(2)(i). We consider that language to include the action described by the commenter, such as actions to challenge the student's joinder in a single suit under Fed. R. Civ. Proc. 20 or a similar rule by which individual litigants may consolidate their actions.

---

[93] Indeed, in at least two of the cases cited in the NPRM, an essential element of the ruling turned on whether the student had agreed to arbitration of issues about the arbitrability of the claims at issue. *Eakins* v. *Corinthian Colleges, Inc.,* No. E058330, 2015 WL 738286 (Cal. Ct. App. Feb. 23, 2015); *Kimble* v. *Rhodes College,* No. C–10–5786, 2011 WL 2175249 (N.D. Cal. June 2, 2011).

We clarify that in this final regulation. An institution remains free to seek relief on grounds other than that the individual is barred from joinder in an action by reason of the terms of the arbitration agreement.

*Changes:* Section 685.300(f)(2)(i) is revised to include opposing joinder in a single action.

*Internal Dispute Processes*

*Comments:* One commenter expressed strong approval for § 685.300(d), which would ban schools from requiring students to use the school's internal complaint process before seeking remedies from accrediting agencies or government agencies. However, a few commenters strongly believed that students should exhaust internal grievance procedures before seeking relief externally. These commenters noted that internal grievance procedures offer students adequate opportunities to seek relief. A few of these commenters touted the transparency and collaboration between students and institutions that results from engaging in these proceedings.

*Discussion:* The regulations do not discourage the use and promotion of internal grievance procedures, and we encourage schools to adopt those procedures in order to remedy grievances before they become claims that lead to litigation or arbitration. The regulations also do not bar the institution from addressing the grievance as fully as it may wish immediately, whether or not the student chooses to raise the complaint to authorities. The institution may succeed in resolving the matter. However, if the student believes that the grievance is significant enough to warrant the attention of law enforcement officials or bodies empowered to evaluate academic matters, we believe that the benefit of bringing that complaint to their attention outweighs the benefits of attempting to compel the student to delay. The regulations do not impose any duty on an authority or accreditor to take any particular action, and they may choose to defer or delay consideration of the complaint until completion of the institutional process. However, the regulations would help those authorities better monitor institutional performance by making timely notice of complaints more likely.

*Changes:* None.

*Comments:* One commenter suggested that proposed § 685.300(d) conflicts with State law that requires that students exhaust internal dispute resolution procedures prior to seeking other relief.

*Discussion:* State law may require a consumer to make a written demand on a merchant before filing suit, and the regulations do not supersede such a law. Some State laws or case law may also require a student to exhaust a school's administrative appeal process before filing suit on a grievance.[94] Section 685.300(d) addresses not the filing of a lawsuit, but rather a very different matter: Seeking redress from the State agency with authority to address the complaint, or the accreditor for the school. If those authorities decline to intervene, the student is left in effect with the need to pursue any internal grievance process. The regulations in no way require those authorities to exercise their independent judgment. The regulations simply bar the school from attempting to block the student from seeking redress from those authorities. The regulations leave the school free to respond to a student's lawsuit by contending that applicable law precludes judicial review of the claim or requires the litigant to first exhaust available internal procedures.

*Changes:* None.

## Forbearance (Sections 685.205(b)(6) and 682.211)

*Comments:* Several commenters expressed support for the Department's proposal to grant an administrative forbearance to a Direct Loan borrower who applies for relief under the borrower defense provisions. Commenters were also supportive of the proposal to grant FFEL borrowers the same type of administrative forbearance that Direct Loan borrowers would receive.

Multiple comments supported the Department's proposed use of forbearance (along with information about how to decline forbearance and providing information about income-driven repayment plans). One commenter, however, recommended that the Department require borrowers to request forbearance instead of expecting borrowers to decline forbearance (opting-in rather than opting-out). Commenters also expressed the view that forbearance should apply to all loan types.

Another commenter suggested that the use of administrative forbearance or the suspension of collection activity would lead to frivolous claims intended to delay repayment.

A group of commenters recommended that forbearance for a borrower who files a borrower defense claim be granted in yearly increments, or for some other

explicit time frame designated by the Department, during which the Department will make a determination of eligibility for a borrower defense claim. These commenters noted that servicing systems generally require periods of forbearance to have explicit begin and end dates. The commenters believed that the proposed change would resolve the servicing requirement and permit the Department to designate an explicit time frame for servicers (such as one to three years) during which the Department would make a determination of eligibility for relief under a borrower defense claim.

Under the commenters' proposal, upon receiving the notification of the Department's determination of eligibility for relief under borrower defenses, FFEL Loan servicers would either end the forbearance and resume servicing or maintain the forbearance until the borrower's loans are consolidated into a Direct Consolidation loan. A group of commenters recommended that, if the Department plans to begin the process for prequalification or consolidation before the effective date of the final regulations, the Department consider permitting early implementation of the new mandatory administrative forbearance under § 682.211(i)(7). The commenters noted that without the new authority to grant mandatory administrative forbearance, discretionary forbearance can be used to suspend servicing and collection. However, these commenters pointed out that discretionary forbearance requires a borrower's request and agreement to the terms of the forbearance. A discretionary forbearance may also be subject to a borrower's cumulative maximum forbearance limit. If a borrower has reached his or her maximum forbearance limit, the loan holder would have no other remedy but to provide a borrower relief during the review period. The commenters believed that early implementation of § 682.211(i)(7) would be more efficient and provide a necessary benefit for borrowers that have reached their cumulative maximum forbearance limit while the Department makes a discharge eligibility determination.

One commenter noted that, under the proposed regulation, a borrower who files a defense to repayment claim will experience immediate relief due to forbearance or suspension of collection. However, any interest that is not paid during forbearance will be capitalized. This commenter suggested that a borrower should not be discouraged from mounting a defense to repayment that could involve extended

---

[94] See, *e.g., Susan M. v. New York Law Sch.,* 76 N.Y.2d 241, 556 NE.2d 1104 (1990).

investigation by having accrued interest capitalized if the claim is rejected. The commenter recommended that the Department set a limit on the interest that can be capitalized or limit the length of time for which accrued interest can be capitalized.

A group of commenters recommended a conforming change to § 682.410(b) to address defaulted loans held by a guaranty agency. In such cases, a guaranty agency is the holder of a loan for which the Department is making a determination of eligibility, not a lender. Under the conforming change, when the guarantor is the holder of a loan, the Department will notify the guarantor to suspend collection efforts, comparably to when a lender is notified by the Department under § 682.211(i)(7) of a borrower defense claim. Upon receiving notification of the Department's determination, a guarantor would either resume collection efforts or maintain the suspension until the borrower's loans are consolidated into a Direct Consolidation loan.

*Discussion:* We appreciate the commenters' support for granting forbearance and providing information about alternatives and believe it will aid borrowers while the Department reviews their applications. Forbearance is available to Direct Loan borrowers and administered by the loan servicers.

The Department will allow lenders and loan holders to implement § 682.211(i)(7) early, so that they may grant the forbearance prior to July 1, 2017. Lenders and loan holders will be required to grant such forbearance as of July 1, 2017, the effective date of these regulations.

We disagree that forbearance should be an opt-in process, as we believe that the majority of borrowers will want to receive the forbearance, making an opt-out process both more advantageous to borrowers and more efficient.

We also disagree that providing forbearance and suspending collection activities will lead to substantial numbers of frivolous claims. Borrowers experiencing difficulty with their monthly loan obligations may avail themselves of income-driven repayment plans, loan deferment, and voluntary forbearance upon request. Additionally, because applicants for forbearance are required to sign a certification statement that the information contained on their application is true and that false statements are subject to penalties of perjury, we do not expect a sizeable increase in fraudulent claims.

We disagree with the recommendation that the Department set a limit on the amount of accrued interest that may be capitalized, or the

length of time that interest may be allowed to accrue, during the administrative forbearance. We have seen no evidence that capitalization of interest that accrues during a forbearance period while a discharge claim is being reviewed discourages borrowers from applying for loan discharges. Even in situations when the suspension of collection activity may be for an extended period of time—such as during bankruptcy proceedings— interest that accrues during the suspension of collection activity is capitalized. We see no justification for limiting capitalization of interest during the period in which a borrower defenses claim is being evaluated by the Department.

We agree with the commenters that it is preferable to have a set time period for mandatory forbearances during the period that the Department is reviewing a borrower defense claim. In addition to resolving the systems issues raised by the commenters, it would help borrowers to have precise begin and end dates for the forbearance. Granting these forbearances in yearly increments, with the option to end the forbearance earlier if the borrower does not qualify, would be consistent with most of the other mandatory forbearances in the FFEL Program, which are granted in yearly increments, or a lesser period equal to the actual period of time for which the borrower is eligible for the forbearance. In most cases, we do not believe that the full year for the forbearance will be required.

We also agree to make the conforming changes that would address defaulted loans held by a guaranty agency.

*Changes:* We have modified § 682.211(i)(7) to specify that the administrative forbearance is granted in yearly increments, until the loan is consolidated or the Department notifies the loan holder to discontinue the forbearance.

We have added a new § 682.410(b)(6)(viii), requiring a guaranty agency to suspend collection activities on a FFEL Loan held by the guaranty agency for borrowers seeking relief under § 682.212(k) upon notification by the Department.

## Closed School Discharges (Sections 674.33, 682.402 and 685.214)

### General

*Comments:* Several commenters supported the proposed closed school discharge regulations. These commenters appreciated the Department's proposal to provide more closed school discharge information to borrowers and to increase access to

closed school discharges. One commenter strongly supported the proposed changes to the closed school discharge regulations that would require greater outreach and provision of information to students at schools that close, and would automatically discharge the loans of students from closed schools who do not re-enroll within three years. This commenter believed that too many students at schools that close neither receive a closed school discharge nor complete their program at another school.

A group of commenters also felt that too few eligible borrowers apply for closed school discharges, primarily because these borrowers are unaware of their eligibility. These commenters believed that amending the regulations to provide additional closed school discharge information to borrowers, to make relief automatic and mandatory for borrowers who do not re-enroll within one year, and to provide for review of guaranty agency denials, would ensure that eligible students get relief.

One commenter supported strengthening regulations to hold institutions accountable and protect student borrowers from fraudulent and predatory conduct. This commenter applauded the Department's efforts on behalf of Latino students who are overrepresented in institutions that engage in this conduct, while suggesting that more must be done to ensure the success of these students.

A group of commenters recommended that the Department broaden the scope of the proposed school regulation to apply to any planned school closures, rather than only school closures for which schools submit teach-out plans. These commenters noted that very few closing schools arrange for teach-outs at other schools, and that many of the recent school closures did not involve teach-outs. These commenters believed that the proposed regulations would fail to ensure that students at closing schools that do not submit teach-out plans receive accurate, complete, and unbiased information about their rights prior to the school closure.

One commenter recommended that the Department require institutions to facilitate culturally responsive outreach and counseling to students who opt-in to teach-out plans to ensure that they understand the benefits and consequences of their decision.

*Discussion:* We thank the commenters for their support. We agree that these are important provisions, and note that through our intended early implementation of the automatic closed school discharge provisions, students

affected by the recent closure of Corinthian will be able to benefit from a more streamlined, automatic process for relief sooner. However, we do not believe that it is necessary to broaden the scope of the regulations to apply to "any planned school closures" because the current regulations already cover all planned school closures. Current 34 CFR 668.14(a)(31) requires a school to submit a teach-out plan under several conditions, including a school intending to close a location that "provides at least 100 percent of at least one program" or if the school "otherwise intends to cease operations." 34 CFR 668.14(a)(31)(iv) and (v). Therefore, the provision of the teach-out plan triggers the provision of the closed school disclosures and application form.

Although we agree that schools should provide culturally responsive outreach and counseling to students who opt-in to teach-out plans, we believe that it would be difficult to establish standards for such outreach and counseling or to define "culturally responsive" through regulation. However, we expect institutions to be cognizant of the needs of their student population, and to provide appropriate outreach and counseling for their students. At a future date, the Department may consider providing resources, guidance, or technical assistance to institutions to facilitate a culturally responsive dissemination of information.

*Changes:* None.

*Availability of Disclosures*

*Comments:* Many commenters supported the Department's proposed regulations that increase disclosure requirements for schools that are closing. These commenters shared the Department's concern that many borrowers are unaware of their eligibility for a closed school discharge because of insufficient outreach and information. These commenters noted that, in some instances, closing schools inform borrowers of the option to complete their program through a teach-out, but either fail to advise them of the option for a closed school discharge, or advise them of the option in a way that discourages them from pursuing a discharge. According to these commenters, students often receive a closed school loan discharge application from the Department after deciding whether to enroll in teach-out programs. The commenters believe that students must receive clear, accurate, and complete information much earlier in the process when they are making major decisions. The commenters speculated that students who have enrolled in, but

have not completed, a teach-out program may not realize they are still eligible for a closed school discharge, and may feel committed to pursuing the teach-out even though it is not in their best interest to do so.

A group of commenters urged the Department to clarify that closed school discharges may be available to eligible students who have re-enrolled in another institution. These commenters argued that relief should not be limited to students who do not re-enroll in a title IV-eligible institution. Commenters stated that the HEA and current regulations provide that a borrower is eligible for closed school discharge if the borrower did not complete a program due to school closure and did not subsequently complete the program through a teach-out or credit transfer. Students who participate in a teach-out or who transfer credits but do not complete their program remain eligible for a closed school discharge, as do students who re-enroll in a different institution but do not transfer credits or transfer some credits to an entirely different program. According to these commenters, this clarification is particularly important because students attending closing institutions have reported frequent instances of having been misled by closing institutions and recruiters from proprietary schools.

In these commenters' view, the low application rate for closed school discharges is due to a lack of understandable and accessible information about closed school discharges.

A group of commenters noted that in some cases it may be unclear when loan discharge information should be provided because the 60-day forbearance or suspension of collection activity period may expire while the borrower is still within the six-month grace period before collection begins. Therefore collection activities will not be resumed by the guaranty agency or lender under § 682.402(d)(6)(ii)(H), or by the Department under § 685.214(f)(4). These commenters urged the Department to revise the regulations to clarify that the closed school discharge information must be provided either when collection first begins (when a borrower enters repayment after the grace period and will be more inclined to exercise their discharge rights) or when collection is resumed, whichever is applicable.

A group of commenters supported the Department's proposal to require closing schools to provide discharge information to students. When schools announce that they are closing, they currently have no obligation to inform

their students about their loan discharge rights and options. According to these commenters, students feel compelled to continue their educations in ways that may not be in their best interests because they lack sufficient information. For example, commenters contended that when a teach-out is offered, students often believe they are obligated to participate, even though they have a right to opt for a closed school discharge instead. Alternatively, although instruction may be seriously deteriorating, students may feel compelled to complete the program at the closing school, unaware that they have a right to withdraw within 120 days of the closure and receive a closed school discharge. These commenters also suggested that students may feel compelled to accept another school's offer to accept their credits, without understanding that by accepting the offer they may become ineligible for a closed school discharge.

Because of the issues discussed above, these commenters supported the Department's proposal to require schools to provide borrowers with a notice about closed school discharge rights when they submit a teach-out plan after the Department initiates an action to terminate title IV eligibility or other specified events.

A group of commenters recommended that we revise the regulations to require that whenever a school notifies the Department of its intent to close, it must provide a written notice to students about the expected date of closure and their closed school discharge rights, including their right to a discharge if they withdraw within 120 days prior to closure.

One commenter stated that the proposed regulations would require the dissemination of a closed school discharge application to students who are not and will not be eligible for discharge. The commenter recommended that the Department revise proposed § 668.14(b)(32) so that an institution would not be required to disseminate a closed school discharge application if the institution's teach-out plan provides that the school or location will close only after all students have graduated or withdrawn. According to this commenter, if a school that plans to close remains open until all students have graduated or withdrawn, few if any students would be eligible for a loan discharge.

The commenter believed that the proposed regulations create incentives to withdraw that are contrary to public policy favoring program completion. The commenter recommended that proposed § 668.14(b)(32) be revised to

provide that when an institution arranges a teach-out opportunity that would permit a student to complete his or her program, the institution would only be required to provide the discharge application and accompanying disclosure if the student declines the teach-out opportunity. The commenter suggested that the Department require that institutions inform students of their opportunity to discharge their loans before the school closes and before the student makes any decision as to whether to participate in the teach-out. The commenter believed that it is unrealistic to assume that students will not take advantage of the opportunity to discharge their loan debt, particularly when students can simply enroll in another institution and complete their program after receiving a discharge.

Another commenter disagreed with the inclusion of voluntary school closures in § 668.14(b)(31)(iv) where the institution intends to close a location that provides 100 percent of at least one program. The commenter stated that when a school decides that a particular location is no longer desirable or viable, and makes plans to responsibly teach-out the enrolled students itself, the school should not be treated like a school which has lost State approval, accreditation, or Federal eligibility. The commenter believed that the proposed regulation would discourage schools from acting responsibly and undertaking the considerable expense to voluntarily teach-out a location because after receiving a discharge application, students would be more likely to withdraw and seek a discharge rather than finishing their education. This commenter recommended limiting the requirement that closing schools provide a discharge application and a written disclosure to situations described in § 668.14(b)(31)(ii) and (iii), where there is some likelihood that the school's behavior may have disadvantaged students.

Some commenters urged the Department to locate the provision requiring closing schools to provide a discharge application and written disclosures in § 668.26, rather than § 668.14, the section of the regulations pertaining to the PPA. These commenters asserted that placing this provision in the PPA could lead to potential False Claims Act liability centered around disputes of fact that cannot be resolved absent undergoing discovery in a court proceeding. According to these commenters, schools would face the risk of costly litigation to address issues of fact regarding whether students received proper

notice, even where schools have documented the proper provision of notice.

One commenter recommended a technical change for non-defaulted loans, by moving the proposed requirement to provide a second application from guarantor responsibilities in § 682.402(d)(6)(ii)(J) to lender responsibilities in § 682.402(d)(7)(ii).

*Discussion:* We appreciate the support of the commenters who agreed with our proposed changes to the disclosure requirements. The commenters are correct that a borrower may receive a closed school discharge even if the borrower re-enrolls at another institution of higher education. Under current § 685.214(c)(1)(C), an otherwise eligible borrower who re-enrolled at another institution may qualify for a closed school discharge if the borrower did not complete the program of study at another school, or by transferring credits earned at the closed school at another school.

With regard to the recommendation that the Department revise the regulations to specify that closed school discharge information be provided either when collection first begins, or when collection resumes, whichever is applicable, we do not believe that a lender in the FFEL program would find the use of the term "resume" confusing. We note that current regulations in § 682.402(d)(7)(i) use the term "resume." We are not aware of any cases in which a FFEL lender failed to meet the requirements in the current regulations to "resume" collections activities because the lender had not yet begun collection activities.

We disagree with the recommendation that a school that plans to keep a closing location open until all of the students have either graduated or withdrawn should be exempted from the requirement to provide its students with the closed school disclosures or the application. Because all students at such a school or location are entitled to the option of a closed school discharge, we believe that all such borrowers should receive this information, so that they have full knowledge of their options. While many of the students at such a school location may plan to take advantage of the teach-out, not all necessarily will.

We disagree with the recommendation that the closed school discharge form only be provided to borrowers who decline the teach-out. As other commenters pointed out, students may accept a teach-out not realizing that they have other options. The disclosure information and the information on the

discharge application form will apprise borrowers of their options, and help the borrower to make an informed decision based on full knowledge of the borrower's options.

We disagree with the comment suggesting that the proposed regulations create an incentive to withdraw that is contrary to public policy. Although public policy generally favors higher rates of program completion, it is not always in the individual borrower's best interest to continue a program through graduation. In a closed school situation, the value of the degree the borrower obtains may be degraded, depending on the reasons for the school closure. Borrowers at closing schools may incur unmanageable amounts of debt in exchange for relatively low-value degrees. We do not believe that it is good public policy to require these borrowers to repay that debt if they cannot or choose not to complete the program and are eligible for a closed school discharge.

Similarly, we disagree with the recommendation that voluntary school closures be exempted from the requirements. As noted earlier, the teach-out requirements in 34 CFR 668.14(a)(31) apply whether the school is forced to close or voluntarily closes. We see no basis for exempting schools that voluntarily close from the closed school discharge requirements promulgated in these final regulations.

With regard to schools being discouraged from acting responsibly and voluntarily providing teach-outs, as noted above, closing schools are *required* to provide teach-outs. A school that declines to provide teach-outs as a result of these final regulations would be in violation of the requirements specified in the school's PPA.

We do not agree with the recommendation that a school be required to provide disclosures whenever a school notifies the Department of its intent to close. The regulations as proposed require a school to provide disclosures as result of any of the events in section 668.14(b)(31)(ii)–(v), which includes "an institution otherwise intends to cease operations." We disagree with the recommendation that the provision in § 668.14 be moved to § 668.26. We believe the provision is more appropriately included in § 668.14, which enumerates the requirements of a school's PPA. We do not agree that schools are at greater risk of costly litigation if the provision is located in § 668.14 than they would be if the provision were located in § 668.26. To the extent that a closed school would face potential liability under the False

Claims Act for claims for Federal funds made after the school failed to comply with this requirement, we see little difference in the risk based on where the regulatory requirement is located in the Code of Federal Regulations.

We agree with the recommended technical change that, for non-defaulted FFEL Program loans, the regulations should include the requirement to provide a borrower a second closed school application under lender responsibilities in § 682.402(d)(7).

*Changes:* We have revised § 682.402(d)(7)(ii) to require a lender to provide a borrower another closed school discharge application upon resuming collection.

*Content of Disclosures*

*Comments:* Under the proposed regulations, institutions are responsible for providing written disclosures to students to inform them of the benefits and consequences of a closed school discharge. A group of commenters made recommendations for the content of the written materials that schools would be required to provide to students under proposed § 668.14(b)(32). Specifically, these commenters suggested that the written disclosure describing the benefits and consequences of a closed school discharge as an alternative to program completion through a teach-out should encourage program completion, because earning a degree can lead to employment. These commenters encouraged the Department to work with the postsecondary education community to draft discharge applications and disclosures that encourage program completion.

This group of commenters also recommended modifications to the closed school discharge regulations, to proscribe the content of the disclosures. These commenters believed that if the Department provided or approved the written disclosures, it would help ensure that borrowers are able to make better-informed choices over how they proceed with their higher education.

These commenters believed that the Department should not rely on failing schools to ensure that students receive this information prior to closure. According to these commenters, because these schools can be liable for the closed school discharges, closing schools often provide inaccurate closed school discharge information or provide information in a format that students are unlikely to read or notice.

To prevent misleading disclosures, which would defeat the purpose of the proposed regulation, these commenters recommend that the Department amend proposed § 668.14(b)(32) to require that the written disclosure the school gives to its students be in a form provided or approved by the Secretary.

This group of commenters recommended that the closed school disclosures also include the expected closure date. These commenters asserted that when schools announce that they are closing, but plan on teaching out all the existing programs themselves, they currently have no obligation to inform their students about the expected date of closure. These commenters suggest that, as a result, students who experience a deterioration in the level of instruction are hesitant to withdraw and in many cases do not know they have the right to withdraw. These commenters contend that even students who are aware of their right to withdraw do not know when they can withdraw while remaining eligible for a closed school discharge.

To provide borrowers with more choice over how they proceed with their higher education, these commenters recommended that, upon notifying the Department of its intent to close and teach-out all existing students, the regulations require a school to provide a written notice to students about the expected date of closure and their right to a discharge if they withdraw within 120 days prior to closure.

One commenter contended that schools required to post letters of credit before closing have a strong financial incentive to minimize the number of students who choose to take a closed school discharge, regardless of what is in each student's best interest. In addition, this commenter suggested that unscrupulous schools often aggressively recruit students from closed schools. This commenter recommended that, to ensure students at closing schools receive clear, accurate, and complete information about their options, the Department should require schools to use standard language and/or a standard fact sheet approved by the Department in their disclosures.

This group of commenters recommended that the disclosures clearly explain the student's closed school discharge rights. The commenters asserted that closing schools often obfuscate a borrower's discharge rights and options. In the commenters' view, the Department's proposal would only encourage continued obfuscation. Under the proposed regulations, a school must provide a disclosure that describes the benefits and consequences of a closed school discharge as an alternative to a teach-out agreement. The commenters believe that a school could comply with this proposed requirement by providing a long, complicated disclosure about benefits and consequences, while burying a borrower's right to obtain a closed school discharge instead of participating in a teach-out. To prevent obfuscation and confusion the commenters recommended that the Department revise proposed § 668.14(b)(32) to require a clear and conspicuous written disclosure informing students of their right to seek a closed school discharge as an alternative to a teach-out.

*Discussion:* We do not have plans to develop written closed school discharge disclosure materials for schools to use, although we may develop such materials in the future if warranted. In addition, we may provide technical assistance to schools required to develop school discharge disclosure materials. We note that the Department already provides information on closed school discharges on our *studentaid.gov* Web site.

The current closed school discharge form provided to borrowers, *Loan Discharge Application: School Closure,* is a Department form. The Department has developed this form in consultation with the student financial aid community. The form is due to expire on August 31, 2017. In the coming months, we will revise the form to reflect the changes in the closed school discharge regulations. The revised version of the form will go through two public comment periods before it is implemented.

We disagree with the recommendation that we require schools to provide students with the expected date of a school closure. The expected date of closure may not be the actual closure date, and the school may actually close earlier or later than that date. Providing a date that may or not be accurate could be confusing to borrowers. It may also discourage borrowers from continuing in their education programs when, in some cases, it may be beneficial for them to complete their programs at that institution.

*Changes:* None.

*Procedures for Providing Disclosures*

*Comments:* A group of commenters expressed support for the Department's closed school discharge proposal, but strongly recommended several modifications to further the Department's goal of increasing the numbers of eligible students who receive closed school discharges. Under current § 685.214(f)(2), after the Department confirms the date of a school closure, the Department mails a closed school discharge application to

borrowers affected by the closure. The Department suspends collection efforts on applicable loans for 60 days. If the borrower does not submit the closed school discharge application within that timeframe, the Department resumes collection on the loan, and grants forbearance for the 60-day period as provided for under § 685.214(f)(4). These commenters noted that, currently, after a school closes, the Department or guaranty agency is required to provide discharge applications to borrowers who appear to have been enrolled at the time of the school's closure or to have withdrawn not more the 120 days prior to closure. The Department or guaranty agency often sends this information one to six months after the school has closed. Then, the Department or guaranty agency must refrain from collecting on the loans obtained to attend the closed school for 60 days. If the borrower does not apply for a closed school discharge during that time, the Department or guaranty agency is required to resume collection on their loans if the loans are not still within the six-month grace period that begins when a borrower ceases to be enrolled at an eligible school on at least a half-time basis, as provided for under §§ 685.207(b)(2)(i) and 685.207(c)(2)(i).

Some commenters believed that many borrowers do not respond to the notice regarding closed school discharge because it is typically provided within the six-month grace period. At that time the borrower is focused on his or her school closure rather than debt burden. These commenters contend that providing another closed school discharge application when the loan is actually being collected, and the borrower faces the burden of loan payments, is likely to increase the borrower response rate.

Another group of commenters proposed that after one year, the Department or guaranty agency should provide a closed school discharge application and information to borrowers who have re-enrolled in a title IV institution, noting that borrowers who have re-enrolled may still qualify for a closed school discharge.

These commenters also recommended requiring that closed school discharge information be provided with the borrower's monthly payment statement upon beginning or resuming collection, or the appropriate entity if the borrower is in default. These commenters contended that many closed school borrowers receive fraudulent solicitations containing inaccurate information. These commenters asserted that many borrowers are confused about

which notifications are legitimate and which are not, and are most likely to trust and pay attention to the monthly payment statement from their loan servicer.

This group of commenters recommended that the Department take measures to ensure that disclosures are provided on a timely basis. In the commenters' view, the Department's proposal does not address a situation in which the school fails to provide the required information. The commenters noted that most schools close due to financial problems, and that by the time they submit teach-out plans (if they do submit such plans), most schools have lost significant personnel and their operations are in disarray. As a result, commenters suggested that some schools are likely to fail to provide the required notices. The commenters recommended that the Department clarify that, if a school fails to provide the notice required under proposed § 668.14(b)(32) within five days after submission of a teach-out plan, the Secretary would be required to provide timely disclosures before any student may take steps toward participation in a teach-out plan that may impact his or her discharge eligibility.

Similarly to teach-outs, a group of commenters recommended that whenever a school notifies the Department of its intent to close, the Department provide a written notice to students about the expected date of closure and their closed school discharge rights, including their right to a discharge if they withdraw within 120 days prior to closure, if the school fails to do so within five days of informing the Department of closure.

*Discussion:* Although we agree that providing the disclosures with the monthly payment statement would be an effective way of providing the disclosures to students, there are a variety of methods in which a loan holder can provide such disclosures to borrowers, and we do not believe that the Department should specify which method to use through regulation. However, nothing in the regulations prevents a loan holder from providing the closed school discharge disclosures in this manner.

We have concerns with the recommendation that a second closed school discharge application be provided to the borrower when payment resumes, either after the six-month grace period has elapsed or after the end of the 60-day forbearance period. We also have concerns about the recommendation that a second closed school discharge application be provided after one year if the borrower

has re-enrolled. Borrowers are often overwhelmed with information that is provided to them related to their student loans, either by the Department or other sources. Providing multiple copies of the discharge form to borrowers at different points in time would likely add to the information overload that student loan borrowers currently experience. We also point out that the Department's current closed school discharge form is easily available on the Department's *studentaid.gov* Web site.

We disagree with the recommendation that the Department provide the required disclosures if the school does not provide them within five days of submission of the teach-out plan. We do not believe that the commenters' suggestion is feasible or practical. The Department expects regulated parties to comply with regulatory requirements, and typically reviews for such compliance in program reviews or audits. It would be difficult for the Department to determine whether the school has provided the disclosures within five days of submission of the teach-out plan without such a review or audit.

*Changes:* None.

*Discharge Without An Application*

*Comments:* The Department proposed revisions to § 674.33(g)(3), § 682.402(d)(8), and § 685.214(c)(2) that would permit the Department to discharge loans of borrowers who do not re-enroll in a title IV-eligible institution within three years of their school's closure. Several commenters supported the Department's proposal to grant a closed school discharge without a borrower application, based on information in its possession indicating that the borrower did not subsequently re-enroll in any title IV-eligible institution within three years after the date the school closed.

One commenter applauded this proposal, noting that 47 percent of all Direct Loan borrowers at schools that closed from 2008–2011 did not receive a closed school discharge or title IV, HEA aid to enroll elsewhere in the three years following the school's closure. The commenter asserted that students were left with debt but no degree, putting them at great risk of default. The commenter asserted that research has consistently shown that students who do not complete their programs are among the most likely to default on their loans, leaving them worse off than when they enrolled. The commenter recommended that the final preamble clearly state that after three years, an eligible borrower's loans shall be

discharged without an application and any amounts paid shall be refunded. This commenter believed that the preamble to the NPRM suggested discharge of loans without an application for students who have not re-enrolled within three years is optional, not required.

One of the commenters supportive of the proposal noted that the proposed regulations would not discharge the loans of students who enroll in a teach-out program but do not complete it and are not still enrolled within three years of a school's closure. The commenter noted that these borrowers may be unaware of their eligibility for a closed school discharge. The commenter recommended that the Department use available data on program completion among students receiving title IV, HEA aid to automatically discharge the loans of students who did not complete and are not enrolled in a comparable program within three years of their school closing.

A commenter recommended that the final regulation provide for automatic discharges of the loans, to the extent that data are available to identify them, for borrowers who:
• Transfer credits from a closed school and enroll in, but do not complete, a comparable program, and
• Transfer credits to enroll in a completely different program.

Several commenters did not support the automatic discharge provision of the proposed rule. One group of commenters contended that under the proposed regulations, the Department would discharge the loan absent any evidence that the failure of the student to re-enroll in another school was a result of the closed school or that the student did not receive any value for the education received from the closed school. This group of commenters believed the proposed rule would not serve the public interest, as it would minimize borrowers' incentives to continue educational pursuits. These commenters recommended that the automatic discharge provision be deleted from the final rule. These commenters further recommended that if the automatic discharge provision is not removed, that schools should not be held liable for loans that have been automatically discharged due to a student's failure to re-enroll in another school.

Another commenter believed that it would not be appropriate for the Department to grant a closed school discharge without a borrower application. In this commenter's view, a loan servicer may easily provide a borrower with the information

necessary to apply for a closed school discharge. This commenter noted that in many instances a student may have completed his or her education under a teach-out agreement without necessarily receiving any additional title IV, HEA aid, and NSLDS may not indicate that the student enrolled in another institution.

A group of commenters that supported the Department's proposal to allow loan holders to grant closed school discharges without applications to borrowers who do not re-enroll in a new institution within three years of their schools' closures noted that, although the disclosures discussed earlier in this section will increase the number of closed school discharge applications submitted by eligible borrowers, many borrowers will still not likely respond to the disclosures. These commenters noted that borrowers in closed school situations, even students who receive information about their rights from State agencies and the Department, are often confused by contradictory information from their schools, as well as aggressive solicitations from other proprietary schools and fraudulent student loan debt relief companies.

The commenters also urged the Department to make additional revisions in the final regulations. They recommended that the Department make automatic discharges mandatory for borrowers who have not re-enrolled in a title IV-eligible institution within three years of their schools' closures. These commenters believed that discharges under the proposed rule would be entirely discretionary, noting that under the proposed rule, loan holders "may" grant discharges in certain circumstances. The commenters expressed concern that, given that the Department and guaranty agencies have conflicting duties and motivations to collect on loans, the discretionary language could make this regulation meaningless. These commenters also noted that the proposed regulations lack a mechanism for allowing an organization, borrower, or attorney general to demand that the Department or guaranty agency implement the automatic discharge provision. These commenters recommended that the Department make automatic discharge mandatory, noting that the Department proposed to make this provision mandatory during the negotiated rulemaking sessions.

This group of commenters also recommended shortening the re-enrollment period from three years to one year. These commenters stated that the vast majority of closed school

borrowers who are able to transfer their credits do so within several weeks to several months after a school closes. They noted that other schools often market their programs to affected students immediately following a school closure. They also claimed that that other schools, including community colleges, often reach out to students within the first few weeks after a school closure, and that students actively search for a new school to accept their closed school credits.

Commenters contended that because very few students transfer their closed school credits after one year, all closed school borrowers who do not re-enroll in a title IV institution within one year should be granted a closed school discharge without any application. These commenters believed that it would be unfair to require these borrowers to wait three years for a closed school discharge, during which time they will make payments and may face burdensome involuntary debt collection tactics if they default.

This group of commenters anticipated that the vast majority of eligible borrowers would likely want a closed school discharge. However, these commenters asserted that some borrowers may not want a discharge. These commenters propose addressing this potential issue through an opt-out procedure, in which students receive notice of the consequences of the discharge and are afforded the opportunity to opt-out of a discharge within 60 days of receiving the notice.

One commenter raised concerns that the proposal to discharge loans without an application from a borrower would deny institutions due process. This commenter proposed revising the regulations to clarify whether there is a presumption that the borrower did not re-enroll absent evidence to the contrary, or whether the Department must have in its possession evidence that the borrower did not re-enroll in another institution. The commenter also recommended that the regulation be revised to afford the closed school with notice and the opportunity to contest the student's eligibility for a loan discharge (e.g., whether the borrower was enrolled within 120 days of the closure or whether the borrower was enrolled at another institution or participated in a teach-out).

In the commenter's view, the procedures the Department follows to discharge a student loan and make a determination regarding amounts owed by an institution constitute informal agency adjudication, and even in the context of informal adjudication, an agency must provide fundamental due

process. The commenter contended that due process requires that a participant in an agency adjudication must receive adequate notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." Though the Department has flexibility in the way it provides such due process, the Department may not deny closed institutions the opportunity to communicate with the Department prior to a discharge and recovery action. The commenter also expressed the view that, as a matter of public policy, it would benefit the Department to involve closed schools before discharging any loans in order to ensure that discharges are only granted to eligible borrowers.

Another group of commenters recommended eliminating the automatic discharge provision. These commenters expressed concern with the concept of an automatic closed school discharge, especially if the Department intends to rely on the school's NSLDS enrollment reporting process for information about student re-enrollment. In the school enrollment reporting process for NSLDS, schools are only required to include title IV recipients. Therefore, NSLDS may not identify students who re-enrolled but did not receive title IV, HEA aid. As a result, commenters suggested that borrowers who received credit from attending the closed school for the same or similar program of study could be improperly identified as eligible to receive a discharge.

Under proposed § 682.402(d)(6)(ii)(K)(*3*), if the Department determines that the borrower meets the requirements for a closed school discharge, the guaranty agency, within 30 days of being informed that the borrower qualifies, will take the actions described under § 682.402(d)(6) and (7). Section 682.402(d)(6) and (7) specifies the responsibilities of a guaranty agency. A group of commenters expressed the view that the cross-reference to § 682.402(d)(6) is too broad. Theses commenters believed that § 682.402(d)(6)(ii)(E) and § 682.402(d)(6)(H)(1) more specifically describe the required action by the guarantor and should replace § 682.402(d)(6) in the cross-reference. These commenters also stated that if the Department determines that the borrower is eligible for a discharge, the guaranty agency will pay the claim and the lender actions in § 682.402(d)(7)(iv) do not change.

These commenters also recommended changes to the regulations to provide that the guarantor pay the claim if the Department determines a borrower is eligible for a discharge. This change

would not impact lender actions in § 682.402(d)(7)(iv).

These commenters also recommended that, if the Department continues using NSLDS and providing an automatic discharge after three years, the Department should be responsible for monitoring identified borrowers during this period, and notifying the applicable guarantor when a closed school discharge must be processed.

*Discussion:* We agree with the commenters who recommended that the Department clarify the final regulations to provide that closed school discharges for Perkins, FFEL and Direct Loan borrowers who have not re-enrolled in a title IV-eligible institution within three years of their schools' closures are not discretionary. We have revised §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2) to clearly delineate the circumstances under which a closed school discharge is discretionary as opposed to required.

We recognize that some borrowers will qualify for closed school discharges, but will not receive an automatic closed school discharge because they re-enrolled in a title IV school within the three-year timeframe. If the borrower is not participating in a teach-out, or transferring credits from the closed school to a comparable program at the new school, the borrower would still be eligible for a closed school discharge. We do not agree, however, that the Department should automatically grant closed school discharges in these situations. A borrower in this type of situation still has access to a closed school discharge; however, the borrower must apply directly for the discharge. The provisions for discharges without an application are intended to provide closed school discharges to borrowers that the Department can readily determine qualify for the discharge, based on information in our possession. A borrower who re-enrolled within the three-year time period may or may not qualify for a closed school discharge, depending on whether the borrower transferred credits from the closed school to a comparable program. A borrower who re-enrolled, but still qualifies for a closed school discharge, would have to provide more detailed information to the Department through the closed school application process to allow for a determination of the borrower's eligibility for a closed school discharge. However, the Department has continued to increase and improve the quality of data reporting by institutions, including beginning the collection of program-level data for borrowers through recently implemented Gainful

Employment regulations and through recent Subsidized Stafford Loan reporting requirements. While current data limitations make it challenging to definitively identify a borrower who has enrolled in a comparable program or who has successfully transferred credits, in future years, the Department may be able to identify those eligible borrowers who did re-enroll, but *not* in a comparable program. In that case, the Department may revisit its ability to provide closed school discharges automatically to those borrowers, using the discretion available to the Secretary and mirroring the three-year provision set forth in these regulations. This will help to ensure that as many eligible borrowers as possible receive the discharges for which they qualify.

We disagree with the commenters who recommended eliminating automatic closed school discharges from the final regulations. We note that the current regulations already provide for a closed school discharge without an application, and believe that this is an important benefit to borrowers. We also believe that the final regulations provide sufficient safeguards to prevent abuse, such as the three-year period before an automatic closed school discharge is granted. Therefore, we also decline to accept the recommendation that we reduce the three-year time period to one year.

With regard to the three-year time period, we note that the discharge of a loan is a significant benefit to a borrower, with potentially significant fiscal impacts. Absent a closed school discharge application from a borrower, we do not believe that a one-year period of non-enrollment would be sufficient to discharge a borrower's debt.

We see no basis for exempting schools from liability for closed school discharges when the discharge is granted without an application.

We do not believe an opt-out notice for the automatic discharge without an application is necessary. It is unlikely that a sufficient number of borrowers will choose not to have their loans discharged to justify the administrative burden involved in sending the borrower an opt-out notice. We are also concerned that an opt-out notice could be confusing, and result in "false positives"—borrowers inadvertently choosing to opt out of the discharge.

We acknowledge that the automatic discharge process could result in discharges being granted to some borrowers who were able to complete their programs but we believe this would be a negligible number of borrowers. Even a borrower who does not receive title IV, HEA aid to attend

another school, may still receive an in-school deferment. Both receipt of additional title IV, HEA aid and receiving an in-school deferment would be reported to NSLDS. Unless the borrower is attending in a less-than-half-time status, the Department will be able to determine whether a borrower has re-enrolled at another title IV eligible institution during the three-year period. We believe that the likely minimal potential cost of granting discharges to a very small number of borrowers who do not qualify is counterbalanced by the benefit of granting closed school discharges to large numbers of borrowers who qualify for them, but do not receive them under our current procedures.

The comment regarding the Department monitoring borrowers during the three-year period relates to operationalization of the final regulations. The Department will develop procedures for determining whether borrowers qualify for a closed school discharge without an application, and the appropriate method of notifying guaranty agencies if the Department makes such a determination. We note, however, that the final regulations in § 682.402(d)(8)(iii) give guaranty agencies the authority to grant closed school discharges without an application based on information in the guaranty agency's possession.

We disagree with commenters who stated that closed school discharge procedures may deny schools of due process. The closed school discharge procedures do not currently involve the school in the determination process. The Department currently pursues recovery of the amounts lost through closed school and other discharges under section 437(c) of the HEA through the ordinary audit and program review process. Thus, in the final audit determination or the final program review determination issued upon closure of a school or one of its locations, the Department asserts a claim for recovery of the amounts discharged. The school may challenge that claim in an appeal under Subpart L of Part 668, as it can with any other audit or program review liability.[95]

*Changes:* We have revised §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2) to clearly delineate the circumstances under which a closed

---

[95] See, *e.g., In the Matter of Coll. of Visual Arts, Respondent,* Docket No.: 15–05–SP, 2015 WL 6396241, at *1 (July 20, 2015); *In the Matter of Pennsylvania Sch. of Bus., Respondent,* Docket No. 15–04–SA, 2015 WL 10459890, at *1 (Oct. 27, 2015).

---

school discharge is discretionary, as opposed to required.

*Comments:* None.

*Discussion:* Upon further review, the Department determined that the proposed regulations related to automatic closed school discharges needed to specify the period of time for which borrowers from closed schools would be evaluated to determine whether they would qualify for automatic discharges. The Department concluded that it would be administratively feasible to conduct such an evaluation for borrowers at schools that closed on or after November 1, 2013.

*Changes:* We have revised §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii), and 685.214(c)(2)(ii) to specify that they apply with respect to schools that closed on or after November 1, 2013.

*Review of Guaranty Agency Denials*

*Comments:* Some commenters expressed strong support for the proposed regulation that would allow borrowers the right to appeal to the Department when guaranty agencies deny closed school discharges. One commenter noted that the right to appeal is paramount to due process. This commenter stated that the right to appeal provides qualified borrowers with a safety net for obtaining debt relief and also provides a framework for accountability in guaranty agency decisions.

These commenters noted that the guarantor in this case would need to notify the lender to resubmit the closed school claim for reimbursement.

A group of commenters recommended that the Department retain current language requiring the guaranty agency to state the reasons for its denial. The group of commenters supported the Department's proposal to provide for the review of guaranty agency denials of closed school discharge applications for FFEL Loans. These commenters averred that FFEL borrowers, whose loans are held by guaranty agencies, should have the same right to challenge an erroneous unpaid refund or closed school discharge denial as Direct Loan and FFEL Loan borrowers whose loans are held by the Department. The commenters noted that current FFEL Loan regulations do not provide borrowers with any right to seek review of guaranty agency denials of closed school discharges. The commenters also noted that, even when FFEL borrowers are entitled to administrative review, their right to seek further review in court is not clear, unlike Direct Loan borrowers. Commenters noted that the APA does not provide for judicial

review of decisions by private, non-governmental entities such as guaranty agencies, nor is there any explicit right to judicial review of guaranty agency decisions in the HEA.

As a result, commenters said that FFEL borrowers whose loans are held by guaranty agencies have no clear way to challenge an erroneous closed school discharge decision from a guaranty agency. Only Direct Loan and FFEL Loan borrowers whose loans are held by the Department may seek judicial review of administrative unpaid refund or closed school discharge denials. These commenters believe that the Department's proposed rule would address what the commenters consider an arbitrary denial of borrower due process.

This group of commenters recommended one modification to the proposed regulations. Under current § 682.402(d)(6)(ii)(F), if a guaranty agency denies a closed school discharge application, it must notify the borrower in writing of its determination and the reasons for the determination. Under the proposed regulation, a guaranty agency would still be required to notify the borrower of its determination, but would not be required to notify the borrower of its reasons for the determination. These commenters believed that removing this requirement would frustrate the purpose of the review process and urged the Department not to remove the notification requirement.

Multiple groups of commenters noted that the proposed regulations do not provide a time frame during which a borrower can request an appeal of a denied closed school discharge by the guarantor. These commenters recommended a 30-day timeframe, which would align with the timeframe allowed for an appeal of a false certification discharge denial. These commenters also proposed language that would allow a borrower to submit a request after the 30-day period.

One group of commenters proposed that the guarantor would still submit the appeal to the Department; however, collection of the loan would continue during the Department's review.

Another group of commenters also recommended additional language to address situations in which a borrower submits a request after the 30-day period. The commenters suggested that in this case, the guarantor would still submit the appeal to the Secretary; however, unlike with a timely request, collection of the loan (nondefaulted or defaulted) would continue during the Secretary's review.

This group of commenters stated that the proposed regulations are not clear on the availability of an appeal option for non-defaulted borrowers. These commenters recommended adding language to clarify that non-defaulted borrowers should be afforded the same opportunity to appeal. Under the proposed regulations, a guarantor would be responsible for notifying a defaulted borrower of the option for review by the Secretary. For consistency, the commenters believed it would be reasonable for the guarantor to utilize this same process for non-defaulted borrowers.

These commenters also believed that it would be less confusing for a borrower for the guarantor to retain the loan until 30 days after the agency's notification to the borrower of the right to appeal. Commenters proposed that if the borrower appeals within 30 days, the loan should remain with the guarantor until the Secretary renders a final determination on the borrower's appeal. These commenters recommended that the guarantor should be responsible for notifying defaulted and non-defaulted borrowers of the option for review by the Secretary.

Under proposed § 682.402(d)(6)(ii)(K)(3), if the Department determines that the borrower meets the requirements for a closed school discharge, the guaranty agency, within 30 days of being informed that the borrower qualifies, will take the actions described under § 682.402(d)(6) and § 682.402(d)(7). Section 682.402(d)(6) specifies the responsibilities of a guaranty agency and 682.402(d)(7) specifies the responsibilities of a lender.

A group of commenters expressed the view that the cross-reference to § 682.402(d)(6) is too broad. These commenters believed that § 682.402(d)(6)(ii)(E) and 682.402(d)(6)(ii)(H)(1) more specifically describe the required action by the guarantor and should replace § 682.402(d)(6) in the cross-reference. These commenters also recommended that we clarify under § 682.402(d)(6)(ii)(K)(3) if the Department determines that the borrower is eligible for a discharge, the guaranty agency will pay the claim and the lender will be required to take the actions specified in § 682.402(d)(7)(iv).

*Discussion:* We do not believe that a 30-day timeframe for appealing a denial of a closed school discharge claim by a guaranty agency is sufficient. We have retained the language in the NPRM, which did not provide a timeframe for such an appeal.

We agree with the commenters who recommended that proposed § 682.402(d)(6)(ii)(F) be revised to specify that, when a guaranty agency notifies a borrower of the denial of a closed school discharge claim and of the opportunity to appeal the denial to the Department, that the notification from the guaranty agency should state the reasons for the denial. Since the proposed revision to the regulation is intended to provide borrowers an opportunity to appeal a negative decision, a borrower should have the opportunity to address the issues that led to the denial during the appeal process.

We agree with the commenters that the regulations should provide for an appeal process for non-defaulted FFEL borrowers (whose loans are held by lenders) as well as for defaulted FFEL borrowers (whose loans are held by guaranty agencies). Although the NPRM only addressed an appeal process for FFEL Program loans held by a guaranty agency, our intent was to provide an appeal process for FFEL Program loans held by either a lender or a guaranty agency.

We agree that the cross-references to § 682.402(d)(6)(ii)(K)(3) should be written more narrowly, and have made additional technical corrections to the FFEL regulations, based on the recommendations relating to the process for granting discharges in the FFEL Program. These technical corrections are identified in the "Changes" section, below.

*Changes:* We have revised § 682.402(d)(6)(ii)(F) to stipulate that a guaranty agency that denies a borrower's closed school discharge request must notify the borrower of the reasons for the denial.

We have revised the cross-references in § 682.402(d)(6)(ii)(K)(3), to more specifically describe the guarantor's action. We have also changed the cross-reference from (d)(7) to (d)(7)(iv), clarifying that after the guaranty agency pays the claim the lender actions in (d)(7)(iv) do not change.

We have made a technical correction to § 682.402(d)(6)(ii)(H), deleting the reference to a guaranty agency exercising a forbearance during the suspension of collection activity.

We have revised § 682.402(d)(7)(iii) to clarify that a borrower whose FFEL Loan is held by a lender, has the same appeal rights as a borrower whose loan is held by a guaranty agency if the guaranty agency denies the closed school discharge request.

*Miscellaneous Recommendations*

*Comments:* One commenter supported the proposed changes to the closed school discharge regulations, but believed that the proposal did not go far enough to provide displaced students with comprehensive assistance and an explanation of their right to debt relief. This commenter urged the Department to ensure that a clearly identifiable, knowledgeable, and accessible representative is made available on campus immediately after announcement of an impending closure, to provide in-person, meaningful assistance to displaced students.

In addition, this commenter recommended that the Department offer ongoing assistance through the creation of a student loan discharge hotline and/ or on-line computer chat, and hyperlinks on the Department's Web site directing students to assistance in their local communities. The commenter averred that assistance should be made available in multiple formats (telephone, smartphone apps, mail, in person, and on-line), as many students at closing or closed schools do not own or have limited access to computers.

A group of commenters recommended that the discharge regulations for Perkins and Direct Loans be amended to extend the 120-day look back period by the number of days between the expected and actual date of closure whenever the actual closure date is later than the expected and disclosed closure date.

Another commenter recommended prohibiting the capitalization of interest when the collections process has been suspended because a student is filing for a closed school discharge.

A group of commenters recommended that the terminology throughout § 682.402(d) be updated for consistency with current § 682.402 regulations for other discharges types. Specifically, commenters suggested replacing references to written and sworn statements with references to applications.

*Discussion:* We appreciate the recommendations for additional steps the Department may take to assist borrowers in closed school situations. Many of these recommendations relate to activities that are not governed by regulations, or are out of the scope of this regulatory action.

With regard to the comment recommending that we extend the look-back period beyond 120 days if the expected closure date is different than the actual closure date, we do not believe such a change is necessary. Under current regulations in

§ 685.214(c)(1)(B), the Department has the authority to extend the look-back period due to "exceptional circumstances." We believe that this provision provides appropriate flexibility to the Department in cases where it may be necessary to extend the look-back period.

Under § 682.202(b)(2)(ii) and (iii) a lender may capitalize interest that accrues during a period of authorized deferment or forbearance. We see no justification for exempting the 60-day forbearance period from this practice.

We agree with the recommendation to update the terminology throughout § 682.402(d) for consistency with current § 682.402 for other discharges types, and will make those changes in the final regulations.

*Changes:* In §§ 682.402(d)(6)(ii)(B)(*1*), (d)(6)(ii)(B)(*2*), (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), and (d)(6)(ii)(H) of the FFEL closed school discharge regulations, we have replaced the terms "sworn statement" or "written request" with the term "application", to conform the regulations with the current closed school discharge application process.

*Data Requests*

*Comments:* A group of commenters recommended that the Department disclose, at the school level, information about closed school discharges, including information about the Department's outreach to borrowers, the number of applicants, the number of applicants who receive a discharge, the total amount discharged, and the amount collected from schools to offset the discharged amounts. Similarly, this group of commenters requested that the Department disclose, at the school and discharge type level, information about false certification discharges, including the number of applicants, the number of applicants who receive a discharge, and total amount discharged and related offsets. In addition, this group of commenters recommended that the Department disclose the number of borrowers for whom a death discharge has been requested, the number of borrowers for whom a death discharge has been granted, and the total discharged amount.

*Discussion:* We thank the commenters for their thoughtful reporting recommendations; however, we do not have plans to provide such information at this time. We note that publication of data at this level may require providing the school with the opportunity to review and challenge or correct inaccurate information. However, the Department may be able to publish more aggregated versions of these data for public review at a later date. The

Department is not prepared to implement such processes at this time, but will consider releasing these data moving forward.

*Changes:* None.

**False Certification Discharges (Section 685.215)**

*High School Diploma*

*Comments:* Commenters generally supported the proposed improvements to the false certification process. Some commenters noted that broadening the reasons that loans may be discharged due to false certification may provide a simpler process for loan discharge than borrower defense to repayment for many borrowers.

A group of commenters expressed support for the proposed regulatory changes that would provide a false certification loan discharge to borrowers whose schools have falsely reported that they earned a high school diploma, including schools that have facilitated the borrower's attainment of a fabricated high school diploma. The commenters noted that that proposed § 685.215(a)(1)(ii) would allow for discharge of a borrower's loan if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma. The commenters viewed this proposed regulation as a critical improvement over the current false certification regulations.

However, several commenters expressed concern that some otherwise eligible borrowers may be denied discharges because their financial aid applications, which were completed by the school, indicate that they reported having earned a high school diploma.

A group of commenters recommended revisions to the final regulations regarding what they referred to as "unfair" evidentiary burdens. These commenters recommended that the Department clarify that students whose schools falsely certified that they have high school diplomas, including schools that do so by falsely certifying financial aid applications, are eligible for false certification discharges.

One group of commenters recommended that the Department further modify the regulatory language to clarify that borrowers who report to their school that they earned a high school diploma are ineligible for a false certification loan discharge, but that borrowers whose FAFSA falsely indicates the borrower had earned a high school diploma may be eligible for a false certification loan discharge.

Another group of commenters believed that the Department should revise the proposed regulations to ensure that a borrower will qualify for a false certification discharge only if the borrower can fulfill the bases for discharge. These commenters recommended that the Department revise proposed § 685.215(c) to require borrowers to demonstrate each element of the bases for discharge under proposed § 685.215(a)(l) in order to qualify for a discharge. The commenters also recommended that the Department provide guidance regarding acceptable online high schools.

These commenters observed that the Department's intent, as stated in the preamble to the NPRM, is that borrowers who provide false information to postsecondary schools regarding high school graduation status will not obtain a false certification discharge. Proposed § 685.215(a)(l) ("Basis for Discharge") states that a false certification discharge is available if a borrower reported to the postsecondary school that the borrower did not have a high school diploma. The commenters believed that the section of the proposed regulation regarding borrower qualifications for discharge does not reflect the Department's intent. Proposed § 685.215(c) ("Borrower qualification for discharge") does not require a borrower to demonstrate that the borrower presented accurate information regarding the borrower's high school graduation status to the postsecondary school.

These commenters believe that under the proposed regulations, taxpayers may be forced to pay for false certification discharges for borrowers who did not meet the test in proposed § 685.215(a)(l) and yet qualified under proposed § 685.215(c)(1). The commenters noted that the Department can seek recovery from institutions for certain losses determined under proposed § 685.2125(a)(l). However, if borrowers are granted discharges under the weaker standard at proposed § 685.215(c)(1), then in many cases the Department will be unable to collect from institutions under the stronger standard at proposed § 685.215(a)(l).

The commenters believed that schools should be able to rely on the fact that a high school is accredited by a reputable accrediting agency, absent a list of high schools that provide instruction to adult students and that are acceptable to the Department. Another commenter requested that the Department provide schools with a reliable source of information regarding appropriately accredited high school

diploma programs available to adults, including those that are offered online.

A group of commenters expressed concerns that the proposed false certification and unauthorized payment discharge rule would penalize institutions for the false certification of the student or the independent actions of a third party.

In addition, these commenters recommended that, under the evidentiary standards articulated in proposed § 685.215(c)(1), a borrower requesting a false certification loan discharge should be required to certify that, at the time of enrollment, he or she did not represent to the school, either orally or in writing, that he or she had a high school diploma. The commenters believed that this evidentiary requirement would help deter frivolous false certification claims.

Some commenters observed that, pursuant to proposed § 685.215(a)(l)(ii), a borrower would be eligible for a false certification loan discharge if the school the borrower attended certified the eligibility of a student who is not a high school graduate based on "[a] high school diploma falsified by the school or a third party to which the school referred the borrower." The commenters recommended that the regulation be revised to clarify that a school is only penalized if it referred a student to a third party for the purpose of having the third party falsify the high school diploma. These commenters believed that it is not uncommon for a school to refer a student to a third-party servicer to verify the diploma, particularly in the case of students who graduated from foreign high schools. The commenters believed that institutions should not be penalized if a third-party verification entity falsified the legitimacy of the foreign credential without the school's knowledge.

*Discussion:* We thank the commenters who are supportive of the proposed revisions of the false certification of high school graduation status regulatory provisions. However, we do not agree that the regulations need further modification to address situations in which a borrower who is not a high school graduate states on the FAFSA that the borrower is a high school graduate. If a borrower falsely stated on the FAFSA that they were a high school graduate, but also reported to the school that they were not a high school graduate, and the school certified the eligibility of the borrower based on the FAFSA, the school would still have falsely certified the eligibility of the borrower. In this situation, the borrower would qualify for a false certification discharge—assuming the borrower did

not meet the alternative to high school graduation status in effect at the time—regardless of the information on the student's FAFSA. The same would hold true whether the FAFSA was actually completed by the borrower, or completed by the school. We note that, while a school may assist a student in completing a FAFSA, a school may never complete a FAFSA for a student. Conversely, if a borrower falsified the FAFSA on their own initiative, did not inform the school that they were not a high school graduate, and the school did not receive any discrepant information indicating that the borrower was not a high school graduate, the borrower would not qualify for a false certification discharge. Borrowers who deliberately provide misleading or false information in order to obtain Federal student loans do not qualify for false certification discharges based on the false or misleading information that the borrower provided to the school.

We agree with the commenters who noted a discrepancy between the language in proposed § 685.215(a)(l) and proposed § 685.215(c)(l). Section 685.215(a)(l) provides the basic eligibility criteria for a false certification discharge based on false certification of a borrower's high school graduation status. Section 685.215(c)(1) describes how a borrower qualifies for a discharge. The two sections are intended to mirror each other, not to establish slightly different standards for the discharge. If a borrower, in applying for the discharge, is only required to state that the borrower "did not have a valid high school diploma at the time the loan was certified," the question of whether the borrower "reported not having a high school diploma or its equivalent" would not be addressed.

We also agree that the standards under which the Department may seek recovery for losses under § 685.215(a)(1) should not be different from the standards under which a borrower may receive a false certification discharge under § 685.215(c)(1).

The commenter who recommended that schools be able to rely on a high school's accreditation status by a "reputable accrediting agency" did not specify what criteria would be used to determine if an agency accrediting a high school is reputable, and does not suggest a process for making such determinations. Moreover, even if it were feasible for the Department to provide a list of acceptable high schools for title IV student financial assistance purposes or guidance regarding acceptable schools, there is no guarantee that a diploma purporting to come from such a school is legitimate.

We do not share the concern of commenters that the proposed regulations may penalize a school for relying on the independent actions of a third party. If a school is relying on a third party to verify the high school graduation status of a borrower, it is incumbent on the school to ensure that the third-party is providing legitimate verifications. We note that high school graduation status, or its approved equivalent, is a fundamental borrower eligibility criterion for title IV federal student assistance. Any school that wishes to participate in the title IV, HEA programs and outsources the determination of high school graduation status to a third party without ensuring that the third party is trustworthy, is acting irresponsibly.

We also note, in response to this comment, that the Department is not proposing revisions to the regulations governing false certification discharges due to unauthorized payment.

We also disagree with the comment recommending that a school should only be penalized if it referred a student to a third-party "for the purpose of having the third party falsify the high-school diploma." This commenter raised this issue in particular with regard to students who graduated from foreign high schools. The commenter stated that schools often use third parties to verify the legitimacy of a foreign credential. We do not believe that the Department must demonstrate intent on the part of a school when assessing liabilities against a school due to false certification of borrower eligibility. We do not believe that a school that routinely certifies eligibility of borrowers who graduated from foreign high schools can credibly claim to be ignorant of the legitimacy of a third-party verification entity that the school uses for verification purposes.

We agree with the comment that the false certification loan discharge application should include a certification from the borrower that the borrower did not report to the school that the borrower had a high school diploma. The current form, *Loan Discharge Application: False Certification (Ability to Benefit)*, expires on August 31, 2017. After these final regulations are published, we will revise the form to make it consistent with these final regulations. The revised version of the form will go through two public comment periods, with the intent of being finalized by the time these regulations become effective on July 1, 2017.

*Changes:* We have revised § 685.215(c)(1) to clarify that the borrower must have reported to the

school that the borrower did not have a high school diploma or its equivalent.

*Disqualifying Condition*

*Comments:* Current regulations under § 685.215(a)(1)(iii) provide for a discharge if a school certified the eligibility of a borrower who would not meet requirements for employment in the occupation for which the training program supported by the loan was intended. The proposed regulations would modify this provision to clarify that the relevant "requirements for employment" are "State requirements for employment" in the student's State of residence at the time the loan was originated.

A group of commenters sought confirmation that, while a borrower may be eligible for a false certification discharge due to a condition that disqualified them for employment in the field for which postsecondary education was pursued, the postsecondary institution would not be financially liable for the discharged loan. These commenters believed that this is the Department's intent because the remedial action provision at proposed § 685.308 does not list the disqualifying condition discharge provision at proposed § 685.215(a)(l)(iv) as a basis for institutional liability. These commenters observed that the current version of § 685.308 states the Department may seek recoupment if the loan certification resulted in whole or in part from the school's violation of a Federal statute or regulation or from the school's negligent or willful false certification.

These commenters averred that anti-discrimination laws limit schools' ability to deny admission to a prospective student, even when the individual would be disqualified for employment in the career field for which the program prepares students. The commenters recommended that the Department state explicitly in the preamble to the final regulations that disqualifying condition discharges will not result in institutional liabilities.

Another commenter asserted that it would be administratively burdensome for institutions to maintain the knowledge necessary to determine what conditions would disqualify a prospective student for employment in a specific field. This commenter suggested that this would be particularly challenging for distance education programs that serve students remotely, since these institutions would only be aware of potentially disqualifying conditions that the student discloses.

A group of commenters echoed this concern, stating that it would be administratively burdensome for distance education programs to comply with proposed § 685.215(c)(2). In these commenters' view, a primarily distance education institution may not have occasion to become aware of a student's disqualifying physical or mental condition unless and until the student voluntarily discloses such information. In addition, for institutions that operate in numerous States, the commenters stated that it would be administratively burdensome and near impossible for an institution to remain constantly vigilant about potential changes to State statutes, State regulations, or other limitations established by the States that may affect a student's eligibility for employment.

Since institutions must comply with various anti-discrimination laws when admitting students, several commenters argued that institutions should not be held liable for discharges based on disqualifying conditions unless it can be shown that the institution engaged in substantial misrepresentation. Another commenter stated that there are legitimate reasons why institutions—including, but not limited to, distance education institutions—may not be aware of a student's disqualifying physical or mental condition or criminal record. The commenter claimed that, under applicable Department regulations, an institution may not make a preadmission inquiry as to whether an applicant has a disability. The commenter cited regulations at 34 CFR 104.42(b)(2) limiting schools' ability to determine whether applicants have a disability.

Another commenter referenced the Department's publication *Beyond the Box: Increasing Access to Higher Education for Justice-Involved Individuals,* which encourages alternatives to inquiring about criminal histories during college admissions and provides recommendations to support a holistic review of applicants.

A commenter asked why the regulation does not specify that the institution knew about or could be expected to have known about the disqualifying condition. The commenter questioned whether a student who intentionally concealed a disqualifying condition should obtain a discharge. The commenter also raised the issue of a borrower whose disqualifying impairment occurs after the fact, but does not qualify for a disability discharge. In such situations, the commenter recommended that the Department clearly state that the school would not be subject to any penalty under § 685.308.

Another group of commenters recommended that the Department expand the regulation pertaining to disqualifying conditions to include certifications not provided by the State, such as those referenced in the Gainful Employment regulations such as professional licensure and certification requirements, including meeting the requirements to sit for any required licensure or certification exam.

A group of commenters noted their opposition to the Department's proposal which, in their view, narrows discharge eligibility for students whose schools falsely certify that they meet the requirements for employment in the occupations for which their programs are intended to train. These commenters asserted that some schools frequently recruit students they know will be barred from employment in their field after program completion.

These commenters objected to the proposed regulatory language, which addresses requirements imposed by the State, not by the profession. To the extent that this discharge provision is intended to provide relief to students whose schools recruit and enroll them despite the fact that they cannot benefit from the program, the commenters believed that the Department should not limit the scope of this protection. The commenters observed that while most professional licensing is found in State law and regulation, others—such as those from trade-specific entities—are not. In the commenters' view, the proposed change would unnecessarily restrict relief to students who are unemployable because they are ineligible for certifications not provided by a State.

The commenters also believed that this change would be inconsistent with the Department's Gainful Employment regulations, which requires schools to certify that each of their career education programs "satisfies the applicable educational prerequisites for professional licensure or certification requirements in that State so that the student who completes the program and seeks employment in that State qualifies to take any licensure or certification exam that is needed for the student to practice or find employment in an occupation that the program prepares students to enter." 34 CFR 668.414(d)(3). As the Department noted in the preamble to the NPRM for the Gainful Employment regulations, a student's enrollment in a program intended to prepare them for a career for which they cannot be certified "can have grave consequences for students' ability to find jobs and repay their loans after graduation." 79 FR 16478.

The commenters believed that the consequences are equally grave for students who are unwittingly enrolled in programs that they personally can never benefit from, though their classmates might. In the view of these commenters, it is therefore unnecessary and unfair to narrow this standard for relief.

*Discussion:* The proposed regulations were not intended to absolve schools of financial liability in the case of false certification due to a disqualifying condition. The commenters point to proposed § 685.308, which inadvertently omitted a cross-reference to § 685.215(a)(1)(iv) in identifying provisions under which the Secretary "collects from the school the amount of the losses the Secretary incurs and determines that the institution is liable to repay." We note that the proposed regulations include cross-references to the provisions covering false certification due to high school graduation status and unauthorized signature. We believe that discharge due to false certification of disqualifying status should be treated the same as the other types of false certification discharges, as it is under current regulations in § 685.308(a)(2).

The commenter who suggested that it would be administratively burdensome for schools to maintain the knowledge necessary to determine what conditions would disqualify a prospective student from employment in a specific field appears to be unaware of the current regulatory requirements. Under current § 685.215(a)(1)(iii), the Department considers a school to have falsely certified a borrower's eligibility for a title IV loan if the school "certified the eligibility of a student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary would not meet the requirements for employment (in the student's State of residence when loan was originated) in the occupation for which the training program supported by the loan was intended." The final regulations revise this provision to refer to "State requirements," but make no additional changes to this provision. The change is consistent with our interpretation set forth in Dear Colleague Letter (DCL) GEN–95–42, dated September 1995. In that DCL, we clarified that for a borrower to qualify for a false certification discharge due to a disqualifying condition, a borrower must provide evidence that the borrower had a disqualifying condition at the time of enrollment and of "a *State prohibition* (in that student's State of residence) against employment" in that

occupation based on the borrower's status.

We note in response to the commenters who were concerned about the administrative burden associated with compliance for distance education programs that these schools have been subject to this regulatory requirement for over 20 years. Neither the proposed regulations nor these final regulations would change the basic requirements regarding false certification due to a disqualifying condition.

The regulation at 34 CFR 104.42 refers to general postsecondary education admission procedures, not eligibility for title IV student financial assistance. While the requirements in § 685.215 do not apply to a school's evaluation of whether to admit a student to a particular program, they do apply to its certification of that student's eligibility for title IV student financial assistance for that program. Therefore, we do not believe that the further limitation suggested by the commenter is necessary.

The Department of Education *Beyond The Box* publication cited by commenters specifically addresses career-training programs. Further, the publication does not advise schools to ignore disqualifying characteristics, but rather not to be overbroad in their preclusion of otherwise eligible applicants:

Tailor questions about CJI ["Criminal Justice Information"] to avoid unnecessarily precluding applicants from entering training programs, and thus employment, for which they might be eligible. For career-oriented training programs, institutions should limit CJI inquiries to criminal convictions that pose barriers to certification and licensing. For example, if a State teacher's board will not grant a license to anyone with a felony conviction for sexual assault or rape, the teaching program could specifically ask, "Have you ever been convicted of felony sexual assault or rape?" instead of broadly asking, "Have you ever been convicted of a crime?" This specificity would enable the institution to adequately assess whether a student could face occupational licensing and credentialing barriers (*Beyond the Box: Increasing Access to Higher Education for Justice-Involved Individuals*, p. 25).

As stated in the *Beyond the Box* publication, we expect schools to be aware of disqualifying conditions for employment in the fields for which the schools are providing training. Schools that offer career-training programs need to be proactive in determining whether borrowers who are training for fields that have such employment restrictions do not have a disqualifying condition for that career.

In response to the comment regarding a student intentionally misleading a

school, if the school could demonstrate that a student intentionally misled the school about a disqualifying condition, we would take that into account in determining the amount that the school is liable to repay under § 685.308(a). However, in our view, it seems unlikely that a borrower would knowingly go through the time, effort, and expense of enrolling in an education program that trains the borrower for an occupation for which the borrower is unemployable. A far more common scenario is unscrupulous schools recruiting students with disqualifying conditions who cannot possibly benefit from the training programs that the school offers.

With regard to borrowers who do not have a disqualifying condition at the time of enrollment, the regulations specify that a borrower qualifies for the discharge only if the borrower had a disqualifying condition that "would have" disqualified the borrower from employment in the occupation, and that the borrower "did not meet" State requirements for employment in the career. A condition that arose after the borrower was no longer enrolled at the school would not qualify the borrower for a false certification discharge due to a disqualifying condition.

We addressed the question of expanding the scope of this provision to include non-State requirements for employment in certain fields, such as employment standards established by professional associations during the negotiated rulemaking sessions and in the NPRM. As we noted earlier, employment standards established by professional associations could vary, and it would not be practical to require schools to determine which professional association standards to use. The reference to the Gainful Employment requirements is inapplicable here, as the Gainful Employment requirements relate to the quality of a school's program.

*Changes:* We have revised § 685.308(a) to clarify that Department assesses liabilities to schools for false certification due to disqualifying condition or identity theft.

*Satisfactory Academic Progress*

*Comments:* A group of commenters supported the proposed regulation that would provide automatic false certification loan discharges for students whose satisfactory academic progress (SAP) was falsified by an institution. While the regulation specifies that these loan discharges are initiated by the Department, these commenters requested that borrowers be permitted to submit an application for false certification loan discharge due to the

falsification of satisfactory academic progress by an institution.

The commenters urged the Department to clarify that students may also apply for a discharge on this basis, rather than wait for the Department to grant discharges without applications. The commenters observed that there are often False Claims Act and government cases involving false certification of SAP, and that many students also know when their academic progress was falsified by schools, but are not covered by such cases.

The commenters suggested that information provided by students in discharge applications would also allow the Department to identify bad-acting schools and prevent abuse of title IV, HEA funding. These commenters recommended that the Department revise the proposed rules to provide a means for students to individually apply for discharge when their SAP is falsely certified by their school.

*Discussion:* We continue to believe that allowing individual borrowers to apply for false certification discharges due to falsification of SAP is not practical. As we discussed in the NPRM, schools have a great deal of flexibility both in determining and in implementing SAP standards. There are a number of exceptions under which a borrower who fails to meet SAP can continue to receive title IV loans. Borrowers who are in danger of losing title IV eligibility due to a failure to meet SAP standards often request reconsideration of the SAP determination. Schools often work with borrowers in good faith efforts to attempt to resolve the situation without cutting off the borrower's access to title IV assistance.

We do not believe that a school should be penalized for legitimate attempts to help a student who is not meeting SAP standards, nor do we believe a student who has successfully appealed a SAP determination should be able to use that initial SAP determination to obtain a false certification discharge on his or her student loans. In addition, we continue to believe that it would be very difficult for an individual borrower to sufficiently demonstrate that a school violated its own SAP procedures.

Given these considerations, the final regulations continue to limit false certification discharges based on falsification of SAP to discharges based on information in the Secretary's possession.

*Changes:* None.

*Ability To Benefit*

*Comments:* A group of commenters requested that the Department reconsider the evidentiary standard for false certification of a borrower's ability to benefit. In these commenters' view, the requirement for additional corroborating evidence beyond the self-certification of the borrower is unreasonable. The commenters suggested that borrowers who are unable to obtain corroborating evidence should be able to submit a sworn statement in support of their false certification application.

These commenters referenced two DCLs the Department issued in connection with false certification of ability to benefit: DCL GEN–95–42 (dated September 1995) and DCL FP–07–09 (dated September 2009). The commenters characterized the DCLs as establishing a presumption that students who claim ability to benefit fraud are not telling the truth unless they submit independent corroborating evidence to support their discharge application. To support this claim, these commenters quoted the statement in DCL GEN–95–42 that the absence of findings of improper ability to benefit practices by authorities with oversight powers "raises an inference that no improper practices were reported because none were taking place."

The commenters asserted that many borrowers cannot provide proof of Federal or State investigations of particular schools because enforcement has been lenient in this area. They asserted that, in 1992, Congress provided for the false certification discharge and overhauled the student loan system because oversight of schools was inadequate.

A group of commenters criticized the Department's current approach, and noted that statements that a borrower makes on the current Loan Discharge Application: False Certification (Ability to Benefit) are made under penalty of perjury. According to commenters, if a borrower is unable to provide investigative findings supporting the borrower's claim, the Department or the guaranty agency will deny the discharge unless the borrower submits additional corroborating evidence (such as statements by school officials or statements made in other borrower claims for discharge relief).

The commenters noted that DCL FP–07–09 discusses guaranty agencies' consideration of "the incidence of discharge applications filed regarding that school by students who attended the school during the same time frame as the applicant," and suggested that

students have no way of knowing whether a guaranty agency has done so in evaluating their applications.

The commenters asserted that students do not have access to school employee statements and do not know whether other borrowers have filed similar claims for relief. When borrowers are able to find attorneys to help them, attorneys are often unable to obtain the required evidence through Freedom of Information Act requests. The commenters also asserted that the Department does not have possession of all false certification discharge applications and does not ensure that copies are retained when guaranty agencies go out of business or retain all potentially corroborating evidence. In addition, if the student has carried the debt for years before learning of their right to a false certification discharge, the school may have closed. At that point, key documents and corroborating evidence may no longer be available.

The commenters recommended that the Department revise its proposed regulations to specify that a student may establish a right to a false certification discharge through a "preponderance of the evidence," as it has proposed for borrower defense claims. In addition, the commenters recommended that borrowers be presumptively eligible for discharge after application in the following circumstances:

• The school's academic and financial aid files do not include a copy of test answers and results showing that the borrower obtained a passing score on an ability-to-benefit test approved by the Secretary;

• No testing agency has registered a passing score on an ability-to-benefit test approved by the Secretary for the borrower; or

• The school directed the borrower to take an online test to obtain a high school degree, the borrower believed the test to be legitimate, and the high school diploma is invalid.

*Discussion:* In the NPRM, we removed the references to "ability to benefit" from the Direct Loan false certification regulatory language and replaced it with a cross-reference to section 484(d) of the HEA, and have retained that change in the final regulations. Section 484(d) establishes the current borrower eligibility requirements for students who are not high school graduates. The current alternative to graduation from high school requirements are substantially different from the earlier ability to benefit requirements. We have provided guidance describing the current alternative to high school graduation requirements in DCL GEN–16–09.

We disagree with the recommendation to revise the regulations pertaining to the evidentiary standards for false certification of ability to benefit. Any modifications to these regulations could only be applied prospectively. Schools can be held liable for false certification discharges, and we cannot impose retroactive requirements on schools.

We also disagree with the commenters' characterization of the guidance in DCL GEN–95–42 and DCL FP–07–09. DCL FP–07–09 does not require a borrower to provide additional corroborating evidence if the borrower is unable to do so. That DCL provides examples of "credible evidence" that would provide a guaranty agency with "an adequate basis for granting a discharge application" when there is no borrower-specific evidence that the borrower qualifies for a discharge due to false certification of ability to benefit.

We believe the two DCLs still provide an accurate description of the legal requirements for false certification, so we do not have plans to update them in the near future.

*Changes:* None.

**Interest Capitalization (Sections 682.202(b)(1), 682.405, and 682.410(b)(4))**

*Comments:* Several commenters supported the proposed changes in §§ 682.202(b)(1), 682.405, and 682.410(b)(4), providing that a guaranty agency may not capitalize unpaid interest after a defaulted FFEL Loan has been rehabilitated, and that a lender may not capitalize unpaid interest when purchasing a rehabilitated FFEL Loan.

A group of commenters noted that in the preamble to the NPRM, the Department characterized these changes as clarifications of existing regulations. The commenters disagreed with this characterization, stating that during the negotiated rulemaking sessions, negotiators representing guaranty agencies, lenders, and servicers did not agree that current regulations prohibit the capitalization of interest following loan rehabilitation. The commenters further stated that the negotiating committee agreed to add this issue to the negotiating agenda after an agreement was reached with the Department that the proposed changes represented a change in policy for prospective implementation. The commenters added that when the Department was asked by another member of the negotiating committee whether the proposed changes would have any retroactive impact, the Department responded that retroactive application was not the issue being negotiated. The commenter requested that the Department clarify in the final regulations that the changes to the FFEL Program regulations prohibiting the capitalization of interest following loan rehabilitation are amendments to the current rules, consistent with the commenters' understanding of what was agreed to during the negotiations. Based on that understanding, the commenters stated that FFEL Program guarantors, lenders, and servicers are planning to implement the changes for loans that go into default on or after the effective date of the regulations and are subsequently rehabilitated.

*Discussion:* We thank the commenters for their support of the changes to prohibit interest capitalization following loan rehabilitation. In response to the group of commenters who requested confirmation that the changes in §§ 682.202(b)(1), 682.405, and 682.410(b)(4) represent amendments to the current regulations and are to be applied only prospectively, we confirm that this is the intent.

*Changes:* None.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This final regulatory action will have an annual effect on the economy of more than $100 million because regulations would have annual federal budget impacts of approximately $1.9 billion in the low impact scenario to $3.5 billion in the high impact scenario at 3 percent discounting and $1.8 billion and $3.4 billion at 7 percent discounting, additional transfers from affected institutions to student borrowers via reimbursements to the Federal government, and annual quantified costs of $9.8 million related to paperwork burden. Therefore, this final action is "economically significant" and subject to review by OMB under section 3(f)(1) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits, both quantitative and qualitative, of this final regulatory action and have determined that the benefits justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these final regulations only on a reasoned determination that

their benefits justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action. The potential costs associated with this regulatory action are those resulting from statutory requirements and those we have determined as necessary for administering the Department's programs and activities.

In this Regulatory Impact Analysis (RIA) we discuss the need for regulatory action, the comments about the NPRM analysis and significant changes from the NPRM, the potential costs and benefits, net budget impacts, assumptions, limitations, and data sources, as well as regulatory alternatives we considered. Although the majority of the costs related to information collection are discussed within this RIA, elsewhere in this notice under *Paperwork Reduction Act of 1995*, we also identify and further explain burdens specifically associated with information collection requirements.

### 1. Need for Regulatory Action

These final regulations address several topics related to the administration of title IV, HEA student aid programs and benefits and options for borrowers.

As detailed in the NPRM, the Department last revised the borrower defense regulations over two decades ago, and until recently, use of borrower defense has been very limited. The lack of clarity in the current regulations has led to much confusion among borrowers regarding what protections and actions for recourse are available to them when dealing with cases of wrongdoing by their institutions. The Department received comments addressing this lack of clarity during the public comment period.

The need for a clearer and more efficient process was also highlighted when the collapse of Corinthian generated an unprecedented level of borrower defense claims activity. As detailed extensively in the NPRM, Corinthian, a publicly traded for-profit

higher education company that in 2014 enrolled over 70,000 students at more than 100 campuses nationwide, filed for bankruptcy in 2015 after being the subject of multiple investigations and actions by Federal and State governments. The Department committed itself to ensuring that students harmed by Corinthian's misrepresentations receive the relief to which they are entitled, and realized that the existing regulations made this process burdensome, both for borrowers and for the Department. Under the current process, the Department would be required to devote significant resources to reviewing individual State laws to determine which law to apply to each borrower's claim. The Department appointed a Special Master in June of 2015 to create and oversee the process of providing debt relief for these Corinthian students. As of October 2016, approximately 3,787 borrower defense discharges totaling $73.1 million had been completed and another 7,858 closed school discharges totaling approximately $103.1 million have been processed. Moreover, the Department has received thousands more claims—both from former Corinthian students and from students at a number of other institutions—that are pending a full review, and expects to receive more as the Department continues to conduct outreach to potentially affected students.

The Department remains committed to ensuring that borrowers with a valid defense to repayment are able to benefit from this option. Research has shown that large sums of student debt can reduce levels of participation in the economy, especially if borrowers are unable to obtain adequate income to repay their debts.[96] If the borrower is harmed such as by being provided with educational credentials worth significantly less than an institution's misrepresentation has led him or her to believe, the borrower may be entitled to some relief from the loans associated with such education. The changes to the borrower defense provisions in these final regulations will update the process and standard for determining relief and allow the Department to effectively address claims that arise in the modern postsecondary educational system.

The landscape of higher education has changed significantly over the past 20 years, including a substantial

increase in the number of students enrolled in distance education. Because distance education allows students to enroll in courses and programs based in other States and jurisdictions, it has created additional challenges as it relates to the Department's current borrower defense regulations.

The current regulations require an analysis of State law to determine the validity of a borrower defense claim. This approach creates complexities in determining which State law applies and may give rise to potential inequities, as students in one State may receive different relief than students in another State, despite common underlying facts and claims.

The expansion of distance education has also impacted the Department's ability to apply its borrower defense regulations. The current borrower defense regulations do not identify which State's law is considered the "applicable" State law on which the borrower's claim can be based.[97] Generally, the regulation was assumed to refer to the laws of the State in which the institution was located; we did not have much occasion to address differences in protection for borrowers in States that offer little protection from school misconduct or borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States have extended their rules to protect these students, while others have not.

The final regulations give students access to consistent, clear, fair, and transparent processes to seek debt relief. The new Federal standard will allow a borrower to assert a borrower defense on the basis of a substantial misrepresentation, a breach of contract, or a favorable, nondefault contested judgment against the school for its act or omission relating to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. Additionally, the final regulations separately address predispute arbitration clauses, another possible obstacle to borrowers pursuing a borrower defense claim. These final regulations also prohibit a school participating in the Direct Loan Program from obtaining, through the use of contractual provisions or other agreements, a predispute agreement for arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's

---

[96] The Economics of Student Loan Borrowing and Repayment, Wen Li, Federal Reserve Bank of Philadelphia, available at *https:// philadelphiafed.org/-/media/research-and-data/ publications/business-review/2013/q3/brq313_ economics-of-student-loan-borrowing-and-repayment.pdf.*

[97] In the few instances prior to 2015 in which claims have been recognized under current regulations, borrowers and the school were typically located in the same State.

regulations. The final regulations also prohibit a school participating in the Direct Loan Program from obtaining an agreement, either in an arbitration agreement or in another form, that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims and from requiring students to engage in internal dispute processes before contacting accrediting or government agencies with authority over the school regarding such claims. In addition, the final regulations establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

Additionally, to enhance and clarify other existing protections for students, these regulations update the basis for obtaining a false certification discharge, clarify the processes for false certification and closed school discharges, require institutions to provide applications and explain the benefits and consequences of a closed school discharge, and establish a process for a closed school discharge without an application for students who do not re-enroll in a title IV-participating institution within three years of an institution's closure. These regulations also codify the Department's practice that a discharge based on school closure, false certification, unpaid refund, or defense to repayment will result in the elimination or recalculation of the subsidized usage period associated with the loan discharged.

These regulations also amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; clarify rules regulating the capitalization of interest on defaulted FFEL Loans; require that proprietary schools at which the median borrower has not repaid in full, or paid down the balance of, the borrower's loans include a warning in advertising and promotional materials about those repayment rate outcomes; require that a school disclose on its Web site and to prospective and enrolled students about events for which it is required to provide financial protection to the Department; clarify the treatment of spousal income in the PAYE and REPAYE plans; and make other changes that we do not expect to have a significant economic impact.

## 2. Summary of Comments and Changes From the NPRM

A number of commenters expressed that the RIA in the NPRM was inadequate and did not support proceeding with the regulations without further study. Commenters noted that the accuracy of several of the Department's past budget estimates had been questioned by Congressional committees and other outside reviewers. Several commenters pointed out that the wide range in the estimate, from $646 million up to $41.3 billion over the 2017 to 2026 loan cohorts, indicated that the Department does not know the potential budget impact of the regulation. Other commenters noted that if the impact is at the higher end of the range, the analysis does not quantify benefits greater than the costs to justify the decision to proceed with the regulations.

Another set of comments focused on the impact of the regulations on higher education, the costs to institutions, and the potential for institutional closures. A number of commenters expressed concern that institutional closures related to the regulations, especially the financial responsibility provisions, will reduce access to higher education for low-income and minority students. Materials included with the comments analyzed National Postsecondary Student Aid Study 2012 (NPSAS 2012) data to demonstrate that students at for-profit institutions are, on average, more likely to be older, racial minorities, veterans, part-time, financially independent, responsible for dependents, and Pell Grant recipients. A number of commenters suggested that the costs of providing financial protection would result in increased costs for students and potentially limit access to higher education. Other commenters were concerned with a lack of analysis about the costs of the financial protection or the possibility that schools would be unable to obtain a letter of credit and would lose access to title IV, HEA funding and be forced to close. Several commenters suggested that the regulations would open the floodgates to frivolous claims that would overwhelm the Department and institutions, exacerbating the harmful effects on higher education.

One commenter argued that the proposed regulations would result in a large number of disappointed borrowers filing borrower defense claims without merit. Several commenters were concerned that the projected net budget impact referred to in the NPRM of as much as $42.698 billion during the coming decade would undermine the integrity of the Direct Loan Program and that neither American taxpayers, nor schools that have successfully educated students, could cover these costs if thousands of students or graduates start requesting discharges of their loans. The commenters argued that the regulations lack any quality control measure to ensure that the Department would not be hit with an influx of fraudulent claims. They cited a recent lawsuit in which a former law student unsuccessfully sued her law school for false advertising.

Finally, a number of commenters suggested the high cost estimate was overstated because schools would change their practices and limit behavior that would result in valid borrower defense claims. Another commenter questioned the characterization of the net budget impact as a cost based on the idea that the Department should not collect on loans established fraudulently. Several commenters noted that the potential fiscal impact should not factor into decisions about whether borrowers are eligible for relief.

We appreciate the comments about the RIA in the NPRM. As discussed in the NPRM, given the limited history of borrower defense claims and the limitations of available data, there is uncertainty about the potential impact of the regulations. Per OMB Circular A–4, in some cases, uncertainty may be addressed by presenting discrete alternative scenarios without addressing the likelihood of each scenario quantitatively. The uncertainty about borrower defense was acknowledged and reflected in the wide range of scenario estimates in the NPRM. The Department presented the range of scenarios and discussion of sources of uncertainty in the estimates in order to be transparent and encourage comments that might aid the Department in refining the estimates for the final regulations.

We do not agree that the analysis was inadequate to support proceeding with the regulations. Under Executive Orders 12866 and 13563, the Department must adopt a regulation only upon a reasoned determination that its benefits justify its cost. The Executive Orders recognize that some benefits and costs are difficult to quantify, and provide that costs and benefits include both quantifiable measures—to the fullest extent that they can be usefully estimated—as well as qualitative measures of costs and benefits that are difficult to quantify but "essential to consider." OMB Circular A–4 provides that in cases where benefit and cost estimates are uncertain, benefit and cost estimates that reflect the full

probability distribution of potential consequences should be reported. Where possible, the analysis should present probability distributions of benefits and costs and include the upper and lower bound estimates as complements to central tendency and other estimates. If a lack of knowledge prevents construction of a scientifically defensible probability distribution, the Department should describe benefits or costs under plausible scenarios and characterize the evidence and assumptions underlying each alternative scenario. The Department took this approach in the NPRM and presents the analysis with relevant revisions for the final regulations.

OMB Circular A–4 suggests that in some instances when uncertainty has significant effects on the final conclusion about net benefits, the agency should consider additional research prior to rulemaking. For example, when the uncertainty is due to a lack of data, the agency might consider deferring rulemaking, pending further study to obtain sufficient data. Delaying a decision will also have costs, as will further efforts at data gathering and analysis. The Department has weighed the benefits of delay against these costs in making the decision to proceed with the regulation. With respect to borrower defense, if the Department did not proceed with the final regulations, the existing borrower defense provisions would remain in effect and some of the costs associated with potential claims would be incurred whether or not the final regulations go into effect. The final regulations build in more clarity and add accountability and transparency provisions that are designed to shift risk from the taxpayers to institutions. Moreover, if the Department were to delay implementation of the final regulations to obtain further information about the scope of institutional behavior that could give rise to claims, it is not clear when a significant amount of relevant data would become available. Borrower responses in absence of the process established in the final regulations do not necessarily reflect the level of claims that will be processed under the final regulations. Delaying the regulations would delay the improved clarity and accountability from the regulations without developing additional data within a definite timeframe, and we do not believe the benefits of such a delay outweigh the costs. As with any regulation, additional data that becomes available will be taken into account in the ongoing re-estimates of the title IV, HEA aid programs.

We have considered the other comments received. Revisions to the analysis in response to those comments and our internal review of the analysis are incorporated into the *Discussion of Costs, Benefits, and Transfers* and *Net Budget Impacts* sections of this RIA as applicable. Table 1 summarizes significant changes made from the NPRM in response to comments and the Department's ongoing development of the final regulations.

### TABLE 1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Reg section | Description of change |
| --- | --- |
| **Financial Responsibility Triggers:** | |
| § 668.171(c)(1) .............................. | As detailed in Table 2, eliminates the $750,000 or 10 percent of current assets materiality threshold. Instead, losses from all of the automatic triggers except 90/10, cohort default rate (CDR), SEC delisting, and SEC warning, are used to recalculate the composite score. If the recalculated score is less than 1.0, the school is not financially responsible and must provide financial protection. |
| | Removes Form 8–K trigger from proposed § 668.171(c)(10)(vii). |
| § 668.171(h) ................................... | Eliminates discretionary trigger based on bond or credit ratings from proposed § 668.171(c)(10)(iv). |
| | Reclassifies proposed automatic triggers including those related to accreditor probation and show-cause actions, pending borrower defense claims, and violations of loan agreements as discretionary triggers. |
| | Specifies that in its notice reporting a triggering event, an institution may demonstrate mitigating factors about the event, including that the reported action or event no longer exists or has been resolved or the institution has insurance that will cover part or all of the debts and liabilities that arise at any time from that action or event. |
| **Financial Protection Disclosures:** | |
| § 668.41(i) ...................................... | Revised to clarify that the Secretary will conduct consumer testing prior to establishing the actions and triggering events that require financial disclosures. |
| | Further clarifies the requirements for testing with consumers before publishing the content of the disclosure, as well as the disclosure delivery requirements to prospective and enrolled students. |
| **Financial Responsibility:** | |
| § 668.175(f)(5) ............................... | Clarifies how long an institution must maintain the financial protection associated with a triggering event in § 668.171. |
| § 668.175(f)(2)(i) ............................ | Provides that the Secretary may identify other acceptable forms of financial protection. |
| § 668.175(h) ................................... | Provides that the Secretary will release any funds held under a set-aside if the institution subsequently provides cash, the letter of credit, or other financial protection required under the zone or provisional certification alternatives in § 668.175(d) or (f). |
| **Repayment Rate:** | |
| § 668.41(h)(3) ................................. | Clarifies that the Secretary will calculate a repayment rate based on the proportion of students who have repaid at least one dollar in outstanding balance, measured in the third year after entering repayment, using data reported and validated through the Gainful Employment program-level repayment rate calculation. |
| | Removes the requirement that repayment rate warnings be delivered individually to all prospective and enrolled students. Enhances the requirement as to how repayment rate warnings must be presented in advertising and promotional materials. |

TABLE 1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS—Continued

| Reg section | Description of change |
|---|---|
| **Closed School Discharge:** | |
| § 682.402(d)(7)(ii) ............................ | Requires a lender to provide a borrower another closed school discharge application upon resuming collection. |
| §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2). | Revised to clearly delineate the circumstances under which a closed school discharge is discretionary, as opposed to required. |
| § 682.402(d)(6)(ii)(F) ...................... | Revised to stipulate that a guaranty agency that denies a borrower's closed school discharge request must notify the borrower of the reasons for the denial. |
| § 682.402(d) ................................... | Updates wording in FFEL closed school discharge regulations to refer to application instead of sworn statement or written request. |
| **False Certification Discharge:** | |
| § 685.215(c)(1) ............................... | Clarifies that a borrower must have reported to the school that the borrower did not have a high school diploma or its equivalent. |
| § 685.308(a) ................................... | Clarifies that the Department assesses liabilities to schools for false certification due to disqualifying condition or identity theft. |
| **Predispute Agreements** | |
| § 685.300 ....................................... | Eliminates the use of predispute arbitration agreements, whether or not they are mandatory, to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense or to prevent a student who has obtained or benefited from a Direct Loan from participating in a class action suit related to borrower defense claim. |

3. Discussion of Costs, Benefits, and Transfers

In developing the final regulations, the Department made some changes to address concerns expressed by commenters and to achieve the objectives of the regulations while acknowledging the potential costs of the provisions to institutions and taxpayers. As noted in the NPRM, the primary potential benefits of these regulations are: (1) An updated and clarified process and a Federal standard to improve the borrower defense process and usage of the borrower defense process to increase protections for students; (2) increased financial protections for taxpayers and the Federal government; (3) additional information to help students, prospective students, and their families make educated decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs. Costs associated with the regulations will fall on a number of affected entities including institutions, guaranty agencies, the Federal government, and taxpayers. These costs include changes to business practices, review of marketing materials,

additional employee training, and unreimbursed claims covered by taxpayers. The largest quantified impact of the regulations is the transfer of funds from the Federal government to borrowers who succeed in a borrower defense claim, a significant share of which will be offset by the recovery of funds from institutions whose conduct gave rise to the claims.

We have considered and determined the primary costs and benefits of these regulations for the following groups or entities that we expect to be impacted by the proposed regulations:
• Students and borrowers
• Institutions
• Guaranty agencies and loan servicers
• Federal, State, and local government

*Borrower Defense, Closed School Discharges, and False Certification Discharges*

*Students and Borrowers*

The fundamental underlying right of borrowers to assert a defense to repayment and obligation of institutions to reimburse the Federal government for such claims that are valid exist under the current borrower defense regulations. These final regulations aim to establish processes that enable more borrowers to pursue valid claims and increase their likelihood of discharging their loans as a result of institutional actions generating such claims. As detailed in the NPRM, borrowers will be the primary beneficiaries of these regulations as greater awareness of

borrower defense, a common Federal standard, and a better defined process may encourage borrowers who may have been unaware of the process, or intimidated by its complexity in the past, to file claims.

Furthermore, these changes could reduce the number of borrowers who are struggling to meet their student loan obligations. During the public comment periods of the negotiated rulemaking sessions, many public commenters who were borrowers mentioned that they felt that they had been defrauded by their institutions of higher education and were unable to pay their student loans, understand the borrower defense process, or obtain debt relief for their FFEL Loans under the current regulations. We received many comments on the NPRM echoing this sentiment.

Through the financial responsibility provisions, these final regulations introduce far stronger incentives for schools to avoid committing acts or making omissions that could lead to a valid borrower defense claim than currently exist. In addition, through clarification of circumstances that could lead to a valid claim, institutions may better avoid behavior that could result in a valid claim and future borrowers may be less likely to face such behavior.

Providing an automatic forbearance with an option for the borrower to decline the temporary relief and continue making payments will reduce the potential burden on borrowers pursuing borrower defenses. These borrowers will be able to focus on

supplying the information needed to process their borrower defense claims without the pressure of continuing to make payments on loans for which they are currently seeking relief. When claims are successful, there will be a transfer between the Federal government and affected student borrowers as balances are forgiven and some past payments are returned. In the scenarios described in the Net Budget Impacts section of this analysis, those transfers range from $1.7 billion for the minimum budget estimate to $3.3 billion in the maximum impact estimate annually, with the primary budget estimate at $2.5 billion annually.

Borrowers who ultimately have their loans discharged will be relieved of debts they may not have been able to repay, and that debt relief can ultimately allow them to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for other expenses. Recent literature related to student loans suggests that high levels of student debt may decrease the long-term probability of marriage,[98] increase the probability of bankruptcy,[99] reduce home ownership rates,[100] and increase credit constraints, especially for students who drop out.[101] Further, when borrowers default on their loans, everyday activities like signing up for utilities, obtaining insurance, or renting an apartment can become a challenge.[102] Borrowers who default might also be denied a job due to poor credit, struggle to pay fees necessary to maintain professional licenses, or be unable open a new checking account.[103] While difficult to quantify because of the multitude of different potential borrowing profiles and nature of the claims of those who will seek relief through borrower defense and the possibility of partial relief, the discharge of loans for which borrowers have valid borrower defenses could have significant positive consequences for affected borrowers and associated spillover economic benefits.

Affected borrowers also will be able to return into the higher education marketplace and pursue credentials they need for career advancement. To the extent borrowers have subsidized loans, the elimination or recalculation of the borrowers' subsidized usage period could relieve them of their responsibility for accrued interest and make them eligible for additional subsidized loans, which could make returning to higher education a more acceptable option.

These regulations will also give borrowers more information with which they can make informed decisions about the institutions they choose to attend. An institution will be required to provide a disclosure for certain actions and triggering events, to be determined through consumer testing, for which it was required to obtain a letter of credit. Recent events involving closure of several large proprietary institutions have shown the need for lawmakers, regulatory bodies, State authorizers, taxpayers, and students to be more broadly aware of circumstances that could affect the continued existence of an institution. This disclosure, the content of which will be prescribed by the Secretary in a notice published in the **Federal Register**, will allow borrowers to receive early warning signs about an institution's risk for students, and therefore borrowers may be able to select a different college, or withdraw or transfer to an institution in better standing in lieu of continuing to work towards earning credentials that may have limited value.

Proprietary institutions will also be required to provide a warning through advertising and promotional materials if their loan repayment rate, based on the proportion of students who have repaid at least one dollar in outstanding balance and measured in the third year after entering repayment, using data reported and validated through the Gainful Employment repayment rate calculation, shows that the median borrower has not paid down his balance by at least one dollar. To estimate the effect of the repayment rate warning on institutions, the Department analyzed program-level repayment rate data prepared for the Gainful Employment regulation [104] and aggregated the proprietary institutions data to the 6-

digit OPEID level and found that 972 of 1,345 institutions in the 2012 Gainful Employment data had a repayment rate that showed the median borrower had not paid down the balance of the borrower's loans by at least one dollar.

A number of commenters pointed to the Department's failure to quantify the benefits of the proposed regulations in the NPRM as an indication that the analysis did not support the implementation of the final regulations. As mentioned throughout the RIA, the extent of the private and public benefit from the regulations is difficult to quantify. We have limited experience with borrower defense claims to draw upon in generating a profile of those likely to make successful claims. There are different potential profiles of student loan borrowers in terms of loan amounts, loan type composition, likelihood of default, fields of employment, degree level, and other factors. We do not have a basis in the data from existing claims to know how borrower profiles and the distribution and nature of claims will intersect. The economic and psychological benefits of debt relief may vary for a graduate student with high income potential receiving partial relief on a high level of debt and a student who dropped out of a certificate program with a lower level of debt and lower earnings potential from that program of education. While we do not quantify the amount, we expect the benefits associated with the substantial transfers to students from successful borrower defense claims will be significant. Several commenters noted that students may face costs or other negative impacts from these final regulations. In particular, commenters expressed concern that the closure of institutions, especially proprietary institutions that serve many low-income, minority, first-generation, and non-traditional students, will hurt access to higher education, especially for those groups. The Department acknowledges that some institutions may close if their actions mean that they are required to provide a substantial amount of financial protection, or that a large number of successful claims are made against them. However, as the regulation comes into effect and examples of conduct that generates claims are better understood, we expect institutions will limit such behavior and compete for students without such conduct, and that closures will be reduced over time. The Department also believes that institutions that do not face significant claims will be able to provide opportunities for students in

[98] Gicheva, D. "In Debt and Alone? Examining the Causal Link between Student Loans and Marriage." Working Paper (2013).

[99] Gicheva, D., and U. N. C. Greensboro. "The Effects of Student Loans on Long-Term Household Financial Stability." Working Paper (2014).

[100] Shand, J. M. (2007). "The Impact of Early-Life Debt on the Homeownership Rates of Young Households: An Empirical Investigation." Federal Deposit Insurance Corporation Center for Financial Research.

[101] Id.

[102] https://studentaid.ed.gov/repay-loans/default.

[103] www.asa.org/in-default/consequences/.

[104] A privacy-protected version of the data is available at http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/2013-repayment-rate-data.xls. The Department aggregated all program numerators and denominators to each unique six-digit OPEID and calculated how many institutions had aggregate rates under the negative amortization threshold and at least 10 borrowers in the denominator. Note that these data reflect students who entered repayment in 2007 and 2008; analysis of later cohorts (those who entered repayment in 2011 and 2012) published through the College Scorecard, which calculate a similar repayment rate, showed 501 institutions with repayment rates below the negative amortization threshold.

the event of closures of other institutions that do.

Another possible impact on students mentioned by some commenters is that the costs of financial protection or other compliance measures will be passed on to students in tuition and fee increases. We believe potential tuition increases will be constrained by loan limits and other initiatives, such as the Department's Gainful Employment regulations, where institutions would be negatively affected by such increases.

*Institutions*

Institutions will bear many of this regulation's costs, which fall into three categories: Paperwork costs associated with compliance with the regulations; other compliance costs that may be incurred as institutions adapt their business practices and training to ensure compliance with the regulations; and costs associated with obtaining letters of credit or suitable equivalents if required by the institution's performance under a variety of triggers. Additionally, there may be a potentially significant amount of funds transferred between institutions and the Federal government as reimbursement for successful claims. Some institutions may close some or all of their programs if their activities generate large numbers of borrower defense claims.

A key consideration in evaluating the effect on institutions is the distribution of the impact. While all institutions participating in title IV loan programs are subject to the possibility of borrower defense, closed school, and false certification claims and the reporting requirements in these final regulations, the Department expects that fewer institutions will engage in conduct that generates borrower defense claims. Over time, the Department expects the number of schools that would face the most significant costs to come into compliance, the amount of transfers to reimburse the government for successful claims, costs to obtain required letters of credit, and disclosure of borrower defense claims against the schools to be reduced as some offenders are eliminated and other institutions adjust their practices. In the primary budget scenario described in the Net Budget Impacts section of this analysis, the annual transfers from institutions to students, via the Federal government, as reimbursement for successful claims are estimated at $994 million. On the other hand, it is possible that high-quality, compliant institutions, especially in the for-profit sector, will see benefits if the overall reputation of the sector improves as a result of (1) more trust that enforcement against bad actors will be effective, and (2) the removal of bad schools from the higher education marketplace, freeing up market share for the remaining schools.

The accountability framework in the regulations requiring institutions to provide financial protection in response to various triggers would generate costs for institutions. Some of the triggering provisions would affect institutions differently depending upon their type and control, as, for example, only publicly traded institutions are subject to delisting or SEC suspension of trading, only proprietary institutions are subject to the 90/10 rule, and public institutions are not subject to the financial protection requirements. To the extent data were available, we evaluated the financial protection triggers to analyze the expected impact on institutions. Several of the triggers are based on existing performance measures and are aimed at identifying institutions that may face sanctions and experience difficulty meeting their financial obligations. The triggers and, where available, data about their potential impact are discussed in Table 2. The consequences of an institution being found to be not financially responsible are set out in § 668.175 and include providing financial protection through a letter of credit, a set-aside of title IV, HEA funds, or other forms of financial protection specified by the Secretary in a notice published in the **Federal Register**. Alternatively, an institution that can prove it has insurance that covers the triggering risk is not considered to be not financially responsible and does not need to provide financial protection to the Department.

The Department will review the triggering events before determining whether to require separate financial protection for a triggering event that occurs with other triggering events. Another change from the NPRM concerns those triggers that include a materiality threshold. Instead of being evaluated separately, lawsuits, borrower protection repayments to the Secretary, losses from gainful employment and campus closures, withdrawal of owner's equity, and other triggers with a materiality threshold will be evaluated by their effect on the institution's most recent composite score, which will allow the cumulative effect of violation of multiple triggers to be taken into account. If the recalculated composite score is a failing score, institutions would be required to provide financial protection. For the triggers evaluated through the revised composite score approach, the required financial protection is 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program received by the institution during its most recently completed fiscal year. For the other triggers, the amount of financial protection required remains 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program received by the institution during its most recently completed fiscal year, unless the Department determines that based on the facts of that particular case, the potential losses are greater.

TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS

| Description | Impact |
|---|---|
| **Automatic Triggers Evaluated through Revised Composite Score Calculation** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the addition of the triggering liability to the institution's most recently calculated composite score causes it to fail the composite score. Triggering liabilities that occur during the period between the fiscal year for which the Secretary last calculated the institution's composite score under § 668.172 and the next following fiscal year for which the Secretary calculates a composite score are evaluated. Requires financial protection of no less than 10 percent of prior year's title IV, HEA aid and such additional amount as the Secretary demonstrates is needed to protect from other losses that may arise within the next 18 months. | |

## TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS—Continued

| Description | Impact |
|---|---|
| **Lawsuits and Other Actions: § 668.171(c)(1)(i) and (ii)** | |
| Triggered if an institution is required to pay any debt or incur any liability arising from a final judgment in a judicial proceeding, or from an administrative proceeding or determination, or from a settlement. Triggered if the institution is being sued in an action brought on or after July 1, 2017 by a Federal or State authority for financial relief on claims related to the making of the Direct Loan for enrollment at the school or the provision of educational services and the suit has been pending for 120 days. Triggered if the institution is being sued in a lawsuit other than by a Federal or State authority related to the making of a Direct Loan or provision of educational services which has survived a motion for summary judgment or the time for such motion has passed. If claims do not state a dollar amount and no amount has been set in a court ruling: (1) For Federal and State borrower defense-related action, the Department will calculate loss by considering claim to seek the amount set by a court ruling, or if no ruling has been issued, in a written demand or settlement offer by the agency, or the amount of all tuition and fees for the period in the suit, for the program or location described in the allegations. Institution allowed to show suit is limited to a smaller portion of the school and that tuition and fees for that portion should be used; and (2) For all other suits the potential loss (if none is stated in the complaint or in a court ruling) is the amount in a written demand pre-suit, the amount offered by the plaintiff to settle, or the amount stated in discovery leading up to a trial. | Since 2010, at least 25 institutions have been investigated or reached settlements with State AGs, with some being involved in actions by multiple States. Federal agencies, including the Department, DOJ, FTC, CFPB, and the SEC have been involved in actions against at least 20 institutions, with multiple actions against some schools. |
| **Accreditor Actions: (Teach-Outs) § 668.171(c)(1)(iii)** | |
| Triggered if institution required by its accrediting agency to submit a teach-out plan that covers the closing of the institution or any of its branches or additional locations. The amount of title IV, HEA aid allocated in the previous year to the closed locations will be used to recalculate the composite score. | |
| **Gainful Employment: § 668.171(c)(1)(iv)** | |
| Triggered if the potential loss from the closure of programs that are one year away from losing their eligibility for title IV, HEA program funds causes the recalculated composite score to fall below 1.0. The amount of title IV, HEA aid allocated in the previous year to programs that could lose eligibility in the next year will be used to recalculate the composite score. | |
| **Withdrawal of Owner's Equity: § 668.171(c)(1)(v)** | |
| The amount of equity withdrawn will be used to recalculate the composite score. Applies only to proprietary institutions and provides that funds transferred between institutions in a group that have a common composite score are not considered withdrawals of owner's equity. | |
| **Automatic Triggers Not Evaluated through Revised Composite Score Calculation** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the triggering events occur. | |
| **Non-Title IV Revenue: § 668.171(d)** | |
| If an institution fails the 90/10 revenue test in its most recently completed fiscal year. Applies to proprietary institutions only. | In the most recent 90/10 report, 14 institutions received 90 percent or more of their revenues from title IV, HEA funds. The total title IV, HEA funding for those institutions in award year (AY) 2013–14 was $56.4 million. |
| **Publicly Traded Institutions—SEC or Exchange Actions: § 668.171(e)** | |
| The SEC warns the institution that it may suspend trading on the institution's stock. The institution failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25. | |

TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS—Continued

| Description | Impact |
|---|---|
| The exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements, or its stock is delisted. | |
| **Cohort Default Rates: § 668.171(f)** | |
| Triggered if institution's two most recent official cohort default rates are 30 percent or above after any challenges or appeals. | From the most recently released official CDR rates, for FY2013 and FY2012, 20 of 3,058 non-public institutions that had CDR rates in both years were over 30 percent in both years. Title IV, HEA aid received by these institutions in AY2015–16 totaled $12.8 million. |
| **Discretionary Triggers** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution. | |
| § 668.171(g)(1): Significant fluctuations in title IV, HEA program funds .. | The Department looked at fluctuations in Direct Loan amounts and found that 1,113 of 3,534 non-public institutions had an absolute change in Direct Loan volume of 25 percent or more between the 2014–15 and 2015–16 award years and 350 had a change of 50 percent or more. |
| § 668.171(g)(2): Citation for failing State licensing or authorizing agency requirements. | |
| § 668.171(g)(3): Failing financial stress test developed or adopted by the Secretary. | |
| § 668.171(g)(4): High annual dropout rates, as calculated by the Secretary. | The Department analyzed College Scorecard data to develop a withdrawal rate within six years. Of 928 proprietary institutions with data, 482 had rates from 0 to 20 percent, 415 from 20 to 40 percent, 30 from 40 to 60 percent, and 1 from 60 to 80 percent. Of 1,058 private not-for-profit institutions with data, 679 had rates from 0 to 20 percent, 328 from 20 to 40 percent, 51 from 40 to 60 percent, and none above 60 percent. Of 1,476 public institutions with data, 857 had rates from 0 to 20 percent, 587 from 20 to 40 percent, 32 from 40 to 60 percent, and none above 60 percent. |
| § 668.171(g)(5): The institution was placed on probation or issued a show-cause order or a status that poses equivalent or greater risk to accreditation. | In the March 2015 accreditation report available at *http://ope.ed.gov/accreditation/GetDownLoadFile.aspx*, 278 of 33,956 programs were on probation and 5 were in the resigned under show cause status. Of the 283 programs in those statuses in the March 2015 accreditation report, 9 were closed by institutions or had their accreditation terminated and 147 remained in the same status for at least 6 consecutive months. |
| § 668.171(g)(6): Institution violates a provision or requirement in a loan agreement that enables a creditor to require an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees. | |
| § 668.171(g)(7): The institution has pending claims borrower relief discharge under § 685.206 or § 685.222. | |
| § 668.171(g)(8): The Secretary expects to receive a significant number of claims for borrower relief discharge under § 685.206 or § 685.222 as a result of a lawsuit, settlement, judgement, or finding from a State or Federal administrative proceeding. | |

In addition to any resources institutions would devote to training or changes in business practices to improve compliance with the final regulations, institutions would incur costs associated with the reporting and disclosure requirements of the final regulations. This additional workload is discussed in more detail under *Paperwork Reduction Act of 1995*. In total, the final regulations are estimated to increase burden on institutions participating in the title IV, HEA programs by 251,049 hours. The monetized cost of this burden on institutions, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf*, is $9,175,841. This cost was based on an hourly rate of $36.55.

*Guaranty Agencies and Loan Servicers*

Several provisions may impose a cost on guaranty agencies or lenders, particularly the limits on interest capitalization. Loan servicers may have to update their process to accept electronic death certificates, but increased use of electronic documents should be more efficient over the long term. As indicated in the Paperwork Reduction Act of 1995 section of this preamble, the final regulations are estimated to increase burden on guaranty agencies and loan servicers by 7,622 hours related to the mandatory forbearance for FFEL borrowers considering consolidation for a borrower defense claim and reviews of denied closed school claims. The monetized cost of this burden on guaranty agencies and loan servicers, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/*

*sp/ecsuphst.pdf*, is $278,584. This cost was based on an hourly rate of $36.55.

*Federal, State, and Local Governments*

In addition to the costs detailed in the *Net Budget Impacts* section of this analysis, the final regulations will affect the Federal government's administration of the title IV, HEA programs. The borrower defense process in the final regulations will provide a framework for handling claims in the event of significant institutional wrongdoing. The Department may incur some administrative costs or shifting of resources from other activities if the number of applications increases significantly and a large number of claims require hearings. Additionally, to the extent borrower defense claims are not reimbursed by institutions, Federal government resources that could have been used for other purposes will be transferred to affected borrowers. Taxpayers will bear the burden of these unreimbursed claims. In the scenarios presented in the *Net Budget Impacts* section of this analysis, annualized unreimbursed claims range from $923 million to $2.1 billion.

The accountability framework and financial protection triggers will provide some protection for taxpayers as well as potential direction for the Department and other Federal and State investigatory agencies to focus their enforcement efforts. The financial protection triggers may potentially assist the Department as it seeks to identify, and take action regarding, material actions and events that are likely to have an adverse impact on the financial condition or operations of an institution. In addition to the current process where, for the most part, the Department determines annually whether an institution is financially responsible based on its audited financial statements, under these final regulations the Department may determine at the time a material action or event occurs that the institution is not financially responsible.

*Other Provisions*

The technical corrections and additional changes in the final regulations will benefit student borrowers and the Federal government's administration of the title IV, HEA programs. Updates to the acceptable forms of certification for a death discharge will be more convenient for borrowers' families or estates and the Department. The provision for consolidation of Nurse Faculty Loans reflects current practice and gives those borrowers a way to combine the servicing of all their loans. Many of these technical corrections and changes involve relationships between the student borrowers and the Federal government, such as the clarification in the REPAYE treatment of spousal income and debt, and they are not expected to significantly impact institutions.

4. Net Budget Impacts

The final regulations are estimated to have a net budget impact in costs over the 2017–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a $381 million modification to cohorts 2014–2016 for the 3-year automatic closed school discharge. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans.

As noted by many commenters, in the NPRM we presented a number of scenarios that generated a wide range of potential budget impacts from $1.997 billion in the lowest impact scenario to $42.698 billion in the highest impact scenario. As described in the NPRM, this range reflected the uncertainty related to the borrower defense provisions in the regulations and our intent to be transparent about the estimates to generate discussion and information that could help to refine the estimates. In response to comments and our own internal review, we have made a number of revisions to the borrower defense budget impact estimate that are described in the discussion of the impact of those provisions.

The provisions with the greatest impact on the net budget impact of the regulations are those related to the discharge of borrowers' loans, especially the changes to borrower defense and closed school discharges. As noted in the NPRM, borrowers may pursue closed school, false certification, or borrower defense discharges depending on the circumstances of the institution's conduct and the borrower's claim. If the institution does not close, the borrower cannot or does not pursue closed school or false certification discharges, or the Secretary determines the borrower's claim is better suited to a borrower defense group process, the borrower may pursue a borrower defense claim. The precise split among the types of claims will depend on the borrower's eligibility and ease of pursuing the different claims. While we recognize that some claims may be fluid in classification between borrower defense and the other discharges, in this analysis any estimated effect from borrower defense related claims are described in that estimate, and the net budget impact in the closed school estimate focuses on the process changes and disclosures related to that discharge.

Borrower Defense Discharges

As the Department will eventually have to incorporate the borrower defense provisions of these final regulations into its ongoing budget estimates, we have moved closer to that goal in refining the estimated impact of the regulations to reflect a primary scenario. The uncertainty inherent in the borrower defense estimate given the limited history of borrower defense claims and other factors described in the NPRM is reflected in the additional sensitivity runs that demonstrate the effect of changes in the specific assumption being tested. Another change from the NPRM is the specification of an estimated baseline scenario for the impact of borrower defense claims if these final regulations did not go into effect and borrowers had to pursue claims under the existing borrower defense regulation. Similar to the NPRM, the estimated net budget impact of $14.9 billion attributes all borrower defense activity for the 2017 to 2026 cohorts to these final regulations, but with the baseline scenario, we present an estimate of the subset of those costs that could be incurred under the existing borrower defense regulation.

These final regulations establish a Federal standard for borrower defense claims related to loans first disbursed on or after July 1, 2017, as well as describe the process for the assertion and resolution of all borrower defense claims—both those made for Direct Loans first disbursed prior to July 1, 2017, and for those made under the regulations after that date. As indicated in this preamble, while regulations governing borrower defense claims have existed since 1995, those regulations have rarely been used. Therefore, we have used the limited data available on borrower defense claims, especially information about the results of the collapse of Corinthian, projected loan volumes, Departmental expertise, the discussions at negotiated rulemaking, comments on the NPRM analysis, and information about past investigations into the type of institutional acts or omissions that would give rise to borrower defense claims to refine the primary estimate and sensitivity scenarios that we believe will capture the range of net budget impacts

associated with the borrower defense regulations.

While we have refined the assumptions used to estimate the impact of the borrower defense provisions, the ultimate method of estimating the impact remains entering a level of net borrower defense claims into the student loan model (SLM) by risk group, loan type, and cohort. The net present value of the reduced stream of cash flows compared to what the Department would have expected from a particular cohort, risk group, and loan type generates the expected cost of the regulations. Similar to the NPRM, we applied an assumed level of school misconduct, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Tables 3–A and 3–B) to the President's Budget 2017 (PB2017) loan volume estimates to generate the estimated net borrower defense claims for each cohort, loan type, and sector.

The limited history of borrower defense claims and other factors that lead the Department to the range of scenarios described in the NPRM are still in effect. These factors include the level of school misconduct that could give rise to claims and institutions' reaction to the regulation to cut back on such activities, borrowers' response to the regulations including the consolidation of FFEL and Perkins borrowers to access the Direct Loan borrower defense process, the level of group versus individual claims, and the extent of full or partial relief applied to claims. Additionally, other regulatory and enforcement initiatives such as the Gainful Employment regulations, creation of the Student Aid Enforcement Unit, and greater rigor in the Department's review of accrediting agencies may have overlapping effects and may affect loan volumes and potential exposure to borrower defense claims at some institutions. To demonstrate the effect of the uncertainty about these factors, we estimated several scenarios to test the sensitivity of the various assumptions.

In refining our approach and estimating a primary scenario with several sensitivity runs, we also changed the assumptions from the NPRM in response to comments and our own review. The development of the estimated baseline scenario described in Table 3–B is one of the changes. Another major change is the incorporation of a deterrent effect of the borrower defense provisions on institutional behavior. In the NPRM, there was no change across cohorts in

the level of school misconduct giving rise to claims. Upon review, we believe it is more likely that the borrower defense provision will have an impact like that of other title IV policies such as the cohort default rate or 90/10 in that institutions will make efforts to comply as the rule comes into effect and the precedents for what constitutes behavior resulting in successful claims are developed. In the past, when provisions targeting specific institutional activities or performance have been introduced, there has generally been a period of several years while the worst performers are removed from the system and while other institutions adapt to the new requirements and a lower steady state is established. We expect a similar pattern to develop with respect to borrower defense, as reflected in the Conduct Percent in Table 3–A. Another change reflected by the Conduct Percent is an increase in maximum level of claims from public and private non-profit institutions to 3 percent. Many commenters expressed concern about the effect of the regulations on these sectors or questions about the type of misconduct leading to claims that exist in those sectors. A number of commenters pointed to graduate programs, especially law programs, as a potential source of claims. Graduate students took out approximately 36 percent of all Direct Loans in 2015–16.[105] Given the history of court decisions related to law school debt, the presumed greater sophistication of graduate borrowers, and the possibility of partial relief due to the value of the education received, we still do not expect many successful claims to come from these sectors but did increase the level to account for the possibility. The other major change is the introduction of a ramp-up in the Borrower Percent and the Recovery Percent to reflect an increase in borrower awareness and the effectiveness of the financial responsibility protections over time.

There are a number of other potential mitigating factors that we did not explicitly adjust for in our estimates in order to avoid underestimating the potential cost of the borrower defense provisions. Several commenters expressed concern about the effect of the regulations on access to higher education, especially for low-income, minority, or first-generation students. It is possible that the mix of financial aid received by students could shift if they

attend different institutions than they would if the rule were not in place, but we believe that students whose choice of schools may have been affected by an institution's wrongdoing will find an alternative and receive similar amounts of title IV, HEA aid. Some students who may not have pursued higher education without the institution's act or omission may not enter the system, reducing the amount of Pell Grants or loans taken out, but we do not expect this to be a substantial portion of affected student borrowers. In the case of Pell Grants in particular, we do not want to estimate savings from potential reductions in aid related to borrower defense until such an effect is demonstrated in relevant data. Similarly, default discharges may decrease as borrowers seek discharge under the borrower defense provisions of these final regulations. If borrowers with valid borrower defense claims differ in their payment profile from the overall portfolio, the effect on the level of defaults, especially in some risk groups, could be substantial.

Table 3–A presents the assumptions for the primary budget estimate with the budget estimate for each scenario presented in Table 4. As in the NPRM, we also estimated the impact if the Department received no recoveries from institutions, the results of which are discussed after Table 4. As in the NPRM, we do not specify how many institutions are represented in the estimate, as the scenario could represent a substantial number of institutions engaging in acts giving rise to borrower defense claims or could represent a small number of institutions with significant loan volume subject to a large number of claims. According to Federal Student Aid data center loan volume reports, the five largest proprietary institutions in loan volume received 26 percent of Direct Loans disbursed in the proprietary sector in award year 2014–15 and the 50 largest represent 69 percent.[106]

As was done in the NPRM, the PB2017 loan volumes by sector were multiplied by the Conduct Percent that represents the share of loan volume estimated to be affected by institutional behavior that results in a borrower defense claim and the Borrower Percent that captures the percent of loan volume associated with potentially eligible borrowers who successfully pursue a claim to generate gross claims. The

---

[105] Federal Student Aid, *Student Aid Data: Title IV Program Volume by School*, available at *https://studentaid.ed.gov/sa/about/data-center/student/title-iv*.

[106] Federal Student Aid, *Student Aid Data: Title IV Program Volume by School Direct Loan Program AY2015–16, Q4*, available at *https://studentaid.ed.gov/sa/about/data-center/student/title-iv* accessed August 22, 2016. *https://studentaid.ed.gov/sa/about/data-center/student/title-iv* accessed August 22, 2016.

Recovery Percent was then applied to the gross claims to calculate the net claims that were processed in the Student Loan Model as increased discharges. The numbers in Tables 3–A and 3–B are the percentages applied for the primary estimate and baseline scenarios for each assumption.

TABLE 3–A—ASSUMPTIONS FOR PRIMARY BUDGET ESTIMATE

| Cohort | 2Yr pub | 2Yr priv | 2Yr prop | 4Yr pub | 4Yr priv | 4Yr prop |
|--------|--------|---------|---------|--------|---------|---------|
| **Conduct Percent** | | | | | | |
| 2017 | 3.0 | 3.0 | 20 | 3.0 | 3.0 | 20 |
| 2018 | 2.4 | 2.4 | 16 | 2.4 | 2.4 | 16 |
| 2019 | 2.0 | 2.0 | 13.6 | 2.0 | 2.0 | 13.6 |
| 2020 | 1.7 | 1.7 | 11.6 | 1.7 | 1.7 | 11.6 |
| 2021 | 1.5 | 1.5 | 9.8 | 1.5 | 1.5 | 9.8 |
| 2022 | 1.4 | 1.4 | 8.8 | 1.4 | 1.4 | 8.8 |
| 2023 | 1.3 | 1.3 | 8.4 | 1.3 | 1.3 | 8.4 |
| 2024 | 1.2 | 1.2 | 8 | 1.2 | 1.2 | 8 |
| 2025 | 1.2 | 1.2 | 7.8 | 1.2 | 1.2 | 7.8 |
| 2026 | 1.1 | 1.1 | 7.7 | 1.1 | 1.1 | 7.7 |
| **Borrower Percent** | | | | | | |
| 2017 | 35 | 35 | 45 | 35 | 35 | 45 |
| 2018 | 36.8 | 36.8 | 47.3 | 36.8 | 36.8 | 47.3 |
| 2019 | 38.6 | 38.6 | 49.6 | 38.6 | 38.6 | 49.6 |
| 2020 | 42.4 | 42.4 | 54.6 | 42.4 | 42.4 | 54.6 |
| 2021 | 46.7 | 46.7 | 60 | 46.7 | 46.7 | 60 |
| 2022 | 50 | 50 | 63 | 50 | 50 | 63 |
| 2023 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2024 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2025 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2026 | 50 | 50 | 65 | 50 | 50 | 65 |
| **Recovery Percent** | | | | | | |
| 2017 | 75 | 23.8 | 23.8 | 75 | 23.8 | 23.8 |
| 2018 | 75 | 23.8 | 23.8 | 75 | 23.8 | 23.8 |
| 2019 | 75 | 26.18 | 26.18 | 75 | 26.18 | 26.18 |
| 2020 | 75 | 28.80 | 28.80 | 75 | 28.80 | 28.80 |
| 2021 | 75 | 31.68 | 31.68 | 75 | 31.68 | 31.68 |
| 2022 | 75 | 33.26 | 33.26 | 75 | 33.26 | 33.26 |
| 2023 | 75 | 34.93 | 34.93 | 75 | 34.93 | 34.93 |
| 2024 | 75 | 36.67 | 36.67 | 75 | 36.67 | 36.67 |
| 2025 | 75 | 37.4 | 37.4 | 75 | 37.4 | 37.4 |
| 2026 | 75 | 37.4 | 37.4 | 75 | 37.4 | 37.4 |

We also estimated a baseline scenario for the potential impact of borrower defense in recognition that many claims could be pursued under the existing State standards. The publicity and increased awareness of borrower defense could lead to increased activity under the existing regulations. In addition to the Corinthian claims, as of October 2016, the Department had received nearly 4,400 claims from borrowers of at least 20 institutions. The Federal standard in the final regulations will provide a unified standard across all States but is based on elements of relevant consumer protection law from the various States. We estimate that the final regulations could increase claims beyond those that could be pursued without it by an average of approximately 10 percent for the FY2017 cohort. This is based on our initial review of claims presented that does not reveal significant differences between the State and Federal standards, limiting the expected increase in claims from the adoption of the Federal standard. The baseline school conduct percentage does improve over time, but at a slower rate than occurs under the regulation. The borrower claim percentage for the baseline is based on the history of limited claims, informational sessions [107] during which during which 5 to 10 percent was presented as a reasonable rate when borrowers have to submit applications or otherwise initiate the process, and the level of effort used by the Department and advocates to get the Corinthian claims into the system. The recovery percentage reflects the fact that public institutions are not subject to the changes in the financial responsibility provisions because of their presumed backing by their respective States. Therefore, the baseline and primary recovery scenarios are the same for public institutions and set at a high level to reflect the Department's confidence in recovering the expected low level of claims against public institutions. Table 3–B presents the assumptions used to generate the share of the total net budget impact that we believe could have occurred even in the absence of these final regulations.

TABLE 3–B—ASSUMPTIONS FOR ESTIMATED BASELINE SCENARIO

| Cohort | All sectors | 2Yr pub | 2Yr priv | 2Yr prop | 4Yr pub | 4Yr priv | 4Yr prop |
|---|---|---|---|---|---|---|---|
| **Conduct Percent** | | | | | | | |
| 2017 | | 2.7 | 2.7 | 18.0 | 2.7 | 2.7 | 18.0 |
| 2018 | | 2.6 | 2.6 | 17.1 | 2.6 | 2.6 | 17.1 |
| 2019 | | 2.4 | 2.4 | 16.2 | 2.4 | 2.4 | 16.2 |
| 2020 | | 2.3 | 2.3 | 15.4 | 2.3 | 2.3 | 15.4 |
| 2021 | | 2.2 | 2.2 | 14.7 | 2.2 | 2.2 | 14.7 |
| 2022 | | 2.1 | 2.1 | 13.9 | 2.1 | 2.1 | 13.9 |
| 2023 | | 2.0 | 2.0 | 13.2 | 2.0 | 2.0 | 13.2 |
| 2024 | | 1.9 | 1.9 | 12.6 | 1.9 | 1.9 | 12.6 |
| 2025 | | 1.8 | 1.8 | 11.9 | 1.8 | 1.8 | 11.9 |
| 2026 | | 1.7 | 1.7 | 11.3 | 1.7 | 1.7 | 11.3 |
| **Borrower Percent** | | | | | | | |
| 2017 | 8 | | | | | | |
| 2018 | 8.4 | | | | | | |
| 2019 | 8.8 | | | | | | |
| 2020 | 9.3 | | | | | | |
| 2021 | 9.7 | | | | | | |
| 2022 | 10.2 | | | | | | |
| 2023 | 10.7 | | | | | | |
| 2024 | 11.3 | | | | | | |
| 2025 | 11.8 | | | | | | |
| 2026 | 12.4 | | | | | | |
| **Recovery Pct** | | | | | | | |
| 2017 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2018 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2019 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2020 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2021 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2022 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2023 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2024 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2025 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2026 | | 75 | 5 | 5 | 75 | 5 | 5 |

As noted in the NPRM, and throughout this RIA, the Department recognizes the uncertainty associated with the factors contributing to the primary budget assumptions presented in Table 3–A. The baseline scenario defined by the assumptions in Table 3–B indicates the net costs of claims the Department assumes could occur in absence of these final regulations. The $4.9 billion estimated cost for the baseline scenario is provided for illustrative purposes and, as discussed above, is included in the $14.9 billion total estimated cost for the borrower defense provisions. To demonstrate the effect of a change in any of the assumptions, the Department designed the following scenarios to isolate each assumption and adjust it by 15 percent in the direction that would increase costs, increasing the Conduct or Borrower percentages and decreasing recoveries. As the gross claims are generated by multiplying the PB2017 estimated volumes by the Conduct Percent and the Borrower Percent, the Con15 scenario demonstrates the effect of the change in either assumption. The recovery percentage is applied to the gross claims to generate the net claims, so the REC15 scenario reduces recoveries by 15 percent to demonstrate the impact of that assumption. The final two runs adjust all the assumptions simultaneously to present a maximum and minimum expected budget impact. These sensitivity runs are identified as Con15, Rec15, All15, and Min15 respectively. The results of the various scenarios range from $14.9 billion to $21.2 billion and are presented in Table 4.

TABLE 4—BUDGET ESTIMATES FOR BORROWER DEFENSE SENSITIVITY RUNS

| Scenario | Estimated costs for cohorts 2017–2026 (Budget Authority in $mns) | Annualized cost to Federal Gov't (3% discounting) | Annualized cost to Federal Gov't (7% discounting) |
|---|---|---|---|
| Primary Estimate | $14,867 | $1,471 | $1,452 |
| Baseline Scenario Estimate | 4,899 | 485 | 478 |
| Con15 | 16,770 | 1,659 | 1,638 |
| Rec15 | 16,092 | 1,592 | 1,571 |
| All15 | 21,246 | 2,102 | 2,075 |
| Min15 | 9,459 | 936 | 923 |

The transfers among the Federal government and affected borrowers and institutions associated with each scenario above are included in Table 5, with the difference in amounts transferred to borrowers and received from institutions generating the budget impact in Table 4. The amounts in Table 4 assume the Federal Government will recover some portion of claims from institutions. In the absence of any recovery from institutions, taxpayers would bear the full cost of successful claims from affected borrowers. At a 3 percent discount rate, the annualized costs with no recovery are approximately $2.465 billion for the primary budget estimate, $637 million for the baseline scenario, $2.758 billion for the Con15 scenario, $3.279 billion for the All15 scenario, and $1.666 billion for the Min15 scenario. At a 7 percent discount rate, the annualized costs with no recovery are

approximately $2.414 billion for the primary budget estimate, $628 million for the baseline scenario, $2.699 billion for the Con15 scenario, $3.213 billion for the All15 scenario, and $1.627 billion for the Min15 scenario. This potential increase in costs demonstrates the significant effect that recoveries from institutions have on the net budget impact of the borrower defense provisions.

Closed School Discharge and False Certification Discharges

In addition to the provisions previously discussed, the final regulations also would make changes to the closed school discharge process, which are estimated to cost $1.732 billion, of which $381 million is a modification to cohorts 2014–2016 related to the extension of the automatic 3-year discharge and $1.351 billion is for cohorts 2017–2026. The final

regulations include requirements to inform students of the consequences, benefits, requirements, and procedures of the closed school discharge option, including providing students with an application form, and establish a Secretary-led discharge process for borrowers who qualify but do not apply and, according to the Department's information, did not subsequently re-enroll in any title IV-eligible institution within three years from the date the school closed. The increased information about and automatic application of the closed school discharge option and possible increase in school closures related to the institutional accountability provisions in the proposed regulations are likely to increase closed school claims. Chart 1 provides the history of closed schools, which totals 12,666 schools or campus locations through September 2016.

## Chart 1: History of School Closures



In order to estimate the effect of the changes to the discharge process that would grant relief without an application after a three-year period, the Department looked at all Direct Loan borrowers at schools that closed from 2008–2011 to see what percentage of them had not received a closed school discharge and had no NSLDS record of title-IV aided enrollment in the three years following their school's closure. Of 2,287 borrowers in the file, 47 percent had no record of a discharge or subsequent title IV, HEA aid. This does not necessarily mean they did not re-enroll at a title IV institution, so this assumption may overstate the potential

effect of the three-year discharge provision. The Department used this information and the high end of closed school claims in recent years to estimate the effect of the final regulations related to closed school discharges. The resulting estimated cost to the Federal government of the closed school provisions is $1.732 billion, of which $381 million is a modification related to extending the 3-year automatic discharge to cohorts 2014 through 2016 and $1.351 billion relates to the 2017 to 2026 loan cohorts.

The final regulations will also change the false certification discharge process to include instances in which schools

certified the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) where the borrower would qualify for a false certification discharge if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma. Under existing regulations, false certification discharges represent a very low share of discharges granted to borrowers. The final regulations will replace the explicit reference to ability to benefit requirements in the false

certification discharge regulations with a more general reference to requirements for admission without a high school diploma as applicable when the individual was admitted, and specify how an institution's certification of the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) could give rise to a false certification discharge claim. However, we do not expect an increase in false certification discharge claims to result in a significant budget impact from this change. We believe that schools that comply with the current ability to benefit assessment requirement and that honor the current high school graduation requirements will continue to comply in the manner they now do, and we have no basis to believe that changing the terminology or adding false certification of SAP as an example of a reason the Secretary may grant a false certification discharge without an application will lead to an increase in claims that will result in a significant net budget impact.

Other Provisions

As indicated in the NPRM, there are a number of additional provisions in these final regulations that are not expected to have a significant net budget impact. These provisions include a number of technical changes related to the PAYE and REPAYE repayment plans and the consolidation of Nurse Faculty Loans, updates to the regulations describing the Department's authority to compromise debt, and updates to the acceptable forms of

verification of death for discharge of title IV loans or TEACH Grant obligations. The technical changes to the REPAYE and PAYE plans were already reflected in the Department's budget estimates for those regulations, so no additional budget effects are included here. Some borrowers may be eligible for additional subsidized loans and no longer be responsible for accrued interest on their subsidized loans as a result of their subsidized usage period being eliminated or recalculated because of a closed school, false certification, unpaid refund, or defense to repayment discharge. However, we believe the institutions primarily affected by the 150 percent subsidized usage regulation are not those expected to generate many of the applicable discharges, so this reflection of current practice is not expected to have a significant budget impact. Allowing death discharges based on death certificates submitted or verified through additional means is convenient for borrowers, but is not estimated to substantially change the amount of death discharges. These updates to the debt compromise limits reflect statutory changes and the Secretary's existing authority to compromise debt, so we do not estimate a significant change in current practices. Revising the regulations to expressly permit the consolidation of Nurse Faculty Loans is not expected to have a significant budget impact, as this technical change reflects current practices. According to Department of Health and Human Services budget documents,

approximately $26.5 million [108] in grants are available annually for schools to make Nurse Faculty Loans, and borrowers would lose access to generous forgiveness terms if they choose to consolidate those loans. Therefore, we would expect the volume of consolidation to be very small, and do not anticipate any significant budget impact from this provision.

Assumptions, Limitations, and Data Sources

In developing these estimates, we used a wide range of data sources, including data from the NSLDS; operational and financial data from Department systems; and data from a range of surveys conducted by the National Center for Education Statistics such as the 2012 National Postsecondary Student Aid Survey. We also used data from other sources, such as the U.S. Census Bureau.

5. Accounting Statement

As required by OMB Circular A–4 (available at *www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf*), in the following table we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these final regulations. This table provides our best estimate of the changes in annual monetized costs, benefits, and transfers as a result of the final regulations based on the assumptions described in the *Net Budget Impacts* and *Paperwork Reduction Act* sections of this preamble.

TABLE 5—ACCOUNTING STATEMENT

| Category | Benefits | |
|---|---|---|
| Updated and clarified borrower defense process and Federal standard to increase protection for student borrowers and taxpayers. | not quantified | |
| Improved awareness and usage of closed school and false certification discharges. | not quantified | |
| Improved consumer information about institutions' performance and practices. | not quantified | |
| **Category** | **Costs** | |
| | 3% | 7% |
| Costs of obtaining LOCs or equivalents ............................................ | not quantified | |
| Costs of compliance with paperwork requirements .................................... | 9.87 | 9.84 |
| **Category** | **Transfers** | |
| | 3% | 7% |
| Borrower Defense claims from the Federal government to affected borrowers (partially borne by affected institutions, via reimbursements. | Primary ............................................ | 2,465 | 2,414 |
| | Baseline ........................................ | 637 | 628 |

[108] Department of Health and Human Services, FY 2017 Health Resources and Services Administration Justification of Estimates for Appropriations Committees. Available at *www.hrsa.gov/about/budget/budgetjustification2017.pdf*.

TABLE 5—ACCOUNTING STATEMENT—Continued

| | | | |
|---|---|---|---|
| Reimbursements of borrower defense claims from affected institutions to affected student borrowers, via the Federal government. | Con15 ............................... | 2,758 | 2,699 |
| | REC15 ............................... | 2484 | 2,434 |
| | ALL15 ............................... | 3,279 | 3,213 |
| | MIN15 ............................... | 1,666 | 1,627 |
| | Primary. | | |
| | | | |
| | Baseline ............................ | 152 | 150 |
| | CON15 ............................... | 1,099 | 1,061 |
| | REC15 ............................... | 891 | 862 |
| | ALL15 ............................... | 1,176 | 1,138 |
| Closed school discharges from the Federal government to affected students. | MIN15 ............................... | 730 | 704 |
| | | 178 | 185 |

### 6. Regulatory Alternatives Considered

In response to comments received and the Department's further internal consideration of these final regulations, the Department reviewed and considered various changes to the proposed regulations detailed in the NPRM. The changes made in response to comments are described in the *Analysis of Comments and Changes* section of this preamble. We summarize below the major proposals that we considered but which we ultimately declined to implement in these regulations.

In particular, the Department extensively reviewed the financial responsibility provisions and related disclosures, the repayment rate warning, and the arbitration provisions of these final regulations. In developing these final regulations, the Department considered the budgetary impact, administrative burden, and effectiveness of the options it considered.

### Final Regulatory Flexibility Analysis

*Description of the Reasons That Action by the Agency Is Being Considered*

The Secretary is amending the regulations governing the Direct Loan Program to establish a new Federal standard, limitation periods, and a process for determining whether a borrower has a borrower defense based on an act or omission of a school. We are also amending the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we are amending the discharge provisions in the Perkins Loan, Direct Loan, FFEL Program, and TEACH Grant programs. These changes will provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school liabilities resulting from borrower defenses.

The U.S. Small Business Administration Size Standards define "for-profit institutions" as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. The standards define "non-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Under these definitions, an estimated 4,365 institutions of higher education subject to the paperwork compliance provisions of the proposed regulations are small entities. Accordingly, we have prepared this final regulatory flexibility analysis to present an estimate of the effect of these regulations on small entities.

*Succinct Statement of the Objectives of, and Legal Basis for, the Final Regulations*

Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Current regulations in § 685.206(c) governing defenses to repayment have been in place since 1995, but have rarely been used. Those regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." In response to the collapse of Corinthian, the Secretary announced in June of 2015 that the Department would develop new regulations to clarify and streamline the borrower defense process, in a manner that would protect borrowers and allow the Department to hold schools accountable for actions that result in loan discharges.

*Description of and, Where Feasible, an Estimate of the Number of Small Entities To Which the Regulations Will Apply*

These final regulations will affect institutions of higher education that participate in the Federal Direct Loan Program and borrowers. Approximately 60 percent of institutions of higher education qualify as small entities, even though the range of revenues at the non-profit institutions varies greatly. Using data from the Integrated Postsecondary Education Data System, the Department estimates that approximately 4,365 institutions of higher education qualify as small entities—1,891 are not-for-profit institutions, 2,196 are for-profit institutions with programs of two years or less, and 278 are for-profit institutions with four-year programs.

*Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Regulations, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record*

Table 6 relates the estimated burden of each information collection requirement to the hours and costs estimated in the *Paperwork Reduction Act of 1995* section of the preamble. This additional workload is discussed in more detail under the *Paperwork Reduction Act of 1995* section of the preamble. Additional workload is expected to result in estimated costs associated with either the hiring of additional employees or opportunity costs related to the reassignment of existing staff from other activities. In total, these changes are estimated to increase burden on small entities participating in the title IV, HEA programs by 109,351 hours. The monetized cost of this additional burden on institutions, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf,* is

$3,996,777. This cost was based on an hourly rate of $36.55.

### TABLE 6—PAPERWORK REDUCTION ACT FOR SMALL ENTITIES

| | Reg section | OMB control No. | Hours | Cost |
|---|---|---|---|---|
| Program Participation Agreement—requires school to provide enrolled students a closed school discharge application and written disclosure of the benefits of consequences of the discharge as an alternative to completing their educational program through a teach-out. | 668.14 | OMB 1845–0022 ........ | 985 | $36,004 |
| Advertising warning of repayment rate outcomes; and disclosure to prospective and enrolled students of actions and triggering events for financial protection. | 668.41 | OMB 1845–0004 ........ | 2,138 | 78,159 |
| Financial Responsibility—reporting of certain actions or triggering events in 668.171(c)–(g) no later than the time specified in 668.171(h). | 668.171 | OMB 1845–0022 ........ | 1,617 | 59,094 |
| Alternative Standards and Requirements—requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in §668.171(c)–(g) if that event warrants protection as determined under §668.175(f)(4). | 668.175 | OMB 1845–0022 ........ | 32,336 | 1,181,881 |
| Borrower defense process—provides a framework for the borrower defense process. Institutions could engage in fact-finding, provide evidence related to claims and appeal decisions. | 685.222 | OMB 1845–0142 ........ | 530 | 19,372 |
| Agreements between an eligible school and the Secretary for participation in the Direct Loan Program—prohibits predispute arbitration agreements for borrower defense claims, specifies required agreement and notification language, and requires schools to provide copies of arbitral and judicial filings to the Secretary. | 685.300 | OMB 1845–0143 ........ | 71,745 | 2,622,268 |

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap, or Conflict With the Regulations*

The final regulations are unlikely to conflict with or duplicate existing Federal regulations.

*Alternatives Considered*

As described above, the Department participated in negotiated rulemaking and reviewed a large number of comments when developing the regulations, and considered a number of options for some of the provisions. We considered multiple issues, including the group discharge process for borrower defense claims, the limitation periods, the appropriate procedure for considering borrower defense claims including the role of State AGs, the Department, borrowers, and institutions, and the continued use of State standards for borrower defense claims. While no alternatives were aimed specifically at small entities, limiting repayment rate warnings to affected proprietary institutions will reduce the burden on the private not-for-profit institutions that are a significant portion of small entities that would be affected by the final regulations. The additional options to provide financial protection may also benefit small entities, even though the changes were not specifically directed at them.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: The public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Sections 668.14, 668.41, 668.171, 668.175, 682.211, 682.402, 685.222, and 685.300 contain information collection requirements. Under the PRA, the Department has submitted a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

In these final regulations, we have displayed the control numbers assigned by OMB to any information collection requirements in this NPRM and adopted in the final regulations.

**Discussion**

*Section 668.14—Program Participation Agreement*

*Requirements:* Section 668.14(b)(32) of the final regulations will require, as part of the program participation agreement, a school to provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in §668.14(b)(31) that would require the institution to submit a teach-out plan.

*Burden Calculation:* From the Award Years 2011–12 to 2014–15 there were 182 institutions that closed (30 private, 150 proprietary, and two public). The number of students who were enrolled at the institutions at the time of the closure was 43,299 (5,322 at the private

institutions, 37,959 at the proprietary institutions, and 18 at the public institutions). With these figures as a base, we estimate that there could be 46 schools closing in a given award year (182 institutions divided by 4 = 45.5) with an average 238 students per institution (43,299 divided by 182 = 237.9).

We estimate that an institution will require two hours to prepare the required written disclosure to be sent with a copy of the closed school discharge application and the necessary mailing list for currently enrolled students. We anticipate that most schools will provide this information electronically to their students, thus decreasing burden and cost.

On average, we estimate that it will take the estimated eight private institutions 16 hours to prepare the written disclosure information required (8 institutions × 2 hours).

On average, we estimate that it will take the estimated eight private institutions that will close a total of 324 hours (1,904 students × .17 (10 minutes)) to process the required written disclosure with a copy of the closed school discharge application based on the mailing list for the estimated 1,904 enrolled students.

The burden for this process for private institutions is 340 hours.

On average, we estimate that it will take the estimated 38 proprietary institutions 76 hours to prepare the written disclosure information required (38 institutions × 2 hours).

On average, we estimate that it will take the estimated 38 proprietary institutions that will close a total of 1,537 hours (9,044 students × .17 (10 minutes)) to process the required written disclosure with a copy of the closed school discharge application based on the mailing list for the estimated 9,044 enrolled students.

The burden for this process for proprietary institutions is 1,613 hours.

For § 668.14, the total increase in burden is 1,953 hours under OMB Control Number 1845–0022.

*Section 668.41—Reporting and Disclosure of Information*

*Requirements:* Section 668.41(h) of the final regulations *Loan repayment warning for proprietary institutions* will expand the disclosure requirements under § 668.41 to provide that, for any award year in which a proprietary institution's loan repayment rate as reported to it by the Secretary shows that the median borrower has not paid down the balance of the borrower's loans by at least $1, the institution must provide a loan repayment warning in

advertising and promotional materials. An institution with fewer than 10 borrowers, or that demonstrates to the Secretary's satisfaction that it has borrowers in non-Gainful Employment programs who would increase the institution's repayment rate to meet the negative amortization threshold if included in the calculation, would not be required to provide the warning.

The process through which a proprietary institution will be informed of its repayment rate, and provided the opportunity to appeal that rate, is included in § 668.41(h)(2) of the final regulations. The Department notifies the institution of its repayment rate. Upon receipt of the rate the institution has 15 days to submit an appeal based on the two conditions in § 668.41(h)(2)(ii) to the Secretary.

Additionally, § 668.41(h)(3) of the final regulations stipulates the treatment of required disclosures in advertising and promotional materials. Under the provision, all advertising and promotional materials made available by or on behalf of an institution that identify the institution by name must include a warning about loan repayment outcomes as prescribed by the Secretary. The Secretary may conduct consumer testing to ensure meaningful and helpful language is provided to the students. All promotional materials, including printed materials, about an institution must be accurate and current at the time they are published, approved by a State agency, or broadcast. The warning must be prominent, clear and conspicuous, easily heard or read. The Secretary may require modifications to such materials if the warning does not meet the regulatory conditions.

*Burden Calculation:* There will be burden on schools to review the repayment rate identified in § 668.41(h)(1) and to submit an appeal to the accuracy of the information, as provided in § 668.41(h)(2). Additionally, there will be burden for those institutions that are required to include the necessary loan repayment warning in their promotional materials.

Based on an analysis of Departmental data, 972 of the 1,345 proprietary institutions with reported repayment rate data would not meet the negative amortization threshold for the repayment rate calculation.

We estimate that it will take the 972 institutions 30 minutes (.50 hours) or 486 hours to review the institutional repayment rate and determine if it meets one of the conditions to submit an appeal to the Secretary (972 institutions × .50 hours = 486 hours).

Of the 972 institutions that would not meet the negative amortization loan

repayment threshold, we anticipate that one percent or 10 institutions could meet the appeal criteria identified in 668.41(h)(2)(ii)(A).

We estimate that it will take the 10 institutions another 2 hours to produce the required evidence to submit with the appeal (10 institutions × 2 hours = 20 hours). We estimate it will take the approximate 10 institutions an additional 30 minutes (.50 hours) to submit the appeal to the Secretary (10 institutions × .50 hours = 5 hours) for a total of 25 hours.

We estimate that 5 institutions will be successful in their appeal, leaving 967 institutions that are required to include the necessary loan repayment warning in their promotional materials.

We estimate that it will take each of the approximate 967 proprietary institutions a total of 5 hours to update their promotional materials (967 institutions × 5 hours = 4,835 hours).

For § 668.41(h), the total increase in burden is 5,346 hours under OMB Control Number 1845–0004.

*Requirements:* Revised § 668.41(i) *Financial protection disclosures* clarified the disclosure requirements regarding triggering events to both enrolled and prospective students, as well as on the institution's Web site. The Secretary will conduct consumer testing to determine which actions and triggering events will require disclosures; and will publish the prescribed content of the disclosures in a **Federal Register** notice after conducting consumer testing to ensure that it is meaningful and helpful to students. Institutions must provide the required disclosures to enrolled and prospective students and post the disclosure to their Web sites within 30 days of notifying the Secretary of the relevant triggering event. Institutions may hand-deliver the disclosure notification, or may send the disclosure notification to the primary email address or other electronic communication method used by the institution for communicating with the enrolled or prospective student. In all cases, the institution must ensure that the disclosure notification is the only substantial content in the message. Prospective students must receive the disclosure before enrolling, registering, or entering into a financial obligation with the institution.

*Burden Calculation:* There will be burden on schools to deliver the disclosures required by the Secretary to enrolled and prospective students and post it on the institution's Web site under this final regulation. However, as § 668.41(i) commits to consumer testing of both the specific actions and events

that will require a disclosure, and of the required disclosure itself, to be published by the Secretary in a **Federal Register** notice, burden will not be included here. Instead, the consumer testing procedures will follow information clearance review requirements. Prior to the implementation of the regulatory requirements under § 668.41(i) there will be an information clearance review package submitted to allow the public to comment.

The total increase in burden is 5,346 hours for OMB Control Number 1845–0004.

*Section 668.171—Financial Responsibility—General*

*Requirements:* We added a new paragraph 668.171(h) under which, in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or triggering event described in § 668.171(c) through (g) in the specified number of days after that action or event occurs.

In that notice, the institution may show that certain actions or events are not material or that those actions we may demonstrate that:
• The amount claimed in a lawsuit by a State or Federal authority for financial relief on a claim related to the making of a Direct Loan for enrollment at the school or the provision of educational services exceeds the potential recovery.
• The withdrawal of owner's equity was used solely to meet tax liabilities of the institution or its owners.
• The creditor waived a violation of a loan agreement. If the creditor imposes additional constraints or requirements as a condition of waiving the violation and continuing with the loan, the institution must identify and describe those constraints or requirements but would be permitted to show why these actions would not have an adverse financial impact on the institution.
• The reportable action or event no longer exists, has been resolved, or there is insurance to cover the liabilities that arise from the action or event.

*Burden Calculation:* There will be burden on schools to provide the notice to the Secretary when one of the actions or triggering events identified in § 668.171(c)–(g) occurs. We estimate that an institution will take two hours per action or triggering event to prepare the appropriate notice and provide it to the Secretary. We estimate that 169 private institutions may have two events annually to report for a total burden of 676 hours (169 institutions × 2 events × 2 hours). We estimate that 392

proprietary institutions may have three events annually to report for total burden of 2,352 hours (392 institutions × 3 events × 2 hours). For § 668.171, the total increase in burden is 3,028 hours under OMB Control Number 1845–0022.

*Section 668.175—Alternative Standards and Requirements*

*Requirements:* Under the provisional certification alternative in § 668.175(f), we added a new paragraph (f)(4) that requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in § 668.171(c)–(g) if that event warrants protection as determined under § 668.175(f)(4).

*Burden Calculation:* There will be burden on schools to provide the required financial protection, such as a letter of credit, to the Secretary to utilize the provisional certifications alternatives. We estimate that an institution will take 40 hours per action or triggering event to obtain the required financial protections and provide it to the Secretary. We estimate that 169 private not-for-profit institutions may have two events annually to report for a total burden of 13,520 hours (169 institutions × 2 events × 40 hours). We estimate that 392 proprietary institutions may have three events annually to report for total burden of 47,040 hours (392 institutions × 3 events × 40 hours).

For § 668.175, the total increase in burden is 60,560 hours under OMB Control Number 1845–0022.

The combined total increase in burden for §§ 668.14, 668.171, and 668.175 is 65,541 hours under OMB Control Number 1845–0022.

*Section 682.211—Mandatory Administrative Forbearance for FFEL Program Borrowers*

*Requirements:* The final regulations add a new paragraph § 682.211(i)(7) that requires a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under § 685.212(k) of the final regulations. The administrative forbearance will be granted in yearly increments or for a period designated by the Secretary until the Secretary notifies the lender that the loan has been consolidated or that the forbearance should be discontinued. If the Secretary notifies the borrower that the borrower

will qualify for a borrower defense discharge if the borrower were to consolidate, the borrower will then be able to consolidate the loan(s) to which the defense applies and, if the borrower were to do so, the Secretary will recognize the defense and discharge that portion of the Consolidation Loan that paid off the FFEL loan in question.

*Burden Calculation:* There will be burden for the current 1,446 FFEL lenders to track the required mandatory administrative forbearance when they are notified by the Secretary of the borrower's intention to enter their FFEL loans into a Direct Loan Consolidation Loan to obtain relief under a borrower defenses claim. We estimate that it will take each lender approximately four hours to develop and program the needed tracking into their current systems. There will be an estimated burden of 5,480 hours on the 1,370 for-profit lenders (1,370 × 4 = 5,480 hours). There will be an estimated burden of 304 hours on the 76 not-for-profit lenders (76 × 4 = 304 hours).

For § 682.211, the total increase in burden is 5,784 hours under OMB Control Number 1845–0020.

*Section 682.402—Closed School Discharges*

*Requirements:* Section 682.402(d)(6)(ii)(F) of the final regulations provides a second level of Departmental review for denied closed school discharge claims in the FFEL program. The final regulations require a guaranty agency that denies a closed school discharge request to inform the borrower in writing of the reasons for the denial, the opportunity for a review of the guaranty agency's decision by the Secretary, and how the borrower may request such review.

Section 682.402(d)(6)(ii)(I) of the final regulations requires the lender or guaranty agency, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge.

Section 682.402(d)(6)(ii)(K) of the final regulations describes the responsibilities of the guaranty agency if the borrower requests such a review.

Section 682.402(d)(8)(ii) of the final regulations authorizes the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-

eligible institution within a period of three years after the school closed.

*Burden Calculation:* There will be burden on guaranty agencies to provide information to borrowers denied closed school discharge regarding the opportunity for further review of the discharge request by the Secretary. We estimate that it will take the 27 guaranty agencies 4 hours to update their notifications and establish a process for forwarding any requests for escalated reviews to the Secretary. There will be an estimated burden of 68 hours on the 17 public guaranty agencies (17 × 4 hours = 68 hours). There will be an estimated burden of 40 hours on the 10 not-for-profit guaranty agencies (10 × 4 hours = 40 hours).

There is an increase in burden of 108 hours under OMB Control Number 1845–0020.

There will be burden on guaranty agencies, upon receipt of the request for escalated review from the borrower, to forward to the Secretary the discharge form and any relevant documents. For the period between 2011 and 2015 there were 43,268 students attending closed schools, of which 9,606 students received a closed school discharge. It is estimated that 5 percent of the 43,268, or 2,163 closed school applications were denied. We estimate that 10 percent or 216 of those borrowers whose application was denied will request escalated review by the Secretary. We estimate that the process to forward the discharge request and any relevant documentation to the Secretary will take .5 hours (30 minutes) per request. There will be an estimated burden of 58 hours on the 17 public guaranty agencies based on an estimated 116 requests (116 × .5 hours = 58 hours). There will be an estimated burden of 50 hours on the 10 not-for-profit guaranty agencies (100 × .5 hours = 50 hours). There is an increase in burden of 108 hours under OMB Control Number 1845–0020.

The guaranty agencies will have burden assessed based on these final regulations to provide another discharge application to a borrower upon resuming collection activities with explanation of process and requirements for obtaining a discharge. We estimate that for the 2,163 closed school applications that were denied, it will take the guaranty agencies .5 hours (30 minutes) to provide the borrower with another discharge application and instructions for filing the application again. There will be an estimated burden of 582 hours on the 17 public guaranty agencies based on an estimated 1,163 borrowers (1,163 × .5 hours = 582 hours). There will be an estimated burden of 500 hours on the 10 not-for-

profit guaranty agencies (1,000 × .5 hours = 500 hours). There is an increase in burden of 1,082 hours under OMB Control Number 1845–0020.

There will be burden on the guaranty agencies to determine the eligibility of a borrower for a closed school discharge without the borrower submitting such an application. This determination requires a review of those borrowers who attended a closed school but did not apply for a closed school discharge to determine if the borrower re-enrolled in any other institution within three years of the school closure. We estimate that 20 hours of programming will be necessary to enable a guaranty agency to establish a process to review its records for borrowers who attended a closed school and to determine if any of those borrowers reenrolled in a title IV eligible institution within three years. There will be an estimated burden of 340 hours on the 17 public guaranty agencies for this programming (17 × 20 hours = 340 hours). There will be an estimated burden of 200 hours on the not-for-profit guaranty agencies for this programming (10 × 20 hours = 200 hours). There is an increase in burden of 540 hours under OMB Control Number 1845–0020.

For § 682.402, the total increase in burden is 1,838 hours under OMB Control Number 1845–0020.

The combined total increase in burden for §§ 682.211 and 682.402 is 7,622 hours under OMB Control Number 1845–0020.

*Section 685.222(e)—Process for Individual Borrowers*

*Requirements:* Section 685.222(e)(1) of the final regulations describes the steps an individual borrower must take to initiate a borrower defense claim. First, an individual borrower will submit an application to the Secretary, on a form approved by the Secretary. In the application, the borrower will certify that he or she received the proceeds of a loan to attend a school; may provide evidence that supports the borrower defense; and will indicate whether he or she has made a claim with respect to the information underlying the borrower defense with any third party, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation. The borrower will also be required to provide any other information or supporting documentation reasonably requested by the Secretary.

While the decision of the Department official will be final as to the merits of the claim and any relief that may be warranted on the claim, if the borrower

defense is denied in full or in part, the borrower will be permitted to request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" will be defined as relevant evidence that the borrower did not previously provide and that was not identified by the Department official as evidence that was relied upon for the final decision.

*Burden Calculation:* There will be burden associated with the filing of the Departmental form by the borrower asserting a borrower defense claim. There is a separate information collection being processed to put the final form through the information collection review process to provide for public comment on the form as well as the estimated burden. A separate information collection review package will be published in the **Federal Register** and available through *Regulations.gov* for review and comment.

Additionally there will be burden on any borrower whose borrower defense claim is denied, if they elect to request reconsideration from the Secretary based on new evidence in support of the borrower's claim. We estimate that two percent of borrower defense claims received will be denied and those borrowers will then request reconsideration by presenting new evidence to support their claim. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 467 borrowers including those that opted out of a successful Borrower Defense group relief would require .5 hours (30 minutes) to submit the request for reconsideration to the Secretary for a total of 234 burden hours (467 × .5 hours) under OMB Control Number 1845–0142.

*Section 685.222(f)—Group Process for Borrower Defenses—General*

*Requirements:* Section 685.222(f) of the final regulations provides a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department will follow for borrower defenses for a group.

Once a group of borrowers with common facts and claims has been identified, the Secretary will designate a Department official to present the group's common borrower defense in the fact-finding process, and will provide each identified member of the

group with notice that allows the borrower to opt out of the proceeding.

*Burden Calculation:* There will be burden on any borrower who elects to opt out of the group process after the Secretary has identified them as a member of a group for purposes of borrower defense. We estimate that one percent of borrowers who are identified as part of a group process for borrower defense claims would opt out of the group claim process. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 187 borrowers would require .08 hours (5 minutes) to submit the request to opt out of the group process to the Secretary for a total of 15 burden hours (187 × .08 hours) under OMB Control Number 1845–0142.

*Section 685.222(g)—Group Process for Borrower Defense—Closed School*

*Requirements:* Section 685.222(g) of the final regulations establishes a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses.

Under § 685.222(g)(1) of the final regulations, a hearing official will review the Department official's basis for identifying the group and resolve the claim through a fact-finding process. As part of that process, the hearing official will consider any evidence and argument presented by the Department official on behalf of the group and on behalf of individual members of the group. The hearing official will consider any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described § 668.174(b) as reported to the Department or as recorded in the Department's records if practicable.

*Burden Calculation:* There will be burden on any school that elects to provide records or response to the hearing official's fact finding. We anticipate that each group will represent a single institution. We estimate that there will be four potential groups involving closed schools. We estimate that the fact-finding process would require 50 hours from one private closed school or persons affiliated with that closed school (1 private institution × 50

hours). We estimate that the fact-finding process will require 150 hours from three proprietary closed schools or persons affiliated with that closed school (3 proprietary institutions × 50 hours). We estimate the burden to be 200 hours (4 institutions × 50 hours) under OMB Control Number 1845–0142.

*Section 685.222(h)—Group Borrower for Defense—Open School*

*Requirements:* Section 685.222(h) of the final regulations establishes the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school.

A hearing official will resolve the borrower defense and determine any liability of the school through a fact-finding process. As part of the process, the hearing official will consider any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary, any evidence presented on behalf of individual group members.

The hearing official will issue a written decision. If the hearing official approves the borrower defense, that decision will describe the basis for the determination, notify the members of the group of the relief provided on the basis of the borrower defense, and notify the school of any liability to the Secretary for the amounts discharged and reimbursed.

If the hearing official denies the borrower defense in full or in part, the written decision will state the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and will inform the borrowers that their loans will return to their statuses prior to the group borrower defense process. It also will notify the school of any liability to the Secretary for any amounts discharged. The Secretary will provide copies of the written decision to the members of the group, the Department official and the school.

The hearing official's decision will become final as to the merits of the group borrower defense claim and any relief that may be granted within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. A decision of the hearing official will not take effect pending the appeal. The Secretary will render a final decision following consideration of any appeal.

After a final decision has been issued, if relief for the group has been provided in full or in part, a borrower may file an individual claim for relief for amounts not discharged in the group process. In addition, the Secretary may reopen a borrower defense application at any time to consider new evidence, as discussed above.

*Burden Calculation:* There will be burden on any school which provides evidence and responds to any argument made to the hearing official's fact finding and if the school elects to appeal the final decision of the hearing official regarding the group claim. We anticipate that each group will represent claims from a single institution. We estimate that there will be six potential groups involving open schools. We estimate that the fact-finding process will require 150 hours from the three open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the fact-finding process will require 150 hours from the three open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours).

We further estimate that the appeal process will require 150 hours from the three open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the appeal process will require 150 hours from the three open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours). The total estimated burden for this section will be 600 hours assessed under OMB Control Number 1845–0142.

Additionally, any borrower whose borrower defense claim is denied under the group claim may request reconsideration based on new evidence to support the individual claim. We believe that the estimate for the total universe of denied claims in § 685.222(e) includes these borrowers.

The combined total increase in burden for § 685.222 is 1,049 hours under OMB Control Number 1845–0142.

*Section 685.300—Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program*

*Requirements:* Section 685.300(e) of the final regulations requires institutions who, after the effective date of the final regulations, incorporate a predispute arbitration agreement or any other predispute agreement addressing class actions in any agreements with Direct Loan program borrowers to include specific language regarding a

borrower's right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, institutions that incorporated a predispute arbitration agreement or any other predispute agreement addressing class actions in any agreements with Direct Loan program borrowers prior to the effective date of the final regulations must provide borrowers with agreements or notices containing specific language regarding their right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Institutions must provide this notice to borrowers no later than the date of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who has not received such notice.

Section 685.300(f) of the final regulations requires institutions who, after the effective date of the final regulations, incorporate predispute arbitration agreements with Direct Loan program borrowers to include specific language regarding a borrower's right to file a lawsuit against the institution when it concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, institutions that incorporated predispute arbitration agreements with Direct Loan program borrowers prior to the effective date of the final regulations must provide borrowers with agreements or notices containing specific language regarding a borrower's right to file a lawsuit against the institution when the class action concerns acts or omissions surrounding

the making of the Direct Loan or provision of educational services purchased with the Direct. Institutions must provide this notice to such borrowers no later than the date of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who hasn't received such notice.

*Burden Calculation:* There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. Based on the Academic Year 2014–2015 Direct Loan information available, there were 1,528,714 Unsubsidized Direct Loan recipients at proprietary institutions. Assuming 66 percent of these students will continue to be enrolled at the time these regulations become effective, 1,008,951 students will be required to receive the agreements or notices required in § 685.300(e) or (f). We anticipate that it will take proprietary institutions .17 hours (10 minutes) per student to develop these agreements or notices, research who is required to receive them, and forward the information accordingly for an increase in burden of 171,522 hours (1,008,951 students × .17 hours) under OMB Control Number 1845–0143.

*Requirements:* Section 685.300(g) of the final regulations requires institutions to provide to the Secretary, copies of specified records connected to a claim filed in arbitration by or against the school regarding a borrower defense claim. The school must submit any records within 60 days of the filing by the school of such records to an arbitrator or upon receipt by the school of such records that were filed by someone other than the school, such as an arbitrator or student regarding a claim.

Section 685.300(h) of the final regulations requires institutions to provide to the Secretary, copies of specified records connected to a claim filed in lawsuit by the school by a

student or any party against the school regarding a borrower defense claim. The school must submit any records within 30 days of the filing or receipt of the complaint by the school or upon receipt by the school of rulings on a dipositive motion or final judgement.

*Burden Calculation:* There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. We estimate that 5 percent of the 1,959 proprietary schools, or 98 schools would be required to submit documentation to the Secretary to comply with the final regulations. We anticipate that each of the 98 schools will have an average of four filings there will be an average of four submissions for each filing. Because these are copies of documents required to be submitted to other parties we anticipate 5 burden hours to produce the copies and submit to the Secretary for an increase in burden of 7,840 hours (98 institutions × 4 filings × 4 submissions/filing × 5 hours) under OMB Control Number 1845–0143.

The combined total increase in burden for § 685.300 is 179,362 hours under OMB Control Number 1845–0143.

Consistent with the discussion above, the following chart describes the sections of the final regulations involving information collections, the information being collected, the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net costs of the increased burden on institutions, lenders, guaranty agencies, and borrowers, using wage data developed using BLS data, available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf*, is $9,458,484 as shown in the chart below. This cost was based on an hourly rate of $36.55 for institutions, lenders, and guaranty agencies and $16.30 for borrowers.

COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.14—Program participation agreement. | The final regulation requires, as part of the program participation agreement, a school to provide to all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that require the institution to submit a teach-out plan. | 1845–0022—This would be a revised collection. We estimate burden would increase by 1,953 hours. | $71,382 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.41—Reporting and disclosure of information. | The final regulation clarifies in § 668.41(h) reporting and disclosure requirements to provide that, for any fiscal year in which the median borrower of a proprietary institution had not paid down the balance of the borrower's loans by at least one dollar, the institution must include a warning about that institution's repayment outcomes in advertising and promotional materials. Additionally, the final regulation clarifies that certain actions and triggering events for financial protection may, under § 668.41(i), require disclosure to prospective and enrolled students. Both the actions and triggering events and the disclosure language are subject to consumer testing. | 1845–0004—This would be a revised collection. We estimate burden would increase by 5,346 hours. | 195,396 |
| § 668.171—Financial responsibility— General. | The final regulations add a new paragraph 668.171(h) under which, in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or triggering event described in § 668.171(c) through (g) in the specified number of days after that action or event occurs. | 1845–0022—This is a revised collection. We estimate burden will increase by 3,028 hours. | 110,673 |
| § 668.175—Alternative standards and requirements. | The final regulations add a new paragraph (f)(4) that requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in § 668.171(c)–(g) if that event warrants protection as determined under § 668.175(f)(4). | 1845–0022—This is a revised collection. We estimate burden would increase by 60,560 hours. | 2,213,468 |
| § 682.211—Forbearance. | The final regulations add a new paragraph § 682.211(i)(7) that requires a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under § 685.212(k) of the final regulations. | 1845–0020—This is a revised collection. We estimate burden will increase by 5,784 hours. | 211,405 |
| § 682.402—Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments. | The final regulations provide a second level of Departmental review for denied closed school discharge claims in the FFEL program. The final language requires a guaranty agency that denies a closed school discharge request to inform the borrower of the opportunity for a review of the guaranty agency's decision by the Department, and an explanation of how the borrower may request such a review. The final regulations require the guaranty agency or the Department, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge. The final regulations describe the responsibilities of the guaranty agency if the borrower requests such a review. The final regulations authorize the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed. | 1845–0020—This is a revised collection. We estimate burden will increase by 1,838 hours. | 67,179 |

### COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 685.222—Borrower Defenses. | The final regulation describes the steps an individual borrower must take to initiate a borrower defense claim. The final regulations also provide a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department will follow for borrower defenses for a group. The final regulations establish a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses. The final regulations establish the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school. | 1845–0142—This is a new collection. We estimate burden will increase by 1,049 hours (249 Individual hours 800 Institutional hours). | 33,299 |
| § 685.300 Agreements between an eligible school and the Secretary for participation in the Direct Loan Program. | The final regulations require institutions, following the effective date of the regulations, to incorporate language into agreements allowing participation by Direct Loan students in class action lawsuits as well as predispute arbitration agreements. There is required agreement and notification language to be provided to affected students. Additionally, the final regulations require institutions to submit to the Secretary copies of arbitral records and judicial records within specified timeframes when the actions concern a borrower defense claim. | 1845–0143—This is a new collection. We estimate burden will increase by 179,362 hours. | 6,555,681 |

The total burden hours and change in burden hours associated with each OMB Control number affected by the final regulations follows:

| Control No. | Total final burden hours | Final change in burden hours |
|---|---|---|
| 1845–0004 ........ | 24,016 | +5,346 |
| 1845–0020 ........ | 8,249,520 | +7,622 |
| 1845–0022 ........ | 2,281,511 | +65,541 |
| 1845–0142 ........ | 1,049 | +1,049 |
| 1845–0143 ........ | 179,362 | +179,362 |
| Total .............. | 10,735,458 | +258,920 |

### Assessment of Educational Impact

Under § 668.171(h) of the final regulations, institutions are required to report to the Department certain events or occurrences that they may also be required to report to the SEC. Under SEC rules and regulations, institutions are generally required to report information that would be material to stockholders, including certain specified information, whereas the Department has identified events and occurrences unique to institutions of higher education that it believes could threaten an institution's financial viability and for which it requires specific and perhaps more timely reporting. We believe this reporting is necessary to ensure that institutions provide financial protection, for the benefit of students and taxpayers, against actions or events that threaten an institution's ability to (1) meet its current and future financial obligations, (2) continue as a going concern or continue to participate in the title IV, HEA programs, and (3) continue to deliver educational services.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.*

Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

### List of Subjects

*34 CFR Part 30*

Claims, Income taxes.

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Parts 686*

Administrative practice and procedure, Colleges and universities, Education, Elementary and Secondary education, Grant programs—education,

Reporting and recordkeeping requirements, Student aid.

Dated: October 17, 2016.

**John B. King, Jr.,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education amends parts 30, 668, 674, 682, 685, and 686 of title 34 of the Code of Federal Regulations as follows:

## PART 30—DEBT COLLECTION

■ 1. The authority citation for part 30 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3(a)(1), and 1226a–1, 31 U.S.C. 3711(e), 31 U.S.C. 3716(b) and 3720A, unless otherwise noted.

■ 2. Section 30.70 is revised to read as follows:

### § 30.70  How does the Secretary exercise discretion to compromise a debt or to suspend or terminate collection of a debt?

(a)(1) The Secretary uses the standards in the FCCS, 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department, unless compromise of the debt is subject to paragraph (b) of this section.

(2) If the amount of the debt is more than $100,000, or such higher amount as the Department of Justice may prescribe, the Secretary refers a proposed compromise of the debt to the Department of Justice for approval, unless the compromise is subject to paragraph (b) of this section or the debt is one described in paragraph (e) of this section.

(b) Under the provisions in 34 CFR 81.36, the Secretary may enter into certain compromises of debts arising because a recipient of a grant or cooperative agreement under an applicable Department program has spent some of these funds in a manner that is not allowable. For purposes of this section, neither a program authorized under the Higher Education Act of 1965, as amended (HEA), nor the Impact Aid Program is an applicable Department program.

(c)(1) The Secretary uses the standards in the FCCS, 31 CFR part 903, to determine whether suspension or termination of collection action on a debt is appropriate.

(2) Except as provided in paragraph (e), the Secretary—

(i) Refers the debt to the Department of Justice to decide whether to suspend or terminate collection action if the amount of the debt outstanding at the time of the referral is more than $100,000 or such higher amount as the Department of Justice may prescribe; or

(ii) May suspend or terminate collection action if the amount of the debt outstanding at the time of the Secretary's determination that suspension or termination is warranted is less than or equal to $100,000 or such higher amount as the Department of Justice may prescribe.

(d) In determining the amount of a debt under paragraph (a), (b), or (c) of this section, the Secretary deducts any partial payments or recoveries already received, and excludes interest, penalties, and administrative costs.

(e)(1) Subject to paragraph (e)(2) of this section, under the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D of the HEA, or the Perkins Loan Program authorized under title IV, part E, of the HEA.

(2) The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection of, a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.

(f) The Secretary refers a proposed resolution of a debt to the Government Accountability Office (GAO) for review and approval before referring the debt to the Department of Justice if—

(1) The debt arose from an audit exception taken by GAO to a payment made by the Department; and

(2) The GAO has not granted an exception from the GAO referral requirement.

(g) Nothing in this section precludes—

(1) A contracting officer from exercising his authority under applicable statutes, regulations, or common law to settle disputed claims relating to a contract; or

(2) The Secretary from redetermining a claim.

(h) Nothing in this section authorizes the Secretary to compromise, or suspend or terminate collection of, a debt—

(1) Based in whole or in part on conduct in violation of the antitrust laws; or

(2) Involving fraud, the presentation of a false claim, or misrepresentation on the part of the debtor or any party having an interest in the claim.

(Authority: 20 U.S.C. 1082(a) (5) and (6), 1087a, 1087hh, 1221e–3(a)(1), 1226a–1, and 1234a, 31 U.S.C. 3711)

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221–3, and 1231a, unless otherwise noted.

■ 4. Section 668.14 is amended:
■ A. In paragraph (b)(30)(ii)(C), by removing the word "and";
■ B. In paragraph (b)(31)(v), by removing the period and adding in its place "; and".
■ C. By adding paragraph (b)(32).
The addition reads as follows:

### § 668.14  Program participation agreement.
\*      \*      \*      \*      \*

(b) \*  \*  \*

(32) The institution will provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and consequences of a closed school discharge as an alternative to completing their educational program through a teach-out agreement, as defined in 34 CFR 602.3, immediately upon submitting a teach-out plan after the occurrence of any of the following events:

(i) The initiation by the Secretary of an action under 34 CFR 600.41 or subpart G of this part or the initiation of an emergency action under § 668.83, to terminate the participation of an institution in any title IV, HEA program.

(ii) The occurrence of any of the events in paragraph (b)(31)(ii) through (v) of this section.

\*      \*      \*      \*      \*

■ 5. Section 668.41 is amended by adding paragraphs (h) and (i) and revising the authority citation to read as follows:

### § 668.41  Reporting and disclosure of information.
\*      \*      \*      \*      \*

(h) *Loan repayment warning for proprietary institutions*—(1) *Calculation of loan repayment rate.* For each award year, the Secretary calculates a proprietary institution's loan repayment rate, for the cohort of borrowers who entered repayment on their FFEL or Direct Loans at any time during the two-year cohort period, using the methodology in § 668.413(b)(3), provided that, for the purpose of this paragraph (h)—

(i) The reference to "program" in § 668.413(b)(3)(vi) is read to refer to "institution";

(ii) "Award year" means the 12-month period that begins on July 1 of one year and ends on June 30 of the following year;

(iii) "Borrower" means a student who received a FFEL or Direct Loan for enrolling in a gainful employment program at the institution; and

(iv) "Two-year cohort period" is defined as set forth in § 668.402.

(2) *Issuing and appealing loan repayment rates.* (i) For each award year, the Secretary notifies an institution of its final loan repayment rate.

(ii) If an institution's final loan repayment rate shows that the median borrower has not either fully repaid all FFEL or Direct Loans received for enrollment in the institution or made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution—

(A) Using the calculation described in paragraph (h)(4)(ii) of this section, the institution may submit an appeal to the Secretary within 15 days of receiving notification of its final loan repayment rate; and

(B) The Secretary will notify the institution if the appeal is—

(*1*) Granted and the institution qualifies for an exemption from the warning requirement under paragraph (h)(4) of this section; or

(*2*) Not granted, and the institution must comply with the warning requirement under paragraph (h)(3) of this section.

(3) *Loan repayment warning*—(i) *Promotional materials.* (A) Except as provided in paragraph (h)(4) of this section, for any award year in which the institution's loan repayment rate shows that the median borrower has not either fully repaid, or made loan payments sufficient to reduce by at least one dollar the outstanding balance, of each of the borrower's FFEL or Direct Loans received for enrollment in the institution, the institution must, in all promotional materials that are made available to prospective or enrolled students by or on behalf of the institution, include a loan repayment warning in a form, place, and manner prescribed by the Secretary in a notice published in the **Federal Register**. The warning language must read: "U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans," unless stated otherwise by the Secretary in a notice

published in the **Federal Register**. Before publishing that notice, the Secretary may conduct consumer testing to help ensure that the warning is meaningful and helpful to students.

(B) Promotional materials include, but are not limited to, an institution's Web site, catalogs, invitations, flyers, billboards, and advertising on or through radio, television, video, print media, social media, or the Internet.

(C) The institution must ensure that all promotional materials, including printed materials, about the institution are accurate and current at the time they are published, approved by a State agency, or broadcast.

(ii) *Clarity of warning.* The institution must ensure that the warning is prominent, clear, and conspicuous. The warning is not prominent, clear, and conspicuous if it is difficult to read or hear, or placed where it can be easily overlooked. In written materials, including email, Internet advertising and promotional materials, print media, and other advertising or hard-copy promotional materials, the warning must be included on the cover page or home page and any other pages with information on a program of study and any pages with information on costs and financial aid. For television and video materials, the warning must be both spoken and written simultaneously. The Secretary may require the institution to modify its promotional materials, including its Web site, if the warning is not prominent, clear, and conspicuous.

(4) *Exemptions.* An institution is not required to provide a warning under paragraph (h)(3) of this section based on a final loan repayment rate for that award year if—

(i) That rate is based on fewer than 10 borrowers in the cohort described in paragraph (h)(1) of this section; or

(ii) The institution demonstrates to the Secretary's satisfaction that not all of its programs constitute GE programs and that if the borrowers in the non-GE programs were included in the calculation of the loan repayment rate, the loan repayment rate would show that the median borrower has made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution.

(i) *Financial protection disclosures—* (1) *General.* An institution must deliver a disclosure to enrolled and prospective students in the form and manner described in paragraph (i)(3), (4), and (5) of this section, and post that disclosure to its Web site as described in paragraph (i)(6) of this section, within 30 days of notifying the Secretary under

§ 668.171(h) of the occurrence of a triggering event or events identified pursuant to paragraph (i)(2) of this section. The requirements in this paragraph (i) apply for the 12-month period following the date the institution notifies the Secretary under § 668.171(h) of a triggering event or events identified under paragraph (i)(2).

(2) *Triggering events.* The Secretary will conduct consumer testing to inform the identification of events for which a disclosure is required. The Secretary will consumer test each of the events identified in § 668.171(c) through (g), as well as other events that result in an institution being required to provide financial protection to the Department, to determine which of these events are most meaningful to students in their educational decision-making. The Secretary will identify the triggering events for which a disclosure is required under paragraph (i)(1) in a document published in the **Federal Register**.

(3) *Form of disclosure.* The Secretary will conduct consumer testing to ensure the form of the disclosure is meaningful and helpful to students. The Secretary will specify the form and placement of the disclosure in a notice published in the **Federal Register** following the consumer testing.

(4) *Delivery to enrolled students.* An institution must deliver the disclosure required under this paragraph (i) to each enrolled student in writing by—

(i) Hand-delivering the disclosure as a separate document to the student individually or as part of a group presentation; or

(ii)(A) Sending the disclosure to the student's primary email address or delivering the disclosure through the electronic method used by the institution for communicating with the student about institutional matters; and

(B) Ensuring that the disclosure is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(5) *Delivery to prospective students.* An institution must deliver the disclosure required under this paragraph (i) to a prospective student before that student enrolls, registers, or enters into a financial obligation with the institution by—

(i) Hand-delivering the disclosure as a separate document to the student individually, or as part of a group presentation; or

(ii)(A) Sending the disclosure to the student's primary email address or delivering the disclosure through the electronic method used by the institution for communicating with

prospective students about institutional matters; and

(B) Ensuring that the disclosure is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(6) *Institutional Web site.* An institution must prominently provide the disclosure required under this paragraph (i) in a simple and meaningful manner on the home page of the institution's Web site.

*       *       *       *       *

(Authority: 20 U.S.C. 1092, 1094, 1099c)

■ 6. Section 668.71 is amended in paragraph (c), in the second sentence of the definition of "Misrepresentation", by removing the word "deceive" and adding in its place the words "mislead under the circumstances" and by adding a fourth sentence.

The addition reads as follows:

**§ 668.71   Scope and special definitions.**

*       *       *       *       *

(c) * * *

*Misrepresentation:* * * * Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading.

*       *       *       *       *

■ 7. Section 668.90 is amended by revising paragraph (a)(3) to read as follows:

**§ 668.90   Initial and final decisions.**

(a) * * *

(3) Notwithstanding the provisions of paragraph (a)(2) of this section—

(i) If, in a termination action against an institution, the hearing official finds that the institution has violated the provisions of § 668.14(b)(18), the hearing official also finds that termination of the institution's participation is warranted;

(ii) If, in a termination action against a third-party servicer, the hearing official finds that the servicer has violated the provisions of § 668.82(d)(1), the hearing official also finds that termination of the institution's participation or servicer's eligibility, as applicable, is warranted;

(iii) In an action brought against an institution or third-party servicer that involves its failure to provide a letter of credit or other financial protection under § 668.15 or § 668.171(c) through (g), the hearing official finds that the amount of the letter of credit or other financial protection established by the Secretary under § 668.175(f)(4) is appropriate, unless the institution can demonstrate that the amount was not warranted because—

(A) For financial protection demanded based on events or conditions described in § 668.171(c) through (f), the events or conditions no longer exist or have been resolved or the institution demonstrates that it has insurance that will cover the debts and liabilities that arise from the triggering event or condition, or, for a condition or event described in § 668.171(c)(1)(iii) (teach out) or (iv) (gainful employment eligibility loss), the amount of educationally related expenses reasonably attributable to the programs or location is greater than the amount calculated in accordance with Appendix C of subpart L of this part. The institution can demonstrate that insurance covers risk by presenting the Department with a statement from the insurer that the institution is covered for the full or partial amount of the liability in question;

(B) For financial protection demanded based on a suit described in § 668.171(c)(1)(i) that does not state a specific amount of relief and on which the court has not ruled on the amount of relief, the institution demonstrates that, accepting the facts alleged as true, and assuming the claims asserted are fully successful, the action pertains to a period, program, or location for which the maximum potential relief is less than the amount claimed or the amount determined under § 668.171(c)(2)(ii);

(C) For financial protection demanded based on the ground identified in § 668.171(g), the factor or event does not and will not have a material adverse effect on the financial condition, business, or results of operations of the institution;

(D)(1) For financial protection demanded under § 668.175(f)(4)(i), the institution does not participate and has not participated for the prior fiscal year in a title IV, HEA loan program; and

(2) For any financial protection demanded of an institution described in paragraph (a)(3)(iii)(D)(1) of this section, and any portion of financial protection demanded of any other institution greater than 10 percent of the amount of title IV, HEA funds received by the institution in its most recently completed fiscal year—

(i) The risk of loss to the Secretary on the grounds demonstrated by the Secretary does not exist;

(ii) The loss as demonstrated by the Secretary is not reasonably likely to arise within the next 18 months; or

(iii) The amount is unnecessary to protect, or contrary to, the Federal interest;

(E) The institution has proffered alternative financial protection that provides students and the Department

adequate protection against losses resulting from the risks identified by the Secretary. In the Secretary's discretion, adequate protection may consist of one or more of the following—

(1) An agreement with the Secretary that a portion of the funds due to the institution under a reimbursement or heightened cash monitoring funding arrangement will be temporarily withheld in such amounts as will meet, no later than the end of a nine-month period, the amount of the required financial protection demanded; or

(2) Other form of financial protection specified by the Secretary in a notice published in the **Federal Register.**

(iv) In a termination action taken against an institution or third-party servicer based on the grounds that the institution or servicer failed to comply with the requirements of § 668.23(c)(3), if the hearing official finds that the institution or servicer failed to meet those requirements, the hearing official finds that the termination is warranted;

(v)(A) In a termination action against an institution based on the grounds that the institution is not financially responsible under § 668.15(c)(1), the hearing official finds that the termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.15(d)(4) have been met; and

(B) In a termination or limitation action against an institution based on the grounds that the institution is not financially responsible—

(1) Upon proof of the conditions in § 668.174(a), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all the conditions in § 668.175(f) have been met; and

(2) Upon proof of the conditions in § 668.174(b)(1), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.174(b)(2) or § 668.175(g) have been met.

*       *       *       *       *

■ 8. Section 668.93 is amended by redesignating paragraphs (h) and (i) as paragraphs (i) and (j), respectively, and adding a new paragraph (h) to read as follows:

**§ 668.93   Limitation.**

*       *       *       *       *

(h) A change in the participation status of the institution from fully certified to participate to provisionally certified to participate under § 668.13(c).

*       *       *       *       *

■ 9. Section 668.171 is revised to read as follows:

**§ 668.171   General.**

(a) *Purpose.* To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that it is financially responsible under the standards established in this subpart. As provided under section 498(c)(1) of the HEA, the Secretary determines whether an institution is financially responsible based on the institution's ability to—

(1) Provide the services described in its official publications and statements;

(2) Meet all of its financial obligations; and

(3) Provide the administrative resources necessary to comply with title IV, HEA program requirements.

(b) *General standards of financial responsibility.* Except as provided under paragraphs (e) and (f) of this section, the Secretary considers an institution to be financially responsible if the Secretary determines that—

(1) The institution's Equity, Primary Reserve, and Net Income ratios yield a composite score of at least 1.5, as provided under § 668.172 and appendices A and B to this subpart;

(2) The institution has sufficient cash reserves to make required returns of unearned title IV, HEA program funds, as provided under § 668.173;

(3) The institution is able to meet all of its financial obligations and otherwise provide the administrative resources necessary to comply with title IV, HEA program requirements. An institution may not be able to meet its financial or administrative obligations if it is subject to an action or event described in paragraph (c), (d), (e), (f), or (g) of this section. The Secretary considers those actions or events in determining whether the institution is financially responsible only if they occur on or after July 1, 2017; and

(4) The institution or persons affiliated with the institution are not subject to a condition of past performance under § 668.174(a) or (b).

(c) *Debts, liabilities, and losses.* (1) Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if, after the end of the fiscal year for which the Secretary has most recently calculated an institution's composite score, the institution is subject to one or more of the following actions or triggering events, and as a result of the actual or potential debts, liabilities, or losses that have stemmed or may stem from those actions or events, the institution's recalculated composite score is less than 1.0, as determined by the Secretary under paragraph (c)(2) of this section:

(i) *Debts and borrower defense-related lawsuits.* (A) The institution is required to pay any debt or incur any liability arising from a final judgment in a judicial proceeding or from an administrative proceeding or determination, or from a settlement;

(B) The institution is being sued in an action brought on or after July 1, 2017 by a Federal or State authority for financial relief on claims related to the making of the Direct Loan for enrollment at the school or the provision of educational services and the suit has been pending for 120 days.

(ii) *Other litigation.* The institution is being sued in an action brought on or after July 1, 2017 that is not described in paragraph (c)(1)(i)(B) of this section and—

(A) The institution has filed a motion for summary judgment or summary disposition and that motion has been denied or the court has issued an order reserving judgment on the motion;

(B) The institution has not filed a motion for summary judgment or summary disposition by the deadline set for such motions by the court or agreement of the parties; or

(C) If the court did not set a deadline for filing a motion for summary judgment and the institution did not file such a motion, the court has set a pretrial conference date or trial date and the case is pending on the earlier of those two dates.

(iii) *Accrediting agency actions.* The institution was required by its accrediting agency to submit a teach-out plan, for a reason described in § 602.24(c)(1), that covers the closing of the institution or any of its branches or additional locations.

(iv) *Gainful employment.* As determined annually by the Secretary, the institution has gainful employment programs that, under § 668.403, could become ineligible based on their final D/E rates for the next award year.

(v) *Withdrawal of owner's equity.* For a proprietary institution whose composite score is less than 1.5, any withdrawal of owner's equity from the institution by any means, including by declaring a dividend, unless the transfer is to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated.

(2) *Recalculating the composite score*—(i) *General.* Unless the institution demonstrates to the satisfaction of the Secretary that the event or condition has had or will have no effect on the assets and liabilities of the institution under paragraph (g)(3)(iv) of this section, as specified in Appendix C of this subpart, the Secretary

recognizes and accounts for the actual or potential losses associated with the actions or events under paragraph (c)(1) of this section, and, based on that accounting, recalculates the institution's most recent composite score. The recalculation will occur regularly after associated actions or events are reported to the Secretary. The Secretary recalculates the composite score under this paragraph using the financial statements on which the institution's composite score has been calculated under § 668.172.

(ii) *Calculation of potential loss—debts and borrower defense-related lawsuits.* For a debt or a suit described in paragraph (c)(1)(i) of this section, the amount of loss is—

(A) The amount of debt;

(B) For a suit, the amount set by a court ruling, or, in the absence of a court ruling—

(1) The amount of relief claimed in the complaint;

(2) If the complaint demands no specific amount of relief, the amount stated in any final written demand issued by the agency to the institution prior to the suit or a lesser amount that the agency offers to accept in settlement of any financial demand in the suit; or

(3) If the agency stated no specific demand in the complaint, in a pre-filing demand, or in a written offer of settlement, the amount of tuition and fees received by the institution during the period, and for the program or location, described in the allegations in the complaint.

(iii) *Calculation of potential loss—other litigation.* For any suit described in paragraph (c)(1)(ii) of this section, the amount of loss is the amount set by a court ruling, or, in the absence of a court ruling—

(A) The amount of relief claimed in the complaint;

(B) If the complaint demands no specific amount of relief, the amount stated in any final written demand by the claimant to the institution prior to the suit or a lesser amount that the plaintiff offers to accept in settlement of any financial demand in the suit; or

(C) If the complainant stated no specific demand in the complaint, in a pre-filing demand, or in a written offer of settlement, the amount of the claim as stated in a response to a discovery request, including an expert witness report.

(iv) *Calculation of potential loss—other events.* (A) For a closed location or institution, or the potential loss of eligibility for gainful employment programs, as described in paragraph (c)(1)(iii) or (iv), the amount of loss is the amount of title IV, HEA program

funds the institution received in its most recently completed fiscal year for that location or institution, or for those GE programs.

(B) For the withdrawal of owner's equity, described in paragraph (c)(1)(v) of this section, the amount of loss is the amount transferred to any entity other than the institution.

(d) *Non-title IV revenue.* Except as provided under paragraph (h)(3) of this section, a proprietary institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if, for its most recently completed fiscal year, the institution did not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds, as provided under § 668.28(c).

(e) *Publicly traded institutions.* Except as provided under paragraph (h)(3) of this section, a publicly traded institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the institution is currently subject to one or more of the following actions or events:

(1) *SEC actions.* The SEC warns the institution that it may suspend trading on the institution's stock.

(2) *SEC reports.* The institution failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25.

(3) *Exchange actions.* The exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements, or its stock is delisted.

(f) *Cohort default rates.* Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(1) The institution files a challenge, request for adjustment, or appeal under that subpart with respect to its rates for one or both of those fiscal years; and

(2) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(g) *Discretionary factors or events.* Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the

Secretary demonstrates that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution, including but not limited to whether—

(1) There is a significant fluctuation between consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs;

(2) The institution is cited by a State licensing or authorizing agency for failing State or agency requirements;

(3) The institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient capital to absorb losses that may be incurred as a result of adverse conditions and continue to meet its financial obligations to the Secretary and students;

(4) As calculated by the Secretary, the institution has high annual dropout rates;

(5) The institution is or was placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation, by its accrediting agency for failing to meet one or more of the agency's standards;

(6)(i) The institution violated a provision or requirement in a loan agreement; and

(ii) As provided under the terms of a security or loan agreement between the institution and the creditor, a monetary or nonmonetary default or delinquency event occurs, or other events occur, that trigger, or enable the creditor to require or impose on the institution, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

(7) The institution has pending claims for borrower relief discharge under § 685.206 or § 685.222; or

(8) The Secretary expects to receive a significant number of claims for borrower relief discharge under § 685.206 or § 685.222 as a result of a lawsuit, settlement, judgement, or finding from a State or Federal administrative proceeding.

(h) *Reporting requirements.* (1) In accordance with procedures established by the Secretary, an institution must notify the Secretary of any of the following actions or events identified in paragraphs (c) through (g) of this section no later than—

(i) For lawsuits and for other actions or events described in paragraph (c)(1)(i) of this section—

(A) For lawsuits, 10 days after the institution is served with the complaint and 10 days after the suit has been pending for 120 days; and

(B) For debts arising from lawsuits and for other actions or events, 10 days after a payment was required or a liability was incurred.

(ii) For lawsuits described in paragraph (c)(1)(ii) of this section—

(A) Ten days after the institution is served with the complaint;

(B) Ten days after the court sets the dates for the earliest of the events described in paragraph (c)(1)(ii) of this section, provided that, if the deadline is set by procedural rules, notice of the applicable deadline must be included with notice of the service of the complaint; and

(C) Ten days after the earliest of the applicable events occurs;

(iii) For an accrediting agency action described in paragraph (c)(1)(iii) of this section, 10 days after the institution is notified by its accrediting agency that it must submit a teach-out plan;

(iv) For a withdrawal of owner's equity described in paragraph (c)(1)(v) of this section, 10 days after the withdrawal is made;

(v) For the non-title IV revenue provision in paragraph (d) of this section, 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3);

(vi) For the SEC and stock exchange provisions for publicly traded institutions in paragraph (e), 10 days after the SEC or exchange warns, notifies, or takes an action against the institution, or 10 days after any extension granted by the SEC;

(vii) For State or agency actions in paragraph (g)(2) of this section, 10 days after the institution is cited for violating a State or agency requirement;

(viii) For probation or show cause actions under paragraph (g)(5) of this section, 10 days after the institution's accrediting agency places the institution on that status; or

(ix) For the loan agreement provisions in paragraph (g)(6) of this section, 10 days after a loan violation occurs, the creditor waives the violation, or the creditor imposes sanctions or penalties in exchange or as a result of the waiver.

(2) The Secretary may take an administrative action under paragraph (k) of this section against the institution if it fails to provide timely notice under this paragraph (h).

(3) In its notice to the Secretary, the institution may demonstrate that—

(i) For a suit by a Federal or State agency described in paragraph (c)(1)(i)(B) of this section, the amount claimed in the complaint or determined

under paragraph (c)(2)(ii) of this section exceeds the potential recovery because the allegations in the complaint, if accepted as true, and the claims asserted, if fully successful, cannot produce relief in the amount claimed or, if no amount was claimed, the amount deemed under paragraph (c)(2)(ii) because they pertain to a period, program, or location for which the full recovery possible is a lesser amount;

(ii) The reported withdrawal of owner's equity under paragraph (c)(1)(v) of this section was used exclusively to meet tax liabilities of the institution or its owners for income derived from the institution;

(iii) The reported violation of a provision or requirement in a loan agreement under paragraph (g)(6) of this section was waived by the creditor. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (g)(6)(ii) of this section, the institution must identify and describe those penalties, constraints, or requirements and may demonstrate that complying with those actions will not adversely affect the institution's ability to meet its current and future financial obligations; or

(iv) The action or event reported under this paragraph (h) no longer exists or has been resolved or the institution has insurance that will cover part or all of the debts and liabilities that arise at any time from that action or event.

(i) *Public institutions.* (1) The Secretary considers a domestic public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the State, local, or municipal government entity, tribal authority, or other government entity that has the legal authority to make that designation; and

(B) Provides a letter from an official of that State or other government entity confirming that the institution is a public institution; and

(ii) Is not subject to a condition of past performance under § 668.174.

(2) The Secretary considers a foreign public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(B) Provides documentation from an official of that country or other government entity confirming that the institution is a public institution and is backed by the full faith and credit of the country or other government entity; and

(ii) Is not subject to a condition of past performance under § 668.174.

(j) *Audit opinions.* Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Secretary does not consider the institution to be financially responsible if, in the institution's audited financial statements, the opinion expressed by the auditor was an adverse, qualified, or disclaimed opinion, or the auditor expressed doubt about the continued existence of the institution as a going concern, unless the Secretary determines that a qualified or disclaimed opinion does not significantly bear on the institution's financial condition.

(k) *Administrative actions.* If the Secretary determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative standard in § 668.175, or the institution does not submit its financial and compliance audits by the date and in the manner required under § 668.23, the Secretary may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs; or

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d).

(Authority: 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95–452, 92 Stat. 1101–1109)

■ 10. Section 668.175 is amended by:
■ A. Revising paragraphs (c) and (d).
■ B. Removing and reserving paragraph (e).
■ C. Revising paragraph (f).
■ D. Adding paragraph (h).
■ E. Revising the authority citation.

The revisions and addition read as follows:

**§ 668.175   Alternative standards and requirements.**

\*   \*   \*   \*   \*

(c) *Letter of credit alternative for participating institutions.* A participating institution that is not financially responsible either because it does not satisfy one or more of the standards of financial responsibility under § 668.171(b) through (g), or because of an audit opinion described under § 668.171(j), qualifies as a financially responsible institution by submitting an irrevocable letter of credit or other form of financial protection specified by the Secretary in a notice published in the Federal Register, that is acceptable and payable to the

Secretary, for an amount determined by the Secretary that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year.

(d) *Zone alternative.* (1) A participating institution that is not financially responsible solely because the Secretary determines that its composite score under § 668.172 is less than 1.5 may participate in the title IV, HEA programs as a financially responsible institution for no more than three consecutive years, beginning with the year in which the Secretary determines that the institution qualifies under this alternative.

(i)(A) An institution qualifies initially under this alternative if, based on the institution's audited financial statement for its most recently completed fiscal year, the Secretary determines that its composite score is in the range from 1.0 to 1.4; and

(B) An institution continues to qualify under this alternative if, based on the institution's audited financial statement for each of its subsequent two fiscal years, the Secretary determines that the institution's composite score is in the range from 1.0 to 1.4.

(ii) An institution that qualified under this alternative for three consecutive years, or for one of those years, may not seek to qualify again under this alternative until the year after the institution achieves a composite score of at least 1.5, as determined by the Secretary.

(2) Under the zone alternative, the Secretary—

(i) Requires the institution to make disbursements to eligible students and parents, and to otherwise comply with the provisions, under either the heightened cash monitoring or reimbursement payment method described in § 668.162;

(ii) Requires the institution to provide timely information regarding any of the following oversight and financial events—

(A) Any event that causes the institution, or related entity as defined in Accounting Standards Codification (ASC) 850, to realize any liability that was noted as a contingent liability in the institution's or related entity's most recent audited financial statement; or

(B) Any losses that are unusual in nature or infrequently occur, or both, as defined in accordance with Accounting Standards Update (ASU) No. 2015–01 and ASC 225;

(iii) May require the institution to submit its financial statement and compliance audits earlier than the time specified under § 668.23(a)(4); and

(iv) May require the institution to provide information about its current operations and future plans.

(3) Under the zone alternative, the institution must—

(i) For any oversight or financial event described in paragraph (d)(2)(ii) of this section for which the institution is required to provide information, in accordance with procedures established by the Secretary, notify the Secretary no later than 10 days after that event occurs; and

(ii) As part of its compliance audit, require its auditor to express an opinion on the institution's compliance with the requirements under the zone alternative, including the institution's administration of the payment method under which the institution received and disbursed title IV, HEA program funds.

(4) If an institution fails to comply with the requirements under paragraph (d)(2) or (3) of this section, the Secretary may determine that the institution no longer qualifies under this alternative.

\*      \*      \*      \*      \*

(f) *Provisional certification alternative.* (1) The Secretary may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if, as determined annually by the Secretary—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b)(1) or (3), its recalculated composite score under § 668.171(c)(2) is less than 1.0, is subject to an action or event under § 668.171(d), (e), (f),or (g) or because of an audit opinion described in § 668.171(i); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Secretary that it has satisfied or resolved that condition.

(2) Under this alternative, the institution must—

(i) Provide to the Secretary an irrevocable letter of credit that is acceptable and payable to the Secretary, agree to a set-aside under paragraph (h) of this section, or, at the Secretary's discretion, provide another form of financial protection specified by the Secretary in a notice published in the **Federal Register**, for an amount determined by the Secretary under paragraph (f)(4) of this section, except that this requirement does not apply to a public institution; and

(ii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3).

(3) If at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible, the Secretary—

(i) May permit the institution to participate under a provisional certification, but—

(A) May require the institution, or one or more persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), or both, to provide to the Secretary financial protection for an amount determined by the Secretary under paragraph (f)(4) of this section; and

(B) May require one or more of the persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), to be jointly or severally liable for any liabilities that may arise from the institution's participation in the title IV, HEA programs; and

(ii) May permit the institution to continue to participate under a provisional certification but requires the institution to provide, or continue to provide, the financial protection resulting from an event described in § 668.171(c) through (g) until the institution meets the requirements of paragraph (f)(5) of this section.

(4)(i) The institution must provide to the Secretary the financial protection described under paragraph (f)(2)(i) in an amount that, together with the amount of any financial protection that the institution has already provided if that protection covers the period described in paragraph (f)(5) of this section, equals, for a composite score calculated under § 668.172, a composite score recalculated under § 668.171(c)(2), or for any other reason that the institution is not financially responsible—

(A) Ten percent of the total amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year; and

(B) Any additional amount that the Secretary demonstrates is needed under paragraph (f)(4)(ii) of this section.

(ii) The Secretary determines the amount specified in paragraph (f)(4)(i)(B) of this section that must be provided by the institution in addition to the amount specified in paragraph (f)(4)(i)(A) of this section, and must ensure that the total amount of financial protection provided under paragraph (f)(4)(i) of this section is sufficient to fully cover any estimated losses. The

Secretary may reduce the amount required under paragraph (f)(4)(i)(B) only if an institution demonstrates that this amount is unnecessary to protect, or is contrary to, the Federal interest.

(5) The Secretary maintains the full amount of the financial protection provided by the institution under paragraph (f)(4) of this section until the Secretary first determines that the institution has—

(i) A composite score of 1.0 or greater based on the review of the audited financial statements for the fiscal year in which all losses from any event described in § 668.171(c), (d), (e), (f), or (g) on which financial protection was required have been fully recognized; or

(ii) A recalculated composite score of 1.0 or greater, and any event or condition described in § 668.171(d), (e), (f), or (g) has ceased to exist.

\*      \*      \*      \*      \*

(h) *Set-aside.* If an institution does not provide a letter of credit or financial protection acceptable to the Secretary for the amount required under paragraph (d) or (f) of this section within 45 days of the Secretary's request, the Secretary offsets the amount of title IV, HEA program funds that an institution is eligible to receive in a manner that ensures that, no later than the end of a nine-month period, the total amount offset equals the amount of financial protection the institution would otherwise provide. The Secretary uses the funds to satisfy the debt and liabilities owed to the Secretary that are not otherwise paid directly by the institution, and provides to the institution any funds not used for this purpose during the period for which the financial protection was required, or provides the institution any remaining funds if the institution subsequently submits the financial protection originally required under paragraph (d) or (f) of this section.

\*      \*      \*      \*      \*

(Authority: 20 U.S.C. 1094 and 1099c)

■ 11. Section 668.176 is added to subpart L to read as follows:

### § 668.176   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

(Authority: 20 U.S.C. 1094, 1099c)

■ 12. Appendix C to subpart L of part 668 is added to read as follows:

**Appendix C to Subpart L of Part 668 - Balance Sheet and Income Statement Adjustments for Recalculating Composite Score**

### Section 1: Proprietary Institutions

| Event | Borrower-defense related lawsuits and other debts, §668.171(c)(1)(i) | Other Litigation, §668.171(c)(1)(ii) | Withdrawal of Owner's Equity, §668.171(c)(1)(iii) | Accrediting Agency Requires Teach-out Plan for Closed Location, §668.171(c)(1)(iii) | Gainful Employment Programs, Loss of Eligibility, §668.171(c)(1)(iv) |
|---|---|---|---|---|---|
| Amount of Loss | Debt, relief claimed, or other amount as determined under §668.171(c)(2)(ii) | Relief claimed, or other amount as determined under §668.171(c)(2)(iii) | Total amount withdrawn, §668.171(c)(2)(iv) | Title IV funds received by the closed insitution or location during the most recently completed fiscal year, §668.171(c)(2)(iv) | Title IV funds received during the most recently completed fiscal year by GE programs in jeopardy of losing eligibility, §668.171(c)(2)(iv) |
| Allowance for Expenses | Not applicable | | | Cost of Goods Sold (#28) / Operating Income (#25) multiplied by Amount of Loss | |

| | | Entries for Loss — Line item from Section 2, Appendix A | | | | | Entries for Loss and Expenses — Line item from Section 2, Appendix A | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit |
| Adjusting Entries | #32, Total Expenses | | #32, Total Expenses | | #23, Total Owners Equity | | #27, Total Income | | #27, Total Income | |
| | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets |
| | NA | | NA | | NA | | #13, Total Assets (expense allowance) | | #13, Total Assets (expense allowance) | |
| | | NA | | NA | | NA | | #32, Total Expenses (expense allowance) | | #32, Total Expenses (expense allowance) |

Note that based on the changes to #27 Total Income and Line #32 Total expenses, the following line items may be recalculated: #34 Net Income Before Taxes, #36 Net Income After Taxes, #38 Net Income, #22 Retained Earnings, #23 Total Owner's Equity, and #24 Total Liabilities and Owner's Equity

## Section 2: Non-profit Institutions

| | Borrower-defense related lawsuits and other debts, §668.171(c)(1)(i) | | Other Litigation, §668.171(c)(1)(ii) | | Accrediting Agency Requires Teach-out Plan for Closed Location, §668.171(c)(1)(iii) | | Gainful Employment Programs, Loss of Eligibility, §668.171(c)(1)(iv) | |
|---|---|---|---|---|---|---|---|---|
| **Event** | | | | | | | | |
| **Amount of Loss** | Debt, relief claimed, or other amount as determined under §668.171(c)(2)(ii) | | Relief claimed, or other amount as determined under §668.171(c)(2)(iii) | | Title IV funds received by the closed institution or location during the most recently completed fiscal year, §668.171(c)(2)(iv) | | Title IV funds received during the most recently completed fiscal year by GE programs in jeopardy of losing eligibility, §668.171(c)(2)(iv) | |
| **Allowance for Expenses** | Not applicable | | | | Operating expenses (#32) / Tuition & Fees (#27) multiplied by Amount of Loss | | | |
| | Entries for Loss Line item from Section 2, Appendix B | | | | Entries for Loss and Expenses Line item from Section 2, Appemdix B | | | |
| | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit |
| **Adjusting Entries** | #38b, Total Expenses (Unrestricted) | | #38b, Total Expenses (Unrestricted) | | #31b, Total Revenue (Unrestricted) | | #31b, Total Revenue (Unrestricted) | |
| | | #12, Total Assets | | #12, Total Assets | | #12, Total Assets | | #12, Total Assets |
| | NA | | NA | | #12, Total Assets (expense allowance) | | #12, Total Assets (expense allowance) | |
| | | NA | | NA | | #38b, Total Expenses (expense allowance) | | #38b, Total Expenses (expense allowance) |

Note that based on the changes to #31b Total Revenue (Unrestricted) and #38b Total Expenses (Unrestricted), the following items may be recalculated: #39b Change in (Unrestricted) Net Assets, #41b (Unrestricted) Net Assets at end of year (will be same as #20 Unrestricted Net Assets), #25 Total Net Assets, #26 Total Liabilitites & Net Assets.

## PART 674—FEDERAL PERKINS LOAN PROGRAM

■ 13. The authority citation for part 674 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087aa–1087hh, unless otherwise noted.

■ 14. Section 674.33 is amended by:
■ A. Revising paragraph (g)(3).
■ B. Redesignating paragraphs (g)(8)(vi) through (ix) as paragraphs (g)(8)(vii) through (x), respectively.
■ C. Adding a new paragraph (g)(8)(vi). The revision and addition read as follows:

### §674.33  Repayment.

* * * * *

(g) * * *

(3) *Determination of borrower qualification for discharge by the Secretary.* (i) The Secretary may discharge the borrower's obligation to repay an NDSL or Federal Perkins Loan without an application if the Secretary determines that—

(A) The borrower qualified for and received a discharge on a loan pursuant to 34 CFR 682.402(d) (Federal Family Education Loan Program) or 34 CFR 685.214 (Federal Direct Loan Program), and was unable to receive a discharge on an NDSL or Federal Perkins Loan because the Secretary lacked the statutory authority to discharge the loan; or

(B) Based on information in the Secretary's possession, the borrower qualifies for a discharge.

(ii) With respect to schools that closed on or after November 1, 2013, the Secretary will discharge the borrower's obligation to repay an NDSL or Federal Perkins Loan without an application from the borrower if the Secretary determines that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

* * * * *

(8) * * *

(vi) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

* * * * *

■ 15. Section 674.61 is amended by revising paragraph (a) to read as follows:

### §674.61  Discharge for death or disability.

(a) *Death.* (1) An institution must discharge the unpaid balance of a borrower's Defense, NDSL, or Federal

Perkins loan, including interest, if the borrower dies. The institution must discharge the loan on the basis of—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the chief financial officer of the institution may approve a discharge based upon other reliable documentation of the borrower's death.

\*    \*    \*    \*    \*

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 16. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

### § 682.202   [Amended]

■ 17. Section 682.202 is amended in paragraph (b)(1) by removing the words "A lender" and adding in their place "Except as provided in § 682.405(b)(4), a lender".

■ 18. Section 682.211 is amended by adding paragraph (i)(7) to read as follows:

### § 682.211   Forbearance.

\*    \*    \*    \*    \*

(i) \* \* \*

(7) The lender must grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k). The mandatory administrative forbearance shall be granted in yearly increments or for a period designated by the Secretary until the loan is consolidated or until the lender is notified by the Secretary to discontinue the forbearance.

\*    \*    \*    \*    \*

■ 19. Section 682.402 is amended:
■ A. By revising paragraphs (b)(2) and (d)(3).
■ B. In paragraph (d)(6)(ii)(B)(1) and (2), by removing the words "sworn statement (which may be combined)"

and adding in their place the word "application".
■ C. By revising paragraph (d)(6)(ii)(F) introductory text.
■ D. In paragraph (d)(6)(ii)(F)(5) removing the words "and sworn statement".
■ E. In paragraph (d)(6)(ii)(G) introductory text, by removing the words "request and supporting sworn statement" and adding, in their place, the words "completed application".
■ F. By revising paragraph (d)(6)(ii)(H).
■ G. By redesignating paragraph (d)(6)(ii)(I) as paragraph (d)(6)(ii)(J).
■ H. By adding new paragraph (d)(6)(ii)(I) and paragraph (d)(6)(ii)(K).
■ I. By revising paragraphs (d)(7)(ii) and (iii) and (d)(8).
■ J. In paragraph (e)(6)(iii), by removing the last sentence.

The revisions and additions read as follows:

### § 682.402   Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

\*    \*    \*    \*    \*

(b) \* \* \*

(2)(i) A discharge of a loan based on the death of the borrower (or student in the case of a PLUS loan) must be based on—

(A) An original or certified copy of the death certificate;

(B) An accurate and complete photocopy of the original or certified copy of the death certificate;

(C) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(D) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(ii) Under exceptional circumstances and on a case-by-case basis, the chief executive officer of the guaranty agency may approve a discharge based upon other reliable documentation of the borrower's or student's death.

\*    \*    \*    \*    \*

(d) \* \* \*

(3) *Borrower qualification for discharge.* Except as provided in paragraph (d)(8) of this section, in order to qualify for a discharge of a loan under paragraph (d) of this section, a borrower must submit a completed closed school discharge application on a form approved by the Secretary. By signing the application, the borrower certifies—

\*    \*    \*    \*    \*

(6) \* \* \*

(ii) \* \* \*

(F) If the guaranty agency determines that a borrower identified in paragraph

(d)(6)(ii)(C) or (D) of this section does not qualify for a discharge, the agency shall notify the borrower in writing of that determination and the reasons for it, the opportunity for review by the Secretary, and how to request such a review within 30 days after the date the agency—

\*    \*    \*    \*    \*

(H) If a borrower described in paragraph (d)(6)(ii)(E) or (F) of this section fails to submit the completed application within 60 days of being notified of that option, the lender or guaranty agency shall resume collection.

(I) Upon resuming collection on any affected loan, the lender or guaranty agency provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

\*    \*    \*    \*    \*

(K)(1) Within 30 days after receiving the borrower's request for review under paragraph (d)(6)(ii)(F) of this section, the agency shall forward the borrower's discharge request and all relevant documentation to the Secretary for review.

(2) The Secretary notifies the agency and the borrower of the determination upon review. If the Secretary determines that the borrower is not eligible for a discharge under paragraph (d) of this section, within 30 days after being so informed, the agency shall take the actions described in paragraph (d)(6)(ii)(H) or (I) of this section, as applicable.

(3) If the Secretary determines that the borrower meets the requirements for a discharge under paragraph (d) of this section, the agency shall, within 30 days after being so informed, take actions required under paragraphs (d)(6)(ii)(E) and (d)(6)(ii)(G)(1) of this section, and the lender shall take the actions described in paragraph (d)(7)(iv) of this section, as applicable.

\*    \*    \*    \*    \*

(7) \* \* \*

(i) \* \* \*

(ii) If the borrower fails to submit a completed application described in paragraph (d)(3) of this section within 60 days of being notified of that option, the lender shall resume collection and shall be deemed to have exercised forbearance of payment of principal and interest from the date the lender suspended collection activity. The lender may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period. Upon resuming collection, the lender provides the borrower with another discharge application and an explanation of the

requirements and procedures for obtaining a discharge.

(iii) The lender shall file a closed school claim with the guaranty agency in accordance with § 682.402(g) no later than 60 days after the lender receives a completed application described in paragraph (d)(3) of this section from the borrower, or notification from the agency that the Secretary approved the borrower's appeal in accordance with paragraph (d)(6)(ii)(K)(3) of this section.

\* \* \* \* \*

(8) *Discharge without an application.* (i) A borrower's obligation to repay a FFEL Program loan may be discharged without an application from the borrower if the—

(A) Borrower received a discharge on a loan pursuant to 34 CFR 674.33(g) under the Federal Perkins Loan Program, or 34 CFR 685.214 under the William D. Ford Federal Direct Loan Program; or

(B) Secretary or the guaranty agency, with the Secretary's permission, determines that the borrower qualifies for a discharge based on information in the Secretary or guaranty agency's possession.

(ii) With respect to schools that closed on or after November 1, 2013, a borrower's obligation to repay a FFEL Program loan will be discharged without an application from the borrower if the Secretary or guaranty agency determines that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed.

\* \* \* \* \*

■ 20. Section 682.405 is amended by redesignating paragraph (b)(4) as paragraph (b)(4)(i) and adding paragraph (b)(4)(ii).

The addition reads as follows:

**§ 682.405   Loan rehabilitation agreement.**

\* \* \* \* \*

(b) \* \* \*

(4) \* \* \*

(ii) The lender must not consider the purchase of a rehabilitated loan as entry into repayment or resumption of repayment for the purposes of interest capitalization under § 682.202(b).

\* \* \* \* \*

■ 21. Section 682.410 is amended:

■ A. In paragraph (b)(4) by adding, after the words "to the lender", the words and punctuation ", but shall not capitalize any unpaid interest thereafter".

■ B. By adding paragraph (b)(6)(viii). The addition reads as follows:

**§ 682.410   Fiscal, administrative, and enforcement requirements.**

\* \* \* \* \*

(b) \* \* \*

(6) \* \* \*

(viii) Upon notification by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k), the guaranty agency must suspend all collection activities on the affected loan for the period designated by the Secretary.

\* \* \* \* \*

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 22. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 23. Section 685.200 is amended by adding paragraphs (f)(3)(v) and (f)(4)(iii) to read as follows:

**§ 685.200   Borrower eligibility.**

\* \* \* \* \*

(f) \* \* \*

(3) \* \* \*

(v) A borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge that results in a remaining eligibility period greater than zero is no longer responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of the loan, as described in paragraph (f)(3)(i) of this section.

(4) \* \* \*

(iii) For a first-time borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge on a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan, the Subsidized Usage Period is reduced. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in full, the Subsidized Usage Period of those loans is zero years. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in part, the Subsidized Usage Period may be reduced if the discharge results in the inapplicability of paragraph (f)(4)(i) of this section.

\* \* \* \* \*

■ 24. Section 685.205 is amended by revising paragraph (b)(6) to read as follows:

**§ 685.205   Forbearance.**

\* \* \* \* \*

(b) \* \* \*

(6) Periods necessary for the Secretary to determine the borrower's eligibility for discharge—

(i) Under § 685.206(c);

(ii) Under § 685.214;

(iii) Under § 685.215;

(iv) Under § 685.216;

(v) Under § 685.217;

(vi) Under § 685.222; or

(vii) Due to the borrower's or endorser's (if applicable) bankruptcy;

\* \* \* \* \*

■ 25. Section 685.206 is amended by revising paragraph (c) to read as follows:

**§ 685.206   Borrower responsibilities and defenses.**

\* \* \* \* \*

(c) *Borrower defenses.* (1) For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph. A "borrower defense" refers to any act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.

(ii) A claim to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(2) The order of objections for defaulted Direct Loans are as described in § 685.222(a)(6). A borrower defense claim under this section must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k).

(3) For an approved borrower defense under this section, except as provided in paragraph (c)(4) of this section, the Secretary may initiate an appropriate proceeding to collect from the school whose act or omission resulted in the borrower defense the amount of relief arising from the borrower defense, within the later of—

(i) Three years from the end of the last award year in which the student attended the institution; or

(ii) The limitation period that State law would apply to an action by the borrower to recover on the cause of action on which the borrower defense is based.

(4) The Secretary may initiate a proceeding to collect at any time if the

institution received notice of the claim before the end of the later of the periods described in paragraph (c)(3) of this section. For purposes of this paragraph, notice includes receipt of—

(i) Actual notice from the borrower, from a representative of the borrower, or from the Department;

(ii) A class action complaint asserting relief for a class that may include the borrower; and

(iii) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower.

\*   \*   \*   \*   \*

§ 685.209   [Amended]

■ 26. Section 685.209 is amended:
■ A. In paragraph (a)(1)(ii), by adding ", for purposes of determining whether a borrower has a partial financial hardship in accordance with paragraph (a)(1)(v) of this section or adjusting a borrower's monthly payment amount in accordance with paragraph (a)(2)(ii) of this section," after the words "*Eligible loan*".
■ B. In paragraph (c)(1)(ii), by adding ", for purposes of adjusting a borrower's monthly payment amount in accordance with paragraph (c)(2)(ii) of this section," after the words "*Eligible loan*".
■ C. In paragraph (c)(2)(ii)(B) introductory text, by removing the word "Both" and adding in its place the words "Except in the case of a married borrower filing separately whose spouse's income is excluded in accordance with paragraph (c)(1)(i)(A) or (B) of this section, both".
■ D. In paragraph (c)(2)(v), by removing the words "or the Secretary determines the borrower does not have a partial financial hardship".
■ E. In paragraph (c)(4)(iii)(B), by removing the citations "(c)(2)(iv), (c)(4)(v), and (c)(4)(vi)" and adding, in their place, the citations "(c)(2)(iv) and (c)(4)(v)".
■ 27. Section 685.212 is amended by revising paragraphs (a)(1) and (2) and adding paragraph (k) to read as follows:

§ 685.212   Discharge of a loan obligation.

(a) *Death.* (1) If a borrower (or a student on whose behalf a parent borrowed a Direct PLUS Loan) dies, the Secretary discharges the obligation of the borrower and any endorser to make any further payments on the loan based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges a loan based upon other reliable documentation of the borrower's or student's death that is acceptable to the Secretary.

\*   \*   \*   \*   \*

(k) *Borrower defenses.* (1) If a borrower defense is approved under § 685.206(c) or § 685.222—

(i) The Secretary discharges the obligation of the borrower in whole or in part in accordance with the procedures in §§ 685.206(c) and 685.222, respectively; and

(ii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the loan that exceed the amount owed on that portion of the loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim subject to § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or

(B) For a claim subject to § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(2) In the case of a Direct Consolidation Loan, a borrower may assert a borrower defense under § 685.206(c) or § 685.222 with respect to a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act that was repaid by the Direct Consolidation Loan.

(i) The Secretary considers a borrower defense claim asserted on a Direct Consolidation Loan by determining—

(A) Whether the act or omission of the school with regard to the loan described in paragraph (k)(2) of this section, other than a Direct Subsidized, Unsubsidized, or PLUS Loan, constitutes a borrower defense under § 685.206(c), for a Direct Consolidation Loan made before July 1, 2017, or under § 685.222, for a Direct Consolidation Loan made on or after July 1, 2017; or

(B) Whether the act or omission of the school with regard to a Direct Subsidized, Unsubsidized, or PLUS Loan made on after July 1, 2017 that was paid off by the Direct Consolidation Loan, constitutes a borrower defense under § 685.222.

(ii) If the borrower defense is approved, the Secretary discharges the appropriate portion of the Direct Consolidation Loan.

(iii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the Direct Consolidation Loan that exceed the amount owed on that portion of the Direct Consolidation Loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim asserted under § 685.206(c), the limitation period under the law applicable to the claim on which relief was granted; or

(B) For a claim asserted under § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(iv) The Secretary returns to the borrower a payment made by the borrower or otherwise recovered on the loan described in paragraph (k)(2) of this section only if—

(A) The payment was made directly to the Secretary on the loan; and

(B) The borrower proves that the loan to which the payment was credited was not legally enforceable under applicable law in the amount for which that payment was applied.

\*   \*   \*   \*   \*

■ 28. Section 685.214 is amended by:
■ A. Revising paragraphs (c)(2) and (f)(4).
■ B. Redesignating paragraphs (f)(5) and (6) as paragraphs (f)(6) and (7), respectively.
■ C. Adding a new paragraph (f)(5).
The revisions and addition read as follows:

§ 685.214   Closed school discharge.

\*   \*   \*   \*   \*

(c) \*   \*   \*

(2) If the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for the discharge of a loan under this section, the Secretary—

(i) May discharge the loan without an application from the borrower; and

(ii) With respect to schools that closed on or after November 1, 2013, will discharge the loan without an application from the borrower if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

\*   \*   \*   \*   \*

(f) * * *

(4) If a borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(5) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

*       *       *       *       *

■ 29. Section 685.215 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Revising paragraph (c) introductory text.
■ C. Revising paragraph (c)(1).
■ D. Redesignating paragraphs (c)(2) through (7) as paragraphs (c)(3) through (8), respectively.
■ E. Adding a new paragraph (c)(2).
■ F. Revising redesignated paragraph (c)(8).
■ G. Revising paragraph (d).
  The revisions and addition read as follows:

§685.215   Discharge for false certification of student eligibility or unauthorized payment.

(a) *Basis for discharge*—(1) *False certification.* The Secretary discharges a borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if a school falsely certifies the eligibility of the borrower (or the student on whose behalf a parent borrowed) to receive the proceeds of a Direct Loan. The Secretary considers a student's eligibility to borrow to have been falsely certified by the school if the school—

(i) Certified the eligibility of a student who—

(A) Reported not having a high school diploma or its equivalent; and

(B) Did not satisfy the alternative to graduation from high school requirements under section 484(d) of the Act that were in effect at the time of certification;

(ii) Certified the eligibility of a student who is not a high school graduate based on—

(A) A high school graduation status falsified by the school; or

(B) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(iii) Signed the borrower's name on the loan application or promissory note without the borrower's authorization;

(iv) Certified the eligibility of the student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment in the student's State of residence when the loan was originated in the occupation for which the training program supported by the loan was intended; or

(v) Certified the eligibility of a student for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (c)(5)(ii) of this section.

*       *       *       *       *

(c) *Borrower qualification for discharge.* To qualify for discharge under this section, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraph (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.

(1) *High school diploma or equivalent.* In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative to graduation from high school eligibility requirements under section 484(d) of the Act applicable at the time the loan was originated, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student on whose behalf a parent received a PLUS loan)—

(i) Reported not having a valid high school diploma or its equivalent at the time the loan was certified; and

(ii) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable at the time the institution certified the loan.

(2) *Disqualifying condition.* In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan)—

(i) Did not meet State requirements for employment (in the student's State of residence) in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

(ii) [Reserved]

*       *       *       *       *

(8) *Discharge without an application.* The Secretary discharges all or part of a loan as appropriate under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge. Such information includes, but is not limited to, evidence that the school has falsified the Satisfactory Academic Progress of its students, as described in § 668.34.

(d) *Discharge procedures.* (1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower an application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(3) If the borrower submits the application described in paragraph (c) of this section, the Secretary determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the Secretary's records and gathered by the Secretary from other sources, including guaranty agencies, other Federal agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations. The Secretary issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The Secretary considers any response from the borrower and any additional information from the borrower, and notifies the borrower whether the determination is changed.

(4) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(5) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination.

\*    \*    \*    \*    \*

§ 685.220   [Amended]

■ 30. Section 685.220 is amended by:
■ A. Removing the words "subpart II of part B" from paragraph (b)(21) and adding in their place the words "part E".
■ B. Removing paragraph (d)(1)(i).
■ C. Redesignating paragraph (d)(1)(ii) and (iii) as paragraphs (d)(1)(i) and (ii).
■ 31. Section 685.222 is added to subpart B to read as follows:

§ 685.222   Borrower defenses.

(a) *General.* (1) For loans first disbursed prior to July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with the provisions of § 685.206(c), unless otherwise noted in § 685.206(c).

(2) For loans first disbursed on or after July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with this section. To establish a borrower defense under this section, a preponderance of the evidence must show that the borrower has a borrower defense that meets the requirements of this section.

(3) A violation by the school of an eligibility or compliance requirement in the Act or its implementing regulations is not a basis for a borrower defense under either this section or § 685.206(c) unless the violation would otherwise constitute a basis for a borrower defense under this section or § 685.206(c), as applicable.

(4) For the purposes of this section and § 685.206(c), "borrower" means—
(i) The borrower; and
(ii) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(5) For the purposes of this section and § 685.206(c), a "borrower defense" refers to an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and
(ii) A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(6) If the borrower asserts both a borrower defense and any other objection to an action of the Secretary with regard to that Direct Loan, the order in which the Secretary will consider objections, including a borrower defense, will be determined as appropriate under the circumstances.

(b) *Judgment against the school.* The borrower has a borrower defense if the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction. A borrower may assert a borrower defense under this paragraph at any time.

(c) *Breach of contract by the school.* The borrower has a borrower defense if the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. A borrower may assert a defense to repayment of amounts owed to the Secretary under this paragraph at any time after the breach by the school of its contract with the student. A borrower may assert a right to recover amounts previously collected by the Secretary under this paragraph not later than six years after the breach by the school of its contract with the student.

(d) *Substantial misrepresentation by the school.* (1) A borrower has a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan. A borrower may assert, at any time, a defense to repayment under this paragraph (d) of amounts owed to the Secretary. A borrower may assert a claim under this paragraph (d) to recover funds previously collected by the Secretary not later than six years after the borrower discovers, or reasonably could have discovered, the information constituting the substantial misrepresentation.

(2) For the purposes of this section, a designated Department official pursuant to paragraph (e) of this section or a hearing official pursuant to paragraph (f), (g), or (h) of this section may consider, as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation, whether the school or any of the other parties described in paragraph (d)(1) engaged in conduct such as, but not limited to:

(i) Demanding that the borrower make enrollment or loan-related decisions immediately;
(ii) Placing an unreasonable emphasis on unfavorable consequences of delay;
(iii) Discouraging the borrower from consulting an adviser, a family member, or other resource;
(iv) Failing to respond to the borrower's requests for more information including about the cost of the program and the nature of any financial aid; or
(v) Otherwise unreasonably pressuring the borrower or taking advantage of the borrower's distress or lack of knowledge or sophistication.

(e) *Procedure for an individual borrower.* (1) To assert a borrower defense under this section, an individual borrower must—

(i) Submit an application to the Secretary, on a form approved by the Secretary—
(A) Certifying that the borrower received the proceeds of a loan, in whole or in part, to attend the named school;
(B) Providing evidence that supports the borrower defense; and
(C) Indicating whether the borrower has made a claim with respect to the information underlying the borrower defense with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and
(ii) Provide any other information or supporting documentation reasonably requested by the Secretary.

(2) Upon receipt of a borrower's application, the Secretary—

(i) If the borrower is not in default on the loan for which a borrower defense has been asserted, grants forbearance and—
(A) Notifies the borrower of the option to decline the forbearance and to continue making payments on the loan; and
(B) Provides the borrower with information about the availability of the income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221; or

(ii) If the borrower is in default on the loan for which a borrower defense has been asserted—

(A) Suspends collection activity on the loan until the Secretary issues a decision on the borrower's claim;

(B) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and

(C) Notifies the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

(3) The Secretary designates a Department official to review the borrower's application to determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official.

(i) As part of the fact-finding process, the Department official notifies the school of the borrower defense application and considers any evidence or argument presented by the borrower and also any additional information, including—

(A) Department records;

(B) Any response or submissions from the school; and

(C) Any additional information or argument that may be obtained by the Department official.

(ii) Upon the borrower's request, the Department official identifies to the borrower the records the Department official considers relevant to the borrower defense. The Secretary provides to the borrower any of the identified records upon reasonable request of the borrower.

(4) At the conclusion of the fact-finding process, the Department official issues a written decision as follows:

(i) If the Department official approves the borrower defense in full or in part, the Department official notifies the borrower in writing of that determination and of the relief provided as described in paragraph (i) of this section.

(ii) If the Department official denies the borrower defense in full or in part, the Department official notifies the borrower of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected, and informs the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application. The Department official also informs the

borrower of the opportunity to request reconsideration of the claim based on new evidence pursuant to paragraph (e)(5)(i) of this section.

(5) The decision of the Department official is final as to the merits of the claim and any relief that may be granted on the claim. Notwithstanding the foregoing—

(i) If the borrower defense is denied in full or in part, the borrower may request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" is relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision. If accepted for reconsideration by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans; and

(ii) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(6) The Secretary may consolidate applications filed under this paragraph (e) that have common facts and claims, and resolve the borrowers' borrower defense claims as provided in paragraphs (f), (g), and (h) of this section.

(7) The Secretary may initiate a proceeding to collect from the school the amount of relief resulting from a borrower defense under this section—

(i) Within the six-year period applicable to the borrower defense under paragraph (c) or (d) of this section;

(ii) At any time, for a borrower defense under paragraph (b) of this section; or

(iii) At any time if during the period described in paragraph (e)(7)(i) of this section, the institution received notice of the claim. For purposes of this paragraph, notice includes receipt of—

(A) Actual notice from the borrower, a representative of the borrower, or the Department of a claim, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c);

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, for underlying facts that may form the basis of a claim under this section and § 685.206(c).

(f) *Group process for borrower defense, generally.* (1) Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant, the Secretary may initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense.

(i) The members of the group may be identified by the Secretary from individually filed applications pursuant to paragraph (e)(6) of this section or from any other source.

(ii) If the Secretary determines that there are common facts and claims that apply to borrowers who have not filed an application under paragraph (e) of this section, the Secretary may identify such borrowers as members of a group.

(2) Upon the identification of a group of borrowers under paragraph (f)(1) of this section, the Secretary—

(i) Designates a Department official to present the group's claim in the fact-finding process described in paragraph (g) or (h) of this section, as applicable;

(ii) Provides each identified member of the group with notice that allows the borrower to opt out of the proceeding;

(iii) If identified members of the group are borrowers who have not filed an application under paragraph (f)(1)(ii) of this section, follows the procedures in paragraph (e)(2) of this section for granting forbearance and for defaulted loans for such identified members of the group, unless an opt-out by such a member of the group is received; and

(iv) Notifies the school on the basis of the group's borrower defense, the initiation of the fact-finding process described in paragraph (g) or (h) of this section, and of any procedure by which the school may request records and respond. No notice will be provided if notice is impossible or irrelevant due to a school's closure.

(3) For a group of borrowers identified by the Secretary, for which the Secretary determines that there may be a borrower defense under paragraph (d) of this section based upon a substantial misrepresentation that has been widely disseminated, there is a rebuttable presumption that each member

reasonably relied on the misrepresentation.

(g) *Procedures for group process for borrower defenses with respect to loans made to attend a closed school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to a Direct Loan to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses arising from borrower defenses, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses—

(1) A hearing official resolves the borrower defense through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official also considers any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in § 668.174(b), if practicable. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision states that determination and the relief provided on the basis of that claim as determined under paragraph (i) of this section.

(ii) If the hearing official denies the borrower defense in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that if any balance remains on the loan, the loan will return to its status prior to the group claim process.

(iii) The Secretary provides copies of the written decision to the members of the group and, as practicable, to the school.

(2) The decision of the hearing official is final as to the merits of the group borrower defense and any relief that may be granted on the group claim.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (g)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(h) *Procedures for group process for borrower defenses with respect to loans made to attend an open school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to Direct Loans to attend a school that is not covered by paragraph (g) of this section, the claim is resolved in accordance with the procedures in this paragraph (h).

(1) A hearing official resolves the borrower defense and determines any liability of the school through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision establishes the basis for the determination, notifies the members of the group of the relief as described in paragraph (i) of this section, and notifies the school of any liability to the Secretary for the amounts discharged and reimbursed.

(ii) If the hearing official denies the borrower defense for the group in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that their loans will return to their statuses prior to the group borrower defense process. The decision notifies the school of any liability to the Secretary for any amounts discharged or reimbursed.

(iii) The Secretary provides copies of the written decision to the members of the group, the Department official, and the school.

(2) The decision of the hearing official becomes final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. In the case of an appeal—

(i) The decision of the hearing official does not take effect pending the appeal; and

(ii) The Secretary renders a final decision.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (h)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(5)(i) The Secretary collects from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under this paragraph (h).

(ii) For a borrower defense under paragraph (b) of this section, the Secretary may initiate a proceeding to collect at any time.

(iii) For a borrower defense under paragraph (c) or (d) of this section, the Secretary may initiate a proceeding to collect within the limitation period that would apply to the borrower defense, provided that the Secretary may bring an action to collect at any time if, within the limitation period, the school received notice of the borrower's borrower defense claim. For purposes of this paragraph, the school receives notice of the borrower's claim by receipt of—

(A) Actual notice of the claim from the borrower, a representative of the borrower, or the Department, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c); or

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, of underlying facts that may form the basis of a claim under this section or § 685.206(c).

(i) *Relief.* If a borrower defense is approved under the procedures in

paragraph (e), (g), or (h) of this section, the following procedures apply:

(1) The Department official or the hearing official deciding the claim determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount.

(2) For a borrower defense brought on the basis of—

(i) A substantial misrepresentation, the Department official or the hearing official will factor the borrower's cost of attendance to attend the school, as well as the value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received, and/or the value of the education the borrower should have expected given the information provided by the institution, into the determination of appropriate relief. A borrower may be granted full, partial, or no relief. Value will be assessed in a manner that is reasonable and practicable. In addition, the Department official or the hearing official deciding the claim may consider any other relevant factors;

(ii) A judgment against the school—

(A) Where the judgment awards specific financial relief, relief will be the amount of the judgment that remains unsatisfied, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations; and

(B) Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment; and

(iii) A breach of contract, relief will be determined according to the common law of contracts, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations.

(3) In a fact-finding process brought against an open school under paragraph (h) of this section on the basis of a substantial misrepresentation, the school has the burden of proof as to any value of the education.

(4) In determining the relief, the Department official or the hearing official deciding the claim may consider—

(i) Information derived from a sample of borrowers from the group when calculating relief for a group of borrowers; and

(ii) The examples in Appendix A to this subpart.

(5) In the written decision described in paragraphs (e), (g), and (h) of this

section, the designated Department official or hearing official deciding the claim notifies the borrower of the relief provided and—

(i) Specifies the relief determination;

(ii) Advises that there may be tax implications; and

(iii) Advises the borrower of the requirements to file a request for reconsideration upon the identification of new evidence.

(6) Consistent with the determination of relief under paragraph (i)(1) of this section, the Secretary discharges the borrower's obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay and, if applicable, reimburses the borrower for amounts paid toward the loan voluntarily or through enforced collection.

(7) The Department official or the hearing official deciding the case, or the Secretary as applicable, affords the borrower such further relief as appropriate under the circumstances. Such further relief includes, but is not limited to, one or both of the following:

(i) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(ii) Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

(8) The total amount of relief granted with respect to a borrower defense cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense. The relief to the borrower may not include non-pecuniary damages such as inconvenience, aggravation, emotional distress, or punitive damages.

(j) *Cooperation by the borrower.* To obtain relief under this section, a borrower must reasonably cooperate with the Secretary in any proceeding under paragraph (e), (g), or (h) of this section. The Secretary may revoke any relief granted to a borrower who fails to satisfy his or her obligations under this paragraph (j).

(k) *Transfer to the Secretary of the borrower's right of recovery against third parties.* (1) Upon the granting of any relief under this section, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary

any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense and for the same loan for which the discharge was granted under this section.

(2) The provisions of this paragraph (k) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(3) Nothing in this paragraph (k) limits or forecloses the borrower's right to pursue legal and equitable relief against a party described in this paragraph (k) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

(Authority: 20 U.S.C. 1087a *et seq.*; 28 U.S.C. 2401; 31 U.S.C. 3702)

■ 32. Section 685.223 is added to subpart B to read as follows:

**§ 685.223  Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

■ 33. Appendix A to subpart B of part 685 is added to read as follows:

**Appendix A to Subpart B of Part 685— Examples of Borrower Relief**

The Department official or the hearing official deciding a borrower defense claim determines the amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. The following are some conceptual examples demonstrating relief. The actual relief awarded will be determined by the Department official or the hearing official deciding the claim, who shall not be bound by these examples.

1. A school represents to prospective students, in widely disseminated materials, that its educational program will lead to employment in an occupation that requires State licensure. The program does not in fact meet minimum education requirements to enable its graduates to sit for the exam necessary for them to obtain licensure. The claims are adjudicated in a group process.

Appropriate relief: Borrowers who enrolled in this program during the time that the misrepresentation was made should receive full relief. As a result of the schools' misrepresentation, the borrowers cannot work in the occupation in which they reasonably expected to work when they enrolled. Accordingly, borrowers received limited or no value from this educational program because they did not receive the value that they reasonably expected.

2. A school states to a prospective student that its medical assisting program has a faculty composed of skilled nurses and physicians and offers internships at a local hospital. The borrower enrolls in the school in reliance on that statement. In fact, none of the teachers at the school other than the Director is a nurse or physician. The school has no internship program. The teachers at the school are not qualified to teach medical assisting and the student is not qualified for medical assistant jobs based on the education received at the school.

Appropriate relief: This borrower should receive full relief. None of the teachers at the school are qualified to teach medical assisting, and there was no internship. In contrast to reasonable students' expectations, based on information provided by the school, the typical borrower received no value from the program.

3. An individual interested in becoming a registered nurse meets with a school's admissions counselor who explains that the school does not have a nursing program but that completion of a medical assisting program is a prerequisite for any nursing program. Based on this information, the borrower enrolls in the school's medical assisting program rather than searching for another nursing program, believing that completing a medical assisting program is a necessary step towards becoming a nurse. After one year in the program, the borrower realizes that it is not necessary to become a medical assistant before entering a nursing program. The borrower's credits are not transferrable to a nursing program.

Appropriate relief: This borrower should receive full relief. Because it is not necessary to become a medical assistant prior to entering a nursing program, she has made no progress towards the career she sought, and in fact has received an education that cannot be used for its intended purpose.

4. A school tells a prospective student, who is actively seeking an education, that the cost of the program will be $20,000. Relying on that statement, the borrower enrolls. The student later learns the cost for that year was $25,000. There is no evidence of any other misrepresentations in the enrollment process or of any deficiency in value in the school's education.

Appropriate relief: This borrower should receive partial relief of $5,000. The borrower

received precisely the value that she expected. The school provides the education that the student was seeking but misrepresented the price.

5. A school represents in its marketing materials that three of its undergraduate faculty members in a particular program have received the highest award in their field. A borrower choosing among two comparable, selective programs enrolls in that program in reliance on the representation about its faculty. However, although the program otherwise remains the same, the school had failed to update the marketing materials to reflect the fact that the award-winning faculty had left the school.

Appropriate relief: Although the borrower reasonably relied on a misrepresentation about the faculty in deciding to enroll at this school, she still received the value that she expected. Therefore, no relief is appropriate.

6. An individual wishes to enroll in a selective, regionally accredited liberal arts school. The school gives inflated data to a well-regarded school ranking organization regarding the median grade point average of recent entrants and also includes that inflated data in its own marketing materials. This inflated data raises the place of the school in the organization's rankings in independent publications. The individual enrolls in the school and graduates. Soon after graduating, the individual learns from the news that the school falsified admissions data. Notwithstanding this issue, degrees from the school continue to serve as effective, well-regarded liberal arts credentials.

The Department also determines that the school violated the title IV requirement that it not make substantial misrepresentations pursuant to 34 CFR 668.71, which constitutes an enforceable violation separate and apart from any borrower defense relief.

Appropriate Relief: The borrower relied on the misrepresentation about the admissions data to his detriment, because the misrepresentation factored into the borrower's decision to choose the school over others. However, the borrower received a selective liberal arts education which represents the value that he could reasonably expect, and gets no relief.

■ 34. Section 685.300 is amended by:
■ A. Redesignating paragraph (b)(11) as paragraph (b)(12).
■ B. Adding a new paragraph (b)(11).
■ C. Adding paragraphs (d) through (i). The additions read as follows:

**§ 685.300   Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.**

\*   \*   \*   \*   \*

(b) \* \* \*

(11) Comply with the provisions of paragraphs (d) through (i) of this section regarding student claims and disputes.

\*   \*   \*   \*   \*

(d) *Borrower defense claims in an internal dispute process.* The school will not compel any student to pursue a complaint based on a borrower defense claim through an internal dispute process before the student

presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

(e) *Class action bans.* (1) The school will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action that is related to a borrower defense claim, including to seek a stay or dismissal of particular claims or the entire action, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2) Reliance on a predispute arbitration agreement, or on any other predispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a class action.

(ii) Seeking to exclude a person or persons from a class in a class action.

(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action.

(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action.

(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved.

(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court in that class action has granted a motion to dismiss the claim and, in doing so, the court noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed.

(3) *Required provisions and notices.* (i) The school must include the following provision in any agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding predispute arbitration or any other predispute agreement addressing class actions and that are entered into after the effective date of this regulation: ''We agree that neither we nor anyone else will use this agreement to stop you from being part of a class action lawsuit in

court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement or any other predispute agreement addressing class actions has been entered into before the effective date of this regulation and does not contain a provision described in paragraph (e)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (e)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (e)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (e)(3)(ii) of this section is amended to contain the provision specified in paragraph (e)(3)(iii)(A) or must provide the notice specified in paragraph (e)(3)(iii)(B) to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this agreement will use it to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit in court even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even

if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(f) *Predispute arbitration agreements.* (1)(i) The school will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim.

(ii) A student may enter into a voluntary post-dispute arbitration agreement with a school to arbitrate a borrower defense claim.

(2) Reliance on a predispute arbitration agreement with a student with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student, including joinder with others in an action;

(ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and

(iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

(3) *Required provisions and notices.* (i) The school must include the following provision in any predispute arbitration agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding arbitration and that are entered into after the effective date of this regulation: ''We agree that neither we nor anyone else will use this agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to lawsuits concerning other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of

educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement has been entered into before the effective date of this regulation that did not contain the provision specified in paragraph (f)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (f)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (f)(3)(ii) of this section is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or must provide the notice specified in paragraph (f)(3)(iii)(B) of this section to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this predispute arbitration agreement will use it to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.''

(g) *Submission of arbitral records.* (1) A school must submit a copy of the

following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim filed in arbitration by or against the school concerning a borrower defense claim:

(i) The initial claim and any counterclaim.

(ii) The arbitration agreement filed with the arbitrator or arbitration administrator.

(iii) The judgment or award, if any, issued by the arbitrator or arbitration administrator.

(iv) If an arbitrator or arbitration administrator refuses to administer or dismisses a claim due to the school's failure to pay required filing or administrative fees, any communication the school receives from the arbitrator or arbitration administrator related to such a refusal.

(v) Any communication the school receives from an arbitrator or an arbitration administrator related to a determination that a predispute arbitration agreement regarding educational services provided by the school does not comply with the administrator's fairness principles, rules, or similar requirements, if such a determination occurs.

(2) A school must submit any record required pursuant to paragraph (g)(1) of this section within 60 days of filing by the school of any such record with the arbitrator or arbitration administrator and within 60 days of receipt by the school of any such record filed or sent by someone other than the school, such as the arbitrator, the arbitration administrator, or the student.

(h) *Submission of judicial records.* (1) A school must submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim concerning a borrower defense claim filed in a lawsuit by the school against the student or by any party, including a government agency, against the school:

(i) The complaint and any counterclaim.

(ii) Any dispositive motion filed by a party to the suit; and

(iii) The ruling on any dispositive motion and the judgment issued by the court.

(2) A school must submit any record required pursuant to paragraph (h)(1) of this section within 30 days of filing or receipt, as applicable, of the complaint, answer, or dispositive motion, and within 30 days of receipt of any ruling on a dispositive motion or a final judgment.

(i) *Definitions.* For the purposes of paragraphs (d) through (h) of this section, the term—

(1) "Borrower defense claim" means a claim that is or could be asserted as a borrower defense as defined in § 685.222(a)(5), including a claim other than one based on § 685.222(c) or (d) that may be asserted under § 685.222(b) if reduced to judgment;

(2) "Class action" means a lawsuit in which one or more parties seek class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process analogous to Federal Rule of Civil Procedure 23;

(3) "Dispositive motion" means a motion asking for a court order that entirely disposes of one or more claims in favor of the party who files the motion without need for further court proceedings;

(4) "Predispute arbitration agreement" means any agreement, regardless of its form or structure, between a school or a party acting on behalf of a school and a student providing for arbitration of any future dispute between the parties.

\*     \*     \*     \*     \*

■ 35. Section 685.308 is amended by revising paragraph (a) to read as follows:

**§ 685.308   Remedial actions.**

(a) The Secretary collects from the school the amount of the losses the Secretary incurs and determines that the institution is liable to repay under § 685.206, § 685.214, § 685.215(a)(1)(i), (ii), (iii), (iv) or (v), § 685.216, or § 685.222 or that were disbursed—

(1) To an individual, because of an act or omission of the school, in amounts that the individual was not eligible to receive; or

(2) Because of the school's violation of a Federal statute or regulation.

\*     \*     \*     \*     \*

■ 36. Section 685.310 is added to subpart C to read as follows:

**§ 685.310   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

## PART 686—TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION (TEACH) GRANT PROGRAM

■ 37. The authority citation for part 686 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, *et seq.,* unless otherwise noted.

■ 38. Section 686.42 is amended by revising paragraph (a) to read as follows:

**§ 686.42   Discharge of an agreement to serve.**

(a) *Death.* (1) If a grant recipient dies, the Secretary discharges the obligation to complete the agreement to serve based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the grant recipient's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges the obligation to complete the agreement to serve based on other reliable documentation of the grant recipient's death that is acceptable to the Secretary.

\*     \*     \*     \*     \*

[FR Doc. 2016–25448 Filed 10–31–16; 8:45 am]

**BILLING CODE 4000–01–P**

# EXHIBIT 14


safety zone need not be enforced for the full duration stated in this notice he or she may use a Broadcast Notice to Mariners to grant general permission to enter the respective safety zone.

Dated: June 12, 2017.

**J.S. Dufresne,**

*Captain, U.S. Coast Guard, Captain of the Port Buffalo.*

[FR Doc. 2017–12547 Filed 6–15–17; 8:45 am]

**BILLING CODE 9110–04–P**

---

## DEPARTMENT OF EDUCATION

**34 CFR Parts 668, 674, 682, and 685**

**RIN 1840–AD19**

**[Docket ID ED–2015–OPE–0103]**

### Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule; notification of partial delay of effective dates.

**SUMMARY:** On November 1, 2016, the Department of Education published final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations) in the **Federal Register**. On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court). In light of the existence and potential consequences of the pending litigation, the Department has concluded that justice requires it to postpone certain provisions of the final regulations pursuant to the Administrative Procedure Act (APA), pending judicial review. The provisions to be postponed are listed in detail in the **SUPPLEMENTARY INFORMATION** section of this document.

**DATES:** As of June 16, 2017, the effective date for the amendments to or additions of: §§ 668.14; 668.41; 668.71; 668.90; 668.93; 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33; 682.202; 682.211; 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*),

(d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4)(ii); 682.410; 685.200; 685.205; 685.206; 685,212(k); 685.214; 685.215; 685.222; Appendix A to Subpart B of Part 685; and 685.308, published November 1, 2016, at 81 FR 75926, is delayed until further notice.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Room 6W252, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** On November 1, 2016, the Department published the final regulations in the **Federal Register** (81 FR 75296), and the final regulations are scheduled to take effect on July 1, 2017. The final regulations made several changes to the Department's student financial assistance regulations. Those changes include a new Federal standard and process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of a school. The final regulations also prohibit schools from using certain contractual provisions regarding dispute resolution processes in their agreements with students, including predispute arbitration provisions and class action waivers. The final regulations further impose new financial responsibility standards and require proprietary schools to make certain disclosures regarding the student loan repayment rates of their graduates.

On May 24, 2017, CAPPS filed its complaint with the Court challenging the final regulations (*California Association of Private Postsecondary Schools v. DeVos,* No. 1:17–cv–00999 (D.D.C. May 24, 2017)), in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial responsibility standards, provisions requiring proprietary institutions to provide warnings about their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. CAPPS has also filed a motion for preliminary injunction asking the Court to restrain the Department from implementing or enforcing the arbitration and class action waiver prohibitions.

Under section 705 of the APA, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. 705. In light of the pending litigation, and for the following reasons, the Department has concluded that justice requires it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved.

First, the postponement will preserve the regulatory status quo while the litigation is pending and the Court decides whether to uphold the final regulations. The plaintiffs have raised serious questions concerning the validity of certain provisions of the final regulations and have identified substantial injuries that could result if the final regulations go into effect before those questions are resolved. Given the legal uncertainty, maintaining the status quo is critical. For instance, if the final regulations are not postponed, institutions participating in the programs under title IV of the Higher Education Act of 1965, as amended (HEA), would be required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests. Postponing the final regulations will avoid the cost that institutions would incur in making these changes while the regulation is subject to judicial review. Additionally, if the final regulations are not postponed, institutions would be subject to financial responsibility trigger provisions that could impose substantial costs. Meanwhile, the postponement of the final regulations will not prevent student borrowers from obtaining relief because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement.

Second, the United States will suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending. As the Department stated in the Net Budget Impacts section of the Regulatory Impact Analysis of the final regulations, the provisions with the greatest impact on the net budget impact of the final regulations are those related to the discharge of borrowers' loans, especially the changes to borrower defense and closed school discharges. The final regulations were estimated to have a net budget impact in costs over the 2016–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the regulations providing for a three-year automatic

closed school discharge. Postponing the effectiveness of the final regulations will help to avoid these significant costs to the Federal government and ultimately the Federal taxpayer.

Separately, the Department is announcing its plan to review and revise the regulations through the negotiated rulemaking process required under section 492 of the HEA. The postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters.

Based upon the foregoing, the Department has determined that it is necessary to postpone the effectiveness of the revisions to or additions of the following provisions of the final regulations:

• § 668.14(b)(30), (31), and (32) Program participation agreement.
• § 668.41(h) and (i) Reporting and disclosure of information.
• § 668.71(c) Scope and special definitions.
• § 668.90(a)(3) Initial and final decisions.
• § 668.93(h), (i), and (j) Limitation.
• § 668.171    General.
• § 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668 subpart L, Appendix C.
• § 674.33(g)(3) and (g)(8) Repayment.
• § 682.202(b)(1) Permissible charges by lenders to borrowers.
• § 682.211(i)(7) Forbearance.
• § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• § 682.405(b)(4)(ii) Loan rehabilitation agreement.
• § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• § 685.205(b)(6) Forbearance.
• § 685.206(c) Borrower responsibilities and defenses.
• § 685.212(k) Discharge of a loan obligation.
• § 685.214(c)(2), (f)(4) through (7) Closed school discharge.
• § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• § 685.222    Borrower defenses.
• Part 685 subpart B, Appendix A Examples of borrower relief.

• § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• § 685.308(a) Remedial actions.

We do not intend to postpone the effectiveness of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) address severability; and (4) make technical corrections. As established in 81 FR 75926, §§ 682.211(i)(7) and 682.410(b)(6)(viii) remain designated for early implementation, at the discretion of each lender or guaranty agency.

In sum, in light of the existence and potential consequences of the pending litigation, and given the potentially significant harm that could result if the status quo is altered by the implementation of the final regulations on July 1, 2017, the Department has determined that the public interest and justice require postponing the effectiveness of the sections of the final regulations specified herein until the matters raised in the litigation are resolved.

In order to accomplish a postponement of certain sections of the final regulations under section 705 of the APA, the Department is delaying the effective date of the sections specified in the **DATES** and **SUPPLEMENTARY INFORMATION** sections of this document pursuant to the **Federal Register** Act and its implementing regulations.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal**

**Register** by using the article search feature at: *www.FederalRegister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects

*34 CFR Part 668*

Administrative practice and procedure; Colleges and universities; Consumer protection; Grant programs—education; Loan programs—education; Reporting and recordkeeping requirements; Selective Service System; Student aid; Vocational education.

*34 CFR Part 674*

Loan programs—education; Reporting and recordkeeping; Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure; Colleges and universities; Loan programs—education; Reporting and recordkeeping requirements; Student aid; Vocational education.

Dated: June 13, 2017.

**Betsy DeVos,**
*Secretary of Education.*

[FR Doc. 2017–12562 Filed 6–14–17; 11:15 am]

**BILLING CODE 4000–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R09–OAR–2016–0653; FRL–9963–43–Region 9]**

### Approval of Nevada Air Plan Revisions, Clark County Department of Air Quality and Washoe County Health District

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking final action to approve revisions to the Clark County Department of Air Quality (CCDAQ) and Washoe County Health District (WCHD) portions of the Nevada State Implementation Plan (SIP). These revisions concern emissions of particulate matter (PM) from fugitive dust and wood burning. We are approving local rules that regulate these emission sources under the Clean Air Act (CAA or the Act).

**DATES:** These rules are effective on July 17, 2017.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2016–0683. All

# EXHIBIT 15

the potential impact of regulations on small entities during rulemaking. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

The Corps certifies under 5 U.S.C. 605(b) that this rule would not have a significant economic impact on a substantial number of small entities. While some owners or operators of vessels that intend to transit the danger zone may be small entities, for the reasons stated in paragraph (a) above this rule would not have a significant economic impact on any vessel owner or operator. In addition, the danger zone is necessary to protect public safety during training exercises. Small entities can utilize navigable waters outside of the danger zone when the danger zone is activated. Small entities may also transit the danger zone when it is activated, as long as they obtain permission from the Commanding Officer, Naval Construction Battalion Center, Gulfport or his/her designees. After considering the economic impacts of this danger zone regulation on small entities, I certify that this action will not have a significant impact on a substantial number of small entities.

*c. Review Under the National Environmental Policy Act*

An environmental assessment (EA) has been prepared. We have concluded that the establishment of the restricted area will not have a significant impact to the quality of the human environment and, therefore, preparation of an environmental impact statement is not required. The final EA and Finding of No Significant Impact may be reviewed at the District Office listed at the end of the **FOR FURTHER INFORMATION CONTACT** section, above.

*d. Unfunded Mandates Reform Act*

This rule does not impose an enforceable duty among the private sector and, therefore, is not a Federal private sector mandate and is not subject to the requirements of Section 202 or 205 of the Unfunded Mandates Reform Act (Public Laws 104–4, 109 Stat. 48, 2 U.S.C. 1501 *et seq.*). We have also found, under Section 203 of the Act, that small governments will not be significantly or uniquely affected by this rule.

**List of Subjects in 33 CFR Part 334**

Danger zones, Marine safety, Navigation (water), Restricted areas, Waterways.

For the reasons stated in the preamble, the Corps is amending 33 CFR part 334 as follows:

**PART 334—DANGER ZONE AND RESTRICTED AREA REGULATIONS**

■ 1. The authority citation for 33 CFR part 334 continues to read as follows:

**Authority:** 40 Stat. 266 (33 U.S.C. 1) and 40 Stat. 892 (33 U.S.C. 3).

■ 2. Add § 334.784 to read as follows:

**§ 334.784   East Pearl River, within the acoustic buffer area of the John C. Stennis Space Center, and adjacent to lands, in Hancock County, Mississippi; danger zone.**

(a) *The area.* A danger zone is established in and to the extent of waters of the United States, as defined in 33 CFR part 329, in the following reaches of the East Pearl River south of a point located at latitude 30.4030° N., longitude −89.6815° W., to a point below the confluence of Mikes River, located at latitude 30.3561° N., longitude −89.6514° W. The datum for these coordinates is NAD 1983.

(b) *The regulation.* (1) No person, vessel, or other watercraft, other than a vessel owned and operated by the United States, shall enter or remain in the danger zone, or within a portion or portions thereof, when closed to public access, as provided in paragraph (b)(2) of this section, except by permission of the Commanding Officer, Naval Construction Battalion Center, Gulfport or such other person(s) as he or she may designate.

(2) The danger zone, or a portion or portions thereof, will be closed, for riverine, weapons, or other dangerous naval training, by placement of Government picket boats at the northern and southern boundaries in the East Pearl River, or at such other location(s) within the danger zone as may be determined to be sufficient to protect the public. Prior to closure, picket boats will transit the area(s) to be closed, to ensure that no persons, vessels, or other watercraft are present. Once the danger zone, or location(s) within the danger zone, has been cleared, picket boats will remain in position, upstream and downstream, until it is safe to re-open the area(s) to public access.

(3) Riverine, weapons, and other dangerous naval training may occur on any day of the week, typically, but not exclusively, in periods of two to eight hours, between 6 a.m. and 6 p.m. Training may occur at night, in darkness.

(c) *Enforcement.* The restrictions on public access in this section shall be enforced by the Commanding Officer, Naval Construction Battalion Center,

Gulfport or by such other person(s) as he or she may designate.

Dated: October 18, 2017.

**Thomas P. Smith,**

*Chief, Operations and Regulatory Division, Directorate of Civil Works.*

[FR Doc. 2017–23004 Filed 10–23–17; 8:45 am]

**BILLING CODE 3720–58–P**

**DEPARTMENT OF EDUCATION**

**34 CFR Parts 668, 674, 682, and 685**

**[Docket ID ED–2017–OPE–0108]**

**RIN 1840–AD25**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Interim final rule; delay of effective date; request for comments.

**SUMMARY:** Consistent with section 553(b)(3)(B) and (d)(3) of the Administrative Procedure Act (APA), which allows Federal agencies to promulgate rules without advance notice and opportunity for comment for good cause, the Secretary issues this interim final rule with request for comment. This interim final rule delays until July 1, 2018, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations), published in the **Federal Register** on November 1, 2016. The provisions this interim final rule delays are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The original effective date of the final regulations was July 1, 2017.

**DATES:** *Effective date:* As of October 24, 2017, the effective date for the amendments to or additions of: §§ 668.14(b)(30), (31), and (32); 668.41(h) and (i); 668.71(c); 668.90(a)(3); 668.93(h), (i), (j); 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33(g)(3) and (g)(8); 682.202(b)(1); 682.211(i)(7); 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H)

through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4); 682.410(b)(4) and (b)(6)(viii); 685.200(f)(3)(v) and (f)(4)(iii); 685.205(b)(6); 685.206(c); 685.212(k); 685.214(c)(2), (f)(4) through (7); 685.215(a)(1), (c)(1) through (c)(8), and (d); 685.222; Appendix A to Subpart B of Part 685; and 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed until further notice on June 16, 2017, in 82 FR 27621, is further delayed until July 1, 2018.

*Comment date:* We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under ''Help.''

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the interim final rule, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W247, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only

information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W247, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation to Comment:* We invite you to submit comments regarding this interim final rule. We will consider comments on the delayed effective date only and will not consider comments on the wording or substance of the final regulations. See **ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this interim final rule by accessing *Regulations.gov.* You may also inspect the comments in person in Room 6W245, 400 Maryland Avenue SW., Washington, DC, between 8:30 a.m. and 4:00 p.m. Washington, DC time, Monday through Friday of each week, except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for this interim final rule. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

**Delay of Effective Date**

On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court) challenging the final regulations in their entirety, and in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial responsibility standards, provisions requiring proprietary institutions to provide warnings about

their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* No. 1:17–cv–00999 (D.D.C. May 24, 2017). As of the date of this interim final rule, the litigation is ongoing.

In light of the pending litigation, on June 16, 2017, the Department published in the **Federal Register** a notification of the partial delay of effective dates under section 705 of the APA (5 U.S.C. 705) (82 FR 27621) (705 Notice), to delay the effectiveness of certain provisions of the final regulations until the legal challenge is resolved. The 705 Notice postponed the effective date of the regulations to preserve the regulatory status quo while the litigation is pending and the Court makes a decision. As explained in the 705 Notice, the plaintiff has raised serious questions concerning the validity of certain provisions of the final regulations and has identified substantial injuries that could result if they go into effect before those questions are resolved. Given the legal uncertainty, maintaining the status quo is critical. For instance, if the final regulations took effect, institutions participating in programs under title IV of the Higher Education Act of 1965, as amended (HEA), would have been required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations. Postponing the final regulations avoids the cost that institutions would incur in making these changes while the final regulations are subject to judicial review. Meanwhile, the Department is continuing to process borrower defense claims under the existing regulations that will remain in effect during the postponement.

Because the final regulations have been postponed beyond July 1, 2017, pursuant to the 705 Notice, the postponement of the final regulations must be for at least one year to comply with section 482 of the HEA (20 U.S.C. 1089). That section imposes a requirement (the ''master calendar requirement'') on the Department for the effective date of regulations affecting programs under title IV of the HEA. Under the master calendar requirement, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or

**49116**   **Federal Register** / Vol. 82, No. 204 / Tuesday, October 24, 2017 / Rules and Regulations

in other words, on July 1 of the next year. Any regulatory change that has not been published in final form by November 1 prior to the start of an award year may not become effective until the beginning of the second award year after the November 1 date.

The master calendar requirement provides that regulatory changes affecting the title IV programs must become effective at the beginning of an award year and does not authorize the Department to make a regulatory change affecting the title IV programs effective in the middle of an award year.[1] Accordingly, regulations promulgated under title IV of the HEA have an effective date of July 1. Congress enacted the master calendar requirement to ensure that institutions have sufficient notice of the timing of any regulatory change in order to implement regulatory changes at the start of each award year. In this way, institutions avoid incurring the costs of compliance on a rolling basis throughout the year and avoid any disruption to the timely delivery of title IV funds. *See* S. Rep. No. 99–296, at 11 (1986); *see also Reauthorization of the Higher Education Act, 1985: Hearings Before the S. Subcomm. On Educ., Arts and Humanities,* 99th Cong. 10 (1985) (statement of the Conference on Higher Education) ("Although progress will always require updating, there is an equally important need for stability so that proper planning by all those involved—including families, aid administrators, and agency officials— can be achieved.").

Congress has been clear that "the effective dates of all regulations on Title IV are driven by the Master Calendar requirements in Section 482," H.R. Rep. No. 102–447, at 77 (1992), and it has reaffirmed the breadth of the master calendar requirement by providing express waivers of the requirement only in specific limited circumstances. *See, e.g.,* Higher Education Opportunity Act, Public Law 110–315, sec. 402(b), 122 Stat. 3078, 3191 (2008); Higher Education Act—Technical Corrections, Public Law 111–39, sec. 409, 123 Stat. 1950, 1953 (2009). Accordingly, the Department has consistently interpreted and applied the master calendar requirement to provide that any regulatory change relating to student financial aid programs may take effect only at the beginning of an award year.

With respect to the final regulations, implementing this substantial regulatory change in the middle of an award year would frustrate the notice objectives of the HEA and deny schools the assurance of the master calendar. For the July 1, 2017, postponement to be consistent with the HEA, therefore, the effective date must be July 1, 2018 (or July 1 of a later year). Because the 705 Notice does not establish a specific effective date but is tied to the pending litigation, this interim final rule provides the public and regulated parties notice that even if the litigation concludes before July 1, 2018, the final regulations will not take effect until that date consistent with the master calendar requirement.

Separately, we note that the delayed effective date is consistent with the Memorandum for the Heads of Executive Departments and Agencies entitled "Regulatory Freeze Pending Review," published in the **Federal Register** on January 24, 2017 (Memorandum), which was intended to ensure that the President's appointees or designees have the opportunity to review any new or pending regulations and where appropriate to suggest changes. Among other things, the Memorandum directed the heads of executive departments and agencies to consider temporarily postponing the effective dates of all regulations that had been published in the **Federal Register** but had not yet taken effect. In addition, on February 24, 2017, the President issued Executive Order 13777, which requires each agency head to consider recommendations to repeal, replace, or modify existing regulations, consistent with applicable law. In accordance with these evaluative efforts, we announced on June 16, 2017, our intent to engage in negotiated and notice-and-comment rulemaking on the topics addressed by the final regulations on (82 FR 27640). The Department is reevaluating its regulations in this area and the burdens on regulated parties may change.

To provide adequate notice to these parties in accordance with the HEA's master calendar requirement, the Department has determined that it is necessary to delay until July 1, 2018, the effective date of the revisions to or additions of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

- § 668.14(b)(30), (31), and (32) Program participation agreement.
- § 668.41(h) and (i) Reporting and disclosure of information.
- § 668.71(c) Scope and special definitions.
- § 668.90(a)(3) Initial and final decisions.
- § 668.93(h), (i) and (j) Limitation.

- § 668.171 General.
- § 668.175(c), (d), (f), and (h) Alternative standards and requirements.
- Part 668 subpart L, Appendix C.
- § 674.33(g)(3) and (g)(8) Repayment.
- § 682.202(b)(1) Permissible charges by lenders to borrowers.
- § 682.211(i)(7) Forbearance.
- § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
- § 682.405(b)(4)(ii) Loan rehabilitation agreement.
- § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
- § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
- § 685.205(b)(6) Forbearance.
- § 685.206(c) Borrower responsibilities and defenses.
- § 685.212(k) Discharge of a loan obligation.
- § 685.214(c)(2), (f)(4) through (7) Closed school discharge.
- § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
- § 685.222 Borrower defenses.
- Part 685 subpart B, Appendix A Examples of borrower relief.
- § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
- § 685.308(a) Remedial actions.

In addition, in connection with this delay, the Department interprets all references to "July 1, 2017" in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations have not taken effect on July 1, 2017, we will read those regulations as referring to the new effective date established by this delay, *i.e.,* July 1, 2018.

We do not intend to delay the effective dates of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the

---

[1] We note that in the limited circumstance where the Secretary designates a regulation for early implementation pursuant to 20 U.S.C. 1089(c)(2), regulated parties may choose to implement the regulation before the July 1 effective date. Early implementation, however, does not change the effective date of the regulation.

regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Program or FFEL loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. As established in 81 FR 75926, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) remain designated for early implementation, at the discretion of each lender or guaranty agency.

*Waiver of Notice-and-Comment Rulemaking, Negotiated Rulemaking, and Delayed Effective Date under the APA:* Under the APA (5 U.S.C. 553), the Department generally offers interested parties the opportunity to comment on proposed regulations and publishes rules not less than 30 days before their effective dates. In addition, under section 492 of the HEA (20 U.S.C. 1098a), all regulations proposed by the Department for programs authorized under title IV of the HEA are subject to negotiated rulemaking requirements. However, the APA provides that an agency is not required to conduct notice-and-comment rulemaking or delay effective dates when the agency, for good cause, finds that the requirement is impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 553(b)(3)(B) and (d)(3)). In addition, section 492(b)(2) of the HEA provides that negotiated rulemaking may be waived for good cause when doing so would be "impracticable, unnecessary, or contrary to the public interest." Section 492(b)(2) of the HEA also requires the Secretary to publish the basis for waiving negotiations in the **Federal Register** at the same time as the proposed regulations in question are first published.

The Department determined under the APA and the HEA that notice-and-comment and negotiated rulemaking are unnecessary and impracticable and therefore is waiving both requirements in this interim final rule. As noted previously, the 705 Notice delayed the effective date of the final regulations to maintain the status quo pending the outcome of the litigation, which could not be resolved before July 1, 2017. Given that delay, the next possible date for the regulations to become effective would be July 1, 2018, in accordance with the HEA's master calendar requirement. Thus, even if the litigation were resolved before July 1, 2018, under the HEA, July 1, 2018, would be the earliest the regulations could take effect. Given the Department's limited discretion to set an effective date under

the master calendar requirement, the Department determined that both notice-and-comment and negotiated rulemaking are unnecessary. The Department also determined that it was impracticable to conduct notice-and-comment and negotiated rulemaking before the original July 1, 2017, effective date. The litigation was initiated on May 24, 2017; the Department would not have been able to conduct negotiated rulemaking or notice-and-comment rulemaking to obtain comment on a possible new effective date in the short amount of time between May 24, and July 1, 2017. And, once the July 1, 2017, date passed, under the master calendar requirement, the Department did not have any discretion to set an effective date earlier than July 1, 2018. For the same reasons, we are also waiving the 30-day delay of the effective date of this interim final rule under the APA. However, the Department is providing a 30-day comment period and invites interested persons to comment on the delay of the effective date of the final regulations from July 1, 2017, to July 1, 2018. In addition, the Department plans to issue a notice of proposed rulemaking to seek public comment on further delaying the effective date of the final regulations until July 1, 2019, to allow for completion of the negotiated rulemaking process before regulatory changes become effective in this area (see 82 FR 27640). The Department will seek public comments on whether such a further delay is desirable to avoid the costs to regulated parties of implementing regulations that may be subject to change in the near future.

**Executive Orders 12866, 13563 and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be −$18.6 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense rules on the 2017 and 2018 loan cohorts, as well as from the delayed paperwork burden on institutions, and the delayed execution of the closed school automatic discharge. This final regulatory action is not a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these

techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this interim final rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this interim final rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

Effects of One-Year Delay

As indicated in the Regulatory Impact Analysis (RIA) published with the final regulations on November 1, 2016, the final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge. As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over a forty-year timeframe, simply delaying the final regulations for a year will have a much more limited effect, as discussed below. This analysis is limited to the effect of delaying the effective date of the final regulations, and does not account for any potential future substantive changes in the final regulations.

Even with the delayed effective date, borrowers will still be able to submit claims. The provisions of the final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process reflected in the final regulations, when implemented. Once in effect, the protection generated by the financial protection provisions will be available to be applied to claims from loans originated earlier, including the

period from July 1, 2017 to June 30, 2018. Loans made before July 1, 2017, were always subject to the State-based standard and their ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations, the Federal standard established in the final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the regulations to mean the effective date of the regulations. As a result, the delayed effective date means that loans made between July 1, 2017 and June 30, 2018, will be subject to the current State-based standard. As we noted in the final regulations, the Federal standard was designed to address much of the conduct already covered by the State-based standard, so the vast majority of claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State law-based standard as well.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the final regulations, institutions bear the major costs of compliance, paperwork burden, and providing financial protection. The financial protection provisions of the final regulations depend on the effective date, so institutions will not incur these costs until the final regulations are in effect. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the initial year of the final regulations. In the revised scenario developed to estimate the effect of the one-year delay in the effective date, transfers from institutions to students, via the Federal government, would be reduced by approximately $1.3 million for the 2017 and 2018 loan cohorts. The costs of providing financial protection were not quantified in the final regulations, and the Department has no additional data to estimate costs institutions may avoid from the delayed effective date of the financial protection provisions.

There is some uncertainty as to the regulatory baseline against which this interim final rule's impacts should be assessed. As noted previously, the 705 Notice delayed the effectiveness of certain provisions of the 2016 final regulations until a legal challenge is resolved. If the legal resolution were to be reached on or after July 1, 2018, then the 705 Notice would provide for the

delay of effectiveness between now and then, and the interim final rule would not have any impact. By contrast, if the legal resolution were to be reached earlier, this interim final rule could have substantial impacts associated with the avoidance of confusion and legal ambiguity regarding the interaction among the 705 Notice, the master calendar, and the 2016 final regulations. Although an analysis of a simple one-year delay does not exactly capture this collection of impacts (due to, among other reasons, the fact that July 1, 2018, is already less than a year away and thus this interim final rule cannot have a full year's impact), it can provide a general sense of the magnitude of upper bound effects.

Net Budget Impact

In order to estimate the net budget impact of the one-year delay in the effective date, the Department developed a scenario that revised the primary estimate assumptions from the final regulations from the affected 2017 and 2018 loan cohorts. The assumptions for the primary scenario from the 2016 final regulation were the basis for the President's Budget 2018 (PB2018) baseline that assumed the regulation would go into effect on July 1, 2017. The scenario developed for this interim final rule is designed to capture the incremental change from the PB2018 baseline associated with the one-year delay in the effective date. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the one-year delay in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulation and the borrower percent is the same. The financial protection provided was always expected to increase over time so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by five percent for the private not-for-profit and proprietary sectors. As in the final regulations, recoveries from public institutions were held constant at 75 percent across scenarios.

TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY

| Cohort | 2017 | | 2018 | |
|---|---|---|---|---|
| | Public/private not for profit | Proprietary | Public/private not for profit | Proprietary |
| Conduct Percent: | | | | |
| Final Primary | 3.0 | 20 | 2.4 | 16 |
| Delay Revised | 2.7 | 18 | 2.16 | 14.4 |
| Borrower Percent: | | | | |
| Final Primary | 35 | 45 | 36.8 | 47.3 |
| Delay Revised | 35 | 45 | 36.8 | 47.3 |
| | Public | Priv/Prop | Public | Priv/Prop |
| Recovery Percent: | | | | |
| Final Primary | 75 | 23.8 | 75 | 23.8 |
| Delay Revised | 75 | 22.61 | 75 | 22.61 |

The net budget impact associated with these effects of the one-year delay in the effective date on the borrower defense provisions only is approximately −$37.7 million from the 2017 and 2018 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of −$37.7 million in reduced costs.

The closed school automatic discharge provisions were the other significant source of estimated net budget impact in the final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in FY 2017 in the President's Budget for FY 2018 (PB2018). As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

The Department does expect to incur the costs associated with the three-year automatic discharge after the delayed effective date, but moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in

a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification is expected to result in estimated savings of less than $10 million.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2018, if they did not want to wait for the automatic discharge to be implemented. For future cohorts, the

delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the upcoming rulemaking and changes to economic assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this interim final rule will result in cost savings. Therefore, this interim final rule is considered an Executive Order 13771 deregulatory action.

Accounting Statement

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million. To evaluate this, the Department looked at the difference in the undiscounted cashflows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the PB2018 baseline and the one-year delay scenario described in the *Net Budget Impacts* section of this interim final rule. The difference from subtracting the one-year delay scenario from the baseline for the 2017 and 2018 cohorts for FY2017 to FY 2026 is summarized in Table 2.

TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 AND 2018 LOAN COHORTS FROM ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE FOR FY2017 TO FY2026

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Change in DDB Cashflow | 406,737 | 846,076 | 514,402 | 4,457,479 | 11,564,985 |
| | 2022 | 2023 | 2024 | 2025 | 2026 |
| Change in DDB Cashflow | 9,114,464 | 635,180 | (2,086,812) | (981,585) | 166,597 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect ... | Not Quantified | |
| **Category** | **Costs** | |
| | 7% | 3% |
| Continued use of state law based standard .................. Delay in providing consumer information about institution's performance and practices. Potential decreased awareness and usage of closed school and false certification discharges. | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements ................................... | −9.5 | −9.51 |
| **Category** | **Transfers** | |
| | 7% | 3% |
| Reduction in transfers from the Federal Government to affected borrowers in the 2017 and 2018 cohorts that would have been partially borne by affected institutions via reimbursements ................................... | −3.8 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 and 2018 are subject to the existing borrower defense regulation .............................. | −1.3 | −1.2 |
| Delay in closed school automatic discharge .................. | −6.6 | −6.6 |

*Paperwork Reduction Act of 1995*

As indicated in the Paperwork Reduction Act section published in the final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated annual cost of $9,458,484.

The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of the final regulations.

| Regulatory section | OMB control No. | Burden hours | Estimated cost $36.55/hour institution $16.30/hour individual |
|---|---|---|---|
| 668.14 ........................................ | 1845–0022 | 1,953 .............................. | 71,382 |
| 668.41 ........................................ | 1845–0004 | 5,346 .............................. | 195,396 |
| 668.171 ...................................... | 1845–0022 | 3,028 .............................. | 110,673 |
| 668.175 ...................................... | 1845–0022 | 60,560 ............................ | 2,213,468 |
| 682.211 ...................................... | 1845–0020 | 5,784 .............................. | 211,405 |
| 682.402 ...................................... | 1845–0020 | 1,838 .............................. | 67,179 |
| 685.222 ...................................... | 1845–0142 | 249 (Individuals) ............ | 4,059 |
| 685.222 ...................................... | 1845–0142 | 800 (Institutions) ............ | 29,240 |
| 685.300 ...................................... | 1845–0143 | 179,362 .......................... | 6,555,681 |
| Total ................................... | .............................. | 258,920 .......................... | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211, for which early implementation is allowed. | .............................. | 253,136 .......................... | 9,247,079 |
| Burden remaining | .............................. | 5,784 .............................. | 211,405 |

This interim final rule delays the effective date of all of the cited regulations and would result in a cost savings of the total amount of $9,247,079. This cost savings equals the cost savings from delaying the effective date of all of the identified provisions of the final regulations other than § 682.211(i)(7), regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, as such section has been designated for early implementation. Lenders may have elected to invoke early implementation, and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost savings. Based on the delayed effective date of July 1, 2018, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Regulatory Flexibility Act*

The Secretary certifies that this interim final regulation will not have a significant economic impact on a substantial number of small entities. The small entities that are affected by these regulations are small postsecondary institutions. As stated above, this delayed effective date is not expected to have a significant economic impact generally. This same analysis applies with regard to affected small entities.

*Intergovernmental Review*

These programs are not subject to Executive Order 12372 and the regulations in 34 CFR part 79.

*Assessment of Educational Impact*

Based on our own review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT**.

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys*. At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: www.*Federal Register.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: October 16, 2017.

**Betsy DeVos,**
*Secretary of Education.*
[FR Doc. 2017–22851 Filed 10–20–17; 4:15 pm]
**BILLING CODE 4000–01–P**

# DEPARTMENT OF VETERANS AFFAIRS

## 38 CFR Part 3

RIN 2900–AP84

### Extension of the Presumptive Period for Compensation for Gulf War Veterans

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** The Department of Veterans Affairs (VA) is issuing this final rule to affirm its adjudication regulations regarding compensation for disabilities resulting from undiagnosed illnesses suffered by veterans who served in the Persian Gulf War. This amendment is necessary to extend the period during which disabilities associated with undiagnosed illnesses and medically unexplained chronic multi-symptom illnesses must become manifest in order for a Veteran to be eligible for compensation. The intended effect of this amendment is to provide consistency in VA adjudication policy, preserve certain rights afforded to Persian Gulf War (GW) veterans, and ensure fairness for current and future GW veterans.

**DATES:** This final rule is effective October 24, 2017.

**FOR FURTHER INFORMATION CONTACT:** Janel Keyes, Policy Analyst, Regulations Staff (211D), Compensation Service, Veterans Benefits Administration, 810 Vermont Avenue NW., Washington, DC 20420, *Janel.Keyes@va.gov*, (202) 461–9700. (This is not a toll-free telephone number.)

**SUPPLEMENTARY INFORMATION:** On October 17, 2016, VA published in the **Federal Register** an interim final rule (81 FR 71382) amending its adjudication regulation regarding compensation for disabilities suffered by veterans who served in the Southwest Asia Theater of Operations during the GW. In order to ensure that benefits established by Congress are fairly administered, VA extended the evaluation period in which disabilities associated with undiagnosed illnesses and chronic multi-symptom illnesses must become manifest in order for a veteran to be eligible for compensation. Accordingly, VA removed the date, December 31, 2016, from 38 CFR 3.317(a)(1)(i) and added, in its place, December 31, 2021.

VA invited interested persons to submit written comments on or before December 16, 2016. VA received 22 comments in response to the interim final rule. VA received comments from military service members, veterans,

family members, and one veteran service organization, which was Veterans of Foreign Wars. Some comments addressed more than one issue. In those instances, VA reviewed and considered each issue independently. VA also grouped together by similar topic all of the issues raised by the commenters that concerned at least one portion of the rule. VA organized the responses to the comments by topic. VA responds to all commenters as follows.

I. Supportive

VA received five comments expressing support for the extension. One commenter provided personal testimony as a GW veteran that his symptoms had a delayed-onset; therefore, an extension was appropriate and justified. Another commenter provided personal testimony as a spouse of a GW veteran stating that her husband's symptoms have "steadily gotten worse over the years". VA appreciates the feedback and support. VA makes no change based on these comments.

II. Elimination of Expiration Date

The majority of commenters, some of whom thanked VA for the extension, asserted that VA should eliminate the expiration date. One commenter stated, "I think that the deadline for [GW] presumptive claims should be totally taken away since there is still not an official end to the [GW] and we do not know when there will be one." Another stated, "It took about 5 years after getting out to see a pattern of illness and at a level to make me concerned. It took even longer to see and feel the full extent of my conditions." Additionally, Veterans of Foreign Wars requested an open-ended presumptive period "without an artificial time limit".

VA makes no change based on these comments. Section 102(7) of the Persian Gulf War Veterans' Benefits Act, Title I of the Veterans' Benefits Improvement Act of 1994, Public Law 103–446, states Congress' finding that further research must be undertaken to determine the causes of GW veterans' illnesses and that

pending the outcome of such research, veterans who are seriously ill as the result of such illnesses should be given the benefit of the doubt and be provided compensation to offset the impairment in earning capacities they may be experiencing.

Hence, Congress contemplated an ongoing process for investigating the nature and causes of GW veterans' illnesses that is reflected in the current statutory and regulatory scheme. See 38 U.S.C. 1117 and 38 CFR 3.317.

# EXHIBIT 16


message can be received without jeopardizing the safety or security of people, places or vessels.

## V. Public Participation and Request for Comments

We view public participation as essential to effective rulemaking, and will consider all comments and material received during the comment period. Your comment can help shape the outcome of this rulemaking. If you submit a comment, please include the docket number for this rulemaking, indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation.

We encourage you to submit comments through the Federal eRulemaking Portal at *http:// www.regulations.gov*. If your material cannot be submitted using *http:// www.regulations.gov*, contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

We accept anonymous comments. All comments received will be posted without change to *http:// www.regulations.gov* and will include any personal information you have provided. For more about privacy and the docket, visit *http:// www.regulations.gov/privacynotice*.

Documents mentioned in this NPRM as being available in this docket and all public comments, will be in our online docket at *http://www.regulations.gov* and can be viewed by following that Web site's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted or a final rule is published.

## List of Subjects in 33 CFR Part 117

Bridges.

For the reasons discussed in the preamble, the Coast Guard proposes to amend 33 CFR part 117 as follows:

## PART 117—DRAWBRIDGE OPERATION REGULATIONS

■ 1. The authority citation for part 117 continues to read as follows:

**Authority:** 33 U.S.C. 499; 33 CFR 1.05–1; Department of Homeland Security Delegation No. 0170.1.

■ 2. Suspend § 117.879 from 6 a.m. on February 26, 2018, through 6 p.m. on July 31, 2019.
■ 3. Add a new temporary § 117.T879, from 6 a.m. on February 26, 2018, through 6 p.m. on July 31, 2019, to read as follows:

### § 117.T879   Isthmus Slough.

The draw of the Oregon State secondary highway bridge, mile 1.0, at Coos Bay, shall operate in single leaf, and open half the draw on signal if at least 24 hours notice is given. The vertical clearance of the non-functioning leaf will be reduced up to ten feet.

Dated: October 13, 2017.

**Brendan C. McPherson,**

*Captain, U.S. Coast Guard, Acting Commander, Thirteenth Coast Guard District.*

[FR Doc. 2017–23052 Filed 10–23–17; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 668, 674, 682, and 685

**[Docket ID ED–2017–OPE–0112]**

**RIN 1840–AD28**

### Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to further delay, until July 1, 2019, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations), published in the **Federal Register** on November 1, 2016. The Secretary proposes this further delay to ensure that there is adequate time to conduct negotiated rulemaking and, as necessary, develop revised regulations. The provisions for which we propose to further delay the effective date are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The current effective date of selected provisions of the final regulations is July 1, 2018, in accordance with the interim final rule (IFR) published elsewhere in this issue of the **Federal Register**.

**DATES:** We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email

or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format*. Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov*, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under ''Help.''

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the notice of proposed rulemaking, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W248, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov*. Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W248, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov*.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation To Comment:* We invite you to submit comments regarding this notice of proposed rulemaking. We will consider comments on the further delayed effective date only and will not consider comments on the wording or substance of the final regulations. See

**ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this notice of proposed rulemaking by accessing *Regulations.gov*. You may also inspect the comments in person in room 6W245, 400 Maryland Avenue SW., Washington, DC, between 8:30 a.m. and 4:00 p.m. Washington, DC time, Monday through Friday of each week, except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public-rulemaking record for this notice of proposed rulemaking. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

Elsewhere in this issue of the **Federal Register,** the Department is publishing an IFR delaying until July 1, 2018, the effective date of selected provisions of the final regulations. The original effective date of the final regulations published November 1, 2016 (81 FR 75926) was July 1, 2017. On June 16, 2017, the Department published in the **Federal Register** a notification of the partial delay of effective dates under section 705 of the Administrative Procedure Act (5 U.S.C. 705) (82 FR 27621) (705 Notice), to delay the effectiveness of certain provisions of the final regulations until a legal challenge by the California Association of Private Postsecondary Schools is resolved. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* Civil Action No. 1:17–cv–00999 (D.D.C. May 24, 2017). As explained in the IFR, because the final regulations have been postponed by the 705 Notice beyond July 1, 2017, they must become effective no earlier than July 1, 2018, to comply with section 482 of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1089), also known as the ''master calendar requirement.''

Also on June 16, 2017, the Department announced its intent to convene a committee to develop proposed regulations to revise the regulations on borrower defense to repayment of Federal student loans and other matters. Given that the first

negotiated rulemaking session is scheduled for November 13–15, 2017, we cannot complete the negotiated rulemaking process and the development of revised regulations by November 1, 2018. Under the master calendar, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before July 1, 2019.

As noted previously, elsewhere in this issue of the **Federal Register,** the Department is publishing an IFR delaying the effective date of the final regulations until July 1, 2018. The Department could implement the final regulations on July 1, 2018, pursuant to the IFR, or, through notice and comment rulemaking, we could delay the effective date until July 1, 2019, or a future July 1. We propose to further delay the effective date of the final regulations, to continue to preserve the regulatory status quo, until July 1, 2019. The Department would continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue to apply for the discharge of all or a part of their loans.

Based on the above considerations, the Department is proposing to delay until July 1, 2019, the effective date of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

• § 668.14(b)(30), (31), and (32) Program participation agreement.

• § 668.41(h) and (i) Reporting and disclosure of information.

• § 668.71(c) Scope and special definitions.

• § 668.90(a)(3) Initial and final decisions.

• § 668.93(h), (i), and (j) Limitation.

• § 668.171 General.

• § 668.175(c), (d), (f), and (h) Alternative standards and requirements.

• Part 668 subpart L, Appendix C.

• § 674.33(g)(3) and (g)(8) Repayment.

• § 682.202(b)(1) Permissible charges by lenders to borrowers.

• § 682.211(i)(7) Forbearance.

• § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(5), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (d)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

• § 682.405(b)(4)(ii) Loan rehabilitation agreement.

• § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.

• § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.

• § 685.205(b)(6) Forbearance.

• § 685.206(c) Borrower responsibilities and defenses.

• § 685.212(k) Discharge of a loan obligation.

• § 685.214(c)(2) and (f)(4) through (7) Closed school discharge.

• § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification or unauthorized payment.

• § 685.222 Borrower defenses.

• Part 685 subpart B, Appendix A Examples of borrower relief.

• § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

• § 685.308(a) Remedial actions.

As noted in the IFR, the Department interprets all references to ''July 1, 2017'' in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations did not take effect on July 1, 2017, we would, in connection with this proposed additional delay of effective date, read those regulations as referring to the new effective date established by this further delay, *i.e.,* July 1, 2019.

This proposed delay of the final regulations will not delay the effective dates of the following regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Loan Program or FFEL Program loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. As established in 81 FR 75926, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) would remain designated for early implementation, at the discretion of each lender or guaranty agency.

*Waiver of Negotiated Rulemaking:* Under section 492 of the HEA (20 U.S.C. 1098a), all regulations proposed by the Department for programs authorized under title IV of the HEA are subject to negotiated rulemaking requirements. However, section 492(b)(2) of the HEA provides that negotiated rulemaking may be waived for good cause when doing so would be "impracticable, unnecessary, or contrary to the public interest." Section 492(b)(2) of the HEA also requires the Secretary to publish the basis for waiving negotiations in the **Federal Register** at the same time as the proposed regulations in question are first published.

For the reasons stated above, it would not be practicable, before the July 1, 2018 effective date specified in the IFR, to engage in negotiated rulemaking and publish final regulations. There is, therefore, good cause to waive negotiated rulemaking pertaining to this delay.

**Executive Orders 12866, 13563, and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be -$26.9 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense provisions of the final regulations as they would apply to the 2017 to 2019 loan cohorts, as well as from the delayed paperwork burden on institutions, and the delayed execution of the closed school automatic discharge. This proposed regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed this proposed rule under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this proposed rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this proposed rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

*Effects of One-Year Delay*

As indicated in the Regulatory Impact Analysis (RIA) published with the final regulations on November 1, 2016, the final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge. As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over 40 years, delaying the final regulations for an additional year will have limited effect, as discussed below. This analysis is limited to the effect of delaying the effective date of the final regulations an additional year from July 1, 2018 to July 1, 2019, and does not account for any potential changes in the final regulations.

Even with the further delayed effective date, borrowers will still be able to submit claims. The provisions of the final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process reflected in the final regulations, when implemented. Once in effect, the protection generated by the financial protection provisions will be available to be applied to claims from loans originated earlier, including the period from July 1, 2018 to June 30, 2019. Loans made before July 1, 2017, were always subject to the State-based standard and borrowers' ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations, for loans made on or after July 1, 2019, the Federal standard established in the final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the final regulations to mean the effective date of the final regulations. As a result, the further delay in the effective date means that loans made between July 1, 2018 and June 30, 2019, will be subject to the

current State-based standard. As we noted in the final regulations, the Federal standard was designed to address much of the conduct already covered by the State-based standard, so the vast majority of claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State-based standard as well.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the final regulations, institutions bear the major costs of compliance, paperwork burden, and providing financial protection. The financial protection provisions of the final regulations depend on the effective date, so institutions will not incur these costs until the final regulations are in effect. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the initial year of the final regulations. In the revised scenario developed to estimate the effect of the additional one-year delay in the effective date, transfers from institutions to students, via the Federal government, would be reduced by approximately $9.3 million for the 2017 and 2018 loan cohorts. The costs of providing financial protection were not quantified in the RIA for the final regulations, and the Department has no additional data to estimate costs

institutions may avoid from the delayed effective date of the financial protection provisions.

Net Budget Impact

In order to estimate the net budget impact of the additional one-year delay in the effective date to July 1, 2019, the Department developed a scenario that revised the primary estimate assumptions from the final regulations for the affected 2017 to 2019 loan cohorts, as was done for the one-year delay described in the IFR. As before, the Department applies an assumed level of school misconduct, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Table 1) to the President's Budget 2018 (PB2018) loan volume estimates to generate the estimated net borrower defense claims for each cohort, loan type, and sector. The assumptions for the primary scenario from the 2016 final regulation were the basis for the President's Budget 2018 (PB2018) baseline that assumed the final regulations would go into effect on July 1, 2017. The scenario developed for this NPRM is designed to capture the incremental change from the one-year delay in the IFR associated with the further one-year delay in the effective date to July 1, 2019. Compared to the scenario developed for the IFR,

recoveries are reduced by an additional two percent for the 2017 and 2018 cohorts, all of the 2018 cohort is subject to the State-based standard, and the affected portion of the 2019 cohort is subject to the current, State-based standard and reduced recoveries at the five percent level used for the one-year delay in the IFR. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the further one-year delay, from July 1, 2018 to July 1, 2019, in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulations and the borrower percent is the same. The financial protection provided was always expected to increase over time, so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the proposed delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by seven percent for the private not-for-profit and proprietary sectors and by five percent for the 2019 cohort. As in the final regulations and the IFR, recoveries from public institutions were held constant at 75 percent across scenarios.

### TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY FROM JULY 1, 2018 TO JULY 1, 2019

| Cohort | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop |
| Conduct Percent: | | | | | | |
| Final Primary | 3.0 | 20 | 2.4 | 16 | 2.0 | 13.6 |
| Delay to 2019 | 2.7 | 18 | 2.16 | 14.4 | 1.8 | 12.24 |
| Borrower Percent: | | | | | | |
| Final Primary | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| Delay to 2019 | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| | Public | Priv/Prop | Public | Priv/Prop | Public | Priv/Prop |
| Recovery Percent: | | | | | | |
| Final Primary | 75 | 23.8 | 75 | 23.8 | 75 | 23.8 |
| Delay to 2019 | 75 | 22.134 | 75 | 22.134 | 75 | 24.871 |

The net budget impact associated with these effects of the additional one-year delay in the effective date on the borrower defense provisions only is approximately -$46.1 million from the 2017 to 2019 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net

budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of -$46.1 million in reduced costs for the affected cohorts. This represents the incremental change associated with the additional one-year delay from July 1, 2018 to July 1, 2019. If compared to the PB2018 baseline, the savings would be approximately -$78.8 million.

The closed school automatic discharge provisions were the other significant source of estimated net

budget impact in the final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in fiscal year (FY) 2017 in the President's Budget for FY 2018 (PB2018). As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

As indicated in the IFR, the Department does expect to incur the costs associated with the three-year

automatic discharge after the delayed effective date, but moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification to July 2018 described in the IFR resulted in estimated savings of less than $10 million. Using the same approach, the further delay to July 2019 is expected to save approximately $15 million above the savings from the initial one-year delay.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2019, if they did not want to wait for the automatic discharge to be implemented. For future cohorts, the delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the upcoming rulemaking and changes to economic

assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this proposed rule will result in cost savings. Therefore, this proposed rule would be considered an Executive Order 13771 deregulatory action.

Accounting Statement

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million. To evaluate this, the Department looked at the difference in the undiscounted cashflows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the one-year delay established in the IFR and the further one-year delay scenario described under *Net Budget Impacts.* The difference from subtracting the further delay scenario from the IFR one-year delay scenario for the 2017 to 2019 cohorts is summarized in Table 2.

TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 TO 2019 LOAN COHORTS FROM THE FURTHER ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE TO JULY 1, 2019

|  | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Change in DDB Cashflow .................................. | 159 | 7,489 | 496,637 | 637,361 | 538,468 |
|  | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 |
| Change in DDB Cashflow .................................. | 6,004,802 | 9,525,520 | 4,668,143 | 2,156,009 | 3,003,657 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect. .. | Not Quantified | |
| Category | Costs | |
|  | 7% | 3% |
| Continued use of State-law based standard<br>Delay in providing consumer information about institution's performance and practices<br>Potential decreased awareness and usage of closed school and false certification discharges | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements. ...................................................... | −9.5 | −9.51 |
| Category | Transfers | |
|  | 7% | 3% |
| Reduction in transfers from the Federal Government to affected borrowers in the 2017 to 2019 cohorts that would have been partially borne by affected institutions via reimbursements. | −3.5 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 to 2019 are subject to the existing borrower defense regulation. ................................................. | −1.2 | −1.3 |
| Delay in closed school automatic discharge implementation from 2018 to 2019 ................................................. | −14.8 | −14.8 |

*Paperwork Reduction Act of 1995*

As indicated in the Paperwork Reduction Act section published in the final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated annual cost of $9,458,484.

The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of the final regulations.

| Regulatory section | OMB Control No. | Burden hours | Estimated cost $36.55/hour institution $16.30/hour individual |
|---|---|---|---|
| 668.14 | 1845–0022 | 1,953 | 71,382 |
| 668.41 | 1845–0004 | 5,346 | 195,396 |
| 668.171 | 1845–0022 | 3,028 | 110,673 |
| 668.175 | 1845–0022 | 60,560 | 2,213,468 |
| 682.211 | 1845–0020 | 5,784 | 211,405 |
| 682.402 | 1845–0020 | 1,838 | 67,179 |
| 685.222 | 1845–0142 | 249 (Individuals) | 4,059 |
| 685.222 | 1845–0142 | 800 (Institutions) | 29,240 |
| 685.300 | 1845–0143 | 179,362 | 6,555,681 |
| Total | | 258,920 | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211 early implementation allowed. | | 253,136 | 9,247,079 |
| Burden remaining | | 5,784 | 211,405 |

This notice of proposed rulemaking delays the effective date of the implementation of all of the cited regulations and would result in a cost savings of the total amount of $9,458,484. However, § 682.211(i)(7) of the final regulations, regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, as would continue to be designated for early implementation. Lenders may have elected early implementation and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost saving. Based on the delayed effective date of July 1, 2019, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs— education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: October 16, 2017.

Betsy DeVos,

*Secretary of Education.*

[FR Doc. 2017–22850 Filed 10–20–17; 4:15 pm]

**BILLING CODE 4000–01–P**

## POSTAL SERVICE

### 39 CFR Part 20

### International Mailing Services: Proposed Product and Price Changes—CPI

**AGENCY:** Postal Service™.

**ACTION:** Proposed rule with a request for comments.

**SUMMARY:** The Postal Service proposes to revise *Mailing Standards of the United States Postal Service, International Mail Manual* (IMM®), to reflect changes in the prices, product features, and classification changes to Mailing Services. These changes would also implement a restriction on the contents of First-Class Mail International® to documents only, to comply with standards established by the Universal Postal Union (UPU).

**DATES:** We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Mail or deliver comments to the manager, Product Classification, U.S. Postal Service®, 475 L'Enfant Plaza SW., RM 4446, Washington, DC 20260– 5015. You may inspect and photocopy all written comments at USPS® Headquarters Library, 475 L'Enfant Plaza SW., 11th Floor N, Washington, DC by appointment only between the hours of 9 a.m. and 4 p.m., Monday through Friday by calling 1–202–268– 2906 in advance. Email comments, containing the name and address of the commenter, to: *ProductClassification@ usps.gov,* with a subject line of "January 2018 International Mailing Services Price Change—CPI." Faxed comments are not accepted.

# EXHIBIT 17

**6458**   Federal Register / Vol. 83, No. 31 / Wednesday, February 14, 2018 / Rules and Regulations

subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35.

**List of Subjects in 22 CFR Part 126**

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, 22 CFR part 126 is amended as follows:

**PART 126—GENERAL POLICIES AND PROVISIONS**

■ 1. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791, and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Sections 7045 and 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 2. Section 126.1 is amended by revising the table in paragraph (d)(2), and adding paragraph (w), and by removing the Note to 126.1.

The revision and addition read as follows:

**§ 126.1   Prohibited exports, imports, and sales to or from certain countries.**

\*   \*   \*   \*   \*

(d) \* \* \*

(2) \* \* \*

| Country | Country specific paragraph location |
|---|---|
| Afghanistan | See also paragraph (g) of this section. |
| Central African Republic | See also paragraph (u) of this section. |
| Cyprus | See also paragraph (r) of this section. |
| Democratic Republic of Congo | See also paragraph (i) of this section. |
| Eritrea | See also paragraph (h) of this section. |
| Haiti | See also paragraph (j) of this section. |
| Iraq | See also paragraph (f) of this section. |
| Lebanon | See also paragraph (t) of this section. |
| Libya | See also paragraph (k) of this section. |
| Somalia | See also paragraph (m) of this section. |
| South Sudan | See also paragraph (w) of this section. |
| Sudan | See also paragraph (v) of this section. |
| Zimbabwe | See also paragraph (s) of this section. |

\*   \*   \*   \*   \*

(w) *South Sudan.* It is the policy of the United States to deny licenses or other approvals for exports of defense articles and defense services destined for South Sudan, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services for monitoring, verification, or peacekeeping support operations, including those authorized by the United Nations or operating with the consent of the relevant parties;

(2) Defense articles and defense services intended solely for the support of, or use by, African Union Regional Task Force (AU–RTF) or United Nations entities operating in South Sudan, including but not limited to the United Nations Mission in the Republic of South Sudan (UNMISS), the United Nations Mine Action Service (UNMAS), the United Nations Police (UNPOL), or the United Nations Interim Security Force for Abyei (UNISFA);

(3) Defense articles and defense services intended solely for the support of or use by non-governmental organizations in furtherance of conventional weapons destruction or humanitarian demining activities;

(4) Non-lethal defense articles intended solely for humanitarian or protective use and related technical training and assistance;

(5) Personal protective equipment including flak jackets and helmets, temporarily exported to South Sudan by United Nations personnel, human rights monitors, representatives of the media, and humanitarian and development workers and associated personnel, for their personal use only; or

(6) Any defense articles and defense services provided in support of implementation of the Comprehensive Peace Agreement, the Agreement on the Resolution of the Conflict in the Republic of South Sudan, or any successor agreement.

**Michael Miller,**

*Office Director, Office of Regional Security and Arms Transfers, Bureau of Political-Military Affairs, U.S. Department of State.*

[FR Doc. 2018–02995 Filed 2–13–18; 8:45 am]

**BILLING CODE 4710–25–P**

---

**DEPARTMENT OF DEFENSE**

**Department of the Navy**

**32 CFR Part 706**

**Certifications and Exemptions Under the International Regulations for Preventing Collisions at Sea, 1972**

*Correction*

In rule document 2018–02554 appearing on pages 5536–5537 in the issue of February 8, 2018, make the following correction:

**§ 706 .2   [Corrected]**

■ On page 5537, in Table Four, in the second column, "DDG 115" should read "DDG 116".

[FR Doc. C1–2018–02554 Filed 2–13–18; 8:45 am]

**BILLING CODE 1301–00–P**

---

**DEPARTMENT OF EDUCATION**

**34 CFR Parts 668, 674, 682, and 685**

**[Docket ID ED–2017–OPE–0112]**

**RIN 1840–AD28**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary delays, until July 1, 2019, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the 2016 final regulations), published in the **Federal**

Register on November 1, 2016. The Secretary is delaying the 2016 final regulations to ensure that there is adequate time to conduct negotiated rulemaking and develop revised regulations. The provisions for which the effective date is being delayed are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The original effective date of the 2016 final regulations, published November 1, 2016, was July 1, 2017. The effective date was delayed by a document issued under section 705 of the Administrative Procedure Act (the 705 Document). The Department announced in an interim final rule (IFR) issued on October 24, 2017, that, under the Department's interpretation of the Higher Education Act, the effective date could be no earlier than July 1, 2018.

**DATES:** As of February 14, 2018, the effective date for the amendments to or additions of: §§ 668.14(b)(30), (31), and (32); 668.41(h) and (i); 668.71(c); 668.90(a)(3); 668.93(h), (i), (j); 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33(g)(3) and (g)(8); 682.202(b)(1); 682.211(i)(7); 682.402(d)(3), (d)(6)(ii)(B)(1) and (2), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(5), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4); 682.410(b)(4) and (b)(6)(viii); 685.200(f)(3)(v) and (f)(4)(iii); 685.205(b)(6); 685.206(c); 685.212(k); 685.214(c)(2), (f)(4) through (7); 685.215(a)(1), (c)(1) through (c)(8), and (d); 685.222; Appendix A to Subpart B of Part 685; and 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed on June 16, 2017 (82 FR 27621) and October 24, 2017 (82 FR 49114), is further delayed until July 1, 2019.

**FOR FURTHER INFORMATION CONTACT:** George Alan Smith, U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 294–34, Washington, DC 20202. Telephone: (202) 453–7757 or by email at: *George.Alan.Smith@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** On October 24, 2017 (82 FR 49114), the Department of Education (Department) published an IFR giving notice that under its interpretation of section 482 of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1089), also known as the "master calendar requirement," selected provisions of the 2016 final regulations would have an effective date of July 1, 2018. (82 FR

49114) The original effective date of the 2016 final regulations (November 1, 2016 at 81 FR 75926) was July 1, 2017. On June 16, 2017, a 705 Document (82 FR 27621) delayed the effective date of certain provisions of the 2016 final regulations until a legal challenge by the California Association of Private Postsecondary Schools (CAPPS) is resolved. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* Civil Action No. 1:17–cv–00999 (D.D.C. May 24, 2017). As explained in the IFR, because the 2016 final regulations have been postponed by the 705 Document beyond July 1, 2017, they cannot become effective earlier than July 1, 2018, to comply with the master calendar requirement. (82 FR 49115–49116).

Also on June 16, 2017, the Department announced its intent to convene a committee to develop proposed regulations to revise the existing regulations on borrower defense to repayment of Federal student loans and other matters (82 FR 27640), the same topics addressed in the 2016 final regulations. Under the master calendar requirement, a regulatory change that has been published in final form on or before November 1 of the year prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before, at the earliest, July 1, 2019.

Accordingly, the Department published a notice of proposed rulemaking (NPRM) proposing to delay the effective date of the 2016 final regulations until July 1, 2019 (October 24, 2017 at 82 FR 49155). This notice adopts that proposal, delaying the effective date of the 2016 final regulations, to continue to preserve the regulatory status quo, until July 1, 2019. The Department will continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue to apply for the discharge of all or a part of their loans.

Based on the above considerations, the Department delays until July 1, 2019, the effective date of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

§ 668.14(b)(30), (31), and (32) Program participation agreement.

§ 668.41(h) and (i) Reporting and disclosure of information.

§ 668.71(c) Scope and special definitions.

§ 668.90(a)(3) Initial and final decisions.

§ 668.93(h), (i), and (j) Limitation.

§ 668.171 General.

§ 668.175(c), (d), (f), and (h) Alternative standards and requirements.

Part 668 subpart L, Appendix C.

§ 674.33(g)(3) and (g)(8) Repayment.

§ 682.202(b)(1) Permissible charges by lenders to borrowers.

§ 682.211(i)(7) Forbearance.

§ 682.402(d)(3), (d)(6)(ii)(B)(1) and (2), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(5), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

§ 682.405(b)(4)(ii) Loan rehabilitation agreement.

§ 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.

§ 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.

§ 685.205(b)(6) Forbearance.

§ 685.206(c) Borrower responsibilities and defenses.

§ 685.212(k) Discharge of a loan obligation.

§ 685.214(c)(2) and (f)(4) through (7) Closed school discharge.

§ 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.

§ 685.222 Borrower defenses.

Part 685 subpart B, Appendix A Examples of borrower relief.

§ 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

§ 685.308(a) Remedial actions.

Note: Section 668.90 has been redesignated as § 668.91 and § 668.93 has been redesignated as § 668.94 pursuant to the borrower defense procedural rule, published January 19, 2017 at 82 FR 6253 (the borrower defense procedural rule).

As noted in the IFR, the Department interprets all references to "July 1, 2017" in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations did not take effect on July 1, 2017, we would, in connection with this delay of the effective date, read those regulations as referring to the new effective date established by this rule, *i.e.,* July 1, 2019.

This delay of the effective date of the 2016 final regulations does not delay the effective dates of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Loan Program or FFEL Program loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. In the 2016 final regulations, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) were designated for early implementation, at the discretion of each lender or guaranty agency. That designation remains effective.

*Public Comment:* In response to our invitation in the NPRM, 14 parties submitted comments on the delay of the effective date. We do not discuss comments or recommendations that are beyond the scope of this regulatory action or that would require statutory change.

### Analysis of Comments and Changes

An analysis of the comments and of any changes to this regulatory action since publication of the NPRM follows.

A number of commenters opposed the proposed rule to delay the effective date of selected provisions of the 2016 final regulations until July 1, 2019, stating that such delay (1) would harm student loan borrowers and, in some cases, taxpayers; (2) is unnecessary and unaligned with the mission of the Department of Education; (3) is not justifiable on the grounds that there is pending litigation as referenced in the NPRM; and (4) would not be compliant with the Administrative Procedure Act (APA). However, several commenters supported the delay because they believed, collectively, that a further delay would (1) relieve the regulatory burden on institutions; (2) mitigate uncertainty about the potential impact of the current regulations; and (3) prevent unnecessary harm and disruption to postsecondary educational institutions. We discuss and respond to these comments in greater detail below.

*Comments:* Several commenters stated that a further delay of the 2016 final regulations would harm borrowers because they would continue to be subject to the predatory practices of certain institutions without those institutions being held accountable through the financial responsibility standards and disclosures and student warnings contained in the 2016 final regulations. The commenters argued that the Secretary should protect and provide relief to borrowers who attended institutions of higher education that misrepresented their program offerings, or that employed deceptive marketing or recruiting tactics, instead of delaying the 2016 final regulations. The commenters claimed that a further delay would ensure that borrowers who apply or have applied for a loan discharge based on a borrower defense would be required to wait for new rules to go into effect before receiving consideration of their claims under the process established by the 2016 final regulations while interest, collection costs and financial distress continued to mount. The commenters also stated that a further delay of the pre-dispute arbitration and class action waiver provisions of the 2016 final regulations would leave students without access to the courts, while statutes of limitation run. Several commenters also argued that a further delay of the rule would harm student loan borrowers because borrowers would be denied access to the many provisions in the 2016 final regulations that are beneficial to borrowers, including provisions that provide:

—Automatic closed school discharges for borrowers who were enrolled in schools that closed on or after November 13, 2013, and who did not enroll in another school within three years of their school's closure;
—A second level of Departmental review for closed school discharge claims that were denied by a guaranty agency;
—An expansion of the conditions under which a FFEL or Direct Loan borrower may qualify for a false certification discharge;
—A clear process, based on new Federal standards, that establishes a borrower's procedural rights and describes how the Department will consider individual and group borrower defense discharge claims and pending requests for forbearance or suspension of collection on loans that are subject to borrower defense claims;
—Prohibitions on schools' ability to enforce pre-dispute arbitration agreements and class action waivers as to borrower defense-related claims for students receiving Direct Loans;

—Institutional financial responsibility triggers to protect the Federal government from losses that may arise from borrower defense claims and sudden school closures; and,
—Institutional financial protection disclosures for prospective and enrolled students to assist students in making informed choices about where to matriculate.

One commenter asserted that further delaying the 2016 final regulations would perpetuate existing harms experienced by borrowers, such as poor credit ratings resulting from debt that borrowers accumulated that the borrower may be able to discharge based on a borrower defense.

One commenter argued that further delay in the effective date harms borrowers because the delay creates uncertainty in how the Department will treat future borrower defense claims. The commenter asserted that while borrowers can wait for the outcome of the new rulemaking effort for clarity on the process, waiting has risks for borrowers as well, including the application of statutes of limitations which may limit the loan amount that may be discharged. The same commenter noted that Direct Loan borrowers with loans issued during the delay cannot avail themselves of the Federal standard in the 2016 final regulations; these borrowers will be limited to the State law standard. Finally, this commenter stated that although the Department claimed that borrowers would not be harmed by the further delay of the effective date of the 2016 final regulations because borrower defense claims would continue to be processed under existing regulations, the Department's own impact analysis estimates a reduction in student loan discharges of nearly two billion as a result of the further delay. Citing a July 2017 letter from the Department's Acting Under Secretary to Senator Richard Durbin, the commenter stated that the Department had not approved borrower defense applications since January 20, 2017, and that there were at least 64,000 outstanding borrower defense applications as of the date of the letter. The commenter noted that the number of unprocessed claims has since risen to 95,000, and that a further delay of the 2016 final regulations will exacerbate the lack of expediency in the Department's borrower defense discharge process to the detriment of borrowers who continue to wait for relief.

*Discussion:* The Department does not agree that borrowers will be significantly harmed by changing the effective date of the 2016 final

regulations to July 1, 2019. While the Department acknowledges that certain benefits of the 2016 final regulations will be delayed, it has determined that those benefits are outweighed by the administrative and transaction costs for regulated entities and borrowers of having those regulations go into effect only to be changed a short while later. First, the 2016 final regulations did not create the borrower defense regime but modified the pre-existing borrower defense regulations, in place since 1995. Those pre-existing regulations remain in effect, as does the statute that allows borrowers to assert defenses to repayment. Therefore, borrowers can continue to apply for relief from payment of loans under this existing process, and the Department is committed to processing those applications in a timely manner. Second, the instant rule merely delays the marginal benefits of the 2016 final regulations for a brief period of time (an additional year), it does not revoke them.

The Department does not share the commenters' concern that borrowers will be subject to certain institutions' predatory practices absent the 2016 final regulations. Because the current borrower defense regulations will remain in effect, borrowers will continue to be able to submit claims to the Department and have their claims processed in accordance with the HEA and those current regulations. Borrowers will not need to wait for new rules to go into effect to have a borrower defense claim considered. We do not anticipate that borrowers will be harmed by the current process because we routinely grant forbearances, and stop collection activities on defaulted loans, to borrowers while their discharge claims are under review. We acknowledge the commenter's concern regarding the number of pending claims before the Department. However, in the time since the commenter submitted the comment, the Department has issued decisions on borrower defense claims and we will continue to accept and process borrower defense claims.

In the event that the borrower defense regulations currently being negotiated result in discharge standards for a borrower defense claim different from the current standards, the new standards would apply only to loans first disbursed on or after the effective date of those regulations. Claims filed as to loans first disbursed before July 1, 2019, which would include currently pending claims and claims filed between the date of this final rule and July 1, 2019, will continue to be

processed under the current standard for borrower defense claims.

We further disagree with commenters who claimed that the July 1, 2019 effective date would harm borrowers because the Federal standard established in the 2016 final regulations would not be in effect. As we noted in the 2016 final regulations, the Federal standard was designed to address much of the conduct covered by the State law-based standard so the vast majority of claims made by borrowers whose loans were first disbursed between July 1, 2017, and July 1, 2019, could be evaluated and discharges provided under the current State law-based standard. (81 FR 75937–75941). Any benefits to borrowers associated with having the Federal standard in place during that time period are outweighed by the confusion and disruption that would result from allowing the 2016 final regulations to take effect during a time when they are subject to a legal challenge and when the Department is reevaluating its borrower defense regulations generally. In addition to causing confusion for borrowers, implementing a different standard for a potentially short period of time could delay the processing of claims. One of the goals of the 2016 final regulations was to provide borrowers with more consistency and clarity about their borrower defense claims. (81 FR 39339–39340). Under the circumstances, the delay of the effective date of the 2016 final regulations provides greater clarity and consistency for borrowers, as well as a more streamlined process, than implementation of the rule under the current schedule.

With respect to the comment about a two billion dollar reduction in claims based on the difference in the primary and baseline scenarios from the net budget impact in the 2016 final regulations, as noted in the Regulatory Impact Analysis (RIA), the Department estimates the savings resulting from the delay to be much less. The savings resulting from the delay are mainly driven by slight differences between the State law-based standards in the current regulations and the Federal standards from the 2016 final regulations if they were applicable to loans disbursed between July 1, 2018, and July 1, 2019. Since we have always maintained that there would be significant overlap between the State law-based and Federal standards from the 2016 final regulations, the differences are estimated to be minor. The provisions of the 2016 final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by

the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process in effect when the claim is made. Additionally, the figures in the Accounting Statement for the 2016 final regulations would more appropriately be characterized as the costs associated with a single cohort and not the costs associated with a fiscal year. As part of its ongoing efforts to improve the utility of student loan information, the Department has updated its Accounting Statement presentation to better align with OMB Circular A–4, so the effects presented in this document do show the impact on the affected cohorts by fiscal year. The Net Budget Impact section of the RIA presents the assumptions about the effect of the delay.

With regard to the financial protection disclosures, the 2016 final regulations provided that before the disclosures would be required, the Secretary would conduct consumer testing to inform the identification of events for which disclosure would be required and to determine the form of the disclosure. In light of the fact that the 2016 final regulations provided for a future process before the disclosure requirement could be implemented, we do not believe a delayed effective date would significantly change what would occur in this regard during the period of the delay. In other words, because we did not anticipate the financial protection disclosures having a significant impact immediately following the 2016 final regulations' effective date, we believe the incremental effect of delaying those provisions is minimal. We address the comments related to institutional financial responsibility triggers in more detail in the RIA.

Moreover, there are other existing protections for borrowers, including periodic reviews and site visits by Department employees to title IV participating institutions to monitor regulatory compliance; and the activities of the enforcement unit within FSA charged with taking actions against parties participating in title IV, HEA programs to enforce compliance. In addition to the Department, other entities also act to protect students, borrowers, and taxpayers, such as the States through State law enforcement activities and other Federal agencies whose jurisdictions may overlap with, or affect, the higher education sector.

Finally, we note that borrowers may continue to apply for closed school and false certification discharges under the current regulations. With regard to the comments relating to the grounds for false certification discharge, as we stated in the notice of proposed

rulemaking that preceded the 2016 final regulations, these changes reflect statutory changes relating to false certification discharges for the lack of a high school diploma or its equivalent and for a disqualifying status. As a result, the Department's authority for false certification discharges on these grounds remains unchanged. (81 FR 39377–39378). In addition, under the current regulations, the Secretary has the authority to provide false certification discharges without an application based on information in the Secretary's possession. The 2016 final regulations explicitly provided that such information may include evidence that the school has falsified the Satisfactory Academic Progress of its students. Because the current regulation does not limit the information that may be considered by the Secretary to provide a false certification discharge without an application, we do not believe a delay of the 2016 revision to this provision will harm borrowers. With regard to a second level of review of a guaranty agency's determinations on closed school discharge requests, borrowers may raise any dispute with a guaranty agency to the Department's Federal Student Aid Ombudsman Group.

The Department acknowledges the commenters' concern that the window under applicable statutes of limitation for some borrowers to file lawsuits may end during the period covered by the delay of the 2016 final regulations' prohibitions on institutions' use of pre-dispute arbitration and class action waiver contractual provisions. However, as acknowledged in the 705 Document, serious questions regarding the legality of these provisions of the final regulations exist and these provisions are among the regulations directly challenged in the CAPPS litigation. The Department thinks that it is likely that the arbitration and class action waiver provisions will be overturned. Should the Department's regulations prohibiting schools from enforcing pre-dispute arbitration agreements and class action waivers be invalidated by the court, there would be significant confusion from borrowers and schools who may have engaged in court litigation on the basis of the prohibitions as to the enforceability of those agreements. We believe the harm from having these provisions take effect in the face of the CAPPS challenge is too great and outweigh any benefits these provisions would have. Further, we note that a borrower may continue to apply for relief, from the Department under the current, State-law based borrower defense to repayment regulations, irrespective of whether the borrower has a pre-dispute arbitration agreement with the school or an agreement to waive involvement in class action lawsuits.

We also note that the pre-dispute arbitration and class action waiver provisions of the 2016 final regulations would require some institutions to change their policies and procedures and to amend their enrollment agreements. In addition, re-training staff and sending notices to borrowers informing them of the changed class action waivers and pre-dispute arbitration provisions would impose administrative costs on institutions. If pre-dispute arbitration requirements and class action waivers are addressed through the current rulemaking process, institutions would need to repeat or reverse these steps to address any requirements that would go into effect on July 1, 2019. Maintaining the regulatory status quo with respect to pre-dispute arbitration agreements and class action waivers will reduce the administrative burden on schools and lessen confusion for borrowers who would be affected by these changes.

The Department further believes that implementing the 2016 final regulations at this time would cause significant confusion around borrower defenses generally that would be unfair to students and schools. Without a delay, if the current rulemaking process results in a different standard for borrower defense claims, there would be three separate sets of standards for borrower defense claims: the State-law based standard that is currently in effect; standards for loans disbursed between July 1, 2018, and July 1, 2019; and standards for loans disbursed on or after July 1, 2019. This would be more confusing for borrowers than the potential for two different standards— one for loans disbursed before July 1, 2019, and one for loans disbursed on or after July 1, 2019. Providing for an effective date of July 1, 2019, will allow the Department and the negotiating committee to develop new borrower defense regulations that would protect students from the most serious predatory practices, provide clear and evenhanded rules for students, colleges and universities to follow, and constrain the costs to taxpayers.

The Department's processing of borrower defense claims is not affected by the effective date of the 2016 final regulations, as the current regulations remain in effect. While the process for reviewing claims and the standard under which they are reviewed would have changed under the 2016 final regulations, the Department does not expect that the length of time required to review individual claims would have changed significantly if the 2016 final regulations had gone into effect as originally scheduled. With regard to group claims, the Department has granted group claims under the existing regulations. While the 2016 final regulations provided a regulatory process for granting group borrower defense claims, the Secretary had and continues to have the authority, and has exercised that authority, to grant group claims under the borrower defense regulations currently in effect.

*Changes:* None.

*Comment:* Some commenters claimed that the delay hurts American taxpayers because the 2016 final regulations would hold institutions that commit fraud monetarily accountable for their actions in cases of student loan discharges, rather than requiring taxpayers to absorb the costs of borrower defense discharges.

*Discussion:* As noted earlier in this section, the delay of the effective date of the 2016 final regulations will allow the Department to develop new borrower defense regulations that may be more beneficial to American taxpayers than the 2016 final regulations. We do not believe the delay will harm American taxpayers because the Department may assess liability for borrower defense claims on schools now, under the current regulations in effect. The financial protection triggers in the 2016 final rule were designed to increase the likelihood of recovering funds from institutions as claims come in over the life of the cohort, especially from institutions that might have significant exposure or that end up closing as a result of the financial risks identified by the triggers. The Department estimated that recovery activity would ramp up as the triggers were implemented, as reflected in the recovery assumption in the 2016 final rule (81 FR 76057), so a delay in the early years of recovery activity is not estimated to have a significant effect, as indicated by the change in the recovery assumption presented in this RIA. With the Department's authority to seek recoveries unchanged because of the change in effective date, we believe the possibility of slightly reduced recovery rates for a short period is warranted to further the goals of providing clarity by maintaining the regulatory status quo during this interim period. We note that the borrower defense procedural rule, which provided a regulatory framework for assessing liabilities against schools for which a borrower defense claim was successful, was published in the **Federal Register** on January 19, 2017,

and those regulations have been effective since that date.

*Changes:* None.

*Comment:* One commenter asserted that the data provided for the impact of the delays in the effective date of the 2016 final regulations were inadequate because the cost of providing financial protection was not quantified in the RIA of the 2016 final regulations and the NPRM preceding this final rule; and there is no additional data to estimate the costs institutions may avoid from the delayed effective date of the financial protection provisions.

Another commenter pointed out that if the effective date of the 2016 final regulations was not delayed, the Department estimated that $381 million in loans would be forgiven between July 1, 2017, and July 1, 2019. The commenter noted that the Department does point out that the Federal government will save this money by delaying the effective date but does not point out that borrowers will end up absorbing the cost. The commenter noted that the Department could change the current regulations and not include the new closed school discharge provisions, and noted that even a temporary delay causes financial stress that can trap some borrowers in poverty. Moreover, borrowers who default on their loans because they are not discharged would not be eligible for further financial aid.

*Discussion:* The Department appreciates the comments about the RIA for the NPRM preceding this final rule. In that RIA, the Department acknowledged that the costs of providing financial protection were not quantified in the RIA for the 2016 final regulations and that there is no additional data to estimate those costs. That fact, however, does not mean that we have not sufficiently justified this delay.

As discussed in the RIA for this final rule with respect to the delay of the financial protection provisions, several factors will affect the cost for individual institutions, including: the level of institutional conduct giving rise to borrower defense claims, the applicability of certain financial protection triggers, the financial strength of the institution, the manner in which the institution provides financial protection to the Department, and the potential development of financial products aimed at providing this protection. The Department believes that individual institutions are best positioned to evaluate their potential exposure to borrower defense claims, their financial relationships with parties who could provide

financial protection, and the cost of providing financial protection. Along with the uncertainty about the projected amount of claims as recognized in the different sensitivity runs presented in the RIA for the 2016 final regulations, the Department believes that quantifying the cost of providing financial protection would provide a false sense of precision. Rather than producing a number that would be inapplicable to most institutions, the Department focused on explaining the regulations and providing data about the provisions for which it had information such as the cohort default rate (CDR), 90/10 revenue requirement, fluctuation in title IV aid, withdrawal rate, and accreditor action triggers. The 2016 final regulations did not present information about the provisions related to U.S. Securities and Exchange Commission or stock exchange actions, gainful employment, the withdrawal of owner's equity from an institution, teach-outs, State licensing, financial stress tests, an institution's violation of a loan agreement, or pending borrower defense claims. Additionally, given that the known borrower defense claims at the time were from a small number of institutions and many had not been approved or disapproved, it is unclear how the distribution of successful borrower defense claims at institutions would match up with the distribution of institutions' performance on the financial responsibility triggers for which the Department had some information.

As is further discussed in the RIA for this final rule, the Department recognizes that the delayed effective date will postpone the impact of the financial protection provisions on institutions. This impact was not quantified for the same reasons described above, but would be a fraction of the total protection expected to be generated under the rule as some of the triggers are tied to the production of certain performance measures and would not have kicked in immediately under the 2016 regulations. Successful claims made by borrowers will be paid regardless of the limited delay in the date for requiring institutions to provide financial protection, and the Department believes the cost to taxpayers of the slightly reduced recoveries described in the Net Budget Impact in the RIA is justified by the benefits of reconsidering the financial protection provisions and appropriately balancing the costs to institutions with protection of borrowers and taxpayers.

With respect to the comment about closed school discharges, the Department disagrees with the claim

that borrowers will bear a $381 million cost because of the delay. As noted in the NPRM, the $364 million savings estimated for FY 2017 occurred because the Department did not execute the modification for cohorts 2014–2016 anticipated in the President's Budget (PB) for 2018 because of the change of the effective date of the 2016 final regulations. The difference in the $381 million estimated for the three-year automatic discharge in the 2016 final regulations and the $364 million estimate for the modification in this rule is that the $381 million was based on PB 2017 loan model assumptions and the modification to be executed was based on the PB 2018 assumptions. Under the credit reform scoring rules applicable to the student loan programs, the unexecuted modification created savings that needed to be recognized. This budget scoring requirement does not affect borrowers or their eligibility for a closed school discharge. Borrowers can avoid any uncertainty about the timing of receiving a closed school discharge or costs associated with a delay in receipt of such discharge by submitting a closed school discharge application at any time. Any costs or savings associated with changes in the automatic discharge provision as a result of the current negotiated rulemaking are outside the scope of the analysis of the delay, and we will address any related issues raised by commenters in response to the NPRM for the proposed rule resulting from the current rulemaking process.

*Changes:* None.

*Comment:* Some commenters expressed their belief that the delay is not aligned with Congressional intent, citing 20 U.S.C. 3402, and is contrary to the public interest.

*Discussion:* In 20 U.S.C. 3402, Congress states that the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive proper treatment at the Federal level, and will enable the Federal government to coordinate its education activities more effectively.

In its execution of these responsibilities, and consistent with 20 U.S.C. 3402, the Department has determined that the public interest is best served by a delay in the effective date of the 2016 final regulations.

*Changes:* None.

*Comments:* Some commenters expressed concerns that the Department did not follow required rulemaking processes in delaying the effective date of the 2016 final regulations. These concerns alleged specific statutory and

APA violations. First, commenters stated that the Department's justification to waive negotiated rulemaking was insufficient. Second, commenters wrote that we did not provide sufficient justification for the delay. One commenter said that the NPRM fails to identify any specific deficiencies in the 2016 final regulations, or findings and rationale that support revising those regulations. Third, a commenter stated that the minor cost savings detailed in the RIA were insufficient justification to delay the rule. In addition, one commenter stated that further negotiated rulemaking on the 2016 final regulations was redundant and wasteful.

*Discussion:* The Department adhered to all applicable laws in promulgating this final rule. First, with regard to waiver of negotiated rulemaking, section 492(b)(2) of the HEA provides that the Secretary may waive negotiated rulemaking if she determines that there is good cause to do so, and publishes the basis for such determination in the **Federal Register** at the same time as the proposed regulations in question are first published. In the NPRM, the Department properly articulated the good cause supporting our waiver of the HEA's negotiated rulemaking requirement. The NPRM explained that the original catalyst for the delay was the CAPPS litigation, filed on May 24, 2017, and that it would not have been possible for the Department to engage in negotiated rulemaking and publish final regulations after that date (much less after October 24, 2017, the date the NPRM was published), and prior to July 1, 2018 (the current effective date of the 2016 final regulations). Negotiated rulemaking on this discrete issue simply was not practicable. It is a time-consuming and resource-intensive process, and could not practicably be completed by July 1, 2018.

Negotiated rulemaking typically takes the Department well over 12 months to complete. The statute requires the Department to hold public hearings before commencing any negotiations. Based upon the feedback the Department receives during the hearings, the Department then identifies those issues on which it will conduct negotiated rulemaking, announces those, and solicits nominations for non-Federal negotiators. Negotiations themselves are typically held over a 3 month period. Following the negotiations, the Department then prepares a notice of proposed rulemaking and submits the proposed rule to OMB for review. The proposed rules are then open for public comment for 30–60 days. Following the receipt of public comments, the Department then

prepares a final regulation and submits it to OMB for review.

With the completion of all of these steps taking well over 12 months, it would not have been feasible for the Department to complete negotiated rulemaking on the delayed effective date by July 1, 2018. Indeed, it would not have been feasible even if the Department had commenced the process on May 24, 2017, when it learned of the CAPPS litigation. Thus, the Department had good cause to waive that requirement.

Regarding the comment that we did not provide sufficient justification to propose delay of the effective date of the 2016 final regulations, the Department is in the process of developing proposed revisions to the borrower defense regulations through the negotiated rulemaking process. As a result of the timing of the negotiated rulemaking and the effect of the master calendar requirement, any regulations resulting from the negotiated rulemaking cannot become effective before July 1, 2019. Therefore, the Department proposed in the NPRM to delay the effective date of the 2016 final regulations to July 1, 2019. This would prevent a scenario in which the 2016 final regulations might become effective for a short period of time before new regulations resulting from the current borrower defense rulemaking process take effect, a result which likely would lead to a great deal of confusion and difficulty for borrowers and schools alike. Accordingly, the Department articulated a reasonable and sufficient justification to propose a delay of a final rule.

Also with regard to the comment that the NPRM fails to identify any specific deficiencies in the 2016 final regulations, the APA and applicable case law require only that an agency's rulemaking justify the particular action or actions to be taken by that rule. This final rule does not amend the substance of the 2016 final regulations; it merely changes the effective date of the 2016 final regulations and is fully supported based on the information provided in the NPRM and in this final rule. Amending the substance of the 2016 final regulations (or prior borrower defense regulations) would require a separate rationale. We are separately conducting a negotiated rulemaking process to address the substance of the borrower defense regulations, and any resulting NPRM will provide a rationale for proposed changes.

The NPRM at issue here proposed only a delay of the effective date of the 2016 final regulations; it did not propose any other changes and therefore the Department was not required to

solicit comment on any matters other than the effective date. Also contrary to the commenter's assertions, the number of comments received in response to an NPRM has no bearing on the sufficiency of the Department's solicitation of public engagement. The APA requires the Department to "give interested persons an opportunity to participate" and consider "the relevant matter presented," not to reach a certain threshold of comments before it may proceed with the rulemaking process. 5 U.S.C. 553(c). The Department requested comments that covered the scope of our rulemaking—delay of an effective date—and considered each applicable comment received in promulgating this final rule.

The regulatory impact analysis in the NPRM estimated the quantified economic effects and net budget impact of the delay, and projected that the delay would result in a net cost savings. However, the delay was not proposed solely on the basis of those calculations. Executive Order 13563 requires the Department to, in part, "propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify)." Just as the commenters note harms to borrowers that cannot be definitively quantified, not all benefits of the delay are measurable in monetary terms. Delaying the effective date as proposed in the NPRM will preserve the regulatory status quo while the Department reconsiders the substance of its regulations governing borrower defense, preventing borrowers and institutions alike from being subject to an uncertain, quickly changing set of regulatory requirements. The Department undertook the required analysis and determined that the benefits of the delay would justify the costs.

With regard to the comment about redundancy and wastefulness, we have substantive concerns about the 2016 final regulations. In light of that, negotiated rulemaking and publication of an NPRM with request for further public comment is the statutorily required path to ensure public input and potentially make substantive changes to the Department's regulations. After careful consideration, we determined the benefits of proceeding with negotiated rulemaking to properly analyze the borrower defense regulations outweighed the costs of doing so.

*Changes:* None.

*Comment:* Some commenters also argued that the CAPPS lawsuit is an inappropriate basis for the delay

because CAPPS' litigation addresses only some of the regulatory provisions being delayed, but the notices effectuating the delay included many regulatory provisions, including those related to closed school discharge.

*Discussion:* The CAPPS litigation is not the basis for the delay proposed in the NPRM, although it was the reason for the initial delay of the 2016 final regulations' effective date. We further note that contrary to the commenter's assertion, CAPPS' complaint expressly prays for an order declaring "that the entirety of the Final Rule is contrary to the Constitution," and asks that the Court enjoin the Department from "taking any action whatsoever pursuant to the final regulations," indicating that its challenge is broader than the commenters portray.

*Changes:* None.

*Comment:* Some commenters supported the proposal in the NPRM. One commenter asserted that the 2016 final regulations' intention missed the mark and created an unnecessarily complex and costly system that is confusing to students, unfair to institutions, and puts taxpayers on the hook for huge costs. The commenter also suggested that maintaining the regulatory status quo under the 1994–95 standard is critical to the public interest and that requiring institutions to use their time and finances to implement the expensive 2016 final regulations while another rulemaking is occurring would be burdensome and contrary to the goals of Executive Order 13777, which is intended to help alleviate the regulatory burdens on the American people. This same commenter emphasized that the delay will help to maintain an existing, easily understood process—especially for students seeking redress under the current State law-based standard.

Commenters asserted that the delay of selected provisions of the 2016 final regulations would mitigate uncertainty about the potential impact of the regulations, especially in light of ongoing litigation, the master calendar requirement, and ongoing negotiated rulemaking.

One commenter asserted that the Department properly used Section 705 of the APA to avoid substantial harm to students. The commenter suggested that if some of the provisions of the 2016 final regulations went into effect and were quickly struck down by a court, the result would be chaotic, particularly if the subsequent regulatory framework change occurred in the course of an award year. The commenter asserted further that the ongoing negotiated rulemaking is justified based on the

need to improve the borrower defense regulations as part of a regulatory reset. This commenter argued that because the reset could lead to significant changes, it would be nonsensical, even aside from the litigation, to implement new regulations for a full or for part of an award year only to change them after the current negotiated rulemaking process is complete.

One commenter asserted that the arbitration and class action provisions in the 2016 final regulations would require institutions to incur significant costs in changing multiple policies and procedures and amending existing and future enrollment agreements, re-training staff, litigating new cases, and sending notices to borrowers that existing class action waivers or arbitration provisions will not be enforced. According to the commenter, the implementation of these requirements would divert resources from students and would require the further diversion of resources if schools were required to retrain staff and litigate the effects of the temporary ban on past agreements with students, including those signed during the interim period, if the regulations were to change as a result of the current rulemaking process.

The commenter also stated that the financial responsibility provisions that require, in some circumstances, an institution to obtain a letter of credit or some type of financial protection would impose a significant burden on schools because a letter of credit is difficult to obtain and the additional cost could cause many schools, including some historically black colleges and universities, to close. The commenter also argued that the delay is appropriate because schools may need to establish different compliance measures if the current negotiated rulemaking process modifies the financial responsibility provisions. In such event, the commenter stated that the temporary implementation of these provisions would lead to potentially unnecessary compliance and training costs for schools to accommodate different rules.

The commenter also argued that the repayment rate provisions which would require proprietary schools with a certain loan repayment rate to distribute a warning to students and prospective students might damage the reputation of such schools and impact such schools' ability to draw students and raise funds. The commenter argued that the delay would prevent any disruptions as changes to the requirements are considered during the negotiated rulemaking process.

Finally, the commenter stated its view that given the significant expansion of

borrower defense under the 2016 final regulations and the changes to the borrower defense regulations that may result from the Department's current rulemaking effort, the additional delay is required to prevent confusion for students and the expenditure of school resources on implementing the different borrower defense standards and procedures when those resources could otherwise be used to enhance student experiences.

*Discussion:* While comments regarding the effect of the 2016 final regulations are outside of the scope of the NPRM, the Department agrees that the delay will provide clarity for institutions and students, as well as save institutions from incurring the costs and expending the resources necessary to comply with the requirements under the 2016 final regulations that would potentially be in effect for only a short period of time.

*Changes:* None.

**Executive Orders 12866, 13563, and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be −$26.9 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense provisions of the 2016 final regulations as they would apply to

the 2017 to 2019 loan cohorts, as well as from the delayed paperwork burden on institutions and the delayed execution of the closed school automatic discharge. This final regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed this final rule under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this final rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this final rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

**Effects of Delay**

As indicated in the RIA published with the 2016 final regulations on November 1, 2016, those final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge.

However, as noted in the RIA for the NPRM published October 24, 2017, the analysis of the net budget impact in this final rule is limited to the effect of delaying the effective date of the 2016 final regulations from July 1, 2018, to July 1, 2019, and does not account for any potential changes in the 2016 final regulations or administrative updates to existing processes and procedures related to borrower defense claims.

As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over 40 years, delaying the 2016 final regulations until July 1, 2019, will have limited effect, as discussed below.

Even with the change in the effective date to July 1, 2019, borrowers will still be able to submit claims. The provisions of the 2016 final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process in effect when the claim is made. Loans made before July 1, 2017, were always subject to the State law-based standard, and borrowers' ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations for loans made on or after July 1, 2019, the Federal standard established in the 2016 final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the final regulations to mean the effective date of the final regulations. As a result, the delay in the effective date means that loans made between July 1, 2018, and June 30, 2019, will be subject to the current State law-based standard.

As we noted in the 2016 final regulations, the Federal standard was designed to address much of the conduct already covered by the State law-based standard, so the vast majority of discharge claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State law-based standard as well. (81 FR 76057)

Some commenters suggested that borrowers will be harmed by the delay, either through uncertainty as to how claims will be handled, the application of statutes of limitation, or processing delays. Commenters also expressed concerns about the processing of existing claims and the effect of the delay on their resolution. The Department does not agree that the delay of the effective date of the 2016 final regulations will affect the processing of existing claims. Existing claims were always subject to the State law-based standard in the current regulations. Efforts to improve the efficiency of claims processing are ongoing and are not contingent upon implementation of the 2016 final regulations.

The Department maintains that the loans affected by the delay from July 1, 2018 to July 1, 2019 are those issued between those dates and for which any potential borrower defense claims will now be evaluated under the State law-based standard. These loans have not been made yet, and the NPRM and this final rule clarify that the State law-based standard will apply to them—this provides borrowers certainty regarding the standard that will be applied to their claims. Some commenters noted the difference in the annualized estimate for the primary and baseline scenarios and suggested the delay will cost borrowers approximately two billion dollars. As explained in the *Net Budget Impact,* the Department estimates the cost of the delay to be much less than two billion dollars given that there is significant overlap between the current State law-based standard and the Federal standard from the 2016 final regulations and that claims associated with these loans will be handled under the process in place when their claim is made. The Department does not believe that the delay will result in reversion to the baseline scenario assumptions for the borrower percentage so the effect on borrowers will be much lower than the commenters suggested. Additionally, the figures in the Accounting Statement for the 2016 final regulations would more appropriately be characterized as the costs associated with a single loan cohort and not the costs associated with a fiscal year, so the change in the

effective date would not result in the two billion dollar difference as it reflects just one year of the 40-year life of the cohort. The Department has updated its Accounting Statement in this final rule so the effects presented in this RIA show the impact on the affected loan cohorts by fiscal year.

As discussed in the *Analysis of Comments and Changes* the potential effects on borrowers include possible reduced access to courts from the delay in the arbitration and class action waiver provisions while statutes of limitation are running. We think it is likely that these provisions will be overturned in the CAPPS litigation and are concerned about the confusion to borrowers that would result. We believe the harm that would occur outweighs any benefits of these provisions. We note that a borrower may submit a borrower defense claim to the Department with respect to his or her Federal loans at any time without regard to arbitration agreements or class action waiver clauses in agreements between the borrower and the school, as the loan is between the Federal government and the borrower.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the 2016 final regulations, institutions would bear the major costs of compliance, paperwork burden, and providing financial protection to the Department. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the first year after the 2016 final regulations were to take effect. In the revised scenario developed to estimate the effect of this delay in the effective date, estimated transfers from institutions to students, via the Federal government, would be reduced by approximately $9.3 million for the 2017 and 2018 loan cohorts because of the slight reduction in claims from the application of the State law-based standard and the change in the effective date of the financial protection provisions as reflected in the assumptions presented in Table 1. The costs of providing financial protection were not quantified in the RIA for the 2016 final regulations, and the Department has no additional data to estimate costs institutions may avoid from the delayed effective date of the financial protection provisions. Given the limited history of borrower defense claims and recovery actions and numerous factors that affect the cost for individual institutions, the Department believed that quantifying the cost of providing financial protection would provide a false sense of precision. As noted in the 2016 final regulations and the NPRM, there are several ways for institutions to provide financial protection to the Department, including some that may be developed in the future. The price of this protection would likely vary by the size of the institution and the institution's existing financial relationships with parties who could provide the financial protection. Other key elements that contribute to the uncertain cost of financial protection overall are the distribution of borrower defense claims, the type of institutions involved, the applicability of specific financial protection triggers, and the Department's pursuit of recoveries. The Department recognizes that the delayed effective date will postpone the impact of the financial protection provisions on institutions. This would be a fraction of the total protection expected to be generated under the rule as some of the triggers are tied to the production of certain performance measures such as gainful employment rates and there would be some time, possibly months, between the effective date and the next release of rates. The recovery assumption always assumed some ramping up of financial protection as different metrics became available for application, so the change in effective date will affect the early years when recoveries were assumed to be smaller. Borrowers are not affected by institutions' delay in incurring the costs of financial protection, and the Department believes it is worth the cost to taxpayers from reduced recoveries described in the Net Budget Impact in the RIA to reconsider the financial protection provisions and appropriately balance the costs to institutions with protection of borrowers and taxpayers.

**Net Budget Impact**

As described in the NPRM, to estimate the net budget impact of the delay in the effective date to July 1, 2019, the Department developed a scenario that revised the primary estimate assumptions from the 2016 final regulations for the affected 2017 to 2019 cohorts, as was done for the one-year delay described in the IFR. The Department has reviewed the comments it received, particularly those about the potential impacts and estimation of the effects of the delay and responded in the Analysis of Comments and Changes section and this RIA. However, the Department believes that the assumptions for the scenario to estimate the net budget impact on the student loan program from the delay from July 2018 to July 2019 remain appropriate and reasonable.

As before, the Department applies an assumed level of school conduct that could generate borrower defense claims, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Table 1) to the PB 2018 loan volume estimates to generate the estimated net borrower defense claims for each loan cohort, loan type, and sector. The assumptions for the primary scenario from the 2016 final regulations were the basis for the PB2018 baseline that assumed the final regulations would go into effect on July 1, 2017. The scenario developed for the NPRM is designed to capture the incremental change from the one-year delay in the IFR associated with the further one-year delay in the effective date to July 1, 2019. Compared to the scenario developed for the IFR, recoveries are reduced by an additional two percent for the 2017 and 2018 cohorts, all of the 2018 cohort is subject to the State law-based standard, and the affected portion of the 2019 cohort is subject to the current, State law-based standard and reduced recoveries at the five percent level used for the one-year delay in the IFR. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the delay from July 1, 2018 to July 1, 2019, in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulations and the borrower percent is the same. The financial protection provided was always expected to increase over time, so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the proposed delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by seven percent for the private not-for-profit and proprietary sectors and by five percent for the 2019 cohort. As in the 2016 final regulations and the IFR, recoveries from public institutions were held constant at 75 percent across scenarios.

### TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY FROM JULY 1, 2018 TO JULY 1, 2019

| Cohort | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop |
| **Conduct Percent:** | | | | | | |
| Final Primary ................................. | 3.0 | 20 | 2.4 | 16 | 2.0 | 13.6 |
| Delay to 2019 ................................. | 2.7 | 18 | 2.16 | 14.4 | 1.8 | 12.24 |
| **Borrower Percent:** | | | | | | |
| Final Primary ................................. | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| Delay to 2019 ................................. | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| | Pub | Priv/Prop | Public | Priv/Prop | Pub | Priv/Prop |
| **Recovery Percent:** | | | | | | |
| Final Primary ................................. | 75 | 23.8 | 75 | 23.8 | 75 | 23.8 |
| Delay to 2019 ................................. | 75 | 22.134 | 75 | 22.134 | 75 | 24.871 |

The net budget impact associated with these effects of the one-year delay in the effective date on the borrower defense provisions only is approximately −$46.1 million from the 2017 to 2019 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of −$46.1 million in reduced costs for the affected cohorts. This represents the incremental change associated with the one-year delay from July 1, 2018, to July 1, 2019. If compared to the PB 2018 baseline, the savings would be approximately −$78.8 million.

The closed school automatic discharge provisions were the other significant source of estimated net budget impact in the 2016 final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in FY 2017 in the PB 2018. As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

Moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification to July 2018 described in the IFR resulted in estimated savings of less than $10 million. Using the same approach, the delay to July 2019 is expected to save approximately $15 million above the savings from the initial one-year delay.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2019, if they did not want to wait for the automatic discharge to be implemented. For future cohorts, the delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the current rulemaking process and changes to economic assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have determined that this rule will result in cost savings. Therefore, this rule would be considered an Executive Order 13771 deregulatory action.

**Accounting Statement**

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million.

To evaluate this, the Department looked at the difference in the undiscounted cash flows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the one-year delay established in the IFR and the one-year delay scenario established in this notice and described under the heading "Net Budget Impact". The difference from subtracting this delay scenario from the IFR one-year delay scenario for the 2017 to 2019 loan cohorts is summarized in Table 2.

### TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 TO 2019 LOAN COHORTS FROM THE ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE TO JULY 1, 2019

| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Change in DDB Cashflow ...... | 159 | 7,489 | 496,637 | 637,361 | 538,468 | 6,004,802 | 9,525,520 | 4,668,143 | 2,156,009 | 3,003,657 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect ... | Not Quantified | |
| Category | Costs | |
| | 7% | 3% |
| Continued use of State-law based standard<br>Delay in providing consumer information about institutions' performance and practices<br>Potential decreased awareness and usage of closed school and false certification discharges | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements ........................................................ | −9.5 | −9.51 |
| Category | Transfers | |
| | 7% | 3% |
| Reduction in transfers from the Federal government to affected borrowers in the 2017 to 2019 cohorts that would have been partially borne by affected institutions via reimbursements ................................................ | −3.5 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 to 2019 are subject to the existing borrower defense regulation ................................................ | −1.2 | −1.3 |
| Delay in closed school automatic discharge implementation from 2018 to 2019 ................................................ | −14.8 | −14.8 |

**Paperwork Reduction Act of 1995**

As indicated in the Paperwork Reduction Act section published in the 2016 final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated cost of $9,458,484. The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of those final regulations.

| Regulatory section | OMB Control No. | Burden hours | Estimated cost $36.55/hour institution, $16.30/hour individual |
|---|---|---|---|
| 668.14 ............................................... | 1845–0022 | 1,953 ............................................... | 71,382 |
| 668.41 ............................................... | 1845–0004 | 5,346 ............................................... | 195,396 |
| 668.171 ............................................. | 1845–0022 | 3,028 ............................................... | 110,673 |
| 668.175 ............................................. | 1845–0022 | 60,560 ............................................. | 2,213,468 |
| 682.211 ............................................. | 1845–0020 | 5,784 ............................................... | 211,405 |
| 682.402 ............................................. | 1845–0020 | 1,838 ............................................... | 67,179 |
| 685.222 ............................................. | 1845–0142 | 249 (Individuals) ............................ | 4,059 |
| 685.222 ............................................. | 1845–0142 | 800 (Institutions) ........................... | 29,240 |
| 685.300 ............................................. | 1845–0143 | 179,362 ........................................... | 6,555,681 |
| Total ............................................. | | 258,920 ........................................... | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211 early implementation allowed. | | 253,136 ........................................... | 9,247,079 |
| Burden remaining | | 5,784 ............................................... | 211,405 |

This final rule delays the effective date of the implementation of all of the cited regulations and will result in a cost savings in the total amount of $9,458,484. However, 34 CFR 682.211(i)(7) which was included in the 2016 final regulations, regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, was designated for early implementation. Lenders may have elected early implementation and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost savings. Based on the delayed effective date of July 1, 2019, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.*

**6470**     Federal Register / Vol. 83, No. 31 / Wednesday, February 14, 2018 / Rules and Regulations

Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

## List of Subjects

### 34 CFR Part 668

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

### 34 CFR Part 674

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

### 34 CFR Parts 682 and 685

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: February 9, 2018.

**Betsy DeVos,**
*Secretary of Education.*

[FR Doc. 2018–03090 Filed 2–9–18; 4:15 pm]

**BILLING CODE 4000–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R06–OAR–2017–0435; FRL–9973–23—Region 6]

### Approval and Promulgation of Air Quality Implementation Plans; Arkansas; Infrastructure State Implementation Plan Requirements for the National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA)

is approving State Implementation Plan (SIP) revisions submitted by the State of Arkansas to address the requirements of sections 110(a)(1) and (2) of the Clean Air Act (CAA or Act) for the 2006 and 2012 fine particulate matter ($PM_{2.5}$) National Ambient Air Quality Standards (NAAQS), 2008 lead (Pb) NAAQS, 2008 ozone ($O_3$) NAAQS, 2010 nitrogen dioxide ($NO_2$) NAAQS, and the 2010 sulfur dioxide ($SO_2$) NAAQS. Under CAA sections 110(a)(1) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance, and enforcement of a revised primary or secondary NAAQS. CAA sections 110(a)(1) and (2) require each state to make a SIP submission within three years after EPA promulgates a new or revised NAAQS for approval into the existing federally-approved SIP to assure that the SIP meets the applicable requirements for such new and revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP or "i-SIP."

**DATES:** This final rule is effective on March 16, 2018.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R06–OAR–2017–0435. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http:// www.regulations.gov* or in hard copy at the EPA Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733.

**FOR FURTHER INFORMATION CONTACT:** Nevine Salem, (214) 665–7222, *salem.nevine@epa.gov.* To inspect the hard copy materials, please schedule an appointment with her or Bill Deese at (214) 665–7253.

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" means the EPA.

## I. Background

The background for this action is discussed in detail in our November 20, 2017 proposal (82 FR 55065). In that action, we proposed to approve the Arkansas i-SIP submittal dated March 24, 2017 to address the requirements of sections 110(a)(1) and (2) of the Act for the 2006 and 2012 $PM_{2.5}$ NAAQS, 2008 lead (Pb) NAAQS, 2008 ozone ($O_3$) NAAQS, 2010 nitrogen dioxide ($NO_2$) NAAQS, and the 2010 sulfur dioxide ($SO_2$) NAAQS. Under CAA sections 110(a)(1) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance, and enforcement of a revised primary or secondary NAAQS. CAA sections 110(a)(1) and (2) require each state to make a new SIP submission within three years after EPA promulgates a new or revised NAAQS for approval into the existing federally-approved SIP to assure that the SIP meets the applicable requirements for such new and revised NAAQS.

We received an anonymous public comment on December 18, 2017 on the proposed rulemaking action. The comment is posted to the docket (EPA–R06–OAR–2017–0435). The commenter raised concerns about the accuracy of agricultural and wild fires emissions inventory. Such comment is irrelevant and is outside the scope of this specific rule making action.

## II. Final Action

As detailed in the proposal action, EPA is approving the majority of the March 24, 2017 Arkansas i-SIP submittal, which addresses the requirements of CAA sections 110(a)(1) and (2) as applicable to the 2006 $PM_{2.5}$, 2008 Pb, 2008 $O_3$, 2010 $SO_2$, 2010 $NO_2$, and 2012 $PM_{2.5}$ NAAQS. Table 1 outlines the specific actions [1] we are approving in this final rulemaking.

TABLE 1—FINAL ACTIONS ON THE ARKANSAS INFRASTRUCTURE SIP SUBMITTAL FOR VARIOUS NAAQS

| Element | 2006 $PM_{2.5}$ | 2008 Pb | 2008 Ozone | 2010 $NO_2$ | 2010 $SO_2$ | 2012 $PM_{2.5}$ |
|---|---|---|---|---|---|---|
| (A): Emission limits and other control measures | A* | A | A | A | A | A |
| (B): Ambient air quality monitoring and data system | A* | A | A | A | A | A |
| (C)(i): Enforcement of SIP measures | A* | A | A | A | A | A |
| (C)(ii): PSD program for major sources and major modifications | A* | A | A | A | A | A |
| (C)(iii): Permitting program for minor sources and minor modifications | A* | A | A | A | A | A |

[1] Note that regarding CAA 110(D)(i)(II) Visibility Protection—("prong 4") for the 2006 $PM_{2.5}$, EPA previously proposed disapproval at 80 FR 38419 (July 6, 2015) for an earlier SIP submittal dated September 21, 2009. However, in the State's March 24, 2017 submittal, Arkansas submitted revisions to address CAA 110(D)(i)(II) ("prong 4") for the 2006 $PM_{2.5}$ that supersede the September 21, 2009 submittal. In Table 1 below, we are making an administrative correction to the table as was originally proposed. We are making an administrative correction to note a minor change from "No submittal" to "No action" for the 2006 $PM_{2.5}$ ("prong 4"). We will address the 2006 $PM_{2.5}$ NAAQS 110(a)(2)(D)(i)(II)("prong 4") element in a future rule making.

# EXHIBIT 18


| Date | Address |
|---|---|
| Monday, February 4, 2019, at 6:00 p.m ................................................ | Corless Auditorium, University of Rhode Island Bay Campus, 215 South Ferry Road, Narragansett, RI 02882, 401–874–6440. |
| Tuesday, February 5, 2019, at 5:30 p.m ................................................ | Gurney's Inn, 290 Old Montauk Road, Montauk, NY 11954, 631–668–2345. |
| Wednesday, February 6, 2019, at 5:30 p.m ................................................ | Congress Hall Hotel, 200 Congress Place, Cape May, NJ 08204, 609–884–8421. |
| Thursday, February 7, 2019, at 6:00 p.m ................................................ | Internet webinar: *http://mafmc.adobeconnect.com/msb-scoping-2019/*, Webinar help: 302–397–1131, With a listening station at the new Virginia Marine Resources Commission location:, 380 Fenwick Road, Ft. Monroe, VA 23651, 757–247–2200. |

Due to the late 2018/early 2019 government shutdown, prior notice of these meetings was not published in the **Federal Register** and NMFS was not able to publish this Notice of Intent before the above hearings. To facilitate comments within the comment period for this notice, an additional internet webinar scoping hearing will be conducted on Wednesday, March 13, 2019, at 7:00 p.m. via this link: *http://mafmc.adobeconnect.com/msb-scoping-2019/*. The Council will also accept additional in-person scoping comments provided at its April 9–11, 2019, meeting at the Icona Golden Inn, 7849 Dune Drive, Avalon, NJ 08202 (telephone number: 609–368–5155). The date and time for the scoping hearing during the April Council meeting will be published in a future separate **Federal Register** notice specific to that meeting. When further developing this action, the Council will consider all relevant public comments received during previously scheduled 2019 hearings even though they occurred prior to the official comment period defined in this Notice of Intent.

### Special Accommodations

The scoping hearings are accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aid should be directed to M. Jan Saunders (302–674–2331, ext 251) at least 5 days prior to the meeting date.

Authority: 16 U.S.C. 1801 *et seq.*

Dated: February 13, 2019.

**Karen H. Abrams,**
*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 2019–02697 Filed 2–15–19; 8:45 am]
**BILLING CODE 3510–22–P**

---

## CONSUMER PRODUCT SAFETY COMMISSION

### Sunshine Act Meeting Notice

**TIME AND DATE:** Wednesday, February 20, 2019; 10:00 a.m.*

**PLACE:** Hearing Room 420, Bethesda Towers, 4330 East-West Highway, Bethesda, MD 20814.

**STATUS:** Commission Meeting—Closed to the Public.

**MATTER TO BE CONSIDERED:** Compliance Matters: Staff will brief the Commission on the status of two compliance matters.

**CONTACT PERSON FOR MORE INFORMATION:** Alberta E. Mills, Secretary, Division of the Secretariat, Office of the General Counsel, U.S. Consumer Product Safety Commission, 4330 East-West Highway, Bethesda, MD 20814, (301) 504–7479.

* For Compliance Matter No. 1, the Commission determined by recorded vote (4–0–1) that Agency business requires calling the meeting without seven calendar days advance public notice. For Compliance Matter No. 2, the Commission unanimously determined by recorded vote that Agency business requires calling the meeting without seven calendar days advance public notice.

Dated: February 14, 2019.

**Alberta E. Mills,**
*Secretary.*

[FR Doc. 2019–02809 Filed 2–14–19; 4:15 pm]
**BILLING CODE 6355–01–P**

---

## DEPARTMENT OF EDUCATION

**[Docket No.: ED–2019–ICCD–0015]**

### Agency Information Collection Activities; Comment Request; William D. Ford Federal Direct Loan Program (Direct Loan Program) Promissory Notes

**AGENCY:** Federal Student Aid (FSA), Department of Education (ED).

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, ED is proposing a revision of an existing information collection.

**DATES:** Interested persons are invited to submit comments on or before April 22, 2019.

**ADDRESSES:** To access and review all the documents related to the information collection listed in this notice, please use *http://www.regulations.gov* by searching the Docket ID number ED–2019–ICCD–0015. Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http://www.regulations.gov* by selecting the Docket ID number or via postal mail, commercial delivery, or hand delivery. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted.* Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 550 12th Street SW, PCP, Room 9086, Washington, DC 20202–0023.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Beth Grebeldinger, 202–377–4018.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize the public's reporting burden. It also helps the public understand the Department's information collection requirements and provide the requested data in the desired format. ED is soliciting comments on the proposed information collection request (ICR) that is described below. The Department of Education is especially interested in public comment addressing the following issues: (1) Is this collection necessary to the proper functions of the Department; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the Department enhance the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the

burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* William D. Ford Federal Direct Loan Program (Direct Loan Program) Promissory Notes.

*OMB Control Number:* 1845–0007.

*Type of Review:* A revision of an existing information collection.

*Respondents/Affected Public:* Individuals or Households .

*Total Estimated Number of Annual Responses:* 9,862,685.

*Total Estimated Number of Annual Burden Hours:* 4,021,534.

*Abstract:* The Department is requesting that three separate ICR packages be combined into a single ICR using OMB Control Number 1845–0007. The three separate ICR packages cover: The Direct Subsidized Loan and Direct Unsubsidized Loan Master Promissory Note, 1845–0007; the Direct PLUS Loan Master Promissory Note and Direct PLUS Loan Endorser Addendum, 1845–0068; and the Direct Consolidation Loan Application and Promissory Note and Related Forms, 1845–0053. We are streamlining all of the forms by eliminating duplicative and obsolete information, reordering items to present information in a more logical order, using plain language to present information more clearly, adding information about the new cancer treatment deferment, updating information about the borrower defense discharge provisions to show changes made through the November 1, 2016 regulation. For the PLUS master promissory note (MPN) we are revising the information and instruction section to clarify who qualifies as a "parent". The promissory notes serve as the means by which an individual applies for and agrees to repay a Federal Direct Loan. It also informs the borrower of the terms and conditions of the Direct Loan and includes a statement of borrower's rights and responsibilities. Instructions explain how to complete the applications. The additional forms for the Direct Consolidation Loan allows the borrower to list all loans that they wish to include that would not fit on the application, and add other loans within the allowed time frame once the Consolidation Loan is made. The LVC for the Consolidation Loan serves as the means by which the Department obtains information needed to pay off the holders of the loans being consolidated

Dated: February 13, 2019.

Kate Mullan,

*PRA Coordinator, Information Collection Clearance Program, Information Management Branch, Office of the Chief Information Officer.*

[FR Doc. 2019–02665 Filed 2–15–19; 8:45 am]

**BILLING CODE 4000–01–P**

---

## DEPARTMENT OF EDUCATION

[Docket No.: ED–2019–ICCD–0014]

### Agency Information Collection Activities; Comment Request; Student Assistance General Provisions— Financial Assistance for Students With Intellectual Disabilities

**AGENCY:** Federal Student Aid (FSA), Department of Education (ED).

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, ED is proposing an extension of an existing information collection.

**DATES:** Interested persons are invited to submit comments on or before April 22, 2019.

**ADDRESSES:** To access and review all the documents related to the information collection listed in this notice, please use *http://www.regulations.gov* by searching the Docket ID number ED–2019–ICCD–0014. Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http://www.regulations.gov* by selecting the Docket ID number or via postal mail, commercial delivery, or hand delivery. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted.* Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 550 12th Street SW, PCP, Room 9086, Washington, DC 20202–0023.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Beth Grebeldinger, 202–377–4018.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize

the public's reporting burden. It also helps the public understand the Department's information collection requirements and provide the requested data in the desired format. ED is soliciting comments on the proposed information collection request (ICR) that is described below. The Department of Education is especially interested in public comment addressing the following issues: (1) Is this collection necessary to the proper functions of the Department; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the Department enhance the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in response to this notice will be considered public records.

*Title of Collection:* Student Assistance General Provisions—Financial Assistance for Students with Intellectual Disabilities.

*OMB Control Number:* 1845–0099.

*Type of Review:* An extension of an existing information collection.

*Respondents/Affected Public:* State, Local, and Tribal Governments; Private Sector.

*Total Estimated Number of Annual Responses:* 443.

*Total Estimated Number of Annual Burden Hours:* 137.

*Abstract:* As provided by the Higher Education Act of 1965, as amended, (HEA) these regulations allow students with intellectual disabilities, who enroll in an eligible comprehensive transition program to receive Title IV, HEA program assistance under the Federal Pell Grant, the Federal Supplemental Educational Opportunity Grant (FSEOG), and the Federal Work Study (FWS) programs.

This request is for an extension of the current record-keeping requirements contained in the regulations at 34 CFR 668.232 and 668.233, related to the administrative requirement of the financial assistance for students with intellectual disabilities program.

Dated: February 13, 2019.

Kate Mullan,

*PRA Coordinator, Information Collection Clearance Program, Information Management Branch, Office of the Chief Information Officer.*

[FR Doc. 2019–02666 Filed 2–15–19; 8:45 am]

**BILLING CODE 4000–01–P**

# EXHIBIT 19

(NCES) and the NAEP assessment development contractor(s). The framework development and update process also produces recommendations for contextual variables, which supports NCES' development of the questionnaires administered to students, teachers, and schools to help the public understand the achievement results in each subject. By engaging NAEP's audiences, partners, and stakeholders in the panels that provide recommendations for NAEP frameworks and seeking public comment, NAEP frameworks reflect content valued by the public as important to measure.

All responses will be taken into consideration before finalizing the updated NAEP Mathematics Assessment Framework for Board adoption. Once adopted, the framework will be used to guide assessment development and reporting for the 2025 NAEP Mathematics Assessment.

Additional information (including the materials referenced below) can be found on the project website at *https:// www.naepframeworkupdate.org.*

**Proposed Updated Mathematics Framework for the 2025 National Assessment of Educational Progress**

The proposed revised framework can be downloaded from the framework project website at *https://www.naep frameworkupdate.org.*

**Existing Mathematics Framework for the National Assessment of Educational Progress**

The existing framework (adopted in 2006) can be downloaded from the Governing Board website at *https:// www.nagb.gov/naep-frameworks/ mathematics.html.*

**Governing Board's Periodic Review and Updating of NAEP Frameworks**

Governing Board policy articulates the Board's commitment to a comprehensive, inclusive, and deliberative process to determine and update the content and format of all NAEP assessments. For each NAEP assessment, this process results in a NAEP framework, outlining what is to be measured and how it will be measured. Periodically, the Governing Board reviews existing NAEP frameworks to determine if changes are warranted. Each NAEP framework development and update process considers a wide set of factors, including but not limited to reviews of recent research on teaching and learning, changes in state and local standards and assessments, and the latest perspectives on the nation's future

needs and desirable levels of achievement.

In 2018, the Board initiated a review of the NAEP Mathematics Framework. To inform its discussions about the extent to which the NAEP Mathematics Framework needs revisions, the Board decided it would be prudent to gather and analyze mathematics curricular standards for grades K through 8 in all 50 states, the District of Columbia, and the Department of Defense Education Activity. The Governing Board's NAEP Mathematics Framework review used this analysis of state standards along with expert commentary to determine whether a framework update was required and the type of updates that may be needed. As a result of this review, the Governing Board initiated a framework update process for the NAEP Mathematics Assessment. Learn more about the review at *https:// www.nagb.gov/focus-areas/framework-development/framework-development-mathematics.html.*

**Summary of Proposed Revisions**

Compared to the existing NAEP Mathematics Framework for the 2009–2017 NAEP Mathematics Assessments, the proposed updated framework reflects the following changes:

• The grade 4 version of six objectives were removed (two objectives each in Number and Operations; Geometry; and Data Analysis, Statistics, and Probability). One objective was added to grade 4 in Algebra.

• Three grade 8 objectives were edited, one was deleted in Number and Operations, and one was added in Algebra.

• Descriptions of objectives in grade 12 were edited. In Measurement, one objective was made optional, and one new optional objective was added.

• Distribution of items for each content area at grades 4 and 12 remains the same. In grade 8, the proportion of items in Data Analysis, Statistics, and Probability was increased 5% (to 20%) and for Algebra decreased by 5% (to 25%).

• A new chapter on Mathematical Practices describes and illustrates the assessment of five mathematical practices through which students engage in knowing and doing mathematics. This chapter replaces the previous chapter on Mathematical Complexity and removed the need for the subtopic of "Reasoning" (this subtopic was introduced in 2009 for Number and Operations; Geometry, Data Analysis, Statistics, and Probability; Algebra). The objectives in that subtopic have been removed.

• The two chapters on item formats and assessment design were merged into a single chapter, Overview of the Assessment Design, and updated extensively to reflect current and future digital platform use and the new item option of scenario-based tasks.

• Continuing the policy established for the 2017 digital administration of NAEP, students will have access to a calculator emulator in blocks of items designated as "calculator blocks": four-function for grade 4, scientific for grade 8. The one change in 2025 will be that the grade 12 calculator will include a graphing emulator.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

Dated: April 22, 2019.

**Lesley Muldoon,**

*Executive Director, National Assessment Governing Board, U.S. Department of Education.*

[FR Doc. 2019–08393 Filed 4–25–19; 8:45 am]

**BILLING CODE 4000–01–P**

---

**DEPARTMENT OF EDUCATION**

[Docket No.: ED–2019–ICCD–0015]

**Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; William D. Ford Federal Direct Loan Program (Direct Loan Program) Promissory Notes**

**AGENCY:** Federal Student Aid (FSA), Department of Education (ED).

**ACTION:** Notice.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, ED is proposing a revision of an existing information collection.

**DATES:** Interested persons are invited to submit comments on or before May 28, 2019.

**ADDRESSES:** To access and review all the documents related to the information collection listed in this notice, please use *http://www.regulations.gov* by searching the Docket ID number ED–2019–ICCD–0015. Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http://www.regulations.gov* by selecting the Docket ID number or via postal mail, commercial delivery, or hand delivery. If the *regulations.gov* site is not available to the public for any reason, ED will temporarily accept comments at *ICDocketMgr@ed.gov.* Please include the docket ID number and the title of the information collection request when requesting documents or submitting comments. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted.* Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 550 12th Street SW, PCP, Room 9086, Washington, DC 20202–0023.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Beth Grebeldinger, 202–377–4018.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize the public's reporting burden. It also helps the public understand the Department's information collection requirements and provide the requested data in the desired format. ED is soliciting comments on the proposed information collection request (ICR) that is described below. The Department of Education is especially interested in public comment addressing the following issues: (1) Is this collection necessary to the proper functions of the Department; (2) will this information be processed and used in a timely manner; (3) is the estimate of burden accurate; (4) how might the Department enhance the quality, utility, and clarity of the information to be collected; and (5) how might the Department minimize the burden of this collection on the respondents, including through the use of information technology. Please note that written comments received in

response to this notice will be considered public records.

*Title of Collection:* William D. Ford Federal Direct Loan Program (Direct Loan Program) Promissory Notes.

*OMB Control Number:* 1845–0007.

*Type of Review:* A revision of an existing information collection.

*Respondents/Affected Public:* Individuals or Households.

*Total Estimated Number of Annual Responses:* 9,862,685.

*Total Estimated Number of Annual Burden Hours:* 4,021,534.

*Abstract:* The Department is requesting that three separate ICR packages be combined into a single ICR using OMB Control Number 1845–0007. The three separate ICR packages cover: The Direct Subsidized Loan and Direct Unsubsidized Loan Master Promissory Note, 1845–0007; the Direct PLUS Loan Master Promissory Note and Direct PLUS Loan Endorser Addendum, 1845–0068; and the Direct Consolidation Loan Application and Promissory Note and Related Forms, 1845–0053. We are streamlining all of the forms by eliminating duplicative and obsolete information, reordering items to present information in a more logical order, using plain language to present information more clearly, adding information about the new cancer treatment deferment, updating information about the borrower defense discharge provisions to show changes made through the November 1, 2016 regulation. For the PLUS master promissory note (MPN) we are revising the information and instruction section to clarify who qualifies as a "parent". The promissory notes serve as the means by which an individual applies for and agrees to repay a Federal Direct Loan. It also informs the borrower of the terms and conditions of the Direct Loan and includes a statement of borrower's rights and responsibilities. Instructions explain how to complete the applications. The additional forms for the Direct Consolidation Loan allows the borrower to list all loans that they wish to include that would not fit on the application, and add other loans within the allowed time frame once the Consolidation Loan is made. The LVC for the Consolidation Loan serves as the means by which the Department obtains information needed to pay off the holders of the loans being consolidated.

Dated: April 23, 2019.

**Kate Mullan,**

*PRA Coordinator, Information Collection Clearance Program, Information Management Branch, Office of the Chief Information Officer.*

[FR Doc. 2019–08443 Filed 4–25–19; 8:45 am]

**BILLING CODE 4000–01–P**

## DEPARTMENT OF EDUCATION

[Docket No.: ED–2019–ICCD–0052]

**Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; Magnet Schools Assistance Program Application for Grants (1894–0001)**

**AGENCY:** Office of Innovation and Improvement (OII), Department of Education (ED).

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, ED is proposing an extension of an existing information collection.

**DATES:** Interested persons are invited to submit comments on or before May 28, 2019.

**ADDRESSES:** To access and review all the documents related to the information collection listed in this notice, please use *http://www.regulations.gov* by searching the Docket ID number ED–2019–ICCD–0052. Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal at *http://www.regulations.gov* by selecting the Docket ID number or via postal mail, commercial delivery, or hand delivery. If the *regulations.gov* site is not available to the public for any reason, ED will temporarily accept comments at *ICDocketMgr@ed.gov.* Please include the docket ID number and the title of the information collection request when requesting documents or submitting comments. *Please note that comments submitted by fax or email and those submitted after the comment period will not be accepted.* Written requests for information or comments submitted by postal mail or delivery should be addressed to the Director of the Information Collection Clearance Division, U.S. Department of Education, 550 12th Street SW, PCP, Room 9086, Washington, DC 20202–0023.

**FOR FURTHER INFORMATION CONTACT:** For specific questions related to collection activities, please contact Tiffany McClain, 202–401–0003.

**SUPPLEMENTARY INFORMATION:** The Department of Education (ED), in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)), provides the general public and Federal agencies with an opportunity to comment on proposed, revised, and continuing collections of information. This helps the Department assess the impact of its information collection requirements and minimize the public's reporting burden. It also

# EXHIBIT 20

Search: ○ Agenda  ○ Reg Review  ● ICR

Go

| Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us |

Display additional information by clicking on the following: ☑ All  ☑ Brief and OIRA conclusion
☑ Abstract/Justification  ☑ Legal Statues  ☑ Rulemaking  ☑ FR Notices/Comments  ☑ IC List  ☑ Burden  ☑ Misc.  ☑
Common Form Info.  ☑ Certification
View Information Collection (IC) List                    View Supporting Statement and Other Documents

Please note that the OMB number and expiration date may not have been determined when this Information Collection Request and associated Information Collection forms were submitted to OMB. The approved OMB number and expiration date may be found by clicking on the Notice of Action link below.

## View ICR - OIRA Conclusion

**OMB Control No:** 1845-0007
**Status:** Historical Active
**Agency/Subagency:** ED/FSA
**Title:** Federal Direct Stafford/Ford Loan and Federal Direct Subsidized/Unsubsidized Stafford/Ford Loan Master Promissory Note
**Type of Information Collection:** Revision of a currently approved collection
**Type of Review Request:** Regular
**OIRA Conclusion Action:** Approved without change
Retrieve Notice of Action (NOA)

**ICR Reference No:** 201311-1845-002
**Previous ICR Reference No:** 201304-1845-001
**Agency Tracking No:** 1388.15

**Common Form ICR:** No

**Conclusion Date:** 02/28/2014
**Date Received in OIRA:** 11/07/2013

**Terms of Clearance:** Since this is a contract that sets the terms for all loans that students and parents sign and loan policies and repayment terms change so frequently, OMB is granting ED with a two year approval for this collection instead of a three year approval.

| | Inventory as of this Action | Requested | Previously Approved |
|---|---|---|---|
| Expiration Date | 02/29/2016 | 36 Months From Approved | 07/31/2014 |
| Responses | 5,207,137 | 5,207,137 | 5,239,078 |
| Time Burden (Hours) | 2,603,569 | 2,603,569 | 2,619,539 |
| Cost Burden (Dollars) | 0 | 0 | 0 |

**Abstract:** The Federal Direct Stafford/Ford Loan (Direct Subsidized Loan) and Federal Direct Unsubsidized Stafford/Ford Loan (Direct Unsubsidized Loan) Master Promissory Note (MPN) serves as the means by which an individual agrees to repay a Direct Subsidized Loan and/or Direct Unsubsidized Loan. An MPN is a promissory note under which a borrower may receive loans for a single or multiple academic years. This revision incorporates changes to information based on statutory and regulatory changes as well as expanding repayment plan information, deleting outdated information and clarifying information through updated charts and language.

**Authorizing Statute(s):** US Code: 20 USC 1087a Name of Law: Higher Education Act 1965 as amended

**Citations for New Statutory Requirements:** None

**Associated Rulemaking Information**
**RIN:**                    **Stage of Rulemaking:**              **Federal Register Citation:**        **Date:**
                            Not associated with rulemaking

**Federal Register Notices & Comments**
**60-day Notice:**          **Federal Register Citation:**        **Citation Date:**
                            78 FR 52169                            08/22/2013
**30-day Notice:**          **Federal Register Citation:**        **Citation Date:**
                            78 FR 66906                            11/07/2013
**Did the Agency receive public comments on this ICR?** No

**Number of Information Collection (IC) in this ICR:** 1

| IC Title | Form No. | Form Name |
|---|---|---|
| Master Promissory Note, William D. Ford Federal Direct Loan Program | 1845-0007 | Direct Subsidized Loan/Direct Unsubsidized Loan MPN |

**ICR Summary of Burden**

| | Total Approved | Previously Approved | Change Due to New Statute | Change Due to Agency Discretion | Change Due to Adjustment in Estimate | Change Due to Potential Violation of the PRA |
|---|---|---|---|---|---|---|
| Annual Number of Responses | 5,207,137 | 5,239,078 | 0 | 0 | -31,941 | 0 |
| Annual Time Burden (Hours) | 2,603,569 | 2,619,539 | 0 | 0 | -15,970 | 0 |
| Annual Cost Burden (Dollars) | 0 | 0 | 0 | 0 | 0 | 0 |

**Burden increases because of Program Change due to Agency Discretion:** No
**Burden Increase Due to:**

**Burden decreases because of Program Change due to Agency Discretion:** No
**Burden Reduction Due to:**

**Short Statement:** There is a downward adjustment due to a decrease in the number of respondents, as explained in the Supporting Statement, Item 15. The Department is identifying program changes based on statutory changes made to the interest rates through the Bipartisan Student Loan Certainty Act of 2013 (P.L. 113-28), and the eligibility time limits made by the Moving Ahead for Progress in the 21st Century Act (P.L. 112-141). We are also adding and expanding repayment plan information, deleting outdated information and supplying clearer information through updated charts and language.

---

**Annual Cost to Federal Government:** $28,172
**Does this IC contain surveys, censuses, or employ statistical methods?** No
**Is the Supporting Statement intended to be a Privacy Impact Assessment required by the E-Government Act of 2002?** No
**Is this ICR related to the Affordable Care Act [Pub. L. 111-148 & 111-152]?** Yes
**Is this ICR related to the Dodd-Frank Wall Street Reform and Consumer Protection Act, [Pub. L. 111-203]?** No
**Is this ICR related to the American Recovery and Reinvestment Act of 2009 (ARRA)?** No
**Agency Contact:** Jon Utz 202 377-4040

---

**Common Form ICR:**  No

---

On behalf of this Federal agency, I certify that the collection of information encompassed by this request complies with 5 CFR 1320.9 and the related provisions of 5 CFR 1320.8(b)(3).

The following is a summary of the topics, regarding the proposed collection of information, that the certification covers:

- ☑ (a) It is necessary for the proper performance of agency functions;
- ☑ (b) It avoids unnecessary duplication;
- ☑ (c) It reduces burden on small entities;
- ☑ (d) It uses plain, coherent, and unambiguous language that is understandable to respondents;
- ☑ (e) Its implementation will be consistent and compatible with current reporting and recordkeeping practices;
- ☑ (f) It indicates the retention periods for recordkeeping requirements;
- ☑ (g) It informs respondents of the information called for under 5 CFR 1320.8 (b)(3) about:
    - (i) Why the information is being collected;
    - (ii) Use of information;
    - (iii) Burden estimate;
    - (iv) Nature of response (voluntary, required for a benefit, or mandatory);
    - (v) Nature and extent of confidentiality; and
    - (vi) Need to display currently valid OMB control number;
- ☑ (h) It was developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected.
- ☑ (i) It uses effective and efficient statistical survey methodology (if applicable); and
- ☑ (j) It makes appropriate use of information technology.

If you are unable to certify compliance with any of these provisions, identify the item by leaving the box unchecked and explain the reason in the Supporting Statement.
**Certification Date:** 11/07/2013

---

 

# Direct Loans
William D. Ford Federal Direct Loan Program

**Federal Direct Stafford/Ford Loan**
**Federal Direct Unsubsidized Stafford/Ford Loan**
**Master Promissory Note** [REVISED FINAL DRAFT FOR OMB APPROVAL 01/15/2014]
**William D. Ford Federal Direct Loan Program**
Warning: Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0007
Form Approved
Exp. Date xx/xx/xxxx

**SECTION A: BORROWER INFORMATION – READ THE INSTRUCTIONS IN SECTION G BEFORE COMPLETING THIS SECTION**

1. Driver's License State and No.

2. Social Security No.

3. E-mail Address (optional)

4. Name and Permanent Address (see instructions)

5. Date of Birth (mm-dd-yyyy)
6. Area Code/Telephone No.

7. References: List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

| | 1. | 2. |
|---|---|---|
| Name | | |
| Permanent Street Address | | |
| City, State, Zip Code | | |
| E-Mail Address (optional) | | |
| Area Code/Telephone No. | ( ) | ( ) |
| Relationship to Borrower | | |

**SECTION B: SCHOOL INFORMATION – TO BE COMPLETED BY THE SCHOOL**

8. School Name and Address

9. School Code/Branch
10. Identification No.

**SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS – READ CAREFULLY BEFORE SIGNING BELOW**

11. This is a Master Promissory Note (MPN) for one or more Federal Direct Stafford/Ford (Direct Subsidized) Loans and/or Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans. I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this MPN not to exceed the allowable maximums under the Act ("the Act" is defined in Section E under Governing Law). My school will notify me of the loan type and loan amount that I am eligible to borrow. Within certain timeframes, I may cancel a loan or request a lower amount by contacting my school, or by refusing to accept or returning all or a portion of a loan disbursement that is made to me. The Borrower's Rights and Responsibilities Statement that accompanies this MPN and the disclosure statements that will be provided to me contain additional information about my right to cancel a loan or request a lower amount.

12. Under penalty of perjury, I certify that:

   A. The information I have provided on this MPN and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

   B. I will use the proceeds of loans made under this MPN for authorized educational expenses that I incur, and I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.

   C. If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science and Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements to repay the amount owed.

   D. If I am in default on any loan I received under the Federal Perkins Loan Program (including National Direct Student Loans), the William D. Ford Federal Direct Loan (Direct Loan) Program, or the Federal Family Education Loan (FFEL) Program, I have made satisfactory repayment arrangements with the loan holder to repay the amount owed.

   E. If I have been convicted of, or if I have pled nolo contendere (no contest) or guilty to, a crime involving fraud in obtaining funds under Title IV of the Higher Education Act of 1965, as amended, (HEA), I have fully repaid the funds to the U.S. Department of Education (ED) or to the loan holder in the case of a Title IV federal student loan.

13. For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN:

   A. I authorize my school to certify my eligibility for the loan.

   B. I authorize my school to credit my loan proceeds to my student account at the school, and to pay to ED any refund that may be due up to the full loan amount.

   C. I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

   D. I authorize ED to defer repayment of principal on my loan while I am enrolled at least half-time at an eligible school, unless I notify ED differently.

   E. I authorize my schools, ED, and their agents and contractors to release information about my loan to the references on the loan and to my immediate family members unless I submit written directions otherwise.

   F. I authorize my schools, ED, and their agents and contractors to share information about my loan with each other.

   G. I authorize my schools, ED, and their agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the number that I provide on this MPN or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages.

14. I understand that:

   A. ED will give me the opportunity to pay the interest that accrues on each loan made under this MPN during grace, in-school, deferment (including in-school deferment), forbearance, and other periods as provided under the Act. If I do not pay the interest that accrues during these periods, ED may add unpaid interest that accrues on each loan made under this MPN to the principal balance of that loan (this is called "capitalization") at the end of the grace, deferment, forbearance, or other period. Capitalization will increase the principal balance on my loan and the total amount of interest I must pay.

   B. ED has the authority to verify information reported on this MPN with other federal agencies.

**SECTION D: PROMISE TO PAY**

15. I promise to pay to ED all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that more than one loan may be made to me under this MPN. I understand that by accepting any disbursement issued at any time under this MPN, I agree to repay the loan associated with that disbursement.

16. If I do not make a payment on a loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney fees, court costs, and other fees.

17. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement.

18. My signature certifies that I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Request, Certifications, Authorizations, and Understandings in Section C, the MPN Terms and Conditions described in Section E, the Notice About Subsequent Loans Made Under this MPN in Section E, and the Borrower's Rights and Responsibilities Statement.
**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

19. Borrower's Signature

20. Today's Date (mm-dd-yyyy)

**Direct Subsidized Loan and Direct Unsubsidized Loan MPN** *(continued)*

## SECTION E: MPN TERMS AND CONDITIONS

### GOVERNING LAW

The terms of this Master Promissory Note (MPN) will be interpreted in accordance with the Higher Education Act of 1965, as amended (the HEA) (20 U.S.C. 1070 et seq.), the U.S. Department of Education's (ED's) regulations, any amendments to the HEA and the regulations in accordance with the effective date of those amendments, and other applicable federal laws and regulations (collectively referred to as the "Act").

Under applicable state law, except as preempted by federal law, you may have certain borrower rights, remedies, and defenses in addition to those stated in this MPN and the Borrower's Rights and Responsibilities Statement.

### DISCLOSURE OF LOAN TERMS

This MPN applies to Federal Direct Stafford/Ford Loans (Direct Subsidized Loans) and Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans). Under this MPN, the principal amount that you owe, and are required to repay, will be the sum of all disbursements that are made (unless you reduce or cancel any disbursements as explained below under Loan Cancellation), plus any unpaid interest that is capitalized and added to the principal balance.

Each loan made under this MPN is separately enforceable based on a true and exact copy of this MPN. At or before the time of the first disbursement of each loan, you will receive a disclosure statement identifying the amount of the loan and additional terms of the loan. The Borrower's Rights and Responsibilities Statement accompanying this MPN contains important additional information. The Borrower's Rights and Responsibilities Statement and any disclosure statement you receive in connection with any loan under this MPN are hereby incorporated into this MPN.

The Act specifies annual and aggregate limits on the amount of loans you may receive under this MPN. You may request additional loan funds to pay for your educational costs up to the annual and aggregate loan limits by contacting your school's financial aid office. Your school will determine if you are eligible for any additional loan funds. You will be notified of any increase or other change in the amount of your loan.

The amount of Direct Subsidized Loans and Direct Unsubsidized Loans you are eligible to receive may increase or decrease based on changes in your financial circumstances. Your school may notify you of any changes in your eligibility. You will be notified of any increase or decrease in the amount of your loan.

ED may use a servicer to handle billing and other communications related to your loan.

### TIME LIMITATION ON DIRECT SUBSIDIZED LOAN ELIGIBILITY FOR FIRST-TIME BORROWERS ON OR AFTER JULY 1, 2013

If you are a first-time borrower on or after July 1, 2013 (see Note below), there is a limit on the maximum period of time (measured in academic years) for which you can receive Direct Subsidized Loans. In general, you may not receive Direct Subsidized Loans for more than 150% of the published length of your program of study. This is called your "maximum eligibility period."

After you have received Direct Subsidized Loans for your maximum eligibility period, you are no longer eligible to receive additional Direct Subsidized Loans, and if you are enrolled in school you may become responsible for paying interest on your Direct Subsidized Loans. You may continue to receive Direct Unsubsidized Loans.

With certain exceptions as provided under the Act (such as if you graduate from your program of study before you receive or at the time you receive Direct Subsidized Loans for your maximum eligibility period), you will become responsible for paying the interest that accrues on your Direct Subsidized Loans during all periods if you:

- Continue to be enrolled in any undergraduate program after you have received Direct Subsidized Loans for your maximum eligibility period, or
- Enroll in another undergraduate program that is the same length as or shorter than your previous program.

The Borrower's Rights and Responsibilities Statement that accompanies this MPN provides additional information concerning the limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013.

**Note:** A first-time borrower on or after July 1, 2013 is an individual who has no outstanding balance on a Direct Loan Program loan or a Federal Family Education Loan (FFEL) Program loan on July 1, 2013, or who has no outstanding balance on a Direct Loan or FFEL Program loan on the date he or she obtains a Direct Loan Program loan after July 1, 2013.

### LOAN CANCELLATION

You may pay back all or part of a loan disbursement within the timeframes set by the Act, as explained in the Borrower's Rights and Responsibilities Statement and in a disclosure statement that you will receive. If you return the full loan amount within those timeframes, you will not have to pay any loan fee or interest charges. If you return part of a disbursement within those timeframes, ED will reduce the loan fee and interest charges in proportion to the amount returned.

### INTEREST

Unless ED notifies you in writing that a different rate will apply, the interest rate for any loan you receive under this MPN is a fixed rate that is calculated in accordance with a formula specified in the Act. The interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans is calculated each year. When the rate is calculated, it applies to Direct Subsidized Loans and Direct Unsubsidized Loans for which the first disbursement is made during the period beginning on July 1 of one year and ending on June 30 of the following year. Different interest rates may apply to different loans you receive under this MPN, depending on when the loan is first disbursed and whether you are an undergraduate student or a graduate or professional student. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%. ED will notify you of the interest rate on each of your loans.

Except as explained below, you are not required to pay the interest that accrues on a Direct Subsidized Loan during an in-school, grace, or deferment period, and during certain periods of repayment under the Income-Based Repayment Plan and the Pay As You Earn Repayment Plan. You must pay the interest that accrues on a Direct Subsidized Loan during all other periods (including forbearance periods), starting on the day after your grace period ends.

You must pay the interest that accrues during the grace period on any Direct Subsidized Loan for which the first disbursement is made on or after July 1, 2012 and before July 1, 2014. In addition, if you are a first-time borrower on or after July 1, 2013, under certain conditions you may become responsible for paying the interest that accrues on your Direct Subsidized Loan during all periods, as described under the heading "Time Limitation on Direct Subsidized Loan Eligibility for First-Time Borrowers on or after July 1, 2013."

You must pay the interest that accrues on a Direct Unsubsidized Loan during all periods (including in-school, grace, deferment, and forbearance periods), starting on the date of the first disbursement.

You agree to pay all interest that accrues on your Direct Loan(s) during the periods described above. You will be given the opportunity to pay the interest that accrues during in-school, grace, deferment, forbearance, or other periods as provided under the Act. If you do not pay this interest, ED may capitalize the interest (add it to the principal balance of your loans) at the end of the grace, deferment, forbearance, or other period.

### LOAN FEE

As provided by the Act, ED charges a loan fee for each Direct Subsidized Loan and Direct Unsubsidized Loan you receive under this MPN. The loan fee is a percentage of the loan amount and will be deducted proportionately from each disbursement of each of your loans. The specific loan fee you are charged will be shown on

disclosure statements that will be sent to you. ED may refund the loan fee only as permitted by the Act.

### LATE CHARGES AND COLLECTION COSTS

ED may collect from you:

- A late charge of not more than six cents for each dollar of each late payment if you do not make any part of a required installment payment within 30 days after it becomes due, and
- Any other charges and fees that are permitted by the Act related to the collection of your loans.

If you default on a loan, you must pay reasonable collection costs, plus court costs and attorney fees.

### GRACE PERIOD

You will receive a 6-month grace period on repayment of each loan made under this MPN. The grace period begins the day after you cease to be enrolled at least half-time at an eligible school.

You are not required to make any payments on your loan during the grace period. However, you are responsible for paying the interest that accrues on your Direct Unsubsidized Loan and, in some cases (see "Interest" in this section of the MPN) on your Direct Subsidized Loan during the grace period, and this interest will be capitalized at the end of the grace period if you do not pay it.

### REPAYMENT

You must repay the full amount of the loans made under this MPN, plus accrued interest. You will repay each loan in monthly installments during a repayment period that begins on the day immediately following your 6-month grace period on that loan. Generally, payments that you make or that someone else makes on your behalf will be applied first to late charges and collection costs that are due, then to interest that has not been paid, and finally to the principal amount of the loan. However, any payments made under the Income-Based Repayment Plan or the Pay As You Earn Plan will be applied first to interest that is due, then to fees that are due, and then to the principal amount.

ED will provide you with a choice of repayment plans. The Borrower's Rights and Responsibilities Statement includes information on these repayment plans.

ED will provide you with a repayment schedule that identifies your payment amounts and due dates. If you intend to repay your loan but are unable to make your scheduled loan payments, ED may grant you a forbearance that allows you to temporarily stop making payments or to temporarily make a smaller payment amount, which extends the time for making payments.

ED may adjust payment dates on your loans or may grant you a forbearance to eliminate a delinquency that remains even though you are making scheduled installment payments.

You may prepay all or any part of the unpaid balance on your loans at any time without penalty. If you do not specify which loans you are prepaying, ED will determine how to apply the prepayment in accordance with the Act.

After you have repaid in full a loan made under this MPN, ED will send you a notice telling you that you have paid off your loan.

### ACCELERATION AND DEFAULT

At ED's option, the entire unpaid balance of a loan made under this MPN will become immediately due and payable (this is called "acceleration") if any one of the following events occurs:

*Section E continues on next page*

Direct Subsidized Loan and Direct Unsubsidized Loan MPN *(continued)*

**SECTION E: MPN TERMS AND CONDITIONS (continued)**

**(1)** You do not enroll as at least a half-time student at the school that certified your loan eligibility;
**(2)** You do not use the proceeds of the loan solely for your educational expenses;
**(3)** You make a false representation that results in your receiving a loan for which you are not eligible; or
**(4)** You default on the loan.

The following events will constitute a default on your loan:

**(1)** You do not pay the entire unpaid balance of the loan after ED has exercised its option under items (1), (2), and (3) above;
**(2)** You do not make installment payments when due and your failure to make payments has continued for at least 270 days; or
**(3)** You do not comply with other terms of the loan, and ED reasonably concludes that you no longer intend to honor your repayment obligation.

If you default, ED may capitalize all outstanding interest. This will increase the principal balance of your loan, and the full amount of the loan, including the new principal balance and collection costs, will become immediately due and payable.

If you default, the default will be reported to nationwide consumer reporting agencies (credit bureaus) and will significantly and adversely affect your credit history. A default will have additional adverse consequences as explained in the Borrower's Rights and Responsibilities Statement. Following default, you may be required to repay the loan (potentially including amounts in excess of the principal and interest) under the Income-Based Repayment Plan or the Income-Contingent Repayment Plan in accordance with the Act.

**LEGAL NOTICES**

Any notice required to be given to you will be effective if it is sent by first-class mail to the most recent address ED has for you, by electronic means to an address you have provided, or by any other method of notification that is permitted or required by applicable statute and regulation. You must immediately notify ED of a change in your contact information or status as specified in the Borrower's Rights and Responsibilities Statement under "Information you must report to us after you receive your loan."

If ED does not enforce or insist on compliance with any term of this MPN, this does not waive any right of ED. No provision of this MPN may be modified or waived except in writing by ED. If any provision of this MPN is determined to be unenforceable, the remaining provisions will remain in force.

Information about your loans will be submitted to the National Student Loan Data System (NSLDS). Information in NSLDS is accessible to schools, lenders, and guarantors for specific purposes as authorized by ED.

**NOTICE ABOUT SUBSEQUENT LOANS MADE UNDER THIS MPN**

This MPN authorizes ED to make multiple loans to you to pay your educational expenses during the multi-year term of this MPN, upon your request and upon your school's annual certification of your loan eligibility.

At schools that are authorized to use the multi-year feature of the MPN and choose to do so, subsequent loans may be made under this MPN for subsequent academic years. At any school, subsequent loans may be made under this MPN for the same academic year.

No subsequent loans will be made under this MPN after the earliest of the following dates:

**(1)** The date ED or your school receives your written notice that no further loans may be made;
**(2)** One year after the date you sign the MPN or the date ED receives the MPN if no disbursements are made under the MPN; or
**(3)** Ten years after the date you sign the MPN or the date ED receives the MPN.

**SECTION F: IMPORTANT NOTICES**

**GRAMM-LEACH-BLILEY ACT NOTICE**

In 1999, Congress enacted the Gramm-Leach-Bliley Act (Public Law 106-102). This Act requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

**PRIVACY ACT NOTICE**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 *et seq.* of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**FINANCIAL PRIVACY ACT NOTICE**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program.

**PAPERWORK REDUCTION NOTICE**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless the collection displays a valid OMB Control Number. Public reporting burden for this collection of information is estimated to average 0.5 hours (30 minutes) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201(a)(2). Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Education, 400 Maryland Ave., SW, Washington, DC 20210-4537 or e-mail ICDocketMgr@ed.gov and reference OMB Control Number 1845-0007. Note: Please do not return the completed Direct Subsidized Loan and Direct Unsubsidized Loan MPN to this address.

If you have any comments or concerns regarding the status of *your individual submission* of this form, write directly to:

U.S. Department of Education
Common Origination and Disbursement School Relations Center
Attn: Applicant Services
PO Box 9002
Niagara Falls, NY 14302

**Direct Subsidized Loan and Direct Unsubsidized Loan MPN** *(continued)*

**SECTION G: INSTRUCTIONS FOR COMPLETING THE MPN**

*Type or print using blue or black ink. Do not use pencil. Enter all dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: January 31, 2014 = 01-31-2014.*

*Some of the items in Section A may have been completed for you. If so, review these items carefully to make sure that the information is correct. Cross out any information that is incorrect and enter the correct information. Put your initials next to any information that you change.*

**SECTION A: BORROWER INFORMATION**

**Item 1.** Enter the two-letter abbreviation for the state that issued your current driver's license, followed by your driver's license number. If you do not have a driver's license, enter N/A.

**Item 2.** Enter your nine-digit Social Security Number.

**Item 3.** Enter your preferred e-mail address for receiving communications. You are not required to provide this information. If you do, ED may use your e-mail address to communicate with you. If you do not have an e-mail address or do not wish to provide one, enter N/A.

**Item 4.** Enter your last name, then your first name and middle initial. Enter your permanent address (number, street, apartment number, or rural route number and box number, then city, state, zip code). If your mailing address is different from your permanent address, you must list both addresses. A temporary school address is not acceptable.

**Item 5.** Enter your date of birth.

**Item 6.** Enter the area code and telephone number at which you can most easily be reached. If you do not have a telephone, enter N/A.

**Item 7.** Enter the requested information for two adults with different U.S. addresses who have known you for at least three years and who will know how to contact you in the future. The first reference should be a parent or legal guardian. References who live outside the United States are not acceptable. Enter the e-mail addresses for the two references (this is optional). If you provide an e-mail address for a reference, ED may use it to communicate with the reference. If a reference does not have a telephone number or e-mail address, or does not wish to provide an e-mail address, enter N/A.

**SECTION B: SCHOOL INFORMATION**

*This section will be completed by the school that certifies your loan eligibility.*

**SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS**

Items 11, 12, 13, and 14. Read these items carefully.

**SECTION D: PROMISE TO PAY**

Items 15, 16, 17, and 18. Read these items carefully.

Items 19 and 20. Sign your full legal name, in blue or black ink, and enter the date you signed this MPN.

By signing this MPN, you:

(1) Acknowledge that you have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings in Section C and the accompanying Borrower's Rights and Responsibilities Statement; and

(2) Agree to repay the loan(s) in full according to the terms and conditions of the MPN.

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

*Important Notice: This Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of the loans you receive under the accompanying Master Promissory Note (MPN) for Federal Direct Stafford/Ford Loans (Direct Subsidized Loans) and Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans). Please keep this Borrower's Rights and Responsibilities Statement for your records. You may request another copy of this Borrower's Rights and Responsibilities Statement at any time by contacting your servicer.*

*Throughout this Borrower's Rights and Responsibilities Statement, the words "we," "us," and "our" refer to the U.S. Department of Education. The word "loan" refers to one or more loans made under the accompanying MPN.*

**1. The William D. Ford Federal Direct Loan Program.** The William D. Ford Federal Direct Loan (Direct Loan) Program includes the following types of loans, known collectively as "Direct Loans":

- Federal Direct Stafford/Ford Loans (Direct Subsidized Loans)
- Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans)
- Federal Direct PLUS Loans (Direct PLUS Loans)
- Federal Direct Consolidation Loans (Direct Consolidation Loans)

The Direct Loan Program is authorized by Title IV, Part D, of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. 1070 et seq.

You must complete a Free Application for Federal Student Aid (FAFSA) before you receive a Direct Subsidized Loan or Direct Unsubsidized Loan.

Direct Loans are made by the U.S. Department of Education. We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with the address and telephone number of your servicer after the school notifies us that the first disbursement of your loan has been made.

**2. Laws that apply to this MPN.** The terms and conditions of loans made under this MPN are determined by the HEA and other applicable federal laws and regulations. These laws and regulations are referred to as "the Act" throughout this Borrower's Rights and Responsibilities Statement. Under applicable state law, except as preempted by federal law, you may have certain borrower rights, remedies, and defenses in addition to those stated in the MPN and this Borrower's Rights and Responsibilities Statement.

NOTE: Any amendment to the Act that affects the terms of this MPN will be applied to your loans in accordance with the effective date of the amendment.

**3. Direct Subsidized Loans and Direct Unsubsidized Loans.** Direct Subsidized Loans and Direct Unsubsidized Loans are made to students to help pay for the cost of education beyond high school.

Direct Subsidized Loans are available only to undergraduate students. Direct Unsubsidized Loans are available to both undergraduate students and graduate or professional students.

To receive a Direct Subsidized Loan, you must have financial need. Except as explained in Item 10 of this Borrower's Rights and Responsibilities Statement ("Payment of interest"), you are not required to pay the interest that accrues on Direct Subsidized Loans while you are in school, during the grace period, during deferment periods, and during certain periods of repayment under the Income-Based Repayment Plan and the Pay As You Earn Repayment Plan.

Direct Unsubsidized Loans are not based on financial need. You must pay the interest that accrues on Direct Unsubsidized Loans during all periods. For more information on interest charges, see Item 10.

**4. Time limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013.**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time (measured in academic years) that you can receive Direct Subsidized Loans.

You are a first-time borrower on or after July 1, 2013 if you had no outstanding balance on a Direct Loan Program loan or a Federal Family Education Loan (FFEL) Program loan on July 1, 2013, or you have no outstanding balance on a Direct Loan or FFEL program loan on the date you obtain a Direct Loan Program loan after July 1, 2013.

In general, if you are a first-time borrower on or after July 1, 2013 you may not receive Direct Subsidized Loans for more than 150% of the published length of your program of study. This is called your "maximum eligibility period." For example, if you are enrolled in a 4-year bachelor's degree program, the maximum period for which you can receive Direct Subsidized Loans is 6 years (150% of 4 years = 6 years).

Your maximum eligibility period is based on the published length of the program in which you are currently enrolled. This means that your maximum eligibility period can change if you change programs. If you receive Direct Subsidized Loans for one program and then change to a different program, the period of time for which you received Direct Subsidized Loans for the earlier program will generally count against your new maximum eligibility period.

After you have received Direct Subsidized Loans for your maximum eligibility period, you are no longer eligible to

receive additional Direct Subsidized Loans, and if you are enrolled in school, you may become responsible for paying interest on your Direct Subsidized Loans. You may continue to receive Direct Unsubsidized Loans. We will notify you if you are no longer eligible to receive additional Direct Subsidized Loans.

With certain exceptions as provided under the Act (for example, if you graduate from your program of study before or at the time you receive Direct Subsidized Loans for your maximum eligibility period), if you continue to be enrolled in any undergraduate program after you have received Direct Subsidized Loans for your maximum eligibility period, or if you enroll in another undergraduate program that is the same length as or shorter than your previous program, you will become responsible for paying all of the interest that accrues on your Direct Subsidized Loans, during all periods, beginning on the date of the enrollment that causes you to become responsible for paying the interest. You will become responsible for paying all of the interest that accrues on your Direct Subsidized Loans based solely on your enrollment as described above, regardless of whether you apply for, request, or receive federal financial aid. We will notify you if you become responsible for paying all of the interest that accrues on your Direct Subsidized Loans.

Additional information about the limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013 will be provided during entrance counseling (see Item 13 of this Borrower's Rights and Responsibilities Statement). You may also obtain additional information from your school's financial aid office, or at StudentAid.gov.

**5. About the MPN.** You may receive more than one loan under this MPN over a period of up to 10 years to pay for your educational costs, as long as the school you are attending is authorized to use the multi-year feature of the MPN and chooses to do so.

If your school is not authorized to use the multi-year feature of the MPN or chooses not to do so, or if you do not want to receive more than one loan under this MPN, you must sign a new MPN for each loan that you receive. If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

**6. Use of your loan money.** You may use the loan money you receive only to pay for your authorized educational expenses for attendance at the school that determined you were eligible to receive the loan. Authorized expenses include the following:

- Tuition;
- Room;

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- Board;
- Institutional fees;
- Books;
- Supplies;
- Equipment;
- Dependent child care expenses;
- Transportation;
- Commuting expenses;
- Rental or purchase of a personal computer;
- Loan fees; and/or
- Other documented, authorized costs

**7.** Information you must report to us **after** you receive your loan. You must notify your servicer and/or the financial aid office at your school about certain changes.

Until you graduate or otherwise leave school, you must notify your school's financial aid office if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Do not enroll at least half-time for the loan period certified by the school;
- Do not enroll at the school that determined you were eligible to receive the loan;
- Stop attending school or drop below half-time enrollment;
- Transfer from one school to another school; or
- Graduate.

You must also notify your servicer if any of the above events occur at any time after you receive your loan. In addition, you must notify your servicer if you:

- Change your employer, or your employer's address or telephone number changes; or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment).

**8** Amount you may borrow. The charts that follow show the maximum amounts of Direct Subsidized Loans and Direct Unsubsidized Loans that you may borrow for a single academic year (annual loan limits), and the maximum amounts that you may borrow in total for undergraduate and graduate study (aggregate loan limits).

The aggregate loan limits are combined limits for Direct Subsidized Loans and Direct Unsubsidized Loans, and any Subsidized Federal Stafford Loans and Unsubsidized Federal Stafford Loans you may have previously received through the Federal Family Education Loan (FFEL) Program.

The annual and aggregate loan limits for independent undergraduates also apply to dependent undergraduates whose parents are unable to borrow under the Direct PLUS Loan Program.

If you are enrolled in certain health professions programs, you may qualify for higher annual and aggregate limits on Direct Unsubsidized Loans.

The actual loan amount you receive will be determined by your school, based on your academic level, dependency status, and other factors such as:

- The length of the program or the remaining portion of the program in which you are enrolled, if it is less than a full academic year;
- Your cost of attendance;
- Your Expected Family Contribution;
- Other financial aid you receive; and
- Your remaining eligibility under the annual or aggregate loan limits.

The actual amount you receive for an academic year may be less than the maximum annual amounts shown in the charts.

If you are an undergraduate student, your school must determine your eligibility for a Federal Pell Grant before you may receive a Direct Subsidized Loan or a Direct Unsubsidized Loan, and must determine your eligibility for a Direct Subsidized Loan before determining your eligibility for a Direct Unsubsidized Loan.

**Annual Loan Limits for Direct Subsidized and Direct Unsubsidized Loans:**

| Dependent Undergraduate Students (*except students whose parents cannot borrow Direct PLUS Loans*) | |
|---|---|
| First Year Total (maximum $3,500 subsidized) | $5,500 |
| Second Year Total (maximum $4,500 subsidized) | $6,500 |
| Third Year & Beyond (Total Each Year) (maximum $5,500 subsidized) | $7,500 |

| Independent Undergraduate Students (and dependent students whose parents cannot borrow Direct PLUS Loans) | |
|---|---|
| First Year Total (maximum $3,500 subsidized) | $9,500 |
| Second Year Total (maximum $4,500 subsidized) | $10,500 |
| Third Year & Beyond (Total Each Year) (maximum $5,500 subsidized) | $12,500 |

| Graduate and Professional Students | |
|---|---|
| *For loan periods beginning before July 1, 2012:* | |
| Total Amount (Each Year) (maximum $8,500 subsidized) | $20,500 |
| *For loan periods beginning on or after July 1, 2012:* | |
| Total Amount (Each Year) (unsubsidized only) | $20,500 |

**Aggregate Loan Limits for Direct Subsidized and Direct Unsubsidized Loans:**

| Dependent Undergraduate Students (*except students whose parents cannot borrow Direct PLUS Loans*) | |
|---|---|
| Total Amount Cumulative (maximum $23,000 subsidized) | $31,000 |

| Independent Undergraduate Students (and dependent students whose parents cannot borrow Direct PLUS Loans) | |
|---|---|
| Total Amount Cumulative (maximum $23,000 subsidized) | $57,500 |

| Graduate and Professional Students | |
|---|---|
| Total Amount Cumulative (maximum $65,500 subsidized; includes loans received for undergraduate study) | $138,500 |

**9. Interest rate.** The interest rate on Direct Subsidized Loans and Direct Unsubsidized Loans is a fixed rate that is calculated in accordance with a formula specified in the Act. The interest rate is calculated each year. When the rate is calculated, it applies to all Direct Subsidized Loans and Direct Unsubsidized Loans for which the first disbursement is made during the period beginning on July 1 of one year and ending on June 30 of the following year. Different fixed interest rates may apply to separate loans made under this MPN depending on when the loan is first disbursed, and whether you are an undergraduate student or a graduate or professional student. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%. We will notify you of the interest rate for each loan you receive in a disclosure statement that we send to you.

If you qualify under the Servicemembers Civil Relief Act, the interest rate on your loans obtained prior to military service may be limited to 6% during your military service. Contact your servicer for information about how to request this benefit.

**10. Payment of interest.** In general, you are not required to pay the interest that accrues on Direct Subsidized Loans during certain periods, but you must pay the interest that accrues on Direct Unsubsidized Loans during all periods, as explained below.

*Direct Subsidized Loans*

Except as explained below, you are not required to pay the interest that accrues on a Direct Subsidized Loan while you are enrolled in school at least half-time, during your grace period, during deferment periods, and during certain periods of repayment under the Income-Based Repayment Plan and the Pay As You Earn Repayment plan. Except as discussed below for certain borrowers who are active duty service members, you must pay the interest that accrues on a Direct Subsidized Loan during all other periods (starting on the day after your grace period ends), including forbearance periods.

You must pay the interest that accrues during the grace period on any Direct Subsidized Loan for which the first disbursement is made on or after July 1, 2012 and before July 1, 2014. In addition, if you are a first-time borrower on or after July 1, 2013, under certain conditions you may become responsible for paying the interest that accrues on your Direct Subsidized Loans during all periods, as explained in Item 4 of this Borrower's Rights and Responsibilities Statement ("Time limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013").

*Direct Unsubsidized Loans*

Except as provided below for certain borrowers who are active duty service members, you must pay the interest that accrues on a Direct Unsubsidized Loan during all periods (starting on the date of the first disbursement). This includes periods while you are enrolled in school at least half-time, during your grace period, and during deferment and forbearance periods. Therefore, you will pay more interest on a Direct Unsubsidized Loan than on a Direct Subsidized Loan.

*No accrual of interest benefit for active duty service members*

Under the no accrual of interest benefit for active duty service members, you are not required to pay the interest that accrues on any type of Direct Loan Program loan first disbursed on or after October 1, 2008 during periods of qualifying active duty military service (for up to 60 months).

*Interest capitalization*

If you do not pay the interest as it accrues on either a Direct Subsidized Loan or a Direct Unsubsidized Loan (during periods when you are responsible for payment of interest), we will add the accrued interest to the unpaid principal balance of your loan. This is called "capitalization." Capitalization increases the unpaid principal balance of your loan, and interest then accrues on the increased principal balance. We capitalize unpaid interest when you resume payment after periods of deferment or forbearance. We may also capitalize unpaid interest that has accrued since the first disbursement of a Direct Unsubsidized Loan when you enter repayment for the first time.

The chart below shows the difference in the total amount you would repay on a $15,000 Direct Unsubsidized Loan if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized.

| | If you pay the interest as it accrues... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan Amount | $15,000 | $15,000 |
| Interest for 12 Months | $1,238 (paid as accrued) | $1,238 (unpaid and capitalized) |
| Principal to be Repaid | $15,000 | $16,238 |
| Monthly Payment | $184 | $199 |
| Number of Payments | 120 | 120 |
| Total Repaid | $23,315 | $23,899 |

The example in the chart above shows payments made under the Standard Repayment Plan at an interest rate of 8.25%, the maximum interest rate for Direct Unsubsidized Loans made to undergraduate students. In this example, you would pay $15 less per month and $584 less altogether

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

if you pay the interest as it accrues during a 12-month deferment or forbearance period.

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.ustreas.gov.

**11. Loan fee.** For each Direct Subsidized Loan or Direct Unsubsidized Loan that you receive under this MPN, we charge a loan fee that is a percentage of the principal amount of each loan. This fee will be subtracted proportionally from each disbursement of your loan and will be shown on a disclosure statement that we send to you.

**12. Repayment incentive programs.** A repayment incentive is a benefit that we offer to encourage you to repay your loan on time. The repayment incentive program described below may be available to you.

*Interest Rate Reduction for Automatic Withdrawal of Payments*

Under the automatic withdrawal option, your bank automatically deducts your monthly loan payment from your checking or savings account and sends it to us. Automatic withdrawal helps to ensure that your payments are made on time. In addition, you receive a 0.25% interest rate reduction while you repay under the automatic withdrawal option. Your servicer will provide you with information about the automatic withdrawal option. You can also get the information on your servicer's web site, or by calling your servicer. Your servicer's web site address and toll-free telephone number are provided on correspondence that your servicer sends you.

**13. Disbursement** (how your loan money will be paid out). Generally, your school will disburse (pay out) your loan money in more than one installment, usually at the beginning of each academic term (for example, at the beginning of each semester or quarter). If your school does not use academic terms or does not have academic terms that meet certain requirements, it will generally disburse your loan in at least two installments, one at the beginning of the period of study for which you are receiving the loan, and one at the midpoint of that period of study. Your school determines the schedule for disbursing your loan money in accordance with the Act.

In most cases, if the Direct Subsidized Loan or Direct Unsubsidized Loan that you are receiving is your first student loan under either the Direct Loan Program or the FFEL Program, you must complete entrance counseling before your school can make the first disbursement of your loan. Your school will tell you if entrance counseling is required, and will provide instructions for completing entrance counseling.

Your school may disburse your loan money by crediting it to your account at the school, or may give some or all of it to you directly by check or other means.

If your school credits your loan money to your account and the amount credited is more than the amount of your tuition and fees, room and board, and other authorized charges, the excess amount is called a credit balance. Unless you authorize your school to hold the credit balance for you, your school must pay you the credit balance within the following timeframes:

• If the credit balance occurs after the first day of class of a payment period (your school can tell you this date), your school must pay you the credit balance no later than 14 days after the date the balance occurs.

• If the credit balance occurs on or before the first day of class of a payment period, your school must pay you the credit balance no later than 14 days after the first day of class of the payment period.

**14. Canceling your loan.** Before your loan money is disbursed, you may cancel all or part of your loan by notifying your school. After your loan money is disbursed, there are two ways to cancel all or part of your loan:

• You may notify your school (within **certain timeframes**). If your school obtains your written confirmation of the types and amounts of Title IV loans that you want to receive for an award year before crediting loan money to your account at the

school, you may tell the school that you want to cancel all or part of that loan within 14 days after the date the school notifies you of your right to cancel all or part of the loan, or by the first day of your school's payment period, whichever is later (your school can tell you the first day of the payment period).

If your school does not obtain your written confirmation of the types and amounts of loans you want to receive before crediting the loan money to your account, you may cancel all or part of that loan by informing the school within 30 days of the date the school notifies you of your right to cancel all or part of the loan.

If you ask your school to cancel all or part of your loan within the timeframes described above, the school will return the cancelled loan amount to us. If you ask your school to cancel all or part of your loan outside the timeframes described above, your school may process your cancellation request, but it is not required to do so.

• You may return all or part of your loan to us. Within 120 days of the date your school disbursed your loan money (by crediting the loan money to your account at the school, by paying it directly to you, or both), you may cancel all or part of your loan by returning all or part of the loan money to us. Contact your servicer for guidance on how and where to return your loan money.

You do not have to pay interest or the loan fee on the part of your loan that is cancelled or returned within the timeframes described above. We will adjust your loan amount to eliminate any interest and loan fee that applies to the amount of the loan that was cancelled or returned.

**15. Grace period.** You will receive a 6-month grace period on repayment of each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive. Your 6-month grace period begins the day after you stop attending school or drop below half-time enrollment. You do not have to begin making payments on your loan until after your grace period ends.

If you are called or ordered to active duty for more than 30 days from a reserve component of the U.S. Armed Forces, the period of your active duty service and the time necessary for you to re-enroll in school after your active duty ends are not counted as part of your grace period. However, the total period that is excluded from your grace period may not exceed three years. If the call or order to active duty occurs while you are in school and requires you to drop below half-time enrollment, the start of your grace period will be delayed until after the end of the excluded period. If the call or order to active duty occurs during your grace period, you will receive a full 6-month grace period at the end of the excluded period.

**16. Repaying your loan.** The repayment period for each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive begins on the day after your grace period ends. Your servicer will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

You must repay all of your Direct Loans under the same repayment plan, unless you want to repay your loans under the IBR Plan, the Pay As You Earn Plan, or the ICR Plan (see below) and you have other Direct Loans that do not qualify for repayment under those plans. In that case, you may select the IBR, Pay As You Earn, or ICR plan for the loans that are eligible for repayment under those plans, and may select a different repayment plan for the loans that may not be repaid under the IBR, Pay As You Earn, or ICR plan.

Your Direct Subsidized Loans and Direct Unsubsidized Loans can be repaid under the following repayment plans:

*Standard Repayment Plan*

Under this plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time period.

*Graduated Repayment Plan*

Under this plan, you will usually make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your monthly payment must at least be equal to the amount of interest that accrues each month. No single payment will be more than three times greater than any other payment.

*Extended Repayment Plan*

You are eligible for this plan only if **(1)** you have an outstanding balance on Direct Loan Program loans that exceeds $30,000, and **(2)** you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998 or on the date you obtained a Direct Loan Program loan after October 7, 1998.

Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time period. If you make graduated payments, your monthly payment must at least be equal to the amount of interest that accrues each month. No single payment under the graduated option will be more than three times greater than any other payment.

*Income-Based Repayment Plan (IBR Plan)*

Under the IBR Plan, your monthly payment amount is generally 15% (10% if you are a new borrower; see Note below) of your annual discretionary income, divided by 12. Discretionary income for this plan is the difference between your adjusted gross income and 150% of the poverty guideline amount for your state of residence and family size. If you are married and file a joint federal income tax return, the income used to determine your IBR Plan payment amount will be the combined adjusted gross income of you and your spouse.

To initially qualify for the IBR Plan and to continue to make payments that are based on your income, the amount you would be required to pay on your eligible student loans under the IBR Plan (as described above) must be less than the amount you would have to pay under the Standard Repayment Plan. If your IBR Plan payment amount is less than the amount you would have to pay under the Standard Repayment Plan, you are considered to have a "partial financial hardship."

If you are married and file a joint federal income tax return, the loan amount we use to determine whether you have a partial financial hardship will include your eligible loans and your spouse's eligible loans.

While you are repaying under the IBR Plan, you must annually provide documentation of your income and certify your family size so that we may determine whether you continue to have a partial financial hardship. Your monthly payment amount may be adjusted annually based on the updated income and family size information that you provide. If we determine that you no longer have a partial financial hardship, you may remain on the IBR Plan, but your monthly payment will no longer be based on your income. Instead, your monthly payment will be what you would be required to pay under the Standard Repayment Plan, based on the amount you owed on your eligible loans at the time you entered the IBR Plan.

Under the IBR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years (20 years if you are a new borrower) of qualifying monthly payments and at least 25 years (20 years if you are a new borrower) have elapsed, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

**Note:** You are a new borrower for the IBR Plan if you have no outstanding balance on a Direct Loan Program or FFEL Program loan on July 1, 2014, or if you have no outstanding balance on a Direct Loan Program or FFEL Program loan on the date you obtain a Direct Loan Program loan after July 1, 2014. Your servicer will determine whether you are a new borrower based on the information about your loans in the

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

U.S. Department of Education's National Student Loan Data System.

*Pay As You Earn Repayment Plan (Pay As You earn Plan)*

Under the Pay As You Earn Plan, your monthly payment amount is generally 10% of your annual discretionary income, divided by 12. Discretionary income for this plan is the difference between your adjusted gross income and 150% of the poverty guideline amount for your state of residence and family size. If you are married and file a joint federal income tax return, the income used to determine your Pay As You Earn Plan payment amount will be the combined adjusted gross income of you and your spouse.

The Pay As You Earn Plan is available only to new borrowers. You are a new borrower for the Pay As You Earn Plan if:

(1) You had no outstanding balance on a Direct Loan Program or FFEL Program loan as of October 1, 2007, or you have no outstanding balance on a Direct Loan Program or FFEL Program loan when you obtain a new loan on or after October 1, 2007, and

(2) You receive a disbursement of a Direct Subsidized Loan, Direct Unsubsidized Loan, or student Direct PLUS Loan (a Direct PLUS Loan made to a graduate or professional student) on or after October 1, 2011, or you receive a Direct Consolidation Loan based on an application received on or after October 1, 2011. However, you are not considered to be a new borrower for the Pay As You Earn Plan if the Direct Consolidation Loan you receive repays loans that would make you ineligible under part (1) of this definition.

In addition to being a new borrower, to initially qualify for the Pay As You Earn Plan and to continue to make payments that are based on your income, the amount you would be required to pay on your eligible student loans under the Pay As You Earn Plan (as described above) must be less than the amount you would have to pay under the Standard Repayment Plan. If your Pay As You Earn Plan payment amount is less than the amount you would have to pay under the Standard Repayment Plan, you are considered to have a "partial financial hardship."

If you are married and file a joint federal income tax return, the loan amount we use to determine whether you have a partial financial hardship will include your eligible loans and your spouse's eligible loans.

While you are repaying under the Pay As You Earn Plan, you must annually provide documentation of your income and certify your family size so that we may determine whether you continue to have a partial financial hardship. Your monthly payment amount may be adjusted annually based on the updated income and family size information that you provide. If we determine that you no longer have a partial financial hardship, you may remain on the Pay As You Earn Plan, but your monthly payment will no longer be based on your income. Instead, your monthly payment will be what you would be required to pay under the Standard Repayment Plan, based on the amount you owed on your eligible loans at the time you entered the Pay As You Earn Plan.

Under the Pay As You Earn Plan, if your loan is not repaid in full after you have made the equivalent of 20 years of qualifying monthly payments and at least 20 years have elapsed, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

*Income Contingent Repayment Plan (ICR Plan)*

Under this plan, your monthly payment amount will be either 20% of your discretionary income or a percentage of what you would repay under a Standard Repayment Plan with a 12-year repayment period, whichever is less. Discretionary income for this plan is the difference between your adjusted gross income and the poverty guideline amount for your state of residence and family size. If you are married and file a joint federal income tax return, the income used to determine your ICR Plan payment amount will be the combined adjusted gross income of you and your spouse. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues monthly on your loan unless you request a forbearance.

While you are repaying under the ICR Plan, you must annually provide documentation of your income and certify your family size. Your monthly payment amount may be adjusted annually based on the updated income and family size information that you provide.

Under the ICR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments and at least 25 years have elapsed, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

*Additional repayment plan information*

Under each plan, the number or amount of payments may need to be adjusted to reflect capitalized interest and/or new loans made to you.

If you can show to our satisfaction that the terms and conditions of the above repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

If you do not choose a repayment plan, we will place you on the Standard Repayment Plan.

The "Repaying Your Loans" charts at the end of this Borrower's Rights and Responsibilities Statement allow you to estimate the monthly and total amounts you would repay under the repayment plans listed above based on various initial loan amounts.

You can also use the Repayment Estimator at StudentAid.gov/Repayment-Estimator to estimate your monthly and total payment amounts under the different repayment plans and to evaluate your eligibility for the IBR and Pay As You Earn plans. The calculators are for informational purposes only. Your servicer will make the official determination of your payment amount and, for the IBR and Pay As You Earn plans, your eligibility for the plan.

You may change repayment plans at any time after you have begun repaying your loan. However, you may not change to a different repayment plan that has a maximum repayment period of less than the number of years your loan has already been in repayment, except that you may change to the IBR Plan, the Pay As You Earn Plan, or the ICR Plan at any time. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month (prepayments).

We apply your payments made under any repayment plan other than the IBR Plan and the Pay As You Earn Plan in the following order: (1) late charges and collection costs, (2) outstanding interest, and (3) outstanding principal. We apply your payments made under the IBR Plan or the Pay As You Earn Plan in the following order: (1) outstanding interest, (2) late charges and collection costs, and (3) outstanding principal.

We apply any prepayments in accordance with the Act. Your servicer can provide more information about how prepayments are applied.

When you have repaid a loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

**17. Transfer of loan.** We may transfer the servicing of one or all of your loans to another servicer without your consent. If there is a change in the address to which you must send payments or direct communications, we will notify you of the new servicer's name, address and telephone number, the effective date of the transfer, and the date when you must begin sending payments or directing communications to that servicer. Transfer of a loan to a different servicer does not affect your rights and responsibilities under that loan.

**18. Late charges and collection costs.** If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than six cents for each dollar of each late payment. If you do not make payments as scheduled, we may also require you to pay other charges and fees involved in collecting your loan.

**19. Demand for immediate repayment.** The entire unpaid amount of your loan becomes due and payable (this is called "acceleration") if you:

- Receive loan money, but do not enroll at least half-time at the school that determined you were eligible to receive the loan;

- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;

- Make a false statement that causes you to receive a loan that you are not eligible to receive; or

- Default on your loan.

**20. Defaulting on your loan.** Default (failing to repay your loan) is defined in detail in the Terms and Conditions section of your MPN (Section E). If you default:

- We will require you to immediately repay the entire unpaid amount of your loan;

- We may sue you, take all or part of your federal and state tax refunds and other federal or state payments, and/or garnish your wages so that your employer is required to send us part of your salary to pay off your loan.

- We will require you to pay reasonable collection fees and costs, plus court costs and attorney fees.

- You will lose eligibility for other federal student aid and assistance under most federal benefit programs.

- You will lose eligibility for loan deferments.

- We will report your default to nationwide consumer reporting agencies (see Item 21, "Consumer reporting agency notification"). This will harm your credit history and may make it difficult for you to obtain credit cards, home or car loans, or other forms of consumer credit.

**21. Consumer reporting agency notification.** We will report information about your loan to nationwide consumer reporting agencies (commonly known as "credit bureaus") on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). Your loan will be identified as an education loan.

If you default on a loan, we will also report this to nationwide consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report it.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response.

**22. Deferment and forbearance (postponing payments).**

If you meet certain requirements, you may receive a deferment that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a forbearance. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

*Deferment*

You may receive a deferment:

- While you are enrolled at least half-time at an eligible school;

- While you are in a full-time course of study in a graduate fellowship program;

- While you are in an approved full-time rehabilitation program for individuals with disabilities;

- While you are unemployed (for a maximum of three years; you must be diligently seeking, but unable to find, full-time employment);

- While you are experiencing an economic hardship (including Peace Corps service), as defined in the Act (for a maximum of three years);

- While you are serving on active duty during a war or other military operation or national emergency or performing qualifying National Guard duty during a war or other military operation or national emergency and, if you were serving on or after October 1, 2007, for an additional 180-day period following the demobilization date for your qualifying service; or

- If you are a member of the National Guard or other reserve component of the U.S. Armed Forces (current or retired) and you are called or ordered to

active duty while you are enrolled at least half-time at an eligible school or within 6 months of having been enrolled at least half-time, during the 13 months following the conclusion of your active duty service, or until you return to enrolled student status on at least a half-time basis, whichever is earlier.

You may be eligible to receive additional deferments if, at the time you received your first Direct Loan, you had an outstanding balance on a loan made under the FFEL Program before July 1, 1993. If you meet this requirement, contact your servicer for information about additional deferments that may be available.

You may receive a deferment based on your enrollment in school on at least a half-time basis if **(1)** you submit a deferment request to your servicer along with documentation of your eligibility for the deferment, or **(2)** your servicer receives information from the school you are attending that indicates you are enrolled at least half-time. If your servicer processes a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active duty military service or qualifying National Guard duty during a war or other military operation or national emergency, a representative acting on your behalf) must submit a deferment request to your servicer, along with documentation of your eligibility for the deferment. In certain circumstances, you may not be required to provide documentation of your eligibility if your servicer confirms that you have been granted the same deferment for the same period of time on a FFEL Program loan. Your servicer can provide you with a deferment request form that explains the eligibility and documentation requirements for the type of deferment you are requesting. You may also obtain deferment request forms and information on deferment eligibility requirements from your servicer's web site.

If you are in default on your loan, you are not eligible for a deferment.

You are not responsible for paying the interest on a Direct Subsidized Loan during a period of deferment, except as explained in Item 10 of this Borrower's Rights and Responsibilities Statement ("Payment of interest"). However, you are responsible for paying the interest on a Direct Unsubsidized Loan during a period of deferment.

*Forbearance*

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

We will give you a forbearance if:

- You are serving in a medical or dental internship or residency program, and you meet specific requirements;
- The total amount you owe each month for all of the student loans you received under Title IV of the Act (Direct Loan Program loans, FFEL Program loans, and Federal Perkins Loans) is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in a national service position for which you receive a national service award under the National and Community Service Trust Act of 1993. In some cases, the interest that accrues on a qualified loan during the service period will be paid by the Corporation for National and Community Service;
- You are performing service that would qualify you for loan forgiveness under the Teacher Loan Forgiveness program that is available to certain Direct Loan and FFEL program borrowers;
- You qualify for partial repayment of your loans under a student loan repayment program administered by the Department of Defense; or
- You are called to active duty in the U.S. Armed Forces.

To request a forbearance, contact your servicer. Your servicer can explain the eligibility and documentation requirements for the type of forbearance you are requesting. You may also obtain information on

forbearance eligibility requirements from your servicer's web site.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following:

- Periods necessary for us to determine your eligibility for a loan discharge;
- A period of up to 60 days in order for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize the interest that is charged during this period); or
- Periods when you are involved in a military mobilization, or a local or national emergency.

You are responsible for paying the interest on both Direct Subsidized Loans and Direct Unsubsidized Loans during a period of forbearance.

**23. Discharge (having your loan forgiven).**

*Loan discharge due to death, bankruptcy, total and permanent disability, school closure, false certification, identity theft, or unpaid refund*

We will discharge (forgive) your loan if:

- You die. Your servicer must receive acceptable documentation (as defined in the Act) of your death;
- Your loan is discharged in bankruptcy after you have proven to the bankruptcy court that repaying the loan would cause undue hardship. Direct Loans are not otherwise automatically discharged if you file for bankruptcy; or
- You become totally and permanently disabled (as defined in the Act) and meet certain other requirements.

In certain cases, we may also discharge all or a portion of your loan if:

- You could not complete a program of study because the school closed;
- Your loan eligibility was falsely certified by the school;
- A loan in your name was falsely certified as a result of a crime of identity theft; or
- The school did not pay a refund of your loan money that it was required to pay under federal regulations.

*Teacher Loan Forgiveness*

We may forgive a portion of eligible student loans you received under the Direct Loan or FFEL program after October 1, 1998 if you:

- Teach full time for five consecutive years in certain low-income elementary or secondary schools, or for certain low-income educational service agencies;
- Meet certain other qualifications; and
- If you did not owe a Direct Loan or FFEL program loan as of October 1, 1998, or as of the date you obtain a loan after October 1, 1998.

*Public Service Loan Forgiveness*

A Public Service Loan Forgiveness program is also available. Under this program, we will forgive the remaining balance due on your eligible Direct Loan Program loans after you have made 120 payments on those loans (after October 1, 2007) under certain repayment plans while you are employed full-time in certain public service jobs. The required 120 payments do not have to be consecutive.

*Additional loan discharge information*

The Act may provide for certain loan forgiveness or repayment benefits on your loans in addition to the benefits described above. If other forgiveness or repayment options become available, your servicer will provide information about these benefits.

For a discharge based on your death, a family member must contact your loan servicer. To request a loan discharge based on one of the other conditions described above (except for a discharge due to bankruptcy), you must complete an application. Your servicer can tell you how to obtain an application.

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done.

You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law. If you believe that you have a defense against repayment of your loan, contact your servicer.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You must repay your loan even if you do not complete the education paid for with the loan, are unable to obtain employment in the field of study for which your school provided training, or are dissatisfied with, or do not receive, the education you paid for with the loan.

**24. Loan consolidation.** A Direct Consolidation Loan Program is available that allows you to consolidate one or more of your eligible federal education loans into a new loan with a single monthly payment, and may allow you to extend the period of time that you have to repay your loans. This may make it easier for you to repay your loans. However, you will pay more interest if you extend your repayment period through consolidation, since you will be making payments for a longer period of time. Contact your servicer for more information about loan consolidation.

**25. Department of Defense and other federal agency loan repayment.** Under certain circumstances, military personnel may have their federal education loans repaid by the Secretary of Defense. This benefit is offered as part of a recruitment program that does not apply to individuals based on their previous military service or to those who are not eligible for enlistment in the U.S. Armed Forces. For more information, contact your local military service recruitment office.

Other agencies of the federal government may also offer student loan repayment programs as an incentive to recruit and retain employees. Contact the agency's human resources department for more information.

**26. AmeriCorps program education awards.** Under the National and Community Service Act of 1990, you may receive an education award that can be used to repay a Direct Subsidized Loan or Direct Unsubsidized Loan if you successfully complete a term of service in an AmeriCorps program. For more information, contact an official of your program.

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

### Repaying Your Loans: Standard, Graduated, and Extended Repayment Plans

| Debt | Standard Repayment Plan (10-year repayment period) | | Graduated Repayment Plan (10-year repayment period) | | | Extended-Fixed Repayment Plan (25-year repayment period) | | Extended-Graduated Repayment Plan (25-year repayment period) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Payment | Total Paid | Minimum Payment | Maximum Payment | Total Paid | Payment | Total Paid | Minimum Payment | Maximum Payment | Total Paid |
| $10,000 | $123 | $14,718 | $72 | $216 | $16,088 | N/A | N/A | N/A | N/A | N/A |
| $20,000 | $245 | $29,437 | $144 | $431 | $32,177 | N/A | N/A | N/A | N/A | N/A |
| $30,000 | $368 | $44,155 | $216 | $647 | $48,265 | N/A | N/A | N/A | N/A | N/A |
| $40,000 | $491 | $58,873 | $287 | $862 | $64,353 | $315 | $94,614 | $275 | $417 | $101,515 |
| $50,000 | $613 | $73,592 | $359 | $1,078 | $80,442 | $394 | $118,268 | $344 | $521 | $126,899 |
| $60,000 | $736 | $88,310 | $431 | $1,294 | $96,530 | $473 | $141,921 | $413 | $625 | $152,280 |
| $70,000 | $859 | $103,028 | $503 | $1,509 | $112,618 | $552 | $165,575 | $481 | $730 | $177,664 |
| $80,000 | $981 | $117,747 | $575 | $1,725 | $128,706 | $631 | $189,228 | $550 | $834 | $203,046 |
| $90,000 | $1,104 | $132,465 | $647 | $1,940 | $144,795 | $710 | $212,882 | $619 | $938 | $228,427 |
| $100,000 | $1,227 | $147,183 | $719 | $2,156 | $160,883 | $788 | $236,535 | $688 | $1,042 | $253,806 |

Notes:
- All estimated payments shown in the chart above are calculated using a fixed interest rate of 8.25%.
- The payment amounts shown in this chart are estimates. Your actual payment amount may differ from these estimates depending on factors such as the interest rate(s) of your loans and the amount of your debt. Your loan servicer will provide you with your actual monthly payment amount after you select a repayment plan.
- For the Extended Repayment Plan, an entry of "N/A" means that you are not eligible for this plan based on the amount owed when your loan enters repayment.
- You may use the Repayment Estimator at StudentAid.gov/Repayment-Estimator to estimate payment amounts based on your actual loan debt.

### Repaying Your Loans: Income-Based Repayment Plan (IBR Plan) for Borrowers Who Are Not New Borrowers on or after July 1, 2014

| Debt | Starting Income of $25,000 | | | | Starting Income of $40,000 | | | | Starting Income of $60,000 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) |
| $20,000 | $97 | $245 | $43,861 | 219 | Not Eligible | - | - | - | Not Eligible | - | - | - |
| $40,000 | $97 | $491 | $89,628 | 300 | $285 | $491 | $72,680 | 173 | Not Eligible | - | - | - |
| $60,000 | $97 | $642 | $94,175 | 300 | $285 | $736 | $148,999 | 268 | $535 | $736 | $97,093 | 143 |
| $80,000 | $97 | $642 | $94,175 | 300 | $285 | $981 | $199,464 | 300 | $535 | $981 | $156,150 | 193 |
| $100,000 | $97 | $642 | $94,175 | 300 | $285 | $1,227 | $201,322 | 300 | $535 | $1,227 | $236,102 | 251 |

# William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

**Repaying Your Loans: Pay As You Earn Repayment Plan (Pay As You Earn Plan) for Eligible Borrowers and IBR Plan for New Borrowers on or after July 1, 2014**

| Debt | Starting income of $25,000 | | | | Starting income of $40,000 | | | | Starting income of $60,000 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) |
| $20,000 | $65 | $245 | $38,488 | 240 | $190 | $245 | $31,254 | 134 | Not Eligible | - | - | - |
| $40,000 | $65 | $309 | $40,127 | 240 | $190 | $491 | $85,707 | 240 | $356 | $491 | $64,729 | 143 |
| $60,000 | $65 | $309 | $40,127 | 240 | $190 | $625 | $89,727 | 240 | $356 | $736 | $129,366 | 222 |
| $80,000 | $65 | $309 | $40,127 | 240 | $190 | $625 | $89,727 | 240 | $356 | $981 | $154,976 | 240 |
| $100,000 | $65 | $309 | $40,127 | 240 | $190 | $625 | $89,727 | 240 | $356 | $1,046 | $155,860 | 240 |

**Repaying Your Loans: Income-Contingent Repayment Plan (ICR Plan)**

| Debt | Starting income of $25,000 | | | | Starting income of $40,000 | | | | Starting income of $60,000 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) | Initial Payment | Final Payment | Total Paid | Time to Repay (Mos.) |
| $20,000 | $151 | $199 | $43,436 | 249 | $193 | $219 | $33,513 | 161 | $219 | $251 | $30,761 | 131 |
| $40,000 | $225 | $423 | $96,630 | 274 | $385 | $438 | $67,027 | 161 | $438 | $502 | $61,523 | 131 |
| $60,000 | $225 | $694 | $146,629 | 300 | $475 | $658 | $106,605 | 175 | $658 | $754 | $92,284 | 131 |
| $80,000 | $225 | $1,018 | $162,256 | 300 | $475 | $939 | $176,175 | 233 | $809 | $1,015 | $124,521 | 240 |
| $100,000 | $225 | $1,018 | $163,256 | 300 | $475 | $1,360 | $281,310 | 298 | $809 | $1,296 | $171,619 | 158 |

Notes:
- For the IBR Plan, the Pay As You Earn Plan, and the ICR Plan, the estimated payment amounts shown in the charts above are calculated using a fixed interest rate of 8.25% and the 2013 Poverty Guidelines (published by the U.S. Department of Health and Human Services). For the ICR Plan, the calculations also use the 2013 income percentage factors. For all three plans, the calculations are based on an assumption that you are single and do not have any children or anyone else in your household, that you live in one of the 48 contiguous states, and that your income will increase at a rate of 5% per year.
- The payment amounts shown in these charts are estimates. Your actual payment amount may differ from these estimates depending on factors such as the interest rate(s) of your loans, the amount of your loan debt, your income, and whether and how quickly your income increases.
- For the IBR Plan and the Pay As You Earn Plan, an entry of "Not Eligible" means that you would not have a partial financial hardship based on the loan debt and starting income shown and therefore would not be eligible to initially select the plan.
- You may use the Repayment Estimator at StudentAid.gov/Repayment-Estimator to evaluate your eligibility for the IBR and Pay As You Earn plans, and to estimate your payment amounts under the IBR, Pay As You Earn, and ICR plans based on your actual loan debt, income, family size, and state of residence.

# EXHIBIT 21

Search: ○ Agenda ○ Reg Review ● ICR

[ Go ]

| Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us |

---

Display additional information by clicking on the following: ☑ All ☑ Brief and OIRA conclusion
☑ Abstract/Justification ☑ Legal Statutes ☑ Rulemaking ☑ FR Notices/Comments ☑ IC List ☑ Burden ☑ Misc. ☑
Common Form Info. ☑ Certification
View Information Collection (IC) List                    View Supporting Statement and Other Documents

---

Please note that the OMB number and expiration date may not have been determined when this Information Collection Request and associated Information Collection forms were submitted to OMB. The approved OMB number and expiration date may be found by clicking on the Notice of Action link below.

## View ICR - OIRA Conclusion

OMB Control No: 1845-0007                          ICR Reference No: 201902-1845-001
Status: Active                                     Previous ICR Reference No: 201512-1845-002
Agency/Subagency: ED/FSA                           Agency Tracking No:
Title: William D. Ford Federal Direct Loan Program (Direct Loan Program) Promissory Notes
Type of Information Collection: Revision of a currently approved collection    Common Form ICR: No
Type of Review Request: Regular
OIRA Conclusion Action: Approved without change    Conclusion Date: 07/12/2019
Retrieve Notice of Action (NOA)                    Date Received in OIRA: 04/26/2019
Terms of Clearance:

| | Inventory as of this Action | Requested | Previously Approved |
|---|---|---|---|
| Expiration Date | 07/31/2022 | 36 Months From Approved | 07/31/2019 |
| Responses | 9,862,685 | 9,862,685 | 5,027,286 |
| Time Burden (Hours) | 4,021,665 | 4,021,534 | 2,513,643 |
| Cost Burden (Dollars) | 0 | 0 | 0 |

Abstract: The Department is requesting that three separate ICR packages be combined into a single ICR using OMB Control Number 1845-0007. The three separate ICR packages cover: the Direct Subsidized Loan and Direct Unsubsidized Loan Master Promissory Note, 1845-0007; the Direct PLUS Loan Master Promissory Note and Direct PLUS Loan Endorser Addendum, 1845-0068 ; and the Direct Consolidation Loan Application and Promissory Note and Related Forms, 1845-0053. We are streamlining all of the forms by eliminating duplicative and obsolete information, reordering items to present information in a more logical order, using plain language to present information more clearly, adding information about the new cancer treatment deferment, updating information about the borrower defense discharge provisions to show changes made through the November 1, 2016 regulation. For the PLUS master promissory note (MPN) we are revising the information and instruction section to clarify who qualifies as a "parent". The promissory notes serve as the means by which an individual applies for and agrees to repay a Federal Direct Loan. It also informs the borrower of the terms and conditions of the Direct Loan and includes a statement of borrower's rights and responsibilities. Instructions explain how to complete the applications. The additional forms for the Direct Consolidation Loan allows the borrower to list all loans that they wish to include that would not fit on the application, and add other loans within the allowed time frame once the Consolidation Loan is made. The LVC for the Consolidation Loan serves as the means by which the Department obtains information needed to pay off the holders of the loans being consolidated.

Authorizing Statute(s): US Code: 20 USC 1087a Name of Law: Higher Education Act 1965 as amended

Citations for New Statutory Requirements: None

Associated Rulemaking Information
RIN:                    Stage of Rulemaking:              Federal Register Citation:        Date:
                        Not associated with rulemaking

Federal Register Notices & Comments
60-day Notice:          Federal Register Citation:        Citation Date:
                        84 FR 4798                        02/19/2019
30-day Notice:          Federal Register Citation:        Citation Date:
                        84 FR 17820                       04/26/2019
Did the Agency receive public comments on this ICR? Yes

Number of Information Collection (IC) in this ICR: 3

| IC Title | Form No. | Form Name |
|---|---|---|
| Direct Consolidation Loan Application and Promissory Note and Related Forms | N/A, N/A, N/A, N/A | N/A , N/A , N/A , N/A |
| Direct Subsidized Loan and Direct Unsubsidized Loan Master Promissory Note | N/A | N/A |
| Direct PLUS Loan Master Promissory Note and Direct PLUS Loan Endorser Addendum | N/A, N/A | N/A , N/A |

ICR Summary of Burden

| | Total Approved | Previously Approved | Change Due to New Statute | Change Due to Agency Discretion | Change Due to Adjustment in Estimate | Change Due to Potential Violation of the PRA |
|---|---|---|---|---|---|---|
| Annual Number of Responses | 9,862,685 | 5,027,286 | 0 | 4,835,399 | 0 | 0 |
| Annual Time | 4,021,665 | 2,513,643 | 0 | 1,508,022 | 0 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Burden (Hours) | | | | | | |
| Annual Cost Burden (Dollars) | 0 | 0 | 0 | 0 | 0 | 0 |

**Burden increases because of Program Change due to Agency Discretion:** Yes
**Burden Increase Due to:** Miscellaneous Actions
**Burden decreases because of Program Change due to Agency Discretion:** No
**Burden Reduction Due to:**
**Short Statement:** The Department is reporting a program change due to the statutory addition of the new cancer treatment deferment which is being included in the loan terms. While the Department is combining three previously separate information collections into one collection, there is no anticipated increase in the number of summed responses at 9,862,685 for summed burden hours at 4,021,665.

---

**Annual Cost to Federal Government: $0**
**Does this IC contain surveys, censuses, or employ statistical methods?** No
**Does this ICR request any personally identifiable information (see OMB Circular No. A-130 for an explanation of this term)? Please consult with your agency's privacy program when making this determination.**    Yes
**Does this ICR include a form that requires a Privacy Act Statement (see 5 U.S.C. §552a(e)(3))? Please consult with your agency's privacy program when making this determination.**    Yes
**Is this ICR related to the Affordable Care Act [Pub. L. 111-148 & 111-152]?** No
**Is this ICR related to the Dodd-Frank Wall Street Reform and Consumer Protection Act, [Pub. L. 111-203]?** No
**Is this ICR related to the American Recovery and Reinvestment Act of 2009 (ARRA)?** No
**Agency Contact:** Beth Grebeldinger 202 708-8242

---

**Common Form ICR:**  No

---

On behalf of this Federal agency, I certify that the collection of information encompassed by this request complies with 5 CFR 1320.9 and the related provisions of 5 CFR 1320.8(b)(3).
The following is a summary of the topics, regarding the proposed collection of information, that the certification covers:

- ☑ (a) It is necessary for the proper performance of agency functions;
- ☑ (b) It avoids unnecessary duplication;
- ☑ (c) It reduces burden on small entities;
- ☑ (d) It uses plain, coherent, and unambiguous language that is understandable to respondents;
- ☑ (e) Its implementation will be consistent and compatible with current reporting and recordkeeping practices;
- ☑ (f) It indicates the retention periods for recordkeeping requirements;
- ☑ (g) It informs respondents of the information called for under 5 CFR 1320.8 (b)(3) about:
    - (i) Why the information is being collected;
    - (ii) Use of information;
    - (iii) Burden estimate;
    - (iv) Nature of response (voluntary, required for a benefit, or mandatory);
    - (v) Nature and extent of confidentiality; and
    - (vi) Need to display currently valid OMB control number;
- ☑ (h) It was developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected.
- ☑ (i) It uses effective and efficient statistical survey methodology (if applicable); and
- ☑ (j) It makes appropriate use of information technology.

If you are unable to certify compliance with any of these provisions, identify the item by leaving the box unchecked and explain the reason in the Supporting Statement.
**Certification Date:** 04/26/2019

---

 



# Master Promissory Note (MPN)   30-DAY CLEARANCE DRAFT – 04/23/2019
# Direct Subsidized Loans and Direct Unsubsidized Loans
## William D. Ford Federal Direct Loan Program

OMB No. 1845-0007
Form Approved
Exp. Date xx/xx/xxxx

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

**BEFORE YOU BEGIN**

Before you begin, read the Instructions on page 14 of this Master Promissory Note (MPN).

**BORROWER INFORMATION**

1. Name and Permanent Address (see Instructions)

2. Social Security Number

3. Date of Birth (mm-dd-yyyy)

4. Driver's License State and Number

5. Email Address (optional)

6. Area Code/Telephone Number

**REFERENCE INFORMATION**

List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

7. First Name: _____   Middle Initial: _____   Last Name: _____

Permanent Address (Street, City, State, Zip Code):

Email Address (optional): _____

Area Code/Telephone Number: ( _____ ) _____ - _____

Relationship to You: _____

8. First Name: _____   Middle Initial: _____   Last Name: _____

Permanent Address (Street, City, State, Zip Code):

Email Address (optional): _____

Area Code/Telephone Number: ( _____ ) _____ - _____

Relationship to You: _____

**SCHOOL INFORMATION – TO BE COMPLETED BY THE SCHOOL**

9. School Name and Address

10. School Code/Branch

11. Identification No.

Borrower's Name: _____   Social Security Number: ___ ___ ___ - ___ ___ - ___ ___ ___ ___

**BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS**

**12.** I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this Master Promissory Note (MPN) that cannot be more than the maximum amounts I am eligible to receive, as provided under federal law and explained in the MPN Terms and Conditions and in the Borrower's Rights and Responsibilities Statement that accompanies this MPN.

**13.** Under penalty of perjury, I certify that:

**A.** The information I provide on this MPN and that I update from time to time is true, complete, and correct to the best of my knowledge and belief.

**B.** I will use the loan money I receive only to pay for my authorized educational expenses for attendance at the school that determined I was eligible to receive the loan, and I will immediately repay any loan money that is not used for that purpose.

**C.** If I owe an overpayment on a Federal Perkins Loan or on a grant made under the federal student aid programs (as defined in the MPN Terms and Conditions), I have made satisfactory arrangements to repay the amount owed.

**D.** If I am in default on a federal student loan, I have made satisfactory repayment arrangements with the loan holder to repay the amount owed.

**E.** If I have been convicted of, or if I have pled *nolo contendere* (no contest) or guilty to, a crime involving fraud in obtaining federal student aid funds, I have fully repaid those funds.

**14.** For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I authorize:

**A.** My schools, the U.S. Department of Education (ED), and their agents and contractors to release information about my loan to the references I provide and to my immediate family members unless I submit written directions otherwise or as otherwise permitted by law.

**B.** My schools, ED, and their agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at any cellular telephone number I provide now or in the future using automated dialing equipment or artificial or prerecorded voice or text messages.

**15.** I understand that:

**A.** My school is authorized to credit my loan money to my account at the school and to pay to ED any refund that may be due up to the full amount of the loan.

**B.** I have the option of paying the interest that accrues on my loans during grace, in-school, deferment (including in-school deferment), forbearance, and certain other periods, but if I do not do so, ED may add unpaid interest that accrues on my loans to the principal balance of those loans at the end of the grace, deferment, forbearance, or other period. This is called "capitalization." Capitalization will increase the principal amount owed on the loan and the total amount of interest I must pay.

**C.** ED has the authority to verify information reported on this MPN with other federal agencies and to report information about my loan status to persons and organizations permitted by law to receive that information.

**D.** My school will notify me of the type of loan and loan amount that I am eligible to borrow.

**E.** Within certain timeframes, I may cancel a loan or request a lower amount by contacting my school, or by refusing to accept or returning all or a portion of a loan disbursement that is made to me.

**F.** More than one loan may be made to me under this MPN for the same or different loan periods.

**G.** I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement.

**PROMISES**

**16.** I promise to pay to ED the full amount of all loans that I receive under this MPN in accordance with the terms of the MPN, plus interest and any other charges and fees that I may be required to pay under the terms of the MPN.

**17.** If I do not make a payment on a loan made under this MPN when it is due, I promise to pay reasonable collection costs, including but not limited to attorney fees, court costs, and other fees.

**18.** I promise that I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it.

**19.** By signing this MPN, whether electronically or on a paper copy, I promise that I have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings, the MPN Terms and Conditions, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

**20.** Borrower's Signature _____

**21.** Today's Date (mm-dd-yyyy) ___ ___ - ___ ___ - ___ ___ ___ ___

**MPN TERMS AND CONDITIONS**

This section summarizes some of the major terms and conditions of your loans. You can find more detailed information about the terms and conditions of your loans in the Borrower's Rights and Responsibilities Statement (BRR) that accompanies the MPN. Each topic covered in this section of the MPN is followed by the number of the item in the BRR that provides additional information about that topic. The BRR is considered to be part of the MPN. Whenever we refer to the MPN, the term "MPN" includes the BRR.

The words "we," "us," and "our" refer to the U.S. Department of Education and our servicers. The word "loan" refers to one or more loans made under the MPN.

The term "federal student aid" refers to aid awarded under the following programs: the Federal Pell Grant Program; the Federal Supplemental Educational Opportunity Grant (FSEOG) Program; the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program; the William D. Ford Federal Direct Loan (Direct Loan) Program; the Federal Family Education Loan (FFEL) Program; and the Federal Perkins Loan Program.

**LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION (BRR Item 1)**

The terms of this MPN are determined in accordance with the Higher Education Act of 1965, as amended (the HEA), our regulations, and other federal laws and regulations. Throughout this MPN, we refer to these laws and regulations as the "Act."

Any notice we are required to send you about your loans, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, emailed to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify us of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive any of our rights to enforce that term or any other term in the future. No term of your loan may be modified or waived, unless we do so in writing. If any term of your loan is determined to be unenforceable, the remaining terms remain in force.

**TYPES OF LOANS YOU CAN RECEIVE UNDER THIS MPN (BRR Item 3)**

This MPN is used to make Direct Subsidized Loans and Direct Unsubsidized Loans. Only undergraduate students with financial need are eligible to receive Direct Subsidized Loans. Both undergraduate and graduate or professional students can receive Direct Unsubsidized Loans.

**TIME LIMITATION ON YOUR ELIGIBILITY TO RECEIVE DIRECT SUBSIDIZED LOAN IF YOU ARE A FIRST-TIME BORROWER ON OR AFTER JULY 1, 2013 (BRR Item 4)**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time for which you can receive Direct Subsidized Loans (this is called your "maximum eligibility period"), and under some circumstances you may become responsible for paying interest on those loans during all periods.

**USE OF THE MPN TO MAKE MORE THAN ONE LOAN (BRR Item 5)**

This MPN can be used to make multiple loans to you to pay your educational expenses over a period of up to 10 years. If you do not want to receive more than one loan under this MPN, you must notify us or your school in writing.

Each loan you receive under this MPN is separately enforceable. At or before the time of the first disbursement of each loan, we will send you a disclosure statement that tells you the amount of the loan and additional terms of the loan. Any disclosure statement we send to you in connection with a loan made under this MPN is considered to be part of the MPN. You can also find information about the amount of your loan and the disbursement dates in the National Student Loan Data System (NSLDS).

**AMOUNT YOU MAY BORROW (BRR Item 6)**

There are annual loan limits (the maximum loan amount you can borrow each academic year) and aggregate loan limits (the maximum loan amount you can borrow for undergraduate and graduate or professional study) under this MPN. The annual and aggregate limits vary depending on your academic level (first-year, second-year, etc.) and, for undergraduate students, whether you are a dependent or independent student.

**YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN (BRR Item 11)**

Before your loan money is disbursed, you may cancel all or part of the loan at any time by notifying your school. After your loan money is disbursed, you may cancel all or part of the loan within certain timeframes set by the Act. These timeframes and the procedures for cancelling all or part of your loan will be explained in the disclosure statement that we will send to you at the time of each loan disbursement.

**INTEREST RATE (BRR Item 7)**

Unless we notify you in writing that a different rate will apply, the interest rate for any loan you receive under this MPN is a fixed rate (meaning that your interest rate will never change) that is calculated each year. When the rate is calculated, it applies to Direct Subsidized Loans and Direct Unsubsidized Loans with first disbursements made during the period beginning on July 1 of one year and ending on June 30 of the following year. This means that different loans you receive under this MPN may have different interest rates.

The calculated interest rate cannot be more than the maximum rate set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%.

If you are in the military and the interest rate on your loan is greater than 6%, you may qualify to have the rate limited to 6% during any period of active duty service or other qualifying periods.

**PERIODS WHEN WE CHARGE INTEREST (BRR Item 8)**

Generally, we do not charge interest on Direct Subsidized Loans while you are enrolled at an eligible school on at least a half-time basis, during your 6-month grace period, during deferment periods, or during certain periods of repayment under certain repayment plans that base your monthly payment amount on your income. Generally, we charge interest on Direct Subsidized Loans during all other periods, starting on the day after your grace period ends.

Generally, we charge interest on Direct Unsubsidized Loans during all periods (including while you are in school and during your grace period), starting when your loan is first disbursed.

You are responsible for paying all interest that we charge on your Direct Loans. If you do not pay this interest, we may capitalize the interest (add it to the principal balance of your loan).

**LOAN FEE (BRR Item 9)**

We charge a loan fee for each loan you receive. The loan fee is a percentage of the loan amount and will reduce the amount of money that you receive to pay for your educational expenses. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee. The specific loan fee you are charged will be shown on disclosure statements that will be sent to you.

**LATE CHARGES AND COLLECTION COSTS (BRR Item 10)**

If you do not make your full monthly loan payment within 30 days of your due date, we may require you to pay a late charge of not more than six cents for each dollar of each late payment.

We may also require you to pay any other charges and fees that are permitted by the Act related to the collection of your loan. If you default on a loan, you must pay reasonable collection costs, plus any court costs and attorney fees.

MPN TERMS AND CONDITIONS (CONTINUED)

### HOW YOU WILL RECEIVE YOUR LOAN MONEY (BRR Item 12)

Generally, your school will pay out your loan money in more than one installment (called a "disbursement") according to a schedule determined by your school. In most cases, the loan money will be applied to your school account to pay for tuition, room and board, and authorized school fees. If there is money left after those charges are paid, the school will give the excess amount (this is called a "credit balance") to you directly, unless you authorize the school to hold the credit balance.

### GRACE PERIOD (BRR Item 15)

You will receive a 6-month grace period on repayment of your loan. The grace period begins the day after you cease to be enrolled at least half-time at an eligible school.

You are not required to make any payments on your loan during the grace period. However, we charge interest during the grace period on Direct Unsubsidized Loans and, in some cases, on Direct Subsidized Loans, and this interest will be capitalized at the end of the grace period if you do not pay it.

### REPAYING YOUR LOAN (BRR Item 16)

You must repay each loan you receive under the MPN in monthly installments during a repayment period that begins on the day immediately following your 6-month grace period on that loan. You have a choice of several repayment plans, including plans that base your required monthly payment amount on your income.

If you are temporarily unable to make your monthly loan payments, you can request a deferment or forbearance that allows you to temporarily stop making payments or to temporarily make a smaller payment amount (see BRR Item 20). In some cases, we may grant you a forbearance without a request.

You may prepay all or any part of your loan at any time without penalty.

After you have fully repaid a loan, we will send you a notice telling you that you have paid off your loan. You may fully repay different loans made under this MPN at different times.

We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school disburses your loan. It is important to keep in contact with us.

### DEFAULTING ON YOUR LOAN (BRR Item 17)

You will be considered in default on your loan if:

- You do not make your monthly loan payments for a total of at least 270 days;
- You do not comply with other terms of the loan, and we determine that you do not intend to repay your loan; or
- We accelerate your loan (see "ACCELERATION") and you do not pay the amount due.

If you default, we may:

- Capitalize all outstanding interest, which will increase the principal amount due on the loan and the total amount of interest you will pay;
- Report the default to nationwide consumer reporting agencies (credit bureaus), which will significantly and negatively affect your credit history;
- Demand that you immediately repay the loan in full;
- Order administrative wage garnishment (AWG) of your wages;
- Take (offset) your federal income tax refund or Social Security Administration payments or any other payment authorized for offset under federal law and use that amount to pay off part of your loan;
- File a lawsuit against you to collect on the loan; and
- Require you to pay collection costs, which will increase the total amount you must pay on your loan.

### ACCELERATION (BRR Item 18)

We may require you to immediately repay the entire unpaid balance of your loan if you :

- Receive loan money, but do not begin attendance in any classes at the school that disbursed your loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that disbursed your loan;
- Make a false statement that causes you to receive a loan that you are not eligible for; or
- Default on your loan (see "DEFAULTING ON YOUR LOAN").

### INFORMATION WE REPORT ABOUT YOUR LOAN (BRR Item 19)

We will report information about your loan to nationwide consumer reporting agencies (credit bureaus) and the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). If you default on a loan, we will report this to nationwide consumer reporting agencies. Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that we authorize.

**IMPORTANT NOTICES**

### GRAMM-LEACH-BLILEY ACT NOTICE

The Gramm-Leach-Bliley Act (Public Law 106-102) requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

### PRIVACY ACT NOTICE

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 *et seq.* of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

### FINANCIAL PRIVACY ACT NOTICE

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program, and also to the financial records of any account at a financial institution used to disburse Direct Loan funds to you.

### PAPERWORK REDUCTION NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0007. Public reporting burden for this collection of information is estimated to average 30 minutes (0.5 hours) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201. If you have comments or concerns regarding the status of your individual submission of this form, write to:

U.S. Department of Education
Common Origination and Disbursement School Relations Center
Attn: Applicant Services
PO Box 9002
Niagara Falls, NY 14302

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

### ABOUT THE BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT (BRR)

This BRR provides additional information about the terms and conditions of the loans you receive under the accompanying Master Promissory Note (MPN) for Direct Subsidized Loans and Direct Unsubsidized Loans. Please keep this BRR for your records. You may request another copy of the BRR at any time by contacting us. You can also obtain a complete copy of the MPN that you signed, including the BRR, on StudentLoans.gov.

Throughout this BRR, the words "we," "us," and "our" refer to the U.S. Department of Education and our servicers. The word "loan" refers to one or more loans made under the accompanying MPN.

### 1. LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION

The terms and conditions of loans made under this MPN are determined by the HEA and other federal laws and regulations. We refer to these laws and regulations as "the Act" throughout this Borrower's Rights and Responsibilities Statement. Under applicable state law (unless federal law preempts a state law), you may have certain borrower rights, remedies, and defenses in addition to those stated in the MPN and this BRR.

Any notice we are required to send you related to a loan made under this MPN, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, sent by electronic means to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify us of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive our right to enforce that term or any other term in the future. No term of this MPN may be modified or waived, unless we do so in writing. If any term of this MPN is determined to be unenforceable, the remaining terms remain in force.

**NOTE:** Amendments to the Act may change the terms of this MPN. Any amendment to the Act that changes the terms of this MPN will be applied to your loans in accordance with the effective date of the amendment. Depending on the effective date of the amendment, amendments to the Act may modify or remove a benefit that existed at the time that you signed this MPN.

### 2. THE WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

The Direct Loan Program (formally known as the William D. Ford Federal Direct Loan Program) includes the following types of loans, known collectively as "Direct Loans":

- Direct Subsidized Loans (formally known as Federal Direct Stafford/Ford Loans)
- Direct Unsubsidized Loans (formally known as Federal Direct Unsubsidized Stafford/Ford Loans)
- Direct PLUS Loans (formally known as Federal Direct PLUS Loans)
- Direct Consolidation Loans (formally known as Federal Direct Consolidation Loans)

Direct Loans are made by the U.S. Department of Education. We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school notifies us that the first disbursement of your loan has been made. It is important to keep in contact with us.

If we transfer one or all of your loans to a new servicer, we will notify you of who your new servicer is, how to contact your new servicer, and when your loans will be transferred. A transfer of the servicing of your loan does not affect any of your rights and responsibilities under that loan. You can find the name of your servicer in the National Student Loan Data System (NSLDS) (see BRR Item 19).

### 3. DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS

Direct Subsidized Loans and Direct Unsubsidized Loans are made to students to help pay for the cost of education beyond high school.

Direct Subsidized Loans are available only to undergraduate students. Direct Unsubsidized Loans are available to both undergraduate and graduate or professional students.

To receive a Direct Subsidized Loan, you must have financial need. Except as explained in BRR Item 8, we do not charge interest on Direct Subsidized Loans while you are in school on at least a half-time basis, during the grace period, during deferment periods, and during certain periods of repayment under the Revised Pay As You Earn Repayment Plan (REPAYE Plan), the Pay As You Earn Repayment Plan (PAYE Plan), and the Income-Based Repayment Plan (IBR Plan).

You can receive a Direct Unsubsidized Loan without showing that you have financial need. Except during certain periods of repayment under the REPAYE Plan, we charge interest on Direct Unsubsidized Loans during all periods. For more information on periods when we charge interest, see BRR Item 8.

### 4. TIME LIMITATION ON DIRECT SUBSIDIZED LOAN ELIGIBILITY FOR FIRST-TIME BORROWERS ON OR AFTER JULY 1, 2013

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time (measured in academic years) that you can receive Direct Subsidized Loans.

You are a first-time borrower on or after July 1, 2013 if you had no outstanding balance on a Direct Loan or on a Federal Family Education Loan Program (FFEL Program) loan on July 1, 2013, or if you have no outstanding balance on a Direct Loan or FFEL program loan on the date you obtain a Direct Loan after July 1, 2013.

In general, if you are a first-time borrower on or after July 1, 2013 you may not receive Direct Subsidized Loans for more than 150% of the published length of your program of study. This is called your "maximum eligibility period." For example, if you are enrolled in a 4-year bachelor's degree program, the maximum period for which you can receive Direct Subsidized Loans is 6 years (150% of 4 years is 6 years).

Your maximum eligibility period is based on the published length of the program in which you are currently enrolled. This means that your maximum eligibility period can change if you change programs. If you receive Direct Subsidized Loans for one program and then change to a different program, the period of time for which you received Direct Subsidized Loans for the earlier program will generally count against your new maximum eligibility period.

After you have received Direct Subsidized Loans for your maximum eligibility period, you are no longer eligible to receive additional Direct Subsidized Loans, and if you are enrolled in school, you may become responsible for paying interest on your Direct Subsidized Loans. You may continue to receive Direct Unsubsidized Loans. We will notify you if you are no longer eligible to receive additional Direct Subsidized Loans.

With certain exceptions as provided under the Act (for example, if you graduate from your program of study before or at the time you receive Direct Subsidized Loans for your maximum eligibility period),we will charge interest on your Direct Subsidized Loans during all periods if you—

- Continue to be enrolled in any undergraduate program after you have received Direct Subsidized Loans for your maximum eligibility period, or

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
### Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

- Enroll in another undergraduate program that is the same length as or shorter than your previous program.

If either of the above events occurs, we will charge interest during all periods, beginning on the date of the enrollment that causes you to become responsible for paying the interest. You will become responsible for paying all of the interest that accrues on your Direct Subsidized Loans based solely on your enrollment as described above, regardless of whether you apply for, request, or receive federal student financial aid. We will notify you if you become responsible for paying all of the interest that accrues on your Direct Subsidized Loans.

Additional information about the limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013 will be provided to you during entrance counseling (see BRR Item 12). You may also obtain additional information from your school's financial aid office, or at StudentAid.gov.

### 5. USE OF THE MPN TO MAKE MORE THAN ONE LOAN

You may receive more than one loan under this MPN over a period of up to 10 years to pay for your educational costs, as long as the school you are attending is authorized to use the MPN in this way and chooses to do so. At any school, you can receive more than one loan for the same academic year under this MPN.

If your school is not authorized to use the MPN for multiple loans or chooses not to do so, or if you do not want to receive more than one loan under this MPN, you must sign a new MPN each time you receive a loan for a new academic year. If you do not want to receive more than one loan under this MPN, you must notify us or your school in writing.

If the school you are attending is authorized to use the MPN for multiple loans and chooses to do so, no additional loans will be made under this MPN after the earliest of the following dates:

- The date we or your school receive your written notice that you do not want to receive any additional loans under the MPN;
- One year after the date you sign the MPN or the date we receive the MPN, if no loan disbursements have been made under the MPN; or
- Ten years after the date you sign the MPN or the date we receive the MPN.

### 6. AMOUNT YOU MAY BORROW

The charts that follow show the maximum amounts of Direct Subsidized Loans and Direct Unsubsidized Loans that you may borrow for a single academic year (annual loan limits), and the maximum amounts that you may borrow in total for undergraduate and graduate study (aggregate loan limits). The actual amount you are eligible to borrow for an academic year may be less than the maximum annual amounts shown in the charts.

If you are enrolled in a program that is less than a full academic year in length, or if the remaining portion of the program you are enrolled in is less than a full academic year in length, the annual loan limits may be lower than those shown in the chart.

If you are enrolled in certain graduate level health professions programs, you may qualify for higher annual and aggregate limits on Direct Unsubsidized Loans.

Your school will determine the actual loan amount you are eligible to receive based on your academic level, dependency status, and other factors such as:

- Your cost of attendance;
- Your Expected Family Contribution;
- Other financial aid you receive; and

- Your remaining eligibility under the annual or aggregate loan limits.

The amount of Direct Subsidized Loans and Direct Unsubsidized Loans you are eligible to receive may increase or decrease based on changes in your financial circumstances. Your school will notify you of any changes in your eligibility.

### ANNUAL LOAN LIMITS

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
| --- | --- |
| First Year Total | $5,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $6,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $7,500 (not more than $5,500 can be subsidized) |
| Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan) | |
| First Year Total | $9,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $10,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $12,500 (not more than $5,500 can be subsidized) |
| Graduate and Professional Students | |
| Total Amount (Each Year) | $20,500 (unsubsidized only) |

### AGGREGATE LOAN LIMITS

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
| --- | --- |
| Total Amount Cumulative | $31,000 (not more than $23,000 can be subsidized) |
| Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan) | |
| Total Amount Cumulative | $57,500 (not more than $23,000 can be subsidized) |
| Graduate and Professional Students | |
| Total Amount Cumulative | $138,500 (not more than $65,500 can be subsidized; includes subsidized and unsubsidized loans received for undergraduate study) |

### 7. INTEREST RATE

The interest rate on Direct Subsidized Loans and Direct Unsubsidized Loans is a fixed rate (meaning that the rate for each loan you receive will never change). The rate is determined according to a formula specified in the Act, and is calculated each year. When the rate is calculated, it applies to all

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

Direct Subsidized Loans and Direct Unsubsidized Loans that have a first disbursement date during the period beginning on July 1 of one year and ending on June 30 of the following year. If you receive more than one loan under this MPN, each loan may have a different fixed interest rate, depending on when the loan is first disbursed, and whether you are an undergraduate student or a graduate or professional student when the loan is made.

The interest rate for any loan you receive under this MPN cannot be more than the maximum rate that is set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%. We will notify you of the interest rate for each loan you receive in a disclosure statement that we send to you.

### Servicemembers Civil Relief Act

If you are in military service, you may qualify for a lower interest rate on your loans.

Under the Servicemembers Civil Relief Act, the interest rate on loans you received before you began your military service may be limited to 6% during your military service. We will determine if you are eligible for this benefit based on information from the U.S. Department of Defense. If you are eligible and have qualifying loans with an interest rate greater than 6%, we will automatically reduce the interest rate on those loans to 6% during your military service. If you think you qualify for the 6% interest rate but have not received it, contact us.

### Interest rate reduction for automatic withdrawal of payments

You will receive a 0.25% reduction in the interest rate on your loan if you choose to repay the loan under the automatic withdrawal option. Under the automatic withdrawal option, we automatically deduct your monthly loan payment from your checking or savings account. In addition to lowering your interest rate, automatic withdrawal ensures that your payments are made on time. We will provide you with information about the automatic withdrawal option.

### 8. PERIODS WHEN WE CHARGE INTEREST

In general, we do not charge interest on Direct Subsidized Loans during certain periods, but we charge interest on Direct Unsubsidized Loans during all periods, as explained below.

### Direct Subsidized Loans

We charge interest on Direct Subsidized Loans—

- During most periods when you are repaying your loans;
- During forbearance periods; and
- During all periods, if you become responsible for paying all interest on your Direct Subsidized Loans (see BRR Item 4).

We do not charge interest on Direct Subsidized Loans—

- While you are enrolled in school at least half-time;
- During your grace period;
- During deferment periods;
- During some periods of repayment under the REPAYE, PAYE, and IBR plans; and
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below).

### Direct Unsubsidized Loans

We charge interest on Direct Unsubsidized Loans, starting on the date of the first disbursement—

- While you are enrolled in school at least half-time;
- During your grace period;
- During most periods when you are repaying your loans;
- During most deferment periods; and
- During forbearance periods.

You will pay more interest on a Direct Unsubsidized Loan than on a Direct Subsidized Loan.

We do not charge interest on Direct Unsubsidized Loans—

- During some periods of repayment under the REPAYE Plan;
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below); and
- During periods of deferment for cancer treatment (see BRR Item 20).

### No accrual of interest benefit for active duty service members

If you qualify for the no accrual of interest benefit for active duty service members, we do not charge interest on any type of Direct Loan Program loan first disbursed on or after October 1, 2008 during periods while you are on qualifying active duty military service (for up to 60 months).

### Interest capitalization

If you do not pay the interest as it accrues on either a Direct Subsidized Loan or a Direct Unsubsidized Loan, we will add the accrued interest to the unpaid principal balance of your loan. This is called "capitalization." Capitalization increases the principal amount you owe on the loan and the total amount of interest you will pay. We capitalize unpaid interest when your grace period ends and when you start making payments again after periods of deferment or forbearance. We may also capitalize unpaid interest that has accrued since the first disbursement of a Direct Unsubsidized Loan when you enter repayment for the first time.

The chart below shows the difference in the total amount you would repay if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized at the end of the deferment or forbearance period. The example illustrated in the chart assumes the following—

- You owed $30,000 in Direct Unsubsidized Loans when your loans entered repayment at the end of the 6-month grace period;
- The interest rate on your loans is 6%;
- You are repaying your loans under the Standard Repayment Plan; and
- You received a 12-month deferment or forbearance that began on the day after your grace period ended.

|  | If you pay the interest as it accrues... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan principal amount owed at beginning of deferment or forbearance | $30,000 | $30,000 |
| Interest for 12 months at an annual interest rate of 6% | $1,800 (paid as accrued) | $1,800 (unpaid and capitalized) |
| Loan principal amount to be repaid at end of deferment or forbearance | $30,000 | $31,800 |
| Monthly payment | $333 | $353 |

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

| Number of payments | 120 | 120 |
|---|---|---|
| Total repaid | $41,767* | $42,365 |

*The total repaid includes $1,800 in interest that was repaid as it accrued during the 12-month deferment or forbearance period.

In this example, you would pay $20 less per month and $598 less altogether if you pay the interest as it accrues during the 12-month deferment or forbearance period.

**Federal income tax deduction for student loan interest payments**

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.gov.

**9. LOAN FEE**

For each Direct Subsidized Loan or Direct Unsubsidized Loan that you receive under this MPN, we charge a loan fee that is a percentage of the amount you initially borrowed. The loan fee will be subtracted from each disbursement of your loan. This means that the actual disbursement amount you receive will be less than the disbursement amount you must repay. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee.

The amount of the loan fee may be different for different loans you receive under the MPN, depending on when the loans are first disbursed. The specific loan fee you are charged will be shown on a disclosure statement that we will send to you.

**10. LATE CHARGES AND COLLECTION COSTS**

If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than 6% of each late payment. We may also require you to pay other charges and fees involved in collecting your loan.

**11. YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN**

Before your loan money is disbursed, you may cancel all or part of your loan at any time by notifying your school. After your loan money is disbursed, there are two ways to cancel all or part of your loan:

- Within certain timeframes you may notify your school that you **want to cancel all or part of your loan.** The timeframes for notifying your school are different depending on whether your school requires you to confirm in writing the types and amounts of loans you want to receive. These timeframes range from 14 days to 30 days after your school notifies you of your right to cancel all or part of your loan. Your school will tell you the specific cancellation timeframe that applies to you. If you tell the school that you want to cancel all or part of your loan within the applicable timeframe, your school is required to process your cancellation request.

  If you ask your school to cancel all or part of your loan outside the applicable timeframe, your school may process your cancellation request, but it is not required to do so.

- You may return all **or part of your loan** to us. Within 120 days of the date your school disbursed your loan money, you may cancel all or part of your loan by returning all or part of the loan money to us. Contact us for instructions on how and where to return your loan money.

You do not have to pay interest or the loan fee on the part of your loan that is cancelled or returned within the timeframes described above. We will adjust your loan amount to eliminate any interest and loan fee that applies to the amount of the loan that is cancelled or returned.

**12. HOW YOU WILL RECEIVE YOUR LOAN MONEY**

Generally, your school will disburse (pay out) your loan money in more than one installment. Each installment is called a disbursement.

If your school uses academic terms (for example, semesters or quarters), it will usually make a loan disbursement at the beginning of each academic term.

If your school does not use academic terms or does not have academic terms that meet certain requirements, it will generally pay out your loan in at least two disbursements, one at the beginning of the period of study for which you are receiving the loan, and one at the midpoint of that period of study. Your school determines the schedule for disbursing your loan money in accordance with the Act.

In most cases, if the Direct Subsidized Loan or Direct Unsubsidized Loan that you are receiving is your first student loan under the Direct Loan Program, you must complete entrance counseling before your school can make the first disbursement of your loan. Your school will tell you if entrance counseling is required, and will provide instructions for completing entrance counseling.

Your school may disburse your loan money by crediting it to your account at the school, or may give some or all of it to you directly by check or other means. We will notify you in writing each time the school disburses part of your loan money.

If your school credits your loan money to your account and the amount credited is more than the amount of your tuition and fees, room and board, and other authorized charges, the excess amount is called a credit balance. Unless you authorize your school to hold the credit balance for you, your school must give you the credit balance within 14 days after the credit balance occurred or 14 days after classes began, whichever is later.

**13. USE OF YOUR LOAN MONEY**

You may use the loan money you receive only to pay for your authorized educational expenses for attendance at the school that determined you were eligible to receive the loan. Authorized expenses include the following:

- Tuition
- Room
- Board
- Institutional fees
- Books
- Supplies
- Equipment
- Dependent care expenses
- Transportation
- Commuting expenses
- Rental or purchase of a personal computer
- Loan fees
- Other documented, authorized costs

**14. INFORMATION YOU MUST REPORT TO US AFTER YOU RECEIVE YOUR LOAN**

You must notify us and/or the financial aid office at your school about certain changes.

While you are still in school, you must notify your school's financial aid office if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Do not enroll at least half-time for the period of study that your loan is intended to pay for;
- Do not enroll at the school that disbursed your loan;

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

- Stop attending school or drop below half-time enrollment;
- Transfer from one school to another school; or
- Graduate.

At any time after you receive your loan, you must notify us if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name); or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment).

### 15. GRACE PERIOD

You do not need to begin making payments on your loan until 6 months after you stop attending school or drop below half-time enrollment. This 6-month period is called your grace period.

If you are a member of a reserve component of the U.S. Armed Forces and you are called to active duty for more than 30 days while you are enrolled in school on at least a half-time basis or during your grace period, the period of your active duty service and the time necessary for you to re-enroll in school after your active duty ends (up to a maximum of three years) are not counted as part of your grace period. We can provide more information about this benefit.

### 16. REPAYING YOUR LOAN

The repayment period for each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive begins on the day after your grace period ends. We will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

You must repay the principal amount of your loan, plus any interest charged on the loan in accordance with the Act. The principal amount that you owe, and are required to repay, is the total of all loan disbursements that are made (except for any disbursements that you reduce or cancel), plus any unpaid interest that is capitalized and added to the principal balance, as authorized under the Act.

You must generally repay all of your Direct Loans under the same repayment plan.

There are two types of repayment plans: traditional repayment plans and income-driven repayment plans. We will ask you to choose a repayment plan before your loans enter repayment. If you do not choose a repayment plan, we will place you on the Standard Repayment Plan, which may require you to make a higher monthly payment than other repayment plans.

If you choose a repayment plan that reduces your monthly payment amount by extending the period of time you have to repay your loans or by basing your payment on your income, you will likely pay more in interest over time than you would pay on another repayment plan.

### TRADITIONAL REPAYMENT PLANS

Under a traditional repayment plan, your required monthly payment amount is based on the loan amount that you owe, the interest rate on your loans, and the length of the repayment period.

### Standard Repayment Plan

Under the Standard Repayment Plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month, and will be more, if necessary, to repay the loan within the required time period.

### Graduated Repayment Plan

Under the Graduated Repayment Plan, you will make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment will be more than three times greater than any other payment.

### Extended Repayment Plan

You are eligible for the Extended Repayment Plan only if (1) you have an outstanding balance on Direct Loans that exceeds $30,000, and (2) you did not have an outstanding balance on a Direct Loan as of October 7, 1998 or on the date you obtained a Direct Loan on or after October 7, 1998.

Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month and may be more, if necessary, to repay the loan within the required time period. If you make graduated payments, your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment under the graduated option will be more than three times greater than any other payment.

### INCOME DRIVEN REPAYMENT PLANS

Under an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan. Changes in your income or family size will result in changes to your monthly payment amount. If you choose an income-driven plan, you must certify your family size and provide documentation of your income (and, if you are married, your spouse's income) each year so that we can recalculate your payment amount.

Your required monthly payment amount under an income-driven repayment plan is generally a percentage of your discretionary income. For all of the income-driven repayment plans except for the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and 150% of the poverty guideline amount for your state of residence and family size, divided by 12. For the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and the poverty guideline amount for your state of residence and family size, divided by 12.

### Revised Pay As You Earn Repayment Plan (REPAYE Plan)

Under the REPAYE Plan, your monthly payment amount is generally 10% of your discretionary income.

If you are married, the income used to determine your REPAYE Plan payment amount will generally be the combined income of you and your spouse, regardless of whether you file a joint or separate federal income tax return. However, your payment amount will be reduced if your spouse also has federal student loans.

Under the REPAYE Plan, any remaining loan amount will be forgiven after you have made the equivalent of either 20 years of qualifying monthly payments (if all of the loans you are repaying under the plan were obtained for undergraduate study) or 25 years of qualifying payments (if any of the loans you are repaying under the plan were obtained for graduate or

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
### Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

professional study). You may have to pay federal income tax on the loan amount that is forgiven.

### Pay As You Earn Repayment Plan (PAYE Plan)

Under the PAYE Plan, your monthly payment amount is generally 10% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your PAYE Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your PAYE Plan payment amount.

To initially qualify for the PAYE Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the PAYE Plan, if your loan is not repaid in full after you have made the equivalent of 20 years of qualifying monthly payments over a period of at least 20 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income-Based Repayment Plan (IBR Plan)

Under the IBR Plan, your monthly payment amount is generally 15% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your IBR Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your IBR Plan payment amount.

To initially qualify for the IBR Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the IBR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income Contingent Repayment Plan (ICR Plan)

Under the ICR Plan, your monthly payment amount will be the lesser of—

- 20% of your discretionary income, or
- A percentage of what you would repay under a Standard Repayment Plan with a 12-year repayment period.

If you are married and file a joint federal income tax return, the income used to determine your ICR Plan payment amount will be the combined adjusted gross income of you and your spouse.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your ICR Plan payment amount.

Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues monthly on your loan unless you request a forbearance.

Under the ICR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Additional repayment information

Under each plan, the number or amount of payments may need to be adjusted to reflect capitalized interest and/or new loans made to you. We may also adjust payment dates on your loans or may grant you a forbearance (see BRR Item 20) to eliminate a past delinquency that remains even though you are making your scheduled monthly payments.

If you can show to our satisfaction that the terms and conditions of the repayment plans described above are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

You can use the Repayment Estimator at StudentAid.gov/Repayment-Estimator to evaluate your eligibility for the PAYE and IBR plans and to estimate your monthly and total payment amounts under all of the repayment plans. The Repayment Estimator is for informational purposes only. We will make the official determination of your eligibility and payment amount.

Generally, you may change from your current repayment plan to any other repayment plan you qualify for at any time after you have begun repaying your loan.

Unless you owe late charges or collection costs, when you make a payment on your loan, we apply the payment first to outstanding interest. If the payment amount is more than the amount of outstanding interest, we apply the remainder of your payment to your loan principal.

If you are required to pay late charges or collection costs, we apply your payment differently depending on your repayment plan. If you are repaying under a traditional repayment plan or the ICR Plan, we apply your payment first to late charges and collection costs, then to outstanding interest, and then to loan principal. If you are repaying under any income-driven repayment plan other than the ICR Plan, we apply your payment first to outstanding interest, then to late charges and collection costs, and then to loan principal.

You can prepay your loans (that is, make loan payments before they are due, or pay more than the amount due in a month) at any time without penalty. We apply any prepayments in accordance with the Act. We can provide more information about how prepayments are applied.

When you have repaid a loan in full, we will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

### 17. DEFAULTING ON YOUR LOAN

Default (failing to repay your loan) is defined in detail in the Terms and Conditions section of your MPN. If you default:

- We will require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration").
- We may sue you, take all or part of your federal and state tax refunds and other federal or state payments as authorized by law, and/or administratively garnish your wages so that your employer is required to send us part of your salary to pay off your loan.
- You will have to pay reasonable collection fees and costs, plus court costs and attorney fees in addition to the amount of your loan.
- You will lose eligibility for other federal student financial aid and for assistance under most federal benefit programs.
- You will lose eligibility for loan deferments, forbearances, and repayment plans.

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- We will report your default to nationwide consumer reporting agencies (see BRR Item **19**). This will harm your credit history and may make it difficult for you to obtain credit cards, home or car loans, or other forms of consumer credit.

If you default on your loan, you will not be charged collection costs if you respond within 60 days to the initial notice of default that we send to you, and you enter into a repayment agreement with us, including a loan rehabilitation agreement, and fulfill that agreement.

**18. CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN**

We may require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration") if you:

- Receive loan money, but do not begin attendance in any classes at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan (see BRR Item 17).

**19. INFORMATION WE REPORT ABOUT YOUR LOAN**

We will report information about your loan to nationwide consumer reporting agencies (commonly known as "credit bureaus") and to the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that we authorize.

If you default on a loan, we will report this to nationwide consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report a default.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response. We respond to objections submitted to consumer reporting agencies using the methods established by those agencies.

**20. DEFERMENT AND FORBEARANCE (POSTPONING PAYMENTS)**

**General**

If you meet certain requirements, you may receive a **deferment** that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a **forbearance**. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment:

- While you are enrolled at least half-time at an eligible school;
- While you are in a full-time course of study in a graduate fellowship program;
- While you are in an approved full-time rehabilitation program for individuals with disabilities;

- While you are unemployed and seeking work (for a maximum of three years);
- While you are experiencing an economic hardship, including serving in the Peace Corps (for a maximum of three years);
- While you are serving on active **d**uty or performing qualifying National Guard duty during a war or other military operation or national emergency and for an additional 180-day period following the demobilization date for your qualifying service;
- For a maximum of 13 months following your active duty service, if you are a current or retired member of the National Guard or reserve component of the U.S. Armed Forces and you are called or ordered to active duty while you are enrolled at least half-time at an eligible school or during your grace period; or
- For Direct Loans that were first disbursed on or after September 28, 2018, or for Direct Loans first disbursed before that date that entered repayment on or before September 28, 2018, while you are receiving treatment for cancer and for an additional 6 months after your treatment has ended.

In most cases, you will automatically receive a deferment based on your enrollment in school on at least a half-time basis based on information that we receive from the school you are attending.

If we process a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active duty military service or National Guard duty, a representative acting on your behalf) must submit a deferment request to us, along with documentation of your eligibility for the deferment.

**Forbearance**

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

You may also receive a forbearance if:

- You are serving in a qualifying medical or dental internship or residency program;
- The total amount you owe each month for all of your federal student loans is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in an AmeriCorps position;
- You are performing service that would qualify you for loan forgiveness under the Teacher Loan Forgiveness program (see BRR Item 21);
- You qualify for partial repayment of your loans under a student loan repayment program administered by the Department of Defense; or
- You are called to active duty in the U.S. Armed Forces.

To request a forbearance, contact us.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation (for example, while we are determining your eligibility for a loan discharge, or during periods when you are affected by a local or national emergency).

**21. DISCHARGE (HAVING YOUR LOAN FORGIVEN)**

**General**

If you meet certain conditions as described below, we may discharge (forgive) some or all of your loans.

For a discharge based on your death, a family member must contact us. To request a loan discharge based on one of the other conditions described

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

## William D. Ford Federal Direct Loan Program
### Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

below (except for a discharge due to bankruptcy), you must complete a loan discharge or forgiveness application and send it to us. We can tell you how to apply.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You cannot have your loan discharged solely because you do not complete the education paid for with your loan, are unable to obtain employment in the field of study for which your school provided training, or are dissatisfied with, or do not receive, the education you paid for with your loan.

**Death, bankruptcy, and total and permanent disability**

We will discharge (forgive) your loan if:

- You die. We must receive acceptable documentation (as defined in the Act) of your death;
- You become totally and permanently disabled; or
- Your loan is discharged in bankruptcy after you have proven to the bankruptcy court that repaying the loan would cause undue hardship.

**School closure, false certification, identity theft, and unpaid refund**

We may also discharge all or a portion of your loan if:

- You could not complete a program of study because your school closed;
- Your loan eligibility was falsely certified by the school;
- A loan in your name was falsely certified as a result of a crime of identity theft; or
- The school did not pay a refund of your loan money that it was required to pay under the Act.

**Teacher Loan Forgiveness**

We may forgive a portion of eligible student loans you received under the Direct Loan Program if you teach full time for five consecutive years in certain low-income elementary or secondary schools, or for certain low-income educational service agencies, and meet certain other qualifications.

Eligible teachers of math, science, or special education may receive up to $17,500 in loan forgiveness. Other teachers may receive up to $5,000 in loan forgiveness.

**Public Service Loan Forgiveness**

A Public Service Loan Forgiveness (PSLF) program is also available. Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007)on those loans under certain repayment plans while you are employed full-time by a qualifying employer. The required 120 payments do not have to be consecutive. Qualifying repayment plans include the REPAYE Plan, the PAYE Plan, the IBR Plan, the ICR Plan, and the Standard Repayment Plan with a 10-year repayment period.

**Note:** Although the Standard Repayment Plan with a 10-year repayment period is a qualifying repayment plan for PSLF, to receive any loan forgiveness under this program you must enter the REPAYE Plan, the PAYE Plan, the IBR Plan, or the ICR Plan, and make the majority of the 120 payments under one of those plans.

**Borrower defense to repayment**

We may discharge all or a portion of your loan if your school did something or failed to do something related to your loan or to the educational services that the loan was intended to pay for.

The specific requirements to qualify for a borrower defense to repayment discharge vary depending on when you received your loan. Contact us for more information.

**22. LOAN CONSOLIDATION**

A Direct Consolidation Loan Program is available that allows you to combine one or more of your eligible federal education loans into a new loan with a single monthly payment, and may allow you to extend the period of time that you have to repay your loans. This may make it easier for you to repay your loans.

If you have loans that were made under the FFEL Program, consolidating those loans into the Direct Loan Program can make them eligible for benefits that are only available for Direct Loans, such as Public Service Loan Forgiveness and certain repayment plans.

Although consolidation can provide certain benefits, it can also cause you to lose benefits on the loans that you consolidate. Contact us for more information about loan consolidation and for help determining whether consolidation is a good option for you.

**END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT**

OMB No. 1845-0007
Form Approved
Exp. Date XX/XX/XXXX

# INSTRUCTIONS
## MASTER PROMISSORY NOTE FOR DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS

### GENERAL INSTRUCTIONS AND INFORMATION

Type or print using blue or black ink. Do not use pencil. Enter all dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: January 31, 2017 = 01-31-2017.

Throughout the Master Promissory Note (MPN) and the accompanying Borrower's Rights and Responsibilities Statement, the words "we," "us," "our," and "ED" refer to the U.S. Department of Education and our servicers.

### BORROWER INFORMATION

Note: Some of the items in this section may have been completed for you. If so, review these items carefully to make sure that the information is correct. Cross out any information that is incorrect and enter the correct information. Put your initials next to any information that you change.

**Item 1.** Enter your first name, then your middle initial and last name. Enter your permanent address (number, street, apartment number, or rural route number and box number, then city, state, zip code). If your mailing address is different from your permanent address, you must list both addresses. A temporary school address is not acceptable.

**Item 2.** Enter your nine-digit Social Security Number.

**Item 3.** Enter your date of birth.

**Item 4.** Enter the two-letter abbreviation for the state that issued your current driver's license, followed by your driver's license number. If you do not have a driver's license, enter N/A.

**Item 5.** Enter your preferred email address for receiving communications. You are not required to provide this information. If you do, we may use your email address to communicate with you. If you do not have an email address or do not wish to provide one, enter N/A.

**Item 6.** Enter the area code and telephone number at which you can most easily be reached. If you do not have a telephone, enter N/A.

### REFERENCE INFORMATION

**Items 7 and 8.** Enter the requested information for two adults with different U.S. addresses who have known you for at least three years and who will know how to contact you in the future. The first reference should be a parent or legal guardian. References who live outside the United States are not acceptable. Providing an email address for a reference is optional. If you provide an email address for a reference, we may use it to communicate with the reference. If a reference does not have a telephone number or email address, or does not wish to provide an email address, enter N/A.

### SCHOOL INFORMATION

This section will be completed by the school that determines your eligibility to receive the loan.

### BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDING5

**Top of Page 2.** Enter your name and Social Security Number.

**Items 12, 13, 14,** and **15.** Read these items carefully.

### PROMISE TO PAY

**Items 16, 17, 18,** and **19.** Read these items carefully.

**Items 20 and 21.** Sign your full legal name, in blue or black ink, and enter the date you signed this MPN.

By signing this MPN, you **(1)** acknowledge that you have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings and the accompanying Borrower's Rights and Responsibilities Statement; and **(2)** agree to repay in full all loans made under this MPN according to the terms and conditions of the MPN.

# EXHIBIT 22

# FAR PART 8 Sole (Limited) Sources Justification

1. Department of Education (DoED), Federal Student Aid (FSA) Acquisitions.

2. Under its GSA 736 (TAPS) schedule number GS-07F-0539N, FSA is awarding Midtown Personnel, Inc. (Midtown), a woman owned small business (WOSB), logical and natural follow-on task order (TO) number EDFSA17O0018, in the amount of $164,700.00.  Under this TO, current Midtown named key personnel resources (NKPRs) will continue delivering, from 28 August 2017 through 26 January 2018, high quality borrower claim processing support services (BCPSS).  The TO includes an option, with a maximum value of $176,839.68 that FSA may exercise, during 28 August 2017 through 26 January 2018, to acquire added resources in response to BCPSS surge needs. Accordingly, the estimated value of this action is $341,539.68.

3. For the reasons of economy and efficiency, this action makes sense; is a wise use of government resources; and is advantageous to and in the best interests of the government.  The action will enable FSA to continue to progressively eliminate, with zero services gap, the existing large backlog of claims from borrowers requesting relief from student loan debts and facilitate BCPSS quality improvements and added reductions in the cost of processing each claim.

4. This action is based on use of authority contained FAR Part 8.405-6 (a)(1)(I)(A) and (C). Previously, FSA competitively awarded Midtown TO number EDFSA16O0016 for similar BCPSS work, which routinely exceeding expectations, Midtown continues to performed well.

5. Though tens of thousands of claims have already been processed, a claims backlog still exists, largely due to a combination of DoED outreach efforts and growing public awareness about the loan relief program, which is causing a continuous flow of new claims.  Also, policy changes may necessitate certain claims already processed be revisited to assess other attributes.

6. For a new BCPSS resource to be able to independently and effectively perform BCPSS, for an extended timeframe, that resource must become engaged in hands-on claim processing under the close guidance of another individual who is very knowledgeable about BCPSS activities.  Due staffing shortfalls, the FSA borrower defense unit currently lacks sufficient staff to support this development activity.  Also, for privacy reasons, designated DoED systems must be used in performing BCPSS and obtaining this access typically entails a long lead time of several weeks.

7. Having effectively provided BCPSS for about 10-months and helped setup claim processing procedures in current use, continuing to use the existing Midtown NKPRs minimizes operational and service gap risks. Highly proficient at performing BCPSS, the NKPRs being continued are readily available; in terms of turnover, they have been very stable; they have proven themselves to be able to quickly adapt to change; they operate with an improvement oriented mindset; and they already possess all needed access. Also, with minimal government involvement, in the event of surge BCPSS needs, these NKPRs are fully capable of developing any new BCPSS resources that might be optionally added.

8. The price of this action represents a significant reduction to pricing listed in the Midtown GSA TAPS schedule and it is equivalent to the competitively awarded pricing contained in the predecessor Midtown TO, number EDFSA16O0016. Therefore, the undersigned has determined the TO price is not only fair and reasonable but it includes added value given extra capabilities the existing Midtown NKPRs provide, e.g., being best position to further lower the cost of processing a claim.

## FAR PART 8 Sole (Limited) Sources Justification

9. Though DoED claim processing policies are evolving, it is anticipated that over the next few months (basis of TO performance period being used) this situation will stabilize.  When that occurs, the resulting updated polices will be blended with BCPSS lessons learned thus far, and that information used to develop good requirements that can be used to execute a longer term BCPSS acquisition strategy.

*To the best of the undersigned knowledge and belief, the above content is accurate and complete.*

_____
Contracting Officer & Date

*The undersigned attests that the above BCPSS program office content is accurate and complete.*

___On File_____    _____
Program Manager                        Date