# EXHIBIT 23



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 4, 2014

Elizabeth Warren
United States Senate
Washington, DC  20510

Dear Senator Warren:

Thank you for your letter of June 25, 2014, concerning Corinthian Colleges, Inc. (Corinthian). The U.S. Department of Education (Department) is doing everything it can to protect students as a result of the sale or closure of Corinthian's institutions of higher education, including seeking to avoid or minimize the disruption to students' lives and educational aspirations that you note could otherwise result from their abrupt closure.  At the same time, we are continuing to perform our important oversight work of Corinthian and will hold the company accountable for compliance with the requirements of the Higher Education Act of 1965, as amended (HEA) and our regulations.

I am pleased to report that on July 9, 2014, the Department reached an agreement with Corinthian on a process to govern the eventual closure and sale of its institutions.  The Operating Agreement covers certain issues that are directly responsive to some of the issues you raised in your letter, and I appreciate the opportunity to provide further detail.  However, please note that the recent events unfolded at an accelerated pace; that the scope of potential institutional closures and sales associated with a single corporate entity is unprecedented; and that circumstances remain quite fluid and will continue to evolve.  As a result, we will continue to review our plans and processes going forward to ensure that we are continuing to do all we can to protect both students' and taxpayers' interests as Corinthian's participation in the Federal Student Aid programs ends.

The agreement reached with Corinthian includes features that your letter urged the Department to consider.  For example, Corinthian will cease to enroll new students in certain circumstances described below, and will make disclosures to affected students concerning their options and the status of their respective institutions.  In particular, and with respect to your specific questions:

- As of July 9, 2014, Corinthian has identified those institutions it plans to sell, as well as those institutions it plans to close *after* providing students who are already enrolled with time to complete their educational programs ("teach-out" institutions).  Corinthian is required, under the Operating Agreement, to cease enrollment of new students at teach-out institutions.  In some cases, Corinthian may work with another institution so that an enrolled student would complete his/her educational program at such other institution.

- Under the Operating Agreement, certain students in a teach-out school may have options that vary depending on their date of enrollment.

Page 2

    o   Students who enrolled prior to June 23, 2014–the date the Department placed Corinthian on heightened financial oversight–will be able to either (1) continue and complete their educational program or (2) withdraw and obtain a full refund of all tuition and other fees paid for their program. Under the agreement, Corinthian will determine whether to provide these students the option of a full refund of tuition and charges paid or the ability to complete their education as originally intended. Students who complete their education under this option would not be eligible for a closed school loan discharge. Students who qualify for a Corinthian refund will have the refund applied to their Federal loan balances, and may qualify for a closed school loan discharge of the remaining amount owed, if any. Students will have an opportunity to appeal Corinthian's decision regarding the option they may pursue.

    o   Students who enrolled on or after June 23, 2014, and before July 8, 2014, have the option to choose to (1) continue and complete their educational program or (2) withdraw and obtain a full refund of all tuition and other fees paid for their program. Under the Operating Agreement, Corinthian must provide these students the ability to choose whichever option benefits them the most. Further, under the agreement, students who fail to make a choice will be withdrawn from their program and provided a full refund. Students who complete their education would not qualify for a closed school loan discharge of their Federal loans. Students who qualify for a Corinthian refund will have the refund applied to their Federal loan balances, and may qualify for a closed school discharge of the remaining amount owed, if any.

- Under the Operating Agreement, Corinthian is also required to disclose to students enrolled at those institutions it plans to sell information regarding the status of the institutions and the options and protections afforded to those students. In addition to specific disclosures drafted for use for students at teach-out institutions discussed above, the Department has drafted disclosures for Corinthian to provide to prospective students enrolling in institutions identified as being for sale. The disclosures inform prospective students that certain Federal and State authorities are investigating the institution and that these investigations could result in future enforcement actions that might negatively affect students' ability to complete their educational programs. The disclosure further informs prospective students that if a school is sold, any new owner might make changes to their educational program, and that it is possible that any credits they earn at a Corinthian institution may not transfer to another school. Further, the Operating Agreement requires Corinthian to obtain signed acknowledgments from new students that they have received the disclosure prior to enrollment to ensure, to the best of the Department's ability, that students are fully aware of the pending sale of the school and what that could mean for their studies.

Please note that the Operating Agreement contemplates that the status of any particular Corinthian institution could change as a result of the Department's ongoing review of Corinthian's compliance with statutory and regulatory requirements. In January, the Department

Page 3

denied Corinthian's request for approval to add certain new locations and programs at selected institutions because it had admitted to falsifying placement rates and/or grade and attendance records at various institutions and because of ongoing State and Federal investigations into serious allegations with respect to Corinthian's administration of the Federal Student Aid programs. Because these issues suggested systemic deficiencies in the operations of Corinthian as a parent corporation of its individual institutions, the Department instructed the company to provide certain required documentation and information with respect to placement rate percentages, and grade and attendance record changes at all Corinthian institutions. Corinthian's failure to substantially comply with our request is what led the Department to place it on a heightened level of Departmental financial oversight and precipitated the establishment of the Operating Agreement.

Under the Operating Agreement, if the Department finds, based on its reviews, that certain Corinthian institutions are ineligible for recertification to participate in Federal Student Aid programs, or are otherwise determined to be ineligible to participate, Corinthian is required to provide students their choice of whether to (1) continue and complete their educational program in accordance with regulations that govern school closures, as in the case that institutions are found to be ineligible, or (2) withdraw from school and receive a full refund of all tuition and other fees paid for their program. In addition, in these circumstances, students may be eligible for closed school loan discharges of any Federal student loans they took out for attendance at the formerly eligible institution. The conditions and qualifications pertaining to closed school discharges are different from those for the refund Corinthian is obligated to provide under the Operating Agreement; an affected student borrower may qualify for both, either, or neither.

You also asked how the Department will seek to ensure relief for Corinthian students with private student loan debt. In the Operating Agreement, we require Corinthian to include private student loans within the refunds that the company provides to students. In particular, we defined refunds in such cases to include repaying any private student loan or debt to any other lender from whom Corinthian received direct disbursements for such student's cost of attendance at Corinthian the amount of such disbursements, including reimbursing the student for any origination and other fees incurred by the student in obtaining a private student loan. Absent this explicit provision in the Operating Agreement, the HEA does not otherwise authorize the Department to seek such relief, and closed school loan discharges pertain only to Federal, not private, student loans. As to other relief that may be available for students who have obtained private loans, the terms of the loan agreement may permit the borrower to assert, as defenses to repayment, claims that the borrower has against the school. Borrowers should review their private loan agreements to determine whether they include a provision allowing such defenses.

The Operating Agreement makes no distinction between students enrolled in online-only programs and students who enroll in programs that require physical attendance.

In addition, you ask how the Department plans to ensure that students are properly notified of their options in cases of school closures and sales, and the consequences for students in cases of program changes by a new owner of a school consequent to a sale. A number of the disclosure requirements within the Operating Agreement are outlined above, and the Department is currently developing a more detailed plan to ensure it is prepared for both an entirely orderly

Page 4

closure and transition of all Corinthian's institutions, as well as a precipitous closure of all of its institutions, should either occur.

School closures and sales are not uncommon. However, the simultaneous closure and sale of as many institutions as comprise Corinthian, and that affect as large a student population, is without precedent. The Department is building upon and modifying existing plans for school closures and sales to bring them into line with the scale of Corinthian's operations. These plans include how the Department will coordinate with accrediting agencies and State authorizing agencies that, under the HEA, have principal roles and authorities in these cases. For example, the potential consequences and options for students as the result of any particular change in ownership will depend on, among other things, the interest and willingness of a buyer to accept and comply with any particular condition, the particular requirements or conditions that an accrediting agency may impose, and the conditions a State may require, given that the HEA does not generally preempt State law or override States' responsibilities for authorizing institutions that operate within their borders. As a result, the features and conditions of any particular sale, and the consequences and options for students, could vary on a case-by-case basis. In the end, however, the Department's concerns and interests are the concerns and interests of students and taxpayers, and the Department will strive to ensure their welfare in the subsequent closure and sale of Corinthian's institutions. To be clear, the Department will not approve a sale to another entity if that entity is currently under State and/or Federal investigation or is unable to meet the qualifications established under the HEA to qualify for Federal Student Aid.

With respect to your question about borrowers' right to present claims to the Department, the Department recognizes as a defense to repayment of Direct Loans a claim that the borrower has against the school that is based on the making of the loan or the provision of educational services, if State law recognizes such a claim and if the borrower proves the elements required to establish the claim.

A borrower or class of borrowers who obtain a judgment against a school upholding a claim can more readily establish that claim as a defense to repayment, but the borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department.

Finally, as part of the Operating Agreement, the Department required that an independent monitor would be appointed to oversee Corinthian's actions. I am pleased to report that Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, under the leadership of former U.S. Attorney Patrick Fitzgerald, has been selected to take on this monitoring role. The Department is confident that Mr. Fitzgerald and his team will strengthen our efforts to oversee this process.

I appreciate your recommendations to the Department as we move forward in addressing issues arising from matters related to Corinthian's decision to wind down and cease operations. We continue to analyze how we can best protect students and taxpayers, and in so doing, will

Page 5

continue to actively consider your recommendations.  If you have additional questions, please have your staff contact Lloyd Horwich, Acting Assistant Secretary, Office of Legislation and Congressional Affairs, at (202) 401-0020.

Sincerely,

Arne Duncan

# EXHIBIT 24



DATE:        JUN 0 4 2015

TO:          Sharon Mar
             Office of Information and Regulatory Affairs
             Office of Management and Budget

THROUGH:     Kathy Axt
             Privacy, Information Collection Clearance Division
             U.S. Department of Education

FROM:        James W. Runcie
             Chief Operating Officer, Federal Student Aid

SUBJECT:     Emergency Clearance of Information Collection to Allow for Receipt of Borrower
             Defense to Repayment Loan Discharge Claims

*Background on Borrower Defense to Repayment Loan Discharge Regulations*

Following a negotiated rulemaking process, the U.S. Department of Education (the
"Department") published amendments to the Federal Direct Loan Program (Direct Loan)
regulations on December 1, 1994. These regulations included borrower defenses specified in 34
CFR 685.206(c). The regulation, in part, states "(1) [i]n any proceeding to collect on a Direct
Loan, the borrower may assert as a defense against repayment, an act or omission of the school
attended by the student that would give rise to a cause of action against the school under
applicable State law."

A subsequent negotiated rulemaking process was established for the purpose of developing
regulations for borrower defenses for both the Direct Loan and the Federal Family Education
Loan Program (FFEL) programs. However, during the first session of the negotiations, the non-
Federal negotiators recommended to the Department that no additional sessions were warranted
and that no further regulatory provisions for borrower defenses would be needed. It was
determined that borrower defenses could be adequately addressed by current regulation and
administrative procedures. A further discussion of this is in the Federal Register, Vol. 60, No,
140, July 21, 1995, 37767-37770.

Prior to 2015, the borrower defense identified above was rarely asserted by any borrowers and no
specific methods of collecting information regarding borrower defense claims have been defined
or found necessary.



830 First St. N.E., Washington, DC 20202

*Borrower Defense Claims from Corinthian Colleges, Inc. Borrowers*

Corinthian Colleges, Inc. (CCI) was the owner of a number of for-profit postsecondary education institutions across the country.  In January 2010, CCI purchased Heald College, which had 14 locations in California, Oregon, and Hawaii.  At the time of its purchase by CCI, Heald College participated in the federal student financial assistance programs authorized under Title IV of the Higher Education Act of 1965 (HEA), as amended.  CCI was also the owner of other title IV eligible institutions, including the Everest and Wyotech chains of schools.

In January 2014, the Department sent a letter to CCI in which the Department requested that CCI provide a copy of school performance disclosure documents for every CCI location, including Heald College institutions, for the calendar years 2010, 2011, 2012, and, when available, 2013.  The Department also asked that CCI provide the evidence upon which CCI relied to derive each of the placement rates cited in the disclosures, including a list of all students either placed or omitted from the placement calculation due to any type of waiver, and the academic, employment, and/or waiver information specified by the Department.

In June 2014 the Department placed CCI on an increased level of financial oversight after the company failed to address concerns about its practices, including concerns that it was falsifying job placement data used in marketing claims to prospective students and allegations of altered grades and attendance.  CCI subsequently agreed to <u>gradually wind down activity</u> as part of an <u>operating agreement with the Department.</u>  As a part of this, CCI sold 56 Everest and Wyotech campuses to the ECMC Group in November 2014.  Over 70,000 students were enrolled in the programs that were transferred to ECMC.

In April 2015, the Department issued a notice of intent to fine Heald College $30 million upon finding that Heald misrepresented placement rates for a number of its programs going back to 2010.  Upon the issuance of the Department's fine letter, CCI announced it would close its remaining programs immediately, including all its Heald locations and several Everest and Wyotech locations that were not part of the sale to the ECMC group.  Almost 16,000 students were enrolled in these programs.

Over the past several months, as the events related to CCI have unfolded, former CCI students, supported by various organizations and non-profits, have organized a campaign to assert that the Department should discharge their student loan debt pursuant to the borrower defense regulations.  Over 1,000 students have already submitted borrower defense claims to the Department.  Several prominent Congressional offices have also voiced their support for this position.  Many media outlets have also written about the CCI closure and the Department's findings of misrepresentation.  While coverage has been mixed, most stories imply that the Department has not taken sufficient action to protect CCI students.  Overall, pressure is mounting for the Department to act.

In the 20 years prior, the Department received 5 claims for borrower defense.  Over the last several months, the Department has received over 1,000 such claims due to a building debt activism movement as well as the notoriety of Corinthian's collapse, creating a need for a clearer

process for potential claimants. This exponential increase in demand was unexpected and outside of the Department's control.

Given that borrowers have a right to assert a defense to repayment claim and that the Department has made findings against a number of CCI's former programs, we expect thousands of more claims to be submitted as several advocacy groups are working to organize CCI borrowers. Many of these borrowers are struggling or behind on their loan payments or in default. Because borrowers have a right to submit defense to repayment claims, the Department must set up a process to review and adjudicate them.

To respond to these events and protect harmed borrowers, which the Department has a legal responsibility to timely provide, the Department seeks to announce on June 8, 2015 that:

- Student borrowers who attended the Heald College programs that the Department has found made false representations will have their loans discharged if they complete the attached attestation. These borrowers need not prove that Heald College's actions violated State law as the Department's findings show a State law violation. The Department estimates that there are potentially 50,000 borrowers in this category.

- A process will be set up to review and adjudicate borrower defense claims from other borrowers, including other CCI borrowers. Although we will advise that borrowers hold their submissions until this process is made public, we cannot bar the submission of claims. Thus, the Department will post on its website the attached language directing those borrowers who choose not to wait to send their claims to the address provided and a short list of information they should include. The Department estimates that there are potentially 100,000 borrowers who may exercise this defense. It is important to note that borrowers from other schools could also submit borrower defense claims if they believe that their school has engaged in a State law violation related to their education that has harmed them.

- All former CCI borrowers who have filed, or plan to file, an application for borrower defense will have the opportunity to enter forbearance while they submit their applications and the Department reviews their claim.

The Department requests that OMB approve the attached Attestation and website language by June 4, 2015 and waive the requirement under §1320.5(a)(1)(iv) to publish notice of the Attestation in the Federal Register, as authorized under §1320.13(d). The Department anticipates announcing guidance on the borrower defense process on June 8, 2015. The closure of the Corinthian schools was unexpected and outside of the Department's control. To preserve borrowers' rights and meet its fiduciary responsibilities of the Direct Loan program, the Department is requesting an emergency approval for an information collection that will allow the Department to collect the information in the attestation for Heald College borrowers and the information needed for borrower defense claims from other borrowers. If the Department is unable to collect this information, borrowers will not be able to immediately take advantage of the relief being announced. This will raise questions from borrowers and our call centers risk becoming overwhelmed to the point of breaking. Without the attached Attestation, many

borrowers may submit incomplete or improperly prepared claims.  All of this confusion may undermine our efforts to provide relief to harmed borrowers and result in a belief that there is no effective recourse available.

We believe that the facts described here meet the standards for emergency clearance in §1320.13(a)(2)(i) and (iii)  because the inability to provide for public comment and notice regarding the Attestation would, if normal clearance procedures are followed, cause public harm to the borrowers who were enrolled in Heald Colleges.  In addition, the use of normal clearance procedures would disrupt the Department's ability to protect the borrowers affected by closure of the Heald colleges and cause grievous harm to the integrity of the Federal Direct Loan program.

Thank you for your prompt consideration of this request.  If you have additional questions, please contact Colleen McGinnis at Colleen.McGinnis@ed.gov or (202)377-4330.

# EXHIBIT 25



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE UNDER SECRETARY

August 17, 2017

Honorable Elizabeth Warren
United States Senate
Washington, DC 20510

Dear Senator Warren:

Thank you for your letter expressing your concerns about the Department of Education's (Department's) delay of the effective date for selected provisions of the final regulations published in the Federal Register on November 1, 2016 (81 Fed. Reg. 75926), commonly known as the Borrower Defense (BD) regulations. Your letter has been referred to my office, and I am pleased to respond. An identical response has been forwarded to each of your cosigners.

On June 16, 2017, the Department published a final rule under section 705 of the Administrative Procedure Act (APA), 5 U.S.C. § 705, 82 Fed. Reg. 27621 (the delay notice). As described in the delay notice, due to pending litigation[1] challenging the BD regulations, the Department is postponing the effective date of the BD regulations until the completion of the judicial review of the regulations. Under section 705 of the APA, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." In light of the pending litigation, and for the reasons described in the delay notice, the Department concluded that justice requires it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved.

The postponement will preserve the regulatory status quo while the litigation is ongoing. In addition to the delay notice, the Department also published on June 16, 2017, a notice of intent to establish negotiated rulemaking committees under Section 492 of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. § 1098a, 82 Fed. Reg. 27640. In the negotiated rulemaking notice, the Department announced its intention to establish two negotiated rulemaking committees. One of the committees is intended to develop proposed regulations to revise the final borrower defense regulations.

The Department conducted public hearings on the forthcoming BD negotiated rulemaking on July 10, 2017, in Washington, D.C., and July 12, 2017, in Dallas, Texas, and accepted written comments. We will listen closely to the concerns of the community, including veterans organizations. Public input is critical in determining how best to protect borrowers and taxpayers.

---

[1] *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* No. 1:17–cv–00999 (D.D.C. May 24, 2017).

Even though the Department has delayed the regulations, borrowers continue to have the right to submit a BD claim with the Department under our long-standing, current regulations, and we will continue to evaluate whether a borrower's claim gives rise to a cause of action consistent with the current, State law-based standard.

It is our responsibility to ensure that the Department's regulations not only provide protection for students, but are also fair for schools and fiscally responsible. The Department will convene a negotiated rulemaking committee to consider revisions to the regulations with the goals of protecting students from predatory practices and providing clear, fair, and balanced rules for colleges and universities to follow, while also protecting the fiscal interests of the Federal government.

I hope you find this information helpful. If you have further questions, please contact the Office of Legislation and Congressional Affairs at 202-401-0020.

Sincerely,

James F. Manning
Acting Under Secretary

# EXHIBIT 26



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

THE INSPECTOR GENERAL

June 6, 2018


The Honorable Richard Durbin
United States Senate
711 Hart Senate Office Building
Washington, DC 20510


Dear Senator Durbin:

Thank you for your letter of May 23, 2018, requesting information from the U.S. Department of Education Office of Inspector General on our December 2017 report titled, "Federal Student Aid's Borrower Defense to Repayment Discharge Process." Attached you will find our responses to your questions.

If you have any additional questions or need more information, please do not hesitate to contact me directly at (202) 245-600, or have a member of your staff contact our Congressional Liaison, Catherine Grant, at (202) 245-7023.


Sincerely,

Kathleen. S. Tighe
Inspector General



Attachment
cc: The Honorable Betsy DeVos, Secretary, U.S. Department of Education

**U.S. Department of Education Office of Inspector General**
**Response to Senator Richard Durbin Regarding OIG Report Titled,**
**"Federal Student Aid's Borrower Defense to Repayment Discharge Process"**
**June 6, 2018**

1. What additional outcome data for the processing of borrower defense claims did
   Federal Student Aid (FSA) provide to your office on October 26, 2017, as noted in
   footnote 5?

   *The footnote refers to an updated "Review Ready Spreadsheet" that FSA provided to us
   on October 26, 2017. The Spreadsheet specified the general status of each claim as
   approved, pending, or ready for review as of October 10, 2017.*

2. The report indicates that FSA's Borrower Defense Unit (BDU) reduced contractor staffing
   by more than two-thirds from November 2016 to September 2017. Did FSA provide a
   rationale for this decrease in staff, even as the number of claims mounted?

   *FSA's BDU did not provide a specific rationale for the decrease in staff.*

3. With regard to the category of borrower defense claims related to ITT Tech guaranteed
   employment misrepresentation noted on page 10, did FSA maintain legal memoranda or
   other documentation for these findings that indicate to how many potential borrowers
   and states such claims would apply?

   *FSA's BDU maintained one legal memorandum related to misrepresentations of ITT
   guaranteed employment. The memorandum applied to only the California locations, but
   did not indicate the number of potential borrowers. FSA's BDU did not provide
   documentation for ITT guaranteed employment misrepresentation claims that indicated
   the number of potential borrowers or the states where they were located.*

4. According to your analysis of unique claims that did not fall within one of BDU's seven
   established categories, "[a]s of January 20, 2017, BDU had identified additional
   categories of claims warranting further research." According to FSA, how many
   additional categories of claims had BDU identified?

   *FSA's BDU stated that with respect to Corinthian schools, it had started research and
   analysis for five additional categories. With respect to schools other than Corinthian, FSA
   was in the processes of gathering and reviewing evidence.*

5. The report notes on page 16 that the further research into additional categories of claims was "placed on hold." According to FSA, who initiated the halt to this research?

   *FSA's BDU stated that in early 2017 the Enforcement Unit was instructed not to continue developing new memoranda on additional categories of claims at the direction of the Acting Under Secretary and the Review Panel.*

6. What explanation was provided by FSA in its decision to halt the BDU research into additional categories of claims, if any?

   *FSA's BDU stated that it had been instructed not to continue developing memoranda on whether additional categories of claims qualify for discharge because the borrower defense policies were being reviewed with the change in administration.*

7. On November 14, 2017 at the opening session of the current borrower defense rulemaking, then Acting Under Secretary Jim Manning stated: "The Department is also working to adjudicate pending claims related to other schools and we are making progress on that front. However, I will admit that we're not as close as we are with the Corinthian claims…Once Corinthians adjudications begin our work on other claims will gather momentum." Based on OIG's assessment that additional research into claims was placed on hold, was Mr. Manning's statement of November 14 accurate?

   *We do not know which "other schools" Mr. Manning was referring to in his statement. We did not analyze data outside of our review's scope of June 2016 through July 2017.*

8. On page 21, the report notes that as of September 2017, FSA was testing a claims management tool. Did FSA indicate when development of this tool commenced and when it is expected to be operational?

   *FSA's BDU did not provide definitive information on when the development of the claims management tool commenced or when it is expected to be fully operational. The tool was in development when we began our review.*

9. Does the development of the claims management tool indicate to OIG that FSA was responsive to the need to further refine BDU processes for handling claims?

   *Per our response above, the claims management tool was in development during the time period of our review, so we did not analyze it. But, with that said, the development of the tool would appear to reflect a recognition by FSA that it needed a better capacity to manage claims.*

10. Which political appointees from the Obama Administration that were involved in writing, or received, the legal memorandums referenced in the report did you interview, respectively?

*We did not interview political appointees from the previous administration because it was not necessary to achieve the objectives of our review. The objectives were to (1) determine FSA's policies and procedures over its Federal student loan borrower defense loan discharge process, (2) determine the documentation FSA maintains to support its borrower defense loan discharge decisions, and (3) determine the outcomes of FSA's borrower defense loan discharge proceedings. The objectives of our review did not include reviewing the development of the legal memoranda or the decisions made in the memoranda.*

11. The current appointees of this Administration have repeatedly framed its borrower defense policies in reference to supposed shortcomings of the prior Administration. For example, again on November 14, 2017, at the opening session of the borrower defense rulemaking, then Acting Under Secretary Jim Manning stated "the Secretary also remains focused on working through pending claims. Unfortunately, she inherited a difficult situation, one where there was inadequate infrastructure in place to properly adjudicate claims." Did OIG consider the intent of Secretary DeVos' request for this review when deciding on the scope and objectives for the review?

*No. In keeping with our mission, we independently established the review's objectives and scope, and we conducted the review in accordance with the Quality Standards for Inspection and Evaluation issued by the Council of the Inspectors General on Integrity and Efficiency. These standards require us to exercise reasonable care and diligence and to observe the principles of serving the public interest and maintaining the highest degree of integrity, objectivity, and independence in applying professional judgment to all aspects of our work.*

# EXHIBIT 27



October 2, 2018



Hearing Decision
Federal Family Education Loans
Debt No.:

Account No.:

Dear ▮

This is in response to your recent request for a hearing on your objection to offset your federal and/or state tax refunds and other payments for a debt held by the U.S. Department of Education, Federal Student Aid. This decision was rendered after a review of the written records you submitted. An oral hearing was not conducted because you did not provide sufficient information or explain why your objection cannot be resolved through a review of documentary evidence.

<u>Your objection(s) to offset:</u>

- You believe this debt is not an enforceable debt.

- You object to offset on the grounds that the school you attended violated a state law related to your loans.

<u>Evidence considered:</u>

We reviewed the documents you provided and information in the Department's electronic records regarding your account.

Borrowers may be eligible for discharge of student loans received to attend a school if that school committed fraud by doing something or failing to do something, or otherwise violated applicable state law related to the loans or the educational services paid for by the student. This type of loan discharge is called "borrower defense to repayment."

We received your supporting documentation for borrower defense to repayment discharge and on August 28, 2018, forwarded it to the Department's Borrower Defense Unit for review. The



Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

Page 2 – ████████████████

Department processes applications in the order in which they are received. The Department will notify the Department's Default Resolution Group if your account should be placed in forbearance while a determination is made regarding your eligibility for discharge. The Borrower Defense Unit will contact you as soon as a decision has been made. We appreciate your patience during this review period.

For further information regarding the status of your loan discharge request, you should visit borrowerdischarge.ed.gov.

If your discharge request is approved, you may receive a full or partial loan discharge. If we determine that you overpaid the loan, we will refund any overpayments, including amounts collected by offset of federal and/or state tax refunds and other payments or wage garnishment. However, if you receive a partial discharge, you may not receive a refund of all the funds collected. If you receive a partial discharge and a balance remains due, we will notify you of the amount that you owe.

Decision:

Our records indicate that a letter was sent to your address on July 25, 2013, stating that the Department intended to request the offset of your federal and/or state tax refunds and other payments, and that you must request any review of your objections within 65 days of the date of the letter. When the Department did not receive any such request within 65 days, the Department referred this debt to the U.S. Department of the Treasury for offset against your federal and/or state tax refunds and other payments.

Consequences of the decision and further rights:

The amount needed to satisfy the outstanding balance on this account is $6,616.48, as of September 27, 2018. This balance includes $6,612.97 in unpaid principal and $3.51 in accrued interest. In addition, Account Control Technology, Inc. has a contract with the Department and is entitled by its contract to a commission on any payments made on this account while the account is placed with the agency for collection. By virtue of Section 484A(b) of the Higher Education Act of 1965, as amended, 20 USC 1091a(b)(1), and the terms of the borrower's promissory note, the borrower is liable for collection costs, which are projected to total $1,610.46. The amount needed to satisfy the obligation in full, therefore, is $8,226.94.

Because the Department finds your student aid obligation past due and legally enforceable, the Department has referred this debt to the U.S. Department of the Treasury for offset. Call our collection representative at the following number to establish satisfactory repayment arrangements.

Page 3 – ████████████

Send payments to:

> U.S. Department of Education
> National Payment Center
> P.O. Box 105028
> Atlanta, GA  30348-5028

You should include your name and account number on the front of all payment instruments.

In order to establish a repayment agreement, you should contact Account Control Technology, Inc. at 1-866-887-2800.

If you disagree with this decision, and your federal and/or state tax refund or other payment is offset, you may have this decision reviewed by bringing a lawsuit in federal district court.

For more information, visit our Web site at myeddebt.ed.gov.

This action is taken to collect a loan or grant obligation held by the Department. It is totally separate from any notice of proposed offset from a guaranty agency. You must contact that agency if you object to collection of a loan held by a guaranty agency.

                              Sincerely,

                              Hearing Official
                              Borrower Services

# EXHIBIT 28



February 8, 2019



Hearing Decision
Federal Family Education Loan
Federal Direct Student Loans
Debt No.:

Account No.:

Dear

This is in response to your recent request for a hearing on your objection to offset your federal
and/or state tax refunds and other payments for a debt held by the U.S. Department of Education,
Federal Student Aid. This decision was rendered after a review of the written records you
submitted. An oral hearing was not conducted because you did not provide sufficient information
or explain why your objection cannot be resolved through a review of documentary evidence.

Your objection(s) to offset:

- You object to offset on the grounds that the school you attended violated a state law
  related to your loan(s).

Evidence considered:

We reviewed the documents you provided and information in the Department's electronic
records regarding your account.



Page 2 – ████████████

We have received your application for borrower defense to repayment discharge. Your discharge request has been forwarded to the Department's Borrower Defense Unit for review. The Department processes applications in the order in which they are received. We may place your account in forbearance while we determine whether it is eligible for discharge. We will contact you as soon as a decision has been made. We appreciate your patience during this review period.

Decision:

The Department finds your debt is legally enforceable and will request the U.S. Department of the Treasury to offset your federal and/or state tax refunds and other payments.

Consequences of the decision and further rights:

The amount needed to satisfy the outstanding balance on this account is $14,160.31, as of January 25, 2019. This balance includes $13,167.39 in unpaid principal and $992.92 in accrued interest. In addition, National Recoveries, Inc. has a contract with the Department and is entitled by its contract to a commission on any payments made on this account while the account is placed with the agency for collection. By virtue of Section 484A(b) of the Higher Education Act of 1965, as amended, 20 USC 1091a(b)(1), and the terms of the borrower's promissory note, the borrower is liable for collection costs, which are projected to total $2,537.52. The amount needed to satisfy the obligation in full, therefore, is $16,697.83.

Because the Department finds your student aid obligation past due and legally enforceable, the Department will refer this debt to the U.S. Department of the Treasury for offset. However, you still have the option to avoid offset of your federal and/or state tax refunds and other payments by sending payment in the amount of $16,697.83 to the address below or by entering into a repayment agreement satisfactory to the Department, making an initial payment within seven days of the date of this letter, and continuing to make timely payments.

Send payments to:

U.S. Department of Education
National Payment Center
P.O. Box 790336
St. Louis, MO 63179-0336

You should include your name and account number on the front of all payment instruments.

For further information, you should contact National Recoveries, Inc. at 1-877-221-9729.

If you disagree with this decision, and your federal and/or state tax refund or other payment is offset, you may have this decision reviewed by bringing a lawsuit in federal district court.

For more information, visit our Web site at myeddebt.ed.gov.

Page 3 – ███████████

This action is taken to collect a loan or grant obligation held by the Department. It is totally separate from any notice of proposed offset from a guaranty agency. You must contact that agency if you object to collection of a loan held by a guaranty agency.

Sincerely,

Hearing Official
Borrower Services

# EXHIBIT 29



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

THE INSPECTOR GENERAL

January 4, 2018

The Honorable Patty Murray
Ranking Member, Committee on Health, Education, Labor and Pensions
United States Senate
Washington, D.C. 20510

Dear Ranking Member Murray:

Thank you for your letter of December 21, 2017, requesting additional information on our recent report titled *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process*. Attached you will find our answers to your questions. As we shared with your staff, we cannot provide the documents that you requested as they are not Office of Inspector General documents. We shared your request with Molly Petersen, Legislative Director of the U.S. Department of Education Office of Legislation and Congressional Affairs, on January 2, 2018, as the Department would be responsible for responding to your request.

If you have any questions or if you need any additional information, please do not hesitate to contact me directly at (202) 245-6900 or have a member of your staff contact our Congressional Liaison, Catherine Grant, at (202) 245-7023.

Sincerely,

Kathleen S. Tighe
Inspector General

cc:     The Honorable Lamar Alexander, Chairman, Committee on Health, Education, Labor, and Pensions, United States Senate
        The Honorable Betsy DeVos, Secretary, U.S. Department of Education

**U.S. Department of Education Office of Inspector General (OIG)**
**Response to Ranking Member Murray, Senate Health, Education, Labor and Pensions**
**Committee Regarding OIG Report Titled,**
**"*Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process*"**
**January 4, 2018**

1. What additional outcome data for the processing of borrower defense claims did Federal Student Aid (FSA) provide to your office on October 26, 2017, as noted in footnote 5?

   *OIG Response: FSA's Business Operations provided an updated "Review Ready Spreadsheet" as of October 10, 2017. The spreadsheet specifies the general status of each claim as approved, pending, or ready for review.  As noted in our report, we did not analyze this spreadsheet.*

2. The report indicates that FSA's Borrower Defense Unit (BDU) reduced contractor staffing by more than two-thirds from November 2016 to September 2017. Did FSA provide a rationale for this decrease in staff, even as the number of claims mounted?

   *OIG Response: FSA's BDU did not provide a specific rationale for the decrease in staff.*

3. With regard to the category of borrower defense claims related to ITT guaranteed employment misrepresentation noted on page 10, did FSA maintain legal memoranda or other documentation for these findings that indicate to how many potential borrowers and states such claims would apply?

   *OIG Response: FSA's BDU maintained one legal memorandum related to misrepresentations of ITT guaranteed employment.  The memorandum applies only to only the California locations but does not indicate the number of potential borrowers. FSA's BDU did not provide documentation for ITT guaranteed employment misrepresentation claims that indicated the number of potential borrowers or the states where they were located.*

4. According to your analysis of unique claims that did not fall within one of BDU's seven established categories, "[a]s of January 20, 2017, BDU had identified additional categories of claims warranting further research." According to FSA, how many additional categories of claims had BDU identified?

   *OIG Response: FSA's BDU stated that with respect to Corinthian schools, it had started research and analysis for five additional categories. With respect to schools other than Corinthian, FSA was in the processes of gathering and reviewing evidence.*

1

5. The report notes on page 16 that the further research into additional categories of claims was "placed on hold." According to FSA, why was this research stopped?

   *OIG Response: FSA's BDU stated that in early 2017, the Enforcement Unit was instructed not to continue developing new memoranda on additional categories of claims at the direction of the Acting Under Secretary and the Review Panel.*

6. The report on page 21 notes that as of September 2017, FSA was testing a claims management tool. Did FSA indicate when development of this tool commenced and when it is expected to be operational?

   *OIG Response: FSA's BDU did not provide definitive information on when the development of the claims management tool commenced or when it is expected to be fully operational. The tool was in development when we began our review.*

7. Which political appointees from the Obama Administration that were involved in writing, or received, the legal memorandums referenced in the report did you interview for this report, respectively?

   *OIG Response: The objectives of our review were to (1) determine FSA's policies and procedures over its Federal student loan borrower defense loan discharge process, (2) determine the documentation FSA maintains to support its borrower defense loan discharge decisions, and (3) determine the outcomes of FSA's borrower defense loan discharge proceedings. We did not interview political appointees from the previous administration because it was not necessary to achieve the objectives of our review. The objectives of our review did not include reviewing the development of the legal memoranda or the decisions made in the memoranda.*

# EXHIBIT 30

# DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS FOR FISCAL YEAR 2019

---

## TUESDAY, JUNE 5, 2018

U.S. SENATE,
SUBCOMMITTEE OF THE COMMITTEE ON APPROPRIATIONS,
*Washington, DC.*

The subcommittee met at 10:15 a.m. in room SD–124, Dirksen Senate Office Building, Hon. Roy Blunt (chairman) presiding.

Present: Senators Blunt, Alexander, Capito, Lankford, Kennedy, Rubio, Hyde-Smith, Murray, Durbin, Reed, Shaheen, Merkley, Baldwin, Murphy, Manchin, and Leahy.

## DEPARTMENT OF EDUCATION

### OFFICE OF THE SECRETARY

**STATEMENT OF HON. BETSY DeVOS, SECRETARY**

**ACCOMPANIED BY BILL CORDES, ELEMENTARY, SECONDARY, AND VO-CATIONAL ANALYSIS DIVISION DIRECTOR, BUDGET SERVICE**

### OPENING STATEMENT OF SENATOR ROY BLUNT

Senator BLUNT. The Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies will come to order.

We are pleased, Secretary DeVos, that you are here with us today. Thank you for appearing to talk about your budget and to answer our questions.

The 2019 budget request from the Department is 11 percent less than the money that the Congress appropriated for fiscal year 2018 in March. To the Department's credit, you propose eliminating and consolidating programs that may not be working effectively, and we will want to look at those very carefully with you.

The budget also includes a $1 billion new competitive grant program for States and school districts to expand their choice programs.

Certainly I appreciate the perspective, the new look, you have brought to the Department. I agree that we should look at programs that are either inefficient or ineffective and prioritize programs that work the best for students.

We have a shared priority—your Department and the committee certainly—on STEM (Science, Technology, Engineering and Mathe-

24

Senator BLUNT. Thank you, Senator Capito.
Senator Durbin.

PROPRIETARY SCHOOLS AND LOAN DEFAULTS

Senator DURBIN. Welcome, Madam Secretary.

I think we both would agree that when students default on their student loans, there are many losers: the student, the student's family, America's taxpayers, and you might say other students who are counting on that money coming back into the Treasury for their generation to have a chance at higher education.

So I want to ask you a question, and I am going to give you multiple choice answers. Here is the question. Which group of colleges and universities enroll 9 percent of all postsecondary students—9 percent of high school grads—but account for 33 percent of Federal student loan defaults? Here are your choices: (A) public colleges and universities, (B) private not-for-profit colleges and universities, and (C) for-profit colleges and universities. Which one would you choose?

Secretary DEVOS. C.

Senator DURBIN. Exactly right.

So could you explain to me why for-profit colleges and universities, which enroll just 9 percent of high school graduates, account for 33 percent of all Federal student loan defaults?

Secretary DEVOS. It is a very serious issue, Senator, and it is one that we have—I think collectively we have to get much more serious about looking at both the opportunities for students and acknowledge—I think this is a much broader question than just what you are trying to get at because——

Senator DURBIN. Well, let me just say——

Secretary DEVOS [continuing]. Students today need to know early on before they even get into high school a number of different options that they have to pursue beyond high school.

Senator DURBIN. It just seems to me that one class with fewer than 10 percent of the students and 33 percent of the student loan defaults really has a problem that the other types of universities and colleges do not, at least to some extent.

So here is what is comes down to as far as I am concerned. They are charging too much and they are providing too little. They are misleading these students into debt and enrollment and then casting them off.

Now, how can I say something as extreme as that? Because here is what the statistics show. Two out of three graduates from for-profit colleges and universities make less money than their high school graduate counterparts who never attend a university. So they are not making much money. And it also turns out that three out of four students from these types of for-profit colleges and universities are not able to pay $1 on their Federal student debt within 3 years of entering repayment. So a lot is going on here.

And luckily for us, you have been in charge of a Department which has an investigative unit that is going to keep an eye on these for-profit colleges and universities because they are being investigated by everybody. In fact, some of them are failing because of the abusive approaches they have used and their misleading marketing: Corinthian, Westwood, ITT Tech and so forth and so on.

25

### APPOINTEES FROM FOR-PROFIT COLLEGE SECTOR

But here is the thing that troubles me and what I want to ask you a question about. Were you aware—I am sure you are not aware of this, but you should be. Were you aware of the fact that the people you have appointed to the enforcement unit to keep an eye on for-profit colleges and universities that are ripping off students and their families and taxpayers—I am sure you are not aware of this. But it turns out that the head of the unit, Julian Schmoke, was a former dean at DeVry, one of the largest for-profit colleges and universities in my home State of Illinois. And it also turns out that Robert Eitel in that same unit you appointed and Diane Auer Jones and Carlos Muniz were former employees at Bridgepoint and Career Education Corporation, for-profit colleges and universities, themselves. So were you aware of the fact that you were appointing people to the enforcement and investigative unit who had a conflict of interest because of their own private careers before they joined you?

Secretary DEVOS. Well, Senator, the enforcement unit, part of Federal Student Aid, is very robust and functioning very well. And most of those individuals you just referred to are not part of the enforcement unit. So that is erroneous information.

### STUDENT AID ENFORCEMENT UNIT

Senator DURBIN. So tell me what happened at the enforcement unit?

Secretary DEVOS. Let me just say we are very focused on ensuring that colleges and universities have a—the opportunities that students have are quality. We have to focus——

Senator DURBIN. You have reduced the number.

Secretary DEVOS [continuing]. On the opportunities and the outcomes for students——

Senator DURBIN. Well, if you focused on the outcomes and 33 percent are defaulting on their student loans and only 10 percent of the students and you took a dozen attorneys in the enforcement unit and cut it down to three and then you riddled the unit with people with conflicts of interest, it is no wonder that little or nothing is being done by way of investigation.

Secretary DEVOS. Well, I am sorry, but your information is just erroneous.

Senator DURBIN. Mr. Chairman, I ask that the article from the "New York Times," which catalogues this in detail—and I am sure you have seen it—be made a part of the record after my question.

Senator ALEXANDER [presiding]. So ordered. Thank you, Senator Durbin.

[The article follows:]

26

New York Times
**Education Department Unwinds Unit Investigating Fraud at For-Profits**
By Danielle Ivory, Erica L. Green and Steve Eder
May 13, 2018

Members of a special team at the Education Department that had been investigating widespread abuses by for-profit colleges have been marginalized, reassigned or instructed to focus on other matters, according to current and former employees.

The unwinding of the team has effectively killed investigations into possibly fraudulent activities at several large for-profit colleges where top hires of Betsy DeVos, the education secretary, had previously worked.

During the final months of the Obama administration, the team had expanded to include a dozen or so lawyers and investigators who were looking into advertising, recruitment practices and job placement claims at several institutions, including DeVry Education Group.

The investigation into DeVry ground to a halt early last year. Later, in the summer, Ms. DeVos named Julian Schmoke, a former dean at DeVry, as the team's new supervisor.

Now only three employees work on the team, and their mission has been scaled back to focus on processing student loan forgiveness applications and looking at smaller compliance cases, said the current and former employees, including former members of the team, who spoke on the condition of anonymity because they feared retaliation from the department.

In addition to DeVry, now known as Adtalem Global Education, investigations into Bridgepoint Education and Career Education Corporation, which also operate large for-profit colleges, went dark.

Former employees of those institutions now work for Ms. DeVos as well, including Robert S. Eitel, her senior counselor, and Diane Auer Jones, a senior adviser on postsecondary education. Last month, Congress confirmed the appointment of a lawyer who provided consulting services to Career Education, Carlos G. Muñiz, as the department's general counsel.

The investigative team had been created in 2016 after the collapse of the for-profit Corinthian Colleges, which set off a wave of complaints from students about predatory activities at for-profit schools. The institutions had been accused of widespread fraud that involved misrepresenting enrollment benefits, job placement rates and program offerings, which could leave students with huge debts and no degrees.

Elizabeth Hill, a spokeswoman for the Education Department, attributed the reduction of the group to attrition and said that "conducting investigations is but one way the investigations team contributes to the department's broad effort to provide oversight." She said that none of the new employees who had previously worked in the for-profit education industry had influenced the unit's work.

She also said the team's deployment on student loan forgiveness applications was an "operational decision" that "neither points to a curtailment of our school oversight efforts nor indicates a conscious effort to ignore 'large-scale' investigations."

Aaron Ament, a former chief of staff to the office of the department's general counsel who helped create the team under President Barack Obama, said it had been intended to protect students from fraudulent for-profit colleges. "Unfortunately, Secretary DeVos seems to think the colleges need protection from their students," said Mr. Ament, who is now president of the National Student Legal Defense Network.

Senator Elizabeth Warren, a Democrat from Massachusetts, also criticized the team's new direction. Ms. DeVos has taken a number of actions to roll back or delay regulations that sought to rein in abuses and predatory practices among for-profit colleges—actions that Ms. Warren and other Democrats have said put the industry's interests ahead of those of students.

"Secretary DeVos has filled the department with for-profit college hacks who only care about making sham schools rich and shutting down investigations into fraud," Ms. Warren said.

DeVry did not respond to requests for comment, and Mr. Schmoke declined to be interviewed. Mr. Schmoke recused himself from matters involving DeVry, according to the department.

27

DeVry agreed to pay $100 million in 2016 to settle a separate Federal Trade Commission lawsuit alleging that it misled prospective students with ads about employment and salaries after graduation.

The Education Department announced a limited settlement with DeVry the same year after finding that the school could not substantiate claims that 90 percent of its alumni since 1975 were employed in their field of study within 6 months of graduating. But the investigative team continued to look into the institution's job placement claims and other recruiting practices.

The former and current employees disputed Ms. Hill's account, and said the group and its work had become an issue of contention during meetings with the Trump transition team. Several of the employees said that there had been a staff push to continue the investigation as recently as this year, with no result.

The group had also been looking into similar issues of recruiting and advertising at Bridgepoint and Career Education during the latter part of 2016, the employees said.

Ms. Hill declined to comment on those cases. "To preserve the integrity of investigations, program reviews and other enforcement activities," she said, "the department's practice is to neither confirm nor deny current or potential investigations."

In a statement, Bridgepoint said the company was aware of a review beginning in 2015, but had "not been made aware of any investigation or involvement by the enforcement unit." Career Education did not respond to requests for comment.

Bridgepoint has a high-profile connection in the Trump administration beyond the Education Department: It is a former client of Mercedes Schlapp, who is now the director of strategic communications at the White House.

Ms. Schlapp was a consultant for Bridgepoint at Cove Strategies, a lobbying and consulting firm she founded with her husband, Matt Schlapp. Bridgepoint said that it remained a Cove client.

The White House did not say whether Ms. Schlapp had recused herself from issues involving Bridgepoint and did not respond to a request to interview her. Mr. Schlapp said in an email that "Bridgepoint and other online institutions were persecuted by President Obama's administration because they dared to bring innovation to the education market."

He added, "I believe educational innovation and disruption are a fight worth having and it matches the President's agenda of rolling back the excess of the Obama regulatory stranglehold."

Mr. Eitel, the senior adviser to Ms. DeVos, last year recused himself from issues involving both Bridgepoint and Career Education, where he was previously a top lawyer.

Ms. Jones, the senior adviser on postsecondary education, has not recused herself from matters involving Career Education, where she previously worked, according to a list of recusals the department provided. The department did not say whether Mr. Muñiz had recused himself from issues involving the company.

Ms. Jones worked for about 5 years as a senior vice president at Career Education Corporation after serving as assistant secretary for postsecondary education for President George W. Bush. She joined the Trump administration early this year.

In a letter to Ms. DeVos last week, Ms. Warren and nine other Democratic senators called on the department to reveal the extent of Ms. Jones's ties to the industry, suggesting she had a history of working "on behalf of bad actors."

The department issued an extensive statement defending Ms. Jones, calling her background an "asset" that would advance the department's goals. Ms. Jones has had "vast higher-ed experience in community colleges, research universities and for-profit colleges," it said in the statement, adding that she had spent only a fraction of her career in the for-profit industry.

The investigative team emerged in the wake of Corinthian Colleges' shutdown as the Obama administration faced criticism for providing loans to students attending other for-profit schools that had also been accused of illegal activity, substandard practices or predatory behavior. While not created expressly to focus on for-profit schools, the group directed its attention to those institutions because of their recruiting practices and the large amount of students they serve.

　
28

Separately, another group, the borrower defense unit, focused on forgiving loans for students at Corinthian and other schools where fraud had been identified. That group's work all but came to a stop last year, but has recently gotten going again.

After Mr. Trump's victory, some employees openly worried about the fate of the investigative unit, and policies quickly changed with the new administration, according to the current and former employees.

Communication with outside groups now required special approval, including with state attorneys general, who had been partners in identifying cases, and Federal agencies like the Consumer Financial Protection Bureau, which had been aggressively monitoring a number of for-profit colleges. Without permission, team members could not contact schools or other parties to request documents, an essential part of making a case, which effectively halted investigative work.

Ms. Hill, the Education Department spokeswoman, said the department was "focused on weeding out bad actors" across higher education, "not capriciously targeting schools based on their tax status."

In recent months, the three remaining team members have been looking at small cases and examining student requests for loan forgiveness, like one filed by Josue Perez.

Mr. Perez, 30, said he was persuaded by an admissions officer at Corinthian Colleges' Everest Institute in the Boston area to take out a $5,000 loan to attend the school for massage therapy.

The officer told him, according to Mr. Perez, that the college would help him find a job when he graduated. But Mr. Perez never received the help, he said, and he still has not worked in the field. The loan has since tripled to more than $15,000, he said.

He has been waiting for more than a year for the Education Department's decision on his claim to forgive the $15,000, he said. In the meantime, he worries about the department's new direction.

"They're basically removing the police force that keeps these colleges in check," he said.

Senator ALEXANDER. Senator Hyde-Smith.

ISSUES FACING RURAL SCHOOLS

Senator HYDE-SMITH. Thank you, Mr. Chairman.

Secretary DeVos, first of all, I am thrilled that you are here. I enjoyed getting to meet you over the phone, and thank you for talking with me.

Rural schools, like many in my State, face unique challenges from recruiting and retaining teachers to the lack of access to broadband. I believe it is imperative that the Department support research to address the specific needs for rural schools and students.

It is my understanding that the Department will recompete a grant to establish a Research and Development Center dedicated to rural education.

My question is, what does the Department consider the most pressing issues facing rural schools, and how will you help tackle these needs, including the severe teacher shortage?

Secretary DEVOS. Senator, thanks for that question.

I know that the needs of rural communities are very unique and they differ from community to community. We very much support the flexibility for rural communities to address their issues and their needs specifically.

When we think about opportunities and making sure that students have a broad range of opportunity, I think one of the most important things is that the schools and the communities have ac-

56

*Answer.* We expected that the enhanced services provided to borrowers beginning at 91 days after the date of delinquency should reduce defaults, allowing for borrowers to avoid negative credit reporting and the increased loan burden that comes with collection fees assessed at the time a student loan defaults. Additionally, focusing on default prevention means expanded options for distressed borrowers, including various repayment plans, deferments, and forbearance, most of which are not available once the loan is in default.

COSTS OF PRIVATE COLLECTION AGENCY PHASE-OUT

*Question.* Would the Department's plan to phase out the use of private collection agencies potentially involve any increase in collection costs for borrowers, including but not limited to shifting costs onto borrowers that are current provided through mandatory fees the Debt Collection Improvement Act of 1982 (DCIA) through contingent fee contracts? If so, please describe these potential costs in detail.

*Answer.* No. FSA's plan will not increase collection costs for borrowers.

CONSUMER PROTECTION STANDARDS FOR SERVICING CONTRACT SELECTION

*Question.* The Consolidated Appropriations Act, 2018 (P.L. 115–141) requires the Department to ensure that contractors selected for participation in the FSA Next Generation Processing and Servicing Environment have a "history of compliance with applicable consumer protections laws." Please describe the consumer protection laws upon which the Department will evaluate such history of compliance, and how previous audits and reviews of compliance with the Department's own contract requirements and standards will be used in this process.

*Answer.* Because the Next Generation Financial Services Environment acquisition is currently an active procurement, there are legal restrictions on the information that FSA can share publicly regarding the selection process. Information regarding the internal evaluation process is source selection information subject to the restrictions on disclosure of the Procurement Integrity Act. The Phase One solicitation includes past performance as one of the selection factors.

STUDENT LOAN RECORD DATA SHARING WITH LAW ENFORCEMENT AGENCIES

*Question.* In a document published on the Federal Register on June 13, 2018, regarding the Privacy Act provisions for the Customer Engagement Management System (Docket ID ED–2018–FSA–0053) the Department indicates that it is "removing former routine use (2) entitled 'Disclosure for Use by Other Law Enforcement Agencies" because the Department no longer intends to disclose any records under this routine use." The effect of this change will be to deny access to student loan information that supports a legitimate law enforcement interest by a State, local, tribal, or other Federal agency charged with the responsibility of investigating or prosecuting violations or potential violations of any applicable statute, regulation, or order of a competent authority. Please provide a detailed justification for why would the Department take action to remove the sharing of student loan record data with law enforcement agencies, including how this action protects and supports student loan borrowers.

*Answer.* The Department is not changing policies regarding the sharing of data from the Customer Engagement Management System (CEMS). The Department is in the process of modernizing the application system for Federal student loan borrowers who wish to apply for relief under the Borrower Defense to Repayment (BD) provisions. In doing so, the Department is moving the BD system to CEMS. As a result, the CEMS SORN needed to be updated to reflect routine uses associated with processing Borrower Defense claims.

The SORN update, and specifically the removal of the law enforcement routine use, does not indicate a policy change. The Department can and will continue to share information for law enforcement purposes pursuant to 5 USC §552a(b)(7) and the routine use governing "enforcement disclosure." We are removing this routine use as it is redundant. The Department will continue to share data from CEMS with the FTC, DOJ, and other appropriate law enforcement agencies.

HOLD ON EXPLORING ADDITIONAL BORROWER DEFENSE CATEGORIES

*Question.* The Department's Office of Inspector General (OIG) released a report on December 8, 2017, titled "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process" which notes, on page 16, that further research into additional categories of borrower defense claims was "placed on hold" during the current Administration. Who placed this research on hold and why?

57

*Answer.* As previously announced, the Department put a hold on certain borrower defense evaluation activities in order to conduct a comprehensive review of the program. This review was done by high-level career and political leaders. One of the recommendations based on the review was a request that the Inspector General review the overall BD adjudication process.

The IG review focused initially on the over 16,000 claims that had been approved in the previous Administration but not yet discharged. Given the significant fiscal implications of full discharge of these claims and because there were numerous complexities involved with many of the claims, the Department focused on those claims first to ensure a smooth discharge process for those borrowers.

Once the processes to discharge those loans were finalized, Department leadership decided to prioritize updating its relief methodology and assessing the large number of existing Corinthian claims not yet adjudicated, including how to handle large numbers of claims that the previous Administration had flagged for denial but had not developed any processes or procedures to effectuate.

### BORROWER DEFENSE AND ITT TECH

*Question.* According to the OIG report on borrower defense, one category of evidence for borrower defense claims relates to ITT Education Services, Inc. ("ITT Tech") misrepresentations of guaranteed employment. Has the Department provided borrower defense discharges from former ITT Tech students due to guaranteed employment misrepresentations or any other category of evidence since January 20, 2017? Furthermore, has the Department made any additional findings or documented any additional evidence or findings that could support borrower defense claims from former ITT Tech students since January 20, 2017? If not, why not?

*Answer.* No. The Department continues to review borrower defense applications related to various institutions, including ITT Tech. As part of this review, the Department is considering whether the allegations in the claim would give rise to a cause of action under applicable State law. The Department is working to evaluate the merits of these claims including applicable evidence related to an institution's alleged wrongdoing.

Regarding additional findings, no. The Department put a hold on Borrower Defense (BD) claim processing during the change of Administration while it requested that the Inspector General review the overall BD adjudication process and the new Administration reviewed BD policies.

### DIGITIZING PUBLIC SERVICE LOAN FORGIVENESS PAPERWORK

*Question.* The Government Paperwork Elimination Act calls on Federal agencies to increase their use of electronic forms, electronic filing, and electronic signatures. Although it is positive that borrowers can digitally upload many forms and documents on the web with their servicers, Public Service Loan Forgiveness (PSLF) forms have not been significantly digitized. What is the status of the Department's effort to implement a fully digital signing and uploading process for all PSLF forms and allow borrowers with any servicer to utilize such process, consistent with bipartisan requests from Congress?

*Answer.* FSA is currently in the process of creating and implementing a PSLF online assistance tool that will allow borrowers to submit Employment Certification Forms (ECF) and PSLF applications online. The tool will assist borrowers with a better understanding the PSLF program, knowing when they should provide the ECF or PSLF application and assist borrowers to understand what payment plans are eligible for PSLF. The tool will use NSLDS® data to provide borrower specific information and help to pre-fill forms being submitted. Borrowers with loans that do not qualify for PSLF will be advised on how they can begin a consolidation application and complete that form on the same online site. FSA anticipates the tool to be in place by the end of 2018.

### PSLF EMPLOYMENT CERTIFICATION

*Question.* Has the Department considered improvements to make the employment certification process more efficient, including logging known employers for PSLF in a centralized database, or entering into a data match with the Office of Personnel Management to eliminate the need of Federal employees to certify Federal employment for the purposes of PSLF? If not, why not?

*Answer.* FSA is currently in the process of creating and implementing a PSLF online assistance tool that will allow borrowers to submit Employment Certification Forms (ECF) and PSLF applications online. FSA envisions future enhancements to this tool that will maintain a database of qualified PSLF employers and allow integration of that database with the PSLF forms simplifying the process for form com-

58

pletion. Integration with various sources to populate and update the employer information is being evaluated and will be implemented to the extent feasible. The implementation of this employer database feature is expected to be in place in 2019.

### BORROWER DEFENSE AND COURT REPORTING INSTITUTE

*Question.* In a January 17, 2018, response letter to me from James Manning, Delegated the Authority to Perform the Functions and Duties of the Under Secretary, regarding the status of borrower defense discharges for victims of the Court Reporting Institute (CRI), I was told that the agency could not provide "an exact timetable for when the Department will reach a decision regarding the specific BD claims" but that the Department was "working tirelessly to reduce the number of pending claims." It has been more than a year and a half (18 months) since I asked the Department to provide debt relief to at least 335 student loan borrowers from Washington who were subject to fraud and abuse by CRI, as detailed in a November 21, 2016, letter from Washington State Attorney General Bob Ferguson to the Department. CRI induced students to enroll and finance their educations with extraordinary levels of debt by systematically misrepresenting its educational practices, instructor qualifications, graduation rates, and employment prospects.

Has this Administration reviewed the evidence provided in the November 21, 2016, letter from Washington State Attorney General Bob Ferguson to the Department regarding CRI's misrepresentations that give rise to State law causes of action under Washington's Consumer Protection Act, RCW 19.86, and common law fraud?

When will the Department answer my requests, the requests of Washington State Attorney General Ferguson, and the pleas of hundreds of former CRI students that were cheated and deserve student loan debt relief?

*Answer.* While we cannot comment on internal or deliberative discussions, we assure you that the Department is working tirelessly to reduce the number of pending claims.

### LOAN DISCHARGE FOR TOTAL AND PERMANENT DISABILITY

*Question.* Is the Department aware of any single example of State tax liability for veterans receiving a total and permanent disability (TPD) discharge of their Federal student loans?

*Answer.* No. The Department has not reviewed each State's tax laws on this point. The Department does not have expertise on the various State tax laws and does not want inadvertently to provide inaccurate tax advice to our borrowers; however, servicer correspondence and websites encourage borrowers to contact a tax professional.

### AUTOMATING LOAN-RELATED PROCESSES FOR SERVICEMEMBERS

*Question.* Senate Report 115–150 accompanying the 2018 appropriations bill notes that under the "Higher Education Relief Opportunities for Students Act of 2003, servicemembers enrolled in income-driven repayment programs are eligible for a waiver from annual recertification obligations of their income [and] servicemembers with Federal Perkins Loans are also eligible for a cancellation of a percentage of their debt, based on qualifying years of military service, in accordance with Section 465 of the Higher Education Opportunity Act of 2008." I have not received the information required by the explanatory statement on either of these provisions. Please describe the Department's plans to automate the application of both of these benefits for our Nation's service members.

*Answer.* The Department is currently pursuing a data matching agreement with the Department of Defense (DoD). This arrangement will commence with a "no-interest accrual" benefit. The agreement will then expand to include additional facets of data matching for borrowers who are service members.

While we move toward automation, there will be some instances, such as with the Higher Education Relief Opportunities for Students (HEROES) Act, where waivers for service members that are required as part of the Act would create a disproportionate hardship to the borrower. As the borrower (i.e., the service member) would self-determine their income information for their IDR application, this self-determination could prevent the ability for total automation.

### RESTORATIONS TO PELL ELIGIBILITY DUE TO SCHOOL CLOSURE

*Question.* Please provide an update on Pell Grant Lifetime Eligibility Used (LEU) restored due to school closure, according to the Department's April 3, 2017, notice, Guidance on COD Processing of Pell Grant Restoration for Students who Attended Closed Schools, including total number of unduplicated students receiving restora-

| Docket # | Institution | Issue Code | Issue Description |
|---|---|---|---|
| 1,141 Title IX Complaints Currently Open for Investigation as of June 18, 2018 | | | |
| 15172309 | PSE | 106.8b | Grievance Procedures |
| 15172309 | PSE | 106.31-4.2 | Sexual Harassment (sexual violence) |
| 15182019 | PSE | 106.8b | Grievance Procedures |
| 15182036 | PSE | 106.8b | Grievance Procedures |
| 15182036 | PSE | 106.31-4.1 | Sexual Harassment (insults, slurs, derogatory expressions, verbal intimidation) |
| 15182036 | PSE | 106.31-99 | Different Treatment/Exclusion/Denial of Benefits (other) |
| 15182036 | PSE | 106.71-2 | Retaliation |
| 15182052 | PSE | 106.71-1 | Retaliation |
| 15182064 | PSE | 106.31-99 | Different Treatment/Exclusion/Denial of Benefits (other) |
| 15182103 | PSE | 106.31-4.5 | Sexual Harassment (other) |
| 15182116 | PSE | 106.8b | Grievance Procedures |
| 10173010 | Vocational | 106.31-99 | Different Treatment/Exclusion/Denial of Benefits (other) |

————

QUESTIONS SUBMITTED BY SENATOR RICHARD J. DURBIN

FOR-PROFIT COLLEGE SECTOR INFLUENCE IN ADMINISTRATION'S APPROACH TO STUDENT
AID INVESTIGATION AND ENFORCEMENT

*Question.* Over the last several years nearly every major for-profit college has been investigated or sued by one or more Federal or State agency for some form of deceptive and abusive practices. Some—notably Corinthian, ITT Tech, and Westwood Colleges—have collapsed under the weight of years of abuse and wrongdoing. But the abuse didn't end with these companies. The abuse in this industry is more than a one-off—it's systemic and it continues. Unfortunately, you're taking the cops off the beat at the Department of Education. According to a New York Times article entitled, "Education Department Unwinds Unit Investigating Fraud at For-Profits" you have gutted the Student Aid Enforcement Unit's Investigations Team which was set up in the wake of Corinthian to ensure that fraud would be detected and stopped to avoid a repeat where thousands of students are harmed and hundreds of millions of taxpayer dollars are lost. The article notes that what included a dozen or so attorneys and investigators by the end of the Obama Administration has dwindled to just three employees under you because those employees have been "marginalized, reassigned, or instructed to work on other matters." The result is that important investigations into fraud by major for-profit college companies have "ground to a halt." Conveniently, several of the investigations that have been disrupted by gutting the Enforcement Unit's Investigations Team were of companies that formerly employed some of your top officials—including Julian Schmoke, Robert Eitel, Diane Auer Jones, and Carlos Muniz.

a. When these individuals began working at the Department, either as a result of your hiring or presidential appointment, were you aware that they had been employed by for-profit education companies that the Department had or was, at the time, investigating?

b. Your spokesperson has denied the allegation in the New York Times article that the Enforcement Unit's investigatory work has been hampered or "ground to a halt." Does the Enforcement Unit currently have open investigations of DeVry University and Bridgepoint Education? If so, how many dedicated staff are assigned to each investigation?

c. You and I disagree about the Department's responsibilities to students under Borrower Defense when fraud has been committed, but would you agree that preventing the types of fraudulent and illegal activities that lead to large numbers of Borrower Defense claims is the best way to protect students and prevent taxpayers from losing money to student loan discharges?

d. If so, how can you explain gutting the Department's resources, including personnel, dedicated to proactively investigating, identifying, and stopping fraudulent practices by institutions?

e. How many new investigations has the Investigation Team opened in 2018?

*Answer.* a. Julian Schmoke, Robert Eitel, Diane Auer Jones, and Carlos Muniz were hired for their qualifications, years of experience, and total body of work that spans multiple sectors across higher education. These individuals have spent more years working in Government or in sectors outside of the proprietary sector than years working in the proprietary sector, a fact which is ignored by those who wish to impugn their characters.

b. It is not Department policy to comment on any deliberative, preliminary, or ongoing investigative work.

c. I do not believe that we disagree about the Department's responsibilities to students who have been defrauded in connection with their educational programs and suffered financial harm. The Department has honored its commitment to borrowers of Corinthian Colleges; it continues to process those claims to identify victims of misrepresentation who relied on those misrepresentations to make enrollment decisions and were harmed financially by those decisions. We will continue to review claims and provide appropriate student loan relief; however, we cannot forgive loans where misrepresentations did not occur or did not cause harm to the borrower; the Department also has a duty to the taxpayer. FSA continues to perform its oversight duties to enforce compliance with its rules and requirements.

d. Staff reduction in the Enforcement Unit is due to attrition, not a Department-initiated reduction in force, and FSA is working to hire qualified employees to fill vacancies. That said, oversight is not relegated solely to the Enforcement Unit, which was not established until 2016. We have teams of people across the agency, including in our regional offices and in the Office of the General Counsel, who play critical roles in performing program reviews and evaluating the compliance of institutions with all FSA regulations.

As part of its oversight duties, Federal Student Aid requires the submission of annual compliance and financial audit reports, and it routinely conducts program reviews to confirm that a school meets FSA requirements for institutional eligibility, financial responsibility, and administrative capability. Final Program Review Determinations (FPRD) are screened for any necessary redactions and posted publicly at https://studentaid.ed.gov/sa/about/data-center/school/program-reviews.

In fiscal year 2017 alone, Program Compliance (PC) staff commenced over 200 new program reviews at institutions determined to present a risk to Title IV dollars. Additionally, PC staff issued over 300 FPRDs to institutions and collectively assessed over $75 million in liabilities due the Department via those FPRDs issued in fiscal year 2017.

In addition to program reviews and audits, FSA also reviews financial statements, 90/10 compliance, and cohort default rates as part of our review process and to inform our investigations and related activities. When appropriate, the Department places institutions on heightened cash monitoring (HCM) or collects and maintains Letters of Credit to hold institutions accountable and to reduce risks to students and taxpayers. For example, in Award Year 2015, the Department requested and received 426 LOCs from 396 institutions or main OPEIDs totaling approximately $932 million.

Additionally, all institutions are required to undergo a recertification for continued participation in the Title IV programs at least once every 6 years. This recertification includes a comprehensive review of the institution. In fiscal year 2017, PC staff completed over 1,150 recertification reviews/applications and processed another 2,300 eligibility updates and approval applications.

Finally, in fiscal year 2017, PC staff reviewed and resolved over 6,000 inquiries, concerns, or institutional complaints submitted by students and constituents.

e. There has been one new investigation opened by the Investigations Group in 2018, but there are investigations from 2017 that are still ongoing.

PENDING BORROWER DEFENSE CLAIMS

*Question.* How many borrower defense claims are currently pending review, decision, or adjudication by any Department official in total and disaggregated by State?

a. How many pending claims are from students who attended Corinthian or ITT, respectively, disaggregated by State?

b. After Corinthian and ITT, what are the next three largest sources of borrower defense claims, disaggregated by institution?

c. How many borrowers who have a pending borrower defense application have had their forbearance expire?

d. How many borrowers who have a pending borrower defense application will have their forbearance expire within the next 6 months?

e. What is the total dollar value of accumulated interest and fees for borrowers whose claims are pending?

*Answer.* For parts (a) and (b), please refer to Tables (A) and (C) in the following attachment.

145

May2018

| TABLE A - Borrower Defense Claims<br>Not Approved Total & by State | | | |
|---|---|---|---|
| | **Total Not<br>Approved Count** | **Corinthian, not<br>approved** | **ITT, not<br>Approved** | **Non<br>CCI/ITT** |
| Total | **99,335** | **45,675** | **13,175** | **40,485** |
| AE | 25 | <10 | <10 | 15 |
| AK | 125 | 55 | <10 | 65 |
| AL | 1,025 | 335 | 315 | 375 |
| AP | 15 | <10 | <10 | <10 |
| AR | 455 | 185 | 85 | 175 |
| AZ | 1,825 | 465 | 275 | 1,095 |
| CA | 20,545 | 13,695 | 1,415 | 5,435 |
| CO | 1,555 | 615 | 145 | 795 |
| CT | 375 | 95 | <10 | 275 |
| DC | 215 | 115 | 15 | 95 |
| DE | 155 | 45 | <10 | 95 |
| FC | 135 | 85 | <10 | 45 |
| FL | 7,765 | 3,705 | 905 | 3,155 |
| FM | 15 | <10 | <10 | <10 |
| GA | 4,305 | 2,155 | 275 | 1,875 |
| HI | 1,125 | 1,005 | 15 | 105 |
| IA | 465 | 135 | 65 | 265 |
| ID | 345 | 115 | 95 | 135 |
| IL | 5,395 | 2,695 | 385 | 2,315 |
| IN | 2,015 | 595 | 615 | 805 |
| KS | 485 | 105 | 65 | 315 |
| KY | 895 | 225 | 255 | 425 |
| LA | 765 | 265 | 165 | 345 |
| MA | 1,305 | 575 | 175 | 555 |
| MD | 1,515 | 585 | 215 | 715 |
| ME | 125 | 55 | <10 | 65 |
| MI | 2,455 | 1,115 | 655 | 685 |
| MN | 1,775 | 475 | 95 | 1,205 |
| MO | 1,915 | 705 | 365 | 855 |
| MS | 725 | 395 | 55 | 265 |
| MT | 155 | 85 | 15 | 55 |
| NC | 2,655 | 975 | 315 | 1,365 |
| ND | 105 | 35 | <10 | 55 |
| NE | 295 | 75 | 95 | 125 |
| NH | 155 | 55 | 25 | 85 |
| NJ | 1,685 | 525 | 65 | 1,095 |
| NM | 385 | 75 | 135 | 175 |

*[Table A continues:]*

| | | | | |
|---|---|---|---|---|
| NV | 1,295 | 585 | 185 | 515 |
| NY | 2,865 | 895 | 305 | 1,665 |
| OH | 3,335 | 965 | 755 | 1,615 |
| OK | 565 | 125 | 125 | 325 |
| OR | 1,485 | 945 | 135 | 415 |
| PA | 2,775 | 915 | 375 | 1,485 |
| PR | 25 | <10 | <10 | 25 |
| RI | 105 | 35 | <10 | 65 |
| SC | 1,065 | 275 | 175 | 615 |
| SD | 115 | 45 | <10 | 65 |
| TN | 1,415 | 275 | 505 | 645 |
| TX | 7,535 | 3,355 | 945 | 3,235 |
| UT | 655 | 225 | 185 | 245 |
| VA | 2,325 | 1,085 | 425 | 805 |
| VI | 15 | <10 | <10 | <10 |
| VT | 55 | 25 | <10 | 25 |
| WA | 3,125 | 2,015 | 375 | 745 |
| WI | 1,315 | 285 | 355 | 675 |
| WV | 475 | 285 | 45 | 155 |
| WY | 115 | 65 | <10 | 45 |
| All Others | 3,425 | 865 | 915 | 1,655 |

For privacy purposes, counts are rounded and represent the midpoint of a 10-point range (for example, values of 10-19 are coded as 15) and counts of less than 10 have been suppressed using a "<10" value.

| Table C - Counts of next 3 schools with highest borrower defense claim volume (after CCI/ITT) | |
|---|---|
| | Count |
| DeVry | 10,275 |
| EDMC | 4,435 |
| Apollo Group, Inc (University of Phoenix) | 3,965 |

For privacy purposes, counts are rounded and represent the midpoint of a 10-point range (for example, values of 10-19 are coded as 15) and counts of less than 10 have been suppressed using a "<10" value.

As of May 1, 2018, there are a total of 99,335 claims are currently pending review, decision or adjudication. State level data is provided in Table A.

a. As of May 1, 2018, there are approximately 45,675 pending claims associated with students who attended Corinthian and 13,175 claims associated with students who attended ITT. State level data is provided in Table A.

b. (May 1, 2018): The next three largest sources of borrower defense claims are associated with DeVry University with approximately 10,275 claims, Education Management Corporation (EDMC) with approximately 4,435 claims, and the Apollo Group (University of Phoenix) with approximately 3,965 claims. Institution level data is provided in Table C.

c. Borrowers who have submitted a substantially complete application have not had their forbearance expire within the last 12 months.

d. The Department has no borrowers with a pending borrower defense application that will have their forbearance expire within the next 6 months.

e. Outstanding interest for borrowers with pending claims total approximately $368.8 million for all loans, including loans unrelated to the Borrower Defense claim. This includes all unpaid interest on all outstanding loans (some of which may have accrued prior to submission of the claims). Previously paid or capitalized interest is not included.

147

DISAGGREGATED BORROWER DEFENSE CLAIMS BY STATE

*Question.* How many borrower defense claims has the Department received on or after January 20, 2017, disaggregated by State?

a. How many of those claims received are from students who attended Corinthian or ITT, respectively, disaggregated by State?

*Answer.* Please refer to Table (B) in the following attachment.

May 2018

| Table B - Borrower Defense Claims Rec'd Jan 20 2017 to Apr 23 2018 - Total and by CCI/ITT/Other | | | | |
|---|---|---|---|---|
| Borrower State of Residence | Total | CCI | ITT | Other |
| **TOTAL** | **63,525** | **23,555** | **7,935** | **32,045** |
| AE | 25 | <10 | <10 | 15 |
| AK | 85 | 35 | <10 | 45 |
| AL | 685 | 185 | 195 | 315 |
| AR | 315 | 115 | 55 | 155 |
| AZ | 1,285 | 235 | 155 | 905 |
| CA | 11,605 | 6,455 | 945 | 4,205 |
| CO | 995 | 275 | 95 | 635 |
| CT | 255 | 45 | <10 | 205 |
| DC | 135 | 65 | <10 | 75 |
| DE | 115 | 25 | <10 | 75 |
| FC | 95 | 65 | <10 | 25 |
| FL | 4,675 | 1,575 | 595 | 2,505 |
| GA | 2,965 | 1,195 | 185 | 1,585 |
| HI | 475 | 395 | <10 | 85 |
| IA | 335 | 75 | 45 | 215 |
| ID | 215 | 55 | 55 | 105 |
| IL | 3,605 | 1,445 | 245 | 1,925 |
| IN | 1,275 | 355 | 285 | 635 |
| KS | 355 | 55 | 35 | 265 |
| KY | 645 | 125 | 165 | 355 |
| LA | 545 | 155 | 105 | 285 |
| MA | 695 | 235 | 105 | 355 |
| MD | 1,015 | 295 | 135 | 585 |
| ME | 85 | 35 | <10 | 45 |
| MI | 1,465 | 525 | 385 | 545 |
| MN | 1,265 | 285 | 65 | 925 |
| MO | 1,345 | 435 | 195 | 715 |
| MS | 515 | 245 | 35 | 235 |
| MT | 95 | 45 | <10 | 45 |
| NC | 1,905 | 625 | 215 | 1,065 |
| ND | 75 | 25 | <10 | 45 |
| NE | 195 | 35 | 55 | 105 |
| NH | 105 | 25 | 15 | 75 |
| NJ | 1,325 | 365 | 45 | 915 |
| NM | 245 | 35 | 75 | 145 |
| NV | 805 | 275 | 115 | 415 |

148

*[Table B continues:]*

| | | | | |
|---|---|---|---|---|
| NY | 2,015 | 535 | 175 | 1,305 |
| OH | 2,415 | 605 | 465 | 1,345 |
| OK | 395 | 65 | 65 | 265 |
| OR | 745 | 375 | 85 | 285 |
| PA | 1,955 | 535 | 245 | 1,175 |
| PR | 15 | <10 | <10 | 15 |
| RI | 65 | 15 | <10 | 45 |
| SC | 705 | 105 | 115 | 495 |
| SD | 85 | 25 | <10 | 55 |
| TN | 925 | 115 | 295 | 515 |
| TX | 5,245 | 2,015 | 595 | 2,635 |
| UT | 415 | 105 | 115 | 195 |
| VA | 1,545 | 655 | 255 | 635 |
| VI | 15 | <10 | <10 | <10 |
| VT | 25 | <10 | <10 | 15 |
| WA | 2,085 | 1,325 | 215 | 545 |
| WI | 835 | 95 | 195 | 555 |
| WV | 305 | 155 | 25 | 125 |
| WY | 85 | 45 | <10 | 35 |
| All Others | 1,845 | 395 | 425 | 1,025 |

For privacy purposes, counts are rounded and represent the midpoint of a 10-point range (for example, values of 10-19 are coded as 15) and counts of less than 10 have been suppressed using a "<10" value.

The Department has received approximately 63,525 borrower defense claims since January 20, 2017. State level data is provided in Table B.

a. As of May 1, 2018, the Department has received 23,555 claims that are associated with students who attended Corinthian; 7,935 are associated with students who attended ITT. State level data is provided in Table B.

APPROVED BORROWER DEFENSE CLAIMS BY STATE

*Question.* How many total borrower defense applications has the Department approved between January 20, 2017 and today? What is the total dollar amount of relief?

a. How many of any approved borrower defense claims during this time period are from students who attended Corinthian or ITT, respectively, disaggregated by State?

*Answer.* Please refer to Table (D) in the following attachment.

149

| TABLE D - Borrower Defense Claims Approved Total & by State Jan 20, 2017 to May 1, 2018 | | | | |
|---|---|---|---|---|
| Borrower State Code of Residence | Total Approved Count | Corinthian, approved | ITT, Approved | Non CCI/ITT, approved |
| TOTAL | 12,385 | 12,385 | <10 | <10 |
| AK | 15 | 15 | <10 | <10 |
| AL | 75 | 75 | <10 | <10 |
| AR | 85 | 85 | <10 | <10 |
| AZ | 75 | 75 | <10 | <10 |
| CA | 3,805 | 3,805 | <10 | <10 |
| CO | 215 | 215 | <10 | <10 |
| CT | 45 | 45 | <10 | <10 |
| DC | 45 | 45 | <10 | <10 |
| DE | 15 | 15 | <10 | <10 |
| FC | 35 | 35 | <10 | <10 |
| FL | 985 | 985 | <10 | <10 |
| GA | 525 | 525 | <10 | <10 |
| HI | 185 | 185 | <10 | <10 |
| IA | 55 | 55 | <10 | <10 |
| ID | 35 | 35 | <10 | <10 |
| IL | 565 | 565 | <10 | <10 |
| IN | 145 | 145 | <10 | <10 |
| KS | 35 | 35 | <10 | <10 |
| KY | 35 | 35 | <10 | <10 |
| LA | 75 | 75 | <10 | <10 |
| MA | 165 | 165 | <10 | <10 |
| MD | 135 | 135 | <10 | <10 |
| ME | 25 | 25 | <10 | <10 |
| MI | 365 | 365 | <10 | <10 |
| MN | 275 | 275 | <10 | <10 |
| MO | 185 | 185 | <10 | <10 |
| MS | 115 | 115 | <10 | <10 |
| MT | 15 | 15 | <10 | <10 |
| NC | 315 | 315 | <10 | <10 |
| ND | 15 | 15 | <10 | <10 |
| NE | 25 | 25 | <10 | <10 |
| NH | 25 | 25 | <10 | <10 |
| NJ | 125 | 125 | <10 | <10 |
| NM | 35 | 35 | <10 | <10 |
| NV | 115 | 115 | <10 | <10 |
| NY | 285 | 285 | <10 | <10 |
| OH | 235 | 235 | <10 | <10 |

*[Table D continues:]*

| OK | 35 | 35 | <10 | <10 |
|---|---|---|---|---|
| OR | 195 | 195 | <10 | <10 |
| PA | 255 | 255 | <10 | <10 |
| SC | 115 | 115 | <10 | <10 |
| SD | 15 | 15 | <10 | <10 |
| TN | 115 | 115 | <10 | <10 |
| TX | 815 | 815 | <10 | <10 |
| UT | 45 | 45 | <10 | <10 |
| VA | 385 | 385 | <10 | <10 |
| VT | 15 | 15 | <10 | <10 |
| WA | 705 | 705 | <10 | <10 |
| WI | 85 | 85 | <10 | <10 |
| WV | 65 | 65 | <10 | <10 |
| WY | 35 | 35 | <10 | <10 |
| All Others | 31 | 31 | <10 | <10 |

For privacy purposes, counts are rounded and represent the midpoint of a 10-point range (for example, values of 10-19 are coded as 15) and counts of less than 10 have been suppressed using a "<10" value.

Between January 20, 2017 and May 1, 2018, 12,385 approved borrower defense to repayment claims were from borrowers who attended Corinthian Colleges, and 10 approved BD claims were from borrowers who attended ITT Tech. The Department has prioritized claims from Corinthian College borrowers, so very few claims from ITT Tech borrowers have been reviewed to date. State level data is provided in Table D.

BORROWER DEFENSE REFUNDS DISCHARGED UNDER TRUMP ADMINISTRATION

*Question.* Of the borrowers whose borrower defense claims were approved (as designated by an email from Federal Student Aid) but who had not yet received a discharge or full refund on or before January 19, 2017, how many have since received a discharge or full refund posted to their accounts?

a. How many attended Corinthian, ITT, or ACI, respectively, disaggregated by State?

b. What is the total dollar value of accumulated interest and fees for these borrowers whose applications have not yet received their previously-approved discharge or refund, if any?

*Answer.* All borrowers who were notified of the decision on their claim prior to January 20, 2017, have received the appropriate loan discharge, unless the borrower was notified that he or she did not have a qualified loan and needed to first consolidate their loans so that it could be discharged and the borrower has not done so.

a. As of May 1, 2018, approximately 11,715 students who received discharges attended Corinthian, 35 students attended ITT, and 2,705 students attended ACI. State level data is provided in Table E.

[The information follows:]

151

| TABLE E - Borrower Defense Claims, Notified prior to 1/20/2017 Approved Total & by State Jan 20, 2017 to May 1, 2018 | | | | |
|---|---|---|---|---|
| | Total Approved | Corinthian, approved | ITT, Approved | Non CCI/ITT, approved |
| TOTAL | 14,455 | 11,715 | 35 | 2,705 |
| AK | 15 | 15 | <10 | <10 |
| AL | 65 | 65 | <10 | <10 |
| AR | 55 | 55 | <10 | <10 |
| AZ | 75 | 75 | <10 | <10 |
| CA | 3,615 | 3,595 | 15 | <10 |
| CO | 215 | 215 | <10 | <10 |
| CT | 45 | 15 | <10 | 35 |
| DE | 15 | 15 | <10 | <10 |
| FL | 935 | 885 | <10 | 35 |
| GA | 455 | 435 | <10 | 15 |
| HI | 135 | 135 | <10 | <10 |
| IA | 35 | 35 | <10 | <10 |
| ID | 35 | 35 | <10 | <10 |
| IL | 475 | 475 | <10 | <10 |
| IN | 175 | 175 | <10 | <10 |
| KS | 35 | 35 | <10 | <10 |
| KY | 45 | 45 | <10 | <10 |
| LA | 55 | 55 | <10 | <10 |
| MA | 2,575 | 155 | <10 | 2,425 |
| MD | 65 | 55 | <10 | <10 |
| ME | 15 | <10 | <10 | <10 |
| MI | 595 | 595 | <10 | <10 |
| MN | 195 | 195 | <10 | <10 |
| MO | 225 | 225 | <10 | <10 |
| MS | 95 | 95 | <10 | <10 |
| MT | 15 | 15 | <10 | <10 |
| NC | 245 | 235 | <10 | 15 |
| ND | 15 | 15 | <10 | <10 |
| NE | 25 | 25 | <10 | <10 |
| NH | 45 | <10 | <10 | 45 |
| NJ | 175 | 175 | <10 | <10 |
| NM | 25 | 15 | <10 | <10 |
| NV | 125 | 115 | <10 | <10 |
| NY | 145 | 125 | <10 | 15 |
| OH | 275 | 275 | <10 | <10 |
| OK | 35 | 35 | <10 | <10 |
| OR | 215 | 215 | <10 | <10 |

152

*[Table E continues:]*

| | | | | |
|---|---|---|---|---|
| PA | 255 | 245 | <10 | 15 |
| RI | 25 | <10 | <10 | 15 |
| SC | 105 | 95 | <10 | <10 |
| SD | 15 | 15 | <10 | <10 |
| TN | 75 | 75 | <10 | <10 |
| TX | 1,085 | 1,065 | <10 | 15 |
| UT | 75 | 65 | <10 | <10 |
| VA | 245 | 235 | <10 | <10 |
| WA | 845 | 835 | <10 | <10 |
| WI | 55 | 45 | <10 | <10 |
| WV | 85 | 85 | <10 | <10 |
| WY | 15 | 15 | <10 | <10 |
| All Others | 35 | 35 | <10 | <10 |

For privacy purposes, counts are rounded and represent the midpoint of a 10-point range (for example, values of 10-19 are coded as 15) and counts of less than 10 have been suppressed using a "<10" value.

b. As of May 1, 2018, the outstanding interest for borrowers with pending claims totals approximately $143.2 million. This includes all unpaid interest on all outstanding loans (some of which may have accrued prior to submission of the claims).

INSTITUTIONS AND PROGRAMS WITH STUDENTS GRANTED REFUND OR DISCHARGE
UNDER BORROWER DEFENSE

*Question.* Please indicate which institutions and programs have borrowers with approved claims that are eligible for or have been granted:
—Full refund of amounts paid; or
—Discharge of loan balances outstanding.
*Answer.* The following institutions and programs have borrowers with approved claims:
Corinthian–Direct Loans, Federal Family Education Loans (FFEL), and Federal Perkins Loan (Perkins); American Career Institute (ACI)—Direct Loans; and ITT–Direct Loans and FFEL.

WAGE GARNISHMENT AND COLLECTIONS AFFECTING FORMER CORINTHIAN COLLEGE
STUDENTS

*Question.* How many former students of Corinthian Colleges, Inc. with first enrollment dates between 7/1/2010 and 9/30/2014 are in the Debt Management Collection System (DMCS)? Please also provide the number of those borrowers in wage garnishment or in the Treasury Offset Program (TOP).
*Answer.* There are 143,318 former Corinthian Colleges, Inc. students who have accounts in the Debt Management Collection System (DMCS). 5,305 of those borrowers are subject to Administrative Wage Garnishment. 59,951 of those borrowers are in the Treasury Offset Program.

QUARTERLY REPORTS ON BORROWER DEFENSE CLAIMS

*Question.* Per Senate Report 115–150, the Department is directed to issue quarterly reports on borrower defense claims that include the total and median dollar amount of outstanding debt from borrowers prior to discharge, the percentage of the total approved claims receiving partial relief, the median student loan debt remaining as part of claims receiving partial relief, the total number of pending borrower defense claims, total number of approved borrower defense claims, total dollar amount of relief, and total number of denied claims, all disaggregated by State. The Explanatory Statement accompanying the fiscal year 2018 Consolidated Appropriations Act (P.L. 115–41) required the Department to include additional information in these reports: the total and median dollar amount of outstanding debt from borrowers prior to discharge, the percentage of total approved claims receiving partial relief, and the median student loan debt remaining as part of claims receiving partial relief.
a. Why has the Department not yet provided these quarterly reports?
b. When will the Department provide the first report?
c. Will the Department post these reports on its website as encouraged by Senate Report 115–150?

153

*Answer.* a. FSA had not yet developed metrics that would allow it to provide these reports. Additionally, time was needed to develop, document, and communicate the new processes to the servicers.

b. FSA anticipates the first report will be published on July 31, 2018 for the reporting period ending June 30, 2018.

c. Yes, the Department will post these reports.

RESPONSE TO REPORT RECOMMENDING ACTIONS TO HELP DEFRAUDED STUDENTS

*Question.* In November 2017, Senator Warren and I published a report entitled, "Insult to Injury: How the DeVos Department of Education is Failing Defrauded Students." The report included nine recommendations. On November 14, 2017, Senator Warren and I, along with 14 of our colleagues, sent you a letter asking for your response to the recommendations. We have yet to receive one. Please respond here to each of the nine recommendations.

*Answer.* Recommendation #1: Immediately provide full discharges for borrowers with borrower defense claims approved prior to January 20, but who have still not received relief.

The Department has completed nearly all discharges on the claims that were approved by the previous administration prior to January 20, 2017. The few that have not have special circumstances, namely that affirmative action is needed by the borrower to consolidate their Federal Family Education Loan Program (FFELP) Loans in order to receive a discharge. Unfortunately, the previous Administration gave borrowers unrealistic and unnecessary timeframes for them to expect discharge and had not developed the procedures to process the more complex claims.

Recommendation #2: Immediately begin processing pending borrower defense claims.

Processing of pending borrower defense applications has been on-going, and in December 2017, the Department resumed adjudicating claims.

Recommendation #3: Provide full relief for approved borrower defense claims.

The borrower defense regulation gives the Secretary the discretion to fashion relief and a borrower with an approved claim may be "relieved of the obligation to repay all or part of the loan...that the borrower would be otherwise obligated to pay." 34 C.F.R. §685.206. The Department has determined that relief in the full amount of the loan may not be appropriate in every case.

Recommendation #4: Provide full, automatic discharges to Corinthian students covered by Department of Education findings.

The Department's Corinthian job placement rate findings require a borrower to attest to multiple certain facts in order to be eligible for borrower defense relief, including that the borrower was enrolled in certain programs at certain times and received information from Corinthian on job placement rates and that they enrolled at Corinthian in substantial part on the information received about those rates. Accordingly, the Department requires applications from borrowers in order to determine eligibility.

Recommendation #5: Issue findings of wrongdoing against ITT Tech that will allow the Department to provide full, automatic discharges to covered students.

The Department continues to review borrower defense applications related to various institutions, including ITT. As part of this review the Department is considering whether the allegations in the claim would give rise to a cause of action under applicable State law as required by the Department's regulations. The Department is working to evaluate the merits of these claims, including applicable evidence related to an institution's alleged wrongdoing.

Recommendation #6: Extend forbearance for all borrowers with pending claims.

A borrower who submits a Borrower Defense application and is in repayment with monthly installments due will have their loans placed into forbearance or collections activity be stopped if the loan is defaulted, unless they opt out. The borrower remains in that status until the claim has been decided.

Recommendation #7: Use evidence and information submitted by state Attorneys General to provide full, group discharges to affected students.

Due to pending litigation the Department is unable to provide a response to this question.

Recommendation #8: Immediately implement the directive in the fiscal year 2018 Senate Labor, HHS, Education Appropriations Subcommittee Report (S. Rept. 115–137) to provide quarterly public reports on the receipt and processing of borrower defense claims.

Quarterly reports on the receipt and processing of borrower defense applications will begin with the period ending June 30, 2018, with the first report released by July 31, 2018.

154

Recommendation #9: Immediately halt collections activity on defaulted borrowers with pending applications for borrower defense and all defaulted Corinthian borrowers.

Collection activities for defaulted borrowers with pending applications cease unless the borrower opts out of forbearance.

INSPECTOR GENERAL REPORT ON LOAN DISCHARGES UNDER BORROWER DEFENSE TO REPAYMENT

*Question.* On December 8, 2017, the Department's Office of Inspector General (OIG) released a report entitled "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process."

a. The report indicates that FSA's Borrower Defense Unit (BDU) reduced contractor staffing by more than two-thirds from November 2016 to September 2017. In response to previous questions to the OIG from me, OIG noted that FSA did not provide a specific rationale for the decrease in staff in the BDU. What was the specific rationale for the decrease in contractor staffing for the BDU from November 2016 to September 2017, even as the number of pending claims continued to increase?

b. The OIG also found that, "[a]s of January 20, 2017, BDU had identified additional categories of claims warranting further research." In response to previous questions to the OIG from me, OIG clarified that FSA's BDU had started research and analysis for five additional categories of claims at Corinthian schools. What is the current status of research in these five additional categories, and other potential categories not yet publicized, for Corinthian schools?

c. The OIG report on borrower defense, on page 16, noted that further research into additional categories of borrower defense claims was "placed on hold" during the current Administration. In response to previous questions to the OIG from me, OIG noted that, in early 2017, the Enforcement Unit was instructed not to continue developing new memoranda on additional categories of claims at the direction of then-Acting Under Secretary James Manning and the Review Panel. Why did then-Acting Under Secretary Manning instruct BDU not to continue developing new memoranda on additional categories of evidence for borrower defense claims?

d. The OIG report also found that one category of evidence for borrower defense claims relates to ITT Tech guaranteed employment misrepresentation. In response to previous questions to the OIG from me, OIG noted that FSA "maintained one legal memorandum related to misrepresentations of ITT guaranteed employment. The memorandum applies only to only the California locations but does not indicate the number of potential borrowers." Has the Department continued to process claims from ITT Tech applicants using this specific category of evidence, and has it gathered any additional categories of evidence for ITT Tech of other types or for other States? If not, why not?

*Answer.* a. As previously announced, the Department put a hold on Borrower Defense (BD) claim processing during the change of Administration while it requested that the Inspector General review the overall BD adjudication process and the new Administration reviewed BD policies.

When new leadership placed a hold on BD claims processing and requested that the IG review the BD adjudication process, there were fewer than 20 contractor staff in place.

At that point in time, career staff was supporting a number of issues including:
—developing a database to manage BD claims and migrating the existing legacy excel-based system into it;
—supporting the IG review (due to its accelerated pace);
—assessing the population of BD claims beyond just those from Corinthian; and
—developing and pilot-testing various review process streams while working with ED leadership and legal counsel to ensure they met policy objectives and legal requirements.

After the Administration announced its new BD policies, FSA began ramping up contractor staff to support BD claim processing under the new policies. While that ramp-up process is ongoing, FSA currently has approximately 16 contractor staff (as of July 9, 2018) in place supporting BD processing.

b. Additional categories of claims warranting further research are still under review at this time.

c. As previously announced, the Department put a hold on certain borrower defense activities in order to conduct a comprehensive review of the program. This review was done by high-level career and political leaders. One of the recommendations based off of the review was a request that the Inspector General review the overall BD adjudication process.

155

Additionally, the review focused initially on the over 16,000 claims that had been approved in the previous administration but not yet discharged. Given the significant fiscal implications of full discharge of these claims and because there were numerous complexities involved with many of the claims, the Department focused on those claims first to ensure a smooth discharge process for those borrowers.

Once the processes to discharge those loans were finalized, Department leadership decided to prioritize updating its relief methodology and assessing the large number of existing Corinthian claims not yet adjudicated, including how to handle large numbers of claims that the previous administration had flagged for denial but had not developed any processes or procedures to effectuate.

Meanwhile, there were other time sensitive projects that, when completed, would result in long term efficiencies. These projects included:

—developing a database to manage BD claims and migrating the existing legacy excel-based system into it;
—supporting the IG review (due to its accelerated pace);
—assessing the population of BD claims beyond just those from Corinthian; and
—developing and pilot-testing various review process streams while working with ED leadership and legal counsel to ensure they met policy objectives and legal requirements.

Consideration and discussion of other pending claim categories have been ongoing throughout this period.

d. The Department continues to review and make progress on borrower defense applications related to various institutions, including ITT. As part of this review the Department is considering whether the allegations in the claim would give rise to a cause of action under applicable State law. The Department is working to evaluate the merits of these claims including applicable evidence related to an institution's alleged wrongdoing. However, the Department's top priority is to complete the review of Corinthian claims since the Department instructed Corinthian students and graduates to file BD claims. In the case of ITT Tech, the prior administration recommended for qualified students to submit closed school discharge claims. We will review those claims once we complete the review of claims made by Corinthian students.

USE OF SOCIAL SECURITY ADMINISTRATION EARNINGS DATA FOR PARTIAL BORROWER DEFENSE RELIEF

*Question.* On December 20, 2017, the Department announced, via the release entitled Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers, that it would use earnings data received from the Social Security Administration (SSA) through a Memorandum of Understanding (MOU) to limit relief to defrauded borrowers. However, the Department, through its legally dubious delay and rewriting of the Gainful Employment Rule, has been unwilling to use the same data for its intended purpose—to hold poor performing Title IV programs accountable.

a. Why does the Department believe that it is appropriate to use earnings data to punish defrauded borrowers be limiting relief, but not to limit Title IV access to poor performing programs—for which the Department's access to the data was legally intended?

b. Why does the Department believe it is appropriate to use a student's earnings to reduce loan relief if the student cannot find a job in the field of study and is working in a field unrelated to their program? How can the program be considered to have had any value to the student?

c. Did the Department consult with SSA about using the Gainful Employment earnings MOU for the purposes of the partial relief scheme prior to its December announcement? If so, did SSA assent to the use of data for purposes of informing limited relief?

d. Please provide any correspondence (prior to or after December 20, 2017) between SSA and the Department related to the latter's use of earnings data obtained through the MOU for purposes of informing limited relief.

e. With the expiration of the MOU on May 24, 2018, has the Department ceased basing partial relief to defrauded borrowers on the earnings data obtained through the MOU? If so, has the Department developed a new basis for providing partial relief?

*Answer.* a. The Department stands by its commitment to provide relief to borrowers who were harmed by an institution's fraudulent actions. However, borrowers should be eligible for relief from their Federal student loan obligations only to the extent they were harmed by an institution's misrepresentations. For example, when publicly available data reveal that programs associated with successful borrower de-

156

fense claims perform quite well when compared to their peer programs, the Department's commitment to safeguarding taxpayer dollars and the integrity of Federal student loan programs demand that it consider such information when assessing any relief owed to borrowers.

b–d. Due to pending litigation, the Department is unable to provide detailed information about its use of aggregate earnings data from the SSA.

e. In accordance with the recent ruling in the case of Manriquez v. U.S. Department of Education, No. 17–7106 (N.D. Cal.), the Department is not currently adjudicating any additional borrower defense claims utilizing the improved discharge process.

ALTERNATIVE EARNINGS APPEALS UNDER GAINFUL EMPLOYMENT RULE

*Question.* On January 9, 2017, the Obama Department of Education released the first round debt-to-earnings rates under the Gainful Employment Rule. The Department under your leadership provided an extension from June 2017 to February 2018 for schools to submit an alternative earnings appeal.

a. To date, how many schools have filed a notice of intent to appeal?

b. To date, how many schools have submitted a viable appeal?

c. To date, how many schools have abandoned their request for an appeal?

d. To date, how many appeals has the Department approved?

e. To date, how many schools submitted incomplete requests for appeals and how many schools did the Department give the opportunity to provide missing information?

f. To date, how many appeals has the Department denied?

g. When does the Department plan to issue the second round of debt-to-earnings rates?

*Answer.* a. 872 Notices of Intent have been filed.

b. 252 appeal packages have been received.

c. 620 schools have abandoned their request for an appeal.

d. The Department has issued 66 approvals.

e. To date, FSA has followed up with 150 schools to request additional information or clarification. Among these 150 schools were those that submitted materially complete appeals packages; however, as a result of reviewer questions or requests for source materials, some have been asked to provide additional information. The Department has made three attempts, by email and phone calls, to try to gather outstanding information from the schools.

f. The Department has not yet denied any appeals.

g. The Department does not yet know when it will issue the second round of debt-to-earnings ratios because of outstanding litigation regarding the use of IRS or Social Security data, and the need to issue a new Memorandum of Understanding with the IRS or SSA subsequent to the judge's decision.

g. This is to be determined; no confirmed date at this time.

DELIBERATIONS, MEETINGS, EVIDENCE, AND DECISION–MAKING REGARDING
REINSTATEMENT OF ACICS

*Question.* In 2016, then-Secretary King denied the appeal of the Accrediting Council for Independent Colleges and Schools (ACICS) to remain a federally-recognized accreditor after a staff report, the National Advisory Committee on Institutional Quality and Integrity, and the Senior Department Official (SDO) all concurred that ACICS should lose Federal recognition. In March 2018, the U.S. District Court for the District of Columbia found that Secretary King erred in not considering ACICS's Part II submission. The Court did not, however, order that ACICS be reinstated as you did in April—erroneously citing the Court's decision as requiring it. This week, the Department was forced to release its draft staff analysis which found that ACICS failed to meet 57 of the 93 criteria required under Federal law.

a. On April 10, 2018, Senators Brown, Warren, Blumenthal, and I wrote to you demanding release of ACICS' Part II submission, which includes the 27-page narrative responding to each of the Department's questions regarding specific recognition criteria and approximately 36,000 additional pages of documentation filed by ACICS. We did not receive a response by the letter's April 17 deadline. Will the Department release this information? If so, when?

b. As stated in your remand, the Department provided ACICS until May 30, 2018, with the opportunity to provide additional supporting data in response to the negative findings in 2016. Please provide a copy of that data and the date it was submitted.

c. Is the Department's review of the additional evidence ACICS provided by May 30, 2018, restricted to the agency's actions and enforcement in 2016, or will it con-

175

The procedures for submitting Privacy Act and Freedom of Information Act requests to the Department are found at 34 CFR Part 5 Subpart C and § 5b.5 and on the Department's website, respectively, at:

- http://www.ed.gov/policy/gen/leg/foia/request_privacy.html; and
- http://www.ed.gov/policy/gen/leg/foia/request_foia.html

The Department's compilation of SORNs is available at https://www2.ed.gov/notices/ed-pia.html.

Any questions concerning this Memorandum should be directed to your Contracting Officer.

830 First St. N.E., Washington, DC 20202
www.FederalStudentAid.ed.gov
1-800-4-FED-AID

**FEDERAL STUDENT AID** ⟩⟩ **START HERE. GO FURTHER.™**

### CLARIFICATION OF STANCE ON OBAMA ADMINISTRATION BORROWER DEFENSE POLICY

*Question.* You have previously said that a cheated student loan borrower simply had to "raise his or her hands to be entitled to so-called free money" under the Obama Administration's borrower defense process. Given that the previous Administration simply provided a discharge of outstanding loan obligations that students would otherwise have otherwise been required to repay for an education that was determined to have been fraudulently provided, what did you mean by these comments?

*Answer.* The policies in this area introduced by the prior administration lacked the analytical rigor needed for an adjudicative process, without which could result in the loss of billions of taxpayer dollars. Borrowers who relied upon and were harmed by fraudulent misrepresentations should be eligible for borrower defense relief. The standards for evaluating such claims should be rigorous to ensure the approval of only valid claims from eligible borrowers.

### INSTITUTIONAL LIABILITY FOR DEBT RELIEF EXPENSES UNDER BORROWER DEFENSE

*Question.* Is the Department considering any steps to recoup funds for the cost of debt relief from the institutions of higher education that are subject to borrower defense claims under the current borrower defense regulations and process?

*Answer.* Consistent with the Secretary's authority under 34 C.F.R. § 685.206(c)(3), the Department will initiate proceedings against an institution that had engaged in acts or omissions that would give rise to a cause of action under State law. To date, the Department has approved borrower defense claims related only to institutions that are insolvent and for which the appropriate statute of limitations stated in the borrower defense regulation has already run.

### EXTRADEPARTMENTAL INSTRUCTIONS REGARDING BUDGETARY IMPACT OF BORROWER DEFENSE

*Question.* Has the Department ever been advised or directed to reduce the budgetary impact of borrower defense relief from senior officials within the Office of Management and Budget, U.S. Department of the Treasury, or the White House?

*Answer.* No, it has not.

### DELAY OF BORROWER DEFENSE RULE AND STUDENT PROTECTION

*Question.* In a press release produced by your agency concerning the delay of the borrower defense to repayment ("borrower defense") rules, you stated that "It is the Department's aim, and this Administration's commitment, to protect students from predatory practices." Please describe specifically how the delay of the borrower defense rule protects students from predatory practices.

*Answer.* The Department continues to protect students from predatory practices through its program reviews, oversight activities and investigations, and we con-

176

tinue to process the nearly 170,000 borrower defense claims already received. The implementation of the borrower defense to repayment regulations was delayed in order to provide time for negotiated rulemaking to address the many elements of the regulation that were unworkable, costly, and unfair. The Department believes that students who have been deceived by predatory practices should receive financial compensation and be made whole, but this should be at the expense of the institution rather than the taxpayer. In addition, judicial proceedings or arbitration are the best ways for borrowers to pursue restitution for acts of consumer fraud since those proceedings can include not just reimbursement for Federal student loans, but for the total cost of attendance (including cash and other forms of credit) and for the opportunity costs associated with attending an institution that committed an act of fraud.

### TOTAL VOLUME AND ACCRUED INTEREST ON LOANS RECEIVING PARTIAL RELIEF UNDER BORROWER DEFENSE

*Question.* In cases where the Department has granted "partial relief" to borrower defense claims, what is the current total volume and average amount of accrued interest on such loans from the period during which the claims were under review, and at the point in which the borrowers were expected to re-enter repayment on the remaining balance?

*Answer.* 15,029 borrowers were approved for partial discharge. The average amount of interest that accrued on those loans during the review period was $0.00 since borrowers at the time they entered repayment received a credit for the approximate amount of interest that had accrued during the time the claim was pending.

### STUDENT AID ENFORCEMENT UNIT STAFFING

*Question.* What is the number of currently employed, full-time equivalent, non-managerial employees in each of the Student Aid Enforcement Unit's four staff groups: Investigations, Borrower Defense, Administrative Actions and Appeals, and Clery?

*Answer.* There are four full-time employees in the Investigations Group; six full-time employees and one part-time employee in the Borrower Defense Unit; 10 employees in the Administrative Actions and Appeals Service Group; and 16 employees in the Clery Act Compliance Division.

### INVESTIGATIONS GROUP STAFFING ALLOCATION

*Question.* How many staff are currently dedicated to the work of conducting investigations within the Investigations Group—not including managers and others who have been assigned to other tasks?

*Answer.* Each member of the staff is dedicated to the work of conducting investigations. This investigatory work can be conducted as a standalone investigation or in support of other FSA teams, such as Program Compliance, the Administrative Actions and Appeals Service Group, and the Borrower Defense Unit.

### STATUS OF DEVRY INVESTIGATION

*Question.* The Department announced in October 2016 that it would "continue to support the FTC's ongoing lawsuit against DeVry, while also continuing its own investigations of the institution." Has this investigation continued in your Administration?

*Answer.* To preserve the integrity of investigations, program reviews and other enforcement activities, the Department's practice is to neither confirm nor deny current or potential investigations.

### RESPONSE TO STAFF REQUESTS TO CONTINUE DEVRY INVESTIGATIONS

*Question.* Has the Department responded to staff requests during your tenure (since January 20, 2017) to continue or move forward with investigations into DeVry?

*Answer.* To preserve the integrity of investigations, program reviews and other enforcement activities, the Department's practice is to neither confirm nor deny current or potential investigations.

### NEW INVESTIGATIONS IN FSA UNDER TRUMP ADMINISTRATION

*Question.* How many new investigations have been opened by the Investigations Group under your Administration (since January 20, 2017)?

*Answer.* Nine new investigations have been opened.

177

INVESTIGATIONS PROMPTING ENFORCEMENT UNDER TRUMP ADMINISTRATION

*Question.* How many investigations—not minor compliance reviews—conducted by the Investigations Group have resulted in an enforcement action under your Administration (since January 20, 2017)?

*Answer.* Not all investigations result in an enforcement action, but thus far there have been no enforcement actions taken as a result of investigations by the Investigations Group that have begun since January 20, 2017.

———

QUESTIONS SUBMITTED BY SENATOR BRIAN SCHATZ

BILINGUALISM IN NATIONAL SECURITY AND COGNITIVE DEVELOPMENT

*Question.* The American Academy of Arts and Sciences released a report last year that details the advantages of bilingualism. It calls for the U.S. to prioritize investments in language education for the purpose of increasing our national security and providing better social and cognitive development opportunities to our youth.

How will you utilize the findings and recommendations in this report to inform your work?

*Answer.* National security is one of this Administration's top priorities. The American Academy of Arts and Sciences' report entitled "America's Languages: Investing in Language Education for the 21st Century" cites a number of recommendations to improve access to language education for people of all ages, ethnicities, and socioeconomic backgrounds, as well as preparing language teachers and promoting public-private partnerships in language education.

The report aligns with a number of the major priorities in the President's 2019 Budget Request. For example, President Trump's emphasis on providing every student the opportunity to attend a school of his or her choice will lead to more options for students and families, including both public and private schools that give priority to bilingualism and foreign language instruction.

At the same time, the Administration is committed to strengthening the Federal investment in education by eliminating funding for programs that are duplicative, ineffective, or more appropriately supported with State, local, or private funds. For this reason, no funds are requested for the International Education programs at the Department. The Department of Defense, the State Department, and other Federal agencies offer a number of programs that support similar activities; consequently, the Administration's overall fiscal year 2019 request provides sufficient resources for programs critical to our national security and global competitiveness.

DUAL LANGUAGE IMMERSION IN CHARTER SCHOOLS

*Question.* In Hawaii, public charter schools play a significant role in language immersion education. Dual language immersion schools empower students to achieve fluency and literacy in multiple languages.

Will you commit to studying the impact of high quality dual language immersion schools as part of the Charter Schools Program?

*Answer.* The Department agrees that language immersion programs offer an important educational option for our Nation's students, including English learners. We will consider including effective charter school immersion programs in our efforts to disseminate best-practice information under the Charter Schools Program.

AUTHORITY TO FOLD OFFICE OF ENGLISH LANGUAGE ACQUISITION INTO OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

*Question.* The legal basis for the Office of English Language Acquisition (OELA) derives from the U.S. Supreme Court's ruling in Lau v. Nichols. Under this landmark 1974 case, school districts that receive Federal funding are required to ensure all students have equal educational opportunities, including through the establishment of multi-lingual programs for language minority students.

What legal authorities do you believe you have to eliminate the independent Office of English Language Acquisition and disperse its staff across the Office of Elementary and Secondary Education?

*Answer.* The Department of Education is proposing to integrate the Office of English Language Acquisition (OELA) into the Office of Elementary and Secondary Education (OESE), not eliminate it or its functions. The Secretary has general authority to reorganize the Department pursuant to section 413 of the Department of Education Organization Act (20 U.S.C. §3473), and any reorganization of the Department would comply with this provision. The Department is working closely with the Office of Management and Budget (OMB), its Office of the General Counsel

# EXHIBIT 31

# EXAMINING FOR-PROFIT COLLEGE OVERSIGHT AND STUDENT DEBT

## HEARING

BEFORE THE

### SUBCOMMITTEE ON ECONOMIC AND CONSUMER POLICY

OF THE

### COMMITTEE ON OVERSIGHT AND REFORM

### HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

MAY 22, 2019

### Serial No. 116–29

Printed for the use of the Committee on Oversight and Reform



Available on: *http://www.govinfo.gov*
*http://www.oversight.house.gov*
*http://www.docs.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

36–664 PDF                    WASHINGTON : 2019

31

Mr. KRISHNAMOORTHI. Good afternoon. In the words of my baseball hero, Ernie Banks, let's play, too. I'd like to thank the first panel for their testimony and for contributing your thoughts to the vital issues we're discussing today.

Now we welcome our final witness, and we thank her for her patience. That's Principal Deputy Under Secretary of the Department of Education, Diane Auer Jones.

If the witness would please rise, I will begin by swearing you in.

Do you swear or affirm that the testimony that you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

Let the record show that the witness answered in the affirmative.

Thank you, and please be seated. The microphones are sensitive, so please speak directly into them. As I mentioned earlier, with our timing system, green means go; yellow means not slow down but speed up; and then red means stop. Without objection, your written statements will be made part of the record.

With that, Secretary Jones, you are now recognized to give an oral presentation of your testimony for five minutes.

### STATEMENT OF DIANE AUER JONES, ACTING UNDER SECRETARY OF EDUCATION

Ms. JONES. Thank you very much. Good afternoon, Chairman Krishnamoorthi, Ranking Member Cloud, and members of the committee. Thank you for the opportunity to appear before you today to discuss our goals to strengthen postsecondary education, including improving accreditation and working to address the problems that arise when schools close.

My work at the Department calls upon all of my experiences in higher education, starting with my personal experience as a first-generation college student. It also includes my work as an instructor and an administrator at public, private, as well as proprietary institutions, and it includes the years I spent in Federal Government working on science and education policy.

In my case, I worked as a nursing assistant and a waitress, and took student loans in order to pay my way through college. I know the challenges that nontraditional students face, not because I've read about them, but because I've experienced them. I've lived them. And I spent almost a decade teaching, supporting students, and advising other first-generation college students at the Community College of Baltimore County.

The Department is working hard to develop policies and procedures, in partnership with accreditors and state authorizing agencies, to guide institutions and students through orderly teach-outs, and to provide sufficient oversight to ensure that students get what they were promised. Sadly, we learn something new from each situation, but the experiences students tell us about allow us to do better the next time.

Mr. Infusino's testimony points out the complexity of closed school situations, and I agree that it can be very difficult for a student to decide what pathway will best serve his or her needs. So, in that vein, I want to use the rest of my five minutes to respond

32

to his concerns and provide information that may be helpful to him and to all students who go through a school closure.

While it is true that the current regulations provide closed school loan discharges for students who were enrolled at the time of closure, or who left the school less than 120 days prior to the campus closure, what we call the lookback period, there are special circumstances under which it can be extended.

We agree that no student should be required to continue attending a school if they do not wish to participate in the teach-out just so that they can hit the 120-day mark. For students who selected to participate in a teach-out plan offered by their closing institution, it is important to know that if the institution did not meet the terms of the plan the student is still eligible for a closed school loan discharge. The scholarship would be considered an important part of the plan, and part of the institution's promise. The point of a teach-out is to expand a student's options and opportunities, not limit them. And we will hold schools accountable for meeting the terms of all teach-out plans and agreements.

The Department is reviewing all of the circumstances of the recent closures, and in particular, the circumstances surrounding the Art Institute of Chicago and the Illinois Institute of Art. Let me be clear that it is the Department's position that those schools were accredited throughout the period between the change of control in January, and the closure in December 2018. Otherwise, the schools could not have participated in Title IV programs.

We will continue to work with students who were part of the school closures, and if those students have questions, they should contact Federal student aid. We never want a student to feel like they are out there on their own navigating these difficult and challenging situations. And I might add, many students call me personally and send me personal emails, and I respond or return the calls to each.

We are proud of the negotiated rulemaking effort that resulted in consensus and that addressed a number of the challenges that were revealed during the recent school closures. The consensus position will go through a public comment period, and based on the results of those comments will be published as a final rule. I cannot predict what will be in the final rule, but in response to your questions today, I can share what was in the consensus document.

We clearly have more work to do, but we recognize the problems and are seeking solutions. As we learned through our successful rulemaking effort, in spite of sometimes significant differences of opinion, when we put the needs of students first, we can find points of agreement and serve their best interests.

I look forward to discussing the Department's work with you, and responding to your questions. Thank you.

Mr. KRISHNAMOORTHI. Thank you, Ms. Jones. We're going to go slightly out of order here. I want to recognize Ms. Bonamici, Congresswoman Bonamici, who is waiving onto our committee for questions, to begin the question line. Congresswoman Bonamici, you have five minutes.

Ms. BONAMICI. Thank you very much, Chair Krishnamoorthi and Ranking Member Cloud, and thank you, Ms. Jones. Thank you for allowing me to be with you today.

33

When Secretary DeVos appeared before the Education and Labor Committee last month, I asked her about the Department's misguided decision to reinstate ACICS, an accreditor that has overseen some of the largest collapses of institutions of higher education in American history. This decision directly led to student harm and those students, along with taxpayers, deserve answers. The Department of Education's decision allowed at least 85 predatory schools to take advantage of more than 110,000 students.

So let's look at one ACICS-accredited school in particular, the Education Corporation of America, or ECA. In April 2018, Secretary DeVos temporarily reinstated ACICS, and then ACICS provided accreditation for ECA campuses, which kept the school operating. And at the time, the ECA campuses had not obtained accreditation from a new agency.

Then in December 2018, two weeks after the Department recommended to fully restore ACICS, ECA, which was the largest college chain accredited by ACICS, collapsed. Without accreditation, ECA could have had a planned shutdown. Thousands of students would not have been lured to attend a financially troubled school, those enrolled would have saved the time and money they wasted, and the Federal Government would have saved money on loan discharges.

In December, a few weeks after ECA collapsed, Senator Warren, Chairman Cummings, and I sent letters to ACICS and to ECA. The findings of our document request were extremely disappointing, and revealed the industry's lack of use of teach-out agreements.

And I notice, Ms. Jones, you were talking about teach-outs. Can you explain the difference, both in the requirements of a school that is closing, and in the way a student is affected in a teach-out agreement versus a teach-out plan?

Ms. JONES. Absolutely, Congresswoman. First, I'd like to begin by saying that the Department reviewed the ACICS situation because the courts remanded the decision back to the Department. So it was not the administration that decided to change the decision of the prior administration, but, in fact, it was the courts that determined that the prior administration failed to review 36,000 pages of evidence.

And so it was remanded back to the Secretary. And you are correct that I read the 36,000 pages, plus tens of thousands of more pages in a 2018 supplement, and, yes, made a recommendation based on the evidence in those documents. So that is why ACICS was reinstated. The courts made that decision and remanded the decision back to us.

In terms of teach-out agreements versus teach-out plans, there is a significant difference. So a teach-out plan is when an institution is planning to close, or if an institution is in a fragile situation or showing signs of financial instability, the accreditor will require a teach-out plan, and that includes things like——

Ms. BONAMICI. I don't want to interrupt you, but I need to reclaim my time because I need to get another question in.

In general, we have heard of too many cases where the teach-out plan was a link to a website or some other predatory school that may themselves shut down. So would you agree—and I know you know the difference. Would you agree that a teach-out agreement

34

better serves the interests of students than a teach-out plan? And that's a yes-or-no question.

Ms. JONES. Well, ma'am, a teach-out agreement is a contract between two institutions. The Department can't force a teach-out agreement. I would agree with you that our teach-out plans need to be more robust. Unfortunately, the consensus decision of the negotiated rulemaking panel did just that.

Ms. BONAMICI. But would you agree that a teach-out agreement better serves students than a teach-out plan? I'm not asking you whether the Department can be part of it. I'm asking you is a teach-out agreement better for students than a teach-out plan?

Mr. INFUSINO. When it is possible to get a teach-out agreement, we always hope that they come through. We always hope that a school can find a teach-out——

Ms. BONAMICI. Thank you. So let me ask you this: The Department has outlined forthcoming regulations that you stated will include, quote, "financial triggers," close quote, that will require colleges to file a teach-out plan with an accreditor. So teach-out agreements provide a stronger safety net. So shouldn't your forthcoming regulations require teach-out agreements, not simply teach-out plans?

Ms. JONES. Well, ma'am, the regulations that you speak of are still—we have to go through a public comment period. So they're not final. So I can't comment on what will be in the final regulations. But the consensus agreement was that accreditors could and should require teach-out plans earlier. The other thing we did is——

Ms. BONAMICI. My question isn't about teach-out plans. It's saying, shouldn't the regulations require teach-out agreements, not just a teach-out plan that could be a link to a website?

Ms. JONES. So the consensus language does call for accreditors to try to get teach-out agreements and to encourage institutions to enter into them. We cannot force teach-out agreements. These are contracts between two institutions, oftentimes involving financial arrangements that cannot be forced by us or an accreditor.

So absolutely, we want schools to seek them sooner, but we can't force them. We can't require them.

Ms. BONAMICI. And I see my time is expired. I just want to say I hope that you and the Department will do more to protect the students and the taxpayers.

And I yield back.

Mr. KRISHNAMOORTHI. Thank you, Congresswoman. I know that votes have been called. We're going to try to get a little bit more questioning in here before we go to votes, adjourn, and then come back.

So, Congressman Grothman, you have five minutes.

Mr. GROTHMAN. Would you mind if I yield my time to Congresswoman Foxx?

Mr. KRISHNAMOORTHI. Okay, sure. Dr. Foxx, you have five minutes.

Ms. FOXX. Thank you, Mr. Chairman, and thank you, Mr. Grothman.

Thank you for clarifying the fact that it was not the Department itself that decided to reopen the ACICS case. It needs to be stated

35

over and over and over again that the court ordered the Department to do that. You have been painted as somebody who had a nefarious reason for opening up this plan, and I think it's a very unfair portraiture of you, and so I am glad that question was asked and has been clarified.

You also have been portrayed as somebody who cares nothing at all for students, but only about making money. But I know that you have an accomplished history in postsecondary education, including not only for-profit schools, but a public community college.

Please tell us about your experience at a public community college and your responsibilities there and why you came to work at the Department of Education, and maybe what is it that gets you out of bed every day, given the vilification that is made of you and the Secretary?

Ms. JONES. Thank you, Congresswoman, for that question. You know, Dr. Foxx, what gets me out of bed every morning is that I had an opportunity to change my life by going to college, and I want every student to have the opportunity to change their life by going to college, by doing an apprenticeship, by finding whatever it is that helps them move forward.

And so, I come to work every day because there are students who, like me, have an opportunity to move forward if there's somebody to help them find the way. And, in fact, that's why I taught at a community college for 10 years.

I'm a molecular biologist by training. I was running a lab, and I was asked to teach an evening microbiology class as an adjunct faculty. I found my passion. My evening students were nontraditional students. I loved working with them. And then eventually I joined the full-time faculty and, in fact, was able to get National Science Foundation grants. I ran STEM camps for middle school kids. I ran STEM programs for teachers. I ran all kinds of extra programs. The students were amazing, and they just needed somebody who cared.

Ms. FOXX. You were not allowed to completely answer your question about teach-out plan and teach-out agreement. I'd like to make a comment as an educator. I don't call myself a former educator, because I think everybody around here will tell you I still act like one and I'm proud of that. And by the way, that's why I do what I do every day is for the same reason that you do it.

But I would assume that a teach-out plan by the schools where the students are enrolled that help them get to certain places would be better than a teach-out agreement where another institution picks up the students and helps them. But it appears to me that if you can have both of those things, that would be the ideal situation.

But tell me if I'm right in my perception of that, and how can this committee understand better the approaches that you are taking in teach-out plan and teach-out agreements? And I understand you have no control over those.

Ms. JONES. Well, Dr. Foxx, I think of myself as an educator, too, and I will until the day I die. And I can't wait to have the time in my life where I can teach as an adjunct faculty member again.

Teach-out plans and teach-out agreements, absolutely, we would love to see situations where both are available. For some students,

it's better for them to go to another institution and complete. For other students, if they're close to graduating it might be better to complete at the institution where they're enrolled. And in other instances, students find their way forward through a transfer agreement. There are differences between plans and agreements. We support both and we hope both are in existence. No student is required to take the options that are available to them through a teach-out agreement. So I agree with you, we need both.

The problem is we can't force a teach-out agreement, because it is a contract between two institutions. We can encourage, and I can assure you that as Argosy was closing, I spent many evenings and weekends on phones with presidents of other institutions asking them if they would be willing to serve as a teach-out partner and enter into a teach-out agreement. And their accreditors reviewed those plans, but we cannot force them.

Ms. FOXX. Well, I thank you very much. And I will tell you, you know, I invest a lot of time in these hearings, and I'm on two committees. And honestly, on this subject we have the most experts in the Congress of any subject that I am aware of, bar none. And they have no experience whatsoever.

Thank you very much. I yield back my time.

Mr. KRISHNAMOORTHI. Thank you, Dr. Foxx.

I'm going to recognize myself for five minutes of questions.

Secretary Jones, the three largest college collapses in American higher education were ITT Tech, Corinthian Colleges, and Education Corporation of America, also known as ECA. ACICS accredited ITT Tech before its collapse, correct?

Ms. JONES. I believe ITT Tech was accredited by ACICS, yes.

Mr. KRISHNAMOORTHI. And ACICS accredited Corinthian Colleges before its collapse as well, correct?

Ms. JONES. No, sir. ACICS accredited some of the Corinthian College campuses. There were several Corinthian college campuses accredited by another accreditor. And all of the Heald Colleges were accredited by WASC, the Western accreditor, which is a regional accreditor in California.

Mr. KRISHNAMOORTHI. But the ones that—among the ones that collapsed in the Corinthian Colleges chain were ACICS-accredited ones, right?

Ms. JONES. No, Congressman, that is not correct. In fact, it was Heald College that was the only college that admitted to falsifying data, that admitted to misrepresentation, and that was the regionally accredited campus. So that is the only group of campuses for which the Department has evidence and an admission of misrepresentation.

Mr. KRISHNAMOORTHI. So you're saying Corinthian Colleges is up and running today?

Ms. JONES. No, sir, I am not.

Mr. KRISHNAMOORTHI. So was Corinthian Colleges accredited by ACICS or not?

Ms. JONES. Some of the campuses.

Mr. KRISHNAMOORTHI. So yes. So some of the Corinthian College campuses were accredited, and those are no longer in operation, correct?

37

Ms. Jones. And neither is the regionally accredited campus of Corinthian, correct.

Mr. Krishnamoorthi. And last December before ECA collapsed and left 20,000 students and their families without an educational home, ACICS had accredited ECA, correct?

Ms. Jones. They had accredited ECA, but ECA was——

Mr. Krishnamoorthi. Thank you. According to the National Center for Education Statistics, the average graduation rate for four-year colleges is 60 percent. According to a letter from 13 state attorneys general in April 2016, only 35 percent of students enrolled at ACICS-accredited schools graduate from their programs, the lowest rate from any accreditor. It should come as no surprise that the Department of Education revoked ACICS' recognition as an accreditor on December 12th, 2016.

Ms. Jones, at 35 percent, ACICS-accredited schools had a graduation rate that was much lower than the national average. Is that worth celebrating, in your opinion?

Ms. Jones. Well, Congressman, I need to make the point that when you look at the 60 percent, you're looking at schools of all selectivity levels. Frankly, and I love community colleges, but most would die to have a 33 or a 35 percent completion rate.

Mr. Krishnamoorthi. Okay, let's talk apples to apples. Four-year colleges. We're only talking about four-year colleges with a four-year graduation rate. The national average is 60 percent. For ACICS-accredited four-year colleges, their six-year graduation rate is 35 percent. Is that worth celebrating or not?

Ms. Jones. Well, sir, I don't think it's worth celebrating, but that actually is a fairly strong performance for an open enrollment institution.

Mr. Krishnamoorthi. Well, let me just tell you what you said two years ago. You were very clear. As a for-profit college lobbyist, in rebuttal expert disclosure testimony in Colorado versus Center for Excellence and Higher Education, you said, quote/unquote: "We would have been popping champagne corks if we had 30, 32, 44 percent graduation rates."

In reinstating recognition of ACICS in November 2018, the Department stated that ACICS met 19 out of 21 Federal criteria, including that ACICS is, quote/unquote, "widely accepted by the national higher education community." Wide acceptance, that's a term of art, is a legally established, quote/unquote, basic "eligibility requirement," meaning if ACICS does not meet this criteria, it is ineligible to receive Federal recognition.

Let me walk you through what the five accreditors you recently cited in October said—and, actually, you repeated this in your March response to our correspondence—said when asked by Congress about their support for ACICS. One, ACTE said that it is, quote, "not in the position to judge if another accreditation agency is, quote, 'widely accepted.'" Another, AART, said it does not, quote, "make statements regarding how widely accepted a particular accreditor is."

Now, these are not national accreditors. They are small programmatic accreditors and they are not ACICS' peer. Now, would you recognize the Accrediting Bureau of Health Education Schools, a national accreditor, as ACICS' peer?

38

Ms. JONES. Yes, I would recognize them as a peer.

Mr. KRISHNAMOORTHI. Well, they didn't endorse ACICS either. And that was one of the letters you put forth in support of the proposition that ACICS is a widely accepted accrediting organization. They explicitly stated in their letter that it is not, quote, "their practice to endorse other organizations."

At least three out of the five letters that you submitted in support of wide acceptance eligibility for ACICS do not state what you purport that they state, that ACICS is a widely accepted accrediting organization. In light of this information, which we received in correspondence from those accrediting agencies, would you be willing to reconsider your recognition of ACICS as an accreditor, federally recognized accreditor?

Ms. JONES. Well, Congressman, the decision is not mine to make. I made a recommendation, but I am not the decider. But I do want to point out that the criteria is not for an endorsement.

And so when you evaluate an accreditor to determine whether it's widely accepted, the question you are asking is, are there other accreditors that will accept an ACICS-accredited institution to either be a programmatically accredited institution? Will a licensing body give licensure to students who graduate from an ACICS accredited institution?

And, sir, I have those exhibits with me if you'd like to see them. The letters came from those organizations and, indeed, affirmed that accreditation, or when a student completes an ACICS accredited—when a student completes their degree at an ACICS-accredited institution, yes, that accreditation is accepted by those other organizations.

Mr. KRISHNAMOORTHI. I'm sorry, that's just flat-out wrong, according to the Federal regulations. I thought you would answer that way. 34 CFR 602.13 clearly states what wide acceptance by other agencies means. It says: The agency—that is in this case ACICS—must demonstrate that its standards, policies, procedures, and decisions to grant or deny accreditations are widely accepted in the United States by, and it says (a), educators and educational institutions; and (b), licensing bodies, practitioners, and employers in the professional or vocational fields for which the educational institutions or programs are within the agency's jurisdiction.

None of these agencies that sent those supporting letters have stated that they accept the policies, standards, procedures and decisions. It's not about whether they would take students who are transferring over; it's whether these particular regulations have been satisfied.

So would you reconsider the decision to reinstate that recognition, in light of this new information that we've received in correspondence from those five institutions?

Mr. INFUSINO. Well, Congressman, I appreciate that you read the regulation, and I didn't hear the word "endorsed" anywhere in what you read. Widely accepted means that licensing bodies and other accreditors will accept as a measure of quality the accreditation of ACICS, either because that's the institutional accreditor and the programmatic accreditor is willing to provide programmatic accreditation at the institution; or, in the case of a licensing body, because when a student graduates from an accredited institution,

39

they can sit for a licensure exam. And so, sir, they did, indeed, meet the criteria in the regulations, and there is no word "endorsement" anywhere in those regulations.

Mr. KRISHNAMOORTHI. And nobody said that they had to endorse. What they did have to say is that they met the standards set forth in the regulation, which they did not.

Ms. JONES. And I have the documents here that were provided from those accreditors, and I'm happy to share them with you.

Mr. KRISHNAMOORTHI. And we're happy to share the correspondence so you can reexamine this new information that has come forth from the accreditation agencies, which purport to be opposite of what has been stated as their support for Federal recognition of ACICS.

We'd better take a pause right now for votes. We will be back at 5 o'clock. Thank you so much.

[Recess.]

Mr. KRISHNAMOORTHI. Thank you and sorry for the recess and thank you again, Secretary Jones, for bearing with us.

I'd like to recognize Dr. Foxx for her questioning for five minutes. Thank you, Dr. Foxx.

Ms. FOXX. Thank you, Mr. Chairman.

Ms. Jones, I want to go back to clarify the scope of the Education Department's responsibility again as it related to ACICS.

Do you have the—did you have the ability to unilaterally open up the ACICS decision?

Ms. JONES. I did not have the ability. The Department had already rendered a decision. It was the Court that remanded the decision back to the Secretary, and I simply made a recommendation to her as to my review.

Ms. FOXX. Okay. All right.

So, I'd like to revisit the conversation on the closure of Corinthian campuses. There was ACICS and a regional accreditor who accredited Corinthian Campus. Is that correct?

Ms. JONES. That is correct, Dr. Foxx.

Ms. FOXX. Okay. The fact that both a regional and a national accreditor were caught up in this tells me we can't single out any one accreditor, that all accreditors need to improve their analysis of quality assurance and continuous improvement. In PROSPER, which we passed in the committee last year, we talked about the need for total reform and the focus on outcomes for students. We believe that's where the accreditor should be. It's very disappointing to me to hear that the fraud went on under an institution that was accredited by a regional accreditor, and I don't think we can say that often enough.

I also want to say right here that I don't want any bad actors out there. I don't care who they are, whether they're for-profits, nonprofits, publics. We don't need any of those, and I just want to reiterate that. Every Republican feels that way. We're not here to defend any one segment of the education institutions. We want all students have the best possible of experience.

Now I want to ask you, Did the closure of Corinthian and ITT campuses happen when President Trump, Secretary DeVos, and you were in office at the Department of Education?

40

Ms. JONES. No, Dr. Foxx, that happened prior to our administration.

Ms. FOXX. Right. It's my understanding that Corinthian closed in 2015 and ITT closed in 2016.

Ms. JONES. I believe those are the correct years.

Ms. FOXX. So, President Obama had been in office for seven years when Corinthian closed and eight years when ITT closed. So can you tell me why President Obama and the other Secretaries of Education in his administration continued to let these horrible, greedy schools exist during his entire administration? Why is this suddenly only a problem now?

You don't need to answer that.

Ms. JONES. Oh, thank you.

Ms. FOXX. Never mind.

That is just something I have considered for a long time, knowing myself when these institutions shut down.

And by the way, they did nothing, absolutely nothing to help those students. They didn't do teach-outs. They didn't do agreements between institutions. And I said at the time that the people who were being hurt were the students because the Obama Administration could have had an orderly shutdown of those institutions, and it did not. They didn't care about those students. They just shut them down arbitrarily and didn't give them a chance to help those students get their transcripts, teach them out, or anything. That's wrong.

The truth is that Congress has failed in its obligation to produce laws and statutes that serve in the interest of students. That's what we should be about, not caring what kind of institution it is, but we have to reform the HEA and the whole system.

So, can you—what are some examples of how you and career staff at FSA and OGC tried to help students when Argosy closed?

Ms. JONES. Well, thank you for that question.

I have to say that the professional staff at FSA have been amazing, and it's just unbelievable the amount of work they've done, and I might add, including a number of them that spent at least five hours a day working between Christmas and New Year's, although they were officially on leave. We were on calls at least five hours a day. So I want to give a shout-out to the professional staff at FSA because they've been amazing.

So there are a number of things that we've done. I personally got involved. Students who called, parents who called or emailed, I responded to those calls or emails. I worked with the state and others at FSA worked with the state-authorizing agencies to identify other schools that might be able to accept those students. There was information provided on the FSA website. FSA went to teach-out fairs, and then I personally spent a long time with institutions and accreditors. There was one accreditor, the American Psychological Association—it's very difficult to have a programmatically accredited program enter into an agreement, and I spent a lot of time with the APA, again, working with them to help facilitate teach-out agreements.

Ms. FOXX. Thank you.

One more quick question, Mr. Chairman, which I hope will help us as we develop legislation. Seriously, this is going to that issue.

41

So it's a tricky situation at Education Corporation of America. What happens when ownership of a school—and what happens when ownership of a school happens in receivership? To the best of my knowledge, the topic of receivership is not mentioned at all in the statutes or regulation. Is that correct?

Ms. JONES. That is correct.

Ms. FOXX. How can Congress help the Department in this regard? Because I think the situation with ECA could have been better had we had some rule on this issue.

Ms. JONES. Thank you very much for recognizing that.

Both with ECA and with Argosy, we had the additional complication of those schools went into Federal receivership. To my knowledge, these were the first two schools that ever went into Federal receivership. And while statute is very clear about what we're supposed to do in the case of bankruptcy, there's no mention of receivership, and, frankly, not only did we lose certain authorities but the accreditors lost certain authorities and the school was no longer being run by qualified people. It was being run by a receiver. So it's a very tricky situation, and it would be great to have some help.

Ms. FOXX. Mr. Chairman, thank you for that indulgence because I did really want to us get some idea of how we could make the legislation better. Thank you.

Mr. KRISHNAMOORTHI. Sure. Thank you, Dr. Foxx. And thank you for your commitment to higher education. We worked very hard on getting some legislation signed into law last term on strengthening career and technical education.

I just want to point out one thing, which the gentlewoman from North Carolina already knows, but, of course, the Obama Administration crafted and implemented the gainful employment rules to weed out the worst actors. Unfortunately, this administration has not implemented those particular rules, even though the first gainful employment data set found 800 programs had failed the standard and another 1,200 were put on probation.

So, with that, I will now recognize Congresswoman Donna Shalala for five minutes.

Ms. SHALALA. Thank you very much.

What was your recommendation to the Secretary on the ACICS that it be reinstated?

Ms. JONES. Ma'am, there were 21 different criteria that I had to evaluate. And I provided a recommendation. In some cases, I found them in compliance. In other cases, I found them not in compliance. And in some other cases, I found them in compliance and recommended that the Secretary request a monitoring report. So each one of the criteria were evaluated.

Ms. SHALALA. So did you recommend to her that we—that you reinstate AC—the accreditation agency?

Ms. JONES. My recommendations were on my findings of each criteria. It was up for the Secretary to decide how she would use that information.

Ms. SHALALA. So you told her on the one hand/on the other hand, basically?

Ms. JONES. Yes, Congresswoman. I mean, it's an 83-page document. And I'd be happy to share it with you, but yes.

42

Ms. SHALALA. Yes, if you could.

Ms. JONES. Yes.

Ms. SHALALA. During the controversy between the accreditor Higher Learning Commission and the Dream Center schools, you issued a guidance document that rescinded an earlier policy. This guidance document allowed for accrediting agencies to retroactively accredit schools. In other words, unaccredited schools could pretend that they had been accredited when they were, in fact, not. This would have undoubtedly benefited the Dream Center which lost its accreditation in January—on January 20, 2018, and did not disclose that to their students until June 20, 2018.

Your guidance is dated just after that, July 25, 2018. Was this guidance designed specifically to assist the Dream Center?

Ms. JONES. No, Congresswoman. There had been a decision made based on one of the nursing programmatic accreditors with regard to the issue of retroactivity. That decision was then appealed, and so it was my job to review that appeal and issue guidance based on the Department's regulations regarding retroactive accreditation. The Department had always allowed it in the past, but I just want to make sure that I'm clear. It does not allow a nonaccredited institution to be retroactively accredited. The retroactive accreditation can only go back to the time of a positive decision by the decision-making body, meaning pre-accreditation.

So it cannot retroactively apply to a nonaccredited institution. And the reason that we need to do this is, if you cannot retroactively accredit an accredited program, you essentially set students up so that you have to graduate, in many cases, one entire class of graduates who could then never be accredited and practice in their field. So there's no way we can give title 4 funds to students and tell them: But no matter what happens, even if the program gets accredited or the institution gets accredited, you will never have a degree from an accredited institution.

That would disallow any new programs that lead to licensure and certification.

So that is the reason for retroactive accreditation. I believe HLC's policies even prior to our guidance was a 30-day retroactive accreditation policy.

Ms. SHALALA. Did you ever communicate with higher learning— the Higher Learning Commission or the Dream Center officials about this guidance before issuing it?

Ms. JONES. I do believe that somebody from HLC called me to ask me about retroactive accreditation, and I did let them know that we were revising our guidance. This was something that many accreditors were following and waiting for because of the appeal. So we had to come to the end of an appeal for the appeal that the nursing programmatic accreditor had submitted.

Ms. SHALALA. So did you base the rescission of this policy in any way on the accreditation dispute between the Higher Learning Commission and the Dream Center?

Ms. JONES. Absolutely not. It had nothing to do with the Dream Center. It was completely based on the appeal by the nursing programmatic accreditor.

43

Ms. SHALALA. In the last six months, there have been three major for-profit chain closures. These closures took students by surprise. How does the Department track colleges at risk of closure?

Ms. JONES. So the Department has requirements in our regulations for the Department to accept audited financial statements every year. The Department then evaluates those audited financial statements to come up with a composite score. And based on what the institution's composite score is, the Department either says it's a financially stable institution or it's in the zone or it's not a financially stable institution. And then we have different levels of action we can take including Heightened Cash Monitoring, letters of credit, et cetera. So we use the audited financial statements primarily to monitor financial risk.

Ms. SHALALA. Those schools were all on the Heightened Cash Monitoring. There are another 650 schools on the Heightened Cash Monitoring which are at risk of closing. So what are you going—how are you going to prioritize the monitoring for those schools?

Ms. JONES. Well, Congresswoman, not every school that's on Heightened Cash Monitoring is at risk for closure. There are a number of reasons that would bring a school into a Heightened Cash Monitoring situation. The Federal Student Aid professional staff in many instances require that the institution provide monthly updates of enrollment or of financial information. We have staff that monitor enrollments of a number of colleges, but the truth of the matter is our evaluation of institutions is based on audited financials, and they are always at least six months old when we get them. It is dated information, and we don't have the opportunity to do day-to-day or month-to-month. So we are always going to struggle with the fact that, by the time we get an audited financial statement, things could have changed at the institution.

And what Heightened Cash Monitoring does is it disallows institutions to pull money down from our system without either prepaying the students or prepaying the students and getting additional permission from us to draw down funds.

Ms. SHALALA. That's a lot of schools.

I yield back.

Mr. KRISHNAMOORTHI. Thank you very much, Congresswoman Shalala.

I believe our distinguished ranking member, Mr. Cloud, is up. And you have five minutes.

Mr. CLOUD. Thank you.

I will yield to the gentlelady from North Carolina, Dr. Foxx.

Ms. FOXX. You get to answer my questions again.

Thank you for that explanation.

So let me reiterate again: The retroactive accreditation was done for the students so that the time they were in school, the money they invested was not wasted.

What you did was to help the students.

Ms. JONES. That is correct.

Ms. FOXX. Thank you.

Ms. Jones, it seems to me that the Democrat Party is obsessed with so-called facts about for-profit schools. So let's take a closer look at the data. According to the College Board, tuition and fees over the last two years have increased 5.4 percent at public com-

44

munity colleges, 5.8 percent at public baccalaureate degree-granting institutions, and by 6.9 percent at private, what are called four-year—and they're not four-year—profit colleges. For-profit schools, their tuition and fees have gone down 12.5 percent over the same time period.

An AEI-Third Way report by Harvard Professor Bridget Terry Long tallied—Bridget Terry Long—excuse me—tallied completion rates of students across all post-secondary education sectors and disaggregated by racial characteristics. The category of school with the highest completion rates? For-profit, two-year institutions.

Mr. Chairman, I have a chart to submit for the record to show—prove what I am saying.

Ms. Foxx. What is notable is that the report also found White, Black, Hispanic, Asian, and Native American students attending four-year for-profit schools all completed at a better rate than their respective public four-year nongraduate degree college student counterparts. It's apples and apples, and that's what we should be comparing.

So far, I've provided data showing proprietary institutions, unlike the other sectors of postsecondary education, are responding to consumer demand for cheap—less expensive education. And they're doing a better job making sure their students earn a credential. But how are students attending for-profit institutions doing with student loan repayment compared to their other peers? According to the College Board, the answer is just as good, if not a little better, than community colleges which enroll a very similar type of student. The two-year default rate at public two-year schools, 23 percent; the two-year default rate at for-profit schools, 18 percent—five points lower.

I want to mention you yourself elected to attend a proprietary institution to earn the craft—learn the craft of massage therapy. I have a granddaughter who just graduated from a for-profit institution two weeks ago who is also pursuing a future as a massage therapist.

Why did you decide to pursue this education? How has this experience informed your outlook on helping all students succeed? And will you practice your art here tonight? Never mind. No.

Ms. Jones. Yes, I practiced as a massage therapist for seven years and, in fact, opened an alternative healthcare center in Catonsville, Maryland, and ultimately employed 15 people. Massage therapy was something that I enjoyed doing. I learned a little bit about it when I was a nursing assistant. And as I progressed through my career, I mean, frankly, the only way I could be a community college professor is if I had another part-time job. And I thought, wouldn't it be great to have my part-time job be something where I can really help other people and have schedule flexibility? So I chose to get a certificate in massage therapy.

Ms. Foxx. Just for the record, my daughter loves it; did not want to leave school but is anxiously awaiting getting her license.

I'm going to conclude by quoting from the comments in discussion section of a Bookings Institution report titled "A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and the Institutions They Attended Contributed to Rising Loan Defaults."

45

Buried at the end of the report, Columbia University economist and former member of the Board of Governors of the Federal Reserve System Frederic Mishkin emphasized the importance of offering better information to help solve the market failure of student lending.

Mishkin suggested, quote: The idea that for-profit institutions are just bad guys who need to be taken care of is not the right way to think about solving the problem, he argued. Focusing on the market failure aspect may help bring to light the kinds of innovations that could come from for-profit institutions, particularly in the online sector. The idea of simply closing down or otherwise severely punishing for-profit institutions, he concluded, could actually be very bad public policy.

Mr. Chairman and Mr. Lead Republican, thank you very much for yielding time to me. I yield back.

Mr. KRISHNAMOORTHI. Thank you, Dr. Foxx.

Okay. I am going to ask another series of questions here.

Secretary, on January 18, 2019, Dream Center, a not-for-profit company that really seemed like a shell company used to operate a chain of for-profit schools, entered into a receivership due to potential insolvency.

A Department of Education statement said, and I quote: Significant funds were released by the Department since mid-January including after the receiver was appointed, close quote.

Ms. Jones, exactly how much Federal funding did Argosy operating under Dream Center receive during this January through February 2019 time period?

Ms. JONES. I believe the total that they received was around 13 million. The bulk of that was disbursed prior to the receivership, and there was a small bit of it that had been approved prior to the receivership and that the receiver was able to draw down after the receivership. So I believe that it was in the neighborhood of 13 million that had been released. The rest of the funds that would have been disbursed for spring semester were held in our system because they were on HCM2 once they went into receivership.

Mr. KRISHNAMOORTHI. Got it.

And HCM is Heightened Cash Monitoring.

Ms. JONES. That's correct.

Ms. FOXX. On February 22, Dream Center receiver Mark Dottore—or Dottore—publicly stated that where—I'm sorry—stated, and I quote: There were irregularities in Dream Center's Title 4 requests before the receivership began.

Secretary Jones, do you know what irregularities Mr. Dottore is referencing?

Ms. JONES. I don't know what he is referencing in particular. I haven't reviewed those records. I believe though that what he was concerned about is that the institution was on Heightened Cash Monitoring, which meant that it had to pay students' stipends first, and I believe what he was trying to determine is how many students been paid their stipend.

Mr. KRISHNAMOORTHI. Do you know if Dream Center falsified certifications to the Department to draw down students' stipend funds?

Ms. JONES. I don't know that. There is a review that's ongoing.

46

Mr. KRISHNAMOORTHI. So, the Department is currently conducting an investigation into this matter?

Ms. JONES. The Department is currently reviewing documents. And, yes, we will go back and look at student accounts, in particular, because we have canceled loans for all of the Argosy students or other Dream Center students who were enrolled in the spring semester. And so it will take time to go back and sort through all those records.

Mr. KRISHNAMOORTHI. Reports show anywhere from $13 million to $16 million meant for students' stipends were given to these financially troubled institutions and has since gone missing.

Can you explain in detail how the missing funds were used?

Ms. JONES. I cannot explain in detail. We haven't received those financials. However, what I was told is that the $13 million did not go missing but was instead used to pay for things like rent, textbooks, continuing services for the computer systems. And so, while it is inappropriate to use those funds without first paying stipends, if what I was told is correct, it's not that it went missing. It's that it was used at a time when it should have been used for student stipends.

Mr. KRISHNAMOORTHI. Got it. So it may—now how about for Dream Center officials, the Dream Center Foundation, or other high-level employees, payments to those folks?

Ms. JONES. I have no idea. That would be part of the financial records. So, once a school closes, we are—they are required to provide us with audited financials. To my knowledge, we have not yet received those financials, but I will double-check when I get back.

Mr. KRISHNAMOORTHI. Got it.

And how about Dream Center CEO Brent Richardson? Did he receive a bonus before he stepped down?

Ms. JONES. We are told that Brent Richardson never took a penny of salary for his work with Dream Center Education Holdings. Again, we haven't received audited financials, but we were told by multiple people that he never took a dollar.

Mr. KRISHNAMOORTHI. And how about other Dream Center officials? Do you know if they received bonuses before the company's collapse?

Ms. JONES. I don't know.

Mr. KRISHNAMOORTHI. Okay. Students did not receive the stipends they expected. Do you know how many students in total did not receive their expected stipends?

Ms. JONES. I don't have an exact number for you. We can look that up.

Mr. KRISHNAMOORTHI. Yes, could you please commit to going back and answering that question, plus the previous question about whether any officials from Dream Center received any bonuses or compensation before the collapse?

I just want to say, you know, not only has these students' education been disrupted but really their quality of life has been directly harmed, and I think everyone would agree about that. Students relied on these stipends for their rent and other necessities. We are aware of at least one student, a veteran with a wife and six children, who experienced homelessness because of the diversion of his stipend.

47

Is the Department doing anything currently to help students in these types of circumstances?

Ms. JONES. Yes, Chairman. So we agree with you that not getting stipends is devastating to students. We spent about three weeks trying to figure out if we had the authority to make direct payments to the students of their stipend because, remember, the majority of the money was still being held in our system. We had not released it. So we spent several weeks, looking. We don't have the authority to make direct payments. So the best we could do was cancel the loans that the students took for the spring semester. So every student, although we could not help them get their stipend, we were able to cancel their loan, and for those students who through a teach-out agreement moved to another institution, they were able to apply for aid at the new institution. And because we had canceled the loan, they could then get their stipend for the semester.

Mr. KRISHNAMOORTHI. Secretary, I urge you to please get to the bottom of this matter and make it a priority because we are aware of constituents and others who are directly harmed by what happened in this particular Dream Center matter. And we owe that to these students. I have no doubt that members of this subcommittee will be in touch with additional inquiries into Department actions to find the truth with regard to this matter, and we urge you to cooperate with us in furthering the investigation.

Ms. JONES. Absolutely.

Mr. KRISHNAMOORTHI. At this time, I am going to turn the gavel over to Congresswoman Tlaib who will conduct the rest of the proceedings and the rest of the questioning here.

Congresswoman Tlaib, ready for the gavel? Okay.

Ms. TLAIB.

[Presiding.] Yes, I won't break it.

Mr. KRISHNAMOORTHI. Okay. Thank you.

Ms. TLAIB. Thank you so much for joining us.

I yield five minutes to myself.

Just yesterday, the Department responded to questions for the record that stated, quote: The Department believed then and continues to believe that these campuses were in accredited status until their date of closure. Let the students at these schools...on record—let it be known as being told that their school was not accredited. Their transcripts shows not accredited, but you maintain that all along that these two schools were accredited.

The question is: Is it within your authority to overrule HLC and retroactively make these schools accredited? And, if so, is that what you are trying to do today?

Ms. JONES. It is not within our authority to overrule the accreditor. However, we have reviewed the accreditor's standards and have found a number of inconsistencies. And, in fact, they did not have a policy in their standards that would have allowed them to take a negative action against the institution, which is why they continued to participate in Title 4. And it so is still our position and our belief, we perceive that those institutions were accredited because there was nothing in the HLC standards that would have allowed them take a negative action against those institutions.

48

Ms. TLAIB. If you believe these schools were accredited, then why did you order Dream Center officials to amend their web page?

Ms. JONES. Well, it was a long and complicated review of standards. And the most important thing was to make sure that the information that the students received was consistent with the accreditors' website. So, despite our concerns about the accuracy, we have a long process that we have to go through to review accreditor standards. And it was important to us that the school adhere to the rules of their accreditor and used the language required by their accreditor on their website.

Ms. TLAIB. So I don't know if—so these responses also state that, on July 18th of 2018, you told Dream Center officials to take corrective action and remove their false declaration of accreditation status. Is that correct?

Ms. JONES. Yes, on July 17th, I had a call with a number of accreditors. And HLC then raised the issue that the website had incorrect information. On the next day, I met with Dream Center leaders, and I provided them with a list of bullets of the information that I had received from accreditors, and part of that was to say to them please update your website to be consistent with HLC's requirements.

I learned after the fact that they had already updated their website, and HLC confirmed to me that the website was correct.

Ms. TLAIB. In responses to QFRs submitted to Senator Durbin yesterday, the Department stated that HLC did not notify the Department that they have taken an adverse action against the institution, which would have disqualified these institutions from participating in Federal Student Aid programs.

Is it your understanding that HLC did not send a copy of their July—January 20th letter or any other related correspondence about the suspension of Dream Center's accreditation to Department officials?

Ms. JONES. I was not at the Department at the time of the transaction, and so I am not in possession of their letters. However, what I was told is that the letter that the Department received from HLC described change-of-control candidacy status as a pre-accredited status, and pre-accredited is an accredited status.

Ms. TLAIB. In December 4th of 2018, a letter to Senator Durbin, you stated that prior to August 2, 2018, only two meetings between the Department personnel and Dream Center representatives occurred in regard to the impending closure of many of Dream Center's campuses.

To clarify, other than these two meetings, did you ever communicate in any way, including but not limited to exchanging calls, emails, or text messages Brent Richardson, Randall Barton, Shelly Murphy, or any other Dream Center officials?

Ms. JONES. Shelly Murphy was their regulatory affairs person. She was the person that I was told to communicate with. I don't remember the exact date, but when we had the meeting, because there were so many accreditors involved in the closures and because it was so complicated, I did say that I would convene accreditors to make sure they were all in agreement that the teach-out plan was sufficient. And at some point in time during those meetings, I did communicate with Shelly Murphy that indeed the

49

accreditors did want to work together. And, in fact, I continued to work with the accreditors throughout the closure.

So I don't remember the exact date, but——

Ms. TLAIB. What was discussed at those meetings?

Ms. JONES. The first meeting was when—in fact, the first meeting in June was the first time I ever met anybody from the Dream Center, and that is when they met with a large group of us, including professional staff from the Department. That's when they said to us that the financial condition of some of the campuses was worse than had been presented to them and that they would need to close a number of campuses. And I think they may have given us the number of 30 campuses.

And so they were talking to us about the campus closures. At the time, you know, we said: You need to notify your accreditors. You need to have teach-out plans.

And we talked about how that might move forward.

Ms. TLAIB. I have to reclaim my time. I'm so sorry, Ms. Jones. Yes or no. Have you exchanged text messages with Brent Richardson?

Ms. JONES. I'd have to go back and look at——

Ms. TLAIB. Sources have been in touch with the subcommittee attesting that you, in fact, texted with Dream Center officials about their suspended accreditation.

Do you agree with that statement?

Ms. JONES. I don't remember. I have to go back and look.

Ms. TLAIB. You don't remember texting?

Ms. JONES. I don't remember texting. I do remember receiving a text from Shelly Murphy that she wanted to talk. I——

Ms. TLAIB. But not Brent Richardson.

Ms. JONES. I'd have to go back and look. I just don't remember.

Ms. TLAIB. Can you followup with the committee please?

Ms. JONES. Absolutely.

Ms. TLAIB. I really appreciate it. Thank you so much.

I will now acknowledge Congresswoman Pressley for her first round of questions.

Ms. PRESSLEY. Thank you, Madam Chair.

Ms. Jones, I'm going to get straight to the point because I'm limited on time here. We have heard extremely troubling figures regarding the Department's lack of action on borrower-defense claims. Department data shows since June 2018, not a single borrower-defense claim has been processed.

Ms. Jones, at this moment, do you know how many claims remain unprocessed?

Ms. JONES. It is a number that changes from time to time. It is probably in the neighborhood of 160,000. The last official count I got was 158,000, so I'm assuming it's somewhere in the name of 160,000 by now.

Ms. PRESSLEY. Well, that is absolutely unacceptable.

Each and every one of these outstanding claims represent a defrauded and harmed student, a student who has been saddled with debt, which is standing in the way of a future degree or a better job to support their family, or a student who literally showed up to a school to find the doors closed. These are lives that have been forever impacted by this industry's predatory and deceptive prac-

50

tices. So it is crucial that we understand how the Department has allowed these claims to pile up. Ms. Jones, for the record, please, yes or no, is there currently a policy which restricts the office of Federal Student Aid from adjudicating or processing any borrower-defense claims that did not stem from a school closure?

Ms. JONES. The problem that we are trying to solve at the Department is that the——

Ms. PRESSLEY. I'm sorry. I'm short on time.

Yes or no? Is there a policy that prevents——

Ms. JONES. There is not a policy that prevents the review of claims. However, we are not able to determine the level of harm or the level of relief that a borrower should get because the methodology we use is now being challenged by the California courts. So, we continue to process——

Ms. PRESSLEY. Reclaiming my time.

In June of last year in a judgment against Secretary DeVos that prevented the Department from collecting on certain Corinthian College students, the ruling stated, and I quote: Nothing in this order, nothing in this order prohibits the Secretary from fully discharging the loans of any borrower who has successfully completed or who successfully completes an attestation form, unquote.

So I'm trying to understand what is the holdup here, Ms. Jones. So, yes or no, can you commit to a concrete timeframe for adjudicating the more than 160,000-plus claims the Department has allowed to buildup?

Ms. JONES. No, Congresswoman, I could not commit to a time. We are still waiting for the California court——

Ms. PRESSLEY. I'm reclaiming my time.

Ms. JONES. But we also said that it was appropriate——

Ms. PRESSLEY. I'm reclaiming my time.

Ms. JONES [continuing]. for us to——

Ms. PRESSLEY. I'm reclaiming my time.

Ms. JONES [continuing]. deliver——

Ms. PRESSLEY. The court case does not apply to all borrowers. What about the others? Are you not going to process any of them?

Ms. JONES. We are processing claims. We continue to process. What we can't do is determine the level of harm or the level of relief——

Ms. PRESSLEY. Okay. Reclaiming my time.

Ms. JONES [continuing]. because the methodology has been challenged.

Ms. PRESSLEY. I'm sorry. I'm short on time. I'm reclaiming my time.

Ms. Jones, the Project on Predatory Lending at Harvard reports that up to 14,000 students from ITT, the for-profit chain which collapsed in 2016, are still awaiting their claims to be processed. Do you know how many of those 14,000 have actually been processed?

Ms. JONES. I would have to get back to you with——

Ms. PRESSLEY. Since 2016? I actually have the number. The answer is 33—33 in four years, Ms. Jones. To add insult to injury, some of these students have even had their tax refunds garnished as their claims have been stalled,

People like my constituent in Mattapan, a neighborhood in Boston who respectfully asked to remain anonymous. His claim has

51

been processing for more than two years, and he has received no response from your agency. His loans are now in default. His wages, his tax refunds including his earned income tax credit have been garnished. He's a single father, just trying to get by to support his family and bounce back from being targeted by this industry.

These are the stories behind the claims that your agency leaves unprocessed, 33 in four years, Ms. Jones.

Ms. JONES. I would encourage your constituent to reach out to us because he should be——

Ms. PRESSLEY. Reclaiming my time.

Ms. JONES [continuing]. in forbearance——

Ms. PRESSLEY. I'm reclaiming my time.

Ms. JONES [continuing]. and not be in collections.

Ms. PRESSLEY. Ms. Jones, does the Department refer students with unprocessed borrower-defense claims to the Treasury Department?

Ms. JONES. Could you repeat that question?

Ms. PRESSLEY. Do you refer that information to the Treasury Department, borrower-defense claims? Are you sharing information with the Treasury Department around borrower-defense claims?

Ms. JONES. I don't believe we share that information with the Treasury Department. I believe that it's the servicers who may have provided information about a default. But, again, when somebody has a pending borrower-defense claim, they are entitled to a forbearance, which means they would not be in default on their loan. They would not have to make payments.

Ms. PRESSLEY. Reclaiming my time.

Ms. JONES. So have your constituent——

Ms. JONES. Reclaiming my time.

Ms. JONES [continuing]. reach out to us.

Ms. PRESSLEY. I'm sorry. Reclaiming my time. I'm running out of time here.

The FOIA documents show that Corinthian's marketing and advertising plan was tailored to low-income people and single mothers of color specifically. The internal documents heartlessly describe these potential students as desperate for a better future and afflicted with low self-esteem, the internal documents. And yet you sit on thousands upon thousands of claims of students that attend schools like this.

Can you commit to providing this committee a detailed plan in the next two weeks, explaining how you plan to expeditiously address these 160,000 unprocessed claims?

Ms. JONES. No, Congresswoman, I cannot.

We are waiting for the California court to make a determination——

Ms. PRESSLEY. This does nothing——

Ms. JONES [continuing]. about our methodology.

Ms. PRESSLEY. That does not speak to all of the loan—of the borrowers.

Ms. JONES. Every single borrower defense——

Ms. PRESSLEY. That——

52

Ms. JONES. Every single borrower-defense claim has to be evaluated for the level of harm and the level of relief. The only methodology——

Ms. PRESSLEY [continuing]. Ms. Jones——

Ms. JONES [continuing]. we have is under——

Ms. PRESSLEY [continuing]. Ms. Jones——

Ms. JONES [continuing]. the courts.

Ms. PRESSLEY. Respectfully, there is no answer that you could provide me that would be sufficient when you have processed 33 claims in four years, and we're talking about thousands of lives which have been irreparably damaged.

I yield back.

Ms. JONES. We processed the Corinthian——

Ms. PRESSLEY. I yield back.

Ms. JONES [continuing]. claims first.

Ms. PRESSLEY. I yield back.

Ms. JONES. So, there have been more than 33 claims total processed.

Ms. PRESSLEY. I yield back.

Ms. TLAIB. Thank you so much.

We will now start our second round. I recognize myself for my second line of questioning.

One year ago today, the House Education and Labor Committee, Ms. Jones, held a hearing with Secretary DeVos on a variety of ethics and conflict-of-interest issues involving Secretary—the Secretary and other appointees of the Department, including yourself.

On January 28, 2017, President Trump issued an executive order which required that every executive branch appointee sign and abide by an ethics pledge. The ethics pledge includes a provision that states, and I quote: I will not for a period of two years from the date of my appointment participate in any particular matter involving specific parties that is directly and substantially related to my former employer or former clients, including regulations and contracts.

Ms. Jones, did you sign that ethics pledge?

Ms. JONES. I did, and I had the good fortune of having gone to the Department of Labor before the Department of Ed. So I've had two career attorneys review that pledge, review my background, and confirm that I am recused from the appropriate prior employers.

Ms. TLAIB. It's wonderful you signed it.

On your financial disclosure report, you reported that, in 2017, while you were a senior fellow at the Urban Institute, you were also an expert witness for the Center For Excellence in Higher Education on, quote, Higher education policies, practices, and regulations.

Ms. JONES. That is correct, and they are on my list of recusals.

Ms. TLAIB. Okay. On your Lincoln page, it currently states you were President of AJ Squared Consulting until October 2017—October 2017. Is that correct?

Ms. JONES. Yes, October 2017, yes. That is correct.

Ms. TLAIB. Did you have any other consulting clients during the two years prior to your appointment at the Department of Education?

53

Ms. JONES. Yes, I did. I spent one month doing a project for APSCU, which is a trade association. They are on my list of recusals. And I spent a couple of months writing a report for Rasmussen University, and they are also on my list of recusals.

Ms. TLAIB. This committee is currently investigating the Trump administration's use and disclosure of ethic waivers as part of an effort to reform and improve existing ethic laws, as you know. Last week, Chairman Cummings sent letters to the White House and 24 Federal agencies, including the Department of Education, seeking information on the use of ethic waivers.

Ms. Jones, have you been issued a waiver under the ethics pledge or any other ethics rule?

Ms. JONES. I have received no waiver with regard to my recusals. I'm not quite sure what you mean by a waiver, but I have not asked for it or received a waiver from any of the organizations or institutions on my recusal list.

Ms. TLAIB. Yet despite the fact that you have not obtained a waiver or you think you didn't have to obtain a waiver, you have participated in matters including the gainful employment rule that are substantially related to your former clients in the for-profit higher education industry.

Did you ever complete an ethics agreement during your time at the Department of Labor?

Ms. JONES. I did.

Ms. TLAIB. As part of the Ethics Committee—agreement—oh, I'm sorry. Did you ever—ethics agreement during your time at the Department of Labor or at the Department of Education? Ethics agreement, you did both of those ethics agreements.

Ms. JONES. I did both of those.

And just to be clear about gainful employment, I spent time with attorneys at both agencies. And I am not recused from working on issues related to gainful employment because the restrictions are around particular issues, particular entities, and gainful employment has a much wider——

Ms. TLAIB. So, as part of the agreement, did you agree to recuse yourself from any matters potentially affecting your former clients or former employers, including Career Education Corporation, particularly that one?

Ms. JONES. Career Education Corporation is not on my list of recusals because I left Career Education Corporation in 2015, and according to the rules and the review by our career attorneys, I was not recused. However, I have not worked on any issues related to Career Education Corporation.

Ms. TLAIB. Okay. So you now work at the Department and are involved in regulating the same industry you recently represented. This is sort of a revolving door between the industry and the government service that the executive order is intended to prevent. You ought to be recusing yourself more in regards to Career Education Corporation. But are you saying gainful employment would not impact any of your prior employees?

Ms. JONES. Gainful employment has a broad reach, including certificate programs at nonprofit institutions.

Ms. TLAIB. So it doesn't?

54

Ms. JONES. So I am not required. It is not a particular matter that I am required to recuse myself from.

Ms. TLAIB. That's what we were—we're not expecting you to say that, but you ought to be recusing yourself from such matters and setting an example for others instead of violating the spirit of the ethics pledge because the spirit, but the spirit of the ethics agreement and as attorney of law, I'm telling you that's the whole point is, you know, government's supposed to be about people and the conflict of interest in making sure the best interests of American people is at the forefront and trying to completely put a wall between you and the former employees is so important.

Ms. JONES. Again, I'm following strictly the guidance that I was given by two career ethics attorneys.

Ms. TLAIB. You should definitely get your own personal lawyer. I'm recommending that to everybody that works for the Trump administration. Please, I'm asking all of you: Seek your own legal counsel. You will not be protected when it comes down on you, but you'll have to fall on the sword. You don't want to do that, Ms. Jones.

Thank you so much.

And I now recognize my colleague, Mr. Grothman, for five minutes.

Mr. GROTHMAN. Sure. Thank you for coming over here today. Obviously, made more difficult than it was intended.

I'd like to ask your opinion of your predecessor, the past administration, what things you wish they would have done differently that would be able to make your job easier today.

Ms. JONES. Well, that's a difficult question, and I try not to look backward, and I try to look forward. So I would have to give that some thought. I'm not quite sure what advice I would have for those who were there before me.

Mr. GROTHMAN. Okay. I think for-profit colleges obviously offer benefits. Otherwise, they wouldn't have so many people going there.

Are you at all concerned that excessive regulation right now might be unnecessarily limiting these opportunities or may be unnecessarily driving up tuition at these institutions?

Ms. JONES. Yes, our position is that we're, you know, we're quite concerned that—I mean, and we heard this from R.J. that oftentimes there are programs that are available only at these institutions, and if those programs don't exist, the student won't have another option. So we are worried about limited options; and we have to review this carefully.

We're also concerned about programs in the nonprofit sector that have not yielded the outcomes that students expected.

Mr. GROTHMAN. Okay. College can be a time for students to find their passions. Some students know what they want, you know, a technical career, plumber, whatever. For-profit colleges offer certificate programs to advance students in these types of careers. Do you feel that disproportionately these colleges provide an option that might not be available otherwise?

Ms. JONES. Absolutely. In fact, if you look at the gainful employment disclosures that were posted by nonprofit colleges, the majority of those programs did not have to report because they served

55

less than 30 students. And if you have less than 30 students, you don't get a report. So the majority of the programs provided by nonprofit institutions that qualify for gainful employment coverage didn't have 30 students.

I think that shows that there aren't enough of these programs, and there aren't enough of these opportunities and, yes, I do believe that the schools that are serving students well provide opportunities that other institutions don't provide.

Mr. GROTHMAN. I'll give you another question, and I asked this to the previous panel, but I'll ask you as well. I know the student loan debt is just an embarrassment to the country that it's gone on so long and, quite frankly, an embarrassment to all sorts of institutions of higher learning that they let their students out into the field in such a disastrous situation.

I'm going to check a little bit more into this, but a prominent person of for-profit suggested that, in the future, before getting any student loans, the universities themselves would have to sign off, the idea being that students like probably everybody else in our society doesn't appreciate the danger of debt, or, you know, they'll take out a loan right now if it means the ability to buy some more junk without thinking about how difficult it's going to be to pay it back in the future.

Do you think it would be a good idea to have all institutions of higher learning sign off on any student loans, sign a statement they reviewed the financial situation and that——

Ms. JONES. I think schools for many years have been asking the Department for the authority to stop borrowing or stop allowing a student to borrow. Right now, an institution does not have the authority to interfere with the student's right to borrow. So you can see a student headed for disaster. You can counsel the student. You can warn the student. But you do not have the authority to cut them off or not allow them to take out a student loan, and that is a problem.

Mr. GROTHMAN. Now, this is where I got it right, from a for-profit who wanted that ability, and actually this person claimed that at one time they were preventing people or did something to try to prevent people from taking out loans, and they got a call from Washington telling them that they couldn't do that.

Is that possible?

Ms. JONES. It is possible. I remember some years ago there was a letter that was sent to the Department asking specifically if an institution could cutoff a borrower. And the response, so I'm told, in response to that letter, was that an institution does not have the right to interfere with the student's right to borrow. I also made that request before I came back to the Department when I was in higher ed, and I was given the same information, that the school may not interfere with the student's right to borrow.

Mr. GROTHMAN. I'd like to work with you on that. I think it's just horrible that the bureaucracy or somebody, I guess, there are people around here who think it's beneficial to borrow more money, but I'd like to work with you on that.

And, again, thanks so much for coming over here today.

Ms. JONES. Thank you.

56

Ms. TLAIB. Thank you as well. We really do appreciate you answering our questions.

Before I yield to—you did say, just to followup on my colleague, you said there was no policy preventing the quote, review of borrower-defense claims, but I—but I want to know if there is a policy preventing the adjudication to completion of claims.

Do you have such a policy?

Ms. JONES. I wouldn't call it a policy. I would say that our methodology is on hold because the California court has said that we cannot continue until a decision is rendered. So we don't have a policy, but the methodology cannot be applied. So we are waiting for the court to rule.

Ms. TLAIB. Thank you.

I now yield to Congresswoman Pressley.

Ms. PRESSLEY. Thank you, Madam Chair.

Ms. Jones, in 2014, the Obama Administration proposed the gainful employment rule. This was proposed as an accountability standard for all career-focused nondegree programs. The rule to revoke a school's access to Federal Student Aid if the typical debt-to-earnings ratio of graduates exceeded a certain threshold two out of three years.

As you well know, it was designed to ensure that career-focused programs had value and led to increased student earnings sufficient to justify their costs.

In January 2017, the first complete set of gainful employment ratings was released by the Department using earnings data attained from a memo of understanding with the Social Security Administration: 800 programs failed to meet the debt-to-earning standard, and 1,200 more fell into probationary status; 98 percent of the programs that failed were at for-profit colleges. Reports show that 350,000 student were enrolled at the worst rated programs, which collected a total $7.5 billion in Federal funds.

Now, the rule can only be enforced if a second year of failing ratings occurs. Yet, under the Trump administration, the Department has issued no additional ratings since the 2017 data set.

Ms. Jones, how many programs would have been subject to enforcement if the Trump administration had continued the Obama Administration's policy?

Ms. JONES. Well, Congresswoman, we cannot get the data from the Social Security Administration to do a second year's analysis. And so I can't tell you how many of those programs would have failed a second year. The MOU was not renewed. We do not have access to those data. We cannot calculate the debt-to-earnings outcomes.

Ms. PRESSLEY. Okay. Well, again, 800 programs failed, and 1,200 were probationary when the Obama Administration was enforcing this rule. And, in fact, The New York Times reports that 300 of these programs have since been shut down. Just as troubling is the fact the Department may have abused its memorandum of understanding with the Social Security Administration with the intent for the MOU to lapse.

So, without the MOU with SSA, is the Department able to evaluate debt to earnings in the manner that gainful employment rule requires?

57

Ms. JONES. No, Congresswoman, we can't. The rule——

Ms. PRESSLEY. Why not?

Ms. JONES [continuing]. is very specific that only Social Security Administration data can be used. This was part of the negotiated rulemaking back in 2014, and the Department was very specific in identifying which government data base would be used, and it is the Social Security Administration.

Ms. PRESSLEY. Well, this is most unfortunate, quite unsavory. I think it's a failure to enforce—the rule would give an additional $5.3 billion to almost exclusively for-profit programs.

Did the Department make any attempts to extend this MOU with SSA?

Ms. JONES. I believe so. I think those attempts began before I joined the Department, but I am aware that——

Ms. PRESSLEY. Can you commit to—I'm sorry. I'm running out of time. Thank you.

Can you commit to submitting these communications to the committee within the next two weeks?

Ms. JONES. I can't commit to a timeframe. I have to work with our General Counsel's Office. I personally don't have those communications. So I will take it back, and we will have a conversation.

Ms. PRESSLEY. Well, again, the Department's MOU expressly stated its purpose for the enforcement of this gainful employment rule, and yet the Department, it seems, has really abused this agreement.

Did the Department intentionally abuse SSA data attained from the MOU to create a tiered relief process for partial loan forgiveness?

Ms. JONES. I don't believe that the Department abused the use of data. I think the question is whether or not Social Security data can be used for any purpose other than administering the Social Security Act. I believe that that is the source of the concern, and so it covers both gainful employment calculations, and the California court has expressed concern about using those data for tiered methodology.

Ms. PRESSLEY. I hope that's true because I would hate to think that the Department intentionally abused earnings data and dragged its feet to trigger cancelation of the MOU.

Can you assure me that that's not what occurred?

Ms. JONES. I wasn't there at the time that the—our relief methodology was developed, so I can't—and I can't assure you to things—about things that happened before I got there, but I can assure you that, right now, the tiered relief methodology is on hold because of the California court.

Ms. PRESSLEY. All right. Well, we've simply got to do better, but I thank you for being here and for taking the time to answer our questions.

Ms. JONES. Thank you.

Ms. TLAIB. Thank you so much again. I'd like to thank again on behalf of all the committee members for your testimony today, Ms. Jones.

Without objection, all members will have five legislative days within which to submit additional written questions for the witness

58

to the chair, which will be forwarded to the witnesses for responses.

I ask our witnesses to please respond as promptly as you are able.

And, with that, this hearing is adjourned.

Thank you.

[Whereupon, at 5:30 p.m., the subcommittee was adjourned.]

○

# EXHIBIT 32

## QUESTIONS SUBMITTED BY SENATOR

## PATTY MURRAY

## HIRING DELAYS AT THE OFFICE FOR CIVIL RIGHTS

*Question.* Despite Congress increasing appropriations for the Office for Civil Rights (OCR) for fiscal years 2018 and 2019 and this Committee directing OCR to increase the number of full-time equivalent staff, OCR staffing levels have fallen from 579 in fiscal year 2017 to 510 in fiscal year 2019, according to the 1st quarter staffing report submitted by the Department.  Right now, staff at OCR handle an unacceptably high 37 cases each, more than double the number 10 years ago.

Why is the Department acting so slowly to hire these needed staff?  Have there been any changes to the hiring process from the one followed prior to 2017?  If so, what are they?  Please provide the timeline for posting job announcements, selecting applicants, and making offers of employment to applicants for all approved hiring actions.

Answer. There has been no change in the Department's hiring process, which includes six major steps: Workforce Planning, Classification, Vacancy Development and Posting, Certificate of Eligibles, Interview/Reference Check, and Offer/Onboarding. Each one of the steps has variable components that directly impact the time it takes to hire staff. The Department is devoting contract and federal resources from across the agency to improve the hiring process and reduce the time it takes to on-board staff. However, even after an offer is made and accepted, the security clearance process could take weeks or even months before an employee is cleared to start work.

The Office for Civil Rights (OCR) hired 14 staff members since January 2019. In addition, OCR currently has 89 positions for which interviews are being conducted; 4 individuals that have accepted offers with a start date in April 2019; and 2 outstanding offers. Finally, 13 Position Descriptions are in the Classification stage of hiring. Once the classification is complete, OCR will post announcements that will result in multiple selections nationwide for positions such as Regional Director, Team Leaders, and new FOIA Personnel.

## RESPONSE RATE REGARDING SPECIFIC REQUESTS FROM SENATOR MURRAY

*Question.*  After I raised concerns about the lack of a substantive response to my letter to you about the dismissal of the acting Inspector General and noting in my statement concerns about the Department's lack of responsiveness, Secretary DeVos claimed that the Department has responded to 110 of 124 letters I've signed.  However, those figures overstate the true response rate because many of the responses do not provide the information I've requested.  Please provide the number of specific requests I've made in my letters to which the Department has provided me with the requested information.

Answer.  The Department has made every reasonable effort to provide substantive and timely responses to your letters and the information you have requested from the Department through these letters, as well as the significant number of follow up requests for information, briefings, and calls with your staff on matters related to your letters. We

value the relationships we have with you and your staff and consider our regular and consistent dialog and engagement on issues related to the Department of critical importance.

## FOUNDATIONS FOR EVIDENCE-BASED POLICYMAKING ACT OF 2018

*Question.* Earlier this year, the President signed into law (P.L. 115-435) a bill I co-wrote with former Speaker Paul Ryan called the "Foundations for Evidence-Based Policymaking Act of 2018." Accordingly, please provide the following information:

a. What steps is the Department of Education taking to prioritize implementation of the bill's key provisions, including those related to developing a multi-year learning agenda, tapping senior leaders to fulfill the law's goals (e.g., a Chief Data Officer and Evaluation Officer, and Statistical Officer), improving coordination of data government at the Department, and improving accessibility of education data?

b. The Department did not include a request for additional resources to support implementation; how does the Department intend to ensure the capacity exists to implement this new law?

c. What is the Department's timeline for designating the senior leaders?

Answer. a. The Department looks forward to supporting the key provisions of the Foundations for Evidence-Based Policymaking Act of 2018 and to providing internal and external stakeholders with more opportunities to use and generate evidence to improve opportunities for students and families. The Department is working to identify qualified senior leaders for the key designations — including a Chief Data Officer, Evaluation Officer, and Statistical Official — that will best position the Department for success. The Department is also exploring new cross-office mechanisms that efficiently bolster agency-wide prioritization, decision making, and support for program offices, especially with respect to developing a learning agenda, evaluation plan, open data plan, and establishing enterprise solutions for evidence and data governance.

b. By the time the Foundations for Evidence-Based Policymaking Act of 2018 was signed into law in January 2019, the Department's proposed budget had already been submitted to the Office of Management and Budget. However, for the time being, the Department is currently exploring opportunities to identify efficiencies and redirect resources to support the new responsibilities contained in the Act.

c. The Department is actively exploring these designations to identify qualified senior leaders that best position the Department for success. The Department fully plans to designate a Chief Data Officer, Evaluation Officer, and Statistical Official no later than July 2019, in accordance with the statutory deadline contained in the Foundations for Evidence-Based Policymaking Act of 2018.

## DATA COLLECTION ON STUDENT ACCESS TO ARTS EDUCATION

*Question.* The Every Student Succeeds Act lists the arts alongside reading, math, and other subjects in the federal definition of a "Well-Rounded Education." It has now been 10 years since the Department has collected data about student access to arts education through its Fast Response Survey System (FRSS). New information is critical

to fuel progress in providing equitable access to learning in dance, media arts, theater, music, and visual arts.  According to the FRSS website, findings from FRSS surveys have been included in congressional reports, testimony to congressional subcommittees, NCES reports, and other Department of Education reports.  The findings are also often used by state and local education officials.

What plans does the Department have underway to collect and report this data?

Answer.  The Department does not currently have plans to collect data about student access to arts education. However, it will examine the feasibility of collecting such information, as well as information on other subjects that contribute to a well-rounded education, such as foreign languages, computer sciences, and digital literacy.

## HBCU CAPITAL FINANCING ADVISORY BOARD OUTREACH

*Question.*  The Consolidated Appropriations Act, 2018 directed the Department to create and execute an outreach plan to work with States and the Capital Financing Advisory Board to improve outreach to states and help additional public HBCUs participate in the program.  It's been almost nine months since the Department indicated it was "making progress in developing such a plan."  What is the status and timeline of the creation and execution of that outreach plan?  Please describe each of the activities that will be undertaken under the plan.

Answer.  The Department has finalized an outreach plan and has begun to execute the plan. The execution of the plan is ongoing with no end date. The plan is outlined in the following four points:

1. Providing information about the program to eligible HBCU presidents and chancellors of HBCUs that are not yet participating in the program to remind them of the opportunity to participate

2. Attending conferences, if resources are available, to share information with leaders in the HBCU community and to provide points of contact within the Department for those institutions that seek technical assistance on the HBCU Capital Financing Program. Some of those conferences may include the White House Initiative on HBCUs; the Thurgood Marshall College Fund; the United Negro College Fund; the National Association for Equal Opportunity in Higher Education; the National Association of HBCU Title III Administrators, Inc.; the National Association of College and University Business Officers; and various accreditation conferences.

3. Working with state universities, state systems, or both to specifically address state-level challenges to participation and share potential solutions to increase public HBCU participation as resources permit and where legally feasible. Examples include working with State Bond Commissions, Board of Regents, and State Attorneys Generals.

4. Asking the bonding authority of ways that it can further efforts to increase outreach.

To date, a number of activities have been implemented in support of this plan and information about the capital finance program has been disseminated accordingly. The bonding authority sent a newsletter to 101 HBCUs as well as higher education authorities that have approvals over state funding. The Executive Director met with public HBCU presidents and chancellors at the Thurgood Marshall College Fund Winter Convening. The Department worked with Morgan State University and the State Attorney General office

to close a loan. Additionally, it closed a loan with Florida A&M University after working years with the State.

## EVIDENCE AS A PRIORITY IN COMPETITIVE GRANT PROGRAMS

*Question.* The Department included priorities for the use of evidence in 12 competitive grant programs in 2017 but only three in 2018. What explains this reduction? For how many competitive grant programs does the Department plan to include an evidence priority in fiscal year 2019 and fiscal year 2020? Please describe the specific actions, including training of Department staff, technical assistance, monitoring and support that the Department is taking in fiscal year 2019 and will take in fiscal year 2020 with respect to evidence requirements in formula grant programs under ESEA.

Answer. When the Department develops evidence priorities and other components of competitions, staff review each competition individually and weigh the body of evidence along with other policy considerations to determine the most appropriate approach. In addition to the three fiscal year 2018 competitions that included a priority for moderate or strong evidence, an approximately 25 additional competitions required or encouraged applicants to provide evidence that meets the promising evidence, evidence-based, or demonstrates a rationale standards. The Department conducted a robust review of competitions for the appropriate use of evidence in fiscal year 2019 and will do the same in fiscal year 2020. We can share more about final decisions for fiscal year 2019 competitions when all notices have been published.

The Department has begun to provide technical assistance on the use of evidence in formula grant programs. For example, it convened a community of practice focused on evidence that resulted in resources that were published on our website. The Department is undergoing a review of its capacity and opportunities to better support staff and the broader education community in the use of evidence, including in formula grant programs. The Department has reorganized in two key offices to support this work. First, the Office of Elementary and Secondary Education now includes the new Evidence-Based Practices Team to inform policy and planning, evaluate program outcomes using data, and facilitate best-practice sharing in the field. Second, the Office of Planning, Evaluation, and Policy Development now includes a Grants Policy Office that, among other things, is focused on supporting the Department and the field to continuously improve performance and results by building stronger evidence, helping offices make decisions based on a clear understanding of the available evidence, and disseminating evidence to decision makers. These teams will collaborate and will partner with the Institute of Education Sciences and other offices in the Department that focus on training and capacity-building to advance this work. These efforts will also be aligned with the requirements of the Foundations for Evidence-Based Policymaking Act of 2018.

## RECOVERY EFFORTS IN PUERTO RICO

*Question.* Appropriations subcommittee staff visited Puerto Rico last November and documented the lack of recovery of Puerto Rico's public schools. School buildings and programs are still not available because of hurricane damage. Power, internet connectivity, and mental health issues for students and school staff continue to pose

challenges to operating schools.  Please describe efforts and outcomes associated with the Department's efforts with funding available in the Bipartisan Budget Act of 2018 to assist with the restart of Puerto Rico's schools, including up to $3 million available for program administration.  What additional efforts, including technical assistance with procurement and contracting, are planned?  Further, what additional efforts will the Department, working in coordination with the Federal Emergency Management Agency, take to fully operationalize public schools in Puerto Rico?

Answer.  The Department of Education has engaged in extensive and continuous outreach and technical assistance to Puerto Rico related to its hurricane education recovery efforts since the hurricanes made landfall in fall of 2017.  In particular, it has worked to ensure the effective and timely use of the Federal hurricane education recovery funding provided in the Bipartisan Budget Act of 2018.  However, recovery efforts continue to be hindered significantly by local capacity and resource issues, including issues related to local procurement and contracting requirements.  The Department currently is working on a range of proposals that, in cooperation with the government of Puerto Rico, could help address these capacity issues.  The Department also has coordinated its hurricane education recovery efforts in Puerto Rico with the Federal Emergency Management Agency, including through the provision of guidance clarifying the circumstances under which Puerto Rico may use hurricane education recovery funds for authorized activities that otherwise might be covered by FEMA.  For example, Puerto Rico may use Department of Education recovery funds to cover many of the immediate costs of restoring the learning environment while requests to FEMA for assistance are pending and repay or repurpose those funds once FEMA assistance is received.

## EXPANDING PERFORMANCE MEASURES FOR 21ST CENTURY COMMUNITY LEARNING CENTERS

*Question.*  In April 2017, the Government Accountability Office made a number of recommendations related to the 21st Century Learning Centers program (GAO-17-400), including "The Secretary of Education should direct the Office of Academic Improvement to expand its performance measures for the 21st Century program to address all program objectives. Specifically, Education should establish performance measures related to key behavioral, including student attendance and disciplinary incidents, and socio-emotional outcomes."  Please update the Committee on the status of your plans for implementation of this recommendation.

Answer.  In fiscal year 2018, the Department awarded a contract to coordinate a review of the Department's performance measures for the 21st Century Community Learning Centers program to obtain stakeholder feedback on those measures, inform options for revising existing measures, and explore the feasibility of creating new measures in the areas highlighted by the GAO report.  Consequently, the Department engaged with State educational agencies, local educational agencies, and other stakeholder groups in facilitated teleconferences in early 2019.  Department staff and the contractor are currently collaborating to develop revised performance measures which the Department will then send to the Office of Management and Budget for review.

### BORROWER DEFENSE BACKLOG AND COMPLIANCE WITH
### CONGRESSIONAL DIRECTIVE

*Question.* Secretary DeVos testified that she believed borrower defense claims were being reviewed as of March 28, 2019, even though the Department had already prepared data for a report to this Committee showing that not one borrower defense claim had been approved in the last six months of 2018. In Senate Report 115-150 accompanying S. 1771, the Committee directed the Department to report on "specific actions taken and planned to process this workload in a timely manner." However, the Department has not provided such information as directed and has taken no action to reduce the backlog of pending claims which has now grown to 158,000. What is the Department's timeline and plan for eliminating the backlog of pending borrower defense claims and for coming into compliance with the Committee's directive by reporting on actions taken to process pending borrower defense claims in a timely manner?

*Answer.* The Department continues its efforts to implement the 2016 final regulations. Although ongoing litigation enjoins the Department from using the Department's relief methodology for approving borrower defense claims, the Department continues to adjudicate the applications on the merits so that applications can be   processed swiftly once an alternative relief methodology is determined.

### IMPACT AID RESEARCH AGENDA

*Question.* Please describe the Impact Aid research agenda identified in the Fiscal Year 2020 Justifications of Appropriation Estimates to the Congress "to help determine the appropriate Federal share in supporting districts impacted by the presence of Federal property."

*Answer.* The Department held preliminary discussions and scheduled additional meetings in spring 2019 to gather information and ideas to inform an Impact Aid research agenda.  Possible options include building on analyses completed in 2007-2008, when the Department contracted for a study that examined the financial burdens school districts faced due to the Federal presence and how well funding formulas were targeted to affected districts.  That study focused primarily on the Basic Supports Payment and Payments for Children with Disabilities programs and did not look at the Payments of Federal Property program.  The Department has also looked at revenue data compared to current Payment for Federal Property formula payments and found 89 percent of LEAs received payments that accounted for less than 5 percent of their total revenue in fiscal year 2017.  Further analysis could help the Department determine to what extent LEAs are still impacted by the Federal acquisition as long as 60 years ago and inform future budget requests for the various components of the Impact Aid program.

### DETAILS ON PROPOSED GRANTS FOR SCHOOL CHOICE UNDER SPECIAL
### PROGRAMS FOR INDIAN CHILDREN

*Question.* Within Special Programs for Indian children, the Fiscal Year 2020 Justifications of Appropriation Estimates to the Congress states that "the Department plans to conduct Tribal consultations.…Based on the feedback gathered during these

consultations, the Department will provide up to $10 million in fiscal year 2020 to support grants that expand the ability of families to choose high-quality educational opportunities that meet the needs of Native youth." Please provide more specific information about these proposed grants, including absolute priorities, eligible uses of funds, eligible applicants, and plans for evaluation of the proposed grants.

Answer. In general, the Administration is focused on putting decision-making power back in the hands of students, families, and communities. We do not have specific information to share about this proposal at this time. The Department will publish a notice of proposed priorities, requirements, definitions, and selection criteria (NPP) in the Federal Register for public comment prior to finalizing the details of the FY 2020 competition, and the NPP will reflect input from Tribal consultation.

## ROLE OF PRE-APPRENTICESHIPS IN EXISTING APPRENTICESHIP PROGRAM INFRASTRUCTURE

*Question.* The Department proposes $60 million to support State efforts to create pre-apprenticeship programs that increase the number of adults who are able to meet the basic entrance requirements of apprenticeship programs. Please clarify whether the purpose of such pre-apprenticeship programs is to enable participants to qualify for and participate in existing registered apprenticeship programs. If not, why does the Department choose to ignore the existing infrastructure around such high-quality registered apprenticeship programs and instead propose pathways into duplicative, lower quality programs?

Answer. The Administration's pre-apprenticeship proposal would help low-skilled adults qualify for and participate in existing high-quality apprenticeship programs identified by each State, including registered apprenticeships. The proposal would utilize the infrastructure both of State agencies that operate Adult Education programs as well as those of existing apprenticeship programs.

## INSTITUTE OF EDUCATION SCIENCES FUNDING FOR RESEARCH PARTNERSHIPS VERSUS ALTERNATIVE MODELS

*Question.* The director of the Institute of Education Sciences (IES) has publicly expressed criticism of the value of research practice partnerships previously funded by this agency, including those funded under the Regional Educational Laboratories program. However, this does not align with what educators say about this model of conducting research being vastly superior to the purely academic approach to education research. Is there a better approach to involving educators in setting education research agendas? If so, what is it and does IES plan to fund this approach?

Answer. IES's main responsibility is to produce research that can help improve the education outcomes of learners throughout the life cycle. Our experience with Researcher-Practitioner Partnerships (RPPs) suggests they often elevate the process of partnering between practitioners and researchers without sufficient attention to whether or not these partnerships produced results that improve educational outcomes. IES is not discouraging partnerships between researchers and practitioners. Indeed, it recognizes that these partnerships can help translate research into practice; however, it also believes that

researchers should be free to use a variety of approaches to involving educators in research.

## PUBLIC SERVICE LOAN FORGIVENESS OUTREACH AND COMPLIANCE WITH CONGRESSIONAL DIRECTIVE

*Question.* The Department received $2.3 million in each of fiscal years 2018 and 2019 "to conduct outreach to borrowers of loans made under part D of title IV of the Higher Education" including "the Secretary shall also communicate to all Direct Loan borrowers the full requirements of section 455(m) of such Act." Unfortunately, the Department has failed to comply with this requirement and has instead pursued various information and social media campaigns that have both failed to comply with the fiscal year 2018 and 2019 appropriations acts. By when will the Department comply with these requirement to contact all Direct Loan borrowers about Public Service Loan Forgiveness? Additionally, what specific strategies will you adopt, and when, in the remaining months of fiscal year 2019 and for fiscal year 2020 so that public servants that are eligible for the forgiveness programs created by Congress (PSLF and TEPSLF) to receive the relief they need and deserve?

Answer. A series of targeted email campaigns sharing specific information about PSLF Program requirements and procedures are planned to segments of Direct Loan borrowers. FSA currently plans to conduct these email campaigns in July and November/December 2019. Routine emails sent to all borrowers whose grace periods are ending already provide information about PSLF and various repayment plan options to every Direct Loan borrower about to enter repayment.

Additionally, on a weekly basis, FSA emails all PSLF applicants denied that week with specific information about TEPSLF eligibility and the application process. To date, FSA has sent approximately 20,000 of these emails.

FSA is reviewing all PSLF borrower communications to improve content and clarity to ensure borrowers receive sufficiently detailed information regarding counts of qualifying payments and their repayment history. FSA is also planning additional blog posts, webinars, and other outreach events for the coming months to help promote PSLF and TEPSLF to borrowers. FSA also plans to conduct organic and paid social media outreach about PSLF, the PSLF Help Tool, and TEPSLF. Additionally, FSA will continue to reach out to all borrowers, whose PSLF applications were denied, with information about TEPSLF.

FSA recognizes there is substantial confusion among borrowers regarding PSLF and intends to implement improvements that will help clarify program eligibility and provide confidence to eligible borrowers that they are on track for forgiveness. On a more long-term basis, new functionality being considered as part of the Next Gen FSA initiative is expected to provide borrowers with real-time, self-service access to information about their eligibility for PSLF and progress towards completion. Through the myStudentAid mobile app, for example, customers will be able to receive information about how to participate in the program, be reminded via push notification to submit an Employment Certification Form (ECF) and check the number of qualifying payments they have made. Additionally, later this year, FSA will be integrating the PSLF Help Tool into the new Digital and Customer Care platform. This will allow the Department to eventually add

functionality to the tool, such as a database of qualifying employers. Next Gen FSA will also eventually give the Department the capability to fully digitize the ECF and application process, which will allow borrowers and employers to sign and submit their forms electronically. We are unable to provide a precise schedule at this time, however, as procurement activities are ongoing.

## NECESSITY OF SEPARATE SCHOOL SAFETY PROGRAM GIVEN ESSA TITLE IV-A FLEXIBILITY

*Question.* The President's budget includes $100 million for an unauthorized program related to school safety that seeks to replace the currently funded $1.170 billion ESSA Title IV-A program that State Education Agencies (SEAs) and Local Education Agencies (LEAs) are familiar with, have the constructs in place to administer, and are making great strides in implementing. States and local educational agencies are required to use Title IV-A funds to support well-rounded education, safe and healthy school environments, and the effective use of technology. How would the proposed program be more efficient or effective and reach the same number of school districts as a program more than ten times its size? Given the inherent flexibility of ESSA Title IV, and its strong deference to local implementation, I am hard-pressed to believe that the proposed program allows something SEAs and LEAs cannot already do under the existing ESSA Title IV.

Answer. The President's budget would eliminate the Title IV-A program as part of overall efforts to streamline the Federal role in education and promote fiscal discipline. States and local communities retain primary responsibility for ensuring that our schools remain safe places for students and teachers.

In addition, the Title IV-A program is poorly structured to provide meaningful support to LEAs because it provides allocations of less than $30,000 to an estimated two-thirds of LEAs and less than $10,000 for one-third of LEAs. Small allocations, combined with the wide range of allowable activities under Title IV-A, make this program an inefficient vehicle for supporting school safety. The proposed $100 million School Safety State Grants program would overcome these limitations by delivering meaningful State-level grants--nearly twice the amount of State-level funding provided by Title IV-A--targeted solely to supporting State and local efforts to improve school climate and safety.

## REDUCING FUNDING FOR ADULT EDUCATION PROGRAMS IN CONTEXT OF SHORTAGE OF SKILLED LABOR

*Question.* I was disappointed to see that the Department's budget proposal included a $156 million (24 percent) cut to adult education programs, which provide education and literacy assistance to low skilled Americans, enabling them to acquire foundational reading, math, and English skills, as well as career readiness skills for employment or transition to advanced postsecondary education. According to the Bureau of Labor Statistics, we have 7.6 million open jobs, but our workforce does not have the skills to fill many of them. Adult Education is a central component of increasing the skills of our workforce, as over 1.5 million Americans annually participate in adult education to improve their literacy and work skills offered at the local level through public schools,

community colleges, libraries, and community-based organizations. Can you tell me how cutting nearly one-quarter of adult education funding will improve the education and skills of our workforce, as well as meet employers' needs for skilled workers?

Answer. The Administration's proposed decrease to Adult Education State Grants primarily reflects the need for fiscal discipline while supporting the President's goal of directing a greater share of existing discretionary funding toward national security and public safety. In addition, the effectiveness of the program as implemented following its reauthorization by the Workforce Innovation and Opportunity Act (WIOA) remains unclear, and the Administration believes it makes sense to redirect a portion of the proposed reduction in funding for Adult Education State Grants to support pre-apprenticeship programs. This $60 million initiative under Adult Education National Leadership Activities would allow States to create pre-apprenticeship programs that increase the number of adults who are able to meet the basic entrance requirements of apprenticeship programs. The Department's budget also supports workforce development through $1.3 billion in Career and Technical Education funding.

## DATA AND TOOLS TO EVALUATE EDUCATIONAL PROGRAMS AND CREDENTIALS

*Question.* We know that students, workers, veterans, employers and others face a very confusing and opaque marketplace of programs and credentials. In fact, there are currently nearly 750,000 credentials available in the U.S. alone. Your department houses and shares data on many, but not all, those programs and credentials, and oversees laws and programs affecting more of the market. It's important to share information about these offerings—such as their cost, quality controls, pathways, and outcomes—with the public. It's also important that individuals are able to easily search across different types of credentials—such as certificates, certifications, licenses, apprenticeships, and degrees— make meaningful comparisons, and reach fully informed decisions. Can I ask for your support in taking steps to make all data about credentials both public and fully comparable, and to work to support the development of tools and apps that put such information in the hands of students, parents, employers, and others?

Answer. The Department strives to promote student achievement and preparation for global competitiveness, including highlighting multiple pathways toward competitiveness in the 21st century. However, the Department's required data collection is currently limited to Title IV participating programs and does not include collecting data about certifications. In fact, IPEDS specifically instructs institutions to NOT report information about certifications since these are not well-defined and many are not the subject of accreditor review and approval. In March 2019, the College Scorecard updated its homepage to include a link to the Department of Labor's apprenticeship finder tool so that students considering college options would also be made aware of apprenticeship options. In addition, by the end of 2019, the Department will also begin providing preliminary program-level loan debt and earnings data among recipients of Title IV aid for all Title IV participating programs at the certificate, baccalaureate, graduate and professional degree level.

## TITLE I PERFORMANCE REPORTS UNDER ESSA

*Question.* Recently, the Department released FY2018 Title I performance reports for six states, including Alaska, Arizona, Illinois, Louisiana, New Mexico, and Texas. The reports cited each of these states as needing to take immediate action to address "significant compliance and quality concerns" related to ESSA implementation. These reports highlight ongoing concerns I have with the implementation of the Every Student Succeeds Act (ESSA) and states' compliance with the myriad of requirements in the law. Each state was given 30 days to provide evidence to the Department to resolve these issues, and three states were required to submit amendments to their approved ESSA plans.

a. Has the Department received the requested evidence from each of these states, and were any necessary amendments and assurances to the state plans also submitted?

b. What steps will the Department take to ensure these states come into full compliance? What additional monitoring will the Department conduct in states cited for "significant compliance and quality concerns" in the coming year?

c. How will the Department make the amendments and assurances to these states plans transparent to Congress and the public?

d. If the states cited in these monitoring reports do not submit sufficient evidence, what additional steps will be taken by the Department to ensure these states come into compliance with the law?

e. Which states, if any, received Title I monitoring visits from the Department in FY2018 in addition to Alaska, Arizona, Illinois, Louisiana, New Mexico, and Texas, and when will their performance reports be made publicly available?

Answer. a. The Department has received additional documentation from each State that has received a final report and continues to work closely with each State to resolve the outstanding issues. In some cases, this documentation has included amendments to State plans; these amendments are currently under Department review.

b. The Department will continue to work with each State until all issues are fully resolved. This starts with the State providing a response within 30 days of receiving the report and may include an iterative process of reviewing State submissions and asking for clarification or additional information as needed. The Department will continue to communicate with each State and provide technical assistance, as needed, until all monitoring findings are resolved. In addition, conditions on grant awards or other actions are sometimes used to account for long-standing issues identified in monitoring findings. The number of conditions from recent monitoring events, the time since the previous monitoring event, and any conditions on grant awards are all risk factors that are included when the Department is determining future monitoring and compliance activities.

c. The Department posts each approved amendment on its web site at https://www2.ed.gov/admins/lead/account/stateplan17/statesubmission.html. In addition, the Department posts all monitoring reports since 2006 for Titles I, II, and III. They can be found at: https://www2.ed.gov/admins/lead/account/performance/index.html.

d. The Department works with States in the event that a State does not meet the timeline established for resolving a monitoring finding or submits insufficient or incomplete information, including offering technical assistance if needed. The Department may take further action as appropriate in a given situation, including increased monitoring,

placing a condition on a grant, placing a grant or an entire entity on "high-risk" status, entering into a compliance agreement, or withholding funds.

e. California, Georgia, and Michigan were also monitored for Title I, Part A in 2018. The Department will finalize these monitoring reports in the coming weeks.


## MONITORING ESSA IMPLEMENTATION

*Question.* Please detail the Department's plans for monitoring the implementation of ESSA, including –

a. How the Department will ensure compliance with ESSA's requirements for the vast majority of states that did not receive a monitoring visit in FY2018 and will not receive a monitoring visit in the upcoming year;

b. Whether the Department will monitor each state for compliance with the law, including the plan and timeline for conducting at least one monitoring visit in each state;

c. The number of monitoring visits planned for FY2019 and FY2020, which states, and what programs and requirements of ESEA they will cover;

d. How the Department is determining which states to conduct monitoring visits in, a description of any risk assessment protocols used to set the schedule for monitoring visits, and whether the states are selected for earlier or more frequent monitoring because they have greater risk for noncompliance with ESSA's requirements;

e. The follow up that will be done for states that the Department finds do not comply with all of ESSA's requirements during the monitoring visits.

Answer.  a. The Department monitors grantee performance in a variety of ways, including formal on-site and desk performance reviews and formal assessment peer reviews. For example, over the past three years, the Department has reviewed almost all States' assessment systems and is continuing to work with States as they address issues identified in the peer review. The Department also reviews annually the data that States submit to EDFacts as part of the annual report to the Secretary required by ESEA section 1111(h)(5). This data includes student outcome data across ESEA programs as well as key school-level performance metrics such as school status (e.g., comprehensive support and improvement, additional targeted support) and performance on accountability indicators. The Department also reviews all proposed amendments to a State's consolidated State plan to ensure compliance with the statute.

b. The Department intends to monitor each State, though it has not yet developed a specific plan and timeline for each ESEA program for future years.

c. In fall 2019, the Department will conduct two on-site monitoring visits that will include a review of Title I, Part A; Title II, Part A; and Title III, Part A. For Title I, Part A, the Department has been phasing in the ESEA components over the past three years. Each year, the Department has piloted a component of its protocol, made changes based on the pilot, and finalized that component of the protocol before using it in the subsequent year. The first phase focused on fiscal requirements – both financial cross-cutting requirements across ESEA programs and Title I, Part A programmatic fiscal requirements; the second phase added in data quality, report cards, accountability, and school improvement; and this year the Department will pilot the remaining programmatic components of Title I, Part A

along with the programmatic requirements for Title II, Part A and Title III, Part A. The Department has not yet completed its monitoring plans for FY 2020.

d. The Department conducts an annual risk assessment, using a tool developed by its Office of Grants Administration (formerly called the Risk Management Service), and documents and closes out instances of noncompliance through written correspondence with grantees following on-site and desk reviews. The assessment looks at program, entity, and grant award risk. Program risk refers to the program design, such as whether the program relies on self-reported child counts and how the person responsible for such counts is impacted by the grant status. Program risk applies across all grantees and helps the Department prioritize which programs to monitor. The entity risk component reviews administrative (i.e., high-risk status, noncompliance, staff inexperience), financial (i.e., credit-worthiness, past use of the Department's grant system G5), and internal controls (i.e., audit findings and resolution) risks of an SEA. Grant award risk assesses results, quality, compliance, and financial domains for individual grant awards. This process is used to identify potential areas of concern and helps OESE program offices determine if (1) grantees have ongoing issues with program implementation, (2) those ongoing issues could result in noncompliance, and (3) new areas of concern merit attention.

e. The Department follows up with States on all issues identified through monitoring that require State action. The Department notifies the State of such issues through a monitoring exit call, the monitoring report, regular follow-up, and, as needed, technical assistance. If such Department support and oversight does not lead to a State resolving the issue, the Department may take further action as appropriate in a given situation; such actions may include increased monitoring, placing a condition on a grant, placing a grant or an entire entity on "high-risk" status, entering into a compliance agreement, or withholding program funds.

## OVERSIGHT TO ENSURE SCHOOLS WITH UNDERPERFORMING SUBGROUPS ARE IDENTIFIED FOR TARGETED SUPPORT

*Question.* The Every Student Succeeds Act contains numerous federal requirements to ensure that all students have the opportunity to receive a high quality education no matter where they live, how much their parents make, or how they learn. Two of these core federal requirements require states to identify schools for comprehensive support and improvement (CSI), targeted support and improvement (TSI), and additional targeted supports (ATS). The law also requires states to include subgroups in their systems of annual meaningful differentiation (AMD). There are states complying with these requirements and states that are not. For the states that are not in full compliance with the law, what oversight is the Department conducting to ensure that schools with consistently underperforming subgroups are included in states systems of AMD and identified for targeted support as required under the law?

Answer.  The Department is not aware of any State plans that do not use subgroup performance to identify schools that need targeted support and improvement based on having one or more "consistently underperforming" subgroups (as defined by the State) or schools that need additional targeted support. Although the Department expects that all States are implementing their approved State plans, in the rare case in which a State's

implementation of its accountability system varies from an approved plan, the Department will take appropriate enforcement action.

## BUREAU OF INDIAN EDUCATION NEGOTIATED RULEMAKING AND TITLE I FUNDING

*Question.* Section 8204(c)(1) of the Elementary Student Succeeds Act (ESSA) requires the Secretary of the Interior to undertake a negotiated rulemaking to develop and implement a new standards, assessments, and accountability system consistent with Section 1111 of ESSA Title I, Part A for the Bureau of Indian Education (BIE) funded schools no later than school year (SY) 2017-2018. According to information contained in both a flier obtained by Politico advertising a "tribal consultation" on April 22, 2018 (April flyer) and a November 22, 2018, letter from the Department to BIE (November letter), the Department granted the Department of the Interior (DOI) a one-year extension to complete the negotiated rulemaking process before the start of SY2018-2019. The April flyer notes that DOI failed to meet this new deadline associated with the SY2018-2019 extension and, as a result, your Department withheld approximately $1.6 million in ESSA Title I funding from the BIE. On August 2, 2018, DOI published a notice in the Federal Registrar announcing the establishment of the BIE Standards, Assessments, and Accountability System Negotiated Rulemaking Committee (NRM Committee). The BIE NRM Committee met four times between September 25, 2018, and March 14, 2019.The November 2018 letter does not offer any information on the final determination of the Department regarding the use of the withheld Title I funding. Additionally, it notes the Department granted DOI an additional ESSA Section 8204(c)(1) compliance extension to SY2019-2020 but expressed concerns that DOI will be unable to implement a final regulation before this new deadline. The November letter subsequently sets out a number of required actions related to ESSA Section 8204(c)(1) progress reporting that DOI had to submit by January 7, 2019 – a date that fell within the partial federal government shutdown that resulted in the furlough of the majority of DOI employees.

a. Under what legal authority did the Department grant DOI the SY2018-2019 and SY2019-2020 extensions of ESSA's Sec. 8204 requirements referenced in the April flyer and November letter?

b. Has the Department used that same authority (or an alternate authority) to grant additional ESSA Sec. 8204 compliance extensions or exceptions to DOI?

c. What did the Department do with the $1.6 million in Title I administrative funding withheld from BIE for failure to meet the deadlines associated with the SY2018-2019 extension?

d. Has the Department opted to withhold any additional Title I funding from the BIE due to failure to comply with ESSA?

e. Did the Department participate in or offer technical assistance at the BIE NRM Committee's meetings?

f. Did the Department receive responses from DOI to the required action items with a January, 7, 2019, deadline contained in the November letter? If not, did the Department provide DOI with an extension on these items as a result of DOI's inclusion in the partial government shutdown?

g. Has the Department communicated with DOI about this matter since the conclusion of the final BIE NRM Committee meeting on March 14, 2019? If so, please provide a summary of those interdepartmental communications.

Answer.  a. Section 8204(c)(1) of the Elementary and Secondary Education Act, as amended (ESEA), requires BIE to use a negotiated rulemaking (NRM) process to develop regulations to define the standards, assessment, and an accountability system consistent with section 1111 of the ESEA for the schools funded by the BIE for implementation no later than the 2017-2018 school year (SY). Using the Department's orderly transition authority in Section 4(b) of the Every Student Succeeds Act (ESSA) and using the authority in section 8204(a)(2) for the two agencies to enter an agreement on the distribution and use of ESEA funds that the Department provides to BIE, the Department extended the preexisting Memorandum of Agreement (MOA) between the two agencies. The MOA extension, which was agreed to and signed by both agencies on July 7, 2017, granted BIE an extension of the negotiated rulemaking timeline, requiring BIE to complete NRM in time for new regulations to be effective for SY 2018-2019. Further, the Department's expectation was that the additional year would be a sufficient amount of time to allow BIE to finish NRM, establish final rules governing its system, and operationalize its system by the beginning of SY 2018-2019. Because BIE did not comply with that timeline, BIE remains out of compliance with the statutory requirements and has violated the terms of the MOA. In our November 2018 letter sent to BIE, the Department made it clear that BIE failed to implement its ESSA compliant system in SY 2018-2019 and required specific actions towards implementation with additional deadlines to show progress.

b. No. The Department has not granted any further extensions to BIE. Since BIE failed to establish its new system within the timeframe stipulated in the July 2017 MOA, BIE remains out of compliance with the statutory requirements. As noted above, the November 2018 letter imposes additional action steps.

c. In April 2018 the Department engaged in Tribal consultation on how to direct the use of the withheld funds; it received testimony and written comments from Tribes and other stakeholders, which it considered before it made a determination to restore 50 percent of the withheld funds to BIE. In addition to comments asking to restore the withheld funds, numerous comments supported directing BIE to use these funds to complete the NRM in a timely manner. Subsequently, in a letter to DOI on July 3, 2018, the Department notified DOI of its intent to restore 50 percent of BIE's State administrative portion of Title I, Part A funds that were previously withheld so that BIE could continue its NRM work. To receive the remaining portion of the withheld funds, BIE was required to complete four items: (1) provide the Department an updated timeline of the negotiated rulemaking process, including the date by when the final regulations will be in place to ensure they will be implemented by the beginning of the 2019-20 SY; (2) publish the dates for the negotiated rulemaking sessions in the federal register; (3) provide the Department with copies of the white papers supporting the negotiated rulemaking process that had already been completed for BIE; and, (4) meet with the Department to provide an update regarding BIE's plans for conducting the rulemaking process. BIE subsequently satisfied all four conditions and on August 28, 2018, the Department restored the remaining withheld funds to BIE. BIE completed its NRM in March 2019 (later than previously scheduled) and has not yet published its notice of proposed rulemaking. As a result, BIE will not meet its

obligation to establish rules for standards, assessments, and accountability in SY 2018-2019, as previously agreed upon.

d. At this point, the Department has not initiated any further withholding of BIE's State administrative portion of Title I, Part A funds.

e. Yes. Department staff from Department program and legal offices provided extensive technical assistance to BIE and DOI staff leading up to each of the four NRM committee meetings held in 2018 and 2019. In addition, Department staff attended BIE's four NRM committee meetings and provided technical assistance to BIE and the committee upon request. Further, BIE accessed Department-funded technical assistance from the Comprehensive Centers throughout this process.

f. No. The Department did not receive any of the items identified in the November 28, 2018 letter by the established deadline of January 7, 2019, as requested; nor did it receive the items that had a February 1, 2019 deadline. On January 15, 2019, DOI's Assistant Secretary, Tara Sweeney, issued a letter to the Department's Assistant Secretary, Frank Brogan, stating that BIE would provide a plan and timeline for its implementation of its ESSA compliant system once the negotiated rulemaking timeline was complete and consultation had concluded. During the regular bi-monthly meeting on February 26, 2019, BIE provided a timeline addressing the negotiated rulemaking process only, showing that consultation was scheduled to be completed in May 2019, an NPRM would be published early June 2019, and the final rule in early September 2019. This, however, did not address the implementation timeline required by the January 7, 2019 deadline. During the same February meeting, BIE also requested additional time until after it concluded its fourth and final NRM session in March 2019 to provide the Department with an implementation timeline. Note that the NRM was originally supposed to have only three sessions and conclude in December 2018, but BIE added a fourth session, which was then impacted by the government shutdown, and did not occur until March 2019. The January 15, 2019 DOI letter also stated that BIE would work towards providing the other items "to the extent possible pending implementation of its accountability system and will notify ED in advance if it needed additional time or support be needed." The Department has not yet received any of the requested information.

g. Yes. The Department followed up with the BIE Director, Tony Dearman, and DOI's Deputy Assistant Secretary, Mark Cruz, on April 4, 2019, to inquire when BIE could reasonably provide the timeline that it indicated it would provide following the conclusion of its fourth NRM session in March 2019. BIE responded that it would be providing this information along with the additional deliverables in the near future but did not provide a specific date it would make this information available to the Department. In addition, on April 29, 2019, the two agencies held a meeting at which BIE indicated that it will need until May 31, 2019 to provide the timeline that was due to the agency on January 7, 2019. BIE also provided general updates on its progress towards completing other action items that were previously due by January 7 and February 1, 2019, and the Department indicated that a follow-up meeting between the two agencies should occur to discuss the items in detail.

### EDUCATION FREEDOM SCHOLARSHIPS AND RESOURCE ALLOCATION FOR PRIVATE VERSUS PRIVATE SCHOOLS

*Question.* You have stated that your proposed Education Freedom Scholarship program "won't take a single cent from local public school teachers or public school students." Yet, this proposed program would create a $5 billion annual federal tax credit. These are dollars that could be spent on increase resources to our public school students through Title I or IDEA, for example.

How is your proposal not a shift of resources from public schools to private schools?

Answer. The Education Freedom Scholarship proposal would create a $5 billion annual federal tax credit, encouraging voluntary donations to scholarships for elementary and secondary students. Those scholarships can be used to support students in a variety of public and private settings, as determined by States. The voluntary donations do not shift Federal resources from public schools or teachers.

### EDUCATION FREEDOM SCHOLARSHIPS AND FEDERAL CIVIL RIGHTS LAWS

*Question.* Does the Department of Education intend for participating private schools under the proposed Education Freedom Scholarship program to adhere to federal civil rights laws that protect all students, and if not, which laws or regulations (including nondiscrimination statutes) does the Department of Education intend to waive for private schools that could participate in this proposed program?

Answer. States, not the Federal government, will determine which education providers can receive scholarships under the Education Freedom Scholarship proposal. States may include private schools in their local programs, but they are not obliged to. The Department will continue to enforce all applicable civil rights laws for all private and public schools. If the Education Freedom Scholarship program is enacted, the Department will not – and cannot – waive any existing civil rights laws.

### STAKEHOLDERS INVOLVED IN FEDERAL COMMISSION ON SCHOOL SAFETY FINAL REPORT

*Question.* What individuals and organizations consulted in the development of the recommendations included in the Final Report of the Federal Commission on School Safety, published on December 18, 2018? Please provide a complete list.

Answer. Students, teachers, parents, administrators, school safety personnel, mental health professionals, and others with an interest in school safety provided vital input into the Commission's work including various school safety recommendations. Transcripts and other documents showing the names of individuals, organizations, and their recommendations (to the extent they so-included any), may be found at the Commission's web page at https://www.ed.gov/school-safety.

Personnel from the Departments of Education, Justice, Health and Human Services, and Homeland Security assisted the Commission in the development of the recommendations included in the Final Report. Officers and staff from the Department of Education who assisted in the development of the recommendations included: Secretary Betsy DeVos, Deputy Secretary Mick Zais, Assistant Secretary of Elementary and Secondary Education Frank Brogan, Kent Talbert, Meredith Miller, Ashley Briggs, Nate

Bailey, Josh Venable, Jessika Ramakis, Victoria Hammer, Erica Lee, Paul Kesner, Rita Foy Moss, Jean Morrow, Chris Rinkus, Bill Cordes, Larry Cohen, Vanessa Tesoriero, Michael Hawes, Dennis Koeppel, Maureen Dowling, Brian Thompson, Thomas Wheeler, Venitia Richardson, William Trachman, and Joe Conaty.

You may wish to contact the other departments for their personnel.


## RESCISSION OF DISCIPLINE GUIDANCE, RECOMMENDATION TO ARM PERSONNEL, AND EFFORTS TO PROMOTE POSITIVE SCHOOL ENVIRONMENT

*Question.* In December 2018, the Department of Education rescinded a 2014 guidance regarding how States and local educational agencies should comply with federal civil rights laws in regards to school discipline. At the same time, the Federal Commission of School Safety issued a report which recommended school districts arm "some specially selected and trained school personnel" and increase police presence on school grounds. Reports and research often shows that arming school personnel and increasing police presence on campus disproportionately and negatively impacts students of color and students with disabilities. What actions will the Department take to help states and school districts create positive school environments for these students and prevent these negative impacts from the rescission of the 2014 guidance?

Answer. On April 10, 2019, the Department announced the release of the "Parent and Educator Guide to School Climate Resources" (Guide). This action fulfilled one of the recommendations of the Federal Commission on School Safety. The Guide, produced jointly by the Department's Office of Elementary and Secondary Education and Office for Special Education and Rehabilitative Services, provides best practices and includes resources that school leaders and teachers can use as they work to achieve a positive school climate, lower disciplinary issues and enhance school safety.

Arranged in a Question and Answer format and available on the Department's website, https://www2.ed.gov/policy/elsec/leg/essa/essaguidetoschoolclimate041019.pdf, the Guide provides parents and educators with useful decision-making frameworks and implementation tools, as well as best practices that school leaders can consider as they work to foster positive and inclusive learning environments. Examples from schools across the country are included to illustrate the various interventions communities are employing to enhance student behavior and achievement. With recent research highlighting the importance of evaluating school climate through a range of indicators, the Guide provides diagnostic tools whereby educators may collect and use data to drive their climate improvement strategies.

Additionally, the Parent and Educator Guide to School Climate Resources provides information to teachers and school leaders on how they can receive support from the Department's two key technical assistance centers dedicated to promoting safe and supportive schools. These centers are the National Center of Safe and Supportive Learning Environments (https://safesupportivelearning.ed.gov), and the Technical Assistance Center on Positive Behavioral Interventions and Supports (www.pbis.org). The Guide includes an appendix of additional resources.

## BASIS FOR REQUESTING INCREASED FUNDS FOR CHARTER SCHOOLS AND PLANS TO ADDRESS CHALLENGES

*Question.* The Department of Education requests an increase for the Charter School Program, following media reports that the Department has been unable to disburse all appropriated funding in FY19 due to lack of applicants. Why did the Department request such a sizeable increase in the program when it has not been able to spend down the funds in this program and how does the Department intend to run any future competitions to address longstanding challenges in the charter sector, including in serving students of color and students with disabilities?

Answer.  The challenge faced by the Department in awarding the full fiscal year 2019 appropriation for the Charter Schools Program (CSP) is largely due to a couple of large states delaying their applications for State Entity grants while constraints in the appropriations language currently prevent the Department from reallocating funds for State Entity grants to areas within the CSP with greater demand. If Congress provides the requested flexibility to redistribute fiscal year 2019 funds to other CSP authorities, including the CSP facilities programs, the Department will be able to award all fiscal year 2019 CSP appropriations. In fiscal year 2020, the Department anticipates that demand for State Entity grants will return to prior-year levels, but it is important to recognize that the Administration's request includes the needed flexibility to direct CSP funds to areas of growing demand, such as facilities grants, thus helping to ensure that the Department will be able to award the full $500 million proposed in the request. Finally, in conducting CSP competitions, the Department will continue to ensure that funds support only schools that comply with the IDEA and Federal civil rights laws, consistent with the program statute's definition of "charter school." Additionally, the Parent and Educator Guide to School Climate Resources provides information to teachers and school leaders on how they can receive support from the Department's two key technical assistance centers dedicated to promoting safe and supportive schools. These centers are the National Center of Safe and Supportive Learning Environments (https://safesupportivelearning.ed.gov), and the Technical Assistance Center on Positive Behavioral Interventions and Supports (www.pbis.org). The Guide includes an appendix of additional resources.

## RESOURCES REQUIRED TO ADDRESS BORROWER DEFENSE BACKLOG

*Question.*  Has the Department conducted any analysis of the resources, including staff full-time equivalencies and any contract funding necessary to clear the backlog of pending borrower defense claims, now totaling at least 158,000 from the end of quarter 4 of 2018? If so, please describe how such analysis was conducted and the principal findings of such analysis, including staffing or contracting resources that could be utilized or necessary.

Answer.  Yes. The Department recently completed a preliminary estimate of the full-time and contractor resources needed to eliminate or substantially reduce the number of pending borrower defense applications. The process included a review of adjudication work flows, as well as platform capabilities and required updates. Additionally, the Department considered potential efficiencies that could be incorporated into the process to reduce the time that borrower defense applications remain pending. Among the principal

findings was the conclusion that existing staff and contractors are insufficient to address the existing applications and, therefore, the Department is in the process of adding full-time and contractor resources. The Department also found that various technology updates are needed to adjudicate applications efficiently. Those updates will be implemented over the next year. Even as staffing adjustments are made, however, the backlog will continue due to our inability to move forward with making determinations of damages since the methodology developed by the Department to conduct this analysis is the subject of a court appeal.

## EFFECT OF PARTIAL RELIEF METHODOLOGY ON PREVIOUSLY APPROVED BORROWER DEFENSE APPLICATIONS

*Question.* How many borrower defense applications have previously been designated approved, but have not yet been formally discharged due to the partial relief methodology announced December 21, 2017?
Answer.  Approximately 23,900.

## RESOURCES REQUIRED TO ISSUE PARTIAL VERSUS FULL DISCHARGE FOR PREVIOUSLY APPROVED BORROWER DEFENSE APPLICATIONS

*Question.*  What resources, including staff full-time equivalencies and any contract funding, does the Department estimate are necessary to provide partial relief to borrowers who attended Corinthian Colleges, Inc. who would otherwise have been eligible for full relief prior the partial relief or discharge formula announced December 21, 2017?
Answer. The Department is considering alternative relief methodologies, and when one is selected, the Department will be able to fully assess the data and personnel needed to implement that methodology.

## RECENT ACTIVITY ON BORROWER DEFENSE APPROVALS, DENIALS, AND FINDINGS

*Question.*  As of March 28, 2019, when was the last time the Department:
a. approved a borrower defense claim?
b. denied a borrower defense claim?
c. developed any findings related to borrower defense claims?
Answer.  a. The last time a borrower defense application was approved was June 12, 2018.
b. The last time a borrower defense application was denied was May 24, 2018. However, the Department has decided to move forward with processing denials while awaiting the court's decisions regarding the methodology to be used for partial relief. Once the Department determines an alternate relief methodology, approved applications processing will begin immediately. Additionally, the Department is completing updates to the new customer engagement platform, which will bring the platform fully into compliance with the 2016 borrower defense regulations and allow the Department to resume processing application denials.

c. The Department has identified no facts relevant to the review of Corinthian Colleges claims, other than the admissions made by Heald College regarding placement rate falsifications, and has instead relied on the allegations of the California Attorney General and other AGs to adjudicate claims. The Department has similarly made no findings of fraud regarding ITT Tech, which is why from the start the Department recommended to ITT Tech students that they pursue closed school loan forgiveness rather than borrower defense to repayment relief. However, as claims are reviewed they may contain information that leads to new findings.

## STAFF ALLOCATED TO BORROWER DEFENSE ACTIVITY

*Question.* How many full-time equivalent positions with the primary job function or responsibility of reviewing, or providing analysis of, borrower clams, including attorneys or advisors:
- Were filled with active employees as of January 19, 2017
- Have become vacant since January 20, 2017
- Have been listed with a vacancy announcement by the Department since January 20, 2017
- Have been hired by the Department since January 20, 2017
- Are employed as of the date of the response to this inquiry

Answer. As of January 19, 2017, there were 11 employees in the Borrower Defense Group. Since January 20, 2017, four of those employees voluntarily separated from the Department. As of March 31, 2019, seven employees remain in the Borrower Defense Group, which includes six full-time employees and one part-time employee. Since January 20, 2017, no additional employees have been hired in the Borrower Defense Group. The Department currently is preparing announcements to fill the vacant positions.

## EXTENT OF AUTONOMY AFFORDED TO BORROWER DEFENSE UNIT

*Question.* Is the Borrower Defense unit at Federal Student Aid empowered to make decisions about whether a borrower qualifies for borrower defense without authorization from senior political appointees? If not, please describe the specific approvals from the rest of Federal Student Aid or the Department that are required.

Answer. The Borrower Defense group, under the leadership of a Department Official, determines whether a borrower's application is approved and, therefore, whether the borrower is eligible for relief. The amount of relief to be provided is also determined by the Department Official based on the methodology developed by the Department and approved by the Department Official. Senior Department officials may be consulted regarding relief approaches and decisions for approved applications.

## PROGRAM REVIEW AND SCHOOL OVERSIGHT CHANGES REQUIRED TO IMPLEMENT 2016 BORROWER DEFENSE REGULATIONS

*Question.* How will the program review process, and any other FSA school oversight functions, be modified to implement the 2016 borrower defense regulations?

Answer.  The Department issued an Electronic Announcement on March 15, 2019 that provided information to institutions about how they must comply with the 2016 borrower defense regulations. The Department is also working to publish a final, revised borrower defense regulation.

## TIMELINE TO FINALIZE CHANGES REQUIRED TO IMPLEMENT 2016 BORROWER DEFENSE REGULATIONS

*Question.*  What is the Department's expected timeline to finalize any changes to FSA's oversight functions to implement the 2016 borrower defense regulations?

Answer.  The Department is working diligently to implement the 2016 borrower defense regulations and issued an Electronic Announcement on March 15, 2019 to provide additional information to institutions on how to comply with the regulation.  The Department is currently using manual data extraction techniques to identify borrowers who are eligible for Automatic Closed School Loan Discharge and is working to develop an automated system to identify eligible borrowers in the future.

## FINANCIAL TRIGGERING EVENTS AND REPAYMENT RATE DISCLOSURES FOR 2016 BORROWER DEFENSE REGULATIONS

*Question.*  Please provide the following information regarding financial triggering events and repayment rate disclosures under the 2016 borrower defense regulations:

a. What steps has the Department taken to recalculate financial responsibility composite scores for institutions that have reported triggering events?

b. What actions will the Department take to integrate financial responsibility triggering events, or the subsequent recalculation of the composite score, if institutions do not report the events to the Department?

c. How does the Department plan to address instances when reporting is not conducted, and does the Department plan to announce any policy or procedure to address non-reporting?

d. Are institutions able to submit alternative forms of surety, in place of a letter of credit, and does the Department plan to announce any policy or procedure for alternative surety?

e. What is the Department's expected timeline to select a vendor to conduct consumer testing for repayment rate disclosures and financial responsibility triggering events, and to begin and complete such consumer testing?

f. What is the Department's timeline to publish in the Federal Register the required trigger events and the format by which repayment rates must be disclosed?

g. Has the Department set aside any resources to pursue further investigation, enforcement action, or review of Program Participation Agreements when it is notified of triggering events such as borrower defense-related lawsuits and accrediting agency actions against an institution?

Answer. a. On March 15, 2019, the Department published an Electronic Announcement                                                                                        at ifap.ed.gov/eannouncements/030719GuidConcernProv2016BorrowerDefensetoRypmtRe gs.html that provides information for institutions about how to report financial triggering events. While no composite scores have been recalculated to date, the Department is prepared to do so if or when the need arises.

b. When an institution fails to report information that it is required to report under the revised financial responsibility regulations, the Department will, as part of its oversight responsibilities, take action to bring the school back into compliance with those regulations, recalculate the composite score (as appropriate), and request a letter of credit, if needed. In addition, the Department will determine whether any fine or other similar action is appropriate.

c. If a school fails to report a financial triggering event, the Department will determine whether any fine or other similar action is appropriate. The Department does not comment on deliberative, preliminary, or ongoing investigative work, including the enforcement of the Title IV regulations.

d. As of May 6, 2019, the Department has not announced whether institutions are able to submit alternative forms of surety in place of a letter of credit. If the Department chooses to accept alternative forms of surety in place of a letter of credit, the Department would need to publish that decision in a Federal Register notice. The Department would provide the appropriate policy or procedure for alternative surety in an Electronic Announcement or another appropriate communication posted on the Information for Financial Aid Professional (IFAP) online portal.

e. The Department is in the final stages of selecting a vendor to conduct consumer testing and anticipates being able to conduct user testing for repayment rate disclosures and financial responsibility triggering events in the summer of 2019.

f. The Department anticipates publishing a Federal Register notice detailing the required triggering events and the format by which repayment rates must be disclosed by the end of Calendar Year 2019.

g. It is Department policy to not comment on any deliberative, preliminary, or ongoing investigative work, including disclosing departmental resources to enforce the Title IV regulations.

## OMITTED DISCUSSION OF ACCOUNTING STANDARDS IN ELECTRONIC ANNOUNCEMENT

*Question.* The Department's electronic announcement did not address the updates to accounting standards 2016-14 and 2016-02.

a. With respect to accounting standards update 2016-14, when does the Department expect the eZ-Audit System to be updated to include the new classes of net assets?

b. With respect to accounting standards update 2016-02, when does the Department expect to complete and publish the Business Impact Analysis detailing the Department's implementation requirements for the part of the ASU 2016-02 update that becomes effective for fiscal years after December 15, 2018?

Answer.  a. The Department is currently modifying the eZ-Audit System to reflect the changes noted in the Accounting Standards Update (ASU) 2016–14. The system modifications will include the new classes of net assets.

b. The Department is working on internal guidance regarding the ASU 2016–02 update and currently does not have a timeline for when it expects to complete the Business Impact Analysis detailing the Department's implementation of the ASU 2016–02 requirements.

## SERVICE LEVEL ACCOUNTABILITY MECHANISMS UNDER NEXTGEN

*Question.*  What specific mechanisms will be included in the NextGen servicing system to hold vendors or contractors accountable to a specific level of service?

Answer.  Section C.3.2 of the Next Gen FSA Business Process Operations (BPO) solicitation, enclosed, requires that successful offerors include performance management mechanisms in their proposed solutions to enable improved and ongoing achievement of metrics. Pursuant to the solicitation, BPO vendors will be measured monthly to determine their level of performance. 'Green' vendors will keep their assigned customers and will also be assigned an equitable share of new customers. 'Yellow' vendors will keep their assigned customers but will not receive new customers. If a vendor remains Yellow for more than six months, their contract may be terminated. If a vendor is 'Red' for two consecutive months, a portion of their assigned customers will be reallocated to other vendors. If a vendor is Red for three consecutive months, their contract may be terminated.



ATTACHMENT BPO
SOLICITATION.pdf

## PLANNED COMPLIANCE MEASURES FOR NEXTGEN

*Question.*  Please provide an explanation of the specific steps the Department will take to ensure NextGen offerors' compliance with  requirements, including, for each component of NextGen:

a. a detailed description of how the Department will assess offerors' history of compliance with consumer protection laws, regulations, agency guidelines, and court mandates prior to awarding federal contracts;

b. a detailed description of how the Department intends to monitor offeror compliance with consumer protection laws, regulations, and agency guidelines; and

c. a detailed description of how the Department intends to enforce offeror compliance with consumer protection laws, regulations, and agency guidelines including in what circumstances the Department will withhold access to contract payments, or use other sanctions, in instances of noncompliance.

Answer.  a. Next Gen FSA offerors are required to submit their record of adhering to consumer protection laws and regulations by detailing relevant legal proceedings and other matters as part of their past performance submission. The submitted information will be evaluated by FSA. Additionally, the Contracting Officer will consider information

obtained from any other sources, in accordance with Federal Acquisitions Regulation (FAR) Subpart 15.305(a)(2).

b. Once each Next Gen FSA vendor receives an award, FSA intends to compile a list of all requirements (including applicable laws, regulations, and guidelines) each vendor will be required to meet. A contract monitoring plan will be established, which will detail how each of these requirements will be monitored for compliance, how frequently each item will be reviewed, and the evidence that will be required to substantiate the vendor's compliance. FSA will review all evidence and will track and report on the results of each vendor's performance in accordance with the monitoring plan. Any vendor not performing adequately based on the results of the contract monitoring plan will be subject to penalties as defined in the contractual agreement between FSA and the vendor.

c. Section C.3.2 of the Next Gen FSA Business Process Operations (BPO) solicitation, enclosed, requires that successful offerors include performance management mechanisms in their proposed solutions to enable improved and ongoing achievement of metrics. Pursuant to the solicitation, BPO vendors will be measured monthly to determine their level of performance. 'Green' vendors will keep their assigned customers and will also be assigned an equitable share of new customers. 'Yellow' vendors will keep their assigned customers but will not receive new customers. If a vendor remains Yellow for more than six months, their contract may be terminated. If a vendor is 'Red' for two consecutive months, a portion of their assigned customers will be reallocated to other vendors. If a vendor is Red for three consecutive months, their contract may be terminated.



ATTACHMENT BPO
SOLICITATION.pdf

## SECURITIES AND EXCHANGE COMMISSION JURISDICTION OVER FEDERAL STUDENT LOANS

*Question.*  Do you acknowledge that the Securities and Exchange Commission has some jurisdiction and oversight authority over federal student loans?

Answer.  The Department of Education does not generally opine on the jurisdiction or oversight authority of other federal agencies.

## FEDERAL DEPOSIT INSURANCE CORPORATION JURISDICTION OVER FEDERAL STUDENT LOANS

*Question.*  Do you acknowledge that the Federal Deposit Insurance Corporation has some jurisdiction and oversight authority over federal student loans?

Answer.  The Department of Education does not generally opine on the jurisdiction or oversight authority of other federal agencies.

## DEPARTMENT OF JUSTICE JURISDICTION OVER FEDERAL STUDENT LOANS

*Question.*  Do you acknowledge that the U.S. Department of Justice has some jurisdiction and oversight authority over federal student loans?

Answer.  The Department of Education does not generally opine on the jurisdiction or oversight authority of other federal agencies.

## CONSUMER FINANCIAL PROTECTION BUREAU JURISDICTION OVER FEDERAL STUDENT LOANS

*Question.*  Do you acknowledge that the Consumer Financial Protection Bureau has some jurisdiction and oversight authority over federal student loans?

Answer.  The Department of Education does not generally opine on the jurisdiction or oversight authority of other federal agencies.

## CONSUMER FINANCIAL PROTECTION BUREAU COMPLAINTS AND SERVICER OVERSIGHT

*Question.* How does the Department incorporate complaints submitted to the Consumer Financial Protection Bureau into its oversight of its contracted student loan servicers, and how has this process changed over time?

Answer. In the Department's Memoranda of Understanding (MOU) with the Consumer Financial Protection Bureau (CFPB), the CFPB agreed to direct to the Department all complaints related to federal student loans within 10 days of receipt. The CFPB ceased sending these complaints to the Department, which was a primary reason the Department terminated its two MOUs with the CFPB in August 2017.

## PER-BORROWER COST OF PRIVATE COLLECTIONS

*Question.* What is the per-borrower cost of using private collection agencies, including collection costs paid by borrowers, and how does that compare to the per-borrower cost of the federal student loan servicing companies?

Answer. The model used to compensate private collection agencies (PCAs) contracted with the Department is different than the model used to compensate contracted Federal student loan servicers. While servicers are paid a flat, monthly fee per borrower regardless of that borrower's activities, PCAs — by contrast — earn a commission on payments received and a flat fee for other types of account resolution, chiefly loan rehabilitation.

While an account is assigned to a PCA for collection activity, the Department pays the default servicer a monthly fee for maintaining that account on the Debt Management and Collections System (DMCS), the system of record for the default portfolio. In fiscal year 2018, the Department paid the default servicer $0.97 per month per borrower to service defaulted borrower accounts, for a total payment of $83.7 million. Unlike the default servicer, a PCA only earns fees on assigned accounts when a borrower makes payments or otherwise resolves the account. In fiscal year 2018, the Department paid contracted PCAs a total of $793 million in fees.

Not all borrowers in default are placed with a PCA. Borrowers have 65 days to enter into a repayment arrangement after being assigned to DMCS; if borrowers do so and

continue making payments, the borrowers' account is not assigned to a PCA, and the borrowers are never charged collection costs.

## PER-BORROWER COST OF COLLECTIONS FOR BORROWERS IN DEFAULT

*Question.* What is the average amount of collection costs paid by borrowers in default? Please express this amount both in dollars and as a percentage of the principal balance of a loan.

Answer.  Collection costs are charged as follows:

- Only defaulted borrowers assigned to a PCA are charged collection costs when they make a voluntary or administrative wage garnishment (AWG) payment. If a borrower's account is not with a PCA, no collection costs are charged when voluntary or AWG payments are made.

- Borrowers who consolidate their defaulted loans with the assistance of a PCA are charged collection costs that are capitalized into the new principal balance of the consolidation loan.

- There are no collection costs charged on Treasury Offset Program (TOP) payments. However, the Department does charge the borrower a fee equal to the servicing fee that Treasury charges the Department to process the offset payment ($17.25 for most offsets in fiscal year 2018).

In fiscal year 2018, the Department assessed approximately $264 million in collection costs against borrowers making voluntary or AWG payments while being serviced by a PCA. The total number of borrowers in the default portfolio at the end of fiscal year 2018 was 7.4 million, and the average defaulted borrower paid $36 in collection costs in fiscal year 2018. The total principal balance of the default portfolio at the end of fiscal year 2018 was $111.8 billion, and the average defaulted borrower paid collection costs equal to 0.24 percent of their principal balance.

## COST OF COLLECTIONS VERSUS COST OF INCOME-DRIVEN REPAYMENT

*Question.* How does the typical amount paid in collections compare to what that same borrower would have paid on an income-driven repayment plan?

Answer.  Below is a breakout of the average annual amount paid in collections for Non-IDR borrowers vs. IDR borrowers.

Non-IDR Borrowers

Population: Student borrowers having open, defaulted Direct Loans in fiscal year 2018.

Source: CEAD STAB, which is a 4 percent sample of the National Student Loan Data System (NSLDS) used for modeling and analysis.

Amount: Fiscal year 2018 recoveries (including principal, interest, fees, and Treasury offsets) collected on the loans described above.

Statistics: There were an estimated 5.3 million borrowers in the population having defaulted loans in fiscal year 2018. Approximately 67 percent of borrowers had no recoveries on their defaulted loans in fiscal year 2018. Of the 33 percent who had recoveries

in fiscal year 2018, the median amount recovered in fiscal year 2018 was $798. The average annual amount recovered across all borrowers with defaulted loans (including those with no recoveries) is $559.

IDR Borrowers

Population: Because various IDR plans apply to different types of loans, for comparability purposes, the population assessed includes those in the REPAYE plan, which limits the sample to borrowers with Direct Loans only. Population includes REPAYE borrowers whose most recent record shows a scheduled payment date within fiscal year 2018.

Source: NSLDS LOAN_RPMT_PLAN table.

Amount: Annual total of scheduled monthly payments by borrower.

Statistics: Total borrowers in this population equal 2.48 million. Approximately 54 percent of borrowers have $0 scheduled payment. Of the 46 percent of borrowers who do not have $0 scheduled payment, the median payment is $1,596. The average annual payments across all borrowers is $1,092.

## HANDBOOK FOR PRIVATE COLLECTION AGENCIES

*Question.* Can you please provide a full copy of the handbook for private collection agencies, including the compensation terms?

Answer. A redacted version of the PCA Procedures Manual for Private Collection Agencies Contracted by Federal Student Aid is enclosed. The redacted information in this version of the manual includes information drafted under the guidance of Department attorneys pertaining to litigation procedures and is, therefore, classified as Attorney-Work Product. PCA employee names have also been redacted.

***ATTACHMENT***

PCA compensation varies depending on the type of collection. Vendors receive:

- A fixed fee of $1,741 for each borrower who completes a loan rehabilitation (note, however, that this fee is capped at the balance being rehabilitated;

- A fixed fee of $150 for completing administrative activities, such as certifying that a borrower is deceased, incarcerated, or eligible to have their loans discharged due to total and permanent disability;

- 2.75 percent of the final pay-off value of loans consolidated out of default, if the borrower establishes satisfactory repayment, or a fixed $150 administrative fee for borrowers who opt to repay the new consolidation loan under an income-driven repayment plan; and

- 15.2 percent of amounts collected through administrative wage garnishment or voluntary payments.

## MEDIAN AND AVERAGE COLLECTION RATES FOR BORROWERS

*Question.* What is the median and average collection rate paid by borrowers? Please break this amount down by the sector attended and outstanding loan balance, as well as borrower characteristics including Pell Grant receipt and dependency status.

Answer. The following table provides median collection rates, net of Contract Collection Costs (CCC), by risk category from the Student Loan Model. These rates represent the lifetime estimated collection percentage for loans in default including principal, interest, and fees. This is the current breakdown of the data based on the assumptions used to develop the President's Budget for fiscal year 2020.

| | President's Budget FY 2020 Net Present Value Recovery Rates (net of CCC) | | |
|---|---|---|---|
| | 2018 cohort | 2019 cohort | 2020 cohort |
| Subsidized Stafford Loans | | | |
|   Four-year Program, Freshman/Sophomore | 82.42% | 82.12% | 80.27% |
|   Four-year Program, Junior/Senior | 82.41% | 82.35% | 80.18% |
|   Two-year Program, Non-profit | 82.84% | 82.45% | 80.53% |
|   Proprietary | 83.24% | 82.85% | 80.68% |
| Unsubsidized Stafford Loans | | | |
|   Four-year Program, Freshman/Sophomore | 82.36% | 82.33% | 80.18% |
|   Four-year Program, Junior/Senior | 82.38% | 83.01% | 79.99% |
|   Graduate Program | 79.45% | 82.67% | 77.11% |
|   Two-year Program, Non-profit | 82.77% | 82.59% | 80.45% |
|   Proprietary | 83.25% | 83.02% | 80.70% |
| PLUS Loans | | | |
|   Four-year Program, Freshman/Sophomore | 77.29% | 76.95% | 75.24% |
|   Four-year Program, Junior/Senior | 74.60% | 75.07% | 72.44% |
|   Graduate Program | 80.26% | 86.09% | 78.17% |
|   Two-year Program, Non-profit | 77.00% | 77.20% | 74.60% |
|   Proprietary | 78.47% | 77.77% | 76.09% |
| | | | |
| Note:  2020 Cohort does not include policy | | | |
| | | | |

### TIME REQUIRED TO ASSIGN AND TRANSFER BORROWERS TO DEBT COLLECTORS

*Question.*  On average, how long does it take for a borrower to be assigned to a debt collector, and how many times is a borrower transferred between debt collectors?

Answer.  At 270 days delinquent, a borrower enters technical default. At 360 days delinquent, the borrower is transferred from their servicer to the Debt Management Collections System (DMCS) for collections. Once the borrower is assigned to DMCS, they are not assigned to a PCA for at least 72 days. During this period, the borrower is sent a due process notice and provided an opportunity to enter voluntary repayment or prove the debt should not be in collections.

Once a borrower is placed with a PCA, that borrower will typically remain with that PCA for a minimum of one year. A borrower generally remains with the PCA so long as the borrower enters into repayment or is otherwise working with the PCA toward resolution, or if the PCA initiates wage garnishment against the borrower.

## TIME REQUIRED TO TAKE LOANS FROM INITIATION TO COMPLETION OF REHABILITATION

*Question.* Please provide the average number of months from rehab initiation to rehab completion.

Answer. For Federal Family Education Loan (FFEL) and William D. Ford Federal Direct Loan (Direct Loan) program loans, the borrower must make nine payments in a 10-month period. For Federal Perkins Loan (Perkins Loan) Program loans, the borrower must make nine consecutive monthly payments. Most borrowers make their first payment immediately once counseled about the benefits of rehabilitation. Therefore, the most common scenario is that borrowers complete the requirements for rehabilitation approximately eight months after they receive counseling about the program. Once the ninth payment is received, FFEL and Direct Loan program loans are typically transferred to a non-default servicer within one week. Perkins Loans are transferred to a non-default servicer within one month.

## COMMITMENT TO REFRAIN FROM INTERFERING WITH OFFICE OF INSPECTOR GENERAL INVESTIGATIONS AND REVIEWS

*Question.* Can you commit that neither you nor anyone else in the Department will attempt to stop, alter, or delay any investigation or review undertaken by the Department's Office of the Inspector General?

Answer. The Department will comply with the Inspector General Act of 1978, 5 U.S.C. App. 1 et seq., as applicable.

## COMMITMENT TO REFRAIN FROM REMOVING OR TRANSFERRING ACTING INSPECTOR GENERAL PRIOR TO CONFIRMATION OF NEW INSPECTOR GENERAL

*Question.* Can you commit that neither you nor anyone else in the Department will take further steps to remove or transfer Acting Inspector General Sandra Bruce until a new Inspector General is confirmed?

Answer. The Department will comply with the Inspector General Act of 1978, 5 U.S.C. App. 1 et seq., the Federal Vacancies Reform Act, 5 U.S.C. 3345, and other relevant federal statutes governing personnel matters, as appropriate.

## SPECIAL OLYMPICS BUDGET AMENDMENT

*Question.* As I indicated in my hearing statement, I was disappointed to see the President's budget proposal to eliminate $17.6 million for Special Olympics education programs. This is the third year President Trump's budget has included such a proposal. Now that President Trump has "just authorized a funding of the Special Olympics," when will a budget amendment be submitted to the Congress consistent with his statement?

Answer. The President submitted a budget amendment to Congress on May 13th that included $17.6 million for the Special Olympics program for fiscal year 2020.

## BORROWER DEFENSE CLAIMS BY CATEGORY AND STATE

*Question.* How many borrower defense claims on or after January 20, 2017 has the Department has received, approved, and are pending, disaggregated by each status and by state.

Answer. Please see the attached three tables providing the number of pending (Table A), received (Table B), and approved (Table C) borrower defense claims disaggregated by state.


Table A - Pending Claims.pdf


Table B - Received Claims.pdf


Table C - Approved Claims.pdf

## BORROWER DEFENSE APPROVALS BY QUARTER

*Question.* How many borrower defense claims were approved:
a. In the first quarter of 2017
b. In the second quarter of 2017
c. In the third quarter of 2017
d. In the fourth quarter of 2017
e. In the first quarter of 2018
f. In the second quarter of 2018

Answer. Borrower defense claim approval numbers by quarter:
   - 15,900 borrower defense claims were approved in the first quarter of 2017.
   - No borrower defense claims approved in the second and third quarters of 2017.
   - 410 borrower defense claims were approved in the fourth quarter of 2017.
   - 5,345 borrower defense claims were approved in the first quarter of 2018.
   - 10,401 borrower defense claims were approved in the second quarter of 2018.

## FULL VERSUS PARTIAL RELIEF BORROWER DEFENSE APPROVALS AND DISCHARGES

*Question.* How many unique borrowers with borrower defense claims:

a. were identified for partial relief or discharge formula (announced December 21, 2017) who have received such partial relief or discharge

b. were identified for partial relief or discharge formula (announced December 21, 2017) who have not yet received such partial relief or discharge

c. were identified for partial relief or discharge formula (announced December 21, 2017) who had previously been identified for full relief prior to January 20, 2017

d. identified for full relief or discharge who have received such discharge since January 20, 2017

e. were identified for full relief or discharge who have not yet received such discharge since January 20, 2017

Answer.  a. Of the 16,151 total applications that have been identified for borrower defense relief under the tiered relief methodology, 15,026 applications received less than 100-percent discharge under the tiered relief methodology.

b. All 15,026 applications that received less than 100-percent discharge under the tiered relief methodology have received relief.

c. There are no applications that were identified for full relief that received tiered relief.

d. Of the 16,151 total applications that have been identified for borrower defense relief under the tiered relief methodology, 1,125 applications received 100-percent discharge under the tiered relief methodology after January 20, 2017.

e. All 1,125 applications identified for 100-percent discharge under the tiered relief methodology after January 20, 2017 have received relief.

## CLAIMS FROM INSTITUTIONS WITH HIGH VOLUMES OF PENDING BORROWER DEFENSE CLAIMS

*Question.*  How many unique borrowers have filed claims from institutions which currently have 1,000 or 500 or more pending claims, respectively, including the total number of pending claims for each institution?

Answer.  Attached is a validated spreadsheet containing a table of institutions that currently have 500 or more pending applications including the total number of pending applications for each institution.



Pending%20Claims.
xlsx

## SCHOOL GROUPS WITH MOST BORROWER DEFENSE CLAIMS

*Question.*  Please provide a list of the 20 school groups (such as a parent company or controlling institution) that have received the most borrower defense claims, including the total number of claims received, the total number of claims pending, the total number of claims approved, and the percentage of all pending borrower defense claims for each school group.

Answer.  Attached is a validated spreadsheet containing a table of borrower defense applications by school group. The table shows the number of applications approved by

school group, the number of applications received by school group, and the percentage of applications received that are still pending by school group. The number of pending applications by school group cannot be provided because small cell sizes carry the risk of privacy disclosure.



School%20Groups.x
lsx

## DEPARTMENT RELATIONSHIP WITH CONSUMER FINANCIAL PROTECTION BUREAU

*Question.* Has there been any change in the Department's relationship with any federal agencies, including the Consumer Financial Protection Bureau (CFPB), since January 20, 2017 regarding the review of borrower defense claims or development of evidence to support the processing of claims? If so, please describe the nature of the change(s) in the relationship(s).

Answer. In August of 2017, the Department terminated the memorandum of understanding (MOU) with the CFPB because the CFPB had not been abiding by the terms set forth in the MOU. The CFPB has not formally attempted to reestablish an MOU with the Department, under 12 U.S.C. 5535, since the previous MOU was terminated.

## DETERMINING APPROPRIATE EXTENSION OF CLOSED SCHOOL DISCHARGE WINDOW

*Question.* What steps is the Department taking to determine the appropriate extensions of the 120-day window for closed school discharges for students who attended Education Corporation of America, Vatterott Colleges, or Dream Center Education Holdings owned schools, respectively, given the reported financial difficulties and accreditation challenges that faced these colleges well in advance of their closures?

Answer.  The Secretary has not issued a decision on whether to extend the date for determining eligibility for a closed school loan discharge under 34 C.F.R. § 685.214(c)(l)(i)(B) due to exceptional circumstances. If the Secretary does not exercise her authority to extend the eligibility window, an institution's last full day of educational instruction is the date utilized to determine potential eligibility for closed school loan discharges.

## STATE-BY-STATE BREAKDOWN OF PUBLIC SERVICE LOAN FORGIVENESS APPLICATIONS FOR FORGIVENESS

*Question.* Please provide a state-by-state breakdown of the number of PSLF Applications for Forgiveness received, approved and denied. Please provide this information for both the number of unique borrowers as well as the total number of applications.

Answer.  Please find the requested data attached.



State%20by%20Stat
e%20PSLF.xlsx

## STATE-BY-STATE BREAKDOWN OF TEMPORARY EXPANDED PUBLIC SERVICE LOAN FORGIVENESS APPLICATIONS

*Question.*  Please provide a state-by-state breakdown of the number of TEPSLF applications (via emails sent to TEPSLF@myfedloan.org) received, approved and denied. Please provide this information for both the number of unique borrowers as well as the total number of applications.

Answer.  Please find the requested data attached.



State%20by%20Stat
e%20TEPSLF.xlsx

## PLANNED FOLLOW-UP ON SENIOR DEPARTMENT OFFICIAL RECOMMENDATIONS FOR ACICS

*Question.*  In the Senior Department Official's October 2018 response regarding the recognition of ACICS, the SDO recommended the Secretary give ACICS 12 months to submit a compliance report regarding the two areas the SDO found ACICS to have not demonstrated full compliance (conflicts of interest and competency of representatives), including how ACICS has made progress to ensure its Ethics Review Board will allow it to be in compliance with those two criteria. In particular, the SDO also recommended that ACICS be required to provide evidence that it requires its IRC members to sign conflicts of interest attestations. The SDO also recommended that ACICS provide additional evidence responding to whether existing evaluators have received the additional training and answer questions regarding the qualifications of the Data Integrity Reviewer. Please provide a detailed explanation regarding when exactly ACICS is expected to submit those reports, who at the Department will review the report, the 12-month date upon which ACICS will be reviewed to see if it demonstrates compliance with all accreditation criteria, and the actions available to the Secretary on that 12-month date.

Answer. The Secretary's decision included two areas of noncompliance - 602.15(a)(2) and 602.15(a)(6) - that require a compliance report within 12 months. The Accreditation Group (AG), within the Office of Postsecondary Education, will process that compliance report per 602.32. The compliance report will be due November 21, 2019, and will be presented at the summer 2020 NACIQI meeting. The monitoring report addressing the issues below will also be due at the same time as the compliance report, but it will be separate and independent of the compliance report. The monitoring report will be reviewed by AG staff.

Monitoring areas:

  - 602.15(a)(1) – Audited financial records and a staffing report (Note: the audited financial records are required to be submitted annually for three years.)

- 602.16(a)(1)(i) – An annual report on the function and effectiveness of ACICS' Placement Verification Program (PVP).
- 602.16(a)(1)(vii) – An annual report on the work of ACICS' At Risk Institutions Group (ARIG) and actions taken by the agency, if any.
- 602.19(b) – An annual report on the work of ACICS' At Risk Institutions Group (ARIG) and actions taken by the agency, if any.

## MEMORANDUM OF UNDERSTANDING BETWEEN OMBUDSMAN OFFICES AT FEDERAL STUDENT AID AND CONSUMER FINANCIAL PROTECTION BUREAU

*Question.* Does the Department maintain a memorandum of understanding (MOU) between its own ombudsman and the student loan ombudsman at the Consumer Financial Protection Bureau, as required by 12 U.S. Code § 5535 "to ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or Federal student loans"? If not, why not, and when will the Department reestablish this MOU?

Answer. In August of 2017, the Department terminated the memorandum of understanding (MOU) with the CFPB because the CFPB had not been abiding by the terms set forth in the MOU. The CFPB has not formally attempted to reestablish an MOU with the Department, under 12 U.S.C. 5535, since the previous MOU was terminated.

## INCORPORATING NEXTGEN OVERSIGHT IN FEDERAL STUDENT AID ANNUAL PERFORMANCE REPORT AND PERSONNEL EVALUATIONS

*Question.* How will elements of oversight incorporated into the Next Generation Financial Services Environment, including but not limited to compliance, be incorporated into individual FSA employee personnel evaluations and in the FSA's annual performance report?

Answer. Vendor and partner performance standards and accountability measures — such as publicly available metrics around service quality with corresponding disincentives up to and including termination — will be built into Next Gen FSA contracts to ensure our customers receive world-class service while protecting taxpayer dollars. Additionally, the Department's new borrower interface will request feedback from borrowers — for example, via surveys after phone, mobile, and online experiences and as part of focus groups — throughout the servicing process. FSA's performance plan will include metrics specifically tied to Next Gen objectives, such as improved customer service and better outcomes for borrowers and taxpayers. Employee performance plans will continue to include elements and goals that are set to achieving organizational objectives.

## DEPARTMENT RESPONSE TO SERVICER ENGAGEMENT IN UNFAIR, DECEPTIVE ACTS OR PRACTICES

*Question.* What actions does the Department take if and when it learns a student loan servicer is violating federal unfair, deceptive, acts, or practices (UDAP) provisions of the Dodd–Frank Wall Street Reform and Consumer Protection Act?

Answer. If the Department determines a vendor is in violation of UDAP, the Department may exercise a combination of actions, including but not limited to: making the customer whole, imposing financial penalties for improper servicing, reducing or eliminating customer allocations, or terminating the contract.


## FEDERAL EXPENDITURES ON LOAN COLLECTION ACTIVITIES

*Question.* How much federal funding has been spent on federal student loan collections activities in each of the last three fiscal years?

Answer. Below is the federal funding that has been spent on federal student loan collections in each of the last three fiscal years:

Default Management Collections System
FY 2018 $86,421,766.87
FY 2017 $80,971,072.14
FY 2016 $87,038,982.08
Private Collection Agencies
FY 2018 $793,005,185.68
FY 2017 $749,818,353.74
FY 2016 $750,164,808.62

## ENFORCEMENT ACTIONS AGAINST TITLE IV PARTICIPANTS

*Question.* Please provide a list of all recertification denials, emergency actions, fine actions, suspension actions, termination actions, or limitation actions taken, released, or initiated by ED between June 2018 and April 5, 2019 relating to any participant in the Title IV, HEA programs (including, without limitation, institutions of higher education, loan servicers, and other third-party servicers).

Answer. Please see attachment "Enforcement Actions."



Enforcement%20Act
ions.xlsx


## DATA ON PROGRAMS OUTSOURCING UP TO 25 PERCENT OF PROGRAM TO INELIGIBLE INSTITUTION OR ORGANIZATION

*Question.* Regulations currently require institutions to report to the Department any written arrangements with an ineligible institution or organization up to 25 percent of an institution's program. Please provide a list of the institutions with a written arrangement with an ineligible institution or organization up to 25 percent of the program, the name of the program, and any other information the Department has regarding the arrangement.

Answer. Currently, the Department's regulations require institutions to report written arrangements to their accreditor when 25 percent or more of a program is provided by an ineligible provider. Institutions are required to seek accreditor approval when a written arrangement allows an ineligible organization to deliver between 25 and 50 percent of the program. Our current regulations do not require institutions to report written arrangements with an ineligible institution or organization (contractual agreements) up to 25 percent of an institution's educational program to the Department. Therefore, the Department is unable to provide the requested information.

## REQUEST FOR DOCUMENTATION OF COMMUNICATIONS REGARDING EMPLOYEE BARGAINING

*Question.* Last September, I requested all communications since January of 2017 between yourself, members of your senior staff and any officials representing the Department in bargaining, and any individuals not employed by the Department that relate to bargaining with Department employees—and have yet to receive the requested communications. I restate that request here and ask you to give me a date on which I will receive all such communications.

Answer. With regard to communications with outside entities that relate to the collective bargaining process, although there have been communications with the FMCS and the Federal Service Impasse Panel during the bargaining process, those communications capture sensitive pre-decisional discussions involving internal management deliberations and guidance connected to the ongoing dispute before the FLRA referenced above. The Department declines to provide those communications while the dispute is still pending before the FLRA.

## AUTOMATIC CLOSED SCHOOL DISCHARGES SINCE NOVEMBER 2013

*Question.* How many borrowers, disaggregated by institution and year, have received automatic closed school discharges after attending an institution that closed on or after November 1, 2013. Where information at the 8-digit OPEID level would result in fewer than 10 borrowers, please roll up such numbers into the 6-digit OPEID level. Please do not disaggregate by institution those institutions with fewer than 10 borrowers with discharged loans at either OPEID level to avoid inadvertent disclosure of personally identifiable information (PII).

Answer. See the attached spreadsheet.



Automatic%20Discharges

## BORROWERS AND OUTSTANDING LOAN VOLUME ELIGIBLE FOR CLOSED SCHOOL DISCHARGE

*Question.* Please provide, disaggregated for each of the following school groups, the number of borrowers and the total estimated balance of outstanding loans whom the Department estimates are eligible for the applicable closed school discharge window

(either 120 days or as extended due to extenuating circumstances) and the number of borrowers and the total amount that has already been discharged through closed school discharge applications:

    a. ITT Educational Services, Inc.

    b. Charlotte School of Law

    c. Education Corporation of America

    d. Vatterott Colleges

    e. Dream Center Education Holdings

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline.  Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible.  Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## DISCHARGES UNDER TOTAL AND PERMANENT DISABILITY

*Question.* Please provide the most recent data available on the total number of borrowers discharged under total and permanent disability (TPD). Within this update please include:

    a. Number of SSA (SSI/SSDI) matched borrowers and total amount discharged;

    b. Number of Veterans Affairs matched borrowers and total amount discharged;

    c. Number of borrowers who matched either SSA or VA databases who are subject to types of forced collections, disaggregated by type (i.e. Tax Refund Offset, Treasury Offset Program, Administrative Wage Garnishment, etc.), and including the number of borrowers who are subject to multiple types of forced collections;

    d. Number of borrowers have had judgments entered against them (including those entered prior to TPD eligibility). Of those judgments, if any, the number of those still in effect;

    e. The number of borrowers in each state who have received a match notification and received discharge, separately, for SSA TPD borrowers;

    f. The number of borrowers in each state who have received a match notification and received discharge, separately, for VA TPD borrowers.

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline.  Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible.  Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## INSTITUTIONS AND NUMBER OF AUTOMATIC CLOSED SCHOOL LOAN DISCHARGES UNDER 2016 BORROWER DEFENSE REGULATIONS

*Question.*  Please provide a list of institutions that have generated automatic closed school discharge per the 2016 borrower defense regulations (34 CFR 685.214(c) (Direct Loan Program), 34 CFR 682.402(d)(8)(ii) (FFEL Program), and 34 CFR 674.33(g)(ii) (Perkins Loan Program)), the number of automatic closed school discharges at each institution granted to date, and the number of students that were in attendance at each institution at the time of closure. Where information at the 8-digit OPEID level would result in fewer than 10 borrowers, please roll up such numbers into the 6-digit OPEID level.

Answer. A list of institutions that have generated automatic closed school discharge per the 2016 borrower defense regulations (34 CFR 685.214(c) (Direct Loan Program), 34 CFR 682.402(d)(8)(ii) (FFEL Program), and 34 CFR 674.33(g)(ii) (Perkins Loan Program)) and the number of automatic closed school discharges at each institution granted to date are provided in the attached spreadsheet. There is one summary line for "All Others" at the bottom of the spreadsheet documenting the total count for all schools with fewer than 10 borrowers that received discharges.

The number of students attending each institution at the time of closure is provided in the attached spreadsheet. The schools with less than 10 borrowers that received discharges are displayed in the list with the indication "<10."



CSD under 2016
Regulations.xlsx



Automatic
Discharges.xlsx

## NUMBER OF APPLICATIONS RECEIVED FOR TRADITIONAL CLOSED SCHOOL DISCHARGE

*Question.* How many individual applications has the Department received for traditional (not automatic) closed school discharge on or after January 20, 2017, disaggregated by state and by claim status (i.e. received, pending, and approved).

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## STATE-BY-STATE BREAKDOWN OF PUBLIC SERVICE LOAN FORGIVENESS EMPLOYMENT CERTIFICATION

*Question.* Please provide a state-by-state breakdown of PSLF Employment Certification Forms (ECFs), including the unique number of borrowers who have any approved, have any denied ECF, and the cumulative number who have submitted any ECF.

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## PAPERWORK ON FILE FOR BORROWERS REJECTED FOR TEMPORARY EXPANDED PUBLIC SERVICE LOAN FORGIVENESS

*Question.* In its March 25, 2019 response to Senator Kaine, the Department indicated that 28,640 of the 38,460 requests (74.4 percent) to the TEPSLF email address were from borrowers without a PSLF Application for Forgiveness on file. As a result, these applicants were not processed for further review. How many of these individuals without a PSLF Application for Forgiveness had at least one Employment Certification on File? Please provide the current information and as of March 25, 2019 (for the 28,640 individuals specified).

Answer. These data currently are not available. Borrowers submit TEPSLF requests via email and are required to include their name and date of birth as identifiers. To reduce the risk of disclosure of personally identifiable information, borrowers are asked not to provide a Social Security number. The name and date of birth identifiers do not allow FSA to reliably identify the full population of borrowers who previously have submitted one or more Employment Certification Form. We expect the Next Gen FSA initiative to greatly improve our TEPSLF and PSLF reporting capabilities.

## ACICS OUTCOMES DATA FOR ACCREDITED COLLEGES

*Question.* Please provide an updated ACICS outcomes data file as of April 5, 2019 that shows for all ACICS-accredited colleges:

a. the date of a school's site visit, if any;

b. the date that a school's application to a prospective accreditor was denied, if applicable;

c. the date that a school's application to a prospective accreditor was withdrawn, if applicable;

d. the compliance status of each institution with the terms of the Program Participation Agreement (PPA) in control as of April 5, 2019;

e. the status of any colleges deemed non-compliant with their PPA terms, including provisions are they non-compliant with and corresponding consequences;

f. for any closed or announced to be closed institutions, information on the schools' plan for closing and teach-out agreements;

g. a summary of any revisions to the PPA made for each school after June 2018.

Answer.  Unfortunately, the Department cannot provide the information requested in the first three points above. Because accreditors are not required to provide information on schools that may be in the accreditation process – only those that are accredited – the Department does not have data for schools that have not yet been accredited. Already accredited schools must typically seek permission from the Department to change institutional accreditors, and in these cases, the Department would have related data available. However, the Department requires no such permission for institutions if their existing accreditor's recognition is withdrawn because the Department presumes affected schools will seek accreditation elsewhere. As such, the Department would not have the requested information for ACICS schools.

Although the Department has sufficient information to provide a response to the last four points of this question, the analysis and validation necessary could not be completed in time to accommodate the clearance process for Congressional questions for the record established in OMB Circular A-11. Thus, the Department was unable to provide a response for insertion into the official hearing record. The Department regrets the inconvenience but commits to providing a response to the Committee as soon as possible.

## DATA ON CLOSED SCHOOL GROUPS

*Question.*  For Education Corporation of America, Vatterott Colleges, and Dream Center Education Holdings, respectively, please provide the following information disaggregated by each school group:

a. How many students were enrolled in colleges owned by each school group at the time their colleges closed?

b. How many students who attended colleges owned by each school group have applied for closed school discharge?
    i. How many of those applications have been granted?
    ii. What is the total outstanding debt of the students that have submitted applications and how much of it has been discharged?

c. How many students attending colleges owned by each school group have applied for borrower defense?
    i. How many of those applications have been granted?

ii. What is the total outstanding debt of the students that have submitted applications?

d. When was the last date that any colleges owned by each school group recorded admitting students?

e. How many of the students enrolled at colleges owned by each school group have since transferred to new schools?
i. Of these, how many students transferred to another for-profit college?

f. Did the Department hold any financial surety, such as a letter of credit, from each school group at the time that it closed?
i. If yes, what was the amount held at the time that closed?
ii. Did the Department release any funds from surety back to the company within one year prior to closure? If yes, please provide a detailed timeline of when the Department released the funds, how much, to whom, and under what conditions.

Answer.  a. Please refer to the following table.

| School Group | Number of Actively Enrolled Students at the Time of Closure |
|---|---|
| Dream Center Education Holdings | 9,609 |
| Education Corporation of America | 20,585 |
| Vatterott Acquisition Co. | 2,149 |

b. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline.  Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible.  Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

c. Enclosed is a validated spreadsheet containing the number of borrower defense applications, approvals, and outstanding student debt for Education Corporation of America, Vatterott Colleges, and Dream Center Education Holdings.



Attachment%20C%2
0Data%20on%20Clo

d. The Department's systems do not capture such enrollment information, and because the schools are now closed, the information cannot be obtained from the institutions.

e. Please refer to the below table.

| School Group | Number of Student Transfers Since Closure |
|---|---|
| Dream Center Education Holdings | 92 |
| Education Corporation of America | 1,149 |
| Vatterott Acquisition Co. | 67 |

f. At the time of the respective school group closures, the Department held financial surety for Dream Center Education Holdings (DCEH) and Vatterott Acquisition Co. schools.

The Department held no financial surety when most of the Education Corporation of America (ECA) schools closed in December 2018. The Department placed all ECA institutions on the Heightened Cash Monitoring 2 Method of Payment on November 8, 2018, and requested surety on November 14, 2018. ECA was required to remit a letter of credit (LOC) to the Department in the minimum amount of $63,940,069. ECA closed most of its locations before providing the required surety amount. However, on March 26, 2019, the Department received an LOC of $1,036,521 for New England College of Business and Finance—the only remaining operational Title IV participating institution owned by ECA—which it continues to hold.

f. i. On March 8, 2019, the Department held—and it continues to hold—more than $24.5 million in surety funds for DCEH institutions.

The Education Principle Foundation (EPF) acquired some Art Institutes and South University from DCEH on January 7, 2019. The Department reallocated $28,500,000 of the available DCEH surety funds into different holding accounts to cover financial risks for the EPF institutions on February 11, 2019.

On Dec. 17, 2018, 14 Vatterott locations closed precipitously. At the time of these closures, the Department held—and it continues to hold—nearly $13 million in surety funds from Vatterott.

f. ii. Yes, in the case of DCEH schools. During the period from August 28, 2018 through December 31, 2018, the Department made seven disbursements totaling $39,586,990 from the LOC proceeds to DCEH. See the response directly above for the conditions justifying the release of funds to DCEH.

Disbursements of LOC proceeds were made to DCEH as follows:

| Disbursement Date (MM/DD/CCYY) | Disbursement Amount |
|---|---|
| 08/28/2018 | $10,000,000 |
| 09/21/2018 | $4,361,704 |
| 10/12/2018 | $4,000,000 |
| 10/23/2018 | $4,000,000 |
| 11/28/2018 | $4,000,000 |
| 12/18/2018 | $9,225,286 |
| 12/31/2018 | $4,000,000 |
| Total | $39,586,990 |

## FEDERAL STUDENT AID BONUSES OR SPECIAL COMPENSATION AND CONNECTION TO BORROWER OUTCOMES

*Question.* Please explain, in detail, how FSA executives or senior managers earn bonuses or special compensation, and how the level of bonus connects to agency goals around improving borrower outcomes? Provide the names, duties, position descriptions, bonus amounts, etc. for the past three fiscal years for all FSA employees who received such bonuses or special compensation.

Answer. Federal Student Aid's (FSA) authority under the Performance-Based Organization legislation allows eligible senior managers to receive a bonus up to 25 percent of their annual salary based on an evaluation of their performance in relation to the goals

in their performance agreement. Each employee's performance agreement—including senior managers—is linked to FSA's five-year Strategic Plan for Fiscal Years 2015–19, which is aligned to the Department's strategic objectives. Senior managers with performance ratings of High Results Achieved or Exceptional Results Achieved are eligible for performance-based awards. The FSA chief operating officer determines the bonus for each senior manager. In accordance with Department policy, awards exceeding $10,000 require approval from the Secretary of Education. The attached report includes bonus information for FSA executives and senior managers for Fiscal Years 2016–18.



Bonuses and Special
Compensation.xlsx

## DOLLAR AND BORROWER VOLUME OF INITIATED LOAN REHABILITATIONS

*Question.* Please provide the total volume of initiated loan rehabilitations (rehabs) (in dollars and unique number of borrowers), including:

a. Total volume of initiated rehabs using income-driven rehab formula (15% of discretionary income)
　　i. Total volume of initiated IDR rehabs with payment of $5
　　ii. Total volume of initiated IDR rehabs with payment greater than $5

b. Total volume of initiated rehabs using 'reasonable and affordable' formula
　　i. Total volume of initiated R&A rehabs with payment of $5
　　ii. Total volume of initiated R&A rehabs with payment greater than $5

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## DOLLAR AND BORROWER VOLUME OF COMPLETED LOAN REHABILITATIONS

*Question.* Please provide the total volume of completed rehabs (in dollars and unique number of borrowers), including:

a. Total volume of completed rehabs using income-driven rehab formula (15% of discretionary income)
　　i. Total volume of completed IDR rehabs with payment of $5
　　ii. Total volume of completed IDR rehabs with payment greater than $5

b. Please provide the total volume of completed rehabs using 'reasonable and affordable' formula, including:

    i. Total volume of completed R&A rehabs with payment of $5

    ii. Total volume of completed R&A rehabs with payment greater than $5

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## COLLECTION VOLUMES FOR CLOSED SCHOOL GROUPS

*Question.* Disaggregated by each school group, please provide the number of former Corinthian Colleges, Inc.; ITT Educational Services, Inc.; Charlotte School of Law; and Educational Corporation of America students in some form of debt collection (Treasury offset, wage garnishment, assigned to PCAs) and the total outstanding loan balance of borrowers in each school group.

*Answer.* Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## REHABILITATED LOANS WITH SUBSEQUENT INCOME-DRIVEN REPAYMENT ENROLLMENT

*Question.* Please provide the volume of completed rehabs where a borrower has subsequently enrolled in IDR and made at least one monthly income-driven payment within 12 months of rehab (in dollars and unique number of borrowers), including:

a. the total volume of completed rehabs using income-driven rehab formula (15% of discretionary income) where a borrower has subsequently enrolled in IDR and made at least one monthly income-driven payment within 12 months of rehab

    i. Above, where IDR rehab payment was $5

    ii. Above, where IDR rehab payment was greater than $5

b. the total volume of completed rehabs using 'reasonable and affordable' formula (15% of discretionary income) where a borrower has subsequently enrolled in IDR and made at least one monthly income-driven payment within 12 months of rehab

    i. Above, where R&A rehab payment was $5

    ii. Above, where R&A rehab payment was greater than $5

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## TIME REQUIRED TO FROM REHABILITATION COMPLETION TO SUCCESSFUL FIRST PAYMENT UNDER INCOME-DRIVEN REPAYMENT

*Question.* Please provide the average number of months from rehab completion to first successful IDR monthly payment.

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## PELL GRANT LIFETIME ELIGIBILITY USED RESTORATION DATA

*Question.* Please provide an update on Pell Grant Lifetime Eligibility Used (LEU) restored due to school closure, according to the Department's April 3, 2017 notice, Guidance on COD Processing of Pell Grant Restoration for Students who Attended Closed Schools, including total number of unduplicated students receiving restoration of Pell LEU, total number of institutions which those students attended, and total number of semesters restored.

Answer. Due to the complexity of the request and competing priorities, and in some instances, inability to analyze and validate data within the requested timeframe, Department officials were unable to draft a response to accommodate the Senate deadline. Thus, the Department was unable to provide a response for insertion into the official hearing record at this time. The Department regrets the inconvenience and commits to providing a response to the Committee as soon as possible. Department staff will regularly provide updates to Congressional staff regarding expected delivery of this response.

## DATA ON PROGRAMS OUTSOURCING BETWEEN 25 AND 50 PERCENT OF PROGRAM TO INELIGIBLE INSTITUTION OR ORGANIZATION

*Question.* Regulations currently require institutions to receive accreditor approval and report to the Department any written arrangements with an ineligible institution or organization between 25 and 50 percent of an institution's program. Please provide a list of the institutions with a written arrangement with an ineligible institution or organization between 25 and 50 percent of the institution's program, the name of the program, the name of the accreditor, and any other information the Department has regarding the arrangement.

Answer. Currently, the Department lacks the regulatory authority to require institutions to report written arrangements with an ineligible institution or organization (contractual agreements) more than 25 percent, but less than 50 percent of an institution's educational program. Although the Department currently lacks this authority, the Department has limited information available about institutions' contractual agreements with an ineligible institution or organization between 25 and 50 percent of the institution's program.

Due to the significant burden involved with the collection of the information, review, and possible redaction of any information about written arrangements, the Department respectfully requests that the requestor's staff requests data for specific institutions. Because the information is limited, the Department cautions that inferences may not be drawn from the data. General information about written arrangements with contractual agreements may be found in Volume 2, Chapter 2 of the 2018-2019 Federal Student Aid Handbook.

## Table A- Borrower Defense Claims Pending (as of 12/31/18) by State

| | Total |
|---|---|
| **All Cases** | **158,110** |
| California | 31,971 |
| Florida | 13,864 |
| Texas | 12,158 |
| Illinois | 8,335 |
| Georgia | 7,018 |
| Ohio | 5,558 |
| New York | 5,290 |
| Washington | 4,991 |
| Pennsylvania | 4,665 |
| North Carolina | 4,400 |
| Michigan | 4,031 |
| Virginia | 3,789 |
| Indiana | 3,487 |
| Arizona | 3,332 |
| Missouri | 3,137 |
| New Jersey | 2,859 |
| Minnesota | 2,774 |
| Colorado | 2,684 |
| Maryland | 2,537 |
| Tennessee | 2,527 |
| Massachusetts | 2,309 |
| Nevada | 2,253 |
| Oregon | 2,196 |
| Wisconsin | 2,147 |
| South Carolina | 1,837 |
| Alabama | 1,674 |
| Kentucky | 1,669 |
| Louisiana | 1,403 |
| Hawaii | 1,346 |
| Utah | 1,144 |
| Mississippi | 1,126 |
| Oklahoma | 1,041 |
| Kansas | 964 |
| Arkansas | 815 |
| Connecticut | 774 |
| West Virginia | 743 |
| Iowa | 698 |
| New Mexico | 658 |
| Idaho | 590 |

| | Total |
|---|---|
| Nebraska | 481 |
| District of Columbia | 373 |
| New Hampshire | 295 |
| Delaware | 286 |
| Montana | 265 |
| Maine | 245 |
| Rhode Island | 227 |
| South Dakota | 211 |
| Wyoming | 194 |
| North Dakota | 177 |
| Alaska | 169 |
| Foreign Country | 97 |
| Vermont | 81 |
| Puerto Rico | 63 |
| US Virgin Islands | 39 |
| Armed Forces Europe | 37 |
| All Others | 76 |

## Table B- Borrower Defense Claims Received between 1/20/17 to 12/31/18 by State

| | Total |
|---|---|
| **All Cases** | **128,325** |
| California | 24,825 |
| Florida | 10,745 |
| Texas | 10,745 |
| Illinois | 6,765 |
| Georgia | 5,915 |
| Ohio | 4,675 |
| New York | 4,455 |
| Washington | 4,055 |
| Pennsylvania | 3,925 |
| North Carolina | 3,695 |
| Michigan | 3,105 |
| Virginia | 3,085 |
| Arizona | 2,805 |
| Missouri | 2,755 |
| Indiana | 2,755 |
| New Jersey | 2,595 |
| Minnesota | 2,215 |
| Colorado | 2,085 |
| Maryland | 2,045 |
| Tennessee | 2,025 |
| Nevada | 1,805 |
| Massachusetts | 1,745 |
| Wisconsin | 1,705 |
| South Carolina | 1,485 |
| Oregon | 1,475 |
| Kentucky | 1,425 |
| Alabama | 1,405 |
| Louisiana | 1,205 |
| Mississippi | 965 |
| Hawaii | 915 |
| Utah | 895 |
| Oklahoma | 875 |
| Kansas | 835 |
| Arkansas | 725 |
| Connecticut | 665 |
| West Virginia | 605 |
| Iowa | 595 |
| New Mexico | 525 |

| | Total |
|---|---|
| Idaho | 475 |
| Nebraska | 385 |
| District of Columbia | 305 |
| New Hampshire | 255 |
| Delaware | 245 |
| Montana | 215 |
| Maine | 205 |
| Rhode Island | 185 |
| South Dakota | 175 |
| Wyoming | 165 |
| North Dakota | 145 |
| Alaska | 135 |
| Foreign Country | 85 |
| Vermont | 55 |
| Puerto Rico | 55 |
| Armed Forces Europe | 35 |
| All Others | 95 |

## Borrower Defense Claims Approved 1/20/17-12/31/18 by State

| | Total |
|---|---|
| **All Cases** | **16,155** |
| Alabama | 135 |
| Alaska | 15 |
| Arizona | 95 |
| Arkansas | 115 |
| California | 4,875 |
| Colorado | 235 |
| Connecticut | 55 |
| Delaware | 25 |
| District of Columbia | 55 |
| Florida | 1,115 |
| Foreign Country | 35 |
| Georgia | 755 |
| Hawaii | 255 |
| Idaho | 35 |
| Illinois | 775 |
| Indiana | 195 |
| Iowa | 65 |
| Kansas | 45 |
| Kentucky | 55 |
| Louisiana | 105 |
| Maine | 25 |
| Maryland | 155 |
| Massachusetts | 175 |
| Michigan | 475 |
| Minnesota | 275 |
| Mississippi | 145 |
| Missouri | 335 |
| Montana | 15 |
| Nebraska | 35 |
| Nevada | 135 |
| New Hampshire | 35 |
| New Jersey | 205 |
| New Mexico | 25 |
| New York | 325 |
| North Carolina | 365 |
| North Dakota | 15 |
| Ohio | 285 |
| Oklahoma | 45 |

| | Total |
|---|---|
| Oregon | 235 |
| Pennsylvania | 335 |
| South Carolina | 125 |
| South Dakota | 15 |
| Tennessee | 135 |
| Texas | 1,645 |
| US Virgin Islands | 15 |
| Utah | 55 |
| Vermont | 15 |
| Virginia | 465 |
| Washington | 805 |
| West Virginia | 75 |
| Wisconsin | 95 |
| Wyoming | 35 |
| All Other | 25 |

Murray Question 32
**Pending Borrower Defense Applications by Institution (500 or greater)**
Data as of 12/31/2018

| OPEID | INSTITUTION | CITY | STATE | SCHOOL TYPE | PENDING APPLICATIONS |
|---|---|---|---|---|---|
| 01072700 | DeVry University | Chicago | IL | Proprietary | 12,505 |
| 00732900 | ITT Technical Institute | Indianapolis | IN | Proprietary | 10,107 |
| 02098800 | University of Phoenix | Phoenix | AZ | Proprietary | 8,556 |
| 00149901 | Altierus Career College | Orlando | FL | Private | 7,996 |
| 00153408 | Everest University | Tampa | FL | Proprietary | 2,417 |
| 00458600 | Purdue University Global | Indianapolis | IN | Public | 1,710 |
| 00915700 | WyoTech | Laramie | WY | Private | 1,644 |
| 00723401 | Heald College | Honolulu | HI | Proprietary | 1,342 |
| 00915705 | WyoTech | Blairsville | PA | Private | 1,268 |
| 00809300 | Heald College | Fresno | CA | Proprietary | 1,113 |
| 00719000 | WyoTech | Fremont | CA | Proprietary | 1,075 |
| 00853200 | Heald College | Hayward | CA | Proprietary | 1,041 |
| 00188100 | Ashford University | San Diego | CA | Proprietary | 1,022 |
| 00723400 | Heald College | San Francisco | CA | Proprietary | 1,014 |
| 04143500 | Charlotte School of Law | Charlotte | NC | Proprietary | 1,011 |
| 02187500 | Heald College | Concord | CA | Proprietary | 955 |
| 02593200 | Heald College | Milpitas | CA | Proprietary | 940 |
| 02593300 | Heald College | Stockton | CA | Proprietary | 931 |
| 00747000 | Art Institute of Pittsburgh (The) | Pittsburgh | PA | Proprietary | 884 |
| 00814600 | Everest University - Pompano Beach | Pompano Beach | FL | Proprietary | 873 |
| 02593100 | Heald College | Roseville | CA | Proprietary | 838 |
| 00747700 | Heald College | Rancho Cordova | CA | Proprietary | 838 |
| 00464600 | Minnesota School of Business | Richfield | MN | Proprietary | 800 |
| 00149900 | Altierus Career College | Tampa | FL | Private | 779 |
| 00754800 | Westwood College - Denver North | Denver | CO | Proprietary | 750 |
| 01287300 | WyoTech | Long Beach | CA | Proprietary | 734 |
| 03034000 | Heald College | Salinas | CA | Proprietary | 702 |
| 02295000 | Everest College Phoenix | Phoenix | AZ | Proprietary | 691 |
| 01287302 | WyoTech | City of Industry | CA | Proprietary | 677 |
| 00481100 | Everest Institute | Rochester | NY | Proprietary | 648 |
| 02075400 | Keller Graduate School of Management | Downers Grove | IL | Proprietary | 629 |
| 00915706 | WyoTech | West Sacramento | CA | Private | 628 |
| 00723402 | Heald College | Portland | OR | Proprietary | 618 |
| 00449400 | Everest College | San Bernardino | CA | Proprietary | 612 |
| 01110900 | Everest College | Reseda | CA | Proprietary | 601 |
| 00112300 | Brooks Institute | Ventura | CA | Proprietary | 588 |
| 02300104 | Altierus Career College | Tacoma | WA | Private | 581 |
| 02250602 | Everest College | Ontario | CA | Private | 570 |
| 00153400 | Everest University | Tampa | FL | Proprietary | 568 |
| 03072300 | Everest College | Ontario | CA | Proprietary | 567 |
| 02113600 | American InterContinental University | Schaumburg | IL | Proprietary | 559 |
| 02606200 | Everest College | Renton | WA | Private | 553 |
| 02237500 | Altierus Career College | Henderson | NV | Private | 547 |
| 00464200 | Globe University | Woodbury | MN | Proprietary | 540 |
| 01185800 | Everest College | Skokie | IL | Private | 539 |
| 00982802 | Altierus Career Education | Austin | TX | Private | 533 |
| 03072700 | Westwood College - Los Angeles | Los Angeles | CA | Proprietary | 501 |

Borrower Defense Applications by School Group

| School Group | Applications Received | Percent Pending |
|---|---|---|
| Corinthian Colleges, Inc. | 113,066 | 50% |
| ITT Educational Services, Inc. | 19,213 | 99% |
| Devry | 13,543 | 100% |
| Apollo Group, Inc (University Of Phoenix) | 8,139 | 100% |
| EDMC | 6,284 | 100% |
| CEC | 5,667 | 100% |
| ACI | 3,011 | 3% |
| Westwood | 2,371 | 100% |
| Graham Holdings Company (Kaplan) | 1,919 | 100% |
| Globe University/Minnesota School Of Business | 1,530 | 100% |
| Dream Center Education Holdings (DCEH) | 1,490 | 100% |
| Education Corporation of America (Willis Stein & Partners III, L.P.) | 1,387 | 100% |
| Bridgepoint Education, Inc. | 962 | 100% |
| Infilaw Holding, LLC | 923 | 100% |
| Marinello School Of Beauty | 806 | 99% |
| Ati Career Training | 739 | 100% |
| Sp/Palm Iec Holdings LLC (United Education Institute) | 616 | 100% |
| Lincoln Technical Institute, Inc. | 584 | 100% |
| Weston Educational, Inc. | 449 | 100% |
| Anthem College | 431 | 100% |

*Note: Pending Numbers are not provided due to a risk of an inadvertent privacy disclosure resulting from small cell sizes.*

**Approvals**

| | |
|---|---|
| Corinthian Colleges, Inc. | 44987 |
| ACI | 2897 |
| ITT Educational Services, Inc. | 33 |
| All Others | 25 |

Data Source: Customer Engagement Management System

**Public Service Loan Forgiveness Application Data**
As of April 25, 2019

| State | Borrower Count | Application Count | Status of Application | | |
|---|---|---|---|---|---|
| | | | Approved | Denied | Pending |
| AK | 134 | 181 | Privacy Redaction | | |
| AL | 1183 | 1496 | Privacy Redaction | | |
| AR | 614 | 787 | Privacy Redaction | | |
| AZ | 1303 | 1707 | 16 | 1378 | 313 |
| CA | 6184 | 7906 | 74 | 6380 | 1452 |
| CO | 1359 | 1875 | 28 | 1522 | 325 |
| CT | 730 | 923 | Privacy Redaction | | |
| DC | 356 | 450 | Privacy Redaction | | |
| DE | 221 | 267 | Privacy Redaction | | |
| FL | 4273 | 5435 | 36 | 4361 | 1038 |
| GA | 3103 | 3979 | 31 | 3178 | 770 |
| HI | 257 | 340 | Privacy Redaction | | |
| IA | 729 | 973 | Privacy Redaction | | |
| ID | 410 | 551 | 11 | 423 | 117 |
| IL | 2837 | 3622 | 43 | 2872 | 707 |
| IN | 1462 | 1875 | 14 | 1462 | 399 |
| KS | 627 | 806 | 15 | 647 | 144 |
| KY | 926 | 1151 | Privacy Redaction | | |
| LA | 905 | 1127 | 12 | 891 | 224 |
| MA | 1505 | 2000 | 25 | 1620 | 355 |
| MD | 1863 | 2378 | 13 | 1906 | 459 |
| ME | 336 | 425 | Privacy Redaction | | |
| MI | 2532 | 3264 | 27 | 2591 | 646 |
| MN | 1475 | 1922 | 29 | 1529 | 364 |
| MO | 1720 | 2225 | 13 | 1837 | 375 |
| MS | 890 | 1108 | Privacy Redaction | | |
| MT | 328 | 430 | 13 | 338 | 79 |
| NC | 2175 | 2889 | 18 | 2321 | 550 |
| ND | 161 | 214 | Privacy Redaction | | |
| NE | 445 | 588 | 13 | 477 | 98 |
| NH | 361 | 454 | Privacy Redaction | | |
| NJ | 1796 | 2273 | 10 | 1789 | 474 |
| NM | 411 | 537 | 13 | 422 | 102 |
| NV | 449 | 572 | Privacy Redaction | | |
| NY | 5567 | 7135 | 67 | 5710 | 1358 |
| OH | 3297 | 4229 | 50 | 3374 | 805 |
| OK | 701 | 923 | 18 | 741 | 164 |
| OR | 1153 | 1516 | 24 | 1207 | 285 |
| PA | 3323 | 4186 | 35 | 3357 | 794 |
| PR | 441 | 527 | Privacy Redaction | | |
| RI | 224 | 299 | Privacy Redaction | | |
| SC | 1427 | 1838 | Privacy Redaction | | |
| SD | 275 | 347 | Privacy Redaction | | |
| TN | 1405 | 1756 | 12 | 1442 | 302 |
| TX | 4795 | 6236 | 44 | 4978 | 1214 |
| UT | 394 | 512 | Privacy Redaction | | |
| VA | 2262 | 2936 | 32 | 2358 | 546 |
| VT | 189 | 240 | Privacy Redaction | | |
| WA | 1573 | 2045 | 41 | 1632 | 372 |
| WI | 1317 | 1748 | 17 | 1389 | 342 |
| WV | 485 | 623 | Privacy Redaction | | |
| WY | 104 | 142 | Privacy Redaction | | |
| Other Locations | 176 | 227 | Privacy Redaction | | |
| Unknown | 4767 | 6124 | Privacy Redaction | | |
| **Total** | **77935** | **100319** | **891** | **80213** | **19215** |

*Note: Data was redacted when any cell size within the status of the application was less than 10.

**Temporary Expanded Public Service Loan Forgiveness Application Data by State**
Data as of March-end 2019

| State | Borrower Count | Application Count | Status of Application | | |
|---|---|---|---|---|---|
| | | | Approved* | Denied | Pending |
| AK | 21 | 24 | Privacy Redacted | | |
| AL | 143 | 201 | Privacy Redacted | | |
| AR | 73 | 98 | Privacy Redacted | | |
| AZ | 210 | 271 | 10 | 239 | 22 |
| CA | 966 | 1,250 | 34 | 1,097 | 119 |
| CO | 229 | 295 | 17 | 253 | 25 |
| CT | 96 | 115 | Privacy Redacted | | |
| DC | 58 | 70 | Privacy Redacted | | |
| DE | 25 | 34 | Privacy Redacted | | |
| FL | 483 | 617 | 17 | 536 | 64 |
| GA | 386 | 523 | 15 | 476 | 32 |
| HI | 31 | 38 | Privacy Redacted | | |
| IA | 125 | 176 | Privacy Redacted | | |
| ID | 87 | 116 | Privacy Redacted | | |
| IL | 409 | 541 | 27 | 464 | 50 |
| IN | 156 | 218 | 14 | 187 | 17 |
| KS | 110 | 143 | Privacy Redacted | | |
| KY | 122 | 170 | Privacy Redacted | | |
| LA | 98 | 121 | Privacy Redacted | | |
| MA | 245 | 313 | Privacy Redacted | | |
| MD | 316 | 423 | 16 | 368 | 39 |
| ME | 56 | 70 | Privacy Redacted | | |
| MI | 398 | 569 | 19 | 495 | 55 |
| MN | 251 | 321 | 12 | 279 | 30 |
| MO | 231 | 284 | 15 | 245 | 24 |
| MS | 66 | 74 | Privacy Redacted | | |
| MT | 45 | 58 | Privacy Redacted | | |
| NC | 292 | 398 | Privacy Redacted | | |
| ND | 19 | 22 | Privacy Redacted | | |
| NE | 64 | 80 | Privacy Redacted | | |
| NH | 54 | 65 | Privacy Redacted | | |
| NJ | 227 | 300 | Privacy Redacted | | |
| NM | 54 | 67 | Privacy Redacted | | |
| NV | 61 | 73 | Privacy Redacted | | |
| NY | 819 | 1,094 | 33 | 969 | 92 |
| OH | 486 | 644 | 34 | 558 | 52 |
| OK | 89 | 119 | Privacy Redacted | | |
| OR | 225 | 284 | 19 | 231 | 34 |
| PA | 357 | 470 | Privacy Redacted | | |
| PR | 32 | 38 | Privacy Redacted | | |
| RI | 48 | 79 | Privacy Redacted | | |
| SC | 150 | 179 | Privacy Redacted | | |
| SD | 36 | 51 | Privacy Redacted | | |
| TN | 148 | 180 | Privacy Redacted | | |
| TX | 521 | 655 | 13 | 603 | 39 |
| UT | 50 | 74 | Privacy Redacted | | |
| VA | 427 | 585 | 15 | 513 | 57 |
| VT | 23 | 33 | Privacy Redacted | | |
| WA | 309 | 399 | 12 | 341 | 46 |
| WI | 238 | 326 | 12 | 265 | 49 |
| WV | 75 | 107 | Privacy Redacted | | |
| WY | 21 | 30 | Privacy Redacted | | |
| Other Locations | 31 | 40 | Privacy Redacted | | |
| Not Reported | 113 | 127 | Privacy Redacted | | |
| TOTAL | 10,405 | 13,652 | 443 | 11,987 | 1,222 |

*Although 442 unique borrowers received TEPSLF discharge, they submitted a total 443 applications.
Note: Data was redacted when any cell size within the status of the application was less than 10.

Murray/Question 79

| Active Case (Y/N) | OPE-ID | School Name | City | State | School Type | Basis for Action | Action Initiated | Fine Amount Initiated | Date Action Initiated | Hearing Requested by the School (Y/N) | Action Imposed | Fine Amount Imposed | Outcome Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N | 417400 | Nashville Barber and Style Academy | Madison | TN | Prop | Administrative Capability | Denial - Recertification | | 2/11/2019 | | Denial - Recertification | | 3/7/2019 | Required Letter of Credit was provided by reconsideration deadline. |
| | 396300 | New England College of Business and Finance | Boston | MA | Prop | LOC Nonsubmission | Denial - Recertification | | 3/12/2019 Y | | Withdrawn | | 3/29/2019 | 3/29/2019 deadline. |
| N | 370100 | Memphis Institute of Barbering | Memphis | TN | Prop | Program Review - Severe Findings | Denial - Recertification | | 3/29/2019 | | Denial - Recertification | | 4/1/2019 | Case Active as of 4/1/19 |
| Y | 404630 | Hong Kong University of Science and Technology (The) | Clear Water Bay | | Frgn Pub | Recertification App Incomplete | Denial - Recertification | | 3/21/2019 | | | | | Case Active as of 4/5/19 |
| N | 424700 | (M)ost Beauty & Body Institute | Lithia Springs | GA | Prop | Audit - Late/Missing | Denial - Recertification | | 3/29/2019 | | Denial - Recertification | | | |
| N | 344800 | Business Industrial Resources | Chicago | IL | Prop | Denial of Reinstatement | Denial of Reinstatement | | 6/29/2018 | | Other | | 8/3/2019 | |
| N | 362300 | Vee's School of Beauty Culture | East St. Louis | IL | Prop | Deny Reinstatement | Denial-Reinstatement (Fraud) | | 1/28/2019 | | Other | | 2/13/2019 | |
| N | 421800 | United Medical and Business Institute | East Point | GA | Prop | Denial of Reinstatement | Denial-Reinstatement | | 11/28/2018 | | Other | | 2/22/2019 | |
| N | 421600 | Gnav College of Barbering | Greenville | NC | Prop | Loss of Accreditation | Loss of Accreditation | | 10/24/2018 | | Termination | | 12/18/2018 | |
| N | 415030 | RWM Fiber Optics | Carson | CA | Prop | Fraud | Emergency Action/Termination | | 12/6/2018 | | Termination | | 1/7/2019 | |
| N | 309600 | Cobb Beauty College | Kennesaw | GA | Prop | Bankruptcy | Emergency Action/Termination | | 12/18/2018 Y | | Withdrawn | | 2/4/2019 | |
| N | | National Student Aid Services | Pahoa | OK | Prop | Program Review Findings | Emergency Action/Termination | | 10/20/2017 | | Termination | | 3/26/2019 | |
| N | 214820 | Fashion Focus Hair Academy | Sarasota | FL | Prop | Loss of Accreditation | Emergency Action/Termination | | 3/15/2019 | | Termination | | 4/8/2019 | |
| N | 427900 | Marshland College | West Frankfort | IL | Priv | Fraud | Emergency Action/Termination/Fine | $2,016,789 | 8/22/2017 Y | | Closed | | 6/4/2018 | Matter dismissed from OHA on June 4, 2018 as a result of school's PPA expiration and impending closure on 6/4/2018 |
| N | 191000 | Coffeyville Community College | Coffeyville | KS | Pub | Campus Security Part 86 | Settlement Agreement | $21,000 | 6/25/2018 Y | | Settlement Agreement/Fine | $105,000 | 6/25/2018 | |
| N | 134800 | Durham Beauty Academy | Durham | NC | Priv | IPEDS Nonsubmission | Fine | $2,000 | 7/25/2018 | | Withdrawn | | 7/31/2018 | |
| N | 422420 | Belle Academy of Cosmetology | Waterbury | CT | Prop | IPEDS Nonsubmission | Fine | $2,000 | 7/25/2018 | | Withdrawn | | 9/12/2018 | |
| N | 415480 | DuVall's School of Cosmetology | Bedford | TX | Prop | IPEDS Nonsubmission | Fine | $6,000 | 7/25/2018 | | Fine | $6,000 | 10/4/2018 | |
| N | 177100 | MacMurray College | Jacksonville | IL | Priv | IPEDS Nonsubmission | Fine | $2,500 | 7/25/2018 | | Fine | $2,500 | 10/4/2018 | |
| N | 336600 | Saint Francis University | Loretto | PA | Priv | Campus Security | Fine | $51,000 | 9/24/2018 | | Fine | $51,000 | 10/23/2018 | |
| N | 161240 | Valley Grande Institute for Academic Studies | Weslaco | TX | Priv | Campus Security Part 86 | Fine | $35,000 | 9/27/2018 | | Fine | $35,000 | 10/23/2018 | |
| N | 384200 | Concordia University | Mequon | WI | Priv | Campus Security Part 86 | Fine | $68,000 | 9/27/2018 | | Fine | $68,000 | 11/8/2018 | |
| N | 206700 | Washington Adventist University | Takoma Park | MD | Priv | Campus Security Part 86 | Fine | $52,000 | 9/27/2018 | | Withdrawn | | 11/14/2018 | |
| N | 232900 | Wayne State University | Detroit | MI | Pub | Campus Security Part 86 | Fine | $127,500 | 9/27/2018 | | Withdrawn | | 11/14/2018 | |
| N | 319000 | Green River College | Auburn | WA | Pub | Campus Security Part 86 | Fine | $574,500 | 9/24/2018 Y | | Settlement Agreement/Fine | $250,000 | 12/6/2018 | |
| N | 344100 | North Greenville University | Tigerville | SC | Priv | Dul Tm (Incentive Compensation) | Settlement Agreement | | 12/14/2018 | | Settlement Agreement/Fine | $2,500,000 | 12/14/2018 | |
| N | 381100 | Davis & Elkins College | Elkins | WV | Priv | Campus Security Part 86 | Fine | $62,000 | 9/26/2018 | | Fine | $36,000 | 12/20/2018 | |
| N | 253600 | University of Montana (The) | Missoula | MT | Pub | Campus Security | Fine | $966,614 | 9/26/2018 | | Settlement Agreement/Fine | $395,000 | 1/11/2019 | |
| N | 118100 | College of the Redwoods | Eureka | CA | Pub | Campus Security Part 86 | Fine | $82,500 | 9/26/2018 | | Fine | $56,000 | 1/26/2019 | |
| N | 422960 | Ruby's Academy for Health Occupations | Plantation | FL | Prop | Loss of Accreditation | Revocation - PPPA | | 6/15/2017 Y | | Revocation - PPPA | | 9/12/2017 | |
| N | 368330 | International Barber & Style College | Nashville | TN | Prop | LOC Nonsubmission | Revocation - PPPA | | 7/7/2017 | | Revocation - PPPA | | 7/31/2017 | |
| N | 419100 | Shepherd University | Los Angeles | CA | Priv | Bankruptcy | Revocation - PPPA | | 8/29/2017 | | Revocation - PPPA | | 9/19/2017 | |
| N | 416320 | European University at St. Petersburg | Saint Petersburg | | Frgn Priv | Loss of State Authorization | Revocation - PPPA | | 1/25/2018 | | Revocation - PPPA | | 2/19/2018 | |
| N | 250400 | BCI | Wenatchee | WA | Prop | Loss of Accreditation | Revocation - PPPA | | 4/13/2018 | | Revocation - PPPA | | 5/7/2018 | |
| N | 303080 | American Broadcasting School | Oklahoma City | OK | Prop | Audit - Late/Missing | Revocation - PPPA | | 6/5/2018 | | Closed | | 6/8/2018 | |
| N | 158700 | Paine College | Augusta | GA | Priv | Loss of Accreditation | Revocation - PPPA | | 3/14/2018 Y | | Other | | 6/20/2018 | |
| N | 666600 | Lutheran School of Nursing | Saint Louis | MO | Priv | Loss of Accreditation | Revocation - PPPA | | 6/5/2018 | | Revocation - PPPA | | 12/19/2018 | |
| N | 266600 | Mid City College | Baton Rouge | LA | Prop | Preliminary Evaluation-Missing Audit | Revocation - PPPA | | 12/20/2018 | | Revocation - PPPA | | 1/8/2019 | |
| N | 226600 | St George's Hospital Medical School | London | | Frgn Pub | USMLE Pass Rate | Termination (medical program only) | | 9/27/2018 | | Other | | 10/17/2018 | |

| OPEID | NAME | STATE | SCHOOL TYPE | DISCHARGED BORROWERS |
|---|---|---|---|---|
| 00107000 | THUNDERBIRD SCHOOL OF GLOBAL MANAGEMENT | AZ | Private Non-Profit | 35 |
| 00147300 | CLEARWATER CHRISTIAN COLLEGE | FL | Private Non-Profit | 35 |
| 001499 | ALTIERUS CAREER COLLEGE | FL | Private Non-Profit | 18 |
| 00375200 | VIRGINIA INTERMONT COLLEGE | VA | Private Non-Profit | 21 |
| 00449400 | EVEREST COLLEGE | CA | Proprietary | 160 |
| 00449401 | EVEREST COLLEGE - SANTA ANA | CA | Proprietary | 13 |
| 00449402 | EVEREST COLLEGE - ONTARIO | CA | Proprietary | 47 |
| 004646 | MINNESOTA SCHOOL OF BUSINESS | MN | Proprietary | 10 |
| 00472900 | MOUNT WASHINGTON COLLEGE | NH | Proprietary | 17 |
| 00472901 | MOUNT WASHINGTON COLLEGE - NASHUA CAMPUS | NH | Proprietary | 32 |
| 00472904 | MOUNT WASHINGTON COLLEGE - PORTSMOUTH CAMPUS | NH | Proprietary | 20 |
| 00472905 | MOUNT WASHINGTON COLLEGE - SALEM CAMPUS | NH | Proprietary | 51 |
| 00472906 | MOUNT WASHINGTON COLLEGE - CONCORD CAMPUS | NH | Proprietary | 11 |
| 00481100 | EVEREST INSTITUTE | NY | Proprietary | 229 |
| 00481102 | EVEREST INSTITUTE - EVEREST COLLEGE | TX | Proprietary | 188 |
| 00489400 | ERIE BUSINESS CENTER | PA | Proprietary | 52 |
| 00489401 | ERIE BUSINESS CENTER - NEW CASTLE CAMPUS | PA | Proprietary | 14 |
| 00719000 | WYOTECH | CA | Proprietary | 141 |
| 00723400 | HEALD COLLEGE | CA | Proprietary | 329 |
| 00723401 | HEALD COLLEGE - HONOLULU | HI | Proprietary | 450 |
| 00723402 | HEALD COLLEGE - PORTLAND | OR | Proprietary | 172 |
| 00723404 | HEALD COLLEGE - CONCORD | CA | Proprietary | 343 |
| 00723405 | HEALD COLLEGE - MILPITAS | CA | Proprietary | 430 |
| 00723406 | HEALD COLLEGE - HAYWARD | CA | Proprietary | 272 |
| 00723407 | HEALD COLLEGE - MODESTO | CA | Proprietary | 284 |
| 00723408 | HEALD COLLEGE - ROSEVILLE | CA | Proprietary | 277 |
| 00723409 | HEALD COLLEGE - SALINAS | CA | Proprietary | 189 |
| 00723410 | HEALD COLLEGE - STOCKTON | CA | Proprietary | 338 |
| 00723411 | HEALD COLLEGE - RANCHO CORDOVA | CA | Proprietary | 266 |
| 00723412 | HEALD COLLEGE - FRESNO | CA | Proprietary | 408 |
| 00732900 | ITT TECHNICAL INSTITUTE | IN | Proprietary | 160 |
| 00736700 | MARINELLO SCHOOL OF BEAUTY | NV | Proprietary | 57 |
| 00737100 | MARINELLO SCHOOL OF BEAUTY | NV | Proprietary | 19 |
| 00747600 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 299 |
| 00760600 | BRYMAN COLLEGE | CA | Proprietary | 12 |
| 00781400 | BROOKSTONE COLLEGE OF BUSINESS | NC | Proprietary | 26 |
| 00781401 | BROOKSTONE COLLEGE OF BUSINESS - GREENSBORO | NC | Proprietary | 33 |
| 00809000 | EVEREST COLLEGE | CA | Proprietary | 75 |
| 00809002 | EVEREST COLLEGE - EVEREST INSTITUTE | MA | Proprietary | 41 |
| 00809003 | EVEREST COLLEGE - BEDFORD PARK | IL | Proprietary | 135 |
| 008332 | MARINELLO SCHOOL OF BEAUTY | KS | Proprietary | 12 |
| 008441 | ANTHEM INSTITUTE | PA | Proprietary | 277 |
| 00887400 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 79 |
| 00903800 | MR. BERNARD'S SCHOOL OF HAIR FASHION | ME | Proprietary | 21 |
| 009313 | DAYMAR COLLEGE | KY | Proprietary | 11 |
| 00974806 | CARRINGTON COLLEGE CALIFORNIA - ANTIOCH/WALNUT CREEK | CA | Proprietary | 10 |
| 00998200 | VICTORY UNIVERSITY | TN | Proprietary | 159 |
| 01005900 | AMERICAN COMMERCIAL COLLEGE | TX | Proprietary | 10 |
| 01005901 | AMERICAN COMMERCIAL COLLEGE - AMERICAN COMMERCIAL C | TX | Proprietary | 31 |
| 010356 | EVEREST INSTITUTE | WV | Proprietary | 13 |
| 01041700 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 57 |
| 01044700 | PLAZA BEAUTY SCHOOL | TN | Proprietary | 48 |
| 01049000 | REGENCY BEAUTY INSTITUTE | MN | Proprietary | 13 |
| 01102400 | BRYMAN COLLEGE | CA | Proprietary | 31 |
| 01110700 | EVEREST COLLEGE | CA | Proprietary | 56 |
| 01110900 | EVEREST COLLEGE | CA | Proprietary | 128 |
| 01110901 | EVEREST COLLEGE - EVEREST INSTITUTE | GA | Proprietary | 96 |
| 01110902 | EVEREST COLLEGE - ATLANTA | GA | Proprietary | 189 |
| 01112100 | BRYMAN COLLEGE | CA | Proprietary | 17 |
| 01112300 | EVEREST COLLEGE | CA | Proprietary | 70 |
| 01112301 | EVEREST COLLEGE - EVEREST INSTITUTE- NORCROSS | GA | Proprietary | 155 |
| 01206100 | BRYMAN COLLEGE | CA | Proprietary | 14 |
| 012128 | LINCOLN COLLEGE OF TECHNOLOGY | OH | Proprietary | 31 |
| 01265000 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 45 |
| 01287300 | WYOTECH | CA | Proprietary | 245 |
| 01287301 | WYOTECH - EVEREST  COLLEGE | CA | Proprietary | 60 |
| 01287302 | WYOTECH - EVEREST  COLLEGE | CA | Proprietary | 166 |

| 02054900 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 64 |
|---|---|---|---|---|
| 02074100 | CAPITOL CITY TRADE & TECHNICAL SCHOOL | TX | Proprietary | 28 |
| 02086400 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 62 |
| 021192 | COURT REPORTING INSTITUTE OF ST LOUIS | MO | Proprietary | 47 |
| 02127900 | SOJOURNER-DOUGLASS COLLEGE | MD | Private Non-Profit | 12 |
| 02136800 | AMERICAN COMMERCIAL COLLEGE | TX | Proprietary | 23 |
| 02164200 | FOREST INSTITUTE OF PROFESSIONAL PSYCHOLOGY | MO | Private Non-Profit | 20 |
| 02221300 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 21 |
| 02223900 | DRAKE COLLEGE OF BUSINESS | NJ | Proprietary | 676 |
| 022392 | ANTHEM COLLEGE | MO | Proprietary | 270 |
| 02255200 | PENNSYLVANIA SCHOOL OF BUSINESS | PA | Proprietary | 58 |
| 022631 | ANTHEM COLLEGE | AZ | Proprietary | 569 |
| 02269400 | EASTERN HILLS ACADEMY OF HAIR DESIGN | OH | Proprietary | 11 |
| 02276600 | HANOVER PUBLIC SCHOOL DISTRICT PRACTICAL NURSING PROG | PA | Public | 10 |
| 02295000 | EVEREST COLLEGE PHOENIX | AZ | Proprietary | 1702 |
| 02295002 | EVEREST COLLEGE PHOENIX - MESA CAMPUS | AZ | Proprietary | 66 |
| 02304000 | MISSOURI TECHNICAL SCHOOL | MO | Proprietary | 18 |
| 02323700 | PAT WILSON'S BEAUTY COLLEGE | KY | Proprietary | 25 |
| 02326500 | INTERFACE COLLEGE | WA | Proprietary | 12 |
| 023314 | NORTHWEST HAIR ACADEMY | WA | Proprietary | 51 |
| 02338700 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 89 |
| 02339800 | SOUTHERN INSTITUTE OF COSMETOLOGY | TN | Proprietary | 10 |
| 02560800 | SOUTHEAST SCHOOL OF COSMETOLOGY | KY | Proprietary | 21 |
| 02561900 | BRILLARE HAIRDRESSING ACADEMY | AZ | Proprietary | 21 |
| 02576200 | MID-CONTINENT UNIVERSITY | KY | Private Non-Profit | 312 |
| 02598200 | UNIVERSITY OF SOUTHERNMOST FLORIDA | FL | Proprietary | 74 |
| 03028800 | AMERICAN NATIONAL COLLEGE | TX | Proprietary | 17 |
| 03042700 | LAURUS TECHNICAL INSTITUTE | GA | Proprietary | 96 |
| 03072300 | EVEREST COLLEGE | CA | Proprietary | 99 |
| 03072303 | EVEREST INSTITUTE - COLUMBUS | OH | Proprietary | 123 |
| 03072304 | EVEREST COLLEGE - EVEREST INSTITUTE | GA | Proprietary | 101 |
| 030764 | BRYMAN SCHOOL OF ARIZONA (THE) | AZ | Proprietary | 637 |
| 03088200 | CARSON CITY BEAUTY ACADEMY | NV | Proprietary | 13 |
| 03089700 | CAREER INSTITUTE OF HEALTH AND TECHNOLOGY | NY | Proprietary | 166 |
| 03094400 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 68 |
| 03148300 | AMERICAN BEAUTY ACADEMY | MD | Proprietary | 211 |
| 031623 | FOUR-D COLLEGE | CA | Proprietary | 74 |
| 03195400 | EVEREST COLLEGE | CA | Proprietary | 21 |
| 03197300 | INSTITUTE FOR HEALTH EDUCATION (THE) | NJ | Proprietary | 41 |
| 03210300 | LE CORDON BLEU COLLEGE OF CULINARY ARTS | CA | Proprietary | 18 |
| 03348400 | MATTIA COLLEGE | FL | Proprietary | 137 |
| 03427400 | CAREER COLLEGES OF AMERICA | CA | Proprietary | 89 |
| 034503 | MARINELLO SCHOOL OF BEAUTY | KS | Proprietary | 27 |
| 03455500 | NATIONAL LABOR COLLEGE | MD | Private Non-Profit | 38 |
| 03467300 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 144 |
| 03513300 | LACY COSMETOLOGY SCHOOL | SC | Proprietary | 12 |
| 03534300 | JONES INTERNATIONAL UNIVERSITY | CO | Proprietary | 10 |
| 03618300 | INSTITUTE OF TECHNICAL ARTS | FL | Proprietary | 46 |
| 03726300 | OHIO MID-WESTERN COLLEGE | OH | Private Non-Profit | 18 |
| 03756300 | ANAMARC COLLEGE | TX | Proprietary | 268 |
| 03809400 | MICROPOWER CAREER INSTITUTE | NY | Proprietary | 57 |
| 03832300 | DADE MEDICAL COLLEGE | FL | Proprietary | 370 |
| 03872500 | NORTHLAND INTERNATIONAL UNIVERSITY | WI | Private Non-Profit | 88 |
| 03875300 | MCI INSTITUTE OF TECHNOLOGY | FL | Proprietary | 57 |
| 03920300 | INSTITUTE OF HAIR DESIGN | TN | Proprietary | 11 |
| 03927300 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 16 |
| 03950500 | NORTHWEST REGIONAL TECHNOLOGY INSTITUTE | PA | Proprietary | 12 |
| 04056300 | CAREER COLLEGE OF CALIFORNIA | CA | Proprietary | 22 |
| 04116000 | VIDEO SYMPHONY ENTERTRAINING | CA | Proprietary | 41 |
| 04125700 | CUT BEAUTY SCHOOL (THE) | OH | Proprietary | 18 |
| 04133000 | BIOHEALTH COLLEGE | CA | Proprietary | 18 |
| 04134500 | SAN DIEGO COLLEGE | CA | Proprietary | 24 |
| 04137900 | BRENSTEN EDUCATION | WI | Proprietary | 35 |
| 04150000 | CENTRAL NURSING COLLEGE | CA | Proprietary | 14 |
| 04171600 | SALON PROFESSIONAL ACADEMY OF ELGIN (THE) | IL | Proprietary | 16 |
| 04173100 | LAB PAUL MITCHELL PARTNER SCHOOL (THE) | NJ | Proprietary | 19 |
| | ALL OTHERS | | | 291 |

| OPEID | School Name | Student Count* |
|---|---|---|
| 00107000 | THUNDERBIRD SCHOOL OF GLOBAL MANAGEMENT | 220 |
| 00145949 | STRAYER UNIVERSITY - PENN CENTER WEST | 10 |
| 00145955 | STRAYER UNIVERSITY - LEXINGTON | 14 |
| 00145956 | STRAYER UNIVERSITY - LOUISVILLE | 23 |
| 00147300 | CLEARWATER CHRISTIAN COLLEGE | 251 |
| 001499 | ALTIERUS CAREER COLLEGE | < 10 |
| 00149913 | EVEREST UNIVERSITY - EVEREST INSTITUTE - MIAMI | 83 |
| 00149914 | EVEREST UNIVERSITY - EVEREST INSTITUTE - KENDALL | 65 |
| 00246401 | FONTBONNE UNIVERSITY - KENNERLY CENTER | 23 |
| 002707 | COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK | 21 |
| 002700706 | COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK - ARTS & SCIENCE | 35 |
| 00270719 | COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK - PUBLIC HEALTH | 15 |
| 00270720 | COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK- ENGINEERING(GRADUATE | 16 |
| 00375200 | VIRGINIA INTERMONT COLLEGE | 198 |
| 00405703 | NATIONAL AMERICAN UNIVERSITY - DENVER | 112 |
| 00449400 | EVEREST COLLEGE | 853 |
| 00449401 | EVEREST COLLEGE - SANTA ANA | 179 |
| 00449402 | EVEREST COLLEGE - ONTARIO | 528 |
| 00464603 | MINNESOTA SCHOOL OF BUSINESS - SHAKOPEE | 68 |
| 00472900 | MOUNT WASHINGTON COLLEGE | 88 |
| 00472901 | MOUNT WASHINGTON COLLEGE - NASHUA CAMPUS | 210 |
| 00472904 | MOUNT WASHINGTON COLLEGE - PORTSMOUTH CAMPUS | 128 |
| 00472905 | MOUNT WASHINGTON COLLEGE - SALEM CAMPUS | 334 |
| 00472906 | MOUNT WASHINGTON COLLEGE - CONCORD CAMPUS | 87 |
| 00481100 | EVEREST INSTITUTE | 878 |
| 00481102 | EVEREST INSTITUTE - EVEREST COLLEGE | 461 |
| 00489400 | ERIE BUSINESS CENTER | 101 |
| 00489401 | ERIE BUSINESS CENTER - NEW CASTLE CAMPUS | 55 |
| 00490100 | NEWPORT BUSINESS INSTITUTE | 32 |
| 004910 | BRIGHTWOOD CAREER INSTITUTE | < 10 |
| 00491400 | NEWPORT BUSINESS INSTITUTE | 35 |
| 004934 | DAYMAR COLLEGE | < 10 |
| 00673101 | CASA LOMA COLLEGE - HAWTHORNE CAMPUS | 109 |
| 00687300 | MARIAN COURT COLLEGE | 86 |
| 00702500 | LEBANON COLLEGE | 27 |
| 007091 | EVEREST INSTITUTE | < 10 |
| 00719000 | WYOTECH | 553 |
| 007234 | HEALD COLLEGE | < 10 |
| 00723400 | HEALD COLLEGE | 9789 |
| 00723401 | HEALD COLLEGE - HONOLULU | 1565 |
| 00723402 | HEALD COLLEGE - PORTLAND | 596 |
| 00723404 | HEALD COLLEGE - CONCORD | 1481 |
| 00723405 | HEALD COLLEGE - MILPITAS | 1486 |
| 00723406 | HEALD COLLEGE - HAYWARD | 1147 |
| 00723407 | HEALD COLLEGE - MODESTO | 1132 |
| 00723408 | HEALD COLLEGE - ROSEVILLE | 1179 |
| 00723409 | HEALD COLLEGE - SALINAS | 743 |
| 00723410 | HEALD COLLEGE - STOCKTON | 1265 |
| 00723411 | HEALD COLLEGE - RANCHO CORDOVA | 1026 |
| 00723412 | HEALD COLLEGE - FRESNO | 1525 |
| 007329 | ITT TECHNICAL INSTITUTE | 12 |
| 00732987 | ITT TECHNICAL INSTITUTE | 49 |
| 007341 | INTERNATIONAL BEAUTY SCHOOL | < 10 |
| 00736700 | MARINELLO SCHOOL OF BEAUTY | 170 |
| 00736701 | MARINELLO SCHOOLS OF BEAUTY - | 79 |
| 00737100 | MARINELLO SCHOOL OF BEAUTY | 152 |
| 00747600 | MARINELLO SCHOOL OF BEAUTY | 224 |
| 00747602 | MARINELLO SCHOOLS OF BEAUTY - SPA ACADEMY WILSHIRE | 71 |
| 00747603 | MARINELLO SCHOOLS OF BEAUTY - INGLEWOOD | 71 |
| 00747604 | MARINELLO SCHOOLS OF BEAUTY - RESEDA | 60 |
| 00747606 | MARINELLO SCHOOLS OF BEAUTY - WEST COVINA | 75 |
| 00747607 | MARINELLO SCHOOLS OF BEAUTY - SAN BERNARDINO | 163 |
| 00747608 | MARINELLO SCHOOLS OF BEAUTY - ONTARIO | 172 |
| 00747609 | MARINELLO SCHOOLS OF BEAUTY - WHITTIER | 63 |
| 00747610 | MARINELLO SCHOOLS OF BEAUTY - LOMITA | 69 |
| 00747611 | MARINELLO SCHOOLS OF BEAUTY - SAN DIEGO | 103 |
| 00747612 | MARINELLO SCHOOLS OF BEAUTY - EL CAJON | 109 |
| 00747613 | MARINELLO SCHOOLS OF BEAUTY - VICTORVILLE | 170 |
| 00747614 | MARINELLO SCHOOLS OF BEAUTY - ANAHEIM | 112 |
| 00747615 | MARINELLO SCHOOLS OF BEAUTY - SIMI VALLEY | 65 |
| 007488 | KAPLAN CAREER INSTITUTE | < 10 |
| 00760600 | BRYMAN COLLEGE | 71 |
| 00781400 | BROOKSTONE COLLEGE OF BUSINESS | 199 |
| 00781401 | BROOKSTONE COLLEGE OF BUSINESS - GREENSBORO | 135 |
| 00809000 | EVEREST COLLEGE | 672 |
| 00809002 | EVEREST COLLEGE - EVEREST INSTITUTE | 110 |
| 00809003 | EVEREST COLLEGE - BEDFORD PARK | 279 |
| 008332 | MARINELLO SCHOOL OF BEAUTY | < 10 |
| 00833200 | MARINELLO SCHOOL OF BEAUTY | 42 |
| 008425 | DAYMAR COLLEGE | < 10 |
| 00844100 | ANTHEM INSTITUTE | 904 |
| 00844101 | ANTHEM INSTITUTE | 248 |
| 00844103 | ANTHEM INSTITUTE - MORRISON UNIVERSITY | 373 |
| 00857500 | SALON PROFESSIONAL ACADEMY (THE) | 34 |
| 00869415 | RASMUSSEN COLLEGE - BISMARCK | 154 |
| 00887400 | MARINELLO SCHOOL OF BEAUTY | 110 |

| 00887401 | MARINELLO SCHOOL OF BEAUTY - HAMDEN | 56 |
|---|---|---|
| 00887402 | MARINELLO SCHOOL OF BEAUTY - FAIRFIELD | 134 |
| 00887403 | MARINELLO SCHOOL OF BEAUTY - WILLIMANTIC | 50 |
| 00903800 | MR. BERNARD'S SCHOOL OF HAIR FASHION | 72 |
| 00903801 | MR BERNARD'S SCHOOL OF HAIR FASHION - BANGOR | 37 |
| 009079 | EVEREST COLLEGE | < 10 |
| 00915706 | WYOTECH - WEST SACRAMENTO CAMPUS | 18 |
| 009313 | DAYMAR COLLEGE | < 10 |
| 00931302 | DAYMAR COLLEGE - LOUISVILLE | 46 |
| 00931308 | DAYMAR COLLEGE -  SCOTTSVILLE | 15 |
| 00966412 | EMPIRE BEAUTY SCHOOL - EXTON | 26 |
| 00974806 | CARRINGTON COLLEGE CALIFORNIA -  ANTIOCH/WALNUT CREEK | 148 |
| 009828 | ALTIERUS CAREER EDUCATION | < 10 |
| 00998200 | VICTORY UNIVERSITY | 1053 |
| 01005900 | AMERICAN COMMERCIAL COLLEGE | 27 |
| 01005901 | AMERICAN COMMERCIAL COLLEGE - AMERICAN COMMERCIAL COLLEGE | 84 |
| 01035600 | EVEREST INSTITUTE | 55 |
| 01035602 | EVEREST INSTITUTE - EAGAN | 45 |
| 01041700 | MARINELLO SCHOOL OF BEAUTY | 193 |
| 01044700 | PLAZA BEAUTY SCHOOL | 85 |
| 01047000 | KALAMAZOO BEAUTY ACADEMY | 11 |
| 010490 | REGENCY BEAUTY INSTITUTE | < 10 |
| 01049007 | REGENCY BEAUTY INSTITUTE - MINNETONKA | 14 |
| 01049023 | REGENCY BEAUTY INSTITUTE - METRO CENTER | 11 |
| 01049052 | REGENCY BEAUTY INSTITUTE - WICHITA | 12 |
| 01049078 | REGENCY BEAUTY INSTITUTE - HOOVER | 18 |
| 010624 | LIGHTHOUSE CAREER INSTITUTE | < 10 |
| 010837 | SIMMONS INSTITUTE OF FUNERAL SERVICE | < 10 |
| 01102400 | BRYMAN COLLEGE | 128 |
| 01110700 | EVEREST COLLEGE | 328 |
| 01110900 | EVEREST COLLEGE | 1071 |
| 01110901 | EVEREST COLLEGE - EVEREST INSTITUTE | 293 |
| 01110902 | EVEREST COLLEGE - ATLANTA | 589 |
| 01112100 | BRYMAN COLLEGE | 63 |
| 01112300 | EVEREST COLLEGE | 686 |
| 01112301 | EVEREST COLLEGE - EVEREST INSTITUTE- NORCROSS | 504 |
| 011510 | EVEREST INSTITUTE | < 10 |
| 01151000 | EVEREST INSTITUTE | 40 |
| 011574 | BAUDER COLLEGE | < 10 |
| 011647 | SBI CAMPUS - AN AFFILIATE OF SANFORD-BROWN | < 10 |
| 011858 | EVEREST COLLEGE | < 10 |
| 01206100 | BRYMAN COLLEGE | 55 |
| 01210700 | INSTITUTE OF DESIGN AND CONSTRUCTION | 14 |
| 012128 | LINCOLN COLLEGE OF TECHNOLOGY | < 10 |
| 01212801 | LINCOLN COLLEGE OF TECHNOLOGY - FLORENCE | 13 |
| 01212804 | LINCOLN COLLEGE OF TECHNOLOGY - NORTHLAND | 12 |
| 01212806 | LINCOLN COLLEGE OF TECHNOLOGY - TOLEDO | 10 |
| 01212808 | LINCOLN COLLEGE OF TECHNOLOGY - CLEVELAND | 19 |
| 01246112 | LINCOLN TECHNICAL INSTITUTE- EUPH INST OF BEAUTYARTS&SCIENCES-ALI | 72 |
| 01265000 | MARINELLO SCHOOL OF BEAUTY | 152 |
| 01265001 | MARINELLO SCHOOL OF BEAUTY - PALMDALE | 148 |
| 01287300 | WYOTECH | 1406 |
| 01287301 | WYOTECH - EVEREST  COLLEGE | 273 |
| 01287302 | WYOTECH - EVEREST  COLLEGE | 762 |
| 012877 | SANFORD-BROWN COLLEGE | < 10 |
| 02054900 | MARINELLO SCHOOL OF BEAUTY | 87 |
| 02054902 | MARINELLO SCHOOL OF BEAUTY - BAKERSFIELD | 138 |
| 02054903 | MARINELLO SCHOOL OF BEAUTY - VISALIA | 92 |
| 02056803 | DAYMAR COLLEGE - CHILLICOTHE | 16 |
| 02074100 | CAPITOL CITY TRADE & TECHNICAL SCHOOL | 120 |
| 02074101 | CAPITOL CITY TRADE & TECHNICAL SCHOOL - ALLIED HEALTH CAREERS | 55 |
| 02086400 | MARINELLO SCHOOL OF BEAUTY | 86 |
| 02086401 | MARINELLO SCHOOL OF BEAUTY - SEASIDE | 116 |
| 02086402 | MARINELLO SCHOOL OF BEAUTY - SAN MATEO | 48 |
| 02086403 | MARINELLO SCHOOL OF BEAUTY - HAYWARD | 85 |
| 02086404 | MARINELLO SCHOOL OF BEAUTY - CASTRO VALLEY | 46 |
| 021004 | EVEREST INSTITUTE | 11 |
| 02116001 | SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - TREVOSE | 42 |
| 02116012 | SANFORD-BROWN COLLEGE - HOUSTON NORTH LOOP | 13 |
| 021192 | COURT REPORTING INSTITUTE OF ST LOUIS | < 10 |
| 02119204 | COURT REPORTING INSTITUTE OF DALLAS - COURT REP. INST. OF ST LOUI | 179 |
| 02120800 | YORKTOWNE BUSINESS INSTITUTE | 62 |
| 021279 | SOJOURNER-DOUGLASS COLLEGE | < 10 |
| 02127900 | SOJOURNER-DOUGLASS COLLEGE | 117 |
| 02136800 | AMERICAN COMMERCIAL COLLEGE | 48 |
| 021385 | BOCES RENSSELAER SCHOOL OF PRACTICAL NURSING | < 10 |
| 02153500 | OAKBRIDGE ACADEMY OF ARTS | 32 |
| 02156300 | MARGATE SCHOOL OF BEAUTY | 17 |
| 021642 | FOREST INSTITUTE OF PROFESSIONAL PSYCHOLOGY | < 10 |
| 02164200 | FOREST INSTITUTE OF PROFESSIONAL PSYCHOLOGY | 86 |
| 02178502 | EAGLE GATE COLLEGE - SLC DOWNTOWN LEARNING SITE | 77 |
| 02200101 | GUTI, THE PREMIER BEAUTY AND WELLNESS ACADEMY - | 12 |
| 02221300 | MARINELLO SCHOOL OF BEAUTY | 98 |
| 02221303 | MARINELLO SCHOOL OF BEAUTY - SAN RAFAEL | 25 |
| 02223900 | DRAKE COLLEGE OF BUSINESS | 686 |
| 02223902 | DRAKE COLLEGE OF BUSINESS - NEWARK CAMPUS | 360 |
| 02239200 | ANTHEM COLLEGE | 828 |

| | | |
|---|---|---|
| 02239202 | ANTHEM COLLEGE - METRO SOUTH | 137 |
| 02239203 | ANTHEM COLLEGE - BEAVERTON | 240 |
| 02239204 | ANTHEM COLLEGE - BROOKFIELD | 180 |
| 02255200 | PENNSYLVANIA SCHOOL OF BUSINESS | 140 |
| 022631 | ANTHEM COLLEGE | < 10 |
| 02263100 | ANTHEM COLLEGE | 1891 |
| 02263101 | ANTHEM COLLEGE - SACRAMENTO | 204 |
| 02263104 | ANTHEM COLLEGE - ANTHEM CAREER COLLEGE -  NASHVILLE | 240 |
| 02263108 | ANTHEM COLLEGE - ANTHEM COLLEGE, ATLANTA | 301 |
| 022662 | HELMS CAREER INSTITUTE | < 10 |
| 02269400 | EASTERN HILLS ACADEMY OF HAIR DESIGN | 36 |
| 02276600 | HANOVER PUBLIC SCHOOL DISTRICT PRACTICAL NURSING PROGRAM | 18 |
| 02294800 | CAPITOL CITY CAREERS | 12 |
| 02295000 | EVEREST COLLEGE PHOENIX | 4635 |
| 02295002 | EVEREST COLLEGE PHOENIX - MESA CAMPUS | 239 |
| 02296003 | PRINCE INSTITUTE  -  GREAT LAKES | 11 |
| 02296004 | PRINCE INSTITUTE - SOUTHEAST - PRINCE INSTITUTE - ROCKY MOUNTAINS | 14 |
| 022985 | EVEREST COLLEGE | < 10 |
| 023001 | ALTIERUS CAREER COLLEGE | < 10 |
| 023013 | PRISM CAREER INSTITUTE | < 10 |
| 02304000 | MISSOURI TECHNICAL SCHOOL | 72 |
| 02305700 | FORTIS COLLEGE | 12 |
| 02306500 | PROFESSIONAL BUSINESS COLLEGE | 95 |
| 02323700 | PAT WILSON'S BEAUTY COLLEGE | 41 |
| 02326500 | INTERFACE COLLEGE | 51 |
| 02331400 | NORTHWEST HAIR ACADEMY | 86 |
| 02331402 | NORTHWEST HAIR ACADEMY - EVERETT | 16 |
| 02331403 | NORTHWEST HAIR ACADEMY - BELLINGHAM | 24 |
| 02331404 | NORTHWEST HAIR ACADEMY - YAKIMA | 27 |
| 02338700 | MARINELLO SCHOOL OF BEAUTY | 109 |
| 02338701 | MARINELLO SCHOOL OF BEAUTY - CHICO | 94 |
| 02338702 | MARINELLO SCHOOL OF BEAUTY - REDDING | 92 |
| 02338703 | MARINELLO SCHOOL OF BEAUTY - FRESNO | 158 |
| 02339800 | SOUTHERN INSTITUTE OF COSMETOLOGY | 38 |
| 025135 | MARION SCHOOL OF BEAUTY | < 10 |
| 02518400 | NATIONAL HISPANIC UNIVERSITY (THE) | 15 |
| 02527600 | LEXINGTON COLLEGE | 47 |
| 025543 | AMERICAN BEAUTY INSTITUTE | < 10 |
| 02556801 | PAUL MITCHELL THE SCHOOL - PAUL MITCHELL THE SCHOOL ST. GEORGE | 31 |
| 02560800 | SOUTHEAST SCHOOL OF COSMETOLOGY | 41 |
| 02561900 | BRILLARE HAIRDRESSING ACADEMY | 88 |
| 025729 | BUSINESS INFORMATICS CENTER | < 10 |
| 025762 | MID-CONTINENT UNIVERSITY | < 10 |
| 02576200 | MID-CONTINENT UNIVERSITY | 1723 |
| 02576201 | MID-CONTINENT UNIVERSITY - PADUCAH 12 | 17 |
| 02598200 | UNIVERSITY OF SOUTHERNMOST FLORIDA | 286 |
| 02598201 | FLORIDA TECHNICAL COLLEGE | 287 |
| 02612200 | MARINELLO SCHOOL OF BEAUTY | 33 |
| 02616401 | SANFORD-BROWN INSTITUTE - TAMPA | 231 |
| 02622001 | SOUTHWEST ACUPUNCTURE COLLEGE -ALBUQUERQUE | 30 |
| 03007600 | ARKANSAS BEAUTY SCHOOL/CONWAY | 17 |
| 030086 | CORTIVA INSTITUTE | < 10 |
| 03028800 | AMERICAN NATIONAL COLLEGE | 30 |
| 03031300 | XENON INTERNATIONAL ACADEMY IV | 13 |
| 03042700 | LAURUS TECHNICAL INSTITUTE | 317 |
| 03072300 | EVEREST COLLEGE | 993 |
| 03072303 | EVEREST INSTITUTE - COLUMBUS | 350 |
| 03072304 | EVEREST COLLEGE - EVEREST INSTITUTE | 342 |
| 03076400 | BRYMAN SCHOOL OF ARIZONA (THE) | 1951 |
| 03076401 | BRYMAN SCHOOL OF ARIZONA (THE) - ANTHEM COLLEGE | 26 |
| 03076402 | BRYMAN SCHOOL OF ARIZONA (THE) - ANTHEM COLLEGE - ORLANDO | 411 |
| 03076403 | BRYMAN SCHOOL OF ARIZONA (THE) - ANTHEM COLLEGE - IRVING | 149 |
| 03076404 | BRYMAN SCHOOL OF ARIZONA (THE) - ANTHEM INSTITUTE - LAS VEGAS | 264 |
| 03076405 | BRYMAN SCHOOL OF ARIZONA (THE) - ANTHEM CAREER COLLEGE - MEMPHIS | 688 |
| 03088200 | CARSON CITY BEAUTY ACADEMY | 66 |
| 030897 | CAREER INSTITUTE OF HEALTH AND TECHNOLOGY | < 10 |
| 03089700 | CAREER INSTITUTE OF HEALTH AND TECHNOLOGY | 409 |
| 03094400 | MARINELLO SCHOOL OF BEAUTY | 109 |
| 03094401 | MARINELLO SCHOOL OF BEAUTY - CONCORD | 80 |
| 03094402 | MARINELLO SCHOOL OF BEAUTY- STOCKTON | 109 |
| 030963 | FORTIS INSTITUTE | < 10 |
| 03108700 | ROYAL BEAUTY CAREERS | 18 |
| 03148300 | AMERICAN BEAUTY ACADEMY | 147 |
| 03148301 | AMERICAN BEAUTY ACADEMY - BALTIMORE | 161 |
| 03148302 | AMERICAN BEAUTY ACADEMY - WILMINGTON | 94 |
| 03148303 | AMERICAN BEAUTY ACADEMY - LANCASTER | 91 |
| 03162300 | FOUR-D COLLEGE | 440 |
| 03162301 | FOUR-D COLLEGE - | 18 |
| 03162302 | FOUR-D COLLEGE - VICTORVILLE | 37 |
| 03187300 | STENOTECH CAREER INSTITUTE | 23 |
| 03187301 | STENOTECH CAREER INSTITUTE - | 28 |
| 03195400 | EVEREST COLLEGE | 97 |
| 03197300 | INSTITUTE FOR HEALTH EDUCATION (THE) | 74 |
| 032103 | LE CORDON BLEU COLLEGE OF CULINARY ARTS | 31 |
| 032783 | CHARTER COLLEGE | < 10 |
| 033294 | PRYOR BEAUTY COLLEGE | < 10 |
| 03348400 | MATTIA COLLEGE | 589 |

| | | |
|---|---|---|
| 033673 | PROFESSIONAL GOLFERS CAREER COLLEGE | < 10 |
| 03389300 | ACADEMY OF MASSAGE THERAPY | 24 |
| 033953 | ICDC COLLEGE | < 10 |
| 034254 | CENTRAL FLORIDA INSTITUTE | < 10 |
| 03427400 | CAREER COLLEGES OF AMERICA | 336 |
| 03427401 | CAREER COLLEGES OF AMERICA - SAN BERNARDINO | 151 |
| 03427402 | CAREER COLLEGES OF AMERICA - LOS ANGELES | 77 |
| 03450300 | MARINELLO SCHOOL OF BEAUTY | 43 |
| 03450301 | MARINELLO SCHOOL OF BEAUTY - WICHITA | 34 |
| 03450302 | MARINELLO SCHOOL OF BEAUTY - OVERLAND PARK | 91 |
| 034555 | NATIONAL LABOR COLLEGE | < 10 |
| 03455500 | NATIONAL LABOR COLLEGE | 165 |
| 03467300 | MARINELLO SCHOOL OF BEAUTY | 158 |
| 03467301 | MARINELLO SCHOOL OF BEAUTY - CATHEDRAL CITY | 20 |
| 03467302 | MARINELLO SCHOOL OF BEAUTY - MURRIETA | 88 |
| 03467303 | MARINELLO SCHOOL OF BEAUTY - NAPA | 34 |
| 03467304 | MARINELLO SCHOOL OF BEAUTY - CITY OF INDUSTRY | 37 |
| 03467305 | MARINELLO SCHOOL OF BEAUTY - BELL | 80 |
| 03467306 | MARINELLO SCHOOL OF BEAUTY - PARAMOUNT | 95 |
| 03467307 | MARINELLO SCHOOL OF BEAUTY - HUNTINGTON BEACH | 33 |
| 03467308 | MARINELLO SCHOOL OF BEAUTY - OGDEN | 40 |
| 03467309 | MARINELLO SCHOOL OF BEAUTY - LAYTON | 58 |
| 035133 | LACY COSMETOLOGY SCHOOL | 12 |
| 03513300 | LACY COSMETOLOGY SCHOOL | 21 |
| 03516500 | EZELL'S COSMETOLOGY SCHOOL, LLC | 26 |
| 03534300 | JONES INTERNATIONAL UNIVERSITY | 27 |
| 035564 | KUSSAD INSTITUTE OF COURT REPORTING | < 10 |
| 03618300 | INSTITUTE OF TECHNICAL ARTS | 152 |
| 03655300 | ILLINOIS CAREERPATH INSTITUTE | 15 |
| 03698400 | CALIFORNIA COLLEGE OF VOCATIONAL CAREERS | 31 |
| 03726300 | OHIO MID-WESTERN COLLEGE | 44 |
| 037563 | ANAMARC COLLEGE | < 10 |
| 03756300 | ANAMARC COLLEGE | 740 |
| 037684 | STYLETRENDS BARBER AND HAIRSTYLING ACADEMY | < 10 |
| 03804402 | MEDTECH INSTITUTE - TUCKER | 13 |
| 038094 | MICROPOWER CAREER INSTITUTE | < 10 |
| 03809403 | MICROPOWER CAREER INSTITUTE - LONG ISLAND CAMPUS | 57 |
| 03809405 | MICROPOWER CAREER INSTITUTE - HAUPPAUGE CAMPUS | 76 |
| 03809406 | MICROPOWER CAREER INSTITUTE - NEW JERSEY CAMPUS | 16 |
| 03832300 | DADE MEDICAL COLLEGE | 879 |
| 03832301 | DADE MEDICAL COLLEGE - MIAMI LAKES | 412 |
| 03832302 | DADE MEDICAL COLLEGE - HOMESTEAD | 241 |
| 03832303 | DADE MEDICAL COLLEGE - HOLLYWOOD | 257 |
| 03832304 | DADE MEDICAL COLLEGE - WEST PALM BEACH | 269 |
| 03832305 | DADE MEDICAL COLLEGE - JACKSONVILLE | 212 |
| 03872500 | NORTHLAND INTERNATIONAL UNIVERSITY | 276 |
| 038753 | MCI INSTITUTE OF TECHNOLOGY | < 10 |
| 03875300 | MCI INSTITUTE OF TECHNOLOGY | 81 |
| 038783 | PROFESSIONAL MASSAGE TRAINING CENTER | < 10 |
| 03886300 | REGENCY SCHOOL OF HAIR DESIGN | 10 |
| 038993 | CALVARY BAPTIST THEOLOGICAL SEMINARY | < 10 |
| 03920300 | INSTITUTE OF HAIR DESIGN | 20 |
| 039273 | MARINELLO SCHOOL OF BEAUTY | < 10 |
| 03927300 | MARINELLO SCHOOL OF BEAUTY | 19 |
| 03927301 | MARINELLO SCHOOL OF BEAUTY - TORRINGTON | 10 |
| 03950500 | NORTHWEST REGIONAL TECHNOLOGY INSTITUTE | 39 |
| 039523 | NATIONAL MASSAGE THERAPY INSTITUTE | < 10 |
| 03999400 | HAWAII COLLEGE OF ORIENTAL MEDICINE | 15 |
| 04056300 | CAREER COLLEGE OF CALIFORNIA | 80 |
| 04116000 | VIDEO SYMPHONY ENTERTRAINING | 78 |
| 04125700 | CUT BEAUTY SCHOOL (THE) | 38 |
| 04133000 | BIOHEALTH COLLEGE | 36 |
| 04134500 | SAN DIEGO COLLEGE | 67 |
| 04137900 | BRENSTEN EDUCATION | 118 |
| 04150000 | CENTRAL NURSING COLLEGE | 49 |
| 04158700 | HOLLYWOOD BEAUTY COLLEGE | 37 |
| 04171600 | SALON PROFESSIONAL ACADEMY OF ELGIN (THE) | 26 |
| 041729 | ACADEMY OF COSMETOLOGY | < 10 |
| 04173100 | LAB PAUL MITCHELL PARTNER SCHOOL (THE) | 55 |
| 04178900 | ASHDOWN COLLEGE OF HEALTH SCIENCES | 27 |
| 04179000 | NEW IMAGE SCHOOL OF COSMETOLOGY, LLC, THE | 14 |
| 04191100 | DESTINATION ACADEMY FOR SPA AND SALON PROFESSIONALS | 19 |
| 04194800 | VELVET TOUCH ACADEMY OF COSMETOLOGY | 19 |
| 04216300 | UEI COLLEGE | 32 |
| 10732920 | ITT TECHNICAL INSTITUTE | 196 |
| 10732930 | ITT TECHNICAL INSTITUTE | 185 |
| 10732933 | ITT TECHNICAL INSTITUTE | 15 |
| 10732946 | ITT TECHNICAL INSTITUTE | 10 |
| 10732948 | ITT TECHNICAL INSTITUTE | 14 |
| 10732959 | ITT TECHNICAL INSTITUTE | 81 |

* Student count only includes students who have at some point received Title IV aid, they did not need to receive that aid at the listed school.

| OPEID | NAME | STATE | SCHOOL TYPE | DISCHARGED BORROWERS |
|-------|------|-------|-------------|----------------------|
| 00107000 | THUNDERBIRD SCHOOL OF GLOBAL MANAGEMENT | AZ | Private Non-Profit | 35 |
| 00147300 | CLEARWATER CHRISTIAN COLLEGE | FL | Private Non-Profit | 35 |
| 001499 | ALTIERUS CAREER COLLEGE | FL | Private Non-Profit | 18 |
| 00375200 | VIRGINIA INTERMONT COLLEGE | VA | Private Non-Profit | 21 |
| 00449400 | EVEREST COLLEGE | CA | Proprietary | 160 |
| 00449401 | EVEREST COLLEGE - SANTA ANA | CA | Proprietary | 13 |
| 00449402 | EVEREST COLLEGE - ONTARIO | CA | Proprietary | 47 |
| 004646 | MINNESOTA SCHOOL OF BUSINESS | MN | Proprietary | 10 |
| 00472900 | MOUNT WASHINGTON COLLEGE | NH | Proprietary | 17 |
| 00472901 | MOUNT WASHINGTON COLLEGE - NASHUA CAMPUS | NH | Proprietary | 32 |
| 00472904 | MOUNT WASHINGTON COLLEGE - PORTSMOUTH CAMPUS | NH | Proprietary | 20 |
| 00472905 | MOUNT WASHINGTON COLLEGE - SALEM CAMPUS | NH | Proprietary | 51 |
| 00472906 | MOUNT WASHINGTON COLLEGE - CONCORD CAMPUS | NH | Proprietary | 11 |
| 00481100 | EVEREST INSTITUTE | NY | Proprietary | 229 |
| 00481102 | EVEREST INSTITUTE - EVEREST COLLEGE | TX | Proprietary | 188 |
| 00489400 | ERIE BUSINESS CENTER | PA | Proprietary | 52 |
| 00489401 | ERIE BUSINESS CENTER - NEW CASTLE CAMPUS | PA | Proprietary | 14 |
| 00719000 | WYOTECH | CA | Proprietary | 141 |
| 00723400 | HEALD COLLEGE | CA | Proprietary | 329 |
| 00723401 | HEALD COLLEGE - HONOLULU | HI | Proprietary | 450 |
| 00723402 | HEALD COLLEGE - PORTLAND | OR | Proprietary | 172 |
| 00723404 | HEALD COLLEGE - CONCORD | CA | Proprietary | 343 |
| 00723405 | HEALD COLLEGE - MILPITAS | CA | Proprietary | 430 |
| 00723406 | HEALD COLLEGE - HAYWARD | CA | Proprietary | 272 |
| 00723407 | HEALD COLLEGE - MODESTO | CA | Proprietary | 284 |
| 00723408 | HEALD COLLEGE - ROSEVILLE | CA | Proprietary | 277 |
| 00723409 | HEALD COLLEGE - SALINAS | CA | Proprietary | 189 |
| 00723410 | HEALD COLLEGE - STOCKTON | CA | Proprietary | 338 |
| 00723411 | HEALD COLLEGE - RANCHO CORDOVA | CA | Proprietary | 266 |
| 00723412 | HEALD COLLEGE - FRESNO | CA | Proprietary | 408 |
| 00732900 | ITT TECHNICAL INSTITUTE | IN | Proprietary | 160 |
| 00736700 | MARINELLO SCHOOL OF BEAUTY | NV | Proprietary | 57 |
| 00737100 | MARINELLO SCHOOL OF BEAUTY | NV | Proprietary | 19 |
| 00747600 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 299 |
| 00760600 | BRYMAN COLLEGE | CA | Proprietary | 12 |
| 00781400 | BROOKSTONE COLLEGE OF BUSINESS | NC | Proprietary | 26 |
| 00781401 | BROOKSTONE COLLEGE OF BUSINESS - GREENSBORO | NC | Proprietary | 33 |
| 00809000 | EVEREST COLLEGE | CA | Proprietary | 75 |
| 00809002 | EVEREST COLLEGE - EVEREST INSTITUTE | MA | Proprietary | 41 |
| 00809003 | EVEREST COLLEGE - BEDFORD PARK | IL | Proprietary | 135 |
| 008332 | MARINELLO SCHOOL OF BEAUTY | KS | Proprietary | 12 |
| 008441 | ANTHEM INSTITUTE | PA | Proprietary | 277 |
| 00887400 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 79 |
| 00903800 | MR. BERNARD'S SCHOOL OF HAIR FASHION | ME | Proprietary | 21 |
| 009313 | DAYMAR COLLEGE | KY | Proprietary | 11 |
| 00974806 | CARRINGTON COLLEGE CALIFORNIA - ANTIOCH/WALNUT CREEK | CA | Proprietary | 10 |
| 00998200 | VICTORY UNIVERSITY | TN | Proprietary | 159 |
| 01005900 | AMERICAN COMMERCIAL COLLEGE | TX | Proprietary | 10 |
| 01005901 | AMERICAN COMMERCIAL COLLEGE - AMERICAN COMMERCIAL CO | TX | Proprietary | 31 |
| 010356 | EVEREST INSTITUTE | WV | Proprietary | 13 |
| 01041700 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 57 |
| 01044700 | PLAZA BEAUTY SCHOOL | TN | Proprietary | 48 |
| 01049000 | REGENCY BEAUTY INSTITUTE | MN | Proprietary | 13 |
| 01102400 | BRYMAN COLLEGE | CA | Proprietary | 31 |
| 01110700 | EVEREST COLLEGE | CA | Proprietary | 56 |
| 01110900 | EVEREST COLLEGE | CA | Proprietary | 128 |
| 01110901 | EVEREST COLLEGE - EVEREST INSTITUTE | GA | Proprietary | 96 |
| 01110902 | EVEREST COLLEGE - ATLANTA | GA | Proprietary | 189 |
| 01112100 | BRYMAN COLLEGE | CA | Proprietary | 17 |
| 01112300 | EVEREST COLLEGE | CA | Proprietary | 70 |
| 01112301 | EVEREST COLLEGE - EVEREST INSTITUTE- NORCROSS | GA | Proprietary | 155 |
| 01206100 | BRYMAN COLLEGE | CA | Proprietary | 14 |
| 012128 | LINCOLN COLLEGE OF TECHNOLOGY | OH | Proprietary | 31 |
| 01265000 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 45 |
| 01287300 | WYOTECH | CA | Proprietary | 245 |
| 01287301 | WYOTECH - EVEREST  COLLEGE | CA | Proprietary | 60 |
| 01287302 | WYOTECH - EVEREST  COLLEGE | CA | Proprietary | 166 |

| 02054900 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 64 |
|---|---|---|---|---|
| 02074100 | CAPITOL CITY TRADE & TECHNICAL SCHOOL | TX | Proprietary | 28 |
| 02086400 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 62 |
| 021192 | COURT REPORTING INSTITUTE OF ST LOUIS | MO | Proprietary | 47 |
| 02127900 | SOJOURNER-DOUGLASS COLLEGE | MD | Private Non-Profit | 12 |
| 02136800 | AMERICAN COMMERCIAL COLLEGE | TX | Proprietary | 23 |
| 02164200 | FOREST INSTITUTE OF PROFESSIONAL PSYCHOLOGY | MO | Private Non-Profit | 20 |
| 02221300 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 21 |
| 02223900 | DRAKE COLLEGE OF BUSINESS | NJ | Proprietary | 676 |
| 022392 | ANTHEM COLLEGE | MO | Proprietary | 270 |
| 02255200 | PENNSYLVANIA SCHOOL OF BUSINESS | PA | Proprietary | 58 |
| 022631 | ANTHEM COLLEGE | AZ | Proprietary | 569 |
| 02269400 | EASTERN HILLS ACADEMY OF HAIR DESIGN | OH | Proprietary | 11 |
| 02276600 | HANOVER PUBLIC SCHOOL DISTRICT PRACTICAL NURSING PROGR | PA | Public | 10 |
| 02295000 | EVEREST COLLEGE PHOENIX | AZ | Proprietary | 1702 |
| 02295002 | EVEREST COLLEGE PHOENIX - MESA CAMPUS | AZ | Proprietary | 66 |
| 02304000 | MISSOURI TECHNICAL SCHOOL | MO | Proprietary | 18 |
| 02323700 | PAT WILSON'S BEAUTY COLLEGE | KY | Proprietary | 25 |
| 02326500 | INTERFACE COLLEGE | WA | Proprietary | 12 |
| 023314 | NORTHWEST HAIR ACADEMY | WA | Proprietary | 51 |
| 02338700 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 89 |
| 02339800 | SOUTHERN INSTITUTE OF COSMETOLOGY | TN | Proprietary | 10 |
| 02560800 | SOUTHEAST SCHOOL OF COSMETOLOGY | KY | Proprietary | 21 |
| 02561900 | BRILLARE HAIRDRESSING ACADEMY | AZ | Proprietary | 21 |
| 02576200 | MID-CONTINENT UNIVERSITY | KY | Private Non-Profit | 312 |
| 02598200 | UNIVERSITY OF SOUTHERNMOST FLORIDA | FL | Proprietary | 74 |
| 03028800 | AMERICAN NATIONAL COLLEGE | TX | Proprietary | 17 |
| 03042700 | LAURUS TECHNICAL INSTITUTE | GA | Proprietary | 96 |
| 03072300 | EVEREST COLLEGE | CA | Proprietary | 99 |
| 03072303 | EVEREST INSTITUTE - COLUMBUS | OH | Proprietary | 123 |
| 03072304 | EVEREST COLLEGE - EVEREST INSTITUTE | GA | Proprietary | 101 |
| 030764 | BRYMAN SCHOOL OF ARIZONA (THE) | AZ | Proprietary | 637 |
| 03088200 | CARSON CITY BEAUTY ACADEMY | NV | Proprietary | 13 |
| 03089700 | CAREER INSTITUTE OF HEALTH AND TECHNOLOGY | NY | Proprietary | 166 |
| 03094400 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 68 |
| 03148300 | AMERICAN BEAUTY ACADEMY | MD | Proprietary | 211 |
| 031623 | FOUR-D COLLEGE | CA | Proprietary | 74 |
| 03195400 | EVEREST COLLEGE | CA | Proprietary | 21 |
| 03197300 | INSTITUTE FOR HEALTH EDUCATION (THE) | NJ | Proprietary | 41 |
| 03210300 | LE CORDON BLEU COLLEGE OF CULINARY ARTS | CA | Proprietary | 18 |
| 03348400 | MATTIA COLLEGE | FL | Proprietary | 137 |
| 03427400 | CAREER COLLEGES OF AMERICA | CA | Proprietary | 89 |
| 034503 | MARINELLO SCHOOL OF BEAUTY | KS | Proprietary | 27 |
| 03455500 | NATIONAL LABOR COLLEGE | MD | Private Non-Profit | 38 |
| 03467300 | MARINELLO SCHOOL OF BEAUTY | CA | Proprietary | 144 |
| 03513300 | LACY COSMETOLOGY SCHOOL | SC | Proprietary | 12 |
| 03534300 | JONES INTERNATIONAL UNIVERSITY | CO | Proprietary | 10 |
| 03618300 | INSTITUTE OF TECHNICAL ARTS | FL | Proprietary | 46 |
| 03726300 | OHIO MID-WESTERN COLLEGE | OH | Private Non-Profit | 18 |
| 03756300 | ANAMARC COLLEGE | TX | Proprietary | 268 |
| 03809400 | MICROPOWER CAREER INSTITUTE | NY | Proprietary | 57 |
| 03832300 | DADE MEDICAL COLLEGE | FL | Proprietary | 370 |
| 03872500 | NORTHLAND INTERNATIONAL UNIVERSITY | WI | Private Non-Profit | 88 |
| 03875300 | MCI INSTITUTE OF TECHNOLOGY | FL | Proprietary | 57 |
| 03920300 | INSTITUTE OF HAIR DESIGN | TN | Proprietary | 11 |
| 03927300 | MARINELLO SCHOOL OF BEAUTY | CT | Proprietary | 16 |
| 03950500 | NORTHWEST REGIONAL TECHNOLOGY INSTITUTE | PA | Proprietary | 12 |
| 04056300 | CAREER COLLEGE OF CALIFORNIA | CA | Proprietary | 22 |
| 04116000 | VIDEO SYMPHONY ENTERTRAINING | CA | Proprietary | 41 |
| 04125700 | CUT BEAUTY SCHOOL (THE) | OH | Proprietary | 18 |
| 04133000 | BIOHEALTH COLLEGE | CA | Proprietary | 18 |
| 04134500 | SAN DIEGO COLLEGE | CA | Proprietary | 24 |
| 04137900 | BRENSTEN EDUCATION | WI | Proprietary | 35 |
| 04150000 | CENTRAL NURSING COLLEGE | CA | Proprietary | 14 |
| 04171600 | SALON PROFESSIONAL ACADEMY OF ELGIN (THE) | IL | Proprietary | 16 |
| 04173100 | LAB PAUL MITCHELL PARTNER SCHOOL (THE) | NJ | Proprietary | 19 |
|  | ALL OTHERS |  |  | 291 |

Borrower Defense Data on Specific School Groups

| | Borrower Defense Applications | Borrower Defense Approvals | Outstanding Debt of Students Submitting Borrower Defense Applications (in millions) | Avg Balance of BD Claim | Students enrolled at time of closure | Students who have successfully transferred | Percentage who have successfully transferred |
|---|---|---|---|---|---|---|---|
| Education Corporation of America | 1,387 | <10 | $18,300,000 | $13,194 | 20585 | 1149 | **5.6%** |
| DCEH owned institutions | 1,490 | <10 | $86,300,000 | $57,919 | 9609 | 92 | **1.0%** |
| Vatterot | 216 | <10 | $5,800,000 | $26,852 | 2149 | 67 | **3.1%** |
| | | | | | 32343 | 1308 | 4.0% |

Source: Customer Engagement Management System

## FEDERAL STUDENT AID BONUS REPORT - FY 2016

| Name | Position Title Opm | Amount Award |
|---|---|---|
| HOUGH, JANA HERNANDES | SENIOR ADVISOR | $2,448.00 |
| FILLINICH, MICHAEL J. | SUP IT SPEC ENT ARCHITECTU | $2,461.00 |
| FARE, JOHN J. | CHIEF PERFORMANCE MANAGEMENT OFFICER | $3,473.00 |
| ENGLAND, SANDRA H. | DIR. ENTRPSE IT ARCH & STRTGC INFRA | $4,464.00 |
| EDWARDS, KAREN T. | IT SPECIALIST (SENIOR TESTING MANAG) | $4,468.00 |
| WILLIAMS, MONICA | DIR. APPLICATION DEVELOPMENT GROUP | $4,942.00 |
| ROBERTS, DENISE | DIRECTOR OF STRATEGIC INITIATIVES DIV | $4,961.00 |
| YAGER, ANN MARIE PEDERSEN | DIRECTOR,CORRESPONDENCE SERVICES UNIT | $5,555.00 |
| BYRNE, DEBRA A. | DIRECTOR, CONF. & OUTREACH SERVICES | $6,072.00 |
| TURNER, GABRIELLE H. | CHIEF COMMUNICATIONS OFFICER | $6,529.00 |
| ABA, SAMUEL K. | SUPERVISORY IT SPECIALIST | $7,176.00 |
| JORDAN, APRIL S. | DIR STRAT PLNG COMM REP ST | $7,404.00 |
| PICKETT, VERONICA | PROGRAM MANAGER | $7,842.00 |
| LEBO, PAUL A | DEPUTY CHIEF ADMINISTRATION OFFICER | $7,935.00 |
| LAVIA, MARK | EXECUTIVE DIRECTOR - SERVICING | $7,975.00 |
| BROADUS, WANDA L. | IT PROGRAM MANAGER | $8,199.00 |
| WILLOUGHBY, LESLIE A. | DEPUTY CHIEF INFORMATION OFFICER | $8,257.00 |
| CURRAN III, FRANK D. | SENIOR ADVISOR | $8,277.00 |
| BROWN, MICHELE Y. | DIR., TECH. & BUSI SUPPORT SERV. GRP | $8,570.00 |
| O'FLAHERTY, SUSAN | DIR. PROGRAM MANAGEMENT SERVICES | $8,584.00 |
| BUMGARNER, BRADLEY | DIR, MISSION PROCUREMENT | $8,614.00 |
| BOND-BUTLER, CYNTHIA R. | DIRECTOR OF BUSINESS PROCUREMENT | $8,670.00 |
| WOODS, TERRENCE J. | SENIOR APPLICATION | $8,688.00 |
| REDDY, GANESH D. | DIR OF INFRASTRUCTURE OPER GROUP | $9,130.00 |
| DUTT, AMITABH K. | SR. MANAGER BUSINESS TRANS | $9,255.00 |
| BLANCHETT, IRMA L. | BUSINESS TRANSFORMATION OF | $12,957.00 |
| WENSIL, BRENDA F. | CHIEF CUSTOMER EXPERIENCE OFFICER | $18,510.00 |
| KAYE, ROBERT S. | CHIEF ENFORCEMENT OFFICER | $25,200.00 |
| WILSON, JEFFREY K. | CHIEF INFORMATION OFFICER | $25,662.00 |
| MCGINNIS, COLLEEN M. | FSA CHIEF OF STAFF | $31,161.00 |
| CROWNER, QUASETTE RAMONDA | CHIEF ADMINISTRATION OFFICER | $35,169.00 |
| BRADFIELD, PATRICK A. | SUPV. CONTRACT SPECIALIST | $36,095.00 |
| MINOR, ROBIN S. | CHIEF COMPLIANCE OFFICER | $36,650.00 |
| LEITH, WILLIAM D. | CHIEF BUSINESS OPERATIONS OFFICER | $37,020.00 |
| SESSA, MATTHEW D. | DEPUTY CHIEF OPERATING OFFICER | $37,020.00 |
| RUNCIE, JAMES W. | CHIEF OPERATING OFFICER | $76,000.00 |

# FEDERAL STUDENT AID BONUS REPORT - FY 2017

| Name | Position Title Opm | Amount Award |
|---|---|---|
| STENNIS, BUFORD F. | SUPV AWARENESS OUTREACH SPECIALIST | $2,346.00 |
| HOUGH, JANA HERNANDES | SENIOR ADVISOR | $2,540.00 |
| STANARD, STEPHANIE V. | HUMAN RESOURCES OFFICER | $3,237.00 |
| RODRIGUE, TIINA K. | SENIOR ADVISOR-CYBERSECURITY | $3,277.00 |
| GIAMBI, MELISSA J. | SENIOR ADVISOR | $5,667.00 |
| YAGER, ANN MARIE PEDERSEN | DIRECTOR,CORRESPONDENCE SERVICES UNIT | $5,965.00 |
| ENGLAND, SANDRA H. | DIR. ENTRPSE IT ARCH & STRTGC INFRA | $6,175.00 |
| EDWARDS, KAREN T. | IT SPECIALIST (SENIOR TESTING MANAG) | $6,181.00 |
| JORDAN, APRIL S. | DIR STRAT PLNG COMM REP ST | $6,558.00 |
| WILLIAMS, MONICA | DIR. APPLICATION DEVELOPMENT GROUP | $6,836.00 |
| TURNER, GABRIELLE H. | CHIEF COMMUNICATIONS OFFICER | $6,839.00 |
| WINZER, ETIENNA R. | DIRECTOR,SCHOOL EXPERIENCE GROUP | $6,925.00 |
| ALLISON, STEPHEN W. | SENIOR ADVISOR TO THE DEPUTY CIO | $6,981.00 |
| BROADUS, WANDA L. | IT PROGRAM MANAGER | $7,042.00 |
| HABASH, JANICE | PROGRAM MANAGER(DIGITAL RECORDS MGMT) | $7,107.00 |
| BOND-BUTLER, CYNTHIA R. | DIRECTOR OF BUSINESS PROCUREMENT | $7,128.00 |
| TOLEDO, MAYRA Y. | SUPV IT SPEC (APPLICATIONS SOFTWARE) | $7,248.00 |
| REDDY, GANESH D. | DIR OF INFRASTRUCTURE OPER GROUP | $7,359.00 |
| COMMONS, DANIEL L | DIRECTOR, IT RISK MANAGEMENT | $8,526.00 |
| WOODS, TERRENCE J. | SENIOR APPLICATION | $8,578.00 |
| BYRNE, DEBRA A. | DIRECTOR, CONF. & OUTREACH SERVICES | $9,358.00 |
| ABA, SAMUEL K. | SUPERVISORY IT SPECIALIST | $9,553.00 |
| PICKETT, VERONICA | PROGRAM MANAGER | $9,857.00 |
| CURRAN III, FRANK D. | SENIOR ADVISOR | $9,950.00 |
| ROBERTS, DENISE | DIRECTOR OF STRATEGIC INITIATIVES DIV | $9,950.00 |
| VALENTINE, INGRID | SUPV. MANAGEMENT AND PROGRAM ANALYST | $9,950.00 |
| BROWN, MICHELE Y. | DIR., TECH. & BUSI SUPPORT SERV. GRP | $12,000.00 |
| FARE, JOHN J. | CHIEF PERFORMANCE MANAGEMENT OFFICER | $15,000.00 |
| LAVIA, MARK | EXECUTIVE DIRECTOR - SERVICING | $15,000.00 |
| WILLOUGHBY, LESLIE A. | DEPUTY CHIEF INFORMATION OFFICER | $15,000.00 |
| BUMGARNER, BRADLEY | SUPERVISORY CONTRACT SPECIALIST | $20,000.00 |
| APPEL, CHARLES J. | SENIOR ADVISOR POLICY &amp; INITIATIV | $25,000.00 |
| WILSON, JEFFREY K. | CHIEF INFORMATION OFFICER | $25,000.00 |
| BRADFIELD, PATRICK A. | SUPV. CONTRACT SPECIALIST | $35,000.00 |
| CROWNER, QUASETTE RAMONDA | CHIEF ADMINISTRATION OFFICER | $35,000.00 |
| LEITH, WILLIAM D. | CHIEF BUSINESS OPERATIONS OFFICER | $35,000.00 |
| MCGINNIS, COLLEEN M. | FSA CHIEF OF STAFF | $35,000.00 |
| MINOR, ROBIN S. | CHIEF COMPLIANCE OFFICER | $35,000.00 |
| SESSA, MATTHEW D. | DEPUTY CHIEF OPERATING OFFICER | $35,000.00 |

# FEDERAL STUDENT AID BONUS REPORT - FY 2018

| Name | Position Title Opm | Amount Award |
|---|---|---|
| STUCKEY, JILL P | SENIOR ADVISOR TEAM ENGAGEMENT | $2,000.00 |
| WRIGHT, ROSALIZES Y. | SENIOR MANAGER | $2,392.00 |
| SPRINGS, LEONARD | SENIOR ADVISOR TO COO FOR UNDER- | $2,576.00 |
| FILLINICH, MICHAEL J. | SUP IT SPEC ENT ARCHITECTU | $5,107.00 |
| WINZER, ETIENNA R. | DIRECTOR,SCHOOL EXPERIENCE GROUP | $5,272.00 |
| DEMOSS, JOYCE E. | OMBUDSMAN | $5,340.00 |
| ISETT, CHRISTINE A. | PUBLIC AFFAIRS SPECIALIST | $5,403.00 |
| WILLOUGHBY, LESLIE A. | DEPUTY CHIEF INFORMATION OFFICER | $6,144.00 |
| EDWARDS, KAREN T. | IT SPECIALIST (SENIOR TESTING MANAG) | $6,305.00 |
| COLTRANE III, RICHARD B. | SUPERVISORY MGMT & PROGRAM ANALYST | $6,672.00 |
| ALLISON, STEPHEN W. | SENIOR ADVISOR TO THE DEPUTY CIO | $7,086.00 |
| COMMONS, DANIEL L | DIRECTOR, IT RISK MANAGEMENT | $7,099.00 |
| TOLEDO, MAYRA Y. | SUPV IT SPEC (APPLICATIONS SOFTWARE) | $7,213.00 |
| HABASH, JANICE | PROGRAM MANAGER(DIGITAL RECORDS MGMT) | $7,214.00 |
| FOX, PATRICK J. | PORTFOLIO MANAGER | $7,500.00 |
| WILSON, JEFFREY K. | SENIOR IT SPECIALIST | $7,555.00 |
| GLICK, MARGARET M. | DIRECTOR PROGRAM MANAGEMENT SERVICES | $7,812.00 |
| VALENTINE, INGRID | SUPV. MANAGEMENT AND PROGRAM ANALYST | $8,550.00 |
| YAGER,ANN MARIE PEDERSEN | DIRECTOR,CORRESPONDENCE SERVICES UNIT | $8,903.00 |
| JORDAN, APRIL S. | SUPV PUBLIC AFFAIRS SPECIALIST | $9,253.00 |
| ENGLAND, SANDRA H. | DIR. ENTRPSE IT ARCH & STRTGC INFRA | $9,401.00 |
| MCGINNIS, COLLEEN M. | SENIOR ADVISOR | $9,444.00 |
| BROWN, MICHELE Y. | DIR., TECH. & BUSI SUPPORT SERV. GRP | $9,500.00 |
| CURRAN III, FRANK D. | SENIOR ADVISOR | $9,500.00 |
| PICKETT, VERONICA | PROGRAM MANAGER | $9,500.00 |
| SHULER, LAURA L. | SENIOR ADVISOR | $9,500.00 |
| ZELNIK, KATHLEEN C | DEPUTY CHIEF ENTERPRISE RISK OFFICER | $9,500.00 |
| BYRNE, DEBRA A. | DIRECTOR, CONF. & OUTREACH SERVICES | $9,545.00 |
| ABA, SAMUEL K. | SUPERVISORY IT SPECIALIST | $9,744.00 |
| GIAMBI, MELISSA J. | SENIOR ADVISOR | $9,908.00 |
| BROADUS, WANDA L. | IT PROGRAM MANAGER | $9,950.00 |
| WOODS, TERRENCE J. | SENIOR APPLICATION | $9,950.00 |
| REDDY, GANESH D. | DIR OF INFRASTRUCTURE OPER GROUP | $11,204.00 |
| O'BRIEN, MARIANNA | CHIEF OF STAFF | $12,500.00 |
| SCHMOKE JR, JULIAN M. | CHIEF ENFORCEMENT OFFICER | $15,000.00 |
| PATTERSON JR, CHARLES E. | SR. ADVISOR-EXECUTIVE LEVEL OUTREACH | $18,000.00 |
| APPEL, CHARLES J. | DIR POLICY LIAISON & IMPLEM STAFF | $20,000.00 |
| BUMGARNER, BRADLEY | SUPERVISORY CONTRACT SPECIALIST | $20,000.00 |
| CROWNER, QUASETTE RAMONDA | CHIEF ADMINISTRATION OFFICER | $20,000.00 |
| DEAN, MICHAEL S. | CHIEF ENTERPRISE RISK OFFICER | $20,000.00 |
| GOLDSTEIN, BARRY S. | CHIEF DATA OFFICER | $20,000.00 |
| LAVIA, MARK | EXECUTIVE DIRECTOR - SERVICING | $20,000.00 |
| SMITH, KATHLEEN A. | DEPUTY CHIEF OPERATING OFFICER | $20,000.00 |
| BRADFIELD, PATRICK A. | SUPV. CONTRACT SPECIALIST | $25,000.00 |
| FARE, JOHN J. | CHIEF PERFORMANCE MANAGEMENT OFFICER | $25,000.00 |
| MINOR, ROBIN S. | CHIEF COMPLIANCE OFFICER | $25,000.00 |
| GREENE, CHRISTOPHER B. | CHIEF CUSTOMER EXPERIENCE OFFICER | $30,000.00 |
| JOHNSON, ARTHUR WAYNE | CHIEF STRTGY & TRANS OFFICER | $35,000.00 |

# EXHIBIT 33

# U.S. DEPARTMENT OF EDUCATION

+ + + + +

## BORROWER DEFENSES AND FINANCIAL RESPONSIBILITY NEGOTIATED RULEMAKING COMMITTEE 2017-2018

+ + + + +

SESSION 1

+ + + + +

TUESDAY
NOVEMBER 14, 2017

+ + + + +

The Negotiated Rulemaking Committee met in Congressional II Room, The Holiday Inn Washington Capitol, 550 C Street, S.W., Washington, D.C., at 9:00 a.m., Ted Bantle, Moira Caruso and Rozmyn Miller, Facilitators, presiding.

PRESENT
TED BANTLE, Federal Mediation and Conciliation
      Service, Facilitator
MOIRA CARUSO, Federal Mediation and Conciliation
      Service, Facilitator
ROZMYN MILLER, Federal Mediation and Conciliation
      Service, Facilitator
BRYAN BLACK, Attorney
MICHAEL BOTTRILL, CFO and CEO, SAE Institute
      North America
KIMBERLY BROWN, Vice President, Enrollment
      Management and Student Affairs, Des Moines
      University
MIKE BUSADA, General Counsel and Vice President,
      Ayers Career College

      This transcript was produced from a recording provided by the Savan Group.

1    information.  And again, hopefully that will help

2    us to inform our process as we move forward.

3              MR. MANNING:  Good morning.  Let me

4    start by thanking you for your service on this

5    committee.  Participating in an intense and time

6    consuming process like negotiated rulemaking,

7    particularly on a topic as debated as this one,

8    takes commitment.

9              So thank you for working to ensure the

10   end result is a borrower defense rule that

11   protects students, safeguards the taxpayer's

12   interest and treats institutions fairly.  The

13   Department has had these same goals in mind as it

14   considers pending borrower defense claims and how

15   to administer the program in the short term until

16   new rules take effect.

17             Like all of you, Secretary DeVos views

18   borrower defense as one of the most important

19   issues facing the Department.  And she has taken

20   steps to make sure it gets the attention such an

21   important issue merits.

22             While her commitment to getting

1    borrower defense right is part of why you're here

2    today, the Secretary also remains focused on

3    working through pending claims.  Unfortunately,

4    she inherited a difficult situation, one where

5    there was inadequate infrastructure in place to

6    properly adjudicate claims.

7             I want to share with you briefly the

8    recent history of borrower defense, its current

9    status and where the Department is headed on

10   administering the program until new rules take

11   effect.  As you know, the borrower defense

12   regulations enacted in 2016 have been delayed and

13   so the Department has and will continue to

14   consider claims under the regulatory status quo

15   which assesses a claim under applicable state law

16   and commits to the Secretary's discretion how to

17   fashion relief.

18            During the tenure the previous

19   administration had approved and discharged

20   approximately 15,000 borrower defense claims, all

21   from former Corinthian students.  The Secretary

22   inherited roughly 65,000 borrower defense claims

1    when she assumed office.

2            Of those approximately 16,300 had been

3    approved in the waning days of the previous

4    administration but not yet discharged.  Most of

5    these approvals were from former Corinthian

6    students.

7            But slightly more than 2,800 were from

8    former American Career Institute students in

9    Massachusetts and 33 from former ITT students in

10   California.  Upon assuming my responsibilities on

11   January 20th I began an evaluation of the

12   Borrower Defense Program.

13           This review is complicated by a lack

14   of defined policies, protocols and procedures

15   established to handle the process and

16   additionally the lack of a proper SORN or a

17   database system that instead was 1,000

18   spreadsheets that had to be searched manually.

19           These claims were approved in haste

20   just before the inauguration and there was no

21   infrastructure in place to adjust them, as I just

22   said.  Given the budgetary implications to the

1       taxpayer and the impact on thousands of borrowers

2       and institutions it was necessary to conduct a

3       high level assessment of the program including

4       all these already approved claims.

5               Throughout the winter and early spring

6       a team consisting of both career and non-career

7       Department leadership evaluated the program and

8       worked to implement controls and procedures for

9       reviewing claims and processes for discharging

10      loans for successful claimants.

11              We examined the programs operational

12      and managerial structure within FSA and its

13      information systems and the legal and evidentiary

14      base for approving or denying claims.  We also

15      looked at business practices for claims intake,

16      review, adjudication and discharge.

17              Our review uncovered several areas of

18      concern which required building an infrastructure

19      to remain, to review claims and make programmatic

20      tweaks which in turn contributed to the time it

21      has taken to adjudicate additional claims.

22              In sum, this short term evaluation was

1    needed to ensure the administration of the

2    program was built on solid foundation that would

3    in the long term operate efficiently and

4    according to sound business practices and

5    processes.

6              In respect to the more than 16,000

7    approved claims, the Secretary couldn't have been

8    clearer when she said promises made to students

9    under the current rule will be promises kept.

10   These claims did merit a close review, but once

11   completed the Department began discharging claims

12   in late spring.

13             Most loans were discharged quickly but

14   a few more complex claims have taken longer.

15   Approximately 2,000 of these claims fell into the

16   complex category.

17             For example, the Department began

18   approving claims from FFEL and Perkins loan

19   borrowers.  However, the Department needed to

20   implement business processes and requirements in

21   order to consolidate those loans into direct

22   loans for discharge.

1              There were other scenarios where

2     borrowers with approved claims had multiple

3     outstanding loans, only some of which were

4     associated with their borrower defense claim.

5     This also made it an extended process.

6              FSA had to manually determine which of

7     these loans to discharge.  In other instances

8     some of the loans associated with the claim fully

9     or partially fell outside of the applicable

10    statute of limitations.

11             And so FSA had to identify and

12    separate out those loans so borrowers would not

13    get a discharge for loans ineligible for relief.

14    Of these complex claims all but a few hundred,

15    several hundred have been discharged or sent to

16    services for discharge.

17             Our internal saying about the program

18    is nothing in borrower defense is easy and these

19    claims certainly were not.  As a side note, the

20    Department has continued to accept borrower

21    defense applications from FFEL and Perkins

22    borrowers under existing statutory authority and

1    the HEA and a part of the 2016 borrower defense

2    rulemaking that was not delayed.

3         Applicants are given a preliminary

4    determination on their claim before consolidation

5    to allow them the option of not consolidating if

6    their claim is denied.  Moving forward, we have

7    approximately 95,000 pending claims of which

8    roughly 65 percent are from former Corinthian

9    students.

10        While I cannot give you a specific

11   date or number, I can tell you that approval of

12   some of these claims is imminent.  While it has

13   taken some time I am confident that the work done

14   to assess and make adjustments to the program

15   during the short term hiatus in adjudicating

16   claims will yield long term improvements and

17   efficiencies beneficial to all.

18        Even the most strident borrower

19   defense advocate would recognize that undoubtedly

20   some claims are going to be denied.  We have been

21   working carefully to ensure that any denial comes

22   only after a thorough review of the claim for its

1     potential applicability to an existing Department

2     finding and a full consideration of any evidence

3     provided in the application that would entitle

4     the borrower to relief.

5                I can tell you today that the

6     Department will soon begin issuing some denials.

7     The Department recognizes that many borrowers

8     have waited a long time to hear about the

9     disposition of their claims.

10                For example, we inherited hundreds of

11     claims that had been sat on for over a year and a

12     half, some of which are now, we're close to

13     adjudicating.  To mitigate the inconvenience for

14     how long it has taken to adjudicate claims

15     interest that accrues on loans for denied claims

16     will be forgiven starting one year after the

17     borrower defense application is filed.

18                The Department is also working to

19     adjudicate pending claims related to other

20     schools and we are making progress on that front.

21     However, I will admit that we're not as close as

22     we are with the Corinthian claims.

1          Unfortunately when we arrived in

2     January little to no work had been performed on

3     processes of adjudicating these claims, as I said

4     earlier.  Another challenge, which I understand

5     was raised yesterday has been the difficulty in

6     assessing how to apply individual state laws to

7     particular claims.

8          Once Corinthians adjudications begin

9     our work on other claims will gather momentum.  I

10    can promise you we are working day and night to

11    get these claims and I expect a consistent

12    downward trend in the number of pending claims

13    starting soon, very soon.

14          Long term I cannot express to you the

15    importance of your efforts here.  While we work

16    to adjudicate claims under the existing borrower

17    defense regulations we look forward to

18    implementing an improved upon regulation that you

19    begin considering this week.

20          I want to thank you again for your

21    service.  Thank you for your commitment to this

22    process and I look forward to following your

1    work.  Thank you so much.  Good luck.

2            MS. CARUSO:  Thank you.  I think his

3    mic is still on.  Thank you.  Okay, yes, so there

4    is a request to speak.  Please come forward.

5            MS. RAWLES:  How is that?  It's green

6    so I think I'm on.  Those are tough shoes and

7    words to follow there.  But I think what I have

8    to say is important this morning.

9            That was very professional and I thank

10   the Department for those comments.  My comments

11   are not unprofessional but they are also very

12   personal.

13           I had a lot of time to think about

14   this last night and this morning.  I've talked to

15   a lot of people on the Committee.  I think it's

16   fair to say that some of us or many of us wish

17   yesterday had gone a bit better.

18           But we're back today and in good faith

19   to hope that it does.  One of the things that

20   upset me on a personal note is the assumptions

21   that many of the negotiators have made about each

22   other before we got here.

# EXHIBIT 34

United States Department of Education
Borrower Defenses and Financial Responsibility
Negotiated Rulemaking Committee 2017-2018

Borrower's Defense Session 2
Monday
January 8, 2018
The Negotiated Rulemaking Committee met in the
Union Center Plaza (UCP) Learning Center, U.S.
Department of Education, 830 First Street, N.E.,
Washington, D.C., at 9:00 a.m., Ted Bantle, Moira
Caruso and Rozmyn Miller, Facilitators, presiding.

8

Proceedings

(9:00 a.m.)

Ms. Miller: Good morning, everybody. Welcome to Session 2 of Borrower Defense Negotiated Rulemaking. Welcome back to a lot of you.

So we're going to go ahead and get started. We have a few negotiators who are in transit and aren't here yet. But we're going to keep the process moving. We don't want to hold on too long and we'll catch them up once they get here.

Does that sound good? Okay. So before we begin I would like to turn it over to the Department to welcome us.

Welcome and Remarks

Mr. Manning: Good morning and welcome back and Happy New Year. I hope you all had a restful holiday and are ready to dive back into the important work of this committee.

In November I addressed you concerning the status of the pending borrower defense claims, the Department's efforts to reduce the backlog and the general plans for administering borrower defense until the new rule takes effect.

Since then you have undoubtedly heard of the Department's execution of the plans I previewed to you then. I am sure you have many questions about the Department's approach and as important stakeholders on this issue I felt it important to provide you with another update.

On December 20th after a careful review taking into account the interests of both borrowers and taxpayers, the Department announced it was resuming the approval process for borrower defense claims, particularly for those from former Corinthian students.

As we've noted, the Department has identified approximately 21,500 claims for approval or denial, 12,900 of which are approvals and 8,600 of which are denials.

9

As of today, we have notified approximately 657 borrowers of the approval of their claim and approximately 500 borrowers have been notified of the denial with several thousand in the pipeline to be acted on soon.

Of the 500 borrowers informed of their denial claims pending for less than a year, so the interest on the deduction process I described to you in November was not applicable because those 500 borrowers, as I said, were less than a year.

The Department will continue on a rolling basis as quickly as we can to notify those borrowers who have yet to hear from the Department about the resolution of their claim. The Department will also apply the already mentioned interest deduction to the denied claims that have been pending for greater than a year.

Our hope for claims moving forward is that borrowers will not need to take advantage of that offering because their claim should be dispensed with within a year's time. The Department will also continue to review the approximately 35,577 Corinthian claims that to date it has not adjudicated under the framework recently announced.

However, now that the Department has the right business process and a solid infrastructure in place we expect to move the existing claims steadily as well as any claims submitted by Corinthian borrowers in the future.

We've seen an approximate 36 percent reduction in the number of pending Corinthian claims as a result of our recent actions and the downward trend should continue. I thank the borrower defense unit at FSA for its hard work in continuing to process these claims.

Now I would like to address a few specifics to improve borrower defense discharge process. First, I'm happy to announce the Department has largely addressed the weaknesses in the existing borrower defense procedures identified in both the Department's own internal review as well as the recent report of the Inspector General.

While some in the press portrayed the IG report as critical of the current administration's handling of the program the truth is that

Secretary DeVos herself requested the IG review because of her concerns regarding the program she inherited.

She was particularly dismayed by the haphazard approach taken by the previous administration exacerbated by activity encouraging borrowers to flood the Department with claims without a proper infrastructure in place to manage them.

I thank the IG for its work and helpful recommendations. I also applaud the work of the Department staff, including those at FSA, to correct weaknesses identified in the IG's report related to improving documentation in the review process.

Establishing time frames for claims intake, review and discharge and shoring up other areas of the program. Next I want to turn off my phone and emphasize that the Department has not changed the existing approval criteria for Corinthian borrowers.

Let me repeat that again. The Department has not changed the existing approval process for Corinthian borrowers. Claims approved under the previous administration will be claims approved under this one.

While some may not agree with facets of our approach the Department has not instructed staff to review claims with extra scrutiny. I would also like to add that many of the claims now being denied were flagged for denial in the previous administration.

As the IG noted in its report, the previous administration had not set up a process to act on denials. We now have. Now I know I'm speaking to an audience that has already been educated on the approach the Department is taking regarding relief to borrowers.

So I'll proceed assuming you have some knowledge of the basics. I would like to make a few points regarding what we call the make whole relief approach.

First, the Secretary was simply not comfortable with an either all or nothing approach. So while the Department does not dispute its own finding regarding Corinthian's wrongful conduct it was skeptical of the prior conclusion that assumed all Corinthian students received nothing

of value from their education.

Given the Secretary's discretion to determine relief owed to borrowers we looked at an alternative approach. The Department engaged in the process you have likely read about which compared aggregate program level earnings data of Corinthian borrowers with peer groups from passing gainful employment programs.

I understand questions have arisen that Corinthian programs were not generally part of GE. That is true. But the Department obtained aggregate earnings data from cohorts of Corinthian borrowers grouped together in the same way as GE cohorts to ensure an apples to apples comparison on earnings data.

Our findings revealed that graduates from many of Corinthian's academic programs did in fact receive something of substantial value from their education. Groups of graduates from Corinthian programs in many instances performed even better than those well performing GE programs.

Given its responsibility to the taxpayer the Department simply could not ignore what the data revealed. And given the fact that borrowers by and large failed to provide any real evidence of harm it has proceeded based on what evidence it does have in its possession.

Likewise the Secretary believed a nothing approach also seemed unfair even for those attendees of Corinthian programs who are earning as much or more than graduates of GE passing programs.

Accordingly, we devised a relief methodology that recognizes that those with valid claims suffered some basic harm by virtue of the misrepresentations. That is why all borrowers with approved claims, even those in groups who earned more than their GE counterparts, will receive at least ten percent relief.

Moreover, within the broad parameters of our approach for relief the Department has made additional assumptions in favor of the borrower leading to awarding more relief. Let me provide some examples.

First, if a borrower had been enrolled in multiple academic programs we would assess relief using their program with the lowest earnings so

as to provide the borrower the greatest amount of relief.

Second, the Department calculated both Corinthian and GE earnings four possible ways using mean or median and weighted approaches and went with the results that provided the most relief for the borrowers in the program. Another, within our tiered relief system all borrower's relief is rounded up to the nearest tenth percentile point.

For example, the Corinthian borrower in a program who averaged earnings of 59 percent of the GE program average earnings could be entitled to only 41 percent relief using a purely one to one inverse relief methodology.

But under our approach that borrower is entitled to 50 percent relief. And as I've said, borrowers whose earnings exceed those of their GE counterparts will receive ten percent relief at least.

There are other examples where the Department made these types of decisions in favor of the borrower. But they begin to get extremely technical and you have a long day ahead of you so I will spare you some of the details now.

In sum, the relief approach outlined is fair to both borrowers and taxpayers and is the product of a data-driven approach that makes the most of a difficult and complex situation. The Department is also working to assess claims from schools other than Corinthian.

We have roughly 46,000 pending claims from non-Corinthian schools. And while we are working diligently to adjudicate those claims, I do not have any more specific information to share with you today.

On behalf of Secretary DeVos I want to thank you all again for the work on this committee. After the slow start last time I realized that there was a lot of thoughtful and fruitful discussion in your first meeting in November and I'm confident that will continue over the next week.

So again, on behalf of Secretary DeVos I want to thank you all again for your work on this committee. After the slow start we're looking forward to another thoughtful and fruitful discussion over the course of the next several days.

So thanks again for your work and your commitment to this very important effort. I look forward to following your progress. Thank you very much.

Mr. Bantle: Okay, thank you. And for those who I have not seen this morning, good morning. Next thing we want to do just as we do have people streaming in with various travel and weather delays, we want to go around the room.

This will also serve to make sure everyone's microphone works and just quickly if the negotiator who is sitting at the table could introduce him or herself and state if you are the primary or the alternate negotiator. So we'll start with Kelli.

Ms. Hudson Perry: Kelli Hudson Perry, primary negotiator for chief business officers.

Mr. McComis: Michale McComis, primary negotiator for the accreditation community of interest.

Mr. Bush: Stevaughn Bush, Howard School of Law, alternate negotiator for United Students Association.

Ms. Hall: Good morning. Wanda Hall, the primary for lenders and secondary markets on the FFEL side.

Ms. O'Connell: Jaye O'Connell, primary for guaranty agencies.

Mr. Busada: Mike Busada, primary for small private for-profit schools under 450 students.

Mr. Murray: Good morning. Lodriguez Murray, alternate for historically black colleges, universities, MSIs. My primary, Mr. Flanigan is not here this week so the alternate has to become the primary.

Ms. Shafroth: Abby Shafroth, primary for legal services organizations that represent students and borrowers.

Mr. Hubbard: Will Hubbard representing the military affiliated community.

Ms. Weisman: Annmarie Weisman representing the Department.

# EXHIBIT 39



PROUD SPONSOR *of*
*the* AMERICAN MIND®

Posted Date: November 25, 2019

Author: Federal Student Aid

Subject: Implementation of School Notice Requirements Under the 2016 Borrower Defense Regulations

On November 1, 2016, the Department published final regulations (the 2016 final regulations) governing the standard and process for evaluating borrower defense to repayment discharge claims. **81 FR 75926**. Those regulations, among other things, established processes for the consideration of borrower defense discharge applications. In particular, 34 CFR 685.222(e)(3)(i) and (f)(2) (iv), provide that we will notify the school associated with the borrower defense application of the claim filing, and give the school the opportunity to submit records or a response to the allegations contained within the application. These regulations govern borrower defense applications associated with loans that are first disbursed before July 1, 2020.

The purpose of this announcement is to alert schools that we will soon begin to send notices required under the 2016 final regulations. In particular, after we receive a borrower defense discharge application, we will send the school associated with the borrower's allegations a letter and a copy of the borrower's application and invite the school to respond and provide information relevant to the borrower's allegations within 30 days. Our letters will be sent to the school's active Postsecondary Education Participation System (PEPS) contacts (which typically include the Chief Executive Officer, Chief Financial Officer, and Financial Aid Administrator), and will provide instructions about how to respond.

*Future Changes to the School Notice Requirements Under the 2019 Borrower Defense Regulations*

On September 23, 2019, the Department published new final regulations to revise the standard and process for borrower defense applications. **84 FR 49788**. Those regulations, which apply to loans first disbursed on or after July 1, 2020, in part modify the 2016 final regulations concerning school notice and submission of evidence processes.  We will provide information on the implementation of these regulations before they become effective.

We thank schools for their continued support of the federal student aid programs.