**United States Senate**
**HEALTH, EDUCATION, LABOR AND PENSIONS COMMITTEE**

# For Profit Higher Education:
# The Failure to Safeguard the Federal Investment and Ensure Student Success



**Majority Committee Staff Report and Accompanying Minority Committee Staff Views**

**July 30, 2012**

# Contents

**Executive Summary** ......................................................................... **1**

**Introduction** ..................................................................................... **12**

**Institutions Examined** .................................................................... **20**

    Publicly Traded Companies ................................................................ 20

    Private Equity Owned Companies ..................................................... 22

    Closely Held Corporations ................................................................. 23

**The Federal Investment and the Changing Sector** ........................ **24**

    Increasing Federal Investment .......................................................... 24

    Increasing Reliance on Federal Dollars ........................................... 24

    Pell Grant Funds ............................................................................... 25

    Military Education Benefits ............................................................... 27

    Growth and Change in the For-Profit Sector .................................... 30

**Why Are Companies that Own For-Profit Colleges Financially Successful?** ............. **35**

    High Cost of Attendance ................................................................... 35

    Higher Tuition at For-Profit Colleges ............................................... 35

    Tuition Decisions Made To Maximize Revenue ............................... 37

    Executives' Recognition That Higher Tuition Leads to More Withdrawals ........................... 43

    Concealing the Cost of Tuition ......................................................... 44

    Aggressive and Deceptive Recruiting ............................................... 46

    Recruiters Operate in a Boiler-Room Sales Atmosphere .................. 49

    Misleading and Deceptive Tactics .................................................... 53

    Techniques to Close a Sale ............................................................... 59

    Military Focused Recruiting ............................................................. 68

**How Are Students Performing?** ..................................................... **72**

    Inadequate Public Data for Meaningful Oversight ........................... 72

    Low Student Retention ...................................................................... 73

    Worst Performing Programs .............................................................. 74

    Online Student Retention .................................................................. 75

    Publicly Traded Company Student Retention .................................... 77

    Heavy "Churn" .................................................................................. 77

    The Costs of Withdrawal ................................................................... 80

**Why Do Many Students Fail to Complete For-Profit Programs?** ................................. **81**

    Spending Choices of For-Profit Education Companies ...................... 81

    Marketing, Recruiting, and Profit ..................................................... 81

    Executive Compensation ................................................................... 84

    Instructional Spending ...................................................................... 86

Student Success is Divorced From Company Success ................................................. 88

Academic Quality .................................................................................................... 89

Part-time Faculty .................................................................................................... 94

Student Services ...................................................................................................... 95

Career Placement Services ...................................................................................... 98

Incentives for Career Services Staff ....................................................................... 100

Programmatic Accreditation and Licensure............................................................ 102

What Is Programmatic Accreditation...................................................................... 102

Students Are Not Informed About Programmatic Accreditation ............................ 103

A Case Study of Sanford-Brown's Disclosures for Popular Program Areas ........... 104

A Comparison of Multiple Schools' Disclosures for Two Smaller Degree Programs........... 109

Lower Licensing Exam Pass Rates ......................................................................... 110

Conclusion ............................................................................................................ 111

**What Are the Consequences for Students?** ...................................................... **112**

High Debt .............................................................................................................. 112

What Default Means for Students and Society........................................................ 118

Higher Unemployment .......................................................................................... 120

Credentials in Lower Demand Careers ................................................................... 121

**Why is This Happening?** .................................................................................. **122**

Accreditation ......................................................................................................... 122

Structural Defects in the Accrediting Process ........................................................ 123

Accreditors Are Not Equipped to Properly Regulate Large For-Profit Institutions .............. 125

Higher Learning Commission of the North Central Association of Colleges and Schools ... 126

Federal Law and Regulation .................................................................................. 132

Evasion of Regulatory Requirements...................................................................... 136

90/10 Strategies ..................................................................................................... 137

Student Loan Default Rate Management And Manipulation .................................... 150

Return of Title IV Funds ........................................................................................ 159

Job Placement Rate Manipulation.......................................................................... 160

**The Consequences of Inaction**........................................................................... **167**

**What Needs to Be Done?** .................................................................................. **169**

Enhanced Transparency .......................................................................................... 169

Stronger Oversight................................................................................................. 171

Meaningful Protections........................................................................................... 173

**Minority Committee Staff Views** ...................................................................... **177**

**Selected Appendices** ......................................................................................... **A3-1**

In accordance with Rule XXV of the Standing Rules of the Senate, the U.S. Senate Committee on Health, Education, Labor, and Pensions (the committee) holds legislative jurisdiction over all proposed legislation, messages, petitions, memorials, and other matters relating to education and student loans and grants.  Proprietary schools and institutions of higher education, henceforth referred to as for-profit colleges, fall under this jurisdiction both as academic institutions and as eligible recipients of Federal loans and grants provided through Title IV of the Higher Education Act.  Senate rules also provide that the committee shall study and review, on a comprehensive basis, matters relating to education.  In April 2010, under the leadership of Chairman Tom Harkin, the committee initiated an oversight investigation into the proprietary sector of higher education.  The majority staff offers this report to the committee with accompanying minority staff views.

# For-Profit Higher Education:

## The Failure to Safeguard the Federal Investment and Ensure Student Success

Between June 2010 and July 2012, Senate HELP Committee Chairman Tom Harkin conducted an in-depth oversight investigation focusing exclusively on the for-profit sector of higher education. The investigation was undertaken to better understand the enormous growth in both the number of students attending for-profit colleges and the Federal student aid investment that taxpayers are making in the colleges. This growth has occurred as for-profit colleges have increasingly been acquired or created by publicly traded companies and private equity firms that are closely tracked by analysts and by investors seeking quick returns. Unlike traditional non-profit and public colleges, virtually all of the revenues of for-profit colleges come directly from taxpayers, and significant portions of their expenses are dedicated to marketing and recruiting and to profit. The key findings of the investigation are summarized below.

# Executive Summary:

- A 2-year investigation by the Senate Committee on Health, Education, Labor, and Pensions demonstrated that Federal taxpayers are investing billions of dollars a year, $32 billion in the most recent year, in companies that operate for-profit colleges. Yet, more than half of the students who enrolled in in those colleges in 2008-9 left without a degree or diploma within a median of 4 months.

- For-profit colleges are owned and operated by businesses. Like any business, they are ultimately accountable by law for the returns they produce for shareholders. While small independent for-profit colleges have a long history, by 2009, at least 76 percent of students attending for-profit colleges were enrolled in a college owned by either a company traded on a major stock exchange or a college owned by a private equity firm. The financial performance of these companies is closely tracked by analysts and by investors.

- Congress has failed to counterbalance investor demands for increased financial returns with requirements that hold companies accountable to taxpayers for providing quality education, support, and outcomes. Federal law and regulations currently do not align the incentives of for-profit colleges so that the colleges succeed financially when students succeed.

- For-profit colleges have an important role to play in higher education. The existing capacity of non-profit and public higher education is insufficient to satisfy the growing demand for higher education, particularly in an era of drastic cutbacks in State funding for higher education. Meanwhile, there has been an enormous growth in non-traditional students—those who either delayed college, attend part-time or work full-time while enrolled, are independent of their parents, or have dependents other than a spouse. This trend has created a "new American majority" of non-traditional students.

- In theory, for-profit colleges should be well-equipped to meet the needs of non-traditional students. They offer the convenience of nearby campus and online locations, a structured approach to coursework and the flexibility to stop and start classes quickly and easily. These innovations have made attending college a viable option for many working adults, and have proven successful for hundreds of thousands of people who might not otherwise have obtained degrees.

- But for-profit colleges also ask students with modest financial resources to take a big risk by enrolling in high-tuition schools. As a result of high tuition, students must take on significant student loan debt to attend school. When students withdraw, as hundreds of thousands do each year, they are left with high monthly payments but without a commensurate increase in earning power from new training and skills.

- Many for-profit colleges fail to make the necessary investments in student support services that have been shown to help students succeed in school and afterwards, a deficiency that undoubt-

edly contributes to high withdrawal rates. In 2010, the for-profit colleges examined employed 35,202 recruiters compared with 3,512 career services staff and 12,452 support services staff, more than two and a half recruiters for each support services employee.

- This may help to explain why more than half a million students who enrolled in 2008-9 left without a degree or Certificate by mid-2010. Among 2-year Associate degree-seekers, 63 percent of students departed without a degree.

- The vast majority of the students left with student loan debt that may follow them throughout their lives, and can create a financial burden that is extremely difficult, and sometimes impossible, to escape.

- During the same period, the companies examined spent $4.2 billion on marketing and recruiting, or 22.7 percent of all revenue. Publicly traded companies operating for-profit colleges had an average profit margin of 19.7 percent, generated a total of $3.2 billion in pre-tax profit and paid an average of $7.3 million to their chief executive officers in 2009.

- In the absence of significant reforms that align the incentives of for-profit colleges to ensure colleges succeed financially only when students also succeed, and ensure that taxpayer dollars are used to further the educational mission of the colleges, the sector will continue to turn out hundreds of thousands of students with debt but no degree, and taxpayers will see little return on their investment.

### *The Federal Investment and the Changing Sector*

- In the 1990s, two-thirds of for-profit colleges enrolled students in training programs lasting less than 1 year. The sector was primarily composed of small trade schools that awarded Certificates and diplomas in fields like air-conditioning repair, cosmetology, and truck driving. While Certificate and diploma offerings have continued to grow, growth in degree programs has been more significant. Between 2004 and 2010, the number of Associate degrees awarded by for-profit colleges increased 77 percent and the number of Bachelor's degrees awarded increased 136 percent.

- For profit colleges are rapidly increasing their reliance on taxpayer dollars. In 2009-10, the sector received $32 billion, 25 percent of the total Department of Education student aid program funds.

- Pell grants flowing to for-profit colleges increased at twice the rate of the program as a whole, increasing from $1.1 billion in the 2000-1 school year to $7.5 billion in the 2009-10 school year.

- Among the companies examined by the committee, the share of revenues received from Department of Education Federal student aid programs increased more than 10 percent, from 68.7 in 2006 to 79.2 percent in 2010.

- Committee staff estimates that in 2009 when all sources of Federal taxpayer funds, including military and veterans' benefits, are included, the 15 publicly traded for-profit education companies received 86 percent of revenues from taxpayers.

- For-profit colleges also receive the largest share of military educational benefit programs: 37 percent of post-9/11 GI bill benefits and 50 percent of Department of Defense Tuition Assistance benefits flowed to for-profit colleges in the most recent period. Because of the cost of the programs however, they trained far fewer students than public colleges. Eight of the top 10 recipients of Department of Veterans Affairs post-9/11 GI bill funds are for-profit education companies.

### *Why Are Companies that Own For-Profit Colleges Financially Successful*

*High Cost of Programs:*

- Most for-profit colleges charge higher tuition than comparable programs at community colleges and flagship State public universities.

  o Bachelor's degree programs averaged 20 percent more than the cost of analogous programs at flagship public universities.

  o Associate degree programs averaged four times the cost of degree programs at comparable community colleges.

  o Certificate programs similarly averaged four and a half times the cost of such programs at comparable community colleges.

- The for-profit education companies examined rarely set tuition below available Federal student aid.

- Internal company documents provide examples of tuition increases being implemented to satisfy company profit goals, that have little connection to increases in academic and instruction expenses, and demonstrate that for-profit education companies sometimes train employees to evade directly answering student questions about the cost of tuition and fees.

*Aggressive and Sometimes Misleading and Deceptive Recruiting Practices:*

- Documents indicate that the recruiting process at for-profit education companies is essentially a sales process. Investors' demand for revenue growth is satisfied by enrolling a steady stream of new student enrollees or "starts." During the period examined, at many companies the performance of each person in the admissions chain, from CEO to newly-hired junior recruiters, was rated at least in part based on the number of students enrolled.

- The committee found that the 30 for-profit education companies examined employed 35,202 recruiters, or about one recruiter for every 53 students attending a for-profit college in 2010.

- Documents demonstrate that in order to achieve company enrollment goals, recruiting managers at some companies created a boiler-room atmosphere, in which hitting an enrollment quota was the recruiters' highest priority. Recruiters who failed to bring in enough students were put through disciplinary processes and sometimes terminated.  Before a ban on incentive compensation was re-instituted in mid-2011, recruiters' salaries at many for-profit colleges were tightly tied to enrolling a certain number of new students.

- Internal documents, interviews with former employees, and Government Accountability Office (GAO) undercover recordings demonstrate that many companies used tactics that misled prospective students with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, or the reputation and accreditation of the school.

- For-profit colleges seek to enroll a population of non-traditional prospective students who are often not familiar with traditional higher education and may be facing difficult circumstances in their lives. Recruiting materials indicate that at some for-profit colleges, admission representatives were trained to locate and push on the pain in students' lives. They were also trained to "overcome objections" of prospective students in order to secure enrollments. Additionally, companies trained recruiters to create a false sense of urgency to enroll and inflate the prestige of the college.

- For-profit colleges gather contact information of prospective students, or "leads," by paying third-party companies known as "lead generators" that specialize in gathering and selling the information. Among the 62 lead generators used by companies analyzed, the cost per lead ranged between $10 and $150. Lead generators advertise themselves as a free, safe, and reliable way to get information about college, but lead generator Web sites generally direct students only to schools and programs that pay them, and have a history of engaging in online marketing using aggressive and misleading methods.

- Servicemembers, veterans, spouses, and family members have become highly attractive prospects to for-profit colleges, and many schools have put significant resources into recruiting and enrolling students eligible for these benefits.

  o Lead generation Web sites, specifically designed to attract members of the military and veterans, use layouts and logos similar to official military websites, but do not inform users that the purpose of the site is to collect contact information on behalf of the site's for-profit college clients.

  o Internal documents show that some schools' pursuit of military benefits led them to recruit

from the most vulnerable military populations, sometimes recruiting at wounded warrior centers and veterans hospitals.

o  In addition to aggressively seeking military personnel, the investigation showed that some recruiters misled or lied to service members as to whether their tuition would be fully covered by military benefits.

*How Are Students Performing*

Because a large proportion of students attending for-profit colleges are not first time, full-time students, and therefore fall outside the Department of Education's tracking of student outcomes, it is difficult to understand how many students are succeeding at for-profit colleges and in what types of degree programs. To fill the information gap, committee staff analyzed retention and withdrawal information for a cohort of students enrolling between 2008-9 and found that:

• 596,556 students who enrolled in 2008-9, or 54 percent, left without a degree or Certificate by mid-2010.

• 298,476 students who enrolled in 2-year Associate degree programs in 2008-9, or 63 percent, departed without a degree. Nine companies had Associate degree programs with withdrawal rates over 60 percent.

• Online: Among companies that provided data that enabled committee staff to compare students attending online and on-campus, students attending online withdrew at much higher rates. Sixty-four percent of students attending online programs left without a degree compared to 46 percent of students attending campus-based programs offered by the same companies.

• Publicly Traded: Colleges owned by a company that is traded on a major stock exchange had 2008-9 student withdrawal rates 9 percent higher than the privately held companies examined. Among the 15 publicly traded companies, 55 percent of students departed without a degree. Among the 15 privately held companies examined, 46 percent of students departed without a degree.

*Why Do Many Students Fail to Complete For-Profit Programs*

*Spending Choices of For-Profit Education Companies:*

• For-profit colleges devote tremendous amounts of resources to non-education related spending including marketing, recruiting, profit and executive compensation, while spending relatively small amounts on instruction. In fiscal year 2009, the education companies examined by the committee spent:

o $4.2 billion or 22.7 percent of all revenue on marketing, advertising, recruiting, and admissions staffing.

o $3.6 billion or 19.4 percent of all revenue on pre-tax profit.

o $3.2 billion, or 17.2 percent of all revenue on instruction.

o This means that the companies together devoted less to actual instruction costs (faculty and curriculum) than to either marketing and recruiting or profit.

o Additionally, the CEOs of the publicly traded, for-profit education companies took home, on average, $7.3 million in 2009. In contrast, the five highest paid leaders of large public universities averaged compensation of $1 million, while the five highest paid leaders at non-profit colleges and universities averaged $3 million.

*Academic Quality:*

• Undercover observation by the GAO and student complaints reveal that some for-profit schools have curricula that do not challenge students and academic integrity policies that are sometimes not enforced.

• The use of part-time faculty is a key component of the efficiencies the for-profit model can deliver, but it must be balanced with ensuring that the faculty is able to exercise genuine academic independence and has a vested stake in the quality of the institution. The investigation found that in 2010, 80 percent of the faculty employed at the schools examined was part-time. Ten companies had more than 80 percent part-time faculty and five companies had more than 90 percent part-time faculty.

*Student Services:*

• The investigation found that while for-profit colleges make large investments in staff to recruit new students, once a student is enrolled that same level of service is often not available. This is true even though the companies seek to enroll the students that research demonstrates are most critically in need of those services. As Dr. Arnold Mitchem, president of the Council for Opportunity in Education told the committee: "First of all, we all need to understand there's a radical difference in educating and graduating a low-income first-generation student than there is a middle-income student … [In] the for-profit sector they address the financial barriers, but they have not adequately addressed the supportive services barriers."

• While the investigation demonstrated a wide variety among for-profit colleges in the commitment to student services staffing and to the student services provided, overall the companies

examined employed almost three times as many recruiters as student service representatives.

*Career Placement Services:*

- The disparity in staffing is more acute when it comes to career services staff. The committee staff analysis indicates that for-profit colleges employ about 10 recruiters for every career services staff member. Despite advertising that attending the school is a pathway to a better job or career, two of the largest for-profit colleges have no career services staff to help students.

- Testimony and internal documents indicate that at some for-profit colleges career services staff are often more focused on meeting placement quotas required by some accreditors than actually helping students achieve quality jobs in the field of their degree or Certificate.

*Programmatic Accreditation and Licensure:*

- Some for-profit colleges train students in fields that require programmatic accreditation, in addition to institutional accreditation, in order for graduates to obtain employment in the field. Institutions that offer programs that lack programmatic accreditation are inconsistent in how they disclose this lack of programmatic accreditation. While some programs are upfront about this issue, others post the disclosure deep in their Web sites or in the fine print in their enrollment agreements, while framing the disclosure in terms that makes it difficult for students to recognize the gravity of this issue.

<u>What Are the Consequences for Students</u>

- Ninety-six percent of for-profit students take out student loans, according to the most recent U.S. Department of Education data.  In comparison, 13 percent of students at community colleges, 48 percent at 4-year public, and 57 percent at 4-year private non-profit colleges borrow money to pay for school.

- For-profit schools enroll far more high-dollar borrowers. Fifty-seven percent of Bachelor's students who graduate from a for-profit college owe $30,000 or more. In contrast, 25 percent of those who earned degrees in the private, non-profit sector and 12 percent from the public sector borrowed at this level.

- Because many students who attend for-profit colleges are unable to get financing through private lending companies, many participate in institutional loan programs operated by for-profit education companies. The committee staff found that institutional loans operated by for-profit education companies often carry high interest rates, and do not provide students with the same safeguards as Federal loans.

- In 2009 seven large for-profit education companies offered institutional loans with interest rates ranging from 11.2 to 18 percent. During this period the Stafford loan rate was 5.6 percent. These

same companies listed expected default rates of 42 to 80 percent.

- Students who attended a for-profit college accounted for 47 percent of all Federal student loan defaults. More than 1 in 5 students enrolling in a for-profit college—22 percent—default within 3 years of entering repayment on their student loans.

- Default rates are driven by students who drop out, those who are left with debt but little means to repay it given the incomplete education and lack of a degree. Students' ability to repay their loans is tightly tied to whether the student stayed in school and achieved a degree.

- Students who attend for-profit schools are more likely to experience unemployment after leaving school. According to a National Center for Education Statistics study, 23 percent of students who attended for-profit schools in 2008-9 were unemployed and seeking work.

*Why is This Happening*

- Accreditation: The self-reporting and peer-review nature of the accreditation process exposes it to manipulation by companies that are more concerned with their bottom line than with academic quality and improvement. Accrediting agencies seek to help colleges improve. Because of this institutional focus on continuous improvement, they sometimes appear to have difficulty drawing and enforcing bright lines and minimum standards.

- State Oversight: State oversight of for-profit education companies has eroded over time due to a variety of factors, including State budget cuts and the influence of the for-profit college industry with State policymakers. The U.S. Department of Education had never defined minimum requirements for State authorization, and many States have taken a passive or minimal role in approving institutions, reviewing and addressing complaints from students and the public, and ensuring that colleges are in compliance with State consumer protection laws.

- Federal Law and Regulation: Federal regulations impose two key checks on for-profit colleges: the proportion of Federal money that the colleges collect, known as the 90/10 rule, and the percentage of students who may default on Federal student loans before the college loses eligibility for Federal financial aid. In addition, some accreditors also require colleges to meet standards regarding the percentage of graduates who obtain employment in their field of study. Some for-profit colleges employ questionable tactics to meet these requirements.

- The investigation documented the use of multiple strategies to comply with the letter of the 90/10 rule with policies that defy the goal and spirit of the regulation.

  o Since for-profit colleges report 90/10 figures by Office of Postsecondary Education ID (OPEID) numbers, instead of by campus, and one OPEID may contain multiple cam-

puses, some companies consolidate and switch campuses between OPEIDs to lower their reported 90/10 number regardless of the proximity of the campus.

o Some for-profit colleges have stopped the flow of student aid funds to certain OPEIDs at the end of the fiscal year. This tactic may hurt students because campuses that do not receive student aid funds may not disburse, in a timely manner, living-expense checks to students who depend on those funds to pay for books, housing, food, transportation, and childcare.

o Some schools have raised their initial enrollment fee—which must be paid in cash—or insisted on cash payments from students in order to lower their reported 90/10 ratio. While asking students to make up-front payments on their education can be a good idea because it is interest-free and also helps them to understand what it will be like to make payments on their loans later, it seems that some for-profit schools are primarily seeking to drive down their 90/10 ratios with these cash payments.

o Department of Education regulations dictate that scholarships awarded to a student do not count as Federal financial aid and instead count on the "10" side of the 90/10 calculation, but only if the scholarships are awarded by an organization independent of the school. Several companies that operate for-profit colleges have designed scholarship programs that should be more closely scrutinized.

o Some schools increase tuition in order to create a gap between the total amount of Federal aid a student can receive and the cost of attending. This illustrates the fundamental problem with the cost of for-profit schools—that the tuition fees and other academic charges bear no relationship to the cost of providing the education. This gap means that students attending these schools must find even more financing by taking out private loans, taking on more debt through a private or institutional loan, or making monthly cash payments, often by credit card, directly to the school to pay for the artificially high cost of the school. The student is left with more debt, likely at a higher rate of interest, so the school can generate sufficient non-Federal income.

o Because neither Department of Defense (DOD) nor Veterans Affairs (VA) educational benefits originate in Title IV of the Higher Education Act, money received through these programs is not counted as Federal financial aid for the purposes of 90/10. This loophole creates an incentive to see servicemembers as nothing more than "dollar signs in uniform."

• Many for-profit education companies also commit significant resources to default management efforts that keep students out of default for the duration of the 2-year (soon 3-year) monitoring window. Default management may involve a multitude of strategies premised on sound goals, such as enrolling students who are likely to graduate and succeed, giving those students the support and tools they need to learn and secure a degree that is valued in the job marketplace, helping them secure a well-paying job, and offering financial literacy classes and quality debt counseling. However, internal documents show that at some schools the emphasis is on signing

students up for forbearance and deferment with the sole goal of protecting the colleges so that they do not lose access to Federal taxpayer-funded student aid dollars.

    o   Evidence suggests that some for-profit colleges use forbearance and deferment as tools to move the school's default rate, without concern for a students' particular situation or whether it is in the best financial interest of the individual. Many students will end up paying more over the life of their loan after a forbearance or deferment.

    o   As default rates have increasingly become a problem for for-profit colleges, many have turned for help to third party vendors that operate call centers with hundreds of employees trained to "cure" student defaults. While the vendor used by at least 12 of the 30 companies examined counsels delinquent students on all repayment options, including income-based repayment options, internal documents demonstrate that the majority of students approached by the vendor end up in forbearance, leading to increased debt. Documents obtained from four large for-profit education companies demonstrate that, on average, over 75 percent of the students "cured" were forbearances or deferments, while only 24 percent were the result of a student making payments on their loans.

- For-profit colleges market themselves as career focused, and encourage students to enroll by offering the prospect of better jobs and better wages. Accordingly, for-profit colleges use job placement data to promote their programs, and to satisfy national accrediting agencies and State regulators that the students who complete the programs are finding jobs in their field. However, when job placement rates are audited by outside agencies, problems have repeatedly been found, and a number of law enforcement investigations over the past 5 years have revealed falsified information in the placement rates of some colleges.

- Rapid enrollment growth and lack of adequate policies and procedures have also led to situations in which for-profit colleges have improperly retained unearned title IV student aid funds that should have been returned to the Department of Education, or are not returning the funds in a timely matter.

### *What Needs to Be Done*

- Enhance transparency by collecting relevant and accurate information about student outcomes.

    o   Require that the Department of Education collect comprehensive student outcome information and enable data retrieval by corporate ownership;

    o   Establish a uniform and accurate methodology for calculating job placement rates;

    o   Increase the regulation of private lending.

- Strengthen the oversight of Federal financial aid.

  o Tie access to Federal financial aid to meeting minimum student outcome thresholds;

  o Prohibit institutions from funding marketing, advertising and recruiting activities with Federal financial aid dollars;

  o Improve cohort default rate tracking by expanding the default reporting rate period beyond 3 years;

  o Require that for-profit colleges receive at least 15 percent of revenues from sources other than Federal funds;

  o Use criteria beyond accreditation and State authorization for determining institutions' access to Federal financial aid.

- Create meaningful protections for students.

  o Create an online student complaint clearinghouse, managed by the Department of Education, for the collection and referral of student complaints to appropriate overseeing agencies, organizations and divisions;

  o Prohibit institutions that accept Federal financial aid from including mandatory binding arbitration clauses in enrollment agreements;

  o Enforce minimum standards for student services that include tutoring, remediation, financial aid, and career counseling and job placement;

  o Extend the ban on incentive compensation to include all employees of institutions of higher education, and clarify that this ban extends to numeric threshold or quota-based termination policies.

# Introduction

American taxpayers invest billions of dollars each year in loans and grants to help people go to college. We do this because, over the past 50 years, achieving a college degree has been, and remains, the best way to ensure that an American student will have secure earning power that increases over time. Attaining skilled training or a college degree has become even more important as manufacturing jobs, which traditionally provided middle-class wages, have become more scarce. Helping Americans pay for college has been good for taxpayers as well, not simply because of the societal goods of an informed and educated citizenry, but also because the vast majority of Americans repay student loans in a timely way at reasonable interest rates, ensuring that the investment is sound.

However, over the past 10 years the United States has lost the place it once held as the world's preeminent provider of higher education. Once first in the world in percentage of people with a college degree, the United States now ranks 11th. At the same time, demand for higher education has outpaced the ability of the existing network of public and non-profit colleges to provide sufficient capacity. This is particularly true with regard to the community college system's ability to meet growing demand among non-traditional students, many of whom have entered the workforce only to discover the limits of their earning power in the absence of some higher education.

Over a decade ago, the Federal Government's National Center for Education Statistics reported that non-traditional students (those who had either delayed college, were attending part-time or working full-time while enrolled, were independent of their parents, or had dependents other than a spouse) made up 73 percent of the undergraduate college population. The enormous growth in the older adult student population over the last half century, which is projected to continue, have shifted the demographic profile of colleges and created a "new American majority" of non-traditional students on campuses across the country.

For many policymakers, for-profit colleges and the flexibility that they offer appeared to be an ideal solution to the problem of unmet demand for non-traditional students. The sector's rapid move to online education and the virtually unlimited capacity to add new students made the for-profit model appear even more promising. For-profit colleges work to cater to non-traditional students, offering flexibility by providing the convenient class locations and schedules, and the ability to stop and start coursework, that make attending college a viable option for working adults. At many schools, coursework is highly structured, meaning students progress from one class to the next without having to consider which elective to take or worrying about fulfilling credit requirements in various disciplines. This model, essentially pioneered by John Sperling and the University of Phoenix, has proven successful for hundreds of thousands of people who might not otherwise have obtained degrees. The University of Phoenix recently graduated its 700,000th student since its founding in 1976. In 2010, the for-profit sector as a whole awarded approximately 450,000 certificates and 260,000 2- and 4-year degrees, many to students who might not otherwise have obtained any higher education.

For-profit colleges are more nimble than most traditional colleges, including community colleges, in developing and implementing programs. When those programs respond to workforce needs and result in jobs in high demand fields that pay good salaries, the outcome for students can be excellent.

Thus, for many policy experts, the for-profit college sector was potentially not only the solution to unmet demand for higher education, it also appeared to be succeeding in breaking down many of the barriers to college for low-income and minority students who did not always find a structure that met their needs at traditional institutions of higher education. For the past decade, swayed in part by good marketing by the sector, opinion leaders have held out hope that large scale for-profit colleges were transforming higher education for historically underserved students.

A 2-year investigation of the for-profit sector by the Senate Committee on Health, Education, Labor, and Pensions has demonstrated that, while the for-profit college sector still offers the potential to be a transformative force in higher education, the sector as it stands today often fails to deliver the returns that higher education has traditionally provided to both students and taxpayers. The investigation, which took an in-depth look at 30 for-profit education companies between 2006 and 2010, found that far too many Americans who enroll in for-profit colleges are not realizing the benefits that higher education has traditionally offered. Over a span of 2 years, the committee has held six hearings to explore the growth, problems, and potential solutions in for-profit higher education. Committee staff interviewed dozens of current and former employees of for-profit colleges, more than 50 current and former students, and a variety of experts in higher education. As part of the investigation, the committee asked 30 companies that operated colleges to provide extensive data and documents regarding their operations between 2006 and 2010. The committee also analyzed data provided by the Department of Education, Department of Defense, and Department of Veterans Affairs as well as investor reports and information filed with the Securities and Exchange Commission.

This was not the first time that Congress had undertaken such an oversight effort.  Between 1989 and 1992, the Senate Permanent Subcommittee on Investigations (PSI), under the leadership of then-Chairman Sam Nunn and then-Ranking Member William Roth, Jr., conducted a similar investigation. The PSI investigation found that many students attending the proprietary schools of that time received little or no training, leaving them with "no job and a large bill to repay."  In 1983, students attending for-profit schools made up 22 percent of students who borrowed Federal loans, but 44 percent of defaulters.  PSI's oversight led to major legislative reforms of the Federal student loan program in the Higher Education Act Authorization of 1992.  However, many of those same reforms have been eroded or repealed over the past two decades.  While defaults in the sector dropped following enactment of the 1992 reforms, by 2011 once again, for-profit college students comprised 13 percent of student borrowers but 47 percent of defaulters. Moreover, the combination of investments made by investors seeking quick returns, exponential enrollment increases, new distance-education models, and weakening of regulations has rendered the sector almost unrecognizable in scope and impact when compared to the late 1980s.

For-profit colleges are those owned and operated by businesses. As with other businesses, they are ultimately accountable by law for the returns they produce for shareholders. For many years, the number of shareholders was small because for-profit colleges were, for the most part, privately held companies with a single location or program. But starting about 15 years ago, Wall Street investors recognized the potential for high profits and low risk and moved aggressively to purchase and invest in for-profit colleges. By 2009, at least 76 percent of students attending for-profit colleges were enrolled in a college owned by either a company that is traded on a major stock exchange or a college that is owned by a private equity firm. The investigation found that while certainly not all for-profit colleges are run by investors looking to make a

quick return on investment, too many of them are. It also found that even those for-profit colleges that are committed to the educational mission, that invest in their students and in robust support services, and that offer programs in high demand fields, still engage in troubling practices in order to achieve the levels of profitability and growth that keep them competitive with less scrupulous players.

Though there is wide variation among the companies' student outcomes, many of the most serious problems were found across the sector. The committee staff analysis found that most programs at for-profit colleges cost far more than similar programs at near-by public schools, and that almost all students who enroll in for-profit colleges borrow a significant amount of money to pay tuition. To enroll students, all companies rely on relentless marketing and advertising, and many also use tactics that an average person would find misleading and deceptive. The overall result is poor student outcomes. The investigation found that most students do not graduate. Of the almost 1.1 million Americans who enrolled in schools owned by the 30 companies examined between 2008 and 2009, over half (596,556) had withdrawn by mid-2010. They are left with student loan debt but without the benefits of a college degree or certificate.

Hundreds of thousands of students, particularly those with some prior experience with higher education, are completing degrees at for-profit colleges each year and some are securing better jobs and improving lifetime earnings potential. But the investigation has demonstrated extremely high drop-out rates among the large for-profit colleges that call into question whether the current regulatory structure is doing enough to ensure that the investment of taxpayer dollars, $32 billion in 2009-10, is being safeguarded.

While quality at for-profit colleges varies among institutions, some students encounter poor quality education. Across the board, comparatively little money is spent on instruction, but those cost savings are not passed on to students in the form of lower tuition. Often, only scant student services such as tutoring, counseling, and job placement are available, or those services that are available are not helpful for students. This is true even though the colleges tout the fact that they enroll higher-risk students who, research demonstrates, are most in need of these services in order to succeed. Meanwhile, some companies engage in efforts to manipulate or evade the few regulatory requirements that govern the sector.

While some for-profit colleges have dramatically higher retention, particularly in non-degree Certificate programs, the volume of students who enroll but soon withdraw calls into question the investment that American taxpayers are making in the colleges. Low retention and sparse student services are problems found at community colleges across the country as well. However, the investments in the for-profit sector from both Federal taxpayer funds and students' resources is far greater compared with the community college sector.[1]

The investigation yielded plenty of examples of good practices including for-profit colleges offering low tuition, offering degrees in fields with high job demand and good wages, offering robust student

---

[1] For-profit executives frequently point to the fact that community colleges and other public universities receive large subsidies from State and local governments without necessarily producing better student outcomes. While this is true, were community colleges or other public universities to find themselves with 15 to 38 percent annual surpluses (the profit range of publicly traded for-profit companies) they would likely reinvest in better services and student success. Additionally, community colleges in particular have a broader educational mandate that accompanies the subsidies that does not allow them to focus solely on career and workforce based programs.

services, implementing risk-free trial programs, offering remedial classes, as well as making a fair profit for shareholders. Some of these colleges are also committed to crafting and following a regulatory regime that works better for students, taxpayers, and colleges. However, in the absence of a strong sector-wide regulatory regime, even for-profit colleges with good practices must compete with lower quality operators who sacrifice student outcomes in the pursuit of large enrollment growth and large profit margins.

American taxpayers are the single biggest investor in for-profit colleges, yet the government that holds their trust has little ability to ensure that they get the return on investment they deserve: educational and career success for the students who enroll. If for-profit colleges are going to deliver on the promise of a path to the middle class and to job security for students who might not have otherwise succeeded in higher education, Congress must put in place a much more rigorous regulatory structure that incentivizes the sector to make the financial investments necessary to result in higher student success.

The for-profit sector has been transformed over the past 10 years. Where once for-profit schools mostly offered short-term job-specific Certificate programs, they have moved aggressively into Associate and Bachelor's degree programs. In conjunction with the ascension of for-profit colleges as stars of Wall Street came the move towards exclusively online programs. Statutory changes in 2006 allowed colleges to offer exclusively online programs and at least 6 for-profit colleges, including four publicly traded companies, now operate almost exclusively online.

These shifts set the stage for tremendous enrollment and revenue growth in the sector. Between 1998 and 2008, enrollment at for-profit colleges increased 225 percent, compared to 31 percent growth in higher education generally. Depending on the measurement used, between 10 and 13 percent of all college students, approximately 2.4 million students, attend a for-profit college. Along with this growth in enrollment, the amount of Federal student aid dollars that taxpayers provide to these companies each year has increased dramatically. In the 2009–10 academic year, $32 billion in Education Department grants and loansswere paid to for-profit colleges. Ten years ago, that figure was about $5 billion. For-profit colleges now collect almost 25 percent of total Federal student aid money (up from 12.2 percent in 2001), over a third of GI bill education benefits to veterans, and half of all active duty servicemember tuition assistance dollars.

By 2009 and early 2010, more and more students were coming forward to report being pressured or duped into enrolling in a for-profit college and taking out loans to pay for a degree that would not help them find a job. Stories appeared in the media telling of colleges' profiting while their students left school without degrees and/or with high debt and little chance of getting the job they were promised due to deficiencies in their education. Moreover, statistics indicated that many companies were engaging in widespread efforts to manipulate or evade the few regulatory requirements that govern the sector. It was against this backdrop that the HELP Committee initiated an oversight investigation into how Federal money is being spent by for-profit education companies.

The investigation found a wide range of problems that run deep within the for-profit sector:

*High tuition*. The high tuition that for-profit colleges charge is not aligned with the cost of the

services they provide; rather, tuition is set to maximize revenue. Students attending for-profit colleges are charged, on average, far higher tuition than they would pay at public colleges for the same program of study. A student attending a for-profit college seeking an Associate degree faces an average tuition of almost $35,000, over four times higher than the same program at a public college in the same geographical area. A 4-year Bachelor's degree costs, on average just under, $63,000, 20 percent more than the price of the same program at nearby public colleges. Moreover, it is often difficult for prospective students researching for-profit schools to determine the actual price of tuition. Despite recent regulations requiring tuition disclosures, promotional materials and admissions recruiters often obscure the overall cost, making it difficult for prospective students to determine how much they will pay.

*Aggressive and misleading recruiting*. Because continual enrollment growth is so critical to their business success, most for-profit colleges' first priority is to enroll as many students as possible. Unlike traditional colleges, for-profit colleges employ a huge number of recruiters, paid salespeople who spend much of their time on the phone calling potential students. For-profit colleges often purchase contact information for potential new students, known as "leads," from other online marketers who attract students to their Web sites with advertisements offering quick and easy education. Recruiters' job security depends on meeting a quota of new enrollments. And, before new regulations went into effect in 2011 prohibiting the practice, recruiters' salaries depended on meeting them too. The boiler-room atmosphere leads to a lax ethical environment, with little room for considering whether a particular student is a good fit for the college or whether attending the college is in that person's best interest.

Internal documents, interviews and undercover Government Accountability Office recordings reveal repeated instances of recruiters misleading prospective students with regard to the cost of the program, the availability and repayment obligations of Federal student loans, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of credits, and the reputation and accreditation of the college. Recruiters are encouraged to search for and exploit potential students' emotional vulnerabilities by finding a "pain point"—unhappiness with a dead-end job, inability to support one's children, fear of disappointing parents or relatives—and pushing on that point to convince prospects that easy, fast, affordable college is the way to finally address previous failings. Students who express concerns about enrolling or taking out loans face sales pitches known as "overcoming objections." Students and faculty interviewed by committee staff, as well as complaints arising from companies' abuses, show that students enrolled using these tactics are likely to be less prepared to meet the challenges of college, and are more likely to withdraw with debt but no diploma when the promised benefits fail to materialize or prove far more challenging than presented.

*Low retention rates*. Most students who attend a for-profit college leave before attaining a degree or certificate according to committee analysis of data provided by the colleges. Overall, 54 percent of students who enrolled in a for-profit college in 2008–9 left without a degree by the middle of 2010, among the 30 companies examined by the committee. There is significant variation in retention performance across the for-profit sector, ranging from 27 percent to 84 percent withdrawal rates for individual undergraduate programs. Rates are generally better for graduate degree programs and for shorter duration certificate or diploma programs: 39 percent of students withdrew from those shorter programs. However, 54 percent of students enrolled in Bachelor's degree programs at for-profit colleges withdrew, and nearly two-thirds of Associate degree students withdrew. Because so many students drop out, for-profit colleges must enroll an

enormous number of new students each year—sometimes the equivalent of their entire student body—in order to satisfy investor expectations of continued growth in enrollment and revenue.

*Low spending on instruction and services; high spending on marketing and profit*. Many for-profit education companies spend less on instruction than public or non-profit institutions, and in some cases even less than the same company spends on marketing and profit. For-profit colleges are business-es that have an imperative to maximize financial returns to shareholders and investors. To achieve those returns, it is critical that companies maintain or grow the size of the student body. However, there is no parallel Federal obligation that the companies achieve high rates of student success, such as comple-tion or job placement. Some States and accrediting agencies have measurements in place, but these are sparsely applied and often unevenly enforced. As a result, per student spending on instruction is often very low. Many for-profit colleges enroll a significant proportion of students online, but the resulting savings on bricks-and-mortar facilities are often not passed on to students in the form of lower tuition.

*Questionable academic rigor*. Undercover observation and student complaints reveal that many for-profit colleges have questionable academic rigor and educational value. Government Accountability Office employees posing as online students encountered numerous situations at for-profit colleges where instructors awarded credit for obviously plagiarized assignments and objectively substandard work, for example, submitting photos of celebrities for an assignment that called for an essay response. Moreover, GAO found that students were charged thousands of dollars to enroll in 3- to 6-week basic courses such as "keyboarding" and "learning strategies and techniques." Complaints received by the committee, in-cluding from former students who contacted committee staff, told of classes that did not prepare students for the job market, highly variable instructor quality, and old equipment and facilities. A student who leaves college without learning the skills required for a job in his or her field of study does not offer the same benefit to the economy—and the tax base—as a skilled graduate.

*Lack of student services*. Many for-profit colleges enroll a student population that requires a robust array of support services such as tutoring, academic advising, and career counseling and job placement services in order to succeed. These services enable students to move confidently through their academic programs and overcome hurdles that may limit their academic engagement. However, many for-profit colleges are not making significant investments in student support services that would help students succeed in school and afterwards. The very limited number of support-services staff available to help students severely restricts the quantity and quality of services a school provides.

*Poor job placement services.* The for-profit sector promotes its programs based on their value in helping students secure jobs in a given field. However, the claims of solid paths to a career have been undermined by recent scandals involving the reporting of false job-placement data. For example, under scrutiny by New York's attorney general, Career Education Corporation, one of the largest for-profit education companies, disclosed that job-placement numbers at many of its campuses were falsified. Another chain of for-profit colleges, ATI Career colleges, had its license to operate 22 programs in Texas suspended after a local news station found evidence that the college created fake documentation to show that unemployed students were working in their fields of study. Investigative reporting and State attorney general investigations have determined that other major for-profit education companies, falsified data

- 17 -

that they gave to regulators or used to convince students to enroll in their career-oriented programs.

*High debt loads.* Due to the high cost of tuition at for-profit colleges, and because these companies often target their marketing to low-income independent students, virtually every student who enrolls in a for-profit college borrows Federal student loan dollars to do so. While the number of students borrowing and the amount of borrowing is increasing rapidly across all colleges, 96 percent of students attending for-profit colleges took out student loans, compared to 13 percent at community colleges, 48 percent at 4-year public, and 57 percent at 4-year private non-profit colleges. Not only do more students at for-profit colleges borrow, the amount they borrow is higher: The average independent student, who represent most of the for-profit student body, graduated with a median debt of $32,700, compared to a median debt of $20,000 for independent students at public colleges, and $24,600 at private non-profit colleges.

*High rates of student loan default.* The disproportionately large debt of students at for-profit colleges helps explain why more than 1 in 5 default on student loan debt within 3 years, according to the most recent data. For public and non-profit colleges, the default number was 1 student in 11. A number of for-profit colleges had default rates above 20 percent. While these default numbers track only the first 3 years of students' repayment, the Department of Education estimates that the "lifetime" default rate on student loan balances for students who attend for-profit colleges is 46 percent. Behind each student loan default is a person who is struggling financially and who may be foreclosed from any further opportunity to obtain some college education. Many of these students find themselves sharply worse off than if they had never enrolled in college. Students who attend for-profit colleges are more likely to be unemployed and less likely to be able to pay off the principal on their student loans compared to students in other sectors.

*Failure of regulation.* Higher education is governed by three regulators: accrediting agencies, State education agencies, and the Federal Department of Education, together known as "the triad." Yet due to the nature of the for-profit education business model and the extreme growth in the sector, the ability of regulators to protect students, ensure academic quality, and safeguard State and Federal taxpayer dollars has been strained. Accrediting agencies operate under the assumption that colleges' primary focus is academic improvement. But this assumption is questionable in the for-profit education context because, in the absence of counter-balancing regulation, financial considerations may predominate. State education agencies are mostly passive as regulators of for-profit colleges; with several notable exceptions, they rubber-stamp for-profit colleges' standing to operate in a State and receive State grant money. Because of resource limitations and other responsibilities in administering the student aid program, the Federal Department of Education has difficulty effectively enforcing the few meaningful regulations currently in place intended to safeguard the taxpayer investment and protect students, including controls on program integrity and incentive compensation for recruiters.

For-profit colleges employ strategies that enable them to stay within the letter of regulatory requirements while violating the spirit of those requirements. For example, to comply with a Higher Education Act mandate that no for-profit college receive more than 90 percent of its revenues from Federal student aid funds, the colleges aggressively pursue military servicemembers and veterans who receive taxpayer-funded education benefits that count as non-Federal revenues; for-profit colleges also use a variety of other tactics that may conflict with students' interests. Also under current law, colleges lose

access to Federal money if a certain percentage of their students default on their Federal student loans. Since this default rate tracks students for only 2 years (soon to be 3) after they leave, some colleges have committed vast resources to soliciting students to sign up for temporary deferments and forbearances so that the colleges' reported default rates appear artificially low. Many times these payment delays are detrimental to students because interest will continue to accrue while loans are in forbearance or deferment, and the interest is added to the loan principal when the student starts repaying again.

_What needs to be done._ Significant policy changes are required to align the current incentives of for-profit colleges with student success. The first step is collection of meaningful and accurate data on student outcomes and institutional performance. This data should be retrievable by corporate ownership, not just by campus or school brand. A uniform methodology for calculating and reporting job placement rates should be established and the accuracy of the rates should be verified through routine audits. The Department of Education should report cohort default rates by institution a number of years beyond the current 3-year window, and the threshold for determining continued title IV eligibility should be expanded from 3 to 4 years.

With the taxpayer investment rapidly growing and an increasing number of student borrowers struggling to repay their loans, Congress needs to examine placing more rigorous performance-based limitations on access to Federal financial aid. These limitations should incentivize higher standards of student success. All institutions of higher education should be prohibited from spending Federal financial aid dollars on marketing and recruiting. The Department of Education should implement an effective enforcement plan to ensure that colleges are not misleading students or misrepresenting their programs.

Currently, no centralized complaint structure exists that allows for an effective analysis of student or employee complaints. An online complaint clearinghouse that steers complaints to the appropriate entity—for fielding quality complaints to accreditors, financial aid complaints to the Department of Education or the Inspector General, and misleading and deceptive tactics complaints to the Federal Trade Commission—should be created and all institutions of higher education should provide a link on their Web sites. For-profit colleges should be required to provide a minimum standard of student services, including tutoring, remediation, financial aid, and career counseling and job placement. Employees in these departments should not be financially incentivized to simply meet quotas, whether its students placed in forbearance, or "placed" in a job.

The recommendations in this report represent some of the elements of a comprehensive legislative framework that should be developed to adequately counterbalance the financial pressures that publicly traded and private equity-owned for-profit colleges bring to the sector. Much work remains to be done to ensure that legislation is crafted to ensure that for-profit colleges properly prioritize student success and deliver on the sector's potential not just for access and added capacity but for affordable quality programs as well.

In the absence of such reforms, the promise of for-profit higher education will not be fully realized. Instead, while remaining financially successful entities, for-profit colleges will continue to fall far short in retaining students and helping them secure valuable degrees and good jobs, and also will fall short in justifying taxpayers' large investment in this sector.

# Institutions Examined

**Publicly Traded Companies**

**American Public Education, Inc.**, headquartered in Charlestown, WV; enrolled approximately 77,700 students as of fall 2010; operates two online-only institutions, American Military University and American Public University; offers Associate and Bachelor's degree programs.

**Apollo Group, Inc.**, headquartered in Phoenix, AZ; enrolled approximately 470,800 students as of fall 2010; operates University of Phoenix, the Nation's largest for-profit college, and Western International University; offers Bachelor's, Master's and Doctoral programs, as well as an exclusively online Associate program, in over 100 different fields. Founded in 1978, it pioneered the modern for-profit education company.

**Bridgepoint Education, Inc.**, headquartered in San Diego, CA; enrolled approximately 77,200 students as of fall 2010; operates Ashford University and University of the Rockies with 2 campuses and 99 percent of students enrolled exclusively online; offers Bachelor's and Associate degrees through Ashford University and Master's and Doctoral degrees through University of the Rockies. The private equity firm Warburg Pincus owns 67.4 percent of the company.

**Capella Education Company**, headquartered in Minneapolis, MN; enrolled approximately 38,634 students as of fall 2010; operates Capella University, a university that operates exclusively online; offers Bachelor's degrees but the majority of students are enrolled in graduate degree programs.

**Career Education Corporation**, headquartered in Schaumburg, IL; enrolled approximately 118,200 students as of fall 2010; operates colleges under 11 brands, American InterContinental University, Briarcliff College, Brooke Institute, Brown College, Collins College, Colorado Technical University, Harrington College of Design, International Academy of Design & Technology, Le Cordon Bleu, Missouri College and Sanford-Brown, with 83 campuses and 4 online divisions; offers Certificates as well as Associate, Bachelor's, Master's and Doctoral degree programs, with nearly 40 percent of students enrolled online.

**Corinthian Colleges, Inc.**, headquartered in Santa Ana, CA; enrolled approximately 113,800 students as of fall 2010; operates Everest, Heald College and WyoTech, with over 105 campuses in 25 States and online; offers diploma and degree programs, with approximately 34 percent of students enrolled online and 64 percent enrolled in a non-degree program.

**DeVry, Inc.**, headquartered in Downers Grove, IL; enrolled approximately 130,375 students as of fall 2010; operates DeVry University, Carrington College, Chamberlain College of Nursing and Keller Graduate School of Management, with 96 campuses and an online division; offers Certificate, Associate, Bachelor's and graduate level programs, with approximately 50 percent of students enrolled in Bachelor's programs.

**Education Management Corporation**, headquartered in Pittsburgh, PA; enrolled approximately 158,000 students as of fall 2010; operates Argosy University, the Art Institutes, Brown Mackie College, South University and Western State University College of Law, with 107 campuses in 32 States and an online division; offers Certificate, Associate, Bachelor's, Master's and Doctoral programs, with approximately 25 percent of students enrolled exclusively online and nearly 50 percent of students enrolled in Bachelor's programs. Goldman Sachs owns 41.8 percent of EDMC.

**Grand Canyon Education, Inc.,** headquartered in Phoenix, AZ; enrolled approximately 42,300 students as of fall 2010; operates Grand Canyon University, with one campus in Phoenix and approximately 89 percent of students enrolled online; offers Bachelor's and graduate degree programs.

**ITT Educational Services, Inc.**, headquartered in Carmel, IN; enrolled approximately 88,000 students as of fall 2010; operates ITT Technical Institute and Daniel Webster, with 145 campuses in 35 States and an online division; offers primarily Associate degree programs and small Bachelor's and Master's degree programs, with approximately 85 percent of ITT students enrolled in Associate programs.

**Kaplan, Inc.**, headquartered in New York City, NY; enrolled approximately 112,100 students as of fall 2010; operates Kaplan Career Institute, College and University, Bauder College, CHI Institute, Concord Law School, Hesser College, Texas School of Business and TESST College of Technology; with over 70 campuses in 21 States and an online division; offers Certificate, Associate, Bachelor's and Master's degree programs, with approximately 60 percent of Kaplan students enrolled online. Kaplan is owned by the Washington Post Company.

**Lincoln Education Services Corporation,** headquartered in West Orange, NJ; enrolled approximately 33,200 students as of fall 2010; operates Euphoria Institute, Lincoln College of Technology, Lincoln College of New England, Lincoln Culinary Institute, Lincoln Technical Institute, Nashville Auto-Diesel College and Southwestern College, with 46 campuses in 17 States and an online division; offers Certificate and Associate degree programs, with the majority of students enrolled in Certificate programs.

**National American University Holdings, Inc.**, headquartered in Rapid City, SD; enrolled approximately 8,255 students as of fall 2010; operates National American University with 30 campuses in nine States; offers Diploma, Associate, Bachelor's and Master's degree programs, with approximately 53 percent of students enrolled exclusively online and nearly 50 percent of students enrolled in Associate programs.

**Strayer Education, Inc.**, headquartered in Herndon, VA; enrolled approximately 60,700 students as of fall 2010; operates Strayer University with 92 campuses in 24 States and online; offers Certificate, Associate, Bachelor's, and graduate degree programs, with between 50 and 60 percent of students enrolled online and more than 50 percent enrolled in Bachelor's programs.

**Universal Technical Institute, Inc.**, headquartered in Scottsdale, AZ; enrolled approximately 21,000 students as of fall 2010; operates Universal Technical Institute, Motorcycle Mechanics Institute,

Marine Mechanics Institute and NASCAR Technical Institute, with no online division; offers Diploma and Associate degree programs in mechanical and automotive fields.

## Private Equity Owned Companies

**Alta Colleges, Inc.** headquartered in Denver, CO; enrolled 19,200 students as of fall 2010; operates 18 campuses under the Westwood Colleges brand, including an online campus, and one campus under the Redstone College brand; offers primarily Associate and Bachelor's degrees across a range of disciplines, with approximately 26 percent of students enrolled online; owned by private equity firm Housatonic Partners.

**Anthem Education Group,** headquartered in Phoenix, AZ; enrolled approximately 12,800 students as of fall 2010; operates Anthem Institute, College and University, Morrison University and the Bryman School of Arizona; with 22 campuses in 15 States; offers primarily diploma and Associate degree programs; owned by private equity firm Great Hill Equity Partners.

**Chancellor University LLC**, headquartered in Seven Hills, OH; enrolled 739 students as of fall 2010; operates one campus in Ohio and an online division; offers all its Certificate, Associate, Bachelor's and Master's degree programs on campus and online; launched by private equity firm Significant Federation LLC.

**Concorde Career Colleges, Inc.,** headquartered in Kansas City, MO; enrolled approximately 8,000 students as of fall 2010; operates 15 campuses in 7 States; offers Diploma and Associate degrees in healthcare programs; owned by private equity firm Liberty partners.

**Henley Putnam University**, headquartered in San Jose, CA; enrolled 515 students as of summer 2010; enrolls primarily veterans and active duty servicemembers; operates exclusively online; offers Diploma, Bachelor's degree and graduate programs in homeland security and counter-intelligence fields; owned by private equity firm Liberty partners. The company does not currently participate in title IV Federal Department of Education student aid programs.

**Rasmussen Colleges, Inc.,** headquartered in Minnetonka, MN; enrolled approximately 17,000 students as of fall 2010; operates 22 campuses and online; offers Diploma, Associate degree and Bachelor's degree programs, with approximately 55 percent of students enrolled online. In 2003, Rasmussen was acquired by a company named Collegis after Collegis sold off its higher education IT business. A private equity firm, the Frontenac Company, made the initial investment to acquire Collegis from its founder and was invested in Rasmussen until 2008. Current CEO Michael Locke previously served as Senior Vice President for Collegis.

**TUI Learning LLC**, headquartered in Cypress, CA; enrolled approximately 7,300 students as of fall 2010; enrolls primarily veterans and active duty servicemembers; operates exclusively online; offers Bachelor's, Master's and Doctoral degrees; owned by private equity firm Summit Partners.

**Vatterott Education Holdings, Inc.**, headquartered in St. Louis, MO; enrolled approximately 11,200 students as of fall 2010; operates Vatterott Colleges, L'Ecole Culinaire, and the Court Reporting Institute, with 19 campuses and an online division; offers technical Diplomas and Associate degrees; owned by private equity firm TA associates.

**Walden University**, headquartered in Minneapolis, MN; enrolled approximately 47,500 students as of fall 2010; operates exclusively online; offers Bachelor's, Master's and Doctoral degree programs, with the vast majority of students enrolled in graduate programs; owned by Laureate Education, Inc., a company partially owned by private equity firm Kohlberg Kravis Roberts & Co. Laureate has announced its intention to become publicly traded.

**Closely Held Corporations**

**American Career College, Inc.**, headquartered in Irvine, CA; enrolled approximately 4,800 students as of fall 2010; operates three campuses with no online division; offers certificates and Associate degrees in healthcare programs.

**ECPI Colleges, Inc.**, headquartered in Virginia Beach, VA; enrolled approximately 13,000 students as of fall 2010; enrolls a significant number of veterans; operates 14 campuses in North Carolina, South Carolina and Virginia, along with a small online division; offers Certificate, Associate, Bachelor's and Master's degree programs, with approximately 14 percent of students enrolled online and 58 percent enrolled in an Associate program.

**Education America, Inc.**, headquartered in Heathrow, FL; enrolled approximately 10,000 students as of fall 2010; operates Remington College with 19 campuses in 10 States and a small online division; offers primarily Certificate and Associate degree programs in a variety of fields, with only degree programs offered online. The company converted to non-profit tax status in early 2011.

**Herzing, Inc.**, headquartered in Milwaukee, WI; enrolled approximately 8,200 students as of fall 2010; operates 11 campuses in eight States and online; offers Associate, Bachelor's and online Master's degree programs in business management, electronics, healthcare, graphic design and public safety.

**The Keiser School, Inc.**, headquartered in Fort Lauderdale, FL; enrolled approximately 19,000 students as of fall 2010; operates Keiser University and Keiser Career College with 14 campuses and an online division; offers Associate, Bachelor's, Master's and Doctoral degree programs in a wide variety of fields. In January 2011, Keiser converted to non-profit status. Keiser also operates Southeastern Institute, a for-profit college with four campuses, but did not provide the committee with information regarding this brand.

**Med-Com Career Training, Inc.**, headquartered in Elizabeth, NJ; enrolled approximately 2,700 students as of fall 2010; operates Drake College of Business with two campuses in New Jersey; offers Certificate programs in medical office technology, dental assisting and Microsoft Office certification.

# The Federal Investment and the Changing Sector

Increasing Federal Investment

For-profit colleges collect a large and expanding share of Federal student aid dollars. During the 2009–10 academic year, the for-profit sector collected $32 billion, out of the total $130 billion in loans and grants disbursed under Title IV of the Higher Education Act.[2] This sum is 5 times greater than the amount the sector collected 10 years earlier. While the total amount of Federal student aid funds disbursed to all sectors has grown, the share collected by for-profit colleges has grown much faster. Consequently, the share of funds collected by the for-profit sector jumped from 12.2 percent in 2000–1 to 25 percent in 2009–10.[3] Because for-profit colleges charge comparatively high tuition and enroll students who are more dependent on Federal student aid, they enroll only about 13 percent of all students but take in 25 percent of total aid.[4]

Increasing Reliance on Federal Dollars

Not only is the amount of Federal aid going to for-profit education companies increasing, for-profit colleges are increasingly reliant on Federal financial aid for the vast share of their revenue. In total, the 30 companies examined derived 68.7 percent of revenue from Federal student aid programs in fiscal year 2006.[5] In fiscal year 2010, just 4 years later, that figure rose to 79.2 percent.[6] And when all Federal educational benefits are counted, including money disbursed from the military Tuition Assistance program and the veterans post-9/11 GI bill program, the proportion is even higher: In fiscal year 2009, the 15 publicly traded for-profit education companies received 86 percent of their revenues from Federal sources.[7] This allocation means for-profit education institutions collect a higher proportion of their revenues from Federal student aid funds than most public and non-profit colleges.

---

[2] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School*, http://federalstudentaid.ed.gov/datacenter/programmatic.html.

[3] Id.

[4] Using the Department of Education's Integrated Postsecondary Education Data System (hereinafter "IPEDS") unduplicated 12-month headcount figure, for-profit colleges account for 13.2 percent of higher education students. Using the fall 2010 enrollment figure, for-profit colleges account for 11.4 percent of higher education students.

[5] For-profit education companies are required to report the proportion of revenue they derive from Federal student aid programs. The Department of Education publishes these figures annually.

[6] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School*, http://federalstudentaid.ed.gov/datacenter/programmatic.html (analysis of date from period 2006-10).

[7] Senate HELP Committee staff analysis based on information provided by the 15 publicly traded companies pursuant to the committee document request of August 5, 2010.  Federal dollars include all revenues made available through Title IV of the Higher Education Act, including subsidized and unsubsidized Stafford loans, Pell grants, PLUS loans and multiple other small loan and grant programs as well as funds received from other Federal sources including the Department of Labor, the Department of Defense and the Department of Veterans Affairs as reported by the companies. In some instances, Federal dollars also include Stafford loan increases permissibly excluded from the companies' reported title IV revenue for each student during fiscal years 2009 and 2010 pursuant to the Ensuring Continued Access to Student Loans Act of 2008, Pub. L. No. 110–227 (2008). Because not every company furnished information on the amount of exclusion they recorded, these figures likely understate the amount of Federal student aid revenue received.



Revenue Collected by 15 Publicly Traded For-Profit Education Companies, 2009

Pell Grant Funds

  The Pell grant program, the largest Federal grant program created to assist needy students with college costs, totaled $8 billion in the 2000–1 school year, growing to $30 billion in the 2009–10 school year as lawmakers made repeated new investments in Pell grant limits in an effort to keep college afford-able.[8] During that same period, the amount of Pell grant funds collected by for-profit colleges increased from $1.1 billion to $7.5 billion.[9] The size of the Pell program grew four and a half times, but the overall Pell dollars flowing to for-profit colleges increased sixfold.[10] Consequently, the share of Pell grant funds that for-profit colleges collected increased from 14 to 25 percent.[11] While part of this increase is attribut-able to the overall economy and the surge of enrollments by Pell eligible students, the disproportionate increase in Pell dollars flowing to the sector has played a significant role in creating annual shortfalls in the Pell grant program.

---

[8] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School*, http://federalstudentaid.ed.gov/datacenter/programmatic.html (accessed July 12, 2012). 2000-1 and 2009-10. Figures for 2000-1 calculated using data provided to the committee by the U.S. Department of Education. Congress has taken steps to make college more accessible and affordable by committing $36 billion in mandatory Pell grant funding over the next 10 years included in the Health Care and Education Reconciliation Act of 2010 and through $17 billion in discretionary funding through the American Recovery and Reinvestment Act of 2009 and annual discretionary funding, which in fiscal year 2010 was $17.6 billion. For the 2009-10 and 2010-11 academic years students attending year-round were also eligible to receive 2 Pell awards in 1 year, leading to a large increase in the total volume of Pell at many institutions in those years. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, 124 Stat 1029 (2010); American Recovery and Reinvestment Act of 2009, Pub. L. 111–5 (2009).

[9] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School*, http://federalstudentaid.ed.gov/datacenter/programmatic.html (accessed July 12, 2012). 2000-1 and 2009-10. Figures for 2000-1 calculated using data provided to the committee by the U.S. Department of Education.

[10] Id.

[11] Id.



Much of this increase is explained by the rapid expansion of large national education companies. The Apollo Group, parent company of the University of Phoenix and the largest for-profit operator, received $24 million in Pell grants during the 2000–1 school year, but by the 2010–11 school year received $1.2 *billion* in Pell dollars.[12] Similarly, colleges owned by the Career Education Corporation in 2001–2 received $38.3 million in Pell grant funds, growing to $408 million in Pell funds in 2009–10,[13] the same year that an investigation by New York's attorney general led to an admission by the company that false job placement data had been submitted at a number of campuses.[14]

Pell grants are an investment in students. This investment is intended to pay returns to taxpayers and society by giving low- and middle-income families access to higher education and employment opportunities, thereby expanding the tax base. As explored in more detail below, the student outcomes documented in the investigation raise serious questions regarding the value and the sustainability of the Pell grant investment currently being made in the for-profit sector.

---

[12] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School* (2009), http://federalstudentaid.ed.gov/datacenter/programmatic.html. University of Phoenix ("Phoenix") is a brand of colleges operated by Apollo Group, Inc. ("Apollo"), a publicly traded for-profit higher education company that enrolled 470,800 students as of fall 2010 and is based in Phoenix, AZ.

[13] Id.

[14] "Career Education Admits to Overstating Job-Placement Data," The Chronicle of Higher Education, August 10, 2011, http://chronicle.com/blogs/ticker/career-education-admits-to-overstating-job-placement-data/35225 (accessed May 23, 2012).

Military Education Benefits

*GI Bill Benefits*

The Federal investment in educational benefits for veterans following World War II paid phenomenal dividends. That investment expanded the middle class, boosted the economy, and helped usher in a new era of shared prosperity in the United States. It has also led to an ongoing commitment to providing educational opportunities to subsequent generations of veterans, including veterans of the conflicts in Iraq and Afghanistan. Pursuant to this commitment, Congress enacted the post-9/11 GI bill. Beginning in August 2009, qualifying veterans and family members became eligible for 36 months of benefits, paying up to $17,500 a year.[15] As Ms. Hollister Petraeus, Assistant Director of the Office of Servicemember Affairs for the Consumer Financial Protection Bureau, testified before a Senate Homeland Security Subcommittee hearing on September 22, 2011, "These are valuable benefits and I think we would all like to see them replicate the success story that happened after World War II, when a generation of veterans came home, went to college on the GI bill, and became the engine that drove our economy to tremendous success." [16]

During the first 2 years of availability of post-9/11 GI bill benefits, for-profit companies collected $1.6 billion, or 37 percent, of the program's total $4.3 billion in benefits dispersed.[17] Eight of the top 10 recipients of post-9/11 GI bill funds are for-profit education companies.[18]

---

[15] Under the original post-9/11 GI bill, the maximum benefit was capped at the highest in-State tuition at a public college in the veteran's state. Post-9/11 Veterans Assistance Act of 2008, Title V of the Supplemental Appropriations Act of 2008, Pub. L. No. 110-252 (2008).

[16] Hollister K. Petraeus (Assistant Director, Office of Servicemember Affairs, Consumer Financial Protection Bureau), Written Statement for the Record, Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security, Senate Committee on Homeland Security and Governmental Affairs, *Improving Educational Outcomes for Our Military and Veterans*, 112th Congress (2011).

[17] The VA paid out an additional $56 million in benefits under the post-9/11 GI bill that was distributed in the early weeks of the program, and has not been tracked by sector. These funds are not included in the $1.75 billion figure.

[18] Senate HELP Committee staff analysis of data provided by the U.S. Department of Veterans Affairs. This information was originally released at a press conference on September 22, 2011. Subsequent to the release, committee staff noticed an error in dates and prepared and issued a correction on November 3, 2011. The finding, that 8 of the top 10 recipients of post-9/11 GI bill funds were large for-profit companies, was unchanged but two sets of companies did change positions within the top 10, and the amount of post-9/11 GI bill funds received by the companies was lower than originally reported.



Because tuition at for-profit colleges is much higher, on average, than at public colleges, tax-payers are spending more money per veteran to support their education. For-profit colleges trained 25 percent of veterans during the first 2 years of the program, but received 37 percent of post-9/11 GI bill funds.[19] In contrast, public schools trained 59 percent of veterans, but collected only 39 percent of the programs' funds.[20]

The share of VA benefits flowing to for-profit colleges also far exceeds the share of Federal Department of Education financial aid flowing to the schools.

---

[19] See Appendix 11.
[20] Id.



Yet, data provided to the committee by for-profit education companies make clear that the general student population is not performing well at these schools. These findings regarding student outcomes, discussed in more detail below, raise serious questions about whether schools run by these companies represent a good investment for taxpayers or veterans.

| Withdrawal Rates for the 10 Highest Recipients of Post-9/11 GI Bill Funds | | | |
|---|---|---|---|
| Company | Amount Received<br><br>[in millions of dollars] | AA Percent Withdrawn[21] | BA Percent Withdrawn[22] |
| Apollo Group, Inc. | $210 | 66.4 | 50.3 |
| ITT Educational Services, Inc. | $178 | 53.1 | 44.5 |
| Education Management Corporation | $173 | 63.7 | 61.9 |
| DeVry, Inc. | $144 | 54.3 | 56.4 |
| Career Education Corporation | $130 | 61.7 | 51.4 |
| Strayer Education, Inc. | $80 | 48.8 | 34.1 |
| Corinthian Colleges, Inc. | $60 | 66.5 | 59.2 |
| University of Maryland System[23] | $51 | N/A | 13.1 |
| University of Texas System[24] | $45 | N/A | 26.4 |
| Kaplan Higher Education Corporation | $44 | 69.1 | 68.2 |

---

[21] See Appendix 11 and Appendix 15. Based on Senate HELP Committee staff analysis of a listing of all students who enrolled in an Apollo, ITT, EDMC, DeVry, Career Education Corporation, Strayer, Corinthian, or Kaplan program between July 1, 2008 and June 30, 2009, provided to the committee by each company.

[22] Id.

[23] U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Data System [hereinafter IPEDS], First-Time, Full-Time Retention Rate (weighted average).

[24] Id.

*Department of Defense Education Programs*

The Department of Defense also seeks to support servicemembers' education through the long-standing Tuition Assistance (TA) program, which allows servicemembers to begin taking postsecondary education classes while on duty. The TA program provides a benefit of $250 per academic credit, capped at $4,500 per year, to increase servicemembers' opportunities for promotion and to help advance their personal, professional and intellectual development.[25] In fiscal year 2011, for-profit colleges collected one of every two Tuition Assistance dollars, totaling $280 million of the $563 million disbursed during the year.[26] Just 2 years prior, during fiscal year 2009, for-profit colleges collected $218 million of $515 million in benefits, 42 percent of the total.[27]



The U.S. Armed Forces operate another education benefit program to help spouses of service-members develop portable career opportunities. These Military Spouse Career Advancement Accounts (MyCAA), provide $2,000 per year with an overall cap of $4,000 over 3 years.[28] During fiscal year 2011, for-profit colleges received $40 million (61 percent) of the $65 million MyCAA program funds disbursed.[29]

Growth and Change in the For-Profit Sector

The for-profit higher education sector today looks dramatically different from 20 years ago. Up

---

[25] U.S. Department of Defense Instruction, Voluntary Education Programs, Number 1322.25, March 15, 2011, available at http://www.dtic.mil/whs/directives/corres/pdf/132225p.pdf (accessed May 24, 2012). Provides $250 per semester credit hour, or $166 per quarter credit hour, depending on institution's academic calendar.

[26] See Appendix 12. Senate HELP Committee staff analysis of data provided by the Department of Defense.

[27] Id.

[28] Department of Defense, MyCAA Fact Sheet, http://www.militaryhomefront.dod.mil/mycaa/FactSheet (accessed July 1, 2012).

[29] See Appendix 12. Senate HELP Committee staff analysis of data provided by the Department of Defense.

until the 1990s, the sector was primarily composed of small trade schools that awarded certificates and diplomas in fields like air-conditioning repair, cosmetology, and truck driving. Two-thirds of for-profit colleges enrolled students in training programs lasting less than 1 year.[30] While certificate and diploma offerings have continued to grow, the sector has dramatically increased its degree programs. Between 2004 and 2010, the amount of AA degrees awarded by for-profit colleges increased 77 percent and the amount of BA degrees awarded increased 136 percent.[31]

Two additional shifts have re-shaped the for-profit education landscape: the rise of large national for-profit higher education companies, many of them publicly traded on major stock exchanges, and the proliferation of online programs. In 1990, there were no publicly traded higher education companies. In 1991 DeVry University became the first for-profit education company listed on a major stock exchange.[32] This initial public offering (IPO) married Wall Street capital to the for-profit education sector. The Apollo Group-owned University of Phoenix followed suit with its IPO in 1994. At that time, these two companies enrolled 80,000 students and accounted for 30 percent of all students who attended for-profit colleges.[33] Thirteen more companies have followed. Today there are 15 publicly traded for-profit higher education companies that together enroll more than 1.4 million students, or 63 percent of all students who attend for-profit colleges.[34] These developments led to significant enrollment growth in the for-profit college sector, increasing from approximately 766,000 students in 2001 to 2.4 million students in 2010.[35]

---

[30] Thomas Bailey, Norena Badway and Patricia J. Gumport, For-Profit Higher Education and Community Colleges, National Center for Postsecondary Improvement, http://www.stanford.edu/group/ncpi/documents/pdfs/ forprofitandcc.pdf (accessed Apr. 27, 2012).

[31] Senate HELP Committee staff analysis of IPEDS data.

[32] DeVry Inc. was the first stand-alone higher education institution to become a publicly traded company on a major exchange that has maintained operations as a public company. Concorde Career Colleges, Inc., which is today a private company, appeared on the NAS-DAQ exchange twice in its history.

[33] Apollo Group, Form 10-K for period ending 8/31/96; DeVry, Inc, Form. 10-K for period ending 6/30/97.

For total for profit sector enrollment, see U.S. Department of Education, National Center for Education Statistics, *Fall Enrollment in Postsecondary Institutions, 1996* (1998), http://nces.ed.gov/pubs99/1999239.pdf (accessed April 27, 2012).

[34] IPEDS, Fall Enrollment, Fall 2009 for unit identification numbers controlled by for-profit education companies.

[35] HELP Committee staff analysis of data from IPEDS and other data from the Department of Education.



More recently, private equity firms have entered the for-profit higher education sector in a significant way. Today, at least 10 private equity firms own schools that enroll just under 300,000 students, another 13 percent of the total enrollment of the for-profit sector. [36]

[36] Senate HELP Committee staff analysis of private equity firm portfolios as of October 2010 and IPEDS, Fall Enrollment, Fall 2009 for unit identification numbers controlled by private equity owned for-profit education companies. The chart below refers to the following private equity firms: Housatonic Partners; JLL Partners; Great Hill Partners; Gryphon Investors; BC Partners; Kohlberg, Kravis, Robert s& Co.; Leeds Equity Partners; Liberty Partners; Quad Partners; and Willis Stein and Partners. The chart below refers to the following publicly traded companies: Apollo Group; Education Management Corp. ; Washington Post Co.; Career Education Corp.; Corinthian Colleges; Bridgepoint Education ; ITT Educational Services, Inc.; DeVry Inc.; American Public Education, Inc.; Strayer Education, Inc.; Grand Canyon Education, Inc.; Capella Education Co.; Lincoln Educational Services; Universal Technical Institute, Inc.; and National American University Holdings, Inc.



Fully online courses have been another driver in the for-profit education sector. Much of the growth in student enrollment, as much as 90 percent by one measure, in the past decade is attributable to students attending primarily online courses.[37] The average number of students taking at least one course online at a for-profit institution grew by more than four times between 2002 and 2006.[38] Four publicly traded companies enroll more than 90 percent of students online.[39] At least three additional companies currently have more than 50 percent of students in online programs.[40] Among education companies

<hr />

[37] David J. Deming, Claudia Goldin, and Lawrence F. Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?," *Journal of Economic Perspectives*, vol. 26(1), Winter 2012, pp. 139–164, http://www.frbatlanta.org/documents/news/conferences/11employment_education_demming.pdf (accessed Apr. 27, 2012).

[38] I. Elaine Allen and Jeff Seaman, *Online Nation: Five Years of Growth in Online Learning*, The Sloan Consortium (2007), http://sloan-consortium.org/sites/default/files/online_nation.pdf (accessed Apr. 27, 2012).

[39] See American Public Education, Inc., About APEI, http://www.americanpubliceducation .com/phoenix.zhtml?c=214618&p=irol-aboutapei (accessed May 24, 2012) (APEI offers courses exclusively online); Capella Education Company, Company Overview, http://www.capellaeducation.com/company_ information/capella_overview.aspx (accessed May 24, 2012) (Capella offers courses exclusively online); Grand Canyon University Investor Relations, *Grand Canyon Education, Inc. Reports First Quarter 2012 Results*, News Release, May 7, 2012, http://investors.gcu.edu/phoenix.zhtml?c=221997&p=irolnewsArticle&ID=1692589&highlight= (accessed May 24, 2012); Bridgepoint Presentation, *Credit Suisse 14th Annual Global Services Conference*, pg. 13, March 13, 2012, available at http://phx.corporate-ir.net/phoenix.zhtml?c=228996 &p=irol-presentations (accessed May 24, 2012) (Bridgepoint's student body is "99% Online").

[40] Strayer Education, *Strayer Education, Inc. Reports First Quarter 2012 Revenues and Earnings; and Soaring Term 2012 Enrollments*, Press Release, April 26, 2012, http://www.strayereducation.com/releasedetail. cfm?ReleaseID=667552 (accessed May 24, 2012); Washington Post Company, *Washington Post Company Reports 2011 and Fourth Quarter Earnings*, Press Release, February 24, 2012, http://www.washpostco.com/phoenix .zhtml?c=62487&p=irol-newsArticle&ID=1665015&highlight= (accessed May 24, 2012); National American University Holdings, Inc., National American University Holdings, Inc. Reports Fiscal 2012 Third Quarter and Nine Months Results, Press Release, April 5, 2012, http://www.national.edu/sites/default/files/National%20 American%20University%20

surveyed by the committee, at least 435,000 students were enrolled in online programs at 11 companies between 2008 and 2009.[41] However, as discussed in more detail later, retention and student loan default rates are worse for students attending an exclusively online program and, with some exceptions, for students attending a college owned by a publicly traded company.

---

Holdings,%20Inc.%20Reports%20Fiscal%202012%20Third%20Quarter%20and%20Nine%20Months%20Results.pdf (accessed May 24, 2012). Before Congress repealed the "50 percent rule" in 2005 colleges were not allowed to furnish more than half their courses online and could not have more than half their students enrolled in distance-learning courses. See Margot A. Schenet, *Higher Education: Reauthorization of the Higher Education Act*, Congressional Research Service, December 3, 1992.

[41] IPEDS, Fall Enrollment, Fall 2009 for unit identification numbers controlled by for-profit education companies.

# Why Are Companies that Own For-Profit Colleges Financially Successful?

**High Cost of Attendance**

For-profit colleges generally charge much higher tuition than public colleges and universities. Many companies that operate for-profit colleges appear to set tuition using sophisticated market strategies designed to maximize revenue without regard to the poor academic and employment outcomes faced by students.

Higher Tuition at For-Profit Colleges

On average, for all degree types and institutions analyzed by committee staff, for-profit colleges charge more than three and a half times as much for the same degree at public institutions in the same State. Since there is significant variation in the length of time to achieve different levels of degrees, it is instructive to examine them separately.[42]

---

[42] The committee asked for information on tuition and fees charged by each of the 30 schools examined by the committee over the previous 4 years. However, tuition and fees are increased so frequently that much of the documentation received was quickly out of date. Thus, most information was gathered from schools' Web sites. Not all 30 schools offered all types of degrees: the dataset presented is drawn from 9 Certificate programs, 15 Associate programs, and 19 Bachelor's programs that provide a cross section of the industry. The "Public College" used as a point of comparison is a public community college near the for-profit company headquarters offering the same Certificate or Associate degree or, in the case of Bachelor's degrees, it is the flagship public university located in the same State as the headquarters of the for-profit school.



For-profit certificate programs cost, on average, four and a half times as much as a comparable program at a community college in the same area.[43] Bachelor's programs averaged 20 percent more than analogous programs at flagship public universities. Associate degree programs also averaged four times the cost at traditional public college counterparts.[44]

Moreover, for-profit colleges are almost always more expensive than nearby public institutions offering similar programs.[45] In every case examined, Certificate and Associate degree programs at the nearest public colleges were less expensive than comparable for-profit programs.

---

[43] For the purposes of this analysis, "Certificate" refers to pre-baccalaureate Certificate programs and diplomas.

[44] See Appendix 14 for a complete list of programs and tuition.

[45] Many for-profit colleges enroll a significant number of students in online programs. In some cases, the lower delivery costs of online classes—which do not include construction, leasing and maintenance of physical buildings—are not passed on to students, who pay the same or higher tuition for online courses.

| Comparison of For-Profit and Public College Associate Degree Programs, 2012 | | | | |
|---|---|---|---|---|
| (Lowest Cost, Highest Cost and Closest to Average Cost For-Profit College) | | | | |
| **For-Profit College** | **For-Profit Program Cost** | **Public College** | **Public Program Cost** | **For-Profit Percent Higher** |
| American Public University (West Virginia)[46] | $15,250 | Blue Ridge Community and Technical College | $8,900 | 71% |
| Westwood College (Colorado)[47] | $48,194 | Community College of Denver | $8,823 | 446% |
| Strayer University[48] | $36,500 | Northern Virginia Community College | $9,587 | 281% |

When compared to similar Bachelor's degree programs at State flagship universities, 18 out of 22 for-profit Bachelor's degree programs are more expensive.[49] While for-profit colleges are more expensive across the board, the cost of tuition varies within the for-profit sector. For example, for comparable diplomas, tuition at for-profit colleges ranges from 2 to 20 times the tuition at local community colleges.[50]

Tuition Decisions Made To Maximize Revenue

The obligation to satisfy shareholders means that many for-profit colleges set and raise tuition based on the internal financial projections of the company, rather than the cost of educating students. While tuition at public schools has increased sharply, this has largely been due to cuts in State budgets that strain the institutions' educational expenditures.[51] In contrast, tuition increases at for-profit colleges are not driven solely by external economic pressures, nor are they tempered by internal cost-saving measures, but rather, are often the result of strategies designed to maximize revenue.

---

[46] American Public University System ("APUS") is a brand operated by American Public Education, Inc. ("APEI"), a publicly traded for-profit higher education company that enrolled 77,000 students as of fall 2010 and is based in Charlestown, WV.

[47] Westwood is a brand of colleges operated by Alta Colleges, Inc. ("Alta"), a for-profit higher education company that enrolled 19,190 students as of 2010 and is based in Denver, CO.

[48] Strayer Education, Inc. ("Strayer") is a publicly traded for-profit higher education company that enrolled 60,711 students as of fall 2010 and is based in Arlington, VA.

[49] An additional company offers a BA programs that is less than $1,000 more than the comparable program offered by the flagship public college. Senate HELP Committee staff analysis. See Appendix 14.

[50] Senate HELP Committee staff analysis. See Appendix 14.

[51] Delta Cost Project, *Trends in College Spending 1999-2009: Where Does the Money Come From? Where Does It Go? What Does It Buy?*, Delta Project on Postsecondary Education Costs, Productivity, and Accountability (2011), http://www.deltacostproject.org/resources/pdf/Trends2011_Final_090711.pdf (accessed April 30, 2012). The tuition at private non-profit colleges and universities has not grown as sharply as public colleges and universities. The average annual price increase between 2001 and 2011 was 2.6 percent at 4-year private non-profit colleges versus 5.6 at public colleges. CollegeBoard Advocacy & Policy Center, *Trends in College Pricing 2011*, College Board, pg. 13 (2011), http://trends.collegeboard.org/downloads/College_Pricing_2011.pdf (accessed May 3, 2012).
In addition, the College Board's analysis shows that because private non-profit colleges award significantly more institutional aid to students, the average net price of attending an open enrollment 4-year non-profit college is slightly less than attending a for-profit college, most of which are open enrollment.

*Maximizing Revenue*

Internal company documents indicate that financial projections, rather than the cost of providing instruction and other student services, determine tuition pricing. For example, in an email discussing a tuition increase for a nursing program at a Kaplan campus in Sacramento,[52] the program's finance director recommended an 8 percent increase, and justified it partly by saying: "With the new pricing, we can lose two students and still make the same profit."[53] The chief financial officer of National American University emailed senior executives and campus presidents that "the university (as a system) was not successful in achieving its summer quarter profit expectations and "as a result" a "mid-year tuition increase" and change in how the company bills students was necessary to hit these expectations.[54]

In 2008, Westwood conducted pricing experiments to see if reducing tuition could increase revenue by attracting more students. An internal presentation showed that the company reduced the tuition for a small group of its programs, but determined that the reduction had "no discernible impact" on recruitment. As a result, the presentation recommended a tuition increase of between 3.5 percent and 4 percent for the following year.[55]

Similarly, part of an internal presentation from DeVry's Chamberlain College of Nursing on whether to raise tuition proposed that "Chamberlain could take an aggressive price leadership position" by raising tuition above competitors [emphasis in original].[56] While the suggestions presented were ultimately not pursued by DeVry, managers reasoned that "so long as out-of-pocket expenses can remain minimal, significant price increases will likely create minimal changes in demand." Another idea proposed but not implemented was that in order to keep students' out-of-pocket costs minimal, the company should arrange for additional private student loans.

Some companies' financial models are even more complex, setting different price points for each geographic region and academic program separately. The investigation found that one company set at least 59 different credit-hour tuition prices, based on program type and location. As an example, this resulted in the company individually setting 17 different tuition rates for its interior design program alone. An analysis of 2010 tuition prices showed that Apollo-owned University of Phoenix charged 13 different prices, between $47,500 and $67,000, for a Bachelor's degree in business, depending on the campus, and Corinthian-owned colleges charged at least 5 different prices, between $58,000 and $77,000.[57]

---

[52] Kaplan Higher Education Corporation ("Kaplan") is a for-profit higher education company that enrolled 112,141 students as of 2010 and is based in New York City, NY. Kaplan is owned by the publicly traded Washington Post Corporation.

[53] Kaplan Internal Email, September 2009, re: *Sacramento Price Increase* (KHE 173528).

[54] National American University Internal Email, October 2007, re: *Mid Year Adjustments* (NAU0013678). National American University is a publicly traded for-profit higher education company that enrolled 9,700 students as of fall 2010 and is based in Rapid City, SD.

[55] Westwood Internal Presentation, 2009, Marketing Presentation on Tuition Pricing (WP000004111, at WP000004116 and WP000004118).

[56] Devry Internal Presentation, February 2009, *Net Promoter Score (NSP)\*, Strategic Pricing, Brand Building: A Presentation to the Chamberlain Leadership Team* (DEVRY0036668, at DEVRY0036696). Chamberlin College of Nursing is a brand of DeVry, Inc. ("DeVry"), a publicly traded for-profit higher education company that enrolled 128,676 students as of fall 2010 and is based in Downers Grove, IL.

[57] Senate HELP Committee staff analysis of tuition information provided to the committee by Apollo and Corinthian.

*Maximizing Revenue By Matching Tuition to Federal Student Aid*

Companies appear to use available Federal aid as a general benchmark for tuition levels. First-year independent students (those considered to be financially independent from their parents) can access $9,500 from Federal Stafford loans, and the average Pell grant recipient receives $3,705 towards tuition and fees for a total of approximately $13,205 in available aid.[58] As the chart below illustrates, a number of publicly traded for-profit colleges appear to set 4-year degree tuition close to that figure.[59]



Further, a 2012 study sponsored by the National Bureau of Economic Research found that for-profit colleges receiving Federal student aid funds charged far more for tuition than those that were not eligible to receive Federal aid.[60] For-profit colleges receiving Federal student aid dollars, the authors found, raised their tuition by approximately the amount of grant aid for which students were eligible. The authors of the study also note that the amount of the tuition premium charged by for-profit colleges that receive title IV program

---

[58] Higher Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (1972); College Board Advocacy & Policy Center, *Trends in College Pricing 2011*, College Board, pg. 13 (2011), http://trends.collegeboard.org/downloads/College_Pricing_2011.pdf (accessed May 3, 2012).

[59] The chart below is based on the Bachelor's degree program tuition at the 12 for-profit education companies which received a document request from the committee and enrolled at least 5,000 students between July 1, 2008, and June 30, 2009.

[60] David J. Deming, Claudia Goldin, and Lawrence F. Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?," *Journal of Economic Perspectives*, vol. 26(1), Winter 2012, pp. 139-164, http://www.frbatlanta.org/documents/news/conferences/11employment_education_demming.pdf (accessed Apr. 27, 2012).

funds is about equal to the average amount that for-profit colleges spend to recruit each new student.[61]

Because available Federal aid limits vary by student, these limits are not the only factor companies use to determine tuition. However, at least one company, Bridgepoint Education, Inc., based its charges almost entirely on the most broadly available Federal student aid limits from the Federal Stafford Loan program.[62] In 2008, Congress raised the annual Stafford Loan limit to $9,500 for first-year students, and somewhat higher for subsequent years.[63] By 2010, Bridgepoint's Ashford University had raised its tuition and "technology fee" to a combined $9,486 per year, just $14 below the newly available student loan funds for first-year students.

Internal Bridgepoint documents demonstrate the company's deliberate approach to matching charges to the broadly available title IV student aid. Bridgepoint created a new fee for most courses, called the "Course Digital Materials" fee, unexpectedly pushing the total cost of attendance approximately $400 above the $9,500 Stafford loan limit. Bridgepoint's CEO, Andrew Clark, learned of this $400 difference, which the company described internally as a "shortfall" of money the student would have to provide, and emailed the chief financial officer, , saying:

> The tuition increase for bachelor degree students is going to cause a $400 short fall!!! People are talking about crazy stuff like alternative financing. You told me there would be no short fall! You need to follow up with Sheng [the Vice President for Operations] immediately and then follow up with me.[64]

The CFO's reply, explaining that the shortfall was a result of the new fees, illustrates the company's marketing practice of using fees to increase revenue while keeping published "tuition" figures artificially low:

> With this increase and one additional increase we can still say that our 'tuition' is below title 4 limits at every grade level.[65]

An in-depth review of Bridgepoint's internal communications regarding tuition revealed little, if any, discussion of the short- or long-term financial impact to students, nor of the cost to educate those students. Instead, Bridgepoint's internal discussions focused on maintaining the strategic marketing message that students can pay for school entirely with Federal funds. That strategy brought the company impressive growth over recent years.

Internal Alta, Inc. documents reviewed by the committee indicate that Alta executives looked for ways to structure the colleges' programs so that the company was able to collect as much Federal money as possible. A 2009 pricing strategy document recommended that the company "restructure terms to 3

---

[61] Id.

[62] Bridgepoint Education, Inc. ("Bridgepoint") is a publicly traded for-profit higher education company that enrolled 77,179 students as of fall 2010, and is based in San Diego, CA.

[63] The loan limits are lower for students who are still claimed as dependents by a guardian who could borrow a Parent PLUS loan.

[64] Bridgepoint Internal Email, February 2010, re: *Re: MAJOR ISSUE* (BPI-HELP_00048618, at BPI-HELP_00048619).

[65] Bridgepoint Internal Email, February 2010, re: *Re: MAJOR ISSUE* (BPI-HELP_00048618).

trimesters/year or quarter time (so that we can grab more of the students' Stafford)." [66] Similarly, a 2007 presentation suggested that the company design "shorter program i.e. fewer number of credits or longer time spent i.e. quarter time so that we can grab more of the students' Stafford" loans.[67]

### Pricing Unrestrained by Federal Benefits, Value, or Competitors' Prices

Remarkably, some companies within the for-profit industry charge higher tuition than their peers, have poorer outcomes, and enroll large numbers of students. The committee staff review of tuition prices revealed that program costs at ITT and Corinthian colleges are among the highest in the industry.[68] ITT reports that a Bachelor's of Business Administration costs an estimated $93,624.[69] This is 30 percent higher than comparable degrees from the University of Phoenix or DeVry University, and it is three times the cost of a comparable degree from American Public University, which charges $30,350.[70] At the Associate level, ITT charges $48,228 for an Associate in Business Administration degree, and Everest College, owned by Corinthian, charges $43,344 for an Associate in Business.[71] In contrast, Kaplan University charges $30,065 for an Associate in Business Administration, while the University of Phoenix charges $24,000.[72] All of these colleges charge significantly more than comparable public institutions: community colleges had an average published tuition price of $5,926 for a 2-year degree.[73] To put this in perspective: an independent college student who qualifies for the maximum amount of Pell grants and Federal Stafford loans would not be able to completely pay for an ITT Bachelor's degree.

ITT and Corinthian charge these higher prices even though their students fare worse after school than many of their peers in the for-profit sector. Only 31 percent of ITT's recent students are making payments on the principal of their Federal student loans, and only 24 percent of Corinthian's recent students are able to do so.[74] The other 13 publicly traded institutions' average repayment rate is 40

---

[66] Alta, February 2009, *Pricing Manager Business Case,* (HELP-ALTA-000153, at HELP-ALTA-000159).

[67] Alta, September 2007, *Pricing Strategy Discussion Document* (WP000004122, at WP000004154).

[68] See Appendix 14.

[69] ITT Technical Institute, *Program of Study Information*, Program Disclosures, http://www.itt-tech.edu /programinfo/psi-ind.pdf (accessed December 14, 2011).

[70] University of Phoenix, *School of Business: Bachelor of Science in Business with a Concentration in Management*, Program Disclosures, http://cdn-static.phoenix.edu/content/dam/altcloud/programs/Sealsheets/BSB-M-025B.pdf?cm_sp=Program+Page-_-SealSheet+PDF-_-BSB-M (accessed December 14, 2011)(see program disclosures); DeVry University, *Gainful Employment Disclosures*, http://www.devry.edu/degree-programs/college-business-management/business-administration-consumer-info.jsp (accessed December 14, 2011); American Public University, Program Disclosures, available at: http://www.apu.apus.edu/academic/programs/degree/15/bachelor-of-business-administration (Accessed 12/14/2011).

[71] ITT Technical Institute, *Program of Study Information*, Program Disclosures, http://www.itt-tech.edu/programinfo/psi-ind.pdf (accessed December 14, 2011).; Everest College, *Program Disclosures*, http://disclosures.everest.edu/disclosures/everest-college-ontario-metro.pdf (accessed December 14, 2011). Everest Colleges and Everest University ("Everest") are brands operated by Corinthian Colleges, Inc. ("Corinthian"), a publicly traded for-profit higher education company that enrolled 113,818 students in 2010 and is based in Santa Ana, CA.

[72] Kaplan, Des Moines Campus Tuition and Fees, http://desmoines.kaplanuniversity.edu/Pages/tuition.aspx (accessed December 14, 2012); University of Phoenix, *School of Business: Bachelor of Science in Business with a Concentration in Management*, Program Disclosures, http://cdnstatic.phoenix.edu/content/dam/altcloud/programs/Sealsheets/BSB-M-025B.pdf?cm_sp=Program+Page-_-SealSheet+PDF-_-BSB-M (accessed December 14, 2011)(see program disclosures).

[73] CollegeBoard Advocacy & Policy Center, *Trends in College Pricing 2011,* College Board, pg. 10 (2011), http://trends.collegeboard.org/downloads/College_Pricing_2011.pdf (accessed May 3, 2012).

[74] Senate HELP Committee staff analysis of data from Department of Education, Cumulative Four-Year Repayment Rate by Institution. http://www2.ed.gov/policy/highered/hearulemaking/2009/ge-cumulative-rates.xls. On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for

percent.[75] In spite of this poor record of student success, ITT still asserts that its regular annual tuition increases—at least 5 percent for each of the 14 years between 1996 and 2010—reflect the return on investment students receive.[76]

However, when discussing a proposed gainful employment regulation in 2010, the ITT CEO and board made clear that they were aware that many former students did not earn enough to pay their tuition debt. Congress requires that for-profit colleges provide educational programs that lead to "gainful employment" in order to obtain access to title IV funds.[77] Accordingly, the administration issued a proposed regulation to clarify what qualified as "gainful employment." The rule, as proposed at the time, would have set restrictions on colleges' access to Federal student aid based on whether graduates earned enough to pay down their loans. A board presentation discussing the proposed rule declared: "the overwhelming majority of our programs do NOT comply with the proposed 'GE [gainful employment] bright line,'[emphasis in original]" but went on to declare that ITT could comply with the proposed rule by reducing tuition levels by an average of 11 percent.[78]

Though an 11 percent cut would still keep ITT's program costs well above those at Kaplan, DeVry, Apollo, and other for-profit colleges, the presentation declared that the tuition reduction was the "least economically efficient scenario" because it would reduce debt levels for all students, not just graduates, while the proposed regulation only applied to the debt-to-income ratios of graduates.[79] While ITT executives discuss how much debt they can impose on their students, HELP Committee analysis indicates that a high proportion of ITT's students withdraw within 1 year without a degree, a fact absent from those discussions.[80]

The board presentation then asserted that the "most economically efficient" solution would be to provide selective financial awards to students likely to graduate. By focusing on graduating students, these awards could affect "only revenue from program completers," but would still "result in a reduction of the median loan debt balance of graduates in each program of study."[81] ITT continued to increase

---

the requirement that 35 percent of students are repaying loans. *Association of Private Colleges and Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012). While the decision questioned the basis for the repayment rate threshold as a part of Department's rulemaking, it did not question the accuracy of the repayment rate data.

[75] Id. The average repayment rate for all 15 publicly traded companies, including ITT and Corinthian, is 38 percent.

[76] ITT Internal Spreadsheets, Quarterly Financial Statements for 1996-2007 (ITT-00119308)

[77] Higher Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (1972). On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans. *Association of Private Colleges and Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012).

[78] ITT Internal Presentation, April 2010, Board of Directors Meeting (ITT-00133682, at ITT-00133684 and ITT-00133692). On June 2, 2011, the administration released its final rule, which was significantly less impactful than the rule discussed by the board. Under the final rule, a school's program does not lose access to title IV funds unless it violates three separate thresholds (loan repayment rates below 35 percent, annual average loan payment above 30 percent of students' discretionary income; *and* the annual loan payments above 12 percent of students total earnings) three separate times in 4 years. On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans. *Association of Private Colleges and Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost. com/judgeordergainful.pdf (accessed July 6, 2012).

[79] ITT Internal Presentation, April 2010, Board of Directors Meeting (ITT-00133682, at ITT-00133692).

[80] Senate HELP Committee staff analysis of data provided by for-profit education companies. See Appendix 15.

[81] ITT Educational Services, 2010, Q1 Earnings Conference Call with Investors.

tuition charges and told investors that the company funneled much of that additional revenue into institutional "scholarships," leaving per-student revenue flat.[82]

One of the scholarship programs created around the same time, the Presidential Scholarship, appears to match the school's strategy articulated in the board presentation. It gives a 20 percent tuition reduction for well-performing students, *applied retroactively* after a student completes a given quarter. Further, only Bachelor's degree students who first enrolled in a Bachelor's program after September 2008 are eligible, and only if they first graduated from an ITT Associate program.[83] While the scholarship does incentivize retention and graduation—a positive for students—it seems that company is able to reduce the debt loads of graduates, without "inefficiently" forgoing higher revenue from students who are not expected to graduate.

<u>Executives' Recognition That Higher Tuition Leads to More Withdrawals</u>

In some cases, tuition prices continue to increase despite for-profit executives' awareness of the burden that these increases represent, and the increased risk that this burden will force students to leave school without a degree. A director of admissions for Herzing's Madison campus wrote in an email:

> We would prefer to see no increases as there is already a struggle for many students . . . many of our students are already coming to us with large amounts of loans from prior institutions. Any increase will make it much more difficult for students to be able to graduate in their programs. This is only adding to the student's debt without them gaining additional marketable skills/degrees.[84]

The company ignored this advice and subsequently increased tuition by more than 5 percent.[85] A Director of Financial Services at Herzing added,

> In my experience, and especially lately, the majority of our students cannot afford higher payments. We have people coming in weekly asking to reduce their contributions or take out the maximum loans to increase their credit balances . . . I'm concerned that we will have increased drops and fewer starts.[86]

Similarly, a Kaplan executive wrote,

> Increases above 3% especially in Iowa. . .would cause a disruption in student packaging expectations that would lead students to reduce their class loads, or as worst case scenario, drop from our programs to attend a cheaper program where they could reduce out-of pocket tuition expenses.[87]

---

[82] Id.

[83] See for example, ITT Technical Institute, 2011, Albuquerque, NM, 2011 Course Catalog, http://www.itt-tech.edu/campus/download/060.pdf (accessed May 3, 2012).

[84] Herzing Internal Email, November 2009, re: *Tuition Increase Recommendations* (HP000006785). Herzing, Inc. ("Herzing") is a for-profit higher education company that enrolled 8,253 students as of 2010 and is based in Milwaukee, WI.

[85] See, for example, Herzing, Tuition Price Increases Between 2009–10 (HP000005259).

[86] Herzing Internal Email, November 2009, re: *Tuition* (HP000005730, at HP000005730).

[87] Kaplan Internal Email, December 2009, re: *RE: Tuition Discussion with Campus Presidents* (KHE 178035, at KHE 178035).

And according to one Apollo executive, "They are starting to hear an increase in the reason that the student is not returning to school is because they are advising that the price increase/high tuition is preventing them from returning." [88] An EDMC executive wrote in an email,

> I am really concerned that we will lose many of those students since many of the parents are telling SFS [Student Financial Services] that they feel that they have been deceived. I am also facing a moral [sic] problem in SFS department. They have been very excited to have moved so many students and now they feel that their work has actually been a negative.[89]

This awareness has led some for-profit executives to question the prudence of continued tuition increases. One EDMC executive wrote,

> While I do not agree with an October increase for the above stated reasons, at least if we'd been informed our admissions team would have used that to push up July and August starts. . .What do we gain compared to what we may lose by doing this? More importantly is this the right thing to do? [90]

This followed an earlier email from the same executive in which he wrote, "a decision to subsequently increase their rate might be viewed very negatively. [Employee] is concerned they will see it as, 'bait and switch.'" [91]

However, documents reviewed by the committee indicate that internal discussions among for-profit executives regarding tuition often revolve around how best to sell these continued tuition increases. In response to an email question as to whether they could remove the 90-day notice for raising tuition from the enrollment agreement, an EDMC executive wrote, "The problem is when we change the tuition on existing students if we do not provide with [sic] this time it creates a back lash on the school and our potential for student drops is larger. They need to absorb the information and get over the initial emotional impact." [92] The company states that the 90-day notice was not ultimately removed. A different EDMC executive wrote, "Although we all know intellectually why we are doing this, the fact remains that the sticker shock of a tuition increase of this magnitude, coupled with the financing issues we will face with the resulting gaps, could easily cause a blip in our enrollment and new start plans for fall." [93]

## Concealing the Cost of Tuition

Why does the high cost of tuition not lead to a decrease in student demand? In other words, if for-profit colleges are more expensive, why do students choose to attend them? The answer lies in the asymmetry of access to information. While for-profit college executives have access to full pricing information, in many cases, students do not. Intensive advertising and marketing means that for-profit

---

[88] Apollo Internal Email, October 2008, re: *RE: GP* (AGI0045758) (University of Phoenix).
[89] EDMC Internal Email, May 2007, re: *New Tuition Increase* (EDMC-916-000212577) (The Illinois Institute of Art-Chicago).
[90] EDMC Internal Email, May 2007, re: *FW: October Tuition* (EDMC-916-000220747).
[91] Id.
[92] EDMC Internal Email, May 2008, re: *Re: Tuition Increase* (EDMC-916-000212943).
[93] EDMC Internal Email, June 2008, re: *Bonuses* (EDMC-916-000211780).

colleges contact hundreds of thousands, or for some companies millions, of potential students to try to persuade them to enroll. If a potential student asks about the price of tuition, recruiters, as explained below, often are encouraged to evade directly answering questions about cost. And, as illustrated further below, many for-profit colleges emphasize to prospective students that they will have to pay little or no out-of-pocket expenses through the use of student loans and grants.[94]

Moreover, for many for-profit colleges, it is difficult to find a current and accessible source for the price of tuition. Despite regulations requiring colleges to clearly post the price of tuition and fees, some for-profit education companies continue to employ tactics to make this information difficult to find.[95]

For example, Rasmussen's Web site features a prominent link to the "Tuition" page.[96] But even after clicking this link and entering a zip code and the degree sought, prospective students only learn the cost *per credit hour*.[97] There is no statement of how many dollars or credits are required for a degree, for a year of classes, or even for a term. Moreover, links produced by a search of "tuition" that returned results including "Frequently Asked Questions" and "Financial Aid" do not provide any further information."[98] Only the eleventh link, "Rasmussen College Student Investment Disclosure Information," the mandated disclosure, actually explains the cost.[99] Similarly, clicking "cost and financial aid" on the Capella Web site eventually leads to a page telling potential students that a Bachelor's degree requires 180 credits, which cost $290 per credit hour for lower level courses and $350 per credit hour for upper level courses.[100] But the page does not tell the student that the program requires, at a minimum, that a student take 96 upper-level credits (a potential cost differential of up to $5,760).[101] The page instead twice mentions that an "enrollment counselor," the company term for recruiters, can help the student determine the price. Upon contacting the company via an online chat, a committee staff member received three separate cost estimates.[102]

Even in the case of companies that charge the same price for each credit and reveal the number of credits required for a degree, students can still find it difficult to determine total program cost. For instance, at Career Education Corporation-owned Colorado Technical University, the officially disclosed program cost for a "Bachelor's Degree in Business Administration and Management, General" is

---

[94] See also Corinthian Colleges Internal Document, Admissions Representative Training Manual Section on Overcoming Common Objections and Responses (CCi-00046774, at CCI-00046777).

[95] U.S. Department of Education, "Program Integrity Issues," Final Rule, 75 Fed. Reg. 66833, October 29, 2010. See also David P. Smole, Department of Education Final Rules for Postsecondary Education Programs That Prepare Students for Gainful Employment in a Recognized Occupation, Congressional Research Service, September 20, 2011.

[96] Rasmussen Colleges, Inc. ("Rasmussen") is a for-profit higher education company that enrolled 17,090 students as of fall 2010 and is based in Minnetonka, MN.

[97] Rasmussen, *Tuition at Rasmussen College*, www.rasmussen.edu/tuition (accessed May 2, 2012).

[98] Rasmussen, Search Results for Tuition, www.rasmussen.edu/search?s=tuition&x=0&y=0 (accessed May 22, 2012).

[99] Id.

[100] Capella Education Company ("Capella") is a publicly traded for-profit higher education company that enrolled 38,634 students as of fall 2010 and is based in Minneapolis, MN.

[101] Capella, *2012-2012 University Catalog*, vol. 12-13, no. 1, p. 102, July 2012, http://www.capella.edu/inc/pdf/catalogs/catalog.pdf?linkID=22991&WT.mc_id=22991&Refr=http://search2.capella.edu/?submit=Search&sp_cs=UTF-8&q=course%20catalog (accessed May 3, 2012).

[102] Senate HELP Committee staff online chat with Capella admissions representative, Capella.org, April 20, 2012.

$31,453.[103] A notation then explains, "Tuition, Fees & Books information above represents the average total charges incurred by students who completed the program in normal time between 07/1/2009 and 6/30/2010." However, this information is out-of-date, and the Web site does not disclose that a student enrolling today could pay nearly $22,000 more.[104]

Some companies also mask program costs by adding expensive fees that are not included in cited tuition figures. For instance, Bridgepoint Inc.'s Ashford University charges a "technology fee" of $1,290 to every new student's account during the 6th week of enrollment.[105] Westwood charges all online students a $40 per-credit-hour fee, which adds up to over $6,000 over the course of a Bachelor's degree.[106] Nonetheless, by labeling the fee separately from tuition, Westwood can list a lower tuition, while still increasing the per-credit-hour cost to its students.

While prospective students face the most sophisticated evasion tactics, some companies also hide the cost of attendance from *current* students. For instance, an accreditor's review panel member suggested that an ITT campus could post tuition increases in the student lounge, so that current students would be notified without first having to locate and read the updated course catalog. ITT's Regulatory Affairs Manager denied the request, stating: "We comply with State requirements and ACICS criteria 3-1-342(a) by clearly posting the tuition and other charges in the catalog. Until the ACICS criteria require an additional posting all ITT Technical Institutes will list tuition and other charges as required in the catalog."[107]

**Aggressive and Deceptive Recruiting**

*In order to make a profit, the product [an education] must first be sold to as many appropriate people as possible. This can happen only when a good sales team is performing well.*

*—Kaplan Director of Admissions training manual*[108]

Demonstrating enrollment growth is critical to the business success of for-profit colleges. Ac-

---

[103] Colorado Technical University, *Tuition, Fees, and Median Loan Debt Disclosure*, http://www.coloradotech.edu/Disclosures/~/media/ Disclosures/CTU/Colorado-Springs/Colorado-Technical-University-Colorado-Springs-010148-00-Tuition-Debt-Disclosure.ashx (accessed May 3, 2012). Colorado Technical University is a brand operated by Career Education Corporation ("CEC") a publicly traded for-profit higher education company that enrolled 118,205 students as of fall 2010 and is based in Schaumburg, IL.

[104] While the disclosure appears to be in compliance with the regulation, if the required credit hours are multiplied by the current cost per credit hour the cost is significantly higher than the disclosure suggests.

[105] Ashford University, Tuition and Fees, http://www.ashford.edu/admissions/online_tuition_fees.htm (accessed May 3, 2012).

[106] See Westwood, Course Catalog Addendum Effective 08/01/12, http://www.westwood.edu/~/media/Files/files/ pdf/catalogs/wco_addendum.ashx (accessed July 1, 2012). See also Westwood Internal Document, 2008, Draft Tuition Pricing Table (WP000003947); Westwood Internal Document, 2008, Draft Tuition Pricing (WP000003948); Westwood Internal Presentation, 2009, Marketing Presentation on Tuition Pricing (WP000004111); Westwood Internal Presentation, 2009, Marketing Presentation on Tuition Pricing (WP000004381).

[107] ITT Educational Services, January 2009, re: *RE: Tuition Increase—posting for students* (ITT-00080730).

[108] Kaplan, *Kaplan Higher Education Western Region Director of Admissions Tool Kit* (KHE 056793, at KHE 056796). Kaplan states that training materials for admissions representatives are approved through a formal review process at Kaplan's home office, and that this document was not authorized through that process and was used by a single manager and admissions team in California, and was removed from use by early 2008.

cordingly, college employees are incentivized to enroll as many students as they can, sometimes using misleading and deceptive tactics. Prior to the committee's investigation, media reports and lawsuits exposed some of the incentive structures and unscrupulous recruiting tactics used by for-profit colleges.

For example, Apollo, parent company of the University of Phoenix, paid $78 million to settle a 2002 lawsuit claiming that it illegally paid its recruiters based on the number of students each recruiter enrolled.[109] In 2005, following a "60 Minutes" report on CEC's recruiting practices, the company's schools were investigated by State agencies in New Jersey and Pennsylvania, the U.S. Department of Justice, the U.S. Department of Education, and the U.S. Securities and Exchange Commission.[110] Alta-owned Westwood recently settled with the Colorado attorney general for allegedly misleading students and falsely advertising job placement rates, salary, transfer of credits and other important information.[111] Many other schools, including Corinthian Colleges, Inc. and ITT, have faced shareholder and whistle-blower lawsuits stemming from their recruiting practices.[112]

The companies, as well as their lobbyists and trade associations, blame these practices on a few "bad apples" among an otherwise well-trained and ethical enrollment staff. The investigation, however, found that the tactics associated with recruiting students to enroll in for-profit colleges are widespread. Internal company documents, undercover recordings by the Government Accountability Office, HELP Committee staff interviews with employees and students, and testimony and statements from former recruiters all demonstrate that recruiters at many schools are trained to aggressively pursue and enroll as many students as possible, often with little regard for ethical standards or the best interests of the prospective students. At many schools, at least during the period examined, misleading students to secure enrollment contracts appeared to be a common practice rather than an exception.

Faced with evidence of recruiting abuses, many companies operating for-profit colleges point to their official policies setting out high ethical standards for their recruiters. Any violations of these

---

[109] Carly O'Reilly and Daniel Golden, "Apollo Settles University of Phoenix Recruiting Suit (Update 3)," *Bloomberg*, December 14, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a7cFhPKPB1mA (accessed May 19, 2012). For a description of complaint against University of Phoenix see Appellant's Opening Brief, United States *ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (2006) (No. 04-16247). For personal accounts from former University of Phoenix counselors that confirm allegations made in the claim, see: Julie Albertson Beh, Exhibit F to Appellant's Opening Brief, United States *ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (2006) (No. 04-16247). Both documents available at http://www.citronresearch.com/wp-content/uploads /2009/03/nice_case_summary.pdf (accessed May 3, 2012).

[110] Eric Wills, "2 More States Open Investigations Into Colleges Owned by Career Education Corp," *The Chronicle of Higher Education*, August 3, 2005, http://chronicle.com/article/2-More-States-Open/120885/ (accessed May 3, 2012); Rebecca Leung, "For Profit College: Costly Lesson," *CBS News*, February 11, 2009, http://www.cbsnews.com/2100-18560_162-772913.html?pageNum=2&tag=contentMain;contentBody (accessed May 3, 2012); Stephen Burd, "Promises and Profits," *The Chronicle of Higher Education*, January 13, 2006, http://chronicle.com/article/PromisesProfits/12779/ (accessed May 3, 2012). The SEC took no action against the company, but the U.S. Department of Education prohibited CEC from expanding until it had resolved issues with financial statements and program reviews connected with Collins College and Brooks College. Career Education Corporation ("CEC") is a publicly traded for-profit higher education company that enrolled 118,205 students as of fall 2010 and is based in Schaumburg, IL.

[111] Alta Colleges, Inc. ("Alta") is a for-profit higher education company that enrolled 19,190 students as of fall 2010 and is based in Denver, CO. Attorney General, Colorado Department of Law, "Attorney General Announces $4.5 Million Settlement with Westwood College to Address Deceptive Business Practices," March 14, 2012, http://www.coloradoattorneygeneral.gov/press/news/2012/03/14/attorney_general_announces_45_million_settlement_westwood_college_address_dece (accessed March 14, 2012).

[112] See, for example, Stuart Pfeifer, "Whistle-blower lawsuit against Corinthian Colleges restored," *Los Angeles Times*, August 20, 2011, http://articles.latimes.com/2011/aug/20/business/la-fi-corinthian-20110820 (accessed May 19, 2012); Goldie Blumenstyk, "ITT Wins a Round in Ex-Recruiters' Suit," *The Chronicle of Higher Education*, November 5, 2004, http://chronicle.com/article/ITT-Wins-a-Round-in/26180 (accessed May 19, 2012).

standards, they say, are the work of rogue employees. But evidence indicates that at some schools, those standards are, in fact, routinely disregarded. Internal coaching and disciplinary memoranda show that recruiting managers focus on one thing: meeting quotas of new enrollments set from above.

These quotas, as discussed below, are enforced through incentives and punishments meted out to recruiters. Since 1992, the Higher Education Act has banned "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." This ban applies to all institutions of higher education. In 2002, the Department of Education through its rulemaking process created 12 "safe harbors" that essentially allowed incentive-based payments to recruiters. These safe harbors were eliminated effective July 2011. At the same the Department of Education revised the definitions and provisions that describe the activities that constitute "substantial misrepresentation" by an institution regarding the nature of its educational program, its financial charges, or the employability of its graduates. Since the the documents discussed below were obtained pursuant to a document request in 2010 and reflect recruiting practices and policies in place before these strengthened regulations were put in place. It is important to note that though the elimination of the safe harbors means companies may no longer pay their recruiters based on enrollments, there is no law or regulation preventing them from firing recruiters who do not meet enrollment quotas.

Kaplan recruiter training presentation slide:[113]



---

[113] Kaplan Internal Presentation, *"Explore" Another Piece of My Heart: Turning Inquiries into Appointments* (KHE 052058 at KHE 52061). Kaplan instituted a new program, the Kaplan Commitment, in late 2010 (after the date of the training materials) that allows all students to withdraw within 5 weeks of starting classes without incurring any obligation to the school or to lenders. If a student leaves Kaplan within that time, or if the company determines that because of the student's performance or attendance he or she is unlikely to succeed, the student can withdraw paying only a minimal application fee. See Kaplan University, *The Kaplan Commitment Statement*, http://getinfo.kaplan.edu/kaplancomittment.aspx (accessed July 1, 2012).

Recruiters Operate in a Boiler-Room Sales Atmosphere

In order to understand the prevalence of the misleading and deceptive tactics documented by the committee, it is important to understand how a typical for-profit college recruiting apparatus works. Unlike traditional colleges, for-profit colleges employ a huge number of recruiters. Although the for-profit industry prefers to call these sales employees enrollment "advisors" or "counselors," their job is to follow a script and, in most cases, to attempt to

enroll every prospective student. Recruiters are often divided into teams that work under a manager who closely supervises the number of contacts they make. In many cases, whether recruiters keep their jobs depends on whether they meet their enrollment quotas.

Documents provided by 30 for-profit education companies show that in 2010 the sector employed more than 35,202 recruiters, or about one recruiter for every 49 students attending a for-profit college.[114] Kaplan employed 3,069 recruiters, ITT employed 2,550, Career Education Corporation had 2,668, and Corinthian had 2,811.[115]

| Comparison of Number of Students Enrolled to Number of Recruiters, 2009-10[116] | | | |
|---|---|---|---|
| Company | Fall 2010 Enrollment[117] | Number of Recruiters | Ratio Students to Recruiters |
| Apollo Group, Inc. | 470,800 | 8,137 | 57 |
| Education Management Corporation | 158,300 | 5,669 | 27 |
| Kaplan Higher Education Corporation | 112,141 | 3,069 | 36 |
| Corinthian Colleges, Inc. | 113,818 | 2,811 | 40 |
| Career Education Corporation | 118,205 | 2,668 | 44 |
| ITT Educational Services, Inc. | 88,004 | 2,550 | 34 |
| DeVry, Inc. | 130,375 | 2,350 | 55 |
| Bridgepoint Education, Inc. | 77,179 | 1,703 | 45 |
| Grand Canyon Education, Inc. | 42,300 | 1,065 | 39 |
| Lincoln Educational Services Company | 33,157 | 711 | 46 |
| All 30 Companies Examined | 1,732,067 | 35,202 | 49 |

The pressure to recruit as many students as possible starts at the top of the for-profit education business model. Investors, whether public or private, demand revenue growth. Revenue growth requires enrolling a steady stream of students. Thus, executives, unless there are balancing priorities, are accountable for bringing in as many students as possible. For instance, the compensation of ITT's management

---

[114] Senate HELP Committee staff analysis of data provided by for-profit education companies. Appendix 24.

[115] Id.

[116] Information is for the 10 companies that employ the largest number of recruiters, organized by number of recruiters.

[117] Senate HELP Committee staff analysis of fall 2010 Enrollment Data, from IPEDS or for-profit education company SEC Filings (where available).

employees depends on meeting several "corporate objectives" related to enrollment and revenue: "Total Enrollment Growth" of 9 percent, "Earnings Per Share" of 20 percent and "Free Cash Flow" of 15 percent.[118] The way to increase enrollments is to hire a large team of recruiters. As one Wall Street analyst noted, "More admissions counselors has historically correlated amazingly highly with more students, and thus more revenues." [119]

Corporate executives, in turn, put pressure on recruiting managers at each campus or call center to hit their budgeted sales numbers. Line-level recruiters are responsible to these managers for the number of students they bring in, termed "starts." The performance of each person in the admissions chain, from CEO to newly-hired junior recruiters, is rated at least in part based on the number of students he or she brings in the door. While the re-instituted ban on incentive compensation may have relieved some of this enrollment pressure, information detailed below shows that at least some companies enrollment quotas are still enforced through disciplinary actions and terminations of recruiters.

### _Hiring and Firing_

For-profit colleges prefer to hire recruiters with past sales experience. Some colleges make this clear in their hiring and training documents. A Corinthian Colleges training manual, for example, instructed Directors of Admissions to look for "sales experience" and "phone, telemarketing experience" among potential hires.[120] Anthem Career College's training manual stated that a recruiter "is a sales position." [121] Similarly, the official job description of a recruiter in one Kaplan manual made it clear that selling was the dominant focus of the position.[122] A recent job advertisement by ATI, a Texas-based chain of schools, stated its recruiter positions offer a "lucrative" opportunity for applicants with a "proven track record of sales performance." [123] A recent EDMC posting for an Assistant Director of Admissions position told applicants "the position is heavily sales focused and is not a traditional counseling position." [124]

---

[118] ITT, Completed 2008 Performance Planning and Evaluation (PP&E) Form (ITT-00041048). ITT states that this document is a draft. Below the corporate management level, Directors of Recruitment are judged based on the performance of the recruiters below them. An internal document from Vatterott Educational Centers, Inc., for example, shows that the recruiting director at a Vatterott campus was demoted for her department's failure to

enroll enough students. Vatterott Internal Memorandum, October 2009, re: _Transfer to Admissions Representative Position_ (VAT-02-15-00350).

[119] Bill Wolf, "Why Shorts and the Street Have it Wrong About Bridgepoint," Seeking Alpha, December 14, 2011, http://seekingalpha.com/article/313976-why-shorts-and-the-street-have-it-wrong-about-bridgepoint (accessed May 3, 2012).

[120] Corinthian College, CCI Director of Admissions Operations Manual (CCi-00045638).

[121] Anthem College, April 2010, _Assistant Director of Admissions & Senior Admissions Representative Training Program Workshop I_ (2AEG-HELP-14-00000811). Anthem Career College is a brand operated by Anthem Education Group ("Anthem"), a for-profit higher education company that enrolled 12,792 students as of fall 2010 and is based in Phoenix, AZ.

[122] Kaplan, _Kaplan Higher Education Western Region Director of Admissions Tool Kit_ (KHE 056793) ("Your successful recruiters will make money for themselves and for you"). Kaplan states that training materials for admissions representatives are approved through a formal review process at Kaplan's home office, and that this document was not authorized through that process and was used by a single manager and admissions team in California, and was removed from use by early 2008. See also Corinthian College, CCI Director of Admissions Operations Manual (CCi-00045638); Anthem College, April 2010, _Assistant Director of Admissions & Senior Admissions Representative Training Program Workshop I_ (2AEG-HELP-14-00000811) ("This is a sales position"); Vatterott, March 2007, _DDC Training_ (VAT-02-14-03904).

[123] WorkinTexas.com, _Admissions Representatives_, April 16, 2012, https://wit.twc.state.tx.us/WORKINTEXAS /wtx?pageid=EM_JP_JOB_DETAILS&id=2578066 (accessed May 23, 2012). ATI is a for-profit higher education company that was not one of the 30 companies to receive a document request by the committee in the course of its investigation.

[124] Craigslist San Francisco Bay Area, listing under "sales jobs" accessed March 26, 2012. EDMC is a publicly traded for-profit higher

Recruiting managers at some companies created an atmosphere that prioritized hitting an enroll-ment quota. For example, a Kaplan manual instructed recruiting managers to clearly "establish expecta-tions" with new recruiters that the enrollment numbers mean everything.[125] This was often accomplished through rigorous and constant monitoring of recruiters' activities. In some cases, managers sent out multiple emails each day to the whole recruiting department listing the "production" of each recruiter. At Corinthian, managers continuously monitored a number of performance metrics for each recruiter including appointments being set, interviews conducted, applications taken and daily enrollment.[126] An EDMC manager's email, from January 2008, illustrates further: "The goal is 100 March starts and we only have 47 on the books. So we must take no less than 15 March apps each week for the next 6 weeks." [127] Another email from an EDMC manager instructed recruiters "PLEASE EVERYONE HIT THE PHONES!!!," because "WE ARE FAR BEHIND WHERE WE NEED TO BE!!!" [emphasis in original].[128]

Recruiters at some companies were evaluated not only based on overall enrollment numbers, but also the number of calls made, appointments set, the ratio of leads-called-to-appointments-set, ratio of appointments-to-applications, and ratio of applications-to-starts. At Bridgepoint, recruiters were ex-pected to bring in three new student applications a week.[129] Newly hired Kaplan recruiters were expected to hit "Minimum Standards" of 10 interviews, 3 applications and one enrollment per week.[130] Vatterott's "expectations" for recruiters included: "Outbound Calls—50 MINIMUM. Appointments Set—5. Ap-pointments Held—3. [And] 3 Packaged per week" [emphasis in original]. [131]

Recruiters who continued to fail to bring in enough students were put through a disciplinary process, regularly ending in termination. "If your performance does not show immediate and sustained improvement, further corrective action may be taken, up to and including termination of employment" is a common admonition in training materials and performance improvement plans at multiple companies examined by the committee.[132]

---

education company that enrolled 158,300 students as of fall 2010 and is based in Pittsburgh, PA.

[125] Kaplan Internal Presentation, Training and Development Professional Development Series: Conversion Coaching (KHE 061037).

[126] Corinthian College, CCI Director of Admissions Operations Manual (CCi-00045638, at CCi-00045678-79).

[127] EDMC Internal Email, February 2008, re: *NO NSR Tomorrow!!!* (EDMC-916-000232415) (Art Institute of Charlotte).

[128] EDMC Internal Email, January 2008, re: *FW: Conversion* (EDMC-916-000234003) (Art Institute of Charlotte).

[129] Bridgepoint, Admissions Advisor Goals Form (BPI-HELP_00032028).

[130] Kaplan Internal Presentation, Training and Development Professional Development Series: Conversion Coaching (KHE 061037, at KHE 061942).

[131] Vatterott, March 2007, *DDC Training* (VAT-02-14-03904). See also Bridgepoint, Enrollment Representative Matrix 1 (BPI-HELP_00062002)(Ashford University). Vatterott Education Holding ("Vatterott") is a for-profit higher education company that enrolled 11,163 students as of fall 2010 and is based in St. Louis, MO.

[132] ITT, November 2009, Completed Employee Counseling Form (ITT-00023885); see also Bridgepoint, January 2009, *Conversion Tracker* (BPI_HELP_00062021); ITT Internal Email, April 2007, re: *Letter of Concern* (ITT-00023887); ITT Educational Services, *Plan for Hitting Start Goals* (ITT-00022941); Vatterott College Internal Memorandum, June 2009, re: *MEMO OF UNDERSTAND-ING/PERFORMANCE IMPROVEMENT PLAN* (VAT-02-30-07962); Anthem College, April 2010, *Assistant Director of Admissions & Senior Admissions Representative Training Program Workshop 1* (2AEG-HELP-14-00000811); National American University Internal Memorandum, January 2009, re: *Performance Improvement Plan* (NAU0025042); National American University Internal Memorandum, June 2005, re: *Performance Improvement Plan* (NAU0025482); National American University Internal Memorandum, June 2009, re: *Performance Improvement Plan* (NAU0025534); ITT, January 2008, Completed Employee Counseling Form (ITT-00023885); Concorde Career Colleges, December 2009, Presentation from Board of Directors Meeting (CCC000000545); Kaplan, *Kaplan Admissions Advisor Compensation Plan* (KHE 0048796); Kaplan Internal Email, June 2010, re: *[redacted employee name] termination request* (KHE 267972); Kaplan Internal Email, June 2010, re: *PICK IT UP* (KHE 282794).

At Bridgepoint, every recruiter who does not hit his or her numbers faced intensive coaching and discipline. An internal document shows that a Bridgepoint recruiting manager met at least 18 different times over 3 months with one recruiter who had a "lack of production." [133] These meetings included: "Individual trainings on overcoming objections," sitting in on the manager's recruiting calls, and discussing "minimum call volumes, scheduling activities, block schedules, daily plan." [134] Another low-producing recruiter faced 14 meetings before being fired after only 6 months on the job.[135]

Managers were also trained to play recruiters against each other by withholding the "leads" (the industry term for contact information of potential students) that are essential for a recruiter to hit their sales numbers. For example, a Corinthian training manual recommended that managers not "distribute an equal amount of [leads] to a new Ad Rep nor an Ad Rep that is underperforming versus a top producing Ad Rep." [136] Whistleblowers confirmed that giving "top producing" reps—who often used deception and high-pressure sales tactics—the most leads is a commonplace tactic, which can create acute competition and an ethical race to the bottom among recruiting staff.[137]

In addition to attrition due to firing under-performing recruiters, the high-pressure atmosphere of for-profit education sales results in high rates of recruiter turnover. For example, one Rasmussen campus saw half of its recruiters leave within a year.[138] Company documents indicated that many employees who quit simply walk out without any notice.[139]

### *Compensation*

Before the ban on incentive compensation was re-instituted in mid-2011, recruiters' salaries at many for-profit colleges were tightly tied to enrolling a certain number of new students, known in the industry as "starts." For instance, Heald College's 2007 compensation plan for online recruiters included "minimum Starts" quotas based on the recruiter's seniority.[140] Junior level recruiters had to achieve at least 45 starts every 6 months. To be eligible for a promotion or raise, though, recruiters had to enroll even more students. Sixty new recruits are necessary for a 10 percent salary increase.[141] Seventy new

---

[133] Bridgepoint, September 2008, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063036); see also Bridgepoint, October 2008, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063243); Bridgepoint, August 2008, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063503); Bridgepoint, October 2008, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063587); Bridgepoint, March 2009, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063642).

[134] Bridgepoint, August 2008, Log of Activity Coaching and Disciplining Recruiter for Lack of Production (BPI-HELP_00063503).

[135] Id.

[136] Corinthian College, CCI Director of Admissions Operations Manual (CCi-00045638).

[137] See Comment submitted to Department of Education by Brent Park, Ashford recruiter; Joshua Pruyn (former Admissions Representative, Alta College, Inc., Denver CO), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience,* 112th Congress (2010).

[138] Rasmussen College Internal Presentation, May 2006, Report of CEO Michael Locke to the Board of Directors (RAS00001285, at RAS00001296).

[139] Rasmussen College Internal Presentation, September 2010, *Admission Turnover & Career Path* (RAS00007757).

[140] Heald College, December 2007, *Adult Admissions Advisors Compensation Plan* (CCi-00041544). Heald College was purchased by Corinthian College in late 2009, and was independent of Corinthian at the time this document was created.

[141] Id.

recruits warranted a 20 percent increase.[142]

In addition to salary increases, managers sometimes used prizes and awards to drive sales. EDMC managers used carrots such as "GET OUT OF WORK AT 3p.m." cards to push recruiters to enroll more students.[143] At ITT, a recruiter manager emailed his team in December 2009 that "ANY TEAM WITH 6 APPOINTMENTS SET OR 2 APPLIED CAN WORK AN EARLY SHIFT ON WEDNESDAY" [emphasis in original].[144] Other schools use much larger prizes, like company-paid trips. "Looks like [recruiter's name] might be going to Hawaii!!!" a recruitment manager emailed her recruiting staff after looking at the daily enrollment report.[145] The company asserts that it never sponsored a trip to Hawaii for its recruiters. The top recruiters at Westwood were rewarded with all-expenses paid trips to Cancun.[146]

Misleading and Deceptive Tactics

The priority placed on "sales" numbers, and the incentive and termination structure that for-profit colleges used to meet those numbers, led recruiters to use tactics most people would find misleading and deceptive in order to secure enrollments. These tactics vary somewhat from company to company. However, internal documents, interviews and Government Accountability Office (GAO) undercover recordings demonstrate that virtually every company reviewed misled some prospective students or omitted information with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, and the reputation and accreditation of the school.

This is particularly troubling because recruiters present themselves to prospective students as "counselors" who provide unbiased information about college programs. They often lead students into believing their intent is to advise the student on what is best for him or her. As one Bridgepoint recruiter wrote, "During the 2 week new employee training, we are told to always consider the best interests of the student. . . All the employee literature and documentation also states the same things based on high morals. But once you get to the sales floor the way they actually conduct business is opposite."[147] Joshua Pruyn, a former recruiter at Westwood College, testified that management often rewarded high-performing recruiters who had a reputation for using high-pressure sales tactics and deception, and singled them out as exemplary to other employees.[148]

---

[142] Id.

[143] EDMC Internal Email, May 2008, re: *FW: conversion* (EDMC-916-000234047) (Art Institute of Charlotte).

[144] ITT Internal Email, December 2009, re: *CONTEST UPDATE ! ! ! 30 APPOINTMENTS—YAHOO ! ! !* (ITT-00028551).

[145] EDMC Internal Email, December 2008, re: *FW: CARS Report Attached* (EDMC-916-000232456) (Art Institute of Charlotte).

[146] Joshua Pruyn (former Admissions Representative, Alta College, Inc., Denver CO), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience,* 112th Congress (2010). Mr. Pruyn testified regarding a number of misleading and deceptive tactics used by Westwood employees that called into question the integrity of recruiting practices at Westwood College. More than four months after his testimony, in December 2010, lawyers for Westwood contacted the committee and asserted that Mr. Pruyn's testimony regarding one point (whether his supervisors had contacted a military student who had changed his mind about enrolling was not correct). While it is possible that Mr. Pruyn's recollection is not correct regarding this point, other parts of his testimony on other points have been substantiated by internal documents produced to the committee and by a March 2012 complaint filed by the Colorado Attorney General's office as part of a settlement reached with Westwood.

[147] Comment submitted to Department of Education by Brent Park, Ashford recruiter.

[148] Joshua Pruyn (former Admissions Representative, Alta College, Inc., Denver CO), Testimony before the Senate Committee on Health,

<u>*Misleading and Deceptive Tactics: Cost, Financial Aid, and Time to Complete*</u>

Recruiters at some schools misstate or mislead prospective students about the cost of attending a school. According to multiple whistleblowers interviewed by committee staff and corroborated by undercover recordings made by the GAO, recruiters commonly emphasize to students that they can quickly complete a program, and recruiters cite a time-to-completion based on year-round full-time attendance. By contrast, when telling the student how much the program will cost, they cite the yearly cost as if the student were only paying tuition for attending part of the year.

Undercover recordings made by GAO agents show that they repeatedly encountered this tactic at the schools it visited. For example, at a University of Phoenix campus in Hohokam, the undercover student was interested in a Bachelor's program in elementary education that required 120 credits.[149] The recruiter said, "This is a Bachelor's so it's 4 years, you would finish in exactly 4 years, that's the worst scenario. . . . There are ways to speed it up." When the undercover prospective student asked about cost, the recruiter replied, "With books and everything it's right about $9,500 a year." In reality, if the prospective student were to take full-time classes, year-round, to finish in less than 4 years, it would cost about $12,000 a year. Josh Pruyn, a former recruiter at Westwood College, explained that his new employee training instructed recruiters to state the cost in a misleading way: "We would say the cost per term is approximately $4,800 per term. The problem with that is that often times the student will automatically assume there are only two or three terms like a traditional school, and there is in reality, five per year. And so it can mislead the student on the total cost." [150]

The committee staff reviewed many complaints from students who were misled regarding how long it would take to complete a degree. As one student, a military servicemember, said in his complaint,

> University of Phoenix is using deceptive practices to lure students into the schools, the enrollment counselors tell students that they should be complete with their course of studies in a short period of time fully knowing how long it is going to take. . . . I have talked with other students at the University of Phoenix and this appears to be a common tactic used by University of Phoenix's enrollment counselors.[151]

Internal training manuals demonstrate tactics recruiters can use to avoid giving a prospective student an accurate answer about the cost of attending. For example, South Dakota-based National American University training materials instructed recruiters to deflect questions about the cost of tuition and "do not bring up the subject again unless they do." [152] If the prospect brought cost up again, the recruiter

---

Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience,* 112th Congress (2010).

[149] See for example, Audio Recording: Undercover Recordings of Visits by GAO Agents to For-Profit Schools, School 1, Scenario 2 at minute 00:11:10 and 00:13:58, available at http://harkin.senate.gov/help/gao.cfm (accessed May 3, 2012) (hereinafter GAO Audio Recording). See also GAO Audio Recording, School 2, Scenario 2; School 5, Scenario 1; and School 10, Scenario 1, available at http://harkin.senate.gov/help/gao.cfm (accessed May 3, 2012).

[150] Joshua Pruyn (former Admissions Representative, Alta College, Inc., Denver CO), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience,* 111th Congress (2010).

[151] Apollo, May 2009, Letter from Office of the Attorney General Department of Consumer Information, re: Online Consumer Complaint (1-AGI0051856).

[152] National American University, 2008, *New Admissions Representative Training Manual 2008* (NAU0014515).

was instructed to give another non-answer. If the prospect asked a third time, the recruiter was instructed to state the cost per credit hour, but not the number of credits required to graduate in the program. Lest there is any doubt, the next page instructed, "Do not give out the complete program cost." [153]

As discussed below, some for-profit colleges enforced a policy of preventing or discouraging prospective students from speaking to a financial aid employee, who can answer questions about cost and aid eligibility, before the prospect signed an enrollment agreement. At the Dallas campus of ATI Career Center, an undercover GAO prospective student expressed concern about being able to afford school and asked to speak to a financial aid representative. A recruiter replied, "They won't even let you back there." [154] When the prospective student asked again, a recruiter aggressively replied, "Let me ask you something, are you serious about this program?" [155]

Beyond just hiding financial aid information, recruiters routinely claimed that financial aid would fully cover the cost of going to school. For example, a veteran who attended Bridgepoint-owned Ashford University was repeatedly told by recruiters that his post-9/11 GI bill benefits would cover the entire cost of his degree, only to find out after he was enrolled that he would owe Ashford approximately $11,000 that his benefits did not cover. "I was extremely disappointed, confused and angry," he wrote, " I felt that I have been misled, deceived or even outright lied to in an effort to gain my contractual agreement." [156]

_Misleading and Deceptive Tactics: Graduation, Job Placement, and Salary_

Recruiters at some colleges misrepresented the college's ability to help the prospective student achieve his or her career goals, employing deceptive statements regarding graduation, job placement, and salary.

For example, at Potomac College in Washington, DC, an undercover GAO applicant asked about graduation and job placement rates. The school's representative replied, "Our graduation rate is good, but exactly what it is I don't know because there is, something online about it, but I don't think it is completely accurate." [157] In reality, far from being "good," according to the Department of Education, only 25 percent of students graduate with a Bachelor's degree from the school in 6 years or less.[158] Likewise, at a Kaplan College campus in California, in response to a question from the GAO undercover student about how many people graduate, the recruiter said, "I want to say 90 percent." [159] Analysis of

---

[153] Id. NAU notes that in 2009 it revised the code of conduct for all recruiters and specifies that all recruiters are required to sign the code of conduct and are held strictly accountable to the code. See National American University, August 2010, _Admissions Code of Conduct,_ (NAU0021252).

[154] GAO Audio Recording, School 15 (ATI Career Training Center), Scenario 2 at minute 00:21:58. See also, GAO Audio Recording, School 7 (MedVance Institute), Scenario 2; GAO Audio Recording, School 15 (ATI Career Training Center), Scenario 2 at minute 00:24:30.

[155] GAO Audio Recording, School 15 (ATI Career Training Center), Scenario 2 at minute 00:21:58.

[156] Bridgepoint Internal Memorandum, August 2010, re: _"This Constitutes My Formal Complaint"_ (BPI-HELP_00026639).

[157] GAO Audio Recording, School 5 (Potomac College), Scenario 1 at minute 00:07:34. See also GAO Audio Recording, School 3 (Westech College), Scenario 1. Potomac College is a small education company with campuses in Washington, DC and Vienna, VA, offering business and IT degrees. It is not part of the 30 companies that received a document request from the committee in the course of its investigation.

[158] U.S. Department of Education, IPEDS, Data for OPEID 03218300. Data cover only first-time full-time students.

[159] GAO Audio Recording, School 4 (Kaplan College Riverside), Scenario 2 at minute 00:19:55.

data gathered by the HELP Committee shows that, in fact, for students enrolling in 2008-9, at least 45.7 percent of students withdrew from that campus before completing their certificate.[160]

At Bennett Career Institute in Washington, DC, which awards certificates in barber styling, the recruiter told the GAO undercover student that barbers can earn $150,000 to $250,000 a year.[161] The reality is very different— the mean wage for barbers in Washington, DC is less than $30,000 a year.[162] At another school, the recruiter said, "We will get you a job. I can't promise you that just because I can't say those words here, but I'm telling you right now, you will get a job." [163]

### *Misleading and Deceptive Tactics: Accreditation and Credit Transfer*

Many for-profit colleges hold *national* accreditation, meaning that they are accredited by an agency that traditionally handles vocational or distance learning schools. Holding this type of accreditation, however, generally means that the credits earned are rarely accepted at *regionally* accredited schools, which include all major non-profit and public universities and some for-profit colleges.[164] And even credits awarded at regionally accredited for-profit colleges may not transfer to other regionally accredited non-profit and public colleges.

Recruiters sometimes play on prospective students' ignorance about accreditation in order to use their schools' accreditation as a selling point.[165] For example, at Kaplan College in Florida, GAO recordings documented a recruiter falsely stating that the college was accredited by "the top accrediting agency" and that "Harvard and University of Florida, they all use that accrediting agency." [166] While Kaplan University based in Iowa *is* regionally accredited, the Kaplan College division *does not* hold regional accreditation and not from the same agency as Harvard or the University of Florida.[167]

Too often, students do not learn that their credits will not transfer until after they leave school. One Remington student explained,

The Recruiter told me that their credits would transfer to any college and that it was accredited

---

[160] U.S. Senate HELP Committee staff analysis of data provided by Kaplan Higher Education.

[161] GAO Audio Recording, School 6 (Bennett Career Institute), Scenario 1. Bennett Career Institute is not part of the 30 companies that received a document request from the committee in the course of its investigation.

[162] Bureau of Labor Statistics, Occupational Employment Statistics, 39-5011 Barbers. http://www.bls.gov/oes/current/oes395011.htm.

[163] GAO Audio Recording, School 8 (Kaplan College Pembroke Pines), Scenario 2 at minute 01:57-02:10.

[164] See, for example, Council for Higher Education Accreditation, *The Fundamentals of Accreditation: What Do You Need to Know*, Council for Higher Education Accreditation, p. 7, September 2002, http://www.chea.org/pdf/fund_accred_20ques_02.pdf (accessed May 24, 2012).

[165] See, for example, GAO Recording (University of Phoenix Wayne), Scenario 1 at minute 00:06:56.

[166] GAO Audio Recording, School 8 (Kaplan College Pembroke Pines), Scenario 1 at minute 03:07:50.

[167] See, for example, Kaplan College Pembroke Pines Campus, *Accreditation Information*, http://pembroke-pines.kaplancollege.com/Pages/Accreditation.aspx (informing prospective students that Kaplan College in Pembroke Pines is accredited by the Accrediting Council for Independent Colleges and Schools). Compare The Office of the Provost of Harvard College, *Accreditation*, http://www.provost.harvard.edu/institutional_research/accreditation.php (accessed May 24, 2012) (informing prospective students that Harvard is accredited by the New England Association of Schools and Colleges); University of Florida, *Southern Association of Colleges and Schools*, http://www.ir.ufl.edu/factbook/SACS.htm (accessed May 23, 2012) (linking to detailed documentation relating to University of Florida's accreditation status with Southern Association of Colleges and Schools).

and I wouldn't have any trouble applying it to a military commission. Since then I have tried to apply it to the Community College of the Air Force—they do not accept the credits. I have tried to transfer it to the University of Memphis and Southwest Community College in Memphis—they do not take their credits. I have tried to start over and obtain a new degree, but I can't get state scholarships (even veteran ones) because I have this Bachelor's degree from them. . . . I was misled and made a terrible mistake.[168]

One student, an Army veteran, interviewed by committee staff chose a for-profit college partly because recruiters said he could finish the VA program in 20 months and then transfer to pursue his Bachelor's degree.[169] He was later told by a community college that none of his credits would transfer because the for-profit college was not regionally accredited.[170] Another veteran interviewed decided to earn a Bachelors of Science in construction management from a for-profit college because it was a 3-year program.[171] He wanted a program he could finish quickly and start working again. However, he also wanted to transfer his credits later to a school where he could earn his Master's degree, and the college's recruiter assured him the credits would transfer. About halfway through the program, he became frustrated with the poor quality of the program, and tried to transfer his credits. Only then did he learn that his credits would not transfer.[172]

Similarly, college recruiters sometimes misled students about whether the school's programs will qualify students for licensing credentials or a higher degree program. For instance, one student was told he would be able to receive his teaching license from Ashford. He found out a year later, right before his scheduled graduation, that Ashford was not allowed by the State of Iowa to award teacher licenses, so he would have to attend a "cooperating school" in Arizona for a year. He states, "I was really blown away to find out that I had spent so much time and money at a College that I was not going to be able to obtain my Teacher's license from." [173]

One ITT student stated that,

During the tour and meeting with the student representative for admissions, I was given an overview of the school's programs, which explained that I would earn a BA in Criminal Justice, which would support the needs I was seeking, of which were to apply for law school. I was advised that should I decide to transfer to another college, that the credits were transferable. [174]

---

[168] Remington External Correspondence, June 2010, Notice of Student Complaint from Tennessee Higher Education Commission (5-000042). Remington is a brand operated by Education America, a for-profit higher education company that enrolled 10,018 students as of fall 2010 and is based in Heathrow, FL.

[169] U.S. Senate HELP Committee staff telephone interview with Marvin Arandia, November 12, 2010 (on file with committee). See also Eric Gorski, "For-Profit Colleges Cashing In On Veterans" *Huffington Post*, December 9, 2010, http://www.huffingtonpost.com/2010/12/09/forprofit-colleges-cashin_n_794398.html (accessed June 12, 2012).

[170] Id.

[171] U.S. Senate HELP Committee staff telephone interview with Jason Longmore, November 12, 2010 (on file with committee). See also Eric Lipton, "Profits and Scrutiny for Colleges Courting Veterans," *New York Times*, December 8, 2010, http://www.nytimes.com/2010/12/09/education/09colleges.html?pagewanted=all (accessed June 12, 2012).

[172] Id.

[173] Bridgepoint, August 2010, Completed Formal Grievance Submission Form (BPI-HELP_00026807) (Ashford University).

[174] ITT, February 2007, Student Comment/Complaint Report (ITT-00006208).

Two years and tens of thousands of dollars later, the student discovered that he could not transfer credits, and that most law schools would not accept the degree.[175]

### *Targeting Sales to Most Vulnerable Populations*

For-profit colleges target a population of non-traditional prospective students who are often less familiar with higher education than other prospective college students and may be facing difficult circumstances in their lives. For instance, Vatterott's internal "Student Profiles," part of a manual to train recruiters, detailed the demographic subgroups that the company targets for enrollment: "Welfare Mom w/Kids. Pregnant Ladies. Recent Divorce. Low Self-Esteem. Low Income Jobs. Experienced a Recent Death. Physically/Mentally Abused. Recent Incarceration. Drug Rehabilitation. Dead-End Jobs-No Future." [176]

Recruiting materials indicate that some for-profit colleges viewed these populations as widely open to influence. "We deal with people that live in the moment and for the moment," Vatterott's training materials explained.[177] "Their decision to start, stay in school or quit school is based more on emotion than logic. Pain is the greater motivator in the short term." [178] The next page contained a number of quotes ostensibly from administrators and teachers: "Lately it seems admissions has been putting in some really troubled people . . . could this be a trend?," "the last batch of students you guys dumped here are about the worst I've seen in years," "Do your ads say, LOSERS ENROLL HERE!" [179] The next page answered these quotes with, "These Students Are The Reason We're in Business!" [180]

A number of schools have tried to generate business by visiting social service agencies and providers. An internal Kaplan email indicates that a recruiter dropped business cards off at "an office for section 8 [public] housing." [181] An internal Concorde email indicates that company employees had visited "welfare offices" and "unemployment offices," although recruiters were later told to stop visiting these offices because it may be a violation of accreditation standards.[182]

### *Aggressive Sales Tactics*

In addition to misleading and deceptive information, recruiters sometimes used hard-sell tactics to enroll prospective students. Internal documents at some colleges admonished recruiters not to think

---

[175] Id.
[176] Vatterott, March 2007, *DDC Training* (VAT-02-14-03904).
[177] Id.
[178] Id.
[179] Id.
[180] Id.
[181] Kaplan Internal Email, February 2010, re: *Homeless Shelter clarification* (KHE 207174).
[182] Concorde Internal Email, June 2010, re: *FW: Recruitment at Unemployment and Welfare offices* (CCC000105156). The company states that the employees did not work for the admissions office and that they were visiting workforce training centers that were co-located with the "welfare" and "unemployment" offices. Concorde Career Colleges, Inc. ("Concorde") is a for-profit higher education company that enrolled 7,952 students as of fall 2010 and is based in Kansas City, MO.

of the call as anything other than a sales pitch. One school's training document, titled "Turning Inquiries into Appointments," made this stance clear in the first bullet point: "Understand this is a sales call."[183] Similarly, a former Bridgepoint recruiter commented,

> Its a boiler room . . . selling education to people who don't really want it [sic]. We are trained spe-cifically on how to work the angle of psychology . . . we tell students this is the right thing to do, it will make their parents proud, it will make them a role model for their kids, it will help them fulfill lifelong goals. If we don't have a degree they want, we are supposed to convince them that one of ours will work for them anyway.[184]

Some bricks-and-mortar schools make clear that the point of the call is actually to give the pros-pect as little information as possible so that they are more likely to come to the campus. For instance, Career Education Corporation admonishes its recruiters, "DO NOT GIVE TOO MUCH INFORMA-TION" over the phone so that the prospective student must come in for a sales interview [emphasis in original].[185]

For both sales pitches conducted over the phone or in person, many for-profit colleges used specific scripts that tell the recruiter what to say to prospective students. These scripts are designed with tested selling techniques and psychology in mind.[186] They allow the recruiter to control the enrollment conversation so that prospective students have little chance to ask questions.[187]

## Techniques to Close a Sale

Recruiters at some colleges were specifically trained to exploit the emotional vulnerabilities of prospective students by using an array of ethically questionable tactics. These techniques included pushing on "pain points," "overcoming objections" to signing an enrollment agreement, and "creating urgency" to press prospective students to sign up right away.

---

[183] Kaplan Internal Presentation, *"Explore" Another Piece of My Heart: Turning Inquiries into Appointments* (KHE 052058).
[184] Comment submitted to Department of Education by Brent Park, Ashford recruiter.
[185] Career Education Corporation, *Telephone Techniques* (CEC000014470).
[186] See, for example Westwood College, *Admissions New Hire Classroom Training*, January 2010 (WP000036036 at WP000036052).
[187] National American University, 2008, *New Admissions Representative Training Manual 2008* (NAU0014515).

_"Poking the Pain" of Prospective Students_

ITT recruiter training presentation slide:[188]



One pervasive sales technique found in the documents of multiple companies is to manipulate a prospective student's emotions.[189] One recruiting manager explained that recruiters "need to focus on . . . digging in and getting to the pain of each and every prospective student."[190]

According to this technique, a recruiter asks probing questions to find a prospective student's "pain"—about a dead-end job, inability to support their children, failing parents or relatives.[191] They then use that "pain" to make the student feel vulnerable.[192] Then, when the prospective student feels vulnerable, the recruiter will offer the prospective student the possibility of a college degree as the opportunity to make that pain go away.[193]

---

[188] ITT, _Increasing Your Scheduled to Conduct Ratio_ (ITT-00028362 at ITT-00028377).

[189] See, for example, Bridgepoint, _Psychology of a Student_ (BPI-HELP_00004019) (internal training documents); ITT, _ITT Technical Institute Questionaire: Exhibit 3_ (ITT-00010050) [The company asserts that the document was created and used only for a short period of time by a few individuals at a single campus and was never approved by ITT management]; Vatterott, March 2007, _DDC Training_ (VAT-02-14-03904). Vatterott, March 2007, _DDC Training_ (VAT-02-14-03904); Vatterott, March 2007, _DDC Training_ (VAT-02-14-03904).

[190] ITT Internal Memorandum, June 2007, re: _June Analysis 2007_ (ITT-00025689). The company asserts that this document is not representative of the school's policies or procedures. _See also_ Vatterott, March 2007, _DDC Training_ (VAT-02-14-03904).

[191] See, for example, Joshua Pruyn (former Admissions Representative, Alta College, Inc., Denver CO), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, _For-Profit Schools: The Student Recruitment Experience,_ 111th Congress (2010).

[192] Id.

[193] Id.

ITT's training materials detailed the steps of this tactic: "Establishing Rapport," "transition into digging for the motivation," "transition into feeling the pain," and "transitioning into making the connection between the motivation and getting a degree." [194] To address students who sign an enrollment agreement but indicate they may not want to start school, recruiters were instructed to "poke the pain a bit" and "remind them what things will be like if they don't continue forward and earn their degrees." [195]

ITT, however, went a step further than most other companies in their pain-based sales techniques with a "Pain Funnel:"



---

[194] ITT, Completed Phoning Techniques Training Worksheet (ITT-00015566). The company asserts that this document was created and used by only a few campus-level employees and never approved by the corporate office.

[195] ITT Internal Memorandum, re: *Ways to combat "drops" in Marketing during the class building period* (ITT-00014590). The company asserts that this document represents an unauthorized set of training materials utilized by a single campus.

- 61 -

After a recruiter located a prospective student's pain point, the"pain funnel" presented a number of questions that the recruiter can ask that are progressively more hurtful.[196] In "Level 1" a recruiter asks prospective students, "tell me more about that" or "give me an example." In "Level 2" the recruiter asks "What have you tried to do about that?" The highest level asks a hurtful question to elicit pain: "Have you given up trying to deal with the problem?"

After Chairman Harkin released these documents during a statement on the Senate floor in February 2011, counsel for ITT wrote to the Chairman noting that "the conduct suggested by the documents referenced in your statement was not sanctioned by ITT." [197] It goes on to note that ITT regrets that the conduct was suggested and has opened an investigation to determine the extent of the conduct and respond appropriately and decisively.[198] However, also following the release of the document, HELP Committee staff were contacted by counsel for a former ITT recruiter who had created the ITT-specific version of the Pain Funnel. Committee staff subsequently interviewed the recruiter.[199] As the recruiter details in her letter to the committee, she adapted documents from a sales training that ITT had paid for her to attend and brought them to her ITT campus.[200] She states that she trained many other ITT staff using the Pain Funnel:

> In addition, at quarterly district meetings I did pain funnel training for nearly every top recruitment representative, financial aid coordinator, dean, instructor, department chairs, all functional managers, all college directors and the district manager for the entire Southern California District, the largest district in the country. The presentation material was also given out to over 100 ITT Tech employees throughout every department in the district.[201]

She goes on to state that she submitted the document to executives at ITT headquarters for consideration for an award:

> In October 2009, I wrote up a BEST OF THE BEST (BOB) submission to HQ that included the same "Pain Funnel and Pain Puzzle" and how proper usage of this tool can bring a prospect to their inner child, an emotional place intended to have the prospect say yes I will enroll.[202]

At Kaplan, the company's training materials described its "pain" technique as asking "a series of probing questions to determine the prospective students buying profile." [203] Kaplan labels these tactics "ARTICHOKE," a method of "peeling back the layers" and "Getting to the PAIN " [emphasis in original].[204] Recruiters were instructed to:

---

[196] ITT, *Pain Funnel and Pain Puzzle* (ITT-00010049) (training materials prepared by Sandler Sales Institute). See also ITT, *ITT Technical Institute Questionnaire: Exhibit 3* (ITT-00010050); Bridgepoint, *Psychology of a Student* (BPI-HELP_00004019).

[197] Letter to Chairman Harkin, from ITT Counsel, Gibson Dunn & Crutcher, LLP, February 10, 2011.

[198] Id.

[199] Majority HELP Committee staff interview with Laura Brozek and Wayne Beaudoin June 21, 2011

[200] Letter from Laura Brozek, June 24, 2012.

[201] Id.

[202] Id.

[203] Kaplan, *Kaplan Higher Education Western Region Director of Admissions Tool Kit* (KHE 056793). Kaplan states that training materials for admissions representatives are approved through a formal review process at Kaplan's home office, and that this document was not authorized through that process and was used by a single manager and admissions team in California, and was removed from use by early 2008.

[204] Kaplan, April 2010, *Custom OBS & Quality Hybrid Job Aid Based on the Latest Undergraduate Outbound Script Published on April*

KEEP DIGGING UNTIL YOU UNCOVER THEIR PAIN, FEARS, AND DREAMS. . . . IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW AND IF THEY DISCUSS THE LIFE THEY CAN'T GIVE THEIR FAMILY BECAUSE THEY DON'T HAVE A DEGREE, YOU WILL DRAMATICALLY INCREASE YOUR CHANCES OF GAINING A COMMITMENT FROM THE STUDENT! IF YOU CAN STIR UP THEIR EMOTIONS, YOU WILL <u>CREATE URGENCY!</u> [emphasis in original].[205]

True to these training materials, undercover recordings show that at many schools visited by GAO agents posing as prospective students, recruiters would "interview" the agents at the beginning of the session, asking them questions about their motivation for returning to school and their financial situation. Then, as the GAO recordings show, the recruiter repeatedly returned to the prospective students' answers and reminded them that their lack of a degree is responsible for their problems.[206] For example, at Kaplan's Riverside, CA campus, when an undercover student expressed his insecurity about signing an enrollment agreement and paying for school, the recruiter replied, "I thought you really wanted to do this?"[207]

*Overcoming Objections*

In addition to specific "pain" tactics, another sales technique that for-profit recruiters are commonly trained to use is "overcoming objections" that the student raises to signing an enrollment agreement. Many schools' training materials posed hypothetical objections that a prospective student might raise, and instructed the recruiter how to answer them.[208] An Apollo Group manual instructed recruiters to answer objections with questions back to the prospective student. If the prospect said "you're too expensive," the recruiter was instructed to respond, "Can you afford not to go?" or "If student loans will match your payment to your income when you are in repayment, why do loans scare you?" or "Why would you not want to invest in yourself?"[209] If a student complained that the University of Phoenix is expensive compared to other schools, the recruiter was instructed to say, "When your degree hangs on the wall in a few years . . . will you tell your friends and family you bought the cheapest degree you could find?"[210]

Recruiters were driven to close a sale on the spot, instead of waiting for a student to return after they have had time to consider their decision or to speak with a financial aid employee. Kaplan's training materials told recruiters that "we ideally want to close on commitment and enroll the student before they go to FA [financial aid]."[211] This is clearly demonstrated in the recordings of an undercover visit to a Kaplan

---

2010 (KHE 096357); Kaplan, July 2009, *Job Aid: Outbound With Rubric & OBS References Based on Undergraduate Script Published on July 08, 2009* (KHE 084935).

[205] Kaplan, July 2009, *Job Aid: Outbound With Rubric & OBS References Based on Undergraduate Script Published on July 08, 2009* (KHE 085294). Documents obtained by the committee contain multiple versions of the "artichoke" training. See for example, Kaplan, July 2009, *Job Aid: Outbound With Rubric & OBS References*; Kaplan, April 2010, *Custom OBS & Quality Hybrid Job Aid Based on the Latest Undergraduate Outbound Script Published on April 2010* (KHE 096357).

[206] See, for example, GAO Audio Recording, School 5 (Potomac College), Scenario 1; GAO Audio Recording, School 12 (Anthem College), Scenario 1 at minute 00:52:02.

[207] GAO Audio Recording, School 8 (Kaplan College Pembroke Pines), Scenario 2 at minute 00:41:45.

[208] See, for example, Bridgepoint, *Overcoming Objections* (BPI-HELP_00005921); ITT, *Overcoming Objections* (ITT-00025676).

[209] Apollo, 2007, *Enrollment Counselor Guide: School of Advanced Studies* (AGI0015231, at AGI0015339) (University of Phoenix). The company states that this document is no longer used.

[210] Apollo, 2007, *Enrollment Counselor Guide: Online Campus* (AGI0014312, at AGI0014465) (University of Phoenix). The company states that this document is no longer used.

[211] Kaplan Internal Email, October 2009, re: *Admissions Process Flow* (KHE 279097).

campus in Florida.[212] During the visit, the undercover prospective student asked at least five times to speak to a financial aid employee so that he can find out how much he would qualify for in grants and how much he would have to pay back in loans. He was rebuffed each time, and made to feel that the question is stupid. The recruiter's replies were: "My question back to you is why is this right now a concern?" and "let's assume that Uncle Sam will help you out" and "this [enrollment agreement] is not signed in blood." [213]

### *False Urgency and Inflated Prestige*

Recruiters sometimes created a false sense of urgency in order to get a student to immediately sign an enrollment agreement. To do so, recruiters would tell students they must enroll immediately to reserve a seat. In reality, there are many (or in the case of online programs, virtually unlimited) spots available and most schools have scheduled class start dates every few weeks.

For example, Apollo documents instructed recruiters, "Do not tell the student we have classes running every week unless you can agree on a start date, or rolling start dates is a selling point." [214] Recruiters were supposed to tell every prospective student, "It looks like I might be able to squeeze you into" the next start date.[215] Two Apollo manuals specifically instructed recruiters not to say "you have plenty of time to get everything in order," because "if the student thinks he/she has plenty of time, he/she might wait and apply later." [216] The company states that these manuals are no longer used.

Bridgepoint's "Creating Urgency" job aid similarly instructed recruiters how to "use pressure to PREVENT them from procrastinating" [emphasis in original].[217] A Career Education Corporation "Telephone Techniques" manual instructed recruiters to "limit the time-frames that you offer to that student [for an in-person appointment] and always express to them how busy your schedule is. . . . If you offer too many time availabilities, it appears as though there is no urgency or demand." [218]

Once a student signs up, the schools make it very difficult to back out or start classes at a later date. At Kaplan, for instance, documents indicate that students who sign an enrollment agreement are put in a "12 step lock-in process" to prevent them from backing out.[219] Kaplan recruiting documents admonish:

> The director of admissions or executive director must approve all rescheduled enrollments. No exceptions. Local students must reschedule, in person . . . not by mail or telephone. . . . No one should be rescheduled until they have paid all applicable fees, tested, packaged in financial aid

---

[212] GAO Audio Recording, School 8, Scenario 2.

[213] Id. at minutes 00:38:33; 00:39:36 and 00:40:13. This Kaplan campus was subsequently shut down .

[214] Apollo, 2007, *Enrollment Counselor Guide: School of Advanced Studies* (AGI0015231, at AGI0015333) (University of Phoenix). The company states that this document is no longer used.

[215] Id at AGI0015334.

[216] Apollo, 2007, *Enrollment Counselor Guide: Online Campus* (AGI0014312, at AGI0014504) (University of Phoenix). The company states that this document is no longer used.

[217] Bridgepoint, *Creating Urgency* (BPI-HELP_00005972).

[218] Career Education Corporation, *Telephone Techniques* (CEC000014470).

[219] Kaplan, Making it Count: The 12 Step Lock-In Process (KHE 054136). *See also* Vatterott, Appointment to Lead – What to Look For (VAT-02-14-03822).

and completed all necessary enrollment paperwork.[220]

Kaplan, however, instituted a new program in late 2010 (after the date of the training materials) that allows all students to withdraw within 5 weeks of starting classes without incurring any obligation to the school or to lenders.[221] If a student leaves Kaplan within that time, or if the company determines that because of the student's performance or attendance he or she is unlikely to succeed, the student can withdraw paying only a minimal application fee.

In addition to fabricating a sense of urgency, for-profit colleges also strived to create an aura of prestige around their brands, which the company then pushed recruiters to use to help "sell" students. Bridgepoint, for example, instructed recruiters to tell students that Ashford University was "established in 1918" and has been "regionally accredited since 1950," claims that were repeated in marketing materials distributed at college and military job fairs nationwide.[222] However, Ashford University did not exist until 2005, when Bridgepoint Education, Inc. used funds from Wall Street private equity firm Warburg Pincus to buy a small religious college formerly known as Mount St. Clare in Clinton, IA. In fact, in 2006, Bridgepoint employees were invited to a "celebration of the one-year anniversary of [Ashford]," where CEO Andrew Clark would be speaking.[223]

### The Role of Lead Generators

Before the sales process begins, for-profit colleges must gather contact information for prospective students. These so-called "leads" are generated either directly by the for-profit colleges themselves,

---

[220] Kaplan, *Kaplan Higher Education Western Region Director of Admissions Tool Kit* (KHE 056793). Kaplan states that training materials for admissions representatives are approved through a formal review process at Kaplan's home office, and that this document was not authorized through that process and was used by a single manager and admissions team in California, and was removed from use by early 2008.

[221] See Kaplan University, *The Kaplan Commitment Statement*, http://getinfo.kaplan.edu/kaplancommittment.aspx (accessed July 1, 2012).

[222] Bridgepoint, June 2009, *Need, Feature, Benefit* (BPI-HELP_00005925) (Ashford University).

[223] Bridgepoint Internal Email, March 2006, re: *FAST 03-17-06* (BPI-HELP_00048670). See also, Kaplan, July 2009, *Job Aid: Outbound With Rubric & OBS References Based on Undergraduate Script Published on July 08, 2009* (KHE 084935). In early 2011, the Chairman decided to hold a hearing that was a case study of Bridgepoint and to invite CEO Andrew Clark to provide testimony. Bridgepoint Chief Executive Officer Andrew Clark was invited to appear at the hearing. Attorneys for the company were notified in early January 2011 that the committee planned to hold the hearing in mid-February and intended to invite Mr. Clark. Attorneys for the company raised concerns about the timing of the testimony, given that the Department of Education Inspector General had recently issued a Final Audit Report on Bridgepoint regarding its management of Federal student aid funds and its recruiting policies and practices. Mr. Clark's representatives insisted that it was imperative that the company have the opportunity to meet with the Department of Education Office of Federal Student Aid (FSA) staff, who would ultimately be responsible for determining the penalty based on the Final Audit Report's findings before he could appear at a public hearing. The committee agreed to move the hearing to March 10 to accommodate the concerns. And indeed Bridgepoint made its submission to FSA and met with FSA staff regarding the Final Audit Report. Both the Department of Education and the inspector general's office made clear they had no concerns with the committee having Mr. Clark as a witness.  Nevertheless, Mr. Clark, through counsel, declined to appear, and thus declined the opportunity to give his perspective on the weighty issues of accountability and compliance with Federal law and regulation raised in the Final Audit Report and elsewhere. The committee held the hearing on March 10 without Mr. Clark but with the participation of the inspector general; the President of the Higher Learning Commission, Ashford University's accreditor; a retired official from the Iowa Department of Education, where Ashford is based, and a respected expert in higher education policy

or purchased from third-party companies known as "lead generators" that specialize in gathering contact information and selling those contacts to schools. Documents show that for-profit colleges paid between about $10 and $150 per lead, depending on the type of lead provided.[224] "Everything on a campus or an Admissions department begins and ends with leads," one executive at a for-profit college commented.[225]

Documents demonstrate that for-profit colleges examined by the committee purchased leads from at least 62 lead-generation companies. Many of these companies derive either all or a substantial portion of their revenue from delivering leads to for-profit institutions.[226] Lead generators advertise themselves on Web sites, billboards and on TV as a free, safe, and reliable way to get information about college. But lead generator sites generally direct students only to schools and programs that pay them. Lead-generation companies have a history of engaging in online marketing using aggressive and misleading methods.[227] The *Chronicle of Higher Education*, a leading publication covering higher education, interviewed a former lead generator employee who said:

> he told students that they would hear from their preferred public college, even though they almost never did. In the meantime, he said, they should consider attending a for-profit college—such as Kaplan University and Westwood College. Most of the prospective students were confused. Some hung up. But sometimes the pitch worked. Some people, especially high-school students, believed he was an educational counselor and gave weight to his recommendations.[228]

Moreover, crucial information is often missing from these sites. Tuition and fee information and curricular details are absent from most lead-generation sites. For example, EarnMyDegree.com, one high profile lead generator, merely serves as a gatekeeper to program details—a search of the business administration degrees listed by the site only directs visitors to a page with a brief description of the demand and salary for business majors and invites users to request more information.[229] Even a search of the word "tuition" returns no information about the cost of attending any of the advertised programs. Rather than disclose comparative costs of various colleges, lead generators entice prospective students with promises of how quickly and easily a person can earn a degree and how much money a student can make at a subsequent career.

---

[224] See, for example, Rasmussen, Insertion Order (RAS00003280) ($37 per lead); Rasmussen, Advertising Agreement (RAS00003443) ($75 per lead); Alta, Lead Development, Maintaining High Conversion Rates (HELP-ALTA_000123) (Westwood College) ($150 per lead).

[225] Kaplan Internal Presentation, *Who Are Our Leads?* (KHE 056401).

[226] See, for example, AcademixDirect, Inc., http://www.academixdirect.com ("100% of our business comes from the higher education market."); Lead2Class, "Higher Education Lead Generation Services," http://www.lead2class.com ("Our approach to Internet advertising is highly targeted and designed to promote online education programs.").

[227] See Josh Keller, "Online Search Ads Hijack Prospective Students, Former Employee Says," *The Chronicle of Higher Education*, September 7, 2011, http://chronicle.com/blogs/wiredcampus/online-search-ads-hijack-prospective-students-former-employee-says/33047 (accessed May 3, 2012) (reporting that a former call center employee for Vantage Media recalled contacting "hundreds of students per day" and was "expected to keep students on the phone long enough to deliver three leads"). Lead-generation companies have been observed participating in Internet advertising campaigns that "falsely implied relationships with public colleges" in order to obtain prospective students' contact information for their for-profit clients. See *id*; see also Josh Keller, "Colleges Fight Google Ads That Reroute Prospective Students," *The Chronicle of Higher Education*, July 31, 2011, http://chronicle.com/article/Colleges-Fight-Google-Ads-That/128414/ (accessed May 3, 2012).

[228] Id.

[229] See EarnMyDegree.com, "Online Business Administration Associate Degree Programs," www.earnmydegree.com/online-education/associate/business/business-administration.html (accessed December 15, 2011); EarnMyDegree.com, "Associate's in Business," www.earnmydegree.com/online-education/online-degrees/everest-university/business-associates-13.html (accessed May 3, 2012).

Frame from 2011 EducationConnection TV advertisement:[230]



Some lead generators use television commercials to drive traffic to their Web sites. Education-Dynamics, for example, places televisions ads directing viewers to EducationConnection.com.[231] The television ads emphasize the ease and flexibility of online degree programs. In one spot, a young woman says, "You could be getting that online degree, right from your home, in your pajamas."[232] Some of the commercials employ many of the same tactics observed online, such as messages implying that online degree programs described at EducationConnection.com serve as prerequisites to future financial success: "Remember, people with a degree, on average, earn a million dollars more in their lifetime."[233] In another, seen above, the message "make $25,000

more every year" flashes while a woman sings, "if I earn a degree I will make a bigger salary."[234]

Once a lead generator has the name of a prospective student who requests more information, it is transferred quickly to the schools that pay the lead generator. The Government Accountability Office (GAO), as part of their undercover investigation, entered an investigator's name and number into a single lead generation site. Within 5 minutes, the GAO received the first calls from recruiters. In 1 month, the investigator received over 180 calls.[235]

---

[230] EducationConnection, Commercial, posted April 27, http://www.youtube.com/watch?v=aDR28lIRGZw (accessed July 15, 2012).

[231] See, for example, Television Commercial: EducationConnection.com, "College in PJ's 2010,"available at http://www.youtube.com/user/EducationConnection#p/u/6/OISn3TXFxlI; EducationDynamics, "What We Do," http://www.educationdynamics.com/About-Us/What-We-Do.aspx. (accessed March 15, 2012).

[232] Television Commercial: EducationConnection.com, "Don't Choose Blindly," available at http://www.youtube.com/watch?feature=player_profilepage&v=8kddCyeXlMU (accessed May 20, 2012).

[233] Id.

[234] EducationConnection, Commercial, http://www.youtube.com/watch?v=aDR28lIRGZw (accessed July 15, 2012).

[235] Gregory Kutz (Managing Director, Office of Forensic Audits and Special Investigations, U.S. Government Accountability Office), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience,* 111th Congress (2010).

Military Focused Recruiting

Servicemembers, veterans, spouses, and family members have become highly attractive prospects to for-profit colleges, and many schools have invested significant resources into recruiting and enrolling students eligible for military education benefits. The recent expansion of military education benefits provided the industry with a new source of potential revenue. Most military benefits are grants rather than loans, allowing students to earn a higher education with smaller debt burdens. This is particularly important for companies at risk of losing Federal aid eligibility due to their students' high loan default rates. And even though the benefits come from Federal taxpayer dollars, military educational benefits are not counted toward the maximum 90 percent in Federal revenues that for-profit colleges are permitted. Thus, these benefits provide a new tool to help for-profit colleges avoid this regulatory restriction.

As one example of how companies are investing heavily to recruit servicemembers and veterans, Kaplan, in one presentation, detailed plans to spend $29 million and hire 45 people over 3 years to enroll more military personnel.[236] Another document, regarding Kaplan's military recruiting strategy, stated that the company must "transition Kaplan into a 'top of mind' educator within the active duty and military segment, penetrating the key decision-maker and influencer (education service officers)." [237] To do so, it planned to place ads in key military publications and target key military installations. Kaplan also planned broad-based outreach through phone calls, Web sites, direct-mail, and a presence at military events. ITT initiated a similar military marketing plan with the goal of increasing military enrollments by 20 percent at selected campuses.[238] ITT's CEO wrote in an email: "we didn't even make the top 40 providers to the military! What an opportunity that we have in front of us!" and that "we need to see how we can penetrate this world." [239]

### *Military-Specific Lead Generators*

There are a number of lead generation Web sites specifically designed to attract members of the military and veterans. QuinStreet, Inc., a publicly traded corporation that aggressively targets servicemembers, manages Web sites that initially appear to provide information of general interest to service members, with domains such as GIBill.com, Military-Net.com, and MilitaryGIBill.com.[240] Some of these sites use layouts and logos similar to official military Web sites, but do not inform users that the purpose of the site is to collect contact information on behalf of paying for-profit clients. However, a search of the two sites for programs accepting GI bill funds results in markedly different lists of options.

---

[236] Kaplan Internal Presentation, *Kaplan Military University* (KHE 267362). It is unclear whether the company invested these resources in their military efforts given that the company received comparably little post-9/11 GI bill funds in the years following the presentation.

[237] Id.

[238] ITT Internal Email, December 2009, re: *2010 Military Marketing Plan* (ITT-00144499).

[239] ITT Internal Email, fw:*Stifel:Education-Summary From the CCME Conference Kickoff* (ITT-00140384).

[240] A review of documents provided to the committee shows that QuinStreet provided lead-generation services to Anthem Education Group, Apollo Group, Inc., Capella Education Company, Concorde Career Colleges, Inc., DeVry, Inc., ECPI Colleges, Inc., National American University Holdings, Inc., TUI Learning LLC, Universal Technical Institute, Inc., and Walden University. Full list of QuinStreet-owned lead generator sites: ArmyStudyGuide.com, ArmyToolbag.com, GIBenefits.com, GIBill.com, GIBillAmerica. com, GruntsMilitary.com, Military-Net.com, MilitaryConnections.com, MilitaryGIBill.com, MilitaryPay.com, NavyStoreKeeper.com, US-Army-Info.com, and VNIS.com. *See also* QuinStreet, Connecting Customers to You, http://quinstreet.com/what_we_do; Army Toolbag, Army Toolbag.com: Tools for Army Leaders, http://www.armytoolbag.com.

A search of the VA site displays a list of all 155 institutions accepting GI bill dollars for a given State, including private, non-profit colleges and public universities. But QuinStreet's lead-generation site returns a list of only five schools—all for-profit colleges—representing four different companies.[241] Military-friendlyschools.com, a lead generator site, releases a heavily-advertised list of the "top military schools." The rankings, however, are not based on academic quality or other student-focused factors, but on the schools' efforts to recruit military students.[242] On June 27, 2012, 20 State attorneys general announced a settlement of a lawsuit against QuinStreet. The States alleged that QuinStreet violated the States' consumer protection laws in the course of operating Web sites that generate leads primarily for the for-profit education industry and that several of the company's sites targeting military servicemembers, including GIBill.com, were deceptive and misleading.[243] GIBill.com, for example, mimicked the form and layout of the official GI bill Web site operated by the Department of Veterans Affairs (VA).[244] The settlement requires the company to turn over the Web site GIBill.com to the Department of Veterans Affairs, pay a $2.5 million fine, and fundamentally alter its disclosures on military and other Web sites. [245]

### *Targeting Wounded Warrior Centers and Veterans' Hospitals*

The documents produced showed that some schools' pursuit of military benefits led them to recruit from the most vulnerable military populations, sometimes recruiting directly at wounded warrior centers and veterans hospitals. This practice was first highlighted in a *Bloomberg News* article about recruiters from a for-profit college making sales pitches to severely injured soldiers living in wounded warrior barracks.[246] As the article put it, "US Marine Corporal James Long," a veteran who suffered a traumatic brain injury, "knows he's enrolled. . .he just can't remember what course he's taking." [247]

For instance, in the training materials for military recruiters at Kaplan, the committee found express recommendations that recruiters look for potential recruits at both veterans' hospitals and wounded warrior programs:

Veterans' hospitals are another place that you can expect to find veterans . . . many of the facilities allow schools to come on site and set up in a common area, such as a lunch room, and provide an information tables. You can expect to see not only veterans but also family members of veterans, and hospital staff that will come to your table for information. . .

Check with your local Wounded Warrior program to find out how Kaplan University can best fit into their educational offerings. [248]

---

[241] See U.S. Department of Veterans Affairs, "WEAMS Public," http://inquiry.vba.va.gov/weamspub/ searchInst.do?content-area.

[242] Military Friendly Schools, "G.I. Jobs Military Friendly Schools ® Methodology," http://www.militaryfriendlyschools.com/methodology.aspx (accessed March 26, 2012).

[243] http://migration.kentucky.gov/Newsroom/ag/quinstreetavc.htm; see also, Bloomberg.com, GI Bill Site Called Misleading Closed in Settlement, Carter Dougherty-Jun 27, 2012.

[244] See U.S. Department of Veterans Affairs, "Welcome to the GI Bill Web Site," http://www.gibill.va.gov.

[245] Id.

[246] Daniel Golden, "Marine Can't Recall His Lessons at For-Profit College (Update 2)," *Bloomberg*, December 15, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=al8HttoCG.ps (accessed May 3, 2012).

[247] Id.

[248] Kaplan, *Military Training* (KHE 267268). Kaplan states that this document does not reflect a training program approved or implemented by Kaplan or Kaplan's approach to enrollment of military personnel.

Kaplan states that this document does not reflect a training program approved or implemented by Kaplan or Kaplan's approach to enrollment of military personnel.  However, one Kaplan recruiter spoke of visiting a wounded warrior unit with the hope of getting "some good soldiers out of the deal" and that they "definitely need to take advantage of" the fact that this was going to occur on a monthly basis.[249]

A recruiter at Grand Canyon University sent a superior the following note regarding her recruiting event for a wounded warrior unit:

> We were a big hit. . . I consolidated our position with the Army National Guard at this event. . . I also made many contacts with the wounded warrior unit that I had not been able to make in the past (the post has a non-solicitation policy). . . I also gained 5 solid leads that will turn into applications this next week.[250]

### *Misleading Servicemembers Regarding Military Bill Benefits*

In addition to aggressively seeking military personnel, the investigation showed that many recruiters misled or lied to service members as to whether their tuition would be covered by military benefits.

In some cases, students have felt duped by schools that claim to be eligible for GI bill funds. Jon Elliott, a Staff Sargent in the Army and Iraq veteran who publicly shared the story of his experience at ATI Career Center in Texas, said: "I was assured over the phone that . . . they had been accepted back in April for the Post-9/11 program. I went in, did a face-to-face with a recruitment official. Once again I asked, 'Are you sure we're good for the Post-9/11?' He said, 'Yes' and we started doing some paperwork." [251] Yet, 3 months later, Sgt. Elliot received a letter from the Department of Veterans Affairs stating that ATI "was not an authorized institution of higher education, and no benefits would be paid." Sgt. Elliott could not afford to pay the tuition without using his benefits, dropped out of school, and was subsequently pursued by ATI for the $9,600 that he had been told the GI bill would pay for.[252]

In other cases, schools misled servicemembers regarding the cost of the program, and whether or not they would need student loans. One combat veteran with Post Traumatic Stress Disorder wrote to ITT saying:

> The ITT Representative I met with told me that the military would pay for my schooling. Then a few months letter [sic], I got bills from Sallie Mae saying I owe money for two loans! A federal and a private loan! What!? I was told I would never see a bill.[253]

---

[249] Kaplan Internal Email, March 2010, re: Wounded Warrior (KHE 195614).

[250] Grand Canyon University, April 2010, re: *RE: Pizza Receipt* (GCUHELP 019907). Grand Canyon Education, Inc. ("Grand Canyon") is a publicly traded for-profit higher education company that enrolled 42,300 students as of 2010 and is based in Phoenix, AZ.

[251] Video: Tom Harkin, "Senator Harkin and Senator Carper Unveil New Data on Post-9/11 G.I. Bill Benefits and For Profit Colleges," http://harkin.senate.gov/help/video_press.cfm.

[252] After Chairman Harkin invited Sgt. Elliott to tell his story at a press conference, ATI contacted Sgt. Elliott to forgive the alleged debt.

[253] ITT Internal Email, January 2009, re: *REDACTED* (ITT-00007708).

The mother of the same soldier wrote in about her son's experience with an ITT representative:

> The Rep. told him he needed a co-signor just so he could start school immediately, but not to worry about it, because the military was going to pay for everything, even give him money to live on and pay his expenses. He sounded so hopeful, something I hadn't heard from him since before the war. It was really hard for him to admit he couldn't continue going to school. He said, he just couldn't retain the material . . . He could hardly come around me when he found out Sallie Mae was calling me for payment of his loan. Veterans with PTSD commonly isolate themselves from family and friends. This made it even worse.[254]

The first GI bill made it possible for millions of service members returning from World War II to attend college and make rapid economic advances; in turn, their success helped to build the middle class, and led to an unprecedented era of shared prosperity in the United States. Congress has made every effort to repeat this success by providing generous educational benefits to the new generation of Iraq and Afghanistan veterans. But this success can only be achieved if taxpayer money is invested in quality institutions that yield a good education and solid career prospects for veterans. When for-profit colleges see veterans as "dollar signs in uniform" as Mrs. Hollister Petraeus, head of the Office of Servicemember Affairs of the Consumer Financial Protection Bureau, put it in a recent Opinion piece, it does a disservice to veterans and taxpayers alike.[255]

---

[254] Id.

[255] Hollister K. Petraeus, "For-Profit Colleges, Vulnerable G.I.'s," New York Times, September 21, 2011, http://www.nytimes.com/2011/09/22/opinion/for-profit-colleges-vulnerable-gis.html (accessed May 24, 2012).

# How Are Students Performing?

At the outset of the investigation, a fundamental question facing the committee was what proportion of students at for-profit colleges were successfully completing their courses of study. Retention of students is one area over which colleges exercise significant control. Enrolling students who are likely to graduate, and supporting them along the way with academic services and counseling is a primary gauge of a successful institution. Completing a program is a student's first step on the way to securing employment, and repaying student loan debt.

Personal narratives and some statistics suggest that many students are succeeding in for-profit colleges. Apollo-owned University of Phoenix alone had graduated hundreds of thousands of students, most of whom might never have completed a degree at a traditional school.[256] Anecdotal evidence, supported by the companies' internal documents, indicate that for-profit colleges provide a particularly accessible route for students who have completed at least 1 year of higher education prior to enrolling. Meanwhile, community colleges are increasingly turning away potential students in some programs because of limited capacity. Yet at the outset of the investigation, limitations in available data made it very difficult to understand how many students were succeeding at for-profit colleges and in what types of degree programs.

Current publicly available graduation-rate data focus only on first-time students attending on a full-time basis; these data do not account for a large proportion of students attending for-profit colleges. To fill this information gap, the committee requested detailed student-retention data from 30 for-profit education companies. These data indicate that 54 percent of students who enrolled in school during a 1-year period between 2008 and 2009 had left school without a degree by mid-2010.[257]

<u>Inadequate Public Data for Meaningful Oversight</u>

Consistent and comprehensive institutional-level information tracking for-profit college student retention and graduation rates is not regularly available. The colleges themselves do not voluntarily disclose this information, and the measurements that the Department of Education collects and publishes are lacking in two key respects.

The Department of Education graduation rate measurement tracks only students who attend on a full-time basis and have not attended college previously. As the University of Phoenix explains the problem:

The issue for institutions such as the University of Phoenix is that IPEDS data is calculated using "first-time students." These are students who start at one institution and complete their entire degree at that same institution. That student is an anomaly at University of Phoenix.[258]

---

[256] In 2012, the University of Phoenix announced it had reached the milestone of 700,000 graduates. Apollo Group, Q2 Statement Issued March 12, 2012.

[257] Senate HELP Committee staff analysis of data provided by for-profit education companies. See Appendix 15. Data from two companies were not usable due to compromised data integrity.

[258] University of Phoenix, Academic Annual Report 2008, http://cdn.assets-phoenix.net/content/dam/altcloud /doc/about_uopx/academic-

The company notes in its 2011 Annual Academic Report that Associate degree completion rates are 12 percent higher, and Bachelor's degree completion rates are 25 percent lower for its total student population than for the students captured in data reported to the Department of Education.[259]

The Department of Education also measures student retention by counting students who are enrolled in the fall of 1 year, and are still enrolled as of the fall of the following year. However, for-profit colleges enroll students throughout the year, not on a traditional fall to spring academic calendar. Data obtained by the committee show that many for-profit college students leave without earning a degree within a few months. Thus, none of those students who started later than the fall and departed before the following fall would be counted in the Department's measurement.

Moreover, the retention data also includes only first-time students who have never attended any other college.[260] For example, the Corinthian Colleges, Inc.-owned schools reported an overall *retention* rate of 64 percent to the Department of Education in the 2008–9 reporting period.[261] This number was based on a first-time full-time population of 15,488 students.[262] Yet, documents produced to the committee show that 130,920 students enrolled in Corinthian schools between 2008 and 2009. The retention rate measure failed to capture the vast majority of those students.

<u>Low Student Retention</u>

Because public data are so limited, the committee's request for student-level enrollment data from 30 for-profit colleges provides the most comprehensive view of the student retention landscape at for-profit colleges. The companies provided a table of each student, identified by a unique ID number, who enrolled in a specified period and whether each student was currently classified as completed, still enrolled or withdrawn. This dataset shows that 54 percent of students who started at a for-profit college examined by the committee in 2008–9 left without a degree by mid-2010.[263] In total, almost 600,000 students left the colleges without a degree. Among 2-year Associate degree seekers, 63 percent, almost 300,000 students, departed without a degree. Among 4-year Bachelor's degree seekers, 54 percent, or

---

annual-report-2008.pdf (accessed May 3, 2012).

[259] Id.; University of Phoenix, Academic Annual Report 2011, http://cdn.assets-phoenix.net/content/dam/altcloud /doc/about_uopx/ academic-annual-report-2011.pdf (accessed May 3, 2012).

[260] In April 2012, the Department of Education announced plans to expand the persistence and completion reporting requirements to include part-time and transfer students. U.S. Department of Education, "Education Department Releases Action Plan to Improve Measures of Postsecondary Success," Press Release, April 11, 2012, http://www.ed.gov/news/press-releases/education-department-releases-action-plan-improve-measures-postsecondary-success. (accessed May 19, 2012).

[261] IPEDS data for Corinthian for 2008–9.

[262] Id.

[263] Senate HELP Committee analysis of comprehensive student-level data provided by 30 for-profit education companies, including all publicly traded companies. Data from two companies were unusable due to compromised data integrity. Rates track students who enrolled between July 1, 2008 and June 30, 2009. For-profit education companies use different internal definitions of whether students are "active" or "withdrawn." The date a student is considered "withdrawn" varies from 10 to 90 days from date of last attendance. Two companies provided amended data to properly account for students that had transferred within programs. Committee staff note that the data request instructed companies to provide a unique student identifier for each student, thus allowing accurate accounting of students who re-entered or transferred programs within the school. The dataset is current as of mid-2010, students who withdrew within the cohort period and re-entered afterward are not counted. The for-profit model allows students to stop and easily re-enroll assuming they have no outstanding tuition balance with the school. It is unclear how many students who drop out within weeks or months of enrolling do in fact re-enroll at a future date. Some students counted as withdrawals may have transferred to other institutions.

over 200,000 students, left by mid-2010. Completion rates were significantly better across most colleges for shorter duration Certificate or diploma programs: just 38.5 percent of students seeking those credentials left.[264]

| Status of Students Enrolled in For-Profit Education Companies in 2008–9, as of 2010 | | | | | |
|---|---|---|---|---|---|
| Degree Level | Enrollment | Percent Completed | Percent Still Enrolled | Percent Withdrawn | Median Days |
| Associate Degree | 474,817 | 9.1 | 28.0 | 62.9 | 126 |
| Bachelor's Degree | 374,264 | 4.6 | 41.1 | 54.3 | 131 |
| Certificate | 246,792 | 56.8 | 4.7 | 38.5 | 100 |
| All Students | 1,095,873 | 18.3 | 27.2 | 54.4 | 124 |

Worst Performing Programs

Some for-profit colleges had significantly lower retention rates. The chart below shows the 10 Associate degree programs with the worst retention outcomes for students, 9 of which had withdrawal rates over 60 percent. In total, 247,617 Associate degree-seeking students left these 10 companies without a degree. These 10 companies are among the largest institutions of higher education in the country; they enroll over one million students, almost half of all for-profit students.

| For-Profit Education Companies with the Highest Associate Degree Withdrawal Rates | | |
|---|---|---|
| Company | Percent Withdrawn | Students Withdrawn |
| Bridgepoint Education, Inc. | 84 | 6,691 |
| Lincoln Educational Services Company | 70 | 4,306 |
| Kaplan Higher Education, Inc. | 69 | 23,030 |
| Corinthian Colleges, Inc. | 66 | 29,547 |
| Apollo Group, Inc. | 66 | 117,738 |
| The Keiser School, Inc. [265] | 65 | 5,877 |
| Education Management Corporation | 64 | 20,444 |
| Rasmussen Colleges, Inc. | 63 | 4,887 |
| Career Education Corporation | 62 | 33,634 |
| Alta Colleges, Inc. | 58 | 1,463 |
| All Companies | 66 | 247,617 |

Overall, the retention rate for Bachelor's degree students is only slightly better. Among the

---

[264] However some certificate programs showed a far higher proportion of students leaving without completing their course of study.
[265] Keiser asserts that their withdrawal rate includes students temporarily classified as not-enrolled while awaiting entry into the core nursing curriculum or who withdrew and later re-enrolled.  For additional information see Keiser school profile.

companies with the 10 highest Bachelor's withdrawal rates, between 57 and 70 percent of students left without a degree. In total, 118,087 students left these 10 companies without a Bachelor's degree. Five of these companies have withdrawal rates over 60 percent. Four of them are among the lowest retention colleges for both Associate and Bachelor's degree students.[266]

| For-Profit Education Companies with the Highest Bachelor's Degree Withdrawal Rates[267] | | |
|---|---|---|
| Company | Percent Withdrawn | Students Withdrawn |
| Kaplan Higher Education, Inc. | 68 | 21,390 |
| Rasmussen Colleges, Inc. | 64 | 1,198 |
| Bridgepoint Education, Inc. | 63 | 25,898 |
| Education Management Corporation | 61 | 23,609 |
| Capella Education Company | 60 | 3,378 |
| Corinthian Colleges, Inc. | 59 | 1,889 |
| Grand Canyon Education, Inc. | 58 | 10,212 |
| The Keiser School, Inc.[268] | 57 | 1,061 |
| Alta Colleges, Inc. | 57 | 6,237 |
| DeVry, Inc. | 56 | 23,215 |
| All Companies | 61 | 118,087 |

Online Student Retention

For-profit colleges exhibit even lower retention rates, on average, among their students who attend exclusively online. Among companies that provided data detailing online enrollment, 64 percent of students attending online programs left without a degree compared to 46 percent of students attending campus-based programs offered by the same companies.[269] According to the CEO of ITT, the typical for-profit college student "does not necessarily do well in an unstructured, self-motivated environment like online learning." [270] That reality, combined with the fact that for-profit colleges, as discussed below, typically invest less in academic instruction or student services, provides some explanation for the low retention amongst online students.

Online learning is already playing an important role in higher education, and this role is likely to increase in future years. In contrast to non-profit and public providers who appear to be producing much higher levels of student success for comparable students, more needs to be done to ensure that for-profit

---

[266] Bridgepoint, Lincoln, EDMC, Corinthian, and Kaplan.

[267] Data exclude Lincoln Educational Services Company due to small sample size.

[268] Keiser asserts that their withdrawal rate includes students temporarily classified as not-enrolled while awaiting entry into the core nursing curriculum or who withdrew and later re-enrolled.  For additional information see Keiser school profile.

[269] Apollo, Bridgepoint, Career Education Corporation, DeVry, ECPI, Grand Canyon, Herzing, Kaplan, Keiser, Vatterott, and Westwood.

[270] Statement of ITT CEO Kevin Modany at the Robert W. Baird Growth Stock Conference.

colleges are meeting the needs of the online student population.[271]

| Comparison of Withdrawal Rates for Students Attending School Online and On Campus | | | | |
|---|---|---|---|---|
| Degree Level | ONLINE | | ON CAMPUS | |
| | Percent With-drawn | Students Withdrawn | Percent With-drawn | Students Withdrawn |
| Associate Degree | 68 | 172,256 | 51 | 28,013 |
| Bachelor's Degree | 57 | 94,214 | 55 | 55,041 |
| Certificate | 59 | 698 | 34 | 26,600 |
| All Students | 64 | 277,046 | 46 | 100,110 |

Online outcomes are particularly troubling at some of the larger publicly traded companies. Career Education Corporation's online Associate program had a withdrawal rate of 69.5 percent, compared to a rate of 44 percent for its on-campus students.



[271] For example, Western Governors University, a non-profit online college has a first-time full-time retention rate of 76 percent and spent $2,172 per student on instruction in 2009–10. IPEDS, First-Time Full-Time Retention, and Instructional Expenses.

At Kaplan, which has since instituted a new orientation program that is expected to have an impact on this rate, 69.5 percent of online Bachelor's students withdrew within a year, compared to 44 percent of its on-campus students.

Publicly Traded Company Student Retention

Retention rates are also lower among the large publicly traded for-profit education companies, which enroll approximately two-thirds of all for-profit college students.[272] Together, the publicly traded companies had withdrawal rates 9 percent higher than privately held companies.[273] The five largest companies by enrollment, all of them publicly traded, had an average withdrawal rate of 57 percent and account for 62 percent of all students in the dataset who withdrew.[274]

| Comparison of Withdrawal Rates for Students Attending Publicly Traded and Privately Held For-Profit Education Companies | | |
|---|---|---|
| **Company Type** | **Percent Withdrawn** | **Students Withdrawn** |
| Five Largest For-Profit Education Companies, by Enrollment | 57 | 369,656 |
| Publicly Traded For-Profit Education Companies | 55 | 549,773 |
| Privately Held For-Profit Education Companies | 46 | 46,832 |

Heavy "Churn"

Because so many students leave school after a short period of time, for-profit colleges must enroll an enormous number of new students each year to meet Wall Street investor expectations of enrollment growth. This practice is known in the industry as "churn." For example, Corinthian Colleges, Inc., began 2010 with 86,066 students and ended with 110,550, a growth of 24,484 students.[275] But, in the same period, 113,317 students left the company (some by graduating or completing programs), requiring Corinthian to enroll 137,831 new students to achieve that growth.[276] In other words, to achieve net enrollment growth, Corinthian has to enroll the equivalent of its entire student body each year. The same trend is visible in the enrollment-withdrawal cycle at other colleges. In 2010, Apollo Group enrolled 371,700 new students to achieve a growth of 27,800 students. ITT enrolled 89,123 new students in order to grow its total student population by 3,920.[277]

---

[272] 1.4 million out of 2 million total for-profit college students attend a college owned by a publicly traded company. IPEDS, Fall Enrollment, Fall 2009 for unit identification numbers controlled by for-profit education companies.

[273] Senate HELP Committee staff analysis of data provided by for-profit education companies. See Appendix 15.

[274] Apollo, Career Education Corporation, Corinthian, Education Management Corporation, and Kaplan.

[275] Corinthian Colleges, Inc., Form 10-Q for period ending 03/31/2012; Corinthian Colleges, Inc., Form 10-Q for the Period Ending 12/31/2011; Corinthian Colleges, Inc., Form 10-Q for period ending 09/31/2012. Corinthian SEC quarterly filings. Churn can most easily be tracked for public companies that report their quarterly enrollment numbers in SEC filings.

[276] Id.

[277] Apollo Group, Inc., Form 10-K for period ending 10/21/2010; ITT Educational Services, Inc., Form 10-K for period ending 02/18/2011.

*Community College Comparison*

Making an accurate assessment of community college withdrawal rates is equally challenging because of the same data limitations. Many students who enroll in community colleges similarly do not show up in data collected and reported by the Department of Education because they attend on a part-time basis and a significant number who enroll, like those at for-profit schools, are not attending college for the first-time.[278]

Because the committee's withdrawal data were the result of a for-profit college-specific document request, it is not possible to do an accurate comparison to other sectors of higher education. However, a more limited dataset from the Beginning Postsecondary Students (BPS) Longitudinal Study indicates that withdrawal rates at community colleges are similarly high.[279] A recent Harvard analysis of students entering in 2004 indicates 22 percent of community college students seeking an Associate degree completed the degree while 28 percent of for-profit students did so. Among bachelor degree-seeking students, however, 66 percent of students attending 4-year public schools attained their degree, but only 26 percent of for-profit students did so.[280] While the BPS dataset is based on a statistical sample of students, rather than all students, it does track students who are not first-time students and represents the best available comparative dataset.[281]

However, because the BPS study looks at a cohort of students who entered school in 2004, the study does not capture the growth, and the corresponding completion problem, with students enrolling in for-profit Associate degree programs between 2004 and 2010. For example, in 2004, the University of Phoenix enrolled 4,000 Associate degree students, which represented 2 percent of the company's total enrollment. But, by 2008, the company enrolled 146,500 Associate degree students who made up 41 percent of the student body.[282] The committee staff analysis shows that 66.4 percent of students enrolling in the University of Phoenix Associate degree programs in 2008–9 withdrew, and did so within a median of 4 months.

This growth has been challenging for policymakers to track effectively because most data does not separately track Associate degree students who attend colleges that also offer Bachelor's degrees.[283] Yet, virtually across the board, colleges analyzed by the committee staff had significantly worse withdrawal rates for 2-year Associate degree programs than for 4-year, certificate or diploma programs. In the case of the Apollo Group, the withdrawal rate is 15 percent higher for students enrolled in 2-year programs compared to 4-year degree programs, and the company itself estimated that the 2006 cohort of Associate

---

[278] In April 2012, the Department of Education announced plans to expand the persistence and completion reporting requirements to include part-time and transfer students. U.S. Department of Education, "Education Department Releases Action Plan to Improve Measures of Postsecondary Success," Press Release, April 11, 2012, http://www.ed.gov/news/press-releases/education-department-releases-action-plan-improve-measures-postsecondary-success (accessed May 19, 2012).

[279] David J. Deming, Claudia Goldin, and Lawrence F. Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?," *Journal of Economic Perspectives*, vol. 26(1), Winter 2012, pp. 139-164, http://www.frbatlanta.org/documents/news/conferences/11employment_education_demming.pdf (accessed Apr. 27, 2012).

[280] Id.

[281] Apollo Group, Inc. 10-K for period ending 8/31/2008.

[282] Id.

[283] Although the Department of Education collects this information through IPEDS and the reported annual graduation data separately breaks out Associate degree students who attend colleges that also offer Bachelor's degrees, it is not easily accessible.

degree students is likely to have a lifetime student loan default rate in excess of 70 percent.[284]

While community colleges and 2-year for-profit programs have similarly low retention rates, the cost of the for-profit programs makes those programs more risky for students and Federal taxpayers. For-profit colleges are much more expensive than community colleges, forcing more for-profit students to borrow, and to borrow higher amounts.[285] While 96 percent of those attending a for-profit college borrow to attend, just 13 percent of community college students do so.[286] Thus, the expense and risk incurred from an attempt at college that did not end in a degree is greater at for-profit colleges, while most community college students have little or no debt if they leave school without a degree. However, community colleges clearly struggle to provide non-traditional students with the support they need to complete programs and appear to have slightly worse to comparable student outcomes than for-profit colleges.

<u>Companies That Charge More do not Show Higher Student Retention</u>

Among for-profit colleges, those that charge more do not retain a higher percentage of students. In fact, as the table below indicates, some schools that charge extremely high tuition have some of the highest withdrawal rates.

| Withdrawal Rates of For-Profit Education Companies with the Highest Associate Degree Tuition for Students Enrolling in 2008-9 | | |
| --- | --- | --- |
| Company | Associate Degree Tuition | Percent of Students Withdrawn |
| Alta Colleges, Inc. | $48,194 | 57.6 |
| Education Management Corporation | $47,410 | 63.7 |
| ITT Educational Services, Inc. | $44,895 | 53.1 |
| Corinthian Colleges, Inc. | $41,149 | 66.5 |
| Rasmussen Colleges, Inc. | $39,432 | 63.0 |

For instance, EDMC's Art Institute Pittsburgh campus charges tuition of $94,765, despite the fact that EDMC has a 61.9 percent withdrawal rate across all Bachelor's degree programs. Career Education Corporation's American InterContinental University and Rasmussen charged $30,659 and $39,432 for Associate degrees, while, respectively, 62 percent and 63 percent of their students left school without a degree. In contrast, the tuition and withdrawal rates were sharply lower at the for-profit college American Public Education, Inc. (APEI).[287] APEI charged $30,350 for a Bachelor's degree, and 46.4 percent of the company's students withdrew without a degree within a year.

The mismatch between student retention and tuition charges points to a larger lack of accountability in the for-profit higher education sector.

---

[284] Apollo Internal Email, May 2010, re: *RE: Default Information* (AGI0049553).

[285] The average student debt among companies that received a document request is $10,915. Senate HELP Committee staff analysis.

[286] College Board Advocacy & Policy Center, *Trends in College Pricing 2011*, College Board, pg. 13 (2011), http://trends.collegeboard.org/downloads/College_Pricing_2011.pdf (accessed May 3, 2012).

[287] American Public Education, Inc. ("APEI") is a publicly traded for-profit higher education company that enrolled 77,000 students as of fall 2010 and is based in Charlestown, WV.

The Costs of Withdrawal

      The high withdrawal rates raise a fundamental question about the value of for-profit colleges for low-income students. Students who leave school without earning a diploma are 10 times more likely to default on their loans according to a National Center for Higher Education Policy report.[288] These institutions ask students with the most modest financial resources to take a big risk by enrolling in their high-tuition colleges. If students succeed at this gamble, they may increase their income. However, if they drop out, as a majority does at some institutions, they are left with significant debt, and a high chance of default. In the words of one Kaplan executive:

> The value proposition does not exist for a dropped student. The value they gave (indebtedness . . .
> ) is greater than the value received (an incomplete education). So they default.[289]

---

[288] Lawrence Gladieux and Laura Perna, *Borrowers Who Drop Out: A Neglected Aspect of the College Student Loan Trend*, National Center for Public Policy and Higher Education, May 2005, http://www.highereducation.org/reports/borrowing/borrowers.pdf (accessed July 5, 2012).

[289] Kaplan Internal Email, November 2008, re: *RE: KU CDR Original Loan Amount and Default Rate* (KHE 197327).

# Why Do Many Students Fail to Complete For-Profit Programs?

## Spending Choices of For-Profit Education Companies

In the absence of regulation that requires for-profit colleges to focus on high retention or other measures of student success, some for-profit companies dedicate up to 30 percent of revenues to marketing and recruiting efforts that ensure a stream of new "starts," while minimizing spending on education and academic support services. Some companies also retain a large percentage of revenue as pre-tax profit, pay their executives far more than other colleges, and divert significant sums to non-educational activities such as lobbying.

### Marketing, Recruiting, and Profit

Some for-profit colleges, including many with the highest profit margins, spend more per student on marketing, recruiting, and profit than on instruction. Publicly traded for-profit education companies spent, on average, $248 million on marketing and recruiting in 2009.[290] Marketing and recruiting includes all spending on advertising, other marketing spending, lead generation, and the recruiting sales staff.[291] That spending equates to 23 percent of total revenue, on average.[292] Some companies dedicate a higher percentage: Grand Canyon and Bridgepoint Education, two companies with common roots, spent 32.6 and 32.1 percent respectively on marketing and recruiting. Alta Colleges, Inc., a privately held company that operates Westwood Colleges, devoted 29.1 percent of its revenues to marketing and recruiting. Together, the 30 education companies examined by the committee spent $4.2 billion on marketing in 2009, or 22.7 percent of all revenue.[293] This translates to approximately $2,622 per student spent on marketing.[294]

---

[290] See Appendix 22.

[291] Companies report spending on marketing and recruiting in different ways.  In order to develop the most comprehensive estimate of spending on marketing and advertising as well as enrollment and recruiting for fiscal year 2009, committee staff used a combination of the annual 10-K statements of publicly traded companies, audited financial statements and information produced pursuant to item number 1 of the second tranche in the committee document request of August 5, 2010 (see Appendix 4).  Form 10-K annual statements and financial statements were used wherever both marketing and recruiting expenses were broken out or where the two categories were combined ("marketing, promotion and selling"). See Appendix 22.

[292] See Appendix 19.

[293] Id.

[294] Student enrollment (denominator) is the "Full Time Equivalent" enrollment reported to the Department of Education. Henley Putnam is not included in this calculation because the company did not participate in title IV student aid programs and therefore is not required to report these data to the Department.



For-profit colleges have asserted that marketing and advertising are critical to reach the non-traditional students that have the potential to benefit the most from obtaining some level of higher education. But attracting non-traditional students through marketing and advertising does not mean that a college must employ aggressive recruiting tactics. For instance, the public online University of Maryland University College has managed to implement an advertising and marketing program directed at reaching these same students. UMUC spent $27.3 million on marketing and advertising in fiscal year 2010 or $1,325 per full-time equivalent student.[295] However, UMUC does not appear to use the tactics of repeated phone calls and emails, sales pitches based on overcoming objections or the deceptive and misleading tactics documented above regarding cost, graduation and job placement.

For-profit education companies are successful as businesses; throughout the 2000s many of the companies had profit margins that topped most of Wall Street.[296] In 2009, publicly traded for-profit colleges had an average profit margin of 19.7 percent and generated a total of $3.2 billion in profit.[297] (Altogether, the 30 companies examined by the committee generated $3.6 billion in profit, or 19.4 percent of revenue, that year. This amount translates to $2,277 per student spent on profit.) In comparison, the highly successful Walt Disney Company reported a profit margin of 18.5 percent in 2009.[298] Similarly,

---

[295] Senate HELP Committee analysis of data provided by University of Maryland.

[296] More recently, some for-profit education companies have seen their profit margins dip.

[297] Profit figures represent operating income before tax and other non-operating expenses including depreciation. See Appendix 3.

[298] Walt Disney Company, Form 10-K for period ending 10/02/2010, available at http://thewaltdisneycompany.com /investors/financial-information/sec-filings (accessed May 24, 2012).

Coca-Cola reported a 26.6 percent profit in 2009.[299]



**Profit Margins (Operating Income) at For-Profit Education Companies, 2009**

Of the 30 companies surveyed 24 posted double digit profit margins. Three companies, ITT, Strayer, and TUI posted profit margins above 30 percent.[300] Apollo, the largest education company, posted a profit of $1.1 billion in 2009.[301] That company collected $3.1 billion in Federal student aid, in addition to $46 million in military education benefits.[302] Proportionally, 86.8 percent of the company's revenue, and $925 million of their profit, is attributed to Federal taxpayer sources.

The profit of many education companies is evidently disconnected from the value for students: revenues (from Federal financial aid dollars) continue to grow even though the most students leave without completing a degree, and many are not able to make payments on their student loan debt. Given that taxpayers are the source of most of those increasing revenues, they have the right to demand educational programs that work for more students.

---

[299] The Coca-Cola Company, Form 10-K for period ending 02/26/2010, available at http://ir.thecoca-colacompany.com/phoenix. zhtml?c=94566&p=irol-sec (accessed May 24, 2012).

[300] TUI Learning LLC ("TUI") is a for-profit higher education company that enrolled 7,307 students as of fall 2010 and is based in Arlington, VA.

[301] Apollo Group, Inc., Form 10-K for period ending 8/31/2009.

[302] U.S. Department of Education, Federal Student Aid Data Center, title IV Program Volume Report for Apollo, http://federalstudentaid. ed.gov/datacenter/programmatic.html.

Executive Compensation

At some for-profit education companies, a substantial amount of tuition dollars that could be spent on instruction are instead channeled to executives of for-profit education companies as salaries and bonuses. In addition, executives are awarded stock options that add up to sometimes enormous sums, even though students at the colleges they oversee are not achieving sought-after outcomes. The CEOs of the large publicly traded for-profit education companies, took home, on average, $7.3 million each in fiscal year 2009.[303] That year saw some of the largest pay packages in the history of the sector: Andrew Clark, CEO of Bridgepoint Education, Inc., collected $1.1 million in salary and bonus and $19.4 million in stock options, and Robert Silberman, the CEO of Strayer, received $40 million in stock options, in addition to $1.5 million in salary and bonus.[304]

| Five Highest Paid Executives at Publicly Traded For-Profit Education Companies, 2009 | | | | |
|---|---|---|---|---|
| Executive | Base Salary | Bonus and Stocks | Other Compensation | Total |
| Robert Silberman<br><br>Strayer Education, Inc. | $665,000 | $40,815,000 | $9,800 | $41,489,800 |
| Andrew Clark<br><br>Bridgepoint Education, Inc. | $372,917 | $20,133,261 | $26,126 | $20,532,304 |
| Karl McDonnell<br><br>Strayer Education, Inc. | $330,000 | $10,500,000 | $9,800 | $10,839,800 |
| John Sperling<br><br>Apollo Group, Inc. | $850,000 | $7,403,089 | $229,265 | $8,617,597 |
| Kevin Modany<br><br>ITT Educational Services, Inc. | $712,500 | $6,855,000 | $61,670 | $7,629,172 |

In comparison, the highest paid leader at each of the eight Ivy Leagues received an average of $1.1 million in compensation, or nearly seven times less than for-profit CEOs.[305] Harvard President Drew Gilpin Faust, for example, received compensation that totaled $822,000 in 2009.[306] The five highest paid leaders of large public universities averaged compensation of $1 million while the five highest paid leaders at non-profit colleges and universities averaged $3 million with most others earning far less.[307]

---

[303] Includes compensation information for 13 of 15 publicly traded for-profit education companies. Kaplan, owned by the Washington Post Company, does not disclose compensation for its executives. And National American University was not listed on a major stock exchange in 2009.

[304] Silberman's $40 million in options vests over 10 years. Much of Clark's 2009 compensation was made up of stock options connected to Bridgepoint's IPO. Bridgepoint Education, Inc. Form DEF 14A for Period Ending 05/12/2012.

[305] Sandy Baum (Policy Analyst at the College Board and Senior Fellow at George Washington University School of Education) Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges* 112th Congress (2011).

[306] The Chronicle of Higher Education, Salaries of Private-College Presidents, 2009, http://chronicle.com/ article/Sortable-Table-Salaries-of/129982/ (accessed May 24, 2012).

[307] Id. Football coaches at some non-profit and public schools are paid more than the college President.  The top five salaries for coaches in 2011 are: University of Texas $5.1 million, University of Alabama $4.8 million; University of Oklahoma $4 million; Louisiana



Perhaps most troubling is that the pay of executives at for-profit schools is based primarily on enrollment and profit goals, not student success. For example, at Corinthian, "75 percent of the annual bonus opportunity for executives [is] based on operating profit performance." [308] Corinthian Colleges, Inc., has some of the highest student loan default rates and lowest retention rates among large for-profit college operators, yet it paid its CEO Peter Waller $4.5 million in 2009.[309] UTI, a publicly traded school focused on automotive technology, bases its bonus structure on the company's earnings.[310] Thus, they are paid large salaries and bonuses regardless of whether student outcomes improve or decline.[311]

For-profit colleges also divert significant sums that could otherwise be spent on education, to lobbying. In 2010, the industry spent more than $8.1 million on lobbying members of Congress.[312] That

---

State University $3.8 million; University of Iowa $3.7 million. See, Christopher Schnaars, Jodi Upton and Kristin DeRamus, USA TODAY College Football Coach Salary Database, *USA TODAY*, http://www.usatoday.com/sports/college/football/story/2011-11-17/ cover-college-football-coaches-salaries-rise/51242232/1 (accessed May 20, 2012). Sandy Baum, Policy Analyst at the College Board and Senior Fellow at George Washington University School of Education, noted the mismatch in her testimony before the committee: "Average compensation for the five highest-paid public university chief executives in 2009–10 was $860,000. The five highest-paid Ivy League presidents received an average of $1.3 million in 2008–9. The top five leaders of publicly traded for-profit postsecondary institutions received and average of $10.5 million in 2009." Sandy Baum (Policy Analyst at the College Board and Senior Fellow at George Washington University School of Education) Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges* 112th Congress (2011).

[308] Corinthian Colleges, Inc., Form DEF 14A for Period Ending 11/15/11.

[309] Id.

[310] Universal Technical Institute, Inc., Form DEF 14A for Period Ending 2/22/12. Universal Technical Institute, Inc. ("UTI") is a publicly traded for-profit higher education company that enrolled 21,000 students as of 2010 and is based in Scottsdale, AZ.

[311] UTI had some of the better outcomes of programs analyzed by the committee with 32 percent of Associate students and 36 percent of certificate students withdrawing in the period analyzed. See Appendix 15.

[312] A consistent criticism of the investigation has been that the for-profit college sector was not given sufficient opportunity to be heard

amount is two and a half times greater than the amount the sector spent on lobbying in 2009. The companies and trade association spent another $8 million in the first 9 months of 2011.[313] These funds paid for 158 lobbyists from 37 firms and for-profit education companies.[314] Some companies have significantly increased their lobbying spending. Capella Education Co., based in Minneapolis, for example, spent $100,000 on lobbying in the first 9 months of 2010, five times more than in the same period in 2009.[315] Moreover, since the definition of a "registered lobbyist" is fairly narrow and does not include State lobbying activity, media campaigns, or funds paid to public relations firms specializing in astroturfing (creating the appearance of grassroots movements), the true amount that the industry spends on influencing lawmakers may be significantly higher.[316]

| Top For-Profit College Registered Lobbying Expenditures January 2010 to October 2011[317] | |
|---|---|
| Company | Lobbying Expenditures [in millions of dollars] |
| Washington Post Company | $1.7 |
| Coalition for Educational Success | $1.7 |
| Career Education Corporation | $1.6 |
| Association of Private Sector Colleges and Universities | $1.5 |
| Apollo Group | $1.4 |
| Corinthian Colleges | $1.4 |
| Education Management Corporation | $1.4 |
| Bridgepoint Education | $1.2 |
| Total | $11.9 |

Instructional Spending

After spending on marketing, recruiting, profit and other non-education expenses is subtracted, the amount left for educating and supporting students appears relatively meager at many for-profit colleges. The amount that publicly traded for-profit companies spend on instruction ranges from $892 to $3,969 per student per year. Among all companies that received a document request, companies spent an

---

in the hearings. The committee invited for-profit education executives to provide testimony in three of the six hearings. The hearings were conducted according to committee rules and while the committee minority chose to not call witnesses at some hearings, they were always afforded the opportunity to do so. An additional hearing was planned for the spring of 2011, but was not held after leaders of two major for-profit education companies that receive over a billion in taxpayer dollars each year indicated that they would not appear. While the Chairman considered compelling the executives to appear, ultimately the facts documented in the investigation speak for themselves.

[313] Eric Lichtblau,"With Lobbying Blitz, For-Profit Colleges Diluted New Rules," *New York Times*, December 9, 2011, http://www. nytimes.com/2011/12/10/us/politics/for-profit-college-rules-scaled-back-after-lobbying.html?pagewanted=all (accessed May 3, 2012).

[314] Paul Blumenthal, "Regulations Lead To Lobbying Surge By The For-Profit College Industry," *Sunlight Foundation Blog*, March 10, 2011, http://sunlightfoundation.com/blog/2011/03/10/regulations-lead-to-lobbying-surge-by-the-for-profit-college-industry/ (accessed May 3, 2012).

[315] Drinker Biddle & Reath, LLP, Lobbying Report for Capella University for First Quarter 2010; Drinker Biddle & Reath, LLP, Lobbying Report for Capella University for Second Quarter 2010; Drinker Biddle & Reath, LLP, Lobbying Report for Capella University for Third Quarter 2010.

[316] The for-profit college sector engaged outside entities like the DCI Group and LawMedia Group to assist in their public relations campaign.

[317] Eric Lichtblau,"With Lobbying Blitz, For-Profit Colleges Diluted New Rules," New York Times, December 9, 2011, http://www.ny-times.com/2011/12/10/us/politics/for-profit-college-rules-scaled-back-after-lobbying.html? pagewanted=all (accessed May 3, 2012).

average of $2,050 on instruction per student in 2009.[318] The chart below details the annual per student spending on instruction and marketing and recruiting for each of the five for-profit institutions with the highest profit margins.[319]



In contrast, public and non-profit schools, which by definition do not retain any revenue as profit and do not pay taxes, generally spend a higher amount per student on instruction, and spend a far lower amount on marketing and recruiting. For example, Northern Virginia Community College spends about $4,068 per student per year on instruction.[320] It devotes two-fifths of 1 percent of its budget to marketing, or about $22 per student per year.[321] Portland Community College in Oregon spends $5,953 per student on instruction, and about 1.2 percent of its budget, or $185 per student, on marketing.[322]

Some for-profit executives also assert that when comparing institutions' spending on marketing, money spent by public and non-profit schools on marketing and recruiting for sports programs includ-

---

[318] See Appendix 21. Senate HELP Committee staff analysis of documents produced by companies for marketing, and IPEDs data for instruction spending. Instruction cost is composed of "general academic instruction, occupational and vocational instruction, special session instruction, community education, preparatory and adult basic education, and remedial and tutorial instruction conducted by the teaching faculty for the institution's students." Denominator (students) used is the U.S. Department of Education's "Full Time Equivalent" enrollment for 2009.

[319] Appendix 21 and Appendix 22.

[320] IPEDS 2009 reported data for Northern Virginia Community College.

[321] Senate HELP Committee staff analysis of fiscal year 2010 data provided by college.

[322] Senate HELP Committee staff analysis of data provided by college and IPEDS.

ing football and basketball should be included.  However, these programs are generally not funded with student financial aid dollars, and are in many cases self-financed with receipts from ticket sales and media rights.[323]  Even the University of Tennessee and the University of Texas at Austin, institutions with the highest spending on sports marketing and recruiting at $8.7 million and $7.8 million respectively, pay these expenses from the revenues generated by the sports programs, and still spend a fraction of the amount spent by many for-profit colleges.[324]

Student Success is Divorced From Company Success

The analysis above demonstrates that the problem of student withdrawals is much more acute among publicly traded for-profit education companies.[325] Looking at only the five publicly traded for-profit companies that were among the worst performers for both Associate degree and Bachelor's degree students, we also see companies with some of the highest profit margins in the country:

| Profit Margins of For-Profit Education Companies with the Highest Associate Degree Withdrawal Rates | | |
|---|---|---|
| Company | Percent of Students Withdrawn | Company Profit Margin (Year) [in percent] |
| Bridgepoint Education, Inc. | 84 | 30 (2010) |
| Lincoln Educational Services Company | 70 | 19 (2010) |
| Kaplan Higher Education, Inc. | 69 | 13 (2009) |
| Corinthian Colleges, Inc. | 66 | 14 (2010) |
| Apollo Group, Inc. | 66 | 21 (2010) |

Student withdrawal rates call into serious question the annual Federal investment of $32 billion in Federal financial aid to these companies. Further, the contrast between the low levels of academic success among students and the high levels of business success among some companies highlights the fact that the current regulatory environment is fundamentally insufficient to ensure that for-profit colleges are focused on an educational mission. Publicly traded companies are duty-bound to demonstrate growth and profitability with no countervailing requirement that they demonstrate high rates of student success. The consequence is a situation in which education companies disproportionately invest in marketing and recruiting while keeping educational spending low and tuition prices high. The 15 publicly traded companies, which saw more than half of their students, 549,773 people, who enrolled in 2008-9 leave without completing degrees, spent a total of $1.9 billion on marketing (at least 85.6 percent of which came from Federal taxpayer dollars), and gave $189 million to their top executives.[326] It is unclear that it is either prudent or sustainable to continue providing a large guaranteed stream of Federal taxpayer dol-

---

[323] See ESPN, "The money that moves college sports," Database, http://b2.caspio.com/dp.asp?AppKey=900c1000 ea466e223e-104a22814a (accessed May 20, 2012).

[324] Id.

[325] Because the committee had not fully developed its research on for-profit education companies owned by private equity firms at the time the document request was issued, further analysis of the outcomes and spending in private equity-owned colleges is warranted.

[326] Senate HELP Committee staff analysis of publicly available executive compensation information and data.

lars to companies who use those dollars for marketing and profit in the absence of requirements that they also demonstrate high levels of student success.

## Academic Quality

A school that dedicates relatively little of its revenues to teaching students, on its face, raises serious questions about its academic quality and value. Students and employers should be able to expect and trust that institutions of higher education, especially career-focused education, have the integrity and rigor to teach skills that are valued in the workplace. Undercover observation and student complaints reveal that many for-profit schools have curricula that do not challenge students, academic integrity policies that are sparsely enforced, and teaching practices that in some cases do not lead to successful student learning and outcomes.

In 2011, undercover employees from the GAO enrolled in 12 different online colleges using fictitious identities and academic credentials.[327] A review of screenshots and other documents from the employees' undercover work presents a window into the for-profit online college experience.

The course structure, across the schools, consists of self-directed reading from books and Web sites, online discussion-threads, online tests, individual written assignments or power-points, and a few courses that included group assignments.[328] The discussions look like what one might expect from an online blog or social networking site, and discussion posts were often worth between 10 percent and 40 percent of the overall course grade.[329] One Introductory Computing quiz included questions such as: "When entering text within a document, you normally press Enter at the end of every_____," with possible answers including: page, sentence, line, and paragraph.[330] Interaction with the teacher was primarily through text-based chat rooms, discussion posts, and direct emails.[331] Few of the courses featured video or audio lecture components.

---

[327] GAO employees attempted to enroll at 15 different institutions using fictitious (and unverifiable) proof of graduation from high school or its equivalent. Only 3 of the 15 schools declined or rescinded the students' admission as a result of those unverifiable credentials, while the other 12 institutions allowed admission. See U.S. Government Accountability Office, *For Profit Schools: Experiences of Undercover Students Enrolled in Online Classes at Selected Colleges*, Report to the Chairman, Committee on Health, Education, Labor, and Pensions, October 2011, http://www.gao.gov/assets/590/586456.pdf [hereinafter GAO II].

[328] See, for example, GAO Investigation Documentation, January 2011, History of Electronic Messages Between GAO Investigator and Online Intro to Computer Instructor (GAOHQ-4750764); GAO Investigation Documentation, May 2011, Week Two Class Discussion, Instructions and Student Comments (DALLAS-334889); GAO Investigation Documentation, December 2011, ITT Technical Institute Discussion Forum Summary Page (HQ-4643279). See, for example, GAO Investigation Documentation, *Title: TB 141 Week 2 Quiz* (HQ-4628843); GAO Investigation Documentation, February 2011, *Record of Analysis: Rasmussen—IB—Week 7 Quiz* (HQ-4687765).
See, for example, GAO Investigation Documentation, *The Gross Domestic Product* (HQ-4600689); GAO Investigation Documentation, *A SWOT Analysis for Online Learning* (HQ-4631902).

[329] See, for example, GAO Investigation Documentation, January 2011, History of Electronic Messages Between GAO Investigator and Online Intro to Computer Instructor (GAOHQ-4750764); GAO Investigation Documentation, May 2011, Week Two Class Discussion, Instructions and Student Comments (DALLAS-334889); GAO Investigation Documentation, December 2011, ITT Technical Institute Discussion Forum Summary Page (HQ-4643279); GAO Investigation Documentation, *Title: TB 141 Week 2 Quiz* (HQ-4628843); GAO Investigation Documentation, February 2011, *Record of Analysis: Rasmussen— IB—Week 7 Quiz* (HQ-4687765); GAO Investigation Documentation, *The Gross Domestic Product* (HQ-4600689); GAO Investigation Documentation, *A SWOT Analysis for Online Learning* (HQ-4631902).

[330] GAO Investigation Documentation, *Title: TB 141 Week 2 Quiz* (HQ-4628843).

[331] GAO II.

Moreover, GAO employees were charged thousands of dollars to enroll in 3- to 6-week basic courses such as "Keyboarding" and "Learning Strategies and Techniques." [332] Schools also enrolled the GAO's employees in: Introduction to the Criminal Justice Program, Introduction to Paralegal Studies, Introductory Computing, Introductory Math, Critical Thinking, and Introduction to the Medical Billing Program (I and II).[333]

The GAO's employees used various tactics to examine academic standards including: submitting obviously plagiarized work; submitting non-responsive or objectively incorrect work; and failing to submit assignments.[334] While several of the for-profit colleges tested responded appropriately to the subpar student performance, the GAO employees' experiences reflect, in many cases, a lack of academic integrity and rigor on the part of for-profit schools.[335]

GAO employees enrolled in five different courses at Rasmussen University and Corinthian-owned Everest University.[336] These employees repeatedly submitted plagiarized work for each of those courses.[337] Four of the five courses granted full or partial credit for multiple plagiarized assignments, and instructors in two of those courses never acknowledged the plagiarism in any way. Although according to the methodology established by the GAO, all students ultimately failed the courses, the failure to discipline the student is contrary to Everest's academic honesty policy provides for discipline ranging from expulsion to reduced credit.[338] Rasmussen's policy requires that no credit be granted for the first dishonest assignment and removal from the course after the second. Neither school followed its own academic honesty policy in response to the plagiarized work.[339]

These failures were not due to the plagiarism being difficult to detect. The plagiarized material was often copied directly from Web sites like Wikipedia or Answer.com, and GAO employees included links to the source Web sites, making it easy to identify plagiarized work.[340]

In some cases, teachers failed to notify the student or the school of plagiarized submissions that were copied verbatim from other students' discussion posts for the same assignment. Several assign-

---

[332] GAO II, Table 1: Federal Financial Aid and Out-of-Pocket Costs of Undercover Student Attendance at 15 For-Profit Colleges.

[333] GAO II, Table 2: Selected Case Details from Undercover Testing at 15 For-Profit Colleges.

[334] Id.

[335] GAO produced documentation to HELP Committee staff of their employees' experiences. This documentation included screenshots and printouts of submitted coursework and communications with the school. Identifying information was first redacted by the GAO to protect the identities of parties involved.

[336] While the identity of individual companies were not made public at the time of the release of the GAO report *For-Profit Schools—Experiences of Undercover Students Enrolled in Online Classes at Selected Colleges*, the information was provided to the committee. The undercover GAO staff enrolled in the following schools: Community Care College, Bridgepoint-owned Ashford University, Kaplan University, Career Point College, CEC-owned International Academy of Design and Technology, Rasmussen College, Corinthian-owned Everest College, Newport Business Institute, Pinnacle Career Institute, ITT, Fortis College, and Trumbell Business College. The three schools that did not permit GAO to enroll were University of Phoenix, DeVry, and Anthem. ITT was school number 10 in the GAO report; Rasmussen was school number 6, and Corinthian-owned Everest College was school number 7.

[337] Another agent submitted a single partially plagiarized assignment at a sixth school, Community Care College, and received partial credit for that assignment in accordance with the school's policies. See GAO II at 12.

[338] GAO II at pg. 20 (GAO refers to Everest College as School 7).

[339] GAO II. GAO agents withdrew after one term, thus any later actions the school might have taken to enforce the academic honesty policy would not be recorded in the GAO documentation.

[340] See, for example, GAO II; GAO Investigation Documentation, Submitted Essay Assignment (HQ-4686888).

ments submitted by GAO employees were given full or partial credit even when the teachers noted that the assignment was plagiarized. For instance, in an Introduction to Business course at Rasmussen University, the GAO's employee submitted material copied directly from the Bureau of Labor Statistics' Web site.[341] The teacher gave 24.5 out of 30 points for the assignment. Even after acknowledging that the answers were not written by the student, the teacher seemed less concerned with cheating and lack of original work than with the fact that the student plagiarized material that was not relevant to the assignment. The teacher said:

> It appears that you copied and pasted from the website. By doing so you put a lot of extra information that I didn't need. Next time I would prefer if you would read the information and only include what is needed. I know that this was a hard assignment though. Everyone struggled with it [sic].[342]

In some cases, teachers did note plagiarism. The most responsible reaction to the plagiarized work came from a teacher of Everest's "Learning Strategies and Techniques" course, who consistently noted the dishonest conduct and gave little or no credit for plagiarized assignments. However, even though the teacher filed incident reports for multiple assignments, Everest failed to follow up with disciplinary action.[343]

GAO employees not only submitted plagiarized work, but also poor quality assignments. Although according to the methodology established by the GAO, all students ultimately failed the course, those who submitted low quality work frequently received higher credit than they should have according to the schools' own academic standards. In 6 of the 20 courses examined by committee staff, undercover employees received full or partial credit that exceeded the grade prescribed by the school's established grading standards. For example, a Career Point College written exam required the student to submit written answers to four questions.[344] The GAO employee instead submitted photographs of political figures and celebrities, but nevertheless got a passing grade of "C-" for the exam.[345] At Newport Business Institute, a student submitted an assignment answering only half of the questions. The teacher acknowledged that the submission was only "worth 50%" of the grade, but granted the assignment a grade of 75 percent.[346]

Further, even where a student "earned" a credit by the school's own grading standards, the academic experience was far less rigorous than a student or potential employer might expect. For instance, at Career Point, it is extremely difficult for students to fail a course because if a student does fail a test, they are required to re-take the same test.[347] For example, after failing a few assignments, an undercover agent was told by a Career Point teacher:

---

[341] GAO Investigation Documentation, *The Gross Domestic Product* (HQ-4600695).

[342] GAO Investigation Documentation, January 2011, *Record of Analysis: Rasmussen —IB—Email 3* (HQ-4610903).

[343] GAO Investigation Documentation, May 2011, *Record of Analysis: Everest —(Strategies for Success)—Professor Feedback* (DAL-LAS-335083).

[344] Career Point College is not one of the 30 for-profit higher education companies that received a document request from the committee in the course of its investigation.

[345] GAO II.

[346] Id.

[347] GAO Investigation Documentation, August 2010, Career Point College, Introduction to Computers Syllabus and Course Outline (GAOHQ-4662274).

Those assignments you did not pass, I've opened them up so you can retake them. They are open book so there should not be any failure. All answers are right in the book and there is no time limit.[348]

Teachers also varied widely in terms of how rigorously they graded material. For example, in a "Learning Strategies and Techniques" course at ITT, students were instructed to write one to two pages describing the eight steps to problem solving and applying them to a work, school, or personal problem. The undercover agent submitted a Word document that listed four steps of problem solving, along with five short sentences referencing a time management problem. The teacher awarded the submission a grade of 90 percent, along with the following feedback: "Paper met expectations, however, it was submitted two days late resulting in a 10% deduction." [349]

Further, because of the structure of these courses, there is often little interaction with teachers. What interaction does occur is typically via email or text-chat, but even those communications often reflect remarkably little time or attention from the teacher. Given the examples described above, it is unclear whether some teachers even reviewed assignments prior to awarding grades for those assignments. For example, one teacher from Everest University seemed to copy-and-paste the exact same feedback for multiple assignments, including identical grammatical and typographical errors in the teacher's comments.[350] This teacher included the following feedback for 5 of 10 discussion assignments, usually with just one or two additional sentences identifying the assignment in question:

Remember that you must response to entire of the main question as well as two responses to other people's posts [sic]. As we learn from each other responses to the course material [sic]. Please let me know if there is any assistance I can provide to assist you in succeeding in the course next discussion.[351]

The GAO employees' experience is borne out by separate complaints of students and instructors at for-profit schools. Although complaints do not represent the experience of the majority of students, they do provide a useful window into some common student grievances. For instance, an instructor at a UTI-owned campus called NTI wrote,

Every day that I come to work, I hear students tell me that they have encountered employers that point blank tell them that they do not hire NTI students because of consistent poor performance. Meanwhile we at NTI are being told to pass students who should fail because we are 'training entry level technicians who paid for the certificates like everybody else.' I am sorry if this offends you, but I was under the impression that our students paid for an education, not just a piece of paper!! I have been told to give students points to pass my courses when they should fail.[352]

Similarly, a Lincoln instructor stated,

---

[348] GAO Investigation Documentation, January 2011, History of Electronic Messages Between GAO Investigator and Online Intro to Computer Instructor (GAOHQ-4750764).

[349] GAO Investigation Documentation, February 2011, Problem Solving Writing Assignment Instructions and Response (HQ-4682883).

[350] GAO Investigation Documentation, May 2011, Record of Analysis: Everest—(Computer Applications)—Professor Feedback (DAL-LAS-335023).

[351] Id.

[352] UTI Internal Email, August 2008, re: *FW;* (UTI-C-000492). UTI was not one of the institutions investigated by GAO II.

I was hired to teach Anatomy & Physiology. There was no syllabus, no order to the course, and I was given no direction as to how teach using the 'Oklahoma Model.' Test questions were outdated. I was told to leave students alone for hours to do case studies and other instructors left them alone for up to 3 hours at a time on most days. Students even asked me if I was going to 'teach' them anything because they were left alone to teach themselves so often. I was unaware that PN students were able to teach themselves nursing![353]

Students complained about easy classes that they believed did not prepare them for the job market, highly variable instructor quality, difficulty getting questions answered, and old equipment and facilities.

"The complete and total lack of preparation, effort, and desire to perform on the part of the instructor has made this course without any doubt in my mind the largest waste of time, money, effort, and resources since I have begun attending this school," complained one ITT student.[354] Another student said, "[I was] rather frustrated with the class I took, felt that I learned nothing and do not feel a bill for $2500 is a fair amount to be paying for a rather inadequate education." [355] One summary of a Kaplan student's complaint stated, "Basically student is upset about quality of instructors; having to teach herself the material; the poor quality of students in the class" [356] A summary of another student's complaint read, "At Kaplan the price is high and the instruction lacking. He is not happy with the quality of the faculty and says that lab experiences have been few and far and between" [357] The complaint ends with, "This is a corporate run school and as such…Money is the main object, not the quality of the education provided."[358]

A Herzing student wrote of one class, "We are currently in our fourth week of class and … I can honestly say that I have not learned anything in this class." [359] She goes on to note that on several occasions when students asked teachers basic questions, the teacher was unable to answer.[360] One UTI student stated,

what I've gathered in my first course is that it appears I've indebted myself $15k dollars to show up in uniform and decipher procedures from a service manual, basically teaching myself instead of receiving accurate and consistent direction from an instructor regarding practical, procedural instruction … the fact that he was left to instruct us without having a demonstrable mastery of all the concepts and procedures covered is something I can't comprehend or ignore without critique … I know that many instructors at the school are former technicians or were otherwise involved in shop operations at dealerships or their own private enterprises, but this type of experience alone doesn't make a good teacher. *Mr. [redacted] is the worst teacher I have ever studied under*,

---

[353] Lincoln, May 2007, Letter of Complaint from Instructor to New Jersey Board of Nursing (LINC0000044). The New Jersey Office of the Attorney General closed the investigation into this complaint without finding violations of law or issuing sanctions. Lincoln was not one of the institutions investigated by GAO II.

[354] ITT Educational Services, August 2006, Completed Student Comment/Complaint Report (ITT-00003876).

[355] ITT Educational Services, July 2010, Letter from Better Business Bureau Regarding a Student Complaint (ITT-00009785).

[356] Kaplan, June 2008, Document Describing Complaint from a Medical Assistant Student (KHE 0038274).

[357] Kaplan, August 2009, Document Describing Complaint from a HVAC Student (KHE 0038727).

[358] Id.

[359] Herzing Student Email, November 2009, Student Letter of Complaint (HP000002321).

[360] Id.

including my associate degree and all the various workshops, paid courses, schools, and seminars I've attended throughout my life [emphasis in original]. [361]

Twenty-two students, an entire class of nursing students at a Concorde Career Colleges, Inc. campus, wrote to school administrators that "instructors [were] late to start class by 20–40 minutes;" lectures were "vague" and "lack[ed] structure;" instructors were "ill-prepared" and spent time "searching for lost papers or tests or equipment;" they were not being taught crucial material about anatomy and pathology; and when instructors were absent the class was "left to sit unlectured, unguided, untested and uninformed," and classes were sometimes excused an hour early.[362]

One ITT student taking courses in information technology and Web site design complained, "Several of the classes were inadequate due to untrained or unqualified instructors, the lack of any instructor in certain class, the lack of book availability in other courses, and problems accessing equipment and software in others." The student's Web Design class

> was inadequate due instructor not teaching any HTML coding language and instead encouraging students to find code for other Internet websites and copy and paste said code as the student's own work. Furthermore, [instructor] installed a computer game on computers which were supposed to be for students' final exam website demonstrations and spent the class period playing that game instead of evaluating student projects. [363]

Another ITT student complained, "I have a huge problem. I have no teacher. It seems like ITT has yet again fired a teacher that plays a very important role up there without a replacement. Therefore, there was a class full of students up there last night and not one person knew what was going on." [364]

While it may suit some colleges' purposes to simply pass students despite negligible learning, this is a betrayal of both students and taxpayers. It fails to equip students for jobs in their chosen fields, and it provides little or no benefit to the economy or the tax base.

Part-time Faculty

Documents produced to the committee show that the majority of faculty at for-profit colleges consists of part-time and adjunct faculty, rather than full-time faculty. Among the 28 colleges analyzed, 80 percent of the faculty is part-time. Together, the companies employed 99,565 faculty members, of whom 79,738 were not full-time, and 22 of the 28 companies had a majority of part-time faculty.[365]

At a number of schools, the disparity is particularly striking. At Bridgepoint, for instance, 98.3 percent of the faculty is part-time, and 96.1 percent of Grand Canyon University's faculty is part time.[366]

---

[361] UTI Internal Email, October 2007, re: *FW: Course 2 ESI full report* (UTI-C-001040, at UTI-C-001041).

[362] Concorde, September 2009, Letter of Complaint from Class of Nursing Students to Concorde Deans and Administration (CCC000109599).

[363] ITT Educational Services, February 2007, Completed Student Comment/Complaint Report and Attachements (ITT-00005086).

[364] ITT Educational Services, December 2006, Completed Student Comment/Complaint Report (ITT-00004629).

[365] Appendix 24.

[366] Senate HELP Committee analysis of data provided by companies. See Appendix 24.

Part-time and adjunct instructors are less expensive to employ and frequently are hired on a short-term basis, thus helping to minimize educational costs. While this model is affordable and efficient, it is unclear if it allows for faculty to exercise genuine academic independence or to have a vested stake in the quality of the institution, two key questions for accreditors. At least one recent study found that community colleges with higher portions of part-time faculty also have lower student graduation rates.[367] While the part-time adjunct model is clearly an important innovation, it is unclear whether sufficient attention is being paid to ensuring that quality is not sacrificed as a result of this trend.



### Student Services

*First of all, we all need to understand there's a radical difference in educating and graduating a low-income first-generation student than there is a middle-income student... [In] the for-profit sector they address the financial barriers, but they have not adequately addressed the supportive services barriers.*

— Dr. Arnold Mitchem, President of the Council for Opportunity in Education.[368]

---

[367] Daniel Jacoby, "Effects of Part-Time Faculty Employment on Community College Graduation Rates," *The Journal of Higher Education*, Vol. 77, No. 6, November/December 2006, pp. 1081-1103.

[368] *The Federal Investment in For-Profit Education: Are Students Succeeding?*, Hearing Before the Senate Committee on Health, Education, Labor, and Pensions, 111th Congress (2010).

For-profit schools enroll large numbers of non-traditional adult learners including low-income and first generation college students, who require more extensive support and services in order to succeed in college.[369] ITT employees, for example, indicated in an internal email that over 90 percent of their students cannot do basic math.[370] For-profit colleges extol the access to higher education they provide to non-traditional low-income and minority students, who have historically been underserved by traditional higher education. While the industry often points to the high enrollment of at-risk students to explain poor student outcomes, many for-profit schools fail to make the necessary investments in student support services that have been shown to help students succeed in school and afterwards. Two large for-profit colleges, committee staff found, offer no organized tutoring services aside from the instructor.[371]

Support services, when they are provided, include tutoring and other out-of-class academic help, as well as advising students on choosing classes, librarian services, and connecting students with child care and transportation help. These services enable students to confidently move through their academic programs and overcome the day-to-day hurdles that may hinder their successful completion. As Dr. Arnold Mitchem, president of the Council for Opportunity in Education, testified at the committee's hearing in September 2010:

> What am I talking about when I talk about supportive services? I'm talking about you have to engage these students. You have to provide intensive counseling. You have to provide mentoring, you have to provide tutoring, you have to provide learning communities. There's a variety of tactics, services, and treatments that you have to put in play to work with this individual. You have to work with them in a holistic way.[372]

The relatively low number of student services staff available to help students at many for-profit colleges severely limits the availability and quality of services the colleges provide. While the services available at individual colleges range from robust to nearly non-existent, in general, staffing is prioritized towards recruiting not student services.

Due to resource constraints, student services are also lacking at many community colleges and at many minority-serving institutions. This helps explain low retention and completion at some of those institutions. However, those colleges, many of them struggling financially, commit available funds to efforts to boost retention and completion. Staffing data indicate that for-profit institutions, many of which generate tens or hundreds of millions of dollars in pre-tax profit, by and large do not invest significantly

---

[369] According to the recently released GAO Report "Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools," for-profit schools enroll a much higher percentage of African-American or Hispanic students compared to other sectors. Forty-seven percent of the students at for-profit colleges are African-American or Hispanic, compared to 28 percent at public schools, and 24 percent at private non-profits. The same report indicates that for-profit colleges enroll a higher proportion of low-income students. At for-profit colleges, 76 percent of students are financially independent and have an annual median family income of $22,932. These numbers were 34 percent and $61,827 for private non-profits, and 46 percent and $44,878 for public schools. For-profit colleges also enroll a larger number of first generation college students as only 34 percent of their students have parents with an Associate degree or higher, compared to 46 percent at private non-profits, and 52 percent at public schools. U.S. Government Accountability Office, *Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools*, GAO-12-143 (December 2011), http://www.gao.gov/assets/590/586738.pdf (accessed May 3, 2012).

[370] ITT, April 2010, Budget Forecast Spreadsheets (ITT-0014496).

[371] Senate HELP Committee interviews with executives of Bridgepoint and CEC.

[372] Arnold Mitchem, Ph.D. (President, Council For Opportunity In Education), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *The Federal Investment in For-Profit Education: Are Students Succeeding?*, 111th Congress (2010).

in these kinds of efforts compared to the sum they invest in recruiting new students.[373]

Among the companies that provided usable data in 2010, the schools employed 35,202 recruiters compared with 3,512 career services staff and 12,452 support services staff.[374]

The deficit of services is reflected in formal complaints students lodged seeking help with academics. For example, one Ashford student, in and out of the hospital due to a chronic disease, felt that she was left to "flounder." She filed a complaint citing "failure on [the school staff's] part to find ways to help [her] during that time period, and also their failure to communicate with [her]."[375] A Kaplan student took issue with an "academic success center," which Kaplan's Web site advertises as "offer[ing] assistance with writing, math, and science." In reality, that center did not have a single tutor.[376] Another student, the first in her family to attend college, was told by ITT school administrators after she attempted to obtain tutoring that, "I needed to watch who I spoke to, and how the people I was talking to weren't my friends, that they were . . . saying I was agitating them." [377] The student concluded: "In so many ways I feel like my life's dream has been ripped right out of my hands." [378]

Formal complaints also reveal a pattern of inattention by the schools encompassing virtually every department, from academic advisors to financial aid to technical support. An Ashford student was careful to tell the enrollment advisors that she was pregnant with twins and "having a great deal of medical issues." [379] After being enrolled and taking classes for a number of weeks, she tried to get help because she would not be able to log in to attend class for a week due to these medical issues. After receiving no help, she submitted a complaint: "No one is responding and giving me the correct information that I need." [380] Another Ashford student wrote, "My major complaint is the fact that when I was enrolling in classes I had no problems with someone from the school returning my phone call. . . . Now that I am an existing student I cannot get anyone to return my phone calls." [381]

One Herzing student reported receiving very attentive treatment while being recruited, but then not getting phone calls returned once enrolled.[382] She stated, "In my experience, communication between Herzing and online students does not exist." [383] She continued, "I am absolutely astonished by the lack of communication, lack of effort and lack of support that I have had from Herzing." [384] A UTI student complained about problems with "Student Services, Financial Aid, Accounting, and Employment services. All of these departments are very unorganized and unprofessional. Nearly every time I went into one of these departments, I only went away unhelped, mad and frustrated."

---

[373] The analysis for the table below excludes six companies that were either not in operation or did not provide data for all years.

[374] Appendix 24. TUI and Walden did not provide information for 2010. Additionally, TUI, Chancellor and Henley Putnam were not in existence for the entire period and CEC provided only 1 year of information.

[375] Bridgepoint Student Email, May 2010, re: *I want to file a grievance please.* (BPI-HELP_00025856).

[376] Kaplan Internal Document, October 2008, Student Complaint Record (KHE 0039787).

[377] ITT Student Complaint, June 2006, Student Letter of Complaint (ITT-00004357).

[378] Id.

[379] Bridgepoint Student Complaint, April 2010, Student Letter of Complaint ( BPI-HELP_00026171).

[380] Id.

[381] Bridgepoint Student Email, July 2008, re: *This is my formal complaint* (BPI-HELP_00027543).

[382] Herzing Student Correspondence, May 2009, re: Herzing University at Birmingham, AL (HP000002286).

[383] Id.

[384] Id.

[385] UTI Student Email, October 2009, re: *(no subject)* (UTI-C-000604, at UTI-C-000608).

## Career Placement Services

For-profit schools present themselves as career-oriented, skill-focused places. Indeed, most advertising for for-profit higher education focuses on "getting the job" after graduating from school. As an example, DeVry recently ran a bus-shelter billboard advertising campaign: "John doesn't need to take the bus anymore because he was given the company car because he got a job with a big-time contractor because he studied game and simulation programming at DeVry University," the ads read.[386] But data and testimony collected during the investigation indicate that for-profit schools' investment in career services is meager. Among colleges that offered career services, the ratio of students to career advisers ranged from 91 to 1545 students per career services advisor. The University of Phoenix, with a student population of nearly half a million, has no career placement staff at all.[387] Bridgepoint-owned Ashford University employs one career placement official for a student population of 77,179 students (as of fall 2010).[388]

This limited investment also often appears focused on satisfaction of placement requirements mandated by accreditors rather than thorough career counseling.

Even where career services are available, many students report that those services are not helpful. A robust investment in career services would ensure that career placement employees are able to foster employer and alumni networks, provide resume and interviewing advice, and give students and graduates access to non-public job information about potential hiring. But Kathleen Bittel, a career services employee at the EDMC-owned Art Institute online division, described a very different process during her testimony at the committee's September 2010 hearing:

> I see a systemic problem here when there are only nine employees servicing the students that are being recruited by an admissions workforce of almost 1,600. Career Services employees are being paid nearly a third of what the top performers in the admissions department receive. I believe these facts speak volumes as to where the real priorities lie within these companies.[389]

Ms. Bittel was responsible for assisting as many as 180 departing students at a time. "I would have loved to have been able to do so much more for my grads, but there was no time," she told the committee. Eric Schmitt, a former Kaplan student testified at the committee's June 2011 hearing,

> The school's Career Services didn't seem prepared or able to help me. I stopped in the office on campus a few times but always seemed to get contradictory or confusing resume tips from them. Career Services would frequently send out emails notifying graduates of jobs being offered that I had seen on Iowa Workforce Development or in the Waterloo Courier. These were job postings

---

[386] Image: DeVry Bus Stop Ad, "John doesn't need to take the bus anymore," available at http://images.greatergreaterwashington.org/images/200903/devry.jpg (on file with the committee).

[387] U.S. Senate HELP Committee staff analysis of documents produced by the companies. See Appendixes 7 and 24. In Apollo's response, found in Appendix 6, the company, for the first time, stated to the committee that it utilizes a third-party provider to "accelerate the delivery of career services to University of Phoenix students."

[388] U.S. Senate HELP Committee staff analysis of documents produced by the companies.

[389] Kathleen A. Bittel (Acme, PA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *The Federal Investment in For-Profit Education: Are Students Succeeding?,* 111th Congress (2010).

that I could apply to on my own, instead of driving to the school.[390]

Student complaints highlight the lack of quality career services. One Kaplan student, who graduated *summa cum laude*, stated that the "Career Placement Service is horrible." [391] Another Kaplan student stated that the "job assistance program really is NO help what so ever! [sic]" and that any job leads he received were from Craigslist, not the school.[392] One Herzing complaint noted that the only support the student received from the career services office was to be sent job postings that he had already found himself.[393] He stated, "If I would have known I would be without a job a year after I finished school then I would never have [come] to your school. [sic]" [394]

A Lincoln student complained,

After graduation I went to the school to look for job placement and the two women who worked in that department had quit their jobs. I was told that no one would be able to help me find employment. I left my email address with an admission representative and she never emailed me any job leads. My Federal aid was wasted on something that I cannot even consider an education. [395]

A Concorde student wrote, "It was made to sound like they had connections that a graduate at any point in their career as long as they asked for help [sic]." [396] "The only 'job placement' the school does is search three websites (main websites as in Craig's List, Monster, and one other ). . . Everyone searches these websites."

The Criminal Justice Department Chair at UEI College, a for-profit college in California, wrote to Senator Harkin to relate his experience: "The real problem I saw was that there was no one in Career Services working on getting these students' jobs. I have kept in contact with some students and so far I believe none of my former CJ [Criminal Justice] students have been able to obtain a job in the field." [397] A former ITT student wrote expressing similar frustrations at his school. "After graduating with highest honors (3.85 GPA), ITT did not get me a single interview. . . . The job packet they would give you was full of fake jobs, after becoming unemployed a couple of years after graduating ITT, I went to the cam-

---

[390] Eric Schmitt (Hampton, IA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges?*, 112th Congress (2011). The company states that 14 out of 17 graduates from Mr. Schmitt's class (who did not seek further education) were placed in jobs. The company also notes that Mr. Schmitt did take a job with the law firm at which he externed, though the job was short-lived because of disciplinary action and misconduct on the part of the partner at the firm.

[391] Kaplan Internal Document, August 2010, Record of Student Complaint (KHE 0039225).

[392] Kaplan, July 2010, Record of Student Complaint About Insufficient Career Services (KHE 0039604).

[393] Herzing External Email, September 2009, Former Student Complaint About Lack of Job Assistance (HP000002319).

[394] Id.

[395] Lincoln External Correspondence, December 2008, re: *CHRO No. 0930220 [redacted] v. Lincoln Technical School* (LINC0000264). The agencies to which the complaint was submitted closed the investigations into this complaint without finding violations of law or issuing sanctions. Lincoln Education Services Company ("Lincoln") is a publicly traded for-profit higher education company that enrolled 33,175 students as of fall 2010 and is based in West Orange, NJ.

[396] Concorde External Correspondence, December 2009, Notification of Student Complaint Submitted to the Better Business Bureau (CCC000110342).

[397] Letter from Paul Scazillo, former instructor at UEI College, to Chairman Tom Harkin, July 7, 2010. UEI is not one of the 30 for-profit higher education companies that received a document request from the committee during its investigation.

pus and grabbed a job packet and it had the same jobs as it did two years earlier." [398]

Aside from difficulties students face in obtaining meaningful career counseling, several investigations have called into question the credibility of job placement data reported by for-profit schools. [399] Career services staff are often incentivized to report as high a number as possible to satisfy their managers, which in turn is used to satisfy regulators and as a promotional tool to convince prospective students to enroll.

Incentives for Career Services Staff

Testimony and internal documents indicate that some for-profit career services offices are more focused on reporting positive placement numbers than actually helping students achieve worthwhile full-time employment.

Kathleen Bittel, who worked in EDMC's Art Institute online job placement office, testified that placement counselors work under a quota system. These employees were required to document that a certain percentage of graduates were employed in a job in their field of study. If she met her quota of 85.9 percent of her students placed in their fields, Ms. Bittel's testified, she could earn a 33 percent bonus (up to $12,000 per year over her salary of $36,000). Conversely, she testified, she was repeatedly told that she would be fired if she failed to meet her placement quotas. [400]

The first step in meeting the requirement, she said, was eliminating certain graduates from the calculation altogether so they would not count against the quota. For instance, graduates would typically be excluded from placement calculations if the counselor reports that they are military spouses or stay-at-home parents, even if they are unemployed or working in a low-wage retail job. "Established professionals" working in an unrelated field can also be excluded. This is true even though at least some of these individuals presumably pursued a degree to further a different career. [401]

One key exclusion employed by a number of colleges is the placement exception for "pursuing further education." In an email between two campus directors at Kaplan University, one director wrote, "John, I was wondering if you could send a list of your MA and MOS graduates from the last 2 years so we can reach out to them to offer the MPM Associate Degree Program. If they haven't been employed yet this will help you with your placement numbers since they will be continuing school." [402]

If a student cannot be excluded from the quota, placement counselors must find a way to count graduates as employed in their field of study. As Ms. Bittel explained, her colleagues at EDMC "were expected to convince graduates that skills they used in jobs such as working as waiters, payroll clerks,

---

[398] Letter from Steven Gossman, former ITT Student, to Chairman Tom Harkin, April 9, 2011.

[399] A description of several investigations is included in the "Job Placement Rate Manipulation" section of this report, discussing regulatory evasion.

[400] Kathleen A. Bittel (Acme, PA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *The Federal Investment in For-Profit Education: Are Students Succeeding?,* 111th Congress (2010).

[401] Id.

[402] Kaplan Internal Email, May 2010, re: *Re: MOS and MA Graduates* (KHE279471).

retail sales, and gas station attendants were actually related to their course of study in areas like graphic design and residential planning" so that the students would consent to sign documentation that they were employed in their field.[403] Ms. Bittel testified that, particularly with graphic design students, one of the most successful strategies was to encourage them to take freelance work and pursue self-employment. While she felt this was one of the few options available for some of the students she counseled, it is unclear whether many of those students were genuinely self-employed and supporting themselves.

Internal documents from ITT illustrate the highly flexible criteria that some schools use to determine whether students are employed in their field. ITT's procedure manual defines work in a "related field" as requiring only "20–49% of time spent on the job using the skills taught in the core courses" of a student's program.[404] Another ITT document indicates that counselors are sometimes permitted to classify graduates of the digital entertainment and game design program as successfully placed if they work at "a Blockbuster or an electronics department that sells video games." [405] To classify students, many of whom took on significant debt, as successfully placed when they take a retail job requiring no specialized training indicates that the job placement requirements are not always aligned with the best interest of students.

Dissatisfaction with career services was a common source of student complaints in the documents reviewed by the committee. For instance, one ITT student filed a complaint stating that "during a discussion with Career Services they wanted me to register a business so that they could have 100% placement for this class." [406] Westwood Colleges recently settled a Colorado lawsuit for $4.5 million that stemmed, in part, from the college's practice of counting students as "placed" if they did as little as a few days of freelance work.[407]

Many students enroll at for-profit universities and colleges because they are looking to start a new career and are often promised a new and better job if they enroll. They correctly expect assistance from the school in making the transition from school to work.

But, for many for-profit colleges, helping students achieve educational and career goals is not a priority. Most for-profit colleges examined devote fewer resources to student services than to recruiting and enrolling students. As student complaints make clear, students often felt a personal connection with the recruiter who enrolled them. But, they did not receive a similar level of attention from the student services representatives. Both the quantity and quality of attention given to students often decline sharply once students are officially enrolled and attending classes. As a result, some for-profit schools are shortchanging their students and failing to provide an education worthy of Federal funding.

---

[403] Kathleen A. Bittel (Acme, PA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *The Federal Investment in For-Profit Education: Are Students Succeeding?,* 111th Congress (2010).

[404] ITT Internal Document, *Career Services Graduate Employment Definitions CS-2* (ITT-00065475).

[405] ITT Internal Document, *FAQs on Employment Classification* (ITT-00065499, at ITT-00065501).

[406] ITT External Correspondence, Notification of Student Complaint Submitted to the Better Business Bureau (ITT-00005144).

[407] Office of the Colorado Attorney General, "Attorney General Announces $4.5 Million Settlement with Westwood College to Address Deceptive Business Practices," Press Release, March 4, 2012, http://www.coloradoattorneygeneral.gov/press/news/2012/03/14/attorney_general_announces_45_million_settlement_westwood_college_address_dece (accessed May 3, 2012).

**Programmatic Accreditation and Licensure**

For-profit colleges sometimes offer programs that do not carry the industry-standard accreditation that allows graduates to obtain employment in the field. Graduates from these programs are often surprised to learn that, although they went to an *institutionally* accredited school, they cannot practice the professions for which they purportedly trained. Some fields, mostly in the health care occupations, require program-specific accreditation. If a college offers a program that does not carry programmatic accreditation, then students often cannot find work because employers only hire graduates from accredited programs, or because State laws prohibit graduates from non-accredited programs from practicing their specialty. In spite of these serious consequences, for-profit schools that offer unaccredited programs seldom provide a meaningful warning to their students about this issue. As a result, many students first learn about their program's accreditation after accumulating debt, attending school, and attempting to enter the workforce.

<u>What Is Programmatic Accreditation</u>

There are two broad types of accreditation for institutions of higher education. The first type is institutional accreditation, which indicates that a membership organization approved by the Department of Education has conducted a peer review of the institution and certified that the college or university meets specified school-wide standards of quality. Institutional accreditation is critical for all colleges and universities because it is required for any school to be eligible to receive financial aid funds from the U.S. Department of Education.

In contrast, rather than certifying an entire school or institution, programmatic accreditation certifies that a specific degree or certificate program meets standards expected within a particular field or profession. Different professions and different States place a different emphasis on programmatic accreditation. For instance, in almost every State, recent law school graduates can become licensed to practice law only if they graduated from a program accredited by the American Bar Association.[408] In contrast, no State laws mandate that diagnostic sonographers graduate from programs accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP).[409] However, most employers seek to hire only registered sonographers, and registration is not open to recent graduates of non-accredited degree programs. In order to become registered, students must either graduate from an accredited program or work for a number of years in the field. Because employers prefer to hire already-registered sonographers, gaining work experience in lieu of an accredited degree can be very challenging. Accordingly, while State law does not create an absolute barrier to practicing for students from unaccredited programs, the practical effect can be the same for many students.

---

[408] National Conference of Bar Examiners, Comprehensive Guide to Bar Admission Requirements 2012, National Conference of Bar Examiners and American Bar Association Section of Legal Education and Admissions to the Bar, http://www.ncbex.org/assets/media_files/Comp-Guide/2012CompGuide.pdf (last accessed May 15, 2012).

[409] See U.S. Department of Labor, Bureau of Labor Statistics, "Diagnostic Medical Sonographers," *Occupational Outlook Handbook*, March 29, 2012, http://www.bls.gov/ooh/healthcare/print/diagnostic-medical-sonographers.htm (last accessed May 15, 2012).

Students Are Not Informed About Programmatic Accreditation

Institutions that offer programs that lack programmatic accreditation are highly inconsistent in how they disclose this lack of programmatic accreditation. Some make a note on the programs' Web pages, albeit rarely in a prominent location. Others post the disclosure deep in their Web sites or in the fine print within pages of enrollment agreements, while framing the disclosure in terms that prevent students from recognizing the gravity of this issue.

Few people would enroll in a program if they knew they would be unable to use their degree or diploma to qualify for a job in their field after graduation. Unfortunately, the investigation has documented multiple examples of students who have been recruited into non-accredited programs under the mistaken belief that their investment of time and money would lead to a valuable credential and access to a job in the field.

Yasmine Issa, who testified before the committee on June 24, 2010, attended Sanford-Brown College New York, a school owned by Career Education Corporation (CEC).[410] CEC is the fourth largest for-profit higher education corporation in the country and operates 36 Sanford-Brown facilities in 18 States. Ms. Issa enrolled in the 18-month program to study sonography with the goal of working in an obstetrical office performing ultrasounds. She completed the program in 2008 at a cost of $32,000. However, it was not until after she completed the program that she learned, from prospective employers, that she needed to take a licensing examination and be certified by the American Registry for Diagnostic Medical Sonographers (ARDMS) in order to be hired. Unfortunately, since the program Ms. Issa attended was not programmatically accredited, she was not allowed to sit for the licensing exam unless she first had a year of work experience in the field.[411] But no employer would give her the work experience in the absence of the license. As she put it, "I thought that going to school to learn a marketable skill would allow me to provide for my family. Instead, it has left me more than $20,000 in debt and unable to be hired in the field I trained for."[412]

During a visit to a hospital in New Jersey, the supervising ultrasound technician explained to Ms. Issa that she could have taken the certification exam without work experience if her degree program had been programmatically accredited. This was the first Ms. Issa had heard about her school's lack of programmatic accreditation. Because the school failed to share that information, except in a disclosure buried in pages of enrollment documents, Ms. Issa cannot find work in her field, nor repay her student loan debt.

Similarly, on June 7, 2011, Eric Schmitt of Hampton, IA testified before the committee regarding his experiences pursuing his degree at Kaplan University's Cedar Falls, IA campus. Mr. Schmitt testified that, in the course of obtaining his associate degree in paralegal studies, the campus dean told him

---

[410] Yasmine Issa (Yonkers, NY), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Emerging Risk? Federal Spending on For-Profit Education*, 111th Congress (2010).

[411] ARDMS is not itself a programmatic accrediting agency, rather it allows students to sit for examination who graduate from programs accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP). The program Ms. Issa attended was not accredited by CAAHEP.

[412] Yasmine Issa (Yonkers, NY), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Emerging Risk? Federal Spending on For-Profit Education*, 111th Congress (2010).

he could go on to law school by attending Concord Law School, also owned by Kaplan Higher Education.[413] As Mr. Schmitt put it, "It seemed . . . that Kaplan could provide everything I needed to fulfill my dream of practicing law." [414]

It was not until several years later, as he was finishing his Bachelor's degree with Kaplan, that Mr. Schmitt happened to mention Concord to a temporary adjunct professor. The professor broke the news that Concord, an online law school, was not accredited by the American Bar Association. The only way to take the bar exam would be to sit for the exam in California, and practice in California if he passed, which was a serious problem since Mr. Schmitt had never planned to relocate from Iowa.[415] To learn these facts from Concord's Web site requires a prospective student click on a small-print section titled "Concord Law School accreditation and disclosure information" and to read multiple small-print paragraphs.

The experiences of Ms. Issa and Mr. Schmitt are not isolated. On March 10, 2011, the committee heard testimony from a retired official of the Iowa Department of Education, Arlie Thoreson Willems, regarding the experiences of students attending Ashford University.[416] Ms. Willems testified that she and her colleagues regularly received calls from around the country about Ashford graduates' lack of eligibility to obtain a teaching credential in their State, many from students who were misled by Ashford's recruiters regarding that eligibility. Even though Ashford is operated by California-based Bridgepoint Education, Inc. and its tens of thousands of online students live in all parts of the country, students called Ms. Willems because Ashford operates a single small physical campus located in Iowa. In order to work as elementary school teachers, students attending Ashford, had to participate in an approved clinical program from another college.[417] Ashford partnered with an Arizona-based community college, Rio Salado, approved by the State of Arizona to provide online clinical teaching programs leading to Arizona State teaching licenses.[418] Through the partnership, students who attended Ashford followed by a separate on-

---

[413] See Eric Schmitt (Hampton, IA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges*, 111th Congress (2011). See also email from Eric Schmitt to the Senate Committee on Health, Education, Labor, and Pensions, March 28, 2011 (on file with committee).

[414] Id. The company states that the initial conversation with the dean, according to Mr. Schmitt's testimony, occurred in the second year of his Associate degree program when law school was no more than a thought on the horizon. The company also states that Mr. Schmitt never applied to Concord law school, and if he had he would have immediately learned that he would not be eligible to sit for the Iowa bar exam.

[415] Mr. Schmitt was encouraged by a Kaplan academic dean to attend Concord Law School, however Mr. Schmitt did not learn about Concord's accreditation status—and its effect on his ability to sit for the bar exam—until he had already completed three-quarters of the work required for his bachelor's degree. See Eric Schmitt (Hampton, IA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges*, 112th Congress (2011). Some States might let Concord graduates sit for the bar exam if they first practice law in California for several years. National Conference of Bar Examiners, Comprehensive Guide to Bar Admission Requirements 2012, National Conference of Bar Examiners and American Bar Association Section of Legal Education and Admissions to the Bar, http://www.ncbex.org/assets/media_files/ CompGuide/2012CompGuide.pdf (last accessed May 15, 2012).

[416] Arlie Thoreson Willems, Ph.D. (Administrative Consultant for Practitioner Preparation, Iowa Department of Education, retired), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight*, 112th Congress (2011).

[417] Although Ashford's brick-and-mortar education programs do qualify graduates for a teaching credential, the institution's online education programs do not meet the State's Department of Education standards. Therefore, graduates from the online program cannot use their degree to qualify for a teaching credential in Iowa. Further, over 99 percent of Ashford's students are online-only students. See, Chapter on Bridgepoint, *infra*.

[418] New approval requirements from the Iowa Department of Education will impact distance education programs offering a path to a teaching credential. Rio De Salado has advised the Iowa College Student Aid Commission that they do not plan to seek approval for a practitioner preparation program in Iowa under the new requirements. Accordingly, once the new requirements take effect, Rio De Salado's teaching program will not be able to enroll Iowa students. Email correspondence with Carolyn Small, Postsecondary Regis-

line year-long program at Rio Salado, were eligible for an Arizona teaching license. However, depending on the laws of a given student's State, that Arizona license might or might not allow them to be licensed to teach in their own State. The University of Phoenix has a similar arrangement with Rio Salado for its teacher programs.

Student complaints produced to the committee by Ashford's parent company, Bridgepoint, provide multiple examples of the misleading tactics used with regard to this program in other States. For instance, a Kansas student wrote to the university saying,

> I was really blown away to find out that I had spent so much time and money at a College that I was not going to be able to obtain my Teacher's license from. The only reason I left my other college was because I was told that I would be able to receive my Teacher's license from Ashford.[419]

Similarly, another student wrote:

> I was told by my state's department of education that neither Rio Salado [nor] Ashford was transferrable to Ohio and that if I continue with my Bachelor's Degree from Ashford…that my Bachelor's Degree would not be recognized and I would have to start all over with a school here in Ohio…I am extremely upset about this because I was told when I enrolled that I could obtain my BA from Ashford regardless, but that I would only need to see if my state would accept Rio Salado.[420]

Complaints filed by students at other schools reflect a similar feeling of being misled about programmatic accreditation. A Kaplan student, who was similarly frustrated with his electrician program, wrote,

> I started attending Kaplan Career Institute in February of 2007. I noted the overly eager sales representative who reeled me in. … I was told by the instructors that the classes we were taking were going to count towards our licensing as electricians, but later down the road I began to hear differently. The School is accredited by the state, but the Electrician program was not recognized by the Electrical board.[421]

A Concorde student contacted the Florida Attorney General's office saying, "when I signed up for surgical tech at Concorde, they told me they were accredited." [422] Then 5 months into the program, "they . . . told us we had to sign papers" that stated that "if they don't become accredited before we finish it's basically not their fault." She told the attorney general's office that if the course was not accredited, she could not sit for the surgical technology certification exam and that she felt lied to. The school's response did not dispute that the program lacked programmatic accreditation, only that the student had signed a statement attesting that she had read the campus's course catalog, which disclosed the lack of accreditation and the fact that the campus was trying to obtain it. The school states that the accreditation was not, at the time,

---

tration Administrator at the Iowa College Student Aid Commission, August 4, 2010.

[419] Bridgepoint, August 2010, Formal Grievance Submission Form and Attachments (BPI-HELP_00026808).

[420] Ashford University, *Formal Grievance,* July 29, 2010 (BPI-HELP_00026393).

[421] Kaplan, August 2007, Record of Student Complaint and Follow-Up (KHE0038613).

[422] Concorde, August 2006, Student Complaint Submitted to FL Attorney General (CCC000109930).

required. However, the student makes clear that to be employable the accreditation was essential.

Some students with similar experiences at other for-profit institutions have successfully sued their schools for misrepresenting or omitting accreditation information.[423] In a recent case, the North Carolina Attorney General opened an investigation into allegations that Kaplan College was operating an unaccredited dental program and for which no application was pending while allegedly telling students accreditation should be approved soon.[424] As a result, the school reportedly refunded over $1 million to students in the program, and surrendered its license to operate that program.[425]

It is clear that some for-profit colleges are working to rectify these problems, though at least some schools still offer programs that do not meet programmatic accreditors' standards. Additionally, even high-quality programs must initially operate without programmatic accreditation while the accreditor reviews the program. However, many other institutions fail to inform students about accreditation issues, despite the fact that accreditation is critically important to professional success. While most schools now include some mention of programmatic accreditation on their Web sites, this information is often in fine-print and seldom conveys how it can be for students' job prospects.

A Case Study of Sanford-Brown's Disclosures for Popular Program Areas

Committee staff examined three programs at Sanford-Brown, (the school attended by Ms. Issa) for which programmatic accreditations are important: surgical technology, dialysis technology, and veterinary technology. A review of program information provided by Sanford-Brown's Web site demonstrates that the company is not forthright in its presentation of its degree programs' programmatic accreditation status. Programmatic accreditation information is buried deep within the site, presented in difficult-to-read paragraphs, and fails to note those campuses that lack accreditation. Further, the page's discussion of accreditation minimizes the relationship between accreditation and graduates' prospects for professional success.

*Programmatic Accreditation and Employment for the Three Fields*

The three programs examined vary somewhat in terms of how strictly programmatic accreditation is required to find work in the field. Surgical technologists regularly seek certification from the National Board of Surgical Technology and Surgical Assisting (NBSTSA). While certification from the NBSTSA is not an absolute requirement for employment, the Bureau of Labor Statistics reports that most employers seek to hire certified surgical technologists.[426] Students may sit for the certification exam if they graduated from a program accredited by the Commission on Accreditation of Allied Health Edu-

---

[423] See, for example, Completed Jury Verdict Form, *Cooney v. Saybrook Graduate School*, Case No. 1:04cv11572 (D. Mass. April 2, 2007) (awarding a graduate $137,000 for fraud regarding programmatic accreditation for a counseling degree).

[424] "Whistleblower 9: Students say they were misled by local college," *WSOCTV.com*, November 22, 2011, http://www.wsoctv.com/news/news/whistleblower-9-students-say-they-were-misled-by-l/nGSy3/ (accessed May 15, 2012).

[425] Ames Alexander, "Kaplan College Reimburses Students After Probe of Dental Program, *Charlotte Observer*, February 10, 2012, http://www.charlotteobserver.com/2012/02/01/2974937/college-reimburses-students-after.html (accessed May 15, 2012).

[426] See U.S. Department of Labor, Bureau of Labor Statistics, "Surgical Technologists," *Occupational Outlook Handbook*, May 29, 2012, http://www.bls.gov/oco/ocos106.htm (accessed May 9, 2012).

cation Programs (CAAHEP). While an alternate path to certification exists for students from unaccredited programs, it requires that students accumulate years of on-the-job training or work experience.

As with the surgical technology program, accreditation in the field of dialysis technology impacts the professional success of program graduates. Many employers and some States require that dialysis technicians be certified. Indeed, under regulations promulgated by the Centers for Medicare & Medicaid Services (CMS) in 2008,[427] clinics must demonstrate that all technicians have passed either a national certification exam or State-sanctioned test that meets the basic conditions outlined by CMS.[428] In order to sit for one of the national certification exams, applicants must either graduate from an accredited program or from a program that provides students with hands-on, clinical training.[429] Despite these requirements, Sanford-Brown claims that "graduates who have diligently attended class and their externship, studied, and practiced their skills should have the skills to seek entry-level employment as dialysis technicians."[430]

Finally, certification is especially important in the field of veterinary technology. Most States require that veterinary technicians pass a credentialing examination, and even in those States that do not, most employers strongly prefer to hire certified technicians.[431] The majority of jurisdictions rely on the Veterinary Technician National Examination (VTNE) as a means of evaluating applicants' suitability for practice and eligibility to be credentialed.[432] Although an independent credentialing body determines the format of the VTNE, the State Boards of Veterinary Examiners or other State agencies tasked with regulating the exam typically require that VTNE candidates graduate from a training program that is accredited by either the American or Canadian Veterinary Medical Association.[433]

### *Misleading Disclosures*

Sanford-Brown offers programs in surgical technology at 10 campuses, including three that are not programmatically accredited. Yet the online promotional materials detailing the three programs that lack programmatic accreditation do not mention the programs' status. Sanford-Brown does publish information about the accreditation and licensure of its training programs online, but only discloses accreditation status in a single location on its Web site.[434] Prospective students investigating the suitability

---

[427] U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, Conditions for Coverage for End-Stage Renal Disease Facilities Final Rule, 42 CFR §§ 405, 410, 413 et al. (2008), http://www.cms.gov/CFCsAndCoPs/downloads/ESRDfinalrule0415.pdf (accessed May 9, 2012).

[428] Id.

[429] Dialysis technology programs are accredited by the Board of Nephrology Examiners, Inc. Nursing and Technology (BONENT), but certifications exams are offered by Nephrology Nursing Certification Commission (NNCC), BONENT, and the National Nephrology Certification Organization (NNCO). See Mark Neumann, "*Time Running Out for Technicians*," Nephrology News, March 2010, http://www.nephrologynews.com/renal-policy/article/time-running-out-for-technicians (accessed May 17, 2012).

[430] Sanford-Brown, *Certificate Program in Dialysis Technology*, http://www.sanfordbrown.edu/Areas-Of-Study/Allied-Health-Technicians-And-Therapists/Dialysis-Technology/Certificate-Program-In-Dialysis-Technology (accessed May 9, 2012).

[431] See U. S. Department of Labor, Bureau of Labor Statistics, "Veterinary Technologists and Technicians," *Occupational Outlook Handbook*, March 29, 2012, http://www.bls.gov/oco/ocos183.htm (accessed May 9, 2012).

[432] See American Association of Veterinary State Boards, http://www.aavsb.org/VTNE (accessed May 9, 2012).

[433] See American Association of Veterinary State Boards, *Eligibility for First Timers*, http://www.aavsb.org/VTNE/eligibility for first timers (accessed May 9, 2012).

[434] See Sanford-Brown, *Accreditation & Licensure*, http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (accessed May 9, 2012).

of a program or campus will not find such accreditation information on the pages describing the program itself. Rather, they would have to select a particular campus,[435] read through the curricular information provided for the surgical technology program available at that location, and then click the link titled "For accreditation and certification information and disclosures for this and other Sanford-Brown programs and campuses, please click here." [436] That, in turn, would take the student to a page providing an extensive list of the credentials and licenses issued to each Sanford-Brown campus and program. Even after navigating that long list, however, a student would only see a list of the programs and campuses that have achieved accreditation, not locations that continue to offer training but lack programmatic accreditation.

Thus, Sanford-Brown's surgical technology programs at campuses in New York City, Skokie, IL, and St. Peters, MO, do not appear on the "Accreditation & Licensure" page, as each currently lacks programmatic accreditation. Similarly, the six campuses that lack programmatic accreditation for dialysis technology and the four campuses that lack accreditation for veterinary studies are all omitted from the disclosures. Confusingly for a student, however, the locations do remain listed among the campuses offering those degree programs, and no mention is made of the fact that the programs lack accreditation.

The page on which the accreditation and licensure information is published also downplays the role of accreditation. The Sanford-Brown Web site states that "accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality." [437]

Tellingly, the online program description for the veterinary technology program offered at Sanford-Brown's Portland, OR, campus claims that "graduates who have diligently attended class and their clinical, studied, and practiced their skills should have the skills to seek entry-level employment as veterinary technicians." [438] In truth, the program has not been accredited by the American Veterinary Medical Association (AVMA). And, the Oregon Veterinary Medical Examining Board (OVMEB) demands that VTNE applicants graduate from an AVMA-accredited program. Applicants with solely on-the-job experience are not allowed to sit for the test.[439] While graduates of the program may be able to move to other States to gain entry in the field, this would present an untenable burden for many people.

The company appears to purposefully diminish the significance of programmatic accreditation and fails to inform prospective students that the lack of accreditation can stand as a barrier to professional success following graduation.

---

[435] See Sanford-Brown, *Surgical Technology*, http://www.sanfordbrown.edu/Areas-Of-Study/Allied-Health-Technicians-And-Therapists/Surgical-Technology (accessed May 9, 2012) (providing a list of every Sanford-Brown campus at which a surgical technology program is available).

[436] See Sanford-Brown, *Associate of Applied Science Degree Program in Surgical Technology*, http://www.sanfordbrown.edu/Areas-of-Study/allied-health-technicians-and-therapists/surgical-technology/Associate-of-Applied-Science-Degree-Program-in-Surgical-Technology (accessed May 9, 2012) (describing the associate degree program available at the St. Peters, MO, location).

[437] Id.

[438] Sanford-Brown Career Training Programs, *Associate of Applied Science Degree Program in Veterinary Technology*, http://www.sanfordbrown.edu/Areas-Of-Study/Allied-Health-Technicians-And-Therapists/Veterinary-Technology/Associate-Of-Applied-Science-Degree-Program-In-Veterinary-Technology (accessed May 9, 2012).

[439] Oregon Veterinary Medical Examining Board, *Veterinary Applications*, http://www.oregon.gov/OVMEB/ applications.shtml (accessed May 9, 2012).

A Comparison of Multiple Schools' Disclosures for Two Smaller Degree Programs

Committee staff also analyzed disclosures for two smaller degree programs that are commonly understood to require licensure: law degrees or Juris Doctorates (JD), and Doctoral programs in clinical psychology. Four of the 30 institutions offered doctoral programs in clinical psychology, and two companies offered JD programs.

The JD programs were offered by Concord Law School, owned by Kaplan, and Western State School of Law, owned by EDMC. Western State School of Law is accredited by the ABA, while Concord Law School is not. Concord's JD Program Web page correctly notes that graduates of the program are eligible to sit for the California Bar Exam and, if they pass the bar exam and meet other requirements, would be eligible to practice law in California.[440] However, the page does not mention that the program was not accredited by the American Bar Association and that as a result, even students who ultimately passed the California Bar Exam would not be allowed to sit for the required bar examination in many other States.[441]

Each of the four clinical psychology doctorate programs correctly stated the American Psychological Association (APA) accreditation status of the program. With regard to clinical psychology, attending an APA accredited program is required in some States in order to practice as a psychologist. Of the four companies offering a doctorate in clinical psychology, Argosy College—owned by Education Management Corporation, the second largest for-profit higher education corporation—was the only school with some programs accredited by the APA. Argosy's Web site provides a list of campuses at which its doctoral clinical psychology programs were accredited.[442] Like Sanford-Brown's disclosures, however, the same page neither mentioned that two of its 11 programs were not accredited, nor that graduates from those two programs would not be able to practice in several States.[443]

Web sites for the other three companies with Clinical Psychology Doctorates acknowledged that they lacked programmatic accreditation. Two of the schools, Laureate-owned Walden University[444] and Bridgepoint-owned University of the Rockies,[445] took the additional step of noting that accreditation is

---

[440] Concord Law School, *Juris Doctorate Degree Program*, http://www.concordlawschool.edu/juris-doctorate-degree.asp (accessed May 9, 2012).

[441] Some States might let Concord graduates sit for the bar exam if they first practice law in California for several years. National Conference of Bar Examiners, Comprehensive Guide to Bar Admission Requirements 2012, National Conference of Bar Examiners and American Bar Association Section of Legal Education and Admissions to the Bar, http://www.ncbex.org/assets/media_files/Comp-Guide/2012CompGuide.pdf (accessed May 15, 2012).

[442] Argosy University, *Clinical Psychology Programs*, http://www.argosy.edu/colleges/ProgramSummary.aspx?id=12 (accessed May 9, 2012).

[443] Florida, Georgia, Mississippi, and Oklahoma require APA accreditation for some licenses. Other States, including Connecticut, Idaho, and Illinois, among others, accept APA accreditation as sufficient to demonstrate a program's eligibility for certification purposes, but also allow students from some non-APA-accredited programs to become certified. See Association of State and Provincial Psychology Boards, *Handbook of Licensing and Certification Requirements*, http://www.asppb.org/HandbookPublic/HandbookReview.aspx (accessed May 9, 2012).

[444] Walden University, *Clinical Psychology Specialization—Doctoral Programs*, http://www.waldenu.edu/Degree-Programs/Doctorate/18013.htm (accessed May 9, 2012). Walden LLC is a for-profit higher education company that enrolled 47,456 students as of 2010 and is based in Minneapolis, MN.

[445] University of the Rockies, *Doctor of Psychology—Clinical Specialization,* http://rockies.edu/degrees/psyd clinical.htm (accessed May 17, 2012).

required to obtain a license in some States, although they failed to list those States. The third school, Capella University, made no mention that the lack of program accreditation meant that, as a practical matter, graduates would be unable to practice in some States.[446] Capella also chose to print the accreditation information in an easy-to-miss greyed-out font near the end of the page.

Lower Licensing Exam Pass Rates[447]

In some cases, the for-profit college sector is not performing as well as other sectors in preparing students for licensing exams in comparison to other sectors of higher education. Between 2008 and 2010, even for those schools that possess the required programmatic accreditations, graduates of for-profit schools generally had lower pass rates than graduates of non-profit and public schools, with wide differences among sectors in a number of fields.[448]

A December 2011 GAO survey determined that, the pass rate for students who attended for-profit colleges was 8.8 percent lower than for students who attended non-profit colleges, and 9.1 percent lower than for students who attended public colleges.[449] Surgical Technology, a program offered by many for-profit schools such as American Career College, Everest, Anthem, Brown Mackie, and Sanford-Brown, had the widest disparity in pass rates: students who attended for-profit schools failed that exam more than twice as often as students who attended public schools.[450]

Student complaints frequently refer to for-profit colleges' inadequate preparation for licensing exams.[451] For example, at Vatterott College, students complained that the Pharmacy Assistant program did not prepare them for the Certified Pharmacy Technician exam.[452] In response to these complaints, school officials denied that Vatterott had ever represented that their program could prepare students to become Certified Pharmacy Technicians. Instead, officials claimed, the program was designed to prepare

---

[446] Capella University, *Doctor of Psychology (PsyD)*, http://www.capella.edu/schools_programs/psychology/psyd /clinical_psychology. aspx (accessed May 17, 2012).

[447] Defined by GAO to refer to exams that are required to work in a specific occupation, even though some of those exams are technically certification exams. For instance, according to The National Board of Surgical Technology and Surgical Assisting, certification as a surgical technologist is voluntary. However, as discussed above, licensing is often required by employers.

[448] U.S. Government Accountability Office, *Postsecondary Education: Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools*, December 2011, GAO-12-143, http://www.gao.gov/assets/590/586738.pdf (accessed May 17, 2012). ("The nine licensing exams for which graduates of for-profit schools generally had lower pass rates were for Registered Nurses (RN), Licensed Practical Nurses (LPN), Radiographers, Emergency Medical Technicians (EMT), Paramedics, Surgical Technologists, Massage Therapists, Lawyers, and Cosmetologists. On some exams, the differences across sectors were statistically significant, but relatively small. For example, 85 percent of graduates earning a bachelor's degree from for-profit nursing programs passed the RN exam, compared to 87 percent of such graduates from nonprofit schools. While we were unable to calculate overall pass rates on the 10th exam (for funeral directors), separate analyses of the two sections of the exam suggest that graduates of for-profit schools had similar or better pass rates than graduates of nonprofit and public schools. While for-profit graduates as a group generally had lower pass rates, some individual for-profit schools had relatively high pass rates.")

[449] Id.

[450] The sample was based off of 225 for-profit students and 393 public students. American Career Colleges, Inc. ("ACC") is a publicly traded for-profit higher education company that enrolled 4,716 students as of fall 2010 and is based in Irvine, CA. Brown Mackie is a brand of colleges operated by Education Management Corporation ("EDMC"), a publicly traded for-profit higher education company that enrolled 158,300 students in 2010 and is based in Pittsburgh, PA.

[451] See, for example, Vatterott External Correspondence, March 2009, re: *Complaint of [redacted student name]* (VAT-02-05-02337).

[452] Id.

students for "entry level" positions in a pharmacy, such as a position as a pharmacy office assistant.[453]

Many professional licensing organizations require potential professionals to meet certain preparatory requirements before they are eligible to sit for a licensing exam. Nonetheless, recruiters sometimes mislead students about those requirements in order to secure an enrollment. For example, Chairman Harkin received a letter from a graduate of Apollo's Associate degree-based Axia College who had a felony drug conviction from her teenage years.[454] Axia's admissions counselor told her that the conviction would not hinder a career as a pharmacy technician after she finished her degree at Axia. The student graduated with a 3.61 GPA, and $27,000 in debt, only to discover that the required licensing board placed a lifetime bar on individuals with felony drug convictions sitting for the exam.[455]

<u>Conclusion</u>

Some for-profit colleges make the investments in academics and support services necessary to help students succeed. However, across the for-profit spectrum, tremendous amounts of taxpayer dollars are being diverted from education-related spending to marketing and recruiting efforts that are sometimes misleading and deceptive. This focus on ensuring the financial success of the companies without first ensuring the academic success of students has tremendous consequences.

---

[453] Id.
[454] Letter from Aubrie Roupe, former University of Phoenix student, to Senator Tom Harkin, April 2, 2011.
[455] Id.

# What Are the Consequences for Students?

High Debt

   At the committee's June 7, 2011 hearing, Sandy Baum, a policy analyst at the College Board and a top expert on student debt, testified that "student loans are an important and justified component of our higher education financing system" but "there is overwhelming evidence that large numbers of students, particularly students from low-income backgrounds, are suffering great hardship as a result of excessive borrowing required to finance their enrollment in for-profit institutions." [456] As college costs continue to rise, more students are borrowing to pay for school, and they are taking out large loans. Student debt across all sectors is growing.[457] Funds paid out under title IV student loan programs have tripled in the past 10 years. The amount students are borrowing at public colleges has doubled in the past 2 years. High student debt is a serious issue, explored in HELP Committee hearings in February 2007, April 2008, March 2012 and most recently in July 2012. High borrowing is a problem in higher education generally, but students at for-profit institutions are more likely to borrow, and more likely to borrow large loan amounts, than their peers at other types of institutions.[458]



   Ninety-six percent of for-profit students take out student loans, according to the most recent U.S. Department of Education data.[459] In comparison, 13 percent of students at community colleges, 48

[456] *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges*, Hearings Before the Senate Committee on Health, Education, Labor, and Pensions, 112th Congress (2011).

[457] Sandy Baum (Policy Analyst at the College Board and Senior Fellow at George Washington University School of Education) Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges* 112th Congress (2011).

[458] Id.

[459] College Board Advocacy & Policy Center, *Trends in College Pricing 2011*, College Board, pg. 13 (2011), http://trends.collegeboard.

percent at 4-year public, and 57 percent at 4-year private non-profit colleges borrow money to pay for school.[460] For-profit schools typically enroll students who are independent from their parents and who do not have high income or assets to pay for school. But that fact does not fully explain the high volume of borrowing, since many community colleges generally enroll this same population of students. One difference is that, as discussed above, for-profit schools charge higher tuition than public schools and do not generally have institutional scholarship money available, as many private non-profit schools do.[461] The combination of factors contribute to this harsh reality: nearly every student who enrolls in a for-profit school must borrow money.

Not only do more students at for-profit schools borrow, they borrow more money than their peers at other types of schools. Independent students, who make up most of the for-profit student body, leave for-profits schools with a median debt of $32,700, but leave public colleges with median debt of $20,000, and private non-profit colleges with a median debt of $24,600.[462] Moreover, for-profit schools enroll far more high-dollar borrowers. While most for-profit students do not graduate, the 57 percent of Bachelor's students who do graduate owe $30,000 or more.[463] In contrast, 25 percent of those who earned degrees in the private non-profit sector and 12 percent from the public sector borrowed that much.[464]

These high debt loads place a heavy burden on students who leave for-profit schools, whether they withdraw or graduate. A Lincoln student filed a complaint with the college, telling officials, "I went to school to better my life, and when my loans become due, I will actually be in worse financial shape than I was before I attend[ed] school. I wish I would have never attended school at all." [465] An ITT student told the college, "I've heard of 10k for a 2 year degree but 40k?! [emphasis in the original]." [466] Another ITT student filed a complaint stating that he took out student loans "in the hopes of improving my knowledge so that I could improve my worth in society, for a higher paying job. Instead now I have a loan to pay off and absolutely nothing to show for it." [467] Some students are incurring debt that they may never be able to pay off. An uncle of a Kaplan student with cerebral palsy told the school that his nephew "is left with $8,400 in loans for a degree he could not possibly obtain." [468] Students with disabilities often require extra accommodations that ensure they can perform at their full level of ability; in the case of this Kaplan student, those accommodations were not provided.

---

org/downloads/College_Pricing_2011.pdf (accessed May 3, 2012).

[460] Id.

[461] See, generally, Delta Cost Project, *Trends in College Spending 1999-2009: Where Does the Money Come From? Where Does It Go? What Does It Buy?*, Delta Project on Postsecondary Education Costs, Productivity, and Accountability (2011), http://www.deltacost-project.org/resources/pdf/Trends2011_Final_090711.pdf (accessed May 3, 2012).

[462] Median debt for students receiving a Bachelor's degree in 2007–8. Sandy Baum (Senior Fellow, George Washington University School of Education and Human Development), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges*, 112th Congress (2011).

[463] Id. at 2.

[464] Id.

[465] Lincoln External Email, January 2007, re: *BBB Complaint Case#42006975(Ref # 58-6023-42006975-4-12200)* (LINC0000001, at LINC0000003). The Better Business Bureau did not pursue an investigation of this complaint.

[466] ITT External Correspondence, January 2009, re: *ITT Technical Institute* (ITT-00009376, at ITT-00009383) (response to student's complaint with text of student's complaint enclosed).

[467] ITT External Correspondence, July 2010, Notice of Student Complaint to Better Business Bureau (ITT-00009785, at ITT-00009786).

[468] Kaplan Internal Record, July 2006, Record of Student's Family's Letter of Complaint (KHE 0038287).

### *Low Repayment and High Default*

Struggling under their debt burdens and unable to find work that allows them to pay down that debt, many students who attended for-profit schools are not actively repaying their loans or have already defaulted.

A little over one-third, about 36 percent, of students who attended for-profit schools are paying down the principal on their student loans, according to Department of Education data.[469] In comparison, 54 percent of students at public colleges, and 56 percent at private non-profit institutions, are actively repaying their student loans.[470] Some for-profit schools have higher repayment rates: At UTI, for example, 54 percent of students were making payments on their loans.[471] Other schools have very low rates: only 23 percent of Vatterott's students and 18 percent of Remington's students are actively repaying their loans.[472]

Students who do not make their student loan payments for 360 days are considered in default.[473] Slightly more than 1 in 5 students who attended a for-profit college (22 percent) defaulted on a student loan within 3 years of leaving the school, according to the most recent data.[474] In contrast, 1 student in 11 at public and non-profit schools defaulted within the same period.[475] On the whole, students who attended for-profit schools default at nearly three times the rate of students who attended other types of institutions.[476] The consequence of this higher rate is that almost half of all student loans defaults nationwide are held by students who attended for-profit colleges.[477]

---

[469] Senate HELP Committee staff analysis of data from Department of Education, Cumulative Four-Year Repayment Rate by Institution. http://www2.ed.gov/policy/highered/hearulemaking/2009/ge-cumulative-rates.xls. On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans. Association of Private Colleges and Universities v. Duncan, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012). While the decision questioned the basis for the repayment rate threshold as a part of Department's rulemaking, it did not question the accuracy of the repayment rate data.

[470] Id.

[471] Id.

[472] Id.

[473] Under the Direct Loan Program. Under the Federal Family Education Loan (FFEL) program, default occurred on the date that a guarantee agency paid a claim of default, which could be between 270 and up to 360 days delinquent.

[474] Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-8, http://federalstudentaid.ed.gov/datacenter/cohort.html. Default rates calculated by cumulating number of students entered into repayment and default by sector.

[475] Id.

[476] Id.

[477] Id.



The trend in default rates points upwards. Among the schools the committee examined, the cohort default rate has been growing 8.9 percent each year for successive groups of students entering repayment in 2005 through 2008.[478] In terms of the impact for students, this growth means that tens of thousands more students are defaulting each year. The situation at some individual campuses is dire. At Lincoln's Southwestern College in Dayton, OH, 19.7 percent of students default within 3 years, for the 2005 cohort.[479] For the 2008 cohort, the proportion of students defaulting jumped to 35.3 percent. Remington College's Tampa, FL, campus saw its 3-year default rate jump by nearly 50 percent, from 16.9 percent to 25.1 percent between 2005 and 2008.[480]

As total student debt reaches $1 trillion and students across all sectors of higher education are confronted with higher debt than previous generations and fewer than expected job opportunities, it is likely that default rates across all sectors of higher education will increase. Since 1996 average debt for Bachelor's degree students has jumped 35 percent, partially accounting for the 68 percent drop in net worth of households led by those under 35 between 1984 and 2009.[481]

However, students who attended a for-profit college already account for 47 percent of all borrowers in default, and 1 in 5 students enrolling in a for-profit college (22 percent) defaults within 3 years of entering repayment on his or her student loans. This is already an unacceptably high rate of failure that needs to be addressed.

---

[478] Id.
[479] Id.
[480] Id.
[481] Matt Townsend, "Young Consumers Pinch Their Pennies," *Bloomberg Businessweek*, March 22, 2012, http://www.businessweek.com/articles/2012-03-22/young-consumers-pinch-their-pennies (accessed May 20, 2012).



Some for-profit education companies have particularly troubling default rates. Corinthian Colleges, the company with the highest default rates among any large for-profit operator, saw 23,623 of its students who entered repayment in 2008 default on a Federal student loan. Among all the students leaving Corinthian-owned schools from 2005–8, over 73,000 defaulted.[482] Moreover, as discussed below, some for-profit education companies use default management tactics that may cross the line to default manipulation and place former students in forbearances or deferments so that these students do not show up in the companies' reported default rates.

*Lifetime Default Rates*

While the Department of Education only reports school-specific default rates for the first 3 years of students' repayments, the Department of Education publishes a Budget Lifetime Default Rate that measures the dollars (as opposed to student borrowers) that the Department expects to default for each sector of higher education.[483] The Department estimates that 46.3 percent of all dollars lent to for-profit students who entered repayment in 2008 will default.[484] The comparable number for 2-year public and non-profit colleges is 31.1 percent.[485]

---

[482] Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-8, http://federalstudentaid.ed.gov/datacenter/cohort.html. In March 2012 Corinthian announced that its 2009 3-year default rate had fallen by 7.3 percent to 28.8 percent.

[483] U.S. Department of Education, Information for Financial Aid Professionals, Cohort Default Rates Charts (2010), http://ifap.ed.gov/eannouncements/attachments/122010CDRlifetimerateattachment2ratechart2010.pdf (accessed May 3, 2012).

[484] Id.

[485] Id.

The committee's investigation uncovered internal documents showing some schools' own internal calculations of lifetime default rates. An email between Apollo Group executives indicated that the company estimated lifetime default rates for the company's Western International University, which included all 2-year degree program students, as high as 77.7 percent.[486] For its larger University of Phoenix division, including all 4-year degree students, estimated lifetime default rates ranged from 21.7 to 33.5 percent.[487] These numbers, which track students leaving college 5 to 10 years ago, are especially disturbing in light of the increase in the cost of tuition and the heavy borrowing of students in the past few years.

### High Interest Institutional Loans

In addition to Federal debt, some students, because of the high price of tuition, must rely on alternative financing. Prior to 2007, the standard practice was for students to obtain this financing through the private lending companies. After the 2008 credit crash, private lenders (led by Sallie Mae) made the decision that they would no longer provide third party private loans to most for-profit college students.[488] The result was the creation of institutional loan programs operated by for-profit education companies themselves. These loans often carry high interest rates, and do not provide students with the same safeguards as Federal loans.

While the interest rate on undergraduate subsidized Federal Stafford loans is currently 3.4 percent (5.6 percent in 2009), for-profit colleges charged students much higher rates for institutional loans. Interest rates documented by the committee range from 13 to 18 percent, though some companies have since lowered their rates. For example, in 2009, Corinthian Colleges lent $65 million to its students at an average interest rate of 14.8 percent, with some students paying as much as 18 percent.[489]  For comparison, the Federal Reserve calculated that the average interest rate on credit card debt in 2009 was 14.3 percent.[490]

| Institutional Loan Interest Rates by Company, 2009 | |
| --- | --- |
| **Company** | **Interest Rate (High)**<br>**[in percent]** |
| Alta Colleges, Inc. | 18 |
| Career Education Corporation | 13 |
| Corinthian Colleges, Inc. | 18 |
| DeVry, Inc. | 12 |
| Education Management Corporation | 11.2 |
| Kaplan Higher Education, Inc. | 15 |
| ITT Educational Services, Inc. | 14.75 |
| Department of Education | 3.4 |

Moreover, for-profit colleges anticipate high rates of expected default on their institutional loan

---

[486] Apollo, May 2010, re: *RE: Default Information . . .* (AGI0049553). Estimated lifetime default rate was 77.7 percent for 2-year degree students in the 2006 cohort.

[487] Id.

[488] Doug Lederman, "The Credit Crunch Takes a Toll," *Inside Higher Ed*, January 23, 2008, http://www.insidehighered.com/news/2008/01/23/credit (accessed May 9, 2012).

[489] Note that in 2010 Corinthian lowered its rate to 6.8 percent.

[490] Board of Governors of the Federal Reserve System, *Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions: Recent Trends in Credit Card Pricing*, June 2012, http://www.federalreserve.gov/publications/other-reports/credit-card-profitability-2012-recent-trends-in-credit-card-pricing.htm (accessed July 5, 2012).

programs.  In their internal accounting, companies estimate the portion of the amounts they lend to students that will default.[491] For instance, according to the company's own internal analysis, Corinthian estimates that 55 percent of its institutional loan balances will default at some point.[492]  Kaplan expects that as high as 80 percent of its institutional loan balances will default.[493]

| Institutional Loan Program Expected Student Default Rates by Company, 2009 | |
| --- | --- |
| Company | Expected Default Rate [in percent] |
| Alta Colleges, Inc. | 44 |
| Career Education Corporation | 48 |
| Corinthian Colleges, Inc. | 55 |
| DeVry, Inc. | 45 |
| Education Management Corporation | 42 |
| Kaplan Higher Education, Inc. | 80 |
| ITT Educational Services, Inc. | N/A |
| Department of Education | 16 |

These loans underscore the for-profit colleges' knowledge and expectation that a majority of students will not succeed in obtaining the employment and financial security necessary to avoid default.  An internal Kaplan email between executives discussed defaults in the course of creating the company's new institutional lending program. A senior executive reported that the company "should assume an 80% default rate for loans in repayment." [494] This assumption was based on private student loans made by a private lender to Kaplan students (before the lender stopped making the loans), which had experienced defaults of 70 percent and 65 percent for loans made in 2006 and 2007, respectively.[495] Typically, students who are taking out private and institutional loans have already borrowed the maximum eligibility for Federal loans. Accordingly, this Kaplan assessment indicates that the risk of default for Federal loans may be equally extreme.

What Default Means for Students and Society

Default rates are driven by students who drop out, for whom their incomplete education and no degree leaves them with debt but little means to repay it. Students' ability to repay their loans is tightly tied to whether they stayed in school and achieved a degree. The Institute for Higher Education Policy, a non-partisan non-profit, reported that, for all sectors of higher education, among students who attended for 1 year or less, nearly two-thirds became delinquent (30 percent) or defaulted (34 percent) on their loans.[496] Internal documents

---

[491] This equates closely with *student* defaults but since students borrow varying amounts, the measurement of the amount of the loans that default is different from the number of student borrowers who default.
[492] Corinthian Colleges, Inc., August 24, 2009, Q4 Earnings Conference Call.
[493] Kaplan Internal Email, April 2009, re: *RE: KC Loan Default Assumption/[Redacted]* (KHE 137576).
[494] Id.
[495] Id.
[496] Alisa F. Cunningham and Gregory S. Kienzl, *Delinquency: The Untold Story of Student Loan Borrowing*, Institute for Higher Education Policy, March 2011, http://www.ihep.org/publications/publications-detail.cfm?id=142 (accessed May 8, 2012).

indicate that this point has not gone unnoticed among for-profit executives. In a November 2009 email, a Kaplan executive notes that "97% of KU defaulters 'drop' rather than graduate."[497] He goes on to point out that students who drop in the first term default at a rate of 27 percent.

When a school has a large proportion of its students defaulting on their loans, this can indicate problems with program quality, retention, student services, career services, and reputation in the employer community. Students who default, in many cases, have not achieved their educational or career goals that led them to attend college. Behind each student loan default is a person who is struggling financially and who may have to put off or cancel plans to continue their education, buy a home or car, or start a family. The number of students facing default points to a huge problem: Among for-profit students who entered repayment on their student loans between 2005 and 2008, more than 638,000 students defaulted.[498]

Because default rates look at the student population that left school 3 years earlier, it cannot provide an accurate snapshot of what is happening now. Thus, there is a significant risk that a higher proportion of students will default in the coming years. The committee determined that, among students enrolling in 2008–9, 54.4 percent withdrew by summer 2010, but it is currently unknown as to how many of these students will ultimately end up in default.[499]

The for-profit industry points to student demographics as a justification for high default rates. The companies argue that non-traditional students are less likely to be able to repay their debts. The colleges, their argument implies, have little ability to change this. But when a school enrolls a student, sets tuition, and recommends that the student take out a loan, the school is making a *de facto* investment recommendation. For each student who defaults, schools have access to information such as the student's program, total debt load, how long he or she stayed, and whether he or she had prior college credit. The school can use this information to predict how other prospective students are likely to succeed academically, earn a degree that will actually help them secure a good job, and be able to repay their loans. Over the past 18 months some for-profit colleges including Kaplan, Apollo, Rasmussen and Walden have introduced varying types of orientation programs that are based at least in-part on these sorts of analyses and appear to be having a beneficial impact on the likelihood of success for students enrolling in those schools.

Some for-profit executives also advance the argument that because students are dropping out quickly, they are not accumulating massive amounts of debt.[500] Retention data obtained by the committee indicate that among students who withdrew, median attendance was approximately 4 months.[501] Withdrawn students have an estimated average debt of $4,000 to $11,000.[502] For the typical student who attends a for-profit college,

---

[497] Kaplan Internal Email, November 2008, re: *RE: KU CDR Original Loan Amount and Default Rate* (KHE 197327).

[498] The total number of defaults in the for-profit sector is actually higher because these data only include the 30 for-profit companies examined by the committee, which account for most, but not all of, the enrollment in the sector.

[499] Senate HELP Committee staff analysis of enrollment data provided to the committee by for-profit education companies.

[500] "Furthermore, debt levels of those who leave school early, and who account for the vast majority of defaults, are relatively low. *In fact, the average debt among Kaplan non-graduates who default is $4,400. In fact, the average debt of our graduates who default is less than twice that amount—$7,700.* These are not insignificant amounts, but neither are these students burdened with 'mountains of debt.'" Kaplan, Letter to Chairman Tom Harkin, May 26, 2011 [emphasis in original].

[501] Students who withdrew from colleges operated by publicly traded companies stay an average of 3.5 months.

[502] *The Return on the Federal Investment in For-Profit Education: Debt Without a Diploma*, Report of Chairman Tom Harkin, Chairman, Committee on Health, Education, Labor, and Pensions, September 30, 2010, http://harkin.senate. gov/documents/pdf/4caf6639e24c3. pdf.

this level of debt coupled with the lack of a degree, is a significant burden.  New skills, self-confidence, and alumni networks assist college graduates to find a well-paying job. This should be true whether a student is rich or poor, white or Latino or African-American. A school that enrolls students who have struggled financially and academically in the past is taking on the responsibility to make sure that those students have a reasonable chance of success. Access to debt is not the same thing as access to the opportunity offered by a good education. States have designed a national network of low-cost, open-access community colleges to make sure that students who have a lower probability of graduating are able to try out higher education with very little financial risk. While some community colleges face serious challenges because of State budget cuts and strained capacity in some programs, they nonetheless offer a much lower risk option to students, while offering a similar chance of successful completion and economic advancement.

Higher Unemployment

Students who attend for-profit schools are more likely to experience unemployment after leaving school. Twenty-three percent of students who attended for-profit schools were unemployed and seeking work, according to the most recent Department of Education longitudinal data.[503] At the time of this report's publication, the national unemployment rate is 8.2 percent, nearly a third the rate of people who attended for-profit schools.[504]

While some of the former students who are unemployed might have had trouble securing employment due to other factors, the role that college plays is significant. One UTI student told the college,

> It would be wise, dollar for dollar to regain the respect of employers in the area who cringe when they hear 'UTI Student.'  That's not an image you want or should have, especially for a private run company.  I for one won't be advertising UTI once I'm finished here and I don't know too many who will for the fear of being laughed at and dismissed from an interview.[505]

The effect of this higher unemployment extends beyond individual students. A school that leaves large numbers of students without the means to pay back their education debt is not offering an acceptable return on taxpayers' investment in terms of building a stronger, better-educated, and better-skilled workforce. Even many of those students who ultimately can pay back their loans must service a large debt into middle age and beyond. To repay this debt, they often must put off life decisions that have a significant positive impact on the American economy, such as starting a family and buying a house.

The type of training that for-profit schools offer can make a difference in unemployment rates and earnings of former students. Education Sector's analysis of Department of Education longitudinal data shows student borrowers "who *graduated* from for-profit, less-than-4-year institutions had an unemployment rate comparable to, *but slightly higher than*, the overall unemployment rate for borrowers who dropped out (27

---

[503] David J. Deming, Claudia Goldin, and Lawrence F. Katz, "The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?," *Journal of Economic Perspectives*, vol. 26(1), Winter 2012, pp. 139-164, http://www.frbatlanta.org/documents/news/conferences/11employment_education_demming.pdf (accessed Apr. 27, 2012)

[504] U.S. Department of Labor, Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey: Unemployment Rate (extracted on July 9, 2012).

[505] UTI Student Correspondence, September 2009, Letter in Regards to [Redacted] as a UTI EM at Norwood Campus (UTI-C-000567, at UTI-C-000577).

percent versus 25 percent)." [506] In other words, students who enrolled at a for-profit school and left without earning a degree or certificate had similar unemployment rates to students who earned those credentials.

Earnings from employment is another concern. As discussed above, for-profit schools have been expanding their Associate enrollment rapidly in the past decade. Yet the long-term economic benefits of completing an Associate degree, especially at a for-profit college, is significantly less than for a Bachelor's degree. According to an analysis by the College Board, a typical person who earns an Associate degree will earn about $42,000 a year. That is $8,200 more per year than a person with just a high school diploma, but $13,700 less than a person who earns a Bachelor's degree.[507] The increased earnings potential does not always justify the tuition that some for-profit colleges charge for an Associate degree. Moreover, a recently published study by economists at the National Bureau of Economic Research states that "students who obtain certificates/degrees from a public or not-for-profit institution receive a large wage premium. … In contrast there is little evidence of a return to any certificate or degree from a for-profit institution. The estimated return to an associates degree is … a modest 9.2 percent return." [508]

### Credentials in Lower Demand Careers

Though for-profit colleges tout their career-focused, get-out-and-get-a-job approach, evidence indicates that many colleges' programs are not in high-demand career fields. One of the biggest advantages that for-profit colleges have over traditional colleges is the ability to respond quickly to emerging workforce needs and implement programs that genuinely meet those needs. The sector has a demonstrated ability to develop curricula and implement programs far more rapidly than most traditional institutions. Yet in some cases for-profits do not base programming on workforce needs, so much as they base programming on revenue potential. For example, nearly every large for-profit education company operates one or more criminal justice programs. Yet criminal justice programs offer few clear paths to quality employment opportunities. As the CEO of ITT noted in a recent call with investors, the company placed enrollment caps on some criminal justice programs because they were not generating good student outcomes, meaning retention, completion and job placement.[509] Programs offered in the health care field offer another example. For example, for-profit schools offer a multitude of programs to prepare students for jobs in the health care field. For-profit colleges often cite data showing that in 2018 there will be 2.8 million job openings in that field.[510] But the health care field is divided into many separate sectors, not all of which promise such high growth. The higher-growth areas of the healthcare field are concentrated in direct patient care jobs, such as nursing. However, as the Center for American Progress found, the majority of for-profit programs in the health care field, 44 percent, were medi-

---

[506] Mary Nguyen, *Degreeless In Debt: What Happens to Borrowers Who Drop Out*, Education Sector, http://www.educationsector.org/sites/default/files/publications/DegreelessDebt_CYCT_RELEASE.pdf (accessed May 8, 2012).

[507] In April 2012, the Department of Education announced plans to expand the persistence and completion reporting requirements to include part-time and transfer students. U.S. Department of Education, "Education Department Releases Action Plan to Improve Measures of Postsecondary Success," Press Release, April 11, 2012, http://www. ed.gov/news/press-releases/education-department-releases-action-plan-improve-measures-postsecondary-success (accessed May 19, 2012)..

[508] Kevin Lang and Russell Weinstein, "Evaluating Student Outcomes at For-Profit Colleges," National Bureau of Economic Research, June 2012, http://www.nber.org/papers/w18201. (For students starting in Associate degree programs at public and non-profit colleges, "the value of an associates degree is large and statistically significant." In contrast, "there is little evidence of any certificate or degree from a for-profit institution.")

[509] ITT Call with Investors, Q1 January 21, 2012.

[510] "Julie Margetta Morgan and Ellen-Marie Whelan, *Profiting from Health Care: The Role of For-Profit Schools in Training the Health Care Workforce*, Center for American Progress, January 2011, http://www.americanprogress.org/issues/2011/01/profiting_from_health_care.html (accessed May 8, 2012).

cal assistant, medical billing or massage therapy programs, while just 9 percent of health care programs were Licensed Practical Nursing and Registered Nursing programs.[511]

## Why is This Happening?

All institutions of higher education that receive Federal student aid are regulated by three distinct entities: the Federal Government, the State in which the institution operates, and an accrediting body recognized by the U.S. Secretary of Education. Together, these three bodies are referred to as "the triad," and are collectively tasked with ensuring that the schools are meeting basic guarantees of academic quality and fiscal soundness, and that they are complying with pertinent State and Federal laws.[512] Recurring problems in the for-profit sector have exposed weaknesses of the triad in regulating sophisticated national and international for-profit education companies. The nature of the for-profit education business model and the extreme growth in the sector have strained the capacity of regulators to protect students, ensure academic quality, and safeguard State and Federal taxpayer dollars.

### Accreditation

*I would just like to take up the distinction you made between a multistate, billion-dollar corporation and a school, and to urge you as you seek solutions, perhaps to think about distinguishing, so that insofar as this is a multistate, billion-dollar corporation, you may well need to have a different regulatory scheme at the Federal level.*

—Sylvia Manning, Executive Director of the Higher Learning Commission, a regional accreditor.[513]

Accreditors are private, non-profit bodies that organize peer review of institutions of higher education. Because the Department of Education requires that institutions be accredited in order to access title IV funds, student aid to ensure that schools apply adequate standards of academics to receive taxpayer dollars, accreditors also serve as *de facto* gatekeepers for billions of dollars of Federal education benefits each year.[514] Unfortunately, the traditional accreditation process has not placed much weight on student outcomes like retention and student loan default. As a result, for-profit institutions routinely obtain and retain accreditation in spite of low graduation rates, job placement rates, or student loan debt repayment rates. For example, as discussed in more detail below, Bridgepoint's Ashford University received full accreditation from the Higher Learning Commission despite information indicating that the majority of Ashford students do not graduate.[515]

---

[511] Id.

[512] See, for example, Accrediting Council for Independent Colleges and Schools, *History of Accreditation*, http://www.acics.org/accreditation/content.aspx?id=2258 (accessed May 23, 2012); The Higher Learning Commission, About the Higher Learning Commission, http://www.ncahlc.org/About-HLC/about-hlc.html (accessed May 23, 2012).

[513] Dr. Sylvia Manning (President, Higher Learning Commission), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight*, 112th Congress (2011).

[514] See Higher Education Act of 1965, 20 U.S.C.A. § 1058(b)(1)(D) (2008) (defining an eligible institution as one "accredited by a nationally recognized accrediting agency or association determined by the Secretary to be reliable authority as to the quality of training offered or which is, according to such an agency or association, making reasonable progress toward accreditation"). Federal funds include Pell grants, Federal student loans, and other Federal and State government funding. Students are eligible for Federal aid only if enrolled at an institution accredited by an agency recognized by the Department of Education.

[515] See Ashford University, November 2009, *Institutional Snapshot* (BPI-HELP_00021644).

Accreditation has traditionally existed as "a process of external quality review created and used by higher education to scrutinize colleges, universities, and programs for quality assurance and quality improvement." [516] Once granted, accreditation can be good for up to a 10-year period, although factors like change of ownership or the addition of new campuses may trigger a review by an accreditation team.[517]

There are two types of accrediting agencies: national accreditors that focus on accrediting for-profit schools, and regional accreditors that accredit most public and non-profit universities. Eight regional accrediting commissions currently operate in six regions throughout the United States.[518] Regional accreditors are responsible for accrediting 3,040 institutions, 96 percent of which are degree-granting non-profit or public colleges and universities.[519] National accreditors oversee the accreditation of 3,933 institutions, 70 percent of which are non-degree granting.[520] Approximately 90 percent of the schools accredited by national accreditors are for-profit institutions.[521] While national accreditation was created as a means to ensure the quality of non-degree programs, thus allowing those programs to access title IV student aid funds, in reality it now offers some large *degree-granting* for-profit colleges a path to Federal dollars without having to meet the same academic quality standards as traditional public and non-profit colleges. The first step of accreditation typically consists of the school performing an institutional self-assessment to determine whether its operation and performance meet the standards of the accrediting organization. This self-assessment is usually followed by a site visit, during which an outside team of volunteers-higher education faculty and administrators, practitioners in specific fields, and sometimes interested members of the public-evaluate the school or program. The visiting team typically prepares an accreditation report that includes judgments about the institution's or program's strengths, weaknesses, and potential for improvement. The draft report may be discussed with accrediting agency staff before the final version is submitted to the accreditation agency's decision making body, with recommendations for action.[522]

<u>Structural Defects in the Accrediting Process</u>

The self-reporting and peer-review nature of the accreditation process exposes it to manipulation by companies that are more concerned with their bottom line than academic quality and improvement.[523] Because national accreditation agencies are composed primarily of for-profit members, for-profit executives dominate the boards of two large national accrediting bodies—the Accrediting Council for Independent Colleges and Schools (ACICS) and the Accrediting Commission of Career Schools and

---

[516] Judith S. Eaton, *An Overview of U.S. Accreditation*, Council for Higher Education, p. 1 (2009).

[517] Id. at 4.

[518] Council for Higher Education Accreditation, *Recognized Accrediting Organizations (as of May 2012)* (2012), http://www.chea.org/pdf/CHEA_USDE_AllAccred.pdf (accessed May 23, 2012).

[519] Senate HELP Committee analysis of publicly available accreditor membership information.

[520] Senate HELP Committee analysis of publicly available accreditor membership information.

[521] See Accrediting Council for Independent Colleges and Schools, *ACICS Member Directory*, https://personify.acics.org/ACICSMemberDirectory/tabid/204/Default.aspx (accessed May 15, 2012); Accrediting Commission of Career Schools and Colleges, *School Directory Search*, http://www.accsc.org/Directory/index.aspx (accessed May 15, 2012).

[522] Judith S. Eaton, *An Overview of U.S. Accreditation*, Council for Higher Education, p. 4 (2009).

[523] Id. ("Accrediting organizations are funded primarily by annual dues from institutions and programs that are accredited and fees that institutions and programs pay for accreditation reviews.") ACCSC, for example, charges around $9,500 for the initial accreditation process and then collects annual fees.

Colleges (ACCSC). The current chair of ACCSC's board also serves as the executive vice president of operations for Corinthian Colleges, Inc., a for-profit school with more than 113,000 students enrolled.[524] The Commission has no members who are current faculty. Its 13-member board includes six members representing the for-profit sector, including Kaplan Higher Education, Lincoln Educational Services, and Remington Colleges, Inc., among others.[525] Similarly, ACICS's 16-member board includes representatives from eight for-profit institutions, and the 2012 chair-elect currently serves as the executive vice president, general counsel, and chief compliance officer at Education Corporation of America, a for-profit education company that operates 35 campuses and an online division under four brand names.[526]

Regional accrediting bodies do not suffer from the same inherent conflicts given the diversity of their membership. However, one regional accreditor, the Higher Learning Commission of the North Central Association of Colleges and Schools, accredits a significant portion of the for-profit sector, and for many years accepted a comparatively large number of for-profit education companies seeking regional accreditation.[527] Additionally, while regional accreditors appear to have more stringent standards as it relates to academic quality, unlike regional accreditors, national accreditors at least require some demonstration that students attending its institutions are finding jobs.

The fee structure also means that both regional and national accrediting organizations are by definition financially dependent on the very institutions they review. This fee-for-review arrangement creates a dynamic that some observers compare to the Wall Street credit ratings agencies that rubber-stamped mortgage-backed securities and other instruments that later incurred large losses.[528] This creates particular problems for regional accreditation agencies reluctant to take on the expense of challenging well-financed for-profit education companies and the extensive legal teams they employ. Moreover, since institutions can select to seek accreditation from a number of agencies, if a particular accrediting agency gets a reputation for being too tough, schools can opt for other, more lenient accreditors. This ability to "forum-shop" makes it more difficult for national accrediting agencies to stick to tough standards. Holding to high standards could result in an accreditor putting itself out of business. In fact, after ACCSC challenged Westwood for having poor career placement rates, Westwood applied to two other accreditors: the Higher Learning Commission and ACICS. Michale McComis, the executive director of ACCSC, said about Westwood:

> Westwood indicated to us that they had chosen to make application to another agency. They told us directly that it was because they were unable to meet our standards particularly with regard to student achievement. I think that's indicative of a problem throughout with regard to accreditation shopping and the opportunity for that to occur.[529]

---

[524] See ACCSC, *ACCSC Commissioners*, http://www.accsc.org/Content/AboutACCSCT/CommissionersBiographies.asp (accessed May 15, 2012).

[525] Id.

[526] See ACICS, *Meet our Commissioners*, http://www.acics.org/contact/content.aspx?id=2272 (accessed May 15, 2012). Regional accrediting commissions, responsible for accrediting most public and non-profit schools, are largely composed of college Presidents, faculty and representatives of the public interest. In other words, members come from an academic, not business or operational, background.

[527] Higher Learning Commission, *Currently or Previously Affiliated Institutions—05/24/2012*, http://www.ncahlc.org/Directory-of-HLC-Institutions.html (accessed May 24, 2012).

[528] See for example, Doug Lederman , "Comparing Higher Ed to Wall Street," Inside Higher Ed, April 29, 2010, http://www.insidehighered.com/news/2010/04/29/shireman (accessed July 6, 2012).

[529] Michale McComis (Executive Director, Accrediting Commission of Career Schools and Colleges), Prepared Testimony submitted

In general, ACICS appears to be the least stringent standards for degree granting institutions.[530]

Accreditors Are Not Equipped to Properly Regulate Large For-Profit Institutions

The for-profit education sector has outpaced accrediting agencies' efforts to measure and enforce basic standards of quality in higher education. Self-evaluation and deference to institutional academic judgment make sense in settings where tenured faculty are in control of the curriculum through shared governance. But, as Barmak Nassirian, the associate executive director of the American Association of Collegiate Registrars & Admissions Officers, testified before the committee, "Now you have an arrangement in which higher education can be extremely lucrative, where executives, who are primarily businessmen as opposed to educators, design academic policy." [531]

Accrediting agencies seek to help colleges improve. Because of this institutional focus on continuous improvement, they often appear to have difficulty drawing and enforcing bright lines and minimum standards. Accreditors have struggled to effectively evaluate institutions driven by business principles that emphasize growth and revenue maximization rather than academic improvement or integrity. Indeed, the for-profit, business-centered model represents a sharp departure from the typical college or university that accrediting agencies traditionally evaluated. As the current president of the Higher Learning Commission testified, accreditors were "behind the curve" when faced with "the entry of large private equity funds into higher education and … the development of distance education"—both hallmarks of the for-profit sector.[532] They simply "did not have the policy framework and …did not have the procedures to deal with it adequately." [533]

Accrediting agencies have been overwhelmed by the rapid growth of non-traditional educational organizations, whose size and methods of education are unfamiliar and demand different protocols of assessment.[534] Accreditors are not equipped to properly oversee the modern-day for-profit education institution, especially those whose important decisions are made at corporate headquarters, not at the campus level. For instance, ACCSC has 32 employees and accredits 951 schools, many of which have multiple campuses and are spread throughout the country.[535] Although about one-third of those schools get reviewed every year, in his testimony at the committee's August 4, 2010 hearing, Doctor Michale

---

to the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience*, 111th Congress (2010).

[530] See generally ACICS, *Accreditation Criteria Policies, Procedures, and Standards*, http://www.acics.org/ publications/criteria.aspx (accessed July 10, 2012).

[531] Barmak Nassirian (Associate Executive Director, American Association of Collegiate Registrars and Admissions Officers), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Improving For-Profit Higher Education: A Roundtable Discussion of Policy Solutions*, 112th Congress (2011).

[532] Dr. Sylvia Manning (President, Higher Learning Commission), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight*, 112th Congress (2011).

[533] Dr. Sylvia Manning (President, Higher Learning Commission), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight*, 112th Congress (2011).

[534] Jose Cruz (Vice President for Higher Education Policy and Practice, Higher Education Trust), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case study in For-Profit Education and Oversight*, 112th Congress (2011).

[535] Michale McComis (Executive Director, Accrediting Commission of Career Schools and Colleges), *Prepared* Testimony submitted to the Senate Committee on Health, Education, Labor, and Pensions, *For-Profit Schools: The Student Recruitment Experience*, 111th Congress (2010).

McComis, the Executive Director of ACCSC was unable to provide a compelling explanation of how, in 629 on-site evaluations over the previous 2 years, ACCSC did not find any "substantial noncompliance," yet undercover recordings show serious problems all three ACCSC-accredited campuses visited by GAO agents.[536] The current design of the accrediting process ensures only a minimal review of business and recruiting policies practices, and accrediting bodies often have insufficient resources to comprehensively examine policies and practices that originate at the corporate level of a for-profit school.[537]

The other major national accrediting agency, ACICS, has faced similar problems. Career Education Corporation, with 49 campuses accredited by ACICS, recently announced that it had revised its placement data for each of its 49 campuses under scrutiny by the New York State attorney general.[538] The revised numbers showed that only 13 of the 49 campuses met the accreditor's placement-rate standards.[539] ACICS's auditing procedures from the past several years were apparently insufficient to prevent or discover such pervasively false data. This is particularly disconcerting given the central role that job placement plays in the educational mission of for-profit colleges.

<u>Higher Learning Commission of the North Central Association of Colleges and Schools</u>

Of the approximately 1.4 million students attending publicly traded for-profit colleges, all but 160,000 of those attended a college accredited by the Higher Learning Commission, a division of the North Central Association of Colleges and Schools.[540] Companies like Bridgepoint Education, Inc. have purchased non-profit institutions with HLC accreditation in order to inherit those institution's access to title IV funds. In fact, for-profit education companies have purchased at least 16 non-profit colleges with regional accreditation since 2004.[541] The fact that HLC granted accreditation to so many for-profit education companies has led to some serious complications for the agency; after it granted accreditation to Career Education Corporation-owned American InterContinental University despite serious problems with how it awards credits to students, the Department of Education issued an alert memo indicating that HLC was at risk of sanctions by the Department.[542] The Department took further action against HLC, establishing a corrective action plan for the organization, after determining the accreditor was not providing sufficient guidance to its members regarding its minimum standards.[543] HLC has since instituted

---

[536] Id.

[537] *Improving For-Profit Higher Education: A Roundtable Discussion of Policy Solutions,* Hearing Before the Senate Committee on Health, Education, Labor, and Pensions, 112th Cong. (2011) [hereinafter *Hearings*] (testimony of Barmak Nassirian).

[538] See Erica Perez, "Accreditor Seeks More Accurate Job Placement Data on For-Profits," *California Watch*, January 27, 2012, http://californiawatch.org/dailyreport/accreditor-seeks-more-accurate-job-placement-data-profits-14644 (accessed May 24, 2012); Stephen Burd, "Career Education's Inadequate Response to Job Placement Rate Abuses," Higher Ed Watch, November 2, 2011, http://higheredwatch.newamerica.net/node/59900 (accessed May 24, 2012).

[539] Career Education Corporation, Form 8K filed May 7, 2012.

[540] Senate HELP Committee staff analysis of IPEDS enrollment information for for-profit college companies accredited by HLC.

[541] Daniel Golden,"How Colleges are Buying Respect," *BusinessWeek*, March 4, 2010, http://www.businessweek.com/magazine/content/10_11/b4170050344129.htm (accessed May 9, 2012). See also, Barmak Nassirian (Associate Executive Director, American Association of Collegiate Registrars and Admissions Officers), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Improving For-Profit Higher Education: A Roundtable Discussion of Policy Solutions,* 112th Congress (2011) ("taxicab medallions can't be sold as easily as accreditation was sold").

[542] See U.S. Department of Education, Office of the Inspector General, *Alert Memorandum on the Higher Learning Commission of the North Central Association of Colleges and Schools' Decision to Accredit American InterContinental University*, Control Number ED-OIG/L13J0006, Dec. 17, 2009.

[543] Id.

a number of new policies and procedures aimed at remedying these weaknesses.[544] These policies appear to be having an impact at stemming the purchase and expansion of existing schools within the HLC region, but it is unclear if the HLC reforms will prove sufficient to allow the agency to more accurately assess the performance of its current members.

### Bridgepoint-Owned Ashford University's Accreditation

In 2005, Bridgepoint Education, Inc., purchased Mount St. Clare, a financially struggling non-profit school of 312 students in Clinton, IA, and converted it into the for-profit Ashford University.[545] In accordance with the Commission's change-of-ownership policy at the time, the college's transformation triggered an initial review in 2006, resulting in HLC reaffirming the school's accreditation status for a period of 10 years.[546]

The Commission performed a second review following Bridgepoint's IPO in 2009 in order to verify continued compliance with HLC academic, staffing, and governance requirements, as well as to inspect the institution's finances.[547] By the time of the second review, company leaders had shifted the school's modality to an almost exclusively online model and grown the enrollment of the school from approximately 312 to over 50,000.[548] The Commission's post-IPO review demanded that impartial observers apply the closest scrutiny to the "effectiveness and outcomes of current experiential learning formats," including the effect of the expanded online offerings on the wider curriculum.[549]

The three-member team assigned to perform the Ashford University site visit included two representatives of the for-profit education industry—the provost of National American University, and the senior vice president of American Public University System.[550] While HLC's Handbook of Accreditation provides that "the Commission does not knowingly allow any person to participate in an organizational evaluation whose past or present activities could affect his/her ability to be impartial and objective,"[551] the balance of power on the team sent to evaluate the fitness of Ashford University was nonetheless heavily skewed toward executives at other for-profit institutions steeped in the business culture of the for-profit industry. When asked about this imbalance, and if she thought it constituted "a good peer review," Dr. Manning answered, "No." She further testified, "In this particular case, frankly, as I look back on it, we had a disproportion. . . . This question of assigning peer reviewers is something that we are in the process of reviewing and revising."[552] Additionally, the

---

[544] The Higher Learning Commission, *Commission Policies Affecting Institutional Affiliation,* http://www.ncahlc.org/ (accessed May 24 ,2010).

[545] Donald J. Andorfer, Jerald L. Garner, and David E. Leasure, "Assurance Section to Ashford University," *Report of a Commission-Mandated Focused Visit*, April 25-26, 2005, (on file with the committee).

[546] Bridgepoint External Correspondence, June 2005, Action Letter from The Higher Learning Commission Acknowledging Successful Completion of Review (on file with the committee).

[547] Michael Horowitz, Samuel Kerr and Karan Hinman Powell, *Report of a Visit for Institutional Change of Control—Institution: Ashford University*, Higher Learning Commission, November 16–18, 2009 (on file with the committee).

[548] See Ashford University, November 2009, *Institutional Snapshot* (BPI-HELP_00021644).

[549] Letter from Andrew Lootens-White, Ph.D., HLC Vice President for Accreditation Relations, to Dr. Jane McAuliffe, President of Ashford University, January 21, 2010 (on file with the committee). According to the company's September 2011 Securities and Exchange Commission (SEC) filings, enrollment has risen further to 90,597 students.

[550] Michael Horowitz, Samuel Kerr and Karan Hinman Powell, *Report of a Visit for Institutional Change of Control—Institution: Ashford University*, Higher Learning Commission, p. 1 of 7, November 16–18, 2009 (on file with the committee).

[551] *Handbook of Accreditation, Third Edition*, Higher Learning Commission, Sections 1.3–2, October 1, 2008.

[552] Dr. Sylvia Manning (President, Higher Learning Commission), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Bridgepoint Education, Inc.: A Case Study in For-Profit Education and Oversight*, 112th Congress, (2011).

peer review team visited the small physical campus facility in Iowa but did not review the company's head-quarters in San Diego, CA where the management team is based.

The review panel overlooked red flags at Ashford. An "Institutional Snapshot" that Ashford provided showed that the enrollment had increased 1,150 percent in the past 3 years. And the percent of first-time new students the college enrolled and retained for 1 year was 41 percent, meaning 59 percent of students had withdrawn in 1 year.[553] This information is substantially similar to the committee's own analysis, which revealed that for students who enrolled during the 2008–9 academic year (the year in which HLC's reviewers visited) 63.4 percent of Bachelor's degree students withdrew by 2010.[554]

Despite these poor outcomes for students, the reviewers reported that Ashford was an institution thriving in the midst of monumental change.[555] Rather than discussing, or even acknowledging, the strikingly low retention rates, reviewers only mentioned the following problems: "limited parking and challenges finding parking, overcrowding in cafeteria, limited computer access in libraries and designated resource centers." [556] The peer reviewers' characterization of Ashford University completely overlooked the fact that student outcomes had declined dramatically and included no examination of whether the recruiting practices or other operations satisfied the requirements of institutional integrity.[557]

### *American InterContinental*

Defects in the peer review process were also evident in HLC's 2009 initial accreditation of American InterContinental University (AIU), a for-profit institution owned by Career Education Corporation. When the Commission decided to accredit AIU, the college was accredited by another regional body, the Commission on Colleges of the Southern Association of Colleges and Schools (SACS/COC).[558] It is unclear if AIU relocated its headquarters to its existing Illinois campus in order to obtain HLC accreditation as it expanded its online operations and engaged in a rapid expansion. However, the comprehensive peer review used to evaluate AIU's application for initial accreditation fell short of rendering effective oversight.

Just as HLC's review of Ashford University failed to take sufficient notice of drastically declining student outcomes, the peer review team assigned to evaluate AIU's Illinois campus declined to take appropriate action in the face of apparent infractions. The two peer reviews were also similar in the composition of their teams: three of the six members of the evaluation team sent to AIU were administrators at for-profit institutions.[559] At AIU, peer reviewers noted radical inflation in the university's assignment of credit hours. Accord-

---

[553] See Ashford University, November 2009, *Institutional Snapshot* (BPI-HELP_00021644, at BPI-HELP_00021647).

[554] Senate HELP Committee analysis of data provided by Bridgepoint.

[555] See Id. at 4.

[556] The Higher Learning Commission, *Report of a Visit for Institutional Change of Control*, p. 4, January 21, 2010 (on file with the committee).

[557] Similarly, board meeting minutes from American Public University System show that the executives believed "site visit teams spend much of their time confirming the information set forth in the institution's self-study report." American Public University, February 2006, *Minutes of the Board of Trustees of American Public University System* (1APEI-HELP-3-00000445).

[558] See The Higher Learning Commission, *Report of a Comprehensive Evaluation Visit for Initial Accreditation to American InterContinental University*, p. 3, May 4, 2009 (on file with the committee).

[559] See id. at 1. The HLC evaluation team included the provost and general counsel of National American University, the senior vice president and academic dean of American Public University System, and the president of Rasmussen College.

ing to the Commission's report, "upper-division bachelor's course syllabi, course assignments, and student artifacts showed that the 9-unit courses offered by AIU are closely equivalent in content to 3-semester-hour courses taught at traditional and other online universities." [560] AIU's inflation of credit hours was significant in that the Federal Government uses credit hours as a measure of student work in establishing the amount of Federal title IV dollars a college may collect for a class or program of study.[561] For a class that AIU claimed was nine-units, AIU could collect significantly more Federal aid compared to another college that deemed the class was 3 credit hours. The credit hours noted by the Commission at AIU represented an inflation of "as much as 100% relative to common practice in American higher education." [562] Despite this finding, the HLC committee tasked with approving the peer reviewers' report signaled that "the institution meets the Commission's Criteria/Core Components for Accreditation." [563]

HLC's accreditation of AIU caught the attention of the U.S. Department of Education's Office of Inspector General, which in late 2009 was concluding a review of regional accreditors' credit hour standards.[564] The Inspector General discovered insufficient oversight of credit hours at three of the seven regional accrediting agencies, together accounting for schools receiving more than 70 percent of the Federal student aid awarded in the 2009–10 academic year. In fact, in the wake of the AIU investigation, the Inspector General recommended that the Department reconsider HLC's accrediting authority.[565] The Department did not suspend or limit HLC's authority but did put in place a Corrective Action Plan.

HLC's handling of both the credit hour problem and the Bridgepoint situation where the change of control was immediately followed by unprecedented enrollment growth and huge drops in student retention, makes clear the challenges that face accreditors. Further discussion is needed to determine the appropriate process and responsibility for determining access to Federal financial aid dollars, and whether the current structure, which depends on a process focused on assessing academic quality, is the most appropriate or sufficient method of allowing access to Federal financial aid dollars.

### State Oversight

---

[560] See id. at 17.

[561] See Dear Colleague Letter from Eduardo M. Ochoa, Assistant Secretary for Postsecondary Education, re: *AMENDED—State authorization under the Program Integrity Rules*, p. 2, March 18, 2011, http://www.ifap.ed.gov/dpcletters/attachments/GEN1106.pdf (accessed May 9, 2012) ("A credit hour is unit of measure that gives value to the level of instruction, academic rigor, and time requirements for a course taken at an educational institution."). See also Higher Education Act of 1965, 20 U.S.C.A. § 1058(e) (2008) (providing that "the term 'full-time equivalent students' [for the purpose of Title IV eligibility] means the sum of the number of students enrolled full time at an institution, plus the full-time equivalent number of students enrolled part time (determined on the basis of the quotient of the sum of the *credit hours* of all part-time students divided by 12) at such institution") [emphasis added].

[562] The Higher Learning Commission, *Report of a Comprehensive Evaluation Visit for Initial Accreditation to American InterContinental University*, p. 17, May 4, 2009 (on file with the committee).

[563] Id. at iii.

[564] See U.S. Department of Education, Office of the Inspector General, *Alert Memorandum on the Higher Learning Commission of the North Central Association of Colleges and Schools' Decision to Accredit American InterContinental University*, Control Number ED-OIG/L13J0006, December 17, 2009 (on file with the committee).

[565] See id. at 1–2 (HLC's grant of full initial accreditation with no limitations to AIU "is not in the best interest of students and calls into question whether the accrediting decisions made by HLC should be relied upon by the Department of Education when assisting students to obtain quality education through the title IV programs. We recommend that the [Department] determine whether HLC is in compliance with [Department regulations] and, if not, take appropriate action . . . to limit, suspend, or terminate HLC's recognition by the Secretary.").

Since its enactment in 1965, the Higher Education Act has required States to legally authorize the postsecondary educational institutions within their States.[566] As a leg of the "triad," States play a key role in overseeing postsecondary educational institutions within their jurisdiction. Such oversight includes authorizing these institutions to operate and ensuring that students attending these schools receive proper consumer protection. It is a State's responsibility to vet, oversee and address complaints from students attending its schools. Most States utilize an agency, commission or other State body to oversee postsecondary schools, and almost every State has a law extending its authority over all students physically located within the state who are taking classes outside the State.[567]  However, the U.S. Department of Education had never defined minimum requirements for State authorization, and many States have taken a passive or minimal role in approving institutions, ensuring their practices comply with State law, and reviewing and addressing complaints from the public about them. Many State regulators have been relying on the other two legs of the triad—private accrediting agencies and the Federal Government—to vet and monitor the schools located in their States. This reliance is especially problematic in regards to schools that are neither regionally nor nationally accredited.[568] In fact, among members of the triad, States may have the greatest potential to properly regulate these institutions given their broad legal authority, their public accountability, and their proximity to campuses.[569]

In a number of States, oversight has eroded over time due to a variety of factors, including State budget cuts and the influence of the for-profit college industry with State policymakers. While the industry has gotten larger, State budgets and appropriations for regulatory oversight and enforcement have been reduced. In New York, during the mid-1990s, the Bureau of Proprietary School Supervision had a staff of 40 to oversee 300 schools. Today, that staff has been reduced by half and is expected to oversee 500 schools, with another 100 to 150 schools' applications waiting to be reviewed. [570] A December 2011 report by the National Consumer Law Center highlighted the top five States with the highest ratios of colleges to State-oversight staff. Washington State topped the list, with a ratio of 187 schools for every oversight employee.[571] More troubling than states without oversight resources are those States where the regulators are the for-profit schools themselves. Arizona's Board for Private Postsecondary Education has eight members, five of whom are employed by the for-profit education industry. State law requires that Florida's oversight agency, the Commission for Independent Education, to reserve four of the seven commissioners seats for for-profit schools.[572] In these cases, it is not clear who is looking out for the interests of students and taxpayers.

Student complaints produced to the committee provide a clear indication of consumer protection related issues occurring at multiple for-profit education companies, yet few States appear to have a sys-

[566] Higher Education Act of 1965, Pub. L. No. 89–329, 79 Stat. 1219 (1965).
[567] Deanne Loonin and Jillian McLaughlin, State Inaction: Gaps in State Oversight of For-Profit Higher Education, *National Consumer Law Center*, December 2011, http://bit.ly/vvenoc (accessed May 9, 2012).
[568] This has particular consequences for DOD Tuition Assistance, MyCAA spousal educational benefits, and Veterans Administration GI bill benefits. The Senate HELP Committee's February 23, 2012 report shows that 6 of the top 10 recipients of MyCAA benefits are unaccredited and unregulated schools.
[569] Thomas L. Harnisch, "Changing Dynamics in State Oversight of For-Profit Colleges," American Association of State Colleges and Universities, A Higher Education Policy Brief, April 2012.
[570] Benjamin Lesser and Greg B. Smith, "Watchdog All Bark But No Bite: Anemic State Agency Overwhelmed by Job of Policing For-Profit Schools," *New York Daily News*, January 18, 2011, http://nydn.us/ySftCx (accessed May 9, 2012).
[571] Deanne Loonin and Jillian McLaughlin, "State Inaction: Gaps in State Oversight of For-Profit Higher Education," *National Consumer Law Center*, December 2011, http://bit.ly/vvenoc (accessed May 9, 2012).
[572] Fla. Stat. §1005.21 (2011).

tem in place that encourages students to file complaints or that allows for any comprehensive assessment of student complaints.

Concerned that "the checks and balances provided by the separate processes of accreditation and State legal authorization [were] being compromised," the U.S. Department of Education released a State authorization rule in 2010.[573] In its justification for proposing the new State authorization regulation, the Department cited recent events regarding the California Bureau for Private Postsecondary and Vocational Education as an example of why it was shifting away from its past approach to the law:

> The weakness of the historical approach of not requiring active State approval and oversight may have contributed to the recent lapse in the existence of California's Bureau for Private Postsecondary and Vocational Education. The Bureau served as the State's oversight and regulatory agency for private proprietary postsecondary institutions until the State legislature eliminated the Bureau. . . .  During the period when there was no State agency authorizing private postsecondary institutions, these institutions continued to participate in the title IV, HEA programs under some voluntary agreements while the State legislature worked on creating a new oversight agency. The proposed regulations, had they been in effect at that time, would have required that the State keep in place the prior oversight agency, or to designate a different State agency to perform the required State functions during the transition to a new State oversight agency.[574]

The Department's finalized rule stated that the Secretary would consider an institution to be legally authorized by a State if: (1) the authorization is given to the institution specifically to offer programs beyond secondary education, (2) the authorization can be revoked by the State, and (3) the State has a process to review and appropriately act on complaints concerning an institution and enforces applicable State laws.[575] The finalized rule also required schools offering postsecondary education through distance or correspondence education in a State in which it was not physically located, to meet any of that State's requirements in order for it to offer postsecondary education to students located in the State. The purpose of this requirement was to ensure that schools offering online classes to students in multiple States were properly authorized by each of the States. Without this requirement, and what is happening currently, is that many schools that primarily offer online classes to students located across the country only have to be authorized by the State in which they are headquartered.

On July 12, 2011, the U.S. District Court for the District of Columbia struck down the distance education portion of the regulation.[576] The U.S. Department of Education is appealing this decision.[577]

---

[573] Reasons for Proposed Regulations, 75 Fed. Reg. 34813, June 18, 2010, http://www.gpo.gov/fdsys/pkg/FR-2010-06-18/pdf/2010-14107.pdf (accessed May 9, 2012).

[574] Proposed Regulations, 75 Fed. Reg. 34813, June 18, 2010, http://www.gpo.gov/fdsys/pkg/FR-2010-06-18/pdf/2010-14107.pdf (accessed May 9, 2012).

[575] Comment, 75 Fed. Reg. 66858, October 29, 2010, http://www.gpo.gov/fdsys/pkg/FR-2010-10-29/pdf/2010-26531.pdf (accessed May 9, 2012).

[576] Career College Association v. Duncan, 796 F.Supp.2d 108 (D.D.C. 2011), http://www.career.org/iMISPublic/AM/CM/ContentDisplay.cfm?ContentFileID=12948&MicrositeID=0&FusePreview=Yes (accessed May 9, 2012).

[577] Though this 2010 Federal regulation is based in language that has been on the books for decades, it received pushback from higher education stakeholders, including the for-profit college industry. In January 2011, the Association of Private Colleges and Universities (APSCU) sued the U.S. Department of Education to overturn the rule. In its complaint, APSCU stated that the state authorization regulation "make[s] the availability of student financial assistance dependent upon States adopting specified regulatory regimes for licensing schools, creating significant economic and administrative burdens for schools that operate in multiple States that could

However, States are still expected to comply with the other components of the regulation.

**Federal Law and Regulation**

The Federal Government is the third leg of the regulatory triad overseeing higher education. While for-profit education providers operated in the United States as early as the mid-19th century, it was the 20th century that brought Federal money, and some Federal regulation, into the sector.

The Servicemen's Readjustment Act of 1944 (the first GI bill) marked the first time the Federal Government provided direct resources to individuals pursuing higher education. The new revenue stream led to an explosion of for-profit schools. The number of for-profit trade and vocational institutions enrolling veterans tripled after the introduction of the GI bill.[578] With the explosion in the number of for-profit schools, concerns about their quality arose. In 1951, the General Accounting Office (GAO) [579] reported that 1.7 million veterans attended for-profit trade schools, yet only 20 percent reported completing their studies.[580] Moreover, the GAO concluded that 65 percent of for-profit schools examined were engaged in "questionable practices that resulted in excessive charges to the Treasury." [581] Following the GAO's findings, the Veterans' Administration (VA) enacted a rule stating that no institution could have a student body that was more than 85 percent veterans. The House Veterans Affairs Committee at the time described the "85/15" rule as "a real safeguard to assure sound training for the veteran, at reasonable cost, by seasoned institutions" and observed that had the rule been in effect during the administration of the World War II GI bill "considerable savings would have resulted." [582]

For-profit colleges became eligible to receive Federal student aid loans and grants through the U.S. Department of Education in 1972.[583] Before that year, only non-profit and public institutions were eligible for these title IV student aid funds.[584] Even while allowing for-profit colleges to receive loans and grants, the Senate Education and Labor Committee at the time expressed concern that some for-profit schools attract students through "sophisticated advertising and unfulfillable promises," and "do not offer the quality of education which the schools claim is available." [585]

This new source of money for eligible for-profit colleges put them on an enrollment growth path. Between 1970 and 1975, enrollment across all higher education sectors grew by 30 percent, but enroll-

---

adversely affect students' ability to use title IV funds to pursue their higher education goals." In a notice to schools on April 20, 2011, the U.S. Department of Education announced it would not enforce the State authorization regulation before July 1, 2014 in order to give schools time to comply.

[578] H.R. Rep. No. 82-160, at 81 (1951).

[579] Since re-named the Government Accountability Office.

[580] Charles A. Quattlebaum, *Educational Benefits for Veterans of the Korean Conflict*, Legislative Reference Service, pg. 29 (1952).

[581] Id. at 110.

[582] H. R. Rep. No. 1943, 82d Congress (1952).

[583] Higher Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (1972).

[584] In 1965, with the passage of the Higher Education Act (HEA) the modern student loan program and the Equal Opportunity Grant program (the precursor of the modern Pell grant program) were created. The programs are housed in title IV of the act.

[585] S. Rept. No. 92–346, at 51 (1971).

ment in for-profit schools increased by 112 percent.[586] With this growth came significant problems. By 1990, the student loan default rate at for-profit schools was double that of higher education overall.[587]

This troubling development led to an investigation by the Senate Permanent Subcommittee on Investigations (PSI) under the leadership of then-Chairman Sam Nunn and then-Ranking Member William Roth, Jr. The investigation and hearings by PSI uncovered a host of troubling practices at for-profit schools, including alarming rates of loan volume increases and student defaults.[588] The investigations found that many students attending for-profit schools received little or no training, leaving them with "no job and a large bill to repay."[589] A review of student aid by the Government Accountability Office found that, on average, the more revenue a for-profit school derived from Federal financial aid, the lower its students' completion and job placement rates and the higher its default rates.[590] The widespread abuse documented by the PSI investigation and accompanying audits by the Department of Education Inspector General led to the closing of hundreds of for-profit schools.

Following the PSI investigation, as part of the Higher Education Amendments of 1992, Congress enacted significant reforms designed to ensure better quality in the for-profit college sector. First, Congress limited the amount of Department of Education student aid funds a for-profit college could receive to 85 percent of the school's revenues.[591] This rule was modeled after the "85/15" rule put in place to protect veterans and the GI bill program. Under the rule, a for-profit campus, as identified by an Education Department "Office of Postsecondary Education Identification" number (OPEID), that violates the rule in 1 fiscal year is put on provisional status for the following 2 years. As currently written, colleges that fail to comply with the rule for 2 consecutive fiscal years lose eligibility to participate in Federal student aid programs under Title IV of the Higher Education Act.[592]

The rule was designed to require some "skin in the game": a measurement of the amount of money that students, employers and State agencies are willing to contribute up-front for students' education at a particular college. It also provides some transparency as to the amount of Federal aid dollars that a company receives, because the Department of Education reports the number publicly. The legislation contemplates that the quality of the programs and the institutions falling under the rule are sufficiently high to attract at least a minimal number of cash-paying students and employers. Though the for-profit

---

[586] U.S. Department of Education, National Center for Education Statistics, Higher Education General Information Survey (HEGIS), "Fall Enrollment in Colleges and Universities" surveys, 1970 through 1985; and 1990 through 2009 PEDS "Fall Enrollment Survey" (IPEDS-EF:90–99), and Spring 2001 through Spring 2010.

[587] See *Abuses in Federal Student Aid Program*, Hearing before the Permanent Subcommittee on Investigations, of the Committee on Governmental Affairs, 101st Congress (1990).

[588] Id.

[589] Id.

[590] U.S. General Accounting Office *Proprietary Schools: Poorer Student Outcomes at Schools That Rely More on Federal Student Aid*, June 1997, Publication No. HEHS-97-103.

[591] Higher Education Amendments of 1992 , Pub. L. No. 89–329, section 487(a)(24)). At the time of enactment in 1992, for-profit schools were prohibited from receiving more than 85 percent of their revenue from Federal student aid funds but the industry successfully lobbied to modify the rule to 90 percent in 1998. When the rule was translated into the Federal student aid context, it was altered to track dollars, not students. See CRS Report for Congress, Institutional Eligibility: The Higher Education Amendments of 1992, Congressional Research Service, Publications No. 93-861 EPW, September (Publication No. 93-861 EPW).

[592] While originally a campus that violated this rule in a single year lost Federal financial aid eligibility, in the 2008 reauthorization of the Higher Education Act Congress loosened the sanctions to apply only when a campus exceeds 90 percent revenue from title IV programs for 2 consecutive fiscal years.

landscape has changed, this policy rationale remains.

In the 1992 Higher Education Act Amendments, Congress also prohibited institutions from receiving title IV funds if they either offered more than 50 percent of their programs as distance-education courses, or enrolled over 50 percent of students in distance programs (the "50 percent rule").[593] Additionally, it prohibited institutions in all sectors from receiving title IV student aid funds if more than 25 percent of the institution's student loan borrowers defaulted on their loans.[594] Finally, Congress put in place a ban on paying college recruiters based on how many students they enrolled ("incentive compensation ban"), and sought to strengthen the accreditation system to ensure that accrediting agencies were operating separately and independently from the institutions they oversaw.

The 1992 amendments were enacted just as the for-profit sector was undergoing a shift away from small vocational and career schools, such as truck driving and secretarial schools, and towards large, degree-granting entities. The University of Phoenix, in particular, pioneered a new model of enrolling students who had already earned a significant number of higher education credits at another institution but had not finished their degree. The University of Phoenix model provided students, primarily working adults, with flexibility and convenience. Students take one class at a time, moving through a standard curriculum with a small group of students. As enrollment soared, other for-profit education providers began to move into degree programs. DeVry and the University of Phoenix broke new ground in the mid-1990s by becoming publicly traded companies.

With newfound capital, as the for-profit sector grew in enrollment and revenues, the sector initiated a gradual campaign to roll back some of the 1992 amendments. In 1998, the reauthorization of the Higher Education Act raised the limit on title IV revenues from 85 percent to 90 percent.[595] This gave for-profit schools that were nearing the 85 percent ceiling relief from potential penalties, and made it possible to enroll more students who were eligible for full Federal student aid. In 2002, the Bush administration's Department of Education effectively dismantled the ban on paying recruiters based on the number of students they enroll by creating "safe harbors," which allowed incentive payments as long as the number of students enrolled was not the sole criterion for compensating recruiters.[596] In practice, this meant that for-profit schools could use the number of students a recruiter enrolled as the basis for 95 percent of his or her salary, and only 5 percent based on other job performance criteria.

In 2006, as part of a provision to provide relief in the wake of Hurricane Katrina, the Deficit Reduction Act eliminated the 50 percent rule requiring at least 50 percent campus-based students and programs.[597] Today, three publicly traded schools now offer exclusively online programs, and many more companies currently have more than 50 percent of students in exclusively online programs.[598] Commit-

---

[593] See Margot A. Schenet, *Higher Education: Reauthorization of the Higher Education Act*, Congressional Research Service, December 3, 1992.

[594] Higher Education Amendments of 1992 , Pub. L. No. 89–329, section 487(a)(24)).

[595] Rebecca R. Skinner, *Institutional Eligibility and the Higher Education Act: Legislative History of the 90/10 Rule and Its Current Status*, Congressional Research Service, p. CRS-6, January 19, 2005.

[596] Federal Student Aid Programs, Final Regulations, 67 Fed. Reg. 67048, November 2, 2002, http://www.gpo.gov/fdsys/pkg/FR-2002-11-01/pdf/02-27627.pdf; 34 C.F.R. 668.14(b)(22).

[597] The claim was made that students displaced by Katrina needed access to distance education.

[598] The three publicly traded online schools are APEI, Capella and Walden. The committee's investigation included an additional 3 com-

tee data indicate that, in 2008–9, at least 434,945 students were enrolled in exclusively online programs offered by just 11 for-profit companies.[599]

The Higher Education Opportunity Act of 2008 brought more rollbacks. Originally, a campus that violated the 90/10 rule in a single year lost all Federal financial aid eligibility. The 2008 law loosened the sanctions, stipulating that they would apply only when a campus exceeds 90 percent revenue from title IV programs for 2 consecutive fiscal years.[600] At the time it was passed, industry lobbyists called the rollback "a significant change because it means that a school will no longer face an immediate" penalty for violating the rule.[601] In practice, this means that a for-profit college can collect more than 90 percent of its revenues without facing a penalty by failing and complying with the 90/10 rule in alternate years. The law also allowed for-profit colleges to count half of the value of loans made to students by the school ("institutional loans") as revenue in the year the money was loaned. This temporary provision, in effect between July 2008 and July 2012, was a significant changeswwwwwas a significant change from previous law that only counted *payments* made by students to be counted.[602] Finally, the Ensuring Continued Access to Student Loans Act of 2008, which increased the Stafford Loan limit for each borrower by up to $2,000 a year, also allowed that for-profit colleges were not required to count the increases in the 90/10 calculation until July 2011.[603]

More recently, during the Obama administration, the Department of Education has attempted to regulate some of the problems in for-profit schools.[604] As part of a rulemaking package enacted in October 2010, the Department of Education once again ensured that recruiters at for-profit schools cannot not be compensated based on the number of students they enrolled. The Department also prohibited colleges from making misrepresentations about their educational programs, financial charges, and graduate employability.[605]

---

panies that are over 90 percent online Bridgepoint Education, Inc., Grand Canyon Education, Inc, and TUI as well as other companies with large online operations including Apollo, DeVry, CEC, ITT and Kaplan.

[599] Senate HELP Committeee analysis of data provided by 11 for-profit education companies.

[600] Higher Education Opportunity Act of 2008, Pub. L. No. 110–315, § 101, 122 Stat. 3086 (2008), available at http://www.gpo.gov/fdsys/pkg/PLAW-110publ315/pdf/PLAW-110publ315.pdf (accessed July 3, 2012).

[601] Association of Private Sector Colleges and Universities, HEA Conferees Include Major Changes to 90-10 Rules, Newsletter, 2008, http://www.career.org/iMISPublic/AM/Template.cfm? Section=Search&template=/CM/HTMLDisplay.cfm&ContentID=17598 (accessed May 24, 2012) (Association of Private Sector Colleges and Universities was known as Career College Association at the time of this newsletter's publication).

[602] Higher Education Opportunity Act of 2008, Pub. L. No. 110–315, § 101, 122 Stat. 3086 (2008), available at http://www.gpo.gov/fdsys/pkg/PLAW-110publ315/pdf/PLAW-110publ315.pdf (accessed July 3, 2012).

[603] Ensuring Continued Access to Student Loans Act of 2008, Pub. L. No. 110–227, § 2, 112 Stat. 740 (2008), available at http://www.gpo.gov/fdsys/pkg/PLAW-110publ227/html/PLAW-110publ227.htm.

[604] Program Integrity: Gainful Employment—Debt Measures, Final Regulations, 76 Fed. Reg. 34386, June 13, 2011.

[605] Additional regulations enacted as part of the 2010 rulemaking package, many of which apply to all institutions of higher education include: requirements to furnish information regarding graduation rates and job placement that will allow the determination of student debt levels and incomes after program completion (gainful employment data collection); minimum standards for the State authorization process; requirement of a structured and consistent policy approach to evaluating satisfactory academic progress; definition of a credit hour that allows accrediting agencies to determine whether an institution's assignment of a credit hour is acceptable; definitions of when a student is considered to have withdrawn from a program for purposes of returning title IV aid; requirement that the Department receive notice of new programs and potential for the Department to require formal new program approval; development of procedures to evaluate the validity of a student's high school diploma; enhanced authority to take action against institutions engaging in deceptive advertising, marketing, and sales practices; revised Ability To Benefit (ATB) test approval procedures and criteria and requirement of some completion of some credits before title IV aid is made available for ATB students; strengthened criteria for when a portion of another institution's educational program can be delivered through a written arrangement; simplification of FAFSA verification; and allowance that a one-time retake of a course may count toward a full course load for purposes of title IV aid. Some

In June 2011, the Department finalized a new regulation that, for the first time, defined colleges' obligation to "provide gainful employment in a recognized occupation." [606] The rule requires that each program at for-profit colleges, as well as vocational programs offered by public and non-profit colleges, demonstrate that 35 percent of their student-borrowers are repaying their student loans, *or* the ratio of their typical graduate's debt to their total income is below 12 percent, *or* the ratio of their typical graduate's debt to the graduate's *discretionary* income is below 30 percent.[607] Although this rule is a first step towards ensuring that students attending for-profit schools are getting a valuable education that serves them well in the job market, the extremely low bar that programs must meet, and the fact that a program must violate all three thresholds for 3 out of 4 years, make it unlikely that many poor-performing programs will face consequences. Moreover, on June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans.[608] While the decision will require that the Department either prevail on an appeal, or initiate a new rulemaking process to better substantiate the need for the 35 percent repayment rate, programs must still disclose whether they meet the gainful employment criteria. On June 26, 2012, the first set of data indicated that 5 percent of programs (193 programs at 93 institutions) all operated by for-profit colleges failed to meet all 3 gainful employment criteria.[609] Among the companies with more than five programs failing all three criteria were Corinthian, Career Education Corporation, Westwood, Vatterott and Education Management Corporation.[610]

Thus, only two key regulatory provisions impose some measure of accountability on for-profit colleges: the weakened 90/10 rule, and the requirement that no more than 30 percent of students default within 3 years. Data and internal documents indicate that some for-profit schools go to great lengths to evade these modest checks.

---

alleged that the Department of Education improperly handled confidential information during the rulemaking process. A subsequent investigation by the Inspector General of the Department of Education found "found no improper disclosure of sensitive information by Department officials in their communications with outside parties." U.S. Department of Education, Office of the Inspector General, *Department's Negotiated Rulemaking Process for Gainful Employment*, Final Audit Report, June 2012 http://www2.ed.gov/about/offices/list/oig/ auditreports/fy2012/a19l0002.pdf (accessed July 8, 2012).

[606] Program Integrity: Gainful Employment—Debt Measures, Final Regulations, 76 Fed. Reg. 34386, June 13, 2011.

[607] Program Integrity: Gainful Employment—Debt Measures, Final Regulations, 76 Fed. Reg. 34386, June 13, 2011.

[608] "The Department does not identify any expert studies or industry practices indicating that a repayment rate of 35 percent would be a "meaningful performance standard," but rather emphasizes that the number was chosen because approximately one quarter of gainful employment programs would fail a test set at that level. … The question before the court is whether the Department has provided a reasoned basis for selecting the debt repayment and debt-to-income standards. The debt-to-income standards were based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely. … The debt repayment standard, by contrast, was not based upon any facts at all. No expert study or industry standard suggested that the rate selected by the Department would appropriately measure whether a particular program adequately prepared its students. Instead, the Department simply explained that the chosen rate would identify the worst-performing quarter of programs. Why the bottom quarter? Because failing fewer programs would suggest that the test was not 'meaningful' while failing more would make for too large a 'subset of programs that could potentially lose eligibility.' That this explanation could be used to justify any rate at all demonstrates its arbitrariness." Association of Private Colleges and *Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012).

[609] U.S. Department of Education, "Five Percent of Career Training Programs Risk Losing Access to Federal Funds; 35 Percent Meet All Three Standards Under Gainful Employment Regulation," Press Release, June 26, 2012, http://www.ed.gov/news/press-releases/five-percent-career-training-programs-risk-losing-access-federal-funds-35-percen (accessed July 6, 2012).

[610] U.S. Department of Education, Federal Student Aid Data Center, *2011 Gainful Employment Informational Metrics*, http://federalstudentaid.ed.gov/datacenter/gainful1.html (accessed July 6, 2012). See also Libby A. Nelson, Missing the Mark on 'Gainful,' *Inside Higher Ed*, June 26, 2012, http://www.insidehighered.com/news/2012/06/26/education-department-releases-data-gainful-employment-rule (accessed July 6, 2012).

**Evasion of Regulatory Requirements**

The two primary Federal checks on for-profit colleges pertain to the proportion of Federal money that the colleges collect and the percentage of students who default on Federal student loans. In addition, some accreditors also require schools to meet standards regarding the percentage of graduates who obtain employment in their field of study. Some for-profit colleges employ questionable tactics to meet these requirements. Strategies for complying with 90/10 include switching campuses between Office of Postsecondary Education ID (OPEID) numbers, stopping the flow of funds to high-90/10 OPEIDs, maximizing cash collected from students, creating scholarship programs, increasing tuition, establishing roadblocks for living expense stipends, utilizing institutional loan programs, pursuing military benefits, and converting from for-profit to non-profit status. Default management tactics involve aggressively signing students up for forbearance and deferment plans. Job placement statistics have been plagued by irregularities and sometimes falsified data.

90/10 Strategies

Each for-profit education company must report annually to the Department of Education the amount of Federal student aid they took in (the "numerator") and the company's total revenue from academic activity (the "denominator") for each OPEID number under the company's control.[611] The numerator consists of all title IV program funds—primarily Federal Stafford Loans and Pell Grants—used for tuition, fees and other institutional charges. The denominator is the sum of all revenues generated by the institution from tuition, fees, and other institutional charges used for educational purposes. In addition to title IV funds, the denominator includes student-paid tuition, employer-paid tuition, State educational loans and grants, scholarships, and, because of a loophole in the law, all other Federal funds (which includes military servicemember and veteran educational benefits). It does not include funds generated from non-educational activities, such as outside investments, or cafeteria and school brand apparel sales. Schools must use cash-basis accounting, meaning that revenue is recognized when it is actually received (instead of when it is earned).

Each year, many for-profit schools edge closer to the 90 percent line. Twenty-four percent of for-profit institutions had a 90/10 ratio of 80 percent or above in 2007–8; just 2 years later, in 2009–10, the proportion jumped to 37 percent of all for-profit institutions.[612]

| For-Profit Education Companies with Highest Reported 90/10 Share, 2010 | | |
|---|---|---|
| Company | Reported 90/10 Share [in percent] | Estimated Share Including All Federal Funds [in percent] |
| Apollo Group, Inc. | 85.3 | 88.7 |

---

[611] The determination regarding whether more than 90 percent of revenues are coming from Federal financial aid dollars is performed for each OPEID number, not based upon all schools operating under the same name or all schools owned by the same corporation. Typically, an OPEID number corresponds to one campus. But because of the consolidation, combinations, and growth in the for-profit sector, one corporate entity may have one number for many campuses, or many. For example, Strayer University, with its 92 campuses has one OPEID number whereas Corinthian Colleges, Inc., with 105 campuses, has 49 OPEID numbers.

[612] U.S. Department of Education, *Proprietary Schools 90/10 Revenue Percentages Tracked Over Student Aid Award Year*, http://federal-studentaid.ed.gov/datacenter/proprietary.html.

| Bridgepoint Education, Inc. | 85.1 | 93.7 |
|---|---|---|
| Herzing, Inc. | 86.1 | 87.4 |
| Kaplan Higher Education Corporation | 85.9 | 87.9 |
| Vatterott Education Holdings, Inc. | 87.0 | 88.1 |

Instead of seeking to attract cash-paying students or employers by offering quality programs, some for-profit schools have devised a number of tactics to artificially lower their reported 90/10 figure.[613] These tactics are detailed below.

*Switching Campuses Between OPEIDs*

The 90/10 rule attaches to an OPEID number, not a school or a parent company. One OPEID number may consist of a main campus and branch campuses. Schools with multiple OPEID numbers can shift campuses to different OPEID numbers and classify them as branches even when they are many States apart. This requires the blessing of the Department of Education, the college's accrediting agency, and the State regulator, which usually grant these shifts. As an example, Career Education Corporation recently applied to consolidate 19 of its OPEIDs into one.[614] Included in this 19 were 6 of its OPEIDs that were over 90 percent.[615]

EDMC discussed internally a consolidation and reorganization of its campuses in late 2009 in part to address concerns with 90/10 issues at some campuses.[616] Similarly, Herzing University enlisted the help of a consultant to review potential schools to purchase "for 90/10 strategies." A Herzing executive instructed the consultant, "We are only interested in schools with low 90/10 ratios, which are healthy, and $1M+ in revenue." [617] The school also made plans to shift its current campuses around under different arrangements of OPEID numbers. Faced with high 90/10 campuses in Toledo and Akron, one executive wrote,

> My initial thought is to match Toledo with Omaha because they are smaller enterprises and that way we can reserve Minneapolis for Akron if necessary. Right now the Toledo/Omaha rate would be . . . 72.6% . . . Right now Akron/Minneapolis would be . . . 78.5%. This group could in theory go up to the $20,000,000.00 mark in combined revenue, with the current cash and still be under the 90% threshold. [618]

Herzing managers also discussed paying bonuses to employees based on each 0.1 percent reduc-

---

[613] One executive said, "90/10 is a multi-front battle, like cancer—we won't find one single solution other than abolition." Herzing Internal Email, September 2009, re: *RE: 90/10 combining* (HP000006166).

[614] Career Education Corporation 10-Q for the period ending 3/31/2011. Consolidation of campuses into fewer OPEID groups is not, in itself, a suspect practice. However, the Department of Education must be mindful of proposed consolidations that seek primarily to evade the penalties for violating the 90/10 rule or student loan default rate rule.

[615] Id.

[616] EDMC, December 2009, *WASC Announcement* (EDMC-916-000200071, at EDMC-916-000200081) (document on file with the committee).

[617] Herzing Internal Email, June 2010, re: *Brookfield opportunity etc* (HP000006414).

[618] Herzing Internal Email, August 2009, re: *RE: 90/10 as of 8.14.2009* (HP000006169).

tion in 90/10 their campus achieved over the course of a year.[619]

### Stopping Flow of Funds to OPEID

Documents reviewed by the committee reveal that some companies have taken the drastic step of stopping the flow of title IV student aid money to its high-90/10 OPEID groups. Since the 90/10 regulation requires schools to use cash basis accounting, schools may delay drawing down title IV funds from the Department of Education for certain campuses and thus push that aid into the next fiscal year.[620]

Stopping the flow of aid hurts students because campuses that do not receive student aid funds may not disburse, in a timely manner, living-expense checks to students who depend on those funds to pay for books, housing, food, transportation, and childcare. Indeed, internal documents show that schools are well aware that withholding aid money could cause significant disruptions and potentially drop-outs. Yet, these schools sometimes ignore the potential harm to students. In an internal email, an EDMC executive noted that "pulling the lever [withholding disbursements] would ensure we stay under 90% in FY'10. . . . The trade-off is student and school disruption and potentially lost revenue to bad debt on drops." [621] The company ultimately opted not to cease drawing down title IV funds at the end of Fiscal Year 2010. A senior vice president in charge of student finance told the chief administrative officer that one EDMC brand had previously used delayed aid disbursal prior to the acquisition at a few campus locations.[622] Likewise, internal documents show that Vatterott engaged in the same practice in 2008: A concerned regional director emailed that the Quincy, IL campus had "more than $900K past due" in title IV funds that should have been disbursed to the campus. An employee at the Quincy campus responded, "Because of the 90/10 issue, corporate has put a hold on our title IV disbursements until the first of the year." [623]

CEC's withholding of Federal student aid funds to its "Fenton OPEID," which reported that it exceeded the 90/10 metric in 2011, led to student frustration over not being given their living stipend disbursements: "Last year during this time, the CPC [CEC's Student Aid Centralized Processing Center] started to receive several calls . . . [from] students questioning why they were not able to receive their disbursements." [624]

### Collecting Cash from Students

Internal documents demonstrate that some schools have raised their initial enrollment fee—which must be paid in cash—or insisted on cash payments from students in order to lower their reported

---

[619] Herzing Internal Email, April 2010, re: *RE: YTD HAPPY Bonus Results* (HP000006143).

[620] While this practice does not violate the 90/10 rule, it may be proscribed in certain instances in which a college violates its cash management obligations to provide students with timely stipend checks.

[621] EDMC Internal Email, March 2010, re: *RE: 90-10 Forecast Summary—March 17 2010 updated* (EDMC-916-000228111). See also EDMC Internal Email, August 21, 2009, re: *FW: 90/10 assistance requested* (EDMC-916-000183672).

[622] EDMC Internal Email, August 2008, re: *RE: 90/10 definition ?* (EDMC-916-000208935). The company asserts that this activity occurred prior to Brown Mackie's acquisition by EDMC.

[623] Vatterott Internal Email, December 2008, re: *Re: accounts receivable* (VAT-02-33-00360).

[624] Career Education Corporation, August 2009, re: *FW: SEC 90/10—HOLD PELL* (CEC000026555).

90/10 ratio. While asking students to make up-front payments on their education can be a good idea because it is interest-free and also helps them to understand what it will be like to make payments on their loans later, it seems that some for-profit schools are primarily seeking to drive down their 90/10 ratios with these cash payments.

In 2007, Herzing raised its enrollment fee to $100 for its online students.[625] The company also proposed to award its recruiters extra points toward salary increases for enrolling students who make cash payments.[626] In order to collect more cash, ITT created "SWAT teams" of three to four financial aid employees to visit specific campuses and approach students in class who were behind on payments to the school.[627] Kaplan proposed "sponsor[ing] tables/treats for a school-wide yard sale, flea market, or food sales to help students obtain additional cash" to pay the school.[628] The company also initiated the "Encourage X-tra Cash Investment Toward Education [EXCITE]" campaign to secure more cash from students.[629] The EXCITE campaign included training for financial aid and other staff to overcome students' objections to paying more cash.[630] The training featured this scenario:

> Sally has a mortgage, car note, day care, utilities, and insurance to pay every month. She is barely making these payments and with the current lay offs occurring at her job, she is not sure how long she can continue to make them. When Sally decides that making $100 per month tuition payments is not a good idea, given her current situation, use the feel, felt, found method to overcome her concerns.

The training materials instruct the employee to respond:

> Sally, I understand how you feel about not wanting to make $100 per month tuition payments. Many of our students felt the same way when they enrolled into the program. What they found, Sally, is this investment in their future was well worth any sacrifices they had to make such as finding ways to reduce utility costs or determine ways to obtain additional resources. Do you agree, that the benefits of getting an education to achieve a stable rewarding career outweigh the costs? Here at Kaplan College, we will gladly work with you to make it easier. How much do you think you could afford? [emphasis in original].[631]

*Scholarship Programs*

Department of Education regulations dictate that scholarships awarded to a student do not count as Federal financial aid and instead count on the "10" side of the 90/10 calculation, only if the scholarships are awarded by an organization independent of the school. The independence requirement prevents

---

[625] Herzing, June 2007, *90/10 Report to Finance Committee of the Board* (HP000001629).
[626] Id.
[627] ITT Internal Presentation, August 2008, *SWAT Team Volunteers* (ITT-00052133) and Senate HELP Committee staff interview with Rashidah Smallwood, February 17, 2011.
[628] Kaplan Internal Presentation, *90/10 Overview* (KHE 272311, at 272318).
[629] Kaplan Internal Document, *EXCITE Initiative Training: Encourage X-tra Cash Investment Towards Education* (KHE 272310).
[630] Kaplan Internal Presentation, *Overcoming Objections Tuition Payment Commitment* (KHE 272320).
[631] Kaplan Internal Presentation, *Overcoming Objections Tuition Payment Commitment* (KHE 272320, at KHE 272326 and KHE 272326).

schools from subverting the 90/10 rule by simply recycling Federal student aid money to award scholarships that count on the "10" side. However, several companies that operate for-profit colleges have designed scholarship programs that appear to be awarded by outside non-profit organizations, but in reality the design and control of the programs appears to come from within the for-profit school. In these cases, the money used to fund the scholarship comes from sources connected to the school and the awards are only given to students at that particular school.

ITT created the "Champagne Scholarship," a "new scholarship named for and funded by [the company's] previous chief executive officer, Renee Champagne." [632] A former employee and whistleblower confirmed that nearly every student who applied received the scholarship.[633] Over the course of a year, the company planned to award a total of $21 million in scholarships. That amount is enough to move ITT's overall 90/10 ratio by more than 1 percent, a significant achievement if a school is in danger of exceeding 90 percent.[634]

Similarly, EDMC created a non-profit tax entity called the "Education Foundation" to bestow scholarships that count towards the 10 percent side.[635] The foundation awards scholarships only to students at EDMC schools.[636] The money is gathered from EDMC employee donations and corporate foundations, often representing companies that do business with EDMC or that market their products to EDMC students, such as student loans from Bank of America, software from Journey Education Marketing, textbooks from Wiley and McGraw-Hill publishers, and soda-machine sales from Vending Management Services, Inc.[637] The company awarded more than 400 scholarships in 2009, ranging up to $5,000 each. In 2009, the company looked to "quadruple the amount of employee contributions and school fund raising activity" explicitly for the purpose of 90/10 compliance.[638]

*Increase Tuition*

Perhaps most troublingly, some schools push their tuition higher in order to create a gap between the total amount of Federal aid a student can receive and the cost of attending. This illustrates the fundamental problem with the cost of for-profit schools-that the tuition fees and other academic charges bear no relationship to the cost of providing the education. This gap means that students attending these schools must find even more financing by taking out private loans, taking on more debt through a private or institutional loan, or making monthly cash payments, often by credit card, directly to the school to pay for the artificially high cost of the school. The student is left with more debt, likely at a higher rate

---

[632] ITT Internal Document, *Champagne Scholarship Fund* (ITT-00060529). See also ITT Internal Presentation Slide, *Champagne Scholarship* (ITT-00052394).

[633] Senate HELP Committee staff interview with Rashidah Smallwood.

[634] Senate HELP Committee staff analysis of documents provided by ITT.

[635] EDMC Internal Document, November 2009, *90-10 Student Mix Project Tracker* (EDMC-916-000000483). The company asserts that EDMC foundation funds are not included in its 90/10 calculation.

[636] The Education Foundation, *What is The Education Foundation?*, http://www.educationfdn.org/about.php (accessed May 10, 2012).

[637] See EDMC Education Foundation, *Charting Courses*, Education Foundation Newsletter, Spring 2009, http://www.educationfdn.org/documents/newsletter_spring_2009.pdf (accessed May 8, 2012); The Education Foundation, *Building Futures Through the Education Foundation,* Program Brochure, http://www.educationfdn.org/documents/Tri-fold%202010%20brochurefinal.pdf (accessed May 8, 2012).

[638] EDMC Internal Document, November 2009, *90-10 Student Mix Project Tracker* (EDMC-916-000000483). The company asserts that EDMC foundation funds are not included in its 90/10 calculation.

of interest, just so the school can count that money towards the "10" side.

What is striking is that companies fail to consider, or consider and dismiss, the possibility of reducing tuition and attracting some students who are willing and able to make cash payments towards their education. This practice would align with the policy goal of the regulation:  to ensure that colleges and the programs they offer are of sufficient quality to draw some cash-paying students.  It is clear, in the case of at least some schools, that such a policy is unacceptable because of the potential reductions in revenue and profit.

Many for-profit colleges stay well under 90 percent even with comparatively low tuition. For example, an analysis of the American Public Education Inc. (APEI), a for-profit system headquartered in West Virginia that enrolls a significant number of military veterans and servicemembers, finds that even when all military benefits are included on the "90" side, the company receives approximately 77.4 percent of revenues from Federal dollars, well under the 90/10 threshold.[639] APEI has avoided 90/10 compliance issues, in part because the company offers much lower tuition than most for-profit education companies and is able to attract both students and employers based on this value proposition. Colleges can also avoid 90/10 issues by attracting employers that offer programs to their employees to pay some or all of the cost of getting a higher degree. For example, Strayer has been able to remain well under the 90/10 threshold largely due to its employer-sponsored tuition programs. Students who receive tuition help from their employers or associations make up approximately 25 percent of the student body at Strayer.[640]

The higher a company sets tuition, the less likely it is for student contributions to provide 10 percent of revenue.[641] At American Public University System, a student contributing 10 percent towards his or her Associate degree would need to pay $1,535, while the same student contributing 10 percent towards a Corinthian Associate degree, which is priced far higher, would need to find $4,183 out-of-pocket.

An email from the vice president of Argosy University Online highlights the limitations of raising tuition to help comply with 90/10.  "While I recognize a higher tuition price point has the potential to positively impact 90/10," he wrote, "I don't think it can be the solution as it will constrain our ability to get enrollments.  We are already priced higher than any of our competitors so if this were a driving factor in 90/10 we would be in a much better position as it relates to 90/10." [642]

Financial analysts, who are usually champions of for-profit higher education, have taken issue with the tactic of justifying tuition raises with 90/10 compliance. After Corinthian instituted a 12 percent tuition increase in the name of 90/10 compliance, Ariel Sokol, a financial analyst with UBS, posed a question to Corinthian executives in an investor conference call, "I'm a little confused why the burden to comply is being placed on the student because if the Company is providing value to businesses where it places students why aren't the businesses willing to offer scholarships to the students you're willing to serve, particularly when the alternative is either the closure of the school or burdening the students/employees with additional debt?"

---

[639] Senate HELP Committee staff analysis.
[640] Strayer, Q2 2011 Earnings Call with Investors.
[641] GAO, "For-Profit Schools: Large Schools and Schools that Specialize in Healthcare Are More Likely to Rely Heavily on Federal Student Aid," October 2010, Slide 28, http://www.gao.gov/assets/320/310897.pdf.
[642] EDMC Internal Email, June 7, 2010, re: *AUO Pricing* (EDMC-916-000229388).

[643] The CEO responded that since Corinthian focuses their recruiting efforts on people who do not have the money to pay for school, most of their students must borrow the maximum they are eligible for.[644] And since most of their students do not have a job and are seeking entry-level positions with their Corinthian degree, employers are not willing to help them fund the cost of school. Sokol called Corinthian's decision to raise tuition 12 percent "perhaps the most counterproductive public negotiating tactic that we've ever witnessed."[645] Corinthian announced the tuition increase "as if they are somehow the victims" when in reality the company knowingly pursued this kind of a growth strategy notwithstanding the existence of 90/10.[646] "It's not as if [the company's 90/10 situation] happened by surprise," and now, "students are being burdened with debt they can't repay. That's not a viable long-term strategy," Sokol said.[647]

*Establishing Roadblocks for Living Expense Stipends*

Students are eligible for stipend checks to pay living expenses while in school if there is money leftover after using their aid to pay tuition and institutional charges. In an effort to reduce their reported 90/10 ratio, some schools have resorted to putting roadblocks up for students to get their stipend checks. An internal document titled "90/10 plan FY2010" reveals that EDMC "put in place a tougher stipend check process which has cut our stipends down dramatically. Students are required to fill out budgets and get letters from their child care provider to support their stipend request. They are also counseled on the effect of taking out more loans."[648] While counseling students to avoid borrowing more than they need to pay for school helps students manage their future loan payments, the practice of making it burdensome to obtain money students need for living expenses is not helpful.

Bridgepoint Education instituted a stipend check procedure under which students must wait 14 weeks to get the full amount of their stipend.[649] Complaints from students attending Bridgepoint-owned Ashford University show many students frustrated by delayed payments, improper amounts, and poor communication with students.[650] One student wrote that his account balance showed that the school owed him a stipend check for $6,393.50 that was delayed multiple times. He wrote, "I am scheduled to start class on Wed the 14th, HOWEVER, like the past 3 classes, I don't have the money to buy books for them, so I had to take the classes

---

[643] Corinthian Investor Call, February 2011.

[644] The CEO said, "Most of our students come to us without jobs, and so, as a result, these are entry level positions and most employers are not willing to step up and provide scholarships or fund that kind of program. . . . And because Congress has done such a good job for our students in terms of increasing the amount of Stafford money available to students and the amount of Pell money available to students, and our tuition historically has been going up at 3 percent to 4 percent a year, it's created this kind of a problem."

[645] Goldie Blymenstyk, "Colleges Scramble to Avoid Violating Federal-Aid Limit: For-Profits Tactics to Comply With 90/10 Rule Raise Questions," *The Chronicle of Higher Education*, April 2, 2011, http://chronicle.com/article/Colleges-Scramble-to-Avoid/126986/ (accessed May 8, 2012).

[646] Id.

[647] Id.

[648] EDMC, *90/10 plan FY2010 Akron* (EDMC-916-000227880). The company asserts that the document only refers to counseling students to limit stipend borrowing and that it has never held back stipend amounts from students. See also Corinthian Internal Email, June 2010, re: *FW: Fwd:* [redacted] (CCi_00058084).

[649] Bridgepoint, October 2008, *New Stipend Process for Financial Aid Students: Effective 10/13/2008* (BPI-HELP_00016331).

[650] See, for example, Bridgepoint Student Email, April 2009, re: *This is my formal complaint* (BPI-HELP_00028217); Bridgepoint External Correspondence, May 2009, re: [redacted] (Letter From an Attorney Regarding Student Loan Complaint) (BPI-HELP_00027873); Bridgepoint Student Correspondence, May 2009, Student Letter of Complaint (BPI-HELP_00027845); Bridgepoint Student Email, February 2010, re: *This Constitutes My Formal Complaint* (BPI-HELP_00027194) (Ashford University); Bridgepoint Student Email, Monday 2010, re: "*This constitutes my formal complaint*" (BPI-HELP_00026309); Bridgepoint Student Correspondence, March 2010, Student Letter of Complaint (BPI-HELP_00026143).

without the textbooks" [emphasis in original].[651] Another student wrote,

> After requesting to have my excess Student Loan money refunded to me and check was supposed to be mailed out. . . . After numerous calls and many Financial Aid Representatives telling me they would research this and follow up I have yet to receive the fund or a phone call. This is the second time this has happened this academic year. . . . Unfortunately, I had to complete my first class without all of the required materials.[652]

In 2010, the Inspector General of the Department of Education released a report detailing an audit of Bridgepoint, finding, among other problems, that the company was using a flawed process for managing stipends.[653]

*Institutional Loans*

Historically, when a school operated its own loan program, these "institutional loans" could only be counted on the "10" side when a student makes payments on the loan, not at the time of disbursement of the loan. At some colleges only a small portion of these loans are ever repaid, perhaps as low as 20-50 percent for students who leave school without a degree, and loan payments that students do make are spread over multiple years. Thus, the utility of institutional loans to move a school's 90/10 ratio was low.[654] However, two recent developments altered the landscape. Congress enacted an exception to this treatment of institutional loans as part of the 2008 reauthorization of the Higher Education Act (HEA).[655] For institutional loans made to students from July 1, 2008 until July 1, 2012, schools are permitted to count 50 percent of the loan amount at the time the loan is made to the student.[656]

Some for-profit colleges subsequently created lending programs or expanded the volume of loans issued under existing loan programs, often at extremely high interest rates. Corinthian partnered with a non-prime consumer credit lender to create the Genesis loan program in 2008. In the first full year of the program, the company made $120 million in loans.[657] The company planned to double the volume of loans in the next fiscal year.[658] The CFO of Corinthian told investors, "Under the current rules we can have these institutional loans count as part of the 10 percent. So, again, we get the benefit of the incremental dollars net of the discount. So if on an ongoing basis 45 percent of that price increase came to us

---

[651] Bridgepoint Student Email, July 2010, re: *"This constitutes my formal complaint."* (BPI-HELP_00026309) (Ashford University).

[652] Bridgepoint, April 2010, Complaint Overview Form from the Better Business Bureau (BPI-HELP_00025972).

[653] U.S. Department of Education, Office of the Inspector General, *Ashford University's Administration of the Title IV, Higher Education Act Programs*, Final Audit Report, January 2011.

[654] Kaplan Internal Correspondence, June 2009, re: *Kaplan Higher Education Corporation Reserve Estimate for Kaplan Choice Loans* (KHE 0037010).

[655] Higher Education Opportunity Act of 2008, Pub. L. No. 110–315, § 101, 122 Stat. 3086 (2008), available at http://www.gpo.gov/fdsys/pkg/PLAW-110publ315/pdf/PLAW-110publ315.pdf (accessed July 3, 2012).

[656] Technically, the act allows schools to count the "net present value" of the loans at the time of disbursement. The net present value is an estimation of the ultimate value of the payments over the life of the loan taking into account defaults and inflation. The Department of Education later enacted a regulation allowing schools to simply count 50 percent of the value of an institutional loan instead of going through the net present value calculation. Most schools have elected this approach. Under the act, colleges may not sell those loans to investors until they have been in repayment for 2 years.

[657] Corinthian investor call, August 2009.

[658] Corinthian investor call, February 2010.

after discount, we get the benefit of that in our 90/10 calculation as part of the 10 percent." [659] When Corinthian introduced the program, students were charged as much as 18 percent interest. Similarly, EDMC created a new "Education Finance Loan" program in 2008, carrying interest rates up to 11.2 percent. The company made $19 million in loans in 2009, and more than tripled the size of the program the next year to $65.9 million.[660] However, with the temporary exception soon expiring, EDMC announced that it would shut down its institutional loan program and look to sell off the loans that it holds on its books.[661]

Additionally, education companies have partnered with Wall Street investment banks to devise lending programs that, through an impressively complex series of financial transactions, allow them to count the amounts they lend to students—not just 50 percent—on the "10" side of the 90/10 ratio. These loan programs consist of pools of money arranged by Wall Street banks and used to fund student loans made by a third-party student lender. The student loans are packaged into securities and sold to investors. The for-profit education company essentially guarantees the loans by obligating itself to make "recourse" payments to investors in the event that an agreed-upon number of the loans default.[662] The Department of Education allows for-profit colleges to count proceeds from these loans on the "10" side of the 90/10 calculation at the time the loans are made.[663]

ITT, the first school to utilize Wall Street backed "recourse" lending on a large scale, partnered with Deutsche Bank to lend approximately $346 million to its students.[664]

---

[659] Corinthian investor call, February 2010.

[660] EDMC investor call, March 2010.

[661] Daniel Malloy, "EDMC ends loans during tough times for industry," *Pittsburgh Post-Gazette*, May 11, 2012, http://old.post-gazette.com/pg/11079/1133033-28.stm (accessed May 11, 2012).

[662] The structure of the transactions also provide other mechanisms of guarantee, such as over-collateralization and subordination.

[663] U.S. Department of Education, "Chapter 3: General GSA Participation Requirements," *Federal Student Aid Handbook*, vol. 2, p. 32, March 2009, http://ifap.ed.gov/fsahandbook/attachments/0910FSAHbkVol2Ch3GenRequirements.pdf (accessed May 11, 2012).

[664] As part of this program, the company issued $300 million in senior debt to investors. ITT 8-K January 20, 2010.

ITT PEAKS Transaction Flowchart[665]



According to an analysis by Morgan Stanley, the PEAKS program allowed ITT to lower its 90/10 ratio by about 10 percent.[666] In June 2011, Corinthian entered into an arrangement similar to ITT's. Corinthian was clear about the reasons for entering into the transaction; the company told investors, "the ASFG arrangement helped us meet our 90/10 requirement of generating at least 10 percent of revenue from non-title IV sources." [667] The arrangement called for $450 million to lend to Corinthian students over 2 years. According to ASFG's Web site, its student loans carry an interest rate of 11.9 to 17.9 percent, nearly three and a half times the current Federal subsidized interest rate of 3.4 percent.[668] Corinthian is obligated to purchase every loan on which no payment has been made for 90 days, essentially guaranteeing a profit for investors. The company expects that it will be obligated to buy back about 55 percent of the loans, in line with its previous "Genesis" institutional loan program in which the company set a reserve of 55 percent based on their own internal analysis of expected defaults.[669] Although Corinthian's Genesis loan program was already large by industry standards, the new loan program will have an even larger impact on Corinthian's 90/10 number. Assuming that $225 million is lent to students each year, judging by the company's 2010 financial results, it will be able to lower its consolidated 90/10 number by more than 10 percent. Without this Wall Street transaction, Corinthian would be at risk of exceeding 90/10.

---

[665] ITT, Program for Education and Knowledge Access (PEAKS) Summary of Transaction Details, January 18, 2010 (ITT- 00146556).

[666] Suzanne E. Stein, Gregory Jonas, Thomas Allen, Todd Castagno and Keith Paxton, *ITT Educational Services: Accounting Treatment of Loans Bears Watching*, January 11, 2012, http://pg.jrj.com.cn/acc/ Res%5CCN_RES% 5CINVEST%5C2012%5C1%5C18%5C636 7af6a-afa9-49dc-85ae-e4d6a693e127.pdf (accessed May 24, 2012).

[667] Corinthian Investor Call, Q3 August 2011.

[668] See, for example, FinAid, *Private Student Loans*, The SmartStudent Guide to Financial Aid, http://www.finaid. org/loans/privatestu-dentloans.phtml.

[669] Corinthian Colleges, Inc. Form 8-K for Period Ending 6/29/11.

*Pursuing Military Benefits*

For-profit institutions have strong incentives that drive the industry's pursuit of veterans' and servicemembers' benefits. One prominent reason is that the recent expansion of veterans' education benefits provides a huge new pool of Federal-taxpayer dollars that are risk-free revenues because they come in the form of grants, not loans, with no obligation to repay and no risk of default. This pool is particularly enticing to for-profit colleges eagerly looking to expand their enrollment or facing problems with meeting 90/10.

Because neither Department of Defense (DOD) nor Veterans Affairs (VA) educational benefits originate in title IV of the Higher Education Act, money received through these programs is not counted as Federal financial aid for the purposes of 90/10. Because of this loophole, the rule considers DOD and VA funds as non-Federal aid by allowing these funds to be counted on the "10" side of the calculation.[670] At least 18 companies received at least 2 percent of revenues from Federal military educational benefit programs.[671] These funds have a significant potential to affect compliance with the 90/10 rule. As Ms. Hollister Petraeus, head of the Office of Servicemember Affairs at the Consumer Financial Protection Bureau, testified before the Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security on September 22, 2011, this loophole creates "an incentive to see servicemembers as nothing more than dollar signs in uniform, and to use some very unscrupulous marketing techniques to draw them in." [672]

This focus on recruiting servicemembers and veterans primarily as a 90/10 compliance strategy is documented in the materials produced to the committee. The companies' internal communications reflected their strong interest in enrolling military students.[673] For example, Bridgepoint's CEO Andrew Clark said in a presentation to Deutsche Bank:

> We believe that when we are able to report our 90/10 for 2009 that it should decrease and we think that decrease from 2008 will be due to our tuition assistance that our students are receiving through the military and our penetration in particular into the military market. We've had a lot of success in that are. . . . Our military enrollment grew from 1% in 2007 to 17% [in] September 2009.[674]

In a July 2010 memo, a consulting company employed by at least one for-profit education company identifies "military spouses" as a prime source of new students to help meet 90/10:

---

[670] See H.R. Rep. No. 1943, 82nd Congress (1952).

[671] Companies receiving more than 2 percent of revenues from post-9/11 GI bill benefits or from Deaprtment of Defense programs are: Alta, APEI, Apollo, Bridgepoint, Capella, Career Education Corp., Concorde, DeVry, ECPI, EDMC, Grand Canyon, ITT, Kaplan, National American University, Remington, Strayer, TUI, and UTI.

[672] Testimony before Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security, U.S. Senate Committee on Homeland Security and Governmental Affairs, September 22, 2011.

[673] A Kaplan email described "active duty military and veterans as the big driver of non-title IV money" and stated that within Kaplan's criminal justice program active duty military and veterans make up 16 percent of the enrollments but 34 percent of the non-title IV revenue. Kaplan Internal Email, February 2010, re: *90-10 Only Data v3.0.xlsx* (KHE 226920, at KHE 226921).

[674] Bridgepoint CEO Andrew Clark Presentation to Deutsche Bank Conference, February 8, 2010.

Probably one of the most important potential short and long-term targets . . . are the 800,000-plus military spouses who have been authorized . . . for a one-time entitlement of up to $6,000. [Also] under the most recent G.I. Bill, [servicemembers and veterans] **can authorize up to 50 percent of his/her education benefits for the spouse to continue their education.** Therefore, in theory, every spouse has access to two separate sources of funding [emphasis in original]. [675]

At Kaplan, a high level executive sent an e-mail proposing possible strategies to address the company's 90/10 situation. His eight-point list of strategies led with: "1. Accelerate military billings/ collections at [Kaplan University]. Go to D.C. and pick up the check if you have to." [676] Kaplan's chief financial officer replied to another email titled "*Active Military Update*" by stating: *"How can we get the money faster? This is important for meeting 90.10."* [677] That sense of urgency was reflected by Kaplan's financial investment in recruiting servicemembers and veterans. According to a Kaplan executive presentation provided to the committee, Kaplan planned to spend $29 million between 2009 and 2011 on military recruitment and marketing. While not all of these funds were ultimately committed, the plan called for a variety of uses, including dedicated military recruiting field staff and advertisements. [678] Kaplan ultimately collected $44 million in post-9/11 GI bill funds between 2009 and 2011, and $8.5 million of Department of Defense Education Benefits in fiscal year 2011. [679]

An email exchange between executives at Education Management Corporation (EDMC) demonstrates a similarly determined attitude towards maximizing military families' benefits. A July 2010 email from the vice president for EDMC's Art Institute Online reported that she wanted to "ensur[e] we are leveraging the military spouse benefits to the fullest extent possible*"* for 90/10. [680] In February 2012, the Art Institutes, in partnership with Military Families United, announced a scholarship program specifically for military spouses to augment their earned benefits. [681]

The president and vice president of Herzing, a smaller Wisconsin-based chain of 12 campuses and an online division, similarly discussed whether or not to participate in the post-9/11 GI bill's yellow ribbon initiative, they showed a similar focus on 90/10. [682] The vice president acknowledged that they were "all in agreement that we should do this for 90/10 if nothing else." [683]

---

[675] Consultant Memorandum, July 2010, (EDMC-916-000228224). The consultant's Web site lists a number of colleges, including Corinthian, Des Moines Area Community College, George Mason and University of North Texas, as clients but EDMC was never a client of Strategic Partnerships. See Strategic Partnerships LLC, Clients, http://strategicpartnershipsllc.com/clients.cfm (accessed June 28, 2012).

[676] Kaplan Internal Email, November 2009, re: *FW: KU 90/10 Issue* (KHE 211344).

[677] Kaplan Internal Email, October 2009, re: *FW: Active Military update* (KHE 292824).

[678] Kaplan Internal Presentation, *Kaplan Military University* (KHE 267384)

[679] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, Title IV *Program Volume Reports for Kaplan*, 2009, http://federalstudentaid.ed.gov/datacenter/programmatic.html.

[680] EDMC Internal Email, July 2010, re: *FW: Possible Opportunities for EDMC "90:10"* (EDMC-916-000228222).

[681] Robert Jackson,"Military Families Deserve Access to Career Colleges," *Stars and Stripes*,March 16, 2012, http://www.stripes.com/ military-families-deserve-access-to-career-colleges-1.171843 (accessed May 20, 2012). See also Education Management Corporation, "Military Families United Partners with The Art Institutes to Provide Scholarships to Spouses of All Armed Forces Members," Press Release, February 3, 2012, http://phx.corporate-ir.net/phoenix.zhtml?c=87813&p=irol-newsArticle&ID=1656526&highlight= (accessed May 20, 2012).

[682] Herzing University enrolled 6,578 students in 2009, compared to EDMC's 136,000 and ITT's 79,208. U.S. Senate HELP Committee staff analysis of Department of Education Data and company SEC Filings.

[683] Herzing Internal Email, February 2009, re: *RE: Veterans Yellow Ribbon Program (Feb 27 deadline)* (H0000728).

*Conversion to Non-Profit Status*

Two for-profit colleges, Keiser and Remington, have gone as far as to convert from for-profit to non-profit status, at least in part to avoid violating 90/10.[684] However, it is unclear whether this change in tax status has been accompanied by a corresponding change in the companies' business practices.[685] Both companies have essentially "sold" the for-profit companies to a non-profit arm that appears to be controlled by the same owners. In both cases, a loan from the for-profit company was made to the non-profit arm in order to then "purchase" the company.[686] For the original for-profit entity and its owners, the payment of this debt will allow them to earn a continuing profit from these debt payments. These transactions raise fundamental questions about using non-profit status as a shield to avoid regulatory review.

In January 2011, Keiser University announced that the company, privately held by Arthur Keiser and other members of the Keiser family, had been sold to Everglades College Inc., a non-profit entity created by the Keiser family in 2000. Everglades is receiving part of the company as a donation, and is acquiring the rest through a purchase financed through a loan from Keiser University.[687] In describing the change, Arthur Keiser specifically noted that the change was not expected to affect tuition and fees or program offerings, saying, "it's operating in the same way, with the same people; the only difference is that it's owned by a nonprofit." [688] In May, 2011, Mr. Keiser was re-elected as chairman of the Association of Private Sector Colleges and Universities, the main trade association that represents for-profit colleges, and Keiser University remains a member of the association.[689]

A week after Keiser announced its acquisition by Everglades, Remington College announced that it had made a loan to non-profit Remington Colleges, Inc., in order to buy Remington College, thus converting itself to non-profit status. Remington is expected to pay back the sales price, which was not disclosed, over 15 years, from its excess cash flows. All the managers and executives will continue to work for the college, and the founder will serve as a consultant to the college and has been appointed to

---

[684] There are three additional issues with these conversions that require attention: (1) the terms of the deals and whether the sale of the schools to the non-profits was done to the private benefit of the owners, (2) whether the compensation of the executives of the now non-profit schools is unreasonable, and (3) whether converting to non-profit status in order to avoid Federal regulation without accompanying changes in operation is commensurate with serving a purely educational and charitable public purpose that warrants exemption from Federal taxes. Neither Remington nor Keiser publicly disclosed the terms of their transactions. On its face, this raises questions about how the values of the schools were determined. No publicly available information reveals whether appraisers were brought in, whether they received second opinions, and what process was used to determine the value of intangibles. The Keiser School, Inc. ("Keiser") is a for-profit higher education company that enrolled 18,956 students as of 2010 and is based in Fort Lauderdale, FL.

[685] In the words of Barmak Nassirian "Until now, the very purpose of this entity was to be a profit-maximizing firm. Now we're being told it has suddenly taken a 180-degree turn and become a charity?" Scott Travis, "Keiser Becomes a Nonprofit; Move Could Mean More State Aid," *Sun Sentinel*., January 18, 2011, available at http://www.accessmylibrary.com/article-1G1-247153443/keiser-becomes-nonprofit-move.html (accessed May 20. 2012).

[686] Goldie Blumenstyk, "For Some Colleges, the Road to Growth is to Go Hybrid," *The Chronicle of Higher Education*, http://chronicle.com/article/For-Some-Colleges-the-Road-to/126001/ (accessed May 20, 2012); Goldie Blumenstyk, "Another College Takes the Path From For-Profit to Nonprofit," *The Chronicle of Higher Education*, January 20, 2012, http://www.intered.com/storage/deptofed/CHE_AnotherCollegeGoesNonProfit.pdf (accessed May 20, 2012).

[687] Goldie Blumenstyk, "For Some Colleges, the Road to Growth is to Go Hybrid," *The Chronicle of Higher Education*, http://chronicle.com/article/For-Some-Colleges-the-Road-to/126001/ (accessed May 20, 2012).

[688] Id.; Scott Travis, "Keiser Becomes a Nonprofit; Move Could Mean More State Aid," *Sun Sentinel*, January 18, 2011, available at http://www.accessmylibrary.com/article-1G1-247153443/keiser-becomes-nonprofit-move.html (accessed May 20, 2012).

[689] committee staff were informed by company executives that he is no longer serving in this role.

serve on its new five-member board.[690] Meanwhile, as recently as January 20 (after the change to non-profit status), Jack W. Forrest, president and CEO of Remington, was still referring to revenue in excess of operating expenses as "profits."[691] Notably, Remington has not made dramatic changes to its business operations since becoming a non-profit.

Both Keiser and Remington had been struggling to meet the regulatory requirement to keep Federal revenue under 90 percent.[692] According to data provided by the Department of Education, Remington had a 2009 90/10 ratio of 84.3 percent.[693] However taking into account the additional $2,000 per student in Stafford funds that companies could permissibly exempt under the Ensuring Continued Access to Student Loan Act (ECASLA), the company may have excluded an additional $10.5 million in Federal revenues.[694] If this amount is included, the proportion of the company's revenue derived from Federal sources could be as high as 91.3 percent.[695] When Remington would no longer be able to take advantage of the ECASLA exception, the company would have faced exceeding 90/10 at some of its OPEID groups. Remington's President indicated that the conversion to non-profit status was driven, at least in part, by concern over exceeding 90/10.[696]

While the full purpose of the conversions remains unclear, converting to non-profit status to avoid a regulation would seem to defeat the purpose of the non-profit tax status, which is to provide an educational and charitable public purpose that justifies exemption from Federal taxes.

Student Loan Default Rate Management And Manipulation

The Higher Education Act provides that colleges (defined by OPEID numbers) lose access to Federal aid money if more than 25 percent of students default on student loans within 2 years of entering repayment, which typically occurs 6 months after a student graduates or withdraws.[697] The regulation applies to all colleges and universities, whether public, non-profit, or for-profit. The Higher Education

---

[690] Goldie Blumenstyk, "Another College Takes the Path From For-Profit to Nonprofit," *The Chronicle of Higher Education*, January 20, 2012, http://www.intered.com/storage/deptofed/CHE_AnotherCollegeGoesNonProfit.pdf (accessed May 20, 2012).

[691] Id.

[692] The U.S. Department of Education has advised Remington that it may require the college to continue to adhere to the 90-10 rule for a few years as a condition of the conversion. Goldie Blumenstyk, "Another College Takes the Path From For-Profit to Nonprofit," *The Chronicle of Higher Education*, January 20, 2012, http://www.intered .com/storage/deptofed/CHE_AnotherCollegeGoesNonProfit.pdf (accessed May 20, 2012).

[693] U.S. Department of Education, *Proprietary Schools 90/10 Revenue Percentages Tracked Over Student Aid Award Year*, http://federal-studentaid.ed.gov/datacenter/proprietary.html. See Appendix 10.

[694] See Appendix 10.

[695] 91.8 percent when military educational benefits are included.

[696] Goldie Blumenstyk, "Another College Takes the Path From For-Profit to Nonprofit," *The Chronicle of Higher Education*, January 20, 2012, http://www.intered.com/storage/deptofed/CHE_AnotherCollegeGoesNonProfit.pdf (accessed May 20, 2012).

[697] Under 34 CFR 668.187(a) a school loses eligibility for Federal loans if the cohort default rate is greater than 40 percent in a single year, or if the cohort default rate is greater than 25% for each of the 3 most recent years. An institution's CDR is the percentage of the institution's former student borrowers who entered repayment on a Federal student loan during the relevant cohort year who defaulted before the end of the next government fiscal year following the cohort year. The government fiscal year begins on October 1. Therefore, for example, a student who leaves school in August 2010 would enter repayment after the 6 month grace period in February, 2011. This student would be included in the school's fiscal year 2011 cohort default rate. If the student defaults any time before the start of fiscal year 2013 on October 1, 2012, then the student would be counted as a "defaulter" under the current 2-year window. Under the 3-year window, if the student defaults any time before October 1, 2013, the student would be counted as a "defaulter." Under the Direct Loan program, default is defined as 360 days of delinquency.

Opportunity Act amended the law so that, in 2014, colleges will be required to demonstrate that no more than 30 percent of students default on Federal student loans within *3* years of entering repayment on their loans.[698] Although penalties would not apply until 2014, the Department of Education has published the 3-year rates since 2009.

Default rates among all sectors of higher education have increased in recent years. But, the trend among for-profit schools is particularly steep. For example, Lincoln Educational Services, Inc., reported a 3-year default rate of 21.6 percent for students entering repayment in 2005.[699] Four years later, for students entering repayment in 2008, the rate had climbed to 27.7 percent.[700] DeVry saw a 40 percent growth in the portion of its students defaulting between 2005 and 2008.[701] Bridgepoint-owned Ashford University saw its default rate more than double in the same time period.[702]

Because continued financial aid eligibility hinges on default rates, schools that have high rates of students defaulting attempt to lower their rates through a variety of means known as "default management." Default management is not intrinsically negative. It may involve a multitude of strategies premised on sound goals, such as enrolling students who are likely to graduate and succeed, giving those students the support and tools they need to learn and secure a degree that is valued in the job marketplace, helping them secure a well-paying job, and offering financial literacy classes and quality debt counseling.

The Department of Education encourages all colleges to contact students who are delinquent on Federal student loan payments in order to help those students avoid the negative and lasting consequences of default. These contacts can include alternative repayment counseling and helping students address obstacles to repayment. However, when contacting delinquent students results in the majority of those students being placed in forbearance or deferment rather than repayment and when these policies simply delay default, the practice crosses a line from default management to default manipulation.

While assisting with students' debt repayment can be helpful to students, the committee's investigation has revealed that many for-profit schools are deploying tactics to delay student loan defaults, not to protect the student, but rather to protect the college so that they do not lose access to Federal taxpayer-funded student aid dollars—the lifeblood of the for-profit model. Many for-profit schools have chosen instead to commit significant resources to sophisticated operations that keep students out of default for the duration of the 2-year (and now 3-year) monitoring window by aggressively signing students up for forbearance and deferment to temporarily delay loan payments. This practice is troubling for taxpayers. The cohort default rate is designed not just as a sanction but also as a key indicator of a school's ability to serve its students and help them secure jobs. If schools actively work to place students in forbearance and deferment, this means taxpayers and policymakers fail to get an accurate assessment of default rates.

---

[698] Beginning with the fiscal year 2014 cohort, a school loses eligibility for Federal loans if the 3-year cohort default rate is greater than 40 percent in a single year, or if the cohort default rate is greater than 30 percent for each of the 3 most recent years.

[699] Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-8, http://federal-studentaid.ed.gov/datacenter/cohort.html. See Appendix 16.

[700] Id.

[701] Id.

[702] Id.

A school that has large numbers of students defaulting on their loans indicates problems with program quality, retention, student services, career services, and reputation in the employer community. Aggressive default management undermines the validity of the default rate indicator by masking the true number of students who end up defaulting on their loans over the long run. Critically, schools that would otherwise face penalties—including loss of access to further taxpayer funds—continue to operate because they are able to manipulate their default statistics.

While many of these tactics appear to cross the line from default management to default manipulation, particularly when efforts to keep students out of default abruptly halt at the close of the 3-year monitoring period, current law and regulations provide little guidance about what procedure constitutes appropriate default management and what amounts to manipulation.

*Forbearance Operations*

Data provided to the committee, internal documents, and statements made to the companies' investors make clear that many schools are achieving lower cohort default rates by committing resources to efforts to routinely place former students into forbearance and deferment.[703] Deferments and forbearances can be extended for 3 years, meaning that a school can use these options to effectively ensure that a student will not show up in the school's cohort default rate. And schools pursue these goals aggressively. Career Education Corporation's 2009 default management guide shows that a student would be contacted an average of 46 times by phone, plus 12 times by letters and emails, once that student's loans entered repayment.[704]

In and of themselves, deferment and forbearance are simply tools available to help a student get through a temporary period when he or she is unable to make payments on loans. However, evidence suggests that some for-profit colleges use forbearance and deferment as tools for manipulating the school's default rate, without concern for a student's particular situation or whether it is the best financial decision for the individual. As one for-profit executive from ECPI explained, "Career colleges have worked hard to manage their default rates for the cohort period, which has been a considerable job and expense, but beyond that period, we know there is a big drop off for most." [705] A Remington executive stated, "we've known all along what ED finally figured out—that most of the borrowers who receive

---

[703] Forbearance can be mandatory or discretionary. The loan holder may grant a forbearance up to 12 months at a time. During the forbearance period, interest continues to accrue on all loans, and the interest is added to the principal at the end of the forbearance. Crucially, a forbearance can be granted verbally over the phone as long as the loan holder sends the borrower confirmation of the terms of the forbearance within 30 days. Deferment must be granted by the loan holder for students and is limited to following situations: pursuing at least half-time study at an eligible school, in a graduate fellowship program approved by the U.S. Department of Education, in a rehabilitation training program, for individuals with disabilities approved by the U.S. Department of Education, active duty military service, actively seeking but unable to find full-time employment, or experiencing economic hardship. The unemployment and economic hardship deferments are available for up to 36 months; a student must re-apply periodically. During the deferment no interest accrues on subsidized loans. Interest continues to accrue on non-subsidized loans, and the interest is added to the principal at the end of the deferment period.

[704] Career Education Corporation, March 2009, *Cohort Default Management Plan* (CEC000012944, at CEC000012950). Even with such repeated student contacts, CEC had a consolidated default rate of 21.6 percent, the rate at one campus exceeded 31 percent, and another three surpassed 25 percent. Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-8, http://federalstudentaid_ed.gov/datacenter/cohort.html. See Appendix 16.

[705] ECPI, November 2007, re: *RE: Grijalva Amendment Yesterday* (E0016579, at E0016580). ECPI is a for-profit higher education company that enrolled 13,119 students as of fall 2010 and is based in Virginia Beach, VA.

payment postponements (forbearance, deferment) during the cohort period ultimately default after the postponement ends.  That's the primary reason ED made the change to 3-yr CDR—they decided we were getting off too easy." [706]

Moreover, forbearances may not always be in the best interest of the student. This is because, during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues. The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance. Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment. A student who enters forbearance for 36 months will end up paying about 20 percent more over the life of their loan.[707] For example, the average Vatterott student left school (withdrew or graduated) with roughly $11,000 in debt. According to Department of Education data, if the student has trouble paying back his or her loans and enters into a forbearance at the behest of the school, the student will end up paying $3,100 more over the next 10 years of the loan.[708] At Chancellor, the average former student carries $18,267 in debt, and would end up paying $5,146 more if she signed up for forbearance for 3 years.[709]

For many students, moreover, forbearance will simply push default further down the road; Pauline Abernathy, vice president of the Institute for College Access and Success, testified at the committee's June 2011, hearing: "Putting students willy-nilly into forbearance when it is not in their interest to be in forbearance just increases the likelihood of default." These students still face a high risk of default, but on a higher balance. Thus, this delaying tactic may help a school while harming students.

Eric Schmitt, a former Kaplan student who also testified at the committee's June 7, 2011, hearing, discussed his loan situation:

> I owe $45,000 in student loans without a permanent job to pay those bills, only very rarely in the past seven years since completing my associates, have I been able to make any payments at all and the debt continues to pile up. The loans from my Associate degree went in default late last year. The loans from my Bachelor's degree are in deferment, but I have no idea how I will manage after my deferment time runs out. Because of the deferment and forbearances, the interest has added more than 10 percent on top of my original balance, and in this battle, it seems even time is against me.[710]

While registering for income-based repayment, a Federal program that adjusts monthly loan payments to fit a student's income, requires time and paperwork, securing a forbearance can be done

---

[706] Remington, December 2009, RE: *RE: Cohort Default Rates—Three Year Calculation Publication* (Remington 22-000144).

[707] Career College Association presentation, June 2009, *Default Prevention at the Campus Level* (HELP-CCA_000001).

[708] Assuming a 6.8 percent interest rate, and 120 monthly payments remaining at the time of forbearance. See forbearance loan calculator at Student Loan Finance Corporation, *Forbearance Calculator*, https://www.slfc.org /slfcPresentationTier/slfcPortal.portal?_ nfpb=true&planForCollegePortlet_actionOverride=/portlets/tools/CalculateCostOfForb (accessed May 12, 2012).

[709] Chancellor University LLC ("Chancellor") is a for-profit higher education company that enrolled 739 students as of fall 2010 and is based in Seven Hills, OH.

[710] Eric Schmitt (Hampton, IA), Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Drowning in Debt: Financial Outcomes of Students at For-Profit Colleges*, 112th Congress (2011).

quickly. Thus, the forbearance option has become the *de facto* tool to lower a school's default rate. Many loan servicers allow forbearances over the phone, with just a "yes" from the student. "Get comfortable with doing a verbal forbearance!!!," instructs EDMC's Spring 2010 Default Prevention presentation.[711] Many schools counsel students on how to enter forbearance or deferment before telling them about different repayment options. Concorde Career College's form letter sent to students who have fallen behind on their loan payments does not mention alternative repayment options, only that the student "may be able to exercise the right to delay [his or her] payments through deferment or forbearance options." [712] Likewise, the Concorde telephone script for calling students mentions only forbearance and deferment, not repayment.[713] The company states that these documents are no longer in use.

Internal documents show that some schools pay lip service to other options, such as alternative repayment plans, but in practice still focus on getting students into forbearance because it is the easiest for the school. For instance, a for-profit school executive told his default-management subordinates, "we do know that [forbearance] is the only successful answer most of the time," but "we need to modify our message to students slightly" so it does not appear "to focus entirely on forbearance." [714]

This strategy has proven effective for the schools. At Capella, forbearances and deferments equal 9.4 percent of students who are counted as "in repayment" and therefore excluded from the default rate.[715] ECPI executives estimated that as many as 90 percent of late-stage delinquencies that are cured, meaning kept out of the default rate, are "cured through [forbearance and deferment] and some by consolidation." [716] ECPI showed an overall 2008 3-year default rate of 23.2 percent, with one of its three OPEID campuses reporting a 29 percent default rate. An ECPI default-management employee, after securing a forbearance from a former student, commented to her boss, "Wow, this will be #10 [forbearance/deferment] submitted this week. . . . Also, there are a few that have called servicer to request [forbearance] due to our calls." Her boss responds, "Are we good or are we good!!!" and then the vice president of Financial Aid chimes in, "This is great!" [sic]. [717] That same vice president prepared a speech for a leadership institute explaining cohort default rate manipulation before the change to a 3-year window: "So, what do we have to do to keep someone out of default? On average, we only have to get students to pay or forbear their loans for 6 months! With the proper effort, it really isn't that hard to keep your default rate low!" [718] The "proper effort" includes plenty of attempts at contacting students and putting them into forbearance.

*Third-Party Default Management Vendors*

As default rates have increasingly become a problem for for-profit colleges, many have turned

---

[711] EDMC Internal Presentation, *September 2010, Default Preventation: EDMC, Spring 2010* (EDMC-916-000083630, at EDMC-916-000083647).

[712] Concorde External Correspondence, Form Letter From a Loan Management Advisor (CCC000060626).

[713] Concorde Internal Document, Script for Calling Students Delinquent on Loans (CCC000052355).

[714] ECPI Internal Email, November 2008, re: *RE: Ecpi Laon Help* (E0016551, at E0016553) .

[715] Capella Internal Email, February 2010, re: *FW: Active Repayment* (CAPELLA-1291450).

[716] Id.
 ECPI Internal Email, July 2010, re: RE: FY09 rates (E0016590).

[717] ECPI Internal Email, November 2008, re: *RE: Ecpi Loan Help* (E0016551, at E0016553).

[718] ECPI Internal Document, Script for Presentation on Default Management (E0007942).

for help to General Revenue Corporation (GRC), a subsidiary of Sallie Mae. Among other services, GRC operates call centers with hundreds of employees trained to "cure" student defaults. While GRC counsels delinquent students on all repayment options, including income-based repayment options, internal documents demonstrate that the majority of students approached by GRC end up in forbearance, leading to increased debt. At least 12 of the 30 companies examined by the committee contract with GRC for default management services. [719] Documents obtained from 4 large for-profit education companies demonstrate that, on average, over 75 percent of the students GRC "cured" were forbearances or deferments, while only 24 percent were the result of a student making payments on their loans. [720] For example, of 776 student cures handled on behalf of DeVry Inc., 64 percent (590) were forbearances, another 13 percent (97) were deferments, and 24 percent were payments. Unlike other companies, DeVry prioritizes repayment by paying GRC a bonus for students placed in repayments and deferments, but not for forbearances. [721] Other companies, such as Corinthian and ITT, pay this bonus regardless of the type of cure. This bonus can be as much as $120 per cure, on top of the standard fee of $30 to $40 for each student account placed with the company. [722]

---

[719] They are Apollo, Bridgepoint, Capella, Corinthian, DeVry, EDMC, ITT, Kaplan, Lincoln, National American, Rasmussen, and Strayer.

[720] ITT Internal Record, August 2010, Cohort Default Management Solutions Executive Dashboard: Table of Key Performance Indicators (ITT-00002316); Bridgepoint Internal Records, August 2010, Cohort Default Management Solutions Executive Dashboard: Table of Key Performance Indicators (BPI-HELP-00049480); DeVry Internal Presentation, August 2010, *Default Management Update* (DEVRY0037185), Strayer, July 2010, Cohort Default Management Solutions Executive Dashboard:Table of Key Performance Indicators (SC-HELP-014911).

[721] DeVry, Services Agreement with General Revenue Corporation (DEVRY0037204), DeVry Internal Presentation, August 2010, Default Management Update (DEVRY0037181).

[722] Corinthian, June 2010, *First Amendement to Cohort Default Management Services Agreement* (CCi-00067423), ITT, June 2010, *First Amendment to Cohort Default Management Services Agreement* (ITT-00002281).



*Case Study: Corinthian Colleges, Inc's Default Management*

Corinthian Colleges, Inc., which operates the Everest, Wyotech and Heald brand schools, has some of the highest default rates among all institutions of higher education. For the 65,485 Corinthian students who entered repayment on their loans in 2008, 12,671 defaulted within 2 years, and 23,623 defaulted within 3 years. All 14 of Corinthian's Everest campuses, as well as two Heald and two Wyotech campuses in California, were recently removed from eligibility for California's student grant program because those campuses had a default rate of more than 24.6 percent.[723]

Faced with the switch to a 3-year default rate measurement, Corinthian began to dedicate millions of dollars and employee hours to reduce the company's reported default rate. Company executives told investors in May 2011, "Forbearance, as you well know, is a pretty easy, just a question you have to agree to it and you're on your way [sic]." [724] The company made it clear that while the *company* was seeing benefits from the effort, the number of students repaying their loans was virtually unchanged: "Our payment rate really has not moved a whole heck of a lot from where it was prior to this effort." [725]

---

[723] Corinthian owns more than one-fourth of the schools suspended from the Cal Grant program. Nanette Asimov, "Some For-Profit Colleges Booted from Cal Grants," *San Francisco Chronicle*, February 6, 2012, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2012/02/05/BAU11N1V83.DTL (accessed May 14, 2012).
[724] Corinthian Investor Call, Q3 May 2011.
[725] Id.

To accomplish a lower reported default rate, Corinthian hired three contractors. One was General Revenue Corporation, which devoted 60 full-time employees to call former Corinthian students who were late making payments but not yet in default. The company also hired two firms, ROI and TEAM Enterprises, to send out 30 or more people to knock on former students' doors to secure "cures." [726] This same document reveals that students in late stages of delinquency but not yet in default—a period during which they are the biggest threat to Corinthian's default rate—could be contacted up to 110 times per month. Another internal document shows that, in order to achieve the company's desired default rate, the call center run by General Revenue Corporation would make between 2 and 2.5 million calls a year, or 429 calls per employee per day to former Corinthian students.[727]

Corinthian also built its own internal default-management operation, complete with a call center and dozens of employees.[728] Documents show that the default-management operations at Corinthian are run with the same high-pressure sales environment as the recruiting department. Compensation is directly tied to the number of students an employee successfully eliminates from the company's default rate. An internal training presentation for default management employees explains that the final step in the cure process is to "close the sale." [729] Corinthian began offering students gift cards to McDonald's in February 2010 in certain "high CDR [Cohort Default Rate] OPEID's" to incentivize students to contact the default management department. The campaign was conducted by email and mobile phone text messages, and the messages explicitly referred to postponing student loan payments. Emails show that managers pushed employees to secure as many "cures" as possible. "Team Central . . . you did it!" reads one email sent to dozens of line-level default management employees, "we cured 243 students on Wednesday . . . our Division is leading CCi and that is a direct reflection of your daily efforts to drive down our CDR." [730]

In addition to this message of encouragement, other emails demonstrate a willingness to reprimand employees if targets are not hit: "Tuesday saw the lowest number of staff calling in the past several days. This lead to less calls and less students we talked to. We all know two truths: This must be a campus-wide effort and this is definitely a numbers game." [731]

Once the student defaults, the company is no longer interested in counseling: According to their model, efforts at contacting defaulted students drop significantly once a student defaults.[732] Moreover, helping students find a job that allows them to repay their loans, which is more difficult than securing a forbearance, is a lower priority. While the student may get hundreds of calls from the default-management offices, Corinthian career services contacts students two to four times per month in the first months after graduation, then not at all if a student becomes delinquent on their loans.[733]

On February 28, 2012, Corinthian announced that it was offering its Everest College campuses in Hayward, San Jose, San Francisco, and the Wilshire area of Los Angeles for sale, noting that while these

[726] Corinthian Internal Presentation, *Default Prevention Operations* (CCi-00056216).
[727] Corinthian Internal Presentation, *Financial Aid and Default Prevention Organization* (CCi-00057049, at CCi-00057051).
[728] Corinthian Internal Presentation, *Default Prevention Operations* (CCi-00056216).
[729] Corinthian Internal Presentation, *Counseling at Risk Borrowers* (CCi-00056493, at CCi-00056505).
[730] Corinthian Internal Email, April 2010, re: *CDR Daily Activity 4-28-10* (CCi-00068416).
[731] Corinthian Internal Email, April 2010, re: *CDR Daily Activity 4-20-10* (CCi-00068830).
[732] Corinthian Internal Presentation, *Default Prevention Operations* (CCi-00056216).
[733] Id.

campuses are doing well in terms of student achievement, their recent financial performance has not met the company's expectations.[734] Three of the four for-sale schools have 3-year default rates over 30 percent, calling into question the company's assertion that these campuses are doing well in terms of student achievement. Corinthian also announced that the company would be closing its Everest campuses in Ft. Lauderdale, Decatur, and Arlington for falling below the company's student outcome or financial performance standards.[735] The sale or closure of these seven campuses is likely to have a positive effect on Corinthian's default rates, and it may be that closing campuses that have poor outcomes is potentially in prospective students' interest.

Corinthian's default management strategy, put in place in 2009, is having a big impact. Thirty-six of the company's 49 OPEID campuses posted 3-year default rates over 30 percent for students entering repayment in 2008. Thirteen campuses posted rates above 40 percent. If the sanctions for the 3-year rate were already in effect, these campuses would be at risk of losing access to Federal financial aid, which accounts for nearly all their revenues.

For the following year's cohort, students entering repayment in 2009, the company was able to lower its default rate to 28.8 percent, a decrease of 7.3 percent from its 2008 rate.[736] Corinthian was especially successful in reducing the default rate of its worst performing OPEIDS. The company reported that zero OPEIDs had rates above 40 percent and only seven had rates above 35 percent. Corinthian touts these efforts as a successful investment, yet it is clear that the program is implemented to accomplish business goals, not to meet the needs of students.

Moreover, the CFO forecasted that, for the 2010 rate, the company would be able to achieve a consolidated 3-year default rate of 18 to 20 percent because of its sophisticated default-management operations.[737] That change is an unprecedented drop from the company's most recent default rate, demonstrating the effectiveness of its efforts.  With regard to 2-year cohort default rates, Corinthian recently announced that the rate had dropped from 21.5 percent for the 2009 cohort to an expected 6.7 percent for 2010, a 14.8 percent improvement in a year.[738]

| Corinthian Colleges Institutions by Default Rate | | |
|---|---|---|
| | 2008 3-Year Default Rates | 2009 3-Year Default Rates |
| Number of Institutions with a Default Rate above 40 Percent | 13 | 0 |
| Number of Institutions with a Default Rate above 35 Percent | 29 | 7 |
| Number of Institutions with a Default Rate above 30 Percent | 36 | 25 |
| Number of Institutions with a Default Rate above 25 Percent | 40 | 36 |
| Number of Institutions with a Default Rate below 25 Percent | 9 | 13 |

---

[734] Corinthian Colleges, Inc., Form 8-K Filed February 28, 2012.
[735] Id.
[736] Corinthian Colleges Inc, Form 8-K. Filed March 5, 2012.
[737] Corinthian Investor Call, Q3 August 2011.
[738] Corinthian Investor Call, Q2 May 2012.

*Use of Private Investigators*

Some schools, notably Kaplan and Rasmussen, have gone so far as to hire private investigators to track down students in order to sign them up for forbearances.[739] These investigators, normally accustomed to finding people who skip town on bail bonds or photographing cheating spouses, find former students and approach them with a forbearance form in-hand. Internal company documents make clear that private investigators, who are not trained in financial aid or debt counseling, are only authorized to present the student with the option of placing loans into forbearance and are paid only for forbearances.[740] In 2009, Kaplan, facing potential default rates above the 25 percent sanction threshold for at least six campuses, paid private investigators a bonus of $625 to $1,000 for *each* forbearance that they secured.[741] In all, the school spent more than half a million dollars on private investigators.[742] Similarly, in 2009, Rasmussen paid private investigators $2,000 per month for "signature gathering services" on forbearance forms.[743]

Through sophisticated default-management operations, including spending millions on contractors and consultants, some for-profit schools have undermined the effectiveness of the cohort default rate measurement. If a school can artificially maintain a low rate by signing high numbers of its former students for temporary forbearances, then the default rate does not paint a true picture of the school. Students may lose because they end up paying more on their student loans after entering forbearance, and, many times, the forbearance will simply push their default further down the road. In the words of one Grand Canyon executive, "students at a certain point run out of options and are no longer able to apply for forbearances and such.  They realize the payments are too high and they don't pay anything.  This is a new trend that has been recognized recently that more and more students are defaulting between years 3 and 4." [744] And taxpayers lose because high-default schools continue to access Federal student aid funds, including Pell grants and Stafford loan dollars.

The line between helping students who are late making payments on student loans avoid default, generally known as default management, and manipulating student default rates for purposes of regulatory compliance is not entirely clear. However, the investigation has demonstrated that manipulation of default rates is occurring and that tactics are being deployed that are not in the interests of students.

---

[739] The committee also notes that, at least in the case of Kaplan, concern that the company could lose access to financial aid as a result of having too many students in default, together with the company's internal analysis of the high correlation between default by students who enrolled for a short period, was at least partially responsible for the company's decision to implement the "Kaplan Commitment." While the committee views this program as an important protection for students—a disproportionate number of whom are Iowa residents—it is important to note that a key rationale for the program's implementation was to address the company's concerns about regulatory compliance with both the cohort default rate regulation and the 90/10 regulation.

[740] Kaplan External Correspondence, August 2008, re: *Terms of Engagement for Retention of Investigatory Services* (KHE 0036513).

[741] Kaplan Internal Presentation, July 2009, *Default Management Status Update and Strategy* (KHE 325968, at KHE 325979); Kaplan Internal Email, July 2009, re: *Delinquent Accounts for Top 6* (KHE 191661); Kaplan, July 2009, re: *RE: Deliquent Accounts for Top 6 + 2* (KHE 137350).

[742] Kaplan Internal Presentation, July 2009, *Default Management Status Update and Strategy* (KHE 325968, at KHE 325989, KHE 325994).

[743] Rasmussen, *Default Prevention & Management* (RAS00004217); Rasmussen Internal Presentation, *Default Management Department* (RAS00004301, at RAS00004313). The company states that it no longer uses private investigators.

[744] Grand Canyon Internal Email, September 2009, re: *RE: 2008 Default Rate Projections* (GCUHELP019302).

Return of Title IV Funds

In recent years, the Department of Education has uncovered instances of colleges, both for-profit and non-profit, improperly retaining unearned title IV student aid funds or not returning the funds in a timely manner. In the case of some for-profit colleges, rapid enrollment growth has led to situations where the financial aid department is overwhelmed by the number of students. In other cases, aggressive business practices result in schools keeping more money than they are entitled to.

When a student who receives Federal financial aid withdraws, the student's school is required to perform a calculation to determine whether any refund must be sent back to the Department of Education. Colleges, of course, prefer to keep as much Federal financial aid money as possible. Although the college may still charge a student directly for tuition and fees if the school is obligated to return Federal financial aid money, as a practical matter many students who withdraw cannot afford to pay and the school must expend resources to attempt to collect the bill.

The Department of Education disburses Stafford loans and Pell grants to schools, not students. The school then applies the funds towards tuition and fees, and, if there is any left over, the school sends a stipend check to the student. The Department sends money to cover an "award period," which can differ according to whether a school uses a quarter, semester or other academic period. A typical award period is 20 weeks. When a student withdraws, the amount of aid money "earned" is determined on a pro rata basis, meaning if a student attended class during 30 percent of the award period, the school keeps 30 percent of the awarded money. Once a student attends class for 60 percent of the award period, that school can keep 100 percent of the money.

In order to make this calculation, the school must determine the date on which the student withdrew. The Department of Education considers a student's withdrawal date to be the date the student began the school's official withdrawal process or provided official notification to the school of his or her intent to withdraw. When a student does not come to class or log in for an extended period, the school must determine that student's withdrawal date by figuring out the student's last date of attendance. A school must return unearned title IV funds within 45 days of the school determining the student's withdrawal date.

In January 2011, the Department of Education's Office of Inspector General (OIG) released a final audit report on Bridgepoint Education's Ashford University, and noted serious deficiencies in the school's return of title IV funds. The Inspector General discovered that Ashford did not properly calculate the amount of unearned funds it was required to return to the Federal Government, because it used an incorrect payment period length, last date of attendance, or tuition amount. As a result, Ashford improperly retained funds for 38 of the 85 students included in the OIG's audit sample. Extrapolating from this sample, the OIG concluded that Ashford improperly retained at least $1.1 million of title IV funds issued in 2006–7. Ashford received $81.4 million in title IV funds that year. Since that time, Ashford has grown enormously. In 2010, the school took in six times more, or $496.6 million, title IV funds. In addition, of the returns that Ashford did make, the school did not return title IV funds in a timely manner. Of

the 47 required returns in the audit sample, Ashford was late in paying 21 of them, or 45 percent.[745]

The Department has found similar problems at other for-profit schools. In an audit of Capella University, the OIG found that the school used the midpoint of the academic term as the withdrawal date for all students who unofficially withdrew, regardless of a student's actual last date of attendance. As a result, Capella improperly retained $588,000 in unearned title IV funds.[746] In an audit of Vatterott College, the OIG found that the school did not maintain adequate documentation of students' official withdrawal notifications, which could affect the determination of the students' withdrawal dates.[747] In a program review of Career Education Corporation's American Intercontinental University, the Department of Education found systemic problems with the school's policy for determining students' withdrawal dates and, therefore, problems with timely return of unearned title IV funds.[748] In an audit of Technical Career Institutes, Inc., a subsidiary of EVCI Career Colleges Holding Corp., the OIG reviewed files for 30 withdrawn students and determined that the school used incorrect withdrawal dates for 15 of those students.[749] The problems at these schools generally stemmed from a lack of adequate policies and procedures concerning the return of title IV funds.

Student aid programs provide taxpayer funds intended to be used to further students' education. When a college improperly retains this money, it is not being used for education. Rather, in the case of for-profit schools, it is money that adds to companies' profits. The college is no longer providing instruction and services to a student who withdraws in the middle of a term, but the college keeps money that is intended for that very purpose.

<u>Job Placement Rate Manipulation</u>

For-profit colleges market themselves as career focused, and entice students to enroll by offering the prospect of better jobs and better wages. Accordingly, for-profit colleges use job placement data to sell their offerings, and to satisfy national accrediting agencies and State regulators that they are performing adequately.

However, some for-profit colleges' job placement statistics have been plagued by irregularities and falsified data. A number of recent law enforcement investigations have revealed widespread falsification of placement rates at some colleges in the for-profit sector.

---

[745] U.S. Department of Education, Office of the Inspector General, *Ashford University's Administration of the Title IV, Higher Education Act Programs*, Final Audit Report, (pp.30) http://www2.ed.gov/about/offices/list/oig /auditreports/fy2011/a05i0014.pdf. (accessed May 17, 2012).

[746] U.S. Department of Education, Office of the Inspector General, *Capella University's Compliance with Selected Provisions of the Higher Education Act of 1965 and Corresponding Regulations*, Final Audit Report, (pp. 1) http://www2.ed.gov/about/offices/list/oig/ auditreports/fy2008/a05g0017.pdf. (accessed May 17, 2012).

[747] U.S. Department of Education, Office of the Inspector General, *Vatterott College—Des Moines' Compliance with Selected Provisions of the Higher Education Act of 1965 and Corresponding Regulations*, Final Audit Report, (pp. 3–4), http://www2.ed.gov/about/of-fices/list/oig/auditreports/fy2008/a07h0018.pdf (accessed May 17, 2012).

[748] Career Education Corporation, Form 10-Q for the period ending 9/30/10.

[749] U.S. Department of Education, Office of the Inspector General, *Technical Career Institutes, Inc.'s Administration of the Federal Pell Grant and Federal Family Education Loan Programs*, Final Audit Report http://www2.ed.gov /about/offices/list/oig/auditreports/ fy2008/a02h0007.pdf (accessed May 17, 2012).

Undercover tapes show that 5 out of 15 campuses visited by the Government Accountability Office provided misleading information about the salaries students could expect to earn from new jobs after graduation.[750] Two schools guaranteed or virtually guaranteed jobs for the undercover GAO agents after graduation. Another told an agent, who expressed interest in a barber program, that barbers can earn $150,000 to $200,000 per year, $100,000 more than the Bureau of Labor Statistics reports that nearly all barbers earn.[751]

*Inconsistent, Unreliable, and Misrepresented Placement Data*

Most taxpayers and policymakers would agree that, at the end of the day, what matters is that students at for-profit colleges end up with quality jobs that pay good wages. However, most regional accreditors (which accredit at least 24 for-profit college brands attended by 1.1 million students) do not require schools to track career placement data. Significantly, at two major regionally accredited for-profit institutions which heavily market their programs as steps towards career advancement, Bridgepoint's Ashford University and Apollo Group's University of Phoenix, this means that they provide *no* career services.[752]

Most national accrediting agencies, as well as some States, do require institutions to track job placements, but this information is self-reported and inconsistent.[753] The reporting requirements vary regarding what information is tracked and how it is verified.[754] Individual colleges' methodology and consistency can vary when collecting the data, and the procedures used are seldom transparent to prospective students or even to policymakers.[755]

*Misleading Accreditors and Regulators*

At schools that track and provide placement data to accreditors or prospective students, internal documents and external investigations provide evidence of a multitude of irregularities and misrepresentations. For instance, documents reviewed by the committee reveal that three career services employees, including the director of career services, at Lincoln Educational Services Corporation's Grand Prairie campus made arrangements with an employer to falsely state that Lincoln graduates had worked for that employer. The Director gave the employer gas cards and cash, in return for his false statements.[756] Lincoln's internal investigator, who was charged with figuring out the extent of the fraud, called 10 "placed" students, and found that all of the students' records had been plainly falsified. As the investigator reported:

---

[750] Audio of undercover visits can be reviewed at http://harkin.senate.gov/help/gao.cfm#gaovid1.

[751] The mean wage for barbers in Washington, DC is less than $30,000 a year. Bureau of Labor Statistics, Occupational Employment Statistics, 39-5011 Barbers. http://www.bls.gov/oes/current/oes395011.htm.

[752] In the company's response, Apollo, for the first time, stated that it utilizes a third-party provider to "accelerate the delivery of career services to University of Phoenix students."

[753] IPEDS, Technical Review Panel Report No. 35.

[754] Id.

[755] Id.

[756] Lincoln Internal Email, June 2010, re: *FW: Grand Prairie Investigation* (LINC0088022)..

The Career Services Representatives in question had knowledge that these placements were not true and legitimate placements. They chose to enter this information rather than perform due diligence and confirm these placements.[757]

Presented with the findings, the senior group vice president of operations expressed frustration with the *internal investigation* that revealed the wrongdoing. His reply stated: "I'm concerned. If this is our method of conducting an investigation, we have a big liability." It is unclear if Lincoln's accreditors were informed of the career services staffs' conduct, or whether other job placements recorded by other Lincoln career services staff were reviewed.[758]

Numerous investigations of other for-profit colleges have found that the Lincoln situation was not an isolated instance.

---

[757] Id.
[758] Id.

| Summary of Selected For-Profit Education Company Placement Investigations | | |
|---|---|---|
| Year | Company / School | Summary |
| 2005 | **Career Education Corporation**<br><br>Brooks College | "60 Minutes" reported that Brooks College was advertising a 98 percent job placement and strong career services, while graduates came forward to assert that neither was true. |
| 2007 | **Corinthian Colleges, Inc.** | California's attorney general filed suit following an investigation revealing that the company significantly inflated its placement rates—by as much as 37 percent—for every program examined. The company paid $6.5 million to students and the State of California to settle the suit. |
| 2009 | **Alta Colleges, Inc.**<br><br>Westwood College | Alta paid the United States $7 million to settle allegations that it inflated its placement rates, advertising 90 percent job placement when the actual rate was 50 percent. |
| 2010 | **ATI Enterprises, Inc.**<br><br>ATI Career Training Center | Several campuses were closed in an agreement with the Texas Workforce Commission after ATI significantly inflated placement rates for 90 percent of its programs. |
| 2010 | **Corinthian Colleges, Inc.**<br><br>Everest College | Corinthian reported that administrators in one of its Everest Campuses in Texas falsified placement records for 288 graduates over 4 years. |
| 2011 | **Career Education Corporation** | CEC audited its placement rates as part of an investigation by the NY attorney general.  As a result, CEC announced that it was revising placement rates for 49 of its campuses, and that 36 of those no longer met its accreditor's standards for placement. |
| 2012 | **Alta Colleges, Inc.**<br><br>Westwood College | Alta paid $4.5 million in damages to students and the state to settle a suit, brought by Colorado's attorney general, alleging inflated placement statistics, deceptive advertising, misleading recruiting practices, and enrolling students in institutional loans without their knowledge. |

*Corinthian, the Texas Workforce Commission, and the California Attorney General*

In 2007, the California attorney general filed a lawsuit accusing Corinthian schools of deliberately and persistently misleading prospective students about the schools' placement rates. Margaret Reiter, former supervising deputy attorney general, testified at the committee's June 24, 2010, hearing that every single program the AG examined had inflated its placement numbers by as much as 37 percent.[759] For most programs, only a third to a half of students obtained employment. Ms. Reiter further testified that, in her long experience with consumer fraud cases, the for-profit college industry has among the

---

[759] Margaret Reiter (former supervising deputy attorney general in Consumer Law, California Attorney General's Office), Testimony before the Senate Health, Education, Labor, and Pensions Committee, *Emerging Risk? An Overview of the Federal Investment in For-Profit Education*, 111th Congress (2010). The company paid $6.5 million to settle the suit. Corinthian Colleges, Inc. 10-k for the period ending June 30, 2007.

"most persistent, egregious, and widespread [consumer abuses] of any industry" she had ever seen.[760] In 2010, Corinthian Colleges also admitted that administrators at one of its Everest College campuses in Texas falsified the employment records of 288 graduates over 4 years. Of those graduates, 176 allegedly worked for a business that had been created by a friend of the school's career services director; this business did not have any actual employees. The other 119 graduates were claimed to be working for a company that actually employed a total of just seven Everest College students.[761]

### ATI and the Texas Workforce Commission

ATI Career Training, a Texas-based privately held for-profit education company owned by the UK-based private equity firm BC Partners, was found to have falsified job placement data in nearly all of its programs. The Texas Workforce Commission requires each educational program to achieve job placement rates of 60 percent or more in order to operate in the State. The company offers programs in a small number of fields including Automotive Service and Medical billing. ATI operates 24 campuses, with 16 in Texas and another 8 in Florida, New Mexico, and Oklahoma. In 2009, the company's enrollment was 9,374 students. A news outlet in Dallas, TX, uncovered evidence that the company was systematically falsifying its job placement data in an effort to mislead students and regulators. The Texas Workforce Commission moved to revoke ATI's license to operate in the State after media reports that:

- Six graduates of ATI's HVAC program, who ATI reported as hired by an air conditioning firm, were in fact never employed and the business address the school listed led to a residential address;

- Five ATI welding graduates were recorded as employed at a company called Paradise Landscaping. The owner of that business said he had never hired anyone from ATI;

- Eight electronics technicians were recorded as employed by two companies, Pyle Security and Widgeon Technology. The owners of those firms say just one ATI student was hired.[762]

According to former ATI officials, the schools would, among other things, forge students' signatures on employment records: "When [students] graduate, they would sign off on all kinds of paperwork," said a former ATI employee and whistleblower. "Then you would take a clean version of their signature, make copies of it, and then paste it into documents to say they were placed."[763]

An outside accounting firm, hired after the scandal broke, found that ATI "significantly over-reported" its job placement rates for 90 percent of the school's programs for the 2010 fiscal year, and 63 percent had actual placement rates below Texas Workforce Commission's required threshold. In addition, none of the 16 campuses had abided by the Commission's rules requiring that they contact all of their most recent graduates to verify their employment records (and some contacted as few as 11 percent).

---

[760] Id.

[761] Corinthian Colleges, *Statement by Corinthian Colleges Regarding Everest College, Arlington Mid-Cities Campus*, October 11, 2010, http://higheredwatch.newamerica.net/sites/newamerica.net/files/ articles/1011_ corinthian_statement%5B1%5D.pdf (accessed May 9, 2012).

[762] Byron Harris, "Bitter lessons for trade school graduates," *WFAA.com Dallas/Fort Worth*, December 15, 2010, http://www.wfaa.com/ news/investigates/Bitter-Lessons-106350718.html (accessed May 9, 2012).

[763] Id.

The Texas Workforce Commission's final dispensation of the matter was to revoke approval for 22 ATI programs and allow all other programs to remain open under certain conditions. As a result, ATI must verify 2011 student employment rates through an independent third party. ATI must also make refunds to all students currently enrolled in any of the 22 programs.

### Career Education Corporation

In 2005, an investigation by "60 Minutes" found significant discrepancies in the job placement promises made to prospective students compared to the actual employment of the graduates at Career Education Corporation's Brooks College. Recruiters promised 98 percent job placement and placement assistance after graduation. Yet, after graduation, several of the graduating class's top students complained that they received little or no placement assistance from the school, and no employment in their field. Career Education Corporation (CEC) replied to the news report by saying that it was disappointed that the news outlet "opted to paint us … with a broad brush based on a few allegations." [764]

Six years later, the same company is facing another larger job placement scandal. The company recently revised its 2010 placement rates for 49 of its campuses to correct "irregularities" found following an investigation by New York's attorney general. The 2010 job placement rates at all 49 campuses were incorrect, and 36 of those campuses had revised job placement rates that were below the campus accreditor's minimum threshold of 65 percent job placement.[765] The CEO of Career Education Corporation, Gary McCullough, resigned when these widespread misrepresentations were uncovered.[766] After initially requiring all 71 ACICS-accredited campuses to "show cause" why their accreditation should not be suspended, ACICS placed four campuses on probation that had revised placement rates below 40 percent, and subjected 24 to additional oversight.[767] CEC has not made the audit of its placement rates public, nor has it indicated whether it will review previous years of placement data or campuses that were not accredited by ACICS.

These recent revelations about CEC of systematic misreporting also indicate the weaknesses of current accreditors' verification of placement rates.  ACICS has stated that it independently verifies each program's job placement rates. However, significant doubt is cast on this assertion given the broad scope of CEC's falsification. Moreover, ACICS typically verifies job placement rate data only during the years when a campus is due for a site visit.[768]

### Westwood, and Investigations by Texas, Colorado, and Federal Authorities

Westwood colleges, owned by Alta Colleges, Inc., settled a lawsuit in 2009 for $7 million stem-

---

[764] Career Education Corporation, Career Education Corporation Comments on "60 Minutes" Story, BusinessWire, January 31, 2005, http://www.businesswire.com/news/home/20050130005030/en/Career-Education-Corporation-Comments-60-Minutes-Story (accessed May 9, 2012).
[765] Career Education Corporation, Form 10-Q filed November 9, 2011.
[766] Id.
[767] Career Education Corporation, Form 8-K filed May 7, 2012.
[768] ACICS requires schools to report placement rates every year.

ming from allegations that the company misled students and officials regarding job placement rates.[769] The U.S. Department of Justice determined that Westwood was claiming a 90 percent job placement rate, when the actual rates were around 50 percent. By doing so, the school falsely obtained its operating license from the Texas Workforce Commission, and thereby acquired the ability to collect Federal student aid dollars.[770]

More recently, the Colorado attorney general brought forward evidence that revealed a pattern of misconduct by Westwood.[771] The attorney general found that Westwood had engaged in deceptive advertising, misleading recruiting practices, and inflating placement statistics. The AG also found evidence that Westwood deceived some students by enrolling them in a private loan program operated by the college without their knowledge, and that the loan program itself was a violation of Colorado law because of its default interest rate. The company settled the case for $4.5 million in damages to students and the student aid programs.[772]

In sum, many for-profit colleges show a remarkable level of sophistication in deploying tactics and policies that do not appear to be in the interest of students or taxpayers in order to technically remain in compliance with the few regulations put in place to protect students and the integrity of taxpayer funds. This phenomenon is, perhaps, the logical result of a profit-driven system that lacks meaningful enforcement and regular oversight. But it raises serious questions about for-profit colleges' stewardship of the multi-billion dollar annual investment they receive from students and taxpayers.

---

[769] U.S. Department of Justice, Office of Public Affairs, "Alta Colleges to Pay U.S. $7 Million to Resolve False Claims Act Allegations," *Justice News*, April 20, 2009 (http://www.justice.gov/opa/pr/2009/April/09-civ-367.html).

[770] Stephen Burd, "Who's to Blame for Job Placement Rate Abuses at For-Profit Colleges," New Foundation America, November 9, 2011, http://higheredwatch.newamerica.net/blogposts/2011/who_s_to_blame_for_job_placement_rate_abuses_at_for_profit_colleges-60157 (accessed May 9, 2012).

[771] Attorney General, Colorado Department of Law, "Attorney General Announces $4.5 Million Settlement with Westwood College to Address Deceptive Business Practices," March 14, 2012, http://www.coloradoattorneygeneral.gov/press/news/2012/03/14/attorney_general_announces_45_million_settlement_westwood_college_address_dece (accessed March 14, 2012).

[772] Id.

# The Consequences of Inaction

If Congress does not enact effective controls, for-profit education companies will continue to churn through students and consume an increasing amount of taxpayer dollars. The available evidence shows that many for-profit colleges make decisions that prioritize their bottom line, even when those decisions limit their students' opportunities for academic success. New rules on program integrity, including the re-instituted ban on paying recruiters based on the number of students they enroll, and the gainful employment regulation, are welcome improvements, but they are a first step to correcting the misaligned incentives that govern the sector.[773]

For-profit colleges receive a large and growing share of Federal student aid dollars. Pell grant disbursements flowing to for-profit colleges increased six fold over the last decade, from $1.4 billion to $8.8 billion. Moreover, for-profit schools collect 38 percent of all post-9/11 GI bill dollars, and 50 percent of all Department of Defense Tuition Assistance funds. At a time when Federal spending is being closely scrutinized, it is more important than ever to ensure that taxpayers are getting the return they seek by providing Federal loans and grants. We are currently committing $32 billion in taxpayer dollars to for-profit higher education with minimal accountability for student success.

For-profit education companies ask students with modest financial resources to take a big risk by enrolling in their high-tuition schools. As a result of high tuition, students must take on significant student loan debt to attend school. When students withdraw, as hundreds of thousands do each year, they are left with high monthly payments but not the commensurate increase in earning power from new training and skills. This debt follows former students throughout their lives and can create a hole that is extremely difficult, and sometimes impossible, to climb out of. Default, while adding fees to a student's debt load, does not eliminate the debt. Nor is student loan debt dischargeable through bankruptcy. Moreover, since students are not eligible for Federal student aid if they have defaulted on a student loan, the opportunity to pursue higher education again may be foreclosed.

Students often blame themselves for academic failures when they leave for-profit colleges before attaining a degree. Students who attend a campus that is part of a large chain, or who enroll online, may be unaware that there are thousands or tens of thousands of other students like them. Many students at for-profit schools are first generation college students who do not have siblings, parents, aunts or uncles who attended college to guide their expectations about what a college should provide and what it should cost. Moreover, they do not recognize that many for-profit schools lack the support services that could help students stay in school and complete their degree.

The existing capacity of non-profit and public higher education is insufficient to satisfy current, much less future, demand, particularly in an era of drastic cutbacks in state funding for higher education. Even if resources were available to make significant new investments in community colleges, it would

---

[773] On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans. *Association of Private Colleges and Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012).

be virtually impossible to accommodate the 2.2 million postsecondary students who currently attend for-profit colleges. The for-profit sector will continue to play an important role in providing capacity to the Nation's higher education infrastructure. And, indeed, the sector can play a constructive role, bringing much-needed innovation to the higher education sector and producing graduates in high-demand fields.

But the goal cannot be simply to enroll students.  As Dr. Arnold Mitchem, the President of the Council for Opportunity in Education, told the committee, "for-profits are the only institutions providing access to postsecondary education for many low-income youth and adults. . . . I think all of us in this room agree that access is critical, but access to what?" Access to debt is not the same thing as access to the opportunity offered by a good education.  Federal law and regulations must strive to align the incentives of for-profit colleges so that the colleges succeed financially when, and only when, students also succeed.

In the absence of significant reforms that require for-profit education companies to focus on their educational mission first and foremost, and ensure that taxpayer dollars are not directed to marketing that is often aggressive and sometimes deceptive and misleading, the growing for-profit education sector will continue on its current path. For-profit colleges, with their potential to provide innovative options for students to obtain a quality higher education that prepares them for available jobs, will continue to fall far short of that promise, with devastating consequences for students, taxpayers, the Federal student aid system, and the American economy.

# What Needs to Be Done?

Over the course of this investigation, the committee identified several problems that indicate significant weaknesses with the effectiveness of the current regulatory scheme in ensuring protections for students and taxpayers. While lax State oversight and insufficient quality control by accrediting agencies are responsible for many of these weaknesses, it is Federal policymakers who have failed to adequately safeguard the $32 billion annual taxpayer investment in the for-profit college sector.

Because for-profit institutions, especially those owned by publicly traded and private equity-held corporations, are fundamentally different from public and private non-profit institutions as a result of profit incentives and fiduciary responsibilities, such institutions have always been, and must continue to be, treated differently under Federal law. While there are also issues that transcend the for-profit sector and should be addressed on a sector-neutral basis, Congress has failed to adjust the unique legislative framework that governs this sector of higher education to ensure that the demands of shareholders and investors do not overrun those of taxpayers and students. Not only has Congress failed to strengthen protections for students and taxpayers, it has actually taken repeated steps to rollback or weaken existing regulations. Therefore, policy changes to account for the changing landscape of the sector are needed.

In particular, the committee believes that a revised framework must address three main areas in dire need of improvement: enhanced transparency through the collection of relevant and accurate information about student outcomes, stronger oversight of the $155 billion Federal financial aid investment to curb fraud and abuse, and meaningful protections for students.

## Enhanced Transparency

### *Improved Data on Student Outcomes*

Any discussion of legislative solutions must begin with new requirements for the collection and analysis of meaningful and accurate information on student outcomes across all sectors of higher education. Currently, only first-time higher education students who attend college on a full-time basis are included in the Department of Education's Integrated Postsecondary Education Data System (IPEDS) graduation rate measurement.  IPEDS retention rate does include students attending part-time, but only first-time students. This means that a significant portion of the student population, including returning and transfer students, are not captured. As an example, the University of Phoenix in its 2008 Annual Academic report notes:

> The issue for institutions such as the University of Phoenix is that IPEDS data is calculated using "first-time students." These are students who start at one institution and complete their entire degree at that same institution. That student is an anomaly at University of Phoenix.  Therefore, the completion rates reported to IPEDS differ from the completion rates calculated by using the true population of the University, most of whom do not fall within the IPEDS definition.

These limitations make the available data virtually useless for assessing the retention, completion and graduation rates of non-traditional students, or for conducting cross-sector analysis.

In addition to the incomplete data, often times the definitions of existing metrics limit data validity. For example, the IPEDS retention rate represents an annual snapshot of how many first-time students who were enrolled in classes in the fall returned to the same institution of higher education the following fall. Thus, this measure not only fails to capture students who are not first-time students, but also fails to capture any student who enrolls after the fall reporting but withdraws in less than 1 year or who transfers to another institution. As an example, in 2009 schools owned by Corinthian Colleges, Inc. reported a retention rate of 64 percent based on a population of 15,488 students. The committee's analysis demonstrated that about 131,000 students enrolled at Corinthian between 2008 and 2009, meaning that more than 100,000 students are not captured in the IPEDS retention rate. The committee's analysis indicates that about 49.5 percent of students were still enrolled or graduated as of mid-2010, significantly lower than the IPEDS rate. Across the education companies analyzed, the median drop-out period for students was approximately 4 months, suggesting that the annual retention rate is failing to capture hundreds of thousands of students entering and leaving again between the traditional fall start periods.

As discussed in the report, manipulation of Office of Postsecondary Education Identifiers or OPEIDs can also obfuscate the performance of individual campuses or campuses owned by a particular corporation. In part because of the large number of "brands" operated by for-profit college companies and the various ownership-shifting acquisitions, the OPEID tracking system bears little relation to the corporate ownership structure or to an individual campus-based identification system. This further complicates a clear understanding of how students are performing at all schools operated and owned by the same entity.

> **Recommendation**: Require that the Department of Education collect comprehensive student outcome information and enable data retrieval by corporate ownership.

### *Job Placement and Earnings*

The current system of tracking job placement is not comprehensive and is subject to manipulation. Regional accrediting agencies generally do not set standards for job placement rates, although over half of all students enrolling in a for-profit college attend a regionally accredited college. National accreditors set varying standards and perform limited audits of self-reported data. Schools required to report job placement rates work to meet required thresholds, but without providing much career counseling. Multiple State investigations have demonstrated that this information is sometimes manipulated or even falsified.

> **Recommendation**:  Establish a uniform methodology for calculating job placement rates to better understand if students are working in their chosen field and set standards to ensure the accuracy of reported job placement rates.

*Cost of Attendance*

Soaring college costs is an area of great concern for the committee. As with consumer choice for any product or service, it is critical that students have access to accurate and easily understood information that will enable them to compare the costs of attending across colleges and programs of study. This remains a concern in the for-profit sector where, even with new regulations requiring tuition disclosures, it can be challenging to accurately determine the actual cost of a program.

> **Recommendation**:  Create a consumer-friendly source where prospective students can easily obtain and compare timely, accurate and complete information on the cost of attendance of any program.

*Private Lending*

Because some for-profit colleges purposefully set tuition above Federal lending limits, some students are forced to take on additional institutional or private loans. However, there is little data available regarding the number of students taking additional private loans and the terms of such loans.

> **Recommendation**: Require the reporting of the terms of private and institutional loans, as well as the number and amount of loans made, and the characteristics of such borrowers. Require mandatory institutional certification of private student loans to curb the use of private loans by students who have not exhausted their Federal loans and to better inform students regarding the risks of private loans. Allow private loans to be discharged in bankruptcy.

## Stronger Oversight

*Outcomes-Based Thresholds*

Between 2001 and 2010, the amount of Federal financial aid flowing to student borrowers through loans and grants almost tripled from $44 billion to $130 billion. With the taxpayer investment rapidly growing and an increasing number of student borrowers struggling to repay their loans, Congress needs to examine placing more rigorous performance-based limitations on access to Federal financial aid.

The committee heard testimony that outcomes-based metrics are a potential area of agreement among stakeholders. As DeVry CEO Daniel Hamburger stated: "There is common ground among all parties in two areas—the current metrics used to evaluate institutional performance are insufficient, and the opportunity exists to improve institutional programs and services." Former U.S. Department of Education deputy undersecretary Bob Shireman went on to explain his view that outcome-based metrics "become unenforceable if it's not a hard line, but if we have a hard line, it ends up being really low level.  So figuring out how to get those incentives to push for the high levels of success, that's going to be a critical part of what we aim for."

**Recommendation**: Examine incentivizing higher standards of student success and tying access to Federal financial student assistance to institutions of higher education meeting minimum student outcome thresholds.

### Limits on Use of Federal Financial Aid Dollars

One of the significant findings of the investigation is that the term "for-profit education company" is in many ways a misnomer, given that well over 80 percent of for-profit education company revenues examined by the investigation come from Federal taxpayer dollars. The committee found that, in 2009, 86 percent of the revenues of publicly traded companies operating for-profit colleges were directly derived from taxpayer dollars.  That same year the companies spent 23 percent of revenues on marketing. Thus, it appears at least 9 percent of the funds spent on advertising and recruiting campaigns, some of which are misleading and deceptive, came from Federal taxpayer dollars designated for education.  In this environment of difficult spending choices, allowing taxpayer dollars to be used for marketing, advertising and recruiting rather than on education-related costs such as instruction and student services is unacceptable.

**Recommendation**: Prohibit institutions of higher education from funding marketing, advertising and recruiting activities with Federal financial aid dollars.

### Improved Cohort Default Rate Tracking

Starting 4 years ago, in preparation for the transition to the 3-year default rate threshold in 2014, the Department of Education began to publish the number of students entering default within 3 years of leaving school, in addition to the existing reporting of the number of those entering default within 2 years of leaving school. The trial 3-year default data show that there is a significant disparity between 2-year and 3-year rates, indicating manipulation of the 2-year default rates. The investigation found that the use of questionable default management practices is rapidly increasing, in an effort to ensure that default rates are reduced significantly prior to implementation of the new 3-year threshold. Because the rate remains subject to manipulation, the window of reporting default rates should be significantly expanded. Additionally, in order to better protect against efforts to place students in forbearance or deferment, which may not be in students' best interest, the threshold for determining continued eligibility for Federal financial aid should be extended from 3 years to 4.

**Recommendation**: Expand the default reporting period and continue using the default rate threshold for purposes of limiting access to Federal financial aid by extending the threshold for determining continued eligibility for Federal financial aid from 3 to 4 years after a student enters repayment.

### Ensuring Quality—the 90/10 Rule

Current law requires that no more than 90 percent of revenues of a for-profit college may come from revenues derived from title IV funds. The regulation is based on the premise that if a college is of sufficient quality, it should be able to obtain at least 10 percent of its revenues from sources other than the

Federal Government, presumably from private funds. While the 90/10 rule has been repeatedly weakened, it remains a critical tool in ensuring that for-profit colleges are held accountable for the tremendous Federal investment they receive and a useful tool in assessing whether a college's quality is sufficient enough so that students and employers are willing to make a financial commitment. However, allowing non-title IV Federal funds to be excluded from this calculation, including veterans and military educational benefits, has had the perverse effect of making servicemembers and veterans the target of for-profit college recruiting efforts. Instead of being further weakened, the 90/10 rule should be strengthened.

> **Recommendation**: Require that for-profit colleges receive at least 15 percent of revenues from sources other than Federal funds, with all Federal educational assistance funds included in the 85 percent calculation, and return to annual compliance for continued title IV eligibility.

### *Access to Financial Aid*

The fundamental role of accrediting agencies is to ensure that institutions of higher education are meeting standards of institutional integrity and academic quality. Accreditation remains a peer-based review process premised on a shared commitment to academic improvement. As a result, regional accrediting agencies in particular have found it extremely difficult to evaluate colleges owned by for-profit education companies that enroll many times more students than some of the largest public systems. The committee has documented that the Higher Learning Commission of the North Central Association of Colleges and Schools was particularly ill-equipped to adequately assess the integrity of some of these colleges. Because accreditation is also the means by which the Federal Government determines whether higher education institutions should access Federal financial aid dollars, this is a serious concern.

While accreditation should remain a required component of access to title IV Federal financial aid, the Department of Education should assume greater responsibility for determining access to title IV based not solely on accreditation but also on additional and expanded criteria.

> **Recommendation**: Utilize criteria beyond accreditation and State authorization for determining access to Federal financial aid.

## Meaningful Protections

### *Improved Complaint Process*

At the initiation of the committee investigation it was difficult to make an accurate assessment of the level of students concerns because there was no centralized or obvious place to turn to evaluate student complaints. In fact, the investigation determined that while hundreds of thousands of students file complaints, the majority of these complaints are made to the students' college or to the Better Business Bureau, which simply refers the complaint back to the college. Close to 100 current and former students and employees of for-profit colleges reached out to the committee, many of whom expressed frustration

that they did not know who else to contact regarding their stories.

Students complained that their schools made deceptive statements regarding the cost of the program and availability of Federal aid, misled students regarding programmatic accreditation, structured classes in such a way that the student was left owing money prior to graduation, performed financial audits after additional student aid was no longer available and engaged in additional problematic practices. The investigation found that schools that are regionally accredited have a more robust complaint process but that the complaints made to all for-profit colleges were a useful way of determining if a particular for-profit college was engaged in a pattern of conduct that generated multiple similar complaints.

Currently, however, no centralized complaint structure exists that allows for an effective analysis of student or employee complaints, or that serves as a clearinghouse in steering complaints to the appropriate entity—for fielding quality complaint to accreditors, financial aid complaints to the Department of Education or the Inspector General, and misleading and deceptive tactics complaints to the Federal Trade Commission. More critically, students have little idea where to file a complaint other than directly with the school.

>**Recommendation**: Create an online student complaint clearinghouse at the Department of Education for the collection and referral of student complaints to the appropriate agency or division, and require all institutions of higher education to provide a link to the complaint center on their Web sites.

### Making Students Whole–Arbitration Clauses

Twenty-one of the twenty-seven enrollment agreements produced to the committee by for-profit education companies contained a clause that required students to go through a process of mandatory binding arbitration. Because the recent Supreme Court decision, *AT&T Mobility v. Concepcion*, held that arbitration claims may not be joined in a class action, students who may have been similarly deceived with regard to cost, likelihood of obtaining a job, or likely salary cannot in most cases join together to sue the school.[774] The investigation has documented that these practices are occurring at a number of for-profit schools, but these students are left with little recourse. Students should have the right to pursue a class action lawsuit against their former colleges if the college deceived them about costs, student loans, programs, job placement or salary after college, and not be forced into arbitration as most enrollment contracts currently stipulate.

>**Recommendation**: Require that institutions of higher education accepting Federal financial aid may not include mandatory binding arbitration clauses in enrollment agreements.

### Minimum Standards for Student Services

As detailed above, the committee investigation demonstrated that the investment made in student

---

[774] *AT&T Mobility v. Concepcion*, 131 S.Ct. 1740 (2011).

services is surprisingly low in the for-profit sector. At least two publicly traded for-profit companies confirmed to the committee staff that they offer no tutoring or other assistance outside of the (usually online) instructor. The committee also documented tremendous disparities between the staffing of enrollment and recruiting departments and other student services departments, including career counseling and financial aid. Although the information produced could not be analyzed in such a way as to demonstrate a greater disparity in services available to online students, anecdotal reports suggest that this might be the case. As a result, it seems necessary to create minimum standards for student services.

> **Recommendation**: Require a set of minimum standards of student services, including tutoring, remediation, financial aid, and career counseling and job placement.

### _Compensation-Based Policies_

The committee investigation has demonstrated problems with the recruiting and admissions tactics used by the for-profit sector. The Government Accountability Office undercover recordings document that misrepresentations and omissions were made during the recruiting process at each of the 15 for-profit college campuses visited. Internal documents make clear that recruiters are often trained in aggressive tactics of emotional exploitation, and that misleading and deceptive practices are tolerated and sometimes tacitly encouraged.

Recently enacted regulations clarified that recruiter salaries may not be based on the number of students they enroll. However, evidence suggests that at some for-profit education companies, enrollment targets are still enforced, not through compensation but through termination of non-performing employees.

The investigation has also found evidence that similar quota-based systems and compensation-based incentives are not limited to recruiting, enrollment and financial aid staff. Faculty, job placement and debt counseling staff at some colleges are offered compensation-based incentives for meeting thresholds and quotas ranging from students completing classes to students placed in forbearance to students "placed" in jobs. The investigation uncovered instances where faculty and staff were pushed to pass unqualified students or exaggerating job placements in order to hit company-demanded quotas.[775] Numeric quotas have no place in decisions regarding compensation or retention of faculty members or any other staff members of an institution of higher education.

> **Recommendation**: Extend the incentive compensation ban to all employees of institutions of higher education and clarify that numeric threshold or quota-based termination policies are not permissible.

---

[775] At least 10 current and former employees of multiple for-profit colleges have contacted Committee staff stating they were pressured to pass student.

*Enforcement*

The Department of Education has taken significant steps to enact new regulations on incentive-based compensation and misrepresentation. Yet, the Department has not implemented an effective enforcement plan to ensure that colleges are meeting these requirements. Further, the Department struggles with setting out clear risk-based criteria that will trigger an audit or program review. Several for-profit colleges continue to promote misleading information regarding the cost of programs, and other colleges, currently under investigation for the integrity of job placement data, have made significant misrepresentations to students and regulators. And while some for-profit colleges appear to have put new controls in place with regard to the conduct of lead generators they hire, in general, these marketing efforts continue to be a serious cause for concern.

> **Recommendation**: Create an enforcement task force within the Department of Education to focus on targeted enforcement of new and existing regulations and require the Department to develop clear risk-based criteria that will trigger audits or program reviews.

These recommendations represent some of the elements of a comprehensive legislative framework that should be developed to adequately counterbalance the financial pressures that publicly traded and private equity-owned for-profit colleges bring to the sector. Much work remains to be done to ensure that legislation is crafted to ensure that for-profit colleges properly prioritize student success and deliver on the sector's potential not just for access and added capacity, but for affordable quality programs as well.

## Minority Committee Staff Views

**Frank J. Macchiarola**
Republican Staff Director

**Nicholas C. Geale**
Oversight & Investigations Director

**Beth B. Buehlmann**
Education Policy Director

**Christopher Eyler**
Education Counsel

Over the past 2 years, a significant amount of the Health, Education, Labor, and Pensions Committee's activity has been focused on an investigation of for-profit institutions of higher education. This investigation has raised a number of questions about the for-profit sector that deserve the attention of this committee.  However, the majority's refusal to work in the committee's bipartisan tradition and the biased conduct throughout this process have raised substantial doubt about the accuracy of the information contained in the report titled, "For-Profit Higher Education:  The Failure to Safeguard the Federal Investment and Ensure Student Success" (Majority Staff Report).

The HELP Committee has a long history of bipartisanship and collaboration, which has allowed for the input of all committee members and ensured the legitimacy of its work.  This practice has been integral to making this committee one of the most productive in Congress, and has produced a body of legislation that regularly earns the overwhelming support of the Senate.  As such, there is little doubt that the committee could have conducted a robust and objective investigation had the majority pursued these proceedings in a bipartisan manner.

It is indisputable that significant problems exist at some for-profit institutions of higher education.  Students must have accurate and unbiased information, and should not be pressured into making decisions they are not prepared to make.  In fact, the aggressive recruiting practices, possible violations of statutory restrictions on incentive compensation, and the misrepresentation of student outcomes by some for-profit institutions that have been identified are real problems that deserve to be investigated in an objective process.  With a fair, reasonable and competent process there is little question that the committee could have addressed these issues and enacted meaningful changes to the law where necessary that would benefit all students.

However, from the outset, the majority did not seek bipartisan input or support in this investigation. It ignored repeated requests by the Ranking Member to expand the scope of the investigation to include all institutions of higher education that serve the other 90 percent of postsecondary students who do not attend for-profit schools but face similar challenges.  Furthermore, the majority ignored a request from Senators Enzi and Alexander asking that the committee hold bipartisan hearings on the Department of Education's program integrity regulations, which would have addressed many of the concerns raised during the investigation.  While the minority recognizes the majority's right to set the committee's agenda, the failure to seek bipartisan collaboration and gain broad support has undermined the credibility of findings contained in the

Majority Staff Report.  The following are examples of the investigative actions that suggest a pattern of abuse that has led a number of observers to question the majority's motives and objectivity.

## I.      This investigation was developed, in part, by relying on the input of an investor with a financial interest in the demise of the for-profit sector.

On June 24, 2010, the committee heard the testimony of Steve Eisman, a hedge-fund manager most notable for betting against subprime mortgages during the U.S. housing crisis.  Mr. Eisman is not a higher education expert, and stated in his testimony that he had a financial interest in the for-profit sector.  However, he refused to explain the extent of his investments when asked in questions for the record by Senator Coburn.  In a July 1, 2010 letter to the committee, Citizens for Responsibility and Ethics in Washington (CREW) explained, "To our knowledge, Mr. Eisman has no expertise in education policy; he holds no degrees, has no experience, and no background on the education policies at issue.  Mr. Eisman's only experience is that he works for a hedge fund that is betting millions of dollars on stock prices falling in the for-profit education industry.  His financial conflicts of interest could not be more blatant, yet they were not disclosed in advance of his testimony.  Even more troubling is Mr. Eisman's use of the congressional hearing and the committee as a vehicle to advance his own economic interests by dragging down stock prices of publicly traded companies."  Notwithstanding Mr. Eisman's lack of qualifications to comment on education policy, it is troubling that the majority would allow any witness to testify without requiring a full disclosure of such clear conflicts of interest.

## II.      The findings of this investigation include discredited Government Accountability Office (GAO) testimony.

On August 4, 2010, Gregory Kutz, former-Managing Director of the GAO's Forensics Audits and Special Investigations Division, testified to the committee about the findings of an undercover investigation of recruiting practices at 15 for-profit institutions of higher education.  Mr. Kutz's testimony disclosed troubling practices, which are described in part in the Majority Staff Report.  However, the GAO substantially revised and reissued Mr. Kutz's testimony on November 30, 2010, making over 50 changes to 12 pages of the original testimony.  Many of the changes revealed that the GAO investigators omitted or misrepresented material facts, which undermined the severity of the allegations made in Mr. Kutz's original written testimony.  In fact, concerns about the process that resulted in these errors led the GAO to reorganize its Forensics Audits and Special Investigations Division and reassign Mr. Kutz.

The individual examples cited in the Majority Staff Report were not among those included in the revisions.  However, the extent of the revisions elsewhere in Mr. Kutz's testimony has cast significant doubt on the overall accuracy and objectivity of the investigation.  Moreover, dismissing the severity of these concerns, while only highlighting select portions that were not revised, ignores the high standards Congress places on the GAO to provide objective and factually accurate reports to inform its work.  Therefore, any reliance on Mr. Kutz's testimony not only weakens the findings of the Majority Staff Report, it raises questions about the legitimacy of any legislative activity the committee develops as a result of the report.

## III.      Majority committee staff directly participated in the drafting of witness testimony before the committee.

On August 4, 2010, the committee heard the testimony of Joshua Pruyn, a former employee of

Westwood College.  Mr. Pruyn testified to the committee about alleged aggressive recruiting practices he participated in while employed by Westwood College.  However, the veracity of Mr. Pruyn's testimony is undermined by documents showing that he received assistance from members of the majority committee staff and staff from The Institute for College Access and Success (TICAS), a public interest group that testified in two other HELP hearings on this subject.  On July 21, 2011, the *Daily Caller* produced e-mails in which majority staff drafted answers for Mr. Pruyn to provide to the committee if asked about his ties to a law firm suing Westwood College.  On July 26, 2011, the *Daily Caller* produced excerpts of additional e-mails that showed Mr. Pruyn's written testimony had been edited by members of the majority staff, as well as by staff from TICAS.  Furthermore, Westwood subsequently submitted documentation to the committee contradicting parts of Mr. Pruyn's testimony.  In order for the committee's work to be viewed as valid, committee members must be assured that witnesses provide testimony to the committee that is truthful and in their own words.

## IV.    The majority has mischaracterized facts and may have harmed the committee's ability to conduct future investigations.

Andrew Clark, CEO of Bridgepoint Education declined an invitation to testify at the committee's March 10, 2011 hearing titled, "Bridgepoint Education, Inc.:  A Case Study in For-Profit Education and Oversight."  In correspondence to the majority staff, Mr. Clark expressed concerns about testifying before the completion of an ongoing audit process by the Department of Education.  However, in a March 1, 2011 response on committee letterhead, the then-majority staff director stated that "you should be aware that it will be made clear at the hearing that your failure to appear is based on nothing other than your own apparent unwillingness to testify regarding how a company that receives over 86 percent of its revenues from the Federal Government saw a 1-year increase in profit from $81 to $216 million, but also has student withdrawal rates of at least 65 to 75 percent."  As has been previously stated, witness testimony must be truthful to ensure the soundness of the committee's work.  The majority staff's hostile letter indicating that the Chairman would mischaracterize Mr. Clark's stated reasons for not appearing is not only a demonstration of a willingness to prejudice a potential witness' testimony, it also raises questions about the majority's desire to provide committee members with all of the facts.

Additionally, the investigation has cited documents out of context to suggest improper motivations or embarrass institutions and their management.  On two separate occasions, the majority cited an unsolicited proposal prepared by a third-party consultant who was seeking to be hired by one for-profit school.  The proposal, which discussed the recruitment of veterans and military service members, had been voluntarily provided to the committee by the school, but was never implemented by the school.  Nevertheless, the majority staff relied on the document twice to inaccurately suggest that the school had implemented aspects of the proposal, despite being cautioned by the minority staff to confirm the accuracy and context of the document.

Finally, some schools have indicated that their proprietary and sensitive business information was not treated with the expectation of confidentiality under which it was voluntarily provided to the committee.  Many schools in their cover letters providing documents to the committee said they understood or requested that certain information not be disclosed to the public or third parties.  Although the majority asserts that no assurances were given regarding the confidentiality of documents, a number of law firms representing these institutions have indicated in writing to the majority that such assurances were indeed made.  And, while the majority did offer consultations with the schools for this report, a significant amount

of information was released previously without any such consultations, and many concerns about confidential information were ignored for this report as well.  Accordingly, the majority's selective mischaracterization of information and disclosure of confidential and proprietary information has the potential to do lasting harm to the committee's ability to conduct effective investigations in the future.

## V.  The majority has refused repeated requests to provide context by examining similar problems at public and private non-profit institutions of higher education.

Many of the issues identified by the investigation are a part of a much larger problem that is not limited to for-profit institutions of higher education.  Across all sectors of higher education, average student debt has increased to $25,250, fewer than half of all graduates have found work within 12 months of graduating, and nearly 40 percent of recent graduates are working in jobs that do not require a college degree.  The urgency of these problems has been discussed at length in the press as well as in a number of academic studies, including a May 12, 2012 *New York Times* article titled, "A Generation Hobbled by the Soaring Cost of College."  Much of that article focuses on the debt students have incurred as a result of soaring tuition at public and non-profit institutions, including students who recently graduated with debts of $65,000, $80,000 and $120,000.  Indeed, the article points out that, "With more than $1 trillion in student loans outstanding in this country, crippling debt is no longer confined to dropouts from for-profit colleges or graduate students who owe on many years of education, some of the overextended debtors in years past."  Moreover, the article indicates that many public and non-profit institutions, like some of the for-profit institutions the investigation has highlighted, are aggressively recruiting students, irrespective of their financial situations.

By failing to examine similar problems at public and non-profit institutions, which serve 90 percent of all postsecondary students, committee members have been given no perspective to judge which problems are limited to the for-profit sector and which exist throughout all institutions of higher education.  Without that perspective, the committee simply does not have a meaningful record upon which it can legislate constructive solutions that benefit all students.

In conclusion, it is clear that significant problems exist within the for-profit sector.  The majority rightfully decided to examine questions of student indebtedness, the role of accreditation and recruiting practices in institutions of higher education.  However, the decision to limit this examination to the for-profit sector alone has resulted in an incomplete record upon which to judge the challenges faced by today's students. Moreover, the partisan nature with which the majority has chosen to carry out this investigation has resulted in numerous examples of malpractice that have plagued this inquiry.  These examples are troubling under any circumstance, but when viewed cumulatively, they demonstrate a disturbing pattern of abuse that has damaged the credibility of the committee.  For these reasons, the overall accuracy and validity of the information contained in the Majority Staff Report is in doubt and should not be used as the basis for any legislative action by the committee.

The minority members of the committee remain willing to work with the majority to develop an objective process to meaningfully reform the Federal Government's commitment to higher education.  But if that process is to be successful, the committee must be willing to act in a way that leaves no doubt about the legitimacy of the process.

## Appendix 3 – Methodology

In order to reach the figures contained in this report, committee staff compiled numerous data sets, performed various calculations, and in some cases made estimates based on the best available data. This appendix is designed to provide a clear explanation regarding how particular analyses and calculations were performed.

**OPEID Numbers Controlled by Each of 30 Companies Examined, FY 2010 (Appendix 8)**

Data, including the amount of title IV revenues received pursuant to the Higher Education Act, and various military benefits, is presented throughout the report on a per-company basis.  Most of this information is reported by the companies to the Department of Education by individual Office of Postsecondary Education ID number (OPEID number  OPEID numbers are traditionally identifiers for individual campuses, but can also contain multiple campuses or branches.

In order to reach a total amount for each company, amounts reported by each OPEID controlled by each company were totaled.   While the OPEIDs under an individual company's control changed somewhat over the years examined, most calculations are based on the OPEIDs controlled by the companies in fiscal year 2010.  These OPEIDS are listed in Appendix 8 and were compiled from data provided by the Department of Education in October and November 2011.

**Enrollment 2001-2010 (Appendix 7)**

Enrollment information is reported to the Department of Education by unit identifiers (unit IDs) and made available through the Integrated Postsecondary Education Database System (IPEDS).   Unit IDs can include information about a single campus, or can include multiple campuses.

Additionally, publicly traded companies typically include new student enrollment and total student enrollment figures in annual and quarterly reporting to the Securities and Exchange Commission (SEC).

The yearly enrollment totals that appear in the report for privately held companies are equal to the fall enrollment for all unit IDs controlled by the company as reported to IPEDS.

The yearly enrollment totals that appear in the report for companies that were publicly traded during the entire 2001-10 period and that reliably disclosed enrollment figures in SEC filings is the total company enrollment reported for the quarter ending in August or September for each year in which the company reported information to the SEC.  IPEDS data was used in the same manner as above for companies that did not reliably disclose enrollment figures in SEC filings.

For companies that issued an Initial Public Offering and became publicly traded between 2001 and 2010 the yearly enrollment totals for companies that appear in the report are collected from IPEDS in the same manner as above up to the date the company began reporting to the SEC.  SEC total enrollment figures for the quarter ending in August or September for each year in which the company reported information to the SEC are used for yearly enrollment totals in years following.

**Pell Grant Funds Collected (Appendix 13)**

The amount of Pell grant funds collected by each company was calculated by examining the

Department of Education's Title IV Programmatic Volume Reports by School and totaling the "Award Year Cumulative Activity" figure for all institutions/OPEIDs controlled by the company for student aid award years (July 1-June 30) 2007 through 2010.  These figures are adjusted by the Department of Education to factor in funds returned in cases in which students withdraw or lose eligibility during an award period.  Over time, the Department revises the figures slightly to account for additional returns .

**Reported 90/10, Fiscal Year 2006-2010 (Appendix 9)**

The Department of Education requires that for-profit colleges provide audited financial statements that document compliance with the requirement that no more than 90 percent of the revenues of the company come from Federal financial aid funds.  The financial statements provide the amount of Federal financial aid funds (the 90/10 numerator) and the total revenues received (the 90/10 denominator).  Because 90/10 calculations must follow cash basis accounting, the revenues reported may differ from other financial statements of the company, which may use different accounting standards.  Consolidated company-wide 90/10 ratios were calculated by aggregating the 90/10 numerators and denominators reported to the Department of Education across all institutions/OPEIDs controlled by the company in each fiscal year for the 29 companies that participate in title IV.  A weighted average was then used to measure the growth in Federal financial aid funds collected over 5 years.

**Share of Federal Dollars (Appendix 10)**

The overall amount and share of Federal funds collected by each for-profit education company was calculated by totaling the Federal funds collected from the categories described below.  The amount of revenue used was the total amount reported to the Department of Education as the 90/10 denominator in fiscal year 2010.  For each company, 90/10 numerators and denominators were aggregated across all institutions/OPEIDs controlled by each company in fiscal year 2010, to provide the total revenues and the total Federal financial aid funds received pursuant to Title IV of the Higher Education Act.

<u>Federal Financial Aid</u>

The amount of Federal financial aid funds collected pursuant to Title IV of the Higher Education Act was calculated, as in Appendix 9, by aggregating the total Federal financial aid funds received, including but not limited to Stafford loans, Pell grants, and PLUS loans, across all institutions/OPEIDs controlled by the company in fiscal year 2010 (the 90/10 numerator).

<u>Military Education Benefits</u>

The Department of Veterans Affairs provided a list of post-9/11 GI bill program funds disbursed to each school during the 1-year period from August 1, 2009 – July 31, 2010 and the nearly 2-year period from August 1, 2009–June 15, 2011.  The total amount of funds collected was aggregated across all schools owned by each company for each program year.

In order to calculate an estimated amount of benefits received in each company's 2010 fiscal year, committee staff calculated the average amount of benefits collected per month for each program year and then totaled the number of months from each program year that occurred during each company's fiscal year 2010.

The Department of Defense provided a list of Tuition Assistance (TA) and My Career Advancement Accounts (MyCAA) program funds disbursed by school during the Federal fiscal years 2009, 2010, and 2011 (October 1–September 30).  The total amount of DOD education funds collected was aggregated across all schools owned by each company for each benefit program.

Committee staff estimated the amount collected during each company's fiscal year 2010 by calculating an average amount of benefits collected per month each Federal fiscal year and then adding up the number of months from each fiscal year that occurred during each company's fiscal year 2010.

<u>ECASLA Exemption</u>

In fiscal year 2010, pursuant to the Ensuring Continued Access to Student Loans Act (ECASLA), for-profit education companies were allowed to temporarily discount up to $2,000 per Stafford loan for purposes of reporting revenues received pursuant to the 90/10 rule.  The result of the exemption is that the actual amount of Federal financial aid funds collected is understated for companies that took advantage of the exemption.  Five of the 30 companies declined to deduct ECASLA funds from their reported title IV revenues, and the amount listed is zero.  For 11 of the 30 for-profit education companies, committee staff was able to estimate the amount of this exemption based on documents provided to the committee.  Because of limitations regarding the information provided, no reliable estimate of ECASLA funds was calculated for the remaining 13 companies; therefore the amount of student aid dollars that appears in the report is lower than the actual amount collected.

Because of the limitations explained above, the chart and the text that appear in the report that provide information on the share of revenues received from both Federal financial aid funds and from other Federal funds are *estimates* and do not provide the exact amount of Federal revenues received.

**Post 9-11 GI Bill Disbursements to 30 Companies Examined and Cumulative Data (Appendix 11)**

The Department of Veteran Affairs provided a list of post-9/11 GI bill program funds disbursed by school during the period August 1, 2009 – July 31, 2010 and the period August 1, 2009-June 15, 2011.  The total amount of post-9/11 GI bill funds collected by each company was aggregated across all schools owned by each company for each program year.  The total amount of post-9/11 GI bill funds collected by public institutions includes all campuses of each state's university system.

Committee staff calculated the number and share of veterans trained and dollars disbursed by sector and the top ten recipients across all sectors.

**Tuition Assistance and MyCAA Disbursements to 30 Companies and Cumulative Data Fiscal Years 2009 and 2010 (Appendix 12)**

The Department of Defense (DOD) provided a list of Tuition Assistance (TA) and My Career Advancement Accounts (MyCAA) program funds disbursed by school the during Federal fiscal years 2009, 2010 and 2011 (October 1–September 30).  The total amount of DOD education funds collected by each company was aggregated across all schools owned by each company for each of the two programs.  The total amount of DOD education funds collected by public institutions includes all campuses of each state's university system.

Committee staff calculated the number and share of veterans trained and dollars disbursed by sector and the top 10 recipients across all sectors from the data provided.

**Comparison of Cost of Attendance (Appendix 14)**

The committee developed cost comparisons primarily from tuition and fees information posted on colleges' Web sites.  Tuition was selected for Associate, Bachelor's, Certificate, and Master's degrees and programs depending on the program of emphasis for each company.

Comparison institutions for Associate and Certificate degrees were selected by identifying a program at a community college close to the for-profit education companies' corporate headquarters and matching it to a similar program offered by the for-profit college.  Comparison institutions for Bachelor's and Master's degrees were selected by identifying a program at the flagship public university in the state of the for-profit education companies' corporate headquarters.  In two instances, the branch of the public university system closest to the headquarters was used.

Generally, the committee compared Bachelor's degrees in business.  However, in the case of Education Management Corporation, because of the size and importance of the Art Institutes brand, both a business program (Argosy) and a Fashion and Retail Management program (Art Institutes) were measured.  At the Associate degree level, a program in business was selected as the comparison program.  If business was not offered, alternative programs selected were information technology or paralegal studies.  At the Certificate and diploma level, programs in allied health, automotive repair, or accounting were selected depending on the programs offered by the for-profit college.

Cost at the for-profit colleges was determined by reviewing gainful employment disclosure information, multiplied by the number of years required to complete the degree assuming the student registers for the maximum number of credits.  Cost at the 4-year public university was determined by reviewing the institution's yearly cost of attendance page for the most current year available, and multiplying that amount by 4 years.  If specific charges for business programs were listed, they were included.  Cost at community colleges for certificate programs was determined by reviewing gainful employment disclosure information.  Cost at community colleges for Associate degree programs was calculated by multiplying the number of credits required by the cost per credit.  The cost of books and fees was included in cost calculations wherever available including for all programs that provided gainful employment disclosures and most public community colleges and universities.  The cost of books and fees was generally not available for Bachelor's and Master's degree programs offered by for-profit colleges, but was included where available.

The committee staff then calculated the average price for each degree level for the programs in Appendix 14 at for-profit colleges, community colleges, and public universities to obtain estimates of the average price difference for the same degree at different type of colleges.

**Retention and Withdrawal (Appendix 15)**

The committee document request of August 5, 2010 asked each company to provide a set of data that tracked each student based on an anonymous unique identifier and provided the student's date of enrollment, date of completion, last date of attendance, or an indication that the student was still enrolled. It stated:

For the period July 1, 2008 to June 30, 2010, for each school operated by the Company, provide the following information:  A list of each student (identified by randomized numbers) who was enrolled on July 1, 2007 or who enrolled between July 1, 2007 and June 30, 2009 together with the student's date of enrollment, and date of completion or graduation, or date of last attendance in class or date of estimated completion or graduation.  Please also provide the type of degree being pursued (certificate, associate's, bachelor's, graduate). Please provide this information in a spreadsheet format compatible with Microsoft Excel 2007. [Committee staff later clarified that the "period" in the first sentence should have been July 1, 2007 to June, 30, 2010.]

This information was used to create a 1-year cohort of student retention data.  For every student who enrolled in a school operated by 28 companies between July 1, 2008 and June 30, 2009, the committee analyzed whether the student had completed, was continuing or had withdrawn as of mid-2010. One company, Chancellor University, failed to produce information that would allow the committee to accurately analyze the number of students that withdrew from Chancellor.  Another company, Med-Com Career Training, Inc./Drake College of Business, provided information that was not useable due to data integrity issues.  Because it is only a 1 year cohort, very few students enrolled in a degree program would be expected to complete, and these numbers are not particularly relevant to the staff analysis. Companies were allowed to define what period of time determined when a student had withdrawn, and these time frames varied from 10 to 90 days.  Committee staff was also able to perform comparative analysis for online and on-campus withdrawal rates for 11 companies.

The dataset provides a clear look at how many students who enrolled in 2008-9 had withdrawn without completing a degree or diploma by mid-2010.  It additionally provides the median time period in which students who withdrew were enrolled.  The for-profit model allows for students to re-enroll, and some students who are classified in the committee staff analysis as withdrawn likely returned.  Although several schools were offered the opportunity to share this information, only one school provided that data.

Four companies had a significant enough share of students enrolled in graduate programs that committee staff also calculated graduate student outcomes for those schools.  These calculations are not included in the overall withdrawal analysis.  The committee also did not include student outcomes for any degree program with less than 500 students enrolled.

**Revenue, Profit, Marketing, Fiscal Year 2009 (Appendix 19)**

The amount of money spent on "marketing" includes all funds spent on marketing and advertising, recruiting, and admissions, including salaries of marketing and recruiting employees.  In 2009, among the 30 companies examined, eight publicly traded companies and 14 privately held companies list an amount that includes both marketing and recruiting in the statement of income included in financial reports.  Where available, this figure was used.  The remaining eight companies reported a figure spent on marketing and on recruiting to the committee in response to question one of the second tranche of the document request of August 5, 2010. (See Appendix 4.)  Appendix 19 indicates both the source and the amount of funds included in the committee staff calculation of marketing and recruiting.

**Revenue, Expenses, and Profit (Operating Income) Fiscal Years 2006-10 (Appendix 18)**

The report includes a chart detailing the annual amount and increase in profit for each of the publicly traded companies between 2007 and 2010, and for each of the privately held companies between

2006 and 2009.  As noted, profit denotes operating income before taxes, depreciation, or amortization are subtracted.  Unlike public colleges or non-profit colleges, for-profit colleges are tax paying entities. Revenue, expenses, and profit numbers for 14 of the publicly traded companies are taken from SEC filings.  Revenue, expenses, and profit numbers for Kaplan Higher Education Corporation, and 13 privately held companies are taken from company financial statements provided to the committee.  Amounts for ECPI Colleges, Inc. and Herzing, Inc. have not been included due to the closely held nature of the companies.  TUI Learning LLC and Chancellor University System LLC were not in existence for all years.

**Executive Compensation (Appendix 17)**

All for-profit college executive compensation figures are taken from company SEC filings.  On an annual basis, publicly traded companies are required to disclose information concerning the amount and type of compensation paid to its chief executive officer, chief financial officer, and the three other most highly compensated executive officers.  This served as the source of 2009 and 2010 executive compensation information for 13 of the 15 publicly traded companies.  For National American University, executive compensation figures are only available for 2010, as the company was not listed on a major stock exchange in 2009.   No executive compensation figures are provided for privately held companies or Kaplan Higher Education Corporation, which is owned by the Washington Post Company, and does not disclose compensation for its Kaplan executives.

All figures regarding public university and non-profit college executive compensation are taken from *Chronicle of Higher Education* reports.  The public university selected was the branch of the flagship university in the state closest to the corresponding company's headquarters.

**Per Student Spending on Instruction (Appendix 21)**

Each institution of higher education annually reports the amount spent on instruction to the Department of Education.  The information reported primarily consists of funds spent on faculty and is defined by the Department of Education as:

> A functional expense category that includes expenses of the colleges, schools, departments, and other instructional divisions of the institution and expenses for departmental research and public service that are not separately budgeted.  Includes general academic instruction, occupational and vocational instruction, community education, preparatory and adult basic education, and regular, special, and extension sessions. Also includes expenses for both credit and non-credit activities. Excludes expenses for academic administration where the primary function is administration (e.g., academic deans). Information technology expenses related to instructional activities if the institution separately budgets and expenses information technology resources are included (otherwise these expenses are included in academic support). Institutions include actual or allocated costs for operation and maintenance of plant, interest, and depreciation.

IPEDS makes this information available by dividing the total spending on instruction (as reported by the institution) by the number of 12-month full-time equivalent students enrolled.  IPEDS then reports this information for institutions of higher education by Unit ID.  Unit IDs can include information about a single campus, or can include multiple campuses.

To generate the spending per student for each company, the total spending on instruction and the 12-month full-time equivalent enrollment for 2009 were aggregated across all Unit IDs operated by each

company and a weighted average of spending per student was calculated.

Med-Com Career Training, Inc. was not included because of because the amount of total instructional spending reported to IPEDS was equal to all expenses listed on its financial statements and was deemed erroneous. Henley Putnam LLC does not currently participate in title IV and is not required to report information to the Department of Education. Materials presented at the March 10, 2011 hearing, "Bridgepoint Education, Inc.: A Case study in For-Profit Education and Oversight" stated that Bridgepoint Education, Inc.'s Ashford University spent $700 per student on instruction in 2009; this amount was calculated using the enrollment figure of all students as reported to the SEC rather than the full-time equivalent enrollment reported to IPEDS. In order to create a complete comparison across all 30 companies examined, this report uses the IPEDS full-time equivalent for the enrollment figure. The $700 figure previously reported continues to be accurate.

## Per Student Spending on Marketing, Recruiting, and Admissions (Appendix 22)

To generate a comparable figure for per student spending on marketing and recruiting for each company for fiscal year 2009, committee staff took the marketing and recruiting total sourced in Appendix 19 and divided that amount by the 12-month full-time equivalent enrollment for 2009 aggregated across all Unit IDs operated by each company.

## Per Student Spending on Profit (Appendix 20)

To generate a comparable figure for amounts dedicated to profit on a per-student basis for each company for fiscal year 2009, committee staff took the reported operating income sourced in Appendix 18 and divided that amount by the 2009 12-month full-time equivalent enrollment aggregated across all Unit IDs operated by each company.

Per student spending on profit could not be calculated for Anthem Education Group, Henley Putnam LLC, or Chancellor University System LLC because none of the three companies were profitable in 2009.

## Instruction Costs per Student at Comparison Institutions (Appendix 23)

For each company, the report provides a comparison of the amount spent on instruction at other types of institutions offering comparable programs in the state of the company headquarters. Each institution of higher education annually reports the amount spent on instruction to the Department of Education. The information reported primarily consists of funds spent on faculty and is defined by the Department of Education (see above Appendix 21).

Instruction costs per student at each comparison institutions were calculated by aggregating the total spending on instruction and the 12-month full-time equivalent enrollment for 2009 across all Unit IDs operated by each institution and a weighted average of spending per student was calculated.

The comparison community college is a community college close to the company headquarters that offers similar programs. The comparison public university is the flagship public university in the state of the company headquarters (and in two instances in California is the branch of the flagship located closest to the headquarters). The private non-profit university is the largest non-profit by enrollment in the state of the company's headquarters.

**Employee Distribution by Company (Appendix 24)**

The report contains information regarding the number of staff employed by each company in various capacities.  The information includes the number of full-time and part-time faculty, staff responsible for recruiting and enrolling students, student services staff, and career services staff.  All data was provided by the companies pursuant to the document request of August 5, 2010 in response to question two of the second tranche of the request.  The question asked that each company provide the total number of staff employed in a number of categories.  These categories included: teaching, recruiting and admissions, financial aid assistance, career services, and placement, marketing and admissions, and student services.  For each category, companies were asked to indicate how many people were full-time and how many were part-time or contract employees.  This information appears in charts that demonstrate the number of recruiters, student service staff and career student staff and the enrollment in each fiscal year 2006-10 for each company that provided information.

The report also makes comparisons regarding how many employees are employed in recruiting, career services and student services on a per student basis.  Those numbers are calculated by dividing the number of employees in each category in fiscal year 2010 by the fall enrollment total (IPEDS or SEC) for 2010.

The following companies did not provide information for all years:  Walden and American Career Colleges, Inc. did not provide data for 2010, Bridgepoint Education, Inc. and TUI Learning LLC did not provide data for 2006, Chancellor University System LLC and Career Education Corporation provided information only for 2009, and Apollo Group, Inc., Anthem Education Group, and TUI Learning LLC did not provide information for some categories (financial aid and marketing and advertising).

**Cohort Default Rate (Appendix 16)**

For each of the years 2005 through 2008, the Department of Education reports, by OPEID, the number of student borrowers and number of students who default within 3 years of entering loan repayment.  Loan repayment generally starts after the end of the 6 month "grace period" after graduating or withdrawing from an institution.  These rates were released in preparation for the change from a default rate monitoring window of 2 years to 3 years in 2014, and are trial rates.  In 2008, companies were provided the opportunity to make corrections and corrected rates were issued.

Committee staff calculated a 3-year cohort default rate for each company by aggregating the total number of borrowers and defaulters for all OPEIDs controlled by the company for each cohort year from 2005 through 2008.

Companies which became eligible for title IV during the period and for which data was not available for all 3 years include American Public Education, Inc. (2005 and 2006); TUI Learning LLC, Chancellor University System LLC (2005-7), and Henley Putnam LLC which does not participate in title IV and for which no data is available.

## Appendix 5: The Undercover General Accountability Office Recruiting Investigation, Report and Corrections

On April 27, 2010, Chairman Harkin requested that the Forensic Audits and Special Investigations of the non-partisan Government Accountability Office (GAO) examine the recruiting practices at selected for-profit colleges in order to "determine whether fraudulent or deceptive practices are being employed in the recruiting or enrollment of students."  Between May and early-July 2011, staff of the Forensic Audits and Special Investigations (FSI) made 2 separate undercover visits to 15 for-profit college campuses selected by the GAO.  Audio of the undercover recordings was subsequently produced to the committee and are publicly available on the committee Web site.  Audio excerpts of several of the visits are referenced and transcribed in the accompanying final report.

Just prior to the completion of the undercover visits in July 2011, committee majority staff was briefed by FSI staff on the work to-date.  Committee staff asked GAO if they could have a report on the findings prepared in time for an early August hearing.  GAO staff indicated that they could.  In late July 2011, in advance of the hearing, both majority and minority staff were briefed on the findings of the undercover work and had an opportunity to view the not yet final video.

On August 4, 2010 the committee held a hearing titled "For-Profit Schools:  The Student Recruitment Experience."  The witnesses included Gregory Kutz, the managing director of the Office of Forensic Audits and Special Investigations.  Mr. Kutz presented the findings of the GAO undercover investigation that documented, on audio and video recordings, deceptive and misleading conduct by recruiters at each of the 15 for-profit college campuses visited by GAO agents in May and June 2010.  In addition to his written testimony–a GAO report that consisted of an 18-page summary and a 9-page appendix detailing the visits–Mr. Kutz also showed videotaped excerpts of some of the deceptive and misleading tactics documented by the agents.  The undercover tapes that the testimony was based upon documented how widespread the use of misleading and deceptive recruiting tactics had become at for-profit colleges.

At the time of the hearing, the Chairman requested that GAO provide him with the work papers produced in the course of its investigation and preparation of the report, including the full video of each of the two visits by undercover GAO agents to the 15 for-profit campuses, so that he could make them available to the public.  Committee staff also told representatives of the schools visited by the GAO that, in the interests of ensuring maximum transparency, the committee would make the tapes available to each school when they were received.

In late October 2010, after repeated inquiries from committee staff about when the audio and video recordings would be available, officials from GAO indicated to the committee that, in the process of preparing the tapes for distribution to the committee, discrepancies had been found between the tapes and the written report, and that the agency expected to issue an errata correcting these errors.

On November 30, 2010, the GAO issued the errata making corrections to the original report presented at the hearing.  The errata, one of eight issued by GAO in fiscal year 2011, contained two small changes to the text of the report and approximately 30 additional changes to the appendix.  While the majority of the changes were not particularly consequential, some of the changes helped to better illustrate the deceptive conduct uncovered by GAO in its investigation, additional changes added context that should have been included in the original presentation and report.

Because the undercover tapes and the GAO findings so clearly demonstrated serious improprieties at multiple for-profit colleges, representatives of various for-profit schools and related industry organizations seized upon the corrections in an attempt to discredit the underlying GAO investigation.  In December 2011, as a result of inquiries by the staff of the House Committee on Oversight and Government Reform, GAO initiated an internal investigation into how the GAO's presentation at the August 4, 2010 HELP Committee hearing was prepared.  According to GAO officials, the internal investigation specifically examined and concluded that no congressional pressure was brought regarding the contents or preparation of the report.  Despite claims made in some online publications, committee staff played no role in either the undercover investigation or in the preparation of the GAO report.

In a further response to the concerns of the House Committee on Oversight and Government Reform, GAO has since taken steps to restructure the Forensic Audits and Special Investigations Unit, including management changes and the appointment of a new director.  While considerable controversy was generated regarding the GAO report, the undercover recordings provide clear evidence of the misleading or deceptive tactics used by for-profit college recruiters at each of the 15 for-profit colleges visited.

**Appendix 7: Fall Enrollment, 2001-10**

Integrated Postsecondary Education Data System Enrollment

| Privately Held Companies | Fall 2001 | Fall 2002 | Fall 2003 | Fall 2004 | Fall 2005 |
|---|---|---|---|---|---|
| Alta Colleges, Inc. | 4,273 | 6,095 | 8,146 | 10,966 | 14,854 |
| American Career College, Inc. | 1,292 | 1,666 | 1,778 | 2,009 | 2,107 |
| Anthem Education Group | 9,768 | 9,893 | 10,266 | 15,212 | 18,433 |
| Chancellor Education LLC | 1,177 | 1,175 | 1,033 | 1,004 | 1,023 |
| Concorde Career Colleges, Inc. | 6,812 | 8,064 | 6,501 | 6,212 | 6,937 |
| ECPI Colleges, Inc. | 4,834 | 4,846 | 4,866 | 5,978 | 6,566 |
| Education America, Inc. | 8,014 | 6,169 | 6,916 | 9,441 | 9,225 |
| Henley Putnam LLC | ~ | ~ | ~ | ~ | ~ |
| Herzing, Inc. | 2,285 | 2,747 | 2,290 | 2,483 | 2,695 |
| Med-Com Career Training, Inc. | 280 | 275 | 329 | 415 | 461 |
| Rasmussen Colleges, Inc. | 1,882 | 2,134 | 2,637 | 2,968 | 3,288 |
| The Keiser School, Inc. | 3,692 | 4,484 | 5,463 | 6,551 | 7,857 |
| TUI Learning LLC | | | | | |
| Vatterott Educational Centers, Inc. | 4,496 | 4,438 | 5,360 | 5,784 | 6,014 |
| Walden E-Learning LLC | 2,082 | 4,565 | 8,227 | 13,553 | 22,168 |

| Privately Held Companies | Fall 2006 | Fall 2007 | Fall 2008 | Fall 2009 | Fall 2010 |
|---|---|---|---|---|---|
| Alta Colleges, Inc. | 14,119 | 14,191 | 18,322 | 15,479 | 19,190 |
| American Career College, Inc. | 2,450 | 2,693 | 3,979 | 4,687 | 4,761 |
| Anthem Education Group | 21,696 | 21,120 | 14,783 | 11,869 | 12,792 |
| Chancellor Education LLC | 942 | 570 | 422 | 515 | 739 |
| Concorde Career Colleges, Inc. | 6,559 | 7,572 | 8,196 | 8,873 | 7,952 |
| ECPI Colleges, Inc. | 8,350 | 9,375 | 9,522 | 12,849 | 13,119 |
| Education America, Inc. | 10,775 | 9,723 | 9,491 | 10,686 | 10,018 |
| Henley Putnam LLC | ~ | ~ | ~ | ~ | ~ |
| Herzing, Inc. | 3,157 | 3,888 | 4,220 | 6,578 | 8,253 |
| Med-Com Career Training, Inc. | 484 | 512 | 551 | 543 | 2,692 |
| Rasmussen Colleges, Inc. | 4,231 | 6,258 | 9,420 | 13,947 | 17,090 |
| The Keiser School, Inc. | 10,380 | 13,145 | 14,863 | 18,788 | 18,956 |
| TUI Learning LLC | | | 8004 | 8046 | 7,307 |
| Vatterott Educational Centers, Inc. | 5,780 | 6,008 | 5,800 | 11,107 | 11,163 |
| Walden E-Learning LLC | 27,412 | 29,455 | 34,779 | 40,714 | 47,456 |

~ data not available

\* data not available for year

**Appendix 7: Fall Enrollment, 2001-10**

Integrated Postsecondary Education Data System Enrollment

| Publicly Traded Companies | Fall 2001 | Fall 2002 | Fall 2003 | Fall 2004 | Fall 2005 |
|---|---|---|---|---|---|
| American Public Education, Inc. | ~ | ~ | ~ | ~ | ~ |
| Apollo Group, Inc. | 101,388 | 130,846 | 170,146 | 235,418 | 292,812 |
| Bridgepoint Education, Inc. | 479 | 553 | 609 | 611 | 968 |
| Capella Education Company | 3,759 | 5,804 | 9,574 | 12,599 | 13,907 |
| Career Education Corporation | 38,162 | 44,278 | 55,067 | 80,247 | 98,005 |
| Corinthian Colleges, Inc. | 53,699 | 62,842 | 76,525 | 78,523 | 75,916 |
| DeVry, Inc. | 36,605 | 56,122 | 55,903 | 58,056 | 52,991 |
| Education Management Corporation | 42,603 | 48,865 | 56,158 | 61,856 | 69,103 |
| Grand Canyon Education, Inc. | 4,113 | 3,973 | 3,091 | 4,491 | 7,969 |
| ITT Educational Services, Inc. | 32,500 | 35,821 | 40,668 | 47,391 | 45,801 |
| Kaplan Higher Education Corporation | 25,445 | 29,172 | 37,785 | 42,483 | 52,935 |
| Lincoln Educational Services Corporation | 12,514 | 14,554 | 19,278 | 22,067 | 25,529 |
| National American University Holdings, Inc. | 3,233 | 3,972 | 4,242 | 4,109 | 4,286 |
| Strayer Education, Inc. | 14,009 | 16,456 | 20,138 | 23,667 | 27,309 |
| Universal Technical Institute, Inc. | 7,243 | 10,250 | 10,039 | 19,632 | 22,840 |

| Publicly Traded Companies | Fall 2006 | Fall 2007 | Fall 2008 | Fall 2009 | Fall 2010 |
|---|---|---|---|---|---|
| American Public Education, Inc. | ~ | 14,769 | 21,729 | 31,331 | 39,296 |
| Apollo Group, Inc. | 294,757 | 330,155 | 395,361 | 376,746 | 406,963 |
| Bridgepoint Education, Inc. | 4,002 | 10,714 | 25,746 | 47,677 | 64,585 |
| Capella Education Company | 17,203 | 21,773 | 25,245 | 31,998 | 39,457 |
| Career Education Corporation | 94,073 | 97,469 | 106,113 | 109,674 | 127,041 |
| Corinthian Colleges, Inc. | 76,890 | 37,816 | 86,089 | 119,133 | 132,229 |
| DeVry, Inc. | 55,974 | 63,333 | 78,544 | 97,430 | 128,676 |
| Education Management Corporation | 77,118 | 90,272 | 101,843 | 129,642 | 152,786 |
| Grand Canyon Education, Inc. | 10,297 | 13,415 | 22,025 | 34,205 | 37,440 |
| ITT Educational Services, Inc. | 49,264 | 54,289 | 61,897 | 78,427 | 86,824 |
| Kaplan Higher Education Corporation | 63,025 | 71,915 | 90,206 | 120,479 | 129,070 |
| Lincoln Educational Services Corp. | 22,894 | 22,947 | 26,643 | 39,754 | 42,198 |
| National American University | 4,567 | 4,911 | 5,569 | 7,739 | 9,700 |
| Strayer Education, Inc. | 30,654 | 35,754 | 45,491 | 54,325 | 58,916 |
| Universal Technical Institute, Inc. | 23,076 | 22,139 | 17,348 | 28,153 | 26,396 |

~ data not available

* data not available for year

**Appendix 7: Fall Enrollment, 2001-10**

Securities and Exchange Commission Reported Enrollment

| Publicly Traded Companies | Fall 2001 | Fall 2002 | Fall 2003 | Fall 2004 | Fall 2005 |
|---|---|---|---|---|---|
| American Public Education, Inc. | * | * | * | * | * |
| Apollo Group, Inc. | 124,800 | 157,800 | 200,100 | 238,400 | 271,400 |
| Bridgepoint Education, Inc. | * | * | * | * | * |
| Capella Education Company | * | * | * | * | * |
| Career Education Corporation | 41,100 | 50,400 | 79,500 | 97,300 | 107,300 |
| Corinthian Colleges, Inc. | 28,372 | 39,347 | 57,580 | 70,500 | 68,262 |
| DeVry, Inc. | * | * | * | * | * |
| Education Management Corporation | 38,047 | 43,784 | 58,828 | 66,179 | 72,500 |
| Grand Canyon Education, Inc. | * | * | * | * | * |
| ITT Educational Services, Inc. | 31,815 | 33,799 | 36,974 | 42,183 | 44,331 |
| Kaplan Higher Education Corporation | * | * | * | * | 66,400 |
| Lincoln Educational Services Corporation | * | * | * | * | 19,824 |
| National American University Holdings, Inc. | * | * | * | * | * |
| Strayer Education, Inc. | 14,009 | 16,532 | 20,138 | 23,539 | 27,305 |
| Universal Technical Institute, Inc. | * | * | * | 15,212 | 17,368 |

| Publicly Traded Companies | Fall 2006 | Fall 2007 | Fall 2008 | Fall 2009 | Fall 2010 |
|---|---|---|---|---|---|
| American Public Education, Inc. | 15,500 | 26,900 | 41,100 | 59,300 | 77,700 |
| Apollo Group, Inc. | 282,300 | 313,700 | 362,100 | 443,000 | 470,800 |
| Bridgepoint Education, Inc. | * | * | 30,574 | 54,894 | 77,179 |
| Capella Education Company | 16,374 | 20,268 | 24,063 | 30,738 | 38,634 |
| Career Education Corporation | 89,400 | 100,500 | 98,400 | 102,100 | 118,205 |
| Corinthian Colleges, Inc. | 67,143 | 67,445 | 74,265 | 93,493 | 113,818 |
| DeVry, Inc. | * | * | * | * | 130,375 |
| Education Management Corporation | 80,300 | 95,900 | 110,800 | 136,000 | 158,300 |
| Grand Canyon Education, Inc. | * | * | 22,000 | 34,200 | 42,300 |
| ITT Educational Services, Inc. | 48,155 | 53,675 | 61,556 | 79,208 | 88,004 |
| Kaplan Higher Education Corporation | 69,800 | 81,600 | 99,700 | 103,849 | 112,141 |
| Lincoln Educational Services Corp. | 18,556 | 19,463 | 22,404 | 31,509 | 33,157 |
| National American University | * | * | * | 6,059 | 8,255 |
| Strayer Education, Inc. | 31,372 | 36,082 | 44,564 | 54,317 | 60,711 |
| Universal Technical Institute, Inc. | 17,523 | 16,882 | 16,481 | 18,802 | 21,000 |

~ data not available

* data not available for year

**Appendix 9: Funds Reported Pursuant to 90/10 Rule by Company**

**Fiscal Year 2006**

| Company | Numerator | Denominator | Ratio |
|---|---|---|---|
| Alta Colleges, Inc. | $164,106,000.00 | $223,446,000.00 | 73.44% |
| American Career College, Inc. | $29,316,807.00 | $37,096,599.00 | 79.03% |
| American Public Education, Inc. | $268,694.00 | $33,351,072.00 | 0.81% |
| Anthem Education Group | $146,604,149.00 | $181,020,842.00 | 80.99% |
| Apollo Group, Inc. | $1,530,227,000.00 | $2,234,139,000.00 | 68.49% |
| Bridgepoint Education, Inc. | $19,007,086.00 | $23,796,823.00 | 79.87% |
| Capella Education Company | $126,426,000.00 | $177,722,000.00 | 71.14% |
| Career Education Corporation | $1,104,465,117.00 | $1,774,126,937.00 | 62.25% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | $22,133,763.00 | $29,252,726.00 | 75.66% |
| Corinthian Colleges, Inc. | $617,526,286.00 | $819,840,470.00 | 75.32% |
| DeVry, Inc. | $514,616,000.00 | $772,760,000.00 | 66.59% |
| ECPI Colleges, Inc. | $59,174,910.10 | $75,156,388.35 | 78.74% |
| Education Management Corporation | $685,732,119.53 | $1,055,535,763.09 | 64.97% |
| Grand Canyon Education, Inc. | $49,414,631.51 | $68,539,912.00 | 72.10% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | $32,614,639.00 | $40,253,682.00 | 81.02% |
| ITT Educational Services, Inc. | $437,841,000.00 | $773,299,000.00 | 56.62% |
| Kaplan Higher Education Corporation | $586,374,588.00 | $724,487,581.00 | 80.94% |
| The Keiser School, Inc. | $93,554,306.00 | $128,516,254.00 | 72.80% |
| Lincoln Educational Services Corporation | $224,439,063.00 | $280,305,800.00 | 80.07% |
| Med-Com Career Training, Inc. | $3,239,217.00 | $3,737,664.00 | 86.66% |
| National American University Holdings, Inc. | $22,917,296.40 | $37,005,996.11 | 61.93% |
| Rasmussen Colleges, Inc. | $34,532,739.00 | $51,167,572.00 | 67.49% |
| Education America, Inc. | $118,990,000.00 | $143,249,000.00 | 83.07% |
| Strayer Education, Inc. | $232,858,567.00 | $322,205,547.00 | 72.27% |
| TUI Learning LLC | | | |
| Universal Technical Institute, Inc. | $241,176,026.00 | $331,309,077.00 | 72.79% |
| Vatterott Education Centers, Inc. | $81,085,702.00 | $97,229,240.00 | 83.40% |
| Walden E-Learning LLC | $131,073,000.00 | $188,634,000.00 | 69.49% |
| Weighted Average | $7,309,714,706.54 | $10,627,184,945.55 | 68.78% |

Appendix 9: Funds Reported Pursuant to 90/10 Rule by Company

**Fiscal Year 2007**

| Company | Numerator | Denominator | Ratio |
|---|---|---|---|
| Alta Colleges, Inc. | $186,339,000.00 | $259,443,000.00 | 71.82% |
| American Career College, Inc. | $32,956,275.00 | $42,399,630.00 | 77.73% |
| American Public Education, Inc. | $7,781,221.00 | $56,069,442.00 | 13.88% |
| Anthem Education Group | $163,405,338.00 | $204,482,291.00 | 79.91% |
| Apollo Group, Inc. | $1,773,621,000.00 | $2,453,419,000.00 | 72.29% |
| Bridgepoint Education, Inc. | $59,731,849.00 | $71,179,203.00 | 83.92% |
| Capella Education Company | $165,788,000.00 | $222,853,000.00 | 74.39% |
| Career Education Corporation | $1,041,154,517.00 | $1,641,011,179.00 | 74.39% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | $77,728,976.00 | $105,124,831.00 | 73.94% |
| Corinthian Colleges, Inc. | $599,533,783.00 | $796,940,213.00 | 75.23% |
| DeVry, Inc. | $578,531,000.00 | $845,297,000.00 | 68.44% |
| ECPI Colleges, Inc. | $79,588,974.90 | $103,046,170.54 | 77.24% |
| Education Management Corporation | $742,646,129.24 | $1,211,740,747.20 | 61.29% |
| Grand Canyon Education, Inc. | $69,695,978.00 | $94,215,892.00 | 73.97% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | $41,403,551.00 | $50,152,489.00 | 82.56% |
| ITT Educational Services, Inc. | $519,655,000.00 | $852,567,000.00 | 60.95% |
| Kaplan Higher Education Corporation | $748,506,213.00 | $909,761,256.00 | 82.28% |
| The Keiser School, Inc. | $108,604,491.00 | $148,518,055.00 | 73.13% |
| Lincoln Educational Services Corporation | $225,015,813.00 | $281,534,342.00 | 79.92% |
| Med-Com Career Training, Inc. | $4,183,684.00 | $4,802,922.00 | 87.11% |
| National American University Holdings, Inc. | $26,144,192.64 | $41,565,323.38 | 62.90% |
| Rasmussen Colleges, Inc. | $47,381,806.00 | $70,308,540.00 | 67.39% |
| Education America, Inc. | $98,631,000.00 | $125,286,000.00 | 78.72% |
| Strayer Education, Inc. | $205,695,931.00 | $287,313,465.00 | 71.59% |
| TUI Learning LLC | | | |
| Universal Technical Institute, Inc. | $225,696,934.00 | $330,644,024.00 | 68.26% |
| Vatterott Education Centers, Inc. | $86,730,544.00 | $100,628,784.00 | 86.19% |
| Walden E-Learning LLC | $154,383,000.00 | $202,249,000.00 | 76.33% |
| Weighted Average | $7,884,195,200.78 | $11,253,109,799.12 | 70.06% |

Appendix 9: Funds Reported Pursuant to 90/10 Rule by Company

**Fiscal Year 2008**

| Company | Numerator | Denominator | Ratio |
|---|---|---|---|
| Alta Colleges, Inc. | $225,607,000.00 | $283,883,000.00 | 79.47% |
| American Career College, Inc. | $51,963,292.00 | $63,613,476.00 | 81.69% |
| American Public Education, Inc. | $17,972,827.00 | $92,597,309.00 | 19.41% |
| Anthem Education Group | $131,955,135.00 | $159,192,675.00 | 82.89% |
| Apollo Group, Inc. | $2,271,850,000.00 | $2,878,265,000.00 | 78.93% |
| Bridgepoint Education, Inc. | $167,781,000.00 | $193,545,000.00 | 86.69% |
| Capella Education Company | $200,912,000.00 | $267,492,000.00 | 75.11% |
| Career Education Corporation | $1,043,477,693.00 | $1,483,506,042.00 | 70.34% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | $103,333,673.00 | $124,837,520.00 | 82.77% |
| Corinthian Colleges, Inc. | $706,980,539.00 | $872,888,295.00 | 80.99% |
| DeVry, Inc. | $645,116,000.00 | $1,003,087,000.00 | 64.31% |
| ECPI Colleges, Inc. | $96,555,918.59 | $117,371,636.29 | 82.27% |
| Education Management Corporation | $1,022,897,217.00 | $1,582,935,440.00 | 64.62% |
| Grand Canyon Education, Inc. | $119,528,402.00 | $152,141,480.00 | 78.56% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | $44,515,240.00 | $52,995,396.00 | 84.00% |
| ITT Educational Services, Inc. | $657,517,000.00 | $915,461,000.00 | 71.82% |
| Kaplan Higher Education Corporation | $904,435,052.00 | $1,070,904,739.00 | 84.46% |
| The Keiser School, Inc. | $145,684,226.00 | $185,635,433.00 | 78.48% |
| Lincoln Educational Services Corporation | $281,228,202.00 | $356,493,038.00 | 78.89% |
| Med-Com Career Training, Inc. | $15,279,310.00 | $17,550,339.00 | 87.06% |
| National American University Holdings, Inc. | $30,016,816.71 | $44,371,113.77 | 67.65% |
| Rasmussen Colleges, Inc. | $72,263,176.00 | $101,257,341.00 | 71.37% |
| Education America, Inc. | $95,108,000.00 | $108,785,000.00 | 87.43% |
| Strayer Education, Inc. | $280,093,219.00 | $361,753,429.00 | 77.43% |
| TUI Learning LLC | $3,769,771.00 | $34,244,000.00 | 11.01% |
| Universal Technical Institute, Inc. | $219,944,630.00 | $306,648,137.00 | 71.73% |
| Vatterott Education Centers, Inc. | $87,356,802.00 | $103,792,721.00 | 84.16% |
| Walden E-Learning LLC | $209,433,000.00 | $311,650,000.00 | 67.20% |
| Weighted Average | $9,626,968,141.30 | $12,963,014,560.06 | 74.26% |

Appendix 9: Funds Reported Pursuant to 90/10 Rule by Company

**Fiscal Year 2009**

| Company | Numerator | Denominator | Ratio |
|---|---|---|---|
| Alta Colleges, Inc. | $271,295,000.00 | $335,808,000.00 | 80.79% |
| American Career College, Inc. | $60,271,103.00 | $75,633,936.00 | 79.69% |
| American Public Education, Inc. | $28,888,032.00 | $133,673,035.00 | 21.61% |
| Anthem Education Group | $102,725,971.00 | $126,338,210.00 | 81.31% |
| Apollo Group, Inc. | $3,118,965,000.00 | $3,647,710,000.00 | 85.50% |
| Bridgepoint Education, Inc. | $329,492,397.00 | $385,623,580.00 | 85.44% |
| Capella Education Company | $256,577,000.00 | $328,458,000.00 | 78.12% |
| Career Education Corporation | $1,311,409,382.00 | $1,663,528,814.00 | 78.83% |
| Chancellor University System LLC | $1,099,424.00 | $1,818,482.00 | 60.46% |
| Concorde Career Colleges, Inc. | $119,546,013.00 | $142,558,161.00 | 83.86% |
| Corinthian Colleges, Inc. | $1,004,672,678.00 | $1,235,838,220.00 | 81.29% |
| DeVry, Inc. | $936,741,000.00 | $1,220,720,000.00 | 76.74% |
| ECPI Colleges, Inc. | $120,570,095.19 | $149,873,794.08 | 80.45% |
| Education Management Corporation | $1,333,937,408.00 | $1,910,504,611.00 | 69.82% |
| Grand Canyon Education, Inc. | $205,143,272.00 | $248,597,760.00 | 82.52% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | $64,471,501.00 | $75,833,389.00 | 85.02% |
| ITT Educational Services, Inc. | $862,369,000.00 | $1,230,791,000.00 | 70.07% |
| Kaplan Higher Education Corporation | $1,283,359,256.00 | $1,507,671,145.00 | 85.12% |
| The Keiser School, Inc. | $190,229,656.00 | $245,642,314.00 | 77.44% |
| Lincoln Educational Services Corporation | $396,363,354.00 | $492,334,560.00 | 80.51% |
| Med-Com Career Training, Inc. | $38,419,309.00 | $44,363,347.00 | 86.60% |
| National American University Holdings, Inc. | $39,877,405.45 | $55,733,844.86 | 71.55% |
| Rasmussen Colleges, Inc. | $121,068,791.00 | $166,636,125.00 | 72.65% |
| Education America, Inc. | $113,122,000.00 | $134,152,000.00 | 84.32% |
| Strayer Education, Inc. | $379,298,332.00 | $488,843,440.00 | 77.59% |
| TUI Learning LLC | $5,430,000.00 | $47,815,000.00 | 11.36% |
| Universal Technical Institute, Inc. | $261,647,903.00 | $351,051,669.00 | 74.53% |
| Vatterott Education Centers, Inc. | $110,001,552.00 | $126,008,942.00 | 87.30% |
| Walden E-Learning LLC | $275,649,000.00 | $380,415,000.00 | 72.46% |
| Weighted Average | $13,071,345,834.64 | $16,618,168,378.94 | 78.66% |

Appendix 9: Funds Reported Pursuant to 90/10 Rule by Company

**Fiscal Year 2010**

| Company | Numerator | Denominator | Ratio |
|---|---|---|---|
| Alta Colleges, Inc. | $320,614,000.00 | $382,187,000.00 | 83.89% |
| American Career College, Inc. | $67,606,612.00 | $85,536,177.00 | 79.04% |
| American Public Education, Inc. | $51,419,487.00 | $197,609,040.00 | 26.02% |
| Anthem Education Group | $111,517,180.00 | $136,143,394.00 | 81.91% |
| Apollo Group, Inc. | $3,648,296,000.00 | $4,278,086,000.00 | 85.28% |
| Bridgepoint Education, Inc. | $496,603,656.00 | $583,848,631.00 | 85.06% |
| Capella Education Company | $326,765,000.00 | $417,987,000.00 | 78.18% |
| Career Education Corporation | $1,544,065,000.00 | $1,894,645,000.00 | 81.50% |
| Chancellor University System LLC | $4,117,379.00 | $4,747,186.00 | 86.73% |
| Concorde Career Colleges, Inc. | $141,734,297.00 | $170,252,158.00 | 83.25% |
| Corinthian Colleges, Inc. | $1,416,124,643.00 | $1,729,333,660.00 | 81.89% |
| DeVry, Inc. | $1,194,880,996.00 | $1,542,222,148.00 | 77.48% |
| ECPI Colleges, Inc. | $153,532,606.00 | $205,983,058.00 | 74.54% |
| Education America, Inc. | $140,845,000.00 | $167,870,000.00 | 83.90% |
| Education Management Corporation | $1,789,333,000.00 | $2,310,779,000.00 | 77.43% |
| Grand Canyon Education, Inc. | $278,123,000.00 | $327,757,000.00 | 84.86% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | $93,103,103.00 | $108,189,110.00 | 86.06% |
| ITT Educational Services, Inc. | $1,048,946,000.00 | $1,726,330,000.00 | 60.76% |
| Kaplan Higher Education Corporation | $1,460,427,211.00 | $1,700,337,448.00 | 85.89% |
| The Keiser School, Inc. | ~ | ~ | ~ |
| Lincoln Educational Services Corporation | $489,423,407.00 | $591,577,476.00 | 82.73% |
| Med-Com Career Training, Inc. | $32,639,741.00 | $38,699,606.00 | 84.34% |
| National American University Holdings, Inc. | $58,250,000.00 | $76,545,809.00 | 76.10% |
| Rasmussen Colleges, Inc. | $177,247,332.00 | $225,017,409.00 | 78.77% |
| Strayer Education, Inc. | $470,689,110.00 | $605,558,887.00 | 77.73% |
| TUI Learning LLC | $6,908,000.00 | $56,429,000.00 | 12.24% |
| Universal Technical Institute, Inc. | $318,641,000.00 | $439,524,000.00 | 72.50% |
| Vatterott Education Centers, Inc. | $166,985,553.00 | $192,044,581.00 | 86.95% |
| Walden E-Learning LLC | $341,311,000.00 | $446,514,000.00 | 76.44% |
| Weighted Average | $16,350,149,313.00 | $20,641,753,778.00 | 79.21% |

**Appendix 10: Estimated Federal Revenues, Fiscal Year 2010**

| Company | Revenue Reported (90/10 Denominator) | Title IV Funds Reported (90/10 Numerator) | Share Title IV Funds | Estimated Military Education Benefits | Share Military Funds | Estimated Total Federal Funds | Share of Federal Dollars | Estimated Non-Reported Title IV Funds (ECASLA) | Share ECASLA Funds |
|---|---|---|---|---|---|---|---|---|---|
| Alta Colleges, Inc. | $382,187,000 | $320,614,000 | 83.9% | $17,504,453 | 4.6% | $338,118,453 | 88.5% | $24,450,009 | 6.4% |
| American Career College, Inc. | $85,536,177 | $67,606,612 | 79.0% | $917,445 | 1.1% | $68,524,057 | 80.1% | $11,969,106 | 14.0% |
| American Public Education, Inc. | $197,609,040 | $51,419,487 | 26.0% | $101,564,703 | 51.4% | $152,984,190 | 77.4% | $0 | 0% |
| Anthem Education Group | $136,143,394 | $111,517,180 | 81.9% | $704,633 | 0.5% | $112,221,813 | 82.4% | $8,506,735 | 6.2% |
| Apollo Group, Inc. | $4,278,086,000 | $3,648,296,000 | 85.3% | $144,415,614 | 3.4% | $3,792,711,614 | 88.7% | $0 | 0% |
| Bridgepoint Education, Inc. | $583,848,631 | $496,603,656 | 85.1% | $50,360,885 | 8.6% | $546,964,541 | 93.7% | $0 | 0% |
| Capella Education Company | $417,987,000 | $326,765,000 | 78.2% | $11,051,641 | 2.6% | $337,816,641 | 80.8% | $6,522,922 | 1.6% |
| Career Education Corporation | $1,894,645,000 | $1,544,065,000 | 81.5% | $71,471,756 | 3.8% | $1,615,536,756 | 85.3% | $17,756,423 | 0.9% |
| Chancellor University System LLC | $4,747,186 | $4,117,379 | 86.7% | $32,342 | 0.7% | $4,149,721 | 87.4% | * | * |
| Concorde Career Colleges, Inc. | $170,252,158 | $141,734,297 | 83.2% | $4,127,155 | 2.4% | $145,861,452 | 85.7% | * | * |
| Corinthian Colleges, Inc. | $1,729,333,660 | $1,416,124,643 | 81.9% | $21,190,748 | 1.2% | $1,437,315,391 | 83.1% | $137,652,311 | 8.0% |
| DeVry, Inc. | $1,542,222,148 | $1,194,880,996 | 77.5% | $52,950,424 | 3.4% | $1,247,831,420 | 80.9% | $0 | 0% |
| ECPI Colleges, Inc. | $205,983,058 | $153,532,606 | 74.5% | $15,804,597 | 7.7% | $169,337,203 | 82.2% | $10,290,800 | 5.0% |
| Education America, Inc. | $167,870,000 | $140,845,000 | 83.9% | $3,364,205 | 2.0% | $144,209,205 | 85.9% | $10,457,697 | 6.2% |
| Education Management Corporation | $2,310,779,000 | $1,789,333,000 | 77.4% | $58,454,353 | 2.5% | $1,847,787,353 | 80.0% | * | * |
| Grand Canyon Education, Inc. | $327,757,000 | $278,123,000 | 84.9% | $7,295,659 | 2.2% | $285,418,659 | 87.1% | * | * |
| Henley Putnam LLC~ | $2,062,141 | $0 | 0% | $1,193,681 | 57.9% | $1,193,681 | 57.9% | $0 | 0% |
| Herzing, Inc. | $108,189,110 | $93,103,103 | 86.1% | $1,458,586 | 1.3% | $94,561,689 | 87.4% | * | * |
| ITT Educational Services, Inc. | $1,726,330,000 | $1,048,946,000 | 60.8% | $87,779,328 | 5.1% | $1,136,725,328 | 65.8% | * | * |
| Kaplan Higher Education Corporation | $1,700,337,448 | $1,460,427,211 | 85.9% | $33,738,673 | 2.0% | $1,494,165,884 | 87.9% | * | * |
| Keiser School, Inc. (The)~ | $245,642,314 | $190,229,656 | 77.4% | $2,894,374 | 1.2% | $193,124,030 | 78.6% | $20,749,905 | 8.4% |
| Lincoln Educational Services Corporation | $591,577,476 | $489,423,407 | 82.7% | $7,416,372 | 1.3% | $496,839,779 | 84.0% | * | * |
| Med-Com Career Training, Inc. | $38,699,606 | $32,639,741 | 84.3% | $0 | 0% | $32,639,741 | 84.3% | * | * |
| National American University Holdings, Inc. | $76,545,889 | $58,250,000 | 76.1% | $3,000,368 | 3.9% | $61,250,368 | 80.0% | $4,371,769 | 5.7% |
| Rasmussen Colleges, Inc. | $225,017,409 | $177,247,332 | 78.8% | $4,119,482 | 1.8% | $181,366,814 | 80.6% | * | * |
| Strayer Education, Inc. | $605,558,887 | $470,689,110 | 77.7% | $43,194,389 | 7.1% | $513,883,499 | 84.9% | * | * |
| TUI Learning LLC | $56,429,000 | $6,908,000 | 12.2% | $36,310,012 | 64.3% | $43,218,012 | 76.6% | * | * |
| Universal Technical Institute, Inc. | $439,524,000 | $318,641,000 | 72.5% | $10,918,391 | 2.5% | $329,559,391 | 75.0% | $16,327,259 | 3.7% |
| Vatterott Education Holdings, Inc. | $192,044,581 | $166,985,553 | 87.0% | $2,301,660 | 1.2% | $169,287,213 | 88.1% | * | * |
| Walden LLC | $446,514,000 | $341,311,000 | 76.4% | $6,227,177 | 1.4% | $347,538,177 | 77.8% | $0 | 0% |

* No reliable estimate available
~ Data listed is fiscal year 2009

A10-1

**Appendix 11: Post 9-11 GI Bill Disbursements to 30 Companies Examined and Cumulative Data, 8/1/2009-6/15/2011**

### Post 9-11 GI Bill Disbursements by Sector

| 2009-10 Data, by Sector | | | |
|---|---|---|---|
| Sector | Veteran's Trained | Amount Paid | Cost Per Veteran |
| For-Profit | 76,746 | $639,831,862 | $8,337 |
| Private Non-Profit | 49,470 | $416,022,759 | $8,410 |
| Public | 203,790 | $696,687,673 | $3,419 |
| **TOTAL** | 330,006 | $1,752,542,224 | $5,311 |

| 2009-11 Data, by Sector | | | |
|---|---|---|---|
| Sector | Veteran's Trained | Amount Paid | Cost Per Veteran |
| For-Profit | 151,980 | $1,586,754,240 | $10,441 |
| Private Non-Profit | 95,006 | $1,005,996,363 | $10,589 |
| Public | 361,535 | $1,678,127,527 | $4,642 |
| **TOTAL** | 608,521 | $4,270,878,130 | $7,018 |

**Appendix 11: Post 9-11 GI Bill Disbursements to 30 Companies Examined and Cumulative Data**

**Post 9-11 GI Bill Disbursements to 30 Companies, 8/1/2009 - 6/15/2011**

| Company | Veterans Trained | Amount Paid | Cost Per Veteran | HELP FY2010 Estimate |
|---|---|---|---|---|
| Alta Colleges, Inc. | 1,894 | $34,762,408 | $18,354 | $17,309,337 |
| American Career College, Inc. | 119 | $1,867,246 | $15,691 | $917,445 |
| American Public Education, Inc. | 4,929 | $19,459,397 | $3,948 | $9,356,252 |
| Anthem Education Group | 178 | $1,820,121 | $10,225 | $633,661 |
| Apollo Group, Inc. | 29,336 | $209,994,159 | $7,158 | $81,579,300 |
| Bridgepoint Education, Inc. | 6,691 | $25,269,775 | $3,777 | $11,974,304 |
| Capella Education Company | 2,021 | $18,516,546 | $9,162 | $8,928,325 |
| Career Education Corporation | 10,045 | $129,658,355 | $12,908 | $63,721,760 |
| Chancellor University System LLC | 8 | $31,960 | $3,995 | $10,404 |
| Concorde Career Colleges, Inc. | 555 | $7,303,399 | $13,159 | $3,526,400 |
| Corinthian Colleges, Inc. | 4,676 | $60,250,796 | $12,885 | $19,871,801 |
| DeVry, Inc. | 14,056 | $143,572,825 | $10,214 | $43,900,796 |
| ECPI Colleges, Inc. | 3,153 | $39,130,786 | $12,411 | $14,274,364 |
| Education America, Inc. | 574 | $7,925,275 | $13,807 | $3,161,658 |
| Education Management Corporation | 11,197 | $173,323,551 | $15,479 | $55,441,884 |
| Grand Canyon Education, Inc. | 1,788 | $10,400,521 | $5,817 | $5,000,939 |
| Henley Putnam LLC | 186 | $913,647 | $4,912 | $438,222 |
| Herzing, Inc. | 278 | $2,695,197 | $9,695 | $1,270,487 |
| ITT Educational Services, Inc. | 11,856 | $178,337,243 | $15,042 | $87,499,062 |
| Kaplan Higher Education Corporation | 4,840 | $43,949,681 | $9,081 | $21,191,895 |
| Lincoln Educational Services Corporation | 921 | $15,028,353 | $16,317 | $7,389,250 |
| Med-Com Career Training, Inc. | 0 | $0 | $0 | $0 |
| National American University Holdings, Inc. | 521 | $3,510,984 | $6,739 | $1,365,542 |
| Rasmussen Colleges, Inc. | 681 | $8,599,722 | $12,628 | $3,861,770 |
| Strayer Education, Inc. | 9,453 | $80,211,305 | $8,485 | $38,689,958 |
| The Keiser School, Inc. | 1,489 | $13,279,985 | $8,919 | $6,463,958 |
| TUI Learning LLC | 2,228 | $7,569,011 | $3,397 | $2,955,551 |
| Universal Technical Institute, Inc. | 1,092 | $24,861,617 | $22,767 | $10,875,476 |
| Vatterott Education Centers, Inc. | 309 | $4,731,278 | $15,312 | $2,295,848 |
| Walden LLC | 1,046 | $10,276,210 | $9,824 | $5,035,618 |

Appendix 12:  Tuition Assistance and Military Spouse Career Advancement Account (MyCAA) Disbursements to
30 Companies and Cumulative Data, Fiscal Years 2009 and 2010

### Disbursements by Sector

| MyCAA Disbursements by Sector, Fiscal Year 2010 | | | |
|---|---|---|---|
| Sector | Number of Students | Total Disbursed | Cost Per Student |
| For-Profit | 35,953 | $118,356,858 | $3,292 |
| Private | 8,712 | $27,388,830 | $3,144 |
| Public | 32,394 | $66,710,724 | $2,059 |
| TOTAL | 77,059 | $212,456,411 | $2,757 |

| MyCAA Disbursements by Sector, Fiscal Year 2011 | | | |
|---|---|---|---|
| Sector | Number of Students | Total Disbursed | Cost Per Student |
| For-Profit | 19,698 | $39,950,825 | $2,028 |
| Private | 2,784 | $4,326,018 | $1,554 |
| Public | 15,092 | $21,006,619 | $1,392 |
| TOTAL | 37,574 | $65,283,463 | $1,737 |

| Tuition Assistance Disbursements by Sector, Fiscal Year 2010 | | | |
|---|---|---|---|
| Sector | Number of Students | Total Disbursed | Cost Per Student |
| For-Profit | 114,664 | $254,776,267 | $2,222 |
| Public | 64,391 | $119,870,457 | $1,862 |
| Private | 124,545 | $160,742,278 | $1,291 |
| TOTAL | 303,600 | $535,389,001 | $1,763.47 |

| Tuition Assistance Disbursements by Sector, Fiscal Year 2011 | | | |
|---|---|---|---|
| Sector | Number of Students | Total Disbursed | Cost Per Student |
| For-Profit | 125,258 | $279,836,048 | $2,234 |
| Private | 62,141 | $119,404,306 | $1,922 |
| Public | 118,612 | $163,485,961 | $1,378 |
| TOTAL | 306,011 | $562,726,314 | $1,839 |

Appendix 12: Tuition Assistance and Military Spouse Career Advancement Account (MyCAA) Disbursements to 30 Companies and Cumulative Data, Fiscal Years 2009 and 2010

**Disbursements to 30 Companies**

| Company | Tuition Assistance Funds | | | MyCAA Funds | | | TA and MyCAA |
|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | HELP FY2010 Estimate |
| Alta Colleges, Inc. | $133,901 | $56,207 | $46,695 | $72,712 | $138,909 | $15,832 | $195,116 |
| American Career College, Inc. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| American Public Education, Inc. | $72,789,346 | $85,583,916 | $16,250 | $1,491,100 | $4,642,942 | $645,714 | $92,208,451 |
| Anthem Education Group | $13,655 | $8,855 | $97,507,518 | $12,814 | $76,951 | $33,866 | $70,972 |
| Apollo Group, Inc. | $31,363,535 | $30,907,508 | $27,141,655 | $7,707,912 | $34,789,858 | $4,223,084 | $62,836,314 |
| Bridgepoint Education, Inc. | $13,193,310 | $26,666,190 | $39,509,974 | $2,406,019 | $10,981,182 | $1,094,233 | $38,386,581 |
| Capella Education Company | $969,265 | $903,938 | $734,104 | $471,018 | $1,648,169 | $102,837 | $2,123,315 |
| Career Education Corporation | $6,580,877 | $3,781,504 | $4,143,546 | $1,550,796 | $4,984,687 | $557,870 | $7,749,997 |
| Chancellor University System LLC | $1,500 | $28,750 | $26,250 | $0 | $0 | $0 | $21,938 |
| Concorde Career Colleges, Inc. | $9,667 | $8,000 | $3,000 | $242,023 | $735,333 | $170,019 | $600,755 |
| Corinthian Colleges, Inc. | $103,946 | $90,005 | $99,446 | $455,778 | $1,482,016 | $810,400 | $1,318,947 |
| DeVry, Inc. | $7,223,395 | $7,653,991 | $7,491,333 | $466,514 | $1,848,876 | $282,585 | $9,049,628 |
| ECPI Colleges, Inc. | $1,280,370 | $1,157,400 | $1,152,679 | $160,674 | $402,563 | $98,698 | $1,530,233 |
| Education America, Inc. | $4,667 | $0 | $0 | $103,252 | $234,090 | $88,102 | $202,547 |
| Education Management Corporation | $812,888 | $1,185,433 | $1,748,564 | $640,824 | $2,346,620 | $355,043 | $3,012,468 |
| Grand Canyon Education, Inc. | $563,323 | $1,213,806 | $1,578,400 | $328,317 | $1,289,169 | $91,555 | $2,294,720 |
| Henley Putnam LLC | $273,144 | $385,776 | $448,769 | $0 | $1,500 | $0 | $402,649 |
| Herzing, Inc. | $56,395 | $56,826 | $111,951 | $26,902 | $149,000 | $22,965 | $188,098 |
| ITT Educational Services, Inc. | $302,330 | $190,971 | $133,913 | $20,248 | $127,511 | $31,702 | $280,265 |
| Kaplan Higher Education Corporation | $3,635,338 | $7,231,437 | $6,626,531 | $2,154,041 | $6,645,712 | $1,929,135 | $12,546,778 |
| Keiser School, Inc. (The) | $55,365 | $49,375 | $76,987 | $96,906 | $386,371 | $77,972 | $365,549 |
| Lincoln Educational Services Corporation | $18,508 | $10,000 | $7,875 | $0 | $17,934 | $16,810 | $27,122 |
| Med-Com Career Training, Inc. | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| National American University Holdings, Inc. | $1,493,979 | $1,456,928 | $1,489,783 | $43,258 | $226,693 | $34,602 | $1,634,826 |
| Rasmussen Colleges, Inc. | $42,156 | $75,720 | $114,122 | $60,886 | $181,991 | $36,660 | $257,711 |
| Strayer Education, Inc. | $4,344,679 | $4,093,475 | $3,446,039 | $301,431 | $748,251 | $46,511 | $4,504,431 |
| TUI Learning LLC | $30,280,976 | $32,508,792 | $33,190,531 | $585,259 | $1,675,079 | $111,817 | $33,354,462 |
| Universal Technical Institute, Inc. | $48,960 | $20,088 | $14,163 | $1,173 | $22,827 | $6,888 | $42,915 |
| Vatterott Education Centers, Inc. | $10,500 | $6,250 | $4,500 | $0 | $0 | $0 | $5,812 |
| Walden LLC | $403,196 | $475,359 | $523,629 | $322,059 | $926,383 | $37,383 | $1,191,559 |

**Appendix 13: Pell Grant Disbursements, Award Year 2007-10**

| Company | AY 2010 | AY 2009 | AY 2008 | AY 2007 |
|---|---|---|---|---|
| Alta Colleges, Inc. | $87,609,034 | $45,947,098 | $33,151,765 | $25,398,195 |
| American Career College, Inc. | $24,404,112 | $16,718,088 | $11,619,972 | $8,936,278 |
| American Public Education, Inc. | $14,196,995 | $4,783,244 | $2,254,191 | $667,907 |
| Anthem Education Group | $41,131,010 | $30,828,445 | $31,853,108 | $37,296,800 |
| Apollo Group, Inc. | $1,154,792,546 | $656,940,560 | $400,713,039 | $256,507,478 |
| Bridgepoint Education, Inc. | $171,377,230 | $79,080,626 | $31,209,006 | $8,970,260 |
| Capella University | $11,138,020 | $3,687,041 | $2,277,514 | $1,559,782 |
| Career Education Corporation | $407,938,658 | $218,723,220 | $184,219,684 | $152,750,572 |
| Chancellor University | $1,430,243 | $754,883 | $719,485 | $0 |
| Concorde Career Colleges, Inc. | $39,852,602 | $31,806,908 | $24,845,388 | $21,065,562 |
| Corinthian Colleges, Inc. | $509,310,282 | $324,636,143 | $220,163,207 | $170,231,061 |
| DeVry, Inc. | $267,510,405 | $142,721,776 | $103,443,202 | $82,332,703 |
| Med-Com Career Training, Inc. | $15,813,336 | $13,267,531 | $3,942,012 | $2,962,695 |
| ECPI Colleges, Inc. | $47,054,058 | $22,505,342 | $18,216,106 | $14,754,315 |
| Education America, Inc. | $54,853,665 | $36,821,804 | $28,624,254 | $31,308,455 |
| Education Management Corporation | $350,642,740 | $190,498,757 | $137,382,388 | $101,480,520 |
| Grand Canyon Education, Inc. | $45,691,098 | $18,647,714 | $6,726,328 | $2,273,748 |
| Henley Putnam LLC | $0 | $0 | $0 | $0 |
| Herzing, Inc. | $34,775,352 | $13,455,484 | $10,688,557 | $8,213,643 |
| ITT Educational Services, Inc. | $264,009,212 | $149,117,326 | $101,765,404 | $83,978,422 |
| Kaplan Higher Education | $440,025,712 | $268,420,624 | $201,027,369 | $151,023,579 |
| Keiser School, Inc. (The) | $69,145,627 | $36,779,506 | $26,857,689 | $22,211,607 |
| Lincoln Educational Services Corporation | $160,327,281 | $91,233,051 | $63,593,141 | $49,927,122 |
| National American University Holdings, Inc. | $19,931,824 | $10,252,979 | $6,591,045 | $5,730,501 |
| Rasmussen, Inc. | $48,201,192 | $21,292,837 | $12,601,550 | $8,311,331 |
| Strayer Education, Inc. | $102,922,077 | $41,584,535 | $28,215,308 | $21,041,669 |
| TUI University | $1,396,591 | $779,322 | $369,222 | $0 |
| Universal Technical Institute, Inc. | $81,044,463 | $37,134,168 | $26,792,824 | $25,083,475 |
| Vatterott Education Holdings, Inc. | $61,633,022 | $28,221,548 | $24,301,074 | $19,885,277 |
| Walden LLC | $12,672,783 | $3,032,396 | $747,113 | $505,712 |

Source: Department of Education, Title IV Program Volume Reports by School

**Appendix 14: Tuition and Fee Comparison**

| | Alta Colleges, Inc. Cost Comparison | | | | |
|---|---|---|---|---|---|
| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
| Westwood College | Bachelor of Science in Business Administration | $80,466 | University of Colorado | Bachelor of Science in Business Administration | $60,704 |
| Westwood College | Associate of Applied Science in Information Technology | $48,194 | Community College of Denver | Associate of Applied Science in Information Technology | $8,823 |
| | American Career College, Inc. Cost Comparison | | | | |
| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
| American Career College | Medical Assistant Program | $17,068 | Orange Coast College | Certificate of Achievement in Medical Assisting: Clinical | $2,046 |
| | American Public Education, Inc. Cost Comparison | | | | |
| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
| American Public University | Bachelor of Science in Business Administration | $30,350 | West Virginia University | Bachelor's Degree in Business Administration | $28,936 |
| American Public University | Associate of Arts in Business Administration | $15,250 | Blue Ridge Community and Technical College | Associate of Applied Science Degree in Business | $8,900 |
| | Anthem Education Group Cost Comparison | | | | |
| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
| Anthem College | Medical Assistant Diploma Program | $14,990 | Phoenix College | Certificate Program in Medical Assisting | $4,503 |

**Appendix 14: Tuition and Fee Comparison**

### Apollo Group, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| University of Phoenix | Bachelor of Science in Business Administration | $74,575 | University of Arizona | Bachelor of Science in Business Administration | $44,200 |
| University of Phoenix | Associate of Arts with a Concentration in Foundations of Business | $24,500 | Phoenix College | Associate of Applied Science in General Business | $4,087 |
| University of Phoenix | Bachelor of Science in Business | | Prescott College | Bachelor's Degree (not specified) | $142,716 |

### Bridgepoint Education, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Ashford University | Bachelor of Arts in Business Administration | $53,680 | University of Iowa | Bachelor's Degree in Business Administration | $43,816 |
| Ashford University | Associate of Arts in Business | $30,574 | Eastern Iowa Community College | Associate of Applied Science in Business Management | $7,936 |

### Capella Education Company Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Capella University | Bachelor of Science in Business Administration | $57,290 | University of Minnesota | Bachelor of Science in Business | $56,240 |
| Capella University | Master of Science in Education | $20,210 | University of Minnesota | Master of Education | $31,235 |

### Career Education Corporation Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| American InterContinental University | Bachelor's Degree in Business Administration | $67,819 | University of Illinois | Bachelor of Science in Business Administration | $84,320 |
| American InterContinental University | Associate Degree in Business Administration and Management | $30,659 | College of DuPage | Associate of Applied Science in Management | $8,704 |

**Appendix 14: Tuition and Fee Comparison**

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| **Chancellor University System LLC Cost Comparison** | | | | | |
| Chancellor University | Bachelor of Science in Business Administration | $47,000 | Ohio State University | Bachelor of Science in Business Administration | $38,844 |
| **Concorde Career Colleges, Inc. Cost Comparison** | | | | | |
| Concorde Career College | Diploma in Medical Office Administration | $15,631 | Johnson County Community College | Medical Administrative and Office Assistant Certificate Program | $4,330 |
| **Corinthian Colleges, Inc. Cost Comparison** | | | | | |
| Everest College | Associate of Science in Paralegal | $41,149 | Santa Ana College | Associate Degree in Paralegal Studies | $2,392 |
| Everest College | Medical Assistant Diploma Program | $23,009 | Orange Coast College | Certificate of Achievement in Medical Assisting: Clinical | $3,682 |
| **DeVry, Inc. Cost Comparison** | | | | | |
| DeVry University | Bachelor of Science in Business Administration | $75,184 | University of Illinois | Bachelor of Science in Business Administration | $84,320 |
| DeVry University | Associate of Applied Science in Accounting | $37,157 | College of DuPage | Associate of Applied Science in Accounting | $9,520 |
| **ECPI Colleges, Inc. Cost Comparison** | | | | | |
| ECPI University | Bachelor of Science in Business Administration | $58,550 | University of Virginia | Bachelor's Degree in Business Administration | $51,912 |
| ECPI University | Associate of Science in Computer and Information Science | $36,650 | Tidewater Community College | Associate of Applied Science in Information Systems Technology | $10,232 |

A14-3

**Appendix 14: Tuition and Fee Comparison**

### Education America, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Remington College | Medical Billing and Coding Certificate Program | $15,995 | Valencia Community College | Medical Information Coder/Biller Certificate | $4,653 |

### Education Management Corporation Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Art Institute of Pittsburgh | Bachelor of Science in Fashion and Retail Management | $94,765 | Penn State University | Bachelor's Degree in Business | $64,892 |
| Argosy University (Online) | Bachelor of Science in Business Administration | $67,545 | Penn State University | Bachelor's Degree in Business | $64,892 |
| Art Institute of Pittsburgh | Associate of Science in Web Design and Interactive Media | $47,410 | Community College of Allegheny County | Associate of Science in Graphic Communication | $6,800 |

### Grand Canyon Education, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Grand Canyon University | Bachelor of Science in Business Administration | $55,950 | University of Arizona | Bachelor of Science in Business Administration | $44,200 |

### Henley-Putnam University Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Henley Putnam LLC | Bachelor of Science, Terrorism and Counterterrorism Studies | $42,300 | University of California at Santa Cruz | Bachelor of Arts in Business Management Economics | $59,292 |

**Appendix 14: Tuition and Fee Comparison**

### Herzing, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Herzing University | Bachelor of Science in Business Management | $57,000 | University of Wisconsin | Bachelor's Degree in Business Administration | $50,480 |
| Herzing University | Diploma in Medical Assisting Services | $22,800 | Milwaukee Technical College | Medical Assisting Technical Diploma | $5,459 |

### ITT Educational Services, Inc. Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| ITT Tech | Bachelor's Degree in Business Administration | $93,624 | Indiana University | Bachelor of Science in Business | $43,528 |
| ITT Tech | Associate of Applied Science Degree in Business Management | $44,895 | Ivy Tech Community College | Associate of Science in Business Administration | $9,385 |

### Kaplan Higher Education Corporation Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Kaplan University | Bachelor of Science in Business Administration | $66,417 | University of Iowa | Bachelor's Degree in Business Administration | $43,816 |
| Kaplan University | Associate of Applied Science in Business Administration | $30,654 | Eastern Iowa Community College | Associate of Applied Science in Business Management | $7,936 |

### Lincoln Educational Services Corporation Cost Comparison

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| Lincoln Technical Institute | Automotive Mechanics Diploma | $13,977 | Sussex County Community College | Automotive Service Technology Certificate | $6,050 |

A14-5

**Appendix 14: Tuition and Fee Comparison**

| | | Med-Com Career Training, Inc. Cost Comparison | | |
|---|---|---|---|---|
| **For-Profit Institution** | **For-Profit Program Name** | **For-Profit Cost** | **Public Institution** | **Public Program Name** | **Public Cost** |
| Drake School of Business | Diploma in Dental Assisting | $19,200 | Essex County Community College | Certificate in Dental Assisting | $5,853 |

| | | National American University Holdings, Inc. Cost Comparison | | |
|---|---|---|---|---|
| **For-Profit Institution** | **For-Profit Program Name** | **For-Profit Cost** | **Public Institution** | **Public Program Name** | **Public Cost** |
| National American University | Bachelor of Science in Business Administration | $62,813 | University of South Dakota | Bachelor's Degree in Business Administration | $35,216 |
| National American University | Associate of Applied Science in Business Administration | $31,469 | Western Dakota Tech. | Associate of Applied Science in Business Management and Marketing | $16,480 |

| | | Rasmussen Colleges, Inc. Cost Comparison | | |
|---|---|---|---|---|
| **For-Profit Institution** | **For-Profit Program Name** | **For-Profit Cost** | **Public Institution** | **Public Program Name** | **Public Cost** |
| Rasmussen College | Bachelor's Degree in Business Management | $68,668 | University of Minnesota | Bachelor of Science in Business | $56,240 |
| Rasmussen College | Associate Degree in Business Management | $39,432 | Normandale Community College | Associate of Applied Science in Business | $7,264 |

| | | Strayer Education, Inc. Cost Comparison | | |
|---|---|---|---|---|
| **For-Profit Institution** | **For-Profit Program Name** | **For-Profit Cost** | **Public Institution** | **Public Program Name** | **Public Cost** |
| Strayer University | Bachelor's Degree in Business Administration | $72,800 | University of Virginia | Bachelor's Degree in Business | $51,912 |
| Strayer University | Associate in Arts in Business Administration | $36,500 | Northern Virginia Community College | Associate of Science in Business Administration | $9,587 |

**Appendix 14: Tuition and Fee Comparison**

| For-Profit Institution | For-Profit Program Name | For-Profit Cost | Public Institution | Public Program Name | Public Cost |
|---|---|---|---|---|---|
| **The Keiser School, Inc. Cost Comparison** | | | | | |
| Keiser University | Bachelor of Arts in Business Administration | $60,456 | University of Florida | Bachelor of Science in Business Administration | $29,000 |
| Keiser University | Associate of Arts in Business Administration | $30,328 | Broward College | Associate in Science in Business Administration | $6,650 |
| **TUI Learning LLC Cost Comparison** | | | | | |
| Trident International University | Bachelor of Science in Business Administration | $35,400 | University of California at Irvine | Bachelor of Arts in Business Administration | $55,880 |
| **Universal Technical Institute, Inc. Cost Comparison** | | | | | |
| Universal Technical Institute | Certificate in Automotive Technology | $30,895 | Mesa Community College | Certificate in Automotive Performance | $1,527 |
| **Vatterott Education Holdings, Inc. Cost Comparison** | | | | | |
| Vatterott College | Diploma in Information Systems Security | $24,500 | St. Louis Community College | Certificate of Proficiency in Information Technology | $4,383 |
| **Walden E-Learning LLC Cost Comparison** | | | | | |
| Walden University | Bachelor of Science in Business Administration | $56,800 | University of Minnesota | Bachelor of Science in Business Administration | $56,240 |
| Walden University | Master of Science in Education | $14,730 | University of Minnesota | | $31,235 |

A14-7

**Appendix 15: Student Outcomes**

| Institution | Degree Type | Total Student Enrollment | Students Complete | Complete | Students Enrolled | Still Enrolled | Students Withdrawn | Withdrawn | Median Days Attended |
|---|---|---|---|---|---|---|---|---|---|
| Alta | Associate | 2,541 | 431 | 17.0% | 647 | 25.5% | 1,463 | 57.6% | 133 |
| Alta | Bachelor's | 10,923 | 40 | 0.4% | 4,646 | 42.5% | 6,237 | 57.1% | 134 |
| Alta | Certificate | 1,107 | 607 | 54.8% | 43 | 3.9% | 457 | 41.3% | 125 |
| Alta | All | 14,571 | 1,078 | 7.4% | 5,336 | 36.6% | 8,157 | 56.0% | 133 |
| American Career | Certificate | 5,246 | 3,650 | 69.6% | 200 | 3.8% | 1,396 | 26.6% | 100 |
| American Public | Associate | 4,859 | 137 | 2.8% | 2,466 | 50.8% | 2,256 | 46.4% | 54 |
| American Public | Bachelor's | 14,800 | 340 | 2.3% | 9,265 | 62.6% | 5,195 | 35.1% | 55 |
| American Public | All | 19,659 | 477 | 2.4% | 11,731 | 59.7% | 7,451 | 37.9% | 55 |
| Anthem | Associate | 661 | 227 | 34.3% | 146 | 22.1% | 288 | 43.6% | 116 |
| Anthem | Certificate | 10,383 | 6,617 | 63.7% | 292 | 2.8% | 3,474 | 33.5% | 95 |
| Anthem | All | 11,044 | 6,844 | 62.0% | 438 | 4.0% | 3,762 | 34.1% | 97 |
| Apollo | Associate | 177,368 | 8,395 | 4.7% | 51,235 | 28.9% | 117,738 | 66.4% | 126 |
| Apollo | Bachelor's | 102,208 | 1,804 | 1.8% | 49,004 | 47.9% | 51,400 | 50.3% | 115 |
| Apollo | All | 279,576 | 10,199 | 3.6% | 100,239 | 35.9% | 169,138 | 60.5% | 123 |
| Bridgepoint | Associate | 7,931 | 94 | 1.2% | 1,146 | 14.4% | 6,691 | 84.4% | 111 |
| Bridgepoint | Bachelor's | 40,866 | 2,411 | 5.9% | 12,557 | 30.7% | 25,898 | 63.4% | 140 |
| Bridgepoint | All | 48,797 | 2,505 | 5.1% | 13,703 | 28.1% | 32,589 | 66.8% | 134 |
| Capella | Bachelor's | 5,602 | 81 | 1.4% | 2,143 | 38.3% | 3,378 | 60.3% | N/A |
| Capella | Master's | 11,867 | 418 | 3.5% | 6,187 | 52.1% | 5,262 | 44.3% | N/A |
| Capella | Doctorate | 5,018 | 1 | 0.0% | 2,910 | 58.0% | 2,107 | 42.0% | N/A |
| Capella | All | 22,487 | 500 | 2.2% | 11,240 | 50.0% | 10,747 | 47.8% | N/A |

A15-1

**Appendix 15: Student Outcomes**

| Institution | Degree Type | Total Student Enrollment | Students Complete | Complete | Students Enrolled | Still Enrolled | Students Withdrawn | Withdrawn | Median Days Attended |
|---|---|---|---|---|---|---|---|---|---|
| Career Ed. Corp. | Associate | 54,553 | 13,505 | 24.8% | 7,414 | 13.6% | 33,634 | 61.7% | 122 |
| Career Ed. Corp. | Bachelor's | 21,726 | 4,131 | 19.0% | 6,438 | 29.6% | 11,157 | 51.4% | 143 |
| Career Ed. Corp. | Certificate | 21,114 | 11,812 | 55.9% | 2,360 | 11.2% | 6,942 | 32.9% | 127 |
| Career Ed. Corp. | All | 97,393 | 29,448 | 30.2% | 16,212 | 16.6% | 51,733 | 53.1% | 127 |
| Concorde | Associate | 1,100 | 528 | 48.0% | 219 | 19.9% | 353 | 32.1% | 127 |
| Concorde | Certificate | 10,004 | 7,198 | 72.0% | 146 | 1.5% | 2,660 | 26.6% | 57 |
| Concorde | All | 11,104 | 7,726 | 69.6% | 365 | 3.3% | 3,013 | 27.1% | 65 |
| Corinthian | Associate | 44,436 | 3,080 | 6.9% | 11,809 | 26.6% | 29,547 | 66.5% | 124 |
| Corinthian | Bachelor's | 3,193 | 194 | 6.1% | 1,110 | 34.8% | 1,889 | 59.2% | 138 |
| Corinthian | Certificate | 83,291 | 47,144 | 56.6% | 1,433 | 1.7% | 34,714 | 41.7% | 79 |
| Corinthian | All | 130,920 | 50,418 | 38.5% | 14,352 | 11.0% | 66,150 | 50.5% | 101 |
| Devry | Associate | 13,539 | 1,639 | 12.1% | 4,542 | 33.5% | 7,358 | 54.3% | 112 |
| Devry | Bachelor's | 41,177 | 2,844 | 6.9% | 15,118 | 36.7% | 23,215 | 56.4% | 112 |
| Devry | Certificate | 10,006 | 6,586 | 65.8% | 198 | 2.0% | 3,222 | 32.2% | 96 |
| Devry | All | 64,722 | 11,069 | 17.1% | 19,858 | 30.7% | 33,795 | 52.2% | 110 |
| ECPI | Associate | 4,589 | 1,159 | 25.3% | 1,275 | 27.8% | 2,155 | 47.0% | 175 |
| ECPI | Bachelor's | 1,409 | 39 | 2.8% | 650 | 46.1% | 720 | 51.1% | 184 |
| ECPI | Certificate | 1,871 | 793 | 42.4% | 315 | 16.8% | 763 | 40.8% | 171 |
| ECPI | All | 7,869 | 1,991 | 25.3% | 2,240 | 28.5% | 3,638 | 46.2% | 176 |
| Ed. Mgmt. Corp. | Associate | 32,107 | 917 | 2.9% | 10,746 | 33.5% | 20,444 | 63.7% | 162 |
| Ed. Mgmt. Corp. | Bachelor's | 38,133 | 231 | 0.6% | 14,293 | 37.5% | 23,609 | 61.9% | 175 |
| Ed. Mgmt. Corp. | Certificate | 8,421 | 2,543 | 30.2% | 1,091 | 13.0% | 4,787 | 56.8% | 141 |
| Ed. Mgmt. Corp. | All | 78,661 | 3,691 | 4.7% | 26,130 | 33.2% | 48,840 | 62.1% | 166 |

**Appendix 15: Student Outcomes**

| Institution | Degree Type | Total Student Enrollment | Students Complete | Complete | Students Enrolled | Still Enrolled | Students Withdrawn | Withdrawn | Median Days Attended |
|---|---|---|---|---|---|---|---|---|---|
| Grand Canyon | Bachelor's | 17,463 | 561 | 3.2% | 6,690 | 38.3% | 10,212 | 58.5% | 125 |
| Grand Canyon | Master's | 9,960 | 1,217 | 12.2% | 4,516 | 45.3% | 4,227 | 42.4% | 132 |
| Grand Canyon | All | 27,423 | 1,778 | 6.5% | 11,206 | 40.9% | 14,439 | 52.7% | 127 |
| Henley Putnam | Bachelor's | 107 | 1 | 0.9% | 57 | 53.3% | 49 | 45.8% | 263 |
| Herzing | Associate | 2,237 | 290 | 13.0% | 769 | 34.4% | 1,178 | 52.7% | 149 |
| Herzing | Bachelor's | 841 | 38 | 4.5% | 388 | 46.1% | 415 | 49.3% | 161 |
| Herzing | Certificate | 1,118 | 233 | 20.8% | 298 | 26.7% | 587 | 52.5% | 150 |
| Herzing | All | 4,196 | 561 | 13.4% | 1,455 | 34.7% | 2,180 | 52.0% | 151 |
| ITT | Associates | 56,557 | 2,818 | 5.0% | 23,727 | 42.0% | 30,012 | 53.1% | 96 |
| ITT | Bachelor's | 8,364 | 504 | 6.0% | 4,139 | 49.5% | 3,721 | 44.5% | 85 |
| ITT | All | 64,921 | 3,322 | 5.1% | 27,866 | 42.9% | 33,733 | 52.0% | 95 |
| Kaplan | Associate | 33,324 | 4,159 | 12.5% | 6,135 | 18.4% | 23,030 | 69.1% | 127 |
| Kaplan | Bachelor's | 31,354 | 1,163 | 3.7% | 8,801 | 28.1% | 21,390 | 68.2% | 126 |
| Kaplan | Certificate | 38,079 | 25,040 | 65.8% | 585 | 1.5% | 12,454 | 32.7% | 98 |
| Kaplan | All | 102,757 | 30,362 | 29.5% | 15,521 | 15.1% | 56,874 | 55.3% | 120 |
| Keiser | Associate | 9,041 | 1,085 | 12.0% | 2,079 | 23.0% | 5,877 | 65.0% | 212 |
| Keiser | Bachelor's | 1,856 | 39 | 2.1% | 756 | 40.7% | 1,061 | 57.2% | 195 |
| Keiser | All | 10,897 | 1,124 | 10.3% | 2,835 | 26.0% | 6,938 | 63.7% | 209 |
| Lincoln | Associate | 6,160 | 954 | 15.5% | 900 | 14.6% | 4,306 | 69.9% | 129 |
| Lincoln | Certificate | 25,466 | 12,079 | 47.4% | 1,460 | 5.7% | 11,927 | 46.8% | 119 |
| Lincoln | All | 31,626 | 13,033 | 41.2% | 2,360 | 7.5% | 16,233 | 51.3% | 122 |

**Appendix 15: Student Outcomes**

| Institution | Degree Type | Total Student Enrollment | Students Complete | Complete | Students Enrolled | Still Enrolled | Students Withdrawn | Withdrawn | Median Days Attended |
|---|---|---|---|---|---|---|---|---|---|
| National American | Associate | 2,214 | 14 | 0.6% | 1,290 | 58.3% | 910 | 41.1% | 74 |
| National American | Bachelor's | 2,231 | 11 | 0.5% | 1,331 | 59.7% | 889 | 39.8% | 70 |
| National American | All | 4,445 | 25 | 0.6% | 2,621 | 59.0% | 1,799 | 40.5% | 72 |
| Rasmussen | Associate | 7,758 | 604 | 7.8% | 2,267 | 29.2% | 4,887 | 63.0% | 164 |
| Rasmussen | Bachelor's | 1,865 | 54 | 2.9% | 613 | 32.9% | 1,198 | 64.2% | 164 |
| Rasmussen | All | 9,623 | 658 | 6.8% | 2,880 | 29.9% | 6,085 | 63.2% | 164 |
| Ed. America | Associate | 2,342 | 286 | 12.2% | 742 | 31.7% | 1,314 | 56.1% | 152 |
| Ed. America | Certificate | 7,977 | 5,163 | 64.7% | 39 | 0.5% | 2,775 | 34.8% | 87 |
| Ed. America | All | 10,319 | 5,449 | 52.8% | 781 | 7.6% | 4,089 | 39.6% | 108 |
| Strayer | Associate | 6,683 | 902 | 13.5% | 2,523 | 37.8% | 3,258 | 48.8% | 119 |
| Strayer | Bachelor's | 23,540 | 2,084 | 8.9% | 13,421 | 57.0% | 8,035 | 34.1% | 189 |
| Strayer | Master's | 11,007 | 2,763 | 25.1% | 6,279 | 57.0% | 1,965 | 17.9% | 210 |
| Strayer | All | 41,230 | 5,749 | 13.9% | 22,223 | 53.9% | 13,258 | 32.2% | 175 |
| TUI | Bachelor's | 3,483 | 763 | 21.9% | 934 | 26.8% | 1,786 | 51.3% | N/A |
| UTI | Associate | 1,776 | 950 | 53.5% | 256 | 14.4% | 570 | 32.1% | 134 |
| UTI | Certificate | 16,343 | 7,924 | 48.5% | 2,434 | 14.9% | 5,985 | 36.6% | 123 |
| UTI | All | 18,119 | 8,874 | 49.0% | 2,690 | 14.8% | 6,555 | 36.2% | 124 |
| Vatterott | Associate | 3,041 | 1,194 | 39.3% | 640 | 21.0% | 1,207 | 39.7% | 143 |
| Vatterott | Certificate | 6,366 | 2,679 | 42.1% | 814 | 12.8% | 2,873 | 45.1% | 127 |
| Vatterott | All | 9,407 | 3,873 | 41.2% | 1,454 | 15.5% | 4,080 | 43.4% | 127 |

A15-4

**Appendix 15: Student Outcomes**

| Institution | Degree Type | Total Student Enrollment | Students Complete | Complete | Students Enrolled | Still Enrolled | Students Withdrawn | Withdrawn | Median Days Attended |
|---|---|---|---|---|---|---|---|---|---|
| Walden | Bachelor's | 3,230 | 44 | 1.4% | 1,527 | 47.3% | 1,659 | 51.4% | 91 |
| Walden | Master's | 11,770 | 1,697 | 14.4% | 6,764 | 57.5% | 3,309 | 28.1% | 173 |
| Walden | Doctoral | 5,325 | 32 | 0.6% | 3,185 | 59.8% | 2,108 | 39.6% | 174 |
| Walden | All | 20,325 | 1,773 | 8.7% | 11,476 | 56.5% | 7,076 | 34.8% | 154 |
| | | | | | | | | | |
| All | Associate | 474,817 | 43,368 | 9.1% | 132,973 | 28.0% | 298,476 | 62.9% | 126 |
| All | Bachelor's | 374,264 | 17,376 | 4.6% | 153,824 | 41.1% | 203,064 | 54.3% | 131 |
| All | Certificate | 246,792 | 140,068 | 56.8% | 11,708 | 4.7% | 95,016 | 38.5% | 100 |
| Largest 5 schools by enrollment | | 651,272 | 104,825 | 16.1% | 176,791 | 27.1% | 369,656 | 56.8% | 124 |
| | | | | | | | | | |
| All | All | 1,095,873 | 200,812 | 18.3% | 298,505 | 27.2% | 596,556 | 54.4% | 124 |

Note: The Keiser School, Inc. asserts that its withdrawal rates are actually significantly lower as 1,019 students temporarily classified as not-enrolled while awaiting entry into the core nursing curriculum are included in the withdrawal rates. The company also states that, despite clear instructions from the committee, an additional 625 students captured as withdrawals were double counted by the company in the production, and that they were actually continuing students who changed programs or campuses. Keiser additionally notes that 888 of the withdrawn students later re-enrolled.

A15-5

Appendix 16: Trial 3-Year Cohort Default Rates by Company, Fiscal Years 2005-8

### Students Entering Repayment in Federal Fiscal Year 2005

| Company | Number of Students Entered into Default | Number of Students Entered into Repayment | Default Rate |
|---|---|---|---|
| Alta Colleges, Inc. | 1,704 | 7,017 | 24.3% |
| American Career College, Inc. | 329 | 2,107 | 15.6% |
| American Public Education, Inc. | ~ | ~ | ~ |
| Anthem Education Group | 2,290 | 10,690 | 21.4% |
| Apollo Group, Inc. | 10,838 | 90,425 | 12.0% |
| Bridgepoint Education, Inc. | 18 | 210 | 8.6% |
| Capella Education Company | 225 | 5,056 | 4.5% |
| Career Education Corporation | 13,896 | 66,256 | 21.0% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | 1,348 | 7,646 | 17.6% |
| Corinthian Colleges, Inc. | 14,822 | 64,640 | 22.9% |
| DeVry, Inc. | 4,594 | 35,171 | 13.1% |
| ECPI Colleges, Inc. | 702 | 3,562 | 19.7% |
| Education America, Inc. | 1,892 | 9,932 | 19.0% |
| Education Management Corporation | 3,824 | 32,678 | 11.7% |
| Grand Canyon Education, Inc. | 41 | 1,358 | 3.0% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | 236 | 1,975 | 11.9% |
| ITT Educational Services, Inc. | 5,688 | 26,912 | 21.1% |
| Kaplan Higher Education Corporation | 6,168 | 31,993 | 19.3% |
| Lincoln Educational Services Corporation | 4,262 | 19,692 | 21.6% |
| Med-Com Career Training, Inc. | 2 | 4 | 50.0% |
| National American University Holdings, Inc. | 224 | 1,699 | 13.2% |
| Rasmussen Colleges, Inc. | 272 | 1,853 | 14.7% |
| Strayer Education, Inc. | 828 | 8,829 | 9.4% |
| The Keiser School, Inc. | 704 | 4,645 | 15.2% |
| TUI Learning LLC | ~ | ~ | ~ |
| Universal Technical Institute, Inc. | 1,696 | 12,281 | 13.8% |
| Vatterott Educational Centers, Inc. | 813 | 4,071 | 20.0% |
| Walden LLC | 55 | 3,159 | 1.7% |
| All 30 Colleges Examined | 77,471 | 453,861 | 17.1% |
| All For-Profit Colleges | 119,807 | 694,897 | 17.2% |
| All Non-Profit Colleges | 39,623 | 942,490 | 4.2% |
| All Public Colleges | 127,014 | 1,792,732 | 7.1% |
| All Colleges | 286,444 | 3,430,119 | 8.4% |

~ data not available for year

* data not available

Appendix 16: Trial 3-Year Cohort Default Rates by Company, Fiscal Years 2005-8

### Students Entering Repayment in Federal Fiscal Year 2006

| Company | Number of Students Entered into Default | Number of Students Entered into Repayment | Default Rate |
|---|---|---|---|
| Alta Colleges, Inc. | 2,245 | 8,601 | 26.1% |
| American Career College, Inc. | 377 | 2,061 | 18.3% |
| American Public Education, Inc. | ~ | ~ | ~ |
| Anthem Education Group | 2,780 | 12,731 | 21.8% |
| Apollo Group, Inc. | 18,883 | 124,586 | 15.2% |
| Bridgepoint Education, Inc. | 25 | 441 | 5.7% |
| Capella Education Company | 284 | 7,494 | 3.8% |
| Career Education Corporation | 14,771 | 82,038 | 18.0% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | 1,673 | 7,207 | 23.2% |
| Corinthian Colleges, Inc. | 16,963 | 62,375 | 27.2% |
| DeVry, Inc. | 5,209 | 37,862 | 13.8% |
| ECPI Colleges, Inc. | 802 | 4,227 | 19.0% |
| Education America, Inc. | 3,039 | 11,306 | 26.9% |
| Education Management Corporation | 4,328 | 38,010 | 11.4% |
| Grand Canyon Education, Inc. | 75 | 2,746 | 2.7% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | 248 | 1,900 | 13.1% |
| ITT Educational Services, Inc. | 6,333 | 30,944 | 20.5% |
| Kaplan Higher Education Corporation | 10,201 | 42,774 | 23.8% |
| Lincoln Educational Services Corporation | 5,610 | 22,978 | 24.4% |
| Med-Com Career Training, Inc. | 14 | 63 | 22.2% |
| National American University Holdings, Inc. | 276 | 2,220 | 12.4% |
| Rasmussen Colleges, Inc. | 353 | 2,467 | 14.3% |
| Strayer Education, Inc. | 1,196 | 11,307 | 10.6% |
| The Keiser School, Inc. | 1,174 | 6,078 | 19.3% |
| TUI Learning LLC | ~ | ~ | ~ |
| Universal Technical Institute, Inc. | 2,239 | 13,899 | 16.1% |
| Vatterott Educational Centers, Inc. | 1,259 | 5,035 | 25.0% |
| Walden E-Learning LLC | 141 | 7,037 | 2.0% |
| All 30 Colleges Examined | 100,498 | 548,387 | 18.3% |
| All For-Profit Colleges | 153,616 | 818,711 | 18.8% |
| All Non-Profit Colleges | 47,303 | 1,050,759 | 4.5% |
| All Public Colleges | 152,591 | 1,980,238 | 7.7% |
| All Colleges | 353,510 | 3,849,708 | 9.2% |

~ data not available for year

* data not available

Appendix 16: Trial 3-Year Cohort Default Rates by Company, Fiscal Years 2005-8

### Students Entering Repayment in Federal Fiscal Year 2007

| Company | Number of Student Entered into Default | Number of Students Entered into Repayment | Default Rate |
|---|---:|---:|---:|
| Alta Colleges, Inc. | 2,154 | 8,524 | 25.3% |
| American Career College, Inc. | 556 | 2,420 | 23.0% |
| American Public Education, Inc. | 3 | 90 | 3.3% |
| Anthem Education Group | 3,244 | 14,504 | 22.4% |
| Apollo Group, Inc. | 22,773 | 128,290 | 17.8% |
| Bridgepoint Education, Inc. | 245 | 1,423 | 17.2% |
| Capella Education Company | 371 | 6,721 | 5.5% |
| Career Education Corporation | 14,567 | 74,065 | 19.7% |
| Chancellor University System LLC | ~ | ~ | ~ |
| Concorde Career Colleges, Inc. | 1,838 | 7,529 | 24.4% |
| Corinthian Colleges, Inc. | 17,691 | 59,543 | 29.7% |
| DeVry, Inc. | 5,650 | 34,882 | 16.2% |
| ECPI Colleges, Inc. | 940 | 4,205 | 22.4% |
| Education America, Inc. | 3,370 | 10,869 | 31.0% |
| Education Management Corporation | 4,811 | 32,989 | 14.6% |
| Grand Canyon Education, Inc. | 119 | 4,001 | 3.0% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | 352 | 2,231 | 15.8% |
| ITT Educational Services, Inc. | 6,738 | 27,955 | 24.1% |
| Kaplan Higher Education Corporation | 13,385 | 46,855 | 28.6% |
| Lincoln Educational Services Corporation | 5,294 | 20,201 | 26.2% |
| Med-Com Career Training, Inc. | 15 | 84 | 17.9% |
| National American University Holdings, Inc. | 364 | 2,304 | 15.8% |
| Rasmussen Colleges, Inc. | 536 | 2,988 | 17.9% |
| Strayer Education, Inc. | 1,388 | 10,673 | 13.0% |
| The Keiser School, Inc. | 1,487 | 6,581 | 22.6% |
| TUI Learning LLC | ~ | ~ | ~ |
| Universal Technical Institute, Inc. | 1,942 | 14,093 | 13.8% |
| Vatterott Educational Centers, Inc. | 1,379 | 4,877 | 28.3% |
| Walden E-Learning LLC | 187 | 6,129 | 3.1% |
| All 30 Colleges Examined | 111,399 | 535,026 | 20.8% |
| All For-Profit Colleges | 172,209 | 813,722 | 21.2% |
| All Non-Profit Colleges | 50,789 | 776,626 | 6.5% |
| All Public Colleges | 166,930 | 1,717,436 | 9.7% |
| All Colleges | 389,928 | 3,307,784 | 11.8% |

~ data not available for year

* data not available

Appendix 16: Trial 3-Year Cohort Default Rates by Company, Fiscal Years 2005-8

### Students Entering Repayment in Federal Fiscal Year 2008

| Company | Number of Student Entered into Default | Number of Students Entered into Repayment | Default Rate |
|---|---|---|---|
| Alta Colleges, Inc. | 2,127 | 8,938 | 23.8% |
| American Career College, Inc. | 641 | 3,055 | 21.0% |
| American Public Education, Inc. | 91 | 820 | 11.1% |
| Anthem Education Group | 3,019 | 14,041 | 21.5% |
| Apollo Group, Inc. | 29,416 | 140,686 | 20.9% |
| Bridgepoint Education, Inc. | 807 | 4,069 | 19.8% |
| Capella Education Company | 444 | 6,828 | 6.5% |
| Career Education Corporation | 13,978 | 64,677 | 21.6% |
| Chancellor University System LLC | 50 | 357 | 14.0% |
| Concorde Career Colleges, Inc. | 1,501 | 7,315 | 20.5% |
| Corinthian Colleges, Inc. | 23,623 | 65,485 | 36.1% |
| DeVry, Inc. | 6,813 | 37,177 | 18.3% |
| ECPI Colleges, Inc. | 1,201 | 5,186 | 23.2% |
| Education America, Inc. | 2,377 | 9,072 | 26.2% |
| Education Management Corporation | 6,533 | 40,948 | 16.0% |
| Grand Canyon Education, Inc. | 343 | 4,640 | 7.4% |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | 381 | 2,403 | 15.9% |
| ITT Educational Services, Inc. | 8,023 | 30,491 | 26.3% |
| Kaplan Higher Education Corporation | 15,146 | 54,434 | 27.8% |
| Lincoln Educational Services Corporation | 5,841 | 21,059 | 27.7% |
| Med-Com Career Training, Inc. | 111 | 277 | 40.1% |
| National American University Holdings, Inc. | 363 | 2,348 | 15.5% |
| Rasmussen Colleges, Inc. | 182 | 1,573 | 11.6% |
| Strayer Education, Inc. | 1,433 | 11,233 | 12.8% |
| The Keiser School, Inc. | 1,278 | 6,585 | 19.4% |
| TUI Learning LLC | 2 | 106 | 1.9% |
| Universal Technical Institute, Inc. | 1,664 | 13,657 | 12.2% |
| Vatterott Educational Centers, Inc. | 1,291 | 4,848 | 26.6% |
| Walden E-Learning LLC | 220 | 7,413 | 3.0% |
| All 30 Colleges Examined | 128,899 | 569,721 | 22.6% |
| All For-Profit Colleges | 191,922 | 859,597 | 22.3% |
| All Foreign Colleges | 270 | 7,576 | 3.6% |
| All Non-Profit Colleges | 51,269 | 757,004 | 6.8% |
| All Public Colleges | 166,571 | 1,715,377 | 9.7% |
| All Colleges | 410,032 | 3,339,554 | 12.3% |

~ data not available for year
* data not available

Appendix 17: Executive Compensation

**Executive Compensation at Publicly Traded For-Profit Colleges**

### American Public Education, Inc. Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Wallace E. Boston | President and Chief Executive Officer | $961,148 | $1,659,360 |
| Harry T. Wilkins | Executive Vice President and Chief Financial Officer | $517,333 | $668,143 |
| Sharon van Wyk | Executive Vice President and Chief Operating Officer | N/A | $761,304 |
| Carol S. Gilbert | Executive Vice President, Marketing and Programs | $490,614 | $456,168 |
| Frank B. McCluskey | Executive Vice President, Provost | $465,725 | $450,111 |

### Apollo Group, Inc. Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| John G. Sperling | Founder and Chairman | $8,617,597 | $6,963,239 |
| Joseph L. D'Amico | President and COO | $5,115,263 | $5,500,246 |
| Brian L. Schwartz | Senior VP and CFO | $2,345,379 | $2,369,601 |
| William J. Pepicello | President, University of Phoenix | $2,035,470 | $2,035,470 |
| Charles B. Edelstein | Co-CEO | $1,800,000 | $1,636,950 |
| Gregory W. Cappelli | Co-CEO | $1,659,712.00 | $1,659,712.00 |

### Bridgepoint Education, Inc. Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Andrew S. Clark | CEO and President | $20,532,304 | $2,233,826 |
| Rodney T. Sheng | Executive VP and Chief Administrative Officer | $4,558,182 | $960,455 |
| Christopher L. Spohn | Former Senior VP and Chief Admissions Officer | $4,518,926 | $910,135 |
| Ross L. Woodard | Senior VP/Chief Marketing Officer | $3,901,932 | N/A |
| Daniel J. Devine | Executive VP and CFO | $3,257,882 | $859,440 |
| Jane McAuliffe | Executive VP and Chief Academic Officer | N/A | $832,169.00 |

### Capella Education Corporation Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| J. Kevin Gilligan | Chief Executive Officer | $3,848,253 | $2,347,197 |
| Lois M. Martin | Former SVP and Chief Financial Officer | $748,499 | $967,637 |
| Stephen G. Shank | Former Chief Executive Officer | N/A | $685,879 |
| Sally B. Chial | Senior Vice President-Capella Experience | $952,482 | $644,665 |
| Michael J. Offerman | Chancellor | $820,718 | $605,422 |
| Gregory W. Thom | Vice President and Senior Counsel | N/A | $564,332 |
| Steve L. Polacek | SVP and Chief Financial Officer | $557,862 | N/A |
| Kyle M. Carpenter | SVP Strategic Business Development | $895,249 | N/A |
| Jason Van De Loo | Vice President-Marketing | $742,362 | N/A |

**Appendix 17: Executive Compensation**

**Executive Compensation at Publicly Traded For-Profit Colleges**

| Career Education Corporation Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Gary E. McCullough | President and Chief Executive Officer | $4,576,923 | $4,923,791 |
| Michael J. Graham | Executive Vice President and Chief Financial Officer | $1,633,227 | $1,751,315 |
| Jeffery D. Ayers | Senior Vice President, General Counsel, Corporate Secretary and Chief Compliance Officer | $1,156,416 | $1,374,454 |
| Deborah L. Lenart | Senior Vice President, Sanford-Brown University | $1,793,900 | $1,278,029 |
| George K. Grayeb | Senior Vice President, Health Education | $1,145,306 | $1,121,574 |

| Corinthian Colleges, Inc. Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Jack Massimino | Executive Chairman | $3,343,434 | $3,032,703 |
| Peter Waller | Chief Executive Officer | $1,984,619 | $4,463,882 |
| Kenneth S. Ord | Executive Vice President and Chief Financial Officer | $1,472,628 | $1,605,529 |
| Beth Wilson | Executive Vice President | $1,409,213 | $1,516,676 |
| Matt Ouimet | President and Chief Operating Officer | $1,406,812 | $2,021,538 |

| DeVry, Inc. Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Daniel Hamburger | CEO and President | $6,387,081 | $6,058,205 |
| David J. Pauldine | President, DeVry University | $1,401,553 | $1,565,349 |
| Richard M. Gunst | CFO and Treasurer | $1,234,842 | $1,447,317 |
| Steven Riehs | President, DeVry Online Services | $895,755 | $976,980 |
| Thomas C. Shepherd | President, Ross University | $714,688 | n/a |
| William B. Hughson | President, Healthcare Group | n/a | $874,794 |

**Appendix 17A**

| Education Management Corporation Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Todd S. Nelson | CEO | $1,812,996 | $3,804,121 |
| Edward H. West | President and CFO | $1,551,802 | $5,486,905 |
| John M. Mazzoni | President, The Art Institutes | $806,152 | $1,010,542 |
| John T. South III | Senior VP and Chancellor of South University | $754,339 | $972,267 |
| Danny D. Finuf | President, Brown Mackie Colleges | $714,957 | $1,003,319 |

**Executive Compensation at Publicly Traded For-Profit Colleges**

### Grand Canyon Education, Inc.  Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Brian E.  Mueller | CEO & Director | $2,167,364 | $1,028,705 |
| Dr.  W.  Stan Meyer | Executive VP | $991,256 | $457,941 |
| Daniel E.  Bachus | CFO | $981,058 | $415,161 |
| Joseph N.  Mildenhall | Chief Information Officer | $705,313 | $720,968 |
| Dr.  Kathy Player | President | $664,535 | $420,184 |
| Christopher C. Richardson | General Counsel & Director | $434,497 | $379,019 |
| Brent D.  Richardson | Executive Chairman | $337,508 | $340,333 |

### ITT Educational Services, Inc. Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Kevin M. Modany | Chairman and CEO | $7,628,172 | $6,745,967 |
| Clark D. Elwood | Executive VP and CAO | $1,827,591 | $1,425,939 |
| Daniel M. Fitzpatrick | Executive VP and CFO | $1,794,617 | $1,429,072 |
| Eugene E. Feichtner | Executive VP and President, ITT Tech | $1,601,380 | $1,327,513 |
| June M. McCormack | Executive VP and President, Online Division | $1,512,783 | $1,239,303 |

### Lincoln Educational Services Corporation Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Shaun E. McAlmont | President and CEO | $2,130,465 | $1,014,295 |
| Scott M. Shaw | Executive VP and CAO | $1,359,145 | $742,644 |
| David F. Carney | Former Executive Chairman | $1,333,693 | $1,088,218 |
| Cesar Ribeiro | Senior VP, CFO, & Treasurer | $1,123,906 | $735,923 |

### National American University Executive Compensation

| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Ronald L. Shape | Chief Executive Officer and Chief Financial Officer | $990,361 | N/A |
| Jerry L. Gallentine | President | $1,154,422 | N/A |
| Michaelle Holland | Regional President for the South and Southeast Regions | $692,807 | N/A |
| Robert D. Buckingham | Executive Chairman of the Board | $3,127,120 | N/A |

Appendix 17: Executive Compensation

**Executive Compensation at Publicly Traded For-Profit Colleges**

| Strayer Education, Inc. Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Robert S. Silberman | Chairman & CEO | $41,489,800 | $1,549,800 |
| Karl McDonnell | President & COO | $10,839,800 | $1,029,800 |
| Mark C. Brown | Executive VP & CFO | $857,800 | $959,800 |
| Dr. Sondra F. Stallard | President, Strayer University | $734,800 | $799,800 |
| Sonya G. Udler | SVP, Corporate Communications | $601,711 | $1,663,785 |

| Universal Technical Institute, Inc. Executive Compensation | | | |
|---|---|---|---|
| Executive Name | Executive Title | 2009 Compensation | 2010 Compensation |
| Kimberley J. McWater | CEO, President and Director | $1,948,901 | $2,248,720 |
| John C. White | Chairman of the Board | $1,345,147 | $1,165,634 |
| Eugene S. Putnam, Jr. | Executive VP and CFO | $1,089,315 | $1,004,052 |
| Richard P. Crain | Senior VP, Marketing and Strategy | $752,329 | $697,483 |
| Thomas E. Riggs | Senior VP, Campus Operations | $706,845 | N/A |

**Appendix 17: Executive Compensation**

**Leaders at Comparison Public Institutions**

| Company | Comparison School | Executive | 2009-10 Compensation |
|---|---|---|---|
| American Public Education, Inc. | West Virginia University | Clements, James P. | $464,700 |
| Apollo Group, Inc. | University of Arizona | Shelton, Robert N. | $633,206 |
| Bridgepoint Education, Inc. | University of Iowa | Mason, Sally K. | $610,234 |
| Capella Education Company | University of Minnesota-Twin Cities | Bruininks, Robert H. | $646,097 |
| Career Education Corporation | University of Illinois at Urbana-Champaign | Herman, Richard | $137,850 |
| Corinthian Colleges, Inc. | University of California at Irvine | Drake, Michael V. | $382,980 |
| DeVry, Inc. | University of Illinois at Urbana-Champaign | Herman, Richard | $137,850 |
| Education Management Corporation | Pennsylvania State University | Spanier, Graham B. | $800,592 |
| Grand Canyon Education, Inc. | University of Arizona | Shelton, Robert N. | $633,206 |
| ITT Educational Services, Inc. | Indiana University at Bloomington | Hanson, Karen | $337,144 |
| Lincoln Educational Services Corporation | Rutgers University at Newark | Diner, Steven J. | $326,000 |
| National American University Holdings, Inc. | South Dakota State University | Chicoine, David L. | $340,642 |
| Strayer Education, Inc. | University of Virginia | Casteen III, John T. | $703,648 |
| University Technical Institute, Inc. | University of Arizona | Robert N. Shelton | $633,206 |

Appendix 17: Executive Compensation

**Average Highest Paid Executives by Sector**

| Highest Paid Public University Executives, 2009-10 | | |
|---|---|---|
| **Institution** | **Executive** | **Total Compensation** |
| Ohio State University | Gee, E. Gordon | $1,818,911 |
| University of Washington | Emmert, Mark A. | $905,004 |
| University of Texas System | Cigarroga, Francisco G. | $813,892 |
| University of Central Florida | Hitt, John C. | $800,703 |
| Pennsylvania State University System | Spanier, Graham B. | $800,592 |
| **Average** | | $1,027,820 |

| Highest Paid Non-Profit College Executives, 2009 | | |
|---|---|---|
| **Institution** | **Executive** | **Total Compensation** |
| Drexel University | Papadakis, Constantine N. | $4,912,127 |
| Johns Hopkins University | Brody, William R. | $3,821,886 |
| University of the Pacific | DeRosa, Donald V. | $2,357,540 |
| Northwestern University | Bienen, Henry S. | $2,240,775 |
| Vanderbilt University | Zeppos, Nicholas S. | $1,890,274 |
| **Average** | | $3,044,520 |

| Highest Paid  For-Profit Education Company Chief Executive Officers, FY 2009 | | |
|---|---|---|
| **Company** | **Executive** | **Total Compensation** |
| Strayer Education, Inc. | Silberman, Robert S. | $41,489,800 |
| Bridgepoint Education, Inc. | Clark, Andrew S. | $20,532,304 |
| Career Education Corporation | McCullough, Gary E. | $4,923,791 |
| ITT Educational Services, Inc. | Modany, Kevin M. | $7,628,172 |
| DeVry, Inc. | Hamburger, Daniel | $6,387,081 |
| **Average** | | $16,192,230 |

**Appendix 18: Revenue, Expenses, and Profit (Operating Income), Fiscal Years 2006-10**

### Fiscal Year 2006

| Privately Held Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| Alta Colleges, Inc. | $268,632,000 | $261,060,000 | $7,572,000 |
| American Career College, Inc. | $37,120,801 | $34,301,387 | $2,819,414 |
| Anthem Education Group | $208,811,526 | $190,675,658 | $18,135,868 |
| Concorde Career Colleges, Inc. | $33,112,000 | $30,472,000 | $2,640,000 |
| ECPI Colleges, Inc. | -- | -- | -- |
| Education America, Inc. | $138,762,000 | $122,128,000 | $16,634,000 |
| Henley Putnam LLC | $47,555 | $1,761,185 | -$1,713,630 |
| Herzing, Inc. | -- | -- | -- |
| Med-Com Career Training, Inc. | $3,749,101 | $2,954,379 | $794,722 |
| Rasmussen Colleges, Inc. | $46,431,794 | $42,753,809 | $3,677,985 |
| The Keiser School, Inc. | $141,796,546 | $122,899,634 | $18,896,912 |
| Vatterott Educational Centers, Inc. | $94,788,580 | $79,204,918 | $15,583,662 |
| Walden E-Learning LLC | $190,665,000 | $157,893,000 | $32,772,000 |

Appendix 18: Revenue, Expenses, and Profit (Operating Income), Fiscal Years 2006-10

### Fiscal Year 2007

| Publicly Traded Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| American Public Education, Inc. | $69,095,000 | $54,404,000 | $14,691,000 |
| Apollo Group, Inc. | $2,721,812,000 | $2,089,804,000 | $632,001,000 |
| Bridgepoint Education, Inc. | $85,709,000 | $81,726,000 | $3,983,000 |
| Capella Education Company | $226,236,000 | $196,286,000 | $29,950,000 |
| Career Education Corporation | $1,652,209,000 | $1,507,417,000 | $144,792,000 |
| Corinthian Colleges, Inc. | $909,904,000 | $888,903,000 | $21,001,000 |
| DeVry, Inc. | $933,473,000 | $831,186,000 | $102,287,000 |
| Education Management Corporation | $1,363,690,000 | $1,135,316,000 | $228,374,000 |
| Grand Canyon Education, Inc. | $99,326,000 | $94,981,000 | $4,345,000 |
| ITT Educational Services, Inc. | $869,508,000 | $626,416,000 | $243,092,000 |
| Lincoln Educational Services Corp. | $327,774,000 | $301,881,000 | $25,893,000 |
| National American University Strayer Education, Inc. | $318,012,000 | $220,455,000 | $97,557,000 |
| Universal Technical Institute, Inc. | $353,370,000 | $329,620,000 | $23,750,000 |

| Privately Held Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| Alta Colleges, Inc. | $292,247,000 | $294,020,000 | -$1,773,000 |
| American Career College, Inc. | $43,439,594 | $39,099,291 | $4,340,303 |
| Anthem Education Group | $227,253,078 | $225,101,922 | $2,151,156 |
| Concorde Career Colleges, Inc. | $102,423,000 | $94,976,000 | $7,447,000 |
| ECPI Colleges, Inc. | -- | -- | -- |
| Education America, Inc. | $119,721,000 | $105,219,000 | $14,502,000 |
| Henley Putnam LLC | $181,179 | $4,346,470 | -$4,165,291 |
| Herzing, Inc. | -- | -- | -- |
| Kaplan Higher Education Corp.~ | $950,090,958 | $848,600,754 | $101,490,204 |
| Med-Com Career Training, Inc. | $6,175,841 | $5,457,867 | $717,974 |
| Rasmussen Colleges, Inc. | $59,883,879 | $48,012,870 | $11,871,009 |
| The Keiser School, Inc. | $168,508,560 | $148,576,893 | $19,931,667 |
| Vatterott Educational Centers, Inc. | $102,373,489 | $92,105,924 | $10,267,565 |
| Walden E-Learning LLC | $246,941,000 | $218,076,000 | $28,865,000 |

~ While Kaplan is owned by the publicly traded Washington Post Company, the company does not always separate out financial figures for Kaplan in its SEC Filings.  The figures for Kaplan in this Appendix are from financial statements produced by the company.

Appendix 18: Revenue, Expenses, and Profit (Operating Income), Fiscal Years 2006-10

### Fiscal Year 2008

| Publicly Traded Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| American Public Education, Inc. | $107,147,000 | $81,459,000 | $25,688,000 |
| Apollo Group, Inc. | $3,133,436,000 | $2,366,060,000 | $767,376,000 |
| Bridgepoint Education, Inc. | $218,290,000 | $184,870,000 | $33,420,000 |
| Capella Education Company | $272,295,000 | $232,193,000 | $40,102,000 |
| Career Education Corporation | $1,651,114,000 | $1,536,270,000 | $114,844,000 |
| Corinthian Colleges, Inc. | $1,059,738,000 | $1,015,755,000 | $43,983,000 |
| DeVry, Inc. | $1,091,833,000 | $929,498,000 | $162,335,000 |
| Education Management Corporation | $1,684,158,000 | $1,420,620,000 | $263,538,000 |
| Grand Canyon Education, Inc. | $161,309,000 | $148,512,000 | $12,797,000 |
| ITT Educational Services, Inc. | $1,015,333,000 | $689,868,000 | $325,465,000 |
| Kaplan Higher Education Corp. | $796,609,234 | $721,897,968 | $74,711,266 |
| Lincoln Educational Services Corp. | $376,907,000 | $341,332,000 | $35,575,000 |
| National American University | $49,457,000 | $49,422,000 | $35,000 |
| Strayer Education, Inc. | $396,275,000 | $269,424,000 | $126,851,000 |
| Universal Technical Institute, Inc. | $343,460,000 | $332,763,000 | $10,697,000 |

| Privately Held Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| Alta Colleges, Inc. | $312,266,000.00 | $293,140,000.00 | $19,126,000.00 |
| American Career College, Inc. | $60,753,851.00 | $53,057,530.00 | $7,696,291.00 |
| Anthem Education Group | $187,768,546.00 | $188,631,137.00 | -$862,591.00 |
| Concorde Career Colleges, Inc. | $123,682,000.00 | $109,801,000.00 | $13,881,000.00 |
| ECPI Colleges, Inc. | -- | -- | -- |
| Education America, Inc. | $111,494,000.00 | $112,287,000.00 | -$793,000.00 |
| Henley Putnam LLC | $1,026,335.00 | $5,245,989.00 | -$4,219,654.00 |
| Herzing, Inc. | -- | -- | -- |
| Med-Com Career Training, Inc. | $13,636,056.00 | $10,798,382.00 | $2,837,674.00 |
| Rasmussen Colleges, Inc. | $91,507,387.00 | $73,445,874.00 | $18,061,513.00 |
| The Keiser School, Inc. | $205,327,991.00 | $174,363,741.00 | $30,964,250.00 |
| TUI Learning LLC | $25,060.00 | $19,402.00 | $5,658.00 |
| Vatterott Educational Centers, Inc. | $112,779,093.00 | $96,137,459.00 | $16,641,634.00 |
| Walden E-Learning LLC | $305,424,000.00 | $234,874,000.00 | $70,550,000.00 |

Appendix 18: Revenue, Expenses, and Profit (Operating Income), Fiscal Years 2006-10

### Fiscal Year 2009

| Publicly Traded Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| American Public Education, Inc. | $148,998,000 | $109,132,000 | $39,866,000 |
| Apollo Group, Inc. | $3,953,566,000 | $2,887,631,000 | $1,065,935,000 |
| Bridgepoint Education, Inc. | $454,324,000 | $372,594,000 | $81,730,000 |
| Capella Education Company | $334,643,000 | $270,721,000 | $63,922,000 |
| Career Education Corporation | $1,833,796,000 | $1,604,836,000 | $228,960,000 |
| Corinthian Colleges, Inc. | $1,300,675,000 | $1,181,282,000 | $119,393,000 |
| DeVry, Inc. | $1,461,453,000 | $1,226,620,000 | $234,833,000 |
| Education Management Corporation | $2,011,458,000 | $1,692,688,000 | $318,770,000 |
| Grand Canyon Education, Inc. | $261,902,000 | $215,330,000 | $46,572,000 |
| ITT Educational Services, Inc. | $1,319,194,000 | $830,402,000 | $488,792,000 |
| Kaplan Higher Education Corp. | $1,186,754,249 | $1,060,578,207 | $126,176,042 |
| Lincoln Educational Services | $552,536,000 | $464,218,000 | $88,318,000 |
| National American University | $62,584,000 | $57,180,000 | $5,404,000 |
| Strayer Education, Inc. | $511,961,000 | $339,607,000 | $172,354,000 |
| Universal Technical Institute, Inc. | $366,635,000 | $347,994,000 | $18,641,000 |

| Privately Held Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| Alta Colleges, Inc. | $380,446,000 | $348,079,000 | $32,367,000 |
| American Career College, Inc. | $79,719,363 | $59,905,469 | $19,813,894 |
| Anthem Education Group | $140,832,170 | $144,863,118 | -$4,030,948 |
| Chancellor University System LLC | $2,948,809 | $9,806,890 | -$6,858,081 |
| Concorde Career Colleges, Inc. | $147,099,000 | $120,187,000 | $26,912,000 |
| ECPI Colleges, Inc. | -- | -- | -- |
| Education America, Inc. | $136,395,000 | $127,814,000 | $8,581,000 |
| Henley Putnam LLC | $2,062,141 | $4,172,877 | -$2,110,736 |
| Herzing, Inc. | -- | -- | -- |
| Med-Com Career Training, Inc. | $49,708,834 | $40,972,195 | $8,736,639 |
| Rasmussen Colleges, Inc. | $147,262,723 | $108,911,660 | $38,351,063 |
| The Keiser School, Inc. | $260,710,041 | $210,291,773 | $50,418,268 |
| TUI Learning LLC | $48,583,000 | $32,559,000 | $16,024,000 |
| Vatterott Educational Centers Inc. | $141,105,665 | $114,601,529 | $26,504,136 |
| Walden LLC | $376,964,000 | $275,924,000 | $101,040,000 |

**Appendix 18: Revenue, Expenses, and Profit (Operating Income), Fiscal Years 2006-10**

**Fiscal Year 2010**

| Publicly Traded Companies | Revenue | Expenses | Operating Income |
|---|---|---|---|
| American Public Education, Inc. | $198,174,000 | $148,152,000 | $50,022,000 |
| Apollo Group, Inc. | $4,925,819,000 | $3,915,095,000 | $1,010,724,000 |
| Bridgepoint Education, Inc. | $713,233,000 | $496,812,000 | $216,421,000 |
| Capella Education Company | $426,123,000 | $331,122,000 | $95,001,000 |
| Career Education Corporation | $2,124,236,000 | $1,877,843,000 | $246,393,000 |
| Corinthian Colleges, Inc. | $1,756,192,000 | $1,515,428,000 | $240,764,000 |
| DeVry, Inc. | $1,915,181,000 | $1,504,279,000 | $410,902,000 |
| Education Management Corporation | $2,508,521,000 | $2,089,711,000 | $418,810,000 |
| Grand Canyon Education, Inc. | $385,625,000 | $327,449,000 | $58,176,000 |
| ITT Educational Services, Inc. | $1,596,529,000 | $982,980,000 | $613,549,000 |
| Kaplan Higher Education Corp. | $1,573,681,062 | $1,361,600,548 | $212,080,514 |
| Lincoln Educational Services Corporation | $639,494,000 | $516,853,000 | $122,641,000 |
| National American University Holdings, Inc. | $89,796,000 | $73,171,000 | $16,625,000 |
| Strayer Education, Inc. | $636,732,000 | $420,961,000 | $215,771,000 |
| Universal Technical Institute, Inc. | $435,921,000 | $389,371,000 | $46,550,000 |

**Appendix 19: Revenue, Profit (Operating Income), and Marketing, Fiscal Year 2009**

| Company | Total Spending On Marketing and Recruiting | Total Spending On Profit (Operating Income) | Total Revenue | Source for Marketing Figure |
|---|---|---|---|---|
| Alta Colleges, Inc. | $110,763,000 | $32,367,000 | $380,446,000 | Financial Statement |
| American Career College, Inc. | $10,881,143 | $19,813,894 | $79,719,363 | Financial Statement |
| American Public Education, Inc. | $20,479,000 | $39,866,000 | $148,998,000 | Financial Statement |
| Anthem Education Group | $28,003,082 | -$4,030,948 | $140,832,170 | Document Request |
| Apollo Group, Inc. | $935,476,000 | $1,065,935,000 | $3,953,566,000 | Financial Statement |
| Bridgepoint Education, Inc. | $145,721,000 | $81,730,000 | $454,324,000 | Financial Statement |
| Capella Education Company | $99,632,000 | $63,922,000 | $334,643,000 | Financial Statement |
| Career Education Corporation | $477,907,000 | $222,604,000 | $1,836,635,000 | Financial Statement |
| Chancellor University System LLC | $1,958,140 | -$6,858,081 | $2,948,809 | Financial Statement |
| Concorde Career Colleges, Inc. | $19,484,000 | $26,912,000 | $147,099,000 | Financial Statement |
| Corinthian Colleges, Inc. | $294,728,000 | $119,265,000 | $1,307,825,000 | Financial Statement |
| DeVry, Inc. | $329,397,000 | $234,833,000 | $1,461,453,000 | Document Request |
| ECPI Colleges, Inc. | -- | -- | -- | Document Request |
| Education America, Inc. | $32,030,000 | $8,581,000 | $136,395,000 | Financial Statement |
| Education Management Corporation | $435,196,000 | $319,000,000 | $2,011,458,000 | Document Request |
| Grand Canyon Education, Inc. | $85,405,000 | $46,572,000 | $261,902,000 | Financial Statement |
| Henley Putnam LLC | $1,282,635 | -$2,110,736 | $2,062,141 | Document Request |
| Herzing, Inc. | -- | -- | -- | Financial Statement |
| ITT Educational Services, Inc. | $251,752,810 | $488,792,000 | $1,319,194,000 | Document Request |
| Kaplan Higher Education Corporation | $372,686,946 | $212,080,514 | $1,573,681,062 | Financial Statement |
| Lincoln Educational Services Corporation | $87,095,989 | $88,318,000 | $552,536,000 | Document Request |
| Med-Com Career Training, Inc. | $465,816 | $8,736,639 | $49,708,834 | Document Request |
| National American University Holdings, Inc. | $11,676,448 | $5,404,000 | $62,584,000 | Document Request |
| Rasmussen Colleges, Inc. | $26,628,088 | $38,351,063 | $147,262,723 | Financial Statement |
| Strayer Education, Inc. | $93,336,000 | $172,354,000 | $511,961,000 | Financial Statement |
| The Keiser School, Inc. | $44,031,342 | $50,418,268 | $260,710,041 | Document Request |
| TUI Learning LLC | $3,851,000 | $16,024,000 | $48,583,000 | Financial Statement |
| Universal Technical Institute, Inc. | $77,348,256 | $18,641,000 | $366,635,000 | Document Request |
| Vatterott Educational Centers, Inc. | $17,787,320 | $26,504,136 | $141,105,665 | Financial Statement |
| Walden LLC | $101,182,000 | $101,040,000 | $376,964,000 | Document Request |
| 15 Publicly Traded Companies | $3,717,837,448 | $3,179,316,514 | $16,157,395,062 | Not Applicable |
| 30 Companies Examined | $4,160,667,527 | $3,544,209,185 | $18,310,458,675 | Not Applicable |

**Appendix 20: Per Student Spending on Profit, Fiscal Year 2009**

| Company | 12-Month FTE Enrollment | Total Spending On Profit | Spending Per Student On Profit |
|---|---|---|---|
| Alta Colleges, Inc. | 11,902 | $32,367,000 | $2,719 |
| American Career College, Inc. | 5,018 | $19,813,894 | $3,949 |
| American Public Education, Inc. | 24,619 | $39,866,000 | $1,619 |
| Anthem Education Group | 23,508 | no profit | |
| Apollo Group, Inc. | 420,526 | $1,065,935,000 | $2,535 |
| Bridgepoint Education, Inc. | 55,961 | $81,730,000 | $1,460 |
| Capella Education Company | 21,955 | $63,922,000 | $2,912 |
| Career Education Corporation | 152,094 | $228,960,000 | $1,505 |
| Chancellor University System LLC | 342 | no profit | |
| Concorde Career Colleges, Inc. | 9,153 | $26,912,000 | $2,940 |
| Corinthian Colleges, Inc. | 119,575 | $119,393,000 | $998 |
| DeVry, Inc. | 81,248 | $234,833,000 | $2,890 |
| ECPI Colleges, Inc. | -- | -- | $2,271 |
| Education America, Inc. | 12,958 | $28,418,031 | $2,193 |
| Education Management Corporation | 104,669 | $318,770,000 | $3,046 |
| Grand Canyon Education, Inc. | 25,197 | $46,572,000 | $1,848 |
| Henley Putnam LLC | no data | no profit | |
| Herzing, Inc. | -- | -- | $2,864 |
| ITT Educational Services, Inc. | 79,771 | $488,792,000 | $6,127 |
| Kaplan Higher Education Corporation | 173,844 | $212,080,514 | $1,220 |
| Lincoln Educational Services Corporation | 42,919 | 88,318,000 | $2,058 |
| Med-Com Career Training, Inc. | 2,505 | $8,736,639 | $3,488 |
| National American University Holdings, Inc. | 4,897 | $5,404,000 | $1,104 |
| Rasmussen Colleges, Inc. | 4,253 | $38,351,063 | $9,017 |
| Strayer Education, Inc. | 38,128 | $172,354,000 | $4,520 |
| The Keiser School, Inc. | 19,099 | $50,418,268 | $2,640 |
| TUI Learning LLC | 7,795 | $16,024,000 | $2,056 |
| Universal Technical Institute, Inc. | 34,468 | $18,641,000 | $541 |
| Vatterott Educational Centers, Inc. | 13,244 | $26,504,136 | $2,001 |
| Walden LLC | 52,756 | $101,040,000 | $1,915 |

**Appendix 21: Integrated Postsecondary Education Data System Per Student Spending on Instruction, Fiscal Year 2009**

| Company | 12-Month FTE Enrollment | Total Spending On Instruction | Spending Per Student On Instruction |
|---|---|---|---|
| Alta Colleges, Inc. | 11,902 | $76,040,458 | $6,389 |
| American Career College, Inc. | 5,018 | $22,355,093 | $4,455 |
| American Public Education, Inc. | 24,619 | $43,926,000 | $1,784 |
| Anthem Education Group | 23,508 | $87,745,123 | $3,733 |
| Apollo Group, Inc. | 420,526 | $374,899,997 | $892 |
| Bridgepoint Education, Inc. | 55,961 | $67,850,631 | $1,212 |
| Capella Education Company | 21,955 | $36,231,609 | $1,650 |
| Career Education Corporation | 152,094 | $231,266,102 | $1,521 |
| Chancellor University System LLC | 342 | $3,725,338 | $10,893 |
| Concorde Career Colleges, Inc. | 9,153 | $42,336,000 | $4,625 |
| Corinthian Colleges, Inc. | 119,575 | $474,626,355 | $3,969 |
| DeVry, Inc. | 81,248 | $242,872,556 | $2,989 |
| ECPI Colleges, Inc. | -- | -- | $3,852 |
| Education America, Inc. | 12,958 | $37,868,130 | $2,922 |
| Education Management Corporation | 104,669 | $362,178,291 | $3,460 |
| Grand Canyon Education, Inc. | 25,197 | $54,864,986 | $2,177 |
| Henley Putnam LLC | * | * | * |
| Herzing, Inc. | -- | -- | $3,822 |
| ITT Educational Services, Inc. | 79,771 | $226,449,254 | $2,839 |
| Kaplan Higher Education Corporation | 173,844 | $269,527,393 | $1,550 |
| Lincoln Educational Services Corporation | 42,919 | $141,101,258 | $3,288 |
| Med-Com Career Training, Inc. | * | * | * |
| National American University Holdings, Inc. | 4,897 | $8,869,345 | $1,811 |
| Rasmussen Colleges, Inc. | 4,253 | $20,416,875 | $4,801 |
| Strayer Education, Inc. | 38,128 | $50,657,281 | $1,329 |
| The Keiser School, Inc. | 19,099 | $61,129,159 | $3,201 |
| TUI Learning LLC | 7,795 | $8,712,000 | $1,118 |
| Universal Technical Institute, Inc. | 34,468 | $95,759,000 | $2,778 |
| Vatterott Educational Centers, Inc. | 13,244 | $31,843,055 | $2,404 |
| Walden LLC | 52,756 | $83,034,000 | $1,574 |

* data not available

**Appendix 22: Per Student Spending on Marketing, Recruiting, and Admissions, Fiscal Year 2009**

| Company | 12-Month FTE Enrollment | Total Spending On Marketing | Spending Per Student On Marketing |
|---|---|---|---|
| Alta Colleges, Inc. | 11,902 | $110,763,000 | $9,306 |
| American Career College, Inc. | 5,018 | $10,881,143 | $2,168 |
| American Public Education, Inc. | 24,619 | $20,479,000 | $832 |
| Anthem Education Group | 23,508 | $28,003,802 | $1,191 |
| Apollo Group, Inc. | 420,526 | $935,476,000 | $2,225 |
| Bridgepoint Education, Inc. | 55,961 | $145,721,000 | $2,604 |
| Capella Education Company | 21,955 | $99,632,000 | $4,538 |
| Career Education Corporation | 152,094 | $477,907,000 | $3,142 |
| Chancellor University System LLC | 342 | $1,958,140 | $5,726 |
| Concorde Career Colleges, Inc. | 9,153 | $19,484,000 | $2,129 |
| Corinthian Colleges, Inc. | 119,575 | $294,728,000 | $2,465 |
| DeVry, Inc. | 81,248 | $329,397,000 | $4,054 |
| ECPI Colleges, Inc. | -- | -- | $1,303 |
| Education America, Inc. | 12,958 | $32,030,000 | $2,472 |
| Education Management Corporation | 104,669 | $435,196,000 | $4,158 |
| Grand Canyon Education, Inc. | 25,197 | $85,405,000 | $3,389 |
| Henley Putnam LLC | * | $1,282,635 | |
| Herzing, Inc. | -- | -- | $2,447 |
| ITT Educational Services, Inc. | 79,771 | $251,752,810 | $3,156 |
| Kaplan Higher Education Corporation | 173,844 | $372,686,946 | $2,144 |
| Lincoln Educational Services Corporation | 42,919 | $87,095,989 | $2,029 |
| Med-Com Career Training, Inc. | 2,505 | $465,816 | $186 |
| National American University Holdings, Inc. | 4,897 | $11,676,448 | $2,384 |
| Rasmussen Colleges, Inc. | 4,253 | $26,628,088 | $6,261 |
| Strayer Education, Inc. | 38,128 | $93,336,000 | $2,448 |
| The Keiser School, Inc. | 19,099 | $44,031,342 | $2,305 |
| TUI Learning LLC | 7,795 | $3,851,000 | $494 |
| Universal Technical Institute, Inc. | 34,468 | $77,348,256 | $2,244 |
| Vatterott Educational Centers, Inc. | 13,244 | $17,787,320 | $1,343 |
| Walden LLC | 52,756 | $101,182,000 | $1,918 |

* data not available

Appendix 23: Per Student Spending on Instruction at Comparison Institutions in Other Sectors

| Comparison to Public 4-Year Universities | | |
|---|---|---|
| **Company** | **Public Institution** | **Spending per Student** |
| Alta Colleges, Inc. | University of Colorado-Boulder | $10,365 |
| American Career Colleges, Inc. | University of California-Irvine | $15,039 |
| American Public Education, Inc. | West Virginia University | $9,862 |
| Anthem Education Group | University of Arizona | $11,128 |
| Apollo Group, Inc. | University of Arizona | $11,128 |
| Bridgepoint Education, Inc. | University of Iowa | $14,882 |
| Capella Education Company | University of Minnesota | $13,247 |
| Career Education Corporation | University of Illinois-Champagne | $11,776 |
| Chancellor University System LLC | Ohio State University-Main Campus | $15,466 |
| Concorde Career Colleges, Inc. | University of Missouri-Columbia | $9,762 |
| Corinthian Colleges, Inc. | University of California-Los Angeles | $30,331 |
| DeVry, Inc. | University of Illinois-Champagne | $11,776 |
| ECPI Colleges, Inc. | University of Virginia-Main Campus | $14,567 |
| Education America, Inc. | N/A | |
| Education Management Corporation | Penn State University | $16,507 |
| Grand Canyon Education, Inc. | University of Arizona | $10,336 |
| Henley Putnam LLC | N/A | |
| Herzing, Inc. | University of Wisconsin | $14,329 |
| ITT Educational Services, Inc. | Indiana University-Bloomington | $11,856 |
| Kaplan Higher Education Corporation | University of Iowa | $14,882 |
| Lincoln Educational Services Corporation | Rutgers University | $16,654 |
| Med-Com Career Training, Inc. | Rutgers University | $16,654 |
| National American University Holdings, Inc. | University of South Dakota | $7,431 |
| Rasmussen Colleges, Inc. | University of Minnesota | $13,247 |
| Strayer Education, Inc. | University of Virginia-Main Campus | $14,567 |
| The Keiser School, Inc. | University of Florida | $14,537 |
| TUI Learning LLC | University of California-Irvine | $15,039 |
| Universal Technical Institute, Inc. | N/A | |
| Vatterott Educational Centers, Inc. | N/A | |
| Walden LLC | University of Minnesota | $13,247 |

**Appendix 23: Per Student Spending on Instruction at Comparison Institutions in Other Sectors**

| Comparison to Community Colleges | | |
|---|---|---|
| **Company** | **Non-Profit Institutions** | **Spending per Student** |
| Alta Colleges, Inc. | Community College of Denver | $2,402 |
| American Career Colleges, Inc. | Orange Coast College | $3,272 |
| American Public Education, Inc. | Blue Ridge Community College | $2,296 |
| Anthem Education Group | Phoenix College | $3,344 |
| Apollo Group, Inc. | Phoenix College | $3,344 |
| Bridgepoint Education, Inc. | Eastern Iowa Community College | $3,866 |
| Capella Education Company | N/A | |
| Career Education Corporation | College of DuPage | $4,603 |
| Chancellor University System LLC | Cuyahoga Community College | $4,867 |
| Concorde Career Colleges, Inc. | Johnson County Community College | $5,801 |
| Corinthian Colleges, Inc. | Orange Coast College | $3,272 |
| DeVry, Inc. | College of DuPage | $4,603 |
| ECPI Colleges, Inc. | Tidewater Community College | $3,789 |
| Education America, Inc. | Valencia Community College | $2,617 |
| Education Management Corporation | Community College of Allegheny County | $4,173 |
| Grand Canyon Education, Inc. | Phoenix College | $3,344 |
| Henley Putnam LLC | N/A | |
| Herzing, Inc. | Milwaukee Area Technical College | $11,970 |
| ITT Educational Services, Inc. | Ivy Tech Community College | $2,827 |
| Kaplan Higher Education Corporation | Eastern Iowa Community College | $3,866 |
| Lincoln Educational Services Corporation | Essex County College | $3,878 |
| Med-Com Career Training, Inc. | Essex County College | $3,878 |
| National American University Holdings, Inc. | Western Dakota Tech | $3,671 |
| Rasmussen Colleges, Inc. | Normandale Community College | $4,208 |
| Strayer Education, Inc. | Northern Virginia Community College | $3,850 |
| The Keiser School, Inc. | Broward College | $3,217 |
| TUI Learning LLC | N/A | |
| Universal Technical Institute, Inc. | Mesa Community College | $4,091 |
| Vatterott Educational Centers, Inc. | Saint Louis Community College | $5,034 |
| Walden | N/A | |

**Appendix 23: Per Student Spending on Instruction at Comparison Institutions in Other Sectors**

| Comparison to Non-Profit 4-Year Colleges | | |
|---|---|---|
| **Company** | **Community College** | **Spending per Student** |
| Alta Colleges, Inc. | University of Denver | $13,954 |
| American Career Colleges, Inc. | N/A | |
| American Public Education, Inc. | Mountain State University | $3,571 |
| Anthem Education Group | Midwestern University | $10,219 |
| Apollo Group, Inc. | Midwestern University | $10,219 |
| Bridgepoint Education, Inc. | Upper Iowa University | $3,734 |
| Capella Education Company | University of Saint Thomas | $11,361 |
| Career Education Corporation | DePaul University | $10,018 |
| Chancellor University System LLC | University of Dayton | $10,416 |
| Concorde Career Colleges, Inc. | Webster University | $5,610 |
| Corinthian Colleges, Inc. | University of Southern California | $35,920 |
| DeVry, Inc. | DePaul University | $10,018 |
| ECPI Colleges, Inc. | Liberty University | $1,957 |
| Education America, Inc. | N/A | |
| Education Management Corporation | University of Pennsylvania | $38,974 |
| Grand Canyon Education, Inc. | Midwestern University | $10,219 |
| Henley Putnam LLC | N/A | |
| Herzing, Inc. | Marquette University | $9,141 |
| ITT Educational Services, Inc. | Indiana Wesleyan University | $4,193 |
| Kaplan Higher Education Corporation | Upper Iowa University | $3,734 |
| Lincoln Educational Services Corporation | N/A | |
| Med-Com Career Training, Inc. | N/A | |
| National American University Holdings, Inc. | Sinte Gleska University | $4,530 |
| Rasmussen Colleges, Inc. | University of Saint Thomas | $11,361 |
| Strayer Education, Inc. | Liberty University | $1,957 |
| The Keiser School, Inc. | Nova Southeastern University | $11,064 |
| TUI Learning LLC | University of Southern California | $35,920 |
| Universal Technical Institute, Inc. | N/A | |
| Vatterott Educational Centers, Inc. | N/A | |
| Walden | University of Saint Thomas | $11,361 |

Appendix 24: Employee Distribution by Company, Fiscal Year 2006-10

| Company | Employee Type | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|---|
| American Career College, Inc. | Career Services and Placement | 13 | 21 | 21 | 35 | * |
| | Faculty-Full Time | 56 | 72 | 73 | 108 | * |
| | Faculty-Not Full Time | 66 | 91 | 77 | 114 | * |
| | Financial Aid Assistance | 16 | 18 | 22 | 20 | * |
| | Marketing and Advertising | 1 | 1 | 2 | 3 | * |
| | Recruiting | 21 | 36 | 41 | 48 | * |
| | Student Services | 6 | 7 | 7 | 7 | * |
| Alta Colleges, Inc. | Career Services and Placement | 88 | 82 | 89 | 119 | 90 |
| | Faculty-Full Time | 203 | 289 | 238 | 243 | 339 |
| | Faculty-Not Full Time | 926 | 934 | 1,026 | 1,250 | 1,332 |
| | Financial Aid Assistance | 124 | 151 | 185 | 228 | 222 |
| | Marketing and Advertising | 13 | 15 | 34 | 41 | 42 |
| | Recruiting | 525 | 513 | 625 | 691 | 651 |
| | Student Services | 109 | 104 | 115 | 143 | 165 |
| Anthem Education Group | Career Services and Placement | 191 | 444 | 160 | 135 | 133 |
| | Faculty-Full Time | 942 | 782 | 725 | 583 | 591 |
| | Faculty-Not Full Time | 409 | 448 | 437 | 341 | 327 |
| | Financial Aid Assistance | 233 | 260 | 182 | 119 | 125 |
| | Marketing and Advertising | ~ | ~ | ~ | ~ | ~ |
| | Recruiting | 1,473 | 1,430 | 577 | 509 | 492 |
| | Student Services | 496 | 192 | 268 | 187 | 167 |
| American Public Education, Inc. | Career Services and Placement | 9 | 13 | 20 | 25 | 28 |
| | Faculty-Full Time | 77 | 118 | 117 | 254 | 261 |
| | Faculty-Not Full Time | 443 | 550 | 626 | 781 | 1,062 |
| | Financial Aid Assistance | 3 | 15 | 36 | 44 | 49 |
| | Marketing and Advertising | 9 | 11 | 17 | 19 | 25 |
| | Recruiting | 28 | 42 | 55 | 63 | 80 |
| | Student Services | 90 | 115 | 152 | 179 | 205 |
| Apollo Group, Inc. | Career Services and Placement | 0 | 0 | 0 | 0 | 0 |
| | Faculty-Full Time | 821 | 837 | 928 | 1,051 | 1,140 |
| | Faculty-Not Full Time | 18,244 | 18,675 | 20,673 | 26,610 | 31,671 |
| | Financial Aid Assistance | ~ | ~ | ~ | ~ | ~ |
| | Marketing and Advertising | ~ | ~ | ~ | ~ | ~ |
| | Recruiting | 5,406 | 6,215 | 7,494 | 8,233 | 8,137 |
| | Student Services | 2,429 | 2,575 | 2,853 | 3,254 | 3,737 |
| Bridgepoint Education, Inc. | Career Services and Placement | * | 0 | 1 | 1 | 1 |
| | Faculty-Full Time | * | 61 | 60 | 61 | 51 |
| | Faculty-Not Full Time | * | 959 | 1,296 | 2,457 | 2,977 |
| | Financial Aid Assistance | * | 111 | 174 | 237 | 284 |
| | Marketing and Advertising | * | 10 | 19 | 29 | 12 |
| | Recruiting | * | 418 | 900 | 1,397 | 1,703 |
| | Student Services | * | 132 | 215 | 328 | 386 |
| Capella Education | Career Services and Placement | 21 | 17 | 19 | 21 | 25 |
| | Faculty-Full Time | 122 | 136 | 158 | 161 | 165 |
| | Faculty-Not Full Time | 576 | 641 | 744 | 871 | 1,073 |
| | Financial Aid Assistance | 18 | 36 | 55 | 88 | 110 |
| | Marketing and Advertising | 74 | 98 | 119 | 123 | 136 |
| | Recruiting | 173 | 211 | 238 | 281 | 329 |
| | Student Services | 226 | 334 | 417 | 353 | 394 |

* data not available for year

~ data not available for employee type

Appendix 24: Employee Distribution by Company, Fiscal Year 2006-10

| Company | Employee Type | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|---|
| Career Education Corporation | Career Services and Placement | * | * | * | * | 293 |
| | Faculty-Full Time | * | * | * | * | 1,867 |
| | Faculty-Not Full Time | * | * | * | * | 5,005 |
| | Financial Aid Assistance | * | * | * | * | 963 |
| | Marketing and Advertising | * | * | * | * | 66 |
| | Recruiting | * | * | * | * | 2,668 |
| | Student Services | * | * | * | * | 865 |
| Chancellor University System LLC | Career Services and Placement | * | * | * | 1 | 3 |
| | Faculty-Full Time | * | * | * | 9 | 20 |
| | Faculty-Not Full Time | * | * | * | 0 | 50 |
| | Financial Aid Assistance | * | * | * | 2 | 6 |
| | Marketing and Advertising | * | * | * | 0 | 0 |
| | Recruiting | * | * | * | 2 | 14 |
| | Student Services | * | * | * | 12 | 15 |
| Concorde Career Colleges, Inc. | Career Services and Placement | 83 | 75 | 82 | 86 | 86 |
| | Faculty-Full Time | 459 | 482 | 513 | 545 | 569 |
| | Faculty-Not Full Time | 459 | 479 | 515 | 520 | 524 |
| | Financial Aid Assistance | 80 | 85 | 100 | 120 | 114 |
| | Marketing and Advertising | 2 | 2 | 10 | 12 | 2 |
| | Recruiting | 159 | 177 | 182 | 209 | 228 |
| | Student Services | 13 | 14 | 26 | 29 | 32 |
| Corinthian Colleges, Inc. | Career Services and Placement | 407 | 410 | 451 | 673 | 784 |
| | Faculty-Full Time | 1,706 | 1,710 | 1,783 | 2,238 | 2,577 |
| | Faculty-Not Full Time | 2,538 | 2,381 | 3,000 | 3,365 | 3,857 |
| | Financial Aid Assistance | 731 | 908 | 1,032 | 1,250 | 1,628 |
| | Marketing and Advertising | 26 | 25 | 27 | 35 | 38 |
| | Recruiting | 1,478 | 1,604 | 1,868 | 2,270 | 2,811 |
| | Student Services | 229 | 290 | 384 | 558 | 711 |
| Devry, Inc. | Career Services and Placement | 141 | 134 | 142 | 144 | 231 |
| | Faculty-Full Time | 1,489 | 1,365 | 1,504 | 1,373 | 1,476 |
| | Faculty-Not Full Time | 3,903 | 4,713 | 5,080 | 6,053 | 7,349 |
| | Financial Aid Assistance | 291 | 342 | 430 | 603 | 746 |
| | Marketing and Advertising | 39 | 44 | 71 | 74 | 81 |
| | Recruiting | 1,149 | 1,278 | 1,615 | 2,027 | 2,350 |
| | Student Services | 756 | 807 | 957 | 1,130 | 1,438 |
| ECPI Colleges, Inc. | Career Services and Placement | 32 | 34 | 41 | 40 | 47 |
| | Faculty-Full Time | 290 | 326 | 308 | 336 | 532 |
| | Faculty-Not Full Time | 229 | 314 | 342 | 428 | 598 |
| | Financial Aid Assistance | 66 | 72 | 75 | 88 | 105 |
| | Marketing and Advertising | 2 | 3 | 3 | 3 | 5 |
| | Recruiting | 128 | 131 | 135 | 179 | 216 |
| | Student Services | 45 | 43 | 53 | 56 | 55 |
| Education America, Inc. | Career Services and Placement | 37 | 64 | 74 | 76 | 110 |
| | Faculty-Full Time | 453 | 378 | 414 | 480 | 547 |
| | Faculty-Not Full Time | 411 | 446 | 422 | 423 | 365 |
| | Financial Aid Assistance | 129 | 146 | 118 | 116 | 130 |
| | Marketing and Advertising | 12 | 13 | 10 | 12 | 13 |
| | Recruiting | 270 | 395 | 359 | 306 | 346 |
| | Student Services | 40 | 66 | 65 | 60 | 60 |

* data not available for year

~ data not available for employee type

Appendix 24: Employee Distribution by Company, Fiscal Year 2006-10

| Company | Employee Type | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|---|
| Education Management Corporation | Career Services and Placement | 261 | 270 | 310 | 274 | 321 |
| | Faculty-Full Time | 1,922 | 2,159 | 3,062 | 3,104 | 3,863 |
| | Faculty-Not Full Time | 4,206 | 5,361 | 6,298 | 6,199 | 8,114 |
| | Financial Aid Assistance | 599 | 776 | 805 | 912 | 1,318 |
| | Marketing and Advertising | 303 | 343 | 417 | 413 | 492 |
| | Recruiting | 1,746 | 2,424 | 3,599 | 4,108 | 5,669 |
| | Student Services | 597 | 693 | 860 | 919 | 1,187 |
| Grand Canyon, Inc. | Career Services and Placement | 3 | 4 | 3 | 3 | 3 |
| | Faculty-Full Time | 82 | 102 | 97 | 97 | 99 |
| | Faculty-Not Full Time | 841 | 1,421 | 2,279 | 3,471 | 2,442 |
| | Financial Aid Assistance | 17 | 20 | 30 | 56 | 69 |
| | Marketing and Advertising | 18 | 43 | 54 | 42 | 41 |
| | Recruiting | 173 | 480 | 837 | 985 | 1,065 |
| | Student Services | 74 | 103 | 233 | 414 | 478 |
| Henley Putnam LLC | Career Services and Placement | 0 | 0 | 0 | 0 | 0 |
| | Faculty-Full Time | 0 | 0 | 0 | 0 | 0 |
| | Faculty-Not Full Time | 11 | 23 | 46 | 47 | 61 |
| | Financial Aid Assistance | 0 | 0 | 0 | 0 | 0 |
| | Marketing and Advertising | 0 | 1 | 1 | 3 | 3 |
| | Recruiting | 2 | 10 | 11 | 7 | 7 |
| | Student Services | 4 | 4 | 4 | 4 | 4 |
| Herzing, Inc. | Career Services and Placement | 9 | 12 | 13 | 21 | 21 |
| | Faculty-Full Time | 104 | 106 | 131 | 160 | 187 |
| | Faculty-Not Full Time | 100 | 157 | 182 | 253 | 283 |
| | Financial Aid Assistance | 35 | 40 | 43 | 66 | 70 |
| | Marketing and Advertising | 3 | 3 | 4 | 7 | 9 |
| | Recruiting | 64 | 86 | 95 | 110 | 119 |
| | Student Services | 28 | 32 | 34 | 45 | 46 |
| ITT Educational Services, Inc. | Career Services and Placement | 306 | 320 | 327 | 391 | 431 |
| | Faculty-Full Time | 1,221 | 1,206 | 1,276 | 1,610 | 1,682 |
| | Faculty-Not Full Time | 2,121 | 2,574 | 3,365 | 3,634 | 4,473 |
| | Financial Aid Assistance | 556 | 609 | 678 | 809 | 876 |
| | Marketing and Advertising | 12 | 10 | 11 | 11 | 12 |
| | Recruiting | 1,601 | 1,855 | 2,113 | 2,378 | 2,550 |
| | Student Services | 24 | 34 | 33 | 97 | 109 |
| Kaplan Higher Education Corporation | Career Services and Placement | 30 | 165 | 238 | 333 | 307 |
| | Faculty-Full Time | 1,328 | 1,478 | 1,587 | 1,782 | 1,705 |
| | Faculty-Not Full Time | 2,855 | 3,386 | 4,599 | 5,873 | 6,472 |
| | Financial Aid Assistance | 354 | 572 | 741 | 1,166 | 1,186 |
| | Marketing and Advertising | 96 | 82 | 107 | 123 | 136 |
| | Recruiting | 1,764 | 2,080 | 2,377 | 3,236 | 3,069 |
| | Student Services | 294 | 458 | 723 | 986 | 979 |
| The Keiser School, Inc. | Career Services and Placement | 27 | 39 | 41 | 51 | 47 |
| | Faculty-Full Time | 355 | 505 | 451 | 498 | 476 |
| | Faculty-Not Full Time | 783 | 832 | 826 | 952 | 861 |
| | Financial Aid Assistance | 266 | 259 | 276 | 283 | 265 |
| | Marketing and Advertising | 5 | 5 | 5 | 5 | 5 |
| | Recruiting | 336 | 333 | 329 | 391 | 371 |
| | Student Services | 69 | 67 | 97 | 105 | 97 |

\* data not available for year

~ data not available for employee type

Appendix 24: Employee Distribution by Company, Fiscal Year 2006-10

| Company | Employee Type | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|---|
| Lincoln Educational Services Corporation | Career Services and Placement | 69 | 66 | 81 | 118 | 122 |
| | Faculty-Full Time | 740 | 712 | 794 | 1,036 | 1,088 |
| | Faculty-Not Full Time | 492 | 473 | 678 | 857 | 855 |
| | Financial Aid Assistance | 154 | 166 | 194 | 257 | 284 |
| | Marketing and Advertising | 7 | 9 | 10 | 16 | 15 |
| | Recruiting | 486 | 503 | 520 | 685 | 711 |
| | Student Services | 21 | 22 | 38 | 52 | 47 |
| Med-Com Career Training, Inc. | Career Services and Placement | 2 | 3 | 10 | 10 | 11 |
| | Faculty-Full Time | 23 | 23 | 55 | 92 | 90 |
| | Faculty-Not Full Time | 0 | 0 | 0 | 0 | 0 |
| | Financial Aid Assistance | 3 | 4 | 6 | 9 | 10 |
| | Marketing and Advertising | 0 | 0 | 0 | 1 | 1 |
| | Recruiting | 4 | 6 | 15 | 16 | 13 |
| | Student Services | 1 | 2 | 8 | 10 | 10 |
| National American University Holdings, Inc. | Career Services and Placement | 30 | 32 | 35 | 45 | 54 |
| | Faculty-Full Time | 21 | 28 | 25 | 26 | 25 |
| | Faculty-Not Full Time | 470 | 570 | 548 | 730 | 628 |
| | Financial Aid Assistance | 68 | 75 | 77 | 94 | 112 |
| | Marketing and Advertising | 9 | 9 | 8 | 5 | 6 |
| | Recruiting | 92 | 93 | 101 | 137 | 190 |
| | Student Services | 36 | 36 | 38 | 47 | 57 |
| Rassmussen Colleges, Inc. | Career Services and Placement | 8 | 12 | 14 | 20 | 30 |
| | Faculty-Full Time | 111 | 120 | 137 | 192 | 265 |
| | Faculty-Not Full Time | 340 | 416 | 540 | 549 | 1,214 |
| | Financial Aid Assistance | 40 | 60 | 85 | 115 | 152 |
| | Marketing and Advertising | 12 | 14 | 15 | 27 | 37 |
| | Recruiting | 111 | 168 | 215 | 344 | 448 |
| | Student Services | 80 | 115 | 175 | 234 | 303 |
| Strayer Education, Inc. | Career Services and Placement | 109 | 121 | 122 | 149 | 165 |
| | Faculty-Full Time | 182 | 219 | 254 | 336 | 423 |
| | Faculty-Not Full Time | 1,105 | 1,293 | 1,507 | 1,735 | 2,048 |
| | Financial Aid Assistance | 191 | 219 | 250 | 303 | 328 |
| | Marketing and Advertising | 27 | 35 | 40 | 41 | 40 |
| | Recruiting | 284 | 271 | 315 | 353 | 393 |
| | Student Services | 289 | 344 | 383 | 453 | 485 |
| TUI Learning LLC | Career Services and Placement | * | ~ | ~ | ~ | ~ |
| | Faculty-Full Time | * | 54 | 66 | 77 | 69 |
| | Faculty-Not Full Time | * | 148 | 198 | 221 | 200 |
| | Financial Aid Assistance | * | 3 | 7 | 12 | 17 |
| | Marketing and Advertising | * | ~ | ~ | ~ | 9 |
| | Recruiting | * | ~ | ~ | 11 | 17 |
| | Student Services | * | ~ | ~ | ~ | 16 |
| Universal Technical Institute, Inc. | Career Services and Placement | 33 | 84 | 81 | 102 | 129 |
| | Faculty-Full Time | 1,096 | 1,003 | 961 | 942 | 1,046 |
| | Faculty-Not Full Time | 10 | 7 | 5 | 2 | 3 |
| | Financial Aid Assistance | 207 | 183 | 183 | 226 | 229 |
| | Marketing and Advertising | 20 | 21 | 31 | 35 | 36 |
| | Recruiting | 386 | 328 | 384 | 412 | 446 |
| | Student Services | 178 | 150 | 161 | 172 | 199 |

* data not available for year

~ data not available for employee type

**Appendix 24: Employee Distribution by Company, Fiscal Year 2006-10**

| Company | Employee Type | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|---|
| Vatterott Education Holdings, Inc. | Career Services and Placement | 32 | 29 | 29 | 33 | 40 |
| | Faculty-Full Time | 375 | 330 | 300 | 334 | 356 |
| | Faculty-Not Full Time | 157 | 224 | 319 | 299 | 367 |
| | Financial Aid Assistance | 57 | 59 | 62 | 70 | 82 |
| | Marketing and Advertising | 0 | 5 | 4 | 4 | 7 |
| | Recruiting | 131 | 96 | 94 | 104 | 109 |
| | Student Services | 106 | 136 | 174 | 187 | 205 |
| Walden LLC | Career Services and Placement | 0 | 0 | 1 | 3 | * |
| | Faculty-Full Time | 103 | 94 | 121 | 153 | * |
| | Faculty-Not Full Time | 992 | 1,096 | 1,580 | 1,848 | * |
| | Financial Aid Assistance | 18 | 21 | 30 | 32 | * |
| | Marketing and Advertising | 100 | 102 | 103 | 104 | * |
| | Recruiting | 291 | 358 | 384 | 475 | * |
| | Student Services | 243 | 368 | 417 | 471 | * |

\* data not available for year

~ data not available for employee type