JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
NATALIE LYONS (SBN 293026)
nlyons@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tomerrill@law.harvard.edu
KYRA A. TAYLOR (*Pro Hac Vice*)
ktaylor@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

   *Plaintiffs*,

  v.

ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,

And

THE UNITED STATES DEPARTMENT OF EDUCATION,

   *Defendants*.

Case No.: 19-cv-03674-WHA

**OPPOSITION TO DEFENDANTS' MOTION AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Date: February 13, 2020
Time: 8:00 a.m.
Place: Courtroom 12, 19th Floor
Honorable William H. Alsup

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

NOTICE OF MOTION .................................................................................................................. vii

MEMORANDUM AND POINTS OF AUTHORITY ...................................................................... 1

I.    INTRODUCTION ................................................................................................................. 1

II.   COUNTER-STATEMENT OF FACTS ............................................................................... 4

    A.   Statutory and Regulatory Framework ..................................................................... 4

        1. 1994 through October 2018 ............................................................................. 5

        2. October 2018 through the Present ................................................................... 6

    B.   Defendants' Interpretation and Implementation of its Duty to Render Decisions on Borrower Defense Applications ............................................................................... 9

        1. 1994 through January 2017 ............................................................................. 9

        2. January 2017 to Present ................................................................................. 12

            *Order to Halt Processing and Developing New Claim Categories* ......................... 12

            *Hostility to Borrowers and Borrower Defense* ....................................................... 13

            *Denial of Resources Necessary to Fulfill Obligation to Resolve Claims* ............... 14

            *Pursuit of Unlawful Relief Methodology* ................................................................ 14

II.   PROCEDURAL HISTORY ................................................................................................ 16

III.  STANDARD OF REVIEW ................................................................................................. 17

IV.  ARGUMENT ...................................................................................................................... 18

    A.   Defendants Have Breached Their Mandatory Duty to Resolve Students' Borrower Defense Applications ............................................................................................. 19

    B.   The Court Is Authorized to Grant the Relief that Plaintiffs Seek ................................ 21

    C.   Defendants Have Not Established that Their Failure to Fulfill the Mandatory Duty to Decide Borrower Defenses is Reasonable ............................................................... 22

    D.   Competing Agency Priorities Do Not Justify the Deparment's Failure to Fulfill Its Mandatory Duty In Light of the Effect on the Welfare of Students ............................ 24

        1. The Proferred "Competing Demands" Do Not Explain, Much Less Justify, the Failure to Decide Borrower Defense Claims ................................................. 25

        2. The Department's Course of Action Is Not Justified When Weighed Against the Harm Caused to Students ................................................................................ 27

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*A.A. v. U.S Citizenship & Immigration Servs.*, No. C15-0813JLR, 2018 WL
   1811352  (W.D. Wash. Apr. 17, 2018) ................................................... 28

*Adams v. Duncan*, 179 F. Supp. 3d 632  (S.D.W. Va. 2016) ........................................ 22

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) .................................... 17

*Am. Ass'n of Cosmetology Sch. v. Riley*, 170 F.3d 1250 (9th Cir. 1999) ..................................... 22

*Asmai v. Johnson*, 182 F. Supp. 3d 1086 (E.D. Cal. 2016) ..................................... 23

*Bauer v. DeVos*, Case No. 17-1330 (RDM) (D.D.C.) ...................................... 6, 7, 8, 25

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ................... 6

*Calvillo Manriquez v. DeVos*, No. 17-cv-07210-SK (N.D. Cal) ................................ 15

*Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir., Sept. 5, 2018) ........................... 15

*Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097 (D.N.J. 1993) .................................... 21

*CAPPS v. DeVos*, Case No. 17-999 (RDM) (D.D.C.). ........................................ 7

*Carr v. DeVos*, 369 F.Supp.3d 554 (S.D.N.Y. 2019) ....................................... 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................... 17

*City of Providence v. Barr*, 385 F. Supp. 3d 160 (D.R.I. 2019) ............................ 23

*Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*, No. civ-05-261-TUC-CKJ,
   2007 WL 9723130 (D. Ariz. Oct. 26, 2007) ................................................ 28

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) .................................. 27

*E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, 590 F. Supp. 2d 1244 (N.D. Cal. 2008) ...... 17

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........................................ 28

*Gearhart v. United States Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798
   (N.D. Cal. Oct. 25, 2019) ............................................ 22

*Geneme v. Holder*, 935 F. Supp. 2d 184 (D.D.C. 2013) ....................................... 30

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Service*, 230 F. Supp. 3d 1106
   (N.D. Cal. 2017). ................................................. 18

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) ................................. 18, 23, 24, 25

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ........................ 18, 23

*In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) ......................... 18

*Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ............................................. 17, 24, 28

*Int'l Dealers Sch., Inc. v. Riley*, 840 F. Supp. 748 (D. Nev. 1993). ............................................... 22

*Mashiri v. Dep't of Educ.*, 724 F.3d 1028 (9th Cir. 2013) .............................................................. 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..................................... 17

*Muwekma Tribe v. Babbitt,* 133 F. Supp. 2d 30 (D.D.C. 2000) ...................................................... 23

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ........................................................... 17, 19

*Okla. Aeronautics, Inc. v. United States*, 661 F.2d 976 (D.C. Cir.1981) ........................................ 22

*San Francisco BayKeeper v. Whitman*, 297 F.3d 877 (9th Cir. 2002) ............................................ 18

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) ................................................................... 24

*Sims v. Ellis*, 972 F. Supp. 2d 1196 (D. Idaho 2013) ...................................................................... 30

*Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464 (D.D.C. 1995) ............................................ 22

*Tang v. Chertoff*, 493 F. Supp. 2d 148 (D. Mass. 2007) ................................................................ 27

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984) .............................. 18, 27

*Tufail v. Neufeld*, No. 2:14-cv-02545-TLN-CMK, 2016 WL 1587218
  (E.D. Cal. Apr. 20, 2016) ......................................................................................................... 24, 25

*Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987) ............................................... 21

*Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068
  (9th Cir. 2016) ....................................................................................................... 17, 18, 19

**Statutes**

5 U.S.C. § 555 ................................................................................................................................. 17

5 U.S.C. § 702 ................................................................................................................................. 17

5 U.S.C. § 704 ................................................................................................................................. 17

5 U.S.C. § 706 ........................................................................................................................... *passim*

20 U.S.C. § 1070 ............................................................................................................................... 4

20 U.S.C. § 1078 ............................................................................................................................... 4

20 U.S.C. § 1082(a)(2) .................................................................................................................... 21

20 U.S.C. § 1087 ............................................................................................................................... 4

20 U.S.C. § 1087e ...................................................................................................................... 5, 19

**Federal Register**

81 Fed. Reg. 39,330 (June 16, 2016) ................................................................................. 8

81 Fed. Reg. 66,642 (Sept. 28, 2016) ............................................................................... 11

81 Fed. Reg. 75,926 (Nov. 1, 2016) ........................................................................ 7, 11, 20

82 Fed. Reg. 27,621 (June 16, 2017) .............................................................................. 7, 25

82 Fed. Reg. 49,114 (Oct. 24, 2017) ................................................................................... 7

83 Fed. Reg. 6,458 (Feb. 14, 2018) ................................................................................ 7, 25

84 Fed. Reg. 17,820 (Apr. 26, 2019) ................................................................................... 8

**Regulations**

34 C.F.R. § 682.209 ............................................................................................................. 5

34 C.F.R. § 685.206 ......................................................................................................... 6, 11

34 C.F.R. § 685.222 ......................................................................................................... 8, 25

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................... 17

**Other Authorities**

David Halperin, *Law Enforcement Investigations and Actions Regarding For-Profit Colleges*, Republic Report (Dec. 10, 2019) https://perma.cc/TA4F-QU68 ............................ 28

Federal Student Aid, *Borrower Defense to Repayment* (2019) https://perma.cc/6YMP-6V49 ............................................................................... 11

Federal Trade Commission, Bureau of Consumer Protection, "Staff Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses" (May 4, 1976), published at 41 Fed. Reg. 20,022 (May 14, 1976) ......................................... 5

*Law Enforcement Actions Against Predatory Schools*, Veterans for Education Success (April 1, 2018) https://perma.cc/G478-HPMA ............................................................... 28

Michael Stratford, *DeVos orders partial loan relief for many duped student borrowers*, Politico (Dec. 6, 2019) https://perma.cc/795J-D47C ............................................ 15

Stacy Cowley, *Education Department Will Cancel $150 Million in Student Debt After Judge's Order*, New York Times (Dec. 14, 2018) https://www.nytimes.com/2018/12/14/business/student-loan-debt-forgiveness.html ...................................................... 8

Staff of S. Health, Education, Labor, and Pensions Comm., 112th Cong., *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012), https://perma.cc/37F4-Q2QC..................................................................5, 28

The Century Foundation, *The Cycle of Scandal at For-Profit Colleges* (2017) https://tcf.org/topics/education/the-cycle-of-scandal-at-for-profit-colleges/?agreed=1.............5

U.S. Dep't of Educ. *Fact Sheet: Protecting Students from Abusive Career Colleges* (June 8, 2015), https://perma.cc/DXL6-29FJ?type=image .................................................. 10

U.S. Dep't of Educ., *Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers* (Dec. 20, 2017 Press Release) https://perma.cc/AWX3-NYAC .................................................................. 15

U.S. Dep't of Educ*., U.S. Department of Education Fines Corinthian Colleges $30 Million for Misrepresentation* (April 14, 2015), https://perma.cc/348D-5CKX.......................9

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on February 13, 2019, at 8:00 am at the U.S. District Courthouse, 450 Golden Gate Avenue, San Francisco, before the Honorable Judge William H. Alsup, Plaintiffs will, and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for an Order granting summary judgment in their favor.

