JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
NATALIE LYONS (SBN 293026)
nlyons@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL  (*Pro Hac Vice*)
tmerrill@law.harvard.edu
KYRA A. TAYLOR  (*Pro Hac Vice*)
ktaylor@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

          *Plaintiffs*,

    v.

ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,

And

THE UNITED STATES DEPARTMENT OF EDUCATION,

          *Defendants*.

Case No.: 19-cv-03674-WHA

**DECLARATION OF KYRA TAYLOR, ESQ.**

I, Kyra Taylor, do hereby declare as follows:

1.   I am a member of good standing in the State Bar of Maryland and the District of Columbia and I have been granted permission to practice *pro hac vice* before the Northern District of California in this matter.

2.   I am a staff attorney in the Project on Predatory Student Lending at the Legal Services Center of Harvard Law School (the Project), counsel of record for Plaintiffs and the certified class in this case.

3.   Unless otherwise stated, I have personal knowledge of the facts stated herein.

4.   The exhibits referenced herein are the exhibits attached to Eileen Connor's Declaration in the Motion to Supplement and Complete the Administrative Record and Exclude Defendants' Declarations.

5.   I submit this declaration in support of Plaintiffs' Motion to Deny or Defer Decision on Defendants' Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(d), and Plaintiffs' Motion to Complete and Supplement the Administrative Record.

6.   Plaintiffs aver that they are unable to present facts essential to justify their opposition to Defendants' Motion for Summary Judgment, insofar as Defendants assert an absence of a genuine dispute with respect to three material issues identified below.

7.   As to each material issue, Plaintiffs have identified categories of information currently unavailable to them, but within the Department's possession, that may be necessary to oppose Defendants' motion for summary judgment.

8.   As to each category of information, Plaintiffs set forth the importance of each information category, *i.e.*, why it is relevant to Plaintiffs' claims for relief and the Defendants' motion for summary judgment, and the basis to believe that such information exists.

9.   As to all categories of information, their absence in the administrative record certified by the Defendants should create no inference as to the unavailability, nonexistence, or irrelevance of such information. Defendants certified the Administrative Record (AR) as a

DECL. OF KYRA TAYLOR                                     Case No: 19-cv-03674-WHA

complete record of "the absence of final agency action by the Department with respect to pending borrower defense claims," ECF 56-1 at 2.

10. Defendants did not file a privilege log identifying any documents that are part of, but not included in, the AR.

11. Pursuant to an email exchange between counsel on November 15, 2019, on which I was copied, counsel for Defendants stated that "there is no final agency decision at issue and thus no official statement of the agency's justifications by which to define the record. As a result, the record consists of evidence demonstrating the reasonableness of the agency's challenged delay. We do not read the court's order to require us to file a privilege log per se, but instead to log any privileged documents that were considered directly or indirectly by any relevant decisionmakers. Because no such documents exist, Defendants will not be filing a privilege log."

12. **Material Issue 1**: Whether the Department of Education (Department) implemented a policy of inaction and a prohibition on issuing final adjudications on borrower defense claims.

   a. *Information Category 1(A):* Communications from the Office of the Secretary, Office of the Under Secretary, and/or the "Review Panel" to the Borrower Defense Unit (BDU) that instruct or otherwise convey to BDU to stop adjudicating borrower defense applications.

   b. This information is important because whether the failure to resolve borrower defense claims of the entire Class is reasonable may turn on whether the failure is attributable to a blanket policy.

   c. In opposing class certification, the Department argued that "the delay in issuing decisions on pending claims results from a myriad of reasons, not a purported 'policy of refus[al].'" ECF 38 at 11 (Sept. 20, 2019).

   d. But the declarations and documents included in the AR indicate that the Department *did* adopt a policy or policies stopping the issuance of final Borrower Defense decisions. As Under Secretary Auer Jones stated in her declaration, "The Department has prioritized development of [a partial relief] methodology and

DECL. OF KYRA TAYLOR                                          Case No: 19-cv-03674-WHA

believes it is imperative to have it in place before finalizing decisions approving borrower defense claims and awarding relief." AR 10, ¶ 25. She then explained, "the Department decided it should not issue denials until it has a methodology in place that will allow it to issue approvals and relief." AR 11, ¶ 27.

