UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,

And

THE UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants*.

Case No.: 19-cv-03674-WHA

**AFFIDAVIT OF JESSICA JACOBSON**

I, Jessica Jacobson, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case. I am a named plaintiff in this class action.

2. I borrowed federal student loans in order to attend the New England Institute of Art ("NEIA") Media Arts and Animation Program.

3. On Mach 4, 2015, attorney Toby Merrill submitted a borrower defense application on my behalf to the United States Department of Education ("Application"), asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4. On August 11, 2020, I received correspondence from the Department of Education, stating that my claim had been denied ("Denial Notice"). A copy of the Denial Notice is attached as Exhibit B.

5. In between the time that I first submitted my Application for loan cancellation and when I received the Denial Notice, my federal student loans have been in forbearance.

6. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to the Program Cost and Nature of Loans.

7. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to Transferring Credits.

8. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to Admissions and Urgency to Enroll.

9. The Denial Notice says that my Application failed to state a legal claim that NEIA engaged in misconduct related to "Other."

10. I do not know what "Other" refers to.

11. The Department's application form did not ask me to state a legal claim. Even so, my Application stated the following legal claims: Unfair and Deceptive Acts and Practices in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; Fraudulent Misrepresentation; Fraudulent Inducement; Unconscionability; Breach of the Covenant of Good Faith and Fair Dealing.

12. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Career Services.

13. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Educational Services.

14. The Denial Notice says that my Application provided insufficient evidence that NEIA engaged in misconduct related to Employment Prospects.

15. My Application was 86 pages long and included a detailed letter summarizing and supporting my legal claims, an affidavit of my first-hand account of experiences with NEIA, and several pieces of documentary evidence including NEIA brochures and course descriptions I relied upon, loan documentation, my enrollment agreement, admissions correspondence, my transcript, a contemporaneous letter recounting my experience at the school, the student handbook, and NEIA's disclosures regarding loan repayment, employment, and graduation

pursuant to Massachusetts Law.

16. The Denial Notice does not respond to any of the claims I made or information I provided.

17. The Denial Notice offers no information about whether any of the evidence I submitted was reviewed, let alone considered, or what was found to be deficient. I do not know whether my evidence was reviewed and how it was found deficient.

18. The Denial Notice states that I may ask for reconsideration. I am not aware of any additional information I could possibly submit.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: August ___, 2020

August 14 2020

Jessica Jacobson



**From:** Borrower Defense <borrowerdefense@ed.gov>
**Date:** August 11, 2020 at 8:51:52 AM EDT
**To:** "j_m_jacobson@yahoo.com"

**Subject: Borrower defense discharge ineligibility information for you    [ ref:_00Dt0Gyiq._500t0DPCh4:ref ]**



8/11/2020

Borrower Defense Application #: 

Dear Jessica Jacobson:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at New England Institute of Art (The). "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at New England Institute of Art (The). ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Employment Prospects

You allege that New England Institute of Art (The) engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 2: Program Cost and Nature of Loans

You allege that New England Institute of Art (The) engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 3: Transferring Credits

You allege that New England Institute of Art (The) engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 4: Career Services

You allege that New England Institute of Art (The) engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 5: Educational Services

You allege that New England Institute of Art (The) engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 6: Other

You allege that New England Institute of Art (The) engaged in misconduct related to Other. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 7: Admissions and Urgency to Enroll

You allege that New England Institute of Art (The) engaged in misconduct related to Admissions and Urgency to Enroll. This allegation fails for the

following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

IA Attorney General's Office
IL Attorney General's Office
CO Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Senate Hearing Testimony of EDMC career services adviser before the Committee on Health, Education, Labor, and Pensions (September 30, 2010)
Materials, including publicly available securities filings, prepared by Education Management Corporation

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [ ref:_00Dt0Gyiq._500t0DPCh4:ref ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;
2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and
3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please

contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. ***See COVID-19 Note below.***

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. ***See COVID-19 Note below.***

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. ***See COVID-19 Note below.***

***COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and

parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

830 First Street, NE, Washington, D.C. 20202
StudentAid.gov/borrower-defense

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



LEGAL SERVICES CENTER
CENTRO DE SERVICIOS LEGALES

The WilmerHale Legal Services Center of Harvard Law School

122 Boylston Street • Jamaica Plain, MA 02130
Telephone: 617-522-3003 • Facsimile: 617-522-0715 • TTY: 617-522-3575
*www.law.harvard.edu/academics/clinical/lsc/*

March 4, 2015

Navient Federal Loan Servicing
PO Box 740351
Atlanta, GA 30348

Re: Borrower Account #0[redacted] Jessica Jacobson

To Whom it May Concern:

I write on behalf of Jessica Jacobson, a former student of the New England Institute of Art ("NEIA") Media Arts and Animation Program. NEIA provided Ms. Jacobson with a useless education and no meaningful job placement assistance despite arranging for and profiting from nearly $100,000 in student loans. Because of NEIA's dishonest recruitment, admissions, and financial aid practices, Ms. Jacobson is now being hounded for over $150,000, and despite years of effort, has been unable to find a single job in the field for which NEIA promised to prepare her. In violation of Massachusetts law, NEIA unfairly and deceptively misrepresented the nature of its program, its career placement services, and its financial aid to Ms. Jacobson prior to enrollment; taught her none of the useful or marketable skills for the career it had promised her; and made no attempts to connect Ms. Jacobson to appropriate employment as it had promised it would. NEIA's many unfair and deceptive acts and practices in violation of Massachusetts law provide Ms. Jacobson a full defense to the repayment of her student loans.

**Basis for Requesting Relief**

Pursuant to the terms of her Direct Consolidated Loan Master Promissory Note and to federal statute and regulations, Ms. Jacobson is entitled to assert state law defenses to the collection of her federal loans. The Higher Education Act grants the Secretary of the Department of Education broad authority to "compromise, waive or release any right, title, claim, lien, or demand."[1] The Secretary is further empowered to specify "acts or omissions of an institution . . . a borrower may assert as a defense to repayment of a loan."[2]

This broad authority is reflected in federal regulations, which state that "the Secretary may compromise a debt, or suspend or terminate collection of a debt."[3] Federal regulations of the Direct Loan program echo a borrower's right to relief when her rights under state law have been violated by her school: "the borrower may assert as a defense against repayment [of her Direct

[1] 20 U.S.C. § 1082(a)(6) (2012).
[2] 20 U.S.C. § 1087(h) (2012).
[3] 34 C.F.R. § 30.70(h) (2014).

Loan] any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[4]

These statutory and regulatory provisions are incorporated into Ms. Jacobson's Direct Loan Master Promissory Note, which states: "you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done . . . If you believe that you have a defense against repayment of your loan, contact your servicer."[5] This provision makes clear that Ms. Jacobson need not sue or obtain a judgment to be granted such relief by the Secretary.

Ms. Jacobson's right to assert state law claims in this manner was recently confirmed by the Secretary in a letter to Senator Elizabeth Warren. Secretary Duncan explained:

> With respect to your question about borrowers' right to present claims to the Department, the Department recognizes as a defense to repayment of Direct Loans a claim that the borrower has against the school that is based on the making of the loan or the provision of educational services, if State law recognizes such a claim and if the borrower proves the elements required to establish the claim. . . . . [T]he borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department.[6]

Ms. Jacobson asks that the Secretary use his authority to relieve her of student loan debt based on unfair, deceptive, and oppressive business practices. NEIA's actions violate Massachusetts law, rendering it liable for damages and rendering Ms. Jacobson's repayment obligations unenforceable. This relief is authorized by federal regulation, which states that "if a borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay."[7] In addition to full cancellation of her federal student loan debt, Ms. Jacobson seeks a determination that she has not been in default and the clearing of all negative credit history related to these loans. The Secretary has broad discretion to authorize the determination, and credit repair that Ms. Jacboson requests.[8]

---

[4] 34 C.F.R. § 685.206(c)(1) (2014).
[5] Attachment 1, Affidavit of Jessica Jacobson ("Jacobson Aff.") Ex. K, at 8.
[6] Attachment 2, Letter from Arne Duncan, Secretary of Education, to Elizabeth Warren, United States Senator (Aug. 4, 2014).
[7] 34 C.F.R. § 685.206(c)(2) (2014).
[8] *Id.* ("The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include, but is not limited to… (i) Reimbursing the borrower . . . . (ii) Determining that the borrower is not in default . . . . (iii) Updating reports to consumer reporting agencies").

**Summary**

When she enrolled at NEIA, Ms. Jacobson had already graduated from community college and was seeking a career in visual effects. NEIA representatives repeatedly told her that its program was very difficult to get into, but that her portfolio "looked great." NEIA's glossy brochures promised high-end equipment and technology, appealing job prospects, and all the skills and equipment necessary to succeed in the industry. An NEIA representative showed Ms. Jacobson around a state-of-the-art facility, including a high-end green screen studio specifically for use in visual effects work. NEIA assured Ms. Jacobson that its name had weight in the industry, and promised industry connections, job leads, networking contacts, and an industry-appropriate portfolio to get her started on a career in visual effects. NEIA did not tell her that its program was focused on gaming and animation and therefore ill-suited to train her in visual effects, nor did it reveal that its tuition and costs of nearly $100,000 would require payments far beyond the average salary of its graduates. She did not know that most of her loans accrued interest while she was in school, and had no idea that most of her loans were not federal student loans.

NEIA's promises and assertions bore no relationship to the courses, program, facilities, or job placement opportunities actually offered to Ms. Jacobson. NEIA's admission process is not at all selective, and the green screen studios it showed Ms. Jacobson on her tour were not available for use by students in her program. She was trained to use software that was obsolete, non-professional, and irrelevant to the field.

NEIA did everything it could to maximize its profits from Ms. Jacobson. Although she had taken and passed twenty-three classes at Mount Wachusett Community College, NEIA accepted only seven classes for transfer credit, maximizing the number of credits she would have to take to earn her degree at NEIA and by extension, the amount of money she would have to borrow. As a result, her degree took three and a half years, even though Ms. Jacobson had already completed two years of community college. NEIA led her to believe that all of her loans were federal when in fact, Ms. Jacobson borrowed over $67,000 in private loans with higher interest rates.

Throughout her time at NEIA, which had a strict attendance policy, Ms. Jacobson was sent out of her classes to the financial aid office, where financial aid advisors would not allow her to go back to class unless she signed forms that they did not explain. In this way, she was coerced into signing loan documents at a moment's notice to avoid risking academic failure. Ms. Jacobson signed everything, believing that the advisors were looking out for her best interests.

NEIA's promised industry contacts never materialized. NEIA never put Ms. Jacobson in touch with a single employer in her field. Its employment advisors directed students and graduates to jobs posted on Craigslist. In a class meant to prepare Ms. Jacobson for her job search, NEIA's career staff distributed a sheet titled "Tips for Applying to a Job from Craigslist." She sought work on her own, with no assistance from NEIA, and secured a single internship, which was her first and last position related to her field. Nevertheless, NEIA's employment office sought to list Ms. Jacobson as an example of employment success.

Ms. Jacobson made good faith efforts to make her time at NEIA fruitful. As Ms. Jacobson progressed in her program and worried she was not getting appropriate skills, she reached out by letter and phone to NEIA's teachers and administrators about her misgivings and made suggestions about how to improve the program to make it more relevant. NEIA simply ignored her, and made no effort to improve her experience. Ms. Jacobson is not the only dissatisfied student: NEIA and other Education Management Corporation-owned schools are currently under investigation by the Massachusetts Attorney General and at least nine other states for unfair and deceptive practices.[9]

Today, Ms. Jacobson holds a worthless degree and has no job prospects. As a result of her crushing student loan debt, her credit has been destroyed, imperiling her ability to rent an apartment, save money, or consider buying a car or home. She has been pursued and harassed by debt collectors. Because of the hopelessness of ever paying off these loans or being employed in the field in which she was trained, she has suffered anxiety and depression, for which she has sought medical treatment.

NEIA's many violations of Massachusetts law, detailed below, provide Ms. Jacobson with a complete defense to repayment of her student loans.

## Legal Claims and Defenses

1) Unfair and Deceptive Acts and Practices in Violation of the Massachusetts Consumer Protection Act, MASS. GEN. LAWS. ch. 93A

NEIA engaged in numerous unfair business practices within the meaning of the Massachusetts Consumer Protection Act, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[10] NEIA violated the Consumer Protection Act by misrepresenting numerous relevant facts, such as the quality, character, and merits of its program[11] and employment outcomes.[12] NEIA's use of deceptive sales tactics to secure Ms. Jacobson's enrollment in an exorbitantly overpriced educational program that dooms students to near-certain default is precisely the kind of oppressive practice barred by the Consumer Protection Act.

NEIA advertised both in brochures and by statements to Ms. Jacobson that its competitive program would prepare her for a career in visual effects.[13] NEIA recruiters gave her glossy brochures promising high-end equipment in a state-of-the-art facility that would give Ms.

---

[9] *See* Megan Woolhouse, *For-Profit Colleges Get Harsh Grades by Former Students*, BOSTON GLOBE, Oct. 20, 2014, at A1; Todd Wallack, *Coakley Widens Schools Inquiry; Targets Lending and Recruiting at For-Profit Facilities*, BOSTON GLOBE, Feb. 4, 2013, at A1.

[10] MASS. GEN. LAWS. ch. 93A, § 2(a).

[11] Jacobson Aff. ¶¶ 7, 10-15, 21-22, 25-29, 34, 37, 40, 46-50, 52-53.

[12] Ms. Jacobson was told that most of NEIA's graduates secured great jobs in the visual effects industry. NEIA's disclosures pursuant to recent state regulation 940 MASS. CODE REGS. 31 (2014) show a 22% employment rate in 2012-2103 for the Media Arts and Animation program. See Attachment 3, Disclosures.

[13] Jacobson Aff., ¶¶ 7, 10; Jacobson Aff. Ex. A.

Jacobson all the skills she would need to succeed in visual effects.[14] Recruiters implied that spots within NEIA's program were highly coveted.[15] The reality, however, bore no resemblance to these misrepresentations. NEIA does not appear to have any admissions criteria other than eligibility for student loans. Ms. Jacobson was not even enrolled in a program intended to prepare students for careers in visual effects, but a "Media Arts and Animation" program that focused nearly exclusively on video gaming and animation, and did not include any training in visual effects.[16]

The facilities displayed in NEIA's brochures and on Ms. Jacobson's tour, including the vaunted green screen studio, were not available for her use. For the one project for which she needed a green screen, Ms. Jacobson was prohibited from using the school's studio because it was not for the use of students in her program.[17] To complete that project, Ms. Jacobson and her classmates taped green pieces of construction paper to a wall.[18]

Additionally, Ms. Jacobson was forced to complete assignments on obsolete and non-professional-grade software or face academic discipline.[19] She attempted to teach herself Adobe Premiere, a more professional program that would likely be used in the visual effects industry and that NEIA's brochures promised students would learn.[20] In response, her professor penalized her and made her begin the project from scratch using Windows Movie Maker, a basic, consumer-level software program that comes free with all Windows computers.[21] NEIA's Media Arts and Animation program was incapable of providing Ms. Jacobson the facilities, skills, or experience she would need to succeed in visual effects.

***Financial Aid Misrepresentations***

NEIA representatives led Ms. Jacobson to believe that her private loans, which accounted for more than two-thirds of her financing, were actually federal loans.[22] NEIA never informed Ms. Jacobson that interest would accrue on some of her loans while she was enrolled, and gave her no idea of her staggering projected loan payments.[23] NEIA's disclosures showed that employed graduates were paid an average starting salary of $26,014.[24] In other words, even if NEIA assumed that, upon her graduation, Ms. Jacobson would find employment and would not be among the graduates making less than its average starting salary, she would nonetheless face projected payments totaling nearly half of that average salary, or almost four times the maximum acceptable amount determined by the U.S. Department of Education.[25] NEIA knew or should

[14] *Id.*
[15] Jacobson Aff. ¶¶ 8, 15.
[16] Jacobson Aff. ¶¶ 25-29, 40.
[17] Jacobson Aff. ¶ 37.
[18] Jacobson Aff. ¶ 38.
[19] Jacobson Aff. ¶¶ 34, 39-40.
[20] Jacobson Aff. ¶ 39, Jacobson Aff. Ex. B, at 2.
[21] Jacobson Aff. ¶ 39.
[22] Jacobson Aff. ¶ 22.
[23] Jacobson Aff. ¶¶ 21, 24.
[24] Attachment 4, "Evolve" Handout listing graduation data.
[25] One measure of whether a program prepares students for gainful employment in a recognized occupation pursuant to U.S. Department of Education regulations is if the program's annual loan payment is less than or equal to 12% of annual earnings. *See* Gainful Employment in a Recognized Occupation, 34 C.F.R. § 668.7(a)(1)(ii)(B) (2012).

have known that this information would dissuade Ms. Jacobson from enrolling and did not disclose it, which was unfair and deceptive.[26]

NEIA's promises of exclusive industry contacts, an industry-appropriate portfolio, and a comprehensive job placement program were also false and misleading in violation of the Consumer Protection Act.[27] NEIA shared no industry employment leads and its courses did not prepare Ms. Jacobson with an industry-appropriate portfolio.[28] Not once did NEIA connect Ms. Jacobson to anyone in the field or any relevant job listing.[29] Instead, NEIA offered a one-page handout on how to apply to Craigslist jobs.[30] NEIA never hosted anyone in the visual effects field to give a talk or to network with students.[31] Ms. Jacobson's instructors had gaming backgrounds and were unable to help her prepare an appropriate portfolio.[32] Ms. Jacobson was left to find relevant internships and jobs without any assistance whatsoever from NEIA, and has been completely unable to find further work in her field after being laid off from her only internship.[33]

Many of NEIA's numerous misrepresentations about its program, the employment prospects of its graduates, and its resources are unfair and deceptive under the Consumer Protection Act as interpreted by the Attorney General's recently-promulgated regulations of for-profit colleges.[34]

The Attorney General's regulations prohibit: false advertising,[35] such as the glossy brochures NEIA showed to Ms. Jacobson; false representation of placement services,[36] like NEIA's promises to assist Ms. Jacobson in her employment search; false statements concerning

[26] Jacobson Aff. ¶¶ 16, 57.
[27] Jacobson Aff. ¶¶ 13-14, 51-56.
[28] Jacobson Aff. ¶¶ 40, 52.
[29] Jacobson Aff. ¶ 52.
[30] Jacobson Aff. ¶ 53, Jacobson Aff. Ex. J.
[31] Jacobson Aff. ¶ 27.
[32] Jacobson Aff. ¶¶ 25-26, 29.
[33] Jacobson Aff. ¶¶ 51-55.
[34] 940 MASS. CODE REGS. 31.00-31.08 (2014).
[35] "It is an unfair or deceptive act or practice for a school to make or publish, or cause or permit to be made or published, any false, untrue, or deceptive statement or representation or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students or any other person, by way of advertising or otherwise, concerning the school, its activities in attempting to enroll students, the character, nature, quality, value, or scope of any course or program offered, the school's influence in obtaining employment for its students, graduation rates, graduation time, program cost, loan amount, repayment amount, transferability of credits, or in any other material respect." 940 MASS. CODE REGS. 31.04(1). The specific actions prohibited, while illustrative of practices that are always violative of the Consumer Protection Act, are "not intended to be all inclusive as to the types of activities prohibited" by the statute, and thus NEIA's conduct may be considered unfair or deceptive even in the absence of such explicit rulemaking. 940 MASS. CODE REGS. 31.02.
[36] "It is an unfair or deceptive act or practice for a school to make any false, untrue, unsubstantiated, or deceptive statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person as to placement, graduate placement rates, total placement rates, or placement services." 940 MASS. CODE REGS. 31.04(5).

the nature or character of classroom instruction,[37] as NEIA made by holding out its program as a hands-on course in real-world visual effects skills; misrepresentation of recruitment personnel as "advisors" or "counselors,"[38] as NEIA's representatives held themselves out to be; misleading statements regarding student loans,[39] such as telling Ms. Jacobson her private loans were from NEIA's "preferred federal lender"; and misrepresentation of opportunity and employment,[40] including NEIA's promises to Ms. Jacobson that it had industry contacts in visual effects and that she would find employment in that field.

The regulations also require schools to disclose "any fact relating to the school or program, disclosure of which is likely to influence the prospective student not to enter into the transaction with the school."[41] NEIA knew that, even if Ms. Jacobson obtained relevant employment, she would be unable to pay back the extraordinary cost of the program. To pay back her federal and private loans over their standard terms would have required a combined monthly payment of over $1,200, or almost $15,000 a year. In other words, NEIA arranged a debt load that would require payments of more than 56% of the average gross income of its employed graduates, which it reports to be $26,014.[42] Federal regulations sanction schools when graduates' loan payments exceed 12% of annual earnings.[43] In order to pay off her loans without a partial economic hardship as defined by the Department of Education,[44] Ms. Jacobson would have needed an adjusted gross income of well over $100,000, or almost four times NEIA's average among its employed graduates.

Unsurprisingly, given the extraordinary cost of her degree and its low value, Ms. Jacobson has never been able to keep up with her loan payments.[45] NEIA put Ms. Jacobson on

---

[37] "It is an unfair or deceptive act or practice for a school to make a statement or representation through advertising or otherwise concerning the nature or character of classroom instruction provided by the school that is false, untrue, deceptive, or which has the tendency or capacity to mislead students or prospective students." 940 MASS. CODE REGS. 31.04(14).
[38] "It is an unfair or deceptive act or practice for a school to refer to salespersons or recruiters as 'counselors' or 'advisors' to imply that a salesperson or recruiter is an academic advisor or counselor, when: (a) the primary role of such person is to sell the school's programs or enroll students in the school; or (b) such person is evaluated or compensated in any part based on student recruitment." 940 MASS. CODE REGS. 31.06(10).
[39] "It is an unfair or deceptive act or practice for a school to make any statement or representation to students, prospective students, or any other person as to student loans or financial aid that is misleading or has the capacity to deceive students or prospective students." 940 MASS. CODE REGS. 31.07(1).
[40] "It is an unfair or deceptive act or practice for a school to make any false, untrue, or deceptive statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or any other person regarding: (a) any opportunity in any job or occupation, or the likelihood of employment in any job or occupation; (b) the necessity, requirement, or usefulness of any program in obtaining professional licensure, employment in the field of study." 940 MASS. CODE REGS. 31.04(7).
[41] 940 MASS. CODE REGS. 31.05(1).
[42] *See* Attachment 4.
[43] Gainful Employment in a Recognized Occupation, 34 C.F.R. § 668.7(a)(ii)(B).
[44] A partial economic hardship exists when a borrower's loan payments are more than 15% of her "discretionary income." Discretionary income is defined as the difference between the borrower's income and 150% of the poverty level as determined by the borrower's family size and state of residence. 34 C.F.R. § 682.215(a)(4).
[45] Jacobson Aff. ¶ 58.

an inescapable path to default in violation of the Consumer Protection Act.[46] NEIA knew or should have known that Ms. Jacobson would almost certainly be unable to pay her loans, yet it used false and misleading statements, and unfair statements to induce her to enroll.

NEIA's actions constitute unfair and deceptive business practices in violation of the Massachusetts Consumer Protection Act, and entitle Ms. Jacobson to damages and equitable relief well beyond the value of her federal student loans.

2) Fraudulent Misrepresentation; Fraudulent Inducement[47]

NEIA fraudulently induced Ms. Jacobson to enroll with false claims to provide a career-oriented education that would qualify her for entry-level work in post-production visual effects. NEIA's false statements and numerous failures to disclose material information to Ms. Jacobson constitute fraudulent misrepresentation under Massachusetts law. NEIA employees intentionally misrepresented to Ms. Jacobson the nature, character, resources, facilities, employment prospects, and institutional assistance it would provide students in its Media Arts and Animation program. Massachusetts law prohibits the fraudulent "misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction."[48] Ms. Jacobson reasonably relied on NEIA's numerous false statements and assurances and acted on them to her detriment,[49] rendering NEIA liable for the harm it caused.

