**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

        *Plaintiffs,*

       v.

ELISABETH DEVOS, in her official
capacity as Secretary of the United States
Department of Education,

And

THE UNITED STATES DEPARTMENT OF
EDUCATION,

        *Defendants.*

Case No.: 19-cv-03674-WHA

**AFFIDAVIT OF YVETTE COLON**

I, Yvette Colon, state as follows:

1.    I am submitting this affidavit in relation to the above-captioned case.

2.    I borrowed federal student loans in order to attend the Non-Invasive
Cardiovascular Technology program at Sanford-Brown Institute (Sanford-Brown) in New York.

3.    I received a restitution check in the amount of $3,094.93 because the Office of the
Attorney General (OAG) of the State of New York investigated Sanford-Brown and found that it
misled and lied to students like me.

4.    On March 9, 2015, my attorneys submitted, on my behalf, a borrower defense
application to the United States Department of Education, asking for these loans to be cancelled.
A copy of that application is attached as Exhibit A, with redactions for personally identifiable
information and communications with my attorneys.

5.    On April 24, 2015, Navient, my loan servicer, sent a letter to my attorney stating
that it "was unable to forgive the balance on [my] Federal Stafford Loans." The letter further

1

1   stated that my loans could only be forgiven upon death or disability, or a school's closure. The

2   letter provided various options for repayment.

3       6.      On August 12, 2016, the Department of Education sent a letter to my attorney

4   providing "information on the status of" my borrower defense application. The letter stated that

5   by May 6, 2015, the Department had "determined that" my borrower defense application "was

6   substantially complete." The Department stated that it would "inform" my attorney "once a

7   determination has been made in relation to the request for a discharge."

8       7.      On July 2, 2020, I received correspondence from the Department of Education,

9   stating that my claim had been denied (denial notice). A copy of the denial notice is attached as

10  Exhibit B.

11      8.      In between the time that I first submitted an application for loan cancellation and

12  when I received the denial notice, my loans were in forbearance.

13      9.      The denial notice says that I provided insufficient evidence that Sanford-Brown

14  engaged in misconduct related to employment prospects.

15      10.     The denial notice says that I provided insufficient evidence that Sanford-Brown

16  engaged in misconduct related to transferring credits.

17      11.     The denial notice says that I provided insufficient evidence about whether

18  Sanford-Brown engaged in misconduct related to educational services.

19      12.     The denial notice says that I provided insufficient evidence about whether

20  Sanford-Brown engaged in misconduct related to "other."

21      13.     I am shocked and disappointed that the Department completely denied my

22  application. I submitted a lot of evidence with the help of my attorneys. Not only did I submit a

23  lot of evidence, I received a restitution check because the OAG found that Sanford-Brown

24  misled and lied to students, including me.  If what I submitted was not enough for the

25  Department, I don't understand what more I could have provided.

26      14.     I do not know what the Department means by "other."

27      15.     The notification of denial states that I may ask for reconsideration. I am unsure of

28  what additional information I could possibly submit since I submitted so much in my application.

2

AFFIDAVIT

I also cannot tell what evidence I submitted was considered and was found to be deficient, or why it was deficient.

I swear under penalty of perjury that the foregoing is true.

Executed on:   August _13_ , 2020
New York, NY

Yvette Colon

Yvette Colon

AFFIDAVIT

# EXHIBIT A



NEW YORK LEGAL ASSISTANCE GROUP

Navient
P.O. Box 9500
Wilkes-Barre, PA 18773-9500

Cc:    U.S. Department of Education
       FSA Ombudsman Group
       830 First Street, N.E.
       Mail Stop 5144
       Washington, DC 20202-5144


*By Certified Mail*

March 9, 2015

Re: Yvette Colon's Defense to Repayment of Her FFELP Loans, Account # █████████

Dear Navient:

I represent Yvette Colon, whose Federal Family Education Loan Program (FFELP) loans are serviced by Navient. Ms. Colon incurred these loans in connection with her enrollment in the Non-Invasive Cardiovascular Technology certificate program at Sanford-Brown Institute (SBI) in New York.

On behalf of Ms. Colon, I write to assert a defense to the repayment of these student loans. SBI falsely represented that it offered a professional certificate that would lead to Ms. Colon obtaining gainful employment as a cardiac sonographer. In fact, SBI's sonography program lacked the programmatic accreditation necessary for Ms. Colon and others to obtain such work. Only after incurring substantial student loan obligations did Ms. Colon learn that SBI's statements about accreditation were false. Ms. Colon has been unable to find employment in her field of study, or to transfer her credits to a legitimate higher education institution.

Federal law,[1] regulations,[2] and the terms of her Master Promissory Note (MPN) provide Ms. Colon with a complete defense to repayment of her FFELP loans under these circumstances, and entitle her to reimbursement of amounts she has already paid toward her loans, and other relief.

Notably, the Office of the Attorney General of the State of New York (OAG) has already determined that SBI systematically engaged in an illegal pattern of making false and deceptive

---

[1] 20 U.S.C. §§ 1082(a)(5)–(6), 1087e(h).

[2] 34 C.F.R. §§ 30.70, 682.209(g), 685.206(c).

representations to prospective students, in violation of the consumer-protection provisions of New York General Business Law §§ 349 and 350. The OAG's investigation examined the consumer-oriented practices at all SBI campuses in New York state, as well as other campuses in New York operated by SBI's parent company, the Career Education Corporation (CEC). The investigation, which lasted several years, focused on SBI's misleading job placement disclosures, its deception regarding its lack of programmatic accreditation, and its failure to disclose that its graduates generally could not transfer their credits to legitimate institutions. The OAG eventually concluded that CEC violated New York consumer protection law in each of these respects. In August 2013, CEC entered into an Assurance of Discontinuance with the OAG, pursuant to which CEC agreed to make extensive changes in its business practices to remedy its violations of law, and to pay restitution to compensate for its illegal practices.[3]

This application for a defense to repayment is supported by an affidavit, sworn under penalty of perjury, of Ms. Colon,[4] the Assurance of Discontinuance entered into by CEC and the OAG (Assurance or AOD), a declaration, sworn under penalty of perjury, of Ms. Colon's counsel,[5] and other attached Exhibits establishing the misrepresentations of SBI.

## I.    SBI's Misconduct Toward Ms. Colon

SBI induced Ms. Colon to enroll and remain enrolled in the Non-Invasive Cardiovascular Technology program on the basis of several misrepresentations. In short, Program Director Naoufel Brahmi and other SBI representatives repeatedly, falsely assured her that SBI already had, or would obtain, the necessary programmatic accreditation for her to obtain a sonography job upon graduation,[6] and that in any event, she and her classmates were guaranteed to obtain highly-paid sonography jobs — which SBI would help them obtain.[7] SBI representatives also inaccurately informed her that her credits were transferrable to legitimate educational institutions.[8]

Before enrolling at SBI, Ms. Colon had taken some nursing classes at community college,[9] and in 1985 completed a medical assistant certificate program.[10] For more than two decades, she

---

[3] *See In re Career Educ. Corp.*, AOD No. 13-379, Assurance of Discontinuance (Aug. 19, 2013) [attached to Declaration of Jason Glick (Mar. 9, 2015) [hereinafter "Glick Decl."] as Ex. A].

[4] *See* Affidavit of Yvette Colon (Feb. 27, 2015) [hereinafter "Colon Aff."].

[5] *See* Glick Decl.

[6] *See* Colon Aff. ¶¶ 24–26, 31–34.

[7] *See id.* ¶¶ 28, 32.

[8] *See id.* ¶ 52.

[9] *See id.* ¶ 7.

[10] *See id.* ¶ 9.

worked in clinical settings, including an oncology hospital, and private OBGYN and radiology practices.[11] Her responsibilities included assisting with patient care, such as biopsies, pap smears, and Doppler monitoring, as well as office management tasks.[12]

In 2004, while working in a radiology practice, Ms. Colon became interested in pursuing a career in cardiac sonography.[13] She was encouraged by a coworker in the radiology practice, herself a sonographer.[14] Her coworker advised Ms. Colon that it was of paramount importance to attend a properly accredited sonography program, so that she could find work in the field upon graduation.[15]

In addition to the proper accreditation, Ms. Colon sought out programs that would allow her to continue her full-time job. At the time, she was financially responsible for her father and other family members, and was not in a position to give up her income. She therefore looked for a program that offered classes at night.[16] Although her coworker recommended the sonography program at NYU,[17] neither this program nor any of those at community colleges offered evening sessions. Ms. Colon then found information about the Ultrasound Diagnostic School (UDS), which did offer evening classes.[18] Ms. Colon began the enrollment process at UDS in 2004.[19] She ultimately did not begin classes at UDS, however, because of personal and family obligations that arose.[20]

In 2006, when Ms. Colon was ready to pursue sonography studies to launch the next phase of her career, she returned to UDS, only to learn that SBI had taken over the school.[21] If she still wanted to enroll in the Non-Invasive Cardiovascular Technology program, she would need to sign a new contract with SBI, at a higher two-year tuition, $29,825 — approximately $6,830 more than she had agreed to pay UDS.[22]

---

[11] *See id.* ¶¶ 10–14.

[12] *See id.* ¶ 10.

[13] *See id.* ¶ 15.

[14] *See id.* ¶¶ 15–16.

[15] *See id.* ¶ 23.

[16] *See id.* ¶ 17.

[17] *See id.* ¶ 16.

[18] *See id.* ¶ 18.

[19] *See id.*

[20] *See id.* ¶ 19.

[21] *See id.* ¶ 20.

[22] *See id.* ¶ 21.

Before finally deciding to enroll at SBI, Ms. Colon went to SBI to speak with a representative again.[23] At her co-worker's urging, she asked an SBI representative whether the program was accredited for cardiac sonography.[24] The SBI representative said, "Oh yes, we are accredited," and pointed to a plaque on the wall, which had the word "accredited."[25] Ms. Colon accordingly decided to enroll in SBI's Non-Invasive Cardiovascular Technology certificate program (SBI did not offer a degree program in this field of study).[26]

When Ms. Colon went back to SBI to complete her financial aid paperwork, she asked a financial aid representative what salary she could expect to earn in a sonography job upon graduation. The representative informed Ms. Colon that she would definitely get a job as a sonographer when she graduated from SBI, and that she would earn $50,000 to $60,000 annually in that job.[27] Ms. Colon took out substantial debt, including federal and private loans, to pay for her tuition.[28]

Toward the end of the first year of her course of study, Ms. Colon and her classmates heard rumors that graduating students were unable to sit for the industry-standard American Registry for Diagnostic Medical Sonography (ARDMS) certification examination.[29] Alarmed, Ms.

---

[23] *See id.* ¶¶ 22, 24.

[24] *See id.* ¶ 23.

[25] *See id.* ¶ 24.

[26] *See id.* ¶ 25.

[27] *See id.* ¶¶ 27–28.

[28] *See id.* ¶ 4; *see also id.* Ex. A (National Student Loan Data System (NSLDS) data) & Ex. D (Navient statement).

[29] *See* Colon Aff. ¶ 31. As a U.S. Senate Committee explained in a scathing report that documented widespread misconduct by for-profit higher education institutions, a de facto requirement for graduates of certificate programs to obtain employment as a sonographer is successful completion of the licensing examination administered by ARDMS. *See* STAFF OF S. COMM. ON HEALTH, EDUC., LABOR, & PENSIONS, FOR PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 103 & n.411 (July 30, 2012), *available at* http://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf [hereinafter "S. HELP REP." or "Senate HELP Report"]. An individual with a certificate in sonography may only sit for the ARDMS examination in one of two circumstances: if she graduated from a certificate program accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP), or if she has worked full-time, in a paid position as a sonographer for at least a year. *See* ARDMS, *SPI Requirement and General Prerequisites*, at 2, 5 nn.2–3, http://www.ardms.org/files/downloads/Prerequisite_Chart.pdf [Glick Decl. Ex. B]. As noted by the Senate HELP Committee, "most employers seek to hire only registered sonographers," and "gaining work experience in lieu of an accredited degree can be very challenging. Accordingly, while State law does not create an absolute barrier to practicing for students from unaccredited programs, the practical effect can be the same . . . ." *See* S. HELP REP. 102; *see also* Assurance ¶ 32 (describing "catch-22" of graduates of SBI ultrasound programs in finding employment without certification); *see also* Assurance p. 30 nn. 2–3

Colon's classmates raised their concerns with SBI's Director, Dr. Naoufel Brahmi. The Director's response was to visit Ms. Colon's class to assure her and her classmates that they had nothing to worry about, for two reasons. First, although the sonography program was not accredited — the first time that SBI informed Ms. Colon of that fact — SBI was supposedly going through the accreditation process, so Ms. Colon and her classmates would be eligible to take the necessary certification examination. Second, SBI reassured the students that their upcoming externships would lead to ultrasound jobs, so that even if the program did not become properly accredited, they would be eligible to take the certification examination after one year working in the cardiac ultrasound field.[30] Given the Director's comments, Ms. Colon decided to remain enrolled, and to continue into the second year of SBI's program — taking out more loans in the process.[31]

As part of SBI's certificate program, Ms. Colon was assigned to complete two consecutive externships, neither of which led to employment. At her first externship, at NYU,[32] her supervisor repeatedly expressed dismay that unlike externs from other schools,[33] the SBI externs were ill-prepared to work in a clinical setting.[34] Ms. Colon's cohort was the first SBI cohort that NYU accepted for externship placements,[35] and based on NYU's experience with SBI's training, it was also the last cohort.[36] Neither Ms. Colon nor any of her classmates received a job offer from NYU after the externship.[37] Ms. Colon's second externship placement was at a Veteran Affairs Hospital in Manhattan.[38] This externship did not lead to a sonography job.[39] From what Ms. Colon heard from the externship coordinator at each site, those hospitals were not interested in hiring SBI graduates based on the lack of hands-on experience in SBI's curriculum.[40]

---

(qualifying exam and/or credential is "typically necessary" for employment in field where more than 50% of jobs require passage of an exam or possession of a credential).

[30] *See* Colon Aff. ¶¶ 32–33.

[31] *See id.* ¶ 34; *see also* Colon Aff. Ex. A (NSLDS data).

[32] *See* Colon Aff. ¶ 36.

[33] *See id.* ¶ 37.

[34] *See id.* ¶ 38.

[35] *See id.* ¶ 37.

[36] *See id.* ¶ 39.

[37] *See id.* ¶ 40.

[38] *See id.* ¶ 36.

[39] *See id.* ¶ 41.

[40] *See id.* ¶¶ 40–41.

Shortly after earning her certificate in sonography from SBI in May 2008,[41] Ms. Colon attempted to register for the certification exam.[42] About a month later, ARDMS returned her application with a letter stating that she was ineligible to even sit for the exam, because she had not submitted documentation that she had graduated from an accredited sonography program.[43]

Ms. Colon thus faced an insurmountable Catch 22: because of SBI's lack of accreditation, she could only sit for the ARDMS exam if she had job experience.[44] But despite her best efforts,[45] she could not find a job without the ARDMS certification in hand. At every job she applied to, employers asked if she already had her license. After she answered no, she never received a callback.[46]

Nor was SBI of any help. To the contrary, Ms. Colon had to conduct her cardiac sonography job search on her own, because SBI's promises of job placement assistance never materialized. She regularly called SBI to ask if they knew of any available positions,[47] but they never provided her any leads.[48] Frustrated that SBI did not provide the job placement resources that it had guaranteed her when she enrolled, she eventually filed a complaint with the SBI Director, Dr. Brahmi.[49] As a result of that complaint, SBI eventually arranged a single, telephone interview for her. The interviewer, a physician, was unprofessional during the interview, and Ms. Colon had a horrible feeling about the job. She later found out from SBI classmates who went to work for that physician that they had quit after being forced to work twelve-hour days without legally required breaks.[50]

Unable to find work in the cardiac sonography field, Ms. Colon eventually found employment in medical billing — the same sector she worked in before attending SBI.[51] Without a license, she remains ineligible to work in the sonography field.

---

[41] *See id.* ¶ 42; *see also* Colon Aff. Ex. B (SBI Certificate).

[42] *See* Colon Aff. ¶ 48.

[43] *See id.* ¶¶ 49–50; *see also* Colon Aff. Ex. C (ARDMS letter).

[44] *See* Colon Aff. ¶ 51.

[45] *See id.* ¶¶ 43–47.

[46] *See id.* ¶ 47.

[47] *See id.* ¶ 43.

[48] *See id.* ¶ 46.

[49] *See id.* ¶ 44.

[50] *See id.* ¶ 45.

[51] *See id.* ¶ 51.

Furthermore, Ms. Colon made unsuccessful attempts to apply her SBI certificate towards a legitimately accredited credential. During her attendance, SBI representatives repeatedly represented that, upon graduation, Ms. Colon would have the option of transferring her credits toward an associate degree program. But when Ms. Colon attempted to register at Borough of Manhattan Community College in 2008, she learned that these representations were false. Her SBI credits were not transferable, because SBI as an institution did not have the accreditation necessary for other, legitimate institutions to accept her credits.[52]

## II.    SBI Repeatedly Violated Ms. Colon's Rights Under New York Law

SBI's unfair and misleading conduct toward Ms. Colon constituted an ongoing series of violations of New York's General Business Law § 349 (GBL). That statute prohibits "[d]eceptive acts or practice in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.[53] This consumer protection statute was adopted "to even the playing field" between consumers and "better funded and superiorly situated fraudulent businesses."[54]

"A plaintiff under [GBL] section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."[55]

There can be no question that SBI's entire interaction with Ms. Colon was "consumer oriented." New York courts have repeatedly held that companies selling post-secondary educational services engage in "consumer-oriented" conduct within the scope of section 349.[56] Moreover, the existence of the OAG investigation into SBI's conduct (to which Ms. Colon was subject) and the subsequent Assurance of Discontinuance provide indisputable proof of the consumer-oriented nature of SBI's misconduct. The OAG is authorized, "in the name of and on behalf of the people of the state of New York," to act against "any person, firm, corporation or association" who "has engaged in or is about to engage in" acts proscribed by section 349.[57] By committing its scarce resources to investigate and prosecute SBI, the OAG necessarily

---

[52] *See id.* ¶ 52.

[53] *See* N.Y. Gen. Bus. Law § 349(a).

[54] *See Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995) (internal quotations omitted).

[55] *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).

[56] *See, e.g.*, *Ansari v. N.Y. Univ.*, No. 96 Civ. 5280, 1997 WL 257473 (S.D.N.Y. May 16, 1997); *Moy v. Adelphi Inst., Inc.*, 886 F. Supp. 696 (E.D.N.Y. 1994); *Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 58 (1st Dep't 2012); *Enzinna v. D'Youville Coll.*, 946 N.Y.S.2d 66 (Sup. Ct. 2010), *aff'd*, 922 N.Y.S.2d 729 (4th Dep't 2011); *Chais v. Technical Career Insts.*, No. 0114949/2001, 2002 WL 34433891 (N.Y. Sup. Ct. 2002); *Bevelacqua v. Brooklyn Law Sch.*, 975 N.Y.S.2d 365 (Sup. Ct. 2013).

[57] N.Y. Gen. Bus. Law § 349(b).

determined that the conduct in question affected the public interest and consumers at large. This conduct is therefore presumptively consumer-oriented conduct within the meaning of GBL § 349.[58]

Moreover, the OAG has already made official findings that several of CEC's practices toward students and prospective students "constitute[d] repeated violations of General Business Law Article 22-A," including section 349 — *i.e.*, these practices were "consumer-oriented," materially deceptive and misleading, and injured students.[59]

Specific to Ms. Colon, three specific aspects of SBI's consumer-oriented conduct were materially misleading and injured Ms. Colon. First, SBI misrepresented and omitted crucial information about its programmatic accreditation status, which led Ms. Colon to believe that the program would permit her to sit for the necessary credentialing exam, and had the potential to lead to gainful employment in her field of study. Second, SBI misled Ms. Colon about the job placement assistance it would provide her and the types of jobs she supposedly was guaranteed to find, and failed to provide the job placement assistance that might have enabled Ms. Colon to obtain employment in her field notwithstanding the fact that SBI lacked the necessary accreditation. Third, SBI gave Ms. Colon patently false information about the transferability of its credits, leaving her unable to pursue further education at a reputable and affordable institute of higher education without starting from scratch.

### A.  SBI Violated New York's GBL by Deceiving Ms. Colon About Its Programmatic Accreditation Status

The overlap — indeed, identity — between Ms. Colon's own experience with SBI, and the OAG's findings that SBI regularly presented false and misleading information to prospective and current students concerning programmatic accreditation, compels the conclusion that SBI violated the GBL in relation to Ms. Colon.

SBI's representations to Ms. Colon about its accreditation status were unquestionably false and misleading. Before Ms. Colon ever enrolled at SBI, she sought assurances that SBI was properly accredited. Not only did SBI deceive her about its accreditation status before she enrolled, but SBI continued to engage in a pattern of deceptive conduct to cover up its lack of programmatic accreditation, when the Director falsely assured Ms. Colon and her classmates that that SBI had any control over the supposedly ongoing CAAHEP accreditation process and that the students would be able to obtain jobs regardless of the accreditation outcome.

---

[58] *See Vitolo v. Mentor H/S, Inc.*, 213 F. App'x. 16 (2d Cir. 2007) (interpreting GBL § 349) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 56 F.3d 256, 264-65 (2d Cir. 1995)).

[59] *See* Assurance ¶¶ 1–43.

In fact, as CEC's Vice President of Regulatory Review has admitted, SBI's Non-Invasive Cardiovascular Technology program "has never been programmatically accredited."[60] Yet, during the entire time Ms. Colon was enrolled at SBI, SBI's website never disclosed the Non-Invasive Cardiovascular Technology program's lack of accreditation. In fact, it suggested the opposite. For example, around the time Ms. Colon first enrolled, SBI's website advertised the Non-Invasive Cardiovascular Technology program as an "exciting . . . career training program," "designed to prepare students for entry-level jobs in the healthcare field that may involve . . . [p]erforming non-invasive cardiovascular procedures," and made no mention of the lack of accreditation.[61] The website was updated in March 2008 to disclose, for the first time, that SBI "[could not] guarantee that graduates will be eligible to take certification exams at all or at any specific time."[62] Even still, the website made no mention of the fact that the program lacked CAAHEP accreditation. Even with the updated website, then, and for the entire time that Ms. Colon was enrolled at SBI, SBI was in violation of the Federal Trade Commission (FTC) requirement that when a vocational school "offers courses or programs of instruction that are not accredited, all advertisements or promotional materials pertaining to those courses or programs, and making reference to the accreditation of the school, should clearly and conspicuously disclose that those particular courses or programs are not accredited."[63] Similarly, SBI violated the federal regulatory requirement that higher education institutions refrain from making "false, erroneous or misleading statements concerning . . . [t]he particular type(s), specific source(s), nature and extent of [their] institutional, programmatic, or specialized accreditation."[64]

---

[60] *See* E-mail from Jill A. DeAtley, Vice President of Regulatory Review, Career Educ. Corp. (Aug. 19, 2013) [Glick Decl. Ex. C]. SBI's archived websites also make clear that SBI-New York lacks CAAHEP accreditation. *See, e.g.*, *Accreditation and Certification*, SANFORD-BROWN (Apr. 2, 2010), http://web.archive.org/web/20100402035756/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (not listing SBI's New York campus as among CAAHEP-accredited programs) [Glick Decl. Ex. D]; *Accreditation and Certification*, SANFORD-BROWN (Jan. 11, 2011), http://web.archive.org/web/20110111064842/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (same) [Glick Decl. Ex. E]; *Accreditation and Licensure*, SANFORD-BROWN (Nov. 6, 2013), http://web.archive.org/web/20131106061316/http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification (not listing SBI's New York campus as among CAAHEP-accredited Cardiovascular Sonography/Technology programs) [Glick Decl. Ex. F].

[61] *See Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Oct. 23, 2006), https://web.archive.org/web/20061023183826/http://www.sbnewyork.com/programs/cardiovascular.asp [Glick Decl. Ex. G]; *Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Aug. 17, 2007), https://web.archive.org/web/20070817072236/http://www.sbnewyork.com/programs/cardiovascular.asp [Glick Decl. Ex. H].

[62] *See Non-Invasive Cardiovascular Technology*, SANFORD-BROWN (Mar. 19, 2008), https://web.archive.org/web/20080319002138/http://www.sanford-brown.edu/campus/59/programs.asp?map=18 [Glick Decl. Ex. I].

[63] *See* 16 C.F.R. § 254.3(a)(1) (2005) (version in effect at the time of SBI's misrepresentations to Ms. Colon).

[64] *See* 34 C.F.R. § 668.72(a).

Moreover, the limited "disclosure" that SBI did provide to Ms. Colon was itself highly deceptive and misleading. For example, SBI claimed — in direct contradiction to the OAG's and Senate HELP Report's conclusions — that "programmatic accreditation is not required for employment in most cases."[65] SBI also explained only in general terms that several of its programs were "not currently programmatically accredited,"[66] and failed to disclose "clearly and conspicuously,"[67] as the OAG requires, that Ms. Colon's specific program, in Non-Invasive Cardiovascular Technology at the New York campus, lacked programmatic accreditation. The "disclosure" template provided to Ms. Colon presumably would fail to satisfy the terms of the Assurance that CEC is now enjoined to follow, to prevent future violations of the GBL.[68] In any event, New York's highest court has unequivocally held that an inadequate disclaimer is insufficient to defeat a GBL claim where oral representations contradict the substance of the disclosure.[69]

The OAG found, consistent with Ms. Colon's experience, that SBI's disclosures about programmatic accreditation were misleading,[70] and misleading in a way that violated the GBL. According to the OAG, SBI's "graduates faced a 'Catch 22'" in that "most employers viewed certification as a requirement for employment, but graduates were ineligible for certification until they obtained one year of employment."[71]

---

[65] *See* SBI, "Accreditation/Certification Information" (June 26, 2006) [Glick Decl. Ex. J].

[66] *See id.*

[67] *See* Assurance p. 31.

[68] Assurance ¶ 37, p. 31 (emphasis added); *see id.* p. 31 (requiring that CEC "clearly and conspicuously" disclose to all prospective students: if a program lacks programmatic accreditation; that graduates of such programs "are not able to sit for certain qualifying exams typically necessary for employment immediately upon graduation or are unable to become registered, licensed, or otherwise credentialed, as applicable, due to the program's or institution's lack of accreditation[;] and that such registration, license, or other credential is typically necessary for employment").

[69] *See Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y. 2d 330, 345 (1999) (GBL standard is whether, considering a defendant's overall course of deception along with any "disclaimers," "reasonable consumers would be misled in a material way").

[70] According to the OAG, SBI, among other CEC institutions, "failed to adequately disclose to prospective and current students that" its health services programs, including the Cardiovascular Sonography program attended by Ms. Colon, "[1] were not programmatically accredited; [2] that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation, and [3] that graduates' inability to sit for these exams could negatively affect their employment opportunities." Assurance ¶¶ 32–33. SBI's failure "to provide clear and conspicuous disclosures concerning the programmatic accreditation status of SBI programs on its websites" constituted an additional GBL violation. *Id.* ¶¶ 34–37, 43.

[71] *See id.* ¶ 32; *accord* S. HELP REP. 103, 106–08.

The OAG's conclusion — that SBI's misrepresentation of its programmatic accreditation violated the GBL — is consistent with similar conclusions in similar circumstances. Courts have unanimously held that ultrasound schools' misrepresentations about programmatic accreditation violate consumer protection statutes, and in particular, constitute materially misleading representations. For example, New Jersey's appellate court has held that a graduate of an ultrasound program stated a cause of action for the violation of a consumer protection statute when: (1) a school not accredited by CAAHEP failed to disclose that graduates could not sit for an ARDMS examination; and (2) the school's dean told a student during her course of study that "she did not need to worry about" ARDMS certification until after graduation.[72] The court held that such "affirmative misrepresentations . . . satisf[ied] the criteria for materiality" under the relevant consumer protection statute.[73] Similarly, a California Court of Appeal upheld a judgment for fraud against an ultrasound school director who informed students that upon completion of a non-CAAHEP-accredited program, they would be able to "obtain positions as ultrasound technicians" and be eligible to take and pass the ARDMS exam.[74] Scores of cases are in accord.[75]

The OAG's conclusion is also consistent with federal law. Specifically, the FTC's Guides for Private Vocational and Distance Education Schools similarly provides that an institute of higher education carries out "deceptive" conduct when it "misrepresent[s], directly or indirectly, the extent or nature of . . . accreditation by an accrediting agency or association."[76] New York courts, in turn, follow the FTC's interpretations as a persuasive guide to determine which deceptive acts and practices violate New York's GBL.[77]

---

[72] *Suarez v. E. Int'l Coll.*, 50 A.3d 75, 80 (N.J. Super. Ct. App. Div. 2012).

[73] *See id.* at 90.

[74] *See Chen v. Instit. of Med. Educ.*, No. 1-11-cv205651, 2014 WL 5409153, at *10 (Cal. Ct. App. Oct. 24, 2014).

[75] *See, e.g.*, *Illinois v. Alta Colls., Inc.*, No. 14-c-3786, 2014 WL 4377579 (N.D. Ill. Sept. 4, 2014) (denying motion to dismiss consumer protection claims based on allegations, *inter alia*, that school falsely informed students that it was accredited); *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 14 (1st Cir. 2004) ("actionably misleading" for a school official to mislead a student to believe that the school could guarantee the outcome of an external accreditation process); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226 (E.D. Pa. 1999) (certifying consumer protection class claims brought by UDS students unable to obtain work or sit for the ARDMS exam because UDS lacked CAAHEP accreditation); *Cavaliere v. Duff's Bus. Instit.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (recognizing cause of action where a "school has asserted that it is accredited or licensed . . . and it is later discovered that this is false"); *Malone v. Acad. of Court Reporting*, 582 N.E.2d 54, 58–59 (Ohio Ct. App. 1990) ("recogniz[ing] . . . that an action for misrepresentation would lie for untrue or misleading statements about accreditation").

[76] 16 C.F.R. § 254.3(a) (2005).

[77] *See, e.g.*, *People ex rel. Spitzer v. Applied Card Systems, Inc.*, 805 N.Y.S.2d 175, 178 (3d Dep't 2005) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)).

### B.  SBI Violated New York's GBL by Misleading Ms. Colon About Its Job Placement Assistance

SBI further violated the GBL when it misled Ms. Colon about the job placement assistance it would provide and the types of jobs she supposedly was guaranteed to find, and failed to provide the job placement assistance that might have enabled Ms. Colon to obtain employment in her field notwithstanding the fact that SBI lacked the necessary accreditation. SBI materially misrepresented to Ms. Colon the job placement assistance it would provide, and her likelihood of obtaining a job in her field of study.

First, before she enrolled, an SBI representative informed Ms. Colon that she "would definitely get a job as a sonographer" when she graduated from SBI, and that she would earn $50,000 to $60,000 annually in that job.[78] Second, SBI's Director falsely claimed that Ms. Colon's and her classmates' externships would lead to permanent jobs in the ultrasound field. Finally, SBI provided virtually none of the job placement assistance it had promised; what little assistance it did provide came only at Ms. Colon's insistence and in the form of a single referral to a physician with a dubious reputation.

SBI's misconduct toward Ms. Colon is typical of its business model as a whole. For example, notwithstanding its lack of programmatic accreditation, at the time of Ms. Colon's enrollment, SBI's website touted as among the "Top Ten" reasons for attending SBI both: 1) "Career Placement Assistance with healthcare industry contacts to help Sanford-Brown students with professional career development and job opportunities" and 2) "**Have the opportunity to gain industry-current job skills to help make you marketable and employable in the healthcare or medical field.**"[79]

These practices are materially misleading. Ms. Colon attended SBI precisely because she reasonably believed, based on SBI's representations, that SBI's program would allow her to advance her career in the medical field. During her tenure as a student, SBI perpetuated the impression that her sonography certificate would lead to a permanent job. But SBI's promised job placement assistance never materialized — in retrospect, perhaps unsurprisingly, in light of the fact that SBI knew the certificate was virtually meaningless given SBI's lack of programmatic accreditation.

---

[78] *See* Colon Aff. ¶ 28.

[79] *See Top Ten Reasons to attend SBI New York*, SANFORD-BROWN (Oct. 23, 2006), http://web.archive.org/web/20061023183837/http://www.sbnewyork.com/topten.asp (emphasis in the original) [Glick Decl. Ex. K].

The OAG, moreover, has already found that similar misconduct by CEC, including at SBI campuses, violates the GBL.[80] As the OAG has explained, "[s]tudents choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly," the OAG found, representations to students about job outcomes and job "placement rate[s] is an important factor in students' decision to enroll in and complete CEC programs."[81]

Indeed, proprietary schools such as SBI are permitted to participate in the Title IV loan program only on the condition that such institutions comply with all statutory and regulatory requirements,[82] including that they "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation."[83] For that reason, federal regulations prohibit an institution of higher education from making "false, erroneous or misleading statements concerning . . . [t]he institution's plans to maintain a placement service for graduates or otherwise assist its graduates to obtain employment[, and t]he institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared."[84]

### C.  SBI Violated New York's GBL by Misleading Ms. Colon About The Transferability of SBI's Credits

Finally, SBI violated the GBL by deceiving Ms. Colon about the transferability of SBI's credits. SBI representatives misled Ms. Colon that she could transfer her credits toward an associate degree program at another institution. Such misrepresentations by CEC — the OAG has already found — constitute violations of the GBL.[85]

Contrary to SBI's representations to Ms. Colon, SBI's credits were not transferrable to most public and non-profit degree granting educational institutions, because those institutions are

---

[80] *See* Assurance ¶¶ 19–22, 43.

[81] *See id.* ¶ 20.

[82] *See* 34 C.F.R. § 668.14(a), (b)(1).

[83] *See* 20 U.S.C. § 1002(b)(1)(A)(i). Each of SBI's job-placement-related deceptive practices individually — and certainly taken as a whole — also violate the FTC's Guidelines. *See* 16 C.F.R. § 254.4(a)(3) (2005) (providing that it is "deceptive" for a proprietary school to "[m]isrepresent the availability of employment while the student is undergoing instruction or the role of the school in providing or arranging for such employment"); *id.* § 254.4(d) ("deceptive" for a proprietary school to "misrepresent . . . the availability of employment after graduation from a course of training, the success that the member's graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment").

[84] *See* 34 C.F.R. § 668.74(b), (c).

[85] *See* Assurance ¶¶ 38–40, 43.

"regionally, rather than nationally, accredited."[86] CEC, in contrast, was nationally accredited. Thus, as the OAG has explained, "credits earned at CEC's nationally-accredited schools are generally not transferrable to public and non-profit degree-granting educational institutions."[87] And as the OAG has found, corroborating Ms. Colon's own experience, "CEC enrollment representatives fail to adequately disclose to prospective students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions."[88]

Both the FTC's and the U.S. Department of Education's regulations alike recognize that proprietary schools engage in materially misleading conduct when they deceive students about the transferability of credits. For example, the FTC recognizes that a proprietary school acts deceptively when the school "[m]isrepresent[s] that students successfully completing a course or program of instruction can transfer the credit to an accredited institution of higher education."[89] And a higher education institution violates the Higher Education Act when it makes "false, erroneous or misleading statements concerning . . . [w]hether a student may transfer course credits earned at the institution to any other institution."[90]

### D. Ms. Colon Suffered Injury as a Result of SBI's Materially Misleading and Deceptive Acts

Ms. Colon's injury from SBI's misconduct takes several forms.

First and foremost, based on SBI's misrepresentations,[91] Ms. Colon enrolled in, and decided to remain enrolled at, SBI, which drew down approximately $14,838 in Stafford loans in Ms. Colon's name in 2006 and 2007. Despite the payments Ms. Colon has already made, that amount, including interest, has since ballooned to an outstanding federal loan balance for Ms. Colon of $22,130.96.[92]

---

[86] *See id.* ¶ 38.

[87] *See id.*

[88] *See id.* ¶ 39.

[89] *See* 16 C.F.R. § 254.3(a)(3) (2005).

[90] *See* 34 C.F.R. § 668.72(b)(1).

[91] Although "reliance is not an element of a [GBL] section 349 claim," *see Stutman*, 95 N.Y.2d at 29, the fact that Ms. Colon did rely on SBI's misrepresentations establishes that in her case, SBI's "'material deceptive act[s]' caused [her] injury," *see id.* Other students may be able to establish causation and injury under the GBL, and accordingly, defenses to repayment, notwithstanding their lack of reliance.

[92] *See* Colon Aff. Ex. D (Navient Statement).

Second, given the extraordinary cost of SBI's program, Ms. Colon was also forced to take out additional private loans to cover that portion of tuition that exceeded maximum annual federal loan allowances,[93] and to cover living expenses when she had to quit her job to complete required externships. With interest, that separate loan balance now totals $29,284.13.

Third, SBI's deceptive course of conduct about its lack of programmatic accreditation induced Ms. Colon to enroll in its program, rather than an accredited program, and thereby prevented Ms. Colon from obtaining a job in her chosen field of study. While SBI was enriched by the student loans disbursed at Ms. Colon's expense, Ms. Colon was left stymied in her efforts to advance in her career, and remains employed in the same career, medical billing, as before she became indebted to SBI. Had SBI not lured Ms. Colon into its unscrupulous program, she could have invested her time in a course of study at an accredited institution. This non-pecuniary harm, attributable to SBI's deceptive and illegal practices, is another form of injury under New York law.[94]

Moreover, as discussed throughout this request, in 2013, the OAG made findings concerning CEC's "repeated violations" of the GBL, including at SBI's New York location, based on SBI's deceptions about its lack of programmatic accreditation, its misleading disclosures about job placement, and its deceptive statements about the transferability of SBI credits.[95] Pursuant to the OAG's Assurance of Discontinuance with CEC, SBI graduates such as Ms. Colon who had enrolled in SBI's programs lacking programmatic accreditation and met other qualifications were entitled to receive restitution from a limited fund.[96] Ms. Colon in fact received $3,094.93 from that fund, as very limited and partial restitution for SBI's wrongdoing. Her qualification for restitution under the OAG's Assurance with SBI's parent company reinforces that she was in fact injured by SBI's misconduct.

In light of the foregoing, in all practical senses, Ms. Colon's degree is practically worthless. The difference between what she was promised and what she actually obtained as a result of attending SBI is cognizable under the GBL.[97]

---

[93] CEC has acknowledged that the Department of Education's "maximum annual borrowing limits with respect to Stafford Loans . . . are generally less than the tuition costs" at its schools. *See* Career Educ. Corp., Annual Report (Form 10-K) (Feb. 28, 2008), *available at* https://www.sec.gov/Archives/edgar/data/1046568/000119312508041800/d10k.htm.

[94] *See Stutman*, 95 N.Y.2d at 29 (both pecuniary and non-pecuniary harm satisfy the GBL's injury requirement).

[95] *See* Assurance ¶¶ 1–43.

[96] *See* Assurance pp. 35–37.

[97] A plaintiff suffers compensable injury under section 349 when his or her "expectations were actually not met" in a consumer transaction. *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 212 (2001). In New York, plaintiffs "adequately allege…injury or damage" under section 349 where they "have

### III.    Ms. Colon Has a Complete Defense to the Repayment of Her FFELP Loans

SBI lured Ms. Colon into enrolling on false pretenses; prolonged her enrollment through repeated material misrepresentations; and left her with a worthless certificate. Under federal law and the terms of her MPN, and given SBI's relationship with the lender for Ms. Colon's FFELP loans, Ms. Colon has a complete defense to the repayment of her FFELP loans based on SBI's violations of New York law.

### A. Federal Regulations and the Mastery Promissory Note Establish Ms. Colon's Right to a Defense to Repayment Based on SBI's Misconduct

For decades, the Department has recognized the Secretary's "long-standing authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."[98] Consistent with that authority, Congress also squarely contemplated that under these circumstances, borrowers such as Ms. Colon would not be required to repay their FFELP loans. Pursuant to the Higher Education Amendments of 1992, "Congress . . . directed the Secretary to develop a 'Common Guaranteed Student Loan Application Form and Promissory Note' specifying the contractual terms governing [FFELP] student loans, and to study the possibility of permitting students to raise fraud-based state law defenses against repayment of student loans."[99] Directly in response to Congress's directive, "the Secretary prepared a common promissory note and included in it a provision modeled on the FTC Holder Rule that was directed specifically at lenders affiliated with for-profit schools."[100]

That promissory note provides:

> If this loan is made by the school, or if the proceeds of this loan are used to pay tuition and charges of a for-profit school that refers applicants to the lender, or that is affiliated with the lender by common control, contract or business

---

alleged that they each were induced to part with [thousands of dollars] in tuition by defendant's alleged misrepresentations of fact and/or unfulfilled promises" about the value of educational programs. *Enzinna*, 946 N.Y.S.2d 66, at *4; *see also Brown v. Hambric*, 638 N.Y.S.2d 873, 877 (Yonkers City Ct. 1995) (plaintiff sufficiently alleged injury under section 349 where she paid hundreds of dollars "for educational services" that defendant represented would "provide the training and education necessary to become a professional travel agent," when in fact it did not).

[98] *See* 60 Fed. Reg. 37,768, 37,769 (July 21, 1995) (quoting 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994)) (discussing FFELP loans).

[99] *See Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1365 (D.C. Cir. 1999) (citing Pub. L. No. 102-325)); *see also* 60 Fed. Reg. 37,768, 37,769.

[100] *See Armstrong*, 168 F.3d at 1365.

arrangement, *any holder of this Note is subject to all claims and defenses which I could assert against the School*.[101]

Federal regulations codify this Master Promissory Note language and provide that any entity

holding a [FFELP] loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan if—

(1) The loan was made by the school or a school-affiliated organization;
(2) The lender who made the loan provided an improper inducement, as described in paragraph (5)(i) of the definition of Lender in § 682.200(b), to the school or any other party in connection with the making of the loan;
(3) The school refers borrowers to the lender; or
(4) The school is affiliated with the lender by common control, contract, or business arrangement.[102]

Federal law and regulations governing defenses to repayment of Direct Loans based on schools' violations of state or federal law also inform the availability of a defense to Ms. Colon's repayment of her FFELP loans under these circumstances.[103] And the Secretary recently confirmed that a Direct Loan borrower may assert a defense to repayment even when the loan is not delinquent. In a letter to several Senators, including Elizabeth Warren, dated August 4, 2014, concerning Corinthian Colleges, Secretary Duncan wrote, "[A] borrower who is not in default can also assert a claim that the loan is not legally enforceable on the basis of a claim against the school. To do so, the borrower should present the claim to the servicer handling the Direct Loan for the Department."[104]

As thoroughly described above, Ms. Colon has demonstrated the requisite misconduct by SBI that entitles her to a defense to the repayment of her federal loans.[105] The affidavits of Ms. Colon

---

[101] *See* "Application and Promissory Note," subsection "Governing Law and Notices" (attachment to "Dear Colleague" letter (Apr. 16, 1993)) (emphasis added) [Glick Decl. Ex. L].

[102] *See* 34 C.F.R. § 682.209(g); *see also* Letter from Acting Asst. Sec'y Whitehead to Congressman Stephen Solarz (May 19, 1988) (explaining the Department's longstanding position that even before the 1992 Higher Education Act amendments, "[i]f a loan is not legally enforceable, it is not reinsurable by the Department") [Glick Decl. Ex. M].

[103] *See* 20 U.S.C § 1087e(h); 34 C.F.R. § 685.206(c).

[104] Letter from Sec'y Duncan to Sen. Warren, at 4 (Aug. 4, 2014). The Direct Loan regulations are also persuasive given that in other contexts, the Secretary has explained the absence of a regulation under the FFEL loan program does not mean that FFEL loans are not subject to state law defenses to repayment. *See* 71 Fed. Reg. 45,666, 45,676–77 (Aug. 9, 2006) (discussing identify theft false certification discharge). Moreover, the Department has explained that the "Direct Loan regulations are intended to ensure that institutions participating in the FFEL and Direct Loan programs have a similar potential liability." *See* 60 Fed. Reg. 37,768, 37,769.

[105] *See* 34 C.F.R. § 682.209(g); 34 C.F.R. § 685.206(c).

and her counsel, and the exhibits thereto, including the Assurance of Discontinuance between OAG and CEC, all point unmistakably to SBI's conduct that renders her FFELP loans unenforceable.

As the Department has recognized, a "borrower is not required to sue or obtain a judgment against [a] school in order to assert [a] claim against the school as a defense to repayment."[106] Even so, Ms. Colon's claims are all the stronger given the OAG's definitive findings regarding CEC's misconduct. The Department has also explained that a "borrower or class of borrowers who obtain a judgment against a school upholding a claim can more readily establish that claim as a defense to repayment."[107] Here, the Assurance stands in lieu of a judgment, and represents the OAG's determination — and CEC's acquiescence to that determination — that CEC had violated New York law.[108]

## B. CEC's Relationship with Sallie Mae Entitles Ms. Colon to Invoke the Holder Rule

As set forth above, there are four independent scenarios under which a FFELP borrower such as Ms. Colon is entitled, under federal law and the Master Promissory Note, to assert, against any current loan holder, a claim that the borrower could assert directly against the school.[109] Each of those four scenarios is satisfied here.

Most evidently, SBI "referred [Ms. Colon] to the lender" of her FFELP loans (and incidentally, her private loans), Sallie Mae, pursuant to a preferred lender relationship.[110] As

---

[106] Letter from Sec'y Duncan to Sen. Warren, at 4 (Aug. 4, 2014).

[107] *Id.*

[108] New York decisional law supports the proposition that, even absent an express admission of wrongdoing, a duly executed Assurance of Discontinuance serves to prove, "as a matter of law," that acts set forth in the AOD constitute violations of the law. *Geiger v. Town of Greece*, No. 07 Civ. 6066, 2007 WL 4232717, at *6 (W.D.N.Y. Sept. 4, 2007); *see also Millenium Partners, L.P. v. Select Ins. Co.*, 24 Misc. 3d 212, 218 (Sup. Ct. N.Y. Cty. 2009) (finding AOD not "susceptible to any other interpretation" than that the defendant violated the law in question). The very authority of the OAG to enter into the Assurance with CEC is predicated on the conduct identified, and in the future restrained, being illegal. The OAG is authorized by New York Executive Law, in lieu of prosecuting a civil action or proceeding as authorized by any law of the state, to "accept an assurance of discontinuance of any act or practice in violation of such law *from any person engaged or who has engaged in any such act or practice.*" N.Y. Exec. Law § 63(15) (emphasis added). Although CEC was not required to concede its liability under the AOD, *see* Assurance p. 14 (setting forth that CEC "neither admits nor denies OAG's Findings"), CEC agreed not to challenge, contest, or otherwise contradict that the OAG's findings were supported by the evidence, *see id.* p. 39 (preventing CEC from "denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis").

[109] *See* 34 C.F.R. § 682.209(g).

[110] *See id.* § 682.209(g)(3); FFELP Federal Stafford Loan MPN (July 8, 2006) [Glick Decl. Ex. N].

stated in her affidavit, when Ms. Colon filled out her financial aid paperwork in 2006, SBI chose the FFELP lender for Ms. Colon, and did not permit her any opportunity to select the lender.[111] And as the Department has unambiguously explained — consistent with the plain text of the regulation — "the Holder Rule applies where a school recommends a particular lender."[112]

Moreover, the safe harbor provision that may be available in some situations, when a "lender has a good-faith belief that [there was] no recommendation" by the school of a particular lender, has no applicability here.[113] As the Department has also explained, "a lender that sends the school promotional material regarding its lending activity would have good reason to believe that loan applications it receives from that school were the result of school recommendation," and therefore no "good-faith belief" that no school recommendation occurred.[114] The following facts vitiate any possibility that Sallie Mae could have such a good-faith belief.

Around the time that SBI chose Sallie Mae as the lender for Ms. Colon's loans, Sallie Mae widely touted that its "sales force, which works with financial aid administrators on a daily basis, [was] the largest in the industry," and that schools' "financial aid office[s]" were Sallie Mae's "primary marketing point-of-contact" for its lending activity, especially at "for-profit schools."[115]

Unsurprisingly, given Sallie Mae's aggressive marketing activity, CEC's schools included Sallie Mae on their preferred lender list. In fact, in 2007, following an investigation of CEC's and other institutions' lending practices, the OAG and the Office of the Illinois Attorney General jointly determined that Sallie Mae and another lender had paid more than $21,000 to CEC, while those lenders were on CEC's preferred lender list, in violation of New York's GBL and Illinois consumer protection statutes.[116] The Attorneys General explained that CEC's misconduct, by

---

[111] *See* Colon Aff. ¶ 30 & Exs. A & D (showing NSLDS data, including lender information). The successor in interest to Ms. Colon's original FFELP lender is "Deutsche Bank ELT Navient & SLM Trusts." *See id.* Ex. A. As an eligible lender trustee (ELT), Deutsche Bank acts as a trustee to Navient and SLM, successors in interest to Sallie Mae. *See, e.g.*, 20 U.S.C. § 1085(d)(7).

[112] U.S. Dep't of Educ., *Overview: Federal Trade Commission (FTC) Holder Rule*, at 3 (July 2, 1993) [hereinafter "*Overview: Holder Rule*"] [Glick Aff., Ex. O].

[113] *See id.*

[114] *See id.*

[115] *See* SLM Corp., Annual Report 12 (10-K) (Mar. 1, 2007), *available at* http://www.sec.gov/Archives/edgar/data/1032033/000095013307000881/w30676e10vk.htm. Sallie Mae pointed to the fact that its "FFELP and private originations at for-profit schools have grown faster than at traditional higher education schools due to enrollment trends as well as [its] increased market share of lending to these institutions." *Id.*

[116] *In re Career Educ. Corp.*, Agreement on Code of Conduct ¶ 14 (Apr. 16, 2007), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2007_04/Agreement%20CEC%20Final.pdf [Glick Decl. Ex. P]; Ill. Att'y Gen., *Madigan Announces Student Loan Agreements – Schools to Adopt New College Code of Conduct* (Apr. 23, 2007), http://www.illinoisattorneygeneral.gov/pressroom/2007_04/20070423.html [Glick Decl. Ex. Q]; Sam

accepting Sallie Mae's donation, came amidst "industry-wide" misconduct involving schools "neglect[ing] to make clear that borrowers have a right to select the Stafford Loan . . . lender of their choice."[117] Similarly, CEC soon thereafter acknowledged that the "majority of non-recourse private loans received by" CEC students in 2005 to 2007 "were provided by" Sallie Mae.[118]

Nor was CEC's preferred-lender-relationship misconduct isolated to New York and Illinois. The Bureau of Consumer Protection of the Office of Attorney General in Pennsylvania, for example, also determined that another of CEC's campuses improperly used a preferred lender list, and among other consumer protection violations, "rushed students through the loan financing process."[119]

Given Sallie Mae's status as a preferred lender, its sophisticated marketing campaign to schools including CEC, and its payments to CEC, it would strain credulity that Sallie Mae "had no direct communication with" CEC "about loan availability," such that Sallie Mae could have a "good-faith belief" that the loan applications it received from CEC on behalf of Ms. Colon and other applicants "were not the result of a school recommendation."[120]

Moreover, in light of the well-documented business relationship between CEC and Sallie Mae, Ms. Colon satisfies each of the other three independent avenues for invoking the Holder Rule. First, given Sallie Mae's donations to CEC around the time SBI chose Sallie Mae as Ms. Colon's lender, Sallie Mae "provided an improper inducement . . . to the school."[121] Second, for the same reasons, SBI and Ms. Colon's lender were "affiliated . . . by . . . business arrangement."[122] Finally, on the same facts, Sallie Mae constitutes a "school-affiliated organization," such that Ms. Colon's FFELP loans were "made by . . . a school-affiliated organization."[123]

---

Dillon, *In U.S. Absence, States Take Lead in Student Loan Cases*, N.Y. TIMES (Apr. 24, 2007), http://www.nytimes.com/2007/04/24/education/24loans.html.

[117] Agreement on Code of Conduct ¶ 8.

[118] *See* Career Educ. Corp., Annual Report 20 (Form 10-K) (Feb. 28, 2008).

[119] *See id.* at 108; *PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues* (Feb. 20, 2008), http://www.prnewswire.com/news-releases/pa-attorney-general-corbett-announces-200000-settlement-in-lehigh-valley-college-probe-funds-will-support-new-statewide-education-program-for-consumer-credit-issues-57034552.html [Glick Decl. Ex. R].

[120] *Cf. Overview: Holder Rule*, at 3.

[121] *See* 34 C.F.R. § 682.209(g)(2).

[122] *Id.* § 682.209(g)(4).

[123] *See id.* § 682.209(g)(1).

Ms. Colon has satisfied each of the four independent criteria of a school-lender affiliation, as a prerequisite to invoking the Holder Rule. SBI's misconduct therefore stands as a bar to the enforceability of her FFELP loans.

## IV.    Conclusion

For the foregoing reasons, Ms. Colon has established and corroborated causes of action against SBI for its numerous GBL violations. She accordingly requests that, in accordance with federal law and the terms of her Master Promissory Note, Navient and/or the Department recognize her complete defense to the repayment of her student loans, and immediately and permanently cease any attempt to collect on these loan obligations. Ms. Colon further requests that Navient and/or the Department: reimburse her for amounts already paid (voluntarily or involuntarily) towards these unenforceable and invalid student loans; restore her ability to receive federal student aid; and remove any negative reports associated with her SBI student loans from the reports of any consumer credit reporting agency. Finally, Ms. Colon requests that the Department initiate proceedings against CEC to recoup amounts nullified under her loan obligations as a consequence of this request.[124]

Thank you for your attention to this matter. Should you have any questions, please contact me or my colleague as listed below. If I do not receive any communication from you within thirty days, I shall consider your non-response a constructive denial and shall pursue an appeal accordingly.

Sincerely,

Eileen Connor
ecounor@nylag.org
(212) 613-6544

Jason Glick
jglick@nylag.org
(212) 613-5000 ext. 5429

---

[124] *See* 60 Fed. Reg. 37,768, 37,769; *see also* 34 C.F.R. § 685.206(c)(3). Given the Senate HELP Committee's and the OAG's investigations and subsequent findings, CEC has long had notice of the facts underlying Ms. Colon's claims. For the fiscal year ending December 31, 2014, CEC reported revenue of $741,358,000, 78 percent of which (or $578,259,240) derived from Title IV funds. For the fiscal year ending December 31, 2013, CEC reported revenue of $839,681,000, 78 percent of which (or $654,951,180) derived from Title IV funds. For the fiscal year ending December 31, 2012, CEC reported revenue of $1,019,903,000, 80 percent of which (or $815,922,400) derived from Title IV funds. *See* Career Educ. Corp., Annual Report 58, 81 (Form 10-K) (Mar. 3, 2015), *available at* http://www.sec.gov/Archives/edgar/data/1046568/000119312515075170/d824438d10k.htm.

## AFFIDAVIT OF YVETTE COLON

State of New York        )
                         ) s.s.:
County of New York       )

I, Yvette Colon, currently residing at ▬▬▬▬▬▬▬ New York, NY 10029, being duly sworn, depose and say:

1.    I submit this Affidavit in support of my asserted defense to repayment of my student loans, obtained to pay for my attendance at Sanford-Brown Institute, New York, New York ("SBI").

2.    I attended SBI from 2006 to 2008 and graduated with a certificate in Non-Invasive Cardiovascular Technology.

3.    In addition to a $75 application fee, the first year tuition was $17,000, and the second year tuition was $12,750.

4.    I paid for my attendance at SBI with a combination of federal and private loans. Specifically, in September 2006, I took out approximately $6,625 in federal loans, and in August 2007, I took out approximately $8,233 in federal loans.

5.    Because SBI's tuition far exceeded the maximum annual borrowing limit for federal Stafford loans, I also took out a considerable additional amount in private student loans. To the best of my knowledge, I borrowed those private loans through Sallie Mae.

6.    I was born in New York on ▬▬▬▬▬▬▬.

7.    After I graduated from high school, I attended Manhattan Community College for less than one year. I studied nursing.

8.    I left school when I got a full-time job at Memorial Sloan Kettering Cancer Center. I was a unit secretary, working on the breast cancer and orthopedic floors.

1

9.      I very much liked working in the medical field, and decided to pursue additional credentials. I attended Mandl School, and obtained a certificate in Medical Assisting in about 1985.

10.     After I obtained this certificate, Mandl assisted in placing me in a job as a Medical Assistant, with Dr. Jacobsen, who had an OBGYN private practice in New York. I worked for him for many years. As a Medical Assistant, I took patient vital signs and collected labs. I also assisted Dr. Jacobsen in clinical functions such as biopsies, pap smears, and Doppler monitoring, and conducted filing and paperwork tasks.

11.     When Dr. Jacobsen retired in approximately 1990, I went back to Memorial Sloan Kettering, and worked in the Social Work Department.

12.     I subsequently left the medical field for several years, to run my own business. When my business began to fail, around 1998, I went back to the medical field.

13.     I obtained a job with a radiologist, Dr. Weinburger, as a receptionist.

14.     This job exposed me to sonography, which is the field of taking radiographic images for diagnostic purposes.

15.     I wanted to become a cardiac sonographer, to advance my career in the medical field. I spoke with a sonographer at Dr. Weinburger's office, Donna, who encouraged me to pursue this dream.

16.     Donna initially encouraged me to go to New York University ("NYU") to study sonography, because they had a good program.

17.     When I looked into the program at NYU, I learned that they did not offer any evening classes. This meant that I would have to quit my job in order to go to school. This was

2

not a possibility for me. My mother had recently passed away, and I was working to support my father.

18.    I learned that a school called Ultrasound Diagnostic School ("UDS"), located in Manhattan, offered evening classes in sonography. In March 2004, I met with a recruiter at UDS and then began the enrollment process.

19.    I was initially set to begin classes in the fall of 2004, but because of family health issues and personal obligations, I delayed my enrollment until those issues resolved.

20.    In 2006, I had the time once again to commit to pursue the necessary training for a career in sonography. I went back to UDS to finalize the enrollment paperwork I had filled out a couple of years earlier.

21.    A representative explained to me that the school was now known as Sanford-Brown Institute. The representative told me that the contract I had signed with UDS was now null and void, and that I would need to sign a new contract. Also, the tuition had gone up by $6,830.

22.    I told the SBI representative I would think about whether I still wanted to enroll.

23.    I mentioned to my co-worker, Donna, that I was considering enrolling at SBI. She immediately responded that I should be careful because not all schools are accredited. Donna told me that I had to make sure that the school was properly accredited, because if it was not, I would have trouble finding a job in my field of study.

24.    Before finally deciding to enroll at SBI, I went back to ask SBI to ask whether the program was accredited for cardiac sonography. An SBI representative said, "Oh yes, we are accredited." She pointed to a plaque on the wall, which had the word "accredited" on it.

3

25.     Based on SBI's assurances about accreditation, I signed up to attend SBI, to obtain a certificate in Non-Invasive Cardiovascular Technology. Because I was in the evening program, the course would take two years to complete.

26.     Had I known that SBI was in fact not programmatically accredited, I would never have decided to make the tremendous time and financial investment to enroll.

27.     When I went back to pick up my schedule, I met with another SBI representative to complete my financial aid paperwork.

28.     I asked this SBI representative what the salary range for sonography graduates was, and he told me it was $50,000 to $60,000. He emphasized that once I graduated, I would definitely get a job as a sonographer.

29.     Had I known that SBI's lack of accreditation meant it was virtually impossible for me to obtain work as a sonographer, I definitely would not have enrolled.

30.     SBI did not give me any opportunity to select the lender for my student loans. The financial aid representative just gave me a pile of forms and told me to sign them. To the best of my knowledge, SBI chose the lender for my loans.

31.     Toward the end of my first year of classes at SBI, around the spring of 2007, I heard that those in the class above me were having trouble sitting for the licensure exam in sonography, which was necessary to get a job.

32.     Some of my classmates asked Naoufel Brahmi, Director of the Cardiovascular Technology program at SBI about these rumors. Dr. Brahmi came into our class and assured us that we had nothing to worry about. He said that the school was going through the process of accreditation, and that my class would not be affected because the accreditation would be in place by the time we graduated and sat for the exam. He also said that we would all get jobs

4

from our externships, and that after one year we would be able to take the state exam, regardless of what happened with SBI's accreditation.

33.     There were about twenty students in my evening class, and we all decided to continue at SBI based on what Dr. Brahmi said.

34.     Had I known that the Director was not telling the truth about SBI's accreditation status and process, and about our chances of obtaining employment, I would not have continued into the second year of the program.

35.     When it came time to do the externship part of my program, I had to quit my day job, because evening externship placements were not available.

36.     I did an externship for three months at NYU, and for three months at the Veterans Affairs ("VA") Hospital on 23rd Street.

37.     Mine was the first group of externs that NYU took from SBI. My supervisor at NYU was named Anthony, and he was not happy with SBI as a school. He felt that my classmates and I had not received appropriate training. He corrected us and guided us on basic techniques, and instructed us on how to use NYU's sonography machines, which were newer and different than the ones we trained on at SBI.

38.     I noticed that the students who were studying at NYU were more competent. Their program was a full-time, two-year program, and they received much more hands-on instruction in the hospital, rather than in the classroom. The SBI students were trying to make up for all of that hands-on training during our externships.

39.     After my class, NYU stopped receiving externs from SBI.

40.     Neither I nor any of my classmates got a job from our externships at NYU. I learned from Anthony that NYU decided to hire students from NYU's own program and determined that SBI students were not as well-trained.

41.     Neither I nor any of my classmates obtained a job from our externships at the VA hospital. I later heard from the supervisor of my externship at the VA Hospital that the Hospital didn't think that SBI had a very good reputation, and was considering discontinuing its externship program with SBI.

42.     I graduated from my program at SBI in April 2008.

43.     I called SBI frequently to ask whether they had job leads and opportunities.

44.     When nothing materialized, I called and emailed Dr. Brahmi about the fact that SBI's job placement assistance was so awful.

45.     Because of the pressure I put on SBI, someone from SBI eventually arranged a phone interview for me with a medical office. The doctor who interviewed me asked me nothing except my salary expectations. I thought that was very strange and had a bad feeling about the doctor. I later met other students who worked briefly for that doctor before quitting, because they were forced to work twelve hour days at low pay, with no lunch break.

46.     That distressing interview was the only one that SBI helped me find.

47.     In addition, I applied to several sonography positions on my own. Employers asked me if I had a license, and unfortunately, I had to answer no. I did not get any callbacks.

48.     About a month after graduating, I registered for the sonography licensing exam administered by the American Registry for Diagnostic Medical Sonography ("ARDMS"). I filled out all of the paperwork and sent it in, along with a $140 check for the registration fee.

6

49.    About one month later, I received my check back in the mail, along with a letter from ARDMS explaining that I did not qualify to sit for the exam under "prerequisite 2," which provides for graduates of properly accredited sonography programs to take the exam, because I had not supplied the required documentation. But I had submitted my SBI certificate, a letter from SBI, and the other paperwork that was called for.

50.    I called the telephone number listed on the letter to obtain more information. I was told that I did not qualify based on my SBI certificate, but that I could qualify otherwise, if I had a Bachelor's Degree or one year of work experience as a sonographer. I had neither.

51.    I was furious. I felt that I was in a catch-22. By this time, I had obtained a position doing medical billing at Memorial Sloan Kettering. To this day, I'm still working in that job.

52.    When I attended SBI, I was told that our credits would transfer to an Associate Degree program. Later, in the summer of 2008, when I attempted to register at Borough of Manhattan Community College for an Associate Degree program, I learned that none of my SBI credits would transfer because SBI did not have the right accreditation.

53.    I wrote a complaint to the Better Business Bureau about SBI because I felt that I had been defrauded. I was promised that SBI would help me find work as a sonographer; that the school was accredited; and that my credits would transfer. None of these promises was true.

54.    Nothing came of my complaint to the Better Business Bureau.

55.    I received a letter from the New York State Attorney General in 2013 about SBI. The letter said that I could apply for restitution, because the school had misled me and others in my position about the accreditation of the sonography program.

56.    I applied for restitution and received $3,094.93.

7

57.     I currently owe about $22,130.96 on my federal student loans. I also owe about $29,284.13 in private student loans, which I borrowed to pay part of my tuition, and to cover my living expenses during the time that I was doing my externship at SBI, since I had to quit my job in order to do the externship.

58.     My federal and private loans are currently serviced by Navient. My account number is ▮▮▮▮▮▮

59.     I would not have attended SBI if I had known that it was not properly accredited. I also was misled about the number of graduates who were placed in jobs, my ability to get a job as a sonographer after finishing the certificate program, and the transferability of credits.

60.     I would gladly exchange my certificate from SBI for cancellation of my student loans. The certificate is useless to me. I learned a few things at SBI, which make it easier when, in my private life, I need to speak with doctors. But besides that, I did not get anything from the program.

61.     When I see people on the subway holding SBI literature, I go out of my way to warn them not to enroll and to explain how SBI misled and defrauded me.

62.     Attached as Exhibit A is a true and correct copy of a summary of my federal loan disbursal history, from the National Student Loan Data System.

63.     Attached as Exhibit B is a true and correct copy of my SBI certificate.

64.     Attached as Exhibit C is a true and correct copy of ARDMS's letter, dated July 31, 2008.

8

65.    Attached as Exhibit D is a true and correct copy of a summary of my recent loan balance, from Navient's website.


**WHEREFORE:**

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097;

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein;

I **CERTIFY**, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

Yvette Colon

2/27/15


Sworn to before me this 27th day of

February , 2015


NOTARY PUBLIC

SIRRAH KARIMA HARRIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 02HA6292419
Qualified in Queens County
My Commission Expires November 04, 2017

9

Financial Aid Review -- YVETTE COLON                                    Page 1 of 1

 START HERE
GO FURTHER
FEDERAL STUDENT AID

National Student Loan Data System (NSLDS) for Stu

NSLDS is a repository of information from many sources. Changes to the data are made by those sources. Collecting the data into one central location such as NSLDS gives you convenience and saves you time. If for any reason you disagree with the information reported to NSLDS, please contact one or more of the sources of your data listed on the detail pages on this site. The Department is also available as a resource at 1-800-4FEDAID if you need additional assistance. Your comments and corrections will help improve the services NSLDS provides.

Aid Summary for YVETTE COLON                          Your enrollment status is GRADUATED , effective 04/29/2008.

 MyStudentData
Download

### Loans

| | Type of Loan | Loan Amount | Loan Date | Disbursed Amount | Canceled Amount | Outstanding Principal | Outstanding Interest |
|---|---|---|---|---|---|---|---|
| 1 | STAFFORD SUBSIDIZED | $4,348 | 08/14/2007 | $4,348 | $0 | $6,066 | $50 |
| 2 | STAFFORD UNSUBSIDIZED | $3,886 | 08/14/2007 | $3,865 | $0 | $5,722 | $94 |
| 3 | STAFFORD UNSUBSIDIZED | $4,000 | 09/08/2009 | $4,000 | $0 | $6,277 | $93 |
| 4 | STAFFORD SUBSIDIZED | $2,625 | 09/08/2008 | $2,625 | $0 | $3,663 | $94 |
| 5 | SUPPLEMENTAL LOAN (SLS) | $2,500 | 09/26/1995 | $2,500 | $0 | $0 | $0 |
| Total STAFFORD SUBSIDIZED | | | | | | $9,731 | $144 |
| Total STAFFORD UNSUBSIDIZED | | | | | | $11,999 | $187 |
| Total SUPPLEMENTAL LOAN (SLS) | | | | | | $0 | $0 |
| Total All Loans | | | | | | $21,730 | $331 |

Information contained on these pages reflects the most current data in the NSLDS database. The data contained on this site is for general information purposes and should not be used to determine eligibility, loan payoffs, overpayment status, or tax reporting. Please consult the Financial Aid Officer at your school or the specific holder of your debts for further information.

MyStudentData
File Source:U.S. DEPARTMENT OF EDUCATION, NATIONAL STUDENT LOAN DATA SYSTEM
(NSLDS)
File Request Date:2015-02-25-16.23.26.299
Student First Name:YVETTE
Student Middle Initial:
Student Last Name:COLON
Student Street Address 1:
Student Street Address 2:
Student City:
Student State Code:
Student Country Code:
Student Zip Code:
Student Email Address:
Student Home Phone Country Code:
Student Home Phone Number:
Student Home Phone Preferred:
Student Cell Phone Country Code:
Student Cell Phone Number:
Student Cell Phone Preferred:
Student Work Phone Country Code:
Student Work Phone Number:
Student Work Phone Preferred:
Student SULA MEP Program School Name:
Student SULA MEP Program Enrollment Status:
Student SULA MEP Program CIP Title:
Student SULA MEP Program Credential Level:
Student SULA MEP Program Begin Date:
Student SULA MEP Program Length In Years:0.0
Student SULA Maximum Eligibility Period:0.0
Student SULA Subsidized Usage Period:0.0
Student SULA Remaining Eligibility Period:0.0
Student Enrollment Status:GRADUATED
Student Enrollment Status Effective Date:04/29/2008
Student Total All Loans Outstanding Principal:$21,730
Student Total All Loans Outstanding Interest:$458
Student Pell Lifetime Eligibility Used:0.000%
Student Total All Grants:$0
Total STAFFORD SUBSIDIZED Outstanding Principal:$9,731
Total STAFFORD SUBSIDIZED Outstanding Interest:$201
Total STAFFORD UNSUBSIDIZED Outstanding Principal:$11,999
Total STAFFORD UNSUBSIDIZED Outstanding Interest:$257
Total SUPPLEMENTAL LOAN (SLS) Outstanding Principal:$0
Total SUPPLEMENTAL LOAN (SLS) Outstanding Interest:$0
Loan Type:STAFFORD SUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW
YORK
Loan Attending School OPEID:02116011
Loan Date:08/14/2007
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/20/2007
Loan Period End Date:04/30/2008
Loan Amount:$4,348
Loan Disbursed Amount:$4,348
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$6,068
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$125
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:4.50%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP

MyStudentData

Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:08/14/2007
Loan Disbursement Date:05/19/2008
Loan Disbursement Amount:$2,174
Loan Disbursement Date:10/12/2007
Loan Disbursement Amount:$2,174
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD UNSUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW
YORK
Loan Attending School OPEID:02116011
Loan Date:08/14/2007
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/20/2007
Loan Period End Date:04/30/2008
Loan Amount:$3,865
Loan Disbursed Amount:$3,865

Page 2

MyStudentData

Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$5,722
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$127
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:6.80%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:08/14/2007
Loan Disbursement Date:05/19/2008
Loan Disbursement Amount:$1,932
Loan Disbursement Date:10/12/2007
Loan Disbursement Amount:$1,933
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262

MyStudentData

```
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD UNSUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW
YORK
Loan Attending School OPEID:02116011
Loan Date:09/08/2006
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/14/2006
Loan Period End Date:05/21/2007
Loan Amount:$4,000
Loan Disbursed Amount:$4,000
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$6,277
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$130
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:6.80%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:09/08/2006
Loan Disbursement Date:04/20/2007
Loan Disbursement Amount:$2,000
Loan Disbursement Date:09/12/2006
Loan Disbursement Amount:$2,000
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
```

MyStudentData

Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:STAFFORD SUBSIDIZED
Loan Award ID:
Loan Attending School Name:SANFORD-BROWN COLLEGE - SANFORD-BROWN INSTITUTE - NEW YORK
Loan Attending School OPEID:02116011
Loan Date:09/08/2006
Loan Repayment Begin Date:10/30/2008
Loan Period Begin Date:08/14/2006
Loan Period End Date:05/21/2007
Loan Amount:$2,625
Loan Disbursed Amount:$2,625
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$3,663
Loan Outstanding Principal Balance as of Date:01/31/2015
Loan Outstanding Interest Balance:$76
Loan Outstanding Interest Balance as of Date:01/31/2015
Loan Interest Rate Type:FIXED
Loan Interest Rate:4.50%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:01/31/2014
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2010
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2009
Loan Status:FB
Loan Status Description:FORBEARANCE
Loan Status Effective Date:11/18/2008
Loan Status:RP
Loan Status Description:IN REPAYMENT
Loan Status Effective Date:10/30/2008
Loan Status:IG
Loan Status Description:IN GRACE PERIOD
Loan Status Effective Date:04/30/2008
Loan Status:IA
Loan Status Description:LOAN ORIGINATED
Loan Status Effective Date:09/08/2006
Loan Disbursement Date:04/20/2007
Loan Disbursement Amount:$1,312
Loan Disbursement Date:09/12/2006
Loan Disbursement Amount:$1,313
Loan Contact Type:Current Servicer
Loan Contact Name:NAVIENT SOLUTIONS, INC.

MyStudentData

```
Loan Contact Street Address 1:220 LASLEY AVE
Loan Contact Street Address 2:
Loan Contact City:WILKES-BARRE
Loan Contact State Code:PA
Loan Contact Zip Code:18706
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Lender
Loan Contact Name:DEUTSCHE BANK ELT NAVIENT & SLM TRUSTS
Loan Contact Street Address 1:11600 SALLIE MAE DR,DEB SOUTHERLAND
Loan Contact Street Address 2:
Loan Contact City:RESTON
Loan Contact State Code:VA
Loan Contact Zip Code:201930000
Loan Contact Phone Number:888-272-5543
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:EDUCATIONAL CREDIT MANAGEMENT CORP
Loan Contact Street Address 1:1 IMATION PLACE
Loan Contact Street Address 2:BUILDING 1
Loan Contact City:OAKDALE
Loan Contact State Code:MN
Loan Contact Zip Code:55128
Loan Contact Phone Number:888-221-3262
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Type:SUPPLEMENTAL LOAN (SLS)
Loan Award ID:
Loan Attending School Name:MANDL SCHOOL
Loan Attending School OPEID:00740100
Loan Date:09/26/1985
Loan Repayment Begin Date:03/02/1986
Loan Period Begin Date:09/01/1985
Loan Period End Date:03/31/1986
Loan Amount:$2,500
Loan Disbursed Amount:$2,500
Loan Canceled Amount:$0
Loan Canceled Date:
Loan Outstanding Principal Balance:$0
Loan Outstanding Principal Balance as of Date:08/05/1996
Loan Outstanding Interest Balance:$0
Loan Outstanding Interest Balance as of Date:08/05/1996
Loan Interest Rate Type:FIXED
Loan Interest Rate:12.00%
Loan Repayment Plan Begin Date:
Loan Repayment Plan Scheduled Amount:
Loan Confirmed Subsidy Status:
Loan Subsidized Usage in Years:
Loan Reaffirmation Date:
Loan Status:DP
Loan Status Description:OEFAULTED, PAID IN FULL
Loan Status Effective Date:08/05/1996
Loan Status:DX
Loan Status Description:DEFAULTED, SIX CONSECUTIVE PAYMENTS
Loan Status Effective Date:11/09/1995
Loan Status:DU
Loan Status Description:DEFAULTED, UNRESOLVED
Loan Status Effective Date:10/31/1986
Loan Disbursement Date:10/28/1985
Loan Disbursement Amount:$2,500
Loan Contact Type:Current Lender
Loan Contact Name:FLEET NATIONAL BANK/GOLDMMAN SACHS
Loan Contact Street Address 1:100 SECOND AVE S STE 400-S TOWER
```

MyStudentData

```
Loan Contact Street Address 2:
Loan Contact City:ST PETERSBURG
Loan Contact State Code:FL
Loan Contact Zip Code:337160000
Loan Contact Phone Number:
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
Loan Contact Type:Current Guaranty Agency
Loan Contact Name:USA FUNDS, INC.
Loan Contact Street Address 1:P.O. BOX 6180
Loan Contact Street Address 2:
Loan Contact City:INDIANAPOLIS
Loan Contact State Code:IN
Loan Contact Zip Code:462066180
Loan Contact Phone Number:
Loan Contact Phone Extension:
Loan Contact Email Address:
Loan Contact Web Site Address:
```

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

From: unknown    Page: 17/34    Date: 2/23/2015 8:34:40 AM

Be it known to all who are interested in the Allied Health Sciences, that

# Yvette Colon

Has successfully completed the comprehensive course

## Non-Invasive Cardiovascular Technology

In recognition of this accomplishment, this

### Certificate

Has been awarded with honors this 29th Day April 2008

Administered by

## Sanford-Brown Institute

New York City, New York Campus

*School President*

*VP of Academic Affairs*

From: unknown     Page: 23/52     Date: 2/23/2015 8:36:53 AM



**ARDMS**
The globally recognized standard
of excellence in sonography

Yvette Colon

New York, NY 10029

July 31, 2008

Dear Yvette Colon:

After careful review of your application, it is necessary to inform you that you are not currently eligible to sit for an ARDMS examination at this time. In order to apply under Prerequisite 2, you must have submitted the following:

- Copy of diploma from ultrasound/vascular program or an official transcript.
- Original letter signed by program director and/or medical director indicating date of graduation or successful completion of the program. Program directors must use the mandatory formatted sample letter, available at www.ARDMS.org/templateletter and shown on page 9 of the 2008 application booklet.
- The clinical verification (CV) form is not required if the application is submitted and received in the ARDMS office within one year after successful completion of the program. Otherwise, an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available online at www.ARDMS.org/cv.

At this time, you have not submitted all of the requisite documentation needed to complete the processing of your application.

Your application cannot be approved without all required documentation. A refund check in the amount of $140.00 is enclosed. A non-refundable processing fee, as specified in the ARDMS applications booklet, has been withheld for each examination. *Please note that when you reapply, you will be considered a first-time applicant, and you will need to submit all documentation and fees.* If you have any questions regarding your eligibility for future examinations, please feel free to contact Registrant Services at the number listed below.

Sincerely,

Registrant Services Department
Certification Processing Specialist
800-541-9754

cc: Applicant File

Navient - Integrated Account Summary                                    Page 1 of 2



APPLY FOR A NEW LOAN    MY ACCOUNT █████    WELCOME YVETTE LOGOUT

MY LOANS        MAKE PAYMENT        CHANGE PAYMENT        CUSTOMER SUPPORT

Form 1098-E statements are available via Print Statements and Documents under the Customer Support menu. Learn more!

> ⚠ **NEEDS IMMEDIATE ATTENTION**
>
> You have missed 19 payment(s). You may pay all of your loans by selecting Quick Pay or pay your loans individually via the following links: Private Loans and Federal Loans.
>
> You have 3 message(s) View all message(s)        NOTE: This notification is an attempt to collect a debt and information obtained will be used for that purpose.

## Loan Summary        Learn how your payments are allocated and applied.

|  | Loans Balance | Payment Due | Pay all of your loans at once |
|---|---|---|---|
| **GRAND TOTAL** | $51,415.09 | $5,181.22 | ▸ **QUICK PAY** |

**PRIVATE LOANS** ▸                                    TAKE ACTION ON YOUR LOANS

Visit our FAQs for info on how to make payments, credit reporting, and how to contact us.

| Loan Name | Loan Balance | Current Interest Rate | Payment Due | Past Due | Payment Due Date |
|---|---|---|---|---|---|
| **Signature Student Loan** -3167 | $13,235.46 | 7.25% | $ 3,692.27 | $3,390.90 | 01/17/2015 ⚠ |
| TOTAL | $13,235.46 | | $ 3,692.27 | $3,390.90 | |
| **Signature Student Loan** -3169 | $16,048.67 | 7.25% | $ 1,404.92 | $1,237.15 | 01/17/2015 ⚠ |

The Smart Option Student Loan. Get Started  Sallie Mae® | Navient℠

| | | | | | |
|---|---|---|---|---|---|
| TOTAL | $16,048.67 | | $ 1,404.92 | $1,237.15 | |

▸ **Pay Private Loans**

**FEDERAL LOANS**                                    TAKE ACTION ON YOUR LOANS

Visit our FAQs for info on how to make payments, credit reporting, and how to contact us.

| Loan Name | Loan Balance | Current Interest Rate | Payment Due | Past Due | Payment Due Date |
|---|---|---|---|---|---|

Navient - Integrated Account Summary                                    Page 2 of 2

| | | | | | |
|---|---|---|---|---|---|
| **Stafford 1-02** | $3,729.08 | 6.8% | $42.83 | $20.79 | 01/17/2015 ⚠ |
| **Stafford 1-03** | $8,398.35 | 6.8% | $73.38 | $35.62 | 01/17/2015 ⚠ |
| **Stafford 1-05** | $6,176.87 | 6.8% | $70.93 | $34.43 | 01/17/2015 ⚠ |
| **Stafford 1-06** | $5,834.66 | 6.8% | $86.89 | $32.47 | 01/17/2015 ⚠ |
| **TOTAL** | $22,130.96 | | $254.03 | $123.31 | |

For delinquency counseling see your options here.              ▸ **Pay Federal Loans**

| | Loans Balance | Payment Due | Pay all of your loans at once |
|---|---|---|---|
| **GRAND TOTAL** | $61,415.09 | $5,161.22 | ▸ **QUICK PAY** |

**PENDING PAYMENTS**
PRIVATE LOANS

PRIVATE LOANS
FEDERAL LOANS
**You currently do not have any pending payments**

**PAYMENTS RECEIVED**
PRIVATE LOANS

| PRIVATE LOANS | Amount |
|---|---|
| FEDERAL LOANS | |
| 12/26/2014 | $-100.00 |
| 11/28/2014 | $-100.00 |
| 10/27/2014 | $-100.00 |

View transaction history

**U** promise              REWARDS

Learn More
Join Upromise for free and earn cash back for everyday spending - which can help pay your loan faster!

⌐⅂ About Us | ⌐⅂ Terms of Use | ⌐⅂ Protecting Your Privacy | ⌐⅂ Social Media Policies | ⓘ About Our Ads | ⌐⅂ Contact Us

Feedback ⊢

© 2014 - 2015 Navient Solutions, Inc. All rights reserved. Navient and the Navient logo are service marks of Navient Solutions, Inc. Navient Corporation and its subsidiaries, including Navient Solutions, Inc. are not sponsored by or agencies of the United States of America.

## DECLARATION OF JASON GLICK

I, Jason Glick, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746, hereby declare as follows:

1.      I am an attorney at the New York Legal Assistance Group ("NYLAG"). NYLAG represents Ms. Colon in connection with her student loans.

2.      Exhibit A, attached, is a true and correct copy of the Assurance of Discontinuance dated August 19, 2013, between the Office of the Attorney General of the State of New York and Career Education Corporation, as downloaded from the website of the Huffington Post on August 20, 2013.

3.      Exhibit B, attached, is a true and correct copy of "SPI Requirement and General Prerequisites," as downloaded from the website of the American Registry for Diagnostic Medical Sonography on February 26, 2015.

4.      Exhibit C, attached, is a true and correct copy of an e-mail from Jill DeAtley dated August 19, 2013, as received by NYLAG from Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

5.      Exhibit D, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation and Certification" and dated April 2, 2010, as downloaded from the website of the Internet Archive on January 12, 2015.

6.      Exhibit E, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation and Certification" and dated January 11, 2011, as downloaded from the website of the Internet Archive on January 12, 2015.

7.      Exhibit F, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Sanford-Brown Career Training Programs - Accreditation & Licensure" and dated November 6, 2013, as downloaded from the website of the Internet Archive on February 27, 2015.

1

8.      Exhibit G, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Cardiovascular Technology Training at Sanford Brown NY" and dated October 23, 2006, as downloaded from the website of the Internet Archive on February 27, 2015.

9.      Exhibit H, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Non-Invasive Cardiovascular Technology Training New York, NY" and dated August 17, 2007, as downloaded from the website of the Internet Archive on February 27, 2015.

10.     Exhibit I, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Non-Invasive Cardiovascular Technology" and dated March 19, 2008, as downloaded from the website of the Internet Archive on February 27, 2015.

11.     Exhibit J, attached, is a true and correct copy of a document titled "Accreditation/Certification Information," dated June 26, 2006, as received by NYLAG from Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

12.     Exhibit K, attached, is a true and correct copy of an archived page from Sanford-Brown's website titled "Top Ten Reasons to Study at SBI" and dated October 23, 2006, as downloaded from the website of the Internet Archive on February 13, 2015.

13.     Exhibit L, attached, is a true and correct copy of a "Dear Colleague" letter dated April 16, 1993 from Robert W. Evans, Director, Division of Policy Development, U.S. Department of Education, and the attachments thereto, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

14.     Exhibit M, attached, is a true and correct copy of a letter dated May 19, 1988 from Acting Assistant Secretary Kenneth D. Whitehead, U.S. Department of Education, to U.S. Representative Stephen J. Solarz, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

15.     Exhibit N, attached, is a true and correct copy of the first page of a FFELP Federal Stafford Loan Master Promissory Note dated July 8, 2006 as received by NYLAG from

2

Career Education Corporation's Compliance and Ethics department on March 4, 2015 as part of Yvette Colon's student file.

16.     Exhibit O, attached, is a true and correct copy of a U.S. Department of Education document entitled "Overview: Federal Trade Commission (FTC) Holder Rule," dated July 2, 1993, as downloaded from the website of the National Consumer Law Center on February 20, 2015.

17.     Exhibit P, attached, is a true and correct copy of the Agreement on Code of Conduct dated April 16, 2007, between the Office of the Attorney General of the State of New York and Career Education Corporation, as downloaded from the website of the Illinois Attorney General on February 27, 2015.

18.     Exhibit Q, attached, is a true and correct copy of an April 23, 2007 document titled "Madigan Announces Student Loan Agreements   Schools to Adopt New College Code of Conduct," as downloaded from the website of the Illinois Attorney General on February 27, 2015.

19.     Exhibit R, attached, is a true and correct copy of a February 20, 2008 document titled "PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues," as downloaded from Lexis Nexis on February 27, 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

Dated: March 9, 2015
New York, New York

Jason Glick
Staff Attorney/Skadden Fellow
New York Legal Assistance Group
7 Hanover Square, 18th Floor
New York, New York 10004
(212) 613-5000 x5429
JGlick@nylag.org

3

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF CONSUMER FRAUDS & PROTECTION
-----------------------------------------------------------------------------X

In the Matter of the
Investigation by Eric T. Schneiderman,
Attorney General of New York, of

              **AOD No.  13-379**

CAREER EDUCATION CORPORATION,

         **Respondent.**

-----------------------------------------------------------------------------X

   The Office of the Attorney General of the State of New York ("OAG") has

conducted an investigation, pursuant to Executive Law § 63(12) and General Business

Law ("GBL") Article 22-A, into certain business practices of Career Education

Corporation ("CEC").  This Assurance of Discontinuance ("Assurance") contains the

findings of the OAG's investigation and the relief agreed to by the OAG and CEC

(collectively referred to hereinafter as the "parties").

## <u>FINDINGS</u>

  1.  CEC is a publicly-traded Delaware corporation with principal offices

located at 231 N. Martingale Rd., Schaumburg, Illinois, 60173.

  2.  In 2012, CEC had over 90 campuses throughout the country and

internationally and offered educational programs to over 116,000 students worldwide in a

range of career-oriented disciplines.  Currently, CEC has approximately 75 campuses and

student enrollment of approximately 75,000.  CEC is organized into six segments or

"strategic business units" ("SBUs"): university, culinary arts, health care education, art

and design, international, and transitional schools.

  3.  CEC operates seven brick-and-mortar campuses in New York State and

two online institutions outside of New York State that enroll New York students.  The

New York brick-and-mortar campuses include three Sanford-Brown Institute ("SBI")

campuses, one SBI-affiliate campus, and three Briarcliffe campuses. These campuses offer non-degree certificate programs and associate's and bachelor's degrees. The SBI and Briarcliffe campuses offer campus-based and online programs. CEC also operates online institutions outside of New York State that enroll New York residents. CEC's online institutions with material enrollments of New York residents are American InterContinental University ("AIU") and Colorado Technical University ("CTU").

4.     The SBI campuses are located at: 711 Stewart Avenue, Garden City, New York; 120 East 16th Street, New York, New York; and 333 Westchester Avenue, White Plains, New York. The SBI-affiliate campus is located at 320 South Service Road, Melville, New York. The Briarcliff campuses are located at: 1055 Stewart Avenue, Bethpage, New York; 225 West Main Street, Patchogue, New York; and 30-30 Thomson Avenue, Long Island City, Queens, New York.

5.     For the period of July 2009 through May 2011, there were approximately 11,000 students enrolled in the brick-and-mortar campuses in New York and approximately 8,800 New Yorkers enrolled in the online institutions.

6.     CEC's SBI campuses in New York are nationally accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"). Briarcliffe College is regionally accredited by the Middle States Association of Colleges and Schools ("MSACS"). AIU and CTU are regionally accredited by the Higher Learning Commission ("HLC"). In addition, certain programs offered by CEC's schools were or are accredited by programmatic accreditors, including the Accrediting Bureau of Health Education Schools ("ABHES") and the Commission on Accreditation of Allied Health Education Programs ("CAAHEP").

7.     Educational institutions are required to maintain institutional accreditation status with an accreditor recognized by the U.S. Department of Education in order to be eligible to receive federal financial aid, including federal grants and federally guaranteed student loans.  Some accrediting agencies develop criteria for schools to employ in calculating and reporting an annual placement rate, the rate at which graduates of the programs are placed in employment.

8.     ACICS requires ACICS-accredited schools to: (a) report placement rates annually to ACICS; (b) disclose placement rate information to students; and (c) for the period of 2008 through 2010, maintain a baseline placement rate of 65%.  Schools that do not meet ACICS' baseline placement rate are subject to heightened monitoring and reporting and, if they do not meet such standards within a certain period of time, could lose their accreditation.

9.     ABHES requires ABHES-accredited programs to: (a) report placement numbers annually; (b) disclose placement rates to students, and (c) maintain a baseline placement rate of 70% in accredited Medical Assistant programs.  Like the ACICS-accredited schools, programs that do not meet ABHES' baseline placement rate are also subject to heightened monitoring and reporting, and, if they do not meet such standards, could lose their accreditation.

10.     CAAHEP requires CAAHEP-programs to: (a) report placement numbers annually; (b) disclose placement rates to students; and (c) maintain a baseline placement rate of 75% in accredited Diagnostic Medical Ultrasound programs, 70% in accredited Cardiovascular Technology programs, and 80% in accredited Surgical Technology programs.  Programs that do not meet CAAHEP's baseline placement rate are also subject

3

to heightened monitoring and reporting and, if they do not meet such standards, could lose accreditation.

11.     Neither MSACS nor HLC requires schools to calculate, report, or disclose placement rates, and neither imposes a minimum requirement for placement rates.

12.     From fall 2008 through spring 2011, certain CEC employees improperly counted graduates as "placed", which inflated CEC's placement rates at CEC's New York schools.  As a result, CEC provided inaccurate and inflated placement rates to prospective and then current students.  In addition, CEC reported inaccurate and inflated placement rate data and placement rates to CEC's accrediting agencies and to the New York State Department of Education's Bureau of Proprietary School Supervision for these schools.

13.     Some CEC Career Services employees used several methods to improperly count graduates as "placed", which inflated placement rates.  First, certain CEC Career Services employees counted certain CEC graduates of health care services programs as "placed" based on these graduates' employment at single one-day health fairs, including fairs initiated at CEC's request for the purpose of inflating placement rates.  Second, certain CEC Career Services employees mischaracterized certain CEC graduates' job duties in order to improperly count such students as "placed" in the field in which the student trained or a related field, when in fact the graduates' employment was neither in the field in which the graduate was trained nor in a field related to their field of study.

14.     CEC set annual goals to meet the accreditors' baseline placement rate requirements at each CEC institution.  CEC school Presidents, Career Services Directors, and other Career Services employees received bonuses based in part upon whether such baseline placement rate requirements were met.  Thus, these employees had financial incentives to meet the placement rate goals set by CEC.

4

A.      **Deceptive Practices Related to Calculation of Placement Rates**

     (i)      **Counting Employment at One-day Health Fairs As "Placements"**

15.      Prior to September 2008, CEC policy required CEC employees to wait until a graduate had completed either three or five days of employment before verifying that graduate's employment for purposes of calculating placement rates. In September 2008, CEC changed its official policy concerning employment verification to permit CEC employees to verify employment on the same day that a graduate began employment. After CEC modified its policies to permit employment verification on the first day of employment, certain CEC Career Services employees began counting graduates' employment at a single one-day health fair as a "placement" for purposes of calculating CEC's placement rates, even though the graduates did not obtain any subsequent employment with the health fair company. Moreover, certain of the CEC employees requested that health companies sponsor health fairs so that large numbers of graduates could be counted as "placed". In the 2010 reporting cohort (July 1, 2009 to June 30, 2010), for example, CEC employees at SBI-NY recorded 101 "placements" based on a single day's employment at one-day health fairs held in that period.

16.      High-level Career Services managers in the Health SBU at CEC's headquarters not only knew about the practice of counting employment at single one-day health fairs as "placements," but explicitly condoned and even encouraged the practice of recording such employment as "placements."

     (ii)      **Mischaracterizing Certain Positions as "In-field" or "Related Field" Employment**

17.      Certain CEC Career Services employees improperly characterized certain graduates' employment as "in-field" or "related field" placements at New York schools.

5

In some cases, these CEC employees mischaracterized graduates' employment duties in order to support their improper characterization of the graduate's employment as an "in field" or "related field" placement. In certain instances, these CEC employees even placed false information in students' placement files to support this mischaracterization.

18.     For example, certain CEC Career Service employees improperly characterized graduates of Criminal Justice programs at New York schools who were employed in retail sales positions and data processing positions as having obtained "in field" placements. Similarly, certain graduates of Accounting programs who were employed as secretaries were improperly characterized as having obtained "in field" placements. In one example, a graduate of a CEC New York Criminal Justice program employed as a data processor at a company that processed parking ticket data was characterized as having obtained a "related field" placement, on the grounds that the graduate's duties included dealing "with the courts" by processing parking ticket data.

### (iii)    Disclosure of Inaccurate and Inflated Placement Rates to Prospective and Current Students

19.     CEC misrepresented its placement rates for New York schools to prospective and then current students. As detailed below, CEC included inaccurate and inflated placement rates for New York schools in school catalogs distributed to prospective and then current students, on CEC's public website, and in written disclosures provided to prospective students who requested placement rate information. These inflated placement rates provided false and misleading information concerning CEC's New York schools' success in placing graduates of its programs in employment.

20.     Students choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly, placement rate is an important factor in students' decision to enroll in and complete CEC programs.

6

21.     The placement rates for New York schools disclosed to prospective and then current students during the period of 2009 through spring 2011 were significantly inflated, giving prospective students a distorted, significantly overly-favorable impression of CEC graduates' employment outcomes.  For example, for the 2008-2009 and 2009-10 reporting cohort, CEC disclosed placement rates for its New York SBI and Briarcliffe campuses ranging from 54.9% to 80.2%, when the corrected rates based on CEC's subsequent efforts to verify placement rates ranged from 24.1% to 64.1%.  CEC disclosed that SBI New York had a placement rate of 65.7% in 2008-2009, but the corrected rate based on CEC's subsequent efforts to verify placement rates was 42.1%.  In another example, CEC disclosed that SBI Melville had a 70% placement rate in the 2009-2010 cohort, but the corrected placement rate was 26.1%.

22.     Furthermore, as detailed below, the corrected placement rates for the SBI campuses in New York and for a number of programmatically accredited programs did not meet CEC's accreditors' baseline placement rate requirements for the 2008-2009, 2009-2010, and 2010-2011 reporting cohorts.  The failure to meet the accreditors' baseline placement rate requirements would have triggered a review that would have put these schools and programs on monitoring and ultimately at potential risk of losing institutional and/or programmatic accreditation.

### (iv)     Reporting Inflated Placement Rates to Accreditors

23.     CEC reported inaccurate, inflated placement rates in its annual reports to the accreditor of its New York SBI campuses, ACICS, for the reporting cohorts 2008-2009 and 2009-2010.

24.     By reporting inflated placement rates to ACICS, CEC was able to meet ACICS' baseline placement rate requirements for New York Health SBU schools,

enabling these CEC schools to maintain their accreditation status and thus maintain eligibility to receive federal financial aid. CEC would not have met the ACICS' baseline at any of its New York ACICS-accredited campuses during the period in question had it not reported inflated placement rates. Thus, CEC would have been at serious risk of triggering review and monitoring that could have put these schools and programs at potential risk of losing accreditation at those campuses.

25.    CEC also provided inaccurate graduate placement rates for its programmatically accredited programs at its New York SBI campuses to its programmatic accreditors ABHES and CAAHEP for the 2008-2009 and 2009-2010 reporting cohorts. The corrected placement rates for some of these programmatically accredited programs would not have met ABHES' and CAAHEP's minimum placement rate requirements. Had CEC reported the corrected placement rates, CEC would have triggered a review and monitoring and been at potential risk of losing programmatic accreditation for those programs.

26.    On November 14, 2011, CEC received a letter from ACICS directing CEC to "Show Cause" at a December 2011 meeting as to why CEC's current accreditation status should not be withdrawn from its' Health SBU ACICS-accredited CEC campuses due to CEC's reporting of inaccurate and inflated placement rates to ACICS.

27.    Based on corrective actions taken by CEC, including efforts to independently verify all placements for the 2010-2011 reporting cohort and improve its placement results and collection of placement results, ACICS determined not to suspend the accreditation of CEC's ACICS-accredited schools. Nor did ACICS request that CEC recalculate inaccurate placement rates reported for the 2008-2009 and 2009-2010 reporting cohorts.

28.     On August 10, 2012, ABHES issued a "Show Cause" letter to SBI-White Plains based upon concerns that SBI-White Plains had inflated 2010-2011 placement rates for its Medical Assistant program graduates by mischaracterizing certain placements, such as secretarial placements, as "in field" or "related field" placements. ABHES required SBI-White Plains to submit a re-calculated placement rate, and SBI-White Plains submitted a revised Annual Report to ABHES for the 2010-2011 reporting cohort re-designating several students who had previously been designated as "placed" to "not yet placed."    However, before ABHES issued a final ruling in the matter, CEC voluntarily relinquished ABHES accreditation for all of its Medical Assistant Programs, rendering the proceedings moot.

### (v)     Reporting Inaccurate and Inflated Placement Rates To New York State

29.     CEC reported inaccurate and inflated placement statistics in its annual reports to the New York State Department of Education's Bureau of Proprietary School Supervision for the years 2008-2009 and 2009-2010.

30.     The reported statistics were inaccurate with regard to the number of students who obtained employment in their field of study or in a related field after graduating from a specific academic program.

### (vi)     CEC's Corrective Actions

31.     After discovering its employees' misconduct in the calculation, disclosure and reporting of placement rates subsequent to receipt of the OAG's subpoena, CEC cooperated in the OAG investigation by bringing these issues to the attention of the OAG and producing evidence and answering questions relevant to the investigation.  CEC immediately suspended employees, and later terminated 15 employees who it determined had engaged in such misconduct, including several high-level managers in the Health

9

SBU at CEC corporate headquarters. CEC also promptly upon discovering these issues, but prior to being requested by the OAG to take any action, began the process of reviewing and modifying its placement practices in an effort to prevent the abuses identified in the investigation from recurring, including by revising its Career Services Policy Manual to impose new, more stringent requirements for calculating placement rates, including, *inter alia,* new requirements related to verifying employment. CEC also created a new position, the Director of Career Services Compliance, to monitor compliance with CEC's revised policies related to calculation of placement rates. In addition, CEC hired an independent company to contact 2010-2011 graduates to confirm placement and subsequently disclosed revised placement rates for 2010-2011 on its websites.

### B. Deceptive Practices Related to Accreditation Status Disclosures

32.    Certain CEC health services programs, including the Diagnostic Medical Ultrasound, the Cardiovascular Technology, and Surgical Technology programs at CEC's SBI-White Plains and Garden City campuses, either lack programmatic accreditation or lacked programmatic accreditation until September 17, 2010 (the SBI-Garden City Diagnostic Medical Ultrasound program) or until November 18, 2011 (the SBI-White Plains Diagnostic Medical Ultrasound and Medical Sonography programs). As a result, graduates of these programs were not eligible to sit for certain types of qualifying exams immediately upon graduation. In the case of the Diagnostic Medical Ultrasound programs, for example, graduates could not sit for the certification exam until they had completed one year of full-time, paid clinical employment. However, graduates who lacked certification often had difficulty finding such employment. Such graduates faced a

"Catch 22": most employers viewed certification as a requirement for employment, but graduates were ineligible for certification until they obtained one year of employment.

33.    Certain CEC enrollment representatives failed to adequately disclose to prospective and current students that the above-referenced programs were not programmatically accredited; that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation; and that graduates' inability to sit for these exams could negatively affect their employment opportunities.

34.    In addition, CEC fails to provide clear and conspicuous disclosures concerning the programmatic accreditation status of SBI programs on its websites. CEC operates three websites for its SBI institutions: www.sanfordbrown.edu, www.sanfordbrown-online.com, and www.careered.com. At the www.sanfordbrown.edu website, webpages that described programs offered at particular campuses did not indicate whether a program had programmatic accreditation directly on the webpage, but instead included a hyperlink titled: "To learn more about what accreditation is, why it is important and details about certification and disclosure information for this and other Sanford-Brown programs and campuses, please click here." The hyperlink was later replaced with a hyperlink titled "Accreditation and Licensure" that appears in a list of hyperlinks when a visitor scrolls over the hyperlink titled "About Us." This hyperlink leads to a webpage that shows hyperlinks labeled "State Authorization information" and "Institutional Accreditation information." No information related to programmatic accreditation is immediately visible. Prospective students are required to scroll through lists below each of these hyperlinks to reach the "Programmatic Accreditation" section. That section includes lists of accredited campuses of particular programs, in paragraph form. The

11

paragraphs are divided by program and by accreditor. Thus, a prospective student seeking to determine whether a program at a particular campus is accredited would, in some cases, have to check several different lists. Where a program lacks programmatic accreditation at particular campuses, the program simply does not appear on any of the lists.

35.     Similarly, the www.sanfordbrown-online.com website failed to adequately disclose whether programs are programmatically accredited. The website included dedicated pages for various SBI campuses and programs offered at each campus, but neither the campus nor program webpages included a disclosure regarding programmatic accreditation on the webpage. Instead, these pages contained a hyperlink titled "More Information" which led to a webpage that contained programmatic accreditation disclosures. However, because the hyperlink did not indicate that accreditation status is available through this hyperlink, website visitors were unlikely to discover the accreditation information.

36.     CEC also operates a website at www.careered.com. At www.careered.com, webpages that list programs offered at particular campuses do not indicate whether a program has programmatic accreditation directly on the webpage, but instead include a hyperlink titled "Accreditation." This hyperlink leads to a webpage that shows information regarding the institutional accreditation of the campus where the program is offered. No information about programmatic accreditation is immediately visible. Prospective students must scroll through the "Institutional Accreditation" section to reach the "Programmatic Accreditation" section. This section includes lists of accredited campuses, in paragraph form. The paragraphs are divided by program and by accreditor. Thus, a prospective student seeking to determine whether a program at a particular campus is accredited would, in some cases, have to check several different lists.

12

Where a program lacks accreditation at particular campuses, the program does not appear on any of the lists.

37.     Furthermore, with respect to programs where lack of programmatic accreditation results in ineligibility to sit for qualifying exams or otherwise obtain certification or licensure, neither the www.sanfordbrown.edu website, the www.sandfordbrown-online.edu website, nor the www.careered.com website include clear and conspicuous program-specific disclosures that programmatic accreditation will result in graduates' inability to sit for such exam or otherwise obtain certification or licensure, or that this may impede graduates' professional prospects.

### C.     Inadequate Disclosure Regarding lack of Transferability of Credits Earned

38.     As noted above, CEC's New York SBI campuses are accredited by national accreditors.  Most public and non-profit degree granting educational institutions are regionally, rather than nationally, accredited.  In most cases, regionally accredited schools do not accept credits from nationally-accredited schools.  Thus, credits earned at CEC's nationally-accredited schools are generally not transferrable to public and non-profit degree-granting educational institutions.

39.     CEC enrollment representatives fail to adequately disclose to prospective students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions.

40.     In addition, CEC's SBI websites failed to adequately disclose that credits earned at CEC's SBI campuses are usually not transferable to regionally accredited public and non-profit institutions.

13

41.    New York Executive Law § 63(12) prohibits persons or business entities from engaging in repeated fraudulent or illegal acts or otherwise demonstrating persistent fraud or illegality in the carrying on, conducting or transaction of business.

42.    New York General Business Law ("GBL") Article 22-A prohibits deceptive acts or practices (GBL § 349) and false advertising (GBL § 350) in the conduct of any business, trade or commerce in this State.

43.    The OAG finds that the practices described above constitute repeated violations of General Business Law Article 22-A, §§ 349 and 350, and repeated fraudulent and illegal acts under Executive Law § 63(12).

<div align="center">**AGREEMENT**</div>

**WHEREAS**, OAG is willing to accept the terms of this Assurance pursuant to New York Executive Law § 63(15) and to discontinue its investigation;

**WHEREAS,** CEC neither admits nor denies OAG's Findings (1)-(43) above; and

**WHEREAS**, the parties each believe that the obligations imposed by this Assurance are prudent and appropriate;

**IT IS HEREBY UNDERSTOOD AND AGREED**, by and between the parties that:

**I.    DEFINITIONS**

1.    "Clear and Conspicuous" or "Clearly and Conspicuously" means that the statement, representation or term being disclosed is of such size, color, contrast and/or audibility and is so presented as to be readily noticed and understood by the person to whom it is being disclosed.  If such statement is necessary as a modification, explanation or clarification to other information with which it is presented, it must be presented in close proximity to the information it modifies, in a manner so as to be readily noticed and

understood.  In addition to the foregoing, in interactive media, the disclosures shall be

presented either directly on a webpage or via a hyperlink that is a prominent and direct

link to another webpage and that is obvious and appropriately labeled to convey the

importance, nature and relevance of the information it leads to.  Such interactive media

disclosures shall be displayed in an open format that can be retrieved, downloaded,

indexed, and searched by commonly-used web search applications.  An open format is one

that is platform independent, is machine readable, and is made public without restrictions

that would impede the reuse of that information.

      2.    "Completer" means a student who is no longer enrolled in a CEC program

of study and who has either completed the time allowed or attempted the maximum

allowable number of credits for the program of study but who did not accomplish the

requirements of graduation, such as, for example, achieving a minimum G.P.A. of at least

2.0, attaining required competencies or speed skills, or satisfying non-academic

requirements (*e.g.*, outstanding financial obligations).

      3.    "Graduate" means a student who has accomplished all of the requirements

of graduation from a CEC program, such as, for example, achieving a minimum G.P.A. of

at least 2.0; successfully passing all required courses and meeting all clinical, internship,

and externship requirements; satisfying all non-academic requirements for graduation,

such as payment of tuition and fees, return of books, etc.; receiving the appropriate

credential; and ceasing enrolling in the program at the campus, unless re-enrolled as a new

student in a different program.

      4.    "New York Program" shall mean any CEC program offered at a

physical location within New York State, except those offered at a regionally accredited

institution.  "New York Program" shall include, but is not limited to, online programs

offered by non-regionally accredited CEC institutions that are physically located within New York State.  Examples of New York Programs include, but are not limited to, the SBI - New York Certificate Program in Diagnostic Medical Ultrasound, the SBI - Garden City Certificate Program in Medical Assistant, and the SBI - Melville Associate in Health Information Management.

5.      "New York Campus" shall mean any CEC campus located in New York State, except campuses of regionally accredited institutions.  Examples of New York Campuses include, but are not limited to, SBI - New York, SBI - Garden City, and SBI - White Plains.

6.      "New York Online Institution" shall mean any CEC institution located outside of New York State that offers online programs and has enrolled at least 50 New York residents within a single reporting cohort (meaning July 1 to June 30 of the following year).  Examples of New York Online Institutions include, but are not limited to, AIU and CTU.  With respect to CEC institutions located outside of New York State that have not enrolled at least 50 New York residents within a single reporting cohort as of the Effective Date of this Assurance, the requirements of this Assurance shall begin for the first reporting cohort for the first cohort year after such CEC institution located outside of New York State that offers online programs enrolls at least 50 New York residents.

7.      "New York Online Program" shall mean any online CEC program offered to New York residents by a New York Online Institution.  Examples of New York Online Programs include, but are not limited to, CTU's Associate of Science in Health Administrative Services and AIU's Bachelors in Accounting.

8. "New York Regionally Accredited Institution" shall mean any regionally accredited CEC institution located in New York State. For example, Briarcliffe College is a New York Regionally Accredited Institution.

9. "Admissions Personnel" shall mean any CEC employees or agents that regularly interact with prospective students during recruitment and enrollment, except that Admissions Personnel shall not include financial aid representatives.

## II.    <u>INJUNCTIVE RELIEF</u>

### A.    <u>NEW YORK EXECUTIVE LAW § 63(12) AND NEW YORK GENERAL BUSINESS LAW ARTICLE 22-A</u>

1. CEC is hereby permanently enjoined from any future violations of New York Executive Law § 63(12) and New York General Business Law ("GBL") Article 22-A, §§ 349 and 350.

### B.    <u>CALCULATION AND VERIFICATION OF PLACEMENT RATES</u>

1. For a period of five cohort years, beginning with cohort year 2013 (*e.g.*, students who graduate between July 1, 2012 and June 30, 2013) and ending with cohort year 2017, CEC shall calculate placement rates for each New York Program and New York Campus as set forth in Section II.B of this Assurance, except that for the 2013 cohort only, CEC may verify employment after the graduate/completer has worked in the position for a minimum of 10 days.

2. For a period of five years, beginning with cohort year 2014 (*e.g.*, for students who graduate between July 1, 2013 and June 30, 2014, and for the 2015, 2016, 2017, and 2018 cohorts) CEC shall calculate placement rates for each New York Online Program and each program offered by a New York Regionally Accredited Institution as set forth in Sections II.B of this Assurance, except for liberal arts or general studies programs. In addition, during cohort years 2014 through 2018, CEC shall adhere to the

requirements of Section II.B of this Assurance for each New York Online Program and each program offered by a New York Regionally Accredited Institution whenever CEC calculates, reports, and/or discloses placement rates for such program(s) to accreditors, governmental entities, the public, and/or prospective students.

      3.      When calculating placement rates for a New York Online Program as required pursuant to this Section, CEC may calculate placement rates based on data for all graduates/completers of such program, or, in the alternative, CEC may calculate placement rates based on data for the New York graduates/completers only. In any disclosure of a placement rate that is based on data for the New York graduates/completers only, CEC shall clearly and conspicuously state that the placement rate is based on data for the New York graduates/completers only.

      4.      For purposes of this Section and calculating placement rates, CEC shall only deem an individual as "placed" if the individual is a graduate/completer and meets the below definition of "employed" or "self-employed or "contract/freelance employee."

      (a)      <u>Employed.</u> The individual shall be deemed "employed" if each of the following requirements are met:

                (i)      the position is included on the list of job titles published by the institution for which the program prepares graduates/completers; requires the use of the skills learned in the graduate's/completer's program as a

18

predominant component of the job[1]; or, for

graduates/completers continuing employment in a

position that was held prior to enrolling in the program,

the graduate/completer attests in writing that the

training received enabled the graduate/completer to

maintain or advance in the graduate's/completer's

position;

(ii)     the position is permanent (*i.e.*, there is no planned end-date);

(iii)    the position is a paid position;

(iv)    the position requires at least 20 work hours per week;

(v)     the graduate/completer has worked in the position for a

minimum of 18 days (*e.g.*, if a graduate/completer works only

two days per week, the graduate/completer cannot be counted as

"placed" until the graduate/completer has worked for 9 weeks);

and

(vi)    CEC has verified the employment after the graduate/completer

has worked in the position for a minimum of 18 days by either:

(1) speaking to either the employer or an agent of the employer to

confirm employment, (2) contacting the graduate/completer directly,

(3) receiving an email from the graduate/completer, (4) the

graduate/completer's employer provides employment information

about the graduate/completer by email or on-line; or (5) for

---

[1] Examples of positions that do *not* "require the use of the skills learned in the graduate's/completer's program as a predominate component of the job" include, but are not limited to:  for graduates/completers of criminal justice programs, retail sales positions; and for graduates/completers of medical assistant programs, receptionist or childcare positions.

19

graduates/completers continuing employment in a position that was held prior to enrolling in or during the program, the graduate/completer attests in writing that the training received enabled the graduate/completer to maintain or advance in the graduate's/completer's position. The attestation form provided by CEC to graduates/completers continuing in a position held prior to enrolling in or during the program shall state that CEC will use the attestation for purposes of calculating placement rates.

(b)     Self-Employed or Contract/Freelance Employee. The individual shall be deemed "self-employed" or a "contract/freelance employee" if each of the following requirements are met:

(i)     the self-employment or contract/freelance employment meets the requirements of paragraph 4(a)(i) of this Section;

(ii)    the graduate/completer has received or anticipates receiving compensation in return for services provided in connection with the self-employment or contract/freelance employment;

(iii)   in the case of contractual, grant-funded or similar employment, that the position is anticipated to employ the graduate for a period of no less than three months;

(iv)    the graduate/completer has completed at least 135 hours of work in connection with the graduate's/completer's self-employment or contract/freelance employment, including time spent marketing the business, cultivating clients,

20

preparing proposals for bids, negotiating contracts and
initiating and/or completing the work; and

    (v)    CEC has verified the self-employment or contract/freelance
employment after the graduate/completer has completed at least
135 hours of work in connection with the graduate's/completer's
self-employment or contract/freelance employment by obtaining
written verification from the graduate/completer that: (A) he/she is
self-employed or a contract/freelance employee (and a description
of the nature of the self-employment or contract/freelance
employment), and (B) the self-employment or contract/freelance
employment meets each of the requirements of subparts (b)(i)-(iv)
of this paragraph.

    (vi)    Federal Work/Study positions at CEC institutions shall not be
counted as self-employment or contractual/freelance
employment.

5.    The term "placement rate" shall mean the total number of placed
graduates/completers divided by the total number of graduates/completers who do not
qualify for exclusion from the calculation as set out in paragraph II.B(8) below. CEC
will only count a graduate/completer as placed or excluded for purposes of calculating a
placement rate where CEC is able to successfully contact a graduate/completer or
employer to verify employment or exclusion.

6.    Placement rates shall be calculated based on the employment status
of graduates/completers (a) who graduated/completed during the period of July 1
through June 30 ("Reporting Period") and (b) as of November 1 of each year,

subject to modification or extension of the November 1 deadline by ACICS, the accreditor of the majority of CEC's New York locations.

7.  Where CEC relies on a third party for verifying and/or calculating placement rates, CEC shall enter into a contract with such third party pursuant to which the third party shall agree to adhere to the requirements of this Assurance concerning calculation and verification of placement rates. CEC shall monitor and ensure such third party's compliance with the requirements of the Assurance.

8.  In calculating placement rate, a graduate/completer may be excluded from the total number of graduates/completers (*i.e.*, the "denominator") if CEC obtains written documentation that the graduate/completer:

    (a)    is pregnant or has a medical condition or disability that results in the graduate/completer's inability to work or the graduate/completer has a parent, child or spouse who has a medical condition that requires the care of the graduate;

    (b)    is engaged in full-time active military duty;

    (c)    is enrolled in an additional program of post-secondary education;

    (d)    is deceased;

    (e)    is not eligible for placement in the United States because of visa restrictions;

    (f)    is a completer/graduate of a stand-alone English as a Second Language Program;

(g)     is a spouse or dependent of military personnel who
        have moved due to military transfer orders; or

(h)     for the on-line AIU and CTU programs, CEC obtains
        written documentation signed by the
        graduate/completer stating that the
        graduate/completer is not seeking employment or not
        seeking new employment but remaining in a position
        held before graduation and not seeking to obtain
        promotion or move up over time.

9.      Where CEC excludes a graduate/completer from the total number of
graduate/completers for the purposes of calculating the placement rate pursuant to
paragraph II.B(8), CEC shall not count that graduate/completer as "placed".

10.     Within 90 days of execution of the Assurance, CEC shall submit to the
OAG for review and approval a protocol for performance checks of those employees
responsible for verifying, calculating, and/or disclosing placement rates.  Such
performance checks shall be designed to provide a reliable assessment of the accuracy
of disclosed placement rates and compliance by CEC employees with the terms of this
Assurance for the verification, calculation, and disclosure of placement rates.  The
performance checks shall be carried out regularly by CEC's quality assurance or
auditing department or an independent third-party. The protocol will include specific
instructions concerning:

(a)     a schedule for performance checks coinciding with each Reporting Period;

23

(b)     a requirement that each employee who engages in verification, calculation, or disclosure of placement rates be subject to such performance checks;

(c)     a description of mandatory, non-discretionary disciplinary actions (such as demotion or termination) that shall be applied to CEC employees and agents who are found to have violated the requirements of this Assurance, falsified placement rate data, or engaged in other misconduct related to placement rates; and

(d)     a requirement that where performance checks reveal that 5% or more of the graduates/completers were incorrectly counted as placed for the purposes of calculating a placement rate, CEC shall: (i) conduct a review of the employment status of every graduate/completer deemed to have been placed to determine the extent to which the placement rate must be revised, (ii) calculate and disclose any corrected placement rates; and (iii) notify the OAG of this finding.

11.     CEC shall not be required to calculate or disclose placement rates for programs being offered for the first time in the relevant cohort reporting period or for any programs with fewer than five students in the relevant cohort reporting period. CEC shall be required to calculate and disclose placement rates as set forth in Sections II.B and C of this Assurance beginning with the first full cohort year that follows the cohort year in which a program is offered for the first time. For example, a program first offered beginning January 1, 2014, will be required to calculate and disclose placement rates as set forth in Sections II.B and C of this Assurance beginning with the July 1, 2014 to June 30, 2015 cohort year.

24

C.    DISCLOSURE OF PLACEMENT RATES

1.    CEC shall not make any misrepresentations concerning the placement rates of CEC graduates/completers of any institution or program that enrolls New York residents in any advertising or in any oral or written disclosures to students, prospective students, the public, an accrediting agency, or a government entity.

2.    Where CEC is required to calculate and disclose placement rates for New York Programs, New York Campuses, New York Regionally Accredited Institutions, or New York Online Institutions, CEC shall clearly and conspicuously disclose placement rates (a) in all catalogues referencing the particular program, campus, or institution, and (b) on CEC's website.

3.    In all advertising or promotional materials for institutions or programs that enroll New York residents, including but not limited to direct mail and email provided to prospective students, where there is an express or implied representation that completion of a CEC program will result in employment, CEC must either disclose the relevant placement rate for such program or provide a hyperlink (in interactive media) or the URL (in other types of media) for a website that provides the relevant placement rate disclosures. The hyperlink or URL label shall include the terms "Placement Rate" or "Employment Rate" or a term of similar meaning.

4.    With regard to disclosures of placement rates on CEC's websites, CEC shall, for all institutions and programs that enroll New York residents: (a) provide a prominent, obvious, appropriately labeled, and direct link to placement rate disclosures on the homepage of its website and on any other webpage containing general, academic, or admissions information about the program; and (b) display the placement rate disclosures in an open format that can be retrieved, downloaded, indexed and searched

25

by commonly used web search applications. The hyperlink label to placement rate disclosures shall include the terms "Placement Rate" or "Employment Rate" or a term of similar meaning.

     5.    Whenever CEC is required to calculate placement rates pursuant to Section II.B for CEC institutions or programs that enroll New York residents, CEC shall also clearly and conspicuously disclose:

     (a)    the categories of graduates/completers that were excluded from the calculation pursuant to paragraph II.B(8) of this Assurance;

     (b)    if CEC counts as "placed" those graduates/completers who are employed after graduation in the same position that they held prior to beginning or during CEC's program, that such graduates/completers were counted as "placed";

     (c)    that graduates/completers were counted as "placed" if (i) their position was included on the list of job titles published by the institution for which the program prepares graduates/completers; (ii) their position requires the use of the skills learned in the graduate's/completer's program as a predominant component of the job; or (iii) for graduates/completers continuing employment in a position that was held prior to enrolling in the program, the graduate/completer attests in writing that the training received enabled the graduate/completer to maintain or advance in the graduate's/completer's position; and

     (d)    that graduates/completers were counted as "placed" if the

graduate/completer obtained either a full-time position or a part-time position of at least 20 hours per week.

6.      CEC employees or agents shall not make any verbal representations to prospective students concerning the placement rates of CEC institutions or programs that enroll New York residents.

7.      CEC Admissions Personnel at CEC institutions that enroll New York residents shall either provide CEC-approved written disclosures of placement rates in response to inquiries from prospective students concerning placement rates or, where the prospective student has immediate access to CEC's website, CEC may refer such prospective student to CEC's website disclosures.  Such disclosures shall include the placement rate for the specific program and campus where the prospective student intends to enroll (except where placement rate information is unavailable because the program is being offered for the first time or enrolled fewer than five students in the relevant cohort reporting period).  The website disclosures shall comply with the requirements of this Assurance and be clear and conspicuous.

8.      CEC shall provide training on at least an annual basis to all CEC Admissions Personnel for CEC institutions that enroll New York residents regarding appropriate procedures for responding to inquiries regarding placement rates and the disclosure of placement rates.  Such training shall include: (a) notification that Admissions Personnel are prohibited from making verbal representations concerning placement rates to prospective students; (b) notification that Admissions Personnel shall either provide a CEC-approved written disclosure to prospective students in response to inquiries concerning placement rates or, where the prospective student has immediate access to CEC's website, may direct prospective students to CEC-approved disclosures

27

of placement rates on CEC's website; and (c) notification of the disciplinary actions (such as demotion or termination) that shall be applied to CEC Admissions Personnel who are found to have violated the requirements of this Assurance, falsified placement rate data, or engaged in other misconduct related to placement rates.

### D. TERMINATING PROGRAMS WITH INADEQUATE PLACEMENT RATES

1.    Beginning with placement rates for academic year 2013-2014, where placement rates for a program offered to New York residents fall below 47.5% for a given cohort year, CEC must take appropriate action to bring the program's placement rate above 47.5% within a time period not to exceed:

    (a)    Twelve months from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program is less than one year in length;

    (b)    Eighteen months from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program, or the longest program offered by the institution, is at least one year, but less than two years, in length; or

    (c)    Two years from the ACICS November 1 placement rate reporting date (or extending reporting date) that follows the end of each respective cohort year, if the program, or the longest program offered by the institution, is at least two years in length.

2.    If the program's placement is not above 47.5% within the specified period, CEC shall teach-out the program (*i.e.*, end enrollment of new students in the program), unless CEC requests and the OAG approves alternative corrective action.

E.    OBLIGATIONS CONCERNING INSTITUTIONAL AND PROGRAMMATIC ACCREDITATION

1.    CEC shall not misrepresent the accreditation status (*e.g.*, provisional accreditation, accreditation in a probationary status, etc.) of any institution or program that enrolls New York residents.

2.    All CEC webpages that reference a New York Program, New York Campus, New York Online Institution, New York Online Program, or New York Regionally Accredited Institution must clearly and conspicuously disclose up-to-date information regarding the accreditation status of such campus, institution or program in close proximity to the name of the program, campus or institution and directly on the specific webpage that references the New York Program, New York Campus, New York Online Institution, New York Online Program, or New York Regionally Accredited Institution, including, where applicable, the disclosures set forth in Section II.E(4) of this Assurance.  Providing disclosures concerning accreditation status via a hyperlink shall not be sufficient to meet this requirement.  Such disclosures shall consist of a statement concerning the accreditation status of the particular institution or program referenced only, rather than a list of accreditation statuses of multiple institutions/programs.  Where CEC provides the required clear and conspicuous, proximate disclosure of the accreditation status of a campus, institution or program directly on the webpage that references such program, campus or institution, CEC may also provide additional information related to accreditation via hyperlink.

3.    CEC shall not offer any program at any institution that enrolls New York residents where the program, or institution where the program is offered, is not accredited and this may result in an inability to sit for at least one qualifying exam that is

typically necessary for employment[2] immediately upon graduation or in an inability to become registered, licensed, or otherwise credentialed where such registration, license, or credential is typically necessary for employment[3] upon graduation, except that CEC may offer such a program:

    (a)    where CEC has obtained provisional accreditation for such program or institution and CEC is making a good faith effort to obtain full accreditation as promptly as possible; or

    (b)    where CEC has formally applied for accreditation for such program or institution and CEC is making a good faith effort to advance the application as promptly as possible; or

    (c)    where an accreditor requires that a program or institution be operational prior to the submission of an application for accreditation and: (i) CEC provides written pre-notification to the accreditor indicating that CEC intends to apply for accreditation for the program or institution; (ii) CEC makes such application within three months of the last day of any prescribed time-period for applying for accreditation, or if there is no prescribed time-period, within six months of the start date of the program; and (iii) CEC makes a good faith effort to advance such application as promptly as possible.

---

[2] For purposes of this Assurance, a qualifying exam is "typically necessary for employment" where more than 50% of positions are open only to graduates that have passed that qualifying exam.

[3] For purposes of this Assurance, a registration, license or credential is "typically necessary for employment" where more than 50% of positions are open only to graduates that have obtain such registration, license or credential.

Where CEC has submitted an application for accreditation for a program subject to this paragraph and such application is denied, CEC shall teach-out the program (*i.e.*, end enrollment of new students in the program).

4.    Where a program or institution that enrolls New York residents is not accredited or is provisionally accredited and this may result in an inability to sit for at least one qualifying exam that is typically necessary for employment immediately upon graduation or in an inability to become registered, licensed, or otherwise credentialed where such registration, license, or credential is typically necessary for employment immediately upon graduation, CEC must clearly and conspicuously disclose on all webpages that refer to the program, in all CEC catalogues and promotional materials that reference the program or institution, and in a separate written disclosure form that shall be provided to prospective students prior to such student enrolling in the institution or program:

(a)    that the institution or program lacks accreditation from the relevant institutional or programmatic accreditor or is provisionally accredited only and may not achieve full accreditation status; and

(b)    that graduates are not able to sit for certain qualifying exams typically necessary for employment immediately upon graduation or are unable to become registered, licensed, or otherwise credentialed, as applicable, due to the program's or institution's lack of accreditation, and that such registration, license, or other credential is typically necessary for employment.

31

F.    DISCLOSURE CONCERNING LACK OF TRANSFERABILITY OF CREDITS EARNED AT NON-REGIONALLY ACCREDITED INSTITUTIONS

1.    All CEC websites that reference a non-regionally accredited institution that enrolls New York residents shall clearly and conspicuously disclose that credits earned at such institution are usually not transferable to public and private non-profit colleges or universities.

2.    CEC shall provide a written disclosure to prospective students at non-regionally-accredited CEC institutions that enroll New York residents stating that credits earned at the institution are usually not transferable to public or private non-profit colleges or universities.

G.    PROVIDING ADEQUATE PLACEMENT ASSISTANCE

1.    CEC shall provide adequate placement assistance services to all enrollees and graduates/completers of programs at New York Campuses. CEC shall designate full-time equivalent employees as placement representatives for each New York Campus. The placement representatives' job responsibilities shall be primarily related to assisting students and graduates/completers in obtaining jobs, including, for example: providing training in resume and cover letter writing, job search strategies, and/or interviewing; editing resumes and cover letters; researching employment opportunities; providing information about employment opportunities to graduates, etc.

2.    CEC shall provide adequate placement assistance services to all enrollees and graduates/completers of programs at regionally accredited campuses or institutions that enroll New York residents where any of CEC's advertisements for such campus or institution during the prior two years included any claims related to the campus's or institution's provision of placement assistance services. Where CEC's advertisements for

32

such campus or institution during the prior two years included any claims related to the provision of placement assistance services, CEC shall designate full-time equivalent employees as placement representatives for such institution. The placement representatives' job responsibilities shall be primarily related to assisting students and graduates/completers in obtaining jobs, including, for example: providing training in resume and cover letter writing, job search strategies, and/or interviewing; editing resumes and cover letters; researching employment opportunities; providing information about employment opportunities to graduates, etc.

3.    CEC shall maintain appropriate placement representative-to-student ratios at (a) all New York Campuses and (b) those regionally accredited institutions that enroll New York residents that included any claims as to placement assistance services in advertisements in the prior two years. With respect to nationally accredited institutions that enroll New York residents, CEC shall provide at least one placement representative for every 100 students graduating on an annual basis for a period of five cohort years beginning with the 2013 cohort (students graduating between July 1, 2013 and June 30, 2014). With respect to regionally accredited institutions subject to this provision, there must be at least one placement counselor for every 125 students graduating and seeking employment on an annual basis for a period of five cohort years beginning in the 2013 cohort.

4.    At all New York Campuses and at regionally accredited institutions that are subject to this provision, CEC shall document and retain records of: (a) all written student and graduate/completer requests for placement assistance services, (b) all placement assistance services provided to students and graduates/completers, and (c) all

33

written complaints related to placement assistance services and CEC's responses to such complaints.

5.     CEC shall include in any general graduate survey to graduates of New York Campuses or regionally accredited institution that are subject to this provision questions requesting that graduates rate or provide information about their satisfaction with the placement assistance services offered by CEC.

H.    COMPLIANCE MEASURES

1.     CEC shall hire an independent consultant or audit firm to independently seek to verify, using the methods described in paragraphs II.B(4)(a)(vi) and II.B(4)(b)(v), 100% of graduates/completers that have been deemed by CEC to be placed for the following placement rate calculations: 2012-13; 2013-14; and 2014-15 for all New York Programs and New York campuses; and 2013-14, 2014-15, and 2015-16 for all New York Regionally Accredited Institutions, programs offered by New York Regionally Accredited Institutions, New York Online Institutions, and New York Online Programs.

2.     Upon completion of the independent verification process, the consultant or audit firm shall prepare a report that includes a description of: (a) the methodology used to conduct the review; and (b) the results of the review. In addition, CEC will provide a description of any corrective actions that have been taken to address any identified problems. The report shall be submitted to the OAG and CEC's Board of Directors on January 15, 2014 for the 2012-2013 year, on and January 15 of each subsequent year for each subsequent cohort for three years total, ending January 15, 2016 for the New York Programs and New York Campuses and ending January 15, 2017 for the New York Regionally Accredited Institutions, programs offered by New York Regionally Accredited Institutions, New York Online Institutions, and New York Online Programs.

I.    ADDITIONAL REPORTING REQUIREMENTS

1.    For a period of three years, CEC shall provide to the OAG by March 1, 2014 for the 2012-2013 year and subsequently by March 1 of each subsequent year:

      (a)    an affidavit of compliance with the Assurance;

      (b)    placement rate data for each program, campus and institution for which CEC calculated and disclosed placement rate data pursuant to Sections II.B and C of this Assurance;

      (c)    representative examples of any advertisements that include placement rates;

      (d)    representative examples of written placement rate disclosures, if any;

      (e)    a summary of the results of the performance checks (described in paragraph II.B(11) above) that were conducted during the calendar year;

      (f)    a detailed description of any instances where disclosed placement rates were revised after disclosure; and

      (g)    any written complaints from students or graduates/completers related to placement assistance services, accreditation, or difficulty obtaining employment.

III.    RESTITUTION

A.    Restitution Fund and Claims Process

1.    The OAG shall hire an outside administrator to administer the claims process.  CEC shall be responsible for the cost of the administrator and all costs

associated with the claims process in an amount not to exceed $250,000, with any amount above $250,000 to be paid from the Restitution Fund.

      2.     CEC shall pay $9,250,000  into a Restitution Fund administered by the outside administrator within thirty (30) days of the Effective Date of the Assurance. Restitution shall be distributed to eligible consumers pursuant to formulas to be determined by the OAG.

      B.     <u>Restitution Related to Placement Rate Misrepresentations</u>

      1.     All graduates/completers who were enrolled in a New York Program or New York Regionally Accredited Institution and all New York graduates/completers who were enrolled in a New York Online Program during 2009-10, 2010-11, or 2011-12 shall be eligible to receive a claim form.  Such graduates/completers shall be eligible to receive restitution where such graduate/completer was not employed within 180 days of graduation/completion in a position that met the requirements set forth in Section II.B.4(a) or II.B.4(b).

      2.     The OAG shall determine a formula for calculating the amount of restitution eligible claimants shall receive.

      3.     Within 60 days of the Effective Date of the Assurance, CEC shall provide the administrator with a database that includes the following information necessary to carry out the claims process related to placement rate misrepresentations: (a) the names and last known addresses of all graduates/completers who were enrolled in a New York Program or New York Regionally Accredited Institution and all New York graduates/completers who were enrolled in a New York Online Program during cohort years 2009-10, 2010-11, or 2011-12; (b) the program(s) that the graduates/completers graduated

36

from or completed; (c) the amount of tuition paid by such graduates/completers; and (d) the disclosed placement rate for the program(s) and institution(s) graduated from or completed.

     C.     Restitution related to Programmatic Accreditation

     1.     New York graduates/completers who enrolled during the cohort years 2009-10, 2010-11, or 2011-12 in CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs that lacked programmatic accreditation, as well as New York graduates/completers who enrolled prior to cohort year 2009-2010 in CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs lacking programmatic accreditation who submitted a complaint to the OAG, Better Business Bureau, or State Education Department prior to the Effective Date of this Assurance or who submit a complaint to the OAG within 60 days of the Effective Date of this Assurance, shall be eligible for restitution from the Restitution Fund pursuant to a formula to be determined by the OAG.

     2.     Within 60 days of the Effective Date of the Assurance, CEC shall provide the administrator with a database that includes the following information: (a) the names and last known addresses of all graduates/completers who were enrolled CEC Diagnostic Medical Ultrasound, Diagnostic Medical Sonography, Cardiovascular Technology, or Surgical Technology programs that lacked programmatic accreditation during cohort years 2009-10, 2010-11, or 2011-12; (b) the program(s) that the graduates/completers graduated from or completed; and (c) the amount of tuition paid by such graduates/completers.

     3.     The OAG shall determine a formula for calculating the amount of restitution eligible claimants shall receive.

37

IV.   CIVIL PENALTY

1.     In consideration of the making and execution of this Assurance, and within ten (10) business days of the Effective Date of this Assurance, CEC shall pay by wire transfer, certified or bank check payable to the State of New York $1 million for penalties, fees and costs. If payment is made by check, it shall be payable to the State of New York and delivered to the State of New York Office of the Attorney General, Consumer Frauds and Protection Bureau, Attention: Jeanna Hussey, Assistant Attorney General, 120 Broadway, 3rd Floor, New York, New York, 10271.

V.   SUBSEQUENT CHANGES IN LAW OR ACCREDITATION STANDARDS

1.     If federal law or regulations or state laws or regulations are enacted subsequent to the Effective Date of the Assurance which relate to calculation of or disclosure of placement rates or other matters hereunder, and such laws or regulations are inconsistent with the provisions of the Assurance, CEC will notify the OAG concerning these changes in law or regulation and may request modification of the relevant provisions of the Assurance, which modification shall not be unreasonably withheld.

2.     If ACICS or any other relevant institutional or programmatic accreditor modifies or revises its guidelines or standards subsequent to the Effective Date of the Assurance, and where such modifications are inconsistent with the provisions of the Assurance, CEC will notify the OAG concerning these changes in guidelines or standards and may request modification of provisions of the Assurance that conflict with such guidelines or standards.

3.     Nothing in this agreement is intended to modify or change the requirements imposed relating to calculating, reporting or disclosing separate placement rates to the New York State Bureau of Proprietary School Supervision (BPSS), New York

38

State Education Department (NYSED), other governmental entities, or CEC's institutional or programmatic accreditors, where required, and CEC may separately calculate, report or disclose to the public and/or prospective students those separate placement rates, as applicable, along with any placements rates calculated and disclosed pursuant to the terms of the Assurance.  CEC shall notify the OAG of significant changes to requirements imposed relating to calculating, reporting, or disclosing separate placement rates to the governmental entities or CEC's accreditors.

VI.   <u>MISCELLANEOUS</u>

1.     OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by CEC and OAG's own factual investigation as set forth in Findings (1)-(42) above.  To the extent that any material representations are later found to be materially inaccurate or misleading, this Assurance is voidable by OAG in its sole discretion.

2.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by CEC in agreeing to this Assurance.

3.     CEC represents and warrants, through the signature below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized.  CEC shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis.  Nothing in this paragraph affects CEC's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which OAG is not a party.  This Assurance is not intended for use by any

third party in any other proceeding and is not intended, and should not be construed, as an admission of liability by CEC.

4. This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

5. This Assurance shall be binding on and inure to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG.

6. It is understood and agreed that this Assurance shall apply to CEC, whether acting through its respective directors, officers, employees, representatives, agents, assigns, successors, affiliates, subsidiaries or other business persons or business entities whose acts, practices, policies are directed, formulated or controlled by Respondents.

7. In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, in the sole discretion of OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

8. To the extent not already provided under this Assurance, CEC shall, upon request by OAG, provide all documentation and information reasonably necessary for OAG to verify compliance with this Assurance.

9. All notices, reports, requests, and other communications to any party pursuant to this Assurance shall be in writing and shall be directed by fax and UPS priority mail as follows:

If to CEC, to:

      Jeffrey D. Ayers
      Senior Vice President, General Counsel & Corporate Secretary
      Career Education Corporation
      231 N. Martingale Road
      Schaumburg, Illinois 60173

If to OAG, to:

      Jeanna Hussey
      Assistant Attorney General
      Bureau of Consumer Frauds & Protection
      Office of the Attorney General of the State of New York
      120 Broadway, 3rd Floor
      New York, NY 10271

10.     Acceptance of this Assurance by OAG shall not be deemed approval by OAG of any of the practices or procedures referenced herein, and CEC shall make no representation to the contrary.

11.     Pursuant to Executive Law § 63(15), evidence of a violation of this Assurance shall constitute prima facie proof of violation of the applicable law in any action or proceeding thereafter commenced by OAG.

12.     If a court of competent jurisdiction determines that CEC has breached this Assurance, CEC shall pay to OAG the cost, if any, of such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

13.     OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding. This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

14.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

15.    This Assurance constitutes the entire agreement between the OAG and CEC and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of this Assurance.

16.    This Assurance may be executed in multiple counterparts.

17.    The Effective Date of this Assurance shall be the date upon which it has been fully executed by all of the signatories hereto.

**IN WITNESS THEREOF**, this Assurance is executed by the parties hereto on August **19**, 2013.

Career Education Corporation

By: _____

Jeffrey D. Ayers
Senior Vice President, General Counsel & Corporate Secretary


Eric T. Schneiderman
Attorney General of the State of New York


By: _____

Jane M. Azia
Bureau Chief
Bureau of Consumer Frauds & Protection


By: _____

Jeanna Hussey
Assistant Attorney General


_____

Carolyn Fast
Assistant Attorney General

Melvin Goldberg
Assistant Attorney General



# ARDMS®

# SPI Requirement
# and General Prerequisites



**ARDMS.org**
**1-800-541-9754**

# Sonography Principles and Instrumentation (SPI) Examination Requirement

*(Note: All listed items must be met and completed prior to submission. See the Notes About the SPI Requirement for footnotes, definitions and complete details.)*

### Education

Successful completion of a general, medical or sonographic physics class/seminar/course.

### Documentation Required with Application

1) A transcript (see transcript requirements below) reflecting successful completion of a graded general, medical or sonographic college, post secondary or higher education physics class (with a grade of C or above);

### OR

A CME certificate denoting successful completion of a general, medical or sonographic physics seminar, physics review course, or physics correspondence course, denoting a minimum award of 12 ARDMS-accepted CME credits. The certificate must meet ARDMS CME documentation requirements (visit ARDMS.org/CME to view ARDMS-accepted CMEs). The CME credits must be earned within two (2) years prior to application submission.

2) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

### Transcript Requirements

• Name of applicant and school must be printed on the transcript; handwritten information will not be accepted.

• The class or course name must specifically indicate "Physics," "Physical Principles" and/or "Instrumentation" in the title and be printed on the transcript. Supplementary information will not be accepted.

• Transcript can be unofficial or official.

• If submitting a foreign transcript or degree, an original course by course foreign transcript evaluation must accompany the application summary and indicate the aforementioned requirements.

• Transcripts only indicating a number grade must include a "grade key" printed on the transcript showing what letter grade the number grade is equivalent to. Supplementary information will not be accepted.

• A grade report will not be accepted in lieu of the transcript (unofficial or official).

# Prerequisite 1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

A single two-year allied health education program that is patient-care related.[1]

Allied health occupations include, but are not limited to, diagnostic medical sonographer, radiologic technologist, respiratory therapist, occupational therapist, physical therapist and registered nurse.

### Required Clinical Ultrasound/Vascular Experience

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

Note: If you are using your DMS/CVT program for the educational requirement, you still have to document an additional 12 months of full-time clinical ultrasound/vascular experience earned outside the two-year program.

### Documentation Required with Application

1) Official transcript from two-year allied health education program as noted in the "Education" requirement of this prerequisite. Must state specific number of credits and indicate quarter or semester based system.

2) Copy of education program certificate, credential or license.

3) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. For required letter content, please visit: ARDMS.org/sampleletters.

4) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

Graduate of a program accredited by an agency recognized by the Council for Higher Education Accreditation (CHEA), United States Department of Education (USDOE) or Canadian Medical Association (CMA), that specifically conducts programmatic accreditation for diagnostic medical sonography/diagnostic cardiac sonography/vascular technology. Currently the only organizations that offer programmatic accreditation under the aforementioned associations are the Commission on Accreditation of Allied Health Education Programs (CAAHEP) and the Canadian Medical Association (CMA).

### Required Clinical Ultrasound/Vascular Experience

No additional experience is required.

### Documentation Required with Application

1) Copy of diploma from ultrasound/vascular program or an official transcript indicating the date the degree was conferred.

2) Original letter signed by program director and/or medical director indicating date of graduation or successful completion of the program[4]. Program directors must use the mandatory formatted sample letter, available on ARDMS.org /sampleletters.

3) The CV form is not required if the application is submitted and received in the ARDMS office within one year after successful completion of the program. Otherwise an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 3A

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

### Education

Bachelor's degree (any major) or foreign degree equivalent to a Bachelor's degree in the U.S. or Canada.

### Required Clinical Ultrasound/Vascular Experience

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

### Documentation Required with Application

1) Copy of Bachelor's degree or an official transcript earned in the U.S. or Canada or an original foreign transcript evaluation indicating that the degree is equivalent to a Bachelor's degree in the U.S. or Canada.

2) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 3B

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

Bachelor's degree in sonography or vascular technology or foreign degree equivalent to a Bachelor's degree in sonography or vascular technology in the U.S. or Canada.

**Required Clinical Ultrasound/Vascular Experience**

No additional experience is required.

Note: Sonography or vascular technology Bachelor's degree applicants may take the examination one year prior to the completion of degree, provided they have completed 12 months of full-time[2] clinical experience[3] within the program.

**Documentation Required with Application**

1) Copy of Bachelor's degree or an official transcript earned in the U.S. or Canada or an original foreign transcript evaluation indicating that the degree is equivalent to a Bachelor's degree in the U.S. or Canada.

2) Original letter signed by education program director verifying length of ultrasound or vascular experience. If program is not completed at the time of application, a letter signed by the program director stating graduation date and completion of appropriate clinical ultrasound experience[3] is needed[5]. Program directors must use the mandatory formatted sample letters, available on ARDMS.org/sampleletters.

3) The clinical verification (CV) form is not required if the application is submitted and received in the ARDMS office within one year prior to successful completion of the program, provided that the applicant has completed 12 months of full-time clinical experience within the program at the time that the application is submitted. Otherwise, an original signed and completed CV form for each appropriate specialty area(s) must be submitted. CV forms are available at ARDMS.org/cv.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 4A1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General, U.S., and Canada — MD or DO degree earned in the U.S. or Canada.

Formal Training — Attendance of an Accreditation Council for Graduate Medical Education (ACGME) or Royal College of Physicians and Surgeons of Canada (RCPSC) accredited residency or fellowship that includes didactic and clinical ultrasound/vascular experience as an integral part of the program.

**Required Clinical Ultrasound/Vascular Experience**

The applicant must be able to document clinical experience with a minimum of 800 studies in the area in which he/she is applying for.

**Documentation Required with Application**

1) Copy of medical school diploma.

2) Original letter from residency/fellowship program director verifying dates of attendance and completion of a minimum of 800 studies in the area in which you are applying. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Applicants should maintain a patient log or other record of the 800 studies. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of application for examination.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 4A2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General, U.S., and Canada — MD or DO degree earned in the U.S. or Canada.

**Required Clinical Ultrasound/Vascular Experience**

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

**Documentation Required with Application**

1) Copy of medical school diploma.

2) Original letter from supervising physician, ARDMS-Registered sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. If you are the supervising physician, you may write your own letter. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 4B1

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

**Education**

General - Outside U.S., and Canada — MD or DO degrees equivalent to those of the U.S. or Canada.

Formal Training — Attendance of an accredited residency or fellowship that includes didactic and clinical ultrasound/vascular experience as an integral part of the program.

**Required Clinical Ultrasound/Vascular Experience**

The applicant must be able to document clinical experience with a minimum of 800 studies in the area in which he/she is applying for.

**Documentation Required with Application**

1) Original credential report or official notarized copy of the evaluation converting the foreign medical degree must indicate that this medical degree is equivalent to a doctor of medicine degree in the U.S. or Canada. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent can be found at ARDMS.org/ForeignTranscripts. If the applicant has taken and passed all three parts of and earned the Educational Commission for Foreign Medical Graduates (ECFMG®) certification, a copy of the ECFMG® certificate may be submitted with a copy of a current, valid MD or DO license from the U.S. or Canada in lieu of the evaluation.

2) Original letter from residency/fellowship program director verifying dates of attendance and completion of a minimum of 800 studies in the area in which you are applying. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s). CV forms may be found at: ARDMS.org/CV.

4) Applicants should maintain a patient log or other record of the 800 studies. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of application for examination.

5) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 4B2

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

## Education

General - Outside U.S., and Canada — MD or DO degrees equivalent to those of the U.S. or Canada.

## Required Clinical Ultrasound/Vascular Experience

12 months of full-time[2] clinical ultrasound/vascular experience.[3]

## Documentation Required with Application

1) Original credential report or official notarized copy of the evaluation converting the foreign medical degree must indicate that this medical degree is equivalent to a doctor of medicine degree in the U.S. or Canada. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent can be found at ARDMS.org/ForeignTranscripts. If the applicant has taken and passed all three parts of and earned the Educational Commission for Foreign Medical Graduates (ECFMG®) certification, a copy of the ECFMG® certificate may be submitted with a copy of a current, valid MD or DO license from the U.S. or Canada in lieu of the evaluation.

2) Original letter from supervising physician, sonographer/technologist or educational program director indicating a minimum of 12 months of full-time clinical/vascular experience including exact dates of ultrasound experience/successful completion of sonography program. If you are the supervising physician, you may write your own letter. For required letter content, please visit: ARDMS.org/sampleletters.

3) Original signed and completed clinical verification (CV) form for each appropriate specialty area(s).

4) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 5

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

## Education

General—Must hold one of the following Active certifications:

ONLY *RCS, RCCS* or *RVS* through Cardiovascular Credentialing International (CCI), or

ONLY *Sonography, Vascular Sonography* or *Breast Sonography* through American Registry of Radiologic Technologist (ARRT), or

*DMU* through Australian Society of Ultrasound in Medicine (ASUM).

## Required Clinical Ultrasound/Vascular Experience

Previously met by achievement of other organization's credential.

## Documentation Required with Application

1) Copy of Active certification identification card or copy of license.

2) Original signed and completed CV form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

3) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 6

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

## Education

MD or DO with RPVI (Active Status)

Physicians who currently hold the RPVI credential with active status may apply directly for the RDMS, RDCS and RVT credential examinations.

## Documentation Required with Application

1) Copy of current, valid medical license.

2) Original signed and completed Clinical Verification (CV) form for each appropriate specialty area(s). CV forms are available at ARDMS.org/cv.

3) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Prerequisite 7

*Prerequisite 7 is scheduled to expire on 12/1/2017.*

*(Note: All listed items must be met and completed prior to submission. See the Notes About the Prerequisites for footnotes, definitions and complete details.)*

## Education:

High school graduate or U.S. or Canadian equivalent of foreign high school graduate.

## Required Clinical Ultrasound/Vascular Experience

Minimum of 48 months full-time[2] clinical ultrasound/vascular experience[3] and a minimum of 3,200 cases in each applied for specialty area.

## Documentation Required with Application

1) Copy of high school diploma or U.S. or Canadian equivalent of foreign high school graduate. (For individuals whose high school diploma/equivalent was earned outside of the U.S. or Canada, an original credential report or official notarized copy of the evaluation is required. A listing of organizations that produce individualized, written reports describing each certificate, diploma or degree earned, and specifying its U.S. or Canadian equivalent, can be found at ARDMS.org/ForeignTranscripts.)

2) Original Physician's Statement Experience letter(s) from reporting physician(s) indicating a minimum of 48 months of full-time clinical/vascular experience and including exact dates of ultrasound experience in each applied for specialty area.

3) Original Sonographer's Statement letter from an ARDMS Registered Sonographer verifying the applicant has performed independently and effectively under their supervision a minimum of 3,200 cases in each applied for specialty area. For required letter content, please visit: ARDMS.org/sampleletters.

4) Original signed and completed Clinical Verification (CV) form for each appropriate specialty area(s). CV forms may be found at ARDMS.org/CV.

5) Thirty ARDMS accepted CMEs that are ultrasound related in the specific applied for specialty area earned within three years prior to the date of application for examination.

6) Applicants should maintain a patient log or other record of the 3,200 cases for each applied for specialty area. This log does not need to be submitted with the application but may be requested as part of a random audit. This documentation should be maintained by the applicant for at least three (3) years following the date of examination.

7) Photocopy of a non-expired government issued photo identification with signature; the name on the identification must exactly match the name under which you are applying for ARDMS examination.

# Notes About the SPI Examination Requirement

- The SPI Examination Requirement applies to the SPI examination only.

- SPI Applicants who can fully meet an existing ARDMS prerequisite (1 through 7) are strongly encouraged to apply under that prerequisite, as future application processing will be faster and easier.

- Applicants who have applied for and been approved to take a former Principles and Instrumentation examination (UPI, CPI, VPI) or any ARDMS specialty examination(s) (e.g. AB, BR, OB/GYN, NE, FE, AE, PE, VT) should not apply under the SPI Examination Requirement but rather as a re-applicant (visit ARDMS.org/reapplicant for details).

- A clinical verification (CV) form is not required when applying under the SPI Examination Requirement.

- To apply for an ARDMS specialty examination (e.g. AB, BR, OB/GYN, NE, FE, AE, PE, VT), an existing ARDMS prerequisite (1 through 7) must be met.

# Notes About the Prerequisites

[1] A two-year allied health education program that is patient-care related is defined as (1) 24 full-time consecutive calendar months or (2) 60 semester credits or (3) 84 quarter credits (4) and requiring a clinical internship/externship to complete the program. Credit hours are based on U.S. equivalency in a post secondary institution. The program or school must be authorized by an accrediting agency to award semester or quarter credits and the type of credits granted must be reflected on the transcript. Transcripts reflecting clock hours must be converted to credit hours. If submitting a foreign degree, an original course by course foreign transcript evaluation must accompany the application summary and indicate the aforementioned requirements.

[2] Full-time is defined as 35 hours per week, at least 48 weeks per year. If working part time, the requirements are prorated. Twenty hours per week would take approximately two years. The full-time definition applies to both paid clinical ultrasound/vascular experience and experience earned through completion of a formal ultrasound/vascular program.

[3] Clinical ultrasound/vascular experience may be obtained one of two ways: (1) being employed as an ultrasound/vascular sonographer in a clinical setting for a minimum of 12 months and a minimum of 1680 hours, or (2) successfully completing a formal, full-time ultrasound/vascular program that is a minimum of 12 months in length, a minimum of 1680 total program hours, including appropriate clinical and didactic hours, and requires a clinical internship/externship to complete the program. If the total length of the program exceeds 12 months, the applicant must successfully complete the program in its entirety prior to using the program as documentation of the required clinical ultrasound/vascular experience. It is recommended that an applicant be directly involved in a minimum of 800 diagnostic cases during his/her clinical experience in each specialty area for which he/she is applying. Clinical diagnostic settings include hospitals, clinics and private practices. ARDMS does not accept volunteer, instructorship, unpaid, barter or veterinarian experience. The time frames in which the education and clinical requirements are met cannot overlap. Clinical experience earned to document the education requirement cannot also be used to support the clinical requirement.

[4] The mandatory Prerequisite 2 Application letter (found on ARDMS.org /sampleletters) is valid for one year from the date of graduation. If the application and appropriate supporting documentation are not received after one year of successful completion of the program, the applicant will need new documentation verifying successful program completion, and a current, completed, original signed CV form for each applied-for specialty area will be required. An original letter per student is required. First-time applicants applying under Prerequisite 2 must apply for either the Sonography Principles and Instrumentation (SPI) examination or a specialty area that is included within the programmatically accredited curriculum.

[5] The mandatory Student Prerequisite 3B Application Letter (found on ARDMS.org/sampleletters), is valid through the expected graduation date. If the student chooses to apply after graduation, then the Graduate Prerequisite 3B Application letter (found on ARDMS.org /sampleletters) and a current, completed, original CV form for each applied-for specialty area will be required. An original letter per student is required.

Note: If the Bachelor's Degree sonography/ vascular technology program is also programmatically accredited through one of the following: Council for Higher Education Accreditation (CHEA), United States Department of Education (USDOE), or Canadian Medical Association (CMA), and the students have graduated, then the prerequisite 3B students should apply under prerequisite 2.

Note: ARDMS, in its discretion, may request from you or others information concerning matters that may be relevant to your eligibility for certification and certification status.

All documentation must be in English or include a notarized translation. (MD licenses, CMEs, etc.)

All documents, communications, and other information received by ARDMS become the property of ARDMS and will not be returned.

Johnny Sallo
Brighton
1234 Broadway Street  Room 877
New York, NY 10000
Tel: (000) 000-0000
Fax: (000) 000-0000
Email: jsallo@career.com



From: Sabina Cruz
Sent: Tuesday, August 20, 2013 11:00 AM
To: Bethany Lynn; Johnny Sallo
Subject: FW: Wattie Colton - SBNY
Importance: High

We need to pull up the file of the above named student. CEC lawyers need this ASAP. Can this be done quickly please and if we locate the file and documents over come? Thanks!

From: Jill Dudley
Sent: Monday, August 19, 2013 2:18 PM
To: Mark Germani
Subject: FW: Wattie Colton - SBNY

The Cardiovascular Technology program at SB New York has never been programmatically accredited.

Jill A. Dudley
Vice President of Regulatory Review
Career Education Corporation
847-... direct / 847-... cell

From: Nestor Samayoa
Sent: Monday, August 19, 2013 2:15 PM
To: Jill Dudley
Subject: Wattie Colton - SBNY

Graduated from Cardiovascular Technology program on 4/29/2008

- Original enrollment status on 5/5/2004
- Cancellation 9/30/2004
- Reenrollment 7/26/2005
- Active between 8/15/2005 - 4/29/2008

Ledger balance: $0

Has had no financial aid from grants owed for some reason.

22



Contact Us: TOLL FREE 1-877-809-2444

Search

Sanford-Brown

**Apply Now!** If you're ready to take the first step towards your career...

**Request Info @** It's easy to learn more about Sanford-Brown

**Career Services:** Pursue a career that's right for you!

ABOUT US | AREAS OF STUDY | LOCATIONS | ADMISSIONS | TUITION & FINANCIAL AID | STUDENT LIFE | REQUEST INFO | APPLY NOW!

- Home
- About Us
  - Welcome Message
  - History & Mission
  - Accreditation & Certification
  - State Licensure & Registration
  - Why Choose Sanford-Brown?
  - Hospital & Community Partners
  - Suggestion Box
  - Career Opportunities
  - Sanford-Brown In the News
  - Sanford-Brown Events
  - Health Forum
  - Press Room

**Candidate for Acceptance**

FIND OUT IF YOU'RE A CANDIDATE FOR ACCEPTANCE TODAY!

LEARN MORE

About Us
Accreditation & Certification

Print Bookmark Share

Home > About Us > Accreditation & Certification

# Accreditation and Certification

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality.

Sanford-Brown Institute - Monroeville and Sanford-Brown Institute – Pittsburgh are institutionally accredited by the Accrediting Commission of Career Schools of Colleges (ACCSC), an independent accrediting agency recognized by the United States Department of Education (DOE).

This indicates that Sanford-Brown Institute - Monroeville and Sanford-Brown Institute – Pittsburgh substantially meets or exceeds the stated criteria of education quality established by ACCSC and approved by the DOE. This recognition of institutional accreditation by ACCSC entitles SBI to offer Title IV Financial Assistance to students who qualify.

All remaining Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the United States Department of Education (DOE) and the Council for Higher Education Accreditation (CHEA).

This indicates that these schools substantially meet or exceed the stated criteria of education quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional accreditation by ACICS entitles SBC to offer Title IV Financial Assistance to students who qualify.

An additional form of accreditation that a school may undertake to obtain is a specific, individual accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same as or a substitution for programmatic accreditation.

Although programmatic accreditation is not required for employment in many cases, the existence of programmatic accreditation is a further indication that a program meets the standards of the profession, and may therefore indirectly enhance employment opportunities.

Also, in some cases, programmatic accreditation will allow the graduates of the accredited program to sit for some credentialing exams immediately upon graduation without any requirement of work experience.

## Institutional Accreditation

- **Sanford-Brown Institute – Monroeville and Sanford-Brown Institute – Pittsburgh** are institutionally accredited by the Accrediting Commission of Career Schools of Colleges (ACCSC) to award certificates and degrees.

 ACCSC
2101 Wilson Boulevard
Suite 302
Arlington, VA 22201
(703) 247-4212
(703) 247-4533 (fax)

-       **All remaining Sanford-Brown schools** are institutionally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award certificates and degrees.

 INTERNET ARCHIVE   Wayback Machine    86 captures   2 Apr. 10 – 29 Nov. 14     http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification   Go    MAR APR MAY   Close ✖    2    2009 2010 2011   Help ?

 ACICS
750 First Street NE
Suite 980
Washington, DC 20002-4241
(202) 336-6780
(866) 510-0746

## Programmatic Accreditation

- The Medical Assistant Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Collinsville, Sanford-Brown College – Fenton, Sanford-Brown College – Hazelwood-Diploma Program in Medical Assistant, Sanford-Brown College – Houston, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – New York, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Pittsburgh, Sanford-Brown Institute – Tampa, Sanford-Brown Institute – Trevose, Sanford-Brown Institute – White Plains.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

- The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Houston, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Tampa.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

- The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown College – Houston, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Monroeville, and Sanford-Brown Institute – Tampa.

- The Diagnostic Medical Sonography Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRCDMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Houston, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Pittsburgh.
CAAHEP
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

- The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Pittsburgh.

CoARC
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

- The Practical Nursing Program at Sanford-Brown College – St. Peters is approved by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3252. Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

- The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown Institute – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – Northloop, Sanford-Brown Institute – Tampa.

ASHP
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

- The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Fenton and Sanford-Brown Institute - Pittsburgh.

■ Mission Statement & Goals

■ Technical Requirements

■ Admission Requirements

**Mission**

The mission of Sanford-Brown College Radiography Program is to provide a quality, highly specialized educational program in the field of radiography to adult learners. The focused radiography program will provide the knowledge necessary for successful passing of the certification exam and for future employment in imaging.

**Program Goals**

1. The graduates will have entry-level employment skills as a radiographer.
2. The graduates will be clinically competent.
3. The graduates will apply critical thinking, problem solving, and communication skills during radiographic procedures.
4. The graduates will demonstrate professional growth and development skills.
5. The radiography program will be evaluated for effectiveness annually.

For more information on JRCERT Accreditation, please contact the JRCERT at:

JRCERT
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

■ The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters and Sanford-Brown Institute - Pittsburgh.

AVMA
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800.248.2862

■ The Occupational Therapy Assistant program at Sanford-Brown College – Hazelwood is currently the only Sanford-Brown campus that is programmatically accredited by the Accreditation Council for Occupational Therapy Education (ACOTE) and is currently on probationary status.

ACOTE
4720 Montgomery Lane
PO Box 31220
Bethesda, MD 20824-1220
Phone: 301-652-2682

The American Occupational Therapy Association, Inc.

## Request More Info!

Tell us more about yourself and specify your campus and program of interest. An admissions representative will contact you to provide you with more information.

* = required fields



Step 1 of 2

* Campus of Interest: — Select —

* Program of Interest: — Select —

NEXT

| About Us | Areas of Study | Locations | Admissions | Tuition & Financial Aid | Student Life |
|---|---|---|---|---|---|
| Welcome Message | Learning Options | Arizona | How to Apply for Admission | How to Apply for Financial Aid | Online Communities |
| History and Mission | Allied Health Diagnostic | Florida | Admission Requirements | Financing Options for Your Education | Alumni |
| Accreditation & Certification | Allied Health Technicians and Therapists | Georgia | Are you a Candidate for Acceptance? | Grants & Scholarships | Career Services |
| State Licensure & Registration | Dental | Illinois | Schedule an Appointment Today | Refund Policy | Faculty Profiles |
| Why Choose Sanford-Brown? | Nursing | Indiana | Documents & Resources | Financial Aid Tools | Sanford-Brown In the News |
| Hospital & Community Partners | Business, Administrative and Legal | Maryland | Request Information | CEC Code of Conduct | Sanford-Brown Events |
| Suggestion Box | Art, Design and Technology | Michigan | Apply Now | Documents & Resources | Refer a Friend |
| Career Opportunities | | Missouri | | Request Information | |
| Sanford-Brown In the News | | New Jersey | | Apply Now | |
| Sanford-Brown Events | | New York | | | |
| Health Forum | | Ohio | | | |
| Press Room | | Pennsylvania | | | |
| | | Rhode Island | | | |
| | | Texas | | | |
| | | Virginia | | | |
| | | Wisconsin | | | |

Affiliated Schools:
SBI Melville
Missouri College
Gibbs Boston
Gibbs Farmington
Brown College

©2010 Sanford-Brown. All rights reserved.

No information may be duplicated without permission from Sanford-Brown.

Sanford-Brown does not guarantee employment or salary.

Privacy Statement     Legal Terms and Conditions     Sitemap





**Career Services:** Pursue a career that's right for you!

ABOUT US   AREAS OF STUDY   LOCATIONS   ADMISSIONS   TUITION & FINANCIAL AID   STUDENT LIFE   REQUEST INFO   APPLY NOW!

Home

**About Us**
Welcome Message
History & Mission
Accreditation & Certification
State Licensure & Registration
Why Choose Sanford-Brown?
Hospital & Community Partners
Social Responsibility
Suggestion Box
Career Opportunities
Sanford-Brown In the News
Sanford-Brown Events
Health Forum
Press Room

## About Us
### Accreditation and Certification

Print    Bookmark    Share

Home   **About Us**   Accreditation & Certification

# Accreditation and Certification

Accreditation is a voluntary process which may be undertaken by
schools to demonstrate compliance with specific standards designed
to indicate a level of education quality.

## Institutional Accreditation

Sanford-Brown Institute - Monroeville and Sanford-Brown Institute –
Pittsburgh are institutionally accredited by the Accrediting Commission
of Career Schools of Colleges (ACCSC), an independent accrediting
agency recognized by the United States Department of Education
(DOE). This indicates that Sanford-Brown Institute - Monroeville and
Sanford-Brown Institute – Pittsburgh substantially meets or exceeds
the stated criteria of education quality established by ACCSC and
approved by the DOE. This recognition of institutional accreditation by
ACCSC entitles SBI to offer Title IV Financial Assistance to students
who qualify.

All remaining Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting
Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the
United States Department of Education (DOE) and the Council for Higher Education Accreditation
(CHEA). This indicates that these schools substantially meet or exceed the stated criteria of education
quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional
accreditation by ACICS entitles SBC to offer Title IV Financial Assistance to students who qualify.

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with
specific standards designed to indicate a level of education quality. Each campus has been approved by
its respective Institutional Accreditor to offer all of its currently available programs.

> **Sanford-Brown Institute – Monroeville and Sanford-Brown Institute – Pittsburgh** are
> institutionally accredited by the Accrediting Commission of Career Schools of Colleges
> (ACCSC) to award certificates and degrees.

ACCSC
2101 Wilson Boulevard
Suite 302
Arlington, VA 22201
(703) 247-4212
(703) 247-4533 (fax)

**All remaining Sanford-Brown schools** are institutionally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award certificates and degrees.

ACICS
750 First Street NE
Suite 980
Washington, DC 20002-4241
(202) 336-6780
(866) 510-0746

## Programmatic Accreditation

An additional form of accreditation that a school may undertake to obtain is a specific, individual accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same as or a substitution for programmatic accreditation. Although programmatic accreditation is not required for employment in many cases, the existence of programmatic accreditation is a further indication that a program meets the standards of the profession, and may therefore indirectly enhance employment opportunities. Also, in some cases, programmatic accreditation will allow the graduates of the accredited program to sit for some credentialing exams immediately upon graduation without any requirement of work experience.

It is important to understand what accreditation is and why it is important to Sanford-Brown. The goal of accreditation is to ensure that the education provided by institutions of higher education meets acceptable levels of quality. DOE recognized accrediting agencies have adopted criteria reflecting the qualities of a sound educational program and have developed procedures for evaluating institutions or programs to determine whether or not they meet these criteria. The standards by which institutions or programs are measured have been developed by subject matter experts and are intended to include what is critical for students to learn in order to successfully pursue a given profession. Having this kind of oversight and ensuring compliance with stated standards is essential to maintaining quality for students. Institutional Accreditation measures the entire operations of a given campus. Programmatic accreditation evaluates the components of a given academic program. Sanford-Brown is committed to offering programs that live up to these standards so that we can help provide qualified and prepared graduates in the field of healthcare. We understand that accreditation is not merely a recognition granted once an institution or program is in substantial compliance with the stated standards, but is a privilege that we must continue to earn through disciplined actions and quality instruction.

Broadly, across our Sanford-Brown campuses, over 60 programs are currently programmatically accredited. Some accrediting agencies require that a new program graduate its first class before the program is eligible for programmatic accreditation but we strive to run our programs according to the standards of our relevant programmatic accreditors and are committed to seeking programmatic accreditation for our eligible programs. This includes not starting the first class until the clinical site requirement is formally demonstrated, not over seating classes, ensuring the self study process is part of the educational plan and making certain that the curriculum, facility, equipment, staff and leadership meet the programmatic accreditation requirements.

To learn about which programs are programmatically accredited by campus, see the detailed information below.

The Medical Assistant Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Collinsville, Sanford-Brown College - Dearborn, Sanford-Brown College - Grand Rapids, Sanford-Brown College – Fenton, Sanford-Brown College – Hazelwood-Diploma Program in Medical Assistant, Sanford-

Brown College – Houston, Sanford-Brown College – Milwaukee, Sanford-Brown College – Phoenix, Sanford-Brown College – Dallas, Sanford-Brown College - San Antonio, Sanford-Brown College – St. Peters, Sanford-Brown College – Vienna, Sanford-Brown Institute - Cranston, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Monroeville, Sanford-Brown Institute – New York, Sanford-Brown College – North Loop, Sanford-Brown Institute – Orlando, Sanford-Brown Institute – Pittsburgh, Sanford-Brown Institute – Tampa, Sanford-Brown Institute – Trevose, Sanford-Brown Institute – White Plains.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Houston, Sanford-Brown College – St. Peters, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Tampa.

ABHES
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown College – Houston, Sanford-Brown College - Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Monroeville, and Sanford-Brown Institute – Tampa.

The Diagnostic Medical Sonography Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRCDMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Houston, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Landover, Sanford-Brown Institute – Pittsburgh.

CAAHEP
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Monroeville.

CoARC
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

The Practical Nursing Program at Sanford-Brown College – St. Peters is conditionally approved by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3252. Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Houston, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute - Jacksonville, Sanford-Brown Institute - Monroeville, Sanford-Brown Institute – New York, Sanford-Brown Institute – Tampa.

ASHP
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Cleveland, Sanford-Brown College – Fenton, Sanford-Brown College – Milwaukee, and Sanford-Brown Institute - Pittsburgh.

Mission Statement & Goals

Technical Requirements

Admission Requirements

**Mission**
The mission of Sanford-Brown College Radiography Program is to provide a quality, highly specialized educational program in the field of radiography to adult learners. The focused radiography program will provide the knowledge necessary for successful passing of the certification exam and for future employment in imaging.

**Program Goals**
1. The graduates will have entry-level employment skills as a radiographer.
2. The graduates will be clinically competent.
3. The graduates will apply critical thinking, problem solving, and communication skills during radiographic procedures.
4. The graduates will demonstrate professional growth and development skills.
5. The radiography program will be evaluated for effectiveness annually.

For more information on JRCERT Accreditation, please contact the JRCERT at:

JRCERT
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters and Sanford-Brown Institute - Pittsburgh.

AVMA
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800.248.2862

The occupational therapy assistant program at **Sanford-Brown College, Hazelwood, Missouri**, was placed on Probationary Accreditation effective December 4, 2010, for nearing the end of the USDE-mandated time period for returning the program to compliance with 2006 OTA Standard A.5.3. (program evaluation plan); Standard A.5.5 (program evaluation data analysis and annual report); and Standard A.5.6. (results of ongoing evaluation). The program has been requested to submit a Progress Report to return the program to full compliance with the Standards within the USDE-mandated time period for correction.

ACOTE
4720 Montgomery Lane
PO Box 31220
Bethesda, MD 20824-1220
Phone: 301-652-2682

The American Occupational Therapy Association, Inc.

Sanford-Brown College - Houston's Medical Laboratory Technician program is programmatically accredited by the National Accrediting Agency for Clinical Laboratory Science (NAACLS). This means that students are eligible take the ASCP and NCA national certification exams for Medical Laboratory Technicians.

NAACLS
National Accrediting Agency for Clinical Laboratory Sciences
5600 N. River Road, Suite, 720
Rosemont, IL 60018
Phone: 773-714-8880

## Request More Info!

Tell us more about yourself and specify your campus and program of interest. An admissions representative will contact you to provide you with more information.

* = required fields

STEP 1 OF 2

* Campus of Interest: — Select — ▼

* Program of Interest: Please select a campus ▼

**About Us**

Welcome Message
History and Mission
Accreditation & Certification
State Licensure & Registration
Why Choose Sanford-Brown?
Hospital & Community Partners
Suggestion Box
Career Opportunities
Sanford-Brown In the News
Sanford-Brown Events
Health Forum
Press Room

**Areas of Study**

Learning Options
Allied Health Diagnostic
Allied Health Technicians and Therapists
Dental
Nursing
Business, Administrative and Legal
Art, Design and Technology

**Locations**

Arizona
Connecticut
Florida
Georgia
Illinois
Indiana
Maryland
Michigan
Missouri
New Jersey
New York
Ohio
Oregon
Pennsylvania
Rhode Island
Texas
Virginia
Wisconsin

Affiliated Schools:
SBI Melville
Briarcliffe College
Brown College
Gibbs Boston
Missouri College

**Admissions**

How to Apply for Admission
Admission Requirements
Are you a Candidate for Acceptance?
Schedule an Appointment Today
Documents & Resources
Request Information
Apply Now

**Tuition & Financial Aid**

How to Apply for Financial Aid
Financing Options for Your Education
Grants & Scholarships
Refund Policy
Financial Aid Tools
CEC Code of Conduct
Documents & Resources
Request Information
Apply Now

**Student Life**

Online Communities
Alumni
Career Services
Faculty Profiles
Sanford-Brown In the News
Sanford-Brown Events
Refer a Friend

©2010 Sanford-Brown. All rights reserved.

No information may be duplicated without permission from Sanford-Brown.

Sanford-Brown does not guarantee employment or salary. Credits earned are unlikely to transfer.

Privacy Statement | Legal Terms and Conditions | Student Outcomes/Disclosures | Sitemap



Student Portal Login ▼

http://www.sanfordbrown.edu/About-Us/Accreditation-And-Certification    Go

OCT NOV DEC    Close
◄ 6 ►    Help
2012 2013 2014    GO

86 captures
2 Apr 10 – 29 Nov 14

**Apply Now!** ✔
If you're ready to take the first
step towards your career

**Request Info @**
It's easy to learn more about
Sanford-Brown

CHAT

About Us    Areas of Study    Locations    Admissions    Tuition & Financial Aid    Student Life    Request Info

Apply Now!
Home



About Us
**Accreditation & Licensure**

**About Us**
Welcome Message
History & Mission
Accreditation & Licensure
Why Choose Sanford-Brown?
State Licensure & Registration
Hospital & Community Partners
Social Responsibility
Suggestion Box
Jobs at Sanford Brown
Sanford-Brown Events
Health Forum
Pegasus Lectures
Press Room
Articulation Agreements

8+1  0

Home    **About Us**    Accreditation & Licensure

## Accreditation & Licensure

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality. Additionally, all schools are authorized in the states in which they operate.

State Authorization information
Institutional Accreditation information

## State Authorization

**ARIZONA**
**Sanford-Brown College, Phoenix AZ**
Sanford-Brown College is licensed by The Arizona State Board for Private Postsecondary Education.

**CONNECTICUT**
**Sanford-Brown College, Farmington CT**
The Connecticut Board of Governors for Higher Education has approved Sanford-Brown College to confer the Associate of Applied Science Degree and Associate of Science. The college is accredited by the State of Connecticut Board of Governors for Higher Education.

**FLORIDA**
**Sanford-Brown Institute, Jacksonville FL**
Sanford-Brown Institute – Jacksonville (License #3006) is licensed by the Commission for Independent Education The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**Sanford-Brown Institute, Ft. Lauderdale, FL**
Sanford-Brown Institute, Fort Lauderdale (License #3005) is licensed by the Commission for Independent Education, The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, toll free telephone number (888) 224-6684.

**Sanford-Brown Institute, Orlando FL**
Sanford-Brown Institute, Orlando (License ID # 4091) is licensed by the Commission for Independent Education; The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**Sanford-Brown Institute, Tampa FL**

Sanford-Brown Institute, Tampa (License #3007) is licensed by Commission for Independent Education; The Florida Department of Education, 325 West Gaines Street, Suite 1414, Tallahassee, Florida 32399-0400, (888) 224-6684

**GEORGIA**
**Sanford-Brown College, Atlanta GA**

Sanford-Brown College – Atlanta campus is licensed by the State of Georgia. Nonpublic Postsecondary Education Commission, 2082 East Exchange Place, Suite 220, Tucker, Georgia 30084-5305. Phone: (770) 414-3300.

**INDIANA**
**Sanford-Brown College, Indianapolis IN**

Sanford-Brown College is regulated by the Board for Proprietary Education (BPE), Indiana Commission for Higher Education, 101 West Ohio Street, Suite 670 Indianapolis, IN 46204. Phone: (317) 464-4400 and Fax: (317) 233-4219.

**ILLINOIS**
**Sanford-Brown College, Collinsville IL**

The college is licensed to operate in the State of Illinois through the office of Illinois State Board of Education 100 North First Street, Springfield, Illinois 62777, (217) 782-2948 or 100 W. Randolph, Suite 14-300, Chicago, Illinois 60601, (312) 814-2220.

The college is also approved to offer Associate of Applied Science degrees in Business Administration, Medical Billing and Coding, Medical Laboratory Technician, and Medical Massage Therapy through the office of the Illinois Board of Higher Education, 431 East Adams Street, Springfield, Illinois 62701

**Sanford-Brown College, Hillside IL**

Certificate of Approval to Operate Issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**Sanford-Brown College, Skokie IL**

Certificate of Approval to Operate Issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777.

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**Sanford-Brown College, Tinley Park IL**

Certificate of Approval to Operate Issued by the Illinois State Superintendent of Education, 100 North First Street, Springfield, Illinois 62777.

**Sanford-Brown is recognized as a private college by the Illinois Board of Higher Education (IBHE). Sanford-Brown is authorized by the IBHE to confer Associate of Applied Science degrees.**

**MASSACHUSSETTS**
**Sanford-Brown College Inc., a private two year college, Boston MA**

The Boston, Massachusetts School is licensed by the Commonwealth of Massachusetts, Department of Education, 350 Main Street, Malden, MA 02148

**MICHIGAN**
**Sanford-Brown College, Dearborn MI**

Sanford-Brown is licensed by the State of Michigan.

**Sanford-Brown College, Grand Rapids MI**

Sanford-Brown is licensed by the State of Michigan.

**MISSOURI**
**Sanford-Brown College, Fenton MO**

Sanford-Brown College is approved to operate in the State of Missouri by the Missouri Department of Higher Education and approved, certified, or recognized by the following agencies/funding sources:
• Vocational Rehabilitation Departments of Missouri and Illinois
• Missouri State Approving Agency (Veterans Education Benefits)
• Workforce Investment Act.

**Sanford-Brown College, St Peters MO**

Sanford-Brown College is approved to operate in the State of Missouri by the Missouri Department of Higher Education and approved, certified, or recognized by the following agencies/funding sources:

- U.S. Department of Education
- Missouri State Board of Nursing (Conditional approval for the Practical Nursing Program)
- Missouri Board of Therapeutic Massage
- Vocational Rehabilitation Departments of Missouri and Illinois
- Missouri State Approving Agency (Veterans Education Benefits)
- Workforce Investment Act

### NEW JERSEY

#### Sanford-Brown Institute, Iselin NJ

Sanford-Brown Institute – Iselin is licensed by the State of New Jersey Departments of Education and Labor and Workforce Development, Division of One-Stop Coordination and Support, School Approval Unit, John Fitch Plaza, Labor Building, 2nd floor, Trenton, New Jersey 08625.

### NEW YORK

#### SBI Campus - an affiliate of Sanford-Brown, Melville NY

The institution is authorized by the Board of Regents of New York State to confer the Associate in Applied Science (A.A.S), the Associate in Occupational Studies (A.O.S.), and certificate programs. All programs are registered by the State Education Department.

#### Sanford-Brown Institute, Garden City, NY

The institution is licensed by the New York State Education Department, Albany, New York.

#### Sanford-Brown Institute, New York City, NY

The institution is licensed by the New York State Education Department, Albany, New York.

#### Sanford-Brown Institute, White Plains, NY

The institution is licensed by the New York State Education Department, Albany, New York.

### OHIO

#### Sanford-Brown College, Middleburg Heights OH

Sanford-Brown College in Middleburg Heights, Ohio is approved by the Ohio State Board of Career Colleges and Schools, Columbus, Ohio, Registration #03-07-1880T.

#### Sanford-Brown College, Columbus OH

Sanford-Brown College in Columbus, Ohio is approved by the Ohio State Board of Career Colleges and Schools, Columbus, Ohio, Registration # 11-01-1956T.

### OREGON

#### Sanford-Brown College, Portland OR

Sanford-Brown College in Portland operates under the corporate laws of Oregon and the regulations of Oregon's Office of Degree Authorization. This school is a unit of a business corporation authorized by the State of Oregon to offer and confer the academic degrees described herein, following a determination that state academic standards will be satisfied under OAR 583-030. Inquiries concerning the standards or school compliance may be directed to the Oregon Office of Degree Authorization, 1500 Valley River Drive, Suite 100, Eugene, OR 97401, (541) 687-7478.

### PENNSYLVANIA

#### Sanford-Brown Institute, Pittsburgh PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

#### Sanford-Brown Institute, Trevose PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

#### Sanford-Brown Institute, Wilkins Township PA

Sanford-Brown is authorized by the Pennsylvania Department of Education to confer Associate in Specialized Business and Associate in Specialized Technology degrees.

### RHODE ISLAND

#### Sanford-Brown Institute, Cranston RI

Sanford-Brown Institute is authorized by the Rhode Island Board of Governors for Higher Education to grant certificates. Rhode Island Board of Governors of Higher Education, Shepard Building, Suite 524, 80 Washington Street, Providence, RI 02903, (401) 456-6000

### TEXAS

#### Sanford-Brown College, Austin TX

Sanford-Brown College is approved and regulated by the following agencies:
Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Austin campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241
THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

### Sanford-Brown College, Dallas TX

Sanford-Brown College is approved and regulated by the following agencies:
Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Dallas campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241
THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.
Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, Houston TX

Sanford-Brown College is approved and regulated by the following agencies. Certificate Programs:
Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*Houston campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241
THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.
Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, Houston-Northloop, TX

Sanford-Brown College is approved and regulated by the following agencies:
Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*North Loop campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241
THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.
Sanford-Brown College is approved for Veterans training in Texas: Veterans Education, Texas Veterans Commission, P.O. Box 12277, Austin, Texas 78711-2277, (877) 898-3833

### Sanford-Brown College, San Antonio TX

Sanford-Brown College is approved and regulated by the following agencies:
Texas Workforce Commission, Career Schools and Colleges, 101 East 15th Street, Austin, Texas 78778-0001, http://csc.twc.state.tx.us, (512) 936-3100

*San Antonio campus student policy regarding complaints*

Degree Programs: Texas Higher Education Coordinating Board (THECB), P.O. Box 12788, Austin, Texas 78711, http://csc.twc.state.tx.us,(512) 427-6241
THECB student complaint information is codified under 19 TAC §§1.110-1.120. An overview of the complaint procedure, how to submit a complaint, and the complaint form can be found by clicking here.

**VIRGINIA**
### Sanford-Brown College, Vienna VA

Sanford-Brown College is certified by the State Council of Higher Education for Virginia (SCHEV) to operate campuses in Virginia. SCHEV is located at 101 North 14th Street, James Monroe Building, Richmond, VA 23219. (804) 225-2600.

**WISCONSIN**

**Sanford-Brown College, West Allis WI**

Sanford-Brown College is authorized to offer education programs and award degrees and diplomas in the State of Wisconsin by the Educational Approval Board, 30 West Mifflin St., 6th Floor, Madison, Wisconsin 53703 (608) 266-1996.

Students are strongly encouraged to utilize the School's grievance procedure which can be found in the Catalog. The school's grievance procedure allows for the prompt resolution of grievances. For additional state contact information, please click here.

Back to Top

## Institutional Accreditation

All Sanford-Brown schools are institutionally accredited (accredited in total) by the Accrediting Council for Independent Colleges and Schools (ACICS), a national accrediting agency recognized by the United States Department of Education (DOE) and the Council for Higher Education Accreditation (CHEA). This indicates that these schools substantially meet or exceed the stated criteria of education quality established by ACICS, and approved by the DOE and CHEA. This recognition of institutional accreditation by ACICS entitles Sanford-Brown schools to offer Title IV Financial Assistance to students who qualify.

Effective as of May 5, 2012, ACICS placed the Sanford-Brown College – Indianapolis, IN campus and the Sanford-Brown College – West Allis, WI campus on probation due to job placement rates that did not meet the expectations of ACICS. Despite the probation action, these schools remain accredited and this status does not affect the institution's ability to continue to offer programs to existing or new students, confer academic credentials, and financial aid is available for students who qualify.

Accreditation is a voluntary process which may be undertaken by schools to demonstrate compliance with specific standards designed to indicate a level of education quality. Each campus has been approved by its respective institutional Accreditor to offer all of its currently available programs.

All Sanford-Brown schools are institutionally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award certificates and degrees.



ACICS
750 First Street NE
Suite 980
Washington, DC 20002-4241
(202) 336-6780
(866) 510-0745

## Programmatic Accreditation

An additional form of accreditation that a school may undertake to obtain is a specific, individual accreditation of certain programs (programmatic accreditation). Institutional accreditation is not the same as or a substitution for programmatic accreditation. Although programmatic accreditation is not required for employment in many cases, the existence of programmatic accreditation is a further indication that a program meets the standards of the profession, and may therefore indirectly enhance employment opportunities. Also, in some cases, programmatic accreditation will allow the graduates of the accredited program to sit for some credentialing exams immediately upon graduation without any requirement of work experience.

It is important to understand what accreditation is and why it is important to Sanford-Brown. The goal of accreditation is to ensure that the education provided by institutions of higher education meets acceptable levels of quality. DOE recognized accrediting agencies have adopted criteria reflecting the qualities of a sound educational program and have developed procedures for evaluating institutions or programs to determine whether or not they meet these criteria. The standards by which institutions or programs are measured have been developed by subject matter experts and are intended to include what is critical for students to learn in order to successfully pursue a given profession. Having this kind of oversight and ensuring compliance with stated standards is essential to maintaining quality for students. Institutional Accreditation measures the entire operations of a given campus. Programmatic accreditation evaluates the components of a given academic program. Sanford-Brown is committed to offering programs that live up to these standards so that we can help provide qualified and prepared graduates in the field of healthcare. We understand that accreditation is not merely a recognition granted once an institution or program is in substantial compliance with the stated standards, but is a privilege that we must continue to earn through disciplined actions and quality instruction.

Broadly, across our Sanford-Brown campuses, over 50 programs are currently programmatically accredited. Some accrediting agencies require that a new program graduate its first class before the program is eligible for programmatic

accreditation but we strive to run our programs according to the standards of our relevant programmatic accreditors and are committed to seeking programmatic accreditation for our eligible programs. This includes not starting the first class until the clinical site requirement is formally demonstrated, not over seeing classes, ensuring the self study process is part of the educational plan and making certain that the curriculum, facility, equipment, staff and leadership meet the programmatic accreditation requirements.

To learn about which programs are programmatically accredited by campus, see the detailed information below.

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Accrediting Bureau of Health Education Schools (ABHES), a national accrediting agency recognized by the United States Department of Education under the provisions of Title 20, Chapter 28, Section 1001 of the U.S. Code, 34 CFR Part 602.2, and subsequent legislation: Sanford-Brown College – Dallas, Sanford-Brown College – Houston, Sanford-Brown College – Northrloop, Sanford-Brown College – Skokie, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, and Sanford-Brown Institute – New York.



**ABHES**
7777 Leesburg Pike, Suite 314N
Falls Church, Virginia 22043
(703) 917-9503

The Surgical Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) accredits upon the recommendation of the Accreditation Review Council on Education for Surgical Technology and Surgical Assisting (ARC/STSA): Sanford-Brown Institute – Iselin and Sanford-Brown Institute – Wilkins Township.

The Diagnostic Medical Sonography and Diagnostic Medical Ultrasound Programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Joint Review Committee on Education in Diagnostic Medical Sonography (JRC-DMS): Sanford-Brown College – Atlanta, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Dearborn, Sanford-Brown College – Houston, Sanford-Brown College – Fenton, Sanford-Brown College – Phoenix, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Iselin, Sanford-Brown Institute – White Plains, Sanford-Brown Institute – New York, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Pittsburgh, and Sanford-Brown Institute - Trevose.

The Cardiovascular Sonography/Technology (CVS/CVT) programs at the following campuses are currently the only Sanford-Brown campuses that have CVS/CVT programs programmatically accredited by the Commission on Accreditation of Allied Health Education Programs (CAAHEP) upon the recommendation of the Joint Review Committee on Education in Cardiovascular Technology (JRC-CVT): Sanford-Brown College – Atlanta, Sanford-Brown College – Boston, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown College – Dearborn, Sanford-Brown College – Hillside, Sanford-Brown College – Milwaukee, Sanford-Brown Institute – Jacksonville, Sanford-Brown College – San Antonio, and Sanford-Brown Institute – Fort Lauderdale.



**CAAHEP**
1361 Park Street
Clearwater, FL 33756
(727) 210-2350

Sanford-Brown College – Fenton: The *Polysomnographic Technology* program is accredited by the Commission on Accreditation of Allied Health Education Programs (www.caahep.org) upon the recommendation of the Committee on Accreditation for Polysomnographic Technologist Education.

The Respiratory Therapy programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Commission on Accreditation for Respiratory Care (CoARC): Sanford-Brown College – Fenton, Sanford-Brown Institute – Wilkins Township.



**CoARC**
1248 Harwood Rd
Bedford, TX 76021
(817) 283-2835

        The Practical Nursing Program at Sanford-Brown College – St. Peters has full approval by the Missouri State Board of Nursing (3605 Missouri Blvd., P.O. Box 656, Jefferson City, MO 65102-0656, Phone: (573) 751-0681). The Nursing Program at Sanford-Brown Institute – Jacksonville is approved with probationary status by the Florida Board of Nursing (Mailing Address: 4052 Bald Cypress Way, BIN C02, Tallahassee, FL 32399-3262. Physical Address: 4042 Bald Cypress Way, Room 120, Tallahassee, FL 32399, Phone: (850) 245-4125).

The Dialysis Technology programs at the following Sanford-Brown campuses are currently approved by the Board of Nephrology Examiners, Inc. Nursing and Technology (BONENT): Sanford-Brown College-Skokie, Sanford-Brown College-North Loop, and Sanford-Brown College-San Antonio.



**BONENT**
1901 Pennsylvania Ave, NW
Suite 607
Washington, DC 20006
Main Phone: 202-462-1252

        The Pharmacy Technician and/or Pharmacy Technology programs at the following schools are currently the only Sanford-Brown campuses that are programmatically accredited by the American Society of Health-System Pharmacists (ASHP): Sanford-Brown College – Houston, Sanford-Brown College – Cleveland, Sanford-Brown College – Dallas, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown Institute – Garden City, Sanford-Brown Institute – Iselin, Sanford-Brown Institute - Jacksonville, Sanford-Brown Institute – Wilkins Township, Sanford-Brown Institute – New York, Sanford-Brown Institute – Tampa, Sanford-Brown College – Phoenix, and Sanford-Brown College - Indianapolis.



**ASHP**
7272 Wisconsin Avenue
Bethesda, MD 20814
Main Phone: 301-657-3000

        The Radiography and/or Radiographer programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the Joint Review Committee on Education in Radiologic Technology (JRCERT): Sanford-Brown College – Cleveland, Sanford-Brown College – Fenton, Sanford-Brown College – Milwaukee, Sanford-Brown College – Northloop.

The Radiography program at Sanford-Brown Pittsburgh is on probationary status by JRCERT, and is not enrolling additional students until further notice.

For more information on JRCERT Accreditation, please contact the JRCERT at:



**JRCERT**
20 N. Wacker Drive
Suite 2850
Chicago, IL 60606-3182
Phone: (312) 704-5300

        The Veterinary Technology programs at the following Sanford-Brown campuses are currently the only Sanford-Brown campuses that are programmatically accredited by the American Veterinary Medical Association (AVMA): Sanford-Brown College – Fenton, Sanford-Brown College – St. Peters, Sanford-Brown Institute – Ft. Lauderdale, Sanford-Brown College – Grand Rapids, Sanford-Brown College – Dearborn, Sanford-Brown College – Portland, Sanford-Brown Institute – Jacksonville, Sanford-Brown Institute – Pittsburgh, and Sanford-Brown College – Tyson's Corner.

The program offered at SBC-Fenton is currently under probationary status by the AVMA. This status does not affect the institution's ability to continue to offer programs to existing students, confer academic credentials,

and financial aid continues to be available for students who otherwise qualify. Graduates of a probationally accredited program are graduates of an accredited program. Programs may remain on probationary accreditation for a maximum of two years, at which time accreditation may be withdrawn if SBC-Fenton fails to substantially meet the Standards of Accreditation.

The program offered at SBI-Jacksonville is currently under probationary status by the AVMA. This status does not affect the institution's ability to continue to offer programs to existing students, confer academic credentials, and financial aid continues to be available for students who otherwise qualify. Graduates of a probationally accredited program are graduates of an accredited program. Programs may remain on probationary accreditation for a maximum of two years (i.e. until Fall 2014), at which time accreditation may be withdrawn if SBI-Jacksonville fails to substantially meet the Standards of Accreditation.



**AVMA**
1931 North Meacham Road, Suite 100
Schaumburg, IL 60173-4360
Phone: 800,248,2862

**Sanford-Brown College – Collinsville and Sanford-Brown College - Houston's** Medical Laboratory Technician programs are programmatically accredited by the National Accrediting Agency for Clinical Laboratory Science (NAACLS). This means that students are eligible take the ASCP and NCA national certification exams for Medical Laboratory Technicians.



**NAACLS**
National Accrediting Agency for Clinical Laboratory Sciences
5600 N. River Road, Suite 720
Rosemont, IL 60018
Phone: 773-714-8880

**Dallas, Ft. Lauderdale and Jacksonville: The program in Dental** Hygiene is accredited by the Commission on Dental Accreditation *and has been granted the accreditation status of Approval without Reporting Requirements.* The Commission is a specialized accrediting body recognized by the United States Department of Education. The Commission on Dental Accreditation can be contacted at (312) 440-4653 or at 211 East Chicago Avenue, Chicago, IL 60611-2678. The Commission's web address is: http://www.ada.org/100.aspx.

**Orlando and Skokie:** The Dental Hygiene programs accreditation has been discontinued by the Commission on Dental Accreditation. Students currently enrolled in the program will be considered graduates of an accredited program. The Commission is a specialized accrediting body recognized by the United States Department of Education. The Commission on Dental Accreditation can be contacted at (312) 440-4653 or at 211 East Chicago Avenue, Chicago, IL 60611-2678. The Commission's web address is: http://www.ada.org/100.aspx.

The Commission on Dental Accreditation (CODA) does not accredit the "Expanded Functions" component of dental assisting programs. CODA accredits the basic dental assisting certificate or diploma programs that comply with the Accreditation Standards and Commission policy. Expanded Functions are unique and specific to each state and are dictated by each state's dental practice act.



**About Us**

Welcome Message
History and Mission
Accreditation & Certification
State Licensure & Registration
Why Choose Sanford-Brown?
Hospital & Community Partners
Suggestion Box
Jobs at Sanford Brown
Sanford-Brown In the News
Sanford-Brown Events
Health Forum
Press Room

**Areas of Study**

Learning Options
Allied Health Diagnostic
Allied Health Technicians and Therapists
Dental
Nursing
Business, Administrative and Legal
Art, Design and Technology

**Locations**

Arizona
Connecticut
Florida
   Ft. Lauderdale
   Jacksonville
   Orlando
   Tampa
Georgia
Illinois
   Collinsville
   Hillside
   Skokie
   Tinley Park
Indiana
Maryland
Massachusetts
Michigan
   Dearborn
   Grand Rapids
Missouri
   Fenton
   Hazelwood
   St. Peters
New Jersey
New York
   Garden City
   New York City
   White Plains
Ohio
   Cleveland
   Columbus
Oregon
Pennsylvania
   Pittsburgh
   Trevose
   Wilkins-Township
Rhode Island
Texas
   Austin
   Dallas
   Houston
   North Loop
   San Antonio
Virginia
Wisconsin

**Affiliated Schools:**

SBI Melville
Briarcliffe College
Brown College
Missouri College

**Admissions**

How to Apply for Admission
Admission Requirements
Are you a Candidate for Acceptance?
Schedule an Appointment Today
Documents & Resources
Request Information
Apply Now

**Tuition & Financial Aid**

Net-Price-Calculator
How to Apply for Financial Aid
Financing Options for Your Education
Grants & Scholarships
Refund Policy
Financial Aid Tools
CEC Code of Conduct
Documents & Resources
Request Information
Apply Now

**Student Life**

Online Communities
Alumni
Transcript Request
Career Services
Faculty Profiles
Sanford-Brown In the News
Sanford-Brown Events
Refer a Friend

©2015   Sanford-Brown. All rights reserved.

No information may be duplicated without permission from Sanford-Brown.

Sanford-Brown cannot guarantee employment or salary. Credits earned are unlikely to transfer.

Privacy Statement    Legal Terms and Conditions    Student Disclosures    Sitemap





NEW YORK CAMPUS FINANCIAL AID

INTERNET ARCHIVE WaybackMachine http://www.sbnewyork.com/programs/cardiovascular.asp Go
2 captures
23 Oct 06 - 17 Aug 07
SEP OCT 23 2005 2006

SANFORD BROWN INSTITUTE

HOME | ABOUT US | ADMISSIONS | CAREER SERVICES | CONTACT US

A LEADER IN HEALTHCARE EDUCATION

Non-Invasive Cardiovascular Technology

This exciting 16 to 20 month program can provide the student at our school with entry-level skills in cardiovascular technology to perform non-invasive cardiovascular exams, including EKG, stress EKG, echocardiographic and vascular testing as an entry-level cardiovascular technologist. Sanford-Brown's comprehensive non-invasive cardiovascular technology training program is also well weighted with practical learning. Both day and evening programs include a full-time, unpaid clinical externship. The programs' courses are designed to prepare students for entry-level jobs in the healthcare field that may involve:

- Performing non-invasive cardiovascular procedures
- Assisting physicians in the diagnosis of a patient's condition through echocardiography
- Working with a team of healthcare physicians in a hospital or clinical environment

Learn more about non-invasive cardiovascular technology.

For more information about Sanford Brown's exciting non-invasive cardiovascular technology career training program, please contact us today for details and start studying for a career in non-invasive cardiovascular technology!

Ready to apply? Find out now if you are a candidate for acceptance at Sanford-Brown Institute in New York, NY.

Back to Sanford-Brown Career Training Programs

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician

Click here to CONTACT US Now!

Click here to find out if you are a candidate FOR ACCEPTANCE!

Click here to find out THE TOP 10 REASONS TO ATTEND SB NEW YORK!

Home | About Us | Admissions | Programs | Financial Aid | Apply
Online | Site Map
Career Services | Contact Us



Licensed by the New York State Education Department
Copyright © 2006 Sanford-Brown Institute - New York. All Rights
Reserved.
No information may be duplicated without permission from
Sanford-Brown Institute - New York.





Sanford-Brown Institute - New York
120 E. 16th St, 2nd Floor
New York City, NY 10003
888-578-9333

Privacy Statement | Legal Terms and Conditions | Webmaster

102



INTERNET ARCHIVE
WaybackMachine
2 captures
23 Oct 06 - 17 Aug 07

http://www.sbnewyork.com/programs/cardiovascular.asp    Go

OCT AUG
◄ 17
2006 2007

**NEW YORK** CAMPUS          FINANCIAL AID

SANFORD
BROWN
INSTITUTE

HOME      PROGRAMS      ABOUT US      ADMISSIONS      CAREER SERVICES      CONTACT US

A LEADER IN HEALTHCARE EDUCATION

Non-Invasive Cardiovascular Technology







Click here to
**CONTACT US** Now!

Click here to find out
if you are a candidate
**FOR ACCEPTANCE!**

This exciting 16 to 20 month program can provide the student at our school with entry-level skills in cardiovascular technology to perform non-invasive cardiovascular exams, including EKG, stress EKG, echocardiographic and vascular testing as an entry-level cardiovascular technologist. Sanford-Brown's comprehensive non-invasive cardiovascular technology training program is also well weighted with practical learning. Both day and evening programs include a full-time, unpaid clinical externship. The program's courses are designed to prepare students for entry-level jobs in the healthcare field that may involve:

- Performing non-invasive cardiovascular procedures
- Assisting physicians in the diagnosis of a patient's condition through echocardiography
- Working with a team of healthcare physicians in a hospital or clinical environment

Learn more about non-invasive cardiovascular technology.

For more information about Sanford Brown's exciting non-invasive cardiovascular technology career training program, please contact us today for details and start studying for a career in non-invasive cardiovascular technology!

Ready to apply? Find out now if you are a candidate for acceptance at Sanford-Brown Institute in New York, NY.

Back to Sanford-Brown Career Training Programs

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician



Click here to find out
**THE TOP 10 REASONS
TO ATTEND
SB NEW YORK!**

A Leader in Healthcare Education

Home | About Us | Admissions | Programs | Financial Aid | Site Map
Career Services | Contact Us



Licensed by the New York State Education Department
Copyright © 2007 Sanford-Brown Institute - New York. All Rights
Reserved.
No information may be duplicated without permission from
Sanford-Brown Institute - New York.

Sanford-Brown Institute – New York
120 East 16th Street – 4th Floor
New York, NY 10003



Privacy Statement | Legal Terms and Conditions | Webmaster

Information on Classes Call Toll Free   (888) 333 9333
All Other Inquiries (646) 111 4510

209

INTERNET ARCHIVE
**WayBackMachine**

http://www.sanford-brown.edu/campus/59/programs.asp?map=18    Go

4 captures
19 Mar 08 - 19 Jan 10

FEB **MAR**
◄ **19**
2007 **2008**



**NEW YORK** CAMPUS

FINANCIAL AID

**SANFORD BROWN** INSTITUTE™

HOME    PROGRAMS    ABOUT US    ADMISSIONS    CAREER SERVICES    CONTACT US

A LEADER IN HEALTHCARE EDUCATION





Click here to **CONTACT US Now!**

Click here to find out if you are a candidate **FOR ACCEPTANCE!**

The Non-Invasive Cardiovascular Technology program at Sanford-Brown Institute-New York City (SBI) is designed to prepare the students to perform non-invasive echocardiographic examinations under the direction of a physician / cardiologist. Students gain both didactic knowledge and practical experience in cardiovascular science, EKG, holter monitoring, telemetry, and echocardiography. The students will have the opportunity to study the anatomy, physiology, and pathophysiology of the organ systems, recognize the EKG patterns of infarction, arrhythmia recognition, appreciate emergency protocols, and perform echocardiography. The core curriculum is structured to include a lecture component and an imaging laboratory component. The final externship portion of the curriculum is structured to include supervised experiences in the clinical environment that require competencies, logs, and evaluations completed by the student. At the conclusion of the program, graduates who have diligently attended class and their externship, studied, and practiced their skills should have the skills to seek entry-level employment as non-invasive cardiovascular technologists.

Graduates of the Non-Invasive Cardiovascular Technology program are encouraged to take the credentialing examinations offered by Cardiovascular Credentialing International (CCI) and the American Registry of Diagnostic Medical Sonographers (ARDMS). These exams are voluntary but obtaining this credential does enhance employment opportunities. Graduates are eligible to apply for the Certified Cardiographic Technician (CCT) and Registered Cardiac Sonographer (RCS) examinations offered by CCI

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician

Certificate Program in Diagnostic Radiography

upon graduation, and to apply for the Registered Diagnostic Cardiac Sonographer (RDMS) exam offered by ARDMS after acquiring the necessary experience after graduation as defined by the ARDMS. Registration and certification requirements for taking and passing these examinations are not controlled by SBI but by outside agencies and are subject to change by the agency without notice. Therefore, SBI cannot guarantee that graduates will be eligible to take these exams, at all or at any specific time, regardless of their eligibility status upon enrollment.

For more information about this exciting program, please contact us today for details!

Ready to apply? Click here to find out if you are a candidate for acceptance.

**A Leader in Healthcare Education**
Home | About Us | Admissions | Programs | Financial Aid | Site Map
Career Services | Contact Us

**Licensed by the New York State Education Department**
**Copyright © 2006 Sanford-Brown Institute - New York. All Rights Reserved.**
**No information may be duplicated without permission from Sanford-Brown Institute - New York.**

**Sanford-Brown Institute - New York**
**120 E. 16th St, 4th Floor**
**New York City, NY 10003**

Privacy Statement | Legal Terms and Conditions | Webmaster

Information on Careers Call Toll Free: (888) 878-5555
All Other Inquiries: (646) 473-4597



## ACCREDITATION/CERTIFICATION INFORMATION



Top Ten Reasons to attend SBI New York

- Hands-on training - Students can learn by doing, using the techniques and tools of professionals working in their desired

---

doing, using the techniques and tools of professionals working in careers in the medical field.
- Many of our school's professors are experienced professionals, bringing real-world experience to Sanford-Brown classes.
- Sanford-Brown's Financial Aid Representatives are accessible to students to answer any questions in regard to student finances, financial aid, student loans or grants.
- Sanford-Brown students take advantage of industry-current equipment and labs used in healthcare settings.
- Career Placement Assistance with healthcare industry contacts to help Sanford-Brown students with professional career development and job opportunities.
- Flexibility - Day, evening and weekend classes are available for Sanford-Brown students.
- Smaller Class Sizes
- Extensive career training program offerings - Our programs are designed to prepare Sanford-Brown students for employment for today's medical careers.
- Strong emphasis on career specific courses & training
- **Have the opportunity to gain industry-current job skills to help make you marketable and employable in the healthcare or medical field.**

Diagnostic Medical Ultrasound

Non-Invasive Cardiovascular Technology

Medical Assistant Program

Medical Billing & Coding Specialist

Certificate Program in Pharmacy Technician



INTERNET ARCHIVE
WaybackMachine
http://www.sbnewyork.com/topten.asp    Go    FEB OCT
4 captures                                    ◀ 23
7 Feb 06 - 7 Aug 08                          2005 2006

Ready to apply? Find out now if you are a candidate for acceptance. Start studying for a medical career.

Or if you have further questions about our medical career training programs at Sanford-Brown New York please contact us today!



Home | About Us | Admissions | Programs | Financial Aid | Apply Online | Site Map
Career Services | Contact Us





**Licensed by the New York State Education Department**
**Copyright © 2006 Sanford-Brown Institute - New York. All Rights Reserved.**
**No information may be duplicated without permission from Sanford-Brown Institute - New York.**

**Sanford-Brown Institute - New York**
**120 E. 16th St, 2nd Floor**
**New York City, NY 10003**
**888-578-9333**

Privacy Statement | Legal Terms and Conditions | Webmaster

133



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

April 16, 1993

Dear Colleague:

Enclosed you will find information about the new common forms for the Federal Family Education Loan Program.  This material has been sent to the guaranty agencies and I wanted you to receive a copy of the final product.

As you review this information, if you have questions please feel free to contact me.

Sincerely yours,

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

# Common Application Material

**SUMMARY:** This information material prescribes the content and layout of the common loan application/promissory note for Federal Stafford Loans (subsidized and unsubsidized) and Federal Supplemental Loans for Students (SLS), related instructions, and information about a borrower's rights and responsibilities, and instructions for the transition to implement the common forms. In addition, this material prescribes the revised common addendum for the current application.

## Common Application and Promissory Note

As mandated by Section 432(m)(1) of the Higher Education Act, the U.S. Department of Education (ED) has developed a common federal loan application form and promissory note in cooperation with representatives of guaranty agencies, lenders, and student financial assistance organizations. ED has approved the attached forms of the complete loan application/promissory note, discussion of borrower rights and responsibilities, and related instructions.

No changes to, deletions from, or additions to the prescribed language in these forms will be permitted, except that information and/or logos identifying the guaranty agency or program may be printed in the space provided in the upper right-hand corner of the application form and the front page of the instructions. The boxes in the upper right-hand corner of the common application form and front page of the instructions are intended to provide a guaranty agency with a space to include its logo, name, a telephone number, and appropriate coding (for example, bar coding to reflect the source, type, or other identification system for filing or processing). An agency may use bar coding in other places on the common application form, (that is, the side or bottom margins of the application) to meet requirements for its individual processing system. These coding identifiers may not be printed on the application where they would alter the general layout of the common form.

## Implementation and Transition Period

The attached documents (the "common forms") have been approved for immediate use. However, ED recognizes that a transition period is needed for schools, lenders, and guaranty agencies to put in place the new common forms and related processing procedures. During the transition period (from now until December 31, 1993), ED expects program participants to process both the existing forms and the new forms as they become available. Agencies may elect to cease distributing previously approved editions of their applications with approved addendum when they have printed and distributed the new common form. However, a lender, school, or agency may not refuse to process a previous application (other than an application that relates only to a specific program year) that a student submits for processing. ED does not want to cause a student to complete two applications for the same period of enrollment because of the new common application form.

During the transition period between forms, ED wants to ensure that students are not subject to filing duplicate applications. We believe that by December 31, 1993, program participants will have made the transition to the common form to the degree that an adequate supply of new common loan applications will be available and that schools and lenders will have prepared for the transition. As financial aid administrators will have received applications and be conducting certification reviews, ED has established December 31, 1993 as the close of the transition period. School officials should plan their processing systems to ensure that all loan applications for the Federal Stafford (subsidized and unsubsidized) and Federal SLS program that are certified on or after January 1, 1994 are processed using the new common application. Guaranty agencies should establish the necessary procedures to ensure that all applications certified by the institution on or after January 1, 1994 and received by the agency for guarantee are on the new common application.

Guaranty agencies that continue to use existing forms approved by ED in the past will be required to use the new addendum in connection with all loans for which the first disbursement is made on or after July 1, 1993.

If agencies use the new common forms as part of a renewal application process, information may be preprinted on the form which the agency has for a borrower. This preprinted information may include the prior lender and code number if the borrower has previously received a loan for that lender.

## Current Applications --- Revised Addendum

Included in this mailing is the revised common addendum for current Federal Stafford and SLS applications that is to be used with existing applications. The addendum may not be used after December 31, 1993. This addendum is necessary to comply with the new provisions of the reauthorized Higher Education Act that take effect on July 1, 1993. However, <u>the addendum may not be used with the new common loan application/promissory note, only with the existing applications during the transition period.</u> This addendum will ensure the proper disclosure information is provided to borrowers. This notice serves as approval for the use of this addendum by your agency; no changes or revisions are permitted to this form.

## Agency-specific Information

No other materials may be physically attached to the forms. However, other appropriate materials may be provided to schools and borrowers along with the common forms. Such agency-specific information is intended as a way for the agency to provide applicants with specific information they need to know about the unique procedures of that guaranty agency. Moreover, until a common description of all loan programs, eligibility information, and general program requirements is developed for future years, agencies might want to include this type of information. Such materials may be shrink-wrapped or placed in folders together with the common forms. The common forms may also be inserted into other materials. The forms cannot, however, be physically attached to these materials. While these other materials may include instructions and other documents specific to the guaranty agency or program providing the application package, they may not include requests for any additional or supplemental information from borrowers, schools, or lenders for purposes of processing the application for FFEL Program loans.

So that ED can monitor the context in which the application is presented, each guaranty agency that sends out common forms together with other materials must submit the packet of material to ED. They should be submitted to me at the Division of Policy Development; U.S. Department of Education/Office of Postsecondary Education; Policy, Training, and Analysis Service; Room 4310, ROB-3; 400 Maryland Avenue, S.W.; Washington, D.C. 20202. However, ED does not intend to approve or comment on these materials unless they do not meet the required standards. This material must to submitted prior to distribution of the forms to the agency's participating schools and lenders.

Notice of Guaranty and Disclosure

The common forms do not include the form of Notice of Guarantee and Disclosure Statement to be sent to borrowers by the guaranty agency. Following consultation with affected groups, ED intends to develop, at a later date, standardized forms for such notices.

Electronic Processing

The Higher Education Act specifically requires that in prescribing common forms that ED not limit the development of electronic forms and procedures. Until further notice, ED is not dictating the format for electronic application forms; however, if these are used, all of the data elements prescribed for the forms by ED must be included.

There are a variety of methods that agencies currently use for electronically processing applications. ED recognizes that in some electronic systems the school and lender sections of applications are completed electronically. If an agency provides for this option in its system, the school and lender section need not be printed on the form that the student completes. The agency may print routing information or brief instructions to the borrower in the space where the school and lender sections normally would be continued. These messages should only provide directions to the borrower; they must not request additional data from the borrower or describe additional services or products offered by the agency, school, or lender. At this time, agencies are not required to submit these variances from the common forms to ED for

approval. Each agency should retain in its files a copy of its electronic formats for further review if ED requires them in the future.

At this time, ED is also not establishing common procedures or other format requirements for the electronic processing system. In the future, ED will work with representatives of the community to review how some areas of electronic processing systems might be standardized and how to create general guidelines for operating of electronic processing systems.

## Borrower's Authorization Statement

The common application and promissory note includes an Electronic Fund Transfer authorization statement (Item 16 of the application) for electronic transfer of funds. ED has determined that this certification provision will meet the requirements of 34 CFR §682.207(b)(1)(iii)(B) if the school provides a notice to the borrower either 30 days before the date the school credits the student's account with the loan proceeds or not later than 30 days after that date notifying the borrower that the funds have been credited to the borrower's account at the school. ED is not prescribing the form of the notice. However, a billing statement, award letter, receipt form, or other appropriate notification procedure by the institution could meet this requirement.

## Delinquency on Other Non-Title IV Federal Debt

Item 17 of the common application includes a question asking if the borrower is delinquent on any non-Title IV federal debt. This question is required as part of a governmentwide initiative from the Office of Management and Budget. If an applicant indicates that he or she is delinquent on a non-Title IV federal debt, the lender should determine the reason for the delinquency and whether the applicant has made satisfactory arrangements for remedying the delinquency. In addition, until related regulations are published by ED, a lender must document the reason for making the loan when the applicant is delinquent on a non-Title IV federal debt. The appropriate documentation from the applicant and the determination by the lender's decision to make the loan despite the applicant's delinquent status should become a part of the loan file created by the lender.

Certified Loan Amount(s)

The financial Aid administrator is required to determine the actual amount of loan eligibility for items 29a, 29b, and 29c.  During the design of the common application, several comments requested that ED permit a guaranty agency to calculate the actual loan eligibility on the basis of information provided on the application by schools.  Pursuant to 34 CFR 682.603 (b), ED requires financial aid administrators to provide the actual certification of loan amount; guaranty agencies may not fulfill this function for schools.  If a school fails to complete the certified loan amount in 29a, 29b, or 29c, the application must be returned by the guaranty agency or lender for completion before a loan is approved.

Anticipated Completion (Graduation) Date

When a school fills in the anticipated completion or graduation date for a borrower, the actual date is required.  If the school has not yet established the completion or graduation date, the school official may use the last day of the month in which it will occur.  When the Student Status Confirmation Roster system reporting requirements provided for in the December 18, 1992 Federal Family Education Loan Program regulations are implemented, and the actual date for completion or graduation is known, it will be required that the date be sent to the appropriate guaranty agency.  For schools that have established the actual completion or graduation dates, the actual date should be provided on the application.

Access to Data at the Central Processing System

As part of implementing the common application procedures, ED is making data supplied in by students on the *Free Application for Federal Student Aid* available to guaranty agencies.  Information on this service will be described in future materials from ED.

## Governing Law and Notices

The Secretary of Education has determined that the Governing Law and Notices section of the common promissory note must include the Federal Trade Commission (FTC) consumer defense clause as required by the FTC regulations, 16 CFR Section 433.2. In addition, this section includes a reference to choice of venue for collection suits and choice of law provision. The note includes a venue clause that would permit -- unless expressly prohibited by state law -- the guarantor to bring suit against defaulters who are residents of the guarantor's own state in the locale of the guarantor's main office as long as the borrower may have the suit transferred to a more convenient location simply by making a timely written objection to the guarantor. The venue clause does not address the venue for suits against non-resident borrowers. ED has decided to leave that question to state law. Please review this section of the promissory note which has been approved by ED's Office of the General Counsel.

## Reproduction of Application Materials

Arrangements have been made to provide the necessary output for application materials in a camera-ready format. Under separate cover you will receive from Desktop Technologies, Inc., a description of the service that will be available. All documents that are a part of the common application will be available. You are not, of course, required to use this service. (This service will be available as of April 26, 1993.) However, you are responsible for ensuring that the forms used by your agency are identical to the ones that ED has approved. As indicated previously, no changes may be made to this form unless they fall into the categories previously discussed in this material.

When the common forms are printed by an agency, the forms must be printed with black ink on white paper. The type face, point size, and general presentation of the form may not be changed from the form which the

Secretary has approved.  The actual number of copies is not being specified, so an agency may print as many copies of the original as are needed.  An agency may print in the lower right hand corner on the application a reference to the type of copy, (e.g. original, student copy, file copy, etc. and NCR paper may be used for the copies.)

<u>Informational Meeting for Program Participants</u>

It has been suggested that a special informational meeting be held so that program participants can meet with ED representatives to review the common application form.  Such a meeting would permit ED to review the purpose of the form, discuss the general policies and procedures that will govern its use for 1993-94, present the guidelines for the transition period, and provide an opportunity to discuss each item on the common forms and describe ED's expectations of how data should be handled.  In addition, the meeting would provide a forum for representatives of guaranty agencies, schools, lenders, higher education associations, and other interested parties to raise questions for ED to review about the use of the common forms.

ED has received an invitation from United Student Aid Funds (USAF) in Indianapolis, Indiana, to hold such a meeting at its facility on May 3, 1993.  You are invited to send representatives to Indianapolis to participate in ED's briefing and to discuss the issues that still need to be considered for successfully implementing the common forms.  I hope you will send representatives to this meeting and encourage you to consider sending representatives from your operations and policy staff who will be responsible for implementing the common forms.  Attached to this material, you will find a registration form for the meeting on May 3.  Please fax this registration form to me at 202-205-0786 no later than noon on April 28.  The meeting will commence at 9 a.m. on May 3.  A map is enclosed for direction to the USAF offices and includes information about hotel accommodations.

Included in this material is a Question/Answer form for questions that you or your staff may need to submit in advance of the meeting on May 3. Please ask your staff to record their questions in advance of the meeting and we will seek to include these in the meeting. We will also use this form at the meeting in case we do not have time to respond to all of the questions.

On a personal note, let me express my deep appreciation to the many people who have worked to ensure that we will implement the new common forms before the deadline established in the statutes. I recognize that we could not meet all the expectations that participants had for the common forms, but I believe we have make a significant step forward by getting approval of a common loan form. As we go forward to implement this common form, we know that fine-tuning the common form for 1994-95 is just around the corner.

4/16/93
Date

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

Enclosures

---

# FEDERAL FAMILY EDUCATION LOAN PROGRAM

# ADDENDUM
## (Read this before accepting your loan.)

A new federal law called the Higher Education Amendments of 1992 recently took effect. This law changed the name and some of the terms of the Robert T. Stafford Student Loan Program. This program, now called the Federal Family Education Loan (FFEL) Program, includes Federal Stafford Loans, Federal Supplemental Loans for Students (SLS), and Federal PLUS (Parent) Loans.

You agree to accept the terms described below if you accept your loan. You accept your loan if you sign your loan check or a statement authorizing your school to release funds that your lender has electronically transferred to the school for you. This is true even if you previously received information that was different than what is described on this form. **If you do not agree to the terms described on this form:**

1. Do not sign your loan check. Request, in writing, that the check be returned to your lender and your loan be cancelled; or

2. If your loan has been or will be disbursed by electronic funds transfer, do not sign the statement authorizing your school to transfer your loan proceeds to your student account. Request, in writing, that the funds be returned to your lender and your loan be cancelled. If you have already signed an Electronic Funds Transfer authorization, inform your school, in writing, that you do not want to accept the loan.

**YOU ARE RECEIVING A LOAN THAT MUST BE REPAID.**

## Changes Affecting the Federal Family Education Loan Program

**1.  Minimum Annual Payment:** The total payments that you are expected to make during any year of any repayment period for your Federal Family Education Loans may not be less than $600 or the amount of interest that is due and payable on those loans, whichever is more. FFEL Program loans are not eligible for the special minimum payment amount previously available for married couples.

**2  "New" Borrower Deferments:** If you are a "new" borrower — a borrower who on the date of application for a loan has no outstanding FFEL Program loans which were disbursed prior to July 1, 1993 — and your loan is disbursed on or after July 1, 1993, you are eligible only for the following deferments covering:

**a.**  Periods during which you are pursuing at least a half-time course of study as determined by an eligible institution.

**b.**  Periods during which you are pursuing a course of study under a graduate fellowship program (inside or outside the United States) or an eligible rehabilitation training program for disabled individuals.

**c.**  Up to three years during periods in which you are seeking and unable to find full-time employment.

**d.**  Up to three years for any reason which the lender determines under federal regulations has caused, or will cause, you to have an economic hardship.

An economic hardship exists when you are working full time and you are earning an amount that does not exceed the greater of the minimum wage or the poverty line for a family of two as determined in accordance with 673 (2) of the Community Service Block Grant Act or if you meet other criteria established in federal regulations.

**3.  Prior Borrower Deferments:** Deferment provisions that were in effect before July 1, 1993, will continue to apply to borrowers with FFEL Program loans made before July 1, 1993, for the life of the borrower's loan.

**4.  Extension of Deferments:** If you receive a deferment on any of your loans, the deferment will apply to the total amount of all of your non-defaulted loans held by the same lender, unless you request otherwise. If you have loans with more than one lender, you must contact each lender to obtain deferment on all of your loans.

**5.  Forbearance for Medical Interns/Residents:** If you are a medical intern or resident, you are eligible for a forbearance if you request it and have exhausted all eligibility for the internship deferments. If the interest that accrues during your forbearance is capitalized, the principal amount you owe will increase.

**6.  Forbearance for Borrowers Generally:** If you request and are granted a forbearance, you will receive a forbearance of all payments unless you request an extension of time for making payments or permission to make smaller payments than were previously scheduled. If the interest that accrues during your forbearance is capitalized, the principal amount you owe will increase.

**7.  Administrative Forbearances:** Your lender may automatically grant you forbearance to bring your account current if you are delinquent at the time an authorized deferment is granted or if you are less than 60 days delinquent on a loan at the time the loan is sold or transferred. This may result in the capitalization of interest, which will increase the principal amount you owe.

**8.  Loan Sales:** Your loan may be sold, transferred or assigned to another holder. If your loan is sold, transferred, or assigned, and the address to which you send payments has changed, you will be notified of the name and address to which you must send subsequent payments and communications. Your rights and responsibilities and those of your lender will not change.

**9.  Consolidation of Debt:** A Federal Consolidation Program is available under which you, or your spouse and you, may consolidate the following loans: FISL, Federal Stafford, Perkins, Federal PLUS (student), Federal PLUS (parent loans made on or after 10-17-86), Federal SLS, Federal Direct Health Professions Student Loans (HPSL) and Health Education Assistance Loans (HEAL). The minimum amount of a Consolidation Loan is $7,500.

**10.  Credit Bureau Reporting:** Information concerning your loan, including the date(s) and amount(s) of disbursements, will be reported to a national credit bureau.

**11.  Defaults:** If you default on an FFEL Program loan:

- You may be sued to collect the loan and have a judgment rendered against you.
- Your default will be reported to a national credit bureau.
- You will be liable for substantial collection costs.
- Your federal and state income tax refunds may be withheld to pay the debt.
- Your wages may be garnished (withheld) to pay the debt.
- You may be ineligible for additional federal student financial aid, as well as assistance under most federal benefit programs.

- The renewal of your professional license may be denied.

**12.  Repayment of Your Loan:** For a Stafford Loan, the repayment period begins on the last day of the month following the end of your grace period. For an SLS Loan, the repayment period begins on the date of the last disbursement of the loan. For the purposes of calculating the 10-year maximum repayment period for an SLS Loan, the period shall commence at the time the first payment of principal is due from the borrower. For a PLUS Loan, the repayment period begins on the date the loan is disbursed.

**13.  Address Information from State Licensing Boards:** If you are ever licensed for professional practice or service in any state, the state board that licenses you is permitted to provide your address to your guaranty agency, if that agency ever requests it because your location is unknown or unavailable to that agency.

**14.  See Chart A "Annual Loan Limits" on Reverse side.**

## Changes Affecting Federal Stafford Loans

**1.  Interest Rate:**

**a.**  If you have no outstanding loans under the Federal Family Education Loan Program and you are borrowing a Federal Stafford Loan fee which the first disbursement is made on or after October 1, 1992, your loan's interest rate is variable and may change every July 1 but will never exceed 9%. If you meet these conditions, the interest rate that applies to your loan until July 1, 1995, is 6.94%. After July 1, 1995, the new interest rate applies to your loan will be available from your lender.

**b.**  If you already have Stafford Loans, your interest rate on new loans will be the same as on your existing loans; but under certain circumstances, you may be eligible for a partial rebate of interest.

**c.**  If you are a first time Federal Stafford Loan borrower with a first disbursement made on or after October 1, 1992 and you have no other Federal SLS, PLUS, or Consolidation Loans, the interest rate on your loan will be an 8% fixed rate (a fixed interest rate does not change).

## Unsubsidized Federal Stafford Loans

**1.  New Program:** The new law authorizes a program of unsubsidized Federal Stafford Loans for students who do not qualify, in whole or in part, for subsidized Federal Stafford Loans. The unsubsidized loan may be made for periods of enrollment beginning on or after October 1, 1992. If your loan is unsubsidized, this fact will be disclosed to you by your lender. The terms of your unsubsidized loan are the same as the terms for subsidized Stafford loans (including those described earlier) except as described below:

**a.**  Interest Payment:  The government does not pay interest on your unsubsidized Federal Stafford Loan. You must pay all of the interest that accrues on this loan during the time you are enrolled in school, during your grace period, and during periods of authorized deferment and forbearance.  There are two ways for you to pay interest during these periods:

**i.**  you may make monthly or quarterly payments to your lender, or

**ii.**  you and your lender may agree to add your interest to the principal of your loan, for no more often than quarterly. (This

is called capitalization). The cost of capitalization to you is illustrated in Chart B. If you do not make an interest payment as scheduled, your interest will be capitalized.

b. Federal Origination Fee/Insurance Premium: You will be charged a 6.5% origination fee/insurance premium on each disbursement of your unsubsidized Federal Stafford Loan. This fee will be deducted from each disbursement and paid to the federal government.

## Changes Affecting Federal Stafford and SLS Loans

1. Graduated or Income Sensitive Repayment: If you are a "new" borrower, you may request an income-sensitive or graduated repayment schedule from your lender. A new borrower is one who on the date of application for a loan has no outstanding FFEL Program loans which were disbursed prior to July 1, 1993, and the new loan is disbursed on or after July 1, 1993.

2. Federal Collection: Should you default on your Federal Stafford or SLS Loan, and should it become payable to the federal government, you may be required to repay your loan debt under an income-contingent repayment plan. This plan, established by regulations to be issued by the United States Department of Education, may result in your having to repay more than the principal and interest on your loan(s).

## Changes Affecting Federal PLUS Loans

1. Adverse Credit History: If you are borrowing a Federal PLUS Loan that will be disbursed on or after July 1, 1993, you are subject to a credit evaluation based on criteria established in federal regulations. Borrowers with an adverse credit history will not be eligible for a PLUS Loan.

2. Discharge of Federal PLUS Loan When Student Dies: If you are a Federal PLUS borrower and the dependent student for whom you borrowed dies, your debt will be discharged.

3. Federal PLUS Loan Disbursement: All Federal PLUS Loans must be disbursed by either a check sent to the eligible school that is copayable to the school and the parent borrower or by electronic transfer of funds (EFT) from the lender to the eligible school.

## Changes Affecting Federal SLS and PLUS Loans

1. Interest Rate: If you are borrowing a Federal SLS or PLUS Loan the first disbursement of which is made on or after October 1, 1992, your loan's interest rate will be 7.36% until July 1, 1993. After that date it will vary every July 1, but will never exceed 11% if it is an SLS Loan or 10% if it is a PLUS Loan. This interest rate applies to your new loan even if you have outstanding loans at different interest rates.

2. Federal Origination Fee: You will be charged a 5% origination fee on each disbursement of your Federal PLUS or SLS Loan. This fee will be deducted from each disbursement and paid to the federal government.

3. Principal Payment: If you are borrowing a Federal SLS Loan and you also have an outstanding Federal Stafford Loan, you are eligible to postpone the repayment of your SLS Loan's principal until the expiration of your Stafford Loan's grace period. This option may involve the capitalization of interest. Contact your lender for further information. The estimated cost of capitalization is illustrated in Chart B in this form.

## Chart A

### 1. Annual Loan Limits

| Borrower's Academic Level and Program Length | Federal Stafford Loan (Subsidized and Unsubsidized) | Federal SLS Loan |
|---|---|---|
| First Year Undergraduate Student | | |
| one academic year in length | $2,625 | $4,000 |
| 2/3 academic year in length | $1,750 | $2,500 |
| 1/3 academic year in length | $875 | $1,500 |
| Second Year Undergraduate Student | | |
| one academic year in length | $3,500 | $4,000 |
| 2/3 academic year in length | $2,325 | $2,500 |
| 1/3 academic year in length | $1,175 | $1,500 |
| Third Year and Remaining Undergraduate Student | | |
| one academic year in length | $5,500 | $5,000 |
| 2/3 academic year in length | $3,675 | $3,325 |
| 1/3 academic year in length | $1,825 | $1,675 |
| Graduate/Professional Student | $7,500* | $10,000 |

### 2. Aggregate Loan Limits

| | | |
|---|---|---|
| Undergraduate | $23,000 | $23,000 |
| Graduate | $65,000 | $73,000† |

\*  $8,500. Effective for loans with periods of enrollment commencing on or after 10/1/93.

†  No annual or aggregate limit for PLUS (parent) loans. Effective for loans with a first disbursement on or after 7/1/93.

## Chart B

The purpose of this chart is to help you estimate the amount of interest that would accrue on your loan every month so that you can estimate how much would be added to your loan's principal if you and your lender agree to capitalize interest as described on this form.

### Approximate Monthly Accrued Interest if Interest Rate is:

| Principal | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% | 11.0% |
|---|---|---|---|---|---|---|
| $500.00 | $2.50 | $2.92 | $3.33 | $3.75 | $4.17 | $4.58 |
| $1,000.00 | $5.00 | $5.83 | $6.67 | $7.50 | $8.33 | $9.17 |
| $1,500.00 | $7.50 | $8.75 | $10.00 | $11.25 | $12.50 | $13.75 |
| $2,000.00 | $10.00 | $11.67 | $13.33 | $15.00 | $16.67 | $18.33 |
| $2,500.00 | $12.50 | $14.58 | $16.67 | $18.75 | $20.83 | $22.92 |
| $3,000.00 | $15.00 | $17.50 | $20.00 | $22.50 | $25.00 | $27.50 |
| $3,500.00 | $17.50 | $20.42 | $23.33 | $26.25 | $29.17 | $32.08 |
| $4,000.00 | $20.00 | $23.33 | $26.67 | $30.00 | $33.33 | $36.67 |
| $4,500.00 | $22.50 | $26.25 | $30.00 | $33.75 | $37.50 | $41.25 |
| $5,000.00 | $25.00 | $29.17 | $33.33 | $37.50 | $41.67 | $45.83 |
| $5,500.00 | $27.50 | $32.08 | $36.67 | $41.25 | $45.83 | $50.42 |
| $6,000.00 | $30.00 | $35.00 | $40.00 | $45.00 | $50.00 | $55.00 |
| $6,500.00 | $32.50 | $37.92 | $43.33 | $48.75 | $54.17 | $59.58 |
| $7,000.00 | $35.00 | $40.83 | $46.67 | $52.50 | $58.33 | $64.17 |
| $7,500.00 | $37.50 | $43.75 | $50.00 | $56.25 | $62.50 | $68.75 |

The advantage of capitalizing interest is that you would not be required to make interest payments during in-school, grace, deferment or forbearance periods. The disadvantage is that you will pay more in interest charges over the life of your loan because your interest charges will be added to your principal balance. Your monthly repayment amount will be higher if you choose to capitalize.

For example, if you owe $500.00 in principal at an interest rate of 6.0%, then approximately $2.50 in interest would accrue on your loan every month. If you and your lender agree to capitalize your interest on a quarterly basis (every three months), approximately $7.50 would be added to your $500.00 principal balance. As a result, at the end of one quarter, you would owe, and interest would accrue on, $507.50 in principal.

Or, if you owe $4,000.00 in principal at an interest rate of 11.0%, then approximately $36.67 in interest would accrue on your loan every month. If you and your lender agree to capitalize your interest on a quarterly basis (every three months), approximately $110.01 would be added to your $4,000.00 principal balance. As a result, at the end of one quarter, you would owe, and interest would accrue on, $4,110.01 in principal.

Contact your lender if you have questions or need more information.

- # Application and Promissory Note
for Federal Stafford Loans (Subsidized and Unsubsidized)
and Federal Supplemental Loans for Students (SLS)

Guarantor, Program, or Lender Identification

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines or imprisonment under the United States Criminal Code and 20 U.S.C. 1097.

## BORROWER SECTION — Please Print Neatly or Type — READ THE INSTRUCTIONS CAREFULLY

| 1. Last Name | First Name | MI | • 2. Social Security Number |
|---|---|---|---|

| 3. Permanent Street Address (If P.O. Box, see instructions) | 4. Telephone Number | 5. Loan Period (MO/YR) From: TO: |
|---|---|---|

| City | State | Zip Code | 6. Driver's License Number (List State, Abbreviation First) |
|---|---|---|---|

| 7. Lender Name | City | State | Zip Code | 8. Lender Code, If Known | 9. Date of Birth (MO/DAY/YR) |
|---|---|---|---|---|---|

10. a. Check the interest rate for your most recent Federal Stafford loan, if any.
7 % ☐  8 % ☐  9 % ☐  8 / 10 % ●  Variable ☐

b. Do you currently have an outstanding Federal SLS, PLUS, or Consolidation Loan(s) at agencies other than the one this application will be processed to? If yes, check here: ☐

11. **REFERENCES** You must provide two separate references with different addresses. Both references must be completed fully.

| Name | | |
|---|---|---|
| Permanent Address | | |
| City, State, Zip Code | | |
| Area Code/Telephone | ( ) | ( ) |
| Relationship to Borrower | | |

## LOAN ASSISTANCE REQUESTED

12. I wish to apply for the following type(s) of loans in the order presented to the extent that I am eligible: (See Instructions - Select all that apply)

a. ● SUBSIDIZED FEDERAL STAFFORD  b. ☐ UNSUBSIDIZED FEDERAL STAFFORD  c. ● FEDERAL SUPPLEMENTAL LOANS FOR STUDENTS (SLS)

13. I request a total amount under these programs not to exceed (see instructions for loan maximums): My school will certify my eligibility for each program for which I am applying. The amount and other details of my loan(s) will be described to me in a Disclosure Statement.   $ _____ .00

14. If I check yes, I am requesting postponement (deferment) of repayment for my Stafford and SLS loan(s) during the in-school and grace periods. If I check no, I do not want to defer repayment.   a. Yes, I want a deferment. ☐   b. No, I defer to pay the interest. ☐

15. If I check yes, I am requesting that the lender add the interest on my unsubsidized Stafford and SLS loan(s) which accrues during the in-school and deferment periods, to my loan principal (capitalization). If I check no, I prefer to pay the interest.   a. Yes, I want my interest capitalized. ☐   b. No, I do not want a deferment. ☐

16. If my school participates in EFT, I authorize the school to transfer the loan proceeds received by EFT to my student account.   a. Yes ●   b. No ☐

17. I certify that I am not delinquent on any other Title IV federal debt.   a. Yes ●   b. No ☐

### PROMISSORY NOTE (Continued on the reverse side)

**PROMISE TO PAY**

I promise to pay to the Lender, or a subsequent holder of this Promissory Note, all sums disbursed (hereafter "loan" or "loans") under the terms of this Note, plus interest and other fees which may become due as provided in this Note. If I fail to make payments on this Note when due, I will also pay reasonable collection costs, including attorney's fees, court costs and collection fees. I understand I may cancel or reduce the size of any loan by refusing to accept any disbursement that is issued.

I understand that this is a Promissory Note. I will not sign this Note before reading it, including the writing on the reverse side, even if otherwise advised. My signature certifies I have read and agree to the terms and conditions, including the "Borrower's Certification," printed on the reverse side of this Application and Promissory Note.

**THIS IS A LOAN(S) THAT MUST BE REPAID**

18. Borrower's Signature _____

Today's Date (MO/DAY/YR) _____

## SCHOOL CERTIFICATION SECTION — TO BE COMPLETED BY SCHOOL

| 19. School Name | 25. School Code/Branch | 30. Telephone Number ( ) |
|---|---|---|

| 20. Street Address | 26. Cost of Attendance $ .00 | 31. Recommended Disbursement Date(s) (MO/DAY/YR) 1st. ___ 2nd. ___ |
|---|---|---|

| City State Zip Code | 27. Federal Expected Family Contribution $ .00 | 3rd. ___ 4th. ___ |
|---|---|---|

| 21. Loan Period (MO/YR) From: To: | 28. Estimated Financial Aid $ .00 | My Signature Certifies that I Have Read and Agreed to the "School Certification" Printed on the Reverse of this Application. |
|---|---|---|

| 22. Grade Level | 29. Certified Loan Amount(s) a. Subsidized $ .00 | 32. Signature of Authorized School Official |
|---|---|---|

| 23. Enrollment Status: Full Time ☐ At Least Half-Time ☐ | b. Unsubsidized $ .00 | Print or Type Name |
|---|---|---|

| 24. Anticipated Completion (Graduation) Date (MO/DAY/YR) | c. SLS $ .00 | Date ___ Check box if electronically transmitted to guarantor: ☐ |
|---|---|---|

## LENDER SECTION — TO BE COMPLETED BY LENDER

| 33. Lender Name | 34. Lender Code/Branch | 35. Telephone Number ( ) | 36. Lender Use Only |
|---|---|---|---|

| Street Address | 37. Amount(s) Approved a. Subsidized $ .00  b. Unsubsidized $ .00  c. SLS $ .00 |
|---|---|

| City State Zip Code | 38. Signature of Authorized Lending Official _____ Print or Type Name, Title and Date |
|---|---|

4/14/93

# Promissory Note *(continued)*

## Disclosure of Terms

This Note may apply to one or more of the following types of loans, which have different terms: subsidized Federal Stafford Loan, unsubsidized Federal Stafford Loan, and Federal Supplemental Loans for Students (SLS). I agree that the lender or any subsequent holder may assign my loan(s) and acknowledge that any one loan may be assigned independently of any other loan to which this Note applies.

At or before the time of my first disbursement, the lender will send me a Disclosure Statement identifying additional terms of each loan. Important additional terms are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this Note.

## Interest

Interest accrues on the unpaid principal balance of each loan from the date of disbursement until the entire principal balance is paid in full. It must pay all interest charges on my unsubsidized Federal Stafford Loan and Federal SLS loan. For a subsidized Federal Stafford Loan, I do not pay interest payable by the federal government under the Higher Education Act of 1965, as amended, and applicable U.S. Department of Education regulations (collectively referred to as the Act). Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loan(s) are those specified in the Act and presented in the statement of Borrower's Rights and Responsibilities. I also may receive rebates of interest as provided by the Act.

Unless I have requested that the interest that accrues on my unsubsidized Federal Stafford and Federal SLS Loans be added to the principal balance of my loans (referred to as Capitalization), I will begin paying interest upon disbursement of such loans. Should I fail to make required payments of interest prior to the commencement of principal repayment, or during a period of authorized deferment or forbearance, I agree that the holder may Capitalize such interest to the extent permitted by the Act.

## Origination Fee and Guarantee Fee

For each loan, the federal government charges an origination fee equal to the amount required by the Act. The guaranty agency that guarantees my loan(s) (the Guarantor) may charge a guarantee fee not to exceed a maximum amount specified in the Act. I will pay these fees, as identified in the Disclosure Statement, which will be deducted proportionately from each disbursement of my loan(s). I understand that origination and guarantee fees are refundable only if a disbursement is canceled or repaid in full within 120 days of disbursement.

## Late Charges and Collection Costs

If I fail to make any part of an installment payment within 10 days after it becomes due, the holder may collect from me a late charge not to exceed 6% of each late installment. If I default on a loan(s), I shall pay reasonable collection fees and costs, plus court costs and attorney fees.

## Repayment

Federal Stafford Loans have a repayment "Grace Period," usually until 6 months after I leave enrollment as at least a half-time student at an eligible school. My Grace Period will be disclosed in my Disclosure Statement.

I will repay the principal of my loan(s) in periodic installments during a repayment period(s) that begins: (i) in the case of a subsidized or unsubsidized Federal Stafford Loan, on the day immediately following the end of my Grace Period; (ii) in the case of a Federal SLS Loan, on the day of the final disbursement. My principal repayment period for each loan generally lasts five years but may not exceed ten years, exclusive of any period of deferment or forbearance.

The holder of my loan(s) will provide me with a Repayment Schedule that identifies the payment amounts and due dates. The minimum annual payment required on all my Federal Stafford and Federal SLS loans is $600 or the amount of interest due and payable,

whichever is longer. If I am eligible and I request it, my lender must provide me with a graduated or income-sensitive Repayment Schedule consistent with the provisions of the Act.

My Repayment Schedule may include all of my loans that are owned by the holder of this Note. I agree this holder may grant me a forbearance for purposes of aligning payment dates on my loans or to eliminate a delinquency that persists even though I am making scheduled payments. I may prepay all or any part of the unpaid balance on my loans at any time without penalty.

## Acceleration and Default

At the option of the holder, the entire unpaid balance shall become immediately due and payable upon the occurrence of any one of the following events: (i) I fail to enroll as at least a half-time student at the school that certified my Application; (ii) I fail to use the proceeds of the loan(s) solely for educational expenses; (iii) I make false representation that results in my receiving a loan(s) for which I am not eligible; or (iv) I default on the loan(s).

The following events that constitute a default on a loan: (i) I fail to pay the entire unpaid balance after the holder has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan(s), and the Guarantor reasonably concludes I no longer intend to honor my repayment obligation, provided my failure has persisted for at least 180 days for payments due monthly or 240 days for payments due less frequently than monthly. If I default, the Guarantor may purchase my loan, and Capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.

If I default, this will be reported to National Credit Bureau Organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the statement of Borrower's Rights and Responsibilities. Following default, the loan(s) may be subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

## Governing Law and Notices

The terms of this Note will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), other applicable federal statutes and regulations, and the Guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies and defenses in addition to those stated in this Note.

If this loan is made by the school, or if the proceeds of this loan are used to pay tuition and charges at a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract or business arrangement, any holder of this Note is subject to all claims and defenses which I could assert against the school. My recovery under this provision shall not exceed the amount I paid on this loan.

If I reside in the state in which the principal office of the Guarantor is located, the Guarantor may sue to enforce this loan in the county in which the Guarantor's office is located. However, if I object to being sued there and I mail a written objection to the Guarantor, that is postmarked no later than 30 days after I am served with the suit, the Guarantor will either have the court transfer the suit to the county in which I live or will dismiss the lawsuit.

Any notice required to be given to me will be effective if mailed by first class mail to the latest address I have provided to the holder of this Note, or if the holder reasonably determines that this address is no longer my address, to the latest address secured by the holder from the Department of Education or other reliable source. Failure by the holder to enforce or insist on compliance with any term of this Note shall not be a waiver of any right of the holder. No provision of this Note may be modified or waived except in writing. If any provision of this Note is determined to be unenforceable, the remaining provisions shall remain in force.

## Borrower Certification

I declare under penalty of perjury that the following is true and correct: (1) I certify that the information contained in the Borrower Section of the Application is true, complete, and correct to the best of my knowledge and belief and is made in good faith. (2) I certify that loan proceeds will be used for authorized educational expenses and that I will immediately repay any loan proceeds that cannot reasonably be attributed to educational expenses for attendance on at least a half-time basis at the certifying school for the loan period certified on the Application. (3) I certify that the total amount of loans I receive under this Note will not exceed the allowable maximums under the Act. (4) I authorize my school to pay to the holder any refund, that may be due to me up to the amount of the loan(s). (5) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Supplemental Educational Opportunity Grant, or a State Student Incentive Grant and that I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans) or the Federal Family Education Loan Program (or FFELP as defined in the statement of Borrower's Rights and Responsibilities), or, if I am in default, I have made payment arrangements that are satisfactory to the holder. (6) I authorize the holder(s) of my loan(s), the Guarantor, or their agents, to investigate my credit record and report information concerning my loan status to proper persons and organizations. (7) I authorize the release of information pertinent to this loan: (i) by the school, current holder and the Guarantor, or their agents, to members of my immediate family unless I submit written directions otherwise; and, (ii) by and amongst my schools, lenders, Guarantors, subsequent holders, the Department of Education, and their agents. (8) So that the loan(s) requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to state agencies and nonprofit organizations that administer financial aid programs under the FFELP. (9) I authorize my schools and Guarantors to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan records is incorrect, then I authorize SSA to disclose my correct social security number to these parties. (10) I have read and understand this Application and Promissory Note and the accompanying statement of Borrower's Rights and Responsibilities.

## School Certification

I hereby certify that the borrower named on this Application is accepted for enrollment on at least a half-time basis and is making satisfactory progress in a program that is eligible for the loan type(s) certified. I certify that the student is an eligible borrower in accordance with the Act. I further certify that the borrower's eligibility for a Pell Grant has been determined, that the borrower is not incarcerated, and that the borrower has been determined eligible for loan(s) in the amount(s) certified. I further certify that the disbursement schedule complies with the requirements of the Act and hereby authorize the Guarantor to adjust disbursement dates if necessary to ensure compliance with the Act. I further certify that based on records available and in inquiry, the borrower has met the requirements of the Selective Service Act, that the borrower is not liable for an overpayment of any federal grant made under the Act, and that the information provided in the Borrower and the School sections of this Application (including information supplied in electronic format) is true, complete and accurate to the best of my knowledge and belief. I agree to provide the borrower with confirmation of any transfer of funds through EFT to the borrower's student account.

## Application and Promissory Note
### for Federal Stafford Loans (Subsidized and Unsubsidized) and Federal Supplemental Loans for Students (SLS)

Guarantor or Program Identification

---

### Instructions for Completing Your Application/Promissory Note

# For Federal Stafford Loans (Subsidized and Unsubsidized) and Federal Supplemental Loans for Students (SLS)

### Borrower Section

Items 1-18 are to be completed by the student borrower.

DO NOT COMPLETE IN PENCIL. USE A BLACK INK BALLPOINT PEN OR TYPEWRITER. YOU ARE MAKING SEVERAL COPIES. SO PRESS FIRMLY ON A HARD SURFACE. IF ALL COPIES ARE NOT LEGIBLE, YOUR APPLICATION WILL BE DELAYED.

NOTE: Incorrect or incomplete information may cause your application to be rejected.

ITEM 1: Enter your last name first, then your first name and middle initial. If this item has been completed for you and any part of your name is incorrect, cross out all the incorrect information and print the correct information.

ITEM 2: Enter your 9-digit Social Security Number. If this item has been completed for you, review it for correctness. If it is incorrect, neatly line through the entire incorrect number and print the entire correct Social Security Number in this box. An application without a Social Security Number will not be processed. Read the Privacy Act and the Right to Financial Privacy Act Notices in this booklet before completing this item.

ITEM 3: Enter your permanent home street address, apartment number, city, state and zip code. If you have a Post Office Box and a street address, you must list both. A temporary school address is not acceptable. If this item has been completed for you and any part of your address is incorrect, cross out all the incorrect information and print the correct information.

ITEM 4: Enter the area code and telephone number for the address listed in ITEM 3.

ITEM 5: Enter the beginning and ending dates (Month and Year) of the academic period for which this loan is to be used (for example, 9/93 to 6/94). These dates must not be more than 12 months apart.

ITEM 6: Enter your current driver's license number, listing the state that issued this license, followed by the number. If you do not have a valid driver's license, enter N/A.

ITEM 7: Enter the name and address of the lender you wish to borrow from for this loan. If you do not already have a lender for this loan, contact the lender where you do business or your school's Financial Aid Office.

ITEM 8: If you know the 6-digit lender code, enter it here. Otherwise, leave it blank.

ITEM 9: Enter the month, day and year of your birth. Use only numbers. Be careful not to enter the current year.

ITEM 10: Enter the following information about your prior federal student loans:

Item 10a - If you have an outstanding Federal Stafford Loan, check the appropriate box to indicate your most recent interest rate. Check only one box. If you do not have an outstanding Federal Stafford Loan do not answer this question.

Item 10b - Check this box if you currently have an outstanding Federal SLS, PLUS, or Consolidation Loan(s) at an agency (or agencies) other than the one this application will be processed by.

ITEM 11: Enter the requested information for two adult references with different addresses. The first reference should be a parent or legal guardian. References with addresses outside the United States are not acceptable. At requested items, including telephone number, must be complete or your application will be delayed.

ITEM 12: Your choices in this item determine which loans you may be considered for. You should check boxes for all loan types for which you are applying. A subsidized Federal Stafford Loan is a guaranteed loan on which the federal government pays the interest while you are in school. An unsubsidized Federal Stafford Loan is a guaranteed loan on which the borrower is responsible for paying the interest. A Federal SLS is a supplemental loan which is available for graduate and professional students, and independent undergraduate students. (Refer to Rights and Responsibilities.) Requesting a given loan type does not necessarily mean you will be eligible to receive that loan type.

Item 12a - Check this box if you wish to receive a subsidized Federal Stafford Loan. If you check this box only, you will not be considered for either an unsubsidized Federal Stafford or an SLS Loan.

Item 12b - Check this box if you wish to receive an unsubsidized Federal Stafford Loan. If you also apply for a subsidized Federal Stafford Loan, the school will determine your eligibility first for the subsidized Federal Stafford Loan, then for the unsubsidized Federal Stafford Loan. If you check this box only, you will not be considered for a subsidized Federal Stafford or Federal SLS Loan. Note: if you apply for an unsubsidized loan, you may reduce your parents' ability to borrow under the Federal PLUS program.

Item 12c - Check this box if you wish to receive a Federal SLS Loan. If you also apply for a subsidized Federal Stafford or a Federal SLS Loan, the school will determine your eligibility first for the subsidized Federal Stafford Loan, then for the unsubsidized Federal Stafford Loan, then for the Federal SLS. Not all schools participate in the SLS program. Your school will determine if you are eligible. If you check this box only, you will not be considered for a subsidized or unsubsidized Federal Stafford Loan.

ITEM 13: Enter the maximum total amount you wish to borrow under the loan programs you selected in ITEM 12. Enter the amount you will need to pay your educational expenses. Apply for what you will need this year, keeping in mind your ability to eventually repay your loan. You may borrow up to the loan limits described in the chart on Maximum Loan Amounts. (See Borrower's Rights and Responsibilities) Note: A disclosure statement sets forth the interest rate and any additional fees. This statement must be presented to you prior to your receiving funds from your lender.

ITEM 14: If you are in school on at least a half-time basis, you are eligible for a postponement (deferment) of payments on your outstanding subsidized and unsubsidized Federal Stafford Loans and Federal SLS Loans. By deferring repayment of your loans, you may coordinate the repayment date for your Federal Stafford and Federal SLS Loans. If you want the deferment, check the "yes" box in this item. If you prefer to make regular payments while in school, check the "no" box. If you want to defer some, but not all of these loans, check the "no" box, then file a separate deferment form for the loan(s) you want to defer. Note: if you fail to respond to this question, it will be assumed that your answer is no.

ITEM 15: If you want the interest added to your loan principal, check the "yes" box. If you wish to pay the interest while you are in school, during any grace period or during periods of authorized deferments, check the "no" box. Even if you indicate now that you want the interest added to your loan principal (capitalization), you may make payments on your loan at any time. The federal government does not pay the interest on your unsubsidized Federal Stafford Loan or Federal SLS Loan while you are in school, during any grace period or during periods of deferment. Therefore, you are responsible for payment of interest during these periods. You may pay this interest during school, or you may let the interest accumulate. You may request that the lender add the interest to your loan principal no more frequently than quarterly. This increases the total amount of your loan. Note: if you fail to respond to this question, it will be assumed that your answer is no.

ITEM 16: Your choice to this question determine whether you wish to authorize your school to transfer your loan proceeds received by Electronic Funds Transfer (EFT) to your student account or your school, if your school participates in EFT.

**Item 16a** – Check this box if you authorize your school to transfer your loan proceeds received by EFT to your student account.

**Item 16b** – Check this box if you do not wish to authorize your school to transfer your loan proceeds by EFT to your student account.

**ITEM 17:** Indicate whether or not you are delinquent on any non Title IV federal debt.

**Item 17a** – Check this box if you are delinquent on any non Title IV federal debt.

**Item 17b** – Check this box if you are not delinquent on any non Title IV federal debt.

**Note: If you have answered yes to this question, you must attach a written statement explaining your current status and submit it with your application.**

**ITEM 18:** Borrower Signature and Date are Required. Sign your legal name. Include your first name, middle initial and last name. USE A BALLPOINT PEN. You are making several copies, so press firmly.

Enter the date you are signing the Application/Promissory Note by signing, you

1) Acknowledge that you have read, understand and agree to the provisions in the Borrower Certification in the Promissory Note,

2) Agree to repay the loan in full in accordance with all the terms and conditions in the Promissory Note.

If you fail to sign and date the Promissory Note, your application will not be processed.

## School Certification Section

**Only a Financial Aid Administrator or other authorized school official is to complete this section. Improperly certified information can create a financial liability for the school.**

**ITEMS 19-20:** Enter your school name and complete address of the office that completes this application.

**ITEM 21:** Enter the dates covered by the Cost of Attendance shown in ITEM 26. These dates must coincide with actual term starting and ending dates. Please use numbers in a Month, Day, Year format; for example, 9/15/93.

**ITEM 22:** Indicate the academic level for which the student is seeking a loan. Select the proper grade level indicator using the standard grade level codes provided:

| Code | Grade Level |
|------|-------------|
| 1 | Freshman/First Year (include proprietary institution programs that are less than one year in duration) |
| 2 | Sophomore/Second Year |
| 3 | Junior/Third Year |
| 4 | Senior/Fourth Year |
| 5 | Fifth Year/Other Undergraduate (including sixth year undergraduates and continuing education students) |
| A | First Year Graduate/Professional |
| B | Second Year Graduate/Professional |
| C | Third Year Graduate/Professional |
| D | Beyond Third Year Graduate/Professional |

**ITEM 23:** Indicate whether the borrower is enrolled at least half-time or full time. Students enrolled less than half-time are not eligible.

**ITEM 24:** This is the date the student is expected to complete the program at your institution. Please use numbers in a Month, Day, Year format; for example, 6/9/94. Day date is needed to determine the specific day borrowers will enter repayment (as per the Act). If you are unsure of the completion (graduation) date in the future, enter the last day of the month.

**ITEM 25:** Enter the assigned six or eight digit codes for your institution. This code is provided by the U.S. Department of Education for the Federal Family Education Loan Programs.

**ITEM 26:** Enter the total cost for the student's tuition and fees, room and board, books and supplies, transportation and personal expenses.

**ITEM 27:** Enter the amount of the Expected Family Contribution based on needs analysis. Enter $ 0 for any student whose need analysis produces a negative Expected Family Contribution.

**ITEM 28:** Enter the amount of assistance, which the school knows the student has been or will be awarded, for the enrollment period indicated in ITEM 19. Financial aid should include aid from all federal, state or private sources, excluding the loan(s) applied for with this application.

**ITEM 29:** Enter the amount of the borrower's eligibility for each loan type. The borrower's certified eligibility must be reduced if the borrower is attending a program with a length of less than a full academic year. The borrower's eligibility may also be reduced based on professional judgement. If this field is left blank the application will not be processed by the guarantor and will be returned to the school.

**ITEM 29a** – Certify the borrower's eligibility for a subsidized Federal Stafford Loan here. If the borrower is not eligible for a subsidized Federal Stafford Loan, enter $ 0.

**ITEM 29b** – Certify the borrower's eligibility for an unsubsidized Federal Stafford Loan here. If the borrower is not eligible for a unsubsidized Federal Stafford Loan, enter $0.

**ITEM 29c** – Certify the borrower's eligibility for a Federal SLS Loan here. If the borrower is not eligible for a Federal SLS Loan enter $0.

**ITEM 30:** Enter the telephone number, including area code, of the school official who can answer questions about this application.

**ITEM 31:** Enter the disbursement dates for this loan(s). First year, first time borrowers may not receive their first disbursement prior to 30 days after the start of classes. Schools may not request that a lender disburse loan proceeds earlier than 30 days prior to the first day of the loan period. For all borrowers, second disbursements, if earlier than the mid point of the enrollment period, must not be sooner than 30 days prior to the commencement of the second term. Multiple disbursements are required unless the loan is disbursed more than halfway through the loan period. You are certifying that the dates you enter meet these requirements.

**ITEM 32:** Your signature acknowledges that you have read and agree to the provisions in the School Certification in the Promissory Note. You must sign the application, print your name and provide the date of certification.

If you have electronically transmitted the school certification data to the Lender or Guaranty Agency, check the box.

## Lender Section

**ITEM 33:** Enter your Lender name and complete address.

**ITEM 34:** Enter the assigned six digit code of your lending institution. This code has been provided by the U.S. Department of Education for the Federal Family Education Loan Programs.

**ITEM 35:** Enter the telephone number, including area code, of the lending official who can answer questions about this application.

**ITEM 36:** This item may be left blank or used by the lender as needed.

**ITEM 37:** Indicate the approved amount for each loan type. Unless you wish to reduce the amount certified by the school, enter the amounts from 27a, 27b and 27c.

**ITEM 37a** – Authorize the loan amount for a subsidized Federal Stafford Loan here. If you do not authorize a subsidized Federal Stafford loan, enter $ 0.

**ITEM 37b** – Authorize the loan amount for an unsubsidized Federal Stafford Loan here. If you do not authorize a unsubsidized Federal Stafford Loan, enter $ 0.

**ITEM 37c** – Authorize the loan amount for a Fede al SLS Loan here. If you do not authorize a Federal SLS loan, enter $ 0.

**ITEM 38:** Sign and date the application. Print or type your name and the date you are certifying the application.

4/14/93

**Important Notices**

(This section will contain the Privacy Act Notice, the Financial Privacy Act Notice and the Equal Credit Opportunity Act Notice.)

## Privacy Act Notice

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is Section 428(b)(2)(A) of the Higher Education Act of 1965, as amended (20 U.S.C. 1078(b)(2)(a)). You are advised that participation in the Federal Family Education Loan Program is voluntary, but the requested information is necessary for participation.

The principal purpose of this information is to verify your identity, to determine your Program eligibility and benefits, to permit the servicing of your loan(s), and, in the event it is necessary, to locate you and to collect on your loan(s) if it becomes delinquent or defaulted.

The routine uses of this information include its disclosure to federal, state, or local agencies, to provide parties such as relatives, present and former employers, business and personal associates, to guaranty agencies, to credit bureau organizations, to educational and financial institutions, and to agency contractors in order to verify your identity, to determine your Program eligibility and benefits, to permit the servicing or collecting of your loan(s), to counsel you in repayment efforts, to investigate possible fraud and to verify compliance with Program regulations, or to locate you if you become delinquent in your loan(s) payments or you default.

You must provide all of the information requested in order to have your application processed.

Section 7(b) of the Privacy Act of 1974 (5 U.S.C. 552a note) requires that when any federal, state, or local government agency requests that you disclose your Social Security Number (SSN), you must also be advised whether that disclosure is mandatory or voluntary, by what statutory or other authority your SSN is solicited, and what uses will be made of it.

Section 7(a)(2) of the Privacy Act provides that an agency may continue to require disclosure of your SSN as a condition to grant you a right, benefit, or privilege provided by law in cases in which the agency required this disclosure under statute or regulation prior to January 1, 1975, in order to verify the identity of an individual.

Disclosure of your SSN is required to participate in the Federal Family Education Program. The United States Department of Education has, for several years, consistently required the disclosure of the SSN on application forms and other necessary Federal Family Education Loan Program documents adopted pursuant to published regulations. Authority for releasing this information is found in Federal Family Education Loan Program regulations, particularly 34 CFR 682.201 (a)(2) and (b)(2) and 682.504.

Your SSN will be used to verify your identity, and as an account number (identifier) throughout the life of your loan(s) in order to record necessary data accurately. As an identifier, the SSN is used in such Program activities as determining your Program eligibility, certifying your school attendance and student status, determining your eligibility for deferment of repayments, determining your eligibility for disability or death claims, and for tracing and collecting from you in case you become delinquent in your loan payments or you default.

## Financial Privacy Act Notice

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), the U.S. Department of Education will have access to financial records in your student loan file maintained by the lender in compliance with the administration of the Federal Family Education Loan Program.

## Equal Credit Opportunity Act Notice

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against you on the basis of race, color, religion, national origin, sex, marital status, or age (provided that you have the capacity to enter into a binding contract); because all or part of your income derives from any public assistance program; or because you have in good faith exercised any right under the Consumer Credit Protection Act.

The names and addresses of the federal agencies which administer compliance with this law are listed below. During the course of the loan application process your lender will, upon request, inform you of the proper body which regulates the lender.

Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551

Office of the Comptroller of the Currency
490 L'Enfant Plaza East, SW
Washington, DC 20219

Federal Deposit Insurance Corporation
550 17th Street, NW
Washington, DC 20429

Federal Home Loan Bank Board
101 Indiana Avenue, NW
Washington, DC 20552

National Credit Union Administration
2025 M Street, NW
Washington, DC 20456

Federal Trade Commission
6th Street and Pennsylvania Avenue, NW
Washington, DC 20580

# Borrower's Rights and Responsibilities

1. **Maximum Loan Amounts** - Under both the Federal Stafford Loan program (including subsidized and unsubsidized loans) and the Federal SLS Loan program, I am subject to annual and aggregate loan limits that are based on my academic level and the length of the academic program (refer to Maximum Loan Amounts chart). If I have received student loans from more than one lender, I am responsible for informing my school and lender of my other student loans. In some cases I may not be eligible for loans for which I have applied.

2. **Use of Loan Proceeds** - I must use loan proceeds for authorized educational expenses incurred to attend the school named (for the loan period indicated) on the Application. Authorized expenses include: tuition, room, board, fees, books, supplies, equipment, dependent child care, transportation and commuting expenses. Loan proceeds may not be used to purchase or lease an automobile.

3. **Change of Status** - I must notify the financial aid office of my school if I reduce my enrollment status to less than half time, withdraw, or fail to re-enroll at the conclusion of a term. I must also notify my school of any change in my local or permanent address during enrollment. Shortly before I end enrollment, I must participate in an Exit Counseling session with my school during which I will update important loan records regarding my address, telephone number, future employer, and repayment plans.

Federal law also requires me to notify my lender (or any subsequent holder of my loans), in writing, if any of the following events occur before a loan is repaid:

- I change my address;
- I change my name (for example, maiden name to married name);
- I fail to enroll in school for the loan period certified;
- I withdraw from school or begin attending less than half-time;
- I transfer from one school to another school;
- I graduate;
- I change my employer or my employer's address changes; or
- I have any other change in status that would affect my loan status (for example, the loss of eligibility for an unemployment deferment by obtaining a job).

4. **Effect of Loans on other Student Aid** - As receipt of a loan will affect my eligibility for other student aid, it may be to my benefit to determine first my eligibility for grants, work-study funds and other forms of student assistance. Before receiving a loan, I must receive a determination of my Pell Grant eligibility.  My Federal Stafford Loan (subsidized and unsubsidized) eligibility must be determined before I accept a Federal SLS Loan.

5. **Interest Rate** - Except for interest charges that the lender on a subsidized Federal Stafford Loan, I have agreed to pay interest on the principal amount of my loan(s) from the date of disbursement until the loan is paid in full. The actual interest rate applicable to my loan(s) will be disclosed to me in the Disclosure Statement.

## Maximum Loan Amounts

| Borrower's Academic Level | Federal Stafford (Subsidized and Unsubsidized) | Federal SLS |
|---|---|---|
| First Year Undergraduate Student | Annual Loan Limits | |
| one academic year | $2,625 | $4,000 |
| 2/3 academic year | $1,750 | $2,500 |
| 1/3 academic year | $ 875 | $1,500 |
| Second Year Undergraduate Student | | |
| one academic year | $3,500 | $4,000 |
| 2/3 academic year | $2,325 | $2,500 |
| 1/3 academic year | $1,175 | $1,500 |
| Third Year and Remaining Undergraduate Student | | |
| one academic year | $5,500 | $5,000 |
| 2/3 academic year | $3,675 | $3,325 |
| 1/3 academic year | $1,825 | $1,675 |
| Graduate or Professional Student | $7,500* | $10,000 |

*$8,500 Effective for loans with periods of enrollment beginning on or after 10/1/93.

| Borrower's Academic Level | Federal Stafford (Subsidized and Unsubsidized)^ | Federal SLS |
|---|---|---|
| | Aggregate Loan Limits | |
| Undergraduate Student | $23,000 | $23,000 |
| Graduate or Professional Student | $65,500 | $73,000 |

The maximum interest rate applicable to a Federal Stafford Loan (both subsidized and unsubsidized) depends on whether I have an outstanding balance on a loan under the Federal Family Education Loan Program (FFELP). The FFELP includes any loans under the Federal Stafford, GSL, FISL, SLS, ALAS, PLUS, or Consolidation loan programs.

If I have no outstanding balance on a FFELP loan, the interest rate will be a variable rate, adjusted annually on July 1, not to exceed 9%. The variable rate for each 12-month period will be equal to the bond equivalent rate of 91-day Treasury Bills auctioned at the final auction held prior to the preceding June 1, plus 3.1%.

If I have an outstanding balance on any Federal Stafford, GSL, or FISL Loan, my interest rate on subsequent Federal Stafford Loans will be the same as the applicable rate on my existing loan(s)— either 7%, 8%, 9%, or 8% through the 48th month of the repayment period and 10% thereafter, or a variable rate as described above.

If I have no outstanding balance on a Federal Stafford, GSL, or FISL Loan, but have an outstanding balance on a Federal SLS, ALAS, Federal PLUS or Federal Consolidation loan, the applicable maximum interest rate on my Federal Stafford Loan will be 8%.

The maximum interest rate applicable to a Federal SLS Loan will be a variable rate adjusted annually on July 1, not to exceed 11%. The variable rate for each 12-month period will be equal to the bond equivalent rate of 52-week Treasury Bills auctioned at the final auction held prior to the preceding June 1, plus 3.1%. Outstanding Federal SLS Loans that I received prior to October 1, 1992, may have a different interest rate.

6. **Cost of Deferring Interest Payments** - Under certain circumstances, interest charges on an unsubsidized Federal Stafford Loan or a Federal SLS Loan will accrue and may be capitalized (added to loan principal) during the in-school and Grace Period, as well as during periods of deferment and forbearance. (See Item 15 of the Application). Capitalization may occur no more frequently than quarterly.

If I choose to defer and capitalize interest charges on an unsubsidized Federal Stafford or a Federal SLS Loan, this will increase the principal balance of my loan and the total amount of interest cost I incur. The chart on the reverse side of this page allows me to estimate the cost and relative effect of capitalization on my monthly payments. If necessary, I must add two or more estimates of my payments together to approximate more closely the total monthly payment.

7. **Sale or Transfer of Loan(s)** - The lender may sell or otherwise transfer one or all of my loans without my consent. Should ownership of a loan be transferred, I will be notified of the name, address and telephone number of the new holder of my loan. Sale or transfer of my loans to a subsequent holder does not affect my rights and responsibilities.

8. **Consequences of Default** - Default is defined in the Note. If I default, the entire unpaid balance and collection fees, will become immediately due and payable. Failure to repay a loan according to its terms and conditions may result in any or all of the following: loss of federal and state income tax refunds, legal action, assessment of collection charges including attorney fees, loss of professional license, loss of eligibility for other student aid, loss of eligibility for deferments, negative credit reports, and administrative wage garnishment.

**Credit Bureau Notification** - Information concerning the amount, disbursement, and repayment of loans will be reported to one or more national credit bureau organizations.  If I default on a loan, this will also be reported to all national credit bureaus. I will be notified at least 30 days in advance that default information will be disclosed to a credit bureau unless I enter into repayment on the loan within 30 days. I will be given a chance to ask for a review of the debt before it is reported. My holder and Guarantor must provide a timely response to a request from any credit organization regarding objections I

might arise with that organization about the accuracy and completeness of information

## 10. Special Repayment Arrangements - A

A Federal Consolidation Loan Program is available under which I (or my spouse and I jointly) may consolidate into one debt student loans received from different lenders and/or under different student loan programs. The Federal Consolidation Loan Program allows the extension of the repayment period beyond the normal 10-year period and permits multiple debts to be combined, resulting in one monthly payment. For additional information, I should contact my lender(s) or holder(s).

If I have outstanding Federal SLS loans at a fixed interest rate, I am eligible to refinance these loans to secure a variable interest rate. For further information, I should contact my holder(s). My holder may charge me an amount not to exceed $100 to cover the administrative costs of refinancing these loans.

Under certain circumstances, military personnel may have their loans repaid by the Secretary of Defense in accordance with 10 U.S.C. 2141. Questions should be addressed to the local service recruiter. This is a recruiting program and does not pertain to prior service individuals or those not eligible for enlistment in the Armed Forces.

## 11. Loan Cancellation - My loan debt will be

cancelled if documentation of my death is submitted to my holder or if my holder accepts a statement submitted from a physician verifying my total and permanent disability. My loan(s) will not automatically be discharged in bankruptcy.

The Act provides for certain loan cancellations for borrowers who are unable to complete a course of study because the institution closes, or whose eligibility was falsely certified by the institution.

Neither the lender, the Guarantor, nor the Department of Education vouch for the quality or suitability of the academic programs offered by participating schools. Repayment of the loans is not conditioned upon the performance of my school nor obtaining employment in my field of study.

## 12. Deferments - I am entitled to postpone

repayment if I provide the holder of my loan(s) (or its servicing agent, with a request for a deferment together with evidence that verifies my eligibility. Upon request, the holder will provide me with a deferment application that lists deferment categories and eligibility requirements. The types of deferments that are available depend on when I first borrowed a FFELP Loan.

For Federal Stafford and Federal SLS Loans disbursed on or after July 1, 1993, to borrowers with no outstanding balance on a FFELP Loan prior to July 1, 1993, the following types of deferments are available:

Enrollment in at least a half-time course of study as determined by an eligible school.

Provided the program is approved by the Department of Education, pursuing a graduate fellowship program or a rehabilitation training program for individuals with disabilities. Up to three years, if I am conscientiously seeking but unable to find full-time employment.

Up to three years, for any reason (in accordance with federal regulations) that has caused me to have an economic hardship.

Deferment categories for borrowers with an outstanding FFELP loan disbursed prior to July 1, 1993, include:

- full-time study in an eligible school, a graduate fellowship program or a rehabilitation program for disabled individuals

- at least half-time study at an eligible school, if I borrow a new loan during the deferment period

- active duty status in the Armed Forces of the United States, or serving as an officer in the Commissioned Corps of the United States Public Health Service, or an active duty member of the National Oceanic and Atmospheric Administration Corps

- serving as a full-time volunteer under the Peace Corps Act, in an ACTION Program or

another comparable program as temporarily eligible for deferment by the U.S. Department of Education

- temporary total disability of the borrower or a dependent

- conscientiously seeking but unable to find full-time employment in the United States

- serving in an internship required to receive professional recognition to begin professional practice, or leading to a post-graduate degree or certificate

- parental leave to care for a newborn or newly adopted child

- full-time teaching in a teacher shortage area as defined by the U.S. Department of Education

- a mother of preschool age children, who is entering or reentering the work force at a salary that is not more than one dollar above the federal minimum wage.

## 13. Forbearance - During a period of forbearance,

interest charges continue to accrue while I am temporarily permitted to delay or reduce payments. If I am willing, but financially unable, to make payments under my repayment schedule, I may request forbearance to allow for any of the following:

- a short period during which I make no payments;

- an extension of time for making payments; or

- a period during which I make smaller payments than were scheduled originally.

My holder is generally not required to grant a forbearance and may ask for any reasons for the request and other information. However, if I am serving in a medical or dental internship or residency program, my holder is required to grant me a forbearance under certain conditions. The Act also provides for forbearance when my debt burden equals or exceeds 20% of gross income.

---

## Capitalization of Unsubsidized Federal Stafford and Federal SLS Loan Interest

### What is Capitalization?

Capitalization is a process whereby a lender adds unpaid interest to the principal balance of a loan. You are responsible for paying the interest due on an unsubsidized Federal Stafford Loan or a Federal SLS Loan from the date the lender disburses the loan.

If you choose to defer and capitalize interest charges, the principal balance of your loan will increase each time your lender capitalizes unpaid interest. As a result, you will pay more interest charges over the life of the loan. When you leave school and begin repaying your loan, your monthly payment amount will be higher or, if your loan is subject to the $50 minimum payment, you will make more payments.

Contact your lender if you have questions or need more information.

| Loan Type | Option 1: Interest Payment Made | | | Option 2: Interest Payment Deferred | |
|---|---|---|---|---|---|
| | Loan Amount | Monthly Interest | Monthly Payment* | Interest Capitalized | Monthly Payment* |
| Unsubsidized Stafford Loan | $2,625 | $19.69 | $50 (67 payments) | $244 | $50 (76 payments) |
| | $3,500 | $26.25 | $50 (99 payments) | $326 | $50 (114 payments) |
| 9% Interest | $5,500 | $41.25 | $70 | $512 | $76 |
| SLS Interest | $4,000 | $36.67 | $55 | $458 | $61 |
| 11% Interest | $5,000 | $45.83 | $69 | $573 | $77 |

\* 120 monthly payments unless otherwise noted.

This chart compares the monthly payments on loans where interest is paid while the borrower is in school (Option 1) and loans where the interest is capitalized (Option 2). The estimate of interest capitalized in these examples is based on quarterly capitalization over a 12-month period.

4/14/93

## Repaying Your Loans

Follow these steps to estimate your loan payment. For subsidized Federal Stafford Loans, complete Step 3 only. The Federal government pays the interest while you are in school.

### Step 1: Calculate Your Monthly Interest Charges

Round your loan up to the nearest $500. If you have a variable interest rate, use 9% for Federal Stafford or 11% for Federal SLS. If your loan amount is not on the table, follow the example below to estimate your monthly accrued interest.

**Example:**

Stafford loan of $2,500 at 9% interest

$2,000 = $15.00/month
+  500 =   3.75/month
           18.75/month

Your monthly interest $ _____

#### Approximate Monthly Interest

| Loan Amount | 7.0% | 8.0% | 9.0% | 11.0% | 12.0% |
|---|---|---|---|---|---|
| $500 | $2.92 | $3.33 | $3.75 | $4.58 | $5.00 |
| $1,000 | $5.83 | $6.67 | $7.50 | $9.17 | $10.00 |
| $2,000 | $11.67 | $13.33 | $15.00 | $18.33 | $20.00 |
| $3,000 | $17.50 | $20.00 | $22.50 | $27.50 | $30.00 |
| $3,500 | $20.42 | $23.33 | $26.25 | $32.08 | $35.00 |
| $4,000 | $23.33 | $26.67 | $30.00 | $36.67 | $40.00 |
| $5,000 | $29.17 | $33.33 | $37.50 | $45.83 | $50.00 |
| $5,500 | $32.08 | $36.67 | $41.25 | $50.42 | $55.00 |
| $6,000 | $35.00 | $40.00 | $45.00 | $55.00 | $60.00 |
| $7,000 | $40.83 | $46.67 | $52.50 | $64.17 | $70.00 |
| $7,500 | $43.75 | $50.00 | $56.25 | $68.75 | $75.00 |

### Step 2: Estimate Your Capitalized Interest

Complete this step only if you will capitalize interest on an unsubsidized Federal Stafford Loan or a Federal SLS Loan. THIS IS AN ESTIMATE ONLY. Actual interest capitalized will depend on disbursement dates, number of disbursements, the variable interest rate and the frequency of capitalization.

| | Monthly Interest (From Step One) | | Number of Months in School and Grace | | Estimate of Capitalized Interest |
|---|---|---|---|---|---|
| Sample | $ 18.75 | x | $ 27 | = | $ 506 |
| Unsubsidized Stafford | $ _____ | x | $ _____ | = | $ _____ |
| SLS | $ _____ | x | $ _____ | = | $ _____ |

### Step 3: Estimate Your Monthly Payment

Round your loan up to the nearest $500. If your principal amount is not on the table, follow the example below to estimate your monthly payment.

**Example:**

Stafford loan of $13,000 at 9% interest

$10,000 = $126.68/month
+ 3,000 =   38.01/month
           $164.69/month

*Minimum monthly payment = $50

#### Estimated Monthly Payments (10 Year Term)

| Principal Balance | 7.0% | 8.0% | 9.0% | 11.0% | 12.0% |
|---|---|---|---|---|---|
| $500* | $5.81 | $8.07 | $6.34 | $6.89 | $7.18 |
| $1,000* | $11.62 | $12.14 | $12.67 | $13.78 | $14.35 |
| $3,000* | $34.84 | $36.40 | $38.01 | $41.33 | $43.05 |
| $4,000* | $46.45 | $48.54 | $50.68 | $55.10 | $57.39 |
| $5,000 | $58.06 | $60.67 | $63.34 | $68.88 | $71.74 |
| $7,000 | $81.28 | $84.93 | $88.68 | $96.43 | $100.43 |
| $9,000 | $104.50 | $109.20 | $114.01 | $123.98 | $129.13 |
| $10,000 | $116.11 | $121.33 | $126.68 | $137.75 | $143.48 |
| $15,000 | $174.17 | $182.00 | $190.02 | $206.63 | $215.21 |
| $20,000 | $232.22 | $242.66 | $263.36 | $275.50 | $286.95 |
| $25,000 | $290.28 | $303.32 | $316.69 | $344.38 | $358.68 |

| | Loan Amount | | Estimate of Capitalized Interest (From Step Two) | | New Principal Balance | Estimated Monthly Payment |
|---|---|---|---|---|---|---|
| Sample | $ 2,500 | + | $ 506 | = | $ 3,006 | $ 50.00 * |
| Subsidized Stafford | $ _____ | + | $ 0 | = | $ _____ | $ _____ |
| Unsubsidized Stafford | $ _____ | + | $ _____ | = | $ _____ | $ _____ |
| SLS | $ _____ | + | $ _____ | = | $ _____ | $ _____ |

## GROUND TRANSPORTATION:

Indy Connection Limousines., Inc..    1/800 8888-INDY  (This service is less expensive than taxi service, which is also available at the airport.)

The major car rental companies are all located at the Indianapolis airport.

## HOTEL:

Omni North Hotel, 8181 N. Shadeland Avenue    (See map below)
(317)849-6668

$65/night

A block of 100 rooms will be held until April 26 under the Department of Education..

The hotel is approximately 30 minutes from the airport and 7-10 minutes from USA GROUP.

# USA GROUP LOCATOR MAPS

## INDIANAPOLIS



From the Indianapolis International Airport, take I465 North to I465 East. Follow I465 East to I69 North. Take the Fishers/116th Street East off I69 and turn right. At the first road, turn right into the Exit Five Corporate Park and follow USA Parkway to the USA GROUP Headquarters.

7/52th

## FISHERS/CASTLETON



🎓  USA GROUP Headquarters
①  Omni North Hotel
②  Quality Inn - Castleton Suites

# Registration Form

### Common Application Meeting
### U.S. Department of Education
### Indianapolis, Indiana
### May 3, 1993

**NAME AND TITLE**

**AGENCY**

**ADDRESS**

**PHONE NUMBER**

**FAX NUMBER**

**Special Note:** Prior to April 28, 1993 return this form to Robert W. Evans, Director, Division of Policy Development, Policy, Training, and Analysis, U.S. Department of Education --- **_FAX TO: 202-205-0786_**

(FORM5)

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE ASSISTANT SECRETARY FOR POSTSECONDARY EDUCATION

RECEIVED JUN   9 1988

MAY 19 1988

Honorable Stephen J. Solarz
House of Representatives
Washington, D.C. 20515

Dear Mr. Solarz:

This responds to your letter of February 10, 1988 to Secretary Bennett
concerning former students of Adelphi Institute, Inc. who have outstanding
Guaranteed Student Loans (GSL) for attendance at that school.

Many students borrowed under the Guaranteed Student Loan Program to finance
their enrollment at Adelphi. These loans were made by various banks and were
guaranteed by a number of guaranty agencies, including the Higher Education
Assistance Foundation. Each of these guaranty agencies has a reinsurance
agreement with the Department. The Department paid interest subsidies on each
loan to a financially needy Adelphi borrower and was guaranteed by one of
these agencies, and the Department reimbursed the agency for some portion of
its losses with regard to those borrowers defaulted and the
lenders filed claims on the respective guarantees.

If a loan is otherwise unenforceable, it is not reimbursable by the Department,
and the Department would not encourage or require a lender or guaranty agency
to attempt to collect such a loan. As a legal matter, however, a student who
borrows under the GSL program from a third party lender remains responsible
for repaying the loan even if the school closes, unless a relationship exists
between the lender and the school that would make the school's failure to
render educational services a defense to repayment of the loan to the lender.
This kind of relationship can arise when the lender makes the school its agent
for certain functions in the loan-making process. The Department has termed
such an agency relationship an "origination relationship." 34 CFR 682.200.

As you may be aware, students who attended the Gary, Indiana branch of
Adelphi have filed a class action challenging the enforceability of their
Adelphi loans guaranteed by HEAF. If the court finds that the school acted as
agent of the lender and determines that the loans for that reason are
null or partially unenforceable against the borrowers, the Department would
honor that determination, and would regard these loans, to that extent, as not
honored by HEAF, and would regard these unenforceable loans for repayment
guaranty agencies to collect them.

Page 3 - Honorable Cf.„k
Page 3 - Honorable Stephen Solarz*

I hope that this has clarified the Department's position regarding the forgiveness of loans under these circumstances. If you have any further questions, or wish any additional information, please contact Mr. William L. Moran, Director, Division of Policy and Program Development, at 732-5217.

Sincerely,

Kenneth D. Whitehead
Acting Assistant Secretary

Federal Family Education Loan Program (FFELP)

Guarantor, Program, or Lender Identification

706

California Student Aid
Commission - 706

OMB No. 1845-0006
Form approved
Exp. date 2-29-2008

# Federal Stafford Loan
# Master Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both, under the United States Criminal Code and 20 U.S.C. 1097.

02116011

## Borrower Information
*Please print neatly or type. Read the instructions carefully.*

| 1. Last Name | First Name | MI | 2. Social Security Number |
|---|---|---|---|
| colon | yvette | | |

| 3. Permanent Street Address (if P.O. Box, see instructions) | | | 4. Home Area Code/Telephone Number | 5. Date of Birth (Month/Day/Year) |
|---|---|---|---|---|
| | | | (212  ) | |

| City | State | Zip Code | 6. Driver's License State and Number | 7. E-mail Address |
|---|---|---|---|---|
| new york | ny | 10029 | State ny # | @hotmail.com |

| 8. Lender Name | City | State | Zip Code | 9. Lender Code, if known |
|---|---|---|---|---|
| SALLIE MAE EDUCATION TRUST (802218) | | | | 802218 |

10. **References:** You must provide two separate references with different U.S. addresses. The first reference should be a parent (if living) or legal guardian. Both references must be completed in full.

| | A. | | B. |
|---|---|---|---|
| Name | | | |
| Permanent Address | | | |
| City, State, Zip Code | | n/a | |
| E-mail Address | | | |
| Area Code/Telephone Number | | | |
| Relationship to Borrower | 0 - Other | | 0 - Other |

| 11. Requested Loan Amount: I request a total amount of subsidized and unsubsidized loans under this Master Promissory Note not to exceed the allowable maximums under the Higher Education Act. My school will notify me of the type(s) and amount(s) of loan(s) that I am eligible to receive. I may cancel my loan or request a lower amount by contacting my lender or school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and Disclosure Statements that have been or will be provided to me. | 12. Interest Payments (Optional): <br> ☐ I want to pay unsubsidized interest while I am in school. |
|---|---|

## Borrower Certifications and Authorizations
*Read carefully before signing below.*

13. Under penalty of perjury I certify that:
   A. The information I have provided on this Master Promissory Note and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.
   B. I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.
   C. (I) I do not now owe an overpayment on a Federal Pell Grant, Supplemental Educational Opportunity Grant, or a Leveraging Educational Assistance Partnership Grant (formerly State Student Incentive Grant); or, if I owe an overpayment, I have made repayment arrangements with the holder to repay the amount owed. (II) I am not now in default on any loan received under the Federal Perkins Loan Program (including NDSL loans), the Federal Direct Loan Program, or the Federal Family Education Loan Program ("FFELP" as defined in the Borrower's Rights and Responsibilities Statement); or, (III) I am in default on a loan, and I have made satisfactory arrangements with the holder of the defaulted loan.

14. For all subsidized and unsubsidized Federal Stafford Loans (as described in the additional MPN provisions and the Borrower's Rights and Responsibilities Statement) I receive under this Master Promissory Note, and for certain other loans as described below, I make the following authorizations:
   A. I authorize my school to certify my eligibility for loans under this Master Promissory Note.
   B. I authorize my school to transfer loan proceeds received by electronic funds transfer (EFT) or master check to my student account.

C. I authorize my school to pay to the lender any refund that may be due up to the full amount of the loan(s).
D. I authorize the lender, the guarantor, or their agents, to investigate my credit record and report information concerning my loan status to persons and organizations permitted by law to receive such information.
E. I request and authorize my lender to: (I) during the in-school and grace periods of any loans made under this Master Promissory Note, defer and align the repayment of principal on all of my FFELP loans that are in repayment status; and (II) add unpaid interest that accrues on all my FFELP loans to the principal balance of such loans ("capitalization") including such loans made under this Master Promissory Note, during forbearance periods, and for unsubsidized loans, during in-school, grace, and deferment periods as provided under the Act. "Capitalization" will increase the principal balance of my loans and the total amount of interest charges I must pay.
F. I authorize the release of information pertinent to my loans: (I) by the school, the lender, and the guarantor, or their agents, to the references on the applicable loans and to members of my immediate family unless I submit written directions otherwise; and, (II) by and among my schools, lenders, guarantors, the Department of Education, and their agents.
G. So that the loans requested can be approved, I authorize the Department of Education to send any information about me that is under its control, including information from the Free Application for Federal Student Aid, to the school, the lender, and to state agencies and nonprofit organizations that administer financial aid programs under the FFELP.

## Promise to Pay
*In this Master Promissory Note (MPN), "lender" refers to, and this MPN benefits, the original lender and its successors and assigns, including any subsequent holder of this MPN.*

15. I promise to pay to the order of the lender all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that multiple loans may be made to me under this MPN. I understand that by accepting any disbursements issued at any time under this MPN, I agree to repay the loans. I understand that, within certain time frames, I may cancel or reduce the amount of any loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that accrues on my unsubsidized loans during in-school, grace, and deferment periods will be added as provided under the Act to the principal balance of such loans. If I do not make any payment on any loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Certifications and Authorizations printed above, the Notice About Subsequent Loans Made Under This MPN, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

| 16. Borrower's Signature **yvette   colon** | 17. Today's Date (Month/Day/Year) **07/08/2006** |
|---|---|

01.01.01    01939BDBBA9A462BF713A2BC174D7B79

*Additional MPN provisions follow*



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE ASSISTANT SECRETARY FOR POSTSECONDARY EDUCATION

# Overview
## Federal Trade Commission (FTC)
## Holder Rule

In preparing the common loan application/promissory note for the FFEL Program, the Department engaged in extensive consultations with representatives for lenders, schools, guaranty agencies, and students.  One of the main topics of discussion was the incorporation of the FTC Holder Rule into the promissory note.  Some of the representatives urged us not to include the FTC Holder Rule in the Note, but others argued that the law and public policy supported inclusion of the FTC Holder Rule notice in the promissory note.  We carefully considered all the views expressed during our consultations, but ultimately the Secretary concluded that the notice must be in the promissory note.

The FTC has consistently stated, both publicly and privately, that their regulation applies to the FFEL Program, and a number of court decisions have agreed with that conclusion.  *See* 57 Fed. Reg. 28815 (June 29, 1992); Jackson v. Culinary School of Washington, 788 F.Supp. 1233 (D.D.C. 1992); Hernandez v. Alexander, C.A. No. CV-S-91-705-PMP (D.Nev., May 19, 1992); Spinner v. Chesapeake Business Institute, C.A. No. 91-634 (E.D.Va., February 5, 1993).  Accordingly, the Secretary decided that the FTC Holder Rule notice must be included in the common application/promissory note.

If a for-profit school and a lender have a referral or business arrangement, the common application/promissory note, by including the Holder Rule clause, makes borrower claims against the school available as legal defenses to repayment of the loan, but apart from that, does not create any new liability for a lender or guarantor.  Whether the claim of the borrower is in fact a legal claim or defense against a holder of the loan, depends on state law.

Page Two:

The Higher Education Act of 1965, as amended (HEA), and FFEL Program regulations require a school and a lender to perform certain specific duties, which may involve some cooperative activity. That specific activity is not the kind of cooperative conduct that constitutes a referral or affiliation" relationship within the meaning of the Holder Rule. Therefore, a for-profit school and a lender do not create a referral or business arrangement between themselves if each does no more than perform those specific duties that the HEA and regulations expressly require each of them to perform.

Furthermore, a for-profit school does not generally create a referral or business arrangement if, in addition to performing specific duties required by the HEA or regulations, the school does no more than give its students *information* on the availability of student loans – for example, a list of available lenders - but does not *recommend* that the applicants seek loans from those lenders and has no other business dealings (*i.e.*, other than those expressly required by statute or regulations, as noted above) with the identified lenders regarding student loans. The Holder Rule clause therefore does not apply to loans made under these circumstances.

If the school contacted a particular lender to inquire whether that lender would be willing to make loans for *its own students*, and later included this lender (if it responded positively) on its information list of lenders, that exchange would be more likely to be considered an affiliation and implicate the Holder Rule. On the other hand, if the school obtained its lender information from third-party sources, such as the guarantor or a trade association, or from a more generalized school inquiry to a lender (*e.g.*, asking merely whether the lender is generally willing to make loans to trade school students in a particular state), that exchange does not constitute an affiliation, again assuming that the school has no other business dealings (*i.e.*, other than those required by statute or regulations, as noted above) with the identified lenders regarding student loans. The Holder Rule does not apply in the latter situations.

Page Three

Although the Holder Rule applies where a school recommends a particular lender or lenders, in order for a referral relationship to arise between a school and a lender, the lender must know that a loan *applicant* was referred by a school. If the lender has no knowledge that the school recommended it to the loan applicant (and, as noted earlier, no other facts exist that would give rise to a referral or affiliation), the Holder Rule is not applicable to that loan.

**Whether** the lender has a good-faith belief that no recommendation occurred will of course depend on the facts of particular cases. A lender that had no direct communication with a school about loan availability would be **more** likely to demonstrate a good-faith belief that applications it receives from the school were not the result of a school recommendation, while a lender that sends the school promotional material regarding its lending activity would have good reason to believe that loan applications it receives from that school were the result of school recommendation.

A lender **that advises a** school that it is generally willing to make student loans, but demands and receives from the school credible assurances that **the** school will do no more than include its name on a list of willing lenders for interested loan applicants, could in good-faith believe that no recommendation was taking place. **Until the lender is on notice of facts that call such assurances into question, and in the absence of other actions that would give rise to a referral or affiliation, the Holder Rule clause would not apply to** loans made under those circumstances. This is consistent with **Department** regulations **that permit lenders to rely in good-faith on statements made by** the school in the loan application process. 34 CFR 682.206(a)(2).

Because the FTC promulgated and administers the Holder Rule, the Department must give deference to any interpretation by the FTC of the application of the rule. An FTC opinion as to whether the rule applies in particular fact situations will therefore be ordinarily dispositive *on that issue* in any dispute regarding the enforceability of an FFEL Program loan. The FTC has provided explanatory statements in the Federal Register regarding

Page Four:

the application of the Holder Rule.  These are found in the Federal Register of November 18, 1975 (40 FR 53506), August 16, 1976 (41 FR 48594), and June 29, 1992 (57 FR 28814).

Finally, we understand that the Department's action in including the Holder Rule language in the promissory note has caused confusion for some lenders. However, lenders are familiar with the implications of the FTC Holder Rule since it applies to every other consumer loan transaction in which they are * involved.  We anticipate that loans will continue to be generally available.

7/2/93
Date

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

**ATTORNEY GENERAL OF THE STATE OF NEW YORK**
-------------------------------------------------------------------------------**X**

      **In the Matter of**

**Career Education Corporation,**

                      **Respondent.**

-------------------------------------------------------------------------------**X**

## AGREEMENT ON CODE OF CONDUCT

      **WHEREAS** the Office of Attorney General of the State of New York (the

"OAG") has commenced an investigation pursuant to Executive Law § 63(12) and General

Business Law §§ 349 and 350 and the Office of the Illinois Attorney General ("ILOAG") has

commenced an investigation pursuant to the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505/1 *et seq.* ("Illinois Consumer Fraud Act") into practices related to

higher education loans offered to students and parents (the "Investigation");

      **WHEREAS** in the course of the Investigation the OAG reviewed extensive

evidence;

      **WHEREAS** Career Education Corporation ("CEC") has cooperated in the

Investigation by voluntarily producing evidence and answering questions relevant to the

Investigation;

      **WHEREAS,** as set forth in the findings of fact ("Findings") below, the OAG and

the ILOAG assert that the Investigation has revealed that many institutions of higher education

and lenders that provide loans to or on behalf of students of those institutions have engaged in

certain acts, practices and omissions that violated Executive Law § 63(12) and General Business

Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/2;

**WHEREAS**, as set forth below in section I(B), the OAG and the ILOAG allege that CEC has engaged in certain of the practices that violate these statutes;

**WHEREAS** CEC does not admit, and expressly denies, that its conduct constituted any violation of law;

**WHEREAS** CEC has advised the OAG and the ILOAG of its desire to resolve the Investigation through this Agreement on Code of Conduct (the "Agreement");

**WHEREAS** CEC, without admitting the OAG's and the ILOAG's Findings and assertions made below, has agreed to alter its practices with respect to education loans, and to adopt a Code of Conduct for education loan practices;

**NOW THEREFORE**, the OAG and the ILOAG, based upon the Investigation, makes the following Findings:

## I. FINDINGS OF THE ATTORNEY GENERAL

### A. Industry-Wide Findings

The Investigation has covered many lenders and institutions of higher education. Based on the Investigation, the OAG and the ILOAG make the following findings as to common practices found throughout the higher education loan industry.

1. Many students and their families are unable to pay all of the expenses appurtenant to higher education. In addition to grants, scholarships and work-study programs, significant numbers of students and their parents turn to loans to cover what they cannot otherwise afford to pay. Higher education loans constitute an $85 billion per year industry.

2. Higher education loans take several forms. By dollar amount, most loans are borrowed by students themselves and are federally regulated and guaranteed. The federal government has created a program for providing loans, know as "Stafford Loans," to students.

2

The interest rate for Stafford Loans is set by the federal government. Lenders, however, have wide latitude in offering benefits to borrowers, including discounts off of that interest rate.

3.      Other federal loans, known as "PLUS Loans" are offered to students' parents to cover higher education expenses incurred by their children and to graduate students. Like Stafford Loans, the federal government sets the interest rates for PLUS Loans and lenders have wide latitude in offering borrower benefits.

4.      In addition to the federal loans described above, parents or students can obtain private "alternative loans" to cover educational expenses not covered by other financial aid. The federal government does not sponsor, subsidize or guarantee alternative loans. Accordingly, the interest rate and other terms of the loans are determined by the borrower's creditworthiness and market forces.

i.      *"Preferred Lender" Lists*

5.      In response to the staggering array of lenders that offer each of the various types of education loans, some institutions of higher education have created lists of recommended lenders. Institutions of higher education that use such lists usually have separate lists for each of the several types of education loans available. In some instances, such lender lists contain dozens of potential lenders that meet certain minimal requirements. In other cases, institutions of higher education use the lists to recommend a handful of lenders, or even a single lender, as "preferred."

6.      The lenders listed on an institution of higher education's list of preferred lenders typically receive up to 90% of the loans taken out by the institution's students and their parents. Despite the significant role that these lists play in determining the lenders from which students and parents borrow, many institutions did not inform their student and parent borrowers about

3

the process and criteria used to formulate the lists of recommended or preferred lenders. Nor did they disclose the potential conflicts of interest on the part of their financial aid offices, which typically compile the preferred lender lists. These conflicts of interest may arise from: lender-funded travel expenses for institutions' financial aid officials to attend meetings and seminars in attractive locations; the appointment of the institutions' financial aid officials to "Boards" or "Committees" sponsored by the lenders; the lenders' provision of staff and services to the institutions; the lenders' provision of "Opportunity Loans;" and revenue sharing. These practices are described below.

      *ii.*    *Revenue Sharing*

      7.    In the context of the education loan business, revenue sharing refers to an arrangement whereby a lender pays an institution of higher education a percentage of the principal of each loan directed toward the lender from a borrower at the institution, often in exchange for the institution of higher education placing the given lender on the institution of higher education's preferred lender lists. This type of arrangement is prohibited by federal regulation in the context of Stafford Loans, PLUS Loans and other federal loan programs; it occurs only in the alternative loan segment of the industry.

      8.    The practice of revenue sharing creates a conflict of interest on the part of the institutions of higher education. When and if the institutions direct students to lenders, they should do so based solely on the best interests of the student and parents who may take out loans from the lenders; yet, the institutions have a financial interest in the selection of the lenders by the student and parents. If the student and parents select a lender with which the institution has a revenue sharing contract – even if another lender or other financial aid resource would be more suitable for the student or parents – the institution receives a financial benefit.

4

*iii.    Denial of Choice of Lender*

9.    Some institutions of higher education have neglected to make clear that borrowers have a right to select the Stafford Loan and PLUS Loan lender of their choice, irrespective of whether the lender appears on any preferred lender lists. In the most egregious cases, institutions have gone so far as to abrogate this right, by stating or strongly implying that the student and parents were limited to the lenders on the list, or even to a single lender.

*iv.    Exclusive Consolidation Loan Marketing Agreements*

10.    Former students may wish to combine their various education loans into a single package, called a "consolidation loan." Some institutions of higher education have entered into agreements with the providers of such consolidation loans pursuant to which the institution agrees to encourage its former students to consolidate the former students' loans with a particular lender and no other. In exchange, the institution secures revenue sharing or other benefits that inure directly or indirectly to the institution rather than the borrower. Once again, the institution is in a conflicted position because its advice and encouragement may be influenced by its financial self-interest.

*v.    Undisclosed Sales of Loans to Another Lender*

11.    In many instances, institutions of higher education place several lenders on the institutions' lists of preferred lenders causing the potential borrower to think that the lender list represents a real choice of options. But, the choice is illusory when, as sometimes occurs, all or a number of the lenders on a lender list have arranged with each other to sell any loans to one of the lenders immediately after one of the other complicit lenders disburses a loan.

*vi.    Opportunity Loans*

5

12.    Lenders have entered into undisclosed agreements with institutions of higher education to provide what are referred to as "Opportunity Loans." These agreements provide that the lender will make loans up to a specified aggregate amount to students with poor or no credit history, or international students, who the lender claims would otherwise not be eligible for the lender's alternative loan program. In exchange for the lender's commitment to make such loans, the institution may provide concessions or promises to the lender that may prejudice other borrowers.

**B.    Findings as to CEC**

13.    Career Education Corporation is a foreign corporation with a principal place of business located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, Illinois. CEC operates post-secondary educational institutions within New York State and elsewhere.

14.    Two Lending Institutions, as defined below, which have made private, alternative loans to CEC students, have made donations to the Career Education Scholarship Fund, a section 501(c)(3) entity, in the aggregate amount of $21,200.00. These funds were not made available in consideration of placement of the Lending Institutions on a preferred lender list, or for reaching agreed loan volumes in any lending program, or in return for any other thing of value.

**C.    Violations**

15.    The OAG and the ILOAG allege that the acts, practices, and omissions set forth in section I(B) on the part of CEC created a conflict of interest and violated Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/2.

6

## II. AGREEMENT

**IT NOW APPEARING THAT** CEC, while it denies any conflict of interest or violation of the laws cited in this Agreement, desires to settle and resolve the Investigation without admitting the OAG's and the ILOAG's Findings;

**AND IT FURTHER APPEARING THAT** CEC agrees to accept a Code of Conduct promulgated by the OAG and the ILOAG for institutions of higher education involved in providing and servicing education loans or advising students or their parents with respect to education loans;

**NOW, THEREFORE,** the OAG, the ILOAG and CEC hereby enter into the Agreement, pursuant to Executive Law § 63(15) and the Illinois Consumer Fraud Act, 815 ILCS 505/6.1, as follows:

### A.    Code of Conduct

   *i.    Prohibition of Certain Remuneration to CEC Employees*

16.    CEC shall require and ensure that no officer, trustee, director, employee, or agent of CEC accepts anything of more than nominal value on his or her own behalf or on behalf of another during any 12 month period from or on behalf of a Lending Institution, except that this provision shall not be construed to prohibit any officer, trustee, director, employee, or agent of CEC from conducting non-CEC business with any Lending Institution. As used in the preceding sentence and throughout the Agreement, a Lending Institution is defined as:

>    (a) Any entity that itself or through an affiliate engages in the business of making loans to students, parents or others for purposes of financing higher education expenses or that securitizes such loans; or

>    (b) Any entity, or association of entities, that guarantees education loans; or

7

(c) Any industry, trade or professional association that receives money from any

entity described above in subsections a and b.

Nothing in this provision or throughout the Agreement shall prevent CEC from holding

membership in any nonprofit professional association.

17.     The prohibition set forth in the previous paragraph shall include, but not be

limited to, a ban on any payment or reimbursement by a Lending Institution to a CEC employee

for lodging, meals, or travel to conferences or training seminars.

    *ii.*     *Limitations on CEC Employees Participating on Lender Advisory Boards*

18.     CEC shall prohibit any officer, trustee, director, employee, or agent of CEC from

receiving any remuneration for serving as a member or participant of an advisory board of a

Lending Institution, or receiving any reimbursement of expenses for so serving, provided,

however, that participation on advisory boards that are unrelated in any way to higher education

loans shall not be prohibited by the Agreement.

    *iii.*     *Prohibition of Certain Remuneration to CEC*

19.     CEC may not accept on its own behalf anything of value from any Lending

Institution in exchange for any advantage or consideration provided to the Lending Institution

related to its education loan activity.  This prohibition shall include, but not be limited to, (i)

"revenue sharing" by a Lending Institution with CEC, (ii) CEC's receipt from any Lending

Institution of any computer hardware for which CEC pays below-market prices and (iii) printing

costs or services.  Notwithstanding anything else in this paragraph, CEC may accept assistance

as contemplated in 34 CFR 682.200(b)(definition of "Lender")(5)(i).

    *iv.*     *Preferred Lender Lists*

8

20.     In the event that CEC promulgates a list of preferred or recommended lenders or similar ranking or designation ("Preferred Lender List"), then

(a) Every brochure, web page or other document that sets forth a Preferred Lender List must clearly disclose the process by which CEC selected lenders for said Preferred Lender List, including but not limited to the criteria used in compiling said list and the relative importance of those criteria; and

(b) Every brochure, web page or other document that sets forth a Preferred Lender List or identifies any lender as being on said Preferred lender List shall state in the same font and same manner as the predominant text on the document that students and their parents have the right and ability to select the education loan provider of their choice, are not required to use any of the lenders on said Preferred Lender List, and will suffer no penalty for choosing a lender that is not on said Preferred Lender List.

(c) CEC's decision to include a Lending Institution on any such list and CEC's decision as to where on the list the Lending Institution's name appears shall be determined solely by consideration of the best interests of the students or parents who may use said list without regard to the pecuniary interests of CEC;

(d) The constitution of any Preferred Lender List shall be reviewed no less than annually;

(e) No Lending Institution shall be placed on any Preferred Lender List unless the said lender provides assurance to CEC and to student and parent borrowers who take out loans from said Lending Institution that the advertised benefits

9

upon repayment will continue to inure to the benefit of student and parent borrowers regardless of whether the Lending Institution's loan are sold;

(f) No Lending Institution that has an agreement to sell its loans to another unaffiliated Lending Institution shall be included on any Preferred Lender List unless such agreement is disclosed therein in the same font and same manner as the predominant text on the document in which the Preferred Lender List appears;

(g) No Lending Institution shall be placed on any one of CEC's Preferred Lender Lists or in favored placement on any one of CEC's Preferred Lender Lists for a particular type of loan, in exchange for benefits provided to CEC or to CEC's students in connection with a different type of loan;

    *v.*    *Prohibition of Lending Institutions' Staffing of CEC's Financial Aid Offices*

21.    CEC shall ensure that no employee or other agent of a Lending Institution is ever identified to students or prospective students of CEC or their parents as an employee or agent of CEC. No employee or other agent of a Lending Institution may staff CEC's financial aid offices at any time.

    *vi.*    *Proper Execution of Master Promissory Notes*

22.    To the extent that CEC links or otherwise directs potential borrowers to any electronic Master Promissory Notes or other loan agreements that do not allow students to enter the lender code or name for any lender offering the relevant loan at that guarantee agency, then CEC shall undertake to use its best efforts so as to allow students to enter such information electronically or otherwise. CEC's link or direction referred to in the prior sentence shall comply with paragraphs 20(a) and (b) herein.

    *vii.*    *School as Lender*

23.    If CEC participates in the "School as Lender" program under 20 U.S.C.

§ 1085(d)(1)(E), CEC may not treat School As Lender loans any differently than if the loans

originated directly from another lender; all sections of the Agreement apply equally to such

School as Lender loans as if the loans were provided by another lender.

    *viii.*    *Prohibition of Opportunity Loans*

24.    CEC shall not arrange with a Lending Institution to provide any Opportunity

Loans as defined above in section I(A)(vi), if the provision of such Opportunity Loans prejudices

any other borrower.

## B.   Consumer Education Program Fund

25.    Within 30 days of the effective date of the Agreement, CEC will pay to the

OAG the sum of $21,200.00, which shall use the funds to create a national consumer education

program for high school seniors and their parents.

## C.   Scope of the Agreement

26.    Except as provided below, the Agreement precludes any action that the OAG and

the ILOAG could commence against CEC or its affiliates and their respective current and former

officers, directors, trustees and employees for the acts, practices, and omissions listed in section

I(B) of the Agreement; provided however, that nothing contained in the Agreement shall be

construed to cover claims of any type by any other state agency or any claims that may be

brought by the OAG and/or the ILOAG to enforce CEC's obligations arising from or relating to

the provisions contained in the Agreement. The Agreement shall not prejudice, waive or affect

any claims, rights or remedies of the OAG and/or the ILOAG with respect to any person, other

than CEC and its affiliates and their current and former officers, directors, trustees and

employees, all of which claims, rights, and remedies are expressly preserved, nor shall the Agreement create any rights on behalf of persons not parties to the Agreement. The Agreement does not preclude any action that the OAG and/or ILOAG may take for acts, practices, or omissions not listed in the Findings section of the Agreement, even if such acts, practices, or omissions constitute a part of the Investigation.

D.    **Cooperation**

27.    CEC shall continue to cooperate fully and promptly with the OAG and the ILOAG with regard to the Investigation and any related proceedings and actions. CEC shall use its best efforts to ensure that all of its officers, directors, employees and agents also fully and promptly cooperate with the OAG and the ILOAG in the Investigation and any related proceedings and actions, subject to their individual rights and privileges.

28.    Cooperation shall include without limitation:

(a) Production, voluntarily and without service of subpoena, by CEC of any information and all documents or other tangible evidence related to education loan practices reasonably requested by the OAG and the ILOAG, and any compilations or summaries of information or data that the OAG and the ILOAG reasonably requests be prepared, subject to recognized privileges and protections for confidential information;

(b) Using CEC's best efforts to cause CEC's officers, directors, employees and agents to attend any proceedings at which the presence of any such persons is requested by the OAG and the ILOAG and having such persons answer any and all inquiries that may be put by the OAG and the ILOAG to any of them at any proceedings or otherwise ("proceedings" include but are not limited to

12

any meetings, interviews, depositions, hearings, grand jury hearing, trial or other proceedings) voluntarily, and without service of a subpoena, subject to their individual rights and privileges; and

(c) Fully, fairly and truthfully disclosing all information and producing all records and other evidence in its possession relevant to all inquiries made by the OAG and the ILOAG in connection with this Investigation concerning any alleged fraudulent or criminal conduct by anyone whatsoever about which CEC, its officers, trustees, directors, employees and agents may have any knowledge or information, subject to recognized privileges and protections for confidential information.

29.    In the event any document otherwise required to be provided under the terms of the Agreement is withheld or redacted on grounds of privilege, work-product or other legal doctrine, a statement shall be submitted in writing by CEC indicating: the type of document; the date of the document; the author and recipient of the document; the general subject matter of the document; the reason for withholding the document; and the Bates number or range of the withheld document. The OAG and/or the ILOAG may challenge such claim in any forum of its choice and may, without limitation, rely on all documents or communications theretofore produced or the contents of which have been described by CEC, its officers, directors, employees, or agents.

30.    CEC shall not jeopardize the confidentiality of any aspect of the Investigation, including sharing or disclosing evidence, documents, or other information with others during the course of the investigation without the consent of the OAG and the ILOAG. Nothing herein

shall prevent CEC from conferring with counsel or consultants, issuing public statements, from providing such evidence or information to other regulators or as otherwise required by law.

**E.      Miscellaneous Provisions**

31.      Pursuant to Executive Law § 63(15) and the Illinois Consumer Fraud Act, the Agreement serves as an assurance of discontinuance. As such, evidence of a violation of the Agreement by CEC shall constitute prima facie proof of a violation of Executive Law § 63(12) and General Business Law §§ 349 and 350 and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*. in any civil action or proceeding subsequently commenced by the OAG or the ILOAG.

32.      If CEC breaches any of the obligations described herein, the OAG and/or the ILOAG may in its sole discretion terminate the Agreement upon written notice to CEC. In such event, any statute of limitations or other time-related defense applicable to the subject of the Agreement and any claims arising from or relating thereto are tolled from and after the last execution date of the Agreement and the Agreement shall in no way bar or otherwise preclude the OAG and/or the ILOAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Investigation, against CEC or from using in any way any statements, documents or other materials produced or provided by CEC after commencement of the Investigation, including, without limitation, any statements, documents or other materials provided for purposes of settlement negotiations.

33.      The Agreement and any dispute related thereto shall be governed by the laws of the State of New York and the State of Illinois without regard to any conflicts of laws principles.

34.      No failure or delay by the OAG and the ILOAG in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise

thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative.

35.    CEC enters into the Agreement voluntarily and represents that no threats, offers, promises or inducements of any kind have been made by the OAG and the ILOAG or any member, officer, employee, agent or representative of the OAG or the ILOAG to induce CEC to enter into the Agreement other than as described herein.

36.    The Agreement may be changed, amended or modified only by a writing signed by all parties hereto.

37.    The Agreement constitutes the entire agreement between the OAG, the ILOAG and CEC and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of the Agreement.

38.    The Agreement shall be binding upon CEC and its successors, assigns, and/or purchasers of all or substantially all its assets.

39.    The Agreement and its provisions shall be effective on the date that it is signed by an authorized representative of the OAG and the ILOAG, except for the provisions contained in sections II(A)(iv) and II(A)(vi) which shall become effective on June 1, 2007.

40.    The Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

41.    Nothing contained herein shall be construed as relieving CEC of its obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions of the Agreement be deemed permission to engage in any act or practice prohibited by such laws, regulations or rules.

15

42.     The acceptance of the Agreement by the OAG and the ILOAG shall not be

deemed approval by the Attorney Generals of any of CEC's business practices, and CEC shall

make no representation to the contrary.  CEC's execution of the Agreement is not an admission

of liability.

43.     Unless otherwise provided, all notices as required by the Agreement shall be

provided as follows:

·       To the OAG:

        Melvin Goldberg, Assistant Attorney General
        Office of the New York State Attorney General
        Bureau of Consumer Frauds & Protection
        120 Broadway, 3rd Floor
        New York, New York 10271
        · tel. (212) 416-8296
        fax. (212) 416-6003

        To the ILOAG:

        Deborah Hagan, Consumer Protection Division Chief
        Office of the Illinois Attorney General
        Consumer Fraud Bureau
        · 500 South Second Street
        Springfield, IL 62706

        To CEC:

        Career Education Corporation
        Office of General Counsel
        2895 Greenspoint Parkway, Suite 600
        Hoffman Estates, Illinois 60169
        Tel (847) 585-2600
        Fax (847) 585-2640

44.     Nothing in the Agreement shall be construed to prevent any individual from

pursuing any right or remedy at law which any consumer may have against CEC.

45.    CEC shall submit to the Attorney Generals, on or before August 15, 2007, an

affidavit, subscribed to by an officer of CEC authorized to bind CEC, setting forth its compliance

with the provisions of the Agreement.

**WHEREFORE,** the signatures evidencing assent to this agreement have been affixed hereto on the dates set forth below.

**ANDREW M. CUOMO**
Attorney General of the State of New York

Dated: April 16, 2007

By: _____
/Benjamin E. Rosenberg
Chief Trial Counsel

**LISA MADIGAN**
Attorney General of the State of Illinois

Dated: April 16, 2007

By: _____
Deborah Hagan
Consumer Protection Division Chief

Career Education Corporation

Dated: April 13 2007

By: _____
Jeremy Wheaton
Senior Vice President of Operations,
Shared Services

18

## ACKNOWLEDGMENT

STATE OF *Illinois* )
                           ) :s.s.
COUNTY OF *Cook* )

       On this the___day of April, 2007, before me personally came Jeremy Wheaton, known to me, who, being duly sworn by me, did depose and say that she/he is Senior Vice President Operations, Shared Services of Career Education Corporation and is duly authorized to execute this document on behalf of Career Education Corporation, and that she/he signed her/his name by like authorization.

_____
           Notary Public

```
OFFICIAL SEAL
SHERRI M WEISSMAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/13/10
```

19

Office of the Illinois Attorney General - Student Loan Agreements

ILLINOIS ATTORNEY GENERAL LISA MADIGAN

**PRESS RELEASE**

www.IllinoisAttorneyGeneral.gov

Contact: Robyn Ziegler
312-814-3118
877-844-5461 (TTY)
rziegler@atg.state.il.us

**For Immediate Release**
**April 23, 2007**

## MADIGAN ANNOUNCES STUDENT LOAN AGREEMENTS – SCHOOLS TO ADOPT NEW COLLEGE LOAN CODE OF CONDUCT

Chicago—Attorney General Lisa Madigan announced that she and the New York Attorney General's Office have reached settlements with Illinois-based DeVry University and Career Education Corporation concerning student loan practices involving the schools and lenders. The settlements require the schools to adopt a *College Code of Conduct* and to return the money paid by lenders to schools.

"Illinois students are entitled to full disclosure of the criteria used to place lenders on the schools' preferred lender lists and should have access to all of the information necessary to ensure that they are able to choose the loan that is best for them," said Madigan. "We acknowledge DeVry University and Career Education Corporation for promptly adopting the College Code of Conduct. We will continue to review the school loan lending practices of all the schools in Illinois."

DeVry University and Career Education Corporation agreed to adopt the College Code of Conduct which outlines requirements for the lender-school relationship.

The Code of Conduct requires:

* On all preferred lender lists the College must clearly disclose the criteria and process used to select preferred lenders. Students must also be told that they have the right to select the lender of their choice regardless of the preferred lender list.

* College preferred lender lists must be based solely on the best interests of the students or parents who may use the list without regard to financial interests of the College.

* Colleges are prohibited from receiving anything of value from any lending institution in exchange for any advantage sought by the lending institution. This specifically prohibits "revenue sharing" arrangements.

* College employees are prohibited from taking anything of more than nominal value from any lending institution. This includes a prohibition

on trips to seminars for financial aid officers and other college officials paid for by lenders.

- College employees are prohibited from receiving anything of value for serving on the advisory board of any lending institution.

- Colleges must ensure that employees of lenders do not staff university financial aid offices or identify themselves as employees of the College.

In addition to abiding by the Code of Conduct, both schools have agreed to return money received from lenders.

DeVry will return to students the $88,122 that it received in the form of revenue-sharing payments from Citibank for listing its private loan product among the University's preferred lender list. This money will be distributed to individual students and parents who took out loans in 2004-2005 on a pro rata basis depending upon the amount of the loan and the interest rate.

DeVry no longer maintains a relationship with Citibank as a preferred lender. DeVry's preferred lenders have also hosted or sponsored national business meetings, meals and training seminars for the university's campus and corporate student finance officers. The Code of Conduct, as well as the settlement agreement, prohibits DeVry from continuing to accept these gifts or promotions.

Career Education Corporation received donations in an aggregate amount of $21,200 from Wachovia and Sallic Mae, two lending institutions on its preferred lender list. Career Education Corporation directed this money to the Career Education Scholarship Fund, a non-profit, tax exempt entity. Career Education Corporation will contribute $21,200 to a nationwide consumer education fund to be used to inform high school students and parents about student loans.

DeVry University is based in Oakbrook Terrace, Illinois. More than 52,000 students are enrolled at its 84 locations in 24 states and Canada, as well as through DeVry University Online. DeVry University offers undergraduate degrees in technology, business, and healthcare technology and graduate degrees in management through the Keller Graduate School of Management.

Career Education Corporation is based in Hoffman Estates, Illinois. Career Education Corporation operates 71 schools and universities nationwide with the following five schools located in Illinois: American InterContinental University Online in Hoffman Estates, International Academy of Design & Technology in Chicago, Sanford-Brown University in Collinsville, The Cooking and Hospitality Institute of Chicago in Chicago, and Harrington College of Design in Chicago.

The Special Litigation and Consumer Fraud Bureaus in Attorney General Madigan's Office are continuing this ongoing investigation of student loan practices in Illinois.

- 30 -

DeVry University Settlement Agreement

Career Education Corp Settlement Agreement

Return to April 2007 Press Releases



1 of 2 DOCUMENTS

Copyright 2008 PR Newswire Association LLC.
All Rights Reserved.
PR Newswire

February 20, 2008 Wednesday 2:57 PM GMT

**LENGTH:** 788 words

**HEADLINE:** PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues

**DATELINE:** HARRISBURG, Pa. Feb. 20

**BODY:**

HARRISBURG, Pa., Feb. 20 /PRNewswire-USNewswire/ -- Attorney General Tom Corbett today announced that the Attorney General's Bureau of Consumer Protection has reached a $200,000 settlement with the two parent companies for Lehigh Valley College, located near Allentown, resolving allegations that the school misrepresented information about student loans, job-placement and the ability to transfer credits to other institutions.

"This consumer settlement will ensure that students receive accurate information and full disclosure about financial aid, the ability to transfer credits to other schools and the likelihood of finding work following graduation -- all key issues in a student's selection of a school," Corbett said. "Additionally, the civil penalties and costs included in this settlement will be used to help launch a new statewide education program about consumer credit, helping every Pennsylvania family make wise choices about college financing, credit cards, home loans and other financial issues."

Corbett said the Assurance of Voluntary Compliance (AVC) covering the conduct at Lehigh Valley College was reached with Allentown Business School Ltd. and Illinois-based Career Education Corporation, which owns Lehigh Valley College and numerous other for-profit schools across the country; including the Katherine Gibbs School, in Norristown, Montgomery County.

Corbett said the consumer settlement resolves allegations that Lehigh Valley College rushed students through the loan financing process, failed to disclose terms of student loans, made inflated claims about its ability to place students in jobs following graduation and misrepresented the ability of students to transfer credits to other schools.

According to the AVC, the owners of Lehigh Valley College are required to pay $50,000 in civil penalties for alleged wrong doing. They are also required to take the following steps to ensure that students receive accurate information:

-- No false or misleading statements about future employment opportunities.

-- No false or misleading statements about the ability to transfer credits to other schools.

PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support
New Statewide Education Program for Consumer Credit Issues PR Newswire February 20, 2008 We

-- Clear and detailed disclosures about student loans and student financial aid.

-- Clear disclosures about the selection of lenders for any "preferred lender lists."

-- Fully comply with Pennsylvania's Consumer Protection Law.

"This case sends a clear message that we will vigorously investigate any allegations of deceptive marketing or
unfair trade practices involving schools and colleges operating in Pennsylvania," Corbett said. "Additionally, this
settlement will benefit every college-bound student, every family and every consumer in Pennsylvania -- helping to
better educate and inform all state residents about essential financial issues."

Corbett said that the settlement includes $150,000 in costs, which will be used to create a statewide consumer
education program about financial issues, including a new "Your Money" section of the Attorney General's website (
http://www.attorneygeneral.gov/ ). The education program and interactive website will include information on college
financial aid, mortgage lending and refinancing, credit cards, predatory lending, debt collection and other common
topics of financial complaints.

The new consumer financial education program and interactive financial website are expected to be launched in
June 2008.

Corbett noted that credit issues impact every Pennsylvania household and generate a regular flow of complaints to
the Attorney General's Office.

"Every year, consumer credit issues are typically the number one topic for complaints to the Attorney General's
Bureau of Consumer Protection," Corbett said. "Last year alone, we received more than 7,500 complaints, spanning a
wide range of credit problems -- from disputes over loans and credit cards to difficulties with credit ratings and debt
collectors."

The Assurance of Voluntary Compliance was filed on Tuesday, February 19, 2008, in Lehigh County Court of
Common Pleas by Senior Deputy Attorney General William A. Slotter, of the Attorney General's Bureau of Consumer
Protection.

(The Signing of an Assurance of Voluntary Compliance is not considered an admission of violation of the
Consumer Protection Law.)

Editors' Note: A copy of the Assurance of Voluntary Compliance is available by contacting the Attorney General's
Press Office at 717-787-5211.

```
CONTACT: Nils Hagen-Frederiksen
Deputy Press Secretary
717-787-5211
nhf@attorneygeneral.gov
```

CONTACT: Nils Hagen-Frederiksen, Deputy Press Secretary for Pennsylvania
Attorney General Corbett, +1-717-787-5211, or cell, +1-717-319-2252,
nhf@attorneygeneral.gov

Web Site: http://www.attorneygeneral.gov/

SOURCE Pennsylvania Office of Attorney General

PA Attorney General Corbett Announces $200,000 Settlement in Lehigh Valley College Probe; Funds Will Support New Statewide Education Program for Consumer Credit Issues PR Newswire February 20, 2008 We

**URL:** http://www.prnewswire.com

**LOAD-DATE:** February 21, 2008

# EXHIBIT B

| From: | Yvette Colon |
| To: | |
| Subject: | Fwd: Borrower defense discharge ineligibility information for you [ ref:_ |
| Date: | Thursday, July 2, 2020 7:38:43 PM |



---------- Forwarded message ---------
From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Thu, Jul 2, 2020 at 4:36 PM
Subject: Borrower defense discharge ineligibility information for you [
ref:
To: <  >

7/2/2020

Borrower Defense Application #:

Dear Yvette Colon:

The U.S. Department of Education (ED) has completed its review of your
application under the applicable Borrower Defense to Repayment
regulations for discharge of your William D. Ford Federal Direct Loans
(Direct Loans) made in connection with your or your child's enrollment
at Sanford-Brown College. "You" as used here should be read to include
your child if you are a Direct PLUS Loan borrower who requested a
discharge for loans taken out to pay for a child's enrollment at Sanford-
Brown College. ED has determined that your application is ineligible for
relief based on review of the facts of your claim and the regulatory criteria
for relief; this decision means that your Direct Loans will not be
discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be
eligible for a discharge (forgiveness) of part or all of one or more Direct
Loans if the borrower's school engaged in acts or omissions that would
give rise to a cause of action against the school under applicable state
law. See § 455(h) of the Higher Education Act of 1965, as amended, 20

U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Educational Services

You allege that Sanford-Brown College engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 2: Other

You allege that Sanford-Brown College engaged in misconduct related to Other. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 3: Transferring Credits

You allege that Sanford-Brown College engaged in misconduct related to

Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

<u>Allegation 4: Employment Prospects</u>

You allege that Sanford-Brown College engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular oversight activities
> Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
> Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [ ref: ███████████████ ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense

to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any

interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid





CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.