Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, CHENELLE ARCHIBALD,     )
DANIEL DEEGAN, SAMUEL HOOD, TRESA      )
APODACA, ALICIA DAVIS, and JESSICA     )
JACOBSON on behalf of themselves       )
and all others similarly situated,     )
                                       )
            Plaintiffs,                )
                                       )
  VS.                                  )   NO. C 19-03674 WHA
                                       )
ELISABETH DEVOS, in her official       )
capacity as Secretary of the United    )
States Department of Education, and    )
THE UNITED STATES DEPARTMENT OF        )
EDUCATION,                             )
                                       )
            Defendants.                )
_____)

                        San Francisco, California
                        Monday, August 31, 2020

              **TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**TELEPHONIC APPEARANCES:**

For Plaintiffs:
                    LEGAL SERVICES CENTER OF
                      HARVARD LAW SCHOOL
                    Project On Predatory Student Lending
                    122 Boylston Street
                    Jamaica Plain, Massachusetts 02130
              BY:   **EILEEN M. CONNOR, ATTORNEY AT LAW**
                    **TOBY R. MERRILL, ATTORNEY AT LAW**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED TELEPHONICALLY BY: ANA M. DUB, RDR, RMR, CRR, CCRR
                    CSR NO. 7445, OFFICIAL U.S.REPORTER

```
 1    TELEPHONIC APPEARANCES:   (CONTINUED)

 2    For Plaintiffs:
                          HOUSING & ECONOMIC RIGHTS ADVOCATES
 3                        Post Office Box 29435
                          Oakland, California 94604
 4                  BY:   CLAIRE L. TORCHIANA, ATTORNEY AT LAW

 5

 6    For Defendants:
                          UNITED STATES DEPARTMENT OF JUSTICE
 7                        Office of the U.S. Attorney
                          Civil Division, Federal Programs Branch
 8                        1100 L Street, N.W.
                          Washington, D.C. 20530
 9                  BY:   KATHRYN C. DAVIS
                          TRIAL ATTORNEY
10

11                        UNITED STATES DEPARTMENT OF JUSTICE
                          Office of the U.S. Attorney
12                        Civil Division, Federal Programs Branch
                          919 East Main Street, Suite 1900
13                        Richmond, Virginia 23219
                    BY:   R. CHARLIE MERRITT
14                        TRIAL ATTORNEY

15

16

17

18

19

20

21

22

23

24

25
```

**Monday - August 31, 2020**                                    **7:58 a.m.**

                         P R O C E E D I N G S

                             ---o0o---

        **THE CLERK:**  This court is now in session.

The Honorable William Alsup presiding.

        Calling Civil Matter 13-3674, Sweet, et al. versus DeVos,

et al.

        Starting with plaintiff, will counsel please state your

appearances.

        **MS. CONNOR:**  Good morning, Your Honor.  This is

Eileen Connor of the Legal Services Center of Harvard Law

School, and I'll be speaking today on behalf of the plaintiff.

        Also on the line for the plaintiff are Toby Merrill, also

of the Legal Services Center, and Claire Torchiana of the

Housing & Economic Rights Advocates.

        **THE COURT:**  Okay.  Next?

        **MR. MERRITT:**  Good morning, Your Honor.  This is

Charlie Merritt from the Department of Justice on behalf of the

defendant, and I'll be speaking today on behalf of defendants.

        Also on the phone is Kathryn Davis of the Department of

Justice for the defense.

        **THE COURT:**  Okay.  Welcome to all of you.

Anyone else?

                         (No response.)

        **THE COURT:**  All right.  So we're here for a case

1   management conference that was requested by the plaintiffs.

2   I've read your materials, but why don't you summarize the

3   situation for the record, and then we'll have a discussion.

4         Let's start with the plaintiff.

5         **MS. CONNOR:**  Yes.  And for the court reporter, this is

6   Eileen Connor.

7         Thank you, Judge Alsup, for making time in your calendar

8   for this conference.

9         And as our papers suggested, since we were last together,

10  in considering whether to give preliminary approval to the

11  settlement, there have been some emergent facts that have

12  caused us some dismay and some -- raised some questions that we

13  think are really important to bring before the Court and allow

14  the parties to address.

