Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

THERESA SWEET, et al., on          )
behalf of themselves and all       )
others similarly situated,         )
                                   )
            Plaintiffs,             )
                                   )
  VS.                              )      No. C 19-3674 WHA
                                   )
ELISABETH DEVOS, Secretary of      )
Education, and THE UNITED          )
STATES DEPARTMENT OF EDUCATION,)
                                   )
            Defendants.             )
_____)      San Francisco, California
                                          Thursday, February 20, 2020


TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          LEGAL SERVICES CENTER OF
                        HARVARD LAW SCHOOL
                        122 Boylston Street
                        Jamaica Plain, Massachusetts 02130
                   BY:  KYRA A. TAYLOR, ATTORNEY AT LAW

                        HOUSING & ECONOMIC RIGHTS ADVOCATES
                        1814 Franklin Street, Suite 1040
                        Oakland, California 94612
                   BY:  NATALIE LYONS, ATTORNEY AT LAW

For Defendants:         U.S. Department OF JUSTICE
                        Civil Division, Federal Programs Branch
                        919 East Main Street, Suite 1900
                        Richmond, Virginia 23219
                   BY:  R. CHARLIE MERRITT, ATTORNEY AT LAW
                        KEVIN P. HANCOCK, ATTORNEY AT LAW

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

| | |
|---|---|
| 1 | **Thursday - February 20, 2020**                              **11:58 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling civil action 19-3674, Sweet, et |
| 5 | al. versus DeVos, et al. |
| 6 | Counsel, please step forward and state your appearances |
| 7 | for the record. |
| 8 | **MS. LYONS:**  Good afternoon, Your Honor.  Natalie Lyons |
| 9 | for plaintiffs. |
| 10 | **MS. TAYLOR:**  Kyra Taylor, Your Honor, for plaintiffs |
| 11 | and the class. |
| 12 | **MR. MERRITT:**  Charlie Merritt, Your Honor, on behalf |
| 13 | of the defendants. |
| 14 | **MR. HANCOCK:**  Kevin Hancock, Your Honor, for |
| 15 | defendants. |
| 16 | **THE COURT:**  All right.  Okay.  My law clerk is |
| 17 | bringing me my notes.  I was told by the magistrate judge that |
| 18 | you were close to settling your case.  Is that -- was that a |
| 19 | false rumor? |
| 20 | Come up here.  You've got to speak into the microphone. |
| 21 | You know, I'm pretty close to having a final order anyway, |
| 22 | so I've done a lot of work on this motion.  But if you're |
| 23 | pretty close to settling it, I can just give -- you know, I |
| 24 | won't rule and I'll let you settle your case. |
| 25 | Where are you here? |

1          **MS. TAYLOR:**  Your Honor, unfortunately, we still have

2    some ways to go in arriving at a settlement.  But we do plan on

3    continuing negotiations after today's argument.

4          **MR. MERRITT:**  Well, to answer your question, Your

5    Honor, I don't believe it was a false rumor about what Judge

6    Ryu represented, the progress we've made on settlement

7    negotiations.

8          We did work diligently since last week's order to try to

9    come to an agreement.  There has been a draft shared.  I won't

10   say anymore about that.

11         But we also believe that settlement is certainly

12   attainable in this case and, you know, from, our perspective,

13   believe it would be fruitful to pursue those and take Your

14   Honor up on the offer to not rule while we continue those

15   negotiations.

16         **THE COURT:**  Are all these people out there in your

17   case?  Are these lawyers working with --

18         **MS. TAYLOR:**  Your Honor, we have Theresa Sweet, the

19   named plaintiff in this case.  We also have two additional

20   students who also submitted borrower defenses.

21         **THE COURT:**  These are students?

22         **MS. TAYLOR:**  These are students, yes, Your Honor.

23         **THE COURT:**  Where do they go to school?

24         **MS. TAYLOR:**  They attended Brooks Institute, and

25   they've all submitted Borrower Defense --

1          **THE COURT:**  Did you say Berkeley?

2          **MS. TAYLOR:**  No, Your Honor.   They attended Brooks

3    Institute.

4          **THE COURT:**  Okay.

5          **MS. TAYLOR:**  And they have all submitted Borrower

6    Defense applications.

7          **THE COURT:**  Oh, these are plaintiffs.

8          **MS. TAYLOR:**  One is a named plaintiff the other two

9    are class members.

