JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
CLAIRE TORCHIANA (SBN 293026)
ctorchiana@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
MARGARET O'GRADY *(Pro Hac Vice Application Pending)*
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

      Plaintiffs,

      v.

ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,

      And

THE UNITED STATES DEPARTMENT OF EDUCATION,

      Defendants.

Case No.: 19-cv-03674-WHA

**DECLARATION OF EILEEN M. CONNOR**

I, Eileen M. Connor, submit this declaration in support of Plaintiffs' Motion to Enforce the Settlement Agreement and Motion for Final Approval of the Settlement Agreement.

1.     I am an attorney in the Project on Predatory Student Lending at the Legal Services Center of Harvard Law School. This office has been appointed to represent the certified class in this action. As such, I have personal knowledge and am fully familiar with the facts described herein.

2.     Pursuant to the Court's May 29, 2020 Order Directing Class Notice and Setting Final Settlement Approval Deadlines (ECF No. 105), the approved class notice was sent by the Department via first class mail and email (for borrowers whose email address the Department has) to the class prior to the July 6, 2020 deadline and in accordance with the parameters set by the Court. *See* ECF 105 ¶ 1.

3.     The Project on Predatory Student lending posted this notice on its website pursuant to the Court's Order at https://predatorystudentlending.org/sweet-v-devos-class-members/. This URL also was included in the notice sent by the Department to the class. In addition to the notice information, this page also includes answers to frequently asked questions of class members, including questions about the settlement and information about objecting and/or commenting, and participating in the October 1, 2020 fairness hearing.

4.     On September 17, 2020, the following information was posted at the top of this page: The October 1 hearing will not be held in person but will proceed by telephone. You should consult the website for the United States District Court for the Northern District of California, https://www.cand.uscourts.gov/ for specific directions on how to attend and comment on the proposed settlement by phone.  *See* ECF 123.

5.     The Project on Predatory Student Lending's website has an intake form. Through this form, and other channels of communication, we are in touch with between 20 and 150 unique student loan borrowers per week.

6.     I have reviewed over four hundred denial notices sent by the Department of Education to class members.

7.     The first denial notice that matches the form of notice included as Exhibit C in the Defendants' September 4, 2020 filing, ECF 116-3, was dated January 17, 2020, and was forwarded by the recipient to the Project on March 23, 2020.

8.     The first denial notice that matches the form of notice included as Exhibit D in the Defendants' September 4, 2020 filing, ECF 116-4, was dated May 7, 2020, and was forwarded to the Project on May 8, 2020. This denial notice was issued to Daniel Deegan, a named plaintiff in this action, and can be found as an exhibit to my declaration filed on August 20, 2020, ECF 108-

8.  The difference between this denial and many of the other denial notices matching Exhibit D is that although it contains the heading "What evidence was considered in determining my application's ineligibility?" the only evidence listed is "Evidence obtained by the Department in conjunction with its regular oversight activities." ECF 108-8 at 11.

9.     The next denial notice to match the form of Exhibit D is dated May 20, 2020, and was forwarded by the recipient to the Project on that same day. The notice concerns the application of a borrower who attended ITT. The list of evidence considered is identical to that found in the denial notice sent to former ITT student Bobby Vang, also dated May 20, 2020. *See* ECF 108-4 at 190.

10.     The number of denial notices that we received from members of the class increased substantially in June, following the distribution of notice to the class regarding the settlement.

11.     Attached hereto are true and correct copies of the following documents:

> **Exhibit 01:**     An excerpt of the official transcript from August 31, 2020 Case Management Conference;
>
> **Exhibit 02:**     An excerpt of the official transcript from February 20, 2020 hearing on motions for summary judgment;
>
> **Exhibit 03:**     Affidavit of Theresa Sweet with accompanying exhibits.

Signed under the penalty of perjury on September 17, 2020.

 /s/    Eileen M. Connor

Eileen M. Connor, Esq.

# EXHIBIT 1

Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, CHENELLE ARCHIBALD,       )
DANIEL DEEGAN, SAMUEL HOOD, TRESA        )
APODACA, ALICIA DAVIS, and JESSICA       )
JACOBSON on behalf of themselves         )
and all others similarly situated,       )
                                         )
          Plaintiffs,                    )
                                         )
   VS.                                   )   NO. C 19-03674 WHA
                                         )
ELISABETH DEVOS, in her official         )
capacity as Secretary of the United      )
States Department of Education, and      )
THE UNITED STATES DEPARTMENT OF          )
EDUCATION,                               )
                                         )
          Defendants.                    )
_____)

                          San Francisco, California
                          Monday, August 31, 2020

             **TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**TELEPHONIC APPEARANCES:**

For Plaintiffs:
                    LEGAL SERVICES CENTER OF
                       HARVARD LAW SCHOOL
                    Project On Predatory Student Lending
                    122 Boylston Street
                    Jamaica Plain, Massachusetts 02130
               BY:  **EILEEN M. CONNOR, ATTORNEY AT LAW**
                    **TOBY R. MERRILL, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED TELEPHONICALLY BY: ANA M. DUB, RDR, RMR, CRR, CCRR
                    CSR NO. 7445, OFFICIAL U.S.REPORTER

```
 1    TELEPHONIC APPEARANCES:   (CONTINUED)

 2    For Plaintiffs:
                             HOUSING & ECONOMIC RIGHTS ADVOCATES
 3                           Post Office Box 29435
                             Oakland, California 94604
 4                  BY:      CLAIRE L. TORCHIANA, ATTORNEY AT LAW

 5

 6    For Defendants:
                             UNITED STATES DEPARTMENT OF JUSTICE
 7                           Office of the U.S. Attorney
                             Civil Division, Federal Programs Branch
 8                           1100 L Street, N.W.
                             Washington, D.C. 20530
 9                  BY:      KATHRYN C. DAVIS
                             TRIAL ATTORNEY
10

11                           UNITED STATES DEPARTMENT OF JUSTICE
                             Office of the U.S. Attorney
12                           Civil Division, Federal Programs Branch
                             919 East Main Street, Suite 1900
13                           Richmond, Virginia 23219
                    BY:      R. CHARLIE MERRITT
14                           TRIAL ATTORNEY

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Monday - August 31, 2020**</u>                                      **7:58 a.m.**

P R O C E E D I N G S

---o0o---

**THE CLERK:**  This court is now in session.
The Honorable William Alsup presiding.

Calling Civil Matter 13-3674, Sweet, et al. versus DeVos,
et al.

Starting with plaintiff, will counsel please state your
appearances.

**MS. CONNOR:**  Good morning, Your Honor.  This is
Eileen Connor of the Legal Services Center of Harvard Law
School, and I'll be speaking today on behalf of the plaintiff.

Also on the line for the plaintiff are Toby Merrill, also
of the Legal Services Center, and Claire Torchiana of the
Housing & Economic Rights Advocates.

**THE COURT:**  Okay.  Next?

**MR. MERRITT:**  Good morning, Your Honor.  This is
Charlie Merritt from the Department of Justice on behalf of the
defendant, and I'll be speaking today on behalf of defendants.

Also on the phone is Kathryn Davis of the Department of
Justice for the defense.

**THE COURT:**  Okay.  Welcome to all of you.
Anyone else?

(No response.)

**THE COURT:**  All right.  So we're here for a case

```
 1              ". . . a decision . . . resolving a borrower

 2         defense application, including a determination of how

 3         much relief the claimant is entitled to, if

 4         any . . . ."

 5         So just basically like a yes-or-no decision on the

 6    application, and then requires the Department to provide

 7    written notification of that to the -- to the applicant, which

 8    clearly is happening.  So --

 9              THE COURT:  At the time that the settlement agreement

10    was entered into -- I've forgotten when that was, but seems

11    like it was around April --

12              MR. MERRITT:  Yes, Your Honor.

13              THE COURT:  -- had the Department already been issuing

14    for some time denials in the form that's being complained of

15    now?

16              MR. MERRITT:  Yes, Your Honor.  I think the form may

17    have undergone some small tweaks but, in essence, substantially

18    similar.  The Department's been using a substantially similar

19    form to notify borrowers of their ineligibility and deny claims

20    since about December 2019.

