1    JEFFREY BOSSERT CLARK
     Acting Assistant Attorney General
2    DAVID L. ANDERSON
     United States Attorney
3    MARCIA BERMAN
     Assistant Branch Director
4    KATHRYN C. DAVIS
     Senior Trial Counsel
5    R. CHARLIE MERRITT
     KEVIN P. HANCOCK
6    Trial Attorneys
7    U.S. Department of Justice
     Civil Division, Federal Programs Branch
8    1100 L Street, N.W.
     Washington, DC 20530
9    Telephone: (202) 616-8098
     E-mail: robert.c.merritt@usdoj.gov

10   *Attorneys for Defendants*

11

12                    **UNITED STATES DISTRICT COURT**
13              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15   THERESA SWEET, *et al.*,                    No. 3:19-cv-03674-WHA

16                        Plaintiffs,

17            v.                                  **DEFENDANTS' OPPOSITION TO**
                                                 **PLAINTIFFS' MOTION TO ENFORCE**
18   ELISABETH DEVOS, in her official capacity   **SETTLEMENT AGREEMENT**
     as Secretary of Education, and the UNITED
19   STATES DEPARTMENT OF EDUCATION              Date: October 22, 2020
                                                 Time: 8:00 a.m.
20                        Defendants.            Judge: Hon. William Alsup

21

22

23

24

25

26

27

28

## **Table of Contents**

Introduction ...................................................................................................................... 1

Background ...................................................................................................................... 3

I.      The Settlement Agreement ................................................................................ 3

II.      The Department's Evaluation of Borrower Defense Claims ............................ 5

III.      Plaintiffs' Post-Execution Concerns with the Agreement ............................... 6

Argument ......................................................................................................................... 7

I.      The Court Should Deny Plaintiffs' Motion to Enforce ..................................... 7

     A.      Plaintiffs Improperly Seek to Amend the Agreement Through Their
Motion to Enforce. ........................................................................................ 8

     B.      The Legal Sufficiency of the Department's Final Borrower Defense
Decisions is Beyond the Scope of This Case and Not Governed by the
Settlement Agreement. .................................................................................. 9

     C.      Plaintiffs Have Not Established a Breach of the Agreement. .............. 14

     D.      Plaintiffs' Allegations of Bad Faith Are Baseless. ............................. 18

     E.      Plaintiffs' Arguments Regarding Remedies Reveals the Impropriety of the
Relief They Seek. ........................................................................................ 21

II.      Final Approval of the Agreement As Written Is Appropriate, But In Light of the
Parties' Dispute Over Its Meaning, Defendants Propose, In the Alternative, that
the Court Defer a Decision on Final Approval and Allow Time For Further
Negotiations. ........................................................................................................ 22

Conclusion ..................................................................................................................... 24

# **Table of Authorities**

**CASES**

*Adams v. Johns-Manville Corp.*,
 876 F.2d 702 (9th Cir. 1989)..................................................................... 7

*Anselmo v. Cnty. of Shasta*,
 873 F. Supp. 2d 1247 (E.D. Cal. 2012) ................................................... 12

*Austin v. United States*,
 118 Fed. Cl. 776 (2014) ........................................................................... 18

*Burton v. City of Belle Glade*,
 178 F.3d 1175 (11th Cir. 1999).............................................................. 13

*Butte Cnty. v. Hogen*,
 613 F.3d 190 (D.C. Cir. 2010) ................................................................ 12

*Churchill Vill., LLC v. Gen. Electric*,
 361 F.3d 566 (9th Cir. 2004)................................................................... 22

*Cuviello v. City of Oakland*,
 No. C-06-5517 MHP (EMC), 2009 WL 734676 (N.D. Cal. Mar. 19, 2009)............................ 13

*Daskalea v. Wash. Humane Soc'y*,
 275 F.R.D. 346 (D.D.C. 2011) ................................................................ 12

*Freeman v. Kern Cnty.*,
 No. 1:07-CV-00219 TAG, 2008 WL 4003978 (E.D. Cal. Aug. 27, 2008)...................... 20-21

*Galen Medical Assocs., Inc. v. United States*,
 369 F.3d 1324 (Fed. Cir. 2004) ............................................................... 18

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank*,
 671 F.3d 1027 (9th Cir. 2012).................................................................. 14

*In re Anthem, Inc. Data Breach Litig.*,
 327 F.R.D. 299 (N.D. Cal. 2018) ............................................................. 22

*In re Linkedin User Privacy Litig.*,
 309 F.R.D. 573 (N.D. Cal. 2015) ............................................................. 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
 229 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................... 22

*Jeff D. v. Andrus*,
  899 F.2d 753 (9th Cir. 1989) ...................................................................... 9, 22

*Klamath Water Users Protective Ass'n v. Patterson*,
  204 F.3d 1206 (9th Cir. 1999) .................................................................. 14, 15

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ....................................................................................... 12

*McCollum v. XCare.net, Inc.*,
  212 F. Supp. 2d 1142 (N.D. Cal. 2002) ......................................................... 20

*McCrary v. Gutierrez*,
  495 F. Supp. 2d 1038 (N.D. Cal. 2007) ......................................................... 18

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*,
  384 F.3d 721 (9th Cir. 2004) ..................................................................... 21-22

*N. Side Lumber Co. v. Block*,
  753 F.2d 1482 (9th Cir. 1985) ........................................................................ 14

*NLRB v. USPS*,
  486 F.3d 683 (10th Cir. 2007) ........................................................................ 13

*Optima Tax Relief, LLC v. Channel Clarity, Inc.*,
  No. SACV-141902-JLS (JCGx), 2016 WL 6821108 (C.D. Cal. Jan. 21, 2016) ..................... 23

*Orlando v. Carolina Cas. Ins. Co.*,
  No. CIV F 07-0092 AWI SMS, 2007 WL 2155708 (E.D. Cal. July 26, 2007) ......................... 7

*Reid v. I.C. Sys. Inc.*,
  No. CV-12-02661-PHX-ROS, 2015 WL 12979110 (D. Ariz. Aug. 27, 2015) ......................... 7

*Runolini Leathers Ltd. v. Mikhaeil*,
  No. C 00-3499 WHA, 2001 WL 1352887 (N.D. Cal. Oct. 23, 2001) ......................... 7

*Spann v. J.C. Penney Corp.*,
  314 F.R.D. 312 (C.D. Cal. 2016) ...................................................................... 22

*Troy Corp. v. Browner*,
  120 F.3d 277 (D.C. Cir. 1997) ........................................................................ 12

*Tyler v. Cuomo*,
  236 F.3d 1124 (9th Cir. 2000) ........................................................................ 14

*U.S. Bank v. Miller,*
  Case No. CV 12-5632 MMM (MANx), 2013 WL 12183652 (C.D. Cal. May 8, 2013) .......... 20

*U.S. for Use & Benefit of Helix Elec., Inc. v. KISAQ RQ 8A 2JV,*
  Case No. 15cv1024-WQH-KSC, 2017 WL 1321454 (S.D. Cal. Apr. 10, 2017)..................... 17

**STATUTES**

5 U.S.C. § 555................................................................................................................ 12

**REGULATIONS**

34 C.F.R. § 685.222........................................................................................................ 16, 17

