UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH DEVOS, et al., <br><br> Defendants. | No. C 19-03674 WHA <br><br> **ORDER DENYING CLASS SETTLEMENT, TO RESUME DISCOVERY, AND TO SHOW CAUSE** |

**INTRODUCTION**

Following preliminary approval of a proposed class settlement meant to restart Department of Education review of student-loan borrower-defense applications under the Higher Education and Administrative Procedure Acts, the Secretary's new perfunctory denial notices undermine the proposed settlement, contradict her original justification for delay, raise substantial questions under the APA, and may impose irreparable harm upon the class of student-loan borrowers. Final approval of the proposed class settlement is **DENIED**. **DISCOVERY** shall resume immediately. Both parties shall **SHOW CAUSE** why the Secretary should not be enjoined from further perfunctory denials. This case resumes on the merits.

**STATEMENT**

Title IV of the Higher Education Act directs the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students" through financial-assistance programs. Education affords most a significant opportunity, but all too

often, for-profit colleges, using fraudulent enrollment tactics (such as inflated job-placement numbers), leave students saddled with debt and little to show for it. To remedy this misconduct, Title IV authorizes the Secretary to cancel a federal student loan (in whole or part) and directs her to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." 20 U.S.C. §§ 1070, 1087e(h).

In 1994, Secretary Richard W. Riley promulgated the first variation of the "borrower defense" rule for certain federal loans, which allowed a borrower to "assert as a defense against repayment of his or her loan 'any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law.'" 60 Fed. Reg. 37,768, 37,770 (July 21, 1995). Yet the system lay dormant for the next twenty years (AR 505).

In May 2015, Corinthian Colleges, Inc., a for-profit college with more than 100 campuses and over 70,000 students, collapsed. Secretary John B. King found "that the college had misrepresented its job placement rates." Predictably, Corinthian students submitted a "flood" of student-loan borrower-defense applications. So, Secretary King quickly moved to update the infrastructure for adjudicating borrower-defense applications and appointed a special master in June 2015 "to create and oversee a process to provide debt relief for these Corinthian borrowers." 81 Fed. Reg. 39,329, 39,330, 39,335 (June 16, 2016). But it remained a game of catch up.

Over the next year, the special master granted full loan discharges to 3,787 applicants. Yet by December, borrowers had submitted 6,691 defense applications, and by June 2016, they'd submitted 26,603. The newly created "Borrower Defense Unit" ("BDU") took over and by October approved 11,822 applications and denied 245, for a total of 15,609 approvals and a 98.5% grant rate. But by that time, borrowers had submitted a total of 72,877 defense applications (AR 339–40, 347, 369, 384–85, 392–94, 502).

In November 2016, the BDU promulgated the new borrower-defense regulations — scheduled to take effect on July 1, 2017 — to codify the process for adjudication and to set a

2

new standard for borrower-defense claims. 81 Fed. Reg. 75,926 (Nov. 1, 2016). The regulations would require a borrower to submit an application with evidence supporting his or her claim and allow the Secretary to designate an official to resolve the claim. *See* 34 C.F.R. §§ 685.206, 685.222 (2018).

In the new year, the Secretary approved another 16,164 applications, but failed to discharge the loans before January 20. In total, by the end of the Obama Administration, the Secretary had approved 31,773 applications for discharge (though not necessarily effected relief) and found 245 ineligible, for a 99.2% grant rate. Borrowers, however, had had submitted 72,877 applications (AR 392–94, 502–03).

With the new administration came new policy. In March 2017, newly-installed Secretary Elisabeth DeVos (our present defendant) created a Borrower Defense Review Panel to examine the entire review process and recommend changes. After the panel also requested an Inspector General review, the BDU "was advised" that "no additional approvals would be processed" until the completion of both the panel and IG reviews. Nevertheless, the panel honored — and the Secretary approved, though "with extreme displeasure" — the 16,164 borrower-defense applications that the prior administration had approved but not discharged before January 20, 2017. By July, however, borrowers had submitted 98,868 applications in total (AR 348–49, 502–05; Dkt. No. 66-3, Ex. 7).

