Pages 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

THERESA SWEET, et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )     NO. C 19-03674 WHA
                                )
ELISABETH DEVOS, in her         )
official capacity as Secretary  )
of the United States Department )
of Education and the UNITED     )
STATES DEPARTMENT OF EDUCATION, )
                                )
          Defendants.           )
_____ )

                        San Francisco, California
                        Thursday, October 1, 2020

             **TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES**:  (via Zoom)

For Plaintiffs:
                        LEGAL SERVICES CENTER OF
                        HARVARD LAW SCHOOL
                        122 Boylston Street
                        Boston, MA  02310
                   **BY:  MARGARET E. O'GRADY, ATTORNEY AT LAW**

For Defendants:
                        UNITED STATES DEPARTMENT OF JUSTICE
                        Civil Division, Federal Programs Branch
                        919 East Main Street - Suite 1900
                        Richmond, Virginia  23219
                   **BY:  R. CHARLIE MERRITT, ATTORNEY AT LAW**

Reported By:       Marla F. Knox, RPR, CRR, RMR
                   United States Official Court Reporter

**APPEARANCES:**   **(CONT'D)**

SPEAKERS:

Rachel Greenbaum

Laura Dadich

Treiva Johnson

Jana Bergevin

Danielle Adorno

Rebekah Sanchez Norton

Victoria Linssen

Maureen Simmons

Tarah Gramza

Evelyn Segovia

Cassandra Nordman

Hugh McGinley

Ashley Hardin

Kishan Redding

<u>**Thursday - October 1, 2020**</u>                              <u>**8:00 a.m.**</u>

P R O C E E D I N G S

---oOo---

        **THE CLERK:**  This court is now in session.  The

Honorable William Alsup presiding.

    Calling civil matter 19-3674, Sweet, et al. versus DeVos,

et al.

    Starting with Plaintiff, will Counsel please make your

appearances.

        **MS. O'GRADY:**  Good morning, Your Honor, this is

Margaret O'Grady, Counsel for Plaintiffs from the Project On

Predatory Student Lending.

        **THE COURT:**  Is anyone representing the Defendants?

        **MR. MERRITT:**  Yes.  Good morning, Your Honor, this is

Charlie Merritt from the Department of Justice on behalf of the

Defendants.

        **THE COURT:**  Thank you.  Welcome.  Any other Counsel

wish to appear?

                        (No response.)

        **THE COURT:**  Okay.  Thank you all for appearing.  And I

want to welcome several hundred class members to this hearing.

Thank you for attending.

    My name is William Alsup, A-L-S-U-P.  I'm the Judge.  And

this is a case -- this is a case brought on behalf of persons

who borrowed student loans and applied to the Department of

1   Education for relief from having to pay back those loans.

2        And there is quite -- I think there is 160,000 in this

3   class.  And the problem is that the Agency has been slow in

4   ruling on the applications.  And so this lawsuit was brought to

5   require the Agency to make a ruling, either yes or no.

6        Now, I want to be very clear.  The lawsuit is not designed

7   to require a ruling in favor of class members or against them

8   but simply to get a ruling, one way or another.

9        So then if a class member were to lose, they would have to

10  then, if they wanted to, pursue it further, go to the District

11  Court when -- they would have a statutory venue and litigate on

12  their own.

13       It would not be up to me to decide whether any of 160,000

14  applications should or should not have been granted.  But the

15  issue before us is the timing of the -- of just getting a

16  ruling, one way or the other.

17       So that's the background.  Now, why are we here today?

18  Well, the parties we thought had reached a settlement that

19  would allow the Department of Education to begin saying --

20  giving rulings on their -- on the 160,000 applications.

21       And under the law, I have to give class members an

22  opportunity to be heard.  So we set today's hearing to give you

23  that opportunity.

24       Now, the problem is, unlike most class actions where there

25  is either zero or one or two people who might want to be heard,

1  over 200 people wanted to be heard today.  It is impossible to

2  do that.

3          So we went through all the comments and picked out,

4  I believe, 15 individuals that we would like to hear from and

5  we think those 15 comments are representative of the hundreds

6  and hundreds of comments that came in.

7          So you will just have to bear with us.  If you were picked

8  to comment, great.  If you weren't, well, just go with your

9  written comments.  I'm sorry.

10         Anyway, that's why we are here today.  I need to give you

11 a heads-up that the lawyers have a different problem, which is

12 they -- the settlement may fall apart for other reasons; but

13 that is not the purpose of today's hearing.

14         The purpose of today's hearing is to get your input on the

15 proposed settlement which has been previously summarized to

16 you.

17         I won't make a decision today.  I want to take into

18 account what you say, but I don't want to make any decision

19 today.  I want to hear from the class members.

20         Now, before we hear from any of the class members -- I

21 don't want any speeches -- but do any of the lawyers have

22 any -- anything that you wish to add or subtract from the

23 preliminary remarks that I made?  First, Plaintiffs' Counsel.

24         MS. O'GRADY:  Thank you, Your Honor.  I would just say

25 that we are happy that the opportunity is being given to the

```
1   class members to speak today and look forward to hearing what
2   they have to say.  Thank you.
3        THE COURT:  Thank you for those comments.  And by the
4   Government?
5        MR. MERRITT:  Nothing more, Your Honor, other than we
6   are thanking everyone for choosing to submit comments and
7   appearing today.  And we look forward to hearing from everyone
8   as well.
9        THE COURT:  Thank you for that brief comment.
10      So at this time, I will ask the Clerk -- by the way, we
11  are in the courtroom.  I don't know if you can tell, but we are
12  actually in the courtroom because it's the only one set up for
13  this kind of telephone plus Zoom proceeding.  So I'm on the
14  bench wearing a robe just like it would be a regular hearing,
15  and my Clerk is here.  And she will now call out the name of
16  the first person.  And I think each person will get up to 90
17  seconds; is that correct?
18      THE CLERK:  That's correct, Your Honor.
19      THE COURT:  Okay.  So you have been previously
20  notified that you were selected.  And are there any other
21  ground rules, Angela?
22      THE CLERK:  No.  They have 90 seconds to speak; and I
23  have let them know when their 90 seconds are up, I would let
24  them know if they can wrap up promptly.  Then I will mute them
25  and we will move on to the next person.
```

1          **THE COURT:**  Very good.  I'm going to be listening

2    carefully.  So, please, Angela, go ahead.

3          **THE CLERK:**  All right.  Rachel Greenbaum, you are up

4    first.

5          **RACHEL GREENBAUM:**  Thank you.  Hi, Your Honor.  My

6    name is Rachel Greenbaum, and I graduated from Brooks Institute

7    of Photography in 2006.

8       I told my own personal student loan horror story at a

9    California State hearing last year that was the first of its

10   kind.

11         My story is as bad as most and worse than some.  Certainly

12   terrible enough to be picked as one of only five to speak on

13   that panel.  The other stories brought me to tears.  Telling my

14   own story broke me down too.

15         We have all collectively been waiting now for years to

16   find out if we get some relief in our lives that have been put

17   on hold.

18         Our futures that have been stolen; our hesitations to

19   marry or dare start families; our immediate family members that

20   have become estranged or just inconsolably angry due to

21   cosigning on monumentous predatory loans that have affected

22   their credit, their lives and relationships.

23         When I discovered there was a settlement to get our loan

24   dismissed, I felt hopeful for justice to finally be served.

25   And when I realized that all that came from it was mass

1   denials, I felt infuriated, deflated and hopeless, which has

2   certainly deepened throughout 2020.

3       My hope now is that the Honorable Judge Alsup will enforce

4   the settlement under the true spirit of the agreement; that our

5   applications should be given real and legitimate consideration.

6   And if then denied -- not just as a smothering blanket

7   denial -- we should be given all the reasons why so that we can

8   launch a factual appeal.

9       Thank you for your consideration and allowing me to speak

10  for all the struggling, hardworking students that were lied to

11  and robbed blind with our Secretary of Education stamp of

12  approval.

13          THE COURT:  Thank you.  What is your -- Rachel, but I

14  didn't get the last name.

15          RACHEL GREENBAUM:  Greenbaum.

16          THE COURT:  Where do you live?

17          RACHEL GREENBAUM:  Currently, I'm in Los Angeles

18  California.

19          THE COURT:  All right.  Thank you for that.

20          RACHEL GREENBAUM:  Thank you.

21          THE COURT:  How much money did you borrow?

22          RACHEL GREENBAUM:  I'm well over a hundred thousand

23  dollars in debt.

