JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
CLAIRE TORCHIANA (SBN 293026)
ctorchiana@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
MARGARET O'GRADY *(Pro Hac Vice)*
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>                    v.<br>ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,<br>                    And<br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br>                    Defendants. | Case No.: 19-cv-03674-WHA<br><br><br>**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE** |

**Table of Contents**

I.INTRODUCTION..................................................................................................................... 1

II.FACTUAL AND PROCEDURAL BACKGROUND ............................................................ 3

A.      Secretary DeVos Ends the Borrower Defense Process....................................................3

B.      Plaintiffs' Lawsuit and the Failed Settlement.................................................................4

III.ARGUMENT ...................................................................................................................... 6

A.      The Court Should Enjoin the Defendants From Providing Legally Insufficient Denial
Notices to the Class..............................................................................................................6

        1.      Plaintiffs are Likely to Succeed in Showing that ED Has Repeatedly and in Bad
Faith Violated the APA.                                                                         7

        2.      ED's *Pro Forma* Denial Notices and "Kafkaesque" Borrower Defense Processes
Have Caused & Will Cause Irreparable Harm to Plaintiffs.                                9

        3.      The Public Interest And The Balance Of Equities Tip In Plaintiffs' Favor.       18

B.      The Court's Injunction Should Maintain The *Status Quo Ante* Before The Department's
Unlawful And Unreasoned Denials
        19

IV.CONCLUSION ................................................................................................................ 21

## **Table of Authorities**

**Cases**

*Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)................................. 9

*Calvillo Manriquez v. DeVos*, Case No. No. 3:17-cv-07210-SK (N.D Cal. 2019) ..................... 15

*Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097 (D.N.J. 1993) ..................................... 7

*DISH Network Corp. v. FCC,* 653 F.3d 771 (9th Cir. 2011) ............................................. 7

*Dep't of Commerce v. New York*, 588 U.S. __, 139 S. Ct. 2551 (2019)........................................ 6

*Doe v. Kelly*, 878 F.3d 710, (9th Cir. 2017)................................................................ 6

*Elrod v. Burns*, 427 U.S. 347, 373 (1976))……………………………………………15

*Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)............................................................ 15

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) .................................................................. 15

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017)............................................................. 9

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 4138 (D.C. Cir. 2004) .................................. 9

*In re Pesticide Action Network N. Am.,* 798 F.3d 809 (9th Cir. 2015) ..................................... 8

*Klamath–Siskiyou Wildlands Center v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine*

*Fisheries Serv.*, 109 F.Supp.3d 1238, 1245-47 (N.D. Cal. 2015)………..........................19

*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)……………………………………15

*Nken v. Holder*, 556 U.S. 418, 435 (2009)    ……………………………………………18

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ............................................ 8

*Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc*., 80 F. Supp. 3d 1058 (C.D. Cal. 2015).19

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. Nov. 20, 2017)…………………...17, 18

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984)................................. 8

*Today's IV, Inc. v. Fed. Trans. Admin.*, 2014 WL 5313943 (C.D. Cal 2014)…...……………19

*Vara v. DeVos*, 2020 WL 3489679 (D. Mass. June 25, 2020)…………………………………16

*Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068 (9th Cir. 2016) ..................... 8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)    ……………………………18

**STATUTES**

5 U.S.C. § 555.......................................................................................................*ibid.*

5 U.S.C. § 702 ........................................................................................... 7

5 U.S.C. § 704 ........................................................................................... 7

5 U.S.C. § 706 ........................................................................................ *ibid.*

20 U.S.C. § 1087 ....................................................................................... 8

**REGULATIONS**

34 C.F.R. § 685.222 ............................................................................... *ibid.*

**RELIEF REQUESTED**

In response to this Court's Order to Show Cause (ECF No. 146), Plaintiffs request that this Court issue an order (i) requiring the Department of Education ("ED") to cease its dissemination of borrower defense denial notices to the class of Plaintiffs, and (ii) vacating the denial notices sent to class members since the inception of this action on June 25, 2019.  In short, the Court should order ED to return class members to the *status quo ante* before it began its illegal conduct of disseminating legally insufficient denial notices to the class, such that Plaintiffs who have applied for borrower defense are given the benefit of administrative forbearance as they await a decision ***on the merits*** of their borrower defense claims.

## I.   <u>INTRODUCTION</u>

Plaintiffs brought suit in June 2019 to compel ED and the Secretary of Education ("Secretary") (together, "Defendants") to begin issuing decisions on the merits of its backlog of 160,000 borrower defense applications, which have been languishing at ED for, in some cases, nearly five years.  *See* Compl., ECF No. 1; McGinley Aff. ¶ 3. The parties negotiated a Settlement Agreement whereby Defendants would issue decisions on all pending applications within an eighteen-month timeframe. ECF No. 97-2 at 5-7. Defendants began issuing decisions after executing the Agreement on April 7, 2020, but, unbeknownst at the time to Plaintiffs' counsel, the denial notices were so "perfunctory" (ECF No. 146 at 16) that the borrowers were given no indication of how to challenge the decision on the merits, what process was available for them to do so, what evidence was reviewed, or whether the application had been reviewed by ED at all. The denial notices are so scant that they give no indication that ED has actually restarted its review of borrower defense applications on the merits.

Defendants should be enjoined from issuing any more perfunctory denial notices, and those already sent to borrowers should be vacated.[1]  An injunction is proper here because Plaintiffs have a likelihood of success on the merits, Plaintiffs will suffered irreparable harm absent an injunction, and the balance of equities and the public interest both tip in Plaintiffs' favor.

