**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THERESA SWEET, ALICIA DAVIS, TRESA
APODACA, CHENELLE ARCHIBALD,
DANIEL DEEGAN, SAMUEL HOOD, and
JESSICA JACOBSON on behalf of themselves
and all others similarly situated,
          Plaintiffs,
          v.
ELISABETH DEVOS, in her official capacity
as Secretary of the United States Department of
Education,
          And
THE UNITED STATES DEPARTMENT OF
EDUCATION,
          Defendants.

Case No.: 19-cv-03674-WHA

**AFFIDAVIT OF REBEKAH NORTON**

I, Rebekah Norton, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans in order to attend Brooks Institute of Photography ("Brooks"), which was owned by Career Education Corporation ("CEC").

3. On November 3, 2016, I submitted a borrower defense application to the United States Department of Education, asking for these loans to be cancelled. A copy of that application is attached as Exhibit A.

4. After my initial application, I sent voluminous follow-up materials to support my application, including a full flat rate postal box of documents providing information on additional lawsuits and findings against CEC related to fraudulent practices. In fact, I submitted additional materials to the Department of Education to support my application in May 2020, just two months before I received a denial notice. A copy of the email confirming receipt is attached as Exhibit B.

1

Affidavit of Rebekah Norton

5. While my borrower defense application was pending for years, I had to spend a lot of time on phone calls with the Department of Education and my servicer to get my administrative forbearance in place and keep it in place. At one point, my servicer told me that the Department wasn't giving it the right information to stay in forbearance, and I had to deal with months of collection calls.

6. On July 10, 2020, I received correspondence from the Department of Education, stating that my claim had been denied.  A copy of that correspondence is attached as Exhibit C. I read this denial notice into the public record during the October 1, 2020 class hearing in this case.

7. Mysteriously, the electronic documentation that the Department had eventually sent to confirm that I was entitled to forbearance status disappeared from the "inbox" of my online account with my servicer just two weeks before I got the denial letter.

8. My loans are still in forbearance due to the CARES Act, which extended forbearance for federal student loans through January 2021.  However, if CARES Act forbearance is not extended, I will suffer extreme financial hardship.

9. I borrowed approximately $72,000 to attend Brooks. But in order to be eligible for the job I have now, I needed additional education, and Brooks credits were not transferrable, so I had to borrow an additional $20,000. With accrued interest, my total federal student loans are now over $170,000. The monthly amount of my student loan payments would be more than the monthly mortgage on my family's home. There is no way that my family can come up with that kind of money. We won't be able to pay our other bills, including the daycare we pay for just so that I can go to work.

Affidavit of Rebekah Norton

10. I'm also extremely concerned about what would happen if the Department of Education contacts my current employer to garnish my wages.

11. In the past, I've been denied job opportunities when potential employers checked my credit and saw my debt-to-income ratio caused by the amount of student loans that I owed. I failed background checks for state and county jobs because my debt-to-income ratio supposedly made me "vulnerable to inappropriate relationships." Other employers have said that they liked me as an applicant but HR would think that I'm irresponsible.

12. These employment challenges are just one example of the hardships I've experienced, and fear I will continue to experience, because of the Department of Education's delay in fairly resolving my borrower defense application.

13. I have also suffered in my ability to provide for my family. I have four children, two of whom have special needs. My oldest daughter has finished college, and was not able to take out parent loans to support her education because of my own student loan debts. I have private student loans that are in default (my federal loans have been in default before, but they were not in default at the time I entered forbearance based on my borrower defense application).

14. I am 45 years old and have been unable to contribute to a retirement fund. I fear now that I will have to work until the day I die because of my student loan debt.

15. I have been denied loans for vehicles. If I did take out a vehicle loan, the interest rate would be higher than on a credit card. To this day, I drive a car that is not registered in my own name.

Affidavit of Rebekah Norton

16. I can't rent my own apartment or buy a home. I had to sign away my ownership interest in the house that my husband and I have lived in for over a decade because of my bad credit.

17. I don't include my Brooks degree on my resumé if at all possible, because I've been mocked professionally for it.

18. Because I was defrauded by Brooks, and because the Department has refused to fairly consider my application for borrower defense, my financial life had been destroyed. This situation had stopped me from participating in normal parts of life that other people can. I feel like a child who can't venture out on my own. I have worked so hard in my life, but I don't have same freedoms as normal people.

19. Even worse is the toll this has taken on my family relationships. Financial issues have threatened my marriage. Other members of my family who provided financial support for me lost faith in me. I come from a military family that believes in "pull yourself up by your bootstraps." I suffer knowing that they assume I just wasn't trying hard enough, or that I was too stupid to ask the right questions. It has seriously affected my self-esteem to have everyone say, "Why didn't you know?"

20. In truth, when I did ask questions about my education I was provided with false information. In other cases, I just didn't know what questions to ask. For instance, as a young single mother seeking a college degree, I didn't understand the different kinds of accreditation that would make it so that my Brooks degree wouldn't qualify me for a job that required a bachelors' degree. My grandparents, who helped support me during those years, also weren't in a position to understand these kinds of technical issues. I just

Affidavit of Rebekah Norton

wanted to provide for my daughter; my mother had recently died; and Brooks' career salary bait made me think I could raise my daughter by pursuing this degree.

21. At Brooks, the instructors would say that this is "good debt" because it's investing in your future, and you need to do whatever it takes to get an education. I didn't understand (and most students there didn't understand either) that we were maxing out our student loan eligibility and that these debts couldn't be paid off with the actual income people would make after graduation. By the time everyone found out it was a useless degree, we either couldn't go back to school because we'd maxed out our loans, or we'd have to pay for another private college for another degree and take on more debt (if another school would even admit us).

22. I was in a pit of depression for years because of my student loan debt. My car was repossessed, and I had to work in a string of minimum-wage jobs. This was humiliating to me after I had been at the top of my class and had always seen myself as a go-getter and an achiever.

23. The opportunity to apply for borrower defense gave me some hope. I believed, naively, that my government would do the right thing. I provided so much information that was so clear, I believed it would be impossible to deny what happened to myself and other CEC students – that this company was feeding off of vulnerable people. I thought our government would do what they're supposed to do: correct this injustice and prevent it from happening again to others.

24. I didn't expect that just because I had submitted an application that it would necessarily be fully approved, but I felt confident in the accuracy and thoroughness of the information I'd provided. As just one example, I was able to provide a form where the

Affidavit of Rebekah Norton

Brooks career center literally crossed out information that I'd written down in order to make my file falsely show that I was a placement of theirs. The fraud was clear.

25. When I finally received my denial notice after years of waiting for a decision, I didn't understand it because it was confusing and vague. There was no explanation of why my claim was denied.

26. I do not understand whether the Department looked at the evidence that I submitted, and I do not understand how the evidence I did submit was not enough to make out a borrower defense claim. My application contains details about my experience and evidence of publicly available information about Brooks' and CEC's use of high-pressure and deceptive practices.

27. It was so disheartening to see that the denial notice only referenced two articles when I sent literally pounds of information in support of my application. I felt deflated because the denial seemed arbitrary and dismissive of my efforts to convey how we were wronged as borrowers and what it was like to be taken advantage of. I felt like I had been tricked, because the Department of Education is supposed to be set up to review these problems, and the problems are not being taken seriously.

28. Instead, they just let CEC change its name and continue to grift vulnerable people. I feel now, not just that I was wronged, but that my own government has endorsed this fraudulent behavior. It's like they are saying that those of us who were victimized don't matter, and it's okay to destroy lives if the victims just weren't "smart enough" to figure out they were being taken advantage of.

29. The denial notice states that I may ask for reconsideration, but I am not sure what this means, nor what information I would need to provide to be reconsidered. I have not filed

Affidavit of Rebekah Norton

for reconsideration because I'm too scared to continue interacting with the Department of Education. I don't feel justice could be had with them.

30. The notice did not say that I had a right to go to court.

31. I have thought about getting an attorney to represent me in my student loan case, but I can't get one – not just because I can't afford it, but because it doesn't exist. Nobody wants to take on the Department of Education.

32. This experience will haunt me forever. I worked full time the entire time I was at Brooks, and I missed out on 3 years of spending time with my daughter – all for nothing. This experience has even had a negative emotional impact on my ability to enjoy photography, which I went to Brooks to study. This activity that I gave so much time, energy, and effort to is now a source of pain.

I swear under penalty of perjury that the foregoing is true.

Executed on:   October 29, 2020
                Camarillo, California

 10/29/2020

                Rebekah Norton

Affidavit of Rebekah Norton

# Exhibit A

# Borrower Defense to Repayment Application
## Brooks Institute of Photography (BIP) & Brooks Institute (BI)

Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and Master Promissory Note (MPN) under the William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program As detailed below, I, **Rebekah Norton**, am hereby applying for a full discharge of my federal student loans according to the "Defense to Repayment" provisions of the Higher Education Act and promulgating regulations.

## Section 1: Borrower Information

**SSN** ██████████

**Name**  Rebekah Ann Norton

**Address** ██████████

**City** ████  **State** ██  **Zip Code** ████

**Telephone**
██████████

**Telephone**
N/A

**Email**
██████████

**Borrower is**

X   Employed
☐   In field of study
X   Out of field of study
☐   Unemployed

**Loan Servicer**
DEPT OF ED/FEDLOAN SERVICING (PHEAA)
PO BOX 530210
ATLANTA, GA 30353-0210
800-699-2908

## Section 2: School Information

**School Name** (The school changed its name)
**Brooks Institute of Photography  (BIP)**
801 Alston Road
Santa Barbara, CA 92108

**AND**

## Section 2: School Information Continued...

**Brooks Institute of Photography  (BIP)**
321 Alameda Padre Serra
Santa Barbara, CA 93103-1809

**AND**

**Brooks Institute (BI)**
5301 N Ventura Ave.
Ventura, CA 93001

**Dates of Attendance**  From  September 1999  To  August 2002

**Name of program**
Undergraduate Still Photography

**Type of Credential**
Bachelor degree

---

**Status**
**X** Completed
☐ Withdrew

---

## Section 3: Illegal Conduct of School

I assert that certain acts and omissions by **Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA** and/or its agents/representatives give me a defense to repayment of my federal student loan(s) under state and federal law and the terms of my federal student loan agreement(s).

**The illegal conduct by Brooks Institute of Photography, Santa Barbara CA and Brooks Institute, Ventura CA includes:**

**Misleading me about how this program would affect my job prospects, including:**

**X  Citing false and/or misleading job placement statistics and salary information to convince me to enroll in Brooks Institute of Photography, Santa Barbara CA**

**Explain:**
The school's job placement rate in writing that had always been provided to myself and other students was 87%, as noted on page 34 of the 1999 catalog (see attached supplemental documentation, copy of full catalog available upon request).  My recollection was that of even higher promises verbally being over 90% every time the admissions office and counselors would discuss it.  This was also the main claim in the 2005 lawsuit Nilsen

2

and Limon brought by the Braun law group, which claimed that the school promsed a 98% placement rate and starting salaries of over $75,000.

My specific recollection was that both Inge Kautzmann, who was the director of admissions at the time my application was submitted and when I signed my initial tuition agreement, and counselor Daisy Moschitto, had reiterated numerous times verbally, as did other staff members in career services, and even the general education teaching staff, that there was "guaranteed job placement" and that the previous years' graduating classes never had less than an 85%-95% employment rate in the field of photography.

The numerous in-person as well as over the phone discussions I had with both Inge and Daisy continually promised and reassured me that immediately out of school I could expect to make at $50,000 a year and that most students made immediately after graduation earned between $50,000 and $70,000. That salary number was significant to me at the time and always remained engrained in my memory because my close friend had recently begun teaching full time at a public school and he was earning slightly over $40,000 at the time and I was impressed that my all but guaranteed earning potential was higher than his current salary. Entering Brooks as a non-traditional student who had completed all general education requirements needed to enter a public and WASC accredited university, I had the opportunity to pursue other college options as well as the need since I was a mother of a 4 year old daughter. I was still a single mother when I applied to Brooks and my earnings potential was essential for the livelihood for myself and my daughter and was not something I was able to gamble with. I was provide reassurance over and over of the high numbers and received continued promises of employment rates, placements through career services, and my ability to pay on the loans I would need to take out for the high rate of tuition noting over and over that the prestige and name of the school would guarantee me full time employment, with their guidance and assistance, upon completion of their bachelors program. As a responsible parent and adult, I never would have enrolled at this school had not been able meet salary requirements that would allow me to financially provide for my child while also paying for the debt I was incurring in school to obtain said degree, and the promises and guarantees made to me over and over that the job placement and minimum salaries earned by Brooks alumni would be sufficient to do so. Instead my independent income was below poverty level at graduation and has been until just this year, 14 years later.

The career planning exit interview (see attached supplemental forms) which was required by all students to be completed and submitted to the office of career services prior to receiving our degree had multiple choice options for selection of pre-determined denominations noting "current salary range". I had selected the box that was $21,000-$24,000. I had also indicated in the selected box that I was actively seeking new employment and that I had been working at that current job since December of 2000, approximately less 1/3 of the way through my tenure as a Brooks student. In the section provided for me to fill in the blank I wrote: "Film Sales" as I was working retail sales at the film counter at a local camera shop, Samy's Camera. I was a cashier that sold film at a retail job that I had obtained independently without assistance from anyone at Brooks, and certainly was not considered to be "in the industry" as a retail sales employee. I had stated my Salary desired to be "$35,000 yr (negotiable...I'm starving)" as at the last month of school it had been made apparent in the lack of action, assistance, and interest of the school the $50,000 a year or higher rate of pay I had been promised at admission and throughout my course of studies was not going to be attainable upon graduation that month nor shortly thereafter.

3

When I requested a copy of my file from the school in or around 2005 I received a copy of the afore mentioned exit interview and attached to the top of it was a form hand written and completed by Dave Oldrich, as identified by his initial D (how he had signed off on all of his forms I had witnessed previously) on the line reading "verified by".  When looking at the form it appears that it was either meant to be completed by the student, and clearly was not as it was the same hand writing as the verifying personnel and attached to the document handwritten by me; either there had been original one I do not recollect that had been replaced by this document that was completed by Mr. Oldrich,  or it was never provided to me nor perhaps other students.

The information on the form reported my current employer as Samy's Camera, accurate and the same as what I had reported on my attached form.  Most of the rest of the document was completed with false information, again written by someone other than myself, and stapled to the top of the documentation I provided, noting it's inaccurate and dishonest reporting.  On the line that stated "Your Title"  Mr. Oldrich had begun to write what looks to be the partial words  "Cust Se" and a line had been drawn through it and the words next that were "Lab Mgr".  I am assuming that he was intending to write Customer Service and changed his mind. Samy's Camera in Santa Barbara, CA  did not have a Lab for anyone to manage.  Additionally, the falsified information provided on the next line of "Start Date" the date of 4-1-02 was filled in, when my document clearly noted my employment at Samy's Camera for my retail sales job began on 12-00, which of course can be corroborated by my federal tax forms and the FASFA forms I filled out each year as well.  The next line "Annual Salary" reported "$27,000" when I had clearly stated my salary at the time was in the range of $21,000-$24,000, and was on the lower end of the report.  The next line was truthful in that "Basic Duties" was reported as "Cust Service / Film Sales".  One can assume that by changing the information and title I was being reported as a "Lab Manger" as working in the industry, though even with the falsified over estimation of my salary I would have been earning almost half of what had been guaranteed to me to be a minimum salary upon graduation.

**X  Misleading me about the type of job placement assistance the school intended to provide me.**

**Explain:**
As noted above throughout the application and admissions process the job placement rate and promises of assistance directly from the school through it's claimed "Strong Alumni Network", working professors, and The Placement Office.  The Placement Office was re-named Career Services in 2000 or 2001, I can't recall which, but upon my application and admissions process it was called The Placement Office.

The misrepresentation was not limited to pre-enrollment as it continued well in to the first year of instruction as well and also included misleading information from the teaching staff.  The professors that were encountered 1st year of school were not the professors who taught classes to the students the last year of school.  The professors that taught the incoming students continually discussed, in class during course work and lectures, that there would be job fairs, other networking events with Alumni and other industry professionals,  and by leaving good impressions without allegedly well connected professors throughout our 3 years we would be connected to employers seeking out the skill set we were being taught.  Even the teaching staff promised of assistance and opportunities and reminded us to connect with The Placement Office (noted later as being called Career Services) our last year of classes to make sure we could take advantage of all of the opportunities that we were told flooded the school by industry employers who were desperate for Brooks students to work for them.

Not only were there no job fairs, no networking events but there was no REAL Career Services office. There was no job placement, no assistance or support, nor guidance provided, but the career services the admissions representatives and counselors touted was only that in title. The office was run by one man, the above mentioned Dave Oldrich. Mr. Oldrich had no experience in, understanding of, nor connections in the industry but was a retired military recruiter. When I did go to his office I asked if he could provide any leads or job interview possibilities and he offered no leads, no opportunities, job searching tools, no ideas, or even a name of any alumni need even a low paying assistant for a day. Instead he did to me what he would do to all the other students who attempted to elicit help from him, he would point at the bulletin board hanging in the hallway across from his office door. The bulletin board never had anything more than minimum wage customer service or childcare help wanted ads posted from local food service and/or families in search of inexpensive labor. The last 7 week session I completed (as the school ran in sessions not in trimesters nor semesters) before graduating I made my final attempt, out of desperation, to elicit help from the Career Services office. After entering Mr. Oldrich's office I received the then familiar silent point to the bulletin board, and I tearfully asked him why he felt it was acceptable to pretend he was offering any assistance to students by posting on the bulletin board that month which was for a local ice cream shop or if he had enjoyed humiliating us. I furthered that as a mother of a 7 year old child, who was graduating at the top of my class, having received awards and nominates for honors from my photography professors, and who also had incurred tens of thousands of dollars in student loan debt, it was fair of me to desire the help promised me from Career Services. He made no response that I recall, just a smirk as I walked away helpless and in tears. I will never forget the desperation nor humiliation of that day in August of 2002.

**X Other false/misleading conduct relating to job prospects.**

**Explain:**
See above for inclusion of the falsified documents of my employment at graduation information as reported as "working in industry" for future students.

---

**Misleading me about the quality of the program, including:**

**X The fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college.**

**Explain:** Approximately half way through my course of studies, and this is a 14 year old recollection so I may be off by a few months, school administrators notified the students, staff, and faculty that they were in the last stages of the process of regaining the WASC accreditation,  understanding now that again it was deception on the school's part, and stating their belief at the start of each and every registration period (every 6-8 weeks depending on student's scheduling availability) that the WASC accreditation could be achieved prior to my graduation date. And of course by my last session making promises it would be done shortly thereafter and would be retro-active making my Bachelor's under the umbrella of their new accreditation.  There were auditors that sat in classes and we were told to behave and ask specific questions. The faculty often taught different lesson plans that were incongruent to what we had been learning the weeks before as well as after while the auditor was present in the back of the classroom. The hope that our degree would be considered more legitimate academically (as at this juncture and that far in I had looked in to transferring and found out

that I would have had to start all over to achieve a degree at a different college as the units and coursework were considered academically legitimate and were more of a "trade school" courses) and eligible for a higher accreditation kept the staff, faculty, and students in line out of desperation to not make matters worse for our financial and potential academic futures.

Of course it's not to be overlooked that during my initial application and admissions process whenever questions about transferring coursework/credits to another college would arise Daisy Moschitto would switch the conversation around to either address the coursework from my previous years at community college IN to Brooks or she would state, "Most colleges will accept our classes but each school can have different class requirements which might make you repeat a class or two" always skirting the issue and deceptively acting as though there would be a possibility for transferring but also following it up with dismissive statements that reassured me of a high completion rates and no need to worry about transferring because that's just for students who aren't able to "hack it" to worry about and her assurance that I would do very well at their school.

**X Other false/misleading conduct relating to the quality of the program.**
**Explain:** In the recruitment catalogs, on the campus/facility tours, and when talking with Daisy Moschitto and Inge Kautzmann class sizes were promised to be small, providing historical date that graduating class sizes, again noted in the 1999 catalog in the employment outlook statistics (same copied document attached) as noting there had been 44 graduates in the Bachelors of Arts program the previous year. I was told, as were my peers whom I talked with at the time of admission, that only the most elite of students would be accepted to the school, once again noting how that tied in hand in hand with job placement as it was "the cream of the crop" only who attended and that there high academic standards and general education requirements in place to assure only students with academic maturity were participating in the same classes, as they were alleged to be intimate in size, citing often less than 15 people in a classroom. This was also false and the class size was over doubled as we were welcomed the first day on campus as "the largest class ever to attend Brooks". That many students straight out of high school had been accepted and would be required to take some classes at the local community college for the general education requirements but that they were going to work on getting more general education instruction held on campus as well.

**Misleading me about how I would pay for the program, including:**
**X  Misleading me about the true cost of the program.**

**Explain:**
It is important to first not that while I received loans and grants I still had to maintain a full time job, which I did throughout the entire 3 years, in order to meet my monthly needs for housing food etc.

The 1999 catalog lists the cost of attendance in a very deceptive way. First and simply the estimate for tuition costs and supplies is not only underestimated dramatically but it is also done in a format a-typical of usual student budget lists. This alone seems very bizarre that there was never a list provided to myself or other

students that broke down the annual costs in a way that has been standard in the education-industry.  Usually the breakdown of total cost of school is done annually and listed like a list, such as:

| | |
|---|---|
| Tuition | $amount |
| Room and Board | $amount |
| Incidentals & Travel expenses | $amount |
| Insurance | $amount |
| | |
| Total average cost per year | $amount |

Brooks instead does not ever provide any form of list either within their catalog nor when applying for admissions nor financial aid and the only way to ascertain it, as no one at the school ever provided a straight answer always stating something to the effect of "we can't give accurate answers because each class has different costs associated with it".

Brooks reported the costs in a way that is not a list nor did it have all of the pertinent information available for reference next to each other in the catalog.  The potential and/or current student would have to piece-meal the information together and calculate the math themselves.

On Page 21 of the 1999 catalog, which is entitled tuition and expenses, it refers you to the 7 week sessions and the current tuition of $2500, which was I did start at when I enrolled.  After several it states that any change in tuition/fees will be announced at least 30 days prior to inception.  Without accounting for any increase in tuition a student then would have to turn to page 4 of the catalog to see how many sessions would be paid for and do the math that way.  Per that catalog and calculation the tuition would have been 18 sessions and totally approximately $48,120 without lab fees etc.  But again, the only way to know the tuition except for in increments of the first 7 week session, is to turn from page 21 to page 4.

Page 21 also notes that the cost of supplies "averages about $500 per month, the amount varies with course requirements and individual student use" and states that there are used equipment packages starting at $1500, which was not the case.  Neither of the local supplying retailers had used packages available prior to or after the start of the first session and that the new equipment package started at $2800 which was also a gross underestimation by well over $1000.

Tuition Costs

| | |
|---|---|
| Sept 99-Dec 99 | $5, 150 |
| Jan 00-Dec 00 | $15, 510 |
| Jan 01-Dec 01 | $16, 320 |
| Jan 02-Aug 02 | $11, 420 |
| Total for Tuition only: | $48,400 |

Supplies and Materials
$2800 Brooks' estimate for 1st session fees for basic equipment package
$500 per month $18,000
Total
Housing without meals etc.
1999 Catalog stated "$800 starting cost for 2 bedroom apartment" x36 months = $28,800

7

And "$650 starting cost for 1 bedroom apartment" x36 months = $23,400

However, part of the acceptance letter packet included an additional letter, see supplemental attachments, welcoming students to Brooks and the 3rd paragraph reads "a one=bedroom apartment at about $800.  A tow-bedroom apartment will begin at approximately $1200"  which was also an intentional underestimation as Santa Barbara California rent was substantially higher than that and I was forced to commute from 30 miles south to find a more affordable apartment in Ventura that was $950.

