

**LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL**
**CENTRO DE SERVICIOS LEGALES**
122 Boylston Street
Jamaica Plain, Massachusetts 02130-2246
TEL: (617) 522-3003 • FAX: (617) 522-0715

January 11, 2021

Re: *Sweet v. DeVos*, No. 19-cv-3674-WH (N.D. Cal.)

To the Honorable Judge Alsup:

Pursuant to Paragraph 34 of Your Honor's Supplemental Standing Order (February 2018) and the October 19, 2020 Order regarding discovery in the above-captioned case (ECF No. 146), Plaintiffs write to ask the Court to order the deposition of former Secretary of Education Elisabeth ("Betsy") DeVos, who abruptly resigned on Jan. 7, 2021.  The parties met and conferred about this issue via telephone on Jan.6, 2021, and exchanged letters on Jan. 7, 2021 (prior to the Secretary's resignation), Jan. 8 and 11, 2021.[1]

This Court authorized Plaintiffs to take written discovery and up to five fact depositions "to inquire into, broadly," three topics, including "[t]he development and use of the form denial letters" ("Topic 1") and "[t]he extent to which the difficulty of reviewing borrower defense applications actually caused or justified the Secretary's eighteen-month delay" ("Topic 2"). (ECF No. 146 at 16.) Plaintiffs have engaged in written discovery,[2] and have taken four depositions of Department officials to date:

- Colleen Nevin, Dir. of Borrower Defense at Fed. Student Aid (FSA) (excerpts attached as Ex. E);

- Mark Brown, Chief Operating Officer of FSA (excerpts attached as Ex. F);

- Diane Auer Jones, Principal Deputy Under Secretary, delegated to perform the duties of Under Secretary at the Department of Education (excerpts attached as Ex. G); and

- James Manning, former Acting Under Secretary of Education and former Acting Chief Operating Officer of FSA (excerpts attached as Ex. H).

Taken together, these four deponents account for, and have personal knowledge of, the operations of FSA and the Office of the Under Secretary (OUS) for the relevant time period. Each has testified that the political appointees at the agency set policy, while FSA implements (and never makes) policy. (Nevin 29:2-7; Jones 20:23-21:5.) However, both FSA and political deponents have disclaimed responsibility for or personal knowledge of Topics 1 and 2. This has made it clear that only Secretary DeVos, as the senior-most policy-setting individual at the agency during the relevant time period, "has unique first-hand knowledge or necessary information [that] cannot be obtained through other, less intrusive means." ECF No. 146 at 16 (stating that "class counsel may not *yet* depose the Secretary").[3] She must be deposed.

## <u>Secretary DeVos Has Unique and Otherwise Unavailable Information About Topic 1.</u>

Plaintiffs have exhausted the available means of discovery and have been unable to extract information about Topic 1.  By written interrogatory (No. 16, attached as Ex. I), Plaintiffs requested information about the process and individuals involved in drafting and reviewing the Form Denial Letters at issue. Defendants' Response is one paragraph long, provides no names, and concludes: "***Based on***

---

[1] Counsel's letters about this issue are attached as Exhibits A through D.

[2] The Plaintiffs have propounded document requests and interrogatories.  The Defendants provided a document production on Dec. 23, 2020, and will be producing a small number additional documents by Jan. 14, 2021.  The Defendants have responded to some of the Plaintiffs' written discovery, but negotiations between the Parties regarding the proper scope of Defendants' responses are ongoing. The Parties have committed to reaching an understanding of Defendants' position by January 14, 2021.

[3] Plaintiffs also note that because the Secretary resigned on Jan. 7, 2020, she is now a private citizen, such that any concerns about a deposition interfering with the Secretary's ability to perform her duties no longer apply.

*Defendants' current inquiry, Defendants lack knowledge or information to provide a further response to this interrogatory.*"[4]

The deponents were no more forthcoming.  When asked about the development of Forms A-D, Ms. Nevin testified that her team did not draft them: "*[T]hese are not our letters*." (Nevin 86:2-4.) She stated that Mr. Brown "would probably be a better person to ask" (*id.* 87:3-8), and that OUS "would provide input on" "any kind of written communications" with borrowers (*id.* 36:3-9, 36:19-20).

Mr. Brown, however, disclaimed any involvement in the development and approval process. (Brown 181:22–183:22.)  First, he stated that the "forms are a collaboration between our [policy] liaison office and our borrower defense office." (*Id.* 182:20-23; *see also id.* 119:17 (referring to the "policy liaison office")) But ultimately, Mr. Brown testified, the form denial letters are "statement[s] of policy" subject to "ultimate approval through the Under Secretary [Diane Auer Jones]." (*Id.* 173:8-21.)[5]

But Ms. Jones stated that she was ***not*** the person who gave final sign-off on the form denial templates, and that she ***did not know who did***.  (Jones 202:2-8.)  Indeed, Ms. Jones expressed surprise at certain aspects of the templates, including the lack of identified state law underpinning the decision. (*Id.* 215:1-12.)  Ms. Jones testified that she "would have been in an editing role in response to somebody else's document" (*id.* 202:16-17), but neither Ms. Jones, nor any other deponent, nor the Defendants responding to the Interrogatories, appears to have any idea who "somebody" is.

