**Pages 1 - 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| THERESA SWEET, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | )        **NO. C 19-03674 WHA** |
| | ) |
| DR. MITCHELL ZAIS, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

San Francisco, California
Wednesday, February 24, 2021

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**APPEARANCES VIA TELEPHONE:**

For Plaintiffs:
                    LEGAL SERVICES CENTER OF
                    HARVARD LAW SCHOOL
                    122 Boylston Street
                    Jamaica Plain, Massachusetts  02130
            BY:  **REBECCA C. ELLIS, ATTORNEY AT LAW**


For Defendants:
                    UNITED STATES DEPARTMENT OF JUSTICE
                    Office of the U.S. Trustee
                    250 Montgomery Street - Suite 1000
                    San Francisco, California  94104-3401
            BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**




Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter

<u>**Wednesday - February 24, 2021**</u>                    <u>**1:46 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

**THE CLERK:**  This court is now in session.  The
Honorable William Alsup presiding.

Calling civil matter 19-3674, Sweet, et al. versus, Zais,
et al.

Starting with Plaintiffs' Counsel, please state your
appearances.

**MS. ELLIS:**  Good afternoon, Your Honor, this is
Rebecca Ellis from the Harvard Legal Services Center
representing Plaintiff.

**THE COURT:**  Okay.  Welcome.  Anyone else?

(No response.)

**THE COURT:**  You might be muted.

**MR. MERRITT:**  Good afternoon, Your Honor, this is
Charlie Merritt from the Department of Justice on behalf of the
Defendants.

**THE COURT:**  Okay.  Welcome to you.

Is that it?

(No response.)

**THE COURT:**  Okay.  Well, let's go ahead.

I'm generally familiar with the problem, and I will ask
the Plaintiff to go first and explain what relief you want and
why.  Please go ahead.

1          **MS. ELLIS:**  Thank you, Your Honor.  This is Rebecca

2     Ellis speaking.

3          We are here on this Motion To Compel talking about a

4     couple of relatively narrow categories of documents.

5          The Defendants state in footnote 4 of their opposition

6     brief that they are withdrawing their privilege claim over the

7     Menashi memorandum.  So we can set that aside for today.

8          So what we are left with first is our request for

9     documents that are sufficient to show any directions given to

10    the Borrower Defense Unit to stop or resume adjudicating

11    applications, submitting applications for approval or develop

12    memoranda regarding Borrower Defense claims.

13         And the second category is our request for certain

14    documents relating to the Borrower Defense review panel and the

15    Inspector General report.

16         In general the reason why we are seeking these documents

17    is because discovery so far hasn't been able to clearly answer

18    one of the main questions at the center of this case which is

19    how and why it came to be that the Department of Education

20    stopped issuing Borrower Defense decisions.

21         The deponents so far haven't been able to answer that

22    question.  They have either said they don't know or don't

23    recall how the policy was put into place.

24         They have also put forward a few different theories for

25    why the Department stopped deciding Borrower Defense

1    applications.

2         Some of those are contradictory, either internally or

3    among each other.  And none of them match what the Department

4    said in its briefing in this case which was that the reason for

5    the delay was the difficulty of reviewing applications.

6         And, in fact, the Director of Borrower Defense, Colleen

7    Nevin, specifically testified that difficulty was not the

8    reason for the delay.

9         And the documents that the Government has produced so far

10   haven't shed light on the answer to this question either.  And

11   all of this, Your Honor, goes directly to the question of

12   pretext which this Court identified is a key concern in the

13   October discovery order.

14        So in terms of relief, what we are seeking here today is

15   for the Department to search and review and produce all the

16   documents in their possession -- which includes e-mails -- that

17   are responsive to our voluntarily narrowed version of

18   requests -- requests 1 through 4.

19        The Department's argument essentially is that this is too

20   burdensome; the marginal utility of these documents is too low.

21        And we obviously would strongly disagree with that

22   characterization.  The marginal utility here is potentially

23   quite large.

24        The question of how and why the Department stopped

25   deciding Borrower Defense claims is really at the center of the

1   case.

2        And the objections the Government has made based on the

3   burden is sort of vague at best, and this is the same tactic

4   that the Government has been using since the fall in the course

5   of the meet-and-confer process in this case, which is to

6   complain very generally at a very high level about burden

7   without being willing to get into the specifics that could

8   actually help resolve the situation.

9        We spoke to the Defendants about our requests for

10  production multiple times.  They never told us that requests 1

11  through 4 are particularly problematic.

12       They just said:  We don't want to search communications.

13  There is too many e-mails.  You made too many requests.

14       We then asked them:  Are you willing to respond to

15  narrower requests?  They wouldn't commit one way or another.

