**Supplemental Complaint**

**Exhibit Index**

**Deposition Transcripts**

| Transcript Order | Deponent |
|---|---|
| 1 | Mark Brown |
| 2 | Diane Auer Jones |
| 3 | James Manning |
| 4 | Colleen Nevin |

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 1 – Mark Brown**

Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4       - - - - - - - - - - - - - - X

5       THERESA SWEET, et al., on      :

6       behalf of themselves and all  :  Case No.:

7       others similarly situated,    :  19-cv-03674-WHA

8                    Plaintiffs,       :

9       vs.                           :

10      ELISABETH DEVOS, in her       :

11      official capacity as          :

12      Secretary of the United       :

13      States Department of          :

14      Education, et al.,            :

15                    Defendants.     :

16      - - - - - - - - - - - - - - X

17

18       Remote Videotaped Deposition of MARK BROWN

19              Tuesday, December 15, 2020

20                 10:03 a.m. (EST)

21

22

23      Job No. 332249

24      Pages:  1 - 250

25      Reported by:  Dana C. Ryan, RPR, CRR

## Page 2

```
 1
 2
 3                              December 15, 2020
 4                              10:03 a.m. (EST)
 5
 6
 7         Remote Videotaped Deposition of MARK BROWN,
 8   held via Zoom video teleconference, before Dana C.
 9   Ryan, Registered Professional Reporter, Certified
10   Realtime Reporter and Notary Public in and for the
11   State of Alabama.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4      REBECCA ELLIS, Esquire
 5      MARGARET O'GRADY, Esquire
 6      EILEEN CONNOR, Esquire
 7      TOBY R. MERRILL, Esquire
 8      Legal Services Center of
 9         Harvard Law School
10      122 Boylston Street
11      Jamaica Plain, Massachusetts 02130
12      Telephone:  (617) 390-3003
13      Email: mogrady@law.harvard.edu
14      Email: econnor@law.harvard.edu
15      Email: rellis@law.harvard.edu
16      Email: tmerrill@law.harvard.edu
17
18            - and -
19
20
21
22
23
24
25
```

## Page 4

```
 1       A P P E A R A N C E S   C O N T I N U E D
 2
 3      JOSEPH JARAMILLO, Esquire
 4      CLAIRE TORCHIANA, Esquire
 5      Housing & Economic Rights Advocates
 6      3950 Broadway, Suite 200
 7      Oakland, California 94611
 8      Telephone:  (510) 271-8443
 9      Email: jjaramillo@heraca.org
10      Email: ctorchiana@heraca.org
11
12   ON BEHALF OF THE DEFENDANTS:
13      R. CHARLIE MERRITT, Esquire
14      KEVIN P. HANCOCK, Esquire
15      KATHRYN C. DAVIS, Esquire
16      MARCIA BERMAN, Esquire
17      U.S. Department of Justice
18      Civil Division, Federal Programs Branch
19      1100 L Street, Northwest
20      Washington, D.C. 20530
21      Telephone:  (202) 307-0342
22      Email: robert.c.merritt@usdoj.gov
23      Email: kathryn.c.davis@usdoj.gov
24      Email: kevin.p.hancock@usdoj.gov
25      Email: marcia.berman@usdoj.gov
```

## Page 5

```
 1       A P P E A R A N C E S   C O N T I N U E D
 2
 3      Also present:
 4         Daniel Macom, Video Technician
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          C O N T E N T S

2    EXAMINATION OF MARK BROWN:          PAGE:

3    By Ms. Torchiana                    12

4

5

6

7          E X H I B I T S

8        (Attached to the Transcript)

9    DEPOSITION                          PAGE:

10   Exhibit 24   Revised Notice Of Deposition   15

11                Of Mark Brown

12   Exhibit 25   Declaration Of Mark Brown       19

13   Exhibit 26   Document Titled Standard         56

14                Protocol With Cover Sheet

15                Titled Exhibit 18

16   Exhibit 27   Declaration Of Mark Brown      136

17                With Cover Sheet Titled

18                Exhibit A

19   Exhibit 28   November 20, 2020 Deposition   141

20                Of Diane Auer Jones

21   Exhibit 29   Borrower Defense Unit Claims   142

22                Review Protocol PowerPoint

23                With Cover Sheet Titled

24                Exhibit 10

25   Exhibit 30   Affidavit Of Rudolph Howell    227

Page 7

1        PREVIOUSLY MARKED EXHIBITS

2        (Not attached to the transcript)

3    DEPOSITION                          PAGE:

4    Exhibit 3    U.S. Department Of Education    73

5                 Office Of Inspector General

6                 Report

7    Exhibit 7    May 4, 2017 Email               79

8    Exhibit 10   May 22, 2019 Hearing            91

9                 Transcript

10   Exhibit 12   April 21, 2019 PowerPoint      231

11                Titled Borrower Defense To

12                Repayment

13   Exhibit 13   Defendants' Response To        176

14                August 31, 2020 Order

15   Exhibit 15   Declaration Of Eileen Connor   190

16   Exhibit 17   Politico Article Titled DeVos  127

17                Orders Partial Loan Relief

18                For Many Duped Student

19                Borrowers

20   Exhibit 18   October 27, 2020 Oversight     213

21                Committee Press Release

22                Titled New Documents Show

23                Department Of Education Froze

24                Tool To Help Defrauded

25                Student Borrowers

Page 8

1

2        PREVIOUSLY MARKED EXHIBITS

3        (Not attached to the transcript)

4    DEPOSITION                          PAGE:

5    Exhibit 19   Defendants' Response Regarding  198

6                 The Court's Request At The

7                 October 1, 2020 Class Hearing

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1        P R O C E E D I N G S

2        THE VIDEOGRAPHER:  Good morning.  We're

3    now on the record.  Participants should be aware

4    that this proceeding is being recorded and as such

5    all conversations held will be recorded unless

6    there's a request and agreement to go off the

7    record.

8        This is remote video recorded

9    deposition of Mr. Mark Brown taken today, Tuesday,

10   December 15th, 2020.  The time is now 15:03 in UTC

11   time.  We're here in the matter of Theresa Sweet

12   versus Elisabeth DeVos, et al.  My name is Dan

13   Macom.  I'm the remote video technician on behalf

14   of U.S. Legal Support which is located at 90 Broad

15   Street, in New York, New York.  I am not related

16   to any party in this action, nor am I financially

17   interested in its outcome.

18        At this time, I'll ask our court

19   reporter, Ms. Dana Ryan, on behalf of U.S. Legal

20   Support to please enter the statement for remote

21   proceedings into the record.

22        THE COURT REPORTER:  The attorneys

23   participating in this deposition acknowledge that

24   I am not physically present in the deposition room

25   and that I will be reporting this deposition

Page 10

1  remotely.  They further acknowledge that, in lieu
2  of an oath administered in person, the witness
3  will be sworn remotely and will declare his
4  testimony in this matter is under penalty of
5  perjury.  The parties and their counsel consent to
6  this arrangement and waive any objections to this
7  manner of reporting.
8         If I could now get counsel to please
9  indicate your agreement by stating your name and
10  your agreement on the record.
11         MS. TORCHIANA:  Ms. Claire Torchiana, I
12  agree.
13         THE COURT REPORTER:  I'm sorry.  I
14  didn't hear anybody else.
15         MS. TORCHIANA:  Can you hear me?
16         THE COURT REPORTER:  I can hear you,
17  Claire.
18         MS. TORCHIANA:  Okay.
19         MR. HANCOCK:  Can you hear me?
20         THE COURT REPORTER:  Kind of.  Not
21  really.
22         MR. HANCOCK:  Okay.  Let me go off my
23  earbuds.
24         THE VIDEOGRAPHER:  Yeah, Mr. Hancock,
25  your batteries might be going low on those.  You

Page 11

1  might be able to use those later on.
2         THE COURT REPORTER:  I can't hear you.
3  Try again.
4         MR. HANCOCK:  Let's see.  How about
5  now?
6         THE COURT REPORTER:  Yes.  Very good.
7         MR. HANCOCK:  Great.  All right.
8         THE COURT REPORTER:  Thank you.
9         MR. HANCOCK:  So this is Kevin Hancock,
10  and I agree as well.
11         THE WITNESS:  This is Mark Brown, and I
12  agree.
13         THE COURT REPORTER:  Thank you,
14  Mr. Brown.
15         I'm going to need a government-issued
16  photo ID.  Do you have a license or a passport
17  handy?
18         MR. HANCOCK:  Dana and Dan, sorry, I
19  didn't think of this before.  But can we go off
20  the record for the presentation of the ID, if that
21  would be okay.
22         THE COURT REPORTER:  Sure.
23         THE VIDEOGRAPHER:  If there is no
24  objection.  We'll go off the record.  The time is
25  15:05 UTC time.

Page 12

1         (Written record only.)
2         (Witness presents government
3  photo-issued ID and identity confirmed.)
4         THE VIDEOGRAPHER:  We are now back on
5  the record.  The time is 15:08 UTC time.
6  ************************
7         MARK BROWN,
8  having been duly sworn, testified as follows:
9  ************************
10  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
11  BY MS. TORCHIANA:
12      Q    Mr. Brown, my name is Claire Torchiana.
13  I'm an attorney with Housing and Economic Rights
14  Advocates for plaintiffs.  I'm just going to go
15  over a couple of things first before we begin.
16  Could you please state your name for the record?
17      A    Mark Brown.
18      Q    Okay.  And could you please communicate
19  that there's no one else in the room with you
20  right now?
21      A    There's no one else in the room with me
22  right now.
23      Q    Okay.  And could you confirm you won't
24  communicate with anyone during the deposition via,
25  you know, smartphone or email or anything like

Page 13

1  that?
2      A    I will not communicate with anyone via
3  any type of device.
4      Q    Okay.  And are there any electronic
5  devices in the room with you right now?
6      A    There are phones on the -- over on the
7  side, and they're turned down, but they're in the
8  room.
9      Q    Okay.  If you could just keep them out
10  of sight, that would be great.
11         And you can take breaks when you need.
12  You can just ask.  All I ask is that we finish
13  questioning before you take a break, so if I'm in
14  the middle of a question, that we finish up that
15  question and then take a break after.
16         Is there anything preventing you from
17  being truthful today?
18      A    There is not.
19      Q    Okay.  And government counsel may
20  object to some questions, but you can still answer
21  unless your counsel instructs you not to.
22         And what did you do today to prepare
23  for this deposition?
24      A    I worked with my --
25      Q    Before today?

Page 14

1     A     Worked with my Department of Justice
2  attorneys.
3     Q     Okay.  And which attorneys did you meet
4  with?
5     A     I -- I have not committed all of their
6  names to memory.  I will say that the lead
7  attorney was Kevin P. Hancock.
8     Q     Okay.  And how long did you meet with
9  them for?
10    A     I don't know the exact amount of time.
11 For several hours on three different occasions.
12    Q     Okay.  And did you consult any
13 documents?
14    A     I read the declarations of myself.  I
15 read the declaration of the lead borrower defense
16 for our organization, borrower defense attorney.
17 And I read the declaration of the under secretary
18 Diane Jones.
19    Q     Okay.  And did those refresh your
20 recollection?
21    A     In some instances, yes, but not in all.
22    Q     Okay.  Okay.  And have you ever been
23 deposed before?
24    A     I've never actually sat through a -- a
25 deposition.

Page 15

1     Q     Okay.  Okay.  So now if you could
2  turn -- our first exhibit is just going to be your
3  deposition notice, and that's behind tab 24.  And
4  in the electronic files it should be bracketed 24?
5     A     Okay.  I will need to open the box and
6  pull them out.
7     Q     Okay.
8     A     Okay.  I have tab 24 in front of me.
9     Q     Okay.  Great.  And did you receive this
10 notice?
11       MS. TORCHIANA:  And can we mark that as
12 Exhibit 24?
13       (Deposition Exhibit 24 was marked for
14 identification and attached to the transcript.)
15       THE WITNESS:  (Reviews document.)
16       I did.
17 BY MS. TORCHIANA:
18    Q     Okay.  Now we're just going to start
19 with some background information.  Could you
20 please tell me about your employment history
21 starting with your graduation from college?
22    A     Yes.  I graduated from Tuskegee
23 Institute University in Tuskegee, Alabama, in May
24 of 1986.  After graduation, I was commissioned a
25 second lieutenant in the United States Air Force.

Page 16

1  Six months prior to going on active duty in the
2  United States Air Force, I worked as an intern on
3  a Southern Bell teleworking company in Atlanta,
4  Georgia.
5        After that, I went to my first military
6  assignment which was in the Republic of the
7  Philippines where I started my military career.  I
8  moved around 16 times in different areas across
9  the country.  I lived in the United Kingdom.  I
10 lived in Spain.  I lived in Turkey.  I worked in
11 Iraq.
12       After 32 years, I retired at the grade
13 of major general as the deputy commander for all
14 of Air Education and Training Command which
15 trains, recruits and develops United States Air
16 Force airmen.
17       Upon retirement, I moved back to
18 Washington, having spent many years in Washington
19 at the Pentagon, and moved into Alexandria,
20 Virginia, where I was a consultant -- defense
21 consultant in the areas of education and training
22 for the defense industry.
23       Upon about -- about one year into that,
24 I was recruited to be a senior advisor at the
25 Department of Education.  I was recruited by the

Page 17

1  deputy of secretary of education.
2        I started that job in October of 2018,
3  and for approximately the next six months, my
4  portfolio involved human capital management where
5  I was looking at how we hired and recruited people
6  and the speed at which we could go through that
7  system of recruiting for Federal Student Aid.  I
8  did that in ten of our regions and across the
9  country in all of the elements that are Federal
10 Student Aid.
11       In March of 2019, I was appointed by
12 the secretary of education to be a chief operating
13 officer, the position that I hold today.
14       The one correction I would say is I may
15 have said October of 2019, meaning October of
16 2018, six months leading into the March of 2019
17 when I became the chief operating officer of
18 Federal Student Aid.
19    Q     I think you said 2018.
20       When you joined as the -- I didn't
21 catch -- what was your position when you joined in
22 October of 2018?
23    A     Senior advisor.
24    Q     Okay.  And other than what you've
25 mentioned, do you have any other involvement in

Page 18

1    higher education before you started this role?
2         A    My involvement in higher education is
3    through the higher education that is presented in
4    the United States Air Force.  I was the deputy
5    commander of air education and training command
6    and would do assignments with oversight of
7    educational facilities, dormitories, as well as
8    curriculum and students and those kinds of things
9    because we are part of Air Force's education.
10        Q    Have you ever had any board member
11   positions that are relative to higher ed?
12        A    I have.  I've been a -- no higher ed,
13   but ed to say to be specific.  I was a board
14   member of the KnowledgeWorks Corporation which is
15   a 501(c) organization that's focused on education.
16   For some time, I let that board membership go to
17   avoid a conflict of interest when I became the
18   chief operating officer here, shortly thereafter.
19   No other board memberships.
20        Q    Okay.  And when did you resign from the
21   board of KnowledgeWorks?
22        A    I don't remember the exact date.  It
23   was probably within three months or so of taking
24   the job as the chief operating officer.
25        Q    Okay.  Did you consider resigning

Page 19

1    before then or . . .
2         A    No.  No, I -- I didn't consider
3    resigning until it appeared to be a conflict of
4    interest, and so I -- I resigned.
5         Q    Okay.  Okay.  And if you could now turn
6    to -- it's tab 25.  And in the electronic files
7    it's bracketed as [25] ECF 71-3.
8         MS. TORCHIANA:  And if we could mark
9    that as Exhibit 25.
10             (Deposition Exhibit 25 was marked for
11   identification and attached to the transcript.)
12             THE WITNESS:  I have the exhibit.
13        BY MS. TORCHIANA:
14        Q    Okay.  So do you recognize this
15   document?
16        A    (Witness reviews document.)
17             I do recognize this as my declaration.
18        Q    Okay.  Did you write it?
19        A    I never write my full declarations.  I
20   do that with the assistance of an attorney.
21        Q    Okay.  And who helped you write it?
22        A    I could not tell you the individual's
23   name.  I could tell you that an attorney within
24   the Office of General Counsel and assisted by
25   whoever assists them inside the Office of General

Page 20

1    Counsel.  I could not give you the individual
2    names.  I don't know them.
3         Q    Okay.  And is that your signature on
4    line --
5         MS. BERMAN:  I'm sorry.  Claire, what
6    tab are you on?
7         MS. TORCHIANA:  Twenty-five.
8         MR. HANCOCK:  I think there may be two
9    25s.
10        MS. TORCHIANA:  Oh, yeah.  It's 25 --
11   it's ECF 71-3, declaration of Mark Brown.
12        MS. BERMAN:  Okay.  Thank you.  There
13   are two tab 25s.  Thank you.
14        MS. TORCHIANA:  Great.  Okay.
15        BY MS. TORCHIANA:
16        Q    Okay.  And if you could turn to
17   paragraph 2, and if you could just tell me -- so
18   your current role is the COO of FSA, and you
19   started March 4th, 2019; is that right?
20        A    That's correct.
21        Q    Okay.  And who was your predecessor?
22        A    My predecessor was Mr. Manning.
23        Q    Okay.  And when you started, did you
24   have any discussions with him about borrower
25   defense?

Page 21

1         A    I did not.
2         Q    Did you meet with him?
3         A    I did not, not -- if your question is
4    did I meet with him on borrower defense, the
5    answer is I did not.
6         Q    Okay.  Did you meet with him at all?
7         A    I did.
8         Q    But you didn't discuss borrower
9    defense?
10        A    I did not.
11        Q    Okay.  What do you recall discussing
12   with him generally?
13        A    Human capital.
14        Q    Okay.  And did you discuss -- by "human
15   capital," do you mean staffing?
16        A    Human capital as it related to my
17   portfolio which was how to hire quicker with
18   unique talents into Federal Student Aid.
19        Q    Okay.  And did you discuss anything
20   about hiring within the borrower defense unit?
21        A    We did not.
22        Q    Okay.  And did he -- did Mr. Manning
23   tell you anything about any concerns about
24   staffing at Federal Student Aid?
25        A    Concerns about the speed at which we

Page 22

1    could hire personnel into Federal Student Aid.
2         Q    Okay.  But not in borrower defense?
3         A    We did not -- again, we did not discuss
4    borrower defense.
5         Q    Okay.  And could you tell me who do you
6    report to?
7         A    I report to the under secretary who is
8    assigned those duties.
9         Q    And has that changed throughout your
10   time at FSA?
11        A    It has not changed since my time as
12   chief operating officer of Federal Student Aid.
13        Q    Okay.  And before you were chief
14   officer, who did you report to?
15        A    Mr. Manning would have been the chief
16   operating officer of Federal Student Aid.
17        Q    So when you were -- just to be clear,
18   so when you were a senior advisor, you were
19   reporting to Mr. Manning?
20        A    Yes.
21        Q    Okay.  And do you report to any
22   political appointees as COO and then before when
23   you were a senior advisor?
24        A    Mr. Manning was a political appointee
25   assigned temporarily to Federal Student Aid.  How

Page 23

1    he was classified at the time, I actually don't
2    know.
3         Q    Uh-huh.
4         A    The under secretary that I report to is
5    a political appointee.
6         Q    Okay.  And how often do you meet
7    with -- by under secretary, I assume you mean
8    Diane Auer Jones.  How often do you meet with her?
9         A    It varies depending on what's going on
10   at the time.  It could be once a week.  It could
11   be more than once a week.  So it varies just
12   depending on the tempo of work at the time.
13        Q    Okay.  And would you say at a minimum,
14   it's one a week?
15        A    I would not.  I would say it varies.
16        Q    Okay.  And do you have any standing
17   meetings?
18        A    I -- I would say that it varies.  I
19   don't believe we have any standing meetings.
20   We -- we have one-on-one sessions, I believe,
21   every week now, but that has not always been the
22   case.  And, so, I'm more comfortable saying it
23   varies.
24        Q    Okay.  And when did you start having
25   weekly meetings?

Page 24

1         A    It was within the last five or six
2    months, I believe.
3         Q    Okay.  And was there a reason you
4    started having weekly meetings?
5         A    Because she requested them.
6         Q    Do you know why she requested them?
7         A    No, I don't.  She's my boss, so when
8    she requested them, I submitted them.
9         Q    And how do you communicate with
10   Ms. Diane Auer Jones?
11        A    Routinely, I call her, or in our
12   situation that we're in now, I do what you and I
13   are doing right now.  I talk to her via some form
14   of social -- some form of platform like we have,
15   Zoom or MS teams, something like that.
16        Q    Okay.  And how often did you meet with
17   the secretary of education?
18        A    I meet with the secretary of education
19   around every two weeks.
20        Q    Okay.  And are those regular meetings
21   scheduled as standing meetings?
22        A    They are regularly scheduled standing
23   meetings.
24        Q    And has that been true since you
25   started as COO?

Page 25

1         A    I believe that has been the case since
2    I started as chief operating officer.
3         Q    Okay.  And what form do these meetings
4    take?  Are they over the phone, in person?
5              I know it's changed since the pandemic.
6         A    It varies.  Routinely, for some time in
7    person.  Now in the method that we are using now,
8    that's how they -- they normally would happen.
9         Q    Okay.  And generally how long were
10   these meetings?  I know it varies, but . . .
11        A    Generally 45 minutes or so, but I would
12   be more comfortable saying it varies.
13        Q    Okay.  And did you ever discuss
14   borrower defense with her?
15        A    Yes, we have had that as an agenda item
16   at times.
17        Q    Okay.  And could you tell me when --
18   well, we'll get into that later.
19              Okay.  So could you tell me what your
20   understanding is of Diane Auer Jones' role within
21   FSA?
22        A    I can tell you that Diane Jones
23   controls the policy of the -- policy element of
24   the department, and -- and, therefore, by virtue
25   of that, has a natural relationship with Federal

Page 26

1    Student Aid that -- that executes policy.
2            And, so, that is how I understand her
3    relationship.  She is delegated the duties of the
4    oversight of FSA from the secretary specifically
5    as it relates to policy.
6       Q    Okay.  And you mentioned -- how often
7    do you meet with not Diane Auer Jones, but members
8    of her team?
9       A    I didn't mention meeting with members
10   of her team.
11      Q    Oh, do you -- do you meet --
12      A    I don't believe --
13      Q    -- with members of her team?
14      A    I do not.
15      Q    Okay.
16      A    I don't meet with members of her team,
17   so no.
18      Q    Okay.  What is your understanding of
19   Ms. Nevin's role within FSA?
20      A    Do you mean Colleen Nevin?
21      Q    Yes.
22      A    Colleen Nevin is the leader of the
23   policy defense team.
24      Q    And does she have a policy role?
25      A    Federal Student Aid does not do policy,

Page 27

1    so no one at Federal Student Aid has a policy
2    role.
3       Q    Okay.  Would you say she does
4    operations, then?
5       A    I would say that everyone at Federal
6    Student Aid does operations.
7       Q    Okay.  And how often do you meet with
8    Ms. Nevin?
9       A    It varies.
10      Q    Okay.  At a minimum, how often do you
11   meet with her?
12      A    Again, I say it varies because I've
13   been the chief of Federal Student Aid since March
14   of 2019, and that varies.  Sometimes I have not
15   met with her on a weekly basis; sometimes I have.
16   It just depends on what things are -- what's going
17   on again and what the issues are.
18           So, you know, I -- if you said you --
19   your question to me was at a minimum if it was
20   weekly.  If I think of that whole period of time,
21   I would still come back to it varies because I
22   can't tell you that more times than not I met with
23   her at least a week -- once a week.  I don't know
24   that to be true.
25      Q    Okay.  Let's say when you started in

Page 28

1    March, how often were you meeting with her in,
2    let's say, the first two months that you were COO?
3       A    Within the first month that I was COO,
4    I met with members of the borrower defense team
5    almost daily because of my interest in the
6    borrower defense issues or my education on the
7    borrower defense issues.
8       Q    Okay.  And what -- what was interesting
9    to you about -- when you say you're interested in
10   borrower defense issues, what do you mean?
11      A    I was interested in the process of
12   borrower defense, the status of borrower defense,
13   our portfolio in borrower defense.  I was
14   interested in it as the chief operating officer
15   because that became the operations of the
16   organization and became my responsibility and that
17   was a part of it.  I had not been exposed to it as
18   the senior advisor.  So that, amongst other
19   issues, I emerged myself into.
20      Q    And was there anything when you started
21   that concerned you about borrower defense?
22      A    The number of cases concerned me, and
23   the amount of staffing available to do those cases
24   concerned me after I became educated on those
25   facts.

Page 29

1       Q    Okay.  And, specifically, what do you
2    mean by the number of cases?
3       A    What I mean is just that; that there
4    were a lot of cases and that represented workload.
5    And as an operating -- a chief operating officer,
6    I would immediately go to "are we sufficiently
7    staffed to do a workload of that -- of that
8    level."  That's what I mean by number of cases.
9       Q    Okay.  And when you started when you
10   were meeting with Ms. Nevin, how did -- why did
11   you understand there to be so many cases?
12      A    Because the borrower defense team
13   showed me the number of cases that they had and
14   the history of the cases, how long they had had
15   them and the history of borrower defense.  And,
16   so, it was very obvious that there were
17   significantly more cases than there had ever been
18   in the history of borrower defense.
19      Q    Right.
20           I meant and why did you understand that
21   to be the case?  What was the reason that there
22   are so many cases?
23           MR. HANCOCK:  Objection: vague.
24   BY MS. TORCHIANA:
25      Q    Okay.  All right.  We'll get into that

Page 30

1   later.
2           Okay.  And is there anyone who reports
3   to you?  Or who reports to you?
4       A    So the way my organization is
5   organized, I have five deputy chief operating
6   officers; all report directly to me.  And other
7   than that, it would be my administrative office
8   that would be in the front office kind of folks,
9   but those are the folks that report to me.
10      Q    Okay.  And could you give me the names
11  of those five deputy chief officers?
12      A    Today -- as of today, those names are
13  Robin Minor, who is the deputy chief operating
14  officer of partner participation and oversight;
15  Dave Albers who is a deputy chief operating
16  officer for strategic planning; Joe Lindsey, who
17  is a principal deputy chief operating officer;
18  Chris Greene, who is a deputy chief operating
19  officer for student engagement and aid delivery;
20  and Colleen McGinnis, who is the deputy chief
21  operating officer for internal controls and those
22  kinds of issues.  And that should make up the five
23  unless I dropped off a name.
24      Q    And are there reports about your
25  performance?

Page 31

1       A    Pardon me, ma'am.  Could you repeat
2   that question, please?
3       Q    Are there reports about your
4   performance?
5       A    Mine, personally?
6       Q    Uh-huh.  Yes.
7       A    Yes, I'm accountable for my performance
8   and there's an annual report.
9       Q    Okay.  And who prepares those reports?
10      A    Who prepares them?  The -- ultimately
11  the secretary of education approves my final
12  report.  I prepare input for that report if that's
13  your question, and I send that input to the deputy
14  under secretary.
15           Was that your question?
16      Q    Yes.
17           And are there any metrics by which your
18  performance is evaluated that you know of?
19           MR. HANCOCK:  Objection: exceeds the
20  scope of the court-ordered discovery.
21           BY MS. TORCHIANA:
22      Q    Well, do you know is anything about
23  borrower defense taken into account in your
24  performance metrics?
25      A    We have many performance metrics in the

Page 32

1   Office of Federal Student Aid if -- if that's your
2   question, and borrower defense has -- has metrics
3   inside of Federal Student Aid.  We're a
4   performance-based organization and by virtue of
5   that, we're a metric of which borrower defense is
6   one.
7       Q    Sorry.  You're cutting out a little
8   bit, but -- but I think I -- I understood that.
9       A    I'm sorry.
10      Q    Okay.  And have you ever been advised
11  to improve your performance as it relates to
12  borrower defense?
13           MR. HANCOCK:  Objection: exceeds the
14  scope of the court-ordered discovery.
15           MS. TORCHIANA:  Okay.  I would say it's
16  pretty relevant, but we can move on for now.
17           BY MS. TORCHIANA:
18      Q    And do you evaluate anyone?
19      A    I -- I ultimately evaluate the five
20  deputy chief operating officers that report to me
21  directly and those inside of my front office.
22      Q    Okay.  And are those formal reviews?
23      A    Yes.  Yes, they have -- they have
24  annual -- we are still a government agency, and so
25  at the end of a reporting period, at the end of a

Page 33

1   fiscal year, we have an end-of-year evaluation
2   done on employees.
3       Q    Okay.  Okay.  And if you could turn to
4   paragraph 3 of your declaration.  You say here
5   that you oversee the management of FSA.
6           Could you explain in more detail how
7   that relates to your work with the borrower
8   defense unit or with borrower defense generally?
9       A    As I stated earlier, I have five deputy
10  chief operating officers.  One of them that I
11  named was Ms. Robin Minor, who is the deputy chief
12  operating officer for partner participation and
13  oversight.  One of Ms. Minor's organizations
14  underneath her as partner participation and
15  oversight is the borrower defense unit.  And, so,
16  in this -- in regards to your question, I manage
17  the deputies who, in turn, manage subordinate
18  units, and one of the subordinate units inside of
19  partner participation and oversight is the
20  borrower defense unit.
21      Q    Okay.  Okay.  And would you say of the
22  five deputies that you oversee, is Robin Minor the
23  only one who works with the BDU; is that true?
24      A    I -- I didn't say that, and it would be
25  difficult to say that.  I -- I wouldn't say that

Page 34

1  because things could go around for, you know,
2  different parts of the organization, so I -- I
3  won't say that none of the other organizations
4  work with the borrower defense unit.  I can only
5  say that they report to Robin Minor.
6      Q    Okay.  The BDU reports to Robin Minor?
7      A    That's correct.
8      Q    You say here -- we've talked about this
9  a bit.  You say here, Federal Student Aid is an
10  apolitical, performance-based organization.
11          Could you tell me a little bit more
12  about what that means?
13      A    That means that we go across -- we
14  don't change in or out based on political
15  appointments; that we go across administrations.
16  Much like the careers of public servants, we -- we
17  don't attribute or work toward any political end.
18  We work toward the execution of whatever
19  legislation and authorities that we are given
20  without regard to political affiliations.
21      Q    Okay.  And on that subject, how is your
22  compensation related to your performance?
23          MR. HANCOCK:  Objection: exceeds the
24  scope of the court-ordered discovery.
25  BY MS. TORCHIANA:

Page 35

1      Q    Okay.  How does your compensation
2  related to processing borrower defense claims?
3          MR. HANCOCK:  Objection: exceeds the
4  scope of the court-ordered discovery.
5  BY MS. TORCHIANA:
6      Q    You can still answer unless your
7  counsel instructs you not to.
8          MR. HANCOCK:  The witness may answer.
9          THE WITNESS:  I'm sorry.  I couldn't
10  hear the counsel.  Say that again?
11          MR. HANCOCK:  The witness may answer.
12          THE WITNESS:  How does my -- could you
13  repeat the question again?  I'm sorry.  I got
14  caught up in the --
15  BY MS. TORCHIANA:
16      Q    I said how -- how is your compensation
17  related to processing borrower defense
18  applications?
19      A    Well, my compensation is not related to
20  processing borrower defense applications.  It's
21  a -- I'm a -- there is no relationship that I'm
22  aware of.
23      Q    Okay.  And when you started at FSA in
24  March 2018 -- 2019, sorry, what were your
25  understandings of the goals and priorities of FSA?

Page 36

1      A    When I started at Federal Student Aid?
2      Q    Well, as COO.
3      A    As COO?
4      Q    Uh-huh.
5      A    When I started at Federal Student Aid
6  as COO, I was not clear on what the goals and
7  objectives of Federal Student Aid was at the time,
8  so I couldn't -- if you were to ask me what were
9  they -- which I think you're asking me what were
10  the goals and objectives of Federal Student Aid in
11  March of 2019, I was not given a set of goals and
12  objectives in March of 2019.
13      Q    Okay.  So when you started -- so when
14  you started, it was not clear to you that FSA had
15  any goals?
16      A    That's not what I said.  No, what I --
17  I thought what you said was what were the goals
18  presented to me when I started at my job as the
19  chief operating officer at Federal Student Aid.
20          Is that your question or --
21      Q    Yes.  What were the goals and
22  priorities that were presented to you that FSA
23  had?
24      A    So my answer is that there were no
25  goals or priorities presented to me when I started

Page 37

1  the job as chief operating officer of Federal
2  Student Aid.  I -- I read the strategic plans of
3  Federal Student Aid to -- to learn what the -- the
4  goals and objectives had been across several years
5  and found them to be broad.
6      Q    Okay.  And did you -- when you started,
7  did you meet with anyone, you know, for example,
8  who onboarded you and explained to you the
9  direction that FSA wanted to go in?
10      A    So I did not go through a formal
11  onboarding process at Federal Student Aid.  My --
12  I simply started in March of 2019 and onboarding
13  of myself.
14      Q    Okay.  And what did you see as the
15  goals and priorities of FSA?
16      A    I -- I believe we needed -- broadly, we
17  needed to be a student center and responsive, and
18  we needed to deliver on a large transformational
19  objective which was called the next generation of
20  Federal Student Aid.
21      Q    Okay.  And when you joined, did you
22  know that the Department of Education had not
23  issued any borrower defense decisions since
24  June 2018?
25      A    I knew what I had read in the media.  I

Page 38

1   had not been educated on borrower defense cases
2   until after I joined.
3       Q     Okay.  And was this something that you
4   discussed with your colleagues at FSA?
5       A     As the chief operating officer, I
6   really only have subordinates inside of Federal
7   Student Aid.  I don't actually have what you would
8   consider, I believe, colleagues or peers.  So as I
9   said earlier, I educated myself on borrower
10  defense amongst other things as a part of my
11  immersion into the organization.
12      Q     Okay.  And did you discuss -- when you
13  joined, did you discuss the fact that the
14  department hadn't issued any borrower defense
15  decisions since June 2018 with any of your
16  subordinates?
17      A     When I became the chief operating
18  officer in March of 2019, I met with all four
19  parts of Federal Student Aid, one of which was
20  partner participation and oversight in the
21  borrower defense unit in which the borrower
22  defense unit educated me on the history of
23  borrower defense and where it was, and that
24  included the status which included the fact that
25  borrower defense issue -- borrower defense cases

Page 39

1   had not been issued for some time.
2       Q     Okay.  And who are those discussions
3   with?
4       A     While I don't recall all the names --
5   because, you know, there are more of the names --
6   I do recall that, at that time, the current
7   borrower defense leader was the borrower defense
8   leader at that time.  So Colleen Nevin was -- was
9   in charge of the borrower defense unit at that
10  time and remains so, and Robin Minor was moving
11  into her job that I have her in now, so she was
12  included in that.
13            Off the top of my head, those are the
14  only names that I can recall.  There were likely
15  others, but I don't recall all of their names.
16      Q     Okay.  And did they express any
17  concerns to you about that ED hadn't issued any
18  borrower defense decisions?
19      A     We went through a number of concerns
20  and issues, and as you would expect, we explored
21  the entire process of borrower defense and all of
22  the issues and all of the concerns and where we
23  needed to go to be productive.  It was a dialogue.
24  It was a -- it was a conversation and mainly
25  intended to educate me on the program.

Page 40

1       Q     Okay.  And did you discuss -- when you
2   started, did you discuss that ED hadn't issued any
3   decisions since June 2018, did you discuss that
4   with anyone at the Department of Ed?
5       A     When I met with partner participation
6   and oversight, this element of partner
7   participation and oversight which was the borrower
8   defense team, we did discuss the status of
9   borrower defense cases which included what I will
10  call a backlog and need to clear up backlog.
11            And at that time, those issues that
12  were beyond me or that where I needed clarity, I
13  would discuss them, and I would discuss them with
14  the Department of Ed, if necessary.
15      Q     Okay.  And you said earlier that you
16  met with the secretary of education regularly.
17  When you first joined, did you -- did you meet
18  with her?
19      A     I'm -- I'm sorry.  Your voice went away
20  there toward the end.  I heard your first part,
21  but I didn't --
22      Q     Yeah.  I said earlier you said that you
23  met with the secretary of education regularly.
24  When you joined in March 2019, did you meet with
25  her?

Page 41

1       A     I -- I don't know if I met in the month
2   of March, but I had a routine meeting with her
3   every two weeks, and so possibly one in March
4   depending on that -- that date, and then on -- on
5   pretty much that rhythm of every two weeks having
6   time with the secretary.
7       Q     Okay.  And at those meetings, did you
8   ever discuss that no borrower defense decisions
9   had been issued since June 2018?
10      A     At those meetings -- and I cannot
11  recall each time -- I don't recall -- I certainly
12  don't recall March and April meetings
13  specifically.
14            Over the course of the times that I was
15  attending meetings with the secretary of Ed, I had
16  discussed borrower defense.  I have discussed the
17  status of it.  I routinely talk about it as a
18  backlog.
19      Q     Okay.  And did you discuss the pace of
20  decisions with the secretary of education?
21      A     Details of that level, I don't recall
22  going into those kinds of details, per se, with
23  the secretary.  I would have done that probably at
24  the under secretary level.  But, frankly, I don't
25  recall, you know, the specific conversations.

Page 42

1  Q    Okay.  But you did speak about the pace
2  of decisions with Diane Auer Jones, or you do
3  remember that?
4       A    No, I -- I have not -- while you have
5  used the term "pace of decisions," I have not used
6  that term because I don't remember having a
7  discussion about pace of decisions.
8            I -- I remember having a discussion
9  about the backlog as it related to borrower
10  defense and as an operating officer the desire to
11  get after that issue from a production
12  perspective.
13           I don't remember ever using or -- or
14  having a discussion specifically about the pace of
15  decisions.
16      Q    Okay.  Sure.  So did you speak about
17  the backlog with Diane Auer Jones when you joined?
18      A    I -- I did.
19      Q    Okay.  And how often would you -- how
20  often would that come up?
21      A    Again, that -- that varies.  Understand
22  that I had all of Federal Student Aid, and so it
23  may have been one of several topics at times when
24  I spoke with her.  I -- I could not tell you
25  specifically how often I spoke to her about

Page 43

1  borrower defense and -- and backlogs.
2            I -- I don't know.
3       Q    Okay.  And do you remember what she
4  communicated with you about why there was a
5  backlog?
6       A    I -- I remember that the -- when I
7  initially started that the borrower defense team
8  believed that they had guidance not to move any
9  additional decisions on borrower defense; that
10  they should be adjudicating them.
11           I remember that that was not clear from
12  the department and from under secretary Jones at
13  the time that they had issued that -- that
14  guidance in that manner.  I would call that
15  confusion, confusion on what was to be done and
16  what was communicated.  I do remember that.
17      Q    Okay.  And when you say guidance, how
18  do you mean exactly?  Was that, you know, formal
19  guidance that was written up, or what -- what do
20  you mean by guidance?
21           MR. HANCOCK:  I'm going to object to
22  the extent the question may call for deliberative
23  privileged information.
24           MS. TORCHIANA:  Okay.  Are you
25  instructing the witness not to answer?

Page 44

1            MR. HANCOCK:  No.  General Brown, you
2  may answer.
3            THE WITNESS:  I -- I did not mean
4  either of those.  I meant because guidance can
5  take lots of forms.  It can be verbal or it can be
6  a written decision memorandum.  So I didn't intend
7  to indicate either of those.  I just meant
8  guidance.
9  BY MS. TORCHIANA:
10      Q    Okay.  And what form did that guidance
11  take?
12      A    I think there was -- when I first
13  started in March of 2019, I think there was no
14  specific guidance.  There was confusion.  And,
15  so -- and that's why I didn't indicate written
16  or -- or verbal.  At the time -- at the initial
17  time, I don't believe there was clarity on either
18  of those.
19      Q    Okay.  You did say there was guidance
20  not to issue any decisions when you started; is
21  that right?
22      A    That's not right.  I -- I said that the
23  borrower defense team believed that they had
24  guidance not to issue decisions.  That's what I
25  said.

Page 45

1            There was not -- they didn't have a
2  written document or some memorandum telling them
3  that.  That's from my -- them educating me on
4  borrower defense cases.  They believed that they
5  had that guidance.
6       Q    Okay.  And why did they believe that
7  they had that guidance?
8       A    I can't speculate as to -- as to why.
9  I don't know what their -- what their -- what
10  their thoughts internally were.  I believe when
11  the Manriquez case had been launched that they
12  believed that stopped them from doing anything
13  further in terms of issuing decisions, and they
14  continued to adjudicate and did not issue
15  decisions.
16      Q    Okay.  And why do you think they
17  believed -- where did that belief come from?  Was
18  it -- you know, obviously it didn't fall from the
19  sky.
20           Who -- what -- why do you think they
21  understood that the Calvillo injunction meant they
22  couldn't issue decisions?
23           MR. HANCOCK:  Objection: vague.
24  BY MS. TORCHIANA:
25      Q    You can still answer.

Page 46

1    A    I -- I don't know.  As I said earlier,
2 I would classify it as confusion because I -- I
3 don't know why they -- why they thought that.
4    Q    Okay.  So was the stoppage a concern
5 when you joined or, you know, you . . .
6         MR. HANCOCK:  Objection.  Potentially
7 calls for deliberative information.
8         MS. TORCHIANA:  The witness can still
9 answer.
10        THE WITNESS:  I was just trying to make
11 sure I understood your question.  I didn't know if
12 you were through with your question.  You said was
13 this guidance a concern.  For -- for me when I
14 started?
15    BY MS. TORCHIANA:
16   Q    When you started, was it a concern that
17 no decisions had been issued?
18   A    When I started, the overall backlog in
19 production, borrower defense processes and system
20 were a concern to me because of -- of -- as I said
21 earlier, the sheer volume and the fact that they
22 were not moving.
23        And, so, not just -- not just the fact
24 that the decisions weren't going out, but that the
25 methodology and other things needed to be known so

Page 47

1 that we could move on with the cases.
2         So I would -- I would say borrower
3 defense as a whole was a concern for me when I
4 started in March of 2019.
5    Q    Okay.  And did you take any -- what
6 steps did you take about the backlog when you
7 started?
8    A    Specifically, and through -- through
9 the deliberation with the team, I concluded that
10 we needed more people.  Specifically, we needed
11 more attorneys and we needed more financial
12 resources if we were to fix the systems that --
13 that manage, collect, case management systems that
14 support the team.  And, so, as the operating
15 officer, I went about focusing on -- on that and
16 fixed it in the next several months.
17   Q    Okay.  So when you say "fixed it," what
18 do you mean?
19   A    Hire attorneys, recruit, hire, bring on
20 board attorneys so that there would be more hands
21 doing the work.
22   Q    Okay.  And do you know --
23   A    Secure the financial resources --
24 secure the financial resources necessary to
25 upgrade and fix the systems that those -- that

Page 48

1 borrower defense cases would be -- would be
2 managed by.  That's when I use the term "fix it."
3 To answer your question, that's what I mean,
4 getting those -- getting those things in place so
5 that this process could start moving.
6    Q    Okay.  And do you know -- we'll discuss
7 this more later, but do you know -- had there been
8 any staff requests for the BDU before you joined?
9    A    I -- I actually don't know if there had
10 been more staff requests for BDU before I joined
11 because I would not have necessarily seen those.
12   Q    Okay.  And how many -- how many staff
13 people were working at the BDU when you joined?
14 Do you remember?
15   A    I -- I don't know precisely, but it
16 was -- in terms of attorneys, I would say probably
17 10 to 12 at the most.
18   Q    Okay.  And how many staff people did
19 you estimate were needed to clear the backlog?
20   A    So estimate being the correct term,
21 I -- I did not estimate.  I -- I went to the
22 borrower defense team and worked with them to see
23 what they thought they needed based on the --
24 based on the caseload.  I can't tell you about
25 their internal workings.  I don't -- I don't know

Page 49

1 that, but collectively I do know we came out to a
2 number of something around 60 -- we needed
3 somewhere in that amount of attorneys in order to
4 have people to adjudicate what was a growing
5 backlog of cases, but I don't know how much -- I
6 could not tell you today that that was some
7 scientific equation.  I can tell you it was the
8 internal workers of BD team as you would go to
9 your experts and ask about what do we need to --
10 to tackle this issue.
11   Q    Okay.  And did you make any requests to
12 hire more staff for the BDU?
13   A    I did.
14   Q    Okay.  And when -- when was the
15 first -- or just how many times did you make --
16 did you request?
17   A    I don't know.  I don't know how many
18 times I -- I made a request.  I just know that my
19 request was approved.  I believe it was approved
20 the first time I asked, so I don't know that there
21 were more than one -- there was more than one time
22 that I had to ask.
23   Q    And when was the first time you asked?
24   A    Shortly after taking over, but I -- but
25 I can't tell you the exact time, but it was

Page 50

1   shortly after taking over, shortly after I had
2   been educated on the process of borrower defense
3   and -- and what we needed.
4        Q    Okay.  And who -- who did you -- when
5   you made a request to hire more staff, who did you
6   make that request to?
7        A    I -- made it through our HR system.
8   I made it verbally to the under secretary, and I
9   made it to the secretary verbally.  And that's
10  what I'm calling the request.  In other words, it
11  was all the same one; right?  I was verbally
12  saying I would like to hire more people in order
13  to address the backlog.
14       Q    And do you have an estimate -- I know
15  you said you don't remember, but do you have a
16  rough estimate of when that was?
17       A    I do not other than what I just said,
18  which is shortly after I took over.
19       Q    Okay.  So sometime in the spring of
20  2019?
21       A    Yes, and -- and I would just emphasize
22  that that's rough.  I don't have a -- I can't -- I
23  can't tell you the exact -- I can't tell you the
24  exact time.  I just simply don't recall that exact
25  time.

Page 51

1        Q    Okay.  And when you made those
2   requests, how did -- for instance, how did the
3   secretary respond?
4        MR. HANCOCK:  Objection: calls for
5   deliberative information.
6        MS. TORCHIANA:  Are you instructing the
7   witness not to answer or --
8        MR. HANCOCK:  I am.
9        MS. TORCHIANA:  Okay.
10  BY MS. TORCHIANA:
11       Q    Okay.  And, generally, how -- when you
12  made those requests, what was the response?
13       A    Yes.
14       Q    Okay.  And do you know before -- you
15  said you don't remember, but what was your
16  understanding of why -- why there wasn't more
17  staff at the BDU?
18       A    I -- I didn't have an understanding of
19  why.  You know, historically, I just wouldn't -- I
20  don't know.  I wasn't -- you know, the borrower
21  defense unit is several years old.  They precede
22  me by several years, and I just don't know what
23  the -- you know, what all the deliberations were.
24       I think, as with most federal agencies,
25  you make decisions on resources and dollars and

Page 52

1   budget, and that normally drives hiring practices,
2   but I don't know what the decisions were prior to
3   March 2019.
4        Q    Okay.  And do you know if there had
5   been any requests for more staff?
6        A    I -- I do not know.  I would have no
7   firsthand knowledge of that.  I'd only started
8   working with issues related to borrower defense
9   March of 2019.  Prior to that, I did not have any
10  relationship with the borrower defense unit.
11       Q    Okay.  Before, when you were a senior
12  advisor and working on human capital management
13  which started in October of 2018, did you have
14  any -- any work relating to hiring for the BDU?
15       A    Again, I was dealing with the speed at
16  which we hire, not -- and there's a nuanced
17  difference here, I think, in your question and
18  what I did.  My job is about process improvement.
19  Why does it take long -- too long to hire a person
20  into -- why did it take too long to recruit them
21  or go find an expertise.  I wasn't dealing with
22  this section or that section, use this person or
23  that person.  I was looking to implement the
24  processing improving, and I don't remember any
25  conversations specifically about borrower defense.

Page 53

1        Q    Okay.  So when you were a senior
2   advisor before you were COO, you hadn't heard of
3   any issues with staffing the borrower defense
4   unit?
5        A    I don't -- I don't recall any
6   discussions about borrower defense group with me,
7   at least, before I became COO.  Our -- our
8   questions were about the process, as I just said,
9   that's required for hiring, the process.
10       Q    So if you could turn to -- still in
11  tab 25, if you could turn to paragraph 4 of your
12  declaration.
13       It says, Among FSA's responsibilities
14  is to make decisions on applications.
15       Could you tell me a bit about what that
16  means in terms of your -- your role?
17       A    One -- one minute, please, if I could
18  read it.
19       (Witness reviews document.)
20       So if -- if I could just make sure I
21  understand your question, what that means as it
22  pertains to my role as the chief operating
23  officer?
24       Q    Uh-huh.  Yes.
25       A    So the responsibilities of Federal

Page 54

1  Student Aid includes borrower defense, and -- and
2  my role as chief operating officer is to ensure
3  that borrower defense have what they need to do
4  the responsibilities that are outlined here.
5  That's my role.  So by law, by legislation, they
6  execute the laws of the borrower defense that
7  are -- that are legislated.
8          My role as the chief operating officer
9  is to ensure that they have the resources, the
10  talent and the time to -- to do that so that they
11  can do it effectively.  I don't -- I don't
12  adjudicate cases.  I'm not -- I'm not an attorney.
13  That's my role.
14      Q     Okay.  And do you have any authority to
15  decide or approve an individual borrower defense
16  application?
17      A     Not that I'm aware of, certainly not in
18  a priority that I have ever even contemplated.
19  I'm not an attorney.
20      Q     Okay.
21      A     Nor am I a borrower defense expert.
22      Q     Okay.  And who at the department would
23  you say has that authority to decide an individual
24  application?
25      A     To -- you mean to decide if it has met

Page 55

1  the criteria for -- for meeting the criteria for
2  borrower defense?
3      Q     Yes.
4      A     While -- while I don't pretend to know
5  all of the internal workings of the borrower
6  defense unit, those authorities are that of the
7  borrower defense unit and within it, they have
8  been delegated down to attorneys who are guided by
9  the law, yet they have a review process within
10  borrower defense.
11          And, so, what I -- what I would say is
12  the authority to do those determinations as you
13  would expect are given to an attorney trained in
14  the business of borrower defense.
15      Q     Okay.  Okay.  If you could now turn --
16  we'll get back to your declaration, but if you
17  could turn to tab 29, and if you could turn to --
18  oh, I'll wait for you to have that in front of
19  you.
20      A     Tab 29, it says Exhibit 10.
21      Q     Yes, that's right.  And if you could
22  turn to page 16.
23      A     I'm on page 16.
24      Q     Okay.  Have you seen this chart before?
25      A     Could I have a minute to look at it,

Page 56

1  please?
2      Q     Yeah.
3          MS. TORCHIANA:  And could we also mark
4  this as Exhibit 29 -- or, sorry, 20- -- are we at
5  26?
6          (Deposition Exhibit 26 was marked for
7  identification and attached to the transcript.)
8          MR. HANCOCK:  Claire, just to make sure
9  I'm looking at the right page, when you say
10  page 16, are you referring to the ECF stamp at the
11  top of the document?
12          MS. TORCHIANA:  Yes.  Yeah.
13          MR. HANCOCK:  Thank you.
14          THE WITNESS:  (Reviews document.)
15          I have not seen this chart before.  I
16  believe it may precede my time as the chief
17  operating officer.
18  BY MS. TORCHIANA:
19      Q     Okay.  Do you know -- is this -- would
20  you say that this is an accurate representation of
21  how operations are run?
22      A     So I can't say that if you are talking
23  about -- and maybe you can help me with the
24  question here.  Do you mean how operations run for
25  borrower defense today or since March of 2019?

Page 57

1          Is that your question?  How is there --
2      Q     Since March 2019, yeah.
3      A     So this chart, as I said, obviously
4  predates me, and it is not a representation, I
5  think, of how borrower defense works from the time
6  that I was there.  I -- I don't know how it worked
7  in 2017, and still I don't know about the accuracy
8  of this chart from the time that it was written.
9      Q     Okay.  Okay.
10          MS. TORCHIANA:  Could we go off the
11  record and take a quick break?
12          MR. HANCOCK:  Sure.  That would be
13  fine.
14          THE VIDEOGRAPHER:  Okay.  We're now
15  going off the record.  The time is 16:16 UTC time.
16          (Recess -- 11:16 a.m.)
17          (After recess -- 11:30 a.m.)
18          THE VIDEOGRAPHER:  We're now back on
19  the record.  The time is 16:30 UTC time.
20          MR. HANCOCK:  And sorry to interrupt,
21  Claire.  I just want to ask one clarifying
22  question about the current exhibit we're working
23  with, and maybe you're planning on moving on from
24  the chart, but I just wanted to note that the
25  electronic version for those of us using Dropbox

Page 58

1    is oriented sideways, and I -- I don't -- maybe
2    the option exists, but I don't see a way to kind
3    of orient it horizontally, so this --
4             MS. TORCHIANA:  Okay.
5             MR. HANCOCK:  I know General Brown
6    doesn't have that issue since he is using a hard
7    copy, which is great.
8             MS. TORCHIANA:  Right.  Okay.  Yeah,
9    thanks for noting that.
10            MR. HANCOCK:  Okay.
11   BY MS. TORCHIANA:
12        Q    We're going to move on from that
13   exhibit.
14            Mr. Brown, I have a couple of follow up
15   questions from some things that we talked about
16   before.  You mentioned that you meet regularly
17   with Secretary DeVos.  Are there generally agendas
18   for those meetings?
19        A    There are generic agendas that -- that
20   talk about how long we will meet, and I think -- I
21   don't prepare the agendas.  My -- my staff does,
22   so I can't -- I can't tell you, you know, what
23   goes on them other than the time, how long we
24   should expect to be there, and I'm not certain if
25   it -- if the actual topics are on those agendas or

Page 59

1    not.
2         Q    Do you read the agendas before you meet
3    with her?
4         A    I know what topics I'm going to talk
5    about, and I don't necessarily look at the
6    physical agenda itself.  The secretary -- the
7    secretary or administrative help sends that, but I
8    know what topics I'm going to discuss.
9         Q    Okay.  And how do you know what topics
10   you're going to discuss with her?
11        A    Because I decide them.
12        Q    Okay.  And do you take notes during
13   those meetings?
14        A    I -- I do not.  Routinely, I do not.
15   I'm not -- I'm not a great note taker.
16        Q    Okay.  Does anyone else take notes
17   during those meetings?
18        A    Not -- not to my knowledge.
19        Q    And when -- when did you first meet
20   with Secretary DeVos?
21        A    I -- I don't -- I don't recall exactly
22   the very first time I met with her, but in general
23   since becoming the -- the chief operating officer,
24   I have met with her about every two weeks, and so
25   it was likely the -- toward the end of March when

Page 60

1    I probably had the first meeting, I would imagine.
2         Q    Okay.  And do you know whether she was
3    meeting regularly with your predecessor?
4             MR. HANCOCK:  I'm going to --
5             THE WITNESS:  I would not know.
6             MR. HANCOCK:  -- object.  That's
7    exceeding the scope of discovery.
8    BY MS. TORCHIANA:
9         Q    You can still answer.
10        A    I would not know.  I don't know.
11        Q    Okay.  And how do you communicate with
12   Ms. Diane Auer Jones?
13        A    How do I communicate with her?
14        Q    Uh-huh.  Yes.
15        A    So for -- just in general, you mean,
16   or --
17        Q    Yeah.
18        A    -- how do I -- how do I --
19        Q    For example, do you ever --
20        A    So when --
21        Q    Do you ever text with her?
22        A    No, ma'am, I don't text with very many
23   people at all.  I -- I pick up the phone and call
24   her.  I might have a meeting in person with her
25   before we went into the Covid-19 situation.  And

Page 61

1    since that time, it's been a virtual meeting or
2    a -- or a phone call.  I don't -- I don't text
3    very much.
4         Q    Okay.  And do you send any emails to
5    each other?
6         A    We -- yes.  Emails go back and forth
7    around Federal Student Aid for various reasons,
8    yeah.
9         Q    Okay.  And earlier you said that when
10   you started at Federal Student Aid, you weren't
11   aware of any goals or priorities that FSA had?
12        A    No, ma'am.  What I said was that -- if
13   I understood your question right, you said what
14   was presented to me as the goals of Federal
15   Student Aid when I became the chief operating
16   officer.  I thought I understood that to be your
17   question before.
18            And what I -- what I said was nothing
19   was presented to me, per se.  I looked at the
20   strategic plans and those kind of things to see
21   over the years what had been the goals and
22   objectives of Federal Student Aid.
23        Q    Okay.  And what -- do you know when the
24   strategic plan was developed?
25        A    So we have a legislative requirement to

Page 62

1    develop a strategic plan every five years and to
2    update it every year, and when I took office, we
3    were developing the strategic plan that would be
4    done for the five years which is one reason why
5    objectives and goals were all being made as I --
6    as I took the office.  It was good timing.
7         And, so, the last one that we did was
8    completed a couple of months ago and represented,
9    you know, what we -- what we believed to be our
10   goals and objectives.
11        Q    Okay.  And what -- and what did you set
12   as the major goals and objectives?
13        A    So there are over -- there are five
14   major objectives, I believe, but there's lots of
15   key performance indicators in there.  And by that,
16   I mean lots, like, over 40 that support those
17   various -- various goals.  And I would have to,
18   you know, have the plan before me to perfectly
19   recite them to you, but we have, like, five major
20   objectives in -- in broad categories with lots of
21   performance -- what you would find in any
22   strategic plan, with lots of performance
23   indicators and those kinds of things in it.
24        Q    Okay.  Are there any -- did you
25   formulate the performance objectives for FSA in

Page 63

1    that plan?
2         A    So if I understand you right, are you
3    saying did I do it?  It's a -- the way the
4    strategic plan is built is a significant effort.
5    It's a very large effort, so I don't do it, per
6    se, by -- I don't say, here, this will be our
7    objectives and these will be our goals.  There's
8    employee input.  There's public comment.  There's
9    legislative requirements.  There's staffing.
10   There's a public comment period that lasts 90
11   days.
12        And, so, all of these things culminate
13   in what we settle in on as the goals and the
14   objectives for Federal Student Aid because it's
15   not ours.  It's the public's.
16        And, so, that's how -- that's how the
17   strategic plan is -- is formulated in -- in
18   general context.
19        Q    Okay.  Okay.  Could you turn to
20   Exhibit 31 in your binder or in your printout?
21        MS. TORCHIANA:  And for those on
22   electronic copies, it's 31 FSA 2020 Annual Report.
23        BY MS. TORCHIANA:
24        Q    Could you turn to page 91?
25        A    (Witness reviews document.)

Page 64

1         Yes, ma'am, I have it.
2         Q    Okay.  And do you see table 37 at the
3    top of the -- of the page?
4         A    Yes.
5         Q    Okay.  And, so, I see here -- so there
6    are target metrics for the number of BD
7    applications adjudicated for fiscal year 2020.
8         A    Uh-huh.
9         Q    And who -- who set that target number?
10        A    So, ma'am, you're looking at table 37,
11   and you're looking at the fiscal year 2020
12   category?
13        Q    Yes.
14        A    And you're looking at the target of
15   150,000 and the actual of 160,000?
16        Q    Yeah.
17        And who set that target number?
18        A    Like I was saying earlier, this -- this
19   annual plan is -- is essentially an output of the
20   strategic plan, and so when you see numbers and --
21   and targets and goals, it's the collaborative
22   effort of the subject matter experts and their
23   view of what's achievable, what they have
24   resources for, so it's a deliberative process.
25        So if your answer is who, I could

Page 65

1    not -- I could not give you a specific person.  I
2    could only tell you the process that it comes out
3    of -- that comes out of it.  That's how it's
4    derived.
5         Q    Okay.  Did you have to approve this
6    number?
7         A    Not the specific number.  I approve the
8    plan, and I take accountability for all of the
9    numbers that are -- that are in here because I --
10   I'm responsible for the process itself that --
11   that produces the numbers.
12        Q    Okay.  And do you know when this target
13   was set approximately?
14        A    I do not because the strategic planning
15   process goes over the course of a -- of a year, so
16   when this specific target was set, I actually -- I
17   don't know.  Because it is a fiscal year 2020
18   goal, I've got to believe it was sometime in that
19   fiscal year, but I can't tell you exactly when it
20   was set.
21        Q    Okay.  And do you know when -- when
22   discussions started about setting -- setting these
23   target numbers for fiscal year 2020?  Do you
24   remember having discussions about that?
25        A    I remember having discussions about the

Page 66

1   strategic plan and making sure we had measurable
2   objectives and those kinds of things, but because
3   this is one part -- and I -- and I think as you
4   can see, of an almost 300-page document, the --
5   the actual targets for each particular group --
6   and, remember, this group is at least two layers
7   removed from me -- those -- those are derived up
8   over time.
9           So I could not tell you exactly when
10  or, you know, exactly who because -- because
11  that's how it works.  It works as a -- as a
12  collaborative -- collaborative document.
13      Q    Okay.  And who do you think -- who do
14  you think might have set those numbers?  Who would
15  you -- yeah.
16      A    Who do I think?
17      Q    Who do you think may have set those
18  numbers -- those target numbers?
19      A    So I would -- I would just clarify that
20  I don't know who set these numbers.  The -- the
21  borrower defense unit is inside of our partner
22  participation and oversight organization, and the
23  partner participation and oversight organization
24  would be a part of that process.  But the subject
25  matter expertise, very much like I noted on how

Page 67

1   many lawyers I needed, the subject lawyer
2   expertise on what production could be done
3   probably starts within the borrower defense unit.
4       Q    Okay.  So do you think someone within
5   the borrower defense unit probably set those
6   target numbers?
7           MR. HANCOCK:  Objection: asked and
8   answered.
9           BY MS. TORCHIANA:
10      Q    You can still answer.
11      A    Again, ma'am, I don't know.  I really
12  don't know.
13          So, you know, again, I can repeat what
14  I just said, is if you look at our organizational
15  chart, this type of work is done inside of the
16  borrower defense unit.
17      Q    Okay.  And do you know when FSA came up
18  with BDU adjudications as a performance metric?
19      A    So I require all -- all elements of
20  Federal Student Aid -- in the March, April, May
21  time frame, I required all elements of Federal
22  Student Aid to be guided by metrics.  So exactly
23  when this particular one came up, I don't know,
24  but it is likely a part of what has been my
25  philosophy since -- since taking over, and that is

Page 68

1   that we need to have measurable results, we need
2   to document them in a plan and we need to work
3   toward them.
4           So I'm assuming -- or I'm sure that
5   this is one of what has been many performance
6   measurements.
7       Q    Okay.  And how did you express to the
8   BDU that they needed to set these target numbers?
9           How did you make that clear to them?
10      A    So we have performance metric meetings
11  as a part of the -- the management and the
12  governance of Federal Student Aid, and -- and one
13  of the parts of that would be the borrower defense
14  unit coming forward, briefing their metrics and
15  briefing their updates.  And for everybody that
16  came before me, I asked them to have long-, mid-
17  and short-term performance metric production
18  goals.
19          When I told -- when we had that
20  particular meeting and when borrower defense got
21  that message, I don't know, but I'm certain they
22  got it from me because I -- I gave that message to
23  the entire organization.  And, so, the entire
24  organization went about developing metrics and
25  measurements and those kind of things for the

Page 69

1   health of the organization and because I think
2   that's what we were legislated to do.
3       Q    Okay.  And when did the BDU start
4   reporting those metrics?
5       A    So when you -- when you say that
6   they -- when did they start -- you mean when did
7   we have metric meetings as an organization?
8           And -- and the -- the part of that is
9   that --
10      Q    Well, you were saying --
11      A    -- the metrics they are reporting --
12      Q    You were saying that you set metrics
13  that were set in, like, about -- annually and
14  quarterly, et cetera.
15      A    Yes.  Right.
16      Q    When did the BDU start reporting those
17  metrics to FSA?
18      A    So I don't -- I don't know the
19  precise -- I don't know the precise time, but
20  within 90 days of my time there, we -- we began to
21  have metric meetings, and BDU is a -- is a -- is a
22  part and a reporter amongst those metric meetings.
23          So the BDU metrics, much like all the
24  other accounts in our metrics we have, are
25  reported through those processes.  And while I

Page 70

1  don't know the exact time, I believe it was within
2  three or four months of my arrival there as the
3  chief operating officer.
4       Q    Okay.  And when you first started
5  reviewing -- when you first started receiving the
6  metrics from the BDU, what -- what were those
7  numbers like?  Do you remember?
8       A    I guess I need to understand your --
9  what were the numbers like?  Do you mean what were
10  they?  What were they?
11       Q    Yeah, yeah.
12       A    So, unfortunately, I can't tell you
13  exactly what they -- what they were, but I can
14  tell you categorically we looked at how many
15  borrower defense cases there were and how many had
16  been adjudicated.
17       So at my level, at the chief operating
18  officer's level, I look at input and output, and I
19  look at the time it goes from input to output and
20  quality.  That's what I do as a -- as a chief
21  operating officer.
22       So while I don't remember the precise
23  numbers then because it has been some time ago, I
24  do know that those are the general categories that
25  we routinely look at.

Page 71

1       Q    Okay.  And when you first started
2  reviewing performance metrics from the BDU, did
3  you have any concerns?
4       A    As I said earlier, I had some
5  understanding that they were in need of two things
6  in order to do well.  And those were more
7  attorneys and an investment in their systems.
8  Those were the two internal FSA things that they
9  needed to do well.
10       And while I wouldn't necessarily
11  categorize that as a concern, those were
12  objectives that I was working toward to assist the
13  borrower defense unit to be successful.
14       Q    Okay.  And here it says fiscal year
15  2020, actual 160,000.  Do you know when that
16  number was reached?
17       A    (Witness reviews document.)
18       I -- I don't know the exact -- I don't
19  know the exact time.  We -- we look at the
20  progress.  I do know that borrower defense unit
21  has made significant progress since getting the
22  resources, and so I'm certain that they either
23  reached that number or came very close to it
24  because they made significant progress since
25  receiving the resources necessary.

Page 72

1       Q    Okay.  And if you go down to the bottom
2  of page 91, it says, This production data is
3  reported in weekly performance metrics evaluated
4  by FSA and department senior leadership.
5       So when -- when did you start receiving
6  those -- or when did that production data start
7  being reported weekly?  Do you know?
8       A    No, no.
9       Q    Okay.  Do you -- did you review those
10  weekly performance metrics?
11       A    Yes.
12       Q    And do you remember roughly when you
13  started reviewing them?
14       A    No, I -- I don't remember.  And -- and
15  I -- I don't -- I don't remember exactly when, but
16  I certainly remember that I -- that I have been
17  doing it.
18       MS. TORCHIANA:  Okay.  And just to ask,
19  would DOJ be able to produce those weekly
20  performance metrics?
21       I'm asking counsel that.
22       MR. HANCOCK:  I mean, we've had
23  discussions regarding the production.  There's a
24  lot of details involved there.  And I'm not going
25  to commit right here to any specific document that

Page 73

1  I haven't seen or aware of.  So we're happy to
2  have that conversation, but . . .
3       BY MS. TORCHIANA:
4       Q    Okay.  So -- so you mentioned -- well,
5  let's see here.  Okay.  We'll get back to this
6  later.
7       I'd now like you to turn to Exhibit 3.
8       (Exhibit 3 referred to.)
9       THE WITNESS:  Exhibit 3.  It says
10  Exhibit 19.  Is that --
11       BY MS. TORCHIANA:
12       Q    Yeah, that's fine.  That's fine.  Yeah.
13       And would you look -- look over this
14  document?
15       A    (Witness reviews document.)
16       Q    Are you familiar with this document?
17  Have you seen it before?
18       A    (Witness reviews document.)
19       I believe this document is an inspector
20  general's report, the Office of the Inspector
21  General.  But I have not seen this entire -- this
22  entire report.  This is a -- I think this is a
23  2017 report, so it is two chief operating officers
24  ago, and I was not at the Department of Education
25  at that time.

Page 74

1    Q    Okay.  Had you seen it before today?
2    A    No, ma'am.  I don't believe I've seen
3  this entire report before today.
4    Q    Have you seen parts of it before today?
5    A    I -- I believe I've had -- I've been --
6  I've heard references to the OIG report, and
7  that's what I meant in my statement.  I've heard
8  references to according to the OIG report.  I've
9  seen it in things according to the OIG report.
10   And, so, the physical report itself, I
11 don't believe that I have seen it.  I don't recall
12 seeing it.  I only recall hearing references to
13 the OIG report --
14   Q    All right.
15   A    -- and I think that's based on the
16 date.
17   Q    Okay.  And based on that, what do you
18 understand were the conclusions of the OIG report?
19   MR. HANCOCK:  Objection to this line of
20 questioning as exceeding the scope of the
21 court-ordered discovery.
22   BY MS. TORCHIANA:
23   Q    You can still answer.
24   A    Unfortunately, ma'am, I have no -- I
25 have no full understanding of this because it

Page 75

1  is -- it is so dated.  And, so, it simply would
2  not have been relevant for what I was going after
3  in March of 2019 forward.
4    Q    Okay.  So would you say that the
5  conclusions in the report were not relevant to
6  your work going forward?
7    A    I have not read the report.
8    Q    Okay.  Okay.  And did you hear any of
9  your coworkers' opinions of it?
10   A    I did not.  I -- I only know of the
11 report because it's referenced in -- you know,
12 when we -- when we look at some of my education in
13 March, it was referenced that there was an OIG
14 report.
15   Q    Okay.
16   A    I can't -- I don't have an opinion of
17 it one way or the other.
18   Q    Okay.  Did you ever discuss it with any
19 coworkers or anyone at your office?
20   A    I do not recall discussing this report
21 with anyone.
22   Q    So if you turn to page -- it's 509 at
23 the bottom in the -- in the small -- small footer.
24 It's page 193 of 270 in the stamp?
25   A    I have the page.

Page 76

1    Q    Okay.  And if you see at the top of the
2  page, it says, FSA established seven categories of
3  borrower defense claims that supported a cause of
4  action under applicable state law and thus
5  qualified a borrower for a loan discharge.
6    So -- and there are, you know, seven
7  listed there.
8    So is it -- is it accurate that as of
9  January 2017, the BDU had developed seven
10 categories of claims that were subject to
11 approval?
12   MR. HANCOCK:  Objection:  Exceeding the
13 scope of the court's ordered discovery.
14   BY MS. TORCHIANA:
15   Q    You can still answer.
16   A    Yeah, regrettably, ma'am, I don't
17 know -- in 2017, I was -- I was not a part of the
18 Department of Education.
19   Q    Okay.  And do you know -- so these are
20 seven approval categories.  So have you ever heard
21 of BDU's approval protocols?
22   A    Approval criticals?
23   Q    Approval protocols.
24   A    Protocols, oh.
25   I am aware that there are categories

Page 77

1  of -- of claims.  I -- I don't know that I could
2  say that there were -- that there were seven and
3  that there still are seven, but I -- I am aware
4  that there are categories of -- of claims.
5    Q    Okay.  And do you know -- do you know
6  if since you've started there were any more
7  categories of claims that were developed for
8  approval outside of these seven?
9    A    I do not.
10   Q    Okay.  And, so, if you go down in the
11 middle of the page, could you read that paragraph
12 in the middle that starts, From January 20th,
13 2017?
14   A    From -- from January 20th, 2017,
15 through July 31st, 2017, BDU did not complete or
16 begin preparing any legal memoranda establishing
17 whether additional categories of borrower defense
18 claims qualified for discharge.  According to the
19 director of BDU, the BDU staff has been instructed
20 not to continue developing memoranda on whether
21 additional categories of claims qualify for
22 discharge because the borrower defense policies
23 are being reviewed with the change in
24 administrations.
25   Q    Okay.  And do you know who -- had you

Page 78

1  heard of who instructed BDU to stop developing
2  these memoranda?
3            MR. HANCOCK:  Objection: calls for
4  speculation.
5            THE WITNESS:  I don't know, ma'am.
6       BY MS. TORCHIANA:
7       Q    Okay.  And did you ever hear of this
8  decision or learn of it?
9       A    So in -- I -- I would not -- ma'am, I
10  would not be able to tell you what -- you know,
11  what was -- what was told in 2017.  I -- I was not
12  a part of the Department of Education in 2017.
13      Q    Okay.  Okay.  We can move on, then.
14           If you could turn to Exhibit 7 in your
15  hard copies.
16           (Exhibit 7 referred to.)
17           THE WITNESS:  It says it's -- yes,
18  Exhibit 7.
19      BY MS. TORCHIANA:
20      Q    And are you familiar with this
21  document?
22      A    (Witness reviews document.)
23           I'm not familiar with the front part of
24  this memorandum at -- at all, the letter.  But I
25  am aware of the secretary's signature on the back

Page 79

1  that says "with extreme displeasure" because it
2  was a -- it was a matter of a media article that I
3  read.
4            So that's my knowledge of this
5  document.
6       Q    Okay.  And what do you take that to
7  mean, her -- her comment?
8            MR. HANCOCK:  Objection: exceeds the
9  scope of the court-ordered discovery.
10      BY MS. TORCHIANA:
11      Q    You can still answer.
12      A    I don't -- I don't know other than -- I
13  read it in a media article.  I don't know -- I
14  don't know that -- I don't know.
15      Q    Okay.  Do you know what -- what caused
16  her extreme displeasure?
17      A    So I -- I think this was signed in
18  2017, and -- and I was not a part of the
19  Department of Education then, so, no, ma'am, I
20  wasn't a part of this.  I don't know.
21      Q    Okay.  And when you -- since you've
22  started, has the secretary expressed any
23  displeasure with any aspects of the BDU's work?
24      A    With any aspects of the BDU work?
25      Q    Yes.

Page 80

1       A    Not -- not to me, no.  I -- I have
2  the -- no, I can't think of anything that would be
3  considered displeasure or -- if that's your
4  question.
5       Q    Okay.  Okay.  And, you know, to get
6  back to some general questions not about this
7  document specifically -- we'll get back to it
8  after.
9            But before -- just turning back to
10  something you've said, before you mentioned --
11  when we were talking about performance metrics for
12  the BDU, do you remember a couple of moments ago,
13  how -- how do you assess -- you said you -- you
14  installed performance metrics and, you know,
15  you -- you were trying to install metrics at the
16  department.
17           How do you measure the output of the
18  BDU unit?
19           MR. HANCOCK:  Objection: misstates
20  testimony.
21      BY MS. TORCHIANA:
22      Q    Okay.  How do you -- do you assess the
23  output of the BDU unit?
24      A    So with -- with all of Federal Student
25  Aid metrics, they normally are production

Page 81

1  oriented.  How many have -- so we are a
2  performance-based organization, so we're a
3  production organization.
4            And, so, we routinely look at input,
5  output and quality, and that would be the same for
6  the BDU -- the BDU unit.
7       Q    Okay.  And how do you assess the input
8  and the output and the quality of the BDU unit's
9  work?
10      A    So keeping in mind that -- I can just
11  tell you generically, I'm not a borrower defense
12  unit expert.  What I can -- what I can tell you is
13  that we look at how many claims that we have in
14  and how many claims we have adjudicated either
15  positively or -- or negatively or approved or
16  disapproved, and at -- and how we're doing at the
17  overall process of -- of getting those answers
18  to -- to the students.
19           So all of those elements of it would --
20  would be at the macro level how the BDU unit is
21  doing.
22      Q    Okay.  And, so, when you came up with
23  the fiscal year 2020 -- not you, but when the
24  performance metric was set, did you have to
25  approve it or sign off on it?

Page 82

1        A    I signed off on all of the -- all of
2    the metrics that go into the strategic plan and
3    the annual plan, one of which is the metric.  And
4    in signing, I denote my confidence in the process
5    of the development of those things.
6        Q    Okay.  So would you ever agree to a
7    performance metric that wasn't reasonable or that
8    you think wasn't attainable?
9        A    So when I look at a performance metric
10   in general, I look to see if we provided the
11   resources necessary to achieve it.  And if we
12   provided the resources necessary to achieve it,
13   then, you know, I would feel comfortable that it
14   was reasonable.
15            But you asked me if I would ever sign
16   off on a performance metric that is not
17   reasonable; am I -- am I correct?
18       Q    Yes.
19       A    I would not knowingly do so; however, I
20   am not beyond flaw and -- and we have a large
21   organization, and as I've said, they all have
22   metrics.  I have to build and trust the process
23   that it would not bring me an unachievable metric,
24   and so -- but it is not without flaw.
25            So there -- there could be one that

Page 83

1    would have to be changed or adjusted if it were
2    not -- if it were found to be, I think as you
3    said, unrealistic.
4        Q    Okay.  And how did you inform yourself
5    that the BDU -- BDU unit's metrics were achievable
6    or attainable?
7             MR. HANCOCK:  Objection: vague; and
8    potentially calls for deliberative information.
9             BY MS. TORCHIANA:
10       Q    You can still answer.
11       A    So we have metrics updates as I was --
12   as I was saying, and -- and -- and a process by
13   which they are developed.  So the way I inform
14   myself in general is by listening and having
15   dialogue and asking questions that I think are
16   challenging that would make those who develop and
17   think deeply about them and looking at, you know,
18   their responses and the history and seeing if
19   together we can agree that this is something that
20   can be done.  And then ultimately they are
21   established that way.
22            So I -- I know that's not a one, two,
23   three answer, but neither is the process.  It is a
24   very deliberative back-and-forth process that
25   leads to what you are calling the metrics.

Page 84

1        Q    Okay.  And, so, when BDU came up with
2    its performance metric, what deliberations did you
3    have with the BDU?  Did you meet with them about
4    the performance metrics?
5             MR. HANCOCK:  Objection: calls for
6    deliberative privileged information.  I instruct
7    the witness not to answer.
8             BY MS. TORCHIANA:
9        Q    Okay.  And how -- when you signed off
10   on the performance metrics, how did you come to
11   understand that that was an achievable goal?  What
12   told you that?
13       A    So what -- so if -- what told me that
14   the goals were achievable?
15       Q    Uh-huh.  Yes.
16       A    From my level -- and I have to explain
17   this a little bit, though -- but from my level,
18   I'm more concerned that the process is in place
19   for the voices to be heard and the development to
20   occur.  And, so, I am spending my time on the
21   process; in other words, are they from the ground
22   up.  Do subject matter experts have an opportunity
23   to say something; are we, you know, not listening
24   to any voices; or how do they look on a historical
25   basis.

Page 85

1             Those kinds of questions when you
2    manage a large organization, you have to become
3    confident that those will help bring out the best
4    in those you manage.
5             And, so, the way -- the reason I'm
6    confident is because I spend an intense amount of
7    time on the process to make sure the process is in
8    place to deliver that.  I don't -- I'm not a
9    borrower defense attorney.  I don't -- I can't
10   tell you perhaps the intricacies that you're
11   looking for in terms of all of those things that
12   happen inside of the borrower defense unit, but I
13   can tell you what process I had used.
14       Q    And who told you about the processes at
15   the BDU?
16       A    Who told me about how borrower defense
17   unit processes the work?  Is that your question,
18   ma'am?
19       Q    Sure.
20            Well, you said you were listening to --
21   when you set the performance metrics you were
22   listening to different voices and it's a
23   deliberative process.
24            Who were you deliberating with to set
25   those numbers?

Page 86

1     A     So in the case of the borrower defense
2  unit, I have a deputy chief operating officer for
3  partner participation and oversight, and my
4  conversations would begin with them.  They, then,
5  would have conversations with the BD unit -- BDU
6  unit who would have conversations internal to the
7  unit, and if we're -- if we're doing it right, all
8  of those voices will be heard at every -- at
9  every -- at every level.
10        So when you ask who am I listening to
11 or who told me, the people that work for me.
12    Q     Okay.  And would that have been Robin
13 Mittner?
14    A     So I believe you mean Robin Minor?
15    Q     Minor, sorry.
16    A     She is the first in the management
17 chain.  She is the first in the management chain
18 of BDU between me and the BDU unit.  And, yes, I
19 would have had conversations with Robin Minor, but
20 they would have not been isolated to that.  She
21 would have had conversations with others as well.
22        The -- so that's, in general, how
23 information flows, if that's your question.
24    Q     Okay.  And -- and when these
25 performance metrics were set, do you know if

Page 87

1  anyone expressed concern about not being able to
2  attain them?
3     A     I -- I don't -- I don't know.  I can't
4  recall any specific concern.  You know, I don't --
5  I'm trying to think here if I can recall it, and I
6  do not.  I don't recall any specific concern about
7  attaining BDU goals.
8     Q     Okay.  So there was no concern about
9  adjudicating 150,000 applications within fiscal
10 year 2020?
11    A     There was concern that I would get the
12 resources necessary to the BDU team, and our -- I
13 think what you may be reading into that is
14 immediately 150,000 claims.
15        Is that a -- is that a concern?
16 There's always -- if you can hire the appropriate
17 number of resources, then we can achieve this
18 goal.  If you aren't allowed or failed to or we
19 can't find them or can't hire them or whatever,
20 then the goal is not achievable.
21        And, so, what I think you may be
22 calling concern, I'm calling the dialogue that
23 goes into the building of metrics.  And so some is
24 on me to go do, right, and some is on the workers
25 to go do.

Page 88

1     I -- I would not use the term "concern"
2  about that because I think it -- that's how you do
3  it.  I mean, that's how -- that's how it happens
4  across the entire organization.  In the case of
5  the BDU unit, it's resources.  It's, you know,
6  people.
7     Q     And, so, what resources were those?
8     A     Attorneys.
9     Q     So you're saying -- what were the
10 resources that were --
11    A     Attorneys.
12    Q     What resources did the BDU think would
13 help them reach their target for the 2020 fiscal
14 year?
15    A     So, again, there were two -- there were
16 two points that had to be addressed.  A number of
17 attorneys, hire to a certain level of attorneys.
18 And then there were also resources to invest in
19 the IT system, the platform that was, in fact, the
20 case management system.
21        And, so, when I say resources and I say
22 attorneys and money, that's what I'm talking
23 about.  We had to collectively achieve those
24 things to achieve the goal.
25    Q     Okay.  So would you say primarily that

Page 89

1  IT resources and attorneys were the two resources
2  that BDU needed to meet its target?
3     A     I -- I did say that.  I said that in
4  order for -- in order for the borrower defense
5  unit to be successful.
6        Now, remember, I'm talking about this
7  at my level, the macro level.  You know, I guess
8  like with anything, if you were three levels down,
9  they may -- they may have concerns of other things
10 that I would not have at my level, but at my -- at
11 my level, my challenges were to have -- have
12 enough attorneys to adjudicate cases and to have
13 the -- to get the money necessary to upgrade the
14 systems, the case management systems that would be
15 needed for the volume of cases we were talking
16 about.
17    Q     And -- and, so, what did you do to get
18 more attorneys in the BDU unit?
19    A     We hired people.  We had hiring fairs.
20 We went nontraditional terms, like --
21 nontraditional for government like Indeed and
22 LinkedIn and we visited law schools with
23 graduating attorneys, and we made offers to -- to
24 get at this situation.
25        That's -- that's what we did, so I

Page 90

1  guess you would put it in a broad -- broad
2  category of recruiting and -- and hiring.  That's
3  what we went about doing in a very aggressive way.
4       Q     Okay.  And when did that start or when
5  did you start doing that?
6       A     Again, I don't know when the very first
7  hiring fair was and when the very first -- I -- I
8  didn't -- I don't conduct the hiring fair myself.
9  I don't physically go.  I tell our experts to do
10 that and I know that they had them.  I don't
11 actually go to the law school and visit and try
12 and -- you know, we send -- we send people who are
13 attorneys who know the business to go do that.
14       I can tell you that shortly after my
15 arrival, we began to try and buildup the number of
16 attorneys after we were -- were given the approval
17 to do so as I said earlier, and then all of those
18 actions began to take place.  It wasn't an
19 overnight thing.  It was -- as you would expect,
20 you get ten, you get five more, you get seven
21 more, you know, until you build up your personnel.
22       Q     And would you say before you joined,
23 were there enough attorneys in the BDU unit?
24       A     So while I would not talk about --
25 because I don't know because enough is -- enough

Page 91

1  would have to do with how many cases you had at
2  the time, so I can't talk to you, ma'am, about
3  anything prior to March 2019.  I really don't know
4  what -- I can tell you that, as I have said
5  earlier, there were around 10 or 12 when I started
6  in March of 2019.  And that was not enough for the
7  number of cases we had to get adjudicated and
8  worked, and therefore we did all those things that
9  I was just going through earlier.
10       Q     Okay.  And did you -- did you have any
11 sense of whether there were any requests to hire
12 more attorneys before you joined?
13       A     As I said earlier, I -- I really don't
14 know.  I don't know.
15       Q     Okay.  Okay.  All right.
16       We'll talk about the IT platform more
17 later.  I'd now like you to go to Exhibit 10.
18            (Exhibit 10 referred to.)
19       THE WITNESS:  Yes, ma'am.
20 BY MS. TORCHIANA:
21       Q     Okay.  And just before we get into
22 that, so when you started in March 2019, it sounds
23 to me like that you made your issues -- or --
24 or -- I guess when you started in March 2019, what
25 was your understanding of why no decisions had

Page 92

1  been issued since June 2018?
2            MR. HANCOCK:  Objection: asked and
3  answered.
4            THE WITNESS:  I think --
5  BY MS. TORCHIANA:
6       Q     You can answer.
7       A     Yeah, I think as I said before, I
8  believe there was confusion, and so it -- my -- my
9  understanding was that there was confusion.
10 That's -- that's how I would classify it.
11       Q     Confusion about what?
12       A     The borrower defense unit believed that
13 they had guidance to -- to not do so, policy
14 guidance not -- not to do so, and had not done so
15 after the Manriquez case, and I'm not certain that
16 the -- at the time that the -- the department was
17 under the understanding that they had provided
18 that guidance.
19       So if you're asking about that time
20 frame when I initially took over in -- in March, I
21 would classify it as confusion.
22       Q     Okay.  So just looking at Exhibit 10,
23 are you familiar with this testimony by Diane Auer
24 Jones?
25       A     I am not familiar with this particular

Page 93

1  testimony.  I know that Ms. Jones provided
2  testimony, but I have not read this document that
3  is -- that you have here as Exhibit 10.
4       Q     So it was in -- on May 22nd, 2019, so
5  after you joined.  Have you ever read through her
6  testimony or looked at it?
7       A     I -- I don't believe so.  At least I
8  don't recall reading through this one.
9       Q     Okay.  And at the top, could you turn
10 to page 50?
11       A     Uh-huh.
12       Q     Okay.  And at the top, could you read
13 the testimony that starts -- so Ms. Jones says,
14 There is not a policy.  Could you read that
15 sentence?
16       A     There is not a policy that prevents the
17 review of claims.  However, we are not able to
18 determine the level of harm or the level of relief
19 that a borrower should get because the methodology
20 we use is now being challenged by the California
21 courts.  So we continue to process.
22       Q     Okay.  And could you tell me what you
23 think this means or explain that statement?
24            MR. HANCOCK:  Objection:  Speculative.
25       BY MS. TORCHIANA:

Page 94

1    Q    You can still answer.
2    A    Actually, I can only tell you what I
3 just -- you know, what I just read. But in terms
4 of what she means by that, I'm not sure I
5 understand your question, ma'am.
6         What would you like me to do with what
7 I just read? It's --
8    Q    How -- okay. That sentence, how do you
9 understand it? What is she saying?
10        MR. HANCOCK: Objection: Speculative.
11        BY MS. TORCHIANA:
12   Q    For example, when she says, We are not
13 able to determine the level of harm or the level
14 of relief because the methodology we use is being
15 challenged by the California courts.
16        So with -- do you know which
17 methodology she's referring to?
18   A    So I am only familiar with -- since
19 I've been the chief operating officer, there's
20 only one methodology that the borrower defense
21 unit has used. And, so, I would only assume here
22 that it's something before that.
23        I have not spent any time on what might
24 have been used in 2017 or '18 or -- or that. I'm
25 only familiar with it -- meaning, that we have a

Page 95

1 methodology that we use now.
2         But -- but I do think it's important
3 that I clarify that the chief operating officer is
4 not the policy element of this process, and
5 methodology -- the determination of methodology
6 would be a question more appropriate for those who
7 make the policy.
8    Q    Okay. And when she refers to a case in
9 the California courts, do you know what case that
10 was?
11   A    Well, regrettably we have more than --
12 more than one or two cases in the California
13 courts, so -- so I wouldn't want to speculate
14 on -- on which one of our multiple lawsuits this
15 might be or which -- I don't know what -- since
16 this doesn't say anything other than what you just
17 told me to read, I don't know, ma'am. I don't
18 know.
19   Q    Okay. And when you started, did you
20 know that the department had been enjoined from
21 using their 2017 methodology?
22   A    I did. I did know that the Manriquez
23 case; that one I did know because it was part of
24 my educational process that started in March. And
25 I mentioned earlier that I was learning about the

Page 96

1 borrower defense process.
2    Q    So that case is called Calvillo. What
3 was your understanding of the Calvillo injunction,
4 what it did, what it said?
5    A    So my understanding from my team was
6 that it prevented us from issuing -- determining
7 percentages of relief based on an income source
8 that the courts had disagreed with. And,
9 therefore, the borrower defense team was unable to
10 do that because they weren't allowed to use that
11 methodology according to the courts.
12   Q    Okay. And do you know who -- who that
13 applied to?
14        When you say that they couldn't use the
15 methodology, who couldn't they use the
16 methodology -- what applications could they not
17 use the methodology with?
18   A    So -- so I know that there was a --
19 there is a -- a set of claims that would be
20 covered under the Manriquez case; that would be
21 the claims for which you could not go forward on
22 and use a methodology.
23        Now, if you're asking me do I know
24 which ones and exactly how many and all of that, I
25 would not be able to give you that level of

Page 97

1 detail, but I do know that there's a class of
2 claims -- I would call them a class, and that
3 those would fall under the Manriquez case.
4    Q    Okay. And who explained to you that
5 the Calvillo injunction prevented relief for
6 some -- you know, those people that you just
7 mentioned?
8         How did -- how did you understand that?
9 Did you read the case? Or did someone tell you?
10        MR. HANCOCK: Objection: ambiguous and
11 compound.
12        MS. TORCHIANA: Okay. I'll ask again.
13        BY MS. TORCHIANA:
14   Q    Who told you that the injunction did
15 what we just said it did?
16   A    So in my educational process in March
17 of how BDU worked and what the status of things
18 were, it was part -- I never used the term the
19 Calvillo case that you just used, but if you mean
20 the Manriquez case, because that's the only term
21 that's ever been brought to me in terms of our
22 discussion of this, if we're talking about the
23 same thing, then that was a part of my instruction
24 from the borrower defense team as I was going in
25 learning about what they -- what they do and what

Page 98

1    their challenges were and those kinds of things.
2       Q    And when you were learning and getting
3    instructions about the borrower defense team, who
4    was providing those instructions to you?
5       A    So there were a number of people, but
6    the leader of that team is the same leader that we
7    have now of the borrower defense unit, and that
8    was Colleen Nevin.
9       Q    Okay.  And did she explain the
10   Manriquez case to you?
11      A    She explained to me the impact of it on
12   the borrower defense processes.
13      Q    Okay.
14      A    But of the entirety of the case, my
15   interests were limited to what impact it had on
16   our ability to do operations.
17      Q    Okay.  And how did she explain the
18   impact that it had on the BD process?
19      A    We could not determine the amount of
20   relief because we were unable to use the
21   methodology because the court did not allow us to
22   use it.  And if you don't know the amount of
23   relief, you can't complete those cases that are
24   found to be valid, and so that contributed to the
25   cases that had not moved.  That's the explanation.

Page 99

1            So as I'm exploring BDU and what's
2    going on and why are there cases and those kinds
3    of things, that's where that explanation would
4    come into play.
5       Q    Okay.  Okay.  If you go down the page a
6    little bit, sort of in the bottom, it --
7    Ms. Pressley asks -- and could you read this out
8    to me?  She says, The court case does not apply to
9    all borrowers.
10           Could you read that and then Ms. Jones'
11   answer?
12      A    Are you still on page 50, ma'am?
13      Q    Yes.
14      A    Okay.  Ms. Pressley:  The court case
15   does not apply to all borrowers.  What about the
16   others?  Are you going to process any of them?
17      Q    Are you not going to process any of
18   them.  But, yeah, go on.
19      A    Are you not going to process any of
20   them?
21           We are processing claims.  We continue
22   to process.  What we can't do is determine the
23   level of harm or the level of relief.
24      Q    Okay.  And, so, could you explain when
25   she says, "continue to process," what did that

Page 100
                                          Page

1    mean in your understanding?
2       A    It -- it actually -- I believe this
3    term "processing" may not be used by everyone the
4    same way.  So I can tell you what I -- I believe
5    it to mean.
6            So I believe it to mean that you can go
7    through the stage of an attorney adjudicating a
8    case and determining if it's eligible or
9    ineligible for relief, and that claim has been
10   processed.
11           Others may believe that that processing
12   isn't complete until you apply an approved
13   methodology and determine what level of relief
14   that particular claim has under whatever
15   methodology has been established.
16           Depending on who's using the term, some
17   people stop at that first part.  Others don't stop
18   until a letter goes out to a borrower with the
19   final answer.
20           So what I just gave you was my very
21   limited one-person's definition of how I would use
22   the term "process."
23      Q    And have you ever heard of that being
24   distinguished as Step 1 versus Step 2?  Is that
25   terminology that's familiar to you?

Page 101
                                          Page

1       A    I have heard of the Step 1 and Step 2
2    categorizing the borrower defense overall process.
3       Q    Okay.  And could you explain to me
4    how -- how that works or how you understand those
5    terms?
6       A    Yes, ma'am.  Actually, I can explain to
7    you how I understand it.  The way that I
8    understand it is if a claim comes in and it goes
9    to an attorney and an attorney adjudicates that
10   claim and determines one thing or the other that
11   it has either met whatever the borrower defense
12   laws or rules are and therefore it is eligible for
13   the methodology to be applied, in other words,
14   they're eligible, then that attorney has completed
15   process -- Step 1 in the process, but not Step 2.
16           Step 2 would start when the methodology
17   is applied, some percent of relief is determined
18   based on the mathematical equation in the
19   methodology, and the borrower is notified of what
20   that answer is.
21      Q    Okay.  So when Ms. Jones says, We
22   continue to process, what does that mean in those
23   terms?
24      A    So I don't know again what Ms. Jones --
25   I can't tell you, ma'am, what -- exactly how

Page 102
Page

1   Ms. Jones was using the term because, as I said
2   earlier, how someone uses the term, I think,
3   differs.
4         So I -- I can't tell you how Ms. Jones
5   was using the term.
6       Q    Okay.  And when you joined the
7   department and, you know, no decisions had been
8   made since June 2018, did you understand whether
9   either Step 1 eligibility determinations -- were
10  any of those proceeding?
11      A    Could you -- would you mind repeating
12  the -- the last part of that question?
13      Q    When you started in March 2019 and
14  going forward, did -- no decisions had been issued
15  since June 2018, did you understand whether any
16  Step 1 decisions were continuing, so as you
17  described it, eligibility?
18      A    Step 1, to my knowledge, never stopped.
19      Q    Okay.
20      A    Those -- that part which we now call
21  Step 1, we're talking about it as Step 1, to my
22  knowledge that had never stopped.
23      Q    Okay.  And -- and how -- was that being
24  reported to you?
25      A    So the metrics and the measurements and

Page 103
Page

1   all the things that we've been talking about
2   didn't exist on day one in March to my knowledge,
3   and -- and nothing was being reported to me other
4   than I was aware that we only had 10 to 12
5   attorneys, as I said before, and the numbers were
6   not that large of the number of claims we were
7   able to even get through Step 1 because BD claims
8   were growing, and as I've said earlier, we simply
9   did not have enough of those two things I
10  mentioned, attorneys and the resources against the
11  systems necessary.
12      Q    Okay.  And so how did you know that
13  Step 1 was continuing?
14      A    So in March I started an education --
15      Q    Not just in March, but, you know, when
16  you started and moving forward.
17           How about from March when you started
18  until December of 2019?
19      A    How did I -- how did I know that Step 1
20  was continuing?
21      Q    Uh-huh.  Yes.
22      A    So -- and I know -- I believe I
23  mentioned that when I first started in March, the
24  BD team immersed me into what they were doing.
25  And, so, part of that is we are adjudicating

Page 104
Page

1   claims.  However, we -- we're not able to
2   adjudicate as many as we would like because we
3   don't have enough resources.
4         And, so, when you say how do I know it
5   was continuing, they -- they told me that they
6   were continuing to adjudicate claims.  That didn't
7   automatically get boiled down to a metric that I
8   was getting automatic weekly updates on.  It took
9   a while, some time for that to come about.  And I
10  don't know exactly when that came about, but it
11  didn't happen immediately.
12        But that's -- that's how I knew that
13  that's what we were doing.
14      Q    Okay.  And as part of your performance
15  metrics, so you -- do you know how many claims
16  have gone through Step 1 eligibility or have been
17  processed at Step 1?
18           Was that ever reported?
19      A    Today you mean or --
20      Q    At any point.
21      A    So, yes, at some -- at some point
22  across during the process of metric building and
23  measurements, I would have an indication of how
24  many claims had been processed and adjudicated and
25  if we were at a point where notifications were

Page 105
Page

1   going out, how many notifications had been sent.
2         That would be a part of the metric.
3       Q    Okay.
4       A    Could I ask, ma'am, for a -- a
5   five-minute break?
6       Q    Sure.
7           MR. HANCOCK:  And, Claire, this might
8   be a good time to just talk generally about lunch
9   break.  It's now 12:43 here on the East Coast,
10  so --
11           THE VIDEOGRAPHER:  Do you want to have
12  this conversation off the record?
13           MR. HANCOCK:  Oh, sure.
14           THE VIDEOGRAPHER:  We're now off the
15  record.  The time is 17:43 UTC time.
16           (Lunch recess -- 12:43 p.m.)
17           (After lunch recess -- 1:18 p.m.)
18           THE VIDEOGRAPHER:  Okay.  We're now
19  back on the record.  The time is 18:18 UTC.
20  BY MS. TORCHIANA:
21      Q    Okay.  So, Mr. Brown, we were just
22  talking about the Calvillo or the Manriquez
23  injunction and what you understood the effect of
24  it to be.  You mentioned that there was confusion
25  within the BDU unit and the BDU unit believed that

Page 106

1   it -- that they couldn't issue any decisions.
2           Do you know -- where would you say --
3   all right.  Let me rephrase it.
4           How did you seek clarification about
5   this confusion?
6       A   So I -- I wouldn't say -- and I
7   don't -- I don't believe I said that there was
8   confusion within the BD unit.  I think what I said
9   was that there was confusion, meaning the BD unit
10  believed they had guidance or policy not to go
11  further with decisions, meaning to send them out.
12          When I asked the department if, in
13  fact, that was the case, the answer I got back was
14  that they didn't believe they had told the BD unit
15  that.
16          That, it's those two positions early on
17  in my time, that I define as confusion.
18      Q   Okay.  So who did you talk from the
19  Department of Education about -- about this
20  confusion?  Who did you talk to?
21      A   I -- I spoke with Under Secretary Jones
22  to get clarification on what the -- you know, what
23  had been told to the BD unit.
24      Q   Okay.  And what did she tell you?
25      A   She responded at the time.  This is in

Page 107

1   the March/April time frame.  I didn't know that
2   the BD unit was not sending out -- or I'm not sure
3   why the BD unit is not sending out decisions.
4   That was the initial response, and this was a
5   verbal conversation.  I don't have this in -- in
6   any form of documentation.
7       Q   So she -- she was the one who said to
8   you she wasn't sure why the BDU -- the BDU unit
9   wasn't issuing decisions?
10      A   Initially.
11      Q   Okay.  And did you seek any
12  clarification?
13      A   I -- I did.  At some point, and I -- I
14  cannot specify for you the exact point because I
15  don't recall the exact point, but at some point it
16  moves to the point of a new methodology was being
17  developed, and once that new methodology was
18  developed, it would allow for the issuance of
19  both -- on -- of decisions, meaning both approval
20  and denials.
21      Q   Okay.  That wasn't quite my question in
22  terms of -- so Ms. Diane Auer Jones told you the
23  BDU unit told you they couldn't issue decisions.
24          Did you seek clarification within the
25  BDU unit asking why they thought that they

Page 108

1   couldn't issue decisions?
2       A   No.  No, no, I -- maybe I don't
3   understand -- understand you.  Ms. -- I asked the
4   BD unit as we were going through that educational
5   process, you know, what we were doing, why were
6   decisions not going out.
7           The BD unit believed that after the
8   Manriquez case decision that they were only to
9   adjudicate cases; they were not to send out any --
10  any answers.  They believed that was the guidance
11  that they had.
12          I asked --
13      Q   Did you seek clarify -- did you seek
14  clarification about why they believed that was the
15  guidance that had been issued?
16      A   Yes.  I -- I asked the under secretary
17  why was the BD unit not sending out decisions.
18  The initial answer or response, if you go back,
19  was I didn't know that the BD unit was not sending
20  out decisions.  That was the initial answer when I
21  first -- when I first started in March/April time
22  frame looking into this.
23      Q   Okay.  And did you ask anyone in the
24  BDU why they thought they'd received that
25  guidance?

Page 109

1           MR. HANCOCK:  Objection:  asked and
2   answered.
3       BY MS. TORCHIANA:
4       Q   I think he mentioned -- or you can go
5   ahead and answer.
6       A   No, it's -- as I had previously stated,
7   the BD unit believed, which I believe gets to your
8   why, that after the Manriquez case decision that
9   they were not to send out any notifications.  They
10  were simply to continue adjudicating cases.
11      Q   And did you talk to anyone in the BDU
12  unit about that belief?
13      A   I -- no, I don't believe that I -- I
14  didn't go any further into -- any further in the
15  history of it because it was answer right -- the
16  answer is they weren't sending any out because
17  they believed they weren't supposed to at the
18  time.
19      Q   And, so, did you do anything to clarify
20  that confusion?
21      A   Yes.  I stated earlier I asked the
22  under secretary, and the initial reply I got back
23  was I didn't -- I didn't know the BD unit was not
24  sending out, but that was only the initial reply
25  that I got back.

Page 110
Page

1        Later on -- and I can't give you the
2    exact time of this -- it was decided that we would
3    continue that same posture while the new
4    methodology was being developed, and that once the
5    new methodology would be developed, we would be
6    going forward with all types, you know, both the
7    adjudications and the notifications.
8        Q    Okay.  When did you decide -- when you
9    say you decided to continue that posture, what do
10   you mean?
11       A    Not that I decided; that the department
12   at that point decided that we would continue the
13   same posture that we were in and not issue
14   notifications but continue to do adjudications
15   until the point at which the methodology was
16   completed, and then that -- and then we would
17   begin doing both.
18       Q    Okay.  And who made that decision?
19       A    I don't know exactly.  I can tell you
20   that that was a decision communicated to me
21   through the under secretary.  I don't know that I
22   could tell you, you know, if that was her sole
23   decision or if there was some other parties
24   involved.
25            I would not know that.

Page 111
Page

1        Q    Okay.  And how was that communicated to
2    you?
3            When you say the under secretary
4    communicated that to you, how was that
5    communicated?  Was it -- in what form?
6        A    Yeah, to -- to my knowledge it was
7    verbal.  I don't -- I don't know that there's a
8    document that says effective this date.  My
9    recollection of that is just that it was given to
10   me verbally.
11       Q    Okay.  So would you say there was a
12   policy not to issue any decisions until a new
13   relief methodology was in place?
14       A    I don't know if I would go as far as to
15   define it as policy, but I would certainly go far
16   enough to call it a set path going forward.
17       Q    Okay.  And that guidance was coming
18   from the Office of the Under Secretary?
19            MR. HANCOCK:  Objection: asked and
20   answered.
21            BY MS. TORCHIANA:
22       Q    Okay.  You can still answer it.
23       A    Yeah -- yes, ma'am, as I just -- as I
24   just stated.  That's who it was communicated to me
25   from.  Exactly where it was coming from and how it

Page 112
Page

1    was developed, I don't -- I don't know.  Only I
2    can relate to you what was communicated to me.
3        Q    Okay.  If you can turn back to your
4    declaration which is -- it should be behind
5    Exhibit 25 -- behind tab 25, sorry.
6        A    I have it.
7        Q    Okay.  And we'll start at -- we'll get
8    back to paragraph 5.  So, you know, you say, On
9    December 10th, 2019, the department issued a
10   policy statement setting forth a tiered relief
11   methodology.
12            So who -- who came up with this tiered
13   relief methodology?
14       A    Who came up with it?
15       Q    Yes.
16       A    So what I would -- what I would say is
17   that the -- the methodology itself is determined
18   by the department.  In terms of the building of
19   it, if that answers your who that came up with it,
20   I'm sure like most other things, it was collective
21   effort of providing information to help decision
22   makers, but the methodology is a statement of
23   policy of the secretary's, and so it would not be
24   inside of Federal Student Aid.
25       Q    Okay.  So who would you say was the

Page 113
Page

1    main decision maker then in coming up with the
2    tiered relief methodology?
3        A    I -- I wouldn't say that because I --
4    you know, I don't know how to -- I don't know how
5    to measure what you mean by who was the main
6    decision maker.  The methodology is a statement of
7    policy, so it comes from the department.  And then
8    our job is to execute that -- that policy.  Who --
9    who weighed in the most or the least, I -- or
10   made, to use your term, I -- I don't know that
11   name.
12       Q    Okay.  And when was it decided to
13   develop on this tiered relief methodology?
14       A    I don't know exactly when it was
15   decided.  I know that we started using that.  I
16   can tell you that.  But exactly when it was
17   decided, I -- I don't know.
18       Q    Okay.  And when you -- let's say in
19   March 2019 when you joined the department, had
20   you -- was there any development of this
21   alternative methodology?
22            MR. HANCOCK:  Objection: misstates
23   testimony.
24            THE WITNESS:  I don't know if I
25   understand that question.  I'm not sure I

Page 114
Page

1  understand your question.
2      BY MS. TORCHIANA:
3      Q    My question was when did this tiered
4  methodology start being developed, and you say you
5  don't remember.  So, you know, in the spring of
6  2019 when you started, do you remember any
7  discussions about this new tiered relief
8  methodology?
9      A    I don't.
10     Q    Okay.  And when do discussions about
11 this tiered relief methodology begin?
12     A    I don't know when the -- again, I don't
13 know when the discussions or the decisions, the
14 inner workings of what would be the policy making,
15 I can't tell you exactly when that began.
16          What I can -- what I can tell you is
17 that in -- in March, I wasn't aware of it if
18 that's your -- if that's your question.
19     Q    Okay.  What about later on, let's
20 say -- when did you become aware that a tiered
21 methodology was being developed?
22     A    So what -- what I know is that as we
23 got into the April/May time frame -- and I don't
24 remember precisely that time frame, but somewhere
25 within there -- the answer to our question of

Page 115
Page

1  moving forward with notification was related to
2  the fact that a methodology was being developed.
3          But I'm not telling you that it started
4  then or it started before then or later because I
5  don't know other than at that point I became aware
6  that it was being developed.  I can't give you
7  the -- I can't give you the parameters of when it
8  started or when it ended or anything like that
9  other than I -- other than I know it was being
10 developed.
11     Q    Okay.  And did you ever discuss the
12 development of the tiered relief methodology with
13 Diane Auer Jones?
14     A    Did I ever discuss that we were -- that
15 she was -- that she and the department
16 collectively were working on this methodology?
17     Q    Yes.
18     A    Yes, I -- I knew that they were working
19 on it.  I -- I did know that.  After that time
20 frame, after that discussion, I -- I knew that.
21     Q    Okay.  And how was that communicated to
22 you?  How -- how -- what form did those
23 discussions take?
24     A    Just that, discussions in meetings, and
25 the reason it was -- would have been discussed is

Page 116
Page

1  because it was key to us moving forward in the
2  borrower defense.
3      Q    Okay.  And what was your involvement in
4  developing this tiered relief methodology?
5      A    So my personal involvement would have
6  been very limited.  If you mean "my", the
7  organization of Federal Student Aid, I would have
8  a slightly different answer.
9      Q    When you say it was very limited, what
10 did you do as part of developing this tiered
11 relief methodology?
12     A    Little -- little to nothing.  When I
13 say very limited, I am -- I'm referring to the
14 fact that I'm the chief operating officer at
15 Federal Student Aid, so anything that Federal
16 Student Aid might provide data for or those kind
17 of things, I can't totally detach myself from it
18 because they are -- it's my organization.
19          But in terms of my personal
20 involvement, that -- that's not what I do.  I
21 would not have personally been sitting with
22 someone developing methodology.
23     Q    Okay.  And who within FSA was working
24 on it?
25     A    So while I can't -- I wouldn't be able

Page 117
Page

1  to give you the details of who, I can tell you
2  that we have a policy -- the liaison office and we
3  have data people who pull data out of systems and
4  run algorithms and those kind of things.  They
5  provide the decision support to the policy makers
6  to help them understand kind of the -- the numbers
7  and the data and those kind of things that they're
8  trying to make decisions on.
9          So I could tell you organizationally we
10 have sections that do that.  We have data
11 analytics; we have data scientists, if you will,
12 that do those kinds of things, and policy liaisons
13 which do that.  And they would have been involved
14 with running various programs and pulling data to
15 be supportive of that effort.
16     Q    Okay.  And how many staff within FSA
17 would you say were working on developing this
18 partial relief methodology?
19     A    I would not know.  This is a dynamic --
20 dynamic kind of thing.  You know, today I need one
21 person; tomorrow I need two; I need a couple of
22 hours on the phone.
23          It's just -- it's very dynamic, and I
24 could not associate it with a particular number of
25 persons or times, nor do I believe we accounted

Page 118
Page

1    for it in any kind of way.
2            So I would not want to speculate.  I
3    don't know, ma'am.
4        Q    Okay.  Was it time-consuming for FSA to
5    developed this tiered relief methodology?
6        A    So by "time-consuming," do you mean
7    that we had to put some time into it, or do you
8    mean that it took an inordinate amount of time?
9            Can you help me understand what you
10   mean by that?
11       Q    Did it take a lot of time for staff
12   members at FSA to develop this tiered relief
13   methodology?  Was it something that -- how much
14   time would you say staff spent on developing this?
15           MR. HANCOCK:  Objection: misstates
16   testimony.
17           MS. TORCHIANA:  You can still answer.
18           THE WITNESS:  Yeah, I wouldn't want to
19   give you a specific amount of time.  I don't know.
20   I could look back and see if we had written that
21   down somewhere, but, you know, I couldn't -- I
22   couldn't tell you exactly how much time was spent
23   on it, not -- not off the top of my head.
24   BY MS. TORCHIANA:
25       Q    Okay.  And did you have a sense that it

Page 119
Page

1    was taking a lot of time for FSA to -- to develop
2    this partial relief methodology?
3            MR. HANCOCK:  Objection: misstates
4    testimony.
5            THE WITNESS:  So the methodology is
6    developed by the department.  The methodology is a
7    statement of policy, and so the -- the role of
8    FSA, and -- and by association my role, is to
9    provide data and analytics for the decision
10   makers.  But we don't develop that policy document
11   which -- which you referred to as a methodology.
12   BY MS. TORCHIANA:
13       Q    So within FSA, what staff was working
14   on developing this methodology?
15       A    So, again, I cannot give you names.  I
16   don't know all of the names.  I can tell you we
17   have a policy liaison office and that only has a
18   couple of people in it.  And we have data
19   analytics, people who pull data.  That could have
20   been one or -- you know, one or two people that
21   got that request and worked that particular
22   request, but it would have been a combination of
23   those kind of folks.
24       Q    Okay.  And -- and what resources would
25   you say were required to develop this partial

Page 120
Page

1    relief methodology?
2            MR. HANCOCK:  Objection: misstates
3    testimony.
4            THE WITNESS:  Could you say it again,
5    ma'am?  I'm sorry.  I didn't understand.
6    BY MS. TORCHIANA:
7        Q    I said, what resources were required to
8    develop this methodology within FSA?
9            So you mentioned staff . . .
10       A    So we have people that pull out data,
11   do data analytics and metrics.  We have people
12   who -- who I would call policy liaison folks who
13   help -- help understand what -- what the policy
14   (audio distortion) locations of them are.  So
15   within their job jar would be to support this kind
16   of effort.
17           But if you're asking for me to quantify
18   it -- or are you asking for me just to give you
19   those organizational elements within FSA?
20       Q    What were the organizational elements
21   within FSA that were needed?
22       A    Data analytics and policy liaison.
23       Q    Okay.  Could you explain to me how this
24   partial relief methodology -- how it works?
25           MR. HANCOCK:  Objection: exceeds the

Page 121
Page

1    scope of the court-ordered discovery.
2    BY MS. TORCHIANA:
3        Q    Okay.  Okay.  And then -- what is your
4    understanding of why loan relief tied to earnings
5    is a relevant measure, if relevant?
6        A    So I would -- would tell you that
7    that's not something I would have a deep
8    understanding of.  It is -- that's essentially, I
9    think, the policy that you're reading from of how
10   the methodology works, and -- and while we do have
11   technicians that compute it, the how or -- or why
12   of the policy would not be within my -- kind of my
13   statement of work.
14       Q    Okay.  Okay.  And then if we could go
15   to paragraph 6, could you just read the -- the
16   first sentence for me?
17       A    After adoption of the tiered relief
18   methodology discussed in the policy statement, FSA
19   resumed issuing decisions on pending borrower
20   defense claims.  If FSA determined that a borrower
21   had submitted an application which met the
22   requirements for a borrower defense discharge, FSA
23   used the methodology described in the policy
24   statement to determine the amount of relief that
25   would be provided to the borrower.

Page 122
Page

1      Q    Yeah, that's fine.  Thank you.
2           So FSA resumed issuing decisions.  When
3    did FSA cease making decisions on borrower defense
4    applications?
5           MR. HANCOCK:  Objection: vague.
6    BY MS. TORCHIANA:
7      Q    You can still answer.
8      A    So I'm -- I'm trying to understand.  Do
9    you mean after this point in time when did we
10   cease?
11     Q    So it says FSA resumed, so resumed is
12   starting again.  So when did FSA stop issuing
13   decisions?
14     A    Oh, I -- I -- okay.  Yeah, I
15   understand.  I think I understand your -- your
16   question.
17          If you mean prior to this time when
18   were we making decisions and when did we stop, I
19   believe we stopped based on my review of the facts
20   and as I was told -- because during my time coming
21   in in March, I looked into this and it was part of
22   my education on borrower defense, that after the
23   Manriquez case decision, that there were no more
24   decisions being issued out of borrower defense.
25          And, so, I don't know the exact time of

Page 123
Page

1    that, but whatever the timing of that court order
2    was is -- is my understanding of when borrower
3    defense stopped.
4           And, so, that was already in process
5    when I took my position in March of 2019.
6      Q    Okay.  And, so, did the decision stop
7    on both Corinthian students' applications and
8    non-Corinthian students' applications?
9      A    So I'm now talking about my
10   understanding of it.  I was not there when the
11   original Manriquez case decision was made, but no
12   decisions were going out to my knowledge in March
13   of 2019.
14          So that would have been, you know,
15   whatever is -- no decisions were going out.
16     Q    Okay.  When you say FSA resumed issuing
17   decisions, was that decisions on all pending
18   borrower defense applications including both
19   Corinthian and non-Corinthian?
20     A    What -- what I mean in that statement
21   is that all decisions, depending on which ones
22   were -- were right for -- for being made, right,
23   those that had been -- cases that had been
24   adjudicated and decisions were ready to go out,
25   and there was a methodology to use in all of those

Page 124
Page

1    schools that you named, if they had cases that
2    were sitting there ready to go out.
3      Q    Okay.  But the injunction was still in
4    place at that time?
5      A    So the cases for which -- the cases for
6    which the injunction did not cover.
7      Q    Okay.  And when you say resumed, does
8    that include -- we spoke about this a bit before.
9    Let me rephrase.
10          Had both decisions on eligibility as to
11   Step 1 as we talked about it, and relief, Step 2
12   as we talked about it, ceased?
13          MR. HANCOCK:  Objection: vague.
14          THE WITNESS:  I --
15   BY MS. TORCHIANA:
16     Q    You can still answer.
17     A    So had -- had decisions -- had
18   decisions for borrower defense cases ceased until
19   the point in this statement when I said resumed?
20          Is that the question?  I'm trying to
21   make sure I understand your question.
22     Q    Yeah.
23          So when you say -- so we established
24   that decisions had stopped, had ceased, and --
25   before this new methodology came out.  And was it

Page 125
Page

1    both decisions as related -- determinations on
2    eligibility, so whether someone was eligible for
3    borrower defense, and also how much relief they
4    were owed?
5      A    Right.  So, ma'am, again, Step 1
6    involves a case coming in being adjudicated by a
7    borrower defense attorney, and then through that
8    process determining if a claimant is eligible or
9    ineligible for borrower defense, a defense for
10   relief.
11          That first part, that Step 1 part,
12   which I think you are describing in this question,
13   again has never stopped.  And, so, it never
14   stopped.
15          And, so, when I said resumed, I'm
16   talking about completing the process through Step
17   2 as I'm defining it, which means the ability to
18   issue a determination to a borrower because now
19   you have a relief methodology.
20          So it goes back to our discussion
21   earlier about Step 1 and Step 2.
22     Q    Okay.  And do you know -- did you know
23   how many Step 1 decisions were being made during
24   that time from June 2018 to December 2019?
25     A    I can't -- I can't recall.  You mean,

Page 126

1   what was their level of activity, how many they
2   were getting through?
3       Q   Uh-huh.  Yeah.
4       A   I don't -- I don't recall all of the
5   numbers because the focus was on getting in enough
6   attorneys to do significantly more.  I can't -- I
7   can't recall exactly how many, the 10 to 12
8   attorneys and those folks, were getting through a
9   week.  But I'm sure it wasn't enough which is why
10  we needed more people.
11      Q   And were those numbers being reported
12  to you?
13      A   I don't recall having those numbers
14  reported to me.  At the time, my interest was on
15  building up the resources because I thought that
16  had to come first before the numbers would be
17  significant.
18      Q   Okay.  So how did you know Step 1
19  decisions were still being made?
20      A   As I -- as I said earlier, when I came
21  in in March, I went through an educational process
22  with the borrower defense unit in which they
23  explained to me how borrower defense worked.  And
24  part of it was that what you're describing as Step
25  1 which is borrower defense cases coming in, being

Page 127

1   adjudicated by lawyers, how far they can go before
2   they have to sit because they don't have the step
3   two things in place was a part of our discussions
4   in learning there.  And some of my folks told me
5   that they were continuing to adjudicate cases, but
6   that those cases could not go out.  And that had
7   something to do with the numbers that I was
8   seeing.
9       Q   Okay.
10      A   Okay.
11      Q   And when you say folks, who was that?
12      A   I use the term "folks" to describe any
13  of the 1,453 people that were in Federal Student
14  Aid.  I consider them all my folks, my team that
15  does work.  So when I use that term, I'm talking
16  about partner participation and oversight and
17  their subordinate unit, the borrower defense team.
18      Q   Okay.  Could we turn to Exhibit 17.
19          (Exhibit 17 referred to.)
20          THE WITNESS:  I have a newspaper
21  article.
22          BY MS. TORCHIANA:
23      Q   Yes, that's right.
24          Could you turn to the second page?  At
25  the bottom of the page the article describes a

Page 128

1   memorandum signed by DeVos issued in mid November
2   which instructs department officials to resume
3   issuing decisions on some roughly 227,000 pending
4   applications.
5           Are you familiar with this memorandum?
6       A   Can I just ask what you -- so I'm
7   looking at the article, and I'm trying to figure
8   out where you're -- where you're looking at.
9       Q   I'm sorry.  Yeah, so on the second page
10  at the bottom of the page, it says, The memo,
11  comma, which was signed?
12      A   (Witness reviews document.)
13          So the article that I have is entitled,
14  Trump Administration Hires McKinsey to Evaluate
15  Student-Loan Portfolio.
16          Is that the one you're referencing?
17      Q   No.  No, that's not.
18      A   So what, six is what got out of section
19  16?
20      Q   Seventeen.
21      A   POLITICO article?
22      Q   Yes, that's right.
23      A   I think we may have had them -- I got
24  you.  So this is entitled, POLITICO: DeVos Orders
25  Partial Loan Relief for Many Duped Student

Page 129

1   Borrowers?
2       Q   Yes, that's right.
3           So if you turn to the second page, so
4   after the cover, at the bottom of the second page?
5       A   Right.  The memo, which was signed by
6   DeVos in mid-November and hasn't been reported
7   previously, instructs department officials to
8   resume issuing decisions on some of the 227,000
9   pending applications filed by borrowers seeking
10  debt relief.  That process has been stalled for
11  the past 18 months.
12      Q   Yes.
13          Are you familiar with this memorandum?
14      A   So I think this is an art- -- this is
15  an article that Politico writes and I can't -- I'm
16  not sure what Mr. Stafford is referring to.
17          We have -- we did have guidance so
18  maybe that's -- maybe he's referring to something
19  I'm not familiar with.  I'm not saying it doesn't
20  exist, but I don't know what Mr. Stafford is
21  referring to.  I don't believe we're sourced in
22  this article.  I think we -- at least from what I
23  can tell.
24      Q   Okay.  So was there some kind of
25  memorandum signed by DeVos that instructed the

Page 130

1   borrower officials to start issuing decisions
2   again that was signed in mid-November?
3            Does that ring a bell or --
4        A    I believe that we had -- we had
5   guidance to begin processing claims and -- and --
6   but I -- I don't know if I can -- you know, I
7   could not recall an exact memo or take you to an
8   exact memo, but I'm certain we had guidance, and
9   we began in December of 2019.
10       Q    Okay.  And how did you receive that
11  guidance?
12       A    That is what I can't remember
13  specifically, but I'm certain that we -- that we
14  had it.  I'm sure that I knew from my
15  conversations with the under secretary, and so I'm
16  sure that we had guidance because as I look at our
17  numbers, we began December of 2019 to process
18  claims as I said in my earlier statement.
19       Q    Okay.  And just to be clear, this is --
20  this is Exhibit 17 which is already marked.  So --
21  can you turn to the fifth page?
22       A    Okay.
23       Q    And it starts with, The ten-page memo.
24       A    Right.
25       Q    And could you just read that sentence

Page 131

1   for me?
2        A    It says, The ten-page memo was prepared
3   by Diane Auer Jones, a top advisor on higher
4   education issues, and Mark Brown, who leads the
5   department's Office of Federal Student Aid.  The
6   new policy, they wrote, will allow the education
7   department to resolve claims in an efficient, fair
8   and predictable manner that doles out federal loan
9   forgiveness in line with the financial harm that
10  borrowers are estimated to have suffered.
11       Q    Okay.  And do you remember what you
12  wrote in that memo or what the contents of that
13  memo are?
14       A    So I'm not prepared to say that the
15  premise of this statement is correct.
16       Q    Okay.  What is incorrect about it?
17       A    I don't write policy memos.
18       Q    Okay.  And do you -- so did you ever
19  prepare a memo with Diane Auer Jones?
20       A    We may have -- if you mean -- if you
21  mean did I -- did I sign off on the data that we
22  would provide or something like that, that --
23  that's very possible because we would provide the
24  data that would have input to the -- to the
25  policy.

Page 132

1        But I would -- at least as it's written
2   here by Mr. Stratford, it says that I came up with
3   the -- that I wrote the policy.  I don't do that.
4   I wouldn't be allowed to do that.
5        Q    Okay.  So after instructions were given
6   to resume on issuing decisions, what happened in
7   the BDU?  Did those decisions start going out
8   right away or how long did it take for those
9   decisions to start going out?
10            MR. HANCOCK:  Objection: compound.
11            THE WITNESS:  So if I understand you,
12  once we had a policy in place in December, did the
13  BD unit immediately go to work; is that your
14  question?
15            Are you saying how soon?
16            BY MS. TORCHIANA:
17       Q    What happened after these instructions
18  were issued to resume decisions?
19       A    Well, once the --
20       Q    You can go chronologically.
21       A    So I can't talk specifically to the
22  instructions that are noted in this -- this
23  letter, so I'm not -- I'm not totally familiar
24  with exactly what Mr. Stafford is talking about.
25            But if -- but if you mean when a relief

Page 133

1   methodology was determined, which is December, the
2   borrower defense unit began to release cases,
3   notify borrowers.  They were not at full capacity
4   yet in terms of numbers of people, but they did
5   their work.  They went to work to continue to
6   adjudicate cases, but to also do notifications
7   when appropriate.
8        Q    Okay.  And then if you -- I'm sorry.
9   I'm just reading this.
10            So if you turn the page and go to
11  page 6, it says -- could you read the beginning of
12  the last paragraph?
13            MR. HANCOCK:  I'm sorry.  Can we just
14  clarify which page?  There are page numbers that I
15  can see, and so I just want to make sure we're
16  looking at the same.
17            MS. TORCHIANA:  Yeah.  On the
18  electronic copy, let's see -- it would be the
19  sixth page of the PDF.
20            MR. HANCOCK:  Okay.  Thank you.
21            THE WITNESS:  Is the paragraph that
22  you're referring to, does it start with, The
23  department believes?
24            BY MS. TORCHIANA:
25       Q    Yes.

Page 134

1        A    The department believes that if it
2   issued denials in advance of issuing approvals,
3   borrowers could be confused and believe that the
4   department would not be approving any claims,
5   which is not the case, Jones wrote.  Therefore, in
6   order to prevent confusion or distress to
7   borrowers who are eligible for relief, the
8   department decided that it should not issue
9   denials until it has a methodology in place that
10  will allow it to issue approvals and relief.
11       Q    Okay.  And do you agree with this
12  statement?
13       A    I -- I agree that we were not issuing
14  denials until we had a methodology so that we
15  could do all at the same time, both approvals and
16  denials.  And if that is what is communicating
17  here in -- in this quotation of Ms. Jones, then I
18  agree with that.
19       Q    Okay.  And do you think -- was there --
20  was there any concern about causing any confusion
21  or distress to borrowers who are not eligible for
22  relief as far as you know?
23       A    I really could -- I mean, I don't -- I
24  don't know.  You mean was I concerned or --
25       Q    Sure.

Page 135

1             Was your under- -- was the Department
2   of Education concerned, was that a concern?
3             MR. HANCOCK:  Objection.  Potentially
4   calls for privileged, deliberative information.
5             THE WITNESS:  I -- I don't know, ma'am.
6   I couldn't tell you how people are feeling.  I
7   couldn't -- I just -- I'm sorry.  I don't know
8   that.
9        BY MS. TORCHIANA:
10       Q    And do you think generally since the
11  department started issuing decisions again that
12  confusion and distress has been avoided?
13       A    Do I -- do I think that confusion and
14  distress has been avoided?
15       Q    Yes.
16       A    Because we were issuing borrower
17  defense claims?
18       Q    Since you restarted issuing borrower
19  defense claims?
20       A    I don't know.  I would say I don't
21  know, and I would just add that we've got
22  43 million customers.  And while I -- I do
23  provide -- or I do listen to customers through our
24  ombudsman and feedback and different sources, I
25  would never make a statement that any particular

Page 136

1   policy eliminated anxiety or stopped any of the
2   things that you noted because I could never say
3   it.  In total, I would have no way of knowing.
4             MS. TORCHIANA:  Can we take a short
5   break and then get back on the record?
6             MR. HANCOCK:  Certainly.  That would be
7   fine.  How long?
8             THE VIDEOGRAPHER:  We're now going off
9   the record.  The time is 19:05 UTC time.
10            (Recess -- 2:05 p.m.)
11            (After recess -- 2:20 p.m.)
12            THE VIDEOGRAPHER:  We're now back on
13  the record.  The time is 19:20 UTC time.
14            MS. TORCHIANA:  And before I get
15  started, could I ask that we mark as Exhibit 27
16  the FSA 2020 annual report which is bracketed 31?
17            (Deposition Exhibit 27 was marked for
18  identification and attached to the transcript.)
19       BY MS. TORCHIANA:
20       Q    So if you could turn to -- back to your
21  declaration which is behind tab 25, so Exhibit 25?
22       A    I have Exhibit 25.
23       Q    Okay.  And in paragraph 7 you note that
24  on December 11th, 2019, FSA issued a total of
25  16,045 decisions on borrower defense claims and

Page 137

1   that 789 met the conditions for discharge.
2             Do you know how many of those 789 that
3   were approved were from either Corinthian or ITT?
4        A    I -- I don't know.  I -- no, ma'am, I
5   would not know off of the top of my head what the
6   breakout of the 789 borrowers were in terms of
7   schools they attended.
8        Q    Okay.  And do you know if any -- since
9   you've started, do you know if any approvals have
10  gone out for schools other than ITT or Corinthian
11  or for borrowers who attended schools other than
12  ITT or Corinthian?
13       A    I would have to look at the data to
14  be -- for -- and, so, I would not want to
15  speculate, but we -- we do make public this --
16  this kind of data, I think, at the macro level.
17  But I wouldn't want to speculate on -- on exactly
18  what schools have had approvals and disapprovals.
19  I don't have those numbers memorized.
20       Q    Okay.  And where -- if you wanted to
21  check that data, where -- where would you get it
22  from?
23       A    At the -- at the macro level we produce
24  data for the public I think every month, and we
25  publish it on our -- on our Web site, on our

Page 138
Page

1  portal site, and we produce those reports that
2  talk about approvals and disapprovals and how many
3  borrower defense cases are there.
4       Q    Okay.  So it's public data how many
5  approvals there have been for each school group?
6       A    Well, I'm not sure, and again I would
7  have to actually look at a borrower defense report
8  to tell you the details of it.  But that isn't
9  anything that I think that we keep insulated into
10  the organization.  We -- I think we publish
11  borrower defense (audio distortion) reports.
12           THE COURT REPORTER:  I'm sorry.  You
13  said, "I think we publish borrower defense," and
14  then you cut out on me.
15           THE WITNESS:  Reports.  We publish
16  borrower defense reports.
17       BY MS. TORCHIANA:
18       Q    If you go to paragraph 8, it says, FSA
19  in the process of issuing an additional 1,000
20  decisions and anticipates issuing thousands more
21  in the next several weeks on a rolling basis.
22           So how -- how are these numbers set?
23           MR. HANCOCK:  Objection: vague.
24       BY MS. TORCHIANA:
25       Q    How does the number of 1,000 additional

Page 139
Page

1  decisions set and the anticipation -- or -- let's
2  just start with that?
3       A    When you say "set," you mean why would
4  we use that number?
5       Q    Yeah.
6       A    So we know how many claims that we
7  have.  We know how many are pending decisions.  We
8  know how many have been adjudicated thus far, and
9  I think what you see here in this statement in
10  paragraph 8 is our anticipation that when a
11  certain number will be at the next stage of the
12  process.
13           So if an attorney had completed
14  adjudication and it was in the band and ready to
15  go, it would be -- you know, we would be able to
16  look at that and say that fairly soon we will
17  have, you know, more decisions on these thousand
18  and then, you know, could look at how many more
19  you have coming and how many attorneys you have,
20  and you can tell it at about what rate you'll be
21  able to go at that point in time with the amount
22  of resources that you have at that point in time.
23           I believe when I made this statement in
24  this particular declaration, which is at the very
25  beginning of the reissuance -- it's in

Page 140
Page

1  December 2019 -- we were looking at just that.
2       Q    Okay.  And, so, who -- okay.  And did
3  you set performance metrics for how many decisions
4  were going to go out in -- in the weeks following
5  December 2019?
6       A    So as I -- as I said earlier, we -- we
7  have -- we had metrics performance for every part
8  of the -- the performance-based organization.
9  That's -- that's what we -- that's what we do.
10           But I think what you just said in your
11  question was did I set a metric for how many would
12  go out in December of 2019.
13       Q    No, after -- after December 2019.
14       A    If -- if I were to set a metric, it
15  wouldn't be for a month, right.  I mean, if you
16  mean did we have goals to meet.  I'm trying to
17  understand your question, ma'am.
18       Q    I don't just mean in a month.  I mean
19  going forward after December 2019 --
20       A    I don't know -- I don't know if we had
21  the metrics established that early.  I don't know.
22  I'd have to go back and look.  So to answer your
23  question, I can't tell you that there was a metric
24  in December 2019 of how many we would do each
25  month for the remainder of the year.  I don't know

Page 141
Page

1  that we were mature enough in the process at that
2  point to have done that.
3           Somewhere along that road, though, we
4  did establish metrics and measurements for the
5  borrower defense team to work toward.
6       Q    Okay.  Could you turn to tab 32 in your
7  hard copies?  And that's document 145.
8           MS. TORCHIANA:  And could we mark that
9  as Exhibit 28?
10           (Deposition Exhibit 28 was marked for
11  identification and attached to the transcript.)
12           THE WITNESS:  Yes, I have it.
13       BY MS. TORCHIANA:
14       Q    Okay.  And do you recognize this
15  document?
16       A    (Witness reviews document.)
17           This is a declaration that I signed.
18       Q    And did you write it?
19       A    As I -- as I said earlier, I don't
20  actually write all the declarations.  These are
21  done in conjunction with counsel.
22       Q    Okay.  And that's your signature on
23  page 3?
24       A    That is my signature.
25       Q    I'm sorry.  I turned to the -- I turned

Page 142
Page

1   to the wrong one.  I meant -- we'll get back to
2   that one later.  I meant to go to tab 27.
3           MS. TORCHIANA:  And if we can mark that
4   as Exhibit 29.
5           (Deposition Exhibit 29 was marked for
6   identification and attached to the transcript.)
7           THE WITNESS:  Okay.
8       BY MS. TORCHIANA:
9       Q    Okay.  And do you recognize this
10  document?
11      A    (Witness reviews document.)
12           I believe this is my -- this is my
13  declaration.
14      Q    Okay.  And did you write it?
15      A    As I stated earlier, the -- I do these
16  in consultation with counsel.
17      Q    Okay.  Okay.  If you turn to
18  paragraph 6 -- that's on page 4 --
19      A    So I -- paragraph 6; right?  Yeah.  On
20  page -- oh, I think we have different page numbers
21  on the top and the bottom, so you read the number
22  that are on the top of the page?
23      Q    Uh-huh.
24      A    I have paragraph 6.  You're good.
25      Q    And this describes the hiring that

Page 143
Page

1   you -- that the BDU did in September of 2019.  So
2   we talked about this a little bit before, but when
3   was the decision to hire more new term attorneys
4   made?
5       A    So I don't know the exact time, but
6   somewhere soon after I was in office in March of
7   2019, somewhere in the next couple of months, we
8   made the decision to -- we had approval to hire
9   new attorneys, and we went through the process of
10  recruiting and doing all the things that I
11  mentioned earlier to bring them on board.
12      Q    Okay.  And who made the decision to
13  hire more attorneys?
14      A    I made the decision to hire more
15  attorneys once I had approval from the -- from the
16  department.
17      Q    Okay.
18      A    As I -- as I stated earlier, I made a
19  request to the department and they said yes.
20      Q    Okay.  And are these employees
21  full-time?
22      A    The term "term," they work full-time,
23  but it doesn't mean forever.  They are for a
24  specific term.
25      Q    Okay.  And what is the term?  Is

Page 144
Page

1   there --
2       A    I believe it is two years.
3       Q    Okay.  And have you hired any new
4   attorneys since -- since you wrote this?
5       A    So there -- there may have been a few
6   more attorneys hired since this -- since this
7   date.  I can't say exactly, but we may have -- we
8   may have brought a few more on because I believe
9   this has a number, like, 452.  We may be at 54 if
10  a couple were not on board yet when this was
11  written.
12      Q    When you said -- you said we made the
13  decision to hire more attorneys, who do you mean
14  by "we"?
15      A    No, ma'am.  I said I made the decision
16  to hire more attorneys.  I asked the -- I said I
17  asked the Department of Education.  They said yes.
18      Q    And who did -- who did you ask at the
19  Department of Education?
20           MR. HANCOCK:  Objection: asked and
21  answered.
22           THE WITNESS:  So as I -- as I said
23  earlier, I asked more than one person as I
24  explained where we were in borrower defense.  That
25  included the under secretary; that included the

Page 145
Page

1   secretary and the human resources folks who deal
2   with these kinds of things.
3       BY MS. TORCHIANA:
4       Q    Okay.  And what was their response?
5       A    As I said earlier, they said yes.
6       Q    Okay.  And do you know -- had there
7   been any requests before you made the request to
8   hire more attorneys?
9           MR. HANCOCK:  Objection: asked and
10  answered.
11           THE WITNESS:  As I said earlier -- as I
12  said earlier, I'm not -- I'm not aware of any --
13  any specific things that may have occurred like
14  that before I -- before I got here.
15       BY MS. TORCHIANA:
16      Q    Okay.  And was the -- what were some of
17  the priorities that were represented to these new
18  hires, these new staff attorneys?
19           MR. HANCOCK:  Objection: vague.
20           THE WITNESS:  I -- I don't know if I
21  under-- I don't know if I understand your
22  question.  You mean when we brought on new term
23  attorneys, you're asking what we told them or what
24  we --
25       BY MS. TORCHIANA:

Page 146

1    Q    Yeah.
2    A    -- told them our plans were?
3    Q    Yes.
4    A    So, ma'am, the way we're organized is
5  I'm the chief operating officer, and I have a
6  deputy chief of partner participation and
7  oversight, and the borrower defense unit works for
8  the partner participation and oversight, and we
9  have a borrower defense team lead and then there
10 are other supervisors in borrower defense.
11        So a line attorney, a brand new
12 attorney, I would not sit down and give them
13 priorities.  So I wasn't in a conversation where I
14 sat down with new attorneys and said these are
15 your priorities.  If that's the question you're
16 asking, that would not have been something that I
17 would have done.
18    Q    Okay.  And do you know if reducing the
19 backlog was represented as a priority to these new
20 employees?
21    A    I don't know.  I -- again, that's just
22 not something that I would have -- I would have --
23 I would have done.
24    Q    Okay.  Why did you want to hire more
25 attorneys?

Page 147

1    A    So we wanted to hire more attorneys
2  because we needed more based on the -- the amount
3  of work that was inside of borrower defense, the
4  number of cases.
5    Q    Okay.  And in the next paragraph, you
6  say that FSA hired three employees to focus on the
7  administrative process end of distributing the
8  decision letters.
9         What does that mean?  What do you mean
10 by "the administrative process end"?
11    A    So once a -- once a decision has been
12 made on a -- on a borrower defense case, and by
13 that, I mean we've gone through what we have
14 described earlier as Step 1 and we have gone
15 through what we called earlier Step 2, the second
16 part of Step 2 is that the borrower must be
17 notified of the decision.  And -- and if we took
18 the scenario where the loan was forgiven or -- or
19 reduced by a certain percentage, there is a -- a
20 long administrative tail to that.
21        There is a -- you know, if you read
22 this on the face, it sounds like we're typing up a
23 letter or writing a letter and that's it, but when
24 you're talking about mass numbers like what we
25 have here, we have to have this loaded into a

Page 148

1  system to -- to generate the letter that would go
2  out to the individual, and then that has to
3  correlate with the loan servicer somewhere in the
4  country, and that has to correlate to a loan
5  number, and that loan number has a promissory
6  note, and the promissory note has to be reduced by
7  the amount if the loan has been forgiven, and then
8  that has to all be reconciled.
9         So this -- what we're calling in
10 general this administrative process is -- is a
11 very long and convoluted process that you have to
12 assign people to manage it as well as
13 contractors and other folks because -- because
14 there are so many -- there are so many of these
15 that it doesn't work on autopilot and you have to
16 do those kind of things to manage it.
17    Q    Okay.  And how many --
18    A    Hundreds of these.
19    Q    So you say you hired three employees.
20 How many attorneys work on the -- on the
21 administrative processing end of distributing
22 those letters?
23    A    So we hire attorneys to adjudicate
24 cases.  These three people are not attorneys.
25    Q    Okay.  How many employees work on

Page 149

1  distributing the letters?
2    A    I don't know that exact number.  It's
3  more than three.  That's three additional people.
4  And, ma'am, to understand -- to understand this,
5  we have -- we have contractors; we have contract
6  support; and we have call centers.  It's a large
7  operation.
8         So when I say three people, I don't
9  mean three people and those three people are going
10 to put out all of the letters and notifications.
11 That's -- that's not what that means.  That means
12 those three people are going to orchestrate a
13 very, very large process and there are a lot of
14 people in a lot of different places that make it
15 actually -- that actually make it happen.
16        So how many people are involved in the
17 administrative process?  You know, I would -- I
18 would have to go back and it would be a range
19 of -- you know, it would be a range of folks, and
20 depending on how you wanted to count them.  If you
21 want to count the contractors or government
22 employees, it would just depend, to include loan
23 servicers who ultimately take the action against
24 the loan.
25    Q    Okay.  Okay.  And then in paragraph 8

Page 150
Page

1  you explain that the increase of personnel within
2  the BDU has enabled FSA to substantially increase
3  the volume of borrower defense decisions it has
4  issued.
5          And, so, if that's the case, why didn't
6  FSA increase its staffing earlier?
7      A    I would not be able -- when you say
8  "earlier," do you mean before March of 2019 when I
9  became the chief operating officer?
10     Q    Before -- before the increased
11 personnel happened.
12     A    So for me, the period that I can talk
13 about, we did it immediately -- started increasing
14 personnel immediately, but it took time to build
15 them up.
16         So, in other words, if you tell me in
17 April or May -- or April that I have approval to
18 hire attorneys and I go out and hire them, I don't
19 know if you're familiar with government hiring,
20 but you have to have a security clearance, and --
21 and you have to go through our process.  You have
22 to fill out an application to -- there are a
23 number of things you have to do that are very
24 bureaucratic.  We simply don't pick a person, hire
25 them and they come to work the next day.

Page 151
Page

1          So I think it is -- it was done in what
2  I would consider immediately in the period of time
3  that I can talk about, which is beginning in March
4  of 2019.  That's the period of time I can speak to
5  directly.  It was done immediately.  It doesn't
6  mean they arrived immediately.
7      Q    Okay.  And you mentioned that, as I
8  understand it, Step 1 -- before you -- you
9  increased this hiring, Step 1 adjudications were
10 still continuing; is that right?
11     A    Yes, as I -- as I said earlier, the
12 Step 1 process, which is the claim coming in,
13 being adjudicated, has never stopped to my
14 knowledge.
15     Q    Okay.  And, so, were all -- when you
16 hired all these new attorneys, were they still
17 working on Step 1 or was it -- I guess were you
18 increasing capacity both for Step 1 and Step 2?
19     A    So we -- we are -- you are asking about
20 what the attorneys were hired for?
21     Q    Yeah.
22     A    They were -- they were hired to
23 adjudicate cases.  And in this particular document
24 in your statement, the conversation is limited to
25 the attorneys, but we increased personnel

Page 152
Page

1  throughout FSA for what would -- I would call the
2  whole picture here of the process by which
3  there's -- the ones I referenced in this statement
4  when I said three additional people came on, they
5  aren't counted in the attorney numbers.
6          So the attorneys came on and -- and
7  they helped in the first part what you're calling
8  Step 1 of the process, and -- and there were
9  others with different specialties that helped with
10 Step 2 of the process to help get this done.
11     Q    Okay.  And -- and do any of these
12 attorneys make any Step 2 determinations?
13     A    So I don't -- I can't speak to all of
14 the internal workings of the borrower defense
15 team, not with any specificity.
16         I can -- I can tell you that in general
17 that there are two different types of things going
18 on, and in Step 1 is purely attorneys for the most
19 part, right, that are adjudicating cases because
20 you have to have an attorney do that.  But letter
21 preparation, the computation of relief using the
22 methodology, the administrative process of getting
23 a letter prepared to go through our digital
24 platform and loading them up on our systems, and
25 then the oversight of those who do that contract

Page 153
Page

1  work are not attorneys.
2          So if you -- if you attribute the
3  increase to -- to something it would -- and you're
4  dividing this into steps, it's Step 1 that
5  increased (audio distortion) attorneys for (audio
6  distortion.)
7      Q    Okay.  So just to be clear, do
8  attorneys make any Step 2 adjudication decisions?
9      A    So I want to define Step 2 to make sure
10 you and I are saying the same thing.
11     Q    Do attorneys make any determination
12 about the percentage of relief that a borrower --
13 that a borrower will get?
14     A    So I would -- I would not call Step 2
15 determination.  I -- I would call Step 2
16 computation because they are not determining --
17 they're not picking winners and losers or
18 percentages.  They're computing a methodology that
19 was given to them as a policy document from the
20 department.  Whatever the number comes out to be,
21 as long as they're compliant with the methodology,
22 that's it.  They're not -- they're not making
23 determinations in that sense.
24     Q    Okay.
25     A    They're technicians performing

Page 154

1   computations, and I think there's a difference.
2        Q    So who -- who performs those
3   computations?
4        A    Policy liaison and technicians that
5   work within the policy liaison teams, the data
6   people.
7        Q    Okay.  And -- and, so -- well, I
8   suppose if -- if you're saying what all the
9   attorneys do is adjudication and Step 1 had been
10  continuing -- had never stopped, why -- why did
11  the BDU need more attorneys?
12       MR. HANCOCK:  Objection: misstates
13  testimony.
14       THE WITNESS:  So is your question why
15  does BDU need more attorneys?
16       BY MS. TORCHIANA:
17       Q    Yes.
18            Why did the BDU need more attorneys?
19       A    Because the volume of claims coming in
20  exceeded the capacity of 10 to 12 attorneys within
21  any reasonable workday.  So if you're receiving
22  2,000-plus claims a week -- and sometimes it was
23  more than that -- and you have 12 attorneys -- 10
24  to 12 attorneys, they can't move that volume.
25  They were not built for that many cases; that

Page 155

1   number was not appropriate for that many cases.
2            So why was there a need for more
3   attorneys?  Like with any organization, we were
4   sizing the workforce to the volume of the work.
5        Q    Okay.  So why did FSA wait until, you
6   know, about September 2019 or so to hire more
7   attorneys?
8        MR. HANCOCK:  Objection: misstates the
9   testimony and asked and answered.
10       THE WITNESS:  So if you decide in March
11  or April and you have approval to hire employees,
12  you start then.  They may not physically be on
13  board until September because government hiring
14  just simply is not as quick as you may think.  It
15  takes several months.  For you to work for Federal
16  Student Aid, you have to pass a security
17  background check which covers your whole life from
18  the time that you were 18 until you get done.  You
19  have to tell them every address that you worked
20  at.  It's a -- it's a full background check.
21            And -- then assuming that process
22  is successful, we then can make an offer to you
23  and establish a date.  That process alone can be a
24  three- or four-month process.  So I can hire you
25  in March, and if you arrive in July, I'm on

Page 156

1   schedule.
2            And in the case of the BD attorneys,
3   you saw decisions and then buildup based on all
4   those required processes.  So as I said earlier,
5   we did begin immediately, and what you see in the
6   numbers is just that, but the process bringing
7   these attorneys on as -- as time would -- would
8   enable it to, given the requirements of working
9   for the federal government.
10       BY MS. TORCHIANA:
11       Q    Okay.  And would you say before this
12  increase of personnel within the BDU, were there
13  not enough attorneys to adjudicate the number of
14  claims coming in?
15       MR. HANCOCK:  Objection: asked and
16  answered.  We've covered this ground a few times
17  now.
18       THE WITNESS:  Yeah, again I'd just say
19  yes.  I don't know what happened before March of
20  2019, ma'am.
21       BY MS. TORCHIANA:
22       Q    Okay.  If you turn to the next
23  paragraph, paragraph 9, you say that the
24  department has issued significantly more decisions
25  finding BD applications ineligible than finding

Page 157

1   them eligible.  This is the result of the
2   department's strategy to prioritize adjudicating
3   and issuing decisions on applications with little
4   or no relevant evidence.
5            So how would you determine what is an
6   application with little or no relevant evidence?
7        A    As the chief operating officer of
8   Federal Student Aid, I don't adjudicate borrower
9   defense claims.  So what we mean by that statement
10  is not how I would determine that.  I would not.
11  I don't adjudicate borrower defense claims.
12            I would -- that is an appropriate
13  question, I think, for one of the borrower defense
14  attorneys who -- whose job is to review the
15  available evidence and in what we have been
16  calling to date to determine if -- if there is
17  evidence sufficient enough to use.
18       Q    Okay.  And would you say from your
19  understanding did the 15,256 denials that were
20  issued in December 2019 -- were those all from
21  applications with little or no relevant evidence?
22       A    I don't know that they all had little
23  or no relevant evidence.  I just know at the time
24  of this report they had been determined to be
25  ineligible.  In -- in the report, I don't -- I

Page 158

Page

1  can't tell you if each one of those cases had --
2  certainly I couldn't tell you if all of them had
3  little to no evidence.  I -- I simply don't know.
4        I could only tell you that they were
5  accounted for as ineligible in our system which
6  is -- which is how I would have been able to write
7  or -- or sign and agree to this -- that number in
8  this report.
9        Q    Okay.  And do you know what the
10  reasoning was to not issue decisions -- denials on
11  applications with little or no relevant evidence
12  until December 2019?
13        A    Could I just ask you to say that one
14  again?  I lost some of it, I think.
15        Q    Yeah.
16        What was the reasoning on not issuing
17  decisions until December 2019 on applications with
18  little or no relevant evidence?
19        A    For -- for all -- for all applications,
20  as I stated earlier, the decision was to wait
21  until we had a methodology developed and to issue
22  decisions, both eligible and ineligible, once that
23  methodology had been produced.  And that
24  methodology was produced, as you said earlier, in
25  around that time frame when we started reissuing

Page 159

Page

1  decisions in December of 2019.
2        Q    Okay.  And you said -- whose decision
3  did you say that was?
4        MR. HANCOCK:  Objection: asked and
5  answered.
6        THE WITNESS:  You're asking me whose
7  decision was it to begin issuing decisions?
8        BY MS. TORCHIANA:
9        Q    To not issue any decisions?
10        A    To not issue any decisions.  That was
11  the department's decision to wait until the
12  methodology was -- was developed.
13        Q    Yes, but -- but whose decision in the
14  department was it to wait until the methodology
15  was developed?
16        MR. HANCOCK:  Objection: asked and
17  answered.  This question has been asked and
18  answered at least three times at this point.
19        BY MS. TORCHIANA:
20        Q    You can still answer.
21        A    Yeah, the -- I don't -- I don't know
22  all the inner workings and the conversations of
23  various department officials.  I can say that the
24  under secretary relays those decisions to Federal
25  Student Aid, but I can't tell you -- I can't

Page 160

Page

1  answer your question which is -- which is who made
2  it and when they made it and that kind of thing.
3        Q    Okay.  In paragraph 11, you say, The
4  department may find a claim ineligible when it is
5  not supported by sufficient evidence.
6        And, so, could you tell me what -- what
7  FSA considers sufficient evidence?
8        A    So I -- I would not want to, you know,
9  speak on behalf of the attorneys.  I'm not -- I'm
10  not an attorney.  And, so, the -- the measurement
11  of evidence that qualifies and doesn't qualify
12  those kind of things are within the internal
13  workings of borrower defense.  I wouldn't be in a
14  position to tell you, ma'am.
15        Q    And do you know -- have you heard of a
16  policy within FSA that a signed declaration with a
17  firsthand account is not considered sufficient
18  evidence on its own?
19        A    Can you say that again, ma'am?  A
20  signed what?
21        Q    A signed -- a signed declaration by a
22  borrower is not considered sufficient evidence on
23  its own?
24        A    Right.  I -- I couldn't -- I'm sorry.
25  I couldn't talk to you about that.  I -- I

Page 161

Page

1  wouldn't know.  I couldn't opine even on -- on all
2  of the -- what I would call the legal decisions of
3  adjudicating the claim and determining what
4  evidence rises to the right level to be included,
5  but that would be an appropriate question, I
6  think, for our -- for the internal workings of our
7  borrower defense team.
8        Q    And would you think that something --
9  that if a borrower signs something under penalty
10  of perjury that that should count as evidence?
11        A    I -- I wouldn't have an opinion on that
12  one way or the other.  I would -- I would allow
13  those trained in the legal aspects of what -- what
14  counts, what doesn't count, what's permissible,
15  what's not permissible, what rises to the right
16  level, all those variety of questions would be a
17  part of what the trained attorney would do in --
18  during their adjudication.  They would determine
19  that along with experienced attorneys that are
20  running the borrower defense unit.
21        So, again, I think it's an appropriate
22  question for the attorneys doing the work.
23        Q    Okay.  Okay.  And if you could turn to
24  paragraph 14.  You write, The department's
25  evaluation of, and decision on, any given borrower

Page 162
Page

1   defense application is an individual process.
2           What do you mean by an individual
3   process?
4       A   Can I have a second to reread this,
5   ma'am?
6       Q   Yes.
7       A   (Witness reviews document.)
8       Yes, ma'am.  I -- what I mean in
9   paragraph 14 is that each case on its individual
10  merits and in its own adjudication, so cases are
11  not the same.  And, so, every case deserves to be
12  adjudicated on its own merits by a qualified
13  attorney, and that's why we needed to hire more
14  attorneys because they -- they needed to do that,
15  and that's what I was alluding to in paragraph 14.
16      Q   Would FSA ever do a -- a group
17  discharge for a group of borrower defense
18  applicants who all attended the same school during
19  the same time periods?
20      MR. HANCOCK:  Objection: exceeds the
21  scope of the court-ordered discovery.
22      BY MS. TORCHIANA:
23      Q   You can still answer.
24      A   So I think you said would we ever --
25  would we ever do it.  I -- I wouldn't have an

Page 163
Page

1   answer to an absolute like that.  Would we ever do
2   it?  I don't know if there would be a set of
3   circumstances.  I don't know off the top of my
4   head of a set of circumstances.  But I couldn't
5   tell you if we would ever do it.  I -- I don't
6   know.
7       Q   Okay.  And in paragraph 16, you
8   mentioned that the BDU is continuing its review of
9   common evidence related to several additional
10  schools other than those for which it has so far
11  approved claims, so other than Corinthian and ITT.
12  It has completed a sufficient preliminary review
13  of the common evidence to determine its scope
14  including time periods and particular acts.
15      So do you know where this process is
16  at?
17      A   So borrower defense is an ongoing
18  process.  And by that, I mean, even today I'm sure
19  more cases came in, and so cases come in each
20  week.
21      And part of what we're alluding to
22  there is that as there is evidence on cases and
23  evidence discovered on cases that's unique that
24  borrower defense will continue to review that
25  common evidence and apply it as appropriate if it

Page 164
Page

1   applies to a particular case.  So where are they
2   at?  I don't think they would ever stop that part
3   because the process itself doesn't -- doesn't
4   stop.
5       Q   Okay.  So do you know if there are any
6   approval protocols that have -- that have been
7   developed for schools other than ITT and
8   Corinthian?
9       A   Approval protocols?
10      Q   Yes.
11      A   I -- I'm certain that the director of
12  borrower defense has procedures and processes.
13  I -- I would not be able to enumerate all of them
14  to you, but I'm certain that they -- that the
15  leader of borrower defense -- I'm confident that
16  the leader of borrower defense has procedures and
17  processes in place for multiple different types of
18  claims that come in.
19      Q   Okay.  And as part of setting the
20  metrics of how many borrower defense applications
21  you want to be adjudicated, do you consider how
22  many approval protocols have been developed?
23      A   I -- I do this in collaboration with
24  the subject matter experts, and I take their
25  recommendations, have dialogue on them.  And there

Page 165
Page

1   are a number of things that they consider, some of
2   which I don't know all the things that they
3   consider.  It may -- those -- those capabilities
4   may or may not include approval protocols because
5   that particular term, I'm -- I'm not certain how
6   the borrower defense unit uses that term.
7       So when they -- when the borrower
8   defense unit tells me that, you know, we can get
9   to so many cases per week and if we have these
10  kinds of resources, that's part of the dialogue.
11      There are many things behind there.
12  Approval protocols may be one of them.  I can't
13  say for certain.
14      Q   Okay.  So in paragraph 17, you write,
15  As BDU completes its analysis of common evidence,
16  the department anticipates there may be an
17  increased number of approvals over time.
18      And, so, could you tell me -- do you
19  know how many schools there are -- or how many
20  categories of schools there are where borrowers'
21  applications have been granted so far?
22      A   How many schools -- I just want to
23  repeat and make sure I understand.  How many
24  schools --
25      Q   How many school groups so far are there

Page 166

1    where there have been approvals?
2         A    I -- I don't know that exact number,
3    ma'am.  I -- I -- I don't -- I don't know.
4         Q    Okay.  And then if we could go forward
5    to -- so we don't have to read through them, but
6    in paragraph 23 and 24, you describe some -- some
7    mistaken -- some errors.  So paragraph 23
8    describes mistaken denial letter that went out to
9    a borrower.
10             Have you spotted any other mistaken
11   approval letters that went out?
12        A    (Witness reviews document.)
13             So, ma'am, you mean in paragraph 23
14   when we talk about the letter of ineligibility
15   when it should have been eligibility?
16        Q    Yeah.  Sorry.
17             Has FSA spotted any other mistaken
18   denial letters going out?
19        A    So I -- I don't -- I don't know if
20   we've had any of recent, but it's possible.  It's
21   possible that there could be an error
22   occasionally.
23             I would say that I know that there is
24   not a systemic error or I would know about that,
25   right, because the numbers or the percentages

Page 167

1    would be such that it would rise to a level of
2    discussion.  We have processes in place for that.
3             But if it's an isolated error and we
4    correct it, I may not necessarily know that.
5         Q    So are -- so are any -- would mistaken
6    denial letter, would that error be reported to
7    you, or is there a way to --
8         A    Not necessarily.  You know, again,
9    just -- just so that we have full understanding
10   here, we have -- and I'll give you an example.  We
11   have attorneys in Chicago, and -- and they have
12   supervisors there, and then supervisors within the
13   borrower defense unit within Washington, and they
14   have supervisors that lead up to the borrower
15   defense leader.  Then we have a whole another
16   process for Step 2.
17             There could be -- there could be an
18   error lodged with this customer here, with
19   Ms. Yvette Colon.  There could be an area where we
20   find through our own systems that someone received
21   letter A and should have received another type of
22   error or got our decisions wrong, and we go out
23   and correct it, and that's not necessarily
24   something that would get -- that will get briefed
25   to me.

Page 168

1              If there were large numbers and if
2    there was a systemic problem, that is more likely
3    going to be briefed to me.
4              So -- so knowing that about our process
5    and the scale of it, I could never tell you that
6    there has never been another letter since the one
7    that's referenced in this declaration.
8         Q    Okay.  But you haven't received any
9    reports of any mistaken denial letters?
10        A    Not that I can recall at this moment.
11        Q    Okay.  And have you received any
12   reports of mistaken eligibility letters that went
13   out?
14        A    Not -- not that I can recall at this
15   moment.
16        Q    And have there been reports of any
17   other mistakes by the BDU?
18             MR. HANCOCK:  Objection: overbroad.
19             THE WITNESS:  I -- I don't -- so I
20   don't know if you're asking me -- are you asking
21   me for March 2019 to date have there been any
22   other mistakes by the BDU unit; is that what
23   you're talking about?
24             BY MS. TORCHIANA:
25        Q    Yes, while you've been COO.

Page 169

1         A    Yes, like every other part of our
2    organization -- well, I could never list them to
3    you now -- there are mistakes somewhere within the
4    organization.  How impactful they are, it just
5    depends.  Some are not impactful at all and some
6    may be impactful, but I cannot cite for you any
7    that were of such a significant impact at borrower
8    defense that I would know them right off the top
9    of my head as it relates to what is in question
10   here today.
11        Q    Okay.  Then in paragraph 24 similarly
12   you write, The department will reach out to Sean
13   Doe, who was incorrectly advised that he should
14   file a FOIA request to obtain his records.
15             Do you know if FSA has provided any
16   records to borrowers who have requested them
17   since?
18        A    So if we provided any records to
19   borrowers who have requested them, I would -- I
20   would rather have my folks answer that question
21   because you said "any," and as I said, there --
22   there are a number of cases, and it's -- and it's
23   possible.  I would not want to give you a
24   definitive answer on that.  But I do believe that
25   it's not a matter of a FOIA request as described

Page 170

1  here.
2      Q    Okay.  We're going to switch tacks a
3  little bit and talk about something you mentioned
4  earlier in this declaration.  Sorry to keep going
5  back and forth, but if you go to paragraph 18, you
6  mention that since December 2019, borrower defense
7  applicants whose applications are found ineligible
8  receive one of four form ineligibility letters.
9           Do you know who drafted these form
10  ineligibility letters?
11      A    So the ineligibility letters are -- are
12  drafted.  Do you mean -- and, again, if I can just
13  make sure that I -- that we're using the words the
14  same way.  So the traditional draft, who is the
15  first person that -- that puts the words on a page
16  and -- and asks everyone else what they think
17  about it.
18           That -- drafts would begin in Federal
19  Student Aid inside of our borrower defense unit
20  and of our folks, drafts would begin there.  I'm
21  sure they were created there.
22      Q    Okay.  And who would have drafted them?
23      A    It would have come from our policy
24  liaison and borrower defense units.
25      Q    And who is your policy liaison?

Page 171

1      A    So it's a team of folks.  The -- the
2  leader on the -- in the policy liaison area is a
3  Mr. Ian Foss, and the leader on the borrower
4  defense team I believe is Colleen Nevin.
5           And, so, something like preparing what
6  words should go on a form, which is preparing a
7  draft, would be done collectively between those
8  two parts of the organization.
9      Q    Okay.  So would you say Ian Foss helped
10  draft these form letters?
11      A    Yes, that's what I'm saying.  These
12  letters have been done collaboratively between
13  those two units, one providing --
14      Q    Anybody else?
15      A    Inside of FSA?  I can't say that
16  there's no one else, but from an organizational
17  perspective, it would be those two parts of the
18  organization.  It could be several other people
19  that are involved that have questions or those
20  kind of things, but those two parts of the
21  organization would be involved.
22      Q    Okay.  When you say could be several
23  other people, who do you think those several other
24  people are?
25      A    So what I'm trying to allude to here is

Page 172

1  if they have a question and they go ask somebody
2  that question, it could be anybody in the
3  organization, right.  They may have to ask is this
4  the appropriate line for this or that, and they
5  may want to talk to someone on the loan servicing
6  side or one on the technical writing side.
7  They -- they're working, so they are -- they are
8  bringing their files together to produce a draft.
9           I couldn't tell you everybody they
10  talked to.  I'm just saying that it's possible.
11      Q    And were you involved at all in
12  drafting these form ineligibility letters?
13      A    So when you say "involved," you mean
14  that I knew what was going on?  That I saw the
15  staffing process?  Or do you mean that I was
16  helping to draft it?
17      Q    Any and all of those things.
18           How were you involved in drafting these
19  letters?
20      A    I was not helping to draft the letter.
21  I was not helping to write what words would go on
22  the letter.  I would not be the right person to do
23  that.
24           What I -- what I was doing was making
25  sure that we had an appropriate staffing process

Page 173

1  and that the controls were in place to make sure
2  the right people saw the letter -- letters before
3  they go final.
4           I was very well aware of that.
5      Q    Okay.  And who would you say were the
6  right people to review those letters before they
7  went out?
8      A    The letters are a statement of policy,
9  and -- and so the final letters would have to be
10  gone through the policy outline of the Department
11  of Education and -- and that might be a general
12  counsel review and an ultimate approval through
13  the under secretary.
14      Q    Okay.  So could you -- so would that be
15  Diane Auer Jones would have reviewed them before
16  they went out?
17      A    Yes, if it was a poll- -- it's the
18  policy letter, she or -- now, I don't work inside
19  of her office, so she may have protocols
20  established where someone else in the office sees
21  it.  So I could not say it was absolutely her that
22  saw every letter.
23           I could tell you the Office of the
24  Under Secretary would be a part of the staffing
25  process.

Page 174

1     Q     Okay.  And what was the process for
2  drafting these letters?
3     A     Inside of Federal Student Aid?
4     Q     Yeah.
5     A     I can -- I can tell you that -- I can
6  tell you the offices that worked to put
7  together -- put together these statements and then
8  put together a staff -- what I would call a staff
9  summary sheet for it to be seen by the relevant
10 parties and sent outside Federal Student Aid.
11 That's -- that's essentially the process.
12           So the borrower defense unit, knowing
13 what the law requires in order for a person to
14 come out and come back in with a -- with a claim
15 and then a policy team working to get that on
16 paper and get it approved.
17    Q     Do you know when that process
18 started -- when the process started for drafting
19 these letters?
20    A     No, I don't, and I don't believe it's a
21 specific time because there are four letters, and
22 they don't all begin or end at the same time.  I
23 think they evolved into -- into having four
24 letters.
25           So to answer your questions, no, I

Page 175

1  don't believe I could tell you exactly when the
2  process began.
3     Q     Okay.  We'll -- we'll go through each
4  one and you can tell me when you think the
5  drafting of that specific letter began.
6           And -- and do you know how -- how long
7  it took to develop these letters?
8     A     I do not.
9     Q     Okay.  And in terms of who approved
10 them, it sounds like that was Diane Auer Jones?
11    A     The process --
12    Q     Is that right?
13    A     Yeah, what I would -- what I would say,
14 ma'am, is the approval process involves the policy
15 element, people that could review -- could require
16 review from the Office of General Counsel, and for
17 it to go through the Office of the Under
18 Secretary.
19           As I stated earlier, I can't tell you
20 their internal protocols, if the under secretary,
21 Diane Jones, approved each particular letter.  But
22 I could tell you that the Office of the Under
23 Secretary would have been involved in the approval
24 of those letters.
25    Q     Do you have a sense of how many drafts

Page 176

1  of these letters were produced?
2     A     I do not.
3     Q     Okay.  So if you could turn to
4  Exhibit 13, which has already been marked as
5  Exhibit 13.
6           (Exhibit 13 referred to.)
7     BY MS. TORCHIANA:
8     Q     It will be behind tab 13.  If you could
9  turn to the exhibits, the first one is Exhibit A.
10 There's a cover page that says Exhibit A?
11    A     Okay.
12    Q     So this letter, I can represent to you,
13 is for Corinthian borrowers who assert job
14 placement reclaims that do not meet the
15 eligibility criteria for such a claim.
16           So do you know who prepared this
17 particular letter?
18    A     I do not.
19    Q     Okay.  And do you know --
20    A     Regarding an individual.  When you say
21 "who," you're meaning an individual; correct?
22    Q     Or multiple individuals.  Which people?
23    A     So what I -- what I would say, just to
24 be clear, on none of the letters will I be able to
25 tell you what individual put pen to paper and

Page 177

1  drafted the letter, but I can tell you from an
2  organizational perspective where those kinds of
3  things happen and where -- and where they come
4  from.
5           So if -- if that's the answer to who,
6  you know, that's -- that's what I know about --
7  about the letters and drafting them.
8     Q     Okay.  Sure.  So --
9     A     So if you ask me that question about
10 this particular letter, I would say it is most
11 likely the borrower defense unit and the policy
12 liaison working together collaboratively to
13 bring -- to come together with the draft and then
14 putting it through the staffing process to be seen
15 by the policy element of the Department of
16 Education.
17    Q     Okay.  And do you know if this form is
18 still being used?
19    A     (Witness reviews document.)
20           I don't know if this paper form is
21 still being used, but there is likely a version of
22 this form still being used.
23           So if you mean this exact form produced
24 in this exact way, I don't think so.  I think that
25 hopefully it's been digitized with the other forms

Page 178
Page

1    and being used in that manner.
2         Q    But is it still going out -- is this
3    format of the letter still going out to borrowers?
4    Obviously filled in with relevant information for
5    the borrower specifically.
6         A    I -- I believe in general that is true,
7    but there -- there may be -- you said format, so
8    it doesn't mean it's the exact same letter.  But
9    if you mean the general format is still continuing
10   on today, I don't believe we're sending out
11   notifications.
12        But if we were sending out
13   notifications, if that's your question, would this
14   form be in presence.  I believe in some form, it
15   would be.
16        Q    Okay.  Now could we turn to Exhibit B,
17   which is a couple of pages down.
18        A    Okay.
19        Q    And this is for current payment
20   borrowers who assert the claim other than job
21   placement rights -- or other than job placement
22   reclaim.
23        And if you turn to -- let's see.
24   Sorry.  If you turn to the bottom of page 2, it
25   says, In order to have a successful borrower

Page 179
Page

1    defense claim based on ED's CCI findings, you must
2    have enrolled in one of the covered programs
3    during a listed time period.
4         So do you -- do you know if it's
5    possible for a borrower defense claimant to have a
6    successful claim if he enrolled in CCI outside of
7    the listed time period?
8         A    There may be some other form of --
9    of -- of damage or concern for the borrower, so
10   I -- I wouldn't want to make a blanket statement
11   that said there is nothing.  I -- I would say it
12   just depends on how that attorney would adjudicate
13   the claim.  I don't -- it depends on the
14   circumstances.
15        Q    Okay.  And then if you could turn to
16   Exhibit C, and this form is for non-Corinthian
17   borrowers who attended a school for which the
18   department does not have any common evidence in
19   its possession.
20        And so do you -- what do you understand
21   as -- what is common evidence?
22        A    As I understand it, and I just want to
23   provide the context that I -- I don't adjudicate
24   borrower defense cases, so I'm not an attorney.
25        But my general understanding of this is

Page 180
Page

1    that common evidence is just that; it is things
2    that have been determined, like a program review,
3    where a finding was found against the school and
4    determined to be validated.
5         And, so, it's available for the
6    attorney doing the adjudication to use as a source
7    of evidence.  That could also be Attorney General
8    determinations or other determinations made
9    against a school where -- where if even if the
10   borrower doesn't submit it themselves, it's
11   common -- commonly known and available to be
12   utilized.
13        That's what I believe we -- we mean
14   when we use the term.
15        Q    Okay.  And do you know if --
16        A    I just want to clarify that -- that
17   last -- what I just -- what I just said, I'm
18   giving you my understanding of it as a lay -- from
19   a layman's perspective.  That's not something I
20   practice against a borrower defense claim because
21   I don't do it.  So I'm just telling you from a
22   layman's perspective and management of borrower
23   defense, the team, that's how the attorneys have
24   generally explained it.
25        Q    Right.

Page 181
Page

1         And if there's no common evidence, can
2    a borrower's claim be granted?
3         A    So in -- in general and for
4    generalities, can it be?  I would say every --
5    every claim is adjudicated on its own merit as
6    stated earlier, and it just depends on what other
7    things there are and what other things have been
8    brought forth.
9         And, so, I would never say it
10   absolutely could not be or absolutely could be.  I
11   could say that every -- every claim is adjudicated
12   based on its own merit.
13        Q    Okay.  And do you know whether since
14   you've started has any claim been granted for a
15   borrower who attended a school for which there is
16   no common evidence?
17        A    I don't know.
18        Q    Okay.  And if we could turn to the last
19   form, form D, this form is for non-Corinthian
20   borrowers who attended a school for which the
21   department does have common evidence.
22        Could you tell me when form D was
23   developed?
24        A    I -- I could not tell you exactly when
25   it was developed.

Page 182
Page

1    Q    Do you know roughly when it was
2  developed?
3    A    I -- I do not.  I think it evolved over
4  time in the -- in the BD unit and possibly liaison
5  as circumstances dictated that an additional type
6  of form would be needed.
7    Q    Okay.  And what circumstances dictated
8  that an additional form would be needed?
9    A    I don't know exactly other -- other
10 than these -- these forms are created based on
11 what is seen in the claims that are being
12 adjusted.
13    So if you see a circumstance occur
14 enough and you believe that claimants need to be
15 able to have certain information in order to file
16 a particular claim, you might adjust or make sure
17 you design a form with that in mind.
18    Q    Okay.  And, again, for this form D, who
19 designed the form?
20    A    So, again, I would say -- I don't know
21 exactly who, other than forms are a collaboration
22 between our liaison office and our borrower
23 defense office.  That's how forms are drafted and
24 then approved through our policy element at the
25 Department of Education.

Page 183
Page

1    Q    Okay.  And did you have to approve this
2  form before it started being used?
3    A    I don't necessarily approve each form.
4  They go -- they go through the staffing process.
5  The approval of a form is the -- is -- is the
6  policy element of what we do because the forms
7  represent an extension of policy.
8    Q    Okay.  So would you say the denial
9  forms are -- they're under policy?
10    MR. HANCOCK:  Objection: asked and
11 answered.
12    BY MS. TORCHIANA:
13    Q    Okay.  Are the denial forms part of
14 operations?
15    A    So what I -- what I would say is the
16 drafting of policy forms like the ones that we
17 just went through, A through -- through D, begins
18 inside of Federal Student Aid.
19    So it -- it begins as part of
20 operations, but the final form and the decision on
21 what the form -- that the form is appropriate is a
22 policy decision.
23    Q    Okay.  So if you look at form D, it
24 says, applicable law, and is this somewhere where
25 you would expect the state law standard under

Page 184
Page

1  which an application was decided would be if it
2  was decided under the 1995 regs?
3    A    If the appropriate state law?
4    Q    Yes.
5    If -- if a borrower's application was
6  decided according to state law, do you think that
7  law would be stated under the applicable law
8  section?
9    A    Yeah, that would -- exactly where to
10 put something on the form would not be something
11 I'd be prepared to opine on.  Exactly where to put
12 it on the form, I don't know.  I would leave it to
13 those in charge with that to -- tell me --
14    Q    Okay.
15    A    -- the laws.
16    Q    Do you think it would be somewhere on
17 the form?
18    A    I don't know.  I would -- I would look
19 to my attorneys to tell me if state law needed to
20 be on the form or not.  And if -- and if they
21 believe that it would be, it would need to then be
22 put through that staffing process I described
23 earlier to make sure those in charge of the forms
24 and policy elements came to an agreement that, in
25 fact, it should be.

Page 185
Page

1    Q    Okay.  And if you -- if you go to the
2  next page, the section it says, What if I do not
3  agree with this decision?
4    A    Yeah.
5    Q    And then it says, number three is,
6  Identify and provide any evidence that
7  demonstrates why ED should approve your borrower
8  defense repayment claim.
9    And, you know, you noted actually
10 earlier in your declaration -- and we can turn
11 back to it if you want to see that, but you say
12 that FSA will consider any evidence under
13 reconsideration which includes both new evidence
14 and evidence already submitted.
15    When was the choice made to consider
16 any evidence as opposed to new evidence?
17    A    So I don't -- I don't know the exact
18 point -- point in time when that became a matter
19 of policy and certainly a matter of our forms.  I
20 know that it is today, but exactly how -- how long
21 ago that was determined, I -- I don't know.
22    Q    Okay.  And would you say that was a
23 policy decision?
24    A    I'm -- I would -- I would say that
25 those kind of elements on a form, like, time

Page 186

Page

1  periods and what's allowed are policy decisions.
2      Q    Okay.  And if a borrower received a
3  letter, for instance, where the only reason for
4  denial under each allegation was insufficient
5  evidence, how would you expect them to reply?
6          MR. HANCOCK:  Objection: calls for
7  speculation.
8          THE WITNESS:  I'm not -- I'm not
9  certain, ma'am, on how they would reply.  So for
10  an individual, how they would react to that; is
11  that you're asking me?
12  BY MS. TORCHIANA:
13      Q    If they were to submit a request for
14  reconsideration but the only thing that their
15  denial letter said was insufficient evidence, what
16  would you expect them to submit?
17          MR. HANCOCK:  Objection: calls for
18  speculation.
19          THE WITNESS:  So I don't -- I don't
20  believe I'm understanding your question.  Are you
21  asking me to kind of assume what -- what a
22  borrower should do if they get that letter?  What
23  does a borrower do if they have a question; is
24  that -- or -- they don't --
25  BY MS. TORCHIANA:

Page 187

Page

1      Q    No.
2      A    -- know what to do or --
3      Q    We'll get into this more -- we'll get
4  into a specific letter later, but -- but here you
5  say, Identify and provide any evidence that
6  demonstrates why ED should approve your borrower
7  defense to repayment claim.  And let's say that
8  the reason someone got the denial was just
9  insufficient evidence.
10          How do you think -- what would they put
11  in their request for reconsideration?
12          MR. HANCOCK:  Objection: calls for
13  speculation.
14          THE WITNESS:  I -- I don't know.  I
15  don't think I can answer your -- I don't think I
16  can answer your question.
17  BY MS. TORCHIANA:
18      Q    Okay.  Okay.  And do you know -- have
19  any requests for reconsideration been granted that
20  you know of?
21      A    One second, please.
22          (Witness reviews document.)
23          I don't know if any have been -- have
24  been granted.  I only know that some have -- have
25  come in through -- through the process.  I -- I

Page 188

Page

1  don't know -- I can't tell you if any have been
2  granted or where those that have come in stand
3  right now today.
4      Q    Okay.  And how many have come in
5  approximately?
6      A    I don't know.  It's a dynamic process
7  where, you know, things come in each day and
8  they're sorted out, and at some point when we do
9  our next update, if some new have come in, I
10  probably would see it visible through our metrics
11  or be told, but right now today I couldn't
12  speculate on how many would come in.
13      Q    Okay.  When was the last update -- when
14  did you receive the last update that had those
15  numbers?
16      A    I believe it was at end-of-November
17  time frame.
18      Q    Okay.  And at the end of November, do
19  you remember roughly how many requests for
20  reconsideration had been received?
21      A    I do not believe it was that many in
22  relative terms, meaning given the number of claims
23  that we do.  But I don't remember exactly how
24  many.
25      Q    And again, these are -- these are the

Page 189

Page

1  weekly performance metrics we discussed before,
2  correct, that have these numbers?
3      A    They -- they are the metrics for
4  borrower defense, correct.
5          MS. TORCHIANA:  Okay.  And I think I've
6  already asked, but I think we will be asking for
7  those to be produced.
8  BY MS. TORCHIANA:
9      Q    Okay.  Do you know if any requests for
10  reconsideration have been denied?
11      A    As I said earlier, I -- either way, I
12  don't know in the process if we have gotten around
13  to decisions one way or the other on those yet.
14      Q    Okay.
15          MS. TORCHIANA:  Okay.  Why don't we
16  take a ten-minute break if that's okay with
17  everyone.
18          THE WITNESS:  Okay.
19          MR. HANCOCK:  That's fine.
20          THE VIDEOGRAPHER:  Okay.  We are now
21  going off the record.  The time is 20:41 UTC time.
22          (Recess -- 3:41 p.m.)
23          (After recess -- 3:55 p.m.)
24          THE VIDEOGRAPHER:  We're now back on
25  the record.  The time is 20:55 UTC time.

Page 190
Page

1       BY MS. TORCHIANA:
2          Q    Mr. Brown, could you turn to tab 15, so
3    that's Exhibit 15 in the electronic folder.
4              (Exhibit 15 referred to.)
5       BY MS. TORCHIANA:
6          Q    And could you turn to -- it's page 24
7    of 56, and that's in the upper right-hand corner.
8          A    Okay. I have it.
9          Q    Okay. And this is the affidavit of
10   Theresa Sweet, the named plaintiff in this case.
11   And as you can see, she -- if you go to
12   paragraph 3, she submitted her application in the
13   fall of 2016. And if you go to paragraph 4, she
14   received her decision on July 8th, 2020.
15             So how many -- how many years is that
16   just to be clear?
17         A    How many years is it from the fall of
18   2016 to July 8th, 2020; is that -- is that what
19   you're asking me?
20         Q    Yes.
21         A    I believe that is just shy of four
22   years.
23         Q    Okay. Okay. And just so we're clear,
24   previously you've said -- what are the -- what are
25   the main reasons you would give for why there was

Page 191
Page

1    a delay in -- in her receiving her answer?
2          A    So just to be clear, I can't give you
3    any information about fall of 2016, '17, '18, up
4    until March 2019.
5              But I can tell you that as of March of
6    2019, the reason that she received, probably,
7    notification is because we addressed the two
8    issues that I brought up. Those two issues are
9    having enough attorneys to adjudicate a
10   significant workload and investigating in the
11   systems and IT technology required to do this job.
12         Q    Okay. So would you say the reason she
13   had to wait four years was because there weren't
14   enough attorneys and the IT system needed to be
15   updated?
16         A    I -- I wouldn't because I couldn't talk
17   to you about '16, '17, '18 and some parts of '19.
18   I can only talk to you about March of 2019
19   forward, and I can't even say that this particular
20   case I could tell you that, in general, those are
21   the two reasons that borrower defense wasn't able
22   to move at the speed that they would have liked to
23   have moved.
24         Q    And she attended Brooks Institute, and
25   that is a CEC school, right, the Career Education

Page 192
Page

1    Corporation?
2          A    I -- I wouldn't know. I have to look
3    on the sheets of paper or sheets that tell you
4    who -- who owns what school. I haven't committed
5    that to memory, so I don't know. I don't know.
6          Q    And on that subject, when you
7    communicate with Ms. Diane Auer Jones, do you
8    redact or remove any information related to CEC
9    that you know of?
10             MR. HANCOCK: Objection: exceeds the
11   scope of the court-ordered discovery.
12         BY MS. TORCHIANA:
13         Q    You can still answer.
14         A    Do I -- do I redact anything as it
15   relates to this particular school?
16         Q    This school group, yes, or remove it or
17   anything like that.
18         A    So I cannot -- I don't know all of
19   the -- I don't know all of the schools, as I said
20   earlier, and the subschools that go -- go under
21   them. I can tell you that if a -- if a senior
22   official has a conflict of interest because of
23   prior employment or something like that, we would
24   do a redaction. And in order to say that this
25   particular school and that was required, I can't

Page 193
Page

1    tell you that today. I would have to go check.
2          Q    Okay. So when you've exchanged any
3    documents or memos or anything with Diane Auer
4    Jones, have you ever -- do you recall ever seeing
5    CEC removed or redacted or anything like that?
6              MR. HANCOCK: Objection: exceeds the
7    scope.
8              What category is this relevant to?
9              MS. TORCHIANA: I would say it's
10   relevant to two and three.
11         BY MS. TORCHIANA:
12         Q    You can still answer unless counsel
13   instructs you not to.
14         A    I -- I don't know the answer, ma'am.
15   I -- I -- again -- I also don't -- I'm not the
16   redactor, and I don't -- I don't redact documents
17   myself, and if it's redacted on a document that I
18   get en route to someone, I don't know what has
19   been redacted.
20             And, so, I'm not in a position to
21   answer your question.
22         Q    Okay. If you turn to page 28, that's
23   the beginning of Ms. Sweet's application.
24             Have you ever seen an application like
25   this?

Page 194
Page

1    A    (Witness reviews document.)
2         I -- I believe so.  I've seen one with
3    similar categories on it.
4    Q    Okay.  Could you turn to page 30?
5    A    Yes.
6    Q    And here Ms. Brooks [sic] quotes some
7    admissions counselors, so here she says, Admission
8    counselors told her, quote, right out of school,
9    quote -- end of quote that 88 to 90 percent of
10   graduates were employed.
11        There's some quotes in the other
12   paragraphs, et cetera.
13        And then if you could turn to page 44,
14   could you just confirm that this application is
15   signed under penalty of perjury?
16   A    (Witness reviews document.)
17        Do you mean -- do you mean page 45?
18   Q    Yeah.  Sorry.  Page 44 and 45.
19   A    And you're asking me is it signed under
20   penalty of perjury?
21   Q    Yes.
22        And that starts under -- if you start
23   at page 44 at Section 6 and just read through.
24   A    (Witness reviews document.)
25   Q    So is that signed under penalty of

Page 195
Page

1    perjury?
2    A    I'm almost done reading it.
3    Q    Okay.
4    A    (Witness continues to review document.)
5         Yes.  Yes, ma'am.  It says in the
6    second paragraph under Section 6 under penalty of
7    perjury which subsequently she signs on
8    November 4th --
9    Q    Okay.
10   A    -- 2016.
11   Q    Okay.  And so is -- is a firsthand
12   account by a borrower signed like this under
13   penalty of perjury, is that considered evidence?
14   A    I don't know, ma'am.  I would not want
15   to speculate on what our attorneys view as
16   acceptable or unacceptable evidence.  I -- I
17   believe that's -- I would leave that to their --
18   to their decisions space and their expertise.
19   Q    And if you could turn to page 52.  It's
20   a bit -- it's kind of hard to see.  It's a little
21   blacked out.  It's on the top -- top right-hand
22   side.
23   A    I see it.
24   Q    Okay.  And here the -- under allegation
25   number one, it says, This allegation fails for the

Page 196
Page

1    following reasons, failure to state a legal claim.
2         And do you know how -- how would she
3    have written this to state a legal claim?
4    MR. HANCOCK:  Objection: calls for
5    speculation.
6    THE WITNESS:  So, again, I'll just say
7    that I don't adjudicate claims, and I'll leave the
8    adjudication of the actual claims to the borrower
9    defense attorneys that we have.  And beyond that,
10   I could not tell you what to add or delete to a
11   particular claim to make it something different.
12   I -- that's -- that's not my expertise.
13   BY MS. TORCHIANA:
14   Q    On the next page, 53, it says, What
15   evidence was considered in determining my
16   application's ineligibility, and there's a list
17   here.
18        As far as you know, what does it mean
19   to have consulted this evidence?
20   A    So you -- you said consulted this
21   evidence.  Is that term here?  Do we say that
22   here?
23   Q    Considered.  Sure.
24   A    I -- I know the generic meaning of the
25   term "considered."  It means it was included in

Page 197
Page

1    their process; that it was part of the process of
2    things that was looked at.
3    Q    And are there memos or, for example,
4    directives that relate to this evidence as it
5    relates to Brooks as a school?
6    MR. HANCOCK:  Objection: vague.
7    THE WITNESS:  I'm not sure if I
8    understand your question.  Do you mean is there --
9    are there memos within borrower defense or --
10   or --
11   BY MS. TORCHIANA:
12   Q    Yeah.
13   A    -- is there memos --
14   Q    Yes.
15   A    -- that relate to --
16   Q    That relate to this evidence and how
17   it's connected to borrower defense claims from
18   Brooks, for example?
19   A    I believe that -- I believe this is
20   what we consider common evidence, and so whatever
21   it is -- whatever evidence it is is inside of
22   borrower defense.  I don't know if that's
23   answering your question.  I don't know if it comes
24   with a memorandum or if we're just talking
25   documents; I don't know that.

Page 198
Page

1       Level of specificity, just that the
2  evidence was reviewed and therefore was probably
3  on hand somewhere within borrower defense.
4       Q    Okay.  We'll -- we'll move on.
5            Could you turn to Exhibit 19 which is
6  behind tab 19?
7            (Exhibit 19 referred to.)
8            THE WITNESS:  I have it here.
9       BY MS. TORCHIANA:
10      Q    Okay.  And -- and just before we --
11  just before we get into that, I wanted to ask a
12  follow-up question about something we were talking
13  about before.
14           Have you seen any documents with
15  redactions -- with, you know, redactions of school
16  groups that are related to borrower defense?
17      A    Have I -- have I seen any documents
18  that were redacted related --
19      Q    Not in --
20      A    -- to borrower defense.
21      Q    Have you seen any documents where the
22  school group -- where any information about a
23  school group is redacted?
24           MR. HANCOCK:  Objection.
25           THE WITNESS:  I have.

Page 199
Page

1            MR. HANCOCK:  Exceeds the scope of
2  court-ordered discovery.
3            THE WITNESS:  So I have seen documents
4  where words are redacted out.
5       BY MS. TORCHIANA:
6       Q    About -- were those words related to
7  specific school groups?
8       A    I don't recall what they were related
9  to, but if you're -- the first part of your
10  question, have I seen documents in the -- in the
11  staffing process and the ruling process where
12  there are -- where there are redactions, I have.
13  I've seen documents where words were redacted out.
14      Q    I don't mean redactions in general.  I
15  meant redactions related to specific school
16  groups.
17      A    That -- that particular -- I -- I just
18  don't recall if it was related to school groups or
19  not.
20      Q    If you could take a look at Exhibit 19.
21  Do you recognize this document -- actually, if you
22  could turn to -- your declaration is in the front,
23  but if you could turn to Attachment 1, that would
24  be helpful.
25           Do you recognize this document?

Page 200
Page

1            MR. HANCOCK:  I'm sorry.  Can I just
2  clarify what document we're looking at?  Is it the
3  Exhibit A in -- in Exhibit 19?
4            MS. TORCHIANA:  No, it's 19, and it's
5  Attachment 1, which is behind Exhibit A.  You see
6  the stamp is page --
7            MR. HANCOCK:  145-2.
8            MS. TORCHIANA:  Yeah, 145-2, page 1 of
9  15.
10           MR. HANCOCK:  Okay.  Thank you.
11           THE WITNESS:  (Reviews document.)
12           This is a -- this is my declaration at
13  Attachment 1, attachment -- or Exhibit A.
14      BY MS. TORCHIANA:
15      Q    Okay.  And when you turn to
16  Attachment 1, have you seen this chart before?
17      A    I -- I have.
18      Q    Okay.  Do you know who put this chart
19  together?
20      A    I -- I don't know specifically who, but
21  I believe it is most likely our borrower defense
22  group and the folks that were in that area.
23      Q    Okay.  And who do you think it would
24  have been in the borrower defense group?
25      A    I would never be able -- I don't know,

Page 201
Page

1  ma'am.  You mean who within all of the borrower
2  defense group that actually did this chart?
3       Q    Yeah, who -- who do you think --
4       A    I don't know.
5       Q    -- compiled it?
6       A    I don't know.
7       Q    Okay.  If you had questions about this
8  chart, about the contents of it, who would you
9  ask?
10      A    So the way we're organized, I would --
11  I would go to the deputy chief operating officer
12  for partner participation and oversight, and I
13  would --
14      Q    And who is that?
15      A    That's Ms. Robin Minor.
16      Q    Okay.
17      A    And I would ask her my question.
18      Q    Okay.
19      A    She might ask who -- whoever is
20  required to get the answer and ultimately I would
21  get my answer then.
22      Q    Okay.  And have you ever -- have you
23  ever asked anybody questions about this chart?
24      A    I don't require -- I don't remember or
25  recall asking questions about this specific

Page 202
Page

1    document.  I do not.
2           However, I see a lot of documents, and
3    I would never tell you in its entirety that this
4    particular document I remember seeing it on that
5    day and I asked or didn't ask questions.  I was --
6    I can only tell you that looking at it now, I
7    don't recall any questions that I would have
8    asked.
9           Q    Okay.  And do you know -- do you know
10   what documents were used to put this chart
11   together, like what are the sources of -- well,
12   why don't you answer that question first.
13          A    What was used to do this chart?
14          Q    Yeah.
15          A    I -- I would assume, and let me answer
16   your -- your question first.  Do -- do I know what
17   documents were used to put together this chart?
18   No.
19          Q    Okay.  What do you -- what do you
20   think -- where do you think this information is
21   coming from or what documents do you think this
22   information is coming from?
23          A    The expertise of the borrower defense
24   unit and their various working papers, those kinds
25   of things.

Page 203
Page

1           Q    Okay.  Okay.  So could you explain to
2    me what column 2 represents?
3           A    Yes, ma'am.  So this chart is -- is
4    listing in column 3 all of the common evidence
5    that has been collected, and in -- and in
6    column 1 -- or available.  And in column 1, the
7    name of the school for which the evidence may
8    relate to.
9           But column 2 sets out some stipulations
10   for which there would be an exclusion -- meaning,
11   if whatever issue is brought up falls within a
12   time frame, for instance, that is not covered, or
13   an enrollment date that's not covered.
14          And while that's not exclusive, it just
15   says in general that the evidence in these time
16   frames are different, and -- and so a claim could
17   be against Apollo Group but be outside the scope
18   of that time period and therefore the common
19   evidence may not apply.
20          Q    So let's take the Apollo Group for
21   example.  So if a borrower is within one of these
22   categories in column 2, that means they don't fit
23   within the evidence that's in column 3; is that
24   right?
25          A    That's -- that's most likely.  That --

Page 204
Page

1    that -- the reasons for which the common evidence
2    is put there is outside of the scope of those
3    dates and things that are provided in column 2.
4           Q    Okay.  So what would happen to an
5    application -- so let's just take this as an
6    example.  What would happen to an application by a
7    borrower who enrolled after October 1st, 2012, and
8    didn't make any allegations relating to
9    partnerships with large companies or programmatic
10   accreditation?
11          A    So if they didn't -- you mean, if they
12   didn't -- if they -- if column 2 applied to them
13   and so none of the common evidence, at least as --
14   as displayed here, was applicable to their case?
15          Q    Yes.
16          A    The -- the attorney would adjudicate
17   the case.
18          Q    Okay.
19          A    And determine it for some other reason
20   that there was reasons for the claim to be
21   relevant.
22          Q    Okay.  And when they were adjudicating
23   the claim, what evidence would they rely on?
24          A    I don't know.  It depends on
25   everything -- every case has to be adjudicated in

Page 205
Page

1    a very individualized way.  So -- so I don't know.
2    I mean, it depends on what came in that case.
3    Maybe something could have been provided by the
4    borrower; maybe there could be something outside
5    of the scope of what's in that common evidence.
6           It just depends.  You could only answer
7    the question that you asked on the specific case
8    and the lawyer here to tell you how that specific
9    case was adjudicated.  I would not want to
10   speculate.
11          Q    Okay.  And you said something that
12   would be outside the scope of common evidence.
13   Can you think of examples of what that would be?
14          A    I -- I could not, but I don't do this
15   on a day-to-day basis.  I'm -- I'm certain that an
16   attorney might find something that if they were
17   seeing all of these, they're familiar with them.
18   They may find something.
19          But if you're asking me what it could
20   be, not -- not knowing Apollo Group or the
21   University of Phoenix or any of these other than
22   the names on the paper, the answer is I don't
23   know.
24          Q    Okay.  And let's say a borrower who
25   fits into this column 2, so let's take a borrower

Page 206

1    from the University of Phoenix who fits into this
2    first category, let's say the only thing they
3    submitted was a firsthand account of their
4    experience signed under penalty of perjury.
5            Would that be considered evidence to
6    support their claim?
7       A    Could you say that again?  I'm sorry,
8    ma'am.  You -- you --
9       Q    I'm sorry.
10      A    Signed under the penalty of perjury,
11   and after that you lost me.  I'm sorry.
12      Q    Okay.  I'll repeat the question.
13           So let's say a borrower who attended
14   University of Phoenix and fits into column 2, so
15   she enrolled after October 1st, 2012, and didn't
16   make any allegations relating to partnerships with
17   large companies or programmatic accreditation, and
18   she had a firsthand account of her experience
19   being defrauded at the University of Phoenix,
20   obviously signed under penalty of perjury.
21           Would her application be considered
22   evidence?
23      A    I -- I couldn't answer.  I would leave
24   the -- kind of the assessment of evidence and what
25   qualifies and what doesn't qualify, what rises to

Page 207

1    the level.  As I stated earlier, that's not an
2    area that I can give you answers on.
3            I go back to my previous answer that an
4    attorney would have to adjudicate this case on its
5    own merits and then they would make the decisions
6    to the kinds of questions and scenarios that you
7    are raising.
8       Q    Okay.  And then what about applications
9    that do fit into the scope of common evidence, so
10   that do fit into column 3?  What happens to those?
11      A    They're adjudicated, and the common
12   evidence is a part of that adjudication.
13      Q    They are adjudicated both at Step 1 and
14   Step 2?
15      A    So to -- kind of recap, Step 1 is
16   the adjudication process.  Step -- Step 2 is when
17   you're using the Department of
18   Education-determined methodology to assess the
19   mathematical part of what percentage of relief
20   will be granted.  And then you'll go on through
21   the administrative process that we talked about
22   for which the borrower would be notified.
23           So at least in the way that I defined
24   it, Step 1 takes care of your adjudication
25   process.

Page 208

1       Q    So to be clear, if an applicant from
2    the University of Phoenix fits into column 3,
3    their application relates to this common evidence,
4    their application would be adjudicated at Step 1?
5            MR. HANCOCK:  Objection: vague.
6            THE WITNESS:  I don't -- I don't know
7    if -- if you're asking me is adjudication going
8    on, do our attorneys the way we describe it here
9    today adjudicate claims in Step 1, then the answer
10   to that question is yes.
11           Again, that answer is yes.  Claims
12   are -- if you're asking me if the Apollo Group
13   and -- and something that's in column 3 absolutely
14   means that a case will be adjudicated under our
15   processes, I can't answer because I don't -- I
16   don't know.  I would -- I would say now the lawyer
17   has the common evidence and the lawyer has
18   everything before them.
19           What they and how they do it is why we
20   have them.  They -- they know those things.  I
21   cannot tell you that absolutely, yes, it would be
22   done, or absolutely, no, it won't be done.  I
23   don't know the answer to that because I'm not a
24   trained attorney.
25           BY MS. TORCHIANA:

Page 209

1       Q    Okay.  And just do you know whether any
2    applicants of the University of Phoenix -- do you
3    know whether any applications have been approved?
4       A    I would want to consult -- I know that
5    there are applications from the University of
6    Phoenix.  I know that they are going through our
7    process.  But rather than just kind of tell you
8    off the top of my head, I would have to have -- I
9    would have to look at the official records and
10   determine.
11      Q    Okay.  And have any been denied?
12      A    Same -- the same answer, ma'am.  I'd
13   have to -- I'd have to look at the official
14   records and then I could cite for you status.
15      Q    Okay.  Let's -- let's go over one more
16   school group.  So could you turn to page 3 of the
17   attachment?  And in the top right corner, it will
18   say page 4 of 5 in the ECF stamp.
19      A    I have 4 of 15; is that right?
20      Q    Yeah, sorry.  Four of 15.
21      A    Okay.
22      Q    So this is Career Education Corp. which
23   we were just speaking about.  And just as a
24   question, do you know whether Diane Auer Jones
25   ever received this fraud list?

Page 210

1    A    Received -- if she received this list?
2    Q    Yeah.
3    A    I -- I don't know.  I --
4    Q    Okay.
5    A    I don't know.
6    Q    And, so, if you could just explain
7    column 2 to me.  It says, Categories of
8    applications determined not to be within the scope
9    of the common evidence listed in column 3.  And
10   then could you -- could you go down and explain --
11   so it says, All schools:  Borrowers who make
12   allegations regarding programmatic accreditations.
13        And then, of course, it says,
14   Applications that do not fit the criteria below.
15        Could you just explain to me how that
16   works?
17   A    Again, column 3 is the available
18   evidence for this particular school that's being
19   characterized as common evidence.  Column 2 is
20   intended to be situations which don't apply to the
21   common evidence found.
22        And, so, I don't know each of these
23   specifics, but at least theoretically that's how
24   that column is designed.  And, so, these things
25   would be those things that don't match to the

Page 211

1    issues that are found in the common evidence in
2    column 3.
3    Q    Okay.  Well -- okay.
4    A    And if you notice, some of these have
5    dates, right.
6    Q    Uh-huh.
7    A    Periods that are very similar to the
8    one we just discussed.
9    Q    Let's say I'm a borrower who attended
10   the Western School of Health and Business or
11   Pittsburgh Career Institute, and I enrolled
12   between May 1, 1999 and May 22, 2004.  Am I within
13   the scope of common evidence or not?
14   A    On the surface of this, based on me
15   reading it, on the surface of it -- and let me
16   just clarify before I answer.  Not for me to
17   determine.  I -- this is not for me to determine.
18        But the intent of, say, that time
19   period does not include what's been found in
20   column 3.  And, so, for these reasons before you,
21   the common evidence of this, I read that to mean
22   that they would not have a claim for that
23   particular common evidence.
24        They may have something else.  There
25   may be other things there.  But that's how I would

Page 212

1    read this.  And the attempt here is to explain
2    that by virtue of -- by virtue of the columns so
3    everyone can see it for these particular schools
4    that are picked.
5         It is not the adjudication of the claim
6    itself.  It's not decisional documents.  Those are
7    things the attorney would be doing for each case
8    individually.
9    Q    Okay.  And do you know how these
10   determinations are made?
11   A    When you say determinations --
12   Q    Of who fits into the scope of common
13   evidence.
14   A    I don't know the particulars about each
15   piece of common evidence because it's -- you know,
16   it's -- it varies.  It depends on which one of
17   these we're talking about and what list we're
18   talking about.
19        But I -- but I do know their findings
20   inside the common evidence, and that's what is --
21   is being used.  And -- and the answer to your
22   question of who determines, I don't know who
23   specifically determines.  I know that this is a
24   function of the borrower defense unit, and
25   therefore this is a product of the borrower

Page 213

1    defense unit.  So the thought for work that has to
2    go into it occurs in there.
3    Q    Okay.  And who do you think would have
4    made these determinations within the borrower
5    defense unit?
6    A    I -- I don't know, ma'am.
7    Q    Okay.  Okay.  Let's move on to the next
8    exhibit.  Could you turn to Exhibit 18, the -- the
9    oversight committee press release.
10        (Exhibit 18 referred to.)
11        THE WITNESS:  I have it here.
12   BY MS. TORCHIANA:
13   Q    Okay.  And do you recognize this press
14   release?
15   A    I do.
16   Q    I'm sorry.  I didn't -- I didn't catch
17   that?
18   A    I do.
19   Q    Okay.  And have you read it?
20   A    I read this -- if this is an exact
21   copy, which, you know, I'd have to read through it
22   and see.  If this is an exact copy of what was
23   released in the House Oversight Committee, then
24   I've read it.  I have not read what's before me
25   here that I just pulled out of the exhibits.

Page 214
Page

1    I'll just leave it as that.  If it is
2    the -- if it is what was released on around this
3    time from the House committee and I see that --
4    hold on one second and I'll tell you.
5    Q    Okay.
6    A    Hold on.
7         (Witness reviews document.)
8         Yes, ma'am, I read it.
9    Q    Okay.  And do you generally understand
10   the issue that it's discussing?
11   A    I -- I do understand it.
12   Q    Okay.  And had you heard of any issues
13   with this tool that it's discussing?
14        MR. HANCOCK:  I object to the scope --
15   I object to this line of questioning as exceeding
16   the scope of the court-ordered discovery.
17        BY MS. TORCHIANA:
18   Q    You can still answer.
19        THE WITNESS:  Am -- am I required to
20   answer here?
21        MR. HANCOCK:  You may answer, General
22   Brown.
23        THE WITNESS:  Okay.  Can you ask me the
24   question again?  I'm trying to understand.
25        Do I know anything about the press

Page 215
Page

1    release?
2        BY MS. TORCHIANA:
3    Q    No.  Sir, the press release mentions a
4    tool designed to ease the borrower defense
5    application process that was frozen by Diane Auer
6    Jones.
7         And are you familiar with -- with this
8    issue?  Do you remember hearing about it?  Were
9    you involved in it?
10   A    Yes.
11   Q    Okay.  And what was your involvement
12   with this Web tool?
13   A    So whoever wrote this doesn't
14   accurately describe some of the -- the -- the
15   procedures, the techniques.  And, so, the reason I
16   ask do I have to answer is because I wouldn't use
17   any of the terms that you just read here.
18        You said this tool and a -- I'm
19   familiar with this because we own a digital
20   customer care portal, and the digital customer
21   care portal is a digitized front door for all
22   student engagement products that come out of
23   Federal Student Aid.  It's a part of what we call
24   the next generation of Federal Student Aid.
25        It's -- it's -- so I don't know what

Page 216
Page

1    they mean by tool, but I -- but -- but that's what
2    we -- that's what we had.  The borrower defense
3    form was digitized and placed on the portal so
4    that people could get it and utilize it.
5         This press release is an attempt, I
6    believe, to describe that process.  I would know
7    that process because -- because we own it.  We --
8    Federal Student Aid owns it.  It's the operations
9    of what we do, how we -- how we go out and engage
10   customers of all types and make things intuitive
11   for them to use -- to answer your question of why
12   I would know this particular subject.
13   Q    Okay.  And you said you felt -- or
14   you -- I am -- I suppose you implied you felt this
15   press release was inaccurate.
16        Could you describe to me in your terms
17   or how you understand what happened with -- with
18   this Web tool related to the borrower defense?
19        MR. HANCOCK:  Objection to the scope.
20        BY MS. TORCHIANA:
21   Q    You can still answer.
22   A    So I don't understand this press
23   release.  The distinction here -- the distinction
24   I'm trying to make here is I understand the
25   automation of our forms and the use of them on the

Page 217
Page

1    digital customer care platform.  This is a very
2    technical kind of issue.  I would understand that
3    because it's a part of our operations and what we
4    do.
5         But -- but you're asking me do I
6    understand this press release, I -- I think.
7    And -- and the answer to that is, no, I don't
8    understand this press release other than they're
9    referencing a tool that's a part of what we use in
10   our digital customer care platform.
11   Q    Okay.  And -- and what tool is that?
12   You mentioned it was the -- you mentioned
13   something about the BDU form being placed on the
14   Web site.
15   A    So -- so we automated the form.  We
16   made the form a smart form and placed it as one
17   item on the digital customer care platform.
18        So if you go out to studentaid.gov and
19   you look at the various little symbols out there
20   and you have a FAFSA ID, and you hit this
21   particular icon, you can get into a smart form --
22   or link you can get into a smart form.
23        I believe that's what this press
24   release was attempting to describe.
25   Q    And did Diane Auer Jones stop this

Page 218
Page

1    smart form from going on the FSA Web site or on
2    the digital customer care platform?
3           MR. HANCOCK:  Objection to the scope.
4    BY MS. TORCHIANA:
5       Q    You can still answer.
6           MS. TORCHIANA:  And just for the
7    record --
8    BY MS. TORCHIANA:
9       Q    Well, you can still answer.
10      A    The form is on the -- is on the digital
11   customer care platform today.
12      Q    Okay.  I --
13      A    So nobody stopped it if I understand
14   your question right.  It's there.  It's -- what I
15   describe to you is a reality.  It's the form that
16   people use.
17      Q    Okay.  And at any point, was the form
18   halted or taken down?
19      A    All of our forms, as I spoke of earlier
20   when we were talking about the four different
21   types of forms, all of our forms are -- are
22   elements of policy; they're extensions of policy.
23           And, so, rightfully so, they are
24   staffed through the department, the Office of the
25   General Counsel, the Office of the Under Secretary

Page 219
Page

1    in order to get final approvals.  When those forms
2    are in their final format that they're going to
3    be, we execute by taking them to whatever the
4    delivery mode may be.
5           The form that's attempting -- that
6    we're attempting to describe here today went just
7    like that.  Went through the staffing process.
8    When that staffing process was over, we placed it
9    with our contractor for the purpose of having it
10   on our digital customer care platform.
11      Q    And, so, was it ever removed from the
12   digital customer care platform?
13           MR. HANCOCK:  Objection: scope.
14           THE WITNESS:  Let me make sure I
15   understand your question.  Was it ever removed
16   from the -- you mean, did the form come down and
17   go back up?
18   BY MS. TORCHIANA:
19      Q    Or did it -- was it supposed to --
20   okay.  Did the form go up and then did it go back
21   down?
22      A    Yes.  Yes, the form -- this particular
23   form went up.  It lacked an appropriate control
24   number for what's called paper reduction.  I know
25   this is far more technical maybe than you want,

Page 220
Page

1    but it lacked a control number for paper
2    reduction.  And, so, we took it down to make sure
3    we got that appropriate control number, and then
4    we put back up the exact same form.  So --
5       Q    Okay.  Do you remember how long it was
6    taken down for?
7       A    I don't -- no, ma'am.  I can't tell you
8    how many days.  It wasn't very long.  It did not
9    take very long to -- to do that process and get it
10   back up.  It may -- it may have been three or four
11   days or something like that, but I don't remember
12   exactly how long it was.
13      Q    Okay.  So if you turn to page 3, the
14   press release says, According to the
15   whistleblower, Jones halted the Web tool because
16   it was too user-friendly and would have helped too
17   many borrowers complete the application correctly,
18   without any disqualifying mistakes.
19           Is that accurate?
20      A    I -- I don't know in this case what
21   they are talking about, and that's why I didn't
22   want to comment on the press release.  I -- I
23   don't know -- I couldn't tell you.  I don't know
24   what the whistleblower is referring to.  That's
25   the term they use here, whistleblower said.  I

Page 221
Page

1    don't remember the term "effectively killing"
2    being used in anything or conversation that I've
3    had.
4       Q    Okay.
5       A    I don't know if it's accurate or not,
6    ma'am.
7       Q    Okay.  And have you ever heard anyone
8    with -- or have you ever heard the under secretary
9    suggest that it's too easy to apply for borrower
10   defense?
11           MR. HANCOCK:  Objection to the scope.
12           THE WITNESS:  No, I can't recall her
13   saying it's too easy to apply for borrower
14   defense.
15   BY MS. TORCHIANA:
16      Q    Not necessarily in those words, but
17   anything along those lines?
18           MR. HANCOCK:  Same objection.
19           THE WITNESS:  I don't -- I don't recall
20   her saying that it was too easy to apply for
21   borrower defense.
22           MS. TORCHIANA:  Okay.  Could we take a
23   ten-minute break?  Is that okay with everyone?
24           MR. HANCOCK:  That's fine with me.
25           Is that okay with you, General Brown?

Page 222

Page

1    MS. BERMAN:  Are we wrapping up?
2    THE VIDEOGRAPHER:  You want to go off
3 the record?
4    MS. BERMAN:  Sure.
5    THE VIDEOGRAPHER:  Okay.  We're going
6 off the record.  The time is 21:45 UTC.
7    (Recess -- 4:47 p.m.)
8    (After recess -- 4:55 p.m.)
9    THE VIDEOGRAPHER:  We're now back on
10 the record.  The time is 21:55 UTC.
11 BY MS. TORCHIANA:
12    Q    Okay.  Mr. Brown, I'm -- so there are a
13 couple of questions or topics that I wanted to
14 circle back on.  One thing we've been discussing
15 you mentioned earlier on that there was a decision
16 or guidance not to issue any decisions until the
17 tiered relief methodology was in place.
18       Could you tell me again who made that
19 decision?
20    MR. HANCOCK:  Objection: asked and
21 answered; misstates testimony.
22    THE WITNESS:  So I -- I couldn't -- I
23 couldn't speak to who, specifically the -- kind of
24 the inner workings of what happened at the
25 department.  But I can -- I can tell you that

Page 223

Page

1 policy decisions are -- come to me through the
2 Office of the Under Secretary, and that -- and
3 that this was no different.
4    BY MS. TORCHIANA:
5    Q    So did Diane Auer Jones make the
6 decision that the BDU wouldn't issue any decisions
7 while the Calvillo injunction was in place?
8    MR. HANCOCK:  Objection: asked and
9 answered.
10    THE WITNESS:  I couldn't tell you who,
11 as I said earlier, because I don't know.  But I
12 could tell you that the Office of the Under
13 Secretary would have relayed that decision to me.
14 Lots, you know, could be going on in the decision
15 making process that I'm just not aware of on the
16 policy side.
17    BY MS. TORCHIANA:
18    Q    Did you ask her who came up with that
19 decision?
20    A    No.
21    Q    Okay.  Do you know whether Ms. Colleen
22 Nevin had a role in making that decision?
23    A    So Colleen Nevin is the director of the
24 borrower defense unit, which is part of partner
25 participation and oversight which is within the

Page 224

Page

1 Office of Federal Student Aid.  And I said that to
2 say that they executed decisions on policy.  They
3 don't make them.
4    Q    Do you think Robin Minor would have
5 made that decision?
6    A    So Robin Minor works directly for me as
7 one of the deputy chief operating officers, and
8 the borrower defense unit is under her.  So I say
9 that to say that she works inside of Federal
10 Student Aid, so she would not make a policy
11 decision.  She would execute them.
12    Q    Okay.  And would Secretary DeVos have
13 made that decision?
14    A    So again, as I said earlier, I don't
15 know who made the decision.  The decisions on
16 policy come from the Department of Education and
17 are relayed to me through the Office of the Under
18 Secretary.
19    Q    Okay.  And similarly, for the denial
20 letters, who -- who has the authority -- just
21 going back -- back to that subject -- who has the
22 authority to authorize changes to the form of
23 denial letters?
24    A    Who has the authority to authorize --
25    Q    Any changes to the form of denial

Page 225

Page

1 letters?
2    A    To the denial letter forms?  You mean
3 take off question 3 and put on question 4, those
4 kind of things?
5    Q    Yeah.
6    A    The final -- the final decision on what
7 goes on at what -- what -- how the form will be
8 constructed, what it will have on it is a -- is,
9 in fact, an extension of policy.  It's a policy
10 decision.
11    Q    So would -- would Diane Auer Jones have
12 the final say over whether to approve any changes
13 to the denial forms?
14    A    So I couldn't tell you who, but I -- I
15 could tell you that those -- those policies would
16 go through the process of Office of General
17 Counsel, Office of Under Secretary, and we would
18 have to have something back in general from --
19 from those offices before we would move forward
20 with an approved form.
21    Q    And then to go back to another
22 question, when we spoke about the partial relief
23 methodology, part of that involves earnings
24 tables, it sounds like.  How many schools has the
25 department issued earnings relief tables for?

Page 226

1      MR. HANCOCK:  Objection.  It exceeds
2  the scope of discovery.
3      THE WITNESS:  I don't know, ma'am.
4  BY MS. TORCHIANA:
5      Q    You don't know.
6      Okay.  Do you think knowing that
7  information would have been relevant to setting
8  your -- your target metrics for the number of
9  adjudications going out?
10     A    Just to be clear, I said I didn't know.
11  I didn't say that there wasn't someone who may
12  have known and may have been a part of that and it
13  may have been a part of the setting and the
14  establishing of metrics.
15     But if you are assuming the premise
16  that it wasn't used in that discussion, I can't
17  validate that that premise is correct.  I could
18  only say that I don't know.  You know, I couldn't
19  tell you which ones were in and which ones were
20  out at that time.  I couldn't tell you that the
21  subject matter experts and the technicians and the
22  policy liaison folks and the folks that are inside
23  the bowels of the organization, they may have been
24  familiar with that, and it could have been a part
25  of their deliberations, but I don't know

Page 227

1  personally.
2      Q    Okay.  And that 150,000 number of
3  targeted adjudications for borrower defense
4  applications, by adjudications, is that decisions
5  that have been processed and sent to borrowers, or
6  what do you consider an adjudicated decision that
7  counts towards that 150,000?
8      A    So when I look at the metric, I take a
9  holistic look at it.  And so to get a check in
10  that column, I'm looking for the full circle,
11  which is what we have called today Step 1 and Step
12  2, to have been completed.
13     Q    Okay.  Okay.  I have a couple more
14  things to go over, and then -- so -- so could you
15  turn to tab 33?
16     MS. TORCHIANA:  And could we mark that
17  as Exhibit 30?
18     (Deposition Exhibit 30 was marked for
19  identification and attached to the transcript.)
20  BY MS. TORCHIANA:
21     Q    And are you familiar with this speech
22  by Secretary DeVos?
23     A    (Witness reviews document.)
24     I'm familiar with the event.  The --
25  the speech itself, I have not read through this

Page 228

1  full -- through this full speech.  But if you --
2  by familiar, do you mean if I know when this was
3  given, the title that's up at the top and --
4      Q    Were you there?
5      A    It's all -- it was a virtual
6  conference.
7      Q    Okay.  Were you listening -- did you --
8  did you hear this speech?
9      A    I was virtually there.  I -- I was -- I
10  was on the -- on the platform, I think would be
11  the way to -- to explain it.  And I did the
12  introduction, and I listened while the speech was
13  given.
14     Q    Okay.
15     A    So if -- if that -- if that is what you
16  mean by am I familiar with it, in that regard, I
17  am.  But if -- but if you mean have I read this
18  speech, the script that was provided here in the
19  information that you sent me, then the answer to
20  that is I have not.
21     Q    Okay.  And could you go to page 3 of 6?
22  It's in small -- it's on the bottom right-hand
23  side of the page.
24     A    Yes, ma'am.
25     Q    And could you read me the paragraph

Page 229

1  that starts with, Still more advance?
2      A    Still more advance the truly insidious
3  notion of government gift giving.  We've heard
4  shrill calls to cancel, to forgive, to make it all
5  free.  Any innocuous label out there can't
6  obfuscate what it really is: wrong.
7      Q    Okay.  And what do you -- what did you
8  understand this to mean, or what do you understand
9  this to mean?
10     MR. HANCOCK:  Objection: exceeds the
11  scope of discovery.  What's the relevance of this
12  to the court's three categories?
13  BY MS. TORCHIANA:
14     Q    You can still answer.
15     A    You're asking me what do I believe that
16  statement is?
17     Q    Yeah, what do you understand this
18  statement to mean.
19     MR. HANCOCK:  Calls for speculation.
20     THE WITNESS:  I am -- can you give me a
21  second to read it again?
22  BY MS. TORCHIANA:
23     Q    Yeah.
24     A    (Witness reviews document.)
25     I don't know what it means.  It was --

Page 230

1    it was obviously written by a speechwriter.  Those
2    are not -- those are not terms I use.  I don't --
3    I don't know what it means.
4         Q    Okay.  And -- sure.
5              And have you ever heard Ms. DeVos in
6    your private meetings with her express these same
7    sentiments?
8              MR. HANCOCK:  Object to the scope of
9    discovery, and I'm going to instruct the witness
10   not to answer.
11             MS. TORCHIANA:  Okay.  Could -- could
12   we go off the record?
13             MR. HANCOCK:  Sure.
14             MS. TORCHIANA:  I think that's
15   exactly --
16             THE COURT REPORTER:  Wait, wait, wait.
17   Wait a minute.  Wait a minute.  You're not off.
18   He's got to read you off.
19             MS. TORCHIANA:  I'm sorry.
20             THE COURT REPORTER:  That's okay.
21             THE VIDEOGRAPHER:  We're going off the
22   record; right?
23             THE COURT REPORTER:  Yes.
24             MS. TORCHIANA:  It seems to be --
25             THE COURT REPORTER:  Yes.

Page 231

1              Wait a minute.
2              MS. TORCHIANA:  -- relevant --
3              THE COURT REPORTER:  Wait a minute.
4              MS. TORCHIANA:  -- to point --
5              THE COURT REPORTER:  No.  He asked the
6    question.
7              Dan, yes, please take us off the
8    record.
9              THE VIDEOGRAPHER:  Thank you.  We're
10   now off the record at ten -- 23:07 UTC.
11             (Recess -- 5:07 p.m.)
12             (After recess -- 5:09 p.m.)
13             THE VIDEOGRAPHER:  We're now back on
14   the record.  The time is 22:09 UTC time.
15             BY MS. TORCHIANA:
16        Q    Okay.  And, so, Mr. Brown, are you --
17   are you declining to answer what you think this
18   sentence means?
19        A    The answer is I don't know.
20        Q    You -- you don't know.  Okay.
21             Okay.  Let's move on.  Let's go to our
22   final exhibit, and then we'll be done.
23             Could you turn to Exhibit -- let's
24   see -- Exhibit 12?
25             (Exhibit 12 referred to.)

Page 232

1              THE WITNESS:  Yes.
2              BY MS. TORCHIANA:
3         Q    Okay.  And are you familiar with this
4    PowerPoint?  Have you seen it before?
5         A    (Witness reviews document.)
6              So, ma'am, I believe I have seen it
7    before.
8         Q    Okay.  So when did you see it?
9         A    I cannot -- I cannot tell you when, but
10   I believe in some of our staff at work and our
11   updates, I have seen these charts before.
12        Q    Okay.  And in what context would you
13   have seen it?
14        A    Updates from the borrower defense team,
15   preparing for updates, those kinds of things.
16        Q    Okay.  And did you receive regular
17   updates from the borrower defense team?
18        A    So I don't know.  I would say the
19   updates from the borrower defense team I receive
20   vary, as I stated earlier.  It just depends on
21   what's going on, you know, what needs to be
22   discussed, and I'm not sure if you would consider
23   that regular or not.
24        Q    Okay.  And this presentation is from
25   August 21st, 2019.  And if you turn to page 2, it

Page 233

1    says, Total borrower defense applications as of
2    the week ending August 6th, 2019.
3              Do you know whether these presentations
4    were given weekly or . . .
5         A    (Witness reviews document.)
6              No, I can't tell you that they were
7    given weekly.
8         Q    Okay.  And were you -- was this
9    presentation given to you, or in what context did
10   you see this PowerPoint?
11        A    Because these -- because I have seen, I
12   think, most of these slides at different times and
13   perhaps some more than once over time.  Your
14   particular question of when was this presentation
15   given to me, I don't -- I don't know that date.  I
16   just can say for sure that I have seen the slides
17   that you are talking about.
18        Q    Okay.
19        A    It's not all at the same time is my
20   point.  Different things, different types,
21   different updates.
22        Q    Okay.  And the second line says, 38,700
23   applications have been adjudicated but not yet
24   processed.
25              As -- as we've been describing it,

Page 234

Page

1  would you describe this as Step 1?

2      A   You -- you mean the adjudication part?

3      Q   Adjudication but not yet processed.

4      A   So Step 1 is the adjudication, so I

5  would describe that 38,700 as having completed

6  Step 1.

7      Q   Okay.

8      A   I would not describe it as Step 1 and

9  Step 2 because the sentence says have not been

10 processed.

11     Q   Okay.  And it says over 27,700 approved

12 applications will be finalized.

13         So are these grants?

14     A   I'm sorry.  Did you say "grants"?

15     Q   Yeah.

16     A   No, we don't do grants, ma'am, in

17 borrower defense if I understand your question

18 right.

19     Q   Are -- are these approvals, approved

20 applications where the borrower made a successful

21 claim for borrower defense?

22     A   These are -- these are borrower defense

23 claims that have determined that the borrower is

24 eligible for a borrower defense claim.

25     Q   Okay.

Page 235

Page

1      A   But there's no relief methodology is

2  what that note is saying at the time or one is not

3  ready, and so they can't go through that second

4  part of the process.

5      Q   Okay.  And then if you could turn to

6  the next page, it says the -- the six stages of a

7  BD application, and below intake borrower

8  increase, it says, School response, New under the

9  2016 regulations.

10         As you understand it, what does that

11 entail?

12     A   It -- it entails letting a school know

13 that a claim has been filed against that school

14 and -- and showing the school that the evidence or

15 documentation that was used in providing an

16 appropriate amount of time for the school to

17 respond back so that the lawyer, that part of it,

18 can do the adjudication.

19     Q   Okay.  When did the department start

20 issuing school responses -- or start soliciting

21 them?

22     A   So claims -- claims are covered by the

23 rule, I think, that was in place at the time.

24 And, so, there are -- there are certain dates that

25 fall under the 2016 rule.

Page 236

Page

1          So as soon as you would get to a

2  2016 -- a claim that's filed under the 2016 rule,

3  then you would be required by that requirement to

4  go to the school for notification and -- and

5  whatever documentation or input they would want to

6  bring back.

7          So when?  Whenever we got to a claim

8  that's -- that the dates of that particular claim

9  made it fall under the 2016 rule.  I -- I don't

10 know that exact date, but that's when the borrower

11 defense team would have had to have sent

12 information to the school.

13     Q   Okay.  And do you know how many schools

14 you've sent out this request for responses to?

15     A   I -- I don't.  I don't know how many

16 claims have fallen under the 2016 rule yet.

17     Q   All right.  Okay.  And then I -- on the

18 next page, on page 4, it says at the bottom, A

19 decision on the relief methodology would result in

20 the ability to proceed with approximately 40,000

21 applications.

22         Could you explain to me what -- what

23 that means?

24     A   That -- that Step 1 had been completed.

25 There were 40,000 applications that had come in,

Page 237

Page

1  and that once we had a relief methodology, we

2  could do the mathematical computations if -- if

3  appropriate for these 40,000, and they could be --

4  notifications could be sent out.

5      Q   Okay.  And do you know whether this

6  included schools other than CCI and ITT?

7      A   I don't -- I don't know.  I would have

8  to go back into the numbers and see, but because

9  it says August 2019, the majority of those cases

10 at the front part of the cycle are CCI and ITT.

11         THE COURT REPORTER:  I'm sorry.  I

12 missed the last part.  The majority of those cases

13 at the front part?  Is that what you said?

14         THE WITNESS:  The majority of those

15 cases at the front part of the cycle are CCI and

16 ITT.

17         THE COURT REPORTER:  Thank you.  Thank

18 you.

19         BY MS. TORCHIANA:

20     Q   Okay.  And if you turn to the sixth

21 page of the PowerPoint, it says, Why are BD

22 applications on hold.  And it says, No relief

23 methodology developed for non-CCI claims.

24         So -- so this presentation was given in

25 August of 2019.  So was there any relief

Page 238
Page

1  methodology for non-CCI claims that had started to
2  be developed at that time that you know of?
3        A    Ma'am, could you -- could you repeat
4  that question again?  I'm sorry.
5        Q    Yeah.
6             So this presentation is from
7  August 2019, and it says, No relief methodology
8  developed for non-Corinthian claims.
9             So do you know whether at the time this
10 presentation was given was there any relief
11 methodology being developed?
12       A    August of 2019?
13       Q    Uh-huh.
14       A    Relief methodology was being worked on.
15       Q    Okay.  And why had it not yet been
16 completed?
17       A    The policy element wasn't done is
18 all -- all that I can tell you.  Why?  I don't
19 know other than I can tell you it's not simple.
20 It's a complex work that they have to do.  Beyond
21 that, I couldn't tell you why it wasn't completed.
22 I'm just sure that we weren't using one yet
23 because that happened December of 2019.
24       Q    Okay.  And what did you understand as
25 the -- what -- what was missing for the

Page 239
Page

1  methodology to be completed?  What -- what stage
2  of the process was it at?
3        A    I don't know.
4        Q    And there's also here -- it says, No
5  processing systems available from summer 2018 to
6  the present due to platform development and
7  migration.
8             Could you tell me who decided that
9  applications would not be processed during this
10 platform and migration?
11       A    I don't -- I don't know -- I started
12 work at Federal Student Aid as the chief operating
13 officer in March of 2019, so I don't know if
14 there's a decision in 2018 related to the
15 platform.
16            But as I stated earlier, the two things
17 that needed to get done were more attorneys and
18 more resources in the development of the platform
19 in order to make the borrower defense process
20 work.
21       Q    And what about the platform is being
22 developed?
23       A    So I can't speak again for what's
24 referenced here in 2018.  I don't know.  But we
25 needed a more advanced data collection system so

Page 240
Page

1  that it would match loan -- claims to loan numbers
2  and then follow the data through the system so
3  that accountability was much -- much tighter.
4             The -- the platform was developed for
5  customer inquiries because we never anticipated
6  years ago having over 200,000 claims under --
7  under this statute of borrower defense.
8             And, so, that -- using that platform,
9  it had to be upgraded, as you can imagine, to
10 handle more data, to handle more content and to
11 also move data from one system to the next.  All
12 of that was required because this was no longer
13 a -- an Excel spreadsheet operation.  This -- this
14 was a major case management processing, and that's
15 what -- that's what's meant occasionally through
16 here when we reference the platform, the upgrades
17 that needed to happen.
18       Q    Okay.  And have these upgrades -- have
19 they been completed?
20       A    So with technology systems, you know,
21 completed is kind of an optimistic term.  I would
22 say that they are working much better today, and
23 they are fully utilized, but I don't know that
24 there aren't some more upgrades that are planned
25 down the road for -- for this system.

Page 241
Page

1        Q    Okay.  So this says, No processing
2  systems available.  So at what point would you say
3  there was a processing system that was available?
4        A    I -- you know, I -- I can't speak again
5  to 2018, but when we got into the April, May, June
6  timeline -- timeline coming into July and August
7  and September of -- of 2019, we had already begun
8  to resource those upgrades and had what I would
9  call a functioning -- a functioning system from
10 which we could go forward on.
11       Q    Okay.  Well -- okay.  It says, No
12 processing systems available from December 2018 to
13 the present, and the present is August 2019.
14       A    Yeah.
15       Q    And it says, Upgrades to platform to be
16 completed by August 30th.
17            So would you say by August 30th the
18 updates were completed, or what -- what happened
19 there?
20       A    I can't -- I can't recall those exact
21 dates, but I know that we began putting financial
22 instructions into the systems in those months that
23 I just named to -- to make it functional.
24       Q    Okay.  And who made the decision to
25 stop processing applications while these

Page 242

Page

1  processing systems were being updated?
2          MR. HANCOCK: Objection: asked and
3  answered.
4          THE WITNESS: I -- I wasn't there in
5  2018, ma'am. I don't . . .
6      BY MS. TORCHIANA:
7      Q    Okay. And do you think decisions could
8  have been adjudicated while the platform is being
9  upgraded?
10     A    I -- I don't know if I answered your --
11 you're asking me were we allowed to continue
12 adjudicating decisions in -- in 2000- -- if you're
13 asking me from March 2019 through the summer of
14 2019 and the fall, when these system changes
15 continuing to go on and upgrades continued to
16 happen, if we were able to adjudicate cases. I'm
17 just trying to repeat what I think you're -- is
18 that what you're asking me?
19     Q    Yes.
20     A    And, so, again I would say that
21 adjudications have never stopped. They have
22 continued on. But -- but keep in mind what we're
23 talking about is Step 2, the processing of -- of
24 things which is not in Step 1. And, so, the
25 relationships to adjudications, you can do

Page 243

Page

1  adjudications, but you can't do it with a high
2  level of efficiency the processing in the mass
3  numbers we're talking about minus some of the IT
4  support that this briefing that you're referencing
5  here is getting at.
6      Q    And could Step 2 decisions have gone
7  out while the platform was being updated?
8      A    Step 2 decisions or borrower
9  notifications, those kinds of things, required a
10 methodology that would be used to compute things.
11 And, so, we mixed a few things up. Until you had
12 the methodology, platform, no platform, decisions
13 aren't going out at least that require relief.
14 And, so, what caused the decisions to go out was
15 the announcement of a methodology December 2019.
16     Q    Okay. And you've repeatedly mentioned
17 that one of the issues holding back issuing
18 decisions was staff limitations and IT
19 limitations. So when you talk about IT, is this
20 what you're talking about, the processing system
21 that had to be upgraded, or were you speaking
22 about something else?
23         MR. HANCOCK: Objection: misstates
24 testimony.
25         THE WITNESS: Could -- could you say

Page 244

Page

1  some of that again, ma'am, maybe in --
2      BY MS. TORCHIANA:
3      Q    Yeah. So when we've been speaking,
4  you've mentioned that two of the major limitations
5  to the BDU were staffing and IT concerns; is that
6  right?
7      A    That's correct.
8      Q    And was the -- the IT concern in
9  question, was this -- when you were referring to
10 that, were you referring to this processing system
11 that was being updated from summer 2018 to present
12 or something else?
13     A    I was -- I was referring to the
14 platform which is used to process borrower defense
15 applications, and I believe that's the same thing
16 that's being referred to here.
17     Q    Okay. And what changes were made to
18 that platform?
19     A    We've -- we began to use a -- a -- a
20 system known as SalesForce. We upgraded the --
21 the database to be able to hold that. We
22 increased the capacity for numbers of documents
23 and a series of other technical upgrades to the --
24 to the program and software that we're using that
25 I'm certainly not technically qualified to lay out

Page 245

Page

1  for you in total.
2          But it's those kinds of upgrades where
3  you increase both the capacity and the memory; you
4  increase the speed; you increase the level of
5  details that you're able to get out of the -- the
6  system; all of those kind of things.
7      Q    Okay. And how long did it take to
8  upgrade those things?
9      A    I -- I don't remember the total amount
10 of time because they're done in phases, like phase
11 one and phase two and phase three. They're all
12 bringing up, you know, additional capability.
13         But the system was being upgraded and
14 worked on throughout the spring and summer of
15 2019, I believe.
16     Q    Okay. Okay.
17         MS. TORCHIANA: I think -- I think
18 that's it. We've gone through most of my
19 questions and, you know, I'm sure everyone's
20 tired, so . . .
21         MR. HANCOCK: Okay.
22         THE WITNESS: If you're -- if you're
23 done, ma'am --
24         THE VIDEOGRAPHER: Should we conclude?
25         MS. TORCHIANA: Yes.

## Page 246

1  THE VIDEOGRAPHER: All right. This
2  concludes today's deposition. We're now going off
3  the record. The time is 22:32 UTC time.
4  MR. HANCOCK: Before you go -- before
5  you go --
6  MS. TORCHIANA: Actually, sorry.
7  MR. HANCOCK: Dan?
8  THE VIDEOGRAPHER: Yes.
9  MR. HANCOCK: I would like to reserve
10 the ability for the witness to read and sign the
11 transcript.
12 MS. TORCHIANA: I would also like to
13 reserve the right to keep the deposition open, and
14 if we learn of anything that we need to, you know,
15 reopen this deposition for . . .
16 THE VIDEOGRAPHER: Okay. Shall we
17 close it again?
18 MS. TORCHIANA: Yes, thank you.
19 THE VIDEOGRAPHER: We're now off the
20 record. The time is 22:32 UTC time.
21 (Signature having not been waived, the
22 Remote Videotaped Deposition of MARK BROWN ended
23 at 5:32 p.m.)
24
25

## Page 247

1  REPORTER'S CERTIFICATE
2  I, Dana C. Ryan, Certified Shorthand Reporter in
3  and for the State of Maryland, hereby certify that
4  the deponent was by me first duly sworn and the
5  foregoing testimony was reported by me and was
6  thereafter transcribed with computer-aided
7  transcription; that the foregoing is a full,
8  complete, and true record, to the best of my
9  ability, of said proceedings.
10 I further certify that I am not of counsel or
11 attorney for either or any of the parties in the
12 foregoing proceedings and caption named or in any
13 way interested in the outcome of the cause in said
14 caption.
15 The dismantling, unsealing, or unbinding of the
16 original transcript will render the reporter's
17 certificate null and void.
18 In witness whereof, I have hereunto set my hand
19 this day: December 18, 2020.
20 ___X___  Reading and Signing was requested.
21 _____  Reading and Signing was waived.
22 _____  Reading and Signing was not requested.
23
24
25 Dana C. Ryan, RPR, CRR

## Page 248

1  INSTRUCTIONS TO WITNESS
2
3  Please read your deposition over
4  carefully and make any necessary corrections. You
5  should state the reason in the appropriate space
6  on the errata sheet for any corrections that are
7  made.
8  After doing so, please sign the errata
9  sheet and date it.
10 You are signing same subject to the
11 changes you have noted on the errata sheet which
12 will be attached to your deposition.
13 It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the
16 deposition transcript by you. If you fail to do
17 so, the deposition transcript may be deemed to be
18 accurate and may be used in court.
19
20
21
22
23
24
25

## Page 249

1  E R R A T A   S H E E T
2  IN RE: THERESA SWEET, et al. v. ELISABETH DEVOS,
3  in her official capacity as Secretary of the
4  United States Department of Education.
5  RETURN BY: _____
6  PAGE  LINE            CORRECTION AND REASON
7  _____ _____           _____
8  _____ _____           _____
9  _____ _____           _____
10 _____ _____           _____
11 _____ _____           _____
12 _____ _____           _____
13 _____ _____           _____
14 _____ _____           _____
15 _____ _____           _____
16 _____ _____           _____
17 _____ _____           _____
18 _____ _____           _____
19 _____ _____           _____
20 _____ _____           _____
21 _____ _____           _____
22 _____ _____           _____
23 _____ _____           _____
24 _____ _____           _____
25 (DATE)                (SIGNATURE)

Page 250
Page

```
1              ACKNOWLEDGMENT OF DEPONENT

2                  I, Mark Brown, do hereby acknowledge

3      that I have read and examined the foregoing

4      testimony, and the same is a true, correct and

5      complete transcription of the testimony given by

6      me and any corrections appear on the attached

7      Errata sheet signed by me.

8

9

10

11     _____    _____

12     (DATE)                        (SIGNATURE)

13

14

15              CERTIFICATE OF NOTARY PUBLIC

16     Sworn and subscribed to before me this

17     _____ day of _____, _____

18

19

20     _____    _____

21     NOTARY PUBLIC            MY COMMISSION EXPIRES

22

23

24

25
```

---

### Exhibits

EX 0024 Brown 121520
  6:10 15:12,13
EX 0025 Brown 121520
  6:12 19:9,10 112:5
  136:21,22
EX 0026 Brown 121520
  6:13 56:6
EX 0027 Brown 121520
  6:16 136:15,17
EX 0028 Brown 121520
  6:19 141:9,10
EX 0029 Brown 121520
  6:21 56:4 142:4,5
EX 0030 Brown 121520
  6:25 227:17,18

---

### 1

**1** 100:24 101:1,15
  102:9,16,18,21
  103:7,13,19 104:16,
  17 124:11 125:5,11,
  21,23 126:18,25
  147:14 151:8,9,12,
  17,18 152:8,18 153:4
  154:9 199:23 200:5,
  8,13,16 203:6
  207:13,15,24 208:4,9
  211:12 227:11 234:1,
  4,6,8 236:24 242:24
**1,000** 138:19,25
**1,453** 127:13
**10** 48:17 55:20 91:5,
  17,18 92:22 93:3
  103:4 126:7 154:20,
  23
**10th** 112:9
**11** 160:3
**11:16** 57:16
**11:30** 57:17
**11th** 136:24
**12** 48:17 91:5 103:4
  126:7 154:20,23,24
  231:24,25
**12:43** 105:9,16
**13** 176:4,5,6,8
**14** 161:24 162:9,15

**145** 141:7
**145-2** 200:7,8
**15** 190:2,3,4 200:9
  209:19,20
**15,256** 157:19
**150,000** 64:15 87:9,14
  227:2,7
**15:03** 9:10
**15:05** 11:25
**15:08** 12:5
**15th** 9:10
**16** 16:8 55:22,23
  56:10 128:19 163:7
  191:17
**16,045** 136:25
**160,000** 64:15 71:15
**16:16** 57:15
**16:30** 57:19
**17** 127:18,19 130:20
  165:14 191:3,17
**17:43** 105:15
**18** 94:24 129:11
  155:18 170:5 191:3,
  17 213:8,10
**18:18** 105:19
**19** 73:10 191:17
  198:5,6,7 199:20
  200:3,4
**193** 75:24
**1986** 15:24
**1995** 184:2
**1999** 211:12
**19:05** 136:9
**19:20** 136:13
**1:18** 105:17
**1st** 204:7 206:15

---

### 2

**2** 20:17 100:24 101:1,
  15,16 124:11 125:17,
  21 147:15,16 151:18
  152:10,12 153:8,9,
  14,15 167:16 178:24
  203:2,9,22 204:3,12
  205:25 206:14
  207:14,16 210:7,19
  227:12 232:25 234:9
  242:23 243:6,8

**2,000-plus** 154:22
**20-** 56:4
**200,000** 240:6
**2000-** 242:12
**2004** 211:12
**2012** 204:7 206:15
**2016** 190:13,18 191:3
  195:10 235:9,25
  236:2,9,16
**2017** 57:7 73:23 76:9,
  17 77:13,14,15
  78:11,12 79:18 94:24
  95:21
**2018** 17:2,16,19,22
  35:24 37:24 38:15
  40:3 41:9 52:13 92:1
  102:8,15 125:24
  239:5,14,24 241:5,12
  242:5 244:11
**2019** 17:11,15,16
  20:19 27:14 35:24
  36:11,12 37:12 38:18
  40:24 44:13 47:4
  50:20 52:3,9 56:25
  57:2 75:3 91:3,6,22,
  24 93:4 102:13
  103:18 112:9 113:19
  114:6 123:5,13
  125:24 130:9,17
  136:24 140:1,5,12,
  13,19,24 143:1,7
  150:8 151:4 155:6
  156:20 157:20
  158:12,17 159:1
  168:21 170:6 191:4,
  6,18 232:25 233:2
  237:9,25 238:7,12,23
  239:13 241:7,13
  242:13,14 243:15
  245:15
**2020** 9:10 63:22 64:7,
  11 65:17,23 71:15
  81:23 87:10 88:13
  136:16 190:14,18
**20:41** 189:21
**20:55** 189:25
**20th** 77:12,14
**21:45** 222:6
**21:55** 222:10
**21st** 232:25
**22** 211:12

**227,000**  128:3 129:8
**22:09**  231:14
**22:32**  246:3,20
**22nd**  93:4
**23**  166:6,7,13
**23:07**  231:10
**24**  15:3,4,8,12,13
  166:6 169:11 190:6
**25**  19:6,7,9,10 20:10
  53:11 112:5 136:21,
  22
**25s**  20:9,13
**26**  56:5,6
**27**  136:15,17 142:2
**27,700**  234:11
**270**  75:24
**28**  141:9,10 193:22
**29**  55:17,20 56:4
  142:4,5
**2:05**  136:10
**2:20**  136:11

---

### 3

**3**  33:4 73:7,8,9
  141:23 190:12 203:4,
  23 207:10 208:2,13
  209:16 210:9,17
  211:2,20 220:13
  225:3 228:21
**30**  194:4 227:17,18
**300-page**  66:4
**30th**  241:16,17
**31**  63:20,22 136:16
**31st**  77:15
**32**  16:12 141:6
**33**  227:15
**37**  64:2,10
**38,700**  233:22 234:5
**3:41**  189:22
**3:55**  189:23

---

### 4

**4**  53:11 142:18 190:13
  209:18,19 225:3
  236:18
**40**  62:16
**40,000**  236:20,25
  237:3

**43**  135:22
**44**  194:13,18,23
**45**  25:11 194:17,18
**452**  144:9
**4:47**  222:7
**4:55**  222:8
**4th**  20:19 195:8

---

### 5

**5**  112:8 209:18
**50**  93:10 99:12
**501(c)**  18:15
**509**  75:22
**52**  195:19
**53**  196:14
**54**  144:9
**56**  190:7
**5:07**  231:11
**5:09**  231:12
**5:32**  246:23

---

### 6

**6**  121:15 133:11
  142:18,19,24 194:23
  195:6 228:21
**60**  49:2
**6th**  233:2

---

### 7

**7**  78:14,16,18 136:23
**71-3**  19:7 20:11
**789**  137:1,2,6

---

### 8

**8**  138:18 139:10
  149:25
**88**  194:9
**8th**  190:14,18

---

### 9

**9**  156:23
**90**  9:14 63:10 69:20
  194:9

**91**  63:24 72:2

---

### A

**a.m.**  57:16,17
**ability**  98:16 125:17
  236:20 246:10
**absolute**  163:1
**absolutely**  173:21
  181:10 208:13,21,22
**acceptable**  195:16
**account**  31:23 160:17
  195:12 206:3,18
**accountability**  65:8
  240:3
**accountable**  31:7
**accounted**  117:25
  158:5
**accounts**  69:24
**accreditation**  204:10
  206:17
**accreditations**  210:12
**accuracy**  57:7
**accurate**  56:20 76:8
  220:19 221:5
**accurately**  215:14
**achievable**  64:23 83:5
  84:11,14 87:20
**achieve**  82:11,12
  87:17 88:23,24
**acknowledge**  9:23 10:1
**action**  9:16 76:4
  149:23
**actions**  90:18
**active**  16:1
**activity**  126:1
**acts**  163:14
**actual**  58:25 64:15
  66:5 71:15 196:8
**add**  135:21 196:10
**additional**  43:9
  77:17,21 138:19,25
  149:3 152:4 163:9
  182:5,8 245:12
**address**  50:13 155:19
**addressed**  88:16 191:7
**adjudicate**  45:14 49:4
  54:12 89:12 104:2,6
  108:9 127:5 133:6
  148:23 151:23 156:13

157:8,11 179:12,23
191:9 196:7 204:16
207:4 208:9 242:16
**adjudicated**   64:7
70:16 81:14 91:7
104:24 123:24 125:6
127:1 139:8 151:13
162:12 164:21 181:5,
11 204:25 205:9
207:11,13 208:4,14
227:6 233:23 242:8
**adjudicates**   101:9
**adjudicating**   43:10
87:9 100:7 103:25
109:10 152:19 157:2
161:3 204:22 242:12
**adjudication**   139:14
153:8 154:9 161:18
162:10 180:6 196:8
207:12,16,24 208:7
212:5 234:2,3,4
235:18
**adjudications**   67:18
110:7,14 151:9 226:9
227:3,4 242:21,25
243:1
**adjust**   182:16
**adjusted**   83:1 182:12
**administered**   10:2
**Administration**   128:14
**administrations**   34:15
77:24
**administrative**   30:7
59:7 147:7,10,20
148:10,21 149:17
152:22 207:21
**Admission**   194:7
**admissions**   194:7
**adoption**   121:17
**advance**   134:2 229:1,2
**advanced**   239:25
**advised**   32:10 169:13
**advisor**   16:24 17:23
22:18,23 28:18 52:12
53:2 131:3
**Advocates**   12:14
**affidavit**   190:9
**affiliations**   34:20
**agencies**   51:24
**agency**   32:24

**agenda**   25:15 59:6
**agendas**   58:17,19,21,
25 59:2
**aggressive**   90:3
**agree**   10:12 11:10,12
82:6 83:19 134:11,
13,18 158:7 185:3
**agreement**   9:6 10:9,10
184:24
**ahead**   109:5
**aid**   17:7,10,18 21:18,
24 22:1,12,16,25
26:1,25 27:1,6,13
30:19 32:1,3 34:9
36:1,5,7,10,19 37:2,
3,11,20 38:7,19
42:22 54:1 61:7,10,
15,22 63:14 67:20,22
68:12 80:25 112:24
116:7,15,16 127:14
131:5 155:16 157:8
159:25 170:19 174:3,
10 183:18 215:23,24
216:8 224:1,10
239:12
**air**   15:25 16:2,14,15
18:4,5,9
**airmen**   16:16
**Alabama**   15:23
**Albers**   30:15
**Alexandria**   16:19
**algorithms**   117:4
**allegation**   186:4
195:24,25
**allegations**   204:8
206:16 210:12
**allowed**   87:18 96:10
132:4 186:1 242:11
**allude**   171:25
**alluding**   162:15
163:21
**alternative**   113:21
**ambiguous**   97:10
**amount**   14:10 28:23
49:3 85:6 98:19,22
118:8,19 121:24
139:21 147:2 148:7
235:16 245:9
**analysis**   165:15
**analytics**   117:11
119:9,19 120:11,22

**announcement**   243:15
**annual**   31:8 32:24
63:22 64:19 82:3
136:16
**annually**   69:13
**answering**   197:23
**answers**   81:17 108:10
112:19 207:2
**anticipated**   240:5
**anticipates**   138:20
165:16
**anticipation**   139:1,10
**anxiety**   136:1
**apolitical**   34:10
**Apollo**   203:17,20
205:20 208:12
**appeared**   19:3
**applicable**   76:4
183:24 184:7 204:14
**applicant**   208:1
**applicants**   162:18
170:7 209:2
**application**   54:16,24
121:21 150:22 157:6
162:1 184:1,5 190:12
193:23,24 194:14
204:5,6 206:21
208:3,4 215:5 220:17
235:7
**application's**   196:16
**applications**   35:18,20
53:14 64:7 87:9
96:16 122:4 123:7,8,
18 128:4 129:9
156:25 157:3,21
158:11,17,19 164:20
165:21 170:7 207:8
209:3,5 210:8,14
227:4 233:1,23
234:12,20 236:21,25
237:22 239:9 241:25
244:15
**applied**   96:13 101:13,
17 204:12
**applies**   164:1
**apply**   99:8,15 100:12
163:25 203:19 210:20
221:9,13,20
**appointed**   17:11
**appointee**   22:24 23:5

appointees  22:22
appointments  34:15
approval  76:11,20,21,
  22,23 77:8 90:16
  107:19 143:8,15
  150:17 155:11 164:6,
  9,22 165:4,12 166:11
  173:12 175:14,23
  183:5
approvals  134:2,10,15
  137:9,18 138:2,5
  165:17 166:1 219:1
  234:19
approve  54:15 65:5,7
  81:25 183:1,3 185:7
  187:6 225:12
approved  49:19 81:15
  100:12 137:3 163:11
  174:16 175:9,21
  182:24 209:3 225:20
  234:11,19
approves  31:11
approving  134:4
approximately  17:3
  65:13 188:5 236:20
April  41:12 67:20
  150:17 155:11 241:5
April/may  114:23
area  167:19 171:2
  200:22 207:2
areas  16:8,21
arrangement  10:6
arrival  70:2 90:15
arrive  155:25
arrived  151:6
art-  129:14
article  79:2,13
  127:21,25 128:7,13,
  21 129:15,22
asks  99:7 170:16
aspects  79:23,24
  161:13
assert  176:13 178:20
assess  80:13,22 81:7
  207:18
assessment  206:24
assign  148:12
assigned  22:8,25
assignment  16:6
assignments  18:6

assist  71:12
assistance  19:20
assisted  19:24
assists  19:25
associate  117:24
association  119:8
assume  23:7 94:21
  186:21 202:15
assuming  68:4 155:21
  226:15
Atlanta  16:3
attached  15:14 19:11
  56:7 136:18 141:11
  142:6 227:19
attachment  199:23
  200:5,13,16 209:17
attain  87:2
attainable  82:8 83:6
attaining  87:7
attempt  212:1 216:5
attempting  217:24
  219:5,6
attended  137:7,11
  162:18 179:17
  181:15,20 191:24
  206:13 211:9
attending  41:15
attorney  12:13 14:7,
  16 19:20,23 54:12,19
  55:13 85:9 100:7
  101:9,14 125:7
  139:13 146:11,12
  152:5,20 160:10
  161:17 162:13
  179:12,24 180:6,7
  204:16 205:16 207:4
  208:24 212:7
attorneys  9:22 14:2,3
  47:11,19,20 48:16
  49:3 55:8 71:7 88:8,
  11,17,22 89:1,12,18,
  23 90:13,16,23 91:12
  103:5,10 126:6,8
  139:19 143:3,9,13,15
  144:4,6,13,16 145:8,
  18,23 146:14,25
  147:1 148:20,23,24
  150:18 151:16,20,25
  152:6,12,18 153:1,5,
  8,11 154:9,11,15,18,
  20,23,24 155:3,7
  156:2,7,13 157:14

160:9 161:19,22
  162:14 167:11 180:23
  184:19 191:9,14
  195:15 196:9 208:8
  239:17
attribute  34:17 153:2
audio  120:14 138:11
  153:5
Auer  23:8 24:10 25:20
  26:7 42:2,17 60:12
  92:23 107:22 115:13
  131:3,19 173:15
  175:10 192:7 193:3
  209:24 215:5 217:25
  223:5 225:11
August  232:25 233:2
  237:9,25 238:7,12
  241:6,13,16,17
authorities  34:19
  55:6
authority  54:14,23
  55:12 224:20,22,24
authorize  224:22,24
automated  217:15
automatic  104:8
automatically  104:7
automation  216:25
autopilot  148:15
avoid  18:17
avoided  135:12,14
aware  9:3 35:22 54:17
  61:11 73:1 76:25
  77:3 78:25 103:4
  114:17,20 115:5
  145:12 173:4 223:15


_____

            B

_____

back  12:4 16:17 27:21
  55:16 57:18 61:6
  73:5 78:25 80:6,7,9
  105:19 106:13 108:18
  109:22,25 112:3,8
  118:20 125:20 136:5,
  12,20 140:22 142:1
  149:18 170:5 174:14
  185:11 189:24 207:3
  219:17,20 220:4,10
  222:9,14 224:21
  225:18,21 231:13
  235:17 236:6 237:8
  243:17

**back-and-forth** 83:24

**background** 15:19
155:17,20

**backlog** 40:10 41:18
42:9,17 43:5 46:18
47:6 48:19 49:5
50:13 146:19

**backlogs** 43:1

**band** 139:14

**based** 34:14 48:23,24
74:15,17 96:7 101:18
122:19 147:2 156:3
179:1 181:12 182:10
211:14

**basis** 27:15 84:25
138:21 205:15

**batteries** 10:25

**BD** 40:2 49:8 64:6
86:5 98:18 103:7,24
106:8,9,14,23 107:2,
3 108:4,7,17,19
109:7,23 132:13
156:2,25 182:4 235:7
237:21

**BDU** 33:23 34:6 48:8,
10,13 49:12 51:17
52:14 67:18 68:8
69:3,16,21,23 70:6
71:2 76:9 77:15,19
78:1 79:24 80:12,18,
23 81:6,8,20 83:5
84:1,3 85:15 86:5,18
87:7,12 88:5,12
89:2,18 90:23 97:17
99:1 105:25 107:8,
23,25 108:24 109:11
132:7 143:1 150:2
154:11,15,18 156:12
163:8 165:15 168:17,
22 217:13 223:6
244:5

**BDU's** 76:21 79:23

**began** 69:20 90:15,18
114:15 130:9,17
133:2 175:2,5 241:21
244:19

**begin** 12:15 77:16
86:4 110:17 114:11
130:5 156:5 159:7
170:18,20 174:22

**beginning** 133:11
139:25 151:3 193:23

**begins** 183:17,19

**begun** 241:7

**behalf** 9:13,19 160:9

**belief** 45:17 109:12

**believed** 43:8 44:23
45:4,12,17 62:9
92:12 105:25 106:10
108:7,10,14 109:7,17

**believes** 133:23 134:1

**bell** 16:3 130:3

**BERMAN** 20:5,12 222:1,
4

**binder** 63:20

**bit** 32:8 34:9,11
53:15 84:17 99:6
124:8 143:2 170:3
195:20

**blacked** 195:21

**blanket** 179:10

**board** 18:10,13,16,19,
21 47:20 143:11
144:10 155:13

**boiled** 104:7

**borrower** 14:15,16
20:24 21:4,8,20
22:2,4 25:14 28:4,6,
7,10,12,13,21 29:12,
15,18 31:23 32:2,5,
12 33:7,8,15,20 34:4
35:2,17,20 37:23
38:1,9,14,21,23,25
39:7,9,18,21 40:7,9
41:8,16 42:9 43:1,7,
9 44:23 45:4 46:19
47:2 48:1,22 50:2
51:20 52:8,10,25
53:3,6 54:1,3,6,15,
21 55:2,5,7,10,14
56:25 57:5 66:21
67:3,5,16 68:13,20
70:15 71:13,20 76:3,
5 77:17,22 81:11
85:9,12,16 86:1 89:4
92:12 93:19 94:20
96:1,9 97:24 98:3,7,
12 100:18 101:2,11,
19 116:2 121:19,20,
22,25 122:3,22,24
123:2,18 124:18
125:3,7,9,18 126:22,
23,25 127:17 130:1
133:2 135:16,18

136:25 138:3,7,11,
13,16 141:5 144:24
146:7,9,10 147:3,12,
16 150:3 152:14
153:12,13 157:8,11,
13 160:13,22 161:7,
9,20,25 162:17
163:17,24 164:12,15,
16,20 165:6,7 166:9
167:13,14 169:7
170:6,19,24 171:3
174:12 177:11 178:5,
25 179:5,9,24
180:10,20,22 181:15
182:22 185:7 186:2,
22,23 187:6 189:4
191:21 195:12 196:8
197:9,17,22 198:3,
16,20 200:21,24
201:1 202:23 203:21
204:7 205:4,24,25
206:13 207:22 211:9
212:24,25 213:4
215:4 216:2,18
221:9,13,21 223:24
224:8 227:3 232:14,
17,19 233:1 234:17,
20,21,22,23,24 235:7
236:10 239:19 240:7
243:8 244:14

**borrower's** 181:2
184:5

**borrowers** 99:9,15
129:1,9 131:10 133:3
134:3,7,21 137:6,11
169:16,19 176:13
178:3,20 179:17
181:20 210:11 220:17
227:5

**borrowers'** 165:20

**boss** 24:7

**bottom** 72:1 75:23
99:6 127:25 128:10
129:4 142:21 178:24
228:22 236:18

**bowels** 226:23

**box** 15:5

**bracketed** 15:4 19:7
136:16

**brand** 146:11

**break** 13:13,15 57:11
105:5,9 136:5 189:16
221:23

breakout   137:6
breaks   13:11
briefed   167:24 168:3
briefing   68:14,15
   243:4
bring   47:19 82:23
   85:3 143:11 177:13
   236:6
bringing   156:6 172:8
   245:12
broad   9:14 37:5 62:20
   90:1
broadly   37:16
Brooks   191:24 194:6
   197:5,18
brought   97:21 144:8
   145:22 181:8 191:8
   203:11
Brown   9:9 11:11,14
   12:7,12,17 20:11
   44:1 58:5,14 105:21
   131:4 190:2 214:22
   221:25 222:12 231:16
   246:22
budget   52:1
build   82:22 90:21
   150:14
building   87:23 104:22
   112:18 126:15
buildup   90:15 156:3
built   63:4 154:25
bureaucratic   150:24
business   55:14 90:13
   211:10

C

California   93:20
   94:15 95:9,12
call   24:11 40:10
   43:14,22 60:23 61:2
   97:2 102:20 111:16
   120:12 149:6 152:1
   153:14,15 161:2
   174:8 215:23 241:9
called   37:19 96:2
   147:15 219:24 227:11
calling   50:10 83:25
   87:22 148:9 152:7
   157:16

calls   46:7 51:4 78:3
   83:8 84:5 135:4
   186:6,17 187:12
   196:4 229:4,19
Calvillo   45:21 96:2,3
   97:5,19 105:22 223:7
cancel   229:4
capabilities   165:3
capability   245:12
capacity   133:3 151:18
   154:20 244:22 245:3
capital   17:4 21:13,
   15,16 52:12
care   207:24 215:20,21
   217:1,10,17 218:2,11
   219:10,12
career   16:7 191:25
   209:22 211:11
careers   34:16
case   23:22 25:1 29:21
   45:11 47:13 86:1
   88:4,20 89:14 92:15
   95:8,9,23 96:2,20
   97:3,9,19,20 98:10,
   14 99:8,14 100:8
   106:13 108:8 109:8
   122:23 123:11 125:6
   134:5 147:12 150:5
   156:2 162:9,11 164:1
   190:10 191:20
   204:14,17,25 205:2,
   7,9 207:4 208:14
   212:7 220:20 240:14
caseload   48:24
cases   28:22,23 29:2,
   4,8,11,13,14,17,22
   38:1,25 40:9 45:4
   47:1 48:1 49:5 54:12
   70:15 89:12,15 91:1,
   7 95:12 98:23,25
   99:2 108:9 109:10
   123:23 124:1,5,18
   126:25 127:5,6
   133:2,6 138:3 147:4
   148:24 151:23 152:19
   154:25 155:1 158:1
   162:10 163:19,22,23
   165:9 169:22 179:24
   237:9,12,15 242:16
catch   17:21 213:16
categorically   70:14

categories   62:20
   70:24 76:2,10,20,25
   77:4,7,17,21 165:20
   194:3 203:22 210:7
   229:12
categorize   71:11
categorizing   101:2
category   64:12 90:2
   193:8 206:2
caught   35:14
caused   79:15 243:14
causing   134:20
CCI   179:1,6 237:6,10,
   15
cease   122:3,10
ceased   124:12,18,24
CEC   191:25 192:8
   193:5
center   37:17
centers   149:6
cetera   69:14 194:12
chain   86:17
challenged   93:20
   94:15
challenges   89:11 98:1
challenging   83:16
change   34:14 77:23
changed   22:9,11 25:5
   83:1
characterized   210:19
charge   39:9 184:13,23
chart   55:24 56:15
   57:3,8,24 67:15
   200:16,18 201:2,8,23
   202:10,13,17 203:3
charts   232:11
check   137:21 155:17,
   20 193:1 227:9
Chicago   167:11
chief   17:12,17 18:18,
   24 22:12,13,15 25:2
   27:13 28:14 29:5
   30:5,11,13,15,17,18,
   20 32:20 33:10,11
   36:19 37:1 38:5,17
   53:22 54:2,8 56:16
   59:23 61:15 70:3,17,
   20 73:23 86:2 94:19
   95:3 116:14 146:5,6
   150:9 157:7 201:11
   224:7 239:12

**choice**  185:15
**Chris**  30:18
**chronologically**
132:20
**circle**  222:14 227:10
**circumstance**  182:13
**circumstances**  163:3,4
179:14 182:5,7
**cite**  169:6 209:14
**claim**  100:9,14 101:8,
10 151:12 160:4
161:3 174:14 176:15
178:20 179:1,6,13
180:20 181:2,5,11,14
182:16 185:8 187:7
196:1,3,11 203:16
204:20,23 206:6
211:22 212:5 234:21,
24 235:13 236:2,7,8
**claimant**  125:8 179:5
**claimants**  182:14
**claims**  35:2 76:3,10
77:1,4,7,18,21
81:13,14 87:14 93:17
96:19,21 97:2 99:21
103:6,7 104:1,6,15,
24 121:20 130:5,18
131:7 134:4 135:17,
19 136:25 139:6
154:19,22 156:14
157:9,11 163:11
164:18 182:11 188:22
196:7,8 197:17
208:9,11 234:23
235:22 236:16 237:23
238:1,8 240:1,6
**Claire**  10:11,17 12:12
20:5 56:8 57:21
105:7
**clarification**  106:4,
22 107:12,24 108:14
**clarify**  66:19 95:3
108:13 109:19 133:14
180:16 200:2 211:16
**clarifying**  57:21
**clarity**  40:12 44:17
**class**  97:1,2
**classified**  23:1
**classify**  46:2 92:10,
21
**clear**  22:17 36:6,14
40:10 43:11 48:19

**clearance**  150:20
**close**  71:23 246:17
**Coast**  105:9
**collaboration**  164:23
182:21
**collaborative**  64:21
66:12
**collaboratively**
171:12 177:12
**colleagues**  38:4,8
**collect**  47:13
**collected**  203:5
**collection**  239:25
**collective**  112:20
**collectively**  49:1
88:23 115:16 171:7
**Colleen**  26:20,22
30:20 39:8 98:8
171:4 223:21,23
**college**  15:21
**Colon**  167:19
**column**  203:2,4,6,9,
22,23 204:3,12
205:25 206:14 207:10
208:2,13 210:7,9,17,
19,24 211:2,20
227:10
**columns**  212:2
**combination**  119:22
**comfortable**  23:22
25:12 82:13
**comma**  128:11
**command**  16:14 18:5
**commander**  16:13 18:5
**comment**  63:8,10 79:7
220:22
**commissioned**  15:24
**commit**  72:25
**committed**  14:5 192:4
**committee**  213:9,23
214:3
**common**  163:9,13,25
165:15 179:18,21
180:1,11 181:1,16,21
197:20 203:4,18
204:1,13 205:5,12
207:9,11 208:3,17
210:9,19,21 211:1,

68:9 130:19 153:7
176:24 190:16,23
191:2 208:1 226:10

13,21,23 212:12,15,
20
**commonly**  180:11
**communicate**  12:18,24
13:2 24:9 60:11,13
192:7
**communicated**  43:4,16
110:20 111:1,4,5,24
112:2 115:21
**communicating**  134:16
**companies**  204:9
206:17
**company**  16:3
**compensation**  34:22
35:1,16,19
**compiled**  201:5
**complete**  77:15 98:23
100:12 220:17
**completed**  62:8 101:14
110:16 139:13 163:12
227:12 234:5 236:24
238:16,21 239:1
240:19,21 241:16,18
**completes**  165:15
**completing**  125:16
**complex**  238:20
**compliant**  153:21
**compound**  97:11 132:10
**computation**  152:21
153:16
**computations**  154:1,3
237:2
**compute**  121:11 243:10
**computing**  153:18
**concern**  46:4,13,16,20
47:3 71:11 87:1,4,6,
8,11,15,22 88:1
134:20 135:2 179:9
244:8
**concerned**  28:21,22,24
84:18 134:24 135:2
**concerns**  21:23,25
39:17,19,22 71:3
89:9 244:5
**conclude**  245:24
**concluded**  47:9
**concludes**  246:2
**conclusions**  74:18
75:5
**conditions**  137:1

conduct   90:8
conference   228:6
confidence   82:4
confident   85:3,6
   164:15
confirm   12:23 194:14
confirmed   12:3
conflict   18:17 19:3
   192:22
confused   134:3
confusion   43:15 44:14
   46:2 92:8,9,11,21
   105:24 106:5,8,9,17,
   20 109:20 134:6,20
   135:12,13
conjunction   141:21
connected   197:17
consent   10:5
considered   80:3
   160:17,22 195:13
   196:15,23,25 206:5,
   21
considers   160:7
constructed   225:8
consult   14:12 209:4
consultant   16:20,21
consultation   142:16
consulted   196:19,20
contemplated   54:18
content   240:10
contents   131:12 201:8
context   63:18 179:23
   232:12 233:9
continue   77:20 93:21
   99:21,25 101:22
   109:10 110:3,9,12,14
   133:5 163:24 242:11
continued   45:14
   242:15,22
continues   195:4
continuing   102:16
   103:13,20 104:5,6
   127:5 151:10 154:10
   163:8 178:9 242:15
contract   149:5 152:25
contractor   219:9
contractors   148:13
   149:5,21
contributed   98:24

control   219:23 220:1,
   3
controls   25:23 30:21
   173:1
conversation   39:24
   73:2 105:12 107:5
   146:13 151:24 221:2
conversations   9:5
   41:25 52:25 86:4,5,
   6,19,21 130:15
   159:22
convoluted   148:11
COO   20:18 22:22 24:25
   28:2,3 36:2,3,6
   53:2,7 168:25
copies   63:22 78:15
   141:7
copy   58:7 133:18
   213:21,22
Corinthian   123:7,19
   137:3,10,12 163:11
   164:8 176:13
corner   190:7 209:17
Corp   209:22
Corporation   18:14
   192:1
correct   20:20 34:7
   48:20 82:17 131:15
   167:4,23 176:21
   189:2,4 226:17 244:7
correction   17:14
correctly   220:17
correlate   148:3,4
counsel   10:5,8 12:10
   13:19,21 19:24 20:1
   35:7,10 72:21 141:21
   142:16 173:12 175:16
   193:12 218:25 225:17
counselors   194:7,8
count   149:20,21
   161:10,14
counted   152:5
country   16:9 17:9
   148:4
counts   161:14 227:7
couple   12:15 58:14
   62:8 80:12 117:21
   119:18 143:7 144:10
   178:17 222:13 227:13
court   9:18,22 10:13,
   16,20 11:2,6,8,13,22

98:21 99:8,14 123:1
   138:12 230:16,20,23,
   25 231:3,5 237:11,17
court's   76:13 229:12
court-ordered   31:20
   32:14 34:24 35:4
   74:21 79:9 121:1
   162:21 192:11 199:2
   214:16
courts   93:21 94:15
   95:9,13 96:8,11
cover   124:6 129:4
   176:10
covered   96:20 156:16
   179:2 203:12,13
   235:22
covers   155:17
Covid-19   60:25
coworkers   75:19
coworkers'   75:9
created   170:21 182:10
criteria   55:1 176:15
   210:14
criticals   76:22
culminate   63:12
current   20:18 39:6
   57:22 178:19
curriculum   18:8
customer   167:18
   215:20 217:1,10,17
   218:2,11 219:10,12
   240:5
customers   135:22,23
   216:10
cut   138:14
cutting   32:7
cycle   237:10,15

---

D

daily   28:5
damage   179:9
Dan   9:12 11:18 231:7
   246:7
Dana   9:19 11:18
data   72:2,6 116:16
   117:3,7,10,11,14
   119:9,18,19 120:10,
   11,22 131:21,24
   137:13,16,21,24
   138:4 154:5 239:25

240:2,10,11
database  244:21
date  18:22 41:4 74:16
  111:8 144:7 155:23
  157:16 168:21 203:13
  233:15 236:10
dated  75:1
dates  204:3 211:5
  235:24 236:8 241:21
Dave  30:15
day  103:2 150:25
  188:7 202:5
day-to-day  205:15
days  63:11 69:20
  220:8,11
deal  145:1
dealing  52:15,21
debt  129:10
December  9:10 103:18
  112:9 125:24 130:9,
  17 132:12 133:1
  136:24 140:1,5,12,
  13,19,24 157:20
  158:12,17 159:1
  170:6 238:23 241:12
  243:15
decide  54:15,23,25
  59:11 110:8 155:10
decided  110:2,9,11,12
  113:12,15,17 134:8
  184:1,2,6 239:8
decision  44:6 78:8
  108:8 109:8 110:18,
  20,23 112:21 113:1,6
  117:5 119:9 122:23
  123:6,11 143:3,8,12,
  14 144:13,15 147:8,
  11,17 158:20 159:2,
  7,11,13 161:25
  183:20,22 185:3,23
  190:14 222:15,19
  223:6,13,14,19,22
  224:5,11,13,15
  225:6,10 227:6
  236:19 239:14 241:24
decisional  212:6
decisions  37:23 38:15
  39:18 40:3 41:8,20
  42:2,5,7,15 43:9
  44:20,24 45:13,15,22
  46:17,24 51:25 52:2
  53:14 91:25 102:7,

14,16 106:1,11
107:3,9,19,23 108:1,
6,17,20 111:12
114:13 117:8 121:19
122:2,3,13,18,24
123:12,15,17,21,24
124:10,17,18,24
125:1,23 126:19
128:3 129:8 130:1
132:6,7,9,18 135:11
136:25 138:20 139:1,
7,17 140:3 150:3
153:8 156:3,24 157:3
158:10,17,22 159:1,
7,9,10,24 161:2
167:22 186:1 189:13
195:18 207:5 222:16
223:1,6 224:2,15
227:4 242:7,12
243:6,8,12,14,18
declaration  14:15,17
  19:17 20:11 33:4
  53:12 55:16 112:4
  136:21 139:24 141:17
  142:13 160:16,21
  168:7 170:4 185:10
  199:22 200:12
declarations  14:14
  19:19 141:20
declare  10:3
declining  231:17
deep  121:7
deeply  83:17
defense  14:15,16
  16:20,22 20:25 21:4,
  9,20 22:2,4 25:14
  26:23 28:4,6,7,10,
  12,13,21 29:12,15,18
  31:23 32:2,5,12
  33:8,15,20 34:4
  35:2,17,20 37:23
  38:1,10,14,21,22,23,
  25 39:7,9,18,21
  40:8,9 41:8,16 42:10
  43:1,7,9 44:23 45:4
  46:19 47:3 48:1,22
  50:2 51:21 52:8,10,
  25 53:3,6 54:1,3,6,
  15,21 55:2,6,7,10,14
  56:25 57:5 66:21
  67:3,5,16 68:13,20
  70:15 71:13,20 76:3
  77:17,22 81:11 85:9,

12,16 86:1 89:4
92:12 94:20 96:1,9
97:24 98:3,7,12
101:2,11 116:2
121:20,22 122:3,22,
24 123:3,18 124:18
125:3,7,9 126:22,23,
25 127:17 133:2
135:17,19 136:25
138:3,7,11,13,16
141:5 144:24 146:7,
9,10 147:3,12 150:3
152:14 157:9,11,13
160:13 161:7,20
162:1,17 163:17,24
164:12,15,16,20
165:6,8 167:13,15
169:8 170:6,19,24
171:4 174:12 177:11
179:1,5,24 180:20,23
182:23 185:8 187:7
189:4 191:21 196:9
197:9,17,22 198:3,
16,20 200:21,24
201:2 202:23 212:24
213:1,5 215:4 216:2,
18 221:10,14,21
223:24 224:8 227:3
232:14,17,19 233:1
234:17,21,22,24
236:11 239:19 240:7
244:14
define  106:17 111:15
  153:9
defined  207:23
defining  125:17
definition  100:21
definitive  169:24
defrauded  206:19
delay  191:1
delegated  26:3 55:8
delete  196:10
deliberating  85:24
deliberation  47:9
deliberations  51:23
  84:2 226:25
deliberative  43:22
  46:7 51:5 64:24
  83:8,24 84:6 85:23
  135:4
deliver  37:18 85:8

delivery  30:19 219:4

demonstrates  185:7
  187:6

denial  166:8,18 167:6
  168:9 183:8,13
  186:4,15 187:8
  224:19,23,25 225:2,
  13

denials  107:20 134:2,
  9,14,16 157:19
  158:10

denied  189:10 209:11

denote  82:4

department  14:1 16:25
  25:24 37:22 38:14
  40:4,14 43:12 54:22
  72:4 73:24 76:18
  78:12 79:19 80:16
  92:16 95:20 102:7
  106:12,19 110:11
  112:9,18 113:7,19
  115:15 119:6 128:2
  129:7 131:7 133:23
  134:1,4,8 135:1,11
  143:16,19 144:17,19
  153:20 156:24
  159:14,23 160:4
  165:16 169:12 173:10
  177:15 179:18 181:21
  182:25 207:17 218:24
  222:25 224:16 225:25
  235:19

department's  131:5
  157:2 159:11 161:24

depend  149:22

depending  23:9,12
  41:4 100:16 123:21
  149:20

depends  27:16 169:5
  179:12,13 181:6
  204:24 205:2,6
  212:16 232:20

deposed  14:23

deposition  9:9,23,24,
  25 12:24 13:23 14:25
  15:3,13 19:10 56:6
  136:17 141:10 142:5
  227:18 246:2,13,15,
  22

deputies  33:17,22

deputy  16:13 17:1
  18:4 30:5,11,13,15,

17,18,20 31:13 32:20
  33:9,11 86:2 146:6
  201:11 224:7

derived  65:4 66:7

describe  127:12 166:6
  208:8 215:14 216:6,
  16 217:24 218:15
  219:6 234:1,5,8

describes  127:25
  142:25 166:8

describing  125:12
  126:24 233:25

deserves  162:11

design  182:17

designed  182:19
  210:24 215:4

desire  42:10

detach  116:17

detail  33:6 97:1

details  41:21,22
  72:24 117:1 138:8
  245:5

determination  95:5
  125:18 153:11,15

determinations  55:12
  102:9 125:1 152:12
  153:23 180:8 212:10,
  11 213:4

determine  93:18 94:13
  98:19 99:22 100:13
  121:24 157:5,10,16
  161:18 163:13 204:19
  209:10 211:17

determined  101:17
  112:17 121:20 133:1
  157:24 180:2,4
  185:21 210:8 234:23

determines  101:10
  212:22,23

determining  96:6
  100:8 125:8 153:16
  161:3 196:15

develop  62:1 83:16
  113:13 118:12 119:1,
  10,25 120:8 175:7

developed  61:24 76:9
  77:7 83:13 107:17,18
  110:4,5 112:1 114:4,
  21 115:2,6,10 118:5
  119:6 158:21 159:12,
  15 164:7,22 181:23,
  25 182:2 237:23

238:2,8,11 239:22
  240:4

developing  62:3 68:24
  77:20 78:1 116:4,10,
  22 117:17 118:14
  119:14

development  82:5
  84:19 113:20 115:12
  239:6,18

develops  16:15

device  13:3

devices  13:5

Devos  9:12 58:17
  59:20 128:1,24
  129:6,25 224:12
  227:22 230:5

dialogue  39:23 83:15
  87:22 164:25 165:10

Diane  14:18 23:8
  24:10 25:20,22 26:7
  42:2,17 60:12 92:23
  107:22 115:13 131:3,
  19 173:15 175:10,21
  192:7 193:3 209:24
  215:5 217:25 223:5
  225:11

dictated  182:5,7

difference  52:17
  154:1

differs  102:3

difficult  33:25

digital  152:23
  215:19,20 217:1,10,
  17 218:2,10 219:10,
  12

digitized  177:25
  215:21 216:3

direction  37:9

directives  197:4

directly  30:6 32:21
  151:5 224:6

director  77:19 164:11
  223:23

disagreed  96:8

disapprovals  137:18
  138:2

disapproved  81:16

discharge  76:5 77:18,
  22 121:22 137:1
  162:17

discovered  163:23

discovery  31:20 32:14
34:24 35:4 60:7
74:21 76:13 79:9
121:1 162:21 192:11
199:2 214:16 226:2
229:11 230:9

discuss  21:8,14,19
22:3 25:13 38:12,13
40:1,2,3,8,13 41:8,
19 48:6 59:8,10
75:18 115:11,14

discussed  38:4 41:16
115:25 121:18 189:1
211:8 232:22

discussing  21:11
75:20 214:10,13
222:14

discussion  42:7,8,14
97:22 115:20 125:20
167:2 226:16

discussions  20:24
39:2 53:6 65:22,24,
25 72:23 114:7,10,13
115:23,24 127:3

displayed  204:14

displeasure  79:1,16,
23 80:3

disqualifying  220:18

distinction  216:23

distinguished  100:24

distortion  120:14
138:11 153:5,6

distress  134:6,21
135:12,14

distributing  147:7
148:21 149:1

dividing  153:4

document  15:15 19:15,
16 45:2 53:19 56:11,
14 63:25 66:4,12
68:2 71:17 72:25
73:14,15,16,18,19
78:21,22 79:5 80:7
93:2 111:8 119:10
128:12 141:7,15,16
142:10,11 151:23
153:19 162:7 166:12
177:19 187:22 193:17
194:1,16,24 195:4
199:21,25 200:2,11
202:1,4 214:7 227:23

229:24 232:5 233:5

documentation  107:6
235:15 236:5

documents  14:13
193:3,16 197:25
198:14,17,21 199:3,
10,13 202:2,10,17,21
212:6 244:22

Doe  169:13

DOJ  72:19

doles  131:8

dollars  51:25

door  215:21

dormitories  18:7

draft  170:14 171:7,10
172:8,16,20 177:13

drafted  170:9,12,22
177:1 182:23

drafting  172:12,18
174:2,18 175:5 177:7
183:16

drafts  170:18,20
175:25

drives  52:1

Dropbox  57:25

dropped  30:23

due  239:6

duly  12:8

Duped  128:25

duties  22:8 26:3

duty  16:1

dynamic  117:19,20,23
188:6

---

## E

earbuds  10:23

earlier  33:9 38:9
40:15,22 46:1,21
61:9 64:18 71:4
90:17 91:5,9,13
95:25 102:2 103:8
109:21 125:21 126:20
130:18 140:6 141:19
142:15 143:11,18
144:23 145:5,11,12
147:14,15 150:6,8
151:11 156:4 158:20,
24 170:4 175:19
181:6 184:23 185:10
189:11 192:20 207:1

218:19 222:15 223:11
224:14 232:20 239:16

early  106:16 140:21

earnings  121:4
225:23,25

ease  215:4

East  105:9

easy  221:9,13,20

ECF  19:7 20:11 56:10
209:18

Economic  12:13

ed  18:11,12,13 39:17
40:4,14 41:15 185:7
187:6

ED's  179:1

educate  39:25

educated  28:24 38:1,
9,22 50:2

educating  45:3

education  16:14,21,25
17:1,12 18:1,2,3,5,
9,15 24:17,18 28:6
31:11 37:22 40:16,23
41:20 73:24 75:12
76:18 78:12 79:19
103:14 106:19 122:22
131:4,6 135:2
144:17,19 173:11
177:16 182:25 191:25
209:22 224:16

Education-determined
207:18

educational  18:7
95:24 97:16 108:4
126:21

effect  105:23

effective  111:8

effectively  54:11
221:1

efficiency  243:2

efficient  131:7

effort  63:4,5 64:22
112:21 117:15 120:16

electronic  13:4 15:4
19:6 57:25 63:22
133:18 190:3

element  25:23 40:6
95:4 175:15 177:15
182:24 183:6 238:17

elements  17:9 67:19,
21 81:19 120:19,20

184:24 185:25 218:22
**eligibility**  102:9,17
  104:16 124:10 125:2
  166:15 168:12 176:15
**eligible**  100:8
  101:12,14 125:2,8
  134:7,21 157:1
  158:22 234:24
**eliminated**  136:1
**Elisabeth**  9:12
**email**  12:25
**emails**  61:4,6
**emerged**  28:19
**emphasize**  50:21
**employed**  194:10
**employee**  63:8
**employees**  33:2 143:20
  146:20 147:6 148:19,
  25 149:22 155:11
**employment**  15:20
  192:23
**en**  193:18
**enable**  156:8
**enabled**  150:2
**end**  32:25 34:17 40:20
  59:25 147:7,10
  148:21 174:22 188:18
  194:9
**end-of-november**
  188:16
**end-of-year**  33:1
**ended**  115:8 246:22
**ending**  233:2
**engage**  216:9
**engagement**  30:19
  215:22
**enjoined**  95:20
**enrolled**  179:2,6
  204:7 206:15 211:11
**enrollment**  203:13
**ensure**  54:2,9
**entail**  235:11
**entails**  235:12
**enter**  9:20
**entire**  39:21 68:23
  73:21,22 74:3 88:4
**entirety**  98:14 202:3
**entitled**  128:13,24
**enumerate**  164:13

**equation**  49:7 101:18
**error**  166:21,24
  167:3,6,18,22
**errors**  166:7
**essentially**  64:19
  121:8 174:11
**establish**  141:4
  155:23
**established**  76:2
  83:21 100:15 124:23
  140:21 173:20
**establishing**  77:16
  226:14
**estimate**  48:19,20,21
  50:14,16
**estimated**  131:10
**et al**  9:12
**evaluate**  32:18,19
  128:14
**evaluated**  31:18 72:3
**evaluation**  33:1
  161:25
**event**  227:24
**everyone's**  245:19
**evidence**  157:4,6,15,
  17,21,23 158:3,11,18
  160:5,7,11,18,22
  161:4,10 163:9,13,
  22,23,25 165:15
  179:18,21 180:1,7
  181:1,16,21 185:6,
  12,13,14,16 186:5,15
  187:5,9 195:13,16
  196:15,19,21 197:4,
  16,20,21 198:2
  203:4,7,15,19,23
  204:1,13,23 205:5,12
  206:5,22,24 207:9,12
  208:3,17 210:9,18,
  19,21 211:1,13,21,23
  212:13,15,20 235:14
**evolved**  174:23 182:3
**exact**  14:10 18:22
  49:25 50:23,24 70:1
  71:18,19 107:14,15
  110:2 122:25 130:7,8
  143:5 149:2 166:2
  177:23,24 178:8
  185:17 213:20,22
  220:4 236:10 241:20
**EXAMINATION**  12:10

**examples**  205:13
**exceeded**  154:20
**exceeding**  60:7 74:20
  76:12 214:15
**exceeds**  31:19 32:13
  34:23 35:3 79:8
  120:25 162:20 192:10
  193:6 199:1 226:1
  229:10
**Excel**  240:13
**exchanged**  193:2
**exclusion**  203:10
**exclusive**  203:14
**execute**  54:6 113:8
  219:3 224:11
**executed**  224:2
**executes**  26:1
**execution**  34:18
**exhibit**  15:2,12,13
  19:9,10,12 55:20
  56:4,6 57:22 58:13
  63:20 73:7,8,9,10
  78:14,16,18 91:17,18
  92:22 93:3 112:5
  127:18,19 130:20
  136:15,17,21,22
  141:9,10 142:4,5
  176:4,5,6,9,10
  178:16 179:16 190:3,
  4 198:5,7 199:20
  200:3,5,13 213:8,10
  227:17,18 231:22,23,
  24,25
**exhibits**  176:9 213:25
**exist**  103:2 129:20
**exists**  58:2
**expect**  39:20 55:13
  58:24 90:19 183:25
  186:5,16
**experience**  206:4,18
**experienced**  161:19
**expert**  54:21 81:12
**expertise**  52:21 66:25
  67:2 195:18 196:12
  202:23
**experts**  49:9 64:22
  84:22 90:9 164:24
  226:21
**explain**  33:6 84:16
  93:23 98:9,17 99:24
  101:3,6 120:23 150:1

203:1 210:6,10,15
212:1 228:11 236:22
**explained** 37:8 97:4
98:11 126:23 144:24
180:24
**explanation** 98:25
99:3
**explored** 39:20
**exploring** 99:1
**exposed** 28:17
**express** 39:16 68:7
230:6
**expressed** 79:22 87:1
**extension** 183:7 225:9
**extensions** 218:22
**extent** 43:22
**extreme** 79:1,16

---

### F

**face** 147:22
**facilities** 18:7
**fact** 38:13,24 46:21,
23 88:19 106:13
115:2 116:14 184:25
225:9
**facts** 28:25 122:19
**FAFSA** 217:20
**failed** 87:18
**fails** 195:25
**failure** 196:1
**fair** 90:7,8 131:7
**fairly** 139:16
**fairs** 89:19
**fall** 45:18 97:3
190:13,17 191:3
235:25 236:9 242:14
**fallen** 236:16
**falls** 203:11
**familiar** 73:16 78:20,
23 92:23,25 94:18,25
100:25 128:5 129:13,
19 132:23 150:19
205:17 215:7,19
226:24 227:21,24
228:2,16 232:3
**federal** 17:7,9,18
21:18,24 22:1,12,16,
25 25:25 26:25 27:1,
5,13 32:1,3 34:9

36:1,5,7,10,19 37:1,
3,11,20 38:6,19
42:22 51:24 53:25
61:7,10,14,22 63:14
67:20,21 68:12 80:24
112:24 116:7,15
127:13 131:5,8
155:15 156:9 157:8
159:24 170:18 174:3,
10 183:18 215:23,24
216:8 224:1,9 239:12
**feedback** 135:24
**feel** 82:13
**feeling** 135:6
**felt** 216:13,14
**figure** 128:7
**file** 169:14 182:15
**filed** 129:9 235:13
236:2
**files** 15:4 19:6 172:8
**fill** 150:22
**filled** 178:4
**final** 31:11 100:19
173:3,9 183:20
219:1,2 225:6,12
231:22
**finalized** 234:12
**financial** 47:11,23,24
131:9 241:21
**financially** 9:16
**find** 52:21 62:21
87:19 160:4 167:20
205:16,18
**finding** 156:25 180:3
**findings** 179:1 212:19
**fine** 57:13 73:12
122:1 136:7 189:19
221:24
**finish** 13:12,14
**firsthand** 52:7 160:17
195:11 206:3,18
**fiscal** 33:1 64:7,11
65:17,19,23 71:14
81:23 87:9 88:13
**fit** 203:22 207:9,10
210:14
**fits** 205:25 206:1,14
208:2 212:12
**five-minute** 105:5
**fix** 47:12,25 48:2

**fixed** 47:16,17
**flaw** 82:20,24
**flows** 86:23
**focus** 126:5 147:6
**focused** 18:15
**focusing** 47:15
**FOIA** 169:14,25
**folder** 190:3
**folks** 30:8,9 119:23
120:12 126:8 127:4,
11,12,14 145:1
148:13 149:19 169:20
170:20 171:1 200:22
226:22
**follow** 58:14 240:2
**follow-up** 198:12
**footer** 75:23
**Force** 15:25 16:2,16
18:4
**Force's** 18:9
**forever** 143:23
**forgive** 229:4
**forgiven** 147:18 148:7
**forgiveness** 131:9
**form** 24:13,14 25:3
44:10 107:6 111:5
115:22 170:8,9
171:6,10 172:12
177:17,20,22,23
178:14 179:8,16
181:19,22 182:6,8,
17,18,19 183:2,3,5,
20,21,23 184:10,12,
17,20 185:25 216:3
217:13,15,16,21,22
218:1,10,15,17
219:5,16,20,22,23
220:4 224:22,25
225:7,20
**formal** 32:22 37:10
43:18
**format** 178:3,7,9
219:2
**forms** 44:5 177:25
182:10,21,23 183:6,
9,13,16 184:23
185:19 216:25
218:19,21 219:1
225:2,13
**formulate** 62:25

**formulated** 63:17
**forward** 68:14 75:3,6
96:21 102:14 103:16
110:6 111:16 115:1
116:1 140:19 166:4
191:19 225:19 241:10
**Foss** 171:3,9
**found** 37:5 83:2 98:24
170:7 180:3 210:21
211:1,19
**four-month** 155:24
**frame** 67:21 92:20
107:1 108:22 114:23,
24 115:20 158:25
188:17 203:12
**frames** 203:16
**frankly** 41:24
**fraud** 209:25
**free** 229:5
**front** 15:8 30:8 32:21
55:18 78:23 199:22
215:21 237:10,13,15
**frozen** 215:5
**FSA** 20:18 22:10 25:21
26:4,19 33:5 35:23,
25 36:14,22 37:9,15
38:4 61:11 62:25
63:22 67:17 69:17
71:8 72:4 76:2
116:23 117:16 118:4,
12 119:1,8,13 120:8,
19,21 121:18,20,22
122:2,3,11,12 123:16
136:16,24 138:18
147:6 150:2,6 152:1
155:5 160:7,16
162:16 166:17 169:15
171:15 185:12 218:1
**FSA's** 53:13
**full** 19:19 74:25
133:3 155:20 167:9
227:10 228:1
**full-time** 143:21,22
**fully** 240:23
**function** 212:24
**functional** 241:23
**functioning** 241:9

---

### G

**gave** 68:22 100:20

**general** 16:13 19:24,
25 44:1 58:5 59:22
60:15 63:18 70:24
73:21 80:6 82:10
83:14 86:22 148:10
152:16 173:11 175:16
178:6,9 179:25 180:7
181:3 191:20 199:14
203:15 214:21 218:25
221:25 225:16,18
**general's** 73:20
**generalities** 181:4
**generally** 21:12 25:9,
11 33:8 51:11 58:17
105:8 135:10 180:24
214:9
**generate** 148:1
**generation** 37:19
215:24
**generic** 58:19 196:24
**generically** 81:11
**Georgia** 16:4
**gift** 229:3
**give** 20:1 30:10 65:1
96:25 110:1 115:6,7
117:1 118:19 119:15
120:18 146:12 167:10
169:23 190:25 191:2
207:2 229:20
**giving** 180:18 229:3
**goal** 65:18 84:11
87:18,20 88:24
**goals** 35:25 36:6,10,
11,15,17,21,25 37:4,
15 61:11,14,21 62:5,
10,12,17 63:7,13
64:21 68:18 84:14
87:7 140:16
**good** 9:2 11:6 62:6
105:8 142:24
**governance** 68:12
**government** 12:2 13:19
32:24 89:21 149:21
150:19 155:13 156:9
229:3
**government-issued**
11:15
**grade** 16:12
**graduated** 15:22
**graduates** 194:10
**graduating** 89:23

**graduation** 15:21,24
**granted** 165:21 181:2,
14 187:19,24 188:2
207:20
**grants** 234:13,14,16
**great** 11:7 13:10 15:9
20:14 58:7 59:15
**Greene** 30:18
**ground** 84:21 156:16
**group** 53:6 66:5,6
138:5 162:16,17
192:16 198:22,23
200:22,24 201:2
203:17,20 205:20
208:12 209:16
**groups** 165:25 198:16
199:7,16,18
**growing** 49:4 103:8
**guess** 70:8 89:7 90:1
91:24 151:17
**guidance** 43:8,14,17,
19,20 44:4,8,10,14,
19,24 45:5,7 46:13
92:13,14,18 106:10
108:10,15,25 111:17
129:17 130:5,8,11,16
222:16
**guided** 55:8 67:22

---

### H

**halted** 218:18 220:15
**Hancock** 10:19,22,24
11:4,7,9,18 14:7
20:8 29:23 31:19
32:13 34:23 35:3,8,
11 43:21 44:1 45:23
46:6 51:4,8 56:8,13
57:12,20 58:5,10
60:4,6 67:7 72:22
74:19 76:12 78:3
79:8 80:19 83:7 84:5
92:2 93:24 94:10
97:10 105:7,13 109:1
111:19 113:22 118:15
119:3 120:2,25 122:5
124:13 132:10
133:13,20 135:3
136:6 138:23 144:20
145:9,19 154:12
155:8 156:15 159:4,
16 162:20 168:18

---

183:10 186:6,17
187:12 189:19 192:10
193:6 196:4 197:6
198:24 199:1 200:1,
7,10 208:5 214:14,21
216:19 218:3 219:13
221:11,18,24 222:20
223:8 226:1 229:10,
19 230:8,13 242:2
243:23 245:21 246:4,
7,9
**hand**  198:3
**handle**  240:10
**hands**  47:20
**handy**  11:17
**happen**  25:8 85:12
104:11 149:15 177:3
204:4,6 240:17
242:16
**happened**  132:6,17
150:11 156:19 216:17
222:24 238:23 241:18
**happy**  73:1
**hard**  58:6 78:15 141:7
195:20
**harm**  93:18 94:13
99:23 131:9
**head**  39:13 118:23
137:5 163:4 169:9
209:8
**health**  69:1 211:10
**hear**  10:14,15,16,19
11:2 35:10 75:8 78:7
228:8
**heard**  40:20 53:2
74:6,7 76:20 78:1
84:19 86:8 100:23
101:1 160:15 214:12
221:7,8 229:3 230:5
**hearing**  74:12 215:8
**held**  9:5
**helped**  19:21 152:7,9
171:9 220:16
**helpful**  199:24
**helping**  172:16,20,21
**high**  243:1
**higher**  18:1,2,3,11,12
131:3
**hire**  21:17 22:1 47:19
49:12 50:5,12 52:16,
19 87:16,19 88:17

91:11 143:3,8,13,14
144:13,16 145:8
146:24 147:1 148:23
150:18,24 155:6,11,
24 162:13
**hired**  17:5 89:19
144:3,6 147:6 148:19
151:16,20,22
**hires**  128:14 145:18
**hiring**  21:20 52:1,14
53:9 89:19 90:2,7,8
142:25 150:19 151:9
155:13
**historical**  84:24
**historically**  51:19
**history**  15:20 29:14,
15,18 38:22 83:18
109:15
**hit**  217:20
**hold**  17:13 214:4,6
237:22 244:21
**holding**  243:17
**holistic**  227:9
**horizontally**  58:3
**hours**  14:11 117:22
**House**  213:23 214:3
**Housing**  12:13
**HR**  50:7
**human**  17:4 21:13,14,
16 52:12 145:1
**Hundreds**  148:18

——————————

**I**

——————————

**Ian**  171:3,9
**icon**  217:21
**ID**  11:16,20 12:3
217:20
**identification**  15:14
19:11 56:7 136:18
141:11 142:6 227:19
**Identify**  185:6 187:5
**identity**  12:3
**imagine**  60:1 240:9
**immediately**  29:6
87:14 104:11 132:13
150:13,14 151:2,5,6
156:5
**immersed**  103:24
**immersion**  38:11

**impact**  98:11,15,18
169:7
**impactful**  169:4,5,6
**implement**  52:23
**implied**  216:14
**important**  95:2
**improve**  32:11
**improvement**  52:18
**improving**  52:24
**inaccurate**  216:15
**include**  124:8 149:22
165:4 211:19
**included**  38:24 39:12
40:9 144:25 161:4
196:25 237:6
**includes**  54:1 185:13
**including**  123:18
163:14
**income**  96:7
**incorrect**  131:16
**incorrectly**  169:13
**increase**  150:1,2,6
153:3 156:12 235:8
245:3,4
**increased**  150:10
151:9,25 153:5
165:17 244:22
**increasing**  150:13
151:18
**indication**  104:23
**indicators**  62:15,23
**individual**  20:1
54:15,23 148:2
162:1,2,9 176:20,21,
25 186:10
**individual's**  19:22
**individualized**  205:1
**individually**  212:8
**individuals**  176:22
**industry**  16:22
**ineligibility**  166:14
170:8,10,11 172:12
196:16
**ineligible**  100:9
125:9 156:25 157:25
158:5,22 160:4 170:7
**inform**  83:4,13
**information**  15:19
43:23 46:7 51:5 83:8
84:6 86:23 112:21

135:4 178:4 182:15
191:3 192:8 198:22
202:20,22 226:7
228:19 236:12
**initial** 44:16 107:4
108:18,20 109:22,24
**initially** 43:7 92:20
107:10
**injunction** 45:21 96:3
97:5,14 105:23
124:3,6 223:7
**innocuous** 229:5
**inordinate** 118:8
**input** 31:12,13 63:8
70:18,19 81:4,7
131:24 236:5
**inquiries** 240:5
**inside** 19:25 32:3,21
33:18 38:6 66:21
67:15 85:12 112:24
147:3 170:19 171:15
173:18 174:3 183:18
197:21 212:20 224:9
226:22
**insidious** 229:2
**inspector** 73:19,20
**install** 80:15
**installed** 80:14
**instance** 51:2 186:3
203:12
**instances** 14:21
**Institute** 15:23
191:24 211:11
**instruct** 84:6 230:9
**instructed** 77:19 78:1
129:25
**instructing** 43:25
51:6
**instruction** 97:23
**instructions** 98:3,4
132:5,17,22 241:22
**instructs** 13:21 35:7
128:2 129:7 193:13
**insufficient** 186:4,15
187:9
**insulated** 138:9
**intake** 235:7
**intend** 44:6
**intended** 39:25 210:20
**intense** 85:6

**intent** 211:18
**interest** 18:17 19:4
28:5 126:14 192:22
**interested** 9:17 28:9,
11,14
**interesting** 28:8
**interests** 98:15
**intern** 16:2
**internal** 30:21 48:25
49:8 55:5 71:8 86:6
152:14 160:12 161:6
175:20
**internally** 45:10
**interrupt** 57:20
**intricacies** 85:10
**introduction** 228:12
**intuitive** 216:10
**invest** 88:18
**investigating** 191:10
**investment** 71:7
**involved** 17:4 72:24
110:24 117:13 149:16
171:19,21 172:11,13,
18 175:23 215:9
**involvement** 17:25
18:2 116:3,5,20
215:11
**involves** 125:6 175:14
225:23
**Iraq** 16:11
**isolated** 86:20 167:3
**issuance** 107:18
**issue** 38:25 42:11
44:20,24 45:14,22
49:10 58:6 106:1
107:23 108:1 110:13
111:12 125:18 134:8,
10 158:10,21 159:9,
10 203:11 214:10
215:8 217:2 222:16
223:6
**issued** 37:23 38:14
39:1,17 40:2 41:9
43:13 46:17 92:1
102:14 108:15 112:9
122:24 128:1 132:18
134:2 136:24 150:4
156:24 157:20 225:25
**issues** 27:17 28:6,7,
10,19 30:22 39:20,22
40:11 52:8 53:3

91:23 131:4 191:8
211:1 214:12 243:17
**issuing** 45:13 96:6
107:9 121:19 122:2,
12 123:16 128:3
129:8 130:1 132:6
134:2,13 135:11,16,
18 138:19,20 157:3
158:16 159:7 235:20
243:17
**item** 25:15 217:17
**ITT** 137:3,10,12
163:11 164:7 237:6,
10,16

---

**J**

**January** 76:9 77:12,14
**jar** 120:15
**job** 17:2 18:24 36:18
37:1 39:11 52:18
113:8 120:15 157:14
176:13 178:20,21
191:11
**Joe** 30:16
**joined** 17:20,21 37:21
38:2,13 40:17,24
42:17 46:5 48:8,10,
13 90:22 91:12 93:5
102:6 113:19
**Jones** 14:18 23:8
24:10 25:22 26:7
42:2,17 43:12 60:12
92:24 93:1,13
101:21,24 102:1,4
106:21 107:22 115:13
131:3,19 134:5,17
173:15 175:10,21
192:7 193:4 209:24
215:6 217:25 220:15
223:5 225:11
**Jones'** 25:20 99:10
**July** 77:15 155:25
190:14,18 241:6
**June** 37:24 38:15 40:3
41:9 92:1 102:8,15
125:24 241:5
**Justice** 14:1

## K

keeping  81:10
Kevin  11:9 14:7
key  62:15 116:1
killing  221:1
kind  10:20 30:8 58:2
  61:20 68:25 116:16
  117:4,6,7,20 118:1
  119:23 120:15 121:12
  129:24 137:16 148:16
  160:2,12 171:20
  185:25 186:21 195:20
  206:24 207:15 209:7
  217:2 222:23 225:4
  240:21 245:6
kinds  18:8 30:22
  41:22 62:23 66:2
  85:1 98:1 99:2
  117:12 145:2 165:10
  177:2 202:24 207:6
  232:15 243:9 245:2
Kingdom  16:9
knew  37:25 104:12
  115:18,20 130:14
  172:14
knowing  136:3 168:4
  174:12 205:20 226:6
knowingly  82:19
knowledge  52:7 59:18
  79:4 102:18,22 103:2
  111:6 123:12 151:14
Knowledgeworks  18:14,
  21

## L

label  229:5
lacked  219:23 220:1
large  37:18 63:5
  82:20 85:2 103:6
  149:6,13 168:1 204:9
  206:17
lasts  63:10
launched  45:11
law  54:5 55:9 76:4
  89:22 90:11 174:13
  183:24,25 184:3,6,7,
  19

laws  54:6 101:12
  184:15
lawsuits  95:14
lawyer  67:1 205:8
  208:16,17 235:17
lawyers  67:1 127:1
lay  180:18 244:25
layers  66:6
layman's  180:19,22
lead  14:6,15 146:9
  167:14
leader  26:22 39:7,8
  98:6 164:15,16
  167:15 171:2,3
leadership  72:4
leading  17:16
leads  83:25 131:4
learn  37:3 78:8
  246:14
learning  95:25 97:25
  98:2 127:4
leave  184:12 195:17
  196:7 206:23 214:1
legal  9:14,19 77:16
  161:2,13 196:1,3
legislated  54:7 69:2
legislation  34:19
  54:5
legislative  61:25
  63:9
letter  78:24 100:18
  132:23 147:23 148:1
  152:20,23 166:8,14
  167:6,21 168:6
  172:20,22 173:2,18,
  22 175:5,21 176:12,
  17 177:1,10 178:3,8
  186:3,15,22 187:4
  225:2
letters  147:8 148:22
  149:1,10 166:11,18
  168:9,12 170:8,10,11
  171:10,12 172:12,19
  173:2,6,8,9 174:2,
  19,21,24 175:7,24
  176:1,24 177:7
  224:20,23 225:1
letting  235:12
level  29:8 41:21,24
  70:17,18 81:20
  84:16,17 86:9 88:17

  89:7,10,11 93:18
  94:13 96:25 99:23
  100:13 126:1 137:16,
  23 161:4,16 167:1
  198:1 207:1 243:2
  245:4
levels  89:8
liaison  117:2 119:17
  120:12,22 154:4,5
  170:24,25 171:2
  177:12 182:4,22
  226:22
liaisons  117:12
license  11:16
lieu  10:1
lieutenant  15:25
life  155:17
limitations  243:18,19
  244:4
limited  98:15 100:21
  116:6,9,13 151:24
Lindsey  30:16
lines  221:17
link  217:22
Linkedin  89:22
list  169:2 196:16
  209:25 210:1 212:17
listed  76:7 179:3,7
  210:9
listen  135:23
listened  228:12
listening  83:14 84:23
  85:20,22 86:10 228:7
listing  203:4
lived  16:9,10
loaded  147:25
loading  152:24
loan  76:5 121:4
  128:25 131:8 147:18
  148:3,4,5,7 149:22,
  24 172:5 240:1
located  9:14
locations  120:14
lodged  167:18
long  14:8 25:9 29:14
  52:19,20 58:20,23
  132:8 136:7 147:20
  148:11 153:21 175:6
  185:20 220:5,8,9,12
  245:7

long- 68:16
longer 240:12
looked 61:19 70:14
  93:6 122:21 197:2
losers 153:17
lost 158:14 206:11
lot 29:4 72:24 118:11
  119:1 149:13,14
  202:2
lots 44:5 62:14,16,
  20,22 223:14
low 10:25
lunch 105:8,16,17

--------

**M**

Macom 9:13
macro 81:20 89:7
  137:16,23
made 49:18 50:5,7,8,9
  51:1,12 62:5 71:21,
  24 89:23 91:23 102:8
  110:18 113:10
  123:11,22 125:23
  126:19 139:23 143:4,
  8,12,14,18 144:12,15
  145:7 147:12 160:1,2
  180:8 185:15 212:10
  213:4 217:16 222:18
  224:5,13,15 234:20
  236:9 241:24 244:17
main 113:1,5 190:25
major 16:13 62:12,14,
  19 240:14 244:4
majority 237:9,12,14
make 30:22 46:10
  49:11,15 50:6 51:25
  53:14,20 56:8 68:9
  83:16 85:7 95:7
  117:8 124:21 133:15
  135:25 137:15
  149:14,15 152:12
  153:8,9,11 155:22
  165:23 170:13 173:1
  179:10 182:16 184:23
  196:11 204:8 206:16
  207:5 210:11 216:10,
  24 219:14 220:2
  223:5 224:3,10 229:4
  239:19 241:23
maker 113:1,6

makers 112:22 117:5
  119:10
making 66:1 114:14
  122:3,18 153:22
  172:24 223:15,22
manage 33:16,17 47:13
  85:2,4 148:12,16
managed 48:2
management 17:4 33:5
  47:13 52:12 68:11
  86:16,17 88:20 89:14
  180:22 240:14
manner 10:7 43:14
  131:8 178:1
Manning 20:22 21:22
  22:15,19,24
Manriquez 45:11 92:15
  95:22 96:20 97:3,20
  98:10 105:22 108:8
  109:8 122:23 123:11
March 17:11,16 20:19
  27:13 28:1 35:24
  36:11,12 37:12 38:18
  40:24 41:2,3,12
  44:13 47:4 52:3,9
  56:25 57:2 59:25
  67:20 75:3,13 91:3,
  6,22,24 92:20 95:24
  97:16 102:13 103:2,
  14,15,17,23 113:19
  114:17 122:21 123:5,
  12 126:21 143:6
  150:8 151:3 155:10,
  25 156:19 168:21
  191:4,5,18 239:13
  242:13
March/april 107:1
  108:21
mark 9:9 11:11 12:7,
  17 15:11 19:8 20:11
  56:3 131:4 136:15
  141:8 142:3 227:16
  246:22
marked 15:13 19:10
  56:6 130:20 136:17
  141:10 142:5 176:4
  227:18
mass 147:24 243:2
match 210:25 240:1
mathematical 101:18
  207:19 237:2

matter 9:11 10:4
  64:22 66:25 79:2
  84:22 164:24 169:25
  185:18,19 226:21
mature 141:1
Mcginnis 30:20
Mckinsey 128:14
meaning 17:15 94:25
  106:9,11 107:19
  176:21 188:22 196:24
  203:10
means 34:12,13 53:16,
  21 93:23 94:4 125:17
  149:11 196:25 203:22
  208:14 229:25 230:3
  231:18 236:23
meant 29:20 44:4,7
  45:21 74:7 142:1,2
  199:15 240:15
measurable 66:1 68:1
measure 80:17 113:5
  121:5
measurement 160:10
measurements 68:6,25
  102:25 104:23 141:4
media 37:25 79:2,13
meet 14:3,8 21:2,4,6
  23:6,8 24:16,18
  26:7,11,16 27:7,11
  37:7 40:17,24 58:16,
  20 59:2,19 84:3 89:2
  140:16 176:14
meeting 26:9 28:1
  29:10 41:2 55:1
  60:1,3,24 61:1 68:20
meetings 23:17,19,25
  24:4,20,21,23 25:3,
  10 41:7,10,12,15
  58:18 59:13,17 68:10
  69:7,21,22 115:24
  230:6
member 18:10,14
members 26:7,9,13,16
  28:4 118:12
membership 18:16
memberships 18:19
memo 128:10 129:5
  130:7,8,23 131:2,12,
  13,19
memoranda 77:16,20
  78:2

memorandum  44:6 45:2
78:24 128:1,5
129:13,25 197:24
memorized 137:19
memory  14:6 192:5
245:3
memos 131:17 193:3
197:3,9,13
mention  26:9 170:6
mentioned  17:25 26:6
58:16 73:4 80:10
95:25 97:7 103:10,23
105:24 109:4 120:9
143:11 151:7 163:8
170:3 217:12 222:15
243:16 244:4
mentions  215:3
merit  181:5,12
merits  162:10,12
207:5
message  68:21,22
met  27:15,22 28:4
38:18 40:5,16,23
41:1 54:25 59:22,24
101:11 121:21 137:1
method  25:7
methodology  46:25
93:19 94:14,17,20
95:1,5,21 96:11,15,
16,17,22 98:21
100:13,15 101:13,16,
19 107:16,17 110:4,
5,15 111:13 112:11,
13,17,22 113:2,6,13,
21 114:4,8,11,21
115:2,12,16 116:4,
11,22 117:18 118:5,
13 119:2,5,6,11,14
120:1,8,24 121:10,
18,23 123:25 124:25
125:19 133:1 134:9,
14 152:22 153:18,21
158:21,23,24 159:12,
14 207:18 222:17
225:23 235:1 236:19
237:1,23 238:1,7,11,
14 239:1 243:10,12,
15
metric  32:5 67:18
68:10,17 69:7,21,22
81:24 82:3,7,9,16,23
84:2 104:7,22 105:2

140:11,14,23 227:8
metrics  31:17,24,25
32:2 64:6 67:22
68:14,24 69:4,11,12,
17,23,24 70:6 71:2
72:3,10,20 80:11,14,
15,25 82:2,22 83:5,
11,25 84:4,10 85:21
86:25 87:23 102:25
104:15 120:11 140:3,
7,21 141:4 164:20
188:10 189:1,3
226:8,14
mid  128:1
mid-  68:16
mid-november  129:6
130:2
middle  13:14 77:11,12
migration  239:7,10
military  16:5,7
million  135:22
mind  81:10 102:11
182:17 242:22
Mine  31:5
minimum  23:13 27:10,
19
Minor  30:13 33:11,22
34:5,6 39:10 86:14,
15,19 201:15 224:4,6
Minor's  33:13
minus  243:3
minute  53:17 55:25
230:17 231:1,3
minutes  25:11
missed  237:12
missing  238:25
misstates  80:19
113:22 118:15 119:3
120:2 154:12 155:8
222:21 243:23
mistaken  166:7,8,10,
17 167:5 168:9,12
mistakes  168:17,22
169:3 220:18
Mittner  86:13
mixed  243:11
mode  219:4
moment  168:10,15
moments  80:12
money  88:22 89:13

month  28:3 41:1
137:24 140:15,18,25
months  16:1 17:3,16
18:23 24:2 28:2
47:16 62:8 70:2
129:11 143:7 155:15
241:22
morning  9:2
move  32:16 43:8 47:1
58:12 78:13 154:24
191:22 198:4 213:7
225:19 231:21 240:11
moved  16:8,17,19
98:25 191:23
moves  107:16
moving  39:10 46:22
48:5 57:23 103:16
115:1 116:1
multiple  95:14 164:17
176:22

---

## N

named  33:11 124:1
190:10 241:23
names  14:6 20:2
30:10,12 39:4,5,14,
15 119:15,16 205:22
natural  25:25
necessarily  48:11
59:5 71:10 167:4,8,
23 183:3 221:16
needed  37:16,17,18
39:23 40:12 46:25
47:10,11 48:19,23
49:2 50:3 67:1 68:8
71:9 89:2,15 120:21
126:10 147:2 162:13,
14 182:6,8 184:19
191:14 239:17,25
240:17
negatively  81:15
Nevin  26:20,22 27:8
29:10 39:8 98:8
171:4 223:22,23
Nevin's  26:19
newspaper  127:20
non-cci  237:23 238:1
non-corinthian  123:8,
19 179:16 181:19
238:8

nontraditional 89:20,
  21
note 57:24 59:15
  136:23 148:6 235:2
noted 66:25 132:22
  136:2 185:9
notes 59:12,16
notice 15:3,10 211:4
notification 115:1
  191:7 236:4
notifications 104:25
  105:1 109:9 110:7,14
  133:6 149:10 178:11,
  13 237:4 243:9
notified 101:19
  147:17 207:22
notify 133:3
noting 58:9
notion 229:3
November 128:1 188:18
  195:8
nuanced 52:16
number 28:22 29:2,8,
  13 39:19 49:2 64:6,
  9,17 65:6,7 71:16,23
  87:17 88:16 90:15
  91:7 98:5 103:6
  117:24 138:25 139:4,
  11 142:21 144:9
  147:4 148:5 149:2
  150:23 153:20 155:1
  156:13 158:7 165:1,
  17 166:2 169:22
  185:5 188:22 195:25
  219:24 220:1,3 226:8
  227:2
numbers 64:20 65:9,
  11,23 66:14,18,20
  67:6 68:8 70:7,9,23
  85:25 103:5 117:6
  126:5,11,13,16 127:7
  130:17 133:4,14
  137:19 138:22 142:20
  147:24 152:5 156:6
  166:25 168:1 188:15
  189:2 237:8 240:1
  243:3 244:22

───────────────

O

───────────────

oath 10:2

obfuscate 229:6
object 13:20 43:21
  60:6 214:14,15 230:8
objection 11:24 29:23
  31:19 32:13 34:23
  35:3 45:23 46:6 51:4
  67:7 74:19 76:12
  78:3 79:8 80:19 83:7
  84:5 92:2 93:24
  94:10 97:10 109:1
  111:19 113:22 118:15
  119:3 120:2,25 122:5
  124:13 132:10 135:3
  138:23 144:20 145:9,
  19 154:12 155:8
  156:15 159:4,16
  162:20 168:18 183:10
  186:6,17 187:12
  192:10 193:6 196:4
  197:6 198:24 208:5
  216:19 218:3 219:13
  221:11,18 222:20
  223:8 226:1 229:10
  242:2 243:23
objections 10:6
objective 37:19
objectives 36:7,10,12
  37:4 61:22 62:5,10,
  12,14,20,25 63:7,14
  66:2 71:12
obtain 169:14
obvious 29:16
occasionally 166:22
  240:15
occasions 14:11
occur 84:20 182:13
occurred 145:13
occurs 213:2
October 17:2,15,22
  52:13 204:7 206:15
offer 155:22
offers 89:23
office 19:24,25 30:7,
  8 32:1,21 62:2,6
  73:20 75:19 111:18
  117:2 119:17 131:5
  143:6 173:19,20,23
  175:16,17,22 182:22,
  23 218:24,25 223:2,
  12 224:1,17 225:16,
  17

officer 17:13,17
  18:18,24 22:12,14,16
  25:2 28:14 29:5
  30:14,16,17,19,21
  33:12 36:19 37:1
  38:5,18 42:10 47:15
  53:23 54:2,8 56:17
  59:23 61:16 70:3,21
  86:2 94:19 95:3
  116:14 146:5 150:9
  157:7 201:11 239:13
officer's 70:18
officers 30:6,11
  32:20 33:10 73:23
  224:7
offices 174:6 225:19
official 192:22
  209:9,13
officials 128:2 129:7
  130:1 159:23
OIG 74:6,8,9,13,18
  75:13
ombudsman 135:24
onboarded 37:8
onboarding 37:11,12
one-on-one 23:20
one-person's 100:21
ongoing 163:17
open 15:5 246:13
operating 17:12,17
  18:18,24 22:12,16
  25:2 28:14 29:5
  30:5,13,15,17,18,21
  32:20 33:10,12 36:19
  37:1 38:5,17 42:10
  47:14 53:22 54:2,8
  56:17 59:23 61:15
  70:3,17,21 73:23
  86:2 94:19 95:3
  116:14 146:5 150:9
  157:7 201:11 224:7
  239:12
operation 149:7
  240:13
operations 27:4,6
  28:15 56:21,24 98:16
  183:14,20 216:8
  217:3
opine 161:1 184:11
opinion 75:16 161:11
opinions 75:9

opportunity  84:22
opposed  185:16
optimistic  240:21
option  58:2
orchestrate  149:12
order  49:3 50:12 71:6
  89:4 123:1 134:6
  174:13 178:25 182:15
  192:24 219:1 239:19
ordered  76:13
Orders  128:24
organization  14:16
  18:15 28:16 30:4
  32:4 34:2,10 38:11
  66:22,23 68:23,24
  69:1,7 81:2,3 82:21
  85:2 88:4 116:7,18
  138:10 140:8 155:3
  169:2,4 171:8,18,21
  172:3 226:23
organizational  67:14
  120:19,20 171:16
  177:2
organizationally
  117:9
organizations  33:13
  34:3
organized  30:5 146:4
  201:10
orient  58:3
oriented  58:1 81:1
original  123:11
outcome  9:17
outline  173:10
outlined  54:4
output  64:19 70:18,19
  80:17,23 81:5,8
overbroad  168:18
overnight  90:19
oversee  33:5,22
oversight  18:6 26:4
  30:14 33:13,15,19
  38:20 40:6,7 66:22,
  23 86:3 127:16
  146:7,8 152:25
  201:12 213:9,23
  223:25
owed  125:4
owns  192:4 216:8

P

p.m.  105:16,17
  136:10,11 189:22,23
  222:7,8 231:11,12
  246:23
pace  41:19 42:1,5,7,
  14
pages  178:17
pandemic  25:5
paper  174:14 176:25
  177:20 192:3 205:22
  219:24 220:1
papers  202:24
paragraph  20:17 33:4
  53:11 77:11 112:8
  121:15 133:12,21
  136:23 138:18 139:10
  142:18,19,24 147:5
  149:25 156:23 160:3
  161:24 162:9,15
  163:7 165:14 166:6,
  7,13 169:11 170:5
  190:12,13 195:6
  228:25
paragraphs  194:12
parameters  115:7
Pardon  31:1
part  18:9 28:17 38:10
  40:20 66:3,24 67:24
  68:11 69:8,22 76:17
  78:12,23 79:18,20
  95:23 97:18,23
  100:17 102:12,20
  103:25 104:14 105:2
  116:10 122:21 125:11
  126:24 127:3 140:7
  147:16 152:7,19
  161:17 163:21 164:2,
  19 165:10 169:1
  173:24 183:13,19
  197:1 199:9 207:12,
  19 215:23 217:3,9
  223:24 225:23
  226:12,13,24 234:2
  235:4,17 237:10,12,
  13,15
partial  117:18 119:2,
  25 120:24 128:25
  225:22

Participants  9:3
participating  9:23
participation  30:14
  33:12,14,19 38:20
  40:5,7 66:22,23 86:3
  127:16 146:6,8
  201:12 223:25
particulars  212:14
parties  10:5 110:23
  174:10
partner  30:14 33:12,
  14,19 38:20 40:5,6
  66:21,23 86:3 127:16
  146:6,8 201:12
  223:24
partnerships  204:9
  206:16
parts  34:2 38:19
  68:13 74:4 171:8,17,
  20 191:17
party  9:16
pass  155:16
passport  11:16
past  129:11
path  111:16
payment  178:19
PDF  133:19
peers  38:8
pen  176:25
penalty  10:4 161:9
  194:15,20,25 195:6,
  13 206:4,10,20
pending  121:19 123:17
  128:3 129:9 139:7
Pentagon  16:19
people  17:5 47:10
  48:13,18 49:4 50:12
  60:23 86:11 88:6
  89:19 90:12 97:6
  98:5 100:17 117:3
  119:18,19,20 120:10,
  11 126:10 127:13
  133:4 135:6 148:12,
  24 149:3,8,9,12,14,
  16 152:4 154:6
  171:18,23,24 173:2,6
  175:15 176:22 216:4
  218:16
percent  101:17 194:9
percentage  147:19
  153:12 207:19

**percentages** 96:7
153:18 166:25
**perfectly** 62:18
**performance** 30:25
31:4,7,18,24,25
32:11 34:22 62:15,
21,22,25 67:18 68:5,
10,17 71:2 72:3,10,
20 80:11,14 81:24
82:7,9,16 84:2,4,10
85:21 86:25 104:14
140:3,7 189:1
**performance-based**
32:4 34:10 81:2
140:8
**performing** 153:25
**performs** 154:2
**period** 27:20 32:25
63:10 150:12 151:2,4
179:3,7 203:18
211:19
**periods** 162:19 163:14
186:1 211:7
**perjury** 10:5 161:10
194:15,20 195:1,7,13
206:4,10,20
**permissible** 161:14,15
**person** 10:2 25:4,7
52:19,22,23 60:24
65:1 117:21 144:23
150:24 170:15 172:22
174:13
**personal** 116:5,19
**personally** 31:5
116:21 227:1
**personnel** 22:1 90:21
150:1,11,14 151:25
156:12
**persons** 117:25
**perspective** 42:12
171:17 177:2 180:19,
22
**pertains** 53:22
**phase** 245:10,11
**phases** 245:10
**Philippines** 16:7
**philosophy** 67:25
**Phoenix** 205:21 206:1,
14,19 208:2 209:2,6
**phone** 25:4 60:23 61:2
117:22

**phones** 13:6
**photo** 11:16
**photo-issued** 12:3
**physical** 59:6 74:10
**physically** 9:24 90:9
155:12
**pick** 60:23 150:24
**picked** 212:4
**picking** 153:17
**picture** 152:2
**piece** 212:15
**Pittsburgh** 211:11
**place** 48:4 84:18 85:8
90:18 111:13 124:4
127:3 132:12 134:9
164:17 167:2 173:1
222:17 223:7 235:23
**placement** 176:14
178:21
**places** 149:14
**plaintiff** 190:10
**plaintiffs** 12:10,14
**plan** 61:24 62:1,3,18,
22 63:1,4,17 64:19,
20 65:8 66:1 68:2
82:2,3
**planned** 240:24
**planning** 30:16 57:23
65:14
**plans** 37:2 61:20
146:2
**platform** 24:14 88:19
91:16 152:24 217:1,
10,17 218:2,11
219:10,12 228:10
239:6,10,15,18,21
240:4,8,16 241:15
242:8 243:7,12
244:14,18
**play** 99:4
**point** 104:20,21,25
107:13,14,15,16
110:12,15 115:5
122:9 124:19 139:21,
22 141:2 159:18
185:18 188:8 218:17
231:4 233:20 241:2
**points** 88:16
**policies** 77:22 225:15
**policy** 25:23 26:1,5,
23,24,25 27:1 92:13

93:14,16 95:4,7
106:10 111:12,15
112:10,23 113:7,8
114:14 117:2,5,12
119:7,10,17 120:12,
13,22 121:9,12,18,23
131:6,17,25 132:3,12
136:1 153:19 154:4,5
160:16 170:23,25
171:2 173:8,10,18
174:15 175:14
177:11,15 182:24
183:6,7,9,16,22
184:24 185:19,23
186:1 218:22 223:1,
16 224:2,10,16 225:9
226:22 238:17
**political** 22:22,24
23:5 34:14,17,20
**Politico** 128:21,24
129:15
**poll-** 173:17
**portal** 138:1 215:20,
21 216:3
**portfolio** 17:4 21:17
28:13 128:15
**position** 17:13,21
123:5 160:14 193:20
**positions** 18:11
106:16
**positively** 81:15
**possession** 179:19
**possibly** 41:3 182:4
**posture** 110:3,9,13
**potentially** 46:6 83:8
135:3
**Powerpoint** 232:4
233:10 237:21
**practice** 180:20
**practices** 52:1
**precede** 51:21 56:16
**precise** 69:19 70:22
**precisely** 48:15
114:24
**predates** 57:4
**predecessor** 20:21,22
60:3
**predictable** 131:8
**preliminary** 163:12
**premise** 131:15
226:15,17

**preparation** 152:21
**prepare** 13:22 31:12
  58:21 131:19
**prepared** 131:2,14
  152:23 176:16 184:11
**prepares** 31:9,10
**preparing** 77:16
  171:5,6 232:15
**presence** 178:14
**present** 9:24 239:6
  241:13 244:11
**presentation** 11:20
  232:24 233:9,14
  237:24 238:6,10
**presentations** 233:3
**presented** 18:3 36:18,
  22,25 61:14,19
**presents** 12:2
**press** 213:9,13 214:25
  215:3 216:5,15,22
  217:6,8,23 220:14,22
**Pressley** 99:7,14
**pretend** 55:4
**pretty** 32:16 41:5
**prevent** 134:6
**prevented** 96:6 97:5
**preventing** 13:16
**prevents** 93:16
**previous** 207:3
**previously** 109:6
  129:7 190:24
**primarily** 88:25
**principal** 30:17
**printout** 63:20
**prior** 16:1 52:2,9
  91:3 122:17 192:23
**priorities** 35:25
  36:22,25 37:15 61:11
  145:17 146:13,15
**prioritize** 157:2
**priority** 54:18 146:19
**private** 230:6
**privileged** 43:23 84:6
  135:4
**problem** 168:2
**procedures** 164:12,16
  215:15
**proceed** 236:20
**proceeding** 9:4 102:10

**proceedings** 9:21
**process** 28:11 37:11
  39:21 48:5 50:2
  52:18 53:8,9 55:9
  64:24 65:2,10,15
  66:24 81:17 82:4,22
  83:12,23,24 84:18,21
  85:7,13,23 93:21
  95:4,24 96:1 97:16
  98:18 99:16,17,19,
  22,25 100:22 101:2,
  15,22 104:22 108:5
  123:4 125:8,16
  126:21 129:10 130:17
  138:19 139:12 141:1
  143:9 147:7,10
  148:10,11 149:13,17
  150:21 151:12 152:2,
  8,10,22 155:21,23,24
  156:6 162:1,3
  163:15,18 164:3
  167:16 168:4 172:15,
  25 173:25 174:1,11,
  17,18 175:2,11,14
  177:14 183:4 184:22
  187:25 188:6 189:12
  197:1 199:11 207:16,
  21,25 209:7 215:5
  216:6,7 219:7,8
  220:9 223:15 225:16
  235:4 239:2,19
  244:14
**processed** 100:10
  104:17,24 227:5
  233:24 234:3,10
  239:9
**processes** 46:19 69:25
  85:14,17 98:12 156:4
  164:12,17 167:2
  208:15
**processing** 35:2,17,20
  52:24 99:21 100:3,11
  130:5 148:21 239:5
  240:14 241:1,3,12,25
  242:1,23 243:2,20
  244:10
**produce** 72:19 137:23
  138:1 172:8
**produced** 158:23,24
  176:1 177:23 189:7
**produces** 65:11
**product** 212:25

**production** 42:11
  46:19 67:2 68:17
  72:2,6,23 80:25 81:3
**productive** 39:23
**products** 215:22
**program** 39:25 180:2
  244:24
**programmatic** 204:9
  206:17 210:12
**programs** 117:14 179:2
**progress** 71:20,21,24
**promissory** 148:5,6
**protocols** 76:21,23,24
  164:6,9,22 165:4,12
  173:19 175:20
**provide** 116:16 117:5
  119:9 131:22,23
  135:23 179:23 185:6
  187:5
**provided** 82:10,12
  92:17 93:1 121:25
  169:15,18 204:3
  205:3 228:18
**providing** 98:4 112:21
  171:13 235:15
**public** 34:16 63:8,10
  137:15,24 138:4
**public's** 63:15
**publish** 137:25
  138:10,13,15
**pull** 15:6 117:3
  119:19 120:10
**pulled** 213:25
**pulling** 117:14
**purely** 152:18
**purpose** 219:9
**put** 90:1 118:7 149:10
  174:6,7,8 176:25
  184:10,11,22 187:10
  200:18 202:10,17
  204:2 220:4 225:3
**puts** 170:15
**putting** 177:14 241:21

---

### Q

**qualified** 76:5 77:18
  162:12 244:25
**qualifies** 160:11
  206:25

**qualify**  77:21 160:11
  206:25
**quality**  70:20 81:5,8
**quantify**  120:17
**quarterly**  69:14
**question**  13:14,15
  21:3 27:19 31:2,13,
  15 32:2 33:16 35:13
  36:20 43:22 46:11,12
  48:3 52:17 53:21
  56:24 57:1,22 61:13,
  17 80:4 85:17 86:23
  94:5 95:6 102:12
  107:21 113:25 114:1,
  3,18,25 122:16
  124:20,21 125:12
  132:14 140:11,17,23
  145:22 146:15 154:14
  157:13 159:17 160:1
  161:5,22 169:9,20
  172:1,2 177:9 178:13
  186:20,23 187:16
  193:21 197:8,23
  198:12 199:10 201:17
  202:12,16 205:7
  206:12 208:10 209:24
  212:22 214:24 216:11
  218:14 219:15 225:3,
  22 231:6 233:14
  234:17 238:4 244:9
**questioning**  13:13
  74:20 214:15
**questions**  13:20 53:8
  58:15 80:6 83:15
  85:1 161:16 171:19
  174:25 201:7,23,25
  202:5,7 207:6 222:13
  245:19
**quick**  57:11 155:14
**quicker**  21:17
**quotation**  134:17
**quote**  194:8,9
**quotes**  194:6,11

- - - - - - - - - - - - - -

                R

- - - - - - - - - - - - - -

**raising**  207:7
**range**  149:18,19
**rate**  139:20
**reach**  88:13 169:12
**reached**  71:16,23

**react**  186:10
**read**  14:14,15,17
  37:2,25 53:18 59:2
  75:7 77:11 79:3,13
  93:2,5,12,14 94:3,7
  95:17 97:9 99:7,10
  121:15 130:25 133:11
  142:21 147:21 166:5
  194:23 211:21 212:1
  213:19,20,21,24
  214:8 215:17 227:25
  228:17,25 229:21
  230:18 246:10
**reading**  87:13 93:8
  121:9 133:9 195:2
  211:15
**ready**  123:24 124:2
  139:14 235:3
**reality**  218:15
**reason**  24:3 29:21
  62:4 85:5 115:25
  186:3 187:8 191:6,12
  204:19 215:15
**reasonable**  82:7,14,17
  154:21
**reasoning**  158:10,16
**reasons**  61:7 190:25
  191:21 196:1 204:1,
  20 211:20
**recall**  21:11 39:4,6,
  14,15 41:11,12,21,25
  50:24 53:5 59:21
  74:11,12 75:20 87:4,
  5,6 93:8 107:15
  125:25 126:4,7,13
  130:7 168:10,14
  193:4 199:8,18
  201:25 202:7 221:12,
  19 241:20
**recap**  207:15
**receive**  15:9 130:10
  170:8 188:14 232:16,
  19
**received**  108:24
  167:20,21 168:8,11
  186:2 188:20 190:14
  191:6 209:25 210:1
**receiving**  70:5 71:25
  72:5 154:21 191:1
**recent**  166:20
**recess**  57:16,17
  105:16,17 136:10,11

  189:22,23 222:7,8
  231:11,12
**recite**  62:19
**reclaim**  178:22
**reclaims**  176:14
**recognize**  19:14,17
  141:14 142:9 199:21,
  25 213:13
**recollection**  14:20
  111:9
**recommendations**
  164:25
**reconciled**  148:8
**reconsideration**
  185:13 186:14
  187:11,19 188:20
  189:10
**record**  9:3,7,21 10:10
  11:20,24 12:1,5,16
  57:11,15,19 105:12,
  15,19 136:5,9,13
  189:21,25 218:7
  222:3,6,10 230:12,22
  231:8,10,14 246:3,20
**recorded**  9:4,5,8
**records**  169:14,16,18
  209:9,14
**recruit**  47:19 52:20
**recruited**  16:24,25
  17:5
**recruiting**  17:7 90:2
  143:10
**recruits**  16:15
**redact**  192:8,14
  193:16
**redacted**  193:5,17,19
  198:18,23 199:4,13
**redaction**  192:24
**redactions**  198:15
  199:12,14,15
**redactor**  193:16
**reduced**  147:19 148:6
**reducing**  146:18
**reduction**  219:24
  220:2
**reference**  240:16
**referenced**  75:11,13
  152:3 168:7 239:24
**references**  74:6,8,12
**referencing**  128:16
  217:9 243:4

referred   73:8 78:16
  91:18 119:11 127:19
  176:6 190:4 198:7
  213:10 231:25 244:16
referring   56:10 94:17
  116:13 129:16,18,21
  133:22 220:24 244:9,
  10,13
refers   95:8
refresh   14:19
regard   34:20 228:16
regions   17:8
regrettably   76:16
  95:11
regs   184:2
regular   24:20 232:16,
  23
regularly   24:22
  40:16,23 58:16 60:3
regulations   235:9
reissuance   139:25
reissuing   158:25
relate   112:2 197:4,
  15,16 203:8
related   9:15 21:16
  34:22 35:2,17,19
  42:9 52:8 115:1
  125:1 163:9 192:8
  198:16,18 199:6,8,
  15,18 216:18 239:14
relates   26:5 32:11
  33:7 169:9 192:15
  197:5 208:3
relating   52:14 204:8
  206:16
relationship   25:25
  26:3 35:21 52:10
relationships   242:25
relative   18:11 188:22
relayed   223:13 224:17
relays   159:24
release   133:2 213:9,
  14 215:1,3 216:5,15,
  23 217:6,8,24
  220:14,22
released   213:23 214:2
relevance   229:11
relevant   32:16 75:2,5
  121:5 157:4,6,21,23
  158:11,18 174:9
  178:4 193:8,10

204:21 226:7 231:2
relief   93:18 94:14
  96:7 97:5 98:20,23
  99:23 100:9,13
  101:17 111:13
  112:10,13 113:2,13
  114:7,11 115:12
  116:4,11 117:18
  118:5,12 119:2
  120:1,24 121:4,17,24
  124:11 125:3,10,19
  128:25 129:10 132:25
  134:7,10,22 152:21
  153:12 207:19 222:17
  225:22,25 235:1
  236:19 237:1,22,25
  238:7,10,14 243:13
rely   204:23
remainder   140:25
remains   39:10
remember   18:22 42:3,
  6,8,13 43:3,6,11,16
  48:14 50:15 51:15
  52:24 65:24,25 66:6
  70:7,22 72:12,14,15,
  16 80:12 89:6 114:5,
  6,24 130:12 131:11
  188:19,23 201:24
  202:4 215:8 220:5,11
  221:1 245:9
remote   9:8,13,20
  246:22
remotely   10:1,3
remove   192:8,16
removed   66:7 193:5
  219:11,15
reopen   246:15
repayment   185:8 187:7
repeat   31:1 35:13
  67:13 165:23 206:12
  238:3 242:17
repeatedly   243:16
repeating   102:11
rephrase   106:3 124:9
reply   109:22,24
  186:5,9
report   22:6,7,14,21
  23:4 30:6,9 31:8,12
  32:20 34:5 63:22
  73:20,22,23 74:3,6,
  8,9,10,13,18 75:5,7,
  11,14,20 136:16

138:7 157:24,25
  158:8
reported   69:25 72:3,7
  102:24 103:3 104:18
  126:11,14 129:6
  167:6
reporter   9:19,22
  10:13,16,20 11:2,6,
  8,13,22 69:22 138:12
  230:16,20,23,25
  231:3,5 237:11,17
reporting   9:25 10:7
  22:19 32:25 69:4,11,
  16
reports   30:2,3,24
  31:3,9 34:6 138:1,
  11,15,16 168:9,12,16
represent   176:12
  183:7
representation   56:20
  57:4
represented   29:4 62:8
  145:17 146:19
represents   203:2
Republic   16:6
request   9:6 49:16,18,
  19 50:5,6,10 119:21,
  22 143:19 145:7
  169:14,25 186:13
  187:11 236:14
requested   24:5,6,8
  169:16,19
requests   48:8,10
  49:11 51:2,12 52:5
  91:11 145:7 187:19
  188:19 189:9
require   67:19 175:15
  201:24 243:13
required   53:9 67:21
  119:25 120:7 156:4
  191:11 192:25 201:20
  214:19 236:3 240:12
  243:9
requirement   61:25
  236:3
requirements   63:9
  121:22 156:8
requires   174:13
reread   162:4
reserve   246:9,13
resign   18:20

resigned  19:4
resigning  18:25 19:3
resolve  131:7
resource  241:8
resources  47:12,23,24
  51:25 54:9 64:24
  71:22,25 82:11,12
  87:12,17 88:5,7,10,
  12,18,21 89:1 103:10
  104:3 119:24 120:7
  126:15 139:22 145:1
  165:10 239:18
respond  51:3 235:17
responded  106:25
response  51:12 107:4
  108:18 145:4 235:8
responses  83:18
  235:20 236:14
responsibilities
  53:13,25 54:4
responsibility  28:16
responsible  65:10
responsive  37:17
restarted  135:18
result  157:1 236:19
results  68:1
resume  128:2 129:8
  132:6,18
resumed  121:19 122:2,
  11 123:16 124:7,19
  125:15
retired  16:12
retirement  16:17
review  55:9 72:9
  93:17 122:19 157:14
  163:8,12,24 173:6,12
  175:15,16 180:2
  195:4
reviewed  77:23 173:15
  198:2
reviewing  70:5 71:2
  72:13
reviews  15:15 19:16
  32:22 53:19 56:14
  63:25 71:17 73:15,18
  78:22 128:12 141:16
  142:11 162:7 166:12
  177:19 187:22 194:1,
  16,24 200:11 214:7
  227:23 229:24 232:5
  233:5

rhythm  41:5
right-hand  190:7
  195:21 228:22
rightfully  218:23
rights  12:13 178:21
ring  130:3
rise  167:1
rises  161:4,15 206:25
road  141:3 240:25
Robin  30:13 33:11,22
  34:5,6 39:10 86:12,
  14,19 201:15 224:4,6
role  18:1 20:18 25:20
  26:19,24 27:2 53:16,
  22 54:2,5,8,13
  119:7,8 223:22
rolling  138:21
room  9:24 12:19,21
  13:5,8
rough  50:16,22
roughly  72:12 128:3
  182:1 188:19
route  193:18
routine  41:2
routinely  24:11 25:6
  41:17 59:14 70:25
  81:4
rule  235:23,25 236:2,
  9,16
rules  101:12
ruling  199:11
run  56:21,24 117:4
running  117:14 161:20
Ryan  9:19

---

**S**

Salesforce  244:20
sat  14:24 146:14
scale  168:5
scenario  147:18
scenarios  207:6
schedule  156:1
scheduled  24:21,22
school  90:11 138:5
  162:18 165:25 179:17
  180:3,9 181:15,20
  191:25 192:4,15,16,
  25 194:8 197:5
  198:15,22,23 199:7,

15,18 203:7 209:16
  210:18 211:10 235:8,
  12,13,14,16,20
  236:4,12
schools  89:22 124:1
  137:7,10,11,18
  163:10 164:7 165:19,
  20,22,24 192:19
  210:11 212:3 225:24
  236:13 237:6
scientific  49:7
scientists  117:11
scope  31:20 32:14
  34:24 35:4 60:7
  74:20 76:13 79:9
  121:1 162:21 163:13
  192:11 193:7 199:1
  203:17 204:2 205:5,
  12 207:9 210:8
  211:13 212:12
  214:14,16 216:19
  218:3 219:13 221:11
  226:2 229:11 230:8
script  228:18
Sean  169:12
secretary  14:17 17:1,
  12 22:7 23:4,7
  24:17,18 26:4 31:11,
  14 40:16,23 41:6,15,
  20,23,24 43:12 50:8,
  9 51:3 58:17 59:6,7,
  20 79:22 106:21
  108:16 109:22 110:21
  111:3,18 130:15
  144:25 145:1 159:24
  173:13,24 175:18,20,
  23 218:25 221:8
  223:2,13 224:12,18
  225:17 227:22
secretary's  78:25
  112:23
section  52:22 128:18
  184:8 185:2 194:23
  195:6
sections  117:10
secure  47:23,24
security  150:20
  155:16
seek  106:4 107:11,24
  108:13
seeking  129:9

sees  173:20
send  31:13 61:4 90:12
  106:11 108:9 109:9
sending  107:2,3
  108:17,19 109:16,24
  178:10,12
sends  59:7
senior  16:24 17:23
  22:18,23 28:18 52:11
  53:1 72:4 192:21
sense  91:11 118:25
  153:23 175:25
sentence  93:15 94:8
  121:16 130:25 231:18
  234:9
sentiments  230:7
September  143:1
  155:6,13 241:7
series  244:23
servants  34:16
servicer  148:3
servicers  149:23
servicing  172:5
sessions  23:20
set  36:11 62:11 64:9,
  17 65:13,16,20
  66:14,17,20 67:5
  68:8 69:12,13 81:24
  85:21,24 86:25 96:19
  111:16 138:22 139:1,
  3 140:3,11,14 163:2,
  4
sets  203:9
setting  65:22 112:10
  164:19 226:7,13
settle  63:13
Seventeen  128:20
sheer  46:21
sheet  174:9
sheets  192:3
short  136:4
short-term  68:17
shortly  18:18 49:24
  50:1,18 90:14
showed  29:13
showing  235:14
shrill  229:4
shy  190:21
sic  194:6

side  13:7 172:6
  195:22 223:16 228:23
sideways  58:1
sight  13:10
sign  81:25 82:15
  131:21 158:7 246:10
signature  20:3 78:25
  141:22,24 246:21
signed  79:17 82:1
  84:9 128:1,11 129:5,
  25 130:2 141:17
  160:16,20,21 194:15,
  19,25 195:12 206:4,
  10,20
significant  63:4
  71:21,24 126:17
  169:7 191:10
significantly  29:17
  126:6 156:24
signing  82:4
signs  161:9 195:7
similar  194:3 211:7
similarly  169:11
  224:19
simple  238:19
simply  37:12 50:24
  75:1 103:8 109:10
  150:24 155:14 158:3
Sir  215:3
sit  127:2 146:12
site  137:25 138:1
  217:14 218:1
sitting  116:21 124:2
situation  24:12 60:25
  89:24
situations  210:20
sixth  133:19 237:20
sizing  155:4
sky  45:19
slides  233:12,16
slightly  116:8
small  75:23 228:22
smart  217:16,21,22
  218:1
smartphone  12:25
social  24:14
software  244:24
sole  110:22
soliciting  235:20

sort  99:6
sorted  188:8
sounds  91:22 147:22
  175:10 225:24
source  96:7 180:6
sourced  129:21
sources  135:24 202:11
Southern  16:3
space  195:18
Spain  16:10
speak  42:1,16 151:4
  152:13 160:9 222:23
  239:23 241:4
speaking  209:23
  243:21 244:3
specialties  152:9
specific  18:13 41:25
  44:14 65:1,7,16
  72:25 87:4,6 118:19
  143:24 145:13 174:21
  175:5 187:4 199:7,15
  201:25 205:7,8
specifically  26:4
  29:1 41:13 42:14,25
  47:8,10 52:25 80:7
  130:13 132:21 178:5
  200:20 212:23 222:23
specificity  152:15
  198:1
specifics  210:23
speculate  45:8 95:13
  118:2 137:15,17
  188:12 195:15 205:10
speculation  78:4
  186:7,18 187:13
  196:5 229:19
Speculative  93:24
  94:10
speech  227:21,25
  228:1,8,12,18
speechwriter  230:1
speed  17:6 21:25
  52:15 191:22 245:4
spend  85:6
spending  84:20
spent  16:18 94:23
  118:14,22
spoke  42:24,25 106:21
  124:8 218:19 225:22
spotted  166:10,17

spreadsheet   240:13

spring   50:19 114:5
  245:14

staff   48:8,10,12,18
  49:12 50:5 51:17
  52:5 58:21 77:19
  117:16 118:11,14
  119:13 120:9 145:18
  174:8 232:10 243:18

staffed   29:7 218:24

staffing   21:15,24
  28:23 53:3 63:9
  150:6 172:15,25
  173:24 177:14 183:4
  184:22 199:11 219:7,
  8 244:5

Stafford   129:16,20
  132:24

stage   100:7 139:11
  239:1

stages   235:6

stalled   129:10

stamp   56:10 75:24
  200:6 209:18

stand   188:2

standard   183:25

standing   23:16,19
  24:21,22

start   15:18 23:24
  48:5 69:3,6,16 72:5,
  6 90:4,5 101:16
  112:7 114:4 130:1
  132:7,9 133:22 139:2
  155:12 194:22
  235:19,20

started   16:7 17:2
  18:1 20:19,23 24:4,
  25 25:2 27:25 28:20
  29:9 35:23 36:1,5,
  13,14,18,25 37:6,12
  40:2 43:7 44:13,20
  46:14,16,18 47:4,7
  52:7,13 61:10 65:22
  70:4,5 71:1 72:13
  77:6 79:22 91:5,22,
  24 95:19,24 102:13
  103:14,16,17,23
  108:21 113:15 114:6
  115:3,4,8 135:11
  136:15 137:9 150:13
  158:25 174:18 181:14
  183:2 238:1 239:11

starting   15:21 122:12

starts   67:3 77:12
  93:13 130:23 194:22
  229:1

state   12:16 76:4
  183:25 184:3,6,19
  196:1,3

stated   33:9 109:6,21
  111:24 142:15 143:18
  158:20 175:19 181:6
  184:7 207:1 232:20
  239:16

statement   9:20 74:7
  93:23 112:10,22
  113:6 119:7 121:13,
  18,24 123:20 124:19
  130:18 131:15 134:12
  135:25 139:9,23
  151:24 152:3 157:9
  173:8 179:10 229:16,
  18

statements   174:7

States   15:25 16:2,15
  18:4

stating   10:9

status   28:12 38:24
  40:8 41:17 97:17
  209:14

statute   240:7

step   100:24 101:1,15,
  16 102:9,16,18,21
  103:7,13,19 104:16,
  17 124:11 125:5,11,
  16,21,23 126:18,24
  127:2 147:14,15,16
  151:8,9,12,17,18
  152:8,10,12,18
  153:4,8,9,14,15
  154:9 167:16 207:13,
  14,15,16,24 208:4,9
  227:11 234:1,4,6,8,9
  236:24 242:23,24
  243:6,8

steps   47:6 153:4

stipulations   203:9

stop   78:1 100:17
  122:12,18 123:6
  164:2,4 217:25
  241:25

stoppage   46:4

stopped   45:12 102:18,
  22 122:19 123:3

124:24 125:13,14
  136:1 151:13 154:10
  218:13 242:21

strategic   30:16 37:2
  61:20,24 62:1,3,22
  63:4,17 64:20 65:14
  66:1 82:2

strategy   157:2

Stratford   132:2

Street   9:15

student   17:7,10,18
  21:18,24 22:1,12,16,
  25 26:1,25 27:1,6,13
  30:19 32:1,3 34:9
  36:1,5,7,10,19 37:2,
  3,11,17,20 38:7,19
  42:22 54:1 61:7,10,
  15,22 63:14 67:20,22
  68:12 80:24 112:24
  116:7,15,16 127:13
  128:25 131:5 155:16
  157:8 159:25 170:19
  174:3,10 183:18
  215:22,23,24 216:8
  224:1,10 239:12

Student-loan   128:15

studentaid.gov   217:18

students   18:8 81:18

students'   123:7,8

subject   34:21 64:22
  66:24 67:1 76:10
  84:22 164:24 192:6
  216:12 224:21 226:21

submit   180:10 186:13,
  16

submitted   24:8 121:21
  185:14 190:12 206:3

subordinate   33:17,18
  127:17

subordinates   38:6,16

subschools   192:20

subsequently   195:7

substantially   150:2

successful   71:13 89:5
  155:22 178:25 179:6
  234:20

suffered   131:10

sufficient   157:17
  160:5,7,17,22 163:12

sufficiently   29:6

suggest   221:9
summary   174:9
summer   239:5 242:13
  244:11 245:14
supervisors   146:10
  167:12,14
support   9:14,20 47:14
  62:16 117:5 120:15
  149:6 206:6 243:4
supported   76:3 160:5
supportive   117:15
suppose   154:8 216:14
supposed   109:17
  219:19
surface   211:14,15
Sweet   9:11 190:10
Sweet's   193:23
switch   170:2
sworn   10:3 12:8
symbols   217:19
system   17:7 46:19
  50:7 88:19,20 148:1
  158:5 191:14 239:25
  240:2,11,25 241:3,9
  242:14 243:20
  244:10,20 245:6,13
systemic   166:24 168:2
systems   47:12,13,25
  71:7 89:14 103:11
  117:3 152:24 167:20
  191:11 239:5 240:20
  241:2,12,22 242:1

---

**T**

tab   15:3,8 19:6 20:6,
  13 53:11 55:17,20
  112:5 136:21 141:6
  142:2 176:8 190:2
  198:6 227:15
table   64:2,10
tables   225:24,25
tackle   49:10
tacks   170:2
tail   147:20
taker   59:15
takes   155:15 207:24
taking   18:23 49:24
  50:1 67:25 119:1
  219:3

talent   54:10
talents   21:18
talk   24:13 41:17
  58:20 59:4 90:24
  91:2,16 105:8 106:20
  109:11 132:21 138:2
  150:12 151:3 160:25
  166:14 170:3 172:5
  191:16,18 243:19
talked   34:8 58:15
  124:11,12 143:2
  172:10 207:21
talking   56:22 80:11
  88:22 89:6,15 97:22
  102:21 103:1 105:22
  123:9 125:16 127:15
  132:24 147:24 168:23
  197:24 198:12
  212:17,18 218:20
  220:21 233:17 242:23
  243:3,20
target   64:6,9,14,17
  65:12,16,23 66:18
  67:6 68:8 88:13 89:2
  226:8
targeted   227:3
targets   64:21 66:5
team   26:8,10,13,16,23
  28:4 29:12 40:8 43:7
  44:23 47:9,14 48:22
  49:8 87:12 96:5,9
  97:24 98:3,6 103:24
  127:14,17 141:5
  146:9 152:15 161:7
  171:1,4 174:15
  180:23 232:14,17,19
  236:11
teams   24:15 154:5
technical   172:6 217:2
  219:25 244:23
technically   244:25
technician   9:13
technicians   121:11
  153:25 154:4 226:21
techniques   215:15
technology   191:11
  240:20
teleworking   16:3
telling   45:2 115:3
  180:21
tells   165:8

tempo   23:12
temporarily   22:25
ten   17:8 90:20 231:10
ten-minute   189:16
  221:23
ten-page   130:23 131:2
term   42:5,6 48:2,20
  88:1 97:18,20 100:3,
  16,22 102:1,2,5
  113:10 127:12,15
  143:3,22,24,25
  145:22 165:5,6
  180:14 196:21,25
  220:25 221:1 240:21
terminology   100:25
terms   45:13 48:16
  53:16 85:11 89:20
  94:3 97:21 101:5,23
  107:22 112:18 116:19
  133:4 137:6 175:9
  188:22 215:17 216:16
  230:2
testified   12:8
testimony   10:4 80:20
  92:23 93:1,2,6,13
  113:23 118:16 119:4
  120:3 154:13 155:9
  222:21 243:24
text   60:21,22 61:2
theoretically   210:23
Theresa   9:11 190:10
thing   90:19 97:23
  101:10 117:20 153:10
  160:2 186:14 206:2
  222:14 244:15
things   12:15 18:8
  27:16 34:1 38:10
  46:25 48:4 58:15
  61:20 62:23 63:12
  66:2 68:25 71:5,8
  74:9 82:5 85:11
  88:24 89:9 91:8
  97:17 98:1 99:3
  103:1,9 112:20
  116:17 117:4,7,12
  127:3 136:2 143:10
  145:2,13 148:16
  150:23 152:17 160:12
  165:1,2,11 171:20
  172:17 177:3 180:1
  181:7 188:7 197:2
  202:25 204:3 208:20

210:24,25 211:25
212:7 216:10 225:4
227:14 232:15 233:20
239:16 242:24 243:9,
10,11 245:6,8
**thought** 36:17 46:3
48:23 61:16 107:25
108:24 126:15 213:1
**thoughts** 45:10
**thousand** 139:17
**thousands** 138:20
**three-** 155:24
**tied** 121:4
**tiered** 112:10,12
113:2,13 114:3,7,11,
20 115:12 116:4,10
118:5,12 121:17
222:17
**tighter** 240:3
**time** 9:10,11,18
11:24,25 12:5 14:10
18:16 22:10,11 23:1,
10,12 25:6 27:20
36:7 39:1,6,8,10
40:11 41:6,11 43:13
44:16,17 49:20,21,
23,25 50:24,25 54:10
56:16 57:5,8,15,19
58:23 59:2 61:1
66:8 67:21 69:19,20
70:1,19,23 71:19
73:25 84:20 85:7
91:2 92:16,19 94:23
104:9 105:8,15,19
106:17,25 107:1
108:21 109:18 110:2
114:23,24 115:19
118:7,8,11,14,19,22
119:1 122:9,17,20,25
124:4 125:24 126:14
134:15 136:9,13
139:21,22 143:5
150:14 151:2,4
155:18 156:7 157:23
158:25 162:19 163:14
165:17 174:21,22
179:3,7 182:4
185:18,25 188:17
189:21,25 203:12,15,
18 211:18 214:3
222:6,10 226:20
231:14 233:13,19
235:2,16,23 238:2,9

245:10 246:3,20
**time-consuming** 118:4,
6
**timeline** 241:6
**times** 16:8 25:16
27:22 41:14 42:23
49:15,18 117:25
156:16 159:18 233:12
**timing** 62:6 123:1
**tired** 245:20
**title** 228:3
**today** 9:9 13:17,22,25
17:13 30:12 49:6
56:25 74:1,3,4
104:19 117:20 163:18
169:10 178:10 185:20
188:3,11 193:1 208:9
218:11 219:6 227:11
240:22
**today's** 246:2
**told** 68:19 78:11
84:12,13 85:14,16
86:11 95:17 97:14
104:5 106:14,23
107:22,23 122:20
127:4 145:23 146:2
188:11 194:8
**tomorrow** 117:21
**tool** 214:13 215:4,12,
18 216:1,18 217:9,11
220:15
**top** 39:13 56:11 64:3
76:1 93:9,12 118:23
131:3 137:5 142:21,
22 163:3 169:8
195:21 209:8,17
228:3
**topics** 42:23 58:25
59:4,8,9 222:13
**Torchiana** 10:11,15,18
12:11,12 15:11,17
19:8,13 20:7,10,14,
15 29:24 31:21
32:15,17 34:25 35:5,
15 43:24 44:9 45:24
46:8,15 51:6,9,10
56:3,12,18 57:10
58:4,8,11 60:8
63:21,23 67:9 72:18
73:3,11 74:22 76:14
78:6,19 79:10 80:21
83:9 84:8 91:20 92:5

93:25 94:11 97:12,13
105:20 109:3 111:21
114:2 118:17,24
119:12 120:6 121:2
122:6 124:15 127:22
132:16 133:17,24
135:9 136:4,14,19
138:17,24 141:8,13
142:3,8 145:3,15,25
154:16 156:10,21
159:8,19 162:22
168:24 176:7 183:12
186:12,25 187:17
189:5,8,15 190:1,5
192:12 193:9,11
196:13 197:11 198:9
199:5 200:4,8,14
208:25 213:12 214:17
215:2 216:20 218:4,
6,8 219:18 221:15,22
222:11 223:4,17
226:4 227:16,20
229:13,22 230:11,14,
19,24 231:2,4,15
232:2 237:19 242:6
244:2 245:17,25
246:6,12,18
**total** 136:3,24 233:1
245:1,9
**totally** 116:17 132:23
**traditional** 170:14
**trained** 55:13 161:13,
17 208:24
**training** 16:14,21
18:5
**trains** 16:15
**transcript** 15:14
19:11 56:7 136:18
141:11 142:6 227:19
246:11
**transformational**
37:18
**true** 24:24 27:24
33:23 178:6
**Trump** 128:14
**trust** 82:22
**truthful** 13:17
**Tuesday** 9:9
**Turkey** 16:10
**turn** 15:2 19:5 20:16
33:3,17 53:10,11
55:15,17,22 63:19,24

73:7 75:22 78:14
93:9 112:3 127:18,24
129:3 130:21 133:10
136:20 141:6 142:17
156:22 161:23 176:3,
9 178:16,23,24
179:15 181:18 185:10
190:2,6 193:22
194:4,13 195:19
198:5 199:22,23
200:15 209:16 213:8
220:13 227:15 231:23
232:25 235:5 237:20
**turned**   13:7 141:25
**turning**   80:9
**Tuskegee**   15:22,23
**Twenty-five**   20:7
**type**   13:3 67:15
  167:21 182:5
**types**   110:6 152:17
  164:17 216:10 218:21
  233:20
**typing**   147:22

---

### U

**U.S.**   9:14,19
**Uh-huh**   23:3 31:6 36:4
  53:24 60:14 64:8
  84:15 93:11 103:21
  126:3 142:23 211:6
  238:13
**ultimate**   173:12
**ultimately**   31:10
  32:19 83:20 149:23
  201:20
**unable**   96:9 98:20
**unacceptable**   195:16
**unachievable**   82:23
**under-**   135:1 145:21
**underneath**   33:14
**understand**   26:2
  29:11,20 42:21 53:21
  63:2 70:8 74:18
  84:11 94:5,9 97:8
  101:4,7,8 102:8,15
  108:3 113:25 114:1
  117:6 118:9 120:5,13
  122:8,15 124:21
  132:11 140:17 145:21
  149:4 151:8 165:23
  179:20,22 197:8

214:9,11,24 216:17,
22,24 217:2,6,8
218:13 219:15 229:8,
17 234:17 235:10
238:24
**understanding**   25:20
  26:18 51:16,18 71:5
  74:25 91:25 92:9,17
  96:3,5 100:1 121:4,8
  123:2,10 157:19
  167:9 179:25 180:18
  186:20
**understandings**   35:25
**understood**   32:8 45:21
  46:11 61:13,16
  105:23
**unique**   21:18 163:23
**unit**   21:20 33:8,15,20
  34:4 38:21,22 39:9
  51:21 52:10 53:4
  55:6,7 66:21 67:3,5,
  16 68:14 71:13,20
  80:18,23 81:6,12,20
  85:12,17 86:2,5,6,7,
  18 88:5 89:5,18
  90:23 92:12 94:21
  98:7 105:25 106:8,9,
  14,23 107:2,3,8,23,
  25 108:4,7,17,19
  109:7,12,23 126:22
  127:17 132:13 133:2
  146:7 161:20 165:6,8
  167:13 168:22 170:19
  174:12 177:11 182:4
  202:24 212:24 213:1,
  5 223:24 224:8
**unit's**   81:8 83:5
**United**   15:25 16:2,9,
  15 18:4
**units**   33:18 170:24
  171:13
**University**   15:23
  205:21 206:1,14,19
  208:2 209:2,5
**unrealistic**   83:3
**update**   62:2 188:9,13,
  14
**updated**   191:15 242:1
  243:7 244:11
**updates**   68:15 83:11
  104:8 232:11,14,15,
  17,19 233:21 241:18

**upgrade**   47:25 89:13
  245:8
**upgraded**   240:9 242:9
  243:21 244:20 245:13
**upgrades**   240:16,18,24
  241:8,15 242:15
  244:23 245:2
**upper**   190:7
**user-friendly**   220:16
**UTC**   9:10 11:25 12:5
  57:15,19 105:15,19
  136:9,13 189:21,25
  222:6,10 231:10,14
  246:3,20
**utilize**   216:4
**utilized**   180:12
  240:23

---

### V

**vague**   29:23 45:23
  83:7 122:5 124:13
  138:23 145:19 197:6
  208:5
**valid**   98:24
**validate**   226:17
**validated**   180:4
**varies**   23:9,11,15,18,
  23 25:6,10,12 27:9,
  12,14,21 42:21
  212:16
**variety**   161:16
**vary**   232:20
**verbal**   44:5,16 107:5
  111:7
**verbally**   50:8,9,11
  111:10
**version**   57:25 177:21
**versus**   9:12 100:24
**video**   9:8,13
**view**   64:23 195:15
**Virginia**   16:20
**virtual**   61:1 228:5
**virtually**   228:9
**virtue**   25:24 32:4
  212:2
**visible**   188:10
**visit**   90:11
**visited**   89:22

**voice**  40:19
**voices**  84:19,24 85:22
  86:8
**volume**  46:21 89:15
  150:3 154:19,24
  155:4

---

### W

**wait**  55:18 155:5
  158:20 159:11,14
  191:13 230:16,17
  231:1,3
**waive**  10:6
**waived**  246:21
**wanted**  37:9 57:24
  137:20 147:1 149:20
  198:11 222:13
**Washington**  16:18
  167:13
**Web**  137:25 215:12
  216:18 217:14 218:1
  220:15
**week**  23:10,11,14,21
  27:23 126:9 154:22
  163:20 165:9 233:2
**weekly**  23:25 24:4
  27:15,20 72:3,7,10,
  19 104:8 189:1
  233:4,7
**weeks**  24:19 41:3,5
  59:24 138:21 140:4
**weighed**  113:9
**Western**  211:10
**whistleblower**  220:15,
  24,25
**winners**  153:17
**words**  50:10 84:21
  101:13 150:16
  170:13,15 171:6
  172:21 199:4,6,13
  221:16
**work**  23:12 33:7 34:4,
  17,18 47:21 52:14
  67:15 68:2 75:6
  79:23,24 81:9 85:17
  86:11 121:13 127:15
  132:13 133:5 141:5
  143:22 147:3 148:15,
  20,25 150:25 153:1
  154:5 155:4,15
  161:22 173:18 213:1

232:10 238:20
  239:12,20
**workday**  154:21
**worked**  13:24 14:1
  16:2,10 48:22 57:6
  91:8 97:17 119:21
  126:23 155:19 174:6
  238:14 245:14
**workers**  49:8 87:24
**workforce**  155:4
**working**  48:13 52:8,12
  57:22 71:12 115:16,
  18 116:23 117:17
  119:13 151:17 156:8
  172:7 174:15 177:12
  202:24 240:22
**workings**  48:25 55:5
  114:14 152:14 159:22
  160:13 161:6 222:24
**workload**  29:4,7
  191:10
**works**  33:23 57:5
  66:11 101:4 120:24
  121:10 146:7 210:16
  224:6,9
**wrapping**  222:1
**write**  19:18,19,21
  131:17 141:18,20
  142:14 158:6 161:24
  165:14 169:12 172:21
**writes**  129:15
**writing**  147:23 172:6
**written**  12:1 43:19
  44:6,15 45:2 57:8
  118:20 132:1 144:11
  196:3 230:1
**wrong**  142:1 167:22
  229:6
**wrote**  131:6,12 132:3
  134:5 144:4 215:13

---

### Y

**year**  16:23 33:1 62:2
  64:7,11 65:15,17,19,
  23 71:14 81:23 87:10
  88:14 140:25
**years**  16:12,18 37:4
  51:21,22 61:21 62:1,
  4 144:2 190:15,17,22
  191:13 240:6

**York**  9:15
**Yvette**  167:19

---

### Z

**Zoom**  24:15

```
                                              Page
1              E R R A T A   S H E E T

2     IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,

3     in her official capacity as Secretary of the

4     United States Department of Education.

5     RETURN BY:  Mark A. Brown
```

| PAGE | LINE | CORRECTION AND REASON |
|------|------|----------------------|
| 18 | 16 | "let" should be "left"; strike "go" |
| 26 | 23 | "policy defense team" should be "borrower defense team" |
| 28 | 19 | "emerged" should be "immersed" |
| 120 | 14 | "locations" should be "implications" |
| 144 | 9 | "like, 452" should be "like, 52" |
| 178 | 12-14 | "would this form in presence" should be "would this form be produced" |

January 12, 2021                     *Mark A. Brown*

(DATE)                               (SIGNATURE)

```
                                                    Page
 1              ACKNOWLEDGMENT OF DEPONENT

 2              I, Mark Brown, do hereby acknowledge

 3      that I have read and examined the foregoing

 4      testimony, and the same is a true, correct and

 5      complete transcription of the testimony given by

 6      me and any corrections appear on the attached

 7      Errata sheet signed by me.

 8


 9


10


11      January 12, 2021              Mark A. Brown
        _____           _____
12      (DATE)                             (SIGNATURE)

13


14


15              CERTIFICATE OF NOTARY PUBLIC

16      Sworn and subscribed to before me this

17      _____day of_____,_____

18


19


20      _____      _____

21      NOTARY PUBLIC             MY COMMISSION EXPIRES

22


23


24


25
```

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 2 – Diane Auer Jones**

                                                    Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4        - - - - - - - - - - - - - - X

5        THERESA SWEET, et al., on      :

6        behalf of themselves and all   :

7        others similarly situated,     :

8                      Plaintiffs,       :

9        vs.                             :

10       ELISABETH DEVOS, in her         :

11       official capacity as           :

12       Secretary of the United        :

13       States Department of           :

14       Education, et al.,             :

15                      Defendants.      :

16       - - - - - - - - - - - - - - X

17

18       Remote Videotaped Deposition Of DIANE AUER JONES

19                  Friday, November 20, 2020

20                     9:15 a.m. (EST)

21

22

23       Job No. 330599

24       Pages:  1 - 301

25       Reported by:  Dana C. Ryan, RPR, CRR

Page 2

```
 1
 2
 3                        November 20, 2020
 4                        9:15 a.m. (EST)
 5
 6
 7
 8         Remote Videotaped Deposition of DIANE AUER
 9  JONES, held via Zoom video teleconference, before
10  Dana C. Ryan, Registered Professional Reporter,
11  Certified Realtime Reporter and Notary Public in
12  and for the State of Maryland.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2
 3         JOSEPH JARAMILLO, Esquire
 4         CLAIRE TORCHIANA, Esquire
 5         Housing & Economic Rights Advocates
 6         3950 Broadway, Suite 200
 7         Oakland, California 94611
 8         Telephone:  (510) 271-8443
 9         Email: jjaramillo@heraca.org
10         Email: ctorchiana@heraca.org
11
12  ON BEHALF OF THE DEFENDANTS:
13         R. CHARLIE MERRITT, Esquire
14         KEVIN P. HANCOCK, Esquire
15         KATHRYN C. DAVIS, Esquire
16         U.S. Department of Justice
17         Civil Division, Federal Programs Branch
18         1100 L Street, Northwest
19         Washington, D.C. 20530
20         Telephone:  (202) 307-0342
21         Email: robert.c.merritt@usdoj.gov
22         Email: kathryn.c.davis@usdoj.gov
23         Email: kevin.p.hancock@usdoj.gov
24
25
```

Page 3

```
 1         A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4         MARGARET O'GRADY, Esquire
 5         EILEEN CONNOR, Esquire
 6         TOBY R. MERRILL, Esquire
 7         R. ELLIS, Esquire
 8         Legal Services Center of
 9            Harvard Law School
10         122 Boylston Street
11         Jamaica Plain, Massachusetts 02130
12         Telephone:  (617) 390-3003
13         Email: mogrady@law.harvard.edu
14         Email: econnor@law.harvard.edu
15         Email: rellis@law.harvard.edu
16         Email: tmerrill@law.harvard.edu
17
18            - and -
19
20
21
22
23
24
25
```

Page 5

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2
 3      Also present:
 4         Dan Macom, Video Technician
 5         Asher Trangle
 6         Matt Pachman
 7         Victoria Roytenberg
 8         Jed Brinton
 9         Andrew Teoh
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1              C O N T E N T S
 2   EXAMINATION OF DIANE AUER JONES:        PAGE:
 3   By Ms. O'Grady                             10
 4
 5
 6
 7              E X H I B I T S
 8        (Attached to the Transcript)
 9   JONES DEPOSITION                        PAGE:
10   Exhibit 1    Revised Notice Of Deposition   13
11   Exhibit 2    Declaration Of Diane Auer      18
12                Jones
13   Exhibit 3    U.S. Department Of Education   48
14                Office Of Inspector General
15                Report
16   Exhibit 4    January 10, 2017 Email         52
17   Exhibit 5    October 24, 2016 Email         57
18   Exhibit 6    January 9, 2017 Email          60
19   Exhibit 7    James 4, 2017 Email            62
20   Exhibit 8    December 14, 2017 Memorandum   64
21   Exhibit 9    Borrower Defense Unit Claims   66
22                Review Protocol
23   Exhibit 10   May 22, 2019 Hearing          111
24                Transcript
25
```

Page 8

```
 1       E X H I B I T S   C O N T I N U E D
 2        (Attached to the Transcript)
 3   JONES DEPOSITION                        PAGE:
 4   Exhibit 16   Wall Street Journal Titled   230
 5                Trump Administration Hires
 6                McKinsey To Evaluate
 7                Student-Loan Portfolio
 8   Exhibit 17   Politico Article Titled DeVos 233
 9                Orders Partial Loan Relief
10                For Many Duped Student
11                Borrowers
12   Exhibit 18   October 27, 2020 Oversight    249
13                Committee Press Release
14                Titled New Documents Show
15                Department Of Education Froze
16                Tool To Help Defrauded
17                Student Borrowers
18   Exhibit 19   Defendants' Response Regarding 263
19                The Court's Request At The
20                October 1, 2020 Class Hearing
21   Exhibit 20   Order Denying Class           289
22                Settlement, To Resume
23                Discovery, And To Show Cause
24
25
```

Page 7

```
 1       E X H I B I T S   C O N T I N U E D
 2        (Attached to the Transcript)
 3   JONES DEPOSITION                        PAGE:
 4   Exhibit 11   Document Titled 84 FR        185
 5                49788-01, 2019 WL 4573049
 6                (F.R.) Rules And Regulations
 7                Department Of Education,
 8                34 CFR Parts 668, 682, And
 9                685, RIN 1840-AD26, [Docket
10                ID ED-2018-OPE-0027] Student
11                Assistance General
12                Provisions, Federal Family
13                Education Loan Program, And
14                William D. Ford Federal
15                Direct Loan Program, Monday,
16                September 23, 2019
17   Exhibit 12   April 21, 2019 PowerPoint    186
18                Titled Borrower Defense To
19                Repayment
20   Exhibit 13   Defendants' Response To      196
21                August 31, 2020 Order
22   Exhibit 14   Affidavit Of Daniel Deegan   216
23   Exhibit 15   Declaration Of Eileen Connor 217
24
25
```

Page 9

```
 1            P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We're now on the
 3   record.  Participants should be aware that this
 4   proceeding is being recorded and as such all
 5   conversations held will be recorded unless there
 6   is a request and agreement to go off the record.
 7   Private conversations and/or attorney-client
 8   interactions should be held outside the presence
 9   of your remote interface.
10           This is the remote video recorded
11   deposition of Ms. Diane Jones taken today, Friday,
12   November 20th, 2020.  The time is now 14:15 in UTC
13   time.  We're here in the matter of Theresa Sweet
14   versus Elizabeth DeVos.
15           My name is Dan Macom.  I'm the remote
16   video technician on behalf of U.S. Legal Support
17   which is located at 90 Broad Street, New York, New
18   York.  I'm not related to any party in this action
19   nor am I financially interested in its outcome.
20           At this time I'll ask our court
21   reporter Ms. Dana Ryan, on behalf of U.S. Legal
22   Support, to please enter the statement for remote
23   proceedings into the record.
24           THE COURT REPORTER:  The attorneys
25   participating in this deposition acknowledge that
```

Page 10

1    I am not physically present in the deposition room
2    and that I will be reporting this deposition
3    remotely.
4            They further acknowledge that, in lieu
5    of an oath administered in person, the witness
6    will be sworn in remotely and will verbally
7    declare her testimony in this matter is under
8    penalty of perjury.
9            The parties and their counsel consent
10   to this agreement and waive any objections to this
11   manner of reporting.
12           Now if I could ask all parties to
13   please state their agreement to this stipulation
14   on the record.
15           MR. MERRITT:  Yes.  This is Charlie
16   Merritt on behalf of the defendants agreeing to
17   that.
18           MS. O'GRADY:  This is Margaret O'Grady
19   on behalf of plaintiffs also agreeing.
20           THE COURT REPORTER:  Could I now get
21   you to please raise your right hand, Ms. Jones?
22           ************************
23           DIANE AUER JONES,
24   having been duly sworn, testified as follows:
25           ************************

Page 11

1    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
2    BY MS. O'GRADY:
3        Q    Good morning, Ms. Jones.  I'm Margaret
4    O'Grady.  I'm an attorney with the Project on
5    Predatory Student Lending.  I go by Maggie, so
6    it's fine if you refer to me that way today.
7        A    Okay.
8        Q    It's nice to meet you in these strange
9    remote circumstances, so I appreciate everyone's
10   flexibility in figuring out how to do this and
11   hope everything runs smoothly.  And if it doesn't,
12   we can just all work together to ensure that it
13   does.
14           I want to go over a few things, much
15   like what I would say if we were in person but
16   some of it tailored for our remote situation.
17           So one of them is just to confirm that
18   even though we probably all have the ability to
19   communicate privately via our smartphones on the
20   desk or something, that you will not be doing that
21   during this deposition today?
22       A    I will not be.
23       Q    And do you have a smartphone or any
24   kind of device within arm's reach right now?
25       A    I do.  I have my personal phone.  I can

Page 12

1    move it.
2        Q    I would appreciate it if you would move
3    it.
4        A    Yep.
5        Q    Thank you.
6            And then that's the only other kind of
7    device that you could use today during the
8    deposition?
9        A    Yeah, I just have my computer and a
10   separate monitor in front of me.
11       Q    Okay.  Thanks.  If you can move that
12   out of reach just to ensure that we're sure that
13   there's no communication happening.
14       A    Sure.
15       Q    And that said, if you need breaks
16   today -- I know that we have a break from 11:30 to
17   noon scheduled.  But any other break, you know, to
18   use the restroom, to take a drink of water, to go
19   off the record for a little while just for fatigue
20   sake, just say so.  I'm happy to take breaks at
21   any time as long as there's not a question
22   pending.
23       A    Okay.
24       Q    And just in general, is there anything
25   preventing you from being truthful today?

Page 13

1        A    No.
2        Q    Anything preventing you from, you know,
3    having your best memory of events that we might be
4    talking about?
5        A    No.
6        Q    And let me just -- we're going to --
7    the first exhibit is the deposition notice in this
8    case, so if we -- if you open up the folder, the
9    files will be in alphabetical order.  There are a
10   couple of extra folders in there, but if we go to
11   the file that is Diane Auer Jones revised
12   deposition notice.
13           MS. O'GRADY:  That's going to be our
14   first exhibit which we'll mark as Exhibit 1.
15           (Jones Deposition Exhibit 1 was marked
16   for identification and attached to the
17   transcript.)
18       BY MS. O'GRADY:
19       Q    Okay.  And, Ms. Jones, do you remember
20   this document?
21           MS. BERMAN:  Sorry, I'm not seeing that
22   exhibit.  Can you tell me where in the zip file it
23   is?
24           MS. O'GRADY:  Sure.  If you open up the
25   zip file, there should be a number of PDFs and

Page 14

1   then some folders and subfolders.  This is one of
2   the PDFs and it should be showing up in
3   alphabetical order under D.  Her name is Diane.
4           THE WITNESS:  This does not look
5   familiar to me.  I don't recall seeing this
6   document before.  It's just a three-page document
7   as well?
8           BY MS. O'GRADY:
9       Q   Yes.  It's just the notice deposition
10  for the deposition.  But you're here today, so I'm
11  assuming your counsel saw it.
12          MS. O'GRADY:  Marcy, have you been able
13  to find it.
14          MS. BERMAN:  Yes, I see it.  It's the
15  fourth one down; right?  Yes.  I got it.  Thank
16  you.
17          MS. O'GRADY:  No problem.
18          BY MS. O'GRADY:
19      Q   As we go forward, the PDFs are
20  automatically alphabetized so I will try to read
21  out the file names as clearly as I can.
22          Ms. Jones, I wanted to talk to you
23  about preparation for this deposition.  Did you do
24  anything to prepare for today?
25      A   I reviewed my deposition.

Page 15

1       Q   And which deposition?
2       A   I'm sorry.  The declaration.
3       Q   Okay.
4       A   I reviewed the declaration that had
5   been submitted earlier.
6       Q   Okay.  Did you review any other
7   documents?
8       A   I reviewed the declaration that was
9   submitted by Mark Brown and the one that was
10  submitted I believe by Colleen Nevin and had
11  conversations with folks on the phone today.
12      Q   Who did you have conversations with
13  today?
14      A   Conversations today or conversations
15  prior to today?
16      Q   Conversations -- any conversations
17  preparing for this deposition.  And I'm not asking
18  for anything privileged.  I don't need to know the
19  content of those conversations, but I'm just
20  wondering who you spoke to to prepare for today's
21  deposition.
22      A   So the attorneys from DOJ that are on
23  the call today, Marcy, Katherine, Charlie and then
24  Jed from the Department of Education, and -- and I
25  think -- is it David?  I'm sorry.  Is it David

Page 16

1   from DOJ as well?  Hancock?  Do I have the name
2   right?  I'm sorry.
3       Q   Kevin.
4       A   Kevin.  I'm sorry.  I'm sorry.
5       Q   Okay.  And how many -- how much time
6   would you say you spent preparing for today's
7   deposition, both conversations and then how much
8   time you spent reviewing the previous declaration?
9       A   I wasn't keeping a time log so I can't
10  give you an exact time.
11      Q   Approximately?  Five hours, more or
12  less?
13      A   I would say maybe between eight hours
14  and --
15      Q   Okay.  And besides your declaration,
16  the declaration of Mark Brown and the declaration
17  of Colleen Nevin, did you review any other
18  documents to refresh your recollection?
19      A   I -- no.  I'm trying to think if I
20  looked at anything else.  Oh, I did go back and
21  looked at the time -- I looked at the date when
22  the 2019 Department of Defense regulation
23  finalized just to refresh the timeline.
24      Q   Did you look at the exhibits to those
25  declarations or just the declarations themselves?

Page 17

1       A   The exhibits to my declaration, I don't
2   believe were included, so I did not.  And I think
3   in the case of other documents, there were some
4   exhibits that I saw and some that I did not.
5       Q   Okay.  Do you happen to recall -- well,
6   I'll ask if today we are going through exhibits
7   and they are one you used to prepare, I'd be
8   interested to know that, if you've seen it
9   recently and not just when the document was first,
10  you know, issued or when you first saw it.
11      A   Okay.
12      Q   Okay.  I'm going to ask just a couple
13  of questions about your job history, work history.
14  And I would like to know, have you ever been
15  deposed before?
16      A   Yes.
17      Q   And how many times?
18      A   Twice.
19      Q   And what cases were those?
20      A   Once I served as an expert witness.
21  This was several years ago, and so I was deposed
22  as an expert witness.  And once was when I was a
23  teenager, I was deposed as part of my parents'
24  divorce hearing.
25      Q   And when you served as an expert

Page 18

1  witness, was that on behalf of the Center for
2  Excellence in Higher Education?
3      A    Yes.
4           MS. O'GRADY:  Okay.  We're going to
5  mark as Exhibit 2 the declaration that you had no
6  specific -- that you used to prepare for this
7  deposition.  And in the folder, that is going to
8  be ECF number 56-3, Jones Declaration.  It is
9  about the eighth file down in the folder.
10          THE WITNESS:  This is the declaration?
11          MS. O'GRADY:  Yes, Jones declaration.
12          (Jones Deposition Exhibit 2 was marked
13  for identification and attached to the
14  transcript.)
15     BY MS. O'GRADY:
16     Q    And do you have that open and ready?
17     A    I do.
18     Q    So, Ms. Jones, did you write this
19  document?
20     A    Yes.
21     Q    Did you have anyone assist you in
22  writing it?
23     A    Yes.
24     Q    And who helped you write it?
25     A    Office of General Counsel at the

Page 19

1  Department of Ed.
2      Q    Anything else?
3      A    No.
4      Q    And on the last page, that's your
5  signature?
6      A    Yes, it is.
7      Q    Okay.  And I just want to note for the
8  record you signed this under penalty of perjury?
9      A    Yes.
10     Q    Now, I'm just -- use your declaration
11  as a jumping off point for getting a sense of your
12  job history and then eventually your
13  responsibilities at the Department of Education.
14          So if we can just go to paragraph 2
15  which discusses your job title and
16  responsibilities.
17     A    I can see it.
18     Q    Thank you.  Okay.  I'm hoping you can
19  expound upon this right now and give me a broader
20  sense of what you at this point consider your job
21  responsibilities to be?
22     A    So I serve currently as the principal
23  deputy under secretary and am delegated the duties
24  of under secretary at the Department of Ed.
25     Q    And what are the main areas that you

Page 20

1  are responsible for?
2      A    I'm responsible for overseeing the
3  Office of Postsecondary Education and that
4  includes both the regulatory, the policy and
5  regulatory division of the Office of Postsecondary
6  Ed.  That hasn't -- the direct supervisor of the
7  assistant secretary ultimately reports up to the
8  media office.  That also includes our grant
9  programs and all our postsecondary ed grant
10  programs.
11          I also receive the office of what's
12  called OCTAE, the Office of Career, Technical and
13  Adult Education.  And again, they have a number of
14  grant programs, and the Perkins loan program --
15  I'm sorry, the Perkins Act programs and those
16  report up to me.
17          And then federal student aid also
18  reports to me.  In the case of federal student
19  aid, it is a performance-based organization, and
20  so the relationship between the department and the
21  FSA is slightly different than OPE or OCTAE, the
22  other two divisions that report up to me.
23          With regard to FSA, I am -- I have
24  oversight over the policy that is implemented by
25  FSA.  So policy and operations are divided in

Page 21

1  statute, and the operations of FSA are the domain
2  of the chief operating officer, and then policy
3  oversight is the domain of both the Office of
4  Postsecondary Ed and then my oversight in the
5  Office of the Under Secretary.
6      Q    So who else besides you oversees policy
7  at FSA?
8      A    Do you mean the implementation of
9  policy or the development of policy?
10     Q    I'll ask both.  First the development
11  of policy?
12     A    So the development of policy, you know,
13  it involves the Office of Postsecondary Education,
14  it involves my office, the Office of the Secretary
15  and the Office of General Counsel.
16          Policy development involves all of
17  those offices in the process, and in some cases
18  the Office of Management and Budget as well.
19     Q    And then the implementation of policy,
20  was that the second prong?
21     A    (Witness nods head.)
22     Q    Okay.  And who oversees that?
23     A    So there -- at FSA, there is a policy
24  implementation office.  They are involved in the
25  actual implementation of the policy at which point

Page 22

1   my role becomes making sure that the
2   implementation of the policy aligns with our
3   regulations.
4        Q    Is anyone else besides you performing
5   that role of, I think as you put it, ensuring the
6   implementation of the policies within the
7   regulations?
8        A    Yes, the Office of the Secretary, the
9   Office of General Counsel and, in some cases, the
10  Office of Management and Budget.
11       Q    And when you say "the Office of the
12  Secretary," do you mean the secretary herself, or
13  are there other certain individuals that are
14  tasked with that?
15       A    There are a group of people that are
16  involved depending upon which policy decision
17  you're discussing, so in some cases it would
18  involve the secretary's chief of staff, the
19  Capitol floor to the secretary, the deputy
20  secretary.  And in some cases where there's a
21  formal decision on loans, for example, the
22  secretary, you know, would be the person who would
23  sign off.
24       So it depends on the issue.  It depends
25  on the topic.  But it could involve her, the

Page 23

1   entire group or some subset of that group.
2        Q    With regard to borrower defense
3   policies, does that include the secretary herself?
4        A    Again it would depend on the issue
5   within the -- under the umbrella of borrower
6   defense, there are many, many issues that fall
7   under that.  Some could include the secretary and
8   some might not.
9        Q    And when has the secretary herself been
10  included?
11       A    Are you asking me about conversations
12  or decisions?
13       Q    I'm asking about decisions.  You said
14  there are certain instances where she might become
15  personally involved, and I'm wondering what those
16  instances are if you can give me examples, if not
17  an exhaustive list?
18       A    Right.  I can't give you an exhaustive
19  list because, you know, I haven't been witness to
20  every decision so I'm not always sure who exactly
21  made the decision.  But I can tell you that with
22  regard to the development and approval of the new
23  relief methodology that was announced in
24  December 2019, I believe, the secretary did sign
25  off and authorize the use of a new methodology.

Page 24

1   So in that case she did sign off.  I -- I was part
2   of that meeting.
3        In other cases, I don't always know who
4   the decision maker was.  There were conversations,
5   but I don't always know who the decision maker
6   was.
7        Q    But regarding the 2019 regulations, the
8   secretary herself was a decision maker?
9        A    Oh, you're talking about our -- our
10  rule-making effort in December 2019?
11       Q    Well, I was just talking about the
12  meeting that you just referenced.
13       A    The meeting I just referenced was with
14  regard to the relief methodology --
15       Q    Okay.
16       A    -- that was determined in 2019.
17       If you're asking me about negotiated
18  rule making, that is a fundamentally different
19  process in -- in which case, no, the secretary is
20  not -- does not, you know, directly sign off on
21  that.  There's negotiator rule-making process, a
22  public comment period, a response.  So that is a
23  much longer process.  That is not just an effort
24  of the secretary making a decision.
25       Q    Okay.  And in terms of the relief

Page 25

1   methodology decision, was she involved just in
2   that one meeting or in decision-making meetings up
3   to that meeting?
4        MR. MERRITT:  Objection: scope.
5        BY MS. O'GRADY:
6        Q    I want to get a sense of whether or not
7   there was a single meeting where the secretary
8   signed the relief methodology or if there had been
9   previous involvement with her personally.
10       MR. MERRITT:  Well, the relief
11  technology is not a topic on which the court
12  authorized discovery.
13       MS. O'GRADY:  Well, I would disagree.
14  I believe it's related.  But for purposes of just
15  getting us started, I'll move on.
16       BY MS. O'GRADY:
17       Q    Okay.  Ms. Jones, who do you report to?
18  I just want to get a sense of the general
19  reporting structure in your current role.
20       A    I report to the Secretary of Education.
21       Q    And is there anyone else between you
22  and her that you report to?
23       A    Directly or indirectly?
24       Q    I suppose -- if there's no one
25  directly, I suppose indirectly.

Page 26

```
1        A    Yeah.  I mean, the secretary's chief of
2   staff performs, and I perform.  So I guess in some
3   sense, you know, one could say that I report to
4   him.  You know, he does that review.
5        Q    Is there anyone else involved in your
6   performance reviews?
7        A    Not that I'm aware of.
8        Q    And how often do you receive those?
9        A    That's an annual process.
10       Q    And whose performance reviews are you
11  responsible for?
12       A    I'm responsible -- that is -- that has
13  changed over time as my role has changed, so I
14  would need to know how do you mean today, this year,
15  in prior years?
16       Q    Would it be too cumbersome to give me
17  the evolution?
18       A    Well, it could be, but I'll try.  When
19  I -- there was a period of time early in my tenure
20  where I was the principal deputy undersecretary,
21  the acting assistant secretary and the acting
22  deputy assistant secretary.  I either had the
23  direct responsibility or was the secondary signer
24  on over 100 performance reviews.
25            As the assistant secretary -- when the
```

Page 27

```
1   assistant secretary was finally confirmed, he took
2   much of that responsibility off of my plate.
3            And then in my role as principal deputy
4   undersecretary, I have the oversight over the
5   individual who runs the Historically Black
6   Colleges and University initiative, and then he
7   has staff beneath him under which, you know, I can
8   serve as a secondary reviewer.
9            I have members of my direct staff, so I
10  have three individuals who are either policy
11  advisors or confidential assistants in the Office
12  of the UnderSecretary.  I do their performance
13  reviews.  And Mark Brown, the chief operating
14  officer, I am responsible for his performance
15  review.
16       Q    And are you responsible for anyone's
17  performance review in FSA?
18       A    I'm only responsible for Mark Brown's
19  performance review who is the chief operating
20  officer.
21       Q    But it's just him in FSA?
22       A    Just him.
23       Q    Okay.  Who would say -- separate from
24  the question of performance reviews, who would you
25  say are your direct reports?
```

Page 28

```
1        A    My direct reports -- do you want them
2   by name or position?
3        Q    Both, if possible.
4        A    Michael Brickman is a policy advisor in
5   my -- in my office.  Jesse Hokanson is a
6   confidential assistant in my office.  John Lucas
7   Adair -- he goes by Lucas, so I only refer to him
8   as Lucas.  Lucas Adair is a confidential assistant
9   in my office.
10            Johnathan Holifield is the director of
11  the White House Initiative on Historically Black
12  Colleges and Universities.  Technically, I am his
13  supervisor, but because of workload, Michael
14  Brickman has stepped in and does the first-line
15  performance review for Johnathan and does the
16  regular meetings with Johnathan.
17            So I'm ultimately responsible, but
18  Michael Brickman is his day-to-day liaison to my
19  office.
20       Q    Okay.
21       A    There was a period of time where there
22  were other White House initiatives that reported
23  to me, so I also had direct supervision of those
24  directors and their performance review, but they
25  have now moved to the Office of Communications,
```

Page 29

```
1   and so I no longer am involved in their
2   performance review or their management.
3        Q    Thank you.
4        A    Uh-huh.
5        Q    If we can go to paragraph 4 of
6   Exhibit 2, your declaration.  And if you could
7   just read paragraph 4 beginning, As part of my
8   responsibilities?
9        A    As part of my responsibilities in the
10  department, I have worked extensively on issues
11  relating to the implementation and administration
12  of the department's regulations regarding borrower
13  defenses to the collection of federal student
14  loans.
15       Q    Okay.  And, Ms. Jones, if you could
16  give me a sense of what that work entailed?
17            Who are the other team members?  You
18  can start there.
19       A    So we engaged in a negotiating
20  rule-making effort on borrower defense.  I had not
21  yet joined the department when the negotiated
22  rule-making process was underway.  But I was at
23  the department for the development of the notice
24  of proposed rule making for the 2019 borrower
25  defense regulations.
```

Page 30

1    The day-to-day work on that is done by
2    the Office of Postsecondary Education, but I don't
3    have oversight of that and involvement in it.
4             We then -- we got over 38,000 comments
5    in response to the notice of proposed rule making.
6    Obviously we have staff -- career staff in the
7    Office of Postsecondary Ed who reviewed those
8    comments and responded to them, but obviously I
9    reviewed that document before moving forward.
10            Office of Management and Budget and
11   other federal offices are involved in the
12   clearance process of a notice of proposed rule
13   making and as well as in the publication of a
14   final regulation.
15            So, you know, I didn't write the
16   specific responses, but obviously all of that I
17   had oversight over and, you know, was involved in
18   making sure we met the timeline and got that final
19   regulation published.
20        Q    And as you began your role, who got you
21   up to speed?
22        A    On what issue?
23        Q    On -- on the negotiated rule making
24   that had already been taking place?
25        A    I believe that I was brought up to

Page 31

1    speed by a team of people -- and I'm not going to
2    remember every person who was in the room.  It was
3    a group of staff in the Office of Postsecondary
4    Education, the staff in the policy group that
5    actually the rule making and wrote the MPRM.  So
6    there were, you know, maybe five, six, seven
7    members of the Office of Postsecondary Education.
8    There were several members of the Office of
9    General Counsel.  Michael Brickman, who at the
10   time was still in the Office of Postsecondary Ed.
11   So there were -- I was brought up to speed on rule
12   making by engaging in these meetings with Office
13   of General Counsel and office of Postsecondary Ed
14   in the development of the MPRM in those proposed
15   rule making.
16        Q    Did your predecessor have any
17   involvement when you began your role?
18        A    Which predecessor do you mean?
19        Q    Well, who was your direct predecessor?
20        A    Jim Manning was the acting under --
21   well --
22        Q    Yeah.
23        A    To be clear, when we -- when we
24   started -- when I started in my role, I was a
25   policy advisor.  There was no predecessors.  I

Page 32

1    started working on the borrower defense
2    regulation.  It was as a policy advisor in the
3    Office of Postsecondary Ed.  There was no
4    predecessor.  Then I moved into the role of acting
5    assistant secretary.  There -- the predecessor
6    there was Frank Brogan who was serving in the
7    acting assistant secretary role until he became
8    confirmed for his permanent role.
9        Q    Ms. Jones, when you were a policy
10   advisor, how long were you a policy advisor?
11        A    I believe it was some -- somewhere in
12   the neighborhood of maybe four months.  I can't
13   remember exactly when Frank Brogan was confirmed,
14   but I joined the department approximately in
15   February, and I believe that Frank Brogan was
16   confirmed early -- perhaps early in the summer.
17            So there was a period of time of a few
18   months.
19        Q    And that's February 2018?
20        A    That is correct.
21        Q    And before February 2018, what was your
22   job?
23        A    Senior policy advisor to the Secretary
24   of Labor at the U.S. Department of Labor.
25        Q    And how long did you have that

Page 33

1    position?
2        A    From November of 2017 until February of
3    2018.
4        Q    And before that, what was your role?
5        A    I was at the Urban Institute, where I
6    was a fellow working on apprenticeship issues, and
7    that started in 2015.
8        Q    And then before 2015?
9        A    2010 to 2015, I was an employee at the
10   Career Education Corporation.
11        Q    What were your roles there?
12        A    When I joined the company, I was a -- I
13   can't remember if I was a senior vice president or
14   vice president but in regulatory affairs, and
15   I'm -- over time I was promoted, I guess, to
16   senior vice president for regulatory affairs and
17   then ultimately I was promoted to senior vice
18   president for external relations, I think, is the
19   title and chief external affairs officer.
20        Q    At any of those roles at CEC, did you
21   deal with borrower defense?
22        A    Can you define what you mean by "deal
23   with"?
24        Q    Did you give any advice regarding,
25   develop policies about, ever answer anybody's

Page 34

1   questions about it, whatever regarding your job?
2          MR. MERRITT:  Objection.  It's broad,
3   and also it's scope.
4          MS. O'GRADY:  I believe the witness can
5   still answer.
6          MR. MERRITT:  Yeah.  Sorry.  Go ahead.
7          THE WITNESS:  So could you restate the
8   question?
9   BY MS. O'GRADY:
10         Q    I'm wondering if in your role at CEC
11  you ever had to discuss borrower defense?
12         A    I was at CEC during the negotiated rule
13  making.  So while the department was engaged in
14  negotiated rule making for 2016, that negotiated
15  rule-making process began while I was at CEC.  So,
16  yes, I absolutely followed that rule-making
17  process.
18         Q    And did you provide advice to CEC about
19  that rule making -- while that rule-making process
20  was going on?
21         MR. MERRITT:  Objection; scope.
22  BY MS. O'GRADY:
23         Q    You can still answer despite Charlie's
24  objection.
25         MR. MERRITT:  Yeah, you can answer that

Page 35

1   question.  But I guess we'll see how -- see how
2   long -- how deep this line of questioning is going
3   to go.
4          THE WITNESS:  I mean, obviously I
5   followed the negotiated rule-making process and
6   provided updates to the management at CEC about
7   first, what had taken place in rule making, and
8   then subsequently the content of the proposed
9   rule.
10         I can't remember if I was still at CEC
11  when the final BP reg was published.  I just can't
12  remember the timeline.  But I do remember updating
13  CEC employees, leaders about the progress of -- of
14  rule making.
15  BY MS. O'GRADY:
16         Q    And, Ms. Jones, at what point -- you
17  had mentioned a deposition you gave as an expert
18  for CEHE.  When were you working for them, at what
19  point?
20         A    I was never working for them.  You
21  know, I was retained to give a deposition.  And I
22  can't remember the exact date, but it was after I
23  was no longer employed by CEC.  So it would have
24  been after 2015 but before I came back to federal
25  service.

Page 36

1          Q    And when you say "retained," they paid
2   you a fee to do that; correct?
3          A    Correct.
4          Q    Okay.  We're going to go back to
5   Exhibit 2.  Let's look at paragraph 7 of your
6   declaration.  And this is under the heading --
7   excuse me, we don't need to actually just go to
8   paragraph 7.  I just want to go to the heading at
9   the very top of the page --
10         A    I'd also like to add because I think
11  it's important to understand that I also spent ten
12  years working at the Community College of
13  Baltimore County, including time working at the
14  University of Maryland, and I spent several years
15  working at Princeton University.
16         So I do want to make it clear that my
17  past employment in higher education was --
18  included a number of institutions and not just
19  Career Education Corporation.
20         Q    On the top of the third page of the PDF
21  of Exhibit 2, your declaration, the heading there
22  is, The department's federal student aid
23  priorities 2018 to 2019.
24         And when you began your position, what
25  was your understanding of those priorities?

Page 37

1          A    When I began my position, my
2   priority -- the priority in which I was engaged
3   was completing the final rule making for borrower
4   defense.  So when I joined the department, I was
5   in the Office of Postsecondary Ed.  I did not have
6   any oversight role with regard to federal student
7   aid.  So my focus was on -- on the -- completing
8   the final rule.  So first, the notice of proposed
9   rule making and then a final rule for the 2019
10  regulation.
11         Q    Okay.  And in the next -- two pages
12  later, so this is on page 5 of the PDF in
13  paragraph 10.  Here you discuss, Once the court
14  decisions were issued and the 2016 regulations
15  became effective, the start of that paragraph.
16         In the middle of that paragraph you
17  write, The department also had to develop
18  processes for implementing the new financial
19  responsibility requirements of the 2016
20  regulations, which included substantial reporting
21  requirements.  The department spent considerable
22  time and effort identifying which offices would
23  handle different parts of the process and
24  developing the necessary instructions.
25         How much time went into that process?

Page 38

1      A      I don't have a record of hours spent,
2  so I can't tell you how many hours, but it was a,
3  you know, very complicated -- it was a very
4  complicated issue that required many meetings
5  which ultimately resulted in the development of an
6  electronic announcement so that we could notify
7  institutions about how to implement the 2016 reg.
8  Initially, I put in a lot of time.  I can tell you
9  that.  But I can't estimate how many hours.
10     Q      In your role do you create timelines
11 and budgets for projects for implementation of
12 regulations?
13     A      In which role?  I mean, are you talking
14 about when I first came to the department?  In my
15 current role?  In which role?
16     Q      Both.  So how about we'll start with
17 when you first came to the department.
18     A      When I first came to the department, I
19 was involved in timelines for publishing final
20 rules.  And then, you know, we launched negotiated
21 rule making for another large regulatory package,
22 so I was involved in -- in developing the timeline
23 for completing those regulations.
24            When I was in the Office of
25 Postsecondary Ed, you know, I oversaw the

Page 39

1  development -- I mean, the development of the
2  Office of Postsecondary Ed's budget.  I'm involved
3  now in overseeing the development of the Office of
4  the Under Secretary's budget, but it's a very,
5  very tiny budget.  It's a small office.
6            And then FSA develops its own budget,
7  but I am involved in the review of that budget and
8  ultimately our budget services office works with
9  the Office of Management and Budget, you know, to
10 develop the president's budget request.  So, you
11 know, I'm involved in conversations about that,
12 but the Office of Management and Budget ultimately
13 approves the president's budget request.
14     Q      And, Ms. Jones, if you don't mind, I
15 just want to ask you one more question about your
16 role as policy advisor at the department budget.
17            What was your portfolio of policies?
18     A      Any -- any regulation under the Title
19 IV program.  So that would include regulations
20 about our federal student aid programs, the TRIO
21 programs, GEAR UP programs, and then all of the
22 regulations related to our grant programs.  So we
23 have regulations called EDGAR.  I cannot remember
24 what EDGAR stands for, but it's the regulations
25 under which all of our grant programs operate.

Page 40

1      Q      And borrower defense falls under the
2  Title IV programs that you mentioned?
3      A      That is correct.
4      Q      Okay.  And in Exhibit 2, paragraph 15,
5  which is going to be on PDF page 6.  So this
6  paragraph discusses what was going on in 2017
7  which is before your tenure either as policy
8  advisor or your subsequent roles.
9            With that in your mind --
10     A      If that's your question, yes.
11     Q      With that in mind, I just want to note
12 that I understand this is from before your tenure,
13 but you did write in this declaration about in
14 2017, that the department conducted a thorough
15 review.
16            What's your understanding why that
17 happened, why that review was conducted?
18     A      So when I -- when I -- so this did take
19 place before I came to the department.  And when I
20 came to the department, I was told that there were
21 people at the department who worked to figure out
22 how to provide relief to borrowers who had
23 submitted claims.  And I believe at the time I was
24 told that the focus was on the Corinthian -- the
25 borrowers who had gone to Corinthian Colleges.

Page 41

1  So, you know, I was told that that methodology had
2  been developed prior to my arrival.
3      Q      And when you say this focus was on
4  borrowers who had gone to Corinthian, what do you
5  mean?
6      A      Meaning that the first group of claims
7  to be reviewed would have been the oldest group of
8  claims, which would have been the claims from
9  Corinthian borrowers.
10     Q      And who told you that?
11     A      I believe it was an individual in the
12 Office of General Counsel.
13     Q      And in this paragraph, you state that
14 the conclusion was it did not have an adequate
15 process to handle the growing list of borrower
16 defense claims.
17            What do you mean by "adequate process"?
18     A      As I understand it, when the Trump
19 administration came into the Department of
20 Education, as I understand it, there was no
21 methodology in place to review claims.  There was
22 no methodology for determining relief.
23            And, in fact, the prior administration
24 had told directly in this Web site and
25 communications to borrowers from ITT that the way

Page 42

1  they would be receiving relief would be through
2  closed school loan discharge, so borrowers who had
3  left -- who had been students at ITT were -- were
4  advised to use closed school loan discharge.  So
5  the administration had not directed those students
6  to file borrower defense claims and, to my
7  knowledge, had not developed any methodology for
8  reviewing those claims and had not developed a
9  methodology for assessing financial harm to either
10 Corinthian borrowers or any other borrower that
11 might apply.  So that was my understanding, that
12 there was no methodology.
13        It's also my understanding that there
14 were a number of denials that had been -- that
15 determinations had been made by the prior
16 administration, but the notifications had not been
17 sent to borrowers.
18    Q    Okay.  I want to ask a few questions
19 about what you just said.  So taking the last
20 point, you said there were a number of denials
21 that had been made but not communicated to
22 borrowers?
23    A    That's my understanding.
24    Q    Do you have a sense of how many?
25    A    I -- I know I've seen numbers, but I

Page 43

1  cannot recall what that number is right now.
2    Q    Okay.  And were there grants that had
3  been decided but not communicated?
4    A    I don't know.
5    Q    When you say "there was no
6  methodology," what do you mean by that?
7    A    So the -- there was no way -- so -- so
8  the 2016 regulation, for example, talks about
9  financial harm, but there had been no methodology
10 developed to figure out what that level of
11 financial harm was.  So there was no methodology
12 to determine financial harm.
13        And, to my knowledge, the department
14 had not reviewed the documents that it had
15 collected from Corinthian Colleges, and so it --
16 it had made a decision on a limited number of
17 programs during a limited time period.
18        So the Trump administration had
19 asserted that it had found evidence of
20 misrepresentation in certain programs at certain
21 times, but they hadn't gone beyond that set of
22 programs.
23        And, so, outside of that list of
24 programs and -- and dates, there had been no
25 methodology developed for either reviewing other

Page 44

1  programs at other times or for reviewing, I
2  suppose, applications that students would submit
3  for other programs at other times.
4    Q    So I want to just really understand the
5  timeline we're talking about here.  The time that
6  you're saying there was no methodology for review,
7  which regulations were governing at that time?
8    A    Well, that's complicated as well.  At
9  the time that I joined the department, the
10 1994-1995 regulations were in place.  As my -- you
11 know, as my tenure so continued and ultimately the
12 court determined that we had to implement the 2016
13 regs, then loans that were either taken after a
14 certain point or consolidated after a certain
15 point would then be subject to a different
16 methodology under the 2016 regs.
17        So when I first entered the department,
18 claims were being adjudicated under the '94-95
19 regs using a state standard, and then as the 2016
20 regulation was implemented, that shifted to a
21 federal standard.
22        So it depends when you ask.  The answer
23 changes.
24    Q    Okay.  I'm going to have a few
25 questions about this.  I want to go back to a

Page 45

1  statement you made that previously the department
2  had not reviewed documents from Corinthian.
3        Is it your understanding under the
4  regulations that it's necessary to do so?
5    A    It is my understanding that the
6  Department of Education has to review evidence
7  provided to it and make a determination about
8  whether or not misrepresentation took place.
9    Q    And in your view, that necessitates
10 review of documents sent by the school?
11    A    It could be documents sent by the
12 schools.  It could be documents submitted by a
13 borrower.  It could be documents collected from
14 some other entity, another agency, another state
15 entity.
16        So the sources of those documents, you
17 know, there are multiple sources of those
18 documents.  But, yes, the Department of Education
19 is supposed to review and determine that there has
20 been misrepresentation.
21    Q    But is it your opinion that the -- it's
22 your understanding of the regulation the school
23 must be given the opportunity to respond in some
24 way?
25    A    Well, that depends on which regulation

Page 46

1   you're talking about.
2       Q    So let's first take under the '94-95
3   regulations.
4       A    So the interesting thing here is that
5   when the prior administration started adjudicating
6   claims, technically it was under the '94-95
7   regulations; however, they had also adopted
8   certain practices that would eventually be in the
9   2016 regulations even though they were not in
10  regulation at the time.
11      Q    So what's your understanding of what is
12  different from the 2016 regulations and the '94-95
13  regulations?
14          MR. MERRITT:  Objection:  Overbroad.
15          MS. O'GRADY:  I can narrow that just
16  for clarity.
17      BY MS. O'GRADY:
18      Q    Especially with regard to the state
19  standard.
20          THE WITNESS:  Can I answer that,
21  Charlie?
22          MR. MERRITT:  You go ahead, Diane,
23  yeah.
24          THE WITNESS:  Okay.
25          So the 1995 regulation relied on a

Page 47

1   state standard.  And so, if the institution was in
2   violation of a state law connected to the making
3   of a loan, then it would be adjudicated under that
4   standard.
5           The 2016 regulation replaced the state
6   standard with a federal standard defined -- and
7   defined that standard and defined the kinds of
8   actions or omissions that would constitute
9   misrepresentation.
10      BY MS. O'GRADY:
11      Q    Let me go back to your statement that
12  there was no methodology to review previously.
13          On what -- if there was no methodology
14  to review as you understood it, what is your
15  understanding of the grants that were made for
16  borrowers who attended CCI and ITT?
17      A    It is my understanding that the
18  department received communication from the
19  California AG based on interviews that the
20  California AG conducted.  And based on the results
21  of those interviews, the prior administration had
22  made a determination that misrepresentation had
23  occurred at certain campuses within certain
24  programs and during certain periods of time.  And
25  it is my understanding that it was borrower

Page 48

1   defense applications from among borrowers who were
2   in those programs during that time period whose
3   claims had been adjudicated.  That's my
4   understanding.  I obviously didn't see those
5   adjudications, but that is my understanding.
6           MS. O'GRADY:  Okay.  If we can open --
7   this is going to be marked as Exhibit 3.
8           (Jones Deposition Exhibit 3 was marked
9   for identification and attached to the
10  transcript.)
11          MS. O'GRADY:  In the PDF file, its file
12  name is IG report.
13          THE WITNESS:  Yes.
14      BY MS. O'GRADY:
15      Q    Do you have that open and visible?
16      A    I do.
17      Q    Okay.  And do you recognize this?
18      A    I recognize the title of the report,
19  and I've heard about the report.  I've never read
20  the report.
21      Q    You've never read the report.
22      A    (Witness nods head.)
23      Q    Okay.  Have you discussed the report?
24      A    The element of the report that I have
25  discussed is apparently in that report there was

Page 49

1   climbing that the department did not have the
2   appropriate systems in place to -- to track or
3   record claims.  So as I understand it the
4   department was using Excel spreadsheets to try to
5   manage this process, and it was my understanding
6   that one of the challenges the IG identified that
7   the use of Excel spreadsheets was inadequate.
8           Now, that's just my understanding.  I
9   haven't read the report.
10      Q    Okay.  I just want to talk about,
11  understanding that you haven't read it previously,
12  a few statements and findings in it.
13          This is going to be on the fifth page
14  of the PDF, and if it's easier you can use the 500
15  page number at the very bottom.
16      A    Okay.  Okay.
17      Q    In its findings, the beginning of the
18  third paragraph, if you could just read out loud
19  the first three sentences.
20      A    Are you talking about the paragraph
21  that begins, We found?
22      Q    Yes, please.
23      A    We found that FSA established seven
24  categories of claims that qualified for loan
25  discharge based on characteristics that the claims

Page 50

1   had in common.  We also found that FSA maintained
2   support for its borrower defense loan discharge
3   decisions.  FSA's business operations maintained
4   borrower claim applications, attestations, and
5   other supporting documentation, such as school
6   transcripts.
7        Q     And then the next sentence, also, if
8   you wouldn't mind?
9        A     BDU used this information to make
10  borrower defense claim determinations and maintain
11  documentation.
12       Q     Okay.  And then if you see up under the
13  headline of what we did on this very same page,
14  the last sentence of that paragraph says, Our
15  review covered FSA's borrower defense loan
16  discharge process from the end of June 2016
17  through July 31st, 2017.
18       A     I see that.
19       Q     So is that time period between
20  June 2016 and July 2017 the same time period you
21  were just saying there was no methodology?
22       A     I -- I don't remember -- I don't recall
23  exactly when the department started adjudicating
24  claims, so I -- I don't know whether June 2016 was
25  the beginning date, but it is that general time

Page 51

1   period that I was told that the department's
2   limited work was based on a -- a certain number of
3   programs at a certain number of campuses during a
4   certain period of time.
5        Q     And in the paragraph -- the sentences
6   that I had you read first in that third paragraph
7   regarding the seven categories of claims, are you
8   familiar with those seven categories of claims?
9             MR. MERRITT:  Objection to the scope
10  and use of the IT report.
11  BY MS. O'GRADY:
12       Q     Ms. Jones, you can answer.
13       A     I am aware that there were certain
14  programs during a certain period of time for which
15  the department was informed by the California AG
16  that misrepresentations occurred.
17            I don't remember the count, but I know,
18  for example, that there were job placement rate
19  claims at certain programs at certain campuses
20  during certain time periods.  I don't recall
21  exactly which programs and which time period.
22       Q     And you're aware just of CCI claims
23  being adjudicated?
24       A     During that time frame, yes, I am aware
25  only of CCI claims being adjudicated in those

Page 52

1   particular programs.
2        Q     And what about ITT?
3        A     I'm not aware of ITT claims having been
4   adjudicated other than it is my understanding that
5   there were some ITT campuses in California.  I
6   don't know when the adjudication began of those
7   claims, but it is my understanding that there may
8   have been -- in -- in the California campuses of
9   ITT, there may have been some adjudications.  I
10  just don't know the time frame of when those took
11  place.
12       Q     Okay.  If we could look at the zip file
13  within the zip file that's titled -- actually, it
14  might not be a file; it might just be a regular
15  folder -- ECF 66-2 Declaration and Exhibits.
16       A     I'm sorry.  ECF?
17       Q     It's a folder, not a file.  It's ECF
18  66-2 Declaration and Exhibits.
19            MR. MERRITT:  It appears at the very
20  top of the list, Diane.
21            THE WITNESS:  Okay.
22  BY MS. O'GRADY:
23       Q     Okay.  And if you could open the one
24  that is Exhibit 6.
25            MS. O'GRADY:  So we'll mark this as

Page 53

1   Exhibit 4 for this deposition.
2            (Jones Deposition Exhibit 4 was marked
3   for identification and attached to the
4   transcript.)
5   BY MS. O'GRADY:
6        Q     Have you ever seen this memorandum
7   before?
8        A     Yeah.  Let me scroll through first.
9            (Witness reviews document.)
10           I have seen this document.
11       Q     In what context have you seen this
12  document?
13       A     I first saw this document when I was
14  asked to sign -- and I might use the wrong
15  terminology here.  I'm not an attorney by
16  training.  I think it was a declaration that I had
17  to sign regarding the recusal -- I don't mean
18  recusals -- please help me find the right terms,
19  but there were documents that our Office of
20  General Counsel had to produce, and there's a
21  process by which information is redacted -- maybe
22  redaction is the right term -- and I was asked to
23  review a series of documents to confirm that what
24  was being redacted was deliberative information,
25  and it was in that context that I first saw this

Page 54

1   document.
2       Q    Okay.  And then just briefly for the
3   record, what is this document?
4       A    So this is a document apparently
5   written by somebody at the borrower defense unit
6   to Under Secretary Ted Mitchell.
7       Q    Regarding?
8       A    Regarding recommendation for ITT
9   borrowers based on guarantees for employment.
10      Q    And this is, as far as you can tell at
11  this point, a full and accurate copy of this
12  document?
13      A    It is a full and accurate copy of the
14  document.  I mean, I'm not reading it word for
15  word, but it looks like the document I've seen.
16      Q    So as you said, this is a
17  recommendation from the borrower defense unit for
18  ITT borrowers alleging that they were guaranteed
19  employment.
20           What regulations govern this
21  recommendation, under what borrower defense
22  regulations?
23      A    Well, it's interesting.  So
24  technically, this recommendation would have been
25  made under the 1995 regulations, but it involved

Page 55

1   the imposition of a group discharge process which
2   was created by the 2016 regulations that were not
3   yet in effect.
4       Q    Now, if we could go to page -- it's PDF
5   page 4, page 3 by the footer of this document.
6       A    Okay.
7       Q    And these appear to be a number of
8   quotations from ITT students.
9       A    Yes.
10      Q    You had noted before that under the
11  regulations, the borrower defense unit must review
12  evidence.
13      A    Yes.
14      Q    Are quotations like this evidence in
15  your understanding?
16      A    You know, I would have to have more
17  information.  I -- you know, I -- I think you're
18  asking me to make a decision about evidence that I
19  haven't reviewed.
20      Q    Well, I'm just -- I'm asking you to
21  make a decision, but I suppose my question is just
22  is testimony from a borrower about their
23  experience the kind of evidence that is considered
24  when deciding a borrower defense application?
25      A    It was considered by the prior

Page 56

1   administration.  I believe that the prior
2   administration had determined that this was the
3   basis of their decision about misrepresentation.
4       Q    Just under the prior administration?
5   Would you say the current administration would
6   also consider student testimony as evidence?
7       A    I think that's a really broad question.
8   You know, I think that our borrower defense
9   attorneys look at, you know, a whole variety of
10  evidence.  And I should let you know that, you
11  know, as a nonattorney, I'm not actually involved
12  in reviewing individual claims.  You know, we have
13  trained attorneys.  I personally don't know how
14  you determine what meets the preponderance of
15  evidence standard.
16           You know, those are questions you'd
17  have to ask our borrower defense attorneys.  I
18  don't get involved in those decisions.
19      Q    Is there a specific person who you work
20  with who is most directly involved in those kinds
21  of decisions?
22      A    You know what, I don't -- I wouldn't --
23  I don't directly supervise her, but it is my
24  understanding that Colleen Nevin in the borrower
25  defense unit is the person who leads the group of

Page 57

1   attorneys that would be evaluating evidence and
2   making determinations about what meets the
3   preponderance standard.
4       Q    Okay.  Great.  If we can, in this same
5   folder we're in, open up Exhibit 4.
6       A    ECF 63-3 number 4?
7       Q    Yes.  For the next few minutes, we're
8   just going to be in this folder.  So this
9   Exhibit -- the file name is Exhibit 4, but we're
10  going to mark it for this deposition as Exhibit 5.
11           (Jones Deposition Exhibit 5 was marked
12  for identification and attached to the
13  transcript.)
14  BY MS. O'GRADY:
15      Q    And, Ms. Jones, do you recognize this
16  document?
17      A    (Witness reviews document.)
18           This appears to be similar or the same
19  to the document I've seen.  Again, I don't have
20  the two documents in front of me, but this appears
21  to be a document that I've reviewed in the past.
22      Q    Okay.  Just for the record, can you
23  just say who this is to, from, the date, and what
24  it's regarding?
25      A    Sure.  The date is October 24th, 2016.

Page 58

1  It is from the borrower defense unit and it is a
2  memo with a recommendation to Under Secretary Ted
3  Mitchell.
4      Q    Is this document typical of memoranda
5  that you review currently?
6      A    No.
7      Q    Now, these are recommendations for
8  Everett/WyoTech borrowers alleging transfer of
9  credit claims.
10     A    Uh-huh.
11     Q    Are these recommendations still in
12 effect or has something superseded these?
13     A    For these groups of claims, the
14 department -- this administration -- it is my
15 understanding that this administration has decided
16 to honor the position of the prior administration.
17 So when the prior administration identified
18 certain programs during certain time periods where
19 misrepresentation took place, this administration
20 has accepted that.
21          So I think this administration has
22 accepted the premise or the allegation that
23 misrepresentation took place in certain programs
24 at certain periods of time.
25     Q    So there's been no additional guidance

Page 59

1  given for this group of students?
2      A    About the determination of the merit of
3  their claims?  Is that what you're asking me?
4      Q    Yes.
5      A    For the -- for the borrowers who were
6  in those programs that were listed by the
7  Department of Education on its Web site as
8  programs where it had determined that
9  misrepresentation took placed, it is my
10 understanding that this administration has not
11 gone back to second guess that; that, you know,
12 those programs for which borrowers were told
13 misrepresentation took place, this administration
14 is accepting that determination that
15 misrepresentation took place.
16          In other words, you know, they -- they
17 made a decision that misrepresentation took place,
18 and to my knowledge, we're not challenging or, you
19 know, changing that determination.
20     Q    When you say you're not challenging or
21 determining -- you're not challenging that
22 determination, excuse me, are you separating out a
23 determination of a misrepresentation from the
24 amount of relief?
25     A    Yes, I am.

Page 60

1      Q    We're going to talk more about that.
2  At this point, I would like to just go back to
3  this folder and look at what in the folder is
4  Exhibit 5.
5          MS. O'GRADY:  And for this deposition,
6  it will be marked as Exhibit 6.
7          (Jones Deposition Exhibit 6 was marked
8  for identification and attached to the
9  transcript.)
10 BY MS. O'GRADY:
11     Q    Again, Ms. Jones, my question is have
12 you seen this document before, and, if so, can you
13 state for the record what it is?
14     A    This appears to be a document that I
15 have reviewed before.  It is a January 9th, 2017
16 memo from the borrower defense unit to Under
17 Secretary Ted Mitchell making recommendations
18 about Corinthian borrowers alleging they were
19 guaranteed employment.
20     Q    Okay.  Has this -- has this written
21 recommendation been superseded by any other
22 written recommendation?
23     A    It is my understanding that the
24 programs for which the Obama administration
25 determined that misrepresentation took place, that

Page 61

1  we have honored that determination of
2  misrepresentation.
3          So it is my understanding that the
4  campuses and programs for which the prior
5  administration determined that there was
6  misrepresentation about guaranteed employment, we
7  have honored those determinations of
8  misrepresentation.
9      Q    Under this recommendation made at this
10 time, the amount of relief for these borrowers was
11 100 percent; is that your understanding?
12     A    I'm not sure.  I'm not aware what that
13 determination was.
14     Q    But when you say you're honoring the
15 decision about the misrepresentation, that is
16 separate from a decision made by the previous
17 administration about the percentage of relief; is
18 that right?
19     A    That is correct.
20     Q    But at this point, you don't recall
21 what the previous administration's decision about
22 the percentage of relief was?
23     A    I -- I -- I don't in particular.  I do
24 know that where they issued relief, that they did
25 provide 100 percent relief.

Page 62

```
1           So in the adjudication that they did,
2   it is my understanding that most, if not all, were
3   issued 100 percent relief. I haven't seen those
4   claims, but it is my understanding that among the
5   claims they completed, borrowers in those programs
6   were afforded -- you know, if not 100 percent
7   relief, the majority were. I haven't seen the
8   exact numbers.
9       Q   Okay. Now, we're going to look at what
10  is Exhibit 7 in this folder.
11          MS. O'GRADY: And we're going to mark
12  for this deposition as Exhibit 7.
13          (Jones Deposition Exhibit 7 was marked
14  for identification and attached to the
15  transcript.)
16          THE WITNESS: Okay.
17  BY MS. O'GRADY:
18      Q   Have you seen this document before,
19  and, if so, can you state for the record what it
20  is?
21      A   (Witness reviews document.)
22          You know, because so much of it is
23  redacted, it's hard for me to know if this is
24  exactly, but I -- this may have been one of the
25  documents included in the packet of documents that
```

Page 63

```
1   I reviewed for redaction. I -- I don't recall --
2   I don't recall specifically whether this was in
3   that packet, but I know it was a number of
4   documents that I had certified that what was
5   redacted was deliberative, and this may have been
6   in that packet.
7       Q   This is a memo from James Manning to
8   the secretary, May 4th, 2017, and the subject is
9   action items in borrower defense.
10      A   Uh-huh.
11      Q   Have you reviewed this document in any
12  context other than reviewing it for redaction?
13      A   Not to my recollection.
14      Q   Can you turn to the fourth page?
15      A   The fourth page of this memo?
16      Q   Yes. It's actually -- it's the last
17  page of the PDF, so I think it says four of four,
18  but it's probably five of the PDF.
19      A   I've got to get my cursor. I'm sorry.
20  I'm trying to work with two screens here, so --
21      Q   Totally understand. But it's run
22  pretty smoothly so far.
23      A   Okay. So you're looking at the actual
24  page that has the decision.
25      Q   Right.
```

Page 64

```
1           Are you familiar with this decision?
2       A   I have been told about this decision.
3       Q   In what context were you told about the
4   decision?
5       A   I -- I -- I can't -- I can't recall
6   exactly when, but at some point in time, you know,
7   early when I joined the department, you know, I --
8   I -- it may have been in the context of the
9   Manriquez decision when I asked for, you know,
10  information about what were we doing. So it may
11  have been when I asked a question about the
12  methodology. I just -- I just don't recall
13  exactly when I -- you know, was told that a
14  decision had been made. I just can't remember the
15  exact timeline.
16      Q   I just have -- I have three more
17  documents that we're spending a relatively short
18  amount of time on, and then I think we can take
19  our quick break.
20          Does that sound okay?
21      A   Sure.
22      Q   Okay. So the next one is Exhibit 8 in
23  this folder which we'll mark for this deposition
24  as Exhibit 8.
25          (Jones Deposition Exhibit 8 was marked
```

Page 65

```
1   for identification and attached to the
2   transcript.)
3       BY MS. O'GRADY:
4       Q   And, Ms. Jones, if you could just state
5   if you've seen this document before and, if so,
6   what it is?
7       A   (Witness reviews document.)
8           I believe I have seen this document
9   before. It was a memo to James Manning from Steve
10  Menashi, who was then acting general counsel,
11  through Justin Riemer, who also -- he was counsel
12  at the time. And it is their legal bases for
13  approval and discharge of pending borrower defense
14  claims for former Corinthian students qualifying
15  for approval on the grounds of job placement rate,
16  guaranteed jobs, and transfer of credit findings.
17          MR. MERRITT: I'm going to object to
18  any further questioning regarding this memo as
19  calling for privileged information. It is a
20  document which the department maintains a claim of
21  privilege.
22          MS. O'GRADY: I'll state for the record
23  that the document is publicly available as a New
24  York Times attachment.
25          MR. MERRITT: Nonetheless, there has --
```

Page 66

1    you know, the department still maintains privilege
2    as having not been subject to an authorized
3    disclosure.
4         BY MS. O'GRADY:
5         Q    Okay.  If we can look at Exhibit 9 in
6    the folder.
7         MS. O'GRADY:  And this document I'm
8    going to mark as Exhibit 9 for the deposition.
9         (Jones Deposition Exhibit 9 was marked
10   for identification and attached to the
11   transcript.)
12        BY MS. O'GRADY:
13        Q    Do you recognize this document?
14        A    (Witness reviews document.)
15             I do not recognize this document.
16        Q    The title is borrower defense unit
17   claims review protocol.  Have you ever reviewed
18   such a protocol?
19        A    I don't recall ever reviewing this
20   document.  It would have been put in place before
21   I was at the department, and I -- it is
22   possible that at some point in time, you know,
23   it -- I don't recall it.  I don't recall reviewing
24   this.
25        Q    So I don't understand you don't recall

Page 67

1    reviewing this particular one, but are there
2    borrower defense unit claims review protocols that
3    are currently in effect you would have reviewed?
4         A    The only -- the only protocol, so to
5    speak, that I was involved in is the development
6    of the new methodology for determining review.
7    So, you know, I was involved as part of a team
8    looking for a new methodology when the Northern
9    District of California enjoined the methodology
10   that had been developed in 2017.
11        Q    As a product of that work, was a
12   guidance sheet like this developed?
13        A    I don't know.
14        Q    If it had been, would you have seen it?
15        A    You know, this looks to me like it was
16   more like a standard operating procedure, and I
17   would not have reviewed a standard operating
18   procedure.  That is something that the attorneys
19   in the BD unit would have developed.  It's not a
20   policy document.  It's an operations document.
21   And, so, I -- I mean it --
22        Q    As -- I mean, as your role at -- of --
23   as your role regarding policy implementation, if
24   there was guidance provided to the unit in
25   connection with the new methodology, is that

Page 68

1    something that you would have looked at?
2         A    Only the methodology.  So there may
3    have been questions on the methodology, for
4    example, you know, do we use four-digit or
5    six-digit CIP codes to identify an occupation.
6             So policy questions would have come to
7    me.  Standard operating procedures, no.  I would
8    characterize this as a standard operating
9    procedure, and, no, that would not have come to
10   me.
11        Q    Who would it have gone to?
12        A    No, I -- I would be speculating.  I
13   mean, my guess is that it would go to the attorney
14   of the BD unit, but that's speculation on my part.
15   I don't know.
16        Q    Well, I mean, if the BD unit is giving
17   guidance to attorneys for how to review based on a
18   new methodology, who would be in charge of
19   ensuring that the protocol matched the
20   methodology?
21        A    That would be an operations decision
22   made by FSA.
23        Q    Okay.  If I could just go back to
24   Exhibit 8, and this is the memoranda from Steven
25   Menashi.

Page 69

1         MS. O'GRADY:  Charlie, are there any
2    questions I can ask on this document, or are you
3    claiming that the entire document is privileged?
4         MR. MERRITT:  I'm claiming privilege
5    over the entire document.
6         MS. O'GRADY:  Okay.  If we could take a
7    five-minute break.  Is that all right with
8    everyone?
9         THE WITNESS:  Sure.
10        MR. MERRITT:  Sure.
11        MS. O'GRADY:  Okay.
12        THE VIDEOGRAPHER:  Okay.  We're now
13   going off the record.  The time is 15:42 UTC time.
14        (Recess -- 10:42 a.m.)
15        (After recess -- 10:56 a.m.)
16        THE VIDEOGRAPHER:  We're now back on
17   the record.  The time is 15:56 UTC time.
18        BY MS. O'GRADY:
19        Q    All right.  We're going to return to
20   Exhibit 2, your declaration.  And I'd like to turn
21   to paragraph 15 which is the middle of the page
22   that is PDF page 6.
23        A    I have to figure out how to get back to
24   that document.
25             You know, before we leave this exhibit,

Page 70

1    I just want to make one point of clarification.
2    So I'm a scientist by training, so when I think of
3    methodology -- when I use the word "methodology,"
4    I'm talking about the relief methodology.  I want
5    to make it clear I'm not an attorney, so I don't
6    get involved in any protocols or methods about
7    determining evidence or reviewing evidence.
8            So when I use the term "methodology," I
9    want to be -- I want to make sure that I'm clear
10   that I'm talking about the relief methodology.  So
11   I may not have used those term -- you know, the
12   term consistently, so I just want to make sure
13   that you understand when I say methodology, I mean
14   the relief methodology.
15       Q    Understood.
16       A    Okay.  Now I'm going to go try to find
17   that document.  I am not facile with technology,
18   so --
19       Q    We've been doing pretty well today,
20   so . . .
21       A    So we are now returning to my
22   declaration.  And I found it.
23       Q    All right.
24       A    Here we are.
25       Q    So we're going to page 6 and

Page 71

1    paragraph 15.
2        A    Okay.
3        Q    And if you wouldn't mind, if you could
4    just read that paragraph 15 for the record because
5    this is what we will be discussing.
6        A    In 2017, the department conducted a
7    thorough review of its existing methods for
8    adjudicating borrower defense claims and
9    calculating relief and concluded that it did not
10   have an adequate process to handle the growing
11   list of borrower defense claims.  As a result of
12   that review, the department developed a new
13   methodology for determining the amount of relief
14   to be given to successful borrower defense
15   claimants who attended certain schools operated by
16   Corinthian Colleges.
17       Q    Okay.  And in this paragraph, what is
18   the thorough review that you're referring to?
19       A    So I can only speak to what -- what I
20   was told.  I wasn't part of this review, so I'm
21   not sure exactly what was included in the review.
22   But as I understand it, the review was to look at
23   the resources available to the department to try
24   to identify methods for evaluating financial harm.
25       Q    And was the focus of that review solely

Page 72

1    on financial harm?
2        A    I don't know.  I wasn't part of that
3    review.
4        Q    And the department developed a new
5    methodology for determining the amount of relief.
6    That new methodology is what?
7        A    As I understand it, that was the
8    methodology that was ultimately enjoined by the
9    Northern District of California.
10       Q    And that methodology, you say here,
11   determined the amount of relief to be given to
12   successful borrower defense claimants who attended
13   certain schools operated by Corinthian.  So it was
14   solely for Corinthian?
15       A    As I -- that's it -- that's how it was
16   explained to me.
17       Q    By whom?
18       A    I -- I don't recall exactly who
19   explained it to me.  Yeah, I mean there -- there
20   are -- I can't remember exactly who gave me that
21   explanation.
22       Q    So this new methodology is about the
23   amount of relief and not about -- let me put this
24   a different way.
25            We've discussed step-one and step-two

Page 73

1    determinations.  Have we used those words today?
2    Are those words that you have used when
3    discussing --
4        A    I don't believe so.
5        Q    -- relief methodology?
6        A    I don't know what you mean by step one
7    and step two.  I think I've talked about, you
8    know, the relief methodology.  That's the part I
9    know about.
10           MR. MERRITT:  I don't believe we've
11   used those terms today.
12           MS. O'GRADY:  All right.  You're right.
13   BY MS. O'GRADY:
14       Q    I think I -- let's actually go to --
15   back out to the main exhibit folder.  We're going
16   to go to ECF number 56-4, Nevin declaration.
17           MR. MERRITT:  And do you mean the
18   second one that's only Nevin declaration as
19   opposed to the one that says Exhibit 20?
20           MS. O'GRADY:  Yes.  Thanks for
21   clarifying.
22           THE WITNESS:  Now I'm having trouble
23   getting back.  Give me a second here.
24           So you're looking at ECF -- oh, shoot.
25   There's number 66.  Let me see if I can get back.

Page 74

1          MR. MERRITT:  Yeah, you should be able
2    to go back like a folder -- jump back a folder.
3          THE WITNESS:  Okay.
4          MR. MERRITT:  To the one's that
5    called -- well, I don't know what you named yours.
6    Mine was called Jones deposition exhibits.
7          THE WITNESS:  And what document am I
8    looking for?  Oh, I think I see it, ECF number
9    56-4.
10   BY MS. O'GRADY:
11       Q    Yes.  And it says Nevin Declaration.
12         MR. MERRITT:  So to clarify, Diane,
13   it's the second one on the list, because there's
14   also one on top of it that also is called ECF
15   56-4, but it's, like, Exhibit 20.  So it's the
16   second one in alphabetical answer.
17         THE WITNESS:  Yep.  Okay.  I have that
18   open right now.
19   BY MS. O'GRADY:
20       Q    And this one, Ms. Jones, you said
21   that -- is this the document -- the Nevin
22   declaration that you had reviewed in advance of
23   today's deposition?
24       A    This looks like the document I
25   reviewed.

Page 75

1          Q    And if you would just give me one
2    second to find what page we're going to go to.
3          My apologies.  I actually -- we are
4    going to use this document, but not right now.
5          A    Okay.
6          Q    I apologize for that.
7          If you can go back to your declaration,
8    and if you we could look at paragraph 24, and that
9    is at the very bottom of page 9.
10       A    Yes.
11       Q    So in this paragraph, if you wouldn't
12   mind reading it out loud for the record, this is
13   why I was using that step-one, step-two --
14       A    Okay.
15       Q    -- language.  So if you wouldn't mind
16   reading out loud paragraph 24 there.
17       A    The department's consideration of a
18   borrower's application for a borrower defense
19   discharge includes two steps.  Step number one, a
20   determination of whether the borrower has
21   submitted a borrower defense claim supported by
22   evidence submitted by the borrower or otherwise
23   available to the department in accordance with the
24   applicable standard.  And if -- I'm sorry.  I have
25   to scroll down.

Page 76

1          And if the borrower satisfied the first
2    step, then number two is a determination of the
3    amount of relief that the borrower should receive.
4          Q    So here is that step-one, step-two
5    classification.  My question was when we were just
6    looking at paragraph 15 and discussing the new
7    methodology for determining the amount of relief,
8    is that solely step two that you refer to in
9    paragraph 24?
10       A    So I don't know about the methodology
11   in total because I wasn't involved in the
12   development, but the element of that methodology,
13   that 27 methodology on which I have been briefed
14   would be committed to step two.
15         So it may have been that the
16   methodology involves, you know, steps beyond step
17   two, but the part that I was briefed on and
18   under-- you know, that I know was put in place
19   is step two.
20       Q    Who would know if there was more to it
21   than the changes for step two?
22       A    The -- the people who wrote that policy
23   document.
24       Q    And which policy document is that?
25       A    So I think you just showed me a

Page 77

1    document earlier that involves Steve Menashi and
2    Justin Riemer and James Manning.  I would assume
3    that one of those individuals would know.
4          Q    So your sole involvement with the new
5    methodology that you identify in paragraph 15 is
6    as it related to the amount of relief for
7    Corinthian borrowers?
8          A    Ultimately I became involved in the
9    determination of a relief methodology for all --
10   all borrowers, all future claimants.  So they --
11   my involvement was of a methodology that would go
12   beyond Corinthian borrowers, but it was limited to
13   the relief methodology.
14       Q    So were you ever involved in developing
15   a methodology regarding step one?
16       A    I -- I don't ever being in a
17   conversation about step one.  You know, again, I'm
18   not an attorney, so I don't know how you look at
19   evidence.  So I just don't recall ever being in a
20   conversation about step one.
21       Q    So you don't recall in your role ever
22   having a conversation about how to decide the
23   merits of a borrower defense application?
24       A    No, not to my recollection.  No.
25       Q    So your understanding right now, what

Page 78

1  methodology is in place to determine whether or
2  not a borrower defense application is
3  successful -- that is, what methodology governs
4  step one?
5      A    Our attorneys in the borrower defense
6  unit under Colleen Nevin's direction evaluate the
7  evidence and make that determination.
8      Q    When you're involved in the rule-making
9  process, did that ever involve step-one
10 determinations?
11     A    Do you mean in the development of the
12 2019 regulation?
13     Q    Yeah.
14     A    So again, those conversations focused
15 on the evidentiary standard, and there was a
16 conversation about the use of the preponderance of
17 evidence versus -- I can't remember what the
18 higher standard was called, but you would know
19 this.  There's a higher standard above
20 preponderance, and I believe in our proposed rule,
21 we put the proposal out using the higher standard,
22 but based on public comments that we got, we
23 ultimately went with the preponderance of evidence
24 standard because that was the standard in the 2016
25 reg.

Page 79

1      Q    So you've been involved in the policy
2  regarding step-two determinations.  How -- how do
3  you know when a step-two determination is needed?
4  I mean, you have to go through step one first;
5  right?
6      A    Right.  But I don't make the
7  determination on a particular borrower's claim
8  even with regard to relief.  My role is to develop
9  a methodology that FSA can employ consistently to
10 determine that relief, but I don't look at any
11 particular claim even on a step-two basis.
12     Q    Okay.  So I guess I'm not asking about
13 particular claims, though.  My question is if
14 you're only doing with step two in your role and
15 have never even had a conversation about policy
16 regarding step one, that means, then, you're only
17 dealing with granted applications; is that right?
18     A    The relief -- the relief methodology
19 would -- would apply to granted applications and
20 with -- with one exception which is that in the
21 case of Corinthian, I believe the 2017 methodology
22 included a minimum guarantee of percent relief, so
23 that was a -- that was a conversation in which I
24 was not involved, and I don't know exactly to whom
25 that applies.

Page 80

1      So I -- I know that there was one group
2  of borrowers for whom there was this base
3  guarantee of 10 percent, so I don't know whether
4  you would -- I don't know how to characterize
5  that.  But in the new methodology, it was -- it
6  was limited only to those borrowers who the
7  attorneys would have deemed eligible for relief.
8      Q    So if you were in charge of policy but
9  only step two, who was in charge of the policy
10 regarding who gets denied?  Because in order to
11 get to step two, you have to have been granted
12 borrower defense relief; right?
13     A    Right.  I mean, Colleen Nevin is the
14 attorney in charge of the BD unit.  She has
15 decision-making power about which claims are, you
16 know, based on the merit of the review to
17 determine whether borrowers are eligible or
18 ineligible, so the determination of eligible and
19 ineligible would be made by Colleen Nevin and her
20 team of attorneys.
21     Q    And who advises Colleen Nevin about how
22 to implement Department of Education policy
23 regarding the merits of the applications?
24     A    I don't believe she's advised.  I
25 believe that she's an attorney who we trust

Page 81

1  understands how to review evidence and make a
2  determination.
3      I -- I -- I don't think anybody advises
4  her on how to review evidence.  I mean, I think
5  that's why we hire attorneys and that --
6      Q    I guess I'm trying to parse out the
7  notion of reviewing evidence as a lawyer and
8  setting policy, and my understanding is your job
9  has been to set policy.
10     A    That's correct.
11     Q    But you have not ever set policy or had
12 a conversation about the policy regarding deciding
13 the application in step one?
14     A    I've never been involved in deciding on
15 a particular application in step one whether a
16 borrower was eligible or ineligible.
17     However, in the process of finalizing
18 the 2019 regs, I was involved in conversations
19 about preponderance of evidence versus whatever
20 that other standard is.  I was involved in
21 conversations about whether or not breach of
22 contract would be included in the 2019 reg.  I was
23 involved in conversations about how we would look
24 at lawsuits brought against a school versus
25 determining judgments on the merits.

Page 82

1        So at a high level in developing the
2   2019 reg, you know, I was involved in
3   conversations about, you know, that kind of
4   evidence; in other words, whether there's breach
5   of contract evidence. But that doesn't mean I
6   know how to --
7        Q    Right. Right. Yeah. I mean, I know
8   you're not an attorney looking at them in that
9   way.
10            I guess who has final authority to sign
11   off on a borrower defense denial or grant, step
12   one?
13       A    Colleen Nevin or her -- I don't know
14   whether she delegates that to attorneys in her
15   group, but ultimately those attorneys report to
16   her. She has final say on the determination.
17       Q    And no one else reviews that
18   determination?
19       A    I don't know what her process is. I
20   don't know who is involved in her process. But
21   I -- but I know that she makes -- she and her team
22   of attorneys make that determination.
23       Q    And do you know if they have any
24   guidance documents that tell them how to make that
25   determination?

Page 83

1        A    I don't know.
2        Q    So in the memos we looked at before --
3   just give me one moment. I have to grab my
4   exhibits, too.
5            Well, we can take the . . .
6        A    I do want to clarify. So you asked me
7   the question about have I ever been involved in
8   conversations. I did just remember a conversation
9   that I want to make sure I share, and that is at
10   one point, you know, I -- I asked Colleen and her
11   team where they were in the process of reviewing
12   evidence for ITT Tech, and they told me that they
13   had a million pages to review. So we did have a
14   conversation where they told me they had a million
15   pages of evidence to review, and my answer was,
16   oh, okay.
17       Q    Okay. So that's the only conversation
18   you've ever had with anyone about step-one
19   determinations?
20       A    Right. Right. At a very high level,
21   you know, how far are you in processing -- in
22   reviewing the evidence --
23       Q    Okay.
24       A    -- on that. Yeah.
25       Q    So it's my -- so I just wanted to go

Page 84

1   back to Exhibit 7 for this deposition, which is --
2   you may not even have to look at. It's the one
3   where their recommendation has been given for --
4   it's heavily redacted. It's from James Manning to
5   the Secretary, May 4th, 2017, and the Secretary
6   signs the granting of the borrower defense.
7            So -- so that -- would you consider
8   this a step-one or a step-two determination, this
9   memorandum?
10       A    You know, there's so much redacted in
11   it that I'm not sure exactly what the content of
12   that memo was. So I -- I can't -- I can't say
13   what she signed off on because I don't remember
14   what -- you know, I don't know if I've seen the
15   unredacted form. Let me see if I can pull it back
16   up and . . .
17            (Witness reviews document.)
18            Okay. I've pulled it --
19       Q    Well, I guess -- I can ask a broader
20   question which is it -- your understanding that
21   Colleen Nevin is the sole authority to sign off on
22   whether a borrower is denied or granted their
23   application, has that always been the case?
24            MR. MERRITT: Objection as to
25   characterization of her prior statement.

Page 85

1   BY MS. O'GRADY:
2        Q    Okay. Please correct me if I
3   mischaracterized your prior statement.
4            Could you say it -- could you state
5   that again?
6        Q    So who currently has the authority to
7   sign off on step-one determinations?
8        A    It -- it is my understanding that
9   Colleen Nevin and her group made that decision.
10   I -- I don't know how she delegates authority
11   within that group. I don't know that she
12   personally signs off on every decision.
13       Q    So she could delegate to someone to
14   sign off on the decision?
15       A    She has a team of attorneys, and it's
16   possible that she has delegated. I just don't
17   know.
18       Q    Is it your understanding that that
19   has -- how long has that been the case where
20   Colleen or the person in Colleen's position has
21   the authority to sign off on granting or
22   borrowing?
23       A    I don't know the answer to that
24   question. I'm not aware of the different
25   circumstance, but that doesn't mean it doesn't

Page 86

1    exist.  I just know of the circumstance -- of the
2    circumstance I'm aware of, she has that authority,
3    but I don't know if there were different
4    circumstances earlier.  I just don't know.
5         Q    And -- and to just -- I -- I think I
6    may have asked this again, but I just want to make
7    sure I'm clear on it.
8              What policies guide Ms. Nevin's
9    decisions?
10        A    So the policies that guide her
11   decisions are the '95 regs, the 2016 regs and the
12   2019 regs.  So, for example, a policy had to be
13   established regarding which state standard would
14   be used to evaluate claims.  Now, I don't have the
15   expertise to be able to review the state standards
16   in different states to understand which one should
17   be implied, and so I did ask Colleen to work with
18   our Office of General Counsel to develop a policy
19   for determining which state standard to use.
20             Now --
21        Q    Did they develop that policy?
22             MR. MERRITT:  Objection.  It's calling
23   for privileged information.
24             MS. O'GRADY:  I just wanted to know if
25   the policy was ever completed.

Page 87

1              MR. MERRITT:  Go ahead, Diane.
2              THE WITNESS:  I actually don't know.
3    BY MS. O'GRADY:
4         Q    So you've never seen it?
5         A    I've never seen it.  So I'm not -- you
6    know, I -- I gave the instruction that it needed
7    to be done, but I don't have the expertise to
8    review it.
9         Q    When did you give the instruction that
10   it needed to be done?
11        A    I believe when Colleen notified me that
12   they were ready to start reviewing evidence for
13   ITT claims, and at that point I said, well, then I
14   think we need to figure out, you know, under which
15   state standard will you be evaluating those
16   claims.
17             So I can't remember the exact date, but
18   it was when she said they were getting ready to
19   review those documents and I said, you know, there
20   has to be a policy for under which state standard.
21        Q    Was it a conversation, or did you write
22   her an email or a memo instructing her to do that?
23        A    I remember that we had a conversation.
24   There -- there may have been an email where I
25   asked her if we had determined what it was.

Page 88

1         Q    Okay.  And you said this was around
2    when they were reviewing evidence for ITT.  Was
3    this the same question when she said -- I think
4    you said, you know, there were millions of
5    documents they had to review?
6         A    Yes.
7         Q    Okay.  So this is that one
8    conversation.
9         A    Yes.
10        Q    About what month and year was this?
11        A    It was before Covid, I know, because
12   the conversation took place in my office.
13        Q    Okay.  Even if you just have an
14   approximate range?
15        A    You know, I'm going to have to think
16   about it.  I just can't remember the timeline, but
17   I know it was prior to Covid.  And -- and it is my
18   understanding that they have determined a policy
19   on a -- to identify the state standard.
20        Q    Okay.
21        A    But it involves understanding -- so you
22   know this better that I do.  Different states have
23   different laws about --
24        Q    Right.
25        A    -- what they have for eminent domain.

Page 89

1    I don't know what the right word is.  So I do know
2    Colleen that has come to a decision about how to
3    identify the state standard.  I -- I just -- you
4    know, I -- I can't -- I can't -- I don't know how
5    to evaluate --
6         Q    Sure.
7         A    -- it, so --
8         Q    So you think that she has some sort of
9    memorandum that memorializes which state standard
10   to use at this point?
11        A    I don't know if there's a memorandum,
12   but I do believe that she has determined a way for
13   identifying which state standard to use.
14        Q    Okay.  And that's -- that's the extent
15   you know?  You don't know if it -- it's written
16   down by her anywhere or has been disseminated to
17   her team at all?
18        A    I -- I don't know.
19        Q    Okay.  When you asked her to develop
20   that state standard, why was that important to do
21   at the time?
22        A    It was important because I -- I don't
23   know how state standards work, but it's my
24   understanding that different states have different
25   laws regarding, you know, matters relevant to our

Page 90

1  defense claims.  Consumer protection law I guess
2  is how I would phrase it because I don't know the
3  names of the laws.
4         But it is my understanding that
5  different states have different laws, and when
6  we -- you know, when she told me that she was
7  ready to start looking at evidence for ITT Tech,
8  understanding that they had campuses across the
9  country in multiple states, my question to her was
10 how are you going to figure out -- for loans taken
11 prior to July 1, 2017, how are you going to figure
12 out which state law you're going to use.
13      Q    And previous to giving her this
14 instruction to develop a 50-state -- or develop a
15 state standard policy, what was your understanding
16 of what state standard she'd been using?
17      A    It was my understanding that in the
18 case of Corinthian, they had decided to use the
19 California state law standard.  Corinthian is
20 headquartered in California.
21         So my question to her was, well, ITT is
22 headquartered in Indiana, does that mean you'll
23 use an Indiana state law standard or will you
24 continue to use the California state law standard,
25 and -- and -- and it took -- and that's when --

Page 91

1  you know, there wasn't an answer for that one.
2         So I said, well, I think as a matter of
3  policy, we have to figure out how are you going to
4  determine which state law standard you use.  It
5  becomes very easy for loans after July 1, 2017,
6  but for earlier loans, A, to determine which state
7  standard, and B, to make sure that borrowers and
8  schools would know under which state standard they
9  were evaluated.
10      Q    So part of the reason you gave her this
11 instruction, if I understand what you just said,
12 is so that -- one of the reasons is that a
13 borrower who receives a determination about their
14 application would know which state standard had
15 been used?
16      A    And -- and the school.
17      Q    And the school who's receiving
18 information about the application?
19      A    That's correct.
20      Q    Okay.
21         MS. O'GRADY:  It's 11:28 by my count.
22 And I think, Ms. Jones, you have an obligation
23 from 11:30 to noon; do I have that right?
24         THE WITNESS:  My calendar has been
25 cleared, so we can go until a regular lunchtime.

Page 92

1  That's fine with me.
2         MS. O'GRADY:  Okay.  All right.  Let's
3  continue, then.
4     BY MS. O'GRADY:
5      Q    So you had said that -- you had said
6  that one of the -- one of the reasons you need to
7  know the state law standard is to inform the
8  school about what standard has been used.
9         Is that true under the '95 regulations
10 and the 2016 and the 2019 in your understanding?
11      A    It is not.  Under the 2016 and 2019
12 regulations, it's a federal standard.  So the
13 issue of which state goes away.  So it is only for
14 claims adjudicated under the '95 regulations that
15 the state standard is an important determination.
16      Q    And is it your understanding that under
17 the 1995 regulations, a school must be alerted
18 about the borrower defense application?
19      A    I am not -- I honestly don't know
20 whether or not the '95 regulation requires that.
21      Q    Okay.  All right.
22      A    Let me -- let me make a clarifying
23 statement.
24         However, the way the 2016 regulation
25 was written, it is applied retroactively.  So it

Page 93

1  depends on when you're asking the question, but
2  once the 2016 regulation was in place, many of the
3  requirements, such as notification of the school,
4  then applied to the loans being adjudicated under
5  the '95 regs.
6         So prior to the 2016 reg, I honestly --
7  I just can't -- I don't think we had detailed
8  enough regulations to say one way or the other
9  prior to '95, but I would have to go back and look
10 at that reg.  But then once the 2016 reg went into
11 effect, it then had requirements that applied to
12 loans that were otherwise considered under the '95
13 reg.
14      Q    So we're going to go back to Exhibit 2,
15 your declaration.
16      A    Uh-huh.
17      Q    And we had just been talking about
18 paragraph 15 on the bottom of page 6.  Okay.  And
19 now I want to move on to the middle of page 7
20 which is paragraph 17.  And in the middle of that
21 paragraph, you write, The court enjoined the
22 department from using that methodology as it
23 currently existed to the extent that the secretary
24 relies upon information provided by the Social
25 Security Administration in violation of the

Page 94

1   Privacy Act.
2           So what was your understanding at the
3   time that you wrote this of what the court in
4   Calvillo Manriquez prevented the Department of
5   Education from doing?
6       A    It's my understanding that the court
7   prevented the Department of Education, that it
8   enjoined our methodology which at the time relied
9   on earnings data from the Social Security
10  Administration.  It is my understanding that the
11  court had concerns about potential violation of
12  the Privacy Act in using Social Security data for
13  this purpose.  And it is my understanding that
14  that methodology was enjoined.
15      Q    And was enjoined as to whom?
16      A    That particular ruling would have
17  applied to the class of borrowers that we refer to
18  as the Manriquez class.  There were a group of
19  borrowers.  I do not recall how many.
20          So the particular ruling was related to
21  those borrowers, but the methodology would have
22  been employed by the department otherwise to --
23  you know, to -- to the larger pool of borrowers.
24      Q    Okay.  So the methodology that you
25  describe in paragraph 15 was not just for those

Page 95

1   who attended certain schools operated by
2   Corinthian, but for all borrowers?
3       A    So I -- the answer to your question is
4   I don't know.  It was communicated to me as the
5   methodology that was developed for Corinthian
6   borrowers.  I don't know when it was developed
7   what the intent was for its long-term use.  I -- I
8   don't know.
9       Q    What was your -- what was your role
10  regarding this methodology?  What was your
11  involvement?
12          MR. MERRITT:  Objection.  It's
13  ambiguous.
14          BY MS. O'GRADY:
15      Q    In your role, were you tasked with
16  applying -- of setting policy that applied this
17  methodology to step-two determinations?
18      A    Are you asking me about the 2017
19  methodology?
20      Q    I'm asking you about the methodology
21  that you discuss in paragraph 15, which is what
22  was made after the department conducted a thorough
23  review of its existing methods and developed a new
24  methodology for Corinthian students?
25      A    I believe that paragraph 15 refers to

Page 96

1   the 2017 methodology.  I had no involvement
2   whatsoever in its development or application.
3       Q    So let's go to paragraph 18.  If you
4   want to just read that out loud for the record?
5       A    The department appealed the district
6   court's decision in Manriquez and still waiting
7   for a decision from the appellate court.  In the
8   meantime, the department has undertaken
9   significant efforts to explore and develop an
10  alternative approach for determining the amount of
11  relief to be given not just to Corinthian
12  borrowers, but to all borrowers with approved
13  borrower defense claims.
14      Q    Okay.  So were you involved with the
15  efforts to explore and develop an alternative
16  approach?
17      A    I was.
18      Q    Okay.  And what was the goal of that
19  alternative approach?
20      A    The goal was, you know, should the --
21  should the District Court of Northern California
22  determine that the methodology already in place
23  was one that we could not use but there would be
24  an alternative methodology that we could use for
25  part two, for step two.

Page 97

1       Q    And I think my question was were you
2   involved in developing this.  Did you lead the
3   development of this effort?
4       A    It was -- it was a group that was
5   involved, and I was part of that group.
6       Q    And who was in that group?
7       A    That group included myself, Michael
8   Brickman from my team; Jeff Appel, who was at FSA
9   and who is sadly now deceased.  Ian Foss, who was
10  at Federal Student Aid.  Then there were others
11  who came in and out of discussions.  We had, you
12  know, representatives from the Office of General
13  Counsel who were involved in some meetings.  You
14  know, there were conversations with our different
15  statistical offices.
16          So other people were brought into the
17  conversation, but I'd say the main working group
18  was, you know, myself, Michael, Jeff Appel, Ian
19  and probably Robin Minor was involved.
20      Q    Did you have regular meetings?
21      A    I can't recall whether it was a
22  regularly scheduled meeting, but we had many
23  meetings.
24      Q    When did this -- when did this effort
25  to explore and develop an alternative approach --

Page 98

1  when did that begin?
2      A    I think the group convened to start the
3  formal discussion somewhere in the neighborhood of
4  April, May, June of 2019.  I'd have to go back and
5  look, but I think it was sometime in the spring of
6  2019.
7      Q    And was the secretary involved in these
8  discussions?
9      A    No.
10     Q    Whose idea was it to make significant
11 efforts to explore and develop an alternative
12 approach?
13     A    I think that, you know, Mark Brown had
14 taken his new role and was concerned that we had
15 still not gotten clarity from the Northern
16 District of California, and he raised this issue
17 with me, and I shared his concern that enough time
18 had passed that it was time for us to start
19 thinking about an alternative methodology.
20         The -- the other thing that prompted
21 that is eventually I was told that the Social
22 Security Administration would not be continuing
23 the memorandum of understanding to provide future
24 earnings data.  And, so, that also, you know,
25 triggered in my mind that we -- we did need to

Page 99

1  come up with a new methodology that didn't rely on
2  social security data because while the court would
3  determine for current borrowers, you know, whether
4  they were going to approve the methodology, moving
5  forward I knew we would not have access to social
6  security data.
7      Q    And just to clarify, the methodology
8  we're talking about again is just about the amount
9  of relief, so a step-two determination; correct?
10     A    That is correct.
11     Q    So as this is all going on, Ms. Nevin
12 is continuing her determinations of denial or
13 grants on the merits?
14     A    I don't supervise Colleen directly, and
15 so I can only speculate.  I -- I don't know --
16     Q    Okay.  So you don't know whether
17 step-one determinations are being made at this
18 point because your methodology is just about step
19 two?
20     A    That is correct.
21     Q    And while this -- while your
22 development of this new methodology regarding step
23 two is going on, you weren't having conversations
24 with Colleen or anyone else about step-one
25 determinations; is that right?

Page 100
Page

1      A    I -- I don't believe our conversation
2  about state law standard was taking place during
3  this time period.  No, I think that conversation
4  about the state law standard was subsequent to the
5  development of the step-two methodology.
6      Q    And you've said that was your only
7  conversation with anyone about step one, so there
8  would be no other.
9      A    Right.  I mean, I got reports on
10 numbers -- you know, numbers of claims that were
11 pending, but, you know, it was just a -- you know,
12 a high level number.
13     Q    You got reports on, okay, numbers of
14 borrower defense claims that were pending, so
15 borrower defense claims that were awaiting a
16 step-one determination?
17     A    Early on, I don't even -- early on, I
18 think the reports were just simply, you know, how
19 many claims we have gotten, yes, and how many
20 claims are pending.  I don't know that I would
21 have known a percentage of them were in process.
22 You know, early on, it was just that this is the
23 number.
24     Q    Did you receive information or reports
25 about claims that had a step-one determination and

Page 101
Page

1  were awaiting a step-two determination?
2      A    Later on, after the methodology had
3  been approved and it was being applied, we -- we
4  did start getting updates on, you know, how
5  many -- how many claims were under review under
6  the part-one review.  So that was much later.
7  Like I said, after the methodology had been
8  approved, then I did start getting reports on, you
9  know, total number of claims, number of claims
10 being -- we use the term adjudicated to mean the
11 determination of the merit.
12     Q    So before the methodology was
13 completed, you were not receiving reports about
14 any adjudications occurring?
15     A    Well, you know, again, there -- we --
16 you know, we -- adjudication is different than
17 processing, meaning notifications.
18     Q    So "adjudication" to you means
19 notifying a student of the decision?
20     A    No, adjudication to me means the
21 attorney is reviewing the evidence to determine if
22 there was merit.
23     Q    Okay.  So adjudication is reviewing a
24 step one.
25         So what's processing?

Page 102
Page

1      A    Well, I didn't invent the terminology,
2   but the terminology as I understand it is that
3   adjudication is step one, reviewing the merit.
4   Step two is the determination of relief.  And then
5   when that is done, the borrower is notified.
6      Q    Okay.  So processing is not a term of
7   art, then?  It goes adjudication, decision
8   notification.
9      A    I think FSA uses the term "processing"
10  to mean the notification of the borrower.
11     Q    Okay.  Now, with this step-one,
12  step-two division, if a claim in step one is
13  adjudicated as denied, step two is not necessary;
14  is that right?
15     A    I -- I don't recall exactly how the
16  10 percent decision is applied to Corinthian, so I
17  can't answer the question there.
18     Q    Taking that aside.
19     A    Outside of that group, I -- I wouldn't
20  imagine that if they're ineligible you'd have to
21  do a determination, so I would imagine that step
22  two the sep- -- it would be separate.
23     Q    So in your role, you've only ever had
24  involvement with grants of borrower defense
25  applications; is that right?

Page 103
Page

1      A    I'm not involved in granting any
2   borrower defense applications.  My role has been
3   around the policy for the regulations and the
4   methodology for determination of relief.
5      Q    Okay.  So my question is the
6   methodology for determination of relief is solely
7   about the percentage of relief once an application
8   has been granted; it doesn't involve a denied
9   application?
10     A    That is correct, you know, with this
11  carve-out for this 10 percent Corinthian.
12     Q    Okay.  In paragraph 25, I want to just
13  read the first sentence of that paragraph for the
14  record.  It's a little bit long.
15     A    Sure.
16          As explained in other declarations
17  submitted as part of this administrative record,
18  the department has continued to adjudicate claims
19  since the injunction was issued in Manriquez,
20  consistent with that injunction, including making
21  step-one determinations that some borrowers have
22  established a successful borrower defense in
23  accordance with the applicable standard.
24     Q    Okay.  So this is -- here you say that
25  claims -- this was written in November.  So as of

Page 104
Page

1   November 2019, step-one determinations were being
2   made pending the development of the new partial
3   relief methodology; is that right?
4      A    That's what I've been told.  I mean, I
5   don't have supervision over that unit, so it
6   was -- I guess you could say I'm speculating here,
7   but that is the information I was provided.
8      Q    And, again, by whom?
9      A    It would either -- you know, I -- I
10  am -- I'm sure Mark Brown would have given me that
11  information, but I may have also gotten it from
12  Colleen Nevin in a meeting.
13     Q    Okay.  And the second part of this
14  sentence is, you know, determinations that some
15  borrowers established successful borrower defense
16  in accordance with the applicable standard, and
17  that standard is the standard governing step-one
18  determinations; right?
19     A    That is correct.
20     Q    Okay.  I think -- we've talked a lot
21  about your lack of involvement with that standard?
22     A    Right.
23     Q    I -- I just want to understand your
24  role.  Is there a reason that you have had no
25  involvement in step one?

Page 105
Page

1      A    I -- I think there are two reasons.
2   One is I'm not an attorney.  I -- I have no
3   expertise or professional experience or ability to
4   evaluate evidence.  I just don't.  So I think, you
5   know -- so one of the reasons is that, you know,
6   I'm not an attorney.
7           But the second reason is that the --
8   the legislation that establishes federal student
9   aid as a performance-based organization makes very
10  clear the division between policy and operations.
11  And with the borrower defense unit residing in
12  FSA, those are operational decisions.  The -- the
13  application of a regulation is FSA's decision to
14  make, right.  So when there is a policy question
15  about that, I get involved; but outside of the
16  policy questions, you know, they are a
17  semi-autonomous unit, so not only --
18     Q    So what --
19     A    -- (indiscernible) experience, you
20  know, that would be crossing the separation of
21  labor.
22     Q    I want to understand, though, how --
23  how do you determine what is a policy question
24  that would be appropriate for you to weigh in on?
25     A    You know, I -- it's hard to give a

Page 106

1   general rule, right, because policy -- it depends,
2   right.  So the answer is it depends.  But I think
3   the place that maybe best described this is that
4   policy are questions about regulations versus what
5   the BD unit which is making decisions about an
6   individual borrower's application.
7        Q    So in your understanding, there is no
8   policy to govern step-one determinations; there's
9   only an individual attorney-driven adjudication of
10  evidence?
11            And I do not want to put words in your
12  mouth.  I want to understand.
13       A    No, I mean, I think the -- the policy
14  question on step one, as I, you know, explained
15  earlier, was which state standard, right.  So, you
16  know, I think we needed a general policy about how
17  do you figure out which state standard to use.
18            Now, I'm not the one who issued that
19  policy, but, for example, do you use the state
20  where the company is located?  Do you use the
21  state where the campus is located?  Do you use the
22  state where the borrower is located?
23       Q    So your understanding is the only
24  policy question with regard to adjudicating
25  borrower defense applications is which state

Page 107

1   standard to use?
2        A    Outside of the regulatory questions
3   about whether or not breach of contract is
4   considered, right.  So we have the high-level
5   policy decisions defining misrepresentation, and
6   obviously I'm involved in creating the 2019
7   regulation which sets forth a definition of
8   misrepresentation.
9            But when it comes to determining for an
10  individual borrower whether misrepresentation
11  occurred, that's not a policy decision beyond the
12  regulatory requirement that the definition of
13  misrepresentation be applied.
14       Q    I want to go back to your statement
15  about it being performance based and you being in
16  operations.
17            Can you clarify that for me and just
18  explain what you meant by that for me a little bit
19  more?
20       A    Sure.  Because FSA is a
21  performance-based organization, they have
22  different hiring authority; they have different
23  contracting authority; and they have a different
24  pay scale.  Senior leaders at FSA get bonuses.
25  The COO, the chief operating officer, has the

Page 108

1   potential to be the highest paid employee at the
2   department because of the bonus structure, and
3   when Congress created the PBO, which I believe was
4   in 1998, they felt as though FSA as a PBO had to
5   be held accountable for their performance and
6   therefore had to have semi-autonomous operational
7   control.
8            But Congress did not want them to be
9   the policy or the regulatory body, and Congress
10  assigned that role to the department.
11       Q    So it's your understanding of that
12  structure -- I hear you saying that that structure
13  determines in part your ability to involve
14  yourself in step-one determinations; is that
15  right?
16       A    Well, I mean, I think it's twofold;
17  right?  I mean, one that is an operational
18  protocol, so I would not be involved because under
19  the way we are managing FSA, I -- I don't get
20  involved in day-to-day operation decisions.  But
21  even if we did, I personally couldn't because I'm
22  not an attorney.
23       Q    Okay.  So what's the difference,
24  though, between step one and step two?
25       A    The difference between step one is it's

Page 109

1   the evaluation of legal evidence to make a legal
2   determination of whether misrepresentation
3   occurred.  That is very different than the policy
4   which defines misrepresentation in regulations.
5        Q    Right.
6            I suppose I'm getting at so the policy
7   that defines misrepresentation in regulations and
8   the policy that sets a schedule for determining,
9   you know, a percentage of relief borrowers on the
10  whole will be getting, why is your role different
11  with respects to step one and step two?
12       A    Well, again in step two, I am not
13  making the determination for any particular
14  borrower about what level of relief they're
15  getting.  All I'm trying to do is in the same way
16  that a policy process defined misrepresentation, I
17  was involved in a policy process to define
18  financial harm.  And then the BD unit applies that
19  definition.
20            So I think you could look at what I
21  refer to as the methodology as the policy
22  definition of what constitutes financial harm.  So
23  the policy is set at a very high level.  This is
24  how we define financial harm, but it's the BD unit
25  that applies it to any particular borrower.

Page 110
Page

1    Q    And why isn't it the case with step one
2  that policy would be set on --
3    A    Policy was set in establishing the
4  definition of misrepresentation.
5    Q    And that's the extent of your
6  involvement with that?
7    A    That is the extent of my involvement is
8  in defining misrepresentation in the 2019 regs.
9  Granted, I was not involved in defining
10 misrepresentation in the 2016 regs or the 1995
11 regs, but I was involved in defining
12 misrepresentation for the 2019 regs.
13       MS. O'GRADY:  Okay.  If we can go to
14 another exhibit.  This will be -- if I could just
15 ask the court reporter, Dana, did I actually mark
16 Exhibit 10 or did I not?  I'm hoping that I did
17 not, but just let me know either way.
18       THE COURT REPORTER:  Can you hear me?
19       MS. O'GRADY:  Now I can.
20       THE COURT REPORTER:  Okay.  Just give
21 me just a second.  I separated files, so I've got
22 to go into the last file.
23       MS. O'GRADY:  By my count, I'm now up
24 to Exhibit 10 because we didn't actually talk
25 about the Nevin declaration.  But if I'm wrong

Page 111
Page

1  about that and it's Exhibit 11, that's fine.  Just
2  please let me know so I don't mess up the
3  numbering.
4        THE COURT REPORTER:  I have 9 as the
5  last one you marked.
6        MS. O'GRADY:  I can tell you which
7  document we're going to open.  It's a PDF in the
8  main folder, Hearing Examining For-Profit College
9  Oversight.
10       THE COURT REPORTER:  I'm sorry, Maggie.
11 Nine is the last one you marked.  Ten is next.
12       Could you hear me then?
13       MS. O'GRADY:  No.  If you could just
14 tell me if the next exhibit is 10 or 11?
15       I see it in the chat.  Thank you.
16       So this exhibit will be Exhibit 10 for
17 this deposition.
18       (Jones Deposition Exhibit 10 was marked
19 for identification and attached to the
20 transcript.)
21       BY MS. O'GRADY:
22    Q    And, Ms. Jones, do you recognize this
23 document?
24    A    Sorry.  I had to get my cursor over to
25 my microphone.

Page 112
Page

1    Q    No problem.
2    A    Yes, this looks like the transcript of
3  my hearing before the House Oversight Committee.
4    Q    Okay.  And who prepared you for this
5  testimony?
6        MR. MERRITT:  Objection to the scope.
7        BY MS. O'GRADY:
8    Q    I believe you can still answer.
9        MR. MERRITT:  Okay.  Go ahead for now.
10       THE WITNESS:  Largely I prepared myself
11 for the hearing, but, you know, there were
12 meetings with, you know, attorneys in the Office
13 of General Counsel.  And -- and certainly people
14 on my team, you know, helped me pull documents to
15 review.
16       BY MS. O'GRADY:
17    Q    Okay.  And what kind of documents did
18 you review?
19       MR. MERRITT:  Objection as to calling
20 for privileged information as well.
21       BY MS. O'GRADY:
22    Q    I certainly don't want any privileged
23 information, but if there were members of your
24 team who were not lawyers that you worked with or
25 to the extent you prepared yourself by reviewing

Page 113
Page

1  previous memoranda, I'd like to know what those
2  were.
3    A    Well, this is a totally different
4  matter.  This has nothing to do with borrower
5  defense.
6    Q    Well, I believe -- I believe some does.
7  We can go to that.  But did -- I take from your
8  answer you mean you did not review any documents
9  about borrower defense in preparation for this
10 testimony?
11       MR. MERRITT:  Again, objection.  It's
12 calling for privileged company.
13       MS. O'GRADY:  That's fine.  I'll move
14 on.
15       BY MS. O'GRADY:
16    Q    I want to talk about your exchange with
17 Congresswoman Pressley, and this is about borrower
18 defense.  I think the easiest page numbering is
19 from the top of the page, and it's 49.
20    A    Yes, I remember this part of the
21 dialogue well.
22    Q    So at the bottom, Congresswoman
23 Pressley asked, Ms. Jones, at this moment, do you
24 know how many claims remain unprocessed?
25       And here she is talking about borrower

Page 114
Page

1   defense claims; correct?
2       A    Yes, so she's asking me about the
3   number of claims.
4       Q    If you want to just read your answer
5   for the record.
6       A    (Witness reviews document.)  Okay.
7       Q    So beginning there, It is a number that
8   changes from time to time.
9       A    Oh, you want me to read it out loud?
10      Q    Yes, if you don't mind.
11      A    Okay.  Let me scroll back up.
12           It is a number that changes from time
13  to time.  It is probably in the neighborhood of
14  160,000.  The last official count I got was
15  158,000, so I'm assuming it's somewhere in the
16  name of 160,000 by now.
17      Q    Okay.  And then on the next page, she
18  says -- this is at the top of the page 50 --
19  Ms. Jones, for the record, yes or no, is there
20  currently a policy which restricts the office of
21  Federal Student Aid from adjudicating or
22  processing any borrower defense claims that did
23  not stem from school closure?
24           And there's a little bit of
25  interruption there.  And the bulk of your answer

Page 115
Page

1   is then where you begin, There is not a policy
2   that prevents.
3           Would you just read that part of your
4   answer out loud for the record?
5       A    Sure.
6           There is not a policy that prevents the
7   review of claims.  However, we are not able to
8   determine the level of harm or the level of relief
9   that a borrower should get because the methodology
10  we use is now being challenged by the California
11  courts, so we continue to process.
12      Q    Okay.  So I want to understand what you
13  mean here by there's not a policy that prevents
14  their view of claims.
15      A    Yes.  There was no policy in place to
16  prevent Colleen Nevin's team from continuing to
17  review evidence, to review claims, to evaluate the
18  merit of an application.
19      Q    And I think you said earlier today that
20  you do not know either way if she and her team
21  were doing that?
22      A    Right.  I mean, I -- you know, I was
23  told on a level that we're continuing to review,
24  but I don't have direct knowledge of that.  I
25  don't supervise her.

Page 116
Page

1       Q    Okay.
2       A    So it was my understanding that they
3   were continuing to look at evidence, but I don't
4   have direct knowledge.
5       Q    And of the pending claims that you've
6   stated were in the neighborhood of 160,000, what
7   schools do those 160,000 borrowers attend?
8           MR. MERRITT:  Objection.  It's
9   overbroad.
10          BY MS. O'GRADY:
11      Q    Are they all CCI?
12      A    I -- I would have to go back and look,
13  but I -- no.  I don't know what percentage of them
14  were CCI, but, no, by this point in time, there
15  were claims from -- from, you know, a list of
16  institutions.
17      Q    Okay.  So I -- I guess I'm still trying
18  to understand why the injunction in the Calvillo
19  Manriquez matter would have prevented step-one and
20  step-two determinations from those who did not
21  attend CCI schools?
22      A    I don't think I've ever suggested that
23  step one stop.  I don't know.  I'm not involved in
24  step one.  I was told it continued, but I don't
25  have direct knowledge.  So I can't tell you for

Page 117
Page

1   certain whether it did or it didn't, but there was
2   certainly no policy to stop step one.
3       Q    Okay.  Assuming step one had continued,
4   what was preventing the department from doing step
5   two for non-CCI students?
6       A    A lack of a methodology to do step two.
7       Q    And what is the reason for the lack of
8   a methodology at this point?
9       A    Because the Northern District of
10  California had determined that our methodology
11  potentially involved a Privacy Act violation.
12      Q    So at the point of the injunction of
13  Calvillo Manriquez, was it Ed's intention to use
14  that partial relief methodology for all pending
15  borrower defense claims step-two determinations?
16      A    I don't know what the intent was of the
17  2017 methodology at the time.
18      Q    Here, you testified that there could be
19  no step-two determinations because of the
20  injunction, and --
21      A    Correct.
22      Q    -- those 160,000 borrowers are not only
23  CCI graduates.  So in effect, that methodology
24  being enjoined prevented all step-two
25  determinations; is that right?

Page 118

Page

1      A    At the time -- yes.  So what -- if your
2  question to me is, you know, when -- when the --
3  let me just take a step back.
4          The application of the methodology by
5  the time I got involved was not just focused on
6  Corinthian Colleges, right.  I get involved in the
7  methodology in the spring of 2019.  So at the time
8  that I engage in the methodology, it is a
9  methodology being developed to be applied broadly.
10          Prior to my involvement, I was not
11  involved in discussions about the methodology.  I
12  could only speculate on its intended use.  But
13  when I became involved in the development of a
14  methodology, the intent was that it would be
15  applicable to any borrower defense claim from any
16  institution at any point in time in the future.
17      Q    Okay.  So the step-one determinations
18  that you believe, but do not know for sure, were
19  being made while the Calvillo injunction was
20  preventing you from making step-two
21  determinations, have they been preserved or kept
22  anywhere or would they be in the normal course?
23          I guess my question is if those
24  step-one determinations were being made, what
25  would have happened to them?

Page 119

Page

1      A    You'd have to ask Colleen Nevin.
2      Q    So the regulations that you were
3  working on, the new methodology, who would be
4  applying step two?
5      A    So --
6      MR. MERRITT:  Objection as vague.
7  BY MS. O'GRADY:
8      Q    We know Colleen and her team do step
9  one.  Who -- who does step two?
10      A    First, I want to clarify that the
11  regulations we were developing are separate from
12  the development of the methodology.
13      Q    Thank you for clarifying.  I should
14  have said methodology.
15      A    Yeah.  So I want to be clear about
16  that.
17      Q    Thank you.
18      A    I don't know who in Colleen's unit
19  conducts the step two.
20      Q    Okay.  So it would be someone else in
21  her unit.  An attorney?
22      A    It would be somebody in FSA.  I don't
23  know who actually does that.  I don't know -- I
24  don't know the qualifications of everybody on her
25  team.

Page 120

Page

1      Q    Is the methodology -- the partial
2  relief methodology that you've been working on to
3  replace, that used in Calvillo, is that complete?
4      Q    What do you mean by "complete"?
5      Q    Has there -- is there a document that
6  sets that policy and outlines the methodology?
7      A    The new methodology --
8      Q    Right.
9      A    -- in December 2019?
10      Q    Yeah.
11      A    Yes.  I believe on our Web site we have
12  told borrowers how that methodology works.  I
13  believe it's published on our Web site.
14      Q    And that guidance -- how is that
15  guidance used by somebody in FSA?
16      MR. MERRITT:  Objection to scope.
17  BY MS. O'GRADY:
18      Q    I guess I just want to understand how
19  the step-two workflow goes.
20          So you develop the methodology.  It's
21  been provided to borrowers on the Web site, and
22  then there are individuals who then apply step-two
23  methodology to step-one determinations which are
24  all going to be the grants, obviously.
25          So I -- I'd like to know how that's

Page 121

Page

1  communicated and has been communicated in
2  determining --
3      MR. MERRITT:  I'm still going to object
4  on scope as the step-two processes is not part of
5  the court's discovery order.
6      MS. O'GRADY:  I think it all goes to
7  reasons for -- for delay, but . . .
8          Charlie, are you instructing the
9  witness not to answer or --
10      MR. MERRITT:  Well, what was the
11  question?
12      MS. O'GRADY:  The question is how the
13  step-two policy that has been developed -- the
14  step-two methodology has been communicated to
15  individuals in Ed in FSA who are actually tasked
16  with implementing it to a decision.
17      MR. MERRITT:  You can answer that.
18      THE WITNESS:  So the answer is I don't
19  know.  There is a team in FSA who creates the data
20  tables, who actually analyzes the data.  And there
21  is a second team at FSA who quality controls the
22  data to divide (audio distortion) the tables.
23          I do know there are two teams involved
24  in development and the quality review of the data
25  tables.  I do not know how Colleen's team divides

Page 122
Page

1   up the work.  I -- I don't know how the standard
2   operating procedure brings those data tables into
3   the process.  I don't know.
4           MS. O'GRADY:  It's 12:15.  Do we want
5   to have a break for lunch now?  Does that work for
6   everyone?
7           THE WITNESS:  It's up to you.
8           MS. O'GRADY:  Okay.  I think that would
9   work.  I think we're at a good breaking point
10  right now and that would work for me if that's
11  okay.  I -- I suggest a short lunch just
12  because --
13          THE VIDEOGRAPHER:  You want to go off
14  the record for this convo?
15          MS. O'GRADY:  Yes, thank you.
16          THE VIDEOGRAPHER:  Okay.  We're now
17  going off the record.  The time is 17:14 UTC time.
18  Thank you.
19          (Lunch recess -- 12:15 p.m.)
20          (After lunch recess -- 12:49 p.m.)
21          THE VIDEOGRAPHER:  We are now back on
22  the record.  The time is 17:49 UTC time.
23      BY MS. O'GRADY:
24      Q     Okay.  Ms. Jones, I have a few
25  follow-up questions about what we discussed at

Page 123
Page

1   break and then we'll go on to the next exhibit.
2   So one of my follow-up questions is the partial
3   relief methodology that was developed for CCI
4   students, at what point was it decided that that
5   should apply to everyone?
6       A     Are you asking me about the -- the
7   methodology in 2019 I was a part of developing or
8   the 2017 methodology?
9       Q     Let's take the 2017 first.  So that was
10  first -- my understanding it says in your
11  declaration that was originally developed for the
12  CCI students in those particular windows, and at
13  what point did that become the methodology that Ed
14  wanted to use for students other than CCI
15  students?
16      A     I -- I -- I don't know, and I -- yeah,
17  I don't know when that decision would or would not
18  have been made.
19      Q     Do you know if that decision was made?
20      A     You know, I don't recall it having been
21  a final decision.  I -- I -- it -- I don't recall
22  because I -- yeah, I don't recall whether it was
23  or was not a decision as made.
24      Q     Was there ever an effort to use a
25  different methodology for non-CCI students when

Page 124
Page

1   the Calvillo -- for step-two determinations for
2   non-CCI students when the Calvillo injunction
3   occurred?
4       A     So I was not -- I didn't come into my
5   current role until after that decision, and so I
6   don't exactly know the answer to that question at
7   the time the decision was made.  I came into my
8   role after that.
9       Q     Okay.  Now during the time that you
10  said in your declaration and you testified before
11  Congress that the Calvillo Manriquez injunction
12  prevented the 2017 partial relief methodology from
13  being applied to any borrower, there were no
14  borrower defense decisions mailed out to students;
15  is that correct?
16      A     I don't know.
17      Q     You don't know either way if during
18  that period there were any decisions sent out to
19  students?
20          MR. MERRITT:  Objection: vague.
21      BY MS. O'GRADY:
22      Q     Were there any decisions sent out to
23  students on their borrower defense applications
24  while the Calvillo Manriquez injunction presented
25  step-two determinations from being made?

Page 125
Page

1       A     Do you mean final decisions, or would
2   that include, for example, if somebody submitted
3   an incomplete application and the borrower defense
4   unit reached out to get more information?
5       Q     I'm asking about final decisions.
6       A     You know, I -- I -- I don't recall
7   final decisions being made.  I -- I can't say that
8   absolutely no decision was ever issued, but I
9   don't recall decisions continuing -- well, let me
10  be clear.  I don't know whether -- you know, I --
11  whether or not decisions were being made.  You
12  know, I was told they were processing, but I don't
13  have direct knowledge.  But I also believe it is
14  the case that final decisions were not being
15  mailed -- you know, borrowers were not being told
16  final decisions.
17          So I think I want it clear as to -- you
18  know, it's a little bit separate in our mind about
19  the review of claims versus the notification of
20  borrowers and I do not believe borrowers had been
21  notified of final decisions.
22      Q     Did it concern you that borrowers were
23  not being notified about final decisions?
24      A     I'm not sure what you mean.
25      Q     Were you -- was it something that you

Page 126
Page

1   thought about or had any concerns about, or did
2   you -- it didn't occur to you that that would be a
3   problem?
4           MR. MERRITT:  Objection as calling for
5   privileged information.
6           MS. O'GRADY:  It's calling for
7   privileged information in that -- on what basis
8   are you making that objection?
9           MR. MERRITT:  Her thoughts and opinions
10  on decision department policy at the time before
11  final policy was established.
12          MS. O'GRADY:  So you're saying it's a
13  deliberative process privilege whether or not she
14  was concerned about any decisions going out or
15  not?
16          MR. MERRITT:  Yes.
17  BY MS. O'GRADY:
18      Q   Ms. Jones, in your role did you have
19  authority to ask FSA to make decisions on the
20  merits -- to make step-one decisions?
21      A   Could you -- meaning?
22      Q   Well, we've -- we've talked about how
23  you don't -- your role as -- your policy role did
24  not involve step-one decisions.  We talked a lot
25  about that before break.

Page 127
Page

1           I'm wondering if you had the authority
2   to say to Ms. Nevin or whoever else in her role
3   the pace of step-one decisions needs to be
4   increased, for example.  You know, was that within
5   your authority?
6       A   So it sounds to me like you're asking a
7   couple of different things.  It started to sound
8   like you were asking me do I have the authority to
9   tell them to make decisions, but then later --
10  later it sounded like you were asking me if I have
11  authority to establish a pace.
12      Q   So let's take both questions then.  So
13  do you have authority to tell them to make
14  decisions and to send borrower -- borrower defense
15  decisions?
16      A   No.
17      Q   Do you have authority to tell them the
18  pace that they should be working at to process
19  borrower defense decisions?
20      A   I don't have the authority to tell them
21  the pace.
22      Q   Did you ever discuss the pace with
23  Ms. Nevin?
24      A   I discussed the case with Mark Brown.
25  I don't recall whether or not I discussed the pace

Page 128
Page

1   with Colleen.
2       Q   And when did you discuss the pace with
3   Mr. Brown?
4       A   I believe -- I believe that after the
5   methodology was approved, the secretary wanted
6   regular updates on -- you know, on -- on how
7   things were moving, and so --
8       Q   And are you talking about -- which
9   methodology are you talking about?
10      A   The 20- -- I guess we'll call it the
11  2019 methodology.
12      Q   So the 2019 partial relief methodology?
13      A   Correct.  Once that had been approved
14  and -- to say, you know, had -- had been told to
15  apply that methodology, you know, she wanted
16  regular updates on -- on -- you know, on how that
17  was going.  And so, yes, in that context, you
18  know, I get regular updates from her and we
19  discussed --
20      Q   And regular updates, what kind of
21  information did that include?
22      A   Generally it included how many pending
23  claims were there.  Sometimes he would give
24  updates on how many new claims had come in, and at
25  some point he would report on, excuse me, how many

Page 129
Page

1   claims had been adjudicated, and by adjudication
2   meaning how many claims had the attorneys reviewed
3   for a determination on the merit, et cetera.
4       Q   Okay.  So how many step-one
5   determinations had been made as opposed to step
6   two was included?
7       A   Correct.  Now, there was a separate
8   number for -- for, you know, processing, and I
9   can't remember at what point that got added to the
10  update, but at some point in time we also added to
11  the reports, you know, the number of borrowers who
12  had received their notification, but I just can't
13  remember when that got added.
14      Q   And these were sent by Mark Brown to
15  the secretary?
16      A   Some were sent from Mark Brown to me
17  and then they were regularly also sent to the
18  leadership team.
19      Q   And how regularly were these sent?
20      A   I can't remember if it was weekly or
21  biweekly.  I just can't remember.  I think it was
22  biweekly, but it may have been weekly.
23      Q   And were these, like, written memos, or
24  were they PowerPoints?
25          What format did they take?

Page 130
Page

1      A      Generally it was an email.  There may
2  have at times been an attachment with a table, but
3  I think generally it was an email, and -- and then
4  ultimately I believe that the data warehouse at
5  FSA added this as a public feature.  I believe
6  these data were then posted for public knowledge
7  on the data warehouse.
8      Q      Okay.  And when were these updates --
9  when did they start getting sent?
10     A      I don't remember the exact date, but
11 I -- I recall that it was after the December 2019
12 implementation of the new methodology.  So there
13 may have been, you know, earlier updates from time
14 to time on total numbers, but the regular updates
15 were after the methodology had been approved and
16 implemented.
17     Q      And how were the metrics used?
18     A      What do you mean by "how were the
19 metrics used"?
20     Q      The information was reviewed by the
21 secretary.  What is your understanding of its
22 purpose?  Was the -- I'll ask that question.  If
23 you need clarification, I can add.
24     A      I mean, I think the purpose was
25 twofold.  You know, general information.

Page 131
Page

1  Obviously, a policy decision had been made and
2  people wanted to know if the process was moving.
3      I believe that there -- there was a
4  significant amount of hiring as well, and I think
5  part of that was to, you know, evaluate, you know,
6  the size of the team, you know, do you need more
7  people; do you need fewer people.
8      I'm not involved in personnel
9  decisions, but, you know, I think part of that was
10 also, you know, viewed by people to see if the
11 team was large enough.  I mean, the team expanded
12 significantly during this time period.
13     Q      So you said at the start of that answer
14 that people wanted to know the process was moving.
15 What do you mean by that?
16     A      At a general level, you know, it's one
17 thing to develop a policy, and it's another to
18 make sure that those implementing it can do so.
19     And, so, I think there was interest in
20 making sure that it was a policy that -- you know,
21 that operationally could be implemented.
22     Q      Prior to the -- prior to this time,
23 around December 2019, when these -- when the
24 partial relief methodology went into effect, had
25 there been updates about progress or lack thereof?

Page 132
Page

1      A      I believe at that time the updates were
2  about total number of claims.  What I don't recall
3  is whether or not those updates included numbers
4  on adjudications.  I just can't remember whether
5  they were included at that time.  I just -- I -- I
6  can't remember.
7      Q      So you don't remember if updates had
8  included whether or not any claims -- any
9  decisions on the merits had been communicated to
10 students?
11     A      I -- I -- you know, I just can't
12 remember the specific, you know, updates that came
13 through.  You know, I just can't remember.
14     But at that point before the 2019
15 regulations were in effect and these updates
16 began, had you talked to anyone about the delay?
17     A      What do you mean by "talked to anyone
18 about the delay"?
19     Q      You know, were there any meetings or
20 conversations you had about the fact that
21 decisions were not being sent out?
22     A      Well, when I came into my role, you
23 know, the -- the decision had been made that
24 because the Northern District of California had
25 concerns about the Privacy Act that we could not

Page 133
Page

1  apply that methodology; that we had to wait and
2  find out whether or not it was going to be deemed
3  that the use of Social Security Administration
4  data was a violation of the Privacy Act.
5      Q      While you were waiting, were -- was
6  another method being developed?
7      A      I started developing the team -- you
8  know, I pulled together the team and we started
9  working on that methodology in, you know, I think,
10 that April, May, June time frame of 2019.
11     Q      I want to go back to the memos that
12 updated the secretary on the progress.  Do you
13 know if those metrics were ever used to determine
14 anyone's bonus?
15     A      I'm not involved in the determination
16 of anyone's bonus, so I don't know.
17     Q      Do you know if those metrics were used
18 to determine anyone's job performance rating or
19 job performance review?
20     MR. MERRITT:  Objection to the scope of
21 these questions.
22     BY MS. O'GRADY:
23     Q      Ms. Jones, I think you can still
24 answer.
25     MR. MERRITT:  Go ahead.

1        THE WITNESS:  I would have to go back
2   and look at Mark's performance review.  I'd have
3   to go back and look at Mark's performance review,
4   but his performance review was done in December,
5   and we didn't have approval on the methodology
6   yet.  His next performance review will be next
7   month.
8        BY MS. O'GRADY:
9        Q    And is the pace of decision making
10  going to be considered in his performance review?
11       A    Federal Student Aid publishes their
12  strategic plan, and the strategic plan I believe
13  has as a metric, you know, resolving outstanding
14  borrower defense claims.  So I believe -- I'd have
15  to go back and look at the strategic plan.  I
16  haven't looked at it recently because I haven't
17  started Mark's review.  But I do think the
18  strategic plan includes as a goal, you know,
19  coming up-to-date, you know, processing
20  outstanding claims and, you know, eliminating the
21  backlog.
22            So, you know, to the actual pacing, per
23  se, I don't know.  But, yes, it is a goal in the
24  strategic plan to revolve these outstanding cases.
25       Q    So to the extent that resolving the

1   backlog, I think you just said, is -- is part of
2   the strategic plan and would be part of the
3   performance review in a positive way, would a
4   failure to eliminate the backlog be part of a
5   performance review in a negative way?
6        A    I mean, I think you're asking me to
7   speculate on somebody's performance review that
8   is, you know, far more complicated than one issue.
9   I can't --
10       Q    Well, I can go to the past in the --
11  you know, for -- for several months until the 2019
12  partial relief methodology went into place, there
13  were no new borrower defense decisions made.
14            Would that reflect negatively on
15  anyone's job performance review?
16            MR. MERRITT:  Objection: beyond the
17  scope.
18            MS. O'GRADY:  I disagree it's beyond
19  the scope.  We can have that discussion, but I
20  think at this point, the witness can answer.
21            MR. MERRITT:  Which of the topics does
22  this go to?
23            MS. O'GRADY:  I think it goes to
24  pretext and the reason for delay.
25            MR. MERRITT:  Is that one of the three

1   topics?  I mean, again, the extent to which the
2   difficulty of reviewing borrower defense
3   applications actually caused or justified
4   Secretary's 18-month delay.
5            MS. O'GRADY:  Can we go off the record
6   to talk about this?
7            THE VIDEOGRAPHER:  Do you agree to go
8   off the record?
9            MR. MERRITT:  Sure.
10           THE VIDEOGRAPHER:  We're going off the
11  record.  The time is 18:08 UTC time.
12           (Recess -- 1:08 p.m.)
13           (After recess -- 1:13 p.m.)
14           THE VIDEOGRAPHER:  We're now back on
15  the record.  The time is 18:13 UTC time.
16           MS. O'GRADY:  Would the court reporter
17  mind reading the question that was pending?
18           THE COURT REPORTER:  Can you guys hear
19  me?  Can you guys hear me?
20           MS. O'GRADY:  If that's not possible, I
21  can try and rephrase.
22           THE COURT REPORTER:  I can type it in.
23           MS. O'GRADY:  Oh, we can get it typed.
24  Thank you.
25           So it looked we could get that typed

1   in.  I don't think we can, so I'll just move on.
2        BY MS. O'GRADY:
3        Q    So, Ms. Jones, you testified that the
4   metrics in the memo were being circulated
5   regularly once the borrower defense decisions were
6   restarted around December 2019; is that correct?
7        A    Okay.  Correct.
8        Q    And I think you also testified that
9   some of those -- those metrics were important
10  because it -- I don't want to put words in your
11  mouth.  What did you testify about the importance
12  of clearing the backlog?
13           You did use that phrase.
14       A    Yeah, the importance of clearing the
15  backlog is that we wanted to resolve the claims.
16  We wanted to finalize them.
17       Q    And was that -- the importance of
18  clearing the backlog, when you first came into
19  your position, was that something you were aware
20  of, the backlog of claims?
21       A    When I first came into my position, I
22  was aware that a judge in California told us that
23  the methodology for determining relief was
24  potentially a violation of the Privacy Act.
25       Q    My question was, though, when you came

Page 138

1  into your position, did you understand it to be
2  important to clear that backlog?  Not about what
3  caused it, but did you understand that it was
4  important to clear the backlog of claims?
5       A     Absolutely I understood it was
6  important to clear out the backlog of claims, but
7  we had been halted in our path by the judge of the
8  Northern District of California.
9       Q     So throughout the time before the --
10  before the methodology went into effect in
11  December 2019 and the claim decisions restarted,
12  was the backlog an ongoing concern of yours?
13           MR. MERRITT:  Again, objection.  That's
14  calling for mental impressions and deliberative
15  privileged information.
16           MS. O'GRADY:  I'll rephrase.
17           BY MS. O'GRADY:
18       Q     Ms. Jones, what steps did you take to
19  clear the backlog prior to the 2019 methodology
20  going into effect in December of 2019?
21       A     The instructions that the borrower
22  defense unit was operating under was that the
23  Northern District of California had determined
24  that we -- that the methodology was potentially a
25  violation of the Privacy Act.  Quite frankly, you

Page 139

1  know, the question that I asked is have we heard
2  from the Northern District of California.  I mean,
3  the Northern District of California was the
4  decision maker on this.  And, yes, I would have
5  loved for them to have issued a decision promptly.
6       Q     Are you aware that -- that the
7  Department of Education argued in the Ninth
8  Circuit that the methodology was only intended for
9  Corinthian students and not for those who had
10  attended schools other than Corinthian?
11       A     I'm not aware of the testimony one way
12  or the other in that case.
13       Q     So you'd be surprised to know that it
14  was Ed's position in that case that the
15  methodology was only ever intended for Corinthian
16  students?
17       A     I -- the -- I would not be surprised to
18  know that the methodology was developed for
19  Corinthian students.  Those were the students that
20  were at the center of that case.  The question of
21  whether or not that methodology would be applied
22  to additional borrowers was a question that we
23  didn't get to.  I never got an answer to that
24  question because before we finished adjudicating
25  the Corinthian borrowers, the Northern District of

Page 140

1  California enjoined the methodology.
2            So you're asking me to speculate what
3  could of, should of.  At the end of the day, we
4  hadn't completed adjudicating Corinthian claims
5  when the judge enjoined the methodology.
6       Q     So when the injunction came down, it
7  was -- you know, you essentially said pencils
8  down; we'll just wait for a decision?
9       A     I didn't say pencils down.
10       Q     Your understanding was that meant
11  because that was prior to your role, but your
12  understanding was that since the injunction, it
13  was pencils down on --
14       A     My understanding --
15       Q     -- on that methodology?
16       A     My understanding was that because the
17  judge had ruled that this was potentially a
18  violation of the Privacy Act, I -- you know, I
19  don't think the department is in the practice of
20  knowingly violating a law.
21            So when this was in question, I -- I
22  think that everybody was waiting for the judge to
23  determine whether or not it was a violation of the
24  Privacy Act.
25       Q     So when the new methodology was

Page 141

1  developed, was that developed with the express
2  purpose of applying to all schools, not just
3  Corinthian?
4       A     I -- I can't speak to what will
5  ultimately be determined about the borrowers, you
6  know, in -- in involve -- I can't predict what the
7  district -- the district court in the --
8       Q     I'm not asking you about that.  What I
9  want to know is -- so now we have a new
10  methodology --
11       A     Yes.
12       Q     -- not enjoined by the court.
13            Is that new methodology for -- will
14  that be applied to every single step-one
15  determination?  So a step-one determination is
16  made.  The borrower defense claim is granted.  It
17  goes to step two.  And this new methodology is for
18  every single student?
19       A     The new methodology is for every
20  applicant; however, in the case that an applicant
21  has already been awarded more, certainly you're
22  not going to go back and apply the new methodology
23  and tell them that they owe us money back, right.
24  I mean, that -- that -- you know, we're not going
25  to go back in time.  But, yes, moving forward, the

Page 142

1   new methodology is being applied to all -- all
2   borrowers who submit a borrower defense claim.
3       Q    And that includes all borrowers who
4   have submitted a borrower defense claim and a
5   step-one determination hasn't yet been made?
6       A    That is correct.
7       Q    Okay.  Let's go to the exhibit folder.
8   We are going to go the file ECF number 56-3,
9   Exhibit 5, 2019 regulations.
10      A    Okay.
11      Q    Okay.  And this was Exhibit 5 to your
12  declaration.  And do you recall reviewing this in
13  advance of today's deposition?
14      A    I did not review this exhibit prior to
15  today.
16      Q    You've seen it before, though; correct?
17      A    Not in this format, but I've certainly
18  seen the 2019 borrower defense final regulation.
19      Q    Okay.  And who wrote this --
20      A    I don't have a Westlaw subscription, so
21  I've never seen it in this format.
22      Q    Okay.  Fair enough.
23           So who wrote this document?
24           MR. MERRITT:  Objection: scope.
25           MS. O'GRADY:  Can the witness answer?

Page 143

1            MR. MERRITT:  Okay.
2            MS. O'GRADY:  I mean . . .
3            THE WITNESS:  A team of people wrote
4   this document, and that team of people included
5   individuals from our career staff from the Office
6   of Postsecondary Ed, staff from the Office of
7   General Counsel, my office was involved, staff
8   from Office of Management and Budget, staff from
9   the Domestic Policy Council, staff from the
10  Department of Justice, staff from the Small
11  Business Administration.  All those regulations go
12  through an interagency clearance process.  Every
13  one of those agencies is allowed to make a comment
14  which we respond.
15           So, collectively, that entire group is
16  involved in writing a final regulation.
17  BY MS. O'GRADY:
18      Q    And, Ms. Jones, what was your role in
19  developing this?
20      A    My role in the final rule was as
21  reviewer.  So the public comments come in.  They
22  get bucketed by career staff.  Career staff write
23  the responses, and then the document goes through
24  an internal review process which included my
25  review.  So I would have reviewed the final rule

Page 144

1   as well as any responses to comments from the
2   interagency review.
3       Q    Okay.  And we're going to look at
4   page -- on the footer of the document, it's
5   page 85.  I think using the footers is the easiest
6   way to navigate.
7            And this is under the heading which is
8   on the bottom of page 84, Summary of the major
9   provisions of this regulatory action:  For the
10  direct loan program, the final regulations.
11           I'm looking at the third bullet point
12  on page 85.
13      A    Uh-huh.
14      Q    And would you read that for the record,
15  that bullet point beginning, Provides schools and
16  borrowers?
17      A    I must be in the wrong place.
18           MR. MERRITT:  It's the sixth page of
19  the PDF if that's helpful.
20           THE WITNESS:  My scrolling feature is
21  kind of bizarre.
22           Okay.  So I'm on page 85, and it
23  appears to me as though the third bullet says,
24  Provide schools and borrowers.
25           Is that what you mean?

Page 145

1   BY MS. O'GRADY:
2       Q    Yes.
3       A    Okay.  Provides schools and borrowers
4   with opportunities to provide evidence and
5   arguments when a defense to repayment application
6   has been filed and to provide an opportunity for
7   each side to respond to the other's submissions,
8   so that the department can review a full record as
9   part of the adjudication process.
10      Q    So can you walk me through the process
11  of the school and borrowers providing evidence and
12  what that means?
13      A    I can -- I can walk you through the
14  policy.  The process would have to be described by
15  Colleen Nevin because that's --
16      Q    Okay.
17      A    -- her operation.
18      Q    Then please walk me through the policy.
19      A    The policy is that the borrower may
20  allege misrepresentation by a school.  At a policy
21  level, the school would be notified and given an
22  opportunity to respond.  All of the documents,
23  including the response by the institution as well
24  as any evidence that the department is using to
25  adjudicate, is made available to the borrower, and

Page 146
Page

1    the borrower gets the last word in the record
2    before it is reviewed by the Office of General
3    Counsel.
4          So that is -- the policy directive is
5    that everybody gets due process rights, but the
6    borrower has the last word before the directive is
7    reviewed.
8      Q    When you say due process rights, do you
9    mean the school gets due process rights as well?
10     A    The school and the borrower.  The
11   borrower gets to respond to whatever the school
12   submits.
13     Q    Okay.  Is it your understanding --
14   well, what is your understanding of the school's
15   interest in the outcome of a borrower defense
16   application?
17     A    I mean, you're -- you're asking me what
18   a school's interest is in --
19     Q    Well, you said they're afforded due
20   process.  So I'm wondering as a policy matter in
21   developing this policy what the reasoning behind
22   giving the school what you're calling due process
23   in this -- in this borrower defense application
24   review is?
25          Do they have -- if the borrower defense

Page 147
Page

1    application is granted, for example, does the
2    school have to pay any money?
3      A    It -- it depends.  It depends on which
4    regulation the loan is being adjudicated under.
5      Q    So if you could explain that further.
6      A    Yeah.  So there are -- as I understand
7    it, again, I'm not an attorney, but as I
8    understand, there are certain statute of
9    limitations imposed by state law, and so it could
10   be that a borrower, you know, was -- made a claim
11   but it -- it was outside of the statute of
12   limitations in the state in which case, you know,
13   the department would not be able to go to the
14   school to, you know, get reimbursed.
15          In the 2016 regulation, it was a
16   two-step process whereby first, the department
17   adjudicated the claim; and then second, the
18   department made a decision about whether or not it
19   would try to recover damages or money, whatever
20   you call it, from the school.
21          And in the 2019 regulation, the idea
22   was to merge that process.
23          So it is possible that the department
24   could go back to the school to try to, you know,
25   essentially bill them for loan -- loan -- you

Page 148
Page

1    know, loan forgiveness.
2      Q    How is that different from the 2016
3    regulations?
4      A    So there are time limits that a
5    borrower has to meet, so the time limits are
6    different in the 2016 reg and the 2019 reg.
7      Q    That's -- okay.
8          Okay.  Now I'd like to go to page 98.
9    So the footer, page 98.
10     A    Okay.
11     Q    And it's -- the paragraph at the bottom
12   of page 98 that begins with, Discussion, could you
13   read that for the record, please?
14     A    I'm sorry.  My arrows are having me go
15   whole pages.
16          Okay.  Discussion:  The department
17   thanks the commenters for their support of the
18   regulations that require individuals to assert
19   borrower defense claims.  To an extent, we
20   understand the commenters' concerns about, and
21   have already become aware of the evidence of,
22   outside actors attempting to personally gain from
23   the bad acts of institutions as well as unfounded
24   allegations.
25          The evidence --

Page 149
Page

1      Q    Okay.  You can stop right there.
2          What is that sentence referring to?
3      A    I need to read the rest of the page for
4    context if you can just --
5      Q    Okay.  Sure.  Take a minute to review
6    it.  That's fine.
7      A    (Witness reviews document.)
8          Okay.  So this was -- so this
9    discussion was in response to comments that came
10   from commenters, and what this is referring to is
11   the department has unfortunately identified and
12   has worked with other agencies.  There are
13   legitimate groups working to help borrowers submit
14   claims, and that's great.  There are also bad
15   actors that are out there calling borrowers and
16   saying, you know, for $300, we'll guarantee you
17   borrower defense relief, and we don't charge a
18   borrower to submit an application.
19          So we -- you know, there -- there are
20   some of these organizations that are, you know,
21   essentially charging borrowers a fee to file
22   their -- you know, to file their claim, and
23   they're benefiting financially from that process,
24   and that's what this is referring to.
25     Q    Okay.  So the -- so the groups that are

Page 150
Page

1  charging borrowers to file their borrower defense
2  applications, I'm trying to understand the
3  connection between that and the -- the decision
4  here to disallow group claims entirely?
5      A    Well, this is a --
6           MR. MERRITT:  Objection.  What is the
7  connection to the scope of the discovery in this
8  case?
9           MS. O'GRADY:  Well, I'd say the
10  connection to the scope of the discovery is I'm
11  trying to understand the development -- we haven't
12  got there yet, but I'm on the road to further
13  understanding the development of the denials, and
14  also point 3, the extent to which the secretary
15  has denied applications of students who attended
16  schools subject to findings of misconduct.
17          So I'm trying to understand the basis
18  for decisions and the basis for changes in the
19  regulations.
20          MR. MERRITT:  Well, you're not asking
21  about basis for decisions.  It's about statements
22  in the 2019 regulation.
23          MS. O'GRADY:  That relate to the policy
24  of decisions.
25          MR. MERRITT:  Okay.  You can answer the

Page 151
Page

1  question.
2           THE WITNESS:  This policy relates to
3  loans made after July 1st, 2020.  This policy in
4  no way applies to the current outstanding claims,
5  with the rare exception of potentially a borrower
6  that has consolidated their loans since July 1,
7  2020.  So these regulations do not apply to
8  pending BD claims except for that small --
9  potential small group of consolidation loans or
10  new claims that have come in since July 1, 2020,
11  on new loans.
12      BY MS. O'GRADY:
13      Q    I still -- I still want to understand
14  the connection between determining that a group
15  claim is frivolous and the fact that borrowers
16  have been duped into paying for a borrower defense
17  application when they don't have to.
18      A    I -- I don't -- but this regulation has
19  nothing to do with pending claims -- currently
20  pending claims.
21      Q    But I'm asking you about the reasoning
22  behind this regulation because I think it -- it --
23  it speaks to the -- it speaks to the priorities
24  and the decision making of -- of the borrower
25  defense policy.

Page 152
Page

1           So I'm asking about this regulation.
2      A    So I think if you read the full reg,
3  what you will find in the preamble and the other
4  parts of the regulation -- and I haven't read this
5  in a long time so I can't identify the page.  But
6  I think what we explained quite clearly in the
7  preamble and other parts of the reg is that we
8  believe every borrower needs to be evaluated as an
9  individual.  We believe every borrower deserves
10  the right to have their claim adjudicated.  We
11  also believe that only those borrowers who
12  suffered financial harm are entitled to relief.
13  That's in the 2016 reg as well.
14          So you have to do a person-by-person
15  adjudication to make the determination that there
16  was misrepresentation; that they relied upon that
17  misrepresentation; and that they suffered
18  financial harm.
19      Q    Prior to this regulation, was there a
20  group adjudication process?
21      A    There was a permissible group
22  adjudication process in the 2016 reg.
23      Q    And had that been used?
24      A    I -- I don't know.
25      Q    Had -- have you ever looked or

Page 153
Page

1  considered the relative efficiency of a group
2  adjudication process and an individual
3  adjudication process?
4      A    Are you asking me which is quicker?
5      Q    I'm asking if you ever thought about
6  which was quicker or ever did any assessment of
7  which was quicker?
8           MR. MERRITT:  Objection.  Going into
9  her mental impressions and thoughts on the
10  development of policy.  Deliberative privileged
11  material.
12      BY MS. O'GRADY:
13      Q    I can ask a different question to get
14  at the same issue.
15          Whose decision would it have been to
16  invoke a group adjudication process?
17      A    I don't know whose it would have been,
18  but I do know it would not have been mine.
19      Q    Okay.  Okay.  Let's go to the page that
20  is 103 at the footer.
21      A    103?
22      Q    Yes.
23      A    Okay.
24      Q    It's the third paragraph that starts
25  with, We acknowledge.  If you can read that out

Page 154
Page

1    loud for the record?
2         A    We acknowledge that there is a risk
3    that unsubstantiated claims could be filed in
4    large numbers to target institutions for the
5    purpose of damaging their reputations before the
6    department can adjudicate the claims as
7    unsubstantiated.  Indeed, we are aware of firms
8    and advocacy groups that are engaging in such
9    coordinated efforts against certain institutions.
10        Q    So what are you referring to or what is
11   this referring to here?
12        MR. MERRITT:  Objection to the scope.
13   We're not here to litigate the 2019 regulation.
14        MS. O'GRADY:  No, but I think it goes
15   to -- the 2019 regulations are based on -- based
16   on policy views informed by what has happened and
17   what is understood to have happened prior.
18        So this is a -- I'm asking the witness
19   about what this means.  This is the basis for
20   developing new regulations.  So I'll ask my
21   question.  I think will be very much within the
22   scope.
23   BY MS. O'GRADY:
24        Q    What is the basis for the belief that
25   there's a risk of unsubstantiated claims filed in

Page 155
Page

1    large numbers?
2         A    You know, I -- again, I want to -- I
3    want to reiterate, you know, this reg is hundreds
4    of pages long, and there are lots of public
5    comments.  And, so, the answer or the response to
6    one single comment is not the basis for a
7    regulatory decision.  It's hundreds of pages long
8    because there are lots and --
9         Q    Okay.
10        A    -- lots of comments and considerations.
11        So I think you're trying to ask me
12   to --
13        Q    I can simplify the question.
14        Do you believe that there is a risk of
15   unsubstantiated claims that can be filed in large
16   numbers?
17        A    There is always the risk that somebody
18   would submit an application that would not qualify
19   for borrower defense relief.
20        Q    Okay.  One person or large numbers of
21   people?
22        A    I think there could be large numbers of
23   people.
24        Q    Do you think there have been large
25   numbers in the past?

Page 156
Page

1         A    I don't know what you mean by "the
2    past."  Could you -- what's your time frame?
3         Q    During your tenure at the Department of
4    Ed.
5         MR. MERRITT:  I'm going to object to
6    this line of questioning as not within the court's
7    order.
8         MS. O'GRADY:  I think it is within the
9    court's order based on the reason for the delay.
10        MR. MERRITT:  Again, at that level of
11   generality, that's not --
12        MS. O'GRADY:  I'm not being very
13   general.  I'm pointing to a sentence in the 2019
14   regs that these regulations are made based on a
15   belief of a risk of unsubstantiated claims filed
16   in large numbers.  If that is a belief of the
17   department as a whole, I think that's quite
18   germane to whether or not the delay was caused by
19   the difficulty of reviewing borrower defense
20   applications.
21        MR. MERRITT:  I don't see how that's
22   germane.  I mean, it's going to -- as Diane said,
23   the regulation was promulgated for a number of
24   reasons, and your -- and this was included in the
25   regulation, but it's not -- it doesn't apply to

Page 157
Page

1    pending claims, as she said.
2         MS. O'GRADY:  I want to understand the
3    reason for department policy and whether or not a
4    belief in a risk of unsubstantiated claims that
5    can be filed in large numbers is a basis for that
6    policy as written in the regulation.  It's a --
7         MR. MERRITT:  Are you asking her if
8    it's a reason for the delay in this case or -- or
9    whether it justified the 2019 regulation which is
10   not at issue in this case?
11        MS. O'GRADY:  Well, I can -- I can ask
12   the question about delay, but what I would like to
13   know is if the witness, who's in charge of policy,
14   agrees with this statement about the risk of
15   unsubstantiated claims.
16        MR. MERRITT:  You can answer that
17   question.
18        THE WITNESS:  Okay.  First of all, I'm
19   not in charge of policy.  I have oversight
20   responsibility over the policy-making process.  I
21   do not solely own it.  It --
22   BY MS. O'GRADY:
23        Q    I didn't mean -- I didn't mean to
24   misstate your responsibilities there, but if you
25   could answer the question, do you -- do you agree

1  with this statement that there is a risk that
2  unsubstantiated claims could be filled in large
3  numbers to target institutions for the purpose of
4  damaging their reputations?
5            MR. MERRITT:  Again, I'm going to
6  object --
7            THE WITNESS:  I do.
8            MR. MERRITT:  -- and instruct not to
9  answer as to enforce a limitation imposed by the
10  court.
11            MS. O'GRADY:  Okay.  Your witness just
12  did answer, "I do."  I don't know if that came on
13  the record.
14       BY MS. O'GRADY:
15       Q    On this topic of unsubstantiated
16  claims, I'll ask specifically about the backlog.
17  So I think we've talked about the backlog of about
18  160,000 claims, and that was in the Congressional
19  hearing testimony we went over earlier today.
20            Of that backlog of 160,000 claims, is
21  it your opinion that some number of those were
22  unsubstantiated?
23       A    I don't understand why my opinion -- I
24  don't review the claims, so I don't have a --
25       Q    I'm asking your opinion, not whether

1  you review the claims.  I understand that.
2       A    Well, I can't formulate an opinion if I
3  don't see the claims.
4       Q    Okay.  So you have no opinion about
5  what percentage of that backlog may have been, as
6  it says here, unsubstantiated?
7            That's the word used here.
8            MR. MERRITT:  Objection; speculative.
9            You can answer her question.
10            THE WITNESS:  What I know is that the
11  BD unit has provided us with examples of
12  ineligible claims, and based on that, I am aware
13  that some claims have come in saying they should
14  get relief because their teacher didn't like them.
15            And, again, you know, I don't review
16  these claims, so I'm relying on what the BD unit
17  tells me.  But, you know, I am told there are
18  claims that came in that said my teacher doesn't
19  like me or I didn't like my teacher or, you know,
20  they closed the cafeteria.
21            So I am told that there are claims that
22  come in with those kind of complaints that don't
23  meet the standard for a borrower defense claim,
24  but I am relying on what people are telling me.  I
25  don't review those claims, and I don't know what

1  percentage of claims look like that.
2            BY MS. O'GRADY:
3       Q    In what context would you be informed
4  of those claims?
5       A    There was a -- I -- I believe that
6  there was -- I don't recall whether it was a
7  Congressional letter or a question for the record
8  following one of the secretary's hearings, but at
9  one point in time this question came up.  FSA
10  answered it, and, you know, I saw that answer as
11  it came through.  But I cannot recall whether -- I
12  can't remember why that answer was prepared.
13       Q    Okay.  I want to go to the bottom of
14  page 226.  Okay.  And at the bottom of 226 --
15       A    I'm not quite at 226.
16       Q    Okay.
17       A    I don't know what's going on with my
18  scroll bar, but it's either too fast or too slow,
19  so I'm not going there to . . .
20            (Witness scrolls through document.)
21            Okay.  I'm on 226.
22       Q    Okay.  And in the bottom in --
23  beginning second paragraph up from the bottom, In
24  addition, provisions in the 2016 final regulations
25  enabled the secretary to initiate defense

1  repayment claims on behalf of entire classes of
2  borrowers.
3            And that's the group discharge process
4  we were just talking about?
5       A    Uh-huh.
6       Q    The next sentence here, Initiating the
7  group discharge process is extremely burdensome on
8  the department and results in inefficiency and
9  delays for individual borrowers.
10            Can you explain why a group discharge
11  process is extremely burdensome as opposed to an
12  individual discharge process?
13       A    I -- I have to think about this.
14  This -- this is in the -- I think this is in the
15  portion of the reg that refers to the potential
16  cost.  I think it's in that section of the reg.
17  So I need to put this in the context.
18            So I believe what this is referring to
19  is that under the 2016 reg, the group discharge
20  process vaguely refers to a process that involves,
21  you know, a special master of some sort, which is
22  not a position that the department currently has.
23            And when -- so -- so the 2016 reg talks
24  about, you know, involving somebody like a special
25  master or Office of Hearing and Appeals, you know,

Page 162

1   some entity in the department to adjudicate these
2   large claims.  And that -- that is burdensome.  We
3   don't -- there isn't a special master.
4            So when it comes to the individual
5   borrowers, the borrower defense unit attorneys can
6   do that adjudication.  But I believe -- I'd have
7   to go back and look at the 2016 rule, but I
8   believe what this refers to is the process that
9   had been -- I don't know if it was described in
10  the reg or just described, but there was this
11  process about engaging a special master in -- in
12  these group claims.
13       Q    Okay.  So your understanding of the
14  change in 2019 is to remove the option of a group
15  claim because then you won't need to appoint a
16  special master?
17       A    No, I think you're mischaracterizing my
18  statement.
19       Q    Okay.  And I don't mean to be doing
20  that.
21       A    Right.
22            So you're asking me in particular what
23  this sentence refers to.  What this sentence is
24  referring to is one of the reasons that we did not
25  include a group discharge in the 2019 regulations.

Page 163

1   One of the reasons is that it is a burdensome
2   process.  That's one of several reasons.  And,
3   yes, that is one of the reasons we describe in
4   this document.
5        Q    Okay.
6        A    And to my knowledge, the 1995 reg also
7   did not have a group discharge process.  I'd have
8   to go back and review, but I don't believe that
9   was part of the '95 reg either.
10       Q    Okay.  And then if we can go to
11  page 90.
12       A    Okay.
13       Q    And at the bottom of page 90, that
14  final paragraph, could you read the first sentence
15  for the record starting with, We agree?
16       A    We agree that a borrower defense to
17  repayment regulation that is poorly constructed
18  under the statute may create a moral hazard by
19  giving students an opportunity to complete their
20  education and raise alleged misrepresentations to
21  avoid paying for that education.
22       Q    And what does that sentence refer to?
23       A    I think you have to read three
24  paragraphs ahead of that where what we explain is
25  that the appropriate way to best serve borrowers

Page 164

1   is to prevent misrepresentation from happening in
2   the first place because there is not just the
3   financial element, there's a time element.
4            So when you read that whole section,
5   what we're referring to is our interest in
6   preventing misrepresentation from the beginning.
7   And as you read this reg, you will see that we
8   have expanded consumer information through our
9   college scorecard so that we are providing data to
10  borrowers that reduces the potential for a school
11  to commit misrepresentation.
12            So when you read this whole section,
13  what you will see is that what we're talking about
14  is that an expanding college scorecard is the
15  better approach.  We want to prevent
16  misrepresentation from ever happening.
17       Q    The borrower defense regulations are
18  concerned with students who are alleging
19  misrepresentation has occurred previously; right?
20       A    This is a prospective regulation that
21  would be implemented after we had the expanded
22  college scorecard.
23            So we're talking about future, and we
24  believe that because the college scorecard put
25  these data out in the public before July 1, 2020,

Page 165

1   for future borrowers covered by this reg, we
2   believed that stopping misrepresentation by the
3   government publishing consistent data on all
4   programs was the best way forward, and that's what
5   this describes.
6        Q    So in this sentence, We agree that a
7   borrower defense to repayment regulation that is
8   poorly constructed, is that referring to previous
9   regulations?
10       A    No, I think it says a borrower defense.
11  We're talking about this regulation.  If we didn't
12  accurately and properly construct this regulation.
13       Q    And the result of not properly
14  constructing this regulation is a moral hazard
15  that gives students an opportunity to complete
16  their education and raise alleged
17  misrepresentations to avoid paying for that
18  education.
19            That's a risk that's created by a
20  poorly constructed regulation?
21       A    It is a potential risk.  That's what it
22  says, that is a potential risk of a poorly
23  constructed regulation.
24       Q    And that's a risk that the 2019
25  regulations, in your view, are constructed to

Page 166

1    mitigate?
2           MR. MERRITT:  Objection: scope and also
3    privileged information, getting to her views of
4    the regulation before the -- before it was
5    published.
6           BY MS. O'GRADY:
7           Q     This sentence refers to a poorly
8    constructed regulation.  Is that regulation the
9    2016 regulation?
10          MR. MERRITT:  Objection: asked and
11   answered.
12          MS. O'GRADY:  I don't know if it was
13   answered.  I'm wondering if the witness would mind
14   answering it again.
15          THE WITNESS:  It was a regulation, a
16   poorly constructed -- a conceivable poorly
17   constructed regulation.
18          BY MS. O'GRADY:
19          Q     I'm really not trying to play games
20   here.  I want to understand if one of the reasons
21   this 2019 regulation was written, as I'm reading
22   from it directly, is that the previous regulation
23   was considered poorly constructed creating a moral
24   hazard.
25          That's what the regulation says to

Page 167

1    me --
2           MR. MERRITT:  Objection.
3           BY MS. O'GRADY:
4           Q     -- and I want to clarify if I'm reading
5    the sentence correctly.
6           MR. MERRITT:  Objection.  That is not
7    within the scope of what the court authorized as
8    discovery.
9           MS. O'GRADY:  All right.  We're going
10   to go to the next exhibit which is in the folder
11   as A09, Borrower Defense Repayment, so it should
12   be one of the first files in the folder.
13          BY MS. O'GRADY:
14          Q     When you have that open, just let me
15   know?
16          A     I have that open.
17          Q     Okay.  Do you recognize this
18   PowerPoint?
19          A     I don't -- I don't know if I recognize
20   this PowerPoint, per se, but the information
21   contained in this PowerPoint is information that
22   I've seen in one format or another.
23          Q     Okay.  And what are some of the other
24   formats you might have seen it in?
25          A     Well, I mean, it could have been that

Page 168

1    pages of this document were put in other
2    PowerPoints, so, you know, I've seen information
3    that's in this PowerPoint.  I just -- I don't
4    recall whether I've seen this specific PowerPoint.
5           Q     The memoranda you were talking about
6    earlier that reported metrics to the secretary, is
7    this the format that information was presented in
8    or is this something different?
9           A     So this appears to me to be a periodic
10   update that talks -- so this is not what I was
11   referring to.  What I was referring to is a tally,
12   you know, just -- just numbers, not -- not pages
13   of PowerPoints, but just, you know, numbers.
14          Q     Do you know who drafted this?
15          A     No, I don't know who drafts documents
16   at FSA, but it appears to be an FSA document.
17          Q     And in what context would you have seen
18   this information?  Would it have been in a meeting
19   or by email?
20          A     It may have been emailed to me, but I
21   would have seen it in the context of a meeting.
22          Q     If we can go to the -- this is the
23   second page of the PDF, and it helpfully has a two
24   at the bottom left of the footer.
25          A     Oh, okay.  I see that.

Page 169

1           Q     Okay.  So this is one of the ones that
2    is going to match the number on the document and
3    the number in the PDF, which is always helpful.
4           A     Uh-huh.
5           Q     So on this heading, Of the nearly
6    280,000 borrower defense applications received
7    since 2015, that first bullet point, 57,000 have
8    been adjudicated, processed and closed.
9           I want to understand if that 57,000 --
10   excuse me.  Really what I want to ask about is the
11   second bullet point, 38,700 have been adjudicated
12   but have not yet been processed, and these were
13   the words we were talking about earlier, the
14   difference between adjudication and processing.
15          So what does that mean?
16          A     I don't know in particular for those
17   38,000 claims exactly what's the process they were
18   in, so I can't speak to any particular claim in
19   that group.
20          But, in general, what it means is that
21   the legal team in the borrower defense unit have
22   reviewed the evidence and have made a
23   determination -- let's just use the terminology on
24   the merit of the claim.  That may not be the right
25   legal terminology, but I think you got what I

Page 170
Page

1    mean.  They looked at the evidence to decide
2    whether it's substantiated.
3           I believe that when it has been
4    adjudicated but not processed, that means the
5    borrower hasn't yet been notified.
6       Q    Okay.
7       A    Right.  So then -- yeah.
8       Q    And then the 27,700 in the next bullet
9    point, those are approved applications that will
10   be finalized when appropriate relief is
11   determined.
12          So that means they've gotten their
13   step-one determination and are awaiting their step
14   two; is that correct?
15      A    I believe that's what it means.
16      Q    And then it says, Nearly 11,000
17   applications have been adjudicated as denied but
18   have not yet been processed.
19          So those are step-one denials not sent
20   to borrowers?
21      A    I'm not sure.
22      Q    Of the approved applications awaiting
23   their step-two determination, the 27,700, do you
24   know what categories of borrowers those are, from
25   what schools they came from?

Page 171
Page

1       A    I don't.
2       Q    And who has to sign off on the grants,
3    the approved applications?
4       A    Colleen Nevin.  Or let me be clear, she
5    may have delegated others on her team, so it would
6    be Colleen Nevin or her designee.  I don't know if
7    she's authorized others to sign off.  I'm unclear
8    about that.
9       Q    Okay.  And then on PowerPoint -- so on
10   the footer and on the PDF 6, page 6.
11      A    Okay.
12      Q    So this -- the heading is, Why are BD
13   applications on hold, and it says -- the second
14   bullet point under approvals says, No relief
15   methodology developed for non-CCI claims.
16      A    Yes.
17      Q    And that's what we've addressed before.
18   That refers to there being no non-CCI methodology
19   while the injunction was enforced; is that
20   correct?
21          I can ask more open ended if you want
22   to just explain that bullet point.
23      A    I think it means a couple of things.
24   It means that we had a methodology for CCI claims,
25   and that has been enjoined.  I believe -- I think

Page 172
Page

1    this was an August PowerPoint.
2       Q    Yes.
3       A    So -- so the situation becomes further
4    complicated during this time period because now
5    we -- we no longer have an agreement with the
6    Social Security Administration, and so we don't
7    even have access to social security data.
8           So -- so -- so we have, you know, the
9    pending methodology for CCI claims, but now we're
10   in a situation where the original method we had is
11   enjoined.  And further, if the California court
12   decides we can use that methodology for non-CCI
13   schools, we don't have access to even getting
14   those data from the Social Security Administration
15   anymore.
16          So if this is -- if the August time
17   frame is right in my mind, this has become further
18   complicated because now, no matter what the judge
19   says we don't have an agreement with social
20   security.
21          So, in other words, we don't have the
22   ability to apply that methodology even if
23   approved.
24      Q    Okay.  And -- and at the same time, no
25   methodology -- no alternative methodology was

Page 173
Page

1    being developed?
2       A    Well, that -- so that's what's
3    confusing about the discussion of the August time --
4       Q    It was August 31st, I believe.
5       A    Of what year?
6       Q    2019.
7       A    Okay.  So by then, we were in the
8    process of developing a methodology but it had not
9    yet been reviewed and approved, yes.  We were in
10   the hard work of -- of developing a methodology.
11      Q    Okay.  So this bullet point, No relief
12   methodology developed for non-CCI claims, then
13   what does that mean?
14      A    I believe what it means is that we are
15   still waiting for Corinthian borrowers for the
16   California court to make a decision, and beyond
17   that we now don't have access to social security
18   data for claims beyond those Corinthian claims.
19      Q    Under the next heading, Denials, it
20   says, Policy decision (spring 2018) to not issue
21   denials until approvals also could be issued.
22          What is that referring to?
23      A    So there had been a decision that was
24   made that if -- if the department issued denials
25   without at the same time issuing approvals,

Page 174

1   borrowers could be misinformed and believe that we
2   would not be approving any claims, and there was a
3   concern that that would have a chilling effect on
4   borrowers.
5           So a decision had been made in -- in --
6   that we would not issue denials if we were not
7   also issuing approvals.
8       Q    Who made that decision?
9       A    I do not know.  I was in meetings about
10  that, but I don't -- I can't tell you who actually
11  made that decision.
12      Q    You don't remember?
13      A    I don't even know if I was in a meeting
14  where the final decision was made.  That
15  decision -- you know, I -- I think the original
16  decision was made before I was in my role.  I
17  think it was revisited from time to time, but I
18  don't believe I was involved in the -- in the
19  making of that initial decision.
20      Q    Uh-huh.
21      A    I don't recall.
22      Q    And your understanding, you said, was
23  that you didn't want to have a chilling effect on
24  borrowers.  What do you mean by that?
25      A    I think the concern was that if the

Page 175

1   only decisions being issued were denials, that
2   that could be misreported by the media to make
3   borrowers believe that we were not going to
4   approve valid claims and the chilling effect would
5   be that, you know, if somebody has a valid claim,
6   they could have been discouraged from filing them.
7           We did not want -- I mean, you know, at
8   no point in time did anybody want somebody with a
9   valid claim to not submit it.
10      Q    And whether or not a claim is valid is
11  a step-one determination after they apply;
12  correct?
13      A    That's correct.
14      Q    So -- so it was determined as a matter
15  of policy that it was better to issue no decisions
16  rather than deny -- rather than send out denials
17  of any claims?
18      A    I -- I believe that's the decision that
19  was made in spring of 2018.
20      Q    Was there ever a discussion about
21  sending out approvals so that -- I mean, it seems
22  to me the choice was to either not issue denials,
23  as it says here, until approvals could be issued.
24          Was there a discussion about increasing
25  the pacing of approvals so that you wouldn't have

Page 176

1   to decide between no decisions or just denials?
2           MR. MERRITT:  Objection: calling for
3   privileged information about the deliberations
4   leading to the decision to not do denials.
5           BY MS. O'GRADY:
6       Q    I can move on.  You don't have to
7   answer that.
8           Okay.  Next bullet point is, No
9   processing systems available from summer 2018 to
10  present due to platform development and migration.
11          Now, what is that referring to?
12      A    I believe that was referring to the
13  development of a system to replace Excel
14  spreadsheets as the BD unit's mechanism for
15  managing claims.
16      Q    So when the processing systems were
17  unavailable, were claims still being adjudicated?
18      A    I don't know.
19      Q    Would Colleen Nevin know?
20      A    Yes, I believe she would be the one to
21  know.
22      Q    Okay.  Then issuance of decide --
23  denial note -- excuse me.
24          Issuance of denial decision scheduled
25  to resume by mid September.  What is that

Page 177

1   referring to?
2       A    I didn't write this slide, and so I'm
3   not quite sure what -- what this refers to.
4       Q    So at this point in your role, were you
5   not keeping tabs on the pace of decisions being
6   made?
7       A    In -- in the August time frame, we were
8   still waiting for the California court to rule on
9   the methodology, and so at this point in time, we
10  were still hopeful that there would be a
11  determination, at least for the Corinthian
12  borrowers, about a methodology.  So at -- at this
13  point in time, we're still waiting for the court.
14          Now, by August, we, the working group,
15  had come up with some potential methods to use for
16  adjudicating future claims, but it had not yet
17  been approved.
18          So I think --
19      Q    Okay.
20      A    You know, this may -- whoops, I'm
21  sorry.  This is the time period where we had
22  developed some options.  They weren't yet applied.
23  And in the meantime, there was still the hope that
24  the California court would rule at least for the
25  Corinthian borrowers.

Page 178

Page

1     Q     Regarding the policy decision in spring
2  2018 not to issue denials until approvals could
3  also be issued, I understand that you didn't
4  initially make that decision because it was before
5  your time?
6     A     Right.
7     Q     Could you have reversed it?
8     A     No.
9     Q     Why not?
10     A     Because now there's litigation
11  involved.
12     Q     Say there wasn't litigation involved.
13     A     Yeah, you're asking me to speculate on
14  the circumstance.
15     Q     Well, I guess -- so the decision not to
16  issue any denials until approvals could also be
17  issued, that's actually not related to litigation;
18  right?
19        That was a decision you said made
20  because you didn't want to give borrowers the
21  wrong idea; right?
22     A     Correct.  Initially, but I think the
23  department position was they didn't want to give
24  borrowers the wrong idea.
25     Q     So that decision?  Could you reverse

Page 179

Page

1  that decision?
2     A     So, I mean, you're asking me to tell
3  you what I think might have happened had the world
4  been different and we had --
5     Q     No, no, no.  In the exact world the way
6  it is, if you had wanted to, could you have said,
7  everybody, we're going to send out those denials
8  even though we're not sending out any grants?
9     A     No.
10     Q     Why not?
11     A     Because now that there is litigation
12  involved --
13     Q     But the denials, there's no litigation.
14  They've been denied.  There's no partial relief at
15  issue.  They're waiting there.  They've been
16  denied.  They're ready to go out.
17        There's a policy decision not to send
18  them out because we don't want to spook borrowers
19  and have them think everything is being denied, I
20  have that right; right?
21     A     Yes.
22     Q     So could you have said, we're not doing
23  that; we're going to send out these details?
24     A     No, I could not have done that.
25     Q     Why?

Page 180

Page

1     A     That's what I'm trying to tell you.
2  Because there's litigation involved.  Even if
3  litigation didn't involve denials, there's now
4  litigation around borrower defense.  So I'm not --
5  I'm not a lawyer and I --
6     Q     What litigation?  Are you talking about
7  something different than Calvillo, the Calvillo
8  Manriquez case?
9     A     No.  At this point, Manriquez was the
10  litigation we were waiting.  Yeah, I mean, that --
11     Q     So Calvillo Manriquez, though, was
12  about applying a certain partial relief
13  methodology that violated the Privacy Act.
14        These denials are totally separate.
15  These are not -- they have nothing to do with that
16  partial relief methodology.
17     A     What I'm saying is I'm not an attorney.
18  I'm not involved in that case.  I don't know what
19  the court said.  I don't know --
20     Q     So it would -- so you thought the
21  Calvillo Manriquez injunction meant that no
22  decisions could be issued at all, denial or
23  grants?
24     A     No, I'm saying that once litigation was
25  involved, those decisions were out of my hands.

Page 181

Page

1     Q     In whose hands were they put?
2     A     It would have been a group decision.
3     Q     By who?
4     A     It would have involved input from, you
5  know, our attorneys.  It would have involved input
6  from Office of the Secretary.  You know, FSA and I
7  would have had, you know, a seat at the table.
8        But I --
9     Q     I really want to understand --
10        MR. MERRITT:  Maggie, would you mind if
11  we took a short break right now?
12        MS. O'GRADY:  Can I just finish --
13        MS. BERMAN:  Yeah.  You can do a
14  question or two more.  I was just thinking we've
15  been going for --
16        MS. O'GRADY:  Sure.  I'm almost done
17  with this --
18        MS. BERMAN:  We've been going for more
19  than an hour and a half now.
20        MS. O'GRADY:  Can I just finish this
21  exhibit?
22        MR. MERRITT:  Yeah.  Is it a lot more
23  questions?
24        MS. O'GRADY:  No.  I really want to pin
25  this down and I think there's just a couple of

Page 182
Page

```
 1    more questions, yeah.
 2            MR. MERRITT:  Okay.
 3        BY MS. O'GRADY:
 4        Q    So I just -- it sounds to me, and
 5    correct me if I'm wrong -- I really want to
 6    understand -- that your position, your
 7    understanding of the state of things at this point
 8    was that the injunction in Calvillo Manriquez
 9    prevented FSA from issuing any borrower defense
10    decisions?
11            MR. MERRITT:  Objection.  It's a
12    mischaracterization of her testimony.
13        BY MS. O'GRADY:
14        Q    Okay.  Please -- please correct me if I
15    misstated that.
16        A    You misstated that.
17        Q    Okay.  So what was your understanding
18    of how Calvillo Manriquez affected FSA's ability
19    to send out borrower defense decisions?
20        A    What I -- what I'm trying to explain to
21    you is that because there was pending litigation,
22    whether a particular decision was related to that
23    litigation or not, because there's pending
24    litigation around borrower defense, I am not a
25    senior enough official to have decision-making
```

Page 183
Page

```
 1    authority.
 2        Q    What was -- so who would have
 3    decision-making authority to -- if not you?
 4        A    I think that's what I'm trying to tell
 5    you is that I -- I -- I -- there's lots of people
 6    who could have it.  I don't know who made all the
 7    decisions, but I do know it wasn't me.
 8        Q    The policy decision not to issue
 9    denials until approvals could also be issued, is
10    it your understanding that began immediately with
11    the Calvillo injunction?
12        A    I don't know the precise timing.
13        Q    Okay.  Because I -- so -- and I really
14    want to get to the bottom of this.  I didn't think
15    they were related because I'm reading this bullet
16    point and you explained that it was about not
17    wanting to give borrowers the wrong idea.  And
18    then we have the Calvillo Manriquez injunction
19    that prevents the application of a certain partial
20    methodology towards a number of CCI students.
21            So -- so the approvals have been paused
22    because the approvals demand -- you know, the
23    approvals need that step-two determination of the
24    partial relief that's been enjoined, but the
25    denials don't need to involve step two, and if
```

Page 184
Page

```
 1    there's denials ready to go out, why couldn't they
 2    have gone out?
 3            MR. MERRITT:  Objection: asked and
 4    answered.
 5            MS. O'GRADY:  It has indeed been asked.
 6            MR. MERRITT:  And it's been answered.
 7        BY MS. O'GRADY:
 8        Q    Okay.  I'll ask again.  So you said you
 9    could not have reversed that decision because of
10    the litigation?
11        A    That's not exactly what I said.
12        Q    Okay.  And I -- I apologize.  I know
13    this is getting redundant and back and forth and I
14    really just want to make it clear.  I don't mean
15    to -- to be -- to be so repetitive.
16            I really do want to understand is there
17    a person or a number of people, and can you
18    identify them, who could have decided to begin
19    issuing those denials rather than deciding not to
20    issue them until approvals could also be issued?
21        A    It would be speculative, right.  I
22    mean, there are any number of people, but because
23    I don't believe exactly who made each decision, it
24    would be speculative on my part.
25        Q    So who made the decision not to issue
```

Page 185
Page

```
 1    denials until approvals could also be issued?
 2        A    I do not know.
 3        Q    You were just told of that decision and
 4    went along with it.  Okay.
 5        A    I was told that was the decision.
 6            MS. O'GRADY:  Okay.  I think we'll take
 7    a break now.  Thank you for those extra few
 8    minutes.
 9            THE WITNESS:  Uh-huh.
10            MS. O'GRADY:  How long do we want the
11    break to be?  Charlie --
12            THE VIDEOGRAPHER:  Hold on one second.
13    The time is 19:24 UTC time.
14            (Recess -- 2:24 p.m.)
15            (After recess -- 2:43 p.m.)
16            THE VIDEOGRAPHER:  Okay.  We're now
17    back on the record.  The time is 19:43 UTC time.
18            MS. O'GRADY:  For the record, I'm just
19    going to state the designations on the last two
20    exhibits.  So file name ECF NO 56-3, Exhibit 5,
21    2019 regulations which is a long PDF file is
22    Exhibit 11.
23            (Jones Deposition Exhibit 11 was marked
24    for identification and attached to the
25    transcript.)
```

Page 186
Page

1        MS. O'GRADY:  And file name
2  A09-Borrower Defense to Repayment FSA PowerPoint
3  to the Secretary is marked as Exhibit 12.
4        (Jones Deposition Exhibit 12 was marked
5  for identification and attached to the
6  transcript.)
7        BY MS. O'GRADY:
8        Q    Okay.  And now we are going to go back
9  to Exhibit 2, your declaration.  And this time
10  we're going to look at paragraph 26.
11        A    Okay.  I found it.  Twenty-six?
12        Q    Yes.
13             So the bottom of this page, middle of
14  the paragraph, it states, The department has been
15  working to develop documents to provide a more
16  robust explanation for borrowers whose claims are
17  denied.
18        A    Yeah.  I must be in the wrong place.
19  Where are you again?
20        Q    I am at the bottom of page 10, the end
21  of paragraph 26 that begins on that page.
22        A    Ah, okay.  I'm there now.
23        Q    Okay.  So -- so here you write, The
24  department has been working to develop documents
25  to provide a more robust explanation for borrowers

Page 187
Page

1  whose claims are denied.
2             And what documents is that sentence
3  referring to?
4        A    (Witness reviews document.)
5             I believe this is referring to the
6  letter that the servicer would send to the
7  borrower following a decision.
8        Q    And the servicer meaning what?
9        A    So federal student aid does much of its
10  operational business through contract servicers,
11  and so the servicers would be the entities that
12  would actually send the letter to the borrower.
13        Q    Does FSA draft the letter?
14        A    FSA creates the template and the
15  information to fill the servicer.  It is my
16  understanding that the servicer or some other
17  contractor does the merge file.  That's my
18  understanding.  I haven't -- I -- I don't work in
19  the systems.
20        Q    Right.
21        A    My understanding is that a servicer or
22  a contractor does the merge.
23        Q    And by doing the merge, you mean puts
24  the information about a certain borrower into the
25  template provided by FSA?

Page 188
Page

1        A    Yes.
2        Q    Okay.  So the document -- the document
3  here is referring to a template denial notice?
4        A    Yes.
5        Q    And then on the next page -- well, it's
6  the continuing page of paragraph 26, which is
7  page 11.  So at the top it begins, Once these
8  documents are developed, the department needs to
9  work with each of its servicers to put the process
10  of loan relief and borrower notification in
11  process, which requires contract updates with each
12  of the federal student aid loan servicers that
13  service direct loans.
14             So that's what you were referring to
15  just now, the contractors doing the merge?
16        A    Right.  So every time we ask a servicer
17  to do anything, notify a borrower, create a new
18  letter, anything, it's a change order and an
19  additional fee that has to be negotiated.
20        Q    So that includes sending a denial
21  letter?
22        A    It is my understanding that the
23  servicers issued -- issued all the letters, but
24  you'd have to check with Colleen Nevin.  She would
25  know better than I.

Page 189
Page

1        Q    When you say "servicer," you mean --
2  what is a servicer?  That's different from a loan
3  servicer?
4        A    It is a loan servicer.
5        Q    So you're referring to loan servicers,
6  okay.
7        A    And -- and -- and, you know -- yes.
8  Simply stated yes, we're talking about loan
9  servicers here.
10        Q    So the next sentence, it says, It takes
11  longer to develop decision letters that provide an
12  explanation for each borrower of why their claim
13  was denied, but we believe this investment of time
14  is important so that borrowers understand the
15  basis for the decision, which is vital to
16  instilling confidence in the process.
17             So in this paragraph, you've said the
18  departments are working to develop these
19  documents -- these denial letters.
20             Is that process complete?  Has the
21  department done so?
22        A    The department has developed denial
23  letters that cover the -- that cover the -- the
24  kinds of situations we have seen so far, but it is
25  always possible that some new category arises and

Page 190

1    a new letter has to be developed.
2            So I can't say that this is the full
3    and complete final census, but the attempt was to
4    develop letters that -- that could be used to
5    communicate regardless of the school the borrower
6    attended.
7        Q    Okay.  And then the next sentence is,
8    This has taken longer than we hoped but the
9    notices are finished and we are now working with
10   our contracting officials and loan services to
11   enter these notices into servicer systems.
12           So this has taken longer than we hoped.
13   How long did you hope it would take to develop
14   these letters?
15       A    Our -- I can't remember what -- I can't
16   remember what I hoped.  I -- I just know that, you
17   know, it -- it took what felt like a long time.
18       Q    And what are the factors that made it
19   take what felt like a long time?
20       A    The complexity -- the complexity of the
21   situation.
22       Q    And what do you mean by that?
23       A    For example, there are some borrowers
24   who have loans that will be adjudicated under all
25   three regulations.  How do you -- you know, we

Page 191

1    were trying to figure out what's the right way to
2    manage.  Do we send one letter for all three
3    adjudications?  Do we separate them into three
4    separate adjudications?
5            So it -- it gets complicated.  There's
6    a -- you know, when borrowers consolidate loans,
7    they don't always understand that they've reset,
8    you know, the clock, right.  So there are -- is
9    it -- the student loan program is a very
10   complicated program, and there's just a lot of
11   complexity around the potential combinations.
12       Q    Okay.
13       A    We have borrowers who, you know, left
14   the program and came back or maybe, you know,
15   completed one degree and now they're back for a
16   second.
17           So it's just a complicated --
18       Q    With respect to the letters that were
19   being developed, how do the letters reflect those
20   complications?
21       A    We had to decide, for example, whether
22   the letter should have a fill in the blank.  So
23   let's say a borrower had loans adjudicated under
24   the '95 regs and the 2016 regs, meaning under the
25   state standard and under the federal standard.

Page 192

1            The complexity was do we try in one
2    letter to explain well, these loans were
3    adjudicated under California state law, blah,
4    blah, blah, but these loans were adjudicated under
5    a federal standard.  And the question was is it
6    better to try and do that all in one letter?
7    Should we send two letters, one for each set of
8    adjudications?
9            So it becomes complicated in deciding
10   what -- what content.
11           In addition, because for Corinthian
12   borrowers a decision had been made that all of
13   those borrowers would get a minimum of 10 percent
14   relief if they were part of the class, we had to
15   have letters that explained the 10 percent to
16   Corinthian borrowers, but that 10 percent had not
17   been -- it was not part of a policy for other
18   schools.  It just hadn't -- hadn't, you know,
19   gotten there yet.
20       Q    So the denial letters that identify or
21   that are dealing with loans that you say are under
22   different regulations, has that letter been
23   developed?
24       A    I believe that the letter has been
25   developed for under the state standard.  And let

Page 193

1    me think about if it's been developed for
2    the regs -- and -- under the federal standard.
3            You know, the longer I recall seeing
4    was to respond under the state standard, which is
5    more complicated than the federal standard, I
6    don't recall whether I've seen a federal standard
7    letter yet.
8        Q    Okay.  So and when you say a letter
9    under the state standard, you're referring to a
10   letter under the '95 regulations?
11       A    Correct.
12       Q    Okay.  And that's -- okay.
13           So besides -- and I think my question a
14   couple of questions ago was, you know, what are
15   some of the factors that made the process of
16   developing this letter -- this denial template
17   take longer than you had hoped, and you said one
18   of them was having to do with a letter under the
19   state standard and the federal standard.
20           Is that right?
21       A    More than one.  That was one example.
22       Q    Yeah.  So my next question is what are
23   some other factors besides that one?
24       A    Some other factors are -- and this gets
25   very weedy, but the name of the school that the

Page 194
Page

1  borrower attended may not be the name of the
2  school officially in our records.
3      Q    And what bearing would that have on the
4  letter itself?
5      A    So the borrower may have submitted a
6  letter saying, you know, I went to school A, and
7  we had to figure out how to send a letter back
8  using school A because that school is actually
9  listed in our records as school B, but the
10 borrower might not have known that.
11          So how do you communicate to a
12 borrower -- so we either had to, you know,
13 communicate to the borrower why this looks to be a
14 different name, or they had to have a system
15 adjustment.
16     Q    Is that a -- is that a new problem,
17 though?  I mean, this is -- I guess I'm asking
18 about the development of these letters that are
19 providing, as you say in paragraph 26, a more
20 robust explanation.
21          So is the -- making sure the school
22 names match something that is a challenge to
23 develop a letter that provides a more robust
24 explanation?
25     A    I would say that that is the case, but

Page 195
Page

1  I don't think that was the primary reason for the
2  statement.  I think the primary reason for this
3  statement was the complexity of the many different
4  situations a borrower could be in.
5      Q    Okay.  And, so, what are some of those
6  situations?
7      A    You know, again, if the borrower -- so
8  depending upon how the state standard was decided,
9  you know, the -- the borrower could get one
10 decision under a state standard but his or her
11 friend could get a different decision under a
12 different state standard.
13          So one of the areas of complexity is
14 explaining to the borrower, or at least listing
15 for the borrower the state standard under which
16 the claim was adjudicated.
17     Q    So the effort to provide these decision
18 letters that provide, quote, an explanation for
19 each borrower why their claim was denied, is to
20 include the state standard used to adjudicate
21 their claim?
22     A    It should notify that -- the borrower
23 of the state standard.
24     Q    And does it?
25     A    It is supposed to.

Page 196
Page

1          MS. O'GRADY:  Okay.  So the next
2  exhibit is in the folder as ECF number 116,
3  Defendants Post-CMC Filing.
4          THE WITNESS:  Can you give me the
5  number?  ECF?
6      BY MS. O'GRADY:
7      Q    Sure.  ECF number 116.
8      A    Ah, okay.
9          MS. O'GRADY:  Okay.  And this exhibit
10 will be marked as Exhibit 13.
11          (Jones Deposition Exhibit 13 was marked
12 for identification and attached to the
13 transcript.)
14     BY MS. O'GRADY:
15     Q    Ms. Jones, have you ever seen this
16 filing before?  You may not have.
17     A    (Witness reviews document.)
18          I don't recall having seen this
19 document before.
20     Q    Okay.  Well, I would like to talk about
21 some much the attachments which I think you
22 probably have seen.  So I can represent to you
23 that this document was filed by defendants in this
24 case as a response to the judge -- a judge's
25 question about denial notices.

Page 197
Page

1          And, so, if you go to PDF -- let's
2  see --
3      A    Oh, so, you know, so may -- I do
4  remember seeing these exhibits as -- as part of my
5  review.  So may -- maybe -- maybe this will -- I
6  can't remember if we're talking --
7      Q    We're just going to talk about the
8  exhibits anyway.
9      A    Okay.
10     Q    So if we go to PDF -- so page 7 -- PDF
11 page 7 should be where exhibit A starts?
12     A    Yes.  Okay.  I'm at exhibit A.
13     Q    Okay.  So this -- and if it's all right
14 with you, I'm going to refer to these as form
15 denial A because I -- I think that's what it is.
16     A    (Witness nods head.)
17     Q    So -- so can you tell me what exhibit A
18 is just so I'm clear that we're on -- that
19 we're -- what we're both looking at?
20     A    Okay.  Let me -- let me look at this.
21          (Witness reviews document.)
22     Q    So maybe an efficient way to do this is
23 in the court filing on PDF page 3, there is kind
24 of a short index identifying what each of these
25 denial notices are.  And on the bottom of page 2,

Page 198

1   it says, a sample attached as exhibit A is for
2   Corinthian borrowers to assert only job placement
3   rate claims but who do not meet the eligibility
4   criteria for such a claim, and that that's
5   Exhibit -- that's Form Denial Notice A.  Does
6   that -- that seems accurate to you, this is Form
7   Denial Notice A?
8        A    It does.  I've scrolled through the
9   letter to where it says borrower defense claims
10  based on CCI job placement.  So that comports with
11  that.
12       Q    So is this one of the letters developed
13  as we were just talking in the paragraphs of your
14  declaration that talk about developing a letter
15  with more information for borrowers about why
16  their claims were denied?
17       A    (Witness reviews document.)
18            Yes.  I can't say that this is
19  precisely the version that I saw, but, you know,
20  this comports with the kind of letter that -- that
21  I reviewed.
22       Q    Okay.  And -- and I just want to make
23  sure that we're both on the same page about each
24  one of these letters.  So again, on the bottom of
25  page 2 of the court filing, it identifies exhibit

Page 199

1   B, which I'll call Form Denial B, as a denial
2   letter for Corinthian borrowers who assert other
3   claims in addition to job placement rate claims?
4        A    And as I scroll through, I want to
5   make.  Clear when I saw this document as part of
6   the review process, it did not have the COVID-19
7   notes, so that's applicable --
8        Q    Okay.
9        A    -- of something that's been added that
10  was -- I didn't review that.  That wasn't in the
11  original document.
12       Q    So at what point did you see Form
13  Denial A?
14       A    It would have been in the time frame
15  of, you know, about this time last year.
16       Q    So this is right around when you wrote
17  your declaration saying that the process of
18  developing those letters is complete?
19       A    (Witness nods head.)
20       Q    Okay.  Now, let's look at exhibit C
21  which is, quote, non-Corinthian borrowers who
22  attended schools for which the department does not
23  have any common evidence in its possession.
24       A    Okay.  I'm scrolling down to C.  Okay.
25  I'm at C.

Page 200

1        Q    Okay.  And is this form letter, perhaps
2   without the Covid paragraph, something that you
3   reviewed and approved?
4        A    (Witness reviews document.)
5            So the part that looks different to me
6   which may or may not be different -- it's just my
7   memory -- is the way the allegations are listed.
8   I don't know if in the version that I saw, you
9   know, it had the template for multiple
10  allegations.  The one that I saw may have just had
11  a placeholder.
12            So I don't know if I've seen it
13  precisely laid out this way, you know, the way
14  allegation one was in the middle of the page.  The
15  version I saw may have just had a placeholder.
16       Q    Okay.
17       A    But in general, this is.
18       Q    In general, yes.  That's helpful.
19            Let's look at the last one which is D,
20  and on the bottom of page 2, exhibit D is
21  identified as a letter for, quote, non-Corinthian
22  borrowers who attended schools for which the
23  department does have common evidence in its
24  possession, and then that's going to be exhibit D.
25       A    On this one, I don't recall whether I

Page 201

1   reviewed this particular document.  I -- I don't
2   recall whether this was just based on a template
3   that I had already reviewed and this was just a
4   derivative of it or whether I saw this one de
5   novo.  I just can't remember.
6        Q    Okay.  So as between C and D, you
7   remember reviewing C but with potentially a more
8   general placeholder under Allegation.  But D,
9   you're not sure you've seen?
10       A    Let me look at it again and . . .
11            (Witness reviews document.)
12            This does look familiar to me.
13       Q    So I'll just -- my understanding is
14  that these four denial letters are the result of
15  the efforts you describe in your declaration in
16  paragraph 26 of developing documents to provide a
17  more robust explanation for borrowers whose claims
18  are denied.
19            And is that -- do I have that right?
20       A    You do.  I mean, again, there could
21  have been final editorial changes or format
22  changes after I saw them, but, yes, my memory
23  is -- this is the kind of thing we were
24  discussing, and this document looks very similar
25  to what I reviewed.

Page 202

1     Q     Are you the person who would give final
2  sign-off on the use of these templates?
3     A     No.
4     Q     Who is that person?
5     A     Again, I -- I don't -- I don't know who
6  actually signs off on these.  I mean, there's a
7  departmental process, and I -- I can't tell you
8  who the final signer is on -- on this document.
9     Q     Would the secretary review these?
10    A     I don't -- I don't know.  I don't know
11 if the secretary would -- would review this
12 document.  It -- it's possible, but I don't know.
13    Q     And what was your involvement in
14 drafting these?
15    A     As -- as -- you know, it was an editing
16 role.  I -- it would have been an editing role in
17 response to somebody else's document.
18    Q     Okay.  Now, I want to look at -- well,
19 first -- first I'll ask, so C is for
20 non-Corinthian borrowers for schools that do not
21 have common evidence.  And D is for non-Corinthian
22 borrowers who went to school that do have common
23 evidence.
24          What is meant by "common evidence"?
25    A     You'd have to ask Colleen Nevin, but I

Page 203

1  think that means -- well, I think you should ask
2  Colleen Nevin, but I -- I think it means to
3  distinguish between evidence provided by the
4  student versus evidence that the department may
5  have in its possession, but you'd need to check
6  with her for the specific terminology.
7     Q     Well, let's look at the paragraph
8  applicable law, and that is -- on exhibit D, it is
9  the first page, middle, and it says, For direct
10 loans first disbursed prior to July 1st, 2017, a
11 borrower may be eligible for a discharge
12 (forgiveness) of part of all of one or more direct
13 loans if the borrower's school engaged in acts or
14 omissions that would give rise to a cause of
15 action against the school under applicable state
16 law.
17    A     Uh-huh.
18    Q     So is there more information about
19 which state law is being applied for these
20 adjudications in these letters?
21    A     Well, you know, if you go up to A
22 for -- I -- I can scroll through this one, but if
23 you go up through A, there's actually a place
24 where it would state the state law standard.
25    Q     Okay.  Let's look at that in A.

Page 204

1     A     I think it was A.  It might have been
2  B.  But let's go up to A and look.
3          (Witness reviews document.)
4          So A -- so for the Corinthian
5  borrowers, they were all adjudicated under the
6  California state law, so that's why this letter
7  says California in the template.
8     Q     Right.  On page 2 in the template.
9  Okay.
10    A     But in --
11    Q     And then --
12    A     -- in the others, the attorney in the,
13 you know, decision/reason or whatever, that's
14 where -- that's where they can state which
15 standard was used for the adjudication.
16    Q     Okay.  And on the template, where do
17 they insert the state law?
18    A     So in template B, for example, where it
19 says, Review recommendation reason, right, the
20 reason would be potentially dependent upon the
21 state law so -- so that -- that is -- that's
22 where -- I think that's the place where the
23 attorney would insert it.
24    Q     Okay.  And, so, that review
25 recommendation reason, that's also in -- that's

Page 205

1  also under the allegation template in C and D.
2          And, so, your understanding is that's
3  where an attorney would write what state law they
4  were applying?
5     A     That's my understanding.
6     Q     Okay.  And that's true for -- I'm
7  looking at template C, and also let's look at
8  template D, allegation type, so that
9  recommendation reason portion is where they would
10 insert the state law.
11         So when you reviewed these letters, is
12 that your understanding of what would happen?
13    A     Yes.
14    Q     I have a -- I want to go back to the
15 common evidence question.  If several borrowers
16 said the same thing, would that be considered
17 common evidence or individual evidence?
18    A     I don't know.  You'd have to ask
19 Colleen.  I don't know how they review evidence.
20    Q     And your understanding of the meaning
21 of common evidence as being something that the --
22 that the department has, if they had in their
23 possession, you know, a whole group of borrowers
24 making the same allegation, would that -- would
25 that be included just in your definition as you

Page 206
Page

1  understand it?
2      A    I guess in my mind the differentiation
3  is does the department have the evidence from some
4  source other than the borrower or does the
5  borrower provide the evidence.
6           Now, Colleen's group may have, you
7  know, subcategories of definitions when it -- I
8  just think about it in terms of did the borrower
9  submit the evidence or is the evidence somewhere
10 else.
11     Q    Okay.  If -- if borrower A from school
12 X submitted evidence about -- for themselves, but
13 the department has on file evidence about the same
14 exact thing from borrowers B through Z of school
15 X, is the evidence of those borrowers B through Z
16 held by the department as common evidence?
17     A    I don't know.  That would be a
18 determination Colleen and her team would make.
19     Q    Okay.  All right.  The next exhibit is
20 in the folder as ECF number -- this one is labeled
21 confusingly.  It's ECF number, ECF number 108-08
22 Daniel Deegan AFF?
23     A    Okay.
24     Q    And have you ever seen this before?
25     A    (Witness reviews document.)

Page 207
Page

1           I don't recall seeing this before.
2  Since it's redacted, I guess it's possible it was
3  in the documents --
4      Q    There are some -- I can just let you
5  know, there are some redactions just for personal
6  information.
7           So this is an affidavit filed in this
8  case by one of the named plaintiffs, and the
9  reason I'm using it as an exhibit today is I'd
10 like to look at an example of a denial letter that
11 appears to me to be using the templates that we
12 just looked at.
13          So if we can go to -- it's -- well,
14 let's start at PDF page 9.  I'm actually -- here,
15 let me -- I'm going to have to open this up, too,
16 just to make sure I'm in the right PDF.  So --
17 pardon me.  Let's say -- yeah, in PDF page 9, and
18 this is an email.  Daniel Deegan is the borrower.
19 It's dated May 7th, 2020.  We've redacted out for
20 personal reasons the borrower defense application.
21          So if you want to just familiarize
22 yourself with the next few pages, which is -- this
23 is the denial letter he received, I'd just like to
24 ask some questions about it in light of the
25 template that we just saw.

Page 208
Page

1      A    (Witness reviews document.)  Okay.
2      Q    Okay.  So we were just talking about
3  the state law that a claim is adjudicated under,
4  and do you see that anywhere in this document?
5      A    I don't see it in this document, but
6  I -- it is -- there are some determinations that
7  are based on state law, and then there are other
8  situations where state law wouldn't apply.  So,
9  for example, the borrower didn't have a loan, but
10 it --
11     Q    Okay.  But is this one of those
12 situations as you understand it?
13     A    So I don't know because I haven't seen
14 case -- I don't know what he alleges and I don't
15 know --
16     Q    Okay.  Well, let's go to on -- the
17 first page, which is PDF page 9 of this letter,
18 applicable law, and it says the same text was in
19 the template, For direct loans first disbursed
20 prior to July 1st, 2017, et cetera, against the
21 school under applicable state law.
22     A    Right.
23     Q    So that matches the template?
24     A    Yes.
25     Q    And then where you had expected the

Page 209
Page

1  state law to appear was under the allegations
2  listed, so let's look at page 10 of this PDF.  It
3  has, Allegation one, employment prospects.  You
4  allege Keller Graduate School of Management
5  engaged in misconduct related to employment
6  prospects.  This allegation fails for the
7  following reasons, insufficient evidence.
8           And there is no state law listed there;
9  correct?
10     A    There -- there is not, but I also don't
11 know what the borrower submitted.
12     Q    Okay.  Let's -- we can go back to that.
13 The borrower's written application is exhibit A,
14 and that begins on PDF 4.  So this is an email
15 sent to the borrower defense repayment address on
16 November 1st, 2016.
17          So I -- I guess -- I'm wondering what
18 you expect to see in the application that would
19 make defining a state law in the denial
20 unnecessary or impossible?
21     A    No, again, I -- I don't know the state
22 law standard, so it's --
23     Q    Right.
24          But I just want to establish that this
25 denial that he received doesn't include one.  I

1  just want to make sure I'm not missing it.
2       A    Yeah, I agree that this denial doesn't
3  include one, but I don't know why.
4       Q    You don't know why.
5            Do you have any idea as to why it might
6  not include one?
7       A    You know, again, I could speculate, but
8  I didn't review the --
9       Q    Speculate away.
10      A    You know, if -- if -- and I don't -- I
11 haven't read -- so, I mean, if -- if the student
12 actually didn't have a loan.
13      Q    If he didn't have a loan, would he
14 receive that form denial D template, or would
15 there be a different kind of notice he would
16 receive saying that you don't even have a loan?
17      A    I can't remember which template would
18 be used for I don't have a loan. I'm just giving
19 you an example of where there could be a denial
20 that doesn't involve the state standard and it
21 would be because it doesn't involve -- you know,
22 it doesn't meet the federal standard, doesn't have
23 a loan or, you know --
24      Q    So it would be -- is it your view that
25 it would be an unusual case for a denial notice

1  based on form denial D to not include the state
2  standard used?
3       A    I don't know what's usual or not usual
4  because I don't do the adjudication. I --
5       Q    Right.
6       A    -- don't --
7       Q    But when we were talking about the
8  template just now, your expectation was that it
9  would include the specific state standard when it
10 was sent out?
11      A    If the decision was based on the state
12 standard.
13      Q    Okay. And under what circumstances
14 could a decision not be based on a state standard?
15      A    If it doesn't meet the federal
16 standard, the application was incomplete, no
17 evidence was submitted, no claim of
18 misrepresentation was made, those are some
19 examples I can think of. But, again, I don't
20 adjudicate claims. I can't imagine all the
21 examples because I haven't seen them.
22      Q    Okay. But a standard application, say,
23 that alleges misrepresentation, the person has a
24 loan.
25           It's your expectation that a state

1  standard would be applied. I mean, as the
2  template says, the temp- -- and his letter
3  actually says, For direct loans first disbursed
4  prior to July 1st, 2017, a borrower may be
5  eligible for a discharge, et cetera, for a cause
6  of action under -- against the school under
7  applicable state law.
8            So given that statement of applicable
9  law, that's saying we're going to apply the state
10 law. And, so, when state law is going to be
11 applied, your expectation would be that the
12 borrower would be told the law of which state is
13 being applied?
14           MR. MERRITT:  Objection: speculative.
15      BY MS. O'GRADY:
16      Q    When a borrower receives a denial
17 notice that gives this notice about what law
18 applies, is it your expectation that the letter
19 would include which law applies?
20           MR. MERRITT:  Objection: speculative.
21           MS. O'GRADY:  I'm really just asking
22 about what the template -- how the template is
23 used and how the witness expects the template to
24 be used. I do think it's already on the record so
25 I can move on.

1            MR. MERRITT:  You have her prior
2  answers, but --
3            MS. O'GRADY:  Okay.
4            MR. MERRITT:  But if you'd like to
5  clarify that answer, you can.
6       BY MS. O'GRADY:
7       Q    When you said one of the reasons it
8  might not include a state law statement was that
9  it didn't meet the federal standard, what did you
10 mean by that?
11      A    To be applicable, it has to meet, you
12 know, the federal definition, meaning it has to be
13 a direct loan. It has to be a federal loan. It
14 has to be, you know, associated within enrollment,
15 and --
16      Q    Okay. So this threshold --
17      A    Yeah, threshold.
18      Q    -- determinations, okay.
19      A    And there has to be evidence against
20 which to make the determination. I mean, I think
21 that's implicit.
22      Q    Right.
23      A    You know, there has to be evidence to
24 evaluate.
25      Q    So we're in agreement that this denial

1    letter that Mr. Deegan received is based on that
2    form D template.  I think that's --
3         A    It appears that's --
4         Q    It appears to be.
5              But this one does not include a mention
6    of which state law applies?
7         A    I would agree.
8         Q    Would it surprise you to know that
9    thousands of these denial letters that have been
10   sent, none include which state law applies?
11             MR. MERRITT:  Objection:  Speculative.
12             MS. O'GRADY:  I don't think that's
13   speculative, and I would like to know if the
14   witness would be surprised to learn that.
15             MR. MERRITT:  She stated her -- that
16   show doesn't have the files before her for each
17   and every application.
18             MS. O'GRADY:  No, but I'm not asking
19   her to look at each and every application.  I want
20   to know if that would be a surprise.
21             MR. MERRITT:  Go ahead.
22             THE WITNESS:  It would -- you know, I'd
23   have to know more of the specifics.
24   BY MS. O'GRADY:
25        Q    But again, going back to the template

1    of form D, the intention of form D was to tell
2    borrowers what state law applied; right?
3         A    That was the intent.
4         Q    And when you wrote in your declaration
5    that you were developing documents so that, quote,
6    borrowers would understand the basis for the
7    decision, part of that basis is which state law
8    would apply; right?
9         A    If it -- if the state law is at this --
10   is the subject of the review and the decision,
11   right.  If the state law is the source of the
12   determination.
13        Q    And other sources of determination
14   would be you don't have a loan not meeting those
15   threshold requirements of even being adjudicated;
16   correct?
17        A    Or you provided no evidence.
18        Q    Okay.  Let's -- on Mr. Deegan's denial,
19   let's go to PDF page 10, and it says there, Why
20   was my application determined to be ineligible.
21             And it says, Ed reviewed your borrower
22   defense claims based on any evidence submitted by
23   you in support of your application, your loan data
24   from National Student Loan Data System and
25   evidence provided by other borrowers.

1         Does this also include the common
2    evidence that Ed would have for certain schools?
3         A    You know, again that would be something
4    you'd have to ask the BD attorneys.  I don't know
5    how they look at evidence, so I -- I can't answer
6    your question.
7         Q    Okay.  You had said that no state law
8    would have to be applied for a borrower who did
9    not submit any evidence for their claim.  What
10   denial letter would they get, what form?
11        A    You know, I -- I -- I don't know off
12   the top of my head.  I don't -- I don't know.
13        Q    Okay.  We're going to look at the next
14   exhibit which is file name ECF number 129-1,
15   Connor Declaration, Plaintiffs' Motion to Enforce.
16             (Jones Deposition Exhibit 14 was marked
17   for identification and attached to the
18   transcript.)
19             THE WITNESS:  All right.  Okay.  I have
20   it open.
21   BY MS. O'GRADY:
22        Q    Okay.  So this is kind of a bulky
23   document and I can -- it is a document that was
24   submitted to the court that includes an affidavit
25   from another one of the named plaintiffs.  And

1    like the previous one we just looked at, I'd like
2    to look at her denial letter.
3              So if you scroll ahead, it's PDF
4    page 24 that that document begins.
5         A    Okay.
6              MS. O'GRADY:  And, for the record, this
7    is Exhibit 15.  And the previous Daniel Deegan
8    affidavit that we just looked at is Exhibit 14.
9              (Jones Deposition Exhibit 15 was marked
10   for identification and attached to the
11   transcript.)
12   BY MS. O'GRADY:
13        Q    Okay.  It's actually page 27 of the PDF
14   it begins.  I apologize.  So like Mr. Deegan's
15   that we just looked at, this is Ms. Sweet's
16   borrower defense application.  And the personal
17   information is redacted, but nothing besides that.
18        A    (Witness reviews document.)
19        Q    And if you can take a -- take a look at
20   the information she provides, she provides
21   narrative information about her experience at
22   Brooks.
23        A    And, so, I'm recused from -- from any
24   matter -- I have voluntarily recused myself from
25   any matter pertaining to a school that was owned

Page 218

1  or operated by Career Education Corporation, so
2  I'm recused from this one.
3      Q    Okay.  So how does that affect your --
4  how does that affect your role more generally?
5      A    I don't review -- I don't review -- I
6  don't make determinations, so --
7      Q    Okay.  You had a role in reviewing the
8  borrower defense denial templates we just looked
9  at, though; correct?
10     A    Yeah, the generic template.
11     Q    And some of those do go out to students
12 who attended the ECC schools?
13     A    That's not how the recusal process
14 works.  The recusal process at the Department of
15 Ed is based on particular matters for a particular
16 institution.
17     Q    How long has this voluntary recusal
18 been in place?
19     A    I voluntarily recused myself from the
20 particular matters with the particular
21 institutions related to CEC from the day I
22 returned to the department.
23     Q    And is there documentation of the
24 recusal?
25     A    Our -- our ethics -- I'm sure our

Page 219

1  ethics officer would have that.  I mean --
2      Q    And how -- so how -- how broad is it?
3  I mean, you're recusing yourself from reviewing
4  this denial letter for a Brooks student.
5      A    Right.  I would not --
6      Q    How else would it affect your job?
7      A    I would not make -- I would not issue a
8  decision on any matter regarding an institution
9  owned and operated by CEC.
10     Q    So can you explain further what that --
11 what that means operationally for your
12 policy-making role or any kind of review that you
13 do of -- of policies that might affect CEC?
14     A    That's not how recusals work.  Recusals
15 are not -- I mean, you know, I worked at Princeton
16 and Community College of Baltimore County.  I
17 don't -- you know, my recusal doesn't mean that I
18 can't look at any matter that might have an impact
19 on Ivy League colleges.  It's particular.
20          So anything -- so in particular, I
21 would not look at something about a student who
22 attended Brooks Institute.  I mean, first of all,
23 I wouldn't look at these anyway because I don't
24 adjudicate the decisions.  I don't review the
25 decisions.  But as a practice, anything that comes

Page 220

1  with the name of an institution -- and, in fact,
2  that includes -- you know, I have asked Mark to
3  mask the names, right, so I don't -- I don't get
4  statistics that would delineate the CEC schools or
5  outcomes.
6      Q    So he -- he you ask Mark to mask the
7  names when you receive, you know, like a list of
8  pending applications so you don't know how many
9  are from CEC schools?
10     A    Correct.  He sent -- after he sent the
11 first one, I sent an email back saying please
12 don't send me a list with the names of schools.
13     Q    So I want to understand how this works.
14 So he'll redact out all the names of all the
15 schools, then, or else you'd know that it was CEC;
16 right?
17     A    He's just stopped sending me the list
18 with the school names.
19     Q    So you get a list but no school names,
20 or you get no list?
21     A    I get the roll-up numbers.
22     Q    Okay.  So how else does this voluntary
23 recusal affect -- affect your role?
24          MR. MERRITT:  Objection.  She's
25 explained the basis of the recusal, and at this

Page 221

1  point it's getting beyond the scope of what the
2  court ordered.
3          BY MS. O'GRADY:
4      Q    Well, I want to understand if this
5  recusal affects in any way your decision to sign
6  off on -- or decision to sign off or not sign off
7  on decisions.
8          We talked a lot about the decision not
9  to send denials.  I want to understand the full
10 scope of it.
11         MR. MERRITT:  She's answered the
12 question.
13         BY MS. O'GRADY:
14     Q    Okay.  So nothing else to add?
15     A    (Witness shakes head.)
16     Q    Okay.  When you were developing your
17 partial -- working on developing the partial
18 relief methodology that went into effect in
19 December 2019, was that -- did you consider CEC
20 schools during that, or were you also --
21     A    There were no -- there were no data on
22 CEC schools, no.  We looked at the methodology
23 based on the data available, which at that point
24 in time was Corinthian and ITT.
25     Q    And no -- and no other schools?

Page 222

1      A      No other schools had data available
2  when we --
3      Q      So if there were no other schools of
4  data available, how was that methodology going to
5  be used for schools other than Corinthian and ITT?
6      A      By methodology, what I mean is the
7  methodology requires earnings tables to be
8  developed, and at the time that we were developing
9  the methodologies, the FSA team had earnings
10 tables only for Corinthian and ITT.
11     Q      And why is that?
12     A      Because it takes time --
13            MR. MERRITT:  Objection to the scope of
14 the questioning.
15 BY MS. O'GRADY:
16     Q      Well, I -- I am going back a couple of
17 topics, but I do want to understand that the
18 partial relief methodology that was -- that was --
19 you've testified you were not able to use because
20 of the Calvillo Manriquez injunction was for all
21 schools, not just CCI and Corinthian; correct?
22            MR. MERRITT:  Objection.  It calls for
23 speculation.
24            Go ahead, Diane.
25            THE WITNESS:  You keep mixing the 2017

Page 223

1  and the 2019 methodology.  I wasn't involved in
2  the 2017 methodology, so I don't know what they
3  looked at or -- I wasn't --
4  BY MS. O'GRADY:
5      Q      But you were involved in the -- the not
6  being able to apply it because it was enjoined.  I
7  mean, that was -- that happened during your
8  tenure, the --
9      A      But it wasn't my decision.
10     Q      Right.  But you testified that that's
11 why -- I mean, before Congress and in your
12 declaration you explained.  I'm asking you about
13 it because you said, you know, we were not going
14 to apply that methodology because it was enjoined
15 by the Calvillo Manriquez court?
16     A      That was the decision that the
17 department had made.  Yes, the methodology was
18 enjoined and until the court issued a final
19 bulleting, yeah, it was enjoined.
20     Q      Okay.  It wasn't because you didn't
21 have data for other schools; it was because it was
22 enjoined?
23     A      So on the 2017 methodology, yes.  You
24 were asking me about the 2019 methodology that I
25 was developing, and what I'm telling you there is

Page 224

1  that relies on earnings data, and the data tables
2  under which I -- I and the team developed the 2019
3  methodology, the data tables had been developed
4  only for Corinthian and ITT.
5      Q      Okay.  So if we can go back to your
6  declaration, which is Exhibit 2?
7      A      Okay.
8      Q      And this is when you say that the
9  department has had to address a number of
10 challenges in developing a new methodology
11 including identification of an accurate, reliable
12 and accessible source of earnings data that would
13 not raise concerns about privacy.
14     A      Yes.
15     Q      So were you able to identify that
16 source of earnings data?
17     A      Ultimately, yes.
18     Q      And when did that identification
19 process begin?
20     A      I can't remember the exact timeline.
21 The college developed the college scorecard, and
22 in that process was able to get earnings data from
23 the IRS.  And, so, once that had happened, we
24 identified that as a potential data source because
25 it was being published in the college scorecard.

Page 225

1      Q      But you recused yourself from looking
2  at the data for CEC schools?
3      A      There was no data for CEC schools.
4      Q      What do you mean there was no data for
5  CEC schools?
6      A      If you're talking about the development
7  of the methodology, there were no data tables on
8  earnings for CEC schools.
9      Q      Why?
10     A      Because they hadn't gotten to it yet.
11     Q      They just hadn't gotten to it yet?
12     A      They just hadn't gotten to it.
13     Q      Because it was delayed or they just --
14 they had a list of schools they just hadn't gotten
15 there?
16     A      I think you don't understand how
17 complicated it is to make these data tables.
18     Q      What was the order of schools to make
19 the data tables for?  Was there a priority of
20 schools?
21     A      Yes, Corinthian and then --
22     Q      Corinthian and then ITT?
23     A      Yes.
24     Q      And then, was the order of schools
25 based on how many borrower defense applications

Page 226

1   had been filed against that school?
2        A    That wasn't my decision to make. Other
3   than Corinthian and ITT, it was up to the borrower
4   defense unit to determine how they were going to
5   move through the remaining schools.
6        Q    Okay. At this point, have they moved
7   through those remaining schools?
8        A    I don't know.
9        Q    So it's possible that there are groups
10  of schools for which step-two determinations are
11  still not possible because the earnings data
12  haven't been gathered yet?
13       A    It's possible.
14       Q    Do you know how many schools that might
15  be true for?
16       A    To my knowledge, I've only seen one
17  other earnings data table, so I don't -- I haven't
18  seen the complete set. I've only seen one other
19  earnings data table in the --
20       Q    What's -- what's the one other you've
21  seen?
22       A    It was for a school group called EDMC.
23       Q    Okay. So at this point, the only
24  schools you know for sure can have step-two
25  determinations made for them are Corinthian, ITT

Page 227

1   and EDMC schools?
2        A    Those are the only schools for whom
3   I've seen data tables. It could be they have them
4   for other schools and they haven't shared them
5   with me.
6        Q    Okay. Is that likely that you wouldn't
7   see them if they existed?
8        A    I certainly wouldn't see it if it
9   existed for a CEC school.
10       Q    Okay. But other schools you would?
11       A    Potentially.
12       Q    How did you come upon seeing the EDMC
13  data?
14       A    I can't remember. I can't remember
15  if -- if I saw it because I asked to see it or
16  whether it was sent to me because it was the next
17  school in line. I -- I can't remember what
18  started the chain, but they -- they did send me
19  the EDMC data table.
20       Q    Okay. And after you sent -- and when
21  was -- when was that?
22       A    That was recently.
23       Q    Okay. And is it your expectation that
24  you'll be sent the data for other schools besides
25  CEC?

Page 228

1        A    I don't really have an expectation, and
2   it's all a matter of timing.
3        Q    What do you mean by that?
4        A    I mean, I don't suspect they're going
5   to have data tables for every school by
6   January 20th.
7        Q    Yeah.
8             And that is the end of your tenure, you
9   suspect?
10       A    I suspect.
11       Q    And who is sending you the data? Is
12  that coming from FSA?
13       A    Yes.
14       Q    Who specifically?
15       A    It comes either from Mark Brown or it
16  comes from Ian Foss.
17       Q    Okay.
18            MS. O'GRADY: Can we take a five-minute
19  break? Is that okay?
20            MR. MERRITT: Yes.
21            MS. O'GRADY: We can all use one, I
22  suspect. Okay. We'll be back here at 3:50, 3:51.
23            THE VIDEOGRAPHER: We are going off the
24  record. The time is 20:46 UTC time.
25            (Recess -- 3:46 p.m.)

Page 229

1            (After recess -- 3:56 p.m.)
2            THE VIDEOGRAPHER: Okay. We're now
3   back on the record. The time is 20:56 UTC time.
4            BY MS. O'GRADY:
5        Q    Okay. Ms. Jones, I'm wondering if in
6   your time at the Department of Ed you've been
7   involved in discussions about the sale of the loan
8   portfolio.
9        A    I'm -- I'm sorry. Could you -- I'm not
10  sure what you're asking me.
11       Q    Have you been involved in any
12  discussions about the overall valuation of the
13  loan portfolio?
14       A    I have been involved in conversations
15  about the valuation, but that's not the sale of
16  the portfolio. That's the valuation of the
17  portfolio.
18       Q    Right.
19            And those conversations, what was --
20  what was the purpose of them?
21            MR. MERRITT: Objection: both scope and
22  potentially calling for privileged information.
23            MS. O'GRADY: We can use a document as
24  a starting off point if that would be easier.
25            Let's go to -- the document is -- the

Page 230

1   document title is Article, Trump administration
2   hires McKinsey to evaluate student-loan portfolio.
3               And let's mark this as Exhibit 16.
4               (Jones Deposition Exhibit 16 was marked
5   for identification and attached to the
6   transcript.)
7   BY MS. O'GRADY:
8        Q    And have you seen this article?
9        A    No.
10       Q    Are you aware of McKinsey's analysis?
11       A    Yes.
12       Q    And is that what you're referring to,
13  discussion about valuation?
14       A    You know, I -- I think valuation is
15  probably the wrong word.  The determination was
16  to, you know, correctly identify the level of risk
17  in the portfolio, so I think -- I think valuation
18  is the wrong term.  But the idea is that we need
19  to project what the cost of managing the loan
20  program and what the cost of the loan program with
21  gains are going to be to the taxpayer, and so this
22  was a method to determine either the cost or the
23  source of revenue that the loan portfolio would be
24  to the taxpayer.
25       Q    And has a conclusion been reached?

Page 231

1               MR. MERRITT:  Objection to scope.  I'm
2   just going to ask what is the relevance to this
3   line of questioning?
4               MS. O'GRADY:  I think discussions about
5   the valuation of the loan portfolio go into, you
6   know, the reasons for policy handling borrower
7   defense claims, whether or not there's a concern
8   about the cost of granting those claims and the
9   reasons for delaying decisions.
10              MR. MERRITT:  I don't think that goes
11  to the extent to which the difficulty of reviewing
12  borrower defense applications actually caused or
13  justified the Secretary's 18-month delay.
14              MS. O'GRADY:  Well, I think it goes to,
15  you know, the -- the loan portfolio includes
16  claims that are borrower defense claims, so the
17  decision on those borrower defense claims affects
18  the valuation of the portfolio and vice versa.  I
19  think those policies are intertwined.
20              MR. MERRITT:  But that's not a topic
21  the court authorized discovery on.
22              MS. O'GRADY:  The policy of Brown's
23  cancellation of student debt and cancellation of
24  loans based on borrower defense applications,
25  specifically -- I mean, can I ask a few questions

Page 232

1   of the witness to narrow the -- to try to, you
2   know --
3               MR. MERRITT:  I mean, I'm inclined to
4   say this is all beyond the scope of the -- what's
5   been authorized.  I mean, if you think this is
6   going to be a short line of questioning --
7               MS. O'GRADY:  I can -- I can make it
8   short.  Let me -- I'm going to ask --
9   BY MS. O'GRADY:
10       Q    If I can ask you, Ms. Jones, in your
11  policy role at the Department of Ed in evaluating
12  or in determining policy regarding borrower
13  defense, did you consider the valuation of the
14  overall portfolio?
15       A    No.
16       Q    And is -- is the likelihood of
17  default -- has that been considered when you've
18  had a policy role regarding borrower defense?
19       A    Meaning?
20       Q    The population of borrowers who filed
21  borrower defense claims, their likelihood of
22  default, have you evaluated that in your position?
23       A    No.  I mean, I will say none of them
24  are at risk of default because when they file a
25  claim, they're in forbearance.  But, you know,

Page 233

1   there is no analysis because they can't default
2   while they're in forbearance.
3        Q    That's true.  I suppose I'm asking,
4   though, you know, outside the forbearance granted
5   by having filed a borrower defense application, is
6   the population of borrowers who file borrower
7   defense applications their likelihood of default
8   once they are denied and back in repayment, has
9   that been a consideration that you've taken into
10  account in your role?
11       A    No.
12              MS. O'GRADY:  Okay.  The next -- the
13  next document is in the folder as Article, DeVos
14  orders partial loan relief.  And this I'm going to
15  mark as Exhibit 17 to this deposition.
16              (Jones Deposition Exhibit 17 was marked
17  for identification and attached to the
18  transcript.)
19  BY MS. O'GRADY:
20       Q    This is an article from December 6th,
21  2019.  And have you seen this article before?
22       A    Probably.
23       Q    Okay.  Okay.  And then in the middle of
24  this second page it says, DeVos in recent weeks
25  directed the Education Department to carry out a

Melissa Jones

Page 234

1   new policy that will provide partial loan
2   forgiveness to many borrowers whom the agency
3   determines were duped or cheated by their
4   colleges, according to an internal memo obtained
5   by POLITICO.
6           Is this referring to the -- the partial
7   relief methodology that went into effect in
8   December of 2019 that we've been discussing today?
9           MR. MERRITT: Objection: speculative.
10          MS. O'GRADY: How so?
11          MR. MERRITT: Well, I mean, you're
12  asking her to state what the intent of the
13  article -- the POLITICO article was.
14          BY MS. O'GRADY:
15      Q   Well, is there -- besides the partial
16  relief methodology that went into effect in
17  December of 2019 that we've discussed today, was
18  there another new policy that Secretary DeVos
19  directed the Education Department to carry out in
20  December 2019?
21          MR. MERRITT: You can answer the
22  question.
23          THE WITNESS: Oh, okay.
24          I am not aware of another -- of a
25  different methodology or a different policy.

Page 235

1           BY MS. O'GRADY:
2       Q   Okay. The next paragraph, The memo,
3   which was signed by DeVos in mid-November and
4   hasn't been reported previously, have you seen
5   that memorandum?
6           MS. O'GRADY: Objection, again -- I
7   mean, it's speculative.
8           BY MS. O'GRADY:
9       Q   Okay. Ms. Jones, have you seen any
10  memorandum --
11          MR. MERRITT: You can answer.
12          BY MS. O'GRADY:
13      Q   -- signed by DeVos in mid-November
14  regarding this subject matter?
15      A   I want to be clear. Are you asking me
16  if I have seen a memo -- asking if I have seen a
17  memo --
18      Q   So this part of the article is
19  discussing a memo signed by Betsy DeVos in
20  mid-November to carry out a new policy that would
21  provide partial loan forgiveness.
22          I'm just wondering if that -- if you've
23  seen such a memo.
24      A   I mean, again, you know, I don't -- I
25  don't know -- Michael Stratford writes lots of

Page 236

1   articles. I'm not really sure -- yeah, I mean,
2   it's another POLITICO story. I don't know -- I
3   don't know how to answer the question.
4       Q   Okay. So do you recall -- if Secretary
5   DeVos sent a memo in November 2019 that directed
6   the Education Department to carry out a new policy
7   that would provide partial loan forgiveness, you
8   would have seen such a memo; right?
9       A   Yes.
10      Q   And as far as you know, there was no
11  other policy in December 2019 that she would have
12  been circulating a memo about besides the one
13  we've been discussing today that was the partial
14  relief policy that went into effect in December of
15  2019; right?
16      A   I -- I don't believe there were other
17  memos.
18      Q   Okay. And then if we go to PDF page 5
19  of this article -- actually, I'm sorry, Ms. Jones.
20  Let's just -- I want to just stay actually on this
21  first page for a moment.
22      A   Uh-huh.
23      Q   The bottom paragraph, it says that the
24  memo, quote, Instructs department officials to
25  resume issuing decisions on some of the roughly

Page 237

1   225,000 [verbatim] pending applications filed by
2   borrowers seeking debt relief based on their
3   colleges' alleged misconduct.
4           Do you recall a memo instructing
5   department officials to resume issuing decisions?
6       A   Yes. I don't know if that's the memo
7   that Michael Stratford is referring to, but, yes,
8   I have.
9       Q   Okay. You've seen a memo like that?
10      A   Yes.
11          MS. O'GRADY: Okay. I would just say
12  to counsel, I don't believe we have that memo and
13  we would like it produced.
14          MR. MERRITT: Okay.
15          BY MS. O'GRADY:
16      Q   Ms. Jones, what was -- what do you
17  remember about the content of that -- of that memo
18  instructing officials to resume issuing decisions?
19      A   All right. I recall that it described
20  the methodology. It -- it described options that
21  the team had come up with and it included a
22  recommendation for the option that the group found
23  to be the most scientifically rigorous, defensible
24  methodology.
25      Q   And when you say "group," what group

Page 238

1   are you referring to?
2       A      This is the group I told you about
3   earlier that was primarily my -- myself, Michael
4   Brickman from my office, Ian Foss.  I think by
5   this time Jeff Appel had died, so I think he was
6   no longer involved.  Or, actually, he might not
7   have died yet, but in think he was maybe in the
8   hospital.  I can't remember the timeline.
9           And then there were various
10  representatives of the Office of General Counsel.
11      Q      Okay.
12      A      And potentially Robin Minor and other
13  FSA staff, you know, they came in and out.
14      Q      And to the extent the memo instructs
15  department officials to resume issuing decisions,
16  what officials would that have been instructing?
17      A      FSA.
18      Q      FSA officials, so that's Colleen Nevin?
19      A      The BD team, I mean Mark --
20      Q      Okay.
21      A      -- and whoever his team was.
22      Q      Okay.  And implicit in an instruction
23  to resume issuing decisions is that the decisions
24  have not been ongoing; correct?
25      A      I -- I -- I think -- you know, again,

Page 239

1   there were no notices being issued, but it is --
2   it is my understanding that the unit was
3   continuing to review data and claims.  So, you
4   know, again, I think we need to be careful about
5   our terminology, but I think I've already said
6   that, yes, the department made the decision to not
7   issue denials after the California court ruling.
8   I think I said that a while ago.
9       Q      Okay.  Let's go to PDF page 5 of this
10  article.  So the top paragraph here says, The
11  ten-page memo was prepared by Diane Auer Jones, a
12  top advisor on education issues -- my apologies if
13  I did not pronounce your name correctly -- and
14  Mark Brown who leads the department's Office of
15  Federal Student Aid.
16          Is this correct that the memo that
17  we're talking about was written by you or is this
18  a different memo?
19      A      Again, you know, there is a memo that
20  was prepared by Mark and myself and the teams, and
21  that memo laid out the options for the secretary.
22  Whether or not that's the document Michael
23  Stratford is referring to, I do not know.  He
24  doesn't leave a picture of the document.
25          But, yes, as I said earlier, there was

Page 240

1   a memo.  It did lay out the options.  It included
2   the recommendations --
3       Q      Okay.
4       A      -- as it was prepared by Mark, myself
5   and our teams.
6           MR. MERRITT:  And, Diane, if you need
7   to read the whole article, please take the time to
8   do that.
9           MS. O'GRADY:  Counsel, I will just say
10  I don't believe we have this memo.  To the extent
11  it is the same or differently from the one we just
12  addressed, I ask that it be produced.
13          MR. MERRITT:  Noted.
14  BY MS. O'GRADY:
15      Q      So, Ms. Jones, in the next paragraph
16  that we just looked at, it says, The memo says the
17  department believes that it should determine that
18  a defrauded borrower was harmed financially by a
19  college's misconduct, quote, only when the
20  earnings imputed to the borrower are significantly
21  different than the median wages of other borrowers
22  who attended similar programs across the country.
23          I understand you can't check that
24  quotation because you don't have the memo in front
25  of you, but is that statement generally accurate

Page 241

1   to what the policy was?
2       A      I'm -- I'm trying to find that place in
3   the --
4       Q      Oh, my apologies.  So it's PDF page 5,
5   and it's the second full paragraph.
6       A      I don't think we would have stated it
7   the way that it is stated in POLITICO, but it is
8   true that we used earnings from -- as the
9   indicator of financial harm.
10      Q      And the comparator of other programs,
11  what -- how are -- how are comparator programs
12  identified?
13      A      This is something that federal student
14  aid does through the use of a Classification of
15  Instructional Program code, a CIP code.
16      Q      I have a question regard -- not
17  regarding this article, necessarily.  If a
18  step-one determination for a borrower's
19  application is a grant, and then under the partial
20  relief methodology they are given 0 percent
21  relief, is your understanding that is then an
22  approval of a claim or a denial of a claim?
23      A      We use a two-part process.  There is an
24  adjudication to determine the merit based on a
25  review of the evidence, and then there is the

Page 242

1   second part which is described in the 2016
2   borrower defense reg.  It's a two-part test, I
3   should say, defined in the 2016 reg:  Did
4   misrepresentation occur and was there reliance on
5   that information and financial harm.
6               The attorneys in BD, you know, review
7   the evidence, and then the second part of that
8   two-part test is this methodology which is used to
9   determine financial harm.
10              Yes, that is the -- that two-step
11  process is described in the 2016 BD reg.
12       Q    So step one is misrepresentation plus
13  reliance, and step two is financial harm?
14       A    Well, I know we've used step one and
15  step two in a different context, I think, earlier.
16       Q    Is that a -- oh, was it in a different
17  context?
18       A    I don't know.  I can't even remember.
19  But I would say that it is a two-part test.
20       Q    Okay.  I just -- I want to understand
21  whether or not in your view if someone is -- their
22  claim is adjudicated on the merits, which I'm
23  considering and you have in your declaration as
24  being a step-one determination, yes, their claim
25  has merit.

Page 243

1               But then they go to step two and based
2   on the partial relief formula, they are given
3   0 percent relief.
4               Do you still consider that a -- an
5   approval of a borrower defense claim?
6        A    I don't think we use the words
7   "approval."  I think we used the words "eligible"
8   or "ineligible" for a claim, and that borrower
9   would be notified that they received 0 percent
10  relief.
11       Q    Well, on the -- let's say for example
12  on the pie chart in that PowerPoint we were
13  looking at, which would be -- that's Exhibit 12 of
14  this deposition, and the file is A09.  PDF page 2,
15  here's the pie chart.  So approved -- the two
16  green ones, approved relief pending and approved
17  relief provided, if someone had a step-one
18  determination that they were approved but they got
19  0 percent, would they be in those green pies or
20  would they be in the denied pie slice?
21       A    Let me look at this table.
22            MR. MERRITT:  Take your time, Diane.
23            THE WITNESS:  (Reviews document.)
24            I don't know -- I don't know whether
25  FSA would have grouped them as approved relief

Page 244

1   provided or whether they would have grouped them
2   with denied.  You'd have to ask FSA.
3            BY MS. O'GRADY:
4        Q    So in your role, you didn't provide any
5   guidance about the 0 percent partial relief result
6   being --
7        A    Not --
8        Q    -- approval or denial?
9        A    No.
10       Q    Okay.  I'm going to go back to your
11  declaration once again.  That's Exhibit 2.  And
12  we'll go to paragraph 24.
13       A    Okay.  Paragraph 24.
14       Q    And this is a topic we've touched on
15  today already.  I want to hone in on the -- the
16  evidence.  Evidence submitted by the borrower or
17  otherwise available to the department in
18  accordance with the applicable standard.
19            So that evidence includes information
20  from schools; correct?
21       A    I don't adjudicate the claims, so you'd
22  have to ask Colleen.  I -- I --
23       Q    As a matter of policy when we were
24  discussing the 2019 regulations, we discussed your
25  belief that schools should be afforded due process

Page 245

1   regarding these claims; right?
2        A    Uh-huh.
3        Q    So as a policy matter, how are schools
4   given the opportunity to present evidence?
5        A    You know, again, that's the 2019
6   regulation that applies to loans starting on
7   July 1, 2020.  I don't believe the borrower
8   defense unit had started adjudicating claims that
9   came in on loans issued after July 1, 2020, so I
10  can't answer that question.
11       Q    So at this point, are schools given the
12  opportunity to present evidence?
13       A    I -- you mean on the Corinthian claims?
14       Q    On any borrower defense application.
15       A    Well, Corinthian and ITT are closed.  I
16  don't think there's anybody who can respond on
17  behalf of the institution.
18       Q    But under the -- there is -- I mean,
19  there is -- we had discussed before that under the
20  2016 regulations also there is an option, at
21  least, to notice -- to give schools notice when
22  the borrower defense application has been filed;
23  correct?
24       A    That's correct, but there has to be a
25  school to notice.  And in the case of ITT and

Page 246
Page

1  Corinthian, there is no school to notice.
2      Q    So what about the other schools that
3  borrower defense applications have been filed for?
4      A    So to my knowledge, the borrower
5  defense unit has started notifying other
6  institutions of pending claims, and it is
7  possible, you know, that those schools are
8  providing information.
9      Q    And when you say "starting," do you
10  mean that began recently?
11     A    Recently meaning sometime in the past
12  year?  Yes.  Recently -- I can't remember exactly
13  when it --
14     Q    Sometime in the past year?
15     A    Yeah.
16     Q    Have you -- has -- the time that
17  notifying a school and awaiting a response for
18  them takes, has that factored into decisions about
19  the -- you know, general policy in your role?
20     A    No.
21     Q    Under the 2019 regulations when those
22  were being crafted, did the -- did the amount of
23  time to solicit and then consider information from
24  the school -- was that considered in drafting
25  those regulations?

Page 247
Page

1          MR. MERRITT:  Objection: scope.  It's
2  going to the merits of the 2019 regulation.
3          MS. O'GRADY:  I think what's in the
4  2019 regulation affects the policy priorities of
5  the department which are at issue in terms of why
6  there is delay.
7          MR. MERRITT:  But are not at issue in
8  that level of generality in the court's discovery
9  order.
10         MS. O'GRADY:  We have a disagreement
11  about that.
12         BY MS. O'GRADY:
13     Q    I want to get at the difference between
14  the 2016 and 2019 regulations concerning notice to
15  schools.  In the 2019 regulations it is mandatory
16  that schools be noticed and given a chance to
17  submit evidence; is that right?
18     A    It is mandatory that they be noticed.
19  It is not mandatory that the schools submit
20  evidence.
21     Q    Under the 2016 regulations, what is
22  different about -- about the school's opportunity
23  to provide evidence?
24     A    So, under the 2016 regs, it is a
25  two-step process.  The 2016 reg anticipates the

Page 248
Page

1  department adjudicating a claim and then notify --
2  and then only after making a decision if they have
3  given relief, then they can issue a demand to the
4  institution to provide certain documents, and that
5  is to determine whether or not the department can
6  recover financial losses from the school.
7      Q    The first step is separated from the
8  recovery of any financial losses; correct?
9      A    That is -- yes, that is how the -- the
10  regs -- those two things appear in two different
11  sections, yes.
12     Q    Okay.  And that's your understanding of
13  the 2016 regulations?
14     A    What is my understanding?
15     Q    What -- that's your understanding of
16  it, what you just explained about the -- the
17  two-step process?
18     A    Right.  My -- my -- just to be clear,
19  my understanding is that they notify the
20  institution.  The institution may or may not
21  submit.  The department issues the decision.  And
22  then if the department has forgiven the loan, step
23  two is then the department can demand evidence
24  because this is when they would engage in
25  reclaiming the financial losses from the school.

Page 249
Page

1      Q    Under the 2016 regulations, are
2  students notified -- when a student's claim is
3  denied, is the student notified of what evidence
4  the school provided?
5      A    To my knowledge, that is not a
6  requirement of the 2016 reg.  That is a
7  requirement of the 2019 reg.  I said to my
8  recollection.  I meant to my recollection.
9          MS. O'GRADY:  Okay.  The next document
10  is in the folder, Oversight committee press
11  release.  There are two files that begin with
12  oversight committee, so the first one we're going
13  to look at is press release.
14         MR. MERRITT:  Counsel, for the record,
15  this is going to be Exhibit 18?
16         MS. O'GRADY:  Yes, thank you.  This
17  will be 18.
18         (Jones Deposition Exhibit 18 was marked
19  for identification and attached to the
20  transcript.)
21         BY MS. O'GRADY:
22     Q    Okay.  And, Ms. Jones, do you recognize
23  this document?
24     A    I -- I've never read this before.  I've
25  never seen this before.

Page 250

Page

1    Q    All right.  Well, you can take a minute
2  to familiarize yourself with it.  I can just state
3  what I know it to be which is a press release from
4  the House Committee on Oversight and Reform on
5  October 27th, 2020, regarding the -- a Web tool
6  for borrower defense.  So if you want to just take
7  a minute to flip through it, that would be fine.
8    A    (Witness reviews document.)  Okay.
9  I've read it.
10   Q    So are you familiar with the Web tool
11 that this press release is discussing?
12   A    I am.
13   Q    And this press release refers to
14 allegations made by a whistleblower about you and
15 the Web tool.
16        Are these accurate statements?
17   A    Some are; some aren't.  I did not call
18 for the tool to be stopped.  I did not know the
19 development of the tool was stopped.  So
20 allegations that I called for the development of
21 the tool to be stopped are patently false.  And --
22   Q    And what were --
23   A    But --
24   Q    Sorry.  Go on.
25   A    When you get to the part of the article

Page 251

Page

1  that quotes the contract official, what I learned
2  after the fact -- this was information that I
3  learned recently -- I had no idea that the
4  contract officer had made a change to the
5  contract.
6        But what happened is that the form is
7  linked to a -- a custom -- a customer --
8  Salesforce, customer management system, I guess.
9    Q    Okay.
10   A    And, so, the form is linked to the
11 cus- -- yeah, to Salesforce, and what I didn't
12 realize is in the development of the form, I did
13 not believe -- I believed that more explanation
14 was required and additional examples of potential
15 misrepresentation were required.  And I say to add
16 those.
17   Q    Okay.  So can you -- can you explain
18 more about that?  Why did you think that
19 additional examples of misrepresentations were
20 needed?
21   A    So that borrowers would understand --
22 have more examples of the kinds of things that
23 constitute misrepresentation.
24   Q    Did you provide them with the examples
25 that you thought would be appropriate to add?

Page 252

Page

1    A    Some.
2    Q    And what were they?
3    A    Schools that say they would provide
4  career placement services and career -- and career
5  services staff and then didn't; schools that said
6  the program could be completed in a certain amount
7  of time and then they didn't offer classes in
8  certain semesters which forced the extension.
9        And I'm paraphrasing here.  These
10 aren't my exact words.
11        Schools that lied to the accreditor or
12 other third parties about their rankings for
13 selectivity; schools that misrepresented faculty
14 credentials.
15        Those are the ones I can think of off
16 the top of my head.
17   Q    And those examples you just gave off
18 the top of your head, are those examples of what
19 you would consider, you know, valid borrower
20 defense claims?
21   A    So this form is to implement the 2019
22 regulation, and, yes, those are -- those would
23 constitute misrepresentation under the definition
24 in the 2019 regulation.
25   Q    Okay.  Would they also constitute

Page 253

Page

1  misrepresentation under the definition of the 2016
2  regulation?
3    A    You know, I don't -- there are some
4  additional -- so I think there are some additional
5  kinds of misrepresentation covered by the 2016 reg
6  that would not be in that list.
7    Q    Okay.  So there's a narrower subset of
8  2019 than there would be for 2016?
9    A    For example, breach of contract is
10 included in the 2016 reg and not in the 2019 reg.
11   Q    Okay.  And your -- your goal with
12 adding these additional explanations into the Web
13 site -- the Web tool was to provide more
14 information about what's available under the 2019
15 regulation?
16   A    That's correct.  It's a smart tool, and
17 so what happens is when the borrower applies, the
18 system identifies when they took their loan and
19 then serves up the appropriate questions based on
20 what that borrower -- based on the regulation
21 under which the claim would be adjudicated.
22   Q    Okay.
23   A    It's a smart form.
24   Q    So if a borrower took out their
25 application before the 2017 cut-off date for the

Page 254

1   2016 regulations, then they would be -- excuse me,
2   not the 2017 cut-off date, the 2020 cut-off date
3   for the 2019 regulations, they would get put into
4   the examples that you were adding that are fewer
5   than the examples for those under the 2016
6   regulation?
7       A    Well, no, the list is -- we've expanded
8   the list for the 2019 regulation.
9       Q    So there are more claims available
10  under the 2019 regulation than under the 2016
11  regulation?
12      A    There's more information about the
13  claims available.
14      Q    Okay.  So for 2019, there are fewer
15  claims available but more information about them.
16  And for the 2016, there are more claims available
17  but less information about them?
18      A    I don't know anything about the number
19  of claims.  I mean, that's to be determined.  But
20  the definition of misrepresentation under the 2019
21  reg does not include breach of contract, and the
22  definition of misrepresentation under the 2016
23  rule does include breach of contract.
24           What I'm talking about with regard to
25  the tool is giving more examples to borrowers of

Page 255

1   the kinds of things that constitute
2   misrepresentation.  They would be covered under
3   the 2016 reg, but the department had not provided
4   those examples in -- in the past to borrowers.
5       Q    Okay.  So the smart tool, when you put
6   in your -- your date of loan disbursement -- I
7   mean, people -- most people are still going to be
8   under the 2016 regulations; right?
9       A    Well, you don't put in your date.  You
10  put in your social security number or your FSA ID
11  number and then --
12      Q    Okay.
13      A    -- NSLDS, which is our loan system,
14  serves it up.
15      Q    Thank you.  That's helpful.
16           So still for most people, it's going to
17  be under the 2016 regulations.  Did you add any
18  examples or suggest adding any examples for the
19  2016 regulations?
20      A    Yes.  Because it's a smart form, this
21  list of examples that I listed would show up for
22  both a borrower applying under 2014 and a borrower
23  applying under 2019.
24      Q    Okay.
25      A    I don't know what would happen for an

Page 256

1   applicant under the state law standard.  I don't
2   know.  I don't know how the smart tool works for
3   them.
4       Q    So this Web tool, who developed it
5   initially?
6           MR. MERRITT:  Object on scope.  I'm
7   going to ask which topic is this -- all of this
8   relevant to on the Web tool?
9           MS. O'GRADY:  I would say it's relevant
10  to the reasons for delay because the delay to the
11  extent it's ongoing I think it's appropriate for
12  the reasons for it currently.
13          MR. MERRITT:  So that's not a topic.
14  The extent to which the difficulty of reviewing
15  borrower defense applications actually caused or
16  justified the 18-month delay that has now ended is
17  what the topic is, so I don't think that's --
18          MS. O'GRADY:  I think it's relevant to
19  discuss, though, how they're currently being
20  reviewed since this is the -- the evolution of how
21  they were reviewed, the evolution of the denial
22  notices, I would argue it's all part of the same
23  story, or I'm trying to understand if it is, for
24  the reasons behind the developments that occurred
25  after the 18-month delay shed light on the reason

Page 257

1   for that 18-month delay.
2           MR. MERRITT:  Well, I guess, like, to
3   the extent the court authorized discovery to the
4   post-18-month delay would be for the development
5   used in the form denial letters which you've
6   discussed.  And the extent to which the secretary
7   has denied applications to students, pertaining to
8   school, subject to findings of misconduct, and I'm
9   not seeing how this line of questioning is
10  relevant to any of those topics.
11          MS. O'GRADY:  I think part of it,
12  though, is about systems generally so some of the
13  delay and some of the reasons given for the delay
14  in the past had been the need to develop systems.
15  My understanding is this computer program is one
16  of those systems.
17          So I can ask -- I can ask more
18  questions about the past development of this
19  computer system and -- and when it began.  I'm
20  happy to go there.  I was going to get there.  And
21  I think that falls squarely within the reasons --
22          MR. MERRITT:  I mean I disagree that
23  the development of systems is something the court
24  authorized discovery into.  You know, we've gone
25  into this a little bit.  I think at some point

Page 258
Page

1  soon, though, we would need to close off this line
2  of questioning that appear to be beyond the scope
3  of the discovery order.
4        MS. O'GRADY:  Well, I can -- I can, as
5  a show of good faith, wrap up quickly.  That's
6  helpful.
7        MR. MERRITT:  I thank you for your
8  explanation, too.  Thank you.
9        BY MS. O'GRADY:
10       Q    So is -- we had talked earlier today
11  about your role and -- at -- your role and FSA's
12  role and, you know, the difference between what
13  happens at FSA.
14            And can you -- can you shed some light
15  for me on your involvement with this Web tool
16  given that it's an FSA process?
17       A    Right.  So perhaps that's why I didn't
18  realize that a contract had been let or that this
19  was linked to Salesforce or that a change order
20  was required.  That's all operational.  I had no
21  idea.
22            My role was -- and -- and, by the way,
23  I -- I haven't actually seen the tool.  What we've
24  been working with is a list of data elements.  So
25  there was a list of data elements, and that was

Page 259
Page

1  sent to me for review to make sure that it was
2  consistent with the 2019 reg.
3            And then after I did my review, I was
4  told that it's a smart form that would be used for
5  2016 and 2019, so subsequent reviews took into
6  account the policy in the 2016 reg and the 2019
7  reg in reviewing the element list.
8        Q    Is it your understanding that this Web
9  tool was developed -- you know, before you had
10  said that the borrower defense applications were
11  kept on a spreadsheet.  Is this Web tool part of
12  the development beyond that spreadsheet?
13       A    To my knowledge, this is part of the
14  development of the FSA's digital customer care
15  environment.  So the digital customer care
16  environment is the way in which borrower's
17  interact with their loans.  And over the period of
18  the last year or so, we have launched a new Web
19  site that gives borrowers new access to
20  information about their loans, ways to make a
21  payment online, a mobile app, a public service
22  loan forgiveness tool, so that they can more
23  easily identify if they work for a qualifying
24  employer.
25            And the development of this tool was --

Page 260
Page

1  I don't know if it was phase two or three -- phase
2  three, but it was one of the phases of the digital
3  customer care.
4            So this is part of the digital customer
5  care effort which is about our Web interface with
6  borrowers.  It is my understanding that somehow
7  this information gets communicated to Salesforce
8  and that Salesforce may be one of the systems that
9  the BD unit will use to manage claims.
10            Now, I don't know enough about
11  Salesforce to be able to tell you how, but my --
12  my current understanding -- and, again, I had no
13  idea that this form was linked to Salesforce until
14  recently, but as I understand it, Salesforce is
15  the connection between the digital customer care
16  environment, which is where this tool was
17  developed, and getting information to the borrower
18  defense team's management system with Salesforce
19  being, I presume, their manage -- new management
20  system.
21       Q    Okay.  You were saying that when you
22  had given those suggestions for additional
23  examples of misrepresentation, it's -- it's a
24  process where a person puts in their social
25  security number, other identifying information,

Page 261
Page

1  and then they're -- their claim is assessed under
2  the appropriate standard.
3        A    They are served up questions that
4  relate to the standard under which they're being
5  reviewed.
6        Q    Okay.  And, so, for the 2019
7  regulations, that's the federal standard we
8  discussed?
9        A    (Witness nods head.)
10       Q    And then 2016, it would be the
11  appropriate state law standard; is that right?
12       A    No, that's a federal standard as well.
13       Q    And for 1995, it would be under the
14  appropriate state law standard?
15       A    Correct.  And that's why I don't know
16  how this form interacts with those borrowers.
17       Q    Okay.  Is it your understanding that
18  after a borrower puts their information in the
19  system, then it's adjudicated by the FSA team; is
20  that right?
21       A    Well, this is a new system, and so I --
22  I -- I don't know whether or not borrowers have
23  put their information.  So are you asking me
24  prospectively or are you asking me about currently
25  pending claims that have come through this tool?

Page 262
Page

1    Q    Well, I -- I -- I'm trying to hone in
2  on this -- the question, and you're absolutely
3  right that was not clear.  I'm trying to hone in
4  on the question of which standard is being used,
5  and -- through this tool how individuals who are
6  adjudicating the claims, what they are using to
7  assess which standard is appropriate?
8    A    So they're using the date of the loan.
9  So let's say Diane Jones has two loans, and one
10  was issued on July 2nd, 2017, and one was issued
11  on July 1st, 1999 -- I'm just making this up --
12  actually, I'm going to use a different set of
13  dates because I don't have the explanation on the
14  '95 borrowers.
15    Q    That's okay.  I see where you're going
16  with that, and I think that does clarify something
17  for me.
18         But what I want to get to is once
19  it's -- it's determined by the system that it's
20  not going to be assessed under a federal standard;
21  that it needs -- a state law standard needs to be
22  applied, what happens to the application then?
23    A    I -- I don't know.  I -- I -- I don't
24  know that the -- I don't know how this tool works.
25  You know, I -- my -- for pre-2016 borrowers.

Page 263
Page

1    Q    Okay.  And for -- okay.  Is this tool
2  up and running right now to your knowledge?
3    A    This tool was launched on November 8th.
4  It is my understanding that there was a technical
5  issue and -- and so for a -- temporary period of
6  time it had to be taken down, and I don't --
7  haven't actually looked today, so I don't know if
8  it's back up.  But it was launched on
9  November 8th, and it was operational maybe until a
10  couple of days ago when -- when this problem was
11  identified.
12    Q    Okay.  So --
13    A    And -- and I want to be clear that
14  even -- that we still have the other application.
15  So there are other ways -- this is only one way
16  for a borrower to apply.  There are other ways.
17  So the other ways still exist for a borrower to
18  apply.  This was one of several.
19    Q    One second.  Just bear with me.
20         MS. O'GRADY:  Okay.  The next exhibit,
21  which will be Exhibit 19, is in the folder as ECF
22  number 145.
23         (Jones Deposition Exhibit 19 was marked
24  for identification and attached to the
25  transcript.)

Page 264
Page

1         THE WITNESS:  I want to make one other
2  point about the tool, which is that the element
3  list for the tool went through two rounds of
4  public comment, so the element list is publicly
5  available.  It's been through two rounds of public
6  comment.
7         Okay.  What exhibit now?
8         BY MS. O'GRADY:
9    Q    ECF number 145, Defendants fraud list.
10  And that is Exhibit 19 for this deposition.
11         THE WITNESS:  I'm going to turn my
12  light on.  Now that it's darker outside, I feel
13  like I'm in a spotlight.
14         BY MS. O'GRADY:
15    Q    Okay.  Do you have that open?
16    A    I do.
17    Q    And do you recognize this filing?  I
18  primarily would like to ask you about the list
19  attached to the declaration of Mark Brown.
20    A    I have not seen this list.
21    Q    Okay.  That -- with that understanding,
22  I would still like to ask you a few things about
23  it and answer to the extent you can.
24         I can represent to you that this is a
25  filing in respect defendants need in response to

Page 265
Page

1  the judge's questions about claims -- borrower
2  defense claims that had been denied where
3  Department of Education has in its possession
4  evidence of wrongdoing.  So I will not ask you
5  about CEC given our discussion about your
6  voluntary recusal.  So we can just take the first
7  column.  So that would be PDF page -- well, if
8  you've already scrolled down to see the exhibit
9  which is the rotated Excel spreadsheet?
10    A    I have.
11    Q    Okay.  Let's look at the first one.
12    A    The Excel spreadsheet -- I'm just
13  looking at a data table.
14    Q    Data table, that's it.  It says 145-2
15  up above and number -- it's page 1 on the bottom
16  and it's a rotated layout; right?
17    A    Yeah.
18    Q    Okay.  So we're at the same place.  So
19  column one, School ownership group (school name),
20  this is the Apollo Group (University of Phoenix).
21  Column two, Categories of applications determined
22  not to be within the scope of the common evidence
23  listed in column three.
24         I want to ask you -- you can finish
25  reading the column names -- if you're familiar

Page 266
Page

1  with the difference between column two and column
2  three as a -- as a general policy matter?
3       MR. MERRITT:  I would also say, if you
4  haven't -- if you're not familiar with the
5  document, there is a description in the
6  declaration if you want to take the chance to look
7  at that as well.
8       THE WITNESS:  Okay.
9       (Reviews document.)
10      So, yeah, I have a high-level
11  understanding of --
12      BY MS. O'GRADY:
13      Q    Okay.  Please share that high-level
14  understanding with me.
15      A    Yeah, I think this is -- as I explained
16  earlier, that there are applications where the
17  borrower has to submit evidence because we -- you
18  know, the -- the department doesn't have -- well,
19  any borrower has the opportunity to submit
20  evidence.  I want that to be clear.  Any borrower
21  can submit evidence.  But there are some borrowers
22  for whom the only evidence the department has is
23  what the borrower submitted, and there are other
24  borrowers that regardless of what they submitted,
25  the department has in its possession from one

Page 267
Page

1  channel or another evidence to use to adjudicate
2  the claim.
3       Q    And borrowers in both of those
4  categories -- or I should say either of those
5  categories, is it possible for their claim to be
6  approved?
7       A    So are you asking me if -- if a --
8  regardless of who supplies the evidence, if the
9  evidence is there and sufficient, can that
10  borrower's claim be approved; is that what you're
11  asking me?
12      Q    We can break it down into two.  So one,
13  a borrower who has submitted no evidence
14  individually but who attended a school during a
15  time period for which there is abundance evidence
16  that the department has, could that borrower's
17  claim be granted?
18      A    So if you're asking me in the
19  theoretical world, yes, but I -- but I don't know
20  how each one of these falls into the category.  So
21  I just want to make sure --
22      Q    That's fine.
23      A    Right.  So are you asking me if the
24  department has evidence that the borrower
25  submitted nothing, could that borrower still be

Page 268
Page

1  approved?
2       Q    Yes.
3       A    It's possible depending on what the
4  borrower's claim is, allegation is.
5       Q    And the converse of that, is it
6  possible for the borrower's claim to be approved
7  if the borrower is the only source of evidence
8  against the school?
9       A    It is possible.
10      Q    And looking here at column two,
11  Categories of applications determined to be
12  within the scope of common evidence listed in
13  column three, if a borrower falls into that
14  category, what happens to their application?
15      A    I don't know.  These would be the
16  decisions that are made by the BD team, and so
17  I -- I don't know.
18      Q    And what is your understanding of what
19  column three means, All other applications are
20  pending further review of common evidence?
21      A    My understanding is that the department
22  is in possession of evidence that they are
23  reviewing, I believe.
24      Q    And what policy governs how they review
25  that evidence?

Page 269
Page

1       A    So that's a legal determination.  So it
2  is -- it is a legal determination about whether or
3  not the claim meets the definition of
4  misrepresentation and meets the preponderance of
5  the evidence standard.  It's not a policy
6  decision.  It's a legal decision.
7       Q    When you say it's a legal decision and
8  not a policy decision, do you mean that there's --
9  there's no discretion to make a different
10  decision?
11      A    By whom?
12      Q    By -- well, by anyone in the
13  department.  I would say the secretary, but by
14  anyone in the department.
15      I'm wondering really what -- what the
16  effect of -- when you characterize something as a
17  legal question or a legal decision, what the
18  effect of that is.
19      A    So that means that it is not in the
20  hands of a legal person.  So it means that
21  whatever the BD attorneys decide on a legal basis,
22  they have the expertise to judge the evidence and
23  make a decision on the merits.  It is possible
24  that they engage with, you know, other attorneys
25  at the department.  You know, there are career

Page 270

1  attorneys that have been involved in -- in BD, so
2  it is possible they engage.  But on a particular
3  decision, it is strictly a legal decision meaning
4  that nobody else in the department knows what it
5  is, knows that it's happening and can weigh in on
6  it.
7        Q    How has it been determined that no one
8  else in the department can weigh in on it?
9        A    It's been determined because none of us
10 know it's happening.
11       Q    My question is why is that?  I mean,
12 so -- so that is --
13       A    Because it's an operations matter based
14 on legal decisions.
15       Q    Is there a policy that has made that
16 determination?
17       A    Well, I mean, there are policies about
18 who has access to FSA's data systems, and those
19 data systems are limited to certain employees
20 within FSA.  There are all kinds of security
21 protocols.  I don't have access to FSA's data
22 systems, and many people who work at FSA don't
23 have access.  There's --
24       Q    What about people --
25       A    -- a protocol (indiscernible)

Page 271

1  information involved, and so there is a particular
2  clearance that somebody has to go through to have
3  access to this data system.
4        Q    What about people in the Office of the
5  General Counsel?  Did any of those individuals
6  have policy roles?
7        A    They -- they don't have policy-making
8  roles, no.  They advise us on legal
9  interpretations.
10       Q    What I'm trying to understand is is how
11 it became determined that the adjudication of
12 borrower defense applications is purely a legal
13 matter which you have no involvement with as -- as
14 you have said today.
15       A    Because it's a legal matter.  I mean,
16 it's about the evaluation of evidence.  I mean --
17 I mean, frankly, you know, the prior
18 administration established that.  The prior
19 administration established that there would be a
20 separate unit, first with a special master and
21 later with the BD unit.  They made the
22 determination that there would be a BD unit that
23 would review and adjudicate these claims.
24       Now, it is true that the prior
25 administration's BD unit chose to engage the under

Page 272

1  secretary in the evaluation of evidence and
2  perhaps he was qualified, and perhaps that's what
3  that administration elected to do.
4        Q    Is it your view that engaging with the
5  under secretary in -- in that manner was
6  inappropriate?
7        A    It was their decision to make.
8        Q    So that's what I'm getting at.  So it
9  was their decision to make, so it was someone's
10 decision at some point to not do that under the
11 administration that you've served under.
12       A    I -- I mean --
13       Q    It's not a -- I'm just saying it's not
14 your lack of involvement; it's not a foregone
15 conclusion; is that fair?
16       A    Well, it certainly should be because
17 I'm not trained as a lawyer.  It should be a
18 foregone conclusion.  I have no capacity,
19 training, capability to in any way look at
20 evidence and make a legal determination.  I can't
21 do that.
22       In the previous administration
23 regarding your predecessor who reviewed or signed
24 off on borrower defense decisions on a group
25 basis, when was that process stopped?

Page 273

1        A    Well, I -- you know, I -- I mean,
2  you've seen -- you've seen the dates on the memos.
3  I think the most recent memo was January 9th of
4  whatever that was, 2017.
5        Q    Meaning --
6        A    That's the most recent document I've
7  seen where the under secretary was involved in the
8  evaluation of evidence.
9        Q    And at that point, is it your view that
10 that was improper?
11       MR. MERRITT:  Objection, in it calls
12 for speculation.
13       THE WITNESS:  Yeah.  I don't know his
14 background.  I mean, I --
15 BY MS. O'GRADY:
16       Q    But if he was -- I mean, your sense --
17 you've said a few times today you're not a lawyer
18 so you can't make this determination.
19       So if he's not a lawyer, is it your
20 understanding that his involvement was
21 inappropriate?
22       MR. MERRITT:  Objection.  Same reason.
23       MS. O'GRADY:  You don't have to answer
24 that.
25       MR. MERRITT:  I mean, it also goes to

Page 274

Page

1  the scope, too, the relevance of that line of
2  questioning.
3              MS. O'GRADY:  We can move on.
4              I want to go off the record for a very
5  short break, and I would also ask how much time we
6  have left.
7              THE VIDEOGRAPHER:  Going off the
8  record.  The time is 22:01 UTC time.
9              (Recess -- 5:01 p.m.)
10             (After recess -- 5:09 p.m.)
11             THE VIDEOGRAPHER:  All right.  We're
12  now back on the record.  The time is 22:09 UTC
13  time.
14         BY MS. O'GRADY:
15     Q     Okay.  Ms. Jones, I want to move to the
16  topic of reconsideration.  What is your
17  understanding of the reconsideration process?
18     A     When a borrower wishes to have their
19  claim reviewed, they can submit a reconsideration
20  application.  It's my understanding that they can
21  submit a request for review.  I believe they have
22  the option to submit additional evidence to
23  support the claim.  And I believe if they have a
24  new allegation, they're instructed to start a new
25  claim.

Page 276

Page

1     A     I don't know.  I'm not involved in the
2  review of evidence.  I think this would go -- you
3  know, again, this is a legal question of how do
4  you review evidence.
5     Q     So you have no policy opinion about the
6  reconsideration process?
7              MR. MERRITT:  Objection to the opinion.
8         BY MS. O'GRADY:
9     Q     Have you ever been involved in setting
10  policy regarding reconsideration?
11     A     There -- there was -- so there was a
12  policy question that arose out of legal review of
13  reconsideration, and that policy question came to
14  me.
15     Q     What question was that?
16     A     The policy question is -- basically I
17  think I mentioned earlier that programs are
18  identified by a Classification of Instructional
19  Program code, a CIP code.  And the institution
20  gets to pick the CIP code when they register the
21  program with the department.  So in our records,
22  we have programs listed by CIP codes.  But
23  sometimes institutions call their program
24  something different than the name affiliated with
25  the CIP code.

Page 275

Page

1              That's my understanding of that
2  process.
3     Q     Okay.  If we could go to the exhibit
4  marked 14 in this deposition, which is ECF number
5  ECF number 108-08, Daniel Deegan affidavit?
6     A     Okay.
7     Q     Okay.  And then if you scroll to PDF
8  11, we're again within the denial Mr. Deegan
9  received which was based on the form D template.
10     A     Uh-huh.
11     Q     In the middle of that page, the
12  question, What if I do not agree with this
13  decision.
14              So you'll want to just take a moment to
15  read that over.
16     A     (Witness reviews document.)
17     Q     I specifically want to ask about point
18  two -- well, point one and point two, Which
19  allegations you believe that Ed incorrectly
20  decided, and Why you believe that Ed incorrectly
21  decided your borrower defense to repayment
22  application.
23              What's your understanding of what
24  information a borrower would have to provide to
25  successfully answer either of those questions?

Page 277

Page

1              And so the question that came to me is,
2  you know, what if a borrower is saying that they
3  were given relief based on one program name but
4  they really enrolled in a different program.
5     Q     Okay.  So your only policy involvement
6  with reconsideration was about program name
7  reconciliation essentially?
8     A     I mean, but that's the kind of policy
9  question --
10     Q     Right.
11     A     -- that would come to me.
12     Q     So when you were involved in reviewing
13  the form denial letters A through D that we looked
14  at before, had you been involved in reviewing the
15  sections about reconsideration of those denial
16  letters?
17     A     You know, I -- I don't remember -- I
18  mean, I think there were instructions included in
19  those original letters.
20     Q     What do you mean by "instructions"?
21     A     I mean, this language of "if you
22  disagree" looks familiar to me, so I can't
23  remember exactly what it said, but I believe this
24  language about if you disagree with this decision,
25  you may ask Ed to reconsider your application.

Page 278
Page

1      Q     Okay.  So at some point, you signed off
2  on this text or something very similar to it?
3      A     Yeah.  I can't remember if it listed
4  those three points, but -- but, yeah, I mean,
5  there was instructions for reconsideration.
6      Q     Okay.  And when you were reviewing the
7  form denial letters, did you think about or
8  consider whether or not they would provide enough
9  information for a borrower to seek
10 reconsideration?
11          MR. MERRITT:  Objection: calling for
12 privileged information.
13          MS. O'GRADY:  Do you mean deliberative
14 process privilege?
15          MR. MERRITT:  I mean you're asking her
16 what she thought, you know, about the review of
17 the letters before they were final.
18     BY MS. O'GRADY:
19     Q     On this final letter, do you believe
20 there's enough information for a borrower to
21 request reconsideration?
22     A     I believe that there is -- yeah, I
23 believe there is enough information about a
24 borrower that they can request and how they would
25 go about it, like address it in an email or, you

Page 279
Page

1  know --
2      Q     Yes.  In terms of logistics, the email
3  address is there and the fact of the
4  reconsideration process has been described?
5      A     Yes.
6      Q     In terms of the substance in point two,
7  Why you believe that Ed incorrectly decided your
8  borrower defense to repayment application, what
9  information in this denial letter could a borrower
10 use to answer that question?
11     A     And that's the part of this that I -- I
12 don't have the expertise.  I -- you know, those
13 particular questions were developed by the BD
14 unit.
15     Q     Let me ask it a different way.  So if
16 you could put yourself in the shoes of the
17 borrower because the borrower is -- I can tell you
18 this borrower and probably most borrowers are not
19 themselves lawyers either.  How do they determine
20 what information to include to answer the
21 question, Why you believe that Ed incorrectly
22 decided your borrower defense to repayment
23 application?
24          MR. MERRITT:  Objection: speculative.
25          BY MS. O'GRADY:

Page 280
Page

1      Q     I'm looking at this particular
2  document.  So what information in this document
3  could a borrower point to to say, Ed, you got it
4  wrong, because?
5      A     I mean, I think they would explain why
6  they think we got it wrong.
7      Q     And what specifically -- how would that
8  explanation be different than their initial
9  application?  You know, what -- what other --
10 what -- why do you believe that Ed incorrectly
11 decided your borrower defense to repayment
12 application?
13     A     I mean, you know, again, I think a
14 borrower would give an explanation, and the -- the
15 one that I'm aware of is, you know, borrowers who
16 wrote in and said, you know, you assigned relief
17 because you said I was in this program but, you
18 know, the college called it this other program,
19 and -- and -- and that's different on the table.
20     Q     So the one example you can think of is
21 a -- is, again, a problem with the -- again,
22 properly identifying what program or what school
23 somebody went to.
24          If a borrower has included information
25 about a number of allegations and then this denial

Page 281
Page

1  letter, for example, if we just scroll up to
2  page 10 of the PDF, Allegation one, employment
3  prospects:  You allege that Keller Graduate School
4  of Management engaged in misconduct related to
5  employment prospects.  This allegation fails for
6  the following reasons:  Insufficient evidence.
7          Your claim for relief on this basis is
8  therefore denied.
9          What basis -- how would a borrower
10 interpret that paragraph?  I mean, I think you put
11 yourself -- well, that's my question.
12          How should a borrower interpret that
13 paragraph?
14     A     Because I don't know what the borrower
15 submitted originally, I -- I don't know.  I don't
16 know what was in the borrower's original
17 application.
18     Q     When you signed off on the initial form
19 denial letters, I think at one point you had said
20 this is the spot, you know, for the following
21 reasons, and that's where you had expected there
22 to be information about the state law standard
23 applied.
24          That's right?  You testified about that
25 earlier today; correct?

Page 282
Page

1        A    I said that when -- yes, in the section
2   where the attorneys explain -- I can't remember
3   the words, but, right, that little bracketed place
4   that you would be evaluating evidence based on the
5   state standard.
6        Q    And here the only words in that
7   bracketed place, which I think was recommendation
8   reason, is the -- are the words "insufficient
9   evidence."
10            Is that -- when you first looked at the
11  template, is -- you know what, let me just take a
12  moment.  Let's look at the template.  My question
13  is about the template.
14            So we're going to go to Exhibit
15  Number 13 of this deposition, and the file is ECF
16  number 116, Defendants Post-CMC Filing.
17            And this, as you'll recall, have the
18  attachment of these form letters.  Let's go all
19  the way down --
20       A    I'm still looking for it.
21       Q    Oh, sure.  Sorry about that.
22       A    (Witness reviews document.)
23            Okay.  I -- I have it.  Which form do
24  you want me to look at?
25       Q    Okay.  So I want to go all the way to

Page 283
Page

1   PDF page 23, and this is the form D denial
2   template.
3        A    Okay.
4        Q    And there in the highlighted -- it's
5   the highlighted text is what a reviewing attorney
6   would insert; correct?
7        A    It -- it would -- it would be what they
8   would enter into their work papers.
9        Q    Okay.  And we discussed before how your
10  expectation was that the highlighted text of
11  review recommendation reason would include the
12  state law standard.
13            And my question now is did you expect
14  any other information to be within those brackets
15  review recommendation reason?
16            What other information did you think
17  when you reviewed this template would be included
18  there?
19            MR. MERRITT:  Objection.  It's calling
20  for privileged and deliberative information.
21            MS. O'GRADY:  Well, I think the witness
22  has already testified about her expectation that
23  the state law standard would be included here, and
24  I want to know her -- when she signed off on the
25  form D template what she was signing off on.

Page 284
Page

1            MR. MERRITT:  Well, it's still going to
2   what her thoughts and impressions were at the time
3   which is deliberative information, what you're
4   asking her now.
5            BY MS. O'GRADY:
6        Q    Did you discuss -- when these were
7   finalized, did you discuss what review
8   recommendation reason meant?
9            MR. MERRITT:  You can answer that.
10            THE WITNESS:  I -- I -- I don't -- I
11  don't know what date they were considered to be
12  finalized, but, yes, I was engaged in
13  conversations about what I believed that meant.
14            BY MS. O'GRADY:
15       Q    And I'm not asking about the
16  deliberation of the different drafts.  I'm asking
17  what your understanding of this template means
18  right here?  What is the review recommendation
19  reason?
20       A    I had to defer to the expertise of the
21  lawyers.  I -- I -- I don't write legal text, so,
22  you know, the expectation was that lawyers would
23  make a decision and that information would be
24  provided.
25       Q    But in your declaration -- we can go

Page 285
Page

1   back to Exhibit 2 of your declaration which is
2   your declaration, I should say.  We'll go back
3   to -- it's PDF page 10 of Exhibit 2, the bottom of
4   paragraph 26.  And you write here, The department
5   has been working to develop documents to provide a
6   more robust explanation for borrowers whose claims
7   are denied.
8            Is this template the result of that
9   effort to develop documents to provide a more
10  robust explanation?
11       A    The development of these templates is
12  what I was referring to when I said that the
13  department was developing documents.
14       Q    Did you ever, before today, review a
15  form D denial notice as it was provided to a
16  borrower?
17       A    No.  The servicers send those.
18       Q    So you've seen the template, but you
19  have never before today seen what it looked like
20  to a borrower receiving it?
21       A    I -- I believe that there was one
22  letter that I saw that came in.  When I asked Mark
23  about it, he told me that the letter that I saw
24  was not a typical letter.  So I've only seen --
25       Q    Which letter was that?  Do you recall?

Page 286

1      A      It was -- it was a letter that -- that
2  said, you know, fill in the blank, basically.  I
3  mean, it -- you know, it was the letter that had
4  the highlighted insert here.  It still said insert
5  here.
6      Q      Oh, so it still said "insert here."
7      A      (Witness nods head.)
8      Q      Okay.  And, so, he said that wasn't
9  typical.
10            Have you ever seen one -- well, let me
11 just go back.  Why did he show that to you?
12     A      He didn't.
13     Q      Oh.
14     A      He didn't show it to me.  I -- I was --
15 it came to me, and I forwarded it to him to ask
16 what happened here; how could this happen.
17     Q      Okay.  And what was his response?
18     A      That it was just a one-off blip.
19     Q      So besides that letter that still had
20 the mistaken highlights included, before today,
21 you'd never seen another one as it was sent out?
22     A      No.
23     Q      Okay.  And if I were to -- the one that
24 we just looked at that simply said, you know,
25 insufficient evidence in -- in the highlighted

Page 287

1  area of review recommendation reason, is that
2  about what you expected them to look like, or is
3  that less text than you expected --
4      MR. MERRITT:  Objection again to the
5  extent you're talking -- you know, referring to
6  her predecisional state of mind.
7      BY MS. O'GRADY:
8      Q      I can ask right now.  You know, would
9  you be surprised that the highlighted text, review
10 recommendation reason for thousands of borrowers
11 only includes one or two phrases?
12     A      Because I haven't seen those claims,
13 I -- I can't tell you.  I -- I haven't seen the
14 applications.  I don't know what the incoming
15 looked like, so I can't answer that question.
16     Q      When the -- I think you said the -- the
17 sample that you saw that had the mistaken
18 allegation type and, you know, highlighted text
19 still included, was that emailed to you?
20     A      I don't remember.  And I don't know
21 that it had the wrong allegation.  It just -- it
22 just didn't have that -- as best I remember, it
23 just didn't have the justification in it.  You
24 know, it just had the fill in here.  I mean, I
25 know it doesn't say fill in here, but you know

Page 288

1  what I mean.
2      Q      Right.  So it had, like, the
3  highlighted text.
4      A      Yeah.
5      Q      So how did you receive that?  Who sent
6  it to you?
7      A      I can't remember who sent it to me.  I
8  can't remember.  It came from outside of the
9  department, but I can't remember who sent it to
10 me.
11     Q      Could you find out?
12     A      I mean --
13     Q      Would it be possible to go into your
14 email and find out?
15     A      I wouldn't even know what to search on.
16     Q      And then you --
17     MR. MERRITT:  Are you asking that that
18 email -- are you making a request for that email
19 to be produced?
20     MS. O'GRADY:  Yes, I am.
21     MR. MERRITT:  I'm just going to say a
22 broader point.  If after this deposition you have
23 further document requests, you know, please send
24 them along.
25     I was also going to suggest based on

Page 289

1  some of the other ones that you review the
2  Pratt -- the (indiscernible) record in the Pratt
3  case, and it's possible some documents could be in
4  there.
5      MS. O'GRADY:  Yes, there are some
6  documents in there, and they should still be
7  produced in this case.
8      And that said, based on the lack of
9  documents about some of these issues, we would
10 like to keep this deposition open to the extent
11 further documents are produced that involve
12 Ms. Jones as a witness?
13     MR. MERRITT:  What do you mean keep it
14 open?
15     MS. O'GRADY:  If we have to call her
16 back as a witness to address documents that we
17 don't have in our possession yet.
18     MR. MERRITT:  I think we have to
19 consider any requests like that you're going to
20 make at the appropriate time.
21     BY MS. O'GRADY:
22     Q      Ms. Jones, I would like to --
23     MS. O'GRADY:  I'm going to mark -- I
24 think this should be our last exhibit, and this is
25 going to be Exhibit Number 20 of this deposition.

1          (Jones Deposition Exhibit 20 was marked
2     for identification and attached to the
3     transcript.)
4          MS. O'GRADY:  The file name is ECF
5     number 146, Order denying settlement show cause.
6          BY MS. O'GRADY:
7     Q     Do you have that open?
8     A     I do.
9     Q     Okay.  And do you recognize this
10    filing --
11    A     It doesn't look familiar --
12    Q     -- or court order?
13    A     -- to me.
14    Q     Okay.  I'll let you know this is a
15    court order in this case that is what ordered the
16    discovery.  It's the genesis of your being here
17    today.
18          So on page 16 of this PDF, if you could
19    scroll there, I just want to use this to ask you
20    some questions about other individuals and their
21    roles if you wouldn't mind.
22          So are you on page 16?
23    A     I am.
24    Q     Okay.  So bullet point one here, these
25    are the topics of discovery.  The development and

1     use of the form denial letters including the
2     submission, timeline of review, and disposition of
3     any request for reconsideration; and the form of
4     denial issued before this suit and under the
5     previous administration.
6          Who is the -- which individuals would
7     be the best people for us to ask about those
8     issues?
9     A     Our Office of General Counsel is who
10    you should ask.  All of those requests are handled
11    through our Office of General Counsel.
12    Q     And when you say "all of those
13    requests," what do you mean?
14    A     I mean, you know, request for
15    documents --
16    Q     No, I -- no, I know that.  I just want
17    to know the -- the topics.  So who is closest to
18    the topic of the use and form of the denial
19    letters that we talked about?  So those denial
20    letter forms A through D.  You reviewed them and
21    signed off on them.  Who else is the person
22    closest to that issue?
23    A     I mean, Colleen Nevin is closest to
24    that issue.
25    Q     Anyone else besides Colleen?

1     A     I -- I -- I have -- I have no idea -- I
2     have no idea who else works -- I don't know the
3     names of any of Colleen's staff except for one.  I
4     know one staff person by name.  So I think you'd
5     have to ask her.
6     Q     Okay.  And that's true for the
7     disposition of any request for reconsideration.
8     Is there anyone else besides Ms. Nevin that would
9     have knowledge of that topic?
10    A     I don't even know what the disposition
11    of any request for reconsideration --
12    Q     Oh, reconsideration is what we were
13    just talking about.
14    A     Right.  But I honestly don't know what
15    disposition of any request means.
16    Q     Okay.  Let's look at topic two.  The
17    extent to which the difficulty of reviewing
18    borrower defense applications actually caused or
19    justified the Secretary's 18-month delay.
20          Who would be the person closest to that
21    question?
22          MR. MERRITT:  I object to this line of
23    questioning.  I mean, you have other --
24    interrogatories and other lines of asking
25    questions like this.

1          MS. O'GRADY:  I want to get a -- I want
2     to get a sense of Ms. Jones' understanding of what
3     her colleagues work on and do especially since we
4     talked a lot today about who has a policy-making
5     role and who doesn't.
6          MR. MERRITT:  We've talked about that
7     and, you know, provided a lot of information about
8     that.  So I think this particular request is
9     getting beyond the scope.  I mean, her specific
10    knowledge of that as opposed to those topics in
11    general, like, who else would be involved.
12         MS. O'GRADY:  I don't understand your
13    objection.  It's the witness' personal knowledge
14    about exactly the scope of the discovery.
15         MR. MERRITT:  I mean, it's somewhat
16    calling for a legal conclusion, I mean, to the
17    extent you're saying who has information relevant
18    to this.
19         I mean, you know, Diane, you've talked
20    about these topics.  You can answer the question.
21         THE WITNESS:  I mean, for -- for number
22    two, it would be our Office of General Counsel.
23    The attorneys that were involved in the Manriquez
24    case.
25         BY MS. O'GRADY:

Page 294

Page

1    Q    Okay.  And what -- the difficulty of
2 reviewing borrower defense applications, what does
3 that phrase mean to you?
4         MR. MERRITT:  Objection:  Speculative.
5         MS. O'GRADY:  I'm just asking?
6         MR. MERRITT:  You're asking her to
7 interpret what the court said.
8         MS. O'GRADY:  No, I'm asking what she
9 thinks it means.  I don't want her to interpret
10 the court's words.  I just, you know . . .
11 BY MS. O'GRADY:
12   Q    Difficulty of reviewing borrower
13 defense applications.
14        Are borrower defense applications, in
15 your view, difficult to review?
16   A    I don't review borrower defense
17 applications, so I don't know.
18   Q    Who would know?
19   A    Colleen Nevin reviews borrower defense
20 applications.
21   Q    And regarding the 18-month delay in
22 processing applications, would the secretary have
23 knowledge about that in your -- in your view?
24   A    You know, again, that decision was made
25 before I was involved in BD.  That was made, you

Page 295

Page

1 know, after the Manriquez case, so I don't know
2 who was involved in making that decision, but
3 that -- that delay was tied to the Manriquez case
4 and which is why I've said, you know, the lawyers
5 involved in the Manriquez case would be the ones,
6 you know, closest to understanding that case.  And
7 it's a --
8    Q    Okay.  And your understanding is that
9 no one -- no one else besides the lawyers involved
10 in the Calvillo Manriquez litigation would have
11 any knowledge about the reason for that delay?
12   A    I'm telling you that I wasn't involved
13 in that decision, but it makes sense to me that of
14 course the lead -- the lawyers who were involved
15 in the Manriquez case would have knowledge of --
16 of that decision and -- and considerations around
17 that decision.
18   Q    To the third point, The extent to which
19 the Secretary has denied applications of students
20 who have attended schools subject to findings of
21 misconduct by the Secretary or any other state or
22 federal body or agency, and the rationale
23 underlying those denials.
24        I'll assume you'll say Colleen Nevin.
25 Is there anyone else besides Ms. Nevin?  And

Page 296

Page

1 please correct me if I assumed incorrectly.
2    A    Colleen Nevin and her team.  I don't
3 know if she reviews every single one, but her team
4 does.  Yeah, she and her team would be the only
5 ones that would have knowledge of this.
6    Q    And is there anyone else in a
7 policy-making role that would have any knowledge
8 of that topic?
9    A    Not in a policy-making role, no.
10   Q    And what about the second question
11 regarding the delay?  Is there anyone else in a
12 policy-making role that would have knowledge of
13 that topic?
14   A    You know what, again, I wasn't involved
15 in the decision so I don't know who was involved
16 in making it.  You'd have -- you'd have --
17   Q    What about carrying out the decision?
18   A    What do you -- what -- I mean, what do
19 you mean carrying out --
20   Q    I understand the decision was made
21 before your tenure, but the decision was in effect
22 during your tenure.
23        Is there anyone else involved in that
24 decision being the status quo, that -- you know,
25 this . . .

Page 297

Page

1    A    Well, the decision had been made and
2 others executed it.  I mean --
3    Q    So who executed that decision?
4    A    Originally Jim Manning and ultimately
5 Mark Brown.
6    Q    And when you say they executed that
7 decision, what do you mean?
8    A    It means that the decision had been
9 made to -- to -- to not issue any more final
10 decisions to borrowers until the California court
11 made its decision.  So the -- what carrying it out
12 means is not issuing decisions to students.
13   Q    And the directive to continue not
14 issuing decisions to students came from Jim
15 Manning and Mark Brown?
16        MR. MERRITT:  Objection.  That's a
17 mischaracterization of her testimony.
18        MS. O'GRADY:  Okay.
19 BY MS. O'GRADY:
20   Q    Please correct the mischaracterization.
21   A    You -- you asked me who would carry out
22 that direction.
23   Q    Right.
24   A    But -- but what you said back to me was
25 that -- I think you said they gave the direction.

Page 298

1    I don't know who gave the direction.  Certainly it
2    wasn't Mark Brown.  He wasn't there then.
3        Q    But they carried out the direction?
4        A    Correct.
5        Q    Correct.  Okay.
6             And my apologies for the redundancy
7    here.  I just want to go back to the development
8    and use of those form denial letters, and those
9    are the form denial letters A through D that we've
10   been discussing that you reviewed.
11            Who else was involved in their
12   development?
13       A    I think I mentioned this earlier.  So I
14   think -- I'm trying to picture the people around
15   the table.
16       Q    Ms. Jones, I think you did testify to
17   that, and I'm sure it's on the record.  You don't
18   need to repeat yourself there.  I think we have
19   that.  Okay.
20            Just give me one moment.
21            MR. MERRITT:  I just want to make one
22   quick point about to the -- you mentioned keeping
23   this deposition open because of potential
24   documents coming in, just to state for the record,
25   plaintiffs submitted document requests two weeks

Page 299

1    ago on November 6, so the responses to that, you
2    know, aren't due and there would have been no
3    obligation to produce any documents before this
4    deposition.  So, you know, you've had -- you've
5    had seven hours today.
6        BY MS. O'GRADY:
7        Q    I just -- Ms. Jones, I have one last
8    point that I wanted to address.  We've talked a
9    lot today about the policy decisions or lack
10   thereof around borrower defense.
11            In your time at the Department of Ed,
12   have -- would you say there have been policy
13   decisions made regarding borrower defense?
14       A    We finalized the 2019 regulation.  It
15   would be hard to say that's not a policy decision.
16       Q    Besides that.
17       A    Sure.  There have been policy decisions
18   about the new methodology, the 2019 methodology,
19   the development of the -- I mean, the methodology
20   is a methodology.  That's the policy.
21       Q    Okay.  And in terms of granting or
22   denying borrower defense, have there been any --
23   step one, have there been any policy decisions?
24       A    Not to my knowledge.
25            MS. O'GRADY:  Okay.  I think we're

Page 300

1    done.
2            THE VIDEOGRAPHER:  Okay.  Shall we
3    close out the record?  No cross?
4            THE WITNESS:  I think the court
5    reporter wanted me to stay on to give her some
6    spellings.
7            THE VIDEOGRAPHER:  Yeah.  I'll just
8    close out the video record.
9            MR. MERRITT:  Yeah.  No cross.
10           THE VIDEOGRAPHER:  Okay.  We're now
11   going off the record.  The time is 22:41 UTC time.
12   This concludes today's testimony given by
13   Ms. Diane Jones.
14           Thank you, and have a great weekend.
15
16
17
18           (Whereupon, the Remote Videotaped
19   Deposition of DIANE AUER JONES ended at
20   5:41 p.m. EST)
21
22
23
24
25

Page 301

1
2              REPORTER'S CERTIFICATE
3    I, Dana C. Ryan, Certified Shorthand Reporter in
4    and for the State of Maryland, hereby certify that
5    the deponent was by me first duly sworn and the
6    foregoing testimony was reported by me and was
7    thereafter transcribed with computer-aided
8    transcription; that the foregoing is a full,
9    complete, and true record, to the best of my
10   ability, of said proceedings.
11   I further certify that I am not of counsel or
12   attorney for either or any of the parties in the
13   foregoing proceedings and caption named or in any
14   way interested in the outcome of the cause in said
15   caption.
16   The dismantling, unsealing, or unbinding of the
17   original transcript will render the reporter's
18   certificate null and void.
19   In witness whereof, I have hereunto set my hand
20   this day: November 24, 2020.
21           _____  Reading and Signing was requested.
22           _____  Reading and Signing was waived.
23           ___X___  Reading and Signing was not requested.
24           _____
25   Dana C. Ryan, RPR, CRR

## Exhibits

EX 0001 Diane Auer Jon
es 112020  6:10 13:14,
  15
EX 0002 Diane Auer Jon
es 112020  6:11 18:5,
  12 29:6 36:5,21 40:4
  69:20 93:14 186:9
  224:6 244:11 285:1,3
EX 0003 Diane Auer Jon
es 112020  6:13 48:7,8
EX 0004 Diane Auer Jon
es 112020  6:16 53:1,2
  57:5,6,9
EX 0005 Diane Auer Jon
es 112020  6:17 57:10,
  11 60:4 142:9,11
  185:20
EX 0006 Diane Auer Jon
es 112020  6:18 52:24
  60:6,7
EX 0007 Diane Auer Jon
es 112020  6:19 62:10,
  12,13 84:1
EX 0008 Diane Auer Jon
es 112020  6:20 64:22,
  24,25 68:24
EX 0009 Diane Auer Jon
es 112020  6:21 66:5,
  8,9
EX 0010 Diane Auer Jon
es 112020  6:23
  110:16,24 111:16,18
EX 0011 Diane Auer Jon
es 112020  7:4 111:1
  185:22,23
EX 0012 Diane Auer Jon
es 112020  7:17 186:3,
  4 243:13
EX 0013 Diane Auer Jon
es 112020  7:20
  196:10,11 282:14,15
EX 0014 Diane Auer Jon
es 112020  7:22 216:16
  217:8
EX 0015 Diane Auer Jon
es 112020  7:23 217:7,
  9
EX 0016 Diane Auer Jon
es 112020  8:4 230:3,4
EX 0017 Diane Auer Jon
es 112020  8:8 233:15,
  16
EX 0018 Diane Auer Jon
es 112020  8:12
  249:15,18
EX 0019 Diane Auer Jon
es 112020  8:18
  263:21,23 264:10
EX 0020 Diane Auer Jon
es 112020  8:21 73:19
  74:15 289:25 290:1

## $

$300  149:16

## 0

0  241:20 243:3,9,19
  244:5

## 1

1  13:14,15 90:11 91:5
  151:6,10 164:25
  245:7,9 265:15
10  37:13 80:3 102:16
  103:11 110:16,24
  111:14,16,18 186:20
  192:13,15,16 209:2
  215:19 281:2 285:3
100  26:24 61:11,25
  62:3,6
103  153:20,21
108-08  206:21 275:5
10:42  69:14
10:56  69:15
11  111:1,14 185:22,23
  188:7 275:8
11,000  170:16
116  196:2,7 282:16
11:28  91:21
11:30  12:16 91:23
12  186:3,4 243:13
129-1  216:14
12:15  122:4,19

12:49  122:20
13  196:10,11 282:15
14  216:16 217:8 275:4
145  263:22 264:9
145-2  265:14
146  290:5
14:15  9:12
15  40:4 69:21 71:1,4
  76:6 77:5 93:18
  94:25 95:21,25
  217:7,9
158,000  114:15
15:42  69:13
15:56  69:17
16  230:3,4 290:18,22
160,000  114:14,16
  116:6,7 117:22
  158:18,20
17  93:20 233:15,16
17:14  122:17
17:49  122:22
18  96:3 249:15,17,18
18-month  136:4 231:13
  256:16,25 257:1
  292:19 294:21
18:08  136:11
18:13  136:15
19  263:21,23 264:10
1994-1995  44:10
1995  46:25 54:25
  92:17 110:10 163:6
  261:13
1998  108:4
1999  262:11
19:24  185:13
19:43  185:17
1:08  136:12
1:13  136:13
1st  151:3 203:10
  208:20 209:16 212:4
  262:11

## 2

2  18:5,12 19:14 29:6
  36:5,21 40:4 69:20
  93:14 186:9 197:25
  198:25 200:20 204:8
  224:6 243:14 244:11
  285:1,3

**20**   73:19 74:15 289:25
  290:1
**20-**   128:10
**2010**   33:9
**2014**   255:22
**2015**   33:7,8,9 35:24
  169:7
**2016**   34:14 37:14,19
  38:7 43:8 44:12,16,
  19 46:9,12 47:5
  50:16,20,24 55:2
  57:25 78:24 86:11
  92:10,11,24 93:2,6,
  10 110:10 147:15
  148:2,6 152:13,22
  160:24 161:19,23
  162:7 166:9 191:24
  209:16 242:1,3,11
  245:20 247:14,21,24,
  25 248:13 249:1,6
  253:1,5,8,10 254:1,
  5,10,16,22 255:3,8,
  17,19 259:5,6 261:10
**2017**   33:2 40:6,14
  50:17,20 60:15 63:8
  67:10 71:6 79:21
  84:5 90:11 91:5
  95:18 96:1 117:17
  123:8,9 124:12
  203:10 208:20 212:4
  222:25 223:2,23
  253:25 254:2 262:10
  273:4
**2018**   32:19,21 33:3
  36:23 173:20 175:19
  176:9 178:2
**2019**   16:22 23:24
  24:7,10,16 29:24
  36:23 37:9 78:12
  81:18,22 82:2 86:12
  92:10,11 98:4,6
  104:1 107:6 110:8,12
  118:7 120:9 123:7
  128:11,12 130:11
  131:23 132:14 133:10
  135:11 137:6 138:11,
  19,20 142:9,18
  147:21 148:6 150:22
  154:13,15 156:13
  157:9 162:14,25
  165:24 166:21 173:6
  185:21 221:19 223:1,
  24 224:2 233:21

234:8,17,20 236:5,
  11,15 244:24 245:5
  246:21 247:2,4,14,15
  249:7 252:21,24
  253:8,10,14 254:3,8,
  10,14,20 255:23
  259:2,5,6 261:6
  299:14,18
**2020**   9:12 151:3,7,10
  164:25 207:19 245:7,
  9 250:5 254:2
**20:46**   228:24
**20:56**   229:3
**20th**   9:12 228:6
**225,000**   237:1
**226**   160:14,15,21
**22:01**   274:8
**22:09**   274:12
**22:41**   300:11
**23**   283:1
**24**   75:8,16 76:9 217:4
  244:12,13
**24th**   57:25
**25**   103:12
**26**   186:10,21 188:6
  194:19 201:16 285:4
**27**   76:13 217:13
**27,700**   170:8,23
**27th**   250:5
**280,000**   169:6
**2:24**   185:14
**2:43**   185:15
**2nd**   262:10

---

                    **3**

**3**   48:7,8 55:5 150:14
  197:23
**31st**   50:17 173:4
**38,000**   30:4 169:17
**38,700**   169:11
**3:46**   228:25
**3:50**   228:22
**3:51**   228:22
**3:56**   229:1

---

                    **4**

**4**   29:5,7 53:1,2 55:5
  57:5,6,9 209:14

**49**   113:19
**4th**   63:8 84:5

---

                    **5**

**5**   37:12 57:10,11 60:4
  142:9,11 185:20
  236:18 239:9 241:4
**50**   114:18
**50-state**   90:14
**500**   49:14
**56-3**   18:8 142:8
  185:20
**56-4**   73:16 74:9,15
**57,000**   169:7,9
**5:01**   274:9
**5:09**   274:10
**5:41**   300:20

---

                    **6**

**6**   40:5 52:24 60:6,7
  69:22 70:25 93:18
  171:10 299:1
**63-3**   57:6
**66**   73:25
**66-2**   52:15,18
**6th**   233:20

---

                    **7**

**7**   36:5,8 62:10,12,13
  84:1 93:19 197:10,11
**7th**   207:19

---

                    **8**

**8**   64:22,24,25 68:24
**84**   144:8
**85**   144:5,12,22
**8th**   263:3,9

---

                    **9**

**9**   66:5,8,9 75:9 111:4
  207:14,17 208:17
**90**   9:17 163:11,13
**94-95**   44:18 46:2,6,12

**95**  86:11 92:9,14,20
 93:5,9,12 163:9
 191:24 193:10 262:14
**98**  148:8,9,12
**9th**  60:15 273:3

---

**A**

**a.m.**  69:14,15
**A09**  167:11 243:14
**A09-borrower**  186:2
**ability**  11:18 105:3
 108:13 172:22 182:18
**absolutely**  34:16
 125:8 138:5 262:2
**abundance**  267:15
**accepted**  58:20,22
**accepting**  59:14
**access**  99:5 172:7,13
 173:17 259:19
 270:18,21,23 271:3
**accessible**  224:12
**accordance**  75:23
 103:23 104:16 244:18
**account**  233:10 259:6
**accountable**  108:5
**accreditor**  252:11
**accurate**  54:11,13
 198:6 224:11 240:25
 250:16
**accurately**  165:12
**acknowledge**  9:25 10:4
 153:25 154:2
**Act**  20:15 94:1,12
 117:11 132:25 133:4
 137:24 138:25
 140:18,24 180:13
**acting**  26:21 31:20
 32:4,7 65:10
**action**  9:18 63:9
 144:9 203:15 212:6
**actions**  47:8
**actors**  148:22 149:15
**acts**  148:23 203:13
**actual**  21:25 63:23
 134:22
**Adair**  28:7,8
**add**  36:10 130:23
 221:14 251:15,25
 255:17

**added**  129:9,10,13
 130:5 199:9
**adding**  253:12 254:4
 255:18
**addition**  160:24
 192:11 199:3
**additional**  58:25
 139:22 188:19
 251:14,19 253:4,12
 260:22 274:22
**address**  209:15 224:9
 278:25 279:3 289:16
 299:8
**addressed**  171:17
 240:12
**adequate**  41:14,17
 71:10
**adjudicate**  103:18
 145:25 154:6 162:1
 195:20 211:20 219:24
 244:21 267:1 271:23
**adjudicated**  44:18
 47:3 48:3 51:23,25
 52:4 92:14 93:4
 101:10 102:13 129:1
 147:4,17 152:10
 169:8,11 170:4,17
 176:17 190:24 191:23
 192:3,4 195:16 204:5
 208:3 215:15 242:22
 253:21 261:19
**adjudicating**  46:5
 50:23 71:8 106:24
 114:21 139:24 140:4
 177:16 245:8 248:1
 262:6
**adjudication**  52:6
 62:1 101:16,18,20,23
 102:3,7 106:9 129:1
 145:9 152:15,20,22
 153:2,3,16 162:6
 169:14 204:15 211:4
 241:24 271:11
**adjudications**  48:5
 52:9 101:14 132:4
 191:3,4 192:8 203:20
**adjustment**  194:15
**administered**  10:5
**administration**  29:11
 41:19,23 42:5,16
 43:18 46:5 47:21
 56:1,2,4,5 58:14,15,

 16,17,19,21 59:10,13
 60:24 61:5,17 93:25
 94:10 98:22 133:3
 143:11 172:6,14
 230:1 271:18,19
 272:3,11,22 291:5
**administration's**
 61:21 271:25
**administrative**  103:17
**adopted**  46:7
**Adult**  20:13
**advance**  74:22 142:13
**advice**  33:24 34:18
**advise**  271:8
**advised**  42:4 80:24
**advises**  80:21 81:3
**advisor**  28:4 31:25
 32:2,10,23 39:16
 40:8 239:12
**advisors**  27:11
**advocacy**  154:8
**AFF**  206:22
**affairs**  33:14,16,19
**affect**  218:3,4 219:6,
 13 220:23
**affected**  182:18
**affects**  221:5 231:17
 247:4
**affidavit**  207:7
 216:24 217:8 275:5
**affiliated**  276:24
**afforded**  62:6 146:19
 244:25
**AG**  47:19,20 51:15
**agencies**  143:13
 149:12
**agency**  45:14 234:2
 295:22
**agree**  136:7 157:25
 163:15,16 165:6
 210:2 214:7 275:12
**agreeing**  10:16,19
**agreement**  9:6 10:10,
 13 172:5,19 213:25
**agrees**  157:14
**ahead**  34:6 46:22 87:1
 112:9 133:25 163:24
 214:21 217:3 222:24
**aid**  20:17,19 36:22
 37:7 39:20 97:10
 105:9 114:21 134:11

187:9 188:12 239:15
241:14
**alerted**  92:17
**aligns**  22:2
**allegation**  58:22
200:14 201:8 205:1,
8, 24 209:3,6 268:4
274:24 281:2,5
287:18,21
**allegations**  148:24
200:7,10 209:1
250:14,20 275:19
280:25
**allege**  145:20 209:4
281:3
**alleged**  163:20 165:16
237:3
**alleges**  208:14 211:23
**alleging**  54:18 58:8
60:18 164:18
**allowed**  143:13
**alphabetical**  13:9
14:3 74:16
**alphabetized**  14:20
**alternative**  96:10,15,
19,24 97:25 98:11,19
172:25
**ambiguous**  95:13
**amount**  59:24 61:10
64:18 71:13 72:5,11,
23 76:3,7 77:6 96:10
99:8 131:4 246:22
252:6
**analysis**  230:10 233:1
**analyzes**  121:20
**and/or**  9:7
**announced**  23:23
**announcement**  38:6
**annual**  26:9
**answering**  166:14
**answers**  213:2
**anticipates**  247:25
**anybody's**  33:25
**anymore**  172:15
**anyone's**  27:16
133:14,16,18 135:15
**Apollo**  265:20
**apologies**  75:3 239:12
241:4 298:6
**apologize**  75:6 184:12
217:14

**app**  259:21
**apparently**  48:25 54:4
**appealed**  96:5
**Appeals**  161:25
**appears**  52:19 57:18,
20 60:14 144:23
168:9,16 207:11
214:3,4
**Appel**  97:8,18 238:5
**appellate**  96:7
**applicable**  75:24
103:23 104:16 118:15
199:7 203:8,15
208:18,21 212:7,8
213:11 244:18
**applicant**  141:20
256:1
**application**  55:24
75:18 77:23 78:2
81:13,15 84:23
91:14,18 92:18 96:2
103:7,9 105:13 106:6
115:18 118:4 125:3
145:5 146:16,23
147:1 149:18 151:17
155:18 183:19 207:20
209:13,18 211:16,22
214:17,19 215:20,23
217:16 233:5 241:19
245:14,22 253:25
262:22 263:14 268:14
274:20 275:22 277:25
279:8,23 280:9,12
281:17
**applications**  44:2
48:1 50:4 79:17,19
80:23 102:25 103:2
106:25 124:23 136:3
150:2,15 156:20
169:6 170:9,17,22
171:3,13 220:8
225:25 231:12,24
233:7 237:1 246:3
256:15 257:7 259:10
265:21 266:16
268:11,19 271:12
287:14 292:18 294:2,
13,14,17,20,22
295:19
**applied**  92:25 93:4,11
94:17 95:16 101:3
102:16 107:13 118:9
124:13 139:21 141:14

142:1 177:22 203:19
212:1,11,13 215:2
216:8 262:22 281:23
**applies**  79:25 109:18,
25 151:4 212:18,19
214:6,10 245:6
253:17
**apply**  42:11 79:19
120:22 123:5 128:15
133:1 141:22 151:7
156:25 172:22 175:11
208:8 212:9 215:8
223:6,14 263:16,18
**applying**  95:16 119:4
141:2 180:12 205:4
255:22,23
**appoint**  162:15
**apprenticeship**  33:6
**approach**  96:10,16,19
97:25 98:12 164:15
**approval**  23:22 65:13,
15 134:5 241:22
243:5,7 244:8
**approvals**  171:14
173:21,25 174:7
175:21,23,25 178:2,
16 183:9,21,22,23
184:20 185:1
**approve**  99:4 175:4
**approved**  96:12 101:3,
8 128:5,13 130:15
170:9,22 171:3
172:23 173:9 177:17
200:3 243:15,16,18,
25 267:6,10 268:1,6
**approves**  39:13
**approving**  174:2
**approximate**  88:14
**approximately**  16:11
32:14
**April**  98:4 133:10
**area**  287:1
**areas**  19:25 195:13
**argue**  256:22
**argued**  139:7
**arguments**  145:5
**arises**  189:25
**arm's**  11:24
**arose**  276:12
**arrival**  41:2

arrows  148:14
art  102:7
article  230:1,8
  233:13,20,21 234:13
  235:18 236:19 239:10
  240:7 241:17 250:25
articles  236:1
assert  148:18 198:2
  199:2
asserted  43:19
assess  262:7
assessed  261:1 262:20
assessing  42:9
assessment  153:6
assigned  108:10
  280:16
assist  18:21
assistant  20:7 26:21,
  22,25 27:1 28:6,8
  32:5,7
assistants  27:11
assume  77:2 295:24
assumed  296:1
assuming  14:11 114:15
  117:3
attached  13:16 18:13
  48:9 53:3 57:12 60:8
  62:14 65:1 66:10
  111:19 185:24 186:5
  196:12 198:1 216:17
  217:10 230:5 233:17
  249:19 263:24 264:19
  290:2
attachment  65:24
  130:2 282:18
attachments  196:21
attempt  190:3
attempting  148:22
attend  116:7,21
attended  47:16 71:15
  72:12 95:1 139:10
  150:15 190:6 194:1
  199:22 200:22 218:12
  219:22 240:22 267:14
  295:20
attestations  50:4
attorney  11:4 53:15
  68:13 70:5 77:18
  80:14,25 82:8 101:21
  105:2,6 108:22
  119:21 147:7 180:17

204:12,23 205:3
  283:5
attorney-client  9:7
attorney-driven  106:9
attorneys  9:24 15:22
  56:9,13,17 57:1
  67:18 68:17 78:5
  80:7,20 81:5 82:14,
  15,22 85:15 112:12
  129:2 162:5 181:5
  216:4 242:6 269:21,
  24 270:1 282:2
  293:23
audio  121:22
Auer  10:23 13:11
  239:11 300:19
August  172:1,16
  173:3,4 177:7,14
authority  82:10 84:21
  85:6,10,21 86:2
  107:22,23 126:19
  127:1,5,8,11,13,17,
  20 183:1,3
authorize  23:25
authorized  25:12 66:2
  167:7 171:7 231:21
  232:5 257:3,24
automatically  14:20
avoid  163:21 165:17
awaiting  100:15 101:1
  170:13,22 246:17
awarded  141:21
aware  9:3 26:7 51:13,
  22,24 52:3 61:12
  85:24 86:2 137:19,22
  139:6,11 148:21
  154:7 159:12 230:10
  234:24 280:15

---

**B**

back  16:20 35:24 36:4
  44:25 47:11 59:11
  60:2 68:23 69:16,23
  73:15,23,25 74:2
  75:7 84:1,15 93:9,14
  98:4 107:14 114:11
  116:12 118:3 122:21
  133:11 134:1,3,15
  136:14 141:22,23,25
  147:24 162:7 163:8
  184:13 185:17 186:8

191:14,15 194:7
  205:14 209:12 214:25
  220:11 222:16 224:5
  228:22 229:3 233:8
  244:10 263:8 274:12
  285:1,2 286:11
  289:16 297:24 298:7
background  273:14
backlog  134:21 135:1,
  4 137:12,15,18,20
  138:2,4,6,12,19
  158:16,17,20 159:5
bad  148:23 149:14
Baltimore  36:13
  219:16
bar  160:18
base  80:2
based  47:19,20 49:25
  51:2 54:9 68:17
  78:22 80:16 107:15
  154:15 156:9,14
  159:12 198:10 201:2
  208:7 211:1,11,14
  214:1 215:22 218:15
  221:23 225:25 231:24
  237:2 241:24 243:1
  253:19,20 270:13
  275:9 277:3 282:4
  288:25 289:8
bases  65:12
basically  276:16
  286:2
basis  56:3 79:11
  126:7 150:17,18,21
  154:19,24 155:6
  157:5 189:15 215:6,7
  220:25 269:21 272:25
  281:7,9
BD  67:19 68:14,16
  80:14 106:5 109:18,
  24 151:8 159:11,16
  171:12 176:14 216:4
  238:19 242:6,11
  260:9 268:16 269:21
  270:1 271:21,22,25
  279:13 294:25
BDU  50:9
bear  263:19
bearing  194:3
began  30:20 31:17
  34:15 36:24 37:1
  52:6 132:16 183:10

246:10 257:19
**begin**  98:1 115:1
  184:18 224:19 249:11
**beginning**  29:7 49:17
  50:25 114:7 144:15
  160:23 164:6
**begins**  49:21 148:12
  186:21 188:7 209:14
  217:4,14
**behalf**  9:16,21 10:16,
  19 18:1 161:1 245:17
**belief**  154:24 156:15,
  16 157:4 244:25
**believed**  165:2 251:13
  284:13
**believes**  240:17
**beneath**  27:7
**benefiting**  149:23
**BERMAN**  13:21 14:14
  181:13,18
**Betsy**  235:19
**bill**  147:25
**bit**  103:14 107:18
  114:24 125:18 257:25
**biweekly**  129:21,22
**bizarre**  144:21
**Black**  27:5 28:11
**blah**  192:3,4
**blank**  191:22 286:2
**blip**  286:18
**body**  108:9 295:22
**bonus**  108:2 133:14,16
**bonuses**  107:24
**borrower**  23:2,5
  29:12,20,24 32:1
  33:21 34:11 37:3
  40:1 41:15 42:6,10
  45:13 47:25 50:2,4,
  10,15 54:5,17,21
  55:11,22,24 56:8,17,
  24 58:1 60:16 63:9
  65:13 66:16 67:2
  71:8,11,14 72:12
  75:18,20,21,22 76:1,
  3 77:23 78:2,5 80:12
  81:16 82:11 84:6,22
  91:13 92:18 96:13
  100:14,15 102:5,10,
  24 103:2,22 104:15
  105:11 106:22,25
  107:10 109:14,25

113:4,9,17,25 114:22
115:9 117:15 118:15
124:13,14,23 125:3
127:14,19 134:14
135:13 136:2 137:5
138:21 141:16 142:2,
4,18 145:19,25
146:1,6,10,11,15,23,
25 147:10 148:5,19
149:17,18 150:1
151:5,16,24 152:8,9
155:19 156:19 159:23
162:5 163:16 164:17
165:7,10 167:11
169:6,21 170:5 180:4
182:9,19,24 187:7,
12,24 188:10,17
189:12 190:5 191:23
194:1,5,10,12,13
195:4,7,9,14,15,19,
22 198:9 203:11
206:4,5,8,11 207:18,
20 208:9 209:11,15
212:4,12,16 215:21
216:8 217:16 218:8
225:25 226:3 231:6,
12,16,17,24 232:12,
18,21 233:5,6
240:18,20 242:2
243:5,8 244:16
245:7,14,22 246:3,4
250:6 252:19 253:17,
20,24 255:22 256:15
259:10 260:17 261:18
263:16,17 265:1
266:17,19,20,23
267:13,24,25 268:7,
13 271:12 272:24
274:18 275:21,24
277:2 278:9,20,24
279:8,9,17,18,22
280:3,11,14,24
281:9,12,14 285:16,
20 292:18 294:2,12,
14,16,19 299:10,13,
22
**borrower's**  75:18 79:7
106:6 203:13 209:13
241:18 259:16
267:10,16 268:4,6
281:16
**borrowers**  40:22,25
41:4,9,25 42:2,10,
17,22 47:16 48:1

54:9,18 58:8 59:5,12
60:18 61:10 62:5
77:7,10,12 80:2,6,17
91:7 94:17,19,21,23
95:2,6 96:12 99:3
103:21 104:15 109:9
116:7 117:22 120:12,
21 125:15,20,22
129:11 139:22,25
141:5 142:2,3
144:16,24 145:3,11
149:13,15,21 150:1
151:15 152:11 161:2,
9 162:5 163:25
164:10 165:1 170:20,
24 173:15 174:1,4,24
175:3 177:12,25
178:20,24 179:18
183:17 186:16,25
189:14 190:23 191:6,
13 192:12,13,16
198:2,15 199:2,21
200:22 201:17
202:20,22 204:5
205:15,23 206:14,15
215:2,6,25 232:20
233:6 234:2 237:2
240:21 251:21 254:25
255:4 259:19 260:6
261:16,22 262:14,25
266:21,24 267:3
279:18 280:15 285:6
287:10 297:10
**borrowing**  85:22
**bottom**  49:15 75:9
93:18 113:22 144:8
148:11 160:13,14,22,
23 163:13 168:24
183:14 186:13,20
197:25 198:24 200:20
236:23 265:15 285:3
**BP**  35:11
**bracketed**  282:3,7
**brackets**  283:14
**breach**  81:21 82:4
107:3 253:9 254:21,
23
**break**  12:16,17 64:19
69:7 122:5 123:1
126:25 181:11 185:7,
11 228:19 267:12
274:5

breaking   122:9
breaks   12:15,20
Brickman   28:4,14,18
   31:9 97:8 238:4
briefed   76:13,17
briefly   54:2
brings   122:2
broad   9:17 34:2 56:7
   219:2
broader   19:19 84:19
   288:22
broadly   118:9
Brogan   32:6,13,15
Brooks   217:22 219:4,
   22
brought   30:25 31:11
   81:24 97:16
Brown   15:9 16:16
   27:13 98:13 104:10
   127:24 128:3 129:14,
   16 228:15 239:14
   264:19 297:5,15
   298:2
Brown's   27:18 231:22
bucketed   143:22
budget   21:18 22:10
   30:10 39:2,4,5,6,7,
   8,9,10,12,13,16
   143:8
budgets   38:11
bulk   114:25
bulky   216:22
bullet   144:11,15,23
   169:7,11 170:8
   171:14,22 173:11
   176:8 183:15 290:24
bulleting   223:19
burdensome   161:7,11
   162:2 163:1
business   50:3 143:11
   187:10

C

cafeteria   159:20
calculating   71:9
calendar   91:24
California   47:19,20
   51:15 52:5,8 67:9
   72:9 90:19,20,24
   96:21 98:16 115:10

117:10 132:24 137:22
   138:8,23 139:2,3
   140:1 172:11 173:16
   177:8,24 192:3
   204:6,7 239:7 297:10
call   15:23 128:10
   147:20 199:1 250:17
   276:23 289:15
called   20:12 39:23
   74:5,6,14 78:18
   226:22 250:20 280:18
calling   65:19 86:22
   112:19 113:12 126:4,
   6 138:14 146:22
   149:15 176:2 229:22
   278:11 283:19 293:16
calls   222:22 273:11
Calvillo   94:4 116:18
   117:13 118:19 120:3
   124:1,2,11,24 180:7,
   11,21 182:8,18
   183:11,18 222:20
   223:15 295:10
campus   106:21
campuses   47:23 51:3,
   19 52:5,8 61:4 90:8
cancellation   231:23
capability   272:19
capacity   272:18
Capitol   22:19
care   259:14,15 260:3,
   5,15
career   20:12 30:6
   33:10 36:19 143:5,22
   218:1 252:4 269:25
careful   239:4
carried   298:3
carry   233:25 234:19
   235:20 236:6 297:21
carrying   296:17,19
   297:11
carve-out   103:11
case   13:8 17:3 20:18
   24:1,19 79:21 84:23
   85:19 90:18 110:1
   125:14 127:24
   139:12,14,20 141:20
   147:12 150:8 157:8,
   10 180:8,18 194:25
   196:24 207:8 208:14
   210:25 245:25 289:3,
   7 290:15 293:24

295:1,3,5,6,15
cases   17:19 21:17
   22:9,17,20 24:3
   134:24
categories   49:24
   51:7,8 170:24 265:21
   267:4,5 268:11
category   189:25
   267:20 268:14
caused   136:3 138:3
   156:18 231:12 256:15
   292:18
CCI   47:16 51:22,25
   116:11,14,21 117:23
   123:3,12,14 171:24
   172:9 183:20 198:10
   222:21
CEC   33:20 34:10,12,
   15,18 35:6,10,13,23
   218:21 219:9,13
   220:4,9,15 221:19,22
   225:2,3,5,8 227:9,25
   265:5
CEHE   35:18
census   190:3
center   18:1 139:20
certified   63:4
cetera   129:3 208:20
   212:5
chain   227:18
challenge   194:22
challenged   115:10
challenges   49:6
   224:10
challenging   59:18,20,
   21
chance   247:16 266:6
change   162:14 188:18
   251:4 258:19
changed   26:13
changing   59:19
channel   267:1
characteristics   49:25
characterization
   84:25
characterize   68:8
   80:4 269:16
charge   68:18 80:8,9,
   14 149:17 157:13,19
charging   149:21 150:1

**Charlie** 10:15 15:23
  46:21 69:1 121:8
  185:11
**Charlie's** 34:23
**chart** 243:12,15
**chat** 111:15
**cheated** 234:3
**check** 188:24 203:5
  240:23
**chief** 21:2 22:18 26:1
  27:13,19 33:19
  107:25
**chilling** 174:3,23
  175:4
**choice** 175:22
**chose** 271:25
**CIP** 68:5 241:15
  276:19,20,22,25
**Circuit** 139:8
**circulated** 137:4
**circulating** 236:12
**circumstance** 85:25
  86:1,2 178:14
**circumstances** 11:9
  86:4 211:13
**claim** 50:4,10 65:20
  75:21 79:7,11 102:12
  118:15 138:11 141:16
  142:2,4 147:10,17
  149:22 151:15 152:10
  159:23 162:15
  169:18,24 175:5,9,10
  189:12 195:16,19,21
  198:4 208:3 211:17
  216:9 232:25 241:22
  242:22,24 243:5,8
  248:1 249:2 253:21
  261:1 267:2,5,10,17
  268:4,6 269:3
  274:19,23,25 281:7
**claimants** 71:15 72:12
  77:10
**claiming** 69:3,4
**claims** 40:23 41:6,8,
  16,21 42:6,8 44:18
  46:6 48:3 49:3,24,25
  50:24 51:7,8,19,22,
  25 52:3,7 56:12
  58:9,13 59:3 62:4,5
  65:14 66:17 67:2
  71:8,11 79:13 80:15
  86:14 87:13,16 90:1

92:14 96:13 100:10,
  14,15,19,20,25
  101:5,9 103:18,25
  113:24 114:1,3,22
  115:7,14,17 116:5,15
  117:15 125:19
  128:23,24 129:1,2
  132:2,8 134:14,20
  137:15,20 138:4,6
  140:4 148:19 149:14
  150:4 151:4,8,10,19,
  20 154:3,6,25 155:15
  156:15 157:1,4,15
  158:2,16,18,20,24
  159:1,3,12,13,16,18,
  21,25 160:1,4 161:1
  162:2,12 169:17
  171:15,24 172:9
  173:12,18 174:2
  175:4,17 176:15,17
  177:16 186:16 187:1
  198:3,9,16 199:3
  201:17 211:20 215:22
  231:7,8,16,17 232:21
  239:3 244:21 245:1,
  8,13 246:6 252:20
  254:9,13,15,16,19
  260:9 261:25 262:6
  265:1,2 271:23 285:6
  287:12
**clarification** 70:1
  130:23
**clarify** 74:12 83:6
  99:7 107:17 119:10
  167:4 213:5 262:16
**clarifying** 73:21
  92:22 119:13
**clarity** 46:16 98:15
**class** 94:17,18 192:14
**classes** 161:1 252:7
**classification** 76:5
  241:14 276:18
**clear** 31:23 36:16
  70:5,9 86:7 105:10
  119:15 125:10,17
  138:2,4,6,19 171:4
  184:14 197:18 199:5
  235:15 248:18 262:3
  263:13 266:20
**clearance** 30:12
  143:12 271:2
**cleared** 91:25

**clearing** 137:12,14,18
**climbing** 49:1
**clock** 191:8
**close** 258:1 300:3,8
**closed** 42:2,4 159:20
  169:8 245:15
**closest** 291:17,22,23
  292:20 295:6
**closure** 114:23
**code** 241:15 276:19,
  20,25
**codes** 68:5 276:22
**colleagues** 293:3
**collected** 43:15 45:13
**collection** 29:13
**collectively** 143:15
**Colleen** 15:10 16:17
  56:24 78:6 80:13,19,
  21 82:13 83:10 84:21
  85:9,20 86:17 87:11
  89:2 99:14,24 104:12
  115:16 119:1,8 128:1
  145:15 171:4,6
  176:19 188:24 202:25
  203:2 205:19 206:18
  238:18 244:22
  291:23,25 294:19
  295:24 296:2
**Colleen's** 85:20
  119:18 121:25 206:6
  292:3
**college** 36:12 111:8
  164:9,14,22,24
  219:16 224:21,25
  280:18
**college's** 240:19
**colleges** 27:6 28:12
  40:25 43:15 71:16
  118:6 219:19 234:4
**colleges'** 237:3
**column** 265:7,19,21,
  23,25 266:1 268:10,
  13,19
**combinations** 191:11
**comment** 24:22 143:13
  155:6 264:4,6
**commenters** 148:17
  149:10
**commenters'** 148:20
**comments** 30:4,8 78:22
  143:21 144:1 149:9

commit  164:11

committed  76:14

committee  112:3
249:10,12 250:4

common  50:1 199:23
200:23 202:21,22,24
205:15,17,21 206:16
216:1 265:22 268:12,
20

communicate  11:19
190:5 194:11,13

communicated  42:21
43:3 95:4 121:1,14
132:9 260:7

communication  12:13
47:18

communications  28:25
41:25

Community  36:12
219:16

company  33:12 106:20
113:12

comparator  241:10,11

complaints  159:22

complete  120:3,4
163:19 165:15 189:20
190:3 199:18 226:18

completed  62:5 86:25
101:13 140:4 191:15
252:6

completing  37:3,7
38:23

complexity  190:20
191:11 192:1 195:3,
13

complicated  38:3,4
44:8 135:8 172:4,18
191:5,10,17 192:9
193:5 225:17

complications  191:20

comports  198:10,20

computer  12:9 257:15,
19

conceivable  166:16

concern  98:17 125:22
138:12 174:3,25
231:7

concerned  98:14
126:14 164:18

concerns  94:11 126:1
132:25 148:20 224:13

concluded  71:9

concludes  300:12

conclusion  41:14
230:25 272:15,18
293:16

conducted  40:14,17
47:20 71:6 95:22

conducts  119:19

confidence  189:16

confidential  27:11
28:6,8

confirm  11:17 53:23

confirmed  27:1 32:8,
13,16

confusing  173:3

confusingly  206:21

Congress  108:3,8,9
124:11 223:11

Congressional  158:18
160:7

Congresswoman  113:17,
22

connected  47:2

connection  67:25
150:3,7,10 151:14
260:15

Connor  216:15

consent  10:9

considerable  37:21

consideration  75:17
233:9

considerations  155:10
295:16

considered  55:23,25
93:12 107:4 134:10
153:1 166:23 205:16
232:17 246:24 284:11

consistent  103:20
165:3 259:2

consistently  70:12
79:9

consolidate  191:6

consolidated  44:14
151:6

consolidation  151:9

constitute  47:8
251:23 252:23,25
255:1

constitutes  109:22

construct  165:12

constructed  163:17
165:8,20,23,25
166:8,16,17,23

constructing  165:14

consumer  90:1 164:8

contained  167:21

content  15:19 35:8
84:11 192:10 237:17

context  53:11,25
63:12 64:3,8 128:17
149:4 160:3 161:17
168:17,21 242:15,17

continue  90:24 92:3
115:11 297:13

continued  44:11
103:18 116:24 117:3

continuing  98:22
99:12 115:16,23
116:3 125:9 188:6
239:3

contract  81:22 82:5
107:3 187:10 188:11
251:1,4,5 253:9
254:21,23 258:18

contracting  107:23
190:10

contractor  187:17,22

contractors  188:15

control  108:7

controls  121:21

convened  98:2

conversation  77:17,
20,22 78:16 79:15,23
81:12 83:8,14,17
87:21,23 88:8,12
97:17 100:1,3,7

conversations  9:5,7
15:11,12,14,16,19
16:7 23:11 24:4
39:11 78:14 81:18,
21,23 82:3 83:8
97:14 99:23 132:20
229:14,19 284:13

converse  268:5

convo  122:14

COO  107:25

coordinated  154:9

copy  54:11,13

Corinthian  40:24,25
  41:4,9 42:10 43:15
  45:2 60:18 65:14
  71:16 72:13,14 77:7,
  12 79:21 90:18,19
  95:2,5,24 96:11
  102:16 103:11 118:6
  139:9,10,15,19,25
  140:4 141:3 173:15,
  18 177:11,25 192:11,
  16 198:2 199:2 204:4
  221:24 222:5,10,21
  224:4 225:21,22
  226:3,25 245:13,15
  246:1

Corporation  33:10
  36:19 218:1

correct  32:20 36:2,3
  40:3 61:19 81:10
  85:2 91:19 99:9,10,
  20 103:10 104:19
  114:1 117:21 124:15
  128:13 129:7 137:6,7
  142:6,16 170:14
  171:20 175:12,13
  178:22 182:5,14
  193:11 209:9 215:16
  218:9 220:10 222:21
  238:24 239:16 244:20
  245:23,24 248:8
  253:16 261:15 281:25
  283:6 296:1 297:20
  298:4,5

correctly  167:5
  230:16 239:13

cost  161:16 230:19,
  20,22 231:8

Council  143:9

counsel  10:9 11:1
  14:11 18:25 21:15
  22:9 31:9,13 41:12
  53:20 65:10,11 86:18
  97:13 112:13 143:7
  146:3 237:12 238:10
  240:9 249:14 271:5
  291:9,11 293:22

count  51:17 91:21
  110:23 114:14

country  90:9 240:22

County  36:13 219:16

couple  13:10 17:12
  127:7 171:23 181:25
  193:14 222:16 263:10

court  9:20,24 10:20
  25:11 37:13 44:12
  93:21 94:3,6,11
  96:7,21 99:2 110:15,
  18,20 111:4,10
  136:16,18,22 141:7,
  12 158:10 167:7
  172:11 173:16 177:8,
  13,24 180:19 197:23
  198:25 216:24 221:2
  223:15,18 231:21
  239:7 257:3,23
  290:12,15 294:7
  297:10 300:4

court's  96:6 121:5
  156:6,9 247:8 294:10

courts  115:11

cover  189:23

covered  50:15 165:1
  253:5 255:2

Covid  88:11,17 200:2

COVID-19  199:6

crafted  246:22

create  38:10 163:18
  188:17

created  55:2 108:3
  165:19

creates  121:19 187:14

creating  107:6 166:23

credentials  252:14

credit  58:9 65:16

criteria  198:4

cross  300:3,9

crossing  105:20

cumbersome  26:16

current  25:19 38:15
  56:5 99:3 124:5
  151:4 260:12

cursor  63:19 111:24

cus-  251:11

custom  251:7

customer  251:7,8
  259:14,15 260:3,4,15

cut-off  253:25 254:2

---

## D

damages  147:19

damaging  154:5 158:4

Dan  9:15

Dana  9:21 110:15

Daniel  206:22 207:18
  217:7 275:5

darker  264:12

data  94:9,12 98:24
  99:2,6 121:19,20,22,
  24 122:2 130:4,6,7
  133:4 164:9,25 165:3
  172:7,14 173:18
  215:23,24 221:21,23
  222:1,4 223:21
  224:1,3,12,16,22,24
  225:2,3,4,7,17,19
  226:11,17,19 227:3,
  13,19,24 228:5,11
  239:3 258:24,25
  265:13,14 270:18,19,
  21 271:3

date  16:21 35:22
  50:25 57:23,25 87:17
  130:10 253:25 254:2
  255:6,9 262:8 284:11

dated  207:19

dates  43:24 262:13
  273:2

David  15:25

day  140:3 218:21

day-to-day  28:18 30:1
  108:20

days  263:10

de  201:4

deal  33:21,22

dealing  79:17 192:21

debt  231:23 237:2

deceased  97:9

December  23:24 24:10
  120:9 130:11 131:23
  134:4 137:6 138:11,
  20 221:19 233:20
  234:8,17,20 236:11,
  14

decide  77:22 170:1
  176:1,22 191:21
  269:21

decided  43:3 58:15
  90:18 123:4 184:18
  195:8 275:20,21
  279:7,22 280:11

decides  172:12

deciding  55:24 81:12,
  14 184:19 192:9

decision  22:16,21
  23:20,21 24:4,5,8,24
  25:1 43:16 55:18,21
  56:3 59:17 61:15,16,
  21 63:24 64:1,2,4,9,
  14 68:21 85:9,12,14
  89:2 96:6,7 101:19
  102:7,16 105:13
  107:11 121:16
  123:17,19,21,23
  124:5,7 125:8 126:10
  131:1 132:23 134:9
  139:4,5 140:8 147:18
  150:3 151:24 153:15
  155:7 173:16,20,23
  174:5,8,11,14,15,16,
  19 175:18 176:4,24
  178:1,4,15,19,25
  179:1,17 181:2
  182:22 183:8 184:9,
  23,25 185:3,5 187:7
  189:11,15 192:12
  195:10,11,17 211:11,
  14 215:7,10 219:8
  221:5,6,8 223:9,16
  226:2 231:17 239:6
  248:2,21 269:6,7,8,
  10,17,23 270:3
  272:7,9,10 275:13
  277:24 284:23 294:24
  295:2,13,16,17
  296:15,17,20,21,24
  297:1,3,7,8,11
  299:15
decision-making  25:2
  80:15 182:25 183:3
decision/reason
  204:13
decisions  23:12,13
  37:14 50:3 56:18,21
  86:9,11 105:12 106:5
  107:5 108:20 124:14,
  18,22 125:1,5,7,9,
  11,14,16,21,23
  126:14,19,20,24
  127:3,9,14,15,19
  131:9 132:9,21
  135:13 137:5 138:11
  150:18,21,24 175:1,
  15 176:1 177:5
  180:22,25 182:10,19
  183:7 219:24,25
  221:7 231:9 236:25
  237:5,18 238:15,23

246:18 268:16 270:14
  272:24 297:10,12,14
  299:9,13,17,23
declaration  15:2,4,8
  16:8,15,16 17:1
  18:5,8,10,11 19:10
  29:6 36:6,21 40:13
  52:15,18 53:16 69:20
  70:22 73:16,18
  74:11,22 75:7 93:15
  110:25 123:11 124:10
  142:12 186:9 198:14
  199:17 201:15 215:4
  216:15 223:12 224:6
  242:23 244:11 264:19
  266:6 284:25 285:1,2
declarations  16:25
  103:16
declare  10:7
Deegan  206:22 207:18
  214:1 217:7 275:5,8
Deegan's  215:18
  217:14
deemed  80:7 133:2
deep  35:2
default  232:17,22,24
  233:1,7
defendants  10:16
  196:3,23 264:9,25
  282:16
defense  16:22 23:2,6
  29:20,25 32:1 33:21
  34:11 37:4 40:1
  41:16 42:6 48:1
  50:2,10,15 54:5,17,
  21 55:11,24 56:8,17,
  25 58:1 60:16 63:9
  65:13 66:16 67:2
  71:8,11,14 72:12
  75:18,21 77:23 78:2,
  5 80:12 82:11 84:6
  90:1 92:18 96:13
  100:14,15 102:24
  103:2,22 104:15
  105:11 106:25 113:5,
  9,18 114:1,22 117:15
  118:15 124:14,23
  125:3 127:14,19
  134:14 135:13 136:2
  137:5 138:22 141:16
  142:2,4,18 145:5
  146:15,23,25 148:19
  149:17 150:1 151:16,

25 155:19 156:19
  159:23 160:25 162:5
  163:16 164:17 165:7,
  10 167:11 169:6,21
  180:4 182:9,19,24
  186:2 198:9 207:20
  209:15 215:22 217:16
  218:8 225:25 226:4
  231:7,12,16,17,24
  232:13,18,21 233:5,7
  242:2 243:5 245:8,
  14,22 246:3,5 250:6
  252:20 256:15 259:10
  260:18 265:2 271:12
  272:24 275:21 279:8,
  22 280:11 292:18
  294:2,13,14,16,19
  299:10,13,22
defenses  29:13
defensible  237:23
defer  284:20
define  33:22 109:17,
  24
defined  47:6,7 109:16
  242:3
defines  109:4,7
defining  107:5 110:8,
  9,11 209:19
definition  107:7,12
  109:19,22 110:4
  205:25 213:12 252:23
  253:1 254:20,22
  269:3
definitions  206:7
defrauded  240:18
degree  191:15
delay  121:7 132:16,18
  135:24 136:4 156:9,
  18 157:8,12 231:13
  247:6 256:10,16,25
  257:1,4,13 292:19
  294:21 295:3,11
  296:11
delayed  225:13
delaying  231:9
delays  161:9
delegate  85:13
delegated  19:23 85:16
  171:5
delegates  82:14 85:10
deliberation  284:16

deliberations   176:3
deliberative   53:24
   63:5 126:13 138:14
   153:10 278:13 283:20
   284:3
delineate   220:4
demand   183:22 248:3,
   23
denial   82:11 99:12
   176:23,24 180:22
   188:3,20 189:19,22
   192:20 193:16 196:25
   197:15,25 198:5,7
   199:1,13 201:14
   207:10,23 209:19,25
   210:2,14,19,25 211:1
   212:16 213:25 214:9
   215:18 216:10 217:2
   218:8 219:4 241:22
   244:8 256:21 257:5
   275:8 277:13,15
   278:7 279:9 280:25
   281:19 283:1 285:15
   291:1,4,18,19 298:8,
   9
denials   42:14,20
   150:13 170:19
   173:19,21,24 174:6
   175:1,16,22 176:1,4
   178:2,16 179:7,13
   180:3,14 183:9,25
   184:1,19 185:1 221:9
   239:7 295:23
denied   80:10 84:22
   102:13 103:8 150:15
   170:17 179:14,16,19
   186:17 187:1 189:13
   195:19 198:16 201:18
   233:8 243:20 244:2
   249:3 257:7 265:2
   281:8 285:7 295:19
deny   175:16
denying   290:5 299:22
department   15:24
   16:22 19:1,13,24
   20:20 29:10,21,23
   32:14,24 34:13 37:4,
   17,21 38:14,17,18
   39:16 40:14,19,20,21
   41:19 43:13 44:9,17
   45:1,6,18 47:18
   49:1,4 50:23 51:15
   58:14 59:7 64:7

65:20 66:1,21 71:6,
   12,23 72:4 75:23
   80:22 93:22 94:4,7,
   22 95:22 96:5,8
   103:18 108:2,10
   117:4 126:10 139:7
   140:19 143:10 145:8,
   24 147:13,16,18,23
   148:16 149:11 154:6
   156:3,17 157:3
   161:8,22 162:1
   173:24 178:23
   186:14,24 188:8
   189:21,22 199:22
   200:23 203:4 205:22
   206:3,13,16 218:14,
   22 223:17 224:9
   229:6 232:11 233:25
   234:19 236:6,24
   237:5 238:15 239:6
   240:17 244:17 247:5
   248:1,5,21,22,23
   255:3 265:3 266:18,
   22,25 267:16,24
   268:21 269:13,14,25
   270:4,8 276:21
   285:4,13 288:9
   299:11
department's   29:12
   36:22 51:1 75:17
   239:14
departmental   202:7
departments   189:18
depend   23:4
dependent   204:20
depending   22:16 195:8
   268:3
depends   22:24 44:22
   45:25 93:1 106:1,2
   147:3
deposed   17:15,21,23
deposition   9:11,25
   10:1,2 11:21 12:8
   13:7,12,15 14:9,10,
   23,25 15:1,17,21
   16:7 18:7,12 35:17,
   21 48:8 53:1,2
   57:10,11 60:5,7
   62:12,13 64:23,25
   66:8,9 74:6,23 84:1
   111:17,18 142:13
   185:23 186:4 196:11
   216:16 217:9 230:4

233:15,16 243:14
   249:18 263:23 264:10
   275:4 282:15 288:22
   289:10,25 290:1
   298:23 299:4 300:19
deputy   19:23 22:19
   26:20,22 27:3
derivative   201:4
describe   94:25 163:3
   201:15
describes   165:5
description   266:5
deserves   152:9
designations   185:19
designee   171:6
desk   11:20
detailed   93:7
details   179:23
determination   45:7
   47:22 59:2,14,19,22,
   23 61:1,13 75:20
   76:2 77:9 78:7 79:3,
   7 80:18 81:2 82:16,
   18,22,25 84:8 91:13
   92:15 99:9 100:16,25
   101:1,11 102:4,21
   103:4,6 109:2,13
   129:3 133:15 141:15
   142:5 152:15 169:23
   170:13,23 175:11
   177:11 183:23 206:18
   213:20 215:12,13
   230:15 241:18 242:24
   243:18 269:1,2
   270:16 271:22 272:20
   273:18
determinations   42:15
   50:10 57:2 61:7 73:1
   78:10 79:2 83:19
   85:7 95:17 99:12,17,
   25 103:21 104:1,14,
   18 106:8 108:14
   116:20 117:15,19,25
   118:17,21,24 120:23
   124:1,25 129:5 208:6
   213:18 218:6 226:10,
   25
determine   43:12 45:19
   56:14 78:1 79:10
   80:17 91:4,6 96:22
   99:3 101:21 105:23
   115:8 133:13,18

140:23 226:4 230:22
240:17 241:24 242:9
248:5 279:19
**determined** 24:16
44:12 56:2 59:8
60:25 61:5 72:11
87:25 88:18 89:12
117:10 138:23 141:5
170:11 175:14 215:20
254:19 262:19 265:21
268:11 270:7,9
271:11
**determines** 108:13
234:3
**determining** 41:22
59:21 67:6 70:7
71:13 72:5 76:7
81:25 86:19 96:10
107:9 109:8 121:2
137:23 151:14 232:12
**develop** 33:25 37:17
39:10 79:8 86:18,21
89:19 90:14 96:9,15
97:25 98:11 120:20
131:17 186:15,24
189:11,18 190:4,13
194:23 257:14 285:5,
9
**developed** 41:2 42:7,8
43:10,25 67:10,12,19
71:12 72:4 95:5,6,23
118:9 121:13 123:3,
11 133:6 139:18
141:1 171:15 173:1,
12 177:22 188:8
189:22 190:1 191:19
192:23,25 193:1
198:12 222:8 224:2,
3,21 256:4 259:9
260:17 279:13
**developing** 37:24
38:22 77:14 82:1
97:2 119:11 123:7
133:7 143:19 146:21
154:20 173:8,10
193:16 198:14 199:18
201:16 215:5 221:16,
17 222:8 223:25
224:10 285:13
**development** 21:9,10,
12,16 23:22 29:23
31:14 38:5 39:1,3
67:5 76:12 78:11

96:2 97:3 99:22
100:5 104:2 118:13
119:12 121:24
150:11,13 153:10
176:10,13 194:18
225:6 250:19,20
251:12 257:4,18,23
259:12,14,25 285:11
290:25 298:7,12
299:19
**developments** 256:24
**develops** 39:6
**device** 11:24 12:7
**Devos** 9:14 233:13,24
234:18 235:3,13,19
236:5
**dialogue** 113:21
**Diane** 9:11 10:23
13:11 14:3 46:22
52:20 74:12 87:1
156:22 222:24 239:11
240:6 243:22 262:9
293:19 300:13,19
**died** 238:5,7
**difference** 108:23,25
169:14 247:13 258:12
266:1
**differentiation** 206:2
**differently** 240:11
**difficult** 294:15
**difficulty** 136:2
156:19 231:11 256:14
292:17 294:1,12
**digital** 259:14,15
260:2,4,15
**direct** 20:6 26:23
27:9,25 28:1,23
31:19 115:24 116:4,
25 125:13 144:10
188:13 203:9,12
208:19 212:3 213:13
**directed** 42:5 233:25
234:19 236:5
**direction** 78:6
297:22,25 298:1,3
**directive** 146:4,6
297:13
**directly** 24:20 25:23,
25 41:24 56:20,23
99:14 166:22
**director** 28:10

**directors** 28:24
**disagree** 25:13 135:18
257:22 277:22,24
**disagreement** 247:10
**disallow** 150:4
**disbursed** 203:10
208:19 212:3
**disbursement** 255:6
**discharge** 42:2,4
49:25 50:2,16 55:1
65:13 75:19 161:3,7,
10,12,19 162:25
163:7 203:11 212:5
**disclosure** 66:3
**discouraged** 175:6
**discovery** 25:12 121:5
150:7,10 167:8
231:21 247:8 257:3,
24 258:3 290:16,25
293:14
**discretion** 269:9
**discuss** 34:11 37:13
95:21 127:22 128:2
256:19 284:6,7
**discussed** 48:23,25
72:25 122:25 127:24,
25 128:19 234:17
244:24 245:19 257:6
261:8 283:9
**discusses** 19:15 40:6
**discussing** 22:17 71:5
73:3 76:6 201:24
234:8 235:19 236:13
244:24 250:11 298:10
**discussion** 98:3
135:19 148:12,16
149:9 175:20,24
230:13 265:5
**discussions** 97:11
98:8 118:11 229:7,12
231:4
**disposition** 291:2
292:7,10,15
**disseminated** 89:16
**distinguish** 203:3
**distortion** 121:22
**district** 67:9 72:9
96:5,21 98:16 117:9
132:24 138:8,23
139:2,3,25 141:7

**divide**  121:22
**divided**  20:25
**divides**  121:25
**division**  20:5 102:12
  105:10
**divisions**  20:22
**divorce**  17:24
**document**  13:20 14:6
  17:9 18:19 30:9
  53:9,10,12,13 54:1,
  3,4,12,14,15 55:5
  57:16,17,19,21 58:4
  60:12,14 62:18,21
  63:11 65:5,7,8,20,23
  66:7,13,14,15,20
  67:20 69:2,3,5,24
  70:17 74:7,21,24
  75:4 76:23,24 77:1
  84:17 111:7,23 114:6
  120:5 142:23 143:4,
  23 144:4 149:7
  160:20 163:4 168:1,
  16 169:2 187:4 188:2
  196:17,19,23 197:21
  198:17 199:5,11
  200:4 201:1,11,24
  202:8,12,17 204:3
  206:25 208:1,4,5
  216:23 217:4,18
  229:23,25 230:1
  233:13 239:22,24
  243:23 249:9,23
  250:8 266:5,9 273:6
  275:16 280:2 282:22
  288:23 298:25
**documentation**  50:5,11
  218:23
**documents**  15:7 16:18
  17:3 43:14 45:2,10,
  11,12,13,16,18
  53:19,23 57:20 62:25
  63:4 64:17 82:24
  87:19 88:5 112:14,17
  113:8 145:22 168:15
  186:15,24 187:2
  188:8 189:19 201:16
  207:3 215:5 248:4
  285:5,9,13 289:3,6,
  9,11,16 291:15
  298:24 299:3
**DOJ**  15:22 16:1
**domain**  21:1,3 88:25

**Domestic**  143:9
**draft**  187:13
**drafted**  168:14
**drafting**  202:14
  246:24
**drafts**  168:15 284:16
**drink**  12:18
**due**  146:5,8,9,19,22
  176:10 244:25 299:2
**duly**  10:24
**duped**  151:16 234:3
**duties**  19:23

---

**E**

**earlier**  15:5 77:1
  86:4 91:6 106:15
  115:19 130:13 158:19
  168:6 169:13 238:3
  239:25 242:15 258:10
  266:16 276:17 281:25
  298:13
**early**  26:19 32:16
  64:7 100:17,22
**earnings**  94:9 98:24
  222:7,9 224:1,12,16,
  22 225:8 226:11,17,
  19 240:20 241:8
**easier**  49:14 229:24
**easiest**  113:18 144:5
**easily**  259:23
**easy**  91:5
**ECC**  218:12
**ECF**  18:8 52:15,16,17
  57:6 73:16,24 74:8,
  14 142:8 185:20
  196:2,5,7 206:20,21
  216:14 263:21 264:9
  275:4,5 282:15 290:4
**ed**  19:1,24 20:6,9
  21:4 30:7 31:10,13
  32:3 37:5 38:25
  121:15 123:13 143:6
  156:4 215:21 216:2
  218:15 229:6 232:11
  275:19,20 277:25
  279:7,21 280:3,10
  299:11
**Ed's**  39:2 117:13
  139:14

**EDGAR**  39:23,24
**editing**  202:15,16
**editorial**  201:21
**EDMC**  226:22 227:1,12,
  19
**education**  15:24 18:2
  19:13 20:3,13 21:13
  25:20 30:2 31:4,7
  33:10 36:17,19 41:20
  45:6,18 59:7 80:22
  94:5,7 139:7 163:20,
  21 165:16,18 218:1
  233:25 234:19 236:6
  239:12 265:3
**effect**  55:3 58:12
  67:3 93:11 117:23
  131:24 132:15
  138:10,20 174:3,23
  175:4 221:18 234:7,
  16 236:14 269:16,18
  296:21
**effective**  37:15
**efficiency**  153:1
**efficient**  197:22
**effort**  24:10,23 29:20
  37:22 97:3,24 123:24
  195:17 260:5 285:9
**efforts**  96:9,15 98:11
  154:9 201:15
**eighth**  18:9
**elected**  272:3
**electronic**  38:6
**element**  48:24 76:12
  164:3 259:7 264:2,4
**elements**  258:24,25
**eligibility**  198:3
**eligible**  80:7,17,18
  81:16 203:11 212:5
  243:7
**eliminate**  135:4
**eliminating**  134:20
**Elizabeth**  9:14
**else's**  202:17
**email**  87:22,24 130:1,
  3 168:19 207:18
  209:14 220:11 278:25
  279:2 288:14,18
**emailed**  168:20 287:19
**eminent**  88:25
**employ**  79:9

employed  35:23 94:22
employee  33:9 108:1
employees  35:13
  270:19
employer  259:24
employment  36:17
  54:9,19 60:19 61:6
  209:3,5 281:2,5
enabled  160:25
end  50:16 140:3
  186:20 228:8
ended  171:21 256:16
  300:19
enforce  158:9 216:15
enforced  171:19
engage  118:8 248:24
  269:24 270:2 271:25
engaged  29:19 34:13
  37:2 203:13 209:5
  281:4 284:12
engaging  31:12 154:8
  162:11 272:4
enjoined  67:9 72:8
  93:21 94:8,14,15
  117:24 140:1,5
  141:12 171:25 172:11
  183:24 223:6,14,18,
  19,22
enrolled  277:4
enrollment  213:14
ensure  11:12 12:12
ensuring  22:5 68:19
entailed  29:16
enter  9:22 190:11
  283:8
entered  44:17
entire  23:1 69:3,5
  143:15 161:1
entities  187:11
entitled  152:12
entity  45:14,15 162:1
environment  259:15,16
  260:16
essentially  140:7
  147:25 149:21 277:7
EST  300:20
establish  127:11
  209:24
established  49:23
  86:13 103:22 104:15
  126:11 271:18,19

establishes  105:8
establishing  110:3
estimate  38:9
ethics  218:25 219:1
evaluate  78:6 86:14
  89:5 105:4 115:17
  131:5 213:24 230:2
evaluated  91:9 152:8
  232:22
evaluating  57:1 71:24
  87:15 232:11 282:4
evaluation  109:1
  271:16 272:1 273:8
events  13:3
eventually  19:12 46:8
  98:21
Everett/wyotech  58:8
everyone's  11:9
evidence  43:19 45:6
  55:12,14,18,23 56:6,
  10,15 57:1 70:7
  75:22 77:19 78:7,17,
  23 81:1,4,7,19 82:4,
  5 83:12,15,22 87:12
  88:2 90:7 101:21
  105:4 106:10 109:1
  115:17 116:3 145:4,
  11,24 148:21,25
  169:22 170:1 199:23
  200:23 202:21,23,24
  203:3,4 205:15,17,
  19,21 206:3,5,9,12,
  13,15,16 209:7
  211:17 213:19,23
  215:17,22,25 216:2,
  5,9 241:25 242:7
  244:16,19 245:4,12
  247:17,20,23 248:23
  249:3 265:4,22
  266:17,20,21,22
  267:1,8,9,13,15,24
  268:7,12,20,22,25
  269:5,22 271:16
  272:1,20 273:8
  274:22 276:2,4 281:6
  282:4,9 286:25
evidentiary  78:15
evolution  26:17
  256:20,21
exact  16:10 35:22
  62:8 64:15 87:17
  130:10 179:5 206:14

224:20 252:10
EXAMINATION  11:1
Examining  111:8
examples  23:16 159:11
  211:19,21 251:14,19,
  22,24 252:17,18
  254:4,5,25 255:4,18,
  21 260:23
Excel  49:4,7 176:13
  265:9,12
Excellence  18:2
exception  79:20 151:5
exchange  113:16
excuse  36:7 59:22
  128:25 169:10 176:23
  254:1
executed  297:2,3,6
exhaustive  23:17,18
exhibit  13:7,14,15,22
  18:5,12 29:6 36:5,21
  40:4 48:7,8 52:24
  53:1,2 57:5,9,10,11
  60:4,6,7 62:10,12,13
  64:22,24,25 66:5,8,9
  68:24 69:20,25
  73:15,19 74:15 84:1
  93:14 110:14,16,24
  111:1,14,16,18 123:1
  142:7,9,11,14 167:10
  181:21 185:20,22,23
  186:3,4,9 196:2,9,
  10,11 197:11,12,17
  198:1,5,25 199:20
  200:20,24 203:8
  206:19 207:9 209:13
  216:14,16 217:7,8,9
  224:6 230:3,4
  233:15,16 243:13
  244:11 249:15,18
  263:20,21,23 264:7,
  10 265:8 275:3
  282:14 285:1,3
  289:24,25 290:1
exhibits  16:24 17:1,
  4,6 52:15,18 74:6
  83:4 185:20 197:4,8
exist  86:1 263:17
existed  93:23 227:7,9
existing  71:7 95:23
expanded  131:11
  164:8,21 254:7

expanding  164:14
expect  209:18 283:13
expectation  211:8,25
  212:11,18 227:23
  228:1 283:10,22
  284:22
expected  208:25
  281:21 287:2,3
expects  212:23
experience  55:23
  105:3,19 217:21
expert  17:20,22,25
  35:17
expertise  86:15 87:7
  105:3 269:22 279:12
  284:20
explain  107:18 147:5
  161:10 163:24 171:22
  182:20 192:2 219:10
  251:17 280:5 282:2
explained  72:16,19
  103:16 106:14 152:6
  183:16 192:15 220:25
  223:12 248:16 266:15
explaining  195:14
explanation  72:21
  186:16,25 189:12
  194:20,24 195:18
  201:17 251:13 258:8
  262:13 280:8,14
  285:6,10
explanations  253:12
explore  96:9,15 97:25
  98:11
expound  19:19
express  141:1
extension  252:8
extensively  29:10
extent  89:14 93:23
  110:5,7 112:25
  134:25 136:1 148:19
  150:14 231:11 238:14
  240:10 256:11,14
  257:3,6 264:23 287:5
  289:10 292:17 293:17
  295:18
external  33:18,19
extra  13:10 185:7
extremely  161:7,11

## F

facile  70:17
fact  41:23 132:20
  151:15 220:1 251:2
  279:3
factored  246:18
factors  190:18
  193:15,23,24
faculty  252:13
fails  209:6 281:5
failure  135:4
fair  142:22 272:15
faith  258:5
fall  23:6
falls  40:1 257:21
  267:20 268:13
false  250:21
familiar  14:5 51:8
  64:1 201:12 250:10
  265:25 266:4 277:22
  290:11
familiarize  207:21
  250:2
fast  160:18
fatigue  12:19
feature  130:5 144:20
February  32:15,19,21
  33:2
federal  20:17,18
  29:13 30:11 35:24
  36:22 37:6 39:20
  44:21 47:6 92:12
  97:10 105:8 114:21
  134:11 187:9 188:12
  191:25 192:5 193:2,
  5,6,19 210:22 211:15
  213:9,12,13 239:15
  241:13 261:7,12
  262:20 295:22
fee  36:2 149:21
  188:19
feel  264:12
fellow  33:6
felt  108:4 190:17,19
fewer  131:7 254:4,14
figure  40:21 43:10
  69:23 87:14 90:10,11
  91:3 106:17 191:1
  194:7

figuring  11:10
file  13:11,22,25
  14:21 18:9 42:6
  48:11 52:12,13,14,17
  57:9 110:22 142:8
  149:21,22 150:1
  185:20,21 186:1
  187:17 206:13 216:14
  232:24 233:6 243:14
  282:15 290:4
filed  145:6 154:3,25
  155:15 156:15 157:5
  196:23 207:7 226:1
  232:20 233:5 237:1
  245:22 246:3
files  13:9 110:21
  167:12 214:16 249:11
filing  175:6 196:3,16
  197:23 198:25
  264:17,25 282:16
  290:10
fill  187:15 191:22
  286:2 287:24,25
filled  158:2
final  30:14,18 35:11
  37:3,8,9 38:19
  82:10,16 123:21
  125:1,5,7,14,16,21,
  23 126:11 142:18
  143:16,20,25 144:10
  160:24 163:14 174:14
  190:3 201:21 202:1,8
  223:18 278:17,19
  297:9
finalize  137:16
finalized  16:23
  170:10 284:7,12
  299:14
finalizing  81:17
finally  27:1
financial  37:18 42:9
  43:9,11,12 71:24
  72:1 109:18,22,24
  152:12,18 164:3
  241:9 242:5,9,13
  248:6,8,25
financially  9:19
  149:23 240:18
find  14:13 53:18
  70:16 75:2 133:2
  152:3 241:2 288:11,
  14

findings   49:12,17
  65:16 150:16 257:8
  295:20
fine   11:6 92:1 111:1
  113:13 149:6 250:7
  267:22
finish   181:12,20
  265:24
finished   139:24 190:9
firms   154:7
first-line   28:14
five-minute   69:7
  228:18
flexibility   11:10
flip   250:7
floor   22:19
focus   37:7 40:24 41:3
  71:25
focused   78:14 118:5
folder   13:8 18:7,9
  52:15,17 57:5,8 60:3
  62:10 64:23 66:6
  73:15 74:2 111:8
  142:7 167:10,12
  196:2 206:20 233:13
  249:10 263:21
folders   13:10 14:1
folks   15:11
follow-up   122:25
  123:2
footer   55:5 144:4
  148:9 153:20 168:24
  171:10
footers   144:5
For-profit   111:8
forbearance   232:25
  233:2,4
forced   252:8
foregone   272:14,18
forgiven   248:22
forgiveness   148:1
  203:12 234:2 235:21
  236:7 259:22
form   84:15 197:14
  198:5,6 199:1,12
  200:1 210:14 211:1
  214:2 215:1 216:10
  251:6,10,12 252:21
  253:23 255:20 257:5
  259:4 260:13 261:16
  275:9 277:13 278:7

281:18 282:18,23
  283:1,25 285:15
  291:1,3,18 298:8,9
formal   22:21 98:3
format   129:25 142:17,
  21 167:22 168:7
  201:21
formats   167:24
forms   291:20
formula   243:2
formulate   159:2
forward   14:19 30:9
  99:5 141:25 165:4
forwarded   286:15
Foss   97:9 228:16
  238:4
found   43:19 49:21,23
  50:1 70:22 186:11
  237:22
four-digit   68:4
fourth   14:15 63:14,15
frame   51:24 52:10
  133:10 156:2 172:17
  177:7 199:14
Frank   32:6,13,15
frankly   138:25 271:17
fraud   264:9
Friday   9:11
friend   195:11
frivolous   151:15
front   12:10 57:20
  240:24
FSA   20:21,23,25 21:1,
  7,23 27:17,21 39:6
  49:23 50:1 68:22
  79:9 97:8 102:9
  105:12 107:20,24
  108:4,19 119:22
  120:15 121:15,19,21
  126:19 130:5 160:9
  168:16 181:6 182:9
  186:2 187:13,14,25
  222:9 228:12 238:13,
  17,18 243:25 244:2
  255:10 258:13,16
  261:19 270:20,22
FSA's   50:3,15 105:13
  182:18 258:11 259:14
  270:18,21
full   54:11,13 145:8
  152:2 190:2 221:9

241:5
fundamentally   24:18
future   77:10 98:23
  118:16 164:23 165:1
  177:16

---

G

gain   148:22
gains   230:21
games   166:19
gathered   226:12
gave   35:17 72:20 87:6
  91:10 252:17 297:25
  298:1
GEAR   39:21
general   12:24 18:25
  21:15 22:9 25:18
  31:9,13 41:12 50:25
  53:20 65:10 86:18
  97:12 106:1,16
  112:13 130:25 131:16
  143:7 146:2 156:13
  169:20 200:17,18
  201:8 238:10 246:19
  266:2 271:5 291:9,11
  293:11,22
generality   156:11
  247:8
generally   128:22
  130:1,3 218:4 240:25
  257:12
generic   218:10
genesis   290:16
germane   156:18,22
give   16:10 19:19
  23:16,18 26:16 29:16
  33:24 35:21 73:23
  75:1 83:3 87:9
  105:25 110:20 128:23
  178:20,23 183:17
  196:4 202:1 203:14
  245:21 280:14 298:20
  300:5
giving   68:16 90:13
  146:22 163:19 210:18
  254:25
goal   96:18,20 134:18,
  23 253:11
good   11:3 122:9 258:5

govern  54:20 106:8
governing  44:7 104:17
government  165:3
governs  78:3 268:24
grab  83:3
Graduate  209:4 281:3
graduates  117:23
grant  20:8,9,14
  39:22,25 82:11
  241:19
granted  79:17,19
  80:11 84:22 103:8
  110:9 141:16 147:1
  233:4 267:17
granting  84:6 85:21
  103:1 231:8 299:21
grants  43:2 47:15
  99:13 102:24 120:24
  171:2 179:8 180:23
great  57:4 149:14
  300:14
green  243:16,19
grounds  65:15
group  22:15 23:1
  31:3,4 41:6,7 55:1
  56:25 59:1 80:1
  82:15 85:9,11 94:18
  97:4,5,6,7,17 98:2
  102:19 143:15 150:4
  151:9,14 152:20,21
  153:1,16 161:3,7,10,
  19 162:12,14,25
  163:7 169:19 177:14
  181:2 205:23 206:6
  226:22 237:22,25
  238:2 265:19,20
  272:24
grouped  243:25 244:1
groups  58:13 149:13,
  25 154:8 226:9
growing  41:15 71:10
guarantee  79:22 80:3
  149:16
guaranteed  54:18
  60:19 61:6 65:16
guarantees  54:9
guess  26:2 33:15 35:1
  59:11 68:13 79:12
  81:6 82:10 84:19
  90:1 104:6 116:17
  118:23 120:18 128:10

178:15 194:17 206:2
  207:2 209:17 251:8
  257:2
guidance  58:25 67:12,
  24 68:17 82:24
  120:14,15 244:5
guide  86:8,10
guys  136:18,19

---

## H

half  181:19
halted  138:7
Hancock  16:1
hand  10:21
handle  37:23 41:15
  71:10
handled  291:10
handling  231:6
hands  180:25 181:1
  269:20
happen  17:5 205:12
  255:25 286:16
happened  40:17 118:25
  154:16,17 179:3
  223:7 224:23 251:6
  286:16
happening  12:13
  164:1,16 270:5,10
happy  12:20 257:20
hard  62:23 105:25
  173:10 299:15
harm  42:9 43:9,11,12
  71:24 72:1 109:18,
  22,24 115:8 152:12,
  18 241:9 242:5,9,13
harmed  240:18
hazard  163:18 165:14
  166:24
he'll  220:14
head  21:21 48:22
  197:16 199:19 216:12
  221:15 252:16,18
  261:9 286:7
heading  36:6,8,21
  144:7 169:5 171:12
  173:19
headline  50:13
headquartered  90:20,
  22

hear  108:12 110:18
  111:12 136:18,19
heard  48:19 139:1
hearing  17:24 111:8
  112:3,11 158:19
  161:25
hearings  160:8
heavily  84:4
held  9:5,8 108:5
  206:16
helped  18:24 112:14
helpful  144:19 169:3
  200:18 255:15 258:6
helpfully  168:23
high  82:1 83:20
  100:12 109:23
high-level  107:4
  266:10,13
higher  18:2 36:17
  78:18,19,21
highest  108:1
highlighted  283:4,5,
  10 286:4,25 287:9,18
  288:3
highlights  286:20
hire  81:5
hires  230:2
hiring  107:22 131:4
Historically  27:5
  28:11
history  17:13 19:12
Hokanson  28:5
hold  171:13 185:12
Holifield  28:10
hone  244:15 262:1,3
honestly  92:19 93:6
  292:14
honor  58:16
honored  61:1,7
honoring  61:14
hope  11:11 177:23
  190:13
hoped  190:8,12,16
  193:17
hopeful  177:10
hoping  19:18 110:16
hospital  238:8
hour  181:19
hours  16:11,13 38:1,
  2,9 299:5

House 28:11,22 112:3
  250:4
hundreds 155:3,7

I

Ian 97:9,18 228:16
  238:4
ID 255:10
idea 98:10 147:21
  178:21,24 183:17
  210:5 230:18 251:3
  258:21 260:13 292:1,
  2
identification 13:16
  18:13 48:9 53:3
  57:12 60:8 62:14
  65:1 66:10 111:19
  185:24 186:5 196:12
  216:17 217:10
  224:11,18 230:5
  233:17 249:19 263:24
  290:2
identified 49:6 58:17
  149:11 200:21 224:24
  241:12 263:11 276:18
identifies 198:25
  253:18
identify 68:5 71:24
  77:5 88:19 89:3
  152:5 184:18 192:20
  224:15 230:16 259:23
identifying 37:22
  89:13 197:24 260:25
  280:22
IG 48:12 49:6
imagine 102:20,21
  211:20
immediately 183:10
impact 219:18
implement 38:7 44:12
  80:22 252:21
implementation 21:8,
  19,24,25 22:2,6
  29:11 38:11 67:23
  130:12
implemented 20:24
  44:20 130:16 131:21
  164:21
implementing 37:18
  121:16 131:18

implicit 213:21
  238:22
implied 86:17
importance 137:11,14,
  17
important 36:11
  89:20,22 92:15 137:9
  138:2,4,6 189:14
imposed 147:9 158:9
imposition 55:1
impossible 209:20
impressions 138:14
  153:9 284:2
improper 273:10
imputed 240:20
inadequate 49:7
inappropriate 272:6
  273:21
inclined 232:3
include 23:3,7 39:19
  125:2 128:21 162:25
  195:20 209:25 210:3,
  6 211:1,9 212:19
  213:8 214:5,10 216:1
  254:21,23 279:20
  283:11
included 17:2 23:10
  36:18 37:20 62:25
  71:21 79:22 81:22
  97:7 128:22 129:6
  132:3,5,8 143:4,24
  156:24 205:25 237:21
  240:1 253:10 277:18
  280:24 283:17,23
  286:20 287:19
includes 20:4,8 75:19
  134:18 142:3 188:20
  216:24 220:2 231:15
  244:19 287:11
including 103:20
  145:23 224:11 291:1
incoming 287:14
incomplete 125:3
  211:16
incorrectly 275:19,20
  279:7,21 280:10
  296:1
increased 127:4
increasing 175:24
index 197:24

Indiana 90:22,23
indicator 241:9
indirectly 25:23,25
indiscernible 105:19
  270:25 289:2
individual 27:5 41:11
  56:12 106:6,9 107:10
  152:9 153:2 161:9,12
  162:4 205:17
individually 267:14
individuals 22:13
  27:10 77:3 120:22
  121:15 143:5 148:18
  262:5 271:5 290:20
  291:6
inefficiency 161:8
ineligible 80:18,19
  81:16 102:20 159:12
  215:20 243:8
inform 92:7
information 50:9
  53:21,24 55:17 64:10
  65:19 86:23 91:18
  93:24 100:24 104:7,
  11 112:20,23 125:4
  126:5,7 128:21
  130:20,25 138:15
  164:8 166:3 167:20,
  21 168:2,7,18 176:3
  187:15,24 198:15
  203:18 207:6 217:17,
  20,21 229:22 242:5
  244:19 246:8,23
  251:2 253:14 254:12,
  15,17 259:20 260:7,
  17,25 261:18,23
  271:1 275:24 278:9,
  12,20,23 279:9,20
  280:2,24 281:22
  283:14,16,20 284:3,
  23 293:7,17
informed 51:15 154:16
  160:3
initial 174:19 280:8
  281:18
initially 38:8 178:4,
  22 256:5
initiate 160:25
Initiating 161:6
initiative 27:6 28:11
initiatives 28:22

injunction  103:19,20
  116:18 117:12,20
  118:19 124:2,11,24
  140:6,12 171:19
  180:21 182:8 183:11,
  18 222:20
input  181:4,5
insert  204:17,23
  205:10 283:6 286:4,6
instances  23:14,16
instilling  189:16
Institute  33:5 219:22
institution  47:1
  118:16 145:23 218:16
  219:8 220:1 245:17
  248:4,20 276:19
institutions  36:18
  38:7 116:16 148:23
  154:4,9 158:3 218:21
  246:6 276:23
instruct  158:8
instructed  274:24
instructing  87:22
  121:8 237:4,18
  238:16
instruction  87:6,9
  90:14 91:11 238:22
Instructional  241:15
  276:18
instructions  37:24
  138:21 277:18,20
  278:5
instructs  236:24
  238:14
insufficient  209:7
  281:6 282:8 286:25
intended  118:12
  139:8,15
intent  95:7 117:16
  118:14 215:3 234:12
intention  117:13
  215:1
interact  259:17
interactions  9:8
interacts  261:16
interagency  143:12
  144:2
interest  131:19
  146:15,18 164:5
interested  9:19 17:8

interesting  46:4
  54:23
interface  9:9 260:5
internal  143:24 234:4
interpret  281:10,12
  294:7,9
interpretations  271:9
interrogatories
  292:24
interruption  114:25
intertwined  231:19
interviews  47:19,21
invent  102:1
investment  189:13
invoke  153:16
involve  22:18,25 78:9
  103:8 108:13 126:24
  141:6 180:3 183:25
  210:20,21 289:11
involved  21:24 22:16
  23:15 25:1 26:5 29:1
  30:11,17 38:19,22
  39:2,7,11 54:25
  56:11,18,20 67:5,7
  70:6 76:11 77:8,14
  78:8 79:1,24 81:14,
  18,20,23 82:2,20
  83:7 96:14 97:2,5,
  13,19 98:7 103:1
  105:15 107:6 108:18,
  20 109:17 110:9,11
  116:23 117:11 118:5,
  6,11,13 121:23 131:8
  133:15 143:7,16
  174:18 178:11,12
  179:12 180:2,18,25
  181:4,5 223:1,5
  229:7,11,14 238:6
  270:1 271:1 273:7
  276:1,9 277:12,14
  293:11,23 294:25
  295:2,5,9,12,14
  296:14,15,23 298:11
involvement  25:9 30:3
  31:17 77:4,11 95:11
  96:1 102:24 104:21,
  25 110:6,7 118:10
  202:13 258:15 271:13
  272:14 273:20 277:5
involves  21:13,14,16
  76:16 77:1 88:21
  161:20

involving  161:24
IRS  224:23
issuance  176:22,24
issue  22:24 23:4
  30:22 38:4 92:13
  98:16 135:8 153:14
  157:10 173:20 174:6
  175:15,22 178:2,16
  179:15 183:8 184:20,
  25 219:7 239:7
  247:5,7 248:3 263:5
  291:22,24 297:9
issued  17:10 37:14
  61:24 62:3 103:19
  106:18 125:8 139:5
  173:21,24 175:1,23
  178:3,17 180:22
  183:9 184:20 185:1
  188:23 223:18 239:1
  245:9 262:10 291:4
issues  23:6 29:10
  33:6 239:12 248:21
  289:9 291:8
issuing  173:25 174:7
  182:9 184:19 236:25
  237:5,18 238:15,23
  297:12,14
items  63:9
ITT  41:25 42:3 47:16
  52:2,3,5,9 54:8,18
  55:8 83:12 87:13
  88:2 90:7,21 221:24
  222:5,10 224:4
  225:22 226:3,25
  245:15,25
IV  39:19 40:2
Ivy  219:19

J

James  63:7 65:9 77:2
  84:4
January  60:15 228:6
  273:3
Jed  15:24
Jeff  97:8,18 238:5
Jesse  28:5
Jim  31:20 297:4,14
job  17:13 19:12,15,20
  32:22 34:1 51:18
  65:15 81:8 133:18,19
  135:15 198:2,10

199:3 219:6
**jobs** 65:16
**John** 28:6
**Johnathan** 28:10,15,16
**joined** 29:21 32:14
 33:12 37:4 44:9 64:7
**jones** 9:11 10:21,23
 11:3 13:11,15,19
 14:22 18:8,11,12,18
 25:17 29:15 32:9
 35:16 39:14 48:8
 51:12 53:2 57:11,15
 60:7,11 62:13 64:25
 65:4 66:9 74:6,20
 91:22 111:18,22
 113:23 114:19 122:24
 126:18 133:23 137:3
 138:18 143:18 185:23
 186:4 196:11,15
 216:16 217:9 229:5
 230:4 232:10 233:16
 235:9 236:19 237:16
 239:11 240:15
 249:18,22 262:9
 263:23 274:15
 289:12,22 290:1
 298:16 299:7 300:13,
 19
**Jones'** 293:2
**judge** 137:22 138:7
 140:5,17,22 172:18
 196:24 269:22
**judge's** 196:24 265:1
**judgments** 81:25
**July** 50:17,20 90:11
 91:5 151:3,6,10
 164:25 203:10 208:20
 212:4 245:7,9
 262:10,11
**jump** 74:2
**jumping** 19:11
**June** 50:16,20,24 98:4
 133:10
**Justice** 143:10
**justification** 287:23
**justified** 136:3 157:9
 231:13 256:16 292:19
**Justin** 65:11 77:2

                    K

**Katherine** 15:23
**keeping** 16:9 177:5
 298:22
**Keller** 209:4 281:3
**Kevin** 16:3,4
**kind** 11:24 12:6 55:23
 82:3 112:17 128:20
 144:21 159:22 197:23
 198:20 201:23 210:15
 216:22 219:12 277:8
**kinds** 47:7 56:20
 189:24 251:22 253:5
 255:1 270:20
**knew** 99:5
**knowingly** 140:20
**knowledge** 42:7 43:13
 59:18 115:24 116:4,
 25 125:13 130:6
 163:6 226:16 246:4
 249:5 259:13 263:2
 292:9 293:10,13
 294:23 295:11,15
 296:5,7,12 299:24

                    L

**labeled** 206:20
**labor** 32:24 105:21
**lack** 104:21 117:6,7
 131:25 272:14 289:8
 299:9
**laid** 200:13 239:21
**language** 75:15
 277:21,24
**large** 38:21 131:11
 154:4 155:1,15,20,
 22,24 156:16 157:5
 158:2 162:2
**Largely** 112:10
**larger** 94:23
**launched** 38:20 259:18
 263:3,8
**law** 47:2 90:1,12,19,
 23,24 91:4 92:7
 100:2,4 140:20 147:9
 192:3 203:8,16,19,24
 204:6,17,21 205:3,10
 208:3,7,8,18,21

209:1,8,19,22 212:7,
 9,10,12,17,19 213:8
 214:6,10 215:2,7,9,
 11 216:7 256:1
 261:11,14 262:21
 281:22 283:12,23
**laws** 88:23 89:25
 90:3,5
**lawsuits** 81:24
**lawyer** 81:7 180:5
 272:17 273:17,19
**lawyers** 112:24 279:19
 284:21,22 295:4,9,14
**lay** 240:1
**layout** 265:16
**lead** 97:2 295:14
**leaders** 35:13 107:24
**leadership** 129:18
**leading** 176:4
**leads** 56:25 239:14
**League** 219:19
**learn** 214:14
**learned** 251:1,3
**leave** 69:25 239:24
**left** 42:3 168:24
 191:13 274:6
**legal** 9:16,21 65:12
 109:1 169:21,25
 269:1,2,6,7,17,21
 270:3,14 271:8,12,15
 272:20 276:3,12
 284:21 293:16
**legislation** 105:8
**legitimate** 149:13
**Lending** 11:5
**letter** 160:7 187:6,
 12,13 188:18,21
 190:1 191:2,22
 192:2,6,22,24 193:7,
 8,10,16,18 194:4,6,
 7,23 198:9,14,20
 199:2 200:1,21 204:6
 207:10,23 208:17
 212:2,18 214:1
 216:10 217:2 219:4
 278:19 279:9 281:1
 285:22,23,24,25
 286:1,3,19 291:20
**letters** 188:23
 189:11,19,23 190:4,
 14 191:18,19 192:7,

15,20 194:18 195:18
198:12,24 199:18
201:14 203:20 205:11
214:9 257:5 277:13,
16,19 278:7,17
281:19 282:18 291:1,
19 298:8,9
**level** 43:10 82:1
83:20 100:12 109:14,
23 115:8,23 131:16
145:21 156:10 230:16
247:8
**liaison** 28:18
**lied** 252:11
**lieu** 10:4
**light** 207:24 256:25
258:14 264:12
**likelihood** 232:16,21
233:7
**limitation** 158:9
**limitations** 147:9,12
**limited** 43:16,17 51:2
77:12 80:6 270:19
**limits** 148:4,5
**lines** 292:24
**linked** 251:7,10
258:19 260:13
**list** 23:17,19 41:15
43:23 52:20 71:11
74:13 116:15 220:7,
12,17,19,20 225:14
253:6 254:7,8 255:21
258:24,25 259:7
264:3,4,9,18,20
**listed** 59:6 194:9
200:7 209:2,8 255:21
265:23 268:12 276:22
278:3
**listing** 195:14
**litigate** 154:13
**litigation** 178:10,12,
17 179:11,13 180:2,
3,4,6,10,24 182:21,
23,24 184:10 295:10
**loan** 20:14 42:2,4
47:3 49:24 50:2,15
144:10 147:4,25
148:1 188:10,12
189:2,4,5,8 190:10
191:9 208:9 210:12,
13,16,18,23 211:24
213:13 215:14,23,24

229:7,13 230:19,20,
23 231:5,15 233:14
234:1 235:21 236:7
248:22 253:18 255:6,
13 259:22 262:8
**loans** 22:21 29:14
44:13 90:10 91:5,6
93:4,12 151:3,6,9,11
188:13 190:24 191:6,
23 192:2,4,21
203:10,13 208:19
212:3 231:24 245:6,9
259:17,20 262:9
**located** 9:17 106:20,
21,22
**log** 16:9
**logistics** 279:2
**long** 12:21 32:10,25
35:2 85:19 103:14
152:5 155:4,7
185:10,21 190:13,17,
19 218:17
**long-term** 95:7
**longer** 24:23 29:1
35:23 172:5 189:11
190:8,12 193:3,17
238:6
**looked** 16:20,21 68:1
83:2 134:16 136:25
152:25 170:1 207:12
217:1,8,15 218:8
221:22 223:3 240:16
263:7 277:13 282:10
285:19 286:24 287:15
**losses** 248:6,8,25
**lot** 38:8 104:20
126:24 181:22 191:10
221:8 293:4,7 299:9
**lots** 155:4,8,10 183:5
235:25
**loud** 49:18 75:12,16
96:4 114:9 115:4
154:1
**loved** 139:5
**Lucas** 28:6,7,8
**lunch** 122:5,11,19,20
**lunchtime** 91:25

---

**M**

---

**Macom** 9:15

**made** 23:21 42:15,21
43:16 45:1 47:15,22
54:25 59:17 61:9,16
64:14 68:22 80:19
85:9 95:22 99:17
104:2 118:19,24
123:18,19,23 124:7,
25 125:7,11 129:5
131:1 132:23 135:13
141:16 142:5 145:25
147:10,18 151:3
156:14 169:22 173:24
174:5,8,11,14,16
175:19 177:6 178:19
183:6 184:23,25
190:18 192:12 193:15
211:18 223:17 226:25
239:6 250:14 251:4
268:16 270:15 271:21
294:24,25 296:20
297:1,9,11 299:13
**Maggie** 11:5 111:10
181:10
**mailed** 124:14 125:15
**main** 19:25 73:15
97:17 111:8
**maintain** 50:10
**maintained** 50:1,3
**maintains** 65:20 66:1
**major** 144:8
**majority** 62:7
**make** 36:16 45:7 50:9
55:18,21 70:1,5,9,12
78:7 79:6 81:1
82:22,24 83:9 86:6
91:7 92:22 98:10
105:14 109:1 126:19,
20 127:9,13 131:18
143:13 152:15 173:16
175:2 178:4 184:14
198:22 199:5 206:18
207:16 209:19 210:1
213:20 218:6 219:7
225:17,18 226:2
232:7 259:1,20 264:1
267:21 269:9,23
272:7,9,20 273:18
284:23 289:20 298:21
**maker** 24:4,5,8 139:4
**makes** 82:21 105:9
295:13
**making** 22:1 24:18,24

29:24 30:5,13,18,23
31:5,12,15 34:13,14,
19 35:7,14 37:3,9
38:21 47:2 57:2
60:17 103:20 106:5
109:13 118:20 126:8
131:20 134:9 151:24
174:19 194:21 205:24
248:2 262:11 288:18
295:2 296:16
**manage**  49:5 191:2
260:9,19
**management**  21:18
22:10 29:2 30:10
35:6 39:9,12 143:8
209:4 251:8 260:18,
19 281:4
**managing**  108:19
176:15 230:19
**mandatory**  247:15,18,
19
**manner**  10:11 272:5
**Manning**  31:20 63:7
65:9 77:2 84:4
297:4,15
**Manriquez**  64:9 94:4,
18 96:6 103:19
116:19 117:13
124:11,24 180:8,9,
11,21 182:8,18
183:18 222:20 223:15
293:23 295:1,3,5,10,
15
**Marcy**  14:12 15:23
**Margaret**  10:18 11:3
**mark**  13:14 15:9 16:16
18:5 27:13,18 52:25
57:10 62:11 64:23
66:8 98:13 104:10
110:15 127:24
129:14,16 220:2,6
228:15 230:3 233:15
238:19 239:14,20
240:4 264:19 285:22
289:23 297:5,15
298:2
**Mark's**  134:2,3,17
**marked**  13:15 18:12
48:7,8 53:2 57:11
60:6,7 62:13 64:25
66:9 111:5,11,18
185:23 186:3,4

196:10,11 216:16
217:9 230:4 233:16
249:18 263:23 275:4
290:1
**Maryland**  36:14
**mask**  220:3,6
**master**  161:21,25
162:3,11,16 271:20
**match**  169:2 194:22
**matched**  68:19
**matches**  208:23
**material**  153:11
**matter**  9:13 10:7 91:2
113:4 116:19 146:20
172:18 175:14
217:24,25 219:8,18
228:2 235:14 244:23
245:3 266:2 270:13
271:13,15
**matters**  89:25 218:15,
20
**Mckinsey**  230:2
**Mckinsey's**  230:10
**meaning**  41:6 101:17
126:21 129:2 187:8
191:24 205:20 213:12
232:19 246:11 270:3
273:5
**means**  79:16 101:18,20
145:12 154:19 169:20
170:4,12,15 171:23,
24 173:14 203:1,2
219:11 268:19
269:19,20 284:17
292:15 294:9 297:8,
12
**meant**  107:18 140:10
180:21 202:24 249:8
284:8,13
**meantime**  96:8 177:23
**mechanism**  176:14
**media**  20:8 175:2
**median**  240:21
**meet**  11:8 148:5
159:23 198:3 210:22
211:15 213:9,11
**meeting**  24:2,12,13
25:2,3,7 97:22
104:12 168:18,21
174:13 215:14
**meetings**  25:2 28:16

31:12 38:4 97:13,20,
23 112:12 132:19
174:9
**meets**  56:14 57:2
269:3,4
**members**  27:9 29:17
31:7,8 112:23
**memo**  58:2 60:16 63:7,
15 65:9,18 84:12
87:22 137:4 234:4
235:2,16,17,19,23
236:5,8,12,24 237:4,
6,9,12,17 238:14
239:11,16,18,19,21
240:1,10,16,24 273:3
**memoranda**  58:4 68:24
113:1 168:5
**memorandum**  53:6 84:9
89:9,11 98:23 235:5,
10
**memorializes**  89:9
**memory**  13:3 200:7
201:22
**memos**  83:2 129:23
133:11 236:17 273:2
**Menashi**  65:10 68:25
77:1
**mental**  138:14 153:9
**mention**  214:5
**mentioned**  35:17 40:2
276:17 298:13,22
**merge**  147:22 187:17,
22,23 188:15
**merit**  59:2 80:16
101:11,22 102:3
115:18 129:3 169:24
241:24 242:25
**merits**  77:23 80:23
81:25 99:13 126:20
132:9 242:22 247:2
269:23
**Merritt**  10:15,16
25:4,10 34:2,6,21,25
46:14,22 51:9 52:19
65:17,25 69:4,10
73:10,17 74:1,4,12
84:24 86:22 87:1
95:12 112:6,9,19
113:11 116:8 119:6
120:16 121:3,10,17
124:20 126:4,9,16
133:20,25 135:16,21,

25 136:9 138:13
142:24 143:1 144:18
150:6,20,25 153:8
154:12 156:5,10,21
157:7,16 158:5,8
159:8 166:2,10
167:2,6 176:2
181:10,22 182:2,11
184:3,6 212:14,20
213:1,4 214:11,15,21
220:24 221:11
222:13,22 228:20
229:21 231:1,10,20
232:3 234:9,11,21
235:11 237:14 240:6,
13 243:22 247:1,7
249:14 256:6,13
257:2,22 258:7 266:3
273:11,22,25 276:7
278:11,15 279:24
283:19 284:1,9 287:4
288:17,21 289:13,18
292:22 293:6,15
294:4,6 297:16
298:21 300:9

**mess** 111:2

**met** 30:18

**method** 133:6 172:10
230:22

**methodologies** 222:9

**methodology** 23:23,25
24:14 25:1,8 41:1,
21,22 42:7,9,12
43:6,9,11,25 44:6,16
47:12,13 50:21 64:12
67:6,8,9,25 68:2,3,
18,20 70:3,4,8,10,
13,14 71:13 72:5,6,
8,10,22 73:5,8 76:7,
10,12,13,16 77:5,9,
11,13,15 78:1,3
79:9,18,21 80:5
93:22 94:8,14,21,24
95:5,10,17,19,20,24
96:1,22,24 98:19
99:1,4,7,18,22 100:5
101:2,7,12 103:4,6
104:3 109:21 115:9
117:6,8,10,14,17,23
118:4,7,8,9,11,14
119:3,12,14 120:1,2,
6,7,12,20,23 121:14
123:3,7,8,13,25

124:12 128:5,9,11,
12,15 130:12,15
131:24 133:1,9 134:5
135:12 137:23
138:10,19,24 139:8,
15,18,21 140:1,5,15,
25 141:10,13,17,19,
22 142:1 171:15,18,
24 172:9,12,22,25
173:8,10,12 177:9,12
180:13,16 183:20
221:18,22 222:4,6,7,
18 223:1,2,14,17,23,
24 224:3,10 225:7
234:7,16,25 237:20,
24 241:20 242:8
299:18,19,20

**methods** 70:6 71:7,24
95:23 177:15

**metric** 134:13

**metrics** 130:17,19
133:13,17 137:4,9
168:6

**Michael** 28:4,13,18
31:9 97:7,18 235:25
237:7 238:3 239:22

**microphone** 111:25

**mid** 176:25

**mid-november** 235:3,
13,20

**middle** 37:16 69:21
93:19,20 186:13
200:14 203:9 233:23
275:11

**migration** 176:10

**million** 83:13,14

**millions** 88:4

**mind** 39:14 40:9,11
50:8 71:3 75:12,15
98:25 114:10 125:18
136:17 166:13 172:17
181:10 206:2 287:6
290:21

**mine** 74:6 153:18

**minimum** 79:22 192:13

**Minor** 97:19 238:12

**minute** 149:5 250:1,7

**minutes** 57:7 185:8

**mischaracterization**
182:12 297:17,20

**mischaracterized** 85:3

**mischaracterizing**
162:17

**misconduct** 150:16
209:5 237:3 240:19
257:8 281:4 295:21

**misinformed** 174:1

**misreported** 175:2

**misrepresentation**
43:20 45:8,20 47:9,
22 56:3 58:19,23
59:9,13,15,17,23
60:25 61:2,6,8,15
107:5,8,10,13 109:2,
4,7,16 110:4,8,10,12
145:20 152:16,17
164:1,6,11,16,19
165:2 211:18,23
242:4,12 251:15,23
252:23 253:1,5
254:20,22 255:2
260:23 269:4

**misrepresentations**
51:16 163:20 165:17
251:19

**misrepresented** 252:13

**missing** 210:1

**misstate** 157:24

**misstated** 182:15,16

**mistaken** 286:20
287:17

**Mitchell** 54:6 58:3
60:17

**mitigate** 166:1

**mixing** 222:25

**mobile** 259:21

**moment** 83:3 113:23
236:21 275:14 282:12
298:20

**money** 141:23 147:2,19

**monitor** 12:10

**month** 88:10 134:7

**months** 32:12,18
135:11

**moral** 163:18 165:14
166:23

**morning** 11:3

**Motion** 216:15

**mouth** 106:12 137:11

**move** 12:1,2,11 25:15
93:19 113:13 137:1
176:6 212:25 226:5

274:3,15
**moved**  28:25 32:4
  226:6
**moving**  30:9 99:4
  128:7 131:2,14
  141:25
**MPRM**  31:5,14
**multiple**  45:17 90:9
  200:9

## N

**named**  74:5 207:8
  216:25
**names**  14:21 90:3
  194:22 220:3,7,12,
  14,18,19 265:25
  292:3
**narrative**  217:21
**narrow**  46:15 232:1
**narrower**  253:7
**National**  215:24
**navigate**  144:6
**necessarily**  241:17
**necessitates**  45:9
**needed**  79:3 87:6,10
  106:16 251:20
**negative**  135:5
**negatively**  135:14
**negotiated**  24:17
  29:21 30:23 34:12,14
  35:5 38:20 188:19
**negotiating**  29:19
**negotiator**  24:21
**neighborhood**  32:12
  98:3 114:13 116:6
**Nevin**  15:10 16:17
  56:24 73:16,18
  74:11,21 80:13,19,21
  82:13 84:21 85:9
  99:11 104:12 110:25
  119:1 127:2,23
  145:15 171:4,6
  176:19 188:24 202:25
  203:2 238:18 291:23
  292:8 294:19 295:24,
  25 296:2
**Nevin's**  78:6 86:8
  115:16
**nice**  11:8

**Ninth**  139:7
**nods**  21:21 48:22
  197:16 199:19 261:9
  286:7
**non-cci**  117:5 123:25
  124:2 171:15,18
  172:12 173:12
**non-corinthian**  199:21
  200:21 202:20,21
**nonattorney**  56:11
**Nonetheless**  65:25
**noon**  12:17 91:23
**normal**  118:22
**Northern**  67:8 72:9
  96:21 98:15 117:9
  132:24 138:8,23
  139:2,3,25
**note**  19:7 40:11
  176:23
**noted**  55:10 240:13
**notes**  199:7
**notice**  13:7,12 14:9
  29:23 30:5,12 37:8
  188:3 198:5,7
  210:15,25 212:17
  245:21,25 246:1
  247:14 285:15
**noticed**  247:16,18
**notices**  190:9,11
  196:25 197:25 239:1
  256:22
**notification**  93:3
  102:8,10 125:19
  129:12 188:10
**notifications**  42:16
  101:17
**notified**  87:11 102:5
  125:21,23 145:21
  170:5 243:9 249:2,3
**notify**  38:6 188:17
  195:22 248:1,19
**notifying**  101:19
  246:5,17
**notion**  81:7
**November**  9:12 33:2
  103:25 104:1 209:16
  236:5 263:3,9 299:1
**novo**  201:5
**NSLDS**  255:13
**number**  13:25 18:8
  20:13 36:18 42:14,20

43:1,16 49:15 51:2,3
55:7 57:6 63:3
73:16,25 74:8 75:19
76:2 100:12,23 101:9
114:3,7,12 129:8,11
132:2 142:8 156:23
158:21 169:2,3
183:20 184:17,22
196:2,5,7 206:20,21
216:14 224:9 254:18
255:10,11 260:25
263:22 264:9 265:15
275:4,5 280:25
282:15,16 289:25
290:5 293:21
**numbering**  111:3
  113:18
**numbers**  42:25 62:8
100:10,13 130:14
132:3 154:4 155:1,
16,20,22,25 156:16
157:5 158:3 168:12,
13 220:21

## O

**O'GRADY**  10:18 11:2,4
13:13,18,24 14:8,12,
17,18 18:4,11,15
25:5,13,16 34:4,9,22
35:15 46:15,17 47:10
48:6,11,14 51:11
52:22,25 53:5 57:14
60:5,10 62:11,17
65:3,22 66:4,7,12
69:1,6,11,18 73:12,
13,20 74:10,19 85:1
86:24 87:3 91:21
92:2,4 95:14 110:13,
19,23 111:6,13,21
112:7,16,21 113:13,
15 116:10 119:7
120:17 121:6,12
122:4,8,15,23 124:21
126:6,12,17 133:22
134:8 135:18,23
136:5,16,20,23 137:2
138:16,17 142:25
143:2,17 145:1
150:9,23 151:12
153:12 154:14,23
156:8,12 157:2,11,22
158:11,14 160:2

166:6,12,18 167:3,9,
13 176:5 181:12,16,
20,24 182:3,13
184:5,7 185:6,10,18
186:1,7 196:1,6,9,14
212:15,21 213:3,6
214:12,18,24 216:21
217:6,12 221:3,13
222:15 223:4 228:18,
21 229:4,23 230:7
231:4,14,22 232:7,9
233:12,19 234:10,14
235:1,6,8,12 237:11,
15 240:9,14 244:3
247:3,10,12 249:9,
16,21 256:9,18
257:11 258:4,9
263:20 264:8,14
266:12 273:15,23
274:3,14 276:8
278:13,18 279:25
283:21 284:5,14
287:7 288:20 289:5,
15,21,23 290:4,6
293:1,12,25 294:5,8,
11 297:18,19 299:6,
25
oath   10:5
Obama   60:24
object   65:17 121:3
156:5 158:6 256:6
292:22
objection   25:4 34:2,
21,24 46:14 51:9
84:24 86:22 95:12
112:6,19 113:11
116:8 119:6 120:16
124:20 126:4,8
133:20 135:16 138:13
142:24 150:6 153:8
154:12 159:8 166:2,
10 167:2,6 176:2
182:11 184:3 212:14,
20 214:11 220:24
222:13,22 229:21
231:1 234:9 235:6
247:1 273:11,22
276:7 278:11 279:24
283:19 287:4 293:13
294:4 297:16
objections   10:10
obligation   91:22
299:3

obtained   234:4
occupation   68:5
occur   126:2 242:4
occurred   47:23 51:16
107:11 109:3 124:3
164:19 256:24
occurring   101:14
OCTAE   20:12,21
October   57:25 250:5
offer   252:7
office   18:25 20:3,5,
8,11,12 21:3,5,13,
14,15,18,24 22:8,9,
10,11 27:11 28:5,6,
9,19,25 30:2,7,10
31:3,7,8,10,12,13
32:3 37:5 38:24
39:2,3,5,8,9,12
41:12 53:19 86:18
88:12 97:12 112:12
114:20 143:5,6,7,8
146:2 161:25 181:6
238:4,10 239:14
271:4 291:9,11
293:22
officer   21:2 27:14,20
33:19 107:25 219:1
251:4
offices   21:17 30:11
37:22 97:15
official   114:14
182:25 251:1
officially   194:2
officials   190:10
236:24 237:5,18
238:15,16,18
oldest   41:7
omissions   47:8 203:14
one's   74:4
one-off   286:18
ongoing   138:12 238:24
256:11
online   259:21
OPE   20:21
open   13:8,24 18:16
48:6,15 52:23 57:5
74:18 111:7 167:14,
16 171:21 207:15
216:20 264:15
289:10,14 290:7
298:23

operate   39:25
operated   71:15 72:13
95:1 218:1 219:9
operating   21:2 27:13,
19 67:16,17 68:7,8
107:25 122:2 138:22
operation   108:20
145:17
operational   105:12
108:6,17 187:10
258:20 263:9
operationally   131:21
219:11
operations   20:25 21:1
50:3 67:20 68:21
105:10 107:16 270:13
opinion   45:21 158:21,
23,25 159:2,4 276:5,
7
opinions   126:9
opportunities   145:4
opportunity   45:23
145:6,22 163:19
165:15 245:4,12
247:22 266:19
opposed   73:19 129:5
161:11 293:10
option   162:14 237:22
245:20 274:22
options   177:22 237:20
239:21 240:1
order   13:9 14:3 80:10
121:5 156:7,9 188:18
225:18,24 247:9
258:3,19 290:5,12,15
ordered   221:2 290:15
orders   233:14
organization   20:19
105:9 107:21
organizations   149:20
original   172:10
174:15 199:11 277:19
281:16
originally   123:11
281:15 297:4
other's   145:7
outcome   9:19 146:15
outcomes   220:5
outlines   120:6
outstanding   134:13,
20,24 151:4

overbroad  46:14 116:9
oversaw  38:25
overseeing  20:2 39:3
oversees  21:6,22
oversight  20:24 21:3,
  4 27:4 30:3,17 37:6
  111:9 112:3 157:19
  249:10,12 250:4
owe  141:23
owned  217:25 219:9
ownership  265:19

---

**P**

p.m.  122:19,20
  136:12,13 185:14,15
  228:25 229:1 274:9,
  10 300:20
pace  127:3,11,18,21,
  22,25 128:2 134:9
  177:5
pacing  134:22 175:25
package  38:21
packet  62:25 63:3,6
pages  37:11 83:13,15
  148:15 155:4,7
  168:1,12 207:22
paid  36:1 108:1
papers  283:8
paragraph  19:14 29:5,
  7 36:5,8 37:13,15,16
  40:4,6 41:13 49:18,
  20 50:14 51:5,6
  69:21 71:1,4,17
  75:8,11,16 76:6,9
  77:5 93:18,20,21
  94:25 95:21,25 96:3
  103:12,13 148:11
  153:24 160:23 163:14
  186:10,14,21 188:6
  189:17 194:19 200:2
  201:16 203:7 235:2
  236:23 239:10 240:15
  241:5 244:12,13
  281:10,13 285:4
paragraphs  163:24
  198:13
paraphrasing  252:9
pardon  207:17
parents'  17:23

parse  81:6
part  17:23 24:1 29:7,
  9 67:7 68:14 71:20
  72:2 73:8 76:17
  91:10 96:25 97:5
  103:17 104:13 108:13
  113:20 115:3 121:4
  123:7 131:5,9 135:1,
  2,4 145:9 163:9
  184:24 192:14,17
  197:4 199:5 200:5
  203:12 215:7 235:18
  242:1,7 250:25
  256:22 257:11
  259:11,13 260:4
  279:11
part-one  101:6
partial  104:2 117:14
  120:1 123:2 124:12
  128:12 131:24 135:12
  179:14 180:12,16
  183:19,24 221:17
  222:18 233:14 234:1,
  6,15 235:21 236:7,13
  241:19 243:2 244:5
Participants  9:3
participating  9:25
parties  10:9,12
  252:12
parts  37:23 152:4,7
party  9:18
passed  98:18
past  36:17 57:21
  135:10 155:25 156:2
  246:11,14 255:4
  257:14,18
patently  250:21
path  138:7
paused  183:21
pay  107:24 147:2
paying  151:16 163:21
  165:17
payment  259:21
PBO  108:3,4
PDF  36:20 37:12 40:5
  48:11 49:14 55:4
  63:17,18 69:22 111:7
  144:19 168:23 169:3
  171:10 185:21 197:1,
  10,23 207:14,16,17
  208:17 209:2,14
  215:19 217:3,13

236:18 239:9 241:4
  243:14 265:7 275:7
  281:2 283:1 285:3
  290:18
PDFS  13:25 14:2,19
penalty  10:8 19:8
pencils  140:7,9,13
pending  12:22 65:13
  100:11,14,20 104:2
  116:5 117:14 128:22
  136:17 151:8,19,20
  157:1 172:9 182:21,
  23 220:8 237:1
  243:16 246:6 261:25
  268:20
people  22:15 31:1
  40:21 76:22 97:16
  112:13 131:2,7,10,14
  143:3,4 155:21,23
  159:24 183:5 184:17,
  22 255:7,16 270:22,
  24 271:4 291:7
  298:14
percent  61:11,25
  62:3,6 79:22 80:3
  102:16 103:11
  192:13,15,16 241:20
  243:3,9,19 244:5
percentage  61:17,22
  100:21 103:7 109:9
  116:13 159:5 160:1
perform  26:2
performance  26:6,10,
  24 27:12,14,17,19,24
  28:15,24 29:2 107:15
  108:5 133:18,19
  134:2,3,4,6,10
  135:3,5,7,15
performance-based
  20:19 105:9 107:21
performing  22:4
performs  26:2
period  24:22 26:19
  28:21 32:17 43:17
  48:2 50:19,20 51:1,
  4,14,21 100:3 124:18
  131:12 172:4 177:21
  259:17 263:5 267:15
periodic  168:9
periods  47:24 51:20
  58:18,24

perjury  10:8 19:8
Perkins  20:14,15
permanent  32:8
permissible  152:21
person  10:5 11:15
  22:22 31:2 56:19,25
  85:20 155:20 184:17
  202:1,4 211:23
  260:24 269:20 291:21
  292:4,20
person-by-person
  152:14
personal  11:25 207:5,
  20 217:16 293:13
personally  23:15 25:9
  56:13 85:12 108:21
  148:22
personnel  131:8
pertaining  217:25
  257:7
phase  260:1
phases  260:2
Phoenix  265:20
phone  11:25 15:11
phrase  90:2 137:13
  294:3
phrases  287:11
physically  10:1
pick  276:20
picture  239:24 298:14
pie  243:12,15,20
pies  243:19
pin  181:24
place  30:24 35:7
  40:19 41:21 44:10
  45:8 49:2 52:11
  58:19,23 59:13,15,17
  60:25 66:20 76:18
  78:1 88:12 93:2
  96:22 100:2 106:3
  115:15 135:12 144:17
  164:2 186:18 203:23
  204:22 218:18 241:2
  265:18 282:3,7
placeholder  200:11,15
  201:8
placement  51:18 65:15
  198:2,10 199:3 252:4
plaintiffs  10:19 11:1
  207:8 216:25 298:25

Plaintiffs'  216:15
plan  134:12,15,18,24
  135:2
plate  27:2
platform  176:10
play  166:19
point  19:11,20 21:25
  35:16,19 42:20
  44:14,15 54:11 60:2
  61:20 64:6 66:22
  70:1 83:10 87:13
  89:10 99:18 116:14
  117:8,12 118:16
  122:9 123:4,13
  128:25 129:9,10
  132:14 135:20
  144:11,15 150:14
  160:9 169:7,11 170:9
  171:14,22 173:11
  175:8 176:8 177:4,9,
  13 180:9 182:7
  183:16 199:12 221:1,
  23 226:6,23 229:24
  245:11 257:25 264:2
  272:10 273:9 275:17,
  18 278:1 279:6 280:3
  281:19 288:22 290:24
  295:18 298:22 299:8
pointing  156:13
points  278:4
policies  22:6 23:3
  33:25 39:17 86:8,10
  219:13 231:19 270:17
policy  20:4,24,25
  21:2,6,9,11,12,16,
  19,23,25 22:2,16
  27:10 28:4 31:4,25
  32:2,9,10,23 39:16
  40:7 67:20,23 68:6
  76:22,24 79:1,15
  80:8,9,22 81:8,9,11,
  12 86:12,18,21,25
  87:20 88:18 90:15
  91:3 95:16 103:3
  105:10,14,16,23
  106:1,4,8,13,16,19,
  24 107:5,11 108:9
  109:3,6,8,16,17,21,
  23 110:2,3 114:20
  115:1,6,13,15 117:2
  120:6 121:13 126:10,
  11,23 131:1,17,20
  143:9 145:14,18,19,

20 146:4,20,21
  150:23 151:2,3,25
  153:10 154:16 157:3,
  6,13,19 173:20
  175:15 178:1 179:17
  183:8 192:17 231:6,
  22 232:11,12,18
  234:1,18,25 235:20
  236:6,11,14 241:1
  244:23 245:3 246:19
  247:4 259:6 266:2
  268:24 269:5,8,20
  270:15 271:6 276:5,
  10,12,13,16 277:5,8
  299:9,12,15,17,20,23
policy-making  157:20
  219:12 271:7 293:4
  296:7,9,12
POLITICO  234:5,13
  236:2 241:7
pool  94:23
poorly  163:17 165:8,
  20,22 166:7,16,23
population  232:20
  233:6
portfolio  39:17
  229:8,13,16,17
  230:2,17,23 231:5,
  15,18 232:14
portion  161:15 205:9
position  28:2 33:1
  36:24 37:1 58:16
  85:20 137:19,21
  138:1 139:14 161:22
  178:23 182:6 232:22
positive  135:3
possession  199:23
  200:24 203:5 205:23
  265:3 266:25 268:22
  289:17
post-18-month  257:4
Post-cmc  196:3 282:16
posted  130:6
postsecondary  20:3,5,
  9 21:4,13 30:2,7
  31:3,7,10,13 32:3
  37:5 38:25 39:2
  143:6
potential  94:11 108:1
  151:9 161:15 164:10
  165:21,22 177:15
  191:11 224:24 251:14

298:23

potentially 117:11
137:24 138:24 140:17
151:5 201:7 204:20
227:11 229:22 238:12
power 80:15
Powerpoint 167:18,20,
21 168:3,4 171:9
172:1 186:2 243:12
Powerpoints 129:24
168:2,13
practice 140:19
219:25
practices 46:8
Pratt 289:2
pre-2016 262:25
preamble 152:3,7
precise 183:12
precisely 198:19
200:13
Predatory 11:5
predecessor 31:16,18,
19 32:4,5 272:23
predecessors 31:25
predecisional 287:6
predict 141:6
premise 58:22
preparation 14:23
113:9
prepare 14:24 15:20
17:7 18:6
prepared 112:4,10,25
160:12 239:11,20
240:4
preparing 15:17 16:6
preponderance 56:14
57:3 78:16,20,23
81:19 269:4
presence 9:8
present 10:1 176:10
245:4,12
presented 124:24
168:7
preserved 118:21
president 33:13,14,
16,18
president's 39:10,13
press 249:10,13
250:3,11,13
Pressley 113:17,23

presume 260:19
pretext 135:24
pretty 63:22 70:19
prevent 115:16 164:1,
15
prevented 94:4,7
116:19 117:24 124:12
182:9
preventing 12:25 13:2
117:4 118:20 164:6
prevents 115:2,6,13
183:19
previous 16:8 25:9
61:16,21 90:13 113:1
165:8 166:22 217:1,7
272:22 291:5
previously 45:1 47:12
49:11 164:19 235:4
primarily 238:3
264:18
primary 195:1,2
Princeton 36:15
219:15
principal 19:22 26:20
27:3
prior 15:15 26:15
41:2,23 42:15 46:5
47:21 55:25 56:1,4
58:16,17 61:4 84:25
85:3 88:17 90:11
93:6,9 118:10 131:22
138:19 140:11 142:14
152:19 154:17 203:10
208:20 212:4 213:1
271:17,18,24
priorities 36:23,25
151:23 247:4
priority 37:2 225:19
privacy 94:1,12
117:11 132:25 133:4
137:24 138:25
140:18,24 180:13
224:13
Private 9:7
privately 11:19
privilege 65:21 66:1
69:4 126:13 278:14
privileged 15:18
65:19 69:3 86:23
112:20,22 113:12
126:5,7 138:15
153:10 166:3 176:3

229:22 278:12 283:20
problem 14:17 112:1
126:3 194:16 263:10
280:21
procedure 67:16,18
68:9 122:2
procedures 68:7
proceeding 9:4
proceedings 9:23
process 21:17 24:19,
21,23 26:9 29:22
30:12 34:15,17,19
35:5 37:23,25 41:15,
17 49:5 50:16 53:21
55:1 71:10 78:9
81:17 82:19,20 83:11
100:21 109:16,17
115:11 122:3 126:13
127:18 131:2,14
143:12,24 145:9,10,
14 146:5,8,9,20,22
147:16,22 149:23
152:20,22 153:2,3,16
157:20 161:3,7,11,
12,20 162:8,11
163:2,7 169:17 173:8
188:9,11 189:16,20
193:15 199:6,17
202:7 218:13,14
224:19,22 241:23
242:11 244:25 247:25
248:17 258:16 260:24
272:25 274:17 275:2
276:6 278:14 279:4
processed 169:8,12
170:4,18
processes 37:18 121:4
processing 83:21
101:17,25 102:6,9
114:22 125:12 129:8
134:19 169:14 176:9,
16 294:22
produce 53:20 299:3
produced 237:13
240:12 288:19 289:7,
11
product 67:11
professional 105:3
program 20:14 39:19
144:10 191:9,10,14
230:20 241:15 252:6
257:15 276:19,21,23

277:3,4,6 280:17,18, 22

programs  20:9,10,14, 15 39:20,21,22,25 40:2 43:17,20,22,24 44:1,3 47:24 48:2 51:3,14,19,21 52:1 58:18,23 59:6,8,12 60:24 61:4 62:5 165:4 240:22 241:10, 11 276:17,22

progress  35:13 131:25 133:12

project  11:4 230:19

projects  38:11

promoted  33:15,17

prompted  98:20

promptly  139:5

promulgated  156:23

prong  21:20

pronounce  239:13

properly  165:12,13 280:22

proposal  78:21

proposed  29:24 30:5, 12 31:14 35:8 37:8 78:20

prospective  164:20

prospectively  261:24

prospects  209:3,6 281:3,5

protection  90:1

protocol  66:17,18 67:4 68:19 108:18 270:25

protocols  67:2 70:6 270:21

provide  34:18 40:22 61:25 98:23 144:24 145:4,6 186:15,25 189:11 195:17,18 201:16 206:5 234:1 235:21 236:7 244:4 247:23 248:4 251:24 252:3 253:13 275:24 278:8 285:5,9

provided  35:6 45:7 67:24 93:24 104:7 120:21 159:11 187:25 203:3 215:17,25 243:17 244:1 249:4

255:3 284:24 285:15 293:7

providing  145:11 164:9 194:19 246:8

provisions  144:9 160:24

public  24:22 78:22 130:5,6 143:21 155:4 164:25 259:21 264:4, 5

publication  30:13

publicly  65:23 264:4

published  30:19 35:11 120:13 166:5 224:25

publishes  134:11

publishing  38:19 165:3

pull  84:15 112:14

pulled  84:18 133:8

purely  271:12

purpose  94:13 130:22, 24 141:2 154:5 158:3 229:20

purposes  25:14

put  22:5 38:8 66:20 72:23 76:18 78:21 106:11 137:10 161:17 164:24 168:1 181:1 188:9 254:3 255:5,9, 10 261:23 279:16 281:10

puts  187:23 260:24 261:18

---

**Q**

---

qualifications  119:24

qualified  49:24 272:2

qualify  155:18

qualifying  65:14 259:23

quality  121:21,24

question  12:21 27:24 34:8 35:1 39:15 40:10 55:21 56:7 60:11 64:11 76:5 79:13 83:7 84:20 85:24 88:3 90:9,21 93:1 95:3 97:1 102:17 103:5 105:14, 23 106:14,24 118:2,

23 121:11,12 124:6 130:22 136:17 137:25 139:1,20,22,24 140:21 151:1 153:13 154:21 155:13 157:12,17,25 159:9 160:7,9 181:14 192:5 193:13,22 196:25 205:15 216:6 221:12 234:22 236:3 241:16 245:10 262:2,4 269:17 270:11 275:12 276:3,12,13,15,16 277:1,9 279:10,21 281:11 282:12 283:13 287:15 292:21 293:20 296:10

questioning  35:2 65:18 156:6 222:14 231:3 232:6 257:9 258:2 274:2 292:23

questions  17:13 34:1 42:18 44:25 56:16 68:3,6 69:2 105:16 106:4 107:2 122:25 123:2 127:12 133:21 181:23 182:1 193:14 207:24 231:25 253:19 257:18 261:3 265:1 275:25 279:13 290:20 292:25

quick  64:19 298:22

quicker  153:4,6,7

quickly  258:5

quo  296:24

quotation  240:24

quotations  55:8,14

quote  195:18 199:21 200:21 215:5 236:24 240:19

quotes  251:1

---

**R**

---

raise  10:21 163:20 165:16 224:13

raised  98:16

range  88:14

rankings  252:12

rare  151:5

rate  51:18 65:15 198:3 199:3

rating  133:18
rationale  295:22
reach  11:24 12:12
reached  125:4 230:25
read  14:20 29:7
  48:19,21 49:9,11,18
  51:6 71:4 96:4
  103:13 114:4,9 115:3
  144:14 148:13 149:3
  152:2,4 153:25
  163:14,23 164:4,7,12
  210:11 240:7 249:24
  250:9 275:15
reading  54:14 75:12,
  16 136:17 166:21
  167:4 183:15 265:25
ready  18:16 87:12,18
  90:7 179:16 184:1
realize  251:12 258:18
reason  91:10 104:24
  105:7 117:7 135:24
  156:9 157:3,8 195:1,
  2 204:19,20,25 205:9
  207:9 256:25 273:22
  282:8 283:11,15
  284:8,19 287:1,10
  295:11
reasoning  146:21
  151:21
reasons  91:12 92:6
  105:1,5 121:7 156:24
  162:24 163:1,2,3
  166:20 207:20 209:7
  213:7 231:6,9
  256:10,12,24 257:13,
  21 281:6,21
recall  14:5 17:5 43:1
  50:22 51:20 61:20
  63:1,2 64:5,12
  66:19,23,25 72:18
  77:16,19,21 94:19
  97:21 102:15 123:20,
  21,22 125:6,9 127:25
  130:11 132:2 142:12
  160:6,11 168:4
  174:21 193:3,6
  196:18 200:25 201:2
  207:1 236:4 237:4,19
  282:17 285:25
receive  20:11 26:8
  76:3 100:24 210:14,
  16 220:7 288:5

received  47:18 129:12
  169:6 207:23 209:25
  214:1 243:9 275:9
receives  91:13 212:16
receiving  42:1 91:17
  101:13 285:20
recent  233:24 273:3,6
recently  17:9 134:16
  227:22 246:10,11,12
  251:3 260:14
recess  69:14,15
  122:19,20 136:12,13
  185:14,15 228:25
  229:1 274:9,10
reclaiming  248:25
recognize  48:17,18
  57:15 66:13,15
  111:22 167:17,19
  249:22 264:17 290:9
recollection  16:18
  63:13 77:24 249:8
recommendation  54:8,
  17,21,24 58:2 60:21,
  22 61:9 84:3 204:19,
  25 205:9 237:22
  282:7 283:11,15
  284:8,18 287:1,10
recommendations  58:7,
  11 60:17 240:2
reconciliation  277:7
reconsider  277:25
reconsideration
  274:16,17,19 276:6,
  10,13 277:6,15
  278:5,10,21 279:4
  291:3 292:7,11,12
record  9:3,6,23 10:14
  12:19 19:8 38:1 49:3
  54:3 57:22 60:13
  62:19 65:22 69:13,17
  71:4 75:12 96:4
  103:14,17 114:5,19
  115:4 122:14,17,22
  136:5,8,11,15 144:14
  145:8 146:1 148:13
  154:1 158:13 160:7
  163:15 185:17,18
  212:24 217:6 228:24
  229:3 249:14 274:4,
  8,12 289:2 298:17,24
  300:3,8,11

recorded  9:4,5,10
records  194:2,9
  276:21
recover  147:19 248:6
recovery  248:8
recusal  53:17 218:13,
  14,17,24 219:17
  220:23,25 221:5
  265:6
recusals  53:18 219:14
recused  217:23,24
  218:2,19 225:1
recusing  219:3
redact  220:14
redacted  53:21,24
  62:23 63:5 84:4,10
  207:2,19 217:17
redaction  53:22 63:1,
  12
redactions  207:5
reduces  164:10
redundancy  298:6
redundant  184:13
refer  11:6 28:7 76:8
  94:17 109:21 163:22
  197:14
referenced  24:12,13
referring  71:18
  149:2,10,24 154:10,
  11 161:18 162:24
  164:5 165:8 168:11
  173:22 176:11,12
  177:1 187:3,5 188:3,
  14 189:5 193:9
  230:12 234:6 237:7
  238:1 239:23 285:12
  287:5
refers  95:25 161:15,
  20 162:8,23 166:7
  171:18 177:3 250:13
reflect  135:14 191:19
Reform  250:4
refresh  16:18,23
reg  35:11 38:7 78:25
  81:22 82:2 93:6,10,
  13 148:6 152:2,7,13,
  22 155:3 161:15,16,
  19,23 162:10 163:6,9
  164:7 165:1 242:2,3,
  11 247:25 249:6,7
  253:5,10 254:21

255:3 259:2,6,7
**regard**  20:23 23:2,22
  24:14 37:6 46:18
  79:8 106:24 241:16
  254:24
**register**  276:20
**regs**  44:13,16,19
  81:18 86:11,12 93:5
  110:8,10,11,12
  156:14 191:24 193:2
  247:24 248:10
**regular**  28:16 52:14
  91:25 97:20 128:6,
  16,18,20 130:14
**regularly**  97:22
  129:17,19 137:5
**regulation**  16:22
  30:14,19 32:2 37:10
  39:18 43:8 44:20
  45:22,25 46:10,25
  47:5 78:12 92:20,24
  93:2 105:13 107:7
  142:18 143:16 147:4,
  15,21 150:22 151:18,
  22 152:1,4,19 154:13
  156:23,25 157:6,9
  163:17 164:20 165:7,
  11,12,14,20,23
  166:4,8,9,15,17,21,
  22,25 245:6 247:2,4
  252:22,24 253:2,15,
  20 254:6,8,10,11
  299:14
**regulations**  22:3,7
  24:7 29:12,25 37:14,
  20 38:12,23 39:19,
  22,23,24 44:7,10
  45:4 46:3,7,9,12,13
  54:20,22,25 55:2,11
  92:9,12,14,17 93:8
  103:3 106:4 109:4,7
  119:2,11 132:15
  142:9 143:11 144:10
  148:3,18 150:19
  151:7 154:15,20
  156:14 160:24 162:25
  164:17 165:9,25
  185:21 190:25 192:22
  193:10 244:24 245:20
  246:21,25 247:14,15,
  21 248:13 249:1
  254:1,3 255:8,17,19
  261:7

**regulatory**  20:4,5
  33:14,16 38:21
  107:2,12 108:9 144:9
  155:7
**reimbursed**  147:14
**reiterate**  155:3
**relate**  150:23 261:4
**related**  9:18 25:14
  39:22 77:6 94:20
  178:17 182:22 183:15
  209:5 218:21 281:4
**relates**  151:2
**relating**  29:11
**relations**  33:18
**relationship**  20:20
**relative**  153:1
**release**  249:11,13
  250:3,11,13
**relevance**  231:2 274:1
**relevant**  89:25 256:8,
  9,18 257:10 293:17
**reliable**  224:11
**reliance**  242:4,13
**relied**  46:25 94:8
  152:16
**relief**  23:23 24:14,25
  25:8,10 40:22 41:22
  42:1 59:24 61:10,17,
  22,24,25 62:3,7
  70:4,10,14 71:9,13
  72:5,11,23 73:5,8
  76:3,7 77:6,9,13
  79:8,10,18,22 80:7,
  12 96:11 99:9 102:4
  103:4,6,7 104:3
  109:9,14 115:8
  117:14 120:2 123:3
  124:12 128:12 131:24
  135:12 137:23 149:17
  152:12 155:19 159:14
  170:10 171:14 173:11
  179:14 180:12,16
  183:24 188:10 192:14
  221:18 222:18 233:14
  234:7,16 236:14
  237:2 241:20,21
  243:2,3,10,16,17,25
  244:5 248:3 277:3
  280:16 281:7
**relies**  93:24 224:1
**rely**  99:1

**relying**  159:16,24
**remain**  113:24
**remaining**  226:5,7
**remember**  13:19 31:2
  32:13 33:13 35:10,
  12,22 39:23 50:22
  51:17 64:14 72:20
  78:17 83:8 84:13
  87:17,23 88:16
  113:20 129:9,13,20,
  21 130:10 132:4,6,7,
  12,13 160:12 174:12
  190:15,16 197:4,6
  201:5,7 210:17
  224:20 227:14,17
  237:17 238:8 242:18
  246:12 277:17,23
  278:3 282:2 287:20,
  22 288:7,8,9
**remote**  9:9,10,15,22
  11:9,16 300:18
**remotely**  10:3,6
**remove**  162:14
**repayment**  145:5 161:1
  163:17 165:7 167:11
  186:2 209:15 233:8
  275:21 279:8,22
  280:11
**repeat**  298:18
**repetitive**  184:15
**rephrase**  136:21
  138:16
**replace**  120:3 176:13
**replaced**  47:5
**report**  20:16,22
  25:17,20,22 26:3
  48:12,18,19,20,21,
  23,24,25 49:9 51:10
  82:15 128:25
**reported**  28:22 168:6
  235:4
**reporter**  9:21,24
  10:20 110:15,18,20
  111:4,10 136:16,18,
  22 300:5
**reporting**  10:2,11
  25:19 37:20
**reports**  20:7,18 27:25
  28:1 100:9,13,18,24
  101:8,13 129:11
**represent**  196:22
  264:24

representatives  97:12
  238:10
reputations  154:5
  158:4
request  9:6 39:10,13
  274:21 278:21,24
  288:18 291:3,14
  292:7,11,15 293:8
requests  288:23
  289:19 291:10,13
  298:25
require  148:18
required  38:4 251:14,
  15 258:20
requirement  107:12
  249:6,7
requirements  37:19,21
  93:3,11 215:15
requires  92:20 188:11
  222:7
reset  191:7
residing  105:11
resolve  137:15
resolving  134:13,25
resources  71:23
respect  191:18 264:25
respects  109:11
respond  45:23 143:14
  145:7,22 146:11
  193:4 245:16
responded  30:8
response  24:22 30:5
  145:23 149:9 155:5
  196:24 202:17 246:17
  264:25 286:17
responses  30:16
  143:23 144:1 299:1
responsibilities
  19:13,16,21 29:8,9
  157:24
responsibility  26:23
  27:2 37:19 157:20
responsible  20:1,2
  26:11,12 27:14,16,18
  28:17
rest  149:3
restarted  137:6
  138:11
restate  34:7
restricts  114:20

restroom  12:18
result  71:11 165:13
  201:14 244:5 285:8
resulted  38:5
results  47:20 161:8
resume  176:25 236:25
  237:5,18 238:15,23
retained  35:21 36:1
retroactively  92:25
return  69:19
returned  218:22
returning  70:21
revenue  230:23
reverse  178:25
reversed  178:7 184:9
review  15:6 16:17
  26:4 27:15,17,19
  28:15,24 29:2 39:7
  40:15,17 41:21 44:6
  45:6,10,19 47:12,14
  50:15 53:23 55:11
  58:5 66:17 67:2,6
  68:17 71:7,12,18,20,
  21,22,25 72:3 80:16
  81:1,4 83:13,15
  86:15 87:8,19 88:5
  95:23 101:5,6
  112:15,18 113:8
  115:7,17,23 121:24
  125:19 133:19 134:2,
  3,4,6,10,17 135:3,5,
  7,15 142:14 143:24,
  25 144:2 145:8
  146:24 149:5 158:24
  159:1,15,25 163:8
  197:5 199:6,10
  202:9,11 204:19,24
  205:19 210:8 215:10
  218:5 219:12,24
  239:3 241:25 242:6
  259:1,3 268:20,24
  271:23 274:21 276:2,
  4,12 278:16 283:11,
  15 284:7,18 285:14
  287:1,9 289:1 291:2
  294:15,16
reviewed  14:25 15:4,8
  30:7,9 41:7 43:14
  45:2 55:19 57:21
  60:15 63:1,11 66:17
  67:3,17 74:22,25
  129:2 130:20 143:25

146:2,7 169:22 173:9
  198:21 200:3 201:1,
  3,25 205:11 215:21
  256:20,21 261:5
  272:23 274:19 283:17
  291:20 298:10
reviewer  27:8 143:21
reviewing  16:8 42:8
  43:25 44:1 56:12
  63:12 66:19,23 67:1
  70:7 81:7 83:11,22
  87:12 88:2 101:21,23
  102:3 112:25 136:2
  142:12 156:19 201:7
  218:7 219:3 231:11
  256:14 259:7 268:23
  277:12,14 278:6
  283:5 292:17 294:2,
  12
reviews  26:6,10,24
  27:13,24 53:9 57:17
  62:21 65:7 66:14
  82:17 84:17 114:6
  149:7 187:4 196:17
  197:21 198:17 200:4
  201:11 204:3 206:25
  208:1 217:18 243:23
  250:8 259:5 266:9
  275:16 282:22 294:19
  296:3
revised  13:11
revisited  174:17
revolve  134:24
Riemer  65:11 77:2
rights  146:5,8,9
rigorous  237:23
rise  203:14
risk  154:2,25 155:14,
  17 156:15 157:4,14
  158:1 165:19,21,22,
  24 230:16 232:24
road  150:12
Robin  97:19 238:12
robust  186:16,25
  194:20,23 201:17
  285:6,10
role  22:1,5 25:19
  26:13 27:3 30:20
  31:17,24 32:4,7,8
  33:4 34:10 37:6
  38:10,13,15 39:16
  67:22,23 77:21 79:8,

14 95:9,15 98:14
102:23 103:2 104:24
108:10 109:10 124:5,
8 126:18,23 127:2
132:22 140:11
143:18,20 174:16
177:4 202:16 218:4,7
219:12 220:23
232:11,18 233:10
244:4 246:19 258:11,
12,22 293:5 296:7,9,
12
**roles**   33:11,20 40:8
271:6,8 290:21
**roll-up**   220:21
**room**   10:1 31:2
**rotated**   265:9,16
**roughly**   236:25
**rounds**   264:3,5
**rule**   24:18 29:24
30:5,12,23 31:5,11,
15 34:12,14,19 35:7,
9,14 37:3,8,9 38:21
78:20 106:1 143:20,
25 162:7 177:8,24
254:23
**rule-making**   24:10,21
29:20,22 34:15,16,19
35:5 78:8
**ruled**   140:17
**rules**   38:20
**ruling**   94:16,20 239:7
**run**   63:21
**running**   263:2
**runs**   11:11 27:5
**Ryan**   9:21

S

**sadly**   97:9
**sake**   12:20
**sale**   229:7,15
**Salesforce**   251:8,11
258:19 260:7,8,11,
13,14,18
**sample**   198:1 287:17
**satisfied**   76:1
**scale**   107:24
**schedule**   109:8
**scheduled**   12:17 97:22
176:24

**school**   42:2,4 45:10,
22 50:5 81:24 91:16,
17 92:8,17 93:3
114:23 145:11,20,21
146:9,10,11,22
147:2,14,20,24
164:10 190:5 193:25
194:2,6,8,9,21
202:22 203:13,15
206:11,14 208:21
209:4 212:6 217:25
220:18,19 226:1,22
227:9,17 228:5
245:25 246:1,17,24
248:6,25 249:4 257:8
265:19 267:14 268:8
280:22 281:3
**school's**   146:14,18
247:22
**schools**   45:12 71:15
72:13 91:8 95:1
116:7,21 139:10
141:2 144:15,24
145:3 150:16 170:25
172:13 192:18 199:22
200:22 202:20 216:2
218:12 220:4,9,12,15
221:20,22,25 222:1,
3,5,21 223:21 225:2,
3,5,8,14,18,20,24
226:5,7,10,14,24
227:1,2,4,10,24
244:20,25 245:3,11,
21 246:2,7 247:15,
16,19 252:3,5,11,13
295:20
**scientifically**   237:23
**scientist**   70:2
**scope**   25:4 34:3,21
51:9 112:6 120:16
121:4 133:20 135:17,
19 142:24 150:7,10
154:12,22 166:2
167:7 221:1,10
222:13 229:21 231:1
232:4 247:1 256:6
258:2 265:22 268:12
274:1 293:9,14
**scorecard**   164:9,14,
22,24 224:21,25
**screens**   63:20
**scroll**   53:8 75:25
114:11 160:18 199:4

203:22 217:3 275:7
281:1 290:19
**scrolled**   198:8 265:8
**scrolling**   144:20
199:24
**scrolls**   160:20
**search**   288:15
**seat**   181:7
**secondary**   26:23 27:8
**secretary**   19:23,24
20:7 21:5,14 22:8,
12,19,20,22 23:3,7,
9,24 24:8,19,24
25:7,20 26:21,22,25
27:1 32:5,7,23 54:6
58:2 60:17 63:8 84:5
93:23 98:7 128:5
129:15 130:21 133:12
150:14 160:25 168:6
181:6 186:3 202:9,11
234:18 236:4 239:21
257:6 269:13 272:1,5
273:7 294:22 295:19,
21
**secretary's**   22:18
26:1 39:4 136:4
160:8 231:13 292:19
**section**   161:16 164:4,
12 282:1
**sections**   248:11
277:15
**security**   93:25 94:9,
12 98:22 99:2,6
133:3 172:6,7,14,20
173:17 255:10 260:25
270:20
**seek**   278:9
**seeking**   237:2
**selectivity**   252:13
**semesters**   252:8
**semi-autonomous**
105:17 108:6
**send**   127:14 175:16
179:7,17,23 182:19
187:6,12 191:2 192:7
194:7 220:12 221:9
227:18 285:17 288:23
**sending**   175:21 179:8
188:20 220:17 228:11
**senior**   32:23 33:13,
16,17 107:24 182:25

sense  19:11,20 25:6,
  18 26:3 29:16 42:24
  273:16 293:2 295:13
sentence  50:7,14
  103:13 104:14 149:2
  156:13 161:6 162:23
  163:14,22 165:6
  166:7 167:5 187:2
  189:10 190:7
sentences  49:19 51:5
sep-  102:22
separate  12:10 27:23
  61:16 102:22 119:11
  125:18 129:7 180:14
  191:3,4 271:20
separated  110:21
  248:7
separating  59:22
separation  105:20
September  176:25
series  53:23
serve  19:22 27:8
  163:25
served  17:20,25 261:3
  272:11
serves  253:19 255:14
service  35:25 188:13
  259:21
servicer  187:6,8,15,
  16,21 188:16 189:1,
  2,3,4 190:11
servicers  187:10,11
  188:9,12,23 189:5,9
  285:17
services  39:8 190:10
  252:4,5
serving  32:6
set  43:21 81:9,11
  109:23 110:2,3 192:7
  226:18 262:12
sets  107:7 109:8
  120:6
setting  81:8 95:16
  276:9
settlement  290:5
shakes  221:15
share  83:9 266:13
shared  98:17 227:4
she'd  90:16
shed  256:25 258:14

sheet  67:12
shifted  44:20
shoes  279:16
shoot  73:24
short  64:17 122:11
  181:11 197:24 232:6,
  8 274:5
show  214:16 255:21
  258:5 286:11,14
  290:5
showed  76:25
showing  14:2
side  145:7
sign  22:23 23:24
  24:1,20 53:14,17
  82:10 84:21 85:7,14,
  21 171:2,7 221:5,6
sign-off  202:2
signature  19:5
signed  19:8 25:8
  84:13 235:3,13,19
  272:23 278:1 281:18
  283:24 291:21
signer  26:23 202:8
significant  96:9
  98:10 131:4
significantly  131:12
  240:20
signing  283:25
signs  84:6 85:12
  202:6
similar  57:18 201:24
  240:22 278:2
simplify  155:13
simply  100:18 189:8
  286:24
single  25:7 141:14,18
  155:6 296:3
site  41:24 59:7
  120:11,13,21 253:13
  259:19
situation  11:16
  172:3,10 190:21
situations  189:24
  195:4,6 208:8,12
six-digit  68:5
sixth  144:18
size  131:6
slice  243:20
slide  177:2

slightly  20:21
slow  160:18
small  39:5 143:10
  151:8,9
smart  253:16,23
  255:5,20 256:2 259:4
smartphone  11:23
smartphones  11:19
smoothly  11:11 63:22
social  93:24 94:9,12
  98:21 99:2,5 133:3
  172:6,7,14,19 173:17
  255:10 260:24
sole  77:4 84:21
solely  71:25 72:14
  76:8 103:6 157:21
solicit  246:23
somebody's  135:7
someone's  272:9
sort  89:8 161:21
sound  64:20 127:7
sounded  127:10
sounds  127:6 182:4
source  206:4 215:11
  224:12,16,24 230:23
  268:7
sources  45:16,17
  215:13
speak  67:5 71:19
  141:4 169:18
speaks  151:23
special  161:21,24
  162:3,11,16 271:20
specific  18:6 30:16
  56:19 132:12 168:4
  203:6 211:9 293:9
specifically  63:2
  158:16 228:14 231:25
  275:17 280:7
specifics  214:23
speculate  99:15
  118:12 135:7 140:2
  178:13 210:7,9
speculating  68:12
  104:6
speculation  68:14
  222:23 273:12
speculative  159:8
  184:21,24 212:14,20
  214:11,13 234:9
  235:7 279:24 294:4

speed  30:21 31:1,11
spellings  300:6
spending  64:17
spent  16:6,8 36:11,14
  37:21 38:1
spoke  15:20
spook  179:18
spot  281:20
spotlight  264:13
spreadsheet  259:11,12
  265:9,12
spreadsheets  49:4,7
  176:14
spring  98:5 118:7
  173:20 175:19 178:1
squarely  257:21
staff  22:18 26:2
  27:7,9 30:6 31:3,4
  143:5,6,7,8,9,10,22
  238:13 252:5 292:3,4
standard  44:19,21
  46:19 47:1,4,6,7
  56:15 57:3 67:16,17
  68:7,8 75:24 78:15,
  18,19,21,24 81:20
  86:13,19 87:15,20
  88:19 89:3,9,13,20
  90:15,16,19,23,24
  91:4,7,8,14 92:7,8,
  12,15 100:2,4 103:23
  104:16,17,21 106:15,
  17 107:1 122:1
  159:23 191:25 192:5,
  25 193:2,4,5,6,9,19
  195:8,10,12,15,20,23
  203:24 204:15 209:22
  210:20,22 211:2,9,
  12,14,16,22 212:1
  213:9 244:18 256:1
  261:2,4,7,11,12,14
  262:4,7,20,21 269:5
  281:22 282:5 283:12,
  23
standards  86:15 89:23
stands  39:24
start  29:18 37:15
  38:16 87:12 90:7
  98:2,18 101:4,8
  130:9 131:13 207:14
  274:24
started  25:15 31:24
  32:1 33:7 46:5 50:23

127:7 133:7,8 134:17
  227:18 245:8 246:5
starting  163:15
  229:24 245:6 246:9
starts  153:24 197:11
state  10:13 41:13
  44:19 45:14 46:18
  47:1,2,5 60:13 62:19
  65:4,22 85:4 86:13,
  15,19 87:15,20 88:19
  89:3,9,13,20,23
  90:12,15,16,19,23,24
  91:4,6,8,14 92:7,13,
  15 100:2,4 106:15,
  17,19,21,22,25
  147:9,12 182:7
  185:19 191:25 192:3,
  25 193:4,9,19 195:8,
  10,12,15,20,23
  203:15,19,24 204:6,
  14,17,21 205:3,10
  208:3,7,8,21 209:1,
  8,19,21 210:20
  211:1,9,11,14,25
  212:7,9,10,12 213:8
  214:6,10 215:2,7,9,
  11 216:7 234:12
  250:2 256:1 261:11,
  14 262:21 281:22
  282:5 283:12,23
  287:6 295:21 298:24
stated  116:6 189:8
  214:15 241:6,7
statement  9:22 45:1
  47:11 84:25 85:3
  92:23 107:14 157:14
  158:1 162:18 195:2,3
  212:8 213:8 240:25
statements  49:12
  150:21 250:16
states  86:16 88:22
  89:24 90:5,9 186:14
statistical  97:15
statistics  220:4
status  296:24
statute  21:1 147:8,11
  163:18
stay  236:20 300:5
stem  114:23
step  73:6,7 75:19
  76:2,8,14,16,19,21
  77:15,17,20 78:4

79:4,14,16 80:9,11
  81:13,15 82:11 96:25
  99:18,22 100:7
  101:24 102:3,4,12,
  13,21 104:25 106:14
  108:24,25 109:11,12
  110:1 116:23,24
  117:2,3,4,6 118:3
  119:4,8,9,19 129:5
  141:17 170:13 183:25
  242:12,13,14,15
  243:1 248:7,22
  299:23
step-one  72:25 75:13
  76:4 78:9 83:18 84:8
  85:7 99:17,24
  100:16,25 102:11
  103:21 104:1,17
  106:8 108:14 116:19
  118:17,24 120:23
  126:20,24 127:3
  129:4 141:14,15
  142:5 170:13,19
  175:11 241:18 242:24
  243:17
step-two  72:25 75:13
  76:4 79:2,3,11 84:8
  95:17 99:9 100:5
  101:1 102:12 116:20
  117:15,19,24 118:20
  120:19,22 121:4,13,
  14 124:1,25 170:23
  183:23 226:10,24
stepped  28:14
steps  75:19 76:16
  138:18
Steve  65:9 77:1
Steven  68:24
stipulation  10:13
stop  116:23 117:2
  149:1
stopped  220:17
  250:18,19,21 272:25
stopping  165:2
story  236:2 256:23
strange  11:8
strategic  134:12,15,
  18,24 135:2
Stratford  235:25
  237:7 239:23
Street  9:17

strictly   270:3
structure   25:19
   108:2,12
student   11:5 20:17,18
   29:13 36:22 37:6
   39:20 56:6 97:10
   101:19 105:8 114:21
   134:11 141:18 187:9
   188:12 191:9 203:4
   210:11 215:24 219:4,
   21 231:23 239:15
   241:13 249:3
student's   249:2
student-loan   230:2
students   42:3,5 44:2
   55:8 59:1 65:14
   95:24 117:5 123:4,
   12,14,15,25 124:2,
   14,19,23 132:10
   139:9,16,19 150:15
   163:19 164:18 165:15
   183:20 218:11 249:2
   257:7 295:19 297:12,
   14
subcategories   206:7
subfolders   14:1
subject   44:15 63:8
   66:2 150:16 215:10
   235:14 257:8 295:20
submission   291:2
submissions   145:7
submit   44:2 142:2
   149:13,18 155:18
   175:9 206:9 216:9
   247:17,19 248:21
   266:17,19,21 274:19,
   21,22
submits   146:12
submitted   15:5,9,10
   40:23 45:12 75:21,22
   103:17 125:2 142:4
   194:5 206:12 209:11
   211:17 215:22 216:24
   244:16 266:23,24
   267:13,25 281:15
   298:25
subscription   142:20
subsequent   40:8 100:4
   259:5
subsequently   35:8
subset   23:1 253:7

substance   279:6
substantial   37:20
substantiated   170:2
successful   71:14
   72:12 78:3 103:22
   104:15
successfully   275:25
suffered   152:12,17
sufficient   267:9
suggest   122:11 255:18
   288:25
suggested   116:22
suggestions   260:22
suit   291:4
Summary   144:8
summer   32:16 176:9
superseded   58:12
   60:21
supervise   56:23 99:14
   115:25
supervision   28:23
   104:5
supervisor   20:6 28:13
supplies   267:8
support   9:16,22 50:2
   148:17 215:23 274:23
supported   75:21
supporting   50:5
suppose   25:24,25 44:2
   55:21 109:6 233:3
supposed   45:19 195:25
surprise   214:8,20
surprised   139:13,17
   214:14 287:9
suspect   228:4,9,10,22
Sweet   9:13
Sweet's   217:15
sworn   10:6,24
system   176:13 194:14
   215:24 251:8 253:18
   255:13 257:19
   260:18,20 261:19,21
   262:19 271:3
systems   49:2 176:9,16
   187:19 190:11
   257:12,14,16,23
   260:8 270:18,19,22

                T

table   130:2 181:7
   226:17,19 227:19
   243:21 265:13,14
   280:19 298:15
tables   121:20,22,25
   122:2 222:7,10
   224:1,3 225:7,17,19
   227:3 228:5
tabs   177:5
tailored   11:16
takes   189:10 222:12
   246:18
taking   30:24 42:19
   100:2 102:18
talk   14:22 49:10 60:1
   110:24 113:16 136:6
   196:20 197:7 198:14
talked   73:7 104:20
   126:22,24 132:16,17
   158:17 221:8 258:10
   291:19 293:4,6,19
   299:8
talking   13:4 24:9,11
   38:13 44:5 46:1
   49:20 70:4,10 93:17
   99:8 113:25 128:8,9
   161:4 164:13,23
   165:11 168:5 169:13
   180:6 189:8 197:6
   198:13 208:2 211:7
   225:6 239:17 254:24
   287:5 292:13
talks   43:8 161:23
   168:10
tally   168:11
target   154:4 158:3
tasked   22:14 95:15
   121:15
taxpayer   230:21,24
teacher   159:14,18,19
team   29:17 31:1 67:7
   80:20 82:21 83:11
   85:15 89:17 97:8
   112:14,24 115:16,20
   119:8,25 121:19,21,
   25 129:18 131:6,11
   133:7,8 143:3,4
   169:21 171:5 206:18
   222:9 224:2 237:21

238:19,21 261:19
268:16 296:2,3,4
**team's** 260:18
**teams** 121:23 239:20
240:5
**Tech** 83:12 90:7
**technical** 20:12 263:4
**technically** 28:12
46:6 54:24
**technician** 9:16
**technology** 25:11
70:17
**Ted** 54:6 58:2 60:17
**teenager** 17:23
**telling** 159:24 223:25
295:12
**tells** 159:17
**temp-** 212:2
**template** 187:14,25
188:3 193:16 200:9
201:2 204:7,8,16,18
205:1,7,8 207:25
208:19,23 210:14,17
211:8 212:2,22,23
214:2,25 218:10
275:9 282:11,12,13
283:2,17,25 284:17
285:8,18
**templates** 202:2
207:11 218:8 285:11
**temporary** 263:5
**ten** 36:11 111:11
**ten-page** 239:11
**tenure** 26:19 40:7,12
44:11 156:3 223:8
228:8 296:21,22
**term** 53:22 70:8,11,12
101:10 102:6,9
230:18
**terminology** 53:15
102:1,2 169:23,25
203:6 239:5
**terms** 24:25 53:18
73:11 206:8 247:5
279:2,6 299:21
**test** 242:2,8,19
**testified** 10:24
117:18 124:10 137:3,
8 222:19 223:10
281:24 283:22

**testify** 137:11 298:16
**testimony** 10:7 55:22
56:6 112:5 113:10
139:11 158:19 182:12
297:17 300:12
**text** 208:18 278:2
283:5,10 284:21
287:3,9,18 288:3
**theoretical** 267:19
**thereof** 131:25 299:10
**Theresa** 9:13
**thing** 46:4 98:20
131:17 201:23 205:16
206:14
**things** 11:14 127:7
128:7 171:23 182:7
248:10 251:22 255:1
264:22
**thinking** 98:19 181:14
**thinks** 294:9
**thought** 126:1 153:5
180:20 251:25 278:16
**thoughts** 126:9 153:9
284:2
**thousands** 214:9
287:10
**three-page** 14:6
**threshold** 213:16,17
215:15
**tied** 295:3
**time** 9:12,13,20 12:21
16:5,8,9,10,21
26:13,19 28:21 31:10
32:17 33:15 36:13
37:22,25 38:8 40:23
43:17 44:5,7,9 46:10
47:24 48:2 50:19,20,
25 51:4,14,20,21,24
52:10 58:18,24 61:10
64:6,18 65:12 66:22
69:13,17 89:21 94:3,
8 98:17,18 100:3
114:8,12,13 116:14
117:17 118:1,5,7,16
122:17,22 124:7,9
126:10 129:10
130:13,14 131:12,22
132:1,5 133:10
136:11,15 138:9
141:25 148:4,5 152:5
156:2 160:9 164:3
172:4,16,24 173:3,25

174:17 175:8 177:7,
9,13,21 178:5
185:13,17 186:9
188:16 189:13
190:17,19 199:14,15
221:24 222:8,12
228:24 229:3,6 238:5
240:7 243:22 246:16,
23 252:7 263:6
267:15 274:5,8,12,13
284:2 289:20 299:11
300:11
**timeline** 16:23 30:18
35:12 38:22 44:5
64:15 88:16 224:20
238:8 291:2
**timelines** 38:10,19
**times** 17:17 43:21
44:1,3 65:24 130:2
273:17
**timing** 183:12 228:2
**tiny** 39:5
**title** 19:15 33:19
39:18 40:2 48:18
66:16 230:1
**titled** 52:13
**today** 9:11 11:6,21
12:7,16,25 14:10,24
15:11,13,14,15,23
17:6 26:14 70:19
73:1,11 115:19
142:15 158:19 207:9
234:8,17 236:13
244:15 258:10 263:7
271:14 273:17 281:25
285:14,19 286:20
290:17 293:4 299:5,9
**today's** 15:20 16:6
74:23 142:13 300:12
**told** 40:20,24 41:1,
10,24 51:1 59:12
64:2,3,13 71:20
83:12,14 90:6 98:21
104:4 115:23 116:24
120:12 125:12,15
128:14 137:22
159:17,21 185:3,5
212:12 238:2 259:4
285:23
**tool** 250:5,10,15,18,
19,21 253:13,16
254:25 255:5 256:2,
4,8 258:15,23 259:9,

11,22,25 260:16
261:25 262:5,24
263:1,3 264:2,3
top  36:9,20 52:20
74:14 113:19 114:18
188:7 216:12 239:10,
12 252:16,18
topic  22:25 25:11
158:15 231:20 244:14
256:7,13,17 274:16
291:18 292:9,16
296:8,13
topics  135:21 136:1
222:17 257:10 290:25
291:17 293:10,20
total  76:11 101:9
130:14 132:2
totally  63:21 113:3
180:14
touched  244:14
track  49:2
trained  56:13 272:17
training  53:16 70:2
272:19
transcript  13:17
18:14 48:10 53:4
57:13 60:9 62:15
65:2 66:11 111:20
112:2 185:25 186:6
196:13 216:18 217:11
230:6 233:18 249:20
263:25 290:3
transcripts  50:6
transfer  58:8 65:16
triggered  98:25
TRIO  39:20
trouble  73:22
true  92:9 205:6
226:15 233:3 241:8
271:24 292:6
Trump  41:18 43:18
230:1
trust  80:25
truthful  12:25
turn  63:14 69:20
264:11
Twenty-six  186:11
two-part  241:23
242:2,8,19
two-step  147:16
242:10 247:25 248:17

twofold  108:16 130:25
type  136:22 205:8
287:18
typed  136:23,25
typical  58:4 285:24
286:9

---

## U

U.S.  9:16,21 32:24
Uh-huh  29:4 58:10
63:10 93:16 144:13
161:5 169:4 174:20
185:9 203:17 236:22
245:2 275:10
ultimately  20:7 28:17
33:17 38:5 39:8,12
44:11 72:8 77:8
78:23 82:15 130:4
141:5 224:17 297:4
umbrella  23:5
unavailable  176:17
unclear  171:7
under-  76:18
underlying  295:23
undersecretary  26:20
27:4,12
understand  36:11
40:12 41:18,20 44:4
49:3 63:21 66:25
70:13 71:22 72:7
86:16 91:11 102:2
104:23 105:22 106:12
115:12 116:18 120:18
138:1,3 147:6,8
148:20 150:2,11,17
151:13 157:2 158:23
159:1 166:20 169:9
178:3 181:9 182:6
184:16 189:14 191:7
206:1 208:12 215:6
220:13 221:4,9
222:17 225:16 240:23
242:20 251:21 256:23
260:14 271:10 293:12
296:20
understanding  36:25
40:16 42:11,13,23
45:3,5,22 46:11
47:15,17,25 48:4,5
49:5,8,11 52:4,7
55:15 56:24 58:15

59:10 60:23 61:3,11
62:2,4 77:25 81:8
84:20 85:8,18 88:18,
21 89:24 90:4,8,15,
17 92:10,16 94:2,6,
10,13 98:23 106:7,23
108:11 116:2 123:10
130:21 140:10,12,14,
16 146:13,14 150:13
162:13 174:22 182:7,
17 183:10 187:16,18,
21 188:22 201:13
205:2,5,12,20 239:2
241:21 248:12,14,15,
19 257:15 259:8
260:6,12 261:17
263:4 264:21 266:11,
14 268:18,21 273:20
274:17,20 275:1,23
284:17 293:2 295:6,8
understands  81:1
understood  47:14
70:15 138:5 154:17
undertaken  96:8
underway  29:22
unfounded  148:23
unit  54:5,17 55:11
56:25 58:1 60:16
66:16 67:2,19,24
68:14,16 78:6 80:14
104:5 105:11,17
106:5 109:18,24
119:18,21 125:4
138:22 159:11,16
162:5 169:21 226:4
239:2 245:8 246:5
260:9 271:20,21,22,
25 279:14
unit's  176:14
Universities  28:12
university  27:6
36:14,15 265:20
unnecessary  209:20
unprocessed  113:24
unredacted  84:15
unsubstantiated
154:3,7,25 155:15
156:15 157:4,15
158:2,15,22 159:6
unusual  210:25
up-to-date  134:19

update 129:10 168:10
updated 133:12
updates 35:6 101:4
   128:6,16,18,20,24
   130:8,13,14 131:25
   132:1,3,7,12,15
   188:11
updating 35:12
Urban 33:5
usual 211:3
UTC 9:12 69:13,17
   122:17,22 136:11,15
   185:13,17 228:24
   229:3 274:8,12
   300:11

**V**

vague 119:6 124:20
vaguely 161:20
valid 175:4,5,9,10
   252:19
valuation 229:12,15,
   16 230:13,14,17
   231:5,18 232:13
variety 56:9
verbally 10:6
verbatim 237:1
versa 231:18
version 198:19 200:8,
   15
versus 9:14 78:17
   81:19,24 106:4
   125:19 203:4
vice 33:13,14,16,17
   231:18
video 9:10,16 300:8
view 45:9 115:14
   165:25 210:24 242:21
   272:4 273:9 294:15,
   23
viewed 131:10
views 154:16 166:3
violated 180:13
violating 140:20
violation 47:2 93:25
   94:11 117:11 133:4
   137:24 138:25
   140:18,23
visible 48:15

vital 189:15
voluntarily 217:24
   218:19
voluntary 218:17
   220:22 265:6

**W**

wages 240:21
wait 133:1 140:8
waiting 96:6 133:5
   140:22 173:15 177:8,
   13 179:15 180:10
waive 10:10
walk 145:10,13,18
wanted 14:22 83:25
   86:24 123:14 128:5,
   15 131:2,14 137:15,
   16 179:6 299:8 300:5
wanting 183:17
warehouse 130:4,7
water 12:18
ways 259:20 263:15,
   16,17
Web 41:24 59:7
   120:11,13,21 250:5,
   10,15 253:12,13
   256:4,8 258:15
   259:8,11,18 260:5
weedy 193:25
weekend 300:14
weekly 129:20,22
weeks 233:24 298:25
weigh 105:24 270:5,8
Westlaw 142:20
whatsoever 96:2
whistleblower 250:14
White 28:11,22
whoops 177:20
windows 123:12
wishes 274:18
witness' 293:13
wondering 15:20 23:15
   34:10 127:1 146:20
   166:13 209:17 229:5
   235:22 269:15
word 54:14,15 70:3
   89:1 146:1,6 159:7
   230:15

words 59:16 73:1,2
   82:4 106:11 137:10
   169:13 172:21 243:6,
   7 252:10 282:3,6,8
   294:10
work 11:12 17:13
   29:16 30:1 51:2
   56:19 63:20 67:11
   86:17 89:23 122:1,5,
   9,10 173:10 187:18
   188:9 219:14 259:23
   270:22 283:8 293:3
worked 29:10 36:13
   40:21 112:24 149:12
   219:15
workflow 120:19
working 32:1 33:6
   35:18,20 36:12,13,15
   97:17 119:3 120:2
   127:18 133:9 149:13
   177:14 186:15,24
   189:18 190:9 221:17
   258:24 285:5
workload 28:13
works 39:8 120:12
   218:14 220:13 256:2
   262:24 292:2
world 179:3,5 267:19
wrap 258:5
write 18:18,24 30:15
   37:17 40:13 87:21
   93:21 143:22 177:2
   186:23 205:3 284:21
   285:4
writes 235:25
writing 18:22 143:16
written 54:5 60:20,22
   89:15 92:25 103:25
   129:23 157:6 166:21
   209:13 239:17
wrong 53:14 110:25
   144:17 178:21,24
   182:5 183:17 186:18
   230:15,18 280:4,6
   287:21
wrongdoing 265:4
wrote 31:5 76:22 94:3
   142:19,23 143:3
   199:16 215:4 280:16

## Y

**year**  26:14 88:10
173:5 199:15 246:12,
14 259:18
**years**  17:21 26:15
36:12,14
**York**  9:17,18 65:24

## Z

**zip**  13:22,25 52:12,13

```
 1      I have read the foregoing transcript of

 2   my deposition given on November 20, 2020, and

 3   it is true, correct and complete, to the best

 4   of my knowledge, recollection and belief,

 5   except for the corrections noted hereon

 6   and/or list of corrections, if any, attached

 7   on a separate sheet herewith.

 8       I used the editing tools available in Adobe (including highlighting, comment
         bubbles and strike outs) to note corrections on the transcript itself.
 9

10

11                            Diane Auer Jones

12       _____

13            DIANE AUER JONES

14            December 24, 2020

15

16

17       Subscribed and sworn to

18       before me this _____ day

19       of _____, 2020.

20

21

22       _____

23       Notary Public

24

25
```

1

2                    E R R A T A   S H E E T

3          I, DIANE AUER JONES, do hereby certify that I

4     have read the foregoing transcript of my testimony, and

5     further certify that it is a true and accurate record

6     of my testimony (with the exception of the corrections

7     listed below).

8     PAGE   LINE    CORRECTION
                          SEE CORRECTIONS ON TRANSCRIPT
9     _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24
      12/24/2020                 Diane Auer Jones
25    Date                       DIANE AUER JONES

Page: 16

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:16:04 AM -05'00' |

Borrower Defense

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:15:48 AM -05'00' |

Borrower Defense

Page: 20

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 7:57:53 AM -05'00' |
|---|---|---|---|---|
| | my office | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:16:55 AM -05'00' |
|---|---|---|---|---|
| | my office | | | |

| | Number: 3 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 12:53:44 PM -05'00' |
|---|---|---|---|---|
| | oversee | | | |

| | Number: 4 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:17:30 AM -05'00' |
|---|---|---|---|---|
| | oversee | | | |

Page: 22

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 12:55:43 PM -05'00' |

Counselor to

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:17:46 AM -05'00' |

counselor to

Page: 24

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 7:59:47 AM -05'00' |
|---|---|---|---|---|

a negotiated

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:18:07 AM -05'00' |
|---|---|---|---|---|

a negotiated

Page: 25

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 12:58:48 PM -05'00' |
methodology

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:18:18 AM -05'00' |
methodology

Page: 26

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:00:24 AM -05'00' |

my performance review

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:18:34 AM -05'00' |

my performance review

Page: 30

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:00:55 AM -05'00' |
do

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:19:09 AM -05'00' |
do

Page: 31

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:01:59 AM -05'00' |
NPRM

| Number: 2 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:02:29 AM -05'00' |
led

| Number: 3 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:19:51 AM -05'00' |
NPRM

| Number: 4 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:02:53 AM -05'00' |
NPRM

| Number: 5 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:20:03 AM -05'00' |
NPRM

Page: 33

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:20:34 AM -05'00' |
|---|---|---|---|---|
| | that was | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:21:00 AM -05'00' |
|---|---|---|---|---|
| | that was | | | |

Page: 36

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:22:03 AM -05'00' |

spent time working

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:22:23 AM -05'00' |

spent time working

Page: 43

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:04:30 AM -05'00' |
prior

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:22:44 AM -05'00' |
prior

Page: 49

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/21/2020 1:29:35 PM -05'00'
finding

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:23:08 AM -05'00'
finding

Page: 76

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:44:00 PM -05'00' |
2017

| T | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:23:23 AM -05'00' |
2017

| | Number: 3 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:44:15 PM -05'00' |
limited

| T | Number: 4 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:23:58 AM -05'00' |
limited

Page: 89

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 1:51:28 PM -05'00' |

that

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out  Date: 12/21/2020 1:51:34 PM -05'00' |

Page: 116

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:32:06 PM -05'00' |

stopped

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:24:30 AM -05'00' |

stopped

Page: 121

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/23/2020 8:05:05 AM -05'00'
ensure the accuracy of

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:24:53 AM -05'00'
ensure the accuracy of

Page: 127

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:40:31 PM -05'00' |
|---|---|---|---|---|
| | pace | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:25:05 AM -05'00' |
|---|---|---|---|---|
| | pace | | | |

Page: 128

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:41:19 PM -05'00' |
|---|---|---|---|

we

| Number: 2 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 6:42:00 PM -05'00' |
|---|---|---|---|

for

| Number: 3 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:26:21 AM -05'00' |
|---|---|---|---|

for

Page: 134

| T | Number: 1    Author: Diane.Jones    Subject: Highlight    Date: 12/21/2020 6:46:26 PM -05'00' |
|---|---|

resolve

Page: 146

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/23/2020 8:29:05 AM -05'00'
evidence

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:11:22 AM -05'00'
evidence

Page: 147

| | | | |
|---|---|---|---|
| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:12:03 AM -05'00' |

statutes of

Page: 169

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:07:34 PM -05'00' |
get

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:13:00 AM -05'00' |
get

Page: 184

Number: 1        Author: Diane.Jones        Subject: Sticky Note        Date: 12/23/2020 8:29:48 AM -05'00'
know

Number: 2        Author: Diane.Jones        Subject: Highlight   Date: 12/23/2020 8:13:34 AM -05'00'
know

Page: 187

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:30:37 AM -05'00' |

it for

Page: 190

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:30:49 AM -05'00' |
|---|---|---|---|---|
set

| | Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:31:01 AM -05'00' |
|---|---|---|---|---|
set

Page: 193

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:21:17 PM -05'00' |
letter

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:31:19 AM -05'00' |
letter

Page: 199

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:24:57 PM -05'00' |
|---|---|---|---|---|
clear

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:39 PM -05'00' |

| | Number: 3 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:30 PM -05'00' |

| | Number: 4 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:24:46 PM -05'00' |

Page: 223

Number: 1          Author: Diane.Jones          Subject: Sticky Note          Date: 12/21/2020 7:36:30 PM -05'00'
decision

Number: 2          Author: Diane.Jones          Subject: Highlight   Date: 12/23/2020 8:31:57 AM -05'00'
decision

Page: 224

| | Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:37:16 PM -05'00' |
|---|---|---|---|---|
| | Department | | | |

| | Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:37:06 PM -05'00' |
|---|---|---|---|---|

Page: 239

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:43:30 PM -05'00' |
| include | | | |

| Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:43:18 PM -05'00' |

Page: 255

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/21/2020 7:51:13 PM -05'00' |

2016

| Number: 2 | Author: Diane.Jones | Subject: Cross-Out | Date: 12/21/2020 7:51:01 PM -05'00' |

Page: 267

| Number: 1 | Author: Diane.Jones | Subject: Sticky Note | Date: 12/23/2020 8:39:04 AM -05'00' |
but

| Number: 2 | Author: Diane.Jones | Subject: Highlight | Date: 12/23/2020 8:38:51 AM -05'00' |
but