**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 3 – James Manning**

Page 1

1                    - JAMES MANNING -

2    UNITED STATES DISTRICT COURT

3    NORTHERN DISTRICT OF CALIFORNIA

4    -------------------------------- X

5    THERESA SWEET, et al., on behalf

6    of themselves and all others

7    similarly situated,

8                    Plaintiffs,

9    vs.

10   ELISABETH DEVOS, in her official

11   capacity as Secretary of the

12   United States Department of

13   Education, et al.

14                   Defendants.

15   -------------------------------- X

16

17   DATE:  December 17, 2020

18   TIME:  9:36 a.m.

19

20            VIDEOTAPED VIDEOCONFERENCE DEPOSITION

21   OF JAMES MANNING, pursuant to Agreement, before

22   Hope Menaker, a Shorthand Reporter and Notary

23   Public of the State of New York.

24

25

Page 2

- JAMES MANNING -

1
2     A P P E A R A N C E S
3
4     LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
5     Attorneys for the Plaintiffs
6         122 Boylston Street
7         Jamaica Plain, Massachusetts 02130
8     BY:  TOBY R. MERRILL, ESQ. (Via Zoom)
9         EILEEN CONNOR, ESQ. (Via Zoom)
10        MARGARET O'GRADY, ESQ. (Via Zoom)
11        (617) 390-3003
12        tmerrill@law.harvard.edu
13        econnor@law.harvard.edu
14        mogrady@law.harvard.edu
15
16            - and -
17
18    HOUSING & ECONOMIC RIGHTS ADVOCATES
19        3950 Broadway, Suite 200
20        Oakland, California 94611
21    BY:  JOSEPH JARAMILLO, ESQ. (Via Zoom)
22        CLAIRE TORCHIANA, ESQ. (Via Zoom)
23        (510)271-8443
24        jjaramillo@heraca.org.
25        ctorchiana@heraca.org.

Page 4

- JAMES MANNING -

1
2         IT IS HEREBY STIPULATED AND AGREED by
3     and among the attorneys for the respective parties
4     hereto, that the sealing and filing of the within
5     deposition be waived.
6
7         IT IS FURTHER STIPULATED AND AGREED
8     that all objections, except as to the form, are
9     reserved to the time of trial.
10
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within examination and any corrections
13    thereto may be signed before any Notary Public
14    with the same force and effect as if signed and
15    sworn to before this Court.
16
17
18
19
20
21
22
23
24            -o0o-
25

Page 3

- JAMES MANNING -

1
2     A P P E A R A N C E S
3
4     U.S. DEPARTMENT OF JUSTICE
5     Attorneys for Defendants
6         Civil Division, Federal Programs Branch
7         1100 L Street, Northeast
8         Washington, D.C.  20530
9     BY:  R. CHARLIE MERRITT, ESQ. (Via Zoom)
10        KEVIN P. HANCOCK, ESQ. (Via Zoom)
11        (202) 307-0342
12        robert.c.merritt@usdoj.gov
13        kevin.p.hancock@usdoj.gov
14
15
16    ALSO PRESENT:  (Via Zoom)
17
18        JOSEPH RAGUSO - Videographer
19
20
21
22
23
24
25

Page 5

- JAMES MANNING -

1
2         THE VIDEOGRAPHER:  We are now on the
3     record.  Participants should be aware that
4     this proceeding is being recorded and that as
5     such, all conversations held will be recorded
6     unless there is a request and agreement to go
7     off the record.  Private conversations and/or
8     attorney-client interactions should be held
9     outside the presence of the remote interface.
10        This is Media Unit 1 of the
11    video-recorded deposition of James Manning
12    being taken by counsel.
13        Today is Thursday, December 17, 2020.
14    The time now is 14:36 in the UTC time code.
15    We're here in the matter of Theresa Sweet
16    versus Elisabeth DeVos.
17        My name is Joe Raguso, remote video
18    technician on behalf of U.S. Legal Support
19    located at 90 Broad Street, New York, New
20    York and I'm not related to any party in this
21    action nor am I financially interested in the
22    outcome.
23        At this time will the reporter, Hope
24    Menaker, on behalf of U.S. Legal Support
25    please enter the statement for remote

Page 6

```
1              - JAMES MANNING -
2   proceedings into the record.
3              THE REPORTER:  The attorneys
4   participating in this deposition acknowledge
5   that I am not physically present in the
6   deposition room and that I will be reporting
7   this deposition remotely.  They further
8   acknowledge that in lieu of an oath
9   administered in person, the witness will
10  verbally declare his testimony in this matter
11  is under penalty of perjury.  The parties and
12  their counsel consent to this arrangement and
13  waive any objections to this manner of
14  reporting.  Please indicate your agreement by
15  stating your name and your agreement on the
16  record.
17             MR. JARAMILLO:  This is Joseph
18  Jaramillo for plaintiffs and I agree.
19             MR. MERRITT:  This is Charlie
20  Merritt, the defense agrees.
21             THE VIDEOGRAPHER:  We're now off the
22  record.  The time is 14:38 UTC.
23             (Whereupon a brief recess was taken
24  at this time.)
25             THE REPORTER:  Will the witness
```

Page 7

```
1              - JAMES MANNING -
2   kindly present his government-issued
3   identification by holding it up to the camera
4   for verification.
5              (Verified.)
6              THE VIDEOGRAPHER:  We are now on the
7   record, the time is 14:38 UTC.
8              JAMES MANNING, called as a witness,
9   having been duly sworn on December 17, 2020,
10  by a Notary Public, was examined and
11  testified as follows:
12                 2001 Pennsylvania Avenue NW
13                 Washington D.C. 20006
14                 (Business)
15
16  EXAMINATION BY MR. JARAMILLO:
17      Q.     Good morning, Mr. Manning.  My name
18  is Joseph Jaramillo and I'm one of the attorneys
19  for the plaintiffs in this case.
20             Can you please state your name for
21  the record?
22      A.     James Manning.
23      Q.     Mr. Manning, thank you for making
24  yourself available today and we appreciate you
25  voluntarily appearing to serve as a witness in
```

Page 8

```
1              - JAMES MANNING -
2   this case.
3              I wanted to go over a few of the
4   ground rules for the deposition, particularly
5   since we're doing this over Zoom.  So, first of
6   all, I wanted to confirm there's no one else in
7   the room with you at this point.
8       A.     There's no one else in the room with
9   me.
10      Q.     And can I have your agreement not to
11  communicate with anyone else while we're on the
12  record in the deposition through electronic device
13  or otherwise?
14      A.     Yes.  I'm assuming that means if I
15  need to go off to ask counsel a question, that's
16  permissible; isn't it?
17      Q.     Yes.  Off -- off the record
18  when -- when we're not doing questions and
19  answers, you can speak with your counsel.
20      A.     Okay.
21      Q.     And can you identify any electronic
22  communication devices in the room such as
23  telephones or things of that nature, iPads?
24      A.     Yes.  I have -- well, I'm working
25  from a small laptop and I have two telephones,
```

Page 9

```
1              - JAMES MANNING -
2   electronic telephones in the room.
3       Q.     Can you -- can I have your agreement
4   to put those out of reach so that you're not using
5   those during the deposition while we're on the
6   record?
7       A.     Sure.  Let me put them out of reach.
8   They're well out of reach.
9       Q.     Thank you, Mr. Manning.
10      A.     Sure.
11      Q.     Even though we're sitting here in our
12  respective homes or offices, I want to emphasize
13  that the -- the oath that you've taken carries
14  the same weight as if given in a court of law.  Do
15  you understand that?
16      A.     I do.
17      Q.     And the court reporter, Ms. Menaker,
18  is taking down everything we say and it will be
19  produced in a transcript form later and serve as
20  evidence in this case.  For that reason, it's
21  important to give audible answers such as yes or
22  no, rather than nods of the head or uh-huh or
23  uh-uh.  Do you understand that?
24      A.     Yes.
25      Q.     And it's also important that we don't
```

Page 10

- JAMES MANNING -

1   talk over each other so that Ms. Menaker can get a
2   clear record of the questions and answers.  I will
3   do my best not to talk over you and I would ask
4   that you could do your best not to talk over me.
5   Is that acceptable?
6       A.      Yes.
7       Q.      Are you represented by legal counsel
8   today in this deposition?
9       A.      Charlie Merritt, the Department of
10  Justice attorneys that are handling this.
11      Q.      And they represent you in this
12  deposition, correct?
13      A.      My understanding.
14      Q.      Okay.  Now, from time to time Mr.
15  Merritt may object to my questions during the
16  deposition.  I just want to explain that unless he
17  instructs you not to answer the question, even
18  though he has objected you are still under an
19  obligation to answer my question.  Do you
20  understand that?
21      A.      Can you repeat that again so it's
22  clear.
23              MR. JARAMILLO:  Ms. Menaker, can you
24      read back my statement.

Page 11

- JAMES MANNING -

1               (The question requested was read back
2       by the reporter.)
3       A.      Yes.
4       Q.      In -- in other words, it may seem
5   awkward because I'm going to ask you a question
6   and Mr. Merritt may object, but the next step
7   would be for you to still answer the question
8   unless he instructs you not to answer.  Do you
9   understand that?
10      A.      Yes.
11      Q.      Now, this is not an endurance
12  contest.  We can take breaks whenever we want.
13  You can take a break whenever you want.  My only
14  request is that if I have a question pending, that
15  you answer that question before we take the break.
16  Do you understand that?
17      A.      Yes.
18      Q.      Is there any reason why you can't
19  give truthful testimony today?
20      A.      No.
21      Q.      Now, did you receive a package with
22  the -- the documents that we may look at today?
23      A.      I have a package.  I haven't opened
24  it so I assume it's the documents, but I don't

Page 12

- JAMES MANNING -

1   know.
2       Q.      Okay.  Can you open that package,
3   please?
4       A.      Here it is.  Here are the documents.
5       Q.      Great.  Thank you, Mr. Manning.
6               Now, there should be a set of tabbed
7   documents that are tabbed with Numbers 1 through
8   22.  Is that what you see before you?
9       A.      I see Tabs 1 through 22.
10      Q.      So during the course of the
11  deposition, I'm going to ask you to look at some
12  of these documents and I will refer to them by tab
13  numbers.  Do you understand that?
14      A.      Yes, and -- yes.
15      Q.      I'm going to have you look at the
16  document that is marked as Tab 1 and in the
17  electronic files there should simply appear the
18  Number 1 on the PDF file and it would say "Revised
19  Notice of Deposition of James Manning."  Do you
20  see that document?
21      A.      I do.
22      Q.      And have you seen this document
23  before?
24      A.      I don't recall seeing the revised

Page 13

- JAMES MANNING -

1   notice.
2               MS. BERMAN:  Sorry.  Joseph, is there
3       a password for the electronic documents?
4               MR. JARAMILLO:  Marcia, I'm sorry,
5       there is.  I just forwarded it to you.
6               MS. BERMAN:  Okay.  Okay, great.
7       Thanks.
8       Q.      So do you recall seeing a Notice of
9   Deposition of James Manning at some point?
10      A.      Well, no, I guess I don't recall.
11      Q.      Did you ever receive a -- I'm sorry,
12  did I cut you off?
13      A.      This is just a declaration I made
14  previously.
15      Q.      Okay.  So you do not recall seeing a
16  notice of your deposition that's dated the -- the
17  time -- or the time and the date of the
18  deposition?
19      A.      I don't recall that.
20      Q.      And you are voluntarily appearing
21  here today for this deposition, correct?
22      A.      Yes.
23      Q.      Have you ever had your deposition
24  taken before?

Page 14

```
1                    - JAMES MANNING -
2        A.      No.
3        Q.      Have you ever given testimony in
4   court before?
5        A.      Yes.
6        Q.      How many times?
7        A.      Multiple times years ago.
8        Q.      When was the last time that you
9   recall?
10       A.      About 1983.
11       Q.      Do you recall what court the trial
12  took place in?
13       A.      No.
14       Q.      Do you recall the state in which the
15  trial took place?
16       A.      District of Columbia.
17       Q.      What was your role in that case, if
18  any?
19       A.      I'm trying to -- I'm trying to recall
20  the, the -- the particulars.  I can't recall if it
21  was a trial or not.  I, at the time, was serving
22  as special agent at the security service at the
23  State Department.  There was an incident at the
24  State Department that went to court and I went to
25  testify on it; and I don't remember beyond that
```

Page 15

```
1                    - JAMES MANNING -
2   because it was a one-time thing.
3        Q.      And you were -- so you were a witness
4   in that case and you gave testimony?
5        A.      Yes.
6        Q.      Do you recall give -- I'm sorry, go
7   ahead.
8        A.      It wasn't '83.  It was -- it was
9   probably -- '81, '82 probably.
10       Q.      Do you recall giving testimony in any
11  other court cases before that?
12       A.      Yes.  I testified regularly in
13  (unintelligible) District Court in Boston,
14  Massachusetts between 1975 and 1978 when I was a
15  university police officer at Northeastern
16  University.
17       Q.      And before those cases do you recall
18  giving testimony in any court cases, any other
19  court cases?
20       A.      The only other court case that I
21  would have testified in was a civil action where I
22  had a two-family house in Boston and a tenant that
23  didn't want to leave or wasn't paying rent to me.
24  I wanted to remove him from the space.
25       Q.      When was that case, approximately?
```

Page 16

```
1                    - JAMES MANNING -
2        A.      1977, 1978.
3        Q.      And -- and you were a witness in this
4   case?
5        A.      I was the complainant and I
6   testified.
7        Q.      Okay, and what court was that in?
8        A.      West Roxbury District Court, Boston,
9   Massachusetts.
10       Q.      Any other cases that you can recall
11  giving testimony in?
12       A.      No.
13       Q.      What did you do to prepare for
14  today's deposition?
15       A.      I -- I talked to counsel and I
16  revisited my declaration and declarations made by
17  Colleen Nevin and Diane Jones.
18       Q.      How many times did you meet with
19  counsel?
20       A.      A few, like three.  I'm -- I'm not
21  sure how many.
22       Q.      And what are the dates or approximate
23  dates that you met with them?
24       A.      Over the last few days.
25       Q.      About how many hours did you spend
```

Page 17

```
1                    - JAMES MANNING -
2   meeting with them?
3        A.      Oh, I don't recall specifically, but
4   maybe about four.
5        Q.      Four hours total or four hours in
6   each meeting?
7        A.      Total.  Maybe a little more than four
8   total.  No four-hour meeting.
9        Q.      And how did you meet with them; was
10  this in person or via Zoom or by telephone?
11              I'm sorry, can you repeat your
12  answer.
13       A.      I was, you know, just using this same
14  type of system, the Zoom system.
15       Q.      And who were the counsel that you met
16  with over Zoom?
17       A.      Charlie Merritt, Marcia -- I forget
18  Marcia's last name.  Marcia.  I -- I don't recall
19  Marcia's last name.  Call into Charlie.  And Kevin
20  -- and I don't recall his last name either.  He
21  was on the call with Charlie.
22       Q.      Anybody else?
23       A.      Not that I recall, but --
24       Q.      And you said you reviewed your
25  declaration?
```

Page 18

1            - JAMES MANNING -
2      A.    Yes.
3      Q.    When -- when did you give -- when did
4  you -- did you sign that declaration?
5      A.    Yes.
6      Q.    When did you sign it?
7      A.    I don't recall.  I have it here, if
8  you'd like me to pull it out and look at it.
9      Q.    Sure.
10     A.    I signed it on April 12, 2018.
11     Q.    And on the front page of that -- can
12  you just hold up the front page of the declaration
13  to your camera.
14     A.    Of course.  Can you see it?
15     Q.    Yeah.  If you could move it
16  back -- actually, just hold it right there.  Thank
17  you and can you move it back a bit.
18          And how many pages -- you can remove
19  it from the camera now.  How many pages is that
20  declaration?
21     A.    Seven.  There's an exhibit attached
22  to it beyond that.  I said in addition to the
23  declaration, there is an exhibit attached to it.
24     Q.    And what is that exhibit?
25     A.    It looks like it's a -- a

Page 19

1            - JAMES MANNING -
2  press -- press release looks like entitled
3  "Improved Borrower Defense Discharge Process Will
4  Aid Defrauded Borrowers, Protect Taxpayers."  So
5  and this press release was December 20, 2017.
6      Q.    Did you have any involvement in the
7  creation of that press release?
8      A.    No.  It's from the Press Office of
9  the Department of Education.
10     Q.    And what' the title of the press
11  release?
12     A.    "Improved Borrower Defense Discharge
13  Process Will Aid Defrauded Borrowers, Protect
14  Taxpayers."
15     Q.    Did you -- did you, yourself, write
16  the declaration or did someone draft it for you?
17     A.    It was drafted for me.
18     Q.    And who drafted it?
19     A.    I don't know.  Someone in the General
20  Counsel's Office, I believe.
21     Q.    And you reviewed it and signed it
22  attesting to its accuracy?
23     A.    Yes.
24     Q.    And this was in the Calvillo
25  Manriquez versus Secretary DeVos' case?

Page 20

1            - JAMES MANNING -
2      A.    Yes.
3      Q.    Were you involved in discussions with
4  counsel about that case during your tenure at the
5  Department of Education?
6      A.    I expect that I had communications
7  with counsel about the issue.  I don't recall any
8  of them specifically.
9      Q.    Were you involved, in any way, with
10  the preparation or production of monthly reports
11  or any periodic reports associated with that case?
12     A.    I don't recall what the reports
13  associated with the case.
14     Q.    Did you follow any of the legal
15  developments in that case such as Court Orders?
16     A.    Not specifically.
17     Q.    We may have further discussions.  In
18  fact, we will have further discussions about that
19  case later on as it impacts this case, but let's
20  move on to discuss about any other documents -- if
21  you could let me know about any other documents
22  that you've reviewed in preparation for today's
23  deposition.
24     A.    As I said, Diane Jones' declaration I
25  reviewed and Colleen Nevin's declaration I

Page 21

1            - JAMES MANNING -
2  reviewed and the attachments on mine.  I don't
3  recall if there were attachments on the other
4  documents, but whatever was attached to it I
5  looked at.
6      Q.    Any other documents besides those
7  you've listed?
8      A.    Well, I'm just looking at -- there
9  was an Exhibit 2 on my declaration which I also
10  reviewed and it's remarks that I made prior to one
11  of the negotiated rulemaking sessions.
12     Q.    And what was the date of that
13  rulemaking session?
14     A.    Well, looking at the remarks and -- I
15  don't see the date on it, but it was shortly after
16  the 1st of the year.
17     Q.    The 1st of the year 2018?
18     A.    Yes.
19     Q.    And is this a transcript of your
20  remarks?
21     A.    Yes.
22     Q.    And is -- why don't I just -- well,
23  let's do this.  How many pages is that transcript?
24     A.    Six.
25     Q.    And is that transcript an accurate

Page 22

```
1                  - JAMES MANNING -
2    reflection of the remarks you made in January,
3    2018 of the negotiated rulemaking -- negotiate --
4    wait, Negotiated Rulemaking Committee?
5        A.    Yes.
6        Q.    Do any of these documents refresh
7    your recollection of the facts?
8        A.    I'm -- I'm sure they did, but I
9    couldn't say specifically what at this moment.
10       Q.    Other than meetings with your counsel
11   over Zoom-type platform, did you speak with
12   anybody else about your deposition?
13       A.    No.
14       Q.    You didn't speak with anybody
15   currently at the Department of Education other
16   than counsel, legal counsel, about your
17   deposition?
18       A.    I didn't speak to anybody about the
19   deposition.  I had somebody approach me at a
20   reception who said they heard I was going to be
21   doing a deposition.
22       Q.    And who was that?
23       A.    Someone who knew me, but I -- I
24   didn't know, a young woman.  I think she was in
25   the General Counsel's Office, actually.  I don't
```

Page 23

```
1    know her name.
2        Q.    Okay.
3        A.    There was no conversation beyond
4    that.
5        Q.    I'm sorry?
6        A.    I said there was no conversation
7    beyond that.
8        Q.    When was this reception?
9        A.    The day before yesterday.
10       Q.    Where did it take place?
11       A.    In the Barnard Auditorium at the U.S.
12   Department of Education.
13       Q.    How many people were there?
14       A.    Approximately 50.
15       Q.    And what was the occasion for the
16   reception?
17       A.    A holiday reception at the end of
18   an administration.
19       Q.    Was Secretary DeVos there?
20       A.    She stopped by, yes.
21       Q.    Did you speak with her?
22       A.    I did.
23       Q.    Did you speak with her about your
24   deposition?
```

Page 24

```
1                  - JAMES MANNING -
2        A.    No.
3        Q.    Did you speak with her about this
4    case?
5        A.    No.
6        Q.    Did you speak with her about the
7    Calvillo Manriquez case?
8        A.    No.
9        Q.    Did you speak with her about borrower
10   defense?
11       A.    No.
12       Q.    And you didn't speak with anybody
13   else about this case that was at that reception?
14       A.    Nobody else.
15       Q.    Besides the -- the unidentified woman
16   that you mentioned?
17       A.    Yes.
18       Q.    Okay.  Did you review any of the
19   deposition transcripts in this case?
20       A.    No.
21       Q.    Okay.
22       A.    I mean, people that have since
23   been -- been deposed previously up to now, is that
24   what you're saying?
25       Q.    Yes.  There are -- as you may be
```

Page 25

```
1    aware, there are people who have been deposed
2    previously in this case.
3        A.    No, I have not read any of those
4    depositions.
5        Q.    And you -- you did not talk to
6    Colleen Nevin about your deposition today?
7        A.    No, I did not.
8        Q.    You didn't talk to Diane Auer Jones?
9        A.    I did not.
10       Q.    You did not talk to Mark Brown about
11   it?
12       A.    No, I did not.
13       Q.    Mr. Manning, we're going to be
14   discussing a lot, as -- as you may imagine, the
15   borrower defense to Repayment Discharges of
16   federal student loans today.
17       A.    Yes.
18       Q.    I will refer to those in the
19   shorthand as just borrower defense or sometimes
20   even BD.  Will that make sense to you?
21       A.    Yeah, BDTR would make sense to me to.
22       Q.    BDTR meaning Borrower Defense to
23   Repayment?
24       A.    Yes.
```

Page 26

1                    - JAMES MANNING -
2        Q.     Mr. Manning, do you have a LinkedIn
3    profile?
4        A.     I do.
5        Q.     And did you create that profile?
6        A.     Yes.
7        Q.     Did you, yourself, enter the
8    information in that profile?
9        A.     Nobody else that I'm aware of put
10   anything on my profile.
11       Q.     Okay.  I'll just represent to you
12   that I -- I went on LinkedIn and I looked at your
13   profile and there's a feature on LinkedIn to
14   generate the profile in a resume-type format and I
15   did that so that we could go over your career
16   background and experience at the Department of
17   Education today as sort of a guidepost; and so I
18   would like to have you turn to Tab 2 in your stack
19   of documents.
20       A.     Are we done with Tab 1?
21       Q.     Yes, we're done with Tab 1.
22       A.     Okay.
23              MS. BERMAN:  Joseph, I just want
24       to -- excuse me, I just want to note for the
25       record that I'm not able to open the Dropbox

Page 27

1                    - JAMES MANNING -
2    attachments.  I seem to be the only person on
3    our team having trouble with it, but it's
4    not -- it's opening for me.  It's asking me
5    to do all sorts of things like create an
6    account; and I tried to do that, but that
7    didn't even work.
8              MR. JARAMILLO:  Mr. Merritt, can we
9       go off the record for this?
10             MR. MERRITT:  Yes.
11             THE VIDEOGRAPHER:  Going off the
12      record, the time is 15:08 UTC.
13             (Whereupon, a brief discussion was
14      held off record.)
15             THE VIDEOGRAPHER:  We're now on the
16      record, time is 15:11 UTC.
17       Q.     Okay, Mr. Manning, so I'm having you
18   look at Tab 2.
19             MR. JARAMILLO:  And, Ms. Menaker, I
20      would like to have you mark this as --
21      actually, Ms. Menaker, we did not mark the
22      first tab, did we?
23             THE REPORTER:  We did not.
24             MR. JARAMILLO:  Okay.  Can we mark
25      the first tab as Exhibit 31, that would be

Page 28

1                    - JAMES MANNING -
2    the Revised Notice of Deposition of James
3    Manning, and I would like to now mark the
4    second tab in the PDF files for Mr. Manning
5    as Exhibit 32.
6              (Whereupon, Exhibit 31 was marked at
7       this time.)
8              (Whereupon, Exhibit 32 was marked for
9       identification.)
10       Q.     Mr. Manning, have you had a chance to
11   look at the document that is Tab 2 in your
12   package?
13       A.     Well, I -- I started to, but I went
14   back because I had seen the Notice, this -- I was
15   just looking for the first time at the actual
16   Notice of Deposition.
17       Q.     Okay.  So, just for clarity, you were
18   looking at a document outside of the packet that
19   you received?
20       A.     No.  I'm looking at the document that
21   was behind Tab 1.
22       Q.     Okay, and that document is called
23   "Revised Notice of Deposition of James Manning"?
24       A.     Yes, and it's just about, you know,
25   today's date basically.  I think that's being the

Page 29

1                    - JAMES MANNING -
2    deposition there, right.
3        Q.     Did -- had you received that document
4    before you got it in the package today?
5        A.     No.
6        Q.     Okay.  Well, let's move on to Tab 2.
7        A.     Okay.
8        Q.     And please take a moment to look at
9    that and let me know if that accurately reflects
10   the information from your LinkedIn profile?
11             Mr. Manning, I'm sorry to interrupt
12   your review, I know you're looking carefully --
13       A.     I'm -- I'm on the last page.  It's
14   a -- this is --
15       Q.     I'll let you finish up and then we
16   can talk about it.
17       A.     Okay.
18       Q.     Is this an accurate -- was this
19   information on -- on this document as to Exhibit
20   32 reflect your -- the information that you put on
21   your LinkedIn profile?
22       A.     It seems to be from another document
23   rather than what I put in my LinkedIn profile.
24   This looks like a -- a resume that I've used a
25   number of times.  I didn't -- I don't -- I have to

Page 30

- JAMES MANNING -

1    - JAMES MANNING -
2    go back and look -- to look and see this.  See
3    this, I don't know how it was attached in all this
4    detail and things, this type -- I'm not saying
5    it's not there.  I just don't recall posting this
6    there.
7           Q.    Sure, and I'll represent to you that
8    there's a function on LinkedIn that generates this
9    type of resume document from the profile.
10          A.    Oh, I didn't -- if that's generated
11   by LinkedIn, then that's -- that's understandable
12   then, but I did not put this on my LinkedIn.
13          I did not put this -- I did not put
14   this document on LinkedIn.  This is a
15   representation of resume that I have used
16   previously, yes.
17          Q.    But the information contained in this
18   document was information that you input into
19   LinkedIn on your profile?
20          A.    I -- I didn't put all this detail in
21   myself.  You -- you had suggested that there's a
22   -- a way that LinkedIn finds outside documents and
23   attaches them; so I asked you what happened with
24   this.  I did not post all of this on this page.
25          Q.    Okay.

Page 31

1    - JAMES MANNING -
2           A.    But it's a fair representation
3    of -- my career.  It's a -- in normally the way
4    I do things, this is not the same structure, so it
5    gives years of service.  I would have put months.
6    I would have typed particular months in.  There --
7    it's -- it's a close approximation to a resume
8    that I've used.
9           It's not what I attached to LinkedIn.
10   If it's on LinkedIn, I'm going on what you
11   suggested that there's a way that LinkedIn, I
12   guess, captures related information and attaches
13   it somehow.  I'll have to go back and look, but
14   the question -- but that is what's happened.
15          I don't need all of this information
16   on this page, but this is -- this is my
17   experience, yes.
18          Q.    I understand, Mr. Manning.  So this
19   generally reflects your work experience?
20          A.    Yes.
21          Q.    And I noticed when you were reviewing
22   the -- the document, you had a pen in your hand.
23   Did you make any notations on the document?
24          A.    Yes, I -- a few places I noticed
25   where there was no month mentioned, where it just

Page 32

1    - JAMES MANNING -
2    said 2017 to 2017, you know.  I made, you know,
3    notations January '17 to April '17, you know.
4           Q.    Okay.  So would that be on Page 3 of
5    the document?
6           A.    That is Page 3, yeah.
7           Q.    And would that be for the entry for
8    Office of the Secretary of Education, Senior
9    Advisor to the Secretary of Higher Education where
10   it says "2017 to 2017"?
11          A.    Yes.
12          Q.    And you noted the months for that?
13          A.    January to April, yes.
14          Q.    So you were senior advisor to the
15   Secretary of Higher Education from January to
16   April, 2017?
17          A.    Yes.  January 20 -- well, she didn't
18   come onboard until the first week of February.  My
19   appointment was senior advisor to the Secretary
20   and I had January 7th -- 20th 1970 -- 2017.
21          Okay, yes.  This is my title from
22   January of '17 through April, into April of '17,
23   following which I became, you know, the acting
24   under the Secretary which appears earlier on this
25   list.

Page 33

1    - JAMES MANNING -
2           Q.    And that entry appears on Page 2 of 5
3    of the document?
4           A.    Yes.
5           Q.    And did you fill in the months for
6    the -- for that entry for the acting
7    Undersecretary of Education?
8           A.    I did it was from April, 2017 to May
9    of 2018.
10          Q.    And then above that on Page 2 is an
11   entry for Federal Student Aid and Office of the
12   U.S. Department of Education acting chief
13   operating officer.  Are those dates correct;
14   January, 2018 through March, 2019?
15          A.    No, I don't think that's correct.  I
16   don't.
17          Q.    What would you do to correct those
18   dates?
19          A.    I can start by saying I can go back
20   over in my mind, but the timeline on this is not
21   exactly correct.
22          Q.    Okay, and as you sit here today what
23   is your best recollection of your time in the
24   acting chief operating officer position with FSA?
25          A.    Well, I -- I had several different

Page 34

- JAMES MANNING -

1   periods when I was acting chief operating officer.
2   Q.      During the Trump Administration.
3   A.      During the Trump Administration, so I
4   became acting chief. I was -- I was the Secretary
5   from April -- this is -- this is incorrect. I was
6   not nor have I ever claimed to be acting chief
7   operating officer from January -- what a second.
8   I'm -- I'm mistaken.
9              It's out of order. My resume would
10  have reflected this in chronological order.
11  Q.      Just, Mr. Manning, what's your best
12  recollection of when you served as -- as acting
13  chief operating officer for FSA?
14  A.      During the Trump Administration?
15  Q.      Yes.
16  A.      Okay. I started January, 2017 senior
17  advisor, became Undersecretary in April, served to
18  the following May.
19             There -- there was a -- a career
20  staff person as the chief operating officer in
21  January of 2017, James Franzi, who was retained.
22  He stayed with the Department until May of 2017.
23  That he -- he might have left the first few days
24  of June, in that area, and we began a search
25

Page 35

- JAMES MANNING -

1   immediately for a new chief operating officer and
2   Wayne Johnson became the chief operating officer,
3   the permanent chief operating officer, in July
4   2017.
5              He served in that capacity until late
6   January, 2018 when a major initiative at the
7   Department was going on with Federal Student Aid.
8              Next Gen, Next Generation FSA was
9   started under Dr. Johnson's leadership. That was
10  an important enough issue that in late January of
11  '18, he was moved from the COO position and
12  focused hundred percent of his time on the Next
13  Generation FSA initiative, and at that time I
14  became acting COO.
15  Q.      That would have been January, 2018?
16  A.      Yes. The end of January, you know,
17  first part of February.
18  Q.      And how long did you serve in that
19  position?
20  A.      I'm -- that's not entirely correct
21  here.
22  Q.      Why -- why don't we do this, Mr.
23  Manning: I'm -- I'm finding that this -- this
24  LinkedIn document may not me the best way to go
25

Page 36

- JAMES MANNING -

1   through your career history. Let's put it to the
2   side and draw from your memory, which might be
3   more efficient.
4              The question being: Do you know when
5   you stopped serving as the acting COO of FSA
6   during the Trump Administration?
7   A.      I'm going to miss a block, I'm sorry.
8   I have all this written down somewhere else.
9   Q.      That's okay. This is not -- this is
10  not, you know, a -- you know, a -- there's no
11  right or wrong answer. I just want to know your
12  best recollection. It's whatever you can come up
13  with as you sit here today in recollection of when
14  you stopped working as acting COO for FSA in the
15  Trump Administration.
16             MR. MERRITT: And, Joe, I'll let him
17  answer this question, I just want to -- we
18  have been going for about an hour. I was
19  wondering whether we might have a short break
20  after he answers this question or -- or
21  sometime soon.
22             MR. JARAMILLO: Yeah. Let me -- I
23  would like to ask him just a couple of more
24  questions related to this, but if -- if you
25

Page 37

- JAMES MANNING -

1   don't mind it might just take a minute or
2   two.
3              THE WITNESS: Well, at the rate I'm
4   answering this it might take longer than
5   that, I'm sorry to say.
6              MR. JARAMILLO: Okay. Well, let's
7   see how it goes, but I would like to if you
8   don't mind, Mr. Merritt, to just take a
9   couple more questions just to nail down ome
10  of the dates here.
11             MR. MERRITT: Yeah, that's okay with
12  me. I just wanted to put it on the radar.
13  A.      Let me take a couple of minutes here
14  and see I can reconstitute what I knew yesterday.
15  .I've been thrown off by the way this was
16  presented here today.
17             MR. JARAMILLO: Okay, Mr. Manning,
18  why don't we do this; I'm not sure that that
19  Tab 2 document is -- is the best way to do
20  it.
21             If you want to take a break and try
22  to refresh your recollection as well, we can
23  -- we can do that.
24             THE WITNESS: Yes.
25

Page 38

```
1              - JAMES MANNING -
2        MR. JARAMILLO:  So, you know, just to
3   be clear; I'm just trying to get your best
4   recollection of the time periods in which you
5   served in, in -- in roles at the Department
6   of Education during the Trump Administration
7   at this point.
8        And we can discuss that when we come
9   back on the record, so we can go ahead and
10  take -- how long would you like, Mr. Merritt,
11  for the break and, Mr. Manning, five or ten
12  minutes?
13       MR. MERRITT:  I will defer to Mr.
14  Manning.  I was thinking it could be five
15  minutes, but what do you think, Jim?
16       THE WITNESS:  I would say give me ten
17  minutes and I'll have this lined up.
18       MR. MERRITT:  All right.  Let's take
19  ten minutes, if that's okay with you.
20       MR. JARAMILLO:  Okay.
21       THE VIDEOGRAPHER:  We are now off the
22  record.  The time is 15:35 UTC.
23       (Whereupon, a brief discussion was
24  held off record.)
25       THE VIDEOGRAPHER:  We are now on the
```

Page 39

```
1              - JAMES MANNING -
2   record, the time is 15:52 UTC.
3        Q.    Mr. Manning, we were talking about
4   your work history during the Trump Administration
5   in the Department of Education.
6        A.    Right.
7        Q.    And I wanted to see if you have any
8   clarity about your time in the role of -- of
9   acting COO of FSA.
10       A.    Yes.  Yes, working backwards I left
11  the Department March 4th, 2019.  I had been the
12  COO until then and I have become the COO after
13  Wayne Johnson in 2018 took over the Next Gen
14  portfolio.  I became the acting COO in February,
15  2018 and served through the beginning of March,
16  2019.
17       Q.    And just to clarify, when were you in
18  the role as acting Undersecretary of Education
19  during the Trump Administration?
20       A.    I think it began in April of 2017 and
21  I've served through May of 2018.  Diane Jones
22  succeeded me.  Diane I think came in in June, but
23  I -- I had left that office near the end of May.
24  '18.
25       Q.    So between February, 2018 and May,
```

Page 40

```
1              - JAMES MANNING -
2   2018, were you wearing two hats; one as the acting
3   COO of FSA and the other as the acting
4   Undersecretary of the Department of Education?
5        A.    Yes, I wore two hats when those
6   positions -- in the timeline there.
7        Q.    And prior to becoming the acting
8   Undersecretary of Education in April, 2017 you
9   served as a senior advisor to the Secretary of
10  Education?
11       A.    Yes, on higher education issues.
12  Yes.
13       Q.    And the dates of -- of that in that
14  role that you -- of senior advisor were January
15  20th, 2017 until April, 2017?
16       A.    Yes.
17       Q.    And prior to serving as senior
18  advisor, did you hold a role on the Trump
19  transition -- I mean, I'm sorry, I didn't want to
20  -- on the Trump transition team?
21       A.    Yes.
22       Q.    When did you start in that position?
23       A.    September of 2016.
24       Q.    And when did you stop work in that
25  role?
```

Page 41

```
1              - JAMES MANNING -
2        A.    January 19th, 2017.  I was a
3   volunteer.
4        Q.    How -- how did you get into that
5   position as a volunteer for the Trump transition
6   team?  Were you recruited or did you just -- did
7   you call somebody and say, I want to do this?
8        A.    No, I was recruited.  I'm trying to
9   remember who contacted me.  Someone that had been
10  working with Governor Christie who led the
11  transition team.  I was just retired at the time
12  working for myself, but I agreed to do that as a
13  volunteer.
14       Q.    What was your role in that -- in that
15  position?
16       A.    Well, initially to think about
17  preparation for the new administration taking
18  responsibility for the Department of Education and
19  then after Trump was elected, began a few weeks
20  later going in and meeting with the staff around
21  the Department to get a sense on where they were
22  and what their activities were and what their
23  projects were.  Obviously no role to in --
24  influence activities; just to learn about what was
25  the status of the Department.
```

Page 42

1                  - JAMES MANNING -
2        Q.    And did you also work on the Trump --
3   what was called the -- the transition landing
4   team?
5        A.    Yes.
6        Q.    And what was that different from the
7   transition team?
8        A.    Well, there's fewer people.  It was a
9   -- it was effectively part of the transition team,
10  but it was the folks that actually went -- went
11  into the Department and met with folks in the
12  Department.
13       Q.    And what was your role on the landing
14  team; did you have a leadership role or did you
15  have a title?
16       A.    I didn't have a title, effectively,
17  as of the transition-- I led the landing team.
18       Q.    And who was on the landing team?
19       A.    Myself, Kent Talbert and Bill, Bill
20  -- Bill Evers.
21       Q.    Just the three of you?
22       A.    Yes.
23       Q.    Did you examine or educate yourself
24  on the Trump -- I mean, I'm sorry, the transition
25  landing team about borrower defense?

Page 43

1                  - JAMES MANNING -
2        A.    Somewhat, yes.
3        Q.    And what did you do in order to
4   educate yourself on that topic?
5        A.    We -- we met once or twice with folks
6   from the Enforcement group.
7        Q.    Do you recall who you met with from
8   the Enforcement group?
9        A.    I -- I know at least one of the
10  meetings was the director and, you know, I don't
11  remember his name -- Robert -- whoever was the
12  director of the Enforcement group was and several
13  of his staffers.  I don't recall any of their
14  names.
15       Q.    Did you meet with Robert Eitel?
16       A.    Eitel.
17       Q.    Yes.
18       A.    How do you spell Eitel?
19       Q.    I think it's E-I-T -- E-I-T-E-L.
20       A.    Bob Eitel.
21       Q.    Eitel.  I'm sorry.
22       A.    Okay.  I know -- I know Bob is in --
23  I know him well, worked with him.  I don't
24  recall -- he didn't have any role on the
25  transition and he had not -- he was -- I don't

Page 44

1                  - JAMES MANNING -
2   believe he was at the Department at that time.  He
3   -- he came onboard in the new administration.
4        Q.    Did you meet with Colleen Nevin?
5        A.    I don't recall if I met with Colleen
6   Nevin during the -- the landing team period.  That
7   would have been, you know, after -- it was
8   actually probably just before Thanksgiving
9   through, you know, January 19th, but I don't know
10  -- I don't believe I met Colleen until after I got
11  onboard at the Department.
12       Q.    Prior -- prior to your work on this
13  transition and landing team, had you done any work
14  or related to borrower defense in your --
15             MR. MERRITT:  Objection.
16       Q.    -- related to this position?
17             MR. MERRITT:  It's a scope objection.
18  What's the relevance to the topics identified
19  by the court in authorizing discovery?
20       Q.    You can answer the question.
21       A.    Could you repeat the question?
22             MR. JARAMILLO:  Can you read back the
23  question, Madam Court Reporter, please.
24             (The question requested was read back
25  by the reporter.)

Page 45

1                  - JAMES MANNING -
2        Q.    Mr. Manning, prior to working in the
3   Trump Administration or on the transition team,
4   had any of your prior work involved borrower
5   defense?
6        A.    Prior to working on the landing team?
7        Q.    Yes.
8        A.    No.
9        Q.    What was your understanding of
10  borrower defense at -- at the time you were on the
11  landing team?
12       A.    I, I -- I don't recall what it was.
13  I'm -- I'm sure that I was learning about it.  You
14  know, part of the, you know, responsibilities of
15  the landing team was to understand what programs
16  were going on.
17       Q.    What did you learn about borrower
18  defense on the landing team?
19       A.    I can't recall specifically, you
20  know, anything in particular that I learned during
21  that period.  Subsequently I, you know, learned
22  more.  I learned more when I came onboard as an
23  employee.
24       Q.    And this would have been in January
25  20, 2017 when you came onboard as an employee?

Page 46

- JAMES MANNING -

1       A.    Correct.
2       Q.    And at that time, did you understand
3  that borrower defense entailed the discharge of
4  federal loans available when a borrower can assert
5  a defense to repayment?
6       A.    Yes.
7       Q.    And did you understand that the
8  Department of Education's duty to resolve borrower
9  defense applications was mandatory?
10           MR. MERRITT:  Objection, beyond the
11      scope.
12      Q.    You can answer the question.
13           MR. MERRITT:  I'm going to instruct
14      you not to answer that question beyond the
15      scope of the discovery the court ordered.
16      Q.    When you came on the -- in the
17  administration in January, 2017 were you aware of
18  the significant increase in the number of borrower
19  defense applications?
20      A.    The day I came on, I -- I don't
21  believe I knew that the day I came on.
22      Q.    When did you -- when did you find
23  that out?
24      A.    Shortly thereafter.
25

Page 47

- JAMES MANNING -

1       Q.    Okay.  How did you find it out?
2       A.    I don't recall specifically.  I, I --
3  I just -- I'm sorry.  I'm trying to remember when
4  I actually can authoritatively answer the
5  question.  Ask the question one more time, please.
6       Q.
7            MR. JARAMILLO:  Ms. Menaker, can you
8       repeat the question for me.
9            (The question requested was read back
10      by the reporter.)
11      A.    I think certainly every day that I
12  was on as a -- an employee, I was working to
13  expand my knowledge on operations at the
14  Department; and it was very early on, I'm sure,
15  that I started getting information about this --
16  the status and standing of the student borrower
17  defense issue.
18      Q.    And who gave you that information?
19      A.    I -- any -- any number of people.
20  You know, I met with -- I think before the
21  Secretary got there, Phil Rosenfelt was the acting
22  Secretary.  I met with Phil a number of times
23  during that period; and the acting deputy
24  Secretary, Joe Connolly was there.  We -- you

Page 48

- JAMES MANNING -

1  know, we had any number of discussions where they
2  would bring me up to speed on issues.
3       Q.    Anyone else that you recall, as you
4  came into your new position in January of 2017
5  with the administration, who gave you information
6  about the borrower defense?
7       A.    Well, those would have been the first
8  couple of folks as I had known them for the -- in
9  the better part of two decades, but that, that -- that
10  group I'm sure got bigger over time and we had a
11  working group that brought in more people.  We
12  had -- there were other attorneys at OGC.
13      Q.    Was this working group specific to
14  borrower defense?
15      A.    Yes.  Yes, and then -- and then
16  ultimately Joe Connolly, the acting deputy
17  Secretary, established a formal working group of
18  borrower defense.  That would have been, you know,
19  after a month or so.
20      Q.    Did the working group have a name?
21      A.    I'm sure it did.  I -- I don't recall
22  offhand what the -- the name was, it was.
23      Q.    Was this the borrower defense Review
24  Panel?
25

Page 49

- JAMES MANNING -

1       A.    Effectively, yes.
2       Q.    Were you on that panel?
3       A.    I was one of the members, yes.
4       Q.    And you met regularly with people on
5  that panel?
6       A.    Well, we met several times.  I can't
7  recall how regularly it was.
8       Q.    Okay.
9       A.    Ultimately Colleen Nevin became part
10  of that.  I think that -- well, actually the --
11  yeah, there were a couple of attorneys that --
12  Justin Riemer was -- was one that came on and
13  spent a significant amount of time working with
14  that group.
15      Q.    What was the purpose of that group?
16      A.    To understand where we were and to
17  think about next steps.
18      Q.    Were any decisions made by that group
19  about borrower defense?
20      A.    I don't know if there was a specific
21  action memo, so to speak, hat -- that resulted in
22  that, but part of the discussion of that group was
23  around the approach to discharge and looking at an
24  approach that would be fundamentally fair to every

Page 50

1               - JAMES MANNING -
2    borrower and also fair to the taxpayer.
3         Q.    Do you have an understanding of why
4    that needed to be looked at?
5         A.    I think the feeling was that it
6    needed to be looked at because there -- there were
7    some that thought that borrowers making a claim,
8    that was accepted to get a hundred percent relief;
9    and the question was raised in that group whether
10   or not that should always be a case or if there
11   was an approach that could look at it through a
12   different lens.
13        Q.    And who suggested that in the group?
14        A.    Who specifically suggested that?
15        Q.    Yes.
16        A.    I, I -- I don't recall who was the
17   first person to -- to say that.  I think that --
18   that when it came up, that there was, you know,
19   further discussion on that; and that ult --
20   ultimately the -- the group decided/recommended an
21   approach to looking at developing methodology that
22   could look at claims and make judgments on whether
23   someone should get a hundred percent or some
24   lesser percentage.  There -- there was a range
25   that went down to ten percent, as I recall.

Page 51

1               - JAMES MANNING -
2               And most of the folks at the table
3    were not expert enough to -- to develop that, but
4    there was an individual that was part of the group
5    who was a career member of the Department from the
6    finance office, Phillip Jeunst, who was -- was
7    qualified and charged to look at the issue and
8    come back with a proposal and a methodology that
9    could be used to make determinations that would
10   allow for forgiveness from ten percent to a
11   hundred percent.
12        Q.    And you said that person's name was
13   Phillip Jeunst?
14        A.    Yeah, I think it was like
15   J-E-U-N-S-T.  I might have spelled that
16   indirectly.  J-U-E-N-S-T I think.  There might
17   have been a G in there, too.  I -- I can't
18   remember how he spelled his name.
19        Q.    And what was his position?
20        A.    He was from the finance office.
21        Q.    Do you know if he's still with the
22   Department of Education?
23        A.    I believe he is, yes.
24        Q.    Do you know his current position?
25        A.    I do not.

Page 52

1               - JAMES MANNING -
2         Q.    And what specifically did he
3    recommend with respect to the -- with the relief
4    methodology?
5         MR. MERRITT:  Objection to the extent
6    it calls for deliberative privileged
7    information.
8         MR. JARAMILLO:  Are you instructing
9    the witness not to answer?
10        MR. MERRITT:  Yes.  Just your
11   question asked for a recommendation, correct?
12        MR. JARAMILLO:  I'll -- I'll
13   rephrase.
14        Q.    Was anything that Phil Jeunst
15   suggested put into writing?
16        A.    Oh, yes, absolutely.  It was put into
17   effect.
18        Q.    How was it put into writing?
19        A.    I -- I don't recall, but it was
20   actually -- it was ultimately put aside by the
21   court.
22        Q.    A partial relief meth -- methodology
23   that resulted from the Borrower Review Defense
24   Panel was -- was put -- set aside by the court in
25   the Calvillo Manriquez case?

Page 53

1               - JAMES MANNING -
2         MR. JARAMILLO:  Can we go off the
3    record.
4         (Whereupon, a brief discussion was
5    held off record.)
6         Q.    Mr. Manning, you froze there on the
7    video screen for a second, so I'm not sure -- I
8    didn't hear an answer.  I'm just -- I'm just going
9    to repeat my question.
10        A.    Go ahead.
11        Q.    When you say that the -- what Mr.
12   Phillip Jeunst suggested was -- was put aside by
13   the court, are you referring to the court's order
14   enjoining the use of the average earnings rule in
15   the Calvillo Manriquez case?
16        A.    Yes, that's correct.
17        Q.    Did anything about the borrower
18   defense Panel review cause a delay in the
19   Department's issuance of borrower defense
20   decisions?
21        MR. MERRITT:  Objection, vague.
22        Q.    You can answer the question.
23        A.    I'm sorry, can you repeat it, please.
24   Did anything?
25        Q.    I'll rephrase it.  Let's back up a

Page 54

1            - JAMES MANNING -
2  little bit.
3            When you came on to the
4  administration, what was your understanding of
5  what the -- how the prior administration had
6  approached borrower defense claims?
7      A.   Well, when I came on at that point I
8  don't know that I had a position.  I -- I came to
9  find out that over the course of the last several
10 weeks at the end of the previous administration
11 that a number of actions had been taken and
12 decisions made and adjudication being taken on a
13 number of claims prepared and authorized by the --
14 the Secretary, previous Secretary for discharge.
15           And, as I recall, there were
16 approximately 16,000 claims that were signed off
17 on that came to my attention early on when I was
18 officially onboard; and we, we -- we looked at
19 those and talked to general counsel and, you know,
20 wanted to come to understand if these had been
21 resolved to the point where the incoming Secretary
22 would need to authorize their approval.
23           There was a -- much discussion about
24 that and ultimately recognition that the previous
25 administration action had been the final action,

Page 55

1            - JAMES MANNING -
2  final Department action that -- that was arrived
3  at with the proper authority.  While it hadn't
4  been discharged, they were necessarily needed to
5  be discharged by the incoming Secretary.
6      Q.   And were you involved in any action
7  to effectuate these discharges by getting the
8  Secretary's approval?
9      A.   I -- I did brief the Secretary on the
10 status and, you know, informed her that we had
11 done necessary due diligence and come to
12 understand and appreciate that this action was a
13 -- a lawful action of the previous administration
14 and that the changes needed to happen and, thus,
15 became her responsibility to sign that
16 authorization.
17     Q.   How did she react to this?
18          MR. MERRITT:  Objection, beyond the
19     scope of discovery the court authorized.
20     Q.   You can answer the question.
21     A.   Well, she -- she wasn't particularly
22 happy about it.
23     Q.   Did she tell you why she wasn't happy
24 about it?
25     A.   Not specifically, no.

Page 56

1            - JAMES MANNING -
2      Q.   Did you have any understanding about
3  why she wasn't happy about it?
4           MR. MERRITT:  Objection, calls for
5     speculation.
6      Q.   You can answer the question.  I just
7  want to know if you had any understanding of why
8  she was unhappy about this decision.
9      A.   Well, I think in principle there were
10 a -- a number of folks that were not happy about
11 the situation.  I don't know if there were any
12 things to say anyone was happy about the
13 situation, but it was a decision that required
14 action.
15           I think that, you know, any
16 conversation beyond that, that -- well, I don't
17 know how to say this.  I think that the -- the
18 idea that every individual that made a claim that
19 was to be discharged will a receive a hundred
20 percent of, you know, discharge did strike any
21 number of us as not necessarily the right way to
22 go, but yet still recognized that the Department
23 had taken the action, the previous Secretary
24 approved it, and we, you know, effectively was
25 obligated to move it forward.

Page 57

1            - JAMES MANNING -
2      Q.   Why didn't you think it was the right
3  way to go?
4           MR. MERRITT:  Objection to the extent
5     that calls for deliberative privileged
6     information.
7      Q.   You can answer the question.
8      A.   Well, the answer to the -- the
9  specific question is I don't know.
10     Q.   If you know, why did others think it
11 was not the right way to go?
12          MR. MERRITT:  Objection, calling
13     for -- to the extent that question calls for
14     deliberative privileged information.
15     Q.   You can answer the question.
16     A.   Well --
17          MR. MERRITT:  I mean, if you're
18     gonna -- if the question is phrased as what
19     do others think about why the discharge
20     shouldn't happen leading up to that decision,
21     then I'll instruct not to answer.  Is that
22     the question?
23          MR. JARAMILLO:  That wasn't the
24     question.
25          MR. MERRITT:  Can you rephrase the

Page 58

                    - JAMES MANNING -

2        question or restate the question?
3        Q.    Why did others think that this was
4   not necessarily the right way to go, your words?
5   Why was this decision not necessarily the right
6   way to go?
7        A.    Well -- well, obviously, I can't
8   speak to what people are thinking, but I can say
9   during conversations amongst the working group
10  that there was discussion about alternatives to a
11  hundred percent relief.
12        The -- the Secretary had the
13  authority to provide relief in part or in whole
14  and we looked at that carefully and had many
15  discussions about that, and I don't recall anyone
16  ultimately suggesting that, oh, we really ought to
17  just say a hundred percent of the claim is made,
18  which led to further discussion that established
19  the pre -- that worked on the entity of -- of
20  methodology that would be fair to borrowers and
21  taxpayers, that would look at, you know, the
22  situation and the -- and look at records that
23  ultimately the court stopped us from using; but
24  there were records that the -- the Department had
25  in hand, because they were the same records that

Page 59

                    - JAMES MANNING -

2   were used earlier in the previous administration
3   to address the gainful employment issue.
4        And so members of the group picked up
5   from there and looked at the potentiality of using
6   that information that would be had, that had been
7   provided by the Social Security Administration for
8   useful gainful employment, to look at that as part
9   of the methodology that was put forward in
10  performance and effectuated, until the court ruled
11  that the use of the information was potentially a
12  violation of a privacy act.
13        Q.    And -- and this approach that
14  resulted from the borrower defense Group Review
15  Panel, was this -- in terms of not awarding a
16  hundred percent relief, that was a change in
17  position from how the prior administration
18  approached this issue, correct?
19        A.    That is correct.
20        Q.    And did -- was it your understanding
21  that the prior adminis -- oh, strike that.
22        Did the Department feel a need to
23  balance the interests of student bor -- borrowers
24  who were victims of misconduct by their schools
25  with the interest of taxpayers?

Page 60

                    - JAMES MANNING -

2        A.    It's a question around balancing it
3   between the bor -- the borrower and -- and the
4   taxpayer.  That was -- balance -- thinking of it
5   in terms of -- I don't recall mentioning it quite
6   like that.
7        Q.    Was it -- was it the drive to try to
8   protect interest of taxpayers that resulted in
9   trying to find ways to limit the relief of -- of
10  applicants for borrower defense?
11        MR. MERRITT:  Objection to the extent
12      it calls for deliberative privileged
13      information.
14        Q.    I'm just asking, in general, at the
15  Department when you were there, was that the --
16  was that the approach?
17        A.    Was what the approach?  Say that
18  again.
19        Q.    To balance the interest of taxpayers
20  by finding ways to limit relief awarded to
21  applicants for borrower defense.
22        A.    I, I -- I don't think that's -- the
23  way you just put it is a fair representation of
24  how the conversation was, but the ideal behind
25  everything that we did from the beginning was to

Page 61

                    - JAMES MANNING -

2   be fair to student borrowers that had been harmed
3   and to give full consideration to how much harm
4   was done and if it was worthy of a hundred percent
5   forgiveness, then that's what should be provided.
6        If it was something where the
7   individual had moved forward and been successful
8   and should have had some relief, at some level,
9   that should be considered too; and that -- and
10  looking at things through that lens ultimately was
11  fair for the borrower and fair for the taxpayer in
12  respect that it was going to cost something, but
13  out of hand we shouldn't start with respect to
14  that -- that everybody that was harmed was harmed
15  a hundred percent.
16        Q.    So in order to protect the taxpayer,
17  the new administration took an approach that would
18  find ways to -- to measure harm and such that a
19  hundred percent relief was not granted; is that
20  true?
21        MR. MERRITT:  Objection,
22      mischaracterization of prior testimony.
23        Q.    You can answer the question.
24        A.    Can you repeat the question, please.
25        Q.    In order to protect the taxpayer, the

Page 62

1                  - JAMES MANNING -
2   new administration's approach was to find ways to
3   limit relief commensurate with what the Department
4   viewed as the harm to the borrower; is that true?
5        A.     No, I don't think that is phrased
6   correctly.
7               I don't think we were thinking of the
8   taxpayer, you know, first and then looking to --
9   to have a balance.  I think we were looking to try
10  to make it fair across the board.
11       Q.     So what were you doing to protect the
12  taxpayer?
13              MR. MERRITT:  Objection, overbroad.
14       Q.     You can answer.
15       A.     I -- I think, though, protecting the
16  taxpayer was -- I don't know what happened when we
17  were deciding correctly for borrowers.
18       Q.     Was the interest of schools also a
19  consideration in revising the -- the relief
20  awarded to borrowers?
21       A.     I, I -- I never heard that was raised
22  as a consideration.
23       Q.     So, in your view, the considerations
24  were the taxpayer and the borrower?
25       A.     Yes.

Page 63

1                  - JAMES MANNING -
2        Q.     Any other considerations?
3        A.     I'm sure there were other
4   considerations discussed at the table.  I don't
5   recall what they were.
6        Q.     In your view, the prior
7   administration did not sufficiently take into
8   account the interest of the taxpayer?
9               MR. MERRITT:  Objection.  We're
10  getting beyond the scope of the discovery the
11  court authorized.
12       Q.     You can answer unless your counsel
13  instructs you not to.
14              MR. MERRITT:  Well, which topic is
15  this relevant to?
16              MR. JARAMILLO:  Well, this is
17  background leading towards the eventual delay
18  in the processing of applications and it has
19  to do with the view of the new administration
20  toward Borrowers Defense claims and what
21  would be used to evaluate them.
22              MR. MERRITT:  I don't think that's a
23  topic.  I mean, if the court's -- as relevant
24  to this witness, the only topic the court
25  authorized discovery into is the extent to

Page 64

1                  - JAMES MANNING -
2   which the difficulty of reviewing borrower
3   defense applications -- sorry about that.
4               So as relevant to this witness, the
5   only topic that the court authorized
6   discovery into is the extent to which the
7   difficulty of reviewing borrower defense
8   applications actually caused or justified the
9   Secretary's 18-month delay and I don't think
10  that question relates to that topic.
11              MR. JARAMILLO:  Well, the court did
12  say that there was a strong showing of agency
13  pretext, the class had been prejudiced by
14  delay, and the court said we need to know
15  what's really going on and that led him to
16  compel discovery on the topic you listed, but
17  other topics as well that Mr. Manning might
18  have knowledge of including the denial issue
19  before this suit and under the previous
20  administration and the extent to which the
21  Secretary denied applications of students who
22  attended the school subject to findings of
23  misconduct.  This all gets to pretext and
24  potential causes of the delay.
25              Are you going to instruct him not to

Page 65

1                  - JAMES MANNING -
2   answer that question?
3               MR. MERRITT:  You're correct that
4   some of the topics could be relevant to Mr.
5   Manning.
6               I will state that the court's general
7   statement that the pretext do not set the
8   parameters for a technical discovery, the
9   actual topics that you listed do.
10              At this point we are very, very far
11  before the 18-month delay the court
12  referenced, which as you now began in 2018.
13  So I guess, at this point, I'll -- I'll ask
14  you to restate the question.
15              MR. JARAMILLO:  We can move on.
16       Q.     Mr. -- Mr. Manning, you testified
17  earlier that it was determined that the Secretary
18  needed to approve the applications of
19  approximately 16,000 borrowers of -- that were
20  prelim -- that were approved by the prior
21  administration, but not actually discharged; is
22  that correct?
23       A.     Correct.
24       Q.     And were you involved in the
25  Secretary's approval of those applications?

Page 66

1           - JAMES MANNING -
2       A.    I -- I briefed her that that was the
3  determination after review by the Office of
4  General Counsel.  There was no option and I -- I
5  recommended she sign.
6       Q.    That she sign what?
7       A.    The discharge of those 16,000 loans
8  -- $200 billion worth of loans.
9       Q.    And was that an actual document
10 discharging the loans?
11      A.    She signed recognizing that, that her
12 -- her action authorized the process to go
13 forward.
14      Q.    And were you involved in drafting the
15 written document for that action?
16      A.    I was not.
17      Q.    Did you give her, the Secretary, any
18 written communication about the action?
19      A.    I believe I may have.  I expect I
20 did, yes.
21      Q.    Why don't we look at Tab 11 in your
22 documents and this was previously submitted as
23 Exhibit 7 in the Jones deposition.
24           (Whereupon, Exhibit 7, having been
25       previously marked, was tendered to the

Page 67

1           - JAMES MANNING -
2       witness for identification.)
3       Q.    And I'll ask you to just skip past
4  the first page that says "Exhibit 7" because that
5  was just used to get it into the court file; and
6  if you turn to the second actual page of the
7  document, do you recognize this document?
8       A.    Uh-huh.
9       Q.    And can you tell me what it is?
10      A.    This is a memo from me to the
11 Secretary.
12           MR. JARAMILLO: And I'm not sure that
13      I did this, but we should mark this -- I'm
14      sorry, we don't have to mark this.  Strike
15      that.
16      Q.    Did you write this memo, Mr. Manning?
17      A.    I signed it.  I don't believe that I
18 was the author.
19      Q.    Do you know who authored it?
20      A.    Probably a committee.
21      Q.    And what committee would that be?
22      A.    Oh, I, I -- I don't know.  I would
23 say that I, you know, ultimately read it and sent
24 it forward.
25      Q.    Who gave you the draft of it?

Page 68

1           - JAMES MANNING -
2       A.    I have no recollection of who gave me
3  the draft.
4       Q.    Do you know if this resulted from the
5  borrower defense Review Panel?
6       A.    I do not.  I think that I would say
7  that -- so the paragraph that reads, "We
8  established a review panel consisting of Joe
9  Connolly, Lynn Mahaffy -- we established a review
10 panel consisting of Joe Connolly, Lynn Mahaffy,
11 Phil Rosenfelt, Justin Riemer and myself who
12 examined the claims and background explanation and
13 made recommendations on how to resolve the pending
14 claims and proceed in the future."
15           So this memo preparation was made in
16 and amongst the group of people represented here.
17      Q.    And was this the action you referred
18 to previously of the -- of Secretary DeVos
19 authorizing the discharge of approximately 16,000
20 borrower defense claims?
21      A.    Yes.  It was --
22      Q.    I'm sorry, go ahead.
23      A.    The answer to what you said so far is
24 yes.  It was a recommendation to the Secretary
25 signed by me to "proceed with discharge for direct

Page 69

1           - JAMES MANNING -
2  and non-direct loans for all impacted borrowers
3  direct for U.S. or in the CFO's Internal Control
4  Unit to set up interim procedures to process
5  claims until new borrower defense regulations are
6  operable and take effect.  Proceeding with
7  requesting OIG launch a review of the borrower
8  defense program."
9       Q.    And you're reading from Page 4 of
10 this exhibit?
11      A.    Correct.
12      Q.    And you see that Secretary DeVos
13 signed it and checked the -- the line that says
14 "Approved"?
15      A.    I do.
16      Q.    And this is a document that shows
17 that she approved the action listed in the
18 recommendation?
19      A.    It is.
20      Q.    And you see your comment at the
21 bottom that says "With extreme displeasure"?
22      A.    I do.
23      Q.    After, did you -- do you recall
24 seeing that after she signed this document?
25      A.    Well, I -- I don't recall that,

Page 70

1              - JAMES MANNING -
2   but --
3          Q.    After she signed this document, did
4   you talk to her about her extreme displeasure?
5          MR. MERRITT:  Objection, asked and
6   answered.
7          Q.    You can answer.
8          A.    Well, I know she was not happy about
9   it and I know that she would have preferred that
10  the action was taken on fully under Trump's
11  administration, but she -- she knew she had an
12  obligation and she signed it and was not happy
13  about it, the way it had been handled up to then.
14         Q.    And after she signed the document, do
15  you know if the 16,000 applications were actually
16  discharged?
17         A.    Yes, they were.
18         Q.    Do you know when they were
19  discharged?
20         A.    I do not.
21         Q.    Do you have an estimate as to when
22  they were discharged?
23         A.    Not long after she signed this.
24         Q.    And were they all discharged with a
25  hundred percent relief?

Page 71

1              - JAMES MANNING -
2          A.    That's my understanding.
3          Q.    During the time period in which the
4   borrower defense Review Panel was -- was meeting
5   to evaluate the borrower defense program, did FSA
6   issue any decisions on borrower defense
7   applications?
8          A.    I don't recall if they issued any or
9   not.  They certainly were receiving applications
10  and were making judgments whether they were
11  acceptable for consideration or not, but I don't
12  recall that.
13         Q.    Do you recall there being -- sorry,
14  go ahead.  I talked over you.
15         A.    That's okay.  Sorry.  I don't recall
16  that there were any that were finally fully
17  settled beyond these.
18         Q.    Was there a decision to put a pause
19  on issuing final decisions during the time period
20  of the borrower defense Review Panel?
21         A.    During a period that involved the
22  panel?  I -- I don't recall a -- a formal
23  decision, but -- I don't -- I don't recall a
24  decision that ordered that.
25              I think there was certainly

Page 72

1              - JAMES MANNING -
2   discussion about moving forward with the
3   methodology and getting to a point where we would
4   be able to move forward, as I said before, fairly
5   for the borrower and the taxpayer by considering
6   the harm that was done to student borrowers and
7   providing relief at an appropriate level that
8   ultimately was between a hundred percent and ten
9   percent.
10         Q.    To your recollection, when was that
11  new methodology put into effect?
12         A.    Oh, I'm -- I'm trying to recall.  I
13  can't remember specifically when it was put into
14  effect, you know, obviously it would take
15  some -- some time to stand up.  It was in
16  effect -- started being worked on through '17.
17              You know, it was in effect for a
18  certain period of time before it was put aside by
19  the court in 2018.  I, I -- I can't remember the
20  specific start date in terms of when it was up for
21  operation.
22         Q.    Until it was up in operation, is it
23  true that the Department did not issue any other
24  final borrower defense decisions except for the
25  approximately 16,000 that were approved by the

Page 73

1              - JAMES MANNING -
2   Secretary in the memo we just looked at?
3          A.    I don't specifically recall, but I
4   expect that it's true though.
5          Q.    And this memo, as you read, did
6   authorize the CFO's Internal Control Unit to set
7   up interim procedures to process claims, right?
8          MR. MERRITT:  Objection, ambiguous.
9   What -- what document?
10         MR. JARAMILLO:  The document we
11  looked at which was the May 4th, 2017 memo
12  that's Exhibit 7 in this case.
13         Q.    Tab 11 for you, Mr. Manning.
14         A.    Yes.  That's Page 4 of Exhibit 7; is
15  that right.
16         Q.    Yes, the authorization of the setting
17  up of interim procedures.
18         A.    Yes, I see what you're saying there.
19  "Direct OUS and the CFO's Internal Control Unit"
20  -- sorry, I'll read the whole thing so you have
21  it.
22              "Proceed with discharge for direct
23  and non-direct loans for all impacted borrowers.
24  Direct OUS and the CFO's Internal Control Unit to
25  set up interim procedures to process claims until

Page 74

- JAMES MANNING -

1    new borrower defense regulations are adopted and
2    take effect.  Proceed with requesting OIG launch a
3    review of the borrower defense program."
4              And my reading of the second sentence
5    "direct all OUS and CFOs' Internal Control Unit to
6    set up interim procedures to process claims until
7    new borrower defense regulations are adopted" to
8    me refers to the establishment of the methodology.
9    New borrower defense regulations, actions on that
10   didn't start until the end of 2017.
11        Q.   Right, and -- and this says that the
12   OUS and the CFO's Internal Control Unit was
13   directed to set up interim procedures to process
14   claims un -- until then; is that right?
15        A.   Yes, and I'm saying that the,
16   the -- what was set up in the interim processes
17   was to effectuate the methodology and apply that.
18        Q.   And were the interim procedures set
19   forth in any document, any document that you're
20   aware of?
21        A.   Not that I recall.
22             MR. MERRITT:  Joe, would it be okay
23        if we took a short break sometime soon for
24        five minutes.
25

Page 75

- JAMES MANNING -

1
2              MR. JARAMILLO:  Yes, let's go ahead
3        and take a break now for five minutes.
4              MR. MERRITT:  Thank you.
5              THE VIDEOGRAPHER:  We are now off the
6        record, the time is 16:53 UTC.
7              (Whereupon, there was a brief recess
8        in the proceedings.)
9              THE VIDEOGRAPHER:  Please standby,
10       everyone.  We're now on the record, the time
11       is 17:07 UTC.
12        Q.   Mr. Manning, we're just back from
13   break and I wanted to ask you if to -- I don't
14   want to know what you talked about.  I want to
15   just ask you if you spoke with anybody during the
16   break.
17        A.   Briefly with the attorneys.
18        Q.   Do you have anything to clarify from
19   your prior testimony?
20        A.   No.
21        Q.   Do you recall any direction -- let's
22   back up a little bit.
23             As acting Undersecretary of Higher
24   Education, who did you report to?
25        A.   In essence I reported to the -- in

Page 76

- JAMES MANNING -

1    that position I reported to the Secretary.
2        Q.   How often did you meet with the
3    Secretary in that role?
4        A.   Well, I -- I met with her -- I'm not
5    sure if I met with her in that role specifically
6    or I had started a meeting with her as a senior
7    advisor and I -- I guess I wasn't officially --
8    but I met with her every few weeks in a group with
9    other -- with other senior advisors.  I would have
10   had some individual -- not individual -- some
11   smaller group meetings from time to time.
12        Q.   With the Secretary?
13        A.   With the Secretary, yeah.
14        Q.   And did you discuss borrower defense
15   issues during any of those meetings?
16        A.   During any of them?
17        Q.   Yes.
18        A.   Certainly.
19        Q.   And who else was present when you
20   discussed borrower defense issues?
21        A.   I can't be clear in terms of, you
22   know, who was there when we were discussing
23   borrower defense issues, but generally the folks
24   that would meet with the Secretary and I would

Page 77

- JAMES MANNING -

1
2    include Bob Eitel, Secretary chief of staff
3    depending on who that was at the time.  She had
4    two different chiefs of staff.
5              When Diane Jones came onboard, she
6    was part of that group.  Liz Hill, who was her
7    communications person and press spokesman.
8              Ultimately when Deputy Secretary came
9    on, General Zeiz, Deputy Secretary of Education
10   was in some of those meetings.  The Deputy
11   Secretary of Education, Zeiz is his last name,
12   Z-E-I-Z, former General.
13             When Wayne Johnson ultimately came
14   onboard, he would be part of those meetings as
15   well, initially as COO and then continuing to --
16   as the director of Next Gen, as I said,
17   initiative.
18        Q.   Other than the May 4th, 2017 memo
19   that was from you to Secretary DeVos, did you have
20   any other written communications with Secretary
21   DeVos about borrower defense issues?
22        A.   Separately, not -- not that I recall.
23        Q.   No e-mail?
24        A.   Quite frankly I can't be sure, but
25   e-mails except but for the fact I don't recall

Page 78

1              - JAMES MANNING -
2  sending e-mails to the Secretary.
3       Q.     And no text messages?
4       A.     No, none.
5       Q.     And underneath you as under acting
6  Secretary, was FSA, correct?
7       A.     Yes, in -- in principal the
8  Undersecretary had oversight of the Higher
9  Education programs, so FSA is part of Education
10 and Career Adult Education.
11      Q.     Who from FSA reported directly to
12 you?
13      A.     Oh, a whole cadre of folks at
14 different times.  I mean, there was a group of
15 senior leaders of or ten or so that met regularly
16 with me.
17      Q.     Did any of them meet regularly with
18 you about borrower defense?
19      A.     The issue of borrower defense may
20 have come up from time to time in general
21 meetings, but...
22      Q.     Who at FSA was responsible for
23 overseeing the implementation of borrower defense
24 during your tenure at the Department?
25      A.     The director of the Enforcement group

Page 79

1              - JAMES MANNING -
2  officially had that responsibility.
3       Q.     And who was that during your tenure?
4  And if it was multiple people just tell me who
5  recall, please.
6       A.     Oh, it was multiple people and it
7  was -- I just forgot the name.  I just saw his
8  name on a e-mail not too long ago.  Robert -- I
9  don't remember his last name.  He left actually
10 earlier; he left in February and then Laura Kim
11 and then shortly after that she left and Colleen
12 Nevin effectively was the senior person there.
13             And I would seek Colleen from time to
14 time until -- until Jillian Schmoke became the
15 director of the borrower -- of the, you know,
16 Enforcement Unit in the summer of '17.  So '17
17 probably August.
18      Q.     And, Mr. Manning, you've named people
19 that were, as you described it, in the role of
20 director of Enforcement within FSA, correct?
21      A.     Yes.
22      Q.     Between you and that role of director
23 of Enforcement, was there anybody else in the
24 chain of reporting?
25      A.     Between me and director?

Page 80

1              - JAMES MANNING -
2       Q.     Yes.
3       A.     Not at FSA.
4       Q.     Okay.  Anywhere else?
5       A.     Quite frankly, I don't know -- not
6  that I know of.
7       Q.     Okay.  So these people, when they
8  were in that role, reported directly to you?
9       A.     I -- actually Jillian Schmoke when he
10 came onboard, he came onboard and we had a
11 full-time COO that was Wayne Johnson, and he
12 reported to Wayne while Wayne was COO through
13 July, '17 through January, '18.  That --
14      Q.     And Jillian -- go ahead.  I'm sorry.
15      A.     Yeah, that was the reporting
16 relationship.
17      Q.     So from Julian Schmoke up to Wayne
18 Johnson and then up to you?
19      A.     Yes.
20      Q.     Did Colleen Nevin ever directly
21 report to you?
22      A.     On paper I'm sure she did.  Let's
23 see.  It would have after the senior leaders had
24 left -- I'm sorry, I don't know the gentleman's
25 name -- and then Laura Kim.  At -- at that point,

Page 81

1              - JAMES MANNING -
2  Colleen reported directly to me.
3       Q.     It -- go ahead.  I'm sorry.
4       A.     It -- it would have been -- you know,
5  if it wasn't March, '17 it could have been shortly
6  after that, early '17.
7       Q.     And, Mr. -- Mr. Manning, please don't
8  take offense at my question, but I want to do a
9  quick check-in to see if there's any reason that
10 you're having trouble recalling any facts today
11 and you don't have to tell me the reason at this
12 point, but I want to know if you are having
13 trouble.
14      A.     Oh, well, I'm only reporting on what
15 I -- well, I'm trying to remember things that I
16 think I -- I should remember, but that are not
17 coming right to mind.
18      Q.     Okay.
19      A.     I have been away from that for a
20 while.  I've been doing other work and I really
21 haven't been following any issues in and around,
22 you know, the Department or borrower defense or I
23 didn't focus on those things.
24      Q.     I -- I understand, Mr. Manning, but I
25 just want to make sure that there's nothing that

Page 82

- JAMES MANNING -

1 might be impeding your recollection today. For
2 example -- and you don't have to tell me if you
3 don't want to, but sometimes medications may have
4 an impact on recollections.
5 I just wanted to make sure there's
6 nothing that you're aware of that could be
7 impacting your recollection today; and, again, I
8 apologize if this is sensitive for you, I know --
9 I know it -- it would be for -- for most people,
10 but are you aware of anything that might be
11 impacting your recollection, other than the
12 passage of time between your time at the
13 Department and now?
14    A.    No. Passage of time.
15    Q.    Okay. You're not aware of anything
16 else?
17    A.    I'm not aware -- not aware of
18 anything else.
19    Q.    Okay, I know it's kind of awkward,
20 but I just kind of had to ask just because, you
21 know -- I know you're doing your best and you're
22 taking time to think and jog your memory and I
23 just wanted to make sure nothing was --
24    A.    Just the fact that I'm 67 and not 57
25

Page 83

- JAMES MANNING -

1 anymore.
2    Q.    I understand. I find myself going
3 through some slowdowns as well.
4    So did you communicate directly with
5 Colleen -- strike that.
6    Did you have any written
7 communications with Colleen Nevin about borrower
8 defense?
9    A.    Not that I recall.
10    Q.    No e-mails between you and her about
11 borrower defense?
12    A.    I'm not saying no e-mails, but I
13 don't recall.
14    Q.    Okay. What involvement did you have,
15 if any, in overseeing the borrower defense program
16 as acting Undersecretary?
17    A.    As acting Undersecretary? Re --
18 repeat the question.
19    Q.    Did you have a role in overseeing the
20 borrower defense program when you were acting
21 Undersecretary in the Trump Administration?
22    A.    Well, in -- in principle the
23 Undersecretary oversees FSA. During those periods
24 when there was someone else as COO, I would not
25

Page 84

- JAMES MANNING -

1 take an active role; and when I dealt directly
2 with Colleen who was to get updated on activities,
3 but I had full faith and confidence in her and
4 allowed her to do her job.
5    Q.    So effectively during that time
6 period, was Colleen Nevin in charge of borrower
7 defense for the Department of Education?
8    MR. MERRITT: Objection,
9 mischaracterization of prior testimony.
10    Q.    You can answer the question.
11    A.    So repeat it again. Was Colleen
12 what?
13    Q.    Was she effectively the person in
14 charge of -- of the borrower defense program at
15 the Department when she reported directly to you
16 and you had full faith and -- and confidence in
17 her?
18    A.    Well, she was -- she was in charge of
19 the Borrower Defense Unit. She wasn't -- your --
20 your statement was too broad in terms of, you
21 know, for the whole Department. There was
22 oversight, but she ran the borrower defense Unit
23 and...
24    Q.    And who gave that oversight to her?
25

Page 85

- JAMES MANNING -

1    A.    Well, the -- the leaders in the
2 Enforcement Unit initially, which would have led
3 to Julian Schmoke spending more of that time.
4    Q.    And what was your understanding of
5 the role of the Borrower Defense Unit?
6    A.    They received an adjudicated
7 applications for borrower defense relief.
8    Q.    So that was one step in the process
9 of borrower defense's claim review and processing
10 during your time at the Department?
11    A.    Yes.
12    Q.    Well, let's go through the whole
13 process step by step. When -- when claims came
14 into the Department, who was in charge of that
15 intake?
16    A.    Claims for borrower defense came into
17 the Department?
18    Q.    Yes.
19    A.    My understanding is they went
20 directly to the Borrower Defense Unit.
21    Q.    And what did the Borrower Defense
22 Unit do with them?
23    A.    They reviewed them, made decisions on
24 whether or not they were sufficient to be given
25

Page 86

- JAMES MANNING -

1  further consideration for relief or they made
2  decisions that they were insufficient to be
3  considered.
4      Q.    If they determined that they were
5  sufficient to be given further consideration for
6  relief, what happened to the claim at that point?
7      A.    I don't recall.
8      Q.    Are you aware of anybody else that
9  would look at it, besides the Borrower Defense
10 Unit?
11     A.    I expect that the director of the
12 Enforcement group might look at it, but I
13 expect -- well, I think that -- no.  I expected
14 the -- the defense -- the director of -- I'm
15 sorry -- the Enforcement group.
16     Q.    And what would director of the
17 Enforcement group do at that point?
18     A.    Just have an understanding of where
19 the applications were.
20     Q.    Okay.  So if someone applied and the
21 Borrower Defense Unit determined that their -- it
22 warrants, the application warrants further
23 consideration for relief, who gives that further
24 consideration for relief or who during your tenure

Page 87

- JAMES MANNING -

1  at the admin -- at the Department?
2      A.    Well, initially it was within the
3  Borrower Defense Unit.  Ultimately when there was
4  a methodology, I don't recall how the review
5  process went once the methodology was established.
6      Q.    Once the methodology was established,
7  was there someone in charge of making a relief
8  determination?
9      A.    I don't recall.
10     Q.    Was BDU involved in making -- was the
11 Borrower Defense Unit involved in making a relief
12 determination?
13     A.    Well, I would say that their work was
14 the first step in the process.  I -- I don't
15 recall beyond their adjudication what the
16 additional steps were beyond that.
17     Q.    Have you heard of their work
18 adjudicating claims being referred to as Step 1?
19     A.    I actually don't remember hearing it
20 that way, but --
21     Q.    Do you recall hearing of a -- of the
22 relief determination being referred to as Step 2?
23     A.    I don't recall hearing that.
24     Q.    Were you ever involved in approving

Page 88

- JAMES MANNING -

1  borrower defense applications or denying --
2  approving or denying them?
3      A.    Initially?  I -- I didn't see the
4  borrower defense claims as they were coming in.
5  The -- the reviews took place in the Borrower
6  Defense Unit and I got a report in terms of the
7  numbers that were coming in.  I wasn't engaged in
8  the decisions.
9      Q.    Okay.  You said that was initially,
10 did that change at any point in time during your
11 tenure at the Department in the Trump
12 Administration?
13     A.    Not that I know.  I, I-- I said I
14 can't recall what the additional steps were once
15 the methodology obviously -- I mean, not
16 obviously, but I expect that would have impact the
17 whole process; but I don't recall.
18     Q.    Did you ever receive a package of
19 borrower defense applications with the cover memo
20 to approve or deny?
21     A.    Borrower defense applications to
22 approve or deny?
23     Q.    Yes.
24     A.    No, I do not recall.  I don't

Page 89

- JAMES MANNING -

1  remember ever receiving a package like that.  I
2  don't remember.  I don't recall.
3      Q.    Did you have approve any borrower
4  defense applications yourself?
5      A.    Individually?
6      Q.    Yes.
7      A.    Not -- not that I recall.
8      Q.    How about as a group?
9      A.    Not that I recall.
10     Q.    Did you ever deny borrower defense
11 applications individually?
12     A.    Individually?  No.
13     Q.    How about as a group?
14     A.    If something came to me, I -- I don't
15 recall.
16     Q.    You don't recall ever being directly
17 involved in issuing borrower defense decisions to
18 individual borrowers or individual borrowers in a
19 group?
20     A.    Not to individual borrowers, but
21 individual borrowers in -- in a group says
22 something different to me.  If there's a document
23 that, you know, asks for a -- approval on a group,
24 something like that, it's possible.  Do I recall

Page 90

1                    - JAMES MANNING -
2    it, no.
3         Q.    And why do you say it's possible?
4         A.    Well, because -- I would say it's
5    possible because I had -- I certainly received
6    packages for consideration on any number of things
7    for signature to signoff and I do not recall any
8    involving borrower defense.  That -- that was not
9    the way information flowed on that, to my
10   recollection.
11        Q.    Do you know if the Office of the
12   Secretary was ever involved in approving borrower
13   defense applications, putting aside the -- the May
14   4th, 2017 decision to approve those approximately
15   16,000?
16        A.    Do I know whether the Office was
17   involved?  That -- that would be highly unusual,
18   but I don't know.
19        Q.    Beyond the Borrower Defense Unit in
20   Enforcement in FSA, do you have any recollection
21   of any other Department or any other unit being
22   involved in making or issuing borrower defense
23   decisions?
24        A.    Issuing or making borrower defense
25   decisions outside of En -- Enforcement Unit and

Page 91

1                    - JAMES MANNING -
2    Borrower Defense Unit?
3         Q.    Yes, that's the question.
4         A.    No, I don't.
5         Q.    Do you know if, if -- if a decision
6    was issued to approve or deny, do you know who
7    would draft the notice of decision?
8              MR. MERRITT:  Objection, calls for
9    speculation.
10        Q.    You can answer.
11        A.    I don't know.
12        Q.    If a borrower application was
13   approved and they were granted full relief, do you
14   know who would be involved in discharging the
15   application -- I mean discharging the loan?  I'm
16   sorry.
17        A.    Well, when you say in "full relief,"
18   you mean a hundred percent?
19        Q.    Well, let's, let's back -- let's
20   strike that question.
21              If a decision was made to grant
22   relief on a borrower defense application, who at
23   the Department would be involved in effectuating
24   that discharge or that -- yeah, or grant --
25   effectuating the relief?

Page 92

1                    - JAMES MANNING -
2         A.    I don't recall.
3         Q.    Were you involved in the development
4    of any policies that affected the borrower defense
5    Unit's work?
6         A.    Any policies that affected the
7    borrowers?  I -- I don't recall the process that
8    was followed when the methodology was in place and
9    I -- I'm not sure if the borrower defense -- what,
10   if any, role they had in the final resolution of
11   those applications when the methodology was being
12   applied.
13        Q.    How about any other policy decisions
14   that you were involved in that might have affected
15   the Borrower Defense Unit; are you aware of any
16   others?
17              MR. MERRITT:  Objection.
18        A.    I don't.
19              MR. MERRITT:  Strike that.
20        Q.    And, Mr. Manning, you mentioned that
21   you -- you're not sure whether BDU, Borrower
22   Defense Unit, was involved with methodology, but
23   other than that was there any policies that you're
24   aware of that -- that you had a role in -- in
25   making that affected the Borrower Defense Unit?

Page 93

1                    - JAMES MANNING -
2         A.    I don't recall.
3         Q.    Now, the Office of the Undersecretary
4    was involved in making policy for the Department,
5    correct?
6         A.    From time to time.
7         Q.    And if you, if you -- if the Office
8    of the Undersecretary made a policy, did it need
9    or did you need the Secretary's approval for any
10   of policies decisions?
11        A.    I don't recall the process.
12        Q.    Was it the Secretary's authority to
13   make certain policies delegated to the Office of
14   the Undersecretary?
15        A.    That's a good question.  I don't
16   recall.
17        Q.    If -- if the Office of the
18   Undersecretary made policy decisions, how would
19   that be reflected?
20        A.    There was correspondence process that
21   directed it through the executive Secretary, but I
22   don't recall what it was.
23        Q.    Would a written document be generated
24   for a policy made by the Office of the
25   Undersecretary?

Page 94

1              - JAMES MANNING -
2      A.    I expect so, but I don't recall in
3   particular.
4      Q.    Do you recall ever signing off on a
5   policy that was made by the Office of the
6   Undersecretary?
7      A.    I signed off on many letters.  I -- I
8   can't recall if or what -- there were any that
9   were specifically policy directives.
10     Q.    Did FSA have authority to make policy
11  or were they just implementing Department policy?
12     A.    They did not make policy FSA.  FSA
13  was an operation, not a policymaking group.  It
14  was an Office of Policy Liaison, a small team of
15  people at FSA that worked closely with the Office
16  of Postsecondary Education to understand, to be
17  fully appreciative of what the pol -- what the
18  current policies were and to be part of the
19  conversation and ultimately policies were going to
20  change that had impact I would say, they played a
21  role in explaining to the policy arm of the Office
22  of Secretary of Education how that might impact
23  one way or the other operations of FSA, but FSA
24  was not a policymaking organization.
25           They had a liaison and policy was

Page 95

1              - JAMES MANNING -
2   driven from -- Postsecondary Education policies
3   was driven from the Department of Education.
4            Policy was driven from the Office of
5   Postsecondary Education and FSA would receive, you
6   know, that policy and implement it, but we were
7   not a policymaking organization.  We were an
8   operation.
9      Q.    If policy was made by the Secretary
10  or other Department leadership, that would need to
11  be communicated to -- strike that.
12           If policy -- if the policy affecting
13  borrower defense was made by leadership at the
14  Department, that would need to be communicated to
15  the Borrower Defense Unit, correct?
16     A.    Yes.
17     Q.    And, in fact, was it the Office of
18  Undersecretary responsible for communicating
19  policy instructions to the Borrower Defense Unit?
20     A.    That would have been one of the
21  responsibilities, I'm sure.
22     Q.    Would you agree that it's important
23  to have clear communication of policy from the
24  Office of the Undersecretary to the Borrower
25  Defense Unit about borrower defense policies?

Page 96

1              - JAMES MANNING -
2           MR. MERRITT:  Objection, speculative
3      and overbroad.
4      Q.    Are you aware of any problems in
5   communication of policy from the Office of the
6   Undersecretary to the Borrower Defense Unit?
7           MR. MERRITT:  Objection, overbroad.
8      Q.    You can answer the question.
9      A.    I'm not, I'm not -- I'm not aware of
10  any.
11     Q.    You're not aware of any
12  misunderstandings that the Borrower Defense Unit
13  had about policy?
14     A.    I don't remember issues along those
15  lines.
16     Q.    Okay. Did you ever give instructions
17  to the Borrower Defense Unit to stop issuing
18  decisions on borrower defense claims?
19     A.    Do I have a memory of that, no.  I
20  don't remember.
21     Q.    Aren't you aware that the Borrower
22  Defense Unit at some point in time during your
23  tenure had an understanding that they were to stop
24  issuing decisions on borrower defense claims?
25           MR. MERRITT:  Objection, vague and

Page 97

1              - JAMES MANNING -
2   ambiguous.
3      Q.    You can answer the question.
4      A.    Can you repeat the question, please.
5      Q.    Are you aware that during your
6   tenure, the Borrower Defense Unit had an
7   understanding that they were to stop issuing
8   decisions on borrower defense claims?
9      A.    I don't recall.
10     Q.    Do you recall if the Borrower Defense
11  Unit ever stopped issuing decisions on borrower
12  defense claims?
13           MR. MERRITT:  Objection, ambiguous as
14      to timing.
15     Q.    At any time during your tenure, are
16  you aware if the Borrower Defense Unit stopped
17  issuing decisions on borrower defense claims?
18     A.    I don't recall.
19     Q.    At any time during your tenure, are
20  you aware that FSA stopped issuing decisions on
21  borrower defense claims?
22     A.    That FSA stop issuing?
23     Q.    Yes.
24     A.    I -- I don't recall.
25     Q.    At any time during your tenure at the

Page 98

1                  - JAMES MANNING -
2   Department, are you aware if the Department of
3   Education stopped issuing borrower defense claims?
4                  MR. MERRITT:  Objection, asked and
5        answered.
6                  MR. JARAMILLO:  It's not asked and
7        answered.  I'm asking about the full
8        Department.
9        A.     Okay, well, repeat the question then.
10       Q.     Are you aware at any time during your
11  tenure at the Department of Education in the Trump
12  Administration if the Department of Education
13  stopped issuing decisions on borrower defense
14  claims?
15       A.     I, I -- I don't recall specifically
16  that it was stopped -- issued.  I expect --
17       Q.     Go ahead.  I'm sorry.
18       A.     I'm trying to recall the facts and I
19  can't.  It's not coming to me.  If there's
20  something that could refresh my memory, it would
21  help that.  I -- I don't recall.
22       Q.     Between July, 2018 and the time you
23  left the Department of Education in March, 2019
24  are you aware of any borrower defense decisions
25  being noticed to borrowers?

Page 99

1                  - JAMES MANNING -
2        A.     Am -- am I aware of any -- of any
3   what?
4        Q.     Borrower defense decisions being
5   noticed or issued to borrowers.
6        A.     I don't recall.
7        Q.     Between July -- July, 2018 and March,
8   2019 when you left the Department, are you aware
9   of any borrower defense applications being
10  approved?
11       A.     Did you say July, 2018 and '19?
12       Q.     Between July, 2018 and the time you
13  left in March, 2019 are you aware of any borrower
14  defense claims being approved by the Department?
15       A.     Between that time?  I don't recall.
16       Q.     Between July, 2018 and March, 2019
17  are you aware of any borrower defense applications
18  being denied?
19       A.     I've had a weekly report on -- on
20  numbers of applications that came in.  I cannot
21  recall whether or not there were reports on the
22  numbers that were acted upon or approved.
23       Q.     During July, 2018 and March, 2019 you
24  don't recall whether or not the Department of
25  Education issued final decisions on borrower

Page 100

1                  - JAMES MANNING -
2   defense applications?
3        A.     Between the summer of '18 and when I
4   left in '19, I -- I don't recall.
5        Q.     Now, Mr. Manning, are you aware of
6   what this case is about, Sweet versus DeVos?
7        A.     Not specifically.
8        Q.     Are -- are you aware of the
9   allegations that the Department -- in this case
10  plaintiffs allege that the Department unreasonably
11  delayed in issuing borrower defense applications?
12       A.     I, I -- I've heard that previously at
13  one point.
14       Q.     Are you aware of any delay in issuing
15  borrower defense applications between July, 2018
16  and March, 2019?
17       A.     Am I aware, no.  I don't recall.
18       Q.     Are you aware of any delay in issuing
19  borrower defense applications during your tenure
20  in the Trump Administration at the Department of
21  Education?
22       A.     I don't recall delays specifically.
23  I -- I'll try to -- I'm trying to remember what,
24  if anything, happened around -- during the period
25  of the --

Page 101

1                  - JAMES MANNING -
2        Q.     Were you aware of any backlog in
3   processing Borrowers Defense applications during
4   the tenure -- your tenure at the Department of
5   Education?
6        A.     Yes.
7        Q.     Okay.  Tell me about what your
8   awareness is of that backlog.
9        A.     Well, as I said earlier, I got a
10  legal report on the growing numbers.
11                 MR. MERRITT:  Joe, just that we're
12       getting close to a lunch break.
13                 MR. JARAMILLO:  Yes, and I'm sorry,
14       we did pass a little, but I want to ask a few
15       more questions.  I think we'll be able to
16       wrap up in -- in at least one or two minutes
17       and then --
18                 MR. MERRITT:  That's fine.  Thank
19       you.  I just wanted to throw it out there.
20                 MR. JARAMILLO:  Thank you, Mr.
21       Merritt.
22       A.     So do you have a question, Joe?
23       Q.     Yes, Mr. Manning.  Just during your
24  tenure at the Department of Education, were you
25  satisfied with the pace at which the Department

Page 102

1            - JAMES MANNING -
2  was issuing borrower defense decisions?
3       A.    Was I satisfied with the pace?  I
4  observed that the numbers were growing.  I
5  can't -- I can't recall -- generally that was a
6  concern, that the numbers were growing.  I can't
7  recall anything more specific than that.
8       Q.    So you were -- were you aware or were
9  you not concerned about the pace in which the
10 Department was issuing Borrowers Defense decisions
11 at any time during your tenure in the Trump
12 Administration?
13      A.    I'm trying to recall what information
14 I had in terms of how that number was growing and
15 I'm re -- remembering a report that I saw weekly,
16 but I don't recall -- I can't specifically recall
17 what that number was do -- doing or if I had that
18 number at the time.
19      Q.    So as you sit here today, you don't
20 have any recollection of any concern over the pace
21 at which the Department was issuing decisions?
22      A.    Well, I -- I think it was growing and
23 I think that, you know, it -- it clearly needed
24 additional attention.
25      Q.    Are -- are you aware of the fact that

Page 103

1            - JAMES MANNING -
2  for the quarter ending June 30th, 2018, according
3  to the Department there were 105,998 borrower
4  defense applications pending?
5       A.    In what month was that did you say?
6       Q.    The quarter ending June 30th, 2018.
7       A.    2018, June 30th was what number
8  again?
9       Q.    105,998 applications pending.
10           MR. MERRITT:  Objection, lack of
11      foundation.
12      Q.    Does that sound accurate to you or
13 does that sound way off?
14      A.    I -- I hear that number and it feels
15 low.
16      Q.    Okay.  Well, let's go -- if we go to
17 March 31st, 2019 I'll represent to you that based
18 on information provided by the Department, that
19 number has grown to 179,377 for the quarter ending
20 March 31st, 2019.  Does that sound accurate to
21 you?
22      A.    I don't know.  What was the first
23 number you gave me?
24      Q.    105,998 for the quarter ending June
25 30th, 2018 and 179.377 for the quarter ending

Page 104

1            - JAMES MANNING -
2  March 31st, 2019.  How do those numbers sound in
3  terms of accuracy from what you remember?
4       A.    Well, I can't remember accurately.
5  You know, I'm -- I'm assuming that you have them,
6  they're the correct numbers.
7       Q.    Do you recall the numbers going up by
8  over 73,000 or more between June 30th, 2018 and
9  March 31st, 2019?
10      A.    I specifically do not remember that.
11      Q.    Okay.  Isn't that something that
12 would strike you as a significant increase?
13           MR. MERRITT:  Objection, speculation.
14      Q.    Impending applications, isn't that
15 something that you -- that would sit in your mind
16 as a -- as a lingering concern?
17      A.    I think the numbers growing -- sure,
18 there were concerns they were growing.
19           MR. JARAMILLO:  Okay, I'm happy to
20      take a lunch break now.  Thank you, Mr.
21      Manning.
22           MR. MERRITT:  Okay.  Thanks, Joe.
23           THE VIDEOGRAPHER:  We're off the
24      record, the time is 17:56 UTC.
25           (Whereupon, a lunch break was taken

Page 105

1            - JAMES MANNING -
2       from 1:00 p.m. to 1:30 p.m.)
3            THE VIDEOGRAPHER:  We're now on the
4       record, the time is 18:33.
5       Q.    Hi, Mr. Manning.  I hope you had a
6  good lunch break.
7       A.    Thank you.
8       Q.    Did you have any meetings over this
9  platform or any other platform with anybody during
10 the lunch break?
11      A.    No.  I didn't have any meetings with
12 anyone, but for the attorneys briefly at the
13 beginning and briefly before we came back on.
14      Q.    Okay.  Do you have anything to
15 clarify from your prior testimony today?
16      A.    Not that I recall.
17      Q.    And I hate to ask this again, but I
18 just want to check:  Are you -- have you taken any
19 medication in the past 24 hours that could impact
20 your ability to recall facts?
21      A.    I don't believe the medication that I
22 take affects my ability to recall facts.
23      Q.    Okay.
24      A.    I don't know that I have any
25 medications that are causing an issue.

Page 106

- JAMES MANNING -

2   Q.   Okay.  Thank you.

3   A.   But, as I said earlier, being 67 as
opposed to when I was 55 I can tell that there are
issues there.

6   Q.   Okay.  Let's turn to Tab 10 in the
packet of documents and, for the record, this is
already admitted as Exhibit 21 in a prior
deposition and it's the declaration of Colleen
Nevin.

11        (Whereupon, Exhibit 21, having been
12        previously marked, was tendered to the
13        witness for identification.)

14   Q.   And, Mr. Manning, I believe you
stated that you reviewed this, the declaration, in
preparation for today's deposition; is that
correct?

18   A.   I did read through it briefly, yes.

19   Q.   Okay.  If I could have you turn to
the last page.

21   A.   Signature page?

22   Q.   Yes, and can you -- can you read me
the date on which Ms. Nevin executed this
declaration?

25   A.   The 14th day of November, 2019.

Page 107

- JAMES MANNING -

2   Q.   Okay.  So it may me obvious, but I
think you would understand that her statements in
here purports to be accurate as of that date; is
that your understanding?

6   A.   I -- I believe that to be true.

7   Q.   Okay.  Let's turn to Page 15 of Ms.
Nevin's declaration.

9   A.   Okay, and could I point out that
I -- I left the Department on March 14th of 2019.

11   Q.   Yes, we understand that.  Let's turn
to Page 15 of Ms. Nevin's declaration.

13   A.   Okay.

14   Q.   And if you look at Paragraph 64,
Lines 14 and 15 of Page 15 it says, "Additionally
between December, December, 2017 and May, 2018,
OUS authorized the denial of over 10,000
applications."

19        Do you recall OUS authorizing the
denial of over 10,000 applications during that
time period?

22   A.   Do I recall it?

23   Q.   Yes.

24   A.   No, I actually do not.  However is it
likely to be correct, I expect that it is.

Page 108

- JAMES MANNING -

2   Q.   And if OUS did authorize the denial
of over 10,000 applications, would you as acting
Undersecretary have been involved in that
authorization?

6   A.   I would expect the denials to come
out of the Borrower Defense Unit as a
recommendation.  I didn't actively review
individual applications.

10   Q.   Would you have been the person at
OUS, as the acting Undersecretary, to authorize
the denial?

13   A.   During that period of time, it would
have come to my attention; and could I have had a
document that I had to sign related to this, I
could have.  I could have signed it, but I do not
recall.

18   Q.   If OUS authorizes the denial of these
applications, would anyone else at OUS besides you
have authorized them?

21   A.   During this period of time anyone
else at OUS, no.

23   Q.   It would have had to have been you,
correct?

25   A.   Yes.

Page 109

- JAMES MANNING -

2   Q.   In Paragraph 65, I'm not going to
read the -- well, I'll read the whole sentence.
Ms. Nevin writes, "While no additional decisions
have been issued to borrowers since in or about
June, 2018, BDU discontinued to make progress on
adjudicating applications."

8        Does this indicate to you that
between in or about June, 2018 and the date Ms.
Nevin's signed the declaration on November 14th,
2019 that no additional decisions were issued to
borrowers on their borrower defense applications?

13   A.   "The borrower defense has continued
to make progress on adjudicating applications,
specifically noting 50,000 applications have been
adjudicated on merits" --

17   Q.   I'm sorry to interrupt, Mr. Manning.
I'm not asking you about the -- that language that
you're reading.  I'm asking you specifically about
the first sentence in Paragraph 65 which states,
"While no additional decisions have been issued to
borrowers since in or about June, 2018."

23        And what I'm asking you is:  Does
that indicate to you that no decisions were issued
to borrowers between in or about June, 2018 and at

Page 110

1              - JAMES MANNING -
2    least, to your knowledge, the time you left the
3    Department in March, 2019?
4         A.    Well, quite frankly, what I was
5    reading was just the rest of the sentence;
6    and -- and normally when I look at something like
7    this, I look at the whole sentence just to make
8    sure I understand what the whole sentence means.
9         Q.    I -- I understand, Mr. Manning, but I
10   will point out that was not the rest of the
11   sentence, you're starting to read the second
12   sentence and I would like you to focus just on the
13   first part of the first sentence and whether that
14   indicates to you that no decisions were issued to
15   borrowers on the borrower defense applications
16   since in or about June, 2018 up until the date
17   Colleen Nevin signed her declaration on November
18   14th, 2019.  Is that what it indicates to you?
19        A.    Again -- yeah, I had said that that
20   seems to be correct.
21        Q.    Okay, and would it also be correct
22   based on that, that no -- no decisions were issued
23   to borrowers since in or about June, 2018 up until
24   the time you left the Department in March 2019;
25   yes or no?

Page 111

1              - JAMES MANNING -
2         A.    Say that again.  Repeat it, what you
3    just said.
4         Q.    No additional decisions were issued
5    to borrowers under borrower defense applications
6    since on or about June, 2018 --
7         A.    Right, I got that part.  What's the
8    rest?
9         Q.    -- through the time you left the
10   Department and beyond in March, 2019?
11        A.    That appears to be correct.
12        Q.    Do you have any reason to doubt that?
13        A.    Not at all.
14        Q.    Okay.  You're not aware of any
15   decisions being issued during that time period?
16        A.    Not that I recall.
17        Q.    I would like you to turn to Tab 7
18   and, for the record --
19        A.    Tab 7?
20        Q.    Yes, and I would like to mark this as
21   Exhibit 33.
22              (Whereupon, Exhibit 33 was marked at
23        this time.)
24        Q.    And, for the record, this is a
25   document from June 13, 2019 that includes the

Page 112

1              - JAMES MANNING -
2    testimony of Secretary DeVos in response to
3    questions, for the record, submitted by U.S.
4    Senator Patty Murray.
5         A.    Uh-huh.
6         Q.    And it has a total of 48 pages.
7         A.    I see it and I have it in hand.
8         Q.    Okay, I would like you to turn to
9    Page 20 of 48, if you could.
10        A.    Okay, I'm there.
11        Q.    Okay.  At the time bottom third of
12   the page under the heading "Recent Activity on
13   borrower defense approvals, Denials, and
14   Findings," the question was posed "As of March 20,
15   2019 when was the last time the Department, A,
16   approved a borrower defense claim?"
17              Can you read Secretary DeVos' answer
18   to Part A?
19        A.    The last time a borrower defense
20   application was approved was June 12th, 2018.
21        Q.    Okay, and then Part B of the question
22   asks "For the same time period, when was the last
23   time the Department denied a borrower defense
24   claim."  Can you just read for me the first
25   sentence of Secretary DeVos' answer in Part B?

Page 113

1              - JAMES MANNING -
2         A.    The last time a borrower against
3    application was denied was May 24th, 2018.
4         Q.    Does that indicate to you again that
5    there were no borrower defense decisions issued to
6    borrowers between June, 2018 and in this case as
7    of March 28, 2019?
8         A.    I see that.  I'm looking at -- this
9    is all I've been doing.  I'm looking at the -- the
10   -- her answer A and then B and the last time a
11   borrower -- from A, the last time a borrower
12   defense application was approved was June 12,
13   2018.
14        Q.    Are you aware of any reasons why the
15   Department stopped approving or denying borrower
16   defense claims during this time period?
17        A.    I'm not aware.
18        Q.    Do you have any recollection of
19   anything that would have caused the Department of
20   Education to stop issuing borrower defense
21   decisions during this time?
22              MR. MERRITT:  Objection, calls for
23        speculation.
24        Q.    Do you have any recollection, sir?
25        A.    Do I have any recollection?  I'm

Page 114

- JAMES MANNING -

1  sorry, repeat the question again.  Do I have any
2  recollection of?
3      Q.    Why did the Department stop issuing
4  borrower defense decisions during this time
5  period?
6      A.    I don't recall.
7      Q.    Can you recall anything happening
8  during this time period that would have caused the
9  Department to stop issuing borrower defense
10 decisions?
11         MR. MERRITT:  Objection, vague.
12     Q.    You can answer the question.
13     A.    Sorry repeat the question.
14     Q.    Mr. Manning, you were acting
15 Undersecretary of the Department of Education, the
16 third-in-command, is that right, during this time
17 period?
18     A.    Yes.
19     Q.    You were the third-in-command in the
20 Department of Education and the Department of
21 Education was responsible for issuing borrower
22 defense decisions to over 100,000 applicants who
23 claimed that they had been harmed by school
24 misconduct and, therefore, their federal student

Page 115

- JAMES MANNING -

1  loans should be discharged, correct?
2      A.    I'm not sure that 100,000 students is
3  the correct number, but aside from that it does
4  sound like a correct statement.
5      Q.    Well, I'll tell you, sir, I would
6  expect you to have an understanding as the
7  third-in-command of this important program
8  affecting over 100,000 borrowers with pending
9  applications.  I would expect you to know the
10 answer to this.  Is, is -- is my expectation
11 unreasonable?
12         MR. MERRITT:  Objection, misstates
13         prior testimony.  He said he didn't recall.
14         MR. JARAMILLO:  Which means he
15         doesn't know the reason.
16         MR. MERRITT:  Now.
17         THE WITNESS:  That's correct.
18         MR. JARAMILLO:  I didn't ask -- I'm
19         asking him now, what's your recollection.
20     Q.    You have no recollection whatsoever
21 of why -- the Department of which you were
22 third-in-command responsible for FSA, responsible
23 for Borrower's Defense, underneath your chain of
24 command directly reporting to you the Enforcement

Page 116

- JAMES MANNING -

1  Unit, the Borrower Defense Unit, how could you not
2  know why this important practice or decision was
3  made in or about June, 2018 to stop issuing
4  decisions; how could you not know, sir?
5          MR. MERRITT:  Objection,
6          argumentative.
7      Q.    Did you at one time know?
8      A.    I believe so.
9      Q.    When -- when do you think you knew?
10     A.    I don't recall.
11     Q.    Who would know the answer to this,
12 Mr. Manning?
13         MR. MERRITT:  Objection.
14     Q.    To your personal knowledge within the
15 realm of what you can recall, who do you think
16 would know the answer to this question of why the
17 Department of Education stopped issuing decisions
18 and did not resume issuing decisions for
19 approximately 18 months?  Who would you expect to
20 know the answer to that?
21     A.    I don't know.  I wish I could recall
22 the answer to that, but I don't.
23     Q.    All right.
24     A.    If there was a document that -- that

Page 117

- JAMES MANNING -

1  would refresh my memory I could consider that, but
2  I do not remember.
3      Q.    Okay.  Who would you have expected to
4  makes such a decision to stop issuing borrower
5  defense decisions for such a long time period?
6          MR. MERRITT:  Objection, calls for
7          speculation.
8      Q.    Who would you expect to know the
9  answer, sir?  That's not speculating.  Either you
10 would expect somebody to know or you wouldn't.
11     A.    I don't know.
12     Q.    I'll represent to you that Colleen
13 Nevin testified in her deposition that she was
14 informed of a decision to stop making -- to stop
15 issuing decisions on borrower defense applications
16 as a result of an injunction order in the
17 Manriquez -- the Calvillo Manriquez case, that she
18 was informed by Justin Riemer.
19         Do you recall any communications with
20 Justin Riemer about the decision to stop issuing
21 applications as a result of the Calvillo Manriquez
22 injunction order?
23     A.    So I don't remember specifically a
24 conversation regarding that.  I don't recall that.

Page 118

1                - JAMES MANNING -
2    I -- I do recall that that case effectively put
3    aside the methodology that we had established and
4    to -- to use going forward.
5         Q.   Sir, what category of claims did that
6    methodology apply; do you know?
7         A.   No, I don't recall.
8         Q.   It only applied to the class members
9    involved in to Calvillo Manriquez case; is that
10   right?
11        A.   I don't know if that's correct or
12   not.  I don't recall the specifics of the finding.
13        Q.   And -- and when you submitted the
14   declaration in the Calvillo Manriquez case, did
15   you have an understanding of what that case
16   involved?
17        A.   At that time when I wrote -- when I
18   signed the document I understood all of that, yes.
19        Q.   But as you sit here today you don't
20   have a clear recollection of it?
21        A.   I absolutely do not have a clear
22   recollection of it.
23        Q.   Do you recall that the methodology
24   enjoined in the Calvillo Manriquez case was
25   developed specifically for CCI students, the

Page 119

1                - JAMES MANNING -
2    current in-school students, at issue in that case?
3         A.   Only the CCI students, is that what
4    you said?
5         Q.   For the class members of that case
6    which were CCI students, I believe, with job
7    placement race claims -- I apologize if I'm not
8    getting that correctly -- correct?
9         A.   I specifically didn't recall that was
10   only CCI students.
11        Q.   So your recollection is that the
12   Calvillo Manriquez's case included students other
13   than CCI students?
14        A.   No.  You asked the question -- I
15   didn't recall one way or the other that there was
16   specified schools.  I didn't recall.
17        Q.   Okay.  Did you review the Calvillo
18   injunction order?
19        A.   I don't believe I did review the
20   injunction order.  I'm not an attorney and I would
21   have attorneys like Justin Riemer of -- look at
22   that form.
23        Q.   Is it possible that Justin Riemer
24   made the decision to stop issuing borrower defense
25   --

Page 120

1                - JAMES MANNING -
2         A.   (Unintelligible cross talk)
3         Q.   Please repeat your answer, Mr.
4    Manning, about Mr. Riemer.
5         A.   What was -- what was your question
6    again directly, so I make sure I'm answering the
7    right question.
8         Q.   Okay, I'm sorry.  Did Justin Riemer
9    make the decision?
10        A.   I don't expect that could be the case
11   because he personally didn't have that authority
12   and wouldn't have made a mistake like that.  He
13   would have come to me, if he needed.
14        Q.   Who had the authority to make a
15   decision like that?
16        A.   Well --
17             MR. MERRITT:  Objection, vague.
18             MR. JARAMILLO:  That's not vague.
19        Q.   You just testified Mr. Riemer
20   that -- I mean, excuse me, Mr. Manning, that
21   Justin Riemer did not have the authority to make
22   as such a decision?
23        A.   Well, in the first one -- go back and
24   repeat the original question because I didn't --
25             MR. MERRITT:  I'll say vague as to

Page 121

1                - JAMES MANNING -
2    what the decision was.
3         Q.   What we're talking about here, Mr.
4    Manning, is who made the decision to stop issuing
5    borrower's defense decisions during the time
6    period?
7         A.   Well -- well, in --in Justin Riemer's
8    time?  I'm -- I'm a little confused from --
9             I think that I need to go back and
10   have, you know, the last couple of questions and
11   answers repeated to me so I -- cause I've lost my
12   place in thought here.
13        Q.   Well, why don't we just -- why don't
14   we just move on.  I'm just going to ask -- try to
15   make my questions clear and specific.
16        A.   Well, that would be good.
17        Q.   Yes.  Did Secretary DeVos make a
18   decision to stop issuing decisions on borrower
19   defense applications?
20        A.   I don't know the answer to that
21   question.
22        Q.   Would she have the authority to issue
23   such a decision?
24        A.   Probably counsel -- I'll the
25   double-check with OGC, but I believe that the

Page 122

1                    - JAMES MANNING -
2    Secretary has the authority to give a part in the
3    whole in that -- in principle, but again I'd want
4    guidance from general counsel at the Department
5    before going forward but --
6         Q.    Would anyone else besides Secretary
7    DeVos have authority to issue such a decision?
8         A.    I don't know.
9         Q.    Would you have authority to issue
10   such a decision?
11        A.    I would have to see the decisions
12   like in front of me for consideration.  I --
13        Q.    Well, we don't -- I'm not aware of
14   such a decision document per se, but there was
15   obviously as you've seen a stoppage in the
16   issuance of borrower defense claims and for an
17   extended period of time.
18        A.    Right.
19        Q.    So you would expect that decision to
20   come from Department leadership, correct?
21        A.    I would expect that's correct, but I
22   don't know where that decision ultimately came
23   from.
24        Q.    Would you have authority to issue
25   such a decision?

Page 123

1                    - JAMES MANNING -
2         A.    I would have -- if I had that option
3    in front of me, I would have discussed so with the
4    general counsel's office to clarify that because
5    it's not clear to me.
6         Q.    But you -- in consultation with the
7    Office of General Counsel, you would have the
8    authority to issue such a decision or not?
9         A.    I, I -- I don't know.  I'd have to
10   have their counsel advise me to that.  I don't
11   know.
12        Q.    But one thing that's absolutely clear
13   is that Secretary DeVos would have that
14   decision-making authority, correct?
15             MR. MERRITT:  Objection,
16   mischaracterization of prior testimony.
17        Q.    I'm just asking the question:  One
18   thing that's clear, Mr. Manning, is that of
19   anybody at the Department of Education, Secretary
20   DeVos would have the authority to issue a decision
21   that would require stopping the issuance of
22   borrower defense approvals and denials; is that
23   right?
24        A.    I expect the Secretary has that
25   authority and so I would expect that she'd be

Page 124

1                    - JAMES MANNING -
2    briefed by others, including general counsel on an
3    issue before an action like that was taken.
4         Q.    But she would have the authority to
5    take the action after that briefing, correct?
6         A.    I expect that's correct.  I --
7         Q.    Did you ever at any time issue an
8    order regarding borrower defense?
9             MR. MERRITT:  Objection, vague.
10        Q.    Did you ever issue a decision
11   regarding borrower defense in your tenure at the
12   Department of Education?
13        A.    Did I have --
14             MR. MERRITT:  Objection, vague.
15        Q.    You can answer the question, Mr.
16   Manning, and I'll repeat it.  Did you ever at any
17   time issue a decision regarding borrower defense?
18        A.    A specific decision?
19        Q.    Any decision.
20        A.    I don't recall.
21        Q.    But you might have issued a decision
22   about borrower defense, but you just don't recall;
23   is that right?
24        A.    It's possible.
25        Q.    I want you to turn to Tab 16, if you

Page 125

1                    - JAMES MANNING -
2    could.  This was previously marked as Exhibit 12
3    and it appears to be a PowerPoint presentation
4    that's titled "Borrower Defense to Repayment
5    August 21, 2019."
6             (Whereupon, Exhibit 12, having been
7         previously marked, was tendered to the
8         witness for identification.)
9         Q.    And I recognize, Mr. Manning, that
10   this postdates your tenure at the Department, but
11   there is something in this document that I want to
12   ask you about.
13        A.    Okay, fair enough.  I have it.
14        Q.    Okay.  Thank you, Mr. Manning.  If
15   you could turn -- the page numbers are located in
16   the lower left-hand corner.
17        A.    I see them.  What number?
18        Q.    I want to go to Page 6 or Slide 6.
19        A.    Okay.
20        Q.    And there's a question on top "Why
21   are BD applications on Hold" and for approvals it
22   says, "'Manriquez' tier relief methodology for CCI
23   subject to injunction (as of May, 2018) and no
24   alternative methodology available."
25             Do you have any recollection of that

Page 126

- JAMES MANNING -

1          - JAMES MANNING -
2    being a reason why BD applications or borrower
3    defense applications were on hold?
4          A.    Well, I'm trying to understand the
5    page as I look at this.
6          Q.    I just want to ask you about that
7    bullet point.  I really -- I mean, that's what I
8    would like to focus on at this point, if you
9    would.
10          MR. MERRITT:  The witness is entitled
11     to familiarize himself with document you're
12     showing him.
13          Q.    Okay, Mr. Manning, but if I
14    recall and I don't want to rush you, but sometimes
15    you can take a while and I'm not sure it's
16    pertinent to read each and every line of this; but
17    if -- if that's what you want to do we can go off
18    the record so you could do it, if that's okay with
19    Mr. Merritt.
20          MR. MERRITT:  I don't think there's
21     any need to go off the record for that.  I
22     mean, when you show the witness documents he
23     has every right to read them and make sure he
24     understands what it is before he answers.
25          MR. JARAMILLO:  Okay, and use up

Page 127

1          - JAMES MANNING -
2    record time, that's fine.
3          Go ahead, Mr. Manning.
4          Why don't we take a short break, Mr.
5    Merritt, and we'll come back to this.
6          A.    Well, this is just a one-page slide.
7    It's not going to take me a half an hour to read
8    it.
9          Q.    I just want to know what you
10    under -- if you understood the first bullet point,
11    that one reason why BD applications were on hold
12    according to this document was that "the Manriquez
13    tier relief methodology for CCI subject to
14    injunction as of May, 2018 and no alternative
15    methodology available."
16          Do you have -- was that anything that
17    you recall, anything about that statement?
18          A.    Well, this, as you pointed out
19    earlier, happened after.
20          Q.    Certainly the PowerPoint application
21    is after your tenure, but we've already seen
22    documentation and you have -- you testified you
23    have no reason to doubt that there was a -- a
24    stoppage in the issuance of borrower defense
25    decisions between June, 2018 at least until the

Page 128

1          - JAMES MANNING -
2    time you left.
3          A.    Right.
4          Q.    And so we're looking at this document
5    and I want you to tell me if you have any comments
6    or if it refreshes your recollection at all as to
7    the first bullet point, as to that being a reason
8    why borrower defense applications were on hold.
9          A.    "Tiered relief methodology for CCI
10    subject to injunction (as of May, 2018) and no
11    alternative methodology available."  No relief
12    methodology developed for non-CCI claims.
13          Q.    Does this refresh your recollection
14    at all, Mr. Manning, about why borrower defense
15    decisions were put on hold?
16          A.    Not -- no, it doesn't.  I remember
17    that Manriquez put aside methodology; and could
18    that have led to delay in approvals, I expect it
19    could have, but --
20          Q.    Would the Department have been
21    legally required to stop issuing decisions on
22    borrower defense as a result of the Calvillo
23    Manriquez's decision and injunction order, to your
24    knowledge?  I'm not asking you as a lawyer, but
25    just to your understanding.

Page 129

1          - JAMES MANNING -
2          A.    Would the Department be required to
3    what again?
4          Q.    Stop issuing decisions on all
5    borrower defense applications as a result of the
6    Manriquez -- the Calvillo Manriquez injunction
7    order, to your understanding as layperson or the
8    third-in-command at the Department of Education at
9    the time.
10          A.    Well, yes, I am a layperson and this
11    -- that question is something if I -- I was
12    getting at the time, I'd be talking to my
13    attorneys in OGC.
14          Q.    And did you do that?
15          A.    I can't recall.
16          Q.    As you can see, Mr. Manning, I'm
17    trying to get to the bottom of who made the
18    decision to stop issuing the borrower defense
19    approvals and denials; and I appreciate your
20    patience in trying to work with me to jog your
21    memory about it and we're coming up blank from
22    your memory, which it is what it is.  Who would
23    you expect to know the answer to my questions?
24          A.    What somebody in the Department you
25    could go back to and ask, is that what you mean?

Page 130

- JAMES MANNING -

1

2    Q.    Who made the decision to stop issuing
3  approvals and denials?
4          MR. MERRITT:  Objection, asked and
5      answered.
6      Q.    Well, the -- the question is, who
7  would you expect to know?  I -- I understand that
8  you say you don't know.  Who would you expect to
9  know?
10         MR. MERRITT:  I believe he answered
11     that as well.
12     Q.    Refresh my memory please, Mr.
13  Manning.  Who would you expect to know, if
14  anybody?
15     A.    Someone in the General Counsel's
16  office.
17     Q.    Can you name somebody in the General
18  Counsel's office that you would expect to know?
19     A.    I probably would go to Phil
20  Rosenfelt.
21     Q.    Is Mr. Rosenfelt still at the Office
22  of General Counsel, to your knowledge?
23     A.    Yes, he is.
24     Q.    Besides Phil Rosenfelt, would you
25  expect anybody else to know who made the decision

Page 131

- JAMES MANNING -

1

2  to stop issuing approvals and denials during the
3  time period?
4      A.    I would expect other people to know,
5  but I don't.
6      Q.    Which other people, sir?
7      A.    I don't know.  I'm saying there
8  certainly would be other people.  I don't know
9  who.
10     Q.    Would you expect Diane Auer Jones to
11  know?
12     A.    Well, she became Undersecretary
13  around this time so --
14     Q.    Would you expect her to know?
15     A.    I would ask her.
16     Q.    Would you expect her to know as the
17  third-in-command as acting Undersecretary?
18         MR. MERRITT:  Objection, asked and
19     answered.
20     Q.    Yes or no, sir, would you expect her
21  to know or not?
22     A.    I would expect she knows.
23     Q.    Would you expect Colleen Nevin to
24  know?
25     A.    I, I -- I do expect that that would

Page 132

- JAMES MANNING -

1

2  go to Colleen.
3      Q.    From -- I'll represent to you, Mr.
4  Manning, that both Colleen Nevin and Diane Auer
5  Jones testified in their depositions they didn't
6  know who made the decision, but that it was
7  communicated -- that Nevin testified that it was
8  communicated by Justin Riemer.
9          Would you expect Wayne Johnson to
10  know?
11     A.    It was communicated by Justin Riemer
12  is what --
13     Q.    What Colleen Nevin testified to.
14     A.    I'm trying to recall.  I'm -- I'm
15  trying to recall the time frame and Julian
16  Schmoke's responsibilities.
17     Q.    You're thinking about Julian Schmoke
18  at this point in time?
19     A.    Yeah, I'm trying to recall when --
20  when he --
21     Q.    Depending on The time frame in which
22  Julian Schmoke worked at the Department, you might
23  expect him to know as well?
24     A.    Well, I'm thinking out loud here.
25  I'm sorry, I shouldn't be doing that, but

Page 133

- JAMES MANNING -

1

2  unfortunately I'm trying to recall when Julian
3  Schmoke was assigned -- was delegated
4  responsibility as chief of the Enforcement Unit.
5      Q.    Okay, that's fine.  We can move on.
6          Let me ask you this:  Would you
7  expect Martin Brown to know?
8      A.    At -- at this time May, 2018?
9      Q.    Well, I think what we saw from the
10  prior documents was that there were no borrower
11  defense decisions issued between June, 2018 until
12  the time that Ms. Colleen Nevin had signed her
13  declaration in November, 2019, but you -- you
14  expect Mark Brown to know who issued that
15  decision?
16     A.    I don't know.  I don't remember.  I
17  don't remember what Mark Brown started at the
18  Department.
19     Q.    Okay.  Would you agree that for
20  decisions to stop on borrower defense applications
21  for such an extended period of time would have
22  required the approval of Department leadership?
23     A.    In principle, I think that's right.
24         MR. JARAMILLO:  Why don't we take a
25     short break.  Is that okay, Charlie?

Page 134

- JAMES MANNING -

1
2    MR. MERRITT:  Yes, that's okay.
3    MR. JARAMILLO:  All right.  Let's
4    take -- let's take ten minutes because I need
5    to use the restroom.  Let's go off the
6    record, sorry.
7    THE VIDEOGRAPHER:  We're off the
8    record, the time is 19:12 UTC.
9    (Whereupon, there was a brief recess
10   in the proceedings.)
11   THE VIDEOGRAPHER:  We're now on the
12   record, the time 19:23 UTC.
13   Q.    Hi, Mr. Manning.
14   A.    Hi, Joe.
15   Q.    I don't want to belabor the point,
16   but I do want to kind of ask a little bit more
17   about this time period when there were no borrower
18   defense decisions, which demonstrates in my mind a
19   -- a policy decision for some reason or another
20   to not issue the decisions and I want to ask you:
21   Would such a policy decision to not issue borrower
22   defense approvals or denials for such an extended
23   period of time, would you expect that to be set
24   forth in writing somewhere in the Department?
25   A.    I -- I don't know if that exists or

Page 135

- JAMES MANNING -

1
2    not.  I'd have to --
3    Q.    Yeah, I'm not asking you if it
4    exists.  I'm just asking you what your expectation
5    would be as third-in-command at the time of the
6    Department of Education.  Would you expect such a
7    decision to be put forth in writing within the
8    Department?
9    A.    I'm trying to recall what actually
10   was happening at that time and I don't recall.  I
11   don't know whether there was or was not a -- a
12   document of that type put forward.
13   Q.    And my question is would you expect
14   such a decision to be put in writing, not whether
15   there was or wasn't but would you expect there to
16   be a writing showing such a decision?
17   A.    Are you saying There is not any in
18   writing, no decisions in writing?
19   Q.    I'm just asking you whether you would
20   expect there to be something in writing and, if
21   you don't mind, is there something that you're
22   looking at, at this point?
23   A.    Yeah, I'm actually looking at the
24   last document that you asked me to look at.
25   Q.    And this would be Tab 16 which was

Page 136

- JAMES MANNING -

1
2    Exhibit 12, Page 6 about why are BD applications
3    on hold?
4    A.    No, no, no.  I was looking -- I was
5    looking at this because it frustrated me that I
6    couldn't read the whole thing.
7    Q.    I apologize for not letting you read
8    the whole thing, but that is Tab 16, correct, the
9    PowerPoint?
10   A.    It was this one.
11   Q.    Yes, okay.  That's right.  Let the
12   record reflect that you've shown Tab 16.
13   A.    Yes.
14   Q.    I apologize for the frustration, but
15   I just want to know what -- what your expectation
16   would be for such a decision to put applications
17   on hold for so long.  Would you expect that to be
18   set forth in writing somewhere within the
19   Department of Education?
20   A.    I don't know if I expect that or not.
21   I'm -- I'm -- I'd be interested in trying to find
22   out if it exists or not.
23   Q.    Would it poss -- I'm sorry, sir, I'll
24   let you finish.  I'm sorry for interrupting.
25   A.    I was about to say I'm speculating

Page 137

- JAMES MANNING -

1
2    and I shouldn't be speculating, you know.
3    Q.    All right.  We don't want you to
4    speculate.  We just want to know what your
5    expectation would be.
6    So would it -- would it be normal
7    under your -- to your recollection, would it be
8    normal in the Department to -- at the Department
9    to order FSA to stop issuing decisions on borrower
10   defense applications without that being put forth
11   in writing?
12   A.    Would that be what?
13   Q.    Would that be normal; is that
14   something the Department, you would expect them to
15   engage in?
16   A.    It was -- Well, no, I wouldn't expect
17   that.
18   Q.    Would you expect such a decision to
19   be put in writing?
20   MR. MERRITT:  Objection, asked and
21   answered.
22   Q.    You can answer, sir.
23   A.    I'm -- I --
24   Q.    I'm giving you three choices; yes,
25   no, I don't know?

Page 138

1                 - JAMES MANNING -
2       A.    Well, then it's I don't know.
3       Q.    Okay.  Let's look back at Tab 16,
4  Page 6, what you were looking at before, "Why are
5  BD applications on the hold."
6       A.    Which page?
7       Q.    Page 6.  It's the page we were
8  looking at.
9       A.    Yes.  So what I had left open on the
10  desk here, yeah.
11       Q.    Yes, sir.  So there's a heading in
12  the left-hand side that says "Denials" and the
13  first bullet point says, "Policy decisions spring
14  2018 to not issue denials until approvals could be
15  issued."  Were you aware of such a policy
16  decision?
17       A.    I think I heard some discussion about
18  that issue.  I don't recall policy decision around
19  it.
20       Q.    Who would make such a policy decision
21  if it were in fact made as stated here?
22       A.    I don't know.
23       Q.    Would the Office of the
24  Undersecretary have authority to make such a
25  decision?

Page 139

1                 - JAMES MANNING -
2       A.    I think on this issue, I would have
3  to engage in further discussion.
4       Q.    On this issue, the Office of
5  Undersecretary would have to engage further
6  discussion --
7       A.    This type of a policy decision and
8  policy, you know, the Office of Postsecondary
9  Education has a voice there.  OGC, you know, has a
10  responsibility there, in -- In addition to OUS.
11       Q.    And after that consultation, would
12  you expect such a decision to be set forth in
13  writing?
14       A.    Generally once policy decisions are
15  made as policy decisions, they are memorialized in
16  writing.
17       Q.    What is a regulatory action memo?
18       A.    I don't recall.
19       Q.    What -- what would you call the
20  writing that you would put a policy decision at
21  the Department in; what -- is there a title, a
22  certain title for the document that would reflect
23  the policy decision?
24       A.    I don't recall.
25       Q.    Would it be similar to the memo that

Page 140

1                 - JAMES MANNING -
2  -- that you authored or has that your name on it
3  from May 4th, 2017 that was given to Secretary
4  DeVos and that you looked at as Tab 11 which is
5  Exhibit 7 in this case?
6       A.    Uh-huh.
7       Q.    Is that a yes?
8       A.    No, it's not a yes to the question.
9  I recognize what you're talking about.  Tab 11,
10  I'll look at it again to see what it says.  You
11  said Tab 11?
12       Q.    Yes.
13       A.    What was your question again about
14  this?
15       Q.    Would you expect -- a policy decision
16  like the bullet point under "Denials" to not issue
17  denials until approvals could be issued,
18  would you expect that to be in writing -- strike
19  that.
20            You testified that you would expect
21  that to be in writing and my question is:  Is
22  there a certain title that the document would have
23  if a policy decision like that were put in
24  writing?
25       A.    Well, then you're referring to like

Page 141

1                 - JAMES MANNING -
2  this document that went to the Secretary from me
3  on May 4th, '17 that she signed.  Because, no, I
4  would not expect it to be like this kind of
5  document that I sent to the Secretary.
6       Q.    All right.  What -- what would you --
7  sorry, go ahead.
8       A.    So you know, I had -- I'm saying that
9  this document I'm looking at from the Secretary,
10  that would have been signed by the Secretary, is a
11  memorandum for decision which is different than a
12  policy document.
13            It has a -- has a recommendation to
14  her for approval or disapproval and that's --
15  that's a decision memo, not an -- an established
16  policy.
17       Q.    So is there a certain title that was
18  used at the Department of Education for policy
19  decisions?
20       A.    I don't recall.
21       Q.    But you would expect it to be in
22  writing?
23       A.    Look, if it's -- if there's a new
24  policy that impacts the general public, then it
25  gets published in -- in the public register.  It

Page 142

1                - JAMES MANNING -
2    depends on what level of policy you're talking
3    about.
4         Q.    So what level of policy was the
5    policy decision of spring 2018 to not issue
6    denials until approvals also could be issued?
7    What type of policy would you classify that as?
8         A.    Well, ask me this question again
9    because I don't --
10        Q.    Okay.  You're looking at -- can you
11   look at Page 6 of why are BD applications on hold
12   at Tab 16, Exhibit 12, second bullet point;
13   "Denials:  Policy decision (spring 2018) to not
14   issue denials until approvals could be issued"?
15        A.    Yes.
16        Q.    What type of policy decision do you
17   classify that as?
18        A.    Well, this is a -- this is a --
19        Q.    I'm not asking you about the
20   document, sir.  I'm asking you about the policy
21   decision described in that bullet point.
22             Is that a policy decision that you
23   would expect to be set forth in a certain type of
24   document within the Department?
25        A.    Well, I don't have enough information

Page 143

1                - JAMES MANNING -
2    to know that this is a policy decision that was in
3    place based on what I'm looking at.
4         Q.    Okay.  Well, it says "Policy decision
5    spring 2018" and you were at the Department at
6    that time, correct?
7         A.    Yes.
8         Q.    And you were acting as Undersecretary
9    at that time, correct?
10        A.    'Til May.  May, 2018.
11        Q.    Okay, and you were also COO of FSA at
12   that time, correct?
13        A.    Yes.  I had to stop and think about
14   the calendar again but, yes, that's correct.
15        Q.    So wouldn't you have known about a
16   policy decision like this?
17             MR. MERRITT:  Objection, asked and
18        answered.
19        Q.    Let's just go back to -- to what
20   I'm -- I just want to, you know, just get a solid
21   answer from you.
22        A.    What's the question?
23        Q.    Would there be a certain title to a
24   document that would contain a policy decision as
25   is described here in that bullet point?

Page 144

1                - JAMES MANNING -
2         A.    I don't recall.
3         Q.    Okay.
4              Mark Brown came in as COO of FSA af
5    -- when you left the Department, is that right, he
6    replaced you in that position?
7         A.    Correct.
8         Q.    Did you have any discussions --
9         A.    My -- my answer was -- Joe was
10   correct, that Mark Brown succeeded me as -- as
11   COO.
12        Q.    In connection with the transition
13   from you as COO to Mark Brown as COO, did you have
14   any discussions with Mr. Brown about borrower
15   defense?
16        A.    I don't recall discussions we had.
17   We had -- you know, it was a relatively quick I
18   decided to leave; and I certainly had
19   conversations with him, may have discussed
20   borrower defense.  I don't recall, you know.
21        Q.    Why did you leave the Department?
22             MR. MERRITT:  Objection, beyond the
23        scope of the discovery the -- the court has
24        authorized.
25        Q.    You can answer the question, Mr.

Page 145

1                - JAMES MANNING -
2    Manning.
3         A.    Okay, I had retired -- sorry.
4    (Unintelligible crosstalk)
5         A.    I retired from the Department in
6    2015, January 3rd, 2015.
7         Q.    I understand, but why -- why did you
8    leave the Department in March, 2019?
9         A.    Keep listening.  I'll answer that
10   question.
11        Q.    Oh, I'm sorry, Mr. Manning.  I
12   didn't know.
13        A.    I -- I expected to be in a state of
14   retirement and do different things; and I was
15   approached to go back on the transition team and
16   then I was asked to stay; and because I've been a
17   public servant all of my life, I agreed to stay
18   for a period of time; and I stayed for more than
19   two years and it was time to, you know, retire
20   again or resign again and did outside consulting
21   myself before I ultimately moved into another
22   position.
23        Q.    How many presidential administrations
24   did you work for?
25        A.    All of them since Carter except for

Page 146

```
1                   - JAMES MANNING -
2    Clinton, but I was a career officer, a career
3    member of the senior executive service.  At the
4    beginning of my service, I was in the Career
5    Foreign Service.
6        Q.     And immediately prior to joining the
7    Trump transition team, were you self-employed
8    doing consulting work?
9        A.     Yes.
10       Q.     So what were the types of clients
11   that you had?
12              MR. MERRITT:  Objection, it's beyond
13          the scope of the discovery that's been
14          authorized.
15       Q.     Did you have any higher education
16   clients?
17       A.     What's your definition of higher
18   education?
19       Q.     How about student loan guarantors?
20       A.     I did work for Strata Education, you
21   know, a former student loan guarantee agency
22   that's no longer a guarantee agency.
23       Q.     Anybody else?
24       A.     Nobody else in higher education.
25       Q.     No -- no institutions of higher
```

Page 147

```
1                   - JAMES MANNING -
2    education?
3        A.     That I worked for as a consultant?
4        Q.     Yes, prior to joining the Department
5    or the Trump transition team.
6               MR. MERRITT:  I going to object to
7           the scope of this line of questioning and how
8           it's relevant to the discovery the court
9           authorized.
10       Q.     You can answer the question.  You
11   mentioned Stratta Education.  Was there any other
12   higher education-related institution that you had
13   as a client?
14       A.     No.
15       Q.     What about USA Funds?
16       A.     USA -- USA Funds was a pre -- Stratta
17   was spun off from USA Funds.  I did not work for
18   you USA Funds.
19       Q.     Did any of your consulting work
20   involve the discharge of federal student loans?
21              MR. MERRITT:  Objection, it's beyond
22          the scope.
23       Q.     Your answer, sir?
24       A.     No.
25       Q.     And did you ever consult in
```

Page 148

```
1                   - JAMES MANNING -
2    connection with the Penn Hill Group after leaving
3    the Department of Education?
4               MR. MERRITT:  Objection, and I'm
5           going to object to that question, beyond the
6           scope.  This has gone on long enough.  I'm
7           going to instruct the witness not to answer
8           to enforce a court order limitation on
9           discovery.
10       Q.     Have you done any work after leaving
11   the administration related to the discharge of
12   student loans?
13              MR. MERRITT:  Objection.  Beyond the
14          scope.  I instruct not to answer to protect
15          the limitation, the court ordered limitation
16          on discovery.
17       Q.     Have you done any the work on behalf
18   of institutions of higher education as in your --
19   in your consulting work after leaving the Trump
20   Administration?
21              MR. MERRITT:  Objection to this line
22          of questioning, we objected to it, beyond the
23          scope of what the court authorized discovery
24          on.  Continue to instruct not to answer.
25              MR. JARAMILLO:  Well, I think it's --
```

Page 149

```
1                   - JAMES MANNING -
2    I think it's relevant.  It goes to
3    credibility and it goes to bias.
4               MR. MERRITT:  Was that one of the
5           topics the court authorized discovery on?
6               MR. JARAMILLO:  That's always an
7           issue when you're talking about a discovery.
8           I don't think Judge Alsup would disagree with
9           that.
10              MR. MERRITT:  And this an ATA case
11          and as you just said the Judge also
12          recognized, a discovery of the agency is
13          favored, that's the presumption.  He
14          obviously authorized discovery in this case,
15          but it must be limited to the topics he
16          actually set forth and this is not related to
17          any of the -- the topics described --
18          (unintelligible crosstalk).
19       Q.     Did your work at the President Forum
20   involve any work for non-for-profit schools?
21              MR. MERRITT:  Objection, still beyond
22          the scope.
23       Q.     Does your work at President Forum,
24   Mr. Manning, involve any discharge of federal
25   student loans?
```

Page 150

1           - JAMES MANNING -
2           MR. MERRITT:  Objection, beyond the
3      scope of the court-authorized discovery.  I
4      instruct the witness not to answer to protect
5      the limitation ordered by the court.
6      Q.     After leaving the Trump
7  Administration, Mr. Manning, did you have any
8  discussions with anybody at the Department of
9  Education regarding borrower defense issues?
10     A.     After I left the Trump
11 Administration?
12     Q.     Yes, sir.
13     A.     Did I have any conversations with
14 people at the Department about borrower defense,
15 is that what you said?  Repeat the question     ,
16 please.
17     Q.     That's it.  You got it, Mr. Manning.
18 That's -- that's the question.  You repeated it
19 accurately.
20     A.     After I left the Trump
21 Administration, did I have conversations
22 with -- none that I recall.
23     Q.     I would like you to turn to Tab 12
24 and this is a document that we need to mark as the
25 next exhibit, which I believe is 34.

Page 151

1           - JAMES MANNING -
2           (Whereupon, Exhibit 34 was marked at
3      this time.)
4      Q.     And this is a document that has on
5  top "U.S. Department of Education Borrower
6  Defenses and Financial Responsibility Negotiated
7  Rulemaking Committee 2017-2018  Session 1."
8      A.     Yes.
9      Q.     Have you seen this document before,
10 Mr. Manning?
11     A.     It looks like a transcript of the
12 remarks I gave at the beginning of this session.
13     Q.     Have you seen it before?
14     A.     Have I seen this document before?
15     Q.     Yes, sir.
16     A.     In this form, not that I recall.
17     Q.     Okay.  I want you to turn to Page 8,
18 please.
19     A.     Happy to.
20     Q.     And I would like you to look at the
21 sentence beginning in the middle of Line 11.
22     A.     Can I just point out, just for my own
23 clarification, this document -- there's a couple
24 of pages Number 1 and the back of the cover page
25 is Number 7, 8, 9, 10.  So is this -- is this a

Page 152

1           - JAMES MANNING -
2  complete document?
3      Q.     Well, sir, I -- thanks for pointing
4  that out.  I think that we just excerpted here
5  your -- your remarks as they appear in this
6  transcript.
7      A.     Okay.
8      Q.     If you could turn to Page 8 on Line
9  11.  Can you read for me the second beginning with
10 "As you know"?
11     A.     Yes.  "As you know, the borrower
12 defense regulations enacted in 2016 have been
13 delayed and so the Department has and will
14 continue to consider claims under the regulatory
15 status quo which assesses a claim under applicable
16 state law and commits to the Secretary's
17 discretion how to fashion relief"
18     Q.     And do you recall making that
19 statement to this committee?
20     A.     Yes.
21     Q.     I would like you to turn to Page 10.
22     A.     Okay.
23     Q.     Can you read the sentence beginning
24 at Line 5.
25     A.     "Throughout the winter and early

Page 153

1           - JAMES MANNING -
2  spring, a team consisting of both career and
3  non-career Department leadership evaluated the
4  program and worked to implement controls and
5  procedures for reviewing claims and processes for
6  discharging loans for successful claimants."
7      Q.     And was that the Borrower Review
8  Defense Panel that we discussed earlier?
9      A.     I believe so.
10     Q.     And what controls and procedures were
11 implemented?  You -- you say that they "worked to
12 implement controls and procedures for reviewing
13 claims and processes for discharging loans for
14 successful claimants."
15           Do you recall any more about those
16 controls and procedures?
17     A.     Well, what came out of that was the
18 establishment of the methodology.
19     Q.     Did anything else come out of that
20 that was related to controls and procedures for
21 reviewing claims and processes for discharging
22 loans?
23     A.     I don't recall.
24     Q.     Can you look at -- on the same page,
25 the sentence starting at Line 17.

Page 154

```
1                  - JAMES MANNING -
2              Could you read that one?
3        A.    Yeah. " Our review uncovered several
4    areas of concern which required building an
5    infrastructure to remain, to review claims and
6    make programmatic tweaks, which in turn
7    contributed to the time it has taken to adjudicate
8    additional claims."
9        Q.    Do you recall what these several
10   areas of concern were?
11       A.    I do not recall.  No, I do not
12   recall.
13       Q.    Do you recall what the programmatic
14   tweaks were?
15       A.    I don't recall that.
16       Q.    Do you recall how all of this
17   contributed to the time it has taken to adjudicate
18   additional claims?
19       A.    I'm -- I'm sorry.  Repeat that,
20   please.
21       Q.    Do you recall how these things
22   contributed to the time it has taken to adjudicate
23   additional claims?
24       A.    I don't recall how this -- no.  No, I
25   don't recall.
```

Page 155

```
1                  - JAMES MANNING -
2        Q.    At this point in time which was in
3    November of 2017, do you recall there being a
4    delay in the issuance of borrower defense claims
5    decisions?
6        A.    I specifically do not recall that.
7        Q.    If I can have you turn to Page 13.
8        A.    Okay.
9        Q.    Can you read -- sorry.  Can you read
10   the sentence starting in the middle of Line 6?
11       A.    "Moving forward"?
12       Q.    Yes.
13       A.    "Moving forward, we have
14   approximately 95,000 pending claims of which
15   roughly 65 percent are from former Corinthian
16   students."
17       Q.    And can you read the next sentence.
18       A.    "While I cannot give you a specific
19   date or number, I can tell you that approval of
20   some these claims is imminent.  While it has taken
21   some time" -- or did you want me to keep on going?
22       Q.    You can keep on going, sir.  Thank
23   you.
24       A.    "While it has some time, I am
25   confident that the work done to assess and make
```

Page 156

```
1                  - JAMES MANNING -
2    adjustments to the program during the short-term
3    hiatus in adjudicating claims will yield long term
4    improvements and efficiencies beneficial to all."
5        Q.    So at that point in time in November,
6    2017 did you believe that the approval of some of
7    these claims was imminent?
8        A.    That's what I said.  I believed it
9    then.
10       Q.    Did -- did anything about your belief
11   change after that point in time whether the
12   approval was imminent or not?
13       A.    I -- I don't recall.
14       Q.    Do you know if any of those claims
15   you believed were about to be approved were, in
16   fact, improved -- approved during your tenure?
17       A.    At this point, I do not recall.
18       Q.    And you mentioned that there was a
19   short-term hiatus in adjudicating claims.  Do you
20   remember what caused the short term hiatus?
21       A.    I do not remember.
22       Q.    Do you remember how long that hiatus
23   actually was?
24       A.    I do not remember.
25       Q.    Do you know if -- up to this point,
```

Page 157

```
1                  - JAMES MANNING -
2    November 14th, 2017, do you recall any approvals
3    other than the 16,000 approximate claims that
4    were approved in the prior administration that
5    Secretary DeVos decided to discharge; are you
6    aware of any other approvals between the time you
7    started in the Department in January, 2017 up
8    until now this point in November, 2017?
9        A.    I don't recall.
10       Q.    You don't know one way or the other
11   whether there were any approvals during that time
12   period?
13       A.    I don't recall one way or the other.
14       Q.    Do you know if there were any denials
15   during that time period?
16       A.    I don't recall.
17       Q.    Do you know when the short -- the
18   hiatus that you call short term, do you know when
19   it ended?
20       A.    I -- no, I don't recall.
21       Q.    Okay.  Do you recall anything about
22   the hiatus?
23       A.    Not -- no, I don't recall anything
24   about the hiatus.  I remember saying it here, but
25   I -- I don't have any recollection now.
```

Page 158

- JAMES MANNING -

1
2       Q.      Okay.  If we could, turn to Page 14.
3       A.      Okay.
4       Q.      Mr. Manning, could you please read
5   for me the sentence beginning on Line 18.
6       A.      "The Department is also working to
7   adjudicate pending claims related to other
8   schools.  We are making progress on that front.
9       Q.      Was that an accurate statement?
10      A.      I believe it to be true when I said
11  it.
12      Q.      What did you base that statement on?
13      A.      Discussion with others I'm sure at
14  the time, but I don't recall who was consulted on
15  this or who initially had a -- a hand in writing
16  it.
17      Q.      So when you had made these remarks,
18  was --- was it sort of a written speech you had
19  prepared beforehand?
20      A.      It certainly was written and prepared
21  beforehand.
22      Q.      Did you write it yourself or did
23  someone on your staff help you write it?
24      A.      I had help.  I -- there was staff
25  writer, I'm sure.  I don't remember who it was.  I

Page 159

- JAMES MANNING -

1
2   definitely saw it before I read it -- before I,
3   you know, delivered it and made adjustments.
4       Q.      Have you ever --
5       A.      I can't recall.
6       Q.      Go ahead.  We spoke over each other.
7   Go ahead, Mr. Manning.
8       A.      If I put my voice to it, I couldn't
9   tell you now which -- which parts were written by
10  somebody else or which were written by me.
11      Q.      And you don't recall who would have
12  been involved in -- in writing it besides you?
13      A.      I don't recall.
14      Q.      Normally, who would write your
15  speeches for you or, or -- or write drafts of them
16  for your review?
17      A.      I -- I didn't give that many.
18      Q.      Okay.  That's fine, if you don't
19  recall.
20      A.      I don't.
21      Q.      And is it true that the Department at
22  that time in November, 2017 was also working to
23  adjudicate pending claims related to schools other
24  than Corinthian?
25      A.      If they were doing it at that time,

Page 160

- JAMES MANNING -

1
2   what did I say here?  I stand by what I said.
3       Q.      And you said the Department is also
4   working to adjudicate pending claims related to
5   other schools?
6       A.      Right.
7       Q.      And you stand by that?
8       A.      Yes.
9       Q.      And you state that "We are making
10  progress on that front."  Do you recall what
11  progress was being made on that front?
12      A.      No, but I expect that it was slow.
13      Q.      Why did you expect that it was slow?
14      A.      Because I'm sure the desire was to
15  move them quicker than they were being moved.
16      Q.      Do you recall being dissatisfied with
17  the pace at which they were moving at that time?
18      A.      My hope always was to move them
19  quicker.  It was a small staff who was handling it
20  at borrower defense, which was an issue and that
21  remained an issue for a long time.  I understand
22  now that the -- the staffing there is much better
23  than it used to be now.
24      Q.      Did you take any steps to try to make
25  the -- the pace of the claim adjudication go more

Page 161

- JAMES MANNING -

1
2   quickly?
3       A.      I don't recall.
4       Q.      Did you take any steps to increase
5   the -- the staff of the Borrower Defense Unit?
6       A.      There was some discussions about that
7   and in principle supported additional staff.  I
8   know it was some time before there was a
9   significant growth in staff, though.
10      Q.      Did anyone at FSA ever make a request
11  to you for additional staff for the Borrower
12  Defense Unit?
13      A.      Oh, I'm sure I had conversations
14  with Colleen where additional staff were discussed
15  and --
16      Q.      Did Colleen ever request additional
17  staff for the Borrower Defense Unit?
18      A.      We discussed that.
19      Q.      Did she request it?
20      A.      I can't remember a specific request,
21  but she and I agreed that there should be more
22  staff.  I don't know when the -- the staff grew.
23  You know, when it grew I don't recall.
24      Q.      What did Ms. Nevin tell you about her
25  concerns about staff?

Page 162

```
1              - JAMES MANNING -
2      A.    I don't remember specifically. Just
3  knowing that we had -- we had the conversation
4  that we needed more staff.
5      Q.    Do you know why it took some time for
6  additional staff to be added to the Borrower
7  Defense Unit?
8      A.    I don't recall.
9      Q.    Did you ever make a request to
10 increase the staff of the DBU or Borrower Defense
11 Unit?
12     A.    I can't remember specifically making
13 that request, but I believe I did.  I don't
14 recall.  I don't recall.
15     Q.    What was the process addition -- for
16 requesting additional staff for the BDU?
17     A.    I don't recall.
18     Q.    And do you recall having a request
19 for additional staff for the BDU ever having been
20 denied by the Department?
21     A.    Denied by who?
22     Q.    Denied by anybody at the Department.
23     A.    I don't recall that.
24     Q.    If you wanted -- if you were to
25 request additional staff for the BDU, what would
```

Page 163

```
1              - JAMES MANNING -
2  you do?
3              MR. MERRITT:  Objection, calls for
4  speculation.
5      Q.    You can answer the question.
6      A.    You mean now or then?
7      Q.    Then.
8      A.    I don't recall what --
9      Q.    Do you recall now what would be done?
10     A.    I don't recall.  You know, I don't
11 recall.
12     Q.    Do you -- do you recall the number of
13 staffing that was in place when you were acting
14 Undersecretary in terms of staffing at the BDU?
15     A.    No, I don't recall what it was then.
16 I do understand that it's significantly higher
17 now --
18     Q.    Okay.  Would --
19     A.    -- which is a good thing.  I hd added
20 which is a goo thing.  I understand that there's
21 more staffing now and I said which is a good
22 thing.
23     Q.    Are you aware that the contractor
24 staffing at the Borrower Defense Unit went from
25 twenty to six between November, 2016 and
```

Page 164

```
1              - JAMES MANNING -
2  September, 2017?
3      A.    November, 2016 and November,
4  2017 --
5      Q.    To September, 2017.
6      A.    I do recall, not specifically what
7  you said, but that people left between late '16
8  and is early '17, including both the -- the
9  gentlemen whose names I can't remember; Robert who
10 led the Enforcement Unit left early and his deputy
11 ultimately left as well and there were other
12 attorneys that left.  Colleen Nevin had been
13 principal of -- Number 3 person there and she
14 remains to this day.
15            Staff did go.  I don't recall how low
16 the number got and I know now that they have
17 significantly more staff.
18     Q.    And how do you know that, Mr.
19 Manning?
20     A.    I'm trying to recall who told me
21 that.  I can't remember.
22     Q.    During your tenure at the Department,
23 was there any assessment made of the amount of
24 staff needed to reduce the backlog of pending
25 borrower defense applications?
```

Page 165

```
1              - JAMES MANNING -
2      A.    A formal assessment, not that I
3  recall.
4      Q.    How about an in formal assessment?
5      A.    Well, I think that Colleen had ideas.
6      Q.    What became of Colleen's ideas, if
7  you know?
8      A.    I don't recall.  I can't remember,
9  you know, what the level fell to or -- or where
10 it, you know, rose to over the following years.  I
11 just don't remember.
12     Q.    I would like to 1have you turn back
13 to Tab 7, which was marked as Exhibit 33.
14     A.    Okay.
15     Q.    And these again are the questions
16 submitted by Senator Patty Murray and Secretary
17 DeVos' answers.
18     A.    All right.  I'm trying to keep these
19 things in order.
20            Okay, I have it.
21     Q.    If you could turn to Page 19 and I'm
22 just going to read to you the question that
23 appears there.
24     A.    Okay.
25     Q.    Are you at Page 19 of 48?
```

Page 166

1              - JAMES MANNING -
2      A.    I was making the mistake of reading
3  the page numbers from the top.
4      Q.    I should point out I'm -- I'm going
5  by the ones at the bottom.
6            The ones at the top appear because of
7  electronically filing the document with the court,
8  but I'm just going to go with the bottom.
9      A.    And I found it.  I'm with you.
10 Gotcha.
11     Q.    Okay, Mr. Manning.  At the bottom of
12 the page there is a heading that says "Resources
13 required to address borrower defense backlog."
14           I'm going to read the question and
15 then we can talk about Secretary DeVos' answer.
16 The question at that time --
17     A.    May I ask the time frame when this
18 was happening?
19     Q.    Yes, and I -- this was from June
20 13th, 2019.  Recognize that this postdates your
21 time at the Department, but it does discuss some
22 things that I wanted to ask you about just in case
23 you were involved with any related items during
24 your time at the Department.
25     A.    Okay.

Page 167

1              - JAMES MANNING -
2      Q.    And I'm going to read the question
3  from Senator Murray and then we'll go over Ms.
4  DeVos' answer and I just wanted to pick your brain
5  a little bit about -- I would'nt know anything
6  about what she's saying here.
7            So the question is, "Has the
8  Department conducted any analysis of the
9  resources, including staff full-time equivalencies
10 and any contract funding necessary to clear the
11 backlog of pending borrower defense claims, now
12 totaling at least 158,000 from the end of quarter
13 4 of 2018?  If so, please describe how such
14 analysis was conducted and the principal
15 findings of such analysis, including staffing or
16 contracting resources that could be utilized or
17 necessary."
18           Mr. Manning, can you read for me just
19 the first two sentences of the answer, "Yes" being
20 the first sentence and then after that the second
21 sentence.
22     A.    Only the first two sentences, not the
23 whole response?
24     Q.    Yes, because I -- yeah, I just want
25 to ask you -- after you read that first two

Page 168

1              - JAMES MANNING -
2  sentences, I want to ask you about it.  Can you
3  read it out loud for the record.
4      A.    "Yes.  The Department recently
5  completed a preliminary estimate of the full-time
6  and contractor resources needed to eliminate or
7  substantially reduce the number of pending
8  borrower defense applications."
9      Q.    I want to ask you about that, Mr.
10 Manning.
11     A.    Oh, that was two sentences.  "Yes"
12 was the first sentence, okay.  I got it.
13     Q.    Were you involved with this
14 preliminary estimate at all?
15     A.    Well, considering that these were
16 asked after I left, I would say that -- no.  I
17 have no recollection.  I mean, I was gone then and
18 then was not involved in assisting in answering
19 these kind of questions and stuff like that.
20     Q.    I understand, Mr. Manning.  I was
21 just curious as to -- you know -- I wanted to just
22 probe a little bit about whether that estimate was
23 undertaken during the time you were at the
24 Department, and I understand the answers to these
25 questions are from a few months afterward and I

Page 169

1              - JAMES MANNING -
2  just wanted to see if you had any knowledge of
3  such an effort being undertaken during your
4  tenure.
5      A.    I don't recall.  May have, but I
6  don't recall.
7      Q.    All right.  So you don't know when
8  this preliminary estimate was undertaken that's
9  described here?
10     A.    I'm looking at the question just to
11 make sure I get it correctly.
12           Yeah, I don't recall.
13     Q.    Are you aware of any time when the
14 Department undertook this type of preliminary
15 estimate of the full-time and contractor resources
16 needed to eliminate or substantially reduce the
17 number of pending BD applications during your
18 tenure?
19     A.    I don't recall.
20     Q.    And, you know, as we discussed, this
21 statement was made in June, 2019.  Assuming that
22 preliminary estimate was in or around that time,
23 do you know why it took the Department so long to
24 conduct such an estimate of resources to reduce
25 the backlog with -- with additional staffing?

Page 170

- JAMES MANNING -

1    A.   I do not.
2    Q.   And you're not aware of any prior
3  estimate made by the Department about this issue?
4    A.   About the time to complete -- I don't
5  recall.
6    Q.   Okay.  I'll just represent to you
7  that the Department has produced a chart that
8  shows the -- the number of staffers of the
9  Borrower Defense Unit from May, 2018 to the
10 present.
11       I'm not going to show it to you, it's
12 not in your packet, but I'll represent to you that
13 it shows the total of sixteen attorneys and
14 contracting staff in May, 2018 when you were at
15 the Department and then it fluctuates, but it ends
16 up at a total of seventeen attorney and contractor
17 staff in March, 2019.
18       Can you explain why there was not an
19 increase in staff to address the backlog in
20 borrower defense applications?
21   A.   Could you just give me those numbers
22 again so I can try to get my head around it.  May,
23 2018 you said was the first thing you gave me.
24   Q.   Yeah, so a total of sixteen attorney
25

Page 171

- JAMES MANNING -

1  and contractor staff at the BDU.
2    A.   Okay, and then the second date, what
3  was it?
4    Q.   As of March, 2019 that number was
5  seventeen and -- and I'll recognize that there was
6  some fluctuation in the middle, but by March, 2019
7  around the time you left the Department, it was at
8  seventeen.
9    A.   Uh-huh.
10   Q.   My question is; why wasn't there a
11 steady increase to address the backlog in borrower
12 defense applications by hiring more staff for the
13 BDU?
14   A.   You -- you don't have a -- a number
15 that represents what the onboard number is today,
16 by chance?
17   Q.   Well, yes, the number is there, but
18 I'm not asking you about that because you're not
19 at the Department anymore, Mr. Manning.
20   A.   I was -- I wasn't at the Department
21 during this -- this period that you're talking
22 about here either and so...
23   Q.   I'm talking about May, 2018 to March,
24 2019.  My understanding is you started at the
25

Page 172

- JAMES MANNING -

1  Department in January 20, 2017 and you left
2  March --
3    A.   I misread my own note here.  You're
4  correct.  If I had a plan why there's only an
5  increase of one attorney, is that it?
6    Q.   Were you concerned about this issue
7  of staffing?
8    A.   Yes, in principle I was concerned
9  that they didn't have everyone that they needed to
10 have.
11   Q.   What did you do to address your
12 concern?
13   A.   I don't recall, to tell you the
14 truth.
15   Q.   Do you recall doing anything to
16 address that issue?
17   A.   I do remember, you know, having
18 conversations with, you know, Colleen.
19   Q.   Did you ever have any conversations
20 with Secretary DeVos about the staffing issue?
21   A.   I don't recall.
22   Q.   You don't recall Secretary DeVos ever
23 asking you about whether additional resources were
24 needed for borrower defense?
25

Page 173

- JAMES MANNING -

1    A.   I don't recall that specific question
2  being asked, and I -- I don't recall specifically
3  having a conversation about this issue, about the
4  staffing issue with Secretary DeVos.  I simply do
5  not recall.  Not to mean that I didn't, but I
6  don't recall.
7    Q.   Do you recall there being a hiring
8  freeze at the Department that affected the ability
9  to hire staff at the beginning of the Trump
10 Administration?
11   A.   Yes, I do understand that.
12   Q.   Do you know how long that hiring
13 freeze lasted?
14   A.   Pretty much from the beginning
15 through most of '17.  That's -- I can't -- I can't
16 say authoritatively when it ended.  It was for a
17 significant period of time, if not most of '17.
18   Q.   Were you surprised at how long that
19 hiring freeze was in place?
20   A.   Well, I've been in federal service
21 for a long time and hiring freezes happen from
22 time to time and so I wasn't completely surprised
23 that there was a freeze.
24   Q.   Who ordered the hiring freeze?
25

Page 174

1              - JAMES MANNING -
2    A.    I have no idea.
3    Q.    How did you find out about the hiring
4  freeze?
5    A.    It was announced, I'm sure. There
6  was notice given that it would be -- there would
7  be a hiring freeze.
8    Q.    Where did that notice come from?
9    A.    I don't recall. It came -- normally
10 those kinds of announcements would come from the
11 Office of Administration, but I don't recall
12 specifically where they come from.
13   Q.    What is the Office of Administration?
14   A.    The management office that
15 coordinates general management issues, including
16 personnel. It was headed by Denise Carter then
17 and I think today --
18   Q.    And is that within the Department of
19 Education?
20   A.    Yes.
21   Q.    How did you find out that the hiring
22 freeze was lifted?
23   A.    I don't recall.
24   Q.    Do you recall ever finding out that
25 it was lifted?

Page 175

1              - JAMES MANNING -
2    A.    I do believe that I was there when it
3  was lifted, but I can't specifically recall when
4  that was or when it was lifted.
5    Q.    How would you expect to find out
6  about whether -- about how it was lifted, would
7  you expect to receive a written document?
8    A.    Well, an announcement of one type or
9  another and I think by that point, you know,
10 e-mails were sent probably, but I don't recall how
11 it actually was done.
12   Q.    Was there some sort of e-mail group
13 at the Department that was for leadership only?
14   A.    I don't know what that means.
15   Q.    In other words, was there a certain
16 e-mail group designated for people such as
17 yourself who were in higher command positions
18 within the Department.
19        MR. MERRITT: Objection. Sorry, go
20 ahead.
21        MR. JARAMILLO: No, go ahead.
22        MR. MERRITT: I'am just going to
23 state an objection to that being outside the
24 scope of court-ordered discovery.
25   Q.    You can answer the question.

Page 176

1              - JAMES MANNING -
2    A.    No, I don't recall any e-mail groups
3  like that that -- I was not aware of any e-mail
4  groups like that.
5    Q.    Was this hiring freeze specific to
6  the Department of Education only or was it within
7  particular units of the Department?
8    A.    I think it impacted the entire
9  Department my recollection, but I can't be sure.
10   Q.    After the freeze was lifted, do you
11 recall having any -- any discussions with anyone
12 at FSA about oh, now that the freeze is lifted we
13 can try to get more staff for the borrower defense
14 claims review process?
15   A.    I don't recall.
16   Q.    Let me have you turn, Mr. Manning,
17 back to Tab 7 which is Exhibit 33, the question
18 and answer between Senator Patty Murray and
19 Secretary DeVos.
20   A.    Oh, thank goodness I didn't put it
21 away. Here it is. What page?
22   Q.    Turn to Page 21 of 48.
23   A.    Okay, got it.
24   Q.    I'll read the -- the question and
25 then I'll just have you read the answer and we can

Page 177

1              - JAMES MANNING -
2  talk about it.
3    A.    Okay.
4    Q.    This is under "Staff allocated to
5  borrower defense activity. Question: "How many
6  full-time equivalent positions with the primary
7  job function of forward-responsibility of
8  reviewing or providing analysis of borrower
9  claims, including attorneys' advisors, were filled
10 with active employees as of January 19, 2017, have
11 become vacant since January 20, 2017, have been
12 listed with a vacancy announcement by the
13 Department since January 20, 2017, have been hired
14 by the Department since January 20, 2017, are
15 employed as of the date of the response inquiry?"
16        And, Mr. Manning, can you read
17 Secretary DeVos's answer for the record?
18   A.    Well, I'm trying to -- answer: "As
19 of January 19, 2017, there were eleven employees
20 in the borrower defense group. Since January 20,
21 '17, four of those employees voluntarily separated
22 from the Department. As of March 31st, 2019,
23 seven employees remained in the borrower defense
24 group which included six full time employees and
25 one part-time employee. As of January 20th, 2017

Page 178

```
1                  - JAMES MANNING -
2    no additional employees have been hired in the
3    borrower defense group.  The Department currently
4    is preparing announcements to fill the vacant
5    positions."
6         Q.     Thank you for reading that, Mr.
7    Manning.
8                Do you know why as of this date in
9    this document, since January 20, 2017 no
10   additional employees have been hired into the
11   borrower defense group?
12        A.     In this documentation June 13th,
13   2019, is that what you're saying?
14        Q.     Yes, and we -- and, you know, just
15   because I know you left in March, 2017 so I can
16   rephrase it -- I mean 2019.  I can rephrase the
17   question:  Do you know why since January 20, 2017
18   up until the time you left the Department, no
19   additional employees have been hired in the
20   borrower defense group?
21        A.     That surprises me.
22        Q.     Why does that surprise you?
23        A.     I was -- I would have thought that
24   there had been a one -- you know, minimal number
25   of additional employees hired I would have
```

Page 179

```
1                  - JAMES MANNING -
2    guessed, but apparently -- I'm sure the Secretary
3    was correct when she said this, but --
4         Q.     Well, wouldn't you -- wouldn't you
5    have known if there were additional hires?
6         A.     Wouldn't what?
7         Q.     Would -- wouldn't you have known if
8    there had been additional hires in the borrower
9    defense group?
10        A.     You're asking me if I would have
11   known.  If I would have known, is that your
12   question?
13        Q.     That's my question,  yes.
14        A.     In -- in principle, yes, but I don't
15   recall.
16        Q.     In principle, yes, you would have
17   known or is should have known what --
18        A.     Because I'm sure I had conversations
19   with Colleen in -- about new hires, so I would
20   have heard that.
21               I -- I specifically don't recall that
22   -- that there were none and I don't recall --
23   obviously if there were none, there were none and
24   I don't -- my recollection --
25        Q.     If -- if there were requests for more
```

Page 180

```
1                  - JAMES MANNING -
2    hires for the borrower defense group, would that
3    request necessarily be communicated to you?
4         A.     While I was COO, probably.
5         Q.     What about when you were acting
6    Undersecretary, during the time period you were
7    not COO at the same time?
8         A.     Yeah, I don't recall what we were
9    doing than around this, and I don't recall -- and
10   beyond this, my understanding -- and I'm not with
11   the Department, but my understanding that if you
12   were answering -- if she was answering this
13   question now, there are a significantly more
14   hires that have been made since she answered this.
15        Q.     Thank you for that, Mr. Manning.  We
16   are fully aware the staffing at this point and
17   that's not what I want to ask you about.
18               This response from Ms. DeVos also
19   says "The Department currently is preparing
20   announcements to fill the vacant positions."  Were
21   you aware of any announcement being prepared to
22   fill vacant positions at borrower defense group
23   during your tenure in the Trump Administration?
24        A.     I don't recall.
25        Q.     And this refers to the vacancies
```

Page 181

```
1                  - JAMES MANNING -
2    basically for attorneys.  Do you think four
3    additional attorneys at that time would have been
4    sufficient to address the backlog in borrower
5    defense applications.
6         MR. MERRITT:  Objection, calls for
7    speculation.
8         MR. JARAMILLO:  Well, let -- let me
9    rephrase the question.
10        Q.     Do you think at any time during your
11   tenure at the Department of Education in the Trump
12   Administration, that merely adding four attorneys
13   to the borrower defense group would have been
14   sufficient to address the backlog in borrower
15   defense applications that needed to be
16   adjudicated?
17        A.     I don't know what that number would
18   have been, but where I would start was to look and
19   see how many were onboard as of January 19, 2017
20   when there were eleven and that was the number
21   that apparently was working for the previous
22   administration.  That -- that would be a target
23   number to have used.
24        Q.     Mr. Manning, what if the backlog was
25   significantly more in March, 2019 than it was in
```

Page 182

- JAMES MANNING -

1   January, 2017; would you agree that perhaps more
2   than four staff attorneys would be necessary to
3   address the backlog?
4         A.    No, I'd have to go to experts in the
5   staffing to project what -- how many additional
6   staffing would be needed.
7         Q.    Mr. Manning, one of the remarks that
8   you read earlier which was in Tab 12 -- which I
9   hope we marked as an exhibit, I think we did as
10  Exhibit 34 -- you said "Moving forward we have
11  approximately 95,000 pending claims" and that was
12  in November, 2017.  If we ran that round that up
13  to 100,000 pending claims --
14        A.    I'm sorry, what exhibit was that?
15        Q.    I don't need you to look at it now.
16  I just want -- I'm representing to you
17  what's -- what's in the document.
18        A.    Okay.  Well, go ahead.  Then start
19  over if you wouldn't mind.
20        Q.    Okay, sir.  You read that the
21  Borrower Defenses and Financial Responsibility
22  Negotiated Rulemaking Committee November 14, 2017,
23  that at that time there were 95,000 pending
24  claims.
25

Page 183

- JAMES MANNING -

1         And let's just -- let's assume that
2   there were ten staff attorneys at that time and
3   let's round it up to 100,000 claims.
4         Do you think it's reasonable for the
5   Department to expect there to only be ten Borrower
6   Defense Unit attorneys for 100,00 claims, making
7   it like 10,000 claims per attorney if you were to
8   divide through by straight division?  Would that
9   --
10        MR. MERRITT:  Objection.  Sorry.
11  Please, continue.  I'm sorry.
12        MR. JARAMILLO:  Okay.
13        MR. MERRITT:  But if you're done, I'm
14  going to object, court stipulation.
15        Q.    I would think, Mr. Manning, as the
16  third-in-command, also wearing two hats during a
17  certain period of time as COO of FSA and the
18  acting U.S. Undersecretary regularly communicating
19  with Colleen Nevin, the director of the BDU, you
20  would have a sense of whether seven staff
21  attorneys would be sufficient for 95,000 pending
22  claims or even eleven staff attorneys for 95,000
23  claims.  Would that be a reasonable workload to
24  expect of the BDU staff?
25

Page 184

- JAMES MANNING -

1         MR. MERRITT:  He stated his knowledge
2   about this time period.  You are also making
3   up numbers, so the speculation objection
4   stands.
5         Q.    One of the --
6         MR. MERRITT:  You can -- you can
7   answer the question.
8         THE WITNESS:  I can answer the
9   question?  I can?
10        MR. MERRITT:  Yes, Mr. Manning.  You
11  can answer the question.
12        THE WITNESS:  Okay.
13        A.    The answer is I -- I don't know the
14  right number and I would have to consult with
15  experts and staffing.
16        Q.    Did you ever consult with experts
17  about this staffing issue?
18        A.    I'm sure I discussed the issue.  I
19  can't recall.  Outside of Colleen, I don't -- I
20  can't recall specifically who.
21        Q.    Do you believe you discussed this
22  issue with anybody, but Colleen Nevin who was not
23  in a position to obtain more staffing for the BDU?
24        A.    Yeah, I expect that I talked to
25

Page 185

- JAMES MANNING -

1   somebody in personnel.  I don't recall who,
2   though.
3         Q.    And what would you have talked to
4   them about?
5         A.    Appropriate numbers of staff under
6   certain criteria, but I don't recall.
7         Q.    What kind of criteria?
8         A.    I don't recall.
9         Q.    Looking back from today's vantage
10  point, would you have approached staffing for the
11  BDU any differently than you did when you were at
12  the Department in the Trump Administration?
13        A.    Perhaps, but I don't -- I don't know.
14  I think that the staffing level that's there right
15  now is better from, what I understand.  I don't
16  have an informed position there.
17        Q.    In -- in hindsight, do you wish you
18  would have got that level of staffing when you
19  were at the Department?
20        A.    I think, you know, any manager always
21  wants to have the proper level of staffing.
22        Q.    That's an important issue, right?
23        A.    Certainly.
24        Q.    And you were aware of Ms. Nevin's
25

Page 186

- JAMES MANNING -

1       - JAMES MANNING -
2   concern as a director of BDU that she wanted more
3   staff, correct?
4       A.    Yes.
5       Q.    But as you sit here today you cannot
6   recall taking any concrete action to request more
7   staff for the BDU, correct?
8       A.    I don't recall.
9       Q.    To your knowledge, was -- was the
10  lack of adequate staffing a cause of the delay in
11  issuing borrower defense decisions during your
12  tenure at the Department?
13      MR. MERRITT:  Objection, calls for
14      speculation.
15      Q.    To your knowledge, sir, was the lack
16  of staffing a cause of the delay in processing
17  borrower defense applications?
18      A.    I don't know.
19      MR. MERRITT:  Joe, I'll let you keep
20      going, but I just wanted to ask for a break
21      at some point relatively soon.
22      MR. JARAMILLO:  We can -- we can take
23      a break now.  I actually need it myself.
24      MR. MERRITT:  Okay, great.
25      MR. JARAMILLO:  Thank you.

Page 187

1       - JAMES MANNING -
2       THE WITNESS:  I'll take advantage of
3       it, too.
4       MR. JARAMILLO:  All right.  Okay.
5       THE VIDEOGRAPHER:  We're off the
6       record, the time is 20:36 UTC.
7       (Whereupon, there was a brief recess
8       in the proceedings.)
9       THE VIDEOGRAPHER:  We're back on the
10      record, the time is 20:53 UTC.
11      Q.    Mr. Manning, did you ever have any
12  discussions with a Wayne Johnson about borrower
13  defense when you were at the Department?
14      A.    I -- I must have, but I don't recall
15  any of them.
16      Q.    Do you recall Mr. Johnson expressing
17  any opinions about how the borrower defense claims
18  review was going at the Department?
19      A.    No, not specifically but when Mr.
20  Johnson became the COO he brought Julian Schmoke
21  and put him in the vacant chief enforcement
22  officer position; and Julian -- Wayne Johnson
23  became COO in July of 2017 and Julian came in -- I
24  don't recall.  It would have been a couple of
25  months after that and he became a chief

Page 188

1       - JAMES MANNING -
2   enforcement officer and worked closely with Wayne.
3       Q.    Did you have discussions with Julian
4   Schmoke about borrower defense?
5       A.    I'm sure I did.  I don't recall the
6   discussions that I -- yeah.
7       Q.    Do you recall discussing staffing
8   levels for the BDU with Julian Schmoke?
9       A.    Not specifically.  I would expect
10  that I did, but I can't attest to that I
11  absolutely did.  I don't recall.
12      Q.    Do you recall Julian Schmoke
13  discussing the need for more staffing for the BDU
14  with you?
15      A.    I don't specifically recall that.
16  Could have happened, but I don't recall that.
17      Q.    And when -- when Mr. Johnson left his
18  position of COO of FSA and you took that over in
19  the acting role did, you have discussions with him
20  at that point about the status of borrower
21  defense?
22      A.    Did I have discussions with who at
23  that point?
24      Q.    Mr. Johnson.
25      A.    I don't recall.

Page 189

1       - JAMES MANNING -
2       Q.    Did you do anything to educate
3   yourself more about the operations of BDU or
4   borrower defense claims processing when you took
5   on the acting role as COO of FSA?
6       A.    I don't recall.
7       Q.    I'll have you turn back, Mr. Manning,
8   to Tab 12, which we have marked previously as
9   Exhibit 34.  Your remarks at BD Negotiated
10  Rulemaking Committee on November 14, 2017.
11      A.    Okay, yes.
12      Q.    And if you could turn to Page 13,
13  please:
14      A.    Okay.
15      Q.    And can you read for me the sentence
16  that begins on Line 18?
17      A.    " Even the most strident borrower
18  defense advocate would recognize that undoubtedly
19  some claims are going to be denied. "
20      Q.    What did you mean by "strident
21  borrower defense advocate"?
22      A.    I don't recall.
23      Q.    Well, sitting here today what does
24  that mean to you, "strident borrower defense
25  advocate"?

Page 190

- JAMES MANNING -

     A.    It makes me wonder why I used the
word "strident."
     Q.    What does the word "strident" mean to
you?
     A.    Well, I think I misused the word
here.
     Q.    And why do you think you misused it?
     A.    I don't know why I misused.  I'm not
reading it now thinking that even the most --
     Q.    Do you have an understanding of what
the word "strident" means, Mr. Manning?
     A.    Yes, I have an understanding.
     Q.    Please inform us of your
understanding.
     A.    Dogmatic.
     Q.    Okay.  Anything else?
           And what do you mean by dogmatic?
           MR. MERRITT:  Objection.  This is all
beyond the scope of the discovery the court
ordered.
           MR. JARAMILLO:  I don't think
referring to borrower defense advocates of
which -- as strident is beyond --
     A.    My --

Page 191

- JAMES MANNING -

     Q.    Go ahead, Mr. Manning.
           MR. MERRITT:  Well, I mean just how
does that relate to the extent to which the
difficulty of reviewing borrower defense
applications -- how does relate to any of the
three topics that court authorized discovery
on?
           MR. JARAMILLO:  Well, the -- the
court-ordered discovery on the extent to
which the difficulty of reviewing borrower
defense applications contributed to the
18-month delay, implicit in that part of it
is the extent to which the difficulty did not
and the extent to which there were other
reasons.
           And the court in the prior page,
before setting forth the three topics, listed
a clear showing of pretext as being something
that was apparent to him in potentially
causing the delay and I'm probing about
pretext, because he's referring to both a --
a strident borrower defense advocate.
           In my mind, strident means loud and
harsh or grating presenting a point of view,

Page 192

- JAMES MANNING -

especially a controversial one, in an
excessively and unpleasant forceful way and
this is how Mr. Manning describes borrower
defense advocate.  This is -- goes directly
to pretext and this goes directly to why
there was potentially other reasons for the
delay beyond any difficulty in reviewing
borrower defense applications and so I'm
going to ask him about.
           MR. MERRITT:  (Unintelligible
crosstalk) In response to your point, the
court did not authorize an open-ended
discovery into pretext.  Pretext was defined
-- the court defined pretext as based on the
fact that, you know, the described difficulty
of reviewing borrower defense applications do
not necessary appear on the face of denial
notices.
           He's carefully specified -- Judge
Alsup carefully specified three topics in
discovery, but certainly we can't interpret
that so broadly to mean any kind of inquiries
of pretext and some of these inquiries, and
particularly in your line of questioning

Page 193

- JAMES MANNING -

right now, is particularly, you know, an
open-ended discussion into pretext and not
based on or relevant to any of the topics the
court authorized discovery into.
           MR. JARAMILLO:  The Judge did say on
Page 15 of his order on October 19th, 2020,
"In sum, we are faced with a strong showing
of agency pretext and the class has been
prejudiced by delaying that.  We need to know
what is really going on.  This compels
expedited discovery."  And so --
           MR. MERRITT:  Bearing in my mind,
discovery of this agency is disfavored it
will be limited, but broad enough to be
effective which" -- you know, and then it
goes on to say what exactly it will be.  So
what discovery is into is the three topics,
not pretext stated that broadly.  There would
be no limitations on that and this is still
an ATA case.
           MR. JARAMILLO:  This relates to Topic
2, and I'm going to press unless you instruct
him not to answer.  I want to know what he
meant by strident.

Page 194

- JAMES MANNING -

1          - JAMES MANNING -
2          MR. MERRITT:  Okay.  I mean, I'm not
3   going to instruct him not to answer that
4   question, but just stating that it's
5   irrelevant to the case, to the topics the
6   court authorized discovery on.
7          MR. JARAMILLO:  Duly noted.
8      Q.    Mr. Manning, why did you refer to
9   borrower defense advocates as strident?
10     A.    I don't recall, reading this now.  I
11  already told you that I'm surprised that word was
12  used.
13     Q.    Do you think -- do you think it would
14  be strident for a borrower defense advocate to
15  assert the rights of student and borrowers?
16     A.    That's not what this sentence has to
17  do with.  This has to do with a borrower -- using
18  a borrower defense advocate to recognize that
19  undoubtedly some claims are going to be denied and
20  that's absolutely true.  Some claims are going to
21  be denied.
22     Q.    How do you define "some claims"?
23     A.    More than one.
24     Q.    Okay.  Would you be surprised --
25  would you expect there to be a 90 percent denial

Page 195

1          - JAMES MANNING -
2   rate by the Department of Education for borrower
3   defense claims?
4      A.    I don't know.
5      Q.    Does that surprise you?
6      A.    Well, borrower defense claims are,
7   you know, reviewed one at a time and...
8      Q.    Did you harbor some bias against
9   borrowers --
10     A.    No.
11     Q.    -- if they were just asserting
12  frivolous claims?
13         MR. MERRITT:  Objection.  It's beyond
14  the scope.
15     Q.    You can answer, Mr. Manning.
16     A.    Restate your question.
17     Q.    Did you harbor any --
18     A.    You're halfway through it, but go
19  ahead.
20     Q.    Did you harbor any bias towards
21  student borrower applicants for borrower defense
22  discharge?
23     A.    No, I did not.
24     Q.    Did you ever -- are you familiar with
25  the content of borrower defense applications?

Page 196

1          - JAMES MANNING -
2      A.    I was briefed on some, but I didn't
3   review them.  I didn't see them regularly.
4      Q.    And from your briefing, did you have
5   any understanding of whether they were easy to
6   resolve or difficult to resolve?
7      A.    As I recall, some were easy to
8   resolve and some were difficult to resolve.
9      Q.    And what did you understand about the
10  ones that were easy to resolve, why 1were they
11  easy to resolve?
12     A.    Because the attorneys reviewing them
13  made the judgment that they weren't sufficient to
14  be considered further.
15     Q.    And what was your understanding of
16  why they were not sufficient to be considered
17  further?
18     A.    I have no idea.  I -- I relied on the
19  attorneys to make that call.  I didn't review
20  their work or make decisions about those
21  applications.
22     Q.    In your opinion, to what extent did
23  the difficulty of reviewing borrower defense
24  applications actually cause a delay in issuing
25  decisions during your tenure?

Page 197

1          - JAMES MANNING -
2      A.    I -- I don't know.  I don't know.
3      Q.    Is it your understanding that
4   generally the applications were easy to be
5   decided?
6      A.    I think there were some very easy to
7   be decide and some that were very difficult, so I
8   don't know specifically; but I would I stand by
9   what I said subsequent to the sentence we're
10  talking about, is that we had been working
11  carefully to ensure that any denial until there
12  was a total review of the claim.  We were
13  absolutely committed to that.
14     Q.    And what did you do to demonstrate
15  your commitment to that?
16     A.    I don't recall.
17     Q.    What did anyone at the Department due
18  to demonstrate a commitment to that?
19         MR. MERRITT:  Objection, overbroad.
20     Q.    To the extent you know, what did
21  anyone at the Department do?
22     A.    I think Colleen Nevin was absolutely
23  committed to that with her staff and reviewed
24  every application that came in appropriately.
25     Q.    Were -- were you aware of the use of

Page 198

- JAMES MANNING -

1    - JAMES MANNING -
2    legal mem -- memoranda at the Department that set
3    forth categories of claims that would qualify for
4    discharge under borrower defense?
5        A.    Repeat that again.
6        Q.    Were you aware of any legal memoranda
7    or category of claims that would qual -- that
8    would set forth criteria to qualifying applicants
9    for borrower defense discharge?
10       A.    I don't recall.
11       Q.    You don't recall memoranda in place
12   for seven categories of claims that -- from the
13   prior administration that included job placement
14   rates claims from Hiel and from Ever -- Everest
15   and Wyo -- Wyotech, transfer of credit
16   misrepresentation claims?
17       A.    I -- I remember -- I remember
18   those -- those schools and the issues that you
19   just mentioned because I just heard you say that,
20   but I don't remember -- I do not remember the
21   legal memorandum that were circulated in that
22   during previous administrations, probably have
23   seen them.
24       Q.    Do you know if the Borrower Defense
25   Unit relied on those memoranda in order to make

Page 199

1    - JAMES MANNING -
2    decisions?
3        A.    If those were provided by the
4    previous administration, I expect fully that the
5    Borrower Defense Unit was, you know, aware for all
6    of them.  That -- that would be my belief.  I
7    don't know for sure.
8        Q.    Were you aware of any memoranda or
9    protocols that the Borrower Defense Unit used in
10   order to adjudicate borrower defense claims?
11       A.    Memoranda?
12       Q.    Let's start with memoranda, yes.
13       A.    Oh, I haven't -- I don't recall any
14   legal memoranda.
15       Q.    What about protocols?
16       A.    I -- I remember that when we
17   conducted the review, before we asked the
18   Inspector General to -- from the beginning on the
19   transition team and then subsequently instruction
20   looking for established protocols on -- you know,
21   and other types of guides for decision-making in
22   the process and recognizing that they were short;
23   that they, the -- the protocols, were not clearly
24   established and that more work had to be done by
25   them to improve those -- those types of documents.

Page 200

1    - JAMES MANNING -
2        Q.    Mr. Manning, I want to show you
3    something --
4        A.    I can't hear you.
5        Q.    Say it again.
6        A.    I couldn't hear you.  You -- you
7    faded.
8        Q.    I apologize.  Bear with me one
9    second.
10       A.    Yeah, of course.
11       Q.    You mentioned, Mr. Manning, that
12   during the review of the borrower defense program
13   during the transition, that you -- you had
14   reviewed as part of that effort established
15   protocols in place at the time; is that right?
16       A.    I think formerly the -- what that --
17   that issue after the 20th, normally we had -- you
18   know -- had meetings previously raising, you know,
19   the -- the question involved.
20       Q.    Did you review any protocols in place
21   at that time?
22       A.    Not during the transition.
23       Q.    How about once you started on with
24   the Department in the new administration?
25       A.    Yes, absolutely.  We sent two people.

Page 201

1    - JAMES MANNING -
2    I can't remember the second person, but one was
3    Justin Riemer, attorney from the Department, to
4    look at operations and documentation in the
5    Borrower Defense Unit.
6        Q.    Are you aware of what documentation
7    they looked at?
8        A.    I don't recall.
9        Q.    Did you look at any of that
10   documentation?
11       A.    Personally, no.
12       Q.    Okay.  I'm going to have you look at
13   Tab 4, which was previously marked as Exhibit 9.
14       A.    Okay.
15             (Whereupon, Exhibit 9, having been
16       previously marked, was tendered to the
17       witness for identification.)
18       A.    Okay, I have it.
19       Q.    And the first page we can -- we can
20   ignore.  This is -- it says "Exhibit 9" there
21   because it was submitted to the court as an
22   exhibit, but I want you to look at the second page
23   where it says "Borrowers' Defense Unit Claims
24   Review Protocol."
25             Have you ever -- do you ever recall

Page 202

1                    - JAMES MANNING -
2    seeing a Borrower Defense Unit Claims Review
3    Protocol?
4        A.    No, I don't recall that.
5        Q.    I don't think you need to read this
6    document line by line, but if you could just flip
7    through and tell me whether any of the contents
8    look familiar to you or whether you don't recall
9    ever seeing those.
10       A.    I don't remember seeing this
11   document.  There's certainly some facts
12   represented here that can be replicated other
13   places I've read outside, but I've never seen this
14   document before.
15       Q.    Can you point out the facts that
16   you've seen replicated in other places, and you
17   can let us know the Bates number?
18       A.    "The legal framework "BD application
19   must state a claim under state law."
20       Q.    And that -- that would be on the
21   third page of this document?  If you look at the
22   lower right-hand corner, there's a 3?
23       A.    Yes.  Yep.
24       Q.    All right, and when did you see that
25   language before?

Page 203

1                    - JAMES MANNING -
2        A.    When did I see it before?
3        Q.    Yes.
4        A.    When -- when did I see it before?
5        Q.    That's the question, sir.
6        A.    I was repeating it for, Hope.
7              So I couldn't tell you, but that
8    certainly was a part of the legal framework that
9    BD application must have a state -- must state a
10   claim under state law.  Elsewhere I've seen that,
11   you know, plenty of times.  Like I -- I can't say
12   where -- where.  I have never seen this document
13   in this form.  I mean --
14       Q.    All right.  Have you seen -- is there
15   any other language here that looks familiar to
16   you?
17       A.    I'm -- I'm having to read to make
18   sure to satisfy --
19       Q.    I'll tell you what, if you're going
20   to read line by line we can move on.
21       A.    You are going to do what?
22       Q.    If you want -- if you're going to
23   read to this line by line, I would just like to
24   move on.
25       A.    Let me just take another minute here

Page 204

1                    - JAMES MANNING -
2    just to be sure.
3        Q.    Okay.
4              MR. MERRITT:  Just to be clear, you
5    -- you asked specifically whether he was
6    familiar with any of the language in there,
7    so --
8              MR. JARAMILLO:  That's true.
9        A.    The legal threshold for eligibility
10   equals preponderance of the evidence."  I've seen
11   that any number of times.
12             "Must base decisions granting or
13   denying relief on a record sufficient to withstand
14   court scrutiny."  Most of the rest of it I haven't
15   seen.
16       Q.    Okay.  Thank you, Mr. Manning.  I
17   would like you to turn to Tab 5.
18       A.    Okay.
19       Q.    And the first page of this tab has
20   Exhibit 10 and I would like to just move on and
21   ignore that.  That was submitted for purposes of
22   getting it into the court.
23             I want to look at the second page
24   that says "Borrower Defense Unit Claims Review
25   Protocol" and let's mark this --

Page 205

1                    - JAMES MANNING -
2              MR. MERRITT:  I'm sorry.  I just want
3    to make sure we're on the same page.  The
4    document I'm looking at doesn't say -- have
5    an exhibit marking.
6              MR. JARAMILLO:  Oh, okay.
7              MR. MERRITT:  It does -- it does say
8    "Borrower Defense Unit Claims Review
9    Protocol."
10             MR. JARAMILLO:  Right, right.
11       A.    It looks like -- it looks similar to
12   the last thing I just looked at.
13       Q.    Okay.
14             MR. JARAMILLO:  And let's just --
15   just to clarify the record, thank you for
16   pointing that out, Charlie.  I think I might
17   have -- when I sent the document, I took off
18   the exhibit page just to go straight to the
19   first page of the actual document.
20             And so this is Tab 5 and I would like
21   to mark it as Exhibit 35.
22             MR. MERRITT:  Again, just to confirm
23   what we're talking about, like at the top
24   it's a document filed in this case; 66-3
25   Page 118 of 137.  I was going to ask a

Page 206

1                  - JAMES MANNING -
2    question, Mr. Jaramillo, but --
3                  MR. JARAMILLO:  I'll, I'll -- let's
4    clarify just to -- I think to identify this.
5    This is Tab 5 which is now Exhibit 35.
6                  (Whereupon, Exhibit 35 was marked at
7    this time.)
8                  MR. JARAMILLO:  At the top of the
9    page above the title of the document, you
10   can see a case file number, Case
11   3:19-cv-03674-WHA Document 66-3, filed
12   12/23/19, page 118 of 137.
13                 And there's another case stamp on the
14   right-hand side.  I'm not going to go over it
15   because I think we've sufficiently identified
16   this.
17                 MR. MERRITT:  That's good enough for
18   me.  Thank you.
19         A.     I'll just say that this document
20   looks remarkably like the document you just had me
21   look at previously, that Borrower Defense Unit
22   Claims Review Protocol, the one that was Exhibit 9
23   we looked at just a few minutes ago, and I was --
24   I made some comments about particular lines.
25                 This -- what I'm looking at now, the

Page 207

1                  - JAMES MANNING -
2    second document you just had us look through,
3    looks very similar.
4          Q.     Okay, great.  Thank you.  Thank you,
5    Mr. Manning.
6          A.     Am I looking at something or --
7          Q.     You know, you were looking at the
8    right thing.  There are some additional pages --
9    there are some pages in this document that were
10   redacted, so it's not exactly the same.
11                 And then at the end, there are --
12   it's the last three pages -- I'm sorry, the last
13   one, two, three, four -- the last five pages are
14   what I want to just focus in on --
15         A.     Okay.
16         Q.     -- to identify them.  I'm going --
17   look at case file stamp at the top of the document
18   it looks -- I want you to turn to Page 133 of 137
19   because that's how it's represented.
20         A.     I'm there now.
21         Q.     Gotcha, and there's chart that says
22   "Approvals  Borrower Defense Claims."  Do you see
23   that?
24         A.     Yes, let me just get reorganized here
25   so I -- I'm looking at the right things.

Page 208

1                  - JAMES MANNING -
2          Q.     Okay.
3          A.     I see the chart.
4          Q.     And have you ever seen that chart
5    before?
6          A.     I've seen a thousand charts that look
7    like this at first glance, and even with my
8    glasses the printing on these boxes is a -- a
9    little tough.
10                 I -- I don't recall specifically
11   seeing this chart.  It was updated on January 30,
12   2017, so --
13         Q.     Yes, it does say "Updated January 30,
14   2017" --
15         A.     Right.
16         Q.     -- and which I recognize is only ten
17   days after you came into the Department under the
18   new administration, correct?
19         A.     Without responsibility for this issue
20   at the time.
21         Q.     Right, because you were senior
22   advisor to the Secretary, correct?
23         A.     That's correct.
24         Q.     And just to do a little side
25   questioning on that, what, what -- did -- did any

Page 209

1                  - JAMES MANNING -
2    of that ad -- advisory responsibility include
3    advice on borrower defense for that particular
4    position when you first came into the
5    administration?
6          A.     Not to that particular position, but
7    I -- I did speak with the Secretary on issues
8    around borrower defense, in -- in particular the,
9    the -- the previous administration's actions at
10   the end of the administration that led to the
11   16,000 cases that were to be ultimately discharged
12   by the Secretary.
13         Q.     And when you had those discussions
14   with the Secretary, you at that point were acting
15   Undersecretary?
16         A.     No.
17         Q.     Okay.  You were senior policy
18   advisor?
19         A.     Yes -- no, senior advisor.
20         Q.     Senior advisor, I'm sorry.
21                 And besides that particular topic,
22   did you speak to the Secretary as senior advisor
23   about anything else related to borrower defense?
24         A.     Not that I recall.  The issue was,
25   you know, what was there and ready for review and

Page 210

- JAMES MANNING -
1
2    signature.
3         Q.    Okay.  Let's turn back to the -- I'm
4    sorry, did I interrupt you, sir.
5         A.    Well, I was going to say I don't
6    remember specifically when she first was
7    Secretary, but I think it was, you know, the first
8    week of February.  I could be wrong.
9         Q.    That's fine.  Looking at this
10   approval chart and what we marked as Exhibit 35 --
11        A.    Am I still on Page 133?
12        Q.    Yes.
13        A.    Okay.  I'm looking at the chart.
14        Q.    Yeah, I'm kind of following like the
15   little people symbols from the left to the right
16   and I see three people and then there's an arrow
17   and then I see a person sitting at a desk and then
18   an arrow going down that says "FSA Internal
19   Control notification."  Do you have any idea what
20   that means?
21        A.    No, I'm not exactly -- I don't recall
22   what that means.  It looks like it's something I
23   -- I'd get from executive Secretary, but this is
24   outside the executive Secretary process.
25        Q.    Okay, and then if I follow the arrows

Page 211

- JAMES MANNING -
1
2    to the right there's two more people sitting at
3    desks and then I see a diamond.
4         A.    Yes.
5         Q.    And inside that diamond it says;
6    "Fiscal impact greater than 10 million or raises
7    policy issues?"  Do you know what that means, Mr.
8    Manning?
9               And no need to speculate.  I just
10   want to know if you know what it means or not.  If
11   you could -- yeah, if you're familiar with that
12   language.
13        A.    Well, I'm -- I'm reading it.  It --
14   it would mean different things to me depending on
15   what day you were reading it, effectively.
16        Q.    Okay, that's -- that's understood and
17   I don't think we need to get into that in detail.
18              My next question is; from that
19   diamond there's an arrow down with a box that says
20   "Yes"?
21        A.    Yes.
22        Q.    And then there's a person sitting at
23   a desk and to the left it says "Undersecretary
24   Approved."  Were you --
25        A.    Yes.

Page 212

- JAMES MANNING -
1
2         Q.    Do you see that?
3         A.    I see that.
4         Q.    Were you aware of any borrower
5    defense process during your tenure where the
6    Undersecretary would need to approve a -- a
7    borrower defense claim if the -- or set of claims
8    if the impact was greater than 10 million or it
9    raised policy issues?
10        A.    I don't specifically remember that.
11        Q.    And do you have -- okay, you don't
12   remember that.
13              Let's -- let's just move on to the
14   next page which says Page 134 of 137, "Denials
15   Borrower Defense Claims."
16        A.    Right.
17        Q.    Have you ever seen this chart before?
18        A.    No.   Not to my -- best of my
19   recollection.  I don't remember seeing this.
20        Q.    Okay, and for -- for both of these
21   charts, the approvals and denials, are you aware
22   of the Borrowers Defense Unit ever using them?
23        A.    Using these charts?
24        Q.    Yes.
25        A.    I -- I don't remember if I was ever

Page 213

- JAMES MANNING -
1
2    aware.  I don't recall anything about these charts
3    at this point.
4         Q.    Okay.  If we could turn to the next
5    page of this document.  It's a little hard to read
6    the page number because the two cases have a Bates
7    stamp on the top -- or on the right-hand side I
8    think.
9               I'm not sure how you're seeing it.  I
10   printed my out a little different, but they seem
11   to be superimposed.
12        A.    It looks like -- it looks like it
13   says 135 of 137 on the -- one of them.
14        Q.    That's correct, and it says "Number
15   of Borrower Defense Claims" and it looks like on
16   the right- hand side there's different lines that
17   represent CCI, ITT and other schools?
18        A.    Yes.
19        Q.    Have you seen this chart before?
20        A.    I, I -- I don't know if I've seen
21   this one before or not.  It has a familiar look to
22   it, but all these kinds of charts they look -- I
23   can't authoritatively attest that I've absolutely
24   seen this before.  I don't know if I've seen this
25   before or not.

Page 214

1              - JAMES MANNING -
2      Q.     And can you see on the chart that by
3  January, 2017 according to this chart there were
4  about 60,000 CCI borrower defense claims?
5      A.     Yes, I see that.
6      Q.     And so is that -- did you
7  have -- were you -- did you realize that there
8  were that amount of claims when you came into the
9  administration?
10     A.     I don't recall that I knew when I
11 came into the administration and I don't remember
12 the number was 60,000 in particular.
13     Q.     Okay.  Earlier, Mr. Manning, you had
14 mentioned an Inspector General's report --
15     A.     Yes.
16     Q.     -- do you recall that?
17     A.     Yes.
18     Q.     What do you recall about this
19 Inspector General report?
20     A.     The Secretary asked the Inspector
21 General to do a review of the Enforcement involved
22 defense units.
23     Q.     And did you have any communication
24 yourself with the Inspector General's Office about
25 that review?

Page 215

1              - JAMES MANNING -
2      A.     The Secretary wrote the Inspector
3  General.  I don't recall I had conversation with
4  the Inspector General at that point about this
5  issue.
6             They took it up and they delivered a
7  report later in the year.
8      Q.     And did you see a copy of what the
9  Secretary wrote to the Inspector General?
10     A.     I -- I don't recall I had.  I
11 probably did, but I don't recall.
12     Q.     Do you know if it was a letter?
13     A.     Well, I -- I think most of the
14 correspondence that came from the Secretary go as
15 letters, but I'm not absolutely certain that it
16 was a letter, so it's not something that you'd
17 have to see.  The Secretary wouldn't send an
18 e-mail like that informal request.  I expect it
19 was a letter, but I don't know.
20     Q.     Do you know what the Secretary
21 communicated to the Inspector General about the
22 request?
23     A.     I don't recall what the specific
24 language was that was used, but once again I feel
25 for operations there and if they had the -- the

Page 216

1              - JAMES MANNING -
2  proper -- proper management documents in order to
3  maintain records appropriately and that type of
4  thing.
5      Q.     Did you communicate with the
6  Inspector General's Office about their reviews?
7      A.     Quite possibly.  I don't specifically
8  recall.  I do recall that their -- their review
9  came black with a few findings, some
10 recommendations on improvements and -- but I don't
11 remember the particulars beyond that.
12     Q.     Are you aware of a Department policy
13 that requires developing a corrective action plan
14 within 30 days of the issuance of an Inspector
15 General's report?
16         MR. MERRITT:  Objection as beyond the
17     scope of the court-ordered discovery.
18         MR. JARAMILLO:  Are you instructing
19     him not to answer it?
20         MR. MERRITT:  No.
21     A.     I am familiar with that.
22     Q.     Okay, and are you familiar with
23 communications from the Inspector General to the
24 COO of FSA at the time, Dr. A. Wayne Johnson ad --
25 advising him of that policy?

Page 217

1              - JAMES MANNING -
2      A.     I don't specifically remember that,
3  but I would expect that I saw it, seen it and read
4  it.
5      Q.     I'm sorry, can you -- can you --
6      A.     I -- I can't speak to the particulars
7  because I don't re -- recall particulars in the
8  report.
9      Q.     And are you aware of any final
10 corrective action plan as it -- as developed by
11 FSA in response to the report?
12     A.     I don't recall.
13     Q.     Would you expect that there would
14 have been a corrective action plan developed by
15 FSA in response to the report?
16     A.     I --
17         MR. MERRITT:  Objection, calls for
18     speculation.
19     Q.     Just -- just what you would expect as
20 Undersecretary at the time?
21     A.     I -- I think the -- the question
22 calls for a response that is generally uniformly
23 followed and so I would -- I -- I don't recall
24 seeing a response, but I expect that there was
25 one.

Page 218

- JAMES MANNING -

1
2      Q.      You -- you expect that there was a
3  response to this?
4      A.      I -- I expect there would have been a
5  response.
6      Q.      And you expect that that response
7  would have been a corrective action plan?
8      A.      Well, I, I -- I don't know how it
9  might have been structured.  Normally you address
10  some of the issues that were raised and agree with
11  some and disagree with others, but I don't -- I
12  don't recall the specificity what that included.
13      Q.      Did you, yourself, read the Inspector
14  General's report?
15      A.      I believe I did.
16      Q.      And who within the Department would
17  you expect to review such a report when it comes
18  back from the Inspector General?
19      A.      When the report comes back from the
20  Inspector General?
21      Q.      Yes.
22      A.      It goes to the office that makes the
23  request, the leadership there.
24      Q.      Okay, in this case being the Office
25  of the Secretary?

Page 219

- JAMES MANNING -

1
2      A.      I -- I'm not -- it might have been
3  delegated to FSA.  Did you say that -- you
4  commented earlier about A. Wayne Johnson and IG,
5  can you refresh my memory on that.  Just a few
6  minutes ago, you mentioned that.
7      Q.      Yeah, sure.  The report has a cover
8  letter from Patrick J. Howard, assistant Inspector
9  General for audit to Dr. A. Wayne Johnson COO of
10  FSA and so does that refresh your recollection as
11  to who the report would have come back to at the
12  Department?
13      A.      Well, is a name on the report?  Is
14  this a report based on the review of the
15  Enforcement and Borrower Defense Unit?
16      Q.      Yeah.  Normally I don't answer like
17  the witness to ask questions, but that is a good
18  question that you just raised and I'll just show
19  it to you.
20              If you could, look to Tab 3 which has
21  been previously introduced as Exhibit 3.
22              (Whereupon, Exhibit 3, having been
23              previously marked, was tendered to the
24              witness for identification.)
25      A.      Does it matter that I don't have Tab

Page 220

- JAMES MANNING -

1
2  3?  I have something labeled Exhibit 19.
3      Q.      No, I'll explain that.  This was just
4  previously introduced as an exhibit with the
5  court, so we can skip over that page.
6      A.      Okay.  So here it is, the "Federal
7  Student Aid's Borrower Defense to Repayment -- I
8  have the Inspector General's report entitled
9  "Federal Student Aid's Borrower Defense to
10  Repayment Loan Discharge Process."
11      Q.      All right, and the date on that is
12  December 8, 2017?
13      A.      Date on that is December 8, 2017,
14  correct.
15      Q.      And would you say this is the report
16  that we have been discussing that was requested by
17  the Department for a review of the borrower
18  defense process?
19      A.      I expect it is, yeah, just looking at
20  the letter.
21      Q.      Okay, so you're looking at the page
22  that I'm going -- we'll just look at the -- the
23  court stamp page numbers, so Page 182 of 270 and
24  it looks like it's a December 8, 2017 memo to Dr.
25  A. Wayne Johnson?

Page 221

- JAMES MANNING -

1
2      A.      Yes.
3      Q.      And it looks -- you wanted to look at
4  this letter.  Does this refresh your recollection
5  about anything about how the report --
6      A.      Give me a minute.  I was reading.
7      Q.      All right, and I'm just going to
8  request you don't read the whole report during
9  this deposition.
10      A.      But I want to read the letter.
11      Q.      I understand.
12      A.      Read the letter.
13              Okay.
14      Q.      All right.  Does this -- after
15  reviewing the December 8th letter included in this
16  report, does that refresh your recollection about
17  who this report would come back to at the
18  Department?
19      A.      Yes, it was through correspondence
20  from Dr. Johnson and that appears, according to
21  this letter, that they received comments from FSA.
22  Let's see -- just a second.
23      Q.      Do you have anything else to answer,
24  Mr. Manning?  We can move on.
25      A.      Okay, just give me 30 seconds more,

Page 222

- JAMES MANNING -

 1   please.
 2           Okay, thank you.
 3       Q.    Now, does anything else about this
 4   letter refresh your recollection about the report
 5   coming back in to the Department?
 6       A.    No.
 7       Q.    Okay.  If you look at the bottom
 8   left-hand corner, there's a CC and it has your
 9   name as Acting Undersecretary.  Do you see that?
10       A.    Yes, I do.
11       Q.    And you remember getting a copy of
12   this letter?
13       A.    Not specifically, but I'm sure I got
14   a copy of the report so I --
15       Q.    When a report like this is issued, do
16   you expect people in the Department to read it?
17       A.    The parties that are impacted, yes.
18       Q.    And in this case, who would be the
19   impacted parties?
20       A.    Well, Dr. Johnson, the folks in the
21   borrower defense that were involved in this, the
22   FSA, the Undersecretary, copies would also go to,
23   you know, other senior leaders, OGC.
24       Q.    What other senior leaders?

Page 223

- JAMES MANNING -

 1       A.    Deputy Secretary.
 2       Q.    And --
 3       A.    (Unintelligible crosstalk) Yes,
 4   generally the folks that get this routinely.
 5       Q.    And would you expect folks in the
 6   Department afterwards, let's say relatively
 7   shortly afterward would then -- within six months,
 8   would you expect them to review a report like this
 9   even if they had not been one of the directly
10   impacted parties to begin with?
11           MR. MERRITT:  Objection, vague.
12       Q.    In other words, would ex -- would you
13   be surprised to learn that Diane Auer Jones
14   testified in her deposition that she never read
15   it?
16       A.    I guess it wouldn't surprise me
17   because it was -- she -- she wasn't at the
18   Department for more than a year after this.  Right
19   -- no, December 8th.  It was before -- it was --
20   it was before her time in terms of -- she wasn't
21   at the Department when this was issued.  She
22   started in her position later -- in '17, '18.
23       Q.    But wouldn't it be important
24   background for her to know, taking on a role that

Page 224

- JAMES MANNING -

 1   would have borrower defense as part of her
 2   portfolio?
 3       A.    Yes, and I'm not sure that she didn't
 4   get it and read it, but she wouldn't have --
 5       Q.    Would you be surprised to learn that
 6   she testified she -- she never read it?
 7           MR. MERRITT:  Objection, asked and
 8   answered.
 9       Q.    Would that surprise you, sir?
10       A.    I don't know if that surprises me or
11   not, but there are other avenues of communication
12   when a new senior leader comes and is reassigned
13   issues as important as this one was to the
14   Department and in particular the Undersecretary,
15   but this was the report that was -- I'm assuming
16   that there was a corrective action plan and she
17   might have seen the corrective action plan but,
18   you know, I don't know.
19           I don't know what transpired once she
20   arrived.  I wouldn't expect that she'd be in a
21   position to look back and read every document
22   that, you know, was made available from the
23   Inspector General necessarily.
24       Q.    Okay.  Let's turn to Page 186 of 270

Page 225

- JAMES MANNING -

 1   of this document.  I'm just using the court
 2   stamps --
 3       A.    I got it, 186.
 4       Q.    Out of 270.
 5       A.    I'm there.
 6       Q.    All right.  That was really quick,
 7   Mr. Manning.  I appreciate it.  Under -- you see
 8   there's a chart there, "Table 1: FSA's Borrower
 9   Defense Outcomes"?
10       A.    I see that, yes.
11       Q.    And then underneath that there's
12   some text that starts with "From January 20, 2017?
13       A.    Yes.
14       Q.    All right.  Well just follow along.
15   I'm going to do the reading this time and then I
16   want to pause after some reading and then ask you
17   a few questions.
18       A.    Okay.
19       Q.    "From January" -- this is, I'm
20   reading from the report, "From January 20th, 2017
21   to July 31, 2017 business operations continued to
22   receive borrowers defense claims.  From January
23   20, 2017 through March, 2017 BDU continued to
24   review transfer of credit and guaranteed

Page 226

1           - JAMES MANNING -
2  employment claims."
3           I want to pause there even though
4  it's mid-sentence just because I want to ask about
5  this date, January 20th, 2017 through March, 2017?
6       A.    Uh-huh.
7       Q.    Do you -- do you have any idea why
8  BDU would have stopped reviewing those claims in
9  March, 2017?
10      A.    I'm sorry, where does it tell me that
11 they stopped March, 2017?
12      Q.    Well, it says that's when they
13 reviewed them.  Let's go a little further.  Maybe
14 it will be more clear.
15      A.    Yeah, it wasn't as clear.  It didn't
16 say stopped at that point, but go ahead.
17      Q.    Right.  So, I mean, implicit in that
18 is that -- that there was -- that they didn't
19 continue after March, 2017.  Would you agree or
20 you disagree about that?
21      A.    Now -- well -- well, let me read it
22 myself again because I -- that's not what I got
23 out of it.  So I'll tell you one thing that
24 surprised me here though is that "January 20th,
25 2017 to July 31st, 2017 business operations

Page 227

1           - JAMES MANNING -
2  continued to receive borrower defense claims" --
3  I'm sorry.  I was saying that the -- the sentence
4  at the beginning of the paragraph "From January
5  20, 2017 to July 31, 2017 business operations
6  continued to receive borrower defense claims."
7       Q.    Why does that surprise you, Mr.
8  Manning?
9       A.    Because I, I -- borrower defense
10 claims should have been going to -- directly to
11 the Borrower Defense Unit.
12      Q.    Okay.
13      A.    I wasn't expected to take over
14 directly Borrower Defense Unit business
15 operations; but beyond that "BD continued to
16 review transfer credit and guaranteed employment
17 claims, and from January 20, 2017 through May 4,
18 2017, BDU continued to review job placement rate
19 claims where they were able to make preliminary
20 determinations of denial or approval based on
21 existing legal memoranda or reports.  However, the
22 acting Under Secretary has not approve or denied
23 these claims."
24      Q.    I would like to pause right there if
25 I could and I appreciate you reading it.  The last

Page 228

1           - JAMES MANNING -
2  sentence says; "However, the acting Undersecretary
3  has not approved or denied these claims."  You
4  were the under act -- you were the acting
5  Undersecretary at that time, right, Mr. Manning?
6       A.    Not from January 20th but
7  from --
8       Q.    Right.  And refresh my memory was
9  it --
10      A.    April, I think, yeah.
11      Q.    April, okay.  Sorry about that.
12      A.    Then late April.  Yes.
13      Q.    Who was -- was there an Acting
14 Undersecretary before you from January to April?
15      A.    You know, there probably was.  I'm
16 thinking out loud here.  You know, Joe Connolly
17 was Acting Deputy Secretary at the beginning.
18 Phil Rosenfelt was the Acting Secretary.  I don't
19 recall who the person was.  It could have --
20 possibly have been Lynn Haffey who was -- who was
21 the Acting Assistant Secretary to secondary for
22 Postsecondary Education at the time.  She happens
23 to be an attorney in OGC now, but I -- I don't
24 know at the time who was the Acting
25 Undersecretary.

Page 229

1           - JAMES MANNING -
2       Q.    Okay, let's, let's -- let's go back
3  to the document.
4       A.    Okay.
5       Q.    What I'm getting from what you read
6  so far, is that the BDU was continuing to review
7  and receive these claims.
8       A.    Right.
9       Q.    And they were able to make
10 preliminary determinations of denial or approval.
11      A.    Right.
12      Q.    Based on existing legal memoranda or
13 reports.  However the acting under Secretary has
14 not approved or denied these claims, understanding
15 that you didn't come into that role or -- or
16 position until April, 2017, but by the time of
17 this report in December, 2017 certainly you had
18 been in -- in that role for several months and I
19 want to ask you why you did not approve or deny
20 those claims at that time?
21      A.    Does it say I didn't approve them by
22 that time?
23      Q.    It says "However, the Acting
24 Undersecretary has not approved or denied these
25 claims" and this report is dated from December,

Page 230

- JAMES MANNING -

2017.

A.    Okay.

Q.    So the question is, do you know why you, at that point in time, had not approved or denied those claims?

A.    I -- I don't recall.

Q.    Okay.  Were you aware that the BDU had made preliminary determinations of denial or approval for those claims?

A.    I don't recall when I learned that, but I understood that that was what the BDU did.

Q.    That they made preliminary determinations of denial or approval?

A.    Yes.

Q.    And so who made the final decisions, if their decisions were preliminary?

A.    Well, I guess the approval of the Undersecretary apparently.

Q.    Okay, but I -- so did you approve or deny claims based on the preliminary determinations of the BDU?

A.    Talking about these ones that are referenced here?  I, I -- I don't recall.

Q.    Okay.  How about any preliminary

Page 231

- JAMES MANNING -

determinations -- did you make, did you approve or deny claims based on other claims, any other claims for borrower defense based on the BDU preliminary determination?

MR. MERRITT:  Objection, asked and answered.

MR. JARAMILLO:  Well, I don't think he answered.  He answered -

MR. MERRITT:  We've gone through several -- sorry.

MR. JARAMILLO:  He answered about the particular claims that are listed here and I'm asking beyond that about any claims.

MR. MERRITT:  We've gone through this several times what his memory of approving or denying borrower defense claims during his tenure but you can answer the question, Mr. Manning.

A.    I don't recall.

Q.    You don't recall whether you approved or denied any claims based on preliminary determinations from the BDU?

A.    I -- I don't -- do not recall.

Q.    Okay.  Now, the last sentence on

Page 232

- JAMES MANNING -

this page that continues on to the next page, I'll just read it and we can talk about it.

A.    Okay.

Q.    It says "According to the director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval or to continue developing memoranda on additional categories of claims that qualify for discharge because the borrower defense policies are being reviewed with the change in administrations."

Now, I want to -- that's a long sentence.  I want to just kind of ask you about different pieces of it, if you don't mind.

A.    Sure, and to clarify that begins by saying "According to the director of BDU, FSA's former Deputy Chief Enforcement Officer communicated to the BDU."

Q.    Yes, sir.  So let's -- do you know who the director of BDU was at that time?

A.    And which dates are we talking about there for that?

Q.    I'm talking about -- well, this report was written in December, 2017 and I'll just

Page 233

- JAMES MANNING -

say that my understanding was it was Collin Nevin was the director of BDU at that time; was that your understanding?

A.    Well, Colleen was the director of -- of BDU after the gentleman left -- someone should help me with that name -- and -- and Laura Kim was -- was the top two folks and, yes, that's correct that Colleen Nevin became direct -- was definitely director of BDU.

Q.    Do you take the sentence to be referring to Colleen Nevin when it says director of BDU?

A.    If we -- reading it from the assumption that this is as of, you know, December 8th then -- I just don't remember specifically when she became the director of BDU.

Q.    Okay, and then it says "FSA's former Deputy Chief Enforcement Officer communicated to the BDU not to submit additional claims for approval."

A.    Right.

Q.    Are you aware of that communication? Were you aware of that communication when you were at the Department?

Page 234

- JAMES MANNING -

1        A.    I wasn't aware of it when it occurred
2   that former Deputy Chief Enforcement Officer
3   communicated to BDU not to submit additional
4   claims.
5        Q.    Did you ever become aware of that
6   communication?
7        A.    Apparently when I read this, I must
8   have become aware of it, but I skimmed over it.  I
9   don't recall but --
10       Q.    Did you direct FSA's former Deputy
11  Chief Enforcement Officer to communicate to BDU
12  not to submit additional claims for approval?
13       A.    I don't remember anything like that.
14       Q.    Do you --
15            MR. MERRITT:  Joe, we -- oh, sorry.
16            MR. JARAMILLO:  Go ahead.
17            MR. MERRITT:  I was going to say
18       we've gone for a little over an hour again.
19       We missed our break window, sometime soon.
20            MR. JARAMILLO:  All right.  Let's
21       unpack this sentence a little bit and then
22       we'll take our break.  I don't think it will
23       take that long.
24            THE WITNESS:  Sure.

Page 235

- JAMES MANNING -

1            MR. JARAMILLO:  All right.
2        Q.    Do you have any idea who would have
3   made a decision to communicate to the BDU not to
4   submit additional claims for approval?
5        A.    I don't know.  I can't tell from
6   this.  I -- I read this and --
7        Q.    At this time, sir.  I'm just asking
8   for your memory.
9        A.    Well, I, I, I -- I know, but I read
10  this and the "FSA's former Deputy Chief
11  Enforcement Officer communicated to the BDU not to
12  submit additional claims."  According to the
13  director of BDU, FSA's former Deputy Chief
14  Enforcement Officer communicated to the BDU not to
15  submit additional claims for approval or to
16  continue developing memoranda."
17            It goes on, but the confusion for me
18  here is that former Deputy Chief Enforcement
19  Officer, I mean is -- is that Laura Kim?  Is that
20  who we're talking about, communicating to the --
21  the BDU to Colleen Nevin not to submit additional
22  claims?  On whose authority was that?  I don't
23  know.  I can't tell by reading this.
24       Q.    Those are precisely my questions, Mr.

Page 236

- JAMES MANNING -

1   Manning.
2            So your answer is you don't know.
3   You're telling me that as you sit here today you
4   don't remember one way or another whether you
5   directed FSA to stop issuing decisions for
6   approval?
7        A.    I don't have any recollection of
8   relaying that information to the former Deputy
9   Chief Enforcement Officer to, to -- to relay; and
10  if I had I -- I expect that I would remember that,
11  but I have no recollection of doing anything like
12  that.  That's outside of a normal procedure.
13       Q.    Now, let's put aside the relaying
14  information.  I want to just back up because my
15  question really was focused on whether you
16  directed FSA to stop issuing decisions for
17  approval.
18       A.    I --
19       Q.    Did you?
20       A.    I don't recall doing that, no, but I
21  don't see that reference or inference being made
22  here.
23       Q.    I'm not asking for an inference.  I'm
24  kind of backing up for now because I don't want to

Page 237

- JAMES MANNING -

1   get caught up in, in the -- you know -- in the
2   relay of information.
3            I just --- really just the important
4   part of this for my purposes is to know whether
5   you directed FSA to stop issuing decisions for
6   approval and your answer was you don't recall; is
7   that correct?
8        A.    I don't recall.
9        Q.    Could you have directed FSA to stop
10  issuing decisions for approval?
11       A.    When are we talking about, what date?
12  As what?
13       Q.    Any time -- any time in your tenure
14  as Acting Undersecretary, could you have directed
15  FSA to stop issuing decisions for approval?
16       A.    Well, would I have had the legal
17  authority?  I'm not -- it's not clear to me that I
18  would have to do that and would have done that.
19       Q.    It's not clear to you whether you had
20  the legal authority to do that?
21       A.    I would have to -- to consult with
22  the attorneys at OGC to be clear on that.
23       Q.    Did you ever direct that no more
24  decisions for borrower defense be issued?

Page 238

1              - JAMES MANNING -
2       A.     I have no recollection of ever saying
3  that.
4       Q.     Is that something that you would have
5  had the authority to do?
6       A.     As I said, I would want to check with
7  the OGC to confirm that before I made a statement
8  like that.
9       Q.     Did you ever check with OGC about
10  that issue?
11      A.     Not that I recall.
12      Q.     Did you ever check with anybody about
13  that issue of being able to direct that no more
14  decisions by borrower defense be issued?
15      A.     No, I don't remember.
16      Q.     And it's your testimony that within
17  the department, it's office-of-the-general-counsel
18  that would know whether or not you had the
19  authority to do something like that?
20      A.     I think checking with the attorneys
21  always a good thing to do at the Department of
22  Education when you have a question about lawful
23  authority.
24      Q.     Certainly Secretary DeVos would have
25  authority to issue such a decision, correct?

Page 239

1              - JAMES MANNING -
2       A.     I -- I expect that is correct.
3       Q.     Did the Secretary ever direct FSA
4  that no mire borrower defense decisions should be
5  issued?
6       A.     I never heard her say that.
7       Q.     Did you ever see any documents that
8  -- implying that she make such a decision?
9       A.     I never -- I don't recall seeing
10  anything like that.
11      Q.     Did anyone ever tell you that she had
12  made such a decision?
13      A.     I don't recall ever hearing that.
14      Q.     Did you ever hear Secretary DeVos
15  express an interest in stopping borrower defense
16  decisions?
17             MR. MERRITT:  Objection, vague.
18      Q.     Did you ever come to know that the
19  Secretary directed that no decisions on borrower
20  defense should be issued?
21      A.     I don't recall ever hearing that.
22      Q.     As you sit here today, you're not
23  aware of Secretary DeVos ever directing that no
24  borrower defense decisions be issued by the
25  Department?

Page 240

1              - JAMES MANNING -
2             MR. MERRITT:  Objection, asked and
3      answered.
4       Q.     You can answer, sir.
5       A.     I don't recall ever hearing Secretary
6  DeVos say that.
7       Q.     And you don't recall anybody ever
8  saying that Secretary DeVos issued such a
9  decision?
10      A.     That -- I don't recall that.
11      Q.     You don't have any awareness that she
12  issued such a decision?
13             MR. MERRITT:  Objection, asked and
14      answered several times.
15      Q.     Do you have any awareness, sir, as
16  you sit here today that she issued such a
17  decision?
18      A.     Awareness as I sit here today?
19      Q.     Yes, sir.
20      A.     Do you have a document here to show
21  me this and I can see --
22      Q.     I'm just asking whether you have any
23  awareness, you can tell me --
24      A.     No, I don't --
25      Q.     You can tell me --

Page 241

1              - JAMES MANNING -
2       A.     I don't have any awareness or
3  recollection.  No, do not.
4       Q.     Okay.  Now, let's turn back to the
5  bottom of Page 3.
6       A.     Do you mind, could I take two
7  minutes.
8             MR. JARAMILLO:  Oh, I'm sorry, you
9      had asked about that earlier.  We can go off
10      the record.
11             THE VIDEOGRAPHER:  Off the record.
12      The time is 22:09 UTC.
13             (Whereupon, there was a brief recess
14      in the proceedings.)
15             THE VIDEOGRAPHER:  We are now on the
16      record, the time is 22:22 UTC.
17      Q.     Mr. Manning, we were looking at Tab 3
18  which has been marked as Exhibit 3.  That's the
19  Inspector General's report and I think when we
20  left off, we were at the bottom of Page 3 of the
21  report and in a sentence that carried over to Page
22  4.
23      A.     Page 3 -- okay, at the bottom?
24      Q.     Or if you want to look at the top, it
25  would say Page 186 of 270.

Page 242

1                  - JAMES MANNING -
2      A.    No, I got it.  I got it.  I got it.
3      Q.    So that last sentence which is pretty
4  long and -- and pretty packed with information,
5  the second part of that, when it describes the
6  communication from FSA as -- that, you know,
7  according to the -- the director of BDU
8  communications to the BDU.
9      A.    Yeah.
10      Q.    The second part says -- basically
11  says that there was a communication not to
12  continue developing memoranda and additional
13  categories of claims that qualify for discharge
14  because the borrower defense policies are being
15  reviewed with the change in administration.
16          Were you aware of that particular
17  decision not to continue developing memoranda?
18      A.    Well, I -- I wasn't aware that the
19  chief enforcement officer had anything to
20  communicate period.
21      Q.    Okay.  So -- so you were not aware of
22  a communication not to develop legal memoranda?
23      A.    Not that way it's represented here,
24  "the former Deputy Chief Enforcement Officer
25  communicated to the BDU not to submit" -- I -- I

Page 243

1                  - JAMES MANNING -
2  don't know whether -- I don't know whether the
3  former Deputy Chief Enforcement Officer would
4  accept that.
5      Q.    Were you aware of any decisions to
6  tell the BDU to stop developing memoranda and
7  additional categories of claims that qualify for
8  discharge?
9      A.    I -- I don't recall that.
10      Q.    Who in -- in your experience at the
11  Department of Education, who would be the person
12  at Department of Education that would make such a
13  decision to tell the BDU to stop developing
14  memoranda on additional categories of claims that
15  qualify for discharge?
16      A.    Well, I don't remember who would be
17  the correct person, perhaps what individual.
18  Potentially it could be the Undersecretary.  It
19  might be the COO at FSA.  It might be the Chief
20  Enforcement Officer relaying that after getting
21  direction from someone else.
22      Q.    After getting direction from someone
23  else?  Who else?
24      A.    Well, like -- like the COO or the
25  Undersecretary and --

Page 244

1                  - JAMES MANNING -
2      Q.    Giving directions to the Chief
3  Enforcement Officer?
4      A.    In -- in terms of a chain of command
5  type of thing, that's the way I would have
6  recalled that.
7      Q.    Okay.  Are you aware if the COO of
8  FSA made the decision to -- to tell the B-- to
9  have the BDU stop developing memoranda?
10      A.    No.  I'm -- I'm not aware of that.
11      Q.    Are you aware of anyone issuing such
12  a decision?
13      A.    I'm sorry?
14      Q.    Are you aware of anyone making such a
15  decision?
16      A.    No, I don't -- I don't recall that.
17      Q.    Do you -- do you ever recall BDU
18  stopping their development of memoranda on
19  additional categories of claims that qualify for
20  discharge?
21      A.    I don't recall all that.
22      Q.    Let me turn to Page 193 of 270 in
23  this document, which is Tab 3 in Exhibit 3, that
24  Inspector General's report.
25      A.    Okay.

Page 245

1                  - JAMES MANNING -
2      Q.    At the top of the page, the first
3  full sentence says; "FSA established seven
4  categories of borrower defense claims that
5  supported the cause of action under applicable
6  state law and thus qualified the borrowers for a
7  loan discharge."
8          Were you aware of these seven
9  categories when you worked at the Department?
10      A.    Well, let me take a look at them.
11          Okay.  This, this -- these are
12  familiar.  I don't recall specifically all the
13  detail, but when it says "FSA established seven
14  categories, who is FSA in that reference?
15      Q.    I'm not -- you know -- I'm not --
16  you're -- I'm the one asking the questions so --
17      A.    I'm sorry, but I'm reading this and
18  I, I -- I don't know what's meant by that so I --
19      Q.    Okay.  You don't know what's meant
20  FSA, Federal Student Aid?
21      A.    "FSA established seven categories."
22  Well, some -- I mean, there are human beings that,
23  you know, worked on that.  I -- I'm trying to, you
24  know, envision -- you know -- there -- there are
25  plenty of folks that work at FSA that are capable

Page 246

```
1              - JAMES MANNING -
2   of doing this, of writing this.
3              But, you know, it's like, as I
4   mentioned earlier, importance of chain of command
5   a few minutes ago, I would like to know who the
6   responsible people are and to be able to go to
7   them; and so I read this, I see "FSA established"
8   and my first question is okay, who do I talk to
9   there?
10     Q.     Who would you talk to?
11     A.     Well, I'd -- I'd start with, you
12  know, the -- the COO at FSA, an explanation as to
13  what this is, you know, and where did it come
14  from.
15     Q.     Because the leadership makes the
16  decisions, right?
17             MR. MERRITT:  Objection, overbroad.
18     Q.     You said human -- you want to talk to
19  a human being.  It's not an organization that
20  makes the decision; it's the human being, correct?
21     A.     Well, it's a human being of several
22  human beings in a group of human beings, but it's
23  -- it's ul -- ultimately you can identify folks
24  that were part of the, you know, conversation and
25  discussion and decision and good to know the
```

Page 247

```
1              - JAMES MANNING -
2   answer to who they are; so it's sufficient to say
3   they established.
4      Q.     Okay.  So for this particular
5   sentence, you would talk to -- you would start
6   with the COO who was A. Wayne Johnson at the time?
7      A.     Was the COO at the time this was
8   issued, yes.
9      Q.     You would start with Mr. Johnson,
10  right?
11     A.     Yes, but I'm also trying to figure
12  out when this particular act was supposed to have
13  taken place.
14     Q.     Okay, it's not -- it's really not
15  that important, so I'm going to have you put the
16  document down, if you will.
17     A.     Okay, it's down.
18     Q.     So your understanding of the borrower
19  defense review process, could the Borrower Defense
20  Unit adjudicate applications from borrowers whose
21  claims did not fall within the established
22  categories that support -- the claims that
23  supported a cause of action under applicable state
24  law?
25     A.     Re -- repeat the question.
```

Page 248

```
1              - JAMES MANNING -
2      Q.     Could the BDU adjudicate applications
3   from borrowers whose claims did not fall within
4   the categories of -- the seven categories?
5              MR. MERRITT:  Objection, ambiguous on
6   timing.
7      Q.     During your tenure at the Department.
8      A.     I -- I don't recall.
9      Q.     So to your recollection, was it
10  possible for the BDU to adjudicate claims that
11  involved pools that were not mentioned in these
12  seven categories?
13     A.     I -- I don't recall.
14     Q.     Do you know if during your tenure the
15  Department ever adopted any one of these seven
16  categories?
17     A.     They -- They look familiar, but I
18  can't, you know, state that they -- whether any of
19  them were specifically adopted.  I would need to
20  get more information.
21     Q.     Okay, and you -- and you looked
22  through the -- each of the seven categories as
23  they're described there, correct?
24     A.     Generally, yeah.  I mean job
25  placement (unintelligible) -- yes.  Yes, I looked
```

Page 249

```
1              - JAMES MANNING -
2   at them.
3      Q.     Okay.  And you -- and you saw that
4   each of these categories that describes the
5   particular document or memoranda with -- that that
6   provides the grounds for each of the categories?
7      A.     Well, yes, I can see that.  There are
8   -- as I look at this, there are more questions
9   that are raised I'd be asking yes.
10             Heald College transfer of credit rate
11  misrepresentation claims based on a May, 2015
12  memorandum.  Was that May, 2015 memorandum
13  superseded by a -- another action.
14     Q.     Do -- do you know?
15     A.     I believe it was, but I'm not -- I
16  don't -- can't say authoritatively that --
17     Q.     Okay, and why do you believe it was
18  superseded?
19     A.     I might be confusing it with
20  something else.
21     Q.     Would you agree that all of these
22  seven categories were established by memoranda
23  that were drafted during the prior administration;
24  prior to -- in other words, the Obama
25  Administration?
```

Page 250

- JAMES MANNING -

1
2       A.      I, I -- I can't be sure that they
3   were all drafted during the Obama Administration.
4           I spent six years in the Obama
5   Administration. The -- questions in my mind are
6   raised about the ones that were based on the
7   January '17 memorandum.
8       Q.      Okay, the question is because January
9   1st through 19th was the Obama Administration and
10  January 20th afterwards was the Trump
11  Administration?
12      A.      Correct.
13      Q.      So in your mind, it's not clear to
14  you whether the memorandum reference that -- that
15  had a January, 2017 date were in -- which
16  administration they were in?
17      A.      Yes.
18      Q.      Okay.
19      A.      Is it clear to you?
20      Q.      I'm sorry?  Go ahead.
21      A.      Is it clear to you?
22      Q.      Well, I'm not -- you're not -- I'm
23  not answering the questions here today.  I just
24  want to know your knowledge.
25          So, I mean, I'll -- I'll represent to

Page 251

- JAMES MANNING -

1
2   you that they were -- none of these were adopted
3   or, you know, drafted and put into effect during
4   -- during the Trump Administration.  They're all
5   from the Obama Administration.
6           Did the Trump Administration or the
7   Department during your tenure ever retract any of
8   these -- the memos for these categories?
9       A.      I don't know.
10      Q.      Are you aware of any memoranda
11  regarding borrower defense written during the
12  Trump Administration?
13      A.      Any -- any mem -- memoranda on
14  borrower defense written during Trump
15  Administration?
16      Q.      Yes.
17      A.      I can't specifically recall.  I would
18  expect there were things written.
19      Q.      Are you aware of any eligibility
20  categories beyond the seven listed here that were
21  created during the Trump Administration?
22      A.      I don't recall.
23      Q.      You don't know one way or the other
24  whether there were any additional categories
25  created?

Page 252

- JAMES MANNING -

1
2       A.      I don't recall.
3       Q.      Okay.  Are you aware that in
4   November, 2017 COO Johnson of FSA prepared --
5   addressed to Christopher Gamble, Regional
6   Inspector General for Audit of the U.S. Department
7   of Education, a response to the draft review
8   report that we're looking at?
9       A.      Was I aware?  I -- I don't recall
10  that, but I expect that that was possible that
11  was -- that's correct, but I don't know with
12  certainty.
13          It was -- the report was addressed to
14  Wayne Johnson and it was asked that to send a
15  response to Gamble and apparently what you're
16  talking about is a letter that he sent, is that
17  right.  I haven't seen that letter --
18      Q.      All right.
19      A.      -- at least not recently.
20      Q.      Right.  Did you -- did you work with
21  Mr. Johnson on any such response?
22      A.      I -- I don't recall working with him
23  on that letter.  I might have seen it in -- in
24  drafts, but I don't recall that either.
25      Q.      I'll have you turn to Page 30 of this

Page 253

- JAMES MANNING -

1
2   report or if you look at the top of Page 213 of
3   270 and the top of it says "Appendix C:  FSA
4   Comments."
5       A.      213 of 270, I got it.  Yeah, okay so
6   this is the document letter that you were talking
7   about.
8       Q.      Have you seen this before?
9       A.      I -- I don't know.  I'll take a look
10  at it and see if I can refresh my memory.
11      Q.      All right, fair enough.  I don't want
12  you to read it line by line, but if you could --
13      A.      I don't know whether I can say I saw
14  it or did not.
15      Q.      Yeah, there you go, Mr. Manning.  You
16  know, I'm trying to -- we don't want this to be a
17  basketball game, you know, with the last fifteen
18  seconds, you know --
19      A.      I have a ball if you want to play
20  though.
21      Q.      I see it, but let's take a look at
22  this and let me know if you've seen the Appendix C
23  document, FSA comments before.
24          Have you had a good enough glance,
25  Mr. Manning, to let us know whether you've seen

Page 254

1                    - JAMES MANNING -
2  this before?
3       A.     And the entire letter is just this
4  one page, right.
5       Q.     Well, no.  It's, it's -- I think
6  Appendix C goes on for several pages and I can --
7       A.     The Wayne Johnson letter is it -- was
8  all --
9       Q.     Oh, are you -- you're not looking at
10 Page 30 of the report.  You're now back to the
11 beginning of the report with the cover letter; is
12 that what you're doing, Mr. Manning?
13      A.     I'm looking at Page 30 --
14      Q.     Yes.
15      A.     -- of the report.  It's the November
16 29, 2017 memo from Wayne Johnson to Christopher
17 Gamble, SIG.
18      Q.     There you go.  So have you seen this
19 document before or does it look familiar?
20      A.     I don't recall seeing it before, but
21 I very well could have.
22      Q.     Okay.  Thank you.
23             I want to have you look at Page 31
24 and there's a Footnote 17.
25      A.     Yes.

Page 255

1                    - JAMES MANNING -
2       Q.     All right.  I'm just going to read it
3  and ask you about it --
4       A.     Go ahead.
5       Q.     -- to see if you know about it.
6  Footnote 17 says, "The Report suggests OIG
7  misunderstood the legal memoranda approval process
8  to require that OUS find any legal memorandum that
9  provided the legal framework to approve a
10 particular type of claim.  That was not the
11 process.  OUS's approval is found on the claim
12 'Approval Memos' not on the legal memoranda."
13             Are you aware of -- of any such claim
14 approval memos in which the Office of the
15 Undersecretary registered its approval?
16             MR. MERRITT:  Objection.  This is
17      beyond the scope of the court-ordered
18      discovery.
19             MR. JARAMILLO:  Are you instructing
20      him not to answer the question because this
21      is a pretty vague and ambiguous description
22      here and I would think he could give us some
23      clarity and it may, in fact, relate to why
24      there was a delay.
25             MR. MERRITT:  I would say that

Page 256

1                    - JAMES MANNING -
2  whether it's vague or ambiguous has nothing
3  to do with whether it would be relevant to
4  the topics the court ordered discovery on.
5             MR. JARAMILLO:  I think we need to,
6      to -- to explore this topic.
7             Are you going to instruct him not to
8      answer or let him answer it.
9             MR. MERRITT:  I'll just note, it's a
10     year before the delay began -- or, sorry, a
11     few months before the delay began.  I'm not
12     going to instruct him not to answer yet, but
13     I wanted to lay down a mark on this line of
14     questioning.
15             MR. JARAMILLO:  So he can answer the
16     question.
17             MR. MERRITT:  He can answer the
18     question.
19      Q.     Mr. Manning, this footnote refers to
20 a claim approval memo.  Are you aware of any such
21 document?
22      A.     I don't recall.
23      Q.     Are you aware of any approval from
24 OUS?
25      A.     Regarding what --

Page 257

1                    - JAMES MANNING -
2       Q.     Regarding borrower -- borrower
3  defense decisions during your tenure.
4       A.     So that question has nothing to do
5  with the 17th Footnote, is that correct?  I'm
6  confused.
7       Q.     Yeah, well, no.  I mean, listen, you
8  -- you don't know about the 17th Footnote so let's
9  put that in the past and I'm just asking you if
10 you're aware of any memo that OUS would issue
11 during your tenure at the Department that concerns
12 approval for a decision that had anything to do
13 with borrowers defense?
14      A.     I do not.
15      Q.     Okay.  If you could, turn to Page 33.
16 There's the heading that -- are you there, Mr.
17 Manning?
18      A.     I am.  Thank you.  Thantingview of
19 Claims" in the middle of that paragraph, I'm just
20 going to read it.  "However, BDU's proposed
21 protocols for addressing claims that are unique or
22 unsupported by existing legal memos were included
23 in the February 2017 'Borrower Defense Unit Claims
24 Review Protocol' document presented to the landing
25 team."

Page 258

- JAMES MANNING -

1                    - JAMES MANNING -
2          Does that refresh your recollection
3    about whether you, in your capacity on the landing
4    team, saw a Borrower Defense Unit Claims Review
5    Protocol?
6          A.    Well, they were included in the
7    February, 2017 Borrower Defense Unit Claims Review
8    Protocol.
9          Q.    I really just want to know if you saw
10   any such Borrower Defense Unit Claims --
11         A.    I don't recall, but I'm telling you
12   I'm also confused about what we're talking about
13   February, 2017, a document presented to the
14   landing team.  There was no landing team February,
15   '17.
16         Q.    Okay.  When did the landing team stop
17   its --
18         A.    Well, I, I -- who was the landing
19   team then?  Some of us were already -- we sat in
20   on the first and were -- I don't recall.
21         I'm, I'm, I'm -- I'm reading this
22   and it confused me and I -- presented to the
23   landing team --
24         Q.    I understand, Mr. Manning.  It sounds
25   like, to your recollection, by that time in

Page 259

1                    - JAMES MANNING -
2    February, 2017 the landing team had stopped its
3    work and the new administration was in full swing?
4          A.    Well, yes.  Yes, that's my instinct,
5    but could it formally exist still with members
6    that were on the landing team that were -- I -- I
7    don't know, but in -- in principle there could
8    have been; but when we say it was presented to the
9    landing team, that doesn't tell me to who it was
10   presented and --
11         Q.    Okay, and if you look under Item 3,
12   "Processing of Claims Flagged for Denial" --
13         A.    Yes.
14         Q.    -- I'm just going to read it for you.
15   "The Report also cites as a weakness that 'BDU did
16   not have a process for closing out and issuing
17   decisions on borrower defense claims it flagged
18   for denial.'  As described above with respect to
19   the review of unique claims, no procedures had
20   been submitted to the previous administration for
21   approval and these claims were not being
22   processed.  In August OUS, OGC, and FSA agreed on
23   a procedure to deny claims."
24         Do you recall --
25         A.    August when, what year in August?

Page 260

1                    - JAMES MANNING -
2          Q.    Well, sir, I'm going to -- because
3    this report was in December, 2017 I'm -- let's
4    assume -- let's just assume for purposes of the
5    question that this is talking about August, 2017.
6          A.    Okay.  I don't recall.
7          Q.    All right, you don't recall -- okay,
8    and you were act -- and just to be clear:  In
9    August of 2017 you were the acting Undersecretary,
10   correct?
11         A.    That's correct.
12         Q.    And would there be anyone else at OUS
13   that would agree with OGC and FSA on a procedure
14   to deny claims at that time?
15         A.    I don't think there would be anyone
16   else in the Office of the Undersecretary that
17   would have had that authority, no.
18         Q.    All right.  Only you would have had
19   that authority, correct?
20         A.    In OUS, correct.
21         Q.    All right.  Well, let me back up --
22   well, let me get through this document.
23         A.    I don't know if -- above it talks
24   about the -- I was just -- I guess I'm not
25   supposed to ask questions though, right?

Page 261

1                    - JAMES MANNING -
2          Q.    Well, is there something you want to
3    say, Mr. Manning?
4          A.    Well, I'm just trying to be clear on
5    when things were done and the -- well, in the
6    paragraph above it -- it talks about the review
7    panel to make recommendations to the Secretary on
8    how to address defense claims.
9          Q.    Okay, Mr. Manning, let's move on.  If
10   we could go to Page 34 and just to kind of keep it
11   pointed, I'm just going to read to you the second
12   to the last sentence in the first paragraph of
13   that Page 34; and I'll just represent to you that
14   this is talking about that -- the review panel
15   that looked at borrower defense.
16         A.    Okay.
17         Q.    I'm just going to read it.  It says,
18   "The panel's work also laid the foundation to
19   approve new claims."
20         Are you aware of the Borrower Review
21   Defense Panel laying a foundation to approve new
22   claims?
23         A.    I don't have any specific
24   recollection, but that was kind of what we hoped
25   they would do and I don't -- I don't have any

Page 262

1              - JAMES MANNING -
2  specific recollection.
3        Q.    Who would know from the Borrower
4  Review Defense Panel about this issue of laying
5  the foundation to approving claims?
6        A.    Well, Joe Connolly was the convenor
7  of that panel.  He was then Acting Deputy
8  Secretary.  He might recall.  Phil Rosenfelt might
9  recall.  I'm not sure if Joe Schmoke -- Joe
10  Schmoke is still at the Department.
11        Q.    Okay.  If you could look in the same
12  page underneath "Recommendation 1," I'm just going
13  to read it.
14        "Request approval from the Acting
15  Undersecretary to resume the review, approval, and
16  discharge processes for claims qualifying under
17  the seven established categories, including claims
18  that have been flagged for approval.
19        We agree with this recommendation.
20  Pursuant to OUS' May 4th, 2017 memorandum to the
21  Secretary, OUS, and the Chief Financial Officer's
22  Internal Control's Unit, CFOICU are working with
23  FSA to 'develop interim procedures' to review
24  claims."
25        Do you recall, as Acting

Page 263

1              - JAMES MANNING -
2  Undersecretary, working with FSA to develop
3  interim procedures to review claims?
4        A.    Well, I would say this is to -- to
5  work on the establishment of the methodology.
6        Q.    So you think the interim procedures
7  just to review claims actually meant the
8  development of a relief methodology?
9        MR. MERRITT:  Objection, asked and
10        answered including when we discussed this
11        memorandum before.
12        Q.    You can answer the question.
13        A.    Well, let me take another look at it.
14  I'm getting a little tired and I have -- you know
15  -- to be careful reading.
16        Q.    Understood.
17        A.    Well, I can't say this was intended
18  to say what I -- what we're saying.
19        I will -- I will say that the -- that
20  some of the same -- some of the same people were
21  working on the -- the methodology, but this is
22  something outside of that so, no.
23        Q.    Was -- was this the development of
24  interim procedures to review claims pending the
25  development of a new methodology?

Page 264

1              - JAMES MANNING -
2        A.    I don't recall.
3        Q.    Do you recall anything about interim
4  procedures to review claims?
5        A.    I, I -- I don't recall, no.
6        Q.    Okay.  If we the look at
7  "Recommendation 2" on Page 34, I'm going to read
8  it.
9        "Request approval from the Acting
10  Undersecretary to resume consideration and
11  determination of whether additional categories of
12  claims with common facts qualifies for discharge.
13  We agree with this recommendation.  And with
14  respect to our response to Recommendation 1, we
15  will work with the CFOICU to strengthen BDU's
16  processes and protocols so the work on these
17  claims can proceed."
18        Do you recall receiving a request for
19  approval to resume consideration and determination
20  of whether additional categories of claims with
21  common facts qualify for discharge?
22        A.    I -- I don't recall.
23        Q.    Okay, and so you do recall that this
24  document we're looking at is from A. Wayne
25  Johnson, correct?  The particular response to

Page 265

1              - JAMES MANNING -
2  Christopher Gamble from A. Wayne Johnson; is that
3  correct?
4        A.    The -- the response, the letter is
5  from Wayne Johnson.
6        Q.    And that -- that's what we're looking
7  at here.  Page 34, do you understand that this was
8  part of Mr. Johnson's response?
9        A.    No, I'm -- no.
10        Q.    You don't understand that, Mr.
11  Manning?  What do you think -- as it says, Mr.
12  Manning, there is a recommendation in bold and
13  then there's a response.  Who do you think drafted
14  the response?
15        A.    I don't know -- confused myself.  It
16  is from Wayne Johnson, you're right.
17        Q.    Okay, and Wayne Johnson agreed with
18  this recommendation, correct, approval should be
19  requested from you; is that right?
20        A.    On which question?
21        Q.    "Recommendation 2:  Request approval
22  from the acting Undersecretary to resume
23  consideration and determination of whether
24  additional categories of claims with common facts
25  qualify for discharge."

Page 266

- JAMES MANNING -

1         - JAMES MANNING -
2         The response listed here says "We
3  agree with this recommendation?"
4         Doesn't that signal to you, Mr.
5  Manning, that Mr. Johnson is acting -- as COO of
6  FSA is agreeing to request approval from you to
7  "resume consideration and determination of whether
8  additional categories of claims with common facts
9  qualify for discharge"?
10    A.    I don't recall receiving anything
11  from Wayne specific to this.
12    Q.    Okay.  Do you recall receiving
13  anything from anybody specific to this?
14    A.    No, I don't recall.
15    Q.    If can look at Footnote Number 21 at
16  the bottom of this Page 34.  I'm just going to
17  read it.  "We want to clarify statement in the
18  Report regarding the pause in submitting claims
19  for approval and in developing additional
20  memoranda for new categories of claims that
21  qualify for discharge.  Although the Report
22  suggests that the Deputy Chief Enforcement Officer
23  made a decision to stay this work, we wanted to
24  clarify that the Deputy Chief Enforcement Officer
25  actually just communicated to the Director of BDU

Page 267

1         - JAMES MANNING -
2  the guidance and direction provided by OUS and the
3  Review Panel."
4         So does that refresh your
5  recollection about whether or not OUS provided
6  guidance and direction to the BDU to pause
7  submitting claims for approval?
8     A.    The direction provided by OUS to the
9  Review Panel.
10    Q.    And does that refresh your
11  recollection about providing the guidance and
12  direction?
13    A.    No, it doesn't.
14    Q.    Okay.  What about providing direction
15  for the development of additional memorandum for
16  new categories of claims that qualify for
17  discharge, does that refresh your recollection
18  that the pause --
19    A.    I don't recall that either.  Sorry.
20    Q.    Borrower defense was part of your
21  portfolio in your tenure at the Department as
22  Acting Undersecretary, right?
23    A.    It was housed at FSA, but OUS oversaw
24  all of higher education so, yes, borrower defense
25  is under it.

Page 268

1         - JAMES MANNING -
2     Q.    And is it your understanding that
3  borrower defense is a matter of policy?
4     A.    Borrower de -- borrower defense is a
5  matter of policy?
6     Q.    Is that your understanding?
7     A.    I -- I'm not sure that I -- I
8  understand what you mean when you say that.
9     Q.    Was the Department's policy during
10  your tenure at Department of Education to
11  implement a -- to have a program for borrowers to
12  discharge their federal student loans based on
13  borrower defense to repayment policies?
14    A.    Yes.
15    Q.    And -- and how was that a matter of
16  policy?
17    A.    I -- I don't understand where you're
18  coming from on that.
19    Q.    That's okay.  Earlier we did have a
20  discussion, if you'll recall, that the Office of
21  the Undersecretary was involved in the policy end
22  in -- in creating policy and FSA was involved in
23  standard operating procedures and implementing
24  policy; is that correct?
25    A.    Generally, and -- but they -- the

Page 269

1         - JAMES MANNING -
2  Office of the Undersecretary during my tenure --
3  I'm trying to remember how many staff people were
4  there; two or three, the Secretary, young intern.
5  The policy work that it would move forward through
6  involving, you know, other members, including the
7  Office of Postsecondary Education, FSA, the other
8  -- those higher education organizations within
9  FSA.
10    Q.    And, and -- and who was in charge of
11  the borrower defense policy at the Department?
12    A.    I think it was shared responsibility.
13    Q.    Okay.  Who -- who shared the
14  responsibility?
15    A.    All the people that were part of the
16  borrower defense review team.
17    Q.    Anybody else?
18    A.    Well, the head of -- the Acting
19  Deputy Secretary.  Generally those people.
20    Q.    Well, the borrower defense review
21  team, wouldn't they be part of FSA in -- involved
22  in implementing policy rather than establishing
23  and creating policy?
24         MR. MERRITT:  Objection, misstatement
25         of prior testimony.

Page 270

1                    - JAMES MANNING -
2        Q.    Would the Borrower Defense Unit be in
3    charge of creating borrower defense policy or
4    would that come from somewhere else in the
5    Department?
6        A.    The Borrower Defense Unit at FSA?
7        Q.    Yes.
8        A.    Would they be in charge of developing
9    policy?
10       Q.    Correct.
11       A.    Without oversight?
12       Q.    Sure, let's start there.  I mean, I'm
13   -- I think I have an idea what the answer is, but
14   I want to hear it from you.
15       A.    No, they didn't develop their own
16   policy.
17       Q.    Okay.  Who developed their policy
18   with regard to borrower defense?
19       A.    I don't recall all the participants
20   who were involved.
21       Q.    Okay.
22             MR. MERRITT:  (Unintelligible
23       crosstalk)  the witness mentioned he was
24       tired, so I mean  we can go off the record if
25       you want to, but I just want to ask for a

Page 271

1                    - JAMES MANNING -
2        time check and maybe a break.
3              MR. JARAMILLO:  Let's -- let's -- I
4        mean, if you don't mind, just a couple more
5        questions on this topic and then we can do
6        that.  If that -- unless -- Mr. Manning, are
7        you requesting a break right now or can you
8        bear with a couple more annoying questions?
9              MR. MERRITT:  Okay.
10             THE WITNESS:  You're just doing your
11       job.  How -- how much longer are we going to
12       go?
13             MR. JARAMILLO:  Well, I have a few
14       more questions on this topic and then we
15       might not have that much time left, but with
16       the time left I do have some other things I
17       wanted to cover relatively quickly.
18             THE WITNESS:  Go ahead.  What were
19       you saying?
20             MR. JARAMILLO:  So can I ask you a
21       few more questions or do you want to take a
22       break now?
23             THE WITNESS:  Well, let's power
24       through it because I --
25             MR. JARAMILLO:  All right.  Let me

Page 272

1                    - JAMES MANNING -
2        ask you a few more questions and then we'll
3        take the break and then we'll get a time
4        check and wrap up.
5              THE VIDEOGRAPHER:  The time --
6              THE WITNESS:  You know what, if we're
7        going to do it that way, let me go ahead and
8        just take a -- a break now and let's get back
9        and finish it up.
10             MR. JARAMILLO:  Okay, fine.  Off the
11       record.
12             THE WITNESS:  Thank you.
13             THE VIDEOGRAPHER:  And the time is
14       23:09 UTC.
15             (Whereupon, there was a brief recess
16       in the proceedings.)
17             THE VIDEOGRAPHER:  We're now on the
18       record.  The time is 23:17 UTC.
19       Q.    So, Mr. Manning, we were talking
20   about pol -- policy decisions at the Department
21   regarding borrower discharge and I would like to
22   know:  If there was a policy to delay issuing
23   borrower defense decisions for an extended period
24   of time, who is the person responsible in the
25   Department for making such a decision or who would

Page 273

1                    - JAMES MANNING -
2    be, to your experience?  Who?
3        A.    I'm thinking.  I just -- you know --
4    who would be the person responsible for
5    recommending a decision like that?
6        Q.    And for making a decision like that.
7        A.    Well, responsible or have the
8    authority or -- I mean --
9        Q.    Okay, let's -- who would have the
10   authority to make a decision like that?
11       A.    Well, it depends on what the policy
12   is you're talking about.
13             Are you talking about real policy or
14   policy changes, then that was the purpose of us
15   reopening the negotiated rulemaking in November,
16   2017.
17       Q.    Okay, let's -- I don't want to talk
18   about the administrative policy that required, you
19   know, publication and notice.
20             I want to talk about an internal
21   Department policy about how to handle borrower
22   discharge claims and specifically a policy or
23   decision that would call for not reviewing -- I
24   mean, strike that -- not issuing decisions on
25   borrower defense claims.

Page 274

- JAMES MANNING -

A.    I don't -- I don't know that there's
an individual that is responsible for that.

Certainly the -- and -- and I don't
recall discussions around that particular issue
or --

Q.    And if there's not one individual,
would it be a group of individuals at the
Department responsible for making a decision on
pausing the issuance of borrower defense decisions
for a certain time period?

A.    There was no group that was
responsible for that.  I don't know --

Q.    Was there a group responsible for
making such policy decisions about borrower
defense?

A.    You're talking about decisions on
delays and I don't recall.

Q.    You don't recall -- you're saying you
don't recall delays, but if there were and -- and
if there was a decision to delay issuance of
approvals and denials of these claims, where would
that authority lie within the Department to make
such a decision?

MR. MERRITT:  Objection.

Page 275

- JAMES MANNING -

Q.    Do you know, Mr. Manning, or you just
don't know?

A.    Oh, oh.  Well, yeah, I'm -- I -- I'm
not sure.

Q.    Let's say, for example, that there
was a decision-maker at the Department that said
we -- we ought to hold off on issuing borrower
defense decisions until we work out how we're
going to measure relief.  Who would make such a
decision, to your knowledge, at the Department?

A.    Hold off on decisions until we
have -- I -- I don't know if there's an individual
that is responsible for --

Q.    Okay.  Who -- is there a group of
individuals responsible?

A.    I -- I don't recall who was involved
in conversations around that issue.  Again, I
don't recall any conversation about that issue.

Q.    That's not my question.  I'm asking
if you're aware of any group of individuals at the
Department that would be involved in making such a
decision if it were to be made, to your knowledge?

A.    Well, I mean there are any number of
folks.  It would be Undersecretary, the -- the

Page 276

- JAMES MANNING -

COO, the Deputy Secretary.  I mean, the -- the
Assistant Secretary of Postsecondary Education.
It's just making this up.  I -- I don't know.

I -- I suppose the, you know, the
borrower defense panel, the -- the review team put
together.  My anticipation was that a group would
come up with ideas in terms of how to move
forward.

Q.    Right, and somebody had to approve
these ideas in order to move forward, correct?

MR. MERRITT:  Can we get a time
check?

Q.    You can answer the question, Mr.
Manning, and then we'll do the time check.

A.    I mean, I don't have to approve some
recommendations that could have gone to the
Undersecretary's approval.

Q.    Didn't -- didn't that group make --

MR. MERRITT:  That's -- that's it.
Let me -- let's check the time.

THE VIDEOGRAPHER:  We just hit seven
hours after that.

MR. MERRITT:  You said we just hit
seven hours?

Page 277

- JAMES MANNING -

THE VIDEOGRAPHER:  Yes.

MR. JARAMILLO:  Okay.  Mr. Merritt,
with your indulgence I just want to have one
-- have him just look at one document and
then authenticate it, if possible.

MR. MERRITT:  We're at seven hours.
I'm not gonna -- I think it's over.

MR. JARAMILLO:  Okay.  Do you have
any questions for the witness?

MR. MERRITT:  I do not.

MR. JARAMILLO:  Okay.  Mr. Manning, I
want to thank you for your time today.  I
know you voluntarily appeared here and we
appreciate that.

And you want the witness to read and
sign, Mr. Merritt?

MR. MERRITT:  Yes, thank you.  I
would like that.

MR. JARAMILLO:  I think we're done.

THE VIDEOGRAPHER:  We are off the
record and this concludes today's testimony
given by Jim Manning at 23:25 UTC.

(Whereupon, the deposition concluded
at 6:25 p.m.)

Page 278

1
2          A C K N O W L E D G E M E N T
3
4    STATE OF NEW YORK        )
5                             ) ss.
6    COUNTY OF NEW YORK       )
7
8        I, JAMES MANNING, hereby certify that I have
9    read the transcript of my testimony taken under
10   oath in my deposition of December 17, 2020; that
11   the transcript is a true, complete and correct
12   record of my testimony, and that the answers on
13   the record as given by me are true and correct.
14
15             _____
16             JAMES MANNING
17
18   Subscribed and sworn
19   to before me on this the
20   _____ day of _____, 2020.
21   Notary Public, State of New York
22
23
24
25

Page 279

1
2          C E R T I F I C A T E
3    STATE OF NEW YORK        )
4                             ) ss.
5    COUNTY OF NEW YORK       )
6
7        I, HOPE LYNN MENAKER, a Notary Public within
8    and for the State of New York, do hereby certify:
9        That JAMES MANNING, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13       I further certify that I am not related to
14   any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17            IN WITNESS WHEREOF, I have hereunto
18   set my hand this 22nd day of December, 2020.
19
20   _____
21             HOPE LYNN MENAKER
22
23
24
25

Page 280

1
2
3                         INDEX
4    WITNESS:  JAMES MANNING
5    EXAMINATION BY                            PAGE
6      MR. JARAMILLO                             7
7
8    INSTRUCTED NOT TO ANSWER                  PAGE
9    And what specifically did he recommend
     with respect to the -- with the relief
10   methodology?                               52
11   And did you ever consult in connection
     with the Penn Hill Group after leaving
12   the Department of Education?              147
13   Have you done any work after leaving the
     administration related to the discharge
14   of student loans?                         148
15   Have you done any the work on behalf of
     institutions of higher education as in
16   your -- in your consulting work after
     leaving the Trump Administration?        148
17   Does your work at President Forum,
18   Mr. Manning, involve any discharge
     of federal student loans?                150
19
20
21   EXHIBITS FOR IDENTIFICATION
22   NUMBER       DESCRIPTION              PAGE
23   Exhibit 31   Tab 1                      28
24   Exhibit 32   Tab 2                      28
25

Page 281

1
2
3    NUMBER       DESCRIPTION              PAGE
4    Exhibit 33   Tab 7                     111
5    Exhibit 34   Tab 12                    151
6    Exhibit 35   Tab 5                     206
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                                            Page 282
 1
 2                      ERRATA SHEET
       THERESA SWEET, ET AL. V. ELISABETH DEVOS, ET AL.
 3            DATE OF DECEMBER 17, 2020
                   JAMES MANNING
 4
       PAGE/LINE(S)/    CHANGE          REASON
 5     ____/_____/_____/_____
       ____/_____/_____/_____
 6     ____/_____/_____/_____
       ____/_____/_____/_____
 7     ____/_____/_____/_____
       ____/_____/_____/_____
 8     ____/_____/_____/_____
       ____/_____/_____/_____
 9     ____/_____/_____/_____
       ____/_____/_____/_____
10     ____/_____/_____/_____
       ____/_____/_____/_____
11     ____/_____/_____/_____
       ____/_____/_____/_____
12     ____/_____/_____/_____
13     _____         _____
       Date               Signature
14
15
16
17
18
19
20
21
22
23
24
25
```

## Exhibits

**EX 0031 James Manning 12 1720**  27:25 28:6 280:22
**EX 0032 James Manning 12 1720**  28:5,8 29:19,20 280:23
**EX 0033 James Manning 12 1720**  111:21,22 165:13 176:17 281:3
**EX 0034 James Manning 12 1720**  151:2 182:11 189:9 281:4
**EX 0035 James Manning 12 1720**  205:21 206:5,6 210:10 281:5

## $

**$200**  66:8

## 1

**1**  5:10 12:8,10,17,19 26:20, 21 28:21 87:19 151:7,24 225:9 262:12 264:14
**10**  106:6 151:25 152:21 204:20 211:6 212:8
**10,000**  107:17,20 108:3 183:8
**100,00**  183:7
**100,000**  114:23 115:3,9 182:14 183:4
**105,998**  103:3,9,24
**11**  66:21 73:13 140:4,9,11 151:21 152:9
**118**  205:25 206:12
**12**  18:10 113:12 125:2,6 136:2 142:12 150:23 182:9 189:8
**12/23/19**  206:12
**12th**  112:20
**13**  111:25 155:7 189:12
**133**  207:18 210:11
**134**  212:14

**135**  213:13
**137**  205:25 206:12 207:18 212:14 213:13
**13th**  166:20 178:12
**14**  107:15 158:2 182:23 189:10
**14:36**  5:14
**14:38**  6:22 7:7
**14th**  106:25 107:10 109:10 110:18 157:2
**15**  107:7,12,15 193:7
**158,000**  167:12
**15:08**  27:12
**15:11**  27:16
**15:35**  38:22
**15:52**  39:2
**16**  124:25 135:25 136:8,12 138:3 142:12 164:7
**16,000**  54:16 65:19 66:7 68:19 70:15 72:25 90:15 157:3 209:11
**16:53**  75:6
**17**  5:13 7:9 32:3,22 72:16 79:16 80:13 81:5,6 141:3 153:25 164:8 173:16,18 177:21 223:23 250:7 254:24 255:6 258:15
**179,377**  103:19
**179.377**  103:25
**17:07**  75:11
**17:56**  104:24
**17th**  257:5,8
**18**  35:12 39:24 80:13 100:3 116:20 158:5 189:16 223:23
**18-month**  64:9 65:11 191:13
**182**  220:23
**186**  224:25 225:4 241:25
**18:33**  105:4
**19**  99:11 100:4 165:21,25 177:10,19 181:19 220:2
**193**  244:22
**1970**  32:20
**1975**  15:14
**1977**  16:2
**1978**  15:14 16:2
**1983**  14:10
**19:12**  134:8
**19:23**  134:12
**19th**  41:2 44:9 193:7 250:9

**1:00**  105:2
**1:30**  105:2
**1have**  165:12
**1st**  21:16,17 250:9
**1were**  196:10

## 2

**2**  21:9 26:18 27:18 28:11 29:6 33:2,10 37:20 87:23 193:23 264:7 265:21
**20**  19:5 32:17 45:25 112:9, 14 172:2 177:11,13,14,20 178:9,17 225:13,24 227:5, 17
**20006**  7:13
**2001**  7:12
**2015**  145:6 249:11,12
**2016**  40:23 152:12 163:25 164:3
**2017**  19:5 32:2,10,16,20 33:8 34:17,22,23 35:5 39:20 40:8,15 41:2 45:25 46:18 48:5 73:11 74:11 77:18 90:14 107:16 140:3 155:3 156:6 157:2,7,8 159:22 164:2,4,5 172:2 177:10,11, 13,14,19,25 178:9,15,17 181:19 182:2,13,23 187:23 189:10 208:12,14 214:3 220:12,13,24 225:13,21,22, 24 226:5,9,11,19,25 227:5, 17,18 229:16,17 230:2 232:25 250:15 252:4 254:16 257:23 258:7,13 259:2 260:3,5,9 262:20 273:16
**2017-2018**  151:7
**2018**  18:10 21:17 22:3 33:9, 14 35:7,16 39:13,15,21,25 40:2 65:12 72:19 98:22 99:7,11,12,16,23 100:15 103:2,6,7,25 104:8 107:16 109:6,9,22,25 110:16,23 111:6 112:20 113:3,6,13 116:4 125:23 127:14,25 128:10 133:8,11 138:14 142:5,13 143:5,10 167:13 170:10,15,24 171:24
**2019**  33:14 39:11,16 98:23 99:8,13,16,23 100:16 103:17,20 104:2,9 106:25 107:10 109:11 110:3,18,24

111:10,25 112:15 113:7
125:5 133:13 145:8 166:20
169:21 170:18 171:5,7,25
177:22 178:13,16 181:25
**2020** 5:13 7:9 193:7
**20:36** 187:6
**20:53** 187:10
**20th** 32:20 40:15 177:25
200:17 225:21 226:5,24
228:6 250:10
**21** 106:8,11 125:5 176:22
266:15
**213** 253:2,5
**22** 12:9,10
**22:09** 241:12
**22:22** 241:16
**23:09** 272:14
**23:17** 272:18
**23:25** 277:23
**24** 105:19
**24th** 113:3
**270** 220:23 224:25 225:5
241:25 244:22 253:3,5
**28** 113:7
**29** 254:16

---

### 3

**3** 32:4,6 164:13 202:22
219:20,21,22 220:2 241:5,
17,18,20,23 244:23 259:11
**30** 208:11,13 216:14 221:25
252:25 254:10,13
**30th** 103:2,6,7,25 104:8
**31** 27:25 28:6 225:22 227:5
254:23
**31st** 103:17,20 104:2,9
177:22 226:25
**32** 28:5,8 29:20
**33** 111:21,22 165:13 176:17
257:15
**34** 150:25 151:2 182:11
189:9 261:10,13 264:7
265:7 266:16
**35** 205:21 206:5,6 210:10
**3:19-cv-03674-wha** 206:11
**3rd** 145:6

---

### 4

**4** 69:9 73:14 167:13 201:13
227:17 241:22
**48** 112:6,9 165:25 176:22
**4th** 39:11 73:11 77:18 90:14
140:3 141:3 262:20

---

### 5

**5** 33:2 152:24 204:17 205:20
206:5
**50** 23:15
**50,000** 109:15
**55** 106:4
**57** 82:25

---

### 6

**6** 125:18 136:2 138:4,7
142:11 155:10
**60,000** 214:4,12
**64** 107:14
**65** 109:2,20 155:15
**66-3** 205:24 206:11
**67** 82:25 106:3
**6:25** 277:25

---

### 7

**7** 66:23,24 67:4 73:12,14
111:17,19 140:5 151:25
165:13 176:17
**73,000** 104:8
**7th** 32:20

---

### 8

**8** 151:17,25 152:8 220:12,
13,24
**81** 15:9
**82** 15:9
**83** 15:8
**8th** 221:15 223:20 233:16

---

### 9

**9** 151:25 201:13,15,20

206:22
**90** 5:19 194:25
**95,000** 155:14 182:12,24
183:22,23

---

### A

**ability** 105:20,22 173:9
**absolutely** 52:16 118:21
123:12 188:11 194:20
197:13,22 200:25 213:23
215:15
**accept** 243:4
**acceptable** 10:6 71:11
**accepted** 50:8
**account** 27:6 63:8
**accuracy** 19:22 104:3
**accurate** 21:25 29:18
103:12,20 107:4 158:9
**accurately** 29:9 104:4
150:19
**acknowledge** 6:4,8
**act** 59:12 228:4 247:12
260:8
**acted** 99:22
**acting** 32:23 33:6,12,24
34:2,5,7,13 35:15 36:6,15
39:9,14,18 40:2,3,7 47:22,
24 48:17 75:23 78:5 83:17,
18,21 108:3,11 114:15
131:17 143:8 163:13 180:5
183:19 188:19 189:5 209:14
222:10 227:22 228:2,4,13,
17,18,21,24 229:13,23
237:15 260:9 262:7,14,25
264:9 265:22 266:5 267:22
269:18
**action** 5:21 15:21 49:22
54:25 55:2,6,12,13 56:14,23
66:12,15,18 68:17 69:17
70:10 124:3,5 139:17 186:6
216:13 217:10,14 218:7
224:17,18 245:5 247:23
249:13
**actions** 54:11 74:10 209:9
**active** 84:2 177:10
**actively** 108:8
**activities** 41:22,24 84:3
**activity** 112:12 177:5
**actual** 28:15 65:9 66:9 67:6
205:19

ad 209:2 216:24
added 162:6 163:19
adding 181:12
addition 18:22 139:10
  162:15
additional 87:17 88:15
  102:24 109:4,11,21 111:4
  154:8,18,23 161:7,11,14,16
  162:6,16,19,25 169:25
  172:24 178:2,10,19,25
  179:5,8 181:3 182:6 207:8
  232:7,9 233:20 234:4,13
  235:5,13,16,22 242:12
  243:7,14 244:19 251:24
  264:11,20 265:24 266:8,19
  267:15
Additionally 107:15
address 59:3 166:13 170:20
  171:12 172:12,17 181:4,14
  182:4 218:9 261:8
addressed 252:5,13
addressing 257:21
adequate 186:10
adjudicate 154:7,17,22
  158:7 159:23 160:4 199:10
  247:20 248:2,10
adjudicated 85:7 109:16
  181:16
adjudicating 87:19 109:7,14
  156:3,19
adjudication 54:12 87:16
  160:25
adjustments 156:2 159:3
admin 87:2
adminis 59:21
administered 6:9
administration 23:19 34:3,4,
  15 36:7,16 38:6 39:4,19
  41:17 44:3 45:3 46:18 48:6
  54:4,5,10,25 55:13 59:2,7,
  17 61:17 63:7,19 64:20
  65:21 70:11 83:22 88:13
  98:12 100:20 102:12
  148:11,20 150:7,11,21
  157:4 173:11 174:11,13
  180:23 181:12,22 185:13
  198:13 199:4 200:24 208:18
  209:5,10 214:9,11 242:15
  249:23,25 250:3,5,9,11,16
  251:4,5,6,12,15,21 259:3,20
administration's 62:2 209:9

administrations 145:23
  198:22 232:12
administrative 273:18
admitted 106:8
adopted 74:2,8 248:15,19
  251:2
Adult 78:10
advantage 187:2
advice 209:3
advise 123:10
advising 216:25
advisor 32:9,14,19 34:18
  40:9,14,18 76:8 208:22
  209:18,19,20,22
advisors 76:10 177:9
advisory 209:2
advocate 189:18,21,25
  191:23 192:5 194:14,18
advocates 190:23 194:9
af 144:4
affected 92:4,6,14,25 173:9
affecting 95:12 115:9
affects 105:22
afterward 168:25 223:8
agency 64:12 146:21,22
  149:12 193:9,14
agent 14:22
agree 6:18 95:22 133:19
  182:2 218:10 226:19 249:21
  260:13 262:19 264:13 266:3
agreed 41:12 145:17 161:21
  259:22 265:17
agreeing 266:6
agreement 5:6 6:14,15 8:10
  9:3
agrees 6:20
ahead 15:7 38:9 53:10 68:22
  71:14 75:2 80:14 81:3 98:17
  127:3 141:7 159:6,7 175:20,
  21 182:19 191:2 195:19
  226:16 234:17 250:20 255:4
  271:18 272:7
Aid 19:4,13 33:11 35:8
  245:20
Aid's 220:7,9
allegations 100:9
allege 100:10
allocated 177:4
allowed 84:5

Alsup 149:8 192:21
alternative 125:24 127:14
  128:11
alternatives 58:10
ambiguous 73:8 97:2,13
  248:5 255:21 256:2
amount 49:14 164:23 214:8
analysis 167:8,14,15 177:8
and/or 5:7
announced 174:5
announcement 175:8
  177:12 180:21
announcements 174:10
  178:4 180:20
annoying 271:8
answering 37:5 120:6
  168:18 180:12 250:23
answers 8:19 9:21 10:3
  36:21 121:11 126:24 165:17
  168:24
anticipation 276:7
anymore 83:2 171:20
apologize 82:9 119:7 136:7,
  14 200:8
apparent 191:20
apparently 179:2 181:21
  230:19 234:8 252:15
appeared 277:14
appearing 7:25 13:21
appears 32:24 33:2 111:11
  125:3 165:23 221:20
Appendix 253:3,22 254:6
applicable 152:15 245:5
  247:23
applicants 60:10,21 114:23
  195:21 198:8
application 86:23 91:12,15,
  22 112:20 113:3,12 127:20
  197:24 202:18 203:9
applications 46:10,20 63:18
  64:3,8,21 65:18,25 70:15
  71:7,9 85:8 86:20 88:2,20,
  22 89:5,12 90:13 92:11
  99:9,17,20 100:2,11,15,19
  101:3 103:4,9 104:14
  107:18,20 108:3,9,19 109:7,
  12,14,15 110:15 111:5
  115:10 117:16,22 121:19
  125:21 126:2,3 127:11
  128:8 129:5 133:20 136:2,
  16 137:10 138:5 142:11

164:25 168:8 169:17 170:21
171:13 181:5,15 186:17
191:6,12 192:9,17 195:25
196:21,24 197:4 247:20
248:2
applied 86:21 92:12 118:8
apply 74:18 118:6
appointment 32:19
appreciative 94:17
approach 22:19 49:24,25
50:11,23 59:13 60:16,17
61:17 62:2
approached 54:6 59:18
145:15 185:11
appropriately 197:24 216:3
approval 54:22 55:8 65:25
89:24 93:9 133:22 141:14
155:19 156:6,12 210:10
227:20 229:10 230:14,18
232:8 233:21 234:13 235:5,
16 236:7,18 237:7,11,16
255:7,11,12,14,15 256:20,
23 257:12 259:21 262:14,
15,18 264:9,19 265:18,21
266:6,19 267:7 276:18
approvals 112:13 123:22
125:21 128:18 129:19 130:3
131:2 134:22 138:14 140:17
142:6,14 157:2,6,11 207:22
212:21 274:22
approve 65:18 88:21,23
89:4 90:14 91:6 212:6
227:22 229:19,21 230:20
231:2 255:9 261:19,21
276:10,16
approved 56:24 65:20
69:14,17 72:25 91:13 99:10,
14,22 112:16,20 113:12
156:15,16 157:4 211:24
228:3 229:14,24 230:5
231:21
approving 87:25 88:3 90:12
113:15 231:16 262:5
approximate 16:22 157:3
approximately 15:25 23:15
54:16 65:19 68:19 72:25
90:14 116:20 155:14 182:12
approximation 31:7
April 18:10 32:3,13,16,22
33:8 34:6,18 39:20 40:8,15
228:10,11,12,14 229:16

area 34:25
areas 154:4,10
argumentative 116:7
arm 94:21
arrangement 6:12
arrived 55:2 224:21
arrow 210:16,18 211:19
arrows 210:25
asks 89:24 112:22
assert 46:5 194:15
asserting 195:11
assess 155:25
assesses 152:15
assessment 164:23 165:2,4
assigned 133:3
assistant 219:8 228:21
276:3
assisting 168:18
assume 11:25 183:2 260:4
assuming 8:14 104:5 169:21
224:16
assumption 233:15
ATA 149:10 193:21
attached 18:21,23 21:4 30:3
31:9
attaches 30:23 31:12
attachments 21:2,3 27:2
attended 64:22
attention 54:17 102:24
108:14
attest 188:10 213:23
attesting 19:22
attorney 119:20 170:17,25
172:6 183:8 201:3 228:23
attorney-client 5:8
attorneys 6:3 7:18 10:11
48:13 49:12 75:17 105:12
119:21 129:13 164:12
170:14 181:2,3,12 182:3
183:3,7,22,23 196:12,19
237:23 238:20
attorneys' 177:9
audible 9:21
audit 219:9 252:6
Auditorium 23:12
Auer 25:9 131:10 132:4
223:14
August 79:17 125:5 259:22,
25 260:5,9

authenticate 277:6
author 67:18
authored 67:19 140:2
authoritatively 47:5 173:17
213:23 249:16
authority 55:3 58:13 93:12
94:10 120:11,14,21 121:22
122:2,7,9,24 123:8,14,20,25
124:4 138:24 235:23
237:18,21 238:5,19,23,25
260:17,19 273:8,10 274:23
authorization 55:16 73:16
108:5
authorize 54:22 73:6 108:2,
11 192:13
authorized 54:13 55:19
63:11,25 64:5 66:12 107:17
108:20 144:24 146:14 147:9
148:23 149:5,14 191:7
193:5 194:6
authorizes 108:18
authorizing 44:19 68:19
107:19
Avenue 7:12
avenues 224:12
average 53:14
awarded 60:20 62:20
awarding 59:15
aware 5:3 25:2 26:9 46:18
74:21 82:7,11,16,18 86:9
92:15,24 96:4,9,11,21 97:5,
16,20 98:2,10,24 99:2,8,13,
17 100:5,8,14,17,18 101:2
102:8,25 111:14 113:14,17
122:13 138:15 157:6 163:23
169:13 170:3 176:3 180:16,
21 185:25 197:25 198:6
199:5,8 201:6 212:4,21
213:2 216:12 217:9 230:8
233:23,24 234:2,6,9 239:23
242:16,18,21 243:5 244:7,
10,11,14 245:8 251:10,19
252:3,9 255:13 256:20,23
257:10 261:20 275:21
awareness 101:8 240:11,15,
18,23 241:2
awkward 11:6 82:20

**B**

B-- 244:8

back 10:25 11:2 18:16,17
28:14 30:2 31:13 33:19 38:9
44:22,24 47:10 51:8 53:25
75:12,22 91:19 105:13
120:23 121:9 127:5 129:25
138:3 143:19 145:15 151:24
165:12 176:17 185:10 187:9
189:7 210:3 218:18,19
219:11 221:17 222:6 224:22
229:2 236:15 241:4 254:10
260:21 272:8
background 26:16 63:17
68:12 223:25
backing 236:25
backlog 101:2,8 164:24
166:13 167:11 169:25
170:20 171:12 181:4,14,24
182:4
backwards 39:10
balance 59:23 60:4,19 62:9
balancing 60:2
ball 253:19
Barnard 23:12
base 158:12 204:12
based 103:17 110:22 143:3
192:15 193:4 219:14 227:20
229:12 230:21 231:3,4,22
249:11 250:6 268:12
basically 28:25 181:2
242:10
basketball 253:17
Bates 202:17 213:6
BD 25:21 125:21 126:2
127:11 136:2 138:5 142:11
169:17 189:9 202:18 203:9
227:15
BDTR 25:22,23
BDU 87:11 92:21 109:6
162:16,19,25 163:14 171:2,
14 183:20,25 184:24 185:12
186:2,7 188:8,13 189:3
225:24 226:8 227:18 229:6
230:8,12,22 231:4,23 232:6,
7,17,19,21 233:3,6,10,13,
17,20 234:4,12 235:4,12,14,
15,22 242:7,8,25 243:6,13
244:9,17 248:2,10 259:15
266:25 267:6
BDU's 257:20 264:15
bear 200:8 271:8
Bearing 193:13

began 34:25 39:20 41:19
65:12 256:10,11
begin 223:11
beginning 39:15 60:25
105:13 146:4 151:12,21
152:9,23 158:5 173:10,15
199:18 227:4 228:17 254:11
begins 189:16 232:16
behalf 5:18,24 148:17
beings 245:22 246:22
belabor 134:15
belief 156:10 199:6
believed 156:8,15
beneficial 156:4
BERMAN 13:3,7 26:23
bias 149:3 195:8,20
bigger 48:11
Bill 42:19,20
billion 66:8
bit 18:17 54:2 75:22 134:16
167:5 168:22 234:22
black 216:9
blank 129:21
block 36:8
board 62:10
Bob 43:20,22 77:2
bold 265:12
bor 59:23 60:3
borrower 19:3,12 24:9
25:16,20,23 42:25 44:14
45:4,10,17 46:4,5,9,19
47:17 48:7,15,19,24 49:20
50:2 52:23 53:17,19 54:6
59:14 60:3,10,21 61:11
62:4,24 64:2,7 68:5,20 69:5,
7 71:4,5,6,20 72:5,24 74:2,
4,8,10 76:15,21,24 77:21
78:18,19,23 79:15 81:22
83:8,12,16,21 84:7,15,20,23
85:6,8,10,17,21,22 86:10,22
87:4,12 88:2,5,6,20,22 89:4,
11,18 90:8,12,19,22,24
91:2,12,22 92:4,9,15,21,25
95:13,15,19,24,25 96:6,12,
17,18,21,24 97:6,8,10,11,
16,17,21 98:3,13,24 99:4,9,
13,17,25 100:11,15,19
102:2 103:3 108:7 109:12,
13 110:15 111:5 112:13,16,
19,23 113:2,5,11,15,20
114:5,10,22 116:2 117:5,16

119:24 121:18 122:16
123:22 124:8,11,17,22
125:4 126:2 127:24 128:8,
14,22 129:5,18 133:10,20
134:17,21 137:9 144:14,20
150:9,14 151:5 152:11
153:7 155:4 160:20 161:5,
11,17 162:6,10 163:24
164:25 166:13 167:11 168:8
170:10,21 171:12 172:25
176:13 177:5,8,20,23 178:3,
11,20 179:8 180:2,22 181:4,
13,14 182:22 183:6 186:11,
17 187:12,17 188:4,20
189:4,17,21,24 190:23
191:5,11,23 192:4,9,17
194:9,14,17,18 195:2,6,21,
25 196:23 198:4,9,24 199:5,
9,10 200:12 201:5 202:2
204:24 205:8 206:21 207:22
209:3,8,23 212:4,7,15
213:15 214:4 219:15 220:7,
9,17 222:22 224:2 225:9
227:2,6,9,11,14 231:4,17
232:10 237:25 238:14
239:4,15,19,24 242:14
245:4 247:18,19 251:11,14
257:2,23 258:4,7,10 259:17
261:15,20 262:3 267:20,24
268:3,4,13 269:11,16,20
270:2,3,6,18 272:21,23
273:21,25 274:10,15 275:8
276:6
borrower's 115:24 121:5
borrowers 19:4,13 50:7
58:20 59:23 61:2 62:17,20
63:20 65:19 69:2 72:6 73:23
89:19,21,22 92:7 98:25 99:5
101:3 102:10 109:5,12,22,
25 110:15,23 111:5 113:6
115:9 194:15 195:9 212:22
225:23 245:6 247:20 248:3
257:13 268:11
Borrowers' 201:23
Boston 15:13,22 16:8
bottom 69:21 112:11 129:17
166:5,8,11 222:8 241:5,20,
23 266:16
box 211:19
boxes 208:8
brain 167:4
break 11:14,16 36:20 37:22
38:11 74:24 75:3,13,16

101:12 104:20,25 105:6,10
127:4 133:25 186:20,23
234:20,23 271:2,7,22 272:3,
8
**breaks** 11:13
**briefed** 66:2 124:2 196:2
**briefing** 124:5 196:4
**briefly** 75:17 105:12,13
106:18
**bring** 48:3
**broad** 5:19 84:21 193:15
**broadly** 192:23 193:19
**brought** 48:12 187:20
**Brown** 25:11 133:7,14,17
144:4,10,13,14
**building** 154:4
**bullet** 126:7 127:10 128:7
138:13 140:16 142:12,21
143:25
**business** 7:14 225:22
226:25 227:5,14

## C

**cadre** 78:13
**calendar** 143:14
**call** 17:19,21 41:7 139:19
157:18 196:19 273:23
**called** 7:8 28:22 42:3
**calling** 57:12
**calls** 52:6 56:4 57:5,13
60:12 91:8 113:22 117:7
163:3 181:6 186:13 217:17,
22
**Calvillo** 19:24 24:7 52:25
53:15 117:18,22 118:9,14,
24 119:12,17 128:22 129:6
**camera** 7:3 18:13,19
**capable** 245:25
**capacity** 35:6 258:3
**captures** 31:12
**career** 26:15 31:3 34:20 36:2
51:5 78:10 146:2,4 153:2
**careful** 263:15
**carefully** 29:12 58:14
192:20,21 197:11
**carried** 241:21
**carries** 9:13
**Carter** 145:25 174:16

**case** 7:19 8:2 9:20 14:17
15:4,20,25 16:4 19:25 20:4,
11,13,15,19 24:4,7,13,19
25:3 50:10 52:25 53:15
73:12 100:6,9 113:6 117:18
118:2,9,14,15,24 119:2,5,12
120:10 140:5 149:10,14
166:22 193:21 194:5 205:24
206:10,13 207:17 218:24
222:19
**cases** 15:11,17,18,19 16:10
209:11 213:6
**categories** 198:3,12 232:9
242:13 243:7,14 244:19
245:4,9,14,21 247:22 248:4,
12,16,22 249:4,6,22 251:8,
20,24 262:17 264:11,20
265:24 266:8,20 267:16
**category** 118:5 198:7
**caught** 237:2
**caused** 64:8 113:19 114:9
156:20
**causing** 105:25 191:21
**CCI** 118:25 119:3,6,10,13
125:22 127:13 128:9 213:17
214:4
**certainty** 252:12
**CFO's** 69:3 73:6,19,24 74:13
**CFOICU** 262:22 264:15
**CFOS'** 74:6
**chain** 79:24 115:24 244:4
246:4
**chance** 28:10 171:17
**change** 59:16 88:11 94:20
156:11 232:11 242:15
**charge** 84:7,15,19 85:15
87:8 269:10 270:3,8
**charged** 51:7
**Charlie** 6:19 10:10 17:17,19,
21 133:25 205:16
**chart** 170:8 207:21 208:3,4,
11 210:10,13 212:17 213:19
214:2,3 225:9
**charts** 208:6 212:21,23
213:2,22
**check** 105:18 238:6,9,12
271:2 272:4 276:13,15,21
**check-in** 81:9
**checked** 69:13
**checking** 238:20

**chief** 33:12,24 34:2,5,7,14,
21 35:2,3,4 77:2 133:4
187:21,25 226:18 233:19
234:3,12 235:11,14,19
236:10 242:19,24 243:3,19
244:2 262:21 266:22,24
**chiefs** 77:4
**choices** 137:24
**Christie** 41:10
**Christopher** 252:5 254:16
265:2
**chronological** 34:11
**circulated** 198:21
**cites** 259:15
**civil** 15:21
**claim** 50:7 56:18 58:17
85:10 86:7 112:16,24
152:15 160:25 197:12
202:19 203:10 212:7
255:10,11,13 256:20
**claimants** 153:6,14
**claimed** 34:7 114:24
**claims** 50:22 54:6,13,16
63:20 68:12,14,20 69:5
73:7,25 74:7,15 85:14,17
87:19 88:5 96:18,24 97:8,
12,17,21 98:3,14 99:14
113:16 118:5 119:7 122:16
128:12 152:14 153:5,13,21
154:5,8,18,23 155:4,14,20
156:3,7,14,19 157:3 158:7
159:23 160:4 167:11 176:14
177:9 182:12,14,25 183:4,7,
8,23,24 187:17 189:4,19
194:19,20,22 195:3,6,12
198:3,7,12,14,16 199:10
201:23 202:2 204:24 205:8
206:22 207:22 212:7,15
213:15 214:4,8 225:23
226:2,8 227:2,6,10,17,19,23
228:3 229:7,14,20,25 230:6,
10,21 231:3,4,13,14,17,22
232:8,9 233:20 234:5,13
235:5,13,16,23 242:13
243:7,14 244:19 245:4
247:21,22 248:3,10 249:11
257:19,21,23 258:4,7,10
259:12,17,19,21,23 260:14
261:8,19,22 262:5,16,17,24
263:3,7,24 264:4,12,17,20
265:24 266:8,18,20 267:7,
16 273:22,25 274:22

clarification 151:23
clarify 39:17 75:18 105:15
   123:4 205:15 206:4 232:16
   266:17,24
clarity 28:17 39:8 255:23
class 64:13 118:8 119:5
   193:9
classify 142:7,17
clear 10:3,23 38:3 76:22
   95:23 118:20,21 121:15
   123:5,12,18 167:10 191:19
   204:4 226:14,15 237:18,20,
   23 250:13,19,21 260:8
   261:4
client 147:13
clients 146:10,16
Clinton 146:2
close 31:7 101:12
closely 94:15 188:2
closing 259:16
code 5:14
Colleen 16:17 20:25 25:7
   44:4,5,10 49:10 79:11,13
   80:20 81:2 83:6,8 84:3,7,12
   106:9 110:17 117:13 131:23
   132:2,4,13 133:12 161:14,
   16 164:12 165:5 172:19
   179:19 183:20 184:20,23
   197:22 233:5,9,12 235:22
Colleen's 165:6
College 249:10
Collin 233:2
Columbia 14:16
command 115:25 175:17
   244:4 246:4
commensurate 62:3
comment 69:20
commented 219:4
comments 128:5 206:24
   221:21 253:4,23
commitment 197:15,18
commits 152:16
committed 197:13,23
committee 22:4 67:20,21
   151:7 152:19 182:23 189:10
common 264:12,21 265:24
   266:8
communicate 8:11 83:5
   216:5 234:12 235:4 242:20
communicated 95:11,14
   132:7,8,11 180:3 215:21

232:7,19 233:19 234:4
   235:12,15 242:25 266:25
communicating 95:18
   183:19 235:21
communication 8:22 66:18
   95:23 96:5 214:23 224:12
   233:23,24 234:7 242:6,11,
   22
communications 20:6 77:7,
   20 83:8 117:20 216:23
   242:8
compel 64:16
compels 193:11
complainant 16:5
complete 152:2 170:5
completed 168:5
completely 173:23
concern 102:6,20 104:16
   154:4,10 172:13 186:2
concerned 102:9 172:7,9
concerns 104:18 161:25
   257:11
concluded 277:24
concludes 277:22
concrete 186:6
conduct 169:24
conducted 167:8,14 199:17
confidence 84:4,17
confident 155:25
confirm 8:6 205:22 238:7
confused 121:8 257:6
   258:12,22 265:15
confusing 249:19
confusion 235:18
connection 144:12 148:2
Connolly 47:25 48:17 68:9,
   10 228:16 262:6
consent 6:12
consideration 61:3 62:19,22
   71:11 86:2,6,24,25 90:6
   122:12 264:10,19 265:23
   266:7
considerations 62:23 63:2,4
considered 61:9 86:4
   196:14,16
consisting 68:8,10 153:2
consult 147:25 184:15,17
   237:22
consultant 147:3

consultation 123:6 139:11
consulted 158:14
consulting 145:20 146:8
   147:19 148:19
contacted 41:9
contained 30:17
content 195:25
contents 202:7
contest 11:13
continue 148:24 152:14
   183:12 226:19 232:8 235:17
   242:12,17
continued 109:13 225:22,24
   227:2,6,15,18
continues 232:2
continuing 77:15 229:6
contract 167:10
contracting 167:16 170:15
contractor 163:23 168:6
   169:15 170:17 171:2
contributed 154:7,17,22
   191:12
Control 69:3 73:6,19,24
   74:6,13 210:19
Control's 262:22
controls 153:4,10,12,16,20
controversial 192:2
convenor 262:6
conversation 23:4,7 56:16
   60:24 94:19 117:25 162:3
   173:4 215:3 246:24 275:19
conversations 5:5,7 58:9
   144:19 150:13,21 161:13
   172:19,20 179:18 275:18
COO 35:12,15 36:6,15 39:9,
   12,14 40:3 77:15 80:11,12
   83:25 143:11 144:4,11,13
   180:4,7 183:18 187:20,23
   188:18 189:5 216:24 219:9
   243:19,24 244:7 246:12
   247:6,7 252:4 266:5 276:2
coordinates 174:15
copies 222:23
copy 215:8 222:12,15
Corinthian 155:15 159:24
corner 125:16 202:22 222:9
correct 10:13 13:22 33:13,
   15,17,21 35:21 46:2 52:11
   53:16 59:18,19 65:3,22,23
   69:11 78:6 79:20 93:5 95:15
   104:6 106:17 107:25 108:24

110:20,21 111:11 115:2,4,5,
18 118:11 119:8 122:20,21
123:14 124:5,6 136:8 143:6,
9,12,14 144:7,10 172:5
179:3 186:3,7 208:18,22,23
213:14 220:14 233:8 237:8
238:25 239:2 243:17 246:20
248:23 250:12 252:11 257:5
260:10,11,19,20 264:25
265:3,18 268:24 270:10
276:11

**corrective** 216:13 217:10,14
218:7 224:17,18

**correctly** 62:6,17 119:8
169:11

**correspondence** 93:20
215:14 221:19

**cost** 61:12

**counsel** 5:12 6:12 8:15,19
10:8 16:15,19 17:15 20:4,7
22:10,16 54:19 63:12 66:4
121:24 122:4 123:7,10
124:2 130:22

**counsel's** 19:20 22:25 123:4
130:15,18

**couple** 36:24 37:10,14 48:9
49:12 121:10 151:23 187:24
271:4,8

**court** 9:14,17 14:4,11,24
15:11,13,18,19,20 16:7,8
20:15 44:19,23 46:16 52:21,
24 53:13 55:19 58:23 59:10
63:11,24 64:5,11,14 65:11
67:5 72:19 144:23 147:8
148:8,15,23 149:5 150:5
166:7 183:15 190:20 191:7,
17 192:13,15 193:5 194:6
201:21 204:14,22 220:5,23
225:2 256:4

**court's** 53:13 63:23 65:6

**court-authorized** 150:3

**court-ordered** 175:24
191:10 216:17 255:17

**cover** 88:20 151:24 219:7
254:11 271:17

**create** 26:5 27:5

**created** 251:21,25

**creating** 268:22 269:23
270:3

**creation** 19:7

**credibility** 149:3

**credit** 198:15 225:25 227:16
249:10

**criteria** 185:7,8 198:8

**cross** 120:2

**crosstalk** 145:4 149:18
192:12 223:4 270:23

**curious** 168:21

**current** 51:24 94:18 119:2

**cut** 13:13

### D

**D.C.** 7:13

**date** 13:18 21:12,15 28:25
72:20 106:23 107:4 109:9
110:16 155:19 171:3 177:15
178:8 220:11,13 226:5
237:12 250:15

**dated** 13:17 229:25

**dates** 16:22,23 33:13,18
37:11 40:13 232:22

**day** 23:10 46:21,22 47:12
106:25 164:14 211:15

**days** 16:24 34:24 208:17
216:14

**DBU** 162:10

**de** 268:4

**dealt** 84:2

**decades** 48:10

**December** 5:13 7:9 19:5
107:16 220:12,13,24 221:15
223:20 229:17,25 232:25
233:15 260:3

**decide** 197:7

**decided** 144:18 157:5 197:5

**decided/recommended**
50:20

**deciding** 62:17

**decision** 56:8,13 57:20 58:5
71:18,23,24 90:14 91:5,7,21
116:3 117:5,15,21 119:24
120:9,15,22 121:2,4,18,23
122:7,10,14,19,22,25 123:8,
20 124:10,17,18,19,21
128:23 129:18 130:2,25
132:6 133:15 134:19,21
135:7,14,16 136:16 137:18
138:16,18,20,25 139:7,12,
20,23 140:15,23 141:11,15
142:5,13,16,21,22 143:2,4,
16,24 235:4 238:25 239:8,

12 240:9,12,17 242:17
243:13 244:8,12,15 246:20,
25 257:12 266:23 272:25
273:5,6,10,23 274:9,21,24
275:11,23

**decision-maker** 275:7

**decision-making** 123:14
199:21

**decisions** 49:19 53:20 54:12
71:6,19 72:24 85:24 86:3
88:9 89:18 90:23,25 92:13
93:10,18 96:18,24 97:8,11,
17,20 98:13,24 99:4,25
102:2,10,21 109:4,11,21,24
110:14,22 111:4,15 113:5,
21 114:5,11,23 116:5,18,19
117:6,16 121:5,18 122:11
127:25 128:15,21 129:4
133:11,20 134:18,20 135:18
137:9 138:13 139:14,15
141:19 155:5 186:11
196:20,25 199:2 204:12
230:16,17 236:6,17 237:6,
11,16,25 238:14 239:4,16,
19,24 243:5 246:16 257:3
259:17 272:20,23 273:24
274:10,15,17 275:9,12

**declaration** 13:14 16:16
17:25 18:4,12,20,23 19:16
20:24,25 21:9 106:9,15,24
107:8,12 109:10 110:17
118:14 133:13

**declarations** 16:16

**declare** 6:10

**defense** 6:20 19:3,12 24:10
25:16,20,23 42:25 44:14
45:5,10,18 46:4,6,10,20
47:18 48:7,15,19,24 49:20
52:23 53:18,19 54:6 59:14
60:10,21 63:20 64:3,7 68:5,
20 69:5,8 71:4,5,6,20 72:24
74:2,4,8,10 76:15,21,24
77:21 78:18,19,23 81:22
83:9,12,16,21 84:8,15,20,23
85:6,8,17,21,22 86:10,15,22
87:4,12 88:2,5,7,20,22 89:5,
11,18 90:8,13,19,22,24
91:2,22 92:4,9,15,22,25
95:13,15,19,25 96:6,12,17,
18,22,24 97:6,8,10,12,16,
17,21 98:3,13,24 99:4,9,14,
17 100:2,11,15,19 101:3
102:2,10 103:4 108:7

Case 3:19-cv-03674-WHA   Document 192-5   Filed 03/18/21   Page 82 of 210

James Marring
12/17/2020
9

109:12,13 110:15 111:5
112:13,16,19,23 113:5,12,
16,20 114:5,10,23 115:24
116:2 117:6,16 119:24
121:5,19 122:16 123:22
124:8,11,17,22 125:4 126:3
127:24 128:8,14,22 129:5,
18 133:11,20 134:18,22
137:10 144:15,20 150:9,14
152:12 153:8 155:4 160:20
161:5,12,17 162:7,10
163:24 164:25 166:13
167:11 168:8 170:10,21
171:13 172:25 176:13
177:5,20,23 178:3,11,20
179:9 180:2,22 181:5,13,15
183:7 186:11,17 187:13,17
188:4,21 189:4,18,21,24
190:23 191:5,12,23 192:5,9,
17 194:9,14,18 195:3,6,21,
25 196:23 198:4,9,24 199:5,
9,10 200:12 201:5,23 202:2
204:24 205:8 206:21 207:22
209:3,8,23 212:5,7,15,22
213:15 214:4,22 219:15
220:7,9,18 222:22 224:2
225:10,23 227:2,6,9,11,14
231:4,17 232:10 237:25
238:14 239:4,15,20,24
242:14 245:4 247:19
251:11,14 257:3,13,23
258:4,7,10 259:17 261:8,15,
21 262:4 267:20,24 268:3,4,
13 269:11,16,20 270:2,3,6,
18 272:23 273:25 274:10,16
275:9 276:6
**defense's** 85:10
**Defenses** 151:6 182:22
**defer** 38:13
**define** 194:22
**defined** 192:14,15
**definition** 146:17
**Defrauded** 19:4,13
**delay** 53:18 63:17 64:9,14,
24 65:11 100:14,18 128:18
155:4 186:10,16 191:13,21
192:8 196:24 255:24
256:10,11 272:22 274:21
**delayed** 100:11 152:13
**delaying** 193:10
**delays** 100:22 274:18,20
**delegated** 93:13 133:3 219:3

**deliberative** 52:6 57:5,14
60:12
**delivered** 159:3 215:6
**demonstrate** 197:14,18
**demonstrates** 134:18
**denial** 64:18 107:17,20
108:2,12,18 192:18 194:25
197:11 227:20 229:10
230:9,14 259:12
**denial.'** 259:18
**denials** 108:6 112:13 123:22
129:19 130:3 131:2 134:22
138:12,14 140:16,17 142:6,
13,14 157:14 212:14,21
274:22
**denied** 64:21 99:18 112:23
113:3 162:20,21,22 189:19
194:19,21 227:22 228:3
229:14,24 230:6 231:22
**Denise** 174:16
**deny** 88:21,23 89:11 91:6
229:19 230:21 231:3 259:23
260:14
**denying** 88:2,3 113:15
204:13 231:17
**department** 10:10 14:23,24
19:9 20:5 22:15 23:13 26:16
33:12 34:23 35:8 38:5 39:5,
11 40:4 41:18,21,25 42:11,
12 44:2,11 46:9 47:15 51:5,
22 55:2 56:22 58:24 59:22
60:15 62:3 72:23 78:24
81:22 82:14 84:8,16,22
85:11,15,18 87:2 88:12
90:21 91:23 93:4 94:11
95:3,10,14 98:2,8,11,12,23
99:8,14,24 100:9,10,20
101:4,24,25 102:10,21
103:3,18 107:10 110:3,24
111:10 112:15,23 113:15,19
114:4,10,16,21 115:22
116:18 122:4,20 123:19
124:12 125:10 128:20
129:2,8,24 132:22 133:18,
22 134:24 135:6,8 136:19
137:8,14 139:21 141:18
142:24 143:5 144:5,21
145:5,8 147:4 148:3 150:8,
14 151:5 152:13 153:3
157:7 158:6 159:21 160:3
162:20,22 164:22 166:21,24
167:8 168:4,24 169:14,23
170:4,8,16 171:8,20,21

172:2 173:9 174:18 175:13,
18 176:6,7,9 177:13,14,22
178:3,18 180:11,19 181:11
183:6 185:13,20 186:12
187:13,18 195:2 197:17,21
198:2 200:24 201:3 208:17
216:12 218:16 219:12
220:17 221:18 222:6,17
223:7,19,22 224:15 233:25
238:17,21 239:25 243:11,12
245:9 248:7,15 251:7 252:6
257:11 262:10 267:21
268:10 269:11 270:5
272:20,25 273:21 274:9,23
275:7,11,22
**Department's** 53:19 268:9
**depending** 77:3 132:21
211:14
**depends** 142:2 273:11
**deposed** 24:23 25:2
**deposition** 5:11 6:4,6,7 8:4,
12 9:5 10:9,13,17 12:12,20
13:10,17,19,22,24 16:14
20:23 22:12,17,19,21 23:25
24:19 25:7 28:2,16,23 29:2
66:23 106:9,16 117:14
221:9 223:15 277:24
**depositions** 25:5 132:5
**deputy** 47:24 48:17 77:8,9,
10 164:10 223:2 228:17
232:6,18 233:19 234:3,11
235:11,14,19 236:9 242:24
243:3 262:7 266:22,24
269:19 276:2
**describe** 167:13
**describes** 192:4 242:5 249:4
**description** 255:21
**designated** 175:16
**desire** 160:14
**desk** 138:10 210:17 211:23
**desks** 211:3
**detail** 30:4,20 211:17 245:13
**determination** 66:3 87:9,13,
23 231:5 264:11,19 265:23
266:7
**determinations** 51:9 227:20
229:10 230:9,14,22 231:2,
23
**determined** 65:17 86:5,22
**develop** 51:3 242:22 262:23
263:2 270:15

U.S. LEGAL SUPPORT
(877) 479-2484

**developed** 118:25 128:12
217:10,14 270:17
**developing** 50:21 216:13
232:8 235:17 242:12,17
243:6,13 244:9 266:19
270:8
**development** 92:3 244:18
263:8,23,25 267:15
**developments** 20:15
**device** 8:12
**devices** 8:22
**Devos** 5:16 23:20 68:18
69:12 77:19,21 100:6 112:2
121:17 122:7 123:13,20
140:4 157:5 172:21,23
173:5 176:19 180:18 238:24
239:14,23 240:6,8
**Devos'** 19:25 112:17,25
165:17 166:15 167:4
**Devos's** 177:17
**diamond** 211:3,5,19
**Diane** 16:17 20:24 25:9
39:21,22 77:5 131:10 132:4
223:14
**differently** 185:12
**difficult** 196:6,8 197:7
**difficulty** 64:2,7 191:5,11,14
192:8,16 196:23
**diligence** 55:11
**direct** 68:25 69:3 73:19,22,
24 74:6 233:9 234:11
237:24 238:13 239:3
**directed** 74:14 93:21 236:6,
17 237:6,10,15 239:19
**directing** 239:23
**direction** 75:21 243:21,22
267:2,6,8,12,14
**directions** 244:2
**directives** 94:9
**directly** 78:11 80:8,20 81:2
83:5 84:2,16 85:21 89:17
115:25 120:6 192:5,6
223:10 227:10,14
**director** 43:10,12 77:16
78:25 79:15,20,22,25 86:12,
15,17 183:20 186:2 232:5,
17,21 233:3,5,10,12,17
235:14 242:7 266:25
**disagree** 149:8 218:11
226:20

**disapproval** 141:14
**discharge** 19:3,12 46:4
49:24 54:14 56:20 57:19
66:7 68:19,25 73:22 91:24
147:20 148:11 149:24 157:5
195:22 198:4,9 220:10
232:10 242:13 243:8,15
244:20 245:7 262:16
264:12,21 265:25 266:9,21
267:17 268:12 272:21
273:22
**discharged** 55:4,5 56:19
65:21 70:16,19,22,24 115:2
209:11
**discharges** 25:16 55:7
**discharging** 66:10 91:14,15
153:6,13,21
**discontinued** 109:6
**discovery** 44:19 46:16 55:19
63:10,25 64:6,16 65:8
144:23 146:13 147:8 148:9,
16,23 149:5,7,12,14 150:3
175:24 190:20 191:7,10
192:14,22 193:5,12,14,18
194:6 216:17 255:18 256:4
**discretion** 152:17
**discuss** 20:20 38:8 76:15
166:21
**discussed** 63:4 76:21 123:3
144:19 153:8 161:14,18
169:20 184:19,22 263:10
**discussing** 25:15 76:23
188:7,13 220:16
**discussion** 27:13 38:23
49:23 50:19 53:4 54:23
58:10,18 72:2 138:17 139:3,
6 158:13 193:3 246:25
268:20
**discussions** 20:3,17,18 48:2
58:15 144:8,14,16 150:8
161:6 176:11 187:12 188:3,
6,19,22 209:13 274:5
**disfavored** 193:14
**displeasure** 69:21 70:4
**dissatisfied** 160:16
**District** 14:16 15:13 16:8
**divide** 183:9
**division** 183:9
**document** 12:17,21,23
28:11,18,20,22 29:3,19,22
30:9,14,18 31:22,23 32:5
33:3 35:25 37:20 66:9,15

67:7 69:16,24 70:3,14 73:9,
10 74:20 89:23 93:23
108:15 111:25 116:25
118:18 122:14 125:11
126:11 127:12 128:4
135:12,24 139:22 140:22
141:2,5,9,12 142:20,24
143:24 150:24 151:4,9,14,
23 152:2 166:7 175:7 178:9
182:18 202:6,11,14,21
203:12 205:4,17,19,24
206:9,11,19,20 207:2,9,17
213:5 224:22 225:2 229:3
240:20 244:23 247:16 249:5
253:6,23 254:19 256:21
257:24 258:13 260:22
264:24 277:5
**documentation** 127:22
178:12 201:4,6,10
**documents** 11:23,25 12:5,8,
13 13:4 20:20,21 21:4,6
22:6 26:19 30:22 66:22
106:7 126:22 133:10 199:25
216:2 239:7
**dogmatic** 190:16,18
**double-check** 121:25
**doubt** 111:12 127:23
**draft** 19:16 67:25 68:3 91:7
252:7
**drafted** 19:17,18 249:23
250:3 251:3 265:13
**drafting** 66:14
**drafts** 159:15 252:24
**draw** 36:3
**drive** 60:7
**driven** 95:2,3,4
**Dropbox** 26:25
**due** 55:11 197:17
**duly** 7:9 194:7
**duty** 46:9

**E**

**E-I-T** 43:19
**E-I-T-E-L** 43:19
**e-mail** 77:23 79:8 175:12,16
176:2,3 215:18
**e-mails** 77:25 78:2 83:11,13
175:10
**earlier** 32:24 59:2 65:17
79:10 101:9 106:3 127:19

153:8 182:9 214:13 219:4 241:9 246:4 268:19
**early** 47:15 54:17 81:6 152:25 164:8,10
**earnings** 53:14
**easy** 196:5,7,10,11 197:4,6
**educate** 42:23 43:4 189:2
**education** 19:9 20:5 22:15 23:13 26:17 32:8,9,15 33:7, 12 38:6 39:5,18 40:4,8,10, 11 41:18 51:22 75:24 77:9, 11 78:9,10 84:8 94:16,22 95:2,3,5 98:3,11,12,23 99:25 100:21 101:5,24 113:20 114:16,21,22 116:18 123:19 124:12 129:8 135:6 136:19 139:9 141:18 146:15,18,20,24 147:2,11 148:3,18 150:9 151:5 174:19 176:6 181:11 195:2 228:22 238:22 243:11,12 252:7 267:24 268:10 269:7, 8 276:3
**Education's** 46:9
**education-related** 147:12
**effect** 52:17 69:6 72:11,14, 16,17 74:3 251:3
**effective** 193:16
**effectively** 42:9,16 49:2 56:24 79:12 84:6,14 118:2 211:15
**effectuate** 55:7 74:18
**effectuated** 59:10
**effectuating** 91:23,25
**efficiencies** 156:4
**efficient** 36:4
**effort** 169:3 200:14
**Eitel** 43:15,16,18,20,21 77:2
**elected** 41:19
**electronic** 8:12,21 9:2 12:18 13:4
**electronically** 166:7
**eleven** 177:19 181:20 183:23
**eligibility** 204:9 251:19
**eliminate** 168:6 169:16
**Elisabeth** 5:16
**emphasize** 9:12
**employed** 177:15
**employee** 45:23,25 47:13 177:25

**employees** 177:10,19,21,23, 24 178:2,10,19,25
**employment** 59:3,8 226:2 227:16
**En** 90:25
**enacted** 152:12
**end** 23:18 35:17 39:23 54:10 74:11 167:12 207:11 209:10 268:21
**ended** 157:19 173:17
**ending** 103:2,6,19,24,25
**ends** 170:16
**endurance** 11:12
**enforce** 148:8
**enforcement** 43:6,8,12 78:25 79:16,20,23 85:3 86:13,16,18 90:20,25 115:25 133:4 164:10 187:21 188:2 214:21 219:15 232:6, 18 233:19 234:3,12 235:12, 15,19 236:10 242:19,24 243:3,20 244:3 266:22,24
**engage** 137:15 139:3,5
**engaged** 88:8
**enjoined** 118:24
**enjoining** 53:14
**ensure** 197:11
**entailed** 46:4
**enter** 5:25 26:7
**entire** 176:8 254:3
**entitled** 19:2 126:10 220:8
**entity** 58:19
**entry** 32:7 33:2,6,11
**envision** 245:24
**equals** 204:10
**equivalencies** 167:9
**equivalent** 177:6
**essence** 75:25
**established** 48:18 58:18 68:8,9 87:6,7 118:3 141:15 199:20,24 200:14 245:3,13, 21 246:7 247:3,21 249:22 262:17
**establishing** 269:22
**establishment** 74:9 153:18 263:5
**estimate** 70:21 168:5,14,22 169:8,15,22,24 170:4
**evaluate** 63:21 71:5

**evaluated** 153:3
**eventual** 63:17
**Everest** 198:14
**Evers** 42:20
**evidence** 9:20 204:10
**EXAMINATION** 7:16
**examine** 42:23
**examined** 7:10 68:12
**excerpted** 152:4
**excessively** 192:3
**excuse** 26:24 120:20
**executed** 106:23
**executive** 93:21 146:3 210:23,24
**exhibit** 18:21,23,24 21:9 27:25 28:5,6,8 29:19 66:23, 24 67:4 69:10 73:12,14 106:8,11 111:21,22 125:2,6 136:2 140:5 142:12 150:25 151:2 165:13 176:17 182:10,11,15 189:9 201:13, 15,20,22 204:20 205:5,18, 21 206:5,6,22 210:10 219:21,22 220:2,4 241:18 244:23
**exist** 259:5
**existing** 227:21 229:12 257:22
**exists** 134:25 135:4 136:22
**expand** 47:14
**expect** 20:6 66:19 73:4 86:12,14 88:17 94:2 98:16 107:25 108:6 115:7,10 116:20 117:9,11 120:10 122:19,21 123:24,25 124:6 128:18 129:23 130:7,8,13, 18,25 131:4,10,14,16,20,22, 23,25 132:9,23 133:7,14 134:23 135:6,13,15,20 136:17,20 137:14,16,18 139:12 140:15,18,20 141:4, 21 142:23 160:12,13 175:5, 7 183:6,25 184:25 188:9 194:25 199:4 215:18 217:3, 13,19,24 218:2,4,6,17 220:19 222:17 223:6,9 224:21 236:11 239:2 251:18 252:10
**expectation** 115:11 135:4 136:15 137:5
**expected** 86:14 117:4 145:13 227:13

**expedited** 193:12
**experience** 26:16 31:17,19 243:10 273:2
**expert** 51:3
**experts** 182:5 184:16,17
**explain** 10:17 170:19 220:3
**explaining** 94:21
**explanation** 68:12 246:12
**explore** 256:6
**express** 239:15
**expressing** 187:16
**extended** 122:17 133:21 134:22 272:23
**extent** 52:5 57:4,13 60:11 63:25 64:6,20 191:4,10,14, 15 196:22 197:20
**extreme** 69:21 70:4

F

**face** 192:18
**faced** 193:8
**fact** 20:18 77:25 82:25 95:17 102:25 138:21 156:16 192:16 255:23
**facts** 22:7 81:10 98:18 105:20,22 202:11,15 264:12,21 265:24 266:8
**faded** 200:7
**fair** 31:2 49:25 50:2 58:20 60:23 61:2,11 62:10 125:13 253:11
**fairly** 72:4
**faith** 84:4,17
**fall** 247:21 248:3
**familiar** 195:24 202:8 203:15 204:6 211:11 213:21 216:21,22 245:12 248:17 254:19
**familiarize** 126:11
**fashion** 152:17
**favored** 149:13
**feature** 26:13
**February** 32:18 35:18 39:14, 25 79:10 210:8 257:23 258:7,13,14 259:2
**federal** 25:17 33:11 35:8 46:5 114:25 147:20 149:24 173:21 220:6,9 245:20 268:12

**feel** 59:22 215:24
**feeling** 50:5
**feels** 103:14
**fell** 165:9
**fewer** 42:8
**fifteen** 253:17
**figure** 247:11
**file** 12:19 67:5 206:10 207:17
**filed** 205:24 206:11
**files** 12:18 28:4
**filing** 166:7
**fill** 33:5 178:4 180:20,22
**filled** 177:9
**final** 54:25 55:2 71:19 72:24 92:10 99:25 217:9 230:16
**finally** 71:16
**finance** 51:6,20
**Financial** 151:6 182:22 262:21
**financially** 5:21
**find** 46:23 47:2 54:9 60:9 61:18 62:2 83:3 136:21 174:3,21 175:5 255:8
**finding** 35:24 60:20 118:12 174:24
**findings** 64:22 112:14 167:15 216:9
**finds** 30:22
**fine** 101:18 127:2 133:5 159:18 210:9 272:10
**finish** 29:15 136:24 272:9
**Fiscal** 211:6
**flagged** 259:12,17 262:18
**flip** 202:6
**flowed** 90:9
**fluctuates** 170:16
**fluctuation** 171:7
**focus** 81:23 110:12 126:8 207:14
**focused** 35:13 236:16
**folks** 42:10,11 43:5 48:9 51:2 56:10 76:24 78:13 222:21 223:5,6 233:8 245:25 246:23 275:25
**follow** 20:14 210:25 225:15
**footnote** 254:24 255:6 256:19 257:5,8 266:15
**forceful** 192:3

**Foreign** 146:5
**forget** 17:17
**forgiveness** 51:10 61:5
**forgot** 79:7
**form** 9:19 119:22 151:16 203:13
**formal** 48:18 71:22 165:2,4
**formally** 259:5
**format** 26:14
**Forum** 149:19,23
**forward** 56:25 59:9 61:7 66:13 67:24 72:2,4 118:4 122:5 135:12 155:11,13 182:11 269:5 276:9,11
**forward-responsibility** 177:7
**forwarded** 13:6
**found** 166:9 255:11
**foundation** 103:11 261:18, 21 262:5
**four-hour** 17:8
**frame** 132:15,21 166:17
**framework** 202:18 203:8 255:9
**frankly** 77:24 80:5 110:4
**Franzi** 34:22
**freeze** 173:9,14,20,24,25 174:4,7,22 176:5,10,12
**freezes** 173:22
**frivolous** 195:12
**front** 18:11,12 122:12 123:3 158:8 160:10,11
**froze** 53:6
**frustrated** 136:5
**frustration** 136:14
**FSA** 33:24 34:14 35:9,14 36:6,15 39:9 40:3 71:5 78:6, 9,11,22 79:20 80:3 83:24 90:20 94:10,12,15,23 95:5 97:20,22 115:23 137:9 143:11 144:4 161:10 176:12 183:18 188:18 189:5 210:18 216:24 217:11,15 219:3,10 221:21 222:23 236:6,17 237:6,10,16 239:3 242:6 243:19 244:8 245:3,13,14, 20,21,25 246:7,12 252:4 253:3,23 259:22 260:13 262:23 263:2 266:6 267:23 268:22 269:7,9,21 270:6

**FSA's** 225:9 232:6,17
233:18 234:11 235:11,14
**full** 61:3 84:4,17 91:13,17
98:7 177:24 245:3 259:3
**full-time** 80:11 167:9 168:5
169:15 177:6
**fully** 70:10 71:16 94:17
180:16 199:4
**function** 30:8 177:7
**fundamentally** 49:25
**funding** 167:10
**Funds** 147:15,16,17,18
**future** 68:14

---

**G**

**gainful** 59:3,8
**Gamble** 252:5,15 254:17
265:2
**game** 253:17
**gave** 15:4 47:19 48:6 67:25
68:2 84:25 103:23 151:12
170:24
**Gen** 35:9 39:13 77:16
**general** 19:19 22:25 54:19
60:14 65:6 66:4 77:9,12
78:20 122:4 123:4,7 124:2
130:15,17,22 141:24 174:15
199:18 214:19,21 215:3,4,9,
21 216:23 218:18,20 219:9
224:24 252:6
**General's** 214:14,24 216:6,
15 218:14 220:8 241:19
244:24
**generally** 31:19 76:24 102:5
139:14 197:4 217:22 223:5
248:24 268:25 269:19
**generate** 26:14
**generated** 30:10 93:23
**generates** 30:8
**Generation** 35:9,14
**gentleman** 233:6
**gentleman's** 80:24
**gentlemen** 164:9
**give** 9:21 11:20 15:6 18:3
38:16 61:3 66:17 96:16
122:2 155:18 159:17 170:22
221:6,25 255:22
**giving** 15:10,18 16:11
137:24 244:2

**glance** 208:7 253:24
**glasses** 208:8
**goo** 163:20
**good** 7:17 93:15 105:6
121:16 163:19,21 206:17
219:17 238:21 246:25
253:24
**goodness** 176:20
**Gotcha** 166:10 207:21
**government-issued** 7:2
**Governor** 41:10
**grant** 91:21,24
**granted** 61:19 91:13
**granting** 204:12
**grating** 191:25
**great** 12:6 13:7 186:24 207:4
**greater** 211:6 212:8
**grew** 161:22,23
**ground** 8:4
**grounds** 249:6
**group** 43:6,8,12 48:11,12,
14,18,21 49:15,16,19,23
50:9,13,20 51:4 58:9 59:4,
14 68:16 76:9,12 77:6
78:14,25 86:13,16,18 89:9,
14,20,22,24 94:13 148:2
175:12,16 177:20,24 178:3,
11,20 179:9 180:2,22
181:13 246:22 274:8,12,14
275:15,21 276:7,19
**groups** 176:2,4
**growing** 101:10 102:4,6,14,
22 104:17,18
**grown** 103:19
**growth** 161:9
**guarantee** 146:21,22
**guaranteed** 225:25 227:16
**guarantors** 146:19
**guess** 13:11 31:12 65:13
76:8 223:17 230:18 260:24
**guessed** 179:2
**guidance** 122:4 267:2,6,11
**guidepost** 26:17
**guides** 199:21

---

**H**

**Haffey** 228:20
**half** 127:7

**halfway** 195:18
**hand** 31:22 58:25 61:13
112:7 158:15 213:16
**handle** 273:21
**handled** 70:13
**handling** 10:11 160:19
**happen** 55:14 57:20 173:22
**happened** 30:23 31:14
62:16 86:7 100:24 127:19
188:16
**happening** 114:8 135:10
166:18
**happy** 55:22,23 56:3,10,12
70:8,12 104:19 151:19
**harbor** 195:8,17,20
**hard** 213:5
**harm** 61:3,18 62:4 72:6
**harmed** 61:2,14 114:24
**harsh** 191:25
**hat** 49:22
**hate** 105:17
**hats** 40:2,5 183:17
**hd** 163:19
**head** 9:22 170:23 269:18
**headed** 174:16
**heading** 112:12 138:11
166:12 257:16
**Heald** 249:10
**hear** 53:8 103:14 200:4,6
239:14 270:14
**heard** 22:20 62:21 87:18
100:12 138:17 179:20
198:19 239:6
**hearing** 87:20,22,24 239:13,
21 240:5
**held** 5:5,8 27:14 38:24 53:5
**hiatus** 156:3,19,20,22
157:18,22,24
**Hiel** 198:14
**higher** 32:9,15 40:11 75:23
78:8 146:15,17,24,25
147:12 148:18 163:16
175:17 267:24 269:8
**highly** 90:17
**Hill** 77:6 148:2
**hindsight** 185:18
**hire** 173:10
**hired** 177:13 178:2,10,19,25
**hires** 179:5,8,19 180:2,14

**hiring** 171:13 173:8,13,20, 22,25 174:3,7,21 176:5
**history** 36:2 39:4
**hit** 276:22,24
**hold** 18:12,16 40:18 125:21 126:3 127:11 128:8,15 136:3,17 138:5 142:11 275:8,12
**holding** 7:3
**holiday** 23:18
**homes** 9:12
**hope** 5:23 105:5 160:18 182:10 203:6
**hoped** 261:24
**hour** 36:19 127:7 234:19
**hours** 16:25 17:5 105:19 276:23,25 277:7
**house** 15:22
**housed** 267:23
**Howard** 219:8
**human** 245:22 246:18,19,20, 21,22
**hundred** 35:13 50:8,23 51:11 56:19 58:11,17 59:16 61:4,15,19 70:25 72:8 91:18

**I**

**I--** 88:14
**idea** 56:18 174:2 196:18 210:19 226:7 235:3 270:13
**ideal** 60:24
**ideas** 165:5,6 276:8,11
**identification** 7:3 28:9 67:2 106:13 125:8 201:17 219:24
**identified** 44:18 206:15
**identify** 8:21 206:4 207:16 246:23
**IG** 219:4
**ignore** 201:20 204:21
**imagine** 25:15
**immediately** 35:2 146:6
**imminent** 155:20 156:7,12
**impact** 82:5 88:17 94:20,22 105:19 211:6 212:8
**impacted** 69:2 73:23 176:8 222:18,20 223:11
**impacting** 82:8,12
**impacts** 20:19 141:24

**impeding** 82:2
**Impending** 104:14
**implement** 95:6 153:4,12 268:11
**implementation** 78:23
**implemented** 153:11
**implementing** 94:11 268:23 269:22
**implicit** 191:13 226:17
**implying** 239:8
**importance** 246:4
**important** 9:21,25 35:11 95:22 115:8 116:3 185:23 223:24 224:14 237:4 247:15
**improve** 199:25
**improved** 19:3,12 156:16
**improvements** 156:4 216:10
**in-school** 119:2
**incident** 14:23
**include** 77:2 209:2
**included** 119:12 177:24 198:13 218:12 221:15 257:22 258:6
**includes** 111:25
**including** 64:18 124:2 164:8 167:9,15 174:15 177:9 262:17 263:10 269:6
**incoming** 54:21 55:5
**incorrect** 34:6
**increase** 46:19 104:12 161:4 162:10 170:20 171:12 172:6
**indirectly** 51:16
**individual** 51:4 56:18 61:7 76:11 89:19,21,22 108:9 243:17 274:3,7 275:13
**individually** 89:6,12,13
**individuals** 274:8 275:16,21
**indulgence** 277:4
**inference** 236:22,24
**influence** 41:24
**inform** 190:14
**informal** 215:18
**information** 26:8 29:10,19, 20 30:17,18 31:12,15 47:16, 19 48:6 52:7 57:6,14 59:6, 11 60:13 90:9 102:13 103:18 142:25 236:9,15 237:3 242:4 248:20
**informed** 55:10 117:15,19 185:17

**infrastructure** 154:5
**initially** 41:16 77:15 85:3 87:3 88:4,10 158:15
**initiative** 35:7,14 77:17
**injunction** 117:17,23 119:18,20 125:23 127:14 128:10,23 129:6
**input** 30:18
**inquiries** 192:23,24
**inquiry** 177:15
**inside** 211:5
**Inspector** 199:18 214:14,19, 20,24 215:2,4,9,21 216:6, 14,23 218:13,18,20 219:8 220:8 224:24 241:19 244:24 252:6
**instinct** 259:4
**institution** 147:12
**institutions** 146:25 148:18
**instruct** 46:14 57:21 64:25 148:7,14,24 150:4 193:23 194:3 256:7,12
**instructing** 52:8 216:18 255:19
**instruction** 199:19
**instructions** 95:19 96:16
**instructs** 10:18 11:9 63:13
**insufficient** 86:3
**intake** 85:16
**intended** 263:17
**interactions** 5:8
**interest** 59:25 60:8,19 62:18 63:8 239:15
**interested** 5:21 136:21
**interests** 59:23
**interface** 5:9
**interim** 69:4 73:7,17,25 74:7,14,17,19 262:23 263:3, 6,24 264:3
**intern** 269:4
**internal** 69:3 73:6,19,24 74:6,13 210:18 262:22 273:20
**interpret** 192:22
**interrupt** 29:11 109:17 210:4
**interrupting** 136:24
**introduced** 219:21 220:4
**involve** 147:20 149:20,24
**involved** 20:3,9 45:4 55:6 65:24 66:14 71:21 87:11,12,

25 89:18 90:12,17,22 91:14,
23 92:3,14,22 93:4 108:4
118:9,16 159:12 166:23
168:13,18 200:19 214:21
222:22 248:11 268:21,22
269:21 270:20 275:17,22
**involvement** 19:6 83:15
**involving** 90:8 269:6
**ipads** 8:23
**irrelevant** 194:5
**issuance** 53:19 122:16
123:21 127:24 155:4 216:14
274:10,21
**issue** 20:7 35:11 47:18 51:7
59:3,18 64:18 71:6 72:23
78:19 105:25 119:2 121:22
122:7,9,24 123:8,20 124:3,
7,10,17 134:20,21 138:14,
18 139:2,4 140:16 142:5,14
149:7 160:20,21 170:4
172:7,17,21 173:4,5 184:18,
19,23 185:23 200:17 208:19
209:24 215:5 238:10,13,25
257:10 262:4 274:5 275:18,
19
**issued** 71:8 91:6 98:16 99:5,
25 109:5,11,21,24 110:14,
22 111:4,15 113:5 124:21
133:11,14 138:15 140:17
142:6,14 222:16 223:22
237:25 238:14 239:5,20,24
240:8,12,16 247:8
**issues** 40:11 48:3 76:16,21,
24 77:21 81:21 96:14 106:5
150:9 174:15 198:18 209:7
211:7 212:9 218:10 224:14
**issuing** 71:19 89:18 90:22,
24 96:17,24 97:7,11,17,20,
22 98:3,13 100:11,14,18
102:2,10,21 113:20 114:4,
10,22 116:4,18,19 117:5,16,
21 119:24 121:4,18 128:21
129:4,18 130:2 131:2 137:9
186:11 196:24 236:6,17
237:6,11,16 244:11 259:16
272:22 273:24 275:8
**Item** 259:11
**items** 166:23
**ITT** 213:17

**J**

**J-E-U-N-S-T** 51:15
**J-U-E-N-S-T** 51:16
**James** 5:1,11 6:1 7:1,8,22
8:1 9:1 10:1 11:1 12:1,20
13:1,10 14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1
28:1,2,23 29:1 30:1 31:1
32:1 33:1 34:1,22 35:1 36:1
37:1 38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1
142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1
150:1 151:1 152:1 153:1
154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1
170:1 171:1 172:1 173:1
174:1 175:1 176:1 177:1
178:1 179:1 180:1 181:1
182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1
190:1 191:1 192:1 193:1
194:1 195:1 196:1 197:1
198:1 199:1 200:1 201:1
202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1
210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1
218:1 219:1 220:1 221:1
222:1 223:1 224:1 225:1
226:1 227:1 228:1 229:1
230:1 231:1 232:1 233:1
234:1 235:1 236:1 237:1
238:1 239:1 240:1 241:1
242:1 243:1 244:1 245:1
246:1 247:1 248:1 249:1
250:1 251:1 252:1 253:1
254:1 255:1 256:1 257:1
258:1 259:1 260:1 261:1
262:1 263:1 264:1 265:1
266:1 267:1 268:1 269:1
270:1 271:1 272:1 273:1
274:1 275:1 276:1 277:1
**January** 22:2 32:3,13,15,17,
20,22 33:14 34:8,17,22
35:7,11,16,17 40:14 41:2
44:9 45:24 46:18 48:5 80:13
145:6 157:7 172:2 177:10,
11,13,14,19,20,25 178:9,17
181:19 182:2 208:11,13
214:3 225:13,20,21,23
226:5,24 227:4,17 228:6,14
250:7,8,10,15
**Jaramillo** 6:17,18 7:16,18
10:24 13:5 27:8,19,24 36:23
37:7,18 38:2,20 44:22 47:8
52:8,12 53:2 57:23 63:16
64:11 65:15 67:12 73:10
75:2 98:6 101:13,20 104:19
115:15,19 120:18 126:25
133:24 134:3 148:25 149:6
175:21 181:8 183:13
186:22,25 187:4 190:22
191:9 193:6,22 194:7 204:8
205:6,10,14 206:2,3,8
216:18 231:8,12 234:17,21
235:2 241:8 255:19 256:5,
15 271:3,13,20,25 272:10
277:3,9,12,20
**Jeunst** 51:6,13 52:14 53:12
**Jillian** 79:14 80:9,14
**Jim** 38:15 277:23
**job** 84:5 119:6 177:7 198:13
227:18 248:24 271:11
**Joe** 5:17 36:17 47:25 48:17
68:8,10 74:23 101:11,22
104:22 134:14 144:9 186:19
228:16 234:16 262:6,9
**jog** 82:23 129:20

**Johnson** 35:3 39:13 77:13 80:11,18 132:9 187:12,16, 20,22 188:17,24 216:24 219:4,9 220:25 221:20 222:21 247:6,9 252:4,14,21 254:7,16 264:25 265:2,5,16, 17 266:5

**Johnson's** 35:10 265:8

**joining** 146:6 147:4

**Jones** 16:17 25:9 39:21 66:23 77:5 131:10 132:5 223:14

**Jones'** 20:24

**Joseph** 6:17 7:18 13:3 26:23

**Judge** 149:8,11 192:20 193:6

**judgment** 196:13

**judgments** 50:22 71:10

**Julian** 80:17 85:4 132:15,17, 22 133:2 187:20,22,23 188:3,8,12

**July** 35:4 80:13 98:22 99:7, 11,12,16,23 100:15 187:23 225:22 226:25 227:5

**June** 34:25 39:22 103:2,6,7, 24 104:8 109:6,9,22,25 110:16,23 111:6,25 112:20 113:6,12 116:4 127:25 133:11 166:19 169:21 178:12

**Justice** 10:11

**justified** 64:8

**Justin** 49:13 68:11 117:19, 21 119:21,23 120:8,21 121:7 132:8,11 201:3

---

**K**

**Kent** 42:19

**Kevin** 17:19

**Kim** 79:10 80:25 233:7 235:20

**kind** 82:20,21 134:16 141:4 168:19 185:8 192:23 210:14 232:14 236:25 261:10,24

**kindly** 7:2

**kinds** 174:10 213:22

**knew** 22:23 37:15 46:22 70:11 116:10 214:10

**knowing** 162:3

**knowledge** 47:14 64:18 110:2 116:15 128:24 130:22 169:2 184:2 186:9,15 250:24 275:11,23

---

**L**

**labeled** 220:2

**lack** 103:10 186:10,15

**laid** 261:18

**landing** 42:3,13,17,18,25 44:6,13 45:6,11,15,18 257:24 258:3,14,16,18,23 259:2,6,9

**language** 109:18 202:25 203:15 204:6 211:12 215:24

**laptop** 8:25

**lasted** 173:14

**late** 35:6,11 164:7 228:12

**launch** 69:7 74:3

**Laura** 79:10 80:25 233:7 235:20

**law** 9:14 152:16 202:19 203:10 245:6 247:24

**lawful** 55:13 238:22

**lawyer** 128:24

**lay** 256:13

**laying** 261:21 262:4

**layperson** 129:7,10

**leader** 224:13

**leaders** 78:15 80:23 85:2 222:24,25

**leadership** 35:10 42:14 95:10,13 122:20 133:22 153:3 175:13 218:23 246:15

**leading** 57:20 63:17

**learn** 41:24 45:17 223:14 224:6

**learned** 45:20,21,22 230:11

**learning** 45:13

**leave** 15:23 144:18,21 145:8

**leaving** 148:2,10,19 150:6

**led** 41:10 42:17 58:18 64:15 85:3 128:18 164:10 209:10

**left** 34:24 39:10,23 79:9,10, 11 80:24 98:23 99:8,13 100:4 107:10 110:2,24 111:9 128:2 138:9 144:5 150:10,20 164:7,10,11,12 168:16 171:8 172:2 178:15,

18 188:17 210:15 211:23 233:6,8 241:20 271:15,16

**left-hand** 125:16 138:12 222:9

**legal** 5:18,24 10:8 20:14 22:16 101:10 198:2,6,21 199:14 202:18 203:8 204:9 227:21 229:12 237:17,21 242:22 255:7,8,9,12 257:22

**legally** 128:21

**lens** 50:12 61:10

**lesser** 50:24

**letter** 215:12,16,19 219:8 220:20 221:4,10,12,15,21 222:5,13 252:16,17,23 253:6 254:3,7,11 265:4

**letters** 94:7 215:15

**letting** 136:7

**level** 61:8 72:7 142:2,4 165:9 185:15,19,22

**levels** 188:8

**liaison** 94:14,25

**lie** 274:23

**lieu** 6:8

**life** 145:17

**lifted** 174:22,25 175:3,4,6 176:10,12

**limit** 60:9,20 62:3

**limitation** 148:8,15 150:5

**limitations** 193:20

**limited** 149:15 193:15

**lined** 38:17

**lines** 96:15 107:15 206:24 213:16

**lingering** 104:16

**Linkedin** 26:2,12,13 29:10, 21,23 30:8,11,12,14,19,22 31:9,10,11 35:25

**list** 32:25

**listed** 21:7 64:16 65:9 69:17 177:12 191:18 231:13 251:20 266:2

**listen** 257:7

**listening** 145:9

**Liz** 77:6

**loan** 91:15 146:19,21 220:10 245:7

**loans** 25:17 46:5 66:7,8,10 69:2 73:23 115:2 147:20 148:12 149:25 153:6,13,22

268:12
**located** 5:19 125:15
**long** 35:19 38:10 70:23 79:8
117:6 136:17 148:6 156:3,
22 160:21 169:23 173:13,
19,22 232:13 234:24 242:4
**longer** 37:5 146:22 271:11
**looked** 21:5 26:12 50:4,6
54:18 58:14 59:5 73:2,11
140:4 201:7 205:12 206:23
248:21,25 261:15
**lost** 121:11
**lot** 25:15
**loud** 132:24 168:3 191:24
228:16
**low** 103:15 164:15
**lower** 125:16 202:22
**lunch** 101:12 104:20,25
105:6,10
**Lynn** 68:9,10 228:20

**M**

**Madam** 44:23
**made** 13:14 16:16 21:10
22:2 32:2 49:19 54:12 56:18
58:17 68:13,15 85:24 86:2
91:21 93:8,18,24 94:5 95:9,
13 116:4 119:24 120:12
121:4 129:17 130:2,25
132:6 138:21 139:15 158:17
159:3 160:11 164:23 169:21
170:4 180:14 196:13 206:24
224:23 230:9,13,16 235:4
236:22 238:7 239:12 244:8
266:23 275:23
**Mahaffy** 68:9,10
**maintain** 216:3
**major** 35:7
**make** 25:21,22 31:23 50:22
51:9 62:10 81:25 82:6,24
93:13 94:10,12 109:6,14
110:7 120:6,9,14,21 121:15,
17 126:23 138:20,24 154:6
155:25 160:24 161:10 162:9
169:11 196:19,20 198:25
203:17 205:3 227:19 229:9
231:2 239:8 243:12 261:7
273:10 274:23 275:10
276:19
**makes** 117:5 190:2 218:22

246:15,20
**making** 7:23 50:7 71:10
87:8,11,12 90:22,24 92:25
93:4 117:15 152:18 158:8
160:9 162:12 166:2 183:7
184:3 244:14 272:25 273:6
274:9,15 275:22 276:4
**management** 174:14,15
216:2
**manager** 185:21
**mandatory** 46:10
**manner** 6:13
**Manning** 5:1,11 6:1 7:1,8,17,
22,23 8:1 9:1,9 10:1 11:1
12:1,6,20 13:1,10 14:1 15:1
16:1 17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1 25:1,14
26:1,2 27:1,17 28:1,3,4,10,
23 29:1,11 30:1 31:1,18
32:1 33:1 34:1,12 35:1,24
36:1 37:1,18 38:1,11,14
39:1,3 40:1 41:1 42:1 43:1
44:1 45:1,2 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1,6
54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1
64:1,17 65:1,5,16 66:1 67:1,
16 68:1 69:1 70:1 71:1 72:1
73:1,13 74:1 75:1,12 76:1
77:1 78:1 79:1,18 80:1 81:1,
7,24 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1
91:1 92:1,20 93:1 94:1 95:1
96:1 97:1 98:1 99:1 100:1,5
101:1,23 102:1 103:1 104:1,
21 105:1,5 106:1,14 107:1
108:1 109:1,17 110:1,9
111:1 112:1 113:1 114:1,15
115:1 116:1,13 117:1 118:1
119:1 120:1,4,20 121:1,4
122:1 123:1,18 124:1,16
125:1,9,14 126:1,13 127:1,3
128:1,14 129:1,16 130:1,13
131:1 132:1,4 133:1 134:1,
13 135:1 136:1 137:1 138:1
139:1 140:1 141:1 142:1
143:1 144:1 145:1,2,11
146:1 147:1 148:1 149:1,24
150:1,7,17 151:1,10 152:1
153:1 154:1 155:1 156:1
157:1 158:1,4 159:1,7 160:1
161:1 162:1 163:1 164:1,19
165:1 166:1,11 167:1,18

168:1,10,20 169:1 170:1
171:1,20 172:1 173:1 174:1
175:1 176:1,16 177:1,16
178:1,7 179:1 180:1,15
181:1,24 182:1,8 183:1,16
184:1,11 185:1 186:1 187:1,
11 188:1 189:1,7 190:1,12
191:1,2 192:1,4 193:1
194:1,8 195:1,15 196:1
197:1 198:1 199:1 200:1,2,
11 201:1 202:1 203:1 204:1,
16 205:1 206:1 207:1,5
208:1 209:1 210:1 211:1,8
212:1 213:1 214:1,13 215:1
216:1 217:1 218:1 219:1
220:1 221:1,24 222:1 223:1
224:1 225:1,8 226:1 227:1,8
228:1,5 229:1 230:1 231:1,
19 232:1 233:1 234:1 235:1
236:1,2 237:1 238:1 239:1
240:1 241:1,17 242:1 243:1
244:1 245:1 246:1 247:1
248:1 249:1 250:1 251:1
252:1 253:1,15,25 254:1,12
255:1 256:1,19 257:1,17
258:1,24 259:1 260:1 261:1,
3,9 262:1 263:1 264:1
265:1,11,12 266:1,5 267:1
268:1 269:1 270:1 271:1,6
272:1,19 273:1 274:1 275:1,
2 276:1,15 277:1,12,23
**Manriquez** 19:25 24:7 52:25
53:15 117:18,22 118:9,14,
24 127:12 128:17 129:6
**Manriquez'** 125:22
**Manriquez's** 119:12 128:23
**March** 33:14 39:11,15 81:5
98:23 99:7,13,16,23 100:16
103:17,20 104:2,9 107:10
110:3,24 111:10 112:14
113:7 145:8 170:18 171:5,7,
24 172:3 177:22 178:15
181:25 225:24 226:5,9,11,
19
**Marcia** 13:5 17:17,18
**Marcia's** 17:18,19
**mark** 25:11 27:20,21,24 28:3
67:13,14 111:20 133:14,17
144:4,10,13 150:24 204:25
205:21 256:13
**marked** 12:17 28:6,8 66:25
106:12 111:22 125:2,7
151:2 165:13 182:10 189:8

201:13,16 206:6 210:10
219:23 241:18
**marking** 205:5
**Martin** 133:7
**Massachusetts** 15:14 16:9
**matter** 5:15 6:10 219:25
268:3,5,15
**meaning** 25:23
**means** 8:14 110:8 115:15
175:14 190:12 191:24
210:20,22 211:7,10
**meant** 193:25 245:18,19
263:7
**measure** 61:18 275:10
**Media** 5:10
**medication** 105:19,21
**medications** 82:4 105:25
**meet** 16:18 17:9 43:15 44:4
76:3,25 78:17
**meeting** 17:2,6,8 41:20 71:4
76:7
**meetings** 22:10 43:10 76:12,
16 77:10,14 78:21 105:8,11
200:18
**mem** 198:2 251:13
**member** 51:5 146:3
**members** 49:4 59:4 118:8
119:5 259:5 269:6
**memo** 49:22 67:10,16 68:15
73:2,5,11 77:18 88:20
139:17,25 141:15 220:24
254:16 256:20 257:10
**memoranda** 198:2,6,11,25
199:8,11,12,14 227:21
229:12 232:9 235:17
242:12,17,22 243:6,14
244:9,18 249:5,22 251:10,
13 255:7,12 266:20
**memorandum** 141:11
198:21 249:12 250:7,14
255:8 262:20 263:11 267:15
**memorialized** 139:15
**memory** 36:3 82:23 96:19
98:20 117:2 129:21,22
130:12 219:5 228:8 231:16
235:9 253:10
**memos** 251:8 255:12,14
257:22
**Menaker** 5:24 9:17 10:2,24
27:19,21 47:8

**mentioned** 24:16 31:25
92:20 147:11 156:18 198:19
200:11 214:14 219:6 246:4
248:11 270:23
**mentioning** 60:5
**merits** 109:16
**Merritt** 6:19,20 10:10,16
11:7 17:17 27:8,10 36:17
37:9,12 38:10,13,18 44:15,
17 46:11,14 52:5,10 53:21
55:18 56:4 57:4,12,17,25
60:11 61:21 62:13 63:9,14,
22 65:3 70:5 73:8 74:23
75:4 84:9 91:8 92:17,19
96:2,7,25 97:13 98:4
101:11,18,21 103:10
104:13,22 113:22 114:12
115:13,17 116:6,14 117:7
120:17,25 123:15 124:9,14
126:10,19,20 127:5 130:4,
10 131:18 134:2 137:20
143:17 144:22 146:12
147:6,21 148:4,13,21 149:4,
10,21 150:2 163:3 175:19,
22 181:6 183:11,14 184:2,7,
11 186:13,19,24 190:19
191:3 192:11 193:13 194:2
195:13 197:19 204:4 205:2,
7,22 206:17 216:16,20
217:17 223:12 224:8 231:6,
10,15 234:16,18 239:17
240:2,13 246:17 248:5
255:16,25 256:9,17 263:9
269:24 270:22 271:9 274:25
276:12,20,24 277:3,7,11,17,
18
**messages** 78:3
**met** 16:23 17:15 42:11 43:5,
7 44:5,10 47:21,23 49:5,7
76:5,6,9 78:15
**meth** 52:22
**methodology** 50:21 51:8
52:4,22 58:20 59:9 72:3,11
74:9,18 87:5,6,7 88:16 92:8,
11,22 118:3,6,23 125:22,24
127:13,15 128:9,11,12,17
153:18 263:5,8,21,25
**mid-sentence** 226:4
**middle** 151:21 155:10 171:7
257:19
**million** 211:6 212:8
**mind** 33:20 37:2,9 81:17
104:15 134:18 135:21

182:20 191:24 193:13
232:15 241:6 250:5,13
271:4
**mine** 21:2
**minimal** 178:24
**minute** 37:2 203:25 221:6
**minutes** 37:14 38:12,15,17,
19 74:25 75:3 101:16 134:4
206:23 219:6 241:7 246:5
**mire** 239:4
**mischaracterization** 61:22
84:10 123:16
**misconduct** 59:24 64:23
114:25
**misread** 172:4
**misrepresentation** 198:16
249:11
**missed** 234:20
**misstatement** 269:24
**misstates** 115:13
**mistake** 120:12 166:2
**mistaken** 34:9
**misunderstandings** 96:12
**misunderstood** 255:7
**misused** 190:6,8,9
**moment** 22:9 29:8
**month** 31:25 48:20 103:5
**monthly** 20:10
**months** 31:5,6 32:12 33:5
116:20 168:25 187:25 223:8
229:18 256:11
**morning** 7:17
**move** 18:15,17 20:20 29:6
56:25 65:15 72:4 121:14
133:5 160:15,18 203:20,24
204:20 212:13 221:24 261:9
269:5 276:8,11
**moved** 35:12 61:7 145:21
160:15
**moving** 72:2 155:11,13
160:17 182:11
**multiple** 14:7 79:4,6
**Murray** 112:4 165:16 167:3
176:18

---

**N**

**nail** 37:10
**named** 79:18

**names** 43:14 164:9
**nature** 8:23
**necessarily** 55:4 56:21 58:4, 5 180:3 224:24
**needed** 50:4,6 55:4,14 65:18 102:23 120:13 162:4 164:2 168:6 169:16 172:10,25 181:15 182:7
**negotiate** 22:3
**negotiated** 21:11 22:3,4 151:6 182:23 189:9 273:15
**Nevin** 16:17 25:7 44:4,6 49:10 79:12 80:20 83:8 84:7 106:10,23 109:4 110:17 117:14 131:23 132:4,7,13 133:12 161:24 164:12 183:20 184:23 197:22 233:2,9,12 235:22
**Nevin's** 20:25 107:8,12 109:10 185:25
**nods** 9:22
**non-career** 153:3
**non-cci** 128:12
**non-direct** 69:2 73:23
**non-for-profit** 149:20
**normal** 137:6,8,13 236:13
**Northeastern** 15:15
**Notary** 7:10
**notations** 31:23 32:3
**note** 26:24 172:4 256:9
**noted** 32:12 194:7
**notice** 12:20 13:2,9,17 28:2, 14,16,23 91:7 174:6,8 273:19
**noticed** 31:21,24 98:25 99:5
**notices** 192:19
**notification** 210:19
**noting** 109:15
**November** 106:25 109:10 110:17 133:13 155:3 156:5 157:2,8 159:22 163:25 164:3 182:13,23 189:10 252:4 254:15 273:15
**number** 12:19 29:25 46:19 47:20,23 48:2 54:11,13 56:10,21 90:6 102:14,17,18 103:7,14,19,23 115:4 125:17 151:24,25 155:19 163:12 164:13,16 168:7 169:17 170:9 171:5,15,16, 18 178:24 181:17,20,23

184:15 202:17 204:11 206:10 213:6,14 214:12 266:15 275:24
**numbers** 12:8,14 88:8 99:20,22 101:10 102:4,6 104:2,6,7,17 125:15 166:3 170:22 184:4 185:6 220:23
**NW** 7:12

## O

**oath** 6:8 9:13
**Obama** 249:24 250:3,4,9 251:5
**object** 10:16 11:7 147:6 148:5 183:15
**objected** 10:19 148:22
**objection** 44:15,17 46:11 52:5 53:21 55:18 56:4 57:4, 12 60:11 61:21 62:13 63:9 70:5 73:8 84:9 91:8 92:17 96:2,7,25 97:13 98:4 103:10 104:13 113:22 114:12 115:13 116:6,14 117:7 120:17 123:15 124:9,14 130:4 131:18 137:20 143:17 144:22 146:12 147:21 148:4,13,21 149:21 150:2 163:3 175:19,23 181:6 183:11 184:4 186:13 190:19 195:13 197:19 216:16 217:17 223:12 224:8 231:6 239:17 240:2,13 246:17 248:5 255:16 263:9 269:24 274:25
**objections** 6:13
**obligated** 56:25
**obligation** 10:20 70:12
**observed** 102:4
**obtain** 184:24
**obvious** 107:2
**occasion** 23:16
**occurred** 234:2
**October** 193:7
**offense** 81:8
**offhand** 48:23
**office** 19:8,20 22:25 32:8 33:11 39:23 51:6,20 66:3 90:11,16 93:3,7,13,17,24 94:5,14,15,21 95:4,17,24 96:5 123:4,7 130:16,18,21

138:23 139:4,8 174:11,13, 14 214:24 216:6 218:22,24 255:14 260:16 268:20 269:2,7
**office-of-the-general-counsel** 238:17
**officer** 15:15 33:13,24 34:2, 8,14,21 35:2,3,4 146:2 187:22 188:2 232:6,18 233:19 234:3,12 235:12,15, 20 236:10 242:19,24 243:3, 20 244:3 266:22,24
**Officer's** 262:21
**offices** 9:12
**officially** 54:18 76:8 79:2
**OGC** 48:13 121:25 129:13 139:9 222:24 228:23 237:23 238:7,9 259:22 260:13
**OIG** 69:7 74:3 255:6
**ome** 37:10
**onboard** 32:18 44:3,11 45:22,25 54:18 77:5,14 80:10 171:16 181:19
**one-page** 127:6
**one-time** 15:2
**open** 12:3 26:25 138:9
**open-ended** 192:13 193:3
**opened** 11:24
**opening** 27:4
**operable** 69:6
**operating** 33:13,24 34:2,8, 14,21 35:2,3,4 268:23
**operation** 72:21,22 94:13 95:8
**operations** 47:14 94:23 189:3 201:4 215:25 225:22 226:25 227:5,15
**opinion** 196:22
**opinions** 187:17
**opposed** 106:4
**option** 66:4 123:2
**order** 34:10,11 43:3 53:13 61:16,25 117:17,23 119:18, 20 124:8 128:23 129:7 137:9 148:8 165:19 193:7 198:25 199:10 216:2 276:11
**ordered** 46:16 71:24 148:15 150:5 173:25 190:21 256:4
**Orders** 20:15
**organization** 94:24 95:7 246:19

organizations 269:8
original 120:24
OUS 73:19,24 74:6,13
  107:17,19 108:2,11,18,19,
  22 139:10 255:8 256:24
  257:10 259:22 260:12,20
  262:21 267:2,5,8,23
OUS' 262:20
OUS's 255:11
outcome 5:22
Outcomes 225:10
overbroad 62:13 96:3,7
  197:19 246:17
oversaw 267:23
overseeing 78:23 83:16,20
oversees 83:24
oversight 78:8 84:23,25
  270:11

**P**

p.m. 105:2 277:25
pace 101:25 102:3,9,20
  160:17,25
package 11:22,24 12:3
  28:12 29:4 88:19 89:2
packages 90:6
packed 242:4
packet 28:18 106:7 170:13
pages 18:18,19 21:23 112:6
  151:24 207:8,9,12,13 254:6
panel 48:25 49:3,6 52:24
  53:18 59:15 68:5,8,10 71:4,
  20,22 153:8 261:7,14,21
  262:4,7 267:3,9 276:6
panel's 261:18
paper 80:22
paragraph 68:7 107:14
  109:2,20 227:4 257:19
  261:6,12
parameters 65:8
part 35:18 42:9 45:14 48:10
  49:10,23 51:4 58:13 59:8
  77:6,14 78:9 94:18 110:13
  111:7 112:18,21,25 122:2
  191:13 200:14 203:8 224:2
  237:5 242:5,10 246:24
  265:8 267:20 269:15,21
part-time 177:25
partial 52:22

participants 5:3 270:19
participating 6:4
particulars 14:20 216:11
  217:6,7
parties 6:11 222:18,20
  223:11
parts 159:9
party 5:20
pass 101:14
passage 82:13,15
password 13:4
past 67:3 105:19 257:9
patience 129:20
Patrick 219:8
Patty 112:4 165:16 176:18
pause 71:18 225:17 226:3
  227:24 266:18 267:6,18
pausing 274:10
paying 15:23
PDF 12:19 28:4
pen 31:22
penalty 6:11
pending 11:15 68:13 103:4,
  9 115:9 155:14 158:7
  159:23 160:4 164:24 167:11
  168:7 169:17 182:12,14,24
  183:22 263:24
Penn 148:2
Pennsylvania 7:12
people 23:14 24:22 25:2
  42:8 47:20 48:12 49:5 58:8
  68:16 79:4,6,18 80:7 82:10
  94:15 131:4,6,8 150:14
  164:7 175:16 200:25
  210:15,16 211:2 222:17
  246:6 263:20 269:3,15,19
percent 35:13 50:8,23,25
  51:10,11 56:20 58:11,17
  59:16 61:4,15,19 70:25
  72:8,9 91:18 155:15 194:25
percentage 50:24
performance 59:10
period 44:6 45:21 47:24
  71:3,19,21 72:18 84:7
  100:24 107:21 108:13,21
  111:15 112:22 113:16
  114:6,9,18 117:6 121:6
  122:17 131:3 133:21
  134:17,23 145:18 157:12,15
  171:22 173:18 180:6 183:18
  184:3 242:20 272:23 274:11

periodic 20:11
periods 34:2 38:4 83:24
perjury 6:11
permanent 35:4
permissible 8:16
person 6:9 17:10 27:2 34:21
  50:17 77:7 79:12 84:14
  108:10 164:13 201:2 210:17
  211:22 228:19 243:11,17
  272:24 273:4
person's 51:12
personal 116:15
personally 120:11 201:11
personnel 174:16 185:2
pertinent 126:16
Phil 47:22,23 52:14 68:11
  130:19,24 228:18 262:8
Phillip 51:6,13 53:12
phrased 57:18 62:5
physically 6:5
pick 167:4
picked 59:4
pieces 232:15
place 14:12,15 23:11 88:6
  92:8 121:12 143:3 163:13
  173:20 198:11 200:15,20
  247:13
placement 119:7 198:13
  227:18 248:25
places 31:24 202:13,16
plaintiffs 6:18 7:19 100:10
plan 172:5 216:13 217:10,14
  218:7 224:17,18
platform 22:11 105:9
play 253:19
played 94:20
plenty 203:11 245:25
point 8:7 13:10 38:7 54:7,21
  65:10,13 72:3 80:25 81:12
  86:7,18 88:11 96:22 100:13
  107:9 110:10 126:7,8
  127:10 128:7 132:18 134:15
  135:22 138:13 140:16
  142:12,21 143:25 151:22
  155:2 156:5,11,17,25 157:8
  166:4 175:9 180:16 185:11
  186:21 188:20,23 191:25
  192:12 202:15 209:14 213:3
  215:4 226:16 230:5
pointed 127:18 261:11

pointing  152:3 205:16
pol  94:17 272:20
police  15:15
policies  92:4,6,23 93:10,13
94:18,19 95:2,25 232:11
242:14 268:13
policy  92:13 93:4,8,18,24
94:5,9,10,11,12,14,21,25
95:4,6,9,12,19,23 96:5,13
134:19,21 138:13,15,18,20
139:7,8,14,15,20,23 140:15,
23 141:12,16,18,24 142:2,4,
5,7,13,16,20,22 143:2,4,16,
24 209:17 211:7 212:9
216:12,25 268:3,5,9,16,21,
22,24 269:5,11,22,23 270:3,
9,16,17 272:20,22 273:11,
13,14,18,21,22 274:15
policymaking  94:13,24 95:7
pools  248:11
portfolio  39:14 224:3 267:21
posed  112:14
position  33:24 35:12,20
40:22 41:5,15 44:16 48:5
51:19,24 54:8 59:17 76:2
144:6 145:22 184:24 185:17
187:22 188:18 209:4,6
223:23 224:22 229:16
positions  40:6 175:17 177:6
178:5 180:20,22
poss  136:23
possibly  216:7 228:20
post  30:24
postdates  125:10 166:20
posting  30:5
Postsecondary  94:16 95:2,5
139:8 228:22 269:7 276:3
potential  64:24
potentiality  59:5
potentially  59:11 191:20
192:7 243:18
power  271:23
Powerpoint  125:3 127:20
136:9
practice  116:3
pre  58:19 147:16
precisely  235:25
preferred  70:9
prejudiced  64:13 193:10
prelim  65:20

preliminary  168:5,14 169:8,
14,22 227:19 229:10 230:9,
13,17,21,25 231:5,22
preparation  20:10,22 41:17
68:15 106:16
prepare  16:13
prepared  54:13 158:19,20
180:21 252:4
preparing  178:4 180:19
preponderance  204:10
presence  5:9
present  6:5 7:2 76:20
170:11
presentation  125:3
presented  37:17 257:24
258:13,22 259:8,10
presenting  191:25
President  149:19,23
presidential  145:23
press  19:2,5,7,8,10 77:7
193:23
presumption  149:13
pretext  64:13,23 65:7
191:19,22 192:6,14,15,24
193:3,9,19
pretty  173:15 242:3,4
255:21
previous  54:10,14,24 55:13
56:23 59:2 64:19 181:21
198:22 199:4 209:9 259:20
previously  13:15 24:23 25:3
30:16 66:22,25 68:18
100:12 106:12 125:2,7
189:8 200:18 201:13,16
206:21 219:21,23 220:4
primary  177:6
principal  78:7 164:13
167:14
principle  56:9 83:23 122:3
133:23 161:7 172:9 179:14,
16 259:7
printed  213:10
printing  208:8
prior  21:10 40:7,17 44:12
45:2,4,6 54:5 59:17,21
61:22 63:6 65:20 75:19
84:10 105:15 106:8 115:14
123:16 133:10 146:6 147:4
157:4 170:3 191:17 198:13
249:23,24 269:25

privacy  59:12
Private  5:7
privileged  52:6 57:5,14
60:12
probe  168:22
probing  191:21
problems  96:4
procedure  236:13 259:23
260:13
procedures  69:4 73:7,17,25
74:7,14,19 153:5,10,12,16,
20 259:19 262:23 263:3,6,
24 264:4 268:23
proceed  68:14,25 73:22
74:3 264:17
proceeding  5:4 69:6
proceedings  6:2 75:8
134:10 187:8 241:14 272:16
process  19:3,13 66:12 69:4
73:7,25 74:7,14 85:9,14
87:6,15 88:18 92:7 93:11,20
162:15 176:14 199:22
210:24 212:5 220:10,18
247:19 255:7,11 259:16
processed  259:22
processes  74:17 153:5,13,
21 262:16 264:16
processing  63:18 85:10
101:3 186:16 189:4 259:12
produced  9:19 170:8
production  20:10
profile  26:3,5,8,10,13,14
29:10,21,23 30:9,19
program  69:8 71:5 74:4
83:16,21 84:15 115:8 153:4
156:2 200:12 268:11
programmatic  154:6,13
programs  45:15 78:9
progress  109:6,14 158:8
160:10,11
project  182:6
projects  41:23
proper  55:3 185:22 216:2
proposal  51:8
proposed  257:20
protect  19:4,13 60:8 61:16,
25 62:11 148:14 150:4
protecting  62:15
Protocol  201:24 202:3
204:25 205:9 206:22 258:5,
8

Protocol' 257:24
protocols 199:9,15,20,23
  200:15,20 257:21 264:16
provide 58:13
provided 59:7 61:5 103:18
  199:3 255:9 267:2,5,8
providing 72:7 177:8
  267:11,14
public 7:10 141:24,25
  145:17
publication 273:19
published 141:25
pull 18:8
purports 107:4
purpose 49:16 273:14
purposes 204:21 237:5
  260:4
Pursuant 262:20
put 9:4,7 26:9 29:20,23
  30:12,13,20 31:5 36:2 37:13
  52:15,16,18,20,24 53:12
  59:9 60:23 71:18 72:11,13,
  18 118:2 128:15,17 135:7,
  12,14 136:16 137:10,19
  139:20 140:23 159:8 176:20
  187:21 236:14 247:15 251:3
  257:9 276:6
putting 90:13

## Q

qual 198:7
qualified 51:7 245:6
qualifies 264:12
qualify 198:3 232:10 242:13
  243:7,15 244:19 264:21
  265:25 266:9,21 267:16
qualifying 198:8 262:16
quarter 103:2,6,19,24,25
  167:12
question 8:15 10:18,20
  11:2,6,8,15,16 31:14 36:5,
  18,21 44:20,21,23,24 46:13,
  15 47:6,9,10 50:9 52:11
  53:9,22 55:20 56:6 57:7,9,
  13,15,18,22,24 58:2 60:2
  61:23,24 64:10 65:2,14 81:8
  83:19 84:11 91:3,20 93:15
  96:8 97:3,4 98:9 101:22
  112:14,21 114:2,13,14
  116:17 119:14 120:5,7,24

121:21 123:17 124:15
125:20 129:11 130:6 135:13
140:8,13,21 142:8 143:22
144:25 145:10 147:10 148:5
150:15,18 163:5 165:22
166:14,16 167:2,7 169:10
171:11 173:2 175:25
176:17,24 177:5 178:17
179:12,13 180:13 181:9
184:8,10,12 194:4 195:16
200:19 203:5 206:2 211:18
217:21 219:18 230:4 231:18
236:16 238:22 246:8 247:25
250:8 255:20 256:16,18
257:4 260:5 263:12 265:20
275:20 276:14
questioning 147:7 148:22
  192:25 208:25 256:14
questions 8:18 10:3,16
  36:25 37:10 101:15 112:3
  121:10,15 129:23 165:15
  168:19,25 219:17 225:18
  235:25 245:16 249:8 250:5,
  23 260:25 271:5,8,14,21
  272:2 277:10
quick 81:9 144:17 225:7
quicker 160:15,19
quickly 161:2 271:17
quo 152:15

## R

race 119:7
radar 37:13
Raguso 5:17
raised 50:9 62:21 212:9
  218:10 219:18 249:9 250:6
raises 211:6
raising 200:18
ran 84:23 182:13
range 50:24
rate 37:4 195:2 227:18
  249:10
rates 198:14
reach 9:4,7,8
react 55:17
read 10:25 11:2 25:4 44:22,
  24 47:10 67:23 73:5,20
  106:18,22 109:3 110:11
  112:17,24 126:16,23 127:7
  136:6,7 152:9,23 154:2

155:9,17 158:4 159:2
165:22 166:14 167:2,18,25
168:3 176:24,25 177:16
182:9,21 189:15 202:5,13
203:17,20,23 213:5 217:3
218:13 221:8,10,12 222:17
223:15 224:5,7,22 226:21
229:5 232:3 234:8 235:7,10
246:7 253:12 255:2 257:20
259:14 261:11,17 262:13
264:7 266:17 277:16
reading 69:9 74:5 109:19
  110:5 166:2 178:6 190:10
  194:10 211:13,15 221:6
  225:16,17,21 227:25 233:14
  235:24 245:17 258:21
  263:15
reads 68:7
ready 209:25
real 273:13
realize 214:7
realm 116:16
reason 9:20 11:19 81:9,11
  111:12 115:16 126:2
  127:11,23 128:7 134:19
reasonable 183:5,24
reasons 113:14 191:16
  192:7
reassigned 224:13
recall 12:25 13:9,11,16,20
  14:9,11,14,19,20 15:6,10,17
  16:10 17:3,18,20,23 18:7
  20:7,12 21:3 30:5 43:7,13,
  24 44:5 45:12,19 47:3 48:4,
  22 49:8 50:16,25 52:19
  54:15 58:15 60:5 63:5
  69:23,25 71:8,12,13,15,22,
  23 72:12 73:3 74:22 75:21
  77:22,25 79:5 83:10,14 86:8
  87:5,10,16,22,24 88:15,18,
  25 89:3,8,10,16,17,25 90:7
  92:2,7 93:2,11,16,22 94:2,4,
  8 97:9,10,18,24 98:15,18,21
  99:6,15,21,24 100:4,17,22
  102:5,7,13,16 104:7 105:16,
  20,22 107:19,22 108:17
  111:16 114:7,8 115:14
  116:11,16,22 117:20,25
  118:2,7,12,23 119:9,15,16
  124:20,22 126:14 127:17
  129:15 132:14,15,19 133:2
  135:9,10 138:18 139:18,24
  141:20 144:2,16,20 150:22

151:16 152:18 153:15,23
154:9,11,12,13,15,16,21,24,
25 155:3,6 156:13,17 157:2,
9,13,16,20,21,23 158:14
159:5,11,13,19 160:10,16
161:3,23 162:8,14,17,18,23
163:8,9,10,11,12,15 164:6,
15,20 165:3,8 169:5,6,12,19
170:6 172:14,16,22,23
173:2,3,6,7,8 174:9,11,23,
24 175:3,10 176:2,11,15
179:15,21,22 180:8,9,24
184:20,21 185:2,7,9 186:6,8
187:14,16,24 188:5,7,11,12,
15,16,25 189:6,22 194:10
196:7 197:16 198:10,11
199:13 201:8,25 202:4,8
208:10 209:24 210:21 213:2
214:10,16,18 215:3,10,11,
23 216:8 217:7,12,23
218:12 228:19 230:7,11,24
231:20,21,24 234:10 236:21
237:7,9 238:11 239:9,13,21
240:5,7,10 243:9 244:16,17,
21 245:12 248:8,13 251:17,
22 252:2,9,22,24 254:20
256:22 258:11,20 259:24
260:6,7 262:8,9,25 264:2,3,
5,18,22,23 266:10,12,14
267:19 268:20 270:19
274:5,18,19,20 275:17,19
**recalled** 244:6
**recalling** 81:10
**receive** 11:22 13:12 56:19
88:19 95:5 175:7 225:23
227:2,6 229:7
**received** 28:19 29:3 85:7
90:5 221:21
**receiving** 71:9 89:2 264:18
266:10,12
**Recent** 112:12
**recently** 168:4 252:19
**reception** 22:20 23:9,17,18
24:13
**recess** 6:23 75:7 134:9
187:7 241:13 272:15
**recognition** 54:24
**recognize** 67:7 125:9 140:9
166:20 171:6 189:18 194:18
208:16
**recognized** 56:22 149:12

**recognizing** 66:11 199:22
**recollection** 22:7 33:23
34:13 36:13,14 37:23 38:4
68:2 72:10 82:2,8,12 90:10,
20 102:20 113:18,24,25
114:3 115:20,21 118:20,22
119:11 125:25 128:6,13
137:7 157:25 168:17 176:9
179:24 212:19 219:10
221:4,16 222:5 236:8,12
238:2 241:3 248:9 258:2,25
261:24 262:2 267:5,11,17
**recollections** 82:5
**recommend** 52:3
**recommendation** 52:11
68:24 69:18 108:8 141:13
262:12,19 264:7,13,14
265:12,18,21 266:3
**recommendations** 68:13
216:10 261:7 276:17
**recommended** 66:5
**recommending** 273:5
**reconstitute** 37:15
**record** 5:3,7 6:2,16,22 7:7,
21 8:12,17 9:6 10:3 26:25
27:9,12,14,16 38:9,22,24
39:2 53:3,5 75:6,10 104:24
105:4 106:7 111:18,24
112:3 126:18,21 127:2
134:6,8,12 136:12 168:3
177:17 187:6,10 204:13
205:15 241:10,11,16 270:24
272:11,18 277:22
**recorded** 5:4,5
**records** 58:22,24,25 216:3
**recruited** 41:6,8
**redacted** 207:10
**reduce** 164:24 168:7 169:16,
24
**refer** 12:13 25:19 194:8
**reference** 236:22 245:14
250:14
**referenced** 65:12 230:24
**referred** 68:17 87:19,23
**referring** 53:13 140:25
190:23 191:22 233:12
**refers** 74:9 180:25 256:19
**reflect** 29:20 136:12 139:22
**reflected** 34:11 93:19
**reflection** 22:2

**reflects** 29:9 31:19
**refresh** 22:6 37:23 98:20
117:2 128:13 130:12 219:5,
10 221:4,16 222:5 228:8
253:10 258:2 267:4,10,17
**refreshes** 128:6
**regard** 270:18
**Regional** 252:5
**register** 141:25
**registered** 255:15
**regularly** 15:12 49:5,8
78:15,17 183:19 196:3
**regulations** 69:5 74:2,8,10
152:12
**regulatory** 139:17 152:14
**relate** 191:4,6 255:23
**related** 5:20 31:12 36:25
44:14,16 108:15 148:11
149:16 153:20 158:7 159:23
160:4 166:23 209:23
**relates** 64:10 193:22
**relationship** 80:16
**relay** 236:10 237:3
**relaying** 236:9,14 243:20
**release** 19:2,5,7,11
**relevance** 44:18
**relevant** 63:15,23 64:4 65:4
147:8 149:2 193:4 256:3
**relied** 196:18 198:25
**relief** 50:8 52:3,22 58:11,13
59:16 60:9,20 61:8,19 62:3,
19 70:25 72:7 85:8 86:2,7,
24,25 87:8,12,23 91:13,17,
22,25 125:22 127:13 128:9,
11 204:13 263:8 275:10
**reliefl** 152:17
**remain** 154:5
**remained** 160:21 177:23
**remains** 164:14
**remarkably** 206:20
**remarks** 21:10,14,20 22:2
151:12 152:5 158:17 182:8
189:9
**remember** 14:25 41:9 43:11
47:4 51:18 72:13,19 79:9
81:15,16 87:20 89:2,3
96:14,20 100:23 104:3,4,10
117:3,24 128:16 133:16,17
156:20,21,22,24 157:24
158:25 161:20 162:2,12
164:9,21 165:8,11 172:18

198:17,20 199:16 201:2
202:10 210:6 212:10,12,19,
25 214:11 216:11 217:2
222:12 233:16 234:14
236:5,11 238:15 243:16
269:3
**remembering** 102:15
**remote** 5:9,17,25
**remotely** 6:7
**remove** 15:24 18:18
**rent** 15:23
**reopening** 273:15
**reorganized** 207:24
**repayment** 25:16,24 46:6
125:4 220:7,10 268:13
**repeat** 10:22 17:11 44:21
47:9 53:9,23 61:24 83:19
84:12 97:4 98:9 111:2
114:2,14 120:3,24 124:16
150:15 154:19 198:5 247:25
**repeated** 121:11 150:18
**repeating** 203:6
**rephrase** 52:13 53:25 57:25
178:16 181:9
**replaced** 144:6
**replicated** 202:12,16
**report** 75:24 80:21 88:7
99:19 101:10 102:15
214:14,19 215:7 216:15
217:8,11,15 218:14,17,19
219:7,11,13,14 220:8,15
221:5,8,16,17 222:5,15,16
223:9 224:16 225:21
229:17,25 232:25 241:19,21
244:24 252:8,13 253:2
254:10,11,15 255:6 259:15
260:3 266:18,21
**reported** 75:25 76:2 78:11
80:8,12 81:2 84:16
**reporter** 5:23 6:3,25 9:17
11:3 27:23 44:23,25 47:11
**reporting** 6:6,14 79:24 80:15
81:14 115:25
**reports** 20:10,11,12 99:21
227:21 229:13
**represent** 10:12 26:11 30:7
103:17 117:13 132:3 170:7,
13 213:17 250:25 261:13
**representation** 30:15 31:2
60:23

**represented** 10:8 68:16
202:12 207:19 242:23
**representing** 182:17
**represents** 171:16
**request** 5:6 11:15 161:10,
16,19,20 162:9,13,18,25
180:3 186:6 215:18,22
218:23 221:8 262:14 264:9,
18 265:21 266:6
**requested** 11:2 44:24 47:10
220:16 265:19
**requesting** 69:7 74:3 162:16
271:7
**requests** 179:25
**require** 123:21 255:8
**required** 56:13 128:21 129:2
133:22 154:4 166:13 273:18
**requires** 216:13
**resign** 145:20
**resolution** 92:10
**resolve** 46:9 68:13 196:6,8,
10,11
**resolved** 54:21
**resources** 166:12 167:9,16
168:6 169:15,24 172:24
**respect** 52:3 61:12,13
259:18 264:14
**respective** 9:12
**response** 112:2 167:23
177:15 180:18 192:12
217:11,15,22,24 218:3,5,6
252:7,15,21 264:14,25
265:4,8,13,14 266:2
**responsibilities** 45:14 95:21
132:16
**responsibility** 41:18 55:15
79:2 133:4 139:10 151:6
182:22 208:19 209:2
269:12,14
**responsible** 78:22 95:18
114:22 115:23 246:6 272:24
273:4,7 274:3,9,13,14
275:14,16
**rest** 110:5,10 111:8 204:14
**restate** 58:2 65:14 195:16
**restroom** 134:5
**result** 117:17,22 128:22
129:5
**resulted** 49:22 52:23 59:14
60:8 68:4

**resume** 29:24 30:9,15 31:7
34:10 116:19 262:15
264:10,19 265:22 266:7
**resume-type** 26:14
**retained** 34:22
**retire** 145:19
**retired** 41:11 145:3,5
**retirement** 145:14
**retract** 251:7
**review** 24:18 29:12 48:24
52:23 53:18 59:14 66:3
68:5,8,9 69:7 71:4,20 74:4
85:10 87:5 108:8 119:17,19
153:7 154:3,5 159:16
176:14 187:18 196:3,19
197:12 199:17 200:12,20
202:2 204:24 205:8 206:22
209:25 214:21,25 216:8
218:17 219:14 220:17 223:9
225:25 227:16,18 229:6
247:19 252:7 257:24 258:4,
7 259:19 261:6,14,20 262:4,
15,23 263:3,7,24 264:4
267:3,9 269:16,20 276:6
**reviewed** 17:24 19:21 20:22,
25 21:2,10 85:24 106:15
195:7 197:23 200:14 226:13
232:11 242:15
**reviewing** 31:21 64:2,7
153:5,12,21 177:8 191:5,11
192:8,17 196:12,23 221:15
226:8 273:23
**reviews** 88:6 216:6
**revised** 12:19,25 28:2,23
**revising** 62:19
**revisited** 16:16
**Riemer** 49:13 68:11 117:19,
21 119:21,23 120:4,8,19,21
132:8,11 201:3
**Riemer's** 121:7
**right-** 213:16
**right-hand** 202:22 206:14
213:7
**rights** 194:15
**Robert** 43:11,15 79:8 164:9
**role** 14:17 39:8,18 40:14,18,
25 41:14,23 42:13,14 43:24
76:4,6 79:19,22 80:8 83:20
84:2 85:6 92:10,24 94:21
188:19 189:5 223:25
229:15,18

roles 38:5
room 6:6 8:7,8,22 9:2
rose 165:10
Rosenfelt 47:22 68:11
 130:20,21,24 228:18 262:8
roughly 155:15
round 182:13 183:4
routinely 223:5
Roxbury 16:8
Rreview 201:24
rule 53:14
ruled 59:10
rulemaking 21:11,13 22:3,4
 151:7 182:23 189:10 273:15
rules 8:4
rush 126:14

## S

sat 258:19
satisfied 101:25 102:3
satisfy 203:18
Schmoke 79:14 80:9,17
 85:4 132:17,22 133:3
 187:20 188:4,8,12 262:9,10
Schmoke's 132:16
school 64:22 114:24
schools 59:24 62:18 119:16
 149:20 158:8 159:23 160:5
 198:18 213:17
scope 44:17 46:12,16 55:19
 63:10 144:23 146:13 147:7,
 22 148:6,14,23 149:22
 150:3 175:24 190:20 195:14
 216:17 255:17
screen 53:7
scrutiny 204:14
search 34:25
secondary 228:21
seconds 221:25 253:18
Secretary 19:25 23:20 32:8,
 9,15,19,24 34:5 40:9 47:22,
 23,25 48:18 54:14,21 55:5,9
 56:23 58:12 64:21 65:17
 66:17 67:11 68:18,24 69:12
 73:2 76:2,4,13,14,25 77:2,8,
 9,11,19,20 78:2,6 90:12
 93:21 94:22 95:9 112:2,17,
 25 121:17 122:2,6 123:13,
 19,24 140:3 141:2,5,9,10

157:5 165:16 166:15
 172:21,23 173:5 176:19
 177:17 179:2 208:22 209:7,
 12,14,22 210:7,23,24
 214:20 215:2,9,14,17,20
 218:25 223:2 227:22
 228:17,18,21 229:13 238:24
 239:3,14,19,23 240:5,8
 261:7 262:8,21 269:4,19
 276:2,3
Secretary's 55:8 64:9 65:25
 93:9,12 152:16
security 14:22 59:7
seek 79:13
self-employed 146:7
Senator 112:4 165:16 167:3
 176:18
send 215:17 252:14
sending 78:2
senior 32:8,14,19 34:17
 40:9,14,17 76:7,10 78:15
 79:12 80:23 146:3 208:21
 209:17,19,20,22 222:24,25
 224:13
sense 25:21,22 41:21
 183:21
sensitive 82:9
sentence 74:5 109:3,20
 110:5,7,8,11,12,13 112:25
 151:21 152:23 153:25
 155:10,17 158:5 167:20,21
 168:12 189:15 194:16 197:9
 227:3 228:2 231:25 232:14
 233:11 234:22 241:21 242:3
 245:3 247:5 261:12
sentences 167:19,22 168:2,
 11
separated 177:21
Separately 77:22
September 40:23 164:2,5
servant 145:17
serve 7:25 9:19 35:19
served 34:13,18 35:6 38:5
 39:15,21 40:9
service 14:22 31:5 146:3,4,5
 173:21
serving 14:21 36:6 40:17
session 21:13 151:7,12
sessions 21:11
set 12:7 52:24 65:7 69:4
 73:6,25 74:7,14,17,19

134:23 136:18 139:12
 142:23 149:16 198:2,8
 212:7
setting 73:16 191:18
settled 71:17
seventeen 170:17 171:6,9
shared 269:12,13
she'd 123:25 224:21
short 36:20 74:24 127:4
 133:25 156:20 157:17,18
 199:22
short-term 156:2,19
shorthand 25:20
shortly 21:15 46:25 79:11
 81:5 223:8
show 126:22 170:12 200:2
 219:18 240:20
showing 64:12 126:12
 135:16 191:19 193:8
shown 136:12
shows 69:16 170:9,14
side 36:3 138:12 206:14
 208:24 213:7,16
SIG 254:17
sign 18:4,6 55:15 66:5,6
 108:15 277:17
signal 266:4
signature 90:7 106:21 210:2
signed 18:10 19:21 54:16
 66:11 67:17 68:25 69:13,24
 70:3,12,14,23 94:7 108:16
 109:10 110:17 118:18
 133:12 141:3,10
significant 46:19 49:14
 104:12 161:9 173:18
significantly 163:16 164:17
 180:13 181:25
signing 94:4
signoff 90:7
similar 139:25 205:11 207:3
simply 12:18 173:5
sir 113:24 115:6 116:5
 117:10 118:5 131:6,20
 136:23 137:22 138:11
 142:20 147:23 150:12
 151:15 152:3 155:22 182:21
 186:15 203:5 210:4 224:10
 232:20 235:8 240:4,15,19
 260:2
sit 33:22 36:14 102:19
 104:15 118:19 186:5 236:4

239:22 240:16,18
**sitting** 9:11 189:23 210:17 211:2,22
**situation** 56:11,13 58:22
**sixteen** 170:14,25
**skimmed** 234:9
**skip** 67:3 220:5
**slide** 125:18 127:6
**slow** 160:12,13
**slowdowns** 83:4
**small** 8:25 94:14 160:19
**smaller** 76:12
**Social** 59:7
**solid** 143:20
**sort** 26:17 158:18 175:12
**sorts** 27:5
**sound** 103:12,13,20 104:2 115:5
**sounds** 258:24
**space** 15:24
**speak** 8:19 22:11,14,18 23:22,24 24:3,6,9,12 49:22 58:8 209:7,22 217:6
**special** 14:22
**specific** 48:14 49:21 57:9 72:20 102:7 121:15 124:18 155:18 161:20 173:2 176:5 215:23 261:23 262:2 266:11,13
**specifically** 17:3 20:8,16 22:9 45:19 47:3 50:14 52:2 55:25 72:13 73:3 76:6 94:9 98:15 100:7,22 102:16 104:10 109:15,19 117:24 118:25 119:9 155:6 162:2, 12 164:6 173:3 174:12 175:3 179:21 184:21 187:19 188:9,15 197:8 204:5 208:10 210:6 212:10 216:7 217:2 222:14 233:16 245:12 248:19 251:17 273:22
**specificity** 218:12
**specifics** 118:12
**speculate** 137:4 211:9
**speculating** 117:10 136:25 137:2
**speculation** 56:5 91:9 104:13 113:23 117:8 163:4 181:7 184:4 186:14 217:18
**speculative** 96:2

**speech** 158:18
**speeches** 159:15
**speed** 48:3
**spell** 43:18
**spelled** 51:15,18
**spend** 16:25
**spending** 85:4
**spent** 49:14 250:4
**spoke** 75:15 159:6
**spokesman** 77:7
**spring** 138:13 142:5,13 143:5 153:2
**spun** 147:17
**stack** 26:18
**staff** 34:21 41:20 77:2,4 158:23,24 160:19 161:5,7,9, 11,14,17,22,25 162:4,6,10, 16,19,25 164:15,17,24 167:9 170:15,18,20 171:2, 13 173:10 176:13 177:4 182:3 183:3,21,23,25 185:6 186:3,7 197:23 269:3
**staffers** 43:13 170:9
**staffing** 160:22 163:13,14, 21,24 167:15 169:25 172:8, 21 173:5 180:16 182:6,7 184:16,18,24 185:11,15,19, 22 186:10,16 188:7,13
**stamp** 206:13 207:17 213:7 220:23
**stamps** 225:3
**stand** 72:15 160:2,7 197:8
**standard** 268:23
**standby** 75:9
**standing** 47:17
**stands** 184:5
**start** 33:19 40:22 61:13 72:20 74:11 181:18 182:19 199:12 246:11 247:5,9 270:12
**started** 28:13 34:17 35:10 47:16 72:16 76:7 133:17 157:7 171:25 200:23 223:23
**starting** 110:11 153:25 155:10
**starts** 225:13
**state** 7:20 14:14,23,24 65:6 145:13 152:16 160:9 175:23 202:19 203:9,10 245:6 247:23 248:18

**stated** 106:15 138:21 184:2 193:19
**statement** 5:25 10:25 65:7 84:21 115:5 127:17 152:19 158:9,12 169:21 238:7 266:17
**statements** 107:3
**states** 109:20
**stating** 6:15 194:4
**status** 41:25 47:17 55:10 152:15 188:20
**stay** 145:16,17 266:23
**stayed** 34:23 145:18
**steady** 171:12
**step** 11:7 85:9,14 87:15,19, 23
**steps** 49:18 87:17 88:15 160:24 161:4
**stipulation** 183:15
**stop** 40:24 96:17,23 97:7,22 113:20 114:4,10 116:4 117:5,15,21 119:24 121:4, 18 128:21 129:4,18 130:2 131:2 133:20 137:9 143:13 236:6,17 237:6,10,16 243:6, 13 244:9 258:16
**stoppage** 122:15 127:24
**stopped** 23:21 36:6,15 58:23 97:11,16,20 98:3,13, 16 113:15 116:18 226:8,11, 16 259:2
**stopping** 123:21 239:15 244:18
**straight** 183:9 205:18
**Strata** 146:20
**Stratta** 147:11,16
**Street** 5:19
**strengthen** 264:15
**strident** 189:17,20,24 190:3, 4,12,24 191:23,24 193:25 194:9,14
**strike** 56:20 59:21 67:14 83:6 91:20 92:19 95:11 104:12 140:18 273:24
**strong** 64:12 193:8
**structure** 31:4
**structured** 218:9
**student** 25:17 33:11 35:8 47:17 59:23 61:2 72:6 114:25 146:19,21 147:20 148:12 149:25 194:15

195:21 220:7,9 245:20
268:12

**students** 64:21 115:3
118:25 119:2,3,6,10,12,13
155:16

**stuff** 168:19

**subject** 64:22 125:23 127:13
128:10

**submit** 232:7 233:20 234:4,
13 235:5,13,16,22 242:25

**submitted** 66:22 112:3
118:13 165:16 201:21
204:21 259:20

**submitting** 266:18 267:7

**subsequent** 197:9

**subsequently** 45:21 199:19

**substantially** 168:7 169:16

**succeeded** 39:22 144:10

**successful** 61:7 153:6,14

**sufficient** 85:25 86:6 181:4,
14 183:22 196:13,16 204:13
247:2

**sufficiently** 63:7 206:15

**suggested** 30:21 31:11
50:13,14 52:15 53:12

**suggesting** 58:16

**suggests** 255:6 266:22

**suit** 64:19

**sum** 193:8

**summer** 79:16 100:3

**superimposed** 213:11

**superseded** 249:13,18

**support** 5:18,24 247:22

**supported** 161:7 245:5
247:23

**suppose** 276:5

**supposed** 247:12 260:25

**surprise** 178:22 195:5
223:17 224:10 227:7

**surprised** 173:19,23 194:11,
24 223:14 224:6 226:24

**surprises** 178:21 224:11

**Sweet** 5:15 100:6

**swing** 259:3

**sworn** 7:9

**symbols** 210:15

**system** 17:14

## T

**tab** 12:13,17 26:18,20,21
27:18,22,25 28:4,11,21 29:6
37:20 66:21 73:13 106:6
111:17,19 124:25 135:25
136:8,12 138:3 140:4,9,11
142:12 150:23 165:13
176:17 182:9 189:8 201:13
204:17,19 205:20 206:5
219:20,25 241:17 244:23

**tabbed** 12:7,8

**table** 51:2 63:4 225:9

**Tabs** 12:10

**taking** 9:18 41:17 82:23
186:6 223:25

**Talbert** 42:19

**talk** 10:2,4,5 25:6,9,11 29:16
70:4 120:2 166:15 177:2
232:3 246:8,10,18 247:5
273:17,20

**talked** 16:15 54:19 71:14
75:14 184:25 185:4

**talking** 39:3 121:3 129:12
140:9 142:2 149:7 171:22,
24 197:10 205:23 230:23
232:22,24 235:21 237:12
252:16 253:6 258:12 260:5
261:14 272:19 273:12,13
274:17

**talks** 260:23 261:6

**target** 181:22

**taxpayer** 50:2 60:4 61:11,16,
25 62:8,12,16,24 63:8 72:5

**taxpayers** 19:4,14 58:21
59:25 60:8,19

**team** 27:3 40:20 41:6,11
42:4,7,9,14,17,18,25 44:6,
13 45:3,6,11,15,18 94:14
145:15 146:7 147:5 153:2
199:19 257:25 258:4,14,16,
19,23 259:2,6,9 269:16,21
276:6

**technical** 65:8

**technician** 5:18

**telephone** 17:10

**telephones** 8:23,25 9:2

**telling** 236:4 258:11

**ten** 38:11,16,19 50:25 51:10
72:8 78:15 134:4 183:3,6

208:16

**tenant** 15:22

**tendered** 66:25 106:12
125:7 201:16 219:23

**tenure** 20:4 78:24 79:3
86:25 88:12 96:23 97:6,15,
19,25 98:11 100:19 101:4,
24 102:11 124:11 125:10
127:21 156:16 164:22
169:4,18 180:23 181:11
186:12 196:25 212:5 231:18
237:14 248:7,14 251:7
257:3,11 267:21 268:10
269:2

**term** 156:3,20 157:18

**terms** 59:15 60:5 72:20
76:22 84:21 88:7 102:14
104:3 163:14 223:21 244:4
276:8

**testified** 7:11 15:12,21 16:6
65:16 117:14 120:19 127:22
132:5,7,13 140:20 223:15
224:7

**testify** 14:25

**testimony** 6:10 11:20 14:3
15:4,10,18 16:11 61:22
75:19 84:10 105:15 112:2
115:14 123:16 238:16
269:25 277:22

**text** 78:3 225:13

**Thanksgiving** 44:8

**Thantingview** 257:18

**Theresa** 5:15

**thing** 15:2 73:20 123:12,18
136:6,8 163:19,20,22
170:24 205:12 207:8 216:4
226:23 238:21 244:5

**things** 8:23 27:5 30:4 31:4
56:12 61:10 81:15,23 90:6
145:14 154:21 165:19
166:22 207:25 211:14
251:18 261:5 271:16

**thinking** 38:14 58:8 60:4
62:7 132:17,24 190:10
228:16 273:3

**third-in-command** 114:17,
20 115:8,23 129:8 131:17
135:5 183:17

**thought** 50:7 121:12 178:23

**thousand** 208:6

**threshold** 204:9

throw 101:19
thrown 37:16
Thursday 5:13
tier 125:22 127:13
Tiered 128:9
Til 143:10
time 5:14,23 6:22,24 7:7
10:15 13:18 14:8,21 27:12,
16 28:7,15 33:23 35:13,14
38:4,22 39:2,8 41:11 44:2
45:10 46:3 47:6 48:11 49:14
71:3,19 72:15,18 75:6,10
76:12 77:3 78:20 79:13,14
82:13,15,23 84:6 85:4,11
88:11 93:6 96:22 97:15,19,
25 98:10,22 99:12,15
102:11,18 104:24 105:4
107:21 108:13,21 110:2,24
111:9,15,23 112:11,15,19,
22,23 113:2,10,11,16,21
114:5,9,17 116:8 117:6
118:17 121:5,8 122:17
124:7,17 127:2 128:2 129:9,
12 131:3,13 132:15,18,21
133:8,12,21 134:8,12,17,23
135:5,10 143:6,9,12 145:18,
19 151:3 154:7,17,22 155:2,
21,24 156:5,11 157:6,11,15
158:14 159:22,25 160:17,21
161:8 162:5 166:16,17,21,
24 168:23 169:13,22 170:5
171:8 173:18,22,23 177:24
178:18 180:6,7 181:3,10
182:24 183:3,18 184:3
187:6,10 195:7 200:15,21
206:7 208:20 216:24 217:20
223:21 225:16 228:5,22,24
229:16,20,22 230:5 232:21
233:3 235:8 237:14 241:12,
16 247:6,7 258:25 260:14
271:2,15,16 272:3,5,13,18,
24 274:11 276:12,15,21
277:13
timeline 33:20 40:6
times 14:6,7 16:18 29:25
47:23 49:7 78:14 203:11
204:11 231:16 240:14
timing 97:14 248:6
tired 263:14 270:24
title 19:10 32:21 42:15,16
139:21,22 140:22 141:17
143:23 206:9

titled 125:4
today 5:13 7:24 10:9 11:20,
23 13:22 25:7,17 26:17 29:4
33:22 36:14 37:17 81:10
82:2,8 102:19 105:15
118:19 171:16 174:17 186:5
189:23 236:4 239:22
240:16,18 250:23 277:13
today's 16:14 20:22 28:25
106:16 185:10 277:22
told 164:20 194:11
top 125:20 151:5 166:3,6
205:23 206:8 207:17 213:7
233:8 241:24 245:2 253:2,3
topic 43:4 63:14,23,24 64:5,
10,16 193:22 209:21 256:6
271:5,14
topics 44:18 64:17 65:4,9
149:5,15,17 191:7,18
192:21 193:4,18 194:5
256:4
total 17:5,7,8 112:6 170:14,
17,25 197:12
totaling 167:12
tough 208:9
transcript 9:19 21:19,23,25
151:11 152:6
transcripts 24:19
transfer 198:15 225:25
227:16 249:10
transition 40:19,20 41:5,11
42:3,7,9,24 43:25 44:13
45:3 144:12 145:15 146:7
147:5 199:19 200:13,22
transition-- 42:17
transpired 224:20
trial 14:11,15,21
trouble 27:3 81:10,13
true 61:20 62:4 72:23 73:4
107:6 158:10 159:21 194:20
204:8
Trump 34:3,4,15 36:7,16
38:6 39:4,19 40:18,20 41:5,
19 42:2,24 45:3 83:22 88:12
98:11 100:20 102:11 146:7
147:5 148:19 150:6,10,20
173:10 180:23 181:11
185:13 250:10 251:4,6,12,
14,21
Trump's 70:10
truth 172:15

truthful 11:20
turn 26:18 67:6 106:6,19
107:7,11 111:17 112:8
124:25 125:15 150:23
151:17 152:8,21 154:6
155:7 158:2 165:12,21
176:16,22 189:7,12 204:17
207:18 210:3 213:4 224:25
241:4 244:22 252:25 257:15
tweaks 154:6,14
twenty 163:25
two-family 15:22
type 17:14 30:4,9 135:12
139:7 142:7,16,23 169:14
175:8 216:3 244:5 255:10
typed 31:6
types 146:10 199:21,25

---

### U

U.S. 5:18,24 23:12 33:12
69:3 112:3 151:5 183:19
252:6
uh-huh 9:22 67:8 112:5
140:6 171:10 226:6
uh-uh 9:23
ul 246:23
ult 50:19
ultimately 48:17 49:10 50:20
52:20 54:24 58:16,23 61:10
67:23 72:8 77:8,13 87:4
94:19 122:22 145:21 164:11
209:11 246:23
un 74:15
uncovered 154:3
underneath 78:5 115:24
225:12 262:12
Undersecretary 33:7 34:18
39:18 40:4,8 75:23 78:8
83:17,18,22,24 93:3,8,14,
18,25 94:6 95:18,24 96:6
108:4,11 114:16 131:12,17
138:24 139:5 143:8 163:14
180:6 183:19 209:15 211:23
212:6 217:20 222:10,23
224:15 228:2,5,14,25
229:24 230:19 237:15
243:18,25 255:15 260:9,16
262:15 263:2 264:10 265:22
267:22 268:21 269:2 275:25
Undersecretary's 276:18

understand 9:15,23 10:21
11:10,17 12:14 31:18 45:15
46:3,8 49:17 54:20 55:12
81:24 83:3 94:16 107:3,11
110:8,9 126:4 130:7 145:7
160:21 163:16,20 168:20,24
173:12 185:16 196:9 221:11
258:24 265:7,10 268:8,17
understandable 30:11
understanding 10:14 45:9
50:3 54:4 56:2,7 59:20 71:2
85:5,20 86:19 96:23 97:7
107:5 115:7 118:15 128:25
129:7 171:25 180:10,11
190:11,13,15 196:5,15
197:3 229:14 233:2,4
247:18 268:2,6
understands 126:24
understood 118:18 127:10
211:16 230:12 263:16
undertaken 168:23 169:3,8
undertook 169:14
undoubtedly 189:18 194:19
unhappy 56:8
unidentified 24:15
uniformly 217:22
unintelligible 15:13 120:2
145:4 149:18 192:11 223:4
248:25 270:22
unique 257:21 259:19
unit 5:10 69:4 73:6,19,24
74:6,13 79:16 84:20,23
85:3,6,21,23 86:11,22 87:4,
12 88:7 90:19,21,25 91:2
92:15,22,25 95:15,19,25
96:6,12,17,22 97:6,11,16
108:7 116:2 133:4 145:5,12,
17 162:7,11 163:24 164:10
170:10 183:7 198:25 199:5,
9 201:5,23 202:2 204:24
205:8 206:21 212:22 219:15
227:11,14 247:20 257:23
258:4,7,10 262:22 270:2,6
Unit's 92:5
units 176:7 214:22
university 15:15,16
unpack 234:22
unpleasant 192:3
unreasonable 115:12
unreasonably 100:10
unsupported 257:22

unusual 90:17
updated 84:3 208:11,13
USA 147:15,16,17,18
UTC 5:14 6:22 7:7 27:12,16
38:22 39:2 75:6,11 104:24
134:8,12 187:6,10 241:12,
16 272:14,18 277:23
utilized 167:16

---

## V

vacancies 180:25
vacancy 177:12
vacant 177:11 178:4 180:20,
22 187:21
vague 53:21 96:25 114:12
120:17,18,25 124:9,14
223:12 239:17 255:21 256:2
vantage 185:10
verbally 6:10
verification 7:4
Verified 7:5
versus 5:16 19:25 100:6
victims 59:24
video 5:17 53:7
video-recorded 5:11
view 62:23 63:6,19 191:25
viewed 62:4
violation 59:12
voice 139:9 159:8
voluntarily 7:25 13:21
177:21 277:14
volunteer 41:3,5,13

---

## W

wait 22:4
waive 6:13
wanted 8:3,6 15:24 37:13
39:7 54:20 75:13 82:6,24
101:19 162:24 166:22 167:4
168:21 169:2 186:2,20
221:3 256:13 266:23 271:17
warrants 86:23
Washington 7:13
Wayne 35:3 39:13 77:13
80:11,12,17 132:9 187:12,
22 188:2 216:24 219:4,9
220:25 247:6 252:14 254:7,
16 264:24 265:2,5,16,17

266:11
ways 60:9,20 61:18 62:2
weakness 259:15
wearing 40:2 183:17
week 32:18 210:8
weekly 99:19 102:15
weeks 41:19 54:10 76:9
weight 9:14
West 16:8
what' 19:10
whatsoever 115:21
window 234:20
winter 132:25
withstand 204:13
woman 22:24 24:15
wondering 36:20
word 190:3,4,6,12 194:11
words 11:5 58:4 175:15
223:13 249:24
wore 40:5
work 27:7 31:19 39:4 40:24
42:2 44:12,13 45:4 81:20
87:14,18 92:5 129:20
145:24 146:8,20 147:17,19
148:10,17,19 149:19,20,23
155:25 196:20 199:24
245:25 252:20 259:3 261:18
263:5 264:15,16 266:23
269:5 275:9
worked 43:23 58:19 72:16
94:15 132:22 147:3 153:4,
11 188:2 245:9,23
working 8:24 36:15 39:10
41:10,12 45:2,6 47:13
48:12,14,18,21 49:14 58:9
158:6 159:22 160:4 181:21
197:10 252:22 262:22
263:2,21
workload 183:24
worth 66:8
worthy 61:4
would'nt 167:5
wrap 101:16 272:4
write 19:15 67:16 158:22,23
159:14,15
writer 158:25
writes 109:4
writing 52:15,18 134:24
135:7,14,16,18,20 136:18
137:11,19 139:13,16,20

140:18,21,24 141:22 158:15
159:12 246:2
**written** 36:9 66:15,18 77:20
83:7 93:23 158:18,20 159:9,
10 175:7 232:25 251:11,14,
18
**wrong** 36:12 210:8
**wrote** 118:17 215:2,9
**Wyo** 198:15
**Wyotech** 198:15

---

### Y

---

**year** 21:16,17 215:7 223:19
256:10 259:25
**years** 14:7 31:5 145:19
165:10 250:4
**yesterday** 23:10 37:15
**yield** 156:3
**York** 5:19,20
**young** 22:24 269:4

---

### Z

---

**Z-E-I-Z** 77:12
**Zeiz** 77:9,11
**Zoom** 8:5 17:10,14,16
**Zoom-type** 22:11

January 29, 2021

Lindsey Withem
WilmerHale Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA  02130

Re:    Deposition of **James Manning Transcript**
        12/17/2020
        Theresa Sweet v. Elisabeth Devos

Dear Attorney Withem:

The witness did not waive the right to read and sign his/her deposition in the above referenced matter.  Enclosed are the completed and signed errata sheet, and the signed original signature page.  These should be attached to the original transcript in your possession. Should you have any questions, please don't hesitate to call.

Sincerely,

Rose Heath
U.S. Legal Support

No. 335262
Enclosures

 cc:   Robert C. Merritt, Esquire

```
 1
 2                    C E R T I F I C A T E
 3     STATE OF NEW YORK          )
 4                                )  ss.
 5     COUNTY OF NEW YORK         )
 6
 7         I, HOPE LYNN MENAKER, a Notary Public within
 8     and for the State of New York, do hereby certify:
 9         That JAMES MANNING, the witness whose
10     deposition is hereinbefore set forth, was duly
11     sworn by me and that such deposition is a true
12     record of the testimony given by the witness.
13         I further certify that I am not related to
14     any of the parties to this action by blood or
15     marriage, and that I am in no way interested in
16     the outcome of this matter.
17             IN WITNESS WHEREOF, I have hereunto
18     set my hand this 22nd day of December, 2020.
19
20        _____
21           HOPE LYNN MENAKER
22
23
24
25
```

1

2               A C K N O W L E D G E M E N T

3

4    STATE OF NEW YORK        )

5                             )  ss.

6    COUNTY OF NEW YORK       )

7

8         I, JAMES MANNING, hereby certify that I have

9    read the transcript of my testimony taken under

10   oath in my deposition of December 17, 2020; that

11   the transcript is a true, complete and correct

12   record of my testimony, and that the answers on

13   the record as given by me are true and correct.

14

15   _James D. Manning_____

16        JAMES MANNING    1/23/21

17

18   Subscribed and sworn

19   to before me on this the

20   _____ day of _____, 2020.

21   Notary Public, State of New York

22

23

24

25

1

2                          ERRATA SHEET
       THERESA SWEET, ET AL. V. ELISABETH DEVOS, ET AL.
3                    DATE OF DECEMBER 17, 2020
                          JAMES MANNING
4

   PAGE/LINE(S)/      CHANGE              REASON
5    34  /   5   /INSERT UNDER    / I WAS UNDER SECRETARY. NOT SECRETARY
     34  /  22   / STRIKE FRANZI  / THE NAME IS RUNCIE
6  44+45/12,13,2.5/ ASKE Q. TO BE READ BACK   THE REDBACK WAS NOT IDENTICAL
   47,48/  2.5+17  STRIKE CONNOLLY / THE NAME IS CONATY. THIS ERROR IS ACROSS THE DOCUMENT
7    50  /  16   / STRIKE INDIRECTLY / SP. ERROR REPLACE W/ INCORRECTLY
     68  / 9+10  / STRIKE CONNOLLY  /  NAME IS CONATY
8    69  /   3   / DIRECT FOR U.S. ← STRIKE FOR U.S. INSERT O US - STRIKE O R IN INSERT
     70  /  10   / STRIKE TRUMP'S   / INSERT THE PREVIOUS THIS TO READ DIRECT OUS AND
9    79  /  14   / STRIKE JILLIAN - / INSERT JULIAN
     80  / 9+11  / STRIKE JILLIAN   / INSERT JULIAN
10   94  /  14   / STRIKE WAS INSERT HAS - (CORRECT WORD
    101  /  10   / STRIKE LEGAL     / INSERT REGULAR
11  107  /  10   / STRIKE 14TH      / INSERT 4TH
    133  / 7+17  / STRIKE MARTIN W'M / INSERT MARK AND WHEN
12  163  / 19+20 / STRIKE hd Ad to God  CORRECTION God to GOOD

13  JANUARY 23, 2021          James F. Manning
    Date                        Signature
14  PAGE   LINE   CHANGE         REASON
    223/  23 / STRIKE '17 / IT IS AN ERROR
15  228/  16 / STRIKE CONNOLLY/ NAME IS CONATY
16  246/  21 / STRIKE OF /INSERT OR
17  257/  18/ A WORD HERE MAKES NO SENSE "THANTINGVIEW" IT IS NOT CORRECT
                                BUT I DO NOT KNOW How TO CORRECT IT
18  262/ 6+9/ ① STRIKE CONNOLLY/ CORRECT NAME IS CONATY
19            ② STRIKE JOE / INSERT JULIAN

20

21

22

23

24

25

**Deposition Transcripts**

**Cited in Supplemental Complaint, March 19, 2021**

**Transcript 4 – Colleen Nevin**

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - X

5    THERESA SWEET, et al., on       :

6    behalf of themselves and all  :   Case No.:

7    others similarly situated,     :   19-cv-03674-WHA

8                  Plaintiffs,       :

9    vs.                            :

10   ELISABETH DEVOS, in her        :

11   official capacity as           :

12   Secretary of the United        :

13   States Department of           :

14   Education, et al.,             :

15                  Defendants.      :

16   - - - - - - - - - - - - - - X

17

18   Remote Videotaped Deposition of COLLEEN M. NEVIN

19            Wednesday, December 9, 2020

20                 9:11 a.m. (EST)

21

22

23   Job No. 332242

24   Pages:  1 - 268

25   Reported by:  Dana C. Ryan, RPR, CRR

Page 2

```
1
2
3                              December 9, 2020
4                              9:11 a.m. (EST)
5
6
7
8        Remote Videotaped Deposition of COLLEEN M.
9   NEVIN, held via Zoom video teleconference, before
10  Dana C. Ryan, Registered Professional Reporter,
11  Certified Realtime Reporter and Notary Public in
12  and for the State of Alabama.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        A P P E A R A N C E S   C O N T I N U E D
2
3        JOSEPH JARAMILLO, ESQ.
4        CLAIRE TORCHIANA, ESQ.
5        Housing & Economic Rights Advocates
6        3950 Broadway, Suite 200
7        Oakland, California 94611
8        Telephone:  (510) 271-8443
9        Email: jjaramillo@heraca.org
10       Email: ctorchiana@heraca.org
11
12   ON BEHALF OF THE DEFENDANTS:
13       R. CHARLIE MERRITT, ESQ.
14       KEVIN P. HANCOCK, ESQ.
15       KATHRYN C. DAVIS, ESQ.
16       MARCIA BERMAN, ESQ.
17       U.S. Department of Justice
18       Civil Division, Federal Programs Branch
19       1100 L Street, Northwest
20       Washington, D.C. 20530
21       Telephone:  (202) 307-0342
22       Email: robert.c.merritt@usdoj.gov
23       Email: kathryn.c.davis@usdoj.gov
24       Email: kevin.p.hancock@usdoj.gov
25       Email: marcia.berman@usdoj.gov
```

Page 3

```
1             A P P E A R A N C E S
2
3        ON BEHALF OF THE PLAINTIFFS:
4        REBECCA ELLIS, ESQ.
5        MARGARET O'GRADY, ESQ.
6        EILEEN CONNOR, ESQ.
7        TOBY R. MERRILL, ESQ.
8        Legal Services Center of
9            Harvard Law School
10       122 Boylston Street
11       Jamaica Plain, Massachusetts 02130
12       Telephone:  (617) 390-3003
13       Email: mogrady@law.harvard.edu
14       Email: econnor@law.harvard.edu
15       Email: rellis@law.harvard.edu
16       Email: tmerrill@law.harvard.edu
17
18              - and -
19
20
21
22
23
24
25
```

Page 5

```
1        A P P E A R A N C E S   C O N T I N U E D
2
3        Also present:
4        Joe Raguso, Video Technician
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1                C O N T E N T S
2    EXAMINATION OF COLLEEN M. NEVIN:          PAGE:
3    By Ms. Ellis                              10
4    By Mr. Merritt                            262
5
6
7
8
9                E X H I B I T S
10       (Attached to the Transcript)
11   DEPOSITION                                PAGE:
12   Exhibit 21   Declaration Of              17
13                Colleen M. Nevin
14   Exhibit 22   Defendants' Responses And   29
15                Objections To Plaintiffs'
16                First Set Of Interrogatories
17   Exhibit 23   Exhibit 18 To The Declaration  184
18                Of Colleen M. Nevin Titled
19                Standard Protocol
20
21
22
23
24
25
```

Page 7

```
1            PREVIOUSLY MARKED EXHIBITS
2    DEPOSITION                                PAGE:
3    Exhibit 5    October 24, 2016 Email       237
4    Exhibit 7    May 4, 2017 Email            129
5    Exhibit 12   April 21, 2019 PowerPoint    157
6                 Titled Borrower Defense To
7                 Repayment
8    Exhibit 13   Defendants' Response To      80
9                 August 31, 2020 Order
10   Exhibit 15   Declaration Of Eileen Connor  92
11   Exhibit 19   Defendants' Response Regarding  173
12                The Court's Request At The
13                October 1, 2020 Class Hearing
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1                P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We are now on the
3    record.  Participants should be aware that this
4    proceeding is being recorded and as such all
5    conversations held will be recorded unless there
6    is a request and agreement to go off the record.
7         Private conversations and
8    attorney-client interactions should be held
9    outside the presence of the remote interface.
10   This is the remote video recorded deposition of
11   Colleen Nevin being taken by counsel.
12        Today is Wednesday, December 9th, 2020.
13   The time now is 14:11 in the UTC time code.  We're
14   here in the matter of Theresa Sweet versus
15   Elisabeth DeVos.
16        My name is Joe Raguso, the remote video
17   technician, on behalf of U.S. Legal Support
18   located at 90 Broad Street, New York, New York.
19   I'm not related to any party in this action, nor
20   am I financially interested in the outcome.
21        At this time will the reporter, Dana
22   Ryan, on behalf of U.S. Legal Support, please
23   enter the statement for remote proceedings into
24   the record.
25        THE COURT REPORTER:  The attorneys
```

Page 9

```
1    participating in this deposition acknowledge that
2    I am not physically present in the room and that I
3    will be reporting this deposition remotely.
4         They further acknowledge that, in lieu
5    of an oath administered in person, the witness
6    will be sworn in remotely and will verbally
7    declare her testimony in this matter is under
8    penalty of perjury.
9         The parties and their counsel consent
10   to this arrangement and waive any objections to
11   this manner of reporting.
12        Now, if I could ask all parties to
13   please state their agreement to the stipulation on
14   the record.
15        MS. ELLIS:  We agree.
16        MR. MERRITT:  I agree.
17        THE COURT REPORTER:  All right.  Now,
18   Ms. Nevin, if I could have you please hold up your
19   driver's license for me.
20        THE WITNESS:  This is going to be part
21   of the record, part of the videotape, you know,
22   the personal information?
23        THE COURT REPORTER:  I guess we could
24   actually get him to cut that off while I look at
25   it.
```

Page 10

1          MR. MERRITT:  Yeah, I think last time
2   we did this part off the record, and we can do
3   that off the record.
4          THE COURT REPORTER:  Okay.
5          THE VIDEOGRAPHER:  So would you like me
6   to go off the record real quick?
7          THE COURT REPORTER:  Please, Joe.
8          THE VIDEOGRAPHER:  We are now off the
9   record.  Time is 14:13 UTC.
10         (Witness presents government-issued
11  photo ID to the camera and identity is verified.)
12         THE VIDEOGRAPHER:  We are now on the
13  record.  Time is 14:13 UTC.
14         ************************
15         COLLEEN M. NEVIN,
16    having been duly sworn, testified as follows:
17         ************************
18  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19  BY MS. ELLIS:
20     Q    Okay.  And will the witness please
21  state your name for the record?
22     A    Colleen Nevin.
23     Q    And since we're in remote deposition,
24  can I please ask you to confirm that there's
25  nobody else in the room with you right now?

Page 11

1      A    There is nobody else in the room with
2   me.
3      Q    And can you please confirm that you
4   won't communicate with anyone during the
5   deposition while we're on the record by email,
6   chat or text, other electronic means?
7      A    I agree.
8      Q    Sorry.
9          Do you have a smartphone in the room
10  with you right now?
11     A    No, I put it in the other room.
12     Q    Okay.  Great.  Thank you.
13         So as we talked about before we got
14  started, we can take breaks whenever you need, not
15  when a question is pending, but we'll take short
16  breaks throughout the day.
17         We do have a video recording of this
18  deposition, but please answer questions yes or no
19  out loud so that we have a record for the written
20  transcript.  I know you're an attorney, so you're
21  probably familiar with all this initial matter,
22  but I'm going to go through it anyway.
23         Government counsel might object to some
24  questions today on bases other than privilege, but
25  you can still answer those questions unless

Page 12

1   counsel instructs you not to answer.
2          There's nothing that's preventing you
3   from answering truthfully today?
4      A    That's correct, yes.
5      Q    And what did you do to prepare for this
6   deposition?
7      A    I met with DOJ and our Office of
8   General Counsel a few times, and they asked me to
9   review some records.
10     Q    Okay.  You reviewed those records to
11  refresh your recollection?
12     A    Yes.
13     Q    What records did you review?
14     A    My declaration, the declarations of
15  Diane Jones and I think two declarations of Mark
16  Brown, the attachments.  I think the
17  administrative record generally, I believe, and
18  the attachments to those declarations.
19     Q    Okay.  About how long did you spend
20  meeting with the government attorneys to prepare
21  for this deposition?
22     A    Total over the course of a few days, I
23  would say -- I'm tallying it up.  Twelve hours,
24  somewhere in that neighborhood.
25     Q    Okay.  And did you discuss this

Page 13

1   deposition with anyone else?
2      A    My team is aware that I'm being
3   deposed, and they were assisting me with pulling
4   documents for the discovery responses and things
5   along those lines.  My boss was aware of me being
6   deposed, probably some other folks in the office
7   that I'm not thinking of right now; Mark Brown is
8   aware that I'm being deposed, and I would imagine
9   that there's some people I'm not remembering
10  within FSA with just awareness that I'm being
11  deposed.  I think that's it.
12     Q    When you referred to your boss, who is
13  that?
14     A    Robin Minor.
15     Q    I'm sorry.  The audio was a little
16  funny.  Can you say that again?
17     A    Sure.  Robin Minor, M-I-N-O-R.
18     Q    Okay.
19     A    She's the acting chief enforcement
20  officer.
21     Q    Okay.  Great.  Thank you.
22         Have you been deposed before?
23     A    I have not.
24     Q    Okay.  Fun.
25         So we're just going to start with some

Page 14

1  background first.  When did you graduate from
2  college?
3      A      1993.
4      Q      And law school?
5      A      '97.
6      Q      And after you graduated from law
7  school, what was your first job?
8      A      I was in private practice.  I worked at
9  a firm in Chicago named Clausen Miller, and I was
10 there for a few years, and then I went to another
11 firm named Vedder Price.
12            Do you want me to go through -- I
13 changed jobs a few times.  I was at the AA -- the
14 Illinois -- excuse me, Illinois State's Attorney's
15 Office.  Then I moved to Massachusetts and joined
16 Adler Pollock & Sheehan, was there for several
17 years, and, then, just prior to coming to the
18 Department of Education, I was an assistant
19 attorney general in Massachusetts for a few years.
20     Q      When you were at the Illinois State's
21 Attorney's Office, did you work at all on student
22 loan issues?
23     A      No, I was handling criminal appeals.
24     Q      And at the Mass AG's office, did you
25 work on student loans issues?

Page 15

1      A      I did.  Yes, I was in the consumer
2  protection division, so that was some of our work.
3      Q      Okay.  Could you describe some of the
4  work you did at Mass consumer protection with
5  respect to student loans?
6      A      Primarily, I was the lead on the
7  investigation of the lawsuit relating to a
8  proprietary school called American Career
9  Institute.  I also did some work related to
10 servicers and probably was tangentially involved
11 with some other kind of unrelated issues, but
12 those were the main focuses.
13     Q      And when did you start in your current
14 position?
15     A      October of 2016.
16     Q      At -- sorry.
17     A      I'm sorry.  That was my fault.
18            October of 2016 is when I started.
19     Q      And that position is as the director of
20 the borrower defense unit?
21     A      That's correct.
22     Q      That's still your position today?
23     A      It is.
24     Q      When you started as the director of the
25 borrower defense unit, what was your understanding

Page 16

1  of the goals and priorities for the unit?
2      A      That's a broad question.  I mean, as
3  a -- the main goal was to adjudicate the borrower
4  defense claims that were coming in, and in order
5  to do that, extend a process and systems that
6  would allow us to do that.
7      Q      And is that still your understanding of
8  the goals and priorities?
9      A      As a general proposition, yes, yes.
10     Q      What about specifically?
11     A      Can you reframe, rephrase?
12     Q      Well, you said, as a general matter,
13 you have the same understanding of the goals and
14 priorities, so I was asking, rather than
15 generally, in the specific is there -- are there
16 things that -- where your understanding about
17 goals and priorities have changed?
18     A      That's the overarching goal.  There are
19 a lot of components to that, so I was just
20 intending to state that, obviously, there are a
21 lot of pieces to that, but that's the overarching
22 goal.
23     Q      Okay.  Understood.  And we'll get into
24 some of the specifics.
25            So I'd like to look at tab 22 in your

Page 17

1  materials and on the Dropbox.  That's the document
2  with the bracketed number 22, ECF56-4 Declaration
3  of Colleen M. Nevin.
4      MS. ELLIS:  And I would like to mark
5  this as an exhibit.  The judge's standing order
6  asks us to do consecutive numbering, so I'd like
7  to pick up where we left off.  The last deposition
8  in the -- the last exhibit in the Jones deposition
9  was 20, so I'd like to mark the Declaration of
10 Colleen Nevin as Exhibit 21.
11            (Deposition Exhibit 21 was marked for
12 identification and attached to the transcript.)
13     BY MS. ELLIS:
14     Q      So do you recognize this document?
15     A      I do.
16     Q      And on the last page, page 17, that's
17 your signature?
18     A      (Witness reviews document.)  Yes.
19     Q      Did you write the document?
20     A      Yes.
21     Q      Did anyone help you write it?
22     A      I believe I worked with our Office of
23 General Counsel and the Department of Justice
24 attorneys on some of it, but it's my work.
25     Q      Okay.  So if you'll turn to

Page 18

1  paragraph 2, please.  You write here, I'm the
2  director of the borrower defense unit within the
3  Enforcement Office within the Office of Federal
4  Student Aid for the United States Department of
5  Education.
6          So is that still an accurate
7  description of your job title?
8      A    Technically, we've had a restructuring
9  within Federal Student Aid since this was filed,
10 so the borrower defense unit is now referred to as
11 the borrower defense group.  Additionally, the
12 Enforcement Office is now known as the Partner
13 Enforcement and Consumer Protection Directorate.
14         So the naming conventions have changed,
15 but the scope of my work has not.
16     Q    Okay.  Is it all right if we refer to
17 it as the borrower defense unit today --
18     A    Sure.
19     Q    -- since that's how it's called in the
20 documents generally?
21     A    That's fine.
22     Q    So who do you report to?
23     A    Robin Minor, M-I-N-O-R.  She's the
24 acting director -- acting chief enforcement
25 officer and also the deputy chief operating

Page 19

1  officer at FSA.
2      Q    Okay.  And throughout your time at the
3  department, has the person who you report to
4  changed?
5      A    Yes.
6      Q    Okay.  So starting -- starting from now
7  and working backwards, can you tell me who are the
8  different people you've reported to and what their
9  roles are?
10     A    Well, I've always reported to the
11 person in the role of chief enforcement officer.
12 That has changed.  So for the past just about a
13 year, Robin Minor has been in that position in an
14 acting capacity.  Prior to that, it was Jeffrey
15 Appel, A-P-P-E-L.  Prior to Mr. Appel, it was
16 Julian Schmoke, S-C-H-M-O-K-E.
17         And prior to Julian Schmoke, Laura Kim,
18 I believe, who was originally the deputy chief
19 enforcement officer, was in an acting role for a
20 period of time, so I believe she was the acting
21 chief enforcement officer for some period of 2017.
22 And prior to that -- and this was when I was
23 hired -- the chief enforcement officer was Robert
24 Kaye, K-A-Y-E.
25     Q    Okay.  Is the chief enforcement officer

Page 20

1  a political appointee?
2      A    No.
3      Q    How often do you meet with the chief
4  enforcement officer?
5      A    It's very ad hoc.  I mean, at a
6  minimum, I have a weekly meeting, but borrower
7  defense has a lot of things going on, so I would
8  say at least maybe -- formal meetings, probably
9  not more than once or twice a week, but I speak
10 with Robin Minor regularly.
11     Q    And how often do you meet with the
12 chief operating officer of FSA?
13     A    Over what period of time?
14     Q    Well, I know 2020 is unusual, but, yes,
15 let's start with 2020 and work backwards.
16     A    Specific to borrower defense, twice a
17 week.  I think it was three times a week for some
18 period of 2020, but I provide very regular updates
19 to him regarding our progress on adjudicating the
20 cases.
21         In addition to the, you know, regular
22 meetings to report on the status of BD, we also
23 have fairly regular meetings in anticipation of
24 his meetings.  He has weekly meetings with the
25 under secretary, Diane Jones, and so I generally

Page 21

1  participate in meetings with him to address any
2  open questions that either he has for me or to
3  find out what the open issues are that we have for
4  the -- for OUS for the under secretary.
5          In addition to that, I think, you know,
6  broader things in terms of FSA that other managers
7  and supervisors may participate in, so they're not
8  specific to borrower defense, that's probably
9  weekly or more.
10     Q    Okay.  In terms of the organizational
11 structure, how does the chief enforcement officer
12 relate to the chief operating officer?
13     A    The chief enforcement officer reports
14 to the deputy COO, deputy chief operating officer,
15 and that's Robin Minor since she's in an acting
16 chief enforcement officer capacity.  She's wearing
17 two hats in that role right now, and, then, she
18 reports directly to Mark Brown, who's the chief
19 operating officer.  That's been the structure
20 since the reorganization.
21         I believe at some point it changed to
22 the chief enforcement officer reporting to the
23 deputy COO.  That was probably 2019, but I'm not
24 sure exactly what the timing was.  Prior to that,
25 I believe the chief enforcement officer reported

Page 22

1  directly to the chief operating officer.
2       Q    And how often do you meet with Under
3  Secretary Diane Auer Jones?
4       A    Not often.  Maybe a -- it's not
5  scheduled.  It's very ad hoc, and I think that
6  there's probably been a total of somewhere in five
7  to ten meetings together since we were both at the
8  department.
9       Q    Have you reviewed the transcript of
10 Ms. Jones' deposition?
11      A    No.
12      Q    And how often have you met with
13 Secretary DeVos?
14      A    I've never met her.  Actually, I take
15 that back.  The day she started, she did a walk
16 around, and I think I saw her then, so I don't
17 know if that counts as meeting, but . . .
18      Q    Okay.  So then who reports to you?
19      A    I have a team of attorneys that report
20 to me.  That number has varied pretty dramatically
21 from 2016 to the present, but they're all
22 attorneys that report to me.
23           Since we staffed up starting last fall,
24 some of my original team moved into supervisory
25 roles, and, then, we also hired some additional

Page 23

1  more senior attorneys to -- acting in supervisory
2  roles because I was bringing on several dozen
3  junior attorneys.
4       Q    So when you say your "original team,"
5  are those people who have been in the borrower
6  defense unit since you started in 2016?
7       A    Yes, that's correct.
8       Q    Okay.  How many of those people are
9  there?
10      A    Five full-time and one part-time.
11      Q    And can you tell me their names,
12 please?
13      A    Brian Bayne, B-A-Y-N-E; Mike Garry,
14 G-A-R-R-Y; Mike Page, P-A-G-E; John Stephenson,
15 S-T-E-P-H-E-N-S-O-N; Andrew Bronstein
16 B-R-O-N-S-T-E-I-N; and the part-time attorney is
17 Erin (phonetic) Joyce, J-O-Y-C-E.
18      Q    Thank you.
19           And, so, those original attorneys are
20 in supervisory roles within the unit now?
21      A    Not all of them.  Four of them are.
22      Q    Okay.  And you referred to staffing up
23 in the fall.  When did you start hiring additional
24 attorneys for the borrower defense unit in 2019?
25      A    When you say "hiring," do you mean when

Page 24

1  did we, you know, post the job and start, you
2  know, interviewing candidates or when did they
3  start?
4       Q    Let's start with when did you post the
5  jobs.
6       A    I believe that was the summer of
7  2019 -- was when we first started posting to --
8  actually, that was for what we call backfills, so
9  we had attrition in the borrower defense unit
10 between 2016 and 2019 and had not been able to
11 replace the attorneys that had left.  So we were
12 able to post to -- to fill those positions, and
13 then also bring on -- we got the authority to hire
14 up to 60 term-appointed attorneys.
15           They were at varying levels.  As I
16 mentioned, some of the folks that we brought on
17 are in more senior roles and have supervisory
18 positions.  The vast majority are recent law
19 grads, junior attorneys.  And they started
20 onboarding, which is the term we used for starting
21 in -- the first group of junior attorneys started
22 in September of 2019.
23      Q    Okay.  When you say "term-appointed,"
24 what is the term?
25      A    In the federal government -- two years.

Page 25

1  It's -- but there's a potential for kind of
2  reupping it or extending their period of service,
3  but the initial term that they were hired for is
4  two years.
5       Q    Why had you been unable to replace the
6  attorneys who you lost due to attrition since
7  2017?
8       A    Well, in early 2017, there was a hiring
9  freeze put in place, and that lasted for a fairly
10 extended period of time across all of -- I think
11 all of the departments, certainly all of FSA.
12           And, then, you know, beyond that, there
13 was a process for getting approval to hire
14 additional staff that went through leadership at
15 FSA and then over to senior leadership at -- at --
16 when I say LBJ, I'm referring to senior leadership
17 in the department, as opposed to within FSA.  But
18 the folks over at LBJ were making the calls on who
19 we could hire back then.
20           So we didn't get the authority to hire
21 anybody in borrower defense until May of 2019 --
22 or summer of 2019.
23      Q    Had you requested to hire additional
24 attorneys before May 2019?
25      A    Yes.

Page 26

1      Q      When did you make that request?
2      A      Several times.
3      Q      When was the first time that you recall
4  requesting to hire additional attorneys?
5      A      Well, we were considering bringing on
6  additional staff at the time of the transition
7  from one administration to the next, And then did
8  not end up doing that.  And, obviously, during the
9  hiring freeze, nobody was allowed to hire anybody,
10 so I don't think that -- you know, I had raised
11 concerns about staffing throughout that period of
12 time, but there was kind of a department-wide
13 freeze.
14             Once there was a change in the process
15 in terms of hiring, Julian Schmoke was the chief
16 enforcement officer at the time, and I would, you
17 know, in my weekly meetings with him reiterate
18 that we needed to increase our staffing.  So that
19 happened on a very regular basis, and he would
20 submit the requests up, and we wouldn't get
21 authority to do that.
22             I don't know how regularly he submitted
23 them, but I know it was kind of a recurring issue.
24     Q      Do you know why the hiring freeze was
25 put in place?

Page 27

1      A      I don't.
2      Q      And was there a specific time when the
3  department-wide hiring freeze ended?
4      A      I'm sure there was.  I don't recall
5  what it was.
6      Q      Do you know who ultimately was
7  responsible for the decision whether or not to
8  approve a hiring request?  Once Julian Schmoke
9  submitted that request, do you know who ultimately
10 was the decision maker?
11     A      My understanding from discussions with
12 him is that it was the -- that the request went to
13 the secretary's chief of staff.  I don't know if
14 he made the decisions or if they went to the
15 secretary or some other process, but, you know, he
16 would communicate to me that he had heard back
17 from the chief of staff that we weren't getting
18 approved.
19     Q      Okay.  So let's talk a minute about the
20 COO.  That's currently Mark Brown?
21     A      That's correct.
22     Q      And what -- how overall would you
23 describe the COO's role with respect to borrower
24 defense?
25     A      Fairly active.

Page 28

1      Q      It sounds like you meet with the COO
2  frequently to discuss borrower defense issues?
3      A      That's correct.
4      Q      Is the COO responsible for setting
5  policy for borrower defense?
6      A      No.  Federal Student Aid does not make
7  the policy at all.
8      Q      Uh-huh.
9      A      The department makes policy, and then
10 Federal Student Aid implements it.
11     Q      When you say "the department," are
12 there specific individuals you're referring to?
13     A      Not for the -- for the general
14 proposition I just stated, I -- it could be.  I
15 have no idea how many different people would be
16 involved, so, no.
17     Q      Okay.  When -- when you draw the
18 distinction between -- you say FSA doesn't make
19 policy; the department makes policy, could you
20 explain what you mean?
21     A      Yeah.  You know, FSA is not -- it's a
22 performance-based apolitical organization, so the
23 top of the Federal Student Aid organization is the
24 chief operating officer who -- I don't know how
25 else to explain it.  It's a performance-based

Page 29

1  organization that's apolitical.
2             We apply the policies that are made by
3  the political appointees within the Department of
4  Education, so everybody from the secretary down
5  through whatever her structure is for -- for the
6  different parts that inform policy for
7  student-loan-related issues.
8      Q      Okay.  I'd like to turn for a second to
9  the defendants' responses to -- responses and
10 objections to plaintiffs' first set of
11 interrogatories.  I believe you have -- you said
12 you have a copy of that?
13     A      I do.  I do not have a second screen,
14 so I'm going to put it up.  I'm not going to be
15 able to see you or anyone else.  I just wanted
16 everybody to be aware of that.
17     Q      Okay.  No problem.
18             And in the Dropbox, this is -- the
19 document, it does not have a bracketed number
20 before it.  The file name is Sweet Defendants'
21 Interrogatory Responses 12/7/20, and I'd like to
22 mark this as Exhibit 22.
23             (Deposition Exhibit 22 was marked for
24 identification and attached to the transcript.)
25             BY MS. ELLIS:

Page 30

1    Q    So if you could please turn to page 3,
2  and at the top of page 3 is interrogatory number
3  2.
4         Could you read that, please?
5    A    (Witness reviews document.)
6         Sorry.  Just want to make sure --
7         Okay.  Identify every person who has
8  knowledge of the facts and circumstances alleged
9  in the complaint and in this -- in this action,
10 and for each person identified describe with
11 specificity each person's knowledge.
12    Q    Okay.  And then you can see at the
13 bottom of page 3 begins the response, and that
14 continues onto page 4.  You'll see at the top of
15 page 4 is your name, and it describes your
16 knowledge as borrower defense processes and
17 decisions.
18         Would you say that's accurate?
19    A    Yes, I think so.
20    Q    Okay.  And then right beneath your name
21 is Jim Manning, and it describes his knowledge as
22 borrower defense policy and processes.
23         Do you see that?
24    A    I do.
25    Q    And a little further down the list is

Page 31

1  Robin Minor, also describing her knowledge as
2  borrower defense policies and processes?
3    A    Right.
4    Q    And a couple of lines down from that,
5  Julian Schmoke, borrower defense policies and
6  processes?
7    A    Right.
8    Q    So is it accurate to say that all three
9  of those people were within FSA?
10        MR. MERRITT:  Object to the form.
11        BY MS. ELLIS:
12    Q    Robin Minor and Julian Schmoke?
13    A    Jim Manning wore multiple hats, but
14 Robin Minor and Julian Schmoke have always just
15 been within FSA.
16        Jim Manning was the acting under
17 secretary in 2017.  And I'm not sure about what
18 the dates were, but he wore two hats in that he
19 also was the chief operating officer of FSA.  So
20 he's been involved in multiple roles.
21    Q    Uh-huh.
22        And they -- they would have knowledge
23 of borrower defense policy even though FSA, you
24 say, was not the policymaker?
25    A    That's right.  Yeah, they would have

Page 32

1  knowledge of the policy in order to oversee
2  implementation of it.
3    Q    And where were they getting their
4  knowledge or instructions regarding the policies
5  from?
6    A    Who specifically are you asking about?
7    Q    Okay.  Jim Manning, you said, wore
8  multiple hats, so that's a little more
9  complicated.  But for Robin Minor and Julian
10 Schmoke, who was instructing them on department
11 policy?
12    A    I think it depends on what period of
13 time.
14    Q    Okay.
15    A    Can you be more specific?
16    Q    Yes, let's take them one at a time.  So
17 Julian Schmoke, you said, he at one time was the
18 chief enforcement officer at FSA?
19    A    Correct.
20    Q    And do you know the dates he held that
21 role?
22    A    Oh, gosh.  He started in 2018.  I -- I
23 don't remember exactly.  Yeah, I wouldn't want to
24 guess.
25    Q    Okay.  During the time that Julian

Page 33

1  Schmoke was chief enforcement officer, who was
2  instructing him on borrower defense policy?
3    A    Well, the chief operating officer
4  position has also changed.  There have been five
5  since I started in 2016.  So the first chief
6  operating officer when I was there was James
7  Runcie.  He left early in 2017, I believe, and the
8  acting chief officer was Matthew Sessa.
9         I believe both of them precede Julian
10 Schmoke because he was hired by the third person
11 on that list, Wayne Johnson, who was the chief
12 operating officer -- I don't know if he started
13 maybe in late 2017, early 2018 -- maybe a little
14 bit later than that, but -- so Julian first
15 reported to Wayne Johnson.
16        Johnson was subsequently moved to a
17 different position, and I believe that's when
18 James Manning took over as the acting chief
19 operating officer, and then Julian reported to him
20 for some period of time.
21        And when Manning was the chief
22 operating officer, he, I believe, brought over
23 from LBJ a deputy chief operating officer named
24 Kathleen Smith, and I think Julian met regularly
25 with her as well.

Page 34

1        I think those were all the people that
2  he reported to.
3        Q     Okay.  Did instructions on borrower
4  defense policy come from the Office of the Under
5  Secretary during the period when James Manning was
6  the acting under secretary?
7        A     Yes.
8        Q     And what about the current period when
9  Diane Jones has been the under secretary?
10       A     Well, the chain of communication has
11 changed a little bit, so when Mark Brown became
12 the chief operating officer, he put a number of
13 processes, kind of chains of communication or
14 paths of communication in place.
15       So, generally speaking, I think most of
16 the instruction from the Office of the Under
17 Secretary during Mark Brown's tenure has been
18 through him.
19       Q     Okay.  But it's your understanding that
20 the Office of the Under Secretary sets borrower
21 defense policy and those policy instructions then
22 come to FSA through Mark Brown?
23       A     I don't know that the Office of the
24 Under Secretary sets all policy.  I know that OUS
25 sets some policy.  I believe Robert Eitel, who is

Page 35

1  the fifth person on the list, and Nathan Bailey,
2  who is the secretary's chief of staff, I believe,
3  have both been involved as well.  So I'm not
4  exactly sure what the structure is over there, but
5  it -- whatever the LBJ policy is -- would
6  typically come to Mark Brown.
7        Q     But the Office of the Under Secretary
8  is one source of borrower defense policy at least?
9        A     Yes.
10       Q     And is that true with respect to policy
11 on the adjudication of borrower defense
12 applications?
13       A     That some of the policy comes from the
14 Office of the Under Secretary?
15       Q     Yes.
16       A     Yes.
17       Q     Specifically, can you identify any
18 policy directives on the adjudication of borrower
19 defense applications that comes from the Office of
20 the Under Secretary?
21       A     Well, that's communicated from the
22 Office of the Under Secretary to FSA?
23       Q     Yes.
24       A     Sure.  So I don't know if staffing is a
25 policy issue that went through the under secretary

Page 36

1  to the secretary's office, but I think the under
2  secretary's office may have had input on that.
3        Policy in terms of applications with
4  the schools, how we advise schools of the claim
5  against them, the, you know, evidence-exchange
6  process, things along those lines, and the
7  development of any kind of written communications
8  are all areas that -- that the Office of the Under
9  Secretary would provide input on.
10       Q     Did anyone summarize Diane Auer Jones'
11 deposition testimony for you?
12       A     No.
13       Q     Okay.  If we could turn back to your
14 declaration, which we've marked as Exhibit 21.
15 You know, before -- before we do that, I just want
16 to follow up on one thing you just said that OUS
17 sets or contributes to policy on written
18 communications.
19       Written communications with who?
20       A     With schools, with borrowers.
21       Those would be the two main ones.
22       Q     Okay.  Thank you.
23       So next I wanted to turn to paragraph 4
24 of your declaration -- that's on page 2 -- to just
25 walk through some of your responsibilities as the

Page 37

1  director of BDU?
2        MR. MERRITT:  I'm sorry.  Rebecca, can
3  you state again what that document -- how it's
4  labeled?  I have to --
5        MS. ELLIS:  Sorry, yes that's the --
6        MR. MERRITT:  -- click in separately
7  each document.
8        MS. ELLIS:  The Declaration of Colleen
9  Nevin in the Dropbox, that is tab 22.  We've
10 marked it as Exhibit 21.
11       MR. MERRITT:  Thank you.
12 BY MS. ELLIS:
13       Q     Okay.  So you have here a list of your
14 responsibilities as director of BDU.  The first
15 one says, Conducting legal research and analyses
16 of borrower defense claims.
17       So can you describe what sort of legal
18 research and analyses you do or that you oversee?
19       A     Sure.  Well, so one of the three
20 regulations that apply to borrower defense claims
21 is the 1995 regulation which is based on an
22 application in state law, and that means that the
23 borrower's application has to be adjudicated to
24 determine whether the borrower states an act or
25 omission that would provide a cause of action

Page 38

1  under state law.
2         So that requires legal analysis and
3  research in connection with those individual state
4  laws.  There are other related issues in terms of,
5  you know, state licensing requirements, different
6  things related to accreditation, but the kind of
7  legal research is related to those '95 claims.
8      Q    Okay.  Does your department -- does the
9  borrower defense unit create memoranda describing
10 the research and analysis of state law for
11 purposes of the 1995 regs?
12     A    Yes.
13     Q    Are those memoranda communicated to the
14 attorneys who are reviewing borrower defense
15 applications?
16     A    Can you rephrase that?  Can you repeat
17 it?
18     Q    So -- so memoranda are created
19 describing the research and analysis of state law;
20 correct?
21     A    Yes.
22     Q    Okay.  So do -- do the individuals who
23 are actually reviewing individual borrower defense
24 applications have access to those memoranda in
25 order to apply state law to an individual claim?

Page 39

1      A    Oh, I see.  Okay.  They have access to
2  them, but our process is -- there's kind of a --
3  an order to it.  We start with determining what
4  the evidence -- if there's common evidence related
5  to the school.  We start with an analysis of the
6  evidence.
7         Then based on what the -- our
8  determinations are with respect to the facts, then
9  there's a legal memo that discusses how the law is
10 applied to those specific sets of facts.
11        Then once we've reached a legal
12 conclusion that, you know, we have evidence to
13 support claims under, you know, X state law
14 because these elements are met, or we don't have
15 sufficient evidence on a certain element for
16 another state law, then that identifies what the
17 borrower would have to provide evidence to support
18 in order to have an approved case.
19        That document then, in terms of the
20 legal analysis, turns into a written protocol, so
21 generally speaking, for any school where there's
22 common evidence, there will be kind of the
23 precursor documents to the protocol in terms of
24 the facts and the law, and then from those facts
25 and law, we determine what elements the borrower

Page 40

1  would need to meet.  That goes into the written
2  protocol.
3         The reviews are primarily done by the
4  junior attorneys; although, my senior team does as
5  well.  But for the most part, the heavy lifting is
6  done by the junior attorneys.  They're following
7  very specific protocols for what they need to look
8  for in each of the applications to see whether the
9  borrower's case should be approved.
10        So that's kind of how the process
11 breaks down.
12     Q    Okay.  How many of those protocols that
13 you just described currently exist?
14     A    How many -- well, we have probably 500
15 schools or more that we've done a preliminary
16 assessment of the evidence to determine the scope
17 of what we're reviewing.  Because we didn't have
18 staffing for such a long period of time, there's
19 still a lot of work to be done on any -- well, on
20 most of the schools that have a lot of common
21 evidence.
22        So in order to move forward with
23 adjudicating, you know, whatever cases that we
24 can, we try to determine upfront what it -- what
25 we're continuing to look at and what we need more

Page 41

1  time to develop and what we don't have evidence
2  relating to and, therefore, would have to look to
3  what the borrowers provide.
4         So we have about, I'd say, 500 or so
5  schools where at least some of the cases can be
6  adjudicated, and so there's a memo describing what
7  it is that we've done to reach the conclusion as
8  to who can be what we call cleared for
9  adjudication and move into an adjudication
10 process.  And those protocols, because there's not
11 common evidence to support the applications at
12 issue, are going to be dependent on what the
13 borrower provides.
14        In addition to that, we have -- I don't
15 know how many total protocols relate to the --
16 we've got job-placement-rate claims for
17 Corinthian, the employment-prospects claims for
18 Corinthian, transfer ability of credit for
19 Corinthian, and then ITT California
20 employment-prospects protocol, and we just
21 finished the protocols for all employment --
22 employment prospects for ITT.
23        So to the extent that those are --
24 those will be in addition to the 500 that I was
25 referencing.

Page 42

1    Q       Okay.  Let me try to walk through that
2   more specifically.  So the Corinthian
3   job-placement-rates protocol, that was already in
4   place when you joined the borrower defense unit;
5   is that correct?
6    A       We've made improvements to it, I think,
7   over time, so it's not going to be in the exact
8   same form, but, yes, the criteria for all intents
9   and purposes go back to 2016.
10    Q       Okay.  And then the Corinthian
11   employment-prospects protocol, that was -- or at
12   least in its initial form developed -- that was in
13   place as of January 2017; correct?
14    A       That's correct.
15    Q       And the Corinthian transfer of credit
16   claim protocol in place as of January 2017?
17    A       Correct.
18    Q       The ITT California employment-prospects
19   protocol, also January 2017?
20    A       By January 20th, yeah, it was probably
21   the second week in January, somewhere in there.
22    Q       Okay.  And you just said you have
23   recently completed a protocol for all ITT
24   employment prospects claims?
25    A       Right.  The initial one was related

Page 43

1   only to California.
2    Q       Uh-huh.
3    A       And, so, we now have one that applies
4   to all ITT employment-prospects claims.
5    Q       When was that completed?
6    A       Well, there are two -- one protocol,
7   there are multiple documents because we had the
8   2016 legal analysis and also the '95 legal
9   analysis.  So the protocol was updated when we
10   completed the -- we completed 2016 first.  That
11   was probably a few weeks ago.  I don't remember
12   exactly what the timing was.  And, you know, so we
13   made updates to it when we were able to move
14   forward on the '95 ones, and that was really just
15   in the last several days.
16    Q       Okay.  Have those protocols been
17   provided to the DOJ attorneys for production in
18   this case?
19    A       We're still pulling records together,
20   but we're going to be producing a lot of the
21   protocols to our Office of General Counsel.
22    Q       Okay.  Well, we would specifically
23   request that these new ITT protocols be included
24   in the production.
25           So, now, I want to back up to the 500

Page 44

1   schools that you referred to as having preliminary
2   evidence.  Can you explain a little more what
3   preliminary evidence means?
4    A       I don't think I said preliminary
5   evidence.  I think I said preliminary assessment
6   or preliminary review or something.
7           But if we have common evidence -- and
8   that can come in many forms.  But if we have
9   common evidence, we first look at it to see -- you
10   know, before we have time to do a comprehensive
11   review of it, we look at what the scope is.
12           So, for example, if we got a package of
13   materials from an attorney general's office and it
14   related to an investigation they did regarding
15   the, you know, employment prospects at a school
16   between 2010 and 2012, we would try to get a sense
17   of whether the evidence really is limited to the
18   2010 to 2012 period of time, whether it's specific
19   to a certain program or group of programs, whether
20   it's related to certain campuses, whether it's
21   more broadly applicable to places outside of that
22   state because AGs generally are focused on
23   their -- you know, the claims of their own
24   constituents.
25           And then we write up a summary of, you

Page 45

1   know, what our understanding is of the evidence,
2   and then we make an assessment of what it doesn't
3   apply to.
4           So, for example, if that package is
5   specific to the criminal justice program for a
6   certain school, you know, we review to make sure
7   that it doesn't, you know, go into anything beyond
8   that and we determine at that point now there's
9   nothing related to the nursing program or medical
10   assistant or things like that, and then those get
11   cleared for adjudication.
12           And then continue to work on the
13   criminal justice piece, and ultimately that will
14   end up with a summary of what we conclude that
15   that evidence supports in terms of findings or
16   facts that may satisfy an element or multiple
17   elements of a borrower's claim whether it's under
18   the 2016 reg or the '95 reg.
19           So the cases that have been adjudicated
20   so far in terms of schools where we have common
21   evidence are the ones that we don't think the
22   common evidence is going to help the borrower get
23   to an approval essentially because of their
24   circumstances because they are not in the program
25   that's at issue or they attended ten years before

Page 46

1  the evidence is relevant or they're in a state
2  outside of, you know, the one that we have
3  evidence for that doesn't seem more broadly
4  applicable.
5       Q    So when you say "cleared for
6  adjudication," what does that mean procedurally?
7       A    That means we write up a protocol, and
8  the protocol says -- you know, just kind of going
9  back to my example of if it's for a certain
10 program for a certain state, open the application.
11 You know, there's a bunch of things that they do
12 upfront.
13           And then one of the first things,
14 though, is -- you know, is the borrower in state
15 X, and if so, did the borrower attend a criminal
16 justice program.  If so, set that case aside.  And
17 then it gets moved into kind of a holding status
18 until we can continue to review and complete the
19 assessment of the evidence that would be related.
20           If the borrower is not in the
21 categories that are relevant to the common
22 evidence, then they would complete the
23 adjudication just like they would for what we call
24 our one-off claims where you have, you know, an
25 individual borrower who brings a claim.  And, so,

Page 47

1  it will depend on, you know, what evidence the
2  borrower support -- provides to support the claim.
3       Q    Okay.  So for -- for about 500 -- I
4  just want to make sure I'm understanding this.
5           For about 500 schools, there's been an
6  assessment of common evidence that would allow
7  reviewers to direct certain claims that fit the
8  common evidence into this bucket of cleared for
9  adjudication where those claims are on hold
10 waiting for a final protocol?
11      A    I'm not sure about that exactly.  Can
12 you say that one more time?
13      Q    So I'm just trying to understand -- so
14 there are 500 schools for which the department has
15 what it considers to be common evidence.
16           Is that correct at the first step?
17      A    I'm approximating, so I probably
18 shouldn't have given an exact number.  I didn't
19 intend to give an exact number.  I think it's
20 somewhere in the ballpark of 500.  And that
21 would -- you know, there are school groups, so
22 that could be individual schools within school
23 groups as well, but, yeah, there are somewhere in
24 the neighborhood of about 500 schools where we've
25 reached that preliminary step.

Page 48

1       Q    Okay.  And, so, for each of those 500
2  schools, are there instructions that are given to
3  reviewers of how to assess whether an individual
4  claim fits within that common evidence?
5       A    Whether -- whether the claim fits
6  within the common evidence?
7       Q    Yeah.
8       A    I think it's the opposite of what
9  you're describing.  So it -- it tells them what
10 they should not move forward on because there may
11 be common evidence that's relevant.
12      Q    Okay.  So the -- let's try to take a --
13 try to make it a little more concrete.  So say --
14 say you receive a package of evidence from a state
15 attorney general about school X and it's about
16 school X making employment-prospect
17 misrepresentations in 2010 to 2012.
18           And does BDU provide instructions to
19 the reviewers essentially saying if you come
20 across an application from school X criminal
21 justice 2010 to 2012, then you set that aside?
22      A    Yes.
23      Q    Okay.  Are those instructions written
24 up?  Are there --
25      A    That's part --

Page 49

1       Q    -- instructions that the reviewers
2  receive?
3       A    Yes, that's part of the written
4  protocol.
5       Q    Okay.  And those are among the
6  documents that you've been gathering to be
7  produced in this action?
8       A    That is correct.
9       Q    Okay.  So then for each of those
10 buckets of applications that are set aside as
11 potentially fitting within the common evidence
12 that you have, for how many schools has BDU
13 proceeded to the next step to actually having a
14 system for granting those applications?
15      A    We're working on -- how many? -- but a
16 lot of schools along those lines.  But we haven't
17 created that for any other than ITT at this point,
18 and that's just limited to the employment
19 prospects.
20      Q    Which other schools are you working on?
21      A    Beckwood (phonetic), the EDMC schools,
22 the American ALO (phonetic), the Court Reporting
23 institutes -- I mean, there are dozens, but those
24 are the ones that come to mind right now.
25           We also have a whole lot of open

Page 50

1   schools where we have claims, but there are some
2   additional processes that need to happen on those,
3   so the ones we've made the most headway on are
4   primarily the closed schools.
5      Q      Since you started your position at BDU,
6   the only claims that have been granted, the only
7   borrower defense claims that have been granted are
8   from Corinthian and ITT?
9      A      With the exception with the American
10  Career Institute cases in January --
11     Q      Right.
12     A      -- of 2017.  Right.
13     Q      ACI was a group application; is that
14  correct?
15     A      That's right.
16     Q      Has BDU developed any group discharge
17  process?
18     A      We wouldn't develop the process, and my
19  understanding is that the department has not
20  developed a process.
21     Q      Who in the department would be
22  responsible for developing a group discharge
23  process?
24     A      I can't answer that hypothetical.  I
25  really don't know if they would -- I don't know if

Page 51

1   they decided to do it.  But, yeah, I don't have an
2   answer to that.
3      Q      Well, aside from an individual, do you
4   have an understanding of what unit or what
5   division of the department would be responsible or
6   would have the authority to create a group
7   discharge process?
8      A      Well, obviously, the secretary would.
9   I don't know who she -- OUS is involved in higher
10  Ed, so that's a possibility, but I really can't
11  answer.  Like I said, it's a hypothetical because
12  my understanding is that there is no such process.
13     Q      Okay.
14     A      There's no such -- yeah, there's no
15  such process.
16     Q      Okay.  For these protocols for other
17  schools that are -- that have some common evidence
18  and are in development, those -- do those analyses
19  involve a determination of what state law will
20  apply to those claims?
21     A      For the '95 applications, before we can
22  adjudicate any application, we would need to --
23  yeah, we would need to determine what the -- what
24  state law will be that will be used to determine
25  the case.

Page 52

1      Q      Do you know about what percentage of
2   pending applications fall under the '95 regs?
3      A      I really don't.  A good number, but
4   I -- I don't know percentage-wise what the
5   breakdown is between '95 and 2016, and it's not as
6   simple as you'd think probably because it -- it
7   involves whether or not they have FFEL loans that
8   would result in the case being consolidated, so
9   there's just a variety of factors that go into it.
10             There are a lot of borrowers who
11  are covered by both because it's dependent on the
12  date of the loan, so they may have loans that --
13  some of them are subject to the '95 reg and others
14  are 2016.
15     Q      Okay.  For claims that are subject to
16  the '95 reg, who decides ultimately what state law
17  should apply?
18     A      Well, currently?  Is that what --
19     Q      Currently.
20     A      -- what time period?
21             Currently, we have -- basically, we
22  have concluded with respect to ITT in particular
23  for the employment prospects that we would apply
24  the state where the borrower resided at the time
25  of separation from the school as a rebuttable

Page 53

1   presumption.  And that's because we're dealing
2   with hundreds of thousands of applications overall
3   and something like 30-something thousand ITT
4   cases.
5             And you can't really do an individual
6   choice of law assessment on each individual case.
7   I mean, as you know, those can get litigated for
8   months on one single case in a lawsuit.  So for
9   the purpose of doing it in a way that's
10  administratively possible, we have a default to
11  the -- I believe it's the state where the borrower
12  lived at the time of separation from the school,
13  and we have different data points that we use to
14  try to determine that.
15             But if the borrower thinks that a
16  different law -- thinks that we got it wrong on
17  determining that based on the data or thinks that
18  a different law should have been applied, then
19  that's something that they can seek
20  reconsideration on, and we would certainly look to
21  that unless the borrower had specifically asked
22  that a certain law be applied.  That would be the
23  exception.  It's very rare, but there are
24  borrowers that say my case should be adjudicated
25  under X law because that's where my campus was

Page 54

1    located or something along those lines.
2        Q    Who made the decision that that was the
3    standard that will be applied to the ITT claims?
4        A    We worked with general counsel in it.
5    You know, there are some challenges with the data
6    in terms of, you know, borrowers around where they
7    live at the time they applied is often different
8    than where they lived when they went to school or
9    where they would have lived when they were, you
10   know, on the receiving end of the alleged
11   misrepresentation.
12           There are a lot of different factors
13   and our, you know, data limitations that we have
14   on that mean that we have to, you know, basically
15   piece it together.
16           So that -- that, we thought, was the
17   most administratively possible and also supported
18   by choice of law principles, so, you know, we
19   looked at the various choice of law principles in,
20   you know, all the different states to try to get a
21   sense of where they would land generally, and that
22   seemed to be the most consistent.
23       Q    Did you make the final decision that
24   that would be the policy you follow or that that
25   would be the choice of law analysis you follow?

Page 55

1        A    Yeah, I wouldn't consider that a policy
2    decision.  Yeah, that was a recommendation from my
3    senior team and -- or some of the members of my
4    senior team, and I reviewed their -- their
5    analysis and agreed with it.
6        Q    So, ultimately, for these other schools
7    that have protocols under process, you also would
8    be the final decision maker on what state law
9    applies to them under the '95 regs?
10       A    Well, I wouldn't state it as such a
11   general proposition because if it were related
12   to -- for example, if an AG submitted something
13   and, you know, had indicated that the attorney
14   general of a particular state had made findings
15   related to state law that would be applicable,
16   there may be circumstances where we would, you
17   know, rely on something along those lines.
18           So I wouldn't say that there's an
19   absolute rule there, but that -- we thought that
20   that was a good framework generally for -- for
21   schools where we have to make that determination.
22       Q    I guess what I'm asking is does the
23   chief enforcement officer or anyone else have to
24   approve these decisions of what state law applies,
25   or is that a decision that you can make as the

Page 56

1    director of BDU?
2        A    Well, I did, but I -- it has been a
3    discussion.  There was a -- there were discussions
4    about whether it's a policy-related issue and
5    whether LBJ could determine what the appropriate
6    choice of law was.  I pushed back and submitted
7    what I thought was the appropriate framework, and
8    as, I said, we worked closely with OGC on it, and
9    they reviewed it and concluded that it was
10   appropriate.
11       Q    Who did you -- who did you have
12   discussions with about this question of whether
13   OUS could decide the choice of law standard?
14       A    I didn't directly have discussions, but
15   I know that there were some communications in
16   LBJ -- in LBJ with their Office of General
17   Counsel, I believe.
18       Q    LBJ's Office of General Counsel which
19   is separate from FSA's Office of General Counsel?
20       A    FSA doesn't have an Office of General
21   Counsel.  When I refer to Office of General
22   Counsel, that's actually the Department of
23   Education's Office of General Counsel.
24       Q    Okay.  I'm just trying to understand
25   the --

Page 57

1        A    Sorry.  We have alphabet --
2        Q    -- relationships.
3        A    -- soup.  I apologize for that.
4             Yeah.  No, the Department of Education,
5    which OUS is, you know, obviously directly under
6    the secretary, has an Office of General Counsel,
7    and they provide legal advice throughout the
8    entirety of the department including Federal
9    Student Aid.  So to the extent that there are
10   legal issues, they would go through the Office of
11   General Counsel over the department.
12       Q    Okay.  So you didn't directly
13   participate in, but you were aware of a question
14   whether OUS would weigh in on what's the
15   appropriate state law standard to use?
16       A    For ITT in particular.
17       Q    For ITT?
18       A    Yeah.
19       Q    And you don't -- do you know who was
20   involved in those discussions on the side of OUS?
21       A    Diane Jones.  And he's not in OUS, but
22   I think Robert Eitel might have been involved as
23   well.
24       Q    Okay.
25            MS. ELLIS:  We've been going for about

Page 58

1  an hour.  Why don't we take just a quick
2  two-minute break here.
3          THE WITNESS:  That sounds great.  Thank
4  you.
5          THE VIDEOGRAPHER:  All parties agree to
6  go off the record?
7          MS. ELLIS:  Yes.
8          MR. MERRITT:  Yes.
9          THE VIDEOGRAPHER:  We are now off the
10 record.  The time is 15:19 UTC.
11         (Recess -- 10:19 a.m.)
12         (After recess -- 10:25 a.m.)
13         THE VIDEOGRAPHER:  We are now on the
14 record.  The time is 15:25 UTC.
15 BY MS. ELLIS:
16    Q    Okay.  So I want to turn back to -- we
17 had been talking about schools for which the
18 department has identified what we've been calling
19 common evidence.  So I wanted to ask more
20 specifically what is considered common evidence?
21 What rises to the level of common evidence?
22    A    Well, it can come in a lot of different
23 forms.  The department, in its oversight -- FSA,
24 in its oversight function, often will look into
25 various issues and may have records relating to

Page 59

1  the school so, you know, that would be our --
2  formerly known as program compliance team or the
3  administrative actions and appeals group.
4          Particularly, if there was a fine
5  against the school or if there was some action
6  taken to either exclude a program or a campus from
7  continuing participation in Title IV funding, all
8  those things -- there may be related documents
9  with respect to the school.
10         We also have evidence from a number of
11 different law enforcement agencies, so CFPB, FTC,
12 the attorneys general.  There are a whole bunch of
13 different schools that have been investigated and
14 been involved in law enforcement actions, and some
15 of those documents have been provided to the
16 department.
17         You know, we could get -- we have
18 applications where borrowers or groups of
19 borrowers submitted a fair amount of evidence
20 themselves.  Your -- or Harvard's program has
21 actually submitted evidence with respect to at
22 least one of the schools I can think of.
23         So it comes from a variety of different
24 sources, and, yeah, those -- those are the ones
25 that come to mind.  I might even be forgetting

Page 60

1  something.  Anything that's available, you know,
2  to the public online, so we look at whether there
3  are things we're not aware of.  We do Internet
4  searches to see if there's something we might not
5  be aware of.
6          So lot of different ways that we get
7  materials.
8     Q    So if you have a group of borrowers who
9  are all submitting applications about the same
10 school and submitting the same kinds of evidence,
11 that would be sort of collated into common
12 evidence?
13    A    We -- that's not as common as you would
14 think, so -- but as we assess the common evidence,
15 we look to see if there are any borrowers who have
16 anything that would be more broadly applicable.
17 You know, sometimes a borrower will have something
18 very specific.  It could be like an email from an
19 admissions rep that is just related to something
20 that particular borrower encountered.
21         But, you know, I remember at least one
22 school where we didn't think that we had anything
23 at all, and in kind of doing a sampling of the
24 cases -- that's one of the things that we do
25 before we adjudicate anything is do some sampling

Page 61

1  and, you know, go through some of the applications
2  to see what kind of materials are being
3  provided -- and found a judgment that one of the
4  borrowers had obtained that would potentially be
5  more broadly applicable to not just that borrower.
6          So -- so that's a possibility, too, but
7  generally speaking, there are -- you know, the
8  vast majority of the borrowers do not have much by
9  way of evidence to support their claims
10 individually, so it's more often the case that we
11 would have to rely on, typically, like I said, our
12 oversight documentation and materials that
13 provided by AGs or legal aid or somebody else.
14    Q    Could you describe that sampling
15 process you that just mentioned?  How does that
16 work?
17    A    Well, you know, depending on how many
18 applications there are from a school because if
19 there are only, you know, 50 to a 100 and -- you
20 know, it would probably be a somewhat smaller
21 size.  I think on ITT, we did a sampling on
22 probably a 100.  I'm guessing, actually.  I
23 shouldn't give an exact number.
24         We did a sampling -- a fairly good size
25 sample of BD applicants relating to

Page 62

1  employment-prospects claims to see what, if any,
2  materials they attached to their applications and
3  what their -- what their allegations looked like
4  and whether there were any specifics to them
5  because that can be a pretty broad range of what's
6  in the allegations themselves.
7        Q     So if you have a school with a smaller
8  number of applicants, you mentioned, say, 50 to
9  100, would you look at all of those applications
10 rather than doing a sample to look for
11 commonalities?
12       A     I don't remember what our number is for
13 that range.  But we wouldn't look at all of them,
14 but we would look at a good distribution of them.
15       And we also allow for the possibility
16 that if we -- in that scenario, if you had 50 or
17 100, you know, those would all be -- if they were
18 all cleared for adjudication based on, you know,
19 not having common evidence or not having
20 identified anything in the sampling, if in the
21 course of reviewing the applications, we find
22 that, you know, the last application we looked at
23 has a judgment that we weren't aware of, then we
24 would probably pull those back before they got
25 processed so that they would be set aside for --

Page 63

1  for further analysis.
2        And, so, the junior attorney would, you
3  know, flag that issue for one of my senior team,
4  and then there would probably be a hold on those
5  until we assess, you know, whether any results
6  would be different.
7        But that would be a decision that
8  wouldn't be made on the first pass.
9        Q     When you say we would do sampling or
10 a -- you know, who -- who is "we" in that scenario
11 who is reviewing the samples?
12       A     Memos are generally done by a
13 combination of somebody on the senior team,
14 sometimes multiple people on the senior team
15 working with junior attorneys to -- it really
16 depends on how much common evidence there is, but
17 usually there would be a member of the senior team
18 either leading the effort or maybe even just
19 handling it him or herself.  It sort of depends on
20 the scope and availability of resources we have.
21       Q     Maybe it would be useful to sort of
22 walk through the process for how an application is
23 adjudicated, so, you know, from -- from the time
24 that somebody opens up an application, what
25 happens to it?

Page 64

1        A     At what period of time are you talking
2  about?
3        Q     Currently.
4        A     So for current applications, you know,
5  the -- the reviewing attorney would --
6  particularly assigned cases, the attorney would
7  open up the case, look at the -- by the way, case
8  is the same thing as an application.  It's just a
9  naming convention from the Salesforce platform, so
10 those are terms that we use interchangeably, but a
11 case is an application.
12       But they would open up the Salesforce
13 case that contains the actual document that's
14 submitted by the borrower, and then there are a
15 series of steps.  I think, actually, there are a
16 couple of protocols in the record, but, you know,
17 they open it up first to see if it's complete,
18 and, you know, there are certain things that --
19 sometimes we get applications in that are
20 incomplete, and, then, they get sent back to our
21 in-state team to follow up with the borrower to
22 get, you know, whatever information was missing
23 from the document.
24       But assuming that it's not something
25 that needs to be sent back to intake, you know,

Page 65

1  they would basically follow the protocols, and the
2  steps in the protocol will depend on what the
3  nature of the claim is.
4        So I don't know that I can give you
5  exact steps because it would depend.
6        Q     Okay.  You mentioned judgments --
7  judgments from private lawsuits as one kind of
8  evidence that's considered.
9        A     Right.
10       Q     What about if a lawsuit has been
11 filed -- if you receive evidence that a lawsuit
12 has been filed but has not yet come to final
13 judgment?
14       A     We would try to get the evidence
15 related to the lawsuit.
16       Q     You would request it from who?
17       A     Well, it depends.  The instance that I
18 was referring to is an individual borrower.  We
19 have a separate investigations unit, so we have a
20 process where if something like that were to
21 surface the investigations unit would reach out to
22 the borrower.
23       If the borrower has an attorney, which
24 is often the case if they have a lawsuit and
25 judgment or would be the case, I guess, then we

Page 66

1  would ask permission from the borrower to speak to
2  his or her attorney, and then -- when I say "we"
3  really I meant investigations.
4          And then they might ask the borrower's
5  attorney if they have any additional supporting
6  materials because maybe, you know, there might be
7  some discovery that they had that they didn't
8  provide or maybe they didn't realize that that
9  would be useful or helpful to them.
10         You know, it depends on whether the
11 judgment is for the borrower, him or herself, or
12 whether they're attaching a copy of a judgment
13 that somebody else brought.  But that's just one
14 scenario.
15     Q    What are some other situations where
16 you might refer a case to the investigations unit
17 to find out more information about the
18 allegations?
19     A    Well, investigations has had major
20 attrition and doesn't have much by way of
21 staffing.  So there's not too much that we've been
22 able to work with them on so far in terms of
23 enlisting their assistance.
24         But on those particular kinds of issues
25 where we think that borrowers maybe just weren't

Page 67

1  aware that, you know, something that they
2  referenced is -- would be potentially helpful to
3  their case, those are some of the scenarios where
4  we've asked investigations to reach out.
5          But I can't think of anything else that
6  they're working on with us right now.
7      Q    Was there a time during your tenure
8  when the investigations unit had more staffing
9  than it does now?
10     A    Yes.
11     Q    When was that?
12     A    Well, I think in 2016, 2017, they had
13 about -- they had a lot more people then.  They've
14 had some pretty major attrition.
15     Q    During 2016 to 2017, did the borrower
16 defense unit work more often or on more issues
17 with the investigations unit when they were better
18 staffed?
19     A    At that point, we were building both
20 units.  They were both new in 2016.  They had a
21 number of investigations that, I think, it was
22 anticipated that potentially would lead to
23 documents that would be relevant to borrower
24 defense, but due to attrition and, I think, policy
25 decisions, I don't think that there was much of

Page 68

1  anything that came out of those investigations
2  that was referred to BD.
3      Q    Do you know if anyone in the
4  investigations unit has asked for more staffing?
5      A    Yes.
6      Q    And do you know what happened to those
7  requests?
8          MR. MERRITT:  Objection to the scope of
9  these questions.
10 BY MS. ELLIS:
11     Q    You can answer.
12     A    I think similar to borrower defense,
13 they've had attrition early on in 2017 going into
14 2018.  And, you know, they would have been subject
15 to the same hiring freeze that everybody else was.
16         I was acting director of investigations
17 for a period of time and Julian Schmoke was the
18 chief enforcement officer, and I had raised that
19 we needed to step up investigations during our
20 meetings during that period of time, but it was
21 kind of the same scenario as borrower defense.
22     Q    During what period were you the acting
23 director of investigations?
24     A    I knew you were going to ask me that,
25 and now I don't remember.  I believe it was around

Page 69

1  spring of 2018 to towards the end of 2018, but I'm
2  not -- I'm not sure about the dates, but somewhere
3  in that general vicinity.
4      Q    Going back to common evidence, what
5  about settlements of lawsuits?
6      A    What about them?
7      Q    Would -- would they -- would that be
8  considered common evidence?
9      A    The settlement would not.  The fact of
10 the lawsuit would be something that we'd want to
11 explore.  So if there was a lawsuit and whoever
12 brought the lawsuit had evidence, then that would
13 be evidence that we would like to consider.
14     Q    So, for instance, if a state attorney
15 general settled a lawsuit with a school, you might
16 ask the attorney general to share the evidence
17 that they had in the course of their investigation
18 that led to the lawsuit?
19     A    At what period of time are you talking
20 about.
21     Q    Any period of time.
22     A    So that's been the case probably --
23 yeah.  Well, this year, that's the case.  Probably
24 for about a year or so.  We have had
25 communications with AGs where we know that they

Page 70

1  participated in and brought -- maybe even not just
2  a lawsuit.  Sometimes we're aware that there was
3  an investigation that didn't result in a filing of
4  a complaint.
5          We would reach out to them to ask them,
6  you know, what the scope of their investigation
7  was, and if, you know, some of them are in the
8  process of submitting materials, so we would want
9  to know before we adjudicate the cases if they are
10 in the process of putting any materials together
11 to send to us if that's their intention.
12         So we try to do that upfront before we
13 adjudicate anything.
14    Q     What about before this year?
15    A     We really didn't have communications
16 with the AGs until probably last fall, I'd say.
17    Q     Does BDU ever initiate or request
18 another group in the department to initiate a
19 further investigation of a school based on common
20 evidence that you have?
21         So, for instance, if you have -- if you
22 have information that a school was misrepresenting
23 its job placement rates for criminal justice in
24 2010 to 2012, would you ever investigate or ask
25 someone to investigate whether they also were

Page 71

1  making similar misrepresentations for other
2  programs during that period of time or for that
3  same program during other periods of time?
4     A     Investigations isn't -- investigations
5  isn't really staffed to handle that much right
6  now, but we, I think, have been -- they're focused
7  generally, we know, for the last few years for
8  something that is currently ongoing and, you know,
9  therefore, potentially going forward.
10         So what we're keeping an eye open for
11 by way of referring to them is if we see something
12 that has happened recently at an open school, you
13 know, whether that's something that they would
14 look at and I think that that would kind of fall
15 within their -- their purview right now.
16         In terms of if we know of, like, the
17 criminal justice program and whether we would
18 refer it for something -- you know, for a school
19 that's been closed or, you know, for something
20 that happened a long time ago, we probably would
21 not.
22    Q     If investigations were properly
23 staffed, is -- would you be able to make those
24 kind of requests for investigations into conduct
25 that happened in the past?

Page 72

1     A     I don't know that I would opine on what
2  a proper staffing is for them because it's not my
3  unit, but I think it would allow for maybe some
4  further exploration on their part.  I'm just
5  working with what we have at this point, so, you
6  know, to the extent that we're already taking up a
7  fair amount of their time in terms of the things
8  that I had already mentioned.
9          Given their very limited resources, we
10 haven't had conversations about expanding that.
11    Q     Again, in terms of what's considered
12 among the common evidence, does BDU consider
13 evidence that's provided by the schools
14 themselves?
15    A     Yes.
16    Q     Under what circumstances does BDU
17 communicate with a school to get evidence
18 regarding borrower defense?
19    A     Well, currently there are some open
20 policy issues or discussions relating to that, but
21 in the spring we -- I'm sorry.  Can you restate
22 your question?
23    Q     Under -- under what circumstances does
24 BDU reach out to a school to ask for evidence
25 regarding a borrower defense issue?

Page 73

1     A     Yeah.  Well, obviously, if the school
2  is closed and no longer doing business, there's
3  nothing we can do about that.
4          If the school is still open, then
5  starting this past spring, there were four school
6  groups that we had reached out to for two reasons.
7  One is to let them know that they were about to
8  receive individual applications as part of the
9  notification process under the 2016 regulations,
10 so really more of just a heads up that their email
11 box was about to get flooded with a whole lot of
12 applications.  But also to request documents that
13 we thought would be helpful in our assessment of
14 the -- the borrower applications.
15         So we had done kind of a preliminary
16 review of what the nature of the claims were with
17 respect to those schools and had come up with a
18 list of documents that we thought would be
19 relevant to that -- that fact-finding process.
20    Q     And what were those four school groups
21 that you reached out to in the spring?
22    A     DeVry, Phoenix, Ashford, I guess,
23 depends on how you define "school group."
24 Technically speaking, DeVry is a school group and
25 a school.  Phoenix, I think, really is just a

Page 74

1   school.  Within a school group, Charlotte School
2   of Law, and Ashford which is part of Bridgepoint,
3   I believe.
4        Q    So from each of those schools, you
5   requested a list of documents that you thought
6   would be helpful to your assessment?
7        A    We wrote them a letter, and that letter
8   included a number of requests, yes.
9        Q    Did you also invite them to submit any
10  other evidence that they wanted you to see?
11       A    The -- that's related to what I was
12  saying in terms of flooding their in-box.  So when
13  they receive an individual borrower's application,
14  they can respond to that application individually
15  with evidence, or they could submit something to
16  us more globally in terms of responses to the
17  overall applications.
18       Q    Okay.  You referred to an ongoing
19  policy debate.  Could you describe what you mean
20  by that?
21       A    I don't know if I would call it a
22  debate, but there's an open question on what that
23  process will look like going forward in terms of
24  what the communications to the school will look
25  like.

Page 75

1        Q    And who's involved in those
2   discussions?
3        A    OUS and with the assistance of the
4   Office of General Counsel.
5        Q    Does OGC make policy decisions
6   regarding borrower defense?
7        A    I think you'd have to ask them.  I
8   don't really understand exactly what the
9   relationship is, or it has some folks that kind of
10  have moved in and out of lane.  So I don't know,
11  as a general proposition, what the answer to that
12  would be.
13       Q    Okay.  Whose idea was it or whose
14  decision was it to reach out to these four schools
15  in spring 2020?
16       A    I don't think it was an idea.  I think
17  it -- my and my senior team's reading of the 2016
18  regulations is that it requires a fact-finding
19  process, and in order to do that fact-finding
20  process for, you know, the circumstances in these
21  schools, we felt like we needed records from the
22  school.
23            So -- so I made the decision to -- to
24  have my team draft those letters and send them.
25       Q    Before the 2016 regs went into effect,

Page 76

1   did BDU ever contact schools to ask for relevant
2   evidence?
3        A    Before the regs went into effect --
4   that was late 2018 -- we were just treading water
5   trying to keep up with Corinthian applications, so
6   we really weren't even at that point.
7        Q    Have -- have any of the four schools
8   who you reached out to in spring 2020 provided the
9   documents that you asked for?
10       A    All have responded, and some have sent
11  most or all of what we requested, and I think one
12  of them may have said that they were sending
13  something, but I don't know if we ever got it.
14       Q    And how is that information used by
15  BDU?
16       A    The documents that they provide?
17       Q    Uh-huh.  Yes.
18       A    We review the evidence regardless of
19  the source.  You know, we might request from them
20  a program manual that we might otherwise have
21  gotten in the course of our oversight at FSA or
22  that might have been provided from an AG's office.
23            So I would look at the nature of the
24  evidence based -- I don't think it's used
25  differently in that sense.  It's -- you know, it's

Page 77

1   what the document purports to be.  Obviously, the
2   source is important to know for the purpose of
3   kind of veracity of the document, but beyond that
4   we don't necessarily treat a program manual or,
5   you know, different kind of advertising material
6   differently depending on the source.
7        Q    So the information you received from
8   schools is incorporated into the general pool of
9   evidence that you're considering regarding that
10  school?
11       A    Yes.
12       Q    In -- you said that the school has the
13  option to respond to an application individually.
14  Is there a mechanism for the borrower to see the
15  evidence that the school submits in response to
16  their application?
17       A    Not under the 2016 regulations.  There
18  will be for the 2020 regulation.
19       Q    Okay.  What about the -- does the 2019
20  regulation have any rule there?
21       A    Sorry.  So when I say 2020, the 2019
22  regulation went into effect July 1, 2020.
23       Q    Oh, I see.
24       A    I refer to that as the 2020 regulation.
25  So that's the new one.

Page 78

1        And just to clarify, the '95 regulation
2   is the old regulation.  2016, we refer to as the
3   2016 regulation because that's when it was
4   published, but it actually went into effect by
5   court order in 2018.  We still refer to it as the
6   2016 regulation.
7        Q    Okay.  Understood.
8             Let's switch back for a second to the
9   law applicable to -- to claims under the '95 regs.
10  So you said that you've just recently developed
11  protocols for ITT claims, non-California
12  employment-prospect-ITT claims under both the '95
13  and 2016 regs; is that correct?
14       A    That's correct.
15       Q    Okay.  So how would a borrower know
16  what law applies to their claim?
17       A    I'm not sure.  Are you asking about the
18  letters?  I'm not sure I understand.
19       Q    Yes, in communications to the borrower.
20            Do communications to the borrower state
21  what law has been applied to their claim?
22       A    I think the CCI ones reference
23  California law.  I don't think the non-CCI ones
24  state an applicable state law.  With respect to
25  those applications, though, because either the

Page 79

1   borrower failed to make an allegation that's
2   potentially the kind that could be approved or the
3   evidence to support it, so regardless of what law
4   you would apply, it's our position that the
5   application would be denied.
6             So those aren't being denied based on,
7   you know, not being able to fulfill a specific
8   element of a particular state law or a specific
9   element of the 2016 regulation.  They're either
10  just kind of something that wouldn't get through a
11  12(b)(6) analysis or they're just lacking in
12  evidence.
13       Q    Are you talking specifically about ITT
14  claims?
15       A    No.  I thought you were referring to
16  the letters, so the ones that have gone out so
17  far, we haven't issued any denials that were based
18  on kind of an application of specific elements of,
19  you know, state law where there could be a
20  different answer in California versus Nebraska.
21       Q    Okay.  Let's look at the denial
22  letters.  That is tab -- give me a second.  That's
23  tab 13 in the hard copies.  On the Dropbox, that's
24  the bracket number 13 ECF 116, Defendants'
25  Response to 8/31.  I think that should say 2020

Page 80

1   Order.
2             And that was marked as Exhibit 13 in
3   the Jones deposition.
4             (Exhibit 13 referred to.)
5             THE WITNESS:  Just to make sure I have
6   the right document, it's Defendants' Response to
7   August 31, 2020 Order.
8        BY MS. ELLIS:
9        Q    Yes, that's correct.
10       A    Okay.
11       Q    So this document, I'll represent to
12  you, is a filing in this case where -- where the
13  government attached the four types of form denial
14  letters, which we've been referring to as forms A,
15  B, C and D according to their attachment letters
16  here in this document.
17            So if you flip to the bottom of page 2
18  of the motion which is page 3 of the document,
19  there's a heading near the bottom of the page,
20  Form of denial letters utilized by the department
21  since December 2019.
22            Do you see that?
23       A    Yes.
24       Q    Okay.  And then at the bottom of the
25  page going onto the next page, it lists -- it

Page 81

1   describes the purposes of the four different
2   letters that are attached as exhibits A, B, C and
3   D to the motion.
4             So for applications from ITT that have
5   been so far denied, which of these four form
6   denial letters would they have received?
7        A    I think it's D.  Yes, I think D is the
8   one that's non-Corinthian but where there is
9   common evidence related to the school.
10       Q    Okay.  So let's flip to form D.  That's
11  the page 22 of the PDF for those looking at it
12  electronically.  And then the actual text of it
13  starts on page 23 of the PDF.  It's document 116-4
14  on the ECF stamps at the top of the page.
15       A    Thank you.
16       Q    So this is an example of form D, and
17  then you can see at the bottom of this first page
18  it shows where someone would fill in blanks for
19  allegation type, primary school and review
20  recommendation reason.
21       A    Correct.
22       Q    Okay.  Is it the case that review
23  recommendation reason is sometimes filled in with
24  the phrase failure to state a claim?
25       A    It's a -- it's a drop-down in our

Page 82

1  platform, but it's filled in by my team, and then
2  that's used to populate these letters by our
3  contractor.
4      Q      Uh-huh.
5             And one of the options in the drop-down
6  is failure to state a claim?
7      A      Correct.
8      Q      So what -- what does that mean?
9      A      It's like a 12(b)(6) analysis, does the
10  borrower make an allegation that could potentially
11  lead to, you know, an illegal case filed in court.
12  Is it something that a court would not dismiss on
13  a 12(b)(6) motion kind of thing.  So an example
14  will be does the borrower allege that the school
15  made a misrepresentation to the borrower on which
16  they relied to, you know, enroll in the school or
17  whatever, based -- something along those lines.
18      Q      How is it determined that an
19  application fails to state a claim if it hasn't
20  yet been determined what law applies?
21      A      It's -- the bar is just -- you know, is
22  an alleged misrepresentation, generally, would be
23  the most common.  So, you know, we get
24  applications on folks who say my loans were too
25  expensive; my school is terrible; my teacher was

Page 83

1  abusive; things that are not borrower
2  defense-related issues; sexual harassment by a
3  staff member; didn't get the classes I wanted.
4             You know, just a whole variety of
5  different things that borrowers may include in
6  their application, but are not something that are
7  of the type that would, you know, provide
8  eligibility for borrower defense relief
9  potentially.
10      Q      Do you know how many form D notices
11  have been mailed out since this form was --
12  started being used?
13      A      I don't.
14      Q      Do you have a sense of what percentage
15  of claims denied under form D fit the description
16  you're giving of someone who doesn't provide any
17  allegation that could potentially state a borrower
18  defense claim?
19      A      As to one of the allegations?  So, in
20  other words, if you see in this letter, there
21  are -- I don't know how many are here -- there's
22  two on this example, but there could be five
23  different allegations in one claim or one
24  application, so those would be five separate
25  claims, and one of the claims might be denied for

Page 84

1  failure to state a claim and another might be
2  denied for insufficient evidence.  It depends on
3  the nature of the claim and what the borrower
4  states for that particular claim.
5      Q      So you're saying that you -- you can't
6  estimate the number of applications that have been
7  denied -- that have received a form denial letter
8  solely because they failed to state any sort of
9  claim?
10      A      I -- I don't know the number off the
11  top of my head, no.
12      Q      Are there department records that would
13  show how many applicants who received form D
14  denial letters -- it was based solely on failure
15  to state a claim?
16      A      It's data in our system, so I'm sure
17  there's some way to pull that.  Yeah, I'm sure
18  there's some way to pull it out of our system, but
19  I don't know that there's a record existing
20  somewhere.  I think somebody would have to do some
21  kind of a data pull.
22      Q      So if -- if an allegation was this
23  school made job-placement-rate-misrepresentation
24  claims, that would not be rejected for failure to
25  state a claim?

Page 85

1      A      It should not be.  I can't say that we
2  have never made a mistake, but the protocol would
3  be that that would then go to, you know, whether
4  there's evidence.  So that would not -- the -- the
5  claim itself, if it were rejected or if the -- if
6  that particular claim was denied, would not be
7  denied based on that.
8      Q      If someone alleged that the school made
9  a job-placement-rate-misrepresentation claim, but
10  the applicant did not specifically state that they
11  relied on that misrepresentation, would that be
12  denied for failure to state a claim?
13      A      I believe so.  I'm trying to remember
14  the drop-downs and what the available drop-down --
15  what the protocol calls for.  The -- I believe the
16  protocol references lack of reliance, so it
17  actually -- that might be an option -- I don't
18  recall, though.  I'd have to look at the protocols
19  to see what -- what the particular entry would be
20  that would show up there.
21      Q      Other than a new protocol that's been
22  developed for ITT non-California
23  employment-prospects claims, has BDU also
24  developed a new form of denial letter to go with
25  that protocol, or would claims denied under that

Page 86

1   protocol continue to receive form D letters?
2        A    Well, your question assumes that BDU
3   develops the letters, and we -- these are not our
4   letters.
5        Q    Okay.  Let me -- let me back up, then,
6   to ask more generally about the -- about the
7   denial letters.
8             So who did develop forms A through D
9   denial letters?
10       A    I think there were a lot of folks
11  involved in it.  At the time, the crew at Mark
12  Brown had wanted my team, the borrower defense
13  unit, to focus on adjudications.  So there was an
14  FSA communications team and our borrower defense
15  program management team, which was a new -- new
16  group, that were kind of tasked with sharing the
17  process for having the letters done.
18            And that was approval letters and
19  denial letters because that -- there were several
20  approval letters, I believe, that were originally
21  developed.  So it's all kind of done at the same
22  time.
23            And then they worked with our senior
24  leadership at the department and the Office of
25  General Counsel on the letters.

Page 87

1        Q    Who ultimately was responsible for
2   approving the form denial letters?
3        A    I can't answer that.  I don't know that
4   there was one person, but I think Mark Brown would
5   probably be a better person to ask because he
6   would have interacted with the folks at LBJ on
7   whether they were given the green light to
8   proceed.
9        Q    How did you find out about the form
10  denial letters?
11       A    About their existence?
12       Q    Yes.
13       A    I was always kind of kept in the loop
14  because my team -- the data that shows up -- so
15  all of these kind of highlighted areas -- it's
16  gray on mine, but I think the original versions
17  are yellow highlights.  Those are fields that are
18  in our platform.  So, you know, we were kind of in
19  a consulting role for what available fields could
20  be pulled into the letter.
21            So I was -- I was on a number of the
22  calls and emails and things along those lines to
23  get the letters finalized, so I don't know when I
24  first became aware -- I mean, I became aware that
25  they were drafting them around the time of when

Page 88

1   they finalized the relief methodology or were
2   close to finalizing the relief methodology for the
3   approvals.
4        Q    And who did you -- who did you consult
5   with about this information that BDU was able to
6   provide for the denial letters?
7        A    Like who asked for input on them?
8        Q    Yeah.
9        A    The head of the communications team
10  that was working on this was a woman named Nicki
11  Meoli.  M-E-O-L-I.  And we worked closely with
12  Chad Schrecengost.  I'm going to get the spelling
13  wrong on this, I think.  S-C-H-R-E-C-E-N-G-O-S-T.
14  I'm pretty sure that's wrong, but that's close.
15       Q    Good effort.
16       A    And I think those were the two folks at
17  FSA who would have asked me or my team for, you
18  know, what is this field; how do you we -- what do
19  we have to fill out, that kind of thing.
20            And then I -- I was also on some calls
21  to that effect with GC.
22       Q    With who?
23       A    Our Office of General Counsel.  I'm
24  sorry.
25       Q    Okay.

Page 89

1        MR. MERRITT:  I'll note for the record
2   that Chad Schrecengost is listed in defendants'
3   response, interrogatory number 2, for spelling and
4   whatever else.
5        BY MS. ELLIS:
6        Q    Okay.  But then beyond Meoli,
7   Schrecengost and some people from OGC, you don't
8   know who was actually involved in the drafting or
9   approval of these letters?
10       A    You broke up a little bit there.  I'm
11  sorry, Rebecca.  Could you repeat that again?
12       Q    No problem.
13            So besides Meoli, Schrecengost and
14  certain people from OGC, you don't know who else
15  was involved in drafting or approving the letters?
16       A    Well, I think those are two different
17  things, the drafting and the approving.  And I
18  don't know all of the people who had a hand in
19  drafting the letter.  I know it was a weeks' long
20  process, so I'm sure there were a lot of people
21  who worked on them.
22            And then I was not involved in, you
23  know, kind of the final sign-off on it, so as I
24  said, I think Mark Brown would probably be the
25  best person to ask that.

Page 90

1      Q     Do you think he would know who was
2   involved in the final sign-off process?
3      A     I would think so.  That would be the
4   typical process, yeah.
5      Q     Okay.  You said you believe it took a
6   matter of weeks to develop these form letters.
7      A     That's my recollection, yes.
8      Q     Do you know what -- what made it
9   complicated or time-consuming to put these
10  together?
11     A     I don't know.
12     Q     Is there anywhere in -- in this form D
13  letter where the applicable law would be filled
14  in?
15     A     I mean, there's an applicable law
16  section.  It doesn't -- I think this letter is for
17  both.  I'm sorry.  I'm just reading.  It's been a
18  while.
19     Q     Go ahead.
20     A     (Witness reviews document.)
21        Yeah, it looks like this is for both
22  regulations.  The applicable state law is not in
23  here for the 2016 regulation.  Obviously, it's a
24  federal standard, so there wouldn't be anything
25  along this line.

Page 91

1      Q     Were you ever involved in any
2   discussions about whether the applicable state law
3   under the '95 regs would be listed in a denial
4   letter?
5      A     There was a conversation about that,
6   and the -- that was not necessarily populated in
7   all of the cases for the reason I mentioned
8   before, which is that the cases that were going
9   out with this letter -- this letter was drafted
10  after a bunch of cases were already adjudicated
11  and not the other way around.
12        And, so, the intent was to send out --
13  actually, I don't know if it was this letter or C
14  because they're pretty similar.  I think it might
15  have been C actually that I'm thinking of.
16        But I -- my recollection is that there
17  was discussion of whether or not to include state
18  law as a field but that would have required more
19  time for my team to go back and, you know, fill in
20  any data that needed to -- with respect to state
21  law where it really wasn't being denied because of
22  state law; it was being denied for the reasons
23  that I mentioned before.
24     Q     Uh-huh.
25     A     And, so, I think the conclusion was

Page 92

1   that that wasn't necessary because it was argued
2   that regardless of what state law might have
3   applied that the application would be denied.
4      Q     So I'd like to look at an example of a
5   completed form D denial letter.
6        MS. ELLIS:  So this will be behind tab
7   15 in your hard copies.  On the Dropbox, the
8   bracket 15 ECF 129-1, Connor declaration.  This
9   was marked as Exhibit 15 in the deposition of
10  Diane Jones.
11        (Exhibit 15 referred to.)
12  BY MS. ELLIS:
13     Q     And there's a number of attachments
14  here.  I'm looking at the affidavit of Theresa
15  Sweet that begins at page 24 of the PDF, page 24
16  of the ECF filing.
17     A     Okay.
18     Q     And then attached to -- further
19  attached to the affidavit of Theresa Sweet all the
20  way down at page 51 of the document is a -- an
21  example of form D.  This is the form D that
22  Theresa Sweet, the named plaintiff in this case,
23  received.
24     A     That's exhibit B to her affidavit?
25     Q     Exhibit B to her declaration.

Page 93

1      A     Yeah.  Got it.
2      Q     Okay.  So if you -- if you go down to
3   the second page of this attachment, there's that
4   section as we were just looking at in the form
5   denial where it lists the allegations and then the
6   reasons for denial.
7        Allegation 1:  Employment Prospects.
8   You allege that Brooks Institute engaged in
9   misconduct related to employment prospects.  This
10  allegation fails for the following reason(s):
11  Failure to state a legal claim.
12        Is there any way that we could tell
13  from reading this letter what was wrong with
14  Theresa Sweet's employment-prospects allegations?
15     A     Well, clearly, all we can tell from
16  this is my team concluded that their -- the
17  specific claim with respect to the employment
18  prospects did not state a legal claim.  That's
19  what's in here.
20     Q     And is that also the case with regard
21  to allegations 2 and 3?
22     A     That is the -- the reason that's
23  included, right.
24     Q     We discussed earlier that it should be
25  unlikely that an allegation of employment

Page 94

1  prospects would be denied for failure to state a
2  legal claim.
3          Is there any way to tell from this
4  letter why --
5      A    Sorry.  I --
6      Q    Wait.
7      A    You broke up again.  And I don't know
8  if it's a problem on my end or if it's other folks
9  or -- I missed the first half of the question,
10  though.  Would you please repeat it?
11     Q    Okay.  We talked earlier that an
12  allegation of misrepresentation of employment
13  prospects would probably be unlikely to be denied
14  for the reason of failure to state a legal claim.
15          Is there any way to tell from this
16  letter why her particular allegations were
17  insufficient?
18          MR. MERRITT:  Objection to the
19  characterization of the prior testimony.
20          BY MS. ELLIS:
21     Q    You can answer.
22     A    I'm not sure I can.  Can you rephrase?
23     Q    It's all right.  I'll move on.
24          Let's move down to allegations 4 and 5.
25  The letter states that these allegations were

Page 95

1  rejected for insufficient evidence; is that
2  correct?
3      A    That's what it says, yes.
4      Q    Is there any way to tell from this
5  letter what about Theresa Sweet's evidence was
6  insufficient?
7      A    Well, your -- I think you're assuming
8  that there was evidence, which I don't know from
9  this, necessarily, but, you know, it could be that
10  there was no evidence, but the drop-down -- the
11  available drop-down is insufficient evidence.  So
12  the conclusion was that whatever it was that was
13  included was insufficient to support the claim.
14     Q    Are borrowers' own statements on their
15  applications considered evidence?
16     A    They're -- they're evidence.  The
17  statement in and of itself without any
18  corroborating evidence would not be sufficient to
19  approve an application, though.
20     Q    The statements on -- of our defense
21  application are made under the penalties of
22  perjury; is that correct?
23     A    Yes.
24     Q    So why wouldn't the borrower's sworn
25  statement be considered sufficient evidence?

Page 96

1      A    That's always been a policy in borrower
2  defense going back to 2016; that one borrower's
3  statement without corroboration would not be
4  sufficient to -- to approve an application.
5      Q    What sort of documentation does BDU
6  expect borrowers to provide in order to rise to
7  the level of sufficient evidence?
8      A    I would take issue with the way you
9  framed that.  We don't have any particular
10  expectation one way or another.  We're just
11  adjudicating based on the evidence in front of us,
12  so, you know, whether that comes from the borrower
13  or from some other source, we make an assessment
14  of the evidence.  But I don't have a particular
15  expectation one way or the other.
16     Q    Does the borrower defense application
17  state that the applicant must submit corroborating
18  materials in order for their claim to be
19  considered?
20     A    Which application are you referring to?
21     Q    I'm referring to the standard form
22  application that's available on the department's
23  Web site.
24     A    I don't recall exactly what the wording
25  is.  I know it requires the borrower to provide

Page 97

1  detailed information, encourages the borrower to
2  provide supporting evidence, but I don't remember
3  exactly what the language is.
4      Q    Do you know who originally set the
5  policy that the borrower's statement alone would
6  be insufficient to make out a borrower defense
7  claim?
8      A    I don't, but that was the policy when I
9  joined in October of 2016.
10     Q    Is that a written policy?
11     A    It's in -- I remember seeing documents
12  somewhere along the way back at that point, so I
13  guess it depends on what you mean by a written
14  policy, but it's -- it's recorded in -- I can
15  remember PowerPoints or something.  I'm sure
16  there's other documentation going that far.
17     Q    Do you know if that PowerPoint has been
18  provided for production in this case?
19     A    I don't know.
20     Q    Would that be considered a policy
21  decision?
22     A    Yes.
23     Q    So that's a decision that would not be
24  made by someone at FSA?
25     A    That's correct.

Page 98

1    Q    Looking back at tab 15, Exhibit 15, the
2 first page of Theresa Sweet's denial letter states
3 that she was enrolled at Brooks Institute; is that
4 correct?
5    A    I'm sorry.  You're on her affidavit
6 now?
7    Q    Yeah.  I'm sorry.  It's the first page
8 of the denial letter which is page 51 of the ECF
9 filing.
10    A    Yes, it says she was enrolled at Brooks
11 Institute.
12    Q    Yes.
13         Is Brooks Institute a school for which
14 BDU has common evidence?
15    A    If memory serves, Brooks Institute is
16 part of the CEC school group, if I am remembering
17 correctly.  I could be wrong on that, but I think
18 it is.  And we do have common evidence relating to
19 CEC.  Whether or not it specifically relates to
20 Brooks, I don't recall.
21    Q    Let's look back at your declaration,
22 tab 21, marked as Exhibit 21.  And I'm looking at
23 paragraph 68 which is on page 16.
24    A    Okay.
25    Q    Could you read the second sentence of

Page 99

1 that paragraph, please?
2    A    Sure.  The second sentence?
3    Q    Of paragraph 68, beginning with,
4 Additionally?
5    A    Additionally, BDU has initiated its
6 review and analysis of the evidence relating to
7 ITT (including campuses outside of California),
8 DeVry University and Brooks Institute but has not
9 had available staff to complete that work and
10 proceed to adjudicate applications from borrowers
11 who attended those schools.
12    Q    So does that refresh your recollection
13 on whether there's common evidence on Brooks
14 Institute?
15    A    Yes.
16    Q    If the review and analysis of common
17 evidence for Brooks Institute was not yet
18 complete, how could Theresa Sweet's application be
19 denied for insufficient evidence?
20    A    Well, your question, I think, is
21 premised on a timing -- you know, if it's not
22 true, it's not true.  This was in November of
23 2019, and I don't know what the date of her letter
24 is.  July of 2020.  So we were in a different
25 stage when we issued her letter.

Page 100

1    Q    So the review and analysis of evidence
2 relating to Brooks Institute is now complete?
3    A    No, but we've done the preliminary
4 analysis that I referred to earlier more generally
5 in terms of the scope of the evidence.  So we must
6 have included that whatever time period that she
7 attended or her program or whatever it is that we
8 concluded the scope of Brooks is, that she falls
9 outside that scope.
10    Q    Whose decision was it to take an
11 approach to borrower defense adjudication where
12 applications would be ruled out by common evidence
13 rather than ruled in by common evidence?
14    A    Well, in 2019, we were directed to move
15 forward at a very accelerated pace, and so, you
16 know, there were a lot of discussions about how to
17 do that and how to get through the backlog in
18 2020.  They wanted all of the cases adjudicated in
19 2020.
20         And the only way to hit the metrics
21 that were required of us were to focus on cases
22 that had established protocols, so the same ones
23 that we were talking about earlier, and cases
24 where either there was no common evidence, which
25 we did those first, or where we could assess what

Page 101

1 the scope of the common evidence was and then move
2 forward on adjudicating other cases.
3         So it was kind of a sequencing issue so
4 that we could continue to meet the -- the weekly
5 numbers that we needed to meet in order to
6 adjudicate the cases.
7         In a perfect world, we would review all
8 of the evidence relating to the school before
9 adjudicating a single case, but if that were the
10 case, then we probably would not be issuing
11 decisions for most of 2020 because, you know, to
12 the extent that, you know, most of the cases that
13 are left right now, at least potentially, are
14 related to some common evidence or the borrower
15 provided substantial evidence of their own or at
16 least some evidence that could potentially support
17 the claim.
18         So it's a -- it was just a sequencing
19 issue that been ordered to the numbers.  That's
20 the way we moved forward.
21    Q    Who set the target numbers?
22    A    The secretary set the elimination of
23 the backlog, and my understanding is that, based
24 on the numbers that were pending at the time, that
25 Mark Brown just did the math essentially and set a

Page 102

1   target of us for 5,000 adjudications per week.
2       Q    But it was the secretary who said this
3   number of cases in the backlog must be eliminated
4   in 2020?
5       A    I don't know that she said anything
6   about the number.  I think she just said -- it was
7   actually eliminate the backlog and adjudicate any
8   new case that comes in within 90 days.
9       Q    And when did that directive come down?
10      A    That specific directive, I believe, was
11  the fall of 2019, but there were already
12  conversations to that effect earlier in 2019.
13      Q    I'm sorry.  It glitched a little.
14           What was earlier in 2019?
15      A    There were already conversations about
16  elimination of the backlog in early 2019.  The
17  specific directive of elimination of the backlog
18  and adjudicating cases within 90 days of receipt,
19  I believe, was in the fall of 2019.
20      Q    And who are the conversations among
21  that were earlier in 2019 about elimination of the
22  backlog?
23      A    Well, I don't know who over in LBJ,
24  but, certainly, Mark Brown made all of us within
25  FSA that are related to BD aware, so that included

Page 103

1   Robin Minor, the then chief enforcement officer
2   Jeffrey Appel, the -- I'm trying to think.  There
3   were other policy folks that were involved because
4   they were working on the relief methodology, so,
5   particularly, it was communicated to FSA to just
6   get it done, essentially.
7       Q    So once that directive came down, whose
8   decision was it about how to approach the
9   sequencing of which claims would get adjudicated
10  first?
11      A    Well, it wasn't really a point in time.
12  I know initially there was a lot of interest in --
13  there's always been a lot of interest in getting
14  through the Corinthian cases, so that was one of
15  the big priorities.
16           But, then, I know some of the folks
17  over in LBJ wanted us to do ITT next, and I -- at
18  the time, we had five full-time and one part-time
19  attorney, so we just didn't have the bandwidth to
20  hit any kind of numbers and review the volume of
21  evidence that we had on ITT because I think we
22  have not quite a million pages of records, but
23  there was a lot of documents that we had, that we
24  weren't in a position to adjudicate the cases
25  because we were pretty confident that there were

Page 104

1   documents in there that would support other claims
2   that we just didn't know what they were or where
3   they were.
4            So I pushed back on that and there were
5   a lot of conversations about what else could be
6   done, and, you know, one of the things that could
7   be done was first the cases that didn't have
8   common evidence and then the cases where the
9   common evidence didn't seem to be related to those
10  cases, so that's kind of how it evolved.
11      Q    For the cases that didn't have common
12  evidence, what would a borrower need to provide in
13  order to be eligible for relief?
14      A    I can't answer that hypothetically.  It
15  really depends on the claim.
16      Q    Are -- are the people who are reviewing
17  individual applications given any instructions on
18  how to assess whether a borrower has provided
19  enough to support their claim?
20      A    They're not really making an assessment
21  of -- they're not weighing evidence.  They're, you
22  know, issue spotting and flagging cases that have
23  something that could potentially warrant approval.
24  So it's a very low bar at that review stage.
25           And, so, the junior attorney, if they

Page 105

1   think there's anything that could lead at all to a
2   possibility of approval, they're supposed to
3   escalate it to one of the senior attorneys.
4            So those cases are all supposed to be
5   set aside.
6       Q    Are they given written instructions on
7   what to look for in order to set aside an
8   application?
9       A    They're trained on that.  The protocols
10  to some extent include that, but there's also --
11  you know, when new attorneys come on, we do a full
12  week of training, and then they go through kind of
13  a probationary period where every case that they
14  adjudicate gets adjudicated by somebody more
15  senior who, you know, walks them through what is
16  or isn't something that states a claim or what is
17  or isn't something that would potentially support
18  approval that they should be setting aside.
19           So they get fairly extensive training
20  on that.
21           MS. ELLIS:  Okay.  Let's take a
22  five-minute break.
23           THE VIDEOGRAPHER:  All parties agree to
24  go off the record?
25           MR. MERRITT:  Agree.

Page 106

1          THE VIDEOGRAPHER:  We're going off the
2   record.  The time is 16:35 UTC.
3          (Recess -- 11:35 a.m.)
4          (After recess -- 11:45 a.m.)
5          THE VIDEOGRAPHER:  We are now on the
6   record.  The time is 16:45 UTC.
7   BY MS. ELLIS:
8      Q    Okay.  I wanted to just briefly circle
9   back to a phrase you used earlier which is
10  "cleared for adjudication."
11         Could you specify what you mean when
12  you say that an application has been cleared for
13  adjudication?
14     A    Yeah.  It's just a shorthand term that
15  we use within BDU that we have concluded that
16  we've done what we needed to do to develop a
17  protocol for review, essentially.  So that's the
18  first prerequisite, essentially.  There has to be
19  a protocol that would allow you to review that
20  specific application, and sometimes that's a
21  school-specific protocol because of the things
22  that we've talked about before in terms of setting
23  aside cases related to common evidence.
24         So cleared for adjudication means that
25  there's an available protocol.

Page 107

1      Q    Does that include both the
2   school-specific protocols and a general protocol
3   such as here's what you do for a claim with no
4   common evidence, or are you talking about just the
5   school-specific protocols?
6      A    Well, we have, you know, kind of like a
7   one-off claim.  There's a standard protocol.  So
8   there's a default protocol that is used when, you
9   know, there isn't common evidence kind of thing.
10  And, so, all of the cases, it just walks through
11  what you look for in terms of the borrower's
12  allegations and the evidence that the borrower
13  provides.  But we do specific protocols if there
14  are things that we know need to be set aside so
15  that cases don't get adjudicated before we've been
16  able to complete the review of the evidence.
17     Q    Okay.  I guess what I'm trying to
18  understand is, does cleared for adjudication mean
19  this is a case that could potentially be granted?
20     A    No.  It's just cleared for review.
21     Q    So it's a complete, a complete
22  application?
23     A    No, that's actually a different
24  question.  It's just that we've determined what
25  the review protocol for that case would be.  It

Page 108

1   makes no predecision at all as to whether or not
2   the borrower, him or herself, provides sufficient
3   information to state a claim or whether or not
4   they provide evidence.  It could go either way.
5          But, you know, in our experience, there
6   are just a whole lot of applications that don't
7   have a lot of supporting evidence and often no
8   supporting evidence.  So, you know, a lot of those
9   do end up getting denied, but they're cleared for
10  adjudication in the sense they can be reviewed one
11  way or the other.
12     Q    So cleared for adjudication means a
13  determination that this application will be judged
14  either under the standard protocol or under some
15  other school-specific protocol?
16     A    Correct.
17     Q    Okay.  Have any -- any claims cleared
18  for adjudication, other than for CCI or ITT, ever
19  been granted?
20     A    We don't have the protocols -- we don't
21  have the approval categories in the protocols yet
22  because we're still reviewing the common evidence
23  for the schools that have potential protocols.
24         So, no, because we're not looking for
25  whether or not they meet (audio distortion) for

Page 109

1   specific elements under state law or under the
2   2016 regs.  We haven't got to that point yet.
3          So as I said, the cases that are being
4   reviewed, it's to look at the borrower's
5   allegations because there's been a determination
6   that there's not common evidence, and if the
7   borrower has, his or her cases aren't adjudicated
8   either because they're set aside for review by a
9   senior team member.
10     Q    Okay.  So Corinthian and ITT have been
11  the only schools with claims granted so far?
12     A    That's right, and they're the two
13  biggest schools by far, and they account
14  collectively for, I think, over half the
15  applications.
16     Q    Before the form denial notices A
17  through D that we talked about earlier started
18  being used, did BDU have a different format for
19  denial letters?
20     A    You broke up again there a little bit.
21  Did you just ask me if we had a different denial
22  letter before forms A through D?
23     Q    Yes.
24     A    There was a denial letter that was
25  conceptually similar to letter A, I believe.

Page 110

1  Letter A is the letter that was used for people
2  who only alleged a job-placement-rate claim.
3  There were job-placement-rate claims that were
4  adjudicated late 2017 to 2018, and there was a
5  letter that met that same criteria, essentially,
6  in terms of who it would go out to that was a
7  different letter.
8      Q    Who drafted that letter, that form
9  letter?
10     A    I believe we did.  I think it was
11 edited by OGC, but I know my team did the initial
12 draft, I believe.
13     Q    And it contained basically the same
14 information that's now in form denial A?
15     A    I don't remember to be honest with you.
16 I mean, it was intended to address the same
17 claims, but I don't remember exactly what the
18 contents were in that one versus this one.
19     Q    Before form denials B, C and D started
20 being used, had any claims other than Corinthian
21 job-placement claims been denied?
22     A    In terms of denied, meaning just not
23 sent out?
24     Q    Meaning had any borrowers been notified
25 of the denial of their claims other than CCI JPR

Page 111

1  applicants?
2      A    There were two denials issued in 2017,
3  summer of 2017, I think.
4      Q    Two denials total, not two schools?
5      A    Two -- two individuals, yeah.
6      Q    Did they receive individual denial
7  letters, or was there a form in place?
8      A    They were individual letters.
9      Q    Okay.
10     A    You froze again there for half a
11 second.  Did you ask me if it was a form?
12     Q    Yeah.  You -- you froze as well.
13          Did you say that they got individual
14 denial letters?
15     A    They received individual denial
16 letters, yes.
17     Q    Okay.  And other than those two
18 individuals, no other borrowers were notified of
19 the denial of their claims until forms B, C and D
20 started going out?
21     A    Other than --
22     Q    Other than Corinthian JPR?
23     A    Yes, making sure I understand your
24 question.  Other than two individual denials in
25 summer of 2017 and the job-placement-rate denials

Page 112

1  in 2017 to 2018, no denials went out.
2      Q    All right.  Thank you.
3          I'm going to back up in time a little
4  bit back to 2017.  When the new administration
5  came in in January '17, did you have any
6  discussions with the transition team about
7  borrower defense?
8          MR. MERRITT:  Objection as beyond the
9  scope.
10         MS. ELLIS:  Are you instructing the
11 witness not to answer?
12         MR. MERRITT:  You can answer that
13 question.  I just do want to note that that is not
14 related to one of the topics the court has
15 authorized discovery on, so . . .
16         MS. ELLIS:  Well, I disagree, and if
17 you'd like to move to strike after today, you can
18 feel free to.
19         MR. MERRITT:  Okay.  You can answer
20 that question, but . . .
21         THE WITNESS:  Yes.
22         BY MS. ELLIS:
23     Q    So did you have any discussions about
24 borrower defense with the Trump transition team in
25 January, February of 2017?

Page 113

1      A    Yes.
2      Q    Who did you discuss that with?
3      A    Oh.  Well, there was the -- a beachhead
4  team and a landing team.  I can't remember which
5  was which.  But there was, you know, the team that
6  came in prior to the inauguration, and we had
7  meetings with them, and then there was a team that
8  came in after that, and we had meetings with them.
9      Q    So what did you talk about with members
10 either of the beachhead team or the landing team
11 with regard to borrower defense?
12         MR. MERRITT:  Objection: beyond the
13 scope.  I'm going to instruct not to answer to
14 enforce the limitation order by the court.
15         MS. ELLIS:  I don't believe that's
16 consistent with the judge's standing order on
17 depositions.
18         MR. MERRITT:  It's consistent with
19 Federal Rule of Civil Procedure 30(c)(2).
20         MS. ELLIS:  Can we talk about this off
21 the record?
22         MR. MERRITT:  Okay.
23         THE VIDEOGRAPHER:  We are now off the
24 record.  The time is 16:56 UTC.
25         (Recess -- 11:57 a.m.)

Page 114

1          (After recess -- 12:13 p.m.)
2          THE VIDEOGRAPHER:  We are now on the
3   record.  The time is 17:13 UTC.
4       BY MS. ELLIS:
5       Q    In January and February of 2017, did
6   you have any conversations with members of the
7   transition team about the process of BDU's
8   adjudication of borrower defense applications?
9       A    Yes, yes.
10      Q    Who did you have those conversations
11  with?
12      A    I'm trying to remember who was on the
13  transition team.  The main point person was Justin
14  Riemer, R-I-E-M-E-R, but there were several
15  members of the transition team, and I can't
16  remember who all of them were.
17      Q    Okay.  And what did you discuss with
18  respect to borrower defense adjudications?
19      A    It wasn't one conversation.  It was a
20  continuing conversation over weeks, and, you know,
21  as with all transitions, as I understand it, when
22  they come in, they ask for data and documents and
23  things like that, so a lot of it was just getting
24  them information to get up to speed.
25      Q    Okay.  I want to turn back to your

Page 115

1   declaration.  That's tab 21, Exhibit 21, starting
2   at paragraph 55 which is at the bottom of page 13.
3       A    Okay.
4       Q    Could you read paragraph 55, please?
5       A    The whole paragraph or just the first
6   sentence?
7       Q    The whole paragraph.  I think it's only
8   two sentences, so the whole paragraph.
9       A    Okay.  In March 2017, the department
10  leadership convened a borrower defense review
11  panel (the review panel) to make recommendations
12  on a borrower defense process.  It is my
13  understanding that the review panel recommended
14  and the secretary subsequently requested a
15  comprehensive review of the borrower defense work
16  and processes by the department's Office of the
17  Inspector General.
18      Q    In March 2017, what was your knowledge
19  about the review panel?
20      A    Not much other than that it was being
21  created, and I think I became aware of a few of
22  the people who were on it, but that's probably the
23  extent of my knowledge at that point except for to
24  the extent that we were getting requests for data
25  and documents and things along those lines.

Page 116

1       Q    So you responded to requests for data
2   and documents from the review panel?
3       A    Yes.
4       Q    Did you ever provide any other
5   information to them?
6       A    Well, the "them" included Justin
7   Riemer, and I don't really, in my mind, delineate
8   between what is requested by him for the review
9   panel as opposed to just in the ordinary course of
10  his responsibilities getting up to speed, so I'm
11  sure there was some overlap there.
12      Q    Understood.
13           Did you ever meet with the review
14  panel?
15      A    Yeah.
16      Q    Were you consulted on the decision to
17  request an OIG review of the borrower defense
18  process?
19      A    No.
20      Q    Did you provide information to OIG
21  during the course of their work?
22      A    Yeah, over a (audio distortion), that
23  was a very labor-intensive process.
24      Q    Did you have an understanding of why
25  the IG review was recommended?

Page 117

1           MR. MERRITT:  Objection: beyond the
2   scope.
3       BY MS. ELLIS:
4       Q    Okay.  I'll move on.
5           Did you ever receive any written
6   decisions or directives or any other written
7   materials from the borrower defense review panel?
8       A    I don't know if it was immediately at
9   the time, but you said "did you ever."  At some
10  point I received the memo recommending to the
11  secretary that she ask the IG to do a review, and
12  I think that there were other things in the memo
13  about -- I don't know if there were conclusions
14  that they reached, but that was the only document
15  to my knowledge.
16      Q    Okay.  Do you know whether that
17  document has been provided for production in this
18  case?
19      A    I don't know.
20           MR. MERRITT:  I'll just note generally
21  that discovery is ongoing as are the document
22  productions, so it's an ongoing process.
23      BY MS. ELLIS:
24      Q    Let's look at the next paragraph of
25  your declaration, paragraph 56.  Could you read

Page 118

1  that for the record, please?
2      A      Enforcement was advised in the spring
3  of 2017 that the department might make significant
4  changes to the BDU processes and that no
5  additional approvals would be processed until the
6  completion of the work of the review panel and,
7  subsequently, by the IG.
8      Q      Who advised enforcement that no
9  approvals would be processed?
10     A      I don't know that it was just one
11 time -- well, I guess when we first were advised I
12 think it was communicated to me by the then deputy
13 chief enforcement officer Laura Kim, but I don't
14 know who exactly communicated that to her.
15     Q      So do you know who, ultimately, was
16 responsible for making the decision that no
17 approvals would be processed?
18     A      No, I don't know.
19     Q      But you -- you were told that no
20 approvals would be processed by deputy chief
21 enforcement officer Kim?
22     A      Yes.  She wasn't making that decision.
23 She was communicating that decision, and I just
24 don't know who at LBJ she had those conversations
25 with or even if she had those directly herself.

Page 119

1      Q      Was that -- was that fact that no
2  approvals would be processed ever memorialized in
3  writing to your knowledge?
4      A      Well, we don't process approvals, so
5  there very well may have been something in writing
6  that, at the time, the issuance of decisions and
7  the handling of the loans was managed by our
8  business operations team.  I don't remember
9  whether there was a document sent to me that I was
10 copied on or something advising them to -- to not
11 send decisions out, but it would have gone to
12 them, not to me.
13     Q      What does it mean -- in this context,
14 what does it mean to process an approval?
15     A      Once the decision is made, whether it's
16 an approval or a denial, that's just the first
17 step.  Then that has to be translated into a
18 communication to the borrower, a communication to
19 the servicer, and all of the loans need to be
20 handled in accordance with the decision.
21        So we call it post adjudication
22 processing in some, you know, of our kind of
23 parlance, but it's -- those are the two main
24 pieces, essentially -- is the decision is part of
25 the processing, the decision to the borrower, and

Page 120

1  then handling the loans, which is work that's
2  handled by somebody either within FSA or a
3  contractor.
4        Previously, it was our business
5  operations unit -- working with the servicers
6  to -- to handle the loans.  So processing for an
7  approval would require a discharge of or whatever
8  the amount of the -- or the percentage of the
9  discharge depending on the circumstances, and then
10 putting loans back in repayment and taking the
11 borrower out of forbearance, typically.  Although
12 in the current climate because of COVID, I think
13 all loans are remaining in forbearance, but our
14 usual process, that would be it.
15     Q      Okay.  When deputy CEO Kim told you no
16 additional approvals would be processed, did she
17 say anything to you about the reason or the
18 purpose for this policy going into effect?
19        MR. MERRITT:  Objection: scope; and
20 potentially calling for privileged information --
21 deliberative information.
22        MS. ELLIS:  It's not a predecisional
23 question.  The decision had been made.
24        MR. MERRITT:  What was the question?
25 Sorry.

Page 121

1        MS. ELLIS:  The question was whether
2  deputy CEO Kim communicated a reason behind the
3  decision to stop processing approvals.
4        MR. MERRITT:  Okay.  I'll note the
5  objection to scope, but the witness can answer.
6        THE WITNESS:  What she communicated to
7  me was that -- well, two things, really.  One,
8  that the department was taking a close look at the
9  borrower defense adjudication processes, and, two,
10 that -- that we probably should cut back on
11 staffing at that point because any work that we
12 had been doing may have to be redone.
13        So, you know, in the interest of budget
14 constraints and whatnot, those were the parts of
15 the equation that FSA has responsibility in terms
16 of addressing budget issues and that kind of
17 thing, so those were the two things that I
18 remember her communicating to me.
19 BY MS. ELLIS:
20     Q      Okay.  You stated in your declaration
21 that no additional approvals would be processed
22 until the completion of the work of the review
23 panel.
24        Did you have any understanding at the
25 time of how long the work of the review panel

Page 122

1  might take?

2      A    No idea.

3      Q    Flipping back to paragraph 54 of your

4  declaration -- that's on the previous page --

5  could you read that for the record, please?

6      A    On January 20, 2017 through March 2017,

7  the BDU continued to adjudicate CCI transfer of

8  credits and guaranteed employment borrower defense

9  claims from January 20, 2017 through May 4,

10 2017, BDU continued to adjudicate CCI JPR claims.

11     Q    Why did you stop adjudicating CCI JPR

12 claims on May 4th, 2017?

13     A    Yeah, I had forgotten about that piece.

14 I believe when Laura Kim advised me that, you

15 know, things were on hold, the -- the JPR review

16 process is very different and has a specific

17 application form, and we also had contractors that

18 were specifically trained on that, and that it

19 seemed like they were taking less of an interest

20 in making changes to that, at least at that early

21 stage.

22          So I think -- I'm trying to remember

23 the timing now.  I believe we continued to work on

24 those for a little bit longer and ask whether we

25 should hold off, and it may have taken some time

Page 123

1  to -- to get that decision, so I think that --

2  that accounts for the time difference, and then,

3  ultimately, we did stop working on those as well.

4      Q    At the time you were told that

5  approvals would no longer be processed, were you

6  also told to stop adjudicating applications?

7      A    Yes.

8      Q    Were you given reason why you should

9  stop adjudicating applications?

10     A    Well, again, it was that the department

11 was making an assessment of whether they wanted to

12 make some -- you know, the way it was put to me,

13 it was they were taking a hard look at what we

14 were doing and what changes they want to make to

15 it, and, secondarily, that any work that we were

16 doing was probably going to have to be reworked

17 because it wasn't going to comply with whatever

18 new processes or policies they might come up with.

19     Q    Was there discussion at that time that

20 the legal basis for relief under the 1995 regs

21 would change?

22          MR. MERRITT:  Objection to the extent

23 it calls for privileged information.

24          THE WITNESS:  I don't think there was

25 any discussion about relief at that time.  Let

Page 124

1  me -- that's too strong a statement.  I think we

2  were asked some questions about relief

3  determinations that had previously been made with

4  respect to the protocols, but I don't recall a

5  discussion about a new relief approach at that

6  time.

7      BY MS. ELLIS:

8      Q    Would you agree that in the disposition

9  of borrower defense applications there is a

10 question of whether the borrower is entitled to

11 borrower defense relief and a separate question of

12 how much relief they are entitled to?

13     A    If any, yes, I think that's -- that's

14 two parts.  So whether or not the application

15 should be approved or denied, and if it's

16 approved, so there's only a second part if it's

17 approved, but if it's approved, what, if any,

18 relief is to be given to the borrower, yes.

19     Q    Okay.  So in the spring of 2017, was

20 there a discussion that department policy around

21 that step one, whether the borrower is entitled to

22 relief, was there discussion that policy around

23 that was going to change?

24     A    Yeah, that's the piece -- that's what

25 my team does.  So what I was referring to before

Page 125

1  is there, you know, may have been -- it didn't

2  turn out that there were a lot of them, but there

3  may have been imminent policy changes that would

4  in some minor or major fashion affect how we

5  adjudicated the cases.

6      Q    And, then, did you have any knowledge

7  or discussions around step 2, the level of relief?

8      A    In -- in the spring of 2017?

9      Q    (Indicated affirmative.)

10     A    No, I don't believe.

11     Q    Okay.  When -- as of the spring of

12 2017, when BDU adjudicated that a claim should be

13 granted, did someone have to sign off on that

14 decision?

15     A    Well, I guess there's always someone

16 who has to sign off.  You mean someone above me?

17     Q    Yes.

18     A    During that time period and before,

19 there was a process that had been set up in 2016

20 that an approval package or a denial package would

21 be sent out to OUS.  In 2016, early 2017, it

22 actually went through the chief enforcement

23 officer to -- to the Office of the Under Secretary

24 and copied to the Office of General Counsel.

25     Q    Did there come a point when that

Page 126

1  process changed?
2      A    Yes, it was a pretty similar process in
3  2017 when we resumed issuing approvals into 2018,
4  but then following the -- the power decision when
5  the 2016 reg went into effect in 2018, there was a
6  process in the 2016 regulation that laid out what
7  should be done to adjudicate cases.
8          So from that point forward, we haven't
9  gone that route of submitting things up through
10 FSA to the Office of the Under Secretary or to the
11 Office of General Counsel.
12     Q    What was the new process that was laid
13 out in the 2016 regs?
14     A    It calls for a department official to
15 adjudicate the cases, do the fact-finding process
16 and adjudicate the cases, and that's -- the
17 consensus is that's me and my team.
18     Q    So after Bauer, since the 2016
19 regulation went into effect, you have the final
20 sign-off on approvals.
21     A    Yes.  That's the way it currently is.
22 Now, it could change with the new administration
23 coming in, but that's the current way.
24     Q    All right.  And are we talking about
25 approval just of step 1, the entitlement to

Page 127

1  relief, or also approval of step 2, the amount of
2  relief?
3      A    Item used to -- as an approval.  It's
4  basically -- the department's position is that
5  relief is a policy decision, so the Office of the
6  Under Secretary twice has issued policy directives
7  that were then implemented by FSA on what the
8  appropriate relief is for -- for the claims that
9  are subject to those particular methodologies.
10         And our policy implementation team
11 worked in both instances with the Office of the
12 Under Secretary -- I believe more so on the second
13 one in 2019 -- and, eventually, that turns into
14 percentages that were handed to us, essentially.
15         So our role with respect to relief
16 under both the 2017 and 2019 methodologies (audio
17 distortion) administerial, essentially.
18     Q    So you have, essentially, a formula
19 that -- once an application is approved, you have
20 a formula that you plug in that determines the
21 amount of relief?
22     A    It's even less involved than that.  We
23 get a chart, and it says, Medical assisting
24 certificate, 25 percent.  And it's just a data
25 entry.

Page 128

1      Q    I see.  And who actually inputs those
2  relief numbers?
3      A    We're working to implement an update to
4  the platform so that it actually doesn't even go
5  through my team at all because, like I said, we're
6  just kind of doing data entry on that.  So what it
7  will look like will be that the data will be fed
8  into the system and then, you know, when it's
9  adjudicated, you just press a button and it will
10 get populated.
11         Right now for the most part, we -- the
12 policy team comes up with a chart, so they crunch
13 the numbers that relate to the specific school and
14 apply the methodology and convert that into
15 percentages.  And then they put it on a chart that
16 they put on -- to hand off to my team, and, then,
17 you know, if we approve a case for, like I said,
18 medical assisting certificate program for CCI,
19 then here's the percentage.
20     Q    How many schools have these charts
21 prepared for them right now?
22     A    Under the 2019 methodology?
23     Q    Yes.
24     A    I don't know.  I mean, I know there's
25 Corinthian and ITT, and I know that we have kept

Page 129

1  in touch with the policy team in terms of schools
2  that we think will have at least some approvals,
3  but I don't know where they are in the process on
4  that, and I think that there are some ongoing
5  policy discussions on how they're applied to
6  particular schools, but we're not really
7  participants in those conversations.
8      Q    In 2016 when you joined BDU, was it
9  also the case then that relief was considered to
10 be a policy decision?
11     A    I don't know.  I don't know.  It was a
12 recommendation from my team to the chief
13 enforcement officer, and then it was recommended
14 to the -- yeah, I guess it would be a policy
15 decision based on a recommendation.
16     Q    A recommendation from who?
17     A    From us, from -- from the enforcement
18 office by way of, you know, borrower defense
19 providing a recommendation to enforcement and then
20 enforcement conveying it to the under secretary.
21     Q    I'd like to look for a minute at
22 Exhibit -- tab 7, which is also Exhibit 7 from the
23 Jones deposition, on the Dropbox that's bracket 7
24 Manning memo 5/4/2017.
25         (Exhibit 7 referred to.)

Page 130

BY MS. ELLIS:

Q    Is this a document that you've seen before?

A    Yes.

Q    And this is a memorandum recommending the -- the discharge of approximately 16,000 loans that have been adjudicated before January 20th, 2017; is that correct?

A    That's correct.

Q    If you look at the last page, please, this document is signed by Secretary DeVos and under the other/comment section she wrote, With extreme displeasure.

Is that accurate?

A    That's what she wrote.

Q    When did you first see this document?

A    It was later.  It was quite a bit later.  I don't remember exactly.  It might have been in even 2018 or later.

Q    What did you take the Secretary's comment to mean?

A    That she was not happy to be signing off on discharges for the previously (indiscernible) cases or the loans related to the previously (indiscernible) cases.

Page 131

Q    Were you aware of the secretary expressing displeasure about BDU's adjudication of borrower defense applications, otherwise?

MR. MERRITT:  Objection: beyond the scope.

MS. ELLIS:  Can the witness answer?

MR. MERRITT:  Can you explain how it's relevant for one of the topics?

MS. ELLIS:  It's relevant to the reasons for the delay.

MR. MERRITT:  That's not one of the topics.

MS. ELLIS:  I'll move on.

BY MS. ELLIS:

Q    In the spring of 2017 when -- when you were told that no more approvals would be processed, was it also your understanding that no denials would be processed?

A    Yes, but we weren't really positioned to issue denials at that point.  As I mentioned, there's kind of a -- it's not just sending out a notice which, you know, it's not just drafting a letter.  We also have to have requirements with the servicers set up so that they know how to handle it.

Page 132

So if a case were denied in total, then the servicers have to have instructions for how to take the borrower out of forbearance.  There were discussions going on -- I don't know if it was this early, but in 2017 about, you know, whether there would be some kind of an interest credit because some of these borrowers' claims were pending for a while, so there was some conversation about that.

So long story short, we weren't -- we weren't holding off on issuing a whole lot of denials in early 2017 because there weren't that many that we had ready to send out at that point.

Q    At that time, were you told to stop developing memoranda or protocols for additional categories of claims other than the Corinthian and ITT protocols that were already in place?

A    We were told to stop seeking approval for such things, but we weren't told to stop reviewing evidence, that kind of thing.

So that work continued, but we weren't staffed at the level that would have allowed us to develop a whole lot of new review protocols at that point anyway.

Q    So you weren't -- you weren't

Page 133

developing protocols during that period, but you were reviewing evidence?

A    Yes.

Q    And what -- what was the result of -- of that review?  Was it -- was it memorialized in any way other than in a application-review protocol?

A    We didn't even get to the review protocols at that point.  A lot of 2017 we spent, you know, a fair amount of time working on both the IG review, the development of a system because we've been working off of, you know, I don't know how many -- I think over a thousand Excel spreadsheets.  There was no system.

So that was my biggest priority when I came in, in terms of operations, was to -- to develop some kind of a system that we could use so that we could track the cases and pull data and do reports and things like that.

So there was a lot of work going on with that in 2017, and there were just a number of different kind of moving parts operationally that we were working on so that we were better positioned to move out once we got the green light to move forward, whatever that looked like.

Page 134

1    Q    Okay.  So could you estimate about how
2  much time you and your staff spent in 2017
3  reviewing evidence regarding potential school
4  misconduct?
5    A    I don't know.  I -- I don't think I
6  could give an accurate estimate at this point, but
7  it wasn't -- it wasn't a high percentage because
8  we were very short staffed, and we basically were,
9  like I said, working on the IG review, the systems
10  and a whole bunch of various issues that pulled a
11  lot of our attention at that point.
12    Q    You said you were told to stop seeking
13  approval for any kind of new protocol.
14        Who was in charge of approving a new
15  protocol?
16    A    We didn't have any to send up at that
17  point, so presumably it would have gone up through
18  Laura Kim to the Office of the Under Secretary
19  like we had done before, not the protocols, but
20  the underlying documents like the legal
21  memorandum.
22    Q    If you had developed any legal
23  memoranda, then you would have sent it to Laura
24  Kim?
25    A    Yes.

Page 135

1    Q    Would she be the one who would approve
2  you to move forward with that if -- if the --
3    A    No, that would -- go ahead.
4    Q    -- if it had occurred, right?
5    A    Sorry.
6    Q    I understand.
7    A    Yeah, I mean, hypothetically, it would
8  have gone through her to the Office of the Under
9  Secretary just like we had done for the previous
10  memos.
11    Q    For the ITT protocols that you
12  developed this year, the non-California
13  employment-prospects claims, who approved those?
14    A    The protocols?
15    Q    Yes, yes, sorry.
16        Who approved the protocols -- the new
17  protocols?
18    A    Yeah, I did.  I -- you know, I relied
19  heavily on my supervisors.  I reviewed very
20  closely the -- the facts and the legal memoranda,
21  so the 2016 and the '95 memos.  And those
22  basically delineate what's going into the
23  protocol.  And then I also looked at the protocol,
24  but, you know, a couple of my supervisors that
25  were working on it, you know, were very in the

Page 136

1  weeds on making sure that it clearly spelled out,
2  you know, what happens to a Michigan claim as
3  opposed to a California claim and that kind of
4  thing.
5    Q    Did you have to get approval from
6  anyone above you in the chain of command to
7  proceed with adjudicating applications under these
8  new protocols?
9    A    No.
10        MS. ELLIS:  Okay.  It's 12:45 now.  I
11  think this is a fine time to break for lunch, so
12  let's plan to get back on the record at 1:15.
13  Does that work?
14        MR. MERRITT:  Yeah, that works.
15        Work for you, Colleen?  Just making
16  sure that works for you, Colleen?
17        THE WITNESS:  Yep, that's fine.  Thank
18  you.
19        THE VIDEOGRAPHER:  We are now off the
20  record.  Time is 17:47 UTC.
21        (Recess -- 12:48 p.m.)
22        (After recess -- 1:18 p.m.)
23        THE VIDEOGRAPHER:  We are now on the
24  record.  The time is 18:18 UTC.
25  BY MS. ELLIS:

Page 137

1    Q    I'd like to turn to page -- page 14,
2  paragraph 59 of your declaration.  That's tab and
3  Exhibit 21.
4        So paragraph 59 states, BDU received
5  permission to resume adjudication of CCI JPR
6  claims (only) on or about October 30th, 2017.
7        Is that accurate?
8    A    I'm sure it is if I included that date.
9  I don't remember off the top of my head what the
10  date was, but I'm sure I checked records to do
11  that.
12    Q    Okay.  Who gave the permission to
13  resume adjudication?
14    A    My recollection is that it was Jim
15  Manning.  I think it was Jim Manning.
16    Q    And do you know why the -- he made the
17  decision to resume adjudication of CCI JPR claims
18  at this time?
19    A    I -- I don't know.
20    Q    Do you know why he made the decision
21  that only CCI JPR claims would resume at this
22  time?
23    A    That might have been the "ask" at that
24  time.  I believe Julian Schmoke had spoken with
25  him about the fact that we -- you know, the review

Page 138

1  panel had completed their work.  The IG
2  investigation was wrapping up.  There wasn't a
3  report yet.  I don't know if there was preliminary
4  information given, but they weren't going to make
5  any changes to JPR.
6       So I don't know exactly what it was,
7  but I think that the ask might have been specific
8  to JPR claims.
9       Q    When you say that was an ask, that was
10  a request you believe Julian Schmoke made to Jim
11  Manning?
12       A    I believe so, yes.
13       Q    Okay.  And in this time in October,
14  November 2017, was BDU making progress towards
15  adjudication of any other claims besides CCI JPR?
16       A    We were focused on JPR at that point.
17  I don't know what the numbers were at that point,
18  but it was probably in the range of 100,000
19  Corinthian cases or more.  It might have been a
20  lot more than that, actually.
21       And the priority -- which was true
22  under the previous administration as well, but was
23  true under this one, is they wanted us to work
24  through the Corinthian claims that the department
25  had represented would be handled in an expedited

Page 139

1  fashion, so that was what our focus was for when
2  we were -- you know, as soon as we were allowed to
3  proceed, yeah, in that period of time.
4       Q    Okay.  Flipping back to paragraph 23 of
5  your declaration, which is on page 7.  In the
6  second sentence, you write, Starting in 2018 after
7  processing of adjudications were resumed, we were
8  given authority to increase our contractor staff.
9       Do you see that?
10       A    I do.
11       Q    So, excuse me, when in 2018 did the
12  processing resume?
13       A    Again, we don't do the processing, so I
14  don't know exactly when that piece started, but
15  the approval that happened prior to processing, so
16  when we would send the package to OUS and they
17  would sign off, started, I believe, in 2017.  It
18  coincided with the relief methodology -- when that
19  relief methodology was finalized.
20       And we started submitting -- they
21  wanted us then to move quickly on submitting
22  approval packages.  So I think it was actually
23  2017 when we started sending them up.  It may be
24  that they didn't actually get processed until
25  early 2018.

Page 140

1       Q    I see.
2       Was there a point where BDU began
3  adjudicating other claims again in addition to CCI
4  JPR?
5       A    Yes.
6       Q    And when was that?
7       A    Well, the results of the IG
8  investigation were that they didn't recommend any
9  changes to our review protocols, and, similarly,
10  nothing came out of the BDU review panel in
11  connection with that.
12       So once the IG report was done, which I
13  believe was around the end of November, beginning
14  of December, basically there was nothing else to,
15  you know, hold us back at that point, I think.
16       So we had already started moving
17  forward to J- -- on JPR claims at that point, and
18  I'm sure it was probably soon after that Julian
19  would have had a conversation with Manning about,
20  you know, we should get started on these other
21  ones again, too, but I don't remember the exact
22  timing.
23       Q    And, so, sometime in 2018, you got
24  authority to increase your contractor staff to
25  work on this resumed process of adjudication?

Page 141

1       A    Correct.
2       Q    Who gave the authority to increase the
3  contractor staff?
4       A    Well, it was conveyed to me by Julian
5  Schmoke, but, you know, there are budget
6  implications to that, so it would have gone up
7  through FSA and, at that point, I think, Jim
8  Manning was both acting chief operating officer
9  and also the acting under secretary.  So I don't
10  know in which capacity he approved it, but I'm
11  pretty sure he's the one who signed off on the
12  additional money needed to hire the contractors.
13       Q    And then after the IG report came out,
14  did the development of new protocols for other
15  schools also resume?
16       A    We were just trying to catch up.
17  The -- the cases that were coming in for
18  Corinthian were exceeding what we were able to
19  adjudicate, so the week over week because of the
20  limited staff we had up to and including when we
21  had these additional contractors, I think, we
22  weren't even keeping pace.  So we were just trying
23  to keep up with the Corinthian cases at that
24  point.  There really was no time to work on other
25  protocols.

Page 142

1    Q    And you had requested additional staff
2  by this point?
3    A    I'm sure multiple times, yes.
4    Q    The contractors who you hired in 2018,
5  what was their role?
6    A    2018.  We've had three different
7  contracting companies, so I'm just thinking which
8  one.  But -- I mean, first and foremost the
9  contractors were to focus on job-placement-rate
10  claim because there is zero discretion,
11  essentially, on those.  It's a matter of what
12  program was the person in, what campus did they
13  attend, what time period did they attend and then
14  how does that line up with the findings.
15        So those we typically pushed to -- to
16  the contracting staff.
17        In 2018, we also were starting to look
18  at the one-off claims and how those could be
19  handled, and there was a lot of trial and error
20  about that and fits and starts or however you want
21  to put it.  We did some kind of pilot testing to
22  see how the contractors did in terms of kind of
23  summarizing the borrower claim or, you know,
24  looking at if we had a school that had fewer than
25  ten claims but, you know, at least seven or eight

Page 143

1  kind of summarizing what the claims were to see if
2  there was any, you know, common theme or anything
3  that included evidence that would support it.
4        So that was all kind of going on in
5  2018 with the contractors, but a lot of it was not
6  very successful, unfortunately, so most of it
7  didn't end up advancing the ball too much.
8    Q    What was the point at which or was
9  there a point at which BDU had sufficient staff to
10  resume working on creating new protocols for other
11  schools other than Corinthian?
12    A    Well, we've been working towards that
13  since we started staffing up a year ago.  One of
14  the things that I did that I think has helped is
15  we phased out of using contractors and brought on
16  term-appointed attorneys that are actually
17  full-time attorneys, and I had control over who we
18  hired and we got really good people, and I think
19  it was just a much higher caliber of people that
20  were working on the claims at that point than some
21  of our contractor staff, unfortunately.
22        So that definitely helped us both in
23  terms of numbers and capabilities.
24        And, so, really since we started
25  staffing up towards the end of last year, I've

Page 144

1  divided people up into teams and kind of different
2  work flows so that we're moving forward on a whole
3  bunch of schools at the same time while also
4  trying to meet the metrics that are required of us
5  in terms of hitting our adjudication numbers.
6        So, you know, it takes a while to get
7  people up to speed, though, once they join BDU,
8  and there's a pretty robust training period and
9  learning curve, so it's a few months at least
10  before people are making, you know, pretty
11  significant contributions, so it wasn't really
12  until this spring, I think, when we were in a
13  position to -- to make really appreciable progress
14  on -- on other schools.
15        So there are a bunch of things that are
16  kind of moving along at a parallel track right
17  now, so it could be that -- it's not going to be
18  that we'll hit one school and then not another one
19  for a long time.  I think there will be several of
20  them that will kind of reach of point of having a
21  review protocol pretty close in time.
22    Q    So it was about three years, from
23  spring 2017 to spring 2020, that, in your opinion,
24  BDU was not really in a position to make any
25  significant progress on protocols for

Page 145

1  non-Corinthian schools?
2    A    Yes.
3    Q    I think I might have asked this before,
4  but just to be clear, do you have any
5  understanding of the reasons why your requests for
6  additional staff were denied after the
7  department-wide hiring freeze ended?
8    A    That's above my pay grade.  I don't
9  know.
10    Q    Okay.  So I'm going to flip over to
11  paragraph 64 of your declaration.  That's on
12  page 15.  That paragraph says, Additionally,
13  between December 2017 and May 2018, OUS authorized
14  the denial of over 10,000 applications.
15        Is that right?
16    A    That's what it says, yes.
17    Q    Do you remember what the basis was for
18  the denial of these applications?
19    A    I believe the ones that were done at
20  that time were Corinthian denials where the
21  borrowers had only asserted a job-placement-rate
22  claim.
23    Q    And they didn't fit into the
24  job-placement-rate evidence, and so they had no
25  other basis for relief?

Page 146

1    A    Correct.
2    Q    So this was during the period when OUS
3  had to authorize the denial of borrower defense
4  applications?
5    A    That was the system that was set up at
6  the time.  Yeah, we just followed the same thing
7  that we were doing for the approvals at that
8  point, so similar thing.  It was a package with a
9  cover memo, a letter and a list of applications
10  that are -- claims that would be getting that
11  letter, so it was similar for both approvals and
12  denials.
13    Q    And, so, at this time today, since the
14  2016 regulations went into effect after the Bauer
15  decision, does OUS have to sign off on denials
16  before they become final?
17    A    No.
18    Q    Are you the final decision maker on
19  denials?
20    A    Myself and the supervisors on my team,
21  yes.
22    Q    So then in the next paragraph,
23  paragraph 65 of your declaration, it states that,
24  No additional decisions have been issued to
25  borrowers since in or about June 2018.

Page 147

1            And this declaration, you signed it in
2  November 2019; correct?
3    A    Yes, correct.
4    Q    So between June 2018 and November 2019,
5  no decisions -- no borrower defense decisions had
6  been issued to borrowers?
7    A    That's my understanding, yes.
8    Q    Why -- why did BDU stop issuing
9  decisions at that time in June 2018?
10    A    BDU doesn't issue decisions, period,
11  but FSA stopped issuing decisions.
12    Q    Why did FSA stop issuing decisions in
13  June 2018?
14    A    Well, my understanding is that
15  following the Manriquez injunction, there was a
16  hold put on approvals and the department made the
17  decision to not issue denials until they could
18  send out approvals as well, and so that coincided
19  with the June 2018 -- I think that's -- that's
20  when they put the brakes on, essentially.
21    Q    Do you know who made the decision to
22  not issue anymore approvals at that time?
23    A    I don't.
24    Q    Do you know who -- excuse me.
25            Do you know who made the decision to

Page 148

1  not issue any denials until approvals started
2  issuing?
3    A    I don't.
4    Q    Who did you find out about these
5  decisions from?
6    A    I believe it was Justin Riemer who
7  communicated that to me.
8    Q    So Justin Riemer might know who the
9  ultimate decision maker was?
10    A    Presumably, yeah.
11    Q    So have you seen the injunction order
12  in the Calvillo Manriquez case?
13    A    A while ago.  But, yeah, I read it,
14  yeah.
15    Q    Do you have an understanding of who is
16  in the class in that case?
17    A    Yes.
18    Q    What's your understanding of that?
19    A    Borrowers with approved
20  job-placement-rate claims that attended Corinthian
21  colleges.
22    Q    And is it your understanding that the
23  injunction prevents the department from using the
24  December 2017 partial relief methodology for that
25  class of borrowers?

Page 149

1    A    Yes.
2    Q    So is it your understanding that FSA
3  could have, consistent with the Calvillo
4  injunction, issued approvals of borrower defense
5  claims for 100 percent relief?
6    A    I don't believe the injunction
7  precludes that.  I think it specifically says that
8  the department could, if I'm remembering
9  correctly.
10    Q    Was there a policy in place so the
11  department would not grant 100 percent relief to
12  Calvillo class members?
13    A    Policy was the relief methodology.  I
14  believe the 2017 methodology did actually have as
15  one of the potential outcomes 100 percent relief.
16  It was fairly narrow, I believe, but that's my
17  recollection is that there was some percentage
18  that -- or some -- some subset depending on the
19  program that they attended that they could have
20  gotten 100 percent.  And then under the
21  methodology, all of the other borrowers would get
22  a different percentage.
23    Q    Do you know whether any grants of
24  100 percent relief were actually issued following
25  the Calvillo Manriquez injunction?

Page 150

1      A      Not that I recall, but it's possible.
2      Q      So consistent with the Calvillo
3  Manriquez injunction, FSA could have processed
4  borrower defense application grants for people who
5  were not making Corinthian JPR claims; is that
6  correct?
7      A      The -- are you asking whether it
8  applied to -- it didn't apply to people who had
9  other -- if their approval was based on something
10  other than job placement rates, the injunction did
11  not apply, yes.
12      Q      Here in paragraph 65 of your
13  declaration, which we were looking at a minute
14  ago, you write in the middle of the paragraph
15  that, Approximately 1,000 applications from CCI
16  and ITT borrowers have been adjudicated as
17  approvals and are not subject to the Manriquez
18  injunction.
19             Was that correct?
20      A      I'm sure it is.  I'm sure I looked at
21  the data at the time.
22      Q      So do you know why those approvals were
23  not processed?
24      A      I don't know what the rationale for the
25  policy was, but my understanding that was -- there

Page 151

1  was a policy that we were not issuing any
2  decisions on borrower defense at that point.
3      Q      Do you know why -- well, let me back
4  up.
5             Do you know who made the decision that
6  no decisions would issue on borrower defense even
7  for borrowers who are not part of the Calvillo
8  Manriquez class?
9      A      I don't know.
10      Q      Did you discuss that decision with
11  anyone?
12      A      I'm sure I did.  I would have told
13  my -- I don't have a specific recollection of it,
14  but I would have told my team.  And I'm sure I
15  became aware somehow, but I don't remember who
16  told me.
17             Again, we don't process the decision,
18  so it was just kind of an FYI sort of thing for me
19  and my team, but impact what -- you know, whether
20  or not we would move forward on the adjudications.
21      Q      During this period when no approvals or
22  denials were issuing, was BDU continuing to
23  adjudicate applications?
24      A      Yes.
25      Q      And we talked earlier about there being

Page 152

1  a sort of step 1 and step 2 of the disposition of
2  borrower defense applications where step 1 is
3  entitlement to relief and step 2 was the amount of
4  relief.
5             So BDU was continuing with step 1 at
6  this time between June 2018 and November 2019?
7      A      That's correct.
8      Q      Were you -- did you at any time become
9  aware of a decision that the partial relief
10  methodology originally developed for the CCI JPR
11  claims would be applied to other types of claims?
12      A      Yes.  It involved getting data from
13  Social Security, and the department worked
14  with Social Security to get the data for ITT.
15             I don't know if there were any other
16  schools.  That's the only one that I can recall.
17      Q      Do you know who made the decision to
18  expand that methodology to ITT?
19      A      I don't know.  No, I don't know.  I'm
20  sorry.
21      Q      Do you remember when you became aware
22  that the department had gathered this Social
23  Security information for the purpose of using it
24  for ITT relief?
25      A      Well, I was aware pretty early on

Page 153

1  because to get the data from Social Security they
2  needed data from the platform that my team uses to
3  come up with a list of borrowers that were being
4  submitted, so we were kind of a subject-matter
5  expert on how you would do that, I think.
6             And we had a fairly new system that had
7  sort of -- we had actually really two new systems.
8  We had an Access platform that became live in late
9  2017, and then around that time would have been
10  when we were migrating the data to our new
11  Salesforce platform.
12             So I'm sure I knew very early on.  I
13  don't remember exactly what the timing was.
14      Q      Would that have been in 2017?
15      A      I think it was probably early 2018, or
16  more like spring of 2018, maybe.
17      Q      So it would have been after the partial
18  relief methodology was announced but before the
19  Calvillo Manriquez injunction?
20      A      Yes, we received the data from Social
21  Security just prior to the injunction, I believe.
22  So I don't remember how long it took for Social
23  Security to do that, but whatever that time frame
24  is.
25      Q      Okay.  So was it your understanding

Page 154

1  that the delay -- or that the policy of not
2  issuing any grants following the Calvillo
3  injunction was related to a desire for the
4  department to formulate a new partial relief
5  methodology?
6       A    At what point in time?
7       Q    I guess this would be beginning in the
8  summer of 2018 and if it -- if it changed at any
9  point along the way?
10      A    I don't think there was any discussion
11 of a new relief methodology that early.  The
12 injunction was issued in May.  I -- I don't
13 remember any conversation about a new relief
14 methodology until at least 2019, and I don't
15 remember exactly when that was.  Probably not even
16 very early in 2019.
17      Q    Okay.  Do you know if work continued on
18 the -- on the old methodology with the ITT data
19 after the Calvillo injunction?
20      A    It did not, so two things I remember
21 happening right after the injunction.  I told my
22 team to stop entering any of those percentages
23 into our platform right after I saw the order, and
24 then, you know, pending discussions with OGC, but
25 that didn't change.  And separately, I believe --

Page 155

1  I don't know who made the call on it, but somebody
2  made the call that the folks who worked on kind of
3  converting the Social Security data into a relief
4  percentage were told to stand down.
5            That's my recollection.
6       Q    For the -- for the CCI JPR claims
7  that -- at the time of the Calvillo injunction,
8  they had been approved as eligible for relief, but
9  not processed, in your -- in your declaration you
10 say there were about 31,000 of those in -- in the
11 Manriquez class that were approved, but not
12 processed.
13           Was it your understanding that -- that
14 there was any rationale under state law for
15 awarding 100 percent relief to those borrowers?
16      A    I don't think the department saw it as
17 solely a question of state law, but certainly --
18 you know, for that, I believe that's why they came
19 up with the relief methodology.  They saw it as a
20 policy decision, but I think when the special
21 master, which predates the existence of the
22 borrower defense unit, first recommended approval
23 of job placement rates, they were relying on
24 California law when they concluded that
25 100 percent relief would be appropriate.

Page 156

1       Q    Do you know who in the department made
2  the determination that the amount of relief was a
3  policy question that was not necessarily governed
4  by state law?
5       A    I might need counsel's advice on
6  whether I can answer that question because it
7  was -- the information was given to me by the
8  Office of General Counsel.
9            MR. MERRITT:  Yeah, I mean, to the
10 extent that question is calling for privileged
11 information, we would object to it.  And it's
12 questionable whether that's within the scope of
13 the discovery the court ordered.
14           MS. ELLIS:  Okay.  Well, I accept that
15 the witness is not answering on the basis of
16 privilege.
17 BY MS. ELLIS:
18      Q    Do you believe there's anything in
19 the -- I believe it's California state law that
20 applies to the CCI JPR claims; is that correct?
21      A    That's what -- yes, that's what we've
22 plied to the JPR claims.
23      Q    Is it your understanding there's
24 anything in California law that would preclude
25 100 percent relief?

Page 157

1            MR. MERRITT:  Objection.  It goes
2  beyond the scope.
3            MS. ELLIS:  Can the witness answer?
4            THE WITNESS:  You want me to answer?
5            I'm not aware of anything that would
6  preclude 100 percent.
7            MS. ELLIS:  I'd like to look for a
8  minute at Exhibit 12.  That's tab 12 in the hard
9  copies.  On the Dropbox, it's bracketed number
10 12ED PowerPoint 8/21/2019.  This was marked as
11 Exhibit 12 in the Jones deposition.
12           (Exhibit 12 referred to.)
13 BY MS. ELLIS:
14      Q    Does this document look familiar to
15 you?
16      A    Vaguely.  I'm sure I probably worked on
17 it myself, but it's been a while.
18      Q    Do you remember what purpose this was
19 prepared for?
20      A    One minute.
21           (Witness reviews document.)
22           I think -- I believe this was to
23 prepare somebody new to the department in
24 leadership.  It might have been -- or somebody who
25 was newly working on BD in leadership.  I don't

Page 158

1  remember who, though.  We've done similar decks
2  for each time we had a new chief operating
3  officer, which doesn't match up with this
4  timeline.  So it might have been the deputy
5  secretary or someone else, but I think it was a
6  briefing to prepare somebody or to kind of give a
7  general status to someone new in leadership or
8  someone newly involved in BD.
9      Q    Okay.  On page 5 of the document.  It's
10  numbered as slide 5, and, also, it has a Bates at
11  the bottom AR-A-0227.  So this slide appears to be
12  giving an update on applications adjudicated, but
13  not processed, as of August 2019.  It states,
14  there are over 1,400 schools with denied
15  applications that are pending processing.
16          That's the second major bullet down.
17          And it specifically mentions denied
18  applications for Wright Career College and
19  Marinello School of Beauty.
20          Do you see that?
21      A    I do.
22      Q    Do you recall the reasons why those two
23  schools had a significant number of claims denied?
24      A    I don't.  We have thousands of schools,
25  so I apologize.  I don't remember the specifics on

Page 159

1  these.
2      Q    Okay.  On the next slide, the slide is
3  titled Why Are BD Applications on Hold.
4          The first topic listed is approvals,
5  and on the second bullet it says, No relief
6  methodology developed for non-CCI claims.
7          Can you explain what that meant as of
8  August 2019 when this slide was written?
9      A    I don't know.  As I'm looking at this
10  deck, this is not exactly what I was thinking it
11  was because the first -- slide 2 is something that
12  I'm very familiar with.  Slide 3 is one that I've
13  worked on, but these other slides, I'm not sure
14  who put them together.
15          As with the second bullet, that's true.
16  And maybe it was in reference to ITT.  That's all
17  I can think of.
18      Q    For -- for non-CCI claims, was there --
19  were you involved in any discussions about
20  development of a new relief methodology?
21      A    Yes.  Mostly as a subject-matter expert
22  for our policy team who was involved in
23  conversations with LBJ on it.
24      Q    Who was --
25      A    I should say policy implementation

Page 160

1  team.  They don't make policy.  They -- they
2  implement the policy that we get from LBJ.
3      Q    Who's -- who makes up the policy
4  implementation team?
5      A    Currently, the acting director of
6  policy implementation is Ian Foss, and he was also
7  one of the leads with respect to -- and is with
8  respect to FSA applying the 2019 methodology to
9  school-specific data.  He's got people on his team
10  that work on that.
11      Q    When was the policy implementation team
12  created?
13      A    Oh, that's a long-standing -- I mean,
14  that -- the name, I think, also changed during the
15  restructuring last fall, but they're not related
16  in particular to BD.  That's part of FSA.
17          Any time there's a new regulation or,
18  you know, kind of global policy on anything, in
19  fact -- that affects student loans, they work very
20  closely.  They're also involved in, like,
21  negotiated-rulemaking process and all that.
22      Q    Okay.  Thank you.
23          Was there ever any discussion of giving
24  100 percent relief to any claims as of
25  approximately August 2019?

Page 161

1      A    The -- not in FSA.  The kind of
2  direction that we've been given and, I mean the
3  royal "we," but that the policy team had been
4  given was focused on developing a new methodology
5  since Manriquez was still pending.
6      Q    Who did that direction come from?
7      A    The Office of the Under Secretary,
8  Diane Jones.
9      Q    Moving down to the next section of this
10  slide under Denials, the first bullet says, Policy
11  decisions (spring 2018) to not issue denials until
12  approvals also could be issued.
13          And I think we may have mentioned this
14  earlier, but do you know who made that policy
15  decision?
16      A    I do not, not -- no.
17      Q    Do you know why that policy decision
18  was put into place?
19      A    I don't.
20      Q    Then looking down at the third bullet
21  up here in the section Denials, it says, Issuance
22  of denial decisions scheduled to resume by
23  mid-September.
24          Do you recall that expectation in
25  August 2019?

Page 162

1      A    Yes.  The -- that didn't happen,
2  obviously.  I believe the -- that was to coincide
3  with -- no, I'm sorry.  I'm trying to remember the
4  timeline here.  It was a decision to hold off, and
5  I don't know if it was this particular time,
6  but -- I'm not sure.  I'm sorry.
7      Q    As of August 2019, had the form A
8  through D denial letters been finalized?
9      A    No, they had not.  In fact, I don't --
10 I don't know if they even started.
11     Q    Was the -- was the ongoing development
12 of those letters one of the reasons why denial
13 decisions did not resume by mid-September?
14     A    No, they were held until we had the
15 approval -- the (audio distortion) approvals which
16 was tied to the relief methodology.
17     Q    So does it follow then that issuance of
18 approvals were scheduled to resume by
19 mid-September 2019?
20     A    Well, like I said, I didn't draft this
21 and I don't know who did, but it may have been in
22 connection with whether or not to hold them.  I'm
23 guessing, so I really -- I don't know.
24     Q    Okay.  So going -- going back to your
25 declaration, looking at paragraph 66, could you

Page 163

1  read the first sentence of paragraph --
2      A    Sorry.  Sixty-six?
3      Q    Yes, 66 at the top of page 16.
4           Could you read the first sentence,
5  please?
6      A    Because BDU has been instructed to
7  maximize the number of applications adjudicated
8  per week, the streamlined JPR claims have been
9  prioritized.  For the same reason, BDU also has
10 focused on application from borrowers who did not
11 provide any evidence and who attended schools for
12 which BDU is not aware of evidence that would
13 support the approval of the applications.
14     Q    Okay.  So this is circling back to
15 something we talked about early on, but who made
16 the decision to maximize the number of
17 applications adjudicated per week?
18     A    That was the direction that we were
19 given from the department leadership, and it was
20 carried out by the chief operating officer and his
21 very clear mandate to me.
22     Q    When did you receive this instruction
23 to maximize the number of applications adjudicated
24 per week?
25     A    Really, as soon as Mark Brown started

Page 164

1  as the chief operating officer, he was very
2  focused on the backlog, the issues that were kind
3  of keeping us from getting through the backlog,
4  and how do we -- how do we eliminate the backlog.
5  So almost from the get-go I would say --
6           THE COURT REPORTER:  I'm sorry.  I'm
7  sorry.  You cut out.
8           THE WITNESS:  I think --
9           THE COURT REPORTER:  Excuse me.  You
10 cut out on me.  Right after you said, Really, as
11 soon as Mark Brown started as the chief operating
12 officer, he was very focused on the backlog, the
13 issues that were kind of keeping us from getting
14 through the backlog, and how do we -- how do we
15 eliminate the backlog, and then you distorted on
16 me.  Sorry.
17           THE WITNESS:  Okay.  I don't think I
18 said anything helpful after that so -- and I don't
19 remember exactly what I said.
20           But, yeah, that was his focus so I
21 guess it was -- you know, when he started at that
22 period of time in February, March 2019, that he
23 started asking about it, and probably very soon
24 thereafter, you know, started pushing us to hit
25 numbers and, you know, have to report on it very

Page 165

1  regularly.
2           I'd say no later than the fall of 2019,
3  but it might have been a little earlier than that,
4  too.
5  BY MS. ELLIS:
6      Q    Did the -- did the number of --
7      A    (Inaudible.)
8      Q    I'm sorry.  What?
9      A    Sorry.  Everybody just froze on me
10 there, so -- I don't know if it's my connection
11 or --
12           MR. MERRITT:  It might be yours, I
13 think, from my perspective at least you're --
14           THE WITNESS:  Can you hear me?
15           MR. MERRITT:  Now, yes.
16 BY MS. ELLIS:
17     Q    Okay.  Can you hear me?
18     A    I can hear you, yep.
19     Q    Okay.  We'll keep going and see what
20 happens.
21     A    Yep.
22     Q    So did -- did the number of
23 applications adjudicated become part of FSA's
24 annual performance metrics this year?
25     A    I believe so, but, yes.

Page 166

1    Q    Had the number of applications
2  adjudicated been a performance metric before 2020?
3    A    I'm so sorry.  I'm having trouble.  Can
4  you say that one more time?
5    Q    It's okay.  I understand.
6         Had the number of borrower defense
7  applications adjudicated been part of FSA's annual
8  performance goals before 2020?
9    A    Not -- not formally.  I think in 2019
10  we were reporting on them very regularly, but, you
11  know, FSA has very defined -- a strategic plan
12  with very defined goals, and borrower defense is
13  now part of those goals, but I don't think it was
14  in 2019 part of the formal goals for the --
15    Q    What about --
16    A    -- organization generally.
17    Q    What about in 2018?
18    A    Like I said, I don't think it was
19  anything formal.  It was a new unit, so it
20  sometimes takes a while for all of the -- for
21  everything to catch up with new -- new parts of
22  the organization, so I think it was really 2020
23  before it became a formal part of the goals.
24    Q    Does meeting that goal affect your
25  compensation?

Page 167

1    A    Not per se, but it, I suppose, is part
2  of my job, so if we, you know, completely fall
3  down on the job, I would imagine my reviews
4  wouldn't be very good, but there's not a
5  specific -- I don't have a quota or anything along
6  those lines in -- in my performance plan, if
7  that's what you're asking.
8    Q    Who -- who reviews the data showing
9  progress toward the goal of maximizing
10  adjudications per week?
11    A    I'm really struggling here with the
12  phrasing.  Should I maybe log out and log back in.
13  And the tech folks can tell me what I can do to
14  make it better.
15         MR. MERRITT:  I suggest we take a
16  break -- a short break and try and troubleshoot
17  it.
18         MS. ELLIS:  Yeah, let's take a
19  five-minute break off the record.
20         THE VIDEOGRAPHER:  We're now going off
21  the record.  The time is 19:08 UTC.
22         (Recess -- 2:08 p.m.)
23         (After recess -- 2:14 p.m.)
24         THE VIDEOGRAPHER:  We're now on the
25  record.  The time is 19:14 UTC.

Page 168

1         MS. ELLIS:  And I'll just say for the
2  record that we fixed or tried to fix our technical
3  issues here by having Ms. Nevin connect via her
4  phone audio, and for that purpose, we have no
5  issue with her phone being in the room even though
6  we had talked earlier about putting it aside, so I
7  just wanted to make sure that was clear for the
8  record.
9         THE WITNESS:  Thank you.
10         BY MS. ELLIS:
11    Q    So, let's see, I think let's pick back
12  up in November of 2019.  Around that time, did you
13  become aware of a memorandum describing a new
14  partial relief methodology for borrower defense
15  claims?
16    A    Yes.
17    Q    Do you know who wrote that memorandum?
18    A    I believe it was Jeffrey Appel and Ian
19  Foss in consultation with Diane Jones and
20  potentially other folks on her end.
21    Q    Okay.  Do you know whether that
22  memorandum has been provided for production in
23  this case?
24    A    I don't know.
25    Q    Okay.  Do you have a copy of it in your

Page 169

1  possession in your computer files?
2    A    I'm sure I do.
3    Q    Okay.  What was your involvement in
4  developing the 2019 partial relief methodology?
5    A    In -- sometime in the fall of 2019, I
6  remember Mark Brown instructing Jeff -- Jeffrey
7  Appel and Ian Foss to follow up with OUS on what
8  she was looking for or what they were looking for
9  as senior leadership at LBJ.
10         And I was, kind of same thing as
11  before, in a consulting role on what data points
12  we had available in terms of borrower applications
13  and -- and it's OUS data and things that would be
14  in our system that could potentially be relevant.
15         And, then, Jeff and Ian came up with
16  options -- a series of options, I guess, and, you
17  know, to the extent they needed input on data,
18  that was -- that was my role there.
19         And then there was a meeting that I
20  participated in or attended with -- with the under
21  secretary, with Diane Jones, and Jeff and Ian, and
22  some other folks where the options were discussed.
23    Q    Was it your understanding in the fall
24  of 2019 that no borrower defense decisions were
25  being processed because this relief methodology

Page 170

1 had not been finalized yet?
2     A    I don't know that it was ever framed
3 that way, but they weren't being issued until we
4 could issue approvals, and we couldn't issue
5 approvals until there was a release methodology,
6 so that's how it was framed.
7     Q    What's your understanding of what the
8 2019 partial relief methodology prescribes?
9     A    I won't even begin to try to opine on
10 standard deviations, so, you know, lawyers and
11 math, I'm definitely one of those folks.
12          It's, I believe, an effort to compare
13 ascribed average earning, something along those
14 lines, to other data sets.
15     Q    But it's based on -- it is not based on
16 in any way on the borrower's actual earnings; is
17 that correct?
18          MR. MERRITT:  Objection.  What is
19 the -- this is not in the scope of the court's
20 order, the actual merits of the methodology.
21 BY MS. ELLIS:
22     Q    So was -- was it after the 2019 partial
23 relief methodology was announced that the pace of
24 adjudications of borrower defense applications
25 increased?

Page 171

1     A    Well, that affected the pace of issuing
2 decisions.  The pace of adjudications was more
3 closely related to the hiring of additional staff.
4     Q    Was the hiring of additional staff in
5 the fall of 2019 made in anticipation of a new
6 relief methodology being announced?
7     A    Not directly.  It was related to the
8 desire to -- to complete review of all the cases
9 in the backlog, so I don't think it was
10 specifically intended to be tied to the release
11 methodology.
12     Q    As of right now, how many full-time,
13 nonterm attorneys are working in BDU?
14     A    Oh, there are a couple I'm trying to
15 remember whether they're term or permanent, but I
16 believe it's 11 plus myself.
17     Q    And you -- you mentioned hiring a
18 number of term attorneys as well.  About how many
19 of those are there?
20     A    I want to say it's 40 -- it's either 47
21 or 52.  It might be 52.  Actually, we just had one
22 person leave for another position.  It might be
23 51.  Somewhere in that range, though.
24     Q    Okay.  And of the full-time and term
25 attorneys working at BDU, how many of them are

Page 172

1 currently working on developing protocols for
2 non-Corinthian schools?
3     A    Well, again the protocols follows the
4 development of the summary of the facts, and then
5 a legal analysis on 2016, and then a legal
6 analysis on 50 different states, if it's a school
7 that's that expansive, and if it's not, then
8 whatever states are relevant to that analysis.  So
9 if they're was only one state, then you would only
10 need the legal memo for '95 on that particular
11 state.
12          But, I guess, your question assumes
13 that they're only working on one thing.  I have a
14 lot of people who are kind of working on multiple
15 work streams, so I would say probably half are
16 working at least part of their time on reviewing
17 the evidence, summarizing the evidence, developing
18 the facts, developing the legal memoranda and
19 then, ultimately, the protocol to adjudicate
20 cases.
21     Q    And while all of that research and
22 analysis is underway, are applicants from the
23 schools under review held up, or are they in the
24 work stream for adjudication.
25     A    I'm not sure I understand the question.

Page 173

1 Can you say that again?
2     Q    Okay.  So if the school is in this
3 process of having evidence reviewed, having the
4 law analyzed, are actual borrower defense
5 applications related to that school -- are they
6 put aside waiting for the completion of the
7 protocol or are they put into a general pool for
8 adjudication?
9     A    No, they would be -- they're not --
10 they're not adjudicated right now.  They would
11 be -- remain pending.  Our platform is set up so
12 that we have sort of different statuses and ways
13 to track where people are in the process.  They
14 would not end up in a pool for adjudication unless
15 somebody makes a mistake, but, generally speaking,
16 the -- the people who have applications related to
17 the common evidence remain pending.
18     Q    Okay.  I'd like to look at tab 19 of
19 the materials on the Dropbox.  This is bracket 19
20 ECF 145 Defendants' Response re frog list.  This
21 was introduced as -- as Exhibit 19 at Diane Jones'
22 deposition.
23          (Exhibit 19 referred to.)
24 BY MS. ELLIS:
25     Q    So this is a filing in this case.  The

Page 174

1  title of the filing is Defendants' Response
2  Regarding the Court's Request at the October 1st,
3  2020 Class Hearing.
4          Do you see that?
5     A   I do.
6     Q   Okay.  And appended to this document --
7  appended to the main filing is the declaration of
8  Mark Brown, and then appended to the declaration
9  of Mark Brown, a document called Attachment 1 is a
10  chart.
11          Do you see -- it starts -- the 13th
12  page of the PDF, the 13th page of the document.
13     A   Yes.
14     Q   Have you seen this document before?
15     A   Yes.  My team put this together at my
16  direction.
17     Q   Sorry.  I didn't catch that.  Who put
18  it together at your direction?
19     A   I'm sorry.  My team.
20     Q   Which is --
21     A   Some of the senior members of my team,
22  yeah.
23     Q   Okay.  And did you ask them to do so
24  for the purposes of this filing, or was it a
25  document that existed before?

Page 175

1     A   It was created for this filing.
2     Q   Okay.  So in column 3, if I'm reading
3  this correctly, column 3 describes the common --
4  the sources of common evidence for each school
5  that's listed in column 1.
6     A   That's correct.
7     Q   Okay.  If we could look at page 3 of
8  this chart, the school ownership group listed in
9  column 1 is Career Education Corp.?
10     A   Yes, I see that.
11     Q   And this includes Brooks Institute,
12  which we were discussing earlier?
13     A   Right.
14     Q   So, I guess, could you explain a little
15  bit how -- how you get from the common evidence
16  listed in column 3 to the exclusions listed in
17  common 2 -- in column 2?
18     A   The exclusions listed in -- so common
19  evidence is in 3.
20     Q   Yes.
21     A   That -- that's the documents and, you
22  know, the evidence that my team is aware of and is
23  in the course of reviewing to develop or to hold
24  for potential approvals.  And in assessing the
25  scope of these various -- so for -- you know, for

Page 176

1  CEC, New York AG's office, Pennsylvania AG's
2  office, and accessing the scope of these materials
3  that were provided, they summarized that in a memo
4  and then determined what kinds of cases
5  potentially may have supporting evidence in -- in
6  here, and then from there what cases could be
7  cleared for adjudication because we didn't have
8  common evidence.
9          So that's where you get to column 2.
10  Column 2 is basically a summary of what got
11  cleared for adjudication, I believe, if I'm
12  remembering correctly.
13     Q   Okay.  So an application that fits a
14  description in column 2, the borrower could
15  theoretically provide sufficient evidence
16  themselves to have their application granted, but
17  they're not going to be within -- considered to be
18  within the scope of common evidence.
19          Is that accurate?
20     A   Well, this is worded that it's
21  applications that do not fit the criteria below,
22  so I think there was some variation on how it
23  was -- you know, for different schools, how it was
24  framed.
25          But for this one, it looks like for

Page 177

1  CEC, this is identifying having categories of
2  applications determined not to be within the scope
3  of common evidence.
4          So it's kind of a double negative,
5  which makes it confusing, so I'm going to read
6  this again.
7          (Witness reviews document.)
8     Q   So -- so does this will say that for
9  CEC, the way it's phrased, does this mean that
10  the -- the bullets here in column 2 for CEC are
11  the types of claims that do fit the common
12  evidence?
13     A   That may, may.
14     Q   May --
15     A   You know, there are not going to be any
16  kind of final conclusions at this point because
17  there's still more work to be done on this, but
18  these are the categories of applications that
19  would be satisfied under the protocol or not
20  assigned at all.  To the extent from the data that
21  we can determine that someone attended during this
22  period of time, they wouldn't even get assigned.
23          But if they did get through to a
24  reviewer, the reviewer would see that, for
25  example, if the borrower enrolled between May 1st,

Page 178

```
1   '99 and May 22nd, 2004, at Western School of,
2   whatever, Health and Business, that claim would be
3   set aside.
4       Q    I see.
5           Do the claims set aside pending further
6   analysis of common evidence count in any way
7   toward the goal of clearing the backlog?
8       A    No, they're just still pending.
9       Q    So if more claims were set aside, it
10  would affect BDU's ability to meet the
11  adjudication targets?
12      A    If more claims were set aside, it just
13  would mean that we'd probably would be
14  prioritizing other claims.  We've got a lot of
15  cases to get through, so -- so, yeah, I mean,
16  we're not setting aside claims just to meet our
17  metrics.  I get yelled at.  It's okay.  I move on.
18  But, you know, we're trying to get through them as
19  efficiently as possible under the mandate, but
20  we're not, you know, shortchanging reviews in
21  order to do that.
22      Q    So the column 3 evidence listed here
23  for CEC, it doesn't appear to include evidence
24  that is culled from -- from borrower defense
25  applications themselves; is that correct?
```

Page 179

```
1       A    Well, if there is such evidence that's
2   broadly applicable and it shows up in the
3   sampling, then it potentially would be described
4   here, but I'm not aware of us having seen anything
5   from CEC borrowers that was kind of -- of the
6   scope that would be that broadly applicable.  I'd
7   have to check with my team to see if they're aware
8   of anything, but I'm not.
9       Q    What about if many borrowers describe
10  the same type of misconduct?  Is there any sort of
11  critical mass that -- that warrants those
12  allegations being treated as evidence or at least
13  further looked into?
14      A    It's -- it's not necessarily a critical
15  mass, but, certainly, if there are a lot of
16  borrowers who are making the same specific
17  allegations, then that would be something that --
18  that we would consider.
19          And, I believe, that's actually
20  reflected in the ITT facts; that it's
21  corroborating evidence, essentially.  It's not the
22  only evidence.  We have other evidence, too.  But
23  that borrowers are making the same kinds of claims
24  or referring to the same documents that they think
25  was misrepresenting something to them.  If it's --
```

Page 180

```
1   if it's, you know, specific, it certainly could be
2   corroborating evidence.
3       Q    Are you aware of that kind of
4   corroborating evidence for any school other than
5   ITT?
6       A    Well, that's the only one that we've
7   completed recently, so I know there are others.  I
8   couldn't tell you what their names are.  You know,
9   some of them are smaller schools that wouldn't
10  necessarily be, you know, the kind of schools that
11  you would know off the top of your head, but there
12  certainly are others.
13      Q    So looking again at CEC, so for -- just
14  to make sure I understand, so someone who enrolled
15  at Western School of Health and Business between
16  May 1st, '99 and May 22nd, '04, they would
17  potentially meet the common evidence and be set
18  aside?
19      A    They would be set aside.  The common
20  evidence may provide support for some -- one or
21  more elements of their application, so, you know,
22  if somebody alleges a misrepresentation claim,
23  there's the -- was the representation-made piece
24  and then the is-it-false piece or misleading or
25  deceptive or whatever the standard is.
```

Page 181

```
1           The common evidence may support part of
2   that and not the other part, so it's very specific
3   to the regulation and the lot at the end of the
4   day.  But these cases are set aside because there
5   may be some common evidence that will get them
6   over the hurdle on one or more of the elements
7   potentially depending on what the law is that
8   applied to their case.
9       Q    Okay.  So if someone applied -- if
10  someone enrolled at Western School of Health and
11  Business other than during that date range, they
12  would still have the opportunity to make out their
13  claim by evidence they submit themselves; they
14  just wouldn't be assisted by the common evidence?
15      A    That's right.
16      Q    Would that be treated under what you've
17  called the one-off claim protocol?
18      A    Well, yes, because basically it will
19  tell the reviewer to set that case aside for
20  further review by a senior attorney who will then
21  look at whether or not there's sufficient evidence
22  on all of these different issues.
23          So if -- if the borrower is not during
24  that time period, so we're looking at what their
25  own evidence is to satisfy each of the elements.
```

Page 182

```
1    If the reviewer sees any borrower evidence to
2    support even some of it, then that's it.  They
3    stop and it gets set aside, you know, escalated,
4    essentially, for consideration by one of the
5    senior team.
6        Q    So if an applicant provides any
7    documentation to support their claim, it gets set
8    aside?
9        A    Not any documentation because a lot of
10   what we get is -- you know, we have borrowers who
11   allege, you know, an employment prospect, kind of
12   they guaranteed me a job type of thing.  And then
13   the evidence that they attached may be relevant to
14   something but not to that, so like a transcript or
15   a program manual that doesn't have any
16   representations regarding employment prospects,
17   things like that.  There would have to be evidence
18   relevant to the claim that would potentially
19   support the claim.
20          If they make multiple claims and the
21   evidence is relevant to any of that, then it would
22   be set aside.
23       Q    Does the department make available any
24   guidance to borrowers about the types of documents
25   they should submit to support their claims?
```

Page 183

```
1        A    We -- the new application form, we
2    tried to build that into it to, you know, give
3    borrowers an indication of the kinds of things
4    that would be helpful.  So to some extent, I think
5    that's in the newer application.  I'm not aware of
6    anything that was out there, though, previously.
7        Q    Did the department make publicly
8    available any sort of list or other reference
9    of -- of schools, programs, time periods for which
10   common evidence exists?
11       A    Well, I think this is public now, so --
12       Q    Right.
13       A    -- I guess, yes.
14       Q    But before -- let's say before
15   October 14th, 2020, when this was filed, was any
16   sort of list like that publicly available?
17       A    No.
18       Q    So a borrower, at the time they apply,
19   wouldn't have a way of knowing whether their claim
20   could potentially fit into existing common
21   evidence?
22       A    That's correct.
23       Q    And they wouldn't necessarily know what
24   kind of documentation they would have to submit in
25   order to have their claim considered?
```

Page 184

```
1        A    That's probably fair.
2        Q    I'd like to look at tab 25 in the
3    printed materials on the -- on the Dropbox.  This
4    is bracket 25 Nevin Declaration Exhibit 18
5    standard protocol.
6           MS. ELLIS:  And this has not previously
7    been marked.  I'd like to -- I'd like to mark
8    this -- I believe we're on Exhibit 23 now.
9           (Deposition Exhibit 23 was marked for
10   identification and attached to the transcript.)
11       BY MS. ELLIS:
12       Q    Do you recognize this document?
13       A    Yes.
14       Q    Can you describe what this document is?
15       A    It's a standard protocol, so this is
16   what would be used for -- like we were referring
17   to before, the cases that, you know, are a one-off
18   kind of scenario or, you know, where there's not
19   common evidence that would result in a separate
20   protocol being developed for that particular
21   school.
22       Q    And when -- when you say "one-off,"
23   that doesn't necessarily mean that there was only
24   one claim from that school; right?
25       A    That's right, because one turns into
```

Page 185

```
1    two as soon as somebody else files one.  So, yeah,
2    we use that loosely to mean generally, you know,
3    very small number of claims.  I think, typically,
4    we've viewed the threshold that, you know, under
5    ten historically, but there are cases where we
6    have probably somewhere in the 10 to 20 range that
7    might still get this.
8        Q    Would this be a protocol that's applied
9    to claims where there might actually be many from
10   a particular school, but they've been determined
11   to fall outside the common evidence?
12       A    What do you mean by "many"?
13       Q    Well, for instance, let's say Art
14   Institutes, potentially thousands of claims.
15       A    No, this would never be for anything
16   like that.
17          If you look at the 2A -- 2A, you move
18   on to part II.  2B, 6 to 20, there's a memo
19   template that's completed as soon as the school
20   hits six claims to determine whether the
21   department, you know, has got any records
22   regarding the school.
23          We do that for -- for part A, that's
24   kind of done on the back end in the clearance
25   process, but, you know, the schools that are in --
```

Page 186

1  that fall into that 2A are typically, you know,
2  state school, you know, kind of -- could be
3  anything.  We've got Ivy league schools that fit
4  into that category.
5          But 2B, as soon as you hit that
6  threshold, there's an Internet search.  We look to
7  see if there's, you know, AG actions, things like
8  that.  So there's kind of a short memo where we
9  summarize whether there's anything out there that
10 we know about.  And, then, once it hits 20, then
11 it gets kind of a longer memo with sampling.
12     Q    So what -- what would be the protocol
13 applicable to a school that has more than a
14 hundred cases?
15     A    So we'll be producing those, but they
16 would each have their own individual protocol, so
17 it wouldn't be the standard protocol that would be
18 used, and it will define the categories that would
19 match up with that spreadsheet that we -- or the
20 chart that we were just looking at.  So, you know,
21 depending on what the parameters are of the
22 evidence -- the scope of the evidence generally,
23 then we would determine what's going to get set
24 aside, essentially.
25          So it may be that it's all campuses,

Page 187

1  all, you know, programs for some period of time,
2  and then anything that's inside that window gets
3  set aside.  It might be that it's limited to a
4  certain program like, you know, the criminal
5  justice one that I was referring to before, so a
6  nursing program, we would go ahead and adjudicate
7  it.
8          And in that instance, it will probably
9  mirror the standard protocol to a large extent for
10 things that fall outside, but it has very specific
11 instructions on things that are related to or
12 potentially related to the common evidence.
13     Q    So for one of those schools that has
14 its own school specific protocol, the reviewer
15 first would compare the application to the scope
16 of the common evidence as it's been determined so
17 far; is that correct?
18     A    Not the reviewer.  The reviewer opens
19 the application, looks at the school.  There's a
20 spreadsheet that identifies what the appropriate
21 protocol is for that school.  They pull up the
22 protocol.  That protocol has already kind of
23 delineated what's related to the common evidence
24 and what's not by telling them what cannot
25 adjudicate, so, you know, if you find that your

Page 188

1  borrower enrolled between 2010 and 2012, advise
2  your supervisor, move on, or move the case to
3  status X and move on.
4          If it doesn't do that, then next look
5  for this because maybe we have common evidence
6  related to a specific campus somewhere during a
7  different period of time.  If so, advise your
8  supervisor and move on, or move it to status,
9  whatever, and move on.
10         If you jump through those hurdles and
11 it's not matching up with anything that's in that
12 chart, then you kind of get to what mirrors the
13 standard protocol, and, then, it's based on what
14 the borrower has, him or herself.
15     Q    Okay.  So once -- once you've
16 determined that it should not be set aside based
17 on the common evidence protocol, you would go to
18 something that looks like what's called part II
19 here in the standard protocol?
20     A    Correct.
21     Q    Okay.  So here for these schools where
22 there's less than 100 cases, there might be this
23 small-batch or medium-batch memo created depending
24 on the number of claims.
25          And, then, what happens to those memos

Page 189

1  once they're created?
2     A    What do you mean what happens to them?
3     Q    The instruction number -- part I,
4  instruction 3 here says, Once you complete the
5  appropriate memo, email the appropriate borrower
6  defense attorney to tell them you've completed the
7  memo, then what does the borrower defense attorney
8  do with the memo?
9     A    So, then, it's in somebody else's
10 court, so if your question is what would happen
11 with respect to the reviewer, it tells them to go
12 on to the cases where -- you know, that's not the
13 case.
14         But the memo itself then would be
15 reviewed and edited and probably follow-up
16 questions and discussions and maybe further work
17 with respect to the memo before it's finalized.
18 So that kind of gets handed off to one of the more
19 senior team members at that point.
20     Q    What's the usual turnaround time for
21 the senior team member reviewing the memo and
22 getting back to the person who wrote it you?
23     A    I don't know, but I'm sure it varies
24 pretty considerably based on workloads.  Nearly
25 all of my senior attorneys and a good number of

Page 190

1  junior attorneys work on multiple things, so it
2  probably varies quite a bit.
3       Q    Do you know how many small- and
4  medium-batched memos have been written?
5       A    I don't know what the breakdown is.
6  Like I said, we have about 500 memos altogether, I
7  think, somewhere in that neighborhood.  So it's
8  some subset of that, but I couldn't give you
9  ballpark on that.
10      Q    These are included -- when you say,
11 generally, you have about 500 school-specific
12 memos, that includes these ones for the smaller
13 schools?
14      A    Yes.
15      Q    Okay.  This document is watermarked as
16 a draft.  Is it actually a draft?
17      A    I don't -- I'd have to do kind of a
18 line-by-line comparison.  It may be just that --
19 when was this produced?  Last November?
20      Q    Yes, this was attached to your book
21 number 2019 declaration.
22      A    Yeah, I can't say for sure, but if it
23 was -- what was it attached to?
24      Q    It was exhibit 18 to your declaration
25 from November 2019.

Page 191

1       A    Oh, we might have just enclosed the
2  wrong document, then.
3            We certainly had a final version of
4  this, and this looks, if not exactly like that --
5  or it very well may be the final version and just
6  the watermark wasn't removed.
7            Or, you know, we've had so many
8  platform updates, so if you see in here in a
9  couple of places it has, like, status numbers and
10 things like that, so we've tweaked the protocol
11 any time there's a change in the platform that
12 requires something to be adjusted to make sure
13 that the data is appropriately corrected.  I'm
14 wondering if it was in connection with something
15 along those lines that maybe there was an update
16 and they added a draft stamp and we just didn't
17 take it off.
18      Q    But this is at least very close to the
19 final form of this document that reviewers
20 actually use?
21      A    Yeah, it definitely looks to be, if not
22 the document, to be very close to it.
23      Q    Great.
24            Moving down to part II, entitled Case
25 Review, part II instruction 2, refers to -- and it

Page 192

1  looks like in the original it hyperlinked to a
2  document called Types of Claims 10/23/2018.
3            Can you describe what that document is?
4       A    Yeah, so it -- it kind of breaks down
5  examples of, you know, what states a claim and
6  what doesn't state a claim just to make it kind of
7  more concrete for training purposes and to refresh
8  people's memories when they're doing these if they
9  haven't done that particular claim for a while.
10           So an example would be -- I think one
11 of the things in there would say something -- it
12 says something like, doesn't state a claim would
13 be my credits didn't transfer, but the borrower
14 doesn't make any allegation that the school ever
15 told them that their credits would transfer.
16           And then the corollary of what does
17 state a claim is the school told me that my
18 credits would transfer, but they didn't.
19           So it kind of gives different kinds of
20 examples.
21           Similarly, I couldn't get a job would
22 be, you know, not something that includes the
23 representation or some kind of conduct on the part
24 of the school, but the school promised me that I
25 would get a job when I graduated, that --

Page 193

1  that's -- so it's things like that, and it's based
2  on kind of the type of common allegations that we
3  have.
4       Q    Do you know if that document has been
5  updated since 10/23/2018?
6       A    I don't think so because that kind of
7  thing doesn't change.  I would have to check, but
8  I believe it's still actually the same document in
9  our current protocols and that would be produced
10 to you with our other protocols.
11      Q    Okay.  What if there's an allegation
12 that doesn't sort of comfortably fit within the
13 types of claims that are described in that
14 document?  What would a reviewer do with that?
15      A    Yeah, we have an "other" bucket on the
16 application, so, you know, they're kind of our
17 common kinds of allegations, and then there's an
18 "other" at the end.  So we do typically get that
19 phrase, but if they see anything that's not
20 clearly covered by something that they have a
21 protocol for, that they should contact their
22 supervisor and get further instruction.  So that
23 would be set aside until they had clear
24 parameters.
25           If it was something novel, that could

Page 194

1  potentially end up in all the cases for that
2  school being put on hold until we figure out
3  whether there's any common evidence related to it,
4  be, but it doesn't happen that often believe it or
5  not.  We tend to see a lot of the same kinds of
6  things over and over again.
7      Q     Okay.  On instruction 4, If the
8  borrower attaches any evidence that supports that
9  borrower's particular allegation, but does not
10 indicate any larger action against the school,
11 email your assigned QC attorney, et cetera, and
12 stop work on the case.
13          So that's the situation we were talking
14 about earlier, right, where, if the reviewer
15 thinks that there's sufficient evidence to support
16 the claim, they're to elevate it?
17     A     Not even sufficient.  Any evidence that
18 supports the claim.
19     Q     How -- how do you draw the distinction
20 between evidence that supports a borrower's claim,
21 but not a more general claim -- or not a larger
22 action against the school as it's put here?
23     A     You know, the latter -- the sort of
24 borrower-specific scenario.  It could be an email
25 that a recruiter sent to an individual borrower,

Page 195

1  so, you know, making a promise in that email,
2  that's not something that was publicly
3  disseminated to a whole bunch of other people
4  unless there's evidence that that recruiter, you
5  know, was making similar allegations to other
6  people and, you know, this would suggest that
7  we're not aware of any common evidence to that
8  effect.  Then that would be borrower specific, so
9  it wouldn't give enough to get somebody else over
10 that hurdle.
11          So that would be a borrower-specific
12 scenario.
13          More often, though, if we see common
14 evidence, if in doubt, it kind of gets thrown into
15 the pool of common evidence and is considered
16 broadly if it's not clearly borrower specific.
17     Q     So in -- in that sort of scenario, if a
18 borrower attached an email from a recruiter where
19 the recruiter, you know, clearly was
20 misrepresenting guaranteed employment or something
21 like that, and the reviewer then elevated that
22 application and said, you know, here's this email
23 that I think supports the claim, would that
24 trigger any sort of investigation or claim
25 sampling from other students at that school to

Page 196

1  say, you know, let's see if other students also
2  were alleging guaranteed employment,
3  misrepresentations around that time?
4      A     Well, a couple of different things
5  could happen there.  You know, once you have the
6  name of a specific -- you know, if it was an email
7  from a recruiter, and now we know that the
8  recruiter is John Smith, we can search our -- you
9  know, our claims.  We have the ability to search
10 somewhat in our system to see if John Smith shows
11 up in other borrower applications, so we would
12 probably do that to see if other borrowers has had
13 an allegation regarding him.
14          Any time that we discovered new
15 evidence, we also would potentially consider
16 reopening other cases.  So it could be that
17 something like that would give rise to
18 (indiscernible) what we have, and if it's an open
19 school, maybe requesting documents from the
20 school.
21          But we haven't had that happen very
22 often to be honest with you.  So I think that
23 there's a pretty small number where the borrowers
24 have that level of information, usually
25 (inaudible) --

Page 197

1          THE COURT REPORTER:  Guys, I'm not
2  hearing her at all.
3          MR. MERRITT:  Yeah, she just cut out.
4          MS. ELLIS:  Colleen, your audio just
5  went out.
6          MR. MERRITT:  Now, it says you're on
7  mute, Colleen, for whatever that's worth,
8  but . . .
9          THE WITNESS:  Can you hear me?
10         MS. ELLIS:  Now, we can.
11         MR. MERRITT:  Yes.
12         THE WITNESS:  I'm going to dial back
13 in.  My call just dropped for whatever reason.
14 I'm so sorry.
15         THE VIDEOGRAPHER:  Okay.
16         THE WITNESS:  I've go to go through
17 this process again.  Joe, can you walk me through
18 this again?  It doesn't look like I'm getting the
19 same options.
20         THE VIDEOGRAPHER:  Yes.
21         Would you like to go off the record,
22 Counsel?
23         MS. ELLIS:  Yes, could we go off the
24 record a minute to fix this?
25         THE VIDEOGRAPHER:  Sure.

Page 198

1    MR. MERRITT:  Yes.
2          THE VIDEOGRAPHER:  We are now off the
3    record.  The time is 19:58 -- excuse me,
4    19:59 UTC.
5          (Recess -- 2:59 p.m.)
6          (After recess -- 3:00 p.m.)
7          THE VIDEOGRAPHER:  We are now on the
8    record.  The time is 20:00 UTC.
9          MS. ELLIS:  Could the reporter please
10   read the last couple lines that you were able to
11   get before the audio cut out?  Dana, can you hear
12   me?
13         THE COURT REPORTER:  I'm sorry.  Were
14   you not hearing me?  I'm sorry.
15         MS. ELLIS:  Yeah, I think you were on
16   mute.
17         THE COURT REPORTER:  Okay.
18         MS. ELLIS:  Would you mind --
19         THE COURT REPORTER:  Sure.
20         MS. ELLIS:  -- just back those last few
21   lines?  Thank you.
22         THE COURT REPORTER:  Sure.
23         (The Record was read as requested.)
24         THE WITNESS:  Okay.
25   BY MS. ELLIS:

Page 199

1    Q    Do you have anything you'd want to add
2    to what you were saying?
3    A    No, I think that covers it.
4    Q    Okay.  So are reviewers given
5    anything -- any guidance that's sort of similar to
6    that types of claims 10/23/18 document for
7    evidence, something that would tell -- tell them,
8    here's the sort of evidence that supports a claim,
9    and here's the sort of evidence that does not
10   support a claim?
11   A    I don't recall.  There may be something
12   in the training materials, but, like I said, the
13   threshold is very low.  If they see anything that
14   could potentially support approval, they're
15   supposed to escalate it.
16   Q    I guess I'm just trying to understand
17   how they would identify a thing that could
18   potentially support approval?
19   A    I mean, I think we cover in the
20   training the kinds of things that we see in cases
21   and what borrowers typically include and whether
22   that does or doesn't support it, so going back to
23   my example, the most often scenario is we get a
24   borrower who alleges employment prospect kind of
25   claim and then attaches a transcript, so that

Page 200

1    would not support the employment-prospect claim.
2          But if the borrower alleged a
3    programmatic accreditation misrepresentation and
4    attached a manual that had any reference at all to
5    accreditation, that would be set aside.
6          So I don't know that it -- it may
7    actually be covered (indiscernible) done on type
8    of claim documents -- well, I can't remember.  But
9    that's the kind of thing we go over in the
10   training.
11   Q    Is that written down in training
12   materials, PowerPoints or handouts, anything like
13   that?
14   A    I don't recall.
15   Q    Do you know if anyone has searched for
16   materials like that for discovery in this case?
17   A    If we had searched for it?
18   Q    Yes.
19   A    I think -- I think we're pulling the
20   training materials in connection with one of the
21   requests.  I can't remember which one.
22   Q    Okay.  So I just want to understand.
23   The applications that are elevated either because
24   they might fit within common evidence or because
25   they provide some of their own evidence, those are

Page 201

1    elevated to the senior borrower defense attorneys;
2    is that correct?
3    A    You said -- you say this a couple of
4    times, "fit within the common evidence," and I
5    think I would say it's not that the application
6    fits within the common evidence.  It's that we've
7    concluded that the common evidence potentially
8    supports some part of the element of the
9    borrower's application.
10         And that said, in terms of elevated,
11   this is specific to kind of the scenarios of, you
12   know, one-offs and, you know, where it's outside
13   of the common evidence is the conclusion already.
14         So these are getting escalated to a
15   senior attorney to have a more meaningful
16   discussion about what the specific allegations or
17   evidence is, et cetera, and determine what the
18   next steps are.
19         So kind of different tasks.
20   Q    Okay.  So I'll take them one at a time.
21         If we're talking about the one-off or
22   no common evidence types of claims that have some
23   supporting documentation on their own, those are
24   elevated, you just said, to a more senior attorney
25   for a discussion of next steps.

Page 202

1      When -- how long does it generally take
2  between when an application is elevated and when a
3  final decision is reached?
4      A    That assumes that that's getting worked
5  on right away, and it's not.  So those are pretty
6  much set aside because they're more complex and
7  they're going to take more time to address.
8          So it's not that, you know, the
9  reviewer identifies it this morning, and then in
10 the afternoon they get feedback on it and the case
11 gets adjudicated.  If it's set aside, it's
12 probably set aside for some period of time until
13 someone has the bandwidth to, you know, dive into
14 the school a little more deeply and see if there
15 are additional steps that need to be taken.
16     Q    Okay.  Any -- can you make a
17 generalization about what that "some period of
18 time" might be?
19     A    No, there's no set time period.
20     Q    Okay.  So is it the case that many
21 applications that get elevated may be set aside
22 for weeks?
23     A    Sure.
24     Q    Yeah.
25     A    Yep.

Page 203

1      Q    Then -- but some -- have -- have any
2  applications that have been elevated under that
3  kind of protocol been finally adjudicated?
4      A    You know, if the reviewer is fairly new
5  and they're -- you know, they're following our
6  instructions, that the bar is very low, so if they
7  have any question at all, to kind of escalate it,
8  they may be escalating way too much and actually,
9  you know, escalating things that aren't evidence
10 that's actually related to the claim.
11         So I'm sure there have been some where
12 the supervising attorney works with the junior
13 attorney to explain why that actually wasn't
14 evidence that was related to the claim and,
15 therefore, it could be -- could move forward with
16 adjudication.
17         But there haven't been cases
18 adjudicated where there was a weighing of the
19 evidence.  So if the supervising attorney agreed
20 that it was evidence that was relevant to the
21 claim, then that would still be pending at this
22 point.
23     Q    Why haven't any of those been
24 adjudicated?
25     A    We're just -- it's a sequencing issue

Page 204

1  with priorities and trying to make sure that we
2  can adjudicate as many cases as possible.  Those
3  are much more time-consuming.  We probably would
4  want to document either way whether there was
5  sufficient evidence to approve it or that we
6  determined that it wasn't sufficient evidence.  So
7  those are still on hold while we work on the cases
8  that have protocols.
9      Q    Okay.  Is there -- is this generally a
10 written feedback process or a verbal one where the
11 senior attorney would tell the reviewing attorney
12 this is not really enough evidence; go ahead and
13 deny the claim?
14     A    I think it's often email or we use
15 Teams Chat or I think at one point we used Skype.
16 We also have very frequent training, so it could
17 take different forms depending on whether it's the
18 kind of thing that would -- you know, that more
19 than one reviewer might see.  Then it might be
20 something that would be addressed in a
21 supplemental training so that not just that
22 reviewer, but all of the reviewers, could get the
23 benefit of that information.
24     Q    So, then, as we continue looking down
25 the standard protocol, number 5 says, If the

Page 205

1  allegation does not state a claim, does not state
2  a BD claim or does not have sufficient evidence to
3  support a claim, set the allegation review
4  recommendation as denied.
5          So does this mean that -- that a
6  first-level reviewing attorney can deny a claim
7  based on their review of the evidence, but cannot
8  approve a claim based on their review of the
9  evidence?
10     A    Well, no, I would disagree with the
11 premise because they're not -- they're not denying
12 it based on a review of the evidence.  They're
13 denying it based on a lack of evidence, or they're
14 basing it on failure to state a claim or failure
15 to state a claim as actionable under BD.
16         But if your question is they deny it,
17 yes, the protocol clearly sets out what they're
18 allowed to do.
19     Q    When I said "review of the evidence,"
20 what I meant, essentially, was opening up the
21 application, looking at the application itself and
22 anything attached to it, and on the basis of
23 looking at those documents, they can deny the
24 claim.
25         Is that accurate?

Page 206

1     A     That's accurate.
2     Q     But they cannot approve the claim?
3     A     Well, once there's a protocol, they
4  will be able to.  So for Corinthian job prospects,
5  for Corinthian transfer of the credits, for
6  Corinthian JPR claims, all of those, ITT, they can
7  approve the claim.  It's just that it has to be
8  reduced to a very clear protocol with very
9  specific parameters.
10    Q     Understood.
11          But a line reviewer can't approve a
12 claim based on individual evidence submitted by
13 the borrower?
14    A     That's right.  We don't have them do an
15 assessment of, you know, kind of a weighing of the
16 evidence or determining the sufficiency.  It's too
17 complicated at that level to try to just open a
18 claim.  You'd have to understand what the elements
19 of the claim are, and that's dependent on the
20 regulation and the state law and, you know,
21 whether there's common evidence that supports some
22 element.
23          So the only way to make sure that we're
24 giving consistent and fair results is to give them
25 very clear criteria.

Page 207

1     Q     Why is it important to have consistent
2  and clear criteria for approvals, but not denials?
3     A     I disagree with your premise.  I think
4  that they're both consistent.
5     Q     Is there a protocol like the protocol
6  for approvals that lays things out consistently
7  and clearly to determine whether a claim should be
8  denied?
9     A     I think our protocols do lay that out
10 consistently and allow for a consistent and fair
11 adjudication either way.
12    Q     Are you referring to this standard
13 protocol as one example that allows a consistent
14 and clear result either way?
15    A     I said consistent and fair.
16    Q     I'm -- I'm sorry.  Yes.
17    A     Yes.
18    Q     The borrower defense senior attorneys
19 perform quality control review of the line
20 attorneys; is that correct?
21    A     We have a quality control team, and
22 then we also -- we have sort of different stages.
23 When somebody new joins BD, they go through a full
24 week of training and probationary period, so all
25 of their claims are reviewed at that point by

Page 208

1  either by somebody on the quality control team or
2  their supervisor or potentially both.  And then,
3  you know, throughout their, you know, review
4  process, depending on whether they're off of the
5  probationary period, then, you know, there's a
6  certain percentage of claims that are reviewed as
7  well.
8          So it kind of depends on how long
9  they've been with us and where they are in the
10 process, but we have a pretty robust training
11 process.
12    Q     I'd like to look at the responses to
13 interrogatories.  This is Exhibit 22.  I'm looking
14 at page 16 which if you flip back to page 15
15 you'll see this is the response to interrogatory
16 number 12 which asks about training for people who
17 adjudicate borrower defense claims.
18          At the bottom of page 16, this
19 interrogatory response refers to follow up
20 trainings to improve the quality of draft denial
21 letters around the end of 2018.
22          I was -- I want to ask about what --
23 what form of denial letter was being used at the
24 end of 2018?
25    A     These were -- people were trained on

Page 209

1  but they never went out.  These draft letters
2  were --
3          Let me read the paragraph for a second.
4          (Witness reviews document.)
5          Yeah.  So the earliest iteration of the
6  letters for one-off claims were not one of the
7  automated templates.  They were draft letters that
8  I mentioned before (indiscernible) trying to
9  figure out how to handle the one-off.
10         And, so, we had contract attorneys take
11 a crack at drafting the letters, and then they
12 were reviewed -- each letter would be reviewed by,
13 you know, a permanent member of the BD team and
14 work with the contract attorney to both review the
15 substance and the -- the form of the letter.
16         It was a very time-consuming and,
17 ultimately, not very successful effort to use the
18 contract attorneys in that capacity, so none of
19 those cases actually resulted in the receipt of
20 these letters.  They, ultimately, became, I think,
21 some of the letters -- the letters that went out
22 in 2019.
23    Q     In 2018 in -- around the end of 2018,
24 that was during the period when no decisions were
25 being processed; is that right?

Page 210

1    A    Yes.
2    Q    So this was a project you were working
3  on in anticipation of when processing began again?
4    A    Yeah.  Yeah.
5    Q    So for all of the borrowers who have
6  received form C or D denial letters since the end
7  of 2019, and those are the ones for non-Corinthian
8  claims, is it fair to say that none of -- none of
9  those applications had any evidence weighed in
10 relation to their claim?
11   A    Unless it was an ITT case for which we
12 had a protocol, so that would have been -- the
13 reviewer didn't do the weighing, but the weighing
14 was done before the approval protocol, but I think
15 with that exception your statement is correct.
16   Q    Okay.
17   A    One thing I just wanted to clarify
18 because I'm not sure I was clear on before.  When
19 we were talking about -- I think it was
20 Ms. Sweet's letter, you were also asking about
21 reliance kind of in a related thread.  I just
22 wanted to make clear that the letters C and D that
23 have gone out were not -- those were not based on
24 a denial related to reliance.
25        Those were based on the reasons that we

Page 211

1  just talked about.  Either a failure to state a
2  claim in the sense that they said, you know, I
3  couldn't transfer my credits, but they didn't say
4  that they -- you know, that there was a
5  misrepresentation.
6        That kind of thing is the failure to
7  state a claim that would be reflected in what went
8  out for the C and D category.
9        MS. ELLIS:  Okay.  I think we've been
10 going for a while with the exception for our tech
11 breaks, so let's take a real five-minute break
12 here if that's all right.
13        THE WITNESS:  Great.
14        MR. MERRITT:  Yes.
15        THE WITNESS:  Thank you.
16        MS. ELLIS:  All right.  Thank you.
17        THE VIDEOGRAPHER:  We are now off the
18 record.  The time is 20:21 UTC.
19        (Recess -- 3:21 p.m.)
20        (After recess -- 3:37 p.m.)
21        THE VIDEOGRAPHER:  We're now on the
22 record.  The time is 20:37 UTC.
23 BY MS. ELLIS:
24   Q    Okay.  So I'd like to go back to the
25 denial letter that Theresa Sweet received that we

Page 212

1  were looking at earlier that was tab 15,
2  Exhibit 15 from the Jones deposition and the
3  denial letter starts at page 51 of that document.
4    A    Sorry.  Is this the declaration of
5  Eileen Connor document?
6    Q    Yes, that's right.  And attached to the
7  declaration of Eileen Connor is the affidavit of
8  Theresa Sweet and attached to that is the denial
9  letter near the end of the document.
10   A    Got it.  Okay.
11   Q    Okay.  So looking down on the third
12 page of the denial letter, which is page 53 of
13 this document overall, there's a heading, What if
14 I do not agree with this decision.
15        Do you see that?
16   A    Yes.
17   Q    And it continues on the next page, In
18 your request for reconsideration, please provide
19 the following information, and there's a list of
20 three things to include in the reconsideration
21 application.
22        Do you see that?
23   A    I do.
24   Q    Okay.  Can you read item 2 on that
25 list, please?

Page 213

1    A    Item 2 is, Why you believe that ED
2  incorrectly decided your borrower defense
3  repayment application.
4    Q    Okay.  Based on reading this form D
5  denial letter, what basis would a borrower have to
6  assert that ED incorrectly decided her borrower
7  defense application?
8    A    Which claim, I guess, is she requesting
9  reconsideration on?
10   Q    Well, let's start theoretically with
11 Allegation 1, Employment Prospects.
12   A    So failure to state a legal claim.  I'm
13 sorry.  Can you repeat your question?
14   Q    I guess I'll -- I can rephrase.  How
15 would the borrower know what failure to state a
16 legal claim means in this context?
17   A    I don't really have an answer to that.
18 I don't know.
19   Q    Is there a standard reconsideration
20 form that a borrower can fill out?
21   A    Not currently.  There's a whole process
22 that has to happen for forms that collect data
23 from borrowers, so that was something that was
24 discussed a while back.  We've actually expanded
25 the reconsideration process beyond what the

Page 214

1  regulation requires because under the 2016
2  regulation, you can only -- well, you can seek
3  reconsideration if you have new evidence that
4  wasn't considered in connection with your
5  application.
6           I had already advocated for having a
7  reconsideration process, period, going back to the
8  beginning of time, but in particular I think with
9  respect to the pace that we're working on these
10 adjudications now, we wanted to make sure that we
11 had a mechanism for correcting any mistakes that
12 we made.
13          So -- so we've actually got a more
14 expansive reconsideration.  You know, it's more
15 expansive in terms of who can -- who can seek it.
16          You know, to the extent that these
17 letters maybe aren't perfect and could provide
18 better information, I don't know what the borrower
19 would look to in particular, but, you know,
20 certainly if they -- on that one if she, you know,
21 articulated her claim more fully -- sometimes we
22 get very short statements in the allegations, and
23 if she gave more information that perhaps could
24 lead to a different result.
25          We do have a lot of applications that

Page 215

1  came in before there was even an application, so
2  they were on emails, there was a template or an
3  entity called the Debt Collective.  I think
4  there's still an entity called the Debt Collective
5  that had their own form.  Sometimes it's just a
6  factor of how it came in, and there could be a
7  scenario where a borrower could provide more
8  detail in the request for reconsideration that
9  would result in a different result.
10      Q     Okay.  But there's nothing in the
11 denial letter that explains that to the borrower;
12 is that correct?
13      A     I think that's fair.
14      Q     And then looking at -- back at the list
15 of what to provide in the reconsideration
16 application, item 3 says, Identify and provide any
17 evidence that demonstrates why ED should approve
18 your borrower defense to repayment under the
19 applicable law set forth above.
20          So do I understand from what you've
21 just said that this isn't meant to require new
22 evidence; it's any evidence?
23      A     It could be new evidence.  It could be
24 that the borrower referenced evidence and then
25 didn't actually include it.  Maybe they thought we

Page 216

1  had.  I don't know.
2           But, you know, certainly, if they have
3  evidence that they didn't provide that wasn't with
4  their application, then that would be something
5  that would be helpful to do.  But it could just
6  be, you know, identifying evidence that may be
7  available elsewhere, too, because we may not know
8  about it.
9       Q     Okay.  But if a -- if a borrower were
10 to resubmit the same evidence they submitted the
11 first time but with a more fulsome explanation,
12 that would receive review as a -- as a complete
13 reconsideration application?
14      A     Under current policy, yes.
15      Q     Right above this section here above,
16 What if I do not agree with this decision, there's
17 another section that's titled, What evidence was
18 considered in determining my application's
19 ineligibility.
20          Is there any way for the borrower to
21 find out more about what was considered under this
22 heading beyond the description provided here?
23      A     Currently, no.
24      Q     How many people have applied for
25 reconsideration in 2020?

Page 217

1       A     I don't know if I've seen data on that
2  lately.  I believe it was at least a few thousand
3  as of a couple of months ago, but I can't be sure
4  of exact numbers.
5       Q     And what's the process for handling
6  reconsideration applications when they come in?
7       A     Well, we're -- we're adding some
8  enhancements to our -- our platform to kind of
9  provide a -- a better mechanism to do it, but
10 right now the -- the request comes in -- it can
11 come in -- sometimes it's immediately in response
12 to the email, so these notifications go out to the
13 borrower by email, and this tells them how to
14 respond.  So sometimes shortly after they get
15 their decision, they submit a request.  Other
16 times, they gather additional evidence and then
17 submit it later.
18          But it goes through our intake process
19 kind of -- sort of along the lines of the way the
20 application comes in, and then it's associated
21 with their application on the review platform.
22      Q     And then how long does it take between
23 when the application gets entered into the review
24 platform and someone actually reviews it?
25      A     We haven't actually started the reviews

Page 218

1  for reconsideration yet.  We just started building
2  up the reconsideration process for the
3  job-placement-rate claims in particular because
4  those have been the ones that have probably been
5  decided the longest, but we've been focusing on
6  trying to get through -- getting original
7  decisions to the entirety of the 340,000 people
8  that applied first and then reconsideration.  Once
9  I have a little bit more bandwidth, we'll start
10  moving forward on getting responses to those.
11      Q    Okay.  On -- I'm going down to the next
12  page again with the items 1 through 3.  And
13  looking at the paragraph following those numbers 1
14  through 3, the third sentence in that paragraph
15  says, Additionally, your loans will not be placed
16  into forbearance unless your request for
17  reconsideration is accepted and your case is
18  reopened.
19          What does "accepted" mean in this
20  context?
21      A    Well, we haven't really had to deal
22  with that yet because of the CARES Act and the
23  fact that all loans are in forbearance currently,
24  but that's something that we're trying to figure
25  out between now and the end of the year; although,

Page 219

1  I understand the secretary now just extended the
2  forbearance period into February because we want
3  to see if we can get that preliminary decision
4  issued before anybody's loans are affected.
5          But, essentially, you know, the way
6  that the regulation is set up, the borrower can
7  request reconsideration, and the department can
8  decide not to agree to essentially reconsider the
9  case.
10          So that's the framework that exists,
11  and so under that framework, it's not until the
12  department agrees to accept the request for
13  reconsideration and kind of do a rereview or
14  whatever that process looks like that the
15  borrower's loans are put into forbearance.
16          But one of the tricky things about that
17  is that by the time you've made that decision,
18  then it might be a pretty short window between
19  when you open the case and then actually issue a
20  new decision, so the borrower may not be in
21  forbearance very long in connection with that.
22          So we're trying to figure out how to
23  address that process.  I think we'll have probably
24  a better understanding of what that looks like in
25  a month or so.  Like I said, we're trying to

Page 220

1  figure that out before the CARES Act expires so
2  that we can address that.
3      Q    Is there a standard that's applied for
4  whether a reconsideration application will be
5  accepted?
6      A    There will be.  Like I said, we haven't
7  really filled out that process because we've been
8  focusing on trying to get results to the folks who
9  still have pending original claims.
10      Q    But it sounds like the acceptance
11  process does involve some sort of preliminary
12  review of the reconsideration application?
13      A    Potentially, but I think we're kind of
14  getting into a deliberative area right now in
15  terms of what way we go on it.
16      Q    Okay.  So you mentioned the 2016
17  regulations having a reconsideration process in
18  place.
19      A    It calls for a reconsideration process,
20  yes.
21      Q    Yes.
22          Had -- had a reconsideration process
23  been set up under the 2016 regs before these form
24  denial letters started going out?
25      A    The -- the groundwork for it in the

Page 221

1  sense that we had the mechanisms to kind of
2  collect the requests and that kind of thing, but
3  we don't have all the pieces in the platform that
4  we'd like before we can kind of efficiently handle
5  them.
6          So part of it, yes, enough for the
7  borrower to make the request to be associated with
8  a case and all that kind of thing, but not for an
9  efficient adjudication process yet.
10      Q    Okay.  So are there -- did the
11  department receive reconsideration applications in
12  2019?
13      A    I don't think so.  I think the earliest
14  ones came in in 2020.
15      Q    And that is likely because decisions
16  hadn't been issuing for most of 2018 and 2019;
17  correct?
18      A    Yeah.
19      Q    Okay.
20      A    Well, going back that to that time, I
21  was thinking because we had -- the first decisions
22  that went out in 2019 were at the end of 2019, and
23  there wasn't a reconsideration process before that
24  associated with the '95 reg.
25      Q    Okay.  So if -- if someone whose

Page 222

1  borrower defense application was decided under the
2  '95 reg had wanted to ask for reconsideration of a
3  denial, would they have had the option to do that?
4       A    At what point in time?
5       Q    Before the Bauer decision put the 2016
6  regs into effect.
7       A    No, there was no reconsideration
8  process before that.
9       Q    So, as you know, this case primarily is
10  about why there was such a long delay in issuing
11  borrower defense decisions.
12            In your view, what are the main reasons
13  why so few borrower defense decisions were issued
14  between January 2017 and January 2020?
15            MR. MERRITT:  Objection on the scope of
16  that question and to the characterization of the
17  case.
18            MS. ELLIS:  Can the witness answer?
19            MR. MERRITT:  Yes.
20            THE WITNESS:  I don't know that there's
21  one answer for that entire time period.  Can you
22  maybe break it up for me?
23       BY MS. ELLIS:
24       Q    Sure.
25            Well, let's start in 2017.

Page 223

1       A    Well, there were no decisions issued
2  for many months in 2017 associated with the
3  decision not to do anything with respect to what
4  we had already adjudicated and not to have more
5  claims pending the review panel and the AG review
6  and then the release methodology -- the
7  development of the release methodology.  So that
8  was 2017.
9            We did issue decisions between end of
10  2017 and May of 2018 primarily on Corinthian
11  cases.
12            And then in 2018 to November 2019, I
13  think it was tied to the relief methodology issue
14  and the policy to not issue decisions on denials
15  while they couldn't issue decisions on approvals
16  or felt that they couldn't issue decisions on
17  approvals.
18       Q    In your view, would it have been
19  possible to issue decisions on approvals in
20  between May 2018 and November 2019?
21       A    Not Corinthian job-placement-rate
22  decisions because of the relief methodology at
23  least under that methodology.
24            On the others, like I said, I think it
25  was a policy decision.

Page 224

1       Q    Was the difficulty of reviewing
2  borrower defense applications a primary reason for
3  the delay in issuing decisions?
4       A    The difficulty affected the volume of
5  the adjudication in the sense of -- you know, the
6  cases got a lot more complicated when the 2016
7  regulation went into effect in 2018 because now we
8  have a lot of cases that are subject to both, and
9  that determination needs to be made.
10            So I think that the -- the pace of the
11  adjudications was affected by various things that
12  made it difficult, but that didn't mean that they
13  couldn't be issued.  That was related to a
14  decision up the food chain.
15       Q    Was the staffing level of BDU a factor
16  in why there was a delay in issuing decisions?
17       A    It was a factor in the number of
18  decisions that were adjudicated.  So to the extent
19  that that was related, I guess it was a factor.
20  But it wasn't -- it didn't prevent decisions from
21  going out.
22       Q    Was the difficulty of discerning or
23  applying state law under the '95 regs a major
24  factor in why so few decisions were issued?
25       A    At what time?

Page 225

1       Q    Did -- did -- is the answer different
2  at different times?
3       A    Yeah, because the Corinthian cases were
4  adjudicated under California law, so that once we
5  had fully explored California law with respect to,
6  you know, the first memo, that really wasn't a
7  factor for Corinthian, which was our focus for a
8  good percentage of the time period at issue.
9       Q    Of the claims that have been
10  adjudicated since December 2019, why have there
11  been so few approvals?
12       A    Well, the premise of your question, I
13  think, is that, you know, it's not that the cases
14  are -- how do I frame that? -- we have a lot of
15  potential approvals, but they're not going out,
16  and we have a lot of decided approvals that are
17  not going out.  So we have -- I don't know what
18  the number is on Corinthian job-placement-rate
19  claims now, but we've proved well over 30,000 of
20  those over that time period that can't be issued.
21  So we've certainly done a lot of approvals on that
22  end.
23            We -- for sequencing purposes, like I
24  said, have focused on the cases that were the most
25  quickly adjudicated which was the Corinthian

Page 226

1  cases, the ITT California cases -- which is a
2  fairly small pool -- and then the cases that
3  didn't have common evidence or that didn't fall
4  within the parameters of, you know, the scope of
5  the evidence for schools where we do have common
6  evidence.
7        So those are just going to be more
8  likely than not denials, but that doesn't mean
9  that there aren't cases from those schools that
10  will be approved. It's just that they're not done
11  yet. So a lot of what we have left has a, you
12  know, much better shot at getting an approval than
13  the cases that we did before.
14        So we've kind of had a -- a weird cycle
15  of -- at the beginning of BD, it was all
16  approvals. Then there was a period of time where
17  it was primarily denials, not all because we were
18  still doing all those Corinthian cases. And now
19  we're probably moving into an area where we'll
20  have a lot more approvals again.
21        So it's largely a factor of sequencing.
22     Q     So your -- your assumption going into
23  this project in 2020 to clear the backlog, was
24  that claims not falling within common evidence
25  would likely be denied?

Page 227

1     A     No, just that they would likely have to
2  stand on their own merits, and so it would depend
3  on what the borrower had -- had provided, him or
4  herself. I didn't make any -- I didn't have any
5  expectation one way or the other as to what the
6  borrower would have, as I said. But we knew that
7  it wouldn't be supported by the common evidence to
8  satisfy the elements of the case, and so it would
9  depend on what individual borrowers came up with.
10     Q     And you expected that would be faster
11  to review than claims involving common evidence?
12     A     We knew it would be, yeah.
13     Q     How did you know?
14     A     Because all that time that you have to
15  spend to summarize the common evidence and develop
16  the legal memos and develop the protocols that are
17  specific to those memos, that all has to happen
18  first where there's common evidence. And for
19  cases where that's not true, they can just move
20  into adjudication.
21        So like I said, very much an issue of
22  just sequencing to adjudicate what didn't require
23  all that front-end work that's so incredibly
24  time-consuming.
25     Q     So you expected that there would not be

Page 228

1  a -- as significant amount of time spent analyzing
2  the evidence that an individual borrower provided
3  with their claim?
4     A     I expect that we would spend whatever
5  time is needed to be spent to look at the
6  borrower's evidence, but, you know, the time that
7  it takes to review an individual application
8  varies a lot depending on what they attached.
9        If they've got a lot of materials,
10  though, there's a pretty good chance that the
11  reviewer just figured there's got to be something
12  in there that potentially supports it and sets it
13  aside.
14        So, you know, for the most part that's
15  why these were much quicker adjudications, because
16  anything that looked like there's something there,
17  there -- there was, you know, a set aside for
18  those.
19     Q     You had mentioned earlier that a
20  mandate came from the under secretary to clean out
21  the backlog and also wanting BDU to adjudicate any
22  application within 90 days.
23        When did you receive that mandate?
24     A     Fall of 2019, I believe.
25     Q     Was that communicated to you verbally

Page 229

1  or in writing?
2     A     I know it was verbally, but I don't --
3  I don't know -- I mean, when you say was the
4  mandate communicated, it's kind of very commonly
5  known, I think, probably for FSA. Borrower
6  defense is a popular topic of the -- of the COO,
7  of the chief operating officer, that we're
8  expected to hit the 5,000 per week, and we do
9  weekly briefings, and our weekly performance
10  metrics are broadly circulated.
11        So I don't know when I first knew about
12  it. It probably was first told to me and then
13  maybe I saw something in writing. But, certainly,
14  I was told verbally, so I guess that's all I can
15  say for sure.
16     Q     And who told you?
17     A     Robin Minor.
18     Q     And then did you discuss with her the
19  strategy for how BDU was going to accomplish that
20  mandate?
21     A     Yeah. After I said I need a whole lot
22  more attorneys, probably. I think we were already
23  having conversations about -- we were already
24  hiring and -- interviewing and hiring people at
25  that point when I was told that the backlog needed

Page 230

1  to be fully eliminated this year, but we'd already
2  had conversations about how difficult that was
3  going to be and that we needed more staff to do
4  it.
5      Q    What's the status of the backlog as of
6  now?
7      A    Well, it depends on whether you're
8  talking about decisions issued or cases
9  adjudicated.  The decisions issued, that's kind of
10 not my lane, so I'm not exactly sure what the data
11 shows on that one.
12          But on the cases adjudicated, we've
13 probably got somewhere in the 50- to 55,000
14 neighborhood that still need most or all of the
15 work for review because they're probably waiting
16 for these review protocols that we've been talking
17 about.  And then there are probably another 10- to
18 15,000 that are in various stages of review.
19          So, you know, like we talked about one
20 application might have five claims, and there may
21 be a review protocol for two of them, and, you
22 know, not for the other three.  But if we can --
23 you know, if we had -- you know, this would mostly
24 be for Corinthian for or ITT.
25          But if we have an ITT review protocol,

Page 231

1  we can review that employment-prospects claim, and
2  if it's been proved, then the borrower can get
3  relief and we wouldn't have to wait for developing
4  the review protocols on the other pieces.
5          So sometimes we'll sequence it so that
6  we can try to get those cases out.  So that's why
7  I said there are probably a lot of cases that are
8  in process of being reviewed but not completed
9  yet.
10     Q    On average, how many borrower defense
11 applications are you getting each week nowadays?
12     A    Receiving?
13     Q    Yeah.
14     A    It's down a lot.  I think the last week
15 it was a very low number maybe related to the
16 holiday.  I think it was only in the hundreds --
17 like 3- or 400, which is low.
18          Prior to that, it was in a 500 to a
19 1,000 range, but this year has sort of been weird.
20 And it sort of depends also on, you know, whether
21 there's an announcement on a settlement with
22 respect to a school with these sites and things
23 like that.
24     Q    At any point since you joined BDU, have
25 you revisited the -- the policy regarding

Page 232

1  borrowers' statements being insufficient alone to
2  make out a claim?
3      A    You know, we probably will revisit a
4  lot of things with the incoming administration.  I
5  have had conversations with my team on a regular
6  basis about what we can do to, you know,
7  constantly improve our processes and what -- what,
8  if anything, we have found that would cause us to
9  want to revisit something.  But we haven't had any
10 policy discussions on that.
11     Q    Have borrower defense cases ever been
12 reopened based on later discovered evidence?
13     A    Not yet, but I'm pretty sure we will be
14 soon.  We had adjudicated some cases relating to a
15 school and then subsequently received some
16 evidence from an attorney general that could
17 change the outcome.  So I think that there were
18 potentially decisions that were issued that might
19 be covered.  I believe a lot of them are set aside
20 for a different reason relating to an internal
21 document, like a whatever oversight issue.
22          But that's something that we certainly
23 expect.  We're moving at a pretty fast pace, and
24 we're very likely going to have to reopen cases if
25 evidence comes in after the fact.

Page 233

1      Q    You mentioned earlier that before this
2  year you hadn't been in active communication with
3  state AG's offices.
4          Why was that?
5      A    There was a department policy about
6  external communications -- that they were to go
7  through -- I don't remember who.  I think the
8  office of policy and something or other over in
9  LBJ.
10          So we were not having any
11 communications with AGs or federal agencies for an
12 extended period.
13     Q    Do you remember when that policy went
14 into effect that you had to go through this office
15 in the main department?
16     A    Early 2017.
17     Q    And has that policy since been
18 eliminated?
19     A    Well, I don't know exactly how the
20 policy was documented, but we revisited it a few
21 times, and when I revisited it in 2019, my
22 understanding from Mark Brown and Robin Minor was
23 that we were given the green light to start
24 reaching out and having communications with --
25 particularly with attorneys general who had

Page 234

1  provided us with materials because for some of
2  them we got them, you know, the document in no
3  particular order and no index, and so we kind of
4  needed a road map for what did you send us, what
5  is this, what does it show, what do you think that
6  it establishes.
7          So we started having those
8  communications in late 2019.
9      Q    So during 2017 and 2018, if you -- if
10 an attorney general's office, you know, mailed you
11 a box of documents, it -- you wouldn't be able to
12 reach out and talk to them about it without going
13 through this other policy office?
14     A    That's correct.
15     Q    Okay.  Are you aware of any political
16 appointees in the department having recused them
17 self -- themselves from -- from consideration of
18 issues involving particular schools?
19         MR. MERRITT:  Objection.  That's not
20 within the scope of the discovery authorized.
21         MS. ELLIS:  Can we take a quick break?
22         MR. MERRITT:  Sure.  Yeah.
23         THE VIDEOGRAPHER:  We are now off the
24 record.  The time is 21:12 UTC.
25         (Recess -- 4:12 p.m.)

Page 235

1          (After recess -- 4:25 p.m.)
2          THE VIDEOGRAPHER:  We are now on the
3  record.  The time is 21:25 UTC.
4  BY MS. ELLIS:
5      Q    So we've talked a few times today about
6  these 500 or so memos regarding common evidence.
7  Is there a single place on the BDU's computer
8  system where those are stored?
9      A    Yeah, but I couldn't tell you off the
10 top of my head where.
11     Q    Okay.  And what -- are they named with
12 any sort of consistent naming convention?
13     A    My hope is yes.  They -- I mean, they
14 kind of evolved over time, so when we first
15 started doing these, we had a number of different
16 attorneys working on them and they didn't look
17 very uniform.  We started a project this summer to
18 make them more uniform, so there are a number of
19 them that actually have two versions, whatever the
20 original version was that wasn't uniform, and then
21 when you get them, you'll see.  I think it has a
22 date and then in parens an updated date to try to
23 make them kind of fit, not a template, but kind
24 of -- same format.
25         So I think they have a common naming

Page 236

1  convention for the later version.  I don't know
2  about the former.
3      Q    They generally have the school's name
4  in the file name?
5          MR. MERRITT:  Objection.  What is the
6  relevance of this line of questioning?
7          MS. ELLIS:  I'm trying to understand
8  how we can easily identify these documents when we
9  receive them.
10         MR. MERRITT:  Okay.  You can answer the
11 question.
12         THE WITNESS:  We can just produce them
13 as a folder.  Probably not that --
14 BY MS. ELLIS:
15     Q    That would be great.
16     A    -- complicated.  I'd defer to DOJ on
17 how to produce it, obviously, but, yeah, I don't
18 think you'll have any trouble recognizing them.
19         MR. MERRITT:  As I said, you know, as
20 we mentioned, the document -- the responses to
21 written discovery are ongoing, and we are working
22 on collecting documents and producing them to you,
23 and we'll do that in the normal course.
24 BY MS. ELLIS:
25     Q    I want to look for a minute in tab 5 in

Page 237

1  the hard copy.  On the Dropbox, that's bracket 5
2  Everest/WyoTech POC Memo, and that was marked as
3  Exhibit 5 in the Jones deposition.
4          (Exhibit 5 referred to.)
5          THE WITNESS:  Okay.
6  BY MS. ELLIS:
7      Q    Do you recognize this document?
8      A    Yes.
9      Q    And what is it?
10     A    This is the memorandum that was drafted
11 in 2016 by the borrower defense unit regarding the
12 conclusions that we reached and the recommendation
13 with respect to the transfer of credits claims for
14 borrowers who attended Everest or Wyotech.
15     Q    And this is dated right around the time
16 that you began working at BDU; correct?
17     A    Yes.
18     Q    Were you involved at all in the
19 creation of this document?
20     A    No, I don't believe so.  I'm pretty
21 sure it was already over sitting on Ted Mitchell's
22 desk by the time I even became aware of the
23 document.
24     Q    Were you involved in working on any of
25 the other Corinthian -- Corinthian protocols that

Page 238

1  were similar to this?
2      A   Yeah, I believe the employment
3  prospects followed this one, at least the approval
4  of it.  I think I worked on that one a little bit.
5  And then ITT employment prospects came last of
6  this batch, and I worked on that one with -- with
7  my team.
8      Q   Okay.  If you flip to the second page
9  of this document, Roman numeral I says, Summary of
10  evidence of representations of transferability.
11  And then under heading A, Student accounts of
12  in-person oral representations of transferability.
13         And following that there's a series of
14  bullet points taken from -- the memos, those were
15  taken from a sample of claims relating to a
16  certain Everest campus.
17         Do you see where that is?
18      A   Yes.
19      Q   In its review of common evidence, is
20  BDU currently undertaking any project similar to
21  this of collating student testimony regarding
22  misrepresentations that were made by a certain
23  school program or campus?
24      A   Yes, that's part of the process for
25  drafting the fact summary.

Page 239

1      Q   And how many schools are currently part
2  of a process of collecting student testimony like
3  this?
4      A   Well, it's not -- it's not like that's
5  a separate project.  We look at all of the
6  evidence.  So regardless of what it is or where it
7  came from, just like a courtroom drafts a
8  findings-of-fact document regardless of whether
9  the plaintiff or defendant submitted it, we
10  summarize the evidence and cite to what the
11  specific document or evidence is.  Sometimes it's
12  recordings.  It could be anything.
13         And part of that analysis would be if
14  there are consistent allegations that -- you know,
15  in this particular instance, it was a specific
16  campus where we were seeing the same thing over
17  and over again.  That's the kind of thing that we
18  would expect to see in the facts.
19      Q   How -- how are those patterns
20  identified from the applications that BDU has
21  received?
22      A   Well, the applications are in a
23  database, Salesforce platform.  One of the things
24  that we typically would do is pull up all, you
25  know, of the cases for -- let's say we wanted to

Page 240

1  look at a specific campus, pull up all the
2  employment-prospects allegations, and then, you
3  know, that can be distilled to a spreadsheet, and
4  kind of review each of the allegations and see
5  where the themes are, see if there's any comments,
6  reference to a document.
7         You know, for one particular school I'm
8  thinking of, there was repeated reference by the
9  borrowers to a specific document, and so we were
10  able to use the data to pick out individual
11  borrower statements that aligned with that and
12  corroborated that evidence.
13      Q   So let's say, for instance, you had a
14  few hundred applications from Art Institute
15  Chicago.  You might line up all the allegations.
16  You might see, okay, there's consistent testimony
17  about employment prospects.  Then what happens?
18      A   Well, it's -- that would probably be
19  used, then, to support whatever the conclusions
20  were related to the fact, so that would be
21  corroborating evidence.
22         Ideally, it would be supporting other
23  evidence, but, you know, it depends on the school
24  and what we have to work with and, you know, then
25  we would make an assessment of the strength of the

Page 241

1  evidence.
2      Q   Would applications from -- let's call
3  it Art Institute Chicago -- that make
4  employment-prospects claims at that point be set
5  aside instead of being kept in the pool for
6  adjudication?
7      A   At what point?
8      Q   At the point where you've identified
9  that there's consistent evidence of
10  misrepresentations.
11      A   I'm not sure where you're thinking that
12  fits in the process, but we -- you know, like I
13  said, we'll do sampling for these larger schools
14  to get a sense of what the kinds of things are, so
15  that would be part of the whole fact-finding
16  process.
17         And then we view the evidence overall
18  to figure out what -- what things are supported by
19  the evidence.  And then that -- that work related
20  to individual borrower's statement would be cited
21  in our document that outlines the evidence.
22         So that doesn't mean that we'll catch
23  every single borrower who said something similar.
24  We're looking for whether there's corroborating
25  evidence in the applications, but it very well may

Page 242

1   be that we only get 10 percent of them and that's
2   enough, and then that's used to develop the legal
3   memos and the review protocols that ultimately
4   would lead to that person probably getting
5   approved assuming there wasn't some other element
6   that they failed to meet.
7        Q    While you're in the process of
8   developing that protocol, are other applicants
9   from Art Institute Chicago being adjudicated even
10  if they make employment-prospects claims that
11  might be consistent with the evidence that you've
12  collected?
13       A    I'm not sure I understand your
14  question.  Can you rephrase?
15       Q    Yes.
16            So say that you've -- you've seen a
17  pattern.  You've taken a sample of students from
18  this school, this campus, and you've seen, okay, a
19  lot of students are saying that there were
20  employment-prospects misrepresentations.  We're
21  going to include that in our analysis of this
22  school and this campus.
23            What's the point at which applications
24  from that school, that campus are pulled aside
25  from the adjudication pool?

Page 243

1        A    I think your question assumes something
2   that's not accurate.  Just alleging an
3   employment-prospects-type of allegation is a very
4   broad statement, and there's a whole bunch of
5   different things that people could be including in
6   that claim.  Some of them might be related to the
7   percentage of job-placement rates; some of them
8   might be talking about a specific document that
9   says everybody gets a job; another one might be
10  referring to some kind of advertisement that says
11  that they have connections with Fortune 100
12  schools.
13            Those wouldn't be corroborative of each
14  other independently without something else that
15  ties that together.  So we're looking for
16  allegations, not just by the overall type, but
17  what actually the borrower is alleging.
18            So, you know, it can vary.
19       Q    Okay.  At what point are claims
20  similar -- strike that.
21            I guess what I'm asking is if you have
22  a sample of -- if you have a sample of claims from
23  one school, one campus that a certain kind of
24  misrepresentation is consistently being made, how,
25  if at all, do you identify other applications that

Page 244

1   make similar allegations and make sure that they
2   don't get denied while you're in the process of
3   writing the protocol?
4        A    Well, first of all, it's not just that
5   they make the same kind of allegation either, so
6   it would have to be specific as I said.  But,
7   also, it has to be within a time period that would
8   corroborate.
9            So if somebody said something and their
10  application was related to their enrollment in
11  1975, and we have applications in the '70s, and
12  people are enrolled in the '70s, that doesn't
13  support somebody's application who attended school
14  in 2020 or 2010.
15            So we look at whether it truly is
16  corroborative, and if we find that in the course
17  of reviewing the applications, that a pattern
18  unfolds that wasn't clear when we originally
19  cleared cases for adjudication, we would stop
20  adjudicating those cases, figure out if there's
21  something else that we should be looking at.  If
22  it's an open school, figure out if we should be
23  reaching out to the school in connection with
24  something.  And then there may be a reason to
25  reopen the cases.

Page 245

1            But there are a lot of variables in
2   what I just described, so it sort of depends on,
3   you know, if there are a lot of borrowers saying
4   this or, you know, if it's just two.  You know,
5   there's a whole range of scenarios based on what
6   you just described.
7        Q    I can understand why a claim relating
8   to 1975 wouldn't relate to a claim in 2020, but
9   what about a claim relating to 2012 and a claim
10  relating to 2013, same school, same campus.
11            Would those be considered corroborative
12  of each other?
13       A    Yeah, I mean, potentially.  If it
14  turned out that it was about two different career
15  service officers and they were not both there at
16  the same time, then, no, but depending on what we
17  can find out about what the statements are.  So in
18  the example that you described, that's quite
19  possibly corroborative evidence, yeah.
20       Q    Are applications ever removed from --
21  are applications ever set aside for later review
22  and adjudication based on their similarities to
23  other corroborating allegations in other
24  applications?
25       A    Well, once we have decided that there

Page 246

1  are corroborating allegations in our sampling,
2  then that could potentially be a reason to set
3  them aside there so -- if I'm understanding your
4  question correctly.
5       Q    I think what I'm getting at
6  generally -- and maybe I should ask it
7  generally -- is how do you make sure that claims
8  are not wrongly denied while protocols are still
9  in the process of being written?
10      A    I wouldn't say they're wrongly denied.
11 We adjudicate them based on the protocol as
12 written.  If there's a reason to revisit the
13 protocol because we discover new evidence in a
14 later application, then we would potentially
15 reopen the case.
16           But there's always going to be another
17 application, so if we decide today's the point in
18 time where we've reviewed all the evidence and
19 then tomorrow some new evidence comes in, that
20 could change everything that we did based on what
21 we saw today.
22           So we always have to allow for the
23 possibility that we could get something new in
24 that would change the result, so I disagree with
25 the way you phrase the question.

Page 247

1            I don't think that those applications
2  that were denied would be wrongly denied, but I
3  think that if they were denied and we subsequently
4  find out about new evidence, that we would reopen
5  the cases where the new evidence would change the
6  results or potentially change the results.
7       Q    How often do you pull samples from
8  these large volume schools to analyze the
9  similarity of student's allegations?
10      A    Are you -- I don't understand your
11 question.  How often?
12      Q    Yes.
13           So if -- if you have -- have you, you
14 know, only ever pulled one sample from Brooks, or
15 do you pull a sample, you know, every six months
16 as new claims come in?
17           How often do you sample them?
18      A    Well, that, I think, assumes things
19 that are not true as well.  Once we -- once we're
20 in a position to adjudicate the cases with the
21 protocol, then we typically -- unless it's a huge
22 volume of cases like in ITT, which Brooks is not,
23 we would get through most of the adjudication in a
24 pretty short period of time.
25           So those -- you know, any kind of

Page 248

1  corroborating evidence would show up to the
2  reviewers because they're doing a large number of
3  the Brooks cases at the same time and would be
4  able to issue -- spot something like that.  And if
5  they saw that there were corroborating statements,
6  then they would flag that for the supervisor.
7       Q    Well, I'm actually asking about an
8  earlier stuff about the development of the
9  protocols.
10           So as you're developing a protocol for
11 a school, maybe you have some attorney general
12 evidence, maybe you have some evidence from FSA
13 oversight, are students' statements part of that
14 pool of common evidence that you used to create
15 the protocol to begin with?
16      A    Yes, the sampling.  That's part of that
17 first process.
18      Q    Right.  And that's what I'm asking.
19           Is each school only sampled once, or is
20 there periodic monitoring for patterns that appear
21 in applications from different schools?
22      A    Well, we're still working on all those
23 cases, so your question kind of assumes that,
24 like, we sampled them a year ago and we're done
25 with that and now there's a whole bunch of other

Page 249

1  cases.  But we're still working on all of these
2  apps, so I'm not sure I follow what you're asking.
3       Q    So are you saying that the protocols
4  are still evolving?
5       A    The protocols will always be subject to
6  change based on the discovery of new evidence.
7       Q    Okay.  And I'm asking how often you
8  review borrower testimony to develop new evidence?
9       A    We don't -- we -- we review
10 applications and, you know, again, if people are
11 spotting similarities, then they would flag it for
12 their supervisor, but we're not sampling every
13 day, if that's what you're asking.
14      Q    I -- I don't think I would expect you
15 to sample every day, but, you know, a sample that
16 would create something like what we see in this
17 Corinthian protocol, a collection of borrower
18 testimony of -- that shows a pattern of
19 misrepresentations.
20      A    Well, we did it, and it led to an
21 approval process for those claims, so we wouldn't
22 need to do it again.
23      Q    Right, right, not for Corinthian,
24 though.  I'm saying a similar process for other
25 schools.

Page 250

```
 1       A    Again, since we're still working on
 2  them, I'm not sure I understand the question.
 3       Q    I'm trying to think of -- if -- if
 4  there's a way I can explain this more clearly.
 5            So for -- for a number of schools now
 6  at this point, you have a collection of common
 7  evidence, and that evidence has been analyzed and
 8  put into memos.
 9            That part is correct?
10       A    They're in process.
11       Q    Okay.
12       A    They're generally not completed.
13       Q    Okay.  So --
14       A    Let me -- let me -- let me reframe
15  that, I'm sorry, because I don't want to get
16  confused the memos that you're going to get with
17  respect to the schools are the summary of the
18  preliminary review for the scope of the evidence.
19  The facts are -- you know, it's a statement of
20  common facts, so that's different from the memos
21  to the extent that -- I'm not sure which one
22  you're asking about.
23       Q    I'm sorry.  Can you -- can you explain
24  the difference between the statement of facts and
25  the memos because maybe I don't --
```

Page 251

```
 1       A    The --
 2       Q    -- have --
 3       A    -- memos --
 4       Q    -- a clear understanding.
 5       A    The preliminary review assesses what --
 6  you know, it's kind of an overview of what we
 7  have, what we know about department documents,
 8  things that we've received from outside agencies,
 9  things that we saw on the Internet, whatever it
10  is, things we got from the school.  It's just an
11  overview.
12            It's not, like, specific facts that
13  we've identified as having been established by the
14  evidence.  That would be in a statement of common
15  facts that cites to the evidence that supports it,
16  and that's where you would see things like what
17  we're seeing in those bullets.
18       Q    Okay.  So -- but there's some -- for at
19  least some of these schools, there are common
20  evidence protocols or outlines that instruct
21  reviewers on which applications to set aside and
22  which ones to proceed to adjudication; is that
23  correct?
24       A    Correct.
25       Q    Okay.  So I guess at what -- at what
```

Page 252

```
 1  point in this process did BDU collect the -- a
 2  sample or would BDU collect a sample of borrower
 3  testimony to see if there are common threads?
 4       A    Shortly before we complete the protocol
 5  to proceed with deciding those cases.
 6       Q    Okay.  And is that ever updated?  Does
 7  the department ever -- does BDU ever go back and
 8  take another sample on a more recent set of
 9  applications to see if there were any new and
10  emerging commonalities?
11       A    Most of these are fairly recently
12  completed, so, no, we haven't done that yet.
13  Maybe at some point we -- you know, once we get
14  through all of the other schools, that might be
15  something we would consider doing.  But these are
16  not -- it's not something that was done three
17  years ago and stuck on a shelf.  These are all
18  fairly recent.
19       Q    Got it.
20            So for -- for applicants from a school
21  that has a protocol still in development, when, if
22  ever, are those applications set aside to say
23  these need to wait for the protocol?
24       A    I think we've talked about this a few
25  times, so I'm not sure I'm following what your
```

Page 253

```
 1  question is asking me.  Are you trying to
 2  basically rereview what we talked about before?
 3       Q    I'm just not sure that I understood the
 4  answer before.
 5            If you're, you know, in the process of
 6  developing a protocol for Brooks, are any Brooks
 7  applications set aside awaiting the protocol, or
 8  might some Brooks applications stay in the queue,
 9  be denied even though it turns out they might have
10  fallen within the protocol?
11       A    So I think we might be talking about
12  two different things, but the initial task is the
13  evidence, the initial summary of what the scope of
14  the common evidence is results in a protocol that
15  allows us to move forward with the cases that
16  don't fall within the scope of what we think the
17  common evidence potentially supports.
18            Those cases are adjudicated.  They
19  don't get put in -- however you phrased it, but
20  they're not on hold.
21            The cases that fall within the scope of
22  the protocol potentially or would potentially be
23  supported by something -- not protocol, excuse
24  me -- it's cases that potentially fall within the
25  scope of the evidence, the common evidence that we
```

Page 254

1   have are not adjudicated.  If we come across them
2   in the course of trying to adjudicate cases that
3   are outside the parameters, they get set aside.
4   But otherwise, you know, they're usually not
5   assigned.
6           Once the facts are fully analyzed and
7   reduced to a statement of common facts where we
8   have such evidence, and then there's a legal memo
9   for 2016 if that's the regs that would apply to
10  the loans at issue, or for '95 where that's the
11  regs that apply to the loans at issue, then
12  there's a new -- it's probably an update to the
13  previous protocol that will change that so that
14  instead of saying if you see a claim between 2012
15  and 2014, move on to the next case -- set that one
16  aside and go on to the next.
17          Now, there's a framework for whether or
18  not that case would be adjudicated as an approval.
19  So it will replace that case once we have the
20  criteria that would allow for the yea or nay
21  decision on somebody who's potentially covered by
22  the common evidence.
23          Does that answer your question?
24      Q   I think I understand that part of the
25  process.

Page 255

1           During the period before the parameters
2   of the common evidence are fully known, what
3   happens to applications from those schools?
4       A   They're not assigned.
5       Q   They're just held until there's some
6   parameters of common evidence?
7       A   I mean, "held" suggests that they're
8   picked up and put down or something.  We can
9   assign based on schools.  We can assign based on
10  different parameters with the Salesforce database.
11  So they're just not selected to be assigned to
12  adjudicators.
13      Q   Yes, yes, held in the database is --
14      A   Yes.  They --
15      Q   Yes.
16      A   They're just still there, yes.
17      Q   Yes.
18          And then once the parameters of the
19  common evidence are defined, those are released to
20  the reviewers to determine whether they should be
21  set aside or adjudicated right now?
22      A   Correct.
23      Q   And as part of the process of defining
24  the parameters of the common evidence, that's when
25  BDU would review a sampling of borrower testimony?

Page 256

1       A   Correct.
2       Q   And it's too early yet to say
3   whether -- whether that sampling will be done
4   again to update the protocols?
5       A   I mean, if we're not getting in a whole
6   lot more applications from the school, then
7   probably not.  I think it will depend on the
8   school, and chances are if there's a huge uptick
9   in cases from a school, it's probably related to
10  something happening outside of BD.  That there was
11  a law enforcement action; that there was some kind
12  of fine by the department; something that might
13  cause us to revisit those cases anyway.
14          And then we would probably do an
15  entirely new or updated version of what originally
16  led to the, you know, clearing cases for
17  adjudication, and figure out if there are cases
18  that we need to revisit.
19      Q   What size samples were you taking on a
20  percentage?
21      A   I don't remember to be honest with you.
22  I know for -- for ITT, I remember seeing 500
23  because that has a large volume of applications,
24  and we were trying to get samples, you know, for
25  as many as we could.

Page 257

1           Obviously, we can't review every
2   application before we develop a protocol because
3   then we'll be reviewing every application at least
4   twice if not more than that, and we'd just -- you
5   know, we'd never get through any of the cases.
6           But I think if there's a range, though,
7   we have specific requirements depending on the
8   number of applications that we have from the
9   school.  I just don't recall off the top of my
10  head what they are.
11      Q   Are there written records of how the
12  sampling process was conducted?
13      A   Well, the memo discusses, you know,
14  generally what they saw that -- I guess it depends
15  on what you mean by "written records."
16      Q   What -- what about the sampling process
17  is memorialized in the memos?
18      A   How many cases were looked at, that
19  kind of thing, if there were patterns.  Generally,
20  the sampling results in fairly generic responses,
21  but where we see, you know, John Smith told me X
22  kind of thing or reference to a specific kind of
23  document or anything that's of any more specific
24  nature would -- would go into that discussion in
25  the sampling.

Page 258

1      Q      So if -- if a student said, someone in
2  admissions told me my credits would transfer and
3  then they didn't, that, in your view, would be too
4  generic?
5      A      I don't want to speak to hypotheticals.
6  It depends on what else we've seen and what the
7  other, you know, evidence is.
8      Q      If a couple of hundred students said,
9  someone in admissions told me that my credits
10 would transfer and then they didn't, would that
11 rise to the level of being considered for common
12 evidence?
13     A      A couple hundred out of how many?
14     Q      How many were there for ITT?
15     A      Well, again, ITT was 50 states.  I
16 don't know how many campuses.  So there are a lot
17 of variables that your question doesn't answer.
18 Is it a couple of hundred at the same campus at
19 roughly the same period of time.  Or is it a
20 couple hundred over 30 years across 50 states.
21            Those are going to be very different
22 scenarios; right?  So we would look at the
23 specific circumstances of the borrowers and the
24 sample size and see if it matches up and
25 corroborates, not just as a general proposition.

Page 259

1            With exceptions, if it -- a couple
2  hundred across various campuses but it's related
3  to something that was produced universally across
4  the enterprise, so job-placement rates,
5  advertising, some kind of document that's handed
6  out in the admissions process, that would be
7  corroborating, but it's -- I can't give you an
8  answer to the hypothetical because it's just
9  dependent on too many variables that are not built
10 into the question.
11     Q      If you had a couple hundred people
12 making that same allegation and it was around the
13 same period of time but spread out over campuses
14 in ten states, would that warrant looking into it
15 further?
16     A      I don't know.  I'd have to see exactly
17 what the language is that the borrowers are
18 stating and how closely they mirror each other and
19 if there's anything else that corroborates that.
20     Q      Earlier you said that you thought it's
21 possible some cases will have to be reopened in
22 the coming months because of -- because of
23 mistakes that were made in the adjudication
24 process.
25            Do you remember saying that?

Page 260

1      A      No, not -- I think there were -- there
2  were some mistakes that we were aware of that
3  relate -- there were different kinds of mistakes
4  that can happen in terms of the adjudication or
5  the processing of the letters, and so if we become
6  aware of that, then, you know, it depends on
7  whether the -- the mistake or the issue would
8  change the outcome of the decision and what it is,
9  but, you know, I think there are certainly will be
10 instances where we find that we -- either my team
11 got it wrong or the processing team got it wrong
12 and that we would reopen the case.
13            I don't remember saying that, but I
14 think that's probably true.
15     Q      Do you think the pace at which the team
16 has been working over the past year is a factor in
17 the likelihood of mistakes?
18     A      I think it's not ideal, but we've done
19 everything that we can to mitigate against that.
20 Like I said, I -- we've put in place a really
21 robust training program, probationary periods for
22 the new attorneys.  We have a pretty strong QC
23 process.  Twenty percent of every case is
24 rereviewed, essentially, and, you know, it's kind
25 of a second-level review by the QC team.

Page 261

1            But, you know, when you're talking
2  about hundreds of thousands of cases and there are
3  humans that are doing it, and, you know, it can be
4  as simple as a click.
5            So, for example, on the letter -- I
6  think a couple of the things that we've identified
7  as mistakes were things like it said failure to
8  state a claim instead of insufficient evidence
9  because those are right next to each other in the
10 drop-down menu, and if somebody just accidentally
11 clicks on one as opposed to the other, then, you
12 know, that's a mistake.  That's an error.
13            It wouldn't have changed the outcome of
14 the borrower's application in the scenario that I
15 just gave you, so we're still trying to figure out
16 what that looks like in terms of do we need to
17 issue a corrected decision just for the borrower's
18 record, but, you know, they still would not have
19 been an approved application in that scenario.
20            So there's different things that we
21 need to figure out how to address, but if we did
22 it wrong, we want to -- we want to correct it and
23 get it right.  We certainly don't want borrowers
24 getting the wrong decision.
25     Q      Okay.

Page 262

1        MS. ELLIS:  Those are all the questions
2   that I have today.
3            Charlie, do you have any questions for
4   the witness.
5        MR. MERRITT:  Yeah, just one or two
6   follow-up questions really briefly.
7     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
8     BY MR. MERRITT:
9     Q     Colleen, earlier you mentioned about --
10   I think you made reference to 30,000 claims that
11   have been approved but were currently being held
12   with -- or the decisions were not issued on those
13   30,000 claims.
14           Do you remember mentioning that?
15    A     Yes.
16    Q     Can you explain a little bit about what
17   those 30,000 approvals are?
18    A     Yeah.  It's well over 30.  They're --
19   they're Corinthian claims that have been approved
20   for job-placement rates, and under the Manriquez
21   injunction, excuse me, the department can't apply
22   the 2017 methodology to those.  I think that's
23   still the intent of the department, to the best of
24   my knowledge, so they're waiting to see how that
25   plays out in the court.

Page 263

1            But until then, those cases are -- the
2   decisions on those cases are not being issued, but
3   the cases from my team's perspective are done.  We
4   have adjudicated them.  They're completed.
5   They're ready to go whenever there is an
6   appropriate relief methodology to apply to them
7   and issue the decision.
8     Q     And are those cases that would receive
9   less than 100 percent relief?
10    A     I believe so, yeah.  I'm pretty sure we
11   continued to issue decisions on the 100 percent,
12   the cases that under the 2017 relief methodology
13   got 100 percent.  But I don't know that for sure
14   because we don't issue the decisions, but I
15   believe that's the case.
16        MR. MERRITT:  Okay.  That's all I have.
17        MS. ELLIS:  Okay.
18        MR. MERRITT:  And I would just like to
19   request the opportunity for the witness to read
20   and sign the transcript.
21        MS. ELLIS:  Fine by me.
22            Joe, could you please tell us how long
23   we've been on the record?
24        THE VIDEOGRAPHER:  Sure.  You want me
25   to go off the record first real quick and then

Page 264

1   tell you?
2        MS. ELLIS:  Sure.
3        THE VIDEOGRAPHER:  We are now off the
4   record.  The time is 22:04 UTC, and this concludes
5   today's testimony given by Colleen Nevin.
6        Thank you.
7
8
9
10       (Signature having not been waived, the
11   Remote Videotaped Deposition of COLLEEN M. NEVIN
12   ended at 5:04 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Dana C. Ryan, Registered Professional
3   Reporter, Certified Realtime Reporter, the officer
4   before whom the foregoing proceedings were taken
5   do hereby certify that the foregoing transcript is
6   a true and correct record to the best of my
7   ability of the proceedings; that said proceedings
8   were taken by me stenographically and thereafter
9   reduced to typewriting under my supervision; and
10   that I am neither counsel for, related to, nor
11   employed by any of the parties to this case and
12   have no interest, financial or otherwise, in its
13   outcome.
14       IN WITNESS WHEREOF, I have hereunto set
15   my hand and affixed my notarial seal this 14th day
16   of December 2020.
17   My Commission expires:
18   November 23, 2024
19
20
21
22   _____
23   NOTARY PUBLIC IN AND FOR THE
24   STATE OF ALABAMA
25

Page 266

```
 1              INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over
 4   carefully and make any necessary corrections.  You
 5   should state the reason in the appropriate space
 6   on the errata sheet for any corrections that are
 7   made.
 8          After doing so, please sign the errata
 9   sheet and date it.
10          You are signing same subject to the
11   changes you have noted on the errata sheet which
12   will be attached to your deposition.
13          It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the
16   deposition transcript by you.  If you fail to do
17   so, the deposition transcript may be deemed to be
18   accurate and may be used in court.
19
20
21
22
23
24
25
```

Page 268

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2          I, Colleen M. Nevin, do hereby
 3   acknowledge that I have read and examined the
 4   foregoing testimony, and the same is a true,
 5   correct and complete transcription of the
 6   testimony given by me and any corrections appear
 7   on the attached Errata sheet signed by me.
 8
 9
10
11   _____    _____
12   (DATE)                 (SIGNATURE)
13
14
15          CERTIFICATE OF NOTARY PUBLIC
16   Sworn and subscribed to before me this
17   _____ day of _____, _____
18
19
20   _____    _____
21   NOTARY PUBLIC              MY COMMISSION EXPIRES
22
23
24
25
```

Page 267

```
 1         E R R A T A   S H E E T
 2   IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,
 3   in her official capacity as Secretary of the
 4   United States Department of Education.
 5
 6   PAGE  LINE            CORRECTION AND REASON
 7   _____ _____          _____
 8   _____ _____          _____
 9   _____ _____          _____
10   _____ _____          _____
11   _____ _____          _____
12   _____ _____          _____
13   _____ _____          _____
14   _____ _____          _____
15   _____ _____          _____
16   _____ _____          _____
17   _____ _____          _____
18   _____ _____          _____
19   _____ _____          _____
20   _____ _____          _____
21   _____ _____          _____
22   _____ _____          _____
23   _____ _____          _____
24   _____          _____
25     (DATE)                 (SIGNATURE)
```

## Exhibits

EXH.
 0021 COLLEEN NEVIN 120
92020 (1)  6:12 17:10,11
 36:14 37:10 98:2 115:1
 137:3
EXH.
 0022 COLLEEN NEVIN 120
92020 (2)  6:14 29:22,23
 208:13
EXH.
 0023 COLLEEN NEVIN 120
92020 (3)  6:17 184:8,9

---

### 0

**04**  180:16

---

### 1

**1**  77:22 93:7 126:25 152:1,2,
 5 174:9 175:5,9 213:11
 218:12,13
**1,000**  150:15 231:19
**1,400**  158:14
**10**  185:6 242:1
**10,000**  145:14
**10-**  230:17
**10/23/18**  199:6
**10/23/2018**  192:2 193:5
**100**  61:19,22 62:9,17 149:5,
 11,15,20,24 155:15,25
 156:25 157:6 160:24 188:22
 243:11 263:9,11,13
**100,000**  138:18
**10:19**  58:11
**10:25**  58:12
**11**  171:16
**116**  79:24
**116-4**  81:13
**11:35**  106:3
**11:45**  106:4
**11:57**  113:25
**12**  157:8,11,12 208:16
**12(b)(6)**  79:11 82:9,13
**12/7/20**  29:21
**129-1**  92:8

**12:13**  114:1
**12:45**  136:10
**12:48**  136:21
**12ED**  157:10
**13**  79:23,24 80:2,4 115:2
**13th**  174:11,12
**14**  137:1
**145**  173:20
**14:11**  8:13
**14:13**  10:9,13
**14th**  183:15
**15**  92:7,8,9,11 98:1 145:12
 208:14 212:1,2
**15,000**  230:18
**15:19**  58:10
**15:25**  58:14
**16**  98:23 163:3 208:14,18
**16,000**  130:6
**16:35**  106:2
**16:45**  106:6
**16:56**  113:24
**17**  17:16 112:5
**17:13**  114:3
**17:47**  136:20
**18**  184:4 190:24
**18:18**  136:24
**19**  173:18,19,21,23
**1975**  244:11 245:8
**1993**  14:3
**1995**  37:21 38:11 123:20
**19:08**  167:21
**19:14**  167:25
**19:58**  198:3
**19:59**  198:4
**1:15**  136:12
**1:18**  136:22
**1st**  174:2 177:25 180:16

---

### 2

**2**  18:1 30:3 36:24 80:17 89:3
 93:21 125:7 127:1 152:1,3
 159:11 175:17 176:9,10,14
 177:10 191:25 212:24 213:1
**20**  17:9 122:6,9 185:6,18
 186:10
**2004**  178:1
**2010**  44:16,18 48:17,21
 70:24 188:1 244:14

**2012**  44:16,18 48:17,21
 70:24 188:1 245:9 254:14
**2013**  245:10
**2014**  254:15
**2016**  15:15,18 22:21 23:6
 24:10 33:5 42:9 43:8,10
 45:18 52:5,14 67:12,15,20
 73:9 75:17,25 77:17 78:2,3,
 6,13 79:9 90:23 96:2 97:9
 109:2 125:19,21 126:5,6,13,
 18 129:8 135:21 146:14
 172:5 214:1 220:16,23
 222:5 224:6 237:11 254:9
**2017**  19:21 25:7,8 31:17
 33:7,13 42:13,16,19 50:12
 67:12,15 68:13 110:4 111:2,
 3,25 112:1,4,25 114:5
 115:9,18 118:3 122:6,9,10,
 12 124:19 125:8,12,21
 126:3 127:16 130:8 131:15
 132:5,12 133:9,21 134:2
 137:6 138:14 139:17,23
 144:23 145:13 148:24
 149:14 153:9,14 222:14,25
 223:2,8,10 233:16 234:9
 262:22 263:12
**2018**  32:22 33:13 68:14 69:1
 76:4 78:5 110:4 112:1
 126:3,5 130:19 139:6,11,25
 140:23 142:4,6,17 143:5
 145:13 146:25 147:4,9,13,
 19 152:6 153:15,16 154:8
 161:11 166:17 208:21,24
 209:23 221:16 223:10,12,20
 224:7 234:9
**2019**  21:23 23:24 24:7,10,22
 25:21,22,24 77:19,21 80:21
 99:23 100:14 102:11,12,14,
 16,19,21 127:13,16 128:22
 147:2,4 152:6 154:14,16
 158:13 159:8 160:8,25
 161:25 162:7,19 164:22
 165:2 166:9,14 168:12
 169:4,5,24 170:8,22 171:5
 190:21,25 209:22 210:7
 221:12,16,22 223:12,20
 225:10 228:24 233:21 234:8
**2020**  8:12 20:14,15,18 75:15
 76:8 77:18,21,22,24 79:25
 80:7 99:24 100:18,19
 101:11 102:4 144:23 166:2,
 8,22 174:3 183:15 216:25
 221:14 222:14 226:23

244:14 245:8
**20:00** 198:8
**20:21** 211:18
**20:37** 211:22
**20th** 42:20 130:7
**21** 17:10,11 36:14 37:10
98:22 115:1 137:3
**21:12** 234:24
**21:25** 235:3
**22** 16:25 17:2 29:22,23 37:9
81:11 208:13
**22nd** 178:1 180:16
**23** 81:13 139:4 184:8,9
**24** 92:15
**25** 127:24 184:2,4
**2:08** 167:22
**2:14** 167:23
**2:59** 198:5
**2A** 185:17 186:1
**2B** 185:18 186:5

---

### 3

**3** 30:1,2,13 80:18 93:21
159:12 175:2,3,7,16,19
178:22 189:4 215:16
218:12,14
**3-** 231:17
**30** 258:20 262:18
**30(c)(2)** 113:19
**30,000** 225:19 262:10,13,17
**30-something** 53:3
**30th** 137:6
**31** 80:7
**31,000** 155:10
**340,000** 218:7
**3:00** 198:6
**3:21** 211:19
**3:37** 211:20

---

### 4

**4** 30:14,15 36:23 94:24
122:9 194:7
**40** 171:20
**400** 231:17
**47** 171:20
**4:12** 234:25

**4:25** 235:1
**4th** 122:12

---

### 5

**5** 94:24 158:9,10 204:25
236:25 237:1,3,4
**5,000** 102:1 229:8
**5/4/2017** 129:24
**50** 61:19 62:8,16 172:6
258:15,20
**50-** 230:13
**500** 40:14 41:4,24 43:25
47:3,5,14,20,24 48:1 190:6,
11 231:18 235:6 256:22
**51** 92:20 98:8 171:23 212:3
**52** 171:21
**53** 212:12
**54** 122:3
**55** 115:2,4
**55,000** 230:13
**56** 117:25
**59** 137:2,4

---

### 6

**6** 185:18
**60** 24:14
**64** 145:11
**65** 146:23 150:12
**66** 162:25 163:3
**68** 98:23 99:3

---

### 7

**7** 129:22,23,25 139:5
**70s** 244:11,12

---

### 8

**8/21/2019** 157:10
**8/31** 79:25

---

### 9

**90** 8:18 102:8,18 228:22
**95** 38:7 43:8,14 45:18 51:21
52:2,5,13,16 55:9 78:1,9,12
91:3 135:21 172:10 221:24

222:2 224:23 254:10
**97** 14:5
**99** 178:1 180:16
**9th** 8:12

---

### A

**A-P-P-E-L** 19:15
**a.m.** 58:11,12 106:3,4
113:25
**AA** 14:13
**ability** 41:18 178:10 196:9
**absolute** 55:19
**abusive** 83:1
**accelerated** 100:15
**accept** 156:14 219:12
**acceptance** 220:10
**accepted** 218:17,19 220:5
**access** 38:24 39:1 153:8
**accessing** 176:2
**accidentally** 261:10
**accomplish** 229:19
**accordance** 119:20
**account** 109:13
**accounts** 123:2 238:11
**accreditation** 38:6 200:3,5
**accurate** 18:6 30:18 31:8
130:14 134:6 137:7 176:19
205:25 206:1 243:2
**ACI** 50:13
**acknowledge** 9:1,4
**act** 37:24 218:22 220:1
**acting** 13:19 18:24 19:14,19,
20 21:15 23:1 31:16 33:8,18
34:6 68:16,22 141:8,9 160:5
**action** 8:19 30:9 37:25 49:7
59:5 194:10,22 256:11
**actionable** 205:15
**actions** 59:3,14 186:7
**active** 27:25 233:2
**actual** 64:13 81:12 170:16,
20 173:4
**ad** 20:5 22:5
**add** 199:1
**added** 191:16
**adding** 217:7
**addition** 20:21 21:5 41:14,
24 140:3

**additional** 22:25 23:23
25:14,23 26:4,6 50:2 66:5
118:5 120:16 121:21 132:15
141:12,21 142:1 145:6
146:24 171:3,4 202:15
217:16
**Additionally** 18:11 99:4,5
145:12 218:15
**address** 21:1 110:16 202:7
219:23 220:2 261:21
**addressed** 204:20
**addressing** 121:16
**adjudicate** 16:3 51:22 60:25
70:9,13 99:10 101:6 102:7
103:24 105:14 122:7,10
126:7,15,16 141:19 151:23
172:19 187:6,25 204:2
208:17 227:22 228:21
246:11 247:20 254:2
**adjudicated** 37:23 41:6
45:19 53:24 63:23 91:10
100:18 103:9 105:14 107:15
109:7 110:4 125:5,12 128:9
130:7 150:16 158:12 163:7,
17,23 165:23 166:2,7
173:10 202:11 203:3,18,24
223:4 224:18 225:4,10,25
230:9,12 232:14 242:9
253:18 254:1,18 255:21
263:4
**adjudicating** 20:19 40:23
96:11 101:2,9 102:18
122:11 123:6,9 136:7 140:3
244:20
**adjudication** 35:11,18 41:9
45:11 46:6,23 47:9 62:18
100:11 106:10,13,24 107:18
108:10,12,18 114:8 119:21
121:9 131:2 137:5,13,17
138:15 140:25 144:5 172:24
173:8,14 176:7,11 178:11
203:16 207:11 221:9 224:5
227:20 241:6 242:25 244:19
245:22 247:23 251:22
256:17 259:23 260:4
**adjudications** 86:13 102:1
114:18 139:7 151:20 167:10
170:24 171:2 214:10 224:11
228:15
**adjudicators** 255:12
**adjusted** 191:12
**Adler** 14:16

**administered** 9:5
**administerial** 127:17
**administration** 26:7 112:4
126:22 138:22 232:4
**administrative** 12:17 59:3
**administratively** 53:10
54:17
**admissions** 60:19 258:2,9
259:6
**advancing** 143:7
**advertisement** 243:10
**advertising** 77:5 259:5
**advice** 57:7 156:5
**advise** 36:4 188:1,7
**advised** 118:2,8,11 122:14
**advising** 119:10
**advocated** 214:6
**affect** 125:4 166:24 178:10
**affected** 171:1 219:4 224:4,
11
**affects** 160:19
**affidavit** 92:14,19,24 98:5
212:7
**affirmative** 125:9
**afternoon** 202:10
**AG** 55:12 186:7 223:5
**AG's** 14:24 76:22 176:1
233:3
**agencies** 59:11 233:11
251:8
**agree** 9:15,16 11:7 58:5
105:23,25 124:8 212:14
216:16 219:8
**agreed** 55:5 203:19
**agreement** 8:6 9:13
**agrees** 219:12
**AGS** 44:22 61:13 69:25
70:16 233:11
**ahead** 90:19 135:3 187:6
204:12
**aid** 18:4,9 28:6,10,23 57:9
61:13
**aligned** 240:11
**allegation** 79:1 81:19 82:10
83:17 84:22 93:7,10,25
94:12 192:14 193:11 194:9
196:13 205:1,3 213:11
243:3 244:5 259:12
**allegations** 62:3,6 66:18
83:19,23 93:5,14,21 94:16,

24,25 107:12 109:5 179:12,
17 193:2,17 195:5 201:16
214:22 239:14 240:2,4,15
243:16 244:1 245:23 246:1
247:9
**allege** 82:14 93:8 182:11
**alleged** 30:8 54:10 82:22
85:8 110:2 200:2
**alleges** 180:22 199:24
**alleging** 196:2 243:2,17
**allowed** 26:9 132:22 139:2
205:18
**ALO** 49:22
**alphabet** 57:1
**altogether** 190:6
**American** 15:8 49:22 50:9
**amount** 59:19 72:7 120:8
127:1,21 133:10 152:3
156:2 228:1
**analyses** 37:15,18 51:18
**analysis** 38:2,10,19 39:5,20
43:8,9 54:25 55:5 63:1
79:11 82:9 99:6,16 100:1,4
172:5,6,8,22 178:6 239:13
242:21
**analyze** 247:8
**analyzed** 173:4 250:7 254:6
**analyzing** 228:1
**Andrew** 23:15
**announced** 153:18 170:23
171:6
**announcement** 231:21
**annual** 165:24 166:7
**answering** 12:3 156:15
**anticipated** 67:22
**anticipation** 20:23 171:5
210:3
**anybody's** 219:4
**anymore** 147:22
**apolitical** 28:22 29:1
**apologize** 57:3 158:25
**appeals** 14:23 59:3
**appears** 158:11
**Appel** 19:15 103:2 168:18
169:7
**appended** 174:6,7,8
**applicable** 44:21 46:4 55:15
60:16 61:5 78:9,24 90:13,
15,22 91:2 179:2,6 186:13
215:19

**applicant** 85:10 96:17 182:6
**applicants** 61:25 62:8 84:13
  111:1 172:22 242:8 252:20
**application** 37:22,23 46:10
  48:20 50:13 51:22 62:22
  63:22,24 64:8,11 74:13,14
  77:13,16 79:5,18 82:19
  83:6,24 92:3 95:19,21 96:4,
  16,20,22 99:18 105:8
  106:12,20 107:22 108:13
  122:17 124:14 127:19 150:4
  163:10 176:13,16 180:21
  183:1,5 187:15,19 193:16
  195:22 201:5,9 202:2
  205:21 212:21 213:3,7
  214:5 215:1,16 216:4,13
  217:20,21,23 220:4,12
  222:1 228:7,22 230:20
  244:10,13 246:14,17 257:2,
  3 261:14,19
**application's** 216:18
**application-review** 133:6
**applications** 35:12,19 36:3
  38:15,24 40:8 41:11 49:10,
  14 51:21 52:2 53:2 59:18
  60:9 61:1,18 62:2,9,21 64:4,
  19 73:8,12,14 74:17 76:5
  78:25 81:4 82:24 84:6 95:15
  99:10 100:12 104:17 108:6
  109:15 114:8 123:6,9 124:9
  131:3 136:7 145:14,18
  146:4,9 150:15 151:23
  152:2 158:12,15,18 159:3
  163:7,13,17,23 165:23
  166:1,7 169:12 170:24
  173:5,16 176:21 177:2,18
  178:25 196:11 200:23
  202:21 203:2 210:9 214:25
  217:6 221:11 224:2 231:11
  239:20,22 240:14 241:2,25
  242:23 243:25 244:11,17
  245:20,21,24 247:1 248:21
  249:10 251:21 252:9,22
  253:7,8 255:3 256:6,23
  257:8
**applied** 39:10 53:18,22 54:3,
  7 78:21 92:3 129:5 150:8
  152:11 181:8,9 185:8
  216:24 218:8 220:3
**applies** 43:3 55:9,24 78:16
  82:20 156:20
**apply** 29:2 37:20 38:25 45:3
  51:20 52:17,23 79:4 128:14

**applying** 150:8,11 183:18 254:9,11
  262:21 263:6
**applying** 160:8 224:23
**appointee** 20:1
**appointees** 29:3 234:16
**appreciable** 144:13
**approach** 100:11 103:8
  124:5
**appropriately** 191:13
**approval** 25:13 45:23 86:18,
  20 89:9 104:23 105:2,18
  108:21 119:14,16 120:7
  125:20 126:25 127:1,3
  132:18 134:13 136:5
  139:15,22 150:9 155:22
  162:15 163:13 199:14,18
  210:14 226:12 238:3 249:21
  254:18
**approvals** 88:3 118:5,9,17,
  20 119:2,4 120:16 121:3,21
  123:5 126:3,20 129:2
  131:16 146:7,11 147:16,18,
  22 148:1 149:4 150:17,22
  151:21 159:4 161:12
  162:15,18 170:4,5 175:24
  207:2,6 223:15,17,19
  225:11,15,16,21 226:16,20
  262:17
**approve** 27:8 55:24 95:19
  96:4 128:17 135:1 204:5
  205:8 206:2,7,11 215:17
**approved** 27:18 39:18 40:9
  79:2 124:15,16,17 127:19
  135:13,16 141:10 148:19
  155:8,11 226:10 242:5
  261:19 262:11,19
**approving** 87:2 89:15,17
  134:14
**approximately** 130:6 150:15
  160:25
**approximating** 47:17
**apps** 249:2
**AR-A-0227** 158:11
**area** 220:14 226:19
**areas** 36:8 87:15
**argued** 92:1
**arrangement** 9:10
**Art** 185:13 240:14 241:3
  242:9
**articulated** 214:21

**ascribed** 170:13
**Ashford** 73:22 74:2
**asks** 17:6 208:16
**assert** 213:6
**asserted** 145:21
**assess** 48:3 60:14 63:5
  100:25 104:18
**assesses** 251:5
**assessing** 175:24
**assessment** 40:16 44:5 45:2
  46:19 47:6 53:6 73:13 74:6
  96:13 104:20 123:11 206:15
  240:25
**assign** 255:9
**assigned** 64:6 177:20,22
  194:11 254:5 255:4,11
**assistance** 66:23 75:3
**assistant** 14:18 45:10
**assisted** 181:14
**assisting** 13:3 127:23
  128:18
**assumes** 86:2 172:12 202:4
  243:1 247:18 248:23
**assuming** 64:24 95:7 242:5
**assumption** 226:22
**attached** 17:12 29:24 62:2
  80:13 81:2 92:18,19 182:13
  184:10 190:20,23 195:18
  200:4 205:22 212:6,8 228:8
**attaches** 194:8 199:25
**attaching** 66:12
**attachment** 80:15 93:3
  174:9
**attachments** 12:16,18 92:13
**attend** 46:15 142:13
**attended** 45:25 99:11 100:7
  148:20 149:19 163:11
  169:20 177:21 237:14
  244:13
**attention** 134:11
**attorney** 11:20 14:19 23:16
  44:13 48:15 55:13 63:2
  64:5,6 65:23 66:2,5 69:14,
  16 103:19 104:25 181:20
  189:6,7 194:11 201:15,24
  203:12,13,19 204:11 205:6
  209:14 232:16 234:10
  248:11
**Attorney's** 14:14,21
**attorney-client** 8:8

**attorneys** 8:25 12:20 17:24 22:19,22 23:1,3,19,24 24:11,14,19,21 25:6,24 26:4 38:14 40:4,6 43:17 59:12 63:15 105:3,11 143:16,17 171:13,18,25 189:25 190:1 201:1 207:18,20 209:10,18 229:22 233:25 235:16 260:22

**attrition** 24:9 25:6 66:20 67:14,24 68:13

**audio** 13:15 108:25 116:22 127:16 162:15 168:4 197:4 198:11

**Auer** 22:3 36:10

**August** 80:7 158:13 159:8 160:25 161:25 162:7

**authority** 24:13 25:20 26:21 51:6 139:8 140:24 141:2

**authorize** 146:3

**authorized** 112:15 145:13 234:20

**automated** 209:7

**availability** 63:20

**average** 170:13 231:10

**awaiting** 253:7

**awarding** 155:15

**aware** 8:3 13:2,5,8 29:16 57:13 60:3,5 62:23 67:1 70:2 87:24 102:25 115:21 131:1 151:15 152:9,21,25 157:5 163:12 168:13 175:22 179:4,7 180:3 183:5 195:7 234:15 237:22 260:2,6

**awareness** 13:10

---

**B**

**B-A-Y-N-E** 23:13

**B-R-O-N-S-T-E-I-N** 23:16

**back** 22:15 25:19 27:16 36:13 42:9 43:25 46:9 56:6 58:16 62:24 64:20,25 69:4 78:8 86:5 91:19 96:2 97:12, 16 98:1,21 104:4 106:9 112:3,4 114:25 120:10 121:10 122:3 136:12 139:4 140:15 151:3 162:24 163:14 167:12 168:11 185:24 189:22 197:12 198:20 199:22 208:14 211:24 213:24 214:7 215:14 221:20

**252:7**

**backfills** 24:8

**background** 14:1

**backlog** 100:17 101:23 102:3,7,16,17,22 164:2,3,4, 12,14,15 171:9 178:7 226:23 228:21 229:25 230:5

**backwards** 19:7 20:15

**Bailey** 35:1

**ball** 143:7

**ballpark** 47:20 190:9

**bandwidth** 103:19 202:13 218:9

**bar** 82:21 104:24 203:6

**based** 37:21 39:7 53:17 62:18 70:19 76:24 79:6,17 82:17 84:14 85:7 96:11 101:23 129:15 150:9 170:15 188:13,16 189:24 193:1 205:7,8,12,13 206:12 210:23,25 213:4 232:12 245:5,22 246:11,20 249:6 255:9

**bases** 11:24

**basically** 52:21 54:14 65:1 110:13 127:4 134:8 135:22 140:14 176:10 181:18 253:2

**basing** 205:14

**basis** 26:19 123:20 145:17, 25 156:15 205:22 213:5 232:6

**batch** 238:6

**Bates** 158:10

**Bauer** 126:18 146:14 222:5

**Bayne** 23:13

**BD** 20:22 61:25 68:2 102:25 157:25 158:8 159:3 160:16 205:2,15 207:23 209:13 226:15 256:10

**BDU** 37:1,14 48:18 49:12 50:5,16 56:1 70:17 72:12, 16,24 76:1,15 85:23 86:2 88:5 96:5 98:14 99:5 106:15 109:18 118:4 122:7,10 125:12 129:8 137:4 138:14 140:2,10 143:9 144:7,24 147:8,10 151:22 152:5 163:6,9,12 171:13,25 224:15 228:21 229:19 231:24 237:16 238:20 239:20 252:1,2,7 255:25

**BDU's** 114:7 131:2 178:10 235:7

**beachhead** 113:3,10

**Beauty** 158:19

**Beckwood** 49:21

**began** 140:2 210:3 237:16

**begin** 170:9 248:15

**beginning** 99:3 140:13 154:7 214:8 226:15

**begins** 30:13 92:15

**behalf** 8:17,22

**beneath** 30:20

**benefit** 204:23

**big** 103:15

**biggest** 109:13 133:15

**bit** 33:14 34:11 89:10 109:20 112:4 122:24 130:17 175:15 190:2 218:9 238:4 262:16

**blanks** 81:18

**book** 190:20

**borrower** 15:20,25 16:3 18:2,10,11,17 20:6,16 21:8 23:5,24 24:9 25:21 27:23 28:2,5 30:16,22 31:2,5,23 33:2 34:3,20 35:8,11,18 37:16,20,24 38:9,14,23 39:17,25 41:13 42:4 45:22 46:14,15,20,25 47:2 50:7 52:24 53:11,15,21 60:17,20 61:5 64:14,21 65:18,22,23 66:1,11 67:15,23 68:12,21 72:18,25 73:14 75:6 77:14 78:15,19,20 79:1 82:10,14, 15 83:1,8,17 84:3 86:12,14 96:1,12,16,25 97:1,6 100:11 101:14 104:12,18 107:12 108:2 109:7 112:7,24 113:11 114:8,18 115:10,12, 15 116:17 117:7 119:18,25 120:11 121:9 122:8 124:9, 10,11,18,21 129:18 131:3 132:3 142:23 146:3 147:5 149:4 150:4 151:2,6 152:2 155:22 166:6,12 168:14 169:12,24 170:24 173:4 176:14 177:25 178:24 181:23 182:1 183:18 188:1, 14 189:5,7 192:13 194:8,25 195:8,16,18 196:11 199:24 200:2 201:1 206:13 207:18 208:17 213:2,5,6,15,20 214:18 215:7,11,18,24

216:9,20 217:13 219:6,20
221:7 222:1,11,13 224:2
227:3,6 228:2 229:5 231:2,
10 232:11 237:11 240:11
241:23 243:17 249:8,17
252:2 255:25

**borrower's** 37:23 40:9 45:17
66:4 74:13 95:24 96:2 97:5
107:11 109:4 170:16 194:9,
20 201:9 219:15 228:6
241:20 261:14,17

**borrower-specific** 194:24
195:11

**borrowers** 36:20 41:3 52:10
53:24 54:6 59:18,19 60:8,15
61:4,8 66:25 83:5 96:6
99:10 110:24 111:18 145:21
146:25 147:6 148:19,25
149:21 150:16 151:7 153:3
155:15 163:10 179:5,9,16,
23 182:10,24 183:3 196:12,
23 199:21 210:5 213:23
227:9 237:14 240:9 245:3
258:23 259:17 261:23

**borrowers'** 95:14 132:7
232:1

**boss** 13:5,12

**bottom** 30:13 80:17,19,24
81:17 115:2 158:11 208:18

**box** 73:11 234:11

**bracket** 79:24 92:8 129:23
173:19 184:4 237:1

**bracketed** 17:2 29:19 157:9

**brakes** 147:20

**break** 58:2 105:22 136:11
167:16,19 211:11 222:22
234:21

**breakdown** 52:5 190:5

**breaks** 11:14,16 40:11 192:4
211:11

**Brian** 23:13

**Bridgepoint** 74:2

**briefing** 158:6

**briefings** 229:9

**briefly** 106:8 262:6

**bring** 24:13

**bringing** 23:2 26:5

**brings** 46:25

**broad** 8:18 16:2 62:5 243:4

**broader** 21:6

**broadly** 44:21 46:3 60:16
61:5 179:2,6 195:16 229:10

**broke** 89:10 94:7 109:20

**Bronstein** 23:15

**Brooks** 93:8 98:3,10,13,15,
20 99:8,13,17 100:2,8
175:11 247:14,22 248:3
253:6,8

**brought** 24:16 33:22 66:13
69:12 70:1 143:15

**Brown** 12:16 13:7 21:18
27:20 34:11,22 35:6 86:12
87:4 89:24 101:25 102:24
163:25 164:11 169:6 174:8,
9 233:22

**Brown's** 34:17

**bucket** 47:8 193:15

**buckets** 49:10

**budget** 121:13,16 141:5

**build** 183:2

**building** 67:19 218:1

**built** 259:9

**bullet** 158:16 159:5,15
161:10,20 238:14

**bullets** 177:10 251:17

**bunch** 46:11 59:12 91:10
134:10 144:3,15 195:3
243:4 248:25

**business** 73:2 119:8 120:4
178:2 180:15 181:11

**button** 128:9

---

## C

**caliber** 143:19

**California** 41:19 42:18 43:1
78:23 79:20 99:7 136:3
155:24 156:19,24 225:4,5
226:1

**call** 24:8 41:8 46:23 74:21
119:21 155:1,2 197:13
241:2

**called** 15:8 18:19 174:9
181:17 188:18 192:2 215:3,
4

**calling** 58:18 120:20 156:10

**calls** 25:18 85:15 87:22
88:20 123:23 126:14 220:19

**Calvillo** 148:12 149:3,12,25
150:2 151:7 153:19 154:2,
19 155:7

**camera** 10:11

**campus** 53:25 59:6 142:12
188:6 238:16,23 239:16
240:1 242:18,22,24 243:23
245:10 258:18

**campuses** 44:20 99:7
186:25 258:16 259:2,13

**candidates** 24:2

**capabilities** 143:23

**capacity** 19:14 21:16 141:10
209:18

**career** 15:8 50:10 158:18
175:9 245:14

**CARES** 218:22 220:1

**carried** 163:20

**case** 39:18 40:9 43:18 46:16
51:25 52:8 53:6,8,24 61:10
64:7,11,13 65:24,25 66:16
67:3 69:22,23 80:12 81:22
82:11 92:22 93:20 97:18
101:9,10 102:8 105:13
107:19,25 117:18 128:17
129:9 132:1 148:12,16
168:23 173:25 181:8,19
188:2 189:13 191:24 194:12
200:16 202:10,20 210:11
218:17 219:9,19 221:8
222:9,17 227:8 246:15
254:15,18,19 260:12,23
263:15

**cases** 20:20 40:23 41:5
45:19 50:10 53:4 60:24 64:6
70:9 91:7,8,10 100:18,21,23
101:2,6,12 102:3,18 103:14,
24 104:7,8,10,11,22 105:4
106:23 107:10,15 109:3,7
125:5 126:7,15,16 130:24,
25 133:18 138:19 141:17,23
171:8 172:20 176:4,6
178:15 181:4 184:17 185:5
186:14 188:22 189:12 194:1
196:16 199:20 203:17
204:2,7 209:19 223:11
224:6,8 225:3,13,24 226:1,
2,9,13,18 227:19 230:8,12
231:6,7 232:11,14,24
239:25 244:19,20,25 247:5,
20,22 248:3,23 249:1 252:5
253:15,18,21,24 254:2
256:9,13,16,17 257:5,18
259:21 261:2 263:1,2,3,8,12

**catch** 141:16 166:21 174:17
241:22

**categories** 46:21 108:21
    132:16 177:1,18 186:18
**category** 186:4 211:8
**CCI** 78:22 108:18 110:25
    122:7,10,11 128:18 137:5,
    17,21 138:15 140:3 150:15
    152:10 155:6 156:20
**CEC** 98:16,19 176:1 177:1,9,
    10 178:23 179:5 180:13
**CEO** 120:15 121:2
**certificate** 127:24 128:18
**cetera** 194:11 201:17
**CFPB** 59:11
**Chad** 88:12 89:2
**chain** 34:10 136:6 224:14
**chains** 34:13
**challenges** 54:5
**chance** 228:10
**chances** 256:8
**change** 26:14 123:21 124:23
    126:22 154:25 191:11 193:7
    232:17 246:20,24 247:5,6
    249:6 254:13 260:8
**changed** 14:13 16:17 18:14
    19:4,12 21:21 33:4 34:11
    126:1 154:8 160:14 261:13
**characterization** 94:19
    222:16
**charge** 134:14
**Charlie** 262:3
**Charlotte** 74:1
**chart** 127:23 128:12,15
    174:10 175:8 186:20 188:12
**charts** 128:20
**chat** 11:6 204:15
**check** 179:7 193:7
**checked** 137:10
**Chicago** 14:9 240:15 241:3
    242:9
**chief** 13:19 18:24,25 19:11,
    18,21,23,25 20:3,12 21:11,
    12,13,14,16,18,22,25 22:1
    26:15 27:13,17 28:24 31:19
    32:18 33:1,3,5,8,11,18,21,
    23 34:12 35:2 55:23 68:18
    103:1 118:13,20 125:22
    129:12 141:8 158:2 163:20
    164:1,11 229:7
**choice** 53:6 54:18,19,25
    56:6,13

**circle** 106:8
**circling** 163:14
**circulated** 229:10
**circumstances** 30:8 45:24
    55:16 72:16,23 75:20 120:9
    258:23
**cite** 239:10
**cited** 241:20
**cites** 251:15
**Civil** 113:19
**claim** 36:4 38:25 42:16
    45:17 46:25 47:2 48:4,5
    65:3 78:16,21 81:24 82:6,19
    83:18,23 84:1,3,4,9,15,25
    85:5,6,9,12 93:11,17,18
    94:2,14 95:13 96:18 97:7
    101:17 104:15,19 105:16
    107:3,7 108:3 110:2 125:12
    136:2,3 142:10,23 145:22
    178:2 180:22 181:13,17
    182:7,18,19 183:19,25
    184:24 192:5,6,9,12,17
    194:16,18,20,21 195:23,24
    199:8,10,25 200:1,8 203:10,
    14,21 204:13 205:1,2,3,6,8,
    14,15,24 206:2,7,12,18,19
    207:7 210:10 211:2,7 213:8,
    12,16 214:21 228:3 231:1
    232:2 243:6 245:7,8,9
    254:14 261:8
**claims** 16:4 37:16,20 38:7
    39:13 41:16,17 42:24 43:4
    44:23 46:24 47:7,9 50:1,6,7
    51:20 52:15 54:3 61:9 62:1
    73:16 78:9,11,12 79:14
    83:15,25 84:24 85:23,25
    103:9 104:1 108:17 109:11
    110:3,17,20,21,25 111:19
    122:9,10,12 127:8 132:7,16
    135:13 137:6,17,21 138:8,
    15,24 140:3,17 142:18,25
    143:1,20 146:10 148:20
    149:5 150:5 152:11 155:6
    156:20,22 158:23 159:6,18
    160:24 163:8 168:15 177:11
    178:5,9,12,14,16 179:23
    182:20,25 185:3,9,14,20
    188:24 192:2 193:13 196:9
    199:6 201:22 206:6 207:25
    208:6,17 209:6 210:8 218:3
    220:9 223:5 225:9,19
    226:24 227:11 230:20
    237:13 238:15 241:4 242:10

    243:19,22 246:7 247:16
    249:21 262:10,13,19
**clarify** 78:1 210:17
**class** 148:16,25 149:12
    151:8 155:11 174:3
**classes** 83:3
**Clausen** 14:9
**clean** 228:20
**clear** 145:4 163:21 168:7
    193:23 206:8,25 207:2,14
    210:18,22 226:23 244:18
    251:4
**clearance** 185:24
**cleared** 41:8 45:11 46:5 47:8
    62:18 106:10,12,24 107:18,
    20 108:9,12,17 176:7,11
    244:19
**clearing** 178:7 256:16
**click** 37:6 261:4
**clicks** 261:11
**climate** 120:12
**close** 88:2,14 121:8 144:21
    191:18,22
**closed** 50:4 71:19 73:2
**closely** 56:8 88:11 135:20
    160:20 171:3 259:18
**code** 8:13
**coincide** 162:2
**coincided** 139:18 147:18
**collated** 60:11
**collating** 238:21
**collect** 213:22 221:2 252:1,2
**collected** 242:12
**collecting** 236:22 239:2
**collection** 249:17 250:6
**Collective** 215:3,4
**collectively** 109:14
**Colleen** 8:11 10:15,22 17:3,
    10 37:8 136:15,16 197:4,7
    262:9
**college** 14:2 158:18
**colleges** 148:21
**column** 175:2,3,5,9,16,17
    176:9,10,14 177:10 178:22
**combination** 63:13
**comfortably** 193:12
**command** 136:6
**comment** 130:21
**comments** 240:5

common 39:4,22 40:20
41:11 44:7,9 45:20,22 46:21
47:6,8,15 48:4,6,11 49:11
51:17 58:19,20,21 60:11,13,
14 62:19 63:16 69:4,8 70:19
72:12 81:9 82:23 98:14,18
99:13,16 100:12,13,24
101:1,14 104:8,9,11 106:23
107:4,9 108:22 109:6 143:2
173:17 175:3,4,15,17,18
176:8,18 177:3,11 178:6
180:17,19 181:1,5,14
183:10,20 184:19 185:11
187:12,16,23 188:5,17
193:2,17 194:3 195:7,13,15
200:24 201:4,6,7,13,22
206:21 226:3,5,24 227:7,11,
15,18 235:6,25 238:19
248:14 250:6,20 251:14,19
252:3 253:14,17,25 254:7,
22 255:2,6,19,24 258:11
commonalities 62:11
252:10
commonly 229:4
communicate 11:4 27:16
72:17
communicated 35:21 38:13
103:5 118:12,14 121:2,6
148:7 228:25 229:4
communicating 118:23
121:18
communication 34:10,13,14
119:18 233:2
communications 36:7,18,19
56:15 69:25 70:15 74:24
78:19,20 86:14 88:9 233:6,
11,24 234:8
companies 142:7
compare 170:12 187:15
comparison 190:18
compensation 166:25
complaint 30:9 70:4
complete 46:18,22 64:17
99:9,18 100:2 107:16,21
171:8 189:4 216:12 252:4
completed 42:23 43:5,10
92:5 138:1 180:7 185:19
189:6 231:8 250:12 252:12
263:4
completely 167:2
completion 118:6 121:22
173:6

complex 202:6
compliance 59:2
complicated 32:9 90:9
206:17 224:6 236:16
comply 123:17
components 16:19
comprehensive 44:10
115:15
computer 169:1 235:7
conceptually 109:25
concerns 26:11
conclude 45:14
concluded 52:22 56:9 93:16
100:8 106:15 155:24 201:7
conclusion 39:12 41:7
91:25 95:12 201:13
conclusions 117:13 177:16
237:12 240:19
concrete 48:13 192:7
conduct 71:24 192:23
conducted 257:12
Conducting 37:15
confident 103:25
confirm 10:24 11:3
confused 250:16
confusing 177:5
connect 168:3
connection 38:3 140:11
162:22 165:10 191:14
200:20 214:4 219:21 244:23
connections 243:11
Connor 92:8 212:5,7
consecutive 17:6
consensus 126:17
consent 9:9
considerably 189:24
consideration 182:4 234:17
considered 58:20 65:8 69:8
72:11 95:15,25 96:19 97:20
129:9 176:17 183:25 195:15
214:4 216:18,21 245:11
258:11
considers 47:15
consistent 54:22 113:16,18
149:3 150:2 206:24 207:1,4,
10,13,15 235:12 239:14
240:16 241:9 242:11
consistently 207:6,10
243:24

consolidated 52:8
constantly 232:7
constituents 44:24
constraints 121:14
consult 88:4
consultation 168:19
consulted 116:16
consulting 87:19 169:11
consumer 15:1,4 18:13
contact 76:1 193:21
contained 110:13
contents 110:18
context 119:13 213:16
218:20
continue 45:12 46:18 86:1
101:4 204:24
continued 122:7,10,23
132:21 154:17 263:11
continues 30:14 212:17
continuing 40:25 59:7
114:20 151:22 152:5
contract 209:10,14,18
contracting 142:7,16
contractor 82:3 120:3 139:8
140:24 141:3 143:21
contractors 122:17 141:12,
21 142:4,9,22 143:5,15
contributes 36:17
contributions 144:11
control 143:17 207:19,21
208:1
convened 115:10
convention 64:9 235:12
236:1
conventions 18:14
conversation 91:5 114:19,
20 132:9 140:19 154:13
conversations 8:5,7 72:10
102:12,15,20 104:5 114:6,
10 118:24 129:7 159:23
229:23 230:2 232:5
convert 128:14
converting 155:3
conveyed 141:4
conveying 129:20
COO 21:14,23 27:20 28:1,4
229:6
COO's 27:23
copied 119:10 125:24

copies 79:23 92:7 157:9
copy 29:12 66:12 168:25
  237:1
Corinthian 41:17,18,19
  42:2,10,15 50:8 76:5 103:14
  109:10 110:20 111:22
  128:25 132:16 138:19,24
  141:18,23 143:11 145:20
  148:20 150:5 206:4,5,6
  223:10,21 225:3,7,18,25
  226:18 230:24 237:25
  249:17,23 262:19
corollary 192:16
Corp 175:9
correct 12:4 15:21 23:7
  27:21 28:3 32:19 38:20
  42:5,13,14,17 47:16 49:8
  50:14 78:13,14 80:9 81:21
  82:7 95:2,22 97:25 98:4
  108:16 130:8,9 141:1 146:1
  147:2,3 150:6,19 152:7
  156:20 170:17 175:6 178:25
  183:22 187:17 188:20 201:2
  207:20 210:15 215:12
  221:17 234:14 237:16 250:9
  251:23,24 255:22 256:1
  261:22
corrected 191:13 261:17
correcting 214:11
correctly 98:17 149:9 175:3
  176:12 246:4
corroborate 244:8
corroborated 240:12
corroborates 258:25 259:19
corroborating 95:18 96:17
  179:21 180:2,4 240:21
  241:24 245:23 246:1 248:1,
  5 259:7
corroboration 96:3
corroborative 243:13
  244:16 245:11,19
counsel 8:11 9:9 10:18
  11:23 12:1,8 17:23 43:21
  54:4 56:17,18,19,21,22,23
  57:6,11 75:4 86:25 88:23
  125:24 126:11 156:8 197:22
  262:7
counsel's 156:5
count 178:6
counts 22:17
couple 31:4 64:16 135:24
  171:14 191:9 196:4 198:10

201:3 217:3 258:8,13,18,20
  259:1,11 261:6
court 8:25 9:17,23 10:4,7
  49:22 78:5 82:11,12 112:14
  113:14 156:13 164:6,9
  189:10 197:1 198:13,17,19,
  22 262:25
court's 170:19 174:2
courtroom 239:7
cover 146:9 199:19
covered 52:11 193:20 200:7
  232:19 254:21
covers 199:3
COVID 120:12
crack 209:11
create 38:9 51:6 248:14
  249:16
created 38:18 49:17 115:21
  160:12 175:1 188:23 189:1
creating 143:10
creation 237:19
credit 41:18 42:15 132:6
credits 122:8 192:13,15,18
  206:5 211:3 237:13 258:2,9
crew 86:11
criminal 14:23 45:5,13 46:15
  48:20 70:23 71:17 187:4
criteria 42:8 110:5 176:21
  206:25 207:2 254:20
critical 179:11,14
crunch 128:12
culled 178:24
current 15:13 34:8 64:4
  120:12 126:23 193:9 216:14
curve 144:9
cut 9:24 121:10 164:7,10
  197:3 198:11
cycle 226:14

─────────────────

D

Dana 8:21 198:11
data 53:13,17 54:5,13 84:16,
  21 87:14 91:20 114:22
  115:24 116:1 127:24 128:6,
  7 133:18 150:21 152:12,14
  153:1,2,10,20 154:18 155:3
  160:9 167:8 169:11,13,17
  170:14 177:20 191:13
  213:22 217:1 230:10 240:10

database 239:23 255:10,13
date 52:12 99:23 137:8,10
  181:11 235:22
dated 237:15
dates 31:18 32:20 69:2
day 11:16 22:15 181:4
  249:13,15
days 12:22 43:15 102:8,18
  228:22
deal 218:21
dealing 53:1
debate 74:19,22
Debt 215:3,4
December 8:12 80:21
  140:14 145:13 148:24
  225:10
deceptive 180:25
decide 56:13 219:8 246:17
decided 51:1 213:2,6 218:5
  222:1 225:16 245:25
decides 52:16
deciding 252:5
decision 27:7,10 54:2,23
  55:2,8,25 63:7 75:14,23
  97:21,23 100:10 103:8
  116:16 118:16,22,23
  119:15,20,24,25 120:23
  121:3 123:1 125:14 126:4
  127:5 129:10,15 137:17,20
  146:15,18 147:17,21,25
  148:9 151:5,10,17 152:9,17
  155:20 161:15,17 162:4
  163:16 202:3 212:14 216:16
  217:15 219:3,17,20 222:5
  223:3,25 224:14 254:21
  260:8 261:17,24 263:7
decisions 27:14 30:17 55:24
  67:25 75:5 101:11 117:6
  119:6,11 146:24 147:5,9,10,
  11,12 148:5 151:2,6 161:11,
  22 162:13 169:24 171:12
  209:24 218:7 221:15,21
  222:11,13 223:1,9,14,15,16,
  19,22 224:3,16,18,20,24
  230:8,9 232:18 262:12
  263:2,11,14
deck 159:10
decks 158:1
declaration 12:14 17:2,9
  36:14,24 37:8 92:8,25 98:21
  115:1 117:25 121:20 122:4
  137:2 139:5 145:11 146:23

147:1 150:13 155:9 162:25
174:7,8 184:4 190:21,24
212:4,7
declarations  12:14,15,18
declare  9:7
deeply  202:14
default  53:10 107:8
defendant  239:9
DEFENDANTS  262:7
defendants'  29:9,20 79:24
80:6 89:2 173:20 174:1
defense  15:20,25 16:4 18:2,
10,11,17 20:7,16 21:8 23:6,
24 24:9 25:21 27:24 28:2,5
30:16,22 31:2,5,23 33:2
34:4,21 35:8,11,19 37:16,20
38:9,14,23 42:4 50:7 67:16,
24 68:12,21 72:18,25 75:6
83:8,18 86:12,14 95:20
96:2,16 97:6 100:11 112:7,
24 113:11 114:8,18 115:10,
12,15 116:17 117:7 121:9
122:8 124:9,11 129:18
131:3 146:3 147:5 149:4
150:4 151:2,6 152:2 155:22
166:6,12 168:14 169:24
170:24 173:4 178:24 189:6,
7 201:1 207:18 208:17
213:2,7 215:18 222:1,11,13
224:2 229:6 231:10 232:11
237:11
defense-related  83:2
defer  236:16
define  73:23 186:18
defined  166:11,12 255:19
defining  255:23
delay  131:10 154:1 222:10
224:3,16
deliberative  120:21 220:14
delineate  116:7 135:22
delineated  187:23
demonstrates  215:17
denial  79:21 80:13,20 81:6
84:7,14 85:24 86:7,9,19
87:2,10 88:6 91:3 92:5 93:5,
6 98:2,8 109:16,19,21,24
110:14,25 111:6,14,15,19
119:16 125:20 145:14,18
146:3 161:22 162:8,12
208:20,23 210:6,24 211:25
212:3,8,12 213:5 215:11
220:24 222:3

denials  79:17 110:19 111:2,
4,24,25 112:1 131:18,20
132:12 145:20 146:12,15,19
147:17 148:1 151:22
161:10,11,21 207:2 223:14
226:8,17
denied  79:5,6 81:5 83:15,25
84:2,7 85:6,7,12,25 91:21,
22 92:3 94:1,13 99:19 108:9
110:21,22 124:15 132:1
145:6 158:14,17,23 205:4
207:8 226:25 244:2 246:8,
10 247:2,3 253:9
deny  204:13 205:6,16,23
denying  205:11,13
department  14:18 17:23
18:4 19:3 22:8 25:17 28:9,
11,19 29:3 32:10 38:8 47:14
50:19,21 51:5 56:22 57:4,8,
11 58:18,23 59:16 70:18
80:20 84:12 86:24 115:9
118:3 121:8 123:10 124:20
126:14 138:24 147:16
148:23 149:8,11 152:13,22
154:4 155:16 156:1 157:23
163:19 182:23 183:7 185:21
219:7,12 221:11 233:5,15
234:16 251:7 252:7 256:12
262:21,23
department's  96:22 115:16
127:4
department-wide  26:12 27:3
145:7
departments  25:11
depend  47:1 65:2,5 227:2,9
256:7
dependent  41:12 52:11
206:19 259:9
depending  61:17 77:6 120:9
149:18 181:7 186:21 188:23
204:17 208:4 228:8 245:16
257:7
depends  32:12 63:16,19
65:17 66:10 73:23 84:2
97:13 104:15 208:8 230:7
231:20 240:23 245:2 257:14
258:6 260:6
deposed  13:3,6,8,11,22
deposition  8:10 9:1,3 10:23
11:5,18 12:6,21 13:1 17:7,8,
11 22:10 29:23 36:11 80:3
92:9 129:23 157:11 173:22

184:9 212:2 237:3
depositions  113:17
deputy  18:25 19:18 21:14,23
33:23 118:12,20 120:15
121:2 158:4
describe  15:3 27:23 30:10
37:17 61:14 74:19 179:9
184:14 192:3
describes  30:15,21 81:1
175:3
describing  31:1 38:9,19
41:6 48:9 168:13
description  18:7 83:15
176:14 216:22
desire  154:3 171:8
desk  237:22
detail  215:8
detailed  97:1
determination  51:19 55:21
108:13 109:5 156:2 224:9
determinations  39:8 124:3
determine  37:24 39:25
40:16,24 45:8 51:23,24
53:14 56:5 177:21 185:20
186:23 201:17 207:7 255:20
determined  82:18,20 107:24
176:4 177:2 185:10 187:16
188:16 204:6
determines  127:20
determining  39:3 53:17
206:16 216:18
develop  41:1 50:18 86:8
90:6 106:16 132:23 133:17
175:23 227:15,16 242:2
249:8 257:2
developed  42:12 50:16,20
78:10 85:22,24 86:21
134:22 135:12 152:10 159:6
184:20
developing  50:22 132:15
133:1 161:4 169:4 172:1,17,
18 231:3 242:8 248:10
253:6
development  36:7 51:18
133:11 141:14 159:20
162:11 172:4 223:7 248:8
252:21
develops  86:3
deviations  170:10
Devos  8:15 22:13 130:11

**Devry** 73:22,24 99:8
**dial** 197:12
**Diane** 12:15 20:25 22:3 34:9
36:10 57:21 92:10 161:8
168:19 169:21 173:21
**difference** 123:2 250:24
**differently** 76:25 77:6
**difficult** 224:12 230:2
**difficulty** 224:1,4,22
**direct** 47:7
**directed** 100:14
**direction** 161:2,6 163:18
174:16,18
**directive** 102:9,10,17 103:7
**directives** 35:18 117:6 127:6
**directly** 21:18 22:1 56:14
57:5,12 118:25 171:7
**director** 15:19,24 18:2,24
37:1,14 56:1 68:16,23 160:5
**Directorate** 18:13
**disagree** 112:16 205:10
207:3 246:24
**discerning** 224:22
**discharge** 50:16,22 51:7
120:7,9 130:6
**discharges** 130:23
**discover** 246:13
**discovered** 196:14 232:12
**discovery** 13:4 66:7 112:15
117:21 156:13 200:16
234:20 236:21 249:6
**discretion** 142:10
**discuss** 12:25 28:2 113:2
114:17 151:10 229:18
**discussed** 93:24 169:22
213:24
**discusses** 39:9 257:13
**discussing** 175:12
**discussion** 56:3 91:17
123:19,25 124:5,20,22
154:10 160:23 201:16,25
257:24
**discussions** 27:11 56:3,12,
14 57:20 72:20 75:2 91:2
100:16 112:6,23 125:7
129:5 132:4 154:24 159:19
189:16 232:10
**dismiss** 82:12
**displeasure** 130:13 131:2

**disposition** 124:8 152:1
**disseminated** 195:3
**distilled** 240:3
**distinction** 28:18 194:19
**distorted** 164:15
**distortion** 108:25 116:22
127:17 162:15
**distribution** 62:14
**dive** 202:13
**divided** 144:1
**division** 15:2 51:5
**document** 17:1,14,18,19
29:19 30:5 37:3,7 39:19
64:13,23 77:1,3 80:6,11,16,
18 81:13 90:20 92:20
117:14,17,21 119:9 130:2,
11,16 157:14,21 158:9
174:6,9,12,14,25 177:7
184:12,14 190:15 191:2,19,
22 192:2,3 193:4,8,14 199:6
204:4 209:4 212:3,5,9,13
232:21 234:2 236:20 237:7,
19,23 238:9 239:8,11 240:6,
9 241:21 243:8 257:23
259:5
**documentation** 61:12 96:5
97:16 182:7,9 183:24
201:23
**documented** 233:20
**documents** 13:4 18:20
39:23 43:7 49:6 59:8,15
67:23 73:12,18 74:5 76:9,16
97:11 103:23 104:1 114:22
115:25 116:2 134:20 175:21
179:24 182:24 196:19 200:8
205:23 234:11 236:8,22
251:7
**DOJ** 12:7 43:17 236:16
**double** 177:4
**doubt** 195:14
**dozen** 23:2
**dozens** 49:23
**draft** 75:24 110:12 162:20
190:16 191:16 208:20
209:1,7
**drafted** 91:9 110:8 237:10
**drafting** 87:25 89:8,15,17,19
131:22 209:11 238:25
**drafts** 239:7
**dramatically** 22:20

**draw** 28:17 194:19
**driver's** 9:19
**drop-down** 81:25 82:5 85:14
95:10,11 261:10
**drop-downs** 85:14
**Dropbox** 17:1 29:18 37:9
79:23 92:7 129:23 157:9
173:19 184:3 237:1
**dropped** 197:13
**due** 25:6 67:24
**duly** 10:16

---

## E

**earlier** 93:24 94:11 100:4,23
102:12,14,21 106:9 109:17
151:25 161:14 165:3 168:6
175:12 194:14 212:1 228:19
233:1 248:8 259:20 262:9
**earliest** 209:5 221:13
**early** 25:8 33:7,13 68:13
102:16 122:20 125:21
132:5,12 139:25 152:25
153:12,15 154:11,16 163:15
233:16 256:2
**earning** 170:13
**earnings** 170:16
**easily** 236:8
**ECF** 79:24 81:14 92:8,16
98:8 173:20
**ECF56-4** 17:2
**Ed** 51:10 213:1,6 215:17
**edited** 110:11 189:15
**EDMC** 49:21
**Education** 14:18 18:5 29:4
57:4 175:9
**Education's** 56:23
**effect** 75:25 76:3 77:22 78:4
88:21 102:12 120:18 126:5,
19 146:14 195:8 222:6
224:7 233:14
**efficient** 221:9
**efficiently** 178:19 221:4
**effort** 63:18 88:15 170:12
209:17
**Eileen** 212:5,7
**Eitel** 34:25 57:22
**electronic** 11:6
**electronically** 81:12

**element** 39:15 45:16 79:8,9 201:8 206:22 242:5
**elements** 39:14,25 45:17 79:18 109:1 180:21 181:6, 25 206:18 227:8
**elevate** 194:16
**elevated** 195:21 200:23 201:1,10,24 202:2,21 203:2
**eligibility** 83:8
**eligible** 104:13 155:8
**eliminate** 102:7 164:4,15
**eliminated** 102:3 230:1 233:18
**elimination** 101:22 102:16, 17,21
**Elisabeth** 8:15
**ELLIS** 9:15 10:19 17:4,13 29:25 31:11 37:5,8,12 57:25 58:7,15 68:10 80:8 89:5 92:6,12 94:20 105:21 106:7 112:10,16,22 113:15,20 114:4 117:3,23 120:22 121:1,19 124:7 130:1 131:6, 9,13,14 136:10,25 156:14, 17 157:3,7,13 165:5,16 167:18 168:1,10 170:21 173:24 184:6,11 197:4,10, 23 198:9,15,18,20,25 211:9, 16,23 222:18,23 234:21 235:4 236:7,14,24 237:6 262:1 263:17,21
**else's** 189:9
**email** 11:5 60:18 73:10 189:5 194:11,24 195:1,18, 22 196:6 204:14 217:12,13
**emails** 87:22 215:2
**emerging** 252:10
**employment** 41:21,22 42:24 44:15 49:18 52:23 93:7,9, 17,25 94:12 122:8 182:11, 16 195:20 196:2 199:24 213:11 238:2,5 240:17
**employment-prospect** 48:16 200:1
**employment-prospect-itt** 78:12
**employment-prospects** 41:17,20 42:11,18 43:4 62:1 85:23 93:14 135:13 231:1 240:2 241:4 242:10,20

**employment-prospects-type** 243:3
**enclosed** 191:1
**encountered** 60:20
**encourages** 97:1
**end** 26:8 45:14 54:10 69:1 94:8 108:9 140:13 143:7,25 168:20 173:14 181:3 185:24 193:18 194:1 208:21,24 209:23 210:6 212:9 218:25 221:22 223:9 225:22
**ended** 27:3 145:7
**enforce** 113:14
**enforcement** 13:19 18:3,12, 13,24 19:11,19,21,23,25 20:4 21:11,13,16,22,25 26:16 32:18 33:1 55:23 59:11,14 68:18 103:1 118:2, 8,13,21 125:22 129:13,17, 19,20 256:11
**engaged** 93:8
**enhancements** 217:8
**enlisting** 66:23
**enroll** 82:16
**enrolled** 98:3,10 177:25 180:14 181:10 188:1 244:12
**enrollment** 244:10
**enter** 8:23
**entered** 217:23
**entering** 154:22
**enterprise** 259:4
**entire** 222:21
**entirety** 57:8 218:7
**entitled** 124:10,12,21 191:24
**entitlement** 126:25 152:3
**entity** 215:3,4
**entry** 85:19 127:25 128:6
**equation** 121:15
**Erin** 23:17
**error** 142:19 261:12
**escalate** 105:3 199:15 203:7
**escalated** 182:3 201:14
**escalating** 203:8,9
**essentially** 45:23 48:19 101:25 103:6 106:17,18 110:5 119:24 127:14,17,18 142:11 147:20 179:21 182:4 186:24 205:20 219:5,8 260:24

**established** 100:22 251:13
**establishes** 234:6
**estimate** 84:6 134:1,6
**eventually** 127:13
**Everest** 237:14 238:16
**Everest/wyotech** 237:2
**evidence** 39:4,6,12,15,17,22 40:16,21 41:1,11 44:2,3,5,7, 9,17 45:1,15,21,22 46:1,3, 19,22 47:1,6,8,15 48:4,6,11, 14 49:11 51:17 58:19,20,21 59:10,19,21 60:10,12,14 61:9 62:19 63:16 65:8,11,14 69:4,8,12,13,16 70:20 72:12,13,17,24 74:10,15 76:2,18,24 77:9,15 79:3,12 81:9 84:2 85:4 95:1,5,8,10, 11,15,16,18,25 96:7,11,14 97:2 98:14,18 99:6,13,17,19 100:1,5,12,13,24 101:1,8, 14,15,16 103:21 104:8,9,12, 21 106:23 107:4,9,12,16 108:4,7,8,22 109:6 132:20 133:2 134:3 143:3 145:24 163:11,12 172:17 173:3,17 175:4,15,19,22 176:5,8,15, 18 177:3,12 178:6,22,23 179:1,12,21,22 180:2,4,17, 20 181:1,5,13,14,21,25 182:1,13,17,21 183:10,21 184:19 185:11 186:22 187:12,16,23 188:5,17 194:3,8,15,17,20 195:4,7, 14,15 196:15 199:7,8,9 200:24,25 201:4,6,7,13,17, 22 203:9,14,19,20 204:5,6, 12 205:2,7,9,12,13,19 206:12,16,21 210:9 214:3 215:17,22,23,24 216:3,6,10, 17 217:16 226:3,5,6,24 227:7,11,15,18 228:2,6 232:12,16,25 235:6 238:10, 19 239:6,10,11 240:12,21, 23 241:1,9,17,19,21,25 242:11 245:19 246:13,18,19 247:4,5 248:1,12,14 249:6,8 250:7,18 251:14,15,20 253:13,14,17,25 254:8,22 255:2,6,19,24 258:7,12 261:8

**evidence-exchange** 36:5
**evolved** 104:10 235:14

evolving 249:4
exact 42:7 47:18,19 61:23
65:5 140:21 217:4
**EXAMINATION** 10:18 262:7
examples 192:5,20
exceeding 141:18
**Excel** 133:13
exception 50:9 53:23 210:15
211:10
exceptions 259:1
exclude 59:6
exclusions 175:16,18
excuse 14:14 139:11 147:24
164:9 198:3 253:23 262:21
exhibit 17:5,8,10,11 29:22,
23 36:14 37:10 80:2,4 92:9,
11,24,25 98:1,22 115:1
129:22,25 137:3 157:8,11,
12 173:21,23 184:4,8,9
190:24 208:13 212:2 237:3,
4
exhibits 81:2
exist 40:13
existed 174:25
existence 87:11 155:21
existing 84:19 183:20
exists 183:10 219:10
expand 152:18
expanded 213:24
expanding 72:10
expansive 172:7 214:14,15
expect 96:6 228:4 232:23
239:18 249:14
expectation 96:10,15
161:24 227:5
expected 227:10,25 229:8
expedited 138:25
expensive 82:25
experience 108:5
expert 153:5 159:21
expires 220:1
explain 28:20,25 44:2 131:7
159:7 175:14 203:13 250:4,
23 262:16
explains 215:11
explanation 216:11
exploration 72:4
explore 69:11
explored 225:5

expressing 131:2
extend 16:5
extended 25:10 219:1
233:12
extending 25:2
extensive 105:19
extent 41:23 57:9 72:6
101:12 105:10 115:23,24
123:22 156:10 169:17
177:20 183:4 187:9 214:16
224:18 250:21
external 233:6
extreme 130:13
eye 71:10

---

**F**

fact 69:9 119:1 137:25
160:19 162:9 218:23 232:25
238:25 240:20
fact-finding 73:19 75:18,19
126:15 241:15
factor 215:6 224:15,17,19,
24 225:7 226:21 260:16
factors 52:9 54:12
facts 30:8 39:8,10,24 45:16
135:20 172:4,18 179:20
239:18 250:19,20,24
251:12,15 254:6,7
failed 79:1 84:8 242:6
fails 82:19 93:10
failure 81:24 82:6 84:1,14,24
85:12 93:11 94:1,14 205:14
211:1,6 213:12,15 261:7
fair 59:19 72:7 133:10 184:1
206:24 207:10,15 210:8
215:13
fairly 20:23 25:9 27:25 61:24
105:19 149:16 153:6 203:4
226:2 252:11,18 257:20
fall 22:23 23:23 52:2 70:16
71:14 102:11,19 160:15
165:2 167:2 169:5,23 171:5
185:11 186:1 187:10 226:3
228:24 253:16,21,24
fallen 253:10
falling 226:24
falls 100:8
familiar 11:21 157:14 159:12
fashion 125:4 139:1

fast 232:23
faster 227:10
fault 15:17
**February** 112:25 114:5
164:22 219:2
fed 128:7
federal 18:3,9 24:25 28:6,10,
23 57:8 90:24 113:19
233:11
feedback 202:10 204:10
feel 112:18
felt 75:21 223:16
fewer 142:24
**FFEL** 52:7
field 88:18 91:18
fields 87:17,19
figure 194:2 209:9 218:24
219:22 220:1 241:18
244:20,22 256:17 261:15,21
figured 228:11
file 29:20 236:4
filed 18:9 65:11,12 82:11
183:15
files 169:1 185:1
filing 70:3 80:12 92:16 98:9
173:25 174:1,7,24 175:1
fill 24:12 81:18 88:19 91:19
213:20
filled 81:23 82:1 90:13 220:7
final 47:10 54:23 55:8 65:12
89:23 90:2 126:19 146:16,
18 177:16 191:3,5,19 202:3
finalized 87:23 88:1 139:19
162:8 170:1 189:17
finalizing 88:2
finally 203:3
financially 8:20
find 21:3 62:21 66:17 87:9
148:4 187:25 216:21 244:16
245:17 247:4 260:10
findings 45:15 55:14 142:14
findings-of-fact 239:8
fine 18:21 59:4 136:11,17
256:12 263:21
finished 41:21
firm 14:9,11
first-level 205:6
fit 47:7 83:15 145:23 176:21
177:11 183:20 186:3 193:12
200:24 201:4 235:23

**fits** 48:4,5 142:20 176:13
201:6 241:12
**fitting** 49:11
**five-minute** 105:22 167:19
211:11
**fix** 168:2 197:24
**fixed** 168:2
**flag** 63:3 248:6 249:11
**flagging** 104:22
**flip** 80:17 81:10 145:10
208:14 238:8
**Flipping** 122:3 139:4
**flooded** 73:11
**flooding** 74:12
**flows** 144:2
**focus** 86:13 100:21 139:1
142:9 164:20 225:7
**focused** 44:22 71:6 138:16
161:4 163:10 164:2,12
225:24
**focuses** 15:12
**focusing** 218:5 220:8
**folder** 236:13
**folks** 13:6 24:16 25:18 75:9
82:24 86:10 87:6 88:16 94:8
103:3,16 155:2 167:13
168:20 169:22 170:11 220:8
**follow** 36:16 54:24,25 64:21
65:1 162:17 169:7 208:19
249:2
**follow-up** 189:15 262:6
**food** 224:14
**forbearance** 120:11,13
132:3 218:16,23 219:2,15,
21
**foremost** 142:8
**forgetting** 59:25
**forgotten** 122:13
**form** 31:10 42:8,12 80:13,20
81:5,10,16 83:10,11,15
84:7,13 85:24 86:1 87:2,9
90:6,12 92:5,21 93:4 96:21
109:16 110:8,14,19 111:7,
11 122:17 162:7 183:1
191:19 208:23 209:15 210:6
213:4,20 215:5 220:23
**formal** 20:8 166:14,19,23
**formally** 166:9
**format** 109:18 235:24
**forms** 44:8 58:23 80:14 86:8
109:22 111:19 204:17

213:22
**formula** 127:18,20
**formulate** 154:4
**Fortune** 243:11
**forward** 40:22 43:14 48:10
71:9 74:23 100:15 101:2,20
126:8 133:25 135:2 140:17
144:2 151:20 203:15 218:10
253:15
**Foss** 160:6 168:19 169:7
**found** 61:3 232:8
**frame** 153:23 225:14
**framed** 96:9 170:2,6 176:24
**framework** 55:20 56:7
219:10,11 254:17
**free** 112:18
**freeze** 25:9 26:9,13,24 27:3
68:15 145:7
**frequent** 204:16
**frequently** 28:2
**frog** 173:20
**front** 96:11
**front-end** 227:23
**froze** 111:10,12 165:9
**FSA** 13:10 19:1 20:12 21:6
25:11,15,17 28:18,21 31:9,
15,19,23 32:18 34:22 35:22
56:20 58:23 76:21 86:14
88:17 97:24 102:25 103:5
120:2 121:15 126:10 127:7
141:7 147:11,12 149:2
150:3 160:8,16 161:1
166:11 229:5 248:12
**FSA's** 56:19 165:23 166:7
**FTC** 59:11
**fulfill** 79:7
**full** 105:11 207:23
**full-time** 23:10 103:18
143:17 171:12,24
**fully** 214:21 225:5 230:1
254:6 255:2
**fulsome** 216:11
**Fun** 13:24
**function** 58:24
**funding** 59:7
**funny** 13:16
**FYI** 151:18

**G**

**G-A-R-R-Y** 23:14
**Garry** 23:13
**gather** 217:16
**gathered** 152:22
**gathering** 49:6
**gave** 137:12 141:2 214:23
261:15
**GC** 88:21
**general** 12:8 14:19 16:9,12
17:23 28:13 43:21 48:15
54:4 55:11,14 56:16,18,19,
20,21,23 57:6,11 59:12
69:3,15,16 75:4,11 77:8
86:25 88:23 107:2 115:17
125:24 126:11 156:8 158:7
173:7 194:21 232:16 233:25
248:11 258:25
**general's** 44:13 234:10
**generalization** 202:17
**generally** 12:17 16:15 18:20
20:25 34:15 39:21 44:22
54:21 55:20 61:7 63:12 71:7
82:22 86:6 100:4 117:20
166:16 173:15 185:2 186:22
190:11 202:1 204:9 236:3
246:6,7 250:12 257:14,19
**generic** 257:20 258:4
**get-go** 164:5
**give** 47:19 61:23 65:4 79:22
134:6 158:6 183:2 190:8
195:9 196:17 206:24 259:7
**giving** 83:16 158:12 160:23
206:24
**glitched** 102:13
**global** 160:18
**globally** 74:16
**goal** 16:3,18,22 166:24
167:9 178:7
**goals** 16:1,8,13,17 166:8,12,
13,14,23
**good** 52:3 55:20 61:24 62:14
88:15 143:18 167:4 189:25
225:8 228:10
**gosh** 32:22
**governed** 156:3
**government** 11:23 12:20
24:25 80:13

**government-issued** 10:10
**grade** 145:8
**grads** 24:19
**graduate** 14:1
**graduated** 14:6 192:25
**grant** 149:11
**granted** 50:6,7 107:19
  108:19 109:11 125:13
  176:16
**granting** 49:14
**grants** 149:23 150:4 154:2
**gray** 87:16
**great** 11:12 13:21 58:3
  191:23 211:13 236:15
**green** 87:7 133:24 233:23
**groundwork** 220:25
**group** 18:11 24:21 44:19
  50:13,16,22 51:6 59:3 60:8
  70:18 73:23,24 74:1 86:16
  98:16 175:8
**groups** 47:21,23 59:18 73:6,
  20
**guaranteed** 122:8 182:12
  195:20 196:2
**guess** 9:23 32:24 55:22
  65:25 73:22 97:13 107:17
  118:11 125:15 129:14 154:7
  164:21 169:16 172:12
  175:14 183:13 199:16
  213:8,14 224:19 229:14
  243:21 251:25 257:14
**guessing** 61:22 162:23
**guidance** 182:24 199:5
**Guys** 197:1


**H**

**half** 94:9 109:14 111:10
  172:15
**hand** 89:18 128:16
**handed** 127:14 189:18 259:5
**handle** 71:5 120:6 131:25
  209:9 221:4
**handled** 119:20 120:2
  138:25 142:19
**handling** 14:23 63:19 119:7
  120:1 217:5
**handouts** 200:12
**happen** 50:2 162:1 189:10
  194:4 196:5,21 213:22

227:17 260:4
**happened** 26:19 68:6 71:12,
  20,25 139:15
**happening** 154:21 256:10
**happy** 130:22
**harassment** 83:2
**hard** 79:23 92:7 123:13
  157:8 237:1
**Harvard's** 59:20
**hats** 21:17 31:13,18 32:8
**head** 84:11 88:9 137:9
  180:11 235:10 257:10
**heading** 80:19 212:13
  216:22 238:11
**heads** 73:10
**headway** 50:3
**Health** 178:2 180:15 181:10
**hear** 165:14,17,18 197:9
  198:11
**heard** 27:16
**hearing** 174:3 197:2 198:14
**heavily** 135:19
**heavy** 40:5
**held** 8:5,8 32:20 162:14
  172:23 255:5,7,13 262:11
**helped** 143:14,22
**helpful** 66:9 67:2 73:13 74:6
  164:18 183:4 216:5
**high** 134:7
**higher** 51:9 143:19
**highlighted** 87:15
**highlights** 87:17
**hire** 24:13 25:13,19,20,23
  26:4,9 141:12
**hired** 19:23 22:25 25:3 33:10
  142:4 143:18
**hiring** 23:23,25 25:8 26:9,
  15,24 27:3,8 68:15 145:7
  171:3,4,17 229:24
**historically** 185:5
**hit** 100:20 103:20 144:18
  164:24 186:5 229:8
**hits** 185:20 186:10
**hitting** 144:5
**hoc** 20:5 22:5
**hold** 9:18 47:9 63:4 122:15,
  25 140:15 147:16 159:3
  162:4,22 175:23 194:2
  204:7 253:20

**holding** 46:17 132:11
**holiday** 231:16
**honest** 110:15 196:22
  256:21
**hope** 235:13
**hour** 58:1
**hours** 12:23
**huge** 247:21 256:8
**humans** 261:3
**hundred** 186:14 240:14
  258:8,13,18,20 259:2,11
**hundreds** 53:2 231:16 261:2
**hurdle** 181:6 195:10
**hurdles** 188:10
**hyperlinked** 192:1
**hypothetical** 51:11 259:8
**hypothetically** 50:24 104:14
  135:7
**hypotheticals** 258:5


**I**

**Ian** 160:6 168:18 169:7,15,
  21
**ID** 10:11
**idea** 28:15 75:13,16 122:2
**ideal** 260:18
**Ideally** 240:22
**identification** 17:12 29:24
  184:10
**identified** 30:10 58:18 62:20
  239:20 241:8 251:13 261:6
**identifies** 39:16 187:20
  202:9
**identify** 30:7 35:17 199:17
  215:16 236:8 243:25
**identifying** 177:1 216:6
**identity** 10:11
**IG** 116:25 117:11 118:7
  133:11 134:9 138:1 140:7,
  12 141:13
**II** 185:18 188:18 191:24,25
**illegal** 82:11
**Illinois** 14:14,20
**imagine** 13:8 167:3
**immediately** 117:8 217:11
**imminent** 125:3
**impact** 151:19
**implement** 128:3 160:2

**implementation** 32:2 127:10
159:25 160:4,6,11
**implemented** 127:7
**implements** 28:10
**implications** 141:6
**important** 77:2 207:1
**improve** 208:20 232:7
**improvements** 42:6
**in-box** 74:12
**in-person** 238:12
**in-state** 64:21
**inaudible** 165:7 196:25
**inauguration** 113:6
**include** 83:5 91:17 105:10
107:1 178:23 199:21 212:20
215:25 242:21
**included** 43:23 74:8 93:23
95:13 100:6 102:25 116:6
137:8 143:3 190:10
**includes** 175:11 190:12
192:22
**including** 57:8 99:7 141:20
243:5
**incoming** 232:4
**incomplete** 64:20
**incorporated** 77:8
**incorrectly** 213:2,6
**increase** 26:18 139:8 140:24
141:2
**increased** 170:25
**incredibly** 227:23
**independently** 243:14
**index** 234:3
**indication** 183:3
**indiscernible** 130:24,25
196:18 200:7 209:8
**individual** 38:3,23,25 46:25
47:22 48:3 51:3 53:5,6
65:18 73:8 74:13 104:17
111:6,8,13,15,24 186:16
194:25 206:12 227:9 228:2,
7 240:10 241:20
**individually** 61:10 74:14
77:13
**individuals** 28:12 38:22
111:5,18
**ineligibility** 216:19
**inform** 29:6
**information** 9:22 64:22
66:17 70:22 76:14 77:7 88:5

97:1 108:3 110:14 114:24
116:5,20 120:20,21 123:23
138:4 152:23 156:7,11
196:24 204:23 212:19
214:18,23
**initial** 11:21 25:3 42:12,25
110:11 253:12,13
**initially** 103:12
**initiate** 70:17,18
**initiated** 99:5
**injunction** 147:15 148:11,23
149:4,6,25 150:3,10,18
153:19,21 154:3,12,19,21
155:7 262:21
**input** 36:2,9 88:7 169:17
**inputs** 128:1
**inside** 187:2
**Inspector** 115:17
**instance** 65:17 69:14 70:21
185:13 187:8 239:15 240:13
**instances** 127:11 260:10
**Institute** 15:9 50:10 93:8
98:3,11,13,15 99:8,14,17
100:2 175:11 240:14 241:3
242:9
**institutes** 49:23 185:14
**instruct** 113:13 251:20
**instructed** 163:6
**instructing** 32:10 33:2
112:10 169:6
**instruction** 34:16 163:22
189:3,4 191:25 193:22
194:7
**instructions** 32:4 34:3,21
48:2,18,23 49:1 104:17
105:6 132:2 187:11 203:6
**instructs** 12:1
**insufficient** 84:2 94:17 95:1,
6,11,13 97:6 99:19 232:1
261:8
**intake** 64:25 217:18
**intend** 47:19
**intended** 110:16 171:10
**intending** 16:20
**intent** 91:12 262:23
**intention** 70:11
**intents** 42:8
**interacted** 87:6
**interactions** 8:8
**interchangeably** 64:10

**interest** 103:12,13 121:13
122:19 132:6
**interested** 8:20
**interface** 8:9
**internal** 232:20
**Internet** 60:3 186:6 251:9
**interrogatories** 29:11
208:13
**interrogatory** 29:21 30:2
89:3 208:15,19
**interviewing** 24:2 229:24
**introduced** 173:21
**investigate** 70:24,25
**investigated** 59:13
**investigation** 15:7 44:14
69:17 70:3,6,19 138:2 140:8
195:24
**investigations** 65:19,21
66:3,16,19 67:4,8,17,21
68:1,4,16,19,23 71:4,22,24
**invite** 74:9
**involve** 51:19 220:11
**involved** 15:10 28:16 31:20
35:3 51:9 57:20,22 59:14
75:1 86:11 89:8,15,22 90:2
91:1 103:3 127:22 152:12
158:8 159:19,22 160:20
237:18,24
**involvement** 169:3
**involves** 52:7
**involving** 227:11 234:18
**is-it-false** 180:24
**issuance** 119:6 161:21
162:17
**issue** 26:23 35:25 41:12
45:25 56:4 63:3 72:25 96:8
101:3,19 104:22 131:20
147:10,17,22 148:1 151:6
161:11 168:5 170:4 203:25
219:19 223:9,13,14,15,16,
19 225:8 227:21 232:21
248:4 254:10,11 260:7
261:17 263:7,11,14
**issued** 79:17 99:25 111:2
127:6 146:24 147:6 149:4,
24 154:12 161:12 170:3
219:4 222:13 223:1 224:13,
24 225:20 230:8,9 232:18
262:12 263:2
**issues** 14:22,25 15:11 21:3
28:2 29:7 38:4 57:10 58:25

66:24 67:16 72:20 83:2
121:16 134:10 164:2,13
168:3 181:22 234:18
**issuing** 101:10 126:3 132:11
147:8,11,12 148:2 151:1,22
154:2 171:1 221:16 222:10
224:3,16
**item** 127:3 212:24 213:1
215:16
**items** 218:12
**iteration** 209:5
**ITT** 41:19,22 42:18,23 43:4,
23 49:17 50:8 52:22 53:3
54:3 57:16,17 61:21 78:11
79:13 81:4 85:22 99:7
103:17,21 108:18 109:10
128:25 132:17 135:11
150:16 152:14,18,24 154:18
159:16 179:20 180:5 206:6
210:11 226:1 230:24,25
238:5 247:22 256:22
258:14,15
**IV** 59:7
**Ivy** 186:3

---

## J

**J-** 140:17
**J-O-Y-C-E** 23:17
**James** 33:6,18 34:5
**January** 42:13,16,19,20,21
50:10 112:5,25 114:5 122:6,
9 130:7 222:14
**Jeff** 169:6,15,21
**Jeffrey** 19:14 103:2 168:18
169:6
**Jim** 30:21 31:13,16 32:7
137:14,15 138:10 141:7
**job** 14:7 18:7 24:1 70:23
150:10 155:23 167:2,3
182:12 192:21,25 206:4
243:9
**job-placement** 110:21 243:7
259:4 262:20
**job-placement-rate** 41:16
110:2,3 111:25 142:9
145:21,24 148:20 218:3
223:21 225:18
**job-placement-rate-
misrepresentation** 84:23
85:9

**job-placement-rates** 42:3
**jobs** 14:13 24:5
**Joe** 8:16 10:7 197:17 263:22
**John** 23:14 196:8,10 257:21
**Johnson** 33:11,15,16
**join** 144:7
**joined** 14:15 42:4 97:9 129:8
231:24
**joins** 207:23
**Jones** 12:15 17:8 20:25 22:3
34:9 57:21 80:3 92:10
129:23 157:11 161:8 168:19
169:21 212:2 237:3
**Jones'** 22:10 36:10 173:21
**Joyce** 23:17
**JPR** 110:25 111:22 122:10,
11,15 137:5,17,21 138:5,8,
15,16 140:4,17 150:5
152:10 155:6 156:20,22
163:8 206:6
**judge's** 17:5 113:16
**judged** 108:13
**judgment** 61:3 62:23 65:13,
25 66:11,12
**judgments** 65:6,7
**Julian** 19:16,17 26:15 27:8
31:5,12,14 32:9,17,25 33:9,
14,19,24 68:17 137:24
138:10 140:18 141:4
**July** 77:22 99:24
**jump** 188:10
**June** 146:25 147:4,9,13,19
152:6
**junior** 23:3 24:19,21 40:4,6
63:2,15 104:25 190:1
203:12
**justice** 17:23 45:5,13 46:16
48:21 70:23 71:17 187:5
**Justin** 114:13 116:6 148:6,8

---

## K

**K-A-Y-E** 19:24
**Kathleen** 33:24
**Kaye** 19:24
**keeping** 71:10 141:22 164:3,
13
**Kim** 19:17 118:13,21 120:15
121:2 122:14 134:18,24

**kind** 15:11 25:1 26:12,23
34:13 36:7 38:6 39:2,22
40:10 46:8,17 60:23 61:2
65:7 68:21 71:14,24 73:15
75:9 77:3,5 79:2,10,18
82:13 84:21 86:16,21 87:13,
15,18 88:19 89:23 101:3
103:20 104:10 105:12
107:6,9 119:22 121:16
128:6 131:21 132:6,20
133:17,22 134:13 136:3
142:21,22 143:1,4 144:1,16,
20 151:18 153:4 155:2
158:6 160:18 161:1 164:2,
13 169:10 172:14 177:4,16
179:5 180:3,10 182:11
183:24 184:18 185:24
186:2,8,11 187:22 188:12
189:18 190:17 192:4,6,19,
23 193:2,6,16 195:14
199:24 200:9 201:11,19
203:3,7 204:18 206:15
208:8 210:21 211:6 217:8,
19 219:13 220:13 221:1,2,4,
8 226:14 229:4 230:9 234:3
235:14,23 239:17 240:4
243:10,23 244:5 247:25
248:23 251:6 256:11
257:19,22 259:5 260:24
**kinds** 60:1 66:24 176:4
179:23 183:3 192:19 193:17
194:5 199:20 241:14 260:3
**knew** 68:24 153:12 227:6,12
229:11
**knowing** 183:19
**knowledge** 30:8,11,16,21
31:1,22 32:1,4 115:18,23
117:15 119:3 125:6 262:24

---

## L

**labeled** 37:4
**labor-intensive** 116:23
**lack** 85:16 205:13
**lacking** 79:11
**laid** 126:6,12
**land** 54:21
**landing** 113:4,10
**lane** 75:10 230:10
**language** 97:3 259:17
**large** 187:9 247:8 248:2
256:23

largely 226:21
larger 194:10,21 241:13
lasted 25:9
late 33:13 76:4 110:4 153:8
234:8
Laura 19:17 118:13 122:14
134:18,23
law 14:4,6 24:18 37:22 38:1,
10,19,25 39:9,13,16,24,25
51:19,24 52:16 53:6,16,18,
22,25 54:18,19,25 55:8,15,
24 56:6,13 57:15 59:11,14
74:2 78:9,16,21,23,24 79:3,
8,19 82:20 90:13,15,22
91:2,18,21,22 92:2 109:1
155:14,17,24 156:4,19,24
173:4 181:7 206:20 215:19
224:23 225:4,5 256:11
laws 38:4
lawsuit 15:7 53:8 65:10,11,
15,24 69:10,11,12,15,18
70:2
lawsuits 65:7 69:5
lawyers 170:10
lay 207:9
lays 207:6
LBJ 25:16,18 33:23 35:5
56:5,16 87:6 102:23 103:17
118:24 159:23 160:2 169:9
233:9
LBJ's 56:18
lead 15:6 67:22 82:11 105:1
214:24 242:4
leadership 25:14,15,16
86:24 115:10 157:24,25
158:7 163:19 169:9
leading 63:18
leads 160:7
league 186:3
learning 144:9
leave 171:22
led 69:18 249:20 256:16
left 17:7 24:11 33:7 101:13
226:11
legal 8:17,22 37:15,17 38:2,
7 39:9,11,20 43:8 57:7,10
61:13 93:11,18 94:2,14
123:20 134:20,22 135:20
172:5,10,18 213:12,16
227:16 242:2 254:8

letter 74:7 83:20 84:7 85:24
87:20 89:19 90:13,16 91:4,
9,13 92:5 93:13 94:4,16,25
95:5 98:2,8 99:23,25
109:22,24,25 110:1,5,7,8,9
131:23 146:9,11 208:23
209:12,15 210:20 211:25
212:3,9,12 213:5 215:11
261:5
letters 75:24 78:18 79:16,22
80:14,15,20 81:2,6 82:2
84:14 86:1,3,4,7,9,17,18,19,
20,25 87:2,10,23 88:6 89:9,
15 90:6 109:19 111:7,8,14,
16 162:8,12 208:21 209:1,6,
7,11,20,21 210:6,22 214:17
220:24 260:5
level 58:21 96:7 125:7
132:22 196:24 206:17
224:15 258:11
levels 24:15
license 9:19
licensing 38:5
lieu 9:4
lifting 40:5
light 87:7 133:24 233:23
likelihood 260:17
limitation 113:14
limitations 54:13
limited 44:17 49:18 72:9
141:20 187:3
line-by-line 190:18
lines 13:5 31:4 36:6 49:16
54:1 55:17 82:17 87:22
115:25 167:6 170:14 191:15
198:10,21 217:19
list 30:25 33:11 35:1 37:13
73:18 74:5 146:9 153:3
173:20 183:8,16 212:19,25
215:14
listed 89:2 91:3 159:4 175:5,
8,16,18 178:22
lists 80:25 93:5
litigated 53:7
live 54:7 153:8
lived 53:12 54:8,9
loan 14:22 52:12
loans 14:25 15:5 52:7,12
82:24 119:7,19 120:1,6,10,
13 130:6,24 160:19 218:15,
23 219:4,15 254:10,11

located 8:18 54:1
log 167:12
long 12:19 40:18 71:20
89:19 121:25 132:10 144:19
153:22 202:1 208:8 217:22
219:21 222:10 263:22
long-standing 160:13
longer 73:2 122:24 123:5
186:11
longest 218:5
looked 54:19 62:3,22 133:25
135:23 150:20 179:13
228:16 257:18
loop 87:13
loosely 185:2
lost 25:6
lot 16:19,21 20:7 40:19,20
43:20 49:16,25 52:10 54:12
58:22 60:6 67:13 73:11
86:10 89:20 100:16 103:12,
13,23 104:5 108:6,7,8
114:23 125:2 132:11,23
133:9,20 134:11 138:20
142:19 143:5 172:14 178:14
179:15 181:3 182:9 194:5
214:25 224:6,8 225:14,16,
21 226:11,20 228:8,9
229:21 231:7,14 232:4,19
242:19 245:1,3 256:6
258:16
loud 11:19
low 104:24 199:13 203:6
231:15,17
lunch 136:11

___

## M

M-E-O-L-I 88:11
M-I-N-O-R 13:17 18:23
made 27:14 29:2 42:6 43:13
50:3 54:2 55:14 63:8 75:23
82:15 84:23 85:2,8 90:8
95:21 97:24 102:24 119:15
120:23 124:3 137:16,20
138:10 147:16,21,25 151:5
152:17 155:1,2 156:1
161:14 163:15 171:5 214:12
219:17 224:9,12 238:22
243:24 259:23 262:10
mailed 83:11 234:10
main 15:12 16:3 36:21

114:13 119:23 174:7 222:12 233:15
**major** 66:19 67:14 125:4 158:16 224:23
**majority** 24:18 61:8
**make** 26:1 28:6,18 30:6 45:2,6 47:4 48:13 54:23 55:21,25 71:23 75:5 79:1 80:5 82:10 96:13 97:6 115:11 118:3 123:12,14 138:4 144:13,24 160:1 167:14 168:7 180:14 181:12 182:20,23 183:7 191:12 192:6,14 202:16 204:1 206:23 210:22 214:10 221:7 227:4 232:2 235:18,23 240:25 241:3 242:10 244:1,5 246:7
**maker** 27:10 55:8 146:18 148:9
**makes** 28:9,19 108:1 160:3 173:15 177:5
**making** 25:18 48:16 71:1 104:20 111:23 118:16,22 122:20 123:11 136:1,15 138:14 144:10 150:5 179:16,23 195:1,5 259:12
**managed** 119:7
**management** 86:15
**managers** 21:6
**mandate** 163:21 178:19 228:20,23 229:4,20
**manner** 9:11
**Manning** 30:21 31:13,16 32:7 33:18,21 34:5 129:24 137:15 138:11 140:19 141:8
**Manriquez** 147:15 148:12 149:25 150:3,17 151:8 153:19 155:11 161:5 262:20
**manual** 76:20 77:4 182:15 200:4
**map** 234:4
**March** 115:9,18 122:6 164:22
**Marinello** 158:19
**mark** 12:15 13:7 17:4,9 21:18 27:20 29:22 34:11,17, 22 35:6 86:11 87:4 89:24 101:25 102:24 163:25 164:11 169:6 174:8,9 184:7 233:22

**marked** 17:11 29:23 36:14 37:10 80:2 92:9 98:22 157:10 184:7,9 237:2
**mass** 14:24 15:4 179:11,15
**Massachusetts** 14:15,19
**master** 155:21
**match** 158:3 186:19
**matches** 258:24
**matching** 188:11
**material** 77:5
**materials** 17:1 44:13 60:7 61:2,12 62:2 66:6 70:8,10 96:18 117:7 173:19 176:2 184:3 199:12 200:12,16,20 228:9 234:1
**math** 101:25 170:11
**matter** 8:14 9:7 11:21 16:12 90:6 142:11
**Matthew** 33:8
**maximize** 163:7,16,23
**maximizing** 167:9
**meaning** 110:22,24
**meaningful** 201:15
**means** 11:6 37:22 44:3 46:7 106:24 108:12 213:16
**meant** 66:3 159:7 205:20 215:21
**mechanism** 77:14 214:11 217:9
**mechanisms** 221:1
**medical** 45:9 127:23 128:18
**medium-batch** 188:23
**medium-batched** 190:4
**meet** 20:3,11 22:2 28:1 40:1 101:4,5 108:25 116:13 144:4 178:10,16 180:17 242:6
**meeting** 12:20 20:6 22:17 166:24 169:19
**meetings** 20:8,22,23,24 21:1 22:7 26:17 68:20 113:7,8
**member** 63:17 83:3 109:9 189:21 209:13
**members** 55:3 113:9 114:6, 15 149:12 174:21 189:19
**memo** 39:9 41:6 117:10,12 129:24 146:9 172:10 176:3 185:18 186:8,11 188:23 189:5,7,8,14,17,21 225:6 237:2 254:8 257:13

**memoranda** 38:9,13,18,24 132:15 134:23 135:20 172:18
**memorandum** 130:5 134:21 168:13,17,22 237:10
**memorialized** 119:2 133:5 257:17
**memories** 192:8
**memory** 98:15
**memos** 63:12 135:10,21 188:25 190:4,6,12 227:16, 17 235:6 238:14 242:3 250:8,16,20,25 251:3 257:17
**mentioned** 24:16 61:15 62:8 65:6 72:8 91:7,23 131:20 161:13 171:17 209:8 220:16 228:19 233:1 236:20 262:9
**mentioning** 262:14
**mentions** 158:17
**menu** 261:10
**Meoli** 88:11 89:6,13
**merits** 170:20 227:2
**MERRITT** 9:16 10:1 31:10 37:2,6,11 58:8 68:8 89:1 94:18 105:25 112:8,12,19 113:12,18,22 117:1,20 120:19,24 121:4 123:22 131:4,7,11 136:14 156:9 157:1 165:12,15 167:15 170:18 197:3,6,11 198:1 211:14 222:15,19 234:19,22 236:5,10,19 262:5,8 263:16, 18
**met** 12:7 22:12,14 33:24 39:14 110:5
**methodologies** 127:9,16
**methodology** 88:1,2 103:4 128:14,22 139:18,19 148:24 149:13,14,21 152:10,18 153:18 154:5,11,14,18 155:19 159:6,20 160:8 161:4 162:16 168:14 169:4, 25 170:5,8,20,23 171:6,11 223:6,7,13,22,23 262:22 263:6,12
**metric** 166:2
**metrics** 100:20 144:4 165:24 178:17 229:10
**Michigan** 136:2
**mid-september** 161:23 162:13,19

middle 150:14
migrating 153:10
Mike 23:13,14
Miller 14:9
million 103:22
mind 49:24 59:25 116:7
198:18
mine 87:16
minimum 20:6
minor 13:14,17 18:23 19:13
20:10 21:15 31:1,12,14 32:9
103:1 125:4 229:17 233:22
minute 27:19 129:21 150:13
157:8,20 197:24 236:25
mirror 187:9 259:18
mirrors 188:12
misconduct 93:9 134:4
179:10
misleading 180:24
misrepresentation 54:11
82:15,22 85:11 94:12
180:22 200:3 211:5 243:24
misrepresentations 48:17
71:1 196:3 238:22 241:10
242:20 249:19
misrepresenting 70:22
179:25 195:20
missed 94:9
missing 64:22
mistake 85:2 173:15 260:7
261:12
mistakes 214:11 259:23
260:2,3,17 261:7
Mitchell's 237:21
mitigate 260:19
money 141:12
monitoring 248:20
month 219:25
months 53:8 144:9 217:3
223:2 247:15 259:22
morning 202:9
motion 80:18 81:3 82:13
move 40:22 41:9 43:13
48:10 94:23,24 100:14
101:1 112:17 117:4 131:13
133:24,25 135:2 139:21
151:20 178:17 185:17
188:2,3,8,9 203:15 227:19
253:15 254:15
moved 14:15 22:24 33:16

46:17 75:10 101:20
moving 133:22 140:16
144:2,16 161:9 191:24
218:10 226:19 232:23
multiple 31:13,20 32:8 43:7
45:16 63:14 142:3 172:14
182:20 190:1
mute 197:7 198:16

___

# N

named 14:9,11 33:23 88:10
92:22 235:11
names 23:11 180:8
naming 18:14 64:9 235:12,
25
narrow 149:16
Nathan 35:1
nature 65:3 73:16 76:23
84:3 257:24
nay 254:20
Nebraska 79:20
necessarily 77:4 91:6 95:9
156:3 179:14 180:10 183:23
184:23
needed 26:18 68:19 75:21
91:20 101:5 106:16 141:12
153:2 169:17 228:5 229:25
230:3 234:4
negative 177:4
negotiated-rulemaking
160:21
neighborhood 12:24 47:24
190:7 230:14
Nevin 8:11 9:18 10:15,22
17:3,10 37:9 168:3 184:4
newer 183:5
newly 157:25 158:8
Nicki 88:10
non-california 78:11 85:22
135:12
non-cci 78:23 159:6,18
non-corinthian 81:8 145:1
172:2 210:7
nonterm 171:13
normal 236:23
note 89:1 112:13 117:20
121:4
notice 131:22

notices 83:10 109:16
notification 73:9
notifications 217:12
notified 110:24 111:18
November 99:22 138:14
140:13 147:2,4 152:6
168:12 190:19,25 223:12,20
nowadays 231:11
number 17:2 22:20 29:19
30:2 34:12 47:18,19 52:3
59:10 61:23 62:8,12 67:21
74:8 79:24 84:6,10 87:21
89:3 92:13 102:3,6 133:21
157:9 158:23 163:7,16,23
165:6,22 166:1,6 171:18
185:3 188:24 189:3,25
190:21 196:23 204:25
208:16 224:17 225:18
231:15 235:15,18 248:2
250:5 257:8
numbered 158:10
numbering 17:6
numbers 101:5,19,21,24
103:20 128:2,13 138:17
143:23 144:5 164:25 191:9
217:4 218:13
numeral 238:9
nursing 45:9 187:6

___

# O

oath 9:5
object 11:23 31:10 156:11
objection 68:8 94:18 112:8
113:12 117:1 120:19 121:5
123:22 131:4 157:1 170:18
222:15 234:19 236:5
objections 9:10 29:10
obtained 61:4
occurred 135:4
October 15:15,18 97:9 137:6
138:13 174:2 183:15
office 12:7 13:6 14:15,21,24
17:22 18:3,12 34:4,16,20,23
35:7,14,19,22 36:1,2,8
43:21 44:13 56:16,18,19,20,
21,23 57:6,10 75:4 76:22
86:24 88:23 115:16 125:23,
24 126:10,11 127:5,11
129:18 134:18 135:8 156:8
161:7 176:1,2 233:8,14

234:10,13

**officer** 13:20 18:25 19:1,11, 19,21,23,25 20:4,12 21:11, 12,13,14,16,19,22,25 22:1 26:16 28:24 31:19 32:18 33:1,3,6,8,12,19,22,23 34:12 55:23 68:18 103:1 118:13,21 125:23 129:13 141:8 158:3 163:20 164:1, 12 229:7

**officers** 245:15

**offices** 233:3

**official** 126:14

**OGC** 56:8 75:5 89:7,14 110:11 154:24

**OIG** 116:17,20

**omission** 37:25

**onboarding** 24:20

**one-off** 46:24 107:7 142:18 181:17 184:17,22 201:21 209:6,9

**one-offs** 201:12

**ongoing** 71:8 74:18 117:21, 22 129:4 162:11 236:21

**online** 60:2

**open** 21:2,3 46:10 49:25 64:7,12,17 71:10,12 72:19 73:4 74:22 196:18 206:17 219:19 244:22

**opening** 205:20

**opens** 63:24 187:18

**operating** 18:25 20:12 21:12,14,19 22:1 28:24 31:19 33:3,6,12,19,22,23 34:12 141:8 158:2 163:20 164:1,11 229:7

**operationally** 133:22

**operations** 119:8 120:5 133:16

**opine** 72:1 170:9

**opinion** 144:23

**opportunity** 181:12 263:19

**opposed** 25:17 116:9 136:3 261:11

**opposite** 48:8

**option** 77:13 85:17 222:3

**options** 82:5 169:16,22 197:19

**oral** 238:12

**order** 16:4 17:5 32:1 38:25 39:3,18 40:22 75:19 78:5

80:1,7 96:6,18 101:5 104:13 105:7 113:14,16 148:11 154:23 170:20 178:21 183:25 234:3

**ordered** 101:19 156:13

**ordinary** 116:9

**organization** 28:22,23 29:1 166:16,22

**organizational** 21:10

**original** 22:24 23:4,19 87:16 192:1 218:6 220:9 235:20

**originally** 19:18 86:20 97:4 152:10 244:18 256:15

**other/comment** 130:12

**OUS** 21:4 34:24 36:16 51:9 56:13 57:5,14,20,21 75:3 125:21 139:16 145:13 146:2,15 169:7,13

**outcome** 8:20 232:17 260:8 261:13

**outcomes** 149:15

**outlines** 241:21 251:20

**overarching** 16:18,21

**overlap** 116:11

**oversee** 32:1 37:18

**oversight** 58:23,24 61:12 76:21 232:21 248:13

**overview** 251:6,11

**ownership** 175:8

---

# P

**P-A-G-E** 23:14

**p.m.** 114:1 136:21,22 167:22,23 198:5,6 211:19, 20 234:25 235:1

**pace** 100:15 141:22 170:23 171:1,2 214:9 224:10 232:23 260:15

**package** 44:12 45:4 48:14 125:20 139:16 146:8

**packages** 139:22

**pages** 103:22

**panel** 115:11,13,19 116:2,9, 14 117:7 118:6 121:23,25 138:1 140:10 223:5

**paragraph** 18:1 36:23 98:23 99:1,3 115:2,4,5,7,8 117:24, 25 122:3 137:2,4 139:4 145:11,12 146:22,23 150:12,14 162:25 163:1

209:3 218:13,14

**parallel** 144:16

**parameters** 186:21 193:24 206:9 226:4 254:3 255:1,6, 10,18,24

**parens** 235:22

**parlance** 119:23

**part** 9:20,21 10:2 40:5 48:25 49:3 72:4 73:8 74:2 98:16 119:24 124:16 128:11 151:7 160:16 165:23 166:7,13,14, 23 167:1 172:16 181:1,2 185:18,23 188:18 189:3 191:24,25 192:23 201:8 221:6 228:14 238:24 239:1, 13 241:15 248:13,16 250:9 254:24 255:23

**part-time** 23:10,16 103:18

**partial** 148:24 152:9 153:17 154:4 168:14 169:4 170:8, 22

**participants** 8:3 129:7

**participate** 21:1,7 57:13

**participated** 70:1 169:20

**participating** 9:1

**participation** 59:7

**parties** 9:9,12 58:5 105:23

**Partner** 18:12

**parts** 29:6 121:14 124:14 133:22 166:21

**party** 8:19

**pass** 63:8

**past** 19:12 71:25 73:5 260:16

**paths** 34:14

**pattern** 242:17 244:17 249:18

**patterns** 239:19 248:20 257:19

**pay** 145:8

**PDF** 81:11,13 92:15 174:12

**penalties** 95:21

**penalty** 9:8

**pending** 11:15 52:2 101:24 132:8 154:24 158:15 161:5 173:11,17 178:5,8 203:21 220:9 223:5

**Pennsylvania** 176:1

**people** 13:9 19:8 23:5,8 28:15 31:9 34:1 63:14 67:13 89:7,14,18,20 104:16 110:1

115:22 143:18,19 144:1,7,
    10 150:4,8 160:9 172:14
    173:13,16 195:3,6 208:16,
    25 216:24 218:7 229:24
    243:5 244:12 249:10 259:11
**people's** 192:8
**percent** 127:24 149:5,11,15,
    20,24 155:15,25 156:25
    157:6 160:24 242:1 260:23
    263:9,11,13
**percentage** 52:1 83:14
    120:8 128:19 134:7 149:17,
    22 155:4 208:6 225:8 243:7
    256:20
**percentage-wise** 52:4
**percentages** 127:14 128:15
    154:22
**perfect** 101:7 214:17
**perform** 207:19
**performance** 165:24 166:2,8
    167:6 229:9
**performance-based** 28:22,
    25
**period** 19:20,21 20:13,18
    25:2,10 26:11 32:12 33:20
    34:5,8 40:18 44:18 52:20
    64:1 68:17,20,22 69:19,21
    71:2 100:6 105:13 125:18
    133:1 139:3 142:13 144:8
    146:2 147:10 151:21 164:22
    177:22 181:24 187:1 188:7
    202:12,17,19 207:24 208:5
    209:24 214:7 219:2 222:21
    225:8,20 226:16 233:12
    244:7 247:24 255:1 258:19
    259:13
**periodic** 248:20
**periods** 71:3 183:9 260:21
**perjury** 9:8 95:22
**permanent** 171:15 209:13
**permission** 66:1 137:5,12
**person** 9:5 19:3,11 30:7,10
    33:10 35:1 87:4,5 89:25
    114:15 142:12 171:22
    189:22 242:4
**person's** 30:11
**personal** 9:22
**perspective** 165:13 263:3
**phased** 143:15
**Phoenix** 73:22,25

**phone** 168:4,5
**phonetic** 23:17 49:21,22
**photo** 10:11
**phrase** 81:24 106:9 193:19
    246:25
**phrased** 177:9 253:19
**phrasing** 167:12
**physically** 9:2
**pick** 17:7 168:11 240:10
**picked** 255:8
**piece** 45:13 54:15 122:13
    124:24 139:14 180:23,24
**pieces** 16:21 119:24 221:3
    231:4
**pilot** 142:21
**place** 25:9 26:25 34:14 42:4,
    13,16 111:7 132:17 149:10
    161:18 220:18 235:7 260:20
**placement** 70:23 150:10
    155:23
**places** 44:21 191:9
**plaintiff** 92:22 239:9
**PLAINTIFFS** 10:18
**plaintiffs'** 29:10
**plan** 136:12 166:11 167:6
**platform** 64:9 82:1 87:18
    128:4 153:2,8,11 154:23
    173:11 191:8,11 217:8,21,
    24 221:3 239:23
**plays** 262:25
**plied** 156:22
**plug** 127:20
**POC** 237:2
**point** 21:21 45:8 49:17 67:19
    72:5 76:6 97:12 103:11
    109:2 114:13 115:23 117:10
    121:11 125:25 126:8 131:20
    132:13,24 133:9 134:6,11,
    17 138:16,17 140:2,15,17
    141:7,24 142:3 143:8,9,20
    144:20 146:8 151:2 154:6,9
    177:16 189:19 203:22
    204:15 207:25 222:4 229:25
    231:24 241:4,7,8 242:23
    243:19 246:17 250:6 252:1,
    13
**points** 53:13 169:11 238:14
**policies** 29:2 31:2,5 32:4
    123:18
**policy** 28:5,7,9,19 29:6
    30:22 31:23 32:1,11 33:2

34:4,21,24,25 35:5,8,10,13,
    18,25 36:3,17 54:24 55:1
    67:24 72:20 74:19 75:5 96:1
    97:5,8,10,14,20 103:3
    120:18 124:20,22 125:3
    127:5,6,10 128:12 129:1,5,
    10,14 149:10,13 150:25
    151:1 154:1 155:20 156:3
    159:22,25 160:1,2,3,6,11,18
    161:3,10,14,17 216:14
    223:14,25 231:25 232:10
    233:5,8,13,17,20 234:13
**policy-related** 56:4
**policymaker** 31:24
**political** 20:1 29:3 234:15
**Pollock** 14:16
**pool** 77:8 173:7,14 195:15
    226:2 241:5 242:25 248:14
**popular** 229:6
**populate** 82:2
**populated** 91:6 128:10
**position** 15:14,19,22 19:13
    33:4,17 50:5 79:4 103:24
    127:4 144:13,24 171:22
    247:20
**positioned** 131:19 133:24
**positions** 24:12,18
**possession** 169:1
**possibility** 51:10 61:6 62:15
    105:2 246:23
**possibly** 245:19
**post** 24:1,4,12 119:21
**posting** 24:7
**potential** 25:1 108:23 134:3
    149:15 175:24 225:15
**potentially** 49:11 61:4 67:2,
    22 71:9 79:2 82:10 83:9,17
    101:13,16 104:23 105:17
    107:19 120:20 168:20
    169:14 176:5 179:3 180:17
    181:7 182:18 183:20 185:14
    187:12 194:1 196:15
    199:14,18 201:7 208:2
    220:13 228:12 232:18
    245:13 246:2,14 247:6
    253:17,22,24 254:21
**power** 126:4
**Powerpoint** 97:17 157:10
**Powerpoints** 97:15 200:12
**practice** 14:8

precede 33:9
preclude 156:24 157:6
precludes 149:7
precursor 39:23
predates 155:21
predecision 108:1
predecisional 120:22
preliminary 40:15 44:1,3,4,
  5,6 47:25 73:15 100:3 138:3
  219:3 220:11 250:18 251:5
premise 205:11 207:3
  225:12
premised 99:21
prepare 12:5,20 157:23
  158:6
prepared 128:21 157:19
prerequisite 106:18
prescribes 170:8
presence 8:9
present 9:2 22:21
presents 10:10
press 128:9
presumption 53:1
pretty 22:20 62:5 67:14
  88:14 91:14 103:25 126:2
  141:11 144:8,10,21 152:25
  189:24 196:23 202:5 208:10
  219:18 228:10 232:13,23
  237:20 247:24 260:22
  263:10
prevent 224:20
preventing 12:2
prevents 148:23
previous 122:4 135:9
  138:22 254:13
previously 120:4 124:3
  130:23,25 183:6 184:6
Price 14:11
primarily 15:6 40:3 50:4
  222:9 223:10 226:17
primary 81:19 224:2
principles 54:18,19
printed 184:3
prior 14:17 19:14,15,17,22
  21:24 94:19 113:6 139:15
  153:21 231:18
priorities 16:1,8,14,17
  103:15 204:1
prioritized 163:9

prioritizing 178:14
priority 133:15 138:21
private 8:7 14:8 65:7
privilege 11:24 156:16
privileged 120:20 123:23
  156:10
probationary 105:13 207:24
  208:5 260:21
problem 29:17 89:12 94:8
procedurally 46:6
Procedure 113:19
proceed 87:8 99:10 136:7
  139:3 251:22 252:5
proceeded 49:13
proceeding 8:4
proceedings 8:23
process 16:5 25:13 26:14
  27:15 36:6 39:2 40:10 41:10
  50:17,18,20,23 51:7,12,15
  55:7 61:15 63:22 65:20
  70:8,10 73:9,19 74:23
  75:19,20 86:17 89:20 90:2,4
  114:7 115:12 116:18,23
  117:22 119:4,14 120:14
  122:16 125:19 126:1,2,6,12,
  15 129:3 140:25 151:17
  160:21 173:3,13 185:25
  197:17 204:10 208:4,10,11
  213:21,25 214:7 217:5,18
  218:2 219:14,23 220:7,11,
  17,19,22 221:9,23 222:8
  231:8 238:24 239:2 241:12,
  16 242:7 244:2 246:9
  248:17 249:21,24 250:10
  252:1 253:5 254:25 255:23
  257:12,16 259:6,24 260:23
processed 62:25 118:5,9,
  17,20 119:2 120:16 121:21
  123:5 131:17,18 139:24
  150:3,23 155:9,12 158:13
  169:25 209:25
processes 30:16,22 31:2,6
  34:13 50:2 115:16 118:4
  121:9 123:18 232:7
processing 119:22,25 120:6
  121:3 139:7,12,13,15
  158:15 210:3 260:5,11
produce 236:12,17
produced 49:7 190:19 193:9
  259:3
producing 43:20 186:15
  236:22

production 43:17,24 97:18
  117:17 168:22
productions 117:22
program 44:19 45:5,9,24
  46:10,16 59:2,6,20 71:3,17
  76:20 77:4 86:15 100:7
  128:18 142:12 149:19
  182:15 187:4,6 238:23
  260:21
programmatic 200:3
programs 44:19 71:2 183:9
  187:1
progress 20:19 138:14
  144:13,25 167:9
project 210:2 226:23 235:17
  238:20 239:5
promise 195:1
promised 192:24
proper 72:2
properly 71:22
proposition 16:9 28:14
  55:11 75:11 258:25
proprietary 15:8
prospect 182:11 199:24
prospects 41:22 42:24
  44:15 49:19 52:23 93:7,9,18
  94:1,13 182:16 206:4
  213:11 238:3,5 240:17
protection 15:2,4 18:13
protocol 39:20,23 40:2
  41:20 42:3,11,16,19,23
  43:6,9 46:7,8 47:10 49:4
  65:2 85:2,15,16,21,25 86:1
  106:17,19,21,25 107:2,7,8,
  25 108:14,15 133:7 134:13,
  15 135:23 144:21 172:19
  173:7 177:19 181:17 184:5,
  15,20 185:8 186:12,16,17
  187:9,14,21,22 188:13,17,
  19 191:10 193:21 203:3
  204:25 205:17 206:3,8
  207:5,13 210:12,14 230:21,
  25 242:8 244:3 246:11,13
  247:21 248:10,15 249:17
  252:4,21,23 253:6,7,10,14,
  22,23 254:13 257:2
protocols 40:7,12 41:10,15,
  21 43:16,21,23 51:16 55:7
  64:16 65:1 78:11 85:18
  100:22 105:9 107:2,5,13
  108:20,21,23 124:4 132:15,
  17,23 133:1,9 134:19

135:11,14,16,17 136:8
140:9 141:14,25 143:10
144:25 172:1,3 193:9,10
204:8 207:9 227:16 230:16
231:4 237:25 242:3 246:8
248:9 249:3,5 251:20 256:4
**proved** 225:19 231:2
**provide** 20:18 36:9 37:25
39:17 41:3 48:18 57:7 66:8
76:16 83:7,16 88:6 96:6,25
97:2 104:12 108:4 116:4,20
163:11 176:15 180:20
200:25 212:18 214:17
215:7,15,16 216:3 217:9
**provided** 43:17 59:15 61:3,
13 72:13 76:8,22 97:18
101:15 104:18 117:17
168:22 176:3 216:22 227:3
228:2 234:1
**providing** 129:19
**public** 60:2 183:11
**publicly** 183:7,16 195:2
**published** 78:4
**pull** 62:24 84:17,18,21
133:18 187:21 239:24 240:1
247:7,15
**pulled** 87:20 134:10 242:24
247:14
**pulling** 13:3 43:19 200:19
**purports** 77:1
**purpose** 53:9 77:2 120:18
152:23 157:18 168:4
**purposes** 38:11 42:9 81:1
174:24 192:7 225:23
**purview** 71:15
**pushed** 56:6 104:4 142:15
**pushing** 164:24
**put** 11:11 25:9 26:25 29:14
34:12 90:9 123:12 128:15,
16 142:21 147:16,20 159:14
161:18 173:6,7 174:15,17
194:2,22 219:15 222:5
250:8 253:19 255:8 260:20
**putting** 70:10 120:10 168:6

**Q**

**QC** 194:11 260:22,25
**quality** 207:19,21 208:1,20
**question** 11:15 16:2 56:12
57:13 72:22 74:22 86:2 94:9
99:20 107:24 111:24
112:13,20 120:23,24 121:1
124:10,11 155:17 156:3,6,
10 172:12,25 189:10 203:7
205:16 213:13 222:16
225:12 236:11 242:14 243:1
246:4,25 247:11 248:23
250:2 253:1 254:23 258:17
259:10
**questionable** 156:12
**questioning** 236:6
**questions** 11:18,24,25 21:2
68:9 124:2 189:16 262:1,3,6
**queue** 253:8
**quick** 10:6 58:1 234:21
263:25
**quicker** 228:15
**quickly** 139:21 225:25
**quota** 167:5

**R**

**R-I-E-M-E-R** 114:14
**Raguso** 8:16
**raised** 26:10 68:18
**range** 62:5,13 138:18 171:23
181:11 185:6 231:19 245:5
257:6
**rare** 53:23
**rates** 70:23 150:10 155:23
243:7 259:4 262:20
**rationale** 150:24 155:14
**reach** 41:7 65:21 67:4 70:5
72:24 75:14 144:20 234:12
**reached** 39:11 47:25 73:6,21
76:8 117:14 202:3 237:12
**reaching** 233:24 244:23
**read** 30:4 98:25 115:4
117:25 122:5 148:13 163:1,
4 177:5 198:10,23 209:3
212:24 263:19
**reading** 75:17 90:17 93:13
175:2 213:4
**ready** 132:13 263:5
**real** 10:6 211:11 263:25
**realize** 66:8
**reason** 81:20,23 91:7 93:22
94:14 120:17 121:2 123:8
163:9 197:13 224:2 232:20
244:24 246:2,12
**reason(s)** 93:10
**reasons** 73:6 91:22 93:6
131:10 145:5 158:22 162:12
210:25 222:12
**Rebecca** 37:2 89:11
**rebuttable** 52:25
**recall** 26:3 27:4 85:18 96:24
98:20 124:4 150:1 152:16
158:22 161:24 199:11
200:14 257:9
**receipt** 102:18 209:19
**receive** 48:14 49:2 65:11
73:8 74:13 86:1 111:6 117:5
163:22 216:12 221:11
228:23 236:9 263:8
**received** 77:7 81:6 84:7,13
92:23 111:15 117:10 137:4
153:20 210:6 211:25 232:15
239:21 251:8
**receiving** 54:10 231:12
**recent** 24:18 252:8,18
**recently** 42:23 71:12 78:10
180:7 252:11
**recess** 58:11,12 106:3,4
113:25 114:1 136:21,22
167:22,23 198:5,6 211:19,
20 234:25 235:1
**recognize** 17:14 184:12
237:7
**recognizing** 236:18
**recollection** 12:11 90:7
91:16 99:12 137:14 149:17
151:13 155:5
**recommend** 140:8
**recommendation** 55:2
81:20,23 129:12,15,16,19
205:4 237:12
**recommendations** 115:11
**recommended** 115:13
116:25 129:13 155:22
**recommending** 117:10
130:5
**reconsider** 219:8
**reconsideration** 53:20
212:18,20 213:9,19,25
214:3,7,14 215:8,15 216:13,
25 217:6 218:1,2,8,17
219:7,13 220:4,12,17,19,22
221:11,23 222:2,7
**record** 8:3,6,24 9:14,21
10:2,3,6,9,13,21 11:5,19

12:17 58:6,10,14 64:16
84:19 89:1 105:24 106:2,6
113:21,24 114:3 118:1
122:5 136:12,20,24 167:19,
21,25 168:2,8 197:21,24
198:3,8,23 211:18,22
234:24 235:3 261:18
263:23,25

**recorded** 8:4,5,10 97:14

**recording** 11:17

**recordings** 239:12

**records** 12:9,10,13 43:19
58:25 75:21 84:12 103:22
137:10 185:21 257:11,15

**recruiter** 194:25 195:4,18,19
196:7,8

**recurring** 26:23

**recused** 234:16

**redone** 121:12

**reduced** 206:8 254:7

**refer** 18:16 56:21 66:16
71:18 77:24 78:2,5

**reference** 78:22 159:16
183:8 200:4 240:6,8 257:22
262:10

**referenced** 67:2 215:24

**references** 85:16

**referencing** 41:25

**referred** 13:12 18:10 23:22
44:1 68:2 74:18 80:4 92:11
100:4 129:25 157:12 173:23
237:4

**referring** 25:16 28:12 65:18
71:11 79:15 80:14 96:20,21
124:25 179:24 184:16 187:5
207:12 243:10

**refers** 191:25 208:19

**reflected** 179:20 211:7

**reframe** 16:11 250:14

**refresh** 12:11 99:12 192:7

**reg** 45:18 52:13,16 126:5
221:24 222:2

**regard** 93:20 113:11

**regs** 38:11 52:2 55:9 75:25
76:3 78:9,13 91:3 109:2
123:20 126:13 220:23 222:6
224:23 254:9,11

**regular** 20:18,21,23 26:19
232:5

**regularly** 20:10 26:22 33:24
165:1 166:10

**regulation** 37:21 77:18,20,
22,24 78:1,2,3,6 79:9 90:23
126:6,19 160:17 181:3
206:20 214:1,2 219:6 224:7

**regulations** 37:20 73:9
75:18 77:17 90:22 146:14
220:17

**reiterate** 26:17

**rejected** 84:24 85:5 95:1

**relate** 21:12 41:15 128:13
245:8 260:3

**related** 8:19 15:9 38:4,6,7
39:4 42:25 44:14,20 45:9
46:19 55:11,15 59:8 60:19
65:15 74:11 81:9 93:9
101:14 102:25 104:9 106:23
112:14 130:24 154:3 160:15
171:3,7 173:5,16 187:11,12,
23 188:6 194:3 203:10,14
210:21,24 224:13,19 231:15
240:20 241:19 243:6 244:10
256:9 259:2

**relates** 98:19

**relating** 15:7 41:2 58:25
61:25 72:20 98:18 99:6
100:2 101:8 232:14,20
238:15 245:7,9,10

**relation** 210:10

**relationship** 75:9

**relationships** 57:2

**release** 170:5 171:10 223:6,
7

**released** 255:19

**relevance** 236:6

**relevant** 46:1,21 48:11 67:23
73:19 76:1 131:8,9 169:14
172:8 182:13,18,21 203:20

**reliance** 85:16 210:21,24

**relied** 82:16 85:11 135:18

**relief** 83:8 88:1,2 103:4
104:13 123:20,25 124:2,5,
11,12,18,22 125:7 127:1,2,
5,8,15,21 128:2 129:9
139:18,19 145:25 148:24
149:5,11,13,15,24 152:3,4,
9,24 153:18 154:4,11,13
155:3,8,15,19,25 156:2,25
159:5,20 160:24 162:16
168:14 169:4,25 170:8,23
171:6 223:13,22 231:3
263:6,9,12

**rely** 55:17 61:11

**relying** 155:23

**remain** 173:11,17

**remaining** 120:13

**remember** 32:23 43:11
60:21 62:12 68:25 85:13
97:2,11,15 110:15,17 113:4
114:12,16 119:8 121:18
122:22 130:18 137:9 140:21
145:17 151:15 152:21
153:13,22 154:13,15,20
157:18 158:1,25 162:3
164:19 169:6 171:15 200:8,
21 233:7,13 256:21,22
259:25 260:13 262:14

**remembering** 13:9 98:16
149:8 176:12

**remote** 8:9,10,16,23 10:23

**remotely** 9:3,6

**removed** 191:6 245:20

**reopen** 232:24 244:25
246:15 247:4 260:12

**reopened** 218:18 232:12
259:21

**reopening** 196:16

**reorganization** 21:20

**rep** 60:19

**repayment** 120:10 213:3
215:18

**repeat** 38:16 89:11 94:10
213:13

**repeated** 240:8

**rephrase** 16:11 38:16 94:22
213:14 242:14

**replace** 24:11 25:5 254:19

**report** 18:22 19:3 20:22
22:19,22 138:3 140:12
141:13 164:25

**reported** 19:8,10 21:25
33:15,19 34:2

**reporter** 8:21,25 9:17,23
10:4,7 164:6,9 197:1 198:9,
13,17,19,22

**reporting** 9:3,11 21:22 49:22
166:10

**reports** 21:13,18 22:18
133:19

**represent** 80:11

**representation** 192:23

**representation-made**
180:23

**representations** 182:16
  238:10,12
**represented** 138:25
**request** 8:6 26:1 27:8,9,12
  43:23 65:16 70:17 73:12
  76:19 116:17 138:10 174:2
  212:18 215:8 217:10,15
  218:16 219:7,12 221:7
  263:19
**requested** 25:23 74:5 76:11
  115:14 116:8 142:1 198:23
**requesting** 26:4 196:19
  213:8
**requests** 26:20 68:7 71:24
  74:8 115:24 116:1 145:5
  200:21 221:2
**require** 120:7 215:21 227:22
**required** 91:18 100:21 144:4
**requirements** 38:5 131:23
  257:7
**requires** 38:2 75:18 96:25
  191:12 214:1
**rereview** 219:13 253:2
**rereviewed** 260:24
**research** 37:15,18 38:3,7,
  10,19 172:21
**resided** 52:24
**resources** 63:20 72:9
**respect** 15:5 27:23 35:10
  39:8 52:22 59:9,21 73:17
  78:24 91:20 93:17 114:18
  124:4 127:15 160:7,8
  189:11,17 214:9 223:3
  225:5 231:22 237:13 250:17
**respond** 74:14 77:13 217:14
**responded** 76:10 116:1
**response** 30:13 77:15 79:25
  80:6 89:3 173:20 174:1
  208:15,19 217:11
**responses** 13:4 29:9,21
  74:16 208:12 218:10 236:20
  257:20
**responsibilities** 36:25 37:14
  116:10
**responsibility** 121:15
**responsible** 27:7 28:4 50:22
  51:5 87:1 118:16
**restate** 72:21
**restructuring** 18:8 160:15
**resubmit** 216:10

**result** 52:8 70:3 133:4
  184:19 207:14 214:24 215:9
  246:24
**resulted** 209:19
**results** 63:5 140:7 206:24
  220:8 247:6 253:14 257:20
**resume** 137:5,13,17,21
  139:12 141:15 143:10
  161:22 162:13,18
**resumed** 126:3 139:7
  140:25
**reupping** 25:2
**review** 12:9,13 44:6,11 45:6
  46:18 73:16 76:18 81:19,22
  99:6,16 100:1 101:7 103:20
  104:24 106:17,19 107:16,25
  109:8 115:10,11,13,15,19
  116:2,8,13,17,25 117:7,11
  118:6 121:22,25 122:15
  132:23 133:5,8,11 134:9
  137:25 140:9,10 144:21
  171:8 172:23 181:20 191:25
  205:3,7,8,12,19 207:19
  208:3 209:14 216:12
  217:21,23 220:12 223:5
  227:11 228:7 230:15,16,18,
  21,25 231:1,4 238:19 240:4
  242:3 245:21 249:8,9
  250:18 251:5 255:25 257:1
  260:25
**reviewed** 12:10 22:9 55:4
  56:9 107:20 108:10 109:4
  135:19 173:3 189:15 207:25
  208:6 209:12 231:8 246:18
**reviewer** 177:24 181:19
  182:1 187:14,18 189:11
  193:14 194:14 195:21 202:9
  203:4 204:19,22 206:11
  210:13 228:11
**reviewers** 47:7 48:3,19 49:1
  191:19 199:4 204:22 248:2
  251:21 255:20
**reviewing** 38:14,23 40:17
  62:21 63:11 64:5 104:16
  108:22 132:20 133:2 134:3
  172:16 175:23 189:21
  204:11 205:6 224:1 244:17
  257:3
**reviews** 17:18 30:5 40:3
  90:20 157:21 167:3,8 177:7
  178:20 209:4 217:24,25
**revisit** 232:3,9 246:12

  256:13,18
**revisited** 231:25 233:20,21
**reworked** 123:16
**Riemer** 114:14 116:7 148:6,
  8
**rise** 96:6 196:17 258:11
**rises** 58:21
**road** 234:4
**Robert** 19:23 34:25 57:22
**Robin** 13:14,17 18:23 19:13
  20:10 21:15 31:1,12,14 32:9
  103:1 229:17 233:22
**robust** 144:8 208:10 260:21
**role** 19:11,19 21:17 27:23
  32:21 87:19 127:15 142:5
  169:11,18
**roles** 19:9 22:25 23:2,20
  24:17 31:20
**Roman** 238:9
**room** 9:2 10:25 11:1,9,11
  168:5
**roughly** 258:19
**route** 126:9
**royal** 161:3
**rule** 55:19 77:20 113:19
**ruled** 100:12,13
**Runcie** 33:7
**Ryan** 8:22

---

**S**

**S-C-H-M-O-K-E** 19:16
**S-C-H-R-E-C-E-N-G-O-S-T**
  88:13
**S-T-E-P-H-E-N-S-O-N** 23:15
**Salesforce** 64:9,12 153:11
  239:23 255:10
**sample** 61:25 62:10 238:15
  242:17 243:22 247:14,15,17
  249:15 252:2,8 258:24
**sampled** 248:19,24
**samples** 63:11 247:7
  256:19,24
**sampling** 60:23,25 61:14,21,
  24 62:20 63:9 179:3 186:11
  195:25 241:13 246:1 248:16
  249:12 255:25 256:3
  257:12,16,20,25
**satisfied** 177:19

**satisfy** 45:16 181:25 227:8

**scenario** 62:16 63:10 66:14 68:21 184:18 194:24 195:12,17 199:23 215:7 261:14,19

**scenarios** 67:3 201:11 245:5 258:22

**scheduled** 22:5 161:22 162:18

**Schmoke** 19:16,17 26:15 27:8 31:5,12,14 32:10,17 33:1,10 68:17 137:24 138:10 141:5

**school** 14:4,7 15:8 39:5,21 44:15 45:6 47:21,22 48:15, 16,20 52:25 53:12 54:8 59:1,5,9 60:10,22 61:18 62:7 69:15 70:19,22 71:12, 18 72:17,24 73:1,4,5,20,23, 24,25 74:1,24 75:22 77:10, 12,15 81:9,19 82:14,16,25 84:23 85:8 98:13,16 101:8 128:13 134:3 142:24 144:18 158:19 172:6 173:2,5 175:4, 8 178:1 180:4,15 181:10 184:21,24 185:10,19,22 186:2,13 187:14,19,21 192:14,17,24 194:2,10,22 195:25 196:19,20 202:14 231:22 232:15 238:23 240:7,23 242:18,22,24 243:23 244:13,22,23 245:10 248:11,19 251:10 252:20 256:6,8,9 257:9

**school's** 236:3

**school-specific** 106:21 107:2,5 108:15 160:9 190:11

**schools** 36:4,20 40:15,20 41:5 44:1 45:20 47:5,14,22, 24 48:2 49:12,16,20,21 50:1,4 51:17 55:6,21 58:17 59:13,22 72:13 73:17 74:4 75:14,21 76:1,7 77:8 99:11 108:23 109:11,13 111:4 128:20 129:1,6 141:15 143:11 144:3,14 145:1 152:16 158:14,23,24 163:11 172:2,23 176:23 180:9,10 183:9 185:25 186:3 187:13 188:21 190:13 226:5,9 234:18 239:1 241:13 243:12 247:8 248:21 249:25 250:5,

17 251:19 252:14 255:3,9

**Schrecengost** 88:12 89:2,7, 13

**scope** 18:15 40:16 44:11 63:20 68:8 70:6 100:5,8,9 101:1 112:9 113:13 117:2 120:19 121:5 131:5 156:12 157:2 170:19 175:25 176:2, 18 177:2 179:6 186:22 187:15 222:15 226:4 234:20 250:18 253:13,16,21,25

**screen** 29:13

**search** 186:6 196:8,9

**searched** 200:15,17

**searches** 60:4

**second-level** 260:25

**secondarily** 123:15

**secretary** 20:25 21:4 22:3, 13 27:15 29:4 31:17 34:5,6, 9,17,20,24 35:7,14,20,22,25 36:9 51:8 57:6 101:22 102:2 115:14 117:11 125:23 126:10 127:6,12 129:20 130:11 131:1 134:18 135:9 141:9 158:5 161:7 169:21 219:1 228:20

**secretary's** 27:13 35:2 36:1, 2 130:20

**section** 90:16 93:4 130:12 161:9,21 216:15,17

**Security** 152:13,14,23 153:1,21,23 155:3

**seek** 53:19 214:2,15

**seeking** 132:18 134:12

**sees** 182:1

**selected** 255:11

**send** 70:11 75:24 91:12 119:11 132:13 134:16 139:16 147:18 234:4

**sending** 76:12 131:21 139:23

**senior** 23:1 24:17 25:15,16 40:4 55:3,4 63:3,13,14,17 75:17 86:23 105:3,15 109:9 169:9 174:21 181:20 182:5 189:19,21,25 201:1,15,24 204:11 207:18

**sense** 44:16 54:21 76:25 83:14 108:10 211:2 221:1 224:5 241:14

**sentence** 98:25 99:2 115:6

139:6 163:1,4 218:14

**sentences** 115:8

**separate** 56:19 65:19 83:24 124:11 184:19 239:5

**separately** 37:6 154:25

**separation** 52:25 53:12

**September** 24:22

**sequence** 231:5

**sequencing** 101:3,18 103:9 203:25 225:23 226:21 227:22

**series** 64:15 169:16 238:13

**serves** 98:15

**service** 25:2 245:15

**servicer** 119:19

**servicers** 15:10 120:5 131:24 132:2

**Sessa** 33:8

**set** 29:10 46:16 48:21 49:10 62:25 97:4 101:21,22,25 105:5,7 107:14 109:8 125:19 131:24 146:5 173:11 178:3,5,9,12 180:17,19 181:4,19 182:3,7,22 186:23 187:3 188:16 193:23 200:5 202:6,11,12,19,21 205:3 215:19 219:6 220:23 228:17 232:19 241:4 245:21 246:2 251:21 252:8,22 253:7 254:3,15 255:21

**sets** 34:20,24,25 36:17 39:10 170:14 205:17 228:12

**setting** 28:4 105:18 106:22 178:16

**settled** 69:15

**settlement** 69:9 231:21

**settlements** 69:5

**sexual** 83:2

**share** 69:16

**sharing** 86:16

**Sheehan** 14:16

**shelf** 252:17

**short** 11:15 132:10 134:8 167:16 186:8 214:22 219:18 247:24

**shortchanging** 178:20

**shorthand** 106:14

**shortly** 217:14 252:4

**shot** 226:12

**show** 84:13 85:20 234:5

248:1
**showing** 167:8
**shows** 81:18 87:14 179:2 196:10 230:11 249:18
**side** 57:20
**sign** 125:13,16 139:17 146:15 263:20
**sign-off** 89:23 90:2 126:20
**signature** 17:17
**signed** 130:11 141:11 147:1
**significant** 118:3 144:11,25 158:23 228:1
**signing** 130:22
**similar** 68:12 71:1 91:14 109:25 126:2 146:8,11 158:1 195:5 199:5 238:1,20 241:23 243:20 244:1 249:24
**similarities** 245:22 249:11
**similarity** 247:9
**similarly** 140:9 192:21
**simple** 52:6 261:4
**single** 53:8 101:9 235:7 241:23
**site** 96:23
**sites** 231:22
**sitting** 237:21
**situation** 194:13
**situations** 66:15
**Sixty-six** 163:2
**size** 61:21,24 256:19 258:24
**Skype** 204:15
**slide** 158:10,11 159:2,8,11, 12 161:10
**slides** 159:13
**small** 185:3 196:23 226:2
**small-** 190:3
**small-batch** 188:23
**smaller** 61:20 62:7 180:9 190:12
**smartphone** 11:9
**Smith** 33:24 196:8,10 257:21
**Social** 152:13,14,22 153:1, 20,22 155:3
**solely** 84:8,14 155:17
**somebody's** 244:13
**sort** 37:17 60:11 63:19,21 84:8 96:5 151:18 152:1 153:7 173:12 179:10 183:8, 16 193:12 194:23 195:17,24

199:5,8,9 207:22 217:19 220:11 231:19,20 235:12 245:2
**sounds** 28:1 58:3 220:10
**soup** 57:3
**source** 35:8 76:19 77:2,6 96:13
**sources** 59:24 175:4
**speak** 20:9 66:1 258:5
**speaking** 34:15 39:21 61:7 73:24 173:15
**special** 155:20
**specific** 16:15 20:16 21:8 27:2 28:12 32:15 39:10 40:7 44:18 45:5 60:18 79:7,8,18 93:17 102:10,17 106:20 107:13 109:1 122:16 128:13 138:7 151:13 167:5 179:16 180:1 181:2 187:10,14 188:6 195:8,16 196:6 201:11,16 206:9 227:17 239:11,15 240:1,9 243:8 244:6 251:12 257:7,22,23 258:23
**specifically** 16:10 32:6 35:17 42:2 43:22 53:21 58:20 79:13 85:10 98:19 122:18 149:7 158:17 171:10
**specificity** 30:11
**specifics** 16:24 62:4 158:25
**speed** 114:24 116:10 144:7
**spelled** 136:1
**spelling** 88:12 89:3
**spend** 12:19 227:15 228:4
**spent** 133:9 134:2 228:1,5
**spoken** 137:24
**spot** 248:4
**spotting** 104:22 249:11
**spread** 259:13
**spreadsheet** 186:19 187:20 240:3
**spreadsheets** 133:14
**spring** 69:1 72:21 73:5,21 75:15 76:8 118:2 124:19 125:8,11 131:15 144:12,23 153:16 161:11
**staff** 25:14 26:6 27:13,17 35:2 83:3 99:9 134:2 139:8 140:24 141:3,20 142:1,16 143:9,21 145:6 171:3,4 230:3

**staffed** 22:23 67:18 71:5,23 132:22 134:8
**staffing** 23:22 26:11,18 35:24 40:18 66:21 67:8 68:4 72:2 121:11 143:13,25 224:15
**stage** 99:25 104:24 122:21
**stages** 207:22 230:18
**stamp** 191:16
**stamps** 81:14
**stand** 155:4 227:2
**standard** 54:3 56:13 57:15 90:24 96:21 107:7 108:14 170:10 180:25 184:5,15 186:17 187:9 188:13,19 204:25 207:12 213:19 220:3
**standing** 17:5 113:16
**start** 13:25 15:13 20:15 23:23 24:1,3,4 39:3,5 213:10 218:9 222:25 233:23
**started** 11:14 15:18,24 22:15 23:6 24:7,19,21 32:22 33:5,12 50:5 83:12 109:17 110:19 111:20 139:14,17, 20,23 140:16,20 143:13,24 148:1 162:10 163:25 164:11,21,23,24 217:25 218:1 220:24 234:7 235:15, 17
**starting** 19:6 22:23 24:20 73:5 115:1 139:6 142:17
**starts** 81:13 142:20 174:11 212:3
**state** 9:13 10:21 16:20 37:3, 22 38:1,3,5,10,19,25 39:13, 16 44:22 46:1,10,14 48:14 51:19,24 52:16,24 53:11 55:8,10,14,15,24 57:15 69:14 78:20,24 79:8,19 81:24 82:6,19 83:17 84:1,8, 15,25 85:10,12 90:22 91:2, 17,20,22 92:2 93:11,18 94:1,14 96:17 108:3 109:1 155:14,17 156:4,19 172:9, 11 186:2 192:6,12,17 205:1, 14,15 206:20 211:1,7 213:12,15 224:23 233:3 261:8
**State's** 14:14,20
**stated** 28:14 121:20
**statement** 8:23 95:17,25 96:3 97:5 124:1 210:15

241:20 243:4 250:19,24
251:14 254:7
**statements** 95:14,20 214:22
232:1 240:11 245:17 248:5,
13
**states** 18:4 37:24 54:20 84:4
94:25 98:2 105:16 137:4
146:23 158:13 172:6,8
192:5 258:15,20 259:14
**stating** 259:18
**status** 20:22 46:17 158:7
188:3,8 191:9 230:5
**statuses** 173:12
**stay** 253:8
**step** 47:16,25 49:13 68:19
119:17 124:21 125:7 126:25
127:1 152:1,2,3,5
**Stephenson** 23:14
**steps** 64:15 65:2,5 201:18,
25 202:15
**stipulation** 9:13
**stop** 121:3 122:11 123:3,6,9
132:14,18,19 134:12 147:8,
12 154:22 182:3 194:12
244:19
**stopped** 147:11
**stored** 235:8
**story** 132:10
**strategic** 166:11
**strategy** 229:19
**stream** 172:24
**streamlined** 163:8
**streams** 172:15
**Street** 8:18
**strength** 240:25
**strike** 112:17 243:20
**strong** 124:1 260:22
**structure** 21:11,19 29:5 35:4
**struggling** 167:11
**stuck** 252:17
**student** 14:21,25 15:5 18:4,
9 28:6,10,23 57:9 160:19
238:11,21 239:2 258:1
**student's** 247:9
**student-loan-related** 29:7
**students** 195:25 196:1
242:17,19 258:8
**students'** 248:13
**stuff** 248:8

**subject** 52:13,15 68:14
127:9 150:17 224:8 249:5
**subject-matter** 153:4 159:21
**submit** 26:20 74:9,15 96:17
181:13 182:25 183:24
217:15,17
**submits** 77:15
**submitted** 26:22 27:9 55:12
56:6 59:19,21 64:14 153:4
206:12 216:10 239:9
**submitting** 60:9,10 70:8
126:9 139:20,21
**subsequently** 33:16 115:14
118:7 232:15 247:3
**subset** 149:18 190:8
**substance** 209:15
**substantial** 101:15
**successful** 143:6 209:17
**sufficiency** 206:16
**sufficient** 39:15 95:18,25
96:4,7 108:2 143:9 176:15
181:21 194:15,17 204:5,6
205:2
**suggest** 167:15 195:6
**suggests** 255:7
**summarize** 36:10 186:9
227:15 239:10
**summarized** 176:3
**summarizing** 142:23 143:1
172:17
**summary** 44:25 45:14 172:4
176:10 238:9,25 250:17
253:13
**summer** 24:6 25:22 111:3,
25 154:8 235:17
**supervising** 203:12,19
**supervisor** 188:2,8 193:22
208:2 248:6 249:12
**supervisors** 21:7 135:19,24
146:20
**supervisory** 22:24 23:1,20
24:17
**supplemental** 204:21
**support** 8:17,22 39:13,17
41:11 47:2 61:9 79:3 95:13
101:16 104:1,19 105:17
143:3 163:13 180:20 181:1
182:2,7,19,25 194:15
199:10,14,18,22 200:1
205:3 240:19 244:13

**supported** 54:17 227:7
241:18 253:23
**supporting** 66:5 97:2 108:7,
8 176:5 201:23 240:22
**supports** 45:15 194:8,18,20
195:23 199:8 201:8 206:21
228:12 251:15 253:17
**suppose** 167:1
**supposed** 105:2,4 199:15
**surface** 65:21
**Sweet** 8:14 29:20 92:15,22
211:25 212:8
**Sweet all** 92:19
**Sweet's** 93:14 95:5 98:2
99:18 210:20
**switch** 78:8
**sworn** 9:6 10:16 95:24
**system** 49:14 84:16,18
128:8 133:11,14,17 146:5
153:6 169:14 196:10 235:8
**systems** 16:5 134:9 153:7

**T**

**tab** 16:25 37:9 79:22,23 92:6
98:1,22 115:1 129:22 137:2
157:8 173:18 184:2 212:1
236:25
**takes** 144:6 166:20 228:7
**taking** 72:6 120:10 121:8
122:19 123:13 256:19
**talk** 27:19 113:9,20 234:12
**talked** 11:13 94:11 106:22
109:17 151:25 163:15 168:6
211:1 230:19 235:5 252:24
253:2
**talking** 58:17 64:1 69:19
79:13 100:23 107:4 126:24
194:13 201:21 210:19
230:8,16 243:8 253:11
261:1
**tallying** 12:23
**tangentially** 15:10
**target** 101:21 102:1
**targets** 178:11
**task** 253:12
**tasked** 86:16
**tasks** 201:19
**teacher** 82:25
**team** 13:2 22:19,24 23:4

40:4 55:3,4 59:2 63:3,13,14,
17 64:21 75:24 82:1 86:12,
14,15 87:14 88:9,17 91:19
93:16 109:9 110:11 112:6,
24 113:4,5,7,10 114:7,13,15
119:8 124:25 126:17 127:10
128:5,12,16 129:1,12
146:20 151:14,19 153:2
154:22 159:22 160:1,4,9,11
161:3 174:15,19,21 175:22
179:7 182:5 189:19,21
207:21 208:1 209:13 232:5
238:7 260:10,11,15,25

**team's** 75:17 263:3

**teams** 144:1 204:15

**tech** 167:13 211:10

**technical** 168:2

**Technically** 18:8 73:24

**technician** 8:17

**Ted** 237:21

**telling** 187:24

**tells** 48:9 189:11 217:13

**template** 185:19 215:2
235:23

**templates** 209:7

**ten** 22:7 45:25 142:25 185:5
259:14

**tend** 194:5

**tenure** 34:17 67:7

**term** 24:20,24 25:3 106:14
171:15,18,24

**term-appointed** 24:14,23
143:16

**terms** 21:6,10 26:15 36:3
38:4 39:19,23 45:15,20 54:6
64:10 66:22 71:16 72:7,11
74:12,16,23 100:5 106:22
107:11 110:6,22 121:15
129:1 133:16 142:22 143:23
144:5 169:12 201:10 214:15
220:15 260:4 261:16

**terrible** 82:25

**testified** 10:16

**testimony** 9:7 36:11 94:19
238:21 239:2 240:16 249:8,
18 252:3 255:25

**testing** 142:21

**text** 11:6 81:12

**theme** 143:2

**themes** 240:5

**theoretically** 176:15 213:10

**Theresa** 8:14 92:14,19,22
93:14 95:5 98:2 99:18
211:25 212:8

**thing** 36:16 64:8 82:13 88:19
107:9 121:17 132:20 136:4
146:6,8 151:18 169:10
172:13 182:12 193:7 199:17
200:9 204:18 210:17 211:6
221:2,8 239:16,17 257:19,
22

**things** 13:4 16:16 20:7 21:6
36:6 38:6 45:10 46:11,13
59:8 60:3,24 64:18 72:7
83:1,5 87:22 89:17 104:6
106:21 107:14 114:23
115:25 117:12 121:7,17
122:15 126:9 132:19 133:19
143:14 144:15 154:20
169:13 182:17 183:3 186:7
187:10,11 190:1 191:10
192:11 193:1 194:6 196:4
199:20 203:9 207:6 212:20
219:16 224:11 231:22 232:4
239:23 241:14,18 243:5
247:18 251:8,9,10,16
253:12 261:6,7,20

**thinking** 13:7 91:15 142:7
159:10 221:21 240:8 241:11

**thinks** 53:15,16,17 194:15

**thought** 54:16 55:19 56:7
73:13,18 74:5 79:15 215:25
259:20

**thousand** 53:3 133:13 217:2

**thousands** 53:2 158:24
185:14 261:2

**thread** 210:21

**threads** 252:3

**threshold** 185:4 186:6
199:13

**thrown** 195:14

**tied** 162:16 171:10 223:13

**ties** 243:15

**time** 8:13,21 10:1,9,13 19:2,
20 20:13 25:10 26:3,6,12,16
27:2 32:13,16,17,25 33:20
40:18 41:1 42:7 44:10,18
47:12 52:20,24 53:12 54:7
58:10,14 63:23 64:1 67:7
68:17,20 69:19,21 71:2,3,20
72:7 86:11,22 87:25 91:19
100:6 101:24 103:11,18

106:2,6 112:3 113:24 114:3
117:9 118:11 119:6 121:25
122:25 123:2,4,19,25 124:6
125:18 132:14 133:10 134:2
136:11,20,24 137:18,22,24
138:13 139:3 141:24 142:13
144:3,19,21 145:20 146:6,
13 147:9,22 150:21 152:6,8
153:9,23 154:6 155:7 158:2
160:17 162:5 164:22 166:4
167:21,25 168:12 172:16
177:22 181:24 183:9,18
187:1 188:7 189:20 191:11
196:3,14 198:3,8 201:20
202:7,12,18,19 211:18,22
214:8 216:11 219:17 221:20
222:4,21 224:25 225:8,20
226:16 227:14 228:1,5,6
234:24 235:3,14 237:15,22
244:7 245:16 246:18 247:24
248:3 258:19 259:13

**time-consuming** 90:9 204:3
209:16 227:24

**timeline** 158:4 162:4

**times** 12:8 14:13 20:17 26:2
142:3 201:4 217:16 225:2
233:21 235:5 252:25

**timing** 21:24 43:12 99:21
122:23 140:22 153:13

**title** 18:7 59:7 174:1

**titled** 159:3 216:17

**today** 8:12 11:24 12:3 15:22
18:17 112:17 146:13 235:5
246:21 262:2

**today's** 246:17

**told** 118:19 120:15 123:4,6
131:16 132:14,18,19 134:12
151:12,14,16 154:21 155:4
192:15,17 229:12,14,16,25
257:21 258:2,9

**tomorrow** 246:19

**top** 28:23 30:2,14 81:14
84:11 137:9 163:3 180:11
235:10 257:9

**topic** 159:4 229:6

**topics** 112:14 131:8,12

**total** 12:22 22:6 41:15 111:4
132:1

**touch** 129:1

**track** 133:18 144:16 173:13

**trained** 105:9 122:18 208:25

**training** 105:12,19 144:8
192:7 199:12,20 200:10,11,
20 204:16,21 207:24
208:10,16 260:21
**trainings** 208:20
**transcript** 11:20 17:12 22:9
29:24 182:14 184:10 199:25
263:20
**transfer** 41:18 42:15 122:7
192:13,15,18 206:5 211:3
237:13 258:2,10
**transferability** 238:10,12
**transition** 26:6 112:6,24
114:7,13,15
**transitions** 114:21
**translated** 119:17
**treading** 76:4
**treat** 77:4
**treated** 179:12 181:16
**trial** 142:19
**tricky** 219:16
**trigger** 195:24
**trouble** 166:3 236:18
**troubleshoot** 167:16
**true** 35:10 99:22 138:21,23
159:15 227:19 247:19
260:14
**Trump** 112:24
**truthfully** 12:3
**turn** 17:25 29:8 30:1 36:13,
23 58:16 114:25 125:2
137:1
**turnaround** 189:20
**turned** 245:14
**turns** 39:20 127:13 184:25
253:9
**tweaked** 191:10
**Twelve** 12:23
**Twenty** 260:23
**two-minute** 58:2
**type** 81:19 83:7 179:10
182:12 193:2 200:7 243:16
**types** 80:13 152:11 177:11
182:24 192:2 193:13 199:6
201:22
**typical** 90:4
**typically** 35:6 61:11 120:11
142:15 185:3 186:1 193:18
199:21 239:24 247:21

**U**

**U.S.** 8:17,22
**Uh-huh** 28:8 31:21 43:2
76:17 82:4 91:24
**ultimate** 148:9
**ultimately** 27:6,9 45:13
52:16 55:6 87:1 118:15
123:3 172:19 209:17,20
242:3
**unable** 25:5
**underlying** 134:20
**understand** 47:13 56:24
75:8 78:18 107:18 111:23
114:21 135:6 166:5 172:25
180:14 199:16 200:22
206:18 215:20 219:1 236:7
242:13 245:7 247:10 250:2
254:24
**understanding** 15:25 16:7,
13,16 27:11 34:19 45:1 47:4
50:19 51:4,12 101:23
115:13 116:24 121:24
131:17 145:5 147:7,14
148:15,18,22 149:2 150:25
153:25 155:13 156:23
169:23 170:7 219:24 233:22
246:3 251:4
**understood** 16:23 78:7
116:12 206:10 253:3
**undertaking** 238:20
**underway** 172:22
**unfolds** 244:18
**uniform** 235:17,18,20
**unit** 15:20,25 16:1 18:2,10,
17 23:6,20,24 24:9 38:9
42:4 51:4 65:19,21 66:16
67:8,16,17 68:4 72:3 86:13
120:5 155:22 166:19 237:11
**United** 18:4
**units** 67:20
**universally** 259:3
**University** 99:8
**unrelated** 15:11
**unusual** 20:14
**update** 128:3 158:12 191:15
254:12 256:4
**updated** 43:9 193:5 235:22
252:6 256:15

**updates** 20:18 43:13 191:8
**upfront** 40:24 46:12 70:12
**uptick** 256:8
**usual** 120:14 189:20
**UTC** 8:13 10:9,13 58:10,14
106:2,6 113:24 114:3
136:20,24 167:21,25 198:4,
8 211:18,22 234:24 235:3
**utilized** 80:20

**V**

**Vaguely** 157:16
**variables** 245:1 258:17
259:9
**variation** 176:22
**varied** 22:20
**varies** 189:23 190:2 228:8
**variety** 52:9 59:23 83:4
**vary** 243:18
**varying** 24:15
**vast** 24:18 61:8
**Vedder** 14:11
**veracity** 77:3
**verbal** 204:10
**verbally** 9:6 228:25 229:2,14
**verified** 10:11
**version** 191:3,5 235:20
236:1 256:15
**versions** 87:16 235:19
**versus** 8:14 79:20 110:18
**vicinity** 69:3
**video** 8:10,16 11:17
**videotape** 9:21
**view** 222:12 223:18 241:17
258:3
**viewed** 185:4
**volume** 103:20 224:4 247:8,
22 256:23

**W**

**wait** 94:6 231:3 252:23
**waiting** 47:10 173:6 230:15
262:24
**waive** 9:10
**walk** 22:15 36:25 42:1 63:22
197:17

**walks** 105:15 107:10
**wanted** 29:15 36:23 58:19
  74:10 83:3 86:12 100:18
  103:17 106:8 123:11 138:23
  139:21 168:7 210:17,22
  214:10 222:2 239:25
**wanting** 228:21
**warrant** 104:23 259:14
**warrants** 179:11
**water** 76:4
**watermark** 191:6
**watermarked** 190:15
**Wayne** 33:11,15
**ways** 60:6 173:12
**wearing** 21:16
**Web** 96:23
**Wednesday** 8:12
**weeds** 136:1
**week** 20:9,17 42:21 102:1
  105:12 141:19 163:8,17,24
  167:10 207:24 229:8
  231:11,14
**weekly** 20:6,24 21:9 26:17
  101:4 229:9
**weeks** 43:11 90:6 114:20
  202:22
**weeks'** 89:19
**weigh** 57:14
**weighed** 210:9
**weighing** 104:21 203:18
  206:15 210:13
**weird** 226:14 231:19
**Western** 178:1 180:15
  181:10
**whatnot** 121:14
**window** 187:2 219:18
**woman** 88:10
**wondering** 191:14
**worded** 176:20
**wording** 96:24
**words** 83:20
**wore** 31:13,18 32:7
**work** 14:21,25 15:2,4,9
  17:24 18:15 20:15 40:19
  45:12 61:16 66:22 67:16
  99:9 115:15 116:21 118:6
  120:1 121:11,22,25 122:23
  123:15 132:21 133:20
  136:13,15 138:1,23 140:25
  141:24 144:2 154:17

160:10,19 172:15,24 177:17
  189:16 190:1 194:12 204:7
  209:14 227:23 230:15
  240:24 241:19
**worked** 14:8 17:22 54:4 56:8
  86:23 88:11 89:21 127:11
  152:13 155:2 157:16 159:13
  202:4 238:4,6
**working** 19:7 49:15,20 63:15
  67:6 72:5 88:10 103:4 120:5
  123:3 128:3 133:10,12,23
  134:9 135:25 143:10,12,20
  157:25 171:13,25 172:1,13,
  14,16 210:2 214:9 235:16
  236:21 237:16,24 248:22
  249:1 250:1 260:16
**workloads** 189:24
**works** 136:14,16 203:12
**world** 101:7
**worth** 197:7
**wrapping** 138:2
**Wright** 158:18
**write** 17:19,21 18:1 44:25
  46:7 139:6 150:14
**writing** 119:3,5 229:1,13
  244:3
**written** 11:19 36:7,17,19
  39:20 40:1 48:23 49:3
  97:10,13 105:6 117:5,6
  159:8 190:4 200:11 204:10
  236:21 246:9,12 257:11,15
**wrong** 53:16 88:13,14 93:13
  98:17 191:2 260:11 261:22,
  24
**wrongly** 246:8,10 247:2
**wrote** 74:7 130:12,15 168:17
  189:22
**Wyotech** 237:14

---

Y

---

**yea** 254:20
**year** 19:13 69:23,24 70:14
  135:12 143:13,25 165:24
  218:25 230:1 231:19 233:2
  248:24 260:16
**years** 14:10,17,19 24:25
  25:4 45:25 71:7 144:22
  252:17 258:20
**yelled** 178:17

**yellow** 87:17
**York** 8:18 176:1

1              E R R A T A   S H E E T

2    IN RE:  THERESA SWEET, et al. v. ELISABETH DEVOS,

3    in her official capacity as Secretary of the

4    United States Department of Education.

5

                              CORRECTION AND REASON

6    PAGE  LINE

                         "has" should be
7    _19__ _12__         "hasn't"_____
                         Beckwood should be
8    _49__ __21_         Westwood_____

9    _49__ __22_         American should be "Marinello"
                         "in-state" should be
10   __64__ _21__        "intake"_____
                         "an illegal" should be "a
11   __82_ __11__        legal"_____
                         "crew at" should be
12   __86_ __11__        "COO"_____
                         "included" should be
13   _100_ __6__         "concluded"_____
                         "power" should be
14   _126__ __4__        "Bauer"_____
                         "plied" should be
15   _156__ __22_        "applied"_____
                         "release" should be
16   _170__ __5__        "relief"_____
                         "lot" should be
17   _181_ ___3__        "law"_____
                         "AG" should be
18   _223__ __5__        "IG"_____ _____
                         _"release" should be
19   _223__ _6 and 7     "relief"_____ _____
20   225_ _19__          _"proved" should be "approved"

21   _231__ _2_____      _"proved should be "approved"____

22   __234_ _2____       __document should be
                         "documents"_____
23   _239__ __7__
                         "courtroom" should be "court"
24   _____1.12.21_____   _____
                                 _Colleen M. Nevin_____
25      (DATE)               (SIGNATURE)

1        ACKNOWLEDGMENT OF DEPONENT

2            I, Colleen M. Nevin, do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true,

5    correct and complete transcription of the

6    testimony given by me and any corrections appear

7    on the attached Errata sheet signed by me.

8

9

10

11    ___1.12.21_____        _Colleen M. Nevin_

12    (DATE)                        (SIGNATURE)

13

14

15        CERTIFICATE OF NOTARY PUBLIC

16    Sworn and subscribed to before me this

17    _____ day of _____, _____

18

19

20    _____     _____

21    NOTARY PUBLIC                MY COMMISSION EXPIRES

22

23

24

25