**Supplemental Complaint**

**Exhibit Index**

**Bates Stamped Documents**

Documents appear in this order, with Bates-Numbered Slip-Sheets Between them. The documents are cited **by Bates Number** in the Supplemental Complaint.

| Document Order | Bates Range | Document Title / Identifier |
|---|---|---|
| 81. | DOE00012862-DOE00012863 | Unitech Training Academy Memo |
| 82. | DOE00012873-DOE00012877 | Universal Technical Institute Memo |
| 83. | DOE00013647-DOE00013656 | Decision Memo: Tiered Relief Methodology |
| 84. | DOE00013704-DOE00013707 | Heald UCL Memo |
| 85. | DOE00013708-DOE00013725 | Heald Transfer of Credits Memo |

**DOE00012862-DOE00012863**

# Initial Review of Medium Batch Applications

## BACKGROUND

| | |
|---|---|
| **Name of Institution** | Unitech Training Academy |
| **Corporate Owner(s)** | Unitech Training Academy |
| **Open or Closed** | OPEN |
| **Total Number of Applications** | 55 |
| **Patterns of Alleged Misconduct** | There are several allegations that the school failed to assist students with career services as promised. There are also some allegations that the school failed to fully explain the nature of student loans. |
| **Evidence/Litigation** | <ul><li>2014 Article about a lawsuit filed by a student who was expelled allegedly for making faces at her teachers. (https://louisianarecord.com/stories/510585213-unitech-training-academy-sued-for-300k-over-expulsion-of-student-for-allegedly-making-faces-at-school-employees)</li><li>2014 Wrongful Termination case by former employee (https://law.justia.com/cases/federal/district-courts/louisiana/laedce/2:2015cv07133/172919/126/)</li><li>2013 lawsuit by employee who thought they were enrolled in healthcare plan (https://www.leagle.com/decision/infdco20130531913)</li><li>2016 article about financial aid employee who schemed to steal money from students between 2009 to 2011. She told students they needed to pay additional funds above their loans but pocketed the money. Also included is the Department of Ed report which mentions this. (https://www.justice.gov/usao-wdla/pr/alexandria-woman-sentenced-12-months-prison-stealing-over-22000-college-students) (https://www2.ed.gov/about/offices/list/oig/semiann/sar73.pdf)</li></ul> |
| **Name of Reviewer** | Alana Smith |
| **Date Review Completed** | 8/23/2019 |

## SUMMARY APPLICATION OVERVIEW

| BD Case Number | School/Campus listed on App | Program(s) | Year of Enrollment | Nature of Allegation(s) | Evidence |
|---|---|---|---|---|---|
| 01261430 | West Monroe, LA | Dental Assistant | 2016 | Guaranteed Job, Educational Services, Other | Web Form |
| 01377122 | Houma | Physical Therapy Tech | 2006 | Career Services | Web Form |
| 01384387 | Monroe, LA | Dental Assistant | 2016 | Career Services, | Signed Statement |

| | | | | Transferability, Educational Services, Other | |
|---|---|---|---|---|---|
| 01390499 | Houma | Medical Assistant | 2009 | Career Services, Program Costs, Transferability, Educational Services, Other | Signed Statement |
| 01401901 | West Monroe, LA | Administrative Medical Assistant | 2017 | Educational Services | Signed Statement |
| 01789863 | Metairie, LA | Medical Assistant | 2013 | Guaranteed Employment, Transferability, | Web Form |
| 01718030 | Alexandria, LA | Dental Assistant | 2018 | Career Services, Program Costs | Web Form |
| 01435141 | Houma | Physical Therapy Technician | 2013 | Career Services, Urgency to Enroll | Signed Statement |
| 01417761 | Alexandria, LA | Physical Therapy Technician | 2010 | Career Services | Signed Statement |
| 01285638 | | Medical Assistant | 2017 | Program Costs | Signed Statement |

## RECOMMENDATION:

Almost every case alleges that the school misrepresented career services and job placement services. There are also several allegations that the school misrepresented the nature of loans.

There are several lawsuits against the school by former employers and one lawsuit by a former student who alleges she was wrongfully expelled. None of these are relevant to the borrower's defense program. Despite the commonality of allegations and some corroboration between programs and enrollment dates, there is no evidence to support the allegations. Therefore, I recommend adjudicating these cases.

**APPROVED BY:** John Stephenson
**DATE:** 8/23/2019

**DOE00012873-DOE00012877**



PROUD SPONSOR *of*
*the* AMERICAN MIND ™

## Initial Review of Medium Batch Applications

### BACKGROUND

| | |
|---|---|
| **Name of Institution and OPEID** | Universal Technical Institute (UTI)<br>• 00822100: Avondale, AZ<br>• 02100500: Phoenix, AZ<br>• 02362000: Houston, TX |
| **Open or Closed** | Open |
| **Additional Locations**<br>• **Add closure date if applicable** | • 00822101: Lisle, IL<br>• 00822102: Phoenix, AZ (closed 06/11/04)<br>• 00822103: Rancho Cucamonga, CA<br>• 00822104: Mooresville, NC<br>• 00822105: Norwood, MA<br>• 00822106: Long Beach, CA<br>• 00822107: Mooresville, NC (closed 05/22/17)<br>• 02100501: Phoenix, AZ (closed 08/16/90)<br>• 02100502: Orlando, FL<br>• 02100503: Phoenix, AZ (closed 10/10/16)<br>• 02100504: Phoenix, AZ (closed 10/10/16)<br>• 02100505: Sacramento, CA (02/23/06)<br>• 02362001: Houston, TX (closed 05/07/03)<br>• 02362002: Exton, PA<br>• 02362003: Irving, TX<br>• 02362004: Bloomfield, NJ |
| **Corporate Owner(s)** | • UTI Holdings, Inc.<br>     o Universal Technical Institute, Inc |
| **Total Number of Applications** | 601 (as of 5/5/2020) |
| **Patterns of Alleged Misconduct** | UTI currently does not have any pending litigation and no evidence suggests that UTI is participating in misrepresentation or fraudulent activity. Based on a sample of 50 applications, the borrowers do not present evidence that indicate UTI committed overt or repetitive misconduct, fraud, or misrepresentations. The application narratives provide individual experiences, frustrations, or misunderstandings encountered as a customer of UTI. |
| **Internal ED Investigation(s)**<br>• **PC, AAASG, OIG** | Eric Miles: FPRD 07/30/18<br>The Department of Education's Multi-Region & Foreign Schools Participation Division completed a Final Program Review Determination of UTI on July 30, 2018. The review team made nine findings of noncompliance at the school. The most relevant finding to Borrower Defense being "Finding 7: Consumer Information." The team found that UTI did not provide its students with the required disclosure regarding the cost of attendance. This finding is |

| | |
|---|---|
| | considered resolved with no further action required on the part of UTI. |
| **Internal Contact(s) for Further Investigation** | N/A |
| **External Investigations (AG), Evidence or Litigation Related to BD** | • The United States Department of Justice notified UTI that the DOJ has declined to intervene in Federal False Claims Act lawsuit and that it has closed its investigation<br><br>    o In July 2012, UTI received notice from the Department of Justice (DOJ) that it was the subject of a preliminary investigation into claims brought by a former employee who alleged UTI's compensation of its admissions representatives violated the "incentive compensation ban," amongst other potential violations allegedly occurring over a number of years.  The same former employee had filed a complaint with the Department of Labor (DOL) alleging retaliatory employment practices in violation of the whistleblower provisions of the Sarbanes-Oxley Act of 2002. UTI entered into a settlement agreement with the former employee resolving all pending claims.<br><br>    o Under the terms of the settlement agreement, UTI and the former employee, sought dismissal of the False Claims Act Suit and a final agency disposition of the DOL complaint, which were obtained on October 29, 2013 and November 7, 2013, respectively.<br><br>    o As of 5/5/2020, the DOJ has not released any findings in relation to this investigation and has not provided to the Department any evidence.<br><br>• In 2012, UTI was the subject of a Civil Investigative Demand (CID) from the Attorney General of the Commonwealth of Massachusetts related to a pending investigation in connection with allegations relating to student loans, guarantees and grants provided to students at Norwood campus<br><br>    o The investigation is not listed on UTI's most recent 10-Q filing with the SEC, indicating that UTI no longer believes the investigation will have an impact on the company's future financial position.<br><br>    o As of 5/5/2020, the Office of the Attorney General for the Commonwealth of Massachusetts has not released any findings in relation to this investigation and has not provided to the Department any evidence. |
| **External Contact(s) for Further Investigation** | N/A |
| **External Investigations, Evidence or Litigation NOT related to BD** | • *Fletcher v. Universal Technical Inst., Inc.*, 2006 WL 2297041. unpaid overtime wages and unpaid wages, alleging violations of the Fair Labor Standards Act and Chapter 448 of the Florida Statutes, and Florida common law. |

2

| | |
|---|---|
| | • *Henry v. Universal Technical Institute*, 559 Fed.Appx.648 (2014). Student brought action against school, instructors, and administrators, alleging race and national origin discrimination in violation of Title VI. The United States District Court for the District of Arizona.<br>• *Brady v. University Technical Institute of Arizona, Inc.* No. CV-09-1044-PHX-FJM (2009). An employment arbitration agreement was valid and enforceable, as both the employee and employer were equally bound by the terms of the arbitration agreement.<br>• *Porter v. Universal Technical Institution of North Carolina, Inc.* 2004 WL 2236080 (W.D.N.C.) (2004).  Statutory and common-law cause of action for violations of Title VII of the Civil Rights Act of 1964, as amended and wrongful termination in violation of North Carolina Equal Employment Practices Act. |
| **News Articles/Media** | • Law Offices of Todd M. Garber Announces Investigation into Possible Suit Against of Universal Technical Institute, Inc.<br> ◦ In a press release, the Law Offices of Todd M Garber, a plaintiff's class action firm, announced that it was investigating potential claims related to the Department of Justice preliminary investigation into Federal False Claims Act claims (see above). The law office has not made any public filings or statements in relation to investigation since the press release.<br>• 10-K Filing<br>• Universal Technical Institute Teacher Files Suit Claiming He Was Assaulted in Classroom<br>• Student Complaint Chat "Pissed Consumers"<br>• Thread regarding layoffs theLayoff.com |
| **Name of Reviewer** | Conor Kruger |
| **Date Review Completed** | 05/05/20 |