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs move for summary judgment on the ground that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. In the alternative, Plaintiffs seek an Order denying Defendants' Motion under Rule 56(d), as set forth in a separate motion filed concurrently herewith. This Motion is supported by the pleadings and other papers filed in this case, the accompanying memorandum of points and authorities, oral argument, and any other matter of which this Court takes notice.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court (1) deny the Defendants' Motion in its entirety; (2) declare that the Department of Education has a mandatory duty to resolve on the merits the borrower defense applications of the Named Plaintiffs and the Class, (3) declare the Defendants have failed to do so in violation of section 706(1) of the Administrative Procedure Act, and (4) order that the Defendants submit for approval within 30 days a plan whereby they resolve all pending borrower defense applications within 12 months.

## MEMORANDUM AND POINTS OF AUTHORITY

## I. INTRODUCTION

The Department of Education authorizes the disbursement of over $100 billion dollars every year pursuant to Title IV of the Higher Education Act (HEA). These funds are disbursed directly to institutions of higher education, as defined by the HEA, in the form of grants and student loans. To receive Title IV funds, institutions must enter into a contractual agreement with the Secretary of the Department, who has the power and authority to approve their participation and to sanction and remove them when they violate the terms of the program.

The HEA mandates that the Department provide a safety valve for students who are encumbered by federal student loans as the result of misconduct on the part of participating institutions (borrower defense). This mandate is carried forward in Department regulations and the promissory notes of all federal student loans. Simply put, a borrower who can establish that their school committed misconduct related to their enrollment and/or educational services has a defense against the repayment of their federal student loan. Separately, the Department has the authority to recoup the uncollectible loan from the institution itself. The borrower defense provision is crucial because there is no statute of limitations on the collection of federal student loans; they are rarely dischargeable in bankruptcy; and, once in default, the Department has extra-judicial powers of collection, including the ability to garnish wages and offset federal benefits and tax refunds. The Department also has the power to bring collection lawsuits against defaulted borrowers, although this mechanism of collection is rarely used.

Named Plaintiffs and members of the Class (Students) raised borrower defenses in the manner prescribed by the Department, but have received no decision on the merits of their claims. This is because the Secretary has deliberately chosen a course of action that precludes the resolution of Students' borrower defense claims. She chose this course of action because she believes that Students are seeking "free money," rather than raising claims that they have a legal right to make. In her tenure, she approved borrower defense claims only when earmarked for approval by a prior administration, and then only "with extreme displeasure." Under her direction, the Department issued orders to cease processing borrower defense claims and to cease identifying

factual and legal bases for granting or denying claims. She gutted the staff and decisionmaking authority of the Department's unit responsible for resolving Students' claims. Meanwhile, she relentlessly pursued a regulatory and policy course to unravel borrower defense. She sought to keep hidden the fact that she inherited a personnel and policy infrastructure that would have allowed her to resolve Students' claims within a matter of months. Instead of relying on this existing infrastructure, she pursued a regulatory unwinding, using tactics that have been declared unlawful at every turn.

Students have suffered a common injury owing to the Defendants' deliberate and uniform policy of withholding final decisions on their borrower defense applications. This withholding is in dereliction of the mandatory duty imposed on the Secretary by statute and regulation to resolve their claims, the existence of which Defendants do not dispute.

Summary judgment in favor of Students is warranted because the Secretary's duty to resolve borrower defense applications is mandatory, discrete, and unchallenged. The Secretary does not dispute that she has failed to meet this duty. Nor has she put forth any evidence that she has a plan in place to ensure that all Students will receive a timely decision on the merits of their claims. Rather, she argues that she has been unable to meet her obligation because a court has prevented her from resolving the claims in her preferred manner.

The Court must reject this false premise. To the extent that the Secretary has discretion regarding borrower defense claims, this discretion does not extend to the patently illegal. The obligation to resolve the merits of borrower defense applications does not allow for a prolonged or indefinite hiatus while the Secretary searches for a means to reach a preferred outcome that can be retrofitted into a passable "partial relief" scheme. This is especially true where, as here, alternative legal means exist for fairly resolving Student's claims.

Plaintiffs respectfully request that the Court (1) declare that the Department of Education has a mandatory duty to resolve on the merits the borrower defense applications of the Named Plaintiffs and the Class, (2) declare the Defendants failed to do so in violation of section 706(1) of the Administrative Procedure Act, and (3) order that the Defendants submit for approval within 30

days a plan whereby they resolve all pending borrower defense applications within 12 months.

Defendants argue for the opposite outcome, arguing for summary judgment on the basis that they took "concrete steps" towards resolving Students' borrower defenses, *see* Defendants' Memorandum in Support of Motion for Summary Judgment (Defs' Mem.), ECF No. 63 at 2, and that their "temporary delay" is the result of a "reasonable" balance of "competing priorities," Defs' Mem. at 17.

Defendants obliquely acknowledge that there was in fact a blanket order to halt decisionmaking on Students' claims, but do not provide the Court with any details about that order. Rather, they invoke the Department's "eminently reasonable policy judgment," *id*. at 21, that "it needs to develop a comprehensive methodology for awarding borrower defense relief to successful claimants before it resumes issuing final decisions," *id*.

The record does not support that this "policy judgment" was necessary, lawful, reasonable, or even germane to the bulk of Students' claims. The certified administrative record consists entirely of three declarations submitted by Department employees, and a series of exhibits, only three of which the Department cites in its Motion. Notably absent from the record are documents that would contradict the Defendants' narrative that, prior to January 2017, the Department's approach to borrower defense—one that allowed it to resolve 30,000 claims in six months and would have substantially eliminated the backlog in applications within months—was "arbitrary and haphazard," Defs' Mem. at 2. This evidence, which the Plaintiffs separately seek to place before the Court for consideration, *see* ECF No. 66, includes legal and policy memoranda and protocols implemented by the Department prior to January 2017.

Additionally, the record does not support the idea that the Department's failure to resolve Students' claims is due to its difficulty implementing the regulations finalized in November 2016, which the Department never intended to implement at all until forced to by a Court in late 2018. The record does not even reveal how many, if any, of Students' claims are governed by the new regulation, despite Defendants' assertion that this regulation governs the procedures for all claims, "despite when the loan was disbursed," Defs' Mem. at 4. This is because the Department only altered federal student loan notes in July 2019, and there is nothing to refute the idea that *all* loans

of Students with pending claims are in fact governed by the state law standard that has been written into the loan contracts since 1995. Even if new procedures do apply to some of Students' loans—and serious questions exist as to whether that is the case—there is absolutely nothing that prevents the Department from using the framework for borrower defense that existed prior to 2017, and even less to suggest that the Department must pursue its chosen relief formula when resolving Students' claims. To the extent that the Secretary has discretion, this record does not demonstrate that this discretion was exercised in a lawful or rational manner. To the contrary, the Secretary has evidenced a bias and hostility toward borrower defense and Students that counsels against accepting Defendants' claims that "competing priorities" excuse their failure to resolve borrower defense claims.

For the reasons set forth herein, the Court must reject the Department's Motion for Summary Judgment and grant Plaintiffs' Cross Motion for Summary Judgment. In the alternative, Plaintiffs have filed a motion under Federal Rule of Civil Procedure 56(d) setting forth with specificity that documents in the Defendants' possession establish issues of material fact that preclude summary judgment in Defendants' favor.

## II.   COUNTER-STATEMENT OF FACTS

### A.   *Statutory and Regulatory Framework*

Title IV of the Higher Education Act (HEA), 20 U.S.C. §§ 1070-1099, provides the statutory authorization for federal student loans, including the Family Federal Education Loan (FFEL) and Direct Loan programs. All Students borrowed either FFEL or Direct Loans. Under the Direct Loan program, the Department directly lends money to eligible student borrowers so they can attend "participating institutions of higher education," which are approved and regulated by the Department. 20 U.S.C. § 1087(a). Under the FFEL program (which ceased issuing loans July 1, 2010), private lenders issued student loans, which were insured by guaranty agencies and reinsured by the Department. 20 U.S.C. § 1078. The Secretary is responsible for overseeing both of these loan programs and regulating institutions that receive federal student aid. *See* 20 U.S.C. § 1070.

The statutory directive regarding borrower defense has not changed since its adoption. In 1993, Congress amended the HEA and directed the Department to create borrower defenses for Students by "specify[ing] in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment made under this part[.]" 20 U.S.C. § 1087e(h).[1]

### 1.    *1994 through October 2018*

When Congress amended the HEA to include borrower defense in the Direct Loan program, loans under the FFEL program were already issued under a common promissory note[2] that included language parallel to that required by the Federal Trade Commission's "Holder Rule."[3] Thus holders of a FFEL loan could be answerable for school misconduct in relation to the loan. A borrower could assert any claim they had against the institution—under common law or state statutory law—as a defense against the repayment of the FFEL loan. The borrower defense language in the FFEL promissory note was later codified. *See* 34 C.F.R. § 682.209(g) (making loan holder "subject to all claims and defenses that the borrower could assert against the school with respect to that loan"). Congress specified that Direct Loans should have "the same terms, conditions, and benefits" as FFEL Loans. 20 U.S.C. § 1087e(a)(1).

The Secretary enacted borrower defense regulations applicable to the Direct Loan program in 1994, effective on July 1, 1995 ("1994 regulations"). These regulations provide:

   (c)(1) In any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the

---

[1] This change reflects Congress's decades-long concern that federal student aid funds not be used to defraud students. *See* The Century Foundation, The Cycle of Scandal at For-Profit Colleges (2017) (describing Congressional action from first GI Bill onward), https://tcf.org/topics/education/the-cycle-of-scandal-at-for-profit-colleges/?agreed=1. This concern is ongoing, *see* Connor Decl., Ex. 40 (Staff of S. Health, Education, Labor, and Pensions Comm., 112th Cong., *For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (2012)) (HELP Report) (revealing "virtually every [for-profit college] company reviewed" misled students). All numbered exhibits cited in this Memorandum are exhibits attached to the Connor Declaration in support of Plaintiffs' Motion Regarding Record, ECF No. 66.