e.  BDU Director Colleen Nevin attested that in the spring of 2017, she learned that "no additional approvals would be processed until the completion of the work of the Review Panel and, subsequently, by the IG." AR 349, ¶ 57. Although "BDU received permission to resume adjudication of CCI JPR claims (only) on or about October 30, 2017," AR 349, ¶ 59, she did not state when, if ever, BDU resumed making final decisions on any other claims. She also attested: "While no additional decisions have been issued to borrowers since in or about June 2018, BDU has continued to make progress on adjudicating applications." AR 350, ¶ 65.

f.  Documents attached to Ms. Nevin's declaration confirm that the Department directed BDU to stop issuing decisions. FSA's response to the Department of Education's Office of the Inspector General's Report (IG Report) investigating BDU stated that the Office of the Under Secretary (OUS) and the "Review Panel" directed the Department to stop making Borrower Defense decisions. AR ¶ 533, n. 21. The "Review Panel" is the "team of both career and non-career Department leadership" that "evaluated the [Borrower Defense] program and worked to implement controls and procedures for reviewing claims and processes for discharging loans for successful claimants." Ex. 33 at 10:2-10 (Transcript of James Manning Remarks on Nov. 14, 2017).

g.  The logical conclusion to draw from these statements is that the BDU received a directive or directives, and altered its behavior accordingly, to withhold final adjudications and to cease progress on interim adjudicatory steps. The directive or directives must, therefore, be memorialized or embodied in some form.

h. ***Information Category 1(B)***: Documents showing the corrective action plan(s) or other correspondence between the Department and the Office of Inspector General relating to the recommendations of the Inspector General to resume processing borrower defense claims, determine whether additional claims categories were warranted, and the need to establish timeframes for resolving claims and controls to ensure timeframes are met**.**

i. This information is important because Defendants claim that their policy of inaction was "temporary" and, in any event, ceased with the December 2017 announcement of a "partial relief" methodology applicable to certain borrower defense applicants.[1] The question of whether this is true, and what the Department's concrete plans were with respect to all other borrower defense applicants, is necessary to dispute this contention. There is nothing in the AR pertaining to any changes the Department made in response to the IG Report.[2]

j. There is reason to believe that documents related to the IG recommendations, and corrective action plans related thereto, exist. Defendants admit that they were required to submit a corrective action plan in response to the IG Report. Ans. ¶ 178, ECF 55. Further, documents related to the corrective action plan are listed in the privilege log filed in *Cal. v. DeVos*, Case 3:17-cv-07106-SK (N.D. Cal. Oct. 25, 2019), ECF 90-1 at 3, a case related to *Calvillo Manriquez*.

13. **Material Issue 2**: Whether, prior to February 2017, the Department had protocols and procedures to resolve borrower defenses and issue final decisions.

---

[1] This methodology was applicable to former students of Corinthian Colleges who asserted borrower defense on the basis of specified conduct. The partial relief methodology was enjoined in *Calvillo Manriqeuz v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal. May 23, 2018), ECF 60. Members of the class certified in that case are excluded, by definition, from the class certified in this case.

[2] The "partial relief" methodology announced in December 2017 is included in the AR, AR 538-585. But this itself cannot be understood as a response to the IG Report, was issued just weeks before the Department announced the new policy.

DECL. OF KYRA TAYLOR                                    Case No: 19-cv-03674-WHA

a. ***Information Category 2(A):*** Documents pertaining to the creation, membership, scope of duties, and output of the "Borrower Defense Review Panel."

b. This information is important because the Defendants contend that their failure to issue decisions on borrower defense claims of the class is explained by the fact that the Department inherited a backlog of claims with no process in place to resolve them, that it decided to "prioritize an overarching methodology for consistently awarding relief," Def's. Mem. at 24.

c. The Review Panel was responsible for assessing the borrower defense landscape inherited by the administration, potentially ordering a halt to adjudications, purportedly requesting an Inspector General review, and making recommendations going forward. Defs Mot. at 8, AR 517-18 (IG Report) (listing IG recommendations, including "resum[ing] the review, approval, and discharge process for claims qualifying under the seven established categories," "resume consideration and determination of whether additional categories of claims with common facts qualify for discharge" and "[e]stablish and document policies and procedures for reviewing and making determinations on unique or other claims for which FSA had no associated legal memorandum."). Therefore, the information sought may shed light on the Defendants' justifications.