NEIA misrepresented matters of material fact to induce Ms. Jacobson enroll and did so with knowledge that its statements were false or with reckless disregard for the truth[50]:

- Recruiters, who were familiar with NEIA's admissions process and enrollment statistics, described NEIA as competitive when it was not and congratulated Ms. Jacobson on a portfolio that "looked great."[51] Its recruitment staff knew that its program was not competitive.

---

[46] Lending that dooms a borrower to default is an unfair practice within the meaning of the Consumer Protection Act. *See Commonwealth v. Fremont Inv. & Loan*, No. 07-4373-BLS1, 2008 WL 517279, at *10 (Mass. Super. Feb. 26, 2008), aff'd, 452 Mass. 733, (2008) (finding mortgage loans that the lender reasonably should have recognized were "doomed to foreclosure" presumptively unfair).

[47] In Massachusetts, fraudulent misrepresentation is a defense, the proof of which avoids a contract, *see, e.g.*, *McGrath v. C.T. Sherer Co.*, 291 Mass. 35, 58 (1935), as well as an independent claim for damages, *see, e.g.*, *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411 (2005).

[48] *Graphic Arts Finishers, Inc. v. Boston Redev. Auth.*, 357 Mass. 40, 44 (1970); *see also Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 431 (1990) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.") (citing Second Restatement of Contracts).

[49] Jacobson Aff. ¶¶ 16, 57.

[50] *See Alpine v. Friend Bros.*, 244 Mass. 164, 167 (1923) (holding misrepresentations include a statement "made with knowledge of its untruth or was made of a fact susceptible of actual knowledge with recklessness as to its truth or falsehood, or was the utterance of a half truth which in effect is a lie, or was the failure to disclose known facts when there was a duty . . . to disclose").

[51] Jacobson Aff. ¶ 8.

- NEIA enrolled Ms. Jacobson in its Media Arts and Animation program, which it claimed would prepare her for a career in visual effects. It knew or should have known that its Media Arts and Animation program was poorly suited to prepare Ms. Jacobson to gain employment in visual effects, as it failed to deliver even the most limited access to the kinds of technology and skill-building she would need to succeed in any field in which it claimed to be training her.

- NEIA's transfer credit policy, which restricted the use of transfer credits to elective courses, further prevented Ms. Jacobson from enrolling in any courses related to visual effects.[52] NEIA's faculty and student advisors had no background in the field Ms. Jacobson intended to pursue,[53] and thus were similarly ill-equipped to prepare her with an industry-appropriate portfolio.

- NEIA represented that Ms. Jacobson would have access to the impressive facilities it had shown her on her tour. She was not permitted to use those facilities when she was enrolled as a student.[54]

- NEIA represented that it would train Ms. Jacobson on industry-appropriate software used by media and animation professionals and would provide the opportunity to build a competitive portfolio for her job search.[55] In fact, NEIA knew or should have known that she could never build such a portfolio, as NEIA gave her access to only obsolete and inadequate tools, such as dated and non-professional software.[56]

- NEIA also misrepresented the nature of the loans Ms. Jacobson was borrowing in order to induce additional borrowing. Financial aid advisors induced Ms. Jacobson to borrow tens of thousands of dollars in private loans, implying that they were federal loans.[57] NEIA did not disclose Ms. Jacobson's expected repayment amount,[58] knowing that the information would give pause to anyone choosing to pursue its programs. The recruiters misled her by telling her she was receiving the "best possible" loan package.[59]

- Although NEIA promised industry connections, exclusive job leads, and placement assistance from NEIA staff, it knew or should have known it would not provide them to Ms. Jacobson.[60] Career services staff did not put Ms. Jacobson in contact with anyone in her field,[61] providing her only with a handout on how to apply to jobs on Craigslist[62] but no relevant job leads.

---

[52] Jacobson Aff. ¶¶ 30-36.
[53] Jacobson Aff. ¶ 26.
[54] *See supra* notes 17-18 and accompanying text.
[55] Jacobson Aff. ¶¶ 7-14; Jacobson Aff. Exs. A & B.
[56] *See supra* notes 17-21 and accompanying text.
[57] Jacobson Aff. ¶ 22.
[58] Jacobson Aff. ¶ 24.
[59] Jacobson Aff. ¶ 22.
[60] Jacobson Aff. ¶¶ 7, 11-14, 25-27, 29, 34-43, 51-52.
[61] Jacobson Aff. ¶ 52.
[62] Jacobson Aff. ¶ 53, Jacobson Aff. Ex. J

In sum, NEIA knew or should have known that its Media Arts and Animation program was poorly suited to help Ms. Jacobson gain employment in visual effects and would not allow her to earn enough money to pay off her debts. Its own statistics showed that graduates of NEIA's programs were unlikely to be employed in their industries or earn a salary sufficient to pay back their loans.[63]

Ms. Jacobson reasonably relied on NEIA's misrepresentations when she enrolled, and as she completed NEIA's program of study. Ms. Jacobson had no way to know the scope and depth of NEIA's misrepresentations. She signed everything NEIA's recruiters asked her to, believing that her future career was in good hands. Had NEIA been honest—had it not fraudulently misrepresented its lack of job placement, low employment rate, incompetent advisors, woefully inadequate facilities, and the improbability of Ms. Jacobson ever getting even a fraction of the skills she would need to succeed in her chosen career or to pay back her loans—she would have never enrolled.[64] Ms. Jacobson has been deeply harmed by NEIA recruiters' misrepresentations. She faces an extraordinary debt burden,[65] her credit is ruined, she has a worthless degree, and she has no relevant job skills.[66] As a result, Ms. Jacobson struggles with depression, anxiety, and feelings of self-doubt and worthlessness, for which she has sought medical treatment.[67] NEIA's misrepresentations violate Massachusetts law and provide Ms. Jacobson with a complete defense to repayment.

3) Unconscionability

NEIA used deceptive sales tactics to trap Ms. Jacobson in a contract with terms so one-sided that no reasonable person in Ms. Jacobson's position (a twenty-one-year-old with no assets and no substantial income) would voluntarily agree. NEIA's enrollment and financial aid practices are so oppressive that they are an affront to decency, amounting to both procedural and substantive unconscionability. Under Massachusetts law, unconscionability is "determined on a case by case basis, giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party."[68] Such judgments must be based on the contract's "commercial setting, purpose, and effect" at origination.[69]

NEIA is part of a sophisticated, national corporation with trained recruiters whose job is to enroll as many students in its programs as they can, without regard to the consequences for

---

[63] Attachment 3, "Evolve" Handout listing graduation data; *see also* Second Amended Qui Tam Complaint at 16-19, *United States ex rel. Sobek v. Educ. Mgmt. Co.*, No. 10-0131 (W.D. Pa. Feb. 10, 2012).
[64] Jacobson Aff. ¶¶ 16, 57.
[65] Jacobson Aff. ¶ 60.
[66] Jacobson Aff. ¶¶ 40, 60.
[67] Jacobson Aff. ¶ 60.
[68] *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 292-93 (1980) (internal citation omitted).
[69] MASS. GEN. LAWS. ch. 106, § 2-302(2).

students.[70] It offers non-negotiable enrollment contracts to prospective students.[71] As a young woman with no experience reviewing contracts, Ms. Jacobson did not understand how one-sided the terms of her enrollment agreement were, and would have been unable to negotiate to change them. In addition to committing Ms. Jacobson to borrowing extraordinary sums of money, NEIA's contract significantly limited Ms. Jacobson's rights and privileges by including a mandatory, binding arbitration clause.[72] NEIA enrollment staff never identified or explained this aspect of the contract,[73] and used its vastly superior bargaining power to induce Ms. Jacobson to waive her right to a jury trial without her knowledge. NEIA's representatives encouraged Ms. Jacobson to sign the documents to enroll as quickly as possible.[74]

After she enrolled, Ms. Jacobson faced continued pressure to borrow more money with little information or explanation. Throughout her time at NEIA, which has a strict attendance policy,[75] Ms. Jacobson was sent from her classes by her teachers to report to the financial aid office.[76] There, she was presented with forms she was required to sign before she was allowed to return to class.[77] Rather than explain to Ms. Jacobson what she was signing, the financial aid advisors in effect threatened her with academic discipline. In this way, she was coerced into signing even more loan documents at a moment's notice or risk academic failure. Because of the significant investment she had already made in her NEIA degree, Ms. Jacobson felt she had little choice but to sign anything put in front of her.[78]

Ms. Jacobson's contract with NEIA was also substantively unconscionable in that her program was exorbitantly priced compared to other, similar institutions[79] and compared to the salaries of its own graduates.[80] Payments on a debt load like Ms. Jacobson's[81] would require over

---

[70] The Senate Committee on Health, Education, Labor and Pensions conducted a comprehensive investigation of NEIA's parent company, Education Management Corporation. The report found intense internal pressure to recruit students. STAFF OF S. COMM. ON HEALTH, EDUC., LABOR, AND PENSIONS, 112TH CONG., FOR-PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 499 (COMM. PRINT 2012) (describing threatening emails to recruiting staff such as "WE ARE FAR BEHIND WHERE WE NEED TO BE!!!" and rewards such as leaving work early or taking company-paid vacations).

[71] Jacobson Aff. Ex. D.

[72] *Id.* at 2. ("Any dispute or civil claim (other than disputes or claims regarding non-payment, grades, or their academic evaluations) between the student and The New England Institute of Art . . . not resolved with the College or regulatory officials shall be submitting [sic] to binding arbitration in the City of Boston, Massachusetts pursuant to the commercial arbitration rules of the American Arbitration Association. . . . Any award entered shall be final and binding on both parties.")

[73] Jacobson Aff. ¶ 18.

[74] Jacobson Aff. ¶ 15.

[75] Jacobson Aff. Ex. H.

[76] Jacobson Aff. ¶ 45.

[77] Jacobson Aff. ¶¶ 46-47; Jacobson Aff. Ex. I.

[78] The Consumer Financial Protection Bureau has determined that similar practices at another for-profit college were unfair, deceptive, and subjected consumers to undue influence or were coercive. *See* Complaint ¶ 160, *Consumer Fin. Protection Bureau v. ITT Educ. Servs., Inc.*, No. 1:14-cv-292 (S.D. Ind. Feb. 26, 2014).

[79] *See* STAFF OF S. COMM. ON HEALTH, EDUC., LABOR, AND PENSIONS, 112TH CONG., FOR-PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 498 (COMM. PRINT 2012) ("We are already priced higher than any of our competitors.").

[80] Attachment 2, "Evolve" Handout listing graduation data.

$12,000 per year, which was more than 200% of the annual discretionary income[82] of the average employed graduate of NEIA's programs. Employed graduates earning less than the average, as well as NEIA's many unemployed graduates like Ms. Jacobson, faced even more dire consequences.

NEIA willfully put Ms. Jacobson on an inescapable path to defaulting on her student loans. In order to pay off her loans without a partial economic hardship as defined by the Department of Education, Ms. Jacobson would have needed an adjusted gross income of well over $100,000, or almost four times NEIA's average among its employed graduates. Given these figures, NEIA knew that Ms. Jacobson would almost certainly default on her student loans, and nonetheless pursued its own profit with disregard for the disastrous consequences for Ms. Jacobson.

NEIA's manufactured sense of urgency to induce Ms. Jacobson to borrow additional money, its knowledge that its actions would doom Ms. Jacobson to default, and its undisclosed arbitration clause are oppressive business practices that offend any sense of decency, and are unconscionable. Because Ms. Jacobson's contract with NEIA is unconscionable, it is unenforceable.

4) Breach of the Implied Covenant of Good Faith and Fair Dealing

NEIA failed to provide Ms. Jacobson relevant skill-building opportunities or meaningful job placement assistance, which deprivations prevented her from obtaining the benefit of their contract. The covenant of good faith and fair dealing is a "pervasive requirement"[83] of Massachusetts contracts that "requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."[84] Breach is shown by a party's "manner of performance" and the "totality of the circumstances" surrounding performance of the contract.[85]

NEIA breached this covenant in its dealings with Ms. Jacobson. Once she enrolled, NEIA lost all interest in Ms. Jacobson beyond profiting from her loans. She was trained on obsolete software and denied access to the facilities and tools she needed to complete her work and learn

---

[81] Ms. Jacobson borrowed $24,736 in private loans with an interest rate of 6.25%, $42,317 in private loans with an interest rate of 8.25%, $14,500 in subsidized federal loans with an interest rate of 2.47%, and $10,500 in unsubsidized federal loans with an interest rate of 6.80%. The estimated monthly payment for her private loans with 6.25% interest is $277.74, and the estimated monthly payment for the private loan with 8.25% interest is $519.03. *See* Repayment Calculator, FINAID, http://www.finaid.org/calculators/loanpayments.phtml. The monthly payment for all of her federal loans would be $257. *See* Repayment Estimator, FEDERAL STUDENT AID, https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action. Together, her loan payments would be $1,053.77 per month, or $12,645.25 per year.

[82] NEIA's 2004 graduate employment disclosures indicate an average salary of $26,014 for its graduates. *See* Attachment 4. 150% of the federal poverty guideline for a single person in 2004 was $13,965. *See* Notice, Annual Update of the HHS Poverty Guidelines, 69 Fed. Reg. 7336, (Feb. 13, 2004). Therefore, a graduate with average earnings of $26,014 had a discretionary income of $12,049: the difference between her income ($26,014) and 150% of the poverty line ($13,965). *See* 34 C.F.R. § 682.215(a)(4)(defining discretionary income). Her annual loan obligation of $12,645.25 per year amounted to 105% of the discretionary income NEIA's average graduates earned.

[83] *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 102 (1977).

[84] *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010) (internal citations and quotations omitted).

[85] *Id.*

her trade.[86] Ms. Jacobson made good faith efforts to remedy her situation. When she was assigned to use Windows Movie Maker, a beginner-level software program that was irrelevant to industry professionals, she asked her teacher for more relevant training, but was rebuffed.[87] She then attempted to teach herself Adobe Premiere, which would be more appropriate, but she was penalized and made to start over using Windows Movie Maker.[88] Ms. Jacobson reached out to the school's president, her advisor, and the program's department head to share her misgivings about the program and seek changes to make her educational experience more relevant. NEIA ignored her.[89] She was therefore unable to gain any professional training or advantage from her enrollment at NEIA.

Despite its promises, NEIA never provided Ms. Jacobson any career support. The most Ms. Jacobson ever received was a handout with "tips" on how to apply for free internet bulletin board postings.[90] She was not introduced to a single employer in her field, sent on any interviews, or invited to attend any networking or job search training events.[91]

In three and a half years of classes, NEIA failed to provide any educational training of value or make any attempt to remedy the program's defects and inadequacies, even after Ms. Jacobson's requests. NEIA prevented Ms. Jacobson from benefiting from their contract at every turn, and in doing so, breached its implied covenant of good faith and fair dealing. NEIA's breach provides Ms. Jacobson with a complete defense to repayment.

**Conclusion**

NEIA created a deplorable situation for Ms. Jacobson: she graduated enormously indebted for an education that lacked any value. Meanwhile, Education Management Corporation, NEIA's parent company, posted $2.5 billion dollars in revenue for the most recent reported year.[92] She endures long-term unemployment because NEIA did not have any of the industry contacts or job preparedness training that it boasted to induce Ms. Jacobson to enroll. NEIA frequently caused her to act against her own interests in pursuit of its own profit, employing high-pressure tactics to ensure Ms. Jacobson was not fully informed about her decisions or able to make them freely.

Ms. Jacobson has been devastated by her student loan debt. With her credit ruined, she is unable to rent an apartment or consider purchasing a home or car.[93] Still unemployed at thirty-one, Ms. Jacobson is in no position to begin saving or planning for her future, nor to pursue further education to help her become employable in her field or any other.[94] She has been

---

[86] *See supra* notes 17-21 and accompanying text.
[87] *See supra* notes 19-21 and accompanying text.
[88] Jacobson Aff. ¶ 39.
[89] Jacobson Aff. ¶¶ 41-43.
[90] Jacobson Aff. ¶ 53; Jacobson Aff. Ex. J.
[91] Jacobson Aff. ¶¶ 27, 52.
[92] Education Management Corporation, 2013 Annual Report (Form 10-K) 3 (Sept. 3, 2013).
[93] Jacobson Aff. ¶ 60.
[94] *Id.*

pursued and harassed by debt collectors.[95] Each day she watches her student loan debt climb while her career goals and dreams for the future fall. Depressed, anxious, and feeling hopeless about her present situation and the future, Ms. Jacobson has sought medical treatment and legal help.[96]

As detailed in this letter, Ms. Jacobson has numerous causes of action against NEIA, which provide complete defenses to repayment of her student loans under Massachusetts law. Pursuant to federal law, regulation, and the terms of her promissory note, she requests full cancellation of her federal student loan debt, a determination that she has not been in default, and the clearing of all negative credit history related to these loans.[97] If you have any questions about her claims or the evidence supporting them, please contact me. Thank you in advance for your attention to this matter.

Sincerely,

Toby Merrill
Attorney for Jessica Jacobson
617-390-2576
tomerrill@law.harvard.edu

Torie Atkinson
Student Advocate

CC: United States Senator Elizabeth Warren
Massachusetts Attorney General Maura Healey

[95] Jacobson Aff. ¶ 61.
[96] Jacobson Aff. ¶ 62.
[97] Following the cancellation of Ms. Jacobson's loan debt, the Department of Education can and should recover these funds from NEIA. *See* 34 C.F.R. § 685.206(c)(3) ("The Secretary may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies.").

# ATTACHMENT 1

# AFFIDAVIT OF JESSICA JACOBSON IN SUPPORT OF HER LETTER ASSERTING STATE LAW DEFENSES

1. My name is Jessica Jacobson. I am thirty-one years old.

2. I reside at 33 Crescent Heights in Fitchburg, Massachusetts.

3. I graduated from Mount Wachusett Community College in May of 2004 with an Associate's Degree in Web Design.

4. In 2004, I was twenty-one years old and living with my parents. I had no assets or significant income and had never lived on my own.

5. I became interested in a career in post-production visual effects and began reaching out to schools with visual effects programs, including the New England Institute of Art ("NEIA").

**Recruitment**

6. In September of 2004, I visited NEIA and met with an admissions representative.

7. The admissions representative asked me about my interests and told me that NEIA's Media Arts and Animation program would prepare me for a career in visual effects.

8. The admissions representative told me that NEIA's program was difficult to get into but that my portfolio "looked great."

9. The admissions representative gave me several brochures, pamphlets, and handouts about NEIA's programs, copies of which are attached as Exhibits A and B.

10. NEIA's brochures and pamphlets convey that NEIA is a great school.

11. NEIA's admissions representative said the Media Arts and Animation Program was new but did not tell me that I would be in the very first class of students and that NEIA had never offered this program before.

12. NEIA's admissions representative gave me a tour of NEIA's facilities, including a high-end green screen studio that she said was for use specifically in visual effects work.

13. NEIA's admissions representative told me that the school's name had weight in the visual effects industry, and that the school and its career services office had exclusive connections, job leads, and networking opportunities in visual effects. The representative said that NEIA would help me through all stages of my job search and most of its graduates got great jobs.

14. NEIA's admissions representative told me that NEIA's career services office would work tirelessly to put me in touch with relevant job leads and connect me to alumni and professionals in the visual effects industry.

15. I felt pressured to apply to NEIA right away because of the representative's statements that the school was competitive.

16. I would not have enrolled at NEIA If I had known that the admission representative's statements about the quality of the Media Arts program, the high chance I would gain visual effects employment, and the resources NEIA would provide to connect me to visual effects jobs, were all false.

17. On November 12, 2004, I completed and signed a Stafford Loan Promissory Note, a copy of which is attached as Exhibit C.

18. On November 14, 2004, I completed and signed an Enrollment Agreement with NEIA, a copy of which is attached as Exhibit D. I did not know that the Enrollment Agreement included a mandatory binding arbitration clause or what that meant.

19. Around November 18, 2004, I received a letter from NEIA, a copy of which is attached hereto as Exhibit E, informing me that I had been accepted for admission into the Media Arts and Animation program to begin in January of 2005.

20. Between 2004 and 2007, I borrowed $92,053 in federal and private student loans, all of which were paid to NEIA.

21. I did not know that some of my loans would accrue interest while I was in school.

22. I did not know that $67,053 of my loans were private loans. The financial aid advisor told me that all of my loans were from NEIA's "preferred federal lender," and that I was receiving "the best possible loans." Therefore, I thought all of my loans were federal loans.

23. I was not asked to have any cosigners or speak to anyone before signing the loan applications or promissory notes.

24. I had no idea what my repayment amount upon graduation would be.

**Media Arts and Animation Program**

25. Once enrolled, I discovered that the Media Arts and Animation program's courses were geared toward aspiring animators and video game designers, not visual effects artists.

26. None of my professors had a background in visual effects.

27. No visual effects professionals ever visited the school.

28. The only class I took related to visual effects, Digital Composition, was taught by Jason Weiner, whose background was in video games.

29. Nobody at NEIA knew how to help me prepare an industry-appropriate portfolio.

30. NEIA accepted credits from only seven of my twenty-three classes from Mount Wachusett Community College. A copy of my NEIA Unofficial Transcript for Winter 2005, a copy of which is attached as Exhibit F. As a result, the program cost more and took longer than NEIA originally led me to believe.

31. I repeatedly contacted the administration, including the head of the Media Arts and Animation Program, Jason Donati, to accept additional transfer credits. Despite numerous meetings, calls, and office visits, NEIA refused.

32. The transfer credits they did accept were only allowed as electives, even if they were substantially equivalent to NEIA's required prerequisites.

33. For example, though I was a web design major at Mount Wachusett, NEIA required me to take "Intro to Computers."

34. I was also required to take "Digital Ink and Paint" because Jason Donati, the director of the Media Arts and Animation program, told me I would learn the program Toon Boom, an industry-appropriate software program. We never used that program. I re-learned Macromedia Flash, a program not relevant to visual effects, which I had already learned at Mount Wauchsett Community College.

35. In "Digital Editing Video and Audio," the professor told us he had taught himself the program we were using three weeks prior to class starting.

36. NEIA did not permit me to enroll in the only 3D visual effects course it offered because my transfer credits had satisfied all of my elective requirements. To take another elective I would have had to pay additional tuition above and beyond what I had already paid.

37. The green screen studio I had been shown on my tour was not available to students enrolled in the Media Arts and Animation program, and I was not permitted to use it for any of my projects.

38. To complete the only class assignment I ever received that required a green screen, I taped green pieces of construction paper to a wall.

39. One professor required me to use Windows Movie Maker to create a movie. This program would never be used in a professional setting. I asked my professor if I could teach myself a more appropriate program, such as Adobe Premiere, which the brochures NEIA's admissions representative had given me promised I would learn. My professor responded by docking my grade, and forced me to begin the project again using Windows Movie Maker.

40. Despite completing the Media Arts and Animation program, I am unprepared for a career in visual effects work. I lack experience with the kind of software that would be used in the visual effects industry and was never able to build an appropriate portfolio.

41. I repeatedly contacted Jason Donati about problems I was having taking relevant courses and being forced to retake courses I had already completed at Mount Wachusett Community College.

42. I wrote to NEIA's president, Stacy Sweeney, to discuss my concerns about NEIA's program, including the use of obsolete software and the dearth of relevant job connections. My draft letter is attached as Exhibit G.

43. No employee or representative of NEIA ever responded to my calls or letters.

**Lending Practices**

44. NEIA has a strict attendance policy described in its Student Handbook, excerpts of which are attached as Exhibit H.

45. Nearly every day, professors sent students out of class to report to the financial aid office.

46. I was frequently sent from my classes to report to the financial aid office, where financial aid officers told me to sign more financial forms.

47. One such document was the Creative Education Loan Promissory Note that I signed on October 19, 2006, attached as Exhibit I.

48. Financial aid officers did not explain the forms they asked me to sign and I was told that if I refused to sign, I would not be allowed to return to class. If I did not return to class, my grades would be penalized.

49. I believed that the financial aid advisors were looking out for my best interests. I signed everything they gave me.

50. I understand now that the forms I was signing were actually loan documents.

**Post-Graduation Job Search**

51. I repeatedly reached out to the Career Services Office about getting an internship in visual effects.

52. I was never put in touch with a single employer in visual effects.

53. During my final year, I was enrolled in a course called "Animation Seminar and Portfolio," which was meant to prepare me for my job search. In the course, the professor distributed a flyer titled "Tips for Applying to a Job from Craigslist," attached as Exhibit J.