15        The new facts are that there have been tens of thousands

16  of denial notices issued to members of the class that don't

17  provide an explanation or a reasoned basis for a decision.  And

18  it's not really just the fact of these denials, but it's the

19  form of them, where they don't seem to be evidence of the

20  culmination of an individualized adjudication or fact-finding

21  process.

22        And in light of the fact that the settlement agreement

23  does put in place time frames where the end goal is to ensure

24  that these borrower defense decisions are made within a

25  specified period of time, I think there's a question of --

 1   first of all, on behalf of the class, there's a need to assess

 2   whether the manner in which the Department has evidenced,

 3   I believe, its intent to perform its obligations under the

 4   settlement agreement, whether it will frustrate the class

 5   members' ability to receive the benefit of the bargain, which

 6   is, simply put, an adjudication of their claims on the merits.

 7          And I think there's a second question that we feel is

 8   necessary to resolve which has to do with whether, should this

 9   settlement gain final approval from the Court, if plaintiff and

10   members of the class will still retain the ability to challenge

11   the form of these denials.

12          In other words, there's some -- there could be an argument

13   that these don't constitute final decisions on the merits and

14   don't actually fulfill the obligation of the defendants under

15   the settlement agreement, but that if the settlement is finally

16   approved, it would be late 2022 until any one plaintiff or one

17   member of the class would be able to make that challenge

18   because they would have to say:  Well, now the decision has

19   been due and you've given me this notice, but it's still

20   patently inadequate and doesn't really address the evidence and

21   doesn't explain the decision so much as provide a conclusory

22   statement in a boilerplate fashion.

23          And I think in the meantime, there will be issues about

24   loans going back into repayment.  And this entire case has been

25   about a prolonged delay.  And so given that there is evidence

1  today of this problem, it doesn't seem wise to not raise it.

2      I think the second concern is that although the waiver and

3  release in the settlement agreement carves out the ability of

4  individual class members to challenge their decision on the

5  merits, it's ambiguous to me as to whether these claims about

6  the form of the denials would be released, given that they're

7  arising prior to what would potentially be the effective date

8  of the settlement.

9      And so I think what we are hoping to hear from the Court

10  or what -- you know, I think that there are a few different

11  ways of going about this.  We have a deadline to respond to the

12  objections.

13      There have been what I think is a significant number of

14  comments and objections filed with the Court that opposing

15  counsel really graciously copied and provided to us.  I believe

16  they provided the same digital copies to the Court, if I'm not

17  mistaken.  And I think a lot of these themes are coming through

18  in those objections as well, including whether the defendants

19  are essentially skirting compliance with the settlement

20  agreement by issuing what some people have called rubber-stamp

21  denials or blanket denials.

22      And so I think one thing that we would like -- or one

23  possibility that we see is perhaps the Court could issue at

24  this point in time an order to show cause to defendants as to

25  why they're not in breach of this settlement agreement, you

know, why issuing decisions in this form is not a violation of

their obligation to execute and perform under the settlement in

good faith.  And I think that there's certainly an ample record

currently before the Court that would prompt such an order.

However, there might be additional data.  We have

information that is only through the end of May, that there

were about 45,000 denials issued but that there were 65,000

applications of class members that had been adjudicated but

notice had not yet been provided.  And if the ratio holds, I

would expect that would be about another 50,000 denial notices

that may have gone out in the interim.  So it's a substantial

portion of the class.

But we don't have firm and current data on that, and

I think it might be appropriate, in light of all this, to

continue or adjourn the September 3rd deadline for responding

to the objections.

And I think that is my summary, Your Honor.

**THE COURT:**  Okay.  Thank you.

Let's hear from the Government.

**MR. MERRITT:**  Good morning, Your Honor.  This is

Charlie Merritt for the Government.

I guess, in short, the defendants' position is that the

concern that the plaintiffs have raised in their motion and in

that summary today just fundamentally goes to an issue that is

beyond the scope of this lawsuit and the parties' settlement

1    agreement, and that is the substantive outcome of borrower

2    defense decisions.

3         So from the beginning, this lawsuit was brought at

4    plaintiffs' own styling to end the Department's delay in

5    issuing borrower defense decisions and to obtain decisions on

6    behalf of the plaintiff class.  And defendants have always

7    expressly disclaimed any intent to regulate the substance or

8    content of the decisions once the Department started issuing

9    decisions.