10         **THE COURT:**  I see.   Okay.   I thought you said they

11   were law students.   No, I misunderstood.   Okay.   You're

12   plaintiffs in the case.   Okay.

13       How about those other people back there?   What are they?

14         **UNIDENTIFIED SPEAKER:**  Your Honor, we're simply

15   observing.

16         **THE COURT:**  Observing.

17         **UNIDENTIFIED SPEAKER:**  Yes.

18         **THE COURT:**  Members of the public.

19         **UNIDENTIFIED SPEAKER:**  Well, members of the Bar in the

20   State of Oregon.   We are very interested in this case.

21         **THE COURT:**  Excellent.   Good for you.   And who is

22   that?

23         **UNIDENTIFIED SPEAKER:**  That's my wife.

24         **THE COURT:**  Excellent too.

25       And how about over here?   Just observers?

1              **UNIDENTIFIED SPEAKER:**  Journalist.

2          **THE COURT:**  Journalist.  Okay.

3              **UNIDENTIFIED SPEAKER:**  Colleague for Government

4    counsel.

5          **THE COURT:**  Okay.  Well, there are a lot of issues

6    here: mootness; whether or not I can enjoin the secretary;

7    whether the delay is unreasonable under the track factors.

8      But I do think -- and if you're dying to argue something,

9    I will say go ahead because we have the time, but I also feel

10   if you're close to settling the case it's better for us not to

11   have the argument.

12     Give me a date by -- let me let you respond to that first.

13   If you are just dying to have the argument, okay.  But what's

14   your side say?

15         **MS. TAYLOR:**  Your Honor, we would like to resolve this

16   case, of course.  And we are more than happy to argue today if

17   you feel that that's best.  However, settlement -- continued

18   settlement negotiations could be productive here.

19         **THE COURT:**  When are you going to see the judge,

20   magistrate judge again?

21         **MR. MERRITT:**  We don't have anything on the calendar

22   currently, but we could certainly make that happen.  Speaking

23   for defendants, we --

24         **THE COURT:**  Are all of you local, or did you come out

25   from Washington?

1           **MS. TAYLOR:**  Your Honor, I came from Boston.

2           **THE COURT:**  Boston.

3           **MS. TAYLOR:**  (Nods head)

4           **MR. MERRITT:**  Came from East Coast.

5           **THE COURT:**  Let's do this.  Let's have an abbreviated

6    argument because you came a long way.  And you're not going to

7    go see the magistrate judge; right?  So I hate for the

8    Government taxpayers' money to be wasted.

9         I'll ask each side one question and then I'm going to

10   submit it.  How's that?  And then I'll just rule on the papers.

11          **MS. TAYLOR:**  Yes, Your Honor.

12          **THE COURT:**  The problem your side has is that the

13   Secretary has started -- ginned up and ruled on a number of

14   these applications.  So the Government says, well, now, maybe

15   it's not moot, but even if -- it's either moot or if it's not

16   moot why not wait a little bit to see how this plays out

17   because now the Secretary is addressing the problem.  So what

18   do you say to that?

19        From my point of view, I owe some -- not deference, I

20   guess, or maybe deference is the right word, but respect to a

21   coequal branch of government.  And I shouldn't just go in there

22   and tell them how to do their job unless it's quite clear that

23   they're not doing their job.  In that case, I have a duty to

24   jump in, I guess.

25        So when you first filed the lawsuit there was a big

1    backlog, but now they've kind of ginned up -- how many

2    thousands have been ruled on in December?  I lost track of it

3    now.  So that's an issue that I -- you know, you should be

4    grateful that some of them have been ruled on.

5         What do you say to that point?

6         **MS. TAYLOR:**  Your Honor, while the Department has put

7    forth the evidence that it issued decisions on one day, they

8    put forth no evidence in the record to suggest that they are

9    even capable of determining the eligibility, a step one issue,

10   for the remaining 170,000 borrowers that are awaiting a

11   Borrower Defense decision or the 18,884 folks who have been

12   waiting for over three years.

13        This is not moot for them, especially when you consider

14   that the Department chose to stop deciding borrower defenses.

15   They chose to abandon their mandatory duty to issue final

16   decisions on Borrower Defense applications.

17        All of the individuals who are waiting are dealing with

18   the consequences of this Department's choice to stop

19   decision-making.