21              THE COURT:  Let me ask the plaintiff something.

22              MS. CONNOR:  Your Honor, may I -- yes.

23              THE COURT:  You can respond, but answer this question.

24         If the pattern and practice had already been established

25    about what the denials would look like -- in other words, the
```

1   short, cryptic phrase -- and if you were already on notice of

2   that by virtue of the history, then wasn't that baked into the

3   settlement agreement as what the future ones would look like?

4       What do you say to that?  And then you can respond.

5           MS. CONNOR:  Yes.  Thank you, Your Honor.

6       No, absolutely not.  This is not what was bargained for

7   here.

8           THE COURT:  Wait.  Answer my question.  Were you aware

9   at the time of the settlement of the cryptic form of the

10  denials from December up until the settlement?  I'm not asking

11  what you bargained for.

12          MS. CONNOR:  No.  No.  The answer is "no."

13          THE COURT:  Okay.  You didn't know that.

14      Why didn't you know that?  Government counsel said that

15  that had been going on for six months.

16          MS. CONNOR:  Your Honor, I don't think that we had

17  seen them.

18      And I think the other thing that we were relying on was

19  statements that were made by the Department in filings to this

20  court in their summary judgment motions that they had

21  adjudicated and determined to deny -- I think the number was

22  15,000 claims; but they were because -- for reasons that there

23  was such scant information provided by the applicant that there

24  was just no basis to even understand what the contention was

25  that was being made or that, in fact, our borrower did not, in

1   fact, have a direct loan in the first place or any federal

2   student loans and that, therefore, those applications had been

3   denied but that the Department lacked the manpower to

4   investigate and come up with adjudications as to the more

5   substantial claims that had been submitted.

6       And so I think those two factors contributed to the fact

7   that we weren't aware that this is what the Department was

8   going to do.

9       And I think, just to take on the suggestion that all that

10  is required by the letter of the agreement is a piece of paper

11  that says "yes" or "no," that's not accurate because

12  the Government also makes an assurance that it will decide

13  these borrower defense applications in accordance with the

14  governing law and the regulations.  And the regulations require

15  notice of the reasons for the decision and the evidence that

16  was considered.

17      And there's also the matter of the general background

18  principles of the Administrative Procedure Act, specifically

19  Section 555(e) which requires more than just a "yes" or "no"

20  when an agency is denying an application, especially where --

21  unless the reason for the denial is self-evident.  And it just

22  can't be said that it's self-evident here.

23      I mean, I think nobody puts it better than members of the

24  class themselves.  You know, there's an objection from -- or a

25  submission from LaQuisha Jennings.  And if you have the same

1   numbers as we have, it is Bates 0009.  I don't know what this

2   letter means, but I do know that it was not fairly reviewed.

3        Number 10, Bates Number 00084, Mary Ann Doran (reading):

4            "Department seems to be unfairly denying my

5        claims now just to satisfy the lawsuit which is

6        reprehensible."

7        There are -- these are coming across like rubber-stamp

8   denials.  It's not in satisfaction of what the Department is

9   required to do under the law or the settlement agreement.

10       **THE COURT:**  Put yourself in the position of a judge

11  for a minute.  We get cases all the time in which somebody

12  makes a large number of contentions.  This is very -- in the

13  IFP cases, it comes up a lot.  So as a judge, what do we do?

14  Do we have an obligation to go through all 17 or 18 contentions

15  when even the strongest contention is an obvious loser?

16       You know that at the Court of Appeals level, they never

17  get into the details.  They'll do one-page summary denial.

18       We try at the district court to do a little bit better

19  than that.  But it's just impossible to say that an

20  administrative law judge or a district judge or any judge is

21  under an obligation to answer everything that's in the record.

22  Really, if that's what you're asking me to do, I won't go

23  there.

24       Now, is there law that says, "Well, that's not what you're

25  asking me to do.  You're asking for more than a three-word

1  denial"?

2       I don't know the law on that, and I think this is going to

3  require some briefing to be able to answer that question.

4       Look, I'm going to give you some thoughts here.  There's

5  no way -- I think you're just fishing to try to get me to make

6  some off-the-cuff ruling or issue an order to show cause, and

7  I'm not going to do that without a better record.  We need to

8  have a full record, a full motion.  You need to do the full job

9  instead of asking for a quick-and-dirty reaction from me.

10       I'll tell you some of the issues, though, that I think

11  this raises.  One is the one that I just mentioned, and that

12  is:  What does the law require?  How brief and cursory can an

13  administrative law judge be in denying or granting relief?  I

14  don't know.  I think the APA may have something on this.

15       The second question is:  Is this a matter for the class,

16  or is it a matter for each individual claimant to take to their

17  own individual district, or whatever, under the APA to make a

18  ruling, get a ruling in their district?  Let's say somebody is

19  in Kentucky.  They go to their district court in Kentucky.  Or

20  is it that you're asking me to rule on 45,000 cases on the

21  merits?  I don't know.  That's not what I signed up for when I

22  certified this class.

23       Another possibility is we just deny the settlement and we

24  litigate it on the merits.  And then, if I did an order that

25  said you have to -- you have to give an order of denial that

1    explains the reasons, then that would -- then I wouldn't have

2    to rely upon the wording of the settlement agreement.

3        I'm also concerned about the possibility that you knew or

4    should have known of the form of the denials at the time the

5    settlement agreement was entered into.  So I would like to have

6    proof on that point of what the form of the denials were at the

7    time -- the six months leading up to it, between December and

8    April, such that was it reasonable for the Government to expect

9    that they could continue with the conveyor belt turning out the

10   same quality or lack-of-quality decisions they had been that

11   you might have been on notice of.

12       I had one other thought on the top of my head that -- oh.

13   The current statistics and how it breaks down.  And is there a

14   way to describe these many thousands of decisions?  Like, how

15   many of them were three-word denials?  How many of them were

16   two-page denials, five-page denials?  How many grant relief?

17   How many deny relief?  And how much of that had already been

18   established prior to the settlement agreement?

19       I don't know the answer to the right procedural -- see,

20   right now, this is not a class settlement.  It's only been

21   preliminarily approved.  And with what you're telling me, maybe

22   the right thing to do is deny it and then we go back to

23   litigating, which is okay.  Maybe that's the right thing to do

24   in these circumstances.

25       But to bring a motion to enforce a settlement agreement

1    that's not yet final, I don't know about that.  I'm not ruling

2    that out.  I'm just saying, I see a problem with trying to

3    treat it as a class settlement when it's only halfway there.

4    It's not finalized yet.

5         So these are all issues that I think we either have to

6    address on October 1 at the motion to confirm the settlement or

7    with whatever type of motion the plaintiffs want to bring

8    between now and then.

9         Now, you do represent a class.  I did certify the class

10   back in -- last year sometime.  And that order specifies what

11   it's for.  So that is not a -- that's already been determined.

12   But the settlement itself has not been approved on a class-wide

13   basis.

14        Anyway, I'm not making any ruling at all.  I am only

15   suggesting ways that we can try to get at the problem.  And I

16   think the plaintiffs are putting their finger on perhaps it is

17   a real problem, but I just think it's too important to try to

18   resolve in a hearing, a hurry-up hearing like this.  I think we

19   need full briefing and full-scale motions with a real record.

20        Now, on the real record part, I'm going to ask

21   the Government to do this by the end of the week.

22        Can you make a filing with the Court that lays out the

23   maximum amount of information that you can get within a week of

24   the statistics?  Can you do that?  And then get it as up to

25   date as possible so we will not have to be guessing at that.

1          **MR. MERRITT:**  Your Honor, we will do our best to

2     provide as much information as possible by the end of the week.

3          Are you planning to enter an order, I guess, asking for

4     specifics on that, or is it to address some of the topics

5     you've brought to --

6          **THE COURT:**  Well, I've listed the things that I

7     would -- I would like to know denials.  I thought the

8     plaintiffs' materials had every single one had been a denial,