**RULES**

Fed. R. Civ. P. 65........................................................................................................... 13

**Introduction**

In this class action, Plaintiffs assert a single claim under Section 706(1) of the Administrative Procedure Act ("APA"), alleging that the U.S. Department of Education ("Department") unlawfully withheld or unreasonably delayed issuing final decisions on borrower defense claims during a period of time that ultimately lasted approximately 18 months between June 2018 and December 2019. They seek a "simple" order compelling the Department to "start granting or denying their borrower defenses." Compl. ¶ 10, ECF No. 1; *see also* Compl., Prayer for Relief (requesting that the Court compel the Department to "grant class members' individual borrower defense assertions if they are eligible for a borrower defense," "deny class members' individual borrower defense assertions if they are not eligible for a borrower defense," and to "notify class members of their borrower defense decisions"). Plaintiffs have made clear from the start that they do "not ask the [C]ourt to opine on the substance or process for adjudicating their individual borrower defenses." Pls.' Reply in Supp. of Mot. for Class Certification ("Pls.' Class Cert. Reply") at 5, ECF No. 42. Rather, they have invoked the metaphor of a "halt[ed]" "conveyor belt," and seek relief that would simply "re-start the machinery and push each Student's application forward," regardless of the ultimate outcome of any individual application. *Id.* (citation omitted).

After briefing the merits of the case and two months of arms-length negotiations, the parties determined to enter into a settlement agreement to resolve the case without the expense and uncertainty of further litigation. The core of the settlement, reflecting the fundamental nature of the case, is the Department's commitment to issue final borrower defense decisions on the applications of class members according to a specified timeline (18 months from the agreement's effective date, following this Court's final approval, with an additional three-month period at the end for the Department to effectuate all appropriate relief). Other than requiring that the Department issue class members written decisions resolving their borrower defense claims, the agreement does not dictate the substantive outcomes of the Department's decisions or the level of analysis they must contain. Plaintiffs "brought this case to ensure that the Department provides Class Members with timely decisions on their borrower defenses." Joint Mot. for Prelim. Approval of Settlement ("Prelim. Approval Mot.") at 9, ECF No. 97. The Agreement does just that, while

reserving the ability of class members to challenge the substance of their final borrower defense decisions—an issue that was always beyond the scope of this lawsuit—as needed through the administrative process or in future litigation.

Now, having signed off on this settlement agreement, Plaintiffs wish that it contained more. And instead of attempting to renegotiate the deal or arguing against its final approval based on that belief, they attempt to unilaterally revise its terms and have the Court finally approve and enforce against Defendants a different agreement than the one the parties executed.  Dissatisfied with the Department's analysis in its decisions denying certain class member claims, Plaintiffs seek to expand their lawsuit and the settlement agreement and have the Court require that the Department issue written decisions that contain some unspecified level of detail.  But the parties' actual agreement never specified the content or substance of the Department's borrower defense decisions, and the Court need not, on a class-wide basis, decide the merits of Plaintiffs' collateral attack on the legal sufficiency of these decisions in order to deny Plaintiffs' motion to enforce the settlement.  Instead, it can resort to general contract principles and the four corners of the document to discern that the agreement does not govern the substance or content of borrower defense decisions, and that Defendants are not in breach of the agreement when they are issuing timely written decisions.  Indeed, the settlement agreement itself expressly permits Plaintiffs to challenge the legal sufficiency of their borrower defense decisions in a different lawsuit (and recognizes their ability to seek reconsideration under the relevant regulations).  In any event, the legal sufficiency of borrower defense decisions could not be appropriately determined on a class-wide basis in this litigation.  The Court should therefore deny Plaintiffs' motion to enforce regardless of whether it grants final approval to the agreement.

Defendants believe that the agreement is a fair and adequate resolution of Plaintiffs' claim and that final approval of the agreement as written—according to its clear and unambiguous terms requiring only that written decisions be issued pursuant to specified timelines—is therefore appropriate.  In contrast, Plaintiffs' motion to enforce, if granted, would hold the Department to a revised settlement to which it did not agree and for which it would not have bargained.  The Department's agreement to issue in excess of 160,000 final decisions on an expedited 18-month

timeline did not contemplate the kind of detailed, fully individualized decisions that Plaintiffs apparently now demand.  Had the Department agreed to such a contract term, it would have also needed to bargain for far in excess of just 18 months to issue all 160,000 final decisions.  In light of the parties' disagreement about Defendants' obligations under their agreement, if the Court is not inclined to grant final approval to the agreement as written at this time, Defendants believe that it would be appropriate for the parties to resume their negotiations to determine whether they can come to a mutually acceptable resolution of an issue—specifically, what information borrowers are given about the final decisions on their claims—that is not encompassed in their agreement (or within the scope of this litigation).

**Background**

### I.    The Settlement Agreement

The parties executed their settlement agreement on April 7, 2020.  Primarily, it requires the Department to issue final decisions on the borrower defense applications of class members whose applications were pending as of that date (the execution date) by a date certain, 18 months following the Court's final approval and the agreement's ultimate effective date.  Proposed Settlement Agreement ("Agreement") § IV.A.1, ECF No. 97-2.  Likewise, the Agreement requires the Department to effectuate all appropriate relief within 21 months of the effective date for class members whose claims it approves.  *Id*. § IV.A.2.

The Agreement defines a "final decision" simply as a "decision by Defendants resolving a borrower defense application, including a determination of how much relief the claimant is entitled to, if any."  *Id*. § IV.A.1.i; *see also id*. §§ IV.A.1.i; II.V (setting forth alternative scenario in which a "Step 1" determination would constitute a final decision and defining that term as "the Department's decision whether a Class Member's borrower defense application is eligible for relief, *i.e.*, granted or denied, without regard to the amount or type of relief that will be issued").  The Agreement does not dictate the substantive outcome of any borrower defense decision or the process the Department must utilize to make and issue its decisions, and leaves each class member free to challenge the substance of the borrower defense decision that she ultimately receives.  *See id*. § VII (waiver and release provision).  As the parties explained in jointly moving for preliminary

approval, the "expeditious relief" provided for in the Agreement, in the form of timely borrower defense decisions, is a "superior outcome" in a "case that is fundamentally about avoiding delay." Prelim. Approval Mot. at 10.

Additionally, the Agreement imposes certain reporting requirements to enable Plaintiffs to monitor the Department's progress in fulfilling its settlement obligations. Agreement § IV.B.  It also reiterates the Department's commitment to follow certain regulations and policies by issuing written decisions to borrowers resolving their applications, refraining from taking action to collect outstanding student loan debt through involuntary collection activity, and providing an interest credit for the pendency of a borrower defense application. *Id.* § IV.C.  Finally, the Agreement provides for the Court's retention of limited jurisdiction to enforce the Agreement only in the case of material breaches that are specifically defined in the Agreement—failure to issue final decisions or to effectuate relief according to the specified 18 and 21 month timelines, failure to abide by the reporting requirements, or the Department or its agents engaging in involuntary collection activity—and to order only such relief as is specified in the Agreement.  *See id.* § V.  The Agreement expressly provides that the Court (1) "shall lack . . . authority to issue any other relief" under the Agreement; (2) "relinquishes jurisdiction over all claims, causes of actions, motions, suits, allegations, and other requests for relief in this Action that are not expressly stated" in the Agreement's section on enforcement; and (3) "shall have no jurisdiction to supervise, monitor, or issue orders in this Action," except to the extent Plaintiffs follow the procedures set forth in the Agreement for invoking the Court's limited jurisdiction.  *Id.* §§ V.A; V.E; V.F.