The IG ultimately recommended only "improved documentation and information systems" and "did not recommend any changes to existing review processes and protocols." The Secretary, however, decided to develop new method for awarding relief to eligible borrowers. She disagreed with the previous administration, which had granted full loan discharges on (as the Secretary puts it) the assumption that borrowers subject to school misconduct had received no value from their education. Instead, the new method would discharge more or less of a loan based empirically upon the difference between the average earnings of borrowers subjected to school misconduct and of students who completed similar programs from other, misconduct-free schools (AR 006–007, 349–50, 590–91).

Between December 2017 and May 2018, the Department reportedly decided more than 26,000 more claims — approving over 16,000 and denying over 10,000 — before a court in this district preliminarily enjoined this new "partial relief methodology" for its likely violation of the Privacy Act, 5 U.S.C. § 552a (AR 006–07, 350). *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (Magistrate Judge Sallie Kim). So, in total by June 2018, the Secretary had granted 47,942 applications (though not necessarily effected relief) and denied or closed 12,314, for a 79.6% grant rate (or, Secretary DeVos's decisions taken alone, a 61.5% grant rate). Yet the flood continued. By that point, borrowers had submitted, in total, 165,880 applications, leaving 105,998 still to be decided (AR 401).[1]

Then, despite the backlog, the decisions stopped. By September, 139,021 applications awaited review. That count rose to 158,110 by the end of December, and to 179,377 by the end of March 2019. By June 2019, borrowers had filed 272,721 applications and 210,168 languished. *For eighteen months*, from June 2018 until December 2019 — *well into this suit* — the Secretary issued no decisions at all (AR 397–404, 587–88).

Plaintiffs Theresa Sweet, Chenelle Archibald, Daniel Deegan, Samuel Hood, Tresa Apodaca, Alicia Davis, and Jessica Jacobson filed borrower-defense applications. Contending the Secretary's delay to be unlawful stonewalling, they sued in June 2019 to compel the Secretary to begin deciding applications again. An October 2019 order certified a nationwide class of approximately 160,000 borrower-defense applicants who still awaited decision and were not already members of *Calvillo Manriquez v. DeVos*, No. C 17-07210 SK, 2018 WL 5316175 (N.D. Cal. Oct. 15, 2018) (Magistrate Judge Sallie Kim).

In November, the Secretary certified an administrative record to explain her delay and cross motions for summary judgment followed (Dkt. Nos. 56, 63, 67). On December 10, 2019, with around 225,000 claims pending, the Secretary released an updated "tiered relief methodology" which, similar to the previously enjoined method, would award partial loan

---

[1] Additionally, shortly before the 2016 regulations' effective date (July 1, 2017), the Secretary had stayed the regulations under Section 705 of the APA. In September 2018, the District Court for the District of Columbia found the delay arbitrary and capricious. *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) (Judge Randolph Moss).

4

1  discharges based upon the difference in earning potential between borrowers subjected to
2  school misconduct and those not; though this method appeared to use data gathered at a higher
3  level to assuage the earlier privacy concerns (AR 589–601).

4  The next day, the Secretary issued 16,045 decisions; but in a marked departure from the
5  previous grant-denial ratio, she approved only 789 applications and denied the remaining
6  15,256 (AR 587–88). Previously, as noted, the Secretary's grant ratio had been 61.5%. These
7  December decisions, however, represented a 95.1% *denial* rate. Though class counsel knew of
8  these early numbers, they maintain that they did not learn of the form denials, and, it seems,
9  could not know of the scope of their use, until later (Dkt. Nos. 121 at 13–14; 129-1 at 2–3).

10 Before the undersigned ruled on the motions for summary judgment, however, the parties
11 apparently reached a proposed class settlement. A May 22, 2020, order preliminarily approved
12 the proposal as it appeared to impose an adequate eighteen-month deadline for the Secretary to
13 decide claims and a twenty-one month deadline to effect relief, penalties for the Secretary's
14 failure, reporting requirements, and it did not prejudice the merits of borrowers' applications.
15 Following preliminary approval, the parties distributed class notice and solicited comments in
16 time for the October 1 fairness hearing. About one hundred thirty borrowers timely responded.