24          THE COURT:  Okay.  Thank you.  All right.  Next.

25          THE CLERK:  Thank you, Ms. Greenbaum.

1        Laura Dadich.

2        **LAURA DADICH:**  Good morning, Your Honor.  I went to

3    Katharine Gibbs School for my Associate's in Healthcare

4    Management for long-term care in 2006.  Upon admissions to

5    Gibbs, I was told my credits would transfer anywhere nationwide

6    to pursue my nursing degree.

7        Not long after, I relocated out of state for more

8    educational opportunities and found out from these schools that

9    I had applied to that, unbeknownst to me, my credits were not

10   accepted because they were from a regionally accredited school;

11   not a nationally accredited school.

12       I was then forced to re-take these classes and soon maxed

13   out of undergrad financial aid and was unable to complete my

14   degree, which I am just short by two semesters.

15       I applied for borrower's defense around September 2015,

16   and all of the sudden I get a denial letter just weeks before

17   today's hearing.  The reasons were incredibly vague and gave no

18   reason for the denial other than -- and I quote -- "other."

19       Years spent at Katharine Gibbs obtaining a 3.8 GPA have

20   got me a worthless degree, mounds of debt and loss faith in the

21   education system.  The financial strain has been extremely

22   challenging.

23       If my loans are discharged, I would be able to complete

24   all of these years my degree.  The employment opportunities

25   that I have missed because of this have cost me both

1    financially and emotionally.

2        I feel that the Department of Education has duped us and

3    issued mass denials just a few weeks ago knowing this.

4        I feel that we are being swept under the rug, and I feel

5    that Ms. DeVos and the Department of Education have been trying

6    to end this Borrower Defense program since she took her

7    position.

8        I feel that it is only fair that those of us who are

9    manipulated, tricked and lied to by these deceitful diploma

10   mills be given the chance to have our loans forgiven or

11   discharged so we can finally have the opportunity to finish our

12   education the legal and fair way and move forward with our

13   lives.  Thank you, Your Honor.

14           THE COURT:  Thank you.  How much money did you borrow?

15           LAURA DADICH:  Oh, federally about $75,000.

16           THE COURT:  And where do you live now?

17           LAURA DADICH:  Currently I'm in St. Paul, Minnesota.

18   Originally from Long Island, New York.

19           THE COURT:  Your last name again?

20           LAURA DADICH:  D-A-D-I-C-H, Dadich.

21           THE COURT:  Okay.  All right.  Thank you very much for

22   those comments.  Next.

23           THE CLERK:  Thank you, Ms. Dadich.  Next is Treiva

24   Johnson.

25           THE COURT:  Say the name more loudly.

1          **THE CLERK:**  Treiva Johnson.

2          **THE COURT:**  Okay.

3          **TREIVA JOHNSON:**  Hello.  Hi.  Good morning, everyone.

4     Thank you for this opportunity to speak today.  I have

5     received a denial pertaining to the loan reimbursement or the

6     forgiveness of the loan.  The reason that I am here today is

7     because I would like to speak for those who are still awaiting.

8          The promotion of higher education and it leading to a

9     better way of life or a way out of what is considered an

10    unfavorable lifestyle is not the case.

11         Meaning that -- I'm sorry -- many believe that the actions

12    taken by the powers that be and in the areas that matter the

13    most, such as our education, are actions that cripple the most

14    vulnerable, who are at risk and who are already living in

15    poverty and looking for a way out.

16         This is an unjust, and it starts as early as junior high

17    and rolling over into high school where students are taught by

18    the very individuals who are seeking loan forgiveness

19    themselves and teaching in red zone communities that obtaining

20    a higher education is the best way to go.

21         A large portion of these individuals are a part of an

22    at-risk community or their backgrounds stem from at-risk

23    communities.  But the -- more importantly, these individuals --

24    because they are struggling and they are poor -- these

25    universities are able to present to them financial aid and

1    loan.  Financial aid and loan may automatically help them

2    because they provide money.

3         At this time I just wanted to speak for those individuals

4    and hope that you take them into consideration.  Thank you.

5              **THE COURT:**  Thank you.  And how much did you borrow?

6              **TREIVA JOHNSON:**  Well, I was actually told I had to

7    borrow more money because I didn't have enough to cover.  So I

8    went to University of Phoenix online, and I think my debt

9    totaled about 86,000.

10             **THE COURT:**  Okay.  Where do you live now?

11             **TREIVA JOHNSON:**  I relocated from Denver, Colorado and

12   I moved to Houston, Texas.

13             **THE COURT:**  Okay.  And this is Treiva Johnson?

14             **TREIVA JOHNSON:**  Yes, sir.

15             **THE COURT:**  All right.  Thank you for your comments,

16   Ms. Johnson.

17             **TREIVA JOHNSON:**  You are very welcome.

18             **THE COURT:**  Next.

19             **THE CLERK:**  Thank you, Ms. Johnson.

20        Next is Jana Bergevin.

21             **JANA BERGEVIN:**  Hello.  Can you guys hear me?

22             **THE COURT:**  Yes, your name, please.

23             **JANA BERGEVIN:**  Jana Bergevin.

24             **THE COURT:**  Richmond?

25             **JANA BERGEVIN:**  Bergevin.

1          **THE COURT:**  Okay.

2          **JANA BERGEVIN:**  Hello, Your Honor.  I'm a defrauded

3    borrower from California.  I have been waiting for a decision

4    to be made on my borrower defense for over five years.  And I

5    am --

6          **THE COURT:**  Please go slower.  It is too fast and I

7    can't hear it.

8          **JANA BERGEVIN:**  Okay, sure.

9          And I'm against the settlement as it stands with the DOE.

10   I'm infuriated by the DOE's complete disregard for the student

11   borrowers.  The DOE has assured me it is not interested in

12   upholding its side of the settlement in good faith.  And this

13   is not the first time that it has done so in a California

14   court.

15         DeVos was held in contempt of court for the *Cavillo*

16   *Manriquez versus DeVos* case for violating the preliminary

17   injunction issued continuing to illegally collect on students.

18         Following DeVos being held in contempt, it was then

19   discovered that the impact was far greater than previously

20   reported.  She has still not returned all the money owed to

21   students.

22         Not only does the DOE not operate in good faith, it

23   continues -- it also seeks to undermine its own mission

24   statement.

25         I direct your attention to an investigation by the House

1    Education and Labor Committee revealing that Diane Jones had

2    worked to paper over the Dream Center's deceptions.  She

3    maliciously covered up the loss of accreditation of art

4    institutes owned by the Dream Center in multiple statements.

5    This debacle can be found in the Congressional record.

6         Finally, I will draw attention back to our current mass

7    denial reality, which is in direct violation of the law and

8    spirit of this very settlement.

9         Given the overwhelming evidence, DOE cannot be trusted to

10   uphold its fight of the settlement, I ask that the Judge remove

11   the decision from the DOE and place it in the hands of an

12   impartial and an independent body.

13        The shroud of civility has gone on too long.  The DOE has

14   had five years of time in which to act promptly and with due

15   process.  They have lost any shred of credibility and decency

16   that they ever had.

17        I thank you for your time.

18             **THE COURT:**  And thank you.  Where do you live now?

19             **JANA BERGEVIN:**  I currently live in Pleasanton,

20   California.

21             **THE COURT:**  And how much did you borrow?

22             **JANA BERGEVIN:**  I borrowed -- initially it was

23   115,000.  I have since paid it down to about 87,000.

24             **THE COURT:**  Okay.  Thank you.  Next.

25             **THE CLERK:**  Thanks, Ms. Bergevin.

1        Next is Danielle Adorno.  Ms. Adorno, you may need to dial
2   star 6 on your phone to unmute.
3        **DANIELLE ADORNO:**  Good morning, Your Honor.  My name
4   is Danielle Adorno.  I am a former student of the Art Institute
5   of New York who filed a borrower's defense repayment in 2015
6   and I was recently denied.  I and countless others have waited
7   for a decision for years.
8        I'm speaking today against the proposed settlement.  I do
9   not believe the Department of Education's decision to due
10  process and the results were reached in a fair manner.  The
11  outcome reached negatively impacts the lives of all the
12  students who were fraudulently misled by the respective
13  institutions.
14       The DOE were and still are aware of these fraudulent
15  practices and continue to allow these organizations to operate
16  in dire of financial deed at the expense of vulnerable
17  students.
18       The students who have been affected by this have been
19  burdened with federal and private loans for degrees that are
20  worthless and not recognized.  Some students are saddled with
21  tremendous debt and have no degree to show it.
22       I ask that these institutions be held accountable and that
23  the debt incurred be discharged for all current and former
24  students who have an (inaudible) of these so-called
25  institutions of learning.