First, as the Court has recognized, ED's issuance of form denial notices "brings cause for alarm."  ECF No. 146 at 7.  ED's scant notices demonstrate that ED has not actually "restarted" the borrower defense decision-making process and suggest that its stated reasons for the challenged delay were pretextual.  *See* ECF 146 at 12.  Plaintiffs are likely to succeed in showing that ED's actions violate section 706(1) of the Administrative Procedure Act (APA).

Second, an injunction is necessary to prevent the irreparable harm already caused by ED's unlawful delay from continuing to compound.  Class members find themselves now even *worse off* than they were at the outset of this litigation.  In the *status quo ante*, borrowers had a hope that their borrower defense applications would receive fair review.  Now, they do not.  This has caused massive confusion and despair among members of the class, whether they are still awaiting their decisions or have received a *pro forma* denial and are wondering what to do next. They are in repayment and cannot afford to be, or are terrified of making ends meet once their CARES Act forbearance[2] expires. Borrowers do not believe ED actually read their applications and do not

---

[1] On October 28, 2020, counsel for Defendants informed counsel for Plaintiffs by phone that ED has currently "put a halt" on "denial notices going out the door." O'Grady Dec. ¶ 2.  However, especially given the Defendants' pattern of bad faith conduct, an order enjoining the Defendants from the conduct enumerated here is still plainly necessary to: (a) ensure that the Defendants have, in fact, stopped issuing legally insufficient denial notices; (b) ensure there is a remedy if Defendants violate the injunction; and (c) vacate the denial notices that have already been sent.

[2] On March 27, 2020, Congress passed, and the president signed, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, which provided for the suspension of federal student loan payments, stopped collections on defaulted federal student loans, and set federal student loan interest rates to 0%, all through September 30, 2020. *See* "Coronavirus and Forbearance Info for Students, Borrowers, and Parents," Federal Student Aid, https://studentaid.gov/announcements-events/coronavirus (last visited Oct. 29, 2020). On August

2

know how to challenge their decisions, and are now thrust into a cycle of review that is "disturbingly Kafkaesque." ECF No. 146 at 8.

Third, the public interest and the equities both favor an injunction. Plaintiffs are experiencing significant and continued harm as a result of ED's behavior; conversely, the Defendants will experience no harm from discontinuing a practice that Plaintiffs are likely to prove is illegal. There is no public interest in having ED violate the law. Rather, the public has an interest in the government issuing reasoned decisions that conform to the APA.

Not only should future form denials be enjoined, but those already issued should also be vacated—including not just the "Form D" Denial Notices used after the Settlement Agreement was signed, but Forms A, B, and C as well. There is no reason for class members to be treated differently depending on whether ED issued the denial notice before it became apparent that ED has not actually "restarted" the borrower defense process.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Secretary DeVos Ends the Borrower Defense Process

In June 2016, ED created its Borrower Defense Unit ("BDU") to process an increasing volume of borrower defense applications, spurred by (but not limited to) the collapse of Corinthian Colleges. *See* ECF No. 146 at 2. Between June 2016 and January 2017, the BDU processed nearly 32,000 pending claims, granting 99.2% of them. *Id.* at 3. That process ground to a halt, however, with the beginning of Secretary DeVos's tenure as Secretary of Education.

When Secretary DeVos took office, 16,164 borrower defense claims had been approved but not discharged. Secretary DeVos discharged these languishing claims, but did so "with extreme displeasure" (ECF No. 146 at 3)—a sentiment that announced ED's apparent new policy: to deny borrower defense claims whenever possible. ED essentially shut down the BDU, and no claims

---

8, 2020, the president, via executive order, directed the Secretary to continue to suspend loan payments, stop collections, and waive interest on federal student loans until December 31, 2020. *See id.*

were processed *at all* between January and July 2017.  AR 506 (IG Report).  Despite the significant number of pending borrower defense claims, ED "tabled" the BDU's request for more attorneys, did not replace the four attorneys who "voluntarily left" the BDU, and slashed the number of BDU contract staff. AR 341, 342 (Nevin Decl. ¶¶ 21-23). In June 2018, ED stopped issuing borrower defense decisions altogether, and that stoppage lasted over a year. ECF No. 146 at 4 ("By June 2019, borrowers had filed 272,721 applications and 210,168 languished. *For eighteen months, from June 2018 until December 2019—well into this suit—*the secretary issued no decisions at all." (emphasis in original)).

### B.   Plaintiffs' Lawsuit and the Failed Settlement

Plaintiffs initiated this lawsuit as a proposed class action on June 25, 2019. ECF No. 1. The Complaint alleges that Defendants violated the Administrative Procedure Act (APA) Section 706(1) because "they have refused to grant applications from members of the proposed class," and "they have refused to deny applications from members of the proposed class." ECF No. 1 ¶¶ 378, 379.  The proposed class, which was soon certified (ECF No. 46), included all people, with certain exceptions, "who have asserted a borrower defense to the Department, whose borrower defense has not been granted or denied on the merits[.]" *Id.* at 14.  Plaintiffs sought an order declaring unlawful ED's alleged policy of refusing to grant and refusing to deny borrower defense applications. ECF No. 1 ¶ 387.

ED answered the Complaint (ECF No. 55), submitted a certified administrative record (ECF No. 56), and moved for summary judgment (ECF No. 63). Plaintiffs opposed (ECF No. 67) and filed their own motion for summary judgment or, in the alternative, to order discovery, along with a motion to supplement the administrative record (ECF No. 76). After these motions were argued and submitted (ECF No. 93), the parties notified the Court of their agreement in principle to settle the case (ECF No. 94).