Subsidized Federal Student Loans Received:

| | |
|---|---|
| Sept 99-April 00 | $2, 625 |
| April 00-Dec 00 | $3, 500 |
| Jan 01-Aug 01 | $5, 500 |
| Sept 01-April 02 | $5, 500 |
| April 02-Aug 02 | $2,750 |
| Total for Subsidized: | $19,875 |

UnSubsidized Federal Student Loans Received:

| | |
|---|---|
| Sept 99-April 00 | $4, 000 |
| April 00-Dec 00 | $4, 000 |
| Jan 01-Aug 01 | $5, 000 |
| Sept 01-April 02 | $5, 000 |
| April 02-Aug 02 | $2,500 |
| Total for UnSubsidized: | $20,500 |

Pel Grant

| | |
|---|---|
| 1999-2000 | $2,675 |
| 2000-2001 | $1,050 |
| 2001-2002 | Not Awarded Unknown as to why |
| 2002 | $313  Grant Disbursed vs.  Grant Awarded $2,350 |
| Total Pel Grants received: | $4038 |

SEOG Grant

| | |
|---|---|
| 1999-2000 | $500 |
| 2000-2001 | $500 |
| 2001-2002 | $500 |
| 2002-2003 | $500 |
| Total SEOG Grants received: | $2000 |

Cal Grant

| | |
|---|---|
| 1999-2000 | $11,775 |
| 2000-2001 | $9,708 |
| 2001-2002 | $7,834 |
| 2002-2003 | $4,248  And received a demand letter for return of $ 2355 of it, stating Brooks had issued a check to me in error (see attached supplemental documents) – I have no recollection of whether or not I had received an refund check from them in that amount but he stated amount and the letter had been sent to me almost a year after graduation. |

Total Cal Grants received:  $33,565

All Grants received in total:      $39,603

| | |
|---|---|
| Total Tuition: | $48,400 |
| Total Materials Per Brooks' Estimate: | $18,000 |
| Housing Per Brooks' addendum Estimate: | $28,800 |
| *note without board | Missing from Brooks' estimate |
| Personal and Transportation expenses | Missing from Brooks' estimate |
| Insurance/Medical/Auto /Photographic Equip | Missing from Books' estimate |

  *welcome letter noted need for insuring equipment as well as vehicle

TOTAL EXCLUDING THE NOTED MISSING NECESSARY STUDENT BUDGET/NEED REQUIREMENTS:  $95,200

Noting what wasn't included that is typically in college financial aid estimates is an additional $ 21,600
- 3 years of board (meals and not including my own childcare needs that were several thousands of dollars each year) at a conservative estimate of $2800 per year individually would be an additional $8400
- 3 years of personal incidentals and transportation expenses (not including a car payment) at an average of $3,000 per year would be an additional $9,000
- insurance for 3 years average of $1400 (medical for myself only, not including my child) per year for all 3 types of insurance an additional $4200

Making:

TOTAL COST OF $116,800
- utilizing their purposefully deflated estimates and approximates on supplies and materials, housing etc...

| | |
|---|---|
| Total Federal Loans: | $40,375 |
| Private Loans | $11,000 |
| Total Grants | $39, 603 |

Total Fin Aid Received   $90,978

Brook's conservative estimate with the omissions of noted missing standard common practice allocation of student financial need was:
- Total cost $95,200
- Leaving me with an additional unmet need of $4,222

With the conservative estimate that DID include the room and board typically in student financial aid budgeting as, I was required to provide the information and demonstrate said need to be eligible for the amount of loans I acquired – but not including that of childcare need for an additional bedroom allowance and my daughter's extensive medical expenses my 3rd year in school:

- Total cost $116,800
- Leaving me with an additional unmet need of $25,822 (without the multi-thousand dollars of real actual figures and need)

As noted earlier the deception of what was needed financially to attend was done in a sneaky and misleading way and the estimates provided were GROSSLY misrepresented.   The original cost of standard equipment was significantly more than the stated $2800 and the monthly supplies fees were thousands of dollars more per year than estimated.  My father and grandfather and extended family members had to come to my aid financially numerous times in order for this deficiency to be met.

I want to reiterate the TOTAL underestimated intentionally deflated amount by Brooks still had an unmet need of thousands of dollars while I was maxing out on federal student loans and receiving grants and working full time trying to stay afloat.


**X  Misleading me about whether I would have to borrow money to attend,  Brooks Institute of Photography, Santa Barbara CA / Brooks Institute, Ventura CA, rather than having it paid for entirely in grants.**

**Explain:**
Verbally I had been reassured numerous times by admissions representatives as well as financial aid that I would be eligible for substantial grants and gift aid that would cover a significant amount of my financial need. One of the grants I was awarded, Cal-Grant for the first year I  attended I received a CAR program award letter from the California Student Aid Commission dated on 7/15/99 that stated it had awarded me the Cal Grant A award in the amount of $14, 130.  When I arrived at Brooks the financial aid award letter given to me  and dated on 9/15/99 notes my award of only $11,775 from Cal Grant, which I was not notified of the change until I had already begun classes as they did not provide us our financial aid awards until the first day of school.  The office had been in contact with me previously but did not notify me that I would be taking out additional loans due to a decrease in Grants until I was already attending class.  Both documents are attached in supplemental documentation.


**X  Misleading me about the amount of student loans I was borrowing.**

**Explain:**
When I was told that the amount of loans I was allowed to take out would cover the cost it was always masked in sessions. There were never totals provided and when we asked about annual rates we were always told that the fee schedule wasn't broken down that way and that we would have calculate it out in weeks while our loans were disbursed as though we were in a trimester program.  No one would have give us actual figures.


**X  Misleading me about the terms of repayment on my federal student loans, including what my monthly payments would be.**

**Explain:**

When exploring the federal student loan .gov sites the month prior to graduation I plugged what I owed and the 8.25% interest in to the loan payment calculator linked from finaid.org.  It generated the payment information and also stated that I would need an estimated annual salary of at least $59, 425.50 to be able to afford to repay the loan if I would be able to pay 10% of my gross monthly income.  It noted also that if I were to pay 15% of my income I would need at least $39, 616.80 as a minimum annual salary and that I "may experience some financial difficulty".  The latter figure was almost double the amount I made my first year out Brooks and it didn't get any better.  I brought this information with me for my appointment for the exit process with Brooks' financial aid department where they continually assured me that I could defer my loans with both the federal and private loans until I was able to find employment that was conducive to the inflated payment in proportion to my income specifically highlighting I could go without making payments as long as I needed to until I found a better paying job.

## X   Other false/misleading conduct in relation to financial aid.
**Explain:**

Also during my exit process with Brooks' financial aid department, while I sat in the office terrified and not knowing what to do, I noted that I had no job prospects and was still making approximately $1700 a month before taxes at my retail sales job, while also supporting my daughter.  I had just learned that my student loan payment to the federal loans alone would be $495 per month and that Sallie Mae private loan was going to be almost $200 per month.  $700 dollar per month in student loans was close to half of my monthly income.

The school informed me that I really only had 2 options and encouraged me to do the latter.  I could defer the loans initially and stated I could do so for up to 3 years, or I could apply to Brooks' graduate program, where I could receive my Master's Degree and defer payments without accruing interest while in school and continue to hunt for a job.  I was terrified I wouldn't be able to make the $495 per month payments and their solution was for me to provide MORE money to the school and take on MORE debt.

The school also assured me that I would be able to defer my private loan with Sallie Mae, which became Navient, and stated that because it was a private loan instead of federal that I would be able to negotiate a lower payment.  Neither of those statements were true.  I was unable to defer with the private SallieMae loan, after the initial 3 months post graduation, they refused options for lowering payments due to income, and I entered into default, my loan was sold to a collections agency in less than a year's time, where it continues to be sold to differing agencies year after year.  My initial private student loan, that would not allow for lower minimum payments, was for $11,000 and currently is owned by Northstar Location Services and has a balance owed on it of $47, 867.47 which the entire balance has been demanded of me, in full, by each company the loan has been sold to for the last 13 years.  This loan has continued to impair my ability to obtain jobs I have applied for and could have been avoided all together if the financial aid office at Brooks met ethical standards and has been honest in disclosing the significant difficulty repayment would be, instead of stating it would be the same repayment options offered to me as the federally backed loans.

---

**Superior Court of the State of California for the County of Los Angeles 2006**
**(Class Members enrolled 1999-2005)**

☐ **I was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit **and I accepted the settlement offer.**
**Plaintiffs**
**vs.**
**Careeer Education Corporation (CEC)**
**Brooks Institute of Photography**
**Defendants**

X I do not have a recollection of being included but I do have documentation received from the lawsuite showing the claims against the school. **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents. Reproduction cost is very high.

---

X I **was part** of the Mark Nilsen, Zoe Curylo and Amanda Johnson On Behalf of Themselves And All Other Similarly Situated, lawsuit **and I believe, to the best of my knowledge, that I recused myself from the Class and settlement offer.** *I state I believe in that I have no recollection of receiving payment and my recollection was that **I did so in order to reserve the right to potentially pursue SallieMae for the fraud, crime and harm committed** in conjunction with their Private Loans, Financial Aid office kick-backs, disregard and elimination of content stated in Promissory Note, radical increase of percentage rate after six month grace period, repayment demands/bills sent to students for several thousand dollars, demands for payment in full, harassment of borrowers employer/s, family members and friends, refusal to allow payment to defer or forebear due to economic hardship after initial 6 months post-graduation, refusal to provide documentation of their demands and/or promises when asked and lack of real attempt to find a solution for repayment to SallieMae as they would not negotiate anything and would only accept the payment they established without options.*
**Plaintiffs**
**vs.**
**Careeer Education Corporation (CEC)**
**Brooks Institute of Photography**
**Defendants**

X **I have significant amounts of documents and/or data** and have included a few pieces here. Please let me know if you need the additional documents.  I was one of the students deposed, for several hours and questioned by Brooks/CEC attorneys repeatedly regarding the false job placement rates and the inflated employment statistics.  I contacted the attorney's office while preparing this document, by email as well as phone, and did not receive a response from him nor his office staff regarding my deposition nor the status of whether or not I had indeed recused myself, as again I have not recollection of receiving any more than reimbursement of little more than $100 for travel and reproduction expenses.

---

Furthermore, the long history of systematic illegal activity and inadequate programs created a high likelihood that school's reputation would be irreparably damaged to the point where the degrees they issued would be worthless. **Brooks Institute of Photography, Santa Barbara CA /Brooks Institute, Ventura CA** never notified me, or otherwise made me aware that that my degree would be worthless due to misconduct.

**Because of this conduct, I have suffered injury, including:**

**X  Federal student loan debt, which has caused me stress, forced me to divert funds from other aspects of my life and otherwise unduly burdened me.**

**Explain:**
The extent to which this has harmed me and my family is far reaching and the reality I face on a daily basis.  I am financially destroyed and because I was not provided with a skill set nor actual degree that would allow for repayment of debt that high, I have been unable to provide for myself in the way that most adults my age can and do.  I am 41 years old and unable to contribute to any retirement fund, I am limited to employment opportunities due to the debt to income ratio I have making me incompatible for county and state job employment opportunities.  I was limited due to the accreditation to attending an additional proprietary school as other schools would not accept the degree so the debt I incurred was even higher.

I am unable to purchase a home as I am ineligible due to the debt ratio to my income and I cannot finance my own vehicle as the interest rate is higher than that of a credit card so I am required to drive a vehicle completely financed in my husband's name and have no ownership of any property.

I was unemployed in 2005 and applied for disability due to the emotional distress the financial ruin on my debt load has caused me.  During that time the I had also defaulted on my federal loans, having exhausted my deferment/forbearance opportunities.  I was able to consolidate in a forgiveness student loan through William D. Ford and the interest I had accrued was so high what had been over $40,000 of student loan debt then became over $60,000.  It has been insurmountable.

**X  A difficult time finding employment, either in the field I went to school for or otherwise.**

**Explain:**  It was impossible finding employment in the field of study from Brooks. I spent years worker vigilantly, I knocked on doors and entered studios of famous photographers and other companies that others didn't have the ability or tenacity to even call and yet I was unable to find employment.  Often mocked by industry professionals and told things like "How much did you spend to be an lowly assistant your whole life" "Brooks makes the best assistants, but you'll never be a photographer".  Some of the best people I knew who continued to work ended up filing bankruptcy and over a decade later are still forced to live with their parents in their 30s and 40s because of their lack of ability to financially support themselves from their Brooks education.

I returned to school to enter a different field and this is the first year of my life I will make over $30,000.  Still not achieving what I was begging for on my exit paper for Career Services, a salary of $35,000 when I had been promised a starting minimum of $50,000.

**X Other injury, including pain and suffering.**

**Explain:**

This question is what took me weeks to complete my application. There isn't a facet of my life that Brooks has not created pain and suffering in. This was painful to revisit and reopen the wound as Brooks has literally financially destroyed me. That's not an exaggeration, complete financial destruction that feels impossible to repair.

More than the financial decimation it destroyed my self-worth and self-esteem for years, and is still something I struggle with. I have so much regret and remorse and self-loathing for the way I was deceived. The humiliation of being so foolish and not knowing what questions to ask or understanding how things should be presented and what I should have known to inquire about as I was the first person in my immediate family to graduate from college. The feeling of worthlessness from failing at something that I was so passionate about that I moved my child to a different city, away from our extended family because I believed, and the faculty who were trusted and touted professionals, reassured me I that was "so amazing and talented". I was unable to achieve the dream of working in the industry, and that dream cost me tens of thousands of dollars and excruciating pain and distress, and truly continues to as the emotional destruction and stress and anxiety it has caused me has haunted me for 14 years now.

It strained and/or severed multiple relationships with my extended family members as I had a received financial assistance and their emotional support during my 3 years of attendance. I had made them the same promises that were made to me, that I would be employed in a lucrative career because I was made to believe it was a guarantee. And when I was unable to produce those promises and I continued to not only work at a sales counter, but actually become in MORE need of assistance financially due to my huge debt incurred they questioned my ability, my perseverance, and my integrity when none of those things had anything to do with it.

My husband and I feel the financial constraints of my poor decision to attend on a daily basis. There have been numerous times it has been the cause for us to doubt the longevity of our marriage, and who can blame anyone for wanting to be rid of the financial albatross that my Brooks student loan debt began. It is now a mountain of money owed that I will never be able to reach the top of. Though I have tried to forgive myself for not understanding I was being deceived I have to remember I was young, impressionable, and school was invested in sales and spinning the truth, not academics not launching the careers of the numerous hopeful artists that applied who were dreamers that didn't know they were being lied to. I was young foolish artist and today I am very financially poor woman with a useless bachelor's degree and a mile of paperwork demanding private loans be paid.

## Section 4: Defense To Repayment of Federal Student Loans

The above conduct gives rise to a cause or causes of action under California law, which relate(s) directly to my loan and/or the provision of educational services for which the loan was given, including:

**California EDUCATION CODE
SECTION 94928-94929.9**

94928. As used in this article, the following terms have the

following meanings:

(a) "Cohort population" means the number of students that began a program on a cohort start date.

(b) "Cohort start date" means the first class day after the cancellation period during which a cohort of students attends class for a specific program.

(c) "On-time graduates" means the number of students who complete a program within 100 percent of the published program length. An institution may separately state completion information for students completing the program within 150 percent of the original contracted time, but that information may not replace completion information for students completing within the original scheduled time. Completion information shall be separately stated for each campus or branch of the institution.

(d) "Graduates available for employment" means the number of graduates minus the number of graduates unavailable for employment.

(e) (1) "Graduates employed in the field" means graduates who are gainfully employed in a single position for which the institution represents the program prepares its graduates, beginning within six months after a student completes the applicable educational program. For occupations for which the state requires passing an examination, the period of employment shall begin within six months of the announcement of the examination results for the first examination available after a student completes an applicable educational program.

(2) The bureau shall define by July 1, 2014, specific measures and standards for determining whether a student is gainfully employed in a full-time or part-time position for which the institution represents the program prepares its graduates, including self-employment or conducting freelance work, and may set the standards for the hours per week and duration of employment and utilize any job classification methodology the bureau determines appropriate for this purpose, including, but not limited to, the United States Department of Labor's Standard Occupational Classification codes.

(3) This subdivision shall not prohibit the bureau from authorizing an institution to aggregate single positions held by a graduate for purposes of meeting the hours per week standards established by the bureau.

(f) "Graduates unavailable for employment" means graduates who, after graduation, die, become incarcerated, are called to active military duty, are international students that leave the United States or do not have a visa allowing employment in the United States, or are continuing their education at an accredited or bureau-approved postsecondary institution.

(g) "Students available for graduation" means the cohort population minus the number of students unavailable for graduation.

(h) "Students unavailable for graduation" means students who have died, been incarcerated, or called to active military duty.

94929. (a) An institution shall annually report to the bureau, as part of the annual report, and publish in its School Performance Fact

Sheet, the completion rate for each program. Except as provided in subdivision (b), the completion rate shall be calculated by dividing the number of on-time graduates by the number of students available for graduation.

(b) In lieu of calculating graduation data pursuant to subdivision (a), an institution may report graduation data reported to, and calculated by, the Integrated Postsecondary Education Data System of the United States Department of Education.

94929.5.  (a) An institution shall annually report to the bureau, as part of the annual report, and shall publish in its School Performance Fact Sheet, all of the following:

(1) The job placement rate, calculated by dividing the number of graduates employed in the field by the number of graduates available for employment for each program that is either (1) designed, or advertised, to lead to a particular career, or (2) advertised or promoted with any claim regarding job placement.

(2) The license examination passage rates for the immediately preceding two years for programs leading to employment for which passage of a state licensing examination is required, calculated by dividing the number of graduates who pass the examination by the number of graduates who take the licensing examination the first time that the examination is available after completion of the educational program. The institution shall use state agency licensing data to calculate license examination passage rates. If those data are unavailable, the institution shall calculate the license examination passage rate in a manner consistent with regulations adopted by the bureau.

(3) Salary and wage information, consisting of the total number of graduates employed in the field and the annual wages or salaries of those graduates stated in increments of five thousand dollars ($5,000).

(4) If applicable, the most recent official three-year cohort default rate reported by the United States Department of Education for the institution and the percentage of enrolled students receiving federal student loans.

(b) Nothing in this section shall limit the bureau's authority to collect information from an institution to comply with this section and ensure, by regulation and other lawful means, that the information required by this section, and the manner in which it is collected and reported, is all of the following:

(1) Useful to students.

(2) Useful to policymakers.

(3) Based upon the most credible and verifiable data available.

(4) Does not impose undue compliance burdens on an institution.

(c) Data and information disclosed pursuant to paragraphs (1) to (3), inclusive, of subdivision (a) is not required to include students who satisfy the qualifications specified in subdivision (d) of Section 94909, but an institution shall disclose on its fact sheet and to the bureau whether its data, information, or both, excludes any students pursuant to this subdivision.

94929.7. (a) The information used to substantiate the rates and information calculated pursuant to Sections 94929 and 94929.5 shall do both of the following:

(1) Be documented and maintained by the institution for five years from the date of the publication of the rates and information.

(2) Be retained in an electronic format and made available to the bureau upon request.

(b) An institution shall provide a list of employment positions used to determine the number of graduates employed in the field for purposes of calculating job placement rates pursuant to this article.

(c) The bureau shall identify the specific information that an institution is required to document and maintain to substantiate rates and information pursuant to this section.

94929.8. (a) On or before January 1, 2011, and pursuant to Section 94877, the bureau shall establish, by regulation, a uniform method for institutions to obtain statistically valid, current, and representative data to comply with this article.

(b) A violation of the regulations adopted pursuant to subdivision (a) is a material violation of this chapter.

94929.9. (a) The bureau shall consider the graduate salary and other outcome data and reporting requirements that are utilized by the United States Department of Education, the Student Aid Commission, accrediting agencies, and student advocate associations. The bureau shall consider the reporting requirements of public postsecondary institutions in California to evaluate the feasibility of adopting these reporting requirements for private postsecondary institutions. The bureau shall make recommendations to the Legislature, on or before December 31, 2016, on how reporting requirements under this chapter should be altered to ensure accurate, useful, and consistent reporting by private postsecondary institutions to the bureau and students.

(b) The bureau is authorized to enter into a personal services contract with an appropriate independent contractor to assist in the evaluation required by subdivision (a). In this connection, the Legislature finds, pursuant to Section 19130 of the Government Code, that this is a new state function.

(c) (1) A report to be submitted to the Legislature pursuant to subdivision (a) shall be submitted in compliance with Section 9795 of the Government Code.

(2) Pursuant to Section 10231.5 of the Government Code, this section is repealed January 1, 2017.

---

Common law action for Fraudulent Misrepresentation; and/or common law action for Fraudulent Concealment.

Additionally, the above conduct violates federal law, including:

1. The Federal Trade Commission Act and Federal Trade Commission regulations, which prohibit "a school, in promoting a course of training, to misrepresent the availability of employment after graduation from a course, the success that the member graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment." 16 C.F.R. § 254.4(d).

2. Title IV of the Higher Education Act and Amendments, and Department of Education regulations, which prevent schools from participating in Title IV programs from committing "substantial misrepresentation" in interactions with students and prospective students.

## Section 5: Requested Relief

Therefore, I request that the Servicer and/or Department of Education take the following steps:

1. Cancel any remaining principal, interest, fees and costs associated with my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

2. Cease any collection actions against me in relation to my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

3. Return any sums paid, whether voluntarily or involuntarily, toward my federal student loans, borrowed to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

4. Remove any adverse reports related to my federal student loans, borrowed to attend School, from all consumer credit reporting agencies.
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

5. Restore my eligibility to receive funds under Title IV, including by restoring any portions of my lifetime eligibility for Pell Grants and federal student loans previously used in order to attend
X **Brooks Institute of Photography, Santa Barbara CA**
X **Brooks Institute, Ventura CA**

I request a notification of a hearing or a determination of my asserted defense to repayment within thirty (30) days, in writing. Should you deny any or all of my defense, please inform me of the process for appealing this decision, in writing. I reserve the right to submit supplementary information in support of this application.

## Section 6: Borrower Acknowledgment, Certifications, Assignment, And Authorization

I acknowledge that any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097.

I certify, under penalty of perjury, that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief.

I certify that I will provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the Department that I meet the qualifications for defense to repayment of my student loans.

I certify that, if my defense is successful, upon request I will provide assistance and cooperation to the U.S. Department of Education (the Department) in any proceedings or enforcement actions against the school related to my defense or the conduct asserted herein.

I hereby assign and transfer to the U.S. Department of Education (the Department) any right to a refund on the amount discharged that I may have received from the school and/or any owners, affiliates, or assignees of the school, and from any third party that may pay claims for a refund because of the actions or omissions of the school, up to the amount discharged by the Department on my loan(s).