Notably, however, both Ms. Jones and Ms. Nevin pointed to Secretary DeVos as the person in a position to approve the form denial notices. Ms. Jones stated that the Secretary is involved in implementing certain policies, and "in some cases where there's a formal decision on loans, for example, the [S]ecretary, you know, would be the person who would sign off." (Jones 22:4-23.)

### Secretary DeVos Has Unique and Otherwise Unavailable Information Regarding Topic 2.

This Court also ordered discovery into the actual cause or justification for "the Secretary's eighteen-month delay." ECF No. 146 at 16. Plaintiffs have been unable to discover the ***real*** reasons for the delay, because each deponent has disclaimed any responsibility for ordering, or knowledge of the rationale for, the delay. Defendants admit that *somebody* told FSA to stop issuing borrower defense decisions from June 2018 through December 2019. (*See, e.g.*, Nevin Decl., ECF No. 56-4 ¶ 65.)[6] But *none* of the deponents were willing or able to identify the person or persons who issued that directive (Jones 180:21-181:7; Brown 224:14-18; Manning 98:22-100:17), or explain, with any consistency, the actual reasoning behind the stoppage. The deponents variously suggested that the preliminary injunction in the *Calvillo Manriquez v. DeVos* litigation prevented the Department from issuing any borrower defense decisions at all (Jones 138:1-9, 173:11-18, 177:4-14; Brown 98:17-25)[7]; that the agency would not issue any decisions until it developed a new partial relief methodology (Brown 110:11-17, 134:13-15); that it would not issue denials until it could also issue approvals, which it could not do for some reason or another (Jones 173:23-174:11, 175:14-19, 178:15-24; 184:25-185:5); that the Borrower Defense Unit was woefully understaffed (Brown 47:8-16, 88:12-17, 239:16-20); and that the agency's IT systems needed updating (*id.* 88:12-20; 91:4-9; 191:8-23; 239:16-20). Notably, none of the deponents testified that the delay was due to the difficulty of reviewing applications. To the contrary, Ms. Nevin testified to exactly the opposite: "[T]he pace of the adjudications was affected by various things that made it difficult, but that didn't mean that they couldn't be issued. ***That***

---

[4] Counsel for Defendants have stated that they may provide a supplemental response to this Interrogatory.

[5] Mr. Brown continued: "All of our forms … are elements of policy; they're extensions of policy. And, so, rightfully so, they are staffed through the department, the Office of the General Counsel, the Office of the Under Secretary in order to get final approvals." (Brown 218:19–219:1.)

[6] This work stoppage followed another period in which someone ordered FSA to stop adjudicating borrower defense applications from spring 2017 through late fall 2017. (*See, e.g.*, Nevin Decl., ECF No. 56-4 ¶¶ 56, 59, 63.)

[7] *See also* Jones 182:17-183:7 (testifying, alternatively, that the *Calvillo* injunction prevented only *some* decisions from issuing, but others were withheld anyway, for unspecified reasons.)

*was related to a decision up the food chain*." (Nevin 224:10-14 (emphasis added)).

Likewise, none of the four deponents took responsibility for setting, developing, or even understanding what agency policy was regarding borrower defense. Indeed, Ms. Jones testified that OUS did not make *any policy decisions* regarding granting or denying borrower defense applications *at all* during her tenure. (Jones 299:21-24 ("Q: Okay. And in terms of granting or denying borrower defense, have there been any – step one, have there been any policy decisions? A:  Not to my knowledge." ).)[8]

Secretary DeVos has been named as the ***only*** individual with authority to stop or restart issuing borrower defense decisions. (Manning 123:18-24; 238:24–239:1.) Mr. Manning testified that he himself had not issued such a decision while he was Acting Under Secretary, and he did not know whether he would have had the authority to do so. (Manning 237:10–238:3.) Likewise, Ms. Jones stated when asked who made the decision to stop issuing denials in light of the injunction in the *Calvillo Manriquez*: "[B]ecause there was pending litigation around borrower defense, ***I am not a senior enough official to have decision-making authority***…I don't know who made all the decisions, but I do know it wasn't me." Jones 182:20-183:7. But if the Under Secretary is not "senior enough," who is? The Secretary, of course.

Indeed, is clear that Secretary DeVos maintained a close involvement with borrower defense policy. She personally requested the Inspector General Report "to review the Department's handling of BD claims in the prior administration" in March 2017. (Manning 214:20-215:7; *see also* DOE00002157). She was instrumental in setting the pace of review (or lack thereof) of borrower defense applications: after the Parties reached their preliminary settlement in this case, the Secretary pushed to clear the "backlog" of applications as soon as possible, and demanded continual updates on its progress.[9] Further, Secretary DeVos has made clear her hostility to the borrower defense program, for example, signing off on discharges for Corinthian claims held over from the previous administration "with extreme displeasure." (Jones Dep. Ex. 7 (attached as Ex. H) at 5; Manning 69:12-70:17.)  All of these factors point to the conclusion that Secretary DeVos is highly knowledgeable about borrower defense policy – something that cannot be said, apparently, of the other Department officials who have testified in this case.