16       We asked them:  Will you discuss search terms with us?

17  They said:  No, it would take too long to discuss search terms.

18       And so after going through this back-and-forth for weeks,

19  we voluntarily narrowed their requests; and now they turn

20  around and say:  Well, that was too late when the Defendants

21  never made any counterproposal of their own; never really

22  engaged with us on the process.

23       And you will see that this pattern continues in the

24  declaration of Brian Siegel, which has been submitted a long

25  with the Defendants' opposition brief.

1    They say:  Our search terms hit on a hundred-thousand

2    e-mails.  Well, what are the search terms?  Is it just

3    "Borrower Defense?"

4    We don't know.  Who is to say?  We really don't see that

5    they have offered any concrete, factual basis for this argument

6    that it would take months to produce the documents that are

7    responsive to our Motion To Compel.

8    And then on request -- the second category of documents --

9    **THE COURT:**  Well, wait.  Let's -- before you go to

10    that, let me hear the argument by the other side just on 1

11    through 4 as narrowed.  So, go ahead.  Let's hear from the

12    Department of Justice.

13    **MR. MERRITT:**  Thank you, Your Honor.

14    I guess I want to start by just taking a little bit of a

15    step back.  And although the Plaintiffs are moving to compel

16    on, you know, a somewhat narrow subset of their request for

17    production, their original requests were much broader than

18    that.

19    And so, you know, we think the best place to start with is

20    Your Honor's standing order to govern discovery practices --

21    specifically paragraph 17 -- which it states that it is

22    designed to encourage reasonably narrow requests from the

23    start.

24    We think Plaintiffs' approach here was kind of a

25    pleromatic violation of the practice that orders set forth

1   in -- you know, just for a little background, the discovery
2   order was issued on October 19th, 2020.
3       Plaintiffs' request came in about three weeks after that,
4   on November 6th, ultimately including 49 requests for
5   production over a multiyear period dating back to essentially
6   the beginning of this presidential administration.
7       So, you know, we think that consistent with your order,
8   when we submitted our timely objections, you know, we were
9   entitled to not produce anything in response to these overbroad
10  and unduly burdensome requests, which we did submit the full
11  scope of the original document requests with our opposition
12  letter brief.
13      So any documents we produced were kind of a bonus on top
14  of that.  But, you know, during this expedited discovery
15  period, Defendants did produce -- devoted significant time and
16  resources to collecting documents relevant to the case and
17  responsive to the document requests.
18      Ultimately produced more than 2,300 documents.  As is said
19  in the papers, that ultimately focused on non-e-mail
20  communications because e-mail communications themselves -- you
21  know, in order to get a comprehensive sample of potentially
22  (inaudible) documents requires fairly broad searches of our
23  custodians here.
24      And we determined that would impose a significant burden
25  on the ones that we cannot sift through in the two-month

1  discovery period, only 48 days of which still were left to go

2  at a point in which the request for production were submitted.

3      But all our document production was in addition, of

4  course, to responding to 20 interrogatories on many of the

5  topics identified in the discovery order and putting forward

6  deponents who spoke at length about all those issues as well.

7      I also do want to emphasize that in connection with both

8  discovery in this case -- and more broadly, you know, in

9  reviewing this case and specifically in compiling the

10 administrative record, which addressed directly the

11 Department's basis for delay in this case -- the Plaintiffs

12 have conducted an inquiry into the basis for the Department's

13 delay which certainly encompasses the subject matter of

14 requests for production 1 through 4, which is what we are

15 addressing right now.

16     And that is a document showing, quote, any direction to

17 the Borrower Defense Unit to stop or resume adjudicating,

18 admitting for decision or developing memoranda regarding

19 Borrower Defense claims.

20     Through that investigation, you know, we did not

21 uncover -- that investigation gave no indication that there are

22 any e-mails giving this kind of direction to either stop or

23 resume issuing Defense Borrower adjudication.

24     So, you know, there is certainly no indication in any of

25 the deponents' testimony, which suggested that -- at least as a

1    general matter -- instructions were often communicated to the

2    Borrower Defense Unit thoroughly.  And as part of that

3    investigation, none of the relevant custodians mention specific

4    e-mails containing that kind of direction.

5         But I think, you know, if we are talking about documents

6    sufficient to show these potential directions regarding

7    stopping issuing Borrower Defense, you know, we have reason to

8    believe that that has already been done.

9         You know, of course, the only way to really know that, I

10   suppose, would be to do the kind of full-blown e-mail search.

11   But in some ways that would require the Defendants to kind of

12   prove a negative about the existence of these e-mails and

13   impose a significant burden as discussed in the briefing.

14        You know, as is also laid out in some of the papers we

15   submitted, you know, the parties did engage in a good-faith

16   meet-and-confer process.

17        From the beginning the Defendants made clear to the

18   Plaintiffs that it would be burdensome to produce e-mails in

19   response to the voluminous document requests; and, you know,

20   ran searches to substantiate the hunch that it was going to,

21   you know, run -- collect these documents in response to such a

22   large document request for such a large period of time would

23   uncover a lot of e-mails.