## RECOMMENDATION

| | |
|---|---|
| **Summary of Allegations Reviewed** | **Application Sample:**<br>Borrower Defense reviewed allegations of each allegation type to identify potential trends in the applicant pool. The enrollment dates for UTI range from 1986 to 2019. The narratives in the reviewed applications provide commentary on the admissions process, the quality of the career services department, the cost of attendance, and frustrations arising from unemployment.<br><br>**Allegation Break Down:**<br>Employment Prospects<br>Five hundred twenty-two of the total applications raise an employment prospects allegation. Of the fifty sampled allegations, twenty-three allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers allege |

3

DOE0012875

that UTI mispresented job placement assistance, employment outcomes, and UTI's relationship with employers. The most common allegations are that UTI guaranteed a job or a wage after graduation. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Program Cost and Nature of Loans
Four hundred fifty of the total applications raise a program cost allegation. Of the fifty sampled allegations, nineteen allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers allege that they were told one price but were ultimately charged another and that they were misled as to whether the aid they received was in the form of grants or loans. Several of the sampled applications allege that they either were not informed about the total cost of attendance or that borrowers were confused as to the total cost. Several borrowers state that UTI made a representation to the effects that they would not have to worry about their loans because they would be making enough to pay them back. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Career Services
Four hundred ninety-one of the total applications raise a career services allegation. Of the fifty sampled allegations, seventeen allegations are of the type that might warrant BD relief, if supported by evidence. The most common allegations are that UTI promised job placement services or job placement assistance. Several claims asserted that UTI guaranteed a wage or employment for the borrower. The rest of the claims asserted that the school promised to help the borrower find a job, but the school failed to deliver. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Admission and Urgency to Enroll
Three hundred eighty-nine of the total applications raise an admissions allegation. Of the fifty sampled allegations, six allegations are of the type that might warrant BD relief, if supported by evidence. The allegations of the type that might warrant BD relief are allegations of misrepresentations related to employment prospects and program cost made during the admissions process or used as the basis for the urgency to enroll. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation.

Educational Services
Three hundred sixty-five of the total applications raise an educational services allegation.  Of the fifty sampled allegations, six allegations are of the type that might warrant BD relief, if supported by evidence. The borrowers' allegations discuss the quality of the education received, including the lack of hands-on training and relevance of the curriculum to the profession. Borrowers failed to

4

|  | provide relevant supporting evidence to establish misconduct regarding educational services. |
|---|---|
|  | **Transfer of Credits**<br>Two hundred ninety-seven of the total applications raise a transfer of credits allegation.  Of the fifty sampled allegations, twenty-nine allegations are of the type that might warrant BD relief, if supported by evidence. Most allegations express credit-related issues encountered throughout the borrower's individual experience. Some borrowers assert that UTI specifically told Borrowers that their UTI credits were generally transferable and their UTI credits did not transfer. Although the allegations asserted are of the type that might warrant BD relief, the borrowers failed to provide relevant supporting evidence to establish these allegations of misrepresentation. |
|  | **Other**<br>Two hundred eighty-five of the total applications raise an "other" allegation. Of the fifty sampled allegations, three allegations are of the type that might warrant BD relief, if supported by evidence. Most of the "other" allegations list the potential violations of Federal law allegedly committed by the school. The rest of the allegations detail issues with the quality of education and the ability to obtain employment afterward. The borrowers failed to provide relevant supporting evidence to establish an allegation of misrepresentation. |
| **Recommended Next Steps** | Based on public information (including public records, news articles, court documents, and filings) and the Department of Education's internal resources (FRPDs, AASG, and OIG investigations), there is no evidence to suggest that Universal Technical Institute engaged in  widespread conduct of a type that would warrant borrower defense relief.  In addition to research conducted, the 50-case sample did not identify a pattern of practice consistent with general misconduct. The allegations sampled focus on individual experiences and do not suggest widespread misrepresentations or violations. Accordingly, it is recommended that the cases be adjudicated using a standard protocol. |
| **Recommended Focus Area(s)** | N/A |
| **APPROVED BY:** | Sarah Angilello |
| **DATE:** | 05/08/20 |

| **Evidence Considered** | ☐ Attorney Submission |
|---|---|
|  | ☐ Borrower Submission |
|  | ☐ Federal Trade Commission |
|  | ☐ Department of Justice |
|  | ☐ Securities and Exchange Commission |
|  | ☐ Attorney General _____ (state) |
|  | ☐ Consumer Financial Protection Bureau |
|  | ☐ ED - FSA/OIG |
|  | ☐ Other - Publicly available SEC filings |

DOE0001 2877

**DOE00013647-DOE00013656**

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

## DECISION MEMO

DATE:      **November 12, 2019**

TO:        **Betsy DeVos, Secretary**

FROM:      **Diane Auer Jones, Principal Deputy Under Secretary**
           **Mark Brown, Chief Operating Officer, Federal Student Aid**

SUBJECT:   **Request to implement a new, tiered-relief methodology to adjudicate current**
           **and future BD claims**

### BACKGROUND

In December 2017, the Department announced that it would use a tiered methodology to adjudicate borrower defense to repayment (BD) claims submitted by students who had attended Corinthian Colleges, Inc. (CCI or Corinthian), and whose claims were based upon findings regarding job placement rate (JPR) misrepresentations by CCI during specified time periods. That methodology ("the 2017 methodology") assessed the relief owed to borrowers based on the extent to which BD applicants had earnings similar to those of graduates of similar programs that had a passing debt-to-earnings ratio under the Gainful Employment (GE) regulations (34 CFR part 668, subpart Q). The level of student loan relief calculated and provided under this methodology ranged from a discharge of 10% to 100% of the amount borrowed. Any borrower who was eligible for more than 50 percent relief was given full loan relief.

To obtain earnings data for use in calculating relief, FSA grouped CCI BD applicants into cohorts (based on program and credential level, using 6-digit Classification of Instructional Program (CIP) codes) and submitted those cohorts to the Social Security Administration (SSA). SSA provided the Department with the mean and median calendar year 2014 earnings for each cohort. The Department then compared the lower of the mean and median earnings of the applicants to the median earnings of similar programs at other institutions that achieved a passing GE score.

The Department was sued by several CCI borrowers with JPR BD claims in a class action, in the lawsuit *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal.). The borrowers sought a preliminary injunction against the Department to enjoin its use of the methodology. In granting the plaintiffs' request in May 2018[1]. The court enjoined the Department from using the methodology based on its conclusion that the plaintiffs were likely to succeed on their argument that obtaining earnings data for a group of BD applicants from SSA violated the

---

[1] The Department appealed the court's preliminary injunction order to the United States Court of Appeals for the Ninth Circuit, where it is pending. *Manriquez v. DeVos*, No. 18-16375 (9th Cir.).

DOE00013647

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

Privacy Act. The Department remains under a preliminary injunction on the use of that methodology or any of the data that we obtained from SSA for cohorts of Corinthian BD applicants who filed a claim based on allegations of Job Placement Rate misrepresentations.

The court, however, did find that the Department had a likelihood of ultimately prevailing on its argument that it has the authority to award partial relief to BD claimants, based upon a methodology developed by the Department. Therefore, the Department has developed a new methodology for determining the level of harm to BD applicants and the corresponding amount of relief it should provide to successful BD applicants. Under the terms of the preliminary injunction, the Department may not use this methodology to provide partial relief to CCI JPR BD applicants (who are the majority of Corinthian borrower defense applicants). However, the injunction does not prevent the Department from utilizing the new methodology to process borrower defense applications for borrowers that are not part of the class that has been certified in *Manriquez*, including non-JPR Corinthian claims and claims filed by borrowers who attended other institutions. Aside from a handful of previously approved categories of borrower defense claims (the largest among them being the JPR claims at issue in *Manriquez*), the Department does not yet have a practice or precedent regarding the amount of relief to offer borrowers in other categories of borrower defense claims, so this methodology represents the Department's first such policy with regard to those categories.

## METHODOLOGY

The Department was hopeful that we would ultimately prevail in court and be able to move forward in adjudicating BD claims using the 2017 methodology. However, SSA did not renew the memorandum of agreement between SSA and the Department that allowed the Department to obtain borrower earnings data, decreasing the utility of the SSA data exchange aspect of the 2017 methodology for purposes of broader application. Thus, while awaiting the court's decision on appeal, we sought a new methodology that avoided the areas of concern raised in the *Manriquez* case but would allow us to award partial or full relief in a fair and equitable manner. We believe that the key principles of any new methodology should continue to be that:

1. Relief is based on the financial harm suffered by a successful BD applicant, as determined by comparing earnings imputed to the BD applicant against earnings of a representative comparison group. Financial harm is quantifiable and generally forms the basis for the kinds of claims underlying borrower defense applications; calculation of financial harm based on comparative earnings makes use of generally available data while focusing on the harm attributable to the school and program attended in contrast to a similar comparable school and program that the applicant might have otherwise attended.