[2] *See* Federal Family Education Loan Program Federal Stafford Loan Master Promissory Note at 2, https://ifap.ed.gov/dpcletters/attachments/FP0608StaffApp2008.pdf.

[3] Federal Trade Commission, Bureau of Consumer Protection, "Staff Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses" (May 4, 1976), published at 41 Fed. Reg. 20,022 (May 14, 1976).

student that would give rise to a cause of action against the school under applicable state law. …

(c)(2) If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include, but is not limited to, the following: (i) reimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection; (ii) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act; (iii) Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

(c)(3) The Secretary may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies. 34 C.F.R. § 685.206 (eff. through October 15, 2018).

Once a student establishes a successful borrower defense, the Department must notify her of its decision and provide the student with some relief. *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1100 (N.D. Cal. 2018).

The Department incorporated a state-law-based standard for borrower defense into the Direct Loan Master Promissory Note (MPN). *See, e.g.*, Ex. 20 at 7 (2014 MPN). The MPN's "Rights and Responsibilities" section informs the borrower:

"In some cases, you may assert, as a defense against collection of your loan that the school did something wrong or failed to do something it that it should have done, … [provided that] the school's act or omissions directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law." *Id.*

The Direct Loan MPN contained the state-law standard until at least October 2016,[4] and possibly until July 1, 2019 or longer, when the Department gained approval to change it.

### 2.    *October 2018 through the Present*

On October 16, 2018, the operative borrower defense regulation changed. This change was due to a pair of federal court rulings, AR 13-66 (*Bauer v. DeVos*, Case No. 17-1330 (RDM), Order

---

[4] Defendants admit that all Direct Loans MPNs "from 1995 to October 2016" incorporate state law. *See* Ans. ¶ 62; *see also* Compl. ¶ 62 (alleging same from 1995 until October 16, 2018). The only changes to the MPN after October 2016 occurred on July 12, 2019, as discussed *infra*.

and Opinion, ECF No. 87 (Sept. 12, 2018, D.D.C.) (*Bauer I*); Order and Opinion, ECF No. 91 (Sept. 17, 2018) (*Bauer II*)),[5] vacating the Department's "delay rule" and stay of borrower defense regulations enacted in 2016, 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("2016 regulations"). The 2016 regulations were set to become effective July 1, 2017. However, in June 2017, the Department issued a notice delaying their implementation under section 705 of the APA, *see* 82 Fed. Reg. 27,621 (June 16, 2017), citing "serious questions" raised in a lawsuit seeking to enjoin the regulations brought by an association of for-profit colleges.[6] The Department also issued an interim, 82 Fed. Reg. 49,114 (Oct. 24, 2017), and final rule, 83 Fed. Reg. 6,458 (Feb. 14, 2018), delaying the effective date of the 2016 regulations until July 1, 2020.

The Department delayed the 2016 regulations to allow time to adopt new regulations that would entirely supplant the 2016 regulations, with which the new administration disagreed.[7] In arguing the delay was in the public interest and not harmful to students, the Department stated that it would continue to process pending applications under the 1994 regulations. *See* 83 Fed. Reg. 6,458, 6,467 (Feb. 14, 2018) (citing "significant overlap between the current State-law based standard and the Federal standard from the 2016 final regulations" and stating that "existing claims were always subject to the State-law based standard in the current regulations"). The Department promised that "[e]fforts to improve the efficiency of claims processing are ongoing and are not contingent upon implementation of the 2016 final regulations[s]." *Id.*; *see also* 83 Fed. Reg. 6,458, 6,460 (Feb. 14, 2018); AR 504 (Inspector General Report (IG Report)) ("Until the delay in implementing the 2017 regulations is lifted or new regulations are issued, all claims are subject to

---

[5] Citations to material included in the Defendants' certified administrative record is cited to as "AR." Plaintiffs have moved to exclude portions of the AR as presented by Defendants. Citations to the AR do not waive arguments about its propriety.

[6] *See CAPPS v. DeVos*, Case No. 17-999 (RDM) (D.D.C.). This lawsuit did not challenge the whole 2016 regulation, but rather provisions limiting institutions' use of arbitration agreements against students, and provisions requiring institutions to post financial security or letters of credit if certain triggering events occur, including the submission of substantial numbers of borrower defenses from former students. On March 1, 2019, the Department defended the lawfulness of the rule. *Id.*, Def. Mot. Opp. Summ. J., ECF No. 93.

[7] The Secretary referred to the 2016 borrower defense regulations as "harmful" because they allowed students to get "free money." Ex. 35 at 5:13 (2017 remarks of Secretary DeVos).

the regulations that became effective July 1, 1995.").

A federal court found the Department's justifications lacking, as the delay "did not come close" to being lawful under the APA. The Department's defense of the delay was "unpersuasive," "mere boilerplate," "at odds with the Department's prior conclusion" and "lack[ing] in any meaningful analysis," *Bauer I*, AR 13-45. On October 16, 2018, the court's vacatur of the delay rules became effective, *Bauer II*, Case No. 17-1330 (RDM), ECF No. 91 (Sept. 17, 2018), and the 2016 regulations took effect immediately.

Although some parts of the 2016 regulation were immediately mandatory,[8] others required Department action for implementation, *see* AR 67-77 (March 15, 2019 Guidance), or otherwise could not be immediately implemented without constituting impermissible retroactive rulemaking.

This limitation applied to the standard for borrower defense. As the Department observed in promulgating the 2016 regulations, the operative standard could not change until the new standard was incorporated into MPNs. 81 Fed. Reg. 39,330, 39,353-54 (June 16, 2016). After the *Bauer* and *CAPPS* decisions, the Department published a notice that it would change the Direct Loan MPN to "update[e] information about the borrower defense discharge provisions to show changes made through the November 1, 2016 regulation." 84 Fed. Reg. 17,820, 17,821 (Apr. 26, 2019). The change, approved on July 12, 2019, included the following language:

> "We may discharge all or a portion of your loan if your school did something or failed to do something related to your loan or to the educational services that the loan was intended to pay for. The specific requirements to qualify for a borrower defense to repayment discharge vary depending on when you received your loan. Contact us for more information." Ex. 21 (2019 MPN).

On November 25, 2019, the Department published an announcement on its website, Ex. 39 (IFAP announcement), addressing a procedural requirement for borrower defense applications decided under the 2016 regulation. *See* 34 C.F.R. § 685.222(f)(2)(iv) (authorizing Secretary to initiate group borrower defense process against currently-operating schools and describing notice required therein); 34 C.F.R. § 685.222(e)(3)(i) (describing notice given to school in process for

---

[8] *See, e.g.,* Stacy Cowley, *Education Department Will Cancel $150 Million in Student Debt After Judge's Order*, New York Times (Dec. 14, 2018) (discussing aspect of 2016 regulation that mandated Secretary provide automatic loan cancellation without borrower defense application for students whose schools closed before they could complete their program of study).

deciding individual borrower defense applications governed by the 2016 regulation).

**B.**   ***Defendants' Interpretation and Implementation of its Duty to Render Decisions on Borrower Defense Applications***

**1.**   ***1994 through January 2017***

From the beginning, the Department interpreted the 1994 regulations as incorporating and relying on "applicable state law" as the basis for resolving borrower defense claims, as to both eligibility and relief under the Direct Loan program. The Department's Office of General Counsel received borrower defense applications, analyzed them under applicable state law, and issued decisions. *See* Compl. ¶ 113;[9] Exs. 1–3 (Department borrower defense decisions prior to 2015).

Upon receiving a high volume of borrower defense claims following the misconduct[10] and closure of Corinthian Colleges, the Department recognized that it needed infrastructure. It appointed a Special Master, who served from 2015 to 2016. *See* Ans., ECF No. 55 at 13, ¶ 122. It also established an application form—specific to the borrower defense claims of former Corinthian students—in 2015. Ans. at 8 ¶¶ 69, 70; AR 425-453. The Department did this because "borrowers have the right to submit defense to repayment claims, [and] the Department must set up a process to review and adjudicate them[.]" Ex. 24 (2015 Letter of FSA to OMB).

During his appointment, the Special Master recommended the complete approval of borrower defense claims for 3,787 former Corinthian students. AR 505-06. He issued four reports summarizing the Department's efforts to develop an infrastructure and polices for processing borrower defense claims, including those from former students of schools other than Corinthian. AR 357-391.

In late June 2016, the Department transitioned borrower defense oversight from the Special Master to the newly-created Enforcement Unit's Borrower Defense Unit (BDU). AR 506 (IG Report). "According to its functional statement, BDU issues written decisions on borrower defense

---

[9] Defendants claimed to "lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph pertaining to the number of loans recommended for discharge." Ans. ¶ 113.

[10] U.S. Dep't of Educ., *U.S. Department of Education Fines Corinthian Colleges $30 Million for Misrepresentation* (April 14, 2015), https://perma.cc/348D-5CKX.

claims that constitute the final decision of the Secretary, in collaboration with the Office of General Counsel." AR 507 (IG Report).[11] The BDU continued to process discharges under the memoranda developed by the Special Master "prior to the creation of the BDU." AR 506 (IG Report).