d. Defendants admitted, Ans. ¶ 150, ECF 55, that high-level Department staff previously worked at DeVry University (Director of the Enforcement Unit, Julian Schmoke), Career Education Corporation (Undersecretary Diane Auer Jones and General Counsel Carlos G. Muniz), and Bridgepoint Education (Senior Advisors Robert Eitel and Linda Rawles).[3] These schools have among the highest numbers of pending Borrower Defenses. *See* Ex. 32, Murray QFR. Plaintiffs believe that

---

[3] "Defendants admit that each individual named in subparagraphs a-f worked at one time or are working at the Department and have the previous jobs or ties mentioned in those subparagraphs among their extensive professional and employment histories. Otherwise, denied."

DECL. OF KYRA TAYLOR                                    Case No: 19-cv-03674-WHA

some of these individuals were members of the "Review Panel" and that they had a vested interest in the outcome of Borrower Defense decisions because of their relationships to those schools. *See* Ex. 30 at 25-28.

e.   There is reason to believe that documents pertaining to the work of the Review Panel exist. Indeed, the Plaintiffs have separately moved to supplement the AR with a document created by the Review Panel, Ex. 7, setting forth a particular recommendation with respect to borrower defense.

f.   ***Information Category 2(B):*** All memoranda setting forth eligibility and relief criteria for borrower defense claims under the 1994 regulation.

g.   This information is important because the Department justifies its failure to resolve borrower defense claims in part by claiming that the prior administration's approach was "haphazard" and rested on "assumptions." Defs. Mot. at 2, 21. The Department also claims that it needed to develop a new "relief methodology" because none existed or was available to be applied to the claims of Students after the 2016 regulation went into effect. *Id.* The requested memoranda will shed light on the veracity of these claims, and their sufficiency as a justification for the Department's failure to meet its borrower defense obligation. The AR does not include any such memorandum.

h.   Documents included within the AR show that the Department created and relied upon memoranda to determine eligibility and relief for groups of similar claims against the same programs at the same school at the same times. AR 509, 512-13.

i.   The Inspector General (IG) Report included reference to six different memoranda that impact Class Members, AR 509:

- May 2015 memorandum prepared by the Office of General Counsel regarding job placement rate misrepresentation claims by former students of Heald College (a division of Corinthian);
- October 2016 memorandum prepared by BDU regarding transfer of credit misrepresentation claims by former students of Heald College;

DECL. OF KYRA TAYLOR                                      Case No: 19-cv-03674-WHA

- October 2016 memorandum prepared by BDU regarding transfer of credit misrepresentation claims by former students of Everest and WyoTech (also divisions of Corinthian);

- January 2017 memorandum prepared by BDU regarding guaranteed employment misrepresentation claims made by former Corinthian Colleges students;

- January 2017 memorandum prepared by BDU regarding guaranteed employment misrepresentation claims of former ITT students;

- January 2017 memorandum prepared by BDU regarding a group borrower defense claim (without individual application) for former students of American Career Institute campuses in Massachusetts.

j. Additionally, there are other, older Eligibility Memoranda the Department used for other schools that the Department omitted from the AR. Plaintiffs have moved to supplement the AR with these materials, Ex. 1 (Oct. 4, 2000 Memorandum regarding Interstate Business College students' borrower defenses), Ex. 2 (Feb. 6, 2001 Memorandum regarding Interstate Business College students' borrower defenses), Ex. 3 (Feb. 11, 2003 Memorandum regarding Interstate Business College students' borrower defenses), but others may exist.

k. Other Eligibility Memoranda have become public, although they are not included in the Departments' Administrative Record. *See* Ex. 6, Memorandum from Borrower Defense Unit to Under Secretary Ted Mitchell (Jan. 10, 2017) (ITT Borrowers Alleging That They Were Guaranteed Employment); Ex. 4, Memorandum from Borrower Defense Unit to Under Secretary Ted Mitchell (Oct. 24, 2016) (Everest and WyoTech Borrowers); Ex. 5 Memorandum from Borrower Defense Unit to Under Secretary Ted Mitchell (Jan. 9, 2017) (Corinthian Borrowers Alleging That They Were Guaranteed Employment); Ex. 8, Memorandum from Steven Menashi, Acting General Counsel to James