54. With no assistance from NEIA, I found one unpaid internship with Brickyard Visual Effects, where I worked as an unpaid intern for several years, and then briefly earned $10 per hr as a part-time, paid intern.

55. I was laid off by Brickyard in 2010 and have not been hired for any job remotely related to visual effects since then.

56. Despite NEIA's inability to help me find an internship and a job and my inability to find any paid work in visual effects, NEIA's career office asked if they could list me as a "success" for their records.

57. If I had known of NEIA's inability to prepare me for and assist me in pursuing a visual effects career, or that my loan payments would be so unaffordable, I never would have enrolled.

58. Soon after I graduated, I was unable to afford my loan payments and all of my loans went into default.

59. On August 30, 2013, I consolidated my federal loans into a Direct Consolidation Loan and enrolled in Income-Based Repayment. A copy of the Master Promissory Note for that loan is attached as Exhibit K.

60. My credit is ruined and I am unable to rent an apartment or consider purchasing a home or car. I cannot save money or plan for my future.

61. I have been pursued and harassed by debt collectors since my graduation.

62. Unemployed and over $140,000 in debt, I fell into a deep depression and suffered from anxiety and panic attacks for which I have sought medical treatment.


I have read the foregoing statement and it is true to the best of my knowledge and belief under the pains and penalties of perjury.

Date: February 28, 2015

Jessica Jacobson

# EXHIBIT A

So, are you going to sit still or are you going to **evolve**





Become the next generation of you

### This is where you and your ideas will evolve

The New England Institute of Art is situated in the greater Boston area [illegible] Brookline, on the city border and just a short distance from Fenway Park and the college campuses of Simmons, Emmanuel, [illegible], Wentworth, and Northeastern. Brookline is a blend of busy city streets and [illegible] countryside. [illegible] boutique shops and small pubs, a hillside park overlooking Boston [illegible] skating rink, a town golf course, and Brookline's very own working farm.

[illegible] retail centers such as Coolidge Corner and Brookline Village [illegible] bookstores, coffee shops, food markets, antique stores, and much more. [illegible] students find our location particularly convenient, thanks to many of Boston's radio and television stations, ad agencies, and media production companies that are located here.

### Study in an environment that nurtures creativity

Our school and facilities are designed to help launch your career. We have six computer labs, two television studios, two digital editing labs, three radio production studios, a MIDI lab, three recording studios, Web radio station, and four graphic design classrooms. We also have a record label company called Naked Ear Records and a video production company called Naked Eye Video.

Our library houses a collection of communications and design-related books, career-related periodicals, videotapes, computers, and CDs. Students may also use the library to access online databases.

### Keep yourself well-rounded

Outside of class, our students are still keeping active in their chosen fields. AI Independent Radio broadcasts entirely on the Net. Staffed and programmed by students and faculty, it broadcasts daily across the globe. Naked Ear Records is our record label and releases compilation and single artist recordings. The New Media Group allows students to explore new media, the Internet, and the Web. In addition, *Naked Truth* is the College's literary magazine published twice a year. Naked Eye Video is the College's production company and produces music videos, documentaries, theatrical productions, and more. The Graphic Design Club gives students the opportunity to work on pro bono and freelance projects outside of the classroom. Drama Club students enjoy various activities, including attending theatrical productions at local venues and preparing for auditions.

### Housing services: Become an artist in residence

Our goal at the Student Services Department is to help you find comfortable, affordable housing that suits your budget and lifestyle. Limited college-sponsored housing is available each semester on a first-come, first-served basis. The College assists students seeking independent housing in the area by providing roommate referrals and rental information.

### Financial Aid

We are here to help you find ways to make your education affordable. Financial assistance is available to those who qualify.

### Career Services: We're here to help

The Career Services Department aids our soon-to-be graduates with their job search — and also assists students in finding part-time employment while they're in school.

your talent? Change happens here. What's it take? A

The New England Institute of Art is dedicated to helping men and women become intellectually aware, socially responsible people as well as actively engaged, technically competent design and communications professionals.

Many of our faculty work outside of the classroom in their field of expertise.

**The New England Institute of Art**℠
*50 Years of Creative Education in Art & Communications*

10 Brookline Place West
Brookline, MA 02445-7295
1-617-739-1700 or 1-800-903-4425
Fax: 1-617-582-4500
www.neia.aii.edu

### Programs of Study

Audio & Media Technology (BS)
Audio Production (AS)
Broadcasting (Radio or Television) (BS)
Graphic Design (BS)
Multimedia & Web Design (BS)

(AS) Associate of Science
(BS) Bachelor of Science

There will be video games, light years ahead of anything you've ever played before. There are cars, yet to be driven, whose beautiful curves will sing siren's songs of "try me, buy me" to you from the sales lot. Or envision a new fusion restaurant, where the cuisine of two countries are melded for the first time.

New ideas are floating around everywhere, and it takes a special kind of person to tap into them. Someone who understands that creativity doesn't just happen overnight. Someone who isn't afraid to take chances and challenge everything, including themselves. Someone who is willing to push conventional thought past the limits into a fresh, workable idea.

Chances are, you're one of those people. The art of creativity demands an open mind that asks "What if?" and "Why not?" It requires pushing ideas and never settling for mediocrity — advancing thought toward

fresh, new solutions. This process keeps art, and those people involved with the creation of art, vibrant and ever forward-thinking.

At The Art Institutes, we provide a launching pad for your personal and professional creative evolution. The tools we provide can give you the means to make your ideas unfold. And you won't be alone. Synapses are firing everywhere; imagine tossing around ideas with a classroom of students who also want to push the envelope, encouraged by faculty who have the experience and commitment to help make those ideas happen. Watch good concepts transform into even better ideas and eventually into creative solutions.

Creativity takes talent, determination, and legwork. You'll be challenged here, cooking up and developing your ideas and learning how to work in the real world and a changing marketplace. **Expect to evolve.**

Media
The digital art of storytelling

→ When you start your first quarter at The Art Institutes you may have some misconceptions about the media arts industry, and you'll be surprised and enlightened as we dispel these for you. Things like, "If you know the software, you can design an effective Web site." Or "If something looks cool, it works." Well, this isn't always the case.

Fact is, there's a systematic process and lots of thinking behind every cool Web site, video game and award-winning TV commercial. There are foundations that are learned before you start creating the world's next infamous superhero. You'll learn to profile your target audience and work as part of a team combining all elements of the creative process to develop a plan and communicate effectively. The best animators, filmmakers, audio engineers, multimedia designers, and game programmers are computer savvy and eager to keep up with the frenzied evolution of software. It's about growing and learning as new technologies emerge. It's concepting, problem solving and self expression. It means thinking like a communicator and a storyteller.

Media drives business.

Whether it's advertising on TV, a corporate industrial video, a radio spot, or a Web site, businesses depend upon the skill of media arts professionals to bring their messages to life in original and interesting ways. That's why the media programs at The Art Institutes emphasize business principles as much as creative ones.

Have you ever seen a TV spot that was cool to look at but didn't give you a sense of why that product was better than anything else on the market? It happens all the time. That's why it's so important, as a communicator, that you learn to use the creative tools at hand to capture the attention of your audience while never losing sight of what your client wants to achieve. If your piece looks great but didn't achieve its goals, time and money have been wasted. Our dedicated faculty will teach you to approach every project as a problem in need of a solution. This means knowing what's going on in the heads of a potential client — knowing what their goals are, and why they want what they want. It also means learning how to work and think as part of a team. You'll learn to pay attention to detail, listen



and create designs that work. Doing your homework, keeping up with industry and technology trends, and studying how to develop effective concepts will make you a more well-rounded professional. So, whether it's designing a Web site that teaches children about safety, a broadcast message that has to appeal to female grocery shoppers over 35, spending hours on a photo shoot to create pictures that speak for themselves, or creating the hottest selling new video game, you'll see that it all comes down to solving real-world problems.

## Making progress in an industry of change.

As you move through your courses in media arts, you will notice that you're not only becoming a vital part of change, but that your talent, skills, and ideas about the role of media arts is also progressing. And because technology continues to evolve at an astounding rate, The Art Institutes provide the necessary training, access, equipment, time, mentors, and practice you'll need. You will acquire knowledge about the stages of the production process and learn how to be part of a creative team. Start-to-finish projects enable you to learn important concept and execution skills, while also giving you the opportunity to learn more about yourself as you grow and refine your skills. Your passion will turn into techniques in courses taught by faculty who know their business. You'll learn to bring your imagination to life in an effective way that speaks to your audience. Faculty and classmates will critique your work and your efforts will improve through good, constructive feedback. You'll spend hours coming up with ideas and refining them. This could mean being in an edit suite making up for less-than-perfect shoot conditions. Or in an audio session coaching the voiceover talent on her delivery. Your storyboards and designs will be scrutinized. And you'll learn that there is much more to learn than you had ever imagined. Ultimately, your own style and innovation will evolve. Each quarter, you'll realize that the creative process does not always follow a straight and narrow path, it can actually be quite chaotic as all sorts of things bubble to the surface while you explore your ideas. You'll also discover that in the midst of the chaos, there will be those "a-ha" moments when it all comes together.

## The pay off

In the final quarter of your program, professional development courses will help you build the skills and confidence you'll need to begin your job search. Our



"In critiques, you learn to start listening to what others are saying and you learn to look at your work objectively. It makes you more well-rounded."
Ashley Summerlin, Graphic Design, Student
The Art Institute of Atlanta
Imagine.
Animated epics that inspire. Game designs that captivate. Special effects that fascinate. Media arts professionals combine imagination and technology to surprise, inform, and entertain via the Internet, television, and the silver screen. They're inspired by the energy of motion and the power of sound. They examine how shadows dance across moving objects. And how movement affects color and proportion. They're the next generation of storytellers.

Career Services staff will guide you through those first steps into the working world through job leads and networking opportunities that can get your foot in the door and your career on the right track. By the time you're ready to graduate from your media arts program, you will have culminated a portfolio of your finest work for potential employers to see — a demonstration of your hard work and imagination. Our goal is to prepare you for entry-level positions in the media arts field. All this, combined with your new-found appreciation for how this industry works, will help you to make an impact in this fast-paced and continuously changing field.

**Media Arts Programs of Study**
Program offerings vary by location.

**Animation**
Master's, bachelor's, and associate's degree programs; diploma and certificate programs

**Audio Production**
Bachelor's and associate's degree programs; diploma and certificate programs

**Broadcasting**
Associate's degree program

**Digital Media Production**
Bachelor's degree program

**Game Art & Design**
Bachelor's degree program; diploma and certificate programs

**Multimedia & Web Design**
Bachelor's and associate's degree programs; diploma and certificate programs

**Photography**
Bachelor's and associate's degree programs; diploma program

**Video Production**
Master's, bachelor's, and associate's degree programs; diploma and certificate programs

**Visual Effects & Motion Graphics**
Bachelor's degree program; diploma and certificate programs



COPY
Ai The New England Institute of Art®
50 Years of Creative Education in Art & Communications
Ai The New England Institute of Art

Career Services



## ABOUT THE COLLEGE

**The New England Institute of Art provides a balance of career and liberal arts education to prepare graduates for employment in their chosen field. Industry-experienced faculty use a student-centered approach and market-driven curricula to support students in developing the tools and skills necessary to achieve their goals.**

## DEGREE PROGRAMS

### Audio and Media Technology

The Bachelor of Science degree program in Audio and Media Technology is for students who are serious about the audio industry and their future. Students get a solid grounding in critical listening, computer music, and the physics of sound, plus exposure to the actual situations that they run into in their professional career.

### Graphic Design

The Bachelor of Science degree program in Graphic Design is the first step toward a career in commercial design. Initially, students develop an understanding of color and composition, design and typography, and drawing skills. As they progress through the program, students are trained in creative problem solving and learn to offer solutions that are effective in the business of Graphic Design.

### Digital Media Production

The Bachelor of Science degree program in Digital Media Production provides an intensive study of digital production in three highly competitive areas: Digital Cinema, Corporate and Commercial Video Production, and E-Journalism. The degree gives all students a solid base of foundational material to develop critical thinking skills in History of Mass Communications, History of the Moving Image, The First Amendment and Media Literacy and Popular Culture. It also immerses students in the digital technology for shooting, editing, writing, graphics, and communications on the web.

### Interior Design

The Bachelor of Science degree program in Interior Design offers students the opportunity to learn foundation art skills, drafting, contract/commercial design, residential design, and furniture history and design to help them solve client problems. Students will develop abilities in all aspects of the design of three-dimensional residential and commercial spaces. Students start with courses in drawing, perspective, proportion, color theory, basic design and other fundamentals. The program also incorporates courses in 2-D and 3-D computer-aided design, history of Interior Design and cultural contexts, furniture design, materials, textiles, environmental systems, architectural detailing, lighting design, building codes, computer rendering, 3-D modeling, accessory design and other topics related to the field.

### Media Arts & Animation

The Bachelor of Science degree program in Media Arts & Animation refines and synthesizes the students' competencies in the field of computer animation. Students apply advanced techniques in drawing characterization, animation in both 2-D and 3-D computerized environments, and interactive technologies. Students will develop a graduate project which represents a unique style and demonstrates conceptual abilities. This program prepares graduates for entry-level positions such as 2-D animators, 3-D animators, special effects animators, broadcast graphic artist, or other animation and art specialties.

### Interactive Media Design

The Bachelor of Science degree program in Interactive Media Design offers hands-on experiences in everything from designing streaming media to managing Web site growth and exploring new dimensions with electronic shopping and interactivity. Students can study a wide range of areas, from designing virtual worlds to marketing on the Internet. Students learn to develop and manage Web activities and create e-commerce applications. Students work in the college's Internet labs, where they learn about Web site development and management, marketing and e-commerce, measuring the success of online activities, and protecting secure access. Students graduate with skills in building and maintaining Web sites and developing Internet-based strategies to help organizations integrate the Web into their operations.

### Audio Production

The Associate of Science degree program in Audio Production allows students to learn a basic skill set covering the fundamentals of various audio applications. Included are courses that require the student to produce projects that demonstrate their creative and technical abilities.

### Broadcasting-Radio & TV

In the Associate of Science degree program in Broadcasting, students can concentrate in either radio or television. Students acquire essential skills of radio or TV broadcasting, from announcing and videography to editing and producing. Students also learn to produce a high-quality product and bring it to market, with assignments built around real-world broadcast situations such as shooting, writing, and editing a TV news story or producing a music video under deadline.

## CAREER PLANNING & PROFESSIONAL PLACEMENT ASSISTANCE

Whether your industry is Graphic Design, Broadcasting, Sound Engineering or Interactive/Multimedia, New England Institute of Art graduates have the training and skills to be valued employees with your company. Career Services takes pride in working closely with employers, students and alums to ensure that our candidates are referred to only appropriate employment opportunities.

The New England Institute of Art and Career Services are committed from the student's very first semester to begin to prepare them for career success. Initially, assistance is offered in finding part-time jobs, via the Student Employment Advisor. The Student Employment Advisor manages the on-campus work study program, however many students choose to work off-campus. Chances are if you have a part-time job available - The New England Institute of Art has a student that can fill that job. Typical student employment jobs are in the following areas: customer service, office/administrative, retail, technical support, audio/video, etc.

Our approach is simple. Students work with specifically assigned Career Advisors to devise a job search strategy. Career Advisors help students determine their interests, skills, abilities during their last semester and work intensively with them after graduation to help them find appropriate field-related positions.

Post your jobs with Career Services! You can feel confident that you'll get a quick response, your positions will be shared only with candidates who are appropriate and as a result you'll receive resumes/inquiries from students and grads who are qualified.

## INTERNSHIPS

At The New England Institute of Art we believe hands-on experience and internships are an integral part of how students learn about the industry they plan to enter. Therefore, it's a requirement that all students complete at least 120 hours of an internship prior to graduation. The Internship Program is administered and overseen by the Office of Career Services. Career Advisors assist students in identifying appropriate internship sites.

Internships are:

- Required (120 hours) additional internships are strongly encouraged,
- Usually done in the student's final year of study,
- Done for college credit,
- Are either paid or unpaid,
- Usually done part-time – students intern an average of 15-20 hours per week

## WAYS TO GET INVOLVED

We value participation and input from our employer partners. Here are a few ways to get involved with The New England Institute of Art.

ON-CAMPUS RECRUITMENT: Save valuable time! Save on advertising costs! You're always welcome to our campus (conveniently located in Brookline Village) to meet with and interview students and/or recent grads for your open positions.

CAREER FAIR: Promote your company! Meet new and future grads for open positions! Usually held in the Spring, The New England Institute of Art career fair is a great way to meet potential candidates for your open positions.

PANEL DISCUSSIONS/GUEST SPEAKING: Share your knowledge and experience with our students and future grads! A number of times per year, Career Services invites employers to share their vast knowledge and experience with students and recent grads.

## ABOUT CAREER SERVICES

**The New England Institute of Art prides itself on a strong emphasis on career preparation. These services include career planning, internships, close employer involvement and job placement assistance for our graduates. Each program has a specific career advisor who works with students, grads and employers in their industry and oversees internship and job placement for students in their major.**



## RECENT NEW ENGLAND INSTITUTE OF ART GRADUATES:

### AUDIO PRODUCTION
- Mike LaPierre, Recording Engineer, Long View Farm Studios, Brookfield, MA
- Elissa Young, Label Manager, Gigantic Music, NYC
- Andy Geel, Pro Tools Editor, Daddy's House, NYC
- Zach McNees, Assistant Engineer, The Hit Factory, NYC
- Carlyle Simmons, Distribution Representative, Sony Records, NYC
- Lora Helstrom, Promotions Assistant, Warner Bros Music Group, NYC
- Alex Brahms, Assistant Director, Presentation Services, Boston, MA
- Andrew Antczak, Customer Service/Sales, Cakewalk, Boston, MA
- Austin Lemieux, Purchase Controller, Pro Audio Design, Rockland, MA
- Jill Mattie, Audio Engineer, Cramer Productions, Norwood, MA
- Raphael Sofer, Assistant Engineer, Q Division Studios, Somerville, MA

### RADIO BROADCASTING
- Lynne Hoffman, Host, VH1 Classic, NYC
- Ramiro Torres, On Air Personality, WJMN JAM'N 94.5 FM, Waltham, MA
- George Knight, On Air Personality, WBOS 92.9 FM, Boston, MA
- Angelle Wood, On Air Personality, WFNX 101.7 FM, Boston, MA
- Leslie Hicks, On Air Personality, WWFX FM, Worcester, MA
- Marc Nazzaro, On Air Personality, WJYY FM, Concord, NH
- William Cooksey, On Air Personality, WESX AM, Marblehead, MA
- Stephen Budwitis, Local Music Director/Night Jock, WKKB FM, Fairhaven, MA
- James Stewart, Producer, WEEI AM Sports Radio, Boston, MA
- Christina Curcuru, Production Assistant, VH1 Satellite Radio XM-156

### TELEVISION BROADCASTING
- Ernesto Jerez, Announcer, ESPN Deportes, Bristol, CT
- Yrlen Ysasis, News Technician, ESPN, Bristol, CT
- Steve Begin, Production Assistant, ESPN, Bristol, CT
- Devon Sayers, Assignment Editor, Hearst-Argyle, Albuquerque, NM
- Bonnie Clifton, Editor, WNEP-TV, Scranton, PA
- Yoko Nakamura, Master Control Operator, New England Cable News, Newton, MA
- Deanna Olcott, Production Coordinator, Comcast, Boston, MA
- Samantha Selig, Technical Support Rep, AVID, Tewksbury, MA
- Leigh Willis, Video Technician, VideoLink Boston, Watertown, MA

### INTERACTIVE MEDIA DESIGN
- David Bozzi, IT Support Associate, Harvard Medical School, Boston, MA
- Ron Bilodeau, Book Production Specialist, Boston Common Press, Brookline, MA
- Tim Taylor, Designer, Flipp Sports, Canton, MA
- Paul Dagnello, Multimedia Producer, Boston College/Office of Marketing & Communications, Chestnut Hill, MA
- Adam Krueger, Designer/Developer, Code Lab Technology, Wakefield, MA
- Jeremy Lassetter, Multimedia Producer, The MITRE Corporation, Bedford, MA
- Jose Medeiros, Multimedia Designer, Glad Works, Pawtucket, RI
- Chris Saint-Amant, Software Engineer, BiT Group, Inc. Somerville, MA
- Dominic Taormina, Production Assistant, Sky Publishing, Cambridge, MA
- Jennifer Boone, Assistant Web Master, WHDH NBC 7, Boston, MA

### GRAPHIC DESIGN
- Christopher Ellsworth, Designer/Owner, CGE Design, Boston, MA
- David Oliva, Production Assistant, Versal Editorial Group, Andover, MA
- Jeffery Jalovec, Graphic Designer, AgaMatrix, Cambridge, MA
- Jeff Silvestris, Graphic Designer, DiBona Bornstein & Random, Boston, MA
- Rich Gorzinski, Graphic Designer/Marketing Assistant, Boston Acoustics, Peabody, MA

**Ai The New England Institute of Art**

*50 Years of Creative Education in Art & Communications*

10 Brookline Place West, Brookline, MA 02445
Tel: (617) 739-1700 Fax: (617) 582-4684
Visit us on the web: www.nela.aii.edu

# Media Arts & Animation Course Descriptions

**Please note all courses are subject to change. All courses are three credits unless otherwise indicated.**

**GD 101 Drawing and Perspective**
A fundamental drawing course in which students learn how to use a variety of drawing tools, draw three-dimensional objects in one, two, and three point perspective, and generate drawings that demonstrate correct proportions. Students are also introduced to the various means of visual indication in design. *Prerequisite: None*

**GD 102 Fundamentals of Design**
An exploration of the basic principles of design and an introduction to the creative process. Design elements and relationships are identified and employed to establish a basis for aesthetic sensitivity and critical analysis. Color theory is explored as well as the cultural and psychological impact of color in relation to design. *Prerequisite: None*

**GD 103 Life Drawing**
The human figure is analyzed and interpreted. Students practice their drawing skills, applying correct proportions, and showing form and gestures through the use of line and tone. *Prerequisite: GD 101 Drawing and Perspective*

**GD 120 Digital Imaging**
An introduction to photo retouching, image manipulation, and the creation of original artwork using computers and bitmap software. Scanning methods, color adjustment, and special effects through the use of filters are stressed. *Prerequisite: CSI 101 Understanding Computer Technology*

**MA 110 Principles of Animation**
Students learn to identify various types of animation. The illusion of artistic animation is analyzed and executed through exercises. This course also involves discussions of new developments and future trends in the industry, analysis of major sectors of the industry and career opportunities within them. *Prerequisite: None*

**MA 210 Advanced Life/Anatomy**
Building on skills developed in previous drawing courses, students will further refine drawing skills as applied to animation. Emphasis will be placed on simplifying drawing through contour lines, generating impressions of form under time constraints and expressing emotion through the user of abstract line and form. *Prerequisite: GD 103 Life Drawing*

**MA 220 Acting and Movement**
The introduction of acting as a tool of research through studies of animated movement. Characters' personality, expression, motivation, body language, and posture will be studied through classroom exercises in a variety of media. *Prerequisite: None*

**MA 230 Storyboarding for Animation**
This course focuses on industry-standard storyboarding and scripting techniques to animation. Contents to be covered include the various purposes and formats of storyboards, the basic terminology and concepts used in storyboarding, and the application of storyboarding techniques to the creation of storyboards with or without a written script. *Prerequisite: MA 210 Advanced Life/Anatomy*

**MA 240 Character/Object Design**
In this course students will design and draw characters or objects for animation using line to accurately delineate the form. Students will learn appropriate proportion and form for an animated character or object. Course assignments include gesture drawing, action poses, turnarounds, and the creation of 3D characters or objects. Students will animate their characters and objects through the use of flip books and/or stop motion animation. *Prerequisite: MA 210 Advanced Life/Anatomy*

**MA 250 Digital Ink and Paint**
This is course is an introduction to the computer as an ink and paint media for animation. Scanning, clean up, ink and paint, camera will be explored. *Prerequisite: CSI 101 Understanding Computer Technology*

**MA 260 2D Animation**
Students will study the basis of timing, weight, and anticipation. Use of a capture device, pencil tests, and other 2D animation skills will be explored. The students will apply these skills through storyboarding and character studies. *Prerequisite: MA 210 Advanced Life/Anatomy, MA 230 Storyboarding for Animation*

**MA 270 3D Modeling**
In this course, students expand their knowledge and skills in a computer-based 3D modeling environment. Topics to be covered include: skinning, beveling, displacement mapping, terrain modeling, metaball modeling, match perspective, 3D scanning, and texture modeling. *Prerequisite: MA 240 Character/Object Design*

**MA 280 Background Design and Layout**
This course focuses on the fundamentals of background layout with an emphasis on perspective, composition, design basics, staging, mood, texture and lighting. Students will also learn the basics of using props as background and foreground design elements. *Prerequisite: MA 210 Advanced Life/Anatomy, MA 230 Storyboarding for Animation*

**MA 310 Digital Editing - Video and Audio**
This course introduces students to the basic concepts and techniques in videography and audio as related to animation. Students will be exposed to basic theories and terminology in video production and the handling of basic gear including tripod, cables, camera, etc. Emphasis is placed on hands-on experience in video production so that students can translate the physical sense of video images into their computer environment for animation. Students will also learn to digitize sound and apply it for audio enhancement of their animations as well as how to produce appropriate audio effect and transition in computer animation. *Prerequisite: MA 230 Storyboarding for Animation, MA 260 2D Animation*

**MA 320 3D Animation**
This course explores the various techniques to create animation in a 3D environment on a computer. Specific animation features and functions of the given software will be discussed and applied to the production of short 3D animation projects. Emphasis will be placed on synthesized use of animation techniques. *Prerequisites: MA 270 3D Modeling*

**MA 330 Advanced 2D Animation**
In this course, building on the principles of 2D animation, students are responsible for organizing the elements necessary to complete a 20 second animation short. Addition of increases the level of complexity and necessitates a storyline. Use of a capture device, pencil tests, and other 2D animation skills will be utilized. *Prerequisites: MA 230 Storyboarding for Animation, MA 260 2D Animation*

**MA 350 Advanced 3D Modeling & Animation**
Built upon the foundation of 3D modeling and animation, this course continues to explore the more advanced techniques needed to create animation in a 3D environment on a computer. Specific animation features and functions of the given software will be discussed and applied to the production of an animation project. Emphasis will be placed on use of advanced animation techniques in a computer-generated 3D animation. *Prerequisites: MA 320 3D Animation*

**MA 410 Digital Compositing**
This course will expose students to the disciplines used in finalizing a composited project utilizing various software. The class will reinforce composing concepts and techniques that students have learned in previous classes. Each student will produce a final edited project that combines live-action, stills, CG imagery, and/or stop motion puppets and miniatures. *Prerequisites: MA 260 2D Animation, MA 310 Digital Editing - Video and Audio, MA 320 3D Animation*

**MA 420 3D Visual Effects**
Effects animation takes students through the basics of making special effects. Students will be using such tools as particles, soft bodies, dynamics and expressions to create several scenes. *Prerequisites: MA 250 2D Animation, MA 270 3D Animation, MA 310 Digital Editing - Video and Audio*

**MA 430 Animation Studio**
Students create a full-length animation with a purpose. In this advanced course, all nuances of project creation, production, and post-production are taught. *Prerequisites: MA 310 Digital Editing - Video and Audio, MA 330 Advanced 2D Animation, MA 320 3D Animation*



COPY

The New England Institute of Art
50 Years of Creative Education in Art & Communications

NEW
Bachelor of Science
Degree Program!