10        This is clear from a lot of the case stylings.  We think

11   it's especially evident in the filings the plaintiff used to

12   obtain certification of their Rule 23(b)(2) class here, where

13   they said in the complaint, quote, does not ask the Court to

14   opine on the substance or process for adjudicating their

15   individual borrower defenses but, instead, to remedy their

16   limbo status.  And they invoked a metaphor of a conveyor belt

17   and requested that the Court enter an order restarting that

18   conveyor belt and the machinery of the borrower defense process

19   so the Department could start issuing final decisions.

20        So based on all of that, this case has always been framed

21   as a challenge to the fact that decisions were delayed over an

22   undisputed period of time, and was never about what those

23   decisions would say, their substance, the process by which they

24   were issued once they kind of went out the door and the

25   inaction was remedied.

1          As plaintiffs have also kind of gotten into, the

2     Department is now doing the very famous case brought by McAdoo.

3          The conveyor belt is rolling.  The Department has made

4     significant progress in issuing borrower defense decisions over

5     the last eight months now since it issued its new methodology

6     in December 2019, which is consistent with the representations

7     it made in the court filings at the time.

8          So it's our position that the Department's current

9     adjudication of claims is a continuation of its practice in

10    adjudicating claims that began in December 2019 when it issued

11    its new methodology, and it is therefore consistent with the

12    parties' settlement agreement that was negotiated during that

13    same period of time.

14         You know, the defendants filed -- we filed a summary

15    judgment cross-motion brief in January that said, you know, as

16    of that date, 15,000 denials had issued to people with pending

17    borrower defense claims and about 700 approvals.  Since that

18    time, the form notices the Department uses to notify borrowers

19    of these decisions has been similar or the same to those

20    plaintiffs have attached to the motion here.  So during the,

21    kind of, period during which the settlement negotiation -- the

22    settlement was being negotiated, denials were issuing according

23    to the same form.  So this is not a surprise at this point.

24              **THE COURT:**  Well, I --

25              **MR. MERRITT:**  And then --

1          **THE COURT:**  -- exactly what you're saying here.

2      What are the current statistics all the way back to, from

3  the time that you adopted your new methodology?

4      Sorry.  My dog is upset about something.

5      What are the current statistics?

6          **MR. MERRITT:**  I understand that, Your Honor.  I just

7  hope my dog doesn't hear it and start barking back.

8      I do not have current verified numbers to provide

9  the Court today as the statistics.  Just, the process has moved

10  fairly quickly to bring the hearing to Your Honor's attention.

11  We can certainly verify those numbers and provide them in

12  pretty short order, but I'm not prepared to, kind of, give

13  vetted, verified numbers on the current status.

14          **THE COURT:**  Well, the accusation is being made that

15  every single decision has been a denial.  Is that true?

16          **MR. MERRITT:**  That is not true, Your Honor.  I can say

17  definitively that the claims are being approved.

18      In the letters -- plaintiffs referenced earlier the

19  Department's public report, which is -- it reports periodically

20  on borrower defense decisions; and the last one was, I believe,

21  in May, which is referenced in the parties' letters which were

22  attached to plaintiffs' motion for this case management

23  conference.  That speaks of about, at that time, 10,000 claims

24  or so had been approved and about 45,000 claims had been

25  denied.

1        So the Department is reviewing the claims, approving some,

2   denying some.  But there's no -- and I'm not sure the plaintiff

3   even alleges -- there's no basis to the contention that all

4   claims are being denied, that they're being denied without

5   being reviewed, or anything like that.

6        I do just want to speak to whether or not -- or the

7   contention that this conduct is inconsistent with the parties'

8   settlement agreement.

9        Of course, the first point to make is that the agreement

10  is expressly conditioned upon Your Honor's approval of it.  So

11  it is not at this time a binding agreement for the parties to

12  undertake, you know, all of the performance set forth in the

13  agreement.  But our position is that the Department's

14  adjudication of claims is consistent with the settlement

15  agreement.