20        And, Your Honor, in the record there is no statement that

21   indicates that the Department will ever resolve the backlog of

22   applications.  And so individuals like Ms. Sweet and the other

23   Brooks Institute students are sitting here, still without a

24   guarantee that their Borrower Defense application will be

25   decided.  And the APA entitles them to more.  They're entitled

1    to more from the Department of Education.

2        And so this case is not moot, and these individuals do

3    have some -- have faced 706(1) violations because of the

4    Department's conduct.  And the Department has not satisfied its

5    burden of demonstrating that students' 706(1) claims are moot

6    here.

7        **THE COURT:**  I heard everything perfectly clear except

8    the very last sentence.  You said they haven't demonstrated

9    that the something, you gave a number like six-one students.  I

10   don't understand what you meant.

11       **MS. TAYLOR:**  The 170,000 individuals who are awaiting

12   a Borrower Defense decision, that 170,000 individuals who are

13   awaiting a Borrower Defense decision comes from the

14   Department's recent statement as to how many individuals are

15   still waiting on a Borrower Defense decision.

16       **THE COURT:**  All right.

17       **MS. TAYLOR:**  And, Your Honor, even as to Corinthian

18   students, the school where the Department has been

19   investigating systemic claims the longest, the Department

20   hasn't even put forth evidence in the record saying that it's

21   exhausted the universe of claims that Corinthian students could

22   bring to substantiate a borrower defense.

23       If they can't -- if they haven't exhausted those claims,

24   they will end up having to stop deciding Corinthian students'

25   claims eventually, and that's to say nothing of the other

1  students who attended other schools where the Department has

2  not determined any eligibility criteria for those schools.

3         **THE COURT:**  What do you say to this point?

4      Let's say that a -- we hold the -- well, I don't want to

5  get involved in this year's election, but let's say you have a

6  new administration that comes in to the Department of Education

7  or, for that matter, any Department, and the new administration

8  looks at the way it's been done in the past and said, We are a

9  different administration and we are going to change the way

10 things have been done.

11     Now, every administration -- you know, I've lived a long

12 time -- they always do this.  The Republicans come in, they

13 want to change it.  The Democrats come in, they want to change

14 it.  And so that's just normal.

15     And when you do decide to change it, it takes some time.

16 And you want to roll it out in a way that everyone gets equal

17 treatment and the same rules are being applied across the board

18 to all the cases.

19     So the rollout may take some time, and I -- you know, I've

20 had -- when President Obama was president, we had somewhat

21 similar issues, delays in ruling on even under the Endangered

22 Species Act.

23     So my point is, isn't it okay for an agency head to say or

24 to direct the agency and say, look, we are going to look at

25 this again, we're going to make -- decide what our policy is

1   going to be, and we will then implement that and roll it out

2   and try to make it as uniform across the board as we can?  And

3   that may take two years.

4        So isn't that something that takes time and is okay for

5   the -- and a judge should not -- if it looks like that's a

6   legitimate explanation, why shouldn't a judge give deference to

7   that?

8        All right.  And I'm not saying that exactly fits our

9   situation.  I'm not going that far.  But I was in the

10  Government for two years back in the '70s, with Jimmy Carter,

11  and I saw some of these problems from the inside, and I

12  think -- in running -- it's not that easy to run the

13  government.

14       So what do you say to that problem?

15       **MS. TAYLOR:**  Your Honor, what's distinct here from

16  other 706(1) cases is that the Department has wholly shut down

17  Borrower Defense decision-making.

18       **THE COURT:**  No, in December they started up again.

19       **MS. TAYLOR:**  They have issued a couple of decisions

20  on -- they submitted evidence that's within the record that

21  they issued decisions on one day.  However, they also shut down

22  establishing eligibility criteria for groups of students so

23  that they could continue issuing decisions.

24       While the Department does have discretion to reevaluate

25  its policies, they do not have the ability to wholly shut down

1    something that Congress has tasked it to do.

2        And here, Your Honor, there is evidence of bad faith.

3    Secretary DeVos has characterized the Borrower Defense

4    regulations as harmful.  She has categorized them as

5    regulations that mean that all one had to do was raise his or

6    her hand to be entitled to so-called free money.

7        She -- when she was signing the discharge of the 16,000

8    individuals who had received notice that they were -- they had

9    gotten a borrower defense granted and would receive a full

10   discharge, she signed that order with extreme displeasure.

11       She has said that she does not agree with Borrower Defense

12   under the Obama Administration when those regulations were

13   being taken advantage of by students.  And when she came into

14   office she hired individuals who had relationships with the

15   for-profit college industry.