9     but you're telling me that's not true.  So I think you should

10    address that.

11         Another thing is that, how many are denied with one

12    sentence or less of explanation?  The examples that were given

13    in the plaintiffs' materials were sometimes three words.  And

14    I'll be honest.  I didn't understand what it meant.  Maybe

15    there's more to it than that, but the examples that were given

16    were hard to figure out what was the reason for denying it.

17    But maybe those are rare exceptions and maybe most of them have

18    two or three sentences or paragraphs.

19         So if there's a way to help elucidate that problem, that

20    would be useful to do between now and the end of the week.

21         Now, if you think you can do a substantially better job if

22    I gave you until Wednesday of next week, I will certainly do

23    that.  But since we got an October 1 hearing and the

24    information would be useful to me as well as the plaintiffs, I

25    would like for you to try to give us accurate information so

1    this piece of it won't be a mystery.

2        Here's another thing.  If there was discussions between

3    you that were in e-mails about what the form of the decisions

4    would be, leading up to the settlement agreement, that would be

5    useful to know.  That's another piece of the puzzle.

6        Okay.  Any questions about -- this is not a ruling.  These

7    are just suggestions, except I am making a ruling that I'm

8    asking the Government to supply the information to us.

9        **MR. MERRITT:**  Your Honor, this is Toby Merritt for

10   the Government.

11       I think, you know, without -- I would want to speak to my

12   client about exactly how much of an ask this is and getting

13   accurate information --

14       **THE COURT:**  Look, you could do that, but I will let

15   them take depositions, and on a hurry-up basis, if you don't.

16   So --

17       **MR. MERRITT:**  Oh, yes, Your Honor.

18       **THE COURT:**  -- you can do it any way you want.

19       You either give it to us voluntarily, or I'm going to let

20   them come to Washington and take your depositions.  Not yours

21   but --

22       **MR. MERRITT:**  No, Your Honor, I didn't mean that we

23   wouldn't do that.  I was just going to say, if you were giving

24   the later date of next Wednesday as opposed to this Friday --

25       **THE COURT:**  I'll let you choose.

# EXHIBIT 2

                                          Pages 1 - 22

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

              BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE


THERESA SWEET, et al., on      )
behalf of themselves and all   )
others similarly situated,     )
                               )
              Plaintiffs,       )
                               )
   VS.                         )      **No. C 19-3674 WHA**
                               )
ELISABETH DEVOS, Secretary of  )
Education, and THE UNITED      )
STATES DEPARTMENT OF EDUCATION,)
                               )
              Defendants.       )
_____)     San Francisco, California
                                      Thursday, February 20, 2020


                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          LEGAL SERVICES CENTER OF
                        HARVARD LAW SCHOOL
                        122 Boylston Street
                        Jamaica Plain, Massachusetts 02130
                   BY:  **KYRA A. TAYLOR, ATTORNEY AT LAW**

                        HOUSING & ECONOMIC RIGHTS ADVOCATES
                        1814 Franklin Street, Suite 1040
                        Oakland, California 94612
                   BY:  **NATALIE LYONS, ATTORNEY AT LAW**

For Defendants:         U.S. Department OF JUSTICE
                        Civil Division, Federal Programs Branch
                        919 East Main Street, Suite 1900
                        Richmond, Virginia 23219
                   BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**
                        **KEVIN P. HANCOCK, ATTORNEY AT LAW**

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

1  delay that is before Your Honor, whether there has been a

2  common delay for all class members.  And so it's undisputed

3  that that delay has ended.

4      And although it's characterized as one day of decisions,

5  you know, what was in the Department's --

6          **THE COURT:**  I thought it was several thousand.  Was

7  it?  What was it?

8          **MR. MERRITT:**  Well, what was in the [unintelligible]

9  record indicated there was about 16,000 decisions that were

10  issued on December 11, 2019.  It also indicated that the

11  Department planned to use the new methodology it had developed

12  to issue claims on a systematic basis going forward.

13          **THE COURT:**  Have you done any more?

14          **MR. MERRITT:**  So I can now report to you that there

15  have been a total of 25,000 final decisions issued.  So an

16  additional 9- to 10,000 since the date of that declaration in

17  the record.

18      And so the intention is certainly to move forward using

19  this methodology to resolve --

20          **THE COURT:**  I'm curious, how many got -- won their

21  defense and how many lost their defense?

22          **MR. MERRITT:**  That includes 5,000 what we'll call

23  approvals, individuals who are deemed eligible for relief and

24  received some measure of relief, and 20,000 denials.

25      And so part of the way the Department is prioritizing

1  claims at this point is that it has focused on claims it can

2  adjudicate more quickly now, which include a lot of claims it

3  can more easily deny because the borrower either, you know,

4  does not present any evidence and does not come from a school

5  about which the Department already has a lot of information

6  regarding the wrongdoing so it has allowed it to issue some of

7  those decisions more quickly.

8      But the point is just that this is an ongoing process, and

9  the Department has stated that it is committed to using this

10  new methodology to issue decisions going forward.

11      As far as the narrow issue that is presented in this case,

12  the total delay of what ended up being 18 months, that has

13  ended.  And we believe that does moot the case as it currently

14  stands and has been certified as a class action.

15      **THE COURT:**  Well, can you report as to whether in the

16  immediate future, like the next 60 days, the Secretary will be

17  issuing yet more rulings?

18      **MR. MERRITT:**  Well, I think we can say with comfort

19  today in the next few weeks there's a plan to issue around 12-

20  to 15,000 more.  Without having more time to kind of validate

21  numbers and look at it more closely, I don't have a more

22  specific plan.

23      **THE COURT:**  Are more being -- are they coming in

24  faster than that?  In other words, are you resolving more than

25  are still coming in, or is it the other way around?

1          **MR. MERRITT:**  I don't know the answer to that, Your

2     Honor.  I know that they do continue to come in.

3          **THE COURT:**  That would be a good thing to know,

4     whether -- whether you're working down the backlog or not.

5          **MR. MERRITT:**  But I will say, so, another key aspect

6     of this is just staffing.

7          And so as represented in one of the declarations in the

8     record from Colleen Nevins, who is the director of the Borrower

9     Defense Unit, one of the reasons that had contributed to

10    putting aside the issue of whether final decisions issued, the

11    Department's ability to work through the backlog of claims over

12    the last 18 months, was a lack of staff.

13         And hiring has now increased, and I can report that there

14    are now 12 permanent attorneys working in the Borrower Defense

15    Unit, and now 32,000 -- or 32 short-term appointments as

16    attorneys.  And that number is expected to grow.  I believe it

17    was reported authority of up to 60 in the record.

18         And so the Department believes that once it's able to, you

19    know, put more staff to both finally adjudicating claims and

20    also doing the research that is necessary with respect to the

21    large volume of evidence of wrongdoing the Department has

22    before it, related to certain schools, and the analysis of

23    applicable law, whether that's state law under the 1995

24    regulation or under the federal standard, the new regulation,

25    lots of time between process, but once these new hires get kind

1   of up to speed it is expected that that work will be able to

2   speed up.

3           THE COURT:   I'm going to bring it to a close.

4           MR. MERRITT:   If you don't mind, Your Honor, can I

5   address -- defer to you, but some of the second points about --

6           THE COURT:   All right.

7           MR. MERRITT:   -- the Department's reasonableness --

8           THE COURT:   Go ahead.

9           MR. MERRITT:   -- and the bad faith?

10      It is not accurate to say that the Department wholly shut

11  down its decision-making process.   And so, you know, when

12  looking at what the Department has done, that is detailed in

13  the record, from the time the injunction issued in 2017 in the

14  *Manriquez* case -- or, sorry, in June 2018 -- the record

15  demonstrates that the Department was not doing nothing.

16      The Borrower Defense Unit was still reviewing claims,

17  developing evidence, developing ways to review new claims, and

18  adjudicated more than 50,000 on the merits during that time

19  period, setting them up for a final decision.

20      And as to why there were no final decisions, as is also

21  explained in the record, the Department was taking the time, as

22  you kind of acknowledged, to review this program and come up