The Court preliminarily approved the proposed settlement agreement on May 22, 2020, finding it adequate because it "sets a timeline to resolve pending claims," "provides for effective enforcement," and "does not compromise the *substance* of class members' borrower defense claims." Order Granting Prelim. Settlement Approval at 2-3 ("Prelim. Approval Order"), ECF No. 103 (emphasis in original).  On May 29, the Court entered a further order directing class notice and setting final settlement approval deadlines.  Order Directing Class Notice & Setting Final Settlement Approval Deadlines, ECF No. 105.  The Court-approved notice informs class members that the instant lawsuit "is ONLY about the fact that final decisions were not issued [between June

1    2018 and December 2019], NOT whether those applications should result in loan cancellation or

2    not." Class Notice (Ex. A to Agreement), ECF No. 97-2 at 27.

3    **II.     The Department's Evaluation of Borrower Defense Applications**

4           The Department is, and has long been, committed to working through the large backlog of

5    borrower defense applications that precipitated this lawsuit. As Defendants recently explained,

6    that means that the Department has been steadily issuing final borrower defense decisions for

7    almost 10 months now, since December 2019, notwithstanding that the timelines set forth in the

8    Agreement have not yet begun to run. *See generally* Defs.' Resp. to Aug. 31, 2020 Order, ECF

9    No. 116. Since December 2019, the Department has issued decisions on more than 131,000

10   borrower defense applications. *Id*. at 1.

11          This uptick in claims adjudication has long been expected, *see, e.g.*, Defs.' Mot. for Summ.

12   J. at 2 (Dec. 5, 2019), ECF No. 63 (anticipating that once the Department had in place a

13   comprehensive methodology for awarding relief to successful borrower defense applicants, it

14   would be able to "systematically adjudicate pending claims"), and is due, in large part, to recent

15   increases to the staffing of the Borrower Defense Unit ("BDU"), which has primary responsibility

16   for resolving borrower defense applications. *See* Decl. of Mark A. Brown ("Brown Decl.") ¶ 6,

17   attached hereto as Exhibit A (explaining that, since September 2019, the BDU has hired 52 new

18   attorneys "to reduce the backlog of pending borrower defense applications"). For the last several

19   months, the Department has been prioritizing efficiently reducing the pending backlog of borrower

20   defense applications. This has meant, to a large extent, focusing on claims that can be denied

21   based on a lack of relevant evidence. *Id*. ¶ 9. This includes applications that fail to even allege

22   that the applicant was subject to actionable misconduct, *see id*. ¶ 10 (providing the example of a

23   borrower who alleges that she could not find a job after graduation, but does not allege that the

24   school she attended made any misrepresentation to her), and applications that are not supported by

25   sufficient evidence to establish a borrower defense under the relevant regulations, *id*. ¶ 11.

26          Applications can be found ineligible on either basis, even where a borrower attends a

27   school for which the Department has in its possession "common evidence" of misconduct, such as

28   findings and investigations from federal agencies and state attorneys general. *See id*. ¶¶ 13-15.

The Department has reviewed this common evidence for several schools and determined, in general, the particular acts or omissions and time-periods it covers. *Id*. ¶ 16. Where the applications of borrowers who attended those schools demonstrate that they are not covered by this common evidence, and the borrowers do not submit sufficient evidence of wrongdoing on their own to sustain a claim, such borrowers are ineligible for relief under the relevant regulations. *Id*. ¶¶ 13-16. In general, "the Department's evaluation of, and decision on, any given borrower defense application is an individual process that necessarily depends on the information submitted by the borrower." *Id*. ¶ 14.

III.    **Plaintiffs' Post-Execution Concerns with the Agreement**

Between January and April 2020, as the Department was issuing these decisions (many of them denials, *see* Defs.' Resp. to Aug. 31 Order at 1), the parties negotiated and executed a settlement agreement and jointly moved for preliminary approval. But as the date for final approval drew closer, Plaintiffs started having second thoughts about the deal the parties had reached. Specifically, they took issue with the substance of certain of Defendants' borrower defense decisions, even as they were issued consistent with (and, so far, in advance of) the Agreement's timelines. According to Plaintiffs, some number of the Department's borrower defense decisions provide insufficient reasoning for denying the relevant application under the APA. *E.g.*, Pls.' Mot. for a Case Management Conference ¶ 6, ECF No. 108. Plaintiffs apparently do not object to the Department's decisions approving class members' claims. *See* Defs.' Resp. to Aug. 31 Order at 1 (stating that the Department has approved approximately 13,500 borrower defense applications since December 2019). As Defendants explained at the time, the merits of borrower defense decisions are "not at issue in this action," *see* Aug. 10, 2020 Letter from Kathryn C. Davis to Eileen Connor at 3 (Ex. B to Decl. of Eileen Connor), ECF No. 108-2 at 10.

Nonetheless, Plaintiffs eventually decided to move to enforce the settlement agreement and, at the same time and despite the parties' lingering disagreement over what the proposed agreement requires, for final approval of the Agreement. Pls.' Mot. to Enforce the Settlement Agreement & For Final Approval of the Settlement Agreement ("Pls.' Mot."), ECF No. 129. Although Plaintiffs argue that Defendants are in breach of the Agreement and ask the Court to

enforce it, their motion does not identify either (1) any provision of the Agreement that Defendants have violated, or (2) what action Plaintiffs request that the Court order Defendants to take. Plaintiffs claim that some of the Department's decisions denying borrower defense applications are invalid under the APA, but they do not specify what they think the denial notices should say or request that the Court require some level of detail beyond what Defendants are currently providing.   Rather, Plaintiffs simply ask the Court to finally approve, and then enforce, the Agreement as written.

**Argument**

**I.     The Court Should Deny Plaintiffs' Motion to Enforce.**

A motion to enforce a settlement agreement "essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989).  A district court's authority to enforce a settlement agreement in a case presently pending before it is limited to "complete settlement agreements."  *E.g.*, *Runolini Leathers Ltd. v. Mikhaeil*, No. C 00-3499 WHA, 2001 WL 1352887, at *2 (N.D. Cal. Oct. 23, 2001) (citation omitted).   Here, the parties' substantive obligations under the Agreement are expressly conditioned on the Court granting final approval.  *See* Agreement §§ XIII.A (Agreement void absent final approval as written); II.M (defining final approval as a condition precedent to the Agreement's "effective date").   Thus, in the absence of an order finally approving the Agreement, Plaintiffs lack the authority to enforce the parties' proposed settlement.  *See, e.g.*, *Reid v. I.C. Sys. Inc.*, No. CV-12-02661-PHX-ROS, 2015 WL 12979110, at *1 (D. Ariz. Aug. 27, 2015) ("[P]arties are free to agree that a contract will not be binding unless it is approved by a court."); *Orlando v. Carolina Cas. Ins. Co.*, No. CIV F 07-0092 AWI SMS, 2007 WL 2155708, at *5 (E.D. Cal. July 26, 2007) ("Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. . . . Generally, if a condition precedent 'is not fulfilled, the right to enforce the contract does not evolve.'" (citations omitted)).   Defendants address the issue of final approval below, *see infra* § II, but even assuming the Court grants final approval of the Agreement, it should still deny Plaintiffs' motion to enforce.