17 Then came the snag. Class counsel discovered that the Secretary had been issuing
18 alarmingly-curt denial notices for several months, in violation (as class counsel put it) of both
19 the spirit of the proposed settlement and the Administrative Procedure Act. The undersigned
20 requested more information from the Secretary and, given the lack of briefing, reserved the
21 problem for the October 1 fairness hearing (Dkt. No. 121).

22 In her requested response, the Secretary admitted to using four different form denial
23 notices. Continuing her rate of denials from December, the Secretary had, as of April, granted
24 only 8,800 applications and denied 36,200. By August, she had approved 13,500 applications,
25 yet denied 118,300, for an 89.8% denial rate. Of those applications from our class of

5

1   borrowers, the Secretary has denied 74,000 applications and granted only 4,400, for a 94.4%
2   denial rate (Dkt. No. 116).[2]
3   As the fairness hearing approached, it became clear the parties could not jointly move for
4   approval.  A September 16 order kept the fairness hearing on calendar to ensure borrowers
5   would be heard, whatever the outcome, but invited the parties to move for relief as they wished
6   on the standard 35-day track (Dkt. No. 123).
7   On October 1, approximately 620 participants, counsel, borrowers, and members of the
8   public joined the proposed-settlement fairness hearing by telephone.  Of the approximately
9   three hundred requests to speak, the Court chose fourteen representative borrowers to comment
10  on the proposed settlement.  The representatives expressed serious concern with the proposed
11  settlement, particularly in light of the Secretary's recent string of form denials.
12  In the meantime, class counsel have moved for approval of the proposed settlement *and*
13  for its enforcement, seeking an order requiring the Secretary, in denying applications, to issue
14  explanatory details under the Department's own regulations, the Administrative Procedure Act,
15  and due process.  The Secretary would consent to approval of the settlement *as written*, but
16  opposes class counsel's view of it.  This motion has been fully briefed.  Time is of the essence.
17  The parties have been heard at two recent hearings.  This motion is appropriate for disposition
18  on the papers.

19  **ANALYSIS**

20  One hundred sixty thousand student-loan borrowers, defrauded by for-profit schools and
21  saddled with debilitating debt, have asked the Secretary of Education for the relief which
22  Congress has provided.  All may not be entitled to relief, but all are entitled to a
23  comprehensible answer.  For eighteen months, the Secretary refused, largely on the grounds
24  that such answers required backbreaking effort and, thus, substantial time.  Now, the Secretary
25  has begun issuing decisions at breakneck speed.  But most are a perfunctory "Insufficient
26  Evidence" — without explanation.

---

[2] It remains unclear on this record when borrowers filed these newly-decided applications.

1.     **THE SETTLEMENT IS DENIED; ENFORCEMENT IS MOOT.**

A class settlement must offer fair, reasonable, and adequate relief.  *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012).  Our proposed settlement primarily offered a timeline for the Secretary to decide the delayed student-loan borrower-defense applications.  Given the borrower-defense applications had already languished without decision for eighteen months (and some had languished much longer), allowing the Secretary another eighteen months from final approval to decide the applications hardly gave cause to celebrate.  But the proposed settlement did offer the substantial benefit that neither party would seek appellate relief.  Upon final approval, the class would face acceptable delay; the Secretary would hit the ground, well, not running, but at least moving forward.

Upon closer inspection, however, this long-awaited restart of borrower-defense application review brings cause for alarm.  The Secretary has been issuing four different form denial notices over the past several months, since even before the settlement.  The class appears to challenge only the fourth form (Dkt. Nos. 116-4, 129 at 9).  This one reads, as received by class member Y. Colon:

> **Applicable Law**
>
> For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law.  See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations).  ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided.  34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).
>
> **Why was my application determined to be ineligible?**
>
> ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.
>
> Allegation 1: Educational Services
> You allege that Sanford-Brown College engaged in misconduct related to Educational Services.  This allegation fails for the