1    Countless lives have been upended due to these debts and
2    (inaudible) restitution.  These institutions are actively
3    taking advantage of people who are making the effort to work
4    towards a better future and be accomplished productive members
5    of our society.

6    Rather than being protected by the regulations in place by
7    the Department of Education -- the entity that is charged with
8    ensuring our school systems remain effective and equitable --
9    these are left to the wolf that is predatory education who has
10   been flagrantly exposing people with impunity by sending them
11   an education that did not live up to the code name.

12   Thank you, and I appreciate your time.

13       **THE COURT:**  Thank you.  Where do you live now?

14       **DANIELLE ADORNO:**  I live in New York.

15       **THE COURT:**  And what was the amount that you borrowed?

16       **DANIELLE ADORNO:**  Federally I borrowed 21,000, and
17   privately I borrowed 5,000 for a 9-month program.

18       **THE COURT:**  Thank you.  Thank you.  We will go to the
19   next person, but I need to -- I need to ask everyone who is
20   speaking -- especially if you are on cell phone -- to speak
21   slowly kind of like the way I am because it is hard -- it is
22   sometimes hard to hear perfectly.

23   Some of you come through clearly, and some of you come
24   through a little muffled.  So if you are on a cell phone,
25   please -- even if you are reading it, speak slowly.  It will

1   also help the court reporter.  It will also help me.  I want to

2   get everything that you have to say.  Okay, Angela, next.

3            **THE CLERK:**  Next is Rebekah Sanchez Norton.

4            **REBEKAH SANCHEZ NORTON:**  Thank you, Your Honor, for

5   this opportunity to share the importance and potential impact

6   of the proposed settlement to me, my family and my fellow

7   defrauded borrowers.

8        As a working mother of four children, two of whom are

9   special needs, and a community-based mental health worker, I

10  was hopeful for justice and submitted my claim and was received

11  by the Department of Education On November 3rd of 2016.

12       When I received notification about the proposed

13  settlement, I was hopeful that the extended delay of a decision

14  on my claim was nearing an end and that our federal courts

15  would enforce a timely review of claims that like mine were in

16  status for years.

17       Enforcing the terms of what proposed was a fair and

18  appropriate resolution would acknowledge the significance of my

19  continued financial devastation and validate the callous and

20  seemingly mass volume of denials by the Department of Education

21  three months following the settlement agreement.

22       Among this group I am certainly not the only person who

23  submitted claims but because of loans are unable to provide for

24  their families due to fraudulent schools.

25       Not the only one in their 40s unable to contribute to

retirement funds and have been ineligible for employment

opportunities limited only due to my debt to income ratio with

momentous student loans making me considered incompatible for

County and State jobs due to the set ratio and providing an

appearance of irresponsible disregard of finances to

organizations; organizations that defrauded me and other

borrowers.

I am sure most others in the courtroom today have also

been denied loans for vehicles and are unable to invest in a

home themselves or a family like I am.

As one of the thousands of borrowers denied relief only

after April's agreement, I understand that the debilitating

financial devastation that my family and I have faced is not

what is under review today.

When my claim was denied in July after years of waiting

for review, adequate notice that was agreed on in the

settlement was not provided me.  I was dismissed with a vague,

confusing and incomplete explanation of decision.

Your Honor, I believe our country, its public servants and

general population fundamentally strive for justice, equality

and genuinely values honesty and integrity.  And I hope you can

help the borrowers obtain that justice.  Thank you, Your Honor.

**THE COURT:**  Okay.  You said that you received a denial

in July?

**REBEKAH SANCHEZ NORTON:**  Yes, sir.

1           **THE COURT:**  How long was that -- how long a statement

2     was it?

3           **REBEKAH SANCHEZ NORTON:**  Oh, it was very brief and

4     vague.  I didn't understand.  It was very confusing and without

5     complete sentences.  There was no explanation of this denial

6     after three and a half years and literally pounds, I mailed, of

7     supporting information.

8           **THE COURT:**  What -- do you have it right there with

9     you?

10          **REBEKAH SANCHEZ NORTON:**  My documents?  Or the

11    application?

12          **THE COURT:**  The denial.

13          **REBEKAH SANCHEZ NORTON:**  The denial, I can -- it's on

14    the same phone in my e-mail box, Your Honor.

15          **THE COURT:**  Well, can you -- if you had it handy, I

16    would like you to read the denial out loud so I can hear what

17    it said.

18          **REBEKAH SANCHEZ NORTON:**  Yes, Your Honor.  Let me grab

19    that.  I apologize.

20                         (Pause in proceedings.)

21          **THE COURT:**  Let's do this:  While you look for it, we

22    will go to the next person and I will come back to you.

23          **REBEKAH SANCHEZ NORTON:**  I appreciate it, Your Honor.

24    Thank you.

25          **THE COURT:**  Okay.  Next.

1          **THE CLERK:**  Next is Victoria Linssen.  Ms. Linssen,

2     you may need to dial star 6 to unmute your phone.

3                    (Pause in proceedings.)

4          **MS. LINSSEN:**  Can you hear me?

5          **THE COURT:**  Yes, now we can.

6          **MS. LINSSEN:**  Okay.  So sorry.  It took me a few

7     seconds to unmute.

8          Good morning, Your Honor.  I applied for my Brooks

9     borrower's defense to -- application in October of 2016.  I'm

10    still waiting to be -- I'm still waiting for my application to

11    be reviewed.  I have received neither a denial or an approval,

12    and I just have a very short statement today.

13         What I'm witnessing amongst my fellow classmates is that

14    it feels to me like the borrower's defense to repayment

15    application that are now being reviewed are being blanket

16    denied whether or not a student has a legitimate claim.

17         And I would really like to be provided with transparency

18    on the exact criteria and data points that the applications are

19    being approved or denied for.

20         And that is it, short and sweet.  Thank you, Your Honor.

21         **THE COURT:**  And where do you live now?

22         **MS. LINSSEN:**  I live in Muncie, Indiana.  I lost my

23    job, my livelihood.  Lost my home.  My car.  Was out of work

24    for four years and forced to move seven states and 1,800 miles

25    away from my family to get work.

1           **THE COURT:**  How much did you borrow?

2           **MS. LINSSEN:**  I initially borrowed I think around -- I

3      want to say around 80 or 90,000.  And I have been paying

4      consistently on my private student loans for eight years.  And

5      that balance for my private student loans have -- I have paid

6      $30,000 on my private student loans, and the balance has gone

7      down by $2,000.

8           I owe $77,000 on my private student loans.  And my federal

9      student loans started at around $45,000.  And with interest,

10     they have ballooned to over 65,000.  So I'm over $125,000 in

11     debt and in student loans right now.

12          **THE COURT:**  What was the name of the institution or

13     the school?

14          **MS. LINSSEN:**  I went to The Brooks Institute of

15     Photography, which in its height was a private institution and

16     then was bought by Career Education Core.  They had a class

17     action lawsuit filed against The Brooks Institute and -- in

18     around 2003 to 2005.

19          When I attended, I asked some very hard questions to the

20     administrators about that lawsuit and I was -- I was told that

21     my concerns were valid items; that the previous lawsuit items

22     and issues had been cleaned up.  And, in fact, they had

23     actually not been cleaned up.

24          And I believe that when Brooks went downhill is when they

25     were purchased by Career Education Corporation, and that's when

the fraud against the students began.  Brooks was accepting
loans for students all the way up until the day they filed
bankruptcy, and they were expanding leases on properties in
Southern California also all the way up until the day they
filed bankruptcy.

      **THE COURT:**  All right.  I wish I had more time to hear
it all, but I appreciate very much your coming in.

    Now, let's go back to Ms. Rebekah Sanchez Norton, I
believe it was.

      **REBEKAH SANCHEZ NORTON:**  Yes, Your Honor.  I have it
right here.  Thank you for that time.

    Would you like me to read the Department of Education -- I
will just start.  I apologize.