The parties entered into a Settlement Agreement on April 7, 2020, and this Court granted preliminary approval on May 22, 2020. ECF No. 103. In the Agreement, ED represented that it

"issues written decisions as required by the Department's 2016 Borrower Defense Regulations" (*id.* at 10) and agreed to issue final decisions on the merits within an eighteen-month timeframe and provide regular reports about its progress, or else be subject to penalty provisions. ECF No. 97-2 at 5-7, 10-13. Defendants also agreed to forego any appeal. *Id.* at 22; *see* ECF No. 146 at 7.

Plaintiffs' counsel soon learned, however, that ED had issued over 78,400 form denial notices to class members, with no explanation of the basis for the denials. *See* ECF No. 116. In total, the borrower defense applications that ED has decided under Secretary DeVos have a 94.4% *denial* rate.  ECF No. 146 at 6 (citing ECF No. 116). This batch of denials did *not* represent a restarting of the decision-making process, as Defendants had committed to under the Agreement.[3] As this Court recognized, "these form denial letters bear *no indication* of such 'time-consuming,' 'complex,' legal analysis of both borrower-submitted and agency evidence" that ED had claimed was the reason for its original delay. ECF No. 146 at 13 (emphasis in original). These scant denial notices, entirely lacking any "reasoning," did not demonstrate that ED had even considered the borrower defense applications *at all*, let alone employed a "complex" analysis. *See* ECF No. 129 at 23-25. As a result, Plaintiffs sought relief from this Court in the form of a motion to enforce the terms of the Agreement, because the denial notices were deficient as a matter of law.  ECF No. 108; *see* ECF No. 146 at 6.  Then, at the October 1, 2020 class hearing, fourteen class members spoke about the proposed settlement, and all "expressed serious concern. . . particularly in light of the Secretary's recent string of form denials." ECF No. 146 at 6.

On October 19, 2020, this Court denied final approval of the Settlement Agreement, finding that there was "no meeting of the minds."  Defendants maintained that their pro forma denial notices complied with the Agreement and the law, while counsel for Plaintiffs argued they did not. *Id.* at 10. The Court ordered the parties to conduct expedited discovery, because

---

[3] The few grants ED has made since December 2019 are not "new." ED has not granted borrower defense applications to anyone other than those who qualified under existing protocols developed for certain students of Corinthian College and ITT in California. *See* ECF No. 108-2 at 9-10 (Davis Letter); ECF No. 129 at 25 n.9.

"[q]uestions of legality plague the Secretary's new perfunctory denial notice," and given that "the circumstances of its use appear to contradict one of the primary justifications for her original delay," the Court and the parties needed "an updated record and updated discovery to determine what is going on before we again attempt to resolve the merits of this case." *Id.* at 11. The Court simultaneously issued the instant Order to Show Cause why the Defendants "should not be enjoined from further denial of class members' borrower-defense applications until a ruling on that form of denial can be had." *Id.* at 6.

"Pretext is the paradigm of agency bad faith." *Id.* at 12 (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019)). To use the metaphor Plaintiffs have employed time and time again: This suit was brought to restart the "conveyor belt" of agency decision-making on borrower defense applications. But to the extent Defendants have "restarted" the conveyor belt, they are indiscriminately and hastily feeding applications through a buzz-saw. This Court should enter an order that requires Defendants to cease these practices.

## III.   **ARGUMENT**

### A.   **The Court Should Enjoin the Defendants From Providing Legally Insufficient Denial Notices to the Class.**

To obtain a preliminary injunction, Plaintiffs must show: "(1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public's interest." *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (citations omitted). "[A] stronger showing of one element may offset a weaker showing of another." *Id.*

Plaintiffs satisfy all of the requirements for immediate equitable relief. *First*, the Department's abdication of its mandatory duty to resolve borrower defense applications on their merits is unlawful under the APA, and persists to this day. As the Court has recognized, "Questions of legality plague the Secretary's new perfunctory denial notice." ECF No. 146 at 11. *Second*, members of the proposed class are suffering, and will continue to suffer, irreparable harm as a result of ED's conduct, ranging from catastrophic economic harm and emotional distress to

6

infringement upon constitutionally protected interests. *Finally*, there is little doubt that an injunction would be equitable and in the public interest, because without it, this class of 160,000 borrowers will be thrust back into untenable repayment, caught in administrative limbo, and unable to move on with their lives, while ED sows even greater confusion and mistrust among the class and members of the public.

      **1.**    **Plaintiffs are Likely to Succeed in Showing that ED Has Repeatedly and in Bad Faith Violated the APA.**

This case was brought under Section 706(1) of the Administrative Procedure Act, which provides that "the reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."[4]   Here, the "action" ED is alleged to have "unlawfully withheld or unreasonably delayed" is a reasoned, fair decision on the merits of the borrower defense applications of the class members.  Plaintiffs will prevail regardless of whether ED's alleged "systemic abdication of its obligation to process borrower defense claims" (ECF No. 46 at 12) is analyzed as "unlawful withholding" or "unreasonable delay."