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at the number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

**Borrower's Signature** _____ **Date** __11|1|16___

Attachments :
Diploma
Transcript
Brooks' Career Planning Exit Interview & Employment Information
Page 34 of Brooks 1999 Catalog re: Employment
Page 21 of Brooks 1999 Catalog  re: Tuition and materials fees
Page 4 of Brooks 1999 Catalog re: Academic Calendar / session breakdown – every 7 weeks
Page 32 of Brooks 1999 Catalog re: Housing Costs & Necessity of Independent Vehicle
Welcome letter from Brooks noting average cost for Housing and requirement for Vehicle
California Aid Report (CAR)
1999-00 Financial Aid Award Letter
Brooks Institute Welcome Letter
Brooks Letter requesting return of CalGrant monies
Annual Enrollment Agreements
Federal Student Loan Payment Schedule
Wells Fargo Account Statement for 1st payment due, 6 months post Graduation
Lawsuits from California courts in 2005

# BROOKS INSTITUTE

has conferred the

# BACHELOR *of* ARTS DEGREE
## *in* PROFESSIONAL PHOTOGRAPHY

*upon*

# Rebekah Ann Norton

who has honorably fulfilled the requirements prescribed by the Institute for that degree
with a major in

## COMMERCIAL/ADVERTISING & PORTRAITURE

Given under our hand and seal

this **30** day of **August**, 20 **02**

in the city of Santa Barbara, California

_____
PRESIDENT

_____
ACADEMIC DEAN

Rebekah Ann Norton                                    BA
                                                      Professional PhotCOM/ADV

```
        TRANSFER CREDIT
  ENG184      English Composition           3.00    T
  ENG385      Journalism                    3.00    T
  PSY187      Theories of Personality       3.00    T
  CUL188      Cultural Studies 1            3.00    T
  ENG280      Advanced English Composit     3.00    T
  MAT181      Math                          3.00    T
              TOTALS:                      18.00

  Session 149   09/07/1999 - 10/22/1999
  FP1         Fundamentals Photograph  6.00   6.00   B   3.06   18.36
  DE1         Design                   3.00   3.00   A   4.00   12.00
  Session Totals:                      9.00   9.00       3.373  30.36

  Session 150   11/01/1999 - 12/17/1999
  FC1         Film And Culture         3.00   3.00   A   4.00   12.00
  BA2         Basic Photographic Fund  6.00   6.00   A-  3.70   22.20
  Session Totals:                      9.00   9.00       3.800  34.20
                  Honor Roll

  Session 151   01/10/2000 - 02/25/2000
  PHO103      Intermediate Principles  6.00   6.00   B+  3.42   20.52
  SCI182      Science                  3.00   3.00   B   3.17    9.51
  Session Totals:                      9.00   9.00       3.337  30.03

  Session 152   03/06/2000 - 04/21/2000
  ACC381      Accounting               3.00   3.00   A-  3.74   11.22
  PHO200      Lighting Theory          6.00   6.00   B   3.00   18.00
  Session Totals:                      9.00   9.00       3.247  29.22

  Session 153   05/01/2000 - 06/16/2000
  BUS480      Business Law             3.00   3.00   A   4.00   12.00
  PHO201      Lighting People          6.00   6.00   A-  3.70   22.20
  Session Totals:                      9.00   9.00       3.800  34.20
                  Honor Roll

  Session 154   07/10/2000 - 08/25/2000
  PHO202      Lighting Studio          6.00   6.00   A   3.75   22.50
  Session Totals:                      6.00   6.00       3.750  22.50
                  Honor Roll
```

Rebekah Ann Norton                          07/05/2001

Rebekah Ann Norton ███████████  ███████████  BA
Professional PhotCOM/ADV

Session 155  09/05/2000 - 10/20/2000
PHO203      Advanced Photography     6.00     6.00     A- 3.75    22.50
Session Totals:                      6.00     6.00        3.750   22.50
            Honor Roll

Session 156  11/06/2000 - 12/22/2000
PSY285      Psychology of Mass Comm  3.00     3.00     A  4.00    12.00
DIM253      Digital Imaging          6.00     6.00     A- 3.90    23.40
Session Totals:                      9.00     9.00        3.933   35.40
            Honor Roll

Session 157  01/08/2001 - 02/23/2001
PHO231      Color Printing Methods   6.00     6.00     A- 3.73    22.38
BUS282      Basic Business           3.00     3.00     A  4.00    12.00
Session Totals:                      9.00     9.00        3.820   34.38
            Honor Roll

Session 158  03/05/2001 - 04/20/2001
SPE283      Speech                   3.00     3.00     A- 3.85    11.55
POR241      Professional Portrait F  6.00     6.00     B  3.00    18.00
Session Totals:                      9.00     9.00        3.283   29.55

Session 159  05/07/2001 - 06/22/2001
MPV161      Video Production         6.00     6.00     A- 3.80    22.20
FIN382      Finance                  3.00     3.00     A  4.00    12.00
Session Totals:                      9.00     9.00        3.800   34.20
            Honor Roll

Session 160  07/16/2001 - 08/31/2001
ADV311      Commercial Photo 1       6.00     0.00                 0.00
Session Totals:                      0.00     0.00                 0.00

--------------------------------------------------------------------------------
        cGPA: 3.619  Credit Earned: 111.00   Quality Points: 336.54
    Status: ** Active

----------NO ENTRIES BELOW THIS LINE ---------------

Rebekah Ann Norton                         07/05/2001


Rebekah Ann Norton       ▇▇▇▇▇▇       ▇▇▇▇▇▇       BA            COM/ADV
                                                   Professional Phot& POR

Session 163   01/07/2002 - 02/22/2002
MRK284        Marketing                    3.00      3.00    A   4.00    12.00
POR299        Beyond Portraiture           6.00      6.00    A   4.00    24.00
Session Totals:                            9.00      9.00        4.000   36.00
              Honor Roll

Session 164   03/04/2002 - 04/19/2002
POR242        Intermediate/Advanced P      6.00      6.00    A-  3.70    22.20
Session Totals:                            6.00      6.00        3.700   22.20

Session 165   05/06/2002 - 06/21/2002
ADV313        Advanced Advertising 1       6.00      6.00    A   4.00    24.00
Session Totals:                            6.00      6.00        4.000   24.00
              Honor Roll

Session 166   07/15/2002 - 08/30/2002
ADT492        Advanced Topics              6.00      6.00    A   4.00    24.00
Session Totals:                            6.00      6.00        4.000   24.00
              Honor Roll

---------------------------------------------------------------------------

        cGPA: 3.649   Credit Earned: 159.00    Quality Points: 514.44
Status: ** Graduated 08/30/2002

        ----------NO ENTRIES BELOW THIS LINE ---------------


        Rebekah Ann Norton                     09/17/2002
        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

# Employment Information

Name _REBEKAH  NORTON_          Graduation Date _AUG  02_

Major _COMM  /  POR_

Company Name _SAMYS_          Department _____

Street _910  E  HALEY_

City _SANTA  BARBARA_          State _CA_     ZIP _93001_

Telephone _963-7269_          E-Mail _____

Your Title _Cust  &  LAB  MGR_   Start Date _4-1-02_ Annual Salary _27,600_

Basic Duties _Cust  service  /  film  Sales_

Supervisor Name/Title _JUSTIN  WHEELER_

---

**Career Services use only**

Verification _D_          Date _9-2-02_

Comments _____

# Career Planning Exit Interview

Name: **Norton, Rebekah Ann S.**   Graduation Date: **08** **02**
       Last    First    Middle Initial                         Month   Year

Address: _____ ████ ████ ████
              Street      City      State      Zip Code

Phone: (___) ████   Fax: **N/A**   Email: ████████

Alternate Contact Name: **N/A**   Phone: _____
                        Last    First

Alternate Contact Address: _____
                           Street    City    State    Zip Code

I understand that Career Services is not solely responsible for my future employment after graduation
and I must actively seek employment in order to be properly assisted by them.

Current Employer: **Samy's Camera**   Supervisor: **Justin Wheeler**

Address: **910 E. Haley, Santa Barbara, CA   93001**
              Street      City      State      Zip Code

Your Job Title: **Film Sales**   Employer's Phone **(805) 963-7269**   Start Date: **12-00**

Do you have benefits at current employer?   Yes **X**   No _____

After graduation I am planning to:
Stay at current employer _____
Actively seek new employment **X**

Current salary range (check one):

| | | | |
|---|---|---|---|
| Less than $15,000 ____ | | | |
| $15,000 - $18,000 ____ | $27,000 - $30,000 ____ | $38,000 - $41,000 ____ | $50,000 - $53,000 ____ |
| $18,000 - $21,000 ____ | $30,000 - $33,000 ____ | $41,000 - $44,000 ____ | $53,000 - $56,000 ____ |
| $21,000 - $24,000 **X** | $33,000 - $35,000 ____ | $44,000 - $47,000 ____ | $56,000 - $59,000 ____ |
| $24,000 - $27,000 ____ | $35,000 - $38,000 ____ | $47,000 - $50,000 ____ | $59,000 - $62,000 ____ |
| | | | Greater than $62,000 ____ |

If you are not currently employed, list the specific job you would like and the location you wish to work: **Los Angeles area ... assisting in commercial / celebrity** ~~photographer~~ (editorial too)
**photographer**   Salary desired: **$35,000 /yr**
(negotiable ... I'm starving!)

Career Services Use Only

Initial: _____   Date: _____

## The Student Right-to-Know and Campus Security Act

*The Student Right-to-Know and Campus Security Act requires institutions to disclose the following information to all students and potential students. (In accordance with CEC 94312(h)(8), 94312(I)(1), (3) regulations)*

### Campus Security Policy and Procedures

Our policy is to provide a safe, comfortable environment for both students and employees.

There are three separate campuses comprising Brooks Institute of Photography. Each has separate security procedures based on campus activities as well as blanket procedures for the whole school.

There are no on-campus living quarters for students at Brooks Institute of Photography. Therefore, all security procedures are designed for work, study and classroom facilities only.

All campuses are closed to students and employees by 12:00 a.m. each evening, (exceptions are made through the campus administrator's office under special circumstances). Guidelines and campus passes for use of specific areas are available from department heads or the campus administrator.

All parking lots, entrances, and hallways are provided with adequate lighting systems. Many lights are automatic, motion sensitive light systems. All exterior lab, office and classroom doors are equipped with locks. Some areas have electronic keypad access. Some areas of the Jefferson Campus are covered by video surveillance cameras. Gated access is provided on the Montecito and Jefferson campuses. All crimes, incidents, and emergencies are reported in writing to the campus administrator and other appropriate administrators through the *Emergency and Crime Information Report*.

Procedures for dealing with students and employees convicted of crimes are covered in the school catalog and employee's handbook respectively. Victims of crimes are referred to the school counselor for consultation and referral as necessary.

### Campus Crime Report

The incidence of crime on Brooks Institute of Photography campuses has traditionally been very low. The following statistics have been reported between July 1997 and May 1998:

- Three reports of petty theft
- One report of a hit and run accident involving a motor vehicle.

### Completion Rates - Bachelor of Arts program

For the period beginning January 10, 1994 and ending December 16, 1994 a total of 139 students enrolled in the introductory photography class, Fundamentals of Photography (101). (Students enrolled as Pre-Grads, or Special Status are not included in this data.) Of these 139 students, 64 (46%) completed the program and graduated between January and December 1997; 4 (3%) are still attending.

A student may complete the B.A. program in 3 years with the necessary prerequisites, however, students may take up to 4.5 years to complete the B.A. program.

### Completion Rates - Diploma program

For the period beginning January 10, 1994 and ending December 16, 1994 a total of 19 students enrolled in the introductory photography class, Fundamentals of Photography (101). (Students enrolled as Pre-Grads or Special Status are not included in this data).

Of these 19 students, 7 (37%) completed the program and graduated between January and December 1997.

A student may complete the Diploma program in 3 years with the necessary prerequisites, however, students may take up to 4.2 years to complete the Diploma program.

### Completion Rates - Graduate program

A total of 7 students entered the Graduate program in January and September 1994. Of these 7, 3 students (43%) graduated between January and December 1997; 4 students (57%) have completed all course work and are continuing work on their thesis or project.

The Graduate program is designed to be completed in three years; one year to complete course work and two years to complete the thesis/ project. However, a student may take up to 4.5 years to complete the program.

### Employment Outlook

A survey of graduates from the academic year 1997/1998 has shown the following: of the 44 graduates from the Bachelor of Arts degree program eligible to work in the United States, 38 (87%) were employed in their field; of the 7 graduates from the Diploma program eligible to work in the United States, 5 (72%) were employed in their field; and of the 7 graduates from the Graduate program eligible to work in the United States, 6 (86%) were employed in their field.

## Brooks Institute Alumni Association

As students progress through their program of study, they will come to recognize the many contributions which alumni make to their education, and to the general welfare of the Institute. Many alumni contribute their time and talents to appear on campus for seminars, lectures, and programs which are part of the educational program. Alumni are continually publicizing Brooks Institute, hiring graduates and advising on matters of curriculum and expectations in the profession. Nearly all are acting ambassadors of the Institute and are instrumental in encouraging prospective students to obtain the finest professional education possible at this Institute.

Alumni of Brooks Institute may be found all over the world successfully engaged in rewarding careers. The goals of the Alumni Association are to give service and to promote the general welfare of the profession.

# Tuition and Expenses - Undergraduate

## Tuition

Undergraduate tuition at Brooks Institute is based on a fifteen week trimester consisting of two seven-week sessions and one transition week. A student is permitted to take 12 to 18 credits per trimester. Tuition is currently $2500.00 plus a non-refundable $75.00 lab fee, per each seven week session. *(See Tuition Addendum for updated tuition information or contact the Admissions Office. Availability of financial aid may be determined by contacting the Financial Aid Office.)* Tuition payment is required at time of registration.

All entering students must pay their first trimester's tuition of $5000.00 plus non-refundable lab fees of $150.00. The tuition due date for all incoming new students is thirty days prior to the start of class. Any funds placed on a student's account are accepted for tuition/lab fee purposes only, credit balances on account are not permitted. All financial aid check(s) received will first be applied to any outstanding tuition.

Payment programs on a per session or annual basis may be arranged with the Accounting Office. These plans are sponsored by Brooks Institute of Photography. Failure to meet the terms of these plans will result in a non-registered status.

Tuition per session is the same for the degree and diploma programs, however, a few specialized courses do require nominal additional fees. After the initial registration, tuition and lab fees cover the full cost of registration and instruction in the Institute's resident programs.

Tuition is required at the time of registration *(see Calendar of Events for Registration dates, page 30).* Grant or loan checks cannot be released until students have actually started classes, or before the first day of the loan period. *Students should not depend solely on grant or loan checks for tuition*

*payments, especially the first trimester's tuition, which is required 30 days prior to the entrance date.*

The Institute reserves the right to make changes in its regulations, tuition, lab fees, and course offerings. Any change in tuition/fees will be announced at least 30 days prior to inception.

## Equipment and Supplies

Used equipment packages start from about $1,500. Used equipment can usually be purchased from the graduating students. New equipment packages start from about $2,800. Supply lists are provided by each instructor at the beginning of each course. A supply list for the first course is available upon request from the Admissions Office. While supplies average about $500 per month, the amount varies with course requirements and individual student use.

The following is a general list of equipment required for both Still Photography and Motion Picture majors enrolled in the first photographic course (Fundamentals of Photography 101), unless otherwise indicated:

- 35mm manually adjustable camera with interchangeable lens capability
- Tripod sufficient to support 4x5 camera (Motion Picture students need to support 35mm camera)
- Incident light meter
- Cable release (minimum length 20")
- Magnifier 4x or 8x
- Dial thermometer (type that can be recalibrated)
- Three graduated cylinders (size dependent on tank capacity)
- One graduated cylinder (1-2 ounces and also calibrated in millimeters)

- One 16 ounce invertible stainless steel film processing tank
- Two 35mm stainless steel processing reels

The following items are required for Still majors *but not required for Motion Picture majors:*
- 4x5 studio view camera and case
- 210mm lens with lens board to fit 4x5 camera
- Polaroid back for 4x5 camera
- 4x5 sheet film holders (minimum 6)
- Film holder cleaning brush
- Focusing cloth for 4x5 camera

The following items are required for Motion Picture and Digital Media majors *but not required for other still majors:*
- 16mm, 1200' split reels (minimum 2)
- 16mm film splicer for work print

# Undergraduate Academic Calendar

## Undergraduate Curriculum

### Entrance Dates

Each trimester is composed of two seven-week sessions with a transition week between each session. During transition week, students are given an assignment to be completed by the first day of their next class. There is usually a three or four week break in mid-summer, and two or three weeks in the winter as indicated.

Students may enter the Institute six times per year on the entry dates shown below, with a few exceptions. Motion Picture/Video majors should enter in January, April, and September, and some upper division courses are not offered every session.



Brooks Institute operates on a trimester basis and offers a three-year program leading to a Bachelor of Arts Degree in Professional Photography. Students may take up to four and one-half years to complete the program. The carefully structured curriculum has been developed to be responsive to the expanding needs of the photographic and motion picture industry. A continuous dialog with Brooks' alumni and other successful professionals provides valuable information concerning current trends and potential future developments within the broad spectrum of photographic/filmmaking careers.

The first half of the program, Lower Division, consists of training considered to be the foundation of career specialization. Fundamental photography and general education courses are taken concurrently to broaden the overall development of the individual, and direction is offered for the eventual selection of a photographic/ filmmaking major.

The Upper Division of the program focuses attention on the student's selected major and specific career objectives. Career-oriented photographic/filmmaking courses are complemented by a variety of business courses to complete the framework for a successful career in photography or film.

In addition to the Bachelor of Arts Program, a three-year Diploma Program is offered. Both Programs are available to international students depending on their qualifications. A Master of Science Degree in Professional Photography is also offered (*see Graduate Program, page 23*).

## Facilities and Services

Facilities include classrooms, studios, laboratories, library, and galleries for student and professional exhibits.

Each of the school's three campuses is fully equipped with a wide variety of photographic equipment and facilities. The audio-visual, motion picture and video departments have complete editing, sound recording, and ancillary facilities. The still photography labs have a total of seventy-one cubicles for enlarging black and white photographs, and twenty-five enlargers and printers for color. Studios, with a total coverage of over 8,000 square feet, are equipped with tungsten and / or electronic light sources. They can accommodate approximately twenty set-ups at any given time. Still and motion picture check-out facilities provide equipment for on and off campus use by students.

The largest studio facility is a modern working environment which enables upper division students to work in a commercial studio or stage, suitable for large-set photography. Our digital imaging laboratory incorporates Power Macintosh and Pentium computers networked to a variety of scanners and printers. CD's and photographic quality prints can be produced for class assignments and projects. Multimedia and animation represents an area of rapid growth and exciting software applications. Computer labs are also available for writing and business applications, as well as Web browsing and video digital post-production.

## Library

Brooks Institute has an excellent library geared toward photographic education. It contains approximately 7000 books and 35,000 journals and technical publications. Current photographic journals, not otherwise indexed, are indexed at the library for the benefit of the students. In addition to photography, the library includes material on advertising, art, business management, marketing, digital imaging and graphics pertaining to photography.

While this facility is primarily for Brooks Institute students, (only enrolled students may borrow) the public is welcome to use its resources for research. Visuals are continually being added. The library is open Monday through Friday and specific Saturdays when the Institute is in session.

## Galleries

Brooks Institute's galleries reflect the diversity of the photographic medium. Exhibits rotate regularly featuring student, alumni and faculty work, internationally known professional photographers and research studies.

## Photographic Competitions

Students are encouraged to enter photographic competitions held throughout the country. Brooks' students have an excellent record in competitions, including those held by the Professional Photographers of America, Hasselblad, Kodak, American Photo, AMI, CPOY, regional photographic associations, magazines, and the Santa Barbara community.

## Advisement Requirements & Counseling:

Initial information about the curriculum and the Institute's policies is provided by the Admissions Office Staff.

Faculty serve as program advisors to students about photographic studies and career opportunities. Students are assigned a faculty advisor during their first year of study. Students are required to meet with their assigned faculty advisor prior to programming a major course of study.

The Counselor is available for consultation about personal growth and academic concerns.

## Insurance

It is recommended that students insure all photographic equipment either before or upon arrival in Santa Barbara. Verification of adequate coverage, with an insurance agent, is also recommended.

An insured automobile is necessary for travel to and between campuses, and for transporting equipment to assignment locations. The State of California requires registration of automobiles and adequate vehicle insurance. Proof of insurance must be carried in the vehicle. Vehicles must be registered with the state when a person has resided here for 20 days. This law applies to students and to parents who provide vehicles for students attending schools in California. Upon arrival in Santa Barbara, students should contact the Department of Motor Vehicles for current information. Students are required to have a valid California Driver's License. International students must apply for a social security number first. Applications may be obtained from the Admissions Office. Processing takes about two weeks.

The Institute makes no provisions for medical insurance for its students.

## Housing

Brooks Institute has no on-campus housing. The Student Services Office maintains housing lists of current vacancies to assist students after they arrive. Furnished rooms, with kitchen privileges, start at approximately $400 per month. Studio apartments start at $550, while one-bedroom apartments start at about $650. Shared rental is usually about $400 per month. Two bedroom apartments start at about $800. Applicants should arrive at least two weeks before their starting date to find housing.

Applicants should also plan for additional living costs and personal expenses.

## Meal Service

Refreshments and snacks can be obtained on each campus. The Institute has no provisions for serving complete meals.

## Parking

Student parking is provided at all three campuses and there is no registration or fee required. We encourage car pooling to improve local air quality and conserve fuel.

## Disabled Students

Brooks Institute of Photography reviews applicants with learning and / or psychological challenges on a case by case basis. It is in this

# Brooks Institute of Photography

A World Leader in Professional Photographic Education.

## WELCOME TO
## BROOKS INSTITUTE OF PHOTOGRAPHY

Congratulations on your acceptance to Brooks Institute!

We are sure that you have many questions about making the move to Santa Barbara. Relocating is not always easy, so we would like to provide some information that should help to make your transition into student life here as smooth as possible.

The campuses of Brooks Institute are located some distance apart, and students attend classes in more than one location. Some of your photographic/film assignments may require you to travel out of town. Furthermore, you will need to transport your equipment to campus and to assignment locations. A car is essential. If you are planning to purchase a car here in Santa Barbara, be sure to allow enough time to complete the transaction before your first day of class. If you are from out of state, check with the Department of Motor Vehicles about registering your car. The local number is 805-963-9741. We also suggest that you check with your insurance company about car and photographic equipment insurance.

Our housing office maintains a file of current vacancies in the area. These listings may be sent to you, upon request only. They are also available to you at the Montecito campus when you arrive to register for classes. The following will give you an idea of typical costs: A room in a private home with kitchen privileges will start around $500 and a One-bedroom apartment at about $800. A Two-bedroom apartment will begin at approximately $1200. Allow yourself at least three to four weeks to find housing and get settled. If you do not have family or friends in the area, you may wish to make reservations with a motel on our list.

BROOKS INSTITUTE OF PHOTOGRAPHY
801 Alston Rd
Santa Barbara, CA  93108

FINANCIAL AID AWARD LETTER FOR 1999-00
09/15/99

We are pleased to offer, subject to the terms and conditions described in this letter, the following financial
assistance for the 99-00 Award Year.

REBEKAH A COHO                                                                SSN: ▮▮▮▮▮

| TYPE | PROGRAM | AMOUNT |
|------|---------|--------|
| Grants: | Federal Pell: | $ 2,675 |
| | FSEOG: | 500 |
| Loans: | FFEL Sub: | 2,625 |
| | FFEL Unsub: | 4,000 |
| Other: | GRANT: | 11,775 |
| | Total All Programs: | $ 21,575 |

| | FEDERAL PELL | | | | FSEOG | | | | FEDERAL PERKINS | |
|---|---|---|---|---|---|---|---|---|---|---|
| PERIOD | AMOUNT | DISB DATE | PERIOD | | AMOUNT | DISB DATE | PERIOD | | AMOUNT | DISB DATE |
| 1st Payment | $ 668.00 | 09/07/99 | 1st Payment | $ | 125.00 | 09/07/99 | | | | |
| 2nd Payment | $ 669.00 | 11/01/99 | 2nd Payment | $ | 125.00 | 11/01/99 | | | | |
| 3rd Payment | $ 669.00 | 01/10/00 | 3rd Payment | $ | 125.00 | 01/10/00 | | | | |
| 4th Payment | $ 669.00 | 03/06/00 | 4th Payment | $ | 125.00 | 03/06/00 | | | | |

COMMENTS:

# California Aid Report (CAR)
# Cal Grant Programs



The California Student Aid Commission is pleased to make this offer of Cal Grant assistance to you. Please read all of the information provided and follow the instructions both on this report and in the enclosed New Recipient Cal Grant Reference Manual.