## Conclusion

This Court's concern when it ordered supplemental discovery was pretext. (ECF No. 146 at 15.) All discovery thus far suggests that former Secretary DeVos drove the policies that caused the delay, developed and disseminated the pretextual excuses for the delay, and has knowledge about the development of the denial letters. Plaintiffs have not been able to get straight answers from her subordinates, and Plaintiffs and this Court deserve to know what really happened and why. As this Court recognized, "where there's smoke, there's fire." *Id.* All signs here point to former Secretary DeVos herself being the one striking the match.

/s/ Margaret E. O'Grady
Counsel for Plaintiffs

---

[8] *But see* Jones 20:2-21:5 ("I'm responsible for overseeing the Office of Postsecondary Education and that includes both the regulatory, the policy and regulatory division[.]"); Brown 25:22-26:5 ("Diane Jones controls the policy…element of the department…. She is delegated the duties of the oversight of FSA from the secretary specifically as it relates to policy.").

[9] Nevin 101:22–102:1 ("The secretary set the elimination of the backlog, and my understanding is that, based on the numbers that were pending at the time, that Mark Brown just did the math essentially and set a target of us for 5,000 adjudications per week."); *see also* Jones 128:2-130:16 (testifying that the Secretary requested regular updates, which were provided to her by Mark Brown, and which "include[ed] how many pending claims were there. Sometimes he would give updates on how many new claims had come in, and at some point he would report on, excuse me, how many claims had been adjudicated, and by adjudication meaning how many claims had the attorneys reviewed for a determination on the merit, et cetera.").

# EXHIBIT A

U.S. Department of Justice

Civil Division, Federal Programs Branch

1100 L Street N.W.
Washington, DC 20005

---

R. Charlie Merritt
Trial Attorney

Tel.: (202) 616-8098
robert.c.merritt@usdoj.gov

January 7, 2021

**VIA EMAIL**

Margaret O'Grady
Rebecca Ellis
Eileen Conner
Toby Merrill
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130

Re:     *Sweet v. DeVos*, No. 19-cv-3674-WH (N.D. Cal.)

Dear Counsel:

We are writing as a follow up to our call on January 6, 2021, in which you expressed your intention to seek the Court's leave to depose Betsy DeVos, Secretary of the United States Department of Education.  As the Court made clear, the well-established rule is that "'[h]eads of government agencies are not normally subject to deposition,'" and for that reason, "class counsel may not yet depose the Secretary."  Order at 16, ECF No. 146 (Oct. 19, 2020) (quoting *Kyle Engineering Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979)); *see also Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) ("top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions").

In light of this high standard, we request that you let us know precisely the information that you seek to solicit from the Secretary that you have not been able to obtain elsewhere.  *See* Oct. 19 Order at 16 (noting that a deposition of a cabinet head can only be justified by "[e]xtraordinary circumstances," such as "if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means").  The Court authorized five depositions of relevant decisionmakers in "the offices of Federal Student Aid, Postsecondary Education, and Career, Technical, and Adult Education within the Office of the Under Secretary," *id.*, and so far you have only taken four such depositions.  Once we have a better understanding of the information you seek in a deposition of the Secretary, we are open to further conferring about a different deponent who might have relevant knowledge.  We are also open to exploring other, less intrusive means of providing your requested discovery.  To the extent you claim that any of our responses to your interrogatories are deficient, and seek to obtain from the Secretary information requested in any of those interrogatories, the parties have until January 14 to determine whether we can reach an agreement regarding the interrogatory responses.  *See* ECF No. 170.

We appreciate your attention to this matter.

Page 2

Sincerely,

/s/ *R. Charlie Merritt*

R. Charlie Merritt

# EXHIBIT B



**LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL**
**CENTRO DE SERVICIOS LEGALES**
122 Boylston Street
Jamaica Plain, Massachusetts 02130-2246
TEL: (617) 522-3003 • FAX: (617) 522-0715

January 8, 2021

Via Email

R. Charlie Merritt
U.S. Department of Justice
Civil Division

Re: *Sweet v. DeVos*, No. 19-cv-3674-WH (N.D. Cal.)

Counsel:

Thank you for your letter. Though the Court acknowledged that "[h]eads of government agencies are not normally subject to deposition," Judge Alsup clearly anticipated that Plaintiffs might require the deposition of (now former) Secretary DeVos. ECF No. 146 at 16 (not allowing class counsel to depose the Secretary "at this time" or "yet," and noting that "the class may seek further depositions, or expansion or extension of discovery via letter brief….").

Here, as we briefly summarized on Wednesday's call, the "extraordinary circumstances" justifying a deposition of the Secretary are clearly present.  As you are well aware, having attended all four depositions in the last two months, we have questioned the relevant Acting Under Secretaries, the Chief Operating Officers, and the Director of Borrower Defense about the three discovery topics ordered by the Court. They all left holes that can only be filled by Secretary DeVos's personal knowledge.

Specifically, the deponents made clear that Secretary DeVos "has unique first-hand knowledge or necessary information [that] cannot be obtained through other, less intrusive means." ECF No. 146 at 16, including but not limited to the following:

- ***The development and approval of Form Denial Notices A-D***.  *See, e.g.,* Nevin 86:2-4 ("[T]hese are not our letters"); *see also* Brown 173:8-21 (the form denial letters are "statement[s] of policy" subject to "ultimate approval through the Under Secretary [Diane Auer Jones]"); *but see* Jones 202:2-8 (stating that she was not the person who gave final sign-off on the form denial templates, and that she did not know who did).