24        And we did confirm that.  As we stated, that there was

25   approximately a hundred-thousand potentially responsive e-mails

1   that would have to be sifted through.

2       We did share with Plaintiffs during the discovery process,

3   the search terms we used to come to that approximation.

4       And the Plaintiffs, you know, never responded with any

5   kind of proposed search terms on their own.

6       You know, that being said, we just focus on the fact that

7   the best way -- especially given the time involved, the

8   relatively short period of time involved and the discovery

9   period -- that the best way to reduce the burden would be to,

10  you know, reduce the time period or to reduce the requests for

11  certain types of communications such as e-mails that were

12  imposing a large part of the burden because --

13          **THE COURT:**  Remind me --

14          **MR. MERRITT:**  Yes, Your Honor.

15          **THE COURT:**  Can I ask you a question?

16      Remind me when the unit stopped reviewing claims.  I have

17  forgotten the timeline.

18          **MR. MERRITT:**  Well, there is the terminology of

19  "reviewing."  I guess there is a stopping decision in about May

20  of 2018.

21      And so what we would -- what has been discussed in both

22  your discovery order and kind of the merits briefing was an

23  18-month period of delay that spanned from basically late

24  May/early June of 2018 to December of 2019.

25      And that was -- the delay was in issuing final decisions

1  but there is -- you know, described in the administrative

2  record and throughout the discovery process, the Borrower

3  Defense Unit was doing work to review the applications even if

4  final decisions weren't going out.

5         **THE COURT:**  Who was in charge of the Unit during that

6  time period?

7         **MR. MERRITT:**  So the Director of the Borrower Defense

8  Unit is Colleen Nevin.  She was deposed in this case.  Also

9  submitted a declaration as part of the administrative record.

10     The Borrower Defense Unit is ultimately included within

11  Federal Student Aid at the Department of Education, and the

12  COO -- currently and during a large chunk of the delay

13  period -- is named Mark Brown, who was also a deponent in this

14  case.

15     And for some period of that delay the COO of FSA was Jim

16  Manning, who was also deposed in this case.

17         **THE COURT:**  And who did they report to?

18         **MR. MERRITT:**  I think that in general the FSA, COO --

19  you will have to forgive me if I don't get this exactly right

20  on the org chart -- but would -- on some matters would report

21  to the Under Secretary at the Department of Education.  You

22  will see in the papers that was a large portion of the delay

23  period, Diane Jones, who is another deponent in this case.

24     And, I guess, ultimately to the Secretary.

25         **THE COURT:**  So it would be the Secretary; then Jones

1   and then the head of Student Aid and then the head of this

2   Unit?  Is that the chain of command?

3            **MR. MERRITT:**  Loosely.  I do think that there are

4   superiors above the Borrower Defense Director.

5       I think the Borrower Defense Unit is within the

6   enforcement unit at FSA, so I think there might be that extra

7   level built in there.

8                        (Pause in proceedings.)

9            **THE COURT:**  What word did the Agency use to describe

10  the cessation of issuing final decisions?

11      Was there a term used within the Agency to describe that

12  or refer to that?

13           **MR. MERRITT:**  I mean, I don't think so, Your Honor.

14      As I mentioned a little bit, I haven't seen, like,

15  documentation specifically saying that.

16      So, I mean, I guess to the extent you are thinking about

17  search terms or time periods, you know, for these requests 1

18  through 4, I do want to emphasize that, you know, the way to

19  cut down this burden would be to really focus on the period of

20  time really close to around the beginning of the, you know,

21  halt on issuing the Borrower Defense decision, which I

22  mentioned was May/June 2018.

23           **THE COURT:**  Well, certainly that would be an important

24  period.

25      Do you have the ability to do search terms by custodian?

1              (No response.)

2         **THE COURT:**  Hello?

3         **MR. MERRITT:**  I just want to make sure I understand --

4    yes, Your Honor, sorry.  I was just trying to make sure I

5    understand exactly what you are asking.

6         So what we did here was identified four custodians that I

7    think I mentioned, each of which I have discussed recently.

8         And then -- you know, I'm not the most sophisticated

9    person on search term mechanics.  I believe those search terms

10   were run against the -- you know, e-mail drives of those four

11   individuals.

12        So, you know, if the question is:  Can search terms be run

13   against each individual?  I think that is possible.

14        **THE COURT:**  Well, here -- can I make some

15   observations, and then I have an idea -- it is not going to be

16   a ruling yet but an idea.

17        My first observation is that I don't agree with the

18   Government that e-mails were below grade or -- because I have

19   had too many contrary examples in life where the e-mails are

20   where all the dirty work is.

21        And so if you get your hands on the e-mails, you can see

22   what really happened.  On the other hand, I do appreciate the

23   burden problem.