2. Earnings determinations will be imputed to a BD applicant using the median earnings of graduates of the program in which the borrower was enrolled, rather than the individual's earnings. Although in the 2017 methodology we used the lower of the median or mean of the applicant's program's earnings and the higher of the median or mean of the comparison group earnings, since the College Scorecard provides only

DOE00013648

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

median earnings, we will use median earnings in this methodology regardless of whether GE disclosure earnings data or College Scorecard data is used, in order to be consistent. Also, mean values can be heavily influenced by outliers who have exceptionally high earnings or exceptionally low earnings, which is why we believe that median earnings is the more appropriate data point to use for this analysis. While an individual's earnings could be influenced by a multitude of factors other than the education they received at a college or university, taking the median of earnings across the program provides a summary statistic based primarily on the common experience of program participants, giving more weight to factors shared among participants because of their shared participation in the program than to factors that vary across the different participants and therefore are less likely to represent the shared experience attributable to participation in that specific program.

The Department has considered a number of potential methodologies to calculate partial relief to successful BD applicants. Below are summaries of each methodology considered, including the methodology the Department recommends for adjudicating BD claims.

### Potential Methodology: Income-Driven Repayment Comparison Approach

One methodology we considered focused on a comparison between the required monthly payment under an income driven repayment (IDR) plan as compared to the required monthly payment under a standard, 10-year repayment plan for federal student loan borrowers. Under this methodology, program level median debt and earnings would be used to calculate the standard payment amount associated with that earnings and debt level as well as the corresponding IDR payment amount (based on a family size of one). The inverse of the quotient of these two payments, as a percentage, would determine the level of relief that would be provided to the borrower on loans associated with the enrollment for which the BD claim was awarded. Under this methodology, the Department would use publicly available program-level median debt and median earnings data (such as those calculated by SSA and reported to the public via the income data disclosures pursuant to the Gainful Employment regulations,[2] or those calculated by the Internal Revenue Service (IRS) and made publicly available through the College Scorecard[3]) to impute earnings to the BD applicant as well as to a comparison group consisting of graduates of similar programs at other schools. For the purpose of the IDR calculation, the Department would use a family size of one because decisions borrowers make regarding their family size are not the responsibility of the institution.

This methodology has serious shortcomings, including that student borrowing is not limited to costs imposed by institutions. Since borrowing limits, as well as eligible repayment programs, are authorized by Congress, not created by institutions, it is not obvious that a borrower's decision to maximize his or utilization of the Federal loan program or to take full advantage of

---

[2] Presently, the Department only has Gainful Employment earnings data from 2014. The Department no longer has an agreement in place with SSA to obtain such data. Moreover, the GE regulations will be rescinded as of July 2020. As a result, the Department will not have such data for any other years.

[3] The IRS began providing income data for College Scorecard disclosure purposes under a memorandum of agreement with the Department beginning in 2019.

DOE00013649

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

his or her opportunity to minimize his monthly student loan payment is a sign that the institution did something wrong.  For example, it may be that an astute borrower takes full advantage of low-interest Federal loans as well as IDR plans in order to prioritize payment of debts that are at higher interest rates or securitized by personal property.

It is difficult to fault institutions for the fact that statute enables students to take loans that generate cash payments, which can be used for non-educational expenses.[4]  In addition, to the extent that IDR plans are designed to enable low-income students to select a job based on their interests and passions rather than the wages a job pays, it would be inappropriate to then suggest that students who take advantage of this policy were somehow harmed by the school they attended.  Therefore, a student's choice to rely on IDR repayment should not be viewed as a sign of harm, especially since the presence of IDR repayment programs may have encourage students to borrow more than they would have otherwise borrowed had such repayment options not been available.

Finally, since Congress has established higher borrowing limits for students over the age of 25, it is unreasonable to attribute financial harm to an institution simply because it serves adult learners who are permitted by Congress to borrow more.  Doing so would discourage institutions from serving adult learners.  The Department has already determined that debt-to-earnings ratios are not an accurate or legitimate proxy for institutional quality since many factors other than program quality influence both earnings and debt.[5]  Therefore, such a proxy would also not serve as a reasonable basis for attributing financial harm to a borrower in the case of a successful BD application.  As a result, we do not recommend the use of this methodology.

**Proposed Methodology: Standard Deviation-Based Approach**

The second methodology we have considered relies on a standard deviation model that would award full relief to an otherwise successful BD applicant if the borrower's imputed median earnings were less than or equal to wages that are two standard deviations below the median wages of the comparison group.  Similar to the method described above, earnings would be imputed to a borrower and to a comparison group based on the median earnings of graduates of the program in which the applicant was enrolled or median earnings of graduates of similar programs.  The median wage for the comparison group would be the median of the medians of the program level earnings calculated for graduates based on a 4-digit CIP code and the credential level. Although the 2017 methodology was based on 6-digit CIP code data available from SSA, that data is no longer available to the Department and that aspect of the

---

[4] *See* 20 U.S.C. § 1087ll ("Cost of attendance").

[5] *See* Program Integrity: Gainful Employment, 84 Fed. Reg. 31392 (Jul 1, 2019) ("the Department has determined that the GE regulations rely on a debt-to earnings (D/E) rates formula that is fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs, fails to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes, fails to provide transparency regarding program-level debt and earnings outcomes for all academic programs, and wrongfully targets some academic programs and institutions while ignoring other programs that may result in lesser outcomes and higher student debt.").

DOE00013650

CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT

methodology has been specifically enjoined. As a result, available data based on 4-digit CIP codes

There is merit to using standard deviations to identify earnings outliers since even among programs of equal quality, median earnings could differ based on the part of the country in which graduates are employed, the socioeconomic level of students prior to enrollment, the age and gender of the students (which could influence the likelihood that graduates would choose part-time work over full-time work) or the selectivity of the institution, among other things. Standard deviations can be used to quantify the amount of variation within a set of data. In other words, the standard deviation demonstrates the distributions of earnings within a data set of all programs that share the same CIP code and credential level. A low standard deviation indicates that the values in the data set tend to be close to the mean (which is also called the average), while a high standard deviation indicates that the values are spread over a wider range. When comparison group earnings have a low standard deviation, this means that there may not be much variability in earnings across the country, so even a small standard deviation below the median may trigger an outlier. On the other hand, if the comparison group has a larger standard deviation, this suggests that earnings vary considerably from one program to another, and only when the earnings imputed to the borrower are significantly different from the median wages should we make the determination that financial harm has occurred. In determining how the median wages of a successful BD applicant's wages compare to the comparison group, we need to consider this data point in relation to the general level of variability in earnings among graduates of other similar programs.

In a normal distribution, around 68 percent of the data points in the sample will fall within one standard deviation and one standard deviation below the median. Around 95 percent of all data points in the sample will fall within two standard deviations from the median. Therefore, we suggest that median earnings at or below the earnings that are two standard deviations from the median result in full relief to successful BD applicants. This does not mean that programs with earnings lower than two standard deviations from the median are necessarily bad programs, but in attempting to identify a methodology to determine the financial harm suffered by a borrower, we believe that wages at or lower than the lowest 2.5% of earnings in a sample would be outliers and should qualify a successful BD applicant for full relief.

Successful BD applicants whose earnings are higher than the threshold that is two standard deviations from the median, but lower than the median would receive partial relief. To determine the level of partial relief such a borrower would receive, the Department could simply divide the difference between median wages and wages two standard deviations below the median by three to establish three tiers of relief between 0% and 100%. In other words, successful BD applicants whose program earnings were less than the median could be awarded 25, 50, 75 or 100 percent relief, depending upon where their program median earnings fall in the range. This option will be considered Option One. Conversely, the Department could simply have three categories of relief, which would include 0 percent if a successful BD applicant's program level median earnings were above the comparison group earnings that are one standard deviation from the mean, 50 percent if the successful BD applicant's program level median earnings were above two standard deviations from the median but at or lower than

DOE00013651

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

one standard deviation from the median, and 100 percent if the successful BD applicant's program level median earnings were at or below the earnings two standard deviations from the median among the comparison group. This option will be considered Option Two.



We believe that Option One provides more gradual differentiation between differently situated borrowers, and is the most favorable to borrowers overall, so we recommend that you select that option for awarding partial relief.

**Potential Methodology: Percentage Earnings-Based Approach**

The final methodology, which is the one that most closely parallels the 2017 methodology, uses publicly available GE earnings disclosure data or IRS data to calculate the quotient of the median earnings of the BD applicant's program and the median earnings of the graduates of other similar programs (the comparison group). The inverse of that quotient, expressed as a percentage, would be the percentage of loan relief provided to successful BD applicants for eligible loans. Relief would be provided in increments of 10%, with the Department rounding up to the next higher percentage. The Department could then follow the practice used in the 2017 methodology in which borrowers who would qualify for more than 50 percent relief would be given 100 percent relief.

This percentage methodology does not take into account that there is normal variation in median earnings among programs even when misrepresentation does not occur, so this methodology does not take into account the variability in earnings among all of the programs in the comparison group to assign relief to the borrower based on the median earnings of his or her program graduates.

**Avoiding Areas of Concern Regarding the 2017 Methodology**

Each of the methods described above avoids the areas of concern raised by the court regarding the 2017 methodology since each relies on publicly available earnings data to impute earnings to the BD applicant. Unlike under the 2017 methodology, the Department will not be submitting a cohort of BD applicants to SSA or IRS to determine their income; instead, we will

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

use publicly available earnings data to impute earnings to both the applicant and the comparison group.

A more detailed description of the methodology for imputing earnings is described below.

1. Imputing earnings to the BD Applicant: Using 4-digit CIP codes and credential levels, the Department will impute earnings to the borrower by determining the median earnings of the graduates of the BD applicant's program. While the Department could use 4-digit or 6- digit CIP codes to impute earnings, the use of the 4-digit CIP code provides greater coverage and enables us to adjudicate a larger number of claims using the borrower's program and credential level. For borrowers with claims made against institutions that are no longer in operation and for which gainful employment data have been published, earnings data will be sourced from publicly available GE earnings disclosures based on data provided by SSA. For other institutions and for determining relief for future BD claims in the future, the Department will use another publicly available data source, such as the College Scorecard, to impute earnings to the applicant.