When creating the borrower defense infrastructure, the Department emphasized it would "rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) [we]re eligible for borrower defense relief [because it would] simplify and expedite the relief process, [and] reduc[e] the burden on borrowers." U.S. Dep't of Educ. *Fact Sheet: Protecting Students from Abusive Career Colleges* (June 8, 2015), https://perma.cc/DXL6-29FJ?type=image. The BDU focused on groups of applications related to the same program at the same school making similar claims about the same time period. In memoranda, the Department established eligibility criteria for groups of borrower defenses ("Eligibility Memoranda"). AR 507-09 (IG Report). Several memoranda specifically set forth the legal basis for issuing favorable decisions on borrower defense applications. The IG Report identified seven Eligibility Memoranda, AR 509 (IG Report).[12] A December 14, 2017 memorandum from the Department's Acting General Counsel, Ex. 8, identifies five additional Department memoranda prepared during this period.[13]

By October of 2016, the BDU was engaged in extensive outreach to encourage Corinthian Students to submit borrower defenses, AR 393-94 (Oct. 2016 BDU Report), and the Department created a "universal" borrower defense form to help all students submit borrower defenses, 81 Fed.

---

[11] Defendants admit that "The Department tasked the BDU with providing 'legal analysis, support, and advice concerning claims of borrowers of Direct Loans. The unit [will] analyze claims to make determinations of injury, investigate institutions in connection with borrower defense claims and coordinate with federal and state agencies regarding those claims," Ans. ¶ 130, but did not include in the AR any documents setting forth the authority and duties of the BDU.

[12] Defendants did not include these memoranda in the AR. Plaintiffs have moved to have them considered by the Court in their Motion Regarding the Record, ECF No. 66. *See* Ex. 4 (Oct. 24, 2016 Memo Re: Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims); Ex. 5, (Jan 9, 2017 Memo Re: Corinthian Borrowers Alleging That They Were Guaranteed Employment); Ex. 6 (Jan. 10, 2017 Memo Re: ITT Borrowers Alleging That They Were Guaranteed Employment).

[13] The Department did not include the December 14, 2017 memorandum nor any of the memoranda it describes in the AR. Plaintiffs have moved to include it in their Motion Regarding the Record, ECF No. 66. *See* Ex. 8 (Dec. 14, 2017 OGC Memo Re: CCI Partial Discharge Memo).

PLAINTIFFS' OPPOSITION AND CROSS       10              Case No.: 19-cv-03674-WHA
MOTION FOR SUMMARY JUDGMENT

Reg. 66,642 (Sept. 28, 2016).[14] Until 2017, the BDU had ten full-time attorneys, 20 contractor staff, and a director, and requested approval to hire additional attorneys. AR 341-42 (Nevin Decl. ¶¶ 20-23).

As of October 2016, the Department discharged 24,504 loans of former Corinthian students with JPR claims; 426 loans of former Corinthian students with transferability of credit claims; 169 loans of former Corinthian students with guaranteed employment claims; 33 loans of former ITT students with guaranteed employment claims; and the loans of 2,864 of former students of American Career Institute in Massachusetts pursuant to a group borrower defense discharge (without individual application).[15] AR 525 (IG Report). From July 2016 to January 2017, BDU granted approximately 28,000 borrower defenses. Including the Special Master's discharges, the Department granted 31,773 borrower defenses by the end of January 2017. AR 502 (IG Report).

Looking to the future, as of late 2016, the Department "expect[ed] to resolve all pending eligible [Corinthian job placement rate] findings claims by Spring 2017." AR 392 (Oct. 2016

---

[14] The Department has a single borrower defense application process for both Direct loan and FFEL borrowers. Federal Student Aid, *Borrower Defense to Repayment* (2019) https://perma.cc/6YMP-6V49. On its website for borrower defense, the Department explains that FFEL borrowers can receive a borrower defense discharge when they consolidate their loans into Direct loans. *Id.* The Department explains, "For the purposes of borrower defense discharge only, we interpret the term "Direct Loan" in 34 C.F.R. 685.206(c) to include Direct Consolidation loans. This interpretation enables borrowers with loans eligible for Direct Loan consolidation, including Federal Family Education Loan (FFEL) Program loans or Federal Perkins Loans, to avail themselves of the borrower discharge process provided here by consolidating such loans into the Direct Loan Program." *Id.* This process reflects the Department's longstanding interpretation that "the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed in the FFEL Program—which allowed borrowers to assert both claims and defenses to repayment without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings." 81 Fed. Reg. 75,926, 75,946 (Nov. 1, 2016).

[15] Defendants admit that these discharges occurred, and that memoranda exist documenting the legal and factual basis for these discharges. Ans. ¶¶ 139, 140, 142. The Answer states, "To the extent the allegations in this paragraph seek to characterize a portion of the memorandum that have not been publicly released, Defendants can neither confirm nor deny them because to do so would reveal information protected by privilege, including the attorney-client privilege." Despite claiming, without any support, that "the Department generally adjudicated these applications, and awarded full loan discharges as relief, without conducting an empirical assessment of the harms suffered by borrowers," Defs' Mem. at 7, and despite being ordered to produce a privilege log along with the AR, ECF No. 44, Defendants have neither included redacted approval memoranda in the AR nor filed a privilege log.

BDU Report). In addition to the seven categories of existing claims (pertaining to Corinthian, ITT, and ACI Massachusetts, schools that were no longer in operation), the Department identified additional categories of claims warranting further research. AR 509, 515 (IG Report); Ex. 9 (2017 BDU Claims Protocol). The Department had received more than 100 applications from former students of at least ten schools other than Corinthian at this point. Compl. ¶ 159; ECF No. 55, Ans. at 16. It had developed a protocol for resolving claims from students of schools other than Corinthian.[16] There were over 50,000 pending borrower defense applications. *See* Ex. 33 (Manning Testimony).

### 2.    January 2017 to present

### <u>Order to Halt Processing and Developing New Claim Categories</u>

By March of 2017, Department assembled a "Borrower Defense Review Panel" of senior Department staff. AR 532-33; Ex. 33 at 10:5-10 (Nov. 14, 2017 Manning Remarks).[17] At some point,[18] the Review Panel and/or someone within authority at the Department ordered that the BDU stop work on borrower defense claims. The IG's report says that the Office of the Under Secretary ordered (through the Deputy Chief Enforcement Officer) that the BDU to "pause […] submitting claims for approval and […] developing additional memoranda for new categories of claims that qualify for discharge." AR 502. However, the Department's Office of Federal Student Aid (FSA) stated that the pause order was *made* by the Office of the Under Secretary and *communicated* to the BDU by the Deputy Chief Enforcement Officer. AR 533.[19]

In any event, "[f]rom January 20, 2017, through July 31, 2017, BDU did not complete or begin preparing any legal memoranda" to protect students from fraudulent practices. AR 509 (IG

---

[16] Ex. 9 (2017 BDU Claims Protocol).

[17] The AR does not contain any documents pertaining to the creation, membership, scope of duties, or output of the Review Panel. Plaintiffs have moved to include a directive from the Review Panel to Secretary DeVos as part of the record before the Court on summary judgment. Ex. 7 (March 14, 2017 Manning Memo). ECF No. 66.

[18] Defendants assert that they "lack sufficient knowledge or information to form a belief" as to when this communication was made. Ans. ¶ 163.

[19] The AR as certified by the Department does not clarify the issue. It does not include any documentation reflecting this command. Instead the Department relies on a passively constructed statement that "[u]pon the change in administration," "the BDU was informed that 'no additional approvals would be processed'" during the review. Defs' Mem. at 8 (quoting Nevin Decl. ¶ 56).

Report). The hiatus on creating new Eligibility Memoranda has continued to today. *See id.*; Ex. 32 at 20-21 (Department response to Sen. Murray's Questions for the Record (QFR)); Ex. 26 at 2 (IG Response to Sen. Durbin QFR).

Also at some point, someone in the Department requested that the Department's Inspector General (IG) conduct a "comprehensive review" of the borrower defense program. Ex. 30 at 57.[20] The IG's review covered the period from June 2016 through July 31, 2017. The IG ultimately recommended, among other things, that the Department request approval from the Acting Under Secretary to resume consideration and determination of whether additional categories of claims with common facts qualify for discharge, AR 517 (recommendation 1), and establish timeframes and controls for resolving claims in a timely way, AR 518 (recommendation 9).[21]

**Hostility to Borrowers and Borrower Defense**

In May 2017, while the IG investigation was unfolding, the Review Panel recommended that the Department honor approximately 16,000 borrower defense claim approvals that had been made, but not effectuated, prior to January 20, 2017. Ans. ¶ 165. Secretary DeVos signed this order "with extreme displeasure."[22] In September 2017, Secretary DeVos stated that she was taking a "regulatory reset to review the previous administration's most harmful and costly regulations," explaining, "We [the Department] have pushed the pause button on … these poorly written regulations." She publicly explained that borrower defense was "harmful" because "all [a Student] had to do was raise his or her hand to be instantly entitled to so-called free money."[23] Ex. 35 at 5:10 (Sectary DeVos remarks at Mackinac Conference, Sept. 2017). The problem, in the Department's view, was the "haphazard approach [of] the previous administration, exacerbated by activity encouraging borrowers to flood the Department with claims without a proper infrastructure

---

[20] The AR does not contain any documents concerning the request for review by the Inspector General. Plaintiffs have requested that the Department provide those documents in their Rule 56(d) Motion and Motion Regarding the Record.

[21] The AR does not contain any documents relating to the Department's implementation of these or any other recommendations of the IG. Plaintiffs have requested these documents in their Rule 56(d) Motion and Motion Regarding the Record. *See* ECF No. 66.

[22] Ex. 7 (May 4, 2017 Manning Memo).

[23] Defendants claim to lack knowledge or information sufficient to form a belief about whether the Secretary made these remarks. Ans. ¶ 168. Plaintiffs have moved to supplement the AR with evidence of these remarks in their Motion Regarding the Record. ECF No. 66.

in place to intake and manage them." Ex. 34 (Jan. 8, 2018 Under Secretary Manning remarks).