DECL. OF KYRA TAYLOR                                              Case No: 19-cv-03674-WHA

Manning, Acting Under Secretary (Dec. 14, 2017) (CCI Partial Discharge Memo).[4]

l.   ***Information Category 2(C)***: All memoranda setting forth criteria to grant or deny claims and claim review protocols developed by the BDU since February 2017.

m.  This information is important because Defendants claim that the Department's "decision-making process has been ongoing," Defs' Mem. at 17, and that "nearly 50,000 applications have been adjudicated on the merits since June 2018," Defs' Mem. at 18 (internal quotations omitted). The veracity of these contentions may be relevant to the lawfulness of Defendants' failure to resolve borrower defense claims, and the existence of a blanket hold on issuing such decisions. No memoranda addressing borrower eligibility, and only a handful of undated protocols, have been introduced, AR 478-495.

n.  There is reason to believe that such memoranda and protocols exist. BDU Director Colleen Nevin attests that "the Department has identified certain categories of claims, based on systemic institutional conduct, with established criteria for approval …. and drafted claim-specific review protocols." AR 345-46, ¶ 39. No documents supporting that assertion are within the Administrative Record. The IG Report indicated that before 2017, "BDU had identified additional categories of claims warranting further research." AR 515.

o.  The Department attached four "review protocols" to Colleen Nevin's declaration. AR 346 (Nevin Decl. ¶ 40-41.); AR 478-495 (the protocols). Ms. Nevin attested that "BDU and its contractors" use those protocols "determine whether [each Borrower Defense] meets the criteria for approval" AR 346 ¶ 40. The protocols

---

[4] This December 14, 2017 memorandum authored by Steven Menashi cites an appendix that has not been publicly released. As cited in the memorandum itself, the appendix contains additional memoranda, including a January 19, 2017 memorandum from the Office of General Counsel setting forth the legal basis for the approval of transferability of credit misrepresentation claims from former Corinthian students.

DECL. OF KYRA TAYLOR                                          Case No: 19-cv-03674-WHA

provided pertain to Corinthian Jobs Placement Rate claims (JPR claims which are the subject of the *Calvillo Manriquez v. DeVos* litigation), AR 478-488, a "protocol for reviewing Corinthian Allegations," AR 489-492, "ITT Employment Prospects Instructions," AR 493, and a "Standard Protocol" watermarked "DRAFT," AR 494-495. The "STANDARD PROTOCOL" marked DRAFT include a hyperlink to another document entitled "Types of Claims 10.23.2018" that is not included in the AR. AR 494. The existence of a dated document suggests that other "Types of Claims" documents also exist.

p.   Ms. Nevin states that in addition to the protocols provided, "The process to develop review protocols currently is ongoing with respect to several schools other than CCI." AR 346, ¶ 39. Those protocols are not included within the Administrative Record.

q.   One of the protocols instructs a reviewer, "**If you have any questions about program eligibility, especially regarding WyoTech programs, please email BDU,**" AR 488, which implies that this is not BDU staff's protocol, but an outside entity. Plaintiffs believe that if claims are being assessed by an outside entity, BDU must have its own protocols. Similarly, in the "STANDARD CLAIMS Protocol," AR 494, if a Student "attaches any evidence that indicates that there has been an attorney general action or class action or any lawsuit relevant to the borrower defense inquiry: a. Email your assigned [Quality Control] attorney [….] b. Stop work on the school. Move on to next school." This suggests there is some kind of protocol governing what the Quality Control attorney should do with the tabled application.

r.   The protocols governing the review of Corinthian JPR claims provide instructions to send initial reviews to quality control, *see* AR 486, which presumably has its own process documents.