# Media Arts & Animation

*Bachelor of Science Degree Program*

## Program Overview

### Bachelor of Science in Media Arts & Animation

Whether it's information or entertainment, the wide appeal of the electronic media has created a growing need for people skilled in media and animation arts. The Media Arts & Animation program at The New England Institute of Art provides intensive training in the skills necessary to succeed in this fast-paced, creative field.

The Bachelor of Science degree in Media Arts & Animation refines and synthesizes the students' competencies in the field of computer animation. Students apply advanced techniques in drawing characterization, animation in both 2-D and 3-D computerized environments, and interactive technologies. Students will develop a graduate project which represents a unique style and demonstrates conceptual abilities. This program prepares graduates for entry-level positions as 2-D animators, 3-D animators, special effects animators, broadcast graphic artist, or other animation and art specialties. The length of the program is eight 15-week semesters.

Students' creativity and critical thinking are nurtured within the liberal arts (general education) component of the program. By fostering intellectual and aesthetic growth, these courses help students develop a perspective about the interaction of their own discipline with other forms of creativity.

Media Arts & Animation graduates are prepared to market their new skills, uniting their creative ability and technical expertise to fulfill the demands of employers who have a need for computer animation, media design, and digital image production and manipulation.

Jan
A1

| | Sequence A | Sequence B | Sequence C | Sequence D | Sequence E |
|---|---|---|---|---|---|
| 1st Semester | CSI 101 or CSI 120 (Pre: CSI 100) | English Selection | SEM 101 Freshman Seminar | GD 101 Drawing & Perspective | GD 102 Fundamentals of Design |
| 2nd Semester | HIS100 History of Communications | English Selection | Humanities Selection | GD 103 Life Drawing (Pre:GD 101) | MA 110 Principles of Animation |
| 3rd Semester | GD 120 Digital Imaging (Pre:CSI 101) | English Selection | Social Science Selection | MA 210 Advanced Life/Anatomy (Pre: GD103) | MA 220 Acting and Movement |
| 4th Semester | MA 250 Digital Ink and Paint (Pre:CSI 101) | Math Selection | Physical Science Selection | MA 240 Character/Object Design (Pre: MA210) | MA 230 Storyboarding for Animation (Pre: MA210) |
| 5th Semester | MA 280 Background Design & Layout (Pre:MA 210) | Math Selection | Social Science Selection | MA 270 3D Modeling (Pre:MA 240) | MA 260 2D Animation (Pre: MA 210, MA 230) |
| 6th Semester | MA 310 Digital Editing Video & Audio (Pre: MA230 & MA 260) | MM 260 Animation Graphics for the Web (Pre:GD 120) | SCI 200 Physical Science of Visual Communication | MA 320 3D Animation (Pre MA 270) | MA 330 Advanced 2D Animation |
| 7th Semester | MA 410 Digital Compositing (Pre:MA260, MA310, MA320) | MM 360 Interactive Web Graphics (Pre: MM260) | General Elective | MA 350 Advanced 3D Modeling & Animation (Pre:MA 320) | MA 430 Animation Studio (Pre: MA310, MA330, MA320) |
| 8th Semester | MA 497 Animation Seminar | MA 498 Animation Internship | General Elective | MA 420 3D Visual Effects (Pre: MA250, MA270, MA310) | MA 450 Animation Production Team (Pre: MA350, MA430, MA410) |

# EXHIBIT B

Media Arts & Animation
The New England Institute of Art
50 Years of Creative Education in Art & Communications

blast-o-ray

**Peter Hart** | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate

**Wayne Chen** | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate

**What makes media arts and animation so exciting?**
The field of Media Arts & Animation is as limitless as your imagination. It constantly evolves as new technology is released and forward thinking individuals embrace it. Dazzling sports graphics, special effects, animation that entertains as it educates — whatever it takes to amaze the eye and the mind is the focus of this exciting profession. Artists in this field are three-dimensional thinkers. They combine their creativity and technical skills to produce work for nearly every industry and take us to new places we've never been before.

To media artists, the world is in constant motion. They find ways to capture the movement of everyday life and re-create it in a digital environment. These artists strive to make their work as lifelike as possible — from studying how shadows shift on moving objects, how movement affects color and proportion, and how technology itself will innovate to respond to the demand of creating such work.

A Media Arts & Animation professional is computer savvy and eager to keep up with the quick and constant evolution of software. It's about artistic ability and the desire to continually improve it. It means to think like a communicator and storyteller. The payoff is being involved in one of the most creative professions today.

**Inspire yourself. Evolve your ideas.**
Before you can jump into creating ultra-cool spinning logos or characters that have been dancing around in your head, you've got to become comfortable with the groundwork. That means starting with the basics — drawing, character and object design, color theory, video production, and computer applications.

Hands-on studies immerse you in computer graphics, image manipulation, and 2-D and 3-D animation techniques. You'll learn how to develop a storyboard and write a script. You'll become knowledgeable in background and scenic layout, audio for animation, and digital video editing. Faculty, many of whom are working professionals in the field, will show you how to work on industry-related Pentium-class PC and Macintosh platforms, along with equipment and software such as Adobe Photoshop, Autodesk 3-D Studio, and Premier.

As you advance through your program, class assignments simulate real-working experiences.



**To media artists, the world is in constant motion. They find ways to capture the movement of everyday life and re-create it in a digital environment.**

Program-related activities such as community service projects and trips to computer animation industry events will give you practical, professional exposure to the working world of animation. Putting your knowledge into motion outside of the school is not only good practice for your first "real world" position — it's also a lot of fun.

**Go out there — do great things.**
Where will our Media Arts & Animation program take you? Network and cable television companies, for starters. Major corporations and commercial post-production facilities, along with interactive, game design, and film companies are also in need of talented animation artists.

After graduation, you'll be prepared for entry-level positions such as animation or digital artist, special effects artist, storyboard artist, background artist, broadcast graphics designer, or lighting designer. With experience, you can advance to such positions as animation project manager or 2-D or 3-D artist to make the most of your skills.

Our Career Services Department has the job and industry connections to help you get your career off the ground. In addition, late-quarter career development courses will bring your résumé and interviewing skills up to speed. Most importantly, you'll want to have your digital portfolio in order. Special courses will help you compile and polish this collection of your best work, and show you how to present it professionally to prospective employers upon your graduation.

Ready to get started? Give us a call. Come in and tour our facilities. Talk with faculty and students. Ask questions. Our admissions staff can help you make an appointment today.

**Daniel Falconer** | Media Arts & Animation
The Art Institute of Vancouver – Burnaby, Graduate

**Shiew Yen Loh** | Media Arts & Animation
The Art Institute of California – San Francisco, Student

A media artist lives a double life. Since their work relies on realism — re-creating movement digitally — they must not only understand the intricacies of their technology, but how to translate anatomy, lighting, and physics into the electronic realm. But that's where the science ends and the fun begins. A hair dryer may influence them to give their new animated spaceman character a blast-o-ray to fend off pesky aliens. These artists know how to have a good time, and they can draw creative inspiration from anywhere.

www.neia.artinstitutes.edu

The New England Institute of Art
50 Years of Creative Education in Art & Communications

Visit The New England Institute of Art at 10 Brookline Place West, Brookline, MA 02445 or call 1.800.903.4425.

© 2004 by The Art Institutes International, Inc.® 10595-02/04 PRBRO

# EXHIBIT C

Federal Family Education Loan Program (FFELP)

# Federal Stafford Loan Master Promissory Note

OMB No. 1845-0006
Form approved
Exp. date 9-30-2005

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both, under the United States Criminal Code and 20 U.S.C. 1097.

Guarantor, Program or Lender Assistance:

United Student Aid Funds

## Borrower Information

*Please print neatly or type. Read the instructions carefully.*

1. Last Name: Jacobson First Name: Jessica MI: M
2. Social Security Number: 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
3. Permanent Street Address (If P.O. Box, see instructions.) City: Lunenburg State: MA Zip Code: 01462
4. Home Area Code/Telephone Number: (978) 345 1434
5. Date of Birth (Month/Day/Year): 08-01-83
6. Driver's License State and Number: State MA S50141737
7. E-mail Address
8. Lender Name City State Zip Code: **Nellie Mae Trust, Attn: EXPORTSS, P.O. Box 59012, Panama City, FL 32412-9012**
9. Lender Code, if known: **829076**

10. References: You must provide two separate references with different U.S. addresses. The first reference should be a parent (if living) or legal guardian. Both references must be completed in full.

| | A. | B. |
|---|---|---|
| Name | Diane Lemay | Judy Braun |
| Permanent Address | 63 Flanader Rd. | 23 Farmer Ave |
| City, State, Zip Code | Leominster, MA 01453 | Fitchburg, MA 01420 |
| E-mail Address | | |
| Area Code/Telephone Number | (978) 537 8057 | (978) 345 1434 |
| Relationship to Borrower | Aunt | Family Friend |

11. Requested Loan Amount: I request a total amount of subsidized and unsubsidized loans under this Master Promissory Note not to exceed the allowable maximums under the Higher Education Act. My school will notify me of the type(s) and amount(s) of loan(s) that I am eligible to receive. I may cancel my loan or request a lower amount by contacting my lender or school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and Disclosure Statements that have been or will be provided to me.

12. Interest Payments (Optional):
☐ I want to pay unsubsidized interest while I am in school.

## Borrower Certifications and Authorizations

*Read carefully before signing below.*

13. Under penalty of perjury I certify that:
   - **A.** The information I have provided on this Master Promissory Note and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.
   - **B.** I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.
   - **C.** **(i)** I do not now owe an overpayment on a Federal Pell Grant, Supplemental Educational Opportunity Grant, or a Leveraging Educational Assistance Partnership Grant (formerly State Student Incentive Grant); or, if I owe an overpayment, I have made repayment arrangements with the holder to repay the amount owed. **(ii)** I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans), the Federal Direct Loan Program, or the Federal Family Education Loan Program ("FFELP" as defined in the Borrower's Rights and Responsibilities Statement); or **(iii)** I am in default on a loan, and I have made satisfactory arrangements with the holder of the defaulted loan.

14. For all subsidized and unsubsidized Federal Stafford Loans (as described in the additional MPN provisions and the Borrower's Rights and Responsibilities Statement) I receive under this Master Promissory Note, and for certain other loans as described below, I make the following authorizations:
   - **A.** I authorize my school to certify my eligibility for loans under this Master Promissory Note.
   - **B.** I authorize my school to transfer loan proceeds received by electronic funds transfer (EFT) or master check to my student account.
   - **C.** I authorize my school to pay to the lender any refund that may be due up to the full amount of the loan(s).
   - **D.** I authorize the lender, the guarantor, or their agents, to investigate my credit record and report information concerning my loan status to persons and organizations permitted by law to receive such information.
   - **E.** I request and authorize my lender to: **(i)** during the in-school and grace periods of any loans made under this Master Promissory Note, defer and align the repayment of principal on all of my FFELP loans that are in repayment status; and **(ii)** add unpaid interest that accrues on all my FFELP loans to the principal balance of such loans ("capitalization") including such loans made under this Master Promissory Note, during forbearance periods, and for unsubsidized loans, during in-school, grace, and deferment periods as provided under the Act. "Capitalization" will increase the principal balance on my loans and the total amount of interest charges I must pay.
   - **F.** I authorize the release of information pertinent to my loans: **(i)** by the school, the lender, and the guarantor, or their agents, to the references on the applicable loans and to members of my immediate family unless I submit written directions otherwise; and, **(ii)** by and among my schools, lenders, guarantors, the Department of Education, and their agents.
   - **G.** So that the loans requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to the school, the lender, and to state agencies and nonprofit organizations that administer financial aid programs under the FFELP.

## Promise to Pay

*In this Master Promissory Note (MPN), "lender" refers to, and this MPN benefits, the original lender and its successors and assigns, including any subsequent holder of this MPN.*

15. I promise to pay to the order of the lender all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. **I understand that multiple loans may be made to me under this MPN.** I understand that by accepting any disbursements issued at any time under this MPN, I agree to repay the loans. I understand that, within certain time frames, I may cancel or reduce the amount of any loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that accrues on my unsubsidized loans during in-school, grace, and deferment periods will be added as provided under the Act to the principal balance of such loans. If I do not make any payment on any loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Certifications and Authorizations printed above, the Notice About Subsequent Loans Made Under This MPN, and the Borrower's Rights and Responsibilities Statement.

I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.

16. Borrower's Signature [signature] 17. Today's Date *(Month/Day/Year)* 11/12/04

BORROWER COPY B

*Additional MPN provisions follow*

# Master Promissory Note *(continued)*

### Disclosure of Loan Terms

This MPN applies to both subsidized and unsubsidized Federal Stafford Loans described in the Interest section below. I agree that the lender may sell or assign this MPN and/or my loans and acknowledge that any loan may be assigned independently of any other loan to which this MPN applies. I agree that each loan is separately enforceable based on a true and exact copy of this MPN. Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified in the Higher Education Act of 1965, as amended, 20 U.S.C. 1070, et seq., and applicable U.S. Department of Education regulations (collectively referred to as the "Act"). Under this MPN, the principal amount that I owe, and am required to repay, will be the sum of all disbursements issued (unless I reduce or cancel any disbursements as provided below).

My lender will determine whether to make any loan under this MPN after my loan eligibility is determined by the school where I am enrolled on at least a half-time basis. At or before the time of the first disbursement for each loan, a disclosure statement will be sent to me identifying the amount of the loan and additional terms of the loan. Important additional information is also disclosed in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The Borrower's Rights and Responsibilities Statement and any disclosure statement I receive in connection with any loan under this MPN are hereby incorporated into this MPN.

I may request additional loan funds for my educational costs (up to the annual and aggregate loan limits). If my school determines that I am eligible for any additional or adjusted loan amount, my school may certify such amount. My eligibility for subsidized and/or unsubsidized loans may change based on changes in my financial circumstances. My school will notify me of any changes in my eligibility. I will be notified of any changes or additions to my subsidized and/or unsubsidized loans in a separate disclosure statement.

### Loan Cancellation

I may pay back all or a part of a disbursement within timeframes set by the Act, as explained in the Borrower's Rights and Responsibilities Statement or other disclosure statement I receive at or before disbursement. In such case, the origination fee and guarantee fee will be reduced or eliminated in proportion to the amount of the disbursement returned within those timeframes. I will not have to pay interest charges if I return the full loan amount as provided in the Act.

### Interest

Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loans are those specified in the Act. The interest rate information is presented in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The interest rate is presented in a disclosure statement that is issued to me.

Interest accrues on the unpaid principal balance of each loan from the date of disbursement by the lender until the loan is paid in full. I agree to pay all interest charges on my subsidized Federal Stafford Loans except interest payable by the federal government under the Act. I agree to pay all interest charges on my unsubsidized Federal Stafford Loans. If I fail to make required payments of interest before the beginning or resumption of principal repayment, or during a period of deferment or forbearance, I agree that the lender may capitalize such interest as provided under the Act. There is no federal interest subsidy on unsubsidized loans, so the total amount of interest I am required to repay on unsubsidized loans will be higher than on subsidized loans.

### Origination Fee and Guarantee Fee

For each subsidized and unsubsidized loan, the federal government charges an origination fee equal to the amount required by the Act. The guaranty agency(ies) that guarantee(s) my loan(s) (in each case, the "guarantor") may charge a per loan guarantee fee not to exceed a maximum amount specified in the Act. I will pay these fees, as identified in the disclosure statement, which will be deducted proportionately from each disbursement of my loans. I understand the origination and guarantee fees may be refundable only to the extent permitted by the Act.

### Late Charges and Collection Costs

The lender may collect from me: **(i)** a late charge for each late installment payment if I fail to make any part of a required installment payment within 15 days after it becomes due, and **(ii)** any other charges and fees that are permitted by the Act for the collection of my loans. If I default on any loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees.

### Repayment

I must repay the full amount of the loans made under this MPN and accrued interest. Federal Stafford Loans have a repayment grace period, which will be disclosed in my disclosure statement. I will repay the principal of each loan in periodic installments during a repayment period that begins on the day immediately following the end of the applicable grace period. Payments submitted by me or on my behalf (exclusive of refunds) may be applied first to charges and collection costs that are due, then to accrued interest that has not been capitalized, and finally to the principal amount.

I understand that the school's certification of my loan eligibility determines whether my loans must be repaid as subsidized and/or unsubsidized loans.

The lender will provide me with a repayment schedule that identifies my payment amounts and due dates. Except as otherwise provided in the Act, the minimum annual payment required on all my FFELP loans is $600 or the amount of interest due and payable, whichever is larger. My lender must provide me with a choice of repayment plans consistent with the provisions of the Act.

If I am unable to make my scheduled loan payments, the lender may allow me to reduce my payment amount, to extend the time for making payments, or to temporarily stop making payments as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance. The lender may align payment dates on my loans or grant me a forbearance to eliminate a delinquency that persists even though I am making scheduled payments.

I may prepay all or any part of the unpaid balance on my loans at any time without penalty. If I do not specify which loans I am prepaying, the lender will determine how to apply the prepayment in accordance with the Act. Upon repayment in full of each loan under this MPN, I agree to accept written notification of such loan payoff in place of receiving the original MPN.

### Acceleration and Default

At the option of the lender, the entire unpaid balance of the applicable loan(s) made under this MPN will become immediately due and payable, (this is called "acceleration"), upon the occurrence of any one of the following events: **(i)** I fail to enroll as at least a half-time student at the school that certified my loan eligibility, **(ii)** I fail to use the proceeds of the loan solely for educational expenses, **(iii)** I make a false representation(s) that results in my receiving a loan for which I am not eligible, or **(iv)** I default on the loan.

The following events shall constitute a default on my loan: **(i)** I fail to pay the entire unpaid balance of the applicable loans after the lender has exercised its option under items (i), (ii), or (iii) in the preceding paragraph; **(ii)** I fail to make installment payments when due, provided my failure has persisted for at least 270 days for payments due monthly or 330 days for payments due less frequently than monthly; or **(iii)** I fail to comply with other terms of the loans, and the lender or guarantor reasonably concludes I no longer intend to honor my repayment obligation. If I default, the guarantor may purchase my loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.

If I default, the default will be reported to all national credit bureaus and will significantly and adversely affect my credit history. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement. Following default, the loans may be subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

### Governing Law and Notices

The terms of this MPN will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.

If a particular loan under this MPN is made by the school, or if the proceeds of a particular loan made under this MPN are used to pay tuition and charges of a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract, or business arrangement, any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan. My recovery under this provision shall not exceed the amount I paid on such loan.

If I reside in the state in which the principal office of the guarantor is located, the guarantor may sue to enforce the applicable loans in the county in which the guarantor's office is located. However, if I object to being sued there and I mail a written objection to the guarantor that is postmarked no later than 30 days after I am served with the suit, the guarantor will either have the court transfer the suit to the county in which I live or will dismiss the lawsuit.

Any notice required to be given to me will be effective if sent by first class mail to the latest address the lender has for me or by electronic means to an electronic address that I have provided. I will immediately notify the lender of any change of address or status as specified in the Borrower's Rights and Responsibilities Statement. Failure by the lender to enforce or insist on compliance with any term on this MPN shall not be a waiver of any right of the lender. No provision of this MPN may be modified or waived except in writing. If any provision of this MPN is determined to be unenforceable, the remaining provisions shall remain in force.

### Notice About Subsequent Loans Made Under This Master Promissory Note

This Master Promissory Note authorizes the lender to disburse multiple loans during the multi-year term of this MPN upon my request and upon the school's certification of my loan eligibility. Subsequent loans may be made under this MPN for the same or subsequent periods of enrollment only at schools designated by the Secretary of the U.S. Department of Education.

I understand that no subsequent loans will be made under this MPN after the earliest of the following dates: (i) the date my lender receives my written notice that no further loans may be disbursed under the MPN; (ii) one year after the date of my signature on this MPN if no disbursement is made during such twelve month period; or (iii) ten years after the date of my signature on this MPN or the date the lender receives this MPN.

Any amendment to the Act governs the terms of any loans disbursed on or after the effective date of such amendment, and such amended terms are hereby incorporated into this MPN.