16       For all of the reasons I've kind of gone into, this case

17  was about decisions going out, not their substance or content

18  once they went out.  And for that reason, the main piece of the

19  settlement agreement is timeline for decisions to be issued and

20  for relief to be effectuated and, also, some reporting

21  obligations, to make sure the Department was kind of hitting

22  those timelines.

23       So it's worth noting that the settlement agreement does

24  define what a final decision is, which is the thing that has to

25  be issued within 18 months.  And it is (reading):

1          ". . . a decision . . . resolving a borrower

2     defense application, including a determination of how

3     much relief the claimant is entitled to, if

4     any . . . ."

5     So just basically like a yes-or-no decision on the

6  application, and then requires the Department to provide

7  written notification of that to the -- to the applicant, which

8  clearly is happening.  So --

9          **THE COURT:**  At the time that the settlement agreement

10  was entered into -- I've forgotten when that was, but seems

11  like it was around April --

12          **MR. MERRITT:**  Yes, Your Honor.

13          **THE COURT:**  -- had the Department already been issuing

14  for some time denials in the form that's being complained of

15  now?

16          **MR. MERRITT:**  Yes, Your Honor.  I think the form may

17  have undergone some small tweaks but, in essence, substantially

18  similar.  The Department's been using a substantially similar

19  form to notify borrowers of their ineligibility and deny claims

20  since about December 2019.

21          **THE COURT:**  Let me ask the plaintiff something.

22          **MS. CONNOR:**  Your Honor, may I -- yes.

23          **THE COURT:**  You can respond, but answer this question.

24     If the pattern and practice had already been established

25  about what the denials would look like -- in other words, the

short, cryptic phrase -- and if you were already on notice of

that by virtue of the history, then wasn't that baked into the

settlement agreement as what the future ones would look like?

What do you say to that?  And then you can respond.

**MS. CONNOR:**  Yes.  Thank you, Your Honor.

No, absolutely not.  This is not what was bargained for

here.

**THE COURT:**  Wait.  Answer my question.  Were you aware

at the time of the settlement of the cryptic form of the

denials from December up until the settlement?  I'm not asking

what you bargained for.

**MS. CONNOR:**  No.  No.  The answer is "no."

**THE COURT:**  Okay.  You didn't know that.

Why didn't you know that?  Government counsel said that

that had been going on for six months.

**MS. CONNOR:**  Your Honor, I don't think that we had

seen them.

And I think the other thing that we were relying on was

statements that were made by the Department in filings to this

court in their summary judgment motions that they had

adjudicated and determined to deny -- I think the number was

15,000 claims; but they were because -- for reasons that there

was such scant information provided by the applicant that there

was just no basis to even understand what the contention was

that was being made or that, in fact, our borrower did not, in

1    fact, have a direct loan in the first place or any federal

2    student loans and that, therefore, those applications had been

3    denied but that the Department lacked the manpower to

4    investigate and come up with adjudications as to the more

5    substantial claims that had been submitted.

6         And so I think those two factors contributed to the fact

7    that we weren't aware that this is what the Department was

8    going to do.

9         And I think, just to take on the suggestion that all that

10   is required by the letter of the agreement is a piece of paper

11   that says "yes" or "no," that's not accurate because

12   the Government also makes an assurance that it will decide

13   these borrower defense applications in accordance with the

14   governing law and the regulations.  And the regulations require

15   notice of the reasons for the decision and the evidence that

16   was considered.

17        And there's also the matter of the general background

18   principles of the Administrative Procedure Act, specifically

19   Section 555(e) which requires more than just a "yes" or "no"

20   when an agency is denying an application, especially where --

21   unless the reason for the denial is self-evident.  And it just

22   can't be said that it's self-evident here.

23        I mean, I think nobody puts it better than members of the

24   class themselves.  You know, there's an objection from -- or a

25   submission from LaQuisha Jennings.  And if you have the same

numbers as we have, it is Bates 0009.  I don't know what this
letter means, but I do know that it was not fairly reviewed.

Number 10, Bates Number 00084, Mary Ann Doran (reading):

"Department seems to be unfairly denying my
claims now just to satisfy the lawsuit which is
reprehensible."

There are -- these are coming across like rubber-stamp
denials.  It's not in satisfaction of what the Department is
required to do under the law or the settlement agreement.