16       Notably, she hired Julian Schmoke and appointed him to the

17   head of the enforcement unit after he was a Dean of DeVry

18   University school, one of the schools with a large pending

19   number of borrower defenses.  And she also appointed under

20   Secretary Diane Auer Jones, who had a prior relationship with

21   the Career Education Corporation, the corporate owner of Brooks

22   Institute.

23       Those individuals were then individuals who potentially

24   were a part of the Borrower Defense review panel, which issued

25   a stop work order for the Borrower Defense Unit.

When we look at all these things together and we look at
what the Department has done with regards to Borrower Defense,
at each step the Department has worked to stop students from
taking advantage of these regulations and worked to stop
students from taking advantage of what Congress told the
Department to provide for students.

We can't ignore that in the summer of 2017, the Department
of Education illegally delayed the implementation of the 2016
regulations.  They can't choose to do that.  The Administrative
Procedure Act requires them to have a reasonable basis for
changing course.  And while, of course, the agency has
discretion to change, it doesn't have discretion to shut down
what Congress has told it to do.

**THE COURT:**  All right.  Government gets its reply.
What would you like to say?

**MR. MERRITT:**  I guess I'll take those points in order,
starting with the mootness issue.

Opposing counsel suggested that the Department, in order
to prove this case is moot, needs to have a plan to resolve the
claims of all class members or things along those lines.

And we think that attempts to prove too much on the
mootness question.  Mootness, especially in this case, needs to
be defined based on the fact that this case has a certified
class, and Your Honor's prior decision certifying that class,
as you recognized.  To actually look at the -- whether an

1  unreasonable delay -- or whether a delay and adjudication is

2  unreasonable for any particular class member would require an

3  individualized inquiry that would be inappropriate for class

4  resolution.

5      THE COURT:  But you have not put forward a plan that

6  would even come close to resolving all of the -- or even a

7  substantial majority of the claims; right?

8      MR. MERRITT:  And such a plan would not be required,

9  Your Honor.  Again, what has been deemed --

10      THE COURT:  For mootness, I think I -- I don't think I

11  could say this is moot unless I could see a path forward where

12  the agency is going to resolve these within at least a couple

13  of years.

14      I would say that you -- you ought to have a plan and

15  convince me that people are going to get relief.  Or at least a

16  decision.  Not necessarily relief, a decision.  So I don't know

17  about mootness.

18      MR. MERRITT:  I would just add to that, Your Honor,

19  the issue that -- I don't want to put words in your mouth or

20  anything but based on the class certification order the issue

21  common to the claim was the common delay.  That was the delay

22  that began in June 2018 and has now resolved, as you pointed

23  out, or ended in December 2019, where all class members were

24  subject to the same delay of no final decisions issuing.

25      And once the case has been framed that way, that is the

1  delay that is before Your Honor, whether there has been a

2  common delay for all class members.  And so it's undisputed

3  that that delay has ended.

4     And although it's characterized as one day of decisions,

5  you know, what was in the Department's --

6        **THE COURT:**  I thought it was several thousand.  Was

7  it?  What was it?

8        **MR. MERRITT:**  Well, what was in the [unintelligible]

9  record indicated there was about 16,000 decisions that were

10  issued on December 11, 2019.  It also indicated that the

11  Department planned to use the new methodology it had developed

12  to issue claims on a systematic basis going forward.

13        **THE COURT:**  Have you done any more?

14        **MR. MERRITT:**  So I can now report to you that there

15  have been a total of 25,000 final decisions issued.  So an

16  additional 9- to 10,000 since the date of that declaration in

17  the record.

18     And so the intention is certainly to move forward using

19  this methodology to resolve --

20        **THE COURT:**  I'm curious, how many got -- won their

21  defense and how many lost their defense?

22        **MR. MERRITT:**  That includes 5,000 what we'll call

23  approvals, individuals who are deemed eligible for relief and

24  received some measure of relief, and 20,000 denials.

25     And so part of the way the Department is prioritizing

claims at this point is that it has focused on claims it can

adjudicate more quickly now, which include a lot of claims it

can more easily deny because the borrower either, you know,

does not present any evidence and does not come from a school

about which the Department already has a lot of information

regarding the wrongdoing so it has allowed it to issue some of

those decisions more quickly.

But the point is just that this is an ongoing process, and

the Department has stated that it is committed to using this

new methodology to issue decisions going forward.