23  with a new methodology that was a time-consuming process and

24  took a lot of research and review and ultimately culminated in

25  that new 2019 methodology.   So all that shows that this was not

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>       *Plaintiffs,*<br><br>v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,<br><br>And<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>       *Defendants.* | Case No.: 19-cv-03674-WHA<br><br><br><br>**AFFIDAVIT OF THERESA SWEET** |

I, Theresa Sweet, state as follows:

1.   I am submitting this affidavit in relation to the above-captioned case. I am a named Plaintiff in this matter.

2.   I borrowed federal student loans in order to attend Brooks Institute of Photography (Brooks).

3.   In or around Fall 2016, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A. Although I did submit evidence with my application, I have not been able to retrieve a copy of that evidence to include here.

4.   On July 8, 2020, I received correspondence from the Department of Education, stating that my claim had been denied. A copy of that correspondence is attached as Exhibit B.

5.   In between the time that I first submitted an application for loan cancellation and when I received the notification of denial, I did not hear from the Department about my

1

1   application or aspects of my application that were deficient. The only information I got from the

2   Department was upon my initiative. I called them a few times and was just told that my

3   application was in process.

4       6.      In between the time that I first submitted an application for loan cancellation and

5   when I received the notification of denial, my loans were in administrative forbearance.

6       7.      The denial notice I received from the Department states "failure to state a claim"

7   as the reason for denying my allegations regarding "employment prospects," "program cost and

8   nature of loans," "career services," and "other." *See* Ex. B.

9       8.      I do not understand what "failure to state a claim" means. In my application, I

10  explained the actions of Brooks' staff that I believed were fraudulent. The Department's

11  response leaves me without any way of determining what I failed to allege. "Failure to state a

12  claim" does not provide any information on what is missing in my application.

13      9.      The denial notice I received from the Department also states "insufficient

14  evidence" as the reason for denying my allegations regarding "educational services" and

15  "transferring credits." *See* Ex. A. I submitted evidence with my application. But "insufficient

16  evidence" does not explain what was deficient about the evidence I submitted.

17      10.     Overall, this feels like a blanket denial, without explanation or due consideration.

18      11.     I was shocked to receive the denial notice, in light of all of the evidence I believe

19  the Department has received through the many borrowers I know who attended Brooks and

20  submitted applications with allegations similar to mine and the external investigations by state

21  attorneys general.

22      12.     The notification of denial states that I may ask for reconsideration. It requires me

23  to specify what about the Department's decision was wrong and what evidence would

24  demonstrate that I am eligible.

25      13.     The Department has not provided me any information to understand what was

26  missing from my application in the first place. They merely have told me that I failed to state a

27  claim and didn't provide sufficient evidence. Thus, the Department has told me that my

28

2

T. SWEET AFFIDAVIT

1   application was deficient, but it has not told me what about my application was deficient or how

2   to fix it.

3       14.     Because this feels like a blanket denial and the Department has given me no

4   information to improve upon my previous application, seeking reconsideration feels like a fool's

5   errand.

6       15.     Nearly four years after I submitting my application, this denial feels like a cursory

7   email, not the result of true consideration of the facts and evidence that I presented.

8

9       I swear under penalty of perjury that the foregoing is true.

10

11      Executed on:  August *16*, 2020

12                     *Los Gatos*, California

13

14                                                *Theresa A. Sweet*

15                                                Theresa Sweet

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        3

                                                        T. SWEET AFFIDAVIT

# EXHIBIT A

**Brooks Institute of Photography (BIP) & Brooks Institute (BI)**
**Borrower defense to repayment Application**

Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and Master Promissory Note (MPN) under the
William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program
As detailed below, I, __**Theresa Ann Sweet**_____ , am hereby applying for a full discharge of my federal student loans according to the "Defense to Repayment" provisions of the Higher Education Act and promulgating regulations.

## Section 1: Borrower Information

**SSN**

**Name**
Theresa Ann Sweet

**Address**

| **City** | **State** | **Zip Code** |
| --- | --- | --- |
| Los Gatos | CA | |

**Telephone**                     **Telephone**

**Email**
(optional)

**Borrower is**
 X Employed
 ☐ In field of study
 X Out of field of study
 ☐ Unemployed

**Loan Servicer**
**Navient**

**Section 2: School Information**

**School Name** (the school changed its name)
Brooks Institute of Photography
321 Alameda Padre Serra
Santa Barbara, CA 93103-1809
**AND**
Brooks Institute
5301 N Ventura Ave.
Ventura, CA 93001

**Dates of Attendance** (From-To)
January 2003- May 2006

**Name of program**
**Bachelor of Arts in Professional Photography**

**Type of Credential**

**Status**
X Completed
☐ Withdrew

**Section 3: Illegal Conduct Of School**

I assert that certain acts and omissions by Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA and/or its agents/representatives give me a defense to repayment of my federal student loan(s) under state and federal law and the terms of my federal student loan agreement(s).

**The illegal conduct by** Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA **includes:**

**Misleading me about how this program would affect my job prospects, including:**

X Citing false and/or misleading job placement statistics and salary information to convince me to enroll in
X Brooks Institute of Photography, Santa Barbara CA
X Brooks Institute, Ventura CA

**Explain:**

X  **Misleading me about the type of job placement assistance the school intended to provide me.**

**Explain:** When I sent for information about Brooks, a person identifying themselves as an "Admissions Counselor" contacted me right away and started telling me what turned out to be a string of falsehoods about the school, it's high level of academic preparation, and it's excellent reputation in the media Industry. They also told me how their students got a lot of job placement assistance after graduation (either through faculty networking or from the job placement assistance office). This turned out not to be true at all. As I got closer to graduation, I asked Instructors for any job leads and nearly all of them told me that when you are starting out, it is very difficult to find any paid work at all and that most students spend years as unpaid interns or as unpaid "assistants" so they could build their portfolio. I received only a few calls from the "placement office" after graduating, and the calls were all to tell me about "opportunities" to work for free, or to read Craigslist postings to me that I had already found on my own. After graduation, I found out that the "Admissions Counselors" were just commissioned sales people.

X  **Other false/misleading conduct relating to job prospects.**

**Explain:** "Admissions Counselors" repeatedly told me that because Brooks had such a great reputation in the industry, 80-90% of graduates were employed "right out of school". I had no reason to doubt them since they told me they had to follow the same rules as all other colleges; only years later did I find out that private schools at that time DID NOT have to report this information to students and that there was no way to verify it until a couple of years ago until the Obama Administration required that private schools also had to provide the info. Many, if not most of my classmates DO NOT work in the media/photography industry- there simply weren't any jobs and many people in the industry said that Brooks' reputation has declined precipitously after the school was purchased by CEC and due to all the legal drama surrounding the school.

**Misleading me about the quality of the program, including:**

X  **The pass rate of program graduates in required licensing exams/certifications.**

**Explain:** There aren't really Licensing Exams in Photography, but my "Admissions Counselor" told me that the program I was interested in was academically rigorous and that graduation rates were very high because students "knew" that once they had a degree from Brooks, they would have an advantage over their peers when it came to job hunting and gaining a foothold in the industry.

**X The fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college.**

**Explain:** My "Admissions Counselor" told me that she "had never had a student call and tell her their credits didn't transfer to another school" so I could *"feel certain it shouldn't be a problem"*. Again, I had no reason to doubt her; only later did I find out that private schools were not required at that time to report this information to students and that there would have been no way to verify it anyhow.

**X Other false/misleading conduct relating to the quality of the program.**

**Explain:**
My "Admissions Counselor" told me that the admissions process was rigorous and that they had very tough standards on which students could get in because they didn't want unqualified people sullying the industry reputation of the school. I was told that the quality of education was extremely high and that we would be expected to excel academically as well as artistically if we wanted to graduate. It turns out that as long as you graduated from high school (or had a GED) and could find a way to pay (mostly through loans that were forced upon us), you could get in and start a program.