**A.     Plaintiffs Improperly Seek to Amend the Agreement Through Their Motion to Enforce.**

Plaintiffs—having brought a case based solely on the Department's delay in issuing final decisions and executing a settlement addressed solely to ending that delay and ensuring timely decisions—now object to the decisions some class members have received and appear to want the Department to spend more time explaining its reasoning before issuing final decisions.  Through the guise of a motion to "enforce" the Agreement, Plaintiffs seek to impose new substantive obligations regulating the content of the Department's final decisions to some, but not all, class members (specifically, those whose claims the Department has denied but who attended schools "where there was evidence of misconduct," Pls.' Mot. at 17).  They attempt to do this by asserting that Defendants are in "breach" of the Agreement because, in some cases, the form denial notices Defendants have used to communicate their written denial decisions to class members allegedly "do not comply with the law."  Pls.' Mot. 8.  But as explained further below, Defendants' denial notices do not violate the Agreement (and Plaintiffs barely even attempt to argue otherwise), and Plaintiffs' challenge to the legal sufficiency of those denial notices (which Defendants dispute) is an issue that is beyond the scope of this case, not appropriate for resolution on a class-wide basis in this forum, and, most importantly, not a basis to assert that Defendants have breached the terms of the parties' written settlement.  *See infra* §§ I.B-I.C

For present purposes, the point is simply that the Court cannot "enforce" Plaintiffs' understanding of the Agreement without revising or modifying its terms.  As written, the Agreement merely requires the Department to issue written final decisions on borrower defense applications, notify borrowers of those decisions, and effectuate any appropriate relief according to specific timelines.  Nothing in the record shows, or even suggests, that the Department is failing to meet any of these obligations—the Agreement's timeframe for deciding claims has not yet even begun to run and even Plaintiffs' submissions make clear that the Department is issuing final written decisions to class members resolving their borrower defense claims.  Thus, in order to find that Defendants were in breach and to "enforce" the Agreement according to Plaintiffs' interpretation, the Court would have to read some further term into the Agreement regarding the substance and content of the Department's final borrower defense decisions.

Plaintiffs, tellingly, do not offer the Court any guidance on what requirement they seek to hold the Department to, or what they think the denial notices should say.  *See, e.g.*, Proposed Order, ECF No. 129-2 (specifying only that the motion to enforce be granted).  This omission illustrates that the Agreement itself provides no basis for the relief Plaintiffs seek.  Had Plaintiffs articulated a requirement for the Court to enforce against Defendants, the source of that requirement would necessarily exist outside of the four corners of the Agreement, making explicit that Plaintiffs are in fact asking this Court not to enforce the Agreement, but to improperly modify the Agreement while granting final approval.  *See Jeff D. v. Andrus*, 899 F.2d 753, 758-59 (9th Cir. 1989) (explaining that Rule 23 "does not permit [a court] to modify the terms of a negotiated settlement"); Agreement § XV.B (providing that, following preliminary approval, the Agreement can only be modified "with the written agreement of all the Parties and with the approval of the Court, upon such notice to the Class, if any, as the Court may require").  The Court should reject Plaintiffs' attempt to amend the Agreement under the guise of a motion to enforce a not-yet-final settlement.

**B.      The Legal Sufficiency of the Department's Final Borrower Defense Decisions is Beyond the Scope of This Case and Not Governed by the Settlement Agreement.**

As detailed above, Plaintiffs brought this case to compel the Department to issue final borrower defense decisions, not to dictate the outcomes of those decisions in individual cases.  It was in recognition of this fact—that Plaintiffs do not challenge "the outcome of each application," but "simply seek to restart the decision-making process to obtain *a* decision"—that the Court certified this case as a class action.  Order Granting Mot. for Class Certification ("Class Certification Order") at 12, ECF No. 46.  And it is why the core of the Agreement between the parties is its "timeline to resolve pending claims."  Prelim. Approval Order at 2.  The Agreement simply requires that the Department issue "final decisions" to borrowers within 18 months of the effective date and effectuate all appropriate relief within 21 months of that date.  Although the term "final decision" is defined in the Agreement, that definition does not contain the requirements that Plaintiffs now ask this Court to add to the Agreement.  Rather, a "final decision" is simply "a decision by Defendants resolving a borrower defense application, including a determination of how much relief the claimant is entitled to, if any."  Agreement § IV.A.1.i.  The focus, of course,

is on the fact *that* such decisions be issued and *when*, not on *what* the decisions must say.  So long as Defendants provide class members with written notice "resolving" their applications—and most importantly, do so within the timeframes specified in the Agreement—Defendants comply with the Agreement.  *Id*.  Had the agreement also required Defendants to produce written decisions that meet Plaintiffs' unstated demands for detail and individualization, Defendants would have bargained for the lengthier timelines required to meet those demands.

Other provisions of the Agreement reinforce the understanding that the timing—not the content—of final decisions is the essence of the settlement.  Plaintiffs seek to circumvent it here, but the Agreement establishes a comprehensive and exclusive enforcement procedure, defining only four claims as permissible to enforce the agreement and providing for the Court to retain jurisdiction only to enforce those four specific claims.  Consistent with the nature of the case and Defendants' obligations under the Agreement, those claims are: (1) failure to issue a final decision to any settlement class member by the "decision due date," 18 months after the Agreement becomes effective; (2) failure to effectuate appropriate relief for any settlement class member by the "relief due date," 21 months after the Agreement becomes effective; (3) failure to submit a timely report on progress adjudicating borrower defense claims, as set forth in the Agreement; and (4) taking action to collect a class member's debt through involuntary collection activities while that class member's borrower defense application is pending.  Agreement § V.B.  As they relate to borrower defense decisions, then, permissible claims are limited to Defendants' failure to provide written decisions according to the timelines specified in the Agreement.  Such claims, by definition, can accrue only after the "decision due date" and "relief due date" 18 and 21 months after the Court's approval of the Agreement, *id*., and, by their terms, do not extend to challenges to the substance or content of any particular decision.

The Agreement does not allow a class member to bring a claim for breach or seek a judicial remedy, in this lawsuit based on this Agreement, if they think that their claim should have been approved or think the Department should have provided a more fulsome explanation.  *See also* Pls.' Class Cert. Reply at 5 (emphasizing that Plaintiffs' complaint "does not ask the [C]ourt to opine on the substance or process for adjudicating their individual borrower defenses").  Indeed,

the Agreement expressly allows any class member to challenge any aspect of their ultimate borrower defense decision in a different lawsuit, in recognition of the fact that any such dispute would be beyond the scope of the claims asserted in this lawsuit.[1]  *See* Prelim. Approval Order at 3 (noting that the agreement "does not compromise the *substance* of class members' borrower defense claims and they retain the right to sue over the Department's final disposition").  And, as the written decisions advise class members, borrowers may directly seek reconsideration from the Department of their borrower defense decision.  *See, e.g.*, Exs. A-D, Defs. Resp. to Aug. 31 Order.