7

>following reason(s): Insufficient Evidence.  Your claim for relief
>on this basis therefore is denied.
>
>Allegation 2: Other
>You allege that Sanford-Brown College engaged in misconduct
>related to Other.  This allegation fails for the following
>reason(s): Insufficient Evidence.  Your claim for relief on this
>basis therefore is denied.
>
>Allegation 3: Transferring Credits
>You allege that Sanford-Brown College engaged in misconduct
>related to Transferring Credits.  This allegation fails for the
>following reason(s): Insufficient Evidence.  Your claim for relief
>on this basis therefore is denied.
>
>Allegation 4: Employment Prospects
>You allege that Sanford-Brown College engaged in misconduct
>related to Employment Prospects.  This allegation fails for the
>following reason(s): Insufficient Evidence.  Your claim for relief
>on this basis therefore is denied.
>
>**What evidence was considered in determining my application's ineligibility?**
>
>We reviewed evidence provided by you and other borrowers who
>attended your school.  Additionally, we considered evidence
>gathered from the following sources:
>
>NY Attorney General's Office
>PA Attorney General's Office
>Evidence obtained by the Department in conjunction with its
>regular oversight activities
>Publicly available securities filings made by Career Education
>Corporation (now known as Perdoceo Education Corporation)
>Multi-State Attorney General Assurance of Voluntary Compliance
>(effective January 2, 2019)

(Dkt. No. 108-16 at 183–85).  In both written letters to the court and in the Zoom chat at the October 1 fairness hearing, many borrowers reported receiving almost identical denial notices (Dkt. No. 141).  Borrowers cannot possibly understand why their applications have been denied.  They do not believe the Secretary has reviewed their borrower-defense applications in good faith and do not know, realistically, how to proceed.

It's no wonder borrowers are confused.  The Secretary's perfunctory denial notice does not explain the evidence reviewed or the law applied.  It provides no analysis.  And, the borrower's path forward rings disturbingly Kafkaesque.  Any request for reconsideration must: (1) explain "[w]hy you believe that ED incorrectly decided your borrower defense to repayment application;" and (2) "[i]dentify and provide any evidence that demonstrates why

8

1    ED should approve your borrower defense to repayment claim under the applicable law set

2    forth above" (Dkt. No. 116-4).  Without any meaningful analysis of the evidence under the

3    law, how might a borrower articulate such bases for reconsideration?  It is, after all, impossible

4    to argue with an unreasoned decision.

5          Class counsel contend this perfunctory denial notice violates the Administrative

6    Procedure Act, which (they argue) requires the Secretary's denial notices to contain not just the

7    conclusion but a meaningful statement of reasoning that could actually be reviewed for error.

8    Counsel acknowledge the APA does not require much, but it does at least require that a "notice

9    shall be accompanied by a brief statement of the grounds for denial."  5. U.S.C. § 555(e).  That

10   is, "[t]he agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it

11   must 'articulate a satisfactory explanation' for its action."  *Butte County, Cal. v. Hogen*, 613

12   F.3d 190, 194 (D.C. Cir. 2010).  Counsel also argue that an unexplained application denial

13   violates due process, which requires a benefits determination to "provide claimants with

14   enough information to understand the reasons for the agency's action," and the Secretary's

15   own regulations, which require her to resolve applications "through a fact-finding process"

16   resulting in a notification "of the reasons for the denial [and] the evidence that was relied

17   upon."  *See Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005); 34 C.F.R. § 685.222.  Against

18   this backdrop, then, class counsel contend that the Secretary has not, in fact, been issuing "final

19   decisions" and move not only for approval of the settlement, but also for the Court to enforce

20   counsel's reading of "final decision" as used in the settlement agreement.

21         The Secretary responds that this case only concerns the timeline of decision —

22   emphatically *not* the substance of the decisions — and that the proposed settlement merely

23   requires her to "issue final decisions," *i.e.* "decision[s] . . . resolving . . . borrower defense

24   application[s]" (Prop. Agmt., Dkt. No. 97-2 at § IV.A.1).  In the Secretary's view, the form

25   denials do just that and the APA, to the extent it applies, requires no more.  The Secretary

26   stresses that she had been issuing this perfunctory denial notice for months *before and*

27   *throughout* the settlement negotiations and expected to continue that course.  At bottom, the

28   Secretary says that if she had understood a "final decision" to require any more then she would

not have agreed to the eighteen-month decision timeline. Thus, the Secretary does not oppose approval of the proposed settlement as written, but opposes any enforcement or approval of the class's interpretation of the proposed settlement.