    It is dated July 10 of 2020.  It has my application number
and my name (reading):

    Dear Rebekah Norton:  The U.S. Department of Education
(ED) has completed its review of your application under the
applicable borrower defense to repayment regulations for
discharge of your William D. Ford federal direct loans (direct
loans) made in connection with your or your child's enrollment
to Brooks Institute.

    You, in quotation marks, as used here should be read to
include your child if you are a direct plus loan borrower who
requested a discharge for loans taken out to pay for a child's
enrollment at Brooks Institute.

1      ED has determined that your application is ineligible for

2  relief based on review of the facts of your claim and the

3  regulatory criteria for relief.  This decision means that your

4  direct loans will not be discharged.  ED explains the reasons

5  below.

6      Applicable law.  For direct loans first disbursed prior to

7  July 1st, 2017, a borrower may be eligible for a discharge

8  (forgiveness) or part or all of one or more direct loans if the

9  borrower's school engaged in acts or omissions that would give

10 rise to cause of action against the school under applicable

11 State law.

12     Would you like me to quote the law?  It then says:  See

13 with squigglies 455(H) of the Higher Education Act of 1965 as

14 amended 20 U.S.C., squigglies, 1087E(H) and 34CFR, more

15 squigglies, 685.26C and 685.222, the borrower defense

16 regulations.

17     ED recognizes a borrower's defense to repayment of a

18 direct loan only in the cause of action if the cause of action

19 directly relates to the direct loan or to the school's

20 provision of educational services for which the direct loan was

21 provided.

22     34CFR, two more squigglies, 685.206(c)(1) and 6851.222(a)

23 (5), U.S. Department of Education notice of interpretation, 60

24 Fed Reg. 37,769 (July 21, 1995).

25     Then in bold it says:  Why was my application determined

1   to be ineligible?

2        ED reviewed your borrower defense claims based on any

3   evidence submitted by you in support of your application.  Your

4   loan data from National Student Loan Data System (NSLDS) and

5   evidence provided by other borrowers.

6        Allegation 1, other.  You allege that Brooks Institute

7   engaged in misconduct related to other.

8        This allegation fails for the following reasons:  Failure

9   to state a legal claim.  Your claim for relief on this basis

10  therefore is denied.

11       Allegation 2, educational services.  You allege that

12  Brooks Institute engaged in misconduct related to educational

13  services.

14       This allegation fails for the following reasons:  Failure

15  to state a legal claim.  Your claim for relief on the basis,

16  therefore, is denied.

17       Allegation 3, transferring credits.  You allege that

18  Brooks Institute engaged in misconduct related to transferring

19  credits.

20       This allegation fails for the following reasons:  Failure

21  to state a legal claim.  Your claim for relief on this basis,

22  therefore, is denied.

23       Allegation 4, career services.  You allege that Brooks

24  Institute engaged in misconduct related to career services.

25       This allegation fails for the following reasons:

1    Insufficient evidence.  Your claim for relief on this basis,

2    therefore, is denied.

3        Allegation 5, program costs and nature of loans.  You

4    allege that Brooks Institute engaged in misconduct related to

5    program costs and nature of loans.

6        This allegation fails for the following reasons:

7    Insufficient evidence.  Your claim for relief on this basis,

8    therefore, is denied.

9        Allegation 6, employment prospects.  You allege that

10   Brooks Institute engaged in misconduct related to employment

11   prospects.

12       This allegation fails for the following reasons:

13   Insufficient evidence.  Your claim for relief on this basis,

14   therefore, is denied.

15       What evidence was considered in determining my

16   application's ineligibility?  We reviewed evidence provided by

17   you and other borrowers who attended your school.

18       Additionally, we considered evidence gathered by the --

19   from the following four sources:  New York Attorney General's

20   Office, Pennsylvania Attorney General's Office, evidence

21   obtained by the Department in conjunction with its regular

22   oversight activities, publicly available security filings made

23   by Career Education Corporation, now known as Perdoceo

24   Education Corporation; multi-state Attorney General assurance

25   of voluntary compliance effective January 2nd, 2019.

1    What do I -- what if I do not agree with this decision?

2   If you disagree with this decision, you may ask ED to

3   reconsider your application.

4    To submit a request for reconsideration, please send an

5   e-mail with the subject line "request for reconsideration,

6   reference 00Dt0GYIQ._500t0DPQQS:ref to borrowerdefense@ed.gov

7   or mail your request to U.S. Department of Education, P.O. Box

8   1854, Monticello, Kentucky, 42633.

9    In your request for reconsideration please provide the

10  following information:  Which allegations you believe that the

11  ED incorrectly decided; why you believe that ED incorrectly

12  decided your borrower defense to repayment application; and,

13  three, identify and provide any evidence that demonstrates why

14  ED should approve your borrower defense to repayment claim

15  under the applicable law set forth above.

16    ED will not accept any requests for reconsideration that

17  includes new allegations.  If you wish to assert allegations

18  that were not included in your application, please see the

19  following section.

20    Additionally, your loans will not be placed into

21  forbearance unless your request for reconsideration is accepted

22  and your case is reopened.

23    Failure to begin or resume repayment will result in

24  collection activity including administrative wage garnishment,

25  off-set of state and federal payments you may be owed and

litigation.

     For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8:00 a.m. to 8:00 p.m. Eastern Time, ET, on Monday through Friday.

     Can I apply for borrower defense if I have additional claims?  If you wish to file a new application regarding acts or omissions by the school other than those described in the borrower defense application -- and then it has case number in paren, but like the words case number, not actual numbers -- please submit an application at studentaid.gov\borrower-defense.

     In the new application you should explain in the relevant sections the basis for any new borrower defense claims and submit all supporting evidence.

     What should I do now?  Besides cry.  Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans.

     ED will notify your servicers of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance.

     Further, if any loan balance remains, the loans are returned to their status prior to the submission of your application.

1    If your loans were in forbearance as a result of your

2 borrower defense application, the servicer will remove these

3 loans from forbearance.  *See COVID-19 note below.

4    If your loans are in default and are currently in stopped

5 collections, your loans will be removed from stopped

6 collections.

7    Failure to begin or resume repayment could result in

8 collection activity such as administrative wage garnishment,

9 off-set of state and government payments that you may be owed

10 and litigation.  *See COVID-19 note below.

11    While normally interest would not be waived for

12 unsuccessful borrower defense applications, given the extended

13 period of time it took ED to complete the review of the

14 application, the Secretary is waiving any interest that accrued

15 on your direct loans from the date of the filing of your

16 borrower defense application to the date of this notification.

17    Your servicer will provide additional information in the

18 coming months regarding the specific amount of interest

19 adjusted.  *See COVID-19 below.

20    *COVID-19 note:  On March 27, 2020, the President signed

21 the CARES Act, which among other things provides broad relief

22 and response to coronavirus disease, 2019 (COVID-19) for

23 federal student loan borrowers whose loans are owned by ED.

24    For the period of March 2020 through September 30th, 2020,

25 the interest rate on the loans will be zero percent and no

payments will be required.

During the same period for defaulted borrowers all proactive collection activities, wage garnishments and treasury off-sets will be stopped.

Your federal loan servicer will answer any questions you have about your specific situation.  In addition, federal student aid's COVID-19 information page for students borrowers and parents are located at studentaid.gov\coronavirus.  Please visit the page regularly for updates.

What if I have another pending borrower defense application?  If you have an additional pending defense -- borrower defense to repayment application, this information applies to you:  If your loans associated with an additional borrower defense to repayment application that is still pending, are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status.

Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

If you are unsure if you have additional pending applications or if you would like to check the status of your loans associated with an additional application, contact our borrower defense hotline at 855-279-6207 from 8:00 a.m. to

 1    8:00 p.m. ET on Monday through Friday.

 2        ED offers a variety of loan repayment options including

 3    the standard 10-year repayment plan as well as extended

 4    repayment, graduated repayment and income-driven repayment

 5    plans.

 6        For more information about student loan repayment options,

 7    visit studentaid.gov\plans.  If you have questions about the

 8    status of your loans or questions about repayment options,

 9    please contact your servicers.

10        If you do not know the name of your federal loan servicer,

11    you may go to studentaid.gov to find your servicer and get your

12    federal loan information.

13        Sincerely, U.S. Department of Education, Federal Student

14    Aid.

15        **THE COURT:**  All right.  Thank you.