A court may compel agency action when there has been a "specific, unequivocal command" placed on an agency to take a "'discrete agency action,' and the agency has failed to take that action." *Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (*SUWA*); *see also* 5 U.S.C. §§ 702, 704. In short, "[section] 706(1) applies to the situation where a federal agency refuses to

---

[4] There is no doubt that this Court may enjoin unlawful action by the Department of Education. Injunctive relief is available in a claim brought pursuant to the APA. *See e.g.*, *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011); *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1106 (N.D. Cal. 2018). The anti-injunction provision of the Higher Education Act does not apply if the Secretary exceeds her legal authority and relief would not interfere with internal agency operations. *See, e.g.*, *Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1102-4 (D.N.J. 1993) (concluding that Secretary's violation of statutory mandate removed protection of anti-injunction provision); *see generally* Plaintiffs' Opposition and Cross Motion for Summary Judgment, ECF No. 67 at 21-22.

act in disregard of its legal duty to act." *Vietnam Veterans of Am.*, 811 F.3d at 1079. Plaintiffs will prevail in showing that Defendants' withholding of decisions on borrower defense applications is a breach of its mandatory duty and thus a violation of section 706(1). *Id.* at 1075. Although the existence of a statutory timeline may create an "unequivocal command" for agency action, it is not required for the Court to find a section 706(1) "unlawful withholding" violation. *See id.* at 1081.[5]

Here, Congress has imposed on Defendants a clear and discrete duty—to resolve borrower defense applications on their merits.  The Higher Education Act (HEA) provides that student loan borrowers can seek cancellation of their loans on the basis of school misconduct, and mandates that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." 20 U.S.C. § 1087e(h). The borrower defense regulations require that the Secretary "designate a Department official" to "resolve the [borrower defense] claim through a fact-finding process."  34 C.F.R. § 685.222(e)(3).

The APA also requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it,"  5 U.S.C. § 555(b), and that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding," 5 U.S.C. § 555(e). This has been interpreted to mean that "an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re*

---

[5] Plaintiffs will also prevail if the Court considers Defendants' policy of inaction under the so-called *TRAC* factors that govern the analysis of what constitutes an "unreasonable delay": (1) "the time agencies take to make decisions," or the "rule of reason," (2) the existence of a statutory timeline, (3) whether "health and human welfare are at stake," (4) whether action will affect "agency activities of a higher or competing priority," (5) the "nature and the extent of injuries prejudiced by the delay," and (6) although not required, whether agency "impropriety [is] lurking behind agency lassitude." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813 (9th Cir. 2015) (citing *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984) (*TRAC*)); *see* ECF No. 46 at 12 (certifying class based on elements of commonality and typicality, and noting that "even if TRAC applies, the analysis of those six factors . . . would still be driven by the alleged policy of inaction").

Plaintiffs' Response to Court's Order to Show Cause
Case No.: 19-cv-03674-WHA

1

2

3

4

5

6

7

8

9

*Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)).  When the agency does respond, its "statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action." ECF No. 146 at 9 (quoting *Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)); *see also Butte County*, 613 F.3d at 195 ("Reasoned decision[-]making [under § 555(e)] is not a procedural requirement . . . It stems directly from § 706 of the APA."). ED's regulations impose additional requirements, specifically that in the event of a denial, "the Department Official notifies the borrower of the reasons for the denial [and] the evidence that was relied upon," and also "informs the borrower of the opportunity to request consideration." 34 C.F.R. § 685.222(e)(4)(ii).

10

11

12

13

14

15

16

17

18

19

20

21

It is undisputed that, for a period of eighteen months, ED did not grant or deny a single borrower defense application. ECF No. 146 at 4. The BDU "was told" to stop investigating the merits of claims. *See* AR 502. And although ED began issuing decisions—the overwhelming majority of which were denials—in December 2019, it continues to neglect its duty to issue fair and lawful decisions on the merits of the applications. Here, as this Court has found, ED's form denials "bear no indication of" purported "time-consuming," "complex" legal analysis of borrower-submitted and agency evidence, "under applicable State law," to "reach considered results." ECF No. 146 at 13. This failure to even attempt to explain the agency's reasoning is particularly egregious given the purported reasons for the Secretary's unlawful delay in adjudicating borrower defense claims. Indeed, "[t]hese cases call for adequate explanation—just as the Secretary told us they would when justifying her delay—and yet the Secretary's perfunctory denial notice does not come close to offering such an explanation." *Id.* at 14.

22

23

## 2.   ED's *Pro Forma* Denial Notices and "Kafkaesque" Borrower Defense Processes Have Caused and Will Cause Irreparable Harm to Plaintiffs.

24

25

Absent a preliminary injunction, members of the class will suffer irreparable harm as a result of ED's conduct. Indeed, this Court has already recognized both the likelihood and gravity

26

27

28

Plaintiffs' Response to Court's Order to Show Cause
Case No.: 19-cv-03674-WHA

of that harm: "Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm — it descended upon the class long ago." ECF No. 146 at 15.[6]

Class members have already suffered, and will continue to suffer, a wide range of harms as a result of ED's refusal to adjudicate borrower defense claims on the merits, as well as from the apparatus that ED has set up surrounding the borrower defense process (ECF No. 146 at 8): disastrous financial harm, harm, including the inability to pay medical expenses and even the risk of homelessness; emotional and psychological harm; and the infringement of constitutionally protected interests.

<b>a)   Financial harm</b>

Economic harm may be grounds for an injunction where a plaintiff lives on a fixed income and minimal increases in their cost of living create "potential financial disaster," the possible "deprivation of life's necessities," and concomitant "emotional distress." *United Steelworkers of Am., AFL-CIO. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (Breyer, J.); *see Calvillo Manriquez v. DeVos,* Case No. 3:17-cv-07210-SK, ECF No. 60 (N.D. Cal. May 25, 2018) (enjoining Secretary DeVos and ED from using the "average earnings rule" to adjudicate borrower defense applications because of Privacy Act violations, and finding that "Plaintiffs have shown irreparable harm because the economic harm they are suffering affects their ability to pay for life's most basic necessities"); *see also Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) (finding cost of insurance coverage was irreparable harm because plaintiffs, "primarily because of their fixed incomes, are unable to absorb even relatively small increases in their expenses without extreme hardship"); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261 (W.D. Mich. 1990) (highlighting uncertainty and worry over new costs as irreparable).