- REBEKAH A COHO

|  |  |
|---|---|
| Date | 7/15/99 |
| Grant ID number | |
| Social Security number | |
| Academic year | 1999-00 |
| GPA | 3.63 |

## Eligibility Information

| School choice | Cal Grant A | Cal Grant B | Cal Grant C |
|---|---|---|---|
| BROOKS INSTITUTE | $14,130 | SEE CODE #10 | SEE CODE #74 |
| | | | |
| | | | |

- **Award Information** --The data provided above is a best estimate of the Cal Grant you may receive based on current state funding. Availability of funding is subject to change. You are responsible for reading your New Recipient Cal Grant Reference Manual.

- **Information Change/Correction** -- If the school you plan to attend is not the first school listed above, you must inform the Commission. If the school is not listed, submit this CAR to the Financial Aid Office and notify the Commission by completing and returning the enclosed Recipient Change Form.

- **Non-Award Definitions** --These can be found in the enclosed New Recipient Cal Grant Reference Manual.

- **Cal Grant Status** -- Enrollment of at least half-time is required to retain your grant. If you do not meet this requirement, contact the Commission and request a Leave of Absence.

- **Community College (CC) Reserve Grant** -- If the Cal Grant A above is a CC Reserve award, your award will be held in reserve for up to two years until you attend a four-year/private two-year school. See page 6 of the manual under CC Reserve for more information.

- **Cal Grant B Community College (CC) Grant** -- If the Cal Grant B designated above is a CC Grant, it will not be possible for you to use your grant at a four-year/private two-year school during the above academic year. If you attend a four-year/private two-year school at any time during the above academic year, you must notify the Commission. Your award will be held for you until the following academic year.

- **Cal Grant B Award Recipients** -- Students who have already completed more than one full-time semester, two full-time quarters, 4 1/2 months at a vocational/technical college or more than 16 part-time college units prior to the June 30th preceding the award year are not eligible for award activation. If you have completed more than these amounts, you must notify the Commission on the enclosed Recipient Change Form.

- **Eligibility** -- The school which you attend is required to confirm your continued eligibility prior to payment of this award.

- **Information Disclosure** -- Information for students eighteen (18) years of age or older will not be released to parents without written authorization.

- **Indefault** -- If the Default Status box is marked below, information received from the United States Department of Education indicates you are in default on a student loan or owe a refund on an educational grant. Your school must certify that you have made satisfactory repayment arrangements prior to your receipt of Cal Grant funds.

## School Use Only

| | Commission records | | Commission records |
|---|---|---|---|
| Education level; Verify [X] Yes | 2 | Remaining Cal Grant eligibility | 300.00 % |
| Housing status | OFF CAMPUS | Dependency status | INDEPENDENT |
| Family contribution | $ 427 | Default Status | |

L9973017/15/99556490548          PAGE 1 OF 2

G-16 (3/99) SACARG

# Brooks Institute of Photography

A World Leader in Professional Photographic Education

April 24, 2003

Rebekah Ann Norton

█████████████

Dear Rebekah:

During a routine reconciliation of our accounts on April 22, 2003 we discovered an administrative error on our part relating to your account at Brooks Institute. On September 17, 2002 we applied by mistake to your account $2,355.00 in Cal Grant funds you were not eligible for (because it was after you had already graduated). We have now refunded those funds from your account to correct the mistake. The correction of our error means that you now have an outstanding balance on your account in the amount of $2,355.00. You can make arrangements with the Student Accounts Office to pay this balance by calling (888) 304-3456, ext. 7605. Please contact the Financial Aid Office at (888) 304-3456, ext. 7631 if you have any questions regarding this matter. We truly apologize for any inconvenience this may cause.

Sincerely,

Stacey Eymann
Assistant Director of Financial Aid
Brooks Institute of Photography

BROOKS INSTITUTE OF PHOTOGRAPHY
Registration Form and Enrollment Agreement

Entering Session: **September 1999**

Student Name: Rebekah Norton          ID # ███████

Address ████████████          Telephone (8██5) ███████

[X] Bachelor of Arts      [ ] Diploma       [ ] Pre-Graduate

[ ] Graduate (MS)        [ ] Special Status

| New Course(s) | Tuition & Fees | Length of Term |
|---|---|---|
| Fundamentals of Photo B Design B | $2500 | September 7, 1999 to October 22, 1999 |
| Basic Photo General Education Course | $2500 | November 1, 1999 to December 17, 1999 |
| Lab Fees | $ 150 | *Non-refundable* |
| Total Paid | $ 2575 | 8/5/99 |

If you fail to attend the above New Course(s) for which you have registered, you will receive a WF for each course. "Tuition and Fees" represents the total amount for all fees, charges and services the student is obligated to pay for the new course(s) of instruction. "New Course(s)"; the name, description and number of hours required to complete the New Course(s) indicated above are set forth in the Institute's current catalog, which is incorporated herein by reference.

Verify all information on this sheet. If any information is incorrect, or if you wish to change your schedule, you must see the Registrar, if after the term has commenced, and the Admissions Office if prior to the start of class.

Buyer's Right to Cancel: The student has the right to cancel this enrollment agreement and obtain a refund in accordance with Brooks Institute's Refund Policy by giving written notice to the Registrar's Office - Jefferson Campus, 1321 Alameda Padre Serra, Santa Barbara CA 93103.

This agreement is a legally binding instrument when signed by the student and accepted by the school. The Consent and Release and Refund Policy form is incorporated herein and made a part of this Agreement by this reference. A copy of this agreement may be obtained upon request to the Registrar's Office. **Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau for Private Postsecondary & Vocational Education. 1027 10th St. 4th Flr. Sacramento CA 93814, (916) 445-3427.**

**My signature below certifies that I have read, understood, and agreed to my rights and responsibilities, and that the institute's cancellation and refund policies have been clearly explained to me.**

_____   8/27/99
Student Signature        Date

_____   8/27/99
Admissions Authorization Signature    Date

Student Enrollment Agreement

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)
Montecito Facility - 801 Alston Road, Santa Barbara, CA 93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA 93103
Media Center - 1722 State Street, Santa Barbara, CA 93101
(805) 966-3888/(888) 304-3456

Rebekah Ann S. Norton
_____                    _____
Student's Name (the Student)                Student's Social Security Number

                                                              State    Zip Code
_____
Date of Birth (Month, Date, Year)          USA
                                            Country of Citizenship

EDUCATIONAL OBJECTIVE:

[X] Bachelor of Arts Degree Program    [ ] Diploma Program         [ ] Other _____

18 Sessions/ 153 Semester Credits    _____ Sessions/_____ Semester Credits    _____ Session(s)/_____ Semester Credits

Program Start Date  Sept. 6, 1999    Scheduled Completion Date  August 30, 2002

SCOPE OF THIS AGREEMENT:

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of 6 (six) Session(s) beginning on 3-6-00 and ending on 2-23-01

TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:

|  | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 | Registration Fee Non-refundable | Academic Year NA |
|---|---|---|---|---|---|---|---|---|
| TUITION | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | | |
| LAB FEES non-refundable | $85 | $85 | $85 | $85 | $85 | $85 | | |
| TOTAL DUE | $2,585 | $2,585 | $2,585 | $2,585 | $2,585 | $2,585 | $15,510 | |
| Payment Due Date | 2-18-00 | 4-14-00 | 6-9-00 | 8-18-99 | 10-13-00 | 12-15-00 | | |

THE STUDENT IS RESPONSIBLE FOR THIS AMOUNT →   BALANCE DUE   $15,510

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

_____                    1-28-00
Signature of Student                       Date

_____                    1.28.00
Signature of Institutional Representative   Date

_____                    _____
Signature of Parent/Guardian (required only for minor applicants)   Date

Any questions or problems concerning this school which have not been satisfactorily answered or resolved
by the school should be directed to the Bureau for Private Postsecondary and Vocational Education,
1027 10th Street, 4th Floor, Sacramento, CA 95814. (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN IT IS SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

ACCEPTED BY: _____      1.28.00      20238
             Signature of Authorized Institutional Official   Date   Student's Brooks ID

## Student Enrollment Agreement

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)
Montecito Facility - 801 Alston Road, Santa Barbara, CA 93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA 93103
Media Center - 1722 State Street, Santa Barbara, CA 93101
(805) 966-3888/(888) 304-3456

Rebekah Ann Norton
Student's Name (the Student)

_____ St. _____
Student's Mailing Address                    City                    State    Zip Code

USA
Date of Birth (Month, Date, Year)          Country of Citizenship

EDUCATIONAL OBJECTIVE:

☒ Bachelor of Arts Degree Program     ☐ Diploma Program     ☐ Other _____

_____ Sessions/_____ Semester Credits     _____ Sessions/_____ Semester Credits     _____ Session(s)/_____ Semester Credits

Program Start Date _____     Scheduled Completion Date _____

SCOPE OF THIS AGREEMENT:

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of _____ Session(s) beginning on _____ and ending on _____

TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:

|  | 158 | 159 | 160 | 161 | 162 | 163 Registration Fee Non-refundable | Academic Year N/A |
|---|---|---|---|---|---|---|---|
|  | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 |  |
| TUITION | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 | 2,625.00 |  |
| ACTIVITY FEE non-refundable | 85.00 | 85.00 | 100.00 | 100.00 | 100.00 | 100.00 |  |
| TOTAL DUE | 2,710.00 | 2,710.00 | 2,725.00 | 2,725.00 | 2,725.00 | 2,725.00 | 16,320.00 |
| Payment Due Date | 2-16-01 | 4-13-01 | 6-15-01 | 8-24-01 | 10-19-01 | 12-13-01 |  |

THE STUDENT IS RESPONSIBLE FOR THIS AMOUNT →     BALANCE DUE   16,320.00

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

_____     2/12/01
Signature of Student                                    Date

_____     2-12-01
Signature of Institutional Representative                Date

_____     _____
Signature of Parent/Guardian (required only for minor applicants)     Date

Any questions or problems concerning this school which have not been satisfactorily answered or resolved
by the school should be directed to the Bureau for Private Postsecondary and Vocational Education,
1027 10th Street, 4th Floor, Sacramento, CA 95814. (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN IT IS SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

ACCEPTED BY: _____     2-12-01          # 20233
                Signature of Authorized Institutional Official          Date          Student's Brooks ID

# Student Enrollment Agreement

**BROOKS INSTITUTE OF PHOTOGRAPHY** (the Institution)
Montecito Facility - 801 Alston Road, Santa Barbara, CA 93108 (mailing address)
Jefferson Facility - 1321 Alameda Padre Serra, Santa Barbara, CA 93103
State Street Facility - 1722 State Street, Santa Barbara, CA 93101
Ventura Facility – 5301 N. Ventura Blvd., Ventura CA 93001
(805) 966-3888/(888) 304-3456

Student's Name (the Student): *Rebekah Ann Norton*

Student's Social Security Number

Student's Home Phone

Student's Mailing ⬛⬛⬛ City ⬛⬛⬛ State ⬛ Country ⬛ Zip Code

Date of Birth (Month, Date, Year)

Country of Citizenship: *USA*

EDUCATIONAL OBJECTIVE BEGINNING ____ *9/7/99* :

[X] Bachelor of Arts Degree Program (18 Session/159 Semester Credits)
  ___ Film and Video Production
  [X] Professional Photography
  ___ Visual Journalism

[ ] Associate of Arts Degree Program (8 Sessions/72 Semester Credits)
  ___ Visual Journalism

[ ] Diploma Program (17 Sessoins/108 Semester Credits)
  ___ Film and Video Production
  ___ Professional Photography

[ ] Pre-Grad Studies (in preparation for the MS Degree)
  _____ Sessions/_____ Semester Credits

## SCOPE OF THIS AGREEMENT:

This Enrollment Agreement covers enrollment in 3-9 semester credits in each of __4__ Session(s) beginning on *3/4/02* and ending on *10/25/02*

TOTAL TUITION AND FEES COVERED BY THE TERMS OF THIS AGREEMENT:

|  | Session 1 | Session 2 | Session 3 | Session 4 | Session 5 | Session 6 | Academic Year |
|---|---|---|---|---|---|---|---|
| Application Fee | | | | | | | $ |
| Registration Fee non-refundable | | | | | | | $ |
| TUITION | $2,755 | $2,755 | $2,755 | $2,755 | $2,755 | $2,755 | |
| ACTIVITY FEES Non-refundable | $100 | $100 | $100 | $100 | $100 | $100 | |
| TOTAL | $2,855 | $2,855 | $2,855 | $2,855 | $2,855 | $2,855 | $17,130.00 |
| Payment Due Date | 2-15-02 | 4-12-02 | 6-14-02 | 8-23-02 | 10-18-02 | 12-13-02 | |

Annual Tuition and Fees

MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, UNDERSTOOD, AND AGREED TO MY RIGHTS AND RESPONSIBILITIES, AND THAT THE INSTITUTION'S CANCELLATION AND REFUND POLICIES HAVE BEEN CLEARLY EXPLAINED TO ME.

Signature of Student _____   Date *2/4/02*

Signature of Parent/Guardian (Required only for minor applicants) ____   Date *2/4/02*

Signature of Institutional Representative _____

Date _____

Any questions or problems concerning this school which have not been satisfactorily answered or resolved by the school should be directed to the Bureau for Private Postsecondary and Vocational Education, 400 R Street, Suite 500, Sacramento, CA 95814. (916) 445-3427

THIS AGREEMENT IS LEGALLY BINDING WHEN SIGNED BY THE STUDENT (AND PARENT/GUARDIAN, IF APPLICABLE) AND ACCEPTED BY THE INSTITUTION.

ACCEPTED BY: _____   Date *2/4/02*   Student's Brooks ID *20238*
Signature of Authorized Institutional Official



**The Smart Student Guide to Financial Aid**



Site Map    About FinAid

**○ Loans**

**❸ Scholarships**

**❸ Military Aid**

Other Types of Aid

Financial Aid Applications

Answering Your Questions

Calculators

Beyond Financial Aid



## Loan Payments Calculator

| | |
|---|---|
| Loan Balance: | $40,375.00 |
| Loan Interest Rate: | 8.25% |
| Loan Term: | 10 years |
| Minimum Payment: | $50.00 |
| **Monthly Loan Payment:** | **$495.21** |
| Number of Payments: | 120 |
| Cumulative Payments: | $59,425.20 |
| Total Interest Paid: | $19,050.20 |

*Note: The monthly loan payment was calculated at 119 payments of $495.21 plus a final payment of $495.21 .*

It is estimated that you will need an annual salary of at least $59,425.20 to be able to afford to repay this loan. This estimate assumes that 10% of your gross monthly income will devoted to repaying your student loans. If you use 15% of your gross monthly income to repay the loan, you will need an annual salary of only $39,616.80 , but you may experience some financial difficulty.

These results assume that the student is paying the interest charges on any unsubsidized loans and is not capitalizing the interest while in school. If the student is capitalizing the interest, the cumulative payments and total interest charges will be higher than shown here.

---

## Payment Schedule

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 1 | $495.21 | $277.58 | $217.63 | $277.58 | $217.63 | $40,157.37 |
| 2 | $495.21 | $276.08 | $219.13 | $553.66 | $436.76 | $39,938.24 |
| 3 | $495.21 | $274.58 | $220.63 | $828.24 | $657.39 | $39,717.61 |
| 4 | $495.21 | $273.06 | $222.15 | $1,101.29 | $879.55 | $39,495.45 |
| 5 | $495.21 | $271.53 | $223.68 | $1,372.83 | $1,103.22 | $39,271.78 |
| 6 | $495.21 | $269.99 | $225.22 | $1,642.82 | $1,328.44 | $39,046.56 |
| 7 | $495.21 | $268.45 | $226.76 | $1,911.26 | $1,555.21 | $38,819.79 |
| 8 | $495.21 | $266.89 | $228.32 | $2,178.15 | $1,783.53 | $38,591.47 |
| 9 | $495.21 | $265.32 | $229.89 | $2,443.47 | $2,013.42 | $38,361.58 |
| 10 | $495.21 | $263.74 | $231.47 | $2,707.20 | $2,244.90 | $38,130.10 |
| 11 | $495.21 | $262.14 | $233.07 | $2,969.35 | $2,477.96 | $37,897.04 |

| 12 | $495.21 | $260.54 | $234.67 | $3,229.89 | $2,712.63 | $37,662.37 |
| 13 | $495.21 | $258.93 | $236.28 | $3,488.82 | $2,948.91 | $37,426.09 |
| 14 | $495.21 | $257.30 | $237.91 | $3,746.12 | $3,186.82 | $37,188.18 |
| 15 | $495.21 | $255.67 | $239.54 | $4,001.79 | $3,426.36 | $36,948.64 |
| 16 | $495.21 | $254.02 | $241.19 | $4,255.81 | $3,667.55 | $36,707.45 |
| 17 | $495.21 | $252.36 | $242.85 | $4,508.18 | $3,910.39 | $36,464.61 |
| 18 | $495.21 | $250.69 | $244.52 | $4,758.87 | $4,154.91 | $36,220.09 |
| 19 | $495.21 | $249.01 | $246.20 | $5,007.88 | $4,401.11 | $35,973.89 |
| 20 | $495.21 | $247.32 | $247.89 | $5,255.20 | $4,649.00 | $35,726.00 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 21 | $495.21 | $245.62 | $249.59 | $5,500.82 | $4,898.59 | $35,476.41 |
| 22 | $495.21 | $243.90 | $251.31 | $5,744.72 | $5,149.90 | $35,225.10 |
| 23 | $495.21 | $242.17 | $253.04 | $5,986.89 | $5,402.94 | $34,972.06 |
| 24 | $495.21 | $240.43 | $254.78 | $6,227.33 | $5,657.71 | $34,717.29 |
| 25 | $495.21 | $238.68 | $256.53 | $6,466.01 | $5,914.24 | $34,460.76 |
| 26 | $495.21 | $236.92 | $258.29 | $6,702.93 | $6,172.53 | $34,202.47 |
| 27 | $495.21 | $235.14 | $260.07 | $6,938.07 | $6,432.60 | $33,942.40 |
| 28 | $495.21 | $233.35 | $261.86 | $7,171.42 | $6,694.46 | $33,680.54 |
| 29 | $495.21 | $231.55 | $263.66 | $7,402.97 | $6,958.12 | $33,416.88 |
| 30 | $495.21 | $229.74 | $265.47 | $7,632.72 | $7,223.58 | $33,151.42 |
| 31 | $495.21 | $227.92 | $267.29 | $7,860.63 | $7,490.88 | $32,884.12 |
| 32 | $495.21 | $226.08 | $269.13 | $8,086.71 | $7,760.01 | $32,614.99 |
| 33 | $495.21 | $224.23 | $270.98 | $8,310.94 | $8,030.99 | $32,344.01 |
| 34 | $495.21 | $222.37 | $272.84 | $8,533.30 | $8,303.84 | $32,071.16 |
| 35 | $495.21 | $220.49 | $274.72 | $8,753.79 | $8,578.56 | $31,796.44 |
| 36 | $495.21 | $218.60 | $276.61 | $8,972.39 | $8,855.17 | $31,519.83 |
| 37 | $495.21 | $216.70 | $278.51 | $9,189.09 | $9,133.68 | $31,241.32 |
| 38 | $495.21 | $214.78 | $280.43 | $9,403.88 | $9,414.10 | $30,960.90 |
| 39 | $495.21 | $212.86 | $282.35 | $9,616.73 | $9,696.46 | $30,678.54 |
| 40 | $495.21 | $210.91 | $284.30 | $9,827.65 | $9,980.75 | $30,394.25 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 41 | $495.21 | $208.96 | $286.25 | $10,036.61 | $10,267.00 | $30,108.00 |
| 42 | $495.21 | $206.99 | $288.22 | $10,243.60 | $10,555.22 | $29,819.78 |
| 43 | $495.21 | $205.01 | $290.20 | $10,448.61 | $10,845.42 | $29,529.58 |
| 44 | $495.21 | $203.02 | $292.19 | $10,651.63 | $11,137.61 | $29,237.39 |
| 45 | $495.21 | $201.01 | $294.20 | $10,852.63 | $11,431.82 | $28,943.18 |
| 46 | $495.21 | $198.98 | $296.23 | $11,051.62 | $11,728.04 | $28,646.96 |
| 47 | $495.21 | $196.95 | $298.26 | $11,248.57 | $12,026.30 | $28,348.70 |
| 48 | $495.21 | $194.90 | $300.31 | $11,443.46 | $12,326.62 | $28,048.38 |
| 49 | $495.21 | $192.83 | $302.38 | $11,636.30 | $12,628.99 | $27,746.01 |
| 50 | $495.21 | $190.75 | $304.46 | $11,827.05 | $12,933.45 | $27,441.55 |
| 51 | $495.21 | $188.66 | $306.55 | $12,015.71 | $13,240.00 | $27,135.00 |
| 52 | $495.21 | $186.55 | $308.66 | $12,202.26 | $13,548.66 | $26,826.34 |
| 53 | $495.21 | $184.43 | $310.78 | $12,386.69 | $13,859.44 | $26,515.56 |
| 54 | $495.21 | $182.29 | $312.92 | $12,568.99 | $14,172.35 | $26,202.65 |
| 55 | $495.21 | $180.14 | $315.07 | $12,749.13 | $14,487.42 | $25,887.58 |