- ***Who ordered FSA to stop issuing borrower defense decisions from June 2018 through December 2019 and why; i.e., the actual cause or justification for "the Secretary's eighteen-month delay."*** ECF No. 146 at 16.  *See, e.g.,* Manning 238:24–239:1; 123:18-24 (identifying Secretary DeVos as the only individual with authority to stop or restart issuing borrower defense decisions); *see also* Nevin 224:10-14 ("[T]he pace of the adjudications was affected by various things that made it difficult, but that didn't mean that they couldn't be issued. That was related to a decision up the food chain.").

- ***Borrower Defense Policy.*** *See* DOE00002157 (Secretary DeVos ordered the IG Report to review

the prior administration's handling of BD policy); Manning 214:20-215:7; Nevin 101:22–102:1; *see also* Jones 128:13-131:21 (regarding updates about BD adjudication pacing requested by Secretary DeVos); Nevin 29:2-7 (FSA implements, but does not set policy); *compare* Jones 299:21-24 (disclaiming involvement in borrower defense policy), *with id.* at 20:2-21:5) *and* Brown 25:19-26:5 (defining the Under Secretary's policy role).

As you note in your letter, you have agreed to respond to our December 10, 2020 letter regarding the proposed narrowed document requests and let us know whether you will supplement your response to Interrogatory No. 16 by January 14, 2021.  However, as we noted throughout the process of negotiating our Stipulation to Modify Deadlines, nothing in the revised schedule forecloses any potential letter brief to expand discovery. *See* ECF No. 170 ¶ 7 ("This proposal is without prejudice to Plaintiffs' ability to 'seek further depositions, or expansion or extension of discovery via letter brief,' as specified by the Court, or to Defendants' ability to 'respond' in opposition to such a request. Oct. 19 Order at 16. Any such letter brief by Plaintiffs shall not be required to be included in the omnibus discovery motion contemplated above.").  And, of course, as noted above, the grounds to depose Secretary DeVos are extensive and would not be satisfied by a more fulsome response to Interrogatory No. 16.

Please let us know your position by Monday, January 11 at 9:30 am ET.

Thank you,

/s/ Margaret E. O'Grady

Counsel for Plaintiffs

# EXHIBIT C

U.S. Department of Justice

Civil Division, Federal Programs Branch

1100 L Street N.W.
Washington, DC 20005

---

R. Charlie Merritt                              Tel.: (202) 616-8098
Trial Attorney                                  robert.c.merritt@usdoj.gov


January 11, 2021

**VIA EMAIL**

Margaret O'Grady
Rebecca Ellis
Eileen Conner
Toby Merrill
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130

Re:     _Sweet v. DeVos_, No. 19-cv-3674-WH (N.D. Cal.)

Dear Counsel:

        We are writing in response to your letter of Friday, January 8, 2021.  We appreciate that you articulated with specificity the information that you seek to obtain in a deposition of former Secretary DeVos, which is an important first step in being able to sufficiently meet and confer regarding whether that information is truly not obtainable through "other, less intrusive means." Order at 16, ECF No. 146 (Oct. 19, 2020).  As we noted in our prior letter, your request to take the deposition of a cabinet secretary is extraordinary—"[h]igh-ranking government officials are not normally subject to depositions." _Thomas v. Cate_, 715 F. Supp. 2d 1012, 1048 (E.D. Cal. 2010); _accord Zimmerman v. Al Jazeera Am., LLC_, 329 F.R.D. 1, 6 (D.D.C. 2018).  Because this general rule can only be overcome based on the existence of extraordinary circumstances, such as "where it is shown that other persons cannot provide the necessary information," _Thomas_, 715 F. Supp. 2d at 1048 (citation omitted), we want to make sure we know exactly what information you seek so we can determine whether that information can be provided by alternative means (for example, the testimony of other officials).

        We have shared your letter with our contacts at the Department, who are looking into the issue.  We believe it is appropriate to allow a reasonable amount of time for the Department to continue this investigation and for the parties to continue to meet and confer about the necessity of a deposition of the former Secretary.  We do not think your demand for our position by Monday, January 11 at 9:30 am EST—less than one full business day after you sent us your letter—is consistent with the requirement to pursue this information through less intrusive means.  The inquiry necessary to address the many important issues raised by your extraordinary request and to have a productive meet and confer takes time even under normal circumstances, let alone when the Secretary has recently resigned.  Nevertheless, we are still interested in pursuing internally whether there are less intrusive means available and, accordingly, will do our best to let you know our position by next Friday, January 22.