24        So what I would suggest is that on that chain of command

25   all the way up to DeVos, you pick certain -- in a limited time

1    first without regard -- I mean, without prejudice to the second

2    step in a minute -- that we pick a more limited timeframe and

3    some search terms and then produce that universe.

4         So let's say that that is 8,000 documents -- make up a

5    number.  I don't know -- over 800 documents -- well, that's --

6    that 800 documents, when you read them will be, I promise you,

7    50 that are -- that suggest follow-up and have much more

8    specific terms that -- for example, an e-mail might refer to an

9    all-hands meeting on the such-and-such date.  And then you

10   might -- well, what happened at the meeting?

11        That can be a very narrow follow-up request for more

12   e-mails as to what happened at the -- what was the e-mail that

13   came out afterwards that explained what happened at the

14   meeting.

15        Or it could be that the -- there was a temporary program

16   with a code name that related to cessation of processing final

17   decisions.  And so if you use that code name -- like Operation

18   Overlord -- then you -- you would put that in and see what hits

19   you got later.

20        So my suggestion is to do this in two parts.  The first

21   would be on the -- not the people in the unit itself, but the

22   people in charge of the unit and the superiors all the way up

23   to and including the Secretary of Education for the period of

24   May and June and let's say July 2018 -- all of May, all of

25   June, all of July -- and then run the word "cessation," "final

1    decisions."

2          You know, you lawyers are close to it.  You can come up

3    with some terms and -- but not more than three or four terms.

4    And then that will -- those hits would produce, I'm going to

5    say, anywhere from 800 to 8,000 documents.

6          And then the -- with the benefit of that knowledge, that

7    peek into the process, a much more refined set of document

8    requests could be directed.

9          And it might not require the entire 18-month period.  It

10   might be more rifle shots but later, say in December or

11   November of last year.  I don't know yet.

12         So my -- that would be my suggestion.  And then the

13   lawyers meet and confer and try that process and -- with the

14   idea, though, that it will lead to another round of requests

15   that are more narrowly directed and based upon the nuggets that

16   are found in the first set of hits.

17         All right.  Now, I'm not ordering that yet.

18         Now, if I were one of you lawyers, that's what I would

19   try.  At least I would consider doing that.

20         Let me hear from the Plaintiff as to whether or not that

21   approach is workable.  Go ahead.

22              **MS. ELLIS:**  Thank you, Your Honor.  For the record

23   this is Rebecca Ellis speaking.

24         I think overall what you have outlined makes eminent

25   sense.

1      I think the one thing I would add is that in that

2  period -- May, June, July of 2018 -- that was the last time

3  that the Department of Education issued a Borrower Defense

4  decision before, you know, well into this litigation in

5  December of 2019.

6      But for over a year before that, they had only issued

7  decisions for about a six-month period and only on Corinthian

8  job placement rate claims.

9      We have reason to believe based on the documents that we

10 have seen so far that other types of Borrower Defense decisions

11 from other schools and other types of claims had actually been

12 under a no-decisions policy as well before then.

13     And particularly since May 2017, then the Under Secretary

14 recommended to the Secretary that no additional claims be

15 approved until they had established some, quote-unquote,

16 interim procedures for the Borrower Defense Unit.

17     We don't know what exactly those interim procedures were;

18 whether they were ever created.  The fact that no decisions

19 issued on non-Corinthian claims for the next year and then for

20 the next year plus indicates that, perhaps, they weren't.

21     So, in addition to that time period, around May, June,

22 July of 2018, I think we would want to do at least a targeted

23 search in an earlier time period as well to try to find what

24 was the actual genesis of the policy of no decisions on

25 non-Corinthian claims.

1              THE COURT:   What was the name of that phrase, interim

2      what?

3              MS. ELLIS:   The language I'm looking at is:   No

4      additional claims be approved until these interim procedures

5      are finalized.

6              THE COURT:   And the "these" refers to?   What was the

7      antecedent that is referred to there?

8              MS. ELLIS:   Yes.   I'm quoting from a document that is

9      Bates number 21 -- the page I'm quoting from is the document

10     that is page number 2146 from the Government's production.

11         It says:   (Reading)   "The work done by the review panel --

12     referring to the Borrower Defense review panel -- should be

13     furthered by the Office of the Under Secretary and the CFO's

14     internal control unit who will collaborate with FSA -- Federal

15     Student Aid -- to stand (inaudible) the procedure to review

16     claims in the interim period before the Department has

17     finalized new Borrower Defense regulations, a process that will

18     take at least a year.   I ask that you -- and this is addressing

19     the Secretary -- Secretary DeVos -- direct no additional claims

20     be approved until these interim procedures are finalized."

21             THE COURT:   What was the date of that?

22             MS. ELLIS:   That is dated May 4th, 2017.

23         So about a year before the complete --

24             THE COURT:   Well, why isn't that -- why doesn't that

25     document itself show that they were going to stop processing

1    anything but Corinthians?