2. Comparison group earnings: Using 4-digit CIP Codes and credential levels the Department will calculate the median earnings of the graduates of like programs offered by other institutions. For complaints adjudicated using publicly available 2014 GE earnings data, generated by SSA, comparison group data will also come from publicly available GE earnings disclosure data. For non-GE programs, and in the future, data will be sourced from the College Scorecard or other publicly available data source using data produced by a Federal agency, such as the IRS.

<u>Relief when imputed earnings data are not available</u>

In some instances, a successful BD applicant may have been enrolled in or graduated from a program so small that the Department cannot obtain median earnings of the program's graduates as a result of privacy protocols. It is also possible, but less likely, that a successful BD applicant's program is offered only by the institution he or she attended, or by other institutions only at a different credential level. In such a case, the Department recommends that we use earnings from graduates of similar programs based on the 4-digit CIP code, but at the next highest credential level, to impute borrower and comparison group earnings. If sufficient data are not available to make that determination, then the Department would review program level outcomes for other programs offered by the institution (and the relevant comparison group) using the 2-digit CIP code and credential level (or the next higher credential level if available, and if not, the next lower credential level) and award to borrowers the highest level of relief that would be awarded to borrowers in any of those programs. In the event that there are no other programs with the same 2-digit CIP code, the Department will award to those successful BD applicants the highest level of relief awarded to any successful BD applicant who received relief calculated under the 2017 methodology or the future methodology.

<u>**ADJUDICATING CLAIMS**</u>

DOE00013653

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

*Corinthian Claims*

We have consulted with OGC, and OGC has advised that under the preliminary injunction entered in *Manriquez*, the Department is permitted at this time to use the new methodology to grant 100 percent relief to Corinthian borrowers who are part of the *Manriquez* class, and to adjudicate approximately 30,000 pending BD applications from Corinthian borrowers who allege that the misrepresentation was something other than a job placement rate misrepresentation (meaning that they are not part of the *Manriquez* class). In addition, there are approximately 6,500 claims from Corinthian borrowers who are ineligible for defense to repayment relief, such as instances when the borrower was not enrolled at Corinthian or was not enrolled in a program deemed by the Department to make the borrower eligible for relief. Borrowers who have submitted claims resulting in partial relief can be notified that their claim is being held as a result of the court injunction.

We recommend adjudicating the non-*Manriquez* BD applications using the new partial relief methodology. In addition, we recommend that we provide at least 10 percent relief to any eligible Corinthian borrower who has a successful claim, even if there is no evidence of financial harm, in following with approach taken in the 2017 methodology establishing a ten percent relief floor for all eligible Corinthian borrowers. We also recommend notifying the 6,500 Corinthian applicants deemed ineligible, either because they do not meet existing criteria for approved claims or because they do not state a cause of action under state law, of that determination.

*ITT Tech*

Borrowers who submitted defense to repayment claims related to their enrollment at ITT Tech are not subject to the court's injunction on awarding partial relief. Therefore, the Department will use the new methodology to award relief to ITT Tech borrowers who submitted successful defense to repayment claims. The Department has already awarded automatic closed school loan discharge (ACSLD) to all eligible ITT borrowers who had not enrolled in a new program three years following the closure of ITT campuses.

Unlike in the case of Corinthian Colleges, where the Department asserted that it had evidence of misrepresentation for several programs offered by CCI campuses, the Department made no such determination for ITT schools or programs. In fact, the Department instructed students to file closed school loan discharge applications when ITT closed and did not recommend that students file BD claims since the Department had no evidence of widespread misrepresentation that would have qualified a class of borrowers for BD relief. Therefore, it will be up to borrowers to provide evidence of the alleged misrepresentation, and the Department will be required to review those claims based on applicable State consumer protection laws.[6]

---

[6] Under the borrower defense regulations, a borrower may assert a borrower defense claim for Direct Loans first disbursed before July 1, 2017, if there is a cause of action under state law. 34 C.F.R. § 685.206(c). Since ITT shut down in the fall of 2016, all ITT borrower defense claims must be reviewed under this standard.

DOE00013654

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

This means that in the case of ITT claims, the Department must review each application and make a determination, based on the information provided, of whether the borrower is eligible for BD relief  There are currently 28,000 outstanding ITT application, of which only 71 have been adjudicated on the merits of the application. Of these 71 applications, approximately 50 were determined to be successful.  Adjudicating these claims will be a manual process that will take months to complete.

We recommend that the Department first adjudicate the non-*Manriquez* BD claims, and then move to ITT claims as well as those filed by borrowers at other institutions.

*Other claims*

We recommend that the Department adjudicate the remaining claims, and any additional claims we receive, using the new methodology selected using this Decision Memo.  The Department will continue to monitor eligibility for automatic closed school loan discharges until such time as the 2019 Borrower Defense regulations go into effect, thus eliminating automatic closed school loan discharges for loans taken out subsequent to July 1, 2020.  Those borrowers who are eligible for ACSLD will receive it, including those borrowers who may have already received partial receive through a successful BD claim.


**Potential Concerns from Outside Constituencies**

Some organizations and entities will continue to argue that a borrower subjected to any level of misrepresentation should receive 100 percent loan relief.  However, were we to follow that model, students who a received education that is serving them well could still have their loans forgiven based on, for example (under the 2016 regulations) something as minimal as a student worker in the admissions office making an exaggerated claim about the opportunities provided by the campus or the success of its graduates.  As a further example, depending upon the results of the respective investigations at the different institutions involved, the recent admissions scandals could result in total loan forgiveness for every student enrolled during the time period when inappropriate practices were in place at each of the institutions involved. Similarly, depending upon the results of the respective investigations students who enrolled at Temple University or University of California, Berkeley during the years when those institutions provided inaccurate information to *U.S. News* could be eligible for full relief, even though it is likely that those students still had good educational outcomes.  Taxpayers who did not have the privilege of attending Temple or Berkeley or the many other elite institutions that engaged in substantial misrepresentation about their admissions practices and selectivity should not be required to repay the loans for those who did.

Therefore, in order to ensure that taxpayers are not left with the cost burden of paying for an education that is serving a borrower well, it is imperative that we consider the level of harm a student experienced in providing loan relief.

DOE00013655

*CONFIDENTIAL AND DELIBERATIVE; NOT FOR DISTRIBUTION OUTSIDE THE DEPARTMENT*

There will be some who argue with the specifics of our methodology; however, at least one court has found as a preliminary matter that the Department likely has the authority to award partial relief on the basis of a methodology that provides broad guidelines for relief.

**RECOMMENDATIONS**

1.  We recommend that you approve the Standard Deviation alternative methodology described above to enable FSA to adjudicate and provide appropriate loan relief to successful BD applicants in an efficient, fair, and predictable manner. We recommend that you select Option One as the method for determining the level of relief a successful BD applicant is entitle to.

| | |
|---|---|
| Approve ___✗___ | Signature _____ |
| Disapprove_____ | Signature _____ |
| Needs more discussion_____ | Signature _____ |
| Modify _____ | Signature _____ |

2.  We recommend that you permit FSA to notify ineligible Corinthian borrowers and those who will receive 100 percent relief of the outcome of their claim.

| | |
|---|---|
| Approve___✗___ | Signature _____ |
| Disapprove_____ | Signature _____ |
| Needs more discussion_____ | Signature _____ |
| Modify _____ | Signature _____ |

3.  We recommend that you permit the Department to use the Standard Deviation methodology to complete the adjudication of the non-*Manriquez* BD applications, as well any other claims pending from borrowers.

| | |
|---|---|
| Approve___✗___ | Signature _____ |
| Disapprove_____ | Signature _____ |
| Needs more discussion_____ | Signature _____ |
| Modify _____ | Signature _____ |

Page 10 of 10

DOE00013656

**DOE00013704-DOE00013707**

Privileged/Deliberative/Confidential

Draft of May 14, 2015

# I.      Elements of the UCL applied to Heald Borrowers

## A. The misrepresentation of placement rates identified in ED's Heald fine letter constitutes unfair competition under the Unfair Competition Law.

The UCL prohibits unfair competition, which it defines in a number of categories established by the UCL.  A business practice need only fall under one of these categories to constitute unfair competition.[1]

1.  Heald's misrepresentation of placement rates violated federal law, specifically, 34 C.F.R. § 668, as determined by ED.  The UCL defines unfair competition to include any "unlawful…business act or practice."  The Legislature intended unfair competition "to include anything that can properly be called a business practice and that at the same time is forbidden by law."[2] If a business practice violates any law, this is *per se* a UCL violation.[3] Therefore, Heald's misrepresentations constitute unlawful business practices and unfair competition under the UCL.

2.  Heald's misrepresentation of placement rates also constitute fraudulent business practices under the UCL, another form of unfair competition.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[4] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[5] True statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[6]

    In the Heald fine letter, ED found as follows:
    > Heald's inaccurate or incomplete placement rate disclosures were misleading or false; [] they overstated the employment prospects of graduates of Heald's programs; and [] current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures.

---

[1] *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[2] *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992) (citations omitted).

[3] *See Kasky v. Nike*, 45 P.3d 243, 249 (Cal. 2002); *see also People v. E.W.A.P. Inc.*, 165 Cal.Rptr. 73, 75 (Cal. Ct. App. 1980).

[4] *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983)35 Cal.3d 197, 211 (Sup. Ct. 1983) superseded by statute, 2004 Cal. Legtis. Serv. Prop. 64 on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006). Note: The "likely to be deceived" standard does not establish a private plaintiff's standing.