Meanwhile, Secretary DeVos staffed the high ranks of her Department with employees who had worked for, or were connected with, the for-profit college industry—even if they had worked for the schools with the largest numbers of borrower defense applications. She appointed staff that worked with DeVry University (Director of the Enforcement Unit, Julian Schmoke), Career Education Corporation (Undersecretary Diane Auer Jones and General Counsel Carlos G. Muniz), and Bridgepoint Education (Senior Advisors Robert Eitel and Linda Rawles). Ans. ¶ 150.

**Denial of Resources Necessary to Fulfill Obligation to Resolve Claims**

Despite the significant number of pending borrower defenses, the Department "tabled" the BDU's request for more attorneys, did not replace the four attorneys who "voluntarily left" the BDU, and slashed the number of BDU contracted staff. AR 341, 42 (Nevin Decl. ¶¶ 21-23). In 2017, after BDU staffing had diminished, the Department stated that the BDU "currently lacks sufficient staff." Ex. 22. [24] And, in March 2019, the Department stated that it "recently completed a preliminary estimate of fulltime and contractor resources needed to eliminate or substantially reduce the number of pending borrower defense applications" because existing staffing was "insufficient."[25] The record contains recent job postings for positions at the BDU, AR 407-415, but does not explain why these positions were not posted and filled earlier, or demonstrate that the positions have been filled.

**Pursuit of Unlawful Relief Methodology**

Shortly after the IG report was published, the Department announced that it would focus on reducing relief for Students who satisfied the criteria provided by the Corinthian memoranda (guaranteed employment, JPR, and transferability of credits). U.S. Dep't of Educ., *Improved*

---

[24] Defendants admit that, "The Department recognized in a procurement notice that 'the FSA [Federal Student Aid] borrower defense unit currently lacks sufficient staff.'" Ans. ¶ 153. The Department did not include this procurement notice in the AR, and Plaintiffs have moved to supplement the AR with it. ECF No. 66.
[25] Defendants admit that this statement is an accurate quote of the Department's responses to Senate Questions for the Record. "Defendants admit that Plaintiffs accurately quote the Department's response to the cited Questions for the Record and respectfully refer the Court to that response for a full and accurate statement of its contents." Ans. ¶ 155. Plaintiffs have moved to supplement the AR with this document. ECF No. 66.

PLAINTIFFS' OPPOSITION AND CROSS       14            Case No.: 19-cv-03674-WHA
MOTION FOR SUMMARY JUDGMENT

*Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers* (Dec. 20, 2017 Press Release) https://perma.cc/AWX3-NYAC. Instead of discharging the entirety of a Corinthian student's loans, as it had done previously, the Department devised a "partial relief" methodology that would ultimately force Corinthian Students with valid borrower defenses to repay the majority—70 percent, in the aggregate—of their student loans. *See* Relief Determination Charts, *Calvillo Manriquez v. DeVos,* No. 3:17-cv-07210-SK, ECF Nos. 40-2 & 42-2 (N.D. Cal, filed April 12, 2018). The Department simultaneously granted or partially denied 12,900 Corinthian Students' claims and fully denied 8,600 Students' claims. Dec. 20, 2017 Press Release. Students who asserted job placement rate claims are challenging the partial relief methodology in separate litigation, and the Department is preliminarily enjoined from using it. *See Calvillo Manriquez v. DeVos*, No. 3:17-cv-07210-SK, ECF No. 60 (May 25, 2018) (granting in part motion for preliminary injunction); ECF No. 96 (Oct. 15, 2018) (certifying class). The Department has stated that this court order—which it has been held in contempt for violating, No. 3:17-cv-07210-SK, ECF No. 130 (Oct. 24, 2019)—prevents it from resolving borrower defense claims,[26] although it has also stated that the partial relief methodology was only ever intended to apply to Corinthian students, Br. of Appellant at 18, 31, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir., Sept. 5, 2018) ("There are no plans for further disclosures to implement the Rule"; "There is no allegation that in implementing the Average Earnings Rule prospectively[.]").

To date, the Department has not put forth evidence that it has any plan for resolving the borrower defense claims of Students.[27] The number of pending borrower defense claims has skyrocketed while the Department has frozen its decisionmaking. As of December 31, 2018, 158,100 Students awaited final borrower defense decisions. AR 397 (Dec. 2018 BD Report). As

---

[26] Ex. 38 at 1:02:30 (April 2019 Remarks of Diane Auer Jones to Bipartisan Policy Center).

[27] The Department relies on declarations of Department officials submitted as the certified administrative record—improperly, Plaintiffs maintain—to assert that "close to announcing" a new relief methodology, it will issue final decisions on borrower defense claims. The AR does not contain any evidence that the Department has finalized this methodology or that this methodology will resolve all Students' claims. A media report indicates that Diane Auer Jones, whose November 14, 2019 declaration is contained in the AR, authored an "options memorandum" outlining possibilities for partial relief, which the Secretary signed in "mid November." *See* Michael Stratford, *DeVos orders partial loan relief for many duped student borrowers,* Politico (Dec. 6, 2019) https://perma.cc/795J-D47C. The "options memorandum" is not in the AR.

of November 12, 2019, over 225,000 Students await a decision. AR 340 (Nevin Decl. ¶ 16).

### III.   PROCEDURAL HISTORY

Plaintiffs filed their class action complaint on June 25, 2019 seeking declaratory and injunctive relief and alleging two causes of action: (1) the Department's complete failure to issue any borrower defense decisions since June 2018 constituted agency action unlawfully withheld or unreasonably delayed and (2) the Defendant's policy of "not grant[ing] any borrower defenses pending the outcome of *Calvillo Manriquez v. DeVos*," Compl. ¶ 391, was arbitrary and capricious for the subclass of borrowers "whose applications ha[d] 'been designated approved,' but whose applications have not been formally granted," Compl. ¶ 402. Defendants moved to dismiss Plaintiffs' second claim on September 12, 2019, ECF No. 35, which Plaintiffs did not oppose, and it was subsequently dismissed. *See* Order (Sept. 28, 2019), ECF No. 41.

On July 23, 2019, Plaintiffs moved for class certification. ECF No. 20. The Court certified a class of "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*." Order (Oct. 30, 2019), ECF No. 46 at 14. The Court found that the Department's failure to issue a borrower defense decision since June 2018 "evidence[d] the uniform policy of inaction alleged," *id.* at 8, which inflicted "common harm" to the class, *id.* at 13. The Court noted that Defendants failed to "offer any timeline for final agency action or explain any *recent* concrete steps taken by the Department (other than mere statements by Department officials) toward resolving the backlog," *id.* at 8-9.

On November 14, 2019, Defendants filed an Administrative Record. ECF No. 56. This record was certified by an employee of the Department's Office of General Counsel on the same day, as constituting "true copies of the administrative record for the absence of final agency action by the Department with respect to pending borrower defense claims." ECF No. 56-1.

The "record" is 585 pages and consists of three declarations by Department employees all dated November 14, 2019, with a total of 27 exhibits attached. The Department did not include a privilege log despite the Court's order directing it to do so, *see* Order (Oct. 2, 2019), ECF No. 43.

IV.   **STANDARD OF REVIEW**

A court should grant a motion for summary judgment where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law" when viewing evidence most favorably for the non-moving party. Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of demonstrating that no genuine issues of material fact exists. *Celotex Corp*, 477 U.S. at 322. The Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *see Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997). A court may also issue summary judgment on "part of each claim or defense," Fed. R. Civ. P. 56(a); *see also E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co*., 590 F. Supp. 2d 1244 (N.D. Cal. 2008).

The APA governs judicial review of the Department's decision to stop deciding borrower defenses. See 5 U.S.C. §§ 702, 704. Section 706(1) of the APA requires that a court "compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). "A court can compel agency action under this section when, there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) (*SUWA*)). Put another way, "706(1) applies to the situation where a federal agency refuses to act in disregard of its legal duty to act." *Vietnam Veterans of Am*., 811 F.3d at 1079.[28]

Courts determine whether an action has been "unlawfully withheld" in violation of Section 706(1) of the APA by identifying whether there is a "specific, unequivocal command that the agency must act" and then identifying whether the agency has ignored that command. *Viet. Veterans of Am.*, 811 F.3d at 1081 (9th Cir. 2016). Although the existence of a statutory timeline

---

[28] The APA itself also requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it" "within a reasonable time, 5 U.S.C. § 555(b), and that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding" 5 U.S.C. § 555(e). This has been interpreted to mean that "an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)).

may create an "unequivocal command" for agency action, it is not required for the Court to find a 706(1) "unlawful withholding" violation. *See id.*

If an agency has delayed fulfilling its duty to act, courts assess whether an "unreasonable delay" has occurred in violation of 706(1) by weighing six factors first articulated in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984) (*TRAC*): (1) "the time agencies take to make decisions," or the "rule of reason," (2) the existence of a statutory timeline, (3) whether "health and human welfare are at stake," (4) whether action will effect "agency activities of a higher or competing priority," (5) the "nature and the extent of injuries prejudiced by the delay," and (6) although not required, whether agency "impropriety [is] lurking behind agency lassitude." *In re Pesticide Action Network N. Am.,* 798 F.3d 809, 813 (9th Cir. 2015).

Although "generally judicial review of an agency action is based on a set administrative record," when courts review an APA failure-to-act claim, "'review is not limited to the record as it existed at any single point in time,'" *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)). Thus, "review is not wholly limited to an administrative record in a failure to act case," *Hoopa Valley Tribe v. Nat'l Marine Fisheries Service*, 230 F. Supp. 3d 1106, 1126 (N.D. Cal. 2017).