DECL. OF KYRA TAYLOR                                    Case No: 19-cv-03674-WHA

s.  The protocols provided as to CCI, AR 478-488, and ITT, AR 493, only pertain to claims covered by the Eligibility Memoranda the Department developed prior to 2017. AR 509. They do not disclose what a reviewer should do if the student raises a claim not covered within those eligibility memoranda or how the Department fulfills the requirements of 34 C.F.R. 685.222(e)(3)(i) (requiring that the Department assess (A) Department records, (B) any response or submission from the school and C) any additional information or argument that may be obtained by the Department official before concluding the "fact-finding process").

t.  ***Information Category 2(D):*** Documents identifying the need to increase staffing at the BDU, making recommendations about the need to increase staffing at the BDU, or indicating the optimal size of staffing and other resources at the BDU sufficient to resolve borrower defense claims.

u.  This information is important because, although the Department acknowledges that the staffing of BDU reduced significantly as a result of attrition since 2017, Defs' Mem. at 20, it only includes information about recent attempts to increase capacity at BDU, AR 407-15. The issue of whether the Department sought to increase its capacity to resolve borrower defense claims, and when, is relevant to the veracity of the Department's claims that it never halted work on borrower defense and continued to process claims.

v.  According to the Department, BDU had "twenty (20) contractor paralegals and attorneys" in October of 2016 and was still "request[ing] approval to hire several additional attorneys for BDU." AR 341 (Nevin Decl. ¶ 20-21). In 2017 "contractor staff was reduced to six individuals." AR 342 (Nevin Decl. ¶ 22). And "for the past year, the contractor staff size was between 7 and 12 contractor attorneys," *Id.* at ¶ 23. The AR does not contain any documentation of these or any other earlier requests for staffing increases or decisions to reduce staff.

DECL. OF KYRA TAYLOR                                    Case No: 19-cv-03674-WHA

w.  The Department has also acknowledged that, as of June 2019, it lacked sufficient resources to handle the volume of borrower defense claims. Ex. 32 at 19-20. There are no documents showing the basis of this contention or any action taken to rectify the situation.

14.  **Material Issue 3**: Whether the 2016 Regulations impacted how the Department treats the borrower defense claims of students at all (i.e. changing the protocols applied to reviewing applications or changing how students could demonstrate eligibility) and, if so, which students.

a.  *Information Category 3(A)***:** Documents sufficient to show how many "Step 1" eligibility determinations (positive or negative) the Department made on borrower defense claims between January 2017 and October 16, 2018 (excluding the *Calvillo Manriquez* class) and what schools and programs were involved.

b.  This information is important because the Department argues that implementing the 2016 Regulations diverted BDU resources and delayed Borrower Defense decisionmaking. And, during the illegally delayed implementation of those regulations, the Department asserted that it could—and was—deciding Borrower Defenses because "claims …. [would] be handled under the process in place when their claim is made," Ex. 17, 83 Fed. Reg. 6458, 6466 (Feb. 14, 2018). The veracity of these assertions may be relevant to whether the Department's failure to resolve borrower defenses is lawful.

c.  There is reason to believe this information exists. BDU Director Collen Nevin attests to the amount of Borrower Defenses that have been "adjudicated on the merits and are pending relief and/or processing" but not had their final decisions effectuated. AR 350, ¶ 65.

d.  *Information Category 3(B):* Documents sufficient to show how many and which class members borrowed federal student loans pursuant to a promissory note that incorporated a state-law standard for borrower defense.

DECL. OF KYRA TAYLOR                                    Case No: 19-cv-03674-WHA

e.   This information is important because if Students maintained a contractual right to assert a Borrower Defense under the 1994 regulations, there is a material issue of fact as to whether the Department had discretion to apply a different relief methodology, or components of the 2016 regulation, to such claims.

f.   Defendants admit that state law was incorporated into all Direct Loan Master Promissory Notes until "October 2016." Ans. ¶ 62, ECF 55. In April 2019, the Department sought permission from OMB to make changes to the Direct Loan MPN to reflect the changes made to borrower defense by the 2016 regulation, which went into effect on October 18, 2016. 84 Fed. Reg. 4797, 4798 (Feb. 19, 2019).

g.   The Department must have records confirming the terms of every individual's student loans, not just those of Students, both to perform its duties under the Higher Education Act, and in order to assert (as it has done) that one standard as opposed to another applies to any given Student's borrower defense application.

15.   The above categories of information are set forth in a Proposed Order.

Signed under pain and penalty of perjury on December 22, 2019.

/s/ *Kyra Taylor*

Kyra Taylor, Esq.

DECL. OF KYRA TAYLOR                                   Case No: 19-cv-03674-WHA