# EXHIBIT D



*50 Years of Creative Education in Art & Communications*
10 BROOKLINE PLACE WEST, BROOKLINE, MA 02445
800 903.4425 fax:617.582.4500
e-mail:neiadmin@aii.edu
www.aine.artinstitutes.edu

## ENROLLMENT AGREEMENT

Name Jacobson Jessica M
(Last Name) (First Name) (Middle)

Social Security # 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

Present Address 139 Howard St
(Street or PO Box)
Lunenburg MA 01462
City State Zip

Telephone: Home 978 345-1434 Business ( )

Cell Phone: 

E-mail Address: blondy_311@yahoo.com

**Check the major course for which you are applying:**

**Associate of Science degree:**
- ☐ Broadcasting / Radio or Television (61 credits)
- ☐ Audio Production (61 credits)

**Bachelor of Science degree:**
- ☐ Multimedia & Web Design (120 credits)
- ☐ Graphic Design (120 credits)
- ☐ Audio & Media Technology (120 credits)
- ☐ Digital Media Production (120 credits)
- ☐ Interior Design (120 credits)
- ☑ Media Arts & Animation (120 credits)

Start Date:
- ☐ September 7, 2004
- ☑ January 10, 2005
- ☐ May 16, 2005
- ☐ September 6, 2005

Financial Information
For those who begin their program September 1, 2004 through May 31, 2005 tuition is charged at $565 per credit [15 credits per semester].
Tuition increases with the start of each Fall Semester. Students enrolling or re-entering for semesters beginning after September 1, 2005 must confirm the tuition rate in effect at that time.
Tuition and fees applicable to The New England Institute of Art programs are as follows:

| | Graphic Design (120 credits) | Multimedia & Web Design (120 credits) | Audio & Media Technology (120 credits) | Broadcasting: Radio [61 credits] | Broadcasting: Television [61 credits] | Audio Production [61 credits] | Digital Media Production [120 credits] | Interior Design (120 credits) | Media Arts & Animation [120 credits] |
|---|---|---|---|---|---|---|---|---|---|
| Application Fee* | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 |
| Enrollment Fee* | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Tuition per semester [15 credits] | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 | 8,475 |
| Activities and Technology Fee (per semester) | 125 | 125 | 325 | 125 | 125 | 325 | 125 | 125 | 125 |
| Supply Kit** | 785 | 735 | 515 | 540 | 700 | 515 | 700 | 785 | 785 |
| TOTAL PROGRAM TUITION AND FEES | 69,735 | 69,685 | 71,065 | 35,655 | 35,815 | 36,430 | 69,650 | 69,735 | 69,735 |
| Estimate of books and supplies cost per semester | 350 | 300 | 225 | 225 | 225 | 225 | 225 | 350 | 350 |

*The Application and Enrollment fees are paid by new and transfer students.
**Supply Kit is charged only in the first semester.

The total tuition charged for any program will be increased from the above stated charges if a student is required to take transitional studies courses. Additional tuition for those courses can vary between $1,614 and $3,228, depending on the number of transitional studies courses required.

By this Enrollment Agreement, The New England Institute of Art agrees not to increase the per credit hour tuition charge for the duration of the program provided that the student does all of the following: submits the enrollment fee and signed enrollment agreement on or before the start date of this agreement; remains enrolled maintaining a minimum of 12 credits in the fall and winter semester and 9 credits in the summer semester; completes their education within 150% of the standard program length in semesters [i.e. must complete an eight semester program within twelve semesters]; and completes their program without interruption, taking Fall, Winter and Summer semesters, without voluntary withdrawal, suspension or termination. Bachelor's degree students are allowed one semester of leave during their program without an increase in tuition. Reentering students will be subject to the per credit hour tuition charge in effect at the time of re-enrollment. Exceptions to this policy may only be made for emergencies, such as serious illness; school-controlled reasons, such as course availability; or major, unforeseen changes in a student's living situation, if these occurrences necessitate a student attending less than full-time or not at all. Exceptions must be requested in writing at the time of the occurrence and be approved by The New England Institute of Art's President.

### Student's Right to Cancel without Penalty or Obligation

**You, the student may cancel your enrollment without any penalty or obligation at any time prior to midnight of the fifth business day after signing this enrollment agreement. You may also cancel your enrollment if upon a doctor's order, you cannot physically receive the services, or you may cancel your enrollment if the service ceases to be offered by the institute. [See reverse side for refund policy prior to matriculation].**

Please do not sign this Enrollment Agreement before you read it in its entirety. You will be given an exact copy of the agreement you sign. Please also note that the provisions of any attached rider[s] signed by you are also part of the Enrollment Agreement.

### Student Acknowledgments

I have received and read a copy of The New England Institute of Art current catalog, the provisions of which I accept. **I have read and understand all provisions of this Agreement, and I have been given a copy of it for my records.** (Parents must also sign the enrollment agreement if you are under 18 years of age.)
I understand that my enrollment and The New England Institute of Art's obligations under this Enrollment Agreement (except the cancellation and refund provisions) may be terminated by The New England Institute of Art if I fail to comply with The New England Institute of Art attendance, conduct, academic, financial or other requirements. I understand that The New England Institute of Art also reserves the right to cancel my enrollment if The New England Institute of Art determines (1) that I have demonstrated poor academic potential (as determined by evaluation of transcript records, or any other academic evaluations deemed appropriate for the program selected), and/or (2) that I do not meet all financial obligations related to enrollment and continuing enrollment. I understand that my financial obligations to The New England Institute of Art must be paid in full before a degree may be awarded and before transcripts will be issued.

Both sides of this agreement and the financial plan shall constitute the entire enrollment agreement. I understand and agree that they supersede any prior or contemporaneous oral or written agreements or statements and may not be modified without the written agreement of the President of the The New England Institute of Art.
I also understand that this agreement shall not be binding until it is accepted by The New England Institute of Art.

### Student's Agreement

**Now, having read and received a copy of this Enrollment Agreement and intending to be legally bound by it, the parties have signed this Enrollment Agreement on the dates below written.**

[signature] 11/14/04
Student's signature Date

[signature] 11-17-04
Signature of accepting official from The New England Institute of Art Date

Art Chair
Title of accepting official Date

Parent's [or Guardian's] signature (if applicant is under 18 years of age) Date

Parent's (or Guardian's) address Date

White: Admissions Yellow: SFS Pink: Student

### Further Financial Information

An application fee of $50 is to be submitted with your application for admission. The enrollment fee of $100.00 is due within 10 days after this Enrollment Agreement is signed. The tuition charge shown above is subject to adjustment each September. This adjustment will not be applied to continuing students as explained in the Financial Information section on page 1. Students are given a notice of 90 days in the event of an adjustment.

For any student enrolling on or after August 1, 2002, the student understands and agrees that s/he will be liable for interest charges that will be assessed on his/her account balance until the balance is paid in full. Interest will be charged at 12% per annum on the student's adjusted outstanding balance at the end of each month. The adjusted outstanding balance is defined as all charges incurred by the student for attendance at the school at the end of the prior month, including but not limited to tuition, fees, housing charges, late registration fees, fines, damages, etc. less the total amount paid to the student's account at the end of the current month including financial aid that the student has been awarded but has not been paid for the semester provided that the student and/or the student's parent(s) have completed all of the requirements for the award. The student understands and agrees that his/her adjusted outstanding balance is different from his/her student payment plan and that the student's financial aid award may be reduced or eliminated if the student does not complete all of the requirements for financial aid.

### The Application Process

As part of the application process, applicants must independently conceive and write an essay of approximately 150 words stating how their education at The New England Institute of Art will help them to attain their career goals. Applicants must also present a record of accomplishment and core academic courses as evidences through high school transcript grade point average or upon evaluation of GED scores. Successful admission into The New England Institute of Art and a satisfactory program start is dependent on the level of accomplishment exhibited in the essay, all grade point averages, evaluation of GED scores, a personal interview with an admissions representative, and meeting all other requirements stated in this Agreement.

First semester tuition and fees for new students become due 30 days prior to entry. Thereafter, semester tuition for each succeeding semester is due upon registration, approximately two weeks prior to the end of each academic semester. Students may not register for any academic semester of study unless all tuition and fees that are due have been paid, or unless students have made arrangements for, and adhered to an approved alternative payment plan. Tuition is charged on a semester-by-semester basis. Students are not obligated beyond the semester they are currently attending. Tuition for repeat courses is charged on a per credit basis.

### Refund Policy Prior to Matriculation

Applicants may cancel their enrollment in person or in writing before the beginning of classes. An applicant not requesting cancellation before the scheduled starting date indicated on this Enrollment Agreement will be considered a student.

1. Enrollment fees paid by applicants will be refunded if they are not accepted for admission.

2. Applicants requesting cancellation before the first scheduled class date will receive a refund of all monies paid, less the $50 application fee and $100 enrollment fee.

3. All monies paid by applicants will be returned, if requested, within three business days after their first visit to The New England Institute of Art or within three business days of the regularly scheduled orientation program for their starting semester, whichever is sooner.

4. Refunds will be made within 30 calendar days after the applicant's/student's request or within 30 calendar days after his/her first scheduled class day.

5. The application and enrollment fee is valid for three consecutive semesters, including the original start date semester. Students wishing to reapply after three semesters will be required to submit a new application and enrollment fee.

### Refund Policy After Matriculation - All Semesters

In the event of withdrawal by the student or suspension by The New England Institute of Art from all courses registered during any semester of study:

1. Prepaid tuition for any period beyond the student's current semester will be refunded in full.

2. The student may voluntarily withdraw from The New England Institute of Art by notifying the their Department Chair in person or in writing.

3. Refunds due shall be paid within 30 days of the notification date, unless the student is withdrawing at the end of the semester. Refunds for a student notifying The New England Institute of Art prior to the end of a semester that s/he will be withdrawing at the end of that semester will be paid within 14 days of the last day of that semester

4. Refunds for a student who completes a previous semester of study and does not notify The New England Institute of Art prior to the end of that semester that s/he will not be returning for the following semester will be paid within 30 days of the first day of that following semester in which the student was expected to return.

5. In the event of a fully documented extreme illness or personal emergency that makes it impractical for the student to complete the program, The New England Institute of Art may modify the tuition refund policy as deemed appropriate to the circumstances.

6. Each academic semester is 15 weeks in duration (summer semesters are 12 weeks in duration). The calculation of refunds is based upon the last day of attendance within the semester. Any portion of a week's attendance is considered a full week of attendance for refund purposes.

### Refund policy - The New England Institute of Art

### Return of Federal Title IV Aid:

A percentage of Federal Title IV Aid will be returned if the student withdraws during the first 60% of the semester. The amount returned will be based on the percentage of days remaining in the semester. The school will determine the calendar days completed in the semester divided by the total number of calendar days in the semester. If the amount is less than or equal to 60%, than that percent of the Federal Title IV Aid received is the amount that can be retained. The difference will be returned to the Federal Title IV Aid program from which funds were received in this order: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan, Pell Grant, SEOG.

If Federal Title IV Aid funds have been given to the student, and if the student withdraws during the first 60% of the semester, the student may need to return some of those funds. If the student needs to return funds, the school will notify the student how much is owed, and how it is to be returned.

### Adjustment of charges

In accordance with school policy, the school will earn tuition and fees as follows:

Week One - 25%
Week Two - 50%
Week Three and Four - 75%
After Week Four - 100%

The Art Institute will first calculate how much needs to be returned under the federal return of Title IV Aid Policy. The amount will then be subtracted from the amount that was paid for the quarter of withdrawal to get the adjusted amount paid. The Art Institute will then calculate how much of the charges can be retained based on the schools policy. The amount that can be retained will be subtracted from the adjusted amount paid. If there is additional money to be refunded from Federal funds after calculating the Return of Title IV formula and the refund policy, the refund will be made to the student, or, with the student's authorization, to the Federal loan program(s) in the following order, up to the amount received, for the term of withdrawal: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan. If there is an additional credit balance made up of non-Title IV funds, it will be refunded in the following order, up to the amount received for the term of withdrawal: Unsubsidized Stafford Loan, Subsidized Stafford Loan, Perkins Loan, PLUS Loan, other loans, other aid (if required), and student.

If kits, components of the kit, books, or supplies, are returned to the book store in resalable condition within 21 days of withdrawal, a credit will be given.

All refunds or return of funds will be made within 30 days of the date that the student notifies the Art Institute of the withdrawal.

Examples of the calculations for this new policy are available in the Student Accounting office.

### General Information and Understandings

### Handling of Student Complaints

If a student feels that a concern or complaint has not been adequately resolved using the Student Grievance Procedure described in the Student Handbook, the student may direct his/her complaint or concern in writing to The New England Association of Schools and Colleges, 209 Burlington Road, Bedford MA 01730-1433 or to the Commonwealth of Massachusetts, Board of Higher Education, One Ashburton Place, Room 1401, Boston, MA 02108-1696.

### Arbitration

**Any dispute or civil claim (other than disputes or claims regarding non-payment, grades, or their academic evaluations) between the student and The New England Institute of Art or any company that is an affiliate of the College or any officer, director, trustee, employee or agent of the College or any such affiliated company not resolved with the College or regulatory officials shall be submitting to binding arbitration in the City of Boston, Massachusetts pursuant to the commercial arbitration rules of the American Arbitration Association. The parties acknowledge that this is a transaction in interstate commerce and that the Federal Arbitration Act will apply. Any award entered shall be final and binding on both parties. Information about the arbitration process is available in the Office of the President.**

### Housing

The New England Institute of Art offers limited housing opportunities. Please see Student Services for more information on housing assistance.

### Transfer of Credits

The New England Institute of Art is licensed by the State of Massachusetts Board of Higher Education to confer the Bachelor of Science degree, Associate of Science degree, and Diploma and accredited by the New England Association of Schools and Colleges, an accrediting agency recognized by the United States Department of Education. However, the fact that a school is licensed and accredited is not necessarily an indication that credits earned at that school will be accepted by another school. In the U.S. higher education system, transferability of credit is determined by the receiving institution taking into account such factors as course content, grades, accreditation and licensing.

The mission of The New England Institute of Art is to help you to prepare for entry-level employment in your chosen field of study. The value of degree programs like those offered by The New England Institute of Art is their deliberate focus on marketable skills. The credits earned are not intended as a stepping-stone for transfer to another institution. For this reason, it is unlikely that the academic credits you earn at The New England Institute of Art will transfer to another school.

Programs offered by one school within the Art Institute system may be similar to but not identical to programs offered at another school within the system. This is due to differences imposed by state law, use of different instructional models, and local employer needs. Therefore, if you decide to transfer to another school within The Art Institutes system, not all of the credits you earn at The New England Institute of Art may be transferable into that school's program.

If you are considering transferring to either another Art Institute or an unaffiliated school, it is your responsibility to determine whether that school will accept your Art Institute credits. We encourage you to make this determination as early as possible. **The New England Institute of Art does not imply, promise, or guarantee transferability of its credits to any other institution.**

### Employment Assistance

The New England Institute of Art does not guarantee employment or any particular level of compensation following graduation. The Institute does, however, offer assistance in finding employment to all graduates at no additional charge. Graduates who confine employment considerations within the metropolitan area served by The New England Institute of Art may limit the particular employment opportunities available to them.

### Policies and Procedures

Each student is enrolled on a continuing semester-by-semester basis and agrees to comply with all published Institute policies and procedures. The New England Institute of Art reserves the right to add, delete, or modify its policies and procedures without notice.

### Student Withdrawal

A student may voluntarily withdraw from The New England Institute of Art by notifying their Department Chair in writing or in person. The refund policies outlined above shall apply in the event that a student withdraws, is suspended, or is terminated from the Institute.

### Class Sessions

Classes are in session six (6) days a week, Monday through Saturday. Class sessions are normally between 9-11:50, 12:30-3:20, 4:00-6:50, 7:10-10:00.

The New England Institute of Art reserves the right to change a class session schedule from time to time, without notice, according to classroom, studio and/or lab availability, and academic and student distribution circumstances. From time to time, instructional activities may occur at an off campus location appropriate for the particular activity.

### Instructional Equipment

Use of instructional equipment will be made available according to the program curriculum. Each student will be provided the opportunity to acquire an understanding of the fundamental principles that s/he would encounter in an entry-level position in the field. Such equipment must be shared by the students. Accordingly, The New England Institute of Art cannot guarantee hands-on usage of such equipment beyond that called for in the curriculum. To complete the requirements of the program, each student will likely find it necessary to schedule use of the equipment outside normal classroom hours.

### Homework

In addition to regular attendance at scheduled classes each student will be required to devote additional time each week outside the classroom to study and work on assigned projects.

### Curriculum

The New England Institute of Art reserves the right to revise course contents, course titles, and the sequence of classes subject to applicable regulator approval.

### Cancellation of Start Date

Cancellation of a scheduled class start date for any program shall entitle the enrollee to elect either: (1) a guaranteed reservation in the next scheduled class for that program, or (2) cancellation of enrollment with a full refund of all monies paid.

### Non-Discrimination

The New England Institute of Art does not discriminate on the basis of race, color, creed, religion, national origin, ancestry, sex, age, sexual orientation, or disability in the administration of any of its educational programs or activities, or with respect to admission or employment. For information on The New England Institute of Art's equal opportunity policy and grievance procedures, please contact the Dean of Education, The New England Institute of Art, 10 Brookline Place West, Brookline, MA 02445.

### Sale, Discount, or Transfer of Agreement

The student consents to the sale, discount, or other transfer of this Agreement with the understanding that, in such event, the cancellation and refund policies would continue to apply.

### Consent for publication of photograph, artwork, video tape, film, and/or verbal or written statements

I hereby give my consent to The New England Institute of Art (and to those whom it may authorize) to photograph, film, and/or videotape me, and/or to use a photographic reproduction of me or my work, to identify me by name, and/or with school and employment information, and/or to quote or record statements made by me, for any editoral, promotional, advertising trade, or other purpose on a royalty-free, perpetual, worldwide basis.

### Requirements for Graduation

To be qualified to graduate, the student must:

1. Receive a passing grade or credit for all required course work.

2. Earn the required credits in each of the disciplines for their major.

3. Achieve a minimum CGPA of 2.0.

4. Satisfy all financial obligations with The New England Institute of Art.

5. Satisfy the residence requirements of 30 credits minimum for the Associate of Science degree and 60 credits for the Bachelor of Science degree at The New England Institute of Art.

6. Complete an internship.

7. Complete a loan counseling exit interview with Student Financial Services.

# EXHIBIT E



 COPY

The New England
Institute of Art℠

*50 Years of Creative Education in Art & Communications*

November 18, 2004

Jessica Jacobson
189 Howard St.
Lunenburg, MA 01462

Dear Jessica,

Congratulations! The Admissions Committee is very pleased to offer you admission to The New England Institute of Art.

You have been admitted to the Bachelor Degree program in Media Arts & Animation beginning 2005, Winter.

You will receive information about orientation and registration prior to your scheduled class start. In the meantime, if there is any way we can be of assistance to you, please call Meredith S. Seiberg, Assistant Director of Admissions.

We look forward to welcoming you to The New England Institute of Art. Again, congratulations!

Sincerely,

Deborah Brent
Director of Admissions

10 Brookline Place West • Brookline, MA 02445-7295 • 1.617.739.1700 • Fax 1.617.582.4500 • www.neia.artinstitutes.edu

# EXHIBIT F



Unofficial Transcript
The New England Institute of Art
10 Brookline Place West

Ms. Jessica Jacobson
189 Howard St.
Lunenburg, MA 01462

ID... 140456
Class......... Academic year 1
Major......... Media Arts & Animation
Concentration.
Degree Date...

Start Date... 01/10/2005
Major2.....
Minor1.....

Degree........ Bachelor of Science
Concen2....
Minor2.....

------------------------ Advanced Winter 2005 ------------------------

Major: MAA

| Course Code | Course Title | Credits | Grade |
|---|---|---|---|
| ENG011 | English Fundamentals | 3.0 | WV |
| MAT011 | Basic Mathematics | 3.0 | WV |
| SEM101 | Freshman Seminar | 3.0 | P |
| | ** Proficiency/Experience ** | | |

Transfer work from Mount Wachusett Community Colleg

| Course Code | Course Title | Credits | Grade |
|---|---|---|---|
| GD102 | Fundamentals of Design | 3.0 | TR |
| GD101 | Drawing and Perspective | 3.0 | TR |
| ENG101 | English I | 3.0 | TR |
| ENG200 | English II | 3.0 | TR |
| GD120 | Digital Imaging | 3.0 | TR |
| GD230 | Web Page Auth for Graphic Des. | 3.0 | TR |
| MM150 | Survey of New Media | 3.0 | TR |

| | attempt | earn | pass | quality | points | gpa |
|---|---|---|---|---|---|---|
| ses | 0.0 | 24.0 | 24.0 | 0.0 | 0.0 | 0.0 |
| cum | 0.0 | 24.0 | 24.0 | 0.0 | 0.0 | 0.0 |

The Family Educational Rights and Privacy Act of 1974 prohibits the release of this information without the student's written consent.

# EXHIBIT G

Dear Stacy,

I am a fifth semester student in the new animation program here at AI. I am amoung the first group of students enrolled in this program and feel as though there are a few issues that should be brought to your attention in hopes to seek a resolution.

I enrolled in this school with high hopes of a great education. Sadly, I have had nothing but problems from my transfer credits, teachers, and now my classes. During admissions interviews I was told that I would be able to focus on digital special effects to lure me into this particular program. Since I was sure of the area that I wanted to focus on prior to coming to this school. I understand that it is a new program but sadly feel that I am not receiving the education that I was promised. I expected as the first set of students that you as the school would want (help us out more until the program gets on its feet) and not only to see your students do well but the program to do so as well. I feel that we are struggling….with no help insight.

I have had a few disappointing classes already, promised to learn something and the teachers not being able to follow through. Take, for example, digital ink and paint I was told that I needed to take that class because I would be learning a program called ToonBoom but to my dismay we never touched that program. The class was just another intro class to Macromedia Flash. Which, I did not need since in my prevous college I obtained a web design degree and already learned all the basics of Flash. Back ground

design layout another class where we should have focused on background designs that turned into a crash course of 3ds max. Which was not the point of this class to my understanding and had to relearn everything that had to do with 3Ds Max, since we learned the wrong way to do things in 3ds max in this crash course. But what really makes me feel cheated is that I was looking forward to taking this class called Digital Editing Video and Audio. This particular class pertains to what I want to concentrate on. My first disappointment was that the teacher taught him self the program that he was going to teach us three weeks before the class started. I don't know weather he wanted to teach this class or was just thrown into it, but as a student I feel that I should be confident that my teacher knows what he is teaching. This class the teacher could not really help me with many of the problems that I encountered and sent me to another fellow student to figure out the problem because he was also learning the program with us. Plus for a video and audio class we only went over editing audio one day out of the semester, two weeks before the final project was due. On top of it, I don't feel we learned real world practical techniques of learning how to do things or the right programs for editing and importing video. This school has so many programs for editing video and audio and he taught us to import it using window movie maker. I am scared to continue with this program but I have already put so much time into it and I am feeling too much like a test dummy ~~and~~ because I am being cheated out of my education that I am paying so much for.

I have gone to Jason Donati the head of our department (~~check spelling of his name~~) about these problems and have received no resolution. I have went to him twice with my concerns but I don't feel comfortable talking to him as a advisor and receive a unbiased opinion.

I am afraid you are stretching Donati's talents too far.

He is a very busy man being the head of the department and the advisor to all the animation student on top of writing a book and helping out in SIGGRAPH. Understanding this is a new program and he is doing the best he can and not all of it is bad. I must say that the class I took with Jason Donati was great, But you can stretch a man only so far and now has other priorities and duties. There is another teacher that is great Micheal McCarthy he knows what he is teaching and cares that we are learning real world techniques. I have also notice by sitting in on the other classes that were taught for a first time with me, that the teachers teaching the classes for a second time are getting a better grasp on the material and getting the hang of teaching but that doesn't help me and my situation.

This is my second college and I have had teachers that I just didn't like but I have never encounter this problem before. I t has gotten so bad that I have stopped taking MAA classes that I don't know who the teacher is in fear that it is another class where the teacher is not prepared to teach or classes that have not been taught before in fear that I will not learn the proper ways of doing things. I was hoping that writing a letter to you being the president of this school would help me in deciding if it was worth continuing my education in this school. I would like to set up a meeting with you to further discus these matters and seek some sort of resolution.

Future Students ~ ways to make it better

1. Digital Video Editing taught by a DMP teacher until they have one suitable to teach that class. one who really know the programs for digital video editing + Audio!