**THE COURT:**  Put yourself in the position of a judge
for a minute.  We get cases all the time in which somebody
makes a large number of contentions.  This is very -- in the
IFP cases, it comes up a lot.  So as a judge, what do we do?
Do we have an obligation to go through all 17 or 18 contentions
when even the strongest contention is an obvious loser?

You know that at the Court of Appeals level, they never
get into the details.  They'll do one-page summary denial.

We try at the district court to do a little bit better
than that.  But it's just impossible to say that an
administrative law judge or a district judge or any judge is
under an obligation to answer everything that's in the record.
Really, if that's what you're asking me to do, I won't go
there.

Now, is there law that says, "Well, that's not what you're
asking me to do.  You're asking for more than a three-word

1    denial"?

2        I don't know the law on that, and I think this is going to

3    require some briefing to be able to answer that question.

4        Look, I'm going to give you some thoughts here.  There's

5    no way -- I think you're just fishing to try to get me to make

6    some off-the-cuff ruling or issue an order to show cause, and

7    I'm not going to do that without a better record.  We need to

8    have a full record, a full motion.  You need to do the full job

9    instead of asking for a quick-and-dirty reaction from me.

10       I'll tell you some of the issues, though, that I think

11   this raises.  One is the one that I just mentioned, and that

12   is:  What does the law require?  How brief and cursory can an

13   administrative law judge be in denying or granting relief?  I

14   don't know.  I think the APA may have something on this.

15       The second question is:  Is this a matter for the class,

16   or is it a matter for each individual claimant to take to their

17   own individual district, or whatever, under the APA to make a

18   ruling, get a ruling in their district?  Let's say somebody is

19   in Kentucky.  They go to their district court in Kentucky.  Or

20   is it that you're asking me to rule on 45,000 cases on the

21   merits?  I don't know.  That's not what I signed up for when I

22   certified this class.

23       Another possibility is we just deny the settlement and we

24   litigate it on the merits.  And then, if I did an order that

25   said you have to -- you have to give an order of denial that

1   explains the reasons, then that would -- then I wouldn't have

2   to rely upon the wording of the settlement agreement.

3        I'm also concerned about the possibility that you knew or

4   should have known of the form of the denials at the time the

5   settlement agreement was entered into.  So I would like to have

6   proof on that point of what the form of the denials were at the

7   time -- the six months leading up to it, between December and

8   April, such that was it reasonable for the Government to expect

9   that they could continue with the conveyor belt turning out the

10  same quality or lack-of-quality decisions they had been that

11  you might have been on notice of.

12       I had one other thought on the top of my head that -- oh.

13  The current statistics and how it breaks down.  And is there a

14  way to describe these many thousands of decisions?  Like, how

15  many of them were three-word denials?  How many of them were

16  two-page denials, five-page denials?  How many grant relief?

17  How many deny relief?  And how much of that had already been

18  established prior to the settlement agreement?

19       I don't know the answer to the right procedural -- see,

20  right now, this is not a class settlement.  It's only been

21  preliminarily approved.  And with what you're telling me, maybe

22  the right thing to do is deny it and then we go back to

23  litigating, which is okay.  Maybe that's the right thing to do

24  in these circumstances.

25       But to bring a motion to enforce a settlement agreement

1    that's not yet final, I don't know about that.  I'm not ruling

2    that out.  I'm just saying, I see a problem with trying to

3    treat it as a class settlement when it's only halfway there.

4    It's not finalized yet.

5         So these are all issues that I think we either have to

6    address on October 1 at the motion to confirm the settlement or

7    with whatever type of motion the plaintiffs want to bring

8    between now and then.

9         Now, you do represent a class.  I did certify the class

10   back in -- last year sometime.  And that order specifies what

11   it's for.  So that is not a -- that's already been determined.

12   But the settlement itself has not been approved on a class-wide

13   basis.

14        Anyway, I'm not making any ruling at all.  I am only

15   suggesting ways that we can try to get at the problem.  And I

16   think the plaintiffs are putting their finger on perhaps it is

17   a real problem, but I just think it's too important to try to

18   resolve in a hearing, a hurry-up hearing like this.  I think we

19   need full briefing and full-scale motions with a real record.