As far as the narrow issue that is presented in this case,

the total delay of what ended up being 18 months, that has

ended.  And we believe that does moot the case as it currently

stands and has been certified as a class action.

**THE COURT:**  Well, can you report as to whether in the

immediate future, like the next 60 days, the Secretary will be

issuing yet more rulings?

**MR. MERRITT:**  Well, I think we can say with comfort

today in the next few weeks there's a plan to issue around 12-

to 15,000 more.  Without having more time to kind of validate

numbers and look at it more closely, I don't have a more

specific plan.

**THE COURT:**  Are more being -- are they coming in

faster than that?  In other words, are you resolving more than

are still coming in, or is it the other way around?

1        **MR. MERRITT:**  I don't know the answer to that, Your

2   Honor.  I know that they do continue to come in.

3        **THE COURT:**  That would be a good thing to know,

4   whether -- whether you're working down the backlog or not.

5        **MR. MERRITT:**  But I will say, so, another key aspect

6   of this is just staffing.

7        And so as represented in one of the declarations in the

8   record from Colleen Nevins, who is the director of the Borrower

9   Defense Unit, one of the reasons that had contributed to

10  putting aside the issue of whether final decisions issued, the

11  Department's ability to work through the backlog of claims over

12  the last 18 months, was a lack of staff.

13       And hiring has now increased, and I can report that there

14  are now 12 permanent attorneys working in the Borrower Defense

15  Unit, and now 32,000 -- or 32 short-term appointments as

16  attorneys.  And that number is expected to grow.  I believe it

17  was reported authority of up to 60 in the record.

18       And so the Department believes that once it's able to, you

19  know, put more staff to both finally adjudicating claims and

20  also doing the research that is necessary with respect to the

21  large volume of evidence of wrongdoing the Department has

22  before it, related to certain schools, and the analysis of

23  applicable law, whether that's state law under the 1995

24  regulation or under the federal standard, the new regulation,

25  lots of time between process, but once these new hires get kind

1    of up to speed it is expected that that work will be able to

2    speed up.

3              THE COURT:  I'm going to bring it to a close.

4         MR. MERRITT:  If you don't mind, Your Honor, can I

5    address -- defer to you, but some of the second points about --

6              THE COURT:  All right.

7         MR. MERRITT:  -- the Department's reasonableness --

8              THE COURT:  Go ahead.

9         MR. MERRITT:  -- and the bad faith?

10        It is not accurate to say that the Department wholly shut

11   down its decision-making process.  And so, you know, when

12   looking at what the Department has done, that is detailed in

13   the record, from the time the injunction issued in 2017 in the

14   *Manriquez* case -- or, sorry, in June 2018 -- the record

15   demonstrates that the Department was not doing nothing.

16        The Borrower Defense Unit was still reviewing claims,

17   developing evidence, developing ways to review new claims, and

18   adjudicated more than 50,000 on the merits during that time

19   period, setting them up for a final decision.

20        And as to why there were no final decisions, as is also

21   explained in the record, the Department was taking the time, as

22   you kind of acknowledged, to review this program and come up

23   with a new methodology that was a time-consuming process and

24   took a lot of research and review and ultimately culminated in

25   that new 2019 methodology.  So all that shows that this was not

1   a whole, you know, complete shutdown.

2       And as for the, you know, accusation of bad faith, it is

3   certainly not enough to point to kind of stray statements in

4   the press by the Secretary.

5       The administrative record contains sworn declarations by

6   Department officials explaining what was going on during the

7   period of delay that's relevant to this case and the agency's

8   reasons for acting.

9       That is the basis on which, you know, to assess the delay

10  at issue here and not, you know -- to find agency bad faith,

11  much more is required, a much stronger showing than the kind of

12  statements in the press that have been alluded to here.

13          **MS. TAYLOR:**  Your Honor, if I may --

14          **THE COURT:**  Wait, wait.

15      Is there a way for me to find out if the backlog is

16  growing or shrinking?  In other words, the unresolved claims,

17  is that growing or shrinking, which would turn on whether or

18  not there are more claims coming in per month than being

19  resolved per month.

20          **MR. MERRITT:**  So the Department submits quarterly

21  reports.  And the most recent one was yesterday that shows --

22  it showed the total number of claims pending and the total

23  number of claims that have been submitted.  And those numbers

24  are current as of December 31st.  That information can be

25  provided.

1          It is a fluid situation.  As you know, applications are

2    coming in every day.