**X Misleading me about how I would pay for the program, including:**
X **Misleading me about the true cost of the program.**

**Explain:**
I was told there would be no tuition increases during the program. This turned out to be entirely false. The amount of tuition per session increased at least once, if not twice during my enrollment. It was also not explained to me that unlike most schools, there was no student health insurance, nor was the cost of housing included in the massive dollar amount of tuition. I was told that we could check out equipment as we needed it for assignments, but with so many students it would have been impossible to complete a program without buying at least a film camera for the beginning of the program and a digital one for the end of the program. Many students were encouraged to take out additional "Equipment Loans" because of the lack of supplies available for us to rent out.

**X Misleading me about whether I would have to borrow money to attend,**
**X Brooks Institute of Photography, Santa Barbara CA**
☐ Brooks Institute, Ventura CA
**rather than having it paid for entirely in grants.**

**Explain:**

When I was accepted and contacted by admissions, I was told that I needed to contact the financial aid office. Once I contacted financial aid, they told me that I would get guaranteed Federal loans and that they also "had a CEC Signature Loan" agreement with Sallie Mae and that I would be approved for those loans as well, without question, and not to worry. It was only after I graduated that I realized that the CEC Signature Loans were not part of any Federal Student loan program and that not only were my interest rates extremely high, but that there were no payment plans that I could afford.

X **Misleading me about the amount of student loans I was borrowing.**

**Explain:**

I would say that hey misled me about what the actual cost of attendance was and how much I would actually have to borrow until it was too late- I was already in Santa Barbara taking classes.

X **Misleading me about whether my loans were federal or private.**

**Explain:**

I definitely feel as though I were misled about the type of loans I was receiving. As stated above, the Financial Aid office told me that I would get several types of "Guaranteed Loans" "through" Brooks. There would be **Stafford Loans** and **CEC Signature Loans**. They made no attempt whatsoever to explain that there were vast differences between the two loans. I think using the term "two types of Guaranteed Loans" was intentionally misleading. Looking back, even saying that the loans were given "through" Brooks makes it seem as though they were trying to mislead us- after all, you cannot borrow Federal student loans unless you are getting them while attending an accredited school.

I also feel that I should mention that for my **"CEC Signature Loans"**, Sallie Mae harassed me relentlessly over the phone, calling me dozens of time each day, demanding fees to put my loan on "Economic Hardship" even when they were unable to explain to me where in my loan paperwork it said that such fees would be expected. They called and harassed people whose contact information I never gave them such as former room mates, family members, and even an ex boyfriend and left my personal financial information on answering machines and voice mails. They demanded absurd monthly payment amounts even when I offered to pay an amount I could. They refused to work with me to even when I filed a complaint with the Consumer Financial Protection Beareau. At one point, they demanded that I pay them more than 50% of my take home pay, which would have left me no money to live on. I cannot even begin to explain the emotional toll this harassment took on me. I was embarrassed and ashamed of the fact

that they were calling people they should not have been calling in their attempts to harass me into paint what was at one time, a monthly payment of more than $4000.00/month. Sallie Mae also actively encouraged me to stay on forbearance when I could not afford payments whiteout making it clear how much this was going to exponentially increase the amount of my loan balance. The last time I opened an envelope from Sallie Mae about my CEC signature Loans, the balance was somewhere in the neighborhood of **$400,000.00. That is not a typo. My balance is nearly half a million dollars.** I also assert that Sallie Mae did not do a remotely acceptable amount of due diligence that would be expected of any company loaning students money. It is absurd that anyone would loan out money in amounts so high to what were essentially Arts Majors.

**X Misleading me about the terms of repayment on my federal student loans, including what my monthly payments would be.**

**Explain:**
All through the financial aid process. I was told "not to worry" about my Federal Loans as "the government has payment plans you can afford", and "you can always put them in forbearance if you can't make payments".  They also mentioned that I didn't need to worry about making payments while I was in school, only after. They made no attempt to explain that the interest on the (unsubsidized) Federal and Private loans would continue to accrue and that it would capitalize at the time of graduation/repayment.

**X Other false/misleading conduct in relation to financial aid.**

**Explain:**
Essentially, I feel the the financial aid process was part of the larger scam going on at the school. I am especially disgusted by how they booked the Federal Student Loan system to the point where students had to max out the amount they borrowed in order to attend as it left students in a position not to be able to borrow if they tried to attend a legitimate degree program later on.

**Misleading me about my options as the school shut down, including:**
☐ **Misleading me about the likelihood that the school would shut down.**

**Explain:**
I had already graduated when the school finally shut down, however there was at least one incident with the accrediting body while I was attending Brooks and we received letters from Greg Strick (I believe his title was President of the school at that time) assuring us that the school would be continued to allow to operate. St that time, I was

already so far into the program that I just hoped to finish. THere were also lawsuits against the school gaining steam.

☐ **Misleading me about my rights and options regarding the teach-out at School, including failing to inform**
me that I had a right to decline the teach out and receive a full discharge of my federal student loans.

**Explain:**
I am not sure what "Teach Out" is. I don't recall ever being asked to attend such a thing. I don't want to answer this question improperly since I don't know what it is referring to, but again, I can definitively say I was never asked to attend such a meeting. I have a feeling that the school didn't follow most of the rules/laws that a well run, legitimate business should be following, so this does not surprise me.

☐ **Other misleading behavior, including:**

**Explain:**
I feel that essentially, my entire experience at Brooks was a giant scam. From the "competitive admissions process" to financial aid, to accreditation, to career services. Looking back, I feel that Brooks and CEC followed to a tee the same unethical and misleading practices that have gotten similar trade schools in trouble in the recent past.

Throughout the admissions process. I was called frequently by agents of the school. They used information in my application (such as the fact that I was the first in my family to attend college) as "pain points" in their high pressure sales tactics.

It doesn't take much in the way of a Google search to put together a time line of legal actions against CEC (the owner of the school when I attended) and their unethical and fraudulent practice. The fact that they have mostly (if not always) settled out of court does nothing to prove their innocence.

**Superior Court of the State of California for the County of Los Angeles 2006 (Class Members enrolled 1999-2005)**

**I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit *and I accepted the settlement*

*offer.*
**Plaintiffs**
**vs.**
Careeer Education Corporation (CEC)
Brooks Institute of Photography
**Defendants**

☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

I know that I was a part of a class action lawsuit in which CEC settled out of court but I cannot remember the name of it so I don't want to misstate which one it was. It was related to their shady admissions practices and unethical business practices. I was compensated about $6000.00 if I remember correctly, but since I was unemployed or under employed for several years after graduation, I had to use the money to live on. Besides, the amount I was compensated was not enough to put a dent in the combined amount of Private and Federal student loans I owed.

CEC, of course, settled out of court without admitting any wrongdoing but as I am sure you are aware, CEC has had a trail of lawsuits following them, including those by shareholders, former students, and I believe Attorneys General across the country.

☐ **I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit *and I recused myself from the Class and settlement offer in order to reserve the right to potentially pursue SallieMae for the fraud, crime and harm committed in conjunction with*