Not surprisingly, then, Plaintiffs barely attempt to argue that the conduct about which they now complain—the substance of the Department's decision letters denying certain class member claims—violates the Agreement itself.  Rather, they spend the bulk of their motion litigating a collateral attack against the Department's final disposition of class member claims under the APA and the Due Process Clause.  But this is not the forum for litigating that dispute.  For one, it would mark an impermissible extension of the subject matter of this case and what the parties agreed to in the settlement, as further set forth below.  *See infra* § I.C.  And second, given the class that has been certified in this case, that dispute is not appropriate for resolution on a class basis.  The record is clear that the Department is approving the claims of some class members, and Plaintiffs apparently do not dispute that at least some of the Department's form denial notices are appropriate in at least some circumstances.  *See* Pls.' Mot. at 18 (indicating that form denial notices for "only

---

[1] The specific language of the waiver is that class members waive and release any claims "alleged in this Action against Defendants through and including the Effective Date," and that the waiver is not intended to release any claim based on "an act or omission or other conduct occurring after the Effective Date, including but not limited to claims by Class Members based on the substance of their borrower defense decisions."  Agreement § VII.  Plaintiffs now contend that this may prevent class members from filing a suit challenging the substance of their borrower defense decisions, *see* Pls.' Mot. at 22, but that concern is overwrought.  While any future *res judicata* determination will be for the reviewing court in any future lawsuit to make, Plaintiffs only agree to waive claims "alleged in this Action," which of course is limited to a claim of delay under Section 706(1) of the APA, and does not extend to the merits of any final borrower defense decisions.  In spelling out that class members would not be barred from asserting a challenge to their decision after the effective date, the Agreement does not suggest that borrowers would be barred from asserting such a claim if they got their decision before the effective date, so long as that claim is not based on the delay challenged in this lawsuit (*i.e.*, from June 2018 through December 2019).

bare-bones applications that presented 'scant evidence'" are not cause for concern and recognizing that notices denying some such claims "are explanatory" (citation omitted)).  Again, the legal issue that the Court determined made this case suitable for resolution on a class basis was the Department's alleged common delay with respect to all class members, not the legal sufficiency of the Department's "specific ruling for each application, which would indeed require an individualized inquiry."  Class Certification Order at 12.

Plaintiffs are free to bring in a separate case their claims that certain of the denial notices they have received are allegedly legally insufficient.  The Department is acting in good faith to comply with applicable legal requirements and will address the specifics of any proper legal challenge to its final decisions if those cases arise.  The important point, however, is that the record here shows that the Department is generally complying with the letter of the APA in providing notice of denial "accompanied by a brief statement of the grounds for denial."  5 U.S.C. § 555(e). Whether any particular "brief statement" satisfies this "minimal" burden of explanation, *see Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), is appropriately decided in individual cases, based on a court's review of the relevant administrative record—not on a class-wide basis and in the context of a motion to enforce a settlement agreement that does not specify the content of the Department's final borrower defense decisions.  *See, e.g.*, *Troy Corp. v. Browner*, 120 F.3d 277, 284 (D.C. Cir. 1997) ("[T]he question of sufficiency of an agency's stated reasons under the arbitrary and capricious review of the APA is fact-specific and record-specific."); *cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 891 (1990) (APA requires a plaintiff to "identify some 'agency action' that affects him in the specified fashion," and it does not permit a plaintiff to "seek *wholesale* improvement of [a federal program] by court decree, rather than in the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made").[2]

---

[2] The same is true with respect to Plaintiffs' asserted "[d]eficiencies [u]nder Due Process."  *See* Pls.' Mot. at 12-14.  Even if Plaintiffs were able to establish that they have a property interest in "the right to be free of collection while they contest their debt," *id*. at 13, they cannot conclusively establish a due process violation with respect to the whole class in these proceedings because the level of notice necessary to comport with due process entails a case-by-case analysis.  *See, e.g.*, *Anselmo v. Cnty. of Shasta*, 873 F. Supp. 2d 1247, 1255 (E.D. Cal. 2012) (Due Process Clause "guarantees only 'due process,'" and the "[d]etermination of what process is due is a fact-specific inquiry" (citation omitted)); *Daskalea v. Wash. Humane Soc'y,*. 275 F.R.D. 346, 362 (D.D.C.

Ultimately, Plaintiffs' motion boils down to a request that the Court enter an order requiring that the Department's written decisions to borrowers follow the law. *See, e.g.*, Pls.' Mot. at 1 (requesting that Court order Defendants to "comply with the Agreement and issue lawful Notices to the class"); *id*. at 9 (contending that signing the Agreement obligated Defendants to "follow the law"). Of course, the Department is expected to (and contends that it does) follow applicable statutory and regulatory requirements in issuing final borrower defense decisions, as is the case when it takes any final agency action. But the Agreement does not include any requirement that all of the Department's decisions ultimately be upheld in any legal challenge to their sufficiency. Any order "enforcing" such a purported requirement would not only exceed the four corners of the parties' Agreement—it would be the type of "obey the law" injunction that is generally prohibited by Federal Rule of Civil Procedure 65. *See, e.g.*, *Cuviello v. City of Oakland*, No. C-06-5517 MHP (EMC), 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (holding that injunctions requiring lawful arrests and barring interference with free speech "are 'obey the law' injunctions and thus not enforceable"); *see also NLRB v. USPS*, 486 F.3d 683, 691 (10th Cir. 2007) ("Injunctions that broadly order the enjoined party simply to obey the law and not violate the statute are generally impermissible."); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999) (similar); Defs.' Opp'n to Pls.' Mot. for Class Certification at 20-21, ECF No. 38.

As the Court has already recognized, adjudicating the legal sufficiency of the Department's borrower defense decisions in individual cases, is "not what [it] signed up for," Tr. of Aug. 31, 2020 Case Management Conference at 16: 21-22 (Ex. 1 to Decl. of Eileen M. Connor), ECF No. 129-1 at 12, and whether any final decision issued by the Department is ultimately legally sufficient is a "matter up to the reviewing district judge" with "statutory venue" to hear a borrower's challenge to the substance of her borrower defense decision, Request Re Settlement, ECF No. 134—challenges that the Agreement expressly allows class members to bring. Pursuant to Court orders, the parties have notified the class of their proposed settlement agreement, *see, e.g.*, Decl. of Janis Brown ¶¶ 8-9, ECF No. 136-1, and thus the class is on notice that they may

---

2011) ("[T]he Due Process Clause is fact-specific and only 'calls for such procedural protections as the particular situation demands.'" (citation omitted)).

bring such challenges if the Agreement is approved.[3]   The resolution of the APA and due process claims Plaintiffs preview here, then, will be for a different day and a different court.   The legal sufficiency of the Department's notices according to either source of law is not an issue that was challenged in this lawsuit or certified for class resolution by the Court.   Accordingly, the Agreement does not require the Department to issue decisions that will survive all legal challenges brought by class members, and it does not specify a breach if any such decision is ultimately found to be legally deficient.   The Court need not resolve the merits of Plaintiffs' legal challenges to the sufficiency of the Department's denial notices in order to deny Plaintiffs' motion to enforce.