The essence of the problem is that we have no meeting of the minds. Federal common law governs contracts with the United States and "we look to general principles." *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). "[W]here there appears to be a manifestation of assent initially, but, following appropriate interpretation or construction, it becomes clear that the parties' apparent assent did not in fact indicate assent at all . . . there is no contract." 1 WILLISTON ON CONTRACTS § 3:4 (4th ed. 2020). During settlement negotiations, our parties used the term "final decision" to refer to the Secretary's work product. Each incorrectly believed its interpretation to be peerless. The Secretary interpreted "final decision" to encompass her perfunctory denial notices, while class counsel (yet unaware of the new form of notice) believed otherwise. The Secretary would not have agreed to counsel's more rigorous interpretation, and counsel would not have agreed to the Secretary's more liberal interpretation. Simply put, the parties bargained for materially different rights and duties and, thus, never reached an agreement.

Counsel appears to argue that under the APA and due process the Secretary could only have agreed to counsel's interpretation of "final decision." But the Secretary *didn't have to agree* to the settlement at all. *If* the Secretary agreed to anything, it would surely have been *her* understanding of the proposed settlement. On appeal, we will, first, lose any hope of keeping to the eighteen-month timeline (the primary benefit offered by proposed settlement) and, second, the Secretary will very reasonably argue that she negotiated under a consistent, material course of conduct and fairly expected the agreement to encompass that course of conduct. We will not saddle the class with the risk of moving forward with a disputed settlement that may fall out from underneath their feet on appeal. In these circumstances, we ought to step back and resolve the dispute on the merits, moving as expeditiously as circumstances permit. Final approval of the proposed class settlement is denied and counsel's motion to enforce falls moot.

\*     \*     \*

The Court is disappointed that it has come to this. This settlement was supposed to jumpstart a long delayed regulatory process, intended to at least get reasoned decisions, even if reasoned denials, to hundreds of thousands of student-loan borrowers. We will return to litigating the merits. Questions of legality plague the Secretary's new perfunctory denial notice, and the circumstances of its use appear to contradict one of the primary justifications for her original delay. We need an updated record and updated discovery to determine what is going on before we again attempt to resolve the merits of this case. And, in the meantime, we need to decide whether the Secretary may continue issuing this challenged form of denial to borrowers.

**2.     EXPEDITED DISCOVERY IS ORDERED.**

Absent a showing otherwise, an agency's certified record, in support of either action or inaction, enjoys a presumption of completeness and regularity. *See Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993); *Dep't of Commerce v. New York*, 588 U.S. \_\_\_, 139 S. Ct. 2551, 2573–74 (2019). Narrow circumstances, such as a showing of agency bad faith, permit consideration of evidence outside the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005). Here, in reviewing agency *inaction*, the scope of review broadens (as no specific dates bound the record). Even so, our review would ordinarily remain bounded by what the agency directly or indirectly considered. *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

Yet meaningful review of agency conduct (activity or not) depends utterly on the record adequately reflecting the basis for that conduct. *Commerce*, 139 S. Ct. at 2573. "An incomplete record *must* be viewed as a 'fictional account of the actual decisionmaking process.'" *Portland*, 984 F.2d at 1548 (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977)) (emphasis added). In these cases, record supplementation and, in "compelling" cases, discovery become appropriate. *Portland*, 984 F.2d at 1548–49; *Public*

11

*Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir. 1982) (Kennedy, J.). We have such a case here.

Pretext is the paradigm of agency bad faith. Even where the challenged agency conduct itself may ultimately be lawful,

> [A]gencies [must] offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better . . . .

*Commerce*, 139 S. Ct. at 2573–76.