16        **REBEKAH SANCHEZ NORTON:**  Thank you, Your Honor.

17        **THE COURT:**  I noticed in the discussion about what I

18    can do now -- or what you can do now, there was no mention that

19    everyone has the right to go to court.

20        **REBEKAH SANCHEZ NORTON:**  No, Your Honor.

21        **THE COURT:**  It doesn't mention that.  But you do have

22    that right.  And that's not what is involved in this lawsuit.

23        What is involved in this lawsuit is trying to get a

24    decision.  But once a decision is made -- those notices maybe

25    should have said:  By the way you have the right to sue us in

1  your District Court if you feel that the decision is not a

2  correct decision.

3      So I'm concerned over that lack of notice to that effect.

4  And all class members should be aware of that procedural

5  option.  Ms. Norton, where do you live?

6      **REBEKAH SANCHEZ NORTON:**  I'm a military brat who

7  landed in Ventura County, California.

8      **THE COURT:**  All right.  Well, you did a very good job

9  reading that.

10     **REBEKAH SANCHEZ NORTON:**  Thank you, Your Honor.  Sorry

11 there was a delay.

12     **THE COURT:**  What do you do for a living?

13     **REBEKAH SANCHEZ NORTON:**  Currently I serve the

14 Medi-Cal community in connecting them to services that are

15 appropriate mental health providers or pointing them to the

16 county for more intensive care.

17     **THE COURT:**  And how much did you borrow?

18     **REBEKAH SANCHEZ NORTON:**  Originally I borrowed, I want

19 to say, about 72,000.  But I was unable to transfer credits, so

20 I attended -- to be eligible for the job I have now, only

21 another private institution would accept a degree, after much

22 begging and pleading.  And so I now currently owe over 170,000.

23 And I only borrowed 20,000 on the additional private before

24 stopping.

25     **THE COURT:**  What was the name of the institution you

1  went to?  Was it called Brooks?

2        **REBEKAH SANCHEZ NORTON:**  I went to Brooks, yes,

3  Your Honor.

4        **THE COURT:**  All right.  All right.

5        **REBEKAH SANCHEZ NORTON:**  Thank you for your time.

6        **THE COURT:**  Thank you.  All right.  Let's go to the

7  next person.

8        **THE CLERK:**  All right.  Thank you, Ms. Norton.  Next

9  is Maureen Simmons.

10       **MAUREEN SIMMONS:**  Good morning, Your Honor.  My name

11  is Maureen Simmons.

12     I filed borrower's defense for $10,000 in loans for Med

13  Help Training School who fraudulently received the loans on my

14  behalf.

15     When I received the e-mail notifying me of the settlement

16  agreement in this matter, I was thrilled at the prospect of

17  finally getting closure for an issue that has been in limbo for

18  years.

19     Unfortunately, several days later I received an e-mail

20  from the Department of Education dismissing my borrower defense

21  application.

22     The Department's vague e-mail claimed there were flaws in

23  my application; though, my application addressed every issue

24  they outlined in great detail.

25     I contacted the class attorneys, but soon learned the

1   Department was issuing blanket decisions for thousands of

2   applications just days after the settlement agreement.

3        Secretary DeVos continues to practice widespread abuse of

4   power that has harmed thousands of class members and her

5   actions circumvent the intentions of the settlement agreement.

6        Like so many others, my application was dismissed without

7   so much of a review of the materials I presented.  This smacks

8   in the face of fairness.  So I beg the Court to not allow this

9   settlement agreement to proceed.

10       Your Honor, I deserve better.  And the members of this

11  class deserve better.  Thank you.

12            **THE COURT:**  Thank you, Ms. Simmons.  Where do you

13  live?

14            **OTHER ATTORNEY:**  I currently live in Northern

15  California in Fairfield.

16            **THE COURT:**  All right.  Thank you.  Next.

17            **THE CLERK:**  Thank you, Ms. Simmons.  Next is Tarah

18  Gramza.  You may need to unmute your phone by dialing star 6.

19                 (Pause in the proceedings.)

20            **THE CLERK:**  It looks like you are unmuted, but we

21  still can't hear you.

22            **TARAH GRAMZA:**  Sorry.  Can you hear me now?

23            **THE CLERK:**  Yes, we can.

24            **TARAH GRAMZA:**  Sorry about that.  Good morning.  Thank

25  you, Your Honor, for letting me speak this morning.

1    I applied in September 2016 for borrower defense program

2    prior to there being a formalized application.

3         After my school, American Intercontinental University

4    online owned by Career Education Corporation or CEC, which we

5    have heard commonly this morning, had multiple sanctions for

6    misbehavior for lying about education, quality, quality of

7    teachers, pressure to enroll, cost of education and others --

8    all of which I personally experienced while attending -- I

9    submitted five separate, carefully written and thought-out

10   complaints with numbered allegations and links to citations and

11   even added additional evidence when CEC had its DOJ settlement

12   for the exact same allegations in 2019.

13        After the *Sweet versus DeVos* proposed settlement, my case

14   was denied in July 2020 with the decision "lack of evidence"

15   for one of the five complaints.

16        The other four complaints were completely ignored and no

17   other explanation was provided.

18        When I called the defense care center, they said to

19   reapply for a new application and file an appeal as well as

20   that they could not see the original complaint due to their

21   system issues of which I did complete.

22        I recently received another e-mail asking for a copy of my

23   original complaint -- yes, from 2016 -- by the Department of

24   Education because they could not see my complaint of which I

25   sent again.

```
 1        If the Department is going to use this settlement to mass
 2   deny cases and not even review them thoroughly and give them
 3   any formal look at, this settlement is completely pointless and
 4   doesn't resolve the lawsuit in a fair manner for us at all.
 5   Thank you.
 6           THE COURT:  Okay.  Tell me your name.  I didn't get
 7   it.
 8           TARAH GRAMZA:  Sure.  My first name is Tarah, and my
 9   last name is Gramza.
10           THE COURT:  Spell the last name.
11           TARAH GRAMZA:  Sure.  It is G-R-A-M-Z-A.
12           THE COURT:  What was the first T or P?
13           TARAH GRAMZA:  G, as in George.  And my first name is
14   Tarah with a T.
15           THE COURT:  Okay.  Where do you live?
16           TARAH GRAMZA:  I live in Arizona.
17           THE COURT:  And how much did you borrow?
18           TARAH GRAMZA:  About $85,000.  I'm now just under
19   $100,000 with the interest.
20           THE COURT:  Okay.  Thank you very much.  Next.
21           THE CLERK:  Thank you, Ms. Gramza.  Next is Evelyn
22   Segovia.
23           EVELYN SEGOVIA:  Hello.  My name is Evelyn Segovia.
24   Let me walk away.  I think I'm getting some feedback.
25           THE CLERK:  If you have another device logged in, you
```

1    should hang up there.

2         **EVELYN SEGOVIA:**  I'm -- so I started attending

3    University of Phoenix in 2007.  I graduated in 2011 and with

4    approximately $69,000 in debt.  And it has since ballooned to

5    around $82,000 in debt due to interest.

6         I received almost the same exact denial letter that one of

7    the previous speakers mentioned.  And they specifically stated

8    that they also reviewed information from the FTC in regards to

9    deciding my application just like they did in hers.

10        I find that especially interesting considering that in

11   2009 the Department of Education produced a report claiming the

12   untimely return of title funds for more than 10 percent of

13   sampled students.

14        The University of Phoenix has settled a false claims suit

15   for $78 and half a million in 2009.  In 2014 the U.S.

16   Department of Education's Office of the Inspector General

17   demanded records from University of Phoenix and the Apollo

18   Group going back to 2007, which was when I was attending,

19   related to marketing recruitment, enrollment, financial aid,

20   fraud prevention and student retention.

21        In October of 2015, the U.S. Department of Defense

22   suspended the school's ability to recruit on U.S. military

23   bases and receive federal funding for educating members of the

24   U.S. Military.

25        The Federal Trade Commission began investigating the

1   University in 2015 in regards to an advertising campaign that

2   ran in 2012 through 2014.  There was also a settlement in

3   relation to that.

4       So to cite in my denial letter that you considered

5   evidence that both other borrowers submitted along with

6   evidence that the FTC already had seems fraudulent because they

7   very clearly did not review their own records considering that

8   I attended at the same time that they also allege that my

9   school participated in predatory practices.  So with that,

10  I'm -- I just believe that they are also issuing blanket

11  denials.