---

[6] The nature of the harm caused by ED's failure to resolve borrower defense applications was described in Plaintiffs' Motion to Certify the Class (ECF No. 20), and supported with sworn affidavits from the seven class representatives (ECF Nos. 20-2 through 9) and 892 members of the class (ECF Nos. 20-26 through-29; ECF No. 21; ECF No. 22).

10

This is precisely the situation here. Many, if not most, class members will have to choose between paying for their life's necessities—such as mortgage, rent, and daycare—and repaying their student loans if they are removed from administrative forbearance by a pro forma denial of their borrower defense claims. *See, e.g.*, Norton Aff. ¶ 9, 13; Gramza Aff. ¶¶ 9, 11; DePaul Aff. ¶¶ 14-15, 15; Greenbaum Aff. ¶ 12; Lezan Aff. ¶¶ 9-10; McGinley Aff. ¶¶ 7-8. Class member Corey DePaul, for instance, explains that if his loans go back into repayment, he "do[es] not know how [he] will be able to afford a place to live," because he cannot afford both rent and loan payments, and he can no longer live with his grandparents because he is an essential worker and his grandfather is at risk of death if he contracts COVID-19. DePaul Aff. ¶¶ 14-15.[7] Class member Rachel Greenbaum has suffered an "inability to pay medical bills and for other basic needs" because of her student loans, in addition to the physical harm caused by her "stress of looming debt for a useless education." Greenbaum Aff. ¶ 16. In no small part because of their experiences being defrauded by for-profit colleges, many class members struggle to find remunerative work in the best of times, much less in the middle of a pandemic. *See, e.g.*, Lezan Aff. ¶ 10 (adjunct professor with no benefits); Tran Aff. ¶ 11 (unemployed); Greenbaum Aff. ¶¶ 12-14 (unemployed

---

[7] Further, as Mr. DePaul addresses in his affidavit, in the days since this Court issued its Order to Show Cause, ED has inflicted even more confusion on members of the class. Counsel learned this week from Mr. DePaul and other class members that ED has posted on its website a message that reads: "Attention Borrowers: Incomplete applications must be submitted by 11:59 p.m. Eastern time on November 7, 2020. Due to system improvements, incomplete applications that are not submitted by November 7, 2020 will be removed. You can start and submit a new application any time after November 7, 2020 by visiting borrowerdischarge.ed.gov." A similar message was disseminated via email to 15,000 individuals, an unknown number of whom are members of this class. O'Grady Dec. at ¶¶ 3-9. Counsel for Plaintiffs is continuing to address this issue with counsel for Defendants, and counsel for Defendants informed Plaintiffs' counsel this morning that the messages are meant to refer to "unfinished" applications that have not yet been submitted, rather than "incomplete" applications (even though the word "incomplete" is used). *Id.* ¶¶ 8-9. As such, counsel for Defendants stated that "removal" does not constitute "denial," because the applications that are being "removed" have not actually been submitted. *Id.* In any case, Defendants' confusing messages underscore the compounding harm of ED's administrative limbo.

Plaintiffs' Response to Court's Order to Show Cause
Case No.: 19-cv-03674-WHA

because of COVID). Many are supporting children. *See* Norton Aff. ¶ 13; Lezan Aff. ¶ 10; McGinley Aff. ¶ 8; Gramza Aff. ¶ 11.

Additionally, members of the class have experienced harm to their credit because of their student loans, which has prevented them from buying cars, homes, or otherwise accessing credit. *See, e.g.*, Norton Aff. ¶¶ 15-16; Greenbaum Aff. ¶ 16; Lezan Aff. ¶ 24; Gargano Aff. ¶ 17. These harms will only multiply if ED is permitted to issue legally deficient denial notices that place borrowers back into repayment. The likely result will be that some borrowers will default, further damaging their credit and preventing access to basic necessities. *See, e.g.*, Norton Aff. ¶ 13 (noting that the borrower already has private student loans in default); DePaul Aff. ¶ 12 (same).

At the moment, class members who have not yet received a *pro forma* denial notice have their loans in forbearance or stopped collection status, but the possibility of being sent back into repayment seriously threatens their financial health and causes them grave emotional distress. *See* Gargano Aff. ¶¶ 7, 13, 19; Tran Aff. ¶¶ 17, 19; DePaul Aff. ¶¶ 16-17. Those who have received a denial notice happen, coincidentally, to have a temporary reprieve, because the CARES Act and related executive order suspended federal student loan repayment obligations until January 1, 2021 due to the COVID-19 pandemic. *See, e.g.*, Norton Aff. ¶ 8; Gramza Aff. ¶ 8; Simmons Aff. ¶ 12. But this pandemic-related relief is no guarantee against imminent financial harm.

For one thing, not all loans are subject to pandemic relief: privately held FFEL loans still must be repaid. *See* McGinley Aff. ¶ 5. For another, ED has not consistently been able to prevent collection even on those loans that *are* subject to pandemic relief. *See* ECF No. 20 at 20 (at time of motion for class certification, 1 out of 3 class members submitting affidavits had received a demand for payment, sometimes in the form of wage garnishment or tax refund offset, despite having a pending borrower defense application); *see also* O'Grady Decl. Ex. 3 ¶ 38 (Dec. of Mark A. Brown in *Barber v. DeVos*) (between the passage of the CARES Act and June 2, 2020, "approximately 115,000 employers had garnished the wages of approximately 390,000 [federal student loan] borrowers"). And most importantly, the continuation of pandemic relief is outside

ED's control. If it were up to Defendants, all class members who have received pro forma denial notices would be in repayment already. Whether or not Congress reauthorizes pandemic relief for federal student loan borrowers in January 2021, ED must be enjoined from illegally placing borrowers in a position where their repayment obligations *could* resume without a proper, legal decision on the merits of their claims.