Case 3:19-cv-03674-WHA   Document 159   Filed 10/30/20   Page 48 of 100

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 56 | $495.21 | $177.98 | $317.23 | $12,927.11 | $14,804.65 | $25,570.35 |
| 57 | $495.21 | $175.80 | $319.41 | $13,102.91 | $15,124.06 | $25,250.94 |
| 58 | $495.21 | $173.60 | $321.61 | $13,276.51 | $15,445.67 | $24,929.33 |
| 59 | $495.21 | $171.39 | $323.82 | $13,447.90 | $15,769.49 | $24,605.51 |
| 60 | $495.21 | $169.16 | $326.05 | $13,617.06 | $16,095.54 | $24,279.46 |
| 61 | $495.21 | $166.92 | $328.29 | $13,783.98 | $16,423.83 | $23,951.17 |
| 62 | $495.21 | $164.66 | $330.55 | $13,948.64 | $16,754.38 | $23,620.62 |
| 63 | $495.21 | $162.39 | $332.82 | $14,111.04 | $17,087.19 | $23,287.81 |
| 64 | $495.21 | $160.10 | $335.11 | $14,271.14 | $17,422.30 | $22,952.70 |
| 65 | $495.21 | $157.80 | $337.41 | $14,428.94 | $17,759.71 | $22,615.29 |
| 66 | $495.21 | $155.48 | $339.73 | $14,584.42 | $18,099.44 | $22,275.56 |
| 67 | $495.21 | $153.14 | $342.07 | $14,737.56 | $18,441.51 | $21,933.49 |
| 68 | $495.21 | $150.79 | $344.42 | $14,888.36 | $18,785.92 | $21,589.08 |
| 69 | $495.21 | $148.42 | $346.79 | $15,036.78 | $19,132.71 | $21,242.29 |
| 70 | $495.21 | $146.04 | $349.17 | $15,182.82 | $19,481.88 | $20,893.12 |
| 71 | $495.21 | $143.64 | $351.57 | $15,326.46 | $19,833.45 | $20,541.55 |
| 72 | $495.21 | $141.22 | $353.99 | $15,467.69 | $20,187.43 | $20,187.57 |
| 73 | $495.21 | $138.79 | $356.42 | $15,606.47 | $20,543.86 | $19,831.14 |
| 74 | $495.21 | $136.34 | $358.87 | $15,742.81 | $20,902.73 | $19,472.27 |
| 75 | $495.21 | $133.87 | $361.34 | $15,876.69 | $21,264.06 | $19,110.94 |
| 76 | $495.21 | $131.39 | $363.82 | $16,008.07 | $21,627.89 | $18,747.11 |
| 77 | $495.21 | $128.89 | $366.32 | $16,136.96 | $21,994.21 | $18,380.79 |
| 78 | $495.21 | $126.37 | $368.84 | $16,263.33 | $22,363.05 | $18,011.95 |
| 79 | $495.21 | $123.83 | $371.38 | $16,387.16 | $22,734.43 | $17,640.57 |
| 80 | $495.21 | $121.28 | $373.93 | $16,508.44 | $23,108.36 | $17,266.64 |
| 81 | $495.21 | $118.71 | $376.50 | $16,627.15 | $23,484.86 | $16,890.14 |
| 82 | $495.21 | $116.12 | $379.09 | $16,743.27 | $23,863.95 | $16,511.05 |
| 83 | $495.21 | $113.51 | $381.70 | $16,856.78 | $24,245.65 | $16,129.35 |
| 84 | $495.21 | $110.89 | $384.32 | $16,967.67 | $24,629.97 | $15,745.03 |
| 85 | $495.21 | $108.25 | $386.96 | $17,075.92 | $25,016.93 | $15,358.07 |
| 86 | $495.21 | $105.59 | $389.62 | $17,181.50 | $25,406.56 | $14,968.44 |
| 87 | $495.21 | $102.91 | $392.30 | $17,284.41 | $25,798.86 | $14,576.14 |
| 88 | $495.21 | $100.21 | $395.00 | $17,384.62 | $26,193.86 | $14,181.14 |
| 89 | $495.21 | $97.50 | $397.71 | $17,482.12 | $26,591.57 | $13,783.43 |
| 90 | $495.21 | $94.76 | $400.45 | $17,576.88 | $26,992.02 | $13,382.98 |
| 91 | $495.21 | $92.01 | $403.20 | $17,668.89 | $27,395.22 | $12,979.78 |
| 92 | $495.21 | $89.24 | $405.97 | $17,758.12 | $27,801.20 | $12,573.80 |
| 93 | $495.21 | $86.44 | $408.77 | $17,844.57 | $28,209.96 | $12,165.04 |
| 94 | $495.21 | $83.63 | $411.58 | $17,928.20 | $28,621.54 | $11,753.46 |
| 95 | $495.21 | $80.81 | $414.40 | $18,009.01 | $29,035.94 | $11,339.06 |
| 96 | $495.21 | $77.96 | $417.25 | $18,086.96 | $29,453.20 | $10,921.80 |
| 97 | $495.21 | $75.09 | $420.12 | $18,162.05 | $29,873.32 | $10,501.68 |
| 98 | $495.21 | $72.20 | $423.01 | $18,234.25 | $30,296.33 | $10,078.67 |
| 99 | $495.21 | $69.29 | $425.92 | $18,303.54 | $30,722.25 | $9,652.75 |

| Payment Number | Payment | Interest | Principal | Cumulative Interest | Cumulative Principal | Remaining Balance |
|---|---|---|---|---|---|---|
| 100 | $495.21 | $66.36 | $428.85 | $18,369.90 | $31,151.10 | $9,223.90 |
| 101 | $495.21 | $63.41 | $431.80 | $18,433.32 | $31,582.89 | $8,792.11 |
| 102 | $495.21 | $60.45 | $434.76 | $18,493.76 | $32,017.66 | $8,357.34 |
| 103 | $495.21 | $57.46 | $437.75 | $18,551.22 | $32,455.41 | $7,919.59 |
| 104 | $495.21 | $54.45 | $440.76 | $18,605.67 | $32,896.17 | $7,478.83 |
| 105 | $495.21 | $51.42 | $443.79 | $18,657.08 | $33,339.97 | $7,035.03 |
| 106 | $495.21 | $48.37 | $446.84 | $18,705.45 | $33,786.81 | $6,588.19 |
| 107 | $495.21 | $45.29 | $449.92 | $18,750.74 | $34,236.73 | $6,138.27 |
| 108 | $495.21 | $42.20 | $453.01 | $18,792.94 | $34,689.74 | $5,685.26 |
| 109 | $495.21 | $39.09 | $456.12 | $18,832.03 | $35,145.86 | $5,229.14 |
| 110 | $495.21 | $35.95 | $459.26 | $18,867.98 | $35,605.12 | $4,769.88 |
| 111 | $495.21 | $32.79 | $462.42 | $18,900.77 | $36,067.54 | $4,307.46 |
| 112 | $495.21 | $29.61 | $465.60 | $18,930.39 | $36,533.13 | $3,841.87 |
| 113 | $495.21 | $26.41 | $468.80 | $18,956.80 | $37,001.93 | $3,373.07 |
| 114 | $495.21 | $23.19 | $472.02 | $18,979.99 | $37,473.95 | $2,901.05 |
| 115 | $495.21 | $19.94 | $475.27 | $18,999.93 | $37,949.22 | $2,425.78 |
| 116 | $495.21 | $16.68 | $478.53 | $19,016.61 | $38,427.75 | $1,947.25 |
| 117 | $495.21 | $13.39 | $481.82 | $19,030.00 | $38,909.57 | $1,465.43 |
| 118 | $495.21 | $10.07 | $485.14 | $19,040.07 | $39,394.71 | $980.29 |
| 119 | $495.21 | $6.74 | $488.47 | $19,046.81 | $39,883.18 | $491.82 |
| 120 | $495.21 | $3.38 | $491.82 | $19,050.20 | $40,375.00 | $0.00 |

---

| | |
|---|---|
| Loan Balance: | 40375 |
| Interest Rate: | 8.25% |
| Loan Term (Years): | 10 |
| Minimum Payment: | 50 |
| Print payment schedule? | ⦿ Yes ○ No |

**CALCULATE**

Home | Loans | Scholarships | Military Aid | Other Types of Aid | Financial Aid Applications
Answering Your Questions | Calculators | Beyond Financial Aid | Site Map | About FinAid®

Copyright ©2000 FinAid Page, LLC. All rights reserved.
Mark Kantrowitz, Publisher
www.FinAid.org

**WELLS FARGO**

Education Financial Services
P.O. Box 5185
Sioux Falls, SD 57117-5185
Email: studentloans@wellsfargoefs.com
800-658-3567

## Account Statement

### 03/12/2003

000627-00627-0500-4
REBEKAH A NORTON

Account Number 

**Questions? Call us at 800-658-3567**
**Email: studentloans@wellsfargoefs.com**

---

### Account Activity

**Last Payment Received**

Transaction Date
Applied to Principal
Applied to Interest
Applied to Fees
Current Principal Balance    $42,520.62

### Current Payment Due

| | |
|---|---|
| Due Date | 04/01/2003 |
| Current Payment Amount | $431.71 |
| Amount Past Due | $0.00 |
| Late Fees | $0.00 |
| Total Due | $431.71 |

This statement is current as of the date above. If you recently sent a payment, we may not have credited it to your account when this statement was printed.

Partial payments will not advance your due date. Full payments in excess of your monthly payment will advance your due date unless you inform Wells Fargo Education Financial Services to do otherwise.

### News From Wells Fargo

Don't have Direct Deposit yet? Ask for it today and have more time for other important things. With Direct Deposit your check is automatically deposited into your account, saving you time by allowing you to avoid teller and ATM lines. And it's absolutely free. Ask for details on whether your regularly received checks may be direct deposited. Just stop by any branch, or call 1-800-869-3557.

---

REBEKAH A NORTON

### PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| Account Number | Due Date | Total Amount Due | Amount Enclosed |
|---|---|---|---|
| | 04/01/2003 | $431.71 | |

**Change of name, address, or telephone number?**

| Name | Telephone Number |
|---|---|
| Address | Apt. # |
| City | State | Zip Code |

☐ Please do not apply excess payment to advance my due date.

Please make check or money order payable to:
Wells Fargo Education Financial Services
P.O. Box 5151
Sioux Falls, SD 57117-5151

556490548999999000431710401031

FROM :ALLSI VC                    FAX NO. :8056586166           Feb. 04 2005 04:36PM  P6

02/04/2005  14:07    3104427756           BRAUN LAW GROUP              PAGE  04/22

1  Michael D. Braun (167416)
   Marc L. Godino (182689)
2  BRAUN LAW GROUP, P.C.
   12400 Wilshire Boulevard
3  Suite 920
   Los Angeles, CA 90025
4  Tel:    (310) 442-7755
   Fax:    (310) 442-7756
5
   Janet Lindner Spielberg (221926)
6  LAW OFFICES OF JANET LINDNER SPIELBERG
   12400 Wilshire Boulevard
7  Suite 400
   Los Angeles, California 90025
8  Tel:    (310) 392-8801
   Fax:    (310) 278-2938
9
   *Attorneys for Plaintiffs*
10

11

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**FEB 0 4 2005**

GARY M. BLAIR, Executive Officer
BY _Merilee A. Jay_
   Merilee A. Jay. Deputy Clerk

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                  FOR THE COUNTY OF SANTA BARBARA                    BY
                                                                     "FAX"
14

15  MARK NILSEN and ANTONIO LIMON On        )   CASE NO.:  1165597
    Behalf of Themselves And All Others Similarly )
16  Situated,                                )   **CLASS ACTION**
                                             )
17              Plaintiffs,                  )   **COMPLAINT FOR DAMAGES AND
                                             )   EQUITABLE RELIEF**
18      vs.                                  )
                                             )   **JURY TRIAL DEMANDED**
19  CAREER EDUCATION CORPORATION,            )
    BROOKS INSTITUTE OF PHOTOGRAPHY,         )   Assigned To:
20  GREG STRICK and DOES 1 through and       )   Dept:
    including 100,                           )
21                                           )
                                             )
22              Defendants.                  )

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\FSserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint701final/revision.wpd

02/04/2005 FRI 13:08  [TX/RX NO 8366] @004

Plaintiffs, by their attorneys, allege upon personal knowledge as to their own acts, and as to all other matters upon information and belief based upon, _inter alia_, the investigation made by and through their attorneys.

## SUMMARY OF ALLEGATIONS

1.     This is a class action brought by current and former students of Brooks Institute of Photography ("Brooks"), a learning institution wholly owned and operated by Career Education Corporation ("CEC"), on behalf of all Brooks students since from February 4, 2001 to present for violations of the California Education Code, Consumer Legal Remedies Act, and California Business and Professions Code.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to Code of Civil Procedure §410.10.  In the aggregate, Class damages exceed the jurisdictional minimum of this Court.

3.     Venue is proper in this Court and the acts of the defendants occurred in this County.

## THE PARTIES

4.     Plaintiff Mark Nilsen, attended Brooks Institute of Photography from March 2001 to December 2002 and was damaged thereby.  Plaintiff Nilsen sues on behalf of himself, all others similarly situated, and on behalf of the General Public pursuant to the "Private Attorney General" provisions of the Unfair Competition Laws embodied in _California Business and Professions Code_ §§17200 and 17500 _et seq._

5.     Plaintiff Antonio Limon attended Brooks Institute of Photography from July 2002 to December 2003 and was damaged thereby.  Plaintiff Limon sues on behalf of himself, all others similarly situated, and on behalf of the General Public pursuant to the "Private Attorney General" provisions of the Unfair Competition Laws embodied in _California Business and Professions Code_ §§17200 and 17500 _et seq._

6.     Defendant Career Education Corporation claims to be the world's largest on-campus provider of private, for-profit post-secondary education.  It owns and operates 82 different schools, in 5 different countries.

1

7.    Defendant Brooks Institute of Photography has been owned an operated by CEC since May 1999 and currently has three campuses (Santa Barbara, Ventura and Milpitas).  Brooks offers degrees in Photography, Visual Communication, Video Production and Video Journalism.

8.    Defendant Greg Strick is president of Brooks Institute of Photography.

9.    The true names and capacities of defendants sued herein under C.C.P. §474 as Does 1 through 100, inclusive, are presently unknown to plaintiffs who therefore sue these defendants by such fictitious names.  Plaintiffs will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by plaintiffs and the members of the class and the general public.

10.   At all times mentioned in the causes of action alleged herein, each and every defendant was an agent and/or employee of each and every other defendant.  In doing the things alleged in the causes of action stated herein, each and every defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission and authorization of each of the remaining defendants.  All actions of each defendant as alleged in the causes of action stated herein were ratified and approved by every other defendant or their officers or managing agents.

## STATEMENT OF FACTS

11.   Defendants embarked on a course of conduct designed to purposefully mislead potential students into believing that Brooks was a quality institute of higher learning, whose graduates were well received by employers.  As part of its sales effort to convince students to enroll in CEC schools, defendants claimed that a CEC education will "equip them to compete successfully in today's demanding job markets."  To bolster this representation, CEC's website and promotional literature claimed that it " provides expert placement assistance for [its] graduates and alumni." In addition, CEC promised that its Career Services Departments  will provide "quality personnel" who will work with students on career planning, interviewing techniques, resume writing, and job-search techniques."

2

1     12.    The culmination of CEC's recruitment efforts was the representation that:

CEC placement professionals help students turn dreams into futures by assisting them in finding and securing the job that will launch them on a rewarding and fulfilling career. In 2003, CEC once again achieved an outstanding placement record, as 93 percent of our graduates system-wide found a job in their chosen field within six months of graduation.

Graduates of CEC schools benefit from career-focused academic programs that equip them to compete successfully in today's demanding job markets, and from our longstanding relationships with leading employers across the country.

13.    In addition to representations made by CEC, Brooks also touts its reputation, extensive alumni network and placement services.

- The carefully structured curriculum has been developed to be responsive to the expanding needs of the photographic and motion picture industry.

- A continuous dialog with Brooks' alumni and other successful professionals provides valuable information concerning current trends and potential future developments within the broad spectrum of photographic/filmmaking careers

- Brooks Institute's programs are designed for anyone who aspires to a career in photography or filmmaking as well as working photographers who seek new skills to advance their careers. As we enter the era of global communication, we will continue to provide one of the finest educations in photography and filmmaking available.

- If you've begun to think about college and are seeking industry current education in imaging, photography, film, video... Then you are probably ready for Brooks Institute of Photography, simply one of the best schools of its kind in the world.

- <u>Graduate Placement Services:</u>
Brooks Institute of Photography places a great deal of emphasis on helping graduates in their search for rewarding career positions. The Student Career Services Office encourages a working partnership with each student.

- Career Education Corporation provides expert placement assistance for our graduates and alumni. Our Career Services Departments are located on each of our campuses and have global access to candidates and job opportunities both domestically and internationally. We strive to provide quality personnel in response to the job opportunities that are available by working with our students on career planning, interviewing techniques, resume writing, and job-search techniques. By being fully aware of a candidate's work ethic, job skills, personal

3

1   history, and educational background, we are able to provide the perfect
    match for the job. Our goal is provide "the right" candidate to the
2   "right employer", as our goal is to satisfy the needs of both the
    candidate and the employer.
3

4       14.    In addition to false promises in their promotional materials, potential Brooks students

5   were each subject to high pressure sales pitches in which school recruiters made, inter alia, the

6   following false and misleading representations:

7           a.    98% job placement rates;

8           b.    Jobs that paid starting salaries of $75,000 plus;

9           c.    Extensive and active alumni network to assist students in their professional

10             endeavors;

11          d.    Competitive application process in which only the elite are selected for

12             admission;

13      15.    In truth, Brooks' placement rates were far below their touted percentages.  Students

14  that were able to find jobs, did so most often without assistance from the school and almost never in

15  the salary range touted by Brooks representatives.

16      16.    Students place great importance on placement statistics when deciding which

17  academic institution to pay for an education.  In fact, job placement statistics are a fundamental

18  consideration of accreditation.

19      17.    Brooks is accredited by the Accrediting Council for Independent Colleges and

20  Schools ("ACICS") and by the California Postsecondary Educational Commission ("CPEC") and

21  also by Bureau for Private Postsecondary and Vocational Education ("BPPVE").   According to

22  ACICS statements of value, one of the four keys to accreditation is accountability.

23      "The Council believes that institutions must be accountable to rigorous educational,

24      administrative, and fiscal standards.... Accountability is operationalized through

25      standards on institutional tracking of students' satisfactory academic progress,

26      institutional effectiveness planning girded in criteria, and <u>retention and placement</u>

27      <u>reporting that requires institutions to account for student achievement leading to</u>

28      <u>gainful employment.</u>"

4

18. The Bureau for Private Postsecondary and Vocational Education ("Bureau") is responsible for regulating California's post secondary educational institutions and their educational services in compliance with the Private Postsecondary and Vocational Education Reform Act of 1989. In order to operate legally in California, schools that are not exempt must obtain approval to operate from the Bureau and meet minimum educations standards under California Education Code §94831.

19. On November 8, 2004 the Bureau for Private Postsecondary and Vocational Education ("Bureau") conducted an on-site assessment of Brooks' records pursuant to a claim by a former Brooks employee regarding certain unethical business practices. Bureau representatives randomly selected 162 student records for review and determined that Brooks was not operating in compliance with California Education Code Title 3, Division 10, Part 59, Chapter 7 and Title 5 Division 7.5 of the California Code of Regulations and that accordingly their ability to operate as an educational institution in California was in jeopardy. Among the most egregious findings were:

   a. Institutions operating under Bureau's jurisdiction are required to disclose all information and material facts likely to affect the decision of the student to enroll. California Education Code §§94814(a)(8), 94810, 94816. "While [the catalog] is a publication that is visually appealing, it is an instrument that does little to inform the student of what he or she can expect in regards to the rigor of the programs or the financial considerations that result from residing in a geographical area in California known for its high cost of living."

   b. Brook's practice of requiring students to sign a new enrollment agreement every year is of concern. It is unclear if students have to hit a moving target as to graduation requirements. The Bureau is also concerned that the enrollment agreement is signed by students several months before the actual start date of the educational program for which they enroll. "The institution's current enrollment agreements were reviewed and found to be not in complete compliance with §94810."

5

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\Fileserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint001finalrevision.wpd

c.   "The undergraduate enrollment agreement does not include all charges and fees, nor clearly illustrate those that are not refundable. It does not specify charges that a student will be obligated to pay upon enrollment. It does not include a line item for the Student Tuition Recovery Fund assessment or the activity fee referred to in the catalog.

d.   The institution does not have a school performance fact sheet with currently appropriate data, as required by §94816(a). Consequently, prospective students are not aware of the completion or placement rates for the educational program they are interested in. Based on the institutions printed material, such as the catalog and brochure, it is obvious that the goal of Brooks Institute of Photography is to prepare students for employment. The catalog on page 5 states, "training methods, course materials, and counseling are designed to lead you through the steps in preparation for employment, the main goal of the entire program." The marketing brochure submitted in the renewal application states, "graduates of this program have learned the skills necessary to successfully compete for jobs with top movie and television studios, design firms and advertising agencies." It also states, "our students have the opportunity to fully immerse themselves into their classes and learn applicable , industry required skills that will help them build successful careers in the real world of entertainment." The catalog states, "Brooks Institute of Photography can provide the tools for you to pursue to job you want." Finally the institutions mission states that it is to "prepare students to successfully pursue careers in professional commercial, still photography, professional filmmaking, visual journalism or visual communication." Based on its own publications the institution indicates that it is preparing its graduates for a particular vocation, trade or career field. ... Thus Brooks is required to provide a School Performance Fact Sheet to every prospective student;

6

1     e.     The institution has violated 94816(b) by failing to produce a School

2               Performance Fact Sheet with current information thereby failing to ensure that

3               each prospective student receives the institution completion and placement

4               disclosure before enrollment;

5     f.     The Brooks Institute Student Disclosure Form does not reflect the exact

6               language required by §94816(b) regarding the transferability of credits;

7     g.     The institution has violated §94816(b) in regards to the statement concerning

8               the transferability of units and degrees earned at our school.  This statement

9               must be disclosed in its entirety and be signed and dated by both the student

10             and representative of the institution;

11     h.     The institution has not established compliance with §94814(b) which requires

12             that no institution shall enter into an enrollment agreement with a student

13             unless the student has first received the institutions catalog and all required

14             disclosures;

15     i.     The institution is not in compliance with California Code of Regulations

16             §71770(a) which requires that "the institution shall not admit any student who

17             is obviously unqualified or who does not appear to have a reasonable prospect

18             of completing the program;"

19     j.     The institution is not in compliance with California Code of Regulations

20             §71775 as there is insufficient evidence that the institution maintains and

21             implements procedures designed to measure student academic progress.

22     k.     78% of the students receive financial aid but it is unclear how many receive

23             federal financial aid and how many receive alternative loans which must be

24             paid back at much higher interest rates.  Alternative loans are not discussed in

25             the catalog but many of the general ledgers included these types of loans.

26     l.     The Institution is not in compliance with §94825 as it has not sufficiently

27             established that it provides to students and prospective students a current

28             schedule of all student charges

7

20. The Bureau concluded that the institution's advertisements and promotional materials were false and misleading. As stated in relevant part:

Ethical Principles and Practices: As outlined in the issues regarding the School Performance Fact Sheet, the institution's printed material and statements therein, indicate that its main objective is to prepare students for a particular vocation, trade, or career field. The brochure submitted in the renewal application indicates that career "outcomes" for Brooks Institute of Photography graduates include job titles from Production Artist for Web to Cartoonists and Animators. The lowest salary is given as $34,466 (of which 25% of graduates in that job title will make less than that salary) and the highest is stated at $76,573. The catalog also includes a "Partial List of Employers" depicting 119 names of corporations and business. Of the fifty graduate files reviewed, which included the placement files, only three placement sheets reflected any of the employers and one of those was the institution itself.

The Bureau was able to contact eleven of the graduates. The students were asked if they had received job placement from the institution and if they were currently working in a field related to their degree. Of the eleven, ten of the graduates stated that they had not received job placement from the institution. One graduate indicated that he had not received job placement services, and further stated the institution only referred him to Monster.com, an on-line job service. Another stated that all the jobs that the institution referred were for $7.00 an hour dead-end jobs while another stated her job, a now closed photo lab, paid $10.50 per hour. Another stated that she has only been able to work as an intern and no one has hired her to date.

Graduate responses to whether they are currently employed indicated that one is working for the institution as an assistant, two are in the masters degree program and another is attending California State University, Chico, although the yellow data sheet in that student's file indicates that she is employed by Chico State. Five of the graduates are currently unemployed. The graduates that are employed include a job at Sunwest Studios at a salary of $600 per month and another is working while enrolled in the masters program at a local camera shop. Of the graduates that are employed all but one stated that they sought and were hired on their own volition although the institution has indicated on the yellow data sheets in the placement files that they have been placed. One of the employers listed on the yellow sheet was, according to the graduate, an internship for which he was not momentarily compensated.

Compliance Violations: The institution's advertisement and promotion is false and misleading as it depicts job titles and salaries that are considerable, particularly when juxtaposed to the small sampling of the graduates. (California Education Code §94832.)

8

1    21.    As current and prior attendees of Brooks, plaintiffs and members of the

2   Class have all been directly and proximately injured by defendants' conduct.  Such injury includes

3   the payment of money for tuition to Brooks and CEC which would not have occurred had there been

4   no misrepresentations or deception on the part of the defendants.

5                          **CLASS ACTION ALLEGATIONS**

6    22.    Plaintiffs bring this class action on behalf of themselves as representatives of the

7   General Public and as a representatives of a proposed plaintiff class.  Plaintiffs bring this class action

8   on behalf of themselves and all others similarly situated as members of a proposed California-wide

9   plaintiff class.  The proposed plaintiff class, which plaintiffs seek to represent, are current and prior

10   attendees of Brooks Institute of Photography (the "Class").  Excluded from the Class are defendants,

11   any entity which defendants have a controlling interest, and any of the defendants' subsidiaries,

12   affiliates, and officers, directors, or employees, and any legal representative, heir, successor, or

13   assignee of defendants.