Page 2

In the meantime, we hope to maintain an open dialogue to reach a solution that would avoid the drastic step of deposing a cabinet head.  To that end, we note that even if, assuming arguendo, the Secretary may have knowledge that the four individuals you deposed lacked about certain topics, that would not establish that the Secretary has "*unique* first-hand knowledge." Oct. 22 Order at 16 (emphasis added).  For example, you claim that James Manning identified the Secretary as "the only individual with authority to stop or restart issuing borrower defense decisions," but he testified only that he "expects that the Secretary has that authority," Manning Dep. Tr. 123:24-25.  He did not say that she was the only individual that would have such authority, that she was the individual who actually exercised that authority, or, most importantly, that she was the only individual with knowledge about how such a decision would be made or was made. Instead, Mr. Manning stated that he "would expect that [the Secretary would] be briefed by others, including general counsel on an issue before an action like that was taken."  *Id*. 123:25-124:2; *see also* Jones Dep. Tr. 22:4-23:8 (explaining that, depending upon the policy at issue, there are a "group of people" that could be involved in policy decisions, including, "in some cases," "the secretary's chief of staff" and "the deputy secretary").

We are hopeful that we can continue the meet-and-confer process and work collaboratively to provide a way for you to obtain the information you seek through less intrusive means than the Secretary's deposition.

Sincerely,

/s/ *R. Charlie Merritt*

R. Charlie Merritt

# EXHIBIT D



**LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL**
**CENTRO DE SERVICIOS LEGALES**
122 Boylston Street
Jamaica Plain, Massachusetts 02130-2246
TEL: (617) 522-3003 • FAX: (617) 522-0715

January 11, 2021

Via Email

R. Charlie Merritt
U.S. Department of Justice
Civil Division

Re: *Sweet v. DeVos*, No. 19-cv-3674-WH (N.D. Cal.)

Counsel:

Thank you for your letter. We disagree that we have not given you enough time to consider our request. We informed you by phone last Wednesday, January 6, 2021, that we plan to seek permission from the Court to depose (now former) Secretary DeVos. This action was clearly contemplated by the Court in its October 2020 Order (ECF No. 146 at 16). And, by mutual agreement, we filed a stipulation on December 18, 2020 that expressly contemplated a letter brief to expand discovery beyond the Court's Order. Finally, you are aware, because you were in attendance, that each of the four depositions established the need to depose the former Secretary.

You offer to continue to pursue the meet-and-confer process to obtain the information we seek via "less intrusive means," but those "less intrusive means" have already been tried. We have propounded interrogatories and document requests and taken four depositions. You have produced some documents, and have agreed to provide a response to our narrowed requests by January 14, 2021. However, the instant meet and confer is about one concrete question: will the former Secretary accede to a deposition in this case? Your letter, in effect, answers the question in the negative, and today we will move the Court accordingly.

As you witnessed during nearly 28 hours of depositions, and as summarized in our prior letter, the four deposed officials did not have the requisite knowledge about a number of key issues, in large part because they did not know who gave directives to delay the issuance of Borrower Defense decisions and they themselves did not have the authority to do so. We do not see the value in your returning to the same, or other officials, who would all also be former Secretary DeVos's subordinates, to get the same non-answers.

In addition, given the Secretary's sudden resignation on January 7, 2021, any concerns about a deposition interfering with the Secretary's ability to perform her duties no longer apply.

In sum: the four depositions we have taken, and the approximately 2500 documents you have thus far produced, do not fully answer the questions at the heart of this case. Secretary DeVos can. We will, as the Court contemplated, seek the Secretary's deposition on the basis that she has "unique firsthand knowledge" and "necessary information" that "cannot be obtained through other, less intrusive means." ECF No. 146 at 16.

Sincerely,

/s/ Margaret E. O'Grady
Counsel for Plaintiffs

# EXHIBIT E

Page 222

1  borrower defense application was decided under the
2  '95 reg had wanted to ask for reconsideration of a
3  denial, would they have had the option to do that?
4       A    At what point in time?
5       Q    Before the Bauer decision put the 2016
6  regs into effect.
7       A    No, there was no reconsideration
8  process before that.
9       Q    So, as you know, this case primarily is
10 about why there was such a long delay in issuing
11 borrower defense decisions.
12          In your view, what are the main reasons
13 why so few borrower defense decisions were issued
14 between January 2017 and January 2020?
15          MR. MERRITT:  Objection on the scope of
16 that question and to the characterization of the
17 case.
18          MS. ELLIS:  Can the witness answer?
19          MR. MERRITT:  Yes.
20          THE WITNESS:  I don't know that there's
21 one answer for that entire time period.  Can you
22 maybe break it up for me?
23          BY MS. ELLIS:
24       Q    Sure.
25          Well, let's start in 2017.

Page 223

1       A    Well, there were no decisions issued
2  for many months in 2017 associated with the
3  decision not to do anything with respect to what
4  we had already adjudicated and not to have more
5  claims pending the review panel and the AG review
6  and then the release methodology -- the
7  development of the release methodology.  So that
8  was 2017.
9          We did issue decisions between end of
10 2017 and May of 2018 primarily on Corinthian
11 cases.
12          And then in 2018 to November 2019, I
13 think it was tied to the relief methodology issue
14 and the policy to not issue decisions on denials
15 while they couldn't issue decisions on approvals
16 or felt that they couldn't issue decisions on
17 approvals.
18       Q    In your view, would it have been
19 possible to issue decisions on approvals in
20 between May 2018 and November 2019?
21       A    Not Corinthian job-placement-rate
22 decisions because of the relief methodology at
23 least under that methodology.
24          On the others, like I said, I think it
25 was a policy decision.