2         **MS. ELLIS:**  Well, Corinthian is not -- the decision to

3    restart Corinthian is not addressed in this May 4, 2017, memo.

4         So essentially what we have in this May 4, 2017, memo is

5    saying:  We recommend -- don't decide anymore claims until

6    there are interim procedures.

7         Then we don't know what happened.  Were there ever interim

8    procedures?  Did anyone even start trying to make interim

9    procedures?

10        Then at some point they started deciding Corinthian again.

11   Unclear why the IG report in December 2017 said:  Go ahead and

12   start deciding claims again.

13        They did start Corinthian JPR -- Corinthian Job Placement

14   Rate for about six months.  Then their relief methodology was

15   enjoined by the *Taleo* case.

16        So there were sort of a lot of moving parts here, but the

17   point is that, you know, we have this memo in 2017 and then

18   what?  Then what happened?

19        That's where we are in the dark because none of our

20   deponents could sort of say who was -- who was directing this

21   policy; who was -- who was keeping this delay going, and why

22   was this delay continuing on as long as it did.

23        **THE COURT:**  All right.  Let me ask the Government a

24   question.

25        Did you produce in your documents that you did produce the

1    interim procedures that are referred to in that memo?

2          **MR. MERRITT:**  Your Honor, I have not reviewed, you

3    know, every document in the production.  I don't know the

4    answer to that question.

5          But, you know, as this discussion goes on, it does -- what

6    is being projected is an inquiry-and-discovery process that has

7    not found, you know, very limited.

8          And, you know, particularly, like in this case, the issue

9    that has been certified, you know, for class certification was

10   a complete lack of any Borrower Defense decisions between, you

11   know, again, May/June 2018 and December 2019.

12         There is no dispute that in the period before that time

13   decisions were being issued.

14         So, you know, if we are going to do kind of a -- an

15   unlimited look into kind of what the Department of Education

16   were doing in the Borrower Defense program starting early 2017

17   all the way through -- which it kind of sounds like what was

18   just being described -- you know, that would seem to impose no

19   limits on discovery in this APA case and would go beyond kind

20   of what your -- what you found; kind of a more limited finding

21   of pretext in the previous discovery order.

22         It would, of course, make the whole process of search and

23   reviewing production be much more burdensome and time

24   consuming.

25                        (Pause in proceedings.)

1          **THE COURT:**  Well, I don't know.   See, you probably

2     know all of the facts cold.   Maybe you don't.

3          But I'm -- it is a mystery to me.   And what I'm trying to

4     do is figure out a way to get into the heart of the e-mails

5     without having to review all of the e-mails.

6          I will hold that thought for a second and start with the

7     Government.   Tell me what the Inspector General's report says

8     and how it relates to this lawsuit.

9          **MR. MERRITT:**   Our position is that it does not relate

10    to this lawsuit.   The Department commissioned an Inspector

11    General report to review the Borrower Defense process.   That

12    was basically done upon the change in administration in 2017.

13         The report was issued in December 2017 making various

14    recommendations.

15         But shortly after that in the December of 2017, the

16    Department announced, you know, new relief methodology and

17    began applying that to specifically Corinthian students, which

18    Plaintiffs' Counsel noted.

19         The decisions -- the decisions generally focused on

20    Corinthian students, even under the Obama administration.   Only

21    a very small number of non-Corinthian claims had ever been

22    decided.

23         So then, you know, in the spring of 2018, decisions were

24    being issued, thousands of them, pursuant to that relief

25    methodology.

1          And then, you know there was an injunction by another --

2     in this district and then decisions stopped.

3          So, you know, our position is that there is very limited

4     relevance for this Inspector General report for the delay to

5     begin after the injunction in the *Enriquez* case in May of 2018,

6     you know, particularly in light against the burden of going

7     back in time, you know, another year or so to start collecting

8     those documents.

9          **THE COURT:**  Let me ask Plaintiffs' Counsel a question.

10         In your depositions did any of the witnesses acknowledge

11    that there were interim procedures?

12         **MS. ELLIS:**  Your Honor, I would say that Colleen Nevin

13    has probably the closest firsthand experience with the process

14    between the -- she was, I believe, the -- only one of the four

15    deponents who had been with the Department of Ed for the entire

16    period of time, from January 2017 to the present.

17         And her testimony was that basically the Borrower Defense

18    Unit did not have sufficient staff to do almost anything for

19    most of 2017, 2018 and until about August of 2019.

20         She testified that --

21         **THE COURT:**  Can you answer my question?  My question

22    is simple.  Did anyone say that -- or did you ask whether these

23    interim procedures ever existed?

24         **MS. ELLIS:**  Yes, what we asked was what works the

25    Borrower Defense Unit did on -- on actually being able to

1   adjudicate claims during these time periods.