[5] CAL. CIV. C. § 1709.

[6] *Boschma v. Home Loan Center*, 129 Cal.Rptr.3d 874, 893 (Cal. Ct. App. 2011).

DOE00013704

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

Heald fine letter at 10. This finding places Heald's misrepresentations squarely within the UCL's definition of fraudulent business practices and thus within its definition of unfair competition.

3. Heald's misrepresentation of placement rates may also be unfair competition under two other prongs of 17200, "unfair, deceptive or untrue advertising" and "unfair...business act or practice." The advertising prong is considered to be very similar to the fraudulent business practice prong. *See* Stern, Business and Professional Code § 172000 Practice at 3-70 (2015).

   Regarding unfair business practices, "[t]he state of the law...is somewhat unsettled."[7] However, the trend appears to be in favor of using section 5 of the Federal Trade Commission Act ("FTCA") to define unfairness. To find unfairness under the FTCA: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.[8] "... [C]onsumers cannot have reasonably avoided the injury ... if their free market decisions were unjustifiably hampered by the conduct of the seller."[9] The placement rate misrepresentations at issue here easily could be described as meeting these standards.

## B. Borrowers who relied on Heald's misrepresented placement rates in deciding to attend Heald programs suffered economic harm.

Section 17204 requires that an individual seeking relief under the UCL have "suffered injury in fact and [have] lost money or property as a result of" the unfair completion of which the person complains. In *Kwikset v. Superior Court*, the California Supreme Court set out numerous ways a consumer can show economic injury and meet these requirements. "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."[10]

Regarding false labeling, the *Kwikset* court also stated,
   A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer

---

[7] *Davis v. Ford Motor Credit Co.*, 101 Cal.Rptr.3d 697, 706 (Cal. Ct. App. 2009).
[8] *Id.* at 709.
[9] *Camacho v. Automobile Club of Southern California*, 48 Cal.Rptr.3d 770, 777-78 (Cal. Ct. App. 2006).
[10] *Kwikset Corp.*, 246 P.3d at 885-86.

DOE00013705

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[11]

Other cases have made clear that a consumer suffers economic harm when he or she makes a purchase in reliance on false representations and thereby is denied benefits or value  promised by the seller. For example, a federal district court ruled in *Johnson v. Gen. Mills, Inc.* that a consumer satisfied the UCL's harm requirement based on his reliance on false statements about a food's health benefits. The court stated,

> [The plaintiff] has UCL … standing because he alleges that he bought YoPlus in reliance on General Mills' allegedly deceptive representations concerning the digestive health benefit of YoPlus as communicated by the second generation YoPlus packaging and a television commercial for YoPlus. He further asserts that he suffered economic injury because he purchased YoPlus but did not receive the promised digestive health benefit.[12]

In *Daghlian v. DeVry University, Inc.*, plaintiff student enrolled at the school and incurred debt "in reliance on defendants' misrepresentations and omissions about the transferability of credits."[13] Plaintiff did not attempt to transfer the credits, and he did not allege that he had to restart his education at a different school.[14] Plaintiff alleged "he did not receive what he bargained for."[15] The court found the plaintiff suffered an injury in fact sufficient to bring a UCL cause of action.[16]

Here, students who were deceived by Heald's inflated placement rates can plausibly argue that they got far less than they bargained for, thus suffering an economic injury. Judging the quality and value of education is a notoriously difficult task.  It would be reasonable for prospective students to look at placement rates (especially placement rates disclosed under legal requirements) as one significant benchmark of quality.  For example, a student selecting a medical assistant training program might well have looked differently at Heald's offering had he known that the placement rate was 33% rather than the advertised 78 %. *See* Heald Fine Letter of April 14, 2015 at 9-10.  The prospective

---

[11] *Id.* at 329-30.
[12] 275 F.R.D. 282, 286 (C.D. Cal. 2011).
[13] 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006).
[14] *Id.*
[15] *Id.* at 1155.
[16] *Id.* at 1156. *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (consumer alleged economic harm where he purchased merchandise advertised as having been marked down from a fictitious original price; "the bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore has a higher resale value.")

3

DOE00013706

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

student might have determined the Heald program was not worth the offering price.  (A factual note is relevant here: the tuition at Heald was significantly higher than at community colleges. Indeed, one argument we have heard is that some students have said that had they known the actual success rate of the Corinthian schools, they would have chosen community colleges.)

The reputational and credentialing purpose of education further supports the argument that an inflated placement rate was part of what a purchaser might have valued in selecting a Heald program.  Besides the training one receives in one's education, part of the utility of a degree is what it represents to others.  According to some, Heald has enjoyed a relatively good local reputation. It is over 100 years old and was regarded as the best asset among the Corinthian chains.  That reputation is largely in tatters with the Department of Education's revelations about the school's inflated placement rates.  Had students known the true placement rates in the Heald programs, they would have known that Heald's reputation was inflated beyond its reality, and they might have judged that the value of their credential was vulnerable to significant deflation if the truth were discovered.  In this sense, too, then, students got far less than they bargained for, and this loss will be suffered every time one shows a resume that shows a Heald degree.

### E.  Statute of Limitations

In 2013, the California Supreme Court resolved a split regarding whether Section 17208's four-year statute of limitations was rigid, or whether the discovery rule and other equitable doctrines applied to UCL claims. In *Aryeh v. Canon Business Solutions*, the court held the discovery rule applied, and thus the statute of limitations only begins accruing "when a reasonable person would have discovered the factual basis for a claim."[17] Because a reasonable person would not have known about Heald's placement rate violations until ED's Heald fine letter, published April 14, 2015, no claims based on those misrepresentations are now barred by the statute of limitations.

---

[17] 55 Cal.4th 1185, 1195-96 (Cal. 2013).

DOE00013707

**DOE00013708-DOE00013725**

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

To:     Under Secretary Ted Mitchell

From:  Borrower Defense Unit

Date:   October 20, 2016

Re:     Recommendation for Borrower Defense Relief for Heald College Borrowers Alleging
         Transfer of Credit Claims

The Borrower Defense Unit proposes loan relief for students who enrolled in degree, certificate or Associate in Applied Science ("AAS") programs at the California campuses of Heald College after the school was acquired by Corinthian Colleges, Inc. ("Corinthian")[1], and who state that Heald misrepresented their ability to transfer to other schools after completing a degree at Heald. Heald made false and misleading representations to these students that they could generally transfer their credits, including to schools in the California State University ("CSU") system. These students are eligible for relief under the borrower defense regulation, 34 C.F.R. § 685.206(c), because these misrepresentations constitute a valid consumer protection claim under California's Unfair Competition Law ("UCL"). Moreover, full loan discharges, subject to the UCL's four-year statute of limitations, are appropriate in this circumstance given the lack of value conferred by Heald credits and/or degrees. Such relief is consistent with the Department's prior borrower defense relief to Corinthian borrowers.

## I.   Heald Represented That Heald Credits Were Transferable And Would Permit Students to Transfer to the CSU System To Earn A Bachelor's Degree

Numerous borrowers report that Heald representatives told them that attending Heald would permit them to transfer into other schools, particularly in the CSU system, and that their Heald credits would be accepted by those schools. Moreover, documents collected by the California AG's office and submitted in support of a default judgment against Heald corroborate these students' general transferability claims.

### A.   Oral Representations of Transferability

In a recent review of 738 borrower defense ("BD") claims submitted by former students of Heald's California campuses, 49 students enrolled in degree, certificate or Associate in Applied Science ("AAS") programs seek borrower defense relief based on oral representations about their ability to transfer their Heald credits to other schools, particularly schools in the CSU system.[2] In addition, in sworn witness statements obtained by the California Attorney General's Office, seven former students of Heald allege that school staff made oral representations that credits earned at Heald would transfer to other colleges and universities.[3] Heald borrowers seeking BD relief report that school representatives orally promised that they would be able to

---

[1] Further research needs to be conducted regarding the falsity of Heald's representations to students at its two non-California campuses, in Honolulu, Hawaii and Portland, Oregon.
[2] Our review of Heald claims is ongoing and we anticipate reviewing additional BD applications making transferability allegations.
[3] *See* Declaration of Nancy Quach, AGPA, in Support of Plaintiff's Application for Entry of Default Judgment Against All Defendants, *California v. Heald et al.* (Mar. 14, 2016) ("Quach Decl."), Ex. 105-11.

1

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer to other schools and use their Heald credits towards a degree at those schools.  For example, borrowers state the following:

1.  "When I first enrolled at Heald College in March of 2010, I explained to my representative that was assigned to me, that I wanted to go to Fresno State for my Bachelors Degree after graduating from Heald and while working...I was told by Elias Astuto my Heald Representative, that all of my credits would transfer to Fresno State..."[4]

2.  "Also throughout my time at Heald I was told they are accredited (which I believe they were) and that if we wanted to continue our education at Fresno State (for example) our credits would transfer and we could continue our education.  What they failed to tell us Is that when you go to apply to Fresno State they do not accept any of your units as they are not accredited the same as Heald led you to believe.  We had meetings with the head of Heald's financial aid department and I remember a student asked 'will my units transfer to Fresno State' without hesitation he stated 'Yes they will transfer.'"[5]

3.  "They had told me I was going to be able to transfer to a university such as San Jose State."[6]

4.  "I was told I would be able to transfer to any 4 year college with my Heald credits."[7]

5.  "They lied saying I could take my credits anywhere if I decided to leave the school...They said I could transfer my credits anywhere which I found out later was a lie."[8]

6.  "I was also told when i was done i could transfer out to any university."[9]

7.  "they told me that all the classes i took from heald college will be transferred to other schools."[10]

8.  "I was also informed by my admissions advisor that all of my credits would be completely transferable, which I also later found to be false."[11]

---

[4] Claim No. BD1614388.
[5] Claim No. BD154156.
[6] Claim No. BD152391.
[7] Claim No. BD1604229.
[8] Claim No. BD151373.
[9] Claim No. BD156458.
[10] Claim No. BD150682.
[11] Claim No. BD1619101.