## V.   ARGUMENT

Plaintiffs are entitled to summary judgment on the question of whether the Defendants have a discrete, mandatory duty to resolve borrower defense applications. Further, there is no genuine issue of material fact that Defendants have breached that duty by failing to issue final decisions on the merits of Students' borrower defense claims, pursuant to a blanket policy of inaction that is *per se* an unreasonable interpretation of its mandatory duty. *See infra* IV.A. And, the Court is empowered to grant Students relief on their claim. Defendants assert that the Court cannot enter an injunction against the Department. But, they are wrong. The APA grants courts the power to review agency action and inaction, and to compel action where it is unlawfully withheld or unreasonably delayed, *see infra* IV.B.

Separately, the Court should deny Defendants' Motion for Summary Judgment. Defendants claim that it is "eminently reasonable," Defs' Mem. at 21, for the Department to

withhold borrower defense decisions from Students while it pursues a yet-to-be-revealed "formula" for deciding their claims.[29] This constitutes a tacit admission by the Defendants that they have in fact subjected Students to a uniform policy of inaction, but it utterly fails to justify that policy (even as information about the policy has been withheld from the record). As explained in section IV.C, this pursuit does not warrant a wholesale abdication of the mandatory duty to resolve borrower defense claims. The Department's conduct is per se unreasonable and cannot be sustained under *TRAC*'s first factor. Finally, as discussed in section IV.D, the remaining *TRAC* factors, to the extent the Court need reach them, do not weigh in Defendant's favor. The record fails to support its claimed "competing priorities" as an explanation for its failure to meet its mandatory duty, especially in light of the harm the delay is inflicting on Students.

## A.   *Defendants Have Breached Their Mandatory Duty to Resolve Students' Borrower Defense Applications*

The threshold question for relief in a 706(1) case is whether there is a "discrete agency action" that the agency has failed to take. *SUWA*, 542 U.S. at 63; *see also Viet. Veterans*, 811 F.3d at 1068. Here, the Secretary has a clear duty to act. Congress directed the Department to create borrower defenses for Students by "specify[ing] in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment made under this part[.]" 20 U.S.C. § 1087e(h). This directive requires the Department to a) enact and maintain regulations and b) make borrower defenses available to Students that will result in loan discharge in at least some instances.

Before the past two years, the Defendants had an unbroken history of recognizing and fulfilling the obligation to receive and decide borrower defense claims. They received borrower defense applications in the Office of General Counsel, Compl. and Ans. ¶ 113, and decided them

---

[29] The Defendants' Motion relies almost exclusively on the declarations, citing only three exhibits: Nevin Decl. Ex. 13, AR 438 (June 8, 2015 Announcement); Nevin Decl. Ex. 19, AR 496 (IG Report); and Nevin Decl. Ex. 20, AR 538 (Corinthian Colleges, Inc. Relief Memo). The completeness of that record is challenged in both a Rule 56(d) Motion and a Motion Regarding the Record, filed simultaneously with this opposition. But even on the record Defendants produced, there are genuine issues of material fact that preclude summary judgment in their favor.

1  under applicable state law, *id.*; *see also* Exs. 1–3 (Department borrower defense decisions prior to

2  2015). The Department has repeatedly acknowledged its mandatory duty to adjudicate borrower

3  defenses in a timely way, and has not disputed its obligation in this litigation. In 2015, the

4  Department sent a memorandum to other federal agencies stating: "Because borrowers have a right

5  to submit defense to repayment claims, the Department **must** set up a process to review and

6  **adjudicate them**. To respond to these events and protect harmed borrowers [by making borrower

7  defense decisions], which the Department **has a legal responsibility to timely provide** …" Ex.

8  24 (emphasis added). And again in 2016, the Department published its interpretation of its

9  obligation in the federal register: "[B]y directing the Secretary to designate acts and omissions that

10  constitute borrower defenses to repayment in section 455(h) of the HEA, **Congress has explicitly**

11  **charged the Department**, under the current and new regulations, **to adjudicate the merits** of

12  claims brought alleging such acts and omissions." 81 Fed. Reg. 75,926, 75,973 (Nov. 1, 2016)

13  (emphasis added).

14  The Department does not dispute that this duty exists, and in fact concedes it. Defs' Mem.

15  at 20 ("[T]he responsibility of adjudicating over 200,000 pending borrower defense claims falls solely

16  on the BDU[.]"). And on November 14, 2019, the Department admitted that it had not decided a

17  single borrower defense since June 2018, and that it had, in fact, granted 27,996 borrower defense

18  applications in the six months between July 2016 and January 2017. Compl. and Ans. ¶¶ 135, 181,

19  182. The Department further acknowledges that, in early 2017, action to identify any new grounds

20  for relief, or to recommend any Student's borrower defense claim for discharge completely halted

21  pursuant to a Directive issued at the top levels of the Department. *See* AR 502-3, 533; Defs' Mem.

22  at 8 (quoting Nevin Decl. at ¶ 56). This is true despite the growing number of applications

23  submitted over this period of time. And, the number of schools responsible for high volumes of

24  claims also continues to grow. In January 2017, over 10 school groups were responsible for 100

25  or more borrower defense claims. Ans. ¶ 159;[30] Ex. 9. As of June 2019, the top twenty school

26

27  ───────────

[30] These schools are Education Management Corporation (EDMC), ITT, DeVry, CEC,

28  Apollo/University of Phoenix, Westwood, ACI, Charlotte School of Law, Globe University/MN
School of Business, and Graham Holdings/Kaplan University.

groups with the highest volume of pending claims had over 400 claims apiece.[31] To date, the Department has granted borrower defense applications only to former students of three schools—Corinthian, ITT, and American Career Institute (Massachusetts campuses). And, it acknowledges that, as of November 14, 2019, it has not finalized any new bases to grant the claims of students who attended *any other school*. *See* AR 345-46, 351 (Nevin Decl. ¶¶ 39, 40, 66); Ex. 32 at 20-21 (Department response to Sen. Murray QFR). On this basis alone, the Plaintiffs are entitled to summary judgment.

### B.    *The Court Is Authorized to Grant the Relief that Plaintiffs Seek*

Contrary to Defendants' assertion, Defs' Mem. at 15-16, the Court is authorized to issue an injunction ordering the Department to fulfill its mandatory duty to resolve the borrower defense claims of the entire class. The HEA's general waiver of sovereign immunity, *see* 20 U.S.C. § 1082(a)(2), does contain a limited exception for injunctive and certain other claims. *Id.* However, the anti-injunction provision does not apply if the Secretary exceeds her legal authority, and relief would not interfere with internal agency operations. *See, e.g.*, *Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1102-4 (D.N.J. 1993) (concluding that Secretary's violation of statutory mandate removed protection of anti-injunction provision); *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir. 1987) (examining nearly identical anti-injunction language in the Small Business Act and concluding that it "should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations").[32]

This rule is particularly relevant in the context of APA claims, which by definition challenge unlawful agency action. *See* 5 U.S.C. § 706; *see also Student Loan Mktg. Ass'n v. Riley*,

---

[31] *See* Ex. 32 (Dept. response to Sen. Murray QFR)("Borrower Defense Applications by School Group" table listing school groups that have the highest numbers of pending borrower defenses: Corinthian Colleges, ITT Educational Services, DeVry, Apollo Group (University of Phoenix), EDMC (later Dream Center Educational Holdings), CEC, ACI, Westwood, Graham Holdings (Kaplan), Globe University/Minnesota School Of Business, Education Corporation of America, Bridgepoint Education, Infilaw, Marinello School Of Beauty, ATI Career Training, United Education Institute, Lincoln Technical Institute, Weston Educational, and Anthem College.)

[32] Because of the similarity of the language in the statutes, courts frequently draw on interpretations

907 F. Supp. 464, 474 (D.D.C. 1995), *aff'd and remanded*, 104 F.3d 397 (D.C. Cir. 1997) (observing "courts have held that the anti-injunction clause of § 1082(a)(2) does not preclude relief for APA claim" and finding jurisdiction); *Adams v. Duncan*, 179 F. Supp. 3d 632, 640–41 (S.D.W. Va. 2016) (citing cases). Indeed, in *International Dealers School, Inc. v. Riley*, the court held that the Department's failure to comply with a statutory mandate "would be acting outside its authority, thus allowing for extraordinary relief" and granted the plaintiffs a preliminary injunction. 840 F. Supp. 748, 749 (D. Nev. 1993). Where, as here, Plaintiffs seek "specific relief requiring the Secretary of Education to perform a duty imposed by law" and "the conduct alleged is determined to be beyond the statutory limits on the Secretary's power," courts my issue injunctive relief against the Department. *See Gearhart v. U.S. Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798, at *2 (N.D. Cal. Oct. 25, 2019); *Canterbury Career Sch., Inc.*, 833 F. Supp. at 1102.

By arguing that the HEA precludes *all* injunctive relief, Defs' Mem. at 15-16, the Department essentially asserts that Plaintiffs cannot seek a remedy that would resolve an unlawful withholding of this agency's action. But it is wrong. Of the three cases the Department cited, only one involved an APA claim.[33] And in that one case, the Ninth Circuit rejected injunctive relief that it found to be "plainly coercive" because such relief would have forced the Department to issue certain federal student loans to schools that the Department had already determined were ineligible for those loans. *See Am. Ass'n of Cosmetology Sch. v. Riley*, 170 F.3d 1250, 1254 (9th Cir. 1999).

### C.    *Defendants Have Not Established that Their Failure to Fulfill the Mandatory Duty to Decide Borrower Defenses is Reasonable*

The Court should deny Defendants' Motion for Summary Judgment; their explanation as to why they've failed to fulfill their mandatory duty is legally insufficient. They acknowledge a blanket policy of inaction, but assert it is justified due to an "eminently reasonable policy

of the SBA when analyzing the HEA. *See, e.g.*, *Int'l Dealers Sch., Inc. v. Riley*, 840 F. Supp. 748, 749 (D. Nev. 1993) (concluding that HEA's anti-injunction provision did not apply and citing SBA case, *Okla. Aeronautics, Inc. v. United States*, 661 F.2d 976, 977 (D.C. Cir.1981)).