2. Digital Ink & Paint
Intro Flash Class?
or Toon Boon Class

3. Background Design Layout
or 3Ds Max Class

~ As the president of the school
– or tell the people who may be interested in it?
would it matter or up to her
to fix ~~[crossed out]~~
~~students~~

- ~ transfer credit people
  have more on staff or have
  an advisor for each majors
  (your advisor be incharge of
  that?) - I herd alot of people have
  had transfer credit problems.

- ~ Donati just being the head
  of the deptartment not both
  or "Class advisor"

  (Don't make him look bad explain
  how both are big jobs 4/1 person!!)

# EXHIBIT H

COPY

Ai

# The New England Institute of Art℠

*50 Years of Creative Education in Art & Communications*

# 2004/2005 Student Handbook

# TABLE OF CONTENTS

College Administration ..... 5
Student Organizations ..... 7
Information/Communication ..... 9
Facilities ..... 10
Transportation ..... 14
Academic Support Services ..... 14
Personal Support Services ..... 15
Career Services ..... 16
Policies and Procedures ..... 18
Enrollment Policies ..... 26
Student Rights and Responsibilities ..... 29
Student Code of Conduct ..... 42
Policy on Computing Ethics ..... 45
Where to go for Assistance ..... 47
2003/2005 Academic Calendar ..... 49

letter from the Office of Student Affairs, explaining what accommodations are appropriate, will be given to the student to share with her/his instructors, department chair, and staff as deemed appropriate by the student. We support the concept of self-advocacy in all students and do not provide faculty or staff with prior notification of a student's disability. Since all accommodations are individualized to meet the needs of each student, they may vary depending upon the disability and/or course content. The Office of Student Affairs considers all information and documentation concerning a student's disability confidential and will not share the information without the permission of the student.

If you have a concern or complaint in this regard, please contact the Associate Dean of Student Affairs or Dean of Student Affairs. Complaints will be handled in accordance with the school's complaint procedures.

**Health Information and Referrals**
Boston has long been known for its excellent health care facilities. The Student Affairs Department can help you locate an area facility for your health care needs. The Department maintains a referral list of local services including walk-in health centers, mental health clinics, and targeted services for substance abuse, nutrition, and many others. All referrals are confidential.

**Emergency Medical Information Form**
All students are requested to complete and return the Emergency Medical Information Form to the Associate Dean of Student Affairs. Any information provided on this form will be relayed to emergency medical personnel in the event of illness in order to facilitate better medical treatment.

**Health Insurance/Immunization**
Massachusetts law requires that all students must have health insurance and certain immunizations and provide proof of such insurance and immunization prior to class start. The New England Institute of Art makes available a health insurance package for any student who needs insurance. For more information on health insurance, please contact the Student Accounting Department on the second floor Administrative area. For more information on immunizations, please contact the Admissions Department. Please be aware that students will not be permitted to attend classes until proof of insurance and required immunizations is received.

## CAREER SERVICES

We know that the vast majority of students, upon completion of their program, wish to secure professional employment in their field of study. Therefore, The New England Institute of Art offers many career-related

services designed to guide you during your time as a student and after graduation.

**Internships**
At The New England Institute of Art we believe hands-on experience and internships are an integral part of how our students learn about the industry they plan to enter. Therefore, it is a requirement that all students complete at least 120 hours of internship experience prior to graduation. All students must register for this internship, complete all necessary documentation, and take this internship in conjunction with the Seminar Course. Students are welcome to take additional internships for experience earlier in their academic career as long as those internships are appropriately registered. Please be aware that some degree programs may require additional internships in order to graduate. Please refer to the college catalog or your academic advisor for more information. For more information and assistance with acquiring an internship, please contact the Career Services Office.

**Career Advising/Placement Assistance**
Students are assigned a Career Advisor who works with all students in a particular program major. The Advisor provides career counseling and job placement assistance prior to and after graduation. These services are designed to assist each student with the job search process and identify appropriate employers and positions. Career Advisors are available for all students at any point in their academic career. During your last semester and after graduation, your Career Advisor will guide you and assist you as you search for your first job in your field of study. Some examples of career advising assistance include resume review, interview practice, an evaluation of career prospects, individual strengths, and job search techniques.

**Career Workshops**
Career Advisors conduct workshops to assist students with job search skills. These workshops are given in the Seminar Course to prepare students for internships and the eventual job search. Workshop topics covered include resume and cover letter writing, interview techniques and researching the industry among others. For individual assistance, you may schedule an appointment with Career Services.

**Student Employment**
A Student Employment Advisor is available to meet with all currently registered students regarding part time employment opportunities for students. There are a variety of employment opportunities including on and off campus jobs.

**Career Fair/Career Events**
Each year, Career Services hosts a Career Fair and other career-related networking events for students and alumni. Students and alumni meet industry professionals and participate in panel discussions and seminars pertaining to careers and topics of relevance. Past guest speakers have included representatives from MTV Networks, Interactive Planet, ESPN, major record labels and design firms.

**Alumni Services**
The New England Institute of Art has a full time Alumni Coordinator who works with graduates of the College. The Alumni Coordinator highlights alumni success and helps to establish and

maintain a cohesive alumni community. Alumni can take advantage of the system-wide alumni web site, graduate newsletters and events.

**Transfer of The New England Institute of Art Credits to other Institutions**
The New England Institute of Art is licensed by the Commonwealth of Massachusetts, Board of Higher Education to confer Bachelor and Associate of Science degrees and accredited by the New England Association of Schools & Colleges, Inc., an accrediting agency recognized by the United States Department of Education. However, the fact that a school is licensed and accredited is not necessarily an indication that credits earned at that school will be accepted by another school. In the U.S. higher education system, transferability of credit is determined by the receiving institution taking into account such factors as course content, grades, accreditation and licensing.

The mission of The New England Institute of Art is to help you to prepare for entry-level employment in your chosen field of study. The value of degree programs like those offered by The New England Institute of Art is their deliberate focus on marketable skills. The credits earned are not intended as a stepping stone for transfer to another institution. For this reason, it is unlikely that the academic credits you earn at The New England Institute of Art will transfer to another school.

Programs offered by one school within The Art Institutes system may be similar to but not identical to programs offered at another school within the system. This is due to differences imposed by state law, use of different instructional models, and local employer needs. Therefore, if you decide to transfer to another school within The Art Institutes system, not all of the credits you earn at The New England Institute of Art may be transferable into that school's program.

If you are considering transferring to either another Art Institute or an unaffiliated school, it is your responsibility to determine whether that school will accept your Art Institute credits. We encourage you to make this determination as early as possible. The New England Institute of Art does not imply, promise, or guarantee transferability of its credits to any other institution.

## POLICIES AND PROCEDURES

At The New England Institute of Art, we strive to provide a student-centered environment conducive to learning. We have created procedures and policies to ensure that all students have a safe, comfortable environment for learning, a support network, and access to services. Please review these policies and procedures and refer any questions to the appropriate department.

**Attendance**
Course work at The New England Institute of Art is very hands-on and students are expected to attend class on a regular basis. Poor attendance will affect a student's final grade in a class as follows:

A student with more than 3 absences (2 during Summer Semester) will have their earned academic grade lowered one letter grade (ex: B+ to C+). More than 4 absences (3 during Summer Semester) will lower their grade to D.

If a student arrives late or leaves early from class, it is noted in the attendance roster. Four late arrivals/early departures count the same as a full absence. Further, if a student is more than 30 minutes late to a class or leaves more than 30 minutes before the conclusion of a class he or she will be marked with a one-half absence for that class. Two half absences count the same as missing an entire class.

Faculty members may set individual attendance policies that are stricter that the above policy. Their individual course syllabi will provide information on allowed absenteeism and the effects that absenteeism will have on a student's final grade if it is stricter than the standard. In no case can a student fail a course based on their attendance. Course failure is strictly based on academic performance.

Students are responsible for making up assignments and communicating with their instructors regarding missing classes. All faculty members have school voice mail and email to help students contact them.

The New England Institute of Art does not distinguish between excused or unexcused absences.

A student who misses all of his or her classes for two consecutive weeks will be withdrawn from the college.

**Grades**

Grades for each course are issued at the conclusion of each semester. The numerical equivalent of grades is as follows:

| | | | | | |
|---|---|---|---|---|---|
| **A** | 4.0 | 93-100 | **C+** | 2.4 | 77-79 |
| **A-** | 3.7 | 90-92 | **C** | 2.0 | 73-76 |
| **B+** | 3.4 | 87-89 | **C-** | 1.7 | 70-72 |
| **B** | 3.0 | 83-86 | **D** | 1.0 | 60-69 |
| **B-** | 2.7 | 80-82 | **F** | 0.0 | 59 and below |

Additional Letter Codes

| | |
|---|---|
| **I** | Incomplete |
| **NR** | No grade submitted |
| **W** | Withdrawal |
| **K** | External Transfer Credit |
| **P** | Proficiency Credit by Exam or Portfolio |
| **S** | Suspension from Course |
| **T** | Termination from College |
| **WV** | Waived Course |
| **WF** | Withdrawal Failing |

# EXHIBIT I

# Creative Education Loan

*Application and Promissory Note*

For Loan Applications Received by May 31, 2007

SallieMae

Academic Year 2006-2007

1-800-984-2944 XS 9009510000

**Section A: Borrower Information** Please read instructions before completing this section.

Social Security Number 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 | Last Name and Suffix JACOBSON | First Name JESSICA | MI M

Permanent Address (No P.O. Boxes) 189 HOWARD ST | City LUNENBURG | State MA | ZIP Code 02467

Permanent Phone Number (978) 582-7279 | Cellular Phone Number | Time at Address (if less than one year, provide prior address) Years 23 Months 0

Prior Address | City | State | ZIP Code

Address While in School | City | State | ZIP Code

Phone Number While in School | Date of Birth (mm/dd/yy) 08/01/1983 | Email Address NONE@SLMA.COM

Citizenship (check one) a) U.S. Citizen ☒ b) Non-Citizen Permanent Resident ☐ c) Foreign Resident ☐ d) Foreign Resident not eligible for a Social Security Number ☐ Note: For options b, c or d see instructions

Have you ever defaulted on a student loan? (check one) Yes ☐ No ☒ If yes, see instructions for required action

Total Loan Amount Requested $ 6,000.00 We encourage you to borrow conservatively, but try to borrow the full amount you need so you will not have to submit another application. (see instructions)

Enrollment Period for which you want to borrow money (cannot exceed 12 months) From (mm/yy) 09/06 To (mm/yy) 04/07

School Name THE NEW ENGLAND INSTITUTE OF ART | City BROOKLINE | State MA

Grade Level (refer to instructions) 03 | Course of Study (refer to instructions) OTH | Current Outstanding Student Loan Debt (refer to instructions) $

References—You must provide two (2) adult references other than the cosigner

1) Last Name and Suffix Jacobson | First Name Donna | MI M | Relationship to Borrower mom
Email Address | Permanent Phone Number 978-582-7279 | Alternate Phone Number

2) Last Name and Suffix Bray | First Name Jody | MI | Relationship to Borrower friend
Email Address | Permanent Phone Number 978-343-0784 | Alternate Phone Number

**Section B: Cosigner Information** Please read instructions before completing this section.

Social Security Number | Last Name and Suffix | First Name | MI

Address (No P.O. Boxes) | City | State | ZIP Code

Permanent Phone Number | Cellular Phone Number | Time at Residence (if less than one year, provide prior address) Years Months

Prior Address (No P.O. Boxes) | City | State | ZIP Code

Citizenship (check one) a) U.S. Citizen ☐ b) Non-Citizen Permanent Resident ☐ Note: For option b, see instructions | Date of Birth (mm/dd/yy) | Have you ever defaulted on a student loan? (check one) Yes ☐ No ☐ If yes, see instructions for required action

Present Employer Name | Employer Address (City, State, ZIP Code) | Work Phone Number

Gross Monthly Income (see instructions) Note: You do not have to reveal alimony, child support or separate maintenance income unless you wish it to be considered as a basis for loan repayment Salary $ Other $ Source | Monthly Mortgage/Rent Amount (check one) $ Own ☐ Rent ☐ | Cosigner's Email Address

References—You must provide two (2) adult references other than the borrower

1) Last Name and Suffix | First Name | MI | Relationship to Cosigner
Email Address | Permanent Phone Number | Alternate Phone Number

2) Last Name and Suffix | First Name | MI | Relationship to Cosigner
Email Address | Permanent Phone Number | Alternate Phone Number

**Section C: Borrower and Cosigner Signature**

**CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. I, THE COSIGNER, HAVE READ THE APPLICABLE COSIGNER NOTICE.**

**Notice to Customer** (a) Do not sign this before you read the Promissory Note even if otherwise advised. (b) Do not sign this if it contains any blank spaces. (c) You are entitled to an exact copy of any agreement you sign. (d) You have the right at any time to pay in advance the unpaid balance due under this agreement and you may be entitled to a partial refund of the finance charge.

I declare that the information provided above is true and complete to the best of my knowledge and belief. I have read the Promissory Note accompanying this application and the Notice to Cosigner. **Promise to pay:** Jointly and severally with the other signers below, I promise to pay the lender or any other holder of this loan all sums disbursed under the terms of the Promissory Note, plus interest and all other charges that may become due. The terms and conditions set forth in the Promissory Note constitute the entire agreement between us.

**Borrower Signature** [signature] (seal) **Date** 10/19/06

**Cosigner Signature (if applicable)** (seal) **Date**

**Section D: School Certification** Must be completed by an authorized school official.

School Name THE NEW ENGLAND INSTITUTE OF ART | School Code/Branch 0074860000

For the Enrollment Period (not to exceed 12 months) From Date (mm/dd/yy) 09/05/2006 To Date (mm/dd/yy) 04/28/2007

Grade Level (circle one) Please refer to instructions. Undergraduate 1 2 (3) 4 5 Graduate A B C D

Enrollment Status (check one) Full-time ☒ Half-time ☐ | Course of Study (refer to instructions) OTH | Anticipated Graduation Date (mm/dd/yy)

| Disbursement Date (mm/dd/yy) | Disbursement Amount |
|---|---|
| 1. / / | 1. $ |
| 2. / / | 2. $ |
| 3. / / | 3. $ |
| 4. / / | 4. $ |
| Total Certified Amount $ | |

I hereby certify that the Borrower is eligible for a Creative Education Loan; that the Total Certified Amount does not exceed the student's cost of attendance minus other financial aid; that the School will, at the request of the lender, provide the lender with subsequent information regarding the Borrower's whereabouts; that this School will comply with all applicable loan policies and provisions; and that information provided in Sections A and B is true, complete and correct to the best of my knowledge and belief.

Authorized school official Sign and date: | Print or type name and title: | Phone (617) 582-4482

EDOCS_RETURN Return Application To: Sallie Mae • PO Box 147023 • Gainesville, FL 32614-7023 (Copyright © Sallie Mae 2000-06) App Code: 1EDM0601 Prom Note Code: 3EDM0602

# EXHIBIT J

# Tips for applying to a job from Craigslist.

Reply to: anon-101949754@craigslist.org
Date: Tue Oct 04 18:51:46 2005

*Dear prospective job hunters.*

Thank you for taking the time to look at our site, and thank you for being interested in working with us.

Most applications I receive go straight to the deleted-items folder because of a few simple mistakes. I'm beginning to feel bad, so if you are going to make the effort to apply for a job here, or anywhere else, I'd like to offer you some advice.

To successfully interest me in hiring you, you need understand what we as business owners face on the other side of the fence. Hiring is the most important task I face, but it is also 76th on my list of a hundred other things to do today. When we put a posting on Craigslist, we usually get around 100 responses within 48 hours. They flood into my inbox, and I have to push them aside until I have time to give them the attention they deserve. In the meantime, I have phones ringing, deadlines to meet, problems with our systems, employees with questions, and much more to compete for the limited capacity of my brain.

But, don't let this put you off. It doesn't take much to distinguish yourself. Here's how :

**1. YOUR COVER LETTER MUST ANSWER OUR NEEDS.**

When I do get round to your email, I do not have time to look at every detail. I make quick and rapid decisions about whether I will call you or not. I don't even get to most resume's because the cover letter is so drab. If you want to stand a chance at getting a response, you ABSOLUTLY MUST spend some time on this.

So, how should you write a cover letter? - Simple, read our post, and tell me quickly how you can meet the needs we have listed. Use examples wherever possible. Take a look at these two different letters....

# EXHIBIT K

# Federal Direct Consolidation Loan Application and Promissory Note

OMB No. 1845-0053
Form Approved
Exp. Date 02/28/2014

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying documentation is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

Borrower's Name (please print) Jessica m Jacobson

Social Security Number 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

## Section E: Borrower Understandings, Certifications, and Authorizations

**22.** I understand that:

**A.** My Direct Consolidation Loan will, to the extent used to pay off loans made under the Federal Family Education Loan (FFEL), Direct Loan, and Federal Perkins Loan (Perkins Loan) programs, count against the applicable aggregate loan limits under the Act. The term "the Act" is defined under "Governing Law" on page 4 of this Note.

**B.** The amount of my Direct Consolidation Loan is the sum of the balances of my outstanding eligible loans that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest and late charges as defined by federal regulations and as certified by the loan holder. Collection costs may also be included. For a Direct Loan Program or FFEL Program loan that is in default, the amount of any collection costs that may be included in the payoff balances of the loans is limited to a maximum of 18.5% of the outstanding principal and interest. For any other defaulted federal education loans, all collection costs that are owed may be included in the payoff balances of the loans.

**C.** Applying for a Direct Consolidation Loan does not obligate me to agree to take the Direct Consolidation Loan. The U.S. Department of Education (ED) will provide me with: **(1)** a notice containing information about the loans and payoff amounts that ED has verified with the holders of my loans or through ED's National Student Loan Data System (NSLDS) before the actual payoffs occur; and **(2)** the deadline by which I must notify ED if I want to cancel the Direct Consolidation Loan, or if I do not want to consolidate any of the loans that ED has verified. The notice that ED sends will include information about loans eligible for consolidation that I listed in Section C1 of this Note ("Education Loan Indebtedness – Loans You Want to Consolidate"). It may also include information about additional loans eligible for consolidation that I did not list in Section C1, if I have additional eligible loans with a holder of a loan listed in Section C1. If I do not inform ED otherwise by the deadline specified in the notice that ED sends to me, all of the loans listed in the notice will be consolidated.

**D.** If the amount ED sends to my loan holders is more than the amount needed to pay off the balances of the selected loans, the holders will refund the excess amount to ED and this excess amount will be applied against the outstanding balance of my Direct Consolidation Loan. If the amount that ED sends to my holders is less than the amount needed to pay off the balances of the loans selected for consolidation, ED will include the remaining amount in my Direct Consolidation Loan.

**E.** Unless I am: **(1)** consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion; **(2)** consolidating a defaulted Federal Consolidation Loan; **(3)** consolidating a Federal Consolidation Loan to use the Public Service Loan Forgiveness Program; or **(4)** consolidating a Federal Consolidation Loan to use the no accrual of interest benefit for active duty service members, I may consolidate an existing Federal Consolidation Loan or Direct Consolidation Loan only if I include at least one additional eligible loan in the consolidation.

**F.** If I am consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion or a defaulted Federal Consolidation loan, and I am not including another eligible loan, I must agree to repay my Direct Consolidation Loan under the ICR Plan or the IBR Plan.

**G.** If I consolidate my loans, I may no longer be eligible for certain deferments, subsidized deferment periods, certain types of loan discharges or loan forgiveness, or reduced interest rates that were available on the loans I am consolidating.

**H.** Any payments made prior to the date of consolidation on the loans I am consolidating will not count toward **(1)** the 25 years of repayment required for loan forgiveness under the IBR Plan or the ICR Plan (see Item 10 of the Borrower's Rights and Responsibilities Statement in this Note), or **(2)** the 120 qualifying payments required for Public Service Loan Forgiveness (see Item 17 of the Borrower's Rights and Responsibilities Statement).

**I.** If I am consolidating a Perkins Loan: **(1)** I will no longer be eligible for interest-free periods while I am enrolled in school at least half time, in the grace period on my loan, and during deferment periods; and **(2)** I will no longer be eligible for full or partial loan cancellation under the Perkins Loan Program based on years of service in one of the following occupations: teacher in a low-income elementary or secondary school; staff member in a eligible preschool program; special education teacher; member of the Armed Forces who qualifies for special pay; Peace Corps volunteer or volunteer under the Domestic Volunteer Service Act of 1973; law enforcement or corrections officer; attorney in an eligible defender organization; teacher of mathematics, science, foreign languages, bilingual education or any other high-need field; nurse or medical technician providing health care services; employee of a public or private nonprofit child or family service agency that services high-risk children from low-income families and their families; fire fighter; faculty member at a Tribal College or University; librarian; or speech language pathologist.

**J.** If I am consolidating a Direct PLUS Loan or a Federal PLUS Loan that I obtained to help pay for my dependent child's undergraduate education, I will not be eligible to repay my Direct Consolidation Loan under the IBR Plan. However, I may repay my Direct Consolidation Loan under the ICR Plan.

**K.** If I am consolidating any Direct Loan Program loans on which I received an up-front interest rebate, and I have not yet made the first 12 required on-time payments on those loans at the time the loans are consolidated, I must make the first 12 required monthly payments on my Direct Consolidation Loan on time to keep the interest rebate (see Item 9 of the Borrower's Rights and Responsibilities Statement).

**23.** Under penalty of perjury, I certify that:

**A.** The information that I have provided on this Note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

**B.** All of the loans selected for consolidation have been used to finance my education or the education of my dependent child(ren).

**C.** All of the loans selected for consolidation are in a grace period or in repayment ("in repayment" includes loans in deferment or forbearance).

**D.** If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science and Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements with the holder to repay the amount owed.

**E.** If I am in default on any loan I am consolidating (except as provided above in Item 22.F.), I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay my Direct Consolidation Loan under the ICR Plan or the IBR Plan.

**F.** If I have been convicted of, or pled *nolo contendere* or guilty to, a crime involving fraud in obtaining federal student aid funds under the Act, I have completed the repayment of those funds to ED, or to the loan holder in the case of a Title IV federal student loan.

**24.** I make the following authorizations:

**A.** I authorize ED to contact the holders of the loans selected for consolidation to determine the eligibility for consolidation and the payoff amounts of the loans listed in Section C1 of this Note and any of my other federal education loans that are held by a holder of a loan listed in Section C1. I further authorize release to ED or its agent of any information required to consolidate my education loans in accordance with the Act.

**B.** I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holders of the selected loans to pay off the debts.

**C.** I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

**D.** I authorize my school(s) and ED to release information about my Direct Consolidation Loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise.

**E.** I authorize my school(s), ED, or their agents to verify my Social Security Number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct Social Security Number to these parties.

**F.** I authorize my schools, ED, and their respective agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages.

## Section F: Promissory Note (continued on page 4) – to be completed and signed by the borrower.

**25. Promise to Pay.** I promise to pay to the ED all sums disbursed under the terms of this Note to pay off my prior loan obligations, plus interest and other charges and fees that may become due as provided in this Note. Unless I make interest payments, interest that accrues on my loan during forbearance periods and on the unsubsidized portion of my loan during deferment periods may be added, as provided under the Act, to the principal balance of my loan. If I do not make payments on this Note when due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees.

If ED accepts my application, I understand that ED will send funds to the holders of the loans that I want to consolidate to pay off those loans. I further understand that the amount of my Direct Consolidation Loan will equal the sum of the payoff balances on the loans selected for consolidation. My signature on this Note serves as my authorization to pay off the balances of the loans selected for consolidation as provided by the holders of the loans.

Promissory Note – continued from page 3

The payoff amount may be greater than or less than the estimated total balance I have indicated in Section C1. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of my Direct Consolidation Loan.

I will not sign this Note before reading the entire Note, even if I am told not to read it. I am entitled to an exact copy of this Note and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this Note, including the Borrower Understandings, Certifications, and Authorizations in Section E, and the Borrower's Rights and Responsibilities Statement.

I UNDERSTAND THAT THIS IS A LOAN THAT I MUST REPAY.

**26. Borrower's Signature** Jessica m Jacobson **Today's Date (mm-dd-yyyy)** 08/30/2013

**(Electronic Signature)**

**Governing Law**

The terms of this Federal Direct Consolidation Loan Application and Promissory Note (Note) will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), the U.S. Department of Education's (ED's) regulations, as they may be amended in accordance with their effective date, and other applicable federal laws and regulations (collectively referred to as the "Act"). Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this Note.