20        Now, on the real record part, I'm going to ask

21   the Government to do this by the end of the week.

22        Can you make a filing with the Court that lays out the

23   maximum amount of information that you can get within a week of

24   the statistics?  Can you do that?  And then get it as up to

25   date as possible so we will not have to be guessing at that.

1      **MR. MERRITT:**  Your Honor, we will do our best to

2   provide as much information as possible by the end of the week.

3      Are you planning to enter an order, I guess, asking for

4   specifics on that, or is it to address some of the topics

5   you've brought to --

6      **THE COURT:**  Well, I've listed the things that I

7   would -- I would like to know denials.  I thought the

8   plaintiffs' materials had every single one had been a denial,

9   but you're telling me that's not true.  So I think you should

10  address that.

11      Another thing is that, how many are denied with one

12  sentence or less of explanation?  The examples that were given

13  in the plaintiffs' materials were sometimes three words.  And

14  I'll be honest.  I didn't understand what it meant.  Maybe

15  there's more to it than that, but the examples that were given

16  were hard to figure out what was the reason for denying it.

17  But maybe those are rare exceptions and maybe most of them have

18  two or three sentences or paragraphs.

19      So if there's a way to help elucidate that problem, that

20  would be useful to do between now and the end of the week.

21      Now, if you think you can do a substantially better job if

22  I gave you until Wednesday of next week, I will certainly do

23  that.  But since we got an October 1 hearing and the

24  information would be useful to me as well as the plaintiffs, I

25  would like for you to try to give us accurate information so

1    this piece of it won't be a mystery.

2        Here's another thing.  If there was discussions between

3    you that were in e-mails about what the form of the decisions

4    would be, leading up to the settlement agreement, that would be

5    useful to know.  That's another piece of the puzzle.

6        Okay.  Any questions about -- this is not a ruling.  These

7    are just suggestions, except I am making a ruling that I'm

8    asking the Government to supply the information to us.

9            **MR. MERRITT:**  Your Honor, this is Toby Merritt for

10   the Government.

11       I think, you know, without -- I would want to speak to my

12   client about exactly how much of an ask this is and getting

13   accurate information --

14           **THE COURT:**  Look, you could do that, but I will let

15   them take depositions, and on a hurry-up basis, if you don't.

16   So --

17           **MR. MERRITT:**  Oh, yes, Your Honor.

18           **THE COURT:**  -- you can do it any way you want.

19       You either give it to us voluntarily, or I'm going to let

20   them come to Washington and take your depositions.  Not yours

21   but --

22           **MR. MERRITT:**  No, Your Honor, I didn't mean that we

23   wouldn't do that.  I was just going to say, if you were giving

24   the later date of next Wednesday as opposed to this Friday --

25           **THE COURT:**  I'll let you choose.

1      **MR. MERRITT:**  -- I think that we would prefer that.

2      **THE COURT:**  You talk to them about whether the extra

3  time would substantially improve the information.

4      **MR. MERRITT:**  Okay.  Yes, Your Honor.

5      **MS. CONNOR:**  And, Your Honor, thank you.

6      I think an additional question that I have, you know, I

7  understand that the settlement has not been given final

8  approval and the Court has an independent role in making an

9  assessment as to whether it's fair and adequate as to the

10  class.  I believe that under the governing law, there is

11  currently a binding contract, though, between us and

12  defendants; and in that contract, we undertake to do everything

13  necessary to obtain final approval of the settlement.

14      And so I'm a little uncertain as to how to proceed with

15  the October 1st hearing in light of that.

16      **THE COURT:**  Well, that's your problem, I guess.

17      But you can't just call up a judge and say, "Judge, I'm at

18  a loss of what to do.  Give me advice."

19      I can't give you advice like that.  I don't know the

20  answer to that.

21      **MS. CONNOR:**  Your Honor --

22      **THE COURT:**  One idea is to bring a motion to enforce.

23  But since it's not finalized yet, I don't know.  That becomes

24  so messy.

25      I've rarely had this problem in a class action.  I can't

1   say in 21 years I've -- I probably have had some version of

2   this, but I can't remember it anyway.

3        I don't have a good answer for you.  I think you've got

4   to -- you've got to -- aren't you at Harvard Law School?