3               THE COURT:  But does it -- what does it show?

4               MR. MERRITT:  I'm sorry?

5               THE COURT:  Does it show that the numbers have been

6    going up overall, the net numbers up overall or down overall?

7    If you don't know, that's okay.

8               MR. MERRITT:  I don't know directly the answer to

9    that.  I know that in the supplemental statement we provided

10   last month it represented there were 170,000 claims that were

11   pending without a decision.  So that was a number that was less

12   than what had been reported in some of the -- like in the

13   administrative record, for example.

14         You know, if Your Honor is interested, we can get

15   up-to-date information about how many come in per month versus

16   how many are decided.

17              THE COURT:  I would like to know that, yes.

18         All right.  You wanted to respond.

19              MS. TAYLOR:  Yes, Your Honor, I would like to respond

20   to opposing counsel's comments regarding the continued action

21   of the Department.

22         The record only provides opaque statements as to what the

23   Department has been doing during the pendency of this -- where

24   it stopped deciding Borrower Defense applications.

25              THE COURT:  Can't I -- I need to know the current

1   situation too.  I need this new information.

2        **MS. TAYLOR:**  Agreed, Your Honor.  We need -- I would

3   suggest that Your Honor likely needs much more information to

4   be able to assess whether or not we would be back in this

5   situation again, where the Department chooses to stop

6   adjudicating borrower defenses because it has stopped the

7   underlying work it must do to even determine eligibility on

8   Borrower Defense applications.

9        I would point Your Honor to Exhibit 32 in the supplemental

10  materials.  The questions for the record the Department

11  responded to, to Senator Murray, on page 20 and 21 of that

12  exhibit, the Department states that they had established no new

13  eligibility criteria for borrower defenses.  And that was a

14  statement that was submitted in, I believe, May of 2019, a year

15  later.

16       Additionally, Your Honor, the Department chose to keep

17  itself short staffed.  They chose to keep the contractor

18  positions anemic during the period of this delay.  So there are

19  real questions as to what the Department has been doing during

20  the 18 months where it was issuing no final Borrower Defense

21  decisions.

22       **THE COURT:**  All right.  Give me -- as I said earlier,

23  we -- I've got a working draft of an order.  It would take me a

24  few days to get it in good shape.

25       I'll hold off on a final ruling so you can talk more

```
1    settlement with the magistrate judge, but give me an outside

2    date at which I'm going to just -- I'm going to say maybe

3    mid-March or near the end of March, what would you suggest is

4    the -- I've got to give you a deadline, otherwise, it will just

5    drift.

6              MS. TAYLOR:  I think mid-March is appropriate, Your

7    Honor.

8              MR. MERRITT:  That's reasonable to us.  I will flag

9    that this is a complex settlement and requires some complicated

10   or perhaps --

11             THE COURT:  March 20.

12             MR. MERRITT:  -- more than normal approval mechanisms

13   on our end.  But we have been working on doing the work to

14   secure that.

15             THE COURT:  How about March 20?

16             MR. MERRITT:  That can work for us, Your Honor.

17             THE COURT:  Friday.  And I'll say at noon.

18        And then it's either you submit a joint statement saying

19   we have totally settled the case and it's over or we did not

20   reach a settlement, in which case an order will come out

21   probably the next week.

22        Thanks to our plaintiffs for coming, our visitors from

23   Oregon.

24             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

25             THE COURT:  Are you lawyers?
```

```
 1          UNIDENTIFIED SPEAKER:  Yes, Your Honor, we are.

 2          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 3          THE COURT:  You're out here on a different case?

 4          UNIDENTIFIED SPEAKER:  We're here for the Impact Fund

 5   Conference, and we saw this case was being argued, and it's in

 6   our wheelhouse.

 7          THE COURT:  Excellent.  Good to have you here.

 8          UNIDENTIFIED SPEAKER:  Thank you.

 9          UNIDENTIFIED SPEAKER:  Thank you.

10          THE COURT:  Thanks to our journalist and all of you

11   who have come a long way.  Boston, Washington.  Did a great

12   job.  Thank you.

13          MS. LYONS:  Thank you.

14          MR. MERRITT:  Thank you, Your Honor.

15      (At 12:28 p.m. the proceedings were adjourned.)

16                         - - - - -

17                   CERTIFICATE OF REPORTER

18      I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE: Friday, September 11, 2020

21

22

23              Katherine Sullivan

24      _____

25      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter
```