*with their Private Loans, including the CEC Signature Loan, Financial Aid office kick-backs, disregard and elimination of content stated in Promissory Note, radical increase of percentage rate after six month grace period and bills sent to students in the 5 and 6 figure realm, demanded payment in full, harassment of borrowers employer/s, family members and friends, payment to defer or forebear due to economic hardship, refusal to put things in writing or give mailing address when asked numerous times, hours spent in attempt to find a solution for repayment and SallieMae all or nothing attitude etc…*
**Plaintiffs**
**vs.**
Careeer Education Corporation (CEC)
Brooks Institute of Photography
**Defendants**

☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.


X **I was not part** of the said Class Action Lawsuit, **and I attended during the Class Action period** of
1999-2005.
I do not think this is the lawsuit that I was a part of, but after reading the reasons that the lawsuit was brought, I can confirm that this is exactly the type of behavior that Sallie Mae engaged in with my CEC signature Loans. Their harassment was relentless even after I begged them to stop calling me constantly and communicate by mail. They called all manner of people that had never been added to my paperwork including my parents, former room mates, an ex boyfriend. It seems as though they looked at my address history and called every house on that list. They left personal financial information with all of these people. They demanded that I make monthly payments far exceeding the actual amount of my take home pay even when I told them I didn't even make that much money. I made multiple attempts to negotiate my payment amount to something  I could afford and at every turn they refused and demanded all or nothing. The only thing they were willing to do, at one point, was to offer me a payment plan that required me to pay more than 50% of my take home pay. Since this is clearly unsustainable, not even a bankruptcy court would be this unreasonable, I could only make payments for a few months before living expenses had to take precedence and I dropped out of the program and defaulted. It is appalling to me that this same company is the one that handles the Federal Student Loan program. Despite changing their name to Navient, it is still the same company and they are blatantly making money off students despite their horrific reputation. Even if you only look on the surface, you will seed that their history is rife with such behavior.


☐ **I was not part** of the said Class Action Lawsuit, and **I attended after the Lawsuit** (note name change to BI from BIP due to post-settlement "restructuring").
☐ **Brooks Institute of Photography, Santa Barbara CA**
☐ **Brooks Institute, Ventura CA**
**in 2006, and was told almost the same fraudulent things (see above description) the people in the Class Action Lawsuit experienced, which was the basis for their suit.**

☐ **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

Furthermore, the long history of systematic illegal activity and inadequate programs created a high likelihood that school's reputation would be irreparably damaged to the point where the degrees they issued would be worthless.

X Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

never notified me or otherwise made me aware that that my degree would be worthless due to misconduct.

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

Absent this conduct, I would not have chosen to attend and/or continue attending

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

I decided to pursue a *postgraduate education* because I wanted to gain the relevant skills to find a more fulfilling career with higher earning potential than I was able to obtain previously. I chose to attend

☐ Brooks Institute of Photography, Santa Barbara CA

☐ Brooks Institute, Ventura CA

because they represented to me that their program would give me useful skills, that their degree would allow me to earn more than I did previously, and that these benefits would outweigh the burden of paying off the obligations I would incur to finance the degree.

**Because of this conduct, I have suffered injury, including:**

**X Federal student loan debt, which has caused me stress, forced me to divert funds from other aspects of my life and otherwise unduly burdened me.**

**Explain:**
Brooks actively encouraged/arranged it so that students had to maximize the amount of Federal loans students borrowed, and I frankly think that this was an intentional, willful money grab from the Federal Loan Program. Since I am maxed out on Federal Student loans, I cannot afford to attend a reputable school for a legitimate BA/BS degree.

**X The inability to enroll in another degree-granting program.**

**Explain:**
As stated above, I am maxed out on Federal student loans for a BA/BS degree and

cannot afford to attend a legitimate program. Not only thins, but any of the general education requirements/classes I took at Brooks are not accepted to most of the schools that I sought to attend part time to chip away at a useful degree over the years.

**X A difficult time finding employment, either in the field I went to school for or otherwise.**

**Explain:**
I NEVER found employment using the education I got at Brooks. I had one photography job, several years after graduation, where I was told in the interview that my Brooks degree made them LESS likely to hire me. Besides that fact, they had a proprietary 2 week training program of the system that they used and my Brooks "education' was unnecessary and did not apply.

**X Missing the opportunity to go to another, better higher education institution and lacking the eligibility for
enough federal loans to do so now.**

**Explain:**
This is due to both the lack of "real" accreditation (and non transferable credits) and the fact that Brooks required students to max out the amount of Federal loans they borrowed in order to afford the cost of attendance.

**X Other injury, including pain and suffering.**

**Explain:**
I spent 3 1/2 struggling desperately to afford the cost of attending Brooks. I have massive loans that I will never be able to afford to repay. My credit is ruined. I cannot buy a car, let alone a home. My own mother no longer speaks to me because she co-signed on a loan that I cannot repay. I have had relationships end due to this massive debt. I feel like a fool for having fallen for the Brooks scam.

The emotional trauma and shame of being the first person in my family to graduate from college and have that degree turn out to be a useless albatross around my neck has brought me to tears more time than I can count. I thought I was doing the right thing by getting "an education" to improve my life and it turns out he only education I got was that giant corporations can run amok and defraud thousands of people with no repercussions.

I was ceaselessly harassed by Sallie Mae for my CEC Signature Loans for years after graduation. Called dozens of times per day. They harassed my family and friends in their attempts to shame me into repaying loans with terms so onerous and usurious that few are the people who could afford to repay them. They shared my personal financial

problems with people that had no right to know, and in violation of Federal Law. They robo dialed myself and people in my life for years until I told them I knew it was illegal and that I would take legal action if they did not stop. They willfully misled me about the true cost of my loans. It sickens me every time I think of it.

**Section 4: Defense To Repayment of Federal Student Loans**

The above conduct gives rise to a cause or causes of action under California law, which relate(s)
directly to my loan and/or the provision of educational services for which the loan was given, including:

## California EDUCATION CODE
## SECTION 94928-94929.9

94928.  As used in this article, the following terms have the following meanings:

(a) "Cohort population" means the number of students that began a program on a cohort start date.

(b) "Cohort start date" means the first class day after the cancellation period during which a cohort of students attends class for a specific program.

(c) "On-time graduates" means the number of students who complete a program within 100 percent of the published program length. An institution may separately state completion information for students completing the program within 150 percent of the original contracted time, but that information may not replace completion information for students completing within the original scheduled time. Completion information shall be separately stated for each campus or branch of the institution.

(d) "Graduates available for employment" means the number of graduates minus the number of graduates unavailable for employment.

(e) (1) "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program. For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the examination results for the first examination available after a student completes an applicable educational

program.

(2) The bureau shall define by July 1, 2014, specific measures and standards for determining whether a student is gainfully employed in a full-time or part-time position for which the institution represents the program prepares its graduates, including self-employment or conducting freelance work, and may set the standards for the hours per week and duration of employment and utilize any job classification methodology the bureau determines appropriate for this purpose, including, but not limited to, the United States Department of Labor's Standard Occupational Classification codes.

(3) This subdivision shall not prohibit the bureau from authorizing an institution to aggregate single positions held by a graduate for purposes of meeting the hours per week standards established by the bureau.