### C.   Plaintiffs Have Not Established a Breach of the Agreement.

As an initial matter, Plaintiffs are not correct that the Agreement in this case, involving a federal government agency and the resolution of federal APA claims, is governed by state law. *See* Pls.' Mot. at 4.   Instead, "[f]ederal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party."   *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999); *see also N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1484 (9th Cir. 1985) (contract claim "arises under federal law because federal common law of contracts applies to contracts with the federal government"); *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank*, 671 F.3d 1027, 1032 (9th Cir. 2012) (noting that state law may only apply to federal contracts in "limited circumstances, 'such as when the United States is not a party, or when the direct interests and obligations of the government are not in question'" (citation omitted)).   Ultimately, the choice of law makes little practical difference, as courts applying federal common law in this context "look to general principles for interpreting contracts." *Klamath Water Users*, 204 F.3d at 1210.   "[T]he determination of whether contract language is ambiguous is a question of law."   *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000) (citation

---

[3] For this reason, there is little to Plaintiffs' assertion that the Department's denial notices "do not provide any information for class members about their ability to challenge the decision in District Court."   Pls.' Mot. at 14.   Plaintiffs point to no case finding a due process violation on this basis, and there is no dispute that final borrower defense decisions are subject to judicial review under the APA.   The Department was under no obligation—under its regulations or otherwise—to notify Plaintiffs of that fact, about which they are now on notice through these settlement proceedings anyway.

omitted).  "Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself."  *Klamath Water Users*, 204 F.3d at 1210.

Here, Defendants' adjudication of class member borrower defense applications is compliant with the clear and unambiguous terms of the Agreement, which do not dictate either the substantive outcomes of borrower defense applications or the contents of the Department's written final decisions resolving such applications.  Plaintiffs' central contention is that the form notices Defendants are using to communicate final decisions to borrowers are deficient under the APA and the Due Process Clause.  But even if that were true (a point Defendants do not concede), the existence of such deficiencies would not mean, as Plaintiffs contend, that the denial notices "[a]re [n]ot [c]ompliant [w]ith [t]he Settlement Agreement."  Pls.' Mot. at 9.  Indeed, Plaintiffs do not even argue that the denial notices violate the Agreement itself, as opposed to ancillary provisions of law not addressed in either Plaintiffs' complaint or the Agreement.  *Id.* (conceding that the Agreement mentions only the Department's regulations "which . . . are written against a backdrop of the [APA] and Due Process.").  As explained above, the Agreement does not address those provisions of law or require that the Department issue final decisions that are deemed legally sufficient by courts in any and all later challenges class members may bring to their substantive decisions.

The closest Plaintiffs come to alleging a breach of the actual Agreement is by referencing Defendants' "assurance" that, in "accordance with applicable statutory and regulatory requirements," they will "issue written decisions resolving borrower defense applications and communicate those decisions to borrower defense applicants, as required by the Department's 2016 Borrower Defense Regulations."  Agreement § IV.C.1.  But the record makes clear that, even in the cherry-picked cases that Plaintiffs have brought to the Court's attention (which represent a minute sampling of the total number of decisions the Department has issued), the Department is, in fact "issu[ing] written decisions resolving borrower defense applications" and "communicat[ing] those decisions to borrower defense applicants," as required by the Agreement. *Id.*  And as required by the letter of the Department's regulations, each of the standard form denial

notices communicates to the borrower the "reasons for the denial"; "the evidence that was relied upon"; "any portion of the loan that is due and payable"; that "if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application"; and that the borrower has "the opportunity to request reconsideration." *Compare* 34 C.F.R. § 685.222(e)(4)(ii), *with* Exs. A–D, Defs. Resp. to Aug. 31 Order.

Plaintiffs in particular complain that certain denial notices merely state that the borrower supplied "insufficient evidence," and argue that such explanation does not meet the regulations' requirements. *See* Pls.' Mot. at 11 (discussing Yvette Colon's denial letter). But while the denial letter states the reason for certain allegations of misconduct failing simply as "insufficient evidence," there is a separate section in the Department's form denial notice that provides more information about the evidence relied upon. Ms. Colon's letter, for example, states the following, under the heading "What evidence was considered in determining my application's ineligibility?": "We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources: NY Attorney General's Office[,] PA Attorney General's Office[,] [e]vidence obtained by the Department in conjunction with its regular oversight activities[,] [p]ublicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)[, and] Multi-state Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)."[4]  ECF No. 108-16 at 185. That may not be as detailed as Plaintiffs would like, but it does show that evidence was actually reviewed and generally explains "the evidence that was relied upon."   34 C.F.R. § 685.222(e)(4)(ii).

Plaintiffs also incorrectly claim that the Department's notices do not comply with the regulatory requirement that they "inform[] the borrower of the opportunity to request

---

[4]  As explained in the Brown Declaration, the Department reviewed Ms. Colon's file and determined that, because she has already received a 100% discharge of her relevant loan debt, her application should have been closed and she should not have received the denial notice.  Brown Decl. ¶ 23.  The notice is still illustrative, however, of the manner in which the Department's denial notices notify borrowers of the evidence that was relied upon in deciding their application. *See also, e.g.*, ECF No. 108-9 at 38-39 (decision letter to class member Ernst Mutchnick, providing similar statement of the Department's review of relevant evidence).

reconsideration," 34 C.F.R. § 685.222(e)(4)(ii), despite also admitting (as they must) that the Department's notices in fact "do mention reconsideration," and "direct[] class members to 'identify and provide any evidence' supporting their claim, and to state 'Why you believe that ED incorrectly decided' the application," Pls.' Mot. at 15 (citing ECF 116-4 at 3 (Form Notice D)). Although the regulation states that the Secretary may reconsider a borrower defense upon the "identification of new evidence," 34 C.F.R. § 685.222(e)(4)(ii), the Department's denial letters provide borrowers with an even *broader* basis upon which to seek reconsideration because the Department will consider "*any* evidence" (which would of course include any new evidence) supporting reconsideration of their denied claim. Brown Decl. ¶ 21.