Here, "[w]e are presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. In justifying her delay of borrower-defense decisions at summary judgment, the Secretary expounded upon the work involved in evaluating each application:

> [T]he Department must determine whether the borrower's school engaged in acts or omissions which would give rise to a cause of action against the institution under applicable State law. Applying such a standard necessarily *involves a legal analysis of what state law applies* to a given application and *whether evidence provided by the borrower establishes a cause of action* under the applicable standard.
>
> \*          \*          \*
>
> [T]the Department has primarily focused its efforts to date on identifying certain categories of claims, based on systemic institutional conduct. For each such category that has been approved, the Department's BDU has *analyzed and summarized the relevant evidence, determined and applied applicable law, established criteria for approval of that type of claim*, and drafted claim-specific review protocols.
>
> \*          \*          \*
>
> [F]or each claim that does not fit within an established category . . . the BDU must *individually review the application and any accompanying evidence* from the borrower and determine whether the borrower has established a defense under the relevant regulation.
>
> \*          \*          \*
>
> In addition to its work processing claims and determining their eligibility on the merits for borrower defense relief, the BDU has also initiated review and analysis of evidence pertaining to

12

additional schools and campuses, which will allow the Department to make streamlined determinations about whether borrowers who attended those programs can meet the regulatory standards for asserting a defense and, ultimately, whether they are entitled to loan relief as a result.

and, most importantly:

> ***Issuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process***, and agencies must be given, within reason, the time necessary to analyze the issues presented so that they can ***reach considered results***.

(Dkt. No. 63 at 18–19) (cleaned up) (emphasis added).

And yet, these form denial letters bear *no indication* of such "time-consuming," "complex," legal analysis of both borrower-submitted and agency evidence, "under applicable State law," to "reach considered results." Recall the perfunctory recitation of law in Ms. Colon's denial notice:

> **Applicable Law**
>
> For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

the recitation of evidence:

> **What evidence was considered in determining my application's ineligibility?**
>
> We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:
>
> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular oversight activities
> Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)

13

> Multi-State Attorney General Assurance of Voluntary Compliance
> (effective January 2, 2019)

and analysis:

> <u>Allegation 1: Educational Services</u>
> You allege that Sanford-Brown College engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Insufficient Evidence. Your claim for relief on this basis therefore is denied.

(Dkt. No. 108-16 at 183–85).

This lack of explanation becomes more all the more galling given Ms. Colon, as so many of our borrowers did, attended a school that has since been found to have misled students. Indeed, after the New York Attorney General sued Sanford-Brown College, Ms. Colon received a restitution check. Her denial notice even acknowledges that the Secretary had the NY AG's evidence (Dkt. Nos. 129 at 11; 142; 145). Which begs the question, why did a student who already qualified for relief based on her school's misconduct under state law not now qualify for relief based on a claim "that would give rise to a cause of action against the school under applicable State law?" *See* 34 C.F.R. § 685.206(c). These cases call for adequate explanation — just as the Secretary told us they would when justifying her delay — and yet the Secretary's perfunctory denial notice does not come close to offering such an explanation.

We also cannot ignore that these perfunctory denial notices have accompanied a drastic increase in both the pace of decisions and the rate of denials. In the 19 months leading up to January 2017, the previous administration decided 32,018 applications, granting 31,773 (including those 16,164 that had been approved and for which Secretary DeVos later authorized relief), for a 99.2% percent grant rate. When Secretary DeVos took control and began deciding claims for the first time under her first iteration of the partial relief methodology, she approved about 16,000 applications and denied 10,000, for a 61.5% grant rate. In the ten months since she began issuing decisions again, however, the Secretary has denied 118,300 of the 131,800 applications decided, an *89.8% denial rate*. For our class of borrowers specifically, the Secretary has denied 74,000 of the 78,400 applications reviewed — a *94.4% denial rate*.