12      If you, yourself, accuse a school of predatory lending

13  practices and fraudulent activity, then it -- you know, it is

14  reasonable to assume that the students who are alleging the

15  same misconduct would receive that same consideration.  That's

16  all I have to say.

17          **THE CLERK:**  Your time is up.

18          **THE COURT:**  Okay.  Next.

19          **THE CLERK:**  Are you ready to hear the next person?

20          **THE COURT:**  Yes, I am.  Next.

21          **THE CLERK:**  Next is Cassandra Nordman.

22          **CASSANDRA NORDMAN:**  Thank you, Angela.  And thank you,

23  Judge Alsup for your time.

24      My name is Cassandra Nordman.  I attended McNally Smith

25  College of Music in St.Paul, Minnesota.  I borrowed around

75,000.

My college targeted minorities and lower income households; lied about their accreditation; convinced us to take hundreds of thousands of dollars in loans; fraudulently altered our graduation requirements; and led us into additional semesters and additional loans; and washed their hands of us in a bankruptcy filing that left absolutely nothing for former students and no personal local recourse.

Now we sit with our futures wrecked by debt and meaningless degrees.  The borrower's defense is the only chance we supposedly have.

We are not millennials looking for an easy way out.  We are hardworking individuals who trusted our federal government to provide us with the ability to seek higher education.  We are not lazy.  We are the young adults who are committed to hundreds of thousands of dollars of debt as teenagers.  Many of us without the support of family.

We are the people who grew up here, and you have to go to college to defy the odds to get ourselves there.  Now, after we have been maliciously taken advantage of, we have fought through the only (inaudible) available to us, the borrowers defense.

(Inaudible) education holding our future captive, in best case scenarios or dismissed in mass for people speaking today. I hear the fight and pain in other people speaking that I have

known constantly for the last five years.

     The settlement alone include 160,000 Americans currently being crippled by not only a pandemic but to the administrations' desperate account to look away from the devastating effect of predatory institutions.

     There is no question that these types of establishments do not align with our American values as evident in the admissions of this process.

     The Department of Education continues to do everything in their power to keep from rectifying the wrongdoing of these institutions.  Holding up this process and dismissing cases without real consideration is actively causing harm.

     I'm sure you can imagine the crossover in currently unemployed people who were taken advantage of by these for-profit institutions.  If anything, the settlement does not begin to come close to doing anything to assure us.

     I ask the Court to remove the decision of the borrower's defense application from the Department of Education and place the investigation in the hands of an independent organization. Thank you for your time.

          **THE COURT:**  All right.  Thank you.  Next.

          **THE CLERK:**  Next is Hugh McGinley but I'm not seeing him anymore.

     So if you are here, Mr. McGinley, please raise your hand and I will call you after the next person.

1      Ashley Hardin, you may need to dial star 6 to unmute your

2  phone.

3          **ASHLEY HARDIN:**  Good morning, Honorable Alsup.  Can

4  you hear me?

5          **THE COURT:**  Yes, I can.  Thank you.

6          **ASHLEY HARDIN:**  Fantastic.  My name is Ashley Hardin

7  and I graduated from Brooks Institute, a CEC owned school, in

8  2009.

9      And I have spent the last 11 years of my life thwarting

10  through and dealing with what feels very much like a

11  bamboozlement.

12      I feel I, along with my colleagues, have -- were taken

13  advantage of and preyed upon by not only our college but by the

14  federal government and their servicers.

15      I am not alone when I say that I have spent a great deal

16  of time and pain in recalling and preparing my application for

17  the review process only to be part of what feels like a blanket

18  denial in which I don't think my application or my colleagues

19  were properly reviewed nor judged.

20      At this time I have questions which is -- which are:  Did

21  lawyers review our applications?  Also, without further

22  information and direction from the Department of Education on

23  the denial reasonings or any further explanations regarding the

24  denial letters, how do you recommend we proceed to appeal?

25  Thank you for your time.

1          **THE COURT:**  I wish I could answer that.  I don't have

2    any answers of that problem.

3          **ASHLEY HARDIN:**  Okay.

4          **THE COURT:**  You should talk to the class action

5    lawyers here, Ms. O'Grady.  She is on the line and she

6    represents the class, and she could give you some advice about

7    that but --

8          **ASHLEY HARDIN:**  Perfect.  Thank you.

9          **THE COURT:**  But as the Judge, I -- I can't really get

10   into giving you advice on how to proceed but she can.

11         **ASHLEY HARDIN:**  Sure.  Okay.

12         **THE COURT:**  I could hear your comments.  Where do you

13   live?

14         **ASHLEY HARDIN:**  I currently reside in Seattle,

15   Washington.

16         **THE COURT:**  And how much did you say you borrowed?

17         **ASHLEY HARDIN:**  I borrowed over 150,000.  And I

18   currently over 133,000.

19         **THE COURT:**  All right.

20         **ASHLEY HARDIN:**  I was current from about 2013 up until

21   March of 2020.

22         **THE COURT:**  Did you also get a denial letter?

23         **ASHLEY HARDIN:**  I did.  I applied for borrower defense

24   November 2nd, 2016, and received my denial letter on July 10th,

25   2020.

 1          **THE COURT:**  Okay.  I appreciate your -- tell me

 2    this -- I couldn't understand one part -- do you --

 3          **ASHLEY HARDIN:**  Sure.

 4          **THE COURT:**  Do you support -- do you want me to

 5    approve this final settlement or do you want me not to approve

 6    it?

 7          **ASHLEY HARDIN:**  I'm for the settlement.  I just don't

 8    feel like the Department of Ed held up their end of the stick.

 9          **THE COURT:**  Okay.  Let's go to the next --

10          **ASHLEY HARDIN:**  Thank you.

11          **THE CLERK:**  Thank you, Ms. Hardin.  It looks like

12    Mr. McGinley is back.  Mr. McGinley, you can -- sorry.  I think

13    I just muted you after you unmuted yourself.

14          **HUGH McGINLEY:**  No problem.  Thank you, Judge Alsup

15    for listening to us.  The time you have already given us is way

16    more than DOE and Betsy DeVos have given us.

17          I disagree with the proposed settlement agreement in this

18    case because I think it is unfair to students.  Under the

19    settlement motion Section A settlement class, this should

20    expand indefinitely.  Not everyone is aware that they can

21    submit a defense to repayment against their fraudulent school.

22    So it excludes those who did not.

23          This should also include those who have already received a

24    decision and those who submit DTIs after the executed

25    settlement.

1      Under Section B relief, the 18 to 21-month time limit

2  given to the DOE to address submitted DTIs is too long and

3  lenient.  The DOE has had plenty of time to address submissions

4  already; some like mine that have taken over four years to

5  address with still no response provided.  Instead, the DOE has

6  used that time to ignore students and to rewrite the rules more

7  favorably towards schools.

8      They are also showing they are not taking this lawsuit

9  seriously and just blanket denying almost every DTI submission

10  since April of this year.

11      The 90-day time period the DOE has been given to report

12  their decision to Plaintiffs is also too long.  This

13  information is easily shareable and should be provided once

14  every one to two weeks, if not on a daily basis.

15      In closing, I do not feel that Betsy DeVos and the DOE are

16  acting in good faith in regards to this lawsuit.  The blanket

17  denials the DOE are giving out are a joke, and they are just

18  laughing in both our faces and the courts.  They are just

19  giving out decisions to meet their requirement.

20      In my opinion all submitted DTIs should be approved and

21  the debt of these students should be forgiven, both federal and

22  private.  The DOE should also be both penalized and

23  investigated for their mishandling and blatant ignorance

24  towards all DTI submissions for many years now.

25      Finally, Betsy DeVos and the DOE should apologize to the

1   Plaintiffs, the Court and to you, Judge Alsup, for treating

2   this lawsuit as a joke.  Thank you.

3           THE COURT:  What was your name again?

4           HUGH McGINLEY:  My name is Hugh McGinley.  I currently

5   live in Los Angeles, California.

6           THE COURT:  All right.  And the amount of your loans?

7           HUGH McGINLEY:  I borrowed 90,000 for this particular

8   defense to repayment.  It's over $100,000 now.

9           THE COURT:  Thank you.

10          HUGH McGINLEY:  You are welcome.  Thank you.

11          THE COURT:  I didn't understand.  You oppose the

12   settlement; is that correct?

13          HUGH McGINLEY:  Yes.  A lot of the terms in the

14   settlement I don't agree with.  It gives the DOE -- it is too

15   lenient to the Department of Education.

16          THE COURT:  And you would -- and did you get a denial

17   letter or not?

18          HUGH McGINLEY:  I did not, sir.  It has been over four

19   years.

20          THE COURT:  Okay.  You are still waiting.  All right.

21   Let's go to the next class member.

22          THE CLERK:  Thank you, Mr. McGinley.  Next is Kishan

23   Redding.

24          THE COURT:  We cannot hear you.  Please push the right

25   buttons.

 1          **KISHAN REDDING:**  Good morning, Your Honor.

 2          **THE COURT:**  We hear you now.

 3          **KISHAN REDDING:**  Great.  Good morning.

 4      I am saddened but also comforted by my fellow class

 5  members' stories.  I truly felt alone until this morning.

 6          While I am in support of the proposed settlement, I would

 7  like to express my concerns regarding oversight and the process

 8  of reviewing applications.

 9          I feel that applications are not reviewed as thoroughly

10  and appropriately as they should be.  For example, after

11  waiting for four years, I received a response denying my

12  application with a total of less than 30 words.  I find wholly

13  suspect that my decision just so happened to be received around

14  the time this case was being settled.

15          If the Department of Education was taking years to respond

16  to applications, logically I feel there is reason for me to

17  question how they would manage and respond to class members'

18  applications within 18 months without rushing through the

19  process.

20          We all know that we have had some major changes in the

21  world, in this country.  And now there is another concern.  How

22  are these investigations going to be completed thoroughly when

23  a lot of schools are having alternate class arrangements?

24          How will they investigate fairly; converse with other

25  students and get information from enough sources related to the

schools when people are still in transition trying to figure
out how to make school work?  These are questions that class
members need to know.

Lastly, the Department claims they are provided with
information from other borrowers.  And I question the
demographics of these borrowers.

As a person of color, I am well aware of disparities and
clear differences between borrowers of different identities and
insist the demographics are taken into account.

People of color, low income individuals and aspiring
artists, amongst many others, are preyed upon as it may be
difficult to get into different schools for a variety of
reasons.

The predators -- and I stand by that word -- of these
schools have taken advantage of thousands of students, and
those students are entitled to a fair and thorough -- I repeat,
fair and thorough -- review of their cases.  Thank you very
much.

      **THE COURT:**  All right.  Is it Redding, R-E-D-D-I-N-G?

      **KISHAN REDDING:**  Yes, Your Honor.

      **THE COURT:**  Where do you live, Mr. Redding?

      **KISHAN REDDING:**  I'm in Los Angeles, California.

      **THE COURT:**  What do you do for a living?

      **KISHAN REDDING:**  I'm actually unemployed right now,
but I worked pre-pandemic as a teaching artist in the school

1    districts.

2          **THE COURT:**  All right.  Well, I could -- I could hear

3    you very clearly.  Are you on a landline or a cell phone?

4          **KISHAN REDDING:**  I'm on the computer actually.

5          **THE COURT:**  Really.  Amazing, very clear.  How much

6    did you borrow?

7          **KISHAN REDDING:**  About 80,000.

8          **THE COURT:**  Okay.  And did you say you did get one of

9    those denial letters or did not?

10         **KISHAN REDDING:**  Yes, I did receive a denial letter.

11         **THE COURT:**  Okay.  And do you support the settlement

12   as written or not?

13         **KISHAN REDDING:**  I support the settlement if there is

14   oversight and people who are not related to the DOE overseeing

15   the process.  I do not support the settlement if the DOE is

16   going to be able to do this alone.

17         **THE COURT:**  Okay.  All right.  Thank you.  Good luck,

18   Mr. Redding.  Next.

19         **THE CLERK:**  Those are all of the people that were

20   selected to speak that confirmed that they were able to speak.

21         **THE COURT:**  I didn't hear you.

22         **THE CLERK:**  Those are all of the people who were

23   selected to speak who showed up at the hearing.

24         **THE COURT:**  Oh, I see.  We have now heard everyone?

25         **THE CLERK:**  That's correct.

1          **THE COURT:**  It is hard for me to hear you too, Angela.

2   I don't know what, the acoustics are.  We are done with the

3   list?

4          **THE CLERK:**  We are done with the list.

5          **THE COURT:**  I see.  Okay.

6          **JANA BERGEVIN:**  Your Honor, may I request to be able

7   to speak following up to something you have mentioned?  I don't

8   know if I'm allowed that, but I thought I would ask.

9          **THE COURT:**  I will let one more person speak, but I

10  can't let -- we have 511 people.  And I just can't hear

11  everyone, you know.  I have got other cases.  And we selected a

12  representative group, but we will let you speak.  One more.  Go

13  ahead.

14         **JANA BERGEVIN:**  Okay.  Thank you.  I had spoken before

15  but something, Your Honor, had said struck me very much, which

16  was that we could seek legal aid to combat these denials.

17      And I wanted to say that that is very far from the truth.

18  I have tried to sue, you know, on by borrower defense before to

19  push for this kind of decision making or just to get a

20  decision.

21      I contacted my local bar association.  I contacted Air Reg

22  (phonetic).  There are no lawyers that will represent a

23  borrower individually.  They don't exist.  So I just wanted to

24  reach out through this that experience.

25         **THE COURT:**  That's good to know.  Ms. O'Grady is on

1 the line.  You should talk to her separately, not in front of

2 everybody.  Maybe she can give you some advice on how to get a

3 lawyer to take an appeal to District Court in your case.

4     **JANA BERGEVIN:**  I would be lucky because I live in

5 California, but I don't see this happening for other members

6 that are in other states.  I just --

7     **MS. O'GRADY:**  Your Honor, this is Margaret O'Grady.

8 If you wouldn't mind, can I address this question briefly?

9     **THE COURT:**  Please, go ahead.

10     **MS. O'GRADY:**  I would just like to reiterate there are

11 170,000 borrowers that are members of this class.  I would love

12 to have the ability to represent every single one of them to

13 challenge the denials on the merits.  I think, for many

14 reasons, that is plainly impractical.

15     And that is why we are here today; to hear from this class

16 of borrowers on the class-wide issue on the Department of

17 Education refusing to decide these borrower defense

18 applications on the merits.

19     And so I think that, as you identified, there is a problem

20 with the notices because they don't -- for many reasons -- but

21 one reason is they don't even state the borrower can seek

22 redress in their district court.  And they don't provide enough

23 information for them to do so.

24     And, as Ms. Bergevin is noting, on an individual basis,

25 there is an impracticability here because there are, in this

1   case alone, 170,000 borrowers affected.

2          **THE COURT:**  Thank you.  That's good information for

3   everyone to have.

4          Well, I need to bring this to a close -- I mean the

5   hearing to a close.  I don't know what to do about whether to

6   approve the settlement or not.  I have to study this.

7          Okay.  We will now sign off and we will bring -- I'm

8   bringing the hearing to a close unless -- I will let the

9   lawyers -- do the lawyers have anything further to say?

10         **MS. O'GRADY:**  Your Honor, I would like to make two

11  more brief points if you will allow me.

12         **THE COURT:**  Say it again.

13         **MS. O'GRADY:**  I would like to make two more brief

14  points if you will allow me to.

15         **THE COURT:**  Sure.  Go ahead.

16         **MS. O'GRADY:**  Thank you.  The first is I just want to

17  express my gratitude and gratitude on behalf of the Plaintiffs'

18  counsel for everyone attending today and those class members

19  who spoke and everyone who asked to speak.

20         It is not often that we get together altogether and that

21  they get to communicate together.  They are their best

22  advocates, and we are honored to represent you.  So I wanted to

23  just give that message to all the class members.

24         I would also like to note that there has been a very

25  active chat during this hearing.  Of course, I have been paying

1    attention to the speakers and haven't been able to go through.

2       But individuals who are on the line and in the chat have

3    been posting full texts of their denial letters.  And other

4    borrowers are weighing in and saying:  I received the exact

5    same denial letter, the exact same text, or I got the same

6    letter.  Just the school name was different.  People are

7    discussing this openly in the chat.

8       And I'm hoping, perhaps, there is a way to make the chat

9    part of the record because I think it is a really, really,

10   important validation of what the speakers have talked about

11   today, really applying to many hundreds more people than we

12   were able to hear from especially with regard to the actual

13   text being posted and people writing in that they received the

14   same words, word-for-word.

15      So I don't know if there is a way for that to become part

16   of the record, but I would like to just make sure that we note

17   that and preserve that in some way.

18          **THE COURT:**  Angela, I don't know the answer to that.

19   That is a good question.  Angela, is there a way to keep a

20   permanent record of all the chat boxes that showed up on the

21   screen?  Quite a number of them.  I saw some of them myself.

22   Is there a way to do that?

23          **THE CLERK:**  Yes, there is, Your Honor.  I was planning

24   on downloading the chat and providing it to the Court after the

25   hearing.  And I will do so.

1          **THE COURT:**  All right.

2          **MS. O'GRADY:**  Wonderful.

3          **THE COURT:**  So, yes, Angela is going to go do that.

4    We will make it part of the record.  And, now, I didn't -- the

5    little things that I saw were just three or four sentence --

6    three or four words.  I didn't see any full pictures of the

7    denial letters on my screen.  But whatever we got here, I think

8    Angela is able to make a record of it.  So we will do that.

9    Thank you for that.

10         **MS. O'GRADY:**  Fantastic.  Thank you so much.  And

11   thank you so much, Angela, for organizing this today.  Again,

12   it was galvanizing to hear from all the borrowers; and I'm glad

13   they were able to connect in the harm the delay has caused each

14   and every one of them.

15         **THE COURT:**  Yes.  I have been a Judge 21 years now,

16   and I have done a lot of class action hearings.  And this is

17   the most interesting one of all because five -- over 500 people

18   tuned in -- way more than you would ever get in a normal class

19   action -- and we have done it so that people can show up from

20   all over the country.  It is quite amazing.

21        I have a question that I would like the lawyers to address

22   for me and each of you -- don't address it now, but I want you

23   to submit a statement within one week, each of you.

24        In listening to the comments, it occurred to me that it

25   would be useful for me to know which educational institutions,

1  like University of Phoenix or Brooks, or whoever -- I don't

2  know the details of this myself -- but which of those

3  institutions have already been found by the Department of

4  Education or the FTC or a State Attorney General or some other

5  official to have been a fraudulent institution or engaged in

6  fraudulent solicitation of students.

7       You probably think that I know the answer to this off the

8  top of my head, but actually I don't.  I don't know that.  It

9  has never come up in this case before.  But it would be useful

10  to me to have a list of those.

11      Now, down the road it might also be useful as to which

12  class members attended which of those schools.  Now, I'm not

13  interested yet in the ones that haven't been adjudicated.  Let

14  me just ask you, Ms. O'Grady, are there institutions that the

15  FTC has already said are fraudulent?

16      **MS. O'GRADY:**  Yes, Your Honor.  I don't have that list

17  off the top of my head either but that is certainly true.

18      **THE COURT:**  What?

19      **MS. O'GRADY:**  There are institutions that the FTC has

20  deemed fraudulent; and there is a number of institutions that

21  specific findings have been made by agencies about misconduct,

22  yes.

23      **THE COURT:**  All right.  So it may be that down the

24  road those institutions that have already been adjudicated to

25  be frauds, we might want to ask the Department of Education to

explain why they are denying, if they are, applications that are associated with the fraudulent institutions.

**MS. O'GRADY:**  Your Honor, we would be quite interested in those explanations as well.  And I can confirm that there have been denials issued for such institutions already by the Department.

**THE COURT:**  Is that true, Mr. Merritt?  That somebody has already adjudicated the institution to be a fraud and yet you are not -- you are not granting the loan application relief?

**MR. MERRITT:**  Your Honor, this is addressed a little bit in one of the letters that the Defendant sent to the Plaintiffs back in August.  It is a part of the record attached to one of Plaintiffs' motions.  I also note that we have a filing today potentially to address some of these issues as well in response to the Plaintiffs' motion to enforce the settlement agreement.

I would just note at this point that there are institutions such as -- you mentioned federal and state enforcement authorities -- have conducted investigations in schools and determined they engaged in certain kind of wrongdoings during certain periods of time.

It doesn't mean that, you know, individuals that were subject to that wrongdoing would have a basis for borrower defense.

1    It is not a matter of, you know, adjudicating a school

2   fraudulent across the board.  It would be based on certain

3   actions at certain period of times.  (Inaudible) school would

4   not necessarily prevent claims being denied from individuals

5   who attended the schools and were not affected by that

6   wrongdoing.

7        **THE COURT:**  I don't know.  Maybe.  But maybe there is

8   a presumption that it's saying that the University of Jonestown

9   was found by the Attorney General of New York to be fraudulent

10   in the year 2010.  That we could presume that it was still

11   fraudulent in the year 2011.  I don't know the answer to that

12   but I want to see the list.

13        **MS. O'GRADY:**  Your Honor, if I may, I think it would

14   be interesting to know the timeline and to discover what is a

15   floor and what is the ceiling.  But there are instances where

16   students have actually received restitution for fraudulent

17   schools directly from a New York Attorney General finding and

18   then were denied by the Department.

19        We have an affidavit attached to our filing by Yvette

20   Collon when we filed for the additional case management

21   conference.  And she is a person who received restitution but

22   then had her borrower defense denied.

23        So that is not an issue of timing or windows or anything

24   like that.  That is a direct contradiction to a previous

25   finding.  There are other examples.  That is just one for now.

1   They are in our papers, previous papers.

2      I will note too those denials are unexplained.  They say

3   they considered evidence from other adjudications and other

4   investigations.  They may list the evidence, but then they deny

5   them without explanation of why that evidence wasn't found to

6   be relevant in this case; and they also do not mention any of

7   the evidence that the individual provided.

8      **MR. MERRITT:**  Your Honor, I think a lot of that

9   points -- a lot of these claims, you know, at least pointed out

10  these cases brought based on the Department's delay in issuing

11  decisions.  And that is kind of the class issue that has been

12  certified.

13     Obviously we are not here today to resolve any of the

14  disputes or issues, but it does point out that, you know,

15  borrowers submit different kinds of applications and the legal

16  sufficiency of the Department's response to any given case

17  would be a case specific determination and is not appropriate

18  for determination in these proceedings and in this class action

19  based on the claims that were brought.

20     **THE COURT:**  All right.  I'm going to end the hearing,

21  but I want to end with one statement and that is:  If it turns

22  out that we undo the class settlement, we would have wasted a

23  lot of time that could have been used -- Ms. O'Grady, you could

24  have been taking depositions in the Department of Education of,

25  Ms. DeVos.

1          You could have been taking depositions of every one of

2     those people writing up the letters, the denial letters.  And

3     none of that has been done on account of this "settlement."

4          So I -- if we do deny it, we are going to get huckle-buck.

5     I don't know if you know that word but that means fast.  We are

6     going to get back into this case fast.  We are going to

7     litigate it like a real lawsuit with depositions; people under

8     oath.

9          I don't know the answer.  But I want to end by saying to

10    all of you who tuned in:  Thank you.  It is a tough problem.  I

11    don't have a good answer.  I wish I did.  But thank you.  I

12    appreciate all of your comments.

13         I'm going to step off the bench now.  And Angela is going

14    to end the -- terminate all of the phone call stuff.  Okay.

15    Bye-bye.

16         **THE CLERK:**  I would like to say to everyone listening

17    that I'm already getting e-mails asking about transcripts and

18    how to access recordings of the hearings.

19         Please, please, please, don't e-mail me.  As much as I

20    would love to respond to each and every one of you, I'm only

21    one person.

22         I will put information in the chat box right now about how

23    you can obtain a transcript of the hearing and access public

24    records in this case.

25         Again, please, please don't e-mail me.  It is not because

1    I don't want to hear from you.  It is just because I can't

2    physically respond to 700 e-mails.

3          You are welcome to log off, Counsel.  It was nice meeting

4    both of you.

5               **MS. O'GRADY:**  Thank you very much.

6               **MR. MERRITT:**  Thank you.

7                    (Proceedings adjourned at 9:22 a.m.)

8                         ---oOo---

9

10                    <u>**CERTIFICATE OF REPORTER**</u>

11          We certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14    DATE:   Sunday, October 18, 2020

15

16

17

18    _____

19               Marla F. Knox, RPR, CRR
                  U.S. Court Reporter

20

21

22

23

24

25