### b)    Emotional and psychological harm

ED's delay in issuing decisions on the merits of borrower defense applications, followed by its pattern of sending perfunctory denial notices to tens of thousands of class members, is causing and will cause significant emotional and psychological harm to class members. "[E]motional stress, depression and reduced sense of well-being" can constitute irreparable harm to support a preliminary injunction. *Chalk v. U.S. Dist. Ct. Cent. Dist. Cal.*, 840 F.2d 701, 709 (9th Cir. 1988) (collecting cases). Emotional harm generally is not compensable against the government, and for that reason as well, such harm is irreparable and thus warrants injunctive relief. *See, e.g.*, *Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (damages that cannot be recovered from the government on account of sovereign immunity are irreparable).

As this Court has noted, the class has experienced "shared trauma" (ECF No. 146 at 16-17): they "sought opportunity via higher education only to be to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt." *Id.* at 17. The named plaintiffs and hundreds of class members submitted affidavits attesting to feeling stress, psychological harm (including suicidal ideation), or physical manifestations of that distress because of the Department's inaction. *See* ECF 20 at 19 (citations omitted). Class members who have already received ED's pro forma denial notices uniformly describe feelings of despair, hopelessness, depression, and frustration because the notices show that their claims were either not closely examined or not taken seriously. Class member Rebekah Norton, for example, states that she "believed, naively, that my government would do the right thing" by considering her borrower defense application, but now she feels "disheartened," "deflated," and "like I had been tricked."

13

Plaintiffs' Response to Court's Order to Show Cause
Case No.: 19-cv-03674-WHA

Norton Aff. ¶ 27. Another affiant, Maureen Simmons, describes the "trauma" of ED's refusal to answer her questions about the denial, and how she "live[s] in fear" that her student loan situation will prevent her from attending law school. Simmons Aff. ¶¶ 16, 23; *see also, e.g.*, Gramza Aff. ¶ 24 ("I don't know where to turn . . . there seems to be literally nothing left that we can do."); Lezan Aff. ¶ 25 ("[M]y experience with my borrower defense application sometimes makes me feel like just another part of a broken system."); Greenbaum Aff. ¶ 10 ("I am disheartened, angry, and dismayed . . . I have completely lost faith in this process").

Class members who have not yet received a response to their applications live in dread, especially after learning that ED has been denying thousands of claims without even offering a clear reason. *See* Gargano Aff. ¶ 13 ("Every time I receive an email from the Department of Education or my loan servicer, I get nauseous and don't want to open it, because I'm afraid it will be a denial."); Tran Aff. ¶ 17("Every day I feel dread that my application will be denied with no explanation, like those of other . . . students."); DePaul Aff. ¶ 16 ("The pressure of these loans has negatively affected not just my ability to enjoy life, but every choice I make, including what to eat."). The process of trying to make themselves heard by ED has been draining on class members for years. Many have struggled with depression, anxiety, and post-traumatic stress disorder. *See* Lezan Aff. ¶ 17; Norton Aff. ¶ 22; Tran Aff. ¶ 11. It is disturbingly common for members of the class to consider suicide. *See* Lezan Aff. ¶ 23; Tran Aff. ¶ 20. Older class members worry that they will have to "work until the day [they] die." Norton Aff. ¶ 14; *see also* Gargano Aff. ¶ 16.

Another common refrain from class members is that, as a result of ED's conduct, they have lost faith in their government—a type of dignitary or democratic harm.[8] Borrowers struggle with feeling "like our government is having a hand in corruption" (Lezan Aff. ¶ 22); "like the Department is telling me that people can engage in fraud and get away with it, and they don't care"

---

[8] Members of the class likewise described an erosion of faith in the government in affidavits filed in support of the motion for class certification. ECF No. 20 at 22 (citations omitted); *see id.* ("[S]tudents like me have been fighting and trying to get relief for five or more years. It is discouraging to see that nothing has been done to help anyone even after all of this time.").

14

(Gramza Aff. ¶ 14); "like [ED is] saying that those of us who were victimized don't matter, and it's okay to destroy lives if the victims just weren't 'smart enough' to figure out they were being taken advantage of" (Norton Aff. ¶ 28); and "like [I am] living in different country – like this can't be the government that's supposed to represent me, where nobody will help or even listen" (Simmons Aff. ¶ 16). Even though some borrowers might qualify for income-based repayment plans if they are forced back into repayment, they fear applying for those plans because they no longer believe that ED will treat them fairly. Gramza Aff. ¶ 9; Lezan Aff. ¶ 9.

### c) Procedural harm and depriviation of constitutionally protected interests

ED's pro forma denial notices show that class members have been deprived of the rational decision-making process that procedural due process requires.[9] Under the due process clause, Plaintiffs must show (1) a protected liberty or property interest, and (2) a denial of adequate procedural protections. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569-71 (1972). As to the first, plaintiffs have a property interest in the outcome of their borrower defense applications. *Cf. Higgins v. Spellings*, 663 F. Supp. 2d 788, 794-95 (W.D. Mo. 2009) (finding that student borrowers had a property interest in discharge of federally guaranteed student loans).[10] Plaintiffs have a

---

[9] Defendants' due process violations are relevant to the preliminary injunction inquiry even though Plaintiffs do not currently allege due process violations in their Complaint. Defendants' actions—both the policy of inaction depriving borrowers of their due process rights and the constitutionally inadequate denial notices—have created an untenable situation for borrowers which an injunction is needed to forestall. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[10] In *Calvillo Manriquez v. DeVos*, Case No. No. 3:17-cv-07210-SK, ECF No. 60 (N.D. Cal. May 25, 2018), the court rejected plaintiffs' claims that they had a "property interest" in the "outcome" of their borrower defense applications. The court's analysis hinged on the Secretary's "discretion" to decide the "amount" of relief, but, relevant to the instant case, the court also noted that "Plaintiffs, once they establish their claims for relief under the borrower defense rule by completing the attestation forms, have a mandatory right to *some* relief." *Id.* at 23. Here, borrowers have completed their borrower defense applications and have a mandatory right to some relief (the "step 1" determination) if they are eligible, and, at the very least, a decision on the merits if they are not.

property interest based on the statutory and regulatory standards entitling individuals to a loan discharge once they satisfy the elements of the borrower defense regulation, and the Department's pre-2017 consistent application of the rule to similarly situated individuals. *See Vara v. DeVos*, 2020 WL 3489679, at *26, *32 (D. Mass. June 25, 2020) (holding that ED is required by law to render reasoned decisions on borrower defense applications and to follow its own "settled course of adjudication" in doing so). Plaintiffs also have a property interest in uninterrupted loan forbearance while waiting for a final decision on the merits of their borrower defense applications. *See* 34 C.F.R. § 685.222(e)(2).

Plaintiffs are suffering irreparable injury to their due process rights because ED is denying Plaintiffs proper process by failing to issue adequate notices of its decisions.  In order to be constitutionally adequate, a notice of benefits determination must provide claimants with enough information to understand the reasons for the agency's action. *See Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)). Here, as this Court has recognized, the perfunctory notices provide Plaintiffs with no way of knowing why their claims were denied, or how to challenge the denials. *See* ECF No. 146 at 14 ("These cases call for adequate explanation—just as the Secretary told us they would when justifying her delay—and yet the Secretary's perfunctory denial notice does not come close to offering such an explanation."). In clear violation of due process, "[c]laimants cannot know whether a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action." *Kapps*, 404 F.3d at 124 (citing *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974)).

It is also worth noting that this "reconsideration" process is not the first example of ED forcing borrowers into an administrative nightmare. Borrowers have described ED representatives hanging up on their phone calls for days on end (Simmons Aff. ¶ 9), trying to disclaim responsibility for misleading emails about forbearance eligibility (Simmons Aff. ¶ 8), and failing to provide servicers with the proper information to maintain forbearance (Norton Aff. ¶ 5; Lezan

16

Plaintiffs' Response to Court's Order to Show Cause
Case No.: 19-cv-03674-WHA

Aff. ¶ 6), among other difficulties. Just this week, ED started sending cryptic messages about "incomplete" applications to borrowers who had never before heard about any problems with their submissions. DePaul Aff. ¶ 6; *see supra* page 9, n. 7; *see also* Gramza Aff. ¶¶ 20-21 (ED requesting borrower to re-file entire application from 2016 because it was "lost" or ED was purportedly "unable to open" it).[11]

ED's denials push borrowers out of forbearance, foreclose the possibility that they will receive a fair decision on the merits of their claim, and direct them into a reconsideration process that is opaque at best, illusory at worst. This represents an irreparable harm in itself. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1200 (N.D. Cal. 2017) (finding that deprivation of procedural due process was "generally sufficient to demonstrate irreparable injury" (citations omitted)); *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) (explaining that, in the Ninth Circuit, "an alleged constitutional infringement will often alone constitute irreparable harm," and preliminarily enjoining a city practice based on an ongoing procedural due process violation (citing, *inter alia*, *Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)). As this Court has recognized, ED's pro forma denials "put[] borrowers in worse positions than they started. They may have a 'decision' (though that is hotly contested), but they have neither a meaningful explanation nor . . . any meaningful opportunity to appeal or request the Secretary's reconsideration. The form denial, frankly, hangs borrowers out to dry." ECF No. 146 at 15; *see also, e.g.*, *Otero v. Johnson*, 2016 U.S. Dist. LEXIS 151961, at *27 (D.

---

[11] In 2018, the *Washington Post* reported that former Everest students whose borrower defense applications were *granted* still faced collection activity and were unable to get information from ED about why they were no longer in forbearance. *See* Daniel Douglas-Gabriel, "Education Dept.'s Mishandling of Student Debt Relief Claims Creating Headaches For Applicants," *Wash. Post* (March 7, 2018), *available at* https://www.washingtonpost.com/news/grade-point/wp/2018/03/07/education-demept-s-mishandling-of-student-debt-relief-claims-creating-headaches-for-applicants/. This report concludes that ED had been aware for months of the risk of applications improperly going out of forbearance, but did nothing to mitigate the risk.

1     Ariz. 2016) (finding irreparable harm and issuing preliminary injunction where immigrant would

2     remain in "administrative limbo" if immigration proceedings were not re-opened).

3            **3.      The public interest and the balance of equities tip in Plaintiffs' favor.**

4            Generally, plaintiffs seeking a preliminary injunction must demonstrate "that the balance

5     of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res.*

6     *Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But where the government is the opposing party, the

7     factors of harm to the opposing party and the public interest are analyzed together.  *Nken v. Holder*,

8     556 U.S. 418, 435 (2009).

9            Here, as above, Plaintiffs are experiencing significant and continued harm as a result of

10    ED's behavior. Conversely, the Defendants will experience no harm from discontinuing their

11    practice of issuing illegal form denial notices. The backlog of borrower defense applications is a

12    result of ED's derogation of its duties. ED's only proffered reason for issuing its perfunctory

13    denials was that it was, supposedly, attempting to comply with the parties' Settlement Agreement.

14    *See* ECF No. 116 at 3 (stating that ED "has faced a very large backlog of borrower defense claims,

15    including more than 168,000 that would be subject to the timelines set forth in the Agreement. In

16    a federal program of that scope, it is not realistic to expect the Department to issue detailed,

17    personalized decisions in every case."). ED never had a legitimate reason to issue illegal notices

18    to students (*see* ECF No. 129 at 21-22), but now that the settlement is no longer moving forward,

19    even its pretextual excuse has evaporated. Under these circumstances, the equities clearly favor

20    Plaintiffs.

21           In addition to ED experiencing no harm as a result of a preliminary injunction being issued,

22    there is no public interest in having ED violate the law by issuing illegal form denials. *See Saravia*

23    *v. Sessions*, 280 F. Supp. 3d 1168, 1200–01 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v.*

24    *Sessions*, 905 F.3d 1137 (9th Cir. 2018) (highlighting the "public interest in ensuring the protection

25    of constitutional rights"). What is in the public's interest is to have the government issue legal,

26    reasoned decisions pursuant to the APA and due process. That is not what is happening here. As

27

28

1    this Court pointed out, "questions of legality plague the Secretary's new perfunctory denial notice,

2    and the circumstances of its use appear to contradict one of the primary justifications for her

3    original delay." ECF No. 146 at 11. In light of these questions, the only way to protect the public

4    interest and to take into account the balance of equities is to issue an order which will stop ED

5    from closing borrower defense applications without addressing their merits.

6    **B.    The Court's Injunction Should Maintain The *Status Quo Ante* Before The Department's Unlawful And Unreasoned Denials.**

7

8          The Court should vacate the previously issued denials at this stage, which would have the

9    effect of treating the whole class the same and preventing the harm of putting class members who

10   have received unlawful denial notices back into repayment.  Though an injunction is forward-

11   looking, and vacatur is inherently backward-looking, this Court can and should issue an order

12   doing both. *See, e.g.*, *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc*., 80 F. Supp. 3d 1058,

13   1108 (C.D. Cal. 2015) (enjoining defendant employer from engaging in certain business practices

14   *and* reinstating employment of previously terminated employees); *cf. Klamath–Siskiyou Wildlands*

15   *Center v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F.Supp.3d 1238,

16   1245-47 (N.D. Cal. 2015) (though denying injunctive relief, vacating previous permits issued by

17   U.S. environmental agencies that violated Endangered Species Act); *Today's IV Inc. v. Fed. Trans.*

18   *Admin.*, 2014 WL 5313943, at *17 (C.D. Cal 2014) ("In general, when a court finds that the action

19   of an agency violated the APA, it remands the matter to the agency for further consideration and

20   vacates the challenged action in whole or in part."). Generally, vacatur of an agency decision is

21   subject to a balancing test weighing "the seriousness of an agency's errors" against "the disruptive

22   consequences that would result from vacatur." *Klamath–Siskiyou*, 109 F. Supp. 3d at 1245-47

23   (finding that the seriousness of agency's errors outweighed the disruption that would result from

24   vacating the permits).  Here, the "seriousness of the agency's errors" is clear and described at

25   length above, and there would be *no* "disruptive consequences" from vacatur; indeed, vacatur

26   would ensure that the class is treated uniformly.

27

28

19

The class certified in this case is made up of 160,000 students awaiting decisions on the merits of their borrower defense applications.  ECF No. 46 at 6, 14. "All may not be entitled to relief, but all are entitled to a comprehensible answer." ECF No. 146 at 6.  ED would have this Court believe that the 118,300 borrowers who received denial letters in the ten months since ED claims to have restarted deciding applications have now received an answer.  *See* ECF 140 at 10. But that "answer" means that they are worse off than the *status quo ante*: their administrative forbearance has ended, and the insufficient form of the notices means that borrowers are unable to challenge the decision on the merits.

This reasoning applies to all class members who have received form denials since this case began, not just to those who received Form D denials after the Settlement Agreement was signed.[12]  As this Court noted, "We don't enjoy the luxury of seeking simply to forestall harm – it descended upon the class long ago." ECF No. 146 at 15.  Plaintiffs previously challenged only the Form D denial letters, and not the pre-settlement denials using Forms A, B, and C, because ED represented that those earlier denials were only used for borrowers with claims that were easily disposed of under the existing borrower defense framework. ECF. No. 121 at 13–14; ECF No. 129-1 at 2–3. But Defendants' ongoing bad faith now casts suspicion over *all* the denial letters, not just Form D.  At bottom, all class members are entitled to a proper assessment of their borrower defense claims, which can only be achieved by going back to the *status quo ante*.

---

[12]  Of course, the limited number of "grants" should not be vacated because they are not, in fact, "new." ED has not granted borrower defense applications to anyone other than those who qualified under previously existing protocols developed for certain students of Corinthian College and ITT in California. *See* ECF No. 108-2 at 9-10 (Davis Letter); ECF No. 129 at 25 n.9.  However, *even if* these "grants" were new (which they are not), there would be no basis to vacate the decisions. First, vacating the grants would *cause* borrowers financial, emotional, and procedural harm, rather than preventing it.  Second, as Plaintiffs have pointed out previously, granted applications are not subject to the same notice requirements as denials under APA § 555(e).

# IV.   **CONCLUSION**

As this Court recognized, the class of Plaintiffs "have a genuine interest; they sought opportunity via higher education only to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt." ECF No. 146 at 17.   Plaintiffs' "shared trauma" (*id.*) will compound absent the requested preliminary injunction and order, which would return them to the *status quo ante* as litigation continues.

Dated: October 30, 2020

/s/ Margaret E. O'Grady

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
MARGARET O'GRADY *(Pro Hac Vice)*
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
CLAIRE TORCHIANA (SBN 293026)
ctorchiana@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

*Counsel for Plaintiffs*