14    23.    This action has been brought and may properly be maintained as a class action

15   pursuant to California Code of Civil Procedure §382 and Civil Code §1781, and case law

16   thereunder, to which the California trial courts have been directed by the California Supreme Court

17   to look for guidance.

18    24.    The members of the Class are so numerous that joinder of all members is

19   impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and

20   can only be ascertained through appropriate discovery, plaintiffs are informed and believe, and on

21   that basis alleges, that thousands of persons are members of the Class.  The precise number of Class

22   members and their addresses are currently unknown to plaintiffs.  The latest statistics provided by

23   the California Post Secondary Education Commission indicates that in 2003 alone over 2100

24   students were enrolled at Brooks  Class members may be notified of the pendency of this action by

25   published and/or mailed notice.

26    25.    There is a well-defined community of interest in the questions of law and fact

27   affecting the parties represented in this action.

28

9

1       26.    Common questions of law and fact exist as to all members of the Class. These

2   common questions predominate over the questions affecting only individual Class members.

3       27.    The questions common to members of the Class are, inter alia:

4           a.    whether through defendants' conduct, defendants engaged in

5                   unfair business practices;

6           b.    whether the defendants violated the California Education Code;

7           c.    whether the defendants violated the Consumer Legal Remedies Act; and

8           d.    the nature and extent of damages and other remedies to which Class members

9                   are entitled as a result to defendants' wrongful conduct.

10       28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

11   of the Class are similarly affected by defendants' wrongful conduct. Plaintiffs have no interests

12   antagonistic to the interests of the other members of the Class. Plaintiffs and all members of the

13   Class have sustained monetary damages arising out of the defendants' violations of common and

14   statutory law as alleged herein.

15       29.    Plaintiffs are  adequate representatives of the Class because their interests do not

16   conflict with the interests of the members of the Class they seek to represent; they have retained

17   counsel competent and experienced in complex class action litigation; and they intend to prosecute

18   this action vigorously. The interests of members of the Class will be fairly and adequately protected

19   by plaintiffs and their counsel.

20       30.    A class action is superior to all other available methods for the fair and efficient

21   adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

22   damages suffered by individual Class members may be relatively small, the expense and burden of

23   individual litigation make it impossible for members of the Class to individually redress the wrongs

24   done to them. There will be no difficulty in the management of this class action. Individualized

25   litigation presents the potential for inconsistent or contradictory judgments. A class action presents

26   far fewer management difficulties and provides the benefits of single adjudication, economy of

27   scale, and comprehensive supervision by a single court.

28

**FIRST CAUSE OF ACTION**

**Unlawful, Unfair and Deceptive Business Practices in Violation of
California Business & Professions Code §17200, *et seq.*
(Against All Defendants)**

31.     Plaintiffs reallege and incorporate herein by reference each of the foregoing paragraphs.

32.     The California Business and Professions Code 17200 defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  The statute is liberally construed to protect California consumers, and it provides for injunctive relief and restitution for violations.

33.     Defendants intentionally made misleading statements regarding placement services in order to attract students to their school.  This deliberate misrepresentation was the substantial factor in causing plaintiffs to attend defendant's school which resulted in plaintiffs' harm.  Plaintiffs suffered a monetary loss in the amount they paid and or still owe for tuition.

34.     Defendants' actions, in intentionally making their placement data appear more favorable than it really was, resulted in members of the public being deceived.  A reasonable person would have no knowledge of the inaccuracies of these representations.

35.     The acts, misrepresentations, omissions and practices of the defendants as alleged above constitute unfair, misleading, false advertising, and unlawful business practices within the meaning of California Business and Professions Code  17200, *et seq*.  Plaintiffs were damaged as a result of this conduct.

36.     Defendants, through their acts of unfair competition, have acquired money from plaintiffs and the members of the proposed Class in the amounts that plaintiffs and members of the proposed Class have paid CEC in tuition fees.  Plaintiffs and members of the Class request this Court restore this money to them, and to enjoin defendants from continuing to violate the California Unfair Competition Law in the future.

37.     Such conduct is ongoing and continues to this date.  Plaintiffs, the Class members and the general public are therefore entitled to the relief described below.

11

**SECOND CAUSE OF ACTION**

**Unlawful, Unfair and Deceptive Business Practices in Violation of
California Business & Professions Code §17500, *et seq.*
(Against All Defendants)**

38.     Plaintiffs hereby incorporate by reference the allegations contained above.  This Cause of Action is brought by Plaintiffs on behalf of the general public.

39.     Defendants use advertising to call attention to their education programs .  Defendants are disseminating advertising concerning their services which by its very nature is unfair, deceptive, untrue, or misleading within the meaning of *California Business & Professions Code* §17500, *et seq.*  Such advertisements are likely to deceive, and continue to deceive, members of the General Public, including prospective students.

40.     In making and disseminating the statements alleged herein, Defendants knew or should have known that the statements were untrue or misleading, and acted in violation of *California Business & Professions Code* §17500, *et seq.*

41.     The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of, *California Business & Professions Code* §17500, *et seq.*

42.     Through their deceptive acts and practices, Defendants have improperly and illegally obtained money from members of the General Public.  As such, Plaintiff requests that this Court cause Defendants to restore this money to such members of the General Public, and to enjoin Defendants from continuing to violate *California Business & Professions Code* §17500, *et seq.*, as discussed above.  Otherwise, the General Public will continue to be harmed by Defendants' false and/or misleading advertising.

43.     Pursuant to *California Business & Professions Code* §§17203 and 17535, Plaintiff seeks an order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations.  Plaintiff additionally requests an order requiring Defendants to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendants by means of such acts of unfair competition and false advertising, plus interest and attorneys fees so as to restore any and all monies to the general public which were acquired and obtained by means of

12

1   such unfair competition, untrue and misleading advertising, misrepresentations and omissions, and

2   which ill-gotten gains are still retained by Defendants.  The general public may be irreparably

3   harmed and/or denied an effective and complete remedy if such an order is not granted.

4       44.     Such conduct is ongoing and continues to this date.  The General Public are therefore

5   entitled to the relief described below.

6                            **THIRD CAUSE OF ACTION**

7                    **Violations of the Consumer Legal Remedies Act**
                            **Civil Code   1750 et seq.**
8                           **(Against All Defendants)**

9       45.     Plaintiffs reallege and incorporate herein by reference each of the foregoing

10  paragraphs.

11      46.     The Consumer Legal Remedies Act established a nonexclusive statutory remedy for

12  unfair methods of competition and unfair or deceptive acts or practices undertaken by any person or

13  company in a transaction intended to result or which results in the sale of goods or services to any

14  consumer.

15      47.     Plaintiffs and the members of the Class are consumers who purchased goods and

16  services intended for sale from defendants.

17      48.     In advertising that their school had the characteristic of exceptional placement

18  services along with exceedingly high career placement rates, and in failing to adequately disclose

19  information as to the transferability of units and degrees earned at the school, defendants

20  misrepresented their services as having characteristics, benefits, or qualities which they do not have,

21  all of which are prohibited acts under Section 1770 of the California Legal Remedies Act.

22      49.     Section 1780 of the Consumer Legal Remedies Act specifically defines damages as

23  *any damage.*  Plaintiffs and members of the Class were damaged in that they were assessed charges

24  for tuition for attending defendant's school based upon these false representations.  Therefore,

25  plaintiffs and members of the class are entitled to monetary compensation in an amount to be

26  determined by the court.

27      50.     Plaintiffs and the members of the Class have all been directly and proximately injured

28  by defendants' conduct.  Such injury includes the payment of money for tuition to Brooks and CEC

                                    13

1   which would not have occurred had there been no misrepresentations or deception on the part of the

2   defendants.

3       51.     In accordance with Civil Code 1780(a) and 1782(d), by this Complaint plaintiffs

4   seek injunctive relief as to defendants' violation of the CLRA. Plaintiffs request that this Court

5   grant such other relief as provided in Civil Code 1780 and in the Prayer for Relief.

6

7                   **Notice Pursuant to Civil Code Section 1782**

8       52.     Plaintiffs hereby demand that within 30 days from service of this complaint,

9   defendants correct or otherwise rectify the deceptive practices complained of herein for the entire

10  Class pursuant to California Civil Code 1770. Failure to do so will result in plaintiffs amending this

11  complaint to seek damages for such deceptive practices pursuant to California Civil Code 1782.

12                   **FOURTH CAUSE OF ACTION**

13           **Violation of California Education Code Section 94832**
                       **(Against All Defendants)**

14

15      53.     Plaintiffs reallege and incorporate herein by reference each of the foregoing

16  paragraphs.

17      54.     Section 94832 of the California Education Code subsections (a), (b), and (h) indicate

18  "no institution or representative of an institution shall make or cause to be made any statement that

19  is in any manner untrue or misleading, either by actual statement, omission, or intimation." "No

20  institution or representative of an institution shall engage in any false, deceptive, misleading, or

21  unfair act in connection with any matter, including the institution's advertising and promotion, the

22  recruitment of students for enrollment in the institution,........education materials, or loan or grant

23  funds from a student,......or job placement." "No institution or any representative of an institution

24  shall in any manner make any untrue or misleading change in, or untrue or misleading statement

25  related to, any test score, grade, record of grades....record indicating student completion or

26  employment, financial information...."

27

28

                                            14

1       55.    CEC's practices of representing career placement data in a knowingly fraudulent

2   manner in order to boost enrollment in CEC's schools is a direct violation of Section 94832 of the

3   California Education Code.

4       56.    California Education Code Sections 94877, 94985(b)(6) and 94985(d) indicate if an

5   institution is in violation of Section 94832 of the Code, the institution shall refund all consideration

6   paid by or on behalf of the student.  Furthermore, a prevailing student shall be entitled to the

7   recovery of damages, equitable relief and reasonable attorney's fees and costs.  If a court finds that a

8   violation was willfully committed, upon the student's written demand, the court shall award a civil

9   penalty of up to two times the amount of the damages sustained by the student.

10                        **PRAYER FOR RELIEF**

11       **WHEREFORE**, plaintiffs pray for relief as follows:

12       A.    For declaration of this action to be a proper class action, with plaintiffs as class

13   representatives, and designating their counsel as lead counsel for plaintiffs;

14       B.    For injunctive relief, enjoining CEC and Brooks from continuing the practice of

15   computing and advertising their Career Placement statistics in a misleading and deceptive manner;

16       C.    For restitution in the form of the disgorgement of any monetary benefits to CEC and

17   Brooks which were the result of this unfair business practice;

18       D.    For restoration to plaintiffs of all funds acquired by means of any act or practice

19   declared by this court to be unlawful, fraudulent, or to constitute unfair competition or untrue or

20   misleading business practices;

21       E.    For punitive and exemplary damages according to proof, including pre-judgment and

22   post-judgment interest as allowed by the State of California;

23       F.    For attorney's fees and expert witness fees, as provided by law; and

24

25

26   ///

27   ///

28   ///

15

---

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\Fileserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint001finalrevision.wpd

1    G.    For such other, further and different relief as the nature of this case may require or

2    may be deemed just and proper by this Court.

3                              **JURY DEMAND**

4          Plaintiffs demand a trial by jury.

5

6    Dated: February 4, 2005                        Michael D. Braun
                                                     Marc L. Godino
7                                                    BRAUN LAW GROUP, P.C.

8

9                                     By: _____
                                                     Marc L. Godino
10                                                   12400 Wilshire Boulevard
                                                     Suite 920
11                                                   Los Angeles, CA 90025
                                                     Tel:    (310) 442-7755
12                                                   Fax:    (310) 442-7756

13                                                   Janet Lindner Spielberg
                                                     LAW OFFICES OF JANET LINDNER SPIELBERG
14                                                   12400 Wilshire Boulevard
                                                     Suite 400
15                                                   Los Angeles, California 90025
                                                     Tel:    (310) 392-8801
16                                                   Fax:    (310) 278-5938

17                                                   *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

                                      16

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**
\\Fileserver\shareddocs\BLG\BROOKS\BROOKSINSTITUTEComplaint001finalrevision.wpd

STATE OF CALIFORNIA                                                    ARNC .D SCHWARZENEGGER, Governor



**BUREAU FOR PRIVATE POSTSECONDARY
AND VOCATIONAL EDUCATION**
Physical Address: 400 "R" Street, Suite 5000 • Sacramento, CA, 958· 4-6200
Mailing Address: P.O. Box 980818 • West Sacramento, CA 95798 )818
Phone: (916) 445-3427 • FAX: (916) 323-6571

State of
California
Department of
**Consumer
Affairs**



July 11, 2005

Dr. Greg Strick, President                       Certified Mail Number 7004 ::890 0000 2794 8983
Brooks Institute of Photography                  Return Receipt Requested
801 Alston Road
Santa Barbara, CA  93108

RE: Notice of Conditional Approval to Operate
    Institution Code No. 4201871

Dear Dr. Strick:

Under the authority granted the Bureau for Private Postsecondary and Vocational Education ("Bureau") under
sections 94900 and 94901 of the California Education Code, the Bureau notifies you, Dr. Greg Strick,
President of Brooks Institute of Photography ("Brooks Institute"), that the Bureau has determined that an
unconditional grant of approval to operate is not in the public interest. Based upon the Renewal Application,
information and materials submitted by Brooks Institute in response to the subsequent Compliance Visit
Report and materials and information reviewed during the Unannounced Visit that followed, Brooks Institute
of Photography is granted a *Conditional Approval* to operate effective from July 11, 2005 through June 30,
2007 (a period of not more than two years). This expiration date may be earlier as a consequence of action
taken by the Bureau resulting from site visit findings or other information brought to the attention of this
Bureau. This *Conditional Approval* is limited to the following programs:

                    **Diploma in Professional Photography**
                    **Diploma in Film and Video Production**
                    **Associate of Arts in Visual Journalism**
                    **Bachelor of Arts in Visual Communication**
                 **Bachelor of Arts in Professional Photography**
                 **Bachelor of Arts in Film and Video Production**
                    **Bachelor of Arts in Visual Journalism**
                    **Master of Science in Photography**

Under California Education Code section 94840, an application for re-approval must be submitted at least
ninety days prior to the termination of your approval. Please reference the attached *Conditional Approval*
documents listing the school title, site address and code number, approved programs and term of approval.
You will be contacted prior to a Site Visit, informed of the composition and qualifications of the Visiting
Committee, and given an opportunity to challenge that composition.

JUL-22-2005 FRI 10:04 AM BPPVE                    FAX NO. 916 323 3780              P. 02



Bureau for Private Postsecondary and Vocational Education

From:    Michele Hedding, Staff Services Analyst
         Administrative Unit
         Telephone: (916) 445-3427, extension 3168
         Fax number: (916) 322-2615
         E-mail: michele_hedding@dca.ca.gov

Subject:   Public Record Act Request -- Brooks Institute of Photography

**Please be advised:**

**The enclosed action by the Bureau is not yet final. The institution has the
right to appeal any allegations contained in the enclosed Notice. If you
would like to find out whether the decision of the Bureau has become final,
please check back with the Bureau and make another public records
request at a later date.**

Number of pages including the cover sheet 20 23

## INSTITUTION'S RIGHT TO A HEARING

Pursuant to Education Code sections 94901(c)(3), 94965, and 94975, and Government Code section 11500 and following, you may make a written request for a hearing within 15 days of the date on which this letter is served on you by certified mail. A written request for a hearing may be made by delivering or mailing, within 15 days of service of this letter, a signed and dated statement to the effect that Brooks Institute of Photography requests a hearing of the Bureau's conditional approval of its application for renewal to operate to: Sheila Hawkins, Education Administrator, Bureau for Private Postsecondary and Vocational Education, 400 R Street, Suite 5000, Sacramento, CA 95814.

Should you request a hearing, you may, but need not be, represented by counsel at all stages of the proceeding. You also have the right to be present at the hearing, to cross-examine witnesses, and to present evidence.

If you request a hearing, further information regarding your right to discovery and to request a postponement of the hearing for good cause will be provided to you with the notice of hearing. Unless a written request for a hearing is signed by you or on your behalf, and is delivered or mailed to the Bureau within 15 days after service of this letter, Brooks Institute of Photography will waive or forfeit the right to an administrative hearing, and the Bureau's conditional approval of Brooks Institute's renewal application will become final on the day following the last day to request a hearing.

## NOTICE REGARDING STIPULATED SETTLEMENTS

Education Code section 94975 provides for the disposition of any issues involved in the hearing by stipulation or settlement prior to the hearing date. A stipulated settlement is a binding written agreement between you and the Bureau regarding any or all of the matters charged and the consequences thereof. Such a stipulation must have the approval of the Bureau but, once approved, would be incorporated into a final order.

## I. BACKGROUND AND HISTORY OF THE APPLICATION

The Bureau is within the Department of Consumer Affairs and is responsible for regulating California's private postsecondary educational institutions in compliance with the Private Postsecondary and Vocational Education Reform Act of 1989 ("Act" – California Education Code sections 94700 and following). In order to operate legally in California, schools that are not exempt must obtain "approval to operate" from the Bureau and meet minimum educational standards under the Act (Education Code section 94831).

Brooks Institute of Photography is owned and operated exclusively as a Limited Liability Corporation, which is wholly owned by Career Education Corporation located at 2985 Greenspoint Parkway, Suite 600, Hoffman Estates, Illinois. The Bureau approved Career Education Corporation's ownership of Brooks Institute on May 4, 1999. Brooks Institute submitted an application for renewal to operate in the State of California, received on October 4, 2004. As part of the evaluation of the renewal application, the Bureau conducted an on-site assessment of Brooks Institute's records on November 8 and 9, 2004. The on-site review was prompted, in part, by allegations of unethical business practices made by a former employee of Brooks Institute to Brooks Institute's accrediting agency, the Accrediting Council for Independent Colleges and Schools (ACICS). The following is a brief chronology of Brooks Institute's application for renewal to operate:

| | |
|---|---|
| October 4, 2004 | The Bureau receives Brooks Institute's application for renewal to operate. |
| November 8, 2004 | Bureau for Private Postsecondary and Vocational Education representatives Marcia Trott and Lynnelle Case conduct an on-site |

|                    |                                                                                                                                                                                 |
| ------------------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                    | assessment of Brooks Institute by randomly selecting student records for review, including fifty student records from the drop/cancellation list.                                |
| December 1, 2004   | Marcia Trott, Senior Education Specialist, sends a report to Brooks Institute detailing general findings and issues of non-compliance and violations of the Act.                 |
| December 31, 2004  | The Bureau receives Brooks Institute's response to the December 1, 2004 report.                                                                                                  |
| January 31, 2005   | The Bureau receives Brooks Institute's revised response to the December 1, 2004 report.                                                                                          |
| February 23, 2005  | Nicole L. Burke, an employee of the Bureau for Private Postsecondary and Vocational Education, visits Brooks Institute posing as a potential student.                            |
| February 28, 2005  | Bureau for Private Postsecondary and Vocational Education representatives Marcia Trott, Lynnelle Case, and Deborah Godfrey conduct an unannounced visit to Brooks Institute.     |

### Reconciliation of the December 1, 2004 Compliance Visit Report

The Bureau has completed an evaluation of Brooks Institute's application for renewal to operate as a private postsecondary educational institution. The November 8 and 9, 2004 on-site evaluation culminated in a compliance report, dated December 1, 2004, outlining findings and specific areas of non-compliance by Brooks Institute. Brooks Institute responded to this report on December 31, 2004, and provided additional and amended information on January 31, 2005. Non-compliance issues included, in part, offering an unapproved program entitled "Pre-Graduate Studies"; the failure to provide prospective students with the "Transferability of Units and Degrees Earned at Our School" disclosure form; and the omission of required information in the catalog and on the enrollment agreement. Also cited were issues regarding Brooks Institute's admissions policies and procedures, as well the omission of material facts in the catalog regarding loan indebtedness a student may incur while enrolled in a Brooks Institute program. Brooks Institute satisfactorily responded to several of the non-compliance issues identified by the Bureau, including:

- admissions policies and procedures
- catalog omissions
- unapproved educational titles
- organization of student records
- enrollment agreements
- Notice Concerning Transferability of Units and Degrees Earned at Our School
- scholastic regulations and graduation requirements
- tuition, fee and refund schedules

The December 1, 2004 compliance report also cited violations, including one regarding the "School Performance Fact Sheet" and another regarding "Ethical Principles and Practices" among others, that have not been sufficiently resolved. In consideration of these unresolved issues, the Bureau conducted an unannounced visit to Brooks Institute in February 2005, which also yielded evidence of non-compliance related to the

Student Tuition Recovery Fund (STRF). It is these violations and acts of non-compliance that are the bases for each of the allegations outlined in Sections A through C of this document.

## II. BASES FOR CONDITIONAL APPROVAL

The Bureau has completed its review and assessment of the Brooks Institute of Photography renewal application to operate as a private postsecondary educational institution pursuant to Education Code section 94900. Education Code section 94901(c)(2) defines the circumstances under which it is appropriate for the Bureau to grant a Conditional Approval to operate:

> "If the institution is in compliance with this chapter, but has operated within three years before the filing of the application in violation of this chapter then in effect, or if the council determines that an unconditional grant of approval to operate is not in the public interest, the council may grant a conditional approval to operate subject to whatever restrictions the council deems appropriate. The council shall notify the institution of the restrictions or conditions, the basis for the restrictions or conditions, and the right to request a hearing to contest them. Conditional approval shall not exceed two years."

The following violations substantiate the Bureau's reasons why it is not in the public interest to grant a full, unconditional approval to operate to Brooks Institute at this time.

## A. BROOKS INSTITUTE PRESENTED FALSE OR MISLEADING INFORMATION TO PROSPECTIVE STUDENTS REGARDING EMPLOYMENT OPPORTUNITIES.

Brooks Institute presented false and misleading information to prospective students regarding employment opportunities in three respects: (1) availability of jobs; (2) potential salaries; and (3) career placement services provided.

Generally, the Bureau may refuse to issue or renew an approval if the institution violates any standard, rule, or regulation under the chapter governing private postsecondary and vocational institutions. (Education Code § 94830(a).) The Bureau has the authority to refuse to issue or renew an approval if the institution presents to prospective students information that is false or misleading relating to employment opportunities. (Education Code § 94830(h).) In addition, the Reform Act prohibits an institution or representative of an institution from "advertis[ing] concerning job availability, degree of skill and length of time required to learn a trade or skill unless the information is accurate and in no way misleading." (Education Code § 94831(f).)

The Act enumerates certain misrepresentations that violate the Act:

> "No institution or representative of an institution shall make or cause to be made any statement that is in any manner untrue or misleading, either by actual statement, omission, or intimation." (Education Code § 94832(a).)

> "No institution or representative of an institution shall engage in any false, deceptive, misleading, or unfair act in connection with any matter, including the institution's advertising and promotion, the recruitment of students for enrollment in the institution, the offer or sale of a program of instruction, course length, course credits, the withholding of equipment, educational materials, or loan or grant funds from a student, training and instruction, the collection of payments, or job placement." (Education Code § 94832(b).)

JUL-22-2005 FRI 10:08 AM BPPVE                    FAX NO. 916 323 3780                    P. 07

The Act then mandates that certain disclosures be made to prospective students: "Each institution offering a degree or diploma program designed to prepare students for a particular vocational, trade, or career field shall provide to each prospective student a school performance fact sheet disclosing all of the following information:

...

(3) The number and percentage of students who begin the program and secure employment in the field for which they were trained. In calculating this rate, the institution shall consider as not having obtained employment, any graduate for whom the institution does not possess evidence, documented in his or her file, showing that he or she has obtained employment in the occupation for which the program is offered.

(4) The average annual starting wages or salary of graduates of the institution's program, if the institution makes a claim to prospective students regarding the starting salaries of its graduates, or the starting salaries or local availability of jobs in a field. The institution shall disclose to the prospective student the objective sources of information necessary to substantiate the truthfulness of the claim.

Each school that offers or advertises placement assistance for any course of instruction shall file with the council its placement statistics for the 12-month period or calendar year immediately preceding the date of the school's application for annual review for every course of instruction." (Education Code § 94816(a).)

<u>Allegations:</u>

1. <u>BROOKS INSTITUTE PROVIDED FALSE OR MISLEADING INFORMATION REGARDING EMPLOYMENT OPPORTUNITIES.</u>

Representatives of Brooks Institute provided false and misleading information regarding employment opportunities to then-prospective students who graduated in 2003, as well as to prospective students entering programs in 2005. Deceptive practices misrepresented job placement and employment tenure that were in direct contradiction with its own placement records, as well as national and state labor statistics.

On or about April 4-5, 2005, the Bureau sent out 121 e-mail surveys to a sampling of 2003 graduates asking what representations were made by Brooks Institute regarding employment opportunities. Of those, fourteen graduates responded.[1] Brooks Institute made the following representations to these prospective students with regards to career opportunities:

Graduate # 3[2]: "I enrolled in the program because I loved photography and was told that after going to Brooks I would have a 95% chance of finding a job after graduation. The admissions representative told me I would have a 95% chance of finding a job after graduation. Brooks did no [sic] meet those expectations, as I don't have a photo related job."

---

[1] The e-mail addresses were provided by Institute from its database. Many were no longer viable.
[2] Individual students are referred to herein by number to protect the privacy of the students. The identities of students will be disclosed at any potential hearing or pursuant to any valid request for discovery. At any potential hearing, complainant will move for an order limiting the disclosure of the identities of these students to this proceeding and/or resulting appeals.

Brooks Institute records indicate this 2003 baccalaureate graduate in Professional Photography was "college-placed" in part-time[3] employment. As recorded, this graduate's employment began eight months after graduation as a "Web Developer" with a wage of 12.00 per hour. "Web Developer" is not a placement in the field of Professional Photography. Institute records also reflect total loan indebtedness for this 2003 graduate of approximately $7,600.

Graduate # 6: "I was told that job placement was almost 100% after graduation with income sufficient to warrant the loans necessary for me to attend. This turned out to be un-true. It took me fifteen months to find industry work, and still it isn't earning me as much as I spent in school." In response to the Bureau's survey question, *"Are you working in an occupation for which your degree or diploma prepared you for?"* Graduate #6 stated, "Yes. To the extent that I am a courier for a production company. I still am not using the skills that I honed in school."

Brooks Institute records indicate this 2003 baccalaureate graduate in Film/ Video Production was self-placed in part-time hourly employment seven months prior to graduation. The job title listed by Brooks Institute was "film/video production." In other Brooks Institute records (*Employment Verification Form*), the job title for this graduate is listed as a "film screener" at a movie theater with a wage of $6.50 per hour. Institute records also reflect total loan indebtedness for this 2003 baccalaureate graduate of approximately $112,000.

Brooks Institute also made representations to prospective students for programs beginning in 2005 when it provided the *Student Performance Fact Sheet* with figures and statistics for the 2003 graduates. The *Fact Sheet* represented the following:

| Program | Of those Students who Completed Their Program in 2003, the Number and Percentage who Secured Employment in the Field |
|---|---|
| Bachelor of Arts in Professional Photography | 92 / 8 % |
| Diploma in Professional Photography | 2 / 67 % |
| Bachelor of Arts in Film and Video Production | 13 / 8 % |
| Diploma in Film and Video Production | There were no starts in this program that were scheduled to complete in 2003. |
| Bachelor of Arts in Visual Journalism | 6 / 8 % |
| Associate of Arts in Visual Journalism | 6 / 8 % |
| Master of Science in Photography | 1 / 10 % |
| Bachelor of Arts in Visual Communication | There were no starts in this program that were scheduled to complete in 2003. |

These representations have proven false. The Bureau's review and verification of Brooks Institute records resulted in lower placement figures than those reported above because the records were contradicted by graduates and employers during the Bureau's investigation. Five of the fourteen 2003 graduates (#s 1, 3, 6, 11 and 13) are not working in a field related to their degree, yet Brooks Institute records reflect all five as employed in industry-related jobs.

The difficulty experienced by these and other 2003 graduates of Brooks Institute's educational programs in securing employment in the field of study is borne out by state and national employment

---

[3] Brooks Institute did not provide a definition of "part time" employment. However, "part time" employment is defined in Education Code § 94854(k)(2) as at least 17.5 hours, but less than 32 hours, per week for a period of at least 6 days in the occupations or job titles to which the program of instruction is represented to lead, provided the student completes a handwritten statement at the beginning of the program and at the end of the program which states that the student's educational objective is part-time employment.

projections and other labor statistics. Nationally, the job outlook for Photographers projects average growth, but competition for job openings will be intense. In California, this occupation is projected to increase by only 5.8 percent, representing 400 net openings in the ten-year period beginning in 2002, with just 180 employment openings per year statewide.[4]

In addition to its diploma and degree programs in Photography, Brooks Institute offers three other degree programs with a different, but shared, focus:

- Associate of Arts in Visual Journalism
- Bachelor of Arts in Visual Journalism
- Bachelor of Arts in Film and Video Production

Graduates of these programs expect to be employed as film and video editors and skilled camera operators. As with Professional Photographers, the national job outlook for Film and Video Editors projects average growth coupled with keen competition for job openings through 2012. However, growth will be tempered by the increase in offshore motion picture production. In California, the demand for Film and Video Editors is projected to have average growth of just 200 annual openings statewide in the ten-year period beginning in 2002.

The demand for Television, Video, and Motion Picture Camera Operators in California is projected to have average growth tempered by increased offshore movie production, resulting in only 170 annual openings statewide through 2012. Nationally, the job outlooks for the Television, Video, and Motion Picture film and video editors and camera operators is expected to grow about as fast as the average for all occupations through 2012. However, as with the Photographer occupational outlook, the competition for job openings will be intense because the number of individuals interested in positions as videographers and movie camera operators usually is much greater than the number of openings. Growth will also be tempered by the increase in offshore motion picture production.

## 2. BROOKS INSTITUTE PROVIDED FALSE AND MISLEADING INFORMATION REGARDING POTENTIAL SALARIES TO PROSPECTIVE STUDENTS.

On or about February 23, 2005, a Bureau employee posing as a potential student, met with admission representative Hank Aizpuru at Brooks Institute. She asked about how much she could anticipate making once she graduated, and Mr. Aizpuru replied, "The sky's the limit." When she asked again, he stated, "I don't know … $50,000 to $150,000 in your first year." He repeated to her that the "sky's the limit," and that with that income she would be able to pay for her tuition at Brooks Institute.

This type of misrepresentation is pervasive. Information obtained by the Bureau from its surveys of 2003 graduates indicate that Brooks Institute made the following representations to prospective students with regard to potential salaries:

Graduate # 3: "I was told, while I was at school, that a starting wage for an apprentice in the field for which I was training was $150/day." Brooks Institute records indicate this 2003 baccalaureate program graduate in Professional Photography was "college-placed" in part-time employment, nine months after graduation, as a "Web Developer" with a wage of $12.00 per hour. ("Web Developer" is not considered a placement in the field of Professional Photography.) Institute records also show total loan indebtedness for this baccalaureate-degree recipient of approximately $76,600.

---

[4] Data source: *2002-2012 Employment Projections by Occupation*, Labor Market Information Division, California Employment Development Department.

Graduate # 6: "I was told that job placement was almost 100% after graduation with income sufficient to warrant the loans necessary for me to attend. I have to work 60-80 hours a week in order to cover the substantial debt incurred at Brooks. The admissions rep had me expecting almost twice the income that I earn now. I am a courier for a production company. I still am not using the skills that I honed in school." Brooks Institute records indicate this 2003 baccalaureate graduate in Film/Video Production was self-employed in part-time hourly employment seven months prior to graduation. The position's job title is listed in Brooks Institute records as a "film screener" at a movie theater with a wage of $6.50 per hour. Brooks Institute records also show total loan indebtedness for this 2003 baccalaureate-degree recipient of approximately $112,000.

Further, Bureau investigation of Brooks Institute records regarding student salaries and wages found the following:

- Brooks Institute's placement records indicate that 106 (67.5 percent) of 157[5] graduates in 2003 were employed part-time.
- For the 45 graduates in 2003 who were reported in Brooks Institute records as employed full-time[6], the average income was approximately $26,000. The average loan indebtedness of this same[7] group of 2003 graduates was approximately $74,000.
- Six 2003 graduates, with an average loan indebtedness of approximately $97 700 each -- the earliest of which had graduated 22 months earlier -- were reported in Brooks Institute records as still not placed as of February 2005.
- Brooks Institute records show that there was not a single 2003 diploma or degree recipient, at any degree level, whose reported wages coupled with the individual's employment tenure, was sufficient to generate even the lower $50,000 estimate of earning potential represented by Mr. Aizpuru to the Bureau employee who posed as a potential student.

## 3. INSTITUTE PRESENTED FALSE AND MISLEADING INFORMATION TO PROSPECTIVE STUDENTS REGARDING CAREER PLACEMENT SERVICES.

In November 2004, the Bureau contacted eleven of the 2003 Brooks Institute graduates. Results of the November 2004 and April 2005 surveys show that students who graduated in 2003 were told during their pre-enrollment interviews, as well as throughout their educational tenure at Brooks Institute, that they would receive career placement assistance. Additionally, Brooks Institute's 2003 catalog (for prospective students beginning a program in 2003) advertised the career placement services provided to enrolled students:

"Career Services – Brooks Institute has a department specifically designed to assist students in finding employment upon graduation. Career Services offers assistance in resume writing and alumni networking. Additionally, the faculty and the Alumni Association are constantly being informed of opportunities for graduates through photographic conventions and personal contacts with members of the profession. The increasing network of Brooks Institute alumni also enhances employment prospects for graduates, and many alumni either refer employers to the Institute or recruit from Brooks

---

[5] Six 2003 graduates were reported in Brooks Institute placement records as "waived," meaning they were unavailable or ineligible for employment. As such, they are exempt from "placement" consideration and are not included here.
[6] Brooks Institute did not provide a definition of "full-time" employment. However, "full-time" employment is defined in Education Code § 94854(k)(2) as at least 32 hours per week for a period of at least 60 days in the occupations or job titles to which the program of instruction is represented to lead.
[7] Indebtedness information for one of the forty-five 2003 graduates was not found in Brooks Institute records.

Institute themselves. Career Services maintains a listing of these professional jobs opportunities for students about to graduate and for alumni wishing to relocate."

These statements were misrepresentations. Eleven of the 2003 Brooks Institute graduates the Bureau contacted in November 2004 stated that they had not received job placement services from Brooks Institute. Of the fourteen Brooks Institute graduates contacted by e-mail in April 2005, all except Graduate #11 indicated that they did not receive any placement assistance from Brooks Institute.[8] Graduate #11 stated that he had received "some" assistance. Information obtained by the Bureau from its surveys of former students indicate that Brooks Institute made the following representations to prospective and enrolled students with regard to placement services:

Graduate #9 (April 2005 survey): "My expectations were that if I worked hard at Brooks and excelled in my degree program (which I did) that I would have assistance in gaining employment. I was lead to believe on many occasions that I would have opportunities upon graduation that I do not have. I feel it is unfair for them to claim that they will assist their graduates in gaining employment when they do not. I do not mean to say that I think Brooks should be directly responsible for finding me a job, but when they imply that they will help and then do not, it is frustrating. I, like many others who have attended Brooks, have very large student loans. I counted on finding a good job, even entry level employment in my field after graduation, to work my way up and begin to pay them off. I feel that I was misled to believe that Brooks would assist me in finding a good job in my field, and I am disappointed with the school's lack of support."

Institute records indicate this 2003 baccalaureate graduate in Professional Photography, whose total loan indebtedness is approximately $73,550, was self-placed in part-time employment, beginning on January 1, 2003, as a Digital Artist with a wage of $8.00 per hour. Brooks Institute recorded this placement on October 24, 2003, the day before the student's graduation.

Graduate #14 (April 2005 survey): "My admissions rep told me, my grandparents, and my parents about the 98% placement after graduation, which was the major reason I chose to attend Brooks. I later found out, AFTER I GRADUATED AND BEGAN LOOKING FOR JOBS, that any job after graduation was counted as "placement" even if it had nothing to do with photography. Even though this made me really mad and disappointed, I did get a job through career services. However, it is teaching students after school, ONE HOUR A WEEK. I feel like I have been lied to and no, my expectations are far far far from being met." The graduate reported the employer as a local public charter school.

Brooks Institute records indicate this 2003 baccalaureate graduate in Professional Photography was employed by Brooks Institute itself – not by a local public charter school, as stated by the graduate – to "assist teachers with shoots." According to the student's description, it appears that the placement was not in the field of "Professional Photography". The electronic record submitted by Brooks Institute in February 2005 lists a part-time wage of $6.00 per hour while the Employment Verification Form in the placement file for the same individual indicates an annual salary of $9,000. Institute records also show this 2003 graduate's total loan indebtedness of more than $18,200.

In summary, it is alleged that Brooks Institute engaged in a pervasive pattern of misrepresentations made to prospective students regarding employment opportunities, salaries, and career placement services. The pervasive nature of Brooks Institute's conduct is reflected in the scripts included in the training manual for

---

[8] One 2003 Brooks Institute graduate was contacted and responded both during the Bureau's November 2004 and February 2005 surveys. Her response has been recounted only once.

Admissions Representatives. The segment called *Looking at Other Schools* instructs the representatives to offer as enticement: "Brooks' job placement while they're in school, and career placement once they graduate – lifetime career placement. Compare where our graduates are (salary, employers, types of jobs) with a Brooks education." It is clear that the representatives influenced students' decisions to attend Brooks Institute, only to find that the job market was not how it was represented and students could receive no assistance in finding the jobs they were told existed.

<u>Determination of Violation(s):</u>

Based on the foregoing, it is alleged that Brooks Institute provided false and misleading information regarding the potential salaries, employment opportunities of graduates in their chosen fields of study, and the availability of career placement services. Providing false information to prospective students is in violation of Education Code Section 94830(h) and is grounds for refusal to issue or renew an application.

## B. INSTITUTE FURNISHED FALSE, MISLEADING, OR INCOMPLETE INFORMATION TO THE BUREAU.

Education Code section 94830(b) authorizes the Bureau to refuse to issue or renew an approval to operate, if the institution furnishes "false, misleading, or incomplete information to the council, or the failure to furnish information requested by the council or required by this chapter."

Education Code section 94830(g) authorizes the Bureau to refuse to issue or renew an approval if the institution fails to "maintain the minimum educational standards prescribed by this chapter, or to maintain standards that are the same as, or substantially equivalent to, those represented in the school's applications and advertising."

An Annual Report must be submitted to the Bureau. "Each institution approved to operate under this chapter shall be required to report to the council, by July 1 of each year, or another date designated by the council, the following information for educational programs offered in the prior fiscal year:

(a) (1) The total number of students enrolled, by level of degree or type of diploma program.
    (2) The number of degrees and diplomas awarded, by level of degree.
    (3) The degree levels offered.
    (4) Program completion rates.
    (5) The schedule of tuition and fees required for each term, program, course of instruction, or degree offered.
    (6) Financial information demonstrating compliance with subdivisions (b) and (c) of Section 94804 and subdivisions (b) and (c) of Section 94855, if applicable.
    (7) Institutions having a probationary or conditional status shall submit an annual report reviewing their progress in meeting the standards required for approval status.
    (8) A statement indicating whether the institution is or is not current on its payments to the Student Tuition Recovery Fund.
    (9) Any additional information that the council may prescribe." (Education Code § 94808(a).)

Brooks Institute must also make disclosures to prospective students in a *School Performance Fact Sheet*. "Each institution offering a degree or diploma program designed to prepare students for a particular vocational, trade, or career field shall provide to each prospective student a school performance fact sheet disclosing all of the following information:

...

(3) The number and percentage of students who begin the program and secure employment in the field for which they were trained. In calculating this rate, the institution shall consider as not having obtained employment, any graduate for whom the institution does not possess evidence, documented in his or her file, showing that he or she has obtained employment in the occupation for which the program is offered.

(4) The average annual starting wages or salary of graduates of the institution's program, if the institution makes a claim to prospective students regarding the starting salaries of its graduates, or the starting salaries or local availability of jobs in a field. The institution shall disclose to the prospective student the objective sources of information necessary to substantiate the truthfulness of the claim.

Each school that offers or advertises placement assistance for any course of instruction shall file with the council its placement statistics for the 12-month period or calendar year immediately preceding the date of the school's application for annual review for every course of instruction." (Education Code § 94816(a).)

## Allegations:

Brooks Institute furnished false, misleading or incomplete information to the Bureau with regard to school performance, both in the Annual Report and in the *School Performance Fact Sheet*.

As part of Brooks Institute's response to the Bureau's December 2004 report of non-compliance, Brooks Institute's *School Performance Fact Sheet* was submitted to the Bureau. The *Fact Sheet* consists of three categories of information: (1) the number of students who were scheduled to complete their program in 2003; (2) the number and percentage of those students who actually completed their program in 2003; and (3) of those students who completed their program in 2003, the number and percentage who secured employment in the field for which they were trained. Information in these three areas is listed on the *Fact Sheet* for each degree program offered by Brooks Institute.

The Bureau attempted to verify the figures reported by Brooks Institute on its *School Performance Fact Sheet* by seeking comparable data posted on the U. S. Department of Education (USDE) internet website. During this verification process, the Bureau found a single statement regarding Brooks Institute's graduate rate (or completion rate, as used by Bureau): "Graduation rates are not present because of an insufficient number of cases." This statement is false and misleading because 1) sufficient student records exist with which Brooks Institute could generate a "graduation rate;" and 2) Brooks Institute reported program completion figures (or graduation rates) to the Bureau through its *School Performance Fact Sheet*.

Brooks Institute's records obtained by the Bureau during the February 2005 site visit contradicted the program completion figures reported on the *Fact Sheet* for each of the six degree programs for which numbers and percentages were reported. The Bureau also found additional inaccurate and contradictory information in February 2005 regarding the percentage of students who completed their programs in 2003 (on schedule) that was reported to the Bureau on Annual Report Form 2003-2a, Line 9 of Brooks Institute's 2003 Annual Report. The Bureau noted that Brooks Institute's Annual Report figures for 2003 regarding program completion, which should have been the same as the figures reported by Brooks Institute on its *School Performance Fact Sheet*, were different from each other. Further, the Bureau found that neither set of figures were accurate when compared to Institute records for the same period that were submitted to the Bureau in February 2005.

In the third category of the *Fact Sheet*, with regard to those students who completed their program in 2003, listing the number and percentage who secured employment in the field, Brooks Institute's records obtained by the Bureau during the February 2005 site visit contradicted the figures reported on the *Fact Sheet* for each of the six degree programs for which numbers and percentages were reported.

Education Code 94816(a)(4) requires the disclosure of starting salary and wage information on *School Performance Fact Sheets*. The Bureau has also incorporated the reporting of this information in institution Annual Reports. Such information is required to be reported for all programs that lead to a specific career, as in the case of Professional Photography. Brooks Institute's 2003 Annual Report to the Bureau also contained false and misleading information, or was incomplete in substantive respects with regard to salaries and wages of graduates. In all cases, the average annual starting wages of Brooks Institute graduates was omitted from the Annual Report Forms [2003-2a (Degree), Line 13] for all degree programs offered by Brooks Institute, even though these data were found in Brooks Institute's records that were submitted to the Bureau.

Further, placement figures reported in Brooks Institute's 2003 Annual Report, as well as its *School Performance Fact Sheet*, was subsequently proven false or inaccurate by graduates and employers contacted by the Bureau during its April 2005 verification process.

During April 2005, the Bureau interviewed eleven employers of 2003 Brooks Institute graduates to verify the information on the *Employment Verification Forms* ("*Form*") included by Brooks Institute in the placement files for those graduates. The following is a narrative of the Bureau's review of this information and related Brooks Institute records, including responses regarding placement from the November 2004 survey:

- According to Brooks Institute records, Graduate #15 completed his educational program in June 2003, with approximately $57,200 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. The *Form* for Graduate #15, completed by Brooks Institute on December 28, 2003, indicates that he was employed as a photo assistant starting on August 1, 2003, two months after graduation, with a wage of $9.00 per hour. Other Brooks Institute records indicate this employment placement was Institute-generated.

  In April 2005, the employer confirmed to the Bureau that Graduate #15 did some freelance work as an "intern" approximately three to four years prior. Thus, the employment would have occurred in 2001 or 2002 (while the graduate was still in school), not shortly after graduation in mid-2003 as reflected on the *Form*. In addition, internships[9] are student assignments conducted for education credit, whether compensated or not and, as such, do not constitute employment for "placement" purposes. Even if Graduate #15 did not receive education credits, freelance work does not constitute a placement.

- According to Brooks Institute records, Graduate #16 completed her educational program in June 2003, with approximately $53,600 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography. The *Form* for Graduate #16, completed by Brooks Institute on February 2, 2004, indicates that she was placed in employment eight months after graduation as a part-time photo

---

[9] The term "internship" is synonymous with "practicum" and is defined by Brooks Institute's accrediting agency, the Accrediting Council for Independent Colleges and Schools (ACICS), as "a supervised practical experience that is the application of previously studied theory. Normally, three hours of work in a practical setting has the credit equivalency of one hour of classroom lecture. Under the supervision of a faculty or staff member, a written agreement shall be developed that outlines the arrangement between the institution and the practicum site, including specific learning objectives, course requirements, and evaluation criteria." ACICS *Glossary of Definitions*, pg. GLO-6, May 1, 2005.

assistant on February 1, 2004, at $21.00 per hour.   Other Brooks Institute records indicate this employment placement was Institute-generated.

When contacted by the Bureau in April 2005, the employer stated that Graduate #16 had not been a paid employee, but that she had been an unpaid intern for a couple of months    Although this position does not appear to have been a for-credit "internship" since it occurred post-graduation, it clearly was not a "placement."

- According to Brooks Institute records, Graduate #17 completed her educational program in June 2003, with approximately $57,100 in total loan indebtedness, receiving an associate of arts degree in Visual Journalism.   The *Form* for Graduate #17, completed by Brooks Institute on November 4, 2003, indicates that she was employed as a photo editor beginning on September 1 2003, but the *Form* does not list any wage or salary data.  Data submitted to the Bureau in February 2005 shows Graduate # 17 was placed by Brooks Institute in part-time employment with a wage of $7.00 per hour.

  When contacted by the Bureau in April 2005, the employer confirmed that Graduate #17 did work as an "intern" in 2004 – not in 2003 as recorded on the Brooks Institute *Form* – for a total of three months, earning a total of $750.00.  Although this position does not appear to have been a for-credit "internship" since it occurred post-graduation, it clearly was not a "placement."

- According to Brooks Institute records, Graduate #18 completed his educational program in August 2003, with approximately $18,300 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography.  The *Form* for Graduate #18 was completed by Brooks Institute on August 2, 2003, the day after graduation.  It indicates that Graduate # 18 was employed a full year prior to graduation, on August 1, 2002 as a photo assistant with a part-time annual salary of $17,000.  When the Bureau reviewed this individual's placement file, it also indicated that Graduate #18 had been employed beginning on August 1, 2002, but as an Industrial Photographer with a part-time wage of $16.00 per hour.

  In response to the Bureau November 2004 survey, Graduate #18 stated that his status with the employer of record was that of an unpaid internship that he used for experience in handling and operating scientific cameras.  As previously noted, internships are student assignments conducted for education credit, whether compensated or not and, as such, do not constitute employment for "placement" purposes.

- According to Brooks Institute records, Graduate # 19 completed her educational program in December 2003, with approximately $145,000 in total loan indebtedness, receiving a baccalaureate degree in Professional Photography.  Brooks Institute placement information for Graduate # 19 indicates that she was self-placed in full-time employment, as of the first day she enrolled as a student at Brooks Institute, as a "Portrait Photographer" with an annual salary of $26,000.  The *Form* for Graduate # 19, however, indicates the position title as a "Groomer & Photographer" with job duties described as "Groom pets (dogs) & take their portrait for clients."

  The placement was recorded on the Brooks Institute *Form* on March 1, 2004, three months after graduation, but reflected an employment start date three and a half years earlier (on September 1, 2000).  The Bureau does not consider this case to meet the definition of placement since the graduate was already employed in the position prior to enrollment at Brooks Institute, and prior to acquiring the baccalaureate degree.

The contradictory information recorded by Brooks Institute in its placement files vis-à-vis the confirmed statements of facts outlined above are evidence of Brooks Institute's false, misleading, or incomplete representations to the Bureau on the *School Performance Fact Sheet* and in the 2003 Annual Report in connection with student placements.

**Determination of Violation(s):**

Based on the foregoing, the Bureau has determined that Brooks Institute provided false, misleading or incomplete information to the Bureau regarding the placement and salaries of its 2003 graduates, in violation of Education Code section 94808 and 94816. A violation of the Reform Act is grounds to refuse to issue or renew an application under Education Code section 94830(b).

## C. INSTITUTE PROVIDED INACCURATE AND UNDERREPORTED STUDENT TUITION RECOVERY FUND (STRF) DATA TO THE BUREAU.

Education Code section 94830(q) authorizes the Bureau to refuse to issue or renew an approval to operate, or to revoke an institution's approval, if the institution fails "to pay any fees, order for costs and expenses under Section 94935, assessments, or penalties owed to the council, as provided in this chapter."

Each institution is required to "collect the amount assessed by the bureau in the form of a Student Tuition Recovery Fund fee from its new students, and remit these fees to the bureau during the quarter immediately following the quarter in which the fees were collected from the students, or from loans funded on behalf of the students, except that an institution may waive collection of the Student Tuition Recovery Fund fee and assume the fee as a debt of the institution." (Education Code § 94945(a)(1)(B).)

Education Code section 94945(a)(3) requires that assessments made pursuant to this section shall be made in accordance with both of the following:

(A) Each new student shall pay a Student Tuition Recovery Fund assessment for the period of January 1, 2002, to December 31, 2002, inclusive, at the rate of three dollars ($3) per thousand dollars of tuition paid, rounded to the nearest thousand dollars.

(B) Commencing January 1, 2003, Student Tuition Recovery Fund fees shall be collected from new students at the rate of two dollars and fifty cents ($2.50) per thousand dollars of tuition charged, rounded to the nearest thousand dollars. For new students signing enrollment agreements between January 1, 2002, and December 31, 2002, inclusive, the assessment rate of three dollars ($3) per thousand dollars of tuition paid, rounded to the nearest thousand dollars, as provided in subparagraph (A) of this paragraph, shall remain the assessment rate for the duration of the student's enrollment agreement.

**Allegations:**

Brooks Institute submitted incomplete Student Tuition Recovery Fund (STRF)-related information to the Bureau and underreported, underpaid, and incorrectly assessed and remitted students' STRF fees to the Bureau in violation of Education Code section 94945. The inconsistencies can be grouped into two categories: 1) the calculations by Brooks Institute to assess STRF fees on eligible (and ineligible) students enrolled; and 2) the application of STRF assessments by the institution with regard to California residency and non-residency of enrolled students.

The Bureau reviewed the general ledgers of the 2003 graduates, which were collected during the February 2005 visit, as well as fifty student records of those students who dropped or withdrew in the 2003 and 2004 calendar year, collected during the November 2004 visit. During the review of these documents, the Bureau found that the institution incorrectly calculated the students' fee for the STRF assessment. The incorrect calculations for some of the assessments were due to inaccurate rounding of tuition charged to the nearest thousand dollars, while other assessments were simply miscalculated. However, the Bureau could not determine the formulas or methodologies used by Brooks Institute that resulted in the miscalculated assessments, as there was no consistency in the formulas used.

While these instances may appear minimal as individual cases, when multiplied by the total number of eligible students, the difference is significant. The Bureau's investigation found evidence of thirty-five additional STRF-eligible students than the 1,277 that were reported by Brooks Institute for a total of 1,312 for 2002. According to an audit by the Bureau's STRF unit of the submitted data, the lower figure reported by Brooks Institute resulted in underpayment to the STRF of at least $3,117. The audit also found that Brooks Institute's misapplication of the STRF assessment on California resident and non-resident students in 2002 resulted in the underpayment to the STRF of $8,354.45.

As stated in the previous paragraph, the Bureau found that the California residency and non-residency of the students for the STRF is inconsistently and incorrectly applied. The Bureau randomly selected 39 student records and reviewed the general ledger for each year the student was enrolled. The findings are as follows:

- Fifteen of 39 randomly selected student records reviewed for compliance were determined to be non-California residents and, therefore, non-eligible for STRF assessments. However, twelve of these fifteen non-eligible (non-California resident) students were assessed STRF fees.

- Application of the STRF assessment on both STRF-eligible (California resident) and non-eligible (non-California resident) students was inconsistent from year to year. The Bureau found that Student #39 – who was not a California resident and, therefore, was non-eligible for STRF – was assessed for STRF by Brooks Institute in the first year she was enrolled, but not in the second year. She was then assessed STRF fees in the third year.

- Brooks Institute reported 1,277 STRF-eligible students to the Bureau for the 2002 Reporting Year (Line B). However, the Bureau found evidence of 1,312 STRF-eligible students for that same period. This under-reporting has resulted in underpayment by Brooks Institute to the STRF.

In Brooks Institute's 2003 Annual Report to the Bureau, it reported total enrollment of 2,806 students enrolled in all degree programs for the 2003 calendar year. This same total student enrollment figure for calendar year 2003 is required to be reported on STRF assessment forms filed by Brooks Institute with the Bureau. However, according to the Bureau's STRF unit review of the records supporting its 2003 STRF assessments, the 2003 Annual Report figure of 2,806 total students reported by Brooks Institute "does not reconcile to the number of students reported on either Line (A) or Line (B) of the assessment reports as filed for the 2003 year."

<u>Determination of Violation(s):</u>

Based on the foregoing, the Bureau has determined that Brooks Institute under-reported, underpaid, and incorrectly assessed STRF fees in violation of Education Code section 94945. A violation of the Act is grounds for refusal to issue or renew an application under Education Code section 94830(q). In addition,

JUL-22-2005 FRI 10:11 AM BPPVE                    FAX NO. 916 323 3780              P. 18

*Brooks Institute of Photography*
*July 11, 2005*
*Page 16 of 19*

the foregoing provides the basis for the Bureau's determination that Brooks Institute has provided false information to the Bureau, in violation of Education Code section 94830(a).

## III. RESTRICTIONS OR CONDITIONS ON APPROVAL

The conditions under which Brooks Institute receives this approval are as follows:

**Condition 1.** Brooks Institute will report quarterly to the Bureau on its progress toward full compliance with the conditions of this approval. The first quarterly report will be due within thirty days from the last day of the month of the quarter in which Brooks Institute receives the Conditional Approval. In the first report, Brooks Institute will develop a timeline, which will be subject to approval by the Bureau, establishing target dates for compliance with each Condition as set forth herein. In each subsequent report, Brooks Institute will report on its progress toward fulfillment of each condition within the timelines established, and provide the Bureau with copies of any forms, manuals, or guidelines developed. This report shall be sent to the following address until the Conditional Approval has been removed:

Marcia Trott
Senior Education Specialist-Degree Program
Bureau for Private Postsecondary and Vocational Education
400 R Street, Suite 5000
Sacramento, CA. 95814

The first report will become the foundation for subsequent reports submitted to the Bureau by Brooks Institute for future and currently enrolled students, and shall include the following:

- The names, addresses, and telephones numbers of each student currently enrolled in Brooks Institute, as well as the title of the degree program in which the students are enrolled.
- For each individual named above, Brooks Institute will provide the date the student was admitted and the date of the first class attended.
- For each individual named above, Brooks Institute will provide the student's status as a California resident or non-resident student.
- For each individual named above that withdraws or cancels, Brooks Institute will provide the last day attended, as well as the reason provided for the discontinuation of the program and the total amount of federal financial aid loans and/or private loans each student is obligated to pay for his or her education as of the last date attended at Brooks Institute.

The first report shall also include the following verifiable information for 2003 graduates and all graduates thereafter:

- The names, addresses, and telephones numbers of each graduate of Brooks Institute (sorted by graduation year) that includes the title of the degree earned, the date of graduation, the date of placement, the placement start date, and the date that the placement was verified.
- For each individual named above, Brooks Institute will provide the total amount of federal financial aid loans and/or private[10] loans that students and/or their parents (in the form of Parent PLUS[11] loans) have

---

[10] When grants, scholarships, and federally sponsored loans are not enough to cover the cost of a student's education, the student and/or their parents can obtain additional funding through one of several alternative private loan options: a Signature Student Loan or a Tuition Answer Loan (SM). Although neither of these loans is federally sponsored, they are both education loans designed to help

incurred to pay for the education to include all loan disbursements made through Brooks Institute. This information will be the foundation for disclosing potential long-term debt upon graduation, a realistic average of the dollars borrowed, and disclosure in the catalog.

- For each individual named above, Brooks Institute will provide the current or starting salary or wage for each graduate who has secured employment, and indicate whether the job is in a field related to the area of study.

**Condition 2.** Brooks Institute will meet with Bureau staff within six months of the date of this approval letter to monitor progress toward compliance with the conditions of approval as set forth herein. All conditions shall be met prior to the submission of the Brooks Institute's application for re-approval.

**Condition 3.** Brooks Institute will evaluate its current placement policies and procedures vis-à-vis the Bureau's findings noted herein and provide this information to the Bureau with the first quarterly report. Brooks Institute will provide to the Bureau notification of any future changes made to these policies and procedures and be able to demonstrate at the request of the Bureau that the process has been utilized and monitored with regard to the placement of students. For each current graduate and all future graduates, Brooks Institute must demonstrate that those graduates have secured employment based on criteria that shall include the following:

- The process and policies developed by Brooks Institute for placement will include a definition of "secure employment" that is not considered temporary or unpaid and will not include internships or one-time events.
- Brooks Institute will provide a written statement from the employer that the graduate is employed along with a brief description of his or her job duties, or a written statement *from the graduate* that he or she has secured employment along with a brief description of his or her job duties.
- Brooks Institute will provide a description of each document it will require in the placement file for each graduate.
- Brooks Institute will provide its process for auditing the placement information, including what will be required in the placement file and how it will be verified.

**Condition 4.** Brooks Institute will refrain from enrolling students into any of its degree or non-degree programs until the following have been demonstrated to the Bureau:

- Brooks Institute will verify the placement information for each 2003 graduate, determine if each has obtained secure employment, and provide to the Bureau accurate "placement" numbers and percentages for 2003 graduates. This information will be submitted in the form of a corrected *School Performance Fact Sheet*, with a revision date. This corrected form will immediately be distributed and explained to prospective and currently enrolled students. This notice shall be signed by both the student and a representative of Brooks Institute and evidenced in the student's file.
- Brooks Institute will assure that any manuals developed or used by its Admission Representatives include accurate information, scripts based upon real and verifiable data, and portrayal of Brooks Institute's ratio of the number of enrollments allotted versus the number of students enrolled that is not unrealistically

students obtain the funding needed to attend the school of their choice. Each of these loan options enable students to borrow up to the full cost of their education, including tuition and fees, room and board, books and supplies, transportation and even living expenses.
[11] The federally sponsored Parent Loan for Undergraduate Students (PLUS) Loans enable parents to borrow to pay the education expenses of each child who is a dependent undergraduate student enrolled at least half time in an approved college or university. These loans are available through both the Direct Loan and FFEL programs. Most of the benefits to parent borrowers are identical in the two programs. Generally, repayment must begin within 60 days after the loan is fully disbursed. There is no grace period for these loans. This means interest begins to accumulate at the time the first disbursement is made. Parents must begin repaying both principal and interest while the student is in school.

inflated or otherwise misleading. Any such manual will include a comprehensive and accurate analysis of the national and state labor statistics regarding employment opportunities in the field of study. This information is to be portrayed as a material fact in the Brooks Institute catalog.

<u>Condition 5.</u> Should Brooks Institute request Bureau approval to add new educational programs while it is operating under a Conditional Approval, the Bureau will consider any such request contingent upon the progress, or lack thereof, Brooks Institute has made in meeting the Conditions outlined herein.

<u>Condition 6.</u> Brooks Institute must provide the following disclosure to each current student and potential student in writing:

"This Institute has received a conditional approval to operate from the Bureau for Private Postsecondary and Vocational Education ("Bureau"). A conditional approval means that this Institute was found to be operating in violation of the statutes and regulations that govern private postsecondary educational institutions, and therefore it was not in the public interest to give this Institute a full unconditional approval to operate in this State. This designation allows Brooks Institute to operate while the Bureau monitors compliance with applicable regulations, statutes and restrictions placed upon this Institute."

This notice shall be signed by both the student and a representative of Brooks Institute and evidenced in the student's file. This disclosure must also be placed in Brooks Institute's current catalog under "Institutional Authority to Grant Degrees" so that students and potential students know that Brooks Institute is operating under a conditional approval.

<u>Condition 7.</u> The full and qualitative review of Brooks Institute's application for renewal will be comprehensive and, as such, the review will not be limited to the findings in this approval document.

<u>Condition 8.</u> Brooks Institute will review the assessments it made to the Student Tuition Recovery Fund for 2002, 2003, 2004, and to-date in 2005. Brooks Institute will determine the amount that should have been charged for each student enrolled during this time period and the amount actually charged. Brooks Institute will remit the difference to the Bureau. It will also provide verifiable documentation that it has refunded those assessments incorrectly assessed or calculated to each student, if applicable. Further, if students were not assessed sufficiently, Brooks Institute will pay that amount to the Bureau and *will not* charge the students.

<u>Condition 9.</u> Brooks Institute of Photography violated provisions of California Education Code 94816, 94831, and 94832, which may result in the unenforceability of any contract or agreement arising from the transaction in which the violation occurred, pursuant to Education Code section 94985(a). No later than August 31, 2005, Brooks Institute of Photography must provide a plan to the Bureau that provides in detail how it will provide equitable restitution to all students enrolled from May 4, 1999 to the present. The Bureau must approve this plan before it is implemented.

Note: Brooks Institute is permitted to submit to the Bureau much of the required information electronically on CD-ROMs or DVDs.

Brooks Institute may, not less than one year after the effective date of this Notice, petition the Bureau for a modification of the Conditional Approval.

Violation of any conditions of the conditional approval is grounds for revocation of the approval to operate. If any violation of the conditional approval occurs, the bureau shall serve respondent with a

JUL-22-2005 FRI 10:12 AM BPPVE                          FAX NO. 916 323 3780        P. 21

*Brooks Institute of Photography*
*July 11, 2005*
*Page 19 of 19*

notice of revocation, and after notice and hearing, impose the discipline of revocation on respondent's license. If during the period of probation, an accusation, statement of issues, or other notice of administrative action has been filed against respondent's approval to operate, or the attorney general's office has been requested to prepare such an accusation, or other notice of administrative action, the effective dates of the conditional approval set forth in this decision shall be automatically extended and shall not expire until the accusation, or notice of administrative action has been acted upon by the bureau.

## IV. GROUNDS FOR CONDITIONAL APPROVAL:

Brooks Institute of Photography violated the Reform Act by willfully misleading, falsifying, and omitting critical information that persuaded prospective students to enroll in educational programs that were advertised and promoted as preparation for a high paying career in their respective fields of study. Brooks Institute then encouraged students to constantly apply and receive student financial loans from governmental and private lenders in considerable excess of the students' potential earnings to repay those loans. Further, required data submitted by Brooks Institute to the Bureau was found to be inaccurate, incomplete, and misleading. These actions are prohibited by Education Code sections 94832(a), (b). Violations of the Reform Act are grounds for denial of a renewal application and revocation of a current approval to operate under Education Code section 94830(a). Violation of Section 94832 provides further grounds for denial of a renewal application and revocation of a current approval to operate under Education Code section 94985(a). Further, fraudulent and deceptive acts constitute grounds for denial of Brooks Institute's renewal application for approval to operate under Business and Professions Code section 480(a)(2).

Although these acts are cause for a denial of Brooks Institute's approval to operate, the Bureau is cognizant of the number of students currently enrolled and the negative impact a revocation and denial would have on the students and their families. The Bureau finds that the resources available to Brooks Institute are sufficient to meet the minimum standards of California Education Code and its regulations. If compliance is not met within the reasonable period of time set forth in this document, the Bureau will move to revoke Brooks Institute's approval to operate.

In closing, again please be advised that unless a timely appeal is received by the Bureau, Brooks Institute of Photography waives its right to an administrative hearing on this action.

Sincerely,

*Barbara Ward*

BARBARA WARD
Chief
Bureau for Private Postsecondary and Vocational Education

Attachments

JUL-22-2005 FRI 10:12 AM BPPVE        FAX NO. 916 323 3780        P. 22

STATE OF CALIFORNIA STATE AND CONSUMER SERVICES AGENCY



**State of California**
**Department of**
**Consumer**
**Affairs**

Bureau for Private Postsecondary and Vocational Education
400 R Street, Suite 5000, Sacramento, CA 95814-6200
P.O. Box 980818, West Sacramento, CA 95798-0818
(916) 445-3427
www.bppve.ca.gov

*In accordance with the provisions of California Education Code 94900 and/or 94915*
*Postsecondary and Vocational Education approves (conditional)*

# BROOKS INSTITUTE OF PHOTOGRAPHY

*1321 Alameda Padre Sierra*
*Santa Barbara, Ca 93108*
*School Code # 4201871*

## INSTITUTIONAL APPROVAL

This institution has received conditional approval to operate from the Bureau for Private Postsecondary and Vocational Education ("Bureau"). A conditional approval to operate means that the Bureau has determined that the institution is in compliance with this chapter, but has operated within three years before the filing of the application in violation of this chapter. Therefore, the Bureau has determined that an unconditional grant of approval to operate is not in the public interest.

Subject to earlier termination in accordance with the law.

Approval #: 20021

Effective Date: July 11, 2005

Expiration Date: June 30, 2007

*Sheila Hawkins, Private Postsecondary Education Administrator*

This document is valid if fees are current. Subject to earlier termination in accordance with the law.

JUL-22-2005 FRI 10:14 AM BPPVE                     FAX NO. 916 323 3780                  P. 23

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                              ARNOLD SCHWARZENEGGER, Governor



**Bureau for Private Postsecondary and Vocational Education**
400 R Street, Suite 5000, Sacramento, CA 95814-6200
P.O. Box 980818, West Sacramento, CA 95798-0818
(916) 445-3427
www.bppve.ca.gov

State of
California
Department of
**Consumer**
**Affairs**



# Approved/Registered Program List

*In accordance with the provisions of California Education Code 94900 and/or 94915 and/or Article 9.5, the Bureau
for Private Postsecondary and Vocational Education conditionally approves:*

## *BROOKS INSTITUTE OF PHOTOGRAPHY*

*1321 Alameda Padre Sierra*
*Santa Barbara, Ca 93108*

*School Code #: 4201871*
*Site Type: Main*

*to offer the following program(s)/course(s):*

| Program Name | Program Approved | Program Type |
|---|---|---|
| AA VISUAL JOURNALISM | 04/04/2001 | Degree |
| BA FILM & VIDEO PRODUCTION | 06/26/2001 | Degree |
| BA PROFESSIONAL PHOTOGRAPHY | 01/01/1995 | Degree |
| BA VISUAL COMMUNICATION | 09/05/2001 | Degree |
| BA VISUAL JOURNALISM | 04/04/2001 | Degree |
| MS PHOTOGRAPHY | 01/01/1995 | Degree |
| FILM & VIDEO PRODUCTION | 06/29/2001 | Non-Degree |

*The program list above represents all currently approved/registered educational services for this institution. The Main, Branch, or
Satellite locations of this institution may offer any subset of this list. Branch and Satellite location(s) may only offer educational
services that are approved at the Main location as stated in Section 94719 and 94742(a) of the Private Postsecondary and Vocational
Education Reform Act.*

*Marcia Trott, Senior Education Specialist*
This document is valid if all fees are current. Subject to earlier termination in
accordance with the law.

*Approved/Registered Program list associated with Institution Approval # 20021, which expires on June 30, 2007.*

JUL-22-2005 FRI 10:14 AM BPPVE                    FAX NO. 916 323 3780              P. 24

Approved/Registered Program List

School Name: BROOKS INSTITUTE OF PHOTOGRAPHY
School Code: 4201871   (Institution Code: 4201871..........Site Type: Main)

| Program Name | Program Approved | Program Type |
|---|---|---|
| PROFESSIONAL PHOTOGRAPHY | 01/01/1995 | Non-Degree |

Degree Programs: 6
Non-Degree (Vocational) Programs\Courses: 2
Total Programs/Courses: 8

*The program list above represents all currently approved/registered educational services for this institution. The Main, Branch, or Satellite locations of this institution may offer any subset of this list. Branch and Satellite location(s) may only offer educational services that are approved at the Main location as stated in Section 94719 and 94742(a) of the Private Postsecondary and Vocational Education Reform Act.*

*Marcia Trott, Senior Education Specialist*
This document is valid if all fees are current. Subject to earlier termination in
accordance with the law.

*Approved/Registered Program list associated with Institution Approval # 30021, which expires on June 30, 200 .*

*Page 3 of 3*
*Printed: 7/22/2005*

# Exhibit B



From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Tue, May 19, 2020 at 12:03 PM
Subject: FSA Borrower Defense Application: 01350173 [ ref: _00Dt0Gyiq._500t0DPQQS:ref ]
To:



Dear Rebekah Norton:

We have received the additional information you provided regarding your application for borrower defense ▆▆▆▆.

You will be notified once a decision has been made on your application.

If you have questions, you may respond to this email or call our borrower defense hotline: **(855) 279-6207**. Representatives are available Monday through Friday from 8 a.m. to 8 p.m. Eastern time.

Sincerely,
U.S. Department of Education (ED)
Federal Student Aid
Borrower Defense Unit


*To respond to this email, please reply to this email thread without modifying the Subject line. That way, your response will automatically attach to your application.*





ref:

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit C



From: **Borrower Defense** <borrowerdefense@ed.gov>
Date: Fri, Jul 10, 2020 at 7:02 AM
Subject: Borrower defense discharge ineligibility information for you [
███████████████████ ]
To: ████████████████████████████████

7/10/2020

Borrower Defense Application #: ████████

Dear Rebekah Norton:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Brooks Institute. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Brooks Institute. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20

U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: Other

You allege that Brooks Institute engaged in misconduct related to Other. This allegation fails for the following reason(s):Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 2: Educational Services

You allege that Brooks Institute engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 3:Transferring Credits

You allege that Brooks Institute engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Failure to State a Legal Claim.
Your claim for relief on this basis therefore is denied.

Allegation 4: Career Services

You allege that Brooks Institute engaged in misconduct related to Career Services. This allegation fails for the following reason(s): Insufficient Evidence.
Your claim for relief on this basis therefore is denied.

Allegation 5: Program Cost and Nature of Loans

You allege that Brooks Institute engaged in misconduct related to Program Cost and Nature of Loans. This allegation fails for the following reason(s): Insufficient Evidence.

Your claim for relief on this basis therefore is denied.

Allegation 6: Employment Prospects

You allege that Brooks Institute engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence.
Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular oversight activities
> Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
> Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [█████████████████]"
to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.