Page 224

1       Q    Was the difficulty of reviewing
2  borrower defense applications a primary reason for
3  the delay in issuing decisions?
4       A    The difficulty affected the volume of
5  the adjudication in the sense of -- you know, the
6  cases got a lot more complicated when the 2016
7  regulation went into effect in 2018 because now we
8  have a lot of cases that are subject to both, and
9  that determination needs to be made.
10          So I think that the -- the pace of the
11 adjudications was affected by various things that
12 made it difficult, but that didn't mean that they
13 couldn't be issued.  That related to a
14 decision up the food chain.
15       Q    Was the staffing level of BDU a factor
16 in why there was a delay in issuing decisions?
17       A    It was a factor in the number of
18 decisions that were adjudicated.  So to the extent
19 that that was related, I guess it was a factor.
20 But it wasn't -- it didn't prevent decisions from
21 going out.
22       Q    Was the difficulty of discerning or
23 applying state law under the '95 regs a major
24 factor in why so few decisions were issued?
25       A    At what time?

Page 225

1       Q    Did -- did -- is the answer different
2  at different times?
3       A    Yeah, because the Corinthian cases were
4  adjudicated under California law, so that once we
5  had fully explored California law with respect to,
6  you know, the first memo, that really wasn't a
7  factor for Corinthian, which was our focus for a
8  good percentage of the time period at issue.
9       Q    Of the claims that have been
10 adjudicated since December 2019, why have there
11 been so few approvals?
12       A    Well, the premise of your question, I
13 think, is that, you know, it's not that the cases
14 are -- how do I frame that? -- we have a lot of
15 potential approvals, but they're not going out,
16 and we have a lot of decided approvals that are
17 not going out.  So we have -- I don't know what
18 the number is on Corinthian job-placement-rate
19 claims now, but we've proved well over 30,000 of
20 those over that time period that can't be issued.
21 So we've certainly done a lot of approvals on that
22 end.
23          We -- for sequencing purposes, like I
24 said, have focused on the cases that were the most
25 quickly adjudicated which was the Corinthian

# EXHIBIT F

Page 222
Page

1           MS. BERMAN:  Are we wrapping up?
2           THE VIDEOGRAPHER:  You want to go off
3    the record?
4           MS. BERMAN:  Sure.
5           THE VIDEOGRAPHER:  Okay.  We're going
6    off the record.  The time is 21:45 UTC.
7           (Recess -- 4:47 p.m.)
8           (After recess -- 4:55 p.m.)
9           THE VIDEOGRAPHER:  We're now back on
10   the record.  The time is 21:55 UTC.
11   BY MR. TORCHIANA:
12        Q    Okay.  Mr. Brown, I'm -- so there are a
13   couple of questions or topics that I wanted to
14   circle back on.  One thing we've been discussing
15   you mentioned earlier on that there was a decision
16   or guidance not to issue any decisions until the
17   tiered relief methodology was in place.
18             Could you tell me again who made that
19   decision?
20           MR. HANCOCK:  Objection: asked and
21   answered; misstates testimony.
22           THE WITNESS:  So I -- I couldn't -- I
23   couldn't speak to who, specifically the -- kind of
24   the inner workings of what happened at the
25   department.  But I can -- I can tell you that

Page 223
Page

1    policy decisions are -- come to me through the
2    Office of the Under Secretary, and that -- and
3    that this was no different.
4    BY MS. TORCHIANA:
5         Q    So did Diane Auer Jones make the
6    decision that the BDU wouldn't issue any decisions
7    while the Calvillo injunction was in place?
8           MR. HANCOCK:  Objection: asked and
9    answered.
10           THE WITNESS:  I couldn't tell you who,
11   as I said earlier, because I don't know.  But I
12   could tell you that the Office of the Under
13   Secretary would have relayed that decision to me.
14   Lots, you know, could be going on in the decision
15   making process that I'm just not aware of on the
16   policy side.
17   BY MS. TORCHIANA:
18        Q    Did you ask her who came up with that
19   decision?
20        A    No.
21        Q    Okay.  Do you know whether Ms. Colleen
22   Nevin had a role in making that decision?
23        A    So Colleen Nevin is the director of the
24   borrower defense unit, which is part of partner
25   participation and oversight which is within the

Page 224
Page

1    Office of Federal Student Aid.  And I said that to
2    say that they executed decisions on policy.  They
3    don't make them.
4         Q    Do you think Robin Minor would have
5    made that decision?
6         A    So Robin Minor works directly for me as
7    one of the deputy chief operating officers, and
8    the borrower defense unit is under her.  So I say
9    that to say that she works inside of Federal
10   Student Aid, so she would not make a policy
11   decision.  She would execute them.
12        Q    Okay.  And would Secretary DeVos have
13   made that decision?
14        A    So again, as I said earlier, I don't
15   know who made the decision.  The decisions on
16   policy come from the Department of Education and
17   are relayed to me through the Office of the Under
18   Secretary.
19        Q    Okay.  And similarly, for the denial
20   letters, who -- who has the authority -- just
21   going back -- back to that subject -- who has the
22   authority to authorize changes to the form of
23   denial letters?
24        A    Who has the authority to authorize --
25        Q    Any changes to the form of denial

Page 225
Page

1    letters?
2         A    To the denial letter forms?  You mean
3    take off question 3 and put on question 4, those
4    kind of things?
5         Q    Yeah.
6         A    The final -- the final decision on what
7    goes on at what -- what -- how the form will be
8    constructed, what it will have on it is a -- is,
9    in fact, an extension of policy.  It's a policy
10   decision.
11        Q    So would -- would Diane Auer Jones have
12   the final say over whether to approve any changes
13   to the denial forms?
14        A    So I couldn't tell you who, but I -- I
15   could tell you that those -- those policies would
16   go through the process of Office of General
17   Counsel, Office of Under Secretary, and we would
18   have to have something back in general from --
19   from those offices before we would move forward
20   with an approved form.
21        Q    And then to go back to another
22   question, when we spoke about the partial relief
23   methodology, part of that involves earnings
24   tables, it sounds like.  How many schools has the
25   department issued earnings relief tables for?

# EXHIBIT G

Page 182
Page

1    more questions, yeah.
2            MR. MERRITT:  Okay.
3        BY MS. O'GRADY:
4        Q    So I just -- it sounds to me, and
5    correct me if I'm wrong -- I really want to
6    understand -- that your position, your
7    understanding of the state of things at this point
8    was that the injunction in Calvillo Manriquez
9    prevented FSA from issuing any borrower defense
10   decisions?
11           MR. MERRITT:  Objection.  It's a
12   mischaracterization of her testimony.
13       BY MS. O'GRADY:
14       Q    Okay.  Please -- please correct me if I
15   misstated that.
16       A    You misstated that.
17       Q    Okay.  So what was your understanding
18   of how Calvillo Manriquez affected FSA's ability
19   to send out borrower defense decisions?
20       A    What I -- what I'm trying to explain to
21   you is that because there was pending litigation,
22   whether a particular decision was related to that
23   litigation or not, because there's pending
24   litigation around borrower defense, I am not a
25   senior enough official to have decision-making

Page 183
Page

1    authority.
2        Q    What was -- so who would have
3    decision-making authority to -- if not you?
4        A    I think that's what I'm trying to tell
5    you is that I -- I -- I -- there's lots of people
6    who could have it.  I don't know who made all the
7    decisions, but I do know it wasn't me.
8        Q    The policy decision not to issue
9    denials until approvals could also be issued, is
10   it your understanding that began immediately with
11   the Calvillo injunction?
12       A    I don't know the precise timing.
13       Q    Okay.  Because I -- so -- and I really
14   want to get to the bottom of this.  I didn't think
15   they were related because I'm reading this bullet
16   point and you explained that it was about not
17   wanting to give borrowers the wrong idea.  And
18   then we have the Calvillo Manriquez injunction
19   that prevents the application of a certain partial
20   methodology towards a number of CCI students.
21       So -- so the approvals have been paused
22   because the approvals demand -- you know, the
23   approvals need that step-two determination of the
24   partial relief that's been enjoined, but the
25   denials don't need to involve step two, and if

Page 184
Page

1    there's denials ready to go out, why couldn't they
2    have gone out?
3            MR. MERRITT:  Objection: asked and
4    answered.
5            MS. O'GRADY:  It has indeed been asked.
6            MR. MERRITT:  And it's been answered.
7        BY MS. O'GRADY:
8        Q    Okay.  I'll ask again.  So you said you
9    could not have reversed that decision because of
10   the litigation?
11       A    That's not exactly what I said.
12       Q    Okay.  And I -- I apologize.  I know
13   this is getting redundant and back and forth and I
14   really just want to make it clear.  I don't mean
15   to -- to be -- to be so repetitive.
16       I really do want to understand is there
17   a person or a number of people, and can you
18   identify them, who could have decided to begin
19   issuing those denials rather than deciding not to
20   issue them until approvals could also be issued?
21       A    It would be speculative, right.  I
22   mean, there are any number of people, but because
23   I don't believe exactly who made each decision, it
24   would be speculative on my part.
25       Q    So who made the decision not to issue

Page 185
Page

1    denials until approvals could also be issued?
2        A    I do not know.
3        Q    You were just told of that decision and
4    went along with it.  Okay.
5        A    I was told that was the decision.
6            MS. O'GRADY:  Okay.  I think we'll take
7    a break now.  Thank you for those extra few
8    minutes.
9            THE WITNESS:  Uh-huh.
10           MS. O'GRADY:  How long do we want the
11   break to be?  Charlie --
12           THE VIDEOGRAPHER:  Hold on one second.
13   The time is 19:24 UTC time.
14           (Recess -- 2:24 p.m.)
15           (After recess -- 2:43 p.m.)
16           THE VIDEOGRAPHER:  Okay.  We're now
17   back on the record.  The time is 19:43 UTC time.
18           MS. O'GRADY:  For the record, I'm just
19   going to state the designations on the last two
20   exhibits.  So file name ECF NO 56-3, Exhibit 5,
21   2019 regulations which is a long PDF file is
22   Exhibit 11.
23           (Jones Deposition Exhibit 11 was marked
24   for identification and attached to the
25   transcript.)

# EXHIBIT H

Page 98

```
1              - JAMES MANNING -
2    Department, are you aware if the Department of
3    Education stopped issuing borrower defense claims?
4              MR. MERRITT:  Objection, asked and
5         answered.
6              MR. JARAMILLO:  It's not asked and
7         answered.  I'm asking about the full
8         Department.
9         A.    Okay, well, repeat the question then.
10        Q.    Are you aware at any time during your
11   tenure at the Department of Education in the Trump
12   Administration if the Department of Education
13   stopped issuing decisions on borrower defense
14   claims?
15        A.    I, I -- I don't recall specifically
16   that it was stopped -- issued.  I expect --
17        Q.    Go ahead.  I'm sorry.
18        A.    I'm trying to recall the facts and I
19   can't.  It's not coming to me.  If there's
20   something that could refresh my memory, it would
21   help that.  I -- I don't recall.
22        Q.    Between July, 2018 and the time you
23   left the Department of Education in March, 2019
24   are you aware of any borrower defense decisions
25   being noticed to borrowers?
```

Page 99

```
1              - JAMES MANNING -
2         A.    Am -- am I aware of any -- of any
3    what?
4         Q.    Borrower defense decisions being
5    noticed or issued to borrowers.
6         A.    I don't recall.
7         Q.    Between July -- July, 2018 and March,
8    2019 when you left the Department, are you aware
9    of any borrower defense applications being
10   approved?
11        A.    Did you say July, 2018 and '19?
12        Q.    Between July, 2018 and the time you
13   left in March, 2019 are you aware of any borrower
14   defense claims being approved by the Department?
15        A.    Between that time?  I don't recall.
16        Q.    Between July, 2018 and March, 2019
17   are you aware of any borrower defense applications
18   being denied?
19        A.    I've had a weekly report on -- on
20   numbers of applications that came in.  I cannot
21   recall whether or not there were reports on the
22   numbers that were acted upon or approved.
23        Q.    During July, 2018 and March, 2019 you
24   don't recall whether or not the Department of
25   Education issued final decisions on borrower
```

Page 100

```
1              - JAMES MANNING -
2    defense applications?
3         A.    Between the summer of '18 and when I
4    left in '19, I -- I don't recall.
5         Q.    Now, Mr. Manning, are you aware of
6    what this case is about, Sweet versus DeVos?
7         A.    Not specifically.
8         Q.    Are -- are you aware of the
9    allegations that the Department -- in this case
10   plaintiffs allege that the Department unreasonably
11   delayed in issuing borrower defense applications?
12        A.    I, I -- I've heard that previously at
13   one point.
14        Q.    Are you aware of any delay in issuing
15   borrower defense applications between July, 2018
16   and March, 2019?
17        A.    Am I aware, no.  I don't recall.
18        Q.    Are you aware of any delay in issuing
19   borrower defense applications during your tenure
20   in the Trump Administration at the Department of
21   Education?
22        A.    I don't recall delays specifically.
23   I -- I'll try to -- I'm trying to remember what,
24   if anything, happened around -- during the period
25   of the --
```

Page 101

```
1              - JAMES MANNING -
2         Q.    Were you aware of any backlog in
3    processing Borrowers Defense applications during
4    the tenure -- your tenure at the Department of
5    Education?
6         A.    Yes.
7         Q.    Okay.  Tell me about what your
8    awareness of that backlog.
9         A.    Well, as I said earlier, I got a
10   legal report on the growing numbers.
11             MR. MERRITT:  Joe, just that we're
12        getting close to a lunch break.
13             MR. JARAMILLO:  Yes, and I'm sorry,
14        we did pass a little, but I want to ask a few
15        more questions.  I think we'll be able to
16        wrap up in -- in at least one or two minutes
17        and then --
18             MR. MERRITT:  That's fine.  Thank
19        you.  I just wanted to throw it out there.
20             MR. JARAMILLO:  Thank you, Mr.
21        Merritt.
22        A.    So do you have a question, Joe?
23        Q.    Yes, Mr. Manning.  Just during your
24   tenure at the Department of Education, were you
25   satisfied with the pace at which the Department
```

# EXHIBIT I

- information and materials available on school websites;

- publicly available information and materials associated with litigation, settlements, or consent judgments;

- relevant publicly available information and materials on the internet; and

- information and materials from public Congressional testimony or investigations.

**Interrogatory No. 16**

Identify the individuals who drafted and approved form Denials A, B, C, and D, and explain the process for review and approval of the letters.  *See* ECF No. 116.

**Objections**:  Defendants object to this request to the extent it seeks information protected by privilege, including but not limited to the attorney-client privilege and the deliberative process privilege.

**Response:**  Individuals in the Department's Federal Student Aid office consulted with staff in the Office of the General Counsel and other offices in the Department on the contents and form of various drafts of the letters referenced in this request, as well as on the availability of data in the Borrower Defense Unit's platform to populate certain aspects of standard, automated templates.  FSA then provided draft letters to Department leadership and the Office of the General Counsel for review.  Based on Defendants' current inquiry, Defendants lack knowledge or information to provide a further response to this interrogatory.  Defendants will continue to conduct a reasonable inquiry and will supplement this response to the extent there is further information to provide.

**Interrogatory No. 17**

Explain the reasoning behind the determination that an application is "from borrowers who did not provide any evidence and who attended schools for which BDU is not aware of evidence that