2       We were not able to ask a specific question about the

3   interim procedures because we did not have these documents at

4   the time of the depositions.

5       And we had asked the Government if they would be able to

6   give us rolling productions, and they said no.

7       So given the short timeframe of discovery, we had to

8   proceed with deposing Ms. Nevin and the others -- all four of

9   the deponents before we received any documents.  So --

10      **THE COURT:**  So you did not even know what -- that

11  there was a document referring to interim procedures when you

12  took the deposition?

13          **MS. ELLIS:**  That's correct, Your Honor.

14          **THE COURT:**  Okay.

15          **MS. ELLIS:**  Yeah.

16          **THE COURT:**  All right.

17          **MS. ELLIS:**  And so --

18          **THE COURT:**  So -- yes.

19          **MS. ELLIS:**  I'm sorry.  Go ahead, Your Honor.

20          **THE COURT:**  Look, I can't stay on the phone all day.

21      Here is what I think we should do on what I have heard so

22  far:  I want to go back and just say we should have a May,

23  June, July agreed upon search terms for everyone from the

24  Secretary of Education to the head of the Unit but not the

25  individual people in the Unit and search their machines for

1   whatever search terms you come up with.  But it shouldn't be

2   more than three or four search terms.

3        And then with the benefit of that, we will see what --

4   how -- where that evidence points and have a second round of

5   where we go next.  So that's point one.

6        With respect to the period prior to that, all I'm going to

7   do is one thing.  I'm going to order the Government to produce

8   to you the interim procedures that were developed as referred

9   to in that memo.

10       So the Government has got to go look through the files and

11  find the right document and then produce that to you, so you

12  will have your hands on the interim document.

13       Now, if it turns out there never was such an interim

14  document, well, then the Government should tell you that.  And

15  that may lead to some discovery in itself.  But I suspect there

16  is an interim document, and that the Government can -- that

17  would shed light on what was going on in that earlier period.

18       All right.  So I have run out of time on that one.  All

19  right.  Let's go to what -- you had more document requests that

20  you want me to look at.  So what is the next one that you want

21  me to examine?

22       MS. ELLIS:  Thank you, Your Honor.  And the second

23  category was our request for production 5 and 12.

24       Request 5 asks for documents that show the recommendations

25  of the Borrower Defense review panel and the reasons for

1    convening the panel and --

2         **THE COURT:**  I'm sorry.  What is -- I don't know.  What

3    is the panel?  Is that the lawyers in the Unit?  What is that?

4         **MS. ELLIS:**  So in, I believe, February of 2017 --

5    shortly after the Trump administration began -- there was a

6    group convened that was called the Borrower Defense review

7    panel.

8         And it consisted of James Manning, who was at the time the

9    acting Under Secretary and, I believe, four or five other

10   individuals who were sort of charged with -- our understanding

11   is that they were charged with looking at the Borrower Defense

12   process that was in place at the time and making

13   recommendations on how to handle Borrower Defense going

14   forward.

15        And our position is that the recommendations of the

16   Borrower Defense review panel are relevant because, you know,

17   this was sort of high-level committee advising the Secretary on

18   what to do about the Borrower Defense process overall.

19        And even though the review panel was convened in 2017, we

20   have no reason to believe that their recommendations were

21   confined to 2017.

22        We believe that they would be relevant to -- to the policy

23   of not deciding Borrower Defense applications that then went on

24   to become the total halt in -- in 2018.

25        And then the -- the other sort of related request to this

```
1    is Request For Production Number 12 which asks for documents

2    sufficient to show whether certain corrective actions were

3    taken in response to the Inspector General's report.

4         The IG's report said in the -- that in the report itself

5    that the -- that the Department was required to develop a

6    corrective action plan in response to the IG's findings.

7         And so what we would like to see is what that corrective

8    action plan was.

9              THE COURT:  Did it have something -- did it have

10   something to do with student loans --

11             MS. ELLIS:  Yes.

12             THE COURT:  -- and forgiveness?

13             MS. ELLIS:  The IG report was specifically concerning

14   the Borrower Defense process, and it made recommendations

15   about -- mostly around sort of recordkeeping and other issues.

16        But the IG recommended that -- that the Borrower Defense

17   Unit go forward with reviewing applications because -- you

18   know, at that point restart reviewing applications; considering

19   additional categories of Borrower Defense claims for discharge;

20   establishing document, various policies and procedures.

21        And so we think that any corrective action that the

22   Department did or did not develop in response to these

23   recommendations of the IG would be relevant to -- to the delay

24   in --

25             THE COURT:  When was the IG report?
```

1          **MS. ELLIS:**  The IG --

2          **THE COURT:**  When was the --

3          **MS. ELLIS:**  I'm sorry.  The IG report was issued in

4   December of 2017.  So this is around the same time that the

5   Department restarted the Corinthian job placement rate

6   decisions for about a 6-month period.

7        But then, you know, about -- the IG says, you know, we

8   should start this process up again.  And by six months later

9   the process has completely stopped again.

10       So that's why we think the corrective action plan are

11  relevant to the -- to what happened for this case.

12         **THE COURT:**  Give me an example of a document you

13  suspect exists that would relate -- be highly relevant to that

14  time period.

15         **MS. ELLIS:**  Okay.

16         **THE COURT:**  It could be theoretical because you don't

17  have it yet.  I'm trying to imagine what kind of documents you

18  are looking for.

19         **MS. ELLIS:**  Well, so, I think I can -- if I can just

20  get myself logged in here -- so we have a document in the

21  production -- and this is Number DOE2953 which is a staffing

22  proposal for the Borrower Defense Unit.

23       And one of the items that is listed here -- one of the

24  things they want to hire new people to do is successfully

25  implement the corrective action plan that resulted from the

1    2017 full IG audit.

2            THE COURT:  Okay.  Wait, wait.  That is the wording in

3    the document you have is "corrective action plan"?

4            MS. ELLIS:  Yeah.

5            THE COURT:  All right.  So you know that -- at least

6    that document highly suggests that such a document called

7    "corrective action plan" existed at the time of the document?

8            MS. ELLIS:  Yes, exactly, Your Honor.

9            THE COURT:  All right.  Let me ask the Government.

10   Why can't you just produce the corrective action plan?

11           MR. MERRITT:  Well, Your Honor, we would certainly

12   maintain our objection that -- you know, just talking about

13   before -- the corrective action plan is about the period of

14   time that proceeds the delayed issue in this case and is not

15   relevant for that reason.

16       But, you know, if -- we can certainly look into producing

17   the corrective action plan.  You know --

18           THE COURT:  Here is what --

19           MR. MERRITT:  -- the burden --

20           THE COURT:  On Number 12 -- on Number 12, for right

21   now, all I'm going to order is the corrective action plan to be

22   produced.

23       And maybe that will reveal something that warrants

24   follow-up with the second round.  But for now, just produce the

25   corrective action plan that is referred to in that document.

 1    Now, that's Number 12.

 2        Number 5 -- let me get my notes.  Tell me again what

 3    Number 5 is.  Oh, that's the review panel recommendations.

 4             **MS. ELLIS:**  Yes.

 5             **THE COURT:**  Do you already have those recommendations?

 6             **MS. ELLIS:**  We don't.  We -- I would say we don't know

 7    to what extent written recommendations of the review panel

 8    exist because the Government's position in response to our

 9    document request was that because these were not justified by

10    the discovery order, they were not going to search or produce

11    them.

12        So we -- we would certainly expect that a body like the

13    review panel would have produced written recommendations, but

14    we do not know, one way or the other, whether they exist.

15        So if the Government can represent that there are no such

16    written recommendations, we would accept that.  Otherwise, we

17    would ask that the written recommendations be produced.

18             **THE COURT:**  Can't you do that much?  Where is the

19    Government?  Can't you produce those recommendations or tell us

20    that none exist?

21             **MR. MERRITT:**  Yes, Your Honor.  If the ask is to find

22    and produce written recommendations of the Borrower Defense

23    review panel, you know, we can look into that and see if they

24    exist.

25             **THE COURT:**  But I don't want you to say you are going

```
 1    to look into it.  I would like to order you to do that.

 2         And -- but I'm willing to -- if there is some blockbuster

 3    reason why it would be impossible, this is the time to tell me.

 4    So --

 5              MR. MERRITT:  I understand, Your Honor.  I don't mean

 6    to --

 7              THE COURT:  If it is in writing -- if it is in

 8    writing, even in an e-mail, then you need to produce those

 9    recommendations.  But that's all I'm going to -- on Number 5

10    that's all I'm going to order for right now.

11         And what I'm trying to help everyone to do is fill in the

12    prior history a little bit with some important documents and

13    then focus on -- I think the Government is right.

14         The main focus ought to be -- not the exclusive focus --

15    but the main focus should be on this period where people didn't

16    get their -- you know, there were no processing of these

17    student loan applications.

18         All right.  Have I now covered everything in your dispute?

19              MS. ELLIS:  Yes.

20              THE COURT:  This is without prejudice to coming back

21    in the future after you get a chance to review this material

22    and coming back and saying:  Okay.  Here is some more leads

23    that we found in the new material, and it would be -- like a

24    rifle shot, it would be easy -- not easy -- it would be doable

25    to go in and get the follow-up.
```

1      So okay.  When can the Government comply?

2          **MR. MERRITT:**  Your Honor, this is Charlie Merritt with

3  the Government.

4      I was just going to say, I do -- so is the order -- let me

5  back up.  For the first thing we were discussing, you know, the

6  e-mail search, I think you suggested the parties meet and

7  confer to discuss search terms.

8          **THE COURT:**  I did.

9          **MR. MERRITT:**  I just want to know --

10         **THE COURT:**  If you can't agree, I will just impose my

11  own; and you probably don't want that.  So can't you meet on

12  and confer on that?

13         **MR. MERRITT:**  Yes.

14         **THE COURT:**  But I'm ordering you to do that, and

15  ordering you to do the search.

16         **MR. MERRITT:**  Yes, Your Honor, I understand that.  It

17  is hard for me to say sitting here how long it will --

18  I guess -- what are you asking, like, how long it will take

19  because --

20         **THE COURT:**  Here is --

21         **MR. MERRITT:**  There could be --

22         **THE COURT:**  I would like to give you a deadline.  I

23  would like to give you a deadline.  One that I think is

24  reasonable is three weeks from today that you would produce all

25  this material.

1          But if you are telling me:  Oh, no, my God, no, this can't

2     be done; the sky will fall, then I might give you five weeks.

3     But I want to be reasonable; but if I don't give you a

4     deadline, it won't happen.

5          **MR. MERRITT:**  Well, Your Honor, I do think three weeks

6     would be very tight.  I mean, you know, we are talking about

7     e-mails.  They are going to have to be reviewed.  Many of them

8     are going to be subject to privilege -- the delivery of process

9     privilege -- and if we do we run the search --

10         **THE COURT:**  If you are going to claim privilege, you

11    have got to give me a privilege log.

12         **MR. MERRITT:**  Yes, Your Honor.

13         **THE COURT:**  So that -- I don't want to -- and it has

14    got to -- I may ask to see the documents so I can make sure

15    they are privileged.

16         **MR. MERRITT:**  Yes, Your Honor.

17         **THE COURT:**  I will give you five weeks.  You get five

18    weeks.  What is the five weeks from today, Angela?

19         **THE CLERK:**  That is March 31st, Judge.

20         **THE COURT:**  Okay.  March 31st, you got to produce.

21    And then the Plaintiff, you should very quickly -- I would say

22    within the month of April -- follow up with your -- the things

23    that -- those leads, whatever leads come out of that, follow up

24    with another round of document requests and try to be narrow.

25    And it may be that I will let you do subsequent time period.

1   You know, we got to start somewhere.  And this is the period of

2   most importance so --

3            **MR. MERRITT:**  Your Honor --

4            **THE COURT:**  Okay.

5            **MR. MERRITT:**  I'm sorry.

6            **THE COURT:**  Yeah.

7            **MR. MERRITT:**  Can I just note one thing?

8            **THE COURT:**  Sure.

9            **MR. MERRITT:**  Can I just suggest one thing?

10      You know, we have done searches for four custodians, all

11   of which were kind of in the line of command we were talking

12   about.  And I think it would be -- to facilitate the process,

13   if we could limit the searches going forward to those four

14   custodians.

15      I think you also mentioned Former Secretary DeVos.  I

16   mean, I don't think there is any indication that she had any,

17   you know, unique connection to any of the documents at issue in

18   this case.

19            **THE COURT:**  Then those --

20            **MR. MERRITT:**  Would it be okay to limit it?

21            **THE COURT:**  Well, I'm not going to do that.  I think

22   she ought to be searched too.  And if you are right, then it

23   will be a very easy task to just report no hits.  We searched

24   her computer, and there were no hits.  And so -- no, I'm not

25   going to exclude her.

1          **MR. MERRITT:**  Okay.

2          **THE COURT:**  All right.  I think you lawyers ought to

3    meet and confer and agree on a form of order that captures what

4    I have ruled here today so that I don't have to go back and

5    figure it out myself.  But I will.

6          If I have to do it all over again, I will just do it from

7    scratch.  And one side or the other may not be happy.  So try

8    to stick to what I actually ruled here.

9          And the Plaintiff, you should not be overreaching.  And

10   the Defendant should not be putting in new roadblocks.

11         Okay.  Thank you for your excellent arguments.  I need to

12   run now.  So everybody have a good day.

13         Let me ask:  Angela, is there a second item on the

14   calendar?

15         **THE CLERK:**  No, Judge.

16         **THE COURT:**  Because Bobbie said there were two.  I

17   didn't understand that part.  Okay.  All right.  Then I'm going

18   to hang up.  Bye, bye, everyone.

19         **MS. ELLIS:**  Thank you very much, Your Honor.

20         **MR. MERRITT:**  Thank you.

21              (Proceedings adjourned at 2:38 p.m.)

22                      ---oOo---

23

24

25

1

2

3                       <u>**CERTIFICATE OF REPORTER**</u>

4            We certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, February 26, 2021

8

9

10

11    _____

12                  Marla F. Knox, RPR, CRR
                     U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25