DOE00013709

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

### B.   Corroborating Written Representations of Transferability

The Heald website and promotional materials corroborate and/or support students' reports of oral assurances that they would be able to transfer to other schools and use their Heald credits towards a degree at those schools.[12]  Heald's marketing materials contain the following statements:

1.   The Heald website advertised that, "Because Heald is regionally accredited, it has articulation agreements with other regionally accredited institutions that accept Heald credits toward bachelor's degree programs.  This means that you can transfer your credits if you choose to pursue further education."[13]

2.   The website also stated: "For those students who transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs."[14]  Moreover, the website listed the "California State University (CSU) system" and seven specific schools in the CSU system as schools with which Heald has articulation agreements and/or documented transfer practices.

3.   On another page on the Heald website, the "California State University (CSU) system" and eight specific CSU campuses were described as "Partner Schools," along with the statement "For students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs.[15]

4.   The Heald College "Viewbook" promised: "use your Heald credits towards a bachelor's degree" and *Heald has articulation agreements or documented transfer guidance with a number of accredited institutions that accept Heald credits toward bachelor's degree programs.  This allows students to transfer and apply coursework toward a higher degree.*"[16]  (emphasis added.)  The Viewbook listed the CSU system and seven specific CSU schools as institutions that had articulation agreements or documented transfer guidance with Heald.

As discussed further below in Section III.C., limited disclaimers attendant to the claims on the website and in the Viewbook fail to cure the deceptive net impression of the transferability claims Heald representatives made to students.

---

[12] The Heald written representations described in this section are attached as Exhibit A to this memorandum.  All red markings on the documents were made by the California AG.
[13] Quach Decl. Ex. 90.
[14] *Id.*
[15] Quach Decl. Ex. 91-92.
[16] Quach Decl. Ex. 94.

3

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

## II.   Heald's Representations of Transferability Were False and Misleading

Heald's representations that credits earned at Heald were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree were false and misleading.  Obtaining a Heald diploma, certificate or AAS degree did not permit students to transfer into the CSU system using Heald credits alone.  These students would have insufficient credits to transfer as upper-division transfer students, and the CSU schools generally only accept upper-division transfer students.  Therefore, as a practical matter, Heald credits were not transferable to the CSU system.

Significantly, in its answer to the California Attorney General's first amended complaint, Heald admitted that "students who complete Heald diploma, certificate, or AAS degree programs do not, without further coursework, appear to qualify for admission as upper division transfers to CSU."[17]  A review of Heald's Course Catalog and Transfer Guide confirms that the diploma and certificate programs did not provide the 90 quarter units that CSU schools require for upper-division transfers.[18]  The AAS degree programs required 100 quarter credits, but some of the courses within these programs were not considered "college level" by the CSU system, and therefore AAS degree program graduates also would not have the 90 quarter units required for an upper-division transfer.  Even if individual Heald credits were technically transferable to a CSU school, Heald students could not actually transfer their credits because they could not enroll as an upper-division transfer using just their Heald credits.

The falsity of Heald's representations about transfer into the CSU system is particularly significant for several reasons.  First, the CSU system is "California's primary undergraduate teaching institution" and the "greatest producer of bachelor's degrees"[19] in the state, making it likely that students who sought to transfer credits from Heald's California campuses would seek to transfer those credits to the CSU system.  Second, Heald's representations regarding transferability focused on the ease of transferring to the CSU system—its website and other marketing materials specifically discuss the process for transferring to the CSU system.

The California State University system's public statements confirm that, dating back to at least 2012, students typically cannot transfer to CSU as lower-division transfer students.  The California State University System's CSUMentor website contains a page with information for transfer applicants.  That page states:

> *Most CSU campuses do not accept lower-division transfers, so be sure to check with the campus if you are considering transferring as a lower-division student.*[20]

---

[17] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, Permanent Injunction, and Other Equitable Relief at ¶ 86(b), 26, *California v. Heald et al.*, No. CGC-13-534793 (Ca. Super. Ct. Mar. 17, 2014).

[18] "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016), http://www.cci.edu/multimedia/closure/Heald-Student-Guide-to-Transfer.pdf;  Heald College Academic Catalog, Effective July 2014.

[19] "2016 Facts About the CSU," The California State University (Aug. 23, 2016), *available at* http://www.calstate.edu/csufacts/2016Facts/.

[20] "Transfer Applicant Overview and Definitions," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/ (emphasis added).

4

DOE00013711

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

The CSU Lower-Division Transfer Requirements website further states: "Please be aware that most CSU campuses do not admit lower-division transfer students."[21]  In fact, twenty out of twenty-three individual CSU campuses report on their websites that they do not accept lower-division transfer students:

1. **Channel Islands**:  On a site entitled "Transfer Admission Requirements," the school states: "California State University Channel Islands (CI) accepts transfer applications for upper-division transfer students: students with more than 60 transferable semester units, or 90 transferable quarter units."[22]  The website does not mention the admission of lower-division transfer students.  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

2. **Chico**:  The school's "Eligibility Requirements" for transfer admissions website states: "Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."[23]

3. **Dominguez Hills**:  On a site entitled "Admissions Criteria for Transfer Students," the school lists only requirements for upper-division transfer students, and does not mention lower-division transfer students.[24]  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

4. **East Bay**:  The school's "Transfer Admission" page states "CSUEB only accepts applications from upper-division transfer students."[25]

5. **Fresno**:  The school's transfer website states "Fresno State does not accept lower division transfer students at this time."[26]

6. **Fullerton**:  Fullerton's "Transfer Undergraduate Students" website states that "CSU Fullerton does not accept lower division transfer applicants.[27]

---

[21] "Lower Division Transfer Requirements," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/lower_div.asp; *see also* Quach Decl. Ex. 95; and "Transfer Applicant Overview and Definitions," CSU Mentor (Dec. 10, 2012), https://web.archive.org/web/20121610333100/http://www.csumentor.edu/planning/transfer/lower_div.asp.

[22] "Transfer Admission Requirements," CSU (May 31, 2016), http://www.csuci.edu/admissions/transfer/ud-requirements.htm.

[23] "Eligibility Requirements: Transfer Students," California State University: Chico (May 31, 2016), http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml.

[24] "Admissions Criteria for Transfer Students," California State University: Dominguez Hills (May 31, 2016), http://www4.csudh.edu/admissions/transfer-students/admission-requirements/index.

[25] "Transfer Student Admission," California State University: East Bay (May 31, 2016), http://www.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/; *see also* Quach Decl. Ex. 98.

[26] "Student Affairs and Enrollment Management," Fresno State (May 31, 2016), http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html; *see also* Quach Decl. Ex. 99.

[27] "Upper Division Transfers," California State University Fullerton (May 31, 2016), http://admissions.fullerton.edu/prospectivestudent/transferlocaladmissionarea.php.

DOE00013712

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

7. **Humboldt:**  The school's Admissions website for lower-division transfer students states "HSU is not currently accepting lower division transfer applications."[28]

8. **Los Angeles:**  The "Transfer Admission" page of the school's website states "Cal State LA is currently not accepting lower division transfer applicants."[29]

9. **Monterey Bay:**  The school's "Transfer Admissions" website states "Cal State Monterey Bay is currently not accepting lower division transfer students. You must meet the upper division requirements for admissions purposes."[30]

10. **Northridge:**  On a site entitled "Apply Lower-Division Transfer Student," the school states "NOTE: Due to increased enrollment demands, Cal State Northridge does not currently admit lower-division transfer applicants. No exceptions are anticipated at this time."[31]

11. **Pomona:**  The Pomona transfer admissions website includes the following statement: "NOTE: We are currently not accepting applications from Lower-Division Transfers - applicants who have completed less than 60 semester transferable college units (90 quarter units)."[32]

12. **Sacramento:**  The "Transfer Admission" webpage on the Sacramento State website states: "CSU, Sacramento is not accepting applications from lower division transfers."[33]

13. **San Bernardino:**  In a section called "Lower-Division Transfer Students" on its Transfer FAQs, the school states "CSUSB is not able to accept applications from or admit lower division transfer students."[34]

14. **San Diego:**  San Diego State's Fall 2016 Admissions Criteria include the following: "SDSU accepts transfer applications only from upper-division transfer or readmission applicants who will have completed 60 or more transferable semester (or 90 or more quarter) units by the end of spring 2016. We do not

---

[28] "Lower Division Transfer Requirements," Humboldt State University (May 31, 2016), http://www2.humboldt.edu/admissions/apply/transfers/lowerdivision.html.
[29] "Transfer Admission," Cal State LA (May 31, 2016), http://www.calstatela.edu/admissions/transfer-admission.
[30] "Transfer Requirements," CSU Monterey Bay (May 31, 2016), https://csumb.edu/admissions/transfer-requirements; *see also* Quach Decl. Ex. 100.
[31] "Apply Lower Division Transfer Student," CSU Northridge (May 31, 2016), http://www.csun.edu/admissions-records/apply-lower-division-transfer-student.
[32] "Admission Requirements and Deadlines," CAL POLY POMONA (May 31, 2016), https://www.cpp.edu/~admissions/undergraduate/transfer/before/requirements-deadlines.shtml.
[33] "Transfer Admission," Sacramento State (May 31, 2016), http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html; *see also* Quach Decl. Ex. 101.
[34] "Admissions and Student Recruitment," CSU San Bernardino (May 31, 2016), http://admissions.csusb.edu/transfer/h_transferstatus.shtml.

DOE00013713

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

accept transfer applications from lower-division students with fewer than 60 transferable semester units."[35]

15. **San Francisco**:  On the transfer section of the school's website, the school provides: "SF State is not currently accepting applications from lower division transfer students. Freshman and sophomore students who have completed fewer than 60 transferable semester units (90 quarter units) are considered lower-division transfer students."[36]

16. **San Jose**:  On a page called "Lower division transfers (Freshmen/Sophomores)," the school notes that "SJSU no longer admits lower division transfers.  A lower division transfer has completed 59 transferable semester units (89 quarter units) or fewer."[37]

17. **San Luis Obispo**:  The school's Transfer Students Admissions website states: "Cal Poly does NOT accept applications for these categories: ... Lower-division transfer applicants (less than 60 transferable semester units or 90 transferable quarter units upon transfer)."[38]

18. **San Marcos**:  Under the "Transfer" section of its website, the school states "California State University San Marcos accepts upper-division transfer student applications each year between October 1 and November 30 for admission to the following fall term."[39]  The website does not mention the admission of lower-division transfer students.  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

19. **Sonoma**:  Under "Fall 2016 Admissions" the school's website states "Lower Division Transfer – CLOSED."  Under "Spring 2017 Admissions" the website states "Closed to lower-division applicants."[40]

---

[35] "Fall 2016 Transfer Admission Criteria," San Diego State University (May 31, 2016), http://arweb.sdsu.edu/es/admissions/transfers/index.html.
[36] "How to Apply – Transfer," San Francisco State University (May 31, 2016), http://www.sfsu.edu/future/apply/transfer.html.
[37] Quach Decl. Ex. 102; *see also* "Lower Division Transfers," San Jose State University (May 31, 2016), http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html.
[38] "Transfer Students," Cal Poly San Luis Obispo (May 31, 2016), http://admissions.calpoly.edu/applicants/transfer/.
[39] "Transfer Student," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/transfer/index.html.  This campus appears to accept out-of-state and international lower-division transfers, but not in-state lower-division transfers.  *See* "Out-of-State Students," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/out-of-state/index.html.  Heald California students would be applying as California residents and therefore would not be able to obtain admission this way.
[40] "Filing Information, Dates, and Deadlines," Sonoma State University (May 31, 2016), http://www.sonoma.edu/admissions/filing.html; *see also* Quach Decl. Ex. 104, "Office of Admissions: Admission Requirements for Transfers," Sonoma State University (Jan. 28, 2014), http://www.sonoma.edu/admissions/ts/requirements.

DOE00013714

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

20. **Stanislaus**:  The Stanislaus website states that "[w]e are closed to Lower-Division Transfers (transfers with fewer than 60 semester/90 quarter units)" for both the Fall 2016 and Spring 2016 semesters.[41]

The only CSU schools that <u>do</u> appear to accept lower-division transfer students are CSU Bakersfield[42], the Maritime Academy, and CSU Long Beach.  The Maritime Academy is a specialized school with a student body of less than 1,000 students offering six majors relating to the maritime industry.[43]  CSU Long Beach only accepts lower-division transfer students for a few majors.[44]  CSU Bakersfield seems to be the only CSU institution that offers a standard undergraduate curriculum and accepts lower-division transfer students.

We also conducted a historical review of websites of seven CSU campuses identified by Heald as "partner schools" in the school's marketing materials.  None of our research into the historical transfer policies at CSU campuses, dating as far back as 2010, suggests the policies described above have changed.[45]

In sum, it is nearly impossible for a student to transfer into the CSU system as a lower-division transfer student.  Since no Heald degree, certificate or AAS graduate would have sufficient credits to qualify for transfer as an upper-division transfer student, representations that Heald graduates could transfer to the CSU system or specific CSU schools to "pursue further education" were false and misleading.[46]

---

[41] "Dates and Deadlines," Stanislaus State (May 31, 2016), https://www.csustan.edu/admissions/dates-deadlines.
[42] "Admission Requirements for Transfer Students," CSU Bakersfield (May 31, 2016), http://www.csub.edu/admissions/apply/transfer/admission_requirements/.
[43] "Academics," California State University Maritime (May 31, 2016), https://www.csum.edu/web/academics.
[44] "Lower Division Transfer Requirements," California State University Long Beach (May 31, 2016), http://web.csulb.edu/divisions/aa/catalog/current/admissions/ld_transfer_requirements.html.
[45] *See* "Eligibility Requirements, Transfer Students," CSU Chico (Jan. 5, 2010), https://web.archive.org/web/20110105090936/http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml ("Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."); "Transfer Student Admission," CSU East Bay (Apr. 9, 2010), https://web.archive.org/web/20100409052353/http://www20.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/ ("Cal State East Bay no longer accepts applications from lower-division transfers."); "Transfer Requirements," CSU Fresno (November 17, 2012), https://web.archive.org/web/20121117011918/http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html ("Fresno State does not accept lower division transfer students at this time."); "Transfer Admission," CSU Sacramento (Aug. 18, 2010), https://web.archive.org/web/20100818083106/http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html ("CSU, Sacramento is not accepting applications from lower division transfers."); "Lower division transfers (Frosh/Sophomore)," CSU San Jose (October 21, 2014), https://web.archive.org/web/20141021203825/http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327,10793.html ("SJSU no longer admits lower division transfers."); "Office of Admissions: Admission Requirements for Upper-Division Transfers," CSU Sonoma (July 5, 2011), https://web.archive.org/web/20110705071536/http://sonoma.edu/admissions/ts/requirements (No process is described for lower division transfers); "Dates and Deadlines," CSU Stanislaus (Mar 29, 2014), https://web.archive.org/web/20140329215220/http://www.csustan.edu/admissions/dates-deadlines ("We are closed to Lower-Division Transfers").
[46] Heald's statements may have been particularly misleading to students seeking to transfer into the CSU system, given recent changes in the law governing the transfer of credits into the CSU system.  On September 29, 2010 the Student Transfer Agreement Reform Act ("STAR Act") was signed into law, making it easier for students attending

8

DOE00013715

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

It should be noted that there is an articulation agreement between Heald and the CSU system, which provides that certain Heald coursework will be accepted by CSU to meet certain general education requirements.[47]  Also, according to a higher education advisory publication listing the transfer credit practices of major public institutions, CSU Northridge did have a general policy of accepting Heald credits from certain Heald campuses.[48]  The possibility that some Heald courses might be transferable into the CSU system, however, does not change the misleading nature of Heald's transferability representations, because students who enrolled in Heald's diploma, certificate and AAS programs would never have enough credits from Heald to qualify for transfer admission into the CSU system in the first place.  The fact that some Heald credits might be transferable after a Heald student was accepted as a transfer into CSU is immaterial when the student could not transfer into CSU at all using Heald credits alone.

Heald California students also faced challenges trying to transfer to other institutions outside the CSU system.  For example, in reviewed applications students report that they were unable to transfer all or a majority of their credits to the following institutions:

1. Modesto Junior College,[49]

2. Contra Costa College,[50]

3. University of California, Berkeley,[51] and

4. Unnamed Nevada community college.[52]

In fact, one student stated that Everest College – another school owned by Corinthian – would not accept Heald credits.[53]  Other students reported that their credits were not transferable to the school they transferred to, but did not specify the institution.[54]

---

California public community colleges to transfer into the CSU system as an upper division student.  SB 1440 – Padilla.  This program went into effect in the 2011-2012 academic year.  Under that law, students who have earned a transfer associate degree at a public California community college are guaranteed junior standing and priority admission consideration over all other transfer students when applying to a CSU program that has been deemed similar to the student's community college program.  Once admitted to CSU, the transfer associate degree student will only be required to complete 60 additional units to earn a bachelor's degree in the program.  The misleading nature of Heald's statements about the ease of transferring to CSU may have been enhanced by the new law.

[47] *See* CSU General Education-Breadth Certification List for Heald College, last updated April 2010 *available at* https://www.calstate.edu/APP/documents/GeneralEducation/Heald-GE-Breadth-certifications.pdf.  An articulation agreement, as defined by the Higher Education Act, is an "agreement between or among institutions of higher education that specifies the acceptability of courses in transfer toward meeting specific degree or program requirements." Section 486A of the Higher Education Act, 20 U.S.C. §1093a.

[48] *See* American Association of Collegiate Registrars and Admissions Officers, TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2012 and TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2015 (noting that Heald credits were transferable to CSU Northridge).

[49] Claim No. BD156389 (Heald Salida/Modesto student).

[50] Claim No. BD153784 (Heald San Francisco student).

[51] Claim No. BD152473 (Heald Heyward student).

[52] Claim No. BD150563 (Heald Stockton student).

[53] Claim No. BD154681 (Heald Concord student).

9

DOE00013716

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

In sum, the nearly-universal inability of Heald diploma, certificate and AAS students to transfer into the CSU system, combined with student-submitted evidence of credits not transferring to other schools, establishes that Heald's representations of general transferability were false and misleading.

## III.  Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[55]  The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.  For the following reasons, the cohort of Heald students identified below applying for borrower defense relief predicated on Heald's transferability misrepresentations:  1) have standing under the California UCL;  and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL.  Moreover, given the lack of value conferred by Heald credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid as applicable, subject to the UCL's four-year statute of limitations.[56]  Such relief is consistent with the Department's award of full borrower defense relief to Corinthian students to date.

### A.   Heald Students Have Standing Under California's UCL

Students attending Heald programs in California demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Heald regarding the transferability of Heald course credits.  Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[57]  California courts have interpreted the UCL to apply only to violations occurring inside the state.[58]  Significantly, however, injured non-residents have standing to assert UCL claims for such conduct provided they allege that the conduct occurred in the state.[59]  Here, all the students attended Heald's California campuses, and the misrepresentations at issue were made by Heald employees of campuses located in California.  Thus, whether or not the students resided in California when they submitted their BD claim or at the time they enrolled, they have standing to bring a California UCL claim.

---

[54] Claim No. BD151150 (Heald Milipitas student); Claim No. BD153655 (Heald Milipitas student); Claim No. BD156458 (Heald Salinas student); Claim No. BD152391 (Heald Salinas student); Claim No. BD157356 (Heald Hayward student); Claim No. BD152589 (Heald Stockton).
[55] 34 C.F.R. § 685.206(c).
[56] CAL. BUS. & PROF. CODE §17208.
[57] CAL. BUS. & PROF. CODE §17204.
[58] *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999).
[59] *Id.*

DOE00013717

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B. Heald Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[60] Here, Heald's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[61]

**1. The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[62] Thus, if a business practice violates any law, this is *per se* a UCL violation.[63]

Corporate misrepresentations like those Heald made regarding transferability are prohibited by a number of state and federal laws. In particular, Heald's misrepresentation of the transferability of its credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[64] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[65]

As described above, Heald made oral and written representations that its credits were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree. These statements were false and misleading. Heald's

---

[60] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[61] Although not discussed here, Heald's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair…business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code § 172000 Practice at 3:212 (2016).

[62] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

[63] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[64] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute … is immaterial since any unlawful business practice … may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because another statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[65] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

11

DOE00013718

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer of credits representations misled students about the value of the credits they would be earning at Heald. Based on the school's misrepresentations, individuals considering enrolling at Heald would have the false belief that Heald credits would not only allow them to obtain a Heald degree, but would also give them a direct entrée into the CSU system as a transfer student, where they would be able to complete a bachelor's degree using their Heald credits. This was in nearly all cases impossible.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor;" furthermore, express claims are presumptively material.[66] Heald's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In attestations submitted to the Department,[67] these borrowers have noted the importance of Heald's transferability claim. Furthermore, their reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Heald students after the institution closed. Moreover, Heald's express assurances in its marketing and other materials that Heald credits transferred to other schools make such statements presumptively material, and demonstrate that Heald recognized how important the issue was for its students. Thus, Heald's transferability misrepresentations constitute unlawful business practices under the FTC Act, and therefore the UCL.

## 2. The Fraudulent Prong

Heald's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Heald students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[68] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[69] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[70] As noted, the transferability representations that Heald made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[71] However, for a consumer who was deceived into purchasing a product—or a student who was

---

[66] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims … are presumed to be material.").

[67] Although the large majority of these applications submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of Department's form and therefore made unsigned statements.

[68] *See Bank of the West*, 2 Cal. 4th at 1254.

[69] CAL CIV. C. § 1709.

[70] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[71] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

12

DOE00013719

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

deceived into enrolling at a school[72]—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.[73]  Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[74] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[75]

As discussed above, the evidence shows that students relied on Heald's transferability representations when they enrolled.  Moreover, Heald widely advertised the transferability of its credits online and in other marketing materials, thereby recognizing its materiality to a prospective student's enrollment.  Indeed, express claims like those made by Heald about the transferability of credits are presumptively material.[76]  Under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[77]  Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C.  Weak Disclaimers In Some of Heald's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Heald's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials as follows:

1.  At the bottom of the Heald webpages containing representations regarding transferability is the following disclaimer:  "It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing."[78]

2.  Similarly, after misleading statements about transferability, the Heald Viewbook contains the following statement: "Acceptance standards vary by program and institution.  Transfer of credits from Heald to another college is determined by the receiving school."[79]

3.  In its answer to the California AG's complaint, Heald argued that a disclosure form signed by incoming students titled "Notice Concerning Transferability of Units and Degrees Earned at Our School," gave notice to students that credits

---

[72] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[73] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").

[74] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[75] *Id.* (internal quotation marks omitted).

[76] *See, e.g., Telebrands Corp.*, 140 F.T.C. 278, 292 (2005); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013).

[77] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

[78] Quach Decl. Ex. 90-92.

[79] Quach Decl. Ex. 93.

13

DOE00013720

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

might not transfer to other schools. Allegedly, the disclosure states: "As with any accredited school, the transferability of credits to another institution is determined exclusively by each receiving institution. Units I earn in my programs, in most cases, will not be transferable to any other college or university.... I acknowledge that it has not been guaranteed or implied by any employee of the School that my credits, diploma or degree will be transferable to another institution."[80] However, this document was not attached to the answer and we have been unable to locate it to date.[81]

These disclaimers do not cure the falsity of Heald's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations. *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers). The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract. *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

Indeed, the disclaimers described above are not even sufficient to cure the otherwise false and misleading statements made by Heald regarding transferability in the written marketing materials. An advertisement "may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[82] The written marketing materials, when reviewed as a whole, still clearly convey that enrolling at Heald would allow a student to directly transfer from Heald to a CSU school in order to complete a bachelor's degree program, which, as explained above, is generally false and misleading. The materials' prominent references to CSU and other institutions as "Partner Schools" create the impression that a student would be able to transfer easily to Heald's "partner school," CSU. A disclaimer at the bottom of the webpage that the receiving institution would ultimately decide which specific credits transfer does not diminish the expectation that students could transfer to CSU, which they generally could not do.

Moreover, here, Heald's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices. Corinthian documents show that the school sought to enroll vulnerable people who

---

[80] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, *supra* note 20 at 87.
[81] Heald did not allege in its answer in the California litigation that there were any disclaimers its course catalog that cured any misrepresentations about transferability. A 2014 edition of a Heald course catalog contains similar language to the written disclaimers described above, but there is no reason to think that any student would have reviewed the course catalog prior to enrollment, given what students report about the enrollment process.
[82] *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases).

14

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[83] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[84] Corinthian advertised on daytime TV,[85] targeting the un- or under-employed. In some instances,, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[86]

Furthermore, regardless of the precise language in any documents provided at the time of enrollment, the nature of the enrollment process made it unlikely that students ever read them. Students repeatedly reported being pressured by school sales representatives to enroll immediately, including being rushed through the enrollment process and not being provided an opportunity to read and review the enrollment agreement.[87]

**D.   Eligible Borrowers**

Based on the above analysis, the following Heald students alleging transfer of credits claims should be eligible for relief, subject to the UCL's four-year statute of limitations:

    1.   Any claimant who attended a Heald California campus and who:

        a.   enrolled in any diploma, certificate, or AAS degree program (i.e., programs for which fewer than 90 quarter units were transferable to CSU schools) on or after January 4, 2010[88], and

---

[83] CA AG Quach Decl. Ex 113.

[84] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[85] CA AG Quach Decl. Ex 113.

[86] CA AG Decl. of Holly Harsh.

[87] See, e.g., BD Claim No. BD152166 ("I told [the admissions representative] I wasn't comfortable . . . and didn't understand the process and why I was signing for a loan if I was covered. I asked for more time to think. She continued to pressure and reassure me my financial aid was fully covered, how Heald guarantees student job placement and how the drop out ratings at Heald was lower than other schools in Honolulu. I felt pressured but trusted and enrolled in Heald College anyway."); Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891("After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process."); Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914 ("The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision."); Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887 ("They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour.").

[88] Because Corinthian purchased all of the Heald campuses on January 4, 2010 (through its purchase of Heald Capital, LLC), for the purposes of granting any potential relief to students, we can reasonably assume that these practices occurred from that point going forward. The transaction was signed on October 19, 2009. However, in its answer to the California AG's first amended complaint, Heald's acknowledgment that the diploma, certificate and AAS degree programs were not transferrable to CSU schools was not time-limited. There is also evidence that Heald College made representations regarding the transferability of its credits to the CSU schools as far back as

DOE00013722

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

    b.  states the school misrepresented that credits were generally transferable, or that credits would be transferable to the CSU system or one of the 23 CSU campuses.

## IV.  Full BD Relief Should Be Provided to Eligible Borrowers

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.  *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).  In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.  *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.  *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim.  The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[89]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages.  Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

    If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and

---

January 2006.  *See* http://www.heald.edu/programs/partner_colleges.htm ("For those students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements with many other accredited institutions that accept Heald credits toward bachelor's degree programs. Below is a sampling of those schools: …California State University (CSU) system") (accessed January 2, 2006 via the Wayback Machine).  Therefore, after further research and review, there may be a basis on which to provide relief to a larger cohort of students alleging a misrepresentation regarding transferability of credits.

[89] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

DOE00013723

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[90]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of … remedies." *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively). Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Heald education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student can transfer credits without great difficulty, the value conferred by such credits is greatly diminished. Likewise, there is diminished value in a degree conferred by an institution that issues credits generally not worthy of transfer towards admission.

Second, and perhaps more importantly, the Department has found that Heald and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[91] Given this well-documented, pervasive, and

---

[90] 34 C.F.R. § 685.206(c)(2).

[91] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthan (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

17

DOE00013724

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

highly publicized misconduct at Corinthian, the value of a Heald education has been severely limited.

Indeed, borrower defense applications confirm the lack of value of a Heald education as many Heald students report that their coursework from Heald has been an impediment rather than an asset as they seek employment. For example, a Heald student reported that "After graduation, I was not able to get any jobs whatsoever with my degree and in many interviews, the employer questioned the validity of my degree with a Heald institution."[92] Another reports: "there is a stigma that follows [Heald]. I feel that when employers see where my degree comes from it will be seen as a joke because it came from a school that committed fraud and lied to their students."[93] Yet another student states "The word 'Heald' in my resume actually made employers turn down my [job application]."[94]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to the UCL's four-year statute of limitations.

---

[92] Claim No. BD154195.
[93] Claim No. BD151006.
[94] Claim No. BD150260.

18

DOE00013725