[33] *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031 (9th Cir. 2013) involved a student's mandamus petition challenging the Department's denial of his Direct loan application due to his immigration status. *Carr v. DeVos*, 369 F.Supp.3d 554, 561 (S.D.N.Y. 2019) involved two students' suit against the Department and Navient Corporation, their private loan issuer, that their FFEL and private loans were unenforceable. Neither case brought APA or failure to act claims.

PLAINTIFFS' OPPOSITION AND CROSS        22            Case No.: 19-cv-03674-WHA
MOTION FOR SUMMARY JUDGMENT

judgment," Defs' Mem. at 21. But the Department cannot simply choose to ignore the mandate.

Although Defendants correctly observe the Ninth Circuit has noted that varying timeframes can constitute an unreasonable delay, Defs' Mem. at 17 (citing cases), they are incorrect that an agency's unlawful conduct must occur for several years before it can be held to judicial account. Other courts have found that "a *reasonable* time for agency action is typically counted in weeks or months, not years." *In re A Cmty. Voice*, 878 F.3d 779, 787 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419) (emphasis added).[34] Here, where the Department has already withheld decisions for more than a year and a half, and no evidence suggests an end in sight for the class of Students as a whole,[35] the delay is indefinite and inconsistent with any "reasonable" timeframe. *See, e.g., City of Providence v. Barr,* 385 F. Supp. 3d 160, 165 (D.R.I. 2019) (holding year-long delay was unreasonable); *Muwekma Tribe v. Babbitt,* 133 F. Supp. 2d 30, 39 (D.D.C. 2000) ("This court does not believe … that Congress intended petitions to languish in the review process indefinitely.").

Instead of demonstrating that there is no policy withholding decisions, the Defendants argue that "the primary driver of [the] delay is the Department's eminently reasonable policy judgment that it needs to develop a comprehensive methodology for awarding borrower defense relief." Defs' Mem. at 21. But, "where an agency has manifested bad faith as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities…." *Indep. Mining Co.,* 105 F.3d at 510 (quotation and citation omitted); *see also Tufail v. Neufeld*, No. 2:14-cv-02545-TLN-CMK, 2016 WL 1587218, at *6-7 (E.D. Cal. Apr. 20, 2016) (holding agency could not indefinitely delay a mandatory decision until a new policy was decided). Moreover, the Ninth Circuit has implicitly asserted that agencies are not "free to make otherwise allowable administrative changes with the

[34] Courts consider the second factor, a statutory timeline, as neutral where none exists. *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1096 (E.D. Cal. 2016).
[35] No record evidence shows that merits adjudications are forthcoming for the class as a whole. To the contrary, the record demonstrates that the Department is *not* prepared to resolve the claims of the class, *see* Ex. 32 at 20-21 (Department has no new eligibility memoranda). There is nothing to show the Department can or will make "merit determinations," or that its yet-to-be-revealed relief formula is capable of resolving the claims of the class.

intent to defeat the mandate of the law by making the process so slow and/or cumbersome as to ensure that no [decisions] would issue[.]" *Indep. Mining Co.,* 105 F.3d at 510. Here the Department has "manifested bad faith" because it is "asserting utter indifference" to Congress's command that it make borrower defenses available to students. *See id.* Agency motivations matter. *See id.* The Department's choice to abandon its duty cannot stand.[36]

### D.   *Competing Agency Priorities Do Not Justify the Deparment's Failure to Fulfill Its Mandatory Duty In Light of the Effect on the Welfare of Students*

If the Court finds that it is necessary to engage in a balancing analysis despite the clear failure to meet a mandatory obligation, it still should deny the Defendants' motion for summary judgment. The Department asserts that "competing demands"— (1) implementing the 2016 Regulations, (2) developing new borrower defense regulations, (3) creating a new claims management system, and (4) developing a new relief methodology—have "slowed its ability to finally determine pending borrower defense claims," which was made all the more difficult by "voluntary departures by [BDU] personnel." Defs' Mem. at 19-20. The Department failed to provide evidence, other than *ipse dixit,* explaining exactly how these other priorities impacted the BDU, the division with "responsibility" to adjudicate borrower defenses, *id.* at 20. As a result, these competing priorities do not weigh in the Department's favor. Even if not pretextual, these competing priorities must yield to the harm that their policy of inaction, *i.e.* a refusal to decide borrower defense applications according to any available lawful means as opposed to a yet-to-be-revealed "formula" causes Students. *See In re A Cmty. Voice*, 878 F.3d at 787 ("Even assuming that [the agency] has numerous competing priorities under the fourth factor and has acted in good faith under the sixth factor, the clear balance of the *TRAC* factors favors issuance of the writ."); *Tufail,* 2016 WL 1587218, at *8.

---

[36] The Department's reliance on *Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) is misplaced. There, the Court assessed whether the agency unreasonably delayed rulemaking and cautioned against premature judicial intervention to force a rule into effect which had not been sufficiently considered by the agency. *Id.* at 798. Here, the Department already promulgated rules and is merely failing to issue the decisions those regulations require.

PLAINTIFFS' OPPOSITION AND CROSS       24         Case No.: 19-cv-03674-WHA
MOTION FOR SUMMARY JUDGMENT

### 1. The Preferred "Competing Demands" Do Not Explain, Much Less Justify, the Failure to Decide Borrower Defense Claims

First, Defendants provide no evidence showing that the Department's implementation of the 2016 Regulations after illegally delaying them for over a year, *Bauer I,* 325 F. Supp. 3d 74 (D.D.C. 2018), actually diverted BDU resources. The Department delayed the 2016 Regulations so that it wouldn't ever have to implement them,[37] and believed until October 2018 that it indeed would never implement them. Yet during the delay, the Department represented it could—and was—decide borrower defense claims pursuant to the 1994 Regulations. In announcing the delay, the Department proclaimed that the 2016 Regulation's process provisions, 34 C.F.R. 685.222(e), did not and would not apply to the majority of pending claims because "claims […] will be handled under the process in place when their claim is made," 83 Fed. Reg. 6,458, 6,466 (Feb. 14, 2018). Further, the Department claimed that delay would have no negative impact on Students because "the Department does not expect that the length of time required to review individual claims would have changed significantly if the 2016 final regulations had gone into effect as originally scheduled," *id.* at 6,462, and "borrowers can continue to apply for relief from payment of loans under this existing process [the 1994 Regulations], and the Department is committed to processing those applications in a timely manner," *id.* at 6,461. Thus, at the time that the 2016 regulations were delayed, the Department denied that their implementation would cause delays in claim adjudication.

The Department has been slow to effectuate the 2016 regulations since October 12, 2018. Over a year after the 2016 regulations took effect, in November 2019, the Department notified schools that it would "soon begin to send notice required under the 2016 final regulations" and "invite the school to respond [to a Student's borrower defense application] …within 30 days." Ex

---

[37] *See* 82 Fed. Reg. 27621, 27622 (June 16, 2017) ("The postponement will allow the Department to review and revise the final regulations"); 83 Fed. Reg. 6459, 6462 (Feb. 14, 2018) ("[the delay] will allow the Department and the negotiating committee to develop new borrower defense regulations[.]"); AR 330 (Senture contract) ("On July 1, 2017, the U.S. Department of Education [] planned to implement the regulations[…] ED decided it would delay key parts of the rule and begin a new rulemaking to reconsider the rule.").

39 (IFAP Announcement). Likewise, the Department waited eight months, until June 2019, to revise its agreement with a key contractor, who will not fully implement changes until January 31, 2020 or later. AR 323 (Decl. of Ian Foss, ¶7), 328-29 (Senture contract).[38] It is unclear how these changes impacted the BDU. Although Director Colleen Nevin states that BDU staff were implicated, she fails to note how long BDU staff were diverted and whether they completely stopped processing applications. AR 345, ¶ 37-38.

Second, the rulemaking process, which the Department was under no mandate to undertake in 2017, need not preclude resolution of pending applications. The Department continued deciding borrower defenses while it promulgated the 2016 borrower defense regulations. *See* AR 504-507 (IG Report). The Department's reliance on the 2019 rulemaking process is merely distraction. Moreover, it is directly contradicted by statements made by the Department *during the rulemaking proceeding*. For example, on November 14, 2017, former Under Secretary James Manning, stated, "Secretary DeVos views borrower defense as one of the most important issues facing the Department … "[T]he Secretary [] remains focused on working through pending [borrower defense] claims. … I can promise you [the Department is] working day and night to get these claims and I expect a consistent downward trend in the number of pending claims starting soon, very soon." Ex. 33 at 8, 15.

Third, the Department chose to keep the BDU understaffed. When the BDU was at its staffing peak in late 2016, it still needed more attorneys. AR 341 (Nevin Decl.). But "[t]hat request was tabled pending the transition to the new administration." *Id.* at ¶ 21. Then, four BDU attorneys left and the Department reduced the BDU contractor staff. *See id.* at 342, ¶ 22-23. The Department acknowledged in 2017 that the BDU "lack[ed] sufficient staff," Ex. 22 (Procurement Notice), but no hiring occurred. Only this year has the Department acknowledged "existing staff and contractors [we]re insufficient to address the existing [borrower defense] applications." Ex. 32 at 19-20 (Department response to Sen. Murray QFR), and attempted to increase BDU staffing. *See* AR 407-15. When considered alongside the steady stream of borrower defenses, *see* AR 397-404

---

[38] Exhibit A to Ian Foss's declaration is undated and does not disclose when this work began. AR 322-23 (Foss Decl.), 325-37 (Ex. A).

(BD Reports), the delayed implementation of the 2016 regulations, and the Department's efforts to diminish students' relief if they asserted eligible borrower defenses, the inadequate staffing is not mere happenstance due to other competing resources. It was deliberate. *See Tang v. Chertoff*, 493 F. Supp. 2d 148, 158 (D. Mass. 2007) (holding that defendants could not rely on a "high volume of applications and scare resources" to abandon "fulfill[ing] their statutory duty to act within a reasonable time").

When "presented [] with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" courts "cannot ignore the disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). Moreover, this incongruent explanation, when read in light of the Secretary's vehement opposition to borrower defense, suggests that there is "impropriety lurking behind [the Department's] lassitude." *TRAC*, 750 F.2d 70, 80 (D.C. Cir. 1984). This opposition, discussed *infra*, boils down to the fact that she does "not agree" with borrower defense.[39] But this is not a valid reason to disregard a mandatory duty.

### 2.    *The Department's Course of Action Is Not Justified When Weighed Against the Harm Caused to Students*

The third factor—the effect on human welfare and class members' interests—weighs heavily in favor of Students. Their professional and personal lives sit in limbo while they wait for a borrower defense decision. One Class Member (a mother of five children) explained the impact the Department's inaction had on her life:

> "I have been denied … getting a loan to purchase a house due to my credit to income ratio. … When I try to apply for a job in banking or in the hospital they run my credit and I am …denied due to my credit. I want to go back to school to obtain my

[39] Ex. 36 at 00:51:58 (Secretary DeVos's testimony before House Subcommittee March 28, 2019). The Secretary has also blamed litigation for her inaction. In an April 10, 2019 House Education and Labor Committee hearing Betsy DeVos stated, "Well Congressman, they had been being approved before the court stepped in, they have not been since the court stepped in." Ex. 37 at 1:34:45 (Video of Secretary DeVos's April 10, 2019 before House Committee on Education and Labor). She stated again when pressed for a clearer answer, "It is true that none have been approved in the last several months, that is due to a pending court decision, a court case, that has precluded us from continuing to [decide]." *Id.* at 1:35:30. Yet, there was no court decision—*Calvillo Manriquez* or otherwise—stopping the Department from issuing complete borrower defense discharges.

PLAINTIFFS' OPPOSITION AND CROSS       27       Case No.: 19-cv-03674-WHA
MOTION FOR SUMMARY JUDGMENT

medical degree. It has been my dream since I was a little girl[.] I wanted to give my children a better life and future, but due to the student loans I cannot[.] … It has caused me so much stress and worry. … I was not protected in 2009 when I was given false information or again when the same school made promises to use my previous credit towards the same degree at a cheaper price … I have been told for years that my application is under review, but nothing more. So no, I do not have faith, but I pray everyday that a blessing will come." T. C. Aff., ECF No. 20-28, Ex. B. Part 1 at 2-3.[40]

Nearly all other Class Members—95 percent—who submitted affidavits in support of class certification stated they could not plan their financial future until they received a borrower defense decision. Joshua Rovenger Decl. ISO Pl. Class Cert. Mot, ECF 20-26 at 5, ¶ 22 (JR Decl.).[41] Sixty-seven percent said that they could not afford life's necessities. *Id*. at ¶ 26. The Department essentially "put [their] entire financial life on hold." G.A. Aff., ECF No. 21, Ex. B Part 3 at 514. For example, they explain that the Department's inaction has prevented them from:

- Budgeting for the future. *See, e.g.,* M.L. Aff., ECF No. 21, Ex. B., Part 3 at 251 ("I am not sure on budgeting for bills or when repayment will start again. I am having a baby soon and the uncertainty of my future budget is very stressful.");
- Accessing forms of credit. *See, e.g.,* H.S. Aff., ECF No. 20-28, Ex. B Part 1 at 16 ("My credit is bad because of the student debt so getting approved for an apartment or car or credit card is very difficult.");
- Planning for retirement. *See, e.g.,* A.S. Aff., ECF No. 20-28, Ex. B Part 1 at 38 ("My mom holds a lot of the loans for my education in the form of Plus Loans and she has put off retiring because she doesn't know whether our borrower defense claims are going to be accepted or not.");
- Affording Medical and Dental care. *See, e.g.,* J.O. Aff., ECF No. 21, Ex. B Part 3 at 396 ("I live in a trailer, unable to save up for a real house for my wife and kids. I have anxiety attacks and health issues that I can't get treated. My son has a bad eye that we can't afford to get fixed because of the Department and the scammers that pushed me into and

---

[40] Many of the schools investigated in the Senate HELP Report (Ex. 40) now have the largest numbers of pending borrower defenses, Ex. 32 (Department response to Sen. Murray QFR). Nearly all of these schools have also been subject to state and federal enforcement actions for defrauding students. *See Law Enforcement Actions Against Predatory Schools*, Veterans for Education Success (April 1, 2018) https://perma.cc/G478-HPMA; David Halperin, *Law Enforcement Investigations and Actions Regarding For-Profit Colleges*, Republic Report (Dec. 10, 2019) https://perma.cc/TA4F-QU68.

[41] The Ninth Circuit recognizes that the scope of the administrative record, and thus the confines of a Court's review, are less clearly defined in cases challenging agency in action as opposed to final agency action. *See generally Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); *Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997). In a 706(1) case, a court "may, in its discretion, consider material outside of the record." *Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev.*, No. civ-05-261-TUC-CKJ, 2007 WL 9723130 at *2 (D. Ariz. Oct. 26, 2007) Declarations showing the harm to class members have been considered by the Court in relation to class certification, and may also be considered here in analysis of the TRAC factors. *See A.A. v. U.S Citizenship & Immigration Servs.*, No. C15-0813JLR, 2018 WL 1811352, at *5 (W.D. Wash. Apr. 17, 2018).

lied to me about going to ITT.").

Worse, 32 percent of those Class Members reported that despite having submitted a borrower defense application, the Department has still sent them notice demanding payment, garnished their wages, or offset their taxes. JR Decl. at ¶ 21; *see e.g.* T.C. Aff, ECF No. 20-28, Ex. B Part 1 at 2; D.R. Aff., ECF No. 20-28 Ex. B Part 1 at 6; J.A. Aff., ECF No. 20-28, Ex. B Part 1 at 235.

Nearly all—92 percent—of Class Members experienced stress and psychological harm (including suicidal ideation) and other physical manifestations of distress because of the Department's inaction. *See* JR Decl. at ¶ 25. This distress includes:

- Physical and psychological manifestations of distress. *See, e.g.,* B.C. Aff., Ex. B Part 1 at 294 ("My doctor says I have high blood pressure and I could have a stroke. I don't see how I can work my way out of this."); B.S. Aff., ECF No. 21, Ex. B Part 3 at 681 ("[M]y loan keeps m[e] up nights and exacerbates my VA Service Connected PTSD.");
- Anxiety and stress. *See, e.g.,* K.B. Aff., ECF No. 20-28, Ex. B Part 3 at 74 ("Four years of calling and not getting any answers while seeing the amount of my student loan increase to numbers I fear I can never pay back has given me anxiety attacks … Not one day goes by that I do not worry about the financial futures for myself, my husband and my children."); E.C. Aff, ECF No. 20-28, Ex. B Part 1 at 14 (It is very stressful knowing you owe so much money to a government agency that is supposed to help and protect students from predatory schools like ITT tech.");
- Depression. *See, e.g.,* A.S. Aff., ECF No. 20-28, Ex. B Part 1 at 38 ("It has caused me to consider my worth as a human being when the numbers attached to my name imply that I have a negative worth. It has caused significant stress with my relationships with my mom and with my partner.").

Half of Class Members stated they cannot form families until they know what decision will befall their borrower defense application, and have delayed getting married and having children. JR Decl. at ¶ 24; *see e.g.* E.R. Aff., ECF No. 20-29, Ex. B Part 2 at 187 ("I am financially unstable so I don't see [marriage or children] happening anytime soon."). And, 61 percent of responding absent Class Members stated they cannot return to another college program until their borrower defense is decided, JR Decl. at ¶ 23; they don't know if they can afford it. *See e.g.* C.V. Aff, ECF No. 20-28, Ex. B Part 1 at 382 ("I wasted my money on ITT Tech which was nothing but broken promises, now I find myself in a hole and continuing my education would require more loans and debt.").

The health and welfare of Students is prejudiced by the Department's borrower defense inaction. Similar circumstances have weighed in plaintiffs' favor in other cases. *See e.g. Geneme v. Holder*, 935 F. Supp. 2d 184, 194 (D.D.C. 2013); *Sims v. Ellis*, 972 F. Supp. 2d 1196, 1207 (D.

Idaho 2013). The Department's justification cannot outweigh the deleterious effects of its inaction on Students.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) deny the Defendants' Motion in its entirety; (2) declare that the Department of Education has a mandatory duty to resolve on the merits the borrower defense applications of the Named Plaintiffs and the Class, (3) declare the Defendants have failed to do so in violation of section 706(1) of the Administrative Procedure Act, and (4) order that the Defendants submit for approval within 30 days a plan whereby they resolve all pending borrower defense applications within 12 months.

Dated: December 23, 2019

Respectfully submitted,
/s/*Eileen Connor*

Eileen M. Connor (SBN 248856)
Toby R. Merrill (*Pro Hac Vice*)
Kyra A. Taylor (*Pro Hac Vice*)
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Joseph Jaramillo (SBN 178566)
Natalie Lyons (SBN 293026)
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel: (510) 271-8443
Fax: (510) 280-2448

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2019, I electronically filed the foregoing document with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

Executed on December 23, 2019, in Alexandria, Virginia.

*/s/ Kyra Taylor*
Kyra Taylor