**Disclosure of Loan Terms**

This Note applies to a Federal Direct Consolidation Loan (Direct Consolidation Loan). Under this Note, the principal amount that I owe and am required to repay will be equal to all sums disbursed to pay off my prior loan obligations, plus any unpaid interest that is capitalized and added to the principal amount.

My Direct Consolidation Loan may have up to two separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans and prior unsubsidized loans. Each applicable loan identification number is represented by this Note.

When the loans that I am consolidating are paid off, a disclosure statement will be provided to me. The disclosure will identify the amount of my Direct Consolidation Loan, the associated loan identification number(s), and additional terms of the loan, such as the interest rate and repayment schedule. If I have questions about the information disclosed, I may contact my servicer. Important additional information is also contained in the Borrower's Rights and Responsibilities Statement. The Borrower's Rights and Responsibilities Statement and any disclosure I receive in connection with the loan made under this Note are hereby incorporated into this Note.

I understand that ED may use a servicer to handle billing and other communications related to my loan.

**Interest**

Interest will be calculated using a formula provided for by the Act. Unless ED notifies me in writing of a lower rate, the interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but will not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged, except for interest ED does not charge me during a deferment period on the subsidized portion of my Direct Consolidation Loan. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

**Late Charges and Collection Costs**

ED may collect from me: **(1)** a late charge of not more than six cents for each dollar of each late payment if I fail to make any part of a required installment payment within 30 days after it becomes due, and **(2)** any other charges and fees that are permitted by the Act related to the collection of my Direct Consolidation Loan. If I default on my loan, I will pay reasonable collection costs, plus court costs and attorney fees.

**Repayment**

I must repay the full amount of the Direct Consolidation Loan made under this Note, plus accrued interest. I will repay my loan in monthly installments during a repayment period that begins on the date of the first disbursement of the loan, unless it is in a deferment or forbearance period. Payments made by me or on my behalf will be applied first to late charges and collection costs that are due, then to interest that has not been paid, and finally to the principal amount of the loan, except during periods of repayment under the Income-Based Repayment (IBR) Plan. Under the IBR Plan, payments will be applied first to interest that is due, then to fees that are due, and then to the principal amount.

ED will provide me with a choice of repayment plans. Information on these plans is included in the Borrower's Rights and Responsibilities Statement. I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with the Act.

ED will provide me with a repayment schedule that identifies my payment amounts and due dates. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in a deferment or forbearance period. If I am unable to make my scheduled loan payments, ED may allow me to temporarily stop making payments, reduce my payment amount, or extend the time for making payments, as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance.

ED may adjust payment dates on my Direct Consolidation Loan or may grant me forbearance to eliminate a delinquency that remains even though I am making scheduled installment payments.

I may prepay any part of the unpaid balance on my loan at any time without penalty. After I have repaid my Direct Consolidation Loan in full, ED will send me a notice telling me that I have paid off my loan.

**Acceleration and Default**

At ED's option, the entire unpaid balance of the Direct Consolidation Loan will become immediately due and payable (this is called "acceleration") if either of the following events occurs: **(1)** I make a false representation that results in my receiving a loan for which I am not eligible; or **(2)** I default on the loan.

The following events will constitute a default on my loan: **(1)** I fail to pay the entire unpaid balance of the loan after ED has exercised its option under the preceding paragraph; **(2)** I fail to make installment payments when due, provided my failure has persisted for at least 270 days; or **(3)** I fail to comply with other terms of the loan, and ED reasonably concludes that I no longer intend to honor my repayment obligation. If I default, ED may capitalize all outstanding interest. This will increase the principal balance, and the full amount of the loan, including the new principal balance and collection costs, will become immediately due and payable.

If I default, the default will be reported to national consumer reporting agencies and will significantly and adversely affect my credit rating. I understand that a default will have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement. Following default, I may be required to repay the loan (including potential collection of amounts in excess of the principal and interest) under the Income Contingent Repayment (ICR) Plan or the IBR Plan in accordance with the Act.

**Legal Notices**

Any notice required to be given to me will be effective if sent by first class mail to the most recent address that ED has for me, by electronic means to an address I have provided, or by any other method of notification permitted or required by applicable statute or regulation. I will immediately notify ED of a change of contact information or status, as specified in the Borrower's Rights and Responsibilities Statement.

If ED fails to enforce or insist on compliance with any term on this Note, this does not waive any right of ED. No provision of this Note may be modified or waived except in writing by ED. If any provision of this Note is determined to be unenforceable, the remaining provisions will remain in force.

Information about my loan will be submitted to the National Student Loan Data System (NSLDS). Information in NSLDS is accessible to schools, lenders, and guarantors for specific purposes as authorized by ED.

## Borrower's Rights and Responsibilities Statement

*Important Notice: This Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of the loan you will receive under the accompanying Federal Direct Consolidation Loan (Direct Consolidation Loan) Application and Promissory Note (Note).* ***Please keep a copy of the Note and this Borrower's Rights and Responsibilities Statement for your records.***

*In this document, the words "we," "us," and "our" refer to the U.S. Department of Education.*

**1. The William D. Ford Federal Direct Loan Program.** The William D. Ford Federal Direct Loan (Direct Loan) Program includes the following types of loans, known collectively as "Direct Loans":

- Federal Direct Stafford/Ford Loans (Direct Subsidized Loans)
- Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans)
- Federal Direct PLUS Loans (Direct PLUS Loans)
- Federal Direct Consolidation Loans (Direct Consolidation Loans)

The Direct Loan Program is authorized by Title IV, Part D, of the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 *et seq.* (HEA).

Direct Loans are made by the U.S. Department of Education. We contract with servicers to service, answer questions about, and process payments on Direct Loans. We will provide you with the address and telephone number of the servicer for your loan.

**2. Laws that apply to this Note.** The terms and conditions of loans made under this Note are determined by the HEA and other applicable federal laws and regulations. These laws and regulations are referred to as "the Act" throughout this Borrower's Rights and Responsibilities Statement. State law, unless it is preempted by federal law, may provide you with certain rights, remedies, and defenses in addition to those stated in the Note and this Borrower's Rights and Responsibilities Statement.

**NOTE: Any change to the Act applies to loans in accordance with the effective date of the change.**

**3. Direct Consolidation Loan identification numbers.** Depending on the type(s) of federal education loan(s) that you choose to consolidate, your Direct Consolidation Loan may have up to two individual loan identification numbers. However, you will have only one Direct Consolidation Loan and will receive only one bill.

**3a.** The subsidized portion of your Direct Consolidation Loan ("Direct Subsidized Consolidation Loan") will have one loan identification number representing the amount of the following types of loans that you consolidate:

- Subsidized Federal Stafford Loans
- Direct Subsidized Loans
- Subsidized Federal Consolidation Loans
- Direct Subsidized Consolidation Loans
- Federal Insured Student Loans (FISL)
- Guaranteed Student Loans (GSL)

**3b.** The unsubsidized portion of your Direct Consolidation Loan ("Direct Unsubsidized Consolidation Loan") will have one identification number representing the amount of the following types of loans that you consolidate:

- Unsubsidized and Nonsubsidized Federal Stafford Loans
- Direct Unsubsidized Loans
- Unsubsidized Federal Consolidation Loans
- Direct Unsubsidized Consolidation Loans
- Federal PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Consolidation Loans
- Federal Perkins Loans
- National Direct Student Loans (NDSL)
- National Defense Student Loans (NDSL)
- Federal Supplemental Loans for Students (SLS)
- Parent Loans for Undergraduate Students (PLUS)
- Auxiliary Loans to Assist Students (ALAS)
- Health Professions Student Loans (HPSL)
- Health Education Assistance Loans (HEAL)
- Nursing Student Loans (NSL)
- Loans for Disadvantaged Students (LDS)

**4. Adding eligible loans to your Direct Consolidation Loan.** You may add eligible loans to your Direct Consolidation Loan by submitting a request to us within 180 days of the date your Direct Consolidation Loan is made. (Your Direct Consolidation Loan is "made" on the date we pay off the first loan that you are consolidating.) After we pay off any loans that you add during the 180-day period, we will notify you of the new total amount of your Direct Consolidation Loan and of any adjustments that must be made to your monthly payment amount and/or interest rate.

If you want to consolidate any additional eligible loan(s) after the 180-day period, you must apply for a new Direct Consolidation Loan.

**5. Loans that may be consolidated.** *General.* Only the federal education loans listed in Items 3a.and 3b. of this Borrower's Rights and Responsibilities Statement may be consolidated into a Direct Consolidation Loan. You may only consolidate loans that are in a grace period or in repayment (including loans in deferment or forbearance). At least one of the loans that you consolidate must be a Direct Loan Program loan or a Federal Family Education Loan (FFEL) Program loan.

*Defaulted loans.* You may consolidate a loan that is in default if **(a)** you first make satisfactory repayment arrangements with the holder of the defaulted loan, or **(b)** you agree to repay your Direct Consolidation Loan under the Income Contingent Repayment (ICR) Plan or the Income-Based Repayment (IBR) Plan (see Item 10).

*Existing consolidation loans.* Generally, you may consolidate an existing Direct Consolidation Loan or Federal Consolidation Loan into a new Direct Consolidation Loan only if you include at least one additional eligible loan in the consolidation. However, you may consolidate a Federal Consolidation Loan into a new Direct Consolidation Loan without including an additional loan if the Federal Consolidation Loan is delinquent and has been submitted by the lender to the guaranty agency for default aversion, or if the Federal Consolidation Loan is in default. In such cases, you must agree to repay the new Direct Consolidation Loan under the ICR Plan or the IBR Plan. You may also consolidate a single Federal Consolidation Loan into a new Direct Consolidation Loan to use the Public Service Loan Forgiveness program described in Item 17 of this Borrower's Rights and Responsibilities Statement, or the no accrual of interest benefit for active duty service members described in Item 8.

**6. Information you must report to us.** Until your loan is repaid, you must notify your servicer if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Change your employer or your employer's address or telephone number changes; or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment)

**7. Interest rate.** The interest rate on your Direct Consolidation Loan will be **the lesser of** the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, OR 8.25%. We will send you a notice that tells you the interest rate on your loan.

The interest rate on a Direct Consolidation Loan is a fixed rate. This means that the interest rate will remain the same throughout the life of your loan.

If you qualify under the Servicemembers Civil Relief Act, the interest rate on your loans obtained prior to military service may be limited to 6% during your military service. To receive this benefit, you must contact your servicer for information about the documentation you must provide to show that you qualify.

**8. Payment of interest.** Except as provided below for borrowers who serve in the military, interest accrues on a Direct Consolidation Loan from the date the loan is made until it is paid in full or discharged, including during periods of deferment or forbearance. You are responsible for paying all interest that accrues, except for interest that accrues on the subsidized portion of a Direct Consolidation Loan ("Direct Subsidized Consolidation Loan" – see Item 3a.) during deferment periods.

If you do not pay the interest as it accrues during the periods described above, we will add the interest to the unpaid principal amount of your loan at the end of the deferment or forbearance period. This is called "capitalization." Capitalization increases the unpaid principal balance of your loan, and interest will then accrue on the increased principal amount.

The chart below shows the difference in the total amount you would repay on a $15,000 Direct Unsubsidized Consolidation Loan if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized.

| | If you pay the interest as it accrues... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan Amount | $15,000 | $15,000 |
| Capitalized Interest for 12 Months (at the maximum rate of 8.25%) | $0 | $1,238 |
| Principal to be Repaid | $15,000 | $16,238 |
| Monthly Payment (Standard Repayment Plan) | $146 | $158 |
| Number of Payments | 180 | 180 |
| Total Amount Repaid | $26,209 | $28,359 |

In this example, you would pay $12 less per month and $2,150 less altogether if you pay the interest as it accrues during a 12-month deferment or forbearance period.

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.ustreas.gov.

Under the no interest accrual benefit for active duty service members, during periods of qualifying active duty military service interest does not accrue on the portion of a Direct Consolidation Loan that repaid a Direct Loan Program or FFEL Program loan first disbursed on or after October 1, 2008 (for up to 60 months).

**9. Repayment Incentive programs.** A repayment incentive is a benefit that we offer to encourage you to repay your loan on time. Under a repayment incentive program, the interest rate we charge on your loan may be reduced. Some repayment incentive programs require you to make a certain number of payments on time to keep the reduced interest rate. For Direct Consolidation Loans, the following repayment incentive program may be available to you:

*Interest Rate Reduction for Automatic Withdrawal of Payments*

Under the automatic withdrawal option, your bank automatically deducts your monthly loan payment from your checking or savings account and sends it to us. Automatic withdrawal helps to ensure that your payments are made on time. In addition, you receive a 0.25% interest rate reduction while you repay under the automatic withdrawal option. We will include information about the automatic withdrawal option in your first bill. You can also get this information on your servicer's web site, or by calling your servicer. Your servicer's web site address and toll-free telephone number are provided on all correspondence that your servicer sends you.

Your servicer can provide you with more information on other repayment incentive programs that may be available.

**Note:** Another repayment incentive program, the up-front interest rebate, is available on Direct Subsidized Loans, Direct Unsubsidized Loans, and Direct PLUS Loans that were first disbursed before July 1, 2012. The rebate is equal to a percentage of the loan amount, and is the same amount that would result if the interest rate on the loan were lowered by a specific percentage. To permanently keep an up-front interest rebate, a borrower must make each of the first 12 required monthly payments on time when the loan enters repayment. If you consolidate a Direct Loan on which you received an up-front interest rebate before you permanently earn the rebate (the correspondence you received about your loan will tell you if you received a rebate), you will have to make the first 12 required monthly payments on your Direct Consolidation Loan on time to keep the interest rebate. "On time" means that we must receive each payment no later than 6 days after the due date. You will lose the rebate if you do not make all of your first 12 required monthly payments on your Direct Consolidation Loan on time. If you lose the rebate, we will add the rebate amount back to the principal balance on your loan account. This will increase the amount that you must repay.

**10. Repaying your loan.** Unless you receive a deferment or forbearance on your loan (see Item 16), your first payment will be due within 60 days of the first disbursement of your Direct Consolidation Loan. Your servicer will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

Generally, you must repay all of your Direct Loans under the same repayment plan. You may choose one of the following repayment plans to repay any Direct Consolidation Loan:

- **Standard Repayment Plan** – Under this plan, you will make fixed monthly payments and repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the amount of your Direct Consolidation Loan and the amount of your other student loan debt (not to exceed the amount you are consolidating) as listed in Section C2 of your Note (see the chart below). Your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time period.
- **Graduated Repayment Plan** – Under this plan, your payments will be lower at first and will then increase over time, usually every two years. You will repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the total amount of your Direct Consolidation Loan and the amount of your other student loan debt (not to exceed the amount you are consolidating) as listed in Section C2 of your Note (see the chart below). No single payment under this plan will be more than three times greater than any other payment.

| Maximum Repayment Periods Under the Standard and Graduated Repayment Plans | |
|---|---|
| **Total Education Loan Indebtedness** | **Maximum Repayment Period** |
| Less than $7,500 | 10 years |
| $7,500 to $9,999 | 12 years |
| $10,000 to $19,999 | 15 years |
| $20,000 to $39,999 | 20 years |
| $40,000 to $59,999 | 25 years |
| $60,000 or more | 30 years |

- **Extended Repayment Plan** – You may choose this plan only if: (1) you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998, or on the date you obtained a Direct Loan Program loan on or after October 7, 1998; and (2) you have an outstanding balance on Direct Loan Program Loans that exceeds $30,000. Under this plan, you may choose to make either fixed or graduated monthly payments and will repay your loan in full over a repayment period not to exceed 25 years (not including periods of deferment or forbearance) from the date your loan entered repayment. If you choose to make fixed monthly payments, your payments must be at least $50 a month ($600 a year) and will be more, if necessary, to repay the loan within the required time period. If you choose to make graduated monthly payments, your payments will start out lower and will then increase over time, generally every two years. Under a graduated repayment schedule, your monthly payment must at least be equal to the amount of interest that accrues each month, and no single payment will be more than three times greater than any other payment.
- **Income Contingent Repayment (ICR) Plan** – Under this plan, your monthly payment amount will be based on your adjusted gross income (and that of your spouse if you are married), your family size, and the total amount of your Direct Loans. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues

monthly on your loan unless you request a forbearance. As your income changes, your payments may change. If you do not repay your loan after 25 years under this plan, the unpaid portion will be forgiven. You may have to pay income tax on any amount forgiven.

In addition to the repayment plans listed above, you may also choose the following repayment plan to repay a Direct Consolidation Loan if you are not consolidating a parent Direct PLUS Loan or a parent Federal PLUS Loan (see Note below):

- **Income-Based Repayment (IBR) Plan** – Under this plan, your required monthly payment amount will be based on your income. To initially qualify for this plan and to continue to make income-based payments, you must have a partial financial hardship. Your monthly payment amount may be adjusted annually. The maximum repayment period under this plan may exceed 10 years. If your loan is not repaid in full after you have made the equivalent of 25 years of qualifying payments and at least 25 years have elapsed, you may qualify for forgiveness of any outstanding balance on your loans. You may have to pay income tax on any amount forgiven.

**NOTE:** A parent PLUS loan is a PLUS loan that you obtained to help pay for your dependent child's undergraduate education. Direct Consolidation Loans that repaid parent Direct PLUS Loans or parent Federal PLUS Loans may not be repaid under the IBR Plan. However, such loans may be repaid under the ICR Plan.

If you can show to our satisfaction that the terms and conditions of these repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

If you do not choose a repayment plan, we will choose a plan for you in accordance with the Act.

You may change repayment plans at any time after you have begun repaying your loan. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month.

Except for payments made under the IBR Plan, we apply your payments in the following order: (1) late charges and collection costs, (2) outstanding interest, and (3) outstanding principal. For payments made under the IBR Plan, we apply your payments in the following order: (1) outstanding interest, (2) late charges and collection costs, and (3) outstanding principal.

When you have repaid your loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

**11. Transfer of loan.** We may transfer one or all of your loans to another servicer without your consent. If the address to which you must send payments or correspondence changes, you will be notified of the new servicer's name, address and telephone number, the effective date of the transfer, and the date when you must begin sending payments or directing communications to that servicer. Transfer of a loan to a different servicer does not affect your rights and responsibilities under that loan.

**12. Late charges and collection costs.** If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than six cents for each dollar of each late payment. If you do not make payments as scheduled, we may also require you to pay other charges and fees involved in collecting your loan.

**13. Demand for immediate repayment.** The entire unpaid amount of your loan becomes due and payable (this is called "acceleration") if you:

- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan.

**14. Defaulting on your loan.** Default (failing to repay your loan) is defined in detail under "Acceleration and Default" on page 4 of this Note. If you default:

- You will be required to immediately repay the entire unpaid amount of your loan.
- We may sue you, take all or part of your federal tax refund or other federal payments, and/or garnish your wages so that your employer is required to send us part of your wages to pay off your loan.
- You will be required to pay reasonable collection fees and costs, plus court costs and attorney fees.
- You will lose eligibility for other federal student aid and assistance under most federal benefit programs.
- You will lose eligibility for loan deferments.
- We will report your default to national consumer reporting agencies (see Item 15).

**15. Consumer reporting agency notification.** We will report information about your loan to each national consumer reporting agency on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). Your loan will be identified as an education loan.

If you default on a loan, we will report the default to national consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report it.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the consumer reporting agency with a prompt response.

**16. Deferment and forbearance (postponing payments).** If you meet certain requirements, you may receive a **deferment** that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a **forbearance**. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment:

- While you are enrolled at least half time at an eligible school;
- While you are in a full-time course of study in a graduate fellowship program;
- While you are in an approved full-time rehabilitation program for individuals with disabilities;
- While you are unemployed (for a maximum of three years; you must be diligently seeking, but unable to find, full-time employment); or
- While you are experiencing an economic hardship (including Peace Corps service), as determined under the Act (for a maximum of three years).
- While you are serving on active duty during a war or other military operation or national emergency, or performing qualifying National Guard duty during a war or other military operation or national emergency, and if you were serving on or after October 1, 2007, for an additional 180-day period following the demobilization date for your qualifying service; or
- If you are a member of the National Guard or other reserve component of the U.S. Armed Forces (current or retired) and you are called or ordered to active duty while enrolled at an eligible school, or within 6 months of having been enrolled at least half time, you are eligible for a deferment during the 13 months following the conclusion of the active duty service, or until you return to enrolled student status on at least a half-time basis, whichever is earlier.

You may be eligible to receive additional deferments if, at the time you received your first Direct Loan, you had an outstanding balance on a loan made under the Federal Family Education Loan (FFEL) Program before July 1, 1993. If you meet this requirement, contact your servicer about additional deferments that may be available.

You may receive a deferment while you are enrolled in school on at least a half-time basis if: (1) you submit a deferment request form to your servicer along with documentation of your eligibility for the deferment; or (2) your servicer receives information from the school you are attending that indicates you are enrolled at least half time. If your servicer processes a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active military duty or qualifying National Guard duty during a war or other military operation or national emergency, your representative) must submit a deferment request form to your servicer, along with documentation of your eligibility for the deferment. In certain circumstances, you may not be required to provide documentation of your eligibility if your servicer confirms that you have been granted the same deferment for the same period of time on a FFEL Program loan. Your servicer can provide you with a deferment request form that explains the requirements for the type of deferment you are requesting. You may also obtain deferment request forms and information on deferment eligibility requirements from your servicer's web site.

If you are in default on your loan, you are not eligible for a deferment.

You are responsible for paying the interest that accrues on a Direct Unsubsidized Consolidation Loan during a deferment period. You are not responsible for paying the interest that accrues on a Direct Subsidized Consolidation Loan during a deferment period.

Forbearance

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

We will give you a forbearance if:

- You are serving in a medical or dental internship or residency program, and you meet specific requirements;
- The total amount you owe each month for all of the student loans you received under Title IV of the Act is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in a national service position for which you receive a national service education award under the National and Community Service Act of 1990 (AmeriCorps). In some cases, the interest that accrues on a qualified loan during the service period will be paid by the Corporation for National and Community Service;
- You qualify for partial repayment of your loans under the Student Loan Repayment Program, as administered by the Department of Defense;
- You are performing service that would qualify you for loan forgiveness under the teacher loan forgiveness program that is available to certain Direct Loan and FFEL program borrowers; or
- You are a member of the National Guard who qualifies for a post-active duty student deferment but not for a military service deferment or other deferment, and you are engaged in active state duty for a period of more than 30 consecutive days.

To request a forbearance, contact your servicer. Your servicer can provide you with a forbearance request form that explains the requirements for the type of forbearance you are requesting. You may also obtain forbearance request forms and information on forbearance eligibility requirements from your servicer's web site. Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following:

- Periods necessary for us to determine your eligibility for a loan discharge;
- A period of up to 60 days for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize interest charged during this period); or
- Periods when you are involved in a military mobilization or are affected by a local or national emergency.

You are responsible for paying the interest that accrues on your entire Direct Consolidation Loan during a forbearance period.

**17. Discharge (having your loan forgiven).** We will discharge (forgive) your Direct Consolidation Loan if:

- Your servicer receives acceptable documentation of your death. We will also discharge the portion of a Direct Consolidation Loan that repaid one or more Direct PLUS Loans or Federal PLUS Loans obtained on behalf of a student who dies.
- Your loan is discharged in bankruptcy. However, federal student loans are not automatically discharged if you file for bankruptcy. To have your loan discharged in bankruptcy, you must prove to the bankruptcy court in an adversary proceeding that repaying the loan would cause undue hardship.
- You become totally and permanently disabled (as defined in the Act) and meet certain other requirements.

In certain cases, we may also discharge all or a portion of your Direct Consolidation Loan if:

- One or more Direct Loan Program, FFEL Program, or Federal Perkins Loan Program loans that you consolidated was used to pay for a program of study that you (or the dependent student for whom you borrowed a PLUS loan) were unable to complete because the school closed;
- Your eligibility (or the eligibility of the dependent student for whom you borrowed a PLUS loan) for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified by the school;
- Your eligibility for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified as a result of a crime of identity theft; or
- The school did not pay a required refund of one or more Direct Loan Program or FFEL Program loans that you consolidated.

We may forgive a portion of your Direct Consolidation Loan that repaid Direct Subsidized or Direct Unsubsidized Loans you received after October 1, 1998, or subsidized or unsubsidized Federal Stafford Loans you received under the FFEL program after October 1, 1998 if you: (1) teach full time for five consecutive years in certain elementary and/or secondary schools or educational service agencies that serve low-income families; (2) meet certain other qualifications; and (3) did not owe a Direct Loan or a FFEL Program loan as of October 1, 1998, or as of the date you obtain a loan after October 1, 1998.

A Public Service Loan Forgiveness program is available that provides for the cancellation of the remaining balance due on your eligible Direct Loan Program loans after you have made 120 full, on-time, scheduled monthly payments (after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by certain public service organizations.

The Act may provide for certain loan forgiveness or repayment benefits on your loans in addition to the benefits described above. If other forgiveness or repayment options become available, your servicer will provide information about these benefits.

To request a loan discharge based on one of the conditions described above (except for discharges due to death or bankruptcy), you must complete an application that you may obtain from your servicer.

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law. If you believe that you have a defense against repayment of your loan, contact your servicer.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You must repay your loan even if you do not complete your education, are unable to obtain employment in your field of study, or are dissatisfied with, or do not receive, the education you paid for with the loan.

**18. Department of Defense and other federal agency loan repayment.** Under certain circumstances, military personnel may have education loans repaid by the Secretary of Defense. This benefit is offered as part of a recruitment program that does not apply to individuals based on their previous military service or to those who are not eligible for enlistment in the U.S. Armed Forces. For more information, contact your local military service recruitment office.

Other agencies of the federal government may also offer student loan repayment programs as an incentive to recruit and retain employees. Contact the agency's human resources department for more information.

***END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT***

IMPORTANT NOTICES

**Gramm-Leach-Bliley Act Notice**

In 1999, Congress enacted the Gramm-Leach-Bliley Act (Public Law 106-102). This Act requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

**Privacy Act Notice**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 et seq. of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Financial Privacy Act Notice**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program.

**Paperwork Reduction Notice**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless the collection displays a valid OMB control number. Public reporting burden for this collection of information is estimated to average 1.0 hour (60 minutes) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201(c)(1). Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Education, 400 Maryland Ave., SW, Washington, DC 20210-4537 or e-mail ICDocketMgr@ed.gov and reference OMB Control Number 1845-0053. **Note: Please do not return the completed Federal Direct Consolidation Loan Application and Promissory Note to this address.**

**If you have any questions regarding the status of your individual submission of this form, write directly to:**

**U.S. Department of Education**
**Consolidation Department**
**P.O. Box 242800**
**Louisville, KY 40224-2800**

## Transaction History

**Below is a summary of actions that you completed during the electronic consolidation application and promissory note process:**

| | |
|---|---|
| Your identity was confirmed by the PIN web site on | 08/30/2013 at 13:32:20 CT |
| You agreed to use an electronic consolidation application and promissory note on | 08/30/2013 at 15:32:53 ET |
| You confirmed that you read, understood, and agreed to the statement of Borrower's Rights and Responsibilities on | 08/30/2013 at 15:33:23 ET |
| You reviewed your draft consolidation application and promissory note and confirmed that you read, understood, and agreed to the Certification and Authorization, Promise to Pay, Disclosure of Terms, and Important Notices on | 08/30/2013 at 15:33:50 ET |
| You signed your consolidation application and promissory note on | 08/30/2013 at 15:34:21 ET |
| You reviewed your signed consolidation application and promissory note and entered your Confirmation Code on | 08/30/2013 at 15:37:23 ET |
| You confirmed your acceptance of the terms and conditions of this consolidation application and promissory note and submitted it to us on | 08/30/2013 at 15:37:30 ET |

**Your consolidation application and promissory note Confirmation Code is: 29D**

# ATTACHMENT 2



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 4, 2014

Elizabeth Warren
United States Senate
Washington, DC 20510

Dear Senator Warren:

Thank you for your letter of June 25, 2014, concerning Corinthian Colleges, Inc. (Corinthian). The U.S. Department of Education (Department) is doing everything it can to protect students as a result of the sale or closure of Corinthian's institutions of higher education, including seeking to avoid or minimize the disruption to students' lives and educational aspirations that you note could otherwise result from their abrupt closure. At the same time, we are continuing to perform our important oversight work of Corinthian and will hold the company accountable for compliance with the requirements of the Higher Education Act of 1965, as amended (HEA) and our regulations.

I am pleased to report that on July 9, 2014, the Department reached an agreement with Corinthian on a process to govern the eventual closure and sale of its institutions. The Operating Agreement covers certain issues that are directly responsive to some of the issues you raised in your letter, and I appreciate the opportunity to provide further detail. However, please note that the recent events unfolded at an accelerated pace; that the scope of potential institutional closures and sales associated with a single corporate entity is unprecedented; and that circumstances remain quite fluid and will continue to evolve. As a result, we will continue to review our plans and processes going forward to ensure that we are continuing to do all we can to protect both students' and taxpayers' interests as Corinthian's participation in the Federal Student Aid programs ends.

The agreement reached with Corinthian includes features that your letter urged the Department to consider. For example, Corinthian will cease to enroll new students in certain circumstances described below, and will make disclosures to affected students concerning their options and the status of their respective institutions. In particular, and with respect to your specific questions:

- As of July 9, 2014, Corinthian has identified those institutions it plans to sell, as well as those institutions it plans to close *after* providing students who are already enrolled with time to complete their educational programs ("teach-out" institutions). Corinthian is required, under the Operating Agreement, to cease enrollment of new students at teach-out institutions. In some cases, Corinthian may work with another institution so that an enrolled student would complete his/her educational program at such other institution.

- Under the Operating Agreement, certain students in a teach-out school may have options that vary depending on their date of enrollment.

- Students who enrolled prior to June 23, 2014–the date the Department placed Corinthian on heightened financial oversight–will be able to either (1) continue and complete their educational program or (2) withdraw and obtain a full refund of all tuition and other fees paid for their program. Under the agreement, Corinthian will determine whether to provide these students the option of a full refund of tuition and charges paid or the ability to complete their education as originally intended. Students who complete their education under this option would not be eligible for a closed school loan discharge. Students who qualify for a Corinthian refund will have the refund applied to their Federal loan balances, and may qualify for a closed school loan discharge of the remaining amount owed, if any. Students will have an opportunity to appeal Corinthian's decision regarding the option they may pursue.

- Students who enrolled on or after June 23, 2014, and before July 8, 2014, have the option to choose to (1) continue and complete their educational program or (2) withdraw and obtain a full refund of all tuition and other fees paid for their program. Under the Operating Agreement, Corinthian must provide these students the ability to choose whichever option benefits them the most. Further, under the agreement, students who fail to make a choice will be withdrawn from their program and provided a full refund. Students who complete their education would not qualify for a closed school loan discharge of their Federal loans. Students who qualify for a Corinthian refund will have the refund applied to their Federal loan balances, and may qualify for a closed school discharge of the remaining amount owed, if any.

- Under the Operating Agreement, Corinthian is also required to disclose to students enrolled at those institutions it plans to sell information regarding the status of the institutions and the options and protections afforded to those students. In addition to specific disclosures drafted for use for students at teach-out institutions discussed above, the Department has drafted disclosures for Corinthian to provide to prospective students enrolling in institutions identified as being for sale. The disclosures inform prospective students that certain Federal and State authorities are investigating the institution and that these investigations could result in future enforcement actions that might negatively affect students' ability to complete their educational programs. The disclosure further informs prospective students that if a school is sold, any new owner might make changes to their educational program, and that it is possible that any credits they earn at a Corinthian institution may not transfer to another school. Further, the Operating Agreement requires Corinthian to obtain signed acknowledgments from new students that they have received the disclosure prior to enrollment to ensure, to the best of the Department's ability, that students are fully aware of the pending sale of the school and what that could mean for their studies.

Please note that the Operating Agreement contemplates that the status of any particular Corinthian institution could change as a result of the Department's ongoing review of Corinthian's compliance with statutory and regulatory requirements. In January, the Department

denied Corinthian's request for approval to add certain new locations and programs at selected institutions because it had admitted to falsifying placement rates and/or grade and attendance records at various institutions and because of ongoing State and Federal investigations into serious allegations with respect to Corinthian's administration of the Federal Student Aid programs. Because these issues suggested systemic deficiencies in the operations of Corinthian as a parent corporation of its individual institutions, the Department instructed the company to provide certain required documentation and information with respect to placement rate percentages, and grade and attendance record changes at all Corinthian institutions. Corinthian's failure to substantially comply with our request is what led the Department to place it on a heightened level of Departmental financial oversight and precipitated the establishment of the Operating Agreement.

Under the Operating Agreement, if the Department finds, based on its reviews, that certain Corinthian institutions are ineligible for recertification to participate in Federal Student Aid programs, or are otherwise determined to be ineligible to participate, Corinthian is required to provide students their choice of whether to (1) continue and complete their educational program in accordance with regulations that govern school closures, as in the case that institutions are found to be ineligible, or (2) withdraw from school and receive a full refund of all tuition and other fees paid for their program. In addition, in these circumstances, students may be eligible for closed school loan discharges of any Federal student loans they took out for attendance at the formerly eligible institution. The conditions and qualifications pertaining to closed school discharges are different from those for the refund Corinthian is obligated to provide under the Operating Agreement; an affected student borrower may qualify for both, either, or neither.

You also asked how the Department will seek to ensure relief for Corinthian students with private student loan debt. In the Operating Agreement, we require Corinthian to include private student loans within the refunds that the company provides to students. In particular, we defined refunds in such cases to include repaying any private student loan or debt to any other lender from whom Corinthian received direct disbursements for such student's cost of attendance at Corinthian the amount of such disbursements, including reimbursing the student for any origination and other fees incurred by the student in obtaining a private student loan. Absent this explicit provision in the Operating Agreement, the HEA does not otherwise authorize the Department to seek such relief, and closed school loan discharges pertain only to Federal, not private, student loans. As to other relief that may be available for students who have obtained private loans, the terms of the loan agreement may permit the borrower to assert, as defenses to repayment, claims that the borrower has against the school. Borrowers should review their private loan agreements to determine whether they include a provision allowing such defenses.

The Operating Agreement makes no distinction between students enrolled in online-only programs and students who enroll in programs that require physical attendance.

In addition, you ask how the Department plans to ensure that students are properly notified of their options in cases of school closures and sales, and the consequences for students in cases of program changes by a new owner of a school consequent to a sale. A number of the disclosure requirements within the Operating Agreement are outlined above, and the Department is currently developing a more detailed plan to ensure it is prepared for both an entirely orderly

closure and transition of all Corinthian's institutions, as well as a precipitous closure of all of its institutions, should either occur.

School closures and sales are not uncommon. However, the simultaneous closure and sale of as many institutions as comprise Corinthian, and that affect as large a student population, is without precedent. The Department is building upon and modifying existing plans for school closures and sales to bring them into line with the scale of Corinthian's operations. These plans include how the Department will coordinate with accrediting agencies and State authorizing agencies that, under the HEA, have principal roles and authorities in these cases. For example, the potential consequences and options for students as the result of any particular change in ownership will depend on, among other things, the interest and willingness of a buyer to accept and comply with any particular condition, the particular requirements or conditions that an accrediting agency may impose, and the conditions a State may require, given that the HEA does not generally preempt State law or override States' responsibilities for authorizing institutions that operate within their borders. As a result, the features and conditions of any particular sale, and the consequences and options for students, could vary on a case-by-case basis. In the end, however, the Department's concerns and interests are the concerns and interests of students and taxpayers, and the Department will strive to ensure their welfare in the subsequent closure and sale of Corinthian's institutions. To be clear, the Department will not approve a sale to another entity if that entity is currently under State and/or Federal investigation or is unable to meet the qualifications established under the HEA to qualify for Federal Student Aid.

With respect to your question about borrowers' right to present claims to the Department, the Department recognizes as a defense to repayment of Direct Loans a claim that the borrower has against the school that is based on the making of the loan or the provision of educational services, if State law recognizes such a claim and if the borrower proves the elements required to establish the claim.

A borrower or class of borrowers who obtain a judgment against a school upholding a claim can more readily establish that claim as a defense to repayment, but the borrower is not required to sue or obtain a judgment against the school in order to assert the claim against the school as a defense to repayment of a Direct Loan. Department regulations explicitly provide that a defaulted borrower may assert that the defaulted loan is not legally enforceable, but a borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department.

Finally, as part of the Operating Agreement, the Department required that an independent monitor would be appointed to oversee Corinthian's actions. I am pleased to report that Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, under the leadership of former U.S. Attorney Patrick Fitzgerald, has been selected to take on this monitoring role. The Department is confident that Mr. Fitzgerald and his team will strengthen our efforts to oversee this process.

I appreciate your recommendations to the Department as we move forward in addressing issues arising from matters related to Corinthian's decision to wind down and cease operations. We continue to analyze how we can best protect students and taxpayers, and in so doing, will

continue to actively consider your recommendations. If you have additional questions, please have your staff contact Lloyd Horwich, Acting Assistant Secretary, Office of Legislation and Congressional Affairs, at (202) 401-0020.

Sincerely,

Arne Duncan

# ATTACHMENT 3


The New England
Institute of Art
CREATIVITY for LIFE

10 Brookline Place West, Brookline, MA 02445
617.739.1700 • 800.903.4425 • www.artinstitutes.edu/boston

**Disclosure Required by Massachusetts Regulation 940 CMR 31.00**
**Media Arts & Animation – Bachelor of Science**

Program cost:

Average program tuition is $92,700
Average cost of books and digital resources is $3,000
Average cost of program fees is $430
Average cost of program room and board is $72,900*
The average total cost of the program is $169,030

30% of students graduated from the program during 2012 – 2013 calendar years. **

The average student graduates in 43 months.

50% of The New England Institute of Art students defaulted on, or failed to repay, their loans during the period of cohort year 2010. The official federal cohort default rate is 17.10%. The U. S. Department of Education does not officially calculate an institution's deferment or forbearance rate and, thus, The New England Institute of Art internally calculated the total percentage of student borrowers who had at least one of their federal loans in deferment or forbearance to be 32.9%. In general terms, a deferment or forbearance is a temporary suspension of payment of up to 12 months, approved by a borrower's federal loan servicer, due to a student's economic hardship, unemployment, continuing education, or military status.***

You must repay money that you borrow as student loans to pay for this program, including interest. You must repay any portion of the money you borrow to pay for this program, even if you fail to complete or drop out of the program. Failure to repay student loans is likely to have a serious negative effect on your credit, future earnings, and your ability to obtain future student loans.

22% of graduates during 2012 - 2013 calendar years obtained full-time, non-temporary jobs in their field of study. 7% of students who enrolled in the program during 2012 - 2013 calendar years obtained full-time, non-temporary jobs in their field of study. ****

Employment statistics substantiating these placement rates are available for inspection on request.

Signature of prospective student Date

Parent/guardian (if prospective student is under the age of 18) Date

* Transportation between student housing and the campus is included in the cost of student housing.

** The New England Institute of Art provides this graduation rate in compliance with Massachusetts 940 CMR 31.00. The Massachusetts graduation rate is a specific calculation based on the number of students who received certificates, diplomas, or degrees in the program during the last two calendar years, divided by the number of students who enrolled in the program during the last two calendar years. Students are included in the calculation based strictly on whether they enrolled in the program in the last two calendar years; the rate does not take into consideration whether the student has been enrolled long enough to complete the program.

*** The federal FY10 cohort default rate is calculated by dividing the number of student borrowers who entered repayment between October 1, 2009 and September 30, 2010 and defaulted by September 30, 2011 by the number of student borrowers who entered repayment during that same period. (Generally the borrowers are students who left school between April 1, 2009 through March 31, 2010.)

**** The New England Institute of Art provides this placement rate in compliance with Massachusetts 940 CMR 31.00. The Massachusetts graduate placement rate is a specific calculation based on the number of students obtaining full time (at least 32 hours per week) and non-temporary employment in the field of study during the latest two calendar years for which the institution has obtain verification, divided by the number of all students graduating from the program during the latest two calendar years, as determined within 180 days from the end of each calendar year. The Massachusetts total placement rate is the product of the graduate placement rate and the graduation rate determined within 180 days from the end of each calendar year. There is no minimum period of time that a graduate must work in order to be included in the statistic. Graduates who were employed prior to or during their enrollment who remain in the same position after graduation are included if their employment relates to their field of study.

For additional information, visit: http://www.artinstitutes.edu/boston/student-consumer-information/overview.aspx .

# ATTACHMENT 4





The New England Institute of Art™
10 Brookline Place West
Brookline, MA 02445-7295
www.neia.aii.edu
1.617.739.1700 or 1.800.903.4425

**Evolve your talent. Your thinking. Yourself.**

Personal and professional growth are the hallmarks of an Art Institutes education in the creative and applied arts. Your talent evolves. Your thinking evolves. Even your career plans can evolve, once you know what opportunities exist out there in the real world. Preparing you for that real world is what Career Services is all about. Résumé writing, networking, and keeping you abreast of what employers are looking for are just a few of our services. But, as they say, proof is in the numbers. Below you'll find detailed information about our graduates' performance in the workplace. Careers begin here. You'll see.

| | Number of Graduates Available for Placement Within Six Months of Graduation | Number of Graduates Employed | Percentage of Graduates Employed in Related Field | Average Starting Salary |
|---|---|---|---|---|
| **Bachelor's Degree Program** | | | | |
| Multimedia & Web Design | 2 | 2 | 100.0% | $43,050 |
| **Total Bachelor's Degree Program** | **2** | **2** | **100.0%** | **$43,050** |
| **Associate's Degree Programs** | | | | |
| Audio Production | 105 | 94 | 89.5% | $25,615 |
| Broadcasting | 68 | 58 | 85.3% | $25,106 |
| Graphic Design | 15 | 13 | 86.7% | $29,471 |
| Multimedia & Web Design | 15 | 13 | 86.7% | $28,438 |
| **Total Associate's Degree Programs** | **208** | **183** | **88.0%** | **$25,827** |
| **Totals** | **210** | **185** | **88.1%** | **$26,014** |

**Doing Our Homework: Successful Career Planning at The Art Institutes**

The Art Institutes are known as leaders in career-oriented education in design, media arts, fashion, and the culinary arts. Our partnership with local and national employers helps us to deliver industry-relevant education and curricula that benefit both students and employers. This means that students develop practical skills, using the technology that's recognized in the workplace. What's more, our faculty includes award-winning and industry-recognized professionals who train students in the fundamental skills required for success in their field. Many of our students gain on-the-job skills through participation in internship or externship programs at local companies and nationally-recognized corporations. And our concern for employer satisfaction and awareness of industry trends allows us to provide employers with candidates who fulfill their needs and leads to graduates' career success, both now and in the future.

**How Our Graduates Measure Up**

Of all 2003 New England Institute of Art graduates available for employment, 88.1% were working in a field related to their program of study within six months of graduation and earning an average salary of $26,014. The chart at left reflects employment statistics for all 2003 calendar year New England Institute of Art graduates available for placement.

**Where Our Graduates Are Working**

The New England Institute of Art graduates have been employed by some of the most prominent companies in the United States and beyond, such as:

- Cramer Productions
- Tweeter Center
- Pro Audio Design
- Universal Music Group
- Bose Corporation
- Greater Boston Radio Group
- WHDH-TV NBC
- Boston Common Press
- FastChannel Network
- The Gillette Company
- Comcast

Programs no longer offered as of June 30, 2004 are not listed in the table above; however, placement activity for these programs is included in overall statistics.



# → graduate and make an impact with your creative ideas.

**What Our Graduates Are Doing**

The New England Institute of Art prepares students to launch their careers with entry-level positions such as:

- Web/Graphic Designer
- Recording Studio Assistant
- Live Sound Technician
- Web Developer
- Television Production Assistant
- Air Talent
- Assistant Multimedia Producer
- Promotions Assistant

**Partners Working Together**

Dedicated Career Services staff offer a range of services that support your efforts as you plan for your career. Our experience and employer contacts in this community, in addition to the resources of The Art Institutes across the country, give us (and therefore you) an edge. There are proven tips and techniques that can help you begin your job search. That's why we provide the following support:

- Instruction in job search skills, résumé writing, interviewing, and networking.
- Job search assistance for full-time employment in your field and a part-time job while you complete your program of study.
- Participation in career days, internships, and job fairs that enable you and employers to interact.
- Insight into what employers are looking for when it comes to skill set and portfolio content.

**Contact the Director of Career Services at the following locations:**

The Art Institute of Atlanta,® GA
770.394.8300 or 1.800.275.4242

The Art Institute of California℠ —
Los Angeles
1.310.752.4700 or 1.888.646.4610

The Art Institute of California℠ —
Orange County
1.714.830.0200 or 1.888.549.3055

The Art Institute of California℠ —
San Diego
1.858.598.1399 or 1.800.591.2422

The Art Institute of California℠ —
San Francisco
1.415.865.0198 or 1.888.493.3261

The Art Institute of Charlotte,® NC
1.704.357.8020 or 1.800.872.4417

The Art Institute of Colorado® (Denver)
303.837.0825 or 1.800.275.2420

The Art Institute of Dallas,® TX
1.214.692.8080 or 1.800.275.4243

The Art Institute of Fort Lauderdale,® FL
1.954.463.3000 or 1.800.275.7603

The Art Institute of Houston,® TX
1.713.623.2040 or 1.800.275.4244

The Art Institute of Las Vegas,® NV
1.702.369.9944 or 1.800.833.2678

The Art Institute of New York City,® NY
1.212.226.5500 or 1.800.654.2433

The Art Institute of Ohio℠ —
Cincinnati*
1.513.771.2821 or 1.866.613.5184

The Art Institute of Philadelphia,® PA
1.215.567.7080 or 1.800.275.2474

The Art Institute of Phoenix,® AZ
1.602.331.7500 or 1.800.474.2479

The Art Institute of Pittsburgh,® PA
1.412.291.6200 or 1.800.275.2470

The Art Institute of Portland,® OR
1.503.228.6528 or 1.888.228.6528

The Art Institute of Seattle,® WA
1.206.448.6600 or 1.800.275.2471

The Art Institute of Tampa,℠ FL
*A branch of Miami International University of Art & Design*
1.813.873.2112 or 1.866.703.3277

The Art Institute of Toronto,℠ ON
1.416.351.8400 or 1.866.202.0481

The Art Institute of Vancouver,℠ BC
1.604.683.9200 or 1.866.717.8080

The Art Institute of Vancouver℠ — Burnaby, BC
1.604.298.5400 or 1.800.661.1885

The Art Institute of Washington®
*A branch of The Art Institute of Atlanta, GA*
(Arlington, VA)
1.703.358.9550 or 1.877.303.3771

The Art Institute Online℠
*A Division of The Art Institute of Pittsburgh, PA*
1.412.291.5100 or 1.877.872.8869

The Art Institutes International Minnesota℠
(Minneapolis)
1.612.332.3361 or 1.800.777.3643

Bradley Academy for the Visual Arts℠
(York, PA)
1.717.755.2300 or 1.800.864.7725

California Design College℠
(Los Angeles — Wilshire Blvd.)
1.213.251.3636 or 1.877.468.6232

The Illinois Institute of Art® — Chicago
1.312.280.3500 or 1.800.351.3450

The Illinois Institute of Art® — Schaumburg**
1.847.619.3450 or 1.800.314.3450

Miami International University of Art & Design,℠ FL
1.305.428.5700 or 1.800.225.9023

The New England Institute of Art℠ (Boston, MA)
1.617.739.1700 or 1.800.903.4425

Not all programs are offered at all locations. Equipment and facilities vary by location.

* The Art Institute of Ohio — Cincinnati, 1011 Glendale-Milford Road, Cincinnati, OH 45215-1107, OH Reg # 04-01-16988
** The Illinois Institute of Art — Schaumburg is accredited by ACCSCT as a branch of The Illinois Institute of Art — Chicago.
A range of online course opportunities is available.
Want to learn online *and* in the classroom? Explore our Plus program that lets you do both.

© 2004 by The Art Institutes International, Inc.® 10920 09/04