5   There's a lot of smart people there.  You can ask them, and

6   they could come up with some good ideas.

7        But to me, it's either we enforce -- we approve it, warts

8   and all, but you've raised some problems.  If this is not going

9   to be good for the class, no way I'm going to approve it.

10  However, I'm not saying yet that it's not good for the class.

11  I'm saying I need a better record to determine that.  And I'd

12  like to know what all those people are saying in all the many,

13  many, many things that you came to review.

14       Nothing in life is easy.

15       Okay.  I think we've come to the end unless you've got one

16  more question, and I'll see what I can do to answer it.

17           **MS. CONNOR:**  Would you like our responses to the

18  objections by December 3rd?

19           **THE COURT:**  What objections?  Oh, yes.  Yes, I'm glad

20  you raised that.  What do you suggest?  You want more time?

21       Would you like more time?  I can't --

22           **MS. CONNOR:**  Yes, I think that we would, yes.

23           **THE COURT:**  What date would work for you but would

24  also work for the -- keeping in mind October 1?

25           **MS. CONNOR:**  And you're contemplating Wednesday of

1    next week for the information from . . .

2        Two weeks?

3            **THE COURT:**  Let's see.  All right.  The 17th.  Okay.

4    You can have till the 17th.

5            **MS. CONNOR:**  Thank you, Your Honor.

6            **THE COURT:**  Okay.  I wish you lawyers could work this

7    out.

8        And on the Government side, if you really can refute the

9    accusation that all of these are three-sentence -- I'm sorry --

10   three-word denials and you can come up with examples where

11   they're different, better, then you'd be helping us all to

12   educate us of what's in these many thousands and thousands of

13   denials.

14       But it's a mystery to me right now what I'm dealing with.

15       All right.  Thank you, Counsel.  And I look forward to

16   seeing you on October 1, or at least talking with you on

17   October 1.

18       I think it may have to be in person, since it's a class

19   settlement.  I think we may have to figure out, see if we're

20   going to do this by Zoom or if we're going to do this by phone.

21   I need to determine whether it should be in person or not.

22       I don't even think I -- we're not doing anything in person

23   on the civil side in San Francisco.  So that's a problem I've

24   got to deal with, but I will let you know in a couple of weeks.

25           **MS. CONNOR:**  Thank you, Your Honor, for that

1    consideration.

2        I just wanted to raise that many members of the class have

3    indicated a desire to participate in the hearing, but have some

4    sort of concerns around traveling during the pandemic.  And so

5    I would put -- certainly -- certainly, as attorneys, we will do

6    what we need to do.

7            THE COURT:  Yes.  As I think about it, it is almost

8    certainly going to have to be by telephone or possibly Zoom.

9    And what that means is, if we're going to have even a dozen

10   class members say something, which they're entitled to, I'm

11   going to need some preliminary help on your side to get that

12   lined up and organized so that it won't be a free-for-all

13   whenever that time comes for comment.

14       So you would need to be --

15           MS. CONNOR:  Yes, Your Honor.

16           THE COURT:  You would need to be getting your ducks

17   lined up so that when I say at the hearing, "Would any class

18   members like to be heard?" you'll say, "Yes.  First, we have 14

19   that want to be heard, and the first one will be Alice Jones,

20   and she's in Marietta, Georgia."

21       And so then she would speak, and then so forth.

22       So it wouldn't just be a lot of people trying to talk at

23   once.  "Cacophony," I think, is the word I was --

24           MS. CONNOR:  I understood.

25           THE COURT:  -- looking for.

1      Okay.  Anything more?

2                          (No response.)

3          **THE COURT:**  All right.  Counsel, we will at least hear

4    you on the telephone on October 1 and maybe sooner.

5          Thank you.  Bye-bye.

6          **MS. CONNOR:**  Thank you.

7          **MR. MERRITT:**  Thank you, Your Honor.

8                    (Proceedings adjourned at 8:36 a.m.)

9                          ---o0o---

10

11                    <u>**CERTIFICATE OF REPORTER**</u>

12          I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:  Tuesday, September 15, 2020

16

17

18   _____

19        Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
                  Official Reporter, U.S. District Court

20

21

22

23

24

25