(f) "Graduates unavailable for employment" means graduates who, after graduation, die, become incarcerated, are called to active military duty, are international students that leave the United States or do not have a visa allowing employment in the United States, or are continuing their education at an accredited or bureau-approved postsecondary institution.

(g) "Students available for graduation" means the cohort population minus the number of students unavailable for graduation.

(h) "Students unavailable for graduation" means students who have died, been incarcerated, or called to active military duty.

94929.  (a) An institution shall annually report to the bureau, as part of the annual report, and publish in its School Performance Fact Sheet, the completion rate for each program. Except as provided in subdivision (b), the completion rate shall be calculated by dividing the number of on-time graduates by the number of students available for graduation.

(b) In lieu of calculating graduation data pursuant to subdivision (a), an institution may report graduation data reported to, and calculated by, the Integrated Postsecondary Education Data System of the United States Department of Education.

94929.5.  (a) An institution shall annually report to the bureau, as part of the annual report, and shall publish in its School

Performance Fact Sheet, all of the following:

(1) The job placement rate, calculated by dividing the number of graduates employed in the field by the number of graduates available for employment for each program that is either (1) designed, or advertised, to lead to a particular career, or (2) advertised or promoted with any claim regarding job placement.

(2) The license examination passage rates for the immediately preceding two years for programs leading to employment for which passage of a state licensing examination is required, calculated by dividing the number of graduates who pass the examination by the number of graduates who take the licensing examination the first time that the examination is available after completion of the educational program. The institution shall use state agency licensing data to calculate license examination passage rates. If those data are unavailable, the institution shall calculate the license examination passage rate in a manner consistent with regulations adopted by the bureau.

(3) Salary and wage information, consisting of the total number of graduates employed in the field and the annual wages or salaries of those graduates stated in increments of five thousand dollars ($5,000).

(4) If applicable, the most recent official three-year cohort default rate reported by the United States Department of Education for the institution and the percentage of enrolled students receiving federal student loans.

(b) Nothing in this section shall limit the bureau's authority to collect information from an institution to comply with this section and ensure, by regulation and other lawful means, that the information required by this section, and the manner in which it is collected and reported, is all of the following:

(1) Useful to students.

(2) Useful to policymakers.

(3) Based upon the most credible and verifiable data available.

(4) Does not impose undue compliance burdens on an institution.

(c) Data and information disclosed pursuant to paragraphs (1) to (3), inclusive, of subdivision (a) is not required to include students who satisfy the qualifications specified in subdivision (d) of Section 94909, but an institution shall disclose on its fact sheet and to the bureau whether its data, information, or both, excludes

any students pursuant to this subdivision.

94929.7.  (a) The information used to substantiate the rates and information calculated pursuant to Sections 94929 and 94929.5 shall do both of the following:

 (1) Be documented and maintained by the institution for five years from the date of the publication of the rates and information.

 (2) Be retained in an electronic format and made available to the bureau upon request.

 (b) An institution shall provide a list of employment positions used to determine the number of graduates employed in the field for purposes of calculating job placement rates pursuant to this article.

 (c) The bureau shall identify the specific information that an institution is required to document and maintain to substantiate rates and information pursuant to this section.

94929.8.  (a) On or before January 1, 2011, and pursuant to Section 94877, the bureau shall establish, by regulation, a uniform method for institutions to obtain statistically valid, current, and representative data to comply with this article.

 (b) A violation of the regulations adopted pursuant to subdivision (a) is a material violation of this chapter.

94929.9.  (a) The bureau shall consider the graduate salary and other outcome data and reporting requirements that are utilized by the United States Department of Education, the Student Aid Commission, accrediting agencies, and student advocate associations. The bureau shall consider the reporting requirements of public postsecondary institutions in California to evaluate the feasibility of adopting these reporting requirements for private postsecondary institutions. The bureau shall make recommendations to the Legislature, on or before December 31, 2016, on how reporting requirements under this chapter should be altered to ensure accurate, useful, and consistent reporting by private postsecondary institutions to the bureau and students.

 (b) The bureau is authorized to enter into a personal services contract with an appropriate independent contractor to assist in the evaluation required by subdivision (a). In this connection, the Legislature finds, pursuant to Section 19130 of the Government Code,

that this is a new state function.

(c) (1) A report to be submitted to the Legislature pursuant to subdivision (a) shall be submitted in compliance with Section 9795 of the Government Code.

(2) Pursuant to Section 10231.5 of the Government Code, this section is repealed January 1, 2017.

Common law action for Fraudulent Misrepresentation; and/or common law action for Fraudulent Concealment.

Additionally, the above conduct violates federal law, including:

1. The Federal Trade Commission Act and Federal Trade Commission regulations, which prohibit "a school, in promoting a course of training, to misrepresent the availability of employment after graduation from a course, the success that the member graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment." 16 C.F.R. § 254.4(d).

2. Title IV of the Higher Education Act and Amendments, and Department of Education regulations, which prevent schools from participating in Title IV programs from committing "substantial misrepresentation" in interactions with students and prospective students.

## Section 5: Requested Relief

Therefore, I request that the Servicer and/or Department of Education take the following steps:

1. Cancel any remaining principal, interest, fees and costs associated with my federal student loans, borrowed to attend
**X** Brooks Institute of Photography, Santa Barbara CA
☐ Brooks Institute, Ventura CA

2. Cease any collection actions against me in relation to my federal student loans, borrowed to attend
**X** Brooks Institute of Photography, Santa Barbara CA
☐ Brooks Institute, Ventura CA

3. Return any sums paid, whether voluntarily or involuntarily, toward my federal student

loans, borrowed to
attend
**X** Brooks Institute of Photography, Santa Barbara CA
☐ Brooks Institute, Ventura CA

4. Remove any adverse reports related to my federal student loans, borrowed to attend
School, from all consumer credit reporting agencies.
**X** Brooks Institute of Photography, Santa Barbara CA
☐ Brooks Institute, Ventura CA

5. Restore my eligibility to receive funds under Title IV, including by restoring any
portions of my lifetime
eligibility for Pell Grants and federal student loans previously used in order to attend
**Brooks Institute of Photography, Santa Barbara,
CA**_____

I request a notification of a hearing or a determination of my asserted defense to
repayment within thirty (30) days, in writing. Should you deny any or all of my defense,
please inform me of the process for appealing this decision, in writing. I reserve the
right to submit supplementary information in support of this application.

## Section 6: Borrower Acknowledgment, Certifications, Assignment, And Authorization

I acknowledge that any person who knowingly makes a false statement or
misrepresentation on this form or any accompanying document is subject to penalties
that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20
U.S.C. § 1097.

I certify, under penalty of perjury, that all of the information I have provided on this
form and in any
accompanying documentation is true and accurate to the best of my knowledge and
belief.

I certify that I will provide, upon request, testimony, a sworn statement, or other
documentation reasonably
available to me that demonstrates to the satisfaction of the Department that I meet the
qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and
cooperation to the U.S.
Department of Education (the Department) in any proceedings or enforcement actions
against the school related to my defense or the conduct asserted herein.

I hereby assign and transfer to the U.S. Department of Education (the Department) any right to a refund on the

amount discharged that I may have received from the school and/or any owners, affiliates, or assignees of the

school, and from any third party that may pay claims for a refund because of the actions or omissions of the

school, up to the amount discharged by the Department on my loan(s).

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any

future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

**Borrower's Signature** _____ **Date**
November 4, 2016

Date:   07/17/2009

# Brooks Institute

## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

Page 1 of 4

**Student:** Theresa A Sweet

**Student ID:** 23252

**DOB:**

**HS:**

**LDA:**

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|

**Program:** Professional Photography - Undeclared
**Award:** Bachelor of Arts
**Enrollment #:** 23252
**Start Date:** 01/13/2003
**Enroll Status:** Internal Program Transfer
**LDA:** 06/21/2006

Professional Photography - Undeclared    **GPA:** 0.00    0.00    0.00

**Program:** Visual Journalism
**Award:** Bachelor of Arts
**Enrollment #:** SW03010466
**Start Date:** 01/13/2003
**Enroll Status:** Transfer to Other Program
**LDA:** 06/21/2006

Visual Journalism    **GPA:** 0.00    0.00    0.00

**Program:** Professional Photography - Undeclared
**Award:** Bachelor of Arts
**Enrollment #:** SW03036852
**Start Date:** 01/13/2003
**Enroll Status:** Transfer to Other Program
**LDA:** 06/21/2006

Professional Photography - Undeclared    **GPA:** 0.00    0.00    0.00

---

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|

**Program:** Professional Photography
**Award:** Bachelor of Arts
**Concentration(s):** Commercial Advertising
**Enrollment #:** SW06011983
**Start Date:** 01/13/2003
**Enroll Status:** Graduate
**Grad Date:** 06/24/2006

**Term: 0301    Session 1 2003    01/10/2003    03/01/2003**

| CUL188 | Cultural Studies 1 | 3.00 | 3.00 | B | 9.00 |
| PHO100 | Basic Photojournalism | 6.00 | 6.00 | B- | 16.20 |

**Term GPA:** 2.80    **Cum GPA:** 2.80    9.00    9.00    25.20

**Term: 0303    Session 2 2003    03/07/2003    04/26/2003**

| MAT181 | Math | 3.00 | 3.00 | D | 3.00 |
| PHO101 | Fundamentals of Photography | 6.00 | 6.00 | C+ | 13.80 |

**Term GPA:** 1.87    **Cum GPA:** 2.33    9.00    9.00    16.80

---

** Indicates Retaken Course
R* Indicates Retaken Override

Unofficial Transcript

Date:    07/17/2009

**Brooks Institute**

**Unofficial Transcript**

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

Page 2 of 4

**Student:** Theresa A Sweet

**Address**

**Student ID:**

**HS:**

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0305** | **Session 3 2003** | **05/02/2003** | | **06/21/2003** | |
| PHO102 | Basic Photography Fundame | 6.00 | 6.00 | C | 12.00 |
| PSY187 | Theories of Personality | 3.00 | 3.00 | B | 9.00 |
| Term GPA: | 2.33 | Cum GPA: 2.33 | 9.00 | 9.00 | | 21.00 |
| **Term: 0307** | **Session 4 2003** | **07/11/2003** | | **08/30/2003** | |
| ENG184 | English Composition | 3.00 | 3.00 | B | 9.00 |
| PHO103 | Intermediate Principles | 6.00 | 6.00 | C+ | 13.80 |
| Term GPA: | 2.53 | Cum GPA: 2.38 | 9.00 | 9.00 | | 22.80 |
| **Term: 0309** | **Session 5 2003** | **09/05/2003** | | **10/25/2003** | |
| PHO200 | Lighting Theory | 6.00 | 6.00 | C | 12.00 |
| Term GPA: | 2.00 | Cum GPA: 2.33 | 6.00 | 6.00 | | 12.00 |
| **Term: 0311** | **Session 6 2003** | **10/31/2003** | | **12/20/2003** | |
| CUL189 | Cultural Studies 2 | 3.00 | 3.00 | C+ | 6.90 |
| PHO201 | Lighting People | 6.00 | 6.00 | D- | 4.20 |

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| Term GPA: | 1.23 | Cum GPA: 2.14 | 9.00 | 9.00 | | 11.10 |
| **Term: 0401** | **Session 1 2004** | **01/09/2004** | | **02/28/2004** | |
| PHO202 | Lighting Studio | 6.00 | 6.00 | B- | 16.20 |
| Term GPA: | 2.70 | Cum GPA: 2.19 | 6.00 | 6.00 | | 16.20 |
| **Term: 0403** | **Session 2 2004** | **03/05/2004** | | **04/24/2004** | |
| DIM253 | Digital Imaging | 6.00 | 6.00 | C | 12.00 |
| Term GPA: | 2.00 | Cum GPA: 2.18 | 6.00 | 6.00 | | 12.00 |
| **Term: 0405** | **Session 3 2004** | **05/07/2004** | | **06/26/2004** | |
| ENG280 | Advanced English Composition | 3.00 | 3.00 | D | 3.00 |
| PHO203 | Advanced Photography | 6.00 | 6.00 | C- | 10.20 |
| Term GPA: | 1.47 | Cum GPA: 2.09 | 9.00 | 9.00 | | 13.20 |

** Indicates Retaken Course
R* Indicates Retaken Override

Unofficial Transcript

Case 3:19-cv-03674-WHA   Document 129-1   Filed 09/17/20   Page 48 of 56

# Brooks Institute
## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Student:** Theresa A Sweet
**Address:** [redacted]
**Student ID:** [redacted]
**HS:** [redacted]
**LDA:** [redacted]

## Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0407** | **Session 4 2004** | | 07/09/2004 | | 08/28/2004 |
| ADV311 | Commercial Photo 1 | 6.00 | 6.00 | C- | 10.20 |
| PSY285 | Psychology of Mass Commun | 3.00 | 3.00 | A- | 11.10 |
| Term GPA: 2.37 | Cum GPA: 2.12 | 9.00 | 9.00 | | 21.30 |
| **Term: 0409** | **Session 5 2004** | | 09/03/2004 | | 10/23/2004 |
| ACC281 | Accounting | 3.00 | 3.00 | A- | 11.10 |
| BUS282 | Basic Business | 3.00 | 3.00 | A | 12.00 |
| ECO281 | Economics | 3.00 | 3.00 | C+ | 6.90 |
| Term GPA: 3.33 | Cum GPA: 2.24 | 9.00 | 9.00 | | 30.00 |
| **Term: 0411** | **Session 6 2004** | | 10/29/2004 | | 12/18/2004 |
| IND314 | Photography as an Analyti | 6.00 | 6.00 | D | 6.00 |
| MRK284 | Marketing | 3.00 | 3.00 | A | 12.00 |
| Term GPA: 2.00 | Cum GPA: 2.22 | 9.00 | 9.00 | | 18.00 |
| **Term: 0501** | **Session 1 2005** | | 01/07/2005 | | 02/26/2005 |
| BUS480 | Business Law | 3.00 | 3.00 | B+ | 9.90 |
| MPV161 | Video Production | 6.00 | 6.00 | B | 18.00 |
| Term GPA: 3.10 | Cum GPA: 2.29 | 9.00 | 9.00 | | 27.90 |
| **Term: 0503** | **Session 2 2005** | | 03/04/2005 | | 04/23/2005 |
| ADT291 | Advanced Topics | 6.00 | 6.00 | D+ | 7.80 |
| SCI182 | Science | 3.00 | 3.00 | D+ | 3.90 |
| Term GPA: 1.30 | Cum GPA: 2.22 | 9.00 | 9.00 | | 11.70 |
| **Term: 0505** | **Session 3 2005** | | 05/06/2005 | | 06/25/2005 |
| ADV312 | Commercial Photo 2 | 6.00 | 0.00 | F | 0.00 |
| FIN382 | Finance | 3.00 | 3.00 | A- | 11.10 |
| Term GPA: 1.23 | Cum GPA: 2.15 | 9.00 | 3.00 | | 11.10 |
| **Term: 0507** | **Session 4 2005** | | 07/08/2005 | | 08/27/2005 |
| ENG390 | Writing for Publication | 3.00 | 3.00 | C | 6.00 |
| Term GPA: 2.00 | Cum GPA: 2.14 | 3.00 | 3.00 | | 6.00 |

** Indicates Retaken Course
R* Indicates Retaken Override

Date:   07/17/2009

Page 4 of 4

# Brooks Institute

## Unofficial Transcript

27 E. Cota Street
Santa Barbara, CA 93101
http://my.brooks.edu

**Student:** Theresa A Sweet

**Address:**

**Student ID:**

HS:

LDA:

### Grade History

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0509** | **Session 5 2005** | | **09/02/2005** | | **10/22/2005** |
| POR280 | Celebrity Portraiture | 6.00 | 6.00 | C | 12.00 |
| Term GPA: | 2.00 | Cum GPA: | 2.14 | | 12.00 |
| 6.00 | 6.00 | | | | |
| **Term: 0511** | **Session 6 2005** | | **10/28/2005** | | **12/17/2005** |
| DIM350 | Digital Illustration | 6.00 | 6.00 | D | 6.00 |
| Term GPA: | 1.00 | Cum GPA: | 2.09 | | 6.00 |
| 6.00 | 6.00 | | | | |
| **Term: 0601** | **Session 1 2006** | | **01/13/2006** | | **03/04/2006** |
| ADV290 | Art Director's Point of View | 6.00 | 6.00 | B- | 16.20 |
| Term GPA: | 1.00 | Cum GPA: | | | 16.20 |
| 6.00 | 6.00 | | | | |
| **Term: 0603** | **Session 2 2006** | | **03/10/2006** | | **04/29/2006** |
| ADT286 | Advanced Topics | 6.00 | 6.00 | A | 24.00 |
| HUM430 | History and Systems | 3.00 | 3.00 | B | 9.00 |
| SPE283 | Speech | 3.00 | 3.00 | B+ | 9.90 |
| Term GPA: | 2.70 | Cum GPA: | 2.11 | | |

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| **Term: 0605** | **Session 3 2006** | | **05/05/2006** | | **06/24/2006** |
| PEO411 | People Photography | 6.00 | 6.00 | D+ | 7.80 |
| Term GPA: | 1.30 | Cum GPA: | 2.19 | | 7.80 |
| 6.00 | 6.00 | | | | |

Professional Photography   GPA:  2.19   165.00   159.00

Degrees awarded for Professional Photography enrollment

| Degree | Date Awarded | Date Cleared |
|---|---|---|
| Bachelor of Arts | 06/24/2006 | 07/05/2006 |

*** End of Transcript ***

** Indicates Retaken Course
R* Indicates Retaken Override

Unofficial Transcript

# EXHIBIT B

## Fwd: Borrower defense discharge ineligibility information for you [ ref:_00Dt0Gyiq._500t0DPyIG:ref ]

**Theresa S.** ███████████████████████████████████                                  Wed, Jul 8, 2020 at 2:41 PM

██████████████████████████████

██████████

---------- Forwarded message ----------
From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Wed, Jul 8, 2020 at 10:18 AM
Subject: Borrower defense discharge ineligibility information for you [ ref:_00Dt0Gyiq._500t0DPyIG:ref ]
To: ████████████████████████████



7/8/2020

Borrower Defense Application #: ███████████

Dear Theresa Sweet:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Brooks Institute. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Brooks Institute. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Employment Prospects

You allege that Brooks Institute engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 2: Program Cost and Nature of Loans

You allege that Brooks Institute engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 3: Career Services

You allege that Brooks Institute engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

Allegation 4: Educational Services

You allege that Brooks Institute engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 5: Transferring Credits

You allege that Brooks Institute engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 6: Other

You allege that Brooks Institute engaged in misconduct related to Other. This allegation fails for the following reason(s): Failure to State a Legal Claim.

Your claim for relief on this basis therefore is denied.

## What evidence was considered in determining my application's ineligibility?

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

NY Attorney General's Office
PA Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

## What if I do not agree with this decision?

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [ ref:_ 00Dt0Gyiq._500t0DPyIG:ref ]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following

information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage

garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you

have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



830 First Street, NE, Washington, D.C. 20202
StudentAid.gov/borrower-defense

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.