In any event, the use of standard form denial notices does not inherently violate the Department's regulations, and the ultimate sufficiency of the Department's notices under its regulations is—as is the case with their sufficiency under the APA and Due Process Clause, *see supra* pp. 11-14—a question to be determined in individual cases challenging actual final decisions, not on a class-wide basis on Plaintiffs' motion to enforce. Whether or not the Department's denial notices are ultimately upheld in such legal challenges, there is no basis to find that Defendants have breached the Agreement the parties negotiated *in this case*. In the end, the parties reached a negotiated deal to resolve Plaintiffs' claims relating to the Department's inaction with respect to borrower defense claims. In a case "fundamentally about avoiding delay," brought to ensure that the class members get "timely decisions on their borrower defenses," Plaintiffs determined that an agreement providing for set deadlines according to which such decisions must issue was a "superior outcome for the Class." Prelim. Approval Mot. at 9-10. That is all the Agreement requires. Because Defendants have not breached the Agreement, the Court should deny Plaintiffs' motion to enforce. *See U.S. for Use & Benefit of Helix Elec., Inc. v. KISAQ RQ 8A 2JV*, Case No. 15cv1024-WQH-KSC, 2017 WL 1321454, at *5 (S.D. Cal. Apr. 10, 2017) ("When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is reasonably susceptible to the interpretation urged by the party. If it is not, the case is over. . . ." (citation omitted)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Plaintiffs' Allegations of Bad Faith Are Baseless.**

As described above, the Department's form denial notices do not establish that it is "performing [its] obligations under the Agreement in . . . blatant disregard of the law." Pls.' Mot. at 16.   That is not a conclusion that the record allows this Court to make in these limited proceedings, and the Court does not generally need to pass on the legal sufficiency of the Department's decisions to determine whether it should enforce a settlement agreement that is (1) not yet final and (2) does not govern the substance or content of final borrower defense decisions. Perhaps recognizing the weakness of their claim, Plaintiffs resort to one of their favorite calling cards throughout this litigation: accusations of bad faith. *See id*. at 16-21.   Once again, however, their assertions are baseless and do not support their requested relief.

As an initial matter, to the extent Plaintiffs seek to invoke the implied covenant of good faith and fair dealing, *see id*. at 21 (citing case law referring to the "covenant of good faith"), they must "overcome the presumption that government officials act in good faith in the discharge of their duties." *Austin v. United States*, 118 Fed. Cl. 776, 790 (2014); *see also McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (federal agencies are "entitled to a presumption of administrative regularity" that can only be overcome by "clear evidence to the contrary" (citation omitted)).   This requires a showing of "well-nigh irrefragable proof" of bad faith, *Austin*, 118 Fed. Cl. at 790, which "has been equated with evidence of some specific intent to injure the plaintiff," *Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citation omitted).

Here, Plaintiffs' allegations—which boil down to a disagreement over whether certain of the Department's decisions denying borrower defense claims are adequately explained—fall well short of this standard.   As discussed above, the Department's notices are not "facially deficient," Pls.' Mot. at 20, and Plaintiffs offer no support for their assertion that the Department intentionally "waited until after Plaintiffs entered the Agreement" to start issuing denials to "a majority of the class," *id*. at 19-20.   As Defendants have consistently explained throughout this litigation, the Department is committed to clearing the backlog of borrower defense claims that existed at the outset of this litigation, and has recently devoted significantly more resources to that project. *See*

Brown Decl. ¶ 6 (stating that the Department has hired 52 new attorneys to "reduce the backlog of pending borrower defense applications" since September 2019); *see also* Admin. R. ("AR") 342 (Decl. of Colleen Nevin ¶ 24, Nov. 14, 2019 ("Nevin Decl.")), ECF No. 56 (discussing the Department's plans to hire several full-time attorneys and up to 60 "term-appointed law clerks and attorneys to assist in expeditiously adjudicating the large number of pending borrower defense applications"). It should be no surprise that the rate of adjudications has increased as the Department has hired additional staff and had more time to review allegations and evidence. Brown Decl. ¶¶ 8, 22.

In light of the fact the Department has approved more than 13,000 applications since December 2019 and that more than 75,000 class member applications subject to the Agreement remain pending, *see* Defs.' Resp. to Aug. 31 Order at 1-2, Plaintiffs' assertion that the Department is pushing every application forward to a "certain, adverse, outcome," Pls.' Mot. at 20 (or, in more colorful terms, restarting the borrower defense decision conveyor belt such that "every application runs into a buzzsaw," *id.* at 21), is belied by the record. As discussed above, the Department has so far placed a priority on issuing final decisions on claims with little or no evidence as part of its effort to reduce the backlog of claims. But this does not mean that the Department has taken shortcuts in its review of pending applications or failed to give them appropriate consideration. Brown Decl. ¶ 22. Rather it reflects the large number of applications that can be denied based on facial deficiencies and a lack of evidence. *Id.* ¶¶ 9-11. And although Plaintiffs reference borrowers who attended schools "with evidence of serious misconduct," Pls.' Mot. at 18-19, there is nothing nefarious about the Department finding applicants who attended such schools ineligible for relief where, for example, they do not establish that they were actually subject to the documented evidence of misconduct that is in the Department's possession (*e.g.*, because they attended the institution at a different time or made allegations about different misconduct), and do not submit sufficient evidence on their own, *id.* ¶¶ 13-16.[5]

---

[5] In any event, even if Plaintiffs were correct that the Department has denied some claims in error, it would not mean that the Department has breached the Agreement, much less acted in bad faith. In an operation as large as the Department's adjudication of borrower defense claims (and with more than 160,000 class members covered by the Agreement), mistakes are bound to happen. Where such mistakes do happen, Plaintiffs can seek reconsideration from the agency or even file

The Department, then, has generally reserved claims for which the application of a significant amount of relevant evidence is necessary until later in the review process (evidence that the Department has explained it previously lacked the time and resources to analyze, *see, e.g.*, AR 351 (Nevin Decl. ¶¶ 66-69) (discussing the BDU's prioritization for adjudicating borrower defense applications, including plans to adjudicate at a later date claims from borrowers who attended schools for which the Department has a substantial amount of relevant evidence that it had not yet reviewed or analyzed).  It is thus hardly cause for alarm that denials have so far outstripped approvals (which, again, are in fact being issued), and it is entirely possible that a higher percentage of claims will be approved going forward. *See* Brown Decl. ¶ 17.  Either way, until the Department has completed its review and decisionmaking process for all class member claims, it is premature to make sweeping assertions about the ratio of approvals to denials and improper to draw any conclusions about the Department's asserted bad faith based solely on those statistics.

Plaintiffs' resort to the implied covenant of good faith and fair dealing reveals, more than anything else, that the conduct about which they complain does not actually "transgress[] the [parties'] express covenant." *U.S. Bank v. Miller*, Case No. CV 12-5632 MMM (MANx), 2013 WL 12183652, at *5 (C.D. Cal. May 8, 2013) (citation omitted).  Even where the implied covenant does apply as a remedy for bad faith conduct by one party to "frustrate the right of the other to receive the benefits of the agreement," *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1152 (N.D. Cal. 2002) (citation omitted), under general principles it is necessarily "limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract," *Miller*, 2013 WL 12183652, at *5 (citation omitted).  Here, the Agreement guarantees class members timely decisions, but says nothing about what those decisions must say or whether they will ultimately provide relief.  Plaintiffs cannot use the implied covenant to impose upon Defendants an obligation—*i.e.*, a requirement to include some unspecified level of detail in denial decisions above that which is already being provided in accordance with the law—that the Agreement does not. *See also Freeman v. Kern Cnty.*, No. 1:07-

a new lawsuit in federal court.  But they provide no basis to conclude that the Department is carrying out its obligations under this Agreement in bad faith on a class-wide basis.

CV-00219 TAG, 2008 WL 4003978, at *9 (E.D. Cal. Aug. 27, 2008) ("The implied covenant of good faith and fair dealing cannot impose substantive duties or limits on the contracting parties to which they did not actually agree.").

### E. Plaintiffs' Arguments Regarding Remedies Reveals the Impropriety of the Relief They Seek.

In arguing that "[e]nforcement of the Settlement Agreement is the [a]ppropriate [r]emedy," Pls.' Mot. at 21, Plaintiffs make clear that the purpose of their motion is to expand the scope of their lawsuit and seek relief to which they would not otherwise be entitled in this litigation.  First, and most importantly, they concede that if an individual class member were to bring a new lawsuit challenging the Department's denial notice according to the grounds specified in Plaintiffs' motion, the appropriate remedy (assuming *arguendo* that such a claim were ultimately successful) would be a "remand to the agency for it to issue a reasoned decision."  Pls.' Mot. at 22.  Defendants agree.  Plaintiffs do not explain, however, why the class members should be entitled to *more relief* than that in this lawsuit, which was brought only to "ensure that the Department provides Class Members with timely decisions on their borrower defenses," Prelim. Approval Mot. at 9, and *not* to "adjudicate their borrower defenses," Compl. ¶ 10.

Second, Plaintiffs give up the game when they suggest that if the Department (in a world in which it had to issue more individualized decisions according to Plaintiffs' specifications) could no longer meet the timelines specified in the Agreement, it could just grant all pending claims.  *See* Pls.' Mot. at 21.  According to Plaintiffs, it would be acceptable for the Department to issue blanket approvals, without any consideration of the merits of individual claims (precisely the type of consideration they assert is improper with respect to the alleged blanket denial notices that are the subject of their motion).  While this makes clear the ultimate outcome Plaintiffs now hope to secure with this lawsuit, it is not the relief they sought in the complaint (nor would it be appropriate relief under Section 706(1) of the APA).  And the Department's regulations and the overriding requirement that any agency engage in reasoned decisionmaking (as well as the Department's borrower defense regulations) would apply to the Department's approvals as any final agency action.  *See, e.g.*, *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721,

728 (9th Cir. 2004) ("It is well established that once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the 'arbitrary and capricious' standard." (citation omitted)).  An ultimate determination of whether a particular borrower defense decision meets this standard of review is, again, beyond the scope of this case and the Agreement, but it is something the Department cannot simply ignore in order to meet the timelines specified in the Agreement.

## II.  Final Approval of the Agreement As Written Is Appropriate, But In Light of the Parties' Dispute Over Its Meaning, Defendants Propose, In the Alternative, that the Court Defer a Decision on Final Approval and Allow Time For Further Negotiations.

"Federal Rule of Civil Procedure 23(e) requires courts to approve any class action settlement."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1068 (N.D. Cal. 2017).   The "standard is whether the settlement 'is fundamentally fair, adequate and reasonable.'"  *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 316-17 (N.D. Cal. 2018) (citation omitted).  In making this determination, "courts look to the eight so-called *Churchill* factors," which include (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of proceedings; (6) the experience and view of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 586 (N.D. Cal. 2015) (citing *Churchill Vill., LLC v. Gen. Electric*, 361 F.3d 566, 575 (9th Cir. 2004)).  Crucially, in light of the manner in which Plaintiffs have chosen to litigate this case, a district court's "power to approve or reject [class action] settlements does not permit it to modify the terms of a negotiated settlement." *Jeff D.*, 899 F.2d at 758-59; *see also In re Anthem Data Breach Litig.*, 327 F.R.D. at 326 ("[T]he Court may grant or deny approval of the Settlement, not revise its terms.").

Defendants agree that final approval of the Agreement, *as written*, is appropriate for the same reasons that supported preliminary approval of the Agreement in May.  *See generally* Prelim. Approval Mot.; *see also Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016) (recognizing that the "showing at the preliminary approval stage—given the amount of time,

money, and resources involved in, for example, sending out new class notices—should be good enough for final approval"). As the Court found in granting such preliminary approval, the agreement sets certain timelines for the Department to timely decide class members' applications; provides for effective enforcement, including penalties for involuntary collection activities taken during the pendency of an application; and has an adequate waiver of class member claims, allowing class members to challenge the substance of any final decision they ultimately receive in a separate lawsuit. *See* Prelim. Approval Order. And, as Defendants previously explained, the small number of objections by class members generally address matters beyond the scope of this lawsuit and the parties' Agreement, and thus do not undermine the fundamental fairness of the Agreement as written. *See generally* Defs.' Reply to Class Member Objections, ECF No. 127. For these reasons, Defendants largely agree with the portion of Plaintiffs' motion that argues for final approval, including in particular the statement that final approval is appropriate because "[t]he Agreement as negotiated . . . expeditiously resolves the pending backlog of claims in favor of a set timeline, and assures that a remedy is available in the form of loan discharge for class members in the event of a breach of the timing provisions." Pls.' Mot. at 6-7. Indeed, Plaintiffs' argument that the Agreement should be finally approved does not reference the substance or content of final borrower defense decisions and demonstrates why approval is appropriate for the Agreement according to its actual terms.

Unfortunately, however, the remainder of Plaintiffs' motion seeks to read additional terms into the Agreement and demonstrates that, notwithstanding the above, final approval may not be appropriate at this time. Because Plaintiffs continue to persist in their (unreasonable) alternative interpretation, Defendants recognize that there is a question as to whether the parties have reached a "meeting of the minds upon the material terms of [the] contract." *Optima Tax Relief, LLC v. Channel Clarity, Inc.*, No. SACV-14-1902-JLS (JCGx), 2016 WL 6821108, at *3 (C.D. Cal. Jan. 21, 2016) (citation omitted). To be clear, Defendants believe that the Agreement is clear and unambiguous in requiring only that decisions be issued according to specified timelines and reserving any disputes over the legal sufficiency of those decisions to later lawsuits by individual class members. But if the Court is inclined to disagree, final approval would not be appropriate at

this time in light of the absence of a meeting of the minds on the meaning of a key term of the agreement. As the Department has previously explained, it would not have agreed to clear the backlog of more than 160,000 cases in 18 months if it were required to issue the type of personalized, detailed decisions Plaintiffs apparently now demand, because the Department would need significantly more time to meet that requirement. *See* Defs.' Resp. to Aug. 31 Order at 3-4. The Department's understanding that it would continue to utilize the types of form denial letters that it had been using for as many as four months prior to executing the Agreement—including during the course of this litigation and the parties' lengthy settlement negotiations—was an important factor in the Department's determination of the amount of time that is necessary to issue decisions on all class members' claims, and, ultimately, the timeline it committed to in the settlement agreement. *See* Brown Decl. ¶ 19.

Thus, in lieu of final approval Defendants propose that the Court afford the parties an additional period of time to negotiate about this issue and determine whether the parties can reach an agreed-upon modification in accordance with the procedures set forth in the Agreement, as the Court has suggested could be an appropriate resolution of the present dispute. *See* Request Re Settlement, ECF No. 134.

## <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to the extent it seeks to enforce the Agreement. To the extent it seeks final approval, Defendants agree that the Agreement should be approved as written. However, given the dispute between the parties regarding the Agreement's meaning, Defendants believe a further period of negotiation would be appropriate if the Court believes that the Agreement should be modified to address the contents of borrower defense decisions.

Dated: October 1, 2020                          Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*

KATHRYN C. DAVIS
Senior Trial Counsel
R. CHARLIE MERRITT (VA Bar # 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*