14

Simply put, where there's smoke, there's fire. After justifying eighteen months of delay largely on the backbreaking effort required to review individual applications, distill common evidence, and "reach considered results," the Secretary has charged out of the gate, issuing perfunctory denial notices utterly devoid of meaningful explanation at a blistering pace. Set aside even the question of whether this form denials is, in fact, a legally sufficient "final decision" under the proposed agreement, the APA, department regulations, and due process. The issue here is that "the evidence tells a story that does not match the explanation the Secretary gave for h[er] decision." Judicial review of agencies is deferential — not naïve. Courts will not suffer pretext in the review of agency conduct. *Ibid*.

In an ordinary case, pretext leads to remand so the agency may explain itself. *Id.* at 2576. Extraordinary circumstances, however, such as a pressing deadline, compel discovery. *See Public Power*, 674 F.2d at 793–95; *Portland*, 984 F.2d at 1548–49.

Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm — it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans. They have waited for relief, or at least decision, for eighteen months. Many have waited much longer; and many are still waiting. In the meantime, we have lost a full eight months chasing this failed settlement. The time to direct supplementation of the record was eight months ago.

Atop this, the harm from delay has been compounding for the last eight months. This form denial puts borrowers in worse positions than they started. They may have a "decision" (though that is hotly contested), but they have neither a meaningful explanation nor (as discussed above) any meaningful opportunity to appeal or request the Secretary's reconsideration. The form denial, frankly, hangs borrowers out to dry.

In sum, we are faced with a strong showing of agency pretext and the class has been prejudiced by delay enough. We need to know what is really going on. This compels expedited discovery. Bearing in mind that discovery against agencies is disfavored, it will be limited, but broad enough to be effective.

15

Two months should do it. The class may take both written discovery and up to five fact depositions of relevant decisionmakers to inquire into, broadly:

> 1. The development and use of the form denial letters, including: (a) the submission, timeline of review, and disposition of any requests for reconsideration; and (b) the form of denial issued before this suit and under the previous administration;
>
> 2. The extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-month delay;
>
> 3. The extent to which the Secretary has denied applications of students who have attended schools subject to findings of misconduct by the Secretary or any other state or federal body or agency, and the rationale underlying those denials.

For now, discovery is limited to the offices of Federal Student Aid, Postsecondary Education, and Career, Technical, and Adult Education within the Office of the Under Secretary. Additionally, at this time, given "[h]eads of government agencies are not normally subject to deposition," class counsel may not yet depose the Secretary. *Kyle Engineering Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979). Extraordinary circumstances, however — for example, if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means — may justify such a deposition at a later date. *See, e.g.*, *Lederman v. New York City Dep't of Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013).

The class may seek further depositions, or expansion or extension of discovery via letter brief, to which the Secretary will have the opportunity to respond. At the end of this discovery period, the class shall move for summary judgment as to the lawfulness of the Secretary's delay and the lawfulness of the perfunctory denial notice. The Secretary may then oppose and/or cross move for the same.

**3.   ORDER TO SHOW CAUSE.**

This leads to the final question. May the Secretary keep issuing potentially unlawful perfunctory denials while we complete discovery and litigate the merits?

Through the class comment period and at the October 1 hearing, the undersigned has been struck by the scope of the problem here. The consistency and passion with which the nearly one hundred thirty written commenters, three hundred speaking requests, and the

fourteen speakers at the fairness hearing have told their stories leads to the conclusion that their voices are not individual, special cases within the class, but representatives of the class's shared trauma. This is not an attorney-driven case. Class members have a genuine interest; they sought opportunity via higher education only to be to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt.

To maintain the status quo until the merits can be litigated, the question arises whether the denials ought to be preliminarily enjoined. Both parties shall show cause why the Secretary should not be enjoined from further denial of class members' borrower-defense applications until a ruling on that form of denial can be had.

## CONCLUSION

Final approval of the proposed settlement is **DENIED**. Discovery (within the bounds described above) closes **DECEMBER 24**. The class's motion for summary judgment is due **JANUARY 7 AT NOON**, to be heard on the ordinary 35-day track (subject to the Secretary's cross motion). The October 22 hearing is **VACATED**. The parties **SHALL SHOW CAUSE** why the Secretary should not be enjoined as described above by **OCTOBER 30 AT NOON**.

**IT IS SO ORDERED